IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE THE HONORABLE RICHARD K. EATON, JUDGE

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | ) ) ) |
| Plaintiffs, | ) ) |
| and | ) ) |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, | ) ) |
| Consolidated Plaintiff, | ) ) |
| and | ) ) |
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | ) ) |
| Consolidated Plaintiff-Intervenor, | ) ) |
| v. | ) ) |
| UNITED STATES, | ) |
| Defendant, | ) ) |
| and | ) ) |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, | ) ) ) |
| Defendant-Intervenors, | ) ) |
| and | ) ) |
| INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | ) ) ) |
| Consolidated Defendant-Intervenors. | ) ) |

Consol. Ct. No. 25-00025

<u>PUBLIC VERSION</u>

**Business Proprietary Information has been removed from pp. 11, 14-15, 23, 28 and 39-40**

**PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel for Industrial Pesquera Santa
Priscila, S.A. and Sociedad Nacional de Galápagos,
C.A.

Dated: August 26, 2025

## TABLE OF CONTENTS

Page

I. RULE 56.2(c) STATEMENT .................................................................................1

   A. The Administrative Determination Sought to Be Reviewed ...........................1

   B. The Issues of Law Presented and Summary of Argument ...............................1

II. ARGUMENT .......................................................................................................5

   A. Substantial Evidence Did Not Support Commerce's Finding that the GOE's
   Investment Contract Program Was De Facto Specific.........................................5

      1. The Statutory Requirements for a Finding of De Facto Specificity ...................5

      2. Description of the GOE's Investment Contract Program .....................................5

      3. Commerce Found that the Investment Contract Program Was De Facto
      Specific .................................................................................................................6

      4. Commerce's Finding of De Facto Specificity Was Not Supported by
      Substantial Evidence............................................................................................7

      5. Conclusion ........................................................................................................10

   B. Substantial Evidence Did Not Support Commerce's Finding that the Tax Benefit
   that Santa Priscila Received under the Annual Motor Vehicle Tax Reduction Program
   Was De Facto Specific.........................................................................................10

      1. Description of the AMVTR Program and Santa Priscila's Use of It.................10

      2. Commerce Misapplied the "Disproportionately Large Amount" Criterion ......11

      3. Commerce's De Facto Specificity Finding Ignored Santa Priscila's
      Greater Usage of the Program ...........................................................................11

      4. Conclusion ........................................................................................................13

   C. Substantial Evidence Did Not Support Commerce's Refusal to Accept the Minor
   Correction that Produmar Submitted at Verification Concerning Its Benefit Amount
   under the AMVTR Program .................................................................................14

      1. Produmar Initially Reported the Benefit that It Obtained for the
      Wrong Year .........................................................................................................14

i

2. Commerce's Initial Explanation for Its Rejection of Produmar's Minor Correction Was Not Supported by Substantial Evidence .......................................15

3. Commerce's Supplemental Explanation Was Not Supported by Substantial Evidence .......................................16

4. Commerce Abused Its Discretion by Refusing to Accept Produmar's Proffered Minor Correction and Then Using AFA to Calculate Produmar's Margin .......................................16

5. This Court's Application of the Criteria for Accepting or Rejecting Minor Corrections Supports the Finding that Produmar's Correction Was in Fact Minor .......................................18

6. Commerce Practice Also Compels the Conclusion that Commerce Abused Its Discretion in Rejecting Produmar's Minor Correction .......................................20

7. Conclusion .......................................21

D. Substantial Evidence Did Not Support Commerce's Refusal to Accept at the Start of Verification the Minor Corrections that Songa and Naturisa Submitted Concerning Their Use of the AMVTR Program .......................................21

1. Commerce Knew that Songa and Naturisa Did Not Initially Report Their Use of the AMVTR Program .......................................21

2. Songa and Naturisa Submitted Minor Corrections at Verification .......................................23

3. Commerce Violated 19 U.S.C. § 1677m(d) by Failing to Request that Songa and Naturisa Report Their AMVTR Benefits Before the Start of Verification .......................................23

4. Commerce Acted Contrary to Law in Failing to Comply with 19 U.S.C. § 1677m(d) .......................................24

5. The Record Contains the AMVTR Program Benefits that Songa and Naturisa Received Despite Commerce's Rejection of Their Proffered Minor Corrections .......................................27

6. Conclusion .......................................28

E. Substantial Evidence Did Not Support Commerce's Application of Adverse Facts Available to Calculate the Countervailable Benefits that Santa Priscila, Produmar, Songa, and Naturisa Received Under the AMVTR Program .......................................29

1. Commerce's Initial Calculation of the AFA Rate .......................................29

ii

2. Commerce Reversed Its Position Concerning the AFA Rate in Its Final Determination ........................................................................30

3. Commerce Provided No Factual or Legal Support for Treating Santa Priscila as Not Having Cooperated in the Investigation........................................31

4. Substantial Evidence Did Not Support Commerce's Decision to Calculate the AMVTR-Related Margins for Santa Priscila, Produmar, Songa, and Naturisa Using Adverse Facts Available................................................................31

5. Commerce's Assignment of AFA Margins of 1.38% to Produmar, Songa, and Naturisa Violated the Statutory AFA Hierarchy.............................................33

6. The Statute and Commerce's Practice Do Not Support the Imposition of a 1.38% AFA Rate ........................................................................35

7. Conclusion........................................................................37

F. Substantial Evidence Did Not Support Commerce's Refusal to Accept the Minor Correction that Songa Presented at Verification Concerning the GOE's ISD Tax Exemption for Imported Assets and Raw Materials Program ........................................37

1. Description of the ISD Tax Exemption on Imports of Assets and Raw Materials Made Available under Songa's Investment Contract............................37

2. History of Songa's Reporting of Its Two ISD Program Benefits .....................37

3. Songa's Minor Correction Document Packages for Its Two ISD Program Benefits ........................................................................39

4. Commerce Abused Its Discretion by Refusing to Accept Songa's Minor Correction of the Benefit Amount that It Received under the ISD Exemption for Imported Materials........................................................................40

5. Conclusion........................................................................41

G. Substantial Evidence Did Not Support Commerce's Application of AFA to Determine the Benefit Amount that Songa Received under the GOE's ISD Tax Exemption for Imported Assets and Raw Materials Program ...........................................42

1. Commerce's Supplemental Rationale for Applying AFA................................42

2. Songa Clearly and Repeatedly Explained How It Determined the ISD Benefit Amount........................................................................43

3. Conclusion........................................................................46

H. Substantial Evidence Did Not Support Commerce's Assignment to Songa of a 1.38% AFA Rate Attributable to Its Alleged Failure to Timely Report the Benefits that It Received under the ISD Tax Exemption for Imported Assets and Raw Materials ...................................................................................................................46

1. Commerce's Selection of the 1.38% AFA Rate ..................................................46

2. Conclusion ..........................................................................................................47

III. CONCLUSION .......................................................................................................48

**TABLE OF AUTHORITIES**

Page

**Court Decisions**

*AK Steel Corp. v. United States*, 192 F. 3d 1367 (Fed. Cir. 1999).................................................. 11

*Bluescope Steel Ltd. v. United States,* 548 F. Supp. 3d 1351 (2021) ............................................26

*Carlisle Tire and Rubber Company v. United States*, 564 F. Supp. 834 (1983) ....................... 7, 10

*China Kingdom Import & Export Co., Ltd. v. United States*, 31 CIT 1329, 507 F.
     Supp.2d 1337 (2007) ...............................................................................................26, 27

*Citic Trading Co. Ltd. v United States*, 27 CIT 356 (2003).........................................................32

*Coalition for the Preservation of American Brake Drum and Rotor Aftermarket
     Manufacturers v. United States*, 23 CIT 88, 44 F. Supp. 2d 229 (1999)..........................15

*F.lli De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*,
     216 F.3d 1027 (Fed. Cir. 2000)...........................................................................................36

*GPX Int'l Tire Corp. v. United States*, 893 F. Supp. 2d 1296 (2013) ...........................................28

*Guizhou Tyre Co, Ltd. v. United States,* 523 F. Supp. 3d 1312 (2021) .........................................18

*Hitachi Energy USA, Inc. v. United States*. 34 F.4th 1375 (Fed. Cir. 2022) ...........................25, 31

*Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1331 (2018) .................................................25

*Jinko Solar Co., Ltd. v. United States,* 229 F. Supp. 3d 1333 (2017) ...........................................18

*Maui Pineapple Company, Ltd. v. United States,* 27 CIT 580, 264 F. Supp.
     2d 1244 (2003).....................................................................................................................19

*Meihua Group International Trading (Hong Kong) Limited v. United States*, 633 F.
     Supp. 3d 1203 (2023) ..........................................................................................................26

*Oman Fasteners, LLC., v. United States*, 125 F. 4th 1068 (Fed. Cir. 2025) .................................32

*The Mosaic Company v. United States*, 659 F. Supp. 3d 1285 (2023) .................................8, 9, 10

*The Mosaic Company v. United States*, 774 F. Supp. 3d 1362 (2025) ....................................12, 13

*The Mosaic Company v. United States*, 744 F. Supp. 3d 1367, 1380 (2025) ..........................12, 13

*Mueller Comercial de Mexico S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1235 (Fed Cir. 2014)..........................................................................................36

*POSCO v. United States*, Slip op. 25-100, Ct. No. 24-00006 (Aug. 8, 2025) .........................12, 13

*PT Zinus Global Indonesia v. United States*, 686 F. Supp. 3d 1349 (2024) ..................................25

*Risen Energy Co., Ltd. v. United States*, 724 F. Supp. 3d 1356 (2024) .........................................28

*Samsung Electronics Co., Ltd. v. United States*, 973 F. Supp. 2d 1321 (2014) ......................11, 14

*Shantou Red Garden Foodstuff Co., Ltd. v. United States*, 36 CIT 53, 815 F. Supp. 2d 1311 (2012) ...........................................................................................19

*Shelter Forest International Acquisition, Inc. v. United States*, 2022 WL 21555965 (Fed. Cir. 2022)..........................................................................................25

*SKF USA Inc. v. United States*, 263 F. 3d 1369 (Fed. Cir. 2003)...................................................40

*Tatung Company v. United States,* 18 CIT 1137 (1994) .................................................................15

*Yama Ribbon and Bows Co., Ltd. v. United States*, 698 F. Supp. 1255 (2024).............................35

**Statutes**

19 U.S.C. § 1677e.............................................................................................................................26

19 U.S.C. § 1677e(a) ........................................................................................................................35

19 U.S.C. § 1677e(b)(1) ...................................................................................................................31

19 U.S.C. § 1677e(b)(2) ...................................................................................................................36

19 U.S.C. § 1677e(d) ........................................................................................................................46

19 U.S.C. § 1677e(d)(1)(A)..........................................................................................................29, 33

19 U.S.C. § 1677e(d)(1)(A)(i) ..........................................................................................................47

19 U.S.C. § 1677e(d)(1)–(2)..............................................................................................................36

19 U.S.C. § 1677m(d)............................................................................................................24, 26, 41

19 U.S.C. § 1677(5A)(D)(iii)(I)–(IV) ................................................................................................5

**Administrative Determinations**

*1-Hydroxyethilidene-1, 1-Diphosphonic Acid from China,*
    82 Fed. Reg. 14,872 (Mar. 23, 2017)................................................................................20

*Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China:*
    *Final Affirmative Determination, and Final Affirmative Critical Circumstances*
    *Determination, in Part*, 80 Fed. Reg. 34,888 (June 18, 2015) ..........................................20

*Certain Uncoated Groundwood Paper From Canada: Final Affirmative*
    *Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Aug. 9, 2018) .......................20

*Brass Rod from the Republic of Korea;  Final Affirmative Countervailing Duty Determination,*
    89 Fed. Reg 29420 (Apr. 22, 2024), and accompanying Issues and Decision
    Memorandum (Apr. 15, 2024) ..........................................................................................35

*Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty*
    *Determination*, 89 Fed. Reg. 85,506 (Oct. 28, 2024) ........................................................1

**Other Authorities**

Statement of Administrative Action, H.R. Rep. No. 103-316, reprinted in 1994
    U.S.C.C.A.N. 4040 ..............................................................................................................7

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                                    **PUBLIC VERSION**

## I.     RULE 56.2(c) STATEMENT

### A.  The Administrative Determination Sought to Be Reviewed

Industrial Pesquera Santa Priscila, S.A. ("Santa Priscila") and Sociedad Nacional de

Galapagos, C.A ("Songa") contest the  determination of the Department of Commerce in *Frozen*

*Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty Determination*, 89

Fed. Reg. 85,506 (Oct. 28, 2024), and accompanying Issues and Decision Memorandum for the

Final Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater

Shrimp from Ecuador ("Final IDM").  P.R. 456.

