**PUBLIC VERSION - Confidential Information Has Been Redacted**

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

**BEFORE THE HONORABLE RICHARD K. EATON, JUDGE**

INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS, C.A.

Plaintiffs,

v.

UNITED STATES,

Defendant,

and

AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,

Defendant-Intervenors,

**Consol. Ct. No. 25-00025**

**NON-CONFIDENTIAL DECLARATION OF KENNETH N. HAMMER UNDER 28 U.S.C. § 1746**

I, Kenneth N. Hammer, state the following:

1. As legal counsel for Sociedad Nacional de Galapagos, C.A .("Songa"), I attended the verification of the questionnaire responses of Songa and its shrimp farming affiliate, Naturisa.

2. At the start of verification, our team presented a list of 12 minor corrections. *See* attached Exhibit 1 for the list that we presented at the start of verification. Item no. 5 on that list summarized Songa's minor correction of the benefit amount received under its "ISD Exemption on Purchases of Imported Assets and Raw Materials." Item no. 7 summarized Songa's minor correction of the benefit amount received under its "Motor Vehicle Income Tax Exemption." Both summaries described the documentation that Songa had compiled to demonstrate that each correction was "minor," and they contained a calculation of the effect of the correction on Songa's

subsidy margin in order to demonstrate the small "magnitude" of the correction, as Commerce required.

3. I also attended the verification of the questionnaire responses of Industrial Pesquera Santa Priscila ("Santa Priscila") and its shrimp farming affiliate, Produmar.

4. At the start of verification, our team provided a list of 3 minor corrections. *See* attached Exhibit 2 for the list that we presented. Item no. 3 on that list summarized Produmar's minor correction of its "Motor Vehicle Tax." This summary described the documentation that Santa Priscila compiled to demonstrate that the correction was "minor," and it contained a calculation of the effect of the correction on Songa's subsidy margin in order to demonstrate the small "magnitude" of the correction, as Commerce required.

5. The Commerce Department's verifiers at both the Songa and Santa Priscila verifications were Reginald Anadio and Zachary Shaykin. They declined to accept for inclusion in the record of the investigation any of the three minor correction summaries described above or the document packages that supported the summaries.

6. **Songa's minor correction document package for its ISD exemption on imported raw materials benefit.** This package contained the types of documents that Commerce required in its verification agenda. Songa provided each supporting document in Attachment 5 to its minor correction summary. *See* attached Exhibit 3 for the complete document package that our team presented in Attachment 5, which contained:

   a. A summary worksheet listing each imported asset, HS Code, supplier, invoice number, invoice value, ISD Tax Form number, ISD Tax Form date, value of imported asset or raw material on the tax form, and the total amount ISD exempted for each importation. This worksheet explained how Songa calculated the change in the countervailable benefit reflected in the minor correction.

   b. ISD tax statements for each importation for which Songa received a qualifying ISD exemption in 2022, which is captioned "*Declaración Informativa de Transacciones no Sujetas del Impuesto a la Salida de Divisas*". The purpose of these documents was to allow Commerce to verify individual components of Songa's calculations.

PUBLIC VERSION - Confidential Information Has Been Redacted

7. Commerce accepted a minor correction document package that concerned Songa's benefits under the ISD program for repayment of principal and interest on foreign loans. Songa provided each supporting document in Attachment 6 to its minor correction summary. *See* attached Exhibit 4 for the complete document package that our team presented in Attachment 6.

8. The documents in Attachment 6 were organized identically to the documents in Attachment 5, and this attachment contained the identical types of documents.

