IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE RICHARD K. EATON, JUDGE

| | |
|---|---|
| **INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS C.A.,**<br><br>      **Plaintiffs,**<br><br>  **and**<br><br>**AMERICAN SHRIMP PROCESSORS ASSOCIATION,**<br><br>      **Consolidated Plaintiff,**<br><br>  **and**<br><br>**AD HOC SHRIMP TRADE ACTION COMMITTEE,**<br><br>      **Consolidated Pl.-Intervenor,**<br><br>    **v.**<br><br>**UNITED STATES,**<br><br>      **Defendant,**<br><br>  **and**<br><br>**AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,**<br><br>      **Defendant-Intervenors,**<br><br>  **and**<br><br>**INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS C.A.,**<br><br>      **Consolidated Def.-Intervenors.** | **Consol. Court No. 25-00025** |

<u>**AD HOC SHRIMP TRADE ACTION COMMITTEE'S RESPONSE IN OPPOSITION TO MOTION FOR JUDGMENT ON THE AGENCY RECORD**</u>

Nathaniel Maandig Rickard
Zachary J. Walker
Anjelika D. Jani

**PICARD KENTZ & ROWE LLP**
1155 Connecticut Ave., NW

Suite 700
Washington, DC 20036
(202) 331-5040

*Counsel to Ad Hoc Shrimp Trade
Action Committee*

March 13, 2026

## <u>TABLE OF CONTENTS</u>

TABLE OF AUTHORITIES................................................................................................ii

INTRODUCTION ........................................................................................................... 1

STATEMENT PURSUANT TO RULE 56.2 ................................................................... 1

      A.    The Administrative Determination Under Review ........................................... 1

      B.    The Issues of Law Presented ......................................................................... 2

STATEMENT OF FACTS ............................................................................................... 2

STANDARD OF REVIEW .............................................................................................. 5

ARGUMENT ................................................................................................................... 6

  I.    SUBSTANTIAL EVIDENCE SUPPORTS COMMERCE'S SPECIFICITY
      FINDINGS.................................................................................................... 6

      A.    Commerce's Decision that the Investment Contract Program Is *de facto*
            Specific Should Be Affirmed ....................................................................... 7

      B.    Commerce's Decision that the AMVTR Program Is *de facto* Specific Should
            Be Affirmed................................................................................................ 12

  II.    COMMERCE PROPERLY REJECTED "MINOR CORRECTIONS" PRESENTED
      BY ECUADORIAN PLAINTIFFS AT VERIFICATION ......................................... 15

  III.    COMMERCE'S APPLICATION OF AFA TO CERTAIN SUBSIDY PROGRAMS
      IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND CONSISTENT WITH
      COMMERCE'S PRACTICE....................................................................... 19

      A.    Commerce's Application of AFA to the AMVTR Program Was Reasonable .. 21

      B.    Commerce's Application of the 1.38 Percent AFA Rate to Songa for Benefits
            Received Under the ISD Tax Exemptions on Purchases of Imported Assets and
            Raw Materials Program Was Reasonable ..................................................... 26

CONCLUSION............................................................................................................... 27

# TABLE OF AUTHORITIES

## Cases

*Am. Alloys, Inc. v. United States,*
  30 F.3d 1469 (Fed. Cir. 1994) ........................................................................................ 16

*Bio-Lab, Inc. v. United States,*
  2026 WL 464679 (Ct. Int'l Trade 2026) ........................................................................ 20

*Boomerang Tube LLC v. United States,*
  856 F.3d 908 (Fed. Cir. 2017) .......................................................................................... 7

*Carlisle Tire and Rubber Company v. United States,*
  564 F. Supp. 834 (Ct. Int'l Trade 1983) ........................................................................ 11

*Consol. Edison Co. v. NLRB,*
  305 U.S. 197 (1938) .......................................................................................................... 5

*Consolo v. Fed. Mar. Comm'n,*
  383 U.S. 607 (1966) .......................................................................................................... 5

*Deacero S.A.P.I. de C.V. v. United States,*
  353 F. Supp. 3d 1303 (Ct. Int'l Trade 2018) ................................................................. 15

*Diamond Sawblades Manufacturers' Coalition v. United States,*
  986 F.3d 1351 (Fed. Cir. 2021) ...................................................................................... 20

*Downhole Pipe & Equip., L.P. v. United States,*
  776 F.3d 1369 (Fed. Cir. 2015) ........................................................................................ 5

*Ellwood City Forge Co. v. United States,*
  600 F. Supp. 3d 1281 (Ct. Int'l Trade 2022) ................................................................. 19

*Goodluck India Limited v. United States,*
  11 F.4th 1335 (Fed. Cir. 2021) ................................................................................. 15, 16

*Gov't of Quebec v. United States,*
  105 F.4th 1359 (Fed. Cir. 2024) ................................................................................. 7, 10

*Hyundai Steel Co. v. United States,*
  803 F. Supp. 3d 1252 (Ct. Int'l Trade 2025) ................................................................. 10

*Jiangsu Senmao Bamboo and Wood Industry Co. v. United States,*
  322 F. Supp. 3d 1308 (Ct. Int'l Trade 2018) ................................................................... 9

*Micron Tech., Inc. v. United States,*
  117 F.3d 1386 (Fed. Cir. 1997) ................................................................................. 16, 19

*Mosaic Co. v. United States,*
    744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) ...................................................... 14

*Nippon Steel Corp. v. United States,*
    337 F.3d 1373 (Fed. Cir. 2003) ........................................................... 20, 21

*POSCO v. United States,*
    353 F. Supp. 3d 1357 (Ct. Int'l Trade 2018) .............................................. 22

*Samsung Electronics Co. v. United States,*
    973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) .............................................. 14

*SolarWorld Americas, Inc. v. United States,*
    229 F. Supp. 3d 1362 (Ct. Int'l Trade 2017) .......................................... 23, 24

*Timken U.S. Corp. v. United States,*
    434 F.3d 1345 (Fed. Cir. 2006) ................................................................. 15

*Yangzhou Bestpak Gifts & Crafts Co. v. United States,*
    716 F.3d 1370 (Fed. Cir. 2013) ................................................................... 9

*Yantai CMC Bearing Co. Ltd. v. United States,*
    203 F. Supp. 3d 1317 (Ct. Int'l Trade 2017) ................................................. 5

**Statutes**

19 U.S.C. § 1516a(b)(1)(B) ...................................................................... 5

19 U.S.C. § 1677(5A)(D)(iii) ..................................................................... 6

19 U.S.C. § 1677(5A)(D)(iii)(I) ............................................................. 8, 10

19 U.S.C. § 1677e ................................................................................... 19

19 U.S.C. § 1677e(a) .............................................................................. 26

19 U.S.C. § 1677e(a)(2) .......................................................................... 19

19 U.S.C. § 1677e(b) ........................................................................ 22, 26

19 U.S.C. § 1677e(b)(1) .......................................................................... 20

19 U.S.C. § 1677e(d)(1)(A) ...................................................................... 23

19 U.S.C. § 1677e(d)(1)(A)(i) ............................................................. 26, 27

28 U.S.C. § 2637(d) ............................................................................ 8, 9

## Regulations

19 C.F.R. § 351.224(f) ............................................................................................ 16

19 C.F.R. § 351.301(c) ............................................................................................. 3

19 C.F.R. § 351.308(j) ............................................................................................ 23

19 C.F.R. § 351.308(j)(3)(ii) ................................................................................... 27

19 C.F.R. § 351.309(c)(2) ......................................................................................... 9

19 C.F.R. § 351.502(a) ............................................................................................. 6

## Administrative Determinations

*Brass Rod from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 89 Fed. Reg 29,420 (Dep't Commerce Apr. 22, 2024) ............................................................... 25

