**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE RICHARD K. EATON, JUDGE**

|  |  |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | ) ) ) |
| Plaintiffs, | ) ) |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, | ) ) |
| Consolidated Plaintiff, | ) ) ) |
| and | ) ) |
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | ) ) **Consol. Ct. No. 25-00025** |
| Consolidated Plaintiff-Intervenor, | ) ) |
|  | ) **NON-CONFIDENTIAL** ) **VERSION** |
| v. | ) ) **Business Proprietary** |
| UNITED STATES, | ) **Information has been redacted** ) **on pp. 4, 24, 30,** ) **and 36** |
| Defendant, | ) ) |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, | ) ) ) |
| Defendant-Intervenors, | ) ) |
| and | ) ) |
| INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | ) ) ) |
| Consolidated Defendant-Intervenors. | ) ) |

**PLAINTIFFS' RESPONSE TO THE RULE 56.2 MOTIONS OF THE**
**AMERICAN SHRIMP PROCESSORS ASSOCIATION AND THE**
**AD HOC SHRIMP TRADE ACTION COMMITTEE**

Respectfully submitted:

/s/ Warren E. Connelly
Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel for Plaintiffs and Consolidated Defendant-
Intervenors Industrial Pesquera Santa Priscila, S.A.
and Sociedad Nacional de Galápagos, C.A.

Date: March 13, 2026

*Non-Confidential Version – Confidential Information Has Been Redacted*

## TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................................iv

I.   SUMMARY OF THE ARGUMENT.......................................................................1

II.  COMMERCE DID NOT ABUSE ITS DISCRETION WHEN IT SELECTED THE
     COMPANIES THAT IT REQUIRED TO SUBMIT QUESTIONNAIRE RESPONSES.......3

     A.  FACTUAL BACKGROUND ...............................................................................3

         1.  Selection of the Mandatory Respondents .........................................................3

         2.  The Standard Questionnaire and the Respondents' Responses ......................3

         3.  The Sources Questionnaire and the Respondents' Responses........................4

         4.  The Respondents' Request for Clarification of Their Reporting Obligations ................5

         5.  ASPA's Objections to the Respondents' Request for Clarification of Their Reporting
             Obligations.................................................................................................6

     B.  ARGUMENT....................................................................................................7

         1.  The Statute Expressly Authorized Commerce to Exercise Its Discretion by Limiting the
             Number of Required Questionnaire Responses................................................8

         2.  ASPA's Request for a Remand Was Untimely.................................................9

         3.  The Preamble to Commerce's Amended Attribution Regulations Stated that Commerce
             Always Had the Discretion to Limit the Number of Responses Required from Cross-
             Owned Companies.....................................................................................10

         4.  ASPA Has Not Identified Any Statute or Regulation that Prohibits Commerce from
             Modifying Questionnaire Requirements ......................................................11

         5.  ASPA Erroneously Claims that Commerce Does Not Have the Discretionary Authority
             to Limit Its Examination of Cross-Owned Input Suppliers...........................12

         6.  ASPA Erroneously Claims that "Past Practice" Supports the Requirement that
             Commerce Issue Questionnaires to All Cross-Owned Input Suppliers.........13

*Non-Confidential Version – Confidential Information Has Been Redacted*

7.  The Law Did Not Require Commerce to Impute Subsidy Margins to the Cross-Owned Shrimp Farms for Which Commerce Did Not Require Questionnaire Responses........15

III.  COMMERCE LAWFULLY DETERMINED THAT THE GOVERNMENT OF ECUADOR DID NOT PROVIDE A COUNTERVAILABLE SUBSIDY IN THE FORM OF THE BRACKISH WATER THAT SHRIMP FARMERS USED, BUT DID NOT CONSUME, IN THE PONDS IN WHICH THEY RAISED RAW SHRIMP .................................................17

A.  FACTUAL BACKGROUND ..............................................................................17

1.  The Nature of Shrimp Farming .......................................................................17

2.  Commerce Thoroughly Investigated ASPA's Brackish Water Allegations...................19

3.  Commerce's Post-Preliminary Analysis of the Brackish Water Issue ...........................25

4.  Commerce's Verification of the GOE' Questionnaire Responses .................................26

5.  Commerce's Final Determination.....................................................................26

B.  ARGUMENT.....................................................................................................28

1.  The Respondents' Non-Consumptive Use of Brackish Water Did Not Satisfy the Statutory Requirements for Finding a Countervailable Benefit ....................................28

2.  The Record Does Not Support ASPA's Claim that the Respondents Were Able to Measure, and Did Measure, the Volume of Water That Flowed Into and Out of Their Shrimp Ponds or that the GOE Maintained Records of Water Usage for Every Shrimp Farm...............................................................................................................29

3.  At Most, Respondents Used Brackish Water on a Temporary Basis, But ASPA Never Alleged that Temporary Use Provided a Countervailable Benefit ...............................31

4.  No Record Evidence Supports ASPA's Claim that Brackish Water Has a Commercial Value When It Is Used for a Non-Consumptive Purpose in Shrimp Aquaculture Activities.............................................................................................................32

5.  No Record Evidence Supports ASPA's Claim that Commerce Should Have Used Adverse Facts Available to Determine the Countervailable Benefit Attributable to the GOE's Provision of Access to Brackish Water.............................................................33

IV.  COMMERCE LAWFULLY DETERMINED THAT THE GOE DID NOT PROVIDE DIESEL FUEL TO RESPONDENTS FOR LTAR.................................................37

A.  FACTUAL BACKGROUND ..............................................................................37

*Non-Confidential Version – Confidential Information Has Been Redacted*

1. Undisputed Facts ........................................................................................................37

2. The Commerce Investigation.........................................................................................38

3. Commerce's Post-Preliminary Analysis and Final IDM ...............................................40

B. ARGUMENT...................................................................................................................41

1. ASPA Never Alleged that the GOE "Indirectly" Provided Diesel Fuel Subsidies to the Respondents..................................................................................................................41

2. ASPA Failed to Timely Allege that Unaffiliated Distributors "Indirectly" Conferred GOE Fuel Subsidies on the Respondents .......................................................................41

3. ASPA's Case Citations Contradict Its Contention that Commerce Was Required to Investigate Whether the GOE Indirectly Provided Diesel Fuel Subsidies ...................42

4. The *Loper Bright* Decision Does Not Compel a Finding that the GOE Indirectly Conveyed a Subsidy to the Respondents .......................................................................45

V. CONCLUSION ......................................................................................................................46

**Non-Confidential Version – Confidential Information Has Been Redacted**

## TABLE OF AUTHORITIES

<u>Cases</u>                                                                                                                          <u>Page</u>

*A.G. Dillinger Huttenwerke v. United States*, 140 F.4th 1364
(Fed. Cir. 2025)..........................................................................................................................9

*Beijing Tianhai Indus. Co., Ltd. v. United States*,
52 F. Supp. 3d 1351 (2015) ................................................................................................41, 42

*Delverde, SrL v. United States*, 202 F.3d 1360 (Fed. Cir. 2000)………………….……….42, 43

*Guangdong Wireking Housewares & Hardware Co. v. United States*,
900 F. Supp. 2d 1362 (2013), aff'd, 745 F.3d 1194 (Fed. Cir. 2014) .....................................42, 43

*Kumho Tire (Vietnam) Co., Ltd. v. United States*,
741 F. Supp. 3d 1277 (Ct. Int'l Trade 2024).................................................................................14

*Loper Bright Enters. v. Raimondo*, 603 U.S. 369 (2024) ..............................................................45

*RZBC Grp. Shareholding Co. v. United States*, 100 F. Supp. 3d 1288
(Ct. Int'l Trade 2015)...............................................................................................................43, 44

*World Finer Foods v. United States*, 24 CIT 541 (2000).................................................................9

<u>Statutes</u>

19 U.S.C. § 1671(a) ..........................................................................................................................11

19 U.S.C. § 1677(5)(B)(i)..................................................................................................................28

19 U.S.C. § 1677(5)(D)(iii) ...............................................................................................................28

19 U.S.C. § 1677(5)(E)(iv)................................................................................................................28

19 U.S.C. § 1677e(a)(1).....................................................................................................................15

19 U.S.C. § 1677f-1(e) ................................................................................................................11, 13

19 U.S.C. § 1677m(c)(1) ...........................................................................................................*passim*

19 U.S.C. § 1677-2 ............................................................................................................................12

*Non-Confidential Version – Confidential Information Has Been Redacted*

**Regulations**                                                                                         **Page**

19 C.F.R. § 351.525(b)(1)..................................................................................................10

19 C.F.R. § 351.525(b)(6)...................................................................................... 11, 16, 17

**Administrative Determinations**

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 80 Fed. Reg.
79,564 (Dec. 22, 2015) ......................................................................................................14

*Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands*,
72 Fed. Reg. 35,220  (June 27, 2007)................................................................................35

*Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814
(Nov. 8, 2017).....................................................................................................................29

*4th Tier Cigarettes from the Republic of Korea:*
*Preliminary Affirmative Determination of Sales at Less Than Fair Value*,
85 Fed. Reg. 44,281 (July 22, 2020) .................................................................................14

*Phosphate Fertilizers from the Russian Federation*, 88 Fed. Reg. 76,182
(Nov. 6, 2023).....................................................................................................................29

*Ripe Olives from Spain*, 82 Fed. Reg. 56,218 (Nov. 28, 2017) .........................16, 17, 35

**Federal Register Notices**

79 Fed. Reg. 108 (Jan. 2, 2014)........................................................................................44

89 Fed. Reg. 101,694 (Dec. 16, 2024).......................................................................*passim*

**Congressional Materials**

H.R. Doc. No. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040 ........................................8

*Non-Confidential Version – Confidential Information Has Been Redacted*

## I.    SUMMARY OF THE ARGUMENT

The American Shrimp Processors Association ("ASPA"), and the Ad Hoc Shrimp Trade Action Committee ("AHSTAC"), challenge three aspects of the Commerce Department's final affirmative countervailing duty determination in its investigation of *Frozen Warmwater Shrimp from Ecuador*, 89 Fed. Reg. 85,506 (Oct. 28, 2024).[1] Commerce provided the rationale for this determination in its accompanying Issues and Decision Memorandum ("Final IDM"). *See* P.R. 456.[2] None of these challenges has merit.

First, ASPA has failed to demonstrate that Commerce abused its discretion or did not support its determination with substantial evidence when it decided to issue questionnaires to the two mandatory Respondents, Industrial Pesquera, S.A. ("Santa Priscila") and Sociedad Nacional de Galapagos, C.A. ("Songa"), as well as to each company's largest cross-owned "raw shrimp" supplier and to three other cross-owned companies. Throughout the investigation, ASPA insisted that Commerce obtain complete questionnaire responses from all 62 of the Respondents' cross-owned companies, as well as 10 more questionnaire responses from *unaffiliated* companies that provided raw shrimp to the Respondents.

However, ASPA alleged for the first time in its Case Brief (at 2) that Commerce should not have "excused respondents from reporting for any of its cross-owned shrimp suppliers except for one supplier for each respondent." P.R. 427. Santa Priscila and Songa had a total of nine such suppliers. But, throughout the investigation, ASPA sought 72 questionnaire responses in addition

---

[1] AHSTAC did not submit separate arguments in support of its Rule 56.2 motion. Instead, its Memorandum in Support of Its Rule 56.2 Motion for Judgment on the Agency Record states (at 2) that it "incorporate{s} by reference the arguments presented by ASPA." ECF No. 45.

