**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE:    THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

|  |  |  |
|---|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A., SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | ) ) ) ) | |
| Plaintiffs/Consolidated Defendant-Intervenors, | ) ) ) | |
| v. | ) ) | |
| UNITED STATES, | ) ) | |
| Defendant, | ) ) | Consol. Court No. 25-00025 |
| and | ) ) | |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, | ) ) ) | |
| Defendant-Intervenor/ Consolidated Plaintiff, | ) ) ) | |
| and | ) ) | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | ) ) ) | |
| Defendant-Intervenor/ Consolidated Plaintiff-Intervenor. | ) ) ) ) | |

**ORDER**

Upon consideration of the motions for judgment upon the administrative record filed by

plaintiffs, responses thereto, plaintiffs' replies, the administrative record, and all other pertinent

papers, it is hereby

ORDERED that plaintiffs' motions are DENIED;

2

ORDERED that the Department of Commerce's determination is affirmed in all respects; and it is further

ORDERED that judgment is entered in favor of the United States.

_____
JUDGE

Dated: _____

2

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A., SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | ) ) ) ) |
| Plaintiffs/Consolidated Defendant-Intervenors, | ) ) |
| v. | ) ) |
| UNITED STATES, Defendant, | ) ) ) Consol. Court No. 25-00025 |
| and | ) **PUBLIC VERSION** |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, | ) BPI redacted from pp. 11, 12, 16, ) 20, 23, 24, 27, 28, 34, 35, 46, 47, ) 51, 52, 53 |
| Defendant-Intervenor/Consolidated Plaintiff, | ) ) |
| and | ) ) |
| AD HOC SHRIMP TRADE ACTION COMMITTEE, Defendant-Intervenor/ Consolidated Plaintiff-Intervenor. | ) ) ) ) ) ) |
| | ) ) |

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

TARA K. HOGAN
Assistant Director
U.S. Department of Justice, Civil Division
OF COUNSEL:                    Commercial Litigation Branch
VANIA WANG                     P.O. Box 480, Ben Franklin Sta.
Attorney                       Washington, D.C. 20044
Department of Commerce         Tele: (202) 616-2228
Office of the Chief Counsel    Email: Tara.Hogan@usdoj.gov
  for Trade Enforcement & Compliance

March 13, 2026                 Attorneys for Defendant

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................ iv

STATEMENT PURSUANT TO RULE 56.2(c)(1) ..........................................................2

    I.      Administrative Determination Under Review ...............................................2

    II.    Issues Presented For Review ........................................................................2

STATEMENT OF FACTS ...............................................................................................3

SUMMARY OF THE ARGUMENT ...............................................................................5

ARGUMENT ...................................................................................................................8

    I.      Standard of Review .......................................................................................8

    II.    Commerce's Determination To Limit Examination Of Cross-Owned Input Suppliers Was In Accordance With The Law And Reasonable ....................9

        A.  Legal Framework ...............................................................................9

        B.  Background on Commerce's Examination of the Respondents' Cross-Owned Input Suppliers ...........................................................11

        C.  Commerce Has The Authority To Limit Examination of Cross-Owned Input Suppliers ........................................................14

        D.  Commerce Was Not Required To Use Facts Available For The Non-Examined Cross-Owned Input Suppliers .................................18

    III.   Commerce's Determination That The Investment Contract Program Was *De Facto* Specific Is Supported By Substantial Evidence ...........................21

        A.  Factual Background on the Investment Contract Program ...................22

        B.  Commerce Reasonably Compared The Number Of Companies Entered Into An Investment Contract And The Total Number of Companies Registered In Ecuador ...................................................................24

    IV.   Commerce Lawfully Declined To Accept New Factual Information Concerning SONGA and Naturisa's Benefit Information For The AMVTR Program ...................26

        A.  Legal Framework ...............................................................................26

        B.  Background ........................................................................................27

   C. Commerce Reasonably Found That SONGA And Naturisa's Corrections Were New Factual Information ..................................................28

V. Commerce Lawfully Applied AFA To SONGA And Naturisa For The AMVTR Program ......................................................................................30

   A. Legal Framework.............................................................................30

   B. Background.......................................................................................31

   C. Commerce Was Not Aware Of SONGA and Naturisa's Error............32

VI. Commerce Reasonably Declined To Accept New Factual Information At Verification Regarding Produmar's Benefit Information For AMVTR Program .......34

   A. Background.......................................................................................34

   B. Commerce Reasonably Found That Produmar's Alleged Minor Corrections Are New Factual Information ..................................................35

VII. Substantial Evidence Supports Commerce's Use Of AFA To Find That The AMVTR Program Is *De Facto* Specific ........................................................37

VIII. Substantial Evidence Supports Commerce's Use Of 1.38% AFA Rate For The AMVTR Program ..................................................................................39

   A. Legal Framework.............................................................................39

   B. Background.......................................................................................40

   C. Commerce Lawfully Treated Santa Priscila and Produmar As Cross-Owned Entities ..............................................................................41

IX. Commerce's Decision To Decline To Accept SONGA's New Factual Information At Verification Regarding The ISD Tax Exemption For Imported Assets And Raw Materials Program ..........................................................45

   A. Background.......................................................................................45

   B. Commerce Reasonably Found That The Information SONGA Presented At Verification Was New Factual Information........................46

   C. Commerce's Application Of AFA Was Lawful and Supported By Substantial Evidence..............................................................................48

   D. Commerce's Selection Of The AFA Rate Followed Its AFA Hierarchy ..............50

X.    Commerce Lawfully Found That The Provision Of Brackish Water Did Not Provide A Financial Contribution ................................................................. 50

A.  Background .................................................................................................... 50

B.  Commerce's Determination That The Provision Of Brackish Water Did Not Constitute A Financial Contribution Is In Accordance With Law ................. 52

XI.   Commerce Reasonably Did Not Initiate An Investigation Of The Indirect Provision Of Fuel ................................................................................................ 56

A.  Background .................................................................................................... 56

B.  Commerce Reasonably Found That The GOE Did Not Provide A Financial Contribution For The Direct Provision Of Fuel ........................................... 58

CONCLUSION ........................................................................................................ 60

## TABLE OF AUTHORITIES

Cases

*ABB Inc. v. United States,*
355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018)...................................................................... 32, 33

*AK Steel Corp. v. United States,*
192 F.3d 1367 (Fed. Cir. 1999)...................................................................................... 22

*Algoma Steel Corp. v. United States,*
865 F.2d 240 (Fed. Cir. 1989)........................................................................................ 25

*An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States,*
287 F. Supp. 3d 1361 (Ct. Int'l Trade 2018).............................................................. 43

*Bebitz Flanges Works Priv. Ltd. v. United States,*
433 F. Supp. 3d 1309 (Ct. Int'l Trade 2020)................................................................ 15

*Beijing Tianhai Indus. Co. v. United States,*
52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015).......................................................... 58, 60

*Boomerang Tube LLC v. United States,*
856 F.3d 908 (Fed. Cir. 2017)................................................................................... 33, 48

*Carlisle Tire & Rubber Co. v. United States,*
564 F. Supp. 834 (Ct. Int'l Trade 1983)...................................................................... 24

*China Kingdom Import & Export Co., Ltd. v. United States,*
507 F. Supp. 2d 1337 (Ct. Int'l Trade 2007)............................................................. 33

*Consolo v. Fed. Mar. Comm'n,*
383 U.S. 607 (1966) ......................................................................................................... 8

*Corus Staal v. United States,*
502 F.3d 1370 (Fed. Cir. 2007)............................................................... 25, 33, 46, 48

*Delverde, SRL v. United States,*
202 F.3d 1360 (Fed. Cir. 2000)...................................................................................... 60

*Downhole Pipe & Equip., L.P. v. United States,*
776 F.3d 1369 (Fed. Cir. 2015)...................................................................................... 55

*Fabrique de Fer de Charleroi v. United States,*
166 F. Supp. 2d 593 (Ct. Int'l Trade 2001).............................................................. 10

*Fine Furniture (Shanghai) Ltd. v. United States,*
748 F.3d 1365 (Fed. Cir. 2014)...................................................................................... 43

*Fujitsu Gen. Ltd. v. United States*,
   88 F.3d 1034 (Fed. Cir. 1996) .................................................................................... 8

*Geneva Steel v. United States*,
   914 F. Supp. 563 (Ct. Int'l Trade 1996) .................................................................. 22

*Goodluck India Ltd. v. United States*,
   11 F.4th 1335 (Fed. Cir. 2021) ................................................................. 26, 29, 35

*Gov't of Québec v. United States*,
   567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022) .......................................................... 24

*Guangdong Wireking Housewares & Hardware Co., Ltd. v. United States*,
   900 F. Supp. 2d 1362 (Ct. Int'l Trade 2013) .......................................................... 58

*Guizhou Tyre Co, Ltd. v. United States*,
   523 F. Supp. 3d 1312 (Ct. Int'l Trade 2012) .......................................................... 36

*Habas Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*,
   413 F. Supp. 3d 1347 (Ct. Int'l Trade 2019) .......................................................... 29

*Heckler v. Chaney*,
   470 U.S. 821 (1985) ................................................................................................. 15

*Hitachi Energy USA Inc. v. United States*,
   34 F.4th 1375 (Fed. Cir. 2022) ................................................................................ 33

*Hyundai Steel Co. v. United States*,
   279 F. Supp. 3d 1349 (Ct. Int'l Trade 2017) .......................................................... 37

*Jinko Solar Co., Ltd. v. United States*,
   229 F. Supp. 3d 1333 (Ct. Int'l Trade 2017) .......................................................... 36

*Linyi Chengen Imp. & Exp. Co. v. United States*,
   391 F. Supp. 3d 1283 (Ct. Int'l Trade 2019) .......................................................... 31

*Loper Bright Enters. v. Raimondo*,
   603 U.S. 369 (2024) ................................................................................................... 9

*Maui Pineapple Co., Ltd. v. United States*,
   264 F. Supp. 2d 1244 (Ct. Int'l Trade 2003) .......................................................... 36

*Mosaic Co. v. United States*,
   160 F.4th 1340 (Fed. Cir. 2025) ........................................................................ 8, 38

*Mosaic Co. v. United States*,
   659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) .......................................................... 25

*Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*,
  753 F.3d 1227 (Fed. Cir. 2014)..................................................................... 43

*Nan Ya Plastics Corp. v. United States*,
  810 F.3d 1333 (Fed. Cir. 2016)..................................................................... 33

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003)......................................................... 30, 31, 38

*PAM, S.p.A. v. United States*,
  582 F.3d 1336 (Fed. Cir. 2009).......................................................................8

*PPG Indus., Inc. v. United States*,
  928 F.2d 1568 (Fed. Cir. 1991)..................................................................... 22

*Qingdao Sea-Line Trading Co. v. United States*,
  766 F.3d 1378 (Fed. Cir. 2014)................................................................ 37, 60

*QVD Food Co., Ltd. v. United States*,
  658 F.3d 1318 (Fed. Cir. 2011)..................................................................... 33

*Rimco, Inc. v. United States*,
  582 F. Supp. 3d 1313 (Ct. Int'l Trade 2022)................................................. 18

*Royal Thai Gov't v. United States*,
  436 F.3d 1330 (Fed. Cir. 2006)..................................................................... 22

*RZBC Group Shareholding Co. v. United States*,
  100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015)................................................. 59

*SeAH Steel Corp. v. United States*,
  659 F. Supp. 3d 1318 (Ct. Int'l Trade 2023)................................................. 26

*Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*,
  605 U.S. 168 (2025) ........................................................................................8

*Shandong Rongxin Imp. & Exp. Co., Ltd. v. United States*,
  355 F. Supp. 3d 1365 (Ct. Int'l Trade 2019)................................................. 33

*Shantou Red Garden Foodstuff Co., Ltd. v. United States*,
  815 F. Supp. 2d 1311 (Ct. Int'l Trade 2012)................................................. 35

*Smith-Corona Grp. v. United States*,
  713 F.2d 1568 (Fed. Cir. 1983)..................................................................... 15

*SolarWorld Am., Inc. v. United States*,
  229 F. Supp. 3d 1362 (Ct. Int'l Trade 2017)............................................ 39, 40

*Tianjin Machinery Imp. & Exp. Corp. v. United States*,
  353 F. Supp. 2d 1294 (Ct. Int'l Trade 2004)....................................................... 26

*TMK IPSCO v. United States*,
  179 F. Supp. 3d 1328 (Ct. Int'l Trade 2016)....................................................... 15

*Torrington Co. v. United States*,
  68 F.3d 1347 (Fed. Cir. 1995)............................................................................. 15

*Tung Mung Dev. Co. v. United States*,
  25 C.I.T. 752 (2001)............................................................................................ 30

*United States v. Eurodif S.A.*,
  555 U.S. 305 (2009) .............................................................................................. 8

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
  435 U.S. 519 (1978) ............................................................................................ 15

Statutes

19 U.S.C. § 1516a ..................................................................................................... 8

19 U.S.C. § 1671(a) ............................................................................................... 10

19 U.S.C. § 1671a ................................................................................................... 58

19 U.S.C. § 1677-2 ........................................................................................... 13, 18

19 U.S.C. § 1677(5) ......................................................................................... passim

19 U.S.C. § 1677(5A) ...................................................................................... passim

19 U.S.C. § 1677d(1) ............................................................................................. 15

19 U.S.C. § 1677e(a) .............................................................................................. 19

19 U.S.C. § 1677e ............................................................................................ passim

19 U.S.C. § 1677f-1 ............................................................................................... 16

19 U.S.C. § 1677m(d) ..................................................................................... passim

28 U.S.C. § 2637(d) ............................................................................................... 24

Regulations

19 C.F.R. § 351.104 .......................................................................................... 29, 30

19 C.F.R. § 351.302(d) ........................................................................................... 29

19 C.F.R. § 351.308 ............................................................................................................ 39

19 C.F.R. § 351.309(c)..................................................................................................... 24, 33, 48

19 C.F.R. § 351.502 ......................................................................................................... 21, 22

19 C.F.R. § 351.525(b) .................................................................................................... 20, 21

Other Authorities

*Countervailing Duties*,
    62 Fed. Reg. 8,818 (Dep't of Commerce Feb. 25, 1997) ........................................................ 9

*Countervailing Duties*,
    63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998)........................................... 10, 11, 16

*Certain Cold-Rolled Carbon Steel Flat Products From Belgium*,
    67 Fed. Reg. 62,130 (Dep't of Commerce Oct. 3, 2002)........................................................ 19

*Final Affirmative Countervailing Duty Determination and Final Negative Critical
    Circumstances Determination*, 71 Fed. Reg. 47,174 (Dep't of Commerce Aug. 16, 2006)..... 42

*Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands*,
    72 Fed. Reg. 35,220 (Dep't of Commerce June 27, 2007) ..................................................... 55

*Definition of Factual Information and Time Limits for Submission of Factual Information*,
    78 Fed. Reg. 21,246 (Dep't of Commerce Apr. 10, 2013)...................................................... 27

