# IN THE UNITED STATES COURT OF INTERNATIONAL TRADE
## BEFORE THE HONORABLE RICHARD K. EATON, JUDGE

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A., <br><br> Plaintiffs, <br><br> and <br><br> AMERICAN SHRIMP PROCESSORS ASSOCIATION, <br><br> Consolidated Plaintiff, and <br><br> AD HOC SHRIMP TRADE ACTION COMMITTEE, <br><br> Consolidated Plaintiff-Intervenor, <br><br> v. <br><br> UNITED STATES, <br><br> Defendant, and <br><br> AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, <br><br> Defendant-Intervenors, and <br><br> INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A., <br><br> Consolidated Defendant-Intervenors. | **Consol. Ct. No. 25-00025** <br><br> **NON-CONFIDENTIAL VERSION** <br><br> **Business proprietary information has been redacted from pp. 10, 12, 14, 15, 19, 20, 25-27** |

## PLAINTIFFS' REPLY BRIEF IN SUPPORT OF THEIR RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD

Submitted by:

Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
202-223-3760

Counsel for Industrial Pesquera Santa Priscila, S.A.
and Sociedad Nacional de Galapagos, C.A.

Date: April 13, 2026

## TABLE OF CONTENTS

Page

I.  THE INVESTMENT TAX CREDIT PROVIDED UNDER THE GOVERNMENT OF ECUADOR'S INVESTMENT CONTRACT PROGRAM IS NOT COUNTERVAILABLE ...................................................................................1

   A.  The *Carlisle Tire* Decision and the Statement of Administrative Action on the URAA Compel the Finding that Investment Contract Program Does Not Provide Either a *De Jure* or *De Facto* Subsidy .................................................................1

   B.  *Commerce's* Consistent Practice When Applying the "Limited Number" Criterion to Determine Whether a Subsidy Is De Facto Specific .......................................3

   C.  The Mosaic *I* Decision Supports Plaintiffs' Contention that Commerce Used the Wrong Denominator When It Applied the "Limited Number" Criterion ......................3

   D.  The Defendant and the Defendant-Intervenors Fail to Distinguish the *Mosaic I* Decision or Provide Other Case Support for Their Reliance on Commerce's Limited Number Finding..............................................................................6

   E.  Plaintiffs Timely Discussed the Relevance of the *Mosaic I* Decision in Their Second Case Brief, and Commerce Discussed *Mosaic I* in Its Final Issues and Decision Memorandum.......................................................................................8

II. SUBSTANTIAL EVIDENCE SUPPORTS THE CONCLUSION THAT THE AMVTR PROGRAM IS NOT *DE FACTO* SPECIFIC ........................................................10

III. COMMERCE ABUSED ITS DISCRETION WHEN IT REJECTED THE MINOR CORRECTION THAT SANTA PRISCILA SUBMITTED BEFORE THE START OF VERIFICATION CONCERNING THE BENEFIT AMOUNT THAT ITS AFFILIATE, PRODUMAR, RECEIVED UNDER THE AMVTR PROGRAM ...................................12

   A.  Produmar's Original Questionnaire Response and Subsequent Minor Correction .......................................................................................12

   B.  Case Law Supports the Conclusion that Commerce Abused Its Discretion in Rejecting Produmar's Minor Correction ...............................................13

   C.  Commerce's Rationale for Rejecting Produmar's Minor Correction Has No Merit ...........................................................................14

IV. COMMERCE ABUSED ITS DISCRETION WHEN IT USED ADVERSE FACTS AVAILABLE TO DETERMINE THE SUBSIDY MARGINS ATTRIBUTABLE TO SANTA PRISCILA'S AND PRODUMAR'S USE OF THE AMVTR PROGRAM ........16

V.     COMMERCE ABUSED ITS DISCRETION WHEN IT REJECTED THE MINOR
       CORRECTION THAT SONGA AND NATURISA SUBMITTED AT VERIFICATION
       CONCERNING THEIR BENEFIT AMOUNT UNDER THE AMVTR PROGRAM .....19

           A. Factual Background ..................................................................................19

           B. Defendant and Defendant-Intervenors Fail to Demonstrate that Songa's
              Correction Was Not Minor .....................................................................21

VI.    COMMERCE ABUSED ITS DISCRETION WHEN IT USED ADVERSE FACTS
       AVAILABLE TO DETERMINE THE COUNTERVAILING DUTY MARGIN FOR
       SONGA AND NATURISA UNDER THE AMVTR PROGRAM ...................................24

VII.   COMMERCE ABUSED ITS DISCRETION WHEN IT REFUSED TO ACCEPT
       SONGA'S MINOR CORRECTION OF THE BENEFIT THAT IT RECEIVED UNDER
       THE ISD TAX EXEMPTION FOR IMPORTED ASSETS AND RAW MATERIALS ...25

           A. Factual Background ..................................................................................25

           B. Commerce's Basis for Rejection of the Minor Correction Has No Merit .............27

VIII.  COMMERCE ABUSED ITS DISCRETION WHEN IT ASSIGNED AN AFA MARGIN
       OF 1.38% TO SONGA'S USE OF THE ISD EXEMPTION ON IMPORTED RAW
       MATERIALS AND ASSETS ........................................................................................28

IX.    CONCLUSION ...........................................................................................................29

ii

# TABLE OF AUTHORITIES

Page

**Court Decisions**

*Ak Steel Corp. v. United States,*
192 F. 3d 1367 (Fed. Cir. 1999)..................................................................................11

*Carlisle Tire and Rubber Company v. United States,*
564 F. Supp. 834 (Ct. Int'l Trade 1983).................................................................*passim*

*Celik Halat Ve Tel Sanayi A. S. v. United States,*
557 F. Supp. 2d 1363 (Ct. Int'l Trade 2022).................................................................18

*Goodluck India Limited v. United States,*
393 F. Supp. 3d 1352 (Ct. Int'l Trade 2019)................................................................14

*Goodluck India Ltd. v. United States*
11 F. 4th 1335 (Fed. Cir. 2021)..............................................................................13, 22

*Government of Quebec v. United States,*
567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022)..................................................................7

*Government of Quebec v. United States,*
105 F. 4th 1359 (Fed. Cir. 2024).............................................................................. 7- 9

*Hyundai Steel Company v. United States,*
753 F. Supp. 3d 1355 (Ct. Int'l Trade 2025)..................................................................2

*Hyundai Steel Company v. United States,*
803 F. Supp. 3d 1252 (Ct. Int'l Trade 2025)..............................................................3, 7

*Itochu Building Products v. United States,*
733 F. 3d 1140 (Fed. Cir. 2013).....................................................................................9

*Magnola Metallurgy, Inc. v. United States,*
508 F. 3d 1349 (Fed. Cir. 2007)...................................................................................16

*POSCO v. United States,*
Slip op. 25-1000, (Ct. Int'l Trade 2025).......................................................................11

*Royal Thai Government v. United States,*
341 F Supp. 2d 1315 (Ct. Int'l Trade 2004) .............................................................5, 6

iii

Page

*Royal Thai Government v. United States,*
    436 F. 3d 1330 (Fed. Cir. 2006).............................................................................................5

*Samsung Electronics Co., Ltd. v. United States,*
    973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014..........................................................................11

*Tatung Company v. United States,*
    18 CIT 1137 (Ct. Int'l Trade 1994)........................................................................................14

*The Mosaic Company v. United States,*
    659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023)...................................................................*passim*

*The Mosaic Company v. United States,*
    744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025).........................................................................11

*The Mosaic Company v. United States,*
    774 F. Supp. 3d 1362 (Ct. Int'l Trade 2025).........................................................................11

**Statutes**

19 U.S.C. § 1677(5A)(D)(iii)(I) ....................................................................................................3

19 U.S.C. § 1677(5)(B) .................................................................................................................1

19 U.S.C. § 1677m(d).............................................................................................................20, 24

**Regulations**

19 C.F.R. § 351.104(a)(2)(ii) ......................................................................................................23

19 C.F.R. § 351.301(a)..........................................................................................................20, 24

**Administrative Determinations**

*Certain Lined Paper Products from Indonesia,*
    71 Fed. Reg. 47,174 (Dep't Commerce Aug. 16, 2006)........................................................18

*Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from China,*
    75 Fed. Reg. 57,444 (Dep't Commerce September 21, 2010) ..........................................17, 18

*Prestressed Concrete Steel Wire Strand from the Republic of Turkey,*
    85 Fed. Reg. 59,287 (Dep't Commerce September 21, 2020) ...............................................18

## Other Authorities

Statement of Administrative Action, H.R. Rep. No. 103-316, reprinted in 1994
   U.S.C.C.A.N. 4040 ........................................................................................................... 1-3, 5

Non-Confidential Version – Confidential Information Has Been Redacted

## I. THE INVESTMENT TAX CREDIT PROVIDED UNDER THE GOVERNMENT OF ECUADOR'S INVESTMENT CONTRACT PROGRAM IS NOT COUNTERVAILABLE

### A. The *Carlisle Tire* Decision and the Statement of Administrative Action on the URAA Compel the Finding that Investment Contract Program Does Not Provide Either a *De Jure* or *De Facto* Subsidy

The Government of Ecuador's ("GOE") Investment Contract Program, which provides an investment tax credit benefit, satisfies the requirements for a finding of non-countervailability that were established in both *Carlisle Tire and Rubber Company v. United States*, 564 F. Supp. 834 (Ct. Int'l Trade 1983) and the Statement of Administrative Action on the Uruguay Round Agreements Act ("SAA"), which expressly endorsed the holding in *Carlisle*. Benefits were provided to Santa Priscila and its affiliate, Produmar, as well as to Songa and its affiliate, Naturisa, because they each made a qualifying investment of at least $1 million in activities that were designed to increase productivity and employment throughout Ecuador's national economy. The Department found that this program was not *de jure* specific because the respondents received them under legislation that provided those benefits to 25 widely diversified sectors of Ecuador's economy. *See* Decision Memorandum for the Preliminary Affirmative Determination ("Prelim IDM") at 24. P.R. 283.

An investment tax credit program was the subject of the *Carlisle* case. There, the court held that the treatment as a countervailable subsidy of an economy-wide "tax credit for expenditures on capital investment even if available to all industries and sectors" would produce an "absurd result." *Id.* at 838. Equally important, *the court rejected the contention that such a program could ever constitute a de facto specific subsidy*. It did this when it discussed the Trade Agreements Act of 1979, 19 U.S.C. § 1677(5)(B), which defined the term "subsidy" to mean a program that provided benefits "*to a specific enterprise or industry, or group of enterprises or*

1

**Non-Confidential Version – Confidential Information Has Been Redacted**

*industries.*" 564 F. Supp. at 839. (Emphasis in original.) In other words, had the court concluded that an economy-wide investment tax credit program could nevertheless be found to provide a *de facto* specific subsidy, it would have said so. This court recently agreed. *See Hyundai Steel Company v. United States*, 753 F. Supp. 3d 1355, 1357 (Ct. Int'l Trade 2025) ("Thus, 'a tax credit for expenditures on capital investment' that is 'available to all industries and sectors' is not specific." (Citations to *Carlisle* and the SAA omitted.)

The SAA expressly endorsed *Carlisle* by stating that the specificity test was intended to "winnow out only those foreign subsidies which are truly broadly available and widely used throughout an economy."[1] Here, there is no dispute that the Investment Contract Program was widely available to 25 diverse industrial sectors. The GOE reported that 19 different industry sectors made investments in 2022 under the Investment Contract program. In the same year, among those 19 industrial sectors, firms in the aquaculture sector accounted for less than 3% of the total amount invested by the 19 industry sectors. *See* Ecua. Case Br. at 32. C.R. 327.

Nevertheless, Commerce relies on that portion of the SAA that discusses the definition of *de facto* specificity, which states that "where the number of enterprises or industries using a subsidy is not large, the first factor alone {i.e., the "limited number" factor} would justify a finding of specificity, because the absurd result envisioned by *Carlisle*" would not be threatened. SAA at 4243. DOC Br. at 21-24.[2] However, reliance on this statement overlooks the fact that treatment of an economy-wide investment tax credit as *de facto* specific brings about the "absurd result" that Congress intended to avoid.

---

[1] *See* 1994 U.S.C.C.A.N. at 4242.

[2] We abbreviate citations to the parties' briefs as follows: DOC Br.; Ecua. Br.; ASPA Br.; and AHSTAC Br.

**Non-Confidential Version – Confidential Information Has Been Redacted**

Equally important, none of the authorities upon which Commerce and the Defendant-Intervenors rely involve an investment tax credit program. An economy-wide investment tax credit program is *sui generis* under *Carlisle* and the SAA for the reasons that both authorities explained. To the best of Plaintiffs' knowledge, no court has ever held that an economy-wide investment tax credit program can be found either *de jure* or *de facto* specific.

### B. Commerce's Consistent Practice When Applying the "Limited Number" Criterion to Determine Whether a Subsidy Is *De Facto* Specific

19 U.S.C. § 1677(5A)(D)(iii)(I) provides that a subsidy is *de facto* specific if "{t}he actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number." Commerce has consistently applied this criterion by comparing the number of benefit recipients to the number of companies operating in an economy or else to the total number of taxpayers. *See, e.g.,* case citations in *Hyundai Steel Company v. United States*, 803 F. Supp. 3d 1252, 1256-57 (Ct. Int'l Trade 2025).

### C. The *Mosaic I* Decision Supports Plaintiffs' Contention that Commerce Used the Wrong Denominator When It Applied the "Limited Number" Criterion

Plaintiffs rely on the decision in *The Mosaic Company v. United States*, 659 F. Supp. 3d 1285 (Ct. Int'l Trade 2023) ("*Mosaic I*") as confirming the existence of an exception to Commerce's denominator practice in circumstances nearly identical to those presented here. There. Commerce, as was its practice, compared the number of corporate taxpayers (8,761) that received a tax benefit under Morocco's reduction in fines and penalties program to the total number of corporate taxpayers in Morocco (262,165). *Id.* at 1314. The *Mosaic I* court was aware of Commerce's practice because it cited the Final IDM in that investigation, which stated (at 75) that: "When analyzing de facto specificity for tax programs in prior cases, Commerce has compared the number of companies that used the program with the total number of tax filers." *Id.*

3

**Non-Confidential Version – Confidential Information Has Been Redacted**

Thus, the issue is whether the facts here fall within the court's rationale for the denominator determination in *Mosaic I*. Plaintiffs submit that the rationale applies for the following reasons.

First, "all Moroccan taxpayers, whether corporate, individual, or otherwise, were eligible to apply for penalty relief under the program." *Id.* Similarly, the GOE's program was available to investors in virtually all industries in Ecuador's diversified economy.

Second, just 3.34% of Moroccan taxpayers took advantage of the program, but these taxpayers participated in "at least eighteen industries." *Id.* Similarly in Ecuador, only a very small percentage of the total number of registered Ecuadorian companies obtained investment contracts. However, these companies participated in 19 of the 25 eligible industries.

Third, the *Mosaic I* court found that Commerce compared the number of "recipients' of penalty relief to the total number of corporate taxpayers." *Id.* Commerce did essentially the same thing here.

Fourth, Commerce did not use as its denominator "the total number of corporate taxpayers *who incurred penalties.*" *Id.* at 1314-15. Similarly here, Commerce did not use as its denominator the total number of taxpayers *that made investments of $1 million or more.* However, *Mosaic I* held that correct denominator should have consisted of those taxpayers *who were eligible to qualify for a benefit.*

Fifth, as a result, the *Mosaic I* court concluded that the numerator and the denominator were "essentially meaningless" because they "were not logically comparable." *Id.* at 1315. That is the same "illogic" that Commerce applied to the GOE's investment tax credit program.

**Non-Confidential Version – Confidential Information Has Been Redacted**

Sixth, the *Mosaic I* court concluded that "Commerce made no attempt to compare the actual recipients to the universe or composition of the group of potential recipients." Therefore, Commerce's methodology "was not analytically sound." *Id.*

Finally, *Mosaic I* held that the fact that just 3.34% of corporate taxpayers benefited from the program "does not support a conclusion that the program was not broadly available and broadly used throughout the Moroccan economy." *Id.*

In addition, *Mosaic I* expressly relied upon the decision in *Royal Thai Government v. United States*, 341 F Supp. 2d 1315, 1319 (Ct. Int'l Trade 2004), aff'd 436 F. 3d 1330 (Fed. Cir. 2006). There, the court found that a list of 351 companies eligible for debt restructuring relief "represented a wide spectrum of companies and industries . . . {and} Given the numerous and diverse *industries* represented on the 351 list, the Court finds that Commerce did not err in its finding that the 351 list was not limited in number based on industry or enterprise." The same conclusion applies with equal force here.

Moreover, *Mosaic I* relied on the SAA for the proposition that the widespread availability and use of a subsidy program militated against a finding of *de facto* specificity, as did the absence of record evidence that the subsidy was provided to discrete segments of the economy. *Id.* at 1316-17. Similarly, widespread availability and use of the GOE's investment tax credit have been demonstrated by the fact that, in 2022, companies in the aquaculture sector accounted for less than 3 percent of the total amount invested by enterprises in the 19 industrial sectors that participated in Ecuador's Investment Contract Program.

Non-Confidential Version – Confidential Information Has Been Redacted

### D. The Defendant and the Defendant-Intervenors Fail to Distinguish the *Mosaic I* Decision or Provide Other Case Support for Their Reliance on Commerce's Limited Number Finding

Commerce first states that "the number of recipients in *Mosaic I* was different than those here." DOC Br. at 25. That difference does not establish a principled distinction given that Commerce found in both cases that the "number of recipients" was "limited."

Second, Commerce asserts that the statute did not require it to consider "the number of industries that use a program." Rather, it was entitled to focus on the "actual recipients of the subsidy." *Id.* The problem with that rationale is that the decision in *Royal Thai Government* contradicts it by stating that: "Given the numerous and diverse industries represented on the 351 list, the Court finds that Commerce did not err in its finding that the 351 list was not limited in number *based on industry or enterprise.*" In other words, the "numerous and diverse industries" that received a benefit did not equate to a finding that only a limited number of enterprises received that benefit.[3] Recognizing the weakness of these two arguments, Commerce urges the court to find that *Mosaic I* "is not binding precedent or persuasive authority." Id. In other words, Commerce urges this Court to find that *Mosaic* was wrongly decided.

The Defendant-Intervenor, American Shrimp Processors Association ("ASPA"), attempts to distinguish *Mosaic I* on the ground that the "fatal flaw" in the court's analysis was its finding that Commerce "did not analyze usage based on all taxpayers in Morocco," as opposed to using only "corporate taxpayers" in its denominator. ASPA Br. at 4. However, this was not the only basis for that decision. Rather, the court also found that:

> Because Commerce made no attempt to compare the actual recipients to the universe or composition of the group of potential recipients, or to ascertain

---

[3] The *Mosaic I* decision expressly relies on the *Royal Thai Government* decision. *See* 659 F. Supp. 3d at 1215-16.

Non-Confidential Version – Confidential Information Has Been Redacted

whether any identifiable group of taxpayers benefited disproportionately, its "specificity" methodology was not analytically sound.

659 F. Supp. 3d at 1315. Moreover,

> That 3.34% of corporate taxpayers benefited from penalty relief, under a program that was not limited to corporate taxpayers, does not support a conclusion that was not broadly available and broadly used throughout the Moroccan economy.

*Id.* Finally, the court held that Commerce's statutory interpretation produces an "absurd result." *Id.* at 1316, For these reasons, ASPA has failed to distinguish *Mosaic I* on the ground that the GOE's program "was not available to all taxpayers," as opposed to corporate taxpayers. ASPA Br. at 4.

ASPA next relies on the decision in *Hyundai Steel Co. v. United States*, 803 F. Supp. 3d 1252, 1258 (Ct. Int'l Trade 2025). That case involved Korea's emissions trading program, called the K-ETS program, in which just 504 companies out of a total of 787,438 Korean companies received a benefit in the form of additional emissions permits. The fact that distinguishes Ecuador's case from the facts in *Hyundai Steel* is that, here, the GOE's Investment Contract Program was available to every Ecuadorian company that made the required investment.

Moreover, the K-ETS program was widely available and widely used by companies in 19 diverse industrial sectors. However, the plaintiffs in *Hyundai Steel* stated that "most of the 787,438 companies operating in Korea receive no permits because they are not subject to the KETS program." 803 F. Supp. 3d at 1257. Thus, *Hyundai Steel* is distinguishable because of the absence of evidence of widespread availability and use.

Equally distinguishable is ASPA's reliance on *Government of Quebec v. United States*, 567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022), aff'd 105 F. 4th 1359 (Fed. Cir. 2024). ASPA Br. at 6-7. There, the court considered the specificity of the Government of Quebec's "On-the-Job" tax credit program. *Id.* at 1281. To make its "limited number" determination, Commerce compared

7

Non-Confidential Version – Confidential Information Has Been Redacted

the number of companies that received the credit "to the total number of tax filers, inclusive of corporations and individuals in business, within Quebec for 2018." *Id.* at 1290. That case was decided before *Mosaic* and, therefore, did not consider the *Mosaic* court's rationale. Rather, *Government of Quebec* affirms Commerce's standard practice of comparing the number of recipients to the total number of companies in an economy.

In contrast, the Federal Circuit decision in *Government of Quebec* discussed the *Mosaic* decision but distinguished it because it concerned "a different and unrelated penalty relief program." 105 F. 4th at 1375, fn. 10. Far more significant is the Federal Circuit's observation that "the facts in other cases may call for different approaches or considerations" than the standard methodology that Commerce applied. Therefore, *Mosaic I* remains good law.

### E. Plaintiffs Timely Discussed the Relevance of the *Mosaic I* Decision in Their Second Case Brief, and Commerce Discussed *Mosaic I* in Its Final Issues and Decision Memorandum

ASPA asserts that the Ecuadorian respondents, in their Case Brief, failed to discuss the relevance of *Mosaic I* to their contention that the investment tax credit benefit under the Investment Contract Program was not *de facto* specific. Therefore, Plaintiffs allegedly failed to exhaust their administrative remedies. ASPA Br. at 8-10. However, Plaintiffs expressly relied upon *Mosaic I* regarding programs that Commerce addressed in its Second Post-Preliminary Analysis. Specifically, Plaintiffs cited *Mosaic I* on pages 3, 4, 21, 23, and 27 of their Case Brief Regarding Programs Addressed in the Second Post-Preliminary Determination. P.R. 445. For example, Plaintiffs stated (at 27) that *Mosaic I* held that "a methodology that compared the total number of corporate taxpayers was meaningless from the standpoint of determining *de facto* specificity because the numerator and denominator were not logically comparable."

8

Non-Confidential Version – Confidential Information Has Been Redacted

In its Issues and Decision Memorandum for the Final Affirmative Determination ("Final IDM") (at 53), Commerce distinguished *Mosaic I* on the ground that "the use of all corporate taxpayers as the denominator to analyze the *de facto* specificity of programs available only to corporations has been upheld by the CIT in the *Government of Quebec v. United States*." P.R. 456. Thus, Commerce expressly acknowledged the Plaintiffs' reliance on the holding in *Mosaic I* with respect to the application of the "limited number" criterion.

For that reason, Commerce, as opposed to ASPA, has not alleged that the Plaintiffs failed to exhaust their administrative remedies by not previously citing *Mosaic I* in support of its position. That is because Commerce understood that Plaintiffs did exhaust their administrative remedies when they repeatedly relied on *Mosaic I* in their Case Brief.

Even if Plaintiffs did not timely raise the *Mosaic I* decision at the agency level, the "futility" exception to the exhaustion doctrine applies here. *See, e.g., Itochu Building Products v. United States*, 733 F. 3d 1140, 1146 (Fed. Cir. 2013). There is no question that Commerce would have rejected Plaintiffs' "wrong denominator" argument because it said so in the Final IDM (at 53) in reliance upon the *Government of Quebec* decision. Moreover, Commerce does not deny that it has repeatedly stated that the appropriate denominator for evaluating whether a limited number of companies received a *de facto* subsidy is either the total number of taxpayers or the total number of enterprises in an economy.[4]

---

[4] In addition, the "pure question of law" exception to exhaustion applies here. The question is whether the statute authorizes Commerce to use as the denominator all taxpayers or all enterprises in every instance where it applies the "limited number" criterion. A pure question of law is one "that can be addressed without further factual development or further exercise of discretion." and that is the situation here. *Itochu*, 733 F. 3d at 1146.

Non-Confidential Version – Confidential Information Has Been Redacted

## II.    SUBSTANTIAL EVIDENCE SUPPORTS THE CONCLUSION THAT THE AMVTR PROGRAM IS NOT *DE FACTO* SPECIFIC

Commerce affirmed that the GOE's tax code provides an 80% exemption from the annual vehicle tax that would otherwise be due on each vehicle weighing one ton or more that is used exclusively in productive or commercial activities. The GOE tax authority automatically calculated the benefit by applying the 80% exemption formula to the list of vehicles that the applicant submitted. *See* Second Post-Preliminary Analysis at 13. P.R. 437.

Thus, a company with more qualifying vehicles would always receive a proportionately larger benefit even though the benefit was calculated identically for every vehicle. Santa Priscila reported over [     ] qualifying vehicles. *See* Exhibit S-4(e) to its Supplemental Section III Questionnaire Response. C.R. 136. Commerce subsequently found that "Santa Priscila received a disproportionate amount of benefit under this program, as the amount it reported receiving was many times greater than the average amount received by other program recipients in Ecuador." *Id.* at 13. It then calculated Santa Priscila's subsidy margin for the AMVTR Program as 0.04% percent. *Id.* at 14.

Commerce verified the accuracy and completeness of Santa Priscila's reported benefit amount. Verif. Rept. at 13. C.R. 314. The verification confirmed that the program operated in exactly the way that the GOE and Santa Priscila had described, which was that it provided benefits "proportionate" to the number of qualifying vehicles. The Merriam-Webster dictionary defines the term "disproportionate" as "being out of proportion." However, Commerce did not find that the tax benefit that Santa Priscila received was "out of proportion" to the number of its qualifying vehicles.

Nevertheless, in its Final IDM (at 51), Commerce affirmed its preliminary finding that Santa Priscila received a disproportionate benefit amount:

Non-Confidential Version – Confidential Information Has Been Redacted

> Further, in the Second Post-Preliminary Memorandum, we found that the share of the benefits received by Santa Priscila under this program during the POI was many times greater than the average benefit received by other program recipients in Ecuador. As such, we determined that Santa Priscila . . . received disproportionate benefits under the program and, therefore, that the program was de facto specific under section 771(5A)(D)(iii)(III) of the Act.

Commerce here sticks by that finding. DOC Br. at 37-38. However, in both its Final IDM and here, Commerce did not even attempt to distinguish the Federal Circuit's decision in *AK Steel* or this court's decisions in *Samsung, Mosaic II, Mosaic III,* and *POSCO,* which all hold that a subsidy is not *de facto* specific merely because one company receives a larger benefit than another company.

Instead, Commerce claims that it countervailed the AMVTR Program because Santa Priscila's affiliate, Produmar, did not initially report the correct benefit amount that it received. As a result, Commerce stated that it was justified in using adverse facts available ("AFA") to calculate the subsidy margin, not just for Produmar, but also for Santa Priscila, even though Commerce had already verified how the program worked and that the GOE had calculated proportionate benefits for Santa Priscila based on the number of its qualifying vehicles. Final IDM at 74-78.

If this Court agrees that the AMVTR Program did not provide a "disproportionately large amount of the subsidy" to favored enterprises or industries, then it should find that Commerce erred in calculating an AMVTR Program subsidy margin for Santa Priscila and Produmar, as well as for Songa and Naturisa.

11

Non-Confidential Version – Confidential Information Has Been Redacted

### III. COMMERCE ABUSED ITS DISCRETION WHEN IT REJECTED THE MINOR CORRECTION THAT SANTA PRISCILA SUBMITTED BEFORE THE START OF VERIFICATION CONCERNING THE BENEFIT AMOUNT THAT ITS AFFILIATE, PRODUMAR, RECEIVED UNDER THE AMVTR PROGRAM

#### A. Produmar's Original Questionnaire Response and Subsequent Minor Correction

In its Supplier Questionnaire Response (at Exhibit PRO-15), Produmar reported that it had received a benefit of [      ] under the AMVTR Program. C.R. 110. However, in preparing for verification, Produmar determined that it had slightly overstated its benefit amount, which should have been [      ] Thus, *it initially overstated its actual benefit amount by just $231*. Produmar provided the explanation for its error in Attachment 3 to its pre-verification submission of minor corrections and there stated that it had "inadvertently reported the tax savings attributable to qualifying vehicles for the year 2023 rather than for 2022, which coincides with the POI."[5] Commerce refused to accept Produmar's minor correction submission. Its rationale was that the "revised database included [      ] of motor vehicle tax exemptions." Verif. Rept. at 2. C.R. 314.

Commerce then took over two months after it had completed the Santa Priscila verification on July 17, 2024 to issue its Second Post-Preliminary Analysis on September 26, 2024. P.R. 437. There, Commerce stated that Produmar failed to provide necessary information requested by Commerce, "significantly impeding this proceeding." *Id.* at 7. That led Commerce to assign to Produmar as "facts otherwise available" the verified actual subsidy rate that it had calculated for Santa Priscila for the identical AMVTR Program, which was 0.04%. *Id.* at 11.

Use of Produmar's initially submitted benefit amount of [      ] would have generated a subsidy margin of 0.01586%. Use of Produmar's corrected benefit amount of [      ] would

---

[5] Pursuant to this Court's October 20, 2025 Order, Commerce submitted this document for the record on November 21, 2025. *See* ECF No. 62.

**Non-Confidential Version – Confidential Information Has Been Redacted**

have generated a subsidy margin of 0.01582%. In other words, the minor correction, if

Commerce had accepted it, would have reduced the subsidy margin by 0.0004%, *which would*

*have constituted an effective correction of zero* after Commerce applied its standard two decimal

point rounding practice.

> **B.  Case Law Supports the Conclusion that Commerce Abused Its Discretion in Rejecting Produmar's Minor Correction**

Commerce relies on the Federal Circuit's decision in *Goodluck India Ltd. v. United*

*States*, 11 F. 4th 1335 (Fed. Cir. 2021) as support for its decision to reject Produmar's minor

correction. DOC Br. at 29. However, Goodluck's rejected minor correction consisted of "a

systemic change to the entire reported database" in an antidumping investigation, which is a far

cry from the facts here. *Id.* In *Goodluck*, the CAFC defined a minor correction as one that

rectifies "minor mistakes in addition, subtraction, or other arithmetic function, minor data entry

mistakes, clerical errors resulting from inaccurate copying, duplication, or the like {or} minor

classification errors." On the other hand, a methodology change does not constitute a minor

correction. *Id.* at 1341.

Produmar's correction fell well within the definition of a "minor mistake." Also, it was

the result of a clerical error, and it constituted a minor data entry mistake. It was not a "systemic

change" or a "methodology change," nor has Commerce claimed that it was. *See* Final IDM at

Comment 16. *The error was so minor that its correction literally would not have changed the*

*resulting margin calculation had Commerce accepted it.*

The arbitrary nature of Commerce's rejection of Produmar's "wrong year" reporting is

demonstrated by Commerce's inconsistent acceptance of a virtually identical minor correction

that Songa submitted at verification. There, Commerce *accepted* a minor correction concerning

the benefit amount that it received under the ISD Exemption on Principal and Interest on Foreign

Non-Confidential Version – Confidential Information Has Been Redacted

Loans Program that was available under its Investment Contract. Verif. Rept. at 3. C.R. 313. Songa erroneously reported the benefit that it received in 2021 under its contract, when it should have reported the benefit it received in 2022. Just as Produmar reported the benefit in the wrong year, so, too, did Songa. The only material difference between the two "wrong year" reporting errors was that Commerce accepted Songa's minor correction but rejected Produmar's.

The benefit amount that Songa erroneously reported for 2021 was [          ] but the accepted 2022 minor correction amount was [          ] Thus, the minor correction increased the benefit amount by $7,060 and increased Songa's subsidy margin by 0.00134%. *No rational basis supports rejection of Produmar's minor correction and acceptance of Songa's, which involved the same correction of wrong year reporting, and which resulted in an equally minimal revision to the calculated subsidy margin.*

Commerce's inconsistent treatment of Produmar and Songa was arbitrary and an abuse of discretion. As Judge Katzmann stated in *Goodluck India Limited v. United States*, 393 F. Supp. 3d 1352, 1357 (Ct. Int'l Trade 2019), if "Commerce acted differently in this case than it has consistently acted in similar circumstances without explanation, then Commerce's actions will have been arbitrary." (Citations omitted.) That is precisely the situation here. If this Court finds that Commerce abused its discretion by refusing to accept Produmar's minor correction, then Commerce's alleged "failure to cooperate" basis for finding a *de facto* subsidy evaporates.

### C. Commerce's Rationale for Rejecting Produmar's Minor Correction Has No Merit

Commerce rejected Produmar's minor correction of its AMVTR benefit because it involved [     ] of vehicles that qualified for the tax benefit. Verif. Rept. at 2. C.R. 314. However,Commerce's rationale constituted an abuse of discretion because, first, as held in *Tatung Company v. United States*, 18 CIT 1137, 1141 (Ct. Int'l Trade 1994), "the issue is not . . .

14

Non-Confidential Version – Confidential Information Has Been Redacted

the number of instances of errors. Rather, the issue is the nature of the errors and their effect on the validity of the submission." As shown above, the trivial difference in Produmar's subsidy margin using the initial wrong year benefit amount and the slightly revised correct year benefit amount did not affect the validity of the submission.

Second, the benefit amount reported in Produmar's original questionnaire response, and the nearly identical minor correction amount, strongly suggest that the original response also involved [          ] of vehicles. Commerce made no effort to determine if this was the case. Moreover, the number of vehicles that received a benefit could not turn the correction into something other than a minor one unless Commerce explained why that was the case. After all, Commerce had no difficulty verifying the proportionate AMVTR benefits that Santa Priscila reported for over [     ] vehicles.

Third, Commerce asserts that Produmar's incorrect initial reporting of its AMVTR benefit amount meant that, '{a}s a result we lack complete benefit information for the entire Santa Priscila cross-owned entity." Final IDM at 78. Moreover, the alleged lack of this information meant that "we are unable to conduct an analysis of disproportionality for the purposes of *de facto* specificity." *Id.* at 51. However, Commerce did conduct an analysis of "disproportionality" for Santa Priscila, and its implicit assertion that it could not conduct this analysis for Produmar is belied by the fact that Commerce did not request that Produmar supplement its vehicle reporting information contained in its original questionnaire response, thereby indicating that it contained information that was sufficient to conduct a proportionality analysis.

To bolster Commerce's lack of a rationale for rejection, ASPA asserts that the AMVTR program was "limited to a discrete segment of the economy." ASPA Br. at 12. However, neither

15

Non-Confidential Version – Confidential Information Has Been Redacted

the Second Post-Preliminary Analysis nor the Final IDM says this, and ASPA has failed to show any such limitation.

In addition, ASPA asserts that *Magnola Metallurgy, Inc. v. United States*, 508 F. 3d 1349, 1353 (Fed. Cir. 2007), upheld "Commerce's methodology in determining whether Magnola received a disproportionate share" of the government of Quebec's job training grants. ASPA Br. at 9. However, the portion of the opinion that ASPA quotes is an excerpt from a *NAFTA panel* decision that the panel determined was entitled to "*Chevron* deference." As such, the *Magnola* case is irrelevant for two reasons: (1) a NAFTA panel decision is not binding on different parties in a different case in this Court and (2) the *Loper Bright* decision overruled the concept of *Chevron* deference. Moreover, review of the "Discussion" section of the *Magnola* opinion reveals that t*he Federal Circuit never affirmed Commerce's methodology for evaluating disproportionality.*

## IV.    COMMERCE ABUSED ITS DISCRETION WHEN IT USED ADVERSE FACTS AVAILABLE TO DETERMINE THE SUBSIDY MARGINS ATTRIBUTABLE TO SANTA PRISCILA'S AND PRODUMAR'S USE OF THE AMVTR PROGRAM

Commerce initially used "facts available" (not adverse facts available) to determine Produmar's subsidy margin after it rejected Produmar's minor correction. This resulted in the same 0.04% margin that Commerce actually calculated for Santa Priscila. *See* Second Post-Preliminary Analysis at 13-14. P.R. 437. However, in its Final IDM (at 77-78), Commerce switched from using an actually calculated margin of 0.04% for Santa Priscila and a "facts available" margin for Produmar of 0.04% to a combined punitive AFA margin for Santa Priscila and Produmar of 1.38%: (a) despite the fact that it had verified Santa Priscila's reported benefit amount and (b) because it rejected Produmar's $231 minor correction. According to Commerce, this punitive result was required because, "when we find that the application of AFA is warranted

Non-Confidential Version – Confidential Information Has Been Redacted

with respect of a respondent's use of a subsidy program, we apply a single AFA rate to all cross-owned firms that comprise the cross-owned entity." Final IDM at 77.

Before this Court, Commerce defends its AFA decision on the grounds that Produmar's rejected minor correction nullified Santa Priscila's previously verified benefit amount. DOC Br. at 37-38. The rationale for this turnabout was that, due to Produmar's failure to timely report its $231 minor correction, "Commerce could not conduct a disproportionality analysis." *Id.*

This is simply incorrect because *Commerce did conduct a disproportionality analysis in its Second Post-Preliminary Analysis*, and it found that Santa Priscila had received a larger share of total AMTVR benefits than other companies. Produmar submitted the same type of AMVTR information as Santa Priscila did. Thus, it was a foregone conclusion that Commerce would find disproportionality as to Produmar for the same reason as it found for Santa Priscila. In short, Commerce had no need or basis to conduct a second disproportionality analysis when the dice had already been cast.

Commerce next insists that it could apply a punitive AFA margin to Santa Priscila because it is cross-owned with Produmar. DOC. Br. at 37, citing three decisions cited in the Final IDM at 77, fns. 372, 375, 376, and 377. P.R. 456. Those decisions are readily distinguishable.

In *Standard Line Pipe from China*, the respondent, Hengyang, as well as the Government of China, "have not provided necessary information on CRC China," which was cross-owned by Hengyang. Final IDM at Comment 22. However, the result in the *Standard Line Pipe* decision directly contradicts Commerce's position here. *The critically relevant portion of that decision is that, as AFA, Commerce applied "the highest calculated rate for the identical program in this investigation if either Hengyang or TPCO used the program." 75 Fed. Reg. at 57,448.* In other words, Commerce did not assign a combined AFA margin to both the respondent, Hengyang, and

**Non-Confidential Version – Confidential Information Has Been Redacted**

its cross-owned affiliate, CRC China. Rather, it used the highest *calculated* rate for Hengyang and applied AFA only to its cross-owned affiliate.

At most, this is precisely what Commerce should have done here, and which this Court should now direct it to do if it first finds that AFA was even appropriate, which it is not. As previously noted, the "highest calculated rate for the identical program," i.e., for the AMVTR program, is Santa Priscila's 0.04% rate.

In addition, the two other agency decisions that Commerce relies upon did not involve a verified benefit amount of a respondent and an allegedly unverifiable benefit amount of its cross-owned company *for the identical program.*

In *Prestressed Concrete Steel Wire from Turkey*, the Court of International Trade rejected Commerce's application of AFA and directed Commerce upon remand to calculate the respondent's, Celik Halat's, subsidy margin using the information contained in that company's Section III questionnaire response.[6] *See Celik Halat Ve Tel Sanayi A. S. v. United States*, 557 F. Supp. 2d 1363 (Ct. Int'l Trade 2022). Thus, there is no issue of the correct AFA rate in that case.

In *Lined Paper from Indonesia*, the respondent, TK, "withdrew from active participation in the investigation" and the Government of Indonesia "stated that it would not provide any confidential information in the context of verification, a position which would have resulted in the verification process being meaningless." Final IDM at Comment 1. In this circumstance, application of AFA to the entire entity was found appropriate.

Commerce does not even attempt to distinguish the AFA-related cases that Plaintiffs rely upon, which support the conclusion that, at most, Commerce should have imposed an AFA rate

---

[6] Commerce's mistakenly cites *Welded Pipe from Turkey*, but its citations in footnotes 372 and 377 to that determination actually pertain to *Prestressed Concrete Steel Wire from Turkey*, which is the decision that we discuss.

Non-Confidential Version – Confidential Information Has Been Redacted

of 0.04% on Produmar and maintained that same verified rate for Santa Priscila. *See* Ecua. Br. at 33-37. Needless to add, the assignment of an AFA margin of 1.38% to Santa Priscila and Produmar was wildly "disproportionate" to the $231 minor correction that Produmar attempted to submit. If this Court rejects the "facts available" 0.04% rate for Produmar, it should direct Commerce to select as AFA a rate that pertains to a tax program that is not an income tax program.

**V.    COMMERCE ABUSED ITS DISCRETION WHEN IT REJECTED THE MINOR CORRECTION THAT SONGA AND NATURISA SUBMITTED AT VERIFICATION CONCERNING THEIR BENEFIT AMOUNT UNDER THE AMVTR PROGRAM**

**A.  Factual Background**

The GOE informed Commerce that Songa and its affiliate, Naturisa, received benefits under the AMVTR program on July 10, 2024 in its Third Post-Preliminary Questionnaire Response. There, in response to Commerce's request that it report the "amount of {AMVTR} assistance approved for each mandatory respondent company, including all cross-owned companies," the GOE reported that Songa and Naturisa received AMVTR benefits totaling

[          ] *See* C.R. 261 at page S5-6. This reported amount would have generated a subsidy margin of 0.013%.[7] After reviewing the GOE's information, Songa realized that the amount that the GOE had reported was incorrect and that, as a result, it needed to submit a minor correction.

Thus, before the July 22, 2024 start of verification, Songa provided a list of minor corrections on July 19, 2024 as part of the "pre-verification document packages" that Commerce's Verification Agenda required it to submit. There, Songa stated that Attachments 7

---

[7] Almost 30,000 companies received AMVTR benefits in 2022. *Id.* at S5-7. In addition, the GOE demonstrated that no respondent in the shrimp aquaculture industry received a disproportionate share of the total benefits that the program provided. *Id.* at S5-8 and Exhibit S5-4.

**Non-Confidential Version – Confidential Information Has Been Redacted**

and 8 to its Exhibit VE-1 provided the requested minor correction information for the AMVTR Program, which corrected the GOE's originally reported amount of [                    ] Acceptance of the correction documented in the two attachments would have generated a subsidy margin of 0.015%. Thus, acceptance of the minor correction would have increased the original subsidy margin reported by the GOE by 0.002%, which is effectively zero after DOC's rounding.

However, after reviewing the two Attachments, Commerce refused to accept them because they identified a total of [    ] vehicles. Verif. Rept. at 2. C.R. 313. In contrast, Santa Priscila reported over [    ] vehicles, and Commerce had no difficulty in verifying Santa Priscila's benefits for those vehicles. Verif. Rept. at 13. C.R. 314.

Commerce did not notify Songa of the *consequence* of its refusal to accept this minor correction until September 26, 2024 in its Second Post-Preliminary Analysis. There, Commerce found (at 7) that Songa and Naturisa "had failed to cooperate to the best of their ability" in responding to Commerce's requests for information and, therefore, that "the use of partial AFA is warranted." P.R. 437. Commerce initially set this AFA rate at 0.04%, which was the calculated rate for Santa Priscila. This rate was intended "to ensure that the companies do not obtain more favorable results by failing to cooperate than if they had fully complied with our request for information." *Id.*[8]

---

[8] In an investigation, Commerce conducts its verification *after*, not before, it has issued its preliminary determination. However, it did not follow that procedure here. Had it done so and waited to conduct verification until after it had completed its review of the AMVTR-related submissions, it could have complied with 19 U.S.C. § 1677m(d) or else 19 C.F.R. § 351.301(a) before the start of verification. This failure constituted an abuse of discretion.

20

Non-Confidential Version – Confidential Information Has Been Redacted

### B. Defendant and Defendant-Intervenors Fail to Demonstrate that Songa's Correction Was Not Minor

The efforts of Commerce, ASPA, and AHSTAC to convince the Court that Songa's corrections were not minor have no merit. Commerce first states that it "was not aware until verification that SONGA and Naturisa used the AMVTR program." DOC Br. at 28. That claim is inaccurate because the GOE provided to Commerce the AMVTR benefits that Songa and Naturisa received in its July 10, 2024 supplemental questionnaire response. The Songa verification did not begin until July 22, 2024.

Second, Commerce contends that "it was reasonable for Commerce to expect SONGA and Naturisa to report receipt of AMVTR benefits" because Santa Priscila and Produmar reported them. *Id.* However, there is no evidence that Songa knew what Santa Priscila or Produmar had reported.

Third, Commerce's claim lacks context. Commerce issued questionnaires and supplemental questionnaires to Songa and its cross-owned companies that covered 33 alleged GOE subsidy programs. Songa's oversight concerning just one of these 33 programs is understandable given the burden that its small staff faced in responding to 14 separate questionnaires and by providing in response over 2,800 pages of documents and narrative explanations concerning each of these programs.[9]

---

[9] See generally, Sources of Raw Shrimp Questionnaire Response (Jan. 3, 2024), C.R. 49-50, Section III "Affiliated Companies" Questionnaire Response (Jan. 4, 2024), C.R. 53, Affiliated Companies Supplemental Questionnaire Response (Jan. 16, 2024), C.R. 60, Affiliated Companies Supplemental Questionnaire Response (Jan. 23, 2024), C.R. 61, Section II of Supplier Questionnaire Response (Feb. 9, 2024), C.R. 71-73, SONGA Section III Questionnaire Response (Feb. 12, 2024), C.R. 85-89, Section III of Supplier Questionnaire Response (Feb. 16, 2024), C.R. 115-117, SONGA Supplemental Section III Questionnaire Response (Mar. 1, 2024), C.R. 134-135, Benchmark Supplemental Questionnaire of SONGA and Industrial Pesquera Santa Priscila (Mar. 15, 2024), C.R. 170-173, SONGA Affiliated Companies Supplemental Questionnaire Response (Mar. 18, 2024), C.R. 177-190, SONGA's New Subsidy Allegations

**Non-Confidential Version – Confidential Information Has Been Redacted**

Fourth, Commerce claims that Songa and Naturisa were "aware" that Commerce was investigating the AMVTR program because its first Post-Preliminary Analysis stated that it would examine it in the future, and Commerce said there that "we invite parties to include comments on the above programs." P.R. 400 at 18, Commerce issued this document on July 12, 2024. Commerce issued Songa's verification agenda on July 9, 2024, and Songa's verification began on July 22, 2024. By those dates, it was too late for Songa to submit comments other than in the form of its minor corrections.

Fifth, Commerce asserts that the number of corrections is a relevant factor when determining whether Commerce acted within its discretion in finding revisions to a database not minor." DOC Br. at 29.[10] However, Commerce does not contest that the following factors may be equally relevant, all of which the courts have considered:

- o the magnitude of the correction in terms of the amount or percentage of the change;

- o the effect of the correction on the subsidy margin calculation;

- o the effect of the correction on the integrity of the original response;

- o whether the respondent initially intended to submit inaccurate information;

- o whether the respondent intentionally withheld information;

- o whether a methodological error was made;

---

Questionnaire Response (Apr. 18, 2024), C.R. 207-209, SONGA's 771B Questionnaire Response (Apr. 25, 2024), C.R. 229-230, SONGA Post-Preliminary Supplemental Questionnaire Response (May 16, 2024), C.R. 244-245, SONGA Second Post-Preliminary Supplemental Questionnaire Response (June 11, 2024), C.R. 246.

In addition to the 14 questionnaire responses detailed above, SONGA filed 23 separate submissions including comments, factual/rebuttal factual information, case briefs, and rebuttal briefs, that collectively exceeded 1,300 pages.

[10] Commerce relies upon the Federal Circuit's decision in *Goodluck India* in support of this contention. DOC Br. at 29. However, that decision involved a "systemic change" to an entire reported antidumping database. No such systemic change is present here.

Non-Confidential Version – Confidential Information Has Been Redacted

- o whether a judgment error was made;

- o whether a substantive error was made;

- o whether there is any evidence that the respondent declined to cooperate in any way during the investigation; and

- o whether the corrected information could have been used without difficulty.

No court has ever held that these are not relevant considerations, but Commerce failed to consider any of them, choosing instead to rely upon the number of vehicles listed in the minor correction, without providing any explanation as to why the number, standing alone, was the disqualifying factor.

Sixth, Commerce asserts that this Court cannot consider the "magnitude" of Songa's minor correction on the ground that "it would run contrary to Commerce's regulations" because, under 19 C.F.R. § 351.104(a)(2)(ii), rejected documents are on the official record "*solely for purposes of establishing and documenting the basis for rejecting the document.*" DOC Br. at 29. (Emphasis in original.) However, Commerce here wrongly conflates its own record with the Court's record. The Court's October 20, 2025 Order states that the minor corrections documents "are a part of the record for review by the court" without limitation. In other words, the Court held that it could consider the substance and magnitude of the minor corrections, not just Commerce's purported reason for rejecting them.[11]

Finally, Commerce's Verification Agendas for both Songa and Santa Priscila directed them, when providing minor corrections, to submit "a chart that the shows the magnitude of

---

[11] ASPA's and AHSTAC's defenses of Commerce's rejection of Songa's minor correction of its AMVTR benefits add little to Commerce's defense since they consist primarily of rote invocations of the rules and procedures governing verification. *See* ASPA Br. at 19-25 and AHSTAC Br. at 15-19.

Non-Confidential Version – Confidential Information Has Been Redacted

changes to quantitative data." C.R. 260 at 8 (Songa). Accordingly, Commerce expressly

acknowledged that the magnitude of a minor correction is a relevant consideration. No such

consideration occurred here since reliance upon the number of vehicles provides no evidence

concerning the magnitude of the correction or, for that matter, any other relevant factor.

## VI.    COMMERCE ABUSED ITS DISCRETION WHEN IT USED ADVERSE FACTS AVAILABLE TO DETERMINE THE COUNTERVAILING DUTY MARGIN FOR SONGA AND NATURISA UNDER THE AMVTR PROGRAM

Commerce applied AFA to determine Songa's and Naturisa's AMVTR margins because

they allegedly "withheld requested information" and "significantly impeded this proceeding."

DOC Br. at 31. The agency also asserts that "it was unaware of SONGA and Naturisa's omission

of information and would not have known to issue a deficiency questionnaire before the record

closed." *Id.* at 32. This statement is incorrect since the GOE reported that it had provided

AMVTR benefits to Songa and Naturisa. Therefore, Commerce knew, or should have known,

that it was obligated to issue a deficiency questionnaire, as required by 19 U.S.C. § 1677m(d) or

else issue another request for information as authorized by 19 C.F.R. § 351.301(a).[12] [13]

Commerce next asserts that its acceptance of Songa's minor correction "would

incentivize parties to respond to Commerce's questions without providing complete information

---

[12] Nothing prevented Commerce from verifying the benefit amounts that Songa and Naturisa received during its verification of the GOE's submissions because the GOE possessed the same verifiable documents as Songa and Naturisa had submitted in their minor correction document package, i.e., application forms and approval grants.

[13] Commerce asserts that Songa failed to exhaust its administrative remedies when it did not raise the relevance of Section 1677m(d) at the agency level. DOC Br. at 33. However, this assertion turns the statutory requirement of a supplemental questionnaire on its head since the statute obligated Commerce to issue that questionnaire. And, in any event, raising Section 1677m(d) at the administrative level would have been "futile" due to Commerce's previous rejection of the minor correction as not minor. Moreover, the applicability of Section 1677m(d) raises a "pure question of law."

Non-Confidential Version – Confidential Information Has Been Redacted

or entirely omit relevant information because even if Commerce were to discover later that such information had been withheld, a party would have an opportunity to provide such information without repercussion." DOC Br. at 33-34. However, no reasonable review of the record of Songa's efforts during the investigation concerning 33 separately investigated programs, in which Songa and Naturisa submitted 14 questionnaire responses, totaling 2,800 pages, would conclude that Songa consciously attempted to avoid its reporting obligations or sought to avoid any "repercussion" by not reporting its AMVTR benefit amount.

For that reason, Commerce's assignment of a highly punitive 1.38% AFA subsidy margin to Songa and Naturisa was an abuse of discretion. Plaintiffs rely on their previous discussion of the reasons for this conclusion. Ecua. Br. at 29-37.

## VII.    COMMERCE ABUSED ITS DISCRETION WHEN IT REFUSED TO ACCEPT SONGA'S MINOR CORRECTION OF THE BENEFIT THAT IT RECEIVED UNDER THE ISD TAX EXEMPTION FOR IMPORTED ASSETS AND RAW MATERIALS

### A.  Factual Background

Two of the three benefits that Songa received under its Investment Contract were: (1) an exemption from the ISD tax on purchases of imported assets and raw materials and (2) an exemption from that same ISD tax on the repayment of principal and interest on foreign loans. These two programs operated in the same way, i.e., a company was entitled to an exemption from the tax that would otherwise apply to the amount of the "outflow of currency" used to: (1) purchase foreign raw materials or assets; or (2) repay principal and interest on foreign loans.

As to the accepted correction of the ISD exemption on repayment of foreign loans, Songa's minor correction documented that, during 2022, it had [    ] loans outstanding for which it received a reduction of [          ] in the ISD tax otherwise due. It had originally reported a tax saving of [          ] Commerce accepted this minor correction, which did not change

Non-Confidential Version – Confidential Information Has Been Redacted

Commerce's calculation of the resulting margin, which both before and after correction was 0.02%. Verif. Rept. at 3, 10, C.R. 313.

As to the rejected ISD exemption on purchases of imported raw materials, Songa's minor correction documented that, during 2022, it had a tax saving of [        ] compared to its initial reporting of a tax saving of [        ] Commerce rejected this minor correction even though acceptance of the corrected benefit amount would have increased the preliminary margin calculation from 0.002% to just 0.017%. *Thus, the "magnitude" of the rejected correction of 0.017% would have been smaller than the magnitude of the accepted correction of 0.02%.*

Nevertheless, Commerce refused to verify the ISD benefit amount on the purchase of foreign raw materials because "the revised database included [   ] transactions for [   ] imported assets." Verif. Rept. at 2. C.R. 313. In fact, there were only two assets, not [   ], which were freezing chambers and blue plastic tubs. The verifiers did not explain why they could not verify any of the [   ] transactions, nor did they make any effort to determine the number of transactions or the number of imported assets that Songa included in its original reporting of the benefit amount.

Commerce's basis for rejecting the minor correction of the benefit amount under the ISD exemption for purchase of imported raw materials was that there were too many transactions to verify. However, Commerce never explained why [   ] raw material purchase transactions were too many to verify, especially when it accepted and verified Songa's reporting of [   ] loan transactions that were exempted from the ISD tax. This is a difference that lacks a principled distinction that Commerce has explained.

**Non-Confidential Version – Confidential Information Has Been Redacted**

### B. Commerce's Basis for Rejection of the Minor Correction Has No Merit

Commerce first defends its inconsistent treatment of Songa's two minor corrections on the ground that Plaintiffs failed to exhaust their administrative remedies:

> Plaintiffs argue that Commerce should have accepted its {correction of} its error in the ISD exemption for imported materials in the same way that Commerce accepted SONGA's minor correction for the ISD exemption for the repayment of principal and interest on foreign loans. Pl. Br. at 39-42. The producers failed to make this argument before Commerce in their case briefs.

DOC Br. at 46. This statement is demonstrably incorrect. Plaintiffs made two arguments in their (refiled) Case Brief at 83-89. C.R. 327. First, Commerce should have accepted the minor correction because "it is also inconsistent with the Department's practice in similar situations," which included the practice in Songa's own investigation of accepting a virtually identical type of correction for the ISD exemption on foreign loans, and which had a greater impact on the resulting subsidy margin. *Id.* at 84, 85. Second, Commerce should have accepted the correction because "the number of transactions or assets alone cannot make a correction not "minor" without addressing the combined impact of those transactions, which is truly minuscule." *Id.* at 86. Accordingly, Songa raised the issue of inconsistent treatment of the two minor corrections in its Case Brief. *See also* respondents' refiled Rebuttal Brief (at 61-66). C.R. 328.

Second, Commerce contends that, even if Songa did exhaust its administrative remedies, the agency's acceptance of the correction on the ISD exemption on foreign loan repayments "was similar to cases in which the corrections were a small portion of the grants previously reported and Commerce accepted as minor." DOC Br. at 47. However, Songa's *accepted minor correction included all [    ] loans for which it obtained a tax exemption*, not just a "small portion" of those loans.

27

**Non-Confidential Version – Confidential Information Has Been Redacted**

Third, Commerce rejects Songa's focus on the "magnitude" of the rejected correction. *See* respondents' refiled Case Brief at 86 ("By any reasonable definition of the term 'minor,' an error that leads to . . . a 0.015% change in the calculated rate for the investment contract program is truly 'minor.'") C.R. 327. Nevertheless, Commerce relies on the statement in the Final IDM (at 71) that "the magnitude of the change is {not} necessarily the sole guiding factor in Commerce's decision to either accept or reject a correction in every instance." DOC Br. at 47.

However, Plaintiffs do not assert that the magnitude of a correction is the "sole" guiding factor. Rather, it is undeniably a significant factor if only because the verification outline requires that the respondent report the magnitude of each change sought through a minor correction. Thus, Commerce abused its discretion when it relied solely on the number of transactions without ever considering the magnitude of the change or explaining why it would have been too difficult to verify.

Fourth, Commerce asserts that the correction was "voluminous" and "did not provide Commerce with sufficient time to examine the corrected data on the spot at verification." Moreover, the corrected data "was not found or traceable in the respondents' financial statement and/or tax return." DOC Br. at 47, citing Final IDM at 72. However, Commerce identifies no evidence that the corrected data was different in volume or nature from the minor correction data that it accepted. And, it is flatly wrong for Commerce to assert that the information could not be traced to Songa's accounting records or tax returns. Commerce did not even attempt such a tracing since it rejected Songa's pre-verification submission of its minor correction. Moreover, Songa repeatedly explained that its tax return did not contain any ISD tax exemption related information, which Commerce now ignores. *See* Ecua. Br. at 43-46.

28

Non-Confidential Version – Confidential Information Has Been Redacted

**VIII.    COMMERCE ABUSED ITS DISCRETION WHEN IT ASSIGNED AN AFA MARGIN OF 1.38% TO SONGA'S USE OF THE ISD EXEMPTION ON IMPORTED RAW MATERIALS AND ASSETS**

Commerce abused its discretion when it used an *income* tax subsidy rate of 1.38% as AFA for Songa's use of the ISD tax exemption on imported raw materials and assets. This is not an income tax program. Rather, it is a currency outflow tax unrelated to the reduction of income tax otherwise due that a taxpayer must report on its federal income tax return. As such, Commerce should have used as AFA a rate determined for a tax program other than a program that provided a reduction of the amount of income tax otherwise due. Ecua. Br. at 33-37.

**IX.    CONCLUSION**

For all the foregoing reasons, this Court should remand the matter to Commerce with an instruction that it recalculate the program-specific countervailing duty margins for Santa Priscila and Songa in a manner consistent with the arguments provided above.

Respectfully submitted,

/s/ Warren E. Connelly
Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
Phone: 202-223-3760
Email: wconnelly@tradepacificlaw.com

## CERTIFICATE OF COMPLIANCE

Undersigned counsel hereby certifies that the foregoing Reply Brief complies with the 9,000 word count limitation in this Court's April 9, 2026 Order. This document contains 8,706 words according to the word count function used in the word processing software used to prepare this Memorandum.

/s/ Warren E. Connelly

Warren E. Connelly