UNITED STATES COURT OF INTERNATIONAL TRADE
Before: The Honorable Richard K. Eaton, Senior Judge

|  |  |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS C.A., <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant,* <br><br> and <br><br> AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, <br><br> *Defendant-Intervenors.* | **PUBLIC VERSION** <br><br> Consol. Court No. 25-00025 <br><br> Business Proprietary Information Identified by Single Brackets [ ] |

**AMERICAN SHRIMP PROCESSORS ASSOCIATION'S REPLY IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Roger B. Schagrin
Elizabeth J. Drake
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W. Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for American Shrimp Processors Association*

Date: April 13, 2026

*Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

**PUBLIC VERSION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ i

ARGUMENT ....................................................................................................................... 2

    I.     COMMERCE HAS FAILED TO JUSTIFY ITS DECISION TO EXCLUDE CROSS-OWNED FRESH SHRIMP SUPPLIERS FROM THE SUBSIDY ANALYSIS......... 5

        A.    Commerce Did Not Have Discretion Under the Statute to Limit its Examination of Cross-Owned Fresh Shrimp Suppliers ............................................................... 5

        B.    Commerce's Rationale for Examining Two Cross-Owned Fresh Shrimp Suppliers Should Be Rejected...................................................................................................... 8

        C.    The Respondents Erroneously Rely on 19 U.S.C. § 1677m(c)(1)........................ 11

        D.    Commerce's Past Practice Does Not Support its Decision.................................. 13

        E.    There Is No Exhaustion or Waiver Issue With Respect to ASPA's Claim .......... 15

        F.    At a Minimum, Commerce Must Resort to Facts Available ............................... 16

    II.    COMMERCE'S DECISION NOT TO COUNTERVAIL THE PROVISION OF BRACKISH WATER IS UNSUPPORTED BY THE LAW AND THE FACTS...... 18

        A.    Commerce's Financial Contribution Analysis Is Inconsistent With the Plain Meaning of the Statute ...................................................................................... 18

        B.    Commerce Ignored Evidence that the GOE and the Respondents Did Not Cooperate to the Best of Their Ability................................................................ 22

        C.    A Remand Is Required for Commerce to Proceed With its Analysis of Benefit and Specificity ........................................................................................................ 24

    III.   COMMERCE'S DECISION NOT TO COUNTERVAIL THE PROVISION OF FUEL IS BASED ON AN UNTENABLE READING OF THE STATUTE............. 25

CONCLUSION.................................................................................................................... 29

# TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Committee v. United States*,
  675 F. Supp. 2d 1287 (Ct. Int'l Trade 2009) .......................................................... 15-16

*Assan Aluminyum Sanayi ve Ticaret A.S. v. United States*,
  624 F. Supp. 3d 1343 (Ct. Int'l Trade 2023) .......................................................... 23-24

*Bebitz Flanges Works Pvt. Ltd. v. United States*,
  433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020) .......................................................... 16-17

*Beijing Tianhai Indus. Co. v. United States*,
  52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015). .......................................................... 25-28

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) ........................................................................................................8

*Committee Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*,
  66 F.4th 968 (Fed. Cir. 2023) ........................................................................................7

*Committee Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*,
  483 F. Supp. 3d 1253 (Ct. Int'l Trade 2020 ..................................................................7

*Commissioner v. Clark*,
  489 U.S. 726 (1989) ......................................................................................................6

*FEC v. Democratic Senatorial Campaign Committee*,
  454 U.S. 27 (1981) .........................................................................................................7

*Guangdong Wireking Housewares and Hardware Co. v. United States*,
  745 F.3d 1194 (Fed. Cir. 2014) ............................................................................. 5, 26-27

*Guangdong Wireking Housewares and Hardware Co. v. United States*,
  900 F. Supp. 2d 1362 (Ct. Int'l Trade 2013) ......................................................... 5, 26-27

*Içdaş Celik Enerji Tersanev e Ulasim Sanayi A.S. v. United States*,
  498 F. Supp. 3d 1345 (Ct. Int'l Trade 2021) .................................................................9

*Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*,
  591 U.S. 657 (2020) ......................................................................................................19

*Meeks v. West*,
  216 F.3d 1363 (Fed. Cir. 2000) ......................................................................................5

*Motor Vehicle Mrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*,
 463 U.S. 29 (1983)........................................................................................................8

*Nan Ya Plastics Corp. v. United States*,
 810 F.3d 1333 (Fed. Cir. 2016)....................................................................................20

*POSCO v. United States*,
 977 F.3d 1369 (Fed. Cir. 2020) ....................................................................................26

*RZBC Group Shareholding Co. v. United States*,
 100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ................................................... 12, 25-28

*Schism v. United States*,
 316 F.3d 1259 (Fed. Cir. 2002)............................................................................. 14-15

*SEC v. Chenery Corp.*,
 332 U.S. 194 (1947)............................................................................................. 12-13

*Telecare Corp. v. Leavitt*,
 409 F.3d 1345 (Fed. Cir. 2005)....................................................................................19

*Uttam Galva Steels Ltd. v. United States*,
 476 F. Supp. 3d 1387 (Ct. Int'l Trade 2020) ........................................................ 12-13

*Wisconsin Bell, Inc. v. United States*,
 604 U.S. 140 (2025)....................................................................................................19

*YC Rubber Co. (North America) LLC v. United States*,
 Appeal No. 2021-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022).........................6

**Statutes**

19 U.S.C. § 1671(a) ...............................................................................4-5, 7-8, 13, 16, 25

19 U.S.C. § 1677(5)(C)..................................................................................................25

19 U.S.C. § 1677(5)(D)..................................................................................................18

19 U.S.C. § 1677(5)(D)(iii)............................................................................................18

19 U.S.C. § 1677(5)(E)...................................................................................................24

19 U.S.C. § 1677(16)......................................................................................................13

19 U.S.C. § 1677a(e).......................................................................................................14

19 U.S.C. § 1677-2 ...............................................................................2-3, 6-8, 13, 16-18

19 U.S.C. § 1677d.................................................................................................26

19 U.S.C. § 1677f-1(e)(2) ............................................................ 6-8, 10-11, 13, 16

19 U.S.C. § 1677m(c)(1)................................................................................. 11-14

## Regulations

19 C.F.R. § 351.309(c)............................................................................................15

19 C.F.R. § 351.402(c)............................................................................................14

19 C.F.R. § 351.511(a)(2).................................................................................24-25

19 C.F.R. § 351.525(b) (2024)................................................................................14

19 C.F.R. § 351.525(b)(6)(iv) ................................................................................17

## Federal Register Notices

*4th Tier Cigarettes from the Republic of Korea*,
  85 Fed. Reg. 44,281 (Dep't Commerce July 22, 2020) ............................................13

*Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses
from the People's Republic of China*,
  75 Fed. Reg. 59,212 (Dep't Commerce Sept. 27, 2010)..................................... 16-17

*Certain Cold-Rolled Carbon Steel Flat Products from Belgium*,
  67 Fed. Reg. 62,130 (Dep't Commerce Oct. 3, 2002) ..............................................14

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*
  80 Fed. Reg. 79,564 (Dep't Commerce Dec. 22, 2015) ............................................13

*Certain Corrosion-Resistant Steel Products from the Republic of Korea*,
  86 Fed. Reg. 42,784 (Dep't Commerce Aug. 5, 2021) ..............................................14

*Certain Softwood Lumber Products from Canada*,
  82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017) .........................................26-27

*Countervailing Duties*,
  63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998)....................................... 9-10

*Frozen Warmwater Shrimp from Ecuador*,
   89 Fed. Reg. 85,506 (Dep't Commerce Oct. 28, 2024) ................................................ 2-4, 10, 12

*Large Diameter Welded Pipe from the Republic of Korea*,
   88 Fed. Reg. 37,200 (Dep't Commerce June 7, 2023) ...............................................................5

*Magnesium from Israel*,
   84 Fed. Reg. 65,785 (Dep't Commerce Nov. 29, 2019) ...................................................... 20-21

*Regulations Enhancing the Administration of the Antidumping and Countervailing Duty
Trade Remedy Laws*,
   89 Fed. Reg. 101,694 (Dep't Commerce Dec. 16, 2024) ...........................................................14

*Stainless Steel Flanges from India*,
   83 Fed. Reg. 40,748 (Dep't Commerce Aug. 16, 2018) ...................................................... 16-17

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
   86 Fed. Reg. 53,279 (Dep't Commerce Sept. 27, 2021)............................................................21

*Steel Concrete Reinforcing Bar from the Republic of Turkey*,
   86 Fed. Reg. 69,009 (Dep't Commerce Dec. 6, 2021) ...................................................... 21-22

**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
   H.R. Rep. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .... 9, 12, 18, 25-26

S. Rep. No. 1221, 92d Cong., 2d Sess. 8 (1972)........................................................................5

UNITED STATES COURT OF INTERNATIONAL TRADE
Before: The Honorable Richard K. Eaton, Senior Judge

INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and
SOCIEDAD NACIONAL DE GALÁPAGOS C.A.,

*Plaintiffs,*

v.

UNITED STATES,

*Defendant,*

and

AD HOC SHRIMP TRADE ACTION COMMITTEE and
AMERICAN SHRIMP PROCESSORS ASSOCIATION,

*Defendant-Intervenors.*

**PUBLIC VERSION**

Consol. Court No. 25-00025

Business Proprietary Information
Identified by Single Brackets [ ]

**AMERICAN SHRIMP PROCESSORS ASSOCIATION'S REPLY IN
SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of this Court, American Shrimp Processors

Association ("ASPA") respectfully submits this reply in support of its motion for judgment on

the agency record in the above-captioned action. For the reasons set forth below, the response

briefs filed in opposition to ASPA's motion for judgment on the agency record fail to refute

ASPA's claims with respect to the issues raised in this appeal. In fact, the response briefs further

highlight the legal and factual errors that render the final determination unsupported by

substantial evidence and otherwise not in accordance with law. Therefore, ASPA respectfully

requests that the Court grant ASPA's motion for judgment on the agency record and remand this

matter for further proceedings.

## ARGUMENT

As set out in ASPA's opening brief (ECF Nos. 41 and 42), the final determination by the U.S. Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of frozen warmwater shrimp from Ecuador is unsupported by substantial evidence and otherwise not in accordance with law. *Frozen Warmwater Shrimp from Ecuador*, 89 Fed. Reg. 85,506 (Dep't Commerce Oct. 28, 2024) and accompanying Issues and Decision Memorandum ("IDM") (P.R. 456) at Comments 1, 2, and 4.[1] The contested aspects of the *Final Determination* are briefly summarized below.

*First*, after selecting Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") and Sociedad Nacional de Galápagos C.A. ("SONGA") (jointly referred to as the "Respondents") for individual examination as mandatory respondents, Commerce limited its analysis to just one cross-owned fresh shrimp supplier for each mandatory respondent. IDM at Comment 4. ASPA's opening brief established that this decision at the very outset of the investigation violated the statute, Commerce's regulations, and Commerce's own policies. ASPA Br. at 16-26. Indeed, Commerce has previously explained the critical importance of treating cross-owned companies as a single entity in order to fulfill the statutory mandate to calculate a CVD rate that captures subsidies received by cross-owned input suppliers. *Id.* at 21-23. Furthermore, given that the record did not contain necessary information regarding the full universe of subsidies received by the Respondents, Commerce was required to rely on facts otherwise available to fill the gap in the record with respect to the benefit that the Respondents received through their purchases of unfairly subsidized fresh shrimp from their unexamined cross-owned suppliers (*i.e.*, [     ] for Santa Priscila and [     ] for SONGA). Commerce properly relied on facts available for the

---

[1] Citations to record documents are designated as "P.R." (public) and "C.R." (confidential).

unexamined non-cross-owned suppliers that were included in the benefit calculation under 19 U.S.C. § 1677-2 – it was similarly required to do so for the unexamined cross-owned suppliers. *Id.* at 26-30.

*Second*, Commerce unreasonably concluded that government-authorized and cost-free access to brackish water owned by the Government of Ecuador ("GOE") does not constitute a financial contribution that provides a countervailable benefit because shrimp farmers are considered non-consumptive users and were responsible for all costs associated with extracting, using, and returning the water back to its original source. IDM at Comment 1. As ASPA explained in its opening brief, Commerce's conclusion with respect to this program is based on an erroneous application of the law and an unreasonable evaluation of the facts. ASPA Br. at 30-35. The statute's broad definition of financial contribution encompasses the provision of a good, whether the government provides the good itself or makes the good available through a right of access. *Id.* at 31-32. The GOE has legislatively established a procedure through which private entities must obtain approval from the GOE before using water (including brackish water) from a public source to engage in any productive activities, such as aquaculture. *Id.* at 32-33. The GOE provided a financial contribution when it gave the Respondents and their cross-owned fresh shrimp suppliers the right to use and access a set volume of brackish water, a finite resource that has commercial value and conferred a benefit. *Id.* at 32-35. Regardless, Commerce found no financial contribution based on facts that were directly contradicted at verification, which warranted the application of adverse facts available ("AFA") to countervail the provision of brackish water. *Id.* at 35-41. Commerce's finding that the Respondents cooperated to the best of their ability is therefore not supported by substantial evidence, and Commerce's refusal to apply AFA is an abuse of discretion.

*Third*, Commerce determined that the mandatory respondents' purchases of government-produced fuel do not constitute a countervailable financial contribution solely because the fuel was not purchased *directly* from the government-owned producer, Petroecuador. IDM at Comment 2. ASPA demonstrated in its opening brief that this decision is based on an untenable reading of the statute and is inconsistent with how Commerce has applied the statute in the past, as has been upheld by this Court. ASPA Br. at 41-46. The record evidence shows that Petroecuador, a state-owned fuel producer, was the ultimate supplier of the fuel that the mandatory respondents purchased from private trading companies and distributors. *Id.* at 45. The statute and legislative history contemplate this exact scenario and unambiguously instruct Commerce to find the existence of a financial contribution, regardless of whether the good was provided directly or indirectly. *Id.* at 41-42. But Commerce failed to give effect to the express intent of Congress when it did not countervail the mandatory respondent's purchases of fuel for no reason other than the fact that they did not purchase the fuel directly from Petroecuador.

*Fourth*, and finally, because of these legally and factually erroneous decisions, Commerce calculated final rates that significantly understate the extent to which the GOE unfairly subsidizes the production and export of frozen shrimp. ASPA Br. at 46. The end result is a final determination that violates 19 U.S.C. § 1671(a), which requires Commerce to impose duties that are equal to the full universe of countervailable subsidies with respect to the subject merchandise, and that is contrary to the remedial purpose of the CVD statute, which requires the imposition of duties to offset the harm caused by unfair subsidization.

As demonstrated below, the arguments in the response briefs filed by the Government (ECF Nos. 73 and 77) and the Respondents (ECF Nos. 71 and 72) are meritless and fail to

demonstrate that the contested aspects of the *Final Determination* are supported by substantial evidence and in accordance with law.

I. **COMMERCE HAS FAILED TO JUSTIFY ITS DECISION TO EXCLUDE CROSS-OWNED FRESH SHRIMP SUPPLIERS FROM THE SUBSIDY ANALYSIS**

A. **Commerce Did Not Have Discretion Under the Statute to Limit its Examination of Cross-Owned Fresh Shrimp Suppliers**

The Government incorrectly asserts that ASPA has identified no statute that requires Commerce to include all cross-owned fresh shrimp suppliers in the subsidy analysis. Gov't Br. at 9. ASPA identified at least three statutory provisions that required a complete examination of the mandatory respondents and all [   ] of their respective cross-owned fresh shrimp suppliers. ASPA Br. at 17-18, 21-23, 26-30.

The first statute is 19 U.S.C. § 1671(a), which provides that CVD rates "shall" be "equal to the amount of the net countervailable subsidy." This statutory provision requires Commerce to conduct its investigation in a way that achieves the remedial purpose of the CVD law and establishes final rates that operate to offset the subsidies that give an unfair advantage to foreign producers and exporters. *See Guangdong Wireking Housewares and Hardware Co. v. United States*, 900 F. Supp. 2d 1362, 1370 (Ct. Int'l Trade 2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014); *see also* S. Rep. No. 1221, 92d Cong., 2d Sess. 8 (1972); *Meeks v. West*, 216 F.3d 1363, 1366-67 (Fed. Cir. 2000) (explaining that statutory provisions must be read "holistically" and based on the "object and policy" of the law as a whole). Additionally, in prior cases, Commerce has correctly observed that the phrase "directly or indirectly" in this statute mandates including cross-owned input suppliers in the subsidy analysis. *See Large Diameter Welded Pipe from the Republic of Korea*, 88 Fed. Reg. 37,200 (Dep't Commerce June 7, 2023) and accompanying Preliminary Decision Memorandum at 7.

**PUBLIC VERSION**

The second statute is 19 U.S.C. § 1677f-1(e)(2), which carves out an exception to the general rule that requires Commerce to determine individual rates for every known producer or exporter of subject merchandise. Commerce has a history of stretching this narrow exception beyond what it authorizes. *See, e.g.*, *YC Rubber Co. (North America) LLC v. United States*, Appeal No. 2021-1489, 2022 WL 3711377 (Fed. Cir. Aug. 29, 2022) (holding that Commerce generally cannot limit its work to a single mandatory respondent). While this exception in the statute grants Commerce the authority to limit its examination to the largest foreign producers or exporters, it does not additionally grant Commerce the authority to further limit its examination by excluding separately incorporated input suppliers that are part of a single cross-owned entity and that may have received subsidies that are attributable to the subject merchandise. *See Commissioner v. Clark*, 489 U.S. 726, 739 (1989) (when a general policy is qualified by an exception, the exception is read narrowly to preserve the primary operation of the policy). In other words, the statute requires Commerce to determine individual rates for the selected mandatory respondents based on a complete examination of the subsidies provided directly or indirectly with respect to the manufacture, production, or export of the subject merchandise, which necessarily includes subsidies provided to any cross-owned input suppliers.

The third statute is 19 U.S.C. § 1677-2, which sets forth a two-pronged test that, if satisfied, requires attributing subsidies to producers of a raw agricultural product (*e.g.*, fresh shrimp) to the production of the downstream processed product (*e.g.*, frozen shrimp). This statute directs Commerce to expand the scope of its analysis by attributing all raw input subsidies to the processed product, regardless of whether the input subsidy was received by a cross-owned or non-cross-owned input supplier. There is no exception to this requirement. When 19 U.S.C.

§ 1677-2 applies, as was the case here, Commerce must include all subsidies to the raw input in its analysis.

These three statutory provisions, whether considered individually or in tandem, required Commerce to examine all [   ] cross-owned fresh shrimp suppliers and capture the full amount of the countervailable subsidy that exists with respect to the manufacture, production, and export of frozen shrimp from Ecuador. Nevertheless, the Government claims that Commerce's decision to examine only two cross-owned fresh shrimp suppliers was within its discretion under the statute. Gov't Br. at 14-17. The Government does not explicitly identify which statutory provision grants Commerce such discretion. And, indeed, there is none. The Government suggests that Commerce's discretion is found in Section 103 of the Uruguay Round Agreements Act ("URAA"). *Id.* at 9-11. However, the Government's reliance on this section of the URAA is misplaced because it delegates rulemaking authority to Commerce only with respect to enacted provisions of the URAA. *See Committee Overseeing Action for Lumber Int'l Trade Investigations or Negotiations v. United States*, 483 F. Supp. 3d 1253, 1264 (Ct. Int'l Trade 2020), *rev'd on other grounds*, 66 F.4th 968 (Fed. Cir. 2023). Stated differently, Section 103 of the URAA on its own cannot grant the agency the discretion to ignore statutory provisions that require Commerce to investigate and countervail potential subsidy benefits.

Additionally, in its implementation of the CVD law, it is axiomatic that Commerce cannot adopt a rule or policy that is plainly inconsistent with the statute's text or congressional intent. *See FEC v. Democratic Senatorial Campaign Committee*, 454 U.S. 27, 32 (1981) ("The courts … must reject administrative constructions of the statute … that are inconsistent with the statutory mandate or that frustrate the policy that Congress sought to implement."). Commerce's decision to limit its analysis to only two cross-owned fresh shrimp suppliers must be rejected

7

because it is incompatible with the statutory provisions that mandate a complete investigation that captures the full universe of subsidies provided directly or indirectly with respect to the manufacture, production, and export of the subject merchandise, *i.e.*, 19 U.S.C. §§ 1671(a), 1677f-1(e)(2), and 1677-2.

**B.      Commerce's Rationale for Examining Two Cross-Owned Fresh Shrimp Suppliers Should Be Rejected**

In the Government's view, Commerce did not err because it "examined cross-owned input suppliers that accounted for sufficient amount of the supply of shrimp from cross-owned suppliers, balanced with its limited resources, to attribute subsidies and calculate the countervailing duty subsidy rate." Gov't Br. at 18. Commerce decided to examine only two cross-owned fresh shrimp suppliers based on factors that are not found in the statute and therefore irrelevant (*i.e.*, the relative volume that the Respondents purchased from each cross-owned supplier and the agency's resources). This is the very definition of arbitrary and capricious agency action. *See Motor Vehicle Mrs. Ass'n v. State Farm Mutual Automobile Ins. Co.*, 463 U.S. 29, 43 (1983); *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971). The Government misunderstands Commerce's investigative obligations under the statute, as explained below.

The Government asserts that the two examined cross-owned fresh shrimp suppliers "accounted for sufficient amount of the supply of shrimp from cross-owned suppliers." *Id.* In particular, the Government observes that Produmar supplied Santa Priscila with [      ] percent and Naturisa supplied SONGA with [      ] percent of the fresh shrimp that was purchased from cross-owned suppliers. *Id.* at 11-12. The record evidence shows that Commerce failed to account for [                              ] cross-owned fresh shrimp purchases. *See* Santa Priscila Sources of Shrimp Questionnaire Response at Exhibit SRS-1, P.R. 118, C.R. 51 (Jan. 3, 2024);

SONGA Sources of Shrimp Questionnaire Response at Exhibit SRS-2, P.R. 117, C.R. 49 (Jan. 3, 2024). Even if this figure could somehow be characterized as small, the Government's volume-based argument fails because there is no *de minimis* exception in the statute that allowed Commerce to disregard *any* cross-owned fresh shrimp suppliers that may have received subsidies attributable to the subject merchandise. In fact, in a recent case, the Government defended Commerce's decision to examine a cross-owned company that supplied the mandatory respondent with a small quantity of scrap, and the Court sustained that decision because scrap is primarily dedicated to the production of the subject merchandise and the law "do{es} not obligate Commerce to measure the impact of an input supplier's contributions when weighing whether to attribute its subsidies to the downstream producer." *See Içdaş Celik Enerji Tersanev e Ulasim Sanayi A.S. v. United States*, 498 F. Supp. 3d 1345, 1364 (Ct. Int'l Trade 2021).

Without any investigation, there was no way for Commerce to know which of the [    ] cross-owned suppliers received subsidies from the GOE. By taking a whack-a-mole approach and disregarding [  ] of the cross-owned suppliers, Commerce has created a loophole through which the Respondents could avoid CVD exposure. Congress made it clear when it enacted the URAA that Commerce should not implement the CVD law in such a haphazard way. *See* Statement of Administrative Action Accompanying the URAA, H.R. Rep. No. 103-316, vol. 1 (1994), at 926, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4239 ("SAA") ("The Administration plans to continue its policy of not permitting the indirect provision of a subsidy to become a loophole when unfairly traded imports enter the United States and injure a U.S. industry."). This loophole frustrates the remedial purpose of the CVD law and is precisely why it was necessary for Commerce to establish the concept of cross-ownership. *See Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*").

9

The Government also argues Commerce decided it could only examine two cross-owned fresh shrimp suppliers due to the agency's "limited resources." Gov't Br. at 18. The only statute cited in support of this resource-based argument is 19 U.S.C. § 1677f-1(e)(2). As noted above, that statute grants Commerce the discretion to limit its individual examination to a reasonable number of respondents, if it is not practicable to follow the statute's general preference of determining individual rates for all known producers or exporters. Commerce already took full advantage of the discretion afforded to it under this narrow exception in the statute when it selected Santa Priscila and SONGA as the two company respondents subject to individual examination. When Commerce evaluated its resources and determined that only two respondents can reasonably be examined, Commerce recognized that it "must" examine Santa Priscila's and SONGA's cross-owned input suppliers and their "corporate structure, financial records, and participation in the alleged subsidy programs." *See* Respondent Selection Memorandum at 3, P.R. 95, C.R. 48 (Dec. 8, 2023). This is because Commerce treats cross-owned companies as a single entity and presumes that the subsidies received by one benefit the cross-owned entity. *See CVD Preamble*, 63 Fed. Reg. at 65,401.

The Government acknowledges several times in its brief that cross-owned companies are treated as one and refers to the Respondents as the "Santa Priscila single entity and SONGA single entity." Gov't Br. at 38, 40, 42-44. Commerce ensured that the Respondents and their respective cross-owned input suppliers were treated as a single entity in other aspects of the *Final Determination*. IDM at Comment 16 ("{G}iven Santa Priscila's and Produmar's failure to report benefits received by Produmar under this program, we are unable to calculate an accurate subsidy rate for Santa Priscila as a whole."). Commerce cannot arbitrarily pick and choose when it does and does not treat cross-owned companies as a single entity. Thus, when Commerce

10

selected Santa Priscila and SONGA as the two "exporters and producers accounting for the largest volume of subject merchandise … that … can be reasonably be examined," Commerce had an obligation to conduct a complete examination of the Respondents and all [  ] of their respective cross-owned fresh shrimp suppliers. Commerce did not have the authority to invoke 19 U.S.C. § 1677f-1(e)(2) a second time in the same case to further limit its individual examination and flout the remedial purpose of the CVD law by excluding [ ] out of [  ] of the mandatory respondents' cross-owned suppliers from the analysis.

**C.    The Respondents Erroneously Rely on 19 U.S.C. § 1677m(c)(1)**

According to the Respondents, Commerce acted within its authority under 19 U.S.C. § 1677m(c)(1) when it modified the Respondents' reporting requirements and did not require questionnaire responses from the [ ] unexamined cross-owned fresh shrimp suppliers. Respondents Br. at 8-9, 12-14. That statutory provision is not applicable to this case.

When a respondent seeks an accommodation pursuant to 19 U.S.C. § 1677m(c)(1), it must "promptly" notify Commerce that it is "unable to submit the information requested in the requested form and manner" and "suggest{} alternative forms" in which the respondent is able to submit the requested information. The Respondents did not "promptly" submit their request to modify their reporting requirements with respect to cross-owned fresh shrimp suppliers. The initial questionnaire was issued on December 12, 2023, and the first page of Section I instructed the Respondents to notify Commerce of any reporting difficulties within 14 days. Initial Questionnaire, P.R. 98 (Dec. 12, 2023). The deadline to notify Commerce was December 26, 2023, but the Respondents submitted their request two weeks later on January 9, 2024. Request to Exclude Certain Companies from Reporting, P.R. 126, C.R. 55 (Jan. 9, 2024). In addition, the Respondents were fully capable of responding on behalf of their cross-owned suppliers, as evidenced by the fact that SONGA had done so in the prior investigation on frozen shrimp from

**PUBLIC VERSION**

Ecuador. Also, the Respondents suggested unacceptable alternatives because they prevented Commerce from capturing the full universe of subsidies that are attributable to subject merchandise. As this Court has explained, "{t}he idea is to help respondents who face technical barriers to filing their answers" and "does not excuse parties from submitting data altogether." *RZBC Group Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1298 (Ct. Int'l Trade 2015) (citing SAA at 865). The Respondents' request therefore did not meet the criteria under 19 U.S.C. § 1677m(c)(1).

More importantly, Commerce did not state in the *Final Determination* that it excused the Respondents from responding on behalf of the unexamined cross-owned fresh shrimp suppliers pursuant to 19 U.S.C. § 1677m(c)(1). IDM at Comment 4. Commerce explained that it was not practicable to examine all [    ] cross-owned fresh shrimp suppliers because of the agency's resource constraints. Gov't Br. at 13 (citing IDM at 34).  But 19 U.S.C. § 1677m(c)(1) plainly states that Commerce may only modify a respondent's reporting requirements "to the extent necessary to avoid imposing an unreasonable burden *on that party*" (emphasis added). The legislative history confirms that the statute is "intended to alleviate some of the difficulties encountered by small firms and firms in developing countries{.}" SAA at 865. The statute does not permit Commerce to abdicate its investigative responsibilities and reduce its own workload by modifying a respondent's reporting requirements. In sum, Commerce cannot rely on 19 U.S.C. § 1677m(c)(1) because it excluded the unexamined cross-owned fresh shrimp suppliers to conserve the agency's own resources, not to avoid imposing an unreasonable burden on the Respondents. *See Uttam Galva Steels Ltd. v. United States*, 476 F. Supp. 3d 1387, 1392 (Ct. Int'l Trade 2020) ("Whatever the merits of Defendant-Intervenors' argument, the court may not

12

sustain Commerce's determination on a rationale not provided by the agency.") (citing *SEC v. Chenery Corp.*, 332 U.S. 194, 196 (1947)).

### D.    Commerce's Past Practice Does Not Support its Decision

The Government and the Respondents continue to rely on Commerce's decision in *Certain Cold-Rolled Steel Flat Products from the Russian Federation* to support the claim that Commerce has previously limited its examination of cross-owned input suppliers. Gov't Br. at 16-17; Respondents Br. at 13-14. ASPA has already explained why this one decision by the agency does not speak to what is permissible under the statute, does not reflect an established agency practice, and involves facts that are distinguishable from those presented here. ASPA Br. at 24-25. The Government claims it has identified three other cases where "Commerce has limited information reporting for practical reasons." Gov't Br. at 18-19. However, all three cases are inapposite because, as the Government recognizes, they are decisions made "{i}n other contexts" and pursuant to the antidumping laws. *Id.* Each case is also distinguishable for other reasons.

In *4th Tier Cigarettes from the Republic of Korea*, the respondent was excused from reporting certain *home market* sales and relaxing the respondent's reporting requirements in this way did not inhibit Commerce's ability to perform the dumping calculation because the statute's definition of "foreign like product" allowed Commerce to use other matching home market sales for its analysis. *See* 85 Fed. Reg. 44,281 (Dep't Commerce July 22, 2020) and accompanying Preliminary Decision Memorandum at 2-3; *see also* 19 U.S.C. § 1677(16). Conversely, excusing the Respondents from reporting on behalf of the [  ] unexamined cross-owned fresh shrimp suppliers prevented Commerce from obtaining the information it needed to determine rates in accordance with 19 U.S.C. §§ 1671(a), 1677f-1(e)(2), and 1677-2.

In *Certain Corrosion-Resistant Steel Products from the Republic of Korea*, Commerce exempted Hyundai from reporting U.S. sales of subject merchandise further manufactured in the United States into finished automobiles, formed automobile parts, and after-service automobile parts pursuant to the so-called "special rule" under 19 U.S.C. § 1677a(e) and 19 C.F.R. § 351.402(c). *See* 86 Fed. Reg. 42,784 (Dep't Commerce Aug. 5, 2021) and accompanying Preliminary Decision Memorandum at 3. The law specifically authorized Hyundai's reporting exemption, which is not the case for the reporting exemption that Commerce granted to the Respondents with respect to the [  ] unexamined cross-owned fresh shrimp suppliers.

Finally, in *Certain Cold-Rolled Carbon Steel Flat Products from Belgium*, Commerce excluded certain U.S. sales because they represented a small portion of total U.S. sales, it was clear that the excluded sales would have had an insignificant impact on the dumping calculations, and Commerce expressly stated that the exclusion was granted to avoid imposing an unreasonable burden on the respondent. *See* 67 Fed. Reg. 62,130 (Dep't Commerce Oct. 3, 2002) and accompanying Issues and Decision Memorandum at 6-7. Here, however, Commerce had no basis to conclude that the [  ] unexamined cross-owned fresh shrimp suppliers would have had an insignificant impact on the total subsidy benefits attributable to the subject merchandise. Commerce also did not excuse the Respondents from reporting on behalf of the cross-owned fresh shrimp suppliers pursuant to 19 U.S.C. § 1677m(c)(1).[2]

---

[2] The Government and the Respondents reference Commerce's rulemaking that, among other things, amended its regulations to codify its so-called practice of limiting the number of examined cross-owned companies based on resource availability. Gov't Br. at 11 (citing *Regulations Enhancing the Administration of the Antidumping and Countervailing Duty Trade Remedy Laws*, 89 Fed. Reg. 101,694 (Dep't Commerce Dec. 16, 2024)); Respondents Br. at 10-11 (citing the same); *see also* 19 C.F.R. § 351.525(b) (2024). ASPA has demonstrated that no such practice ever existed. Regardless, Commerce has not identified any statute that authorizes the "practice" that is now codified in the agency's regulations. *Schism v. United States*, 316 F.3d

14

### E.    There Is No Exhaustion or Waiver Issue With Respect to ASPA's Claim

The Respondents contend that ASPA's claim with respect to the unexamined cross-owned fresh shrimp suppliers should be disregarded because it was not timely raised in the underlying administrative proceeding. Respondents Br. at 9. This contention is devoid of merit and does not raise any exhaustion or waiver issue. ASPA filed written submissions and met with Commerce officials to oppose *any* modification to the Respondents' reporting requirements. *See* ASPA Opposition to Request to Exclude Companies from Reporting Obligations, P.R. 131 (Jan. 11, 2024); *Ex Parte* Meeting, P.R. 149 (Jan. 18, 2024); ASPA Opposition to Exclusion of Cross-Owned Input Suppliers, P.R. 167 (Jan. 29, 2024). ASPA also raised the issue in its administrative case brief, as required by 19 C.F.R. § 351.309(c). ASPA Case Br. at 15-17, P.R. 427, C.R. 316 (Sept. 16, 2024). Notably, the Government has not argued that ASPA has failed to exhaust its administrative remedies.

Nonetheless, the Respondents complain that ASPA's written submissions at the beginning of the investigation demanded that the Respondents submit questionnaire responses on behalf of all 62 cross-owned companies as well as 10 non-cross-owned fresh shrimp suppliers, whereas ASPA's case brief focused mainly on the [  ] unexamined cross-owned fresh shrimp suppliers. Respondents Br. at 9. The Respondents do not cite to any legal authority to support their position that it was untimely for ASPA to raise the issue in its case brief. The caselaw explains that even if an interested party submits written comments on an issue during the early phase of a proceeding, any issue that an interested party would like to pursue must be included in their case brief to provide Commerce with an opportunity to address it in the first instance and to preserve any claim for judicial review. *See, e.g.*, *Ad Hoc Shrimp Trade Action Committee v. United States*, 675

---

1259, 1285 (Fed. Cir. 2002) ("{A}n agency cannot do by regulation what the applicable statute itself does not authorize.").

F. Supp. 2d 1287, 1300-01 (Ct. Int'l Trade 2009). The Respondents do not dispute that ASPA raised the issue in its case brief, which means the issue was properly raised in the underlying investigation.

Moreover, in arguing that "the investigation was far too advanced for Commerce to consider {ASPA's argument in its case brief}," the Respondents unwittingly concede that it was futile for ASPA to raise the issue and that there is no exhaustion issue. Respondents Br. at 9. The Court should therefore reject the Respondents' unsupported claim that ASPA did not timely raise the issue during the administrative proceeding.

**F.      At a Minimum, Commerce Must Resort to Facts Available**

In response to ASPA's argument that the missing questionnaire responses from the [  ] unexamined cross-owned fresh shrimp suppliers required the application of facts available, the Government asserts "Commerce found that the information was not necessary and did not need to use a method to fill that gap." Gov't Br. at 20. However, as discussed above and in ASPA's opening brief, countervailable subsidies provided to the mandatory respondents *via* cross-owned and non-cross-owned fresh shrimp suppliers were attributable to subject merchandise and had to be included in the subsidy analysis, per the requirements of 19 U.S.C. §§ 1671(a), 1677f-1(e)(2) and 1677-2.

In the past, Commerce has explained that missing information from cross-owned companies is "necessary" for its subsidy analysis and that the application of facts available is warranted when this necessary information is not available. *See, e.g.*, *Stainless Steel Flanges from India*, 83 Fed. Reg. 40,748 (Dep't Commerce Aug. 16, 2018) and accompanying Issues and Decision Memorandum at Comment 1 ("Without complete, accurate and reliable data upon which to attribute cross-owned companies' subsidies to Bebitz, Commerce cannot accurately calculate Bebitz's CVD subsidy rate for this final determination."), *aff'd*, *Bebitz Flanges Works*

16

**PUBLIC VERSION**

*Pvt. Ltd. v. United States*, 433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020); *Certain Coated Paper Suitable for High-Quality Print Graphics Using Sheet-Fed Presses from the People's Republic of China*, 75 Fed. Reg. 59,212 (Dep't Commerce Sept. 27, 2010) and accompanying Issues and Decision Memorandum at Comment 31. Commerce's decision in this case cannot be reconciled with the agency's longstanding view regarding the importance of questionnaire responses for cross-owned companies.

Because questionnaire responses from the [  ] unexamined cross-owned fresh shrimp suppliers are missing from the record, Commerce did not have necessary information and was required to resort to facts available to fill that informational gap. Commerce faced a similar quandary with respect to unexamined non-cross-owned suppliers and, as facts available, Commerce developed a formula to attribute the per-kilogram subsidy benefit found for the examined fresh shrimp producers to the unexamined non-cross-owned suppliers. Thus, as one possible option, ASPA suggested that Commerce could include the unexamined cross-owned suppliers by applying the same facts available methodology that was employed for the unexamined non-cross-owned suppliers.

However, the Government maintains that the calculation for the non-cross-owned suppliers was performed pursuant to 19 U.S.C. § 1677-2 and that "the calculation for non-cross-owned input suppliers is not an appropriate approach for the calculation for cross-owned input suppliers." Gov't Br. at 20-21. ASPA understands the Government's position is that the attribution rule under 19 C.F.R. § 351.525(b)(6)(iv) is the preferred calculation method for cross-owned input suppliers. However, the fact is that the information that Commerce ordinarily relies upon for such a calculation is not available. The Government specifically mentions missing information that is needed for the sales denominator. Gov't Br. at 20. The only reason this

17

information is missing is because Commerce impermissibly excused the Respondents from submitting questionnaire responses for the unexamined cross-owned suppliers.

The missing information does not justify excluding the unexamined cross-owned suppliers from the subsidy analysis and benefit calculations altogether. Rather, when necessary information is not available on the record, Commerce "shall" use facts otherwise available. ASPA reminded Commerce of its obligations and suggested including the unexamined cross-owned suppliers in the benefit calculation for the unexamined non-cross-owned suppliers under 19 U.S.C. § 1677-2. Commerce had the choice of adopting ASPA's suggested approach or applying facts available in a different manner. However, Commerce could not completely disregard the cross-owned suppliers that it impermissibly declined to examine.

## II.    COMMERCE'S DECISION NOT TO COUNTERVAIL THE PROVISION OF BRACKISH WATER IS UNSUPPORTED BY THE LAW AND THE FACTS

### A.    Commerce's Financial Contribution Analysis Is Inconsistent With the Plain Meaning of the Statute

The Government and the Respondents maintain that Commerce correctly concluded government-provided access to brackish water from public water sources does not constitute a financial contribution. Gov't Br. at 52-55; Respondents Br. at 28-29. They rely heavily on the fact that the GOE [                                                              ] and that the Respondents used the brackish water non-consumptively and eventually returned the water back to its original source. Neither fact is material for the financial contribution analysis. The Government and the Respondents have strayed from the plain terms of the statute.

The statute lists four generic and broad categories of government practices that constitute a financial contribution. 19 U.S.C. § 1677(5)(D); *see also* SAA at 927. In relevant part, the statute lists "providing goods or services, other than general infrastructure," as one type of government practice that is recognized as a financial contribution. 19 U.S.C. § 1677(5)(D)(iii).

18

The issue presented in this appeal is straightforward. The parties dispute whether the GOE "provid{ed}" a good to the Respondents by granting them the right to use government-owned brackish water. The CVD law does not define the word "provide." Accordingly, the term should be given its plain meaning "using standard dictionaries in effect at the time of the statute's enactment." *Telecare Corp. v. Leavitt*, 409 F.3d 1345, 1353 (Fed. Cir. 2005). Relying on dictionary definitions both pre- and post-URAA, the Supreme Court has explained that the word "provide" means to "supply," to "furnish," or to "make available." *Wisconsin Bell, Inc. v. United States*, 604 U.S. 140, 148-149 (2025) (citing American Heritage Dictionary 1411 (4th ed. 2000) and 12 Oxford English Dictionary 713 (2d ed. 1989)); *see also Little Sisters of the Poor Saints Peter and Paul Home v. Pennsylvania*, 591 U.S. 657, 676 (2020) (defining "provide" in the same way). This definition is consistent with how ASPA's opening brief walks through the best reading of the statute and describes the provision of a good, which encompasses the provision of the good itself *and* making the good available through a right of access. ASPA Br. at 31-32.

The question thus becomes whether the GOE supplied, furnished, or made available brackish water to the Respondents. The answer, of course, is yes. The salient facts are as follows. Water, including brackish water, is government-owned property. *See* GOE Section II Response at Exhibit TAX-4(a) (Article 318 of Ecuador's Constitution), P.R. 188, C.R. 91 (Feb. 14, 2024). The GOE is the sole authority responsible for the management of water and "authorization {is} required for the use of water for productive purposes . . . ." *Id.* The GOE has established a procedure through which private entities engaged in any aquaculture activity (such as shrimp farming) must obtain authorization from the GOE before conducting the activity, regardless of whether the water will be used consumptively or non-consumptively. *Id.* at TAX-4(b) (Article 108 of the Law on Water). In other words, private entities cannot pump government-owned

brackish water for aquaculture activities without first obtaining authorization from the GOE. These facts are undisputed and show that a financial contribution exists because the GOE provided (that is, made available) a good to the Respondents when it granted them the right to access and use government-owned brackish water. Commerce's conclusion that government-authorized use of brackish water does not constitute a financial contribution is inconsistent with the plain meaning of the statute and must therefore be rejected.

The Government argues that a financial contribution does not exist because the GOE does not charge a fee for the non-consumptive use of brackish water. Gov't Br. at 52-54. This is obviously illogical. If a foreign government provides a good without charging for it, does that make the provision of that good no longer a financial contribution under the countervailing duty law? Of course not. If that were the case, foreign governments could simply stop charging their industries for the provision of electricity, land, water, fuel, etc., and there would be no remedy available to U.S. producers for the injurious exports that benefit from such programs.

Moreover, there is nothing in the statute that requires a reciprocal exchange to find the existence of a financial contribution in the form of the provision of a good. The Court should decline to "impose conditions not present in or suggested by the statute's text." *Nan Ya Plastics Corp. v. United States*, 810 F.3d 1333, 1347 (Fed. Cir. 2016). Commerce has historically found that the provision of a good, even if it is provided at no cost, constitutes a financial contribution. In fact, Commerce has found that the Government of Israel provided producers or exporters of magnesium with a financial contribution by providing them with free groundwater. *See Magnesium from Israel*, 84 Fed. Reg. 65,785 (Dep't Commerce Nov. 29, 2019) and accompanying Issues and Decision Memorandum at Comment 6 ("{B}ecause the GOI provides free groundwater to DSW, this program constitutes a financial contribution within the meaning

20

of section 771(5)(D)(iii) of the Act in the form of the provision of a good or service . . . .”). Also, to the extent a fee or lack thereof is relevant, the GOE does not charge a fee on the condition that the brackish water is used non-consumptively. A fee is charged if this condition is not followed and the water is consumptively used. Commerce has found that this type of arrangement can be characterized as a conditional easement to use a government-owned resource for free. *See Steel Concrete Reinforcing Bar from the Republic of Turkey*, 86 Fed. Reg. 53,279 (Dep’t Commerce Sept. 27, 2021) and accompanying Issues and Decision Memorandum at Comment 6 (finding the conditional right to use land for free is a financial contribution). Again, as ASPA explained in its opening brief, whether the GOE charges a fee or not is only relevant in the benefit analysis and the adequacy of remuneration. Indeed, to the extent no fee was charged at all, the benefit was only greater than it would have been if some fee were charged.

The Government also considers it important that the Respondents pumped brackish water for non-consumptive use and that the water had to be returned to its source. Gov’t Br. at 52. The Respondents share that view and argue that “in a sense, the ‘access,’ even if it was first granted, was later returned to the GOE.” Respondents Br. at 29. The statute does not distinguish between permanent and temporary financial contributions. A financial contribution exists if the government makes a good available through a right of access; nothing in the statute indicates that the financial contribution is extinguished if the good was provided on the condition that it must be returned at some point in the future. The provision of land for less than adequate remuneration is a helpful analogy that shows any temporal limit to a financial contribution is immaterial. For example, Commerce routinely countervails rent-free leases of government-owned land. *See, e.g.*, *Steel Concrete Reinforcing Bar from the Republic of Turkey*, 86 Fed. Reg. 69,009 (Dep’t Commerce Dec. 6, 2021) and accompanying Preliminary Decision Memorandum at 13 (“{T}he

provision of rent-free land constitutes a financial contribution in the form of land provided for LTAR under section 771(5)(D)(iii) of the Act.") (unchanged in final results). Like the brackish water at issue here, government-owned land that is leased to a private party must be handed back to the government in the same condition that it was received at the conclusion of the lease term. Commerce does not require the beneficiary to "consume" the land in order to find a benefit – the mere right of use is sufficient. The same is true here. Just as a factory requires land to operate, a shrimp farm requires access to water to function. Without access to that water, the shrimp will never grow or survive. Indeed, the Respondents themselves emphasized how vital that water access was to their operations. *See* Respondents' Rebuttal to New Subsidy Allegation Supplemental Questionnaire Response at 5, P.R. 269 (Mar. 15, 2024) (stating that "shrimp farms must make non-consumptive use of brackish water to grow shrimp" and that "{i}t is no exaggeration to say that acceptance of the petitioners' brackish water allegation would bankrupt every Ecuadorian shrimp farm"). Finally, the Respondents' non-consumptive use of brackish water can hardly be described as temporary because the water is used continuously and is pumped into and out of [            ] shrimp ponds on a daily basis.

**B.    Commerce Ignored Evidence that the GOE and the Respondents Did Not Cooperate to the Best of Their Ability**

The Government has not adequately addressed why it was reasonable for Commerce to find that the Respondents and the GOE cooperated to the best of their ability when the representations in the questionnaire responses were directly contradicted at verification.

The GOE maintained throughout the investigation that it never charged the Respondents for their non-consumptive use of brackish water. However, the verified record evidence shows that [

22

] GOE

Verification Exhibits at Exhibit VE-4, P.R. 410, C.R. 276 (July 26, 2024). The Government

responds by stating that "Produmar believed that the charge was erroneous" and filed an appeal.

Gov't Br. at 54. However, the fact remains that [

] and Commerce completely ignored this detracting

evidence.

In addition, the Respondents rebuffed Commerce's requests to provide information on the

volumes of brackish water they accessed, but at verification it became evident that [

]. GOE Verification

Exhibits at Exhibit VE-4, P.R. 410, C.R. 276 (July 26, 2024). Contrary to the Respondents'

assertions, ASPA is not speculating regarding their ability to measure their water usage;

[

]. Respondents Br. at 29-30. The

Respondents appear to concede that at least some of their shrimp ponds had [

]. *Id.* at 36. But

Commerce gave no weight to this compelling evidence and unreasonably found, in the words of

the Government, "there is no evidence that mandatory respondents could or should have reported

the volume of brackish water." Gov't Br. at 56.

As this Court has recognized in other cases, when Commerce decides not to apply AFA

due to the agency's refusal to address evidence that a party has not cooperated to the best of its

ability, the decision is not supported by substantial evidence. *See Assan Aluminyum Sanayi ve*

23

*Ticaret A.S. v. United States*, 624 F. Supp. 3d 1343, 1376-78 (Ct. Int'l Trade 2023). Commerce's decision here is therefore not supported by substantial evidence, and it must be remanded.

      **C.     A Remand Is Required for Commerce to Proceed With its Analysis of Benefit and Specificity**

ASPA strongly disagrees with the Respondents' argument that brackish water for non-consumptive use does not have commercial value. Respondents Br. at 32-33. The Respondents received, free of charge, the right to use brackish water that was plainly for the benefit – indeed, the basic survival – of their shrimp farming operations. According to the Respondents, "{a}ccess to sufficient supplies of brackish water is the essential precondition to successful shrimp aquaculture." *Id.* at 18. The commercial need for brackish water is precisely why the Respondents "invested heavily in pumping machinery, pipelines, and related infrastructure" and paid all other expenses to operate the pipelines and pumps. *Id.* at 19. The Respondents utilize over [     ] pumps for over [        ] ponds. *Id.* at 30. Why would a business devote so much of its capital resources to pump this unique blend of salt and fresh water if it has no commercial value? Additionally, the record evidence shows that brackish water is a finite resource and non-consumptive users like the Respondents were authorized to use the water [

    ]. As Respondents acknowledge, their use of brackish water could be described as rented water and they benefited from using the water to fill their shrimp ponds. The bottom line is that the Respondents [         ] the water for their productive needs and do not drain a pond until the shrimp are ready to be harvested. The Respondents' position regarding benefit is illogical and entirely divorced from reality.

Under the benefit-to-the-recipient standard in the statute, a benefit is conferred if a good is provided for less than adequate remuneration. 19 U.S.C. § 1677(5)(E). The provision of

24

brackish water conferred a benefit equal to the difference between the price that the Respondents paid for the water (*i.e.*, zero) and the commercial value of the water (*i.e.*, a market-determined price selected based on the regulatory three-tiered hierarchy). 19 C.F.R. § 351.511(a)(2). Commerce never performed this analysis before jumping to the conclusion that the provision of brackish water does not confer a countervailable benefit. Based on the Government's response, Commerce found that there can be no benefit if there is no financial contribution. Gov't Br. at 53 ("{I}f there is nothing given as financial contribution, there is no benefit that is countervailable."). However, as discussed above, Commerce misapplied the law when it found that the provision of brackish water does not constitute a financial contribution. The Court should therefore remand this matter with instructions to find the existence of a financial contribution and to proceed with an analysis of benefit and specificity.

### III.    COMMERCE'S DECISION NOT TO COUNTERVAIL THE PROVISION OF FUEL IS BASED ON AN UNTENABLE READING OF THE STATUTE

As ASPA established in its opening brief, Petroecuador is a governmental authority and was the ultimate supplier of the subsidized fuel that the Respondents purchased from private trading companies and distributors. ASPA Br. at 42-43. The statute contemplates this type of scenario and unambiguously instructs Commerce to countervail subsidies, regardless of whether they are provided directly or indirectly. *See* 19 U.S.C. §§ 1671(a), 1677(5)(C). This Court has held that financial contributions may "originate with the government" and "pass through an intermediary before going to the ultimate user," that "the financial contribution need not be direct," and that "the respondent end user need not directly receive the financial contribution." *RZBC Group Shareholding Co.*, 100 F. Supp. 3d at 1302; *Beijing Tianhai Indus. Co. v. United States*, 52 F. Supp. 3d 1351, 1363 (Ct. Int'l Trade 2015); *Guandong Wireking*, 900 F. Supp. 2d at 1379-80, *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014). These decisions are consistent with the

25

PUBLIC VERSION

legislative intent of the statute, which states that "it is irrelevant whether … the subsidy is provided directly or indirectly." SAA at 927. Here, like in *RZBC*, *Beijing Tianhai*, and *Guangdong Wireking*, the Respondents were indirect recipients of a financial contribution when they purchased government-produced fuel from private intermediaries. Commerce erred when it declined to countervail the subsidy program solely because the Respondents did not purchase fuel directly from Petroecuador.

The Government attempts to defend this legally erroneous decision by asserting that Commerce initiated an investigation only with respect to the direct provision of fuel from Petroecuador and it therefore could not countervail indirect subsidy benefits. Gov't Br. at 57-58. The Respondents argue the same. Respondents Br. at 41-46. This is wrong for at least two reasons. First, Commerce did not limit its investigation to direct purchases of fuel from Petroecuador. The initiation memorandum states the following: "We recommend initiating on this program, in part, on the basis that the direct provision of fuel from the GOE/Petroecuador may be *de facto* specific under the meaning of section 771(5A)(D)(iii)(II) of the Act . . . ." New Subsidy Allegations Initiation at 4, P.R. 279 (Mar. 21, 2024). While this statement uses the word "direct," the statement is focused on specificity, not financial contribution, and explains that while ASPA alleged that the provision of fuel is both *de jure* and *de facto* specific, Commerce found that the evidence adequately alleged *de facto* specificity. And, second, even if Commerce did not formally initiate an investigation into the precise type of financial contribution that the Respondents received, "Commerce has an affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation." *POSCO v. United States*, 977 F.3d 1369, 1378 (Fed. Cir. 2020) (citing 19 U.S.C. § 1677d). Commerce has also explained that "{t}here is no legal requirement that {Commerce} initiate a formal

26

investigation before investigating (and ultimately countervailing) what appear to be countervailing subsidies discovered during an investigation." *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017) and accompanying Issues and Decision Memorandum at Comment 57. In addition, "once an investigation has been initiated," Commerce is obligated to "investigate potential subsidies it discovers in the course of the proceeding." *Id.* at Comment 5. If sustained, the Court will in essence be ruling that Commerce committed no legal error when it ignored irrefutable record evidence that the Respondents were indirect recipients of government-produced fuel. That would be the antithesis of Commerce's affirmative duty under the statute.

The Government and the Respondents have failed to distinguish the cases that ASPA cited to support its claim in its opening brief. That is because the financial contribution here is indistinguishable from the financial contribution that Commerce countervailed and that the Court approved in *RZBC*, *Beijing Tianhai*, and *Guangdong Wireking*. The Respondents agree that the statute recognizes the indirect provision of a financial contribution *via* private intermediaries, but they claim that the cases are distinguishable because Commerce initiated a formal investigation into indirectly provided subsidies. Respondents Br. at 42-45. The Respondents have not identified any language to this effect in the decisions. Regardless, as explained above, Commerce's initiation did not limit its investigation to the direct provision of subsidies and, even if it did, Commerce nonetheless had an affirmative duty to investigate and countervail the Respondents' purchases of government-produced fuel because the evidence showed the existence of a financial contribution that conferred a benefit that is specific. The Government addresses only one of the three cases and quotes language that highlights the similarity between *RZBC* and this case. Gov't Br. at 59. The Government believes *RZBC* is distinguishable because that case

involved a direct financial contribution. *Id.* However, the quoted language from the agency's decision in that case states that government-produced steam coal and sulfuric acid was provided directly *to the trading companies* and the inputs were subsequently resold to the respondents. *Id.* This case involves the exact same factual scenario. Petroecuador provided fuel directly to the trading companies, and the fuel was then resold to the Respondents. The financial contribution was direct in this sense. As explained in *Beijing Tianhai*, the financial contribution and the benefit need not be conferred on the same person. 52 F. Supp. 3d at 1362-67. Again, under the statute, it is irrelevant whether the financial contribution is direct or indirect.

Finally, even though the Government had a duty to investigate the matter fully, it claims that Commerce lacked the evidence it needed to find the existence of a financial contribution because "the GOE did not collect information from the private traders and/or distributors on sales to registered end-users." Gov't Br. at 59-60. ASPA has already explained that the record evidence leaves no doubt that the fuel the Respondents purchased was ultimately supplied by Petroecuador. ASPA Br. at 45; *see also* Santa Priscila NSA Questionnaire Response at NSA-7 and Exhibits NSA-6 and NSA-7(a) P.R. 319, C.R. 212 (Apr. 18, 2024); SONGA NSA Questionnaire Response at NSA-6 and NSA-10, P.R. 316, C.R. 207 (Apr. 18, 2024); GOE NSA Questionnaire Response at NSA-12 - NSA-13 and NSA-27 - NSA-28, P.R. 321, C.R. 213 (Apr. 18, 2024). The record is not lacking in any way. The evidence shows that Petroecuador provided the intermediary parties with the fuel that was eventually purchased by the Respondents. The Court should therefore remand this matter with instructions to find the existence of a financial contribution and to proceed with an analysis of benefit and specificity.

## CONCLUSION

For the reasons set forth in ASPA's opening brief and this reply brief, the Court should

hold that Commerce's final determination is unsupported by substantial evidence and otherwise

not in accordance with law. This matter should therefore be remanded for further proceedings.

Respectfully submitted,

/s/ Elizabeth J. Drake
Roger B. Schagrin
Elizabeth J. Drake
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for American Shrimp
Processors Association*

Date: April 13, 2026

*Admitted only in New York and
New Jersey. Practice limited to
matters before federal courts and
agencies.

29

## **CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief contains 8,601 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures and this Court's April 9, 2026 order. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

Dated: April 13, 2026                                          /s/ Elizabeth J. Drake
                                                                          Elizabeth J. Drake

## CERTIFICATE OF SERVICE

In accordance with Administrative Order 25-01 and the Rules of this Court, I hereby

certify that the confidential version of the foregoing brief was served on the following parties via

secure file transfer protocol on April 13, 2026.

**Counsel for Plaintiffs Industrial Pesquera**
**Santa Priscila S.A. and Sociedad Nacional**
**de Galapagos, C.A.**
Warren E. Connelly, Esq.
Jarrod M. Goldfeder, Esq.
Kenneth N. Hammer, Esq.
**Trade Pacific PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20004
wconnelly@tradepacificlaw.com
jgoldfeder@tradepacificlaw.com
khammer@tradepacificlaw.com

**Counsel for Consolidated Plaintiff-**
**Intervenor**
Nathaniel J. Rickard, Esq.
Anjelika D. Jani, Esq.
Sophia J.C. Lin, Esq.
Whitney M. Rolig, Esq.
Zachary J. Walker, Esq.
**Picard, Kentz & Rowe, LLP**
1155 Connecticut Avenue, NW
Suite 700
Washington, DC 20036
nrickard@pkrllp.com
ajani@pkrllp.com
slin@pkrllp.com
wrolig@pkrllp.com
zwalker@pkrllp.com

**Counsel for Defendant United States**
Tara K. Hogan, Esq.
**U.S. Department of Justice**
Commercial Litigation Branch - Civil
Division
P.O. Box 480
Ben Franklin Station
Washington, DC 20044
tara.hogan@usdoj.gov

**Of Counsel for Defendant United States**
Vania Wang, Esq.
William M. Purdy, Esq.
**U.S. Department of Commerce**
Office of the Chief Counsel for Trade
Enforcement and Compliance
1401 Constitution Avenue, NW
Suite 3623
Washington, DC 20230
vania.wang@trade.gov
william.purdy@trade.gov

/s/ Elizabeth J. Drake
Elizabeth J. Drake