Commerce calculated a countervailing duty margin of 3.57% for Santa Priscila and

4.41% for Songa.  Had Commerce correctly applied the law, it would have calculated margins

for both respondents below the 2.0% *de minimis* level and, therefore, Commerce would have had

no basis to issue the countervailing duty order published at 89 Fed. Reg. 104,982 (Dec. 26,

2024).  P.R. 467.

### B.  The Issues of Law Presented and Summary of Argument

1. *Did substantial evidence support Commerce's finding that the Investment Contract*
   *program of the Government of Ecuador ("GOE") was de facto specific because it*
   *was allegedly provided to a "limited number" of enterprises.*

**Summary of Argument:**

The Investment Contract program is not *de facto* specific because it is an economy-wide

infrastructure development program that the statute and the Statement of Administrative Action

recognize as non-countervailable.  In addition, Commerce erred in comparing the total number of

registered enterprises in Ecuador to the number of companies that received benefits to determine

that a "limited number" of companies received those benefits.  Commerce should have compared

1

**Consolidated Case No. 25-00025**                    **PUBLIC VERSION**

the number of companies that made a qualifying $1 million investment to the number of

companies that participated in the program after making the required investment.

> 2.  *Did substantial evidence support Commerce's determination that the benefit that*
>     *Santa Priscila and Songa, as well as their shrimp farming affiliates, Produmar and*
>     *Naturisa, received under the GOE's Annual Motor Vehicle Tax Reduction program*
>     *("AMVTR") was de facto specific.*

**Summary of Argument:**

The AMVTR program provided the identical tax reduction benefit on every qualifying

vehicle to every company in Ecuador.  A recipient could only receive a greater total benefit

amount than other recipients when it owned more qualifying vehicles.  However, *de facto*

specificity does not exist where a subsidy is usage-based, and the recipient receives a larger share

of the total benefit solely because of its greater usage.

> 3.  *Did substantial evidence support Commerce's refusal to accept at the start of*
>     *verification the minor correction that Santa Priscila's shrimp farming affiliate,*
>     *Produmar, submitted concerning the benefit that it received under the AMVTR*
>     *program.*

**Summary of Argument:**

Produmar's minor correction slightly changed the benefit amount that it received under

the AMVTR program.  Commerce acted unlawfully by refusing to accept that correction and by

failing to include the rejected correction document package in the record.  In addition,

Commerce's basis for rejecting the minor correction, which was the number of vehicles

involved, did not constitute substantial evidence of the basis for Commerce's refusal.

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                                    **PUBLIC VERSION**

4. *Did substantial evidence support Commerce's refusal to accept at the start of*
   *verification the minor corrections that Songa and its shrimp farming affiliate,*
   *Naturisa, submitted concerning their AMVTR-related benefits.*

**Summary of Argument:**

Commerce acted unlawfully by refusing to accept the corrections and by failing to
include the rejected corrections in the record. In addition, the basis upon which Commerce
rejected the minor correction, which was the number of vehicles involved, did not constitute
substantial evidence of the basis for Commerce's refusal.

5. *Did substantial evidence support Commerce's use of adverse facts available*
   *("AFA") to determine the countervailable benefit amounts that Santa Priscila,*
   *Produmar, Songa, and Naturisa received under the AMVTR program.*

**Summary of Argument:**

Since the AMVTR program is not *de facto* specific, no basis existed for Commerce's use
of AFA to calculate the benefit amounts that the respondents all received. Alternatively, the
record does not support the conclusion that those companies failed to cooperate to the best of
their ability. Thus, application of an AFA rate was not supported by substantial evidence.
Moreover, Commerce unlawfully selected a "non-similar" program for its AFA rate.

6. *Did substantial evidence support Commerce's refusal to accept the minor correction*
   *that Songa presented at the start of its verification concerning the countervailable*
   *benefit that it received under the GOE's Currency Outflow Tax ("ISD") Exemption*
   *for Imported Assets and Raw Materials program.*

3

Consolidated Case No. 25-00025                              PUBLIC VERSION

**Summary of Argument:**

Songa submitted a minor correction at the start of verification concerning the benefit

amount that it received under the ISD program.  Commerce abused its discretion by rejecting that

correction and by failing to include it in the record.  Commerce also acted arbitrarily by

simultaneously accepting a minor correction of the benefit amount that Songa received

concerning a slightly different ISD program.   Both minor corrections involved "wrong year"

reporting and provided an identical type of benefit.

7. *Did substantial evidence support Commerce's use of AFA to determine the*

   *countervailable benefit that Songa received under the ISD Exemption program due*

   *to its alleged failure to cooperate by not acting to the best of its ability to comply*

   *with Commerce's requests for information.*

**Summary of Argument:**

Commerce premised its application of AFA on its finding that Songa did not link its

reported calculation to any of its tax filings.  However, Songa repeatedly explained to Commerce

that its tax filings did not require reporting of its ISD tax exemption benefit, as did the GOE.

Moreover, it fully explained how the benefit program worked.  Therefore, Commerce's

application of AFA was unsupported by substantial evidence.  Moreover, Songa cooperated in the

investigation to the best of its ability.

8. *Did substantial evidence support Commerce's application of the third step of its AFA*

   *hierarchy to assign a 1.38% ad valorem rate to Songa attributable to Songa's*

   *alleged failure to timely provide information concerning the benefits that it received*

   *under the ISD Exemption program.*

4

**Consolidated Case No. 25-00025**                                    **PUBLIC VERSION**

    **Summary of Argument:**

    Commerce unlawfully selected a "non-similar" program for its AFA rate. Thus, the

premise of Commerce's imposition of a punitive AFA margin, which was the highest margin for

any of the 14 separate programs of Santa Priscila for which it calculated subsidy margins, was

not supported by substantial evidence.

## II.     ARGUMENT

### A. Substantial Evidence Did Not Support Commerce's Finding that the GOE's Investment Contract Program Was *De Facto* Specific

#### 1. The Statutory Requirements for a Finding of *De Facto* Specificity

    A domestic subsidy is *de facto* specific where: (1) the actual recipients are "limited in

number;" (2) an enterprise or industry is a "predominant user" of a benefit program; (3) an

enterprise or industry receives a "disproportionately large amount" of the total benefit; or (4) the

manner in which the authority providing the benefit exercised discretion in the decision to grant

the benefit indicates that an enterprise or industry is favored over others. 19 U.S.C.

§ 1677(5A)(D)(iii)(I)–(IV).

#### 2. Description of the GOE's Investment Contract Program

    The Investment Contract program is a means by which the GOE encourages capital

investment throughout Ecuador's economy. It provides tax benefits if an enterprise invests at

least $1 million in new productive activities that generate additional employment opportunities.

*See* Decision Memorandum for the Preliminary Affirmative Determination ("Prelim. IDM") at

23-26. P.R. 283.

    Both Santa Priscila and Songa had GOE-approved investment contracts, as did their two

shrimp farming affiliates. For example, Santa Priscila's investment contract required it to invest

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                                      **PUBLIC VERSION**

the money needed to construct two new shrimp processing plants and purchase the equipment necessary to operate those plants.

In return for agreeing to investment contracts and satisfying the terms of the program, qualifying investors became eligible for: (1) an exemption from the 25% federal corporate income tax on the profit earned on their new productive investments; (2) an exemption from Ecuador's 5% currency outflow tax (the "ISD"), which otherwise applied to payments for imported assets and raw materials that were used in the activities for which the new investments were made; and (3) an exemption from the 5% ISD for repayment of principal and interest on loans obtained from foreign lending institutions used to finance the new investments. Prelim. IDM at 23-26. P.R. 283.

### 3. Commerce Found that the Investment Contract Program Was *De Facto* Specific

Commerce found that "a limited number of companies" received benefits under the Investment Contract program. Final IDM at 50. P.R. 456. To reach this conclusion, Commerce first identified the number of companies that agreed to an investment contract with the GOE in 2019, 2020, 2021, and 2022. It then compared that number to the "total number of companies registered in Ecuador in 2019, 2020, 2021, and 2022," respectively.[1] Commerce then concluded that less than one percent of the over 100,000 registered companies in Ecuador held investment contracts between 2019 and 2022. To Commerce, this meant that "assistance under this program was provided to a limited number of users and, thus, was *de facto* specific under the meaning of section 771(5A)(D)(iii)(1) of the Act." *Id.* at 4.

---

[1] Santa Priscila's Final Calculations Memorandum (at 4) contained this analysis. C.R. 331. Songa's Final Calculations Memorandum contained the same analysis. C.R. 329.

Consolidated Case No. 25-00025                                    **PUBLIC VERSION**

### 4. Commerce's Finding of *De Facto* Specificity Was Not Supported by Substantial Evidence

#### a. The *Carlisle Tire* Decision

The seminal decision in *Carlisle Tire and Rubber Company v. United States*, 564 F. Supp. 834 (1983) contradicts Commerce's "limited number of users" finding. There, the court considered whether Korea's tax deductions for accelerated depreciation of equipment constituted countervailable subsidies. These deductions were available to "the entire business community of Korea." 564 F. Supp. at 836. Commerce found that the benefits were not countervailable. Carlisle Tire, then appealed. *Id.* at 837.

The court affirmed Commerce's non-countervailability determination, and it recognized the "absurd result" that would be brought about if "such things as public highways and bridges, as well as a tax credit for expenditures on capital investment, even if available to all industries and sectors," could be countervailed. *Id.* at 838. (Emphasis added.)

#### b. The Statement of Administrative Action

The Statement of Administrative Action that accompanied the Uruguay Round Agreements Act expressly endorsed the *Carlisle Tire* decision. *See* H.R. Rep. No. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040. The SAA stated that the purpose of the specificity test was to "winnow out only those foreign subsidies which are truly broadly available and widely used throughout an economy," citing *Carlisle Tire* for that proposition and expressly quoting the portion of that decision referencing "a tax credit for expenditures on capital investment." *Id.* at 4242. The tax benefits that the GOE's Investment Contract program provided are precisely the type of non-countervailable, economy-wide capital investment incentives that both the SAA and *Carlisle Tire* approved.

7

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                           **PUBLIC VERSION**

The SAA also stated that Commerce was required "to take account of (1) the extent of diversification of economic activities withing the economy in question; and (2) the length of time during which the subsidy program has been in operation." *Id.* at 4243. These criteria would "inform the application of, rather than supersede or substitute for, the enumerated specificity factors." *Id.* So, for example, "where a new subsidy program is recently introduced, it is unreasonable to expect that the use of the subsidy will spread throughout the economy in question instantaneously." *Id.* at 4243-44.

This statement is relevant because the GOE established its Investment Contract Program in 2010 and limited its benefits at that time to only 10 priority sectors. It was only in 2018 that the GOE expanded the program to 24 sectors that encompassed virtually the entire Ecuadorian economy. *See* GOE Response to Commerce's Post-Preliminary Supplemental Questionnaire at S3-6-8. C.R. 234.[2] Accordingly, it was not surprising that the number of recipients of investment contract benefits was relatively low in the startup years. Commerce never considered this aspect of the Investment Contract program even though the SAA stated that the startup date of benefits should "inform" its specificity decision.

### c. The Decision in *The Mosaic Company v. United States*

The decision in *The Mosaic Company v. United States*, 659 F. Supp. 3d 1285 (2023) ("*Mosaic I*") further compels the conclusion that Commerce's reliance upon the "limited number" criterion lacks substantial evidentiary support. There, the court considered whether a Moroccan government program that provided relief from tax fines and penalties was *de facto*

---

[2] Eligible Ecuadorian industries included food production, petrochemicals, pharmaceuticals, tourism, renewable energy, foreign trade logistics, biotechnology, software, construction materials, energy efficiency, agribusiness, chemicals, pesticides, soaps and detergents, ceramics, radio, tv, cellular services, clothing, textiles, leather, footwear, cement, and domestic appliances. *Id.*

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                    **PUBLIC VERSION**

specific because only 8,761 companies out of 262,165 corporate taxpayers received penalty

reductions. *Id.* at 1314. According to Commerce, these 8,761 recipients, which belonged to at

least 18 different industries, constituted a "limited number" when compared to the total number

of taxpayers.

The court held that the fatal flaw in Commerce's "limited number" conclusion was its

selection of the wrong denominator, i.e., Commerce used the total of 262,165 corporate

taxpayers as its denominator to calculate the percentage of taxpayers that received benefits.

However, the correct denominator was "the total number of corporate taxpayers <u>who incurred

penalties</u>." *Id.* at 1314-15. (Emphasis added.)

By using the wrong denominator, the resulting percentage that Commerce relied upon

was "essentially meaningless from the standard of determining the 'specificity' of the program

because the numerator and denominator were not logically comparable." *Id.* at 1315. That was

because the "only corporate taxpayers who could have applied for relief under the program

during the POI, i.e., the 'potential' recipients were those that had incurred a tax penalty and had

satisfied the requirement to pay all the taxes that they owed." *Id.* However,

> {b}ecause Commerce made no attempt to compare the actual recipients to the
> universe or composition of the group of potential recipients, or to ascertain
> whether any identifiable group of taxpayers benefited disproportionately, its
> "specificity" methodology was not analytically sound.

*Id.*

The court's conclusion in *Mosaic I* directly applies here. <u>The denominator for evaluating

the "limited number" criterion under the Investment Contract program should have been the

number of companies that made investments of $1 million or more during the 2019-2022 period.</u>

Those were the only companies that were eligible to participate in the Investment Contract

program, which is identical in principle to the situation in *Mosaic I*, where the court found that

9

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                    **PUBLIC VERSION**

the only taxpayers eligible for the penalty reduction program were those that had in fact paid

penalties, not all taxpayers, regardless of whether they had previously paid any penalties.

*Mosaic I* is also relevant because the court relied on both *Carlisle Tire* and the SAA's

statement that, "to escape a specificity finding," a program must be both broadly available and

widely used throughout an economy. *Id.* at 1316. The record demonstrates that the Investment

Contract program was "broadly available" and "widely used" in Ecuador.

Specifically, no evidence demonstrated that the program was used by only discrete

segments of the economy. Rather, 19 of the 24 categories of eligible industries obtained benefits

under the program. *See* GOE Response to Section II of Commerce's initial questionnaire at

Volume VI (Other Subsidies) at OTH-16. C.R. 105.

### 5. Conclusion

This Court should find that the Investment Contract program, which was designed to

stimulate capital investment throughout Ecuador's economy, is neither *de jure* nor *de* facto

specific. Alternatively, this Court should find that Commerce failed to provide substantial

evidence that the GOE's Investment Contract program was *de facto* specific because it used the

wrong denominator to determine whether there were a "limited number" of recipients.

### B. Substantial Evidence Did Not Support Commerce's Finding that the Tax Benefit that Santa Priscila Received under the Annual Motor Vehicle Tax Reduction Program Was *De Facto* Specific

#### 1. Description of the AMVTR Program and Santa Priscila's Use of It

The GOE's AMVTR program allowed every Ecuadorian company to receive an 80

percent reduction of the tax that it would otherwise owe for each vehicle that weighed one ton or

more that it used in productive and commercial activities. *See* Second Post-Preliminary Analysis

Memorandum at 13-14. P.R. 437. Over 29,000 companies received the AMVTR tax benefit in

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                          **PUBLIC VERSION**

2022.  *See* GOE Response to Third Post-Preliminary Supplemental Questionnaire at S5-7.  C.R.

258.

  To support its operations in 2022, Santa Priscila operated over [    ] motor vehicles that

qualified for the tax reduction.  Using verified information, Commerce calculated Santa Priscila's

countervailing duty margin from this tax saving at a minimal 0.04%.  Second Post-Prelim. Anal.

Memo at 14.  P.R. 437; *see also* Santa Priscila Verif. Rept. at 13.  C.R. 314.

### 2. Commerce Misapplied the "Disproportionately Large Amount" Criterion

  Commerce found that "the amount {of benefit} that {Santa Priscila} reported receiving

was many times greater than the average amount received by other program recipients in

Ecuador." Second Post-Prelim. Anal. Memo at 13.  However, Commerce's finding of *de facto*

specificity under the "disproportionately large amount" criterion was erroneous because the

AMVTR program provided the exact same 80% tax reduction benefit to every recipient for each

qualifying vehicle.   Thus, a company with many more qualifying vehicles would always receive

a larger total benefit.  Commerce's disproportionality analysis impermissibly failed to account

for this fact.  Moreover, Commerce did not find that Santa Priscila received a greater benefit

amount than the law permitted.

### 3. Commerce's *De Facto* Specificity Finding Ignored Santa Priscila's Greater Usage of the Program

  Where the Department bases its *de facto* specificity analysis of a program that applies a

standard formula tied to usage, the fact that one group received more benefits merely because of

its size and, consequently, had greater usage does not constitute disproportionality.  *Samsung*

*Electronics Co., Ltd. v. United States*, 973 F. Supp. 2d 1321, 1326-27 (2014)  (citing *AK Steel*

*Corp. v. United States*, 192 F. 3d 1367, 1384-85 (Fed. Cir. 1999) holding that the Department's

*de facto* specificity finding that a program that conferred a benefit based on a standard pricing

11

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                    **PUBLIC VERSION**

mechanism tied to usage was unreasonable where it relied solely on the fact that a respondent

received a disproportionately large benefit by only comparing the respondent's share of the total

benefit to the share received by an average beneficiary).

In *The Mosaic Company v. United States*, 744 F. Supp. 3d 1367, 1380 (2025) ("*Mosaic*

*II*"), the court rejected Commerce's finding that the respondent had received a

"disproportionately large amount of the total subsidy:

> Commerce cited no evidence to support its assumptions that a company's total
> reduction in tax fines or penalties has no relationship to the total amount of its
> revenue or to the total taxes for which it is liable. Nor did Commerce make any
> attempt to demonstrate that OCP got some preferential treatment or other atypical
> benefit.

*See also The Mosaic Company v. United States*, 774 F. Supp. 3d 1362 (2025) ("*Mosaic III*").

There, the court once again rejected Commerce's *de facto* specificity. The Moroccan producer,

OCP, "received a share of reductions that was roughly 900 times larger than the average amount"

received by any other company in Morocco. 774 F. Supp. 3d at 1381. Nevertheless, the court

concluded that:

> Commerce has not reached a valid factual finding that OCP was a
> "disproportionate" user of the program. . . . As it did in the investigation,
> Commerce dismissed these "relative size" arguments {made by the respondent
> OCP} during the review, concluding that the size of the company relative to other
> companies receiving penalty reductions was irrelevant. As this Court stated in
> *Mosaic II*, "{t}his objection defies logic and common sense. Commerce cited no
> evidence to support its assumptions that a company's total reduction in tax fines
> and penalties has no relationship to the total amount of its revenue or to the total
> taxes for which it is liable."

*Id.* at 1382-1383.

In *POSCO v. United States*, Slip op. 25-100, Ct. No. 24-00006 (Aug. 8, 2025),

Commerce found that the Korean steel industry, combined with two other industries, received a

electricity subsidy because they "used over half the industrial electricity in Korea." Slip op. at 8.

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                    **PUBLIC VERSION**

Based on this fact, Commerce found that this usage level made the subsidy *de facto* specific

because the three industries collectively "plainly received a disproportionately large amount of

the subsidy." *Id.*

> The court rejected Commerce's conclusion because:

> The agency's only reasoning for its disproportionality analysis is that the Korean steel industry uses a large amount of electricity. Commerce, however, was required by the plain meaning of the statute to use a baseline that shows the Korean steel industry's subsidy is out of line with the industry's own usage, not just {out of line with} the benefits {received by} others. . . . Commerce's "untenable logic would lead to almost every generally available subsidy being <u>de facto</u> specific to every "large company . . . merely because of the size of the company. . . . Commerce must show more to support a finding of disproportionate subsidy use.

Slip op. at 9-10. (Citations omitted.)

The analyses rejected in *Mosaic II*, *Mosaic III*, and *POSCO*, are identical to Commerce's

analysis in this investigation. Here, as there, the amount of the subsidy depended directly on the

usage made of a subsidy program. Here, as there, one company received a greater amount of the

total subsidy than other companies only because its usage was greater. Here, as there, Commerce

did not assert that the subsidy amount that the beneficiary received exceeded the amount

authorized by the government's program.

### 4. Conclusion

The Department improperly based its "disproportionately large amount" determination

solely on the fact that "the amount {Santa Priscila} reported receiving was many times greater

than the average amount received by other program recipients in Ecuador." However, the

AMVTR program provided the exact same 80% tax reduction benefit to every company for

every qualifying vehicle that it owned. Accordingly, the total benefit amount automatically

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                    **PUBLIC VERSION**

would increase for a company like Santa Priscila that registered more qualifying vehicles. Thus,

Commerce's finding was not supported by substantial evidence.

The Department's disproportionality methodology also fails because the Department did

not request information on individual beneficiaries other than the mandatory respondents. *See*

*Samsung I*, 973 F. Supp. 2d at 1326 (holding that comparing a respondent's share of total benefits

with the share received by an average beneficiary was not reasonable where the Department did

not request information on individual beneficiaries other than the mandatory respondents).

### C. Substantial Evidence Did Not Support Commerce's Refusal to Accept the Minor Correction that Produmar Submitted at Verification Concerning Its Benefit Amount under the AMVTR Program

#### 1. Produmar Initially Reported the Benefit that It Obtained for the Wrong Year

Produmar initially reported a benefit of [          ] under the AMVTR program. *See*

Exhibit PRO-15 to Produmar's Response to Section III of Commerce's Supplier Questionnaire.

C.R. 110. However, while preparing for verification, Produmar determined that it had reported

the benefit that it received in 2023, not in 2022, as required. Therefore, to correct this error at the

start of verification, it provided a minor correction document package that the Commerce refused

to accept. Verif. Rept. at 2. C.R. 314. The record does not contain Produmar's minor correction

document package for the AMVTR program because Commerce refused to accept it.

However, the record does contain the respondents' redacted and refiled Rebuttal Brief,

which Commerce did accept.[3] There, Produmar stated that:

> In preparing for verification, Produmar discovered that it had reported the value
> of Motor Vehicle Tax Exemptions under this program in 2022 based on Internal
> Revenue Service's (SRI) electronic registry data attributable to qualifying
> vehicles for the year [     ] rather than the POI. . . . In accordance with the

---

[3] Commerce rejected portions of the respondents' original Rebuttal Brief on the ground that it contained "untimely new factual information." P.R. 449. However, Commerce did not reject the redacted and refiled Rebuttal Brief. C.R. 328.

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                                    **PUBLIC VERSION**

>  Department's instructions, Produmar disclosed at the start of verification that it
>  inadvertently reported benefits received in [      ] in its questionnaire response
>  instead of 2022 based on an error in manually capturing data from the Ecuadorian
>  Internal Revenue Service's (SRI's") website for each individual [      ] number to
>  assemble the universe of qualifying vehicles and Annual Motor Vehicle tax
>  exempted for each vehicle and manually entering that data into a worksheet.

Redacted and refiled Rebuttal Br. at 68-69. C.R. 328.

### 2. Commerce's Initial Explanation for Its Rejection of Produmar's Minor Correction Was Not Supported by Substantial Evidence

Commerce's initial explanation for rejecting the minor correction was as follows:

>  At the start of verification, Produmar officials reported that in Santa Priscila's
>  February 16, 2024, Section III questionnaire response at Exhibit PRO-15,
>  Produmar mistakenly reported motor vehicle tax exemptions received under fiscal
>  year [      ], rather than the year of [
>       ]. The revised database included [      ] of motor vehicle tax exemptions.
>  We did not accept this correction.

Verif. Rept.at 2. C.R. 314. This explanation was not supported by substantial evidence because

Commerce did not explain why the purported number of corrections rendered them not "minor."

Moreover, this court has rejected reliance on the number of minor corrections as constituting an

adequate basis for rejecting them.

For example, in *Tatung Company v. United States*, 18 CIT 1137, 1141 (1994), the court

held that "the issue is not the value of the errors as a percentage of total U.S. sales, or the number

of instances of errors. Rather, the issue is the nature of the errors and their effect on the validity

of the submission." The decision in *Coalition for the Preservation of American Brake Drum and

Rotor Aftermarket Manufacturers v. United States*, 23 CIT 88, 44 F. Supp. 2d 229, 236 (1999)

cited *Tatung* with approval, and it added that "errors in a response that are not substantial do not

affect the integrity of the response." *Id.*

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                                    PUBLIC VERSION

### 3. Commerce's Supplemental Explanation Was Not Supported by Substantial Evidence

In its Final IDM (at 51), Commerce explained that it had refused to accept the minor

correction because Produmar's failure to provide the amount of AMVTR benefits that it received

in 2022 meant that:

> Because we lack information on the amount of benefits that Santa Priscila and SONGA received during the POI under the {AMVTR} program, we are unable to analyze whether the two respondents received disproportionate benefits under the program.

P.R. 456. However, Commerce did not support this conclusion with substantial evidence that

explained why it was "unable" to conduct its analysis.[4]  Moreover, the record demonstrates that

Commerce intended to verify the AMVTR benefits, whatever they were.  Specifically,

Commerce's Verification Agenda (at 9) stated that it intended to verify the benefits that both

Santa Priscila and Produmar received under the AMVTR program.  C.R. 259.  Their examination

would include, among other things, review of "applications, approvals, receipt of the subsidy,

tracing the reported subsidy to the general ledger accounts and source documents."  *Id.* at 5.

Thus, Commerce planned to verify Produmar's minor correction and had allotted the time

needed to do so.  Moreover, the evidence that it could easily have done so was demonstrated by

the fact that it did verify Santa Priscila's AMVTR benefit calculation.  Verif. Rept. at 13.  C.R.

314.  Accordingly, this supplemental explanation also was not supported by substantial evidence.

### 4. Commerce Abused Its Discretion by Refusing to Accept Produmar's Proffered Minor Correction and Then Using AFA to Calculate Produmar's Margin

Commerce's explanation that it was unable to determine whether Produmar received

"disproportionate benefits" (and its subsequent imposition of a subsidy margin determined using

---

[4] Commerce was unable to determine whether the respondents received disproportionate benefits solely because it erroneously rejected their minor correction document packages.

Consolidated Case No. 25-00025                                    PUBLIC VERSION

"adverse facts available" for <u>both Santa Priscila and Produmar</u>) was the direct result of its abuse

of discretion in failing to accept Produmar's minor correction.

Commerce instructed Santa Priscila and Produmar to present corrections to their previous

questionnaire responses at the outset of verification, including a chart that showed the

"magnitude" of changes to quantitative data. Verif. Agenda at 8. C.R. 259. Therefore, the

"magnitude" of the changes constituted a relevant consideration. However, the Department

never considered their <u>magnitude</u> in violation of its own criterion.

The following indisputable facts demonstrate that Commerce abused its discretion and,

therefore, acted unlawfully, in refusing to accept Produmar's minor correction.

- Produmar did not omit initial reporting of its AMVTR benefit; rather, it "clarified" or "corrected" the benefit amount.

- There is no evidence that Produmar initially intended to submit inaccurate information.

- There is no evidence that Produmar withheld any information.

- Produmar explained the necessity of its correction, which was to ensure an accurate calculation of the subsidy.

- The minor correction did not constitute a methodological error.

- The minor correction did not constitute a judgment error.

- The minor correction did not constitute any other type of substantive error.

- Commerce always intended to verify Produmar's AMVTR benefit amount.

- Commerce failed to explain why it could not have verified Produmar's minor correction information.

- Commerce prevented Produmar from demonstrating the minimal change in the amount of its benefit when it rejected its minor correction document package.

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                    **PUBLIC VERSION**

- There is no evidence that Santa Priscila or Produmar declined to cooperate in any way during the investigation, which encompassed 37 separate benefit programs, or, for that matter, in their contemporaneous antidumping investigation.

- Commerce could have used the corrected information to calculate Produmar's margin without any difficulty.

5. **This Court's Application of the Criteria for Accepting or Rejecting Minor Corrections Supports the Finding that Produmar's Correction Was in Fact Minor**

The courts have routinely accepted as "minor" the type of correction that Produmar submitted.

In *Guizhou Tyre Co, Ltd. v. United States*, 523 F. Supp. 3d 1312, 1348-49 (2021), the court rejected as unsupported Commerce's finding that a respondent's reporting at verification of over 40 previously unreported grants did not constitute a minor correction:

> Given that Commerce rejected all of the information pertaining to the grants presented at verification, there is no information on the record to substantiate the number or amount of grants presented, notwithstanding that Commerce noted that there were "more than 40 grants." IDM at 15, 65. Accordingly, Commerce's finding that the number of grants was "extensive," Commerce's estimates of the size of each grant, and Commerce's conclusion that the number and size of the grants presented could not constitute a minor correction are not supported by substantial evidence and are, accordingly, remanded.

Similarly here, Commerce did not explain why a minor correction allegedly involving an unspecified number of motor vehicles could not constitute a minor correction. Moreover, without including the rejected minor correction document package in the record, it denied this Court the opportunity to evaluate whether the correction was "minor."

In *Jinko Solar Co., Ltd. v. United States*, 229 F. Supp. 3d 1333, 1356-57 (2017), the petitioner asked Commerce to use "facts otherwise available" to calculate the antidumping margin for the respondent, Trina Solar, because it had failed to report certain quality insurance expense information. Trina Solar's minor correction covered only the last two months of the

18

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                      **PUBLIC VERSION**

POI. Commerce then inquired about the expenses for the first four months of the POI, and Trina

Solar submitted those expenses at the verification.

The petitioner challenged Commerce's acceptance of this second minor correction on the

grounds that Trina Solar had withheld information, missed the filing deadline, and thereby

impeded the investigation. The court rejected petitioner's challenge because acceptance of the

correction "led to a more complete and accurate picture of the respondent's indirect selling

expenses." *Id.* at 1357. The same conclusion applies here.

In *Shantou Red Garden Foodstuff Co., Ltd. v. United States*, 36 CIT 53, 815 F. Supp. 2d

1311, 1341 (2012), the Court stated that:

> Red Garden states that Commerce arbitrarily refused to accept a corrected growth
> stage multiplier that Red Garden submitted on the first day of verification. The
> incorrect growth stage multiplier stated that for one of Red Garden's suppliers,
> Longfeng, more than 100% of the farmed shrimp were used in processing, a
> logical impossibility. Although Commerce required Red Garden to submit a
> revised sales database with minor corrections, Commerce without explanation
> refused to allow plaintiff to correct the growth stage multiplier. Defendant now
> seeks a remand to allow Commerce to reconsider this decision. The court
> considers such reconsideration to be appropriate. (Citations omitted.)

Similarly here, Commerce failed to explain why the minor correction did not qualify as "minor"

even though it was undeniably a small correction or clarification of a previously submitted

benefit amount.

In *Maui Pineapple Company, Ltd. v. United States*, 27 CIT 580, 264 F. Supp. 2d 1244

(2003), the respondent, Dole Food Company, mistakenly failed to report its military sales during

the investigation and instead presented those sales in a minor correction submission at

verification. Commerce accepted the correction because it had time to verify it and use it in the

calculation of Dole's antidumping margin. 264 F. Supp. 2d at 1257. Moreover, the military sales

Consolidated Case No. 25-00025                        PUBLIC VERSION

"were a small percentage of all United States sales" by Dole, and the addition of those sales to

the record "made the United States sales more accurate." *Id.* at 1258.

These decisions all support the conclusion that Commerce's rejection of the minor

correction was unsupported by substantial evidence.

### 6. Commerce Practice Also Compels the Conclusion that Commerce Abused Its Discretion in Rejecting Produmar's Minor Correction

In *1-Hydroxyethilidene-1, 1-Diphosphonic Acid from China*, 82 Fed. Reg. 14,872 (Mar.

23, 2017), Commerce accepted "a total of 14 previously unreported grants" that were presented

at verification as minor corrections. *See* Verif. Rept. at 2 (ACCESS Barcode 3535537-01).

In *Certain Uncoated Groundwood Paper From Canada: Final Affirmative

Countervailing Duty Determination*, 83 Fed. Reg. 39,414 (Aug. 9, 2018), and the accompanying

Issues and Decision Memorandum, (at 60), even though Commerce itself discovered unreported

subsidies, Commerce has accepted information pertaining to those subsidies.

In *Certain Passenger Vehicle and Light Truck Tires From the People's Republic of

China: Final Affirmative Determination, and Final Affirmative Critical Circumstances

Determination, in Part*, 80 Fed. Reg. 34,888 (June 18, 2015), and the accompanying Issues and

Decision Memorandum (at 19–20) Commerce accepted as minor corrections "several unreported

grants in certain sub-ledgers of . . . chart of accounts."[5]

---

[5] Commerce attempted to distinguish our reliance upon these precedents by contrasting their facts with a discussion of the nature of the minor correction that <u>Songa</u>, not Produmar, submitted at verification and that Commerce then accepted, which concerned the ISD exemption for repayment of principal and interest on foreign loans, discussed below. Final IDM at 71-72. P.R. 456. However, since the record does not contain Produmar's minor correction document package, Commerce's attempt has no evidentiary support. Moreover, Commerce's acceptance of Songa's minor correction further demonstrates the arbitrary nature of its rejection of Produmar's minor correction.

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                                    **PUBLIC VERSION**

These decisions further illustrate that Commerce deviated from its prior practice in rejecting Produmar's minor correction.

### 7. Conclusion

Commerce's rejection of Produmar's minor correction was not supported by substantial evidence. Moreover, since Commerce excluded Produmar's minor correction submission from the record, this Court cannot find that substantial evidence supported Commerce's rejection of that correction.[6] Upon remand, this Court should direct Commerce to calculate the margin attributable to the AMVTR program using the corrected benefit amount that Produmar reported. In addition, this Court should find that acceptance of Produmar's minor correction moots Commerce's application of adverse facts available for both Santa Priscila and Produmar with respect to the AMVTR program. Moreover, Commerce never explained why it concluded that either company failed to cooperate to the best of its ability or withheld information.

### D. Substantial Evidence Did Not Support Commerce's Refusal to Accept at the Start of Verification the Minor Corrections that Songa and Naturisa Submitted Concerning Their Use of the AMVTR Program.

#### 1. Commerce Knew that Songa and Naturisa Did Not Initially Report Their Use of the AMVTR Program

Commerce's initial questionnaire asked Songa to report any "Other Subsidies" that it or its affiliates had received. P.R. 98 at 44-45. Neither Songa nor Naturisa initially identified the AMVTR program as an "Other Subsidy."

---

[6] For that reason, Plaintiffs are filing a Motion to Complete the Record so that the Court will be able to fully evaluate whether Commerce's rejection of Produmar's minor correction was supported by substantial evidence. This motion also requests inclusion in the record of two rejected minor correction document packages submitted by Songa and Naturisa.

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                              **PUBLIC VERSION**

In contrast, Produmar did determine that this program might provide a countervailable subsidy. Accordingly, Produmar, in its February 20, 2024 response to Commerce's Supplier Questionnaire, stated that: "Produmar received benefits in the form of an eighty percent reduction of the motor vehicle tax on vehicles used exclusively for productive or commercial activities. Accordingly, this tax incentive is generally available to all natural persons or enterprises in Ecuador." C.R. 110 at III-PRO-14.

Santa Priscila also reported on March 4, 2024 that it had received AMVTR tax benefits, stating that: "This tax incentive is generally available to all natural persons or enterprises in Ecuador, and, therefore, this program is not countervailable because it is not specific." *See* Santa Priscila's Supplemental Section III Questionnaire Response at page S-2 and Exhibit S-4(b). C.R. 136.

Thus, Commerce knew early in its investigation that a previously unknown "Other Subsidy" was available to every Ecuadorian enterprise that operated qualifying vehicles. Nevertheless, Commerce never asked Songa or Naturisa to report whether they had similarly received AMTVR program benefits. From February 20, 2024, when Commerce first learned of the existence of the AMVTR program, Commerce issued three supplemental questionnaires to Songa. C.R. 120, C.R. 232, and P.R. 380. However, Commerce never asked Songa to report whether it or Naturisa had received AMVTR program benefits in any of those questionnaires even though Commerce knew that shrimp farmers, as well as shrimp processors, made extensive use of motor vehicles in their operations.

A third reason why Commerce knew or should have known that Songa and Naturisa might have received AMVTR benefits was that that Commerce issued a Third Post-Preliminary Supplemental Questionnaire Response to the GOE on July 2, 2024 in which it asked the GOE to

22

**Consolidated Case No. 25-00025**                                   **PUBLIC VERSION**

answer 10 questions concerning the AMVTR program, including the "amount of assistance

approved for each mandatory respondent company." P.R. 390. In its July 11, 2024 response, the

GOE reported that Songa had received a POI benefit of [          ], and Naturisa had received a

benefit of [          ] C.R. 261 at S5-6. In addition, it reported that over 4,000 companies in the

"agriculture, forestry, and fishing" industry (which included the shrimp aquaculture industry)

received benefits. *Id.* at S5-6 and Exhibit S5-4. The GOE described this as "a nationwide,

widely available, program." *Id.* at S5-7. Nevertheless, Commerce failed to issue a supplemental

questionnaire to Songa, Naturisa, or the GOE, further inquiring about those benefits, which

would have provided the respondents with an opportunity to report their benefits earlier in the

investigation.

### 2. Songa and Naturisa Submitted Minor Corrections at Verification

After recognizing that Commerce might decide to countervail their AMVTR benefits,

both Songa and Naturisa submitted minor AMVTR corrections, which Commerce rejected:

> At the start of verification, SONGA and Naturisa officials reported that both
> entities omitted the reporting of vehicle ownership tax exemptions received
> pursuant to the Motor Vehicle Tax Exemption program. SONGA claimed that it
> received tax exemptions on [   ] vehicles and Naturisa claimed that it received
> vehicle tax exemptions on [   ] vehicles. We did not accept these corrections.

Verif. Rept. at 2. C.R. 313. The record does not contain the rejected minor correction document

package, and for that reason is included in the Motion to Complete the Record that the Plaintiffs

are filing. Moreover, Commerce unlawfully failed to explain why the number of vehicles for

which tax exemptions were obtained disqualified the corrections from being classified as

"minor."

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                                      PUBLIC VERSION

### 3. Commerce Violated 19 U.S.C. § 1677m(d) by Failing to Request that Songa and Naturisa Report Their AMVTR Benefits Before the Start of Verification

Respondents have an obligation to provide all requested information contained in

Commerce questionnaires.  However, 19 U.S.C. § 1677m(d) contains an exception to this

requirement:

> If the administering authority or the Commission determines that a response to a request for information under this subtitle does not comply with the request, the administering authority or the Commission (as the case may be) <u>shall promptly inform the person submitting the response of the nature of the deficiency and shall, to the extent practicable, provide that person with an opportunity to remedy or explain the deficiency</u> in light of the time limits established for the completion of investigations or reviews under this subtitle.

(Emphasis added.)

Songa's and Naturisa's questionnaire responses were deficient because neither company

initially reported its AMVTR benefits.  Commerce knew or should have known this because of

the information that it received from Produmar, Santa Priscila, and the GOE.  Thus, Section

1677m(d) required Commerce to provide Songa and Naturisa with the opportunity to supply

information concerning their use of the AMVTR program before the verification began or else

during (or after) that verification.[7]

### 4. Commerce Acted Contrary to Law in Failing to Comply with 19 U.S.C. § 1677m(d)

Commerce's failure to apply 19 U.S.C. § 1677m(d) contrasts with Commerce's

appropriate application of that provision in another instance during the same investigation and

thereby demonstrates the arbitrariness of Commerce's rejection of the minor correction.

Specifically, on May 2, 2024, Commerce issued a Post-Preliminary Supplemental Questionnaire

---

[7] Under 19 C.F.R. § 351.301(a), Commerce "may request any person to submit factual information at any time during a proceeding or provide additional opportunities to submit factual information."

24

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                                    **PUBLIC VERSION**

to Santa Priscila stating that the respondent had omitted from a list of all the subsidy programs

from which either Santa Priscila or Produmar had benefited both the Environmental Tax

Incentives program and the Youth Employment program. C.R. 231. For that reason, Commerce

requested that it "explain these discrepancies" and report "all benefits and subsidies received

under these programs." In this way, Commerce appropriately invoked Section 1677m(d) to

remedy an observed reporting deficiency. It was arbitrary for Commerce not to follow the same

procedure here.

Court precedents further compel the conclusion that Commerce abused its discretion

when it failed to provide Songa and Naturisa with the second chance that the statutory "Deficient

submissions" provision required.

In *Hitachi Energy USA, Inc. v. United States*. 34 F. 4th 1375, 1384 (Fed. Cir. 2022), the

court held that even though a deficiency was not determined until verification, "the statutory

entitlement to notice and opportunity to remedy is unqualified."

In *Shelter Forest International Acquisition, Inc. v. United States*, 2022 WL 21555965

(Fed. Cir. 2022), the court held (at 5) that:

> Commerce abused its discretion in the original proceeding by failing, as required
> by 19 U.S.C. § 1677m(d), to notify Shelter Forest of any deficiency in its
> February 12, 2019 Partial Response and to provide Shelter Forest with an
> opportunity to remedy or explain such deficiency.

In *Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1331, 1349 (2018), the court held

that Commerce's failure to timely notify a party of a deficiency "is itself a violation of §

1677m(d)."

In *PT Zinus Global Indonesia v. United States*, 686 F. Supp. 3d 1349, 1355 (2024), the

court agreed with the plaintiff's argument that:

25

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                                    **PUBLIC VERSION**

> {i}f Commerce had any doubt, or considered this information missing from the
> record, it had an obligation to ask Zinus for this information. It failed to do so.
> Even if it were the case that Zinus had failed to provide necessary information or
> otherwise satisfied 19 U.S.C. § 1677e(a), Commerce failed to observe the notice
> requirements of 19 U.S.C. § 1677m(d).

In *Meihua Group International Trading (Hong Kong) Limited v. United States*, 633 F.

Supp. 3d 1203, 1212 (2023), the court held that Commerce failed to fulfill its statutory obligation

under 19 U.S.C. § 1677m(d) because:

> Commerce neither notified Meihua of any deficiencies in its provision of
> information, nor provided Meihua with an opportunity to correct such deficiencies
> before Commerce determined that Meihua failed to cooperate to the best of its
> ability and drew adverse inferences against Meihua.

That led the court to conclude that Commerce had no authority to apply adverse facts and

inferences under 19 U.S.C. § 1677e.

In *Bluescope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351, 1359 (2021), this Court

held that Commerce failed to justify its use of total AFA on the ground that:

> the Department did not comply with 19 U.S.C. § 1677m(d), which requires it to
> provide a respondent with notice of deficient responses, and an opportunity to
> remediate, before deciding to rely on facts available. Because the use of facts
> available was not warranted, there was no opportunity for the Department to
> apply adverse inferences.

In *China Kingdom Import & Export Co., Ltd. v. United States*, 31 CIT 1329, 507 F. Supp.

2d 1337 (2007), China Kingdom erroneously submitted certain information provided by its

crawfish tail meat producer that did not pertain to the period of review but instead pertained to a

prior time period. 507 F. Supp. 2d at 1341. China Kingdom then attempted to remedy its

mistake "by providing Commerce with corrected data at the outset of the phase of the

verification occurring at the location of its producer." *Id.* However, "Commerce rejected the

substitute data, considering it to be new information that was unacceptable if submitted after the

26

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                                           **PUBLIC VERSION**

deadline set forth in its regulations." *Id.* It then terminated the verification because China

Kingdom had not acted "to the best of its ability in providing the requested information." *Id.*

The court rejected Commerce's finding that China Kingdom's verification submission

was untimely and that the company had intentionally withheld information. *Id.* at 1348. The

court also held that Commerce wrongly concluded that Section 1677m(d) did not apply "where a

respondent discloses the factual basis for a finding that its own submission has a deficiency." *Id.*

at 1353. Rather, the "fact that Commerce was not the first to discover the error is irrelevant to

the Department's obligations under that statutory provision {which} does not condition those

obligations on the manner in which Commerce discovered facts causing it to draw the conclusion

of deficiency." *Id.* Therefore, Commerce erred in failing to allow China Kingdom to remedy its

prior reporting deficiency at verification. *Id.* at 1354. Specifically, Commerce failed to explain

why "the verification team could not have subjected the substitute information to a verification

procedure had it not been ordered to refrain from doing so." *Id.* at 1357.

These cases support the conclusion that Commerce should have applied Section

1677m(d) to allow Songa and Naturisa to remedy their reporting deficiencies.

### 5. The Record Contains the AMVTR Program Benefits that Songa and Naturisa Received Despite Commerce's Rejection of Their Proffered Minor Corrections

Even though Commerce denied Songa's request to include its minor correction

submission in the record so that this Court could consider its relevance, Songa's redacted and

refiled combined Rebuttal Brief (at 71) contains sufficient information to allow this Court to find

that the agency abused its discretion by failing to accept the minor corrections. C.R. 328.

Specifically, this brief stated that the GOE had reported that Songa and Naturisa received

AMVTR benefits totaling [                                    ] respectively, during the POI. *Id.* These

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                    **PUBLIC VERSION**

benefits, when divided by the applicable sales denominator, yielded an additional countervailing

duty margin of [    ]%.  By any definition, this was a minor correction.[8]

Another ground for remand is that Commerce relied on the same basis for rejecting

Songa's and Naturisa's minor corrections as it did for rejecting Produmar's AMVTR-related

minor correction, i.e., it relied on the number of vehicles for which benefits were not reported

and not on the "magnitude" of the benefits that were attributable to those vehicles, as required:

> SONGA claimed that it received vehicle tax exemptions on [    ] vehicles and
> Naturisa claimed that it received vehicle tax exemptions on [    ] vehicles.  We did
> not accept these corrections.

Verif. Rept. at 2.  C.R. 313.  Commerce, here again, failed to explain why the number of vehicles

should serve as the sole criterion for determining whether a correction was "minor."

In addition, the same court precedents and administrative determinations cited above with

respect to Produmar's (erroneously) rejected minor correction apply with equal force to Songa's

and Naturisa's vehicle-related minor corrections.

**6.  Conclusion**

The record confirms that the AMVTR program was not de *facto* specific.  Accordingly,

Commerce erred in countervailing the benefits that Songa and Naturisa received.  This fact alone

compels a remand in which Commerce should be directed not to calculate any countervailing

duty margin attributable to the AMVTR program.  Alternatively, the Court should direct

Commerce to accept the minor corrections submitted by Songa and Naturisa and then calculate

the countervailing duty margins attributable to the AMVTR program instead of using "adverse

facts available" to calculate those margins.  The same indisputable facts discussed above that

---

[8] In *GPX Int'l Tire Corp. v. United States*, 893 F. Supp. 2d 1296, 1332 (2013), this court held that
"Commerce must consider all information placed on the record."  *See also Risen Energy Co.,
Ltd. v. United States*, 724 F. Supp. 3d 1356, 1363 (2024).

**Consolidated Case No. 25-00025**                                    **PUBLIC VERSION**

support the conclusion that Produmar's AMVTR correction was minor equally support the

conclusion that Songa's and Naturisa's AMVTR corrections were minor. As a second

alternative, this Court should direct Commerce to calculate the margins using neutral "facts

otherwise available," not AFA.

### E. Substantial Evidence Did Not Support Commerce's Application of Adverse Facts Available to Calculate the Countervailable Benefits that Santa Priscila, Produmar, Songa, and Naturisa Received Under the AMVTR Program

#### 1. Commerce's Initial Calculation of the AFA Rate

Commerce initially determined an actual verified margin of 0.04% attributable to the

benefit that Santa Priscila timely reported receiving under the AMVTR program after first

erroneously determining that the program was *de facto* specific. Second Post-Prelim. Anal.

Memo. at 13-14. P.R. 437. Then, Commerce assigned to Produmar, Songa, and Naturisa the

same 0.04% margin that Commerce calculated for Santa Priscila as the required AFA rate on the

(erroneous) ground that they had failed to cooperate in the investigation by not timely submitting

their AMVTR benefit information. *Id.*

To determine this 0.04% AFA margin, Commerce relied on the "first step" of the

"investigation hierarchy" in 19 U.S.C. § 1677e(d)(1)(A). Under that step, "we apply the highest

non-zero rate calculated for a cooperating company for the identical program in the

investigation." *Id.* at 10. The "cooperating company" was obviously Santa Priscila, which is

why Commerce selected Santa Priscila's calculated and verified 0.04% rate for the identical

program as the AFA rate for Produmar, Songa, and Naturisa. Commerce's basis for its AFA

margin was that "There are no facts on this record that suggest a rate other than the highest rate

envisioned under the appropriate step of the hierarchy applied in accordance with section

776(d)(1) of the Act." *Id.* at 11.

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                                    **PUBLIC VERSION**

However, Commerce did not adopt this rate for Santa Priscila, or the three other

companies, in its Final Determination despite its prior statement that no record facts indicated

that any other AFA rate should be used instead of the 0.04% verified rate of Santa Priscila, which

was the "cooperating company."

### 2. Commerce Reversed Its Position Concerning the AFA Rate in Its Final Determination

Commerce reversed course in its Final IDM with respect to both the 0.04% verified rate

for Santa Priscila and the identically assigned 0.04% AFA rates for Produmar, Songa, and

Naturisa. P.R. 456 at 74-78. Instead, it first assigned a punitive AFA margin of 1.38% to Santa

Priscila despite its full cooperation. Thus, from a "cooperating company," Santa Priscila was

transformed, without any factual basis, into a "non-cooperating company" on the ground that

"Commerce treats responding cross-owned companies as a single entity." *Id*. at 77.

To justify its turnabout, Commerce explained, without citing any supporting evidence,

that:

> in this type of situation, we calculate a single CVD rate that applies to all cross-owned firms that comprised the cross-owned entity. Similarly, when we find that the application of AFA is warranted with regard to a respondent's use of a subsidy program, we apply a single AFA rate to all cross-owned firms that comprise the cross-owned entity. Therefore, Commerce erred in the Second Post-Preliminary Determination when we used the net subsidy rate we calculated for Santa Priscila under the Motor Vehicle Tax Program as an AFA plug for another member of the Santa Priscila cross-owned entity. We similarly erred in the Second Post-Preliminary Determination when we used the net subsidy rate calculated for Santa Priscila . . . as an AFA plug for the SONGA cross-owned entity.

Final IDM at 77-78. P.R. 456. No case precedent supported this conclusion in the factual

circumstances presented here, and Commerce cited none.

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                              **PUBLIC VERSION**

### 3. Commerce Provided No Factual or Legal Support for Treating Santa Priscila as Not Having Cooperated in the Investigation

Santa Priscila fully cooperated in Commerce's investigation of the AMVTR program, and Commerce found that it had fully cooperated. For that reason, Commerce has never claimed that Santa Priscila failed to provide any required information or did so on an untimely basis. Moreover, Commerce verified the accuracy of the AMVTR-related information that Santa Priscila provided. Verif. Rept. at 13. C.R. 421.

As such, Commerce's assignment to Santa Priscila of a 1.38% margin determined using AFA constituted an abuse of discretion and lacked substantial evidentiary support. The statute only permits the application of AFA where Commerce determines that "an interested party failed to cooperate by acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). Commerce never explained why Santa Priscila satisfied this test. Rather, the correct margin was the verified, calculated 0.04% rate.[9]

### 4. Substantial Evidence Did Not Support Commerce's Decision to Calculate the AMVTR-Related Margins for Santa Priscila, Produmar, Songa, and Naturisa Using Adverse Facts Available

Commerce may apply an adverse inference only if it first finds that a party "has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). For example, AFA "may be appropriate when an interested party has been notified of a defect in its questionnaire response yet continues to provide a defective response." *Hitachi Energy USA, Inc. v. United States,* 34 F. 4th 1375, 1385 (Fed. Cir. 2022) (citation

---

[9] Commerce assigned an AFA rate to Santa Priscila because it "treats responding companies as a single entity. As such, in this type of situation, we calculate a single CVD rate that applies to all cross-owned firms that comprised the cross-owned companies." Final IDM at 77. However, this practice is irrelevant because it does not address the issue of an affiliated company that has an actual, calculated rate.

**Consolidated Case No. 25-00025**                              **PUBLIC VERSION**

omitted.)  However, before drawing an adverse inference, "Commerce must examine a

respondent's actions and assess the extent of the respondent's abilities, efforts, and cooperation in

responding to Commerce's requests for information."  *Id.* at 1386 (citations omitted.)

Commerce did not conduct, much less explain the results of, the required examination of

the three respondents' actions before using AFA to determine the countervailing duty margins for

the AMVTR program for Produmar, Songa, and Naturisa.  Instead, it merely concluded that: "By

failing to provide accurate, timely information . . .  by the established deadline, Produmar,

SONGA, and Naturisa failed to cooperate to the best of their ability to comply with Commerce's

request for information in this proceeding."  Second Post-Prelim. Anal. Memo at 7.  P.R. 437.

This is a mere conclusion, not the examination that the Federal Circuit has required.

Accordingly, Commerce's application of AFA to the calculation of the AMVTR-related margins

was not supported by substantial evidence.[10]

Moreover, had Commerce conducted the required examination, it would have considered

the significance of the fact that Santa Priscila, Produmar, Songa, and Naturisa responded to a

total of 26 questionnaires and supplemental questionnaires during the investigation that

concerned 37 alleged subsidy programs.  They provided over 5,000 pages of narrative

explanations and supporting documentation in response to those questionnaires.  Seen in this

context, the relative significance of the rejected minor corrections was small and demonstrated

that they fully cooperated to the best of their abilities.

---

[10] *See Citic Trading Co. Ltd. v United States*, 27 CIT 356, 372 (2003) ("Commerce may not
simply provide the conclusory statement that a party 'has failed to cooperate by not acting to the
best of its ability' . . . in order to draw adverse inferences against it."  *See also Oman Fasteners,
LLC., v. United States*, 125 F. 4th 1068, 1087 (Fed. Cir. 2025) ("a necessary condition {for the
imposition of AFA} would be the establishment of a particularly strong need to deter non-
compliance, which would have to rest on a particularly serious failure to cooperate."

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                    **PUBLIC VERSION**

### 5. Commerce's Assignment of AFA Margins of 1.38% to Produmar, Songa, and Naturisa Violated the Statutory AFA Hierarchy

Even assuming that Commerce could reasonably characterize Santa Priscila as non-cooperative, not because of anything it did or failed to do, it was nevertheless unreasonable for Commerce to characterize Santa Priscila's affiliate, Produmar, as uncooperative despite its submission of a truly minor correction to its previously reported AMVTR program benefit. This abuse of discretion caused Commerce to treat both Santa Priscila and Produmar as uncooperative, which then led to both companies, along with Songa and Naturisa, receiving AFA margins of 1.38%.

This abuse violated the statutory AFA hierarchy, which required Commerce to assign an AFA margin using the "first step" of the "investigation hierarchy" prescribed in 19 U.S.C. § 1677e(d)(1)(A). Under that step:

> we apply the highest non-zero rate calculated for a cooperating company for the identical program in the investigation. Under this step, we will even use a de minimis rate as AFA if that is the highest rate calculated for another cooperating respondent in the same industry for the same program.

Second Post-Prelim. Anal. Memo at 10. P.R. 437. The "highest non-zero rate calculated for another cooperating respondent" was Santa Priscila's 0.04% rate. This is the AFA rate that Commerce should have assigned to Produmar, as well as to Songa and Naturisa, if any. If Commerce wanted to assign a higher rate using a different step in the AFA hierarchy, then it had an obligation to explain its basis, which it failed to do.

Commerce asserted that the 1.38% AFA rate that it selected was the "highest calculated above-*de minimis* subsidy rate for a similar or comparable (*i.e.* tax) program in any CVD proceeding involving Ecuador. This is the rate calculated for Santa Priscila for the Investment

33

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                                    **PUBLIC VERSION**

Contract program." Final IDM at 10-11. P.R. 456. However, the Investment Contract program was neither "similar" nor "comparable" to the AMVTR program for the following reasons:

- The 1.38% AFA margin was the margin that Commerce calculated and verified under which Santa Priscila obtained an exemption from Ecuador's 25% <u>income tax</u> rate that otherwise would have applied to the profit that it earned on its qualifying investment. In contrast, the AMVTR program was a <u>property tax</u> program under which purchasers of qualifying motor vehicles could obtain an 80% reduction in the tax that they would otherwise owe.

- Thus, the method of calculating the benefit amount differed substantially between the two programs, as did the resulting benefit amount.

- Under the Investment Contract program, qualifying investors had to claim their income tax reduction on their annual federal income tax return. This requirement did not apply to the AMVTR program. Instead, motor vehicle purchasers filed a form for each vehicle captioned "*Solicitud de exoneración, reducción o rebaja especial de impuestos vehiculares*," which translated means "Request for exemption, reduction or special lowering of vehicle taxes."

- Different types of documentation had to be maintained to support the claimed benefits in case of an audit. For the Investment Contract income tax exemption, recipients had to maintain revenue and expense information at the cost-center level (and have a discrete cost center in their accounting records to allow for segregation of profits attributable to the new productive investment) or else allocate profits between their existing and new investments. Thus, the income tax exemption was self-reported based on the company's accounting records and was subject to IRS audit. In contrast, under the

34

AMVTR program, the company simply registered the license plates associated with qualifying vehicles, and the 80% exemption was automatically calculated in the IRS's system based on the value of the vehicles. There was no IRS audit process, and the companies were only required to maintain a record of ownership of the registered vehicles and the motor vehicle tax actually paid (i.e., not exempted).

Therefore, Commerce's selection of the 1.38% AFA rate was not based on a remotely "similar" program and, thus, was not supported by substantial evidence.[11] If anything, Commerce should have based the rate on neutral "facts otherwise available" under 19 U.S.C. § 1677e(a), and not on AFA. Even assuming that Produmar, Songa, and Naturisa did not cooperate to the best of their ability, the AFA rate should have been 0.04%, i.e., the verified rate determined for Santa Priscila for the identical AMVTR program.

### 6. The Statute and Commerce's Practice Do Not Support the Imposition of a 1.38% AFA Rate

Neither the AFA statute nor Commerce's practice supports applying the 1.38% AFA rate applied to Produmar, Songa, and Naturisa. Commerce ignored the benefit information correctly reported by Santa Priscila, which Commerce verified. In prior cases where Commerce calculated a rate for a respondent—but could not verify the benefit information reported by one of the same respondent's cross-owned affiliates—Commerce nevertheless applied the calculated rate as AFA for the same program to the cross-owned affiliate. See Brass Rod from the Republic of Korea: Final Affirmative Countervailing Duty Determination, 89 Fed. Reg 29420 (Apr. 22,

---

[11] See Yama Ribbon and Bows Co., Ltd. v. United States, 698 F. Supp. 1255, 1262-63 (2024), where this court rejected an AFA rate because Commerce failed to explain why a preferential lending program was similar to an export promotion lending program.

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                                    **PUBLIC VERSION**

2024), and accompanying Issues and Decision Memorandum (Apr. 15, 2024), at 9 (for loan

programs where Commerce verified the benefit information reported by the respondent,

Daechang, Commerce applied Daechang's calculated rate as AFA to its cross-owned affiliate,

because Daechang's rate was the highest calculated rate for the identical program in Korea).

 Commerce cited no basis to depart from the statutory hierarchy and its prior practice.

Commerce erred by applying a rate for a similar program instead of the calculated rate calculated

for Santa Priscila for the identical program.  The statute allows Commerce to select a rate that is

sufficiently adverse to ensure that the uncooperative respondent does not obtain a more favorable

rate than had it fully cooperated.  See 19 U.S.C. § 1677e(b)(2); see also F.lli De Cecco Di Filippo

Fara S. Martino S.p.A. v. United States, 216 F.3d 1027, 1032 (Fed. Cir. 2000).  But, the statute

does not allow Commerce to sacrifice accuracy in favor of deterrence when Commerce

calculated a rate for a cooperating party for the same program in the same investigation.  See 19

U.S.C. § 1677e(d)(1)–(2); see also Mueller Comercial de Mexico S. de R.L. de C.V. v. United

States, 753 F.3d 1227, 1235 (Fed Cir. 2014) (stating that Commerce must have as its *primary*

*objective* the calculation of an accurate rate and finding "no support in our caselaw or the

statute's plain text for the proposition that deterrence, rather than *fairness or accuracy*, is the

overriding purpose of the statute when calculating a rate for a cooperating party) (emphasis

added).

 To ignore a verified calculated rate for the identical program would sacrifice the statutory

requirement of applying an accurate rate in favor of a punitive rate that is untethered to

information accurately reported by Santa Priscila.  Accordingly, Commerce's decision to apply

the highest calculated rate for the unrelated investment contract income tax exemption program

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                               **PUBLIC VERSION**

(i.e., 1.38%) rather than Santa's Priscila's calculated rate for the AMVTR program was contrary to law and otherwise not supported by substantial evidence.

### 7. Conclusion

If this Court determines that the AMVTR program is not *de facto* specific, then Commerce's calculation of countervailing duty margins using AFA for Santa Priscila, Produmar, Songa, and Naturisa becomes moot. Similarly, the AFA rate becomes moot if the Court determines that the companies acted to the best of their abilities in responding to Commerce's information requests and that Commerce failed to explain why the four companies failed to cooperate to the best of their ability. Finally, at most, Commerce should have applied a neutral "facts otherwise available" rate, not an AFA rate for a demonstrably "non-similar" program.

**F. Substantial Evidence Did Not Support Commerce's Refusal to Accept the Minor Correction that Songa Presented at Verification Concerning the GOE's ISD Tax Exemption for Imported Assets and Raw Materials Program**

### 1. Description of the ISD Tax Exemption on Imports of Assets and Raw Materials Made Available under Songa's Investment Contract

The term "ISD" is an abbreviation for the *Impuesto a la Salida de Divisas*, which means "tax on currency outflow." Songa's Investment Contract provided an "Exemption from the {5%} tax on the outflow of foreign currency (ISD) for imports of capital goods and materials necessary for the development of the project, up to the amounts and terms established in the aforementioned contract . . . ." *See* Exhibit 10 to Songa's Section III questionnaire response at Clause Seven, captioned "Tax Incentives." C.R. at 88-89. That Clause also provided for a second type of 5% ISD tax exemption, which was the "Exemption from the tax on the outflow of foreign currency for external financing operations."

### 2. History of Songa's Reporting of Its Two ISD Program Benefits

**Consolidated Case No. 25-00025**                                    **PUBLIC VERSION**

Songa initially reported that it had received an ISD tax exemption on imported materials

for fiscal year 2021 of [          ] *See* Exhibit 11 to Songa's Section III questionnaire response at

5. C.R. 88. Songa subsequently provided a further description of this tax exemption, along with

a worksheet explaining how it had been determined:

> Thus, in order to calculate the benefits received under the ISD exemption on
> imported materials under its investment contract, SONGA reviewed the value of
> the imported goods that were approved under its investment contract and
> purchased during 2021. Then, using this information, SONGA determined the tax
> value that would have been due on each one and applied the ISD rate in effect
> during the period of investigation ("POI") (i.e., 5 percent) to calculate the
> reported benefit amount under this exemption. Exhibit S2-4(a) contains a
> worksheet illustrating how SONGA calculated the ISD exemption on imported
> materials.

Post-Preliminary Supplemental Questionnaire Response at S2-5. C.R. 244. The referenced

exhibit once again identified the benefit as having been earned in 2021. Thus, Songa

inadvertently reported the wrong year's benefit.

Songa's error was identical to the error that it made concerning the third type of tax-

related benefit under its Investment Contract, which, as just noted, was the ISD exemption on the

repayment of the principal and interest on foreign loans. There, as well, Songa reported the

benefit that it received in 2021, which was [          ], rather than the benefit that it received in

2022, which was [          ]. Verif. Rept. at 3, 10. C.R. 313. These two "wrong year" errors

were identical to Produmar's wrong year reporting of its AMVTR program benefit in 2023,

rather than in 2022.

However, in preparing for verification, Songa realized that it should have reported the

exemption amount for 2022, not 2021, for both the ISD exemption on imported materials and the

ISD exemption on the repayment of principal and interest owed on foreign loans. Accordingly, it

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                    **PUBLIC VERSION**

prepared minor correction document packages for presentation at the start of verification in

which it identified the correct 2022 amounts for both programs.  Verif. Rept. at 2, 3.  C.R. 313.

### 3. Songa's Minor Correction Document Packages for Its Two ISD Program Benefits

Songa timely submitted its required "pre-verification" documents by this deadline.  C.R.

260 at 1-2.  This submission included: (1) a minor correction of the amount of benefit reported

for the ISD exemption for imported materials used under the Investment Contract; and (2) a

minor correction of the ISD exemption for the repayment of principal and interest on foreign

loans used to finance the Investment Contract's investment.

At verification, Commerce refused to accept correction (1), but accepted correction (2),

even though both corrections identically reflected the revised reporting of the benefits received

in 2022 rather than in 2021.  As the basis for rejecting the minor correction of Songa's benefit

under the ISD exemption for imported raw materials, Commerce stated that:

> At the start of verification, SONGA officials reported that in SONGA's February 12, 2024, Section III questionnaire response at Exhibit 11 and May 16, 2024, supplemental questionnaire response at Exhibit S2-4(a), they mistakenly reported currency outflow tax (ISD) exemptions on purchases of imported assets and raw materials under the investment contract as received in 2021 instead of the period of investigation (POI). The revised database included [   ] transactions for [   ] imported assets. We did not accept these corrections.

Verif. Rept. at 2.  C.R. 313.

On the other hand, as just noted, Commerce <u>accepted</u> Songa's minor correction of its

benefit amount under the ISD exemption for repayment of principal and interest on foreign

loans, stating that "SONGA mistakenly reported ISD exemptions on foreign loans available

pursuant to its investment contract received in 2021 instead of the {2022} POI."  *Id.* at 3.

Verification Exhibit VE-1, attached to the Verification Report, contained a worksheet

39

**Consolidated Case No. 25-00025**                                        **PUBLIC VERSION**

summarizing the benefit that Songa received under the ISD exemption for repayment of principal

and interest on foreign loans, which identified 16 separate repayments that qualified for the ISD

exemption. *Id.*

> **4.  Commerce Abused Its Discretion by Refusing to Accept Songa's Minor Correction of the Benefit Amount that It Received under the ISD Exemption for Imported Materials**

This Court should find that Commerce abused its discretion and acted unlawfully in

refusing to consider Songa's minor correction for the following reasons.

First, Commerce accepted Songa's minor correction of the benefit it received under the

ISD exemption for repayment of principal and interest on foreign loans even though <u>Songa made

the exact same "wrong year" error</u> in initially reporting this benefit it received as it did for the

ISD exemption for imported materials program.

Second, Commerce failed to explain either in its Verification Report or Final IDM why it

treated the two identical types of minor correction differently.  In *SKF USA Inc. v. United States*,

263 F. 3d 1369, 1382 (Fed. Cir. 2003), the court held that "{A}n agency action is arbitrary when

the agency offer{s} insufficient reasons for treating similar situations differently."  That is

precisely the situation here because Commerce treated Songa's two ISD-related minor

corrections differently even though they had the same "wrong year" basis and involved closely

related programs under Songa's Investment Contract.

Third, Commerce failed to consider the "magnitude" of either minor correction, choosing

instead to reject one of the two minor corrections on the ground that it involved "[    ]

transactions for [    ] imported assets."  Verif. Rept. at 2.  However, the minor correction that it

**Consolidated Case No. 25-00025**                                    **PUBLIC VERSION**

did accept involved [    ] separate transactions.[12] *See* Exhibit VE-1 to Songa's submission of

Minor Corrections Presented at Verification (at 3-4). This was a distinction without a difference

that Commerce failed to explain.

Fourth, Commerce stated that "it would have been unduly burdensome to verify on the

spot" the minor correction that Songa submitted. However, this conclusory statement is

contradicted by the fact that Commerce had no difficulty in verifying "on the spot" the nearly

identical minor correction of Songa's benefit under the tax exemption for the repayment of

principal and interest on foreign currency loans. Verif. Rept. at 10. C.R. 313. Moreover,

Commerce never explained why this verification would have been unduly burdensome.

Finally, from the very first questionnaire response that Songa submitted, Commerce knew

that Songa had reported the 2021 benefits that it received under the ISD exemption for imported

materials, not its 2022 benefits. Therefore, Commerce abused its discretion and violated 19

U.S.C. § 1677m(d) when it repeatedly failed to request that Songa provide its 2022 benefits.

### 5. Conclusion

Failure to accept the rejected minor correction submission constituted an abuse of

discretion and was not supported by substantial evidence. For this reason alone, a remand is

---

[12] Commerce provided two reasons for ignoring the small number of Songa's transactions. First,
"while the verification agenda instructed SONGA to demonstrate the magnitude of changes to
quantitative data of a minor correction, this does not mean that the magnitude of the change is
necessarily the sole guiding factor in Commerce's decision to either accept or reject or accept a
correction in every instance." Second, "the Courts have upheld Commerce's decision to not
accept minor corrections because of the number of affected transactions and the need to account
for different aspects of the transactions.' Final IDM at 71. In support, Commerce cited *Eregli
Demir ve Celik Fabrikalari T.A.S. v. United States*, 357 F. Supp. 3d 1325 (2018). That decision
is distinguishable because Commerce concluded that, in the antidumping investigation at issue,
acceptance of the minor correction "would have required Commerce to match each affected
transaction to particular invoices and their respective discounts." *Id.* at 1336. No such effort was
required in Songa's case. Moreover, the decision does not hold that the magnitude of a
correction is irrelevant.

**Consolidated Case No. 25-00025**                                    **PUBLIC VERSION**

required in which the Court should direct Commerce to consider the rejected minor corrections

as well as the arguments in the respondents' Case Brief and Rebuttal Brief, which Commerce

directed them to redact because they relied upon information in the rejected minor corrections.

Although Commerce did not consider the information in the original versions of those two briefs,

it retained them in its record with the notation "Rejected & Retained Document" on each page.

The irony in Commerce's rejection of the minor correction is its statement that

"SONGA's attempt to characterize its {minor correction} data as minor is not supported by

record evidence since the record lacks such data." Final IDM at 71. But, the record lacks that

"data" because Commerce arbitrarily and unfairly excluded from the record Songa's minor

correction document package and refused to consider the analysis of it in its briefs.

### G. Substantial Evidence Did Not Support Commerce's Application of AFA to Determine the Benefit Amount that Songa Received under the GOE's ISD Tax Exemption for Imported Assets and Raw Materials Program

#### 1. Commerce's Supplemental Rationale for Applying AFA

Since the Verification Report did not provide a sufficient basis for rejecting Songa's

minor correction, Commerce attempted to bolster its rejection rationale in its Final IDM (at 37-

39) where it stated that Songa had failed to "explain how it calculated and reported the ISD

exemption for imported assets and raw materials."[13] *Id.* at 38. P.R. 456. Moreover, Commerce

premised its application of AFA on its finding that "SONGA did not link its reported calculation

to any of its tax filings." *Id.* (Emphasis added.) In conclusion, Commerce stated that:

> the record demonstrates that Commerce requested the data on multiple occasions,
> and SONGA did not provide such information at the time it was requested.
> Therefore, the record demonstrates that SONGA withheld information requested

---

[13] Commerce's assertion that it did not understand Songa's calculation methodology is belied by the GOE Verification Report, where Commerce provided a lengthy explanation of the benefits available under the Investment Contract program, including the ISD tax exemptions on imported materials and repayment of principal and interest on foreign loans. C.R. 315 at 3-6

*Confidential Information Has Been Deleted*

> from it, failed to provide the correct data by the deadlines outlined by Commerce, and significantly impeded the proceeding.

*Id.* These statements were wrong and, therefore, failed to provide an evidentiary basis for

Commerce's imposition of AFA in the form of a 1.38% AFA margin for the ISD exemption

benefit.

### 2. Songa Clearly and Repeatedly Explained How It Determined the ISD Benefit Amount

The calculation of the tax exemption benefit when an Ecuadorian company imports

materials that it intends to use in a project for which the GOE has approved an investment

contract is a straightforward exercise. The investment contract identifies each material to be

used in the project for which the tax exemption will be allowed. In Songa's case, the imported

materials exempted from the ISD tax were: [

]

The exemption amount equaled the amount of the ISD tax that otherwise applied, which

during the 2022 POI was 5%. Despite Commerce's assertion that Songa consistently failed to

explain their underlying calculations, Songa clearly did so because it informed Commerce that

the total amount of the exemption in any tax year equaled the value of the imported goods for

which the Investment Contract authorized an exemption, multiplied by 5%.

Songa initially reported its calculation of the benefit amount as being [          ] for 2021

in Exhibit 11 to its February 12, 2024 questionnaire response. C.R. 88. In that same exhibit (at

2), in response to a Commerce request for the records that Songa kept concerning the benefits

received under the program, it replied that each "payable {import} transaction" was

accompanied by a "*Declaracion Informativa de Transacciones Exentas No Sujetas del Impuesto*

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                              **PUBLIC VERSION**

*a la Salida de Divisas,*" which translates as the "Informative Declaration of Exempt Transactions

Not Subject to the Currency Outflow Tax."

In contrast, for the income tax reduction benefit that was also available under Songa's

Investment Contract, Songa stated that it reported this benefit on the "101 Formulary (Tax

Return)." This is the annual income tax return, which is filed with Ecuador's Internal Revenue

Service. Thus, Commerce knew from the start of the investigation that Songa's annual income

tax return did not include the amount of the ISD benefit available for purchases of imported

materials or, for that matter, for the repayment of principal and interest on foreign loans.

Commerce then issued its first supplemental questionnaire to which Songa responded on

March 1, 2024. There, Songa explained (at page S-7) that:

> Under the ISD exemption program discussed on page III-26 of SONGA's IQR
> {i.e., Songa's initial questionnaire response}, approved companies with
> investment contracts may present to the National Customs Service of Ecuador that
> an imported item is among a list of pre-approved merchandise in order to avoid
> payment of ISD in order to avoid payment of ISD at the time of importation.

C.R. 134. Thus, Songa made clear, once again, that it claimed and then obtained the exemption,

not on its annual income tax return, but rather, through the presentation of documents to the

National Customs Service establishing the right to the ISD exemption on each previously

approved product for importation.

Then, in its March 19, 2024 response to Commerce's "Affiliated Companies

Supplemental Questionnaire (at S-AFF-2-3)" Songa stated, in response to a Commerce question

asking "where {each tax} benefit is found in the company's tax return," that:

> as SONGA has explained previously, certain tax programs do not appear on the
> tax form. For example, exemptions on paying currency outflow taxes do not
> appear on the tax form because they are an exemption at the time of entry and,
> thus, there is no need to report that within the tax filing.

C.R. 177 . (Emphasis added.)

44

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                                    **PUBLIC VERSION**

Finally, in its May 17, 2024 response to Commerce's second supplemental questionnaire, Songa again explained (at S2-5) how it calculated the ISD exemption for 2021:

> Thus, in order to calculate the benefits under the ISD exemption on imported materials under its investment contract, SONGA reviewed the value of the imported goods that were approved under its investment contract and purchased during 2021. Then, using this information, SONGA determined the tax value that would have been due on each one and applied the ISD rate in effect during the period of investigation ("POI") (i.e., 5 percent) to calculate the reported benefit amount under this exemption. Exhibit S2-4(a) contains a worksheet illustrating how SONGA calculated the ISD exemption on imported materials.

C.R. 244. Songa concluded by stating that: "<u>Finally, as SONGA stated on page S-AFF-3 of the March 18th Affiliate SQR, the ISD exemption tax benefits do not appear in SONGA's tax declaration.</u>" *Id*. at S2-6. (Emphasis added.)

In summary, Songa explained its calculation methodology to Commerce on four separate occasions and made it clear on each occasion that it did not report on its annual income tax return the benefit amount that it received under the ISD exemption for imported materials. Nevertheless, the basis upon which Commerce determined to apply AFA for this benefit was that "SONGA did not link its reported calculation to any of its tax filings."

If any doubt remains about whether Commerce knew that Songa's tax returns did not contain ISD-related information, it is eliminated by the GOE Verification Report, where Commerce verified the statement of "Government officials {who}stated that the benefits for ISD exemptions are reported separately from the income tax return." C.R. 315 at 6.

Thus, Commerce clearly erred considering Songa's repeated insistence that it its reported calculation could not be linked to "any of its tax filings." Accordingly, Commerce's basis for imposing AFA was not supported by substantial evidence. Moreover, as with Commerce's imposition of AFA on Songa's AMVTR program benefit, the case law required Commerce to describe the basis for its conclusion that Songa failed to cooperate to the best of its ability.

**Consolidated Case No. 25-00025**                                    **PUBLIC VERSION**

Commerce's failure to provide this description rendered its AFA determination unsupported by substantial evidence. In addition, the factual grounds that support the finding that Produmar's correction of its "wrong year" reporting of its AMVTR benefit constituted a minor correction apply equally to Songa's "wrong year" reporting of its ISD exemption on imported materials benefit.

### 3. Conclusion

This Court should remand the ISD exemption issue with an instruction that Commerce reevaluate whether Songa sufficiently explained how it calculated its ISD exemption benefit under its Investment Contract and whether any other factual basis existed for the imposition of AFA, assuming that the Court does not first find that Commerce should have accepted Songa's minor correction. Alternatively, the Court should instruct Commerce to apply neutral "facts otherwise available," not AFA, to calculate Songa's ISD exemption benefit for imported raw materials in view of the lack of any evidence showing that AFA was warranted.

### H. Substantial Evidence Did Not Support Commerce's Assignment to Songa of a 1.38% AFA Rate Attributable to Its Alleged Failure to Timely Report the Benefits that It Received under the ISD Tax Exemption for Imported Assets and Raw Materials

#### 1. Commerce's Selection of the 1.38% AFA Rate

Commerce selected as the AFA rate the 1.38% *ad valorem* rate that it calculated and verified for Santa Priscila as the income tax benefit under its Investment Contract. Final IDM at 39. P.R. 456. Commerce violated 19 U.S.C. § 1677e(d) in selecting this rate.

Under the statute, Commerce may use a countervailable subsidy rate "applied for the same or similar program . . . involving the same country." However, only in the situation where "there is no same or similar program" may Commerce "use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use."

*Confidential Information Has Been Deleted*

Consolidated Case No. 25-00025                                    **PUBLIC VERSION**

Moreover, it may use "the highest such rate or margin, based on the evaluation by the

administering authority of the situation that resulted in the administering authority using an

adverse inference in selecting among the facts otherwise available."

Here, Commerce used as an AFA rate the verified rate for an income tax exemption

program that Santa Priscila used. The income tax exemption program is a domestic subsidy,

while the ISD program on imported raw materials is an import substitution subsidy since it

incentivizes imports that will contribute to an investment project.

The first step in the AFA hierarchy requires assignment of the "rate applied for the same

or similar program in a countervailing duty proceeding involving the same country." 19 U.S.C. §

1677e(d)(1)(A)(i). Commerce calculated a 0.10% rate for the identical ISD program for Santa

Priscila. *See* Final Determination Calculations for Santa Priscila at Attachment I. C.R. 331.

This is the AFA rate that Commerce should have applied. Commerce provided no explanation

why it ignored its AFA hierarchy in selecting, instead, the 1.38% rate calculated for Santa

Priscila's investment contract benefit.

Commerce's rationale for (unlawfully) selecting a "non-similar" program for its AFA

rate was, as explained above, that Songa failed to explain its calculation methodology and "did

not link its reported calculation to any of its tax filings." Final IDM at 38. We have

demonstrated that both assertions are incorrect. Thus, the premise of Commerce's imposition of

a punitive AFA margin, which was the highest margin for any of the 14 separate programs of

Santa Priscila for which it calculated subsidy margins, was unjustified and, therefore, unlawful.

### 2. Conclusion

Songa's correction of its wrong year reporting was a minor one, and Commerce's

rejection of that correction was not supported by substantial evidence. Therefore, this Court

*Confidential Information Has Been Deleted*

**Consolidated Case No. 25-00025**                                    **PUBLIC VERSION**

should remand the issue for calculation of the actual margin attributable to the corrected benefit

amount.  Alternatively, at most, the benefit that Songa received under the ISD tax exemption on

imported materials should be determined using on neutral "facts otherwise available."  The AFA

punishment meted out to Songa simply does not fit the "crime" where only "wrong year"

reporting was involved and where Commerce inconsistently accepted at verification Songa's

correction of its "wrong year" reporting of the separate benefit it received in the form of the ISD

exemption for the repayment of principal and interest on foreign loans.

**III.    CONCLUSION**

This Court should remand Commerce's final determination for reconsideration in

accordance with the arguments and remand requests provided above.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel for Industrial Pesquera Santa
Priscila S.A. and Sociedad Nacional de Galápagos,
C.A.

Dated: August 26, 2025

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that the foregoing Memorandum of Points and Authorities complies with the word count limitation in the Standard Chamber Procedures. This Memorandum contains 13,366 words according to the word count function used in the word processing software used to prepare this Memorandum.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly

Dated: August 26, 2025