9. **Songa's minor correction document package for its minor correction of its motor vehicle tax exemption benefit**. This package contained the types of documents that Commerce required in its verification agenda. Songa provided each supporting document in Attachment 7 to its minor correction summary. *See* attached Exhibit 5 for the complete document package that our team presented in Attachment 7, which contained:

   a. A one-page summary worksheet presenting the total motor vehicle property tax that would have been due on qualifying vehicles; (b) the total property tax for which SONGA received the exemption; and (c) the actual non-exempted motor vehicle property tax paid on vehicles weighing one ton or more.

   b. A detailed listing of the calculation of the AMVTR benefit for each qualifying vehicle, which is captioned "*SONGA Vehicle Property Tax Exemption Detail*".

   c. Applications for AMVTR benefits (captioned "*Solicitud de exoneración, reducción o rebaja especial de impuestos vehiculares*") resolutions approving the AMVTR benefit applications for exemption for all vehicles (captioned "Asunto*: Se ateniende solicitud de reducción Annual sobre la Propedad de los Vehiculos Motorizados",* screenshots from the Ecuador's Internal Revenue Service web portal (captioned "Query of values to be paid by plate or *chasis / Consulta valores a pagar por placa o chasis*") listing the taxes and other fees paid for each approved vehicle, .

10. **Santa Priscila's minor correction document package for Produmar's minor correction of its motor vehicle tax exemption benefit**. This package contained the types of documents that Commerce required in its verification agenda. Santa Priscila provided each supporting document in Attachment 3 to its minor correction summary.

*See* attached Exhibit 6 for the complete document package that our team presented in Attachment 3, which contained:

a. A one-page summary listing each of the 62 qualifying vehicles for which a tax exemption was obtained and the amount of the tax saving on each vehicle. The total tax saving was [ ] as shown at the bottom of this summary.

b. A form for each of those vehicles captioned "*Detalle Pago Del Valor De La Matricula*," which translates as the "Detail of the Payment of the Value of the Registration." Each form then listed the "*Exoneracion por Tonelaje*," which translates as the "Exemption by tonnage," i.e., the tax exemption benefit for that vehicle under the AMVTR program.

11. Each of the three rejected minor correction document packages contained a significant number of documents because that is what Commerce's verification agendas required, not just for minor corrections but for all items that Commerce intends to verify. The final verification package collected by Commerce in connection with Songa's benefits under the ISD program for repayment of principal and interest on foreign loans, for which Commerce accepted a minor corrections, contained approximately 103 pages because Commerce requested additional supporting documentation after it accepted the minor correction.

12. In my experience, Commerce never verifies the accuracy of every required document and every component of every required calculation. Nevertheless, Songa and Santa Priscila presented exhaustive documentation for each minor correction, not just the rejected minor corrections, that would allow Commerce to spot-check and thereby verify any individual item of information.

13. The documents contained in all twelve of Songa's minor correction document packages were originally prepared in Spanish, as were many of the documents that did not relate to minor corrections, but that Commerce verified. Commerce retained an interpreter to attend both verifications who could translate any Spanish language document upon request. In addition, I could translate any requested document since I am fluent in Spanish.

14. Foreign language documents are routinely reviewed and verified. Their review is a part of every verification in which I have participated. During the Songa and Santa Priscila verifications, Commerce's verifiers reviewed many Spanish language documents, not just those documents contained in any of the minor correction document packages that Commerce did accept for both Songa and Santa Priscila.

I declare under penalty of perjury that the foregoing is true and correct.

*<u>/s/ Kenneth N. Hammer</u>*
Kenneth N. Hammer

Dated: August 29, 2025

**Exhibit List – DECLARATION OF KENNETH N. HAMMER UNDER 28 U.S.C. § 1746**

| Exhibit No. | Description |
|---|---|
| 1 | Narrative of Minor Corrections Presented by Songa at Verification |
| 2 | Narrative of Minor Corrections Presented by Santa Priscila at Verification |
| 3 | Attachment 5 to Minor Corrections Presented by Songa at Verification |
| 4 | Attachment 6 to Minor Corrections Presented by Songa at Verification |
| 5 | Attachment 7 to Minor Corrections Presented by Songa at Verification |
| 6 | Attachment 3 to Minor Corrections Presented by Santa Priscila at Verification |

# EXHIBIT 1

## Minor Corrections

Sociedad Nacional de Galapagos C.A. ("SONGA") and its cross-owned affiliates, Naturisa S.A. ("Naturisa"), Empacadora Champmar S.A. ("Champmar") and Holdings Sola & Sola Solacciones S.A. ("Sola") discovered the following minor errors while preparing for this countervailing duty verification:

1. **SONGA's Reported Sales Values:** In SONGA's March 1, 2024, supplemental questionnaire response (at Exhibit S-2), SONGA reported revised sales values, as requested in the Department's questionnaire.

   First, in order to report "Sales of Subject Merchandise," SONGA deducted sales of non-subject merchandise (i.e., fresh shrimp and heads) from its reported total sales value. SONGA inadvertently did not include all sales of non-subject merchandise in the sales value of non-subject merchandise, which, in turn, was used to report Sales of Subject Merchandise. Specifically, the [ ] line item should have included all sales of non-subject merchandise to all markets. However, SONGA included only the value of non-subject sales of fresh shrimp and shrimp heads sold to the U.S. market in the relevant line item. Sales of shrimp heads to [ ] were inadvertently excluded from the value deducted from total sales (i.e., [ ]). As a result, Songa's reported Total Sales of Subject Merchandise were [ ].

   Second, SONGA's revised sales reporting (at Exhibit S-2) contained a typographical error in reporting the value of Total Exports to the United States. SONGA manually entered the Total Exports to the United States" line item of Exhibit S-2, and it inadvertently entered [ ] when the correct calculation resulted in [ ]. As a result, Songa's reported Total Exports to the U.S were [ ] and its reported Total Sales of Subject Merchandise to the U.S. were [ ]

   **Attachment 1** contains: (1) a revised sales chart for SONGA; and (2) a screenshot from SONGA's accounting system reflecting sales by product and market querying the total value of export sales of shrimp to the United States.

2. **Electricity for LTAR:** In SONGA's March 1, 2024 Supplemental Questionnaire Response (at Ex. S-4(a)), February 16, 2024, Supplier Questionnaire Response (at Exs. NAT-III-5, EC-III-1), and March 18, 2024, Supplemental Supplier Questionnaire Response (at Ex. S-AFF-Q23a), SONGA, Naturisa, and Empacadora Champmar reported

electricity usage for their facilities. In the same exhibit, SONGA, Naturisa, and Champmar separately reported the quantity (i.e., kilowatt hours ("kWh")), value (i.e., U.S. dollars), and average per-unit prices for each month of the period of investigation ("POI") in three categories based on [ ].

The revised electricity templates provide greater detail derived from each invoice to more precisely connect the relevant information to each time of use category in CNEL's tariff schedules. For example, Champmar was invoiced for industrial use categories A, B, C and D, which vary based on "time of use." In the original submitted templates, the electricity usage was not reported in separate industrial use categories.

**Attachments 2, 3, and 4**, contain, respectively, the revised electricity templates for SONGA, Naturisa, and Champmar. The revised templates separately report electricity based on each of the four "time of use" categories (i.e., A, B, C, and D), where applicable.

These changes have no effect on the overall reported electricity usage. Rather, these changes reflect a greater level of detail, which is necessary to tie the rates charged to CNEL's electricity schedule.

3. **Electricity for LTAR:** In its March 1, 2024 Supplemental Questionnaire Response (at Ex. S-4(a)), SONGA reported electricity usage for its facilities. SONGA inadvertently omitted the electricity usage incurred at [ ] meters associated with [ ] facilities that [ ]. Nevertheless, SONGA reports this usage because it consumes the electricity invoiced to these meters and pays for the electricity service. These payments were overlooked in preparing SONGA's response because they are not recorded in the same account as SONGA's other electricity usage.

**Attachment 2** contains a corrected version reporting SONGA's electricity usage during the POI for the [ ]. After these corrections, the additional electricity usage associated with these two meters reflects a mere [ ], whereas SONGA's overall electricity purchases at its warehouse facilities was [ ]. Likewise, the additional electricity usage associated with these two meters reflects a mere [ ] kilowatts hours ("kWh"), whereas SONGA's overall electricity usage at its warehouse facilities was [ ] kWh. The electricity usage inadvertently omitted from the electricity usage template amounted to a mere [ ]%, by value, and [ ]%, by quantity, of SONGA's overall electricity usage during the POI.

4. **Electricity for LTAR:** In SONGA's February 16, 2024, Supplier Questionnaire Response (at Ex. EC-III-1), and its March 18, 2024, Supplemental Supplier

Questionnaire Response (at Ex. S-AFF-Q23a), Champmar reported electricity usage for its facilities.

First, Champmar inadvertently misreported its electricity consumption for its office facility, which is not involved in production. **Attachment 4** contains a revised electricity template with the correct consumption values for Champmar's office facility. Champmar clarifies that it only reported consumption for [ ] because these were the only months in which it consumed electricity during the POI. **Attachment 4** also contains Champmar's commercial electricity invoices for all months of the POI to support the revised reporting.

This revision resulted in a [ ] in the value of electricity reported under Champmar's commercial meter during the POI of approximately [ ], which is approximately [ ] than the electricity value reported by Champmar for the POI. This revision resulted in a [ ] in the quantity of electricity reported under Champmar's commercial meter during the POI of approximately [ ] kWh, which is approximately [ ] than the electricity quantity reported by Champmar for the POI. Nevertheless, this correction [ ] SONGA and Champmar's combined overall electricity consumption value during the POI by a mere [ ] and its overall electricity consumption quantity by only [ ]. These changes reflect a particularly small changes in quantity and value consumed.

Second, Champmar made minor errors in reporting electricity consumption at its plant facility. Champmar discovered that it inadvertently omitted certain [ ] incurred at its plant facility from its electricity reporting. **Attachment 4** contains a revised electricity template for Champmar's plant facility. Champmar also added a column in the revised plant facility template to reflect the total value paid for each usage category contained on its electricity invoices. Champmar recalculated the transformer capacity unit prices initially reported by dividing total paid by the invoiced transformer capacity used. Collectively, these changes [ ] to the value of Champmar's industrial electricity purchases over the POI. Because additional fees do not affect the consumption quantities, these changes do not affect the quantity of industrial electricity Champmar reported consuming during the POI. These changes collectively represent a miniscule [ ] in the overall value of industrial electricity purchases of SONGA and its cross-owned affiliates during the POI, so they are truly minor.

5. **ISD Exemption on Purchases of Imported Assets and Raw Materials:** In SONGA's February 12, 2024, Section III questionnaire response (at Ex. 11), and its May 16, 2024, supplemental questionnaire response (at Exhibits S2-4(a) and S2-4(b)), SONGA reported Currency Outflow Tax ("ISD") tax exemption benefits received in 2022 in connection with purchases of qualifying imported materials, commodities and capital goods used to further the investment project pursuant to the terms its investment contract with the

Ecuadorian government. In the course of reviewing its ISD payment documentation, SONGA determined that it inadvertently reported the value of ISD exemptions received under this program in 2022 based on ISD declarations filed with taxing authorities in 2021. **Attachment 5** contains a worksheet summarizing SONGA's revised ISD exemptions for 2022 in connection with imported assets and raw materials reported based on SONGA's 2022 ISD statements filed during the POI. The exhibit includes ISD statements from 2022 to support the revised reporting.

This change causes a tiny increase (i.e., [ ]) in the subsidy rate for SONGA attributable to this program calculated in the Department's preliminary determination.

6. **ISD Exemption on Principal and Interest on Foreign Loans:** In SONGA's February 12, 2024, Section III questionnaire response (at Ex. 11), and its May 16, 2024, supplemental questionnaire response (at Exhibits S2-4(a) and S2-4(b)), SONGA reported its benefits received in the form of ISD tax exemptions received in 2022 in connection with capital and interest payments on foreign loans available pursuant to the terms of its investment contract with the Ecuadorian government. In the course of reviewing its ISD payment documentation, SONGA realized it inadvertently reported the value of ISD exemptions received under this program in 2021 based on ISD declarations filed in 2021. **Attachment 6** contains a worksheet summarizing SONGA's revised ISD exemptions for 2022 in connection with principal interest on foreign loans reported based on SONGA's 2022 ISD statements filed during the POI. The exhibit includes ISD statements from 2022 to support the revised reporting.

This change causes a tiny increase (i.e., [ ]) in the subsidy rate for SONGA attributable to this program calculated in the Department's preliminary determination, without accounting for additional benefits calculated pursuant to Section 771B.

7. **Motor Vehicle Income Tax Exemption:** SONGA and Naturisa omitted annual vehicle ownership tax exemptions received pursuant to the Motor Vehicle Tax Exemption program, which SONGA did not report because these tax benefits are generally available to all businesses in Ecuador and are not disproportionately received by companies in the shrimp industry. **Attachments 7** and **8** contain summary worksheets and supporting documentation for SONGA and Naturisa, respectively, reflecting the 80% exemptions of Vehicle Ownership Tax received in connection with certain qualifying vehicles used exclusively for business purposes. Therefore, the correction to include these benefits has no impact on SONGA's reported countervailable benefits or on the countervailable subsidy rate calculated in the Department's preliminary determination.

Even if the corrected benefits under this program were countervailable—which they are not—they would not have a significant impact on SONGA's overall CVD rate. Even if the Department were to calculate subsidy rates in connection with these benefits—which it should not—the benefits received under this program would result in no measurable benefit for SONGA (i.e., [ ]). If the Department were to calculate subsidy rates in

connection with these benefits—which it should not—the benefits received under this program would result in a miniscule increase in the total overall subsidy rate calculated Naturisa (i.e., [ ]).

8. **Tax Exemption on Time Deposits and Fixed Income Securities:** Sola & Sola Solacciones, a holding company that earns only passive income on investments, and which is not engaged in farming of fresh shrimp or processing frozen shrimp, omitted tax exemptions received pursuant to Tax Exemptions on Time Deposits and Fixed program, which is generally available to all businesses in Ecuador and are not disproportionately received by companies in the shrimp industry. Therefore, the correction to include these benefits has no impact on SONGA's reported countervailable benefits or on the countervailable subsidy rate calculated in the Department's preliminary determination.

   **Attachment 9** contains output from Sola's accounting system from the subaccount [ ] and a screenshot from Sola's accounting system.

9. **Corporate Structure and Affiliation:** In its January 4, 2024, affiliated companies response (Ex. AFF-1), SONGA reported its affiliates during the POI. SONGA inadvertently omitted [ ] affiliated holding companies (i.e., [ ], with no operations of their own, and that have no involvement in the farming or production of shrimp, which were formed during the POI. Both entities are privately held [ ].

   The added affiliates have no impact on this investigation because they are [ ], are not producers of subject merchandise, have no business operations of any kind, and did not supply any inputs used in the production of fresh or frozen shrimp to SONGA or any other cross-owned affiliate of SONGA.

   **Attachment 10** contains a revised affiliations chart as well as additional information to support the date on which [ ] became a SONGA affiliate.

10. **Electricity for LTAR:** In its March 1, 2024 Supplemental Questionnaire Response (at Ex. S-4(a)), SONGA reported electricity usage for its facilities. For SONGA's warehouse facility, SONGA inadvertently reported December 2022 electricity consumption data the row for January 2022.

    SONGA inadvertently reported its electricity consumption in Exhibit S-4(a) based on the invoice date rather than the dates of service, which is inconsistent with its electricity reporting for other facilities, as explained on page S-AFF-13 of the March 18, 2024 Supplier Supplemental Questionnaire Response. Thus, the consumption data reported in Exhibit S-4(a) for February 2022, is now reported for January, 2022, etc. However, SONGA's electricity reporting over the POI for the warehouse facility, as reported in

Exhibit S-4(a) was complete for the POI because it inadvertently reported electricity consumption in December 2022 (i.e., invoiced in January 2023) as attributable to January 2022.

**Attachment 2** contains a revised electricity template, which reports electricity consumption based on the month of electricity service, consistent with how it reported all other electricity consumption for other facilities.

This change had no effect on the total quantity consumed during the POI. The impact on the total value of electricity reporting for SONGA's warehouse facility was truly miniscule (i.e., [ ] during the POI).

11. **Electricity for LTAR:** In its March 1, 2024 Supplemental Questionnaire Response (at Ex. S-4(a)), SONGA reported electricity usage for its facilities. For SONGA's processing facility, SONGA inadvertently reported its electricity consumption in Exhibit S-4(a) based on the invoice date rather than the dates of service, which is inconsistent with its electricity reporting for other facilities. Thus, the consumption data reported in Exhibit S-4(a) for February, 2022, is now reported for January, 2022, etc. SONGA corrects the reported electricity consumption data for December 2022.

    **Attachment 2** contains a revised electricity template, which reports electricity consumption based on the month of electricity service, consistent with how it reported all other electricity consumption for other facilities. **Attachment 2** also corrects the reporting of electricity consumption for December 2022.

    This change had a tiny effect on the total quantity and value of SONGA's electricity consumption at its processing facility over the POI. Specifically, this change resulted in a [ ] in the quantity of electricity consumed and a [ ] in the value of electricity consumed at SONGA's warehouse facility.

12. **Electricity for LTAR:** In SONGA's February 16, 2024, Supplier Questionnaire Response (at Ex. NAT-III-5), Naturisa reported electricity usage for its facilities. For Naturisa's [ ] Naturisa inadvertently copied the consumption data reported for November 2022 and repeated the same data in its electricity consumption reporting for December 2022.
    Likewise, for Naturisa's [ ] site, Naturisa mistakenly reported incorrect information for the months of February, March, and July 2022.

    **Attachment 3** contains a revised electricity templates for the [ ] sites.

    Across all Naturisa's electricity reporting, these changes resulted in a tiny [ ] of electricity quantities consumed at Naturisa's facilities during

the POI. Likewise, these changes resulted in a similarly insignificant [ ] of electricity values at Naturisa's facilities during the POI.

# EXHIBIT 2

## Minor Corrections

Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") and its cross-owned affiliates, Produmar S.A., Egidiosa S.A., Tropical Packing Ecuador ("Tropack"), and Manesil S.A., discovered the following minor error while preparing for this countervailing duty verification:

1. **Electricity for LTAR - Egidiosa:** In Section III of Santa Priscila's February 16, 2024, Supplier Questionnaire Response (at Vol. III, Ex. EGI-1), Egidiosa reported electricity usage for its facility. In the same exhibit, Egidiosa separately reported the quantity (i.e., kilowatt hours ("kWh")), value (i.e., U.S. dollars), and average per-unit prices for each month of the period of investigation ("POI") based on [ ].

   First, when reviewing its electricity invoices, Egidiosa discovered that it inadvertently overlooked that the usage periods reflected on the invoices issued by its electricity provider, Corporacion Nacional Electricidad E.P ("CNEL"), are divided into [ ]. Egidiosa reported usage during the [ ] quantity and value. When reviewing the tariff schedules issued by the Government of Ecuador ("GOE"), Egidiosa determined it had aggregated electricity consumed during the hours of [ ] instead of reporting its usage for the [ ], as reflected in the tariff schedules issued by the GOE.

   Second, Egidiosa discovered an error in copying the electricity consumption values for two months of the POI (i.e., [ ]) from the respective invoices.

   **Attachment 1** contains a corrected version reporting all electricity usage during the POI by Egidiosa reflecting the corrected electricity usage during the [ ], as reflected on Egidiosa's electricity invoices and the tariff schedules issued by the GOE. **Attachment 1** also corrects the values reported for the months of [ ] 2022. Finally, **Attachment 1** contains a sample electricity invoice to support the corrections to the revised electricity template contained in the attachment.

   The reclassification of the charges resulted in no changes to the consumption quantity and value and the corrections for the January and October usage resulted in a minisccule [ ] kilowatt hours ("kWh") electricity over the entire POI. Applying the corrected [ ] electricity tariff rates resulted in a miniscule [ ] in the value of electricity purchased over the entire POI. Furthermore, the aggregated difference in kWh over the entire POR amounts to less than [ ] and the

aggregated difference in the value of electricity purchases over the entire POR amounts to less than [ ].

2. **Electricity for LTAR - Produmar:** In Section III of Santa Priscila's February 16, 2024, Supplier Questionnaire Response (at Vol. III, Ex. PRO-5), Produmar reported electricity usage for its facility. In the same exhibit, Produmar separately reported the quantity (i.e., kilowatt hours ("kWh")), value (i.e., U.S. dollars), and average per-unit prices for each month of the period of investigation ("POI") based on [ ].

Produmar discovered that it inadvertently overlooked that the usage periods reflected on the invoices issued by its electricity provider, Corporacion Nacional Electricidad E.P ("CNEL"), are divided into [ ]. Produmar reported usage during the [ ] quantity and value. When reviewing the tariff schedules issued by the Government of Ecuador ("GOE"), Produmar determined it had aggregated electricity consumed during the hours of [ ] instead of reporting its usage for the [ ], as reflected in the tariff schedules issued by the GOE.

**Attachment 2** contains a corrected version reporting all electricity usage during the POI by Produmar reflecting the corrected electricity usage during the [ ], as reflected on Produmar's electricity invoices and the tariff schedules issued by the GOE. A sample invoice is provided in the electricity verification exhibit.

Produmar has only made this correction to demonstrate how the electricity rates in the tariff schedule align with the electricity reporting. There is no difference between the annual quantity or value of electricity consumption reported during the POI.

3. **Motor Vehicle Tax – Produmar:** In its March 18, 2024, Supplier Questionnaire response (at Ex. PRO-15), Produmar reported $[ ] in exempt "Vehicle Ownership Tax" benefits for qualifying vehicles pursuant to the Annual Motor Vehicle tax exemption program for the POI. When Produmar reviewed the Internal Revenue Service's (SRI) electronic registry to obtain the tax records for the vehicles for which it reported receiving benefits, Produmar realized that it inadvertently reported the tax savings attributable to qualifying vehicles for the year 2023 rather than for 2022, which coincides with the POI.

**Attachment 3** contains a worksheet listing the qualifying vehicles, the amount of "Vehicle Ownership Tax" before the exemption is applied, the amount of tax actually paid, and the amount exempted for each qualifying vehicle for 2022. The exhibit also includes screenshots from the SRI's online platform for each of the vehicle reflected in

the revised 2022 worksheet, which supports the amount of tax before the exemption is applied, the amount of exempt "Vehicle Ownership Tax" for each vehicle and the year. The difference in total reported tax exemption benefits for all qualifying vehicles in 2022in the corrected worksheet, when compared to the tax savings reported in Ex. PRO-15, is a mere [ ]%.

# EXHIBIT 3

**THE FOLLOWING 51 PAGES ARE**

**NOT SUSCEPTIBLE TO PUBLIC**

**SUMMARY**

# EXHIBIT 4

# THE FOLLOWING 7 PAGES ARE NOT SUSCEPTIBLE TO PUBLIC SUMMARY

# EXHIBIT 5

# THE FOLLOWING 70 PAGES ARE NOT SUSCEPTIBLE TO PUBLIC SUMMARY

# EXHIBIT 6

# THE FOLLOWING 69 PAGES ARE NOT SUSCEPTIBLE TO PUBLIC SUMMARY