*Frozen Warmwater Shrimp From Ecuador*, 89 Fed. Reg. 85,506 (Dep't Commerce Oct. 28, 2024) ...................................................................................................... passim

*Frozen Warmwater Shrimp From Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With the Final Antidumping Duty Determination*, 63 Fed. Reg. 22,379 (Dep't Commerce Apr. 1, 2024) .................................. 2, 4

*Frozen Warmwater Shrimp From Indonesia: Antidumping Duty Order; Frozen Warmwater Shrimp From Ecuador, India, and the Socialist Republic of Vietnam: Countervailing Duty Orders*, 89 Fed. Reg. 104,982 (Dep't Commerce Dec. 26, 2024) ............................................ 1

*Ripe Olives From Spain: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 28,186 (Dep't Commerce June 18, 2018) ............................................................. 22

## Other Authorities

Statement of Administrative Action Accompanying Uruguay Round Agreements Act, H.R. Doc. No. 103-316, vol. 1 (1994) .......................................................................... 6, 7, 11

## INTRODUCTION

Defendant-Intervenor Ad Hoc Shrimp Trade Action Committee ("AHSTAC") submits this response in opposition to the Rule 56.2 motion for judgment on the agency record filed by Plaintiffs Industrial Pesquera Santa Priscila, S.A. ("Santa Priscila") and Sociedad Nacional de Galapagos, C.A. ("Songa") (collectively, the "Ecuadorian Plaintiffs"). *See* Pls. Mot. for J. on the Agency R., Aug. 26, 2025 ("Pls. Br."), ECF 43 (conf.), ECF 44 (public).

For the reasons set forth below, AHSTAC respectfully requests that this Court deny Plaintiffs' motion for judgment on the agency record and enter judgment in favor of Defendant.

## STATEMENT PURSUANT TO RULE 56.2

### A.    The Administrative Determination Under Review

The administrative determination under review is the U.S. Department of Commerce's ("Commerce") final affirmative determination issued to conclude its countervailing duty ("CVD") investigation of frozen warmwater shrimp from Ecuador. *See Frozen Warmwater Shrimp From Ecuador*, 89 Fed. Reg. 85,506 (Dep't Commerce Oct. 28, 2024) (final affirmative countervailing duty determination) ("*Final Determination*"), P.R. 459. The challenged factual findings and legal conclusions are set out primarily in the "Issues and Decision Memorandum" accompanying the *Final Determination*. *See* Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador (Oct. 21, 2024) ("IDM"), P.R. 456. The resulting CVD order was published in the *Federal Register* on December 26, 2024. *Frozen Warmwater Shrimp From Indonesia: Antidumping Duty Order; Frozen Warmwater Shrimp From Ecuador, India, and the Socialist Republic of Vietnam: Countervailing Duty Orders,* 89 Fed. Reg. 104,982 (Dep't Commerce Dec. 26, 2024), P.R. 467.

Consol. Court No. 25-00025

B.    **The Issues of Law Presented**

Ecuadorian Plaintiffs challenge Commerce's determination on the following five issues:

1.    Whether substantial evidence supported Commerce's finding that the Government of Ecuador's ("GOE") Investment Contract Program was *de facto* specific.

2.    Whether substantial evidence supported Commerce's finding that the GOE's Annual Motor Vehicle Tax Reduction ("AMVTR") program was *de facto* specific.

3.    Whether Commerce properly exercised its authority to reject Plaintiffs' "minor corrections" at the start of verification.

4.    Whether Commerce's application of facts available with an adverse inference ("AFA") to Santa Priscila and Songa and their affiliates for benefits received under the AMVTR Program was reasonable.

5.    Whether Commerce's application of AFA to Songa for benefits received under the Currency Outflow Tax (*Impuesto a la Salida de Divisas*) ("ISD") Tax Exemption on Imports of Assets and Raw Materials Program was supported by substantial evidence on the record.

## STATEMENT OF FACTS

In April 2024, Commerce published its preliminary determination in the countervailing duty investigation on frozen warmwater shrimp from Ecuador, *Frozen Warmwater Shrimp From Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With the Final Antidumping Duty Determination*, 63 Fed. Reg. 22,379 (Dep't Commerce Apr. 1, 2024) ("*Preliminary Determination*"), P.R. 293, and issued its findings and conclusions in the accompanying Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador (Mar. 25, 2024) ("PDM"), P.R. 283.  The agency's preliminary determination analyzed

**Consol. Court No. 25-00025**

Plaintiffs' initial questionnaires and various supplemental questionnaires and found several subsidy programs to be countervailable. *Id.* at 15-28.

In July 2024, Commerce conducted verifications of Santa Priscila's and Songa's responses to the agency's questionnaire responses regarding various subsidy programs. *See* IDM at 4, P.R. 456. Plaintiffs submitted three "minor" correction document packages to the agency during the start of their respective verifications. Memorandum to the File, re: *Verification of the Questionnaire Responses of Sociedad Nacional de Galapagos C.A.* (Aug. 13, 2024) ("Songa Verification Report"), at 2, P.R. 420, C.R. 313; Memorandum to the File, re: *Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A.* (Aug. 22, 2024) ("Santa Priscila Verification Report"), at 2, P.R. 421, C.R. 314. Specifically, Santa Priscila attempted to submit documents at the start of verification to correct a mistake in the reporting of its shrimp farming affiliate, Manesil S.A., Produmar S.A. ("Produmar"), concerning benefits received under the GOE's AMVTR Program. Santa Priscila Verification Report at 2, P.R. 421, C.R. 314. SONGA initially failed to report information concerning its own use and its shrimp farming affiliate, Naturista S.A.'s ("Naturista"), use of the AMVTR Program in its initial questionnaire response and attempted to submit responsive documents at the start of its verification after the deadline for the submission of factual information had closed. Songa Verification Report at 2, P.R. 420, C.R. 313. *See also* 19 C.F.R. § 351.301(c) (setting time limits for "{f}actual information submitted in response to questionnaires"); Letter from Commerce to Trade Pacific PLLC, re: *Verification Agenda of SONGA* (July 9, 2024) ("Songa Verification Agenda"), at 2 (emphasis added) (noting that "verification is not intended to be an opportunity for submission of new factual information" and that the agency's regulations "establish{} time limits for the submission of new factual information"), P.R. 397, C.R. 260. Songa also attempted to submit

3

**Consol. Court No. 25-00025**

documents regarding a mistake in its reporting concerning use of the GOE's ISD Tax

Exemptions on Purchases of Imported Assets and Raw Materials Program.  Songa Verification

Report at 2, P.R. 420, C.R. 313.  Commerce rejected these documents, determining that the

corrections were "not minor in nature, and therefore constituted untimely new factual

information."  IDM at 71, 77, P.R. 456.

Because the record did not contain any usable information to determine the actual amount

of benefits conferred for each affected subsidy program during the period of investigation

("POI"), Commerce preliminarily applied AFA to Songa's, Naturista's, and Produmar's use of

the AMVTR Program.  Memorandum to The File, re: *Second Post-Preliminary Analysis* (Sept.

26, 2024) ("Second Post-Prelim. Analysis"), at 6-7, P.R. 437.  An AFA rate of 0.04 percent was

assigned to the respondents for the AMVTR Program because it applied Santa Priscila's CVD

rate, as the only "cooperating respondent in the investigation."  *Id*. at 11.  In the *Final*

*Determination*, Commerce changed its analysis of this program, deciding to apply AFA to the

benefits Santa Priscila received from the AMVTR Program.  IDM at 10-11, P.R. 456.  Based on

this change, Commerce revisited the AFA rate and proceeded to apply "the second step of our

AFA hierarchy for CVD investigations, which is to apply the highest non-*de minimis* rate

calculated for a cooperating company in another CVD proceeding involving the same country for

the identical program, or if the identical program is not available, for a similar program."  *Id*. at

78.  Accordingly, Commerce applied an AFA rate of 1.38 percent, the subsidy rate calculated for

Santa Priscila under the Investment Contract Program, to Santa Priscila, Produmar, Songa, and

Naturista.  *Id*. at 10-11.

The benefit calculated for Songa's use of the ISD Tax Exemption on Imports of Assets

and Raw Materials Program was preliminarily found to be not measurable.  *See* PDM at 26, 293.

Consol. Court No. 25-00025

However, in the *Final Determination*, Commerce revised the subsidy rate for SONGA after deciding to apply AFA to Songa because of the respondent's failure to provide timely information and failure to cooperate to the best of its ability. *See* IDM at 11, Comments 5 and 15, P.R. 456. An AFA rate of 1.38 percent was assigned to Songa for the ISD Program because it is "the rate calculated for Santa Priscila under the Investment Contract program, because it is the highest calculated subsidy rate for a similar or comparable (i.e., tax) program in any CVD proceeding involving Ecuador, pursuant to Commerce's CVD AFA hierarchy." *Id.* at 11.

As further discussed below, following the publication of the *Final Determination*, Plaintiffs challenged Commerce's specificity and benefit findings for certain programs found to be countervailable on appeal.

## STANDARD OF REVIEW

In reviewing Commerce's determinations, the Court will "hold unlawful any determination, finding, or conclusion found . . . to be unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B). Substantial evidence means such evidence that "a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Under the substantial evidence standard, "{t}he fact that a plaintiff can point to evidence that detracts from the agency's conclusion or that there is a possibility of drawing two inconsistent conclusions from the evidence does not preclude the agency's finding from being supported by substantial evidence." *Yantai CMC Bearing Co. Ltd. v. United States*, 203 F. Supp. 3d 1317, 1321 (Ct. Int'l Trade 2017) (citing *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966)). "The court may not 'reweigh the evidence or . . . reconsider questions of fact anew.'" *Yantai CMC Bearing Co.*, 203 F. Supp. 3d at 1321 (quoting *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015)).

Consol. Court No. 25-00025

<u>**ARGUMENT**</u>

**I.    SUBSTANTIAL EVIDENCE SUPPORTS COMMERCE'S SPECIFICITY
FINDINGS**

In the final determination underlying this appeal, Commerce, appropriately determined

that the GOE's Investment Contract and AMVTR Programs were *de facto* specific.  The

Ecuadorian Plaintiffs' arguments to the contrary must be rejected as detailed below.

Prior to finding a subsidy to be countervailable, the statute requires Commerce to

determine whether the program under examination is specific.  Under section 771(5A)(D)(iii) of

the Tariff Act of 1930, as amended (the "Tariff Act" or "Act"), Commerce may find a subsidy

program to be *de facto* specific if one or more of the following factors exist:

> (I) The actual recipients of the subsidy, whether considered on an enterprise or
> industry basis, are limited in number.
>
> (II) An enterprise or industry is a predominant user of the subsidy.
>
> (III) An enterprise or industry receives a disproportionately large amount of the
> subsidy.
>
> (IV) The manner in which the authority providing the subsidy has exercised
> discretion in the decision to grant the subsidy indicates that an enterprise or industry
> is favored over others.

19 U.S.C. § 1677(5A)(D)(iii).  Commerce considers these factors in sequential order.  19 C.F.R.

§ 351.502(a).  And once a single factor warrants a finding that the program under examination is

specific, Commerce "will not undertake further analysis." *Id.*

The Statement of Administrative Action accompanying the Uruguay Round Agreements

Act explains that "{t}he Administration intends to apply the specificity test in light of its original

purpose, which is to function as an initial screening mechanism to winnow out only those foreign

subsidies which truly are broadly available and widely used throughout an economy."  Statement

of Administrative Action Accompanying Uruguay Round Agreements Act, H.R. Doc. No. 103-

316, vol. 1, at 929 (1994) ("SAA").  The SAA notes further that:

Consol. Court No. 25-00025

> The specificity test was intended to function as a rule of reason and to avoid imposition of countervailing duties in situations where, because of the widespread availability *and use* of a subsidy, the benefit of the subsidy is spread throughout an economy.   Conversely, the specificity test was not intended to function as a loophole through which narrowly focussed {sic} subsidies provided to or used by discrete segments of an economy could escape the purview of the CVD law.

*Id.* at 930 (emphasis original).  Importantly, with respect to analyzing *de facto* specificity, the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit") has held that the statute grants Commerce latitude "in choosing the appropriate approach."  *Gov't of Quebec v. United States*, 105 F.4th 1359, 1374 (Fed. Cir. 2024).

### A.    Commerce's Decision that the Investment Contract Program Is *de facto* Specific Should Be Affirmed

In the final determination underlying this appeal, Commerce appropriately determined that the GOE's Investment Contract Program was *de facto* specific.  *See* IDM at 50-51, P.R. 456. The Ecuadorian Plaintiffs contest this finding.  *See* Pls. Br. 5-10.  However, these parties failed to exhaust certain of their arguments at the administrative level.  *See, e.g.*, *Boomerang Tube LLC v. United States*, 856 F.3d 908 (Fed. Cir. 2017) ("{A}bsent a strong contrary reason, the court should insist that parties exhaust their remedies before the pertinent administrative agencies."). Moreover, the Ecuadorian Plaintiffs' arguments ignore case law from the Federal Circuit and the U.S. Court of International Trade ("CIT") that have repeatedly sustained Commerce's established practice of comparing the number of subsidy recipients to the number of companies or industries operating in the economy.  *See, e.g.*, *Gov't of Quebec v. United States*, 105 F.4th 1359 (Fed. Cir. 2024).

In finding the Investment Contract Program *de facto* specific, Commerce identified the number of companies that entered into an investment contract with the GOE in calendar years 2019, 2020, 2021, and 2022 and then compared that number to the "total number of companies registered in Ecuador" in those same years.  *See, e.g.*, Commerce Memorandum, re: *Final*

Consol. Court No. 25-00025

*Determination Calculations for Industrial Pesquera Santa Priscila S.A.* (Oct. 21, 2024), at 4 (calculating the percent of companies that entered into contracts under the Investment Contract Program), P.R. 461, C.R. 331. Based on this percentage, Commerce found that assistance under this program was provided to a limited number of users and *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act. *Id.*

The Ecuadorian Plaintiffs argue that Commerce is prohibited from assessing the specificity of tax programs like the Investment Contract Program by comparing the actual number of recipients that benefited from the program to the total number of companies registered in Ecuador. *See* Pls. Br. 7-10. Relying on the CIT's decision in *Mosaic Company v. United States*, these parties argue that Commerce used the incorrect denominator in performing its specificity analysis and contend that the denominator "should have been the number or companies that were eligible to participate in the Investment Contract program." *Id.* at 9-10. *See also id.* at 1-2 (arguing that "Commerce should have compared the number of companies that made a qualifying $1 million investment to the number of companies that participated in the program after making the required investment"). The Ecuadorian Plaintiffs further argue that the benefits provided by the Investment Contract Program are "the type of non-countervailable, economy-wide" investment incentives that Congress intended to be non-countervailable. *Id.* at 7-10.

As an initial matter, the Court is required to determine, as a threshold question, whether the Ecuadorian Plaintiffs have exhausted their administrative remedies with respect to their arguments regarding the denominator of Commerce's specificity analysis as well as the number of recipients being low in the "startup years" of the program. *See* Pls. Br. 8-10. Exhaustion of remedies is required by statute and regulation. *See* 28 U.S.C. § 2637(d) ("{T}he Court of

Consol. Court No. 25-00025

International Trade shall, where appropriate, require the exhaustion of administrative remedies"); 19 C.F.R. § 351.309(c)(2) ("The case brief must present all arguments that continue in the submitter's view to be relevant to the Secretary's final determination or final results, including any arguments presented before the date of publication of the preliminary determination or preliminary results.").

The CIT has explained that "{t}he doctrine of exhaustion of administrative remedies requires, as a general matter, that a party raising an issue upon judicial review first have presented its arguments to the administrative agency in the manner the agency requires." *Jiangsu Senmao Bamboo and Wood Industry Co. v. United States*, 322 F. Supp. 3d 1308, 1348-49 (Ct. Int'l Trade 2018).  Accordingly, the Ecuadorian Plaintiffs had an obligation, pursuant to 28 U.S.C. § 2637(d), to exhaust their administrative remedies and present their arguments regarding the denominator of Commerce's specific analysis at the agency level.  The Ecuadorian Plaintiffs failed to fulfill this obligation.

Specifically, the administrative case brief submitted by the Ecuadorian respondents presented no argument contesting the denominator used by Commerce to evaluate whether the Investment Contract Program was *de facto* specific.  *See* Letter from Trade Pacific PLLC to Sec'y Commerce, re*: Redacted Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador* (Oct. 11, 2024), at 31-33, P.R. 451, C.R. 327.  Nor did these parties present any argument concerning the number of recipients of Investment Contract Program benefits being "relatively low in the startup years."  Ecuadorian respondents had the opportunity to present these arguments to Commerce but failed to do so, thereby depriving Commerce of the opportunity to address the argument in the first instance.  *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1381 (Fed. Cir. 2013).  Accordingly, the Court should hold

**Consol. Court No. 25-00025**

that Ecuadorian Plaintiffs failed to exhaust its administrative remedies with respect to arguments not presented to Commerce in the first instance.

Regardless, the method used by Commerce in the underlying investigation—a comparison of the taxpayers that benefit from the program to the total number of registered companies in the country—is on its face a reasonable method of assessing *de facto* specificity. Section 771(5A)(D)(iii)(I) of the Act requires a finding of specificity where "{t}he actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number." 19 U.S.C. § 1677(5A)(D)(iii)(I). Thus, under the plain language of the statute, Commerce is not required to determine whether a subsidy is specific to a certain industry or industries to make a finding of *de facto* specificity. Rather, Commerce may assess whether the number of enterprises that benefited from the subsidy was limited, and it properly did so here. In fact, the method Commerce used in the underlying case is its standard method for determining *de facto* specificity under section 771(5A)(D)(iii)(I) of the Act.

As the CIT noted in *Hyundai Steel Co. v. United States*, both the CIT "and the Federal Circuit have sustained Commerce determinations when the agency compared the number of subsidy recipients to the number of companies or industries operating in the economy." *Hyundai Steel Co. v. United States*, 803 F. Supp. 3d 1252, 1256-57 (Ct. Int'l Trade 2025) (citations omitted). Notably, in *Government of Quebec v. United States*, the Federal Circuit sustained Commerce's *de facto* specificity finding on a "limited in number" basis. 105 F.4th 1359, 1374 (Fed. Cir. 2024) (sustaining Commerce comparing 4,930 tax credit recipients to 387,949 corporate taxpayers). Thus, *Government of Quebec* demonstrates that Commerce's specificity analysis reasonably takes into account the number of enterprises in the economy in question to determine whether the number of enterprises using a subsidy is actually large or small. *Id.* Like

Consol. Court No. 25-00025

that case, the nature of the program and the small percentage of recipients here support

Commerce's *de facto* specificity finding.

The Ecuadorian Plaintiffs' argument that Commerce's approach conflicts with the SAA

is also incorrect.  *See* Pls. Br. 7-8.  As stated in the SAA, the specificity determination serves to

"winnow out only those foreign subsidies which truly are broadly available and widely used

throughout an economy" and ensures that countervailing duties are not levied against subsidies

that are generally available and widely used across the economy, such as certain public

infrastructure-related programs.  SAA at 929-30.  Commerce's comparison of the Investment

Contract Program recipients to the total number of companies in Ecuador aligns with this

intended purpose of the specificity determination as it demonstrates that the benefits provided

under this program were not widely used throughout the economy.

Finally, the Ecuadorian Plaintiffs' reliance on *Carlisle Tire and Rubber Company v.*

*United States*, 564 F. Supp. 834 (Ct. Int'l Trade 1983) is inapposite.  *See* Pls. Br. 7.  As an initial

matter, *Carlisle* was decided under the pre-URAA statute.  Regardless, in discussing *Carlisle*

*Tire*, the SAA states that "the specificity test was not intended to function as a loophole through

which narrowly focused subsidies provided to or used by discrete segments of an economy could

escape the purview of the CVD law."  SAA at 929.  Here, the Ecuadorian Plaintiffs incorrectly

conflate the subsidy program at issue—an investment program—with subsidies that are actually

generally available such as those for public infrastructure.  The evidence relied on by Commerce

demonstrates that the Investment Contract Program is *de facto* specific as the actual recipients

are limited in number.  Accordingly, the Court should reject Ecuadorian Plaintiffs' arguments

and sustain Commerce's decision that the Investment Contract Program is *de facto* specific.

Consol. Court No. 25-00025

**B.    Commerce's Decision that the AMVTR Program Is *de facto* Specific Should Be Affirmed**

In the final determination underlying this appeal, Commerce appropriately determined that the AMVTR Program was *de facto* specific.  *See* IDM at 51-52, 77-78, P.R. 456.  The Ecuadorian Plaintiffs' arguments to the contrary should be rejected because they are based on a flawed interpretation of Commerce's determination as detailed below.

The AMVTR Program provides companies an eighty-percent reduction on vehicle taxes that would otherwise be owed provided that: (1) the vehicle weighs one ton or more; and (2) is used for productive and commercial activities.  Second Post-Prelim. Analysis at 13, P.R. 437. *See also* Letter from Trade Pacific PLLC to Sec'y Commerce, re: *Santa Priscila's Supplemental Section III Questionnaire Response* (Mar. 4, 2024), at Exhibit S-4(b) ("Santa Priscila is eligible to claim a reduction of eighty percent on its vehicle tax by virtue of owning vehicles weighing one ton or more and using those vehicles exclusively for productive and commercial activities."), P.R. 234, C.R. 136.[1]  Commerce initially determined that the AMVTR Program was specific within the meaning of section 771(5A)(D)(iii) of the Act after analyzing usage data from the GOE that indicated that Santa Priscila received a "disproportionate amount of benefit under this program, as the amount it reported receiving was many times greater than the average amount received by other program recipients in Ecuador."  Second Post-Prelim. Analysis at 13, P.R. 437. The agency's final determination, however, revised its specificity analysis.  IDM at 51-52,

---

[1]  SONGA and Naturista failed to report benefits under the AMVTR Program in response to Commerce's initial questionnaire.  *See* Second Post-Prelim. Analysis at 6-7, P.R. 437.  Instead, these respondents belatedly admitted to having "omitted" the reporting of tax exemptions received under this program at the start of verification.  *See* Songa Verification Report at 2, P.R. 420, C.R. 313.  As a result of SONGA's failure to provide necessary information requested by Commerce, the agency found that the application of AFA was appropriate with respect to the benefit amount received by SONGA under this program.  IDM at 16, 77-78, P.R. 456.

Consol. Court No. 25-00025

P.R. 456.  Specifically, Commerce determined in its final determination that the application of

AFA was warranted in conducting its *de facto* specificity analysis of this program because of the

Ecuadorian respondents "fail{ure} to indicate the actual amount of benefits they received during

the POI" under this program.  IDM at 51-52, 77-78, P.R. 456.  This failure resulted in Commerce

being "unable to conduct an analysis of disproportionality for the purposes of de facto specificity

under subparagraph (III) of the Act" and the agency's application of AFA.  *Id.* at 51.

The Ecuadorian Plaintiffs argue that Commerce erred in finding that Santa Priscila

received a disproportionate amount of benefit under this program.  *See* Pls. Br. 11-14.

According to the Ecuadorian Plaintiffs, the "same 80% tax reduction benefit" was granted "to

every recipient for each qualifying vehicle," *id.* at 11, and that Commerce improperly based its

specificity finding on the fact "that 'the amount {Santa Priscila} reported receiving was many

times greater than the average amount received by other program recipients in Ecuador.'"  *Id.*

at 13 (quoting Second Post-Prelim. Analysis at 13, P.R. 437).  In so arguing, the Ecuadorian

Plaintiffs rely on three CIT decisions that they claim rejected analyses "identical" to

Commerce's analysis in this investigation.  *Id.*  These arguments should be rejected.

Significantly, Commerce's finding in the final determination that the tax saving benefits

received under the AMVTR Program was *de facto* specific under section 771(5A)(D)(iii)(III) of

the Act stemmed from its decision to apply AFA.  *See* IDM at 51-52, 77-78, P.R. 456.  The

Ecuadorian Plaintiffs fail to acknowledge this fact in their challenge to Commerce's specificity

finding.  *See* Pls. Br. 10-13.  In choosing to contest the analysis in Commerce's second post-

preliminary analysis memorandum, *see id.* at 11 (quoting Second Post-Prelim. Analysis at 13,

P.R. 437), the Ecuadorian Plaintiffs ignore the actual basis for Commerce's final specificity

determination.

Consol. Court No. 25-00025

Even if a challenge to a preliminary determination not maintained in the final agency action were relevant, the CIT decisions cited by Ecuadorian Plaintiffs as having rejected analyses "identical" to Commerce's analysis in this investigation are factually distinct in significant ways. *See* Pls. Br. 11-13. In *Samsung Electronics Co. v. United States*, the CIT remanded Commerce's disproportionality analysis because the agency failed to request information on individual beneficiaries other than the mandatory respondents. 973 F. Supp. 2d 1321, 1327 (Ct. Int'l Trade 2014). Unlike that case, Commerce's *de facto* specificity finding here was based on AFA as a result of the lack of record information on the amount of benefits that Santa Priscila and SONGA received during the POI. IDM at 51-52, P.R. 456.

The Ecuadorian Plaintiffs' argument based on the *Mosaic* line of cases is equally unpersuasive.[2] *See* Pls. Br. 12. The subsidy program considered by the CIT in those decisions, Relief from Tax Fines and Penalties, was remanded after the Court found that Commerce's disproportionality analysis failed to adequately respond to the respondent's argument that it "was only the tenth largest recipient of benefits through the program, despite being the largest employer in the country and representing around five percent of Morocco's gross domestic product." *See Mosaic Co. v. United States*, 744 F. Supp. 3d 1367, 1380 (Ct. Int'l Trade 2025) (quotation omitted). No such argument is presented here. Indeed, such an argument cannot be made given the Ecuadorian Plaintiffs' failure to report the actual amount of benefits received under the AMVTR Program. Accordingly, substantial evidence supports Commerce's determination that the AMVTR Program was *de facto* specific.

---

[2] AHSTAC notes that the CIT's judgment in *The Mosaic Company v. United States*, Consol. Ct. No. 23-00246, was appealed to the Federal Circuit on February 13, 2026. *See* Not. of Appeal, *The Mosaic Co. v. United States*, Consol. Ct. No. 23-00246 (Feb. 13, 2026), ECF 121.

Consol. Court No. 25-00025

## II.    COMMERCE PROPERLY REJECTED "MINOR CORRECTIONS" PRESENTED BY ECUADORIAN PLAINTIFFS AT VERIFICATION

Ecuadorian Plaintiffs' challenge Commerce's rejection of document packages presented during verification as "minor corrections," and argue that Commerce's decision was not supported by substantial evidence. *See* Pls. Br. 14-29, 37-42.  These documents purportedly result in "slight" changes to the benefit amounts received by Ecuadorian Plaintiffs under the AMVTR and ISD Tax Exemption on Imports of Assets and Raw Materials Programs during the POI.  *Id*.  Commerce rejected Ecuadorian Plaintiffs' request on the basis that the documents were not "minor corrections," but instead constituted untimely new factual information.  *See* IDM at Comments 5, 14 and 15, P.R. 456.  Although the Court granted Ecuadorian Plaintiffs' request to include these documents on this record, this does not resolve the question of whether Commerce properly exercised its discretionary authority to reject Ecuadorian Plaintiffs' documents during verification. S*ee* Pls. Br. 14-29, 37-42. *See also* Pls. Rule 73.2(b) Mot. to Complete the Agency R., Aug. 29, 2025, ECF 46 (conf.), ECF 47 (public); Order Granting Pls. Rule 73.2(b) Mot. to Complete the Agency R., Oct. 20, 2025, ECF 60.  As further explained below, Commerce acted well within its discretion in rejecting this information as untimely.

The courts have recognized that "Commerce has discretion to accept or reject corrective information on a case-by-case basis." *Goodluck India Limited v. United States*, 11 F.4th 1335, 1342 (Fed. Cir. 2021) (citing *Deacero S.A.P.I. de C.V. v. United States*, 353 F. Supp. 3d 1303, 1307 (Ct. Int'l Trade 2018)).  *See also Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006).  The courts have also recognized that "Commerce's discretion has limits" and that the agency must provide a reasonable explanation.  *Goodluck India*, 11 F.4th at 1342.  *See also id*. at 1344 (holding that Commerce's conclusion that the respondent's error was not minor

Consol. Court No. 25-00025

was supported by substantial evidence and this Court "cannot impose {their} own contrary

finding over a determination by Commerce that is supported by substantial evidence").

Verification is not an opportunity to provide new factual information that goes beyond

minor corrections.  Minor corrections refer to corrections that rectify "minor mistakes in

addition, subtraction, or other arithmetic function, minor data entry mistakes, clerical errors

resulting from inaccurate copying, duplication, or the like, {or} minor classification errors."  *Id*.

*See* 19 C.F.R. § 351.224(f).  The Federal Circuit held that "{t}his practice, as applied at

verification, strikes an appropriate balance between finality and accuracy.  And, importantly, it is

within Commerce's discretion to decide which interest outweighs the other on a case-by-case

basis."  *Goodluck India*, 11 F.4th at 1343.  *See also Micron Tech., Inc. v. United States*, 117 F.3d

1386, 1396 (Fed. Cir. 1997) ("Congress has implicitly delegated to Commerce the latitude to

derive verification procedures ad hoc."); *Am. Alloys, Inc. v. United States*, 30 F.3d 1469, 1475

(Fed. Cir. 1994) ("{T}he statute{s} give{ } Commerce wide latitude in its verification

procedures.").  Here, Commerce properly exercised its discretion to reject Ecuadorian Plaintiffs'

document packages and sufficiently explained why they did not reflect the standard definition of

a "minor correction."

Prior to conducting verification, Commerce issued verification agendas for each

respondent and clearly stated that "<u>verification is not intended to be an opportunity for

submission of new factual information</u>" and that new factual information would only be accepted

in the limited circumstances when "(1) the need for that information was not evident previously;

(2) the information makes minor corrections to information already on the record; or (3) the

information corroborates, supports, or clarifies information already on the record."  Songa

Verification Agenda at 2 (emphasis added), P.R. 397, C.R. 260; Letter from Commerce to Trade

16

Consol. Court No. 25-00025

Pacific PLLC, re: *Verification Agenda of Santa Priscila S.A.* (July 8, 2024) ("Santa Priscila Verification Agenda"), at 2 (emphasis added), P.R. 395, C.R. 259.  Commerce further explained that it would accept "new factual information" at verification only when the information "<u>makes minor corrections to information already on the record or when information is requested by the verifiers</u>."  Songa Verification Agenda at 2 (emphasis added), P.R. 397, C.R. 260; Santa Priscila Verification Agenda at 2 (emphasis added), P.R. 395, C.R. 259.  Accordingly, Commerce explicitly set expectations for what it intended to verify and thus, the respondents were aware of these parameters and the fact that verification did not present an opportunity to submit otherwise untimely new factual information.

Despite this, Ecuadorian Plaintiffs still attempted to supplement the record with new information.  In this appeal, they doubled down and faulted Commerce for refusing to review the documents for various reasons, such as the agency having "had allotted the time needed to do so," and more egregiously, insisting that the agency should have known early in its investigation that certain subsidy programs were available to all Ecuadorian companies and should have asked the respondents for that information.  *See, e.g.*, Pls. Br. 16, 24.  However, these arguments also underscore the fact that the Ecuadorian Parties had several opportunities to correct or clarify information provided in their initial questionnaires and in supplemental questionnaires issued by the agency prior to verification and failed to do so.  *See* IDM at Comments 15 and 16, P.R. 456.

For example, SONGA was presented with opportunities to correct the information it provided for the ISD Tax Exemptions on Purchases of Imported Assets and Raw Materials program.  Commerce explained in the *Final Determination* that SONGA "consistently failed to explain its underlying calculations of the benefit they reported receiving under the program in 2021."  IDM at 73, P.R. 456.  In the initial questionnaire, SONGA merely reported that it

17

Consol. Court No. 25-00025

received benefits under the ISD Tax Exemptions on Purchases of Imported Assets and Raw

Materials Program as reported in its 2022 tax return but did not provide the underlying

calculations requested.  *Id*.  A supplemental questionnaire was issued requesting information on

how benefits under the program were calculated and reported, and again, SONGA failed to

specifically link the reported benefits received to its tax filings.  *Id*.  Commerce then explained

that had the requested calculations been provided, "such information could have alerted

Commerce to the fact that SONGA's receipt of the tax savings benefits under the program

occurred at the time that the taxes were paid or otherwise due, and thus, that the appropriate year

of receipt was 2022 and not 2021."  *Id*.  During verification, Commerce officials appropriately

rejected SONGA's attempt to later revise this information because the data "would have been

unduly burdensome to verify on the spot" and "the correction data {was} not minor in nature,

and therefore constituted untimely new factual information."  *Id*. at 71.  Songa also argued that it

provided calculations that demonstrated that the correction was minor in nature.  *See id*. at

Comment 15.  However, Commerce explained that (1) this demonstration does not solely guide

Commerce officials' decision to accept or reject a correction, and more importantly, (2) the

number of transactions it was presented for SONGA's error was voluminous and would not have

allowed Commerce to verify the accuracy of the data in a timely manner.  *Id*.

Ecuadorian Plaintiffs were similarly provided opportunities to correct the information

they provided or failed to provide in their initial questionnaire responses regarding the AMVTR

Program and failed to do so in a timely manner.  *See* Second Post-Prelim. Analysis at 6-7, P.R.

437.  Despite the parties' arguments that the documents provided during verification constitute

"minor" corrections, Commerce again determined that the corrections were not minor in nature

and in accordance with its verification procedures, would not accept untimely new factual

**Consol. Court No. 25-00025**

information.  *Id*.  *See also* SONGA Verification Agenda at 2, P.R. 397, C.R. 260; Santa Priscila

Verification Agenda at 2, P.R. 395, C.R. 259.

The courts have stated that the substantial evidence standard applies when reviewing

Commerce's verification procedures and results, including the agency's acceptance or rejection

of minor corrections.  *See Ellwood City Forge Co. v. United States*, 600 F. Supp. 3d 1281, 1299

(Ct. Int'l Trade 2022); *Micron Tech.*, 117 F.3d at 1397.  Given the arguments provided above,

Commerce's decision to reject Santa Priscila and Songa's document packages during verification

was proper and supported by substantial evidence on the record, and therefore, should be

sustained by this Court.

## III.    COMMERCE'S APPLICATION OF AFA TO CERTAIN SUBSIDY PROGRAMS IS SUPPORTED BY SUBSTANTIAL EVIDENCE AND CONSISTENT WITH COMMERCE'S PRACTICE

In the *Final Determination*, Commerce applied an AFA rate of 1.38 percent to calculate

the benefits received by Santa Priscila, Produmar, Songa, and Naturista under the AMVTR

Program, and an AFA rate of 1.38 percent to calculate the benefit received by Songa under the

ISD Tax Exemption for Imported Assets and Raw Materials Program.  IDM at Comments 5 and

16, P.R. 456.  Ecuadorian Plaintiffs challenged both the application of AFA to the programs and

the validity of the AFA rate applied, arguing that Commerce's determination was neither

supported by substantial evidence on the record nor did the agency properly exercise its

discretion to do so.  *See* Pls. Br. 29-37, 42-46.  These arguments are meritless.

Commerce's authority to apply AFA in countervailing duty proceedings is founded in

section 776 of the Tariff Act.  *See* 19 U.S.C. § 1677e.  Under section 776(a) of the Act,

Commerce "use{s} facts otherwise available" when an interested party withholds requested

information, does not provide information in timely manner, "significantly impedes a

proceeding," or provides information that cannot be verified.  19 U.S.C. § 1677e(a)(2).  This

subsection specifically applies when there are gaps in the reliable information presented on the record, considering the information is "not in fact tainted by its supplier's conduct." *Diamond Sawblades Manufacturers' Coalition v. United States*, 986 F.3d 1351, 1365 (Fed. Cir. 2021). Under section 776(b) of the Act, Commerce applies "adverse inferences" where an interested party "has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). The Federal Circuit has held that "{c}ompliance with the 'best of its ability' standard is determined by assessing whether respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation. While the standard does not require perfection and recognizes that mistakes sometimes occur, it does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). The Court further explained that "{w}hile intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element. 'Inadequate inquiries' may suffice." *Id*. at 1383.

When applying AFA, Commerce must demonstrate "objectively 'that a reasonable and responsible {respondent} would have known that the requested information was required to be kept and maintained under the applicable statutes, rules, and regulations,'" and "must demonstrate subjectively that the respondent's 'failure to fully respond is the result of the respondent's lack of cooperation in either: (a) failing to keep and maintain all required records, or (b) failing to put forth its maximum efforts to investigate and obtain the requested information from its records.'" *Bio-Lab, Inc. v. United States*, 2026 WL 464679, at *2 (Ct. Int'l Trade 2026) (internal citations omitted). As further explained below, Commerce's decision to apply AFA to Plaintiffs in the *Final Determination* was reasonable and supported by the record.

Consol. Court No. 25-00025

A.    **Commerce's Application of AFA to the AMVTR Program Was Reasonable**

As an initial matter, Ecuadorian Plaintiffs argued that Commerce's treatment of Produmar, Songa, and Naturista as uncooperative during the investigation was unreasonable. *See* Pls. Br. 32.  They cite to the "over 5,000 pages of narrative explanations and supporting documentation" about the AMVTR Program that were rejected at verification and claim that the "relative significance of the rejected minor corrections was small and demonstrative that they fully cooperated to the best of their abilities." *Id*.  However, as explained above, Commerce correctly determined that these documents did not constitute "minor corrections."  Commerce further explained that Ecuadorian Plaintiffs had multiple opportunities prior to verification to provide the agency with additional information in supplemental questionnaires and the parties failed to do so.  As such, Commerce's rejection of this information was reasonable and demonstrates Ecuadorian Plaintiffs' failure to cooperate "by not acting to the best of {their} ability to comply with a request for information." *Nippon Steel*, 337 F.3d at 1382.

Next, Ecuadorian Plaintiffs argue that Commerce did not sufficiently explain why it preliminarily treated Santa Priscila as a "cooperating company" only to later treat the company as a "non-cooperating company" in the *Final Determination* and apply AFA to Santa Priscila's use of the AMVTR Program.  Pls. Br. 29-30.  Specifically, Commerce initially applied Santa Priscila's rate of 0.04 percent to Produmar, Songa, and Naturista's benefit calculation since it was deemed to be the only "cooperating company" that provided reliable information for the AMVTR Program. *See* Second Post-Prelim. Analysis at 10-11, P.R. 437.  Commerce later stated in the *Final Determination* that it erred by failing to apply AFA to Santa Priscila and that it was "correcting {the respondents'} AFA rate to comply with past precedent and its statute."  IDM at 77, P.R. 456.  Ecuadorian Plaintiffs' claim that Commerce's change in the *Final Determination* was unprecedented based on the facts presented in the underlying investigation is disingenuous.

Consol. Court No. 25-00025

*See* Pls. Br. 30. Rather, as Commerce explicitly stated in its final determination, its practice is to "treat{} responding cross-owned companies as a single entity" and so the agency must "calculate a single CVD rate that applies to all cross-owned firms that comprised the cross-owned entity." IDM at 77, P.R. 456. Commerce further explained that "when we find that the application of AFA is warranted with regard to a respondent's use of a subsidy program, we apply a single AFA rate to all cross-owned firms that comprise the cross-owned entity." *Id.* In demonstrating that AFA is often applied to respondents due to non-cooperating affiliates, Commerce also cited to prior administrative proceedings, where it applied AFA to a respondent because of a cross-owned entity's incomplete reporting, *id.* at 78 n.378 (citing *Ripe Olives From Spain: Final Affirmative Countervailing Duty Determination*, 83 Fed. Reg. 28,186 (Dep't Commerce June 18, 2018) and accompanying Issues and Decision Memorandum at Comment 23; and *Supercalendered Paper from Canada: Final Affirmative Countervailing Duty Determination*, 80 Fed. Reg. 63,535 (Dep't Commerce Oct. 20, 2015) and accompanying Issues and Decision Memorandum at Comment 17), and to this Court's decision in *POSCO v. United States* where the CIT expressly "sustain{ed} Commerce's application of AFA to a mandatory respondent for failure by foreign producer's cross-owned supply company to report research and development grants." IDM at 78 n.378 (citing *POSCO v. United States*, 353 F. Supp. 3d 1357, 1374 (Ct. Int'l Trade 2018)).

Here, Santa Priscila and Produmar submitted a document package during verification to correct Produmar's reporting for tax exemptions it received under the AMVTR Program. *See* Second Post-Prelim. Analysis at 13-14, P.R. 437; IDM at 10, P.R. 456. These corrections, however, did not constitute minor corrections and were rejected by Commerce. *Id.* As a result, Commerce determined that application of AFA under section 776(b) of the Act was warranted

Consol. Court No. 25-00025

because Produmar "fail{ed} to provide accurate, timely information regarding the usage of the

{AMVTR} program pursuant to Commerce's Initial Questionnaire by the established deadline."

Second Post-Prelim. Analysis at 7, P.R. 437.  Produmar's AFA determination resulted in

Commerce revising its approach in the *Final Determination*, where the agency "assigned a single

AFA rate to the firms that comprise the Santa Priscila cross-owned entity."  IDM at 78, P.R. 456.

Therefore, Commerce's decision to apply partial AFA to Santa Priscila, despite its cooperation

during aspects of the investigation, was consistent with the agency's practice and supported by

record evidence.

Lastly, Ecuadorian Plaintiffs disputed Commerce's application of the 1.38 percent AFA

rate in its final determination and claimed that the rate "was not based on a remotely 'similar'

program."  Pls. Br. 35.  They claim that Commerce "violated the statutory AFA hierarchy, which

required Commerce to assign an AFA margin using the 'first step' of the 'investigation

hierarchy' prescribed in 19 U.S.C. § 1677e(d)(1)(A)."  *Id.* at 33.  These arguments are meritless.

The statute directs Commerce to assess the following steps in hierarchical order when

assigning an AFA rate in CVD investigations:

> (i) use a countervailable subsidy rate applied for the same or similar program in a
> countervailing duty proceeding involving the same country; or
>
> (ii) if there is no same or similar program, use a countervailable subsidy rate for a
> subsidy program from a proceeding that the administering authority considers
> reasonable to use.

*See* 19 U.S.C. § 1677e(d)(1)(A).  *See also* 19 C.F.R. § 351.308(j).  In applying this hierarchy,

"Commerce seeks to induce cooperation by ensuring that a non-cooperating respondent does not

receive a more favorable rate for the program under AFA than it would have received had the

company cooperated."  *SolarWorld Americas, Inc. v. United States*, 229 F. Supp. 3d 1362, 1367

(Ct. Int'l Trade 2017).  The courts have "reviewed with approval Commerce's use of hierarchical

Consol. Court No. 25-00025

methods to determine AFA subsidy rates." *Bio-Lab, Inc.*, 435 F. Supp. 3d at 1369. *See also*

*Essar Steel Ltd. v. United States*, 753 F.3d 1368, 1373-74 (Fed. Cir. 2014); *SolarWorld*

*Americas, Inc.*, 229 F. Supp. 3d at 1370.

Here, Commerce explained in the Second-Post Preliminary Analysis that its methodology

is consistent with the statute:

> Under the first step of Commerce's investigation hierarchy, we apply the highest
> non-zero rate calculated for a cooperating company for the identical program in the
> investigation. Under this step, we will even use a de minimis rate as AFA if that is
> the highest rate calculated for another cooperating respondent in the same industry
> for the same program. However, if there is no identical program match within the
> investigation, or if the rate is zero, then we will shift to the second step of our
> investigation hierarchy, and either apply the highest non-de minimis rate calculated
> for a cooperating company in another CVD proceeding involving the same country
> for the identical program, or if the identical program is not available, for a similar
> program. This step focuses on the amount of subsidy that the government has
> provided in the past under the investigated program. The assumption under this
> step is that the non-cooperating respondent under investigation uses the identical
> program at the highest above de minimis rate of any other company using the
> identical program. Finally, if no such rate exists, under the third step of
> Commerce's investigation hierarchy, we apply the highest rate calculated for a
> cooperating company from any non-company-specific program that the industry
> subject to the investigation could have used for the production or exportation of
> subject merchandise.

Second Post-Prelim. Analysis at 10 (emphasis added), P.R. 437.

In the underlying investigation, because Produmar did not report its benefits under the

AMVTR Program in a timely manner, the record did not contain enough information to properly

assess the benefits received by the entire Santa Priscila cross-owned entity to determine a rate

under this program. IDM at 78, P.R. 456. The agency then determined that it was unable to use

a rate for an identical subsidy program in the instant investigation. *Id*. Accordingly, Commerce

proceeded to the next step and found that it was able to determine an AFA rate based on "the

highest non-de minimis rate calculated for a cooperating company in another CVD proceeding

involving the same country for the identical program, or if the identical program is not available,

Consol. Court No. 25-00025

for a similar program." *Id.* The AMVTR Program was investigated for the first time in the underlying investigation, meaning an identical program was not available in any other Ecuador CVD proceeding. Commerce therefore "used the highest non-de minimis subsidy rate calculated for a tax program (i.e., a similar program based on treatment of the benefit) in an Ecuadorean CVD proceeding, which is the 1.38 percent net subsidy rate calculated for Santa Priscila under the Investment Contract Program in the instant investigation." *Id.* This remains consistent with the methodology Commerce provided in the Second Post-Preliminary Analysis and with the guidance provided in the statute.

Ecuadorian Plaintiffs also claim that Commerce should have used the 0.04 percent rate assigned to Santa Priscila in the *Preliminary Determination* for the AMVTR Program. Pls. Br. 35-37. They argue that Commerce applied AFA rates for the same program to a respondent's cross-owned entities in prior cases, particularly citing *Brass Rod from the Republic of Korea*. *See* Pls. Br. 35-36 (citing *Brass Rod from the Republic of Korea: Final Affirmative Countervailing Duty Determination*, 89 Fed. Reg. 29,420 (Dep't Commerce Apr. 22, 2024) and accompanying Issues and Decision Memorandum ("*Brass Rod from Korea* IDM")). However, the facts of *Brass Rod from Korea* are distinct from those in this investigation. In *Brass Rod from Korea*, Commerce was only unable to verify reported loan information for one cross-owned entity, but "was able to verify all other information reported by {the respondent} and its five other cross-owned companies." *Brass Rod from Korea* IDM at 8. Commerce found in that case that it was reasonable to use the respondent's highest calculated loan rate as the AFA rate in the investigation because it had sufficient information to determine the loan benefits received by the respondents and the majority of its cross-owned entities. *Id.* On the other hand, in the investigation underlying this appeal, Commerce found that it had incomplete information

Consol. Court No. 25-00025

regarding Santa Priscila and Produmar's benefits received under the AMVTR Program, such that

it could not properly use an AFA rate under step one of the hierarchy.  *See* IDM at 78, P.R. 456.

As such, Commerce's application of the 1.38 percent AFA rate calculated for Santa Priscila

under the Investment Contract Program was reasonable and consistent with its practice.  This

Court should, therefore, sustain Commerce's determination.

### B.    Commerce's Application of the 1.38 Percent AFA Rate to Songa for Benefits Received Under the ISD Tax Exemptions on Purchases of Imported Assets and Raw Materials Program Was Reasonable

In the *Final Determination*, Commerce found that Songa failed to cooperate during the

investigation by withholding requested information and failing to timely provide requested

information regarding the ISD Tax Exemptions on Purchases of Imported Assets and Raw

Materials Program.  *Id*. at 39.  Songa attempted to provide minor corrections pertaining to this

program at verification and the document package was subsequently rejected by the agency.  *See*

*Id*. at Comment 15.  As explained above, Songa was presented with many opportunities to

correct and clarify information about this program through supplemental questionnaires issued

by Commerce and failed to sufficiently respond.  *See id*. at Comments 5 and 15.  As a result,

Commerce applied AFA in accordance with section 776(a) and 776(b) of the Act.  *Id*.

Commerce assigned Songa a 1.38 percent *ad valorem* rate, which was "the rate calculated

for Santa Priscila under the Investment Contract program, because it is the highest calculated

subsidy rate for a similar or comparable (i.e., tax) program in any CVD proceeding involving

Ecuador, pursuant to Commerce's CVD AFA hierarchy."  *Id*. at 11.  *See* 19 U.S.C. §

1677e(d)(1)(A)(i).  Plaintiffs disputed Commerce's selection and argued that the AFA rate

applied was for a "non-similar program" because it is "an income tax exemption program that

Santa Priscila used.  The income tax exemption program is a domestic subsidy, while the ISD

program on imported raw materials is an import substitution subsidy since it incentivizes imports

Consol. Court No. 25-00025

that will contribute to an investment project." *Id.* Despite Ecuadorian Plaintiffs' attempt to distort the characterization of these programs, the nature of both the ISD Program and the Investment Contract Program is to provide tax savings. *See* 19 C.F.R. § 351.308(j)(3)(ii) (Commerce "will normally determine a program to be similar or comparable based on the {agency's} treatment of the program's benefit"). Because both programs provide benefits through taxes, Commerce reasonably determined the programs to be similar. As such, Commerce correctly assigned an AFA rate based on "a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country." 19 U.S.C. § 1677e(d)(1)(A)(i) (emphasis added). The Court should reject Ecuadorian Plaintiffs' arguments and sustain Commerce's determination.

**CONCLUSION**

For the foregoing reasons, AHSTAC respectfully requests that this Court sustain the determinations, findings, and conclusions challenged by Ecuadorian Plaintiffs in this appeal.

Respectfully submitted,

*/s/ Nathaniel Maandig Rickard*

Nathaniel Maandig Rickard
Zachary J. Walker
Anjelika D. Jani

**PICARD KENTZ & ROWE LLP**
*Counsel to Ad Hoc Shrimp Trade*
*Action Committee*

Dated: March 13, 2026

## CERTIFICATE OF COMPLIANCE

The undersigned counsel hereby certifies that this brief complies with the 14,000 word-count limitation established in section 2(B) of the Standard Chambers Procedures.  Specifically, this brief contains 8,220 words according to the word-count function of the word-processing software used to prepare the memorandum, excluding the table of contents, table of authorities, and counsel's signature block.

Respectfully submitted,

*/s/ Nathaniel Maandig Rickard*
Nathaniel Maandig Rickard

**PICARD KENTZ & ROWE LLP**
 *Counsel to Ad Hoc Shrimp Trade
 Action Committee*

Dated: March 13, 2026

IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
BEFORE: THE HONORABLE RICHARD K. EATON, JUDGE

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS C.A.,<br><br>      Plaintiffs,<br><br>  and<br><br>AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>      Consolidated Plaintiff,<br><br>  and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE,<br><br>      Consolidated Pl.-Intervenor,<br><br>     v.<br><br>UNITED STATES,<br><br>      Defendant,<br><br>  and<br><br>AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,<br><br>      Defendant-Intervenors,<br><br>  and<br><br>INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS C.A.,<br><br>      Consolidated Def.-Intervenors. | Consol. Court No. 25-00025 |

## PROPOSED ORDER

Upon consideration of the Rule 56.2 motions for judgment on the agency record filed in this matter by Ecuadorian Plaintiffs challenging the final determination of the U.S. Department of Commerce set out in *Frozen Warmwater Shrimp From Ecuador: Final Affirmative*

*Countervailing Duty Determination*, 89 Fed. Reg. 85,506 (Dep't Commerce Oct. 28, 2024) and the accompanying Issues and Decision Memorandum, and all other papers and proceedings had herein, it is hereby

      **ORDERED** that the Ecuadorian Plaintiffs' motion for judgment on the agency record is **DENIED**.

      **SO ORDERED**.


Dated: _____          _____
     New York, New York          The Honorable Richard K. Eaton, Judge