[2] ECF No. 27-1 contains the public record ("P.R."). ECF No. 27-2 contains the confidential record ("C.R."). Plaintiffs cite the public version of a confidential document whenever possible.

*Non-Confidential Version – Confidential Information Has Been Redacted*

to those submitted by Santa Priscila and Songa, not just responses from their nine cross-owned shrimp suppliers. Thus, ASPA untimely asserted in its Case Brief that Commerce violated the law by not seeking nine responses from cross-owned raw shrimp suppliers.[3]

Second, Commerce did not violate the law in deciding that the Government of Ecuador ("GOE") did not provide a countervailable subsidy when it authorized raw shrimp farmers to access brackish water from tidal estuaries for non-consumptive use in their shrimp ponds. All shrimp farmers must install pipelines and pumps at their own expense to deliver brackish water to their ponds. They return all of that water to its source when they drain a pond during the process of harvesting raw shrimp. Thus, there is no net countervailable benefit.

Third, Commerce did not violate the law in finding that ASPA failed to allege that the GOE had "indirectly" provided diesel fuel subsidies to Santa Priscila and Songa through the independent distributors that purchased that fuel directly from the GOE. Due to this failure, Commerce determined that it had no evidentiary basis upon which to initiate an investigation into whether the GOE had provided an *indirect* subsidy to the Respondents through the distributors to which the GOE sold fuel. ASPA's Brief fails to demonstrate that it ever requested an investigation of fuel subsidies that the GOE *indirectly* provided to shrimp farmers.

---

[3] Similarly, in its Memorandum in support of its Rule 56.2 Motion (at 25), ASPA untimely alleges that Commerce erred "by not fully investigating all of the mandatory respondents' cross-owned fresh shrimp suppliers." ECF No. 41.

*Non-Confidential Version – Confidential Information Has Been Redacted*

## II. COMMERCE DID NOT ABUSE ITS DISCRETION WHEN IT SELECTED THE COMPANIES THAT IT REQUIRED TO SUBMIT QUESTIONNAIRE RESPONSES

### A. FACTUAL BACKGROUND

#### 1. Selection of the Mandatory Respondents

Soon after Commerce initiated its countervailing duty investigation, it determined that it needed to "limit its examination due to the large number of potential respondents relative to its resource constraints." *See* December 7, 2023 "Respondent Selection Memorandum" at 3. P.R. 95. Accordingly, Commerce selected Santa Priscila and Songa as the two mandatory Respondents because they were the "two exporters and producers with the largest volume of entries of subject merchandise" during the POI. *Id.* at 7. Commerce explained its limitation of the scope of the investigation as follows:

> Examining all known exporters or producers would require significant resources for Commerce to analyze each company's corporate structure, financial records, and participation in the alleged subsidy programs on which Commerce has initiated an investigation. In addition, Commerce must examine the same categories of information for companies determined during the course of this investigation to be "cross-owned" with the respondents investigated. Such cross-owned companies can include the respondents' input suppliers and parent companies, for example. Moreover, Commerce must solicit and analyze information from the Government of Ecuador during the course of the CVD investigation, further limiting Commerce's available resources to select additional company respondents.

*Id.* at 3. As an additional reason for limiting its investigation, Commerce identified 36 other investigations and administrative reviews to which Operations Office IV had already been assigned. *Id.* at 3-4.

#### 2. The Standard Questionnaire and the Respondents' Responses

Section III of Commerce's standard CVD questionnaire required Santa Priscila and Songa to provide an enormous amount of information on what ultimately turned out to be 34 separate GOE programs. One Commerce request was that each company identify all its

***Non-Confidential Version – Confidential Information Has Been Redacted***

"affiliated" companies and then state whether each affiliate was "cross-owned." *See* December 12, 2023 "Initial Questionnaire" at 37. P.R. 98.

In response, Santa Priscila identified 41 cross-owned companies that supplied inputs dedicated to shrimp production. *See* January 5, 2024 "Section III Affiliated Companies Questionnaire Response" at Exhibit AFF-1. C.R. 54. Similarly, Songa identified 21 cross-owned companies that supplied inputs dedicated to shrimp production. *See* January 5, 2024 "Section III Affiliated Companies Questionnaire Response" at Exhibit AFF-1. C.R. 53. These 62 cross-owned input suppliers consisted of hatcheries, shrimp farms, shrimp laboratories, shrimp feed mills, construction and logistics firms, and service providers essential to shrimp production. Therefore, the questionnaire directed the Respondents to prepare a complete response to the standard questionnaire for each of their 62 cross-owned companies for each of 34 separately alleged subsidy programs. *See* Final IDM at 11-18 for a list of these programs. P.R. 456.

### 3. The Sources Questionnaire and the Respondents' Responses

On December 14, 2023, Commerce issued a second questionnaire captioned "Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp," which required each Respondent to identify each affiliated and unaffiliated supplier of raw shrimp, as well as provide the volume of raw shrimp that it produced internally. P.R. 102 (Santa Priscila); P.R. 104 (Songa).

Santa Priscila identified [    ] affiliated shrimp farming companies that met the cross-ownership standard.  *See* January 3, 2024 "Sources of Raw Shrimp Questionnaire Response" at Exhibit SRS-1. C.R. 51. [    ] of these farms supplied raw shrimp to Santa Priscila.

Songa identified [    ] affiliated farms that met the cross-ownership standard. *See* January 3, 2024 "Sources of Raw Shrimp Questionnaire Response" at Exhibit SRS-2. C.R. 49. [    ] of these farms supplied raw shrimp to Songa.

*Non-Confidential Version – Confidential Information Has Been Redacted*

### 4. The Respondents' Request for Clarification of Their Reporting Obligations

Both Santa Priscila and Songa concluded that it would be virtually impossible to prepare complete questionnaire responses for the unprecedented total of 62 cross-owned companies that supplied essential inputs for shrimp production. Therefore, the Respondents requested that Commerce:

- Not require them to submit complete questionnaire responses on behalf of all 62 cross-owned suppliers of inputs to shrimp farms.

- Or, if Commerce required complete responses, then it should extend the filing deadline by an additional four weeks.

- Alternatively, Commerce should permit each Respondent to provide a complete response for its largest cross-owned shrimp farming company. In Santa Priscila's case, that was Produmar, S.A., and in Songa's case it was Naturisa, S.A.

- The Respondents further proposed that if Commerce, after reviewing the responses of Produmar and Naturisa, concluded that it required information from additional cross-owned shrimp farms, then it should request that information.

In support of their clarification request, the Respondents stated that:

> To the best of our knowledge, the sheer number of cross-owned suppliers identified as cross-owned by Santa Priscila and SONGA is an extremely rare, or even unique circumstance. For this reason, it is not feasible for Santa Priscila or SONGA to respond on behalf of all suppliers of inputs to shrimp farms and all suppliers {of} raw shrimp with which they are potentially cross-owned within the limited timeframe allotted to respond to Section III of the Department's questionnaire.

*See* January 9, 2024 "Request for Clarification of Section III Reporting Obligations and to Exclude Certain Companies from Reporting" at 2. C.R. 55.

*Non-Confidential Version – Confidential Information Has Been Redacted*

The Respondents' clarification request was authorized by, and complied with, 19 U.S.C. § 1677m(c)(1), captioned "Difficulties in meeting requirements":

> If an interested party, promptly after receiving a request from the administering authority or the Commission for information, notifies the administering authority or the Commission (as the case may be) that such party is unable to submit the information requested in the requested form and manner, together with a full explanation and suggested alternative forms in which such party is able to submit the information, the administering authority or the Commission (as the case may be) shall consider the ability of the interested party to submit the information in the requested form and manner and may modify such requirements to the extent necessary to avoid imposing an unreasonable burden on that party.

### 5. ASPA's Objections to the Respondents' Request for Clarification of Their Reporting Obligations

ASPA opposed the Respondents' clarification request and instead urged that Commerce:

> deny Respondents' request, require Respondents to provide full responses for all {62} of their cross-owned input suppliers, and deny any extensions of time for the reporting of this information.

*See* January 11, 2024 "Opposition to Respondents' Request to Exclude Companies from Reporting Obligations" at 1. P.R. 131.

One day later, ASPA requested that Commerce additionally direct each Respondent to submit a questionnaire response for each of its five largest *unaffiliated* suppliers of raw shrimp. *See* "Comments on Respondents' Supplier and Affiliation Questionnaire Responses" at 2-3. C.R. 58.

The Respondents opposed ASPA's additional request on the ground that it was engaged in a "gross overreach that is unsupported by any precedent." *See* January 16, 2024 "Objection to Petitioner's Request for Questionnaire Responses from Unaffiliated Shrimp Farms" at 1. P.R. 137. Respondents also observed that they had no means of compelling questionnaire responses from unaffiliated farms and, even assuming that they could do so, an additional time extension would be required. *Id.* at 3.

*Non-Confidential Version – Confidential Information Has Been Redacted*

After considering the parties' opposing views, Commerce limited Santa Priscila's reporting obligations to Produmar and three additional cross-owned affiliates, Manesil S.A., Egidiosa S.A., and Tropack Packing Ecuador S.A. *See* January 25, 2024 "Supplier Questionnaire" at 1. P.R.161. Commerce also limited Songa's reporting obligations to Naturisa and two additional cross-owned affiliates, Holding Sola & Sola Solacciones S.A. and Empacadora Champmar. *See* Supplier Questionnaire at 1. P.R. 160.

Unhappy with Commerce's decision, ASPA on January 29, 2024 filed an "Opposition to Exclusion of Respondents' Cross-Owned Input Suppliers," in which it reasserted that "Commerce's regulations, agency practice, and Commerce's questionnaire all require Respondents to report on behalf of all {62} of their cross-owned input suppliers." P.R. 167 at 1-2.

As noted above, Commerce investigated 34 alleged GOE subsidy programs. Had Commerce acceded to ASPA's request, 62 cross-owned companies, plus an additional 10 unaffiliated shrimp farms, would have been required to provide extensive information concerning their use of each program. Then, Commerce would have been required to analyze and subsequently verify the accuracy and completeness of 72 separate responses and supplemental responses in addition to the responses of Santa Priscila and Songa.[4]

## B. ARGUMENT

Commerce faced a choice between the Respondents' measured proposal and the incredibly burdensome proposal *upon which ASPA refused to compromise*. Commerce fully explained its reasonable basis for rejecting ASPA's request for 72 additional questionnaire

---

[4] Respondents submitted a total of 27 initial and supplemental questionnaire responses for their nine cross-owned companies, totaling over 5,200 pages.

*Non-Confidential Version – Confidential Information Has Been Redacted*

responses and for adopting a middle course in which it required questionnaire responses from a total of seven cross-owned companies, plus responses from Santa Priscila and Songa. *See* Final IDM at 33-36. Respondents do not repeat here Commerce's analysis but nevertheless rely upon it as demonstrating the factual basis for its reasonable exercise of discretion to limit reporting obligations, as authorized by statute. We now refute each of ASPA's contentions.

### 1. The Statute Expressly Authorized Commerce to Exercise Its Discretion by Limiting the Number of Required Questionnaire Responses

The statute expressly authorized Commerce to modify the Respondents' reporting requirements. The Statement of Administrative Action on Section 782 of the Uruguay Round Agreements Act, later codified as 19 U.S.C. § 1677m(c)(1), states that:

> Under new section 782(c)(1), Commerce or the Commission may modify their respective requests for information if promptly asked to do so by an interested party, to avoid imposing an unreasonable burden on the party. Commerce or the Commission will take due account of difficulties experienced by parties, particularly small companies, in supplying information, and will provide such assistance as the agencies consider practicable

H.R. Doc. No. 103-316, reprinted in 1994 U.S.C.C.A.N. 4040, 4195.

The Respondents, as required, provided a "full explanation" of their reporting difficulties and the burdens that would be entailed. The Respondents then provided three "suggested alternative forms" of satisfying their reporting obligations, namely that: (1) Commerce should extend the filing deadline for all 72 additionally requested responses for four weeks; (2) alternatively, Commerce should permit Santa Priscila and Songa to each provide a complete response for their largest cross-owned shrimp farm; and (3) if Commerce, after reviewing the responses of Produmar and Naturisa, concluded that it required more information, then it should request that information.

*Non-Confidential Version – Confidential Information Has Been Redacted*

ASPA has not contended that the Respondents' clarification request was deficient under Section 1677m(c)(1). Nor has it contended that this provision does not authorize Commerce to modify information reporting requirements when the statutory prerequisites are met, as they were here.[5] Commerce's explanation of the basis for its decision shows that it reasonably exercised its statutory discretion. *See* Final IDM at 33-36.

### 2. ASPA's Request for a Remand Was Untimely

ASPA has untimely contended that Commerce erred in failing to obtain questionnaire responses from nine more cross-owned shrimp farms in addition to Produmar and Naturisa, from which the two Respondents purchased raw shrimp. ASPA Br. at 16-26. However, *ASPA's September 16, 2024 Case Brief was the first time that it substituted a demand for nine more responses, as opposed to its original demand that Commerce obtain 72 questionnaire responses.* ASPA did not present Commerce with this option in January 2024 when it insisted on 72 additional questionnaire responses, and, by September 2024, the investigation was far too advanced for Commerce to consider it, especially since all verifications had been completed long before then.

Accordingly, this Court should find untimely ASPA's assertion that "this matter should be remanded for further proceedings to include the unexamined cross-owned fresh shrimp suppliers in the subsidy analysis." ASPA Br. at 17.

---

[5] This Court has on numerous occasions upheld Commerce's discretion to modify reporting requirements that have been properly requested. *See, e.g., World Finer Foods v. United States*, 24 CIT 541, 543-46 (2000); s*ee also AG Dillinger Huttenwerke v. United States*, 140 F. 4th 1364, 1371-73 (Fed. Cir. 2025).

*Non-Confidential Version – Confidential Information Has Been Redacted*

3. **The Preamble to Commerce's Amended Attribution Regulations Stated that Commerce Always Had the Discretion to Limit the Number of Responses Required from Cross-Owned Companies**

19 C.F.R. § 351.525(b)(1) now provides as follows:

> (b) Attribution of subsidies –

> (1) In general. In attributing a subsidy to one or more products, the Secretary will apply the rules in paragraphs (b)(2) through (9) of this section. *The Secretary may determine to limit the number of cross-owned companies examined under this section based on record information and resource availability.*

The emphasized sentence became effective on January 15, 2025, *i.e.,* after the Ecuadorian shrimp investigation concluded. *See* 89 Fed. Reg. 101,694 (Dec. 16, 2024). However, in the preamble to its publication of the final rule, Commerce stated that:

> Indeed, it is common for Commerce to limit the number of transactions or affiliated parties reviewed in a case when the facts on the record warrant such limitation. This should not be surprising to anyone who practices before Commerce—it is the normal authority given to a Federal agency in charge of administering an administrative proceeding.

> \*\*\*

> When Commerce examines cross-owned entities, such as cross-owned input suppliers, it must essentially conduct an additional, complete, investigation of the cross-owned entity or entities, including issuing questionnaires and supplemental questionnaires to examine the subsidies received by the cross-owned entities for purposes of attributing the subsidies received by the cross-owned entities to the respondent company. When Commerce has fully developed the record in this regard, it must then analyze the information and consider which of the attribution methodologies is appropriate for effectuating the purpose of identifying the subsidies to the production and exportation of the subject merchandise. Moreover, the inclusion of cross-owned entities in Commerce's analysis expands Commerce's verification obligations, increasing the resources that Commerce must devote to fulfilling its statutory obligations regarding verification obligations.

89 Fed. Reg. at 101,747. Thus, the new provision made explicit what had long been embodied in 19 U.S.C. § 1677m(c)(1), i.e., that Commerce always had the authority to modify reporting obligations.

### 4. ASPA Has Not Identified Any Statute or Regulation that Prohibits Commerce from Modifying Questionnaire Requirements

ASPA first relies on 19 U.S.C. §§ 1677f-1(e) and 1671(a) for the proposition that Commerce must "calculate subsidy rates as accurately as possible." ASPA Br. at 17-18. However, neither provision prescribes a particular calculation methodology. Moreover, these provisions provide Commerce with broad discretion in calculating subsidy margins precisely because the law requires Commerce to consider what is "possible." The possibility standard encompasses resource limitations such as those that Commerce has described. *See* Final IDM at 34-36. Specifically, Commerce determined that it was not "possible" to issue 62 questionnaires to all cross-owned companies, as well as 10 more questionnaires to unaffiliated shrimp farming companies.

ASPA next relies on 19 C.F.R. § 351.525(b)(6)(iv), which addresses whether and how Commerce should attribute subsidies received by an "input producer" to the sales of "downstream products." This provision addresses selection of the appropriate denominator for calculating the *ad valorem* margin attributable to input subsidies that are conveyed to downstream products.

Thus, Section 351.525(b)(6)(iv) is an attribution rule. It does not address whether Commerce has the statutory discretion to modify reporting requirements. In other words, Commerce can only decide whether to apply the attribution rule after it first exercises its discretion to investigate whether a particular input producer received subsidies from which the

downstream producer benefited. Thus, ASPA erroneously conflates input producer selection with input subsidy attribution. ASPA Br. at 19-20.

ASPA also claims that "Nothing in the *CVD Preamble* indicates that Commerce may choose not to investigate a cross-owned company supplying such inputs and {thereby} render this attribution rule a nullity." ASPA Br. at 21. However, the December 16, 2024 preamble to Commerce's "Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws" says just the opposite. There, Commerce rejected a commenter's statement that "such a limitation {of the number of investigated cross-owned companies} would be tantamount to allowing certain subsidies to go unremedied." 89 Fed. Reg. at 101,747. Commerce also rejected a commenter's request that it adopt a "rebuttable presumption . . . that unexamined cross-owned entities receive subsidies at a rate attributable of subject merchandise that is an average of the rates calculated with respect to examined cross-owned entities." *Id.* at 101,748.

ASPA's additionally relies on 19 U.S.C. § 1677-2, which addresses the attribution of subsidies on "raw agricultural products" to the manufacture, production, or exportation of the processed product." ASPA Br. at 21-22. Here again, this is an attribution rule that, as Commerce made clear, it applies to investigated companies, not cross-owned companies for which Commerce does not have the resources or time to investigate or verify.

### 5. ASPA Erroneously Claims that Commerce Does Not Have the Discretionary Authority to Limit Its Examination of Cross-Owned Input Suppliers

ASPA claims that no statute provides "discretionary authority {to Commerce} to limit its examination of cross-owned input suppliers based on an evaluation of the agency's resources." ASPA Br. at 22. This claim should be dismissed because 19 U.S.C § 1677m(c)(1) provides express authority for the agency to exercise its discretion to modify reporting requirements.

*Non-Confidential Version – Confidential Information Has Been Redacted*

ASPA also asserts that, although Commerce has discretion to limit the number of mandatory respondents, that fact does not authorize its exercise of discretion to limit the number of cross-owned companies that must submit questionnaire responses. ASPA Br. at 22-23. However, here again, Section 1677m(c)(1) provides express authority for that limitation. Moreover, Commerce expressly rejected this narrow reading of the statute:

> Commerce disagrees with certain commenters that because the Act expressly allows Commerce to select respondents when the number of potential respondents is too large to examine, the Act does not also permit Commerce to limit examination of certain transactions or entities when resource constraints and the record supported such a limitation. *Indeed, it is common for Commerce to limit the number of transactions or affiliated parties reviewed in a case when the facts on the record warrant such limitation.*

89 Fed. Reg. at 101,747. (Citations omitted. Emphasis added.)

Moreover, although ASPA acknowledges that Commerce can limit the number of mandatory respondents after considering its available resources, current workload, and deadline constraints, it illogically contends that Commerce lacks the statutory authority to decide not to issue 72 additional questionnaires. The two situations are functionally identical because in each situation Commerce is balancing its resources and workload with the goal of arriving at a reasonable estimation of the subsidy margin.[6]

### 6. ASPA Erroneously Claims that "Past Practice" Supports the Requirement that Commerce Issue Questionnaires to All Cross-Owned Input Suppliers

ASPA claims that Commerce's standard questionnaire, which expressly requires every cross-owned input supplier to submit a questionnaire response, has constituted the agency's past

---

[6] ASPA claims that "Nothing in the text of 19 U.S.C. § 1677f-1(e)(2) indicates that there is any circumstance in which Commerce may conduct a partial examination of a mandatory respondent." ASPA Br. at 22. However, ASPA, by limiting its court appeal to nine additional cross-owned raw shrimp suppliers, necessarily concedes that Commerce does have the statutory discretion to limit its investigation to something less than all cross-owned input suppliers.

*Non-Confidential Version – Confidential Information Has Been Redacted*

practice "for decades." ASPA Br. at 23. This cannot constitute a "practice" because 19 U.S.C. §

1677m(c)(1) provides Commerce with broad discretion to modify unduly burdensome reporting

requirements. For this reason, ASPA is compelled to acknowledge that Commerce did modify its

so-called "practice" in *Certain Cold-Rolled Steel Flat Products from the Russian Federation*,

where it excused a respondent from providing questionnaire responses for every supplier of scrap

steel.[7] ASPA Br. at 24-25. *See also 4th Tier Cigarettes from the Republic of Korea: Preliminary*

*Affirmative Determination of Sales at Less Than Fair Value,* 85 Fed. Reg. 44,281 (July 22, 2020)

and accompanying Issues and Decision Memorandum at 1 (Commerce limited home market

sales reporting requirements to two sales channels).

ASPA also claims that Commerce, in its 2013 investigation of frozen warmwater shrimp

from Ecuador, required questionnaire responses from a total of "at least seven cross-owned

shrimp farms, four laboratories or hatcheries, and a pair of additional entities." ASPA Br. at 24.

This fact allegedly supports its current assertion that all cross-owned shrimp farms should have

been required to submit questionnaire responses in this investigation. ASPA Br. at 24. Of course,

every case is different and, therefore, prior decisions and fact patterns are not necessarily

relevant.[8] Moreover, there is a stark contrast between the 13 cross-owned companies for which

---

[7] ASPA claims that the Russian steel case did not establish a "practice." ASPA Br. at 24.
However, Respondents do not assert, and they do not need to establish, that Commerce has a
"practice" of reducing the number of cross-owned input suppliers required to submit
questionnaire responses. Rather, 19 U.S.C. § 1677m(c)(1) establishes the agency's discretion to
depart from its standard questionnaire instructions in specified circumstances.

[8] *See, e.g., Kumho Tire (Vietnam) Co., Ltd. v. United States*, 741 F. Supp. 3d 1277 (Ct. Int'l Trade
2024) ("the above five unrelated and factually distinct decisions over 40 years do not comprise a
practice by Commerce . . . . As this Court recently stated: "'isolated investigations {do} not
proved the existence of past practice{}' but rather only that 'Commerce thought differently on
different facts and {at} different times.'" (Citation omitted.)

*Non-Confidential Version – Confidential Information Has Been Redacted*

responses were provided in 2013 and the 72 responses that ASPA consistently sought in this investigation until its very end.

### 7. The Law Did Not Require Commerce to Impute Subsidy Margins to the Cross-Owned Shrimp Farms for Which Commerce Did Not Require Questionnaire Responses

ASPA next asserts that Commerce should have used "facts otherwise available" to determine the countervailable benefits received by the nine unexamined cross-owned shrimp farms. ASPA Br. at 26-30. Putting aside the untimeliness of this claim, no record evidence supports the conclusion that any of these farms received countervailable benefits.

Equally important, no statute or regulation required Commerce to impute or extrapolate countervailable benefits to unexamined cross-owned shrimp farms. In fact, as demonstrated above, Commerce expressly rejected this alleged requirement. *See* 89 Fed. Reg. at 101,747. In addition, ASPA's claim that Commerce was required to impute additional benefit amounts derives entirely from its erroneous assertion that the statute and regulations required Commerce to obtain nine more questionnaire responses. Here again, ASPA erroneously conflates the attribution rules with the separate issue of which companies and their cross-owned affiliates should be required to submit questionnaire responses.

ASPA further asserts that Commerce acted inconsistently when it developed a methodology for imputing countervailable benefit amounts to unexamined *unaffiliated* suppliers of raw shrimp while not doing the same for unexamined *cross-owned* shrimp suppliers: "Commerce refused to apply the same per-kilogram formula to derive the benefit associated with the fresh shrimp purchased from these unexamined {cross-owned raw shrimp} suppliers." ASPA Br. at 27. ASPA alleges that this method of applying "facts otherwise available" is required under 19 U.S.C. § 1677e(a)(1) when "necessary information is not available on the record." *Id.*

*Non-Confidential Version – Confidential Information Has Been Redacted*

However, ASPA's assertion fails because Commerce reasonably determined that the information was not "necessary" for it to fulfill its statutory and regulatory obligations once it had limited "the investigation to Santa Priscila, SONGA, and certain of their cross-owned entities." Final IDM at 34.

ASPA also claims that Commerce's decision in *Ripe Olives from Spain* is irrelevant because the only two cross-owned suppliers of raw olive inputs to processors of ripe olives "submitted the information that Commerce needed to attribute the subsidy benefits pursuant to 19 C.F.R. § 351525(b)(6)(iv)" and that "is simply not the case here." ASPA Br. at 29. In fact, that is the point – Commerce in *Ripe Olives* received questionnaire responses from two-cross owned input suppliers, which allowed it then to attribute the countervailable benefits that those suppliers received to Angel Camacho, which was the mandatory respondent. *See* November 20, 2017 Decision Memorandum for the Preliminary Determination in the Countervailing Duty Investigation of Ripe Olives from Spain at 11, available at: https://access.trade.gov/Resources/frn/summary/spain/2017-25660-1.pdf

However, Commerce used a different methodology to determine the subsidy amount attributable to unaffiliated producers of raw olive inputs. *Id.* at 17. That is Commerce's point in this investigation – it has discretion to use different imputation methods for cross-owned input suppliers, as opposed to unaffiliated input suppliers. In the *Ripe Olives* investigation, it had the information that it needed to impute subsidies received by cross-owned companies. In the instant investigation, it did not.

Specifically, Commerce explained that the imputation of subsidies to unexamined cross-owned input suppliers "is not strictly governed by" Section 351.525(b)(6) of the regulations. Final IDM at 36. ASPA nevertheless asks this Court to direct Commerce upon remand to use the

*Non-Confidential Version – Confidential Information Has Been Redacted*

same method of imputation of countervailable benefits that it used for unexamined unaffiliated input suppliers to unexamined cross-owned input suppliers as "facts otherwise available." ASPA Br. at 29.

However, Commerce reasonably determined that it lacked the data to apply the attribution rules in Section 351.525(b)(6)(iv)(A). That is because that rule requires a sales denominator over which the benefit amounts must be allocated once they are determined:

> the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

However, Commerce did not have that denominator for each of the unexamined cross-owned shrimp suppliers, in contrast to the record in *Ripe Olives*, where it did.

### III. COMMERCE LAWFULLY DETERMINED THAT THE GOVERNMENT OF ECUADOR DID NOT PROVIDE A COUNTERVAILABLE SUBSIDY IN THE FORM OF THE BRACKISH WATER THAT SHRIMP FARMERS USED, BUT DID NOT CONSUME, IN THE PONDS IN WHICH THEY RAISED RAW SHRIMP

#### A. FACTUAL BACKGROUND

##### 1. The Nature of Shrimp Farming

Santa Priscila and Songa obtain the raw shrimp that they process into frozen shrimp suitable for human consumption from shrimp ponds into which shrimp larvae have been introduced and then raised until they grow large enough to be harvested. These ponds contain brackish water that shrimp farms obtain from nearby estuaries. By law, the GOE owns the water in these estuaries.

An estuary is where tidal saltwater meets a fresh water source, such as the mouth of a river. As a result, the water in an estuary is characterized as "brackish," *i.e.,* it consists of a mixture of saltwater and fresh water. Shrimp farmers must grow their shrimp in ponds that

*Non-Confidential Version – Confidential Information Has Been Redacted*

contain brackish water. In Ecuador, they can only obtain this water by purchasing and installing the pipelines, pumps, filtration systems, and infrastructure that they need to pump water from nearby estuaries.

Access to sufficient supplies of brackish water is the essential precondition to successful shrimp aquaculture. Shrimp farmers in Ecuador typically produce shrimp year-round due to the country's warm and frequently rainy climate. The crop cycle begins with pumping brackish water into a dried-out pond. Shrimp larvae are then introduced, the larvae are fed, the water is aerated, and a percentage of the water is exchanged every day. Once the larvae grow into mature shrimp suitable for human consumption, they are harvested during the process of draining the pond. The drained water is pumped back to its original source.[9]

Ecuadorian law requires that any entity or individual that "consumes" water must pay for it. An example of consumptive use would be the use of water for irrigation. Irrigation "consumes" the water because it cannot be returned to its source. However, entities or individuals that use water for *non-consumptive* purposes are not required to pay for it.[10] Thus, whether a party must pay for brackish water is not a matter of the type of water or the type of user, but rather, whether the water has been consumed.

The undisputed record establishes that the shrimp farms from which Respondents obtained raw shrimp did not consume brackish water. Rather, after filling a pond with brackish

---

[9] In their June 11, 2024 "Second Post-Preliminary Supplemental Questionnaire Responses," both Santa Priscila and Songa provided extensive descriptions, photographs, and scientific articles that discussed: (1) the number of ponds that they operated; (2) their water pumping and pipeline operations; (3) the estuaries from which they obtained brackish water; (4) the process of preparing dried out ponds for aquaculture operations; (5) the aquaculture process; (6) the draining and harvesting process; and (7) the number of harvests per year. *See* C.R. 247 and C.R. 246, respectively.

[10] Ecuadorian law defines both consumptive use and non-consumptive use as "productive use." Thus, use of the term "productive use" does not indicate that the water must be paid for.

*Non-Confidential Version – Confidential Information Has Been Redacted*

water, they subsequently drained it and returned it to its source. To do this, the Respondents

invested heavily in pumping machinery, pipelines, and related infrastructure, and they paid all

associated expenses, including for the fuel and electricity that they needed to operate their

pipelines and pumps.

### 2. Commerce Thoroughly Investigated ASPA's Brackish Water Allegations

ASPA's petition admitted that the GOE had provided brackish water to the shrimp sector

for "non-consumptive use," but that its failure to charge for this water constituted the provision

of a benefit for "less than adequate remuneration" ("LTAR"). Commerce initiated an

investigation, but not under the statutory LTAR provision because "The petitioner did not

provide information that would support finding that the GOE official rate {charged to individuals

for consumable fresh water, not for brackish water}is or is not reflective of prevailing market

conditions in Ecuador." Although Commerce declined to initiate an LTAR investigation, it

instead initiated an investigation "based on the allegation as a financial contribution in the form

of revenue foregone, pursuant to Section 771(5)(D)(ii) of the Act." *See* "Initiation Checklist" at

8. P.R. 79.

In its February 14, 2024 Response to Commerce's initial Section II questionnaire, the

GOE explained that: (1) it did not forego the collection of "usage fees that would otherwise be

owed in connection with concessions held by shrimp farmers; (2) no GOE institution levied fees

upon the use of brackish water *per se*; (3) "consumptive users of public water sources – brackish

or otherwise – are subject to fees for productive and consumptive use of a public water source";

(4) all users intending to extract water from public sources, including from "rivers, oceans,

streams, springs, aquifers, salt pans, etc." had to obtain prior authorization to do so from the

GOE; (5) the GOE's law defined non-consumptive use as that "which does not extract resources

*Non-Confidential Version – Confidential Information Has Been Redacted*

from its source of origin as long as it is returned to same without the need for prior treatment and without affecting the quantity and quality of the resource."; and (6) no member of the shrimp industry "received any exemption of fees that are due for the consumptive use of water."

In support, the GOE submitted its laws, resolutions, technical rules, and technical opinions governing water use, as well as the tariffs applicable to *consumptive* use. The GOE also explained that it maintained a registry of all authorizations for water use. It then explained the process for obtaining the required authorization. *See* February 14, 2024 GOE "Response to Section II of the Department's December 12, 2024 CVD Questionnaire, Volume II – Tax Programs" at TAX-38-57. P.R. 187.

ASPA concluded that it could not establish proof of "revenue foregone" by the GOE. Instead, in its February 21, 2024 "New Subsidy Allegations" ("NSA"), ASPA alleged that the GOE had conveyed a countervailable benefit in providing brackish water for "less than adequate remuneration." P.R. 217. Santa Priscila and Songa opposed initiation of this NSA on the grounds, among others, that: (1) ASPA failed to submit "any evidence that any other country charges for brackish water used in aquaculture operations"; (2) the Respondents did not actually receive and *consume* the alleged benefit; and (3) any benefit that the Respondents may have received was returned when a pond was drained. *See* Respondents' March 4, 2024 "Factual Information to Rebut, Clarify, and/or Correct New Subsidy Allegations" at 2-8. P.R. 235.

ASPA then attempted to provide evidence that the alleged brackish water subsidy was *de facto* specific, and it submitted what it purported to be a "market-determined benchmark price of the commercial value of the non-consumptive use of brackish water." *See* March 5, 2024 "New Subsidy Allegations Supplemental Response" at 2-4. P.R. 237. Santa Priscila and Songa provided a complete rebuttal to ASPA's assertions in their March 15, 2024 Rebuttal Submission. P.R. 268.

*Non-Confidential Version – Confidential Information Has Been Redacted*

After considering the parties' submissions, Commerce initiated an LTAR investigation of brackish water on March 21, 2024. P.R. 279. Then, on March 28, 2024, Commerce directed the GOE, Santa Priscila, and Songa to respond to the "Standard Questions Appendix" and the "Provisions of Goods/Services Appendix" contained in the Department's standard questionnaire. P.R. 285.

The GOE's April 18, 2024 questionnaire response explained that "when brackish water is used for non-consumptive purposes, the end result is no loss in quantity or quality of the water at the source and thus, the GOE has no basis upon which to charge a fee for the temporary use of that water." P.R. 321 at NSA-35. In addition, "unlike freshwater, neither the GOE nor any other water related agency supplies brackish or salt water to any users in Ecuador." *Id.* at NSA-36.

Consistent with the GOE's responses, both Santa Priscila and Songa reported that they did not receive any countervailable benefits attributable to their non-consumptive use of brackish water. Moreover, Santa Priscila, and Songa stated that they did not maintain records of the volume of water that shrimp farmers used in filling or draining their ponds because no law required them to measure it. *See* Santa Priscila's April 19, 2024 Response to the NSA Questionnaire at NSA-16-24. P.R. 319; Songa's April 18, 2024 Response to the NSA Questionnaire at NSA-15-21. P.R. 316.

In summary, the GOE's questionnaire response established that the GOE did not treat brackish water as a good that it sold nor did it charge for providing pumping services or services related to pumping. Rather, shrimp farmers were entirely responsible for installing all necessary infrastructure (*e.g.,* transmission pipes and water pumps) to access brackish water and for paying all operational costs (*e.g.,* fuel and electricity costs, as well as the costs of maintaining pumping systems). Thus, the GOE literally did not "provide" brackish water or "provide access" to that

*Non-Confidential Version – Confidential Information Has Been Redacted*

water because private parties had to use and pay for their own pipelines, pumps, and infrastructure.

Similarly, the Respondents' NSA questionnaire responses supported and reinforced the accuracy of the GOE's response. However, while acknowledging that they would have had to pay for any consumptive use of water, "no public water utility or entity monitors Santa Priscila's or Produmar's actual pumping of brackish water." *See* "Santa Priscila Response to NSA Questionnaire" at NSA-18. C.R. 212. *See also* Songa's NSA questionnaire response for the identical statement as to Naturisa.[11] C.R. 207 at NSA-17.

In its May 2, 2024 "Deficiency Comments and Rebuttal Factual Information" (at 2) ASPA complained about alleged "glaring deficiencies" in these responses and asked Commerce to issue supplemental questionnaires to obtain information that would cure them. P.R. 350. Moreover, failing the receipt of adequate information, ASPA asked Commerce to use "adverse facts available" to calculate the subsidy margins attributable to brackish water. *Id.* at 2-3. ASPA insisted that even water that is used non-consumptively "has a commercial value." *Id.* at 3-4. Therefore, ASPA insisted that Commerce require Santa Priscila and Songa to answer nine questions, including the following:

- Provide any planning, design, or similar documents that establish the annual water needs of your shrimp farming operations, including any documents regarding the number, size, and capacity of your shrimp ponds and the pumping capacity required to service your shrimp ponds during the POI.

- Provide a list of the water pumps used to access brackish water . . . and the pumping capacity and flow rate for each pump.

- Provide a list of the number of shrimp ponds used in your farming operations during the POI, and the size, depth, and location of each pond. Provide the water capacity of each pond and report the daily water exchange rate for each pond during the POI. Report the frequency with which water was completely replaced in each pond during the POI.

---

[11] Songa does not directly own any shrimp farms, unlike Santa Priscila.

*Non-Confidential Version – Confidential Information Has Been Redacted*

ASPA demanded that Commerce obtain this information, and more, from Santa Priscila and Songa for all brackish water that they pumped during the POI. ASPA also provided an equally onerous list of questions for the GOE to answer. It justified these questions on the (erroneous) ground that the Respondents had "defied" Commerce's instructions in their initial April 18, 2024 NSA questionnaire responses.

On May 14, 2024, Santa Priscila, Songa, and the GOE submitted their rebuttal to ASPA's submission, in which they asserted that they had not refused to respond to any question that Commerce had posed, much less tried to evade their reporting obligations or withhold information. P.R. 365. Moreover, they reiterated their previous statement that they could not respond to many of the questions that ASPA wanted Commerce to ask because they did not maintain records concerning their non-consumptive use of brackish water. *Id.* at 4-5.

After considering the Respondents' submission, ASPA retrenched by urging Commerce to require Respondents "to provide at least some basic information about their use of brackish water during the period of investigation." *See* May 22, 2024 "Request for Supplemental Information" at 2. P.R. 376. Specifically, ASPA wanted Commerce to ask the following questions to the Respondents "at a minimum":

> Please report the volume of brackish water used by your shrimp farms during the POI. If this information is not available, please explain why not. Please explain how your company is able to confirm that it returns all of the brackish water it uses in its shrimp ponds if it does not track the amount of water used.
>
> Please provide the total area, in hectares, of your shrimp farms that used brackish water during the POI. Please provide supporting documentation.
>
> For your largest shrimp pond that used brackish water during the POI, please report the volume of water used during the POI. If this information is not available, please report: (1) the area of the pond in hectares; (2) the depth of the pond; (3) the number of crops produced by the pond during the POI; and (4) the

**Non-Confidential Version – Confidential Information Has Been Redacted**

average amount of water exchanged in the pond each day during the POI. Please provide supporting documentation for these figures.

*Id.* at 3. In addition, ASPA requested that Commerce ask the GOE the following question:

Please describe in detail how the GOE confirms that all of the brackish water used by Respondents is returned to the source. Please provide supporting documentation such as monitoring reports, on-site audits, or the results of any other verification or enforcement activities regarding the use of brackish water by Respondents during the POI.

*Id.* Answers to these questions were allegedly needed to avoid allowing "Respondents {to} stonewall its investigation through argument and evasion." *Id.* at 2.

On May 29, 2024, the Respondents opposed ASPA's latest effort. *See* "Respondents' Opposition to ASPA's Request for Supplemental Questionnaire." P.R. 377. However, Commerce responded by issuing supplemental questionnaires to Santa Priscila, Songa, and the GOE. *See* P.R. 381, 380, and 382, respectively.

Santa Priscila's narrative response provided an extensive discussion of its water pumping and harvesting operations with accompanying photographs and noted that it and Produmar operated [    ] ponds during the POI. C.R. 247 at S3-2. It then described a dispute with the water authority and a resulting legal challenge in which Produmar sought relief from an erroneous charge for its alleged consumptive use of brackish water on certain farms. Santa Priscila provided complete documentation of the nature of the dispute. *Id.* at S3-3-7.

Santa Priscila noted that its legal challenge remained pending before the National Court of Justice as of the date of its response. It also stated that it had "no reason to record the volume of water returned to the source" because, as the pond was drained after the harvest, the "water has nowhere else to go other than back to its source." *Id.* at S3-3.

Songa similarly described Naturisa's water pumping and harvesting operations, and it provided representative photographs of them. C.R. 244 at S3-1-4. Naturisa operated over [    ]

ponds during the POI. Naturisa stated that it did not "record the volume of water returned to the source" because its drainage pipelines lead only back to the same estuaries from which the water was originally acquired. *Id.* at S3-3.

The GOE's response also discussed the situation involving Produmar in which the water authority sought to impose a charge for the alleged consumption of water, and the GOE noted that the dispute was pending before the National Court of Justice. However, "Produmar has not made any payment for its productive use of water during 2017 through 2022." C.R. 249 at p. S4-3. The GOE provided documentation of the water use authorizations for those ponds for which the water authority had alleged consumptive use. *Id.* at S4-4 and related exhibits. However, the GOE stated that it did not monitor or otherwise examine the water operations of any of the Respondents or their cross-owned affiliates. *Id.*

### 3. Commerce's Post-Preliminary Analysis of the Brackish Water Issue

Commerce preliminarily found that the GOE's alleged provision of brackish water for LTAR was not countervailable. *See* "Post-Preliminary Analysis Memorandum" at 16-17. P.R. 400. Commerce affirmed that the GOE required users of any type of water drawn from a public source to obtain authorization to do so. However, the Respondents did not use brackish water for consumptive purposes "because all brackish water which is pumped from local estuaries in the production of subject merchandise is returned to the sources, either at the time at which shrimp is harvested or via a 'water exchange.'"[12] *Id.* at 16.

After "considering the totality of evidence referenced above,{Commerce} preliminarily find{s} that this program does not provide countervailable benefits." *Id.* at 17.

---

[12] The term "water exchange" refers to the essential production step of draining from a shrimp pond every day a certain volume of water and replacing it with the equivalent volume to ensure water quality and sufficient oxygenation.

*Non-Confidential Version – Confidential Information Has Been Redacted*

### 4. Commerce's Verification of the GOE' Questionnaire Responses

In its GOE "Verification Report," Commerce first confirmed that Ecuadorian law required "all users who intend to extract water in Ecuador to obtain {GOE} authorization to do so." After explaining how the authorization process worked, including the need to find that sufficient water was available, Commerce verified that the GOE determined whether the use would be consumptive or non-consumptive.[13]  C.R. 315 at 11.

Commerce then discussed the issue that had arisen with respect to one of Produmar's shrimp farms, *i.e.,* the GOE had initially determined that this farm was engaged in the consumptive use of brackish water. *Id.* at 12. The GOE had assessed a fee for consumptive use. Produmar then filed an administrative complaint in which it asserted that its use on that farm was non-consumptive. After failing to obtain an administrative determination, Produmar instituted litigation, which was dismissed due to "improper filing." However, Produmar appealed this dismissal, but a hearing on its appeal had not been scheduled as of the date of the GOE verification.

There was uncertainty among the GOE officials at the verification as to why Produmar had initially been found to have engaged in consumptive use on one of its farms. Thus, Commerce was unable to reach a conclusion as to whether this particular farm had used water consumptively.

### 5. Commerce's Final Determination

Commerce made no change from its Post-Preliminary Determination that the "Provision of Brackish Water for LTAR Program" was not countervailable. Commerce found, based on the

---

[13] Commerce exercised its discretion not to verify the brackish water related submissions made by Santa Priscila and Songa.

*Non-Confidential Version – Confidential Information Has Been Redacted*

"totality of record evidence," that (1) the Respondents used brackish water non-consumptively; (2) they invested in equipment and water pumping infrastructure "to allow them to pump water from local estuaries into shrimp ponds, and subsequently return that water to its source at a later date"; (3) the GOE did not provide any infrastructure to the Respondents for water pumping; (4) the Respondents bore all costs "for constructing, maintaining, and operating" the water pumping infrastructure; (5) the GOE was not involved in any other way in the Respondents' water pumping operations; and (6) neither the GOE nor the Respondents were uncooperative or failed to act to the best of their ability in responding to the GOE's requests for information concerning the brackish water investigation. Final IDM at 20.

Commerce then rejected ASPA's claim that the record indicated that the GOE charged Produmar for its use of brackish water. Rather, Produmar's lawsuit challenging an assessment of charges was then pending based on its position that it had engaged in non-consumptive use. *Id.* at 20-21.

Next, Commerce rejected ASPA's claim that the GOE had misstated the facts when it asserted that prior GOE authorization was not required before brackish water could be used non-consumptively. Rather, Commerce found that the GOE had fully described its prior authorization process in a supplemental questionnaire response. Moreover, the GOE provided this description before Commerce issued its First Post-Preliminary Determination, as well as before the start of verification. *Id.* at 21.

Third, Commerce rejected as unsupported ASPA's claim that the Respondents recorded their use of brackish water "in the ordinary course of business." Thus, AFA was not justified due to the Respondents' alleged failure to report their usage. *Id.*

*Non-Confidential Version – Confidential Information Has Been Redacted*

Finally, Commerce concluded that "there is no evidence on the record to substantiate finding that the mandatory respondents could -- and should -- have reported certain water-use volumes corresponding to their shrimp farms during the POI." *Id.*

## B. ARGUMENT

### 1. The Respondents' Non-Consumptive Use of Brackish Water Did Not Satisfy the Statutory Requirements for Finding a Countervailable Benefit

A subsidy is countervailable if a governmental authority "provides a financial contribution." 19 U.S.C. § 1677(5)(B)((i). The statute defines a "financial contribution" to include "providing goods or services." 19 U.S.C. § 1677(5)(D)(iii). However, a subsidy is only countervailable where a government is found to have "conferred" a benefit when it provides a good "for less than adequate remuneration." 19 U.S.C. § 1677(5)(E)(iv). However, the GOE did not "provide" a good to the Respondents; it did not provide "access" to a good; and it did not "confer" a benefit on the Respondents.

Rather, the uncontradicted record establishes that the Respondents themselves obtained access to brackish water, i.e., the "good," by installing their own pipelines, pumps, and related infrastructure. Nor did the GOE provide the good itself because the Respondents obtained brackish water through their own efforts and at their own expense. Moreover, no benefit was "conferred" because all water was returned to its source.

ASPA nevertheless relies upon the fact that the GOE issues permits authorizing the use of brackish water. ASPA Br. at 33. ASPA asserts that the permitting process "provided the mandatory respondents with the right to use or access brackish water, which in and of itself is the provision of a good and constitutes a financial contribution." *Id.* However, the requirement of a permit does not address the issue of whether the permit "conferred" a benefit. In other words, even assuming, which we do not concede, that a shrimp farm's receipt of access to brackish

*Non-Confidential Version – Confidential Information Has Been Redacted*

water confers a benefit, that benefit is "re-conferred" to the GOE when the pond is drained and the water is returned to its source.

ASPA relies upon Commerce's determinations in *Certain Softwood Lumber Products from Canada* and *Phosphate Fertilizers from the Russian Federation* as precedents for its claim that Commerce has previously countervailed a government's provision of a "right of access." ASPA Br. at 31-34. But, those cases are distinguishable because the timber that was logged in Canada and the phosphate rock that was mined in Russia were not returned to their sources. That is very different from the situation here where the alleged "good" was returned to the water sources owned by the GOE after it was non-consumptively used. Thus, in a sense, the "access," even if it was first granted, was later returned to the GOE.

> **2. The Record Does Not Support ASPA's Claim that the Respondents Were Able to Measure, and Did Measure, the Volume of Water That Flowed Into and Out of Their Shrimp Ponds or that the GOE Maintained Records of Water Usage for Every Shrimp Farm**

To demonstrate that the GOE conveyed brackish water for LTAR, ASPA needed to propose a "benchmark" price for brackish water that Commerce could use to measure the amount of the alleged benefit. To measure that benefit amount, it would be essential to first measure the volume of water (typically expressed in cubic meters) that the Respondents acquired before assigning a benchmark value to it.

To support its claim that the Respondents were able to measure, and in fact had measured, the volume of water that they used at each shrimp pond during the POI, ASPA *speculated* that "Respondents *may* use flow meters to monitor the volume of water being pumped into their ponds." *See* May 2, 2024 "Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses" at 5. P.R. 350. Thus, according to ASPA, if both water inflow and outflow *may* be measured at each shrimp pond, then Commerce could allegedly

*Non-Confidential Version – Confidential Information Has Been Redacted*

calculate the benefit amount conferred, which would equal a benchmark price, expressed in dollars per cubic meter, multiplied by the total volume of cubic meters that each shrimp pond non-consumptively used during the 12-month long POI. Thus, ASPA's May 2, 2024 deficiency comments urged Commerce to obtain significant information containing brackish water usage. *Id.* at 7-9.

The Respondents reported that their pumping operations required a total of over [    ] pumps during the POI, and they pumped water into and out of each pond every day in the process known as "water exchange," which is used to maintain good water quality and prevent disease. An independent survey estimated that the average daily rate of water exchange in Ecuador was 8.5%. *See* Respondents' March 15, 2024 Rebuttal Submission to the "Petitioners' March 5, 2024 Response to Supplemental Questions Regarding NSA" at 3. P.R. 268. Thus, the average pond replaced all its water about every 12 days.

It strains credulity for ASPA to speculate that the Respondents could measure and did measure the *daily* inflow and outflow volume of water from over [    ] pumps into over [    ] ponds.[14] Thus, Commerce acted reasonably in not requesting the information that ASPA sought.

In addition, the GOE confirmed that it does not generally take any steps to confirm the volume of brackish water accessed by a shrimp farm. *See* GOE "Response to Post-Preliminary Supplemental Questionnaire" at S4-3. C.R. 249. Rather, the local zonal directorate of the water

---

[14] In order to measure the volume of non-consumptive water use at a single pond, a shrimp farmer would need to determine: (a) the surface area of the pond and the depth of the pond in order to calculate the number of cubic meters of water needed to fill the pond; (b) the number of gallons of water contained in a cubic meter; (c) the daily volume of water exchange in that pond; and (d) the number of days that the pond was filled during the POI, as opposed to the number of days when it was drying out after a harvest. Complicating this effort would be the likely inability of a farmer to know just how much water was pumped into and out of a pond since a single pump sometimes serviced more than one pond. ASPA never demonstrated that a single pump separately measured the water that it pumped into each pond that it serviced.

*Non-Confidential Version – Confidential Information Has Been Redacted*

agency undertakes a prospective on-site study to confirm the amount of water requested by the

applicant at the catchment point that is subject to the application. *Id.* The GOE also confirmed

that the water agency only conducts further studies of actual usage to ensure compliance with the

terms of the authorization. *Id.* However, the GOE confirmed that the agency referred to as

ARCA did not prepare any technical reports as part of its enforcement duties with respect to

productive use authorizations in effect for Produmar during the POI. Thus, nothing in the record

contradicts the GOE's statement that it did not have any records of the Respondents' actual

volume of brackish water accessed during the POI.

### 3. At Most, Respondents Used Brackish Water on a Temporary Basis, But ASPA Never Alleged that Temporary Use Provided a Countervailable Benefit

No record evidence established that Respondents used meters to measure the daily

volume pumped into or out of a pond by every pump.[15] Respondents denied that that was the

case, and nothing in Commerce's GOE Verification Report or Final IDM contradicts their denial.

Commerce stated just the opposite:

> Santa Priscila and Produmar reported that, because no water is retained in a pond
> intended for harvesting raw shrimp after the pond is drained during harvesting,
> neither company tracks the total volume of water that is pumped back to the main
> source. As such it is reasonable that Santa Priscila and Produmar would not be
> able to report some of the detailed figures requested {by ASPA} if such tracking
> is not undertaken in the ordinary course of business.

Final IDM at 21 (footnote omitted).

ASPA does not dispute the fact that brackish water is not consumed on a shrimp farm;

rather, it is returned in the same volume as it has been acquired, which Ecuadorian law requires

as a condition of permitting. However, even if the GOE did initially provide a benefit (which

---

[15] Citations of authority are not needed for the conclusion that speculation does not constitute
substantial evidence.

*Non-Confidential Version – Confidential Information Has Been Redacted*

Respondents have never conceded), the benefit was temporary. In other words, it is undisputed

that the Respondents, after using the water that the GOE allegedly provided, returned the exact

same "benefit" that they initially received. Accordingly, at most, the Respondents, in effect,

"rented" water for the period that they used. The benefit, therefore, was not permanent, as it

would be if the water had been consumed.

The fatal problem with this hypothetical "rental" analysis is that ASPA never raised it

before Commerce, and it has not done so here.

### 4. No Record Evidence Supports ASPA's Claim that Brackish Water Has a Commercial Value When It Is Used for a Non-Consumptive Purpose in Shrimp Aquaculture Activities

ASPA asserts that it is possible to measure the "adequacy of remuneration by comparing

the government price to a market-determined price." ASPA Br. at 35. The fatal flaw in this

assertion is that ASPA did not identify a government authority anywhere in the world that

charged a "market-determined price" for the non-consumptive use of brackish water, regardless

of where or how it was used.[16] In contrast, the Respondents submitted the Declaration of George

Chamberlain, President of the Global Aquaculture Alliance, who stated that he had personally

visited shrimp farms in over 30 countries and had "never encountered a single farm that has paid

a governmental authority for the brackish water that it uses in its ponds and then returns to the

original source." *See* Santa Priscila's "Response to NSA Questionnaire" at Exhibit NSA-11. P.R.

320.

---

[16] Brackish water is not a "finite" resource, despite ASPA's contrary claim. Rather, it is an "infinite" resource both because it is always available in estuaries and because shrimp farms always return the water that they use to those estuaries.

*Non-Confidential Version – Confidential Information Has Been Redacted*

The Respondents also submitted the Declaration of Claude E. Boyd, who is one of the world's leading authorities on shrimp aquaculture, having authored or co-authored over 300 scientific journal articles and other publications devoted to aquaculture. Dr. Boyd stated that "During my 55-year career, I have visited shrimp farms in over 35 countries, as well as most shrimp farms in the United States. In my personal experience, no federal, provincial, state or local authority in any country, including in the United States, charges for brackish water that is pumped into shrimp ponds and subsequently discharged through water exchange or at harvest." *Id.* at Exhibit NSA-12.

Considering the uncontradicted experience of these two world-renowned experts, it was not surprising that ASPA failed to establish that brackish water used, but not consumed, on a shrimp farm, had a commercial value.

### 5. No Record Evidence Supports ASPA's Claim that Commerce Should Have Used Adverse Facts Available to Determine the Countervailable Benefit Attributable to the GOE's Provision of Access to Brackish Water

Because ASPA could not establish a credible and supportable "benchmark" that Commerce could use to determine the amount of the benefit that the GOE allegedly provided, it was compelled to allege that the Respondents did not cooperate "to the best of their ability" during the investigation. As a result, the Department should have used "adverse facts available" ("AFA") to determine the countervailable benefit. ASPA Br. at 35-39. Commerce dismissed this claim as unsupported by the record. Final IDM at 20-21. We need not repeat Commerce's analysis here, but rely upon it, as well as upon the following uncontroverted facts.

First, Commerce issued four questionnaires and supplemental questionnaires to Santa Priscila and Songa that asked about various aspects of the Respondents' use of brackish water, which both companies fully answered, replete with lengthy exhibits. *See* Letter from Trade

*Non-Confidential Version – Confidential Information Has Been Redacted*

Pacific PLLC, re: "Santa Priscila's New Subsidy Allegations Questionnaire Response" (Apr. 18, 2024), at NSA-17 to NSA-23, Exs. NSA-11 and NSA-12, C.R. 210–12, Letter from Trade Pacific PLLC, re: "SONGA's New Subsidy Allegations Questionnaire Response" (Apr. 18, 2024), at NSA-15 to NSA-21, Exs. NSA-10 and NSA-11, C.R. 207–209, Letter from Trade Pacific PLLC, re: "Santa Priscila's Second Post-Preliminary Supplemental Questionnaire Response" (June 11, 2024), at S3-1 to S3-7, Exs. S3-1 to S3-8, C.R. 247–248, Letter from Trade Pacific PLLC, re: "SONGA Second Post-Preliminary Supplemental Questionnaire Response" (June 11, 2024), at S3-1 to S3-3, and Exs. S3-1 to S3-4, C.R. 245–246.  The GOE also responded fully to four questionnaires from Commerce. *See* Letter from Trade Pacific PLLC, re: "Government of Ecuador's New Subsidy Allegations Questionnaire Response" (Apr. 18, 2024), at NSA-35 to NSA-50, C.R. 213–15, Letter from Trade Pacific PLLC, re: "Government of Ecuador's Post-Preliminary Supplemental Questionnaire Response," (May 16, 2024), at S3-16 to S3-18, C.R. 234–241, Letter from Trade Pacific PLLC, re: "Government of Ecuador's Second Post-Preliminary Supplemental Questionnaire Response," (June 12, 2024), at S4-1 to S4-4, Exs. S4-1(a) to S4-2(b), C.R. 249–257. Commerce also verified the GOE's brackish water-related questionnaire responses and did not identify any inaccuracies or incompleteness. *See* GOE "Verification Report" at 11-12 and related Exhibit SVE-4. C.R. 315. ASPA did not like the answers, but that did not make them any less responsive to the questions that Commerce posed.

Second, ASPA grossly misstates the facts by stating that the GOE charged Produmar for its *non-consumptive* use of brackish water. That is simply wrong because it mischaracterizes the factual situation involving just two of Produmar's farms. *See* GOE "Verification Exhibit S4-1(a)." C.R. 315. The first farm drew water from the Guayas river. The GOE authorized Produmar to use a maximum of 19.6 million cubic meters of water per year on this farm. However, the

authorization did not state whether the water would be used for a consumptive or non-consumptive purpose. Thus, this document does not support ASPA's claim that the GOE determined that the water had a consumptive use.

ASPA identifies a second shrimp farm that drew water from the Taura river. In that permit, the GOE authorized Produmar fill its pond initially with 6.0 million cubic meters of water and then authorized an "annual replacement volume" of 4.3 million cubic meters. This authorization also stated that Produmar would have to annually pay "the productive use authorization fee for aquaculture activities in the waters of the Taura River," as set by the then applicable published tariff. Here again, the permit did not state whether the GOE regarded Produmar's "productive" use as a consumptive or non-consumptive use. Under Ecuadorian law, the term "productive" use encompasses both consumptive and non-consumptive use.

Produmar disagreed with the GOE's statement that it had to pay for the water and filed an administrative complaint, to which the GOE never responded. Produmar then exercised its right to institute litigation. When its lawsuit was dismissed on procedural grounds, it filed an appeal with Ecuador's National Court of Justice. That appeal remained pending at the time Santa Priscila and the GOE submitted their questionnaire responses and Commerce conducted its verification. As a result, Commerce stated that "Based on the existence of outstanding litigation regarding Produmar's appeal and the lack of final adjudication regarding this litigation, we find that there is an insufficient basis to claim that the GOE charges for non-consumptive use of brackish water." *See* GOE "Verification Report" at 21.

ASPA claims that "Commerce generally accepts the *status quo* unless and until a final and conclusive court decision says otherwise," relying upon decisions in *Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands* and *Ripe Olives from Spain.* ASPA Br. at 38.

*Non-Confidential Version – Confidential Information Has Been Redacted*

Neither case supports the conclusion that this Court should accept ASPA's assertion that the GOE charges for the non-consumptive use of brackish water.

The cited portion of the *Netherlands Steel* case actually supports the Respondents because it states that:

> {A}ny decision the Department takes under a particular statute is valid unless it is vacated by a court. Courts have found that the Department's determinations are presumed valid and accurate, notwithstanding any pending challenges, until there is a final and conclusive court decision holding otherwise.

Therefore, here, Commerce's decision not to countervail brackish water is "presumed valid and accurate." Moreover, the *Netherlands Steel* decision does not address how Commerce should treat the pendency of litigation in a foreign jurisdiction.

Similarly, in the *Ripe Olives* decision, Commerce declined to give effect to a Federal Circuit decision because the mandate had not yet been issued and the period to seek an appeal had not yet expired. For those reasons, Commerce declined to give effect to the Federal Circuit's decision which found that Commerce's application of "Cohen's d test" was unreasonable. Here, as well, Commerce presumed that its decision was valid and accurate. Moreover, this case also did not address the status or relevance of litigation pending in a foreign jurisdiction.

Third, ASPA claims that the GOE requires [

] ASPA Br. at 39. However, the record does not support this assertion. ASPA relies on the requirements for two of Santa Priscila's and Produmar's total of [          ] shrimp ponds. There is no basis to assume that meters are required or were installed for any other shrimp pond operated by Santa Priscila or Produmar or that, even if they were installed, recorded daily water usage.

*Non-Confidential Version – Confidential Information Has Been Redacted*

Fourth, ASPA claims that, "Because the mandatory respondents and the GOE did not submit accurate and complete information in their questionnaire responses, Commerce was required to resort to facts otherwise available." ASPA Br. at 39. Specifically, "The mandatory respondents withheld and did not submit timely information regarding the amount of brackish water they each used during the POI, thereby significantly impeding the investigation." *Id.* Moreover, the GOE "significantly impeded the investigation when it withheld information on the regime regulating the use of water and falsely reported that it never charges non-consumptive users a fee." *Id.* Neither allegation has record support.

Both Santa Priscila and Songa stated that they could not and did not measure the volume of their use of brackish water. No record evidence contradicts their statements. Moreover, the GOE never charged non-consumptive water users a fee. Here again, ASPA's claim lacks record support. It just does not like the answers that the Respondents and the GOE provided.

Finally, ASPA asserts that Commerce abused its discretion by failing to use AFA to determine the benefit provided by the GOE's provision of brackish water for non-consumptive use. ASPA Br. at 40. However, Commerce found that "there is no evidence on the record to substantiate finding that the mandatory respondents could – and should – have reported certain water-use volumes corresponding to their shrimp farms during the POI." Final IDM at 21. Since ASPA provided no evidence to contradict this finding, Commerce had no basis to apply AFA.

## IV.    COMMERCE LAWFULLY DETERMINED THAT THE GOE DID NOT PROVIDE DIESEL FUEL TO RESPONDENTS FOR LTAR

### A. FACTUAL BACKGROUND

#### 1. Undisputed Facts

- Petroecuador is Ecuador's national oil company.

**Non-Confidential Version – Confidential Information Has Been Redacted**

- Petroecuador sold diesel fuel to independent, privately owned fuel distributors, but it did not sell diesel fuel to Santa Priscila or Songa.

- Petroecuador charged fixed prices to those distributors.

- The distributors, which were not affiliated with either Santa Priscila or Songa, in turn sold diesel fuel to them in arm's-length transactions.

- No GOE agency, including Petroecuador, "entrusted or directed" the distributors to charge prices to Respondents that resulted in the "pass through" of all or a part of any subsidy that Petroecuador may have provided to independent distributors.

- ASPA never claimed that the GOE "indirectly" provided diesel fuel subsidies to the Respondents through the distributors. Instead, ASPA alleged that the GOE "directly" provided those subsidies.

### 2. The Commerce Investigation

ASPA submitted "New Subsidy Allegations" in which it requested that Commerce initiate an investigation as to whether the GOE had provided diesel fuel to the Respondents for LTAR. P.R.119. ASPA first alleged that Petroecuador sold diesel fuel *directly* to the shrimp sector at below market prices. ASPA also alleged that "To the extent that an entity other than a state-owned enterprise made the sale at the regulated price, that entity would be *entrusted or directed* to make a financial contribution at government established prices under 19 U.S.C. § 1677(5)(B)(iii)." *Id.* at 8.

Commerce then issued a supplemental questionnaire requesting that ASPA support its allegation that entities other than state-owned companies "would be entrusted or directed to make a financial contribution at government-established prices." P.R. 170 at 4. ASPA responded that the "prices for diesel fuel for shrimp producers set by Petroecuador are applicable not only to Petroecuador, but also must be offered by any private sellers of diesel." *Id*. Moreover, "Other official reports confirm that prices for fuel are set administratively by the GOE – without restriction as to whether the fuel is sold by a private or public entity." *Id.* at 5. ASPA also stated

**Non-Confidential Version – Confidential Information Has Been Redacted**

that the GOE "had a pattern of practices . . . to entrust or direct private entities to provide fuel to shrimp producers at subsidized prices." *Id.* at 7.

ASPA concluded by stating that "Commerce should investigate the provision of fuel to shrimp producers for less than adequate remuneration, including *both the direct provision of fuel from* government authorities such as Petroecuador and *the entrustment or direction of private entities* to also provide fuel to shrimp producers at below-market prices." *Id.* at 9.

Based on ASPA's representations, Commerce initiated an investigation. P.R. 279. Commerce's "Recommendation Memorandum" stated that:

> We recommend initiating on this program, in part, on the basis that the *direct* provision of fuel from the GOE/Petroecuador may be *de facto* specific . . . because record evidence indicates that, while there is no law limiting the provision of diesel fuel to specific industries under this program, shrimp farmers may be the predominant users of diesel fuel subsidies. However, we find that the evidence provided by petitioner is insufficient to justify its claim that the GOE may be *entrusting or directing* private entities to provide fuel to the shrimp sector.

*Id*. (Emphasis added.) Thus, Commerce did not initiate an investigation of whether the GOE "indirectly" provided diesel fuel subsidies to the Respondents.

Commerce then issued NSA questionnaires to Santa Priscila, Songa, and the GOE. Santa Priscila responded that the prices that the GOE issued "were the terminal-gate prices at which the state-owned petroleum company, EP Petroecuador, sold diesel fuel to the private traders." *See* April 19, 2024 "Response to New Subsidy Allegation Questionnaire" at NSA-2. P.R. 319. However, "No law or regulation controlled the price that fuel traders and distributors charged to authorized end users . . . . Fuel traders and/or distributors charged a markup on the terminal-gate price to Santa Priscila and Produmar, which was determined based on market forces." *Id.* at NSA-3. Songa provided a similar response. P.R. 316.

*Non-Confidential Version – Confidential Information Has Been Redacted*

The GOE similarly responded that "distributors separately had agreements with the shrimp sector which determined the prices and quantities. There were no guidelines or requirements imposed on these private distributors; they were free to negotiate the prices charged to the shrimp parties and the GOE does not have access to the prices that were charged to the ultimate consumers." *See* April 19, 2024 "GOE Response to New Subsidy Allegation Questionnaire" at NSA-15. P.R. 321

### 3. Commerce's Post-Preliminary Analysis and Final IDM

Commerce addressed ASPA's diesel fuel allegations in its "Post-Preliminary Analysis Memorandum." P.R. 400. Recall that Commerce had initiated its investigation "on the basis that the GOE may have *directly* provided fuel to the mandatory respondents." *Id.* at 16. However, Commerce found that "none of the mandatory respondents nor the cross-owned entities for which Commerce solicited information in this investigation *directly* received fuel from government-owned fuel suppliers." *Id.* Moreover, ASPA had failed to submit evidence that the GOE had "*entrusted or directed*" private sellers of diesel fuel to provide diesel for LTAR. *Id.* For those reasons, Commerce preliminarily found that the Respondents' fuel purchases did not constitute a financial contribution from the GOE.

Commerce reached the same conclusions in its Final IDM. P.R. 456. First, record evidence "indicates that EP Petroecuador . . . sells fuel to private traders in Ecuador, but did not sell fuel to the mandatory respondents during the POI. *Id.* at 23. In addition, Commerce distinguished on its facts each case that ASPA had discussed that allegedly required Commerce to find that the GOE had "indirectly" sold diesel fuel to the Respondents through the distributors with which it did business. *Id.* at 24-25. Moreover, Commerce relied on its finding that the GOE's diesel fuel pricing policy "is only for private traders and/or distributors, not end-users,

**Non-Confidential Version – Confidential Information Has Been Redacted**

(*i.e.*, shrimp farmers)." *Id.* at 25. For these reasons, Commerce again found that "the respondents' purchases of fuel do not constitute a financial contribution {from the GOE}." *Id.*

## B. ARGUMENT

### 1. ASPA Never Alleged that the GOE "Indirectly" Provided Diesel Fuel Subsidies to the Respondents.

Before this Court, ASPA *for the first time* contends that the GOE "indirectly" provided diesel fuel for LTAR even though it previously failed to provide evidence showing that the GOE directed or controlled the distributors or else required them to sell fuel to the Respondents for LTAR. It is uncontroverted that distributors, as private entities, were free to exercise their discretion when determining the prices that they would charge to the Respondents.

In support of its new "indirectly provided" allegation, ASPA first contends that Commerce erred because "it never initiated an investigation into whether the GOE entrusted or directed the private middlemen to provide the mandatory respondents with the subsidized fuel." ASPA Br. at 42-43. However, ASPA never submitted evidence of "entrustment or direction" that might have justified initiation of an investigation of whether this occurred. Needless to add, ASPA's Brief does not identify any record evidence that suggests GOE entrustment or direction.

### 2. ASPA Failed to Timely Allege that Unaffiliated Distributors "Indirectly" Conferred GOE Fuel Subsidies on the Respondents

For the first time, ASPA asserts before this Court that:

the mandatory respondents were *indirect* recipients of a financial contribution from Petroecuador. The statute contemplates this type of scenario and unambiguously instructs Commerce to countervail subsidies, regardless of whether they are provided directly or indirectly. . . . Commerce disregarded the statute's clear instruction when it did not countervail the mandatory respondents' purchases of subsidized fuel for no reason other than the fact that they did not receive the fuel directly from Petroecuador.

**Non-Confidential Version – Confidential Information Has Been Redacted**

ASPA Br. at 42. (Emphasis added.) The fatal flaw in this assertion is that *ASPA never requested that Commerce initiate an investigation of whether the GOE had provided an indirect subsidy to the Respondents through the unaffiliated distributors.* For that reason, Commerce never initiated an investigation of whether the GOE indirectly provided diesel fuel subsidies. Thus, ASPA cannot raise the issue now. Moreover, Commerce could not have abused its discretion in declining to initiate an investigation of indirect subsidies when ASPA never requested that it do so.

### 3. ASPA's Case Citations Contradict Its Contention that Commerce Was Required to Investigate Whether the GOE Indirectly Provided Diesel Fuel Subsidies

In *Beijing Tianhai Industry Co., Ltd. v. United States*, 52 F. Supp. 3d 1351(2015), this Court found that Chinese producers of high-pressure steel cylinders had indirectly received a subsidy from the Chinese government on their purchases of steel tube inputs even though those producers purchased those tubes from unaffiliated "third party trading companies" at what Commerce concluded were below-market prices. *Id.* at 1360-61. This Court upheld Commerce's determination that the statute allowed it to countervail subsidies even though the "financial contribution" was provided by the Chinese government, and the "benefit" was conferred by the trading companies. *Id.* at 1362-65.

The distinguishing fact in *Beijing Tianhai* is that Commerce in that case had actually initiated an investigation into whether the Chinese government had *indirectly* provided subsidies to the Chinese producers. During that investigation, Commerce obtained the information that it needed to determine the "world market prices {for steel tubes} available to purchasers in the PRC." *Id.* at 1356. It then compared those "benchmark" prices to the "sales prices from the trading companies to determine the value of the benefit provided to BTIC and Tianjin Tianhai in

**Non-Confidential Version – Confidential Information Has Been Redacted**

its less-than adequate-remuneration" calculation." *Id.* at 1360, This analysis was only necessary because Commerce had to measure the amount of the benefit that the Chinese government indirectly conveyed to the Chinese producers.

In *Beijing Tianhai*, this Court identified two decisions that supported its analysis of the indirect subsidy issue – *Guangdong Wireking Housewares & Hardware Co. v. United States*, 900 F. Supp. 2d 1362 (2013), *aff'd* 745 F.3d 1194 (Fed. Cir. 2014) and *Delverde, SrL v. United States*, 202 F.3d 1360 (Fed. Cir. 2000). Those cases hold that Commerce has the statutory authority to investigate indirect subsidies provided by unaffiliated trading companies. *Id.* at 1363-64. In both cases, unlike the situation here, Commerce initiated investigations as to whether indirect subsidies had been provided.

Specifically, in *Guangdong Wireking*, Commerce calculated a benchmark against which it measured the adequacy of remuneration in the situation where the respondent purchased wire rod from "certain privately-owned trading companies" that had initially purchased it from the Chinese government. 900 F. Supp. 2d at 1379-80. The issue there was whether the statute permitted the finding of a financial contribution where the Chinese government had not directly provided the benefit. The court concluded that it could do so.

The court then discussed whether Commerce had correctly calculated the benchmark price. *Id.* at 1380-82. The court found that Commerce's benchmark determination was reasonable. However, Commerce would never have reached the benchmark issue if it had not first initiated an investigation of whether the Chinese government had *indirectly* conveyed a countervailable subsidy.[17]

---

[17] ASPA similarly relies on the *Guangdong Wireking* decision.

*Non-Confidential Version – Confidential Information Has Been Redacted*

The *Delverde* decision held that the statute did not allow Commerce to "presume conclusively" that the subsidies granted to a former owner of corporate assets automatically "passed through" to the new owner following the sale. Rather, Commerce had to examine the "particular facts and circumstances of the sale" to determine whether the purchaser either "directly or indirectly received both a financial contribution and benefit from a government." 52 F. Supp. 3d at 1364.

Then, in *Beijing Tianhai*, this Court indicated that *Delverde* supported its conclusion that the initiation of an indirect subsidy investigation was required before Commerce could determine whether a benefit had been conveyed via an unaffiliated private party.

ASPA also relies on *RZBC Group Shareholding Co. v. United States*, 100 F.Supp.3d 1288 (Ct. Int'l Trade 2015), as authority for its claim that the statute permitted Commerce to investigate indirect subsidies that citric acid producers allegedly received indirectly from the Chinese government on their purchases of steam coal and sulfuric acid inputs from a "middleman." ASPA Br. at 43-44. However, Respondents have never disputed this point because statutory authority to investigate indirect subsidies does exist – but only where the requisite evidence is provided to justify initiation of such an investigation, which did not happen here.

The *RZBC* decision holds that the statute:

> allows Commerce to counteract contributions which originate with the government, but which pass through an intermediary before going to the ultimate user. In the last variation, the middleman may skim some of the benefit by reselling the subsidized inputs at a markup. But if the marked-up cost that the final user pays is less than the market cost, the user still gets a benefit. Commerce can countervail these sales because the authorities made a contribution to a person (the intermediary), thereby conferring a benefit to the producer (in a sum reduced by the middleman's cut).

100 F. Supp. 3d at 1302. In the citric acid investigation discussed in *RZBC*, Commerce determined that "the prices RZBC paid to the trading companies for the inputs at issue are less

*Non-Confidential Version – Confidential Information Has Been Redacted*

than the benchmark prices and, thus we have determined that the transactions conferred a benefit in the form of the provision of a good for LTAR." Final IDM at Comment 5. 79 Fed. Reg. 108 (Jan. 2, 2014). Thus, here again, Commerce necessarily had to first initiate an investigation of indirect subsidies in order then to calculate a benchmark to determine the benefit that the Chinese citric acid producer received through the middleman.

### 4.    The *Loper Bright* Decision Does Not Compel a Finding that the GOE Indirectly Conveyed a Subsidy to the Respondents

ASPA claims that "Commerce abruptly stopped its analysis and {erroneously}did not determine whether the respondents indirectly received a financial contribution from Petroecuador." ASPA Br. at 42. This error allegedly occurred because Commerce "never initiated an investigation into whether the GOE entrusted or directed the private middlemen to provide the mandatory respondents with the subsidized diesel fuel." ASPA Br. at 42-43. However, this claim improperly conflates the statutory "entrustment and direction" criterion for finding a subsidy with the statutory "indirect" subsidy criterion.

Commerce did not investigate an investigation under either criterion due to ASPA's failure of proof with respect to "entrustment and direction" and its failure to allege an indirect subsidy. That is why ASPA intentionally avoids the issue by improperly conflating the "entrustment and direction" criterion with the "indirect" subsidy criterion. These are two separate statutory standards for finding a countervailable subsidy. However, ASPA never addresses, much less refutes, Commerce's finding that: (1) ASPA did not submit evidence that justified an investigation into whether the GOE entrusted or directed privately owned, unaffiliated distributors to convey a diesel fuel subsidy and (2) it did not allege that the GOE provided an indirect subsidy.

*Non-Confidential Version – Confidential Information Has Been Redacted*

For these reasons, ASPA fails in attempting to rely on *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). ASPA Br. at 41. According to ASPA, the "best reading" of the statute is that "a subsidy is countervailable, regardless of whether the subsidy is provided *directly or indirectly*." *Id.* However, Respondents concede that Commerce is permitted to countervail indirect subsidies, but it can do so only where it is first properly alleged and later proven to have occurred. Therefore, *Loper Bright* is irrelevant.

In addition, no "loophole" has been created in this in this investigation, contrary to Congressional intent. ASPA Br. at 41-42. Commerce did not create a loophole when it found that ASPA never alleged that the GOE had "indirectly" provided subsidies to the Respondents.

## V.    CONCLUSION

For the foregoing reasons, this Court should find that Commerce acted lawfully in its determinations concerning: (1) the selection of mandatory questionnaire respondents; (2) its decision not to countervail the GOE's provision of brackish water for non-consumptive use; and (3) whether the Respondents received indirect countervailable subsidies from the GOE on diesel fuel.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly
Jarrod M. Goldfeder

Kenneth N. Hammer
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Counsel for Industrial Pesquera Santa
Priscila S.A., Sociedad Nacional de Galápagos,
C.A., and the Government of Ecuador

Date: March 13, 2026

*Non-Confidential Version – Confidential Information Has Been Redacted*

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that the foregoing Response to the Rule 56.2 Motion for Judgment on the Agency record submitted by the American Shrimp Processors Association complies with the 14,000 word count limitation in this Court's Standard Chamber Procedures. This Memorandum contains 13,809 words according to the word count function used in the word processing software used to prepare this Memorandum.

Undersigned counsel further certifies that this Response has not been prepared with the assistance of any form of artificial intelligence.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly

Dated: March 13, 2026