*Citric Acid and Certain Citrate Sales from the People's Republic of China*,
    79 Fed. Reg. 108 (Dep't of Commerce Jan. 2, 2014) ............................................................ 59

*Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China*,
    80 Fed. Reg. 34,888 (Dep't of Commerce June 18, 2015) ..................................................... 36

*Welded Line Pipe From the Republic of Turkey*,
    80 Fed. Reg. 61,371 (Dep't of Commerce Oct. 13, 2015)..................................................... 42

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian
    Federation*, 80 Fed. Reg. 79,564 (Dep't of Commerce Dec. 22, 2015).............................. 16, 42

*Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian
    Federation*, 81 Fed. Reg. 49,935 (Dep't of Commerce July 29, 2016) ................................... 17

*1-Hydroxyethilidene-1, 1-Diphosphonic Acid from China*,
    82 Fed. Reg. 14,872 (Dep't of Commerce Mar. 23, 2017)..................................................... 36

*Certain Softwood Lumber Products from Canada*,
    82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017)....................................................... 53

*Ripe Olives From Spain*,
82 Fed. Reg. 56,218 (Dep't of Commerce Nov. 28, 2017)........................................ 18

*Ripe Olives From Spain*,
83 Fed. Reg. 28,186 (Dep't of Commerce June 18, 2018) ........................................ 18

*Certain Uncoated Groundwood Paper From Canada*,
83 Fed. Reg. 39,414 (Dep't of Commerce Aug. 9, 2018)........................................... 36

*Welded Line Pipe From the Republic of Turkey*,
85 Fed. Reg. 59,287 (Dep't of Commerce Sept. 21, 2010)....................................... 42

*4th Tier Cigarettes from the Republic of Korea*,
85 Fed. Reg. 79,994 (Dep't of Commerce Dec. 11, 2020) ....................................... 19

*4th Tier Cigarettes from the Republic of Korea*,
85 Fed. Reg. 44281 (Dep't of Commerce July 22, 2020)........................................... 19

*Certain Corrosion-Resistant Steel Products From the Republic of Korea*,
86 Fed. Reg. 42,784 (Dep't of Commerce Aug. 5, 2021)........................................... 19

*Certain Corrosion-Resistant Steel Products From the Republic of Korea*,
86 Fed. Reg. 70,111 (Dep't of Commerce Dec. 9, 2021) .......................................... 19

*Phosphate Fertilizers from the Russian Federation*,
88 Fed. Reg. 76,182 (Dep't of Commerce Nov. 6, 2023)......................................... 53

*Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and the Socialist Republic of Vietnam*, 88 Fed. Reg. 81,053 (Dep't of Commerce Nov. 21, 2023).......................................... 4

*Warmwater Shrimp From Ecuador*,
89 Fed. Reg. 22,379 (Dep't of Commerce Apr. 1, 2024)............................................. 4

*Frozen Warmwater Shrimp From Ecuador*,
89 Fed. Reg. 31,722 (Dep't of Commerce Apr. 25, 2024)........................................... 4

*Frozen Warmwater Shrimp From Ecuador*,
89 Fed. Reg. 85,506 (Dep't of Commerce Oct. 28, 2024) ..................................... 2, 5

*Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws*, 89 Fed. Reg. 101,694 (Dep't of Commerce Dec. 16, 2024) ............................ 11

*Brass Rod from Korea*,
89 Fed. Reg. 29,290 (Dep't of Commerce Apr. 22, 2024)........................................ 42

*Aluminum Extrusions From Mexico*,
89 Fed. Reg. 80,496 (Dep't of Commerce Oct. 3, 2024)........................................... 53

*Ripe Olives from Spain*,

90 Fed. Reg. 25,223 (Dep't of Commerce June 16, 2025) ....................................................... 55

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act (SAA),
H. R. REP. No. 103-316, vol. 1, at 931 (1994),
*reprinted in* 1994 U.S.C.C.A.N. 4040.......................................................................... 21, 24, 25

x

**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**

BEFORE: THE HONORABLE RICHARD K. EATON, SENIOR JUDGE

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A., SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | ) ) ) ) |
| Plaintiffs/Consolidated Defendant-Intervenors, | ) ) ) ) |
| v. | ) ) |
| UNITED STATES, | ) ) |
| Defendant, | ) Consol. Court No. 25-00025 ) |
| and | ) **PUBLIC VERSION** ) |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, | **)** ) ) |
| Defendant-Intervenor/ Consolidated Plaintiff, | ) ) ) |
| and | ) ) |
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | ) ) ) |
| Defendant-Intervenor/ Consolidated Plaintiff-Intervenor. | ) ) ) ) |

**DEFENDANT'S RESPONSE TO PLAINTIFFS'
MOTION FOR JUDGMENT UPON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, defendant, the United States,

respectfully submits this response to the motions for judgment upon the agency record filed by

Plaintiffs Industrial Pesquera Santa Priscila, S.A. (Santa Priscila) and Sociedad Nacional de

Galápagos, C.A. (SONGA), ECF No. 43, Consolidated Plaintiff American Shrimp Processors

Association (ASPA), ECF No. 41, and Consolidated Plaintiff-Intervenor Ad Hoc Shrimp Trade Action Committee, ECF No. 45. Because the Department of Commerce's final determination is supported by substantial evidence and otherwise in accordance with law, we respectfully request that the Court sustain Commerce's final determination.

## STATEMENT PURSUANT TO RULE 56.2(c)(1)

### I.      Administrative Determination Under Review

Plaintiffs challenge Commerce's final determination in the countervailing duty investigation of frozen warmwater shrimp from Ecuador. *See Frozen Warmwater Shrimp From Ecuador,* 89 Fed. Reg. 85,506 (Dep't of Commerce Oct. 28, 2024) (final determination of countervailing duty investigation) (P.R. 459), and accompanying Issues and Decision Memorandum (IDM) (P.R. 456). The investigation covers entries or sales of frozen warmwater shrimp from Ecuador made January 1, 2022 through December 31, 2022. *Id.*

### II.      Issues Presented For Review

1.      Whether Commerce lawfully limited its examination of cross-owned input suppliers.

2.      Whether Commerce's determination that the Government of Ecuador (GOE's) Investment Contract program was *de facto* specific was supported by substantial evidence.

3.      Whether Commerce's decision to decline to accept SONGA and Naturisa S.A. (Naturisa)'s factual information concerning the existence of previously unreported benefit for the Annual Motor Vehicle Tax Reduction (AMVTR)[1] program at verification was supported by substantial evidence.

---

[1] Commerce refers to this program as Motor Vehicle Tax Reduction program. To keep the terminology consistent, we use the same name as plaintiffs.

2

4.      Whether Commerce's application of adverse facts available (AFA) to SONGA and Naturisa for the AMVTR program is lawful.

5.      Whether Commerce's decision to decline to accept Produmar S.A. (Produmar)'s voluminous revisions to its benefit for the AMVTR program database at verification was supported by substantial evidence.

6.      Whether Commerce's application of AFA to determine that the AMVTR program was specific was supported by substantial evidence.

7.      Whether Commerce's selection of an AFA rate for the AMVTR program was supported by substantial evidence.

8.      Whether Commerce's decision to decline to accept SONGA's voluminous revisions for its benefit and use of the ISD Tax Exemption for Imported Assets and Raw Materials program at verification was supported by substantial evidence.

9.      Whether Commerce's application of AFA and selection of the AFA rate to find that SONGA benefited from the ISD Tax Exemption for Imported Assets and Raw Materials program was lawful and supported by substantial evidence.

10.     Whether Commerce's determination that the provision of brackish water did not constitute a financial contribution was in accordance with law.

11.     Whether Commerce lawfully found that the provision of fuel was not countervailable.

## STATEMENT OF FACTS

Given the numerous and dissimilar issues challenged, we provide the relevant facts underlying each issue below in the argument section.  We provide an overview of the investigation here.

On November 21, 2023, Commerce initiated a countervailing duty investigation on frozen warmwater shrimp from Ecuador. *See Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and the Socialist Republic of Vietnam*, 88 Fed. Reg. 81,053 (Dep't of Commerce Nov. 21, 2023) (initiation notice), P.R. 87. Commerce selected Santa Priscila and SONGA for individual examination as mandatory respondents. Respondent Selection Memorandum (Dec. 7, 2023), P.R. 95, C.R. 48.

On April 1, 2024, Commerce published its preliminary determination. *See Frozen Warmwater Shrimp From Ecuador*, 89 Fed. Reg. 22,379 (Dep't of Commerce Apr. 1, 2024) (prelim. determination), P.R. 293, and accompanying decision memorandum (PDM), P.R. 283. On April 25, 2024, Commerce published an amended preliminary determination, which corrected significant ministerial errors. *See Frozen Warmwater Shrimp From Ecuador*, 89 Fed. Reg. 31,722 (Dep't of Commerce Apr. 25, 2024) (amended prelim. determination), P.R. 338. Commerce preliminarily calculated subsidy rates of 2.89 percent for Santa Priscila, 1.69 percent (de minimis) for SONGA, and 2.89 percent for all others. *Amended Preliminary Determination*, 89 Fed. Reg. at 31,723.

On July 12, 2024, Commerce issued a post-preliminary analysis memorandum. First Post-Preliminary Memorandum (July 12, 2024), P.R. 400. In it, Commerce preliminarily found certain newly alleged programs not to be countervailable, including the provision of fuel for less than adequate remuneration (LTAR) and the provision of brackish water for LTAR. *Id*. at 15-16. Parties submitted case and rebuttal briefs for the programs analyzed in the preliminary determination and first post-preliminary analysis memorandum. ASPA First Case Brief (Sept. 16, 2024), P.R. 427, C.R. 316; ASPA First Rebuttal Brief (Sept. 23, 2024), P.R. 431, C.R. 319; Respondents First Case Brief (Oct. 11, 2024), P.R. 451-452, C.R. 327; Respondents First

Rebuttal Brief (Oct. 11, 2024), P.R. 453-454, C.R. 328. On September 27, 2024, Commerce issued a second post-preliminary analysis memorandum. Second Post-Preliminary Memorandum (Sept. 27, 2024), P.R. 437.  Parties submitted case and rebuttal briefs on the second post-preliminary analysis memorandum as well.  ASPA Second Case Brief (Oct. 2, 2024), P.R. 442; ASPA Second Rebuttal Brief (Oct. 8, 2024), P.R. 447, C.R. 326; Respondents Second Case Brief (Oct. 2, 2024), P.R. 445, C.R. 325; Respondents Second Rebuttal Brief (Oct. 7, 2024), P.R. 446.

After considering the interested parties' comments, Commerce issued its final determination.  Commerce calculated subsidy rates of 3.57 percent for Santa Priscila, 4.41 percent for SONGA, and 3.78 percent for all others.  *Final Determination*, 89 Fed. Reg. at 85,507.

## SUMMARY OF THE ARGUMENT

Commerce's final determination should be sustained.  None of the arguments raised by the Ecuadorian producers or the domestic petitioners demonstrate reversible error by Commerce.

First, Commerce lawfully limited its examination of the respondents' cross-owned input suppliers.  Neither the statute nor Commerce's regulations require Commerce to examine every supplier.  Commerce has wide discretion regarding its procedures and methodology, and it was well within Commerce's discretion to limit its examination to certain suppliers, in light of its limited resources and practical restraints on Commerce's investigation.

Second, substantial evidence supports Commerce's conclusion that the Investment Contract program was *de facto* specific.  The actual recipients of the subsidy represent a small segment of the Ecuadorian economy and therefore, the actual recipients of the subsidy are limited in number.

Third, Commerce's decision to decline to accept SONGA and Naturisa's alleged minor corrections at verification is supported by substantial evidence. SONGA and Naturisa's previously unreported use and benefit information for the AMVTR program constituted new factual information. Commerce was not aware that SONGA and Naturisa used and benefited from the AMVTR program; therefore, the burden was on SONGA and Naturisa to timely report this information

Fourth, Commerce's application of AFA to SONGA and Naturisa for the AMVTR program was supported by substantial evidence. Neither SONGA nor Naturisa reported that either company used the AMVTR program, and Commerce reasonably expected SONGA and Naturisa to do so. Commerce was not aware of SONGA and Naturisa's error and would not have known to send a deficiency questionnaire.

Fifth, Commerce's decision to decline to accept Produmar's alleged minor corrections is supported by substantial evidence because of the voluminous nature of the revisions and difficulty in verifying such voluminous corrections. Produmar's alleged minor corrections were new factual information and not minor corrections that Commerce was required to accept at verification.

Sixth, Commerce's use of an adverse inference to find that the AMVTR program was *de facto* specific is supported by substantial evidence. Santa Priscila and SONGA failed to report their respective period of investigation subsidy usage and actual amount of benefits they received. As a result, the record was missing information necessary to conduct an analysis of disproportionality for the purposes of *de facto* specificity. Moreover, an adverse inference was warranted based upon their failure to cooperate to the best of their ability. Based upon AFA, Commerce found that Santa Priscila and SONGA received disproportionate benefits.

6

Seventh, Commerce's selection and application of the AFA rate for the AMVTR program was supported by substantial evidence.  Because Santa Priscila and Produmar are cross-owned entities, Commerce applied the AFA rate for the AMVTR program to both companies.

Eighth, Commerce's decision to decline to accept, at verification, SONGA's corrections regarding its benefit information for the ISD Tax Exemption for Imported Assets and Raw Materials program was supported by substantial evidence.  SONGA's alleged minor corrections were numerous and could not be verified in the limited time Commerce had.  As such, Commerce found that SONGA's alleged minor corrections are new factual information.

Ninth, substantial evidence supports Commerce's application of AFA to determine benefit for SONGA for the ISD Tax Exemption for Imported Assets and Raw Materials program. Commerce could not have known that the benefit information provided by SONGA was for the incorrect year.  Thus, contrary to the producers' arguments, Commerce was not required to issue a deficiency questionnaire.  Further, Commerce's selection of the AFA rate, using the highest non-zero rate calculated in this investigation for a similar program, was supported by substantial evidence and consistent with Commerce's AFA hierarchy.

Tenth, Commerce lawfully determined that the provision of brackish water did not constitute a financial contribution because the use of the water was non-consumptive and the GOE did not charge a fee for non-consumptive use nor aid in the pumping or transport of the water.

Finally, Commerce lawfully determined that the provision of fuel was not countervailable because record evidence demonstrated that EP Petroecuador (Petroecuador) did not directly provide any fuel to the respondents and that there is insufficient evidence to initiate an investigation that Petroecuador entrusted or directed private sellers.  Because ASPA did not

allege any other form of indirect provision of fuel, Commerce only investigated the direct provision of fuel, in which there was no financial contribution.

Commerce's final determination with respect to all issues for the mandatory respondents was in accordance with law and supported by substantial evidence. Commerce's calculation of the mandatory respondents' rates and the all-others rate should be sustained.

## ARGUMENT

### I.    Standard of Review

In reviewing Commerce's determinations, "the Court of International Trade must sustain 'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" *Fujitsu Gen. Ltd. v. United States*, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"The specific factual findings on which {Commerce} relies in applying its interpretation are conclusive unless unsupported by substantial evidence." *United States v. Eurodif S.A.*, 555 U.S. 305, 316 n.6 (2009). Substantial evidence means "more than a mere scintilla" and "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *PAM, S.p.A. v. United States*, 582 F.3d 1336, 1339 (Fed. Cir. 2009). Further, even if the Court may draw two inconsistent conclusions from the record evidence, that possibility "does not prevent an administrative agency's finding from being supported by substantial evidence." *Consolo v. Fed. Mar. Comm'n*, 383 U.S. 607, 620 (1966).

"'{W}hen an agency exercises discretion granted by a statute, judicial review is typically conducted under the Administrative Procedure Act's deferential arbitrary-and-capricious standard.'" *Mosaic Co. v. United States*, 160 F.4th 1340, 1346 (Fed. Cir. 2025) (quoting *Seven Cnty. Infrastructure Coal. v. Eagle Cnty., CO*, 605 U.S. 168, 179–80 (2025)).

8

## II.    Commerce's Determination To Limit Examination Of Cross-Owned Input Suppliers Was In Accordance With The Law And Reasonable

The Court should sustain Commerce's determination to limit the number of cross-owned input suppliers that it examined.  It was well within Commerce's discretion in administering the investigation.  ASPA identifies no statute or regulation that requires Commerce to evaluate every single cross-owned input supplier, no matter how small the supplier or impact upon Commerce's resources.

### A.  Legal Framework

Congress, through statute, may "empower an agency to prescribe rules to 'fill up the details' of a statutory scheme" or use terms that "leave {} agencies with flexibility" such as "appropriate" or "reasonable."  *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 395 (2024) (internal citations omitted).  In section 103 of the Uruguay Round Agreements Act (URAA), codified at 19 U.S.C.  § 3513(a)(2), Congress delegated to Commerce the authority to "adopt 'such regulations as may be *necessary* to ensure that any provision of {the URAA}, or amendment made by {the URAA}, that takes effect on the date any of the Uruguay Round Agreements enters into force with respect to the United States is *appropriately* implemented on such date.'" (emphasis added).  Therefore, Congress delegated to Commerce the authority to issue regulations that implement the URAA.

Consequently, Commerce published rules to conform to the URAA and codify administrative practices determined to be appropriate under the URAA, including regulations regarding codifying the definition of cross-ownership along with general rules about attribution and cross-ownership.  *Countervailing Duties*, 62 Fed. Reg. 8,818 (Dep't of Commerce Feb. 25, 1997); *Countervailing Duties*, 63 Fed. Reg. 65,348 (Dep't of Commerce Nov. 25, 1998) (*CVD Preamble*).

9

Under 19 U.S.C. § 1671(a), Commerce will impose duties if Commerce determines "the government of a country or any public entity within the territory of a country is providing, directly or indirectly, a countervailable subsidy with respect to the manufacture, production, or export of a class or kind of merchandise imported, or sold (or likely to be sold) for importation, into the United States" and the International Trade Commission makes an affirmative injury determination. Commerce's regulations provide guidance as to how subsidies should be attributed, including those provided to corporation with cross-ownership:

> If there is cross-ownership between an input producer that supplies, either directly or indirectly, a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations).

19 C.F.R. § 351.525(b)(6)(iv)(A).

Although the term "cross-ownership" is not found in the statute, the preamble to Commerce's regulations states that "the relationships captured by the cross-ownership definition include those where the interests of two corporations have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same ways it can use its own assets (or subsidy benefits)." *CVD Preamble*, 63 Fed. Reg. at 65,401. More specifically, for cross-owned input suppliers, Commerce's concern was "the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product—the type of input product that is merely a link in the overall production chain." *Id.* This Court has sustained Commerce's ability to attribute subsidies. *Fabrique de Fer de Charleroi v. United States*, 166 F. Supp. 2d 593, 604 (Ct. Int'l Trade 2001) (noting that plaintiff's sale-by-sale approach would be an administrative burden not required by the law).

Because different factual scenarios may arise, and to avoid "an extremely lengthy set of rules that might prove unduly rigid," Commerce's regulations provide general rules. *CVD Preamble*, 63 Fed. Reg. at 65,399. At the time Commerce developed these regulations, "it had limited experience with the attribution of subsidies between affiliated companies." *Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws*, 89 Fed. Reg. 101,694, 101,740 (Dep't of Commerce Dec. 16, 2024).[2] Moreover, Commerce did not include any specific procedures regarding how it would examine cross-owned input suppliers in 19 C.F.R. § 351.525(b)(6)(iv). "Ideally, Commerce would examine all cross-owned input suppliers in an investigation." IDM at 34. However, Commerce may exercise its discretion to require only certain cross-owned suppliers to provide information in an investigation. *Id.*

### B. Background on Commerce's Examination of the Respondents' Cross-Owned Input Suppliers

On January 9, 2024, the two mandatory respondents, Santa Priscila and SONGA, requested that Commerce limit its examination of cross-owned input suppliers. Respondents Request (Jan. 9, 2024), P.R. 126. C.R. 55. Santa Priscila stated that it had purchased shrimp from [     ] cross-owned input suppliers, but [     ] of these suppliers represented an insignificant share of its purchases during the POI. *Id.* at 5. Santa Priscila also stated that Santa Priscila's [     ] cross-owned shrimp supplier, Produmar, accounts for [     ] percent of all the raw shrimp supply provided by its cross-owned suppliers.[3] *Id.* at 6. Santa Priscila argued

---

[2] In late 2024, Commerce formalized its practice of limiting examination of cross-owned companies through rulemakings. Although the regulations became effective after this investigation, Commerce's explanation of its evolving cross-ownership analysis practice is relevant.

[3] Santa Priscila supplied [     ] percent of its own raw shrimp supply and cross-owned input suppliers account for [     ] percent of raw shrimp processed by Santa Priscila. Respondents' Request at 5-6.

11

that because the external cross-owned input suppliers, other than Produmar, collectively represent a miniscule share of Santa Priscila's overall purchases of shrimp from cross-owned input suppliers any countervailable benefit that may have been received by any cross-owned input supplier other than Produmar would not affect the calculation of the overall CVD rate for Santa Priscila. *Id.* at 6. SONGA had [      ] cross-owned input suppliers, and Naturisa accounted for [     ] percent of SONGA's total purchases for raw shrimp from its cross-owned input suppliers. Respondents Request at 7. SONGA argued that it was not feasible to complete responses on behalf of all its cross-owned input suppliers. Because the shrimp farms other than Naturisa represented an insignificant share of SONGA's overall purchase of raw shrimp, any countervailable benefit that may have been received by any other supplier of raw shrimp that met the cross-ownership standard would not affect the calculation of the overall CVD rate. *Id.* at 7-8.

ASPA opposed the request, arguing that the request was untimely, the inputs are primarily dedicated to the production of frozen shrimp, there is no precedent to excuse reporting, there is no *de minimis* threshold for the attribution of subsidies, and there was sufficient time for responses on behalf of all of the respondents' cross-owned input suppliers. ASPA Opposition (Jan. 11, 2024), P.R. 131. ASPA reiterated its arguments in an *ex parte* meeting with Commerce officials. Ex Parte Memorandum (Jan. 18, 2024), P.R. 149.

On January 25, 2024, Commerce issued supplier questionnaires, requesting responses from Produmar as Santa Priscila's [      ] supplier of shrimp to submit a response and Naturisa as SONGA's [      ] supplier of shrimp. Santa Priscila Supplier Questionnaire (Jan. 25, 2024), P.R. 161, C.R. 67; SONGA Supplier Questionnaire (Jan. 25, 2024), P.R. 160, C.R. 66. On January 29, 2024, ASPA filed another submission, opposing limiting the number of cross-owned input suppliers for examination. ASPA Opposition (Jan. 29, 2024), P.R. 167. In case

12

briefs, the parties addressed whether Commerce could or should limit examination of cross-owned input suppliers.  ASPA First Case Brief at 56-61; ASPA Second Case Brief at 2-3; Respondents First Rebuttal Brief at 1-6; Respondents Second Rebuttal Brief at 4-5.

In its final determination, Commerce addressed ASPA's arguments.  Commerce explained that its regulations do not require Commerce to investigate all cross-owned input suppliers.  Commerce explained it could lawfully "limit{} the reporting requirements to a select group of cross-owned companies and attributing subsidies to only the cross-owned input suppliers we required to respond to our request for information in this investigation."  IDM at 34. Commerce explained that, because of the significant resources required, it was not practicable to examine each cross-owned affiliate of the respondents.  IDM at 34.

Commerce disagreed that it must include the volume of all raw shrimp suppliers including unexamined raw shrimp suppliers in its calculation of countervailable subsidies attributable to suppliers of raw shrimp pursuant to 19 U.S.C. § 1677-2 and found it would not be appropriate to do so when Commerce had not requested information from those cross-owned input suppliers.  IDM at 35.  Commerce explained that ASPA's proposed method of incorporating the volumes of raw shrimp for non-examined cross-owned input suppliers into Commerce's section 1677-2 calculation was not necessarily more accurate.  *Id.*  Commerce explained that "the attribution of subsidies received by cross-owned companies is governed by the regulations, whereas the attribution of subsidies bestowed on the raw product is not strictly governed by this provision."  *Id.*

13

### C. Commerce Has The Authority To Limit Examination of Cross-Owned Input Suppliers

Commerce lawfully limited its examination of cross-owned input suppliers based upon its resource limitations and attributed subsidies for the examined cross-owned input suppliers. ASPA reads in a requirement that does not exist in the statute or the plain language of the regulation: that Commerce must examine *all* cross-owned input suppliers, no matter how small, and attribute all subsidies even from non-examined cross-owned input suppliers. Commerce's cross-ownership regulations, necessarily general in nature, do not address all aspects of Commerce's examination of cross-owned input suppliers and attribution of subsidies. Instead, Commerce may, in its discretion, set procedures, including, if appropriate, limiting its examination of cross-owned input suppliers and attribute subsidies of the examined cross-owned input suppliers.

ASPA argues that 19 C.F.R. § 351.525(b)(6)(iv)'s use of the auxiliary verb "will" when describing Commerce's attribution of subsidies received by a supplier requires Commerce to investigate *all* cross-owned input suppliers. ASPA Br. at 19. The regulations do not address whether Commerce may limit the scope of its examination to fewer than all cross-owned input suppliers. The regulation instead "instructs Commerce on how to attribute subsidies for those cross-owned input suppliers that Commerce does investigate." IDM at 34. In this investigation, Commerce complied with the regulation by examining the selected cross-owned input suppliers and attributing subsidies. IDM at 34.

ASPA contends that limiting investigation to fewer than all suppliers would create a loophole whereby a cross-owned entity could avoid CVD exposure for input subsidies by separately incorporating the division that makes the input. ASPA argues that Commerce did not fulfill its duty to investigate the extent to which the mandatory respondents benefited from the

14

alleged subsidy programs through their respective cross-owned fresh shrimp suppliers.  ASPA Br. at 19-20.  However, Commerce has "broad discretion in executing the law" in line with the "general standards" set by Congress.  *Smith-Corona Grp. v. United States*, 713 F.2d 1568, 1571 (Fed. Cir. 1983).  "Commerce has significant discretion in determining the procedures by which it will gather and analyze information necessary to meet the statutory deadlines imposed." *Bebitz Flanges Works Priv. Ltd. v. United States*, 433 F. Supp. 3d 1309, 1325 (Ct. Int'l Trade 2020).  Indeed, "absent constitutional constraints or extremely compelling circumstances, the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties." *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 543-44 (1978).

Even Commerce's affirmative duty to investigate any appearance of subsidies related to the investigation under 19 U.S.C. § 1677d(1) is tempered by its resource limitations.  *See Torrington Co. v. United States*, 68 F.3d 1347, 1351 (Fed. Cir. 1995) ("agencies with statutory enforcement responsibilities enjoy broad discretion in allocating investigative and enforcement resources") (citing *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)).  ASPA asks this Court to "substitute its judgment for the agency's regarding the allocation of resources," *TMK IPSCO v. United States*, 179 F. Supp. 3d 1328, 1338 (Ct. Int'l Trade 2016), which this Court should not do.

ASPA claims that the *CVD Preamble* does not allow Commerce to choose not to investigate a cross-owned company.  ASPA Br. at 20-21.  ASPA's citation to the *CVD Preamble* is unpersuasive.  The *CVD Preamble* lays out the general reasons why Commerce found it necessary to have the cross-ownership practice and promulgate regulations regarding cross-ownership.  It does not specify the procedures that Commerce would take in examining cross-owned input suppliers, including whether to limit examination and attribution.  Indeed, the

15

regulations are "general rules of attribution." *CVD Preamble*, 63 Fed. Reg. at 65,399.  In this case, Commerce struck a reasonable balance between the resource limitations and the need to examine cross-owned suppliers by limiting Commerce's examination to the [      ] cross-owned input suppliers.

ASPA asserts that Commerce has no statutory authority to limit its examination of cross-owned input suppliers based upon an evaluation of the agency's resources.  ASPA Br. at 22-23. However, as explained above, Commerce may establish procedures to administer its investigations, including how it conducts its cross-ownership determinations and attribution of subsidies to cross-owned entities.  Moreover, the countervailing duty statute itself acknowledges that Commerce is an agency with limited resources such that it may not be practicable to examine every company.  *See, e.g.*, 19 U.S.C. § 1677f-1(e)(2) (explaining that Commerce can limit examination of respondents).  Therefore, the statute, which does not even use the term "cross-owned," does not prevent Commerce from determining, on a specific factual record, to limit the number of cross-owned input suppliers for examination.

ASPA argues that Commerce's practice is to require mandatory respondents to submit questionnaire responses on behalf of all cross-owned suppliers of inputs that are primarily dedicated to the production of subject merchandise, and there are no unique circumstances in the investigation to warrant limiting examination of cross-owned input suppliers.  ASPA Br. at 23-24.  However, Commerce does not have unlimited resources and, where appropriate, has limited examination of cross-owned input suppliers in a prior case.  IDM at 35 (citing *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 80 Fed. Reg. 79,564 (Dep't of Commerce Dec. 22, 2015), and accompanying PDM at 2, unchanged in *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the*

16

*Russian Federation*, 81 Fed. Reg. 49,935 (Dep't of Commerce July 29, 2016)).  Even if Commerce had not done so in the past, it does not mean that Commerce cannot begin limiting examination of cross-owned input suppliers as it develops experience and reacts to new circumstances.

Moreover, Commerce makes its determinations based on the record of each case and case-specific facts.  The balance between the resources and examining cross-owned suppliers may have not been in favor of limiting examination of cross-owned input suppliers in other cases.  Here, the "nature of shrimp farming in Ecuador is such that numerous small shrimp farmers throughout the country supply shrimp to our respondents, Santa Priscila and SONGA." IDM at 34.  Commerce found that "{e}xamining all of Santa Priscila and SONGA's cross-owned affiliates in investigation would require significant resources for Commerce to analyze each company's corporate structure, accounting and selling practices, and production information."[4] IDM at 34.  Commerce explained that "combined with the overlapping statutory deadlines of other AD and CVD proceedings and Office IV's notable workload, place a significant constraint on the number of analysts that can be assigned to this investigation."  IDM at 34-35.  Therefore, Commerce concluded "it would not be practicable in this investigation to examine each cross-owned affiliate for Santa Priscila and SONGA, and determined to select certain cross-owned affiliates for investigation."  IDM at 34.  That decision should be sustained as reasonable and within Commerce's discretion to administer the countervailing duty laws.

---

[4]  The producers also explained that it was not feasible to complete responses for all of their cross-owned input suppliers.  Respondents Request at 5, 7-8.

17

### D. Commerce Was Not Required To Use Facts Available For The Non-Examined Cross-Owned Input Suppliers

ASPA contends that based upon 19 U.S.C. § 1677-2, Commerce was required to rely on facts available to determine the benefit mandatory respondents received through their purchases of fresh shrimp from cross-owned suppliers that were not examined. ASPA Br. at 26. However, ASPA misinterprets the statute. For agricultural products processed from raw agricultural product in which certain requirements are met, "countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product." 19 U.S.C. § 1677-2. In those circumstances, Commerce will attribute subsidies from both cross-owned and non-cross-owned input suppliers. IDM at 35; *see also Ripe Olives From Spain*, 82 Fed. Reg. 56,218 (Dep't of Commerce Nov. 28, 2017) and accompanying PDM at 11, 17 (using to two separate calculations for cross-owned input suppliers and non-cross-owned input suppliers), unchanged in *Ripe Olives From Spain*, 83 Fed. Reg. 28,186 (Dep't of Commerce June 18, 2018) (*Olives from Spain*). Nothing in the statute requires Commerce to ignore its resource constraints in doing so or requires Commerce to do so for all cross-owned input suppliers. *See also Rimco, Inc. v. United States*, 582 F. Supp. 3d 1313, 1321 (Ct. Int'l Trade 2022) ("It has long been recognized that Commerce is the "master" of the countervailing and antidumping duty laws and was entrusted by Congress with determining the appropriate countervailing and antidumping duties.") (citations omitted). Here, Commerce has followed the statute and attributed subsidies for both cross-owned and non-cross-owned input suppliers. IDM at 35. Commerce examined cross-owned input suppliers that accounted for sufficient amount of the supply of shrimp from cross-owned suppliers, balanced with its limited resources, to attribute subsidies and calculate the countervailing duty subsidy rate. Thus, additional information was not necessary. In other

18

contexts, Commerce has limited information reporting for practical reasons, and there is no indication that Commerce relied on facts available for the unreported information.  *See, e.g., Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 86 Fed. Reg. 42,784 (Dep't of Commerce Aug. 5, 2021), and accompanying PDM at 2-3 (exempting reporting for certain sales of CORE and exempting reporting of U.S. sales of after-service automobile parts, finished automobiles, and formed parts), unchanged in *Certain Corrosion-Resistant Steel Products From the Republic of Korea*, 86 Fed. Reg. 70,111 (Dep't of Commerce Dec. 9, 2021); *4th Tier Cigarettes from the Republic of Korea,* 85 Fed. Reg. 44281 (Dep't of Commerce July 22, 2020), and accompanying PDM at 1 (explaining that "Commerce limited home market sales reporting requirements to two sales channels") unchanged in *4th Tier Cigarettes from the Republic of Korea*, 85 Fed. Reg. 79,994 (Dep't of Commerce Dec. 11, 2020); *Certain Cold-Rolled Carbon Steel Flat Products From Belgium*, 67 Fed. Reg. 62,130 (Dep't of Commerce Oct. 3, 2002) and accompanying IDM at Comment 1 (declining to use partial adverse facts available and continuing to exempt respondent from reporting certain U.S. sales).   Therefore, facts available under 19 U.S.C. § 1677e(a) is not required.

Moreover, because attribution from cross-owned input suppliers is governed by the regulations and attribution from non-cross-owned input suppliers is not, Commerce calculates attribution of cross-owned input suppliers using two separate calculations.  IDM at 36.  The calculation for attribution for cross-owned inputs suppliers is not same as the calculation for non-cross-owned input suppliers.  *Id.*   Because Commerce did not have information on non-cross-owned input suppliers, Commerce relied on subsidy information of the cross-owned input suppliers and a per-kilogram method.  PDM at 10-11.  ASPA advocates the same per-kilogram method as facts available for the non-examined cross-owned input suppliers.  ASPA Br. at 27-

19

28. However, Commerce explained that this approach "would be an incomplete approach under 19 CFR 351.525(b)(6), because it would not account for the information needed for the sales denominator." IDM at 36. ASPA complains that Commerce created the information gap. ASPA Br. at 28-29. But, as explained above, Commerce found that the information was not necessary and did not need to use a method to fill that gap. Commerce has sufficient information to calculate the countervailable subsidy rate for cross-owned suppliers, and using an incomplete approach to attribution of cross-owned input suppliers would not make Commerce's calculation more accurate.

ASPA points to Commerce's statements that Commerce must still determine the level of subsidization for non-cross-owned inputs suppliers even when Commerce did not have information from non-cross-owned input suppliers. ASPA Br. at 27-28. However, the facts for non-cross-owned input suppliers differ significantly. Commerce had no information for non-cross-owned input suppliers to determine the level of subsidization. IDM at 64. In contrast, Commerce had information from Produmar and Naturisa, which are Santa Priscila and SONGA's [      ] cross-owned input suppliers respectively. *See* Respondent's Request at 6-7; Santa Priscila Supplier Questionnaire; SONGA Supplier Questionnaire.

Finally, ASPA complains that Commerce claimed Commerce was consistent *Olives from Spain*, but Commerce had both input suppliers for Camacho submit information in *Olives from Spain*.[5] ASPA Br. at 29-30. Yet, Commerce's citation to the case was for the proposition that because cross-owned input suppliers and non-cross-owned input suppliers are different scenarios, Commerce has two separate calculations for cross-owned input suppliers and non-

---

[5] In contrast, both Santa Priscila and SONGA had [                    ] cross-owned input suppliers. Respondents' Request at 5, 7.

cross-owned inputs suppliers in this investigation as consistent with *Olives from Spain*.  IDM at

36.  The same is true here.  *Id.*  Commerce uses two separate calculations for attribution of cross-

owned input suppliers and non-cross-owned input suppliers, and the calculation for non-cross-

owned input suppliers is not an appropriate approach for the calculation for cross-owned input

suppliers.  *Id.*  Therefore, Commerce reasonably did not use ASPA's suggested per-kilogram

approach.

### III.    Commerce's Determination That The Investment Contract Program Was *De Facto* Specific Is Supported By Substantial Evidence

This Court should sustain Commerce's determination that the investment contract

program was *de facto* specific.  Commerce will find a countervailable subsidy when an

"authority" provides a "financial contribution" that results in a "benefit conferred" and the

subsidy is "specific."  19 U.S.C. § 1677(5).  A domestic subsidy is *de facto* specific when,

among other factors, "{t}he actual recipients of the subsidy, whether considered on an enterprise

or industry basis, are limited in number."  19 U.S.C. § 1677(5A)(D)(iii)(I).  Commerce "is not

required to determine whether there are shared characteristics among the enterprises or industries

that are eligible for, or actually receive, a subsidy," but reviews only whether they are, in fact,

"limited in number."  19 C.F.R. § 351.502(b); 19 U.S.C. § 1677(5A)(D)(iii).

The Statement of Administrative Action (SAA), the authoritative expression of the

United States, states that, when Commerce applies the "*de facto* specificity" test, "the weight

accorded to particular factors will vary from case to case."  Statement of Administrative Action

Accompanying the Uruguay Round Agreements Act (SAA), H. R. REP. No. 103-316, vol. 1, at

931 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040, 4243.  Commerce's regulations also provide

that, in *de facto* specificity analyses, Commerce "will examine the factors contained in section

21

{1677(5A)(D)(iii)} sequentially in order of their appearance.  If a single factor warrants a finding of specificity, {Commerce} will not undertake further analysis." 19 C.F.R. § 351.502(a).

Courts have long recognized that Commerce's *de facto* specificity analysis is fact-intensive and case-specific.  *See, e.g., Royal Thai Gov't v. United States*, 436 F.3d 1330, 1335-36 (Fed. Cir. 2006) (citing *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999) (stating Commerce's *de facto* specificity determinations "are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case")).  Consequently, Commerce is vested with broad discretion in determining whether a subsidy is *de facto* specific.  Indeed, in interpreting an earlier version of the statute, the Federal Circuit has stated that Commerce's specificity decision must be upheld unless Commerce's interpretation "is effectively precluded by the statute."  *PPG Indus., Inc. v. United States*, 928 F.2d 1568, 1573 (Fed. Cir. 1991); *see Geneva Steel v. United States*, 914 F. Supp. 563, 599 (Ct. Int'l Trade 1996) (observing, in *de facto* specificity context, that "Commerce enjoys considerable deference in erecting methodologies and procedures for implementing the CVD laws," and may not be overruled "so long as the test as applied is reasonable and conforms to Congressional intent").

### A.  Factual Background on the Investment Contract Program

The Investment Contract program gives tax incentives for companies to "enter into investment contracts with domestic and foreign investors who make investments of at least one million U.S. dollars that generate employment in Ecuador."  PDM at 23.  Commerce determined that the manner in which benefits were disbursed under the Investment Contract program were *de facto* specific because the actual recipients of the subsidy are limited in number, within the

meaning of 19 U.S.C. § 1677(5A)(D)(iii)(I).  PDM at 24; IDM at 50.  More specifically, the

GOE reported:

| Year | Number of Companies That Entered into An Investment Contract | Total Number of Companies Registered in Ecuador |
|---|---|---|
| 2019 | [    ] | [      ] |
| 2020 | [    ] | [      ] |
| 2021 | [    ] | [      ] |
| 2022 | [    ] | [      ] |

GOE Section II Questionnaire Response (Section II IQR) (Feb. 14, 2024), P.R. 207, C.R. 105 at

Exhibit OTH-2(b); GOE Supplemental Section II Questionnaire Response (Section II SQR1)

(Mar. 13, 2024), P.R. 263, C.R. 153 at Exhibit S-Q3(a).  Based on this data, Commerce

determined explained that "{b}ased on these data, the percent of companies that were approved

assistance under this program out of all companies registered in Ecuador in the years 2019, 2020,

and 2021, were [      ] percent, [      ] percent, and [      ] percent, respectively." Santa

Priscila Calculation Memorandum (Oct. 21, 2024), P.R. 461, C.R. 331 at 4; SONGA Calculation

Memorandum (Oct. 21, 2024), P.R. 460, C.R. 329 at 3.  *Id.*  Therefore, Commerce "because the

number of companies that received assistance under this program constitute [

] of the total number of companies registered in Ecuador between 2019 and 2021,"

Commerce concluded that "assistance under this program was provided to a limited number of

users and, thus, is *de facto* specific."  *Id.*

23

B. **Commerce Reasonably Compared The Number Of Companies Entered Into An Investment Contract And The Total Number of Companies Registered In Ecuador**

Commerce's determination that the Investment Contract program was *de facto* specific is supported by substantial evidence. Relying upon *Carlisle Tire & Rubber Co. v. United States*, 564 F. Supp. 834 (Ct. Int'l Trade 1983) and the SAA, plaintiffs argue that the Investment Contract program provides tax benefits that are non-countervailable, economy-wise capital investment incentives. Pl. Br. at 7. However, Commerce's specificity analysis achieved the goal of winnowing "out only those foreign subsidies which truly are broadly available and widely used throughout an economy." SAA at 929. Commerce compared the number of companies that entered into an investment contract and the total number of companies registered in Ecuador and found that "the number of companies that received assistance under this program constitute [

] of the total number of companies registered in Ecuador between 2019 and 2021." Santa Priscila Calculation Memorandum at 4; SONGA Calculation Memorandum at 3. Moreover, Congress did not direct how Commerce should consider specificity; "the law itself permits Commerce to determine the appropriate reach of its specificity determinations." *Gov't of Québec v. United States*, 567 F. Supp. 3d 1273, 1292 (Ct. Int'l Trade 2022), *aff'd*, 105 F.4th 1359, 1374 (Fed. Cir. 2024).

Plaintiffs claim that the SAA required Commerce to consider the short length of time that the program has been in existence and the corresponding ramp-up in participation. Pl. Br. at 8. Plaintiffs never raised this argument before Commerce and therefore did not exhaust their administrative remedies. *See* 28 U.S.C. § 2637(d) ("the Court of International Trade shall, where appropriate, require the exhaustion of administrative remedies."); 19 C.F.R. § 351.309(c)(2) (requiring a party raise all arguments in the case briefs before the agency). None of the exceptions to exhaustion apply. The argument is fact dependent, there has been no intervening

24

case law, and it would not have been futile for the producers to do so. Moreover, the "mere fact that an adverse decision may have been likely does not excuse a party from a statutory or regulatory requirement that it exhaust administrative remedies." *Corus Staal v. United States*, 502 F.3d 1370, 1378-81 (Fed. Cir. 2007).

These facts, in any event, do not undermine the substantial evidence supporting Commerce's decision. Even if the Investment Contract program expanded in 2018, the Investment Contract program was not recently introduced; it was established in 2010, over a decade before the period of investigation. PDM at 24 (citing GOE Initial Questionnaire Response (IQR) (Feb. 14, 2024), P.R. 206, C.R.105 at OTH-4). Further, the SAA states that "the Administration does not intend" that the duration of a subsidy program "be used to excuse *de facto* specificity." SAA at 932.

Plaintiffs assert that the Court should adopt the reasoning in *The Mosaic Co. v. United States*, 659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023). Pl. Br. at 8-10. There, another judge of this Court found a tax penalty reduction program not to be *de facto* specific because the program was not industry specific. Pl. Br. at 8-10. We respectfully submit that *Mosaic* is not binding precedent or persuasive authority. *See Algoma Steel Corp. v. United States*, 865 F.2d 240, 243 (Fed. Cir. 1989) (explaining that one judge on the Court of International Trade is not bound by decisions of another judge on the court). First, the number of recipients in *Mosaic* was different than those here. 659 F. Supp. 3d at 1314. Second, section 1677(5A)(D)(iii)(I) "does not require the administering authority to make a determination based on the number of industries that use a program, but instead states that a program is specific if the 'actual recipients of the subsidy, whether considered on an enterprise *or* industry basis, are limited in number.'" IDM at 51 (quoting 19 U.S.C. § 1677(5A)(D)(iii)(I) (emphasis added)). Here, the actual recipients of the

25

subsidy represent a very small segment of the Ecuadorian economy.  IDM at 51.  Therefore, Commerce's *de facto* specificity finding for the Investment Contract program was supported by substantial evidence.

**IV.    Commerce Lawfully Declined To Accept New Factual Information Concerning SONGA and Naturisa's Benefit Information For The AMVTR Program**

The Court should find that Commerce did not abuse its discretion in rejecting new information that SONGA provided for the first time at verification.  As we demonstrate below, the corrective information related to SONGA and Naturisa's benefit from the AMVTR program was more than a permissibly minor correction.

### A.  Legal Framework

As part of the verification process, Commerce allows parties to submit minor corrections to information already submitted in their questionnaire responses.  *See Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342-43 (Fed. Cir. 2021) (affirming Commerce's practice "to accept corrective information at verification only for minor corrections to information already on the record."); *see also SeAH Steel Corp. v. United States*, 659 F. Supp. 3d 1318, 1324 (Ct. Int'l Trade 2023) (same).  Verification is not an opportunity to submit new factual information or non-minor corrections.  *Tianjin Machinery Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294, 1305 (Ct. Int'l Trade 2004), a*ff'd*, 146 F. App'x 493 (Fed. Cir. 2005).  Verification "is intended to test the accuracy of data already submitted, {not} to provide a respondent with an opportunity to submit a new response{.}" *Id*. at 1304.  Commerce sets deadlines for the submission of factual information, well before verification, to ensure that Commerce can avoid situations where it would not have sufficient time and resources to "adequately examine, analyze, conduct follow-up inquiries regarding and, if necessary, verify {} information."

26

*Definition of Factual Information and Time Limits for Submission of Factual Information*, 78

Fed. Reg. 21,246, 21,247 (Dep't of Commerce Apr. 10, 2013).

### B. Background

In its initial questionnaire, Commerce requested SONGA to report any other subsidies

that it or its cross-owned affiliates received. Initial Questionnaire (Dec. 12, 2023), P.R. 98 at 44-

45. Neither SONGA nor Naturisa reported that it received benefits under the AMVTR program.

in which companies may receive an eighty-percent reduction on vehicle taxes owed by owning

one or more vehicle(s) weighing one-ton or more, and by using those vehicles for productive and

commercial activities. Produmar Section III Supplier Initial Questionnaire Response (IQR) (Feb.

20, 2024), P.R. 208, C.R. 110 at Exhibit PRO-15. In its preliminary determination, Commerce

explained that it intended to analyze the AMVTR program in a post-preliminary determination.

PDM at 29-30. Commerce continued to collect information on the AMVTR program.

On July 10, 2024, in its supplemental questionnaire response regarding the AMVTR

program, the GOE reported that SONGA and Naturisa received benefits under this program.

GOE Post-Preliminary Third Supplemental Questionnaire Response (SQR3), P.R. 398, C.R. 261

at S5-6. On July 12, 2024, in its first post-preliminary analysis memorandum, Commerce stated

that AMVTR would be examined in an additional post-preliminary analysis memorandum. First

Post-Preliminary Memorandum at 18. Commerce officials conducted verification of SONGA

and Naturisa's responses. "At the start of verification, SONGA and Naturisa officials reported

that both entities omitted the reporting of vehicle ownership tax exemptions received pursuant to

the {AMVTR} program." SONGA Verification Report (Aug. 13, 2024), P.R 420, C.R. 313 at 2.

"SONGA claimed that it received vehicle tax exemptions on [     ] vehicles and Naturisa claimed

27

that it received vehicle tax exemptions on [    ] vehicles." *Id.*  Commerce did not accept these corrections.  *Id.*

### C.  Commerce Reasonably Found That SONGA And Naturisa's Corrections Were New Factual Information

Commerce reasonably found that SONGA and Naturisa's corrections were new factual information and not minor corrections.  Plaintiffs argue that Commerce should have known that SONGA and Naturisa received benefits under the AMTVR program and never asked them to report their benefits.  Pl. Br. at 21-23.  However, Commerce was not aware until verification that SONGA and Naturisa used the AMTVR program.  Both Santa Priscila and Produmar reported that they had received AMVTR benefits, but neither SONGA nor Naturisa did so.  *See* Santa Priscila Supplemental Section III Questionnaire Response (March 1, 2024), P.R. 234, C.R. 136 at S-2 and Exhihit S(4)-b; Produmar Section III Supplier IQR at Exhibit PRO-15.  Santa Priscila and Produmar's reporting demonstrates that it was reasonable for Commerce to expect SONGA and Naturisa to report receipt of AMVTR benefits.  Mere knowledge of the existence of the program is not sufficient reason for Commerce to know that SONGA and Naturisa used the AMVTR program.  Companies do not necessarily receive a benefit from every subsidy that could provide a countervailable benefit.  *See e.g.*, IDM at 18 (listing programs determined not to be used by the mandatory respondents).  Moreover, in its preliminary decision memorandum, Commerce explained that it intended to analyze the AMVTR program in a post-preliminary determination.  PDM at 29-30.  SONGA and Naturisa were aware that Commerce was investigating this program.

On July 11, 2024, the GOE responded to a supplemental questionnaire regarding the AMVTR program and reported that SONGA and Naturisa received benefits under this program.  GOE Post-Preliminary SQR3 at S5-6.  Plaintiffs point out that the GOE described the AMVTR

programs as nationwide, widely available, Pl. Br. at 23, but a reasonable belief that a program is not countervailable does not excuse the failure to report requested information. *Habas Sinai Ve Tibbi Gazlar Istihsal Endüstrisi A.S. v. United States*, 413 F. Supp. 3d 1347, 1355 n.14 (Ct. Int'l Trade 2019). SONGA and Naturisa should have known that Commerce was investigating the AMVTR program but did not attempt to correct its omission until verification and after the GOE notified Commerce that SONGA and Naturisa had benefitted from the AMVTR program.

Plaintiffs contend that Commerce did not explain why the number of vehicles for which tax exemptions were obtained was not a minor correction. Pl. Br. at 23, 28. However, the number of corrections required is a relevant factor when determining whether Commerce acted within its discretion in finding revisions to a database not minor. For example, in *Goodluck India*, the Federal Circuit found that Commerce did not abuse its discretion in rejecting corrections at verification that would have constituted "systemic change to the entire reported database," contrasting the revisions at issue to revisions that were "singular, such as a missing word or an error in arithmetic." *Id.* at 1343.

Plaintiffs claim that the record contains information about magnitude of the error in rejected but retained case briefs. Pl. Br. at 27-28. However, consideration of this rejected but retained information for any other purpose than establishing and documenting the basis of the rejection would run contrary to Commerce's regulations, which provide that Commerce "will not consider or retain in the official record of the proceeding . . . untimely filed factual information." 19 C.F.R. § 351.302(d). Rejected documents are on the official record "*solely for purposes of establishing and documenting the basis for rejecting the document.*" 19 C.F.R. § 351.104(a)(2)(ii) (emphasis added). Here, Commerce rejected plaintiffs' first case and rebuttal briefs as containing untimely filed factual information but retained copies on the record pursuant

to 19 C.F.R. § 351.104(a)(2)(ii)(A).  Rejection Letter (Oct. 10, 2024), P.R. 449.  Moreover, Commerce does not solely consider magnitude when determining whether corrections are minor. IDM at 71.  Therefore, Commerce's decision not to accept SONGA and Naturisa's new factual information at verification was supported by substantial evidence and should be sustained.

**V.     Commerce Lawfully Applied AFA To SONGA And Naturisa For The AMVTR Program**

### A.  Legal Framework

Commerce shall use facts otherwise available to reach its final determination when "necessary information is not available on the record," a party "withholds information that has been requested," fails to provide the information timely or in the manner requested, "significantly impedes a proceeding," or provides information Commerce is unable to verify. 19 U.S.C. § 1677e(a)(1)-(2).  Where an agency's request is clear and relates to issues in an investigation, a respondent has a "statutory obligation to prepare an accurate and complete record in response to questions plainly asked by Commerce." *Tung Mung Dev. Co. v. United States*, 25 C.I.T. 752, 758 (2001).  "The mere failure of a respondent to furnish requested information—for any reason—requires Commerce to resort to other sources of information to complete the factual record on which it makes its determination." *Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1381 (Fed. Cir. 2003).  However, prior to resorting to facts otherwise available, Commerce must inform and provide, where practicable, the noncomplying party with an opportunity to comply.  19 U.S.C. § 1677m(d).  If a party is provided with an opportunity to comply and does so, Commerce may nevertheless "disregard all or part of the original and subsequent responses" if it determines that the information provided is not satisfactory or untimely, subject to 19 U.S.C. § 1677m(e).  *Id.*

Further, if Commerce finds that "an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information," then Commerce "may use an inference that is adverse to the interests of that party in selecting from among the facts otherwise available." 19 U.S.C. § 1677e(b). When determining whether a respondent has complied to the "best of its ability," Commerce "assess{es} whether {a} respondent has put forth its maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*, 337 F.3d at 1382. Adverse inferences are not warranted "merely from a failure to respond," but rather in instances when Commerce reasonably expected that "more forthcoming responses should have been made." *Id*. at 1383. "The statutory trigger for Commerce's consideration of an adverse inference is simply a failure to cooperate to the best of respondent's ability, regardless of motivation or intent." *Id.* "Respondents should be forthcoming with information, regardless of their views on relevancy, in the event the agency finds differently." *Linyi Chengen Imp. & Exp. Co. v. United States*, 391 F. Supp. 3d 1283, 1298 (Ct. Int'l Trade 2019) (citations omitted).

### B. Background

At verification, Commerce "discovered that SONGA and Naturisa received benefits under the {AMTVR} program" which were not reported in its original responses to the initial questionnaire. Second Post-Preliminary Memorandum at 7. Commerce did not accept SONGA and Naturisa's new factual information at verification. As a result, Commerce did not have information on the record to determine whether each of the financial contributions provided to SONGA and Naturisa constitutes a benefit. *Id.* Because necessary information is not available on the record, and because SONGA and Naturisa withheld requested information, failed to provide the information by the applicable deadline, and significantly impeded this proceeding,

31

Commerce relied on facts available in accordance with 19 U.S.C. § 1677e(a)(1) and (2)(A)-(C). *Id.* Commerce also found that by failing to provide accurate, timely information regarding the usage of the AMVTR program pursuant to Commerce's Initial Questionnaire by the established deadline, SONGA and Naturisa failed to cooperate by not acting to the best of their ability to comply with Commerce's request for information in this proceeding within the meaning of 19 U.S.C. § 1677e(b). *Id.* Accordingly, Commerce found that the use of AFA is warranted to determine the benefits received for SONGA, and Naturisa to ensure that the companies do not obtain more favorable results by failing to cooperate than if they had fully complied with Commerce's request for information. *Id.;* IDM at 77-78.

### C.  Commerce Was Not Aware Of SONGA and Naturisa's Error

Commerce's application of an adverse inference was lawful. Plaintiffs argue that Commerce did not comply with 19 U.S.C. § 1677m(d) because Commerce did not send a deficiency questionnaire for the information. Pl. Br. at 24-27. However, as explained above, Commerce was unaware of SONGA and Naturisa's omission of information and would not have known to issue a deficiency questionnaire before the record closed. "When a respondent provides seemingly complete, albeit completely inaccurate, information, § 1677m(d) does not require Commerce to issue a supplemental questionnaire seeking assurances that the initial response was complete and accurate." *ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018).

After the GOE submitted its response showing that SONGA and Naturisa received benefits under the AMVTR program on July 10, 2024, Commerce officials began verification of the GOE and Santa Priscila a week later. GOE SQR3 at S5-6; Santa Priscila Verification Report (Aug. 22, 2024), P.R. 421, C.R. 314 at 1; GOE Verification Report (Sept. 3, 2024), P.R. 422,

32

C.R. 315 at 1.  Then, Commerce officials began verification of SONGA starting on July 22, 2024.  SONGA Verification Report at 1.  Moreover, although plaintiffs argued that Commerce did not send a deficiency questionnaire with respect to Produmar, plaintiffs failed to make any arguments with respect to 19 U.S.C. § 1677m(d) for SONGA and Naturisa.  Resp. Second Case Br. at 34.  As such, Commerce did not have the opportunity to address these arguments and these arguments have not been exhausted.  *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017); 19 C.F.R. § 351.309(c)(2).  None of the exceptions to exhaustion apply.  The argument is fact-dependent and the facts of SONGA and Naturisa's error differ from Produmar's error, there has been no intervening case law, and the futility exception is narrow and strictly viewed.  *Corus Staal*, 502 F.3d at 1378-81.

Plaintiffs cite several cases to support their argument that Commerce did not provide the statutorily-required opportunity to correct their deficiencies.  These cases are distinguishable.  In *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375, 1383 (Fed. Cir. 2022), Commerce changed its methodology after the first remand and Hyundai sought to provide data and information related to the new methodology.  Moreover, *Shandong Rongxin Import & Export Co., Ltd. v. United States*, 355 F. Supp. 3d 1365, 1374-75 (Ct. Int'l Trade 2019) explained that subsequent cases since {*China Kingdom Import & Export Co., Ltd. v. United States*, 507 F. Supp. 2d 1337 (Ct. Int'l Trade 2007)} from the Federal Circuit and this Court "have clarified that respondents are primarily responsible for the state of the record." (citing *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1337 (Fed. Cir. 2016); *QVD Food Co., Ltd. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011); *ABB Inc.*, 355 F. Supp. 3d at 1221-23).

Plaintiffs' argument would incentivize parties to respond to Commerce's questions without providing complete information or entirely omit relevant information because even if

33

Commerce were to discover later that such information had been withheld, a party would have an opportunity to provide such information without repercussion.  This weaponization of 19 U.S.C. § 1677m(d) should not be sanctioned.

## VI.   Commerce Reasonably Declined To Accept New Factual Information At Verification Regarding Produmar's Benefit Information For AMVTR Program

### A.  Background

On January 25, 2024, Commerce issued a supplier questionnaire to Santa Priscila and its cross-owned entity, Produmar, requesting information for income tax programs in the Income Tax Programs Appendix.  Specifically, the supplier questionnaire stated:

> Indicate the amount of the tax savings derived from the use of this program. Provide a detailed calculation of the assistance and all source materials. Show the amount of tax (or the amount of loss incurred) that would have been due absent this benefit. Indicate where in the tax return this assistance is shown. For tax deferrals, please indicate the amount of tax owed and the length of the deferral period.

Santa Priscila Supplier Questionnaire at Section III.  On February 20, 2024, Produmar responded for the AMTVR program, "{t}he total amount of the exemption claimed by Produmar during the POI is $[83,689]."  Produmar Section III Supplier Questionnaire Response (Feb. 20, 2024), P.R. 208, C.R. 110 at Exhibit PRO-15.  From July 15 to July 17, 2024, Commerce conducted verification of Produmar's responses.  Santa Priscila Verification Report (Aug. 22, 2024), P.R. 421, C.R. 314 at 1.  "At the start of verification, Produmar officials reported that in Santa Priscila's February 16, 2024, Section III questionnaire response at Exhibit PRO-15, Produmar mistakenly reported motor vehicle tax exemptions received under fiscal year [        ], rather than the year of [                                            ]."  Santa Priscila Verification Report at 2.  "The revised database included [        ] of motor vehicle tax exemptions."  *Id.* Commerce did not accept this correction.  *Id.*

34

**B. Commerce Reasonably Found That Produmar's Alleged Minor Corrections Are New Factual Information**

Commerce reasonably found that Produmar's corrections were not minor and therefore constituted new factual information. Plaintiffs argue that Commerce did not explain why the number of corrections rendered them not minor. Pl. Br. at 15. The number of corrections are relevant when determining whether Commerce acted within its discretion in finding revisions not minor. *Goodluck*, 11 F.4th at 1343. In particular, the Federal Circuit explained that the revisions at issue in *Goodluck* "were not singular, such as a missing word or an error in arithmetic." *Id.*

Plaintiffs contend that Commerce intended to verify the AMVTR benefits and had the allotted time to do so. Pl. Br. at 16. However, Commerce had allotted time to verify information that was already on the record and for which Commerce officials had prepared, not new information presented at the start of verification. Even if Commerce had the time to verify, this would not turn Produmar's revisions into a minor correction. "A minor correction is one that rectifies minor mistakes in addition, subtraction, or other arithmetic function, minor data entry mistakes, clerical errors resulting from inaccurate copying, duplication, or the like, or minor classification errors. *Goodluck*, 11 F.4th at 1343. Produmar's revised database, which included [       ] of motor vehicle tax exemptions, does not fall within that definition. Santa Priscila Verification Report at 2.

Plaintiffs cite several cases as support for their argument that Commerce should have accepted their corrections. Pl. Br. at 18-20. All are distinguishable and do not provide persuasive authority. In *Shantou Red Garden Foodstuff Co., Ltd. v. United States*, Commerce requested a voluntary remand to allow the respondent to correct a "clerical error." 815 F. Supp. 2d 1311, 1341 (Ct. Int'l Trade 2012). In *Jinko Solar Co., Ltd. v. United States*, Commerce accepted at verification additional information that "corrected and clarified" insurance expense

35

information already on the record.  229 F. Supp. 3d 1333, 1356-57 (Ct. Int'l Trade 2017).  In

*Maui Pineapple Co., Ltd. v. United States*, Commerce accepted a revision at verification to

correct an error affecting a single product code.  264 F. Supp. 2d 1244, 1262 (Ct. Int'l Trade

2003).  In *Guizhou Tyre Co, Ltd. v. United States*, this Court found that it could not evaluate

Commerce's allegation that the corrections were not minor absent certain record evidence.  523

F. Supp. 3d 1312, 1348-49 (Ct. Int'l Trade 2012).  By contrast, record evidence about the volume

of corrections demonstrates that they were not minor.  Santa Priscila Verification Report at 2.

Further, this Court has already ordered certain documents that plaintiffs claim were the

corrections not accepted at verification as part of this Court's record.  ECF No. 60.

Plaintiffs also rely upon administrative determinations in which Commerce found

information at verification to be minor corrections.  Pl. Br. at 20-21.  In *1-Hydroxyethilidene-1,*

*1-Diphosphonic Acid from China*, 82 Fed. Reg. 14,872 (Dep't of Commerce Mar. 23, 2017), the

14 grants were a small portion of the total number of grants previously reported.  *See also* IDM

at 72.  In *Certain Uncoated Groundwood Paper From Canada*, 83 Fed. Reg. 39,414 (Dep't of

Commerce Aug. 9, 2018), and the accompanying Issues and Decision Memorandum at 60,

Commerce determined that two tax credits discovered at verification were not countervailable,

which is not true here for the AMVTR program.  In *Certain Passenger Vehicle and Light Truck*

*Tires From the People's Republic of China*, 80 Fed. Reg. 34,888 (Dep't of Commerce June 18,

2015), and the accompanying Issues and Decision Memorandum at 19-20, the amount of

unreported grants accepted as minor correction is not clear in comparison to the voluminous

amount here.  However, here, Commerce found that the corrections were not minor because of

the volume of corrections.

Moreover, "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record." *Qingdao Sea-Line Trading Co. v. United States*, 766 F.3d 1378, 1387 (Fed. Cir. 2014)). "Commerce is not bound by decisions made in different segments of a proceeding, let alone decisions made in different proceedings." *Hyundai Steel Co. v. United States*, 279 F. Supp. 3d 1349, 1372 (Ct. Int'l Trade 2017). The administrative reviews cited by the producers involve different factual records, different errors, and different programs under investigation. They are therefore of limited relevance and do not undermine Commerce's decision here, which is supported by substantial evidence.

## VII.    Substantial Evidence Supports Commerce's Use Of AFA To Find That The AMVTR Program Is *De Facto* Specific

Commerce's determination that the AMVTR program was *de facto* specific is reasonable and supported by substantial evidence. Commerce preliminarily determined that Santa Priscila received a disproportionate amount of benefit under AMVTR because Santa Priscila reported receiving a benefit "many times greater than the average amount received by other program recipients in Ecuador." Second Post-Preliminary Memorandum at 13. Commerce did not have reliable benefit information for SONGA, Produmar, and Naturisa, needed to conduct a specificity analysis. Therefore, Commerce relied, as facts available, on Santa Priscila's reported benefit and found that the AMVTR program was *de facto* specific under 19 U.S.C. 1677(5A)(D)(iii)(III). *Id.* at 13-14. However, in the final determination, Commerce reconsidered its treatment of Santa Priscila and Produmar. Commerce found that because Santa Priscila and Produmar are cross-owned, Commerce should treat Santa Priscila and Produmar as a single cross-owned entity. IDM at 77. Thus, because the Santa Priscila cross-owned entity and the SONGA cross-owned entity failed to report their respective POI subsidy usage, Commerce

37

could not conduct a disproportionality analysis. IDM at 51. Therefore, Commerce found that an adverse inference was warranted for its specificity analysis. Based upon AFA, Commerce concluded that Santa Priscila and SONGA received disproportionate benefits and determined that the program was *de facto* specific. IDM at 51.

Thus, notwithstanding *Mosaic Co. v. United States*, 160 F.4th 1340, 1347 (Fed. Cir. 2025), which found that "Commerce has reasonable flexibility in assessing predominant usage," plaintiffs' arguments regarding Commerce's *de facto* specificity finding in the second post-preliminary memorandum is not applicable here. Pl. Br. at 11-13.

Plaintiffs argue that Commerce's application of AFA to find disproportionate benefit was an abuse of discretion. They list "undisputable" facts, claiming Commerce should have accepted Produmar's new factual information and that Produmar did not intend to submit inaccurate information. Pl. Br. at 17. However, as explained above, Produmar's proffered information was not a minor correction. Moreover, "there is no mens rea component" to Commerce's determination as to whether Produmar cooperated to the best of its ability. *Nippon Steel*, 337 F.3d at 1383. Here, the Santa Priscila cross-owned entity and the SONGA cross-owned entity did not provide accurate benefit information. Because of the lack of benefit information, Commerce could not conduct a disproportionality analysis. Commerce found that the Santa Priscila single entity and the SONGA single entity did not cooperate to the best of their ability. IDM at 51, 77. Commerce reasonably applied AFA to find that the program was *de facto* specific.

38

**VIII.  Substantial Evidence Supports Commerce's Use Of 1.38% AFA Rate For The AMVTR Program**

      **A.  Legal Framework**

This Court should sustain Commerce's selection of 1.38% as the AFA rate for the AMVTR program.  Commerce may select a rate with which to countervail a subsidy program by applying an adverse inference from among the facts otherwise available where it "finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with {its} request for information."  19 U.S.C. § 1677e(b)(1).  When applying an adverse inference, Commerce may rely on information derived from any stage of the proceeding, including the petition, a final determination in the investigation, any previous review, or any other information placed on the record.  19 U.S.C. § 1677e(b)(2); *see also* 19 C.F.R. § 351.308(c)(1)(i)–(iii) (2012).

Commerce has established a practice for selecting an adverse facts available rate in countervailing duty proceedings with different hierarchical methodologies for investigations versus administrative reviews.  *See SolarWorld Am., Inc. v. United States*, 229 F. Supp. 3d 1362, 1366-67 (Ct. Int'l Trade 2017).  The hierarchical methodologies were codified in a 2015 amendment to the statute.  The statute permits Commerce to "use" as adverse facts available in a countervailing duty proceeding "a countervailable subsidy rate applied for the same or similar program in a countervailing duty proceeding involving the same country; or if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that the administering authority considers reasonable to use." 19 U.S.C.    § 1677e(d)(1)(A).

In investigations, Commerce first considers and normally "applies the highest calculated rate for the identical program in the investigation if a responding company used the identical program, and the rate is not zero."  Second Post-Preliminary Memorandum at 8.  Next, "{i}f

39

there is no identical program match within the investigation, or if the rate is zero, Commerce will use the highest non-de minimis rate for a similar program (based on treatment of the benefit) in another CVD proceeding involving the same country." *Id.*  Finally, "{a}bsent an above-de minimis subsidy rate calculated for a similar program, Commerce applies the highest calculated above-*de minimis* subsidy rate for any non-company specific program otherwise identified in a CVD case involving the same country that could conceivably be used by the non-cooperating companies." *Id.*; *see also SolarWorld*, 229 F. Supp. 3d at 1366-67.

### B.  Background

In the second post-preliminary analysis memorandum, Commerce applied to Produmar. SONGA, and Naturisa the 0.04 percent rate calculated for Santa Priscila as the AFA rate for the AMVTR program.  Second Post Preliminary Memorandum at 11.  However, to correct its deviation from its practice of treating cross-owned companies as a single entity, in the final determination, Commerce revised its AFA rate analysis.  IDM at 77-78.  Commerce lacked a net subsidy rate calculated in the investigation for the AMVTR program that it could use as an AFA rate under the first step of its AFA hierarchy.  IDM at 78.  Therefore, Commerce used the second step, "which is to apply the highest non-de minimis rate calculated for a cooperating company in another CVD proceeding involving the same country for the identical program, or if the identical program is not available, for a similar program."  IDM at 78.  Commerce had not previously examined the AMVTR program in another CVD proceeding involving Ecuador.  IDM at 78. Therefore, Commerce used the highest non-*de minimis* subsidy rate calculated for a tax program or a similar program based on treatment of the benefit in an Ecuadorean CVD proceeding, which is the 1.38 percent net subsidy rate calculated for Santa Priscila under the Investment Contract Program in the investigation.  IDM at 78.  Accordingly, Commerce applied the 1.38 percent net

40

subsidy rate to the firms that comprise the Santa Priscila cross-owned entity and to the firms that comprise the SONGA cross-owned entity.  IDM at 78.

### C.  Commerce Lawfully Treated Santa Priscila and Produmar As Cross-Owned Entities

Commerce followed its AFA hierarchy in using the rate for a similar program.  Plaintiffs cite various differences between the AMVTR program and the Investment Contract program to argue that they are not similar programs.  Pl. Br. at 33-35.  However, both programs are income tax programs for which the tax benefits are calculated as the amount of the tax that should have been paid minus what was actually paid.  IDM at 78; PDM at 24.  Commerce had not previously examined the AMVTR program in another CVD proceeding involving Ecuador, so Commerce used the highest program rate for which the benefit is treated similarly.  IDM at 78.  Indeed, Produmar used the Income Tax Program Appendix to report the benefit for the Investment Contract program and AMVTR program.  Produmar Section III Supplier Questionnaire (Feb. 20, 2024) at Exhibit PRO-6, P.R. 208, C.R. 106 and PRO-15, P.R. 208, C.R. 110.

Plaintiffs' proposed alternative, using the 0.04% rate calculated for Santa Priscila, is contrary to Commerce's practice.  IDM at 77-78.  Commerce's use of 1.38 percent net subsidy rate calculated for Santa Priscila under the Investment Contract Program as the AFA rate for the AMVTR program reflects Commerce's practice.  Although Santa Priscila may have timely reported the benefits it individually received under the AMVTR program, "it did not timely report the benefits received by Produmar, a firm that was part of the cross-owned entity."  IDM at 78.  As a result, Commerce did not have complete benefit information for the entire Santa Priscila cross-owned entity.  For this reason, Commerce did "not use{} the partial benefit information reported by Santa Priscila when determining the AFA rate under this program."  IDM at 78.  Plaintiffs highlight that, in another, unrelated proceeding, Commerce applied the

41

calculated rate as AFA for the same program to the cross-owned affiliate. Pl. Br. at 35-36. In *Brass Rod from Korea*, Commerce, based on the "unique and unusual facts" of that record, declined to use the highest rate from among the rates available. 89 Fed. Reg. 29,290 (Dep't of Commerce Apr. 22, 2024), and accompanying IDM at 8-9. The facts of this record, by contrast, reasonably led Commerce to use the 1.38 percent net subsidy rate calculated for Santa Priscila under the Investment Contract Program as the AFA rate for the AMVTR program.

Plaintiffs contend there is no support for Commerce to treat Santa Priscila as uncooperative. Pl. Br. at 30-31. However, Commerce's use of 1.38 percent net subsidy rate calculated for Santa Priscila under the Investment Contract Program as the AFA rate for the AMVTR program reflects Commerce's practice to treat cross-owned companies as a single entity. IDM at 77 (citing *Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 71 Fed. Reg. 47,174 (Dep't of Commerce Aug. 16, 2006), and accompanying IDM at 26)). Commerce calculates "a single CVD rate that applies to all cross-owned firms that comprised the cross-owned entity." IDM at 77 (citation omitted).

Similarly, when Commerce finds "that the application of AFA is warranted with regard to a respondent's use of a subsidy program," Commerce applies a "single AFA rate to all cross-owned firms that comprise the cross-owned entity." IDM at 77 (citing *Welded Line Pipe From the Republic of Turkey*, 85 Fed. Reg. 59,287 (Dep't of Commerce Sept. 21, 2010), and accompanying PDM at 13 (preliminarily applying the AFA rate determined by its AFA rate selection hierarchy to respondent and its relevant cross-owned affiliates), unchanged in *Welded Line Pipe From the Republic of Turkey*, 80 Fed. Reg. 61,371 (Dep't of Commerce Oct. 13, 2015), and accompanying IDM at Appendix 187 (applying an 8.82 percent rate for the "Pre-

42

Export Credit Program," to respondent Celik Hayat and its cross-owned affiliates a single time based on the highest rate calculated in the investigation)).

Commerce may lawfully use an adverse inference, even if doing so may "have collateral consequences for a cooperating party." *An Giang Fisheries Imp. & Exp. Joint Stock Co. v. United States*, 287 F. Supp. 3d 1361, 1373 (Ct. Int'l Trade 2018) (citing *Mueller Comercial de Mexico, S. de R.L. de C.V. v. United States*, 753 F.3d 1227, 1236 (Fed. Cir. 2014)).  For example, "{c}ooperating respondents may be subject to collateral effects due to the adverse inferences applied when a government fails to respond to Commerce's questions," but "this result is not contrary to the statute or its purposes, nor is it inconsistent with this court's precedent." *Fine Furniture (Shanghai) Ltd. v. United States*, 748 F.3d 1365, 1373 (Fed. Cir. 2014).

Similarly, here, because it treats cross-owned companies as a single entity, Commerce assigned a single AFA rate to the firms that comprise the Santa Priscila cross-owned entity.  This approach reflects "the view that the cross-owned entity, as a whole, failed to accurately report its usage of the program," leaving Commerce without sufficient information "to determine the actual amount of benefits that the cross-owned entity received under the program."  IDM at 78. Although Santa Priscila may have timely reported the benefits it individually received under the AMVTR program, "it did not timely report the benefits received by Produmar, a firm that was part of the cross-owned entity."  IDM at 78.  Commerce therefore lacked complete benefit information for the entire Santa Priscila cross-owned entity.  For this reason, Commerce did "not use{} the partial benefit information reported by Santa Priscila when determining the AFA rate under this program."  IDM at 78.  Commerce further elaborated that its approach "is no different from a situation in which a single respondent reports using a subsidy program and then attempts to report additional usage of the program at verification that Commerce finds is not minor."

43

IDM at 78. "In such a situation, at verification Commerce would not accept the additional usage information, and Commerce would not use the incomplete benefit information the respondent timely divulged as an AFA plug for the additional benefit information that the respondent failed {to} submit prior to verification." IDM at 78.

Plaintiffs claim that Commerce did not examine Santa Priscila, Produmar, SONGA, and Naturisa's actions and brush off Commerce's explanation as conclusory rather than reflecting an examination. Pl. Br. at 31-32. Specifically, plaintiffs assert that Commerce should have considered the number of questionnaires and amount of information provided overall. *Id.* However, Commerce was not considering whether AFA was warranted for all of the programs or the programs in which Santa Priscila, Produmar, SONGA, and Naturisa submitted timely and correct information. Commerce was considering the more limited question of whether the respondents cooperated to the best of their ability in responding to requests for benefit information for the AMVTR program. For this specific program, Commerce found that neither the Santa Priscila single entity nor the SONGA single entity cooperated to the best of their ability to comply with Commerce's request for information "{b}y failing to provide accurate, timely information regarding the usage of the {AMVTR} program pursuant to Commerce's Initial Questionnaire by the established deadline." Second Post-Preliminary Memorandum at 7; IDM at 77-78. Accordingly, Commerce found that AFA is warranted "to ensure that the companies do not obtain more favorable results by failing to cooperate than if they had fully complied with our request for information." *Id.* Commerce's selection and application of the AFA rate to the Santa Priscila single entity and SONGA single entity for the AMVTR program is supported by substantial evidence and should be sustained.

44

IX.    **Commerce's Decision To Decline To Accept SONGA's New Factual Information At Verification Regarding The ISD Tax Exemption For Imported Assets And Raw Materials Program**

A.    **Background**

In its initial questionnaire, Commerce requested SONGA to provide a detailed calculation of the tax assistance it received, all source materials, and to identify where in its tax returns this assistance was shown.  Initial Questionnaire, P.R. 98.   On February 12, 2024, SONGA stated "{t}he amount of the benefit reported on the 2022 return" and did not provide an underlying calculation.  SONGA Initial Questionnaire Response (IQR) (Feb. 12, 2024), P.R. 184, C.R. 88 at Exhibit 11.  On May 2, 2024, Commerce issued a post-preliminary supplemental questionnaire and asked SONGA to "explain how SONGA calculated these amounts and how they were reported in SONGA's tax returns."  SONGA Post-Preliminary Supplemental Questionnaire (May 2, 2024), P.R. 354, C.R. 232.  On May 16, 2024, SONGA provided a calculation worksheet "illustrating how SONGA calculated the ISD exemption on imported materials," and explained that:

> in order to calculate the benefits received under the ISD exemption on imported materials under its investment contract, SONGA reviewed the value of the imported goods that were approved under its investment contract and purchased during 2021. Then, using this information, SONGA determined the tax value that would have been due on each one and applied the ISD rate in effect during the period of investigation ("POI") (i.e., 5 percent) to calculate the reported benefit amount under this exemption.

SONGA Post-Preliminary Supplemental Questionnaire Response (SQR) (May 16, 2024), P.R. 374, C.R.244 at S2-5.

At the start of verification, SONGA officials reported an error in SONGA's February 12, 2024, Section III questionnaire response at Exhibit 11 and May 16, 2024, supplemental questionnaire response at Exhibit S2-4(a).  SONGA "reported currency outflow tax (ISD) exemptions on purchases of imported assets and raw materials under the investment contract as

45

received in 2021 instead of the period of investigation (POI)." SONGA Verification Report at 2. "The revised database included [    ] transactions for [    ] imported assets." *Id.* Commerce did not accept these corrections. *Id.*

In the final determination, Commerce found that facts available was warranted consistent with 19 U.S.C. 1677e(a)(2)(A) and (B) because the record demonstrated that SONGA withheld requested information and failed to provide the correct data by the deadlines set by Commerce. IDM at 73-74. Because SONGA failed to provide the data at the time it was requested by Commerce and failed to provide the corrected data prior to verification, Commerce also found that SONGA did not act to the best of its ability to comply with Commerce's request for data and applied an adverse inference in accordance with 19 U.S.C. 1677e(b)(1). IDM at 74.

### B. Commerce Reasonably Found That The Information SONGA Presented At Verification Was New Factual Information

Commerce reasonably found that the information SONGA presented at verification constituted new factual information, not minor corrections. Plaintiffs argue that Commerce should have accepted its error in the ISD exemption for imported materials in the same way that Commerce accepted SONGA's minor correction for the ISD exemption for the repayment of principal and interest on foreign loans. Pl. Br. at 39-41. The producers failed to make this argument before Commerce in their case briefs. Moreover, none of the exceptions to the exhaustion requirement apply. The argument is fact-dependent, there has been no intervening case law, and it would not have been futile for the producers to raise this argument. *Corus Staal*, 502 F.3d at 1378-81.

Even if the Court were to find the exhaustion requirement waived, Commerce provided an explanation on the record for treating these two corrections differently. Commerce explained that SONGA's minor correction for the ISD exemption for the repayment of principal and

46

interest on foreign loans was similar to cases in which the corrections were a small portion of the grants previously reported and Commerce accepted as minor. IDM at 72. In contrast, "the entire data with its numerous transactions and assets for the ISD Exemption on Imported Assets and Raw Materials pursuant to SONGA's Investment Contract program required a correction." IDM at 72. Indeed, Commerce's acceptance of SONGA's minor correction for the ISD exemption for the repayment of principal and interest on foreign loans demonstrates "Commerce's willingness to accept revisions presented at verification provided that the amount of new information may be adequately examined in the time allotted to Commerce staff during verification." IDM at 72.

Plaintiffs contend that Commerce did not focus on the magnitude of the correction. Pl. Br. at 40. However, Commerce did not consider the magnitude of the change to be "the sole guiding factor in Commerce's decision to either accept or reject a correction in every instance." IDM at 71. Indeed, the verification outline cautions respondents that "verifiers will examine the errors to determine if they are minor," and does not stipulate potential reasons for a rejection. SONGA Verification Outline (July 9, 2024), P.R. 397, C.R. 260 at 8.

Contrary to plaintiffs' claim that Commerce did not explain why it would be unduly burdensome to verify the correction, Pl. Br. at 41, Commerce explained that "the change to the ISD Exemption on Imported Assets and Raw Materials pursuant to SONGA's Investment Contract was voluminous, which did not provide Commerce sufficient time to examine the corrected data on the spot at verification, {and} . . . was not found or traceable in the respondents' financial statement and/or tax return." IDM at 72. Indeed, "the revised data is based on numerous transactions and assets, which would have been unduly burdensome to verify on the spot." IDM at 71 (citing SONGA Verification Report at 2).

47

### C. Commerce's Application Of AFA Was Lawful and Supported By Substantial Evidence

Commerce's application of AFA is lawful and supported by substantial evidence. The producers did not provide information that could have alerted Commerce to SONGA's error. Plaintiffs argue that Commerce knew that SONGA had reported the 2021 benefits instead of its 2022 benefits and violated 19 U.S.C. § 1677m(d) by not requesting SONGA to provide its 2022 benefits. Pl. Br. at 41. However, the producers did not make this argument in their case briefs and therefore did not exhaust administrative remedies. *See Boomerang Tube LLC v. United States*, 856 F.3d 908, 912 (Fed. Cir. 2017); 19 C.F.R. § 351.309(c)(2). Nor do any of the exceptions to exhaustion apply: the argument is fact-dependent and the facts of SONGA and Naturisa's error differ from Produmar's error, there has been no intervening case law, and it would not have been futile. *Corus Staal*, 502 F.3d at 1378-81. In any event, Commerce did not have on the record the tax information that would have alerted Commerce to the appropriate year of receipt. IDM at 73. Without such information, Commerce was not in the position to solicit 2022 benefit information from SONGA.

Plaintiffs contend that Commerce's application of AFA was unsupported by substantial evidence, noting SONGA's explanation for its calculation of the benefit and arguing that SONGA could not have linked the 2021 benefit to its tax filings because the ISD exemption tax does not appear in SONGA's income tax return. Pl. Br. at 42-46. Plaintiffs misunderstand Commerce's AFA analysis and ignore SONGA's response to Commerce's initial questionnaire. Commerce requested a detailed calculation of the assistance, all source materials, and for SONGA to indicate where in the tax return this assistance was shown. SONGA responded by stating "{t}he amount of the benefit reported on the 2022 return" and did not provide a

48

calculation.  SONGA IQR at Exhibit 11.  Commerce reasonably expected a linkage to SONGA's

2022 tax return because SONGA stated the benefit was reported on the 2022 tax return.

In a supplemental questionnaire, Commerce requested that SONGA explain its

calculation and reporting of the ISD exemption on imported materials.  SONGA responded by

providing a calculation worksheet "illustrating how SONGA calculated the ISD exemption on

imported materials," and an explanation for its calculation.  SONGA Post-Preliminary SQR at

S2-5.  However, SONGA again did not provide linkage to its tax filings in any of its responses.

Plaintiffs argue that it could not do so because this information does not appear in the SONGA's

tax declaration, Pl. Br. at 45.  But this only further demonstrates that SONGA continued to

provide benefit information for the incorrect year in its supplemental response.  Because

Commerce was not alerted to the fact that the benefit information was for the wrong year,

Commerce was not in the position to solicit 2022 benefit information from SONGA.  IDM at 73.

Then, after the record has been closed and when only minor corrections are accepted, at

verification, Commerce discovered that the information provided was incorrect.  SONGA's

correction included numerous and voluminous revisions, which Commerce found constituted

new factual information.  IDM at 71-72.  As explained above, Commerce lawfully declined to

accept SONGA's correction.  Finding that "SONGA withheld information requested from it and

failed to provide the correct data by the deadlines outlined by Commerce," Commerce found that

facts available was warranted, consistent with 19 U.S.C. 1677e(a)(2)(A) and (B).  IDM at 73-74.

Because SONGA failed to provide the requested data at the time it was requested by Commerce

and failed to provide the corrected data prior to verification, Commerce also found that SONGA

did not act to the best of its ability to comply with Commerce's request for data and applied an

adverse inference in accordance with 19 U.S.C. 1677e(b)(1). IDM at 74. Commerce's application of AFA was supported by substantial evidence.

### D. Commerce's Selection Of The AFA Rate Followed Its AFA Hierarchy

Commerce followed its AFA hierarchy to select the rate from the Investment Contract program, a program similar to the ISD exemption program. Plaintiffs claim that the Investment Contract program was not similar. In arguing that Commerce should use an identical ISD exemption program, Pl. Br. at 46-47, plaintiffs conflate two separate ISD exemption programs. Commerce calculated a 0.10 percent rate for an ISD exemption program established under Article 20 of Ecuador's Environmental Promotion and Optimization of State Revenues Law. IDM at 11-12; PDM at 17-20. The ISD exemption program in which Commerce applied a 1.38 percent rate as AFA was one of three sub-programs established under the greater Investment Contract program, which was enacted under Articles 26 to 30 of Ecuador's Organic Law for the Promotion, Attraction of Investment, Employment Generation, and Fiscal Stability and Balance (LFP). IDM at 13; PDM at 23-24. These ISD exemption programs are not identical. Commerce considers the Investment Contract program as a similar program because both programs were established under the same Investment Contract umbrella. IDM at 13; PDM at 26.

## X. Commerce Lawfully Found That The Provision Of Brackish Water Did Not Provide A Financial Contribution

### A. Background

On February 21, 2024, ASPA submitted new subsidy allegations (NSAs), including an allegation regarding the provision of brackish water for less than adequate remuneration (LTAR). New Subsidy Allegations (Feb. 21, 2024) (Second NSA), P.R. 217. Commerce initiated an investigation into the allegation for the provision of brackish water for less than adequate remuneration. NSA Initiation Memorandum (Mar. 21, 2024).

In its first post-preliminary analysis memorandum, Commerce found that the provision of brackish water was not countervailable because the GOE did not make a financial contribution that conferred countervailable benefits. First Post-Preliminary Memorandum at 17. Specifically, Commerce considered that the GOE requires non-consumptive users to obtain authorization to extract water from a public source, including brackish water sources. *Id.* at 16 (citing GOE's Post-Preliminary Second Post-Preliminary Questionnaire Response (SQR2) (June 12, 2024), P.R. 389, C.R. 249 at S4-1 and S4-2). However, the authorization [

]. Santa Priscila's Post-Preliminary Second Supplemental Questionnaire Response (SQR2) (June 11, 2024), P.R. 388, C.R. 247 at S3-5.

Commerce further considered that Santa Priscila, Produmar, and Naturisa reported that "their usage of brackish water was non-consumptive in nature," and that "Santa Priscila, Produmar, and Naturisa (*i.e.*, the entities which engage in water pumping of brackish water for non-consumptive use) have never consumed brackish water or used brackish water for consumptive purposes, because all of the brackish water which is pumped from local estuaries in the production of subject merchandise is returned to the source, either at the time at which shrimp is harvested or via a 'water exchange.'" First Post-Preliminary Memorandum at 16-17 (citing Santa Priscila's Post-Preliminary SQR2 at S3-3 through S-7 and SONGA's Post-Preliminary Second Supplemental Questionnaire Response (SQR2) (June 11, 2024), P.R. 387, C.R. 246 at S3-3). Commerce also considered statements by Santa Priscila and SONGA "that they and/or their cross-owned affiliates invest in equipment and incur significant operating costs for the water pumping infrastructure, including pipelines and powered pumps," and Santa Priscila, Produmar, and Naturisa bear all costs for constructing, maintaining, and operating the infrastructure to transport brackish water to and from their facilities. *Id.* (citing Santa Priscila's

51

Post-Preliminary SQR2 at S3-1; SONGA's Post-Preliminary SQR2 at S3-1 through S3-3).  The

GOE stated that it provides no infrastructure for the respondents' pumping of brackish water and

does not charge for the non-consumptive use of brackish water.  *Id.* (citing GOE's NSA Initial

Questionnaire Response (IQR) (April 18, 2024), P.R. 321, C.R. 213 at NSA-37 and NSA-42).

Therefore, considering the totality of the evidence, Commerce preliminarily found that the

provision of brackish water was not countervailable.  In its final determination, Commerce

continued to find that the provision of brackish water was not countervailable.  IDM at 20.

### B.  Commerce's Determination That The Provision Of Brackish Water Did Not Constitute A Financial Contribution Is In Accordance With Law

Commerce's determination that the provision of brackish water did not constitute a

financial contribution is in accordance with law because the respondents' use of brackish water is

non-consumptive.  The statute specifies one form of financial contribution is "providing goods or

services, other than general infrastructure."  19 U.S.C. 1677(5)(D)(iii).  ASPA argues that by

granting a permit, the GOE provides a financial contribution in the form of a right to use or

access government-owned water.  ASPA Br. at 31-35.  The GOE requires authorization to

extract brackish water from a public source, in which the GOE will conduct an on-site study and

prepare "a technical plan in relation to water pumping of public water sources for businesses."

However, [                                                        ] and the usage of the brackish

water was non-consumptive.  First Post-Preliminary Memorandum at 16; Santa Priscila Post-

Preliminary SQR2 at S3-5; IDM at 20.  Non-consumptive means the brackish water is not

consumed because the respondents invest in equipment and water pumping infrastructure to

allow them to pump water from local estuaries into shrimp ponds and subsequently return that

water to its source.  IDM at 20.  Neither case cited by ASPA addresses non-consumption.  *See*

ASPA Br. at 33-4 (citing *Phosphate Fertilizers from the Russian Federation,* 88 Fed. Reg.

76,182 (Dep't of Commerce Nov. 6, 2023), and accompanying IDM (*Phosphate Fertilizers from Russia* IDM) at Comment 2a and *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Dep't of Commerce Nov. 8, 2017), and accompanying IDM (*Softwood Lumber from Canada* IDM) at Comment 11).  Moreover, in both cases, the government charged fees, which is not true here.  *Phosphate Fertilizers from the Russia* IDM at Comment 2a ("the GOR charges taxes and fees to companies that extract subsoil resources such as phosphate ore, thereby allowing JSC Apatit to access the 'good.'"); *Softwood Lumber from Canada* IDM at Comment 11 ("our finding was supported by the fact that the provinces collect stumpage fees based on the volume of standing timber harvested under tenures and supply guarantees").

ASPA contends that the fact that is a fee is not charged for non-consumptive use but is charged for consumptive use is relevant to the benefit analysis, not the financial contribution.  ASPA Br. at 32-33.  However, ASPA continues to ignore two facts: the [

] and the fact that respondents return the water to its source.  Santa Priscila Post-Preliminary SQR2 at S3-5; IDM at 20.  The lack of a fee for non-consumptive use of the brackish water reinforces Commerce's conclusion that no financial contribution was provided.  IDM at 20; *contrast with Softwood Lumber from Canada* IDM at Comment 11 (using the stumpage fees charged based on volume of standing timber harvested as support for finding right of access as financial contribution).  Moreover, although Commerce considers financial contribution separately from its analysis of benefit, if there is nothing given as financial contribution, there is no benefit that is countervailable.  *See, e.g., Aluminum Extrusions From Mexico*, 89 Fed. Reg. 80,496 (Dep't of Commerce Oct. 3, 2024) and accompanying IDM at Comment 1 ("it is not clear how respondents would receive a benefit in the absence of sufficient

53

evidence regarding the existence of a financial contribution."). Here, Commerce considered these facts to also find no countervailable benefit. IDM at 20-21.

ASPA claims that any expenses incurred by the mandatory respondents to access the government-provided good do not negate, offset, or eliminate the countervailable benefit that access to the good provides. ASPA Br. at 34-35. However, provision of infrastructure for pumping and transporting brackish water to and from the respondent's facilities is relevant to whether the GOE may have provided a financial contribution in another way than the one ASPA alleges. Commerce may have ultimately found no financial contribution because the GOE did not provide such infrastructure but that does not mean such facts are not relevant to determining whether a financial contribution exists. Moreover, ASPA ignores that Commerce also found that there was no countervailable benefit in addition to the lack of financial contribution. IDM at 21.

ASPA asserts that evidence that Produmar was charged a fee for its use of brackish water shows that mandatory respondents tracked the amount of brackish water used. ASPA Br. at 38-39. Commerce considers the whole record, not just one piece of evidence. IDM at 20. Further, Commerce did consider this fact. It also considered that Produmar believed that the charge was erroneous and had filed an appeal to the GOE. IDM at 20-21 (citing Santa Priscila's Post-Preliminary SQR2 at Exhibits S3-3 through -7). ASPA faults Commerce for considering the ongoing appeal and argues that Commerce should accept the status quo unless a final and conclusive court decision says otherwise. ASPA Br. at 38. Record evidence shows that the respondents "use brackish water non-consumptively for their shrimp farms, whereby they invest in equipment and water pumping infrastructure to allow them to pump water from local estuaries into shrimp ponds, and subsequently return that water to its source at a later date." IDM at 20. *See also* First Post-Preliminary Memorandum at 16-17 ("Santa Priscila, Produmar, and Naturisa

54

(*i.e.*, the entities which engage in water pumping of brackish water for non-consumptive use) have never consumed brackish water or used brackish water for consumptive purposes, because all of the brackish water which is pumped from local estuaries in the production of subject merchandise is returned to the source, either at the time at which shrimp is harvested or via a 'water exchange.' . . . The respondents confirmed that their usage of brackish water was non-consumptive in nature, *i.e.*, shrimp farms operated by Santa Priscila, Produmar, and Naturisa pump brackish water from estuaries for use in shrimp farms, and the water is subsequently returned to those estuaries in the same quantity and quality.") (citing Santa Priscila's Post-Preliminary SQR2 at S3-3 through S-7 and SONGA's Post-Preliminary SQR2 at S3-3).

However, ASPA supports this proposition with cases in which Commerce continues to use its practice while the practice is being challenged in court. ASPA Br. at 38 (citing *Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands*, 72 Fed. Reg. 35,220 (Dep't of Commerce June 27, 2007), and accompanying IDM at Comment 1; *Ripe Olives from Spain*, 90 Fed. Reg. 25,223 (Dep't of Commerce June 16, 2025), and accompanying IDM at Comment 6). Commerce's evaluation here is not what law to apply, but is focused on whether the totality of the record evidence demonstrates that there is a financial contribution or countervailable benefit. IDM at 20-21. Commerce considered the GOE charging Produmar for its use of brackish water as one piece of evidence among many. IDM at 20-21. ASPA's argument "invite{s} this {C}ourt to reweigh this evidence," which it "may not do." *Downhole Pipe & Equip., L.P. v. United States*, 776 F.3d 1369, 1377 (Fed. Cir. 2015).

ASPA suggests that Commerce abused its discretion by not applying an adverse inference. ASPA contends that the mandatory respondents did not report the volume of brackish water used and the GOE "falsely reported" that it never charges non-consumptive users a fee.

ASPA Br. at 39-41.  However, given the totality of the evidence, Commerce found "an insufficient basis to claim that the GOE charges for nonconsumptive use of brackish water." IDM at 21.  Additionally, "Santa Priscila and Produmar reported that, because no water is retained in a pond intended for harvesting raw shrimp after the pond is drained during harvesting, neither company tracks the total volume of water that is pumped back to the main source."  IDM at 21 (citing Santa Priscila's Post-Preliminary SQR2 at Exhibit S3-3).  Therefore, Commerce found "it is reasonable that Santa Priscila and Produmar would not be able to report some of the detailed figures requested if such tracking is not undertaken in the ordinary course of business." IDM at 21.  Moreover, because Commerce continued to find that the program does not provide countervailable benefits, there is no evidence that mandatory respondents could or should have reported the volume of brackish water.  IDM at 21.

## XI.  Commerce Reasonably Did Not Initiate An Investigation Of The Indirect Provision Of Fuel

### A.  Background

On January 8, 2024, ASPA submitted a new subsidy allegation for the provision of fuel to shrimp farmers for less than adequate remuneration, alleging entrustment or direction for sales made by entities other than state-owned enterprises.  New Subsidy Allegations (Jan. 8, 2024) (First NSA), P.R. 119 at 8.  Specifically, for financial contribution, ASPA alleged that "{t}he provision of fuel at the price established by the GOE constitutes a financial contribution under 19 U.S.C. § 1677(5)(D)(iii) to the extent that a state-owned company such as Petroecuador made the sale." *Id.* at 8.  ASPA also alleged that "{t}o the extent that an entity other than a state-owned enterprise made the sale at the regulated price, that entity would be entrusted or directed to make a financial contribution at government-established prices under 19 U.S.C. § 1677(5)(B)(iii)." *Id.*

These were the only two allegations regarding financial contribution for the provision of fuel that ASPA made. *Id.*

Commerce subsequently initiated an investigation of "the direct provision of fuel from the GOE/Petroecuador." NSA Initiation Memorandum at 4. However, Commerce found that the evidence provided by ASPA was "insufficient to justify its claim that the GOE may be entrusting or directing private entities to provide fuel to the shrimp sector." *Id.* Therefore, "based on the lack of information provided indicating that the GOE/Petroecuador may be entrusting or directing private sellers of fuel to provide diesel fuel for LTAR," Commerce did not initiate on this portion of the allegation. *Id.*

In its first post-preliminary analysis, Commerce preliminarily found that the provision of fuel for LTAR was not countervailable. First Post-Preliminary Memorandum at 15-16. Commerce considered that under Executive Decree number 231, the GOE indicated that consumers of natural gas for shrimp farming would be eligible for specific fuel price categories. *Id.* at 15. Commerce also considered that Petroecuador, the government-owned petroleum company, sells fuel to private traders in Ecuador, and that the private traders are permitted to sell the fuel purchased. *Id.* Commerce then considered that "the prices that were established in Executive Decree Number 231 are not the prices that companies pay to purchase diesel fuel." *Id.* Importantly, "the GOE reported that a majority of the diesel fuel sold to the shrimp sector was sold through private traders and/or distributors, and that none of the mandatory respondents nor the cross-owned entities for which Commerce solicited information in this investigation directly received fuel from government-owned fuel suppliers." *Id.* at 15-16.

Commerce explained it had only initiated an investigation into the allegation of the *direct* provision of fuel. Commerce continued to find no record evidence "indicating that private

57

sellers of diesel fuel may have been entrusted or directed by the GOE." *Id.* at 16. In the final determination, Commerce continued to find that the provision of fuel for LTAR did not provide a financial contribution and was not countervailable. IDM at 23.

### B. Commerce Reasonably Found That The GOE Did Not Provide A Financial Contribution For The Direct Provision Of Fuel

Commerce's determination that the GOE did not provide a financial contribution for the direct provision of fuel is lawful because the record demonstrates that GOE did not directly sell fuel to the respondents. Moreover, ASPA failed to provide sufficient evidence for Commerce to initiate on its allegation and misconstrues Commerce's analysis regarding the indirect provision of fuel.

Commerce will initiate an investigation into a new subsidy allegation where an interested party "alleges the elements necessary" along with "information reasonably available to the petitioner supporting those allegations." 19 U.S.C. § 1671a(b)(1). Here, Commerce initiated an investigation of the direct provision of fuel from the GOE and Petroecuador but declined to initiate an investigation on the indirect provision of fuel, finding insufficient evidence to support petitioner's claim that the GOE may be entrusting or directing private entities to provide fuel to the shrimp sector. NSA Initiation Memorandum at 4.

Citing *Loper Bright*, ASPA contends that Commerce has misconstrued the countervailing duty statute by not finding the indirect provision of fuel countervailable. ASPA Br. at 41-46. This Court has found that financial contributions can be provided indirectly. *E.g., Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1360–67 (Ct. Int'l Trade 2015); *Guangdong Wireking Housewares & Hardware Co., Ltd. v. United States,*, 900 F. Supp. 2d 1362, 1379–80 (Ct. Int'l Trade). The problem identified, however, is not one of statutory interpretation; it is evidentiary. ASPA did not provide reasonably available evidence to allow for

initiation of an investigation of the indirect provision of fuel via entrustment or direction.  NSA Initiation Memorandum at 4.

For this reason, the cases cited by ASPA do not demonstrate any error by Commerce. ASPA Br. at 43-44.  In *Citric Acid*, Commerce found that the Government of China provided "a direct financial contribution (provision of a good) to the trading companies," who, in turn, sold the government-produced inputs to the respondents.  *Citric Acid and Certain Citrate Sales from the People's Republic of China*, 79 Fed. Reg. 108 (Dep't of Commerce Jan. 2, 2014), and accompanying IDM (Citric Acid IDM) at Comment 5.  This Court sustained Commerce's final results regarding the relevant subsidy in *RZBC Group Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1301–03 (Ct. Int'l Trade 2015).  Commerce found that *Citric Acid* was "not applicable because record evidence indicates the GOE provided supporting documentation to show that shrimp farmers, in particular the mandatory respondents, did not receive a direct financial contribution from Petroecuador and the GOE did not collect information from the private traders and/or distributors on sales to registered end-users."  IDM at 24 (citing GOE's NSA at NSA-9 and NSA-15).

ASPA argues that there is record evidence that Petroecuador provided a direct financial contribution to the private middlemen.  ASPA Br. at 44-45.  However, none of the record evidence that ASPA cites contradicts Commerce's finding that the GOE did not collect information from the private traders and/or distributors on sales to registered end-users.  Even if it did, Commerce's findings "may still be supported by substantial evidence even if two inconsistent conclusions can be drawn from the evidence."  *Qingdao Sea-Line Trading*, 766 F.3d at 1385.  Ultimately, the statute requires that Commerce make its determination "by examining the particular facts and circumstances of the sale and determining whether {the purchaser}

59

directly or indirectly received both a financial contribution and benefit from a government."

*Beijing Tianhai Indus.*, 52 F. Supp. 3d at 1364 (quoting *Delverde, SRL v. United States*, 202 F.3d

1360, 1364 (Fed. Cir. 2000)).  Reviewing the particular facts and circumstances on the record,

Commerce initiated an investigation into the provision of fuel "on the bases that the GOE may

have directly provided fuel to the mandatory respondents" and found that "the GOE did not

provide fuel to the mandatory respondents."  IDM at 25.  Commerce also considered that the

GOE did not collect information from the private traders and/or distributors on sales to registered

end-users.  IDM at 24.  Therefore, Commerce reasonably declined to find that Petroecuador

provided a direct financial contribution.

## CONCLUSION

For these reasons, we respectfully request that the Court deny parties' motions and

sustain Commerce's final determination.

Respectfully submitted,

BRETT A. SHUMATE
Assistant Attorney General

PATRICIA M. McCARTHY
Director

s/Tara K. Hogan
Assistant Director
U.S. Department of Justice

OF COUNSEL:                                 Civil Division
VANIA WANG                                  Commercial Litigation Branch
Attorney                                    P.O. Box 480, Ben Franklin Sta.
Department of Commerce                      Washington, D.C. 20044
Office of the Chief Counsel                 Tele: (202) 616-2228
  for Trade Enforcement & Compliance        Email: Tara.Hogan@usdoj.gov

March 13, 2026                              Attorneys for Defendant

60

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify that the foregoing brief complies with the Rules of this Court and the

Court's order dated March 9, 2026, ECF No. 69, in that it contains **<u>17,331</u>** words, including text,

footnotes, and headings.


/s/Tara K. Hogan