**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE RICHARD K. EATON, SENIOR JUDGE**

INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A.,

Plaintiffs,

and

AMERICAN SHRIMP PROCESSORS ASSOCIATION,

Consolidated Plaintiff, and

AD HOC SHRIMP TRADE ACTION COMMITTEE,

Consolidated Plaintiff-Intervenor,

v.

UNITED STATES,

Defendant, and

AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION,

Defendant-Intervenors, and

INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A.,

Consolidated Defendant-Intervenors.

**Consol. Ct. No. 25-00025**

**NON-CONFIDENTIAL VERSION**

**JOINT APPENDIX**

Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
202-223-3760

Counsel for Industrial Pesquera Santa Priscila, S.A.
and Sociedad Nacional de Galapagos, C.A.

Date: April 27, 2026

**Table of Contents**


| Tab No. | Document Description | Page(s) Included | Record Document Index Nos.[1] |
|---|---|---|---|
| 1 | Petition from Schagrin Associates to Sec'y of Commerce, re: "*Volume IV*" (Oct. 25, 2023) | Cover page, 1-39 | P.R. 26-35; C.R. 20 |
| 2 | Memorandum to The File, re: "*Countervailing Duty Investigation Initiation Checklist*" (Nov. 14, 2023) | Cover page, 5-8, 23-24 | P.R. 79-80; C.R. 44-45 |
| 3 | Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations, 88 Fed. Reg. 81053 (Nov. 21, 2023) | All | P.R. 87 |
| 4 | Memorandum to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Respondent Selection*" (Dec. 7, 2023) | All | P.R. 95; C.R. 48 |
| 5 | Letter from Dep't of Commerce to Embassy of Ecuador, re: "*Investigation of Frozen Warmwater Shrimp from Ecuador: Countervailing Duty Questionnaire*" (Dec. 12, 2023) | Cover page, 1, II-1 to II-6, III-37, III-41 to III-45 | P.R. 98 |
| 6 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty (CVD) Investigation on Frozen Warmwater Shrimp from Ecuador: Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp*" (Industrial Pesquera Santa Priscila S.A.) (Dec. 14, 2023) | All | P.R. 102 |
| 7 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty (CVD) Investigation on Frozen Warmwater Shrimp from Ecuador: Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp*" (Sociedad Nacional de Galápagos C.A.) (Dec. 14, 2023) | All | P.R. 104 |


[1] Documents contained in the administrative record are identified by the name and date of the documents, followed by the confidential ("C.R.") and public ("P.R.") index numbers assigned to these documents in the respective administrative record indices that the U.S. Department of Commerce filed with the Court on March 31, 2025. *See* Admin. Rec. Index, Mar. 31, 2025, ECF No. 27.

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 8 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Sociedad Nacional de Galápagos C.A.'s Sources of Raw Shrimp Questionnaire Response*" (Jan. 3, 2024) | Cover letter, narrative, exhibit list; Ex. SRS-2 | P.R. 115; C.R. 49-50 |
| 9 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Industrial Pesquera Santa Priscila S.A.'s Sources of Raw Shrimp Questionnaire Response*" (Jan. 3, 2024) | All | P.R. 116; C.R. 51 |
| 10 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Sociedad Nacional de Galápagos C.A.'s Section III 'Affiliated Companies' Questionnaire Response*" (Jan. 5, 2024) | All | P.R. 117; C.R. 53 |
| 11 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Industrial Pesquera Santa Priscila S.A.'s Section III 'Affiliated Companies' Questionnaire Response*" (Jan. 5, 2024) | Cover letter, narrative, exhibit list; Ex. AFF-1 | P.R. 118; C.R. 54 |
| 12 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations*" (Jan. 8, 2024) | Cover letter, 1, 4-10 | P.R. 119 |
| 13 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Santa Priscila and Songa's Req for Clarification of Section III Reporting Obligations and to Exclude Certain Companies from Reporting*" (Jan. 9, 2024) | All | P.R. 126; C.R. 55 |
| 14 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Opposition to Respondents' Req to Exclude Companies from Reporting Obligations*" (Jan. 11, 2024) | All | P.R. 131 |
| 15 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Comments on Respondents' Supplier and Affiliation Responses*" (Jan. 12, 2024) | All | P.R. 134; C.R. 58 |
| 16 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Respondents' Objection to Petitioner's Req for Questionnaire Responses from Unaffiliated Shrimp Farms*" (Jan. 16, 2024) | All | P.R. 137 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 17 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Affiliated Companies Supplemental Questionnaire Response*" (Jan. 16, 2024) | All | P.R. 139; C.R. 60 |
| 18 | Memorandum to The File, re: "*Ex Parte Meeting*" (Jan. 18, 2024) | All | P.R. 149 |
| 19 | Letter from Trade Pacific PLLC, re: "*Affiliated Companies Supplemental Questionnaire Response*" (Jan. 23, 2024) | All | P.R. 155; C.R. 64 |
| 20 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Sociedad Nacional de Galápagos C.A.*" (Jan. 25, 2024) | All | P.R. 160; C.R. 66 |
| 21 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Industrial Pesquera Santa Priscila S.A.*" (Jan. 25, 2024) | All | P.R. 161; C.R. 67 |
| 22 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Opposition to Exclusion of Respondents' Cross-Owned Input Suppliers*" (Jan. 29, 2024) | Narrative | P.R. 167 |
| 23 | Letter from Dep't of Commerce to Schagrin Associates, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: First Supplemental Questionnaire Regarding New Subsidy Allegation*" (Jan. 31, 2024) | All | P.R. 170 |
| 24 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Section II of Supplier Questionnaire Response*" (Feb. 12, 2024) | Cover letter, narrative, exhibit list | P.R. 179; C.R. 71 |
| 25 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Section III Questionnaire Response*" (Feb. 13, 2024) | Cover letter, narrative; Exs. 10, 11 | P.R. 183-84; C.R. 85, 87-88 |
| 26 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of the Government of Ecuador to Section II Countervailing Duty Questionnaire, Volume II – Tax Programs*" (Feb. 15, 2024) | Cover letter, Volume II cover page, TAX-38 to TAX-57, exhibit list; Exs. TAX-4(a), TAX-4(b) | P.R. 186-88; C.R. 90-91 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 27 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of the Government of Ecuador to Section II Countervailing Duty Questionnaire, Volume VI*" (Feb. 15, 2024) | Volume VI cover page, OTH-16; Exs. OTH-2(b), OTH-4 | P.R. 206-07; C.R. 105 |
| 28 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of Santa Priscila to Section III Supplier Questionnaire*" (Feb. 20, 2024) | Cover letter, Vol I cover page, III-PRO-14; Ex. PRO-15 | P.R. 208; C.R. 106-14 |
| 29 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of SONGA's Section III Supplier Questionnaire*" (Feb. 20, 2024) | Cover letter, narrative, exhibit list | P.R. 212; C.R. 115 |
| 30 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations*" (Feb. 21, 2024) | All | P.R. 217 |
| 31 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*SONGA Section III Supplemental Questionnaire*" (Feb. 20, 2024) | All | P.R. 218; C.R. 120 |
| 32 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA Section III Supplemental Questionnaire Response*" (Mar. 1, 2024) | Cover letter, cover page, S-7 | P.R. 232; C.R. 134 |
| 33 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Santa Priscila's Supplemental Section III Questionnaire Response*" (Mar. 4, 2024) | Cover letter, cover page, S-2, S-13 to S-14; Exs. S-4(b), S-4(e) | P.R. 234; C.R. 136 |
| 34 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Factual Information to Rebut, Clarify, and/or correct New Subsidy Allegations*" (Mar. 4, 2024) | Cover letter, 2-8 | P.R. 235 |
| 35 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations Supplemental Response*" (Mar. 5, 2024) | Cover letter, 2-4 | P.R. 237 |
| 36 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador Supplemental Section II Questionnaire Response*" (Mar. 14, 2024) | Cover letter, cover page, Ex. S-Q3(a) | P.R. 263-64; C.R. 153 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 37 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Benchmark Supplemental Questionnaire of SONGA and Santa Priscila*" (Mar. 15, 2024) | Cover letter, narrative, exhibit list | P.R. 266; C.R. 170 |
| 38 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Petitioners' March 5, 2024 Response to Supplemental Questionnaire Regarding NSAs*" (Mar. 15, 2024) | 1-5 | P.R. 268 |
| 39 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA Affiliation Supplemental Questionnaire Response*" (Mar. 19, 2024) | Cover letter, cover page, S-AFF-2 to S-AFF-3 | P.R. 273; C.R. 177 |
| 40 | Memorandum to Eric B. Greynold, Director of Office IV, re: "*New Subsidy Allegations*" (Mar. 21, 2024) | All | P.R. 279 |
| 41 | Memorandum to Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, re: "*Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador*" (Mar. 25, 2024) | All | P.R. 283 |
| 42 | Letter from Dep't of Commerce to Embassy of Ecuador, re: "*Countervailing Duty Questionnaire Regarding New Subsidy Allegation*" (Mar. 28, 2024) | All | P.R. 285 |
| 43 | Frozen Warmwater Shrimp From Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With the Final Antidumping Duty Determination, 89 Fed. Reg. 22379 (Apr. 1, 2024) | All | P.R. 293 |
| 44 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's New Subsidy Allegations Questionnaire Response*" (Apr. 19, 2024) | Cover letter, cover page, NSA-1, NSA-6, NSA-10, NSA-15 to NSA-21; Exs. NSA-10, NSA-11 | P.R. 316-17; C.R. 207-08 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 45 | Letter from Trade Pacific PLLC to Sec'y of Commerce re: "*Santa Priscila's New Subsidy Allegations Questionnaire Response*" (Apr. 19, 2024) | Cover letter, cover page, NSA-1 to NSA-3, NSA-7, NSA-16 to NSA-24; Exs. NSA-6, NSA-7(a), NSA-11, NSA-12 | P.R. 318-19; C.R. 210, 212 |
| 46 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador's New Subsidy Allegations Questionnaire Response*" (Apr. 19, 2024) | Cover letter, cover page, NSA-1, NSA-9, NSA-12 to NSA-13, NSA-15, NSA-27 to NSA-28, NSA-35 to NSA-50; Ex. NSA-11 | P.R. 320-21; C.R. 213, 214-15 |
| 47 | Frozen Warmwater Shrimp From Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation, 89 Fed. Reg. 31722 (Apr. 25, 2024) | All | P.R. 338 |
| 48 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's 771B Questionnaire Response*" (Apr. 26, 2024) | Cover letter, narrative, exhibit list | P.R. 342; C.R. 229 |
| 49 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses*" (May 2, 2024) | All | P.R. 350 |
| 50 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Santa Priscila Supplemental Questionnaire*" (May 2, 2024) | All | P.R. 353; C.R. 231 |
| 51 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*SONGA Supplemental Questionnaire*" (May 2, 2024) | All | P.R. 354; C.R. 232 |
| 52 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Respondents' Submission of Factual Information to Rebut, Clarify or Correct Information that the Petitioners Submitted on May 2, 2024 in Their 'Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses' Concerning Their Brackish Water Allegations*" (May 14, 2024) | Narrative | P.R. 365 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 53 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador's Post-Preliminary Supplemental Questionnaire Response*" (May 17, 2024) | Cover letter, cover page, S3-6 to S3-8, S3-16 to S3-18 | P.R. 366; C.R. 234 |
| 54 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA Post-Preliminary Supplemental Questionnaire Response*" (May 17, 2024) | Cover letter, cover page, S2-1 to S2-6 | P.R. 374; C.R. 244 |
| 55 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Request for Supplemental Questionnaire*" (May 22, 2024) | All | P.R. 376 |
| 56 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Respondents' Opposition to the Petitioner's May 22, 2024 'Request for Supplemental Questionnaire' re Brackish Water NSA*" (May 29, 2024) | All | P.R. 377 |
| 57 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*SONGA Post Preliminary Second Supplemental Questionnaire*" (May 31, 2024) | All | P.R. 380 |
| 58 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Santa Priscila Post Preliminary Second Supplemental Questionnaire*" (May 31, 2024) | All | P.R. 381 |
| 59 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Government of Ecuador Post Preliminary Second Supplemental Questionnaire*" (May 31, 2024) | All | P.R. 382 |
| 60 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Second Post-Preliminary Supplemental Questionnaire Response*" (June 11, 2024) | Cover letter, cover page, S3-1 to S3-4; Exs. S3-1 to S3-4 | P.R. 387; C.R. 245-46 |
| 61 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Santa Priscila's Second Post-Preliminary Supplemental Questionnaire Response*" (June 11, 2024) | All | P.R. 388; C.R. 247-48 |
| 62 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador's Second Post-Preliminary Supplemental Questionnaire Response*" (June 12, 2024) | Cover letter, S4-1 to S4-4, exhibit list; Exs. S4-1(a) to S4-2(b) | P.R. 389; C.R. 249-57 |
| 63 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Government of Ecuador Post Preliminary Third Supplemental Questionnaire*" (July 2, 2024) | All | P.R. 390 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 64 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Santa Priscila 3rd Post-Preliminary Supplemental Questionnaire Response*" (July 5, 2024) | All | P.R. 392; C.R. 258 |
| 65 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Verification Agenda of Santa Priscila S.A.*" (July 8, 2024) | All | P.R. 395; C.R. 259 |
| 66 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Verification Agenda of SONGA*" (July 9, 2024) | All | P.R. 397; C.R. 260 |
| 67 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador 3rd Post-Preliminary Supplemental Questionnaire Response*" (July 11, 2024) | Cover letter, cover page, S5-6 to S5-8, S5-15; Exs. S5-4 to S5-6 | P.R. 398; C.R. 261 |
| 68 | Memorandum to Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, re: "*Post-Preliminary Analysis*" (July 12, 2024) | All | P.R. 400 |
| 69 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador Verification Exhibits*" (July 26, 2024) | Cover letter, exhibit list; Ex. VE-4 | P.R. 410; C.R. 271, 276 |
| 70 | Memorandum to The File, re: "*Verification of the Questionnaire Responses of Sociedad Nacional de Galapagos C.A.*" (Aug. 13, 2024) | 1-3, 10 | P.R. 420; C.R. 313 |
| 71 | Memorandum to The File, re: "*Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A.*" (Aug. 22, 2024) | 1-2, 13 | P.R. 421; C.R. 314 |
| 72 | Memorandum to The File, re: "*Verification of the Questionnaire Responses of Government of Ecuador*" (Sept. 3, 2024) | 1, 3-6, 11-12 | P.R. 422; C.R. 315 |
| 73 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Case Brief*" (Sept. 16, 2024) | Cover letter, cover page, table of contents, 1-13, 15-17 | P.R. 427; C.R. 316 |
| 74 | Memorandum to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, re: "*Second Post-Preliminary Analysis*" (Sept. 26, 2024) | All | P.R. 437 |
| 75 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Case Brief*" (Oct. 2, 2024) | All | P.R. 442 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 76 | Letter from Trade Pacific PLLC to Sec'y Commerce, re: "*Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador Relating to the Three Programs Addressed in the Second Post-Preliminary Determination*" (Oct. 3, 2024) | Cover letter, cover page, table of contents, 1, 3, 4, 21, 23, 27 | P.R. 445; C.R. 325 |
| 77 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Rejection of Respondents' Case and Rebuttal Brief Comments*" (Oct. 10, 2024) | All | P.R. 449 |
| 78 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Redacted Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador*" (Oct. 11, 2024) | Cover letter, attachment, cover letter, cover page, table of contents, 1-6, 31-33, 83-90 | P.R. 451-52; C.R. 327 |
| 79 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Rebuttal Brief*" (Oct. 11, 2024) | Cover letter, attachment, cover letter, cover page, table of contents, 1, 61-69, 71 | P.R. 453-54; C.R. 328 |
| 80 | Memorandum to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, re: "*Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador*" (Oct. 21, 2024) | All | P.R. 456 |
| 81 | Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty Determination, 89 Fed. Reg. 85506 (Oct. 28, 2024) | All | P.R. 459 |
| 82 | Memorandum to The File, re: "*Final Determination Calculations for SONGA*" (Oct. 21, 2024) | All | P.R. 460; C.R. 329 |
| 83 | Memorandum to The File, re: "*Final Determination Calculations for Industrial Pesquera Santa Priscila S.A.*" (Oct. 21, 2024) | All | P.R. 461; C.R. 331 |
| 84 | Frozen Warmwater Shrimp From Ecuador, 89 Fed. Reg. 104982 (Dec. 26, 2024) (countervailing duty order) | All | P.R. 467 |

# Tab 1

# P.R. 26-35

# C.R. 20

Barcode: 4452837-26 C-331-806 INV - Investigation

DOC Inv. No. C-331-806
USITC Inv. Nos. 701-TA___ and 731-TA-___
Total Pages: 1,581
Investigation

**PUBLIC DOCUMENT**

**BEFORE THE**
**INTERNATIONAL TRADE ADMINISTRATION**
**UNITED STATES DEPARTMENT OF COMMERCE AND**
**THE UNITED STATES INTERNATIONAL TRADE COMMISSION**

# FROZEN WARMWATER SHRIMP FROM ECUADOR, INDIA, INDONESIA, AND THE SOCIALIST REPUBLIC OF VIETNAM

## PETITIONS FOR THE IMPOSITION OF ANTIDUMPING AND COUNTERVAILING DUTIES PURSUANT TO SECTIONS 701 AND 731 OF THE TARIFF ACT OF 1930, AS AMENDED

## VOLUME IV – INFORMATION RELATED TO COUNTERVAILABLE SUBSIDIES PROVIDED TO ECUADORIAN PRODUCERS OF SUBJECT MERCHANDISE

Consultants
Rui Fan
David DePrest

Roger B. Schagrin
Elizabeth J. Drake
Christopher T. Cloutier
William A. Fennell
Nicholas J. Birch
Justin M. Neuman*
Michelle R. Avrutin
Alessandra A. Palazzolo, *Law Clerk*
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

Edward T. Hayes
LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701

*Counsel to the American Shrimp Processors Association*

October 25, 2023

* Admitted only in Ohio. Practice limited to matters before federal courts and agencies.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

## I. SHRIMP FROM ECUADOR IS SUBSIDIZED

Pursuant to Section 701(a)(1) and (2) of the Act, 19 U.S.C. § 1671(a)(1) and (2), the U.S. Department of Commerce ("Commerce") shall impose a countervailing duty ("CVD") on merchandise imported from a "Subsidies Agreement" country,[1] where imported merchandise: (1) is produced or exported by companies that benefit from countervailable subsidies, and (2) materially injures or threatens material injury to a domestic industry. Volume I of this petition contains information and allegations that the domestic frozen warmwater shrimp ("shrimp") industry has been materially injured by unfairly traded imports from Vietnam, India, Indonesia, and Ecuador.

This volume of the petitions presents information reasonably available to the American Shrimp Processors Association ("ASPA") that the production or exportation of shrimp from Ecuador is benefitting from countervailable subsidies within the meaning of Section 771(5) of the Tariff Act of 1930, as amended ("the Act"), 19 U.S.C. § 1677(5). Petitioner alleges that the Government of Ecuador ("GOE") maintains various economic programs and policies that have conferred countervailable subsidies on Ecuadorian farmers and processors of shrimp, and that these subsidized subject imports are materially injuring the shrimp industry in the United States. Accordingly, Petitioner requests that Commerce apply the U.S. CVD laws to offset the countervailable policies and programs outlined in this petition.

[1] Ecuador, as a member of the World Trade Organization ("WTO"), is a country under the "Subsidies Agreement" as it relates to 19 U.S.C. § 1671(b) and Section 701(b).

Commerce has previously investigated subsidies provided to Ecuadorian shrimp farmers and processors and found numerous countervailable subsidies.[2]

## II. NAME OF THE COUNTRY IN WHICH THE SUBJECT MERCHANDISE IS FARMED OR PROCESSED

The subject merchandise farmed or processed in Ecuador, and the subsidies conferred by Ecuador or its political subdivisions.

## III. NAMES AND ADDRESSED OF THE ECUADORIAN SHRIMP FARMERS AND PROCESSORS BENEFITTING FROM THE SUBSIDY PROGRAMS

Petitioners have identified a number of shrimp processors in Ecuador believed to have benefitted from countervailable subsidies and whose products are believed to have been exported to the United States. The names and addresses of these companies can be found in Volume I of these petitions, at Exhibit I-16.

## IV. PERIOD OF INVESTIGATION AND AVERAGE USEFUL LIFE

The most recently completed calendar year as of the filing of these petitions is 2022, and 2022 is therefore the appropriate period of investigation ("POI") for this proceeding.[3] In addition to investigating any reoccurring subsidies granted during the POI and any subsidized loans outstanding during the POI, Commerce is also required to investigate any non-recurring subsidies conferring a benefit that is allocable to the POI.[4] Commerce will presume the allocation period for non-recurring subsidies to be the average useful life ("AUL") of renewable

---

2 *See Certain Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Determination*, 78 Fed. Reg. 50,389 (Dep't Commerce Aug. 19, 2013), and accompanying Issues and Decision Memorandum.

3 19 C.F.R. § 351.204(b)(2).

4 19 C.F.R. §§ 351.524(a) and (b), 351.525.

Barcode: 4452837-26 C-331-806 INV - Investigation

physical assets for the industry concerned as listed in the U.S. Internal Revenue Service's 1977 Class Life Asset Depreciation Range System.[5] In the instant case, the AUL is 12 years.[6]

Commerce should therefore investigate any non-recurring subsidies received from 2011 to 2022, as well as recurring subsidies and outstanding loans during 2022.

## V. EFFORTS TO OBTAIN INFORMATION

In accordance with the statutory and regulatory provisions setting forth requirements for CVD petitions, this petition presents "reasonably available" information concerning possible countervailable subsidies available to and bestowed upon producers and exporters of the subject merchandise in Ecuador. *See* Section 701(b)(1) of the Act, 19 U.S.C. § 1671a(b)(l), and 19 C.F.R. § 351.202(b) (both setting forth the "reasonably available" standard). Notably, Petitioner does not have to prove at the outset that a subsidy allegation will be confirmed during the course of the investigation, nor does the Petition have to establish that a potentially countervailable subsidy actually has been used for a subsidy allegation to be included in an investigation. Petitioner has conducted extensive research to document Ecuadorian government subsidies to the shrimp industry in Ecuador, including a review of the following sources:

(1) Past Commerce countervailing duty determinations (*i.e.*, Federal Register notices and information from case dockets contained in the Central Records Unit) covering the country, subject merchandise, and or/producers included in this Petition;

(2) Articles and news reports on the producers, industries, and country in question available through the World Wide Web and online data services;

(3) Where available, publicly accessible financial information for the producers, industries, and country at issue in this Petition;

---

[5] *See Publication 946 (2022): How to Depreciate Property*, Department of the Treasury, Internal Revenue Service (excerpt) at p. 98, **Exhibit VI-1**.

[6] *Id*. at Table B-2, Asset Class 20.4 ("Manufacture of Other Food and Kindred Products").



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

(4) Previous countervailing duty petitions concerning similar merchandise produced in Ecuador and any associated deficiency questions issued by Commerce with respect to such petitions; and

(5) World Trade Organization ("WTO"), European Union, U.S. government, and GOE reports concerning producers of the subject merchandise, industries in Ecuador, and the alleged subsidy programs.

However, much of the information that would allow Petitioner to determine with certainty the types and amounts of subsidies received by Ecuadorian shrimp producers is difficult or impossible to obtain. As a result of the difficulties inherent in documenting subsidization, Petitioner agrees with Commerce that "there are typically no independent sources for data on company-specific benefits resulting from countervailable subsidy programs."[7] The most accurate and thorough manner in which the type and number of subsidies may be determined is through administrative investigation and preliminary and final investigative determinations.

Despite these difficulties in obtaining information, Petitioner researched and is herein providing information demonstrating that the Ecuadorian government has granted, and continues to grant, financial assistance to Ecuador's shrimp producers and exporters, which constitutes countervailable subsidization pursuant to Section 771 of the Act, 19 U.S.C. § 1677.

## VI. SCOPE OF SUBSIDIES INCLUDED IN THE PETITION

This petition includes subsidies to processors of frozen shrimp as well as subsidies to producers of fresh shrimp (*e.g.*, shrimp farmers and fishermen). Commerce should include both types of subsidies in its initiation, as it is likely that one or more shrimp processors selected for investigation will also farm shrimp or be cross-owned with shrimp farming operations. To the extent that foreign producers of frozen shrimp also produce fresh shrimp, subsidies tied to the

[7] *See Notice of Preliminary Affirmative Countervailing Duty Determination: Prestressed Concrete Steel Wire Strand from India*, 68 Fed. Reg. 40,629, 40,632 (July 8, 2003).



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

production of those inputs will be attributed to both the input and the downstream product.[8] In addition, subsidies to the production of fresh shrimp by cross-owned input suppliers will be attributed to the combined sales of the input and downstream products if Commerce finds that fresh shrimp is primarily dedicated to the production of frozen shrimp.[9] According to the International Trade Commission, fresh shrimp is "overwhelmingly used as an input in the production of frozen product" and is "overwhelmingly sold in processed form."[10] Commerce should therefore find that fresh shrimp is primarily dedicated to the production of frozen shrimp and attribute any subsidies to the production of fresh shrimp from which cross-owned input suppliers benefit to the combined sales of the input and the downstream product. To the extent that companies selected for investigation produce their own fresh shrimp or source the input from cross-owned suppliers, no upstream subsidy allegation is necessary for Commerce to initiate an investigation into programs benefitting the production of fresh shrimp.[11]

Alternatively, in the event that a processor selected for investigation is not integrated or cross-owned with shrimp farming operations, Commerce should initiate an investigation into subsidies to raw shrimp and deem such subsidies to be provided with respect to the manufacture, production, or exportation of processed frozen shrimp under Section 771B of the Act. The Act States as follows:

---

8 19 C.F.R. § 351.525(b)(5)(ii).

9 19 C.F.R. § 351.525(b)(6)(iv).

10 *See* U.S. International Trade Commission, *Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA-1064 and 1066-1068 (Third Review), USITC Pub. 5432 (June 2023) ("USITC Pub. 5432") at 13, excerpts attached at **Exhibit IV-2**.

11 19 C.F.R. § 351.525(b)(5)(ii) and (6)(iv).



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

> In the case of an agricultural product processed from a raw agricultural product in which –
> (1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and
> (2) the processing operation adds only limited value to the raw commodity,
> countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.[12]

These processor/grower provisions apply to fishery products such as shrimp. The statute defines "raw agricultural product" as "any farm or fishery product."[13] Commerce has noted that this definition applies to the raw and processed agricultural subsidy provisions in Section 771B of the Act.[14] Moreover, Section 771B codified existing Commerce practice when it was enacted in 1988.[15] At that time, Commerce's practice was to deem raw fish subsidies to be provided with respect to processed fish exports in the same manner in which subsidies to other raw agricultural products were deemed to be provided with respect to processed agricultural exports.[16] Thus, fresh shrimp and processed shrimp qualify as raw and processed agricultural products, respectively, under Section 771B of the Act.

---

[12] 19 U.S.C. § 1677-2.

[13] 19 U.S.C. § 1677(4)(E)(iv).

[14] *See Certain Softwood Lumber Products from Canada*, 57 Fed. Reg. 22,570, 22,573 (Dep't Commerce May 28, 1992) (final affirmative countervailing duty determination).

[15] H.R. Rep. No. 100-576, at 588 (1988) (Conf. Rep.), reprinted in 1988 U.S.C.C.A.N. 1547, 1621.

[16] *See, e.g., Certain Fresh Atlantic Groundfish From Canada*, 51 Fed. Reg. 10,041 (Dep't Commerce March 24, 1986) (final affirmative countervailing duty determination) (countervailing subsidies to fishermen and processors); *Certain Fish from Canada*, 43 Fed. Reg. 25,996 (Dep't Commerce June 16, 1978) (final countervailing duty determination) (same). Although not explicitly addressed in *Certain Fresh Atlantic Groundfish From Canada or Certain Fish from Canada*, Commerce has recognized both of these cases as situations in which benefits to producers of a raw agricultural product were considered benefits to producers of the processed agricultural product. *Fresh, Chilled, and Frozen Pork from Canada*, 54 Fed. Reg. 30,774, 30,775 (Dep't Commerce July 24, 1989) (final affirmative countervailing duty determination).



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

Furthermore, both of the requirements of Section 771B are met in this case. Indeed, Commerce found that raw and processed shrimp met both prongs of Section 771B of the Act in its prior subsidy investigations on frozen warmwater shrimp,[17] and the Petitioner is not aware of any change in facts that would require a different result here.

First, demand for fresh shrimp is substantially dependent on demand for frozen shrimp, as required under Section 771B(1).[18] In previous cases, Commerce has found this criterion to be met when most of the raw product is produced for further processing.[19] The U.S. Court of International Trade has affirmed this practice, explaining: "Where more than half of a prior stage product is dedicated to the production of a latter stage product, demand for the prior stage product is largely but not wholly dependent on the latter stage product," and the requirements of Section 771B(1) are satisfied.[20] As noted above, the International Trade Commission has found that fresh shrimp is "overwhelmingly" sold in processed form, and earlier this year it determined there had been no changes to the facts underlying this original determination.[21] Because nearly all fresh shrimp is processed into frozen shrimp and the first statutory criterion is met in this case.

---

[17] *See, e.g., Certain Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty Determination*, 78 Fed. Reg. 50,398 (Dep't Commerce Aug. 19, 2013) and accompanying Issues and Decision Memorandum at Comment 1.

[18] 19 U.S.C. § 1677-2(1).

[19] *See Fresh, Chilled, and Frozen Pork from Canada*, 54 Fed. Reg. 30,774, 30,775 (Dep't Commerce July 24, 1989) (final affirmative countervailing duty determination).

[20] *See Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 589 F. Supp. 3d 1346, 1357 (Ct. Int'l Trade 2022).

[21] USTIC Pub. 5432 at 13 – 15, excerpts attached at **Exhibit IV-2**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Second, the processing of frozen shrimp adds only limited value to fresh shrimp, as required under Section 771B(2).[22] In previous cases, Commerce has found this criterion to be satisfied where processing operations did not change the essential character of the raw product and where such operations added limited value to the product, such as 20 to 30 percent of the value.[23] As the Commission has noted in its shrimp investigations, the "initial stages of processing did not significantly change the physical characteristics and use of the product and appeared to add at most moderate value to the product," and earlier this year the Commission determined there had been no changes to the facts underlying this original determination.[24] In addition, in its most recent sunset review on frozen warmwater shrimp, the Commission found that raw material costs represent the largest component of the price of frozen shrimp, with the ratio of raw material costs to net sales ranging from 74.1 to 79.3 percent.[25] Raw shrimp accounted for 96.5 percent of these raw material costs, and thus the cost of the raw shrimp input alone accounted for anywhere from 71.5 to 76.5 of the final sales value of the frozen product.[26] Thus, additional raw materials, processing costs, selling, general, and administrative expenses, and profit together accounted for less than 30 percent of the value of the final frozen processed product. Thus, the second statutory criterion is also met in this case.

22 *Id.* at 13.

23 *See Rice from Thailand*, 56 Fed. Reg. 68, 69 (Dep't Commerce Jan. 2, 1991) (final results of countervailing duty administrative review); *see also Fresh, Chilled, and Frozen Pork from Canada*, 54 Fed. Reg. 30,774, 30,775 (Dep't Commerce July 24, 1989) (final affirmative countervailing duty determination).

24 USTIC Pub. 5432 at 13 – 15, excerpts attached at **Exhibit IV-2**.

25 *Id.* at III-19, Table III-12.

26 *Id.* at III-30, Table III-15 (0.741*0.965=0.715 and 0.793*0.965=0.765).



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

For all these reasons, Commerce should continue its practice from prior subsidy investigations on frozen warmwater shrimp and deem any subsidies to producers of raw shrimp to be provided with respect to the production and export of frozen shrimp under Section 771B of the Act. These subsidies benefit the production of frozen shrimp even where the shrimp processors are not integrated or cross-owned with shrimp farming operations. Furthermore, no upstream subsidy allegation is required under Section 771A of the Act in order for Commerce to include these subsidies in its investigation and deem them to be provided with respect to frozen shrimp.[27]

In conclusion, Commerce should include subsidies to producers of raw shrimp in its investigation with regard to shrimp processors that are vertically integrated or cross-owned with shrimp farming operations. In addition, even if processors are not integrated or cross-owned with producers of raw shrimp, Commerce should investigate subsidies to fresh shrimp because any subsidies should be deemed to be provided to the production and export of frozen shrimp under Section 771B of the Act.

## VII. GOVERNMENT OF ECUADOR SUBSIDY PROGRAMS

### 1. Tax Exemptions

#### i. VAT Exemption for Unprocessed Shrimp

Ecuador's Value Added Tax ("VAT") or Impuesto al valor agregado ("IVA") is assessed on nearly all goods and services purchased with some exemptions. KPMG published a profile of

[27] *See Fresh, Chilled, and Frozen Pork from Canada*, 54 Fed. Reg. 30,774, 30,775 (Dep't Commerce July 24, 1989) (final affirmative countervailing duty determination) (explaining why no upstream subsidy allegation is required when subsidies are deemed provided to processed products under 19 U.S.C. § 1677-2); *see also Rice from Thailand*, 51 Fed. Reg. 12,356, 12,357-58, 12,362 (Dep't Commerce April 10, 1986) (final affirmative countervailing duty determination and countervailing duty order).



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

Ecuador's VAT system, and according to its report, unprocessed foods are exempt from VAT.[28] Thus, in its natural form, fresh shrimp, the largest input for frozen shrimp processors, is purchased VAT free.

*A. Financial Contribution*

The VAT exemption for purchases of fresh shrimp provides a financial contribution in the form of government revenue foregone under 19 U.S.C. § 1677(5)(D)(ii).

*B. Benefit*

Under 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.510, the benefit conferred by the program is equal to the difference between the amount of VAT shrimp processors pay for fresh shrimp under the program and the amount of VAT that shrimp processors would pay on fresh shrimp in the absence of the VAT exemption. The standard VAT rate in Ecuador is 12%.[29] A complete VAT exemption on fresh shrimp provides a benefit equal to 12% of the value of a processor's purchase of fresh shrimp.

*C. Specificity*

The VAT exemption for purchases of fresh and unprocessed foodstuff is *de jure* specific under 19 U.S.C. § 1677(5A)(D)(i), because it is limited by law to a group of enterprises or industries, namely, purchasers or fresh, unprocessed foodstuff.[30]

---

[28] *See Ecuador: VAT Essentials*, attached as **Exhibit VI-3**; *see also* Government of Ecuador, *Guide for taxpayers, Goods and Services taxed at a 0% rate*, attached as **Exhibit IV-4**.

[29] *Id.*

[30] *See Final Affirmative Countervailing Duty Determination: Fresh and Chilled Atlantic Salmon from Norway,* 56 Fed. Reg. 7678, 7685 (Dep't Commerce Feb. 25, 1991).



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

### ii. VAT Exemption for Shrimp Feed and Veterinary Inputs

Article 4 of Article 55 of the Internal Tax Regime Law states that there will be a 0% VAT rate on preparations that are used as food for animals raised for human consumption.[31] This 0% VAT rate would apply to shrimp feed as it is the primary food source for the farming of shrimp. The 0% rate also applies to antiparasitics and other veterinary products used in aquaculture.[32]

*A. Financial Contribution*

The VAT exemption for purchases of shrimp feed provides a financial contribution in the form of government revenue foregone under 19 U.S.C. § 1677(5)(D)(ii).

*B. Benefit*

Under 19 C.F.R. § 351.510, the benefit conferred by the program is equal to the difference between the amount of VAT shrimp producers pay on shrimp feed and other inputs under the program and the amount of VAT shrimp producers would otherwise pay on shrimp feed and other inputs in the absence of the VAT exemption. As noted earlier, the standard VAT rate in Ecuador is 12%.[33] A complete VAT exemption on shrimp feed and other inputs provides a benefit equal to 12% of the value of a shrimp producer's purchases of shrimp feed and other inputs.

*C. Specificity*

The VAT Exemptions for purchases of shrimp feed and other inputs is *de jure* specific under 19 U.S.C. § 1677(5A)(D)(i), because it is limited by law to a group of enterprises or

31 *See Application of 0% VAT Rate on Imports of Preparations for Animal Feed (Shrimp), and Veterinary Products for Aquaculture Use*, Valero & Valero (May 5, 2021), attached as **Exhibit IV-5**.

32 *Id.*

33 *See Ecuador: VAT Essentials*, attached as **Exhibit VI-3**.

industries, i.e. purchasers of fish feed and other aquaculture inputs. Commerce considers the fisheries and aquaculture sector to be of sufficiently limited scope that programs targeted to these industries constitute countervailable subsidies.[34] Alternatively, the exemption on these inputs is limited to aquaculture and livestock industries. Commerce has previously determined that the livestock sector is sufficiently limited to support a finding of specificity.[35]

**iii. Refund of Currency Outflow Tax (ISD) on Purchase of Inputs for Exports**

The GOE usually levies a Currency Outflow Tax ("ISD") of 5% for all remittances abroad via any type of transfers, and it is usually levied on the value of all monetary operations and transactions carried out abroad.[36] The GOE refunds the ISD on the purchases of inputs that will be used to produce goods for export.[37]

*A. Financial Contribution*

The refund of ISD for input purchases used to produce goods for export provides a financial contribution in the form of government revenue foregone under 19 U.S.C. § 1677(5)(D)(ii).

*B. Benefit*

Under 19 C.F.R. § 351.510, the benefit conferred by the program is equal to the difference between the amount of ISD shrimp producers pay for inputs under the program and the amount of ISD shrimp producers would otherwise pay for inputs in the absence of the

[34] *See Final Affirmative Countervailing Duty Determination: Fresh and Chilled Atlantic Salmon from Norway,* 56 Fed. Reg. 7,678, 7,685 (Dep't Commerce Feb. 25, 1991).

[35] *See Final Affirmative Countervailing Duty Determination; Live Swine and Fresh, Chilled and Frozen Pork Products/rom Canada,* 50 Fed. Reg. 25,097, 25,100-01 (Dep't Commerce June 17, 1985); *see also Final Negative Countervailing Duty Determination: Live Swine from Canada,* 70 Fed. Reg. 12,186 (Dep't Commerce Mar. 11,2005) and accompanying Issues and Decision Memorandum at 16.

[36] *See Ecuador Investment Guide*, Finnpartners (May 2021) at 8, attached as **Exhibit IV-6**.

[37] *Id.*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

program. As noted above, the ISD rate is 5%, so shrimp exporters benefit from refunds equal to 5% of their input purchases used for export.

*C. Specificity*

This program is contingent upon exports and is therefore specific under 19 U.S.C. § 1677(5A)(B).

**iv. Tax Exemptions for the Development of Fishing and Aquaculture**

Shrimp has traditionally been the "second most exported product" from Ecuador.[38] The Ecuadorian economy depends on shrimp as one of its leading non-oil exports, and, in the period between January and October 2022, shrimp exports exceeded $6.2 billion and are the non-oil export that have generated the highest income for Ecuador.[39] After having spent many years in second place to oil exports, shrimp "dethroned oil for the first time in 2023" reaching nearly $4.4 billion in exports from January to July of 2023, about $314 million more than crude oil during the same period.[40] In recognition of the economic importance of this sector, Ecuador developed several tax exemptions to those involved in the fishing and aquaculture sector as part of their Organic Law for the Development of Aquaculture and Fisheries.[41]

Specifically, the GOE will grant an income tax reduction of 10% for taxpayers that reinvest their profits in the aquaculture and fishing projects or programs promoted by the Public Aquaculture and Fisheries Research Institute and accredited by the governing body of Higher

---

[38] *See Shrimp, the second most exported product from Ecuador*, MasContainer (Feb. 24, 2023), attached as **Exhibit IV-7**.

[39] *Id.*

[40] *See Shrimp dethroned oil for the first time in 2023 as the first export product with $314 million*, Camara Maritima del Ecuador (Sept. 25, 2023), attached as **Exhibit IV-8**.

[41] *See Organic Law for the Development of Aquaculture and Fisheries*, Government of Ecuador, attached as **Exhibit IV-9**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

education. In 2019, the Organic Law of Simplification and Progressivity Tax instituted the following tax exemptions:

- 0% VAT rate on the acquisition of boats, machinery, navigation equipment and materials for the artisanal fishing sector;
- 0% VAT rate for artisans qualified by competent public organizations in the terms described in the standard;
- Services and goods of all artisans (not only the National Board for the Defense of Artisans), as long as their income does not exceed the limits for accounting;
- Exemption from ICE for the acquisition of vans and trucks with up to 3.5 tons of cargo;
- Exemption from ISD on payments made abroad in the execution of projects financed entirely with credits or funds, both non-refundable from government to government.[42]

These tax exemptions are countervailable subsidies under U.S. law.

*A. Financial Contribution*

The tax exemptions provide a financial contribution in the form of government revenue foregone under 19 U.S.C. § 1677(5)(D)(ii).

*B. Benefit*

The tax exemptions confer a benefit equal to the amount of revenue foregone by the government under 19 U.S.C. § 1677(5)(E) and 19 C.F.R. §§ 351.509 and 510. With the standard VAT rate in Ecuador of 12%, businesses are already receiving a substantial tax exemption.

*C. Specificity*

The tax exemptions are specific because they are expressly limited by law to a group of enterprises or industries under 19 U.S.C. § 1677(5A)(D)(i). As noted in Article 1 of the Organic Law for the Development of Aquaculture and Fisheries, the purpose of the law is to establish the

---

[42] *See* Noba, Pena & Torres, *Review of the Organic Law for the Development of the Aquaculture and Fishing*, Legal Ecuador (May 2020), attached as **Exhibit IV-10**.

development of a narrow industry, namely: aquaculture and fishing. Commerce has previously found that subsidies limited to the fishery and aquaculture industries are specific, and therefore countervailable.[43]

**v. Aquaculture Tax Benefits**

Law 19,175 of December 20, 2013 of the Legal Regime of Fisheries and Aquaculture grants tax benefits to aquaculture activity defined in the law as "the activity of reproduction, cultivation or breeding of hydrobiological species in a controlled environment, covering complete or partial biological cycles."[44] Despite best efforts, the Petitioner was unable to find an additional description of the exact tax benefits granted under this law.

*A. Financial Contribution*

This program grants a financial contribution under 19 U.S.C. § 1677(5)(D)(ii) in the form of government revenue foregone.

*B. Benefit*

This program confers a benefit equal to the amount of revenue foregone under this program under 19 U.S.C. § 1677(5)(D)(ii) and 19 C.F.R. § 351.509, as well as potentially under 19 C.F.R. § 351.510, depending on whether Commerce finds that the tax benefits are direct or indirect.

*C. Specificity*

The benefits conferred under this program are specific as described in 19 U.S.C. § 1677(5A)(D)(i) because they are limited to certain enterprises, specifically fisheries and

---

43 *See Final Affirmative Countervailing Duty Determination: Fresh and Chilled Atlantic Salmon from Norway*, 56 Fed. Reg. 7678, 7685 (Dep't Commerce Feb. 25, 1991).

44 *See Aquaculture – Tax Benefits*, Guia Practica Del Administrador (Jan. 27, 2014), attached as **Exhibit IV-11**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

aquaculture. Commerce has previously found that subsidies limited to the fishery and aquaculture industries are specific, and therefore countervailable.[45]

**vi. Environmental Tax Incentives**

According to the organic law, those who dedicate themselves to aquaculture, fishing and related activities in a sustainable manner, and who develop means that allow their expansion, such as innovation, technology transfer, and, in general, changing in production and consumption patterns, will be eligible for environmental incentives in accordance with current environmental regulations.[46] Among the benefits, the tax regulations establish an additional deduction of 100% of the depreciation of machinery, equipment or technology intended for the implementation of cleaner production mechanisms in energy generation processes from renewable sources, prevention of environmental impacts and reduction of greenhouse gas emissions.[47] In addition, the regulations also provide a 0% VAT rate on the import of solar panels and wastewater treatment plants.[48]

*A. Financial Contribution*

The environmental tax incentives provide a financial contribution in the form of government revenue foregone under 19 U.S.C. § 1677(5)(D)(ii).

B. *Benefi*t

The environmental tax incentives confer a benefit equal to the amount of revenue foregone by the government under 19 U.S.C. § 1677(5)(E). In the case of direct taxes, a benefit

---

45 *See Final Affirmative Countervailing Duty Determination: Fresh and Chilled Atlantic Salmon from Norway*, 56 Fed. Reg. 7678, 7685 (Dep't Commerce Feb. 25, 1991).

46 *See* Noba, Pena & Torres*, Review of the Organic Law for the Development of the Aquaculture and Fishing,* Legal Ecuador (May 2020) at 7, attached as **Exhibit IV-10**.

47 *Id*.

48 *Id.*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

is conferred under 19 C.F.R. § 351.509. In the case of indirect taxes, a benefit is conferred under 19 C.F.R. § 351.510.

*C. Specificity*

The environmental tax incentives are specific because they are expressly limited by law to a group of enterprises or industries under 19 U.S.C. § 1677(5A)(D)(i). As noted in Article 1 of the Organic Law for the Development of Aquaculture and Fisheries, the purpose of the law is to establish the development of a narrow industry, namely: aquaculture and fishing. Commerce has previously found that subsidies limited to the fishery and aquaculture industries are specific, and therefore countervailable.[49]

**vii. Tax Incentives for Priority Sectors under the 2010 Organic Production Code**

The shrimp industry is also included among the state priority sectors identified in the 2010 Organic Code for Production, Trade, and Investment ("Production Code"). The Production Code identifies nine sectors (in addition to those identified for import substitution purposes) which are entitled to treatment due to their status as priority sectors for the state – the production of fresh, frozen, and processed foods is the first listed in the new code.[50] A 2011 Executive Decree explains that the sector includes the production of frozen and processed foods, as well as, *inter alia*, the fishing and aquaculture production chain that contributes value added to the production of such foods.[51]

---

49 *See Final Affirmative Countervailing Duty Determination: Fresh and Chilled Atlantic Salmon from Norway*, 56 Fed. Reg. 7,678, 7,685 (Dep't Commerce Feb. 25, 1991).

50 *See 2010 Organic Code for Production, Trade, and Investment*, Government of Ecuador, attached as **Exhibit IV-12**.

51 *See* Executive Decree No. 757, *Regulation of the Structure and institutionalization of productive development, investment, and development mechanisms and instruments established by the Organic Code of Production, Trade and Investment* (May 6, 2011) at Art. 17(A), Official Register No. 450 (May 17, 2011), attached as **Exhibit IV-13**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

The Production Code establishes a number of tax incentives and other support programs for investment in this and other priority sectors. For example, all new investments in fresh, frozen and processed foodstuff sectors are entitled to complete exemption from income taxes for five years.[52] Tax incentives are countervailable subsidies under U.S. law.

*A. Financial Contribution*

The tax incentives provide a financial contribution in the form of government revenue foregone under 19 U.S.C. § 1677(5)(D)(ii).

*B. Benefit*

The tax incentives confer a benefit equal to the amount of revenue foregone by the government under 19 U.S.C. § 1677(5)(E). According to the World Bank, Ecuador's corporate income taxes are normally levied at a statutory rate of 25%.[53] The benefit of the program in any given year is the amount of tax that would have been due in the absence of tax incentives provided.

*C. Specificity*

The tax incentives are specific because they are expressly limited by a law to a group of enterprises or industries under 19 U.S.C. § 1677(5A)(D)(i). Article 24(2) of the Production Code limits the tax holiday to the sectors specified in the code's second corrective disposition, which lists nine sectors.[54] The first of the nine sectors identified is the production of fresh, frozen, and

---

[52] *See 2010 Organic Code for Production, Trade, and Investment*, Government of Ecuador, attached as **Exhibit IV-12**. As noted above, the production of fresh, frozen, and processed food is one of the priority sectors identified in the second corrective disposition (2.2) of the Production Code.

[53] *See Doing Business 2020 – Economy Profile Ecuador*, World Bank Group (2020) at 45, attached as **Exhibit IV-14**.

[54] *See 2010 Organic Code for Production, Trade, and Investment*, Government of Ecuador, attached as **Exhibit IV-12**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

processed foods.[55] Implementing regulations explain that the sector includes the production of frozen and processed foods, as well as, *inter alia*, the fishing and aquaculture production chain that contributes value added to the production of such foods.[56] We note that in previous cases Commerce has found subsidy programs to be specific on the basis of government catalogues that list as "encouraged projects" as many as 539 industry activities spanning 26 industry categories.[57]

**viii. Tax Incentives for Special Economic Development Zones**

The Organic Law on the Promotion of Production, Attraction of Investment, Generation of Employment, and Fiscal Stability and Balance promotes the special economic development zones (ZEDEs) through a ten-year income tax exemption for their management and operators and a ten-point reduction on their income tax rate for an additional ten years after the expiration of the exemption period.[58] These ZEDEs are exempt from tariff payments on imported goods, have a 0% VAT rate for imports, enjoy a tax credit for the VAT paid on locally purchased raw materials, inputs and services, benefit from an exemption from the foreign exchange exit tax for imports or for external finance payments abroad as well as a "5% reduction in the rate of IR in

---

55 *Id.*

56 Executive Decree No. 757, *Regulation of the structure and institutionalization of productive development, investment, and development mechanisms and instruments established by the Organic Code Of Production, Trade and Investment* (May 6, 2011) at Art. 17(A), Official Register No. 450 (May 17, 2011), attached as **Exhibit IV-13**.

57 *See, e.g. Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 72 Fed. Reg. 60,645 (Dep't Commerce Oct. 25, 2007) and accompanying Issues and Decision Memorandum at Comment 8 (p. 52— 53) (discussing Decree No. 40).

58 *See* Report by the Secretariat, *Trade Policy Review: Ecuador*, WT/TPR/S/383 (Jan. 8, 2019) at 22, attached as **Exhibit IV-15**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

the Quito and Guyaquil urban areas, and full exemption from IR for 5 years outside those areas."[59] These tax incentives are countervailable subsidies under U.S. law.

*A. Financial Contribution*

Tax incentives provide a financial contribution in the form of government revenue forgone under 19 U.S.C. § 1677(5)(D)(ii).

*B. Benefit*

The tax exemptions confer a benefit equal to the amount of revenue foregone by the government under 19 U.S.C. § 1677(5)(E). For zone firms enjoying the exemption for corporate income taxes, they are benefitting from not having to pay for a 25% income tax.[60] While all firms that are entitled to a complete exemption from VAT on imports as well as domestic purchases of goods and services for their production processes are benefitting from an exemption of 12%.[61]

Exemptions from indirect taxes on inputs to the production of goods for export confer a benefit unless it can be shown that either: (1) the government has a reasonable and effective system in place to confirm which inputs are consumed in the production of goods for export and to confirm that the exemption only applies to indirect taxes paid on such inputs, or (2) the government has otherwise carried out an examination of the actual inputs concern to confirm these facts.[62] If Ecuador has no such system or has not carried out such examination, the entire amount of the VAT exemption is countervailable.[63]

---

59 *Id.* at 45.

60 *See Doing Business 2020 – Economy Profile Ecuador*, World Bank Group (2020) at 45, attached as **Exhibit IV-14**.

61 *See Ecuador: VAT Essentials*, attached as **Exhibit VI-3**.

62 19 C.F.R. § 351.518(a).

63 *Id.*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

*C. Specificity*

The tax incentives are specific. The tax incentives for exporters located in free zones and for firms in ZEDEs on the basis of their export performance are specific because they are contingent on export performance under 19 U.S.C. § 1677(5A)(B). Commerce has previously found certain subsidies to producers in export processing zones to be specific because they are contingent on export performance.[64]

**2. Export Subsidies**

**i. Export Tax Incentive**

According to the Tax Regime Law, the GOE provides "incentives with 10 percentage points less in the income tax for exporting companies."[65] By definition, any shrimp exporter would be eligible for this tax benefit.

*A. Financial Contribution*

This program grants a financial contribution under 19 U.S.C. § 1677(5)(D)(ii) in the form of revenue foregone.

*B. Benefit*

The program provides a benefit equal to the amount of government revenue foregone under 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.509. The standard income tax rate in Ecuador is 25%.[66]

---

64 *See e.g., Notice of Initiation of Countervailing Duty Investigation: Carbazole Violet Pigment 23 From India*, 68 Fed. Reg. 70,778 (Dep't Commerce Dec. 19, 2003).

65 *See How Environmental and Social Certification Elevates the Violation of Human Rights and Nature in Ecuador Industrial Shrimp Aquaculture in the Period 2008-2018*, C-CONDEM (Aug. 2020) at 13, attached as **Exhibit IV-16**.

66 *See Doing Business 2020 – Economy Profile Ecuador*, World Bank Group (2020) at 45, attached as **Exhibit IV-14**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

*C. Specificity*

This program is contingent upon exports and is therefore specific under 19 U.S.C. § 1677(5A)(B).

**ii. Export Tax Incentives for Sustained/Increased Employment**

The Internal Tax Regime Law also provides for a 3% tax reduction to exporters who maintain or increase employment in the corresponding fiscal year.[67] By definition, any shrimp exporter would be eligible for this tax benefit.

*A. Financial Contribution*

This program grants a financial contribution under 19 U.S.C. § 1677(5)(D)(ii) in the form of revenue foregone.

*B. Benefit*

The program provides a benefit equal to the amount of government revenue foregone under 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.509. The standard income tax rate in Ecuador is 25%.[68]

*C. Specificity*

This program is contingent upon exports and is therefore specific under 19 U.S.C. § 1677(5A)(B).

**iii. Export Taxes Lowered to Promote Agricultural Exports**

On February 7, 2015, President Rafael Correa announced that the government would provide incentives to Ecuadorian agricultural product exporters through drawbacks and a

[67] *See* Lexis, *Internal Tax Regime Law* (Oct. 4, 2023), attached as **Exhibit IV-17**.

[68] *See Doing Business 2020 – Economy Profile Ecuador*, World Bank Group (2020) at 45, attached as **Exhibit IV-14**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

reduction in bureaucratic paperwork needed to obtain export permits and documentation.[69] Exports of non-traditional products (i.e. fresh flowers) were slated to benefit from a five percent tax reduction based on freight-on-board declared export values, while tuna exports would see a three percent tax reduction.[70] The creation of the Ecuadorian Investment and Export Promotion Corporation (CORPEI) helps the exporter by reducing the paperwork required to export goods by providing exporters with "the appropriate information required for the exportation process and everything associated with foreign trade and investment."[71] Available information indicates that these tax incentives have likely been implemented, but Petitioner was not able to find additional publicly available information regarding the program.[72]

*A. Financial Contribution*

This program grants a financial contribution under 19 U.S.C. § 1677(5)(D)(ii) in the form of revenue foregone.

*B. Benefit*

The program provides a benefit equal to the amount of government revenue foregone under 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.509. The benefit of this program appears to range from 3 to 5% of the value of qualifying exports, depending on the type of product.

*C. Specificity*

This program is contingent upon exports and is therefore specific under 19 U.S.C. § 1677(5A)(B).

---

69 *See* USDA Agricultural Service, *Ecuador Lowers Taxes to Promote Agricultural Exports* (Feb. 1, 2015), attached as **Exhibit IV-18**.

70 *Id.*

71 *See Doing Business and Investing in Ecuador*, PricewaterhouseCoopers, attached as **Exhibit IV-19**.

72 *See The government will offer subsidies and tax incentives for farmers*, Primicias (May 13, 2022), attached as **Exhibit IV-20**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

### 3. Energy and Fuel Subsidies

#### i. Investment in the Electrification of the Shrimp Sector

One of the largest and most recent government programs for the shrimp sector in Ecuador has been investments in the electrification of the shrimp sector. In 2021, the GOE invested around $300 million to carry out projects to improve the energy efficiency of the aquaculture sector and rural areas in the coastal provinces.[73] The ministries of Energy and Non-Renewable Natural Resources and the Ministry of Production, Foreign Trade, Investment and Fishers, together with the National Electricity Corporation (CNEL) signed an inter-institutional agreement with a duration of two years that was financed through loans by the inter-American Development Bank (IDB) and the Development Bank of Latin America (CAF), and a counterpart of the Ecuadorian State.[74] The greater goal of this plan is to "boost the productivity, export, energy efficiency and marketing opportunities for more than 2,300 shrimp companies in the provinces of Guayas, El Oro, Manabi, Esmereldas, and Santa Elena."[75] In regard to electrification, the Minister of Energy Rene Ortiz stated that the electrification plan should electrify more than 15,000 hectares of the shrimp sector.[76]

*A. Financial Contribution*

This program confers a financial contribution under 19 U.S.C. § 1677(5)(D)(i) to the extent the government directly transfers funds supporting electrification to the shrimp sector. Alternatively, if the government is directly providing electricity to shrimp producers through

---

73 *See Ecuador will invest 300 million dollars to electrify the shrimp sector*, EFE Agency (Mar. 18, 2021), attached as **Exhibit IV-21**.

74 *See Ecuador will invest around USD 300 million for the electrification of the shrimp sector*, BNAmericas (Mar. 19, 2021), attached as **Exhibit IV-22**.

75 *Id.*

76 *Id.*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

CNEL or another government authority, there is a financial contribution through the provision of a service under 19 U.S.C. § 1677(5)(D)(iii).

*B. Benefit*

To the extent funds are being provided directly to the shrimp industry, a benefit is conferred under 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.504. Electricity provided by CNEL or any other government authority confers a benefit under 19 U.S.C. § 1677(5)(E)(iv) to the extent the electricity is provided for less than adequate renumeration.

*C. Specificity*

This program is *de jure* specific under 19 U.S.C. § 1677(5)(D)(i) because the subsidy is limited to the shrimp sector.

**ii. Government Provision of Electricity for Less Than Adequate Renumeration**

Ecuador's electricity market is controlled by the state, and major electricity providers such as Corporación Eléctrica del Ecuador (CELEC EP) and the Strategic Public Electric Company Corporación Nacional de Electricidad (CENEL EP) are owned by the GOE.[77] Further, the GOE's Ministry of Energy has been working with consultants to the shrimp industry such as the GPS Group to establish a specific electricity rate that was competitive with the price of diesel at the time in order to support electrification and automation of the shrimp sector.[78]

*A. Financial Contribution*

The provision of electricity is a financial contribution in the form of the provision of a service under 19 U.S.C. § 1677(5)(D)(iii). As noted above, several of the electricity providers are

---

77 *See* Report by the Secretariat, *Trade Policy Review: Ecuador*, WT/TPR/S/383 (Jan. 8, 2019) at 123, para 4.71, attached as **Exhibit IV-15**; *see also Corporación Eléctrica del Ecuador (CELEC EP)*, BNAmericas, attached as **Exhibit IV-23**.

78 *See GPS Group History*, GPS, attached as **Exhibit IV-24**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

state-owned entities. In addition, to the extent the GOE has established electricity rates specific to the shrimp industry, they have entrusted or directed private electricity providers to prove a financial contribution through the provision of electricity.

*B. Benefit*

The provision of electricity confers a benefit equal to the difference between the amount paid for the service and a commercial price under prevailing market conditions pursuant to 19 U.S.C. § 1677(5)(E)(iv). Given that the electricity sector in Ecuador is dominated by the government and there is no "world market price" for electricity, in determining whether a benefit is conferred under this program, Commerce should examine whether the government-set price is consistent with market principles pursuant to 19 C.F.R. § 351.511(a)(iii). As noted above, information reasonably available to the Petitioner indicates that electricity prices in Ecuador are not set consistent with market principles but instead in order to benefit shrimp producers in Ecuador.

*C. Specificity*

The provision of electricity for less than adequate remuneration is *de jure* specific because it is limited to supporting electrification and automation of the shrimp industry under 19 U.S.C. § 1677(5A)(D)(i).

**4. Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays**

The Directorate General for Fisheries grants concessions to set up aquaculture facilities in beaches and bays for both natural and legal persons.[79] Concessions are granted for a period of ten years and can be extended for period of equal duration and only for the areas that are actually

[79] *See Ecuador National Aquaculture Legislation*, Food and Agriculture Organization of the United Nations, attached as **Exhibit IV-25**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

being used. Natural persons may not be granted more than 50 hectares and legal persons can be granted no more than 250 hectares. Further, Article 6 of Decree 1391 states that for the occupation of beach and bay areas (mangrove ecosystem), companies do not have to pay for the first 0 to 10 hectares and from 11 hectares onwards only have to pay 25 USD per hectare per year.[80] To be granted this concession, companies only need to file an application. Available evidence indicates that artisanal fishermen of the 22 de Abril cooperative received the award of 84 hectares of land for 30 years with 45 hectares dedicated to shrimp farming which they can now operate due to the advice and training the government provided.[81]

*A. Financial Contribution*

This program provides a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(iii) in the form of the provision of a good.

*B. Benefit*

This program provides a benefit to the extent that the GOE provides land for less than adequate renumeration under 19 U.S.C. § 1677(5)(E)(iv). Land in Ecuador can be priced between $500 and $5,000 per hectare depending on the land and resources available,[82] while this program permits shrimp farms to occupy land without pay for the first ten hectares and for only $25/hectare for 11 hectares and above.[83]

---

80 *See How Environmental and Social Certification Elevates the Violation of Human Rights and Nature in Ecuador Industrial Shrimp Aquaculture in the Period 2008-2018*, C-CONDEM (Aug. 2020) at 8, attached as **Exhibit IV-16**.

81 *See Shrimp farm was concessioned to artisanal fishermen from the Gulf of Guayaquil*, Government of Ecuador (Mar. 3, 2017), attached as **Exhibit IV-26**.

82 *See Shrimp Like It Hot*, Ecuador Homes and Land, attached as **Exhibit IV-27**.

83 *See How Environmental and Social Certification Elevates the Violation of Human Rights and Nature in Ecuador Industrial Shrimp Aquaculture in the Period 2008-2018*, C-CONDEM (Aug. 2020) at 8, attached as **Exhibit IV-16**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

*C. Specificity*

The government provision of land concessions to shrimp farmers is *de jure* specific under 19 U.S.C. § 1677(5A)(D)(i), because the program is limited by law to a group of enterprises or industries, namely the aquaculture industry and short-cycle agriculture. The program is not broadly available to all agricultural producers.

**5. Government Forgiveness of Land Use Fees and Provision of Land to Delinquent Shrimp Farmers**

As noted above, the GOE grants aquaculture concessions for bay area land, and the terms of the agreement require the land to be continuously occupied for five years. Government Decree 408 was signed into law on April 25, 2022 and allows for previously illegal shrimp farms to be formalized.[84] With the signing of this resolution, small and medium-sized shrimp farmers have been able to carry out their activity legally and 18,900 hectares of land have been formalized for their use in shrimp farming.[85] Interested parties had a year to present three copies of the plan of their land, certificates, complete sworn statements before a notary public, and pay an administrative fee of $500.[86]

Another recent law called the Organic Law for the Development of Aquaculture further suggests that the concession term of these lands will be 20 years, renewable for equal periods and are renewed for the portions of the land actively used.[87] Social organizations and legal

---

84 *See Government signs decree to regularize shrimp farms*, El Comercio (Apr. 25, 2022), attached as **Exhibit IV-28**.

85 *Id.*

86 *Id.*

87 *See* Article 65 of the *Organic Law for the Development of Aquaculture and Fisheries* (April 21, 2020), attached as **Exhibit IV-9**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

entities are entitled to claim 1,000 hectares of land, while individuals can claim up to 250 hectares.[88]

Many of these farms were not paying land use fees for many years and now with the development of the registration process, reasonably available information indicates that outside of a simple registration process, the payment of a nominal fee and their allowance of "access and free movement for artisanal fishing activities on the banks of the mangroves and water flows, rivers and estuaries," these otherwise delinquent shrimp farmers do not owe any other obligations.[89]

*A. Financial Contribution*

This program provides a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(ii) in the form of government revenue foregone regarding the forgiveness of land use fees. In addition, the program provides a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(iii) in the form of the provision of a good by formalizing the land claims of otherwise illegal shrimp farms.

*B. Benefit*

Under 19 U.S.C. § 1677(5)(E)(ii), the forgiveness of unpaid land use fees confers a benefit equal to the amount of fees, plus interest and penalties, that have been forgiven. In calculating the benefit of this program, the amount of fees that would have otherwise been due in the absence of this forgiveness program can be calculated by the information provided in World Bank publication for Doing Business in Ecuador in 2020. Just for land registration, land owners registering their property would need to pay 1% of the property price, as well as

---

88 *Id.* at Article 68.

89 *See* Patricia Gonzalez, *Decree laws on risks confronts shrimpers and crabbers*, Primicias (Sept. 20, 2023), attached as **Exhibit IV-29**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

additional fees of $1,576 to notarize documents, $500 to obtain notice of registration from the property registry, among other costs.[90] In addition to being exempt from these administrative fees, the shrimp farmers in Ecuador being granted this land do not have to pay for the coastal land, thus conferring a benefit under 19 U.S.C. § 1677(5)(E) (iv). As noted above, land in Ecuador can be priced between $500 and $5,000 per hectare depending on the land and resources available.[91]

*C. Specificity*

The government forgiveness of land use fees to shrimp farmers and provision of land to shrimp farmers is *de jure* specific under 19 U.S.C. § 1677(5A)(D)(i), because the program is limited by law to a group of enterprises or industries, namely the aquaculture industry and short-cycle agriculture. The program is not broadly available to all agricultural producers.

**6. Provision of Water for LTAR**

All water resources in Ecuador are property of the state.[92] With limited exceptions, private entities that seek to use water resources in the country must receive a concession approved by the GOE.[93] The Law on Water Resources, Uses and Exploitation of Water determined that the shrimp sector makes non-consumptive use of water which means that the sector is not subject to any fee for water consumption.[94] Available information indicates that raw

---

90 *See Doing Business 2020 – Economy Profile Ecuador*, World Bank Group (2020) at 27-28, attached as **Exhibit IV-14**.

91 *See Shrimp Like It Hot*, Ecuador Homes and Land, attached as **Exhibit IV-27**.

92 *See* USAID, *Ecuador – Property Rights and Resource Governance Profile* at 11, attached as **Exhibit IV-30**.

93 *See Organic Law of Water Resources and Uses and Water Use*, Republic of Ecuador (Aug. 6, 2014), attached as **Exhibit IV-31** noting that to comply with the provisions of the Constitution, the Single Water Authority will continue to review concessions of rights to use and exploit water.

94 *See Shrimp Sector Will Not Pay For the Non-Consumptive Use of Brackish Waters*, Camara Nacional de Acuacultura (Apr. 24, 2018), attached as **Exhibit VI-32**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

water after 200 liters per inhabitant per day is valued at 0.0039 dollars per cubic meter.[95] Information regarding standard commercial prices for water consumption are not readily available.

*A. Financial Contribution*

This program provides a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(iii) in the form of provision of a good. Alternatively, the program provides a financial contribution by exempting shrimp producers from paying any fees for water consumption, thus foregoing government revenue pursuant to 19 U.S.C. § 1677(5)(D)(ii).

*B. Benefit*

This program confers a benefit within the meaning of 19 U.S.C. § 1677(5)(E)(iv) because the government provides water to the shrimp sector for less than adequate renumeration. Alternatively, the program confers a benefit equal to the government revenue foregone pursuant to 19 U.S.C. § 1677(5)(E).

*C. Specificity*

This program is *de jure* specific within the meaning of 19 U.S.C. § 1677(5A)(D)(i) because the free water use is limited to a group of industries, namely those in the shrimp sector.

### 7. Preferential and Government-Supported Loans, Lines of Credit, and Loan Guarantees

#### i. Credit Lines Boost for Electrification of the Shrimp Sector

The Ecuadorian Minister of Agriculture, Livestock, Aquaculture and Fisheries announced a credit plan through BanEcuador (of which he is President and serves on the Board of Directors)

95 *See Agreement No. 2017-1523 – Approves and sets the unified value of the Minimum Vital Quantity per inhabitant per raw water in the Ecuadorian Territory*, Food and Agriculture Organization of the United States (May 23, 2017), attached as **Exhibit VI-33**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

which granted lines of credit of up to $20,000 for individuals and up to $200,000 for associations for those sectors affected by the earthquake of April 16, 2016.[96] As the shrimp sector is the main economic sector of Pedernales, the epicenter of the earthquake, it is one of the sectors greatly affected by the earthquake and it follows that it was one of the main beneficiaries of the plan.[97] As part of this plan, BanEcuador serviced loans of up to $20,000 while state-owned CFN would provide the credits for the shrimp farmers that "require for the total reconstruction of their facilities."[98] These credit lines granted the shrimp sector one or two years of grace.

*A. Financial Contribution*

The financial institutions providing the credit lines are state-owned or state-controlled (as noted above, the Minister of Agriculture, Livestock, Aquaculture, and Fisheries is the President and on the Board of Directors) and are therefore capable of providing a financial contribution within the meaning of 19 U.S.C. § 1677(5)(D)(i).

*B. Benefit*

Government loans confer a benefit pursuant to 19 U.S.C. § 1677(5)(E)(ii) if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market. In addition, to the extent the GOE provided loan guarantees, they provide a benefit under 19 U.S.C. § 1677(5)(E)(iii), to the extent these credit lines are guaranteed by the government and the established grace period would not be available on the regular commercial market. Thus, the benefit is the difference between what the companies are paying through this

96 *See Credit plans ready to reactivate the productive sector*, Ministry of Agriculture and Livestock (May 12, 2016), attached as **Exhibit IV-34**.

97 *Id.*

98 *Id.*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

credit line program and the rates they would receive on the open market for one to two years without a grace period.

*C. Specificity*

As the shrimp sector was the sector largely affected by the earthquake due to its location, these credit lines are largely benefiting shrimp farmers. Thus, the loans and guarantees are *de facto* specific, as the shrimp industry received a disproportionately large amount of the subsidy pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(III).

**ii. Access to Preferential Lines of Credit for Aquaculture and Fishing**

As part of the Organic Law for the Development of Aquaculture and Fishing, the state provides through public banking lines of credit with preferential financing mechanisms for aquaculture and artisanal fishing.[99] The resources provided by these credit line are used for acquisition, modernization or renewal of the national fishing fleet, safety equipment, parts and pieces for vessels, implements for aquaculture and fishing, products with added value in aquaculture and fishing processing activities, as well as for mariculture and infrastructure projects in the area of artisanal aquaculture.[100] These credit lines appear to be directly supported by government-owned and controlled CFN and the Ministry of Agriculture, Livestock, Aquaculture and Fisheries (MAGAP) and are aimed at creating a more productive seafood industry, generating more raw materials, and strengthening the production and marketing chain in the country. Available information indicates that the credit is for fixed assets up to ten years

[99] *See* Noba, Pena & Torres, *Review of the Organic Law for the Development of the Aquaculture and Fishing*, Legal Ecuador (May 2020) at 5, attached as **Exhibit IV-10**.

[100] *Id.*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

with working capital for operating up to three years with financing supporting up to 70 percent of the project.[101]

*A. Financial Contribution*

The financial institutions providing the credit lines are state-owned or state-controlled and are therefore capable of providing a financial contribution within the meaning of 19 U.S.C. § 1677(5)(D)(i).

*B. Benefit*

Government loans confer a benefit pursuant to 19 U.S.C. § 1677(5)(E)(ii) if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market. In addition, to the extent the GOE provided loan guarantees, they provide a benefit under 19 U.S.C. § 1677(5)(E)(iii), these credit lines are guaranteed by the government and the established grace period would not be available on the regular commercial market. Thus, the benefit is the difference between what the companies are paying through this credit line program and the rates they would receive on the open market.

*C. Specificity*

In this case, the GOE is limiting access to this loan program to a certain group of industries and is therefore *de jure* specific under 19 U.S.C. § 1677(5A)(D)(ii). As highlighted on the GOE's website, the credit lines are aimed at supporting the aquaculture and fishery industry. Add language about aquaculture being found specific in prior cases.

101 *See MAGAP and CFB Open Line of Credit for Marine Aquaculture*, Government of Ecuador (Oct. 7, 2013), attached as **Exhibit IV-35**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

### iii. Loans for Organic Production

The GOE-owned National Finance Corporation (CFN) and BanEcuador offer producers involved in organic production credit lines to finance working capital and fixed assets.[102] These credit lines offer a grace period for fixed assets for up to three years and for working capital up to one year and the amounts range from 50 to 3 million dollars.[103] These credit lines are available to producers in the shrimp sector whose annual sales the previous year have been from $100,000 to $5 million who wish to obtain an eligible organic certification.[104] In addition, shrimp producers who report sales of between $5 and $10 million who already have an eligible certification may also qualify.

*A. Financial Contribution*

The financial institutions providing the loans are state-owned and are therefore capable of providing a financial contribution within the meaning of 19 U.S.C. § 1677(5)(D)(i).

*B. Benefit*

Government loans confer a benefit pursuant to 19 U.S.C. § 1677(5)(E)(ii) if there is a difference between the amount the recipient of the loan pays on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market. In addition, to the extent the GOE provided loan guarantees, they provide a benefit under 19 U.S.C. § 1677(5)(E)(iii) if these loans are guaranteed by the government and the established grace period would not be available on the regular commercial market. Thus, the

---

[102] *See BanEcuador and CFN present loans for organic production, promoted by the MAG*, Government of Ecuador (May 21, 2021), attached as **Exhibit IV-36**.

[103] *Id.*

[104] *Id.*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

benefit is the difference between what the companies are paying through this loan program and the rates they would receive on the open market for three years, certainly without a grace period.

*C. Specificity*

In this case, the GOE is limiting access to this loan program to a smaller group of industries – i.e., producers of organic products – and is therefore specific under 19 U.S.C. § 1677(5A)(D)(ii). As shrimp farms are one of the few fishing industries that can be organic given the control they have over the environment and the fact that "most shrimp farms in Ecuador function in an organic matter,"[105] these loans are believed to largely benefit shrimp farmers.

**iv. Export Credits from CFN**

The GOE-owned CFN also provides export credits at concessional rates. According to the WTO Secretariat, the CFN provides an export line of credit that finances up to 100% of export-related costs.[106] The export financing is provided at a minimum of $50,000 per client with the maximum amount of $25,000,000 per borrower and $50,000,000 per economic group.[107] These loans could be used for short-term loans to finance the period between shipment and payment by the foreign purchaser, as well as long-term loans aimed at generating new export capacity.[108] The loan period is fixed at a maximum of five years for working capital and fifteen for fixed assets.[109] The nominal interest rate is 7.5% for the corporate segment, 8.25% for the

105 *See Shrimp Like it Hot*, Ecuador Homes and Land, attached as **Exhibit IV-27**.

106 *See* Report by the Secretariat, *Trade Policy Review: Ecuador*, WT/TPR/S/383 (Jan. 8, 2019) at p. 75-76, attached as **Exhibit IV-15**.

107 *Id.*

108 *Id.*

109 *Id.*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

Barcode: 4452837-26 C-331-806 INV - Investigation

business segment, and 9.75% for the SME segment.[110] Export credits from CFN to shrimp exporters are countervailable subsidies under U.S. law.

*A. Financial Contribution*

The export credits provide a financial contribution in the form of a direct transfer of funds from government-owned banks under 19 U.S.C. § 1677(5)(D)(i).

*B. Benefit*

Under 19 U.S.C. § 1677(5)(E)(ii), export credits confer a benefit equal to the difference between the amount the recipient paid on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market. As noted above, according to the WTO TPRM report, interest rates on export credits from CFN range from 7.5% to 9.75%. Despite best efforts, Petitioner is unable to find more current interest rates for CFN export credits.

*C. Specificity*

The export credits are specific because they are contingent on export performance under 19 U.S.C. § 1677(5A)(B).

**8. International Factoring**

In addition to loans, CFN also provides exporters with early settlement of future invoices with international clients in order to obtain working capital.[111] These early settlement offers can finance "up to 80% of the value of the export invoice with a due date of at least 30 days" and is

[110] *Id.*

[111] *See* Report by the Secretariat, *Trade Policy Review: Ecuador*, WT/TPR/S/383 (Jan. 8, 2019) at 76, attached as **Exhibit IV-15**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

available to non-oil exporters with annual sales exceeding $100,000.[112] The discount rate is 6.25% per annum up to 60 days, 7.25% up to 120 days, and 7.25% up to 180 days.[113]

*A. Financial Contribution*

The export factoring provides a financial contribution in the form of a direct transfer of funds from government-owned banks under 19 U.S.C. § 1677(5)(D)(i).

*B. Benefit*

Under 19 U.S.C. § 1677(5)(E)(ii), the export factoring confers a benefit equal to the difference between the amount the recipient paid on the loan and the amount the recipient would pay on a comparable commercial loan that the recipient could actually obtain on the market.

*C. Specificity*

The export factoring is specific because it is contingent on export performance under 19 U.S.C. § 1677(5A)(B).

**9. Funding Under the National Agro-Industrial Development Plan (NAIDP)**

The National Agroindustrial Development Plan of Ecuador was an instrument that covered the period between 2009 and 2011 with a general objective of promoting the development of the country's agroindustrial sector.[114] To do this, the plan aimed to strengthen the Directorates of Departments related to the agroindustrial sector of the Ministry of Agriculture, Aquaculture, and Fisheries (MAGAP).[115] More recently, through an Executive Decree, the State policies for the agricultural sector between 2006 -2016 were issued for the

[112] *Id.*

[113] *Id.*

[114] *See Agreement No. 90 – National Agroindustrial Development Plan of Ecuador*, FAOLEX (Apr. 13, 2009), attached as **Exhibit IV-37**.

[115] *See id.*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

development of a four-year work program to strengthen and boost the productivity and competitiveness of the agroindustrial sector.[116] Petitioner has not been able to find updated information regarding this program and cannot confirm whether or not the program has been discontinued. However, Commerce previously determined that this program is countervailable in *Certain Frozen Warmwater Shrimp from Ecuador*.[117]

*A. Financial Contribution*

Government financing under the plan provides a financial contribution in the form of the direct transfer of funds under 19 U.S.C. § 1677(5)(D)(i).

*B. Benefit*

This program confers a benefit equal to the amount of the funding shrimp producers receive, under 19 C.F.R. § 351.504(a).

*C. Specificity*

This program is specific within the meaning of 19 U.S.C. § 1677(5A)(D)(i) because the program is limited to the aquaculture sector.

## VIII. CONCLUSION

As described herein, producers and exporters of frozen warmwater shrimp in Ecuador are benefitting from substantial countervailable subsidies that are causing material injury to the domestic industry in the United States. Petitioner therefore requests that Commerce initiate a countervailing duty investigation of imports of frozen warmwater shrimp from Ecuador.

---

116 *Id.*

117 *See Certain Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Determination*, 78 Fed. Reg. 50,389 (Dep't Commerce Aug. 19, 2013), and accompanying Issues and Decision Memorandum at 35.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/24/23 10:24 PM, Submission Status: Approved

# Tab 2

# P.R. 79-80

# C.R. 44-45

Barcode:4465826-01 C-331-806 INV - Investigation -

C-331-806
Investigation
~~Business Proprietary Document~~
E&C/OIV: ZS, TM, ST, MTA
**Public Version**

November 14, 2023

**ENFORCEMENT AND COMPLIANCE**
**OFFICE OF AD/CVD OPERATIONS**
**COUNTERVAILING DUTY INVESTIGATION INITIATION CHECKLIST**

**SUBJECT:** Frozen Warmwater Shrimp from Ecuador
**CASE NUMBER:** C-331-806

**THE PETITIONER:**

American Shrimp Processors Association
P.O. Box 399
Port Arthur, TX 77640
(409) 719-7090

**LEAD COUNSEL TO THE PETITIONER:**

Elizabeth J. Drake
Schagrin Associates
900 Seventh Street, N.W., Suite 500
Washington, DC 20001
(202) 223-1700

**SCOPE:** *See* Attachment I – Scope of the Investigation, to this checklist.

**APPROXIMATE CASE CALENDAR:**

| **Event** | **No. of Days** | **Date of Action** | **Day of Week** |
|---|---|---|---|
| | **Countervailing Duty Investigation** | | |
| Petition Filed | 0 | October 25, 2023 | Wednesday |
| Initiation Date | 20 | November 14, 2023 | Tuesday |
| ITC Preliminary Determination* | 45 | December 11, 2023 | Monday* |
| ITA Preliminary Determination†** | 85 | January 18, 2024 | Thursday |

Filed By: Zachary Shaykin, Filed Date: 11/20/23 8:56 AM, Submission Status: Approved

☒ a statement indicating that the Petition was filed simultaneously with the U.S. Department of Commerce (Commerce) and the ITC (*see* cover letter to the Petition at 2).

☒ an adequate summary of the proprietary data (*see* public versions of the Petition, First General Issues Supplement, Second General Issues Supplement.

☒ a statement regarding release under administrative protective order (*see* the cover letters to the Petition at 1-4, First General Issues Supplement at 1-2, Second General Issues Supplement at 1.

☒ a certification of the facts contained in the Petition by an official of the petitioning firm(s) and its legal representative (if applicable) (*see* attachments to the cover letters to attachments to the cover letters to the Petition and attachments to the narratives to the Scope Amendment, First General Issues Supplement, Second General Issues Supplement, and Ecuador CVD Supplement).[6]

---

**COUNTERVAILING DUTY ALLEGATIONS:**

The proposed period of investigation (POI) is January 1, 2022, through December 31, 2022.

The petitioner filed the Petition on October 25, 2023. On October 27, 2023, Commerce sought clarification on certain subsidy issues in the Petition.[7] The petitioner provided additional information in response to Commerce's questionnaires on November 1, 2023.[8]

---

**CONSULTATIONS:**

Pursuant to section 702(b)(4)(A)(ii) of the Act, on October 27, 2023, we invited representatives of the Government of Ecuador (GOE) for consultations with respect to the countervailing duty (CVD) petition.[9] We did not receive any response to our request for consultations from the GOE.

---

**COUNTERVAILING DUTY INVESTIGATION INITIATION STANDARD:**

Section 702(b) of the Act states that the petitioner must allege the elements necessary for the imposition of a CVD under section 701(a) of the Act; *i.e.*, the existence of countervailable subsidies and material injury, or threat of material injury, by reason of the subsidized imports.

[6] *See* Petitioner's Letter, "Petition Supplemental Questions Response," dated November 1, 2023 (Ecuador CVD Supplement).
[7] *See* Commerce's Letter, "Supplemental Questions," dated October 27, 2023.
[8] *See* Ecuador CVD Supplement.
[9] *See* Commerce's Letter, "Invitation for Consultations to Discuss the Countervailing Duty Petition," dated October 27, 2023.

Section 702(b)(1) of the Act requires that these allegations be supported by information reasonably available to the petitioner.

The petitioner alleges in the Petition that producers of frozen shrimp in Ecuador benefited from countervailable subsidies bestowed by the GOE. In addition to subsidies allegedly provided to processors of frozen shrimp, the Petition includes subsidies allegedly provided to producers of fresh shrimp. According to the petitioner, Ecuadorean producers of frozen shrimp are likely to have their own integrated aquaculture operations or are cross-owned with farming operations that supply fresh shrimp.[10] In these situations, the petitioner states that subsidies tied to the production of fresh shrimp will be attributed to the processed product, citing 19 CFR 351.525(b)(5)(ii) and 19 CFR 351.525(b)(6)(iv). With respect to cross-owned suppliers of fresh shrimp and the requirements of 19 CFR 351.525(b)(6)(iv), the petitioner points to the ITC's finding that fresh shrimp is overwhelmingly used to produce frozen shrimp[11] in support of its claim that fresh shrimp is "primarily dedicated" to the frozen product.

Alternatively, the petitioner claims that Commerce should investigate subsidies to producers of fresh shrimp and deem such subsidies to be provided with respect to the frozen product under section 771B of the Act, which addresses processed agricultural products (including fishery products).[12] In support, the petitioner claims that: (i) the demand for fresh shrimp is substantially dependent on the demand for frozen shrimp and (ii) the processing of the fresh shrimp into frozen shrimp adds limited value and the essential character of the raw product is not changed. In support, the petitioner refers to the above-cited finding by the ITC and to its finding that raw shrimp accounted for between 71.5 and 76.5 percent of the final value of the product, meaning that processing and all other expenses account for less than 30 percent of the final value.[13] According to the petitioner, Commerce has previously found this level of value added to be limited.[14] Moreover, the petitioner states, the essential character of the fresh shrimp is not changed with processing.

Based on the petitioner's allegation regarding the relationship between fresh and frozen shrimp, Commerce recommends initiating an investigation of the programs listed in Section I, "Programs on which Commerce is Initiating an Investigation," including the programs that allegedly provide subsidies to producers of fresh shrimp. In particular, the petitioner has supported its allegations that subsidies for fresh shrimp may be attributable to frozen shrimp under 19 CFR 351.525(b)(5)(ii), 351.525(b)(6)(iv) and section 771B of the Act. Moreover, for each program, the petitioner has alleged the elements of a subsidy, that is, financial contribution, benefit, and

---

[10] *See* Petition at Volume IV at 4 and 5.
[11] *Id.* at 5 (citing *Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam*, Inv. Nos. 731-TA0-1064 and 1066-1068 (Third Review), USITC Pub. 5432 (June 2023) (*Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam)*.
[12] *Id.* at 5 and 6.
[13] *Id.* at 8 (citing *Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam*).
[14] *Id.* (citing *Certain Frozen Warmwater Shrimp from Ecuador: Final Affirmative Countervailing Duty Determination*, 78 FR 50398 (August 19, 2013) (*Shrimp from Ecuador Inv Final*), and accompanying Issues and Decision Memorandum (IDM) at Comment 1). While Commerce previously conducted a CVD investigation on shrimp from Ecuador, the investigation did not result in an order (*see Frozen Warmwater Shrimp from China, Ecuador, India, Malaysia, and Vietnam*, 78 FR 64009 (October 25, 2013).

specificity. Commerce finds that the petitioner's allegations are supported by adequate and accurate information that was reasonably available to it.

---

## PROGRAMS ON WHICH COMMERCE IS INITIATING AN INVESTIGATION

*Recommendation:* For each of the following programs, the petitioner alleged the elements of a subsidy, *i.e.*, financial contribution, benefit, and specificity (description and specific provisions summarized below). We find that the petitioner's allegations are supported by adequate and accurate information that was reasonably available to them. We recommend investigating the programs listed below based on the description and support provided by the petitioner. Unless otherwise noted, we recommend initiating investigation of these programs as alleged by the petitioner. Any program below for which we recommend initiating on a different basis than that alleged by the petitioner, we state our recommendation under each program.

### A. Tax Programs

Unless otherwise noted, for each of the tax programs listed below, the petitioner alleges that: (1) it provides a financial contribution in the form of revenue forgone, pursuant to section 771(5)(D)(ii) of the Act; (2) it confers the benefit in the amount of revenue forgone under 19 CFR 351.509; and (3) it is *de jure* specific under section 771(5A)(D)(i) of the Act, because recipients are limited by law to certain enterprises or industries.

1. Environmental Tax Incentives

Information to support the petitioner's allegation regarding this program can be found on pages 16 through 17 and Exhibit IV-10 of Volume IV of the Petition. The petitioner states that companies in the aquaculture and fishing industries are eligible for a deduction of 100% of the depreciation of machinery, equipment, or technology that is intended to be used for clean energy generation from renewable sources, the prevention of impacts on the environment, and the reduction of greenhouse gas emissions.[15]

2. Tax Incentives for Priority Sectors Under the 2010 Organic Production Code

Information to support the petitioner's allegation regarding this program can be found on pages 17 through 19 and Exhibits IV-12 through IV-14 of the Petition and pages 8 and 9 and Exhibit IV-5 of the Ecuador CVD Supplement. The petitioner states that companies are eligible to receive tax benefits including a complete exemption of income taxes for five years for companies which invest in fresh, frozen, and processed foodstuff sectors.[16] The petitioner provided information indicating that the nine sectors eligible to receive tax benefits under this program as "priority sectors," including, *inter alia*, the sector involved in the production of fresh, frozen, and industrialized (*i.e.*, processed) foods.[17]

---

[15] *See* Petition at Volume IV at 16.
[16] *Id.* at 17 through 19.
[17] *See* Ecuador CVD Supplement at 8 and 9.

3. Fee Exemptions for Brackish Water[18]

Information provided by the petitioner regarding this alleged program can be found on pages 30-31 and Exhibits IV-30 through IV-33 of Volume IV of the Petition and pages 18-19 and Supp. Exhibit IV-22 of the Ecuador CVD Supplement. The petitioner alleges that the GOE owns and provides concessions for all water resources in Ecuador but has determined that the shrimp sector makes non-consumptive use of brackish water (*i.e.*, coastal waters) and it is not subject to any fee for water consumption. The petitioner alleges that the official rate for raw water provided to drinking water service providers is valued at $0.0039 per cubic meter.

*Recommendation*: While the petitioner alleges that this program is a less-than-adequate-remuneration (LTAR) program due to the GOE determination that the shrimp industry's use of brackish water is non-consumptive and is therefore not subject to the payment of water fees/rates, the petitioner was only able to provide the GOE official rate for raw groundwater as a benchmark. The petitioner did not provide information that would support finding that the GOE official rate is or is not reflective of prevailing market conditions in Ecuador. As a result, it's uncertain whether this rate would be useable by Commerce as a benchmark to determine LTAR (as a tier I benchmark). Alternatively, the petitioner alleges this program as revenue forgone. Since shrimp producers are exempt from paying water consumption fees in comparison to other consumers of water, the benefit provided under this program would be the difference between the fee non-consumptive users of water pay, including shrimp producers and processors (*i.e.*, $0.00), and the fee shrimp producers and processors would otherwise be required to pay absent this program.[19] The team recommends initiating an investigation of this program based on the allegation as a financial contribution in the form of revenue forgone, pursuant to section 771(5)(D)(ii) of the Act.

4. Government Forgiveness of Land Use Fees and Provision of Land to Delinquent Shrimp Farmers

Information to support the petitioner's allegation regarding this program can be found on pages 28-30 and Exhibits IV-9, IV-14, and IV-27 through IV-29 of Volume IV of the Petition and page 18 and Exhibit IV-21 of the Ecuador CVD Supplement. The petitioner states that GOE forgoes the assessment of land use and administrative fees for small and medium-sized shrimp farmers, for up to 20 years. The petitioner states that the GOE forgoes the assessment of administrative fees for small and medium-sized shrimp farmers that can total 1 percent of the total land registration, $1,576 to notarize documents, and $500 to obtain notice of registration.

**B. Export Programs**

[18] The petitioner alleged this program as the Provision of Water for LTAR; however, because the government provides an exemption of fees for brackish water for non-consumptive use by shrimp producers and processors under this program, we have determined to initiate an investigation of this program as Fee Exemptions for Brackish Water. *See* Petition at Volume IV at 30 and 31.
[19] *Id.* at Volume IV at 31 and Exhibit IV-33.

processors sell shrimp to end users and distributors.[86] The petitioner notes that fresh shrimp and shrimp frozen on the vessel are both sold at the dock.[87]

3) *Differences in the physical characteristics and functions of the upstream and downstream articles*

The petitioner contends that processing of fresh warmwater shrimp into frozen warmwater shrimp does not change the essential character or functions of the upstream article.[88] The petitioner states that the ITC has previously noted that the "initial stages of processing did not significantly change the physical characteristics and use of the product and appeared to add at most moderate value to the product."[89]

4) *Differences in the costs or value of the vertically differentiated articles*

The petitioner states that the ITC has previously found that processing adds at most moderate value to frozen warmwater shrimp.[90] The petitioner also notes that in *Shrimp 2023 Sunset*, the ITC found that raw material costs represent the largest component of the price of frozen warmwater shrimp, with the ratio of raw material costs to net sales ranging from 74.1 to 79.3 percent.[91] The petitioner states that the ITC also found in *Shrimp 2023 Sunset* that shrimp accounted for 96.5 percent of these raw material costs, and thus the cost of the raw shrimp input alone accounted for anywhere from 71.5 to 76.5 of the final sales value of the frozen product.[92] The petitioner contends that additional raw materials, processing costs, selling, general, and administrative expenses, and profit together accounted for less than 30 percent of the value of the final frozen processed product.[93]

5) *The significance and extent of the processes used to transform the upstream into the downstream articles*

The petitioner contends that the most basic processing needed to transform fresh warmwater shrimp to processed shrimp – freezing and deheading – is not extensive.[94] The petitioner states that processors use a variety of cleaning, weighing, and sorting equipment, as well as blast freezers, to further process frozen, shell-on shrimp, and may also peel and devein the shrimp.[95]

**Commerce's Position:**

We analyzed the criteria presented by the petitioner with respect to the ITC's domestic like product factors, as well as the five factors traditionally analyzed by the ITC in its semifinished

[86] *Id*. at 4.
[87] *Id*. at 4 and Exhibit I-4 (containing *Shrimp 2013 Preliminary* at 10).
[88] *Id*.
[89] *Id*. at 4 and Exhibit I-4 (containing *Shrimp 2023 Sunset* at 13-15).
[90] *Id*. at 4 and Exhibit I-4 (containing *Shrimp 2023 Sunset* at 13-15, III-19, and III-30).
[91] *Id.* at 4 and Exhibit I-4 (containing *Shrimp 2023 Sunset* at III-19).
[92] *Id.* at 4 and Exhibit I-4 (containing *Shrimp 2023 Sunset* at III-30).
[93] *Id.* at 4-5.
[94] *Id.* at 5.
[95] *Id.* at 5 and Exhibit I-4 (containing *Shrimp 2013 Preliminary* at 10).



Filed By: Zachary Hohenberger, Filed Date: 11/20/23 3:56 PM, Submission Status: Approved

products analysis. We note that the petitioner's domestic like product definition encompassing both fresh warmwater shrimp and frozen warmwater shrimp is consistent with the domestic like product defined by the ITC in past investigations of frozen warmwater shrimp.[96] Based on our analysis of the information submitted in the Petitions, we have determined that the domestic like product consists of frozen warmwater shrimp, as defined in the scope of the Petitions, as well as fresh warmwater shrimp.[97]

Furthermore, unless Commerce finds the petitioner's definition of the domestic like product to be inaccurate, we will adopt the domestic like product definition set forth in the Petitions.[98] We analyzed the information presented by the petitioner and have found that there is reason to conclude that fresh and frozen warmwater shrimp constitute a single domestic like product. This is consistent with Commerce's broad discretion to define and clarify the scope of an antidumping or countervailing duty investigation in a manner that reflects the intent of the petition.[99] Consequently, Commerce's discretion permits interpreting the Petitions in such a way as to best effectuate not only the intent of the Petitions, but the overall purpose of the antidumping and countervailing duty laws as well.[100]

**Agricultural Provision**

The Petitions on frozen warmwater shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam (Vietnam) were filed on behalf of processors of frozen warmwater shrimp, and were supported by harvesters of fresh warmwater shrimp. As discussed in the "Background" section above, to calculate industry support in investigations involving a processed agricultural product that is produced from a raw agricultural product, the Act considers an expansion of the definition of the domestic "industry." Specifically, the Act allows Commerce to consider the producers or growers of the raw agricultural product as part of the industry producing the processed agricultural product. In order for producers or harvesters to be considered part of the industry, the processed agricultural product must be (1) produced from the raw agricultural product through a single continuous line of production, and (2) there must be a substantial coincidence of economic interest between the producers or growers of the raw agricultural product and the processors of the processed agricultural product.[101] Relevant economic factors which are evidence of a substantial coincidence of economic interest may include "price, added

[96] *See* Petitions at Volume I (pages 2-5 and Exhibits I-2 through I-4 (containing *Shrimp 2004 Preliminary* at 13-14; *Shrimp 2004 Final* at 6; *Shrimp 2013 Preliminary* at 8-10; *Shrimp 2013 Final* at 9; and *Shrimp 2023 Sunset* at 14-15, III-19, and III-30)).

[97] *See* Attachment I – Scope of the Investigation, to this Checklist; *see also* Petitions at Volume I (pages 2-5 and 9-11, and Exhibits I-2 through I-4 (containing *Shrimp 2004 Preliminary* at 13-14; *Shrimp 2004 Final* at 6; *Shrimp 2013 Preliminary* at 8-10; and *Shrimp 2013 Final* at 9; *Shrimp 2023 Sunset* at 14-15, III-19, and III-30) and I-12 through I-13); Scope Amendment at Exhibit 1; and First General Issues Supplement at 3 and Exhibit 1.

[98] *See* Petitions at Volume I (pages 2-5 and Exhibits I-2 through I-4 (containing *Shrimp 2004 Preliminary* at 13-14; *Shrimp 2004 Final* at 6; *Shrimp 2013 Preliminary* at 8-10; *Shrimp 2013 Final* at 9; and *Shrimp 2023 Sunset* at 14-15, III-19, and III-30)).

[99] *See, e.g., Fujitsu Ltd. V. United States*, 36 F. Supp. 2d 394 (CIT 1999) (citing *Kern-Liebers USA, Inc. v. United States*, 19 C.I.T. 393, 396, 881 F. Supp. 618, 621 (1995) (citation omitted)); and *Initiation of Antidumping Duty Investigations: Spring Table Grapes from Chile and Mexico*, 66 FR 26831 (May 15, 2001).

[100] *See Notice of Final Determination of Sales at Less Than Fair Value: Freshwater Crawfish Tail Meat from the People's Republic of China*, 62 FR 41347, 42357 (August 1, 1997).

[101] *See* section 771(4)(E) of the Act.

# Tab 3

# P.R. 87

requirements pertaining to the service of documents in 19 CFR 351.303(f).[13]

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, limited to issues raised in the case and rebuttal briefs, must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce, within 30 days after the publication of this notice. Requests should contain the party's name, address, telephone number, the number of participants, whether any participant is a foreign national, and a list of the issues to be discussed. If a request for a hearing is made, Commerce intends to hold the hearing at a time and date to be determined. Parties should confirm by telephone the date, time, and location of the hearing two days before the scheduled date.

Unless the deadline is extended, Commerce intends to issue the final determination of this inquiry, including the results of its analysis of the issues raised in any written briefs, no later than 300 days from the date of initiation of the inquiry, pursuant to 19 CFR 351.226(e)(2). As such, the deadline to issue the final determination is currently March 27, 2024.

### Notification to Interested Parties

Commerce is issuing and publishing this affirmative preliminary determination of circumvention in accordance with sections 781(c) of the Act, 19 CFR 351.226(j), and 19 CFR 351.226(g)(1).

Dated: November 14, 2023.

**Abdelali Elouaradia,**

*Deputy Assistant Secretary for Enforcement and Compliance.*

### Appendix—List of Topics Discussed in the Preliminary Decision Memorandum

I. Summary
II. Background
III. Scope of the Orders
IV. Merchandise Subject to the Circumvention Inquiry
V. Statutory and Regulatory Framework
VI. Circumvention Analysis
VII. Preliminary Affirmative Determination of Circumvention
VIII. Recommendation

[FR Doc. 2023–25689 Filed 11–20–23; 8:45 am]

**BILLING CODE 3510–DS–P**

[13] *See Administrative Protective Order, Service, and Other Procedures in Antidumping and Countervailing Duty Proceedings; Final Rule,* 88 FR 67069 (September 29, 2023).

**DEPARTMENT OF COMMERCE**

**International Trade Administration**

**[C–331–806; C–533–921; C–560–843; C–552–838]**

## Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**DATES:** Applicable November 14, 2023.

**FOR FURTHER INFORMATION CONTACT:** Zachary Shaykin (Ecuador), Steven Seifert (India), Kelsie Hohenberger (Indonesia), and Adam Simons (Vietnam), AD/CVD Operations, Offices II, IV, V, and IX, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–2630, (202) 482–3350, (202) 482–2517, or (202) 482–6172, respectively.

**SUPPLEMENTARY INFORMATION:**

### The Petitions

On October 25, 2023, the U.S. Department of Commerce (Commerce) received countervailing duty (CVD) petitions concerning imports of frozen warmwater shrimp (shrimp) from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam (Vietnam) filed in proper form on behalf of the American Shrimp Processors Association (ASPA or the petitioner).[1] The CVD petitions were accompanied by antidumping duty (AD) petitions concerning imports of shrimp from Ecuador and Indonesia.[2]

On October 27, 2023, through November 9, 2023, Commerce requested supplemental information pertaining to certain aspects of the Petitions.[3] On October 26, 2023, the petitioner filed an amendment to the proposed scope.[4] On October 31, through November 13, 2023, the petitioner filed timely responses to these requests for additional information.[5]

In accordance with section 702(b)(1) of the Tariff Act of 1930, as amended (the Act), the petitioner alleges that the Government of Ecuador (GOE), Government of India (GOI), the

[1] *See* Petitioner's Letter, ''Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam,'' dated October 25, 2023 (Petitions).

[2] *Id.*

[3] *See* Commerce's Letters, ''Petition for the Imposition of Countervailing Duties on Imports of Frozen Warmwater Shrimp from Ecuador: Supplemental Questions,'' dated October 27, 2023; ''Petition for the Imposition of Countervailing Duties on Imports of Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Supplemental Questions, dated October 27, 2023; ''Petition for the Imposition of Countervailing Duties on Imports of Frozen Warmwater Shrimp from Indonesia: Supplemental Questions,'' dated October 27, 2023; ''Petition for the Imposition of Countervailing Duties on Imports of Frozen Warmwater Shrimp from India: Supplemental Questions,'' dated October 27, 2023; ''Petitions for the Imposition of Antidumping and Countervailing Duties on Imports of Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Supplemental Questions,'' dated October 30, 2023 (General Issues Supplemental Questionnaire); ''Petition for the Imposition of Countervailing Duties on Imports of Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Additional Supplemental Questions,'' dated October 31, 2023; ''Petition for the Imposition of Countervailing Duties on Imports of Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Additional Supplemental Questions,'' dated November 8, 2023; Memorandum, ''Phone Call with Counsel to the Petitioner,'' dated November 6, 2023 (November 6 Memorandum); and Memorandum, ''Phone Call with Counsel to the Petitioner,'' dated November 9, 2023.

[4] *See* Petitioner's Letter, ''Amendment to Petitions for the Imposition of Antidumping and Countervailing Duties on Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam,'' dated October 26, 2023 (Scope Amendment).

[5] *See* Petitioner's Letters, ''Countervailing Duty Investigation of Frozen Warmwater Shrimp from the Socialist Republic of Vietnam; Amendment to the Petition for the Imposition of Countervailing Duties on Frozen Warmwater Shrimp from Vietnam,'' dated October 31, 2023; ''Petition for the Imposition of Countervailing Duties on Frozen Warmwater Shrimp from Indonesia: Petition Supplemental Questions Response,'' dated October 31, 2023; ''Petition for the Imposition of Countervailing Duties on Warmwater Shrimp from India: Petition Supplemental Questions Response,'' dated October 31, 2023; ''Petition for the Imposition of Antidumping and Countervailing Duties on Imports of Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam: Petition Supplemental Questions Response,'' dated November 1, 2023 (First General Issues Supplement); ''Petition for the Imposition of Countervailing Duties on Frozen Warmwater Shrimp from Ecuador: Petition Supplemental Questions Response,'' dated November 1, 2023; ''Countervailing Duty Investigation of Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Second Amendment to the Petition for the Imposition of Countervailing Duties on Frozen Warmwater Shrimp from Vietnam,'' dated November 2, 2023; ''Petition for the Imposition of Antidumping and Countervailing Duties on Imports of Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam: Second Supplemental Questions Response,'' dated November 8, 2023 (Second General Issues Supplement); ''Countervailing Duty Investigation of Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Third Amendment to the Petition for the Imposition of Countervailing Duties on Frozen Warmwater Shrimp from Vietnam,'' dated November 9, 2023; and ''Petition for the Imposition of Antidumping and Countervailing Duties on Imports of Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam: Petition 3rd Supplemental Question Response,'' dated November 13, 2023 (Third General Issues Supplement).

Government of Indonesia (GIND), and the Government of Vietnam (GOV) (collectively, Governments) are providing countervailable subsidies, within the meaning of sections 701 and 771(5) of the Act, to producers of shrimp from Ecuador, India, Indonesia, and Vietnam, and that such imports are materially injuring, or threatening material injury to, the domestic industry producing shrimp in the United States. Consistent with section 702(b)(1) of the Act and 19 CFR 351.202(b), for those alleged programs on which we are initiating CVD investigations, the Petitions were accompanied by information reasonably available to the petitioner supporting its allegations.

Commerce finds that the petitioner filed the Petitions on behalf of the domestic industry because the petitioner is an interested party as defined in section 771(9)(E) of the Act.[6] Commerce also finds that the petitioner demonstrated sufficient industry support with respect to the initiation of the requested CVD investigations.[7]

**Periods of Investigation**

Because the Petitions were filed on October 25, 2023, the periods of investigation (POI) for Ecuador, India, Indonesia, and Vietnam are January 1, 2022, through December 31, 2022.[8]

**Scope of the Investigations**

The merchandise covered by these investigations is shrimp from Ecuador, India, Indonesia, and Vietnam. For a full description of the scope of these investigations, *see* the Appendix to this notice.

**Comments on the Scope of the Investigations**

On October 30, 2023, Commerce requested information and clarification from the petitioner regarding the proposed scope to ensure that the scope language in the Petitions is an accurate reflection of the products for which the domestic industry is seeking relief.[9] On October 26, 2023, and November 1, 2023, the petitioner revised the scope.[10] The description of merchandise covered by these investigations, as described in the appendix to this notice, reflects these revisions.

As discussed in the *Preamble* to Commerce's regulations, we are setting aside a period for interested parties to raise issues regarding product coverage (*i.e.,* scope).[11] Commerce will consider all comments received from interested parties and, if necessary, will consult with interested parties prior to the issuance of the preliminary determination. If scope comments include factual information, all such factual information should be limited to public information.[12] To facilitate preparation of its questionnaires, Commerce requests that all interested parties submit such comments by 5:00 p.m. Eastern Time (ET) on December 4, 2023, which is 20 calendar days from the signature date of this notice.[13] Any rebuttal comments, which may include factual information, must be filed by 5:00 p.m. ET on December 14, 2023, which is 10 calendar days from the initial comment deadline.

Commerce requests that any factual information that the parties consider relevant to the scope of the investigations be submitted during this time period. However, if a party subsequently finds that additional factual information pertaining to the scope of the investigations may be relevant, the party may contact Commerce and request permission to submit the additional information. All scope comments must also be filed simultaneously on the records of the concurrent AD and CVD investigations.

**Filing Requirements**

All submissions to Commerce must be filed electronically via Enforcement and Compliance's Antidumping Duty and Countervailing Duty Centralized Electronic Service System (ACCESS), unless an exception applies.[14] An electronically filed document must be received successfully in its entirety by the time and date it is due.

**Consultations**

Pursuant to sections 702(b)(4)(A)(i) and (ii) of the Act, Commerce notified the Governments of the receipt of the Petitions and provided an opportunity for consultations with respect to the Petitions.[15] Commerce held consultations with the GOI on November 13, 2023, the GIND on November 9, 2023, and the GOV on November 8, 2023.[16] The GOE did not request consultations.

**Determination of Industry Support for the Petitions**

Section 702(b)(1) of the Act requires that a petition be filed on behalf of the domestic industry. Section 702(c)(4)(A) of the Act provides that a petition meets this requirement if the domestic producers or workers who support the petition account for: (i) at least 25 percent of the total production of the domestic like product; and (ii) more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the petition. Moreover, section 702(c)(4)(D) of the Act provides that, if the petition does not establish support of domestic producers or workers accounting for more than 50 percent of the total production of the domestic like product, Commerce shall: (i) poll the industry or rely on other information in order to determine if there is support for the petition, as required by subparagraph (A); or (ii) determine industry support using a statistically valid sampling method to poll the ''industry.''

Section 771(4)(A) of the Act defines the ''industry'' as the producers as a whole of a domestic like product. In investigations involving processed agricultural products, the statute allows Commerce to also include growers or producers of the raw agricultural product within the definition of the domestic industry.[17] Thus, to determine

[6] *See* Petitions at Volume I (page 2).

[7] *See* ''Determination of Industry Support for the Petitions'' section, *infra.*

[8] *See* 19 CFR 351.204(b)(2).

[9] *See* General Issues Supplemental Questionnaire.

[10] *See* Scope Amendment at Exhibit 1; *see also* First General Issues Supplement at 3 and Exhibit 1.

[11] *See Antidumping Duties; Countervailing Duties*, 62 FR 27296, 27323 (May 19, 1997) (*Preamble*).

[12] *See* 19 CFR 351.102(b)(21) (defining ''factual information'').

[13] *See* 19 CFR 351.303(b)(1).

[14] *See Antidumping and Countervailing Duty Proceedings: Electronic Filing Procedures; Administrative Protective Order Procedures,* 76 FR 39263 (July 6, 2011); *see also Enforcement and Compliance; Change of Electronic Filing System Name,* 79 FR 69046 (November 20, 2014), for details of Commerce's electronic filing requirements, effective August 5, 2011. Information on using ACCESS can be found at *https://access.trade.gov/help.aspx* and a handbook can be found at *https://access.trade.gov/help/Handbook_on_Electronic_Filing_Procedures.pdf.*

[15] *See* Commerce's Letters, ''Countervailing Duty Petition on Frozen Warmwater Shrimp from India: Invitation for Consultations to discuss the Countervailing Duty Petition,'' dated October 26, 2023; ''Countervailing Duty Petition on Frozen Warmwater Shrimp from Ecuador: Invitation for Consultations to discuss the Countervailing Duty Petition,'' dated October 27, 2023; ''Countervailing Duty Petition on Frozen Warmwater Shrimp from Indonesia: Invitation for Consultations to discuss the Countervailing Duty Petition,'' dated October 27, 2023; and ''Countervailing Duty Petition on Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Invitation for Consultations to discuss the Countervailing Duty Petition,'' dated October 27, 2023.

[16] *See* Memoranda, ''Countervailing Duty Petition Regarding Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Consultations with the Government of Vietnam,'' dated November 8, 2023; ''Consultations with the Government of Indonesia on the Countervailing Duty Petition Regarding Frozen Warmwater Shrimp from Indonesia,'' dated November 9, 2023; and ''Consultations with Officials from the Government of India,'' dated November 13, 2023.

[17] *See* section 771(4)(E) of the Act. For a full discussion of this provision of the Act and Commerce's analysis, *see* Countervailing Duty

whether a petition has the requisite industry support, the statute directs Commerce to look to producers and workers who produce the domestic like product. The U.S. International Trade Commission (ITC), which is responsible for determining whether ''the domestic industry'' has been injured, must also determine what constitutes a domestic like product in order to define the industry. While both Commerce and the ITC apply the same statutory definition regarding the domestic like product,[18] they do so for different purposes and pursuant to a separate and distinct authority. In addition, Commerce's determination is subject to limitations of time and information. Although this may result in different definitions of the like product, such differences do not render the decision of either agency contrary to law.[19]

Section 771(10) of the Act defines the domestic like product as ''a product which is like, or in the absence of like, most similar in characteristics and uses with, the article subject to an investigation under this title.'' Thus, the reference point from which the domestic like product analysis begins is ''the article subject to an investigation'' (*i.e.,* the class or kind of merchandise to be investigated, which normally will be the scope as defined in the petition).

With regard to the domestic like product, the petitioner does not offer a definition of the domestic like product distinct from the scope of the investigations.[20] Based on our analysis of the information submitted on the record, we have determined that shrimp, as described in the domestic like product definition set forth in the Petitions, constitutes a single domestic like product, and we have analyzed industry support in terms of that domestic like product.[21]

In determining whether the petitioner has standing under section 702(c)(4)(A) of the Act, we considered the industry support data contained in the Petitions with reference to the domestic like product as defined in the ''Scope of the Investigations,'' in the appendix to this notice.

To establish industry support for fresh shrimp and frozen shrimp, the petitioner provided the 2022 production of ASPA members, as well as the 2022 production of frozen shrimp for three additional processors that support the Petitions.[22] In addition, the petitioner provided letters of support from over 800 shrimp fishermen, expressing support for the Petitions and establishing each vessel's 2022 production (harvested quantity) of fresh shrimp.[23] On October 27, 2023, and November 6, 9, and 14, 2023, we received submissions from the Ad Hoc Shrimp Trade Action Committee (AHSTAC) providing letters of support from six additional processors and 49 additional shrimp fishermen.[24]

To establish total production of fresh shrimp, the petitioner relied on 2022 U.S. commercial landings data for fresh shrimp reported for the Gulf and South Atlantic regions in 2022 reported by the National Oceanic and Atmospheric Administration's (NOAA's) National Marine Fisheries Service (NFMS) Fisheries One Stop Shop (FOSS) database and added an estimate for farmed shrimp based on information from the ITC's publication for *Shrimp 2023 Sunset* to arrive at total U.S. production of fresh shrimp.[25] Because data on the production of frozen shrimp were not available from NOAA, to establish total production of frozen shrimp, the petitioner relied on the same NOAA NFMS FOSS data on U.S. commercial landings in the Gulf and South Atlantic regions, as well as the same farmed shrimp estimate from the ITC's 2023 sunset review, and added total 2022 U.S. imports of fresh shrimp, as reported in official import statistics, to account for imported fresh shrimp that is further processed into frozen shrimp in the United States.[26] To establish total production of fresh shrimp and frozen shrimp by the U.S. shrimp industry, the petitioner combined the total 2022 U.S. production of fresh shrimp with the total 2022 U.S. production of processed shrimp.[27] To establish industry support, the petitioner provided three separate calculations comparing the supporters' production of frozen shrimp, fresh shrimp, and combined frozen and fresh shrimp to the respective totals for the entire U.S. industry.[28] We relied on data provided by the petitioner and AHSTAC for purposes of measuring industry support.[29]

Our review of the data provided in the Petitions, the First General Issues Supplement, the Second General Issues Supplement, the AHSTAC Letters, the Third General Issues Supplement, and other information readily available to Commerce indicates that the petitioner has established industry support for the Petitions.[30] First, the Petitions established support from domestic producers (or workers) accounting for more than 50 percent of the total production of the domestic like product and, as such, Commerce is not required to take further action in order to

---

Investigation Initiation Checklists: Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam (Country-Specific CVD Initiation Checklists), at Attachment II, Analysis of Industry Support for the Antidumping and Countervailing Duty Petitions Covering Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam (Attachment II). These checklists are dated concurrently with this notice and are on file electronically via ACCESS.

[18] *See* section 771(10) of the Act.

[19] *See USEC, Inc.* v. *United States,* 132 F. Supp. 2d 1, 8 (CIT 2001) (citing *Algoma Steel Corp., Ltd.* v. *United States,* 688 F. Supp. 639, 644 (CIT 1988), *aff'd* 865 F.2d 240 (Fed. Cir. 1989)).

[20] *See* Petitions at Volume I (pages 2–5 and Exhibits 1–2 through I–4 (containing *Certain Frozen or Canned Warmwater Shrimp and Prawns from Brazil, China, Ecuador, India, Thailand, and Vietnam,* Inv. No. 731–TA–1063–1068 (Preliminary), USITC Pub. 3672 (February 2004) at 13–14; *Certain Frozen or Canned Warmwater Shrimp and Prawns from Brazil, China, Ecuador, India, Thailand, and Vietnam,* Inv. No. 731–TA–1063–1068, USITC Pub. 3478 (January 2005) at 6; *Frozen Warmwater Shrimp From China, Ecuador, India, Indonesia, Malaysia, Thailand, and Vietnam,* Inv. Nos. 701–TA–491–497 (Preliminary), USITC Pub. 4830 (February 2013) at 8–10; *Frozen Warmwater Shrimp from China, Ecuador, India, Malaysia, and Vietnam,* Inv. Nos. 701–TA–491–493, 495, and 497 (Final), USITC Pub. 4429 (October 2013) at 9; and *Frozen Warmwater Shrimp from China, India, Thailand, and Vietnam,* Inv. No. 731–TA–1064 and 1066–1068, USITC Pub. 5432 (June 2023) (*Shrimp 2023 Sunset*) at 14–15, I–43, I–44, III–19, and III–30).

[21] For a discussion of the domestic like product analysis as applied to these cases and information regarding industry support, *see* Country-Specific CVD Initiation Checklists at Attachment II.

[22] See Petitions at Volume I (page 7–8 and Exhibits I–9 and I–10); *see also* First General Issues Supplement at Exhibits 4 and 10–13; and Second General Issues Supplement at 2–4 and Exhibits 1 and 4.

[23] *See* Petitions at Volume I (pages 7–8 and Exhibit I–11); *see also* First General Issues Supplement at 7–8 and Exhibits 10–12; and Second General Issues Supplement at 3–4 and Exhibits 1 and 4.

[24] *See* AHSTAC's Letters, ''Additional Support for the Petitions,'' dated October 27, 2023; ''Additional Support for the Petitions,'' dated November 6, 2023; ''Further Additional Support for the Petitions,'' dated November 6, 2023; ''Additional Support for Petitions,'' dated November 9, 2023; and ''Additional Support for Petitions,'' dated November 14, 2023 (collectively, AHSTAC Letters).

[25] *See* Petitions at Volume I (page 6 and Exhibit I–4 (containing *Shrimp 2023 Sunset* at IV–31 and IV–32) and I–8); *see also* First General Issues Supplement at 5–6 and Exhibits 5 and 9; and Second General Issues Supplement at Exhibit 1.

[26] *See* Petitions at Volume I (pages 6–8 and Exhibits I–4, I–7, and I–8); *see also* First General Issues Supplement at Exhibits 5–8; and Second General Issues Supplement at 2 and Exhibits 1–3.

[27] *See* Petitions at Volume I (page 8); *see also* First General Issues Supplement at Exhibit 8; and Second General Issues Supplement at 2 and Exhibit 1.

[28] *See* Petitions at Volume I (page 8); *see also* First General Issues Supplement at Exhibit 8; and Second General Issues Supplement at 2–4 and Exhibit 1.

[29] *See* Petitions at Volume I (pages 6–8 and Exhibits I–4 (containing *Shrimp 2023 Sunset* at IV–31 and IV–32) and I–5 through I–11); *see also* First General Issues Supplement at 3–9 and Exhibits 2–13; Second General Issues Supplement at 2–4 and Exhibits 1–4; and AHSTAC Letters. For further discussion, *see* Attachment II of the Country-Specific CVD Initiation Checklists.

[30] *See* Attachment II of the Country-Specific CVD Initiation Checklists.

evaluate industry support (*e.g.*, polling).[31] Second, the domestic producers (or workers) have met the statutory criteria for industry support under section 702(c)(4)(A)(i) of the Act because the domestic producers (or workers) who support the Petitions account for at least 25 percent of the total production of the domestic like product.[32] Finally, the domestic producers (or workers) have met the statutory criteria for industry support under section 702(c)(4)(A)(ii) of the Act because the domestic producers (or workers) who support the Petitions account for more than 50 percent of the production of the domestic like product produced by that portion of the industry expressing support for, or opposition to, the Petitions.[33] Accordingly, Commerce determines that the Petitions were filed on behalf of the domestic industry within the meaning of section 702(b)(1) of the Act.[34]

**Injury Test**

Because Ecuador, India, Indonesia, and Vietnam are ''Subsidies Agreement Countries'' within the meaning of section 701(b) of the Act, section 701(a)(2) of the Act applies to these investigations. Accordingly, the ITC must determine whether imports of the subject merchandise from Ecuador, India, Indonesia, and/or Vietnam materially injure, or threaten material injury to, a U.S. industry.

**Allegations and Evidence of Material Injury and Causation**

The petitioner alleges that imports of the subject merchandise are benefitting from countervailable subsidies and that such imports are causing, or threaten to cause, material injury to the U.S. industry producing the domestic like product. In addition, the petitioner alleges that subject imports from India, Indonesia, and Vietnam exceed the negligibility threshold provided for under section 771(24)(A) of the Act.[35] In CVD petitions, section 771(24)(B) of the Act provides that imports of subject merchandise from developing and least-developed countries must exceed the negligibility threshold of four percent. The petitioner also demonstrates that subject imports from Ecuador, which has been designated as a developing country under section 771(36)(A) of the Act,[36] exceed the negligibility threshold of four percent.[37]

The petitioner contends that the industry's injured condition is illustrated by the significant volume of subject imports; declining market share; underselling and price depression and/or suppression; lost sales and revenues; inventory overhang; and negative impact on the production, shipments, and financial performance.[38] We assessed the allegations and supporting evidence regarding material injury, threat of material injury, causation, as well as negligibility, and we have determined that these allegations are properly supported by adequate evidence and meet the statutory requirements for initiation.[39]

**Initiation of CVD Investigations**

Based upon the examination of the Petitions and supplemental responses, we find that they meet the requirements of section 702 of the Act. Therefore, we are initiating CVD investigations to determine whether imports of shrimp from Ecuador, India, Indonesia, and Vietnam benefit from countervailable subsidies conferred by the GOE, GOI, GIND, and GOV. In accordance with section 703(b)(1) of the Act and 19 CFR 351.205(b)(1), unless postponed, we will make our preliminary determinations no later than 65 days after the date of these initiations.

**Ecuador**

Based on our review of the Petitions, we find that there is sufficient information to initiate a CVD investigation on 15 of the 22 programs alleged by the petitioner. For a full discussion of the basis for our decision to initiate on each program, *see* the Ecuador CVD Initiation Checklist. A public version of the initiation checklist for this investigation is available on ACCESS.

**India**

Based on our review of the Petitions, we find that there is sufficient information to initiate a CVD investigation on all 19 of the programs alleged by the petitioner. For a full discussion of the basis for our decision to initiate on each program, *see* the India CVD Initiation Checklist. A public version of the initiation checklist for this investigation is available on ACCESS.

**Indonesia**

Based on our review of the Petitions, we find that there is sufficient information to initiate a CVD investigation on 15 of the 16 programs alleged by the petitioner. For a full discussion of the basis for our decision to initiate on each program, *see* the Indonesia CVD Initiation Checklist. A public version of the initiation checklist for this investigation is available on ACCESS.

**Vietnam**

Based on our review of the Petitions, we find that there is sufficient information to initiate a CVD investigation on all 40 of the programs alleged by the petitioner. For a full discussion of the basis for our decision to initiate on each program, *see* the Vietnam CVD Initiation Checklist. A public version of the initiation checklist for this investigation is available on ACCESS.

**Respondent Selection**

The petitioner identified 227 companies in Ecuador, 675 companies in India, 276 companies in Indonesia, and 1046 companies in Vietnam as producers and/or exporters of shrimp.[40] Commerce intends to follow its standard practice in CVD investigations and calculate company-specific subsidy rates in these investigations. In the event that Commerce determines that the number of companies is large and it cannot individually examine each company based upon Commerce's resources, where appropriate, Commerce intends to select mandatory respondents based on U.S. Customs and Border Protection (CBP) data for U.S. imports of shrimp from Ecuador, India, Indonesia, and Vietnam during the POI under the appropriate Harmonized Tariff Schedule of the United States subheadings listed in the ''Scope of the Investigations'' in the Appendix.

On November 13, 2023, Commerce released CBP data on U.S. imports of shrimp from Ecuador, India, Indonesia, and Vietnam, under administrative protective order (APO) to all parties with access to information protected by APO and indicated that interested parties wishing to comment on the CBP data and/or respondent selection must do so within three business days after

[31] *Id.; see also* section 702(c)(4)(D) of the Act.

[32] *See* Attachment II of the Country-Specific CVD Initiation Checklists.

[33] *Id.*

[34] *Id.*

[35] *See* Petitions at Volume I (page 15 and Exhibit I–14).

[36] *See Designations of Developing and Least-Developed Countries under the Countervailing Duty Law,* 85 FR 7613, 7615 (February 10, 2020).

[37] *See* Petitions at Volume I (page 15 and Exhibit I–14).

[38] *Id.* at Volume I (pages 14–30 and Exhibits I–4, I–8, I–9, I–14, I–17, and I–18); *see also* Second General Issues Supplement at 5 and Exhibit 5.

[39] *See* Country-Specific CVD Initiation Checklists at Attachment III, Analysis of Allegations and Evidence of Material Injury and Causation for the Antidumping and Countervailing Duty Petitions Covering Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam.

[40] *See* Petitions at Volume I at 12 (Exhibit I–16).

the publication date of the notice of initiation of these investigations.[41] Commerce will not accept rebuttal comments regarding the CBP data or respondent selection.

**Distribution of Copies of the Petitions**

In accordance with section 702(b)(4)(A) of the Act and 19 CFR 351.202(f), a copy of the public version of the Petitions has been provided to the GOE, GOI, GIND, and GOV via ACCESS. To the extent practicable, we will attempt to provide a copy of the public version of the Petitions to each exporter named in the Petitions, as provided under 19 CFR 351.203(c)(2).

**ITC Notification**

Commerce will notify the ITC of its initiation, as required by section 702(d) of the Act.

**Preliminary Determination by the ITC**

The ITC will preliminarily determine, within 45 days after the date on which the Petitions was filed, whether there is a reasonable indication that imports of shrimp from Ecuador, India, Indonesia, and/or Vietnam are materially injuring, or threatening material injury to, a U.S. industry.[42] A negative ITC determination for any country will result in the investigation being terminated with respect to that country.[43] Otherwise, these CVD investigations will proceed according to statutory and regulatory time limits.

**Submission of Factual Information**

Factual information is defined in 19 CFR 351.102(b)(21) as: (i) evidence submitted in response to questionnaires; (ii) evidence submitted in support of allegations; (iii) publicly available information to value factors under 19 CFR 351.408(c) or to measure the adequacy of remuneration under 19 CFR 351.511(a)(2); (iv) evidence placed on the record by Commerce; and (v) evidence other than factual information described in (i)–(iv). Section 351.301(b) of Commerce's regulations requires any party, when submitting factual information, to specify under which subsection of 19 CFR 351.102(b)(21) the information is being submitted[44] and, if the information is submitted to rebut, clarify, or correct factual information already on the record, to provide an explanation identifying the information already on the record that the factual information seeks to rebut, clarify, or correct.[45] Time limits for the submission of factual information are addressed in 19 CFR 351.301, which provides specific time limits based on the type of factual information being submitted. Interested parties should review the regulations prior to submitting factual information in these investigations.

**Extensions of Time Limits**

Parties may request an extension of time limits before the expiration of a time limit established under 19 CFR 351.301, or as otherwise specified by Commerce. In general, an extension request will be considered untimely if it is filed after the expiration of the time limit established under 19 CFR 351.301, or as otherwise specified by Commerce.[46] For submissions that are due from multiple parties simultaneously, an extension request will be considered untimely if it is filed after 10:00 a.m. ET on the due date. Under certain circumstances, we may elect to specify a different time limit by which extension requests will be considered untimely for submissions which are due from multiple parties simultaneously. In such a case, Commerce will inform parties in a letter or memorandum of the deadline (including a specified time) by which extension requests must be filed to be considered timely. An extension request must be made in a separate, standalone submission; under limited circumstances we will grant untimely filed requests for the extension of time limits. Parties should review Commerce's regulations concerning the extension of time limits and the *Time Limits Final Rule* prior to submitting factual information in these investigations.[47]

**Certification Requirements**

Any party submitting factual information in an AD or CVD proceeding must certify to the accuracy and completeness of that information.[48] Parties must use the certification formats provided in 19 CFR 351.303(g).[49] Commerce intends to reject factual submissions if the submitting party does not comply with the applicable certification requirements.

**Notification to Interested Parties**

Interested parties must submit applications for disclosure under administrative protective order in accordance with 19 CFR 351.305. Parties wishing to participate in these investigations should ensure that they meet the requirements of 19 CFR 351.103(d) (*e.g.,* by filing the required letters of appearance). Note that Commerce has modified its regulations to make permanent certain changes to its service procedures that were adopted on a temporary basis due to COVID–19, as well as to make additional clarifications and corrections to its AD/CVD regulations.[50]

This notice is issued and published pursuant to sections 702 and 777(i) of the Act, and 19 CFR 351.203(c).

Dated: November 14, 2023.

**Abdelali Elouaradia,**

*Deputy Assistant Secretary for Enforcement and Compliance.*

**Appendix—Scope of the Investigations**

The scope of these investigations includes certain frozen warmwater shrimp and prawns whether wild-caught (ocean harvested) or farm-raised (produced by aquaculture), head-on or head-off, shell-on or peeled, tail-on or tail-off, deveined or not deveined, cooked or raw, or otherwise processed in frozen form. ''Tails'' in this context means the tail fan, which includes the telson and the uropods.

The frozen warmwater shrimp and prawn products included in the scope, regardless of definitions in the Harmonized Tariff Schedule of the United States (HTSUS), are products which are processed from warmwater shrimp and prawns through freezing and which are sold in any count size.

The products described above may be processed from any species of warmwater shrimp and prawns. Warmwater shrimp and prawns are generally classified in, but are not limited to, the *Penaeidae* family. Some examples of the farmed and wild-caught warmwater species include, but are not

[41] *See* Memoranda, ''Frozen Warmwater Shrimp from Ecuador Countervailing Duty Petition: Release of U.S. Customs and Border Protection Entry Data,'' dated November 13, 2023; ''Frozen Warmwater Shrimp from India Countervailing Duty Petition: Release of U.S. Customs and Border Protection Entry Data,'' dated November 13, 2023; ''Frozen Warmwater Shrimp from Indonesia Countervailing Duty Petition: Release of U.S. Customs and Border Protection Entry Data,'' dated November 13, 2023; and ''Frozen Warmwater Shrimp from the Socialist Republic of Vietnam Countervailing Duty Petition: Release of U.S. Customs and Border Protection Entry Data,'' dated November 13, 2023.

[42] *See* section 703(a)(1) of the Act.

[43] *Id.*

[44] *See* 19 CFR 351.301(b).

[45] *See* 19 CFR 351.301(b)(2).

[46] *See* 19 CFR 351.302.

[47] *See* 19 CFR 351.301; *see also Extension of Time Limits; Final Rule,* 78 FR 57790 (September 20, 2013) (*Time Limits Final Rule*), available at *https://www.gpo.gov/fdsys/pkg/FR-2013-09-20/html/2013-22853.htm.*

[48] *See* section 782(b) of the Act.

[49] *See Certification of Factual Information to Import Administration During Antidumping and Countervailing Duty Proceedings,* 78 FR 42678 (July 17, 2013) (*Final Rule*); *see also* frequently asked questions regarding the *Final Rule,* available at *https://enforcement.trade.gov/tlei/notices/factual_info_final_rule_FAQ_07172013.pdf.*

[50] Effective October 30, 2023, these changes apply to all AD/CVD proceedings that are ongoing on the effective date and all AD/CVD proceedings initiated on or after the effective date. *See Administrative Protective Order, Service, and Other Procedures in Antidumping and Countervailing Duty Proceedings,* 88 FR 67069 (September 29, 2023).

limited to, whiteleg shrimp (*Penaeus vannemei*), banana prawn (*Penaeus merguiensis*), fleshy prawn (*Penaeus chinensis*), giant river prawn (*Macrobrachium rosenbergii*), giant tiger prawn (*Penaeus monodon*), redspotted shrimp (*Penaeus brasiliensis*), southern brown shrimp (*Penaeus subtilis*), southern pink shrimp (*Penaeus notialis*), southern rough shrimp (*Trachypenaeus curvirostris*), southern white shrimp (*Penaeus schmitti*), blue shrimp (*Penaeus stylirostris*), western white shrimp (*Penaeus occidentalis*), and Indian white prawn (*Penaeus indicus*).

Frozen shrimp and prawns that are packed with marinade, spices or sauce are included in the scope. In addition, food preparations, which are not ''prepared meals,'' that contain more than 20 percent by weight of shrimp or prawn are also included in the scope.

Excluded from the scope are: (1) breaded shrimp and prawns (HTSUS subheading 1605.21.1020); (2) shrimp and prawns generally classified in the *Pandalidae* family and commonly referred to as coldwater shrimp, in any state of processing; (3) fresh shrimp and prawns whether shell-on or peeled (HTSUS subheadings 0306.36.0020 and 0306.36.0040); (4) shrimp and prawns in prepared meals (HTSUS subheadings 1605.21.0500 and 1605.29.0500); (5) dried shrimp and prawns; (6) canned warmwater shrimp and prawns (HTSUS subheading 1605.29.1040); and (7) certain battered shrimp. Battered shrimp is a shrimp-based product: (1) that is produced from fresh (or thawed-from-frozen) and peeled shrimp; (2) to which a ''dusting'' layer of rice or wheat flour of at least 95 percent purity has been applied; (3) with the entire surface of the shrimp flesh thoroughly and evenly coated with the flour; (4) with the non-shrimp content of the end product constituting between four and ten percent of the product's total weight after being dusted, but prior to being frozen; and (5) that is subjected to individually quick frozen (IQF) freezing immediately after application of the dusting layer. When dusted in accordance with the definition of dusting above, the battered shrimp product is also coated with a wet viscous layer containing egg and/or milk, and par-fried.

The products covered by the scope are currently classified under the following HTSUS subheadings: 0306.17.0004, 0306.17.0005, 0306.17.0007, 0306.17.0008, 0306.17.0010, 0306.17.0011, 0306.17.0013, 0306.17.0014, 0306.17.0016, 0306.17.0017, 0306.17.0019, 0306.17.0020, 0306.17.0022, 0306.17.0023, 0306.17.0025, 0306.17.0026, 0306.17.0028, 0306.17.0029, 0306.17.0041, 0306.17.0042, 1605.21.1030, and 1605.29.1010. These HTSUS subheadings are provided for convenience and for customs purposes only and are not dispositive, but rather the written description of the scope is dispositive.

[FR Doc. 2023–25735 Filed 11–20–23; 8:45 am]

BILLING CODE 3510–DS–P

**DEPARTMENT OF COMMERCE**

**National Oceanic and Atmospheric Administration**

**[RTID 0648–XD506]**

## Takes of Marine Mammals Incidental to Specified Activities; Taking Marine Mammals Incidental to a Geophysical Survey in the Ross Sea, Antarctica

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Notice; issuance of renewal incidental harassment authorization.

**SUMMARY:** In accordance with the regulations implementing the Marine Mammal Protection Act (MMPA), as amended, notification is hereby given that NMFS has issued a renewal incidental harassment authorization (IHA) to the United States National Science Foundation (NSF) to incidentally harass marine mammals incidental to a geophysical survey in the Ross Sea, Antarctica.

**DATES:** This renewal IHA is valid from December 15, 2023 through December 14, 2024.

**ADDRESSES:** Electronic copies of the original application, Renewal request, and supporting documents (including NMFS **Federal Register** notices of the original proposed and final authorizations, and the previous IHA), as well as a list of the references cited in this document, may be obtained online at: *https://www.fisheries.noaa.gov/action/incidental-take-authorization-national-science-foundation-office-polar-programs-geophysical.* In case of problems accessing these documents, please call the contact listed below (see **FOR FURTHER INFORMATION CONTACT**).

**FOR FURTHER INFORMATION CONTACT:** Jenna Harlacher, Office of Protected Resources, NMFS, (301) 427–8401.

**SUPPLEMENTARY INFORMATION:**

## Background

The Marine Mammal Protection Act (MMPA) prohibits the ''take'' of marine mammals, with certain exceptions. Sections 101(a)(5)(A) and (D) of the MMPA (16 U.S.C. 1361 *et seq.*) direct the Secretary of Commerce (as delegated to NMFS) to allow, upon request, the incidental, but not intentional, taking of small numbers of marine mammals by U.S. citizens who engage in a specified activity (other than commercial fishing) within a specified geographical region if certain findings are made and either regulations are promulgated or, if the taking is limited to harassment, an incidental harassment authorization is issued.

Authorization for incidental takings shall be granted if NMFS finds that the taking will have a negligible impact on the species or stock(s) and will not have an unmitigable adverse impact on the availability of the species or stock(s) for taking for subsistence uses (where relevant). Further, NMFS must prescribe the permissible methods of taking and other ''means of effecting the least practicable adverse impact'' on the affected species or stocks and their habitat, paying particular attention to rookeries, mating grounds, and areas of similar significance, and on the availability of such species or stocks for taking for certain subsistence uses (referred to here as ''mitigation measures''). NMFS must also prescribe requirements pertaining to monitoring and reporting of such takings. The definition of key terms such as ''take,'' ''harassment,'' and ''negligible impact'' can be found in the MMPA and NMFS's implementing regulations (see 16 U.S.C. 1362; 50 CFR 216.103).

NMFS' regulations implementing the MMPA at 50 CFR 216.107(e) indicate that IHAs may be renewed for additional periods of time not to exceed 1 year for each reauthorization. In the notice of proposed IHA for the initial IHA, NMFS described the circumstances under which we would consider issuing a renewal for this activity, and requested public comment on a potential renewal under those circumstances. Specifically, on a case-by-case basis, NMFS may issue a one-time 1-year renewal IHA following notice to the public providing an additional 15 days for public comments when (1) up to another year of identical, or nearly identical, activities as described in the Detailed Description of Specified Activities section of the initial IHA issuance notice is planned or (2) the activities as described in the Description of the Specified Activities and Anticipated Impacts section of the initial IHA issuance notice would not be completed by the time the initial IHA expires and a renewal would allow for completion of the activities beyond that described in the **DATES** section of the notice of issuance of the initial IHA, provided all of the following conditions are met:

1. A request for renewal is received no later than 60 days prior to the needed renewal IHA effective date (recognizing that the renewal IHA expiration date cannot extend beyond 1 year from expiration of the initial IHA).

2. The request for renewal must include the following:

# Tab 4

# P.R. 95

# C.R. 48

Barcode:4475955-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
~~**Business Proprietary**~~
E&C/OIV: ZS
**Public Version**

December 7, 2023

**MEMORANDUM TO:** James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**THROUGH:** Eric B. Greynolds EBG
Director, Office IV
Antidumping and Countervailing Duty Operations

**FROM:** Zachary Shaykin
International Trade Compliance Analyst, Office IV
Antidumping and Countervailing Duty Operations

**RE:** Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Respondent Selection

---

## I. SUMMARY

For the reasons detailed below, we recommend selecting, in alphabetical order, Industrial Pesquera Santa Priscila S.A. (Santa Priscila) and Sociedad Nacional de Galápagos C.A. (SONGA), as the mandatory respondents in this countervailing duty (CVD) investigation.

## II. BACKGROUND

On October 25, 2023, the U.S. Department of Commerce (Commerce) received a CVD petition concerning imports of frozen warmwater shrimp (shrimp) from Ecuador, filed on behalf of the American Shrimp Processors Association.[1] The period of investigation (POI) is January 1, 2022, through December 31, 2022.

---

[1] *See* Petitioner's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam," dated October 25, 2023, at Volume IV (Petition).

Filed By: Zachary Shaykin, Filed Date: 12/8/23 10:12 AM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

On November 14, 2023, Commerce initiated a CVD investigation of shrimp from Ecuador.[2] In the "Respondent Selection" section of the *Initiation Notice*, Commerce stated that, if necessary, it intended to select respondents based on U.S. Customs and Border Protection (CBP) data for entries of shrimp from Ecuador made under the Harmonized Tariff Schedule of the United States (HTSUS) subheadings 0306.17.0004, 0306.17.0005, 0306.17.0007, 0306.17.0008, 0306.17.0010, 0306.17.0011, 0306.17.0013, 0306.17.0014, 0306.17.0016, 0306.17.0017, 0306.17.0019, 0306.17.0020, 0306.17.0022, 0306.17.0023, 0306.17.0025, 0306.17.0026, 0306.17.0028, 0306.17.0029, 0306.17.0041, 0306.17.0042, 1605.21.1030, and 1605.29.1010 during the POI.[3]

Accordingly, on November 13, 2023, Commerce released the CBP data to all interested parties under an administrative protective order and requested comments regarding the data and respondent selection.[4]

On December 1, 2023, we received comments on behalf of Santa Priscila and SONGA, requesting that Commerce select Santa Priscila and SONGA as mandatory respondents based on data compiled and maintained by the National Chamber of Aquaculture of Ecuador (NCA).[5]

## III. DISCUSSION OF ISSUES

### Issue 1: Limiting Examination to a Reasonable Number of Companies

<u>Applicable Statutory Provision</u>

Section 777A(e)(1) of the Tariff Act of 1930, as amended (the Act), directs Commerce to determine an individual countervailing subsidy rate for each known exporter or producer of the subject merchandise. Commerce, however, may limit its examination to a reasonable number of exporters or producers under section 777A(e)(2) of the Act and 19 CFR 351.204(c)(2), if it determines that it is not practicable to determine individual countervailable subsidy rates because of the large number of exporters or producers involved in the investigation.

*Santa Priscila and SONGA's Comments*[6]

- Commerce should not depart from its usual respondent selection methodology, and thus, should select the largest exporters, by volume of entries of subject merchandise, for individual examination.

---

[2] *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 88 FR 81053 (November 23, 2023) (*Initiation Notice*).
[3] *Id.*, 88 FR at 81058.
[4] *See* Memorandum, "Release of U.S. Customs and Border Protection Entry Data," dated November 13, 2023 (CBP Data Memorandum).
[5] *See* Industrial Pesquera and SONGA's Letter, "Respondent Selection Comments," dated December 1, 2023 (CBP Data Comments), at Attachment.
[6] *See* CBP Data Comments at 2.

Analysis

The Petition identified 227 exporters or producers of shrimp from Ecuador,[7] and the CBP data indicate there are 151[8] companies attributable to entries during the POI under the HTSUS subheadings 0306.17.0004, 0306.17.0005, 0306.17.0007, 0306.17.0008, 0306.17.0010, 0306.17.0011, 0306.17.0013, 0306.17.0014, 0306.17.0016, 0306.17.0017, 0306.17.0019, 0306.17.0020, 0306.17.0022, 0306.17.0023, 0306.17.0025, 0306.17.0026, 0306.17.0028, 0306.17.0029, 0306.17.0041, 0306.17.0042, 1605.21.1030, and 1605.29.1010.

Ideally, in an investigation, Commerce would examine all known exporters and producers. However, in instances where Commerce must limit its examination due to the large number of potential respondents relative to its resource constraints, Commerce will examine as many exporters and producers as is practicable, consistent with its statutory obligation.

While section 777A(e)(2) of the Act does not define a "large number of exporters or producers," we find that the number of exporters and producers included in the Petition constitutes a large number. Accordingly, we conclude that it would not be practicable in this investigation to examine each known exporter or producer individually and determine an individual net countervailable subsidy rate for each. Examining all known exporters or producers would require significant resources for Commerce to analyze each company's corporate structure, financial records, and participation in the alleged subsidy programs on which Commerce has initiated an investigation. In addition, Commerce must examine the same categories of information for companies determined during the course of this investigation to be "cross-owned" with the respondents investigated. Such cross-owned companies can include the respondents' input suppliers and parent companies, for example. Moreover, Commerce must solicit and analyze information from the Government of Ecuador during the course of the CVD investigation, further limiting Commerce's available resources to select additional company respondents.

In addition to this investigation, Antidumping Duty (AD)/CVD Operations Office IV, the office to which this investigation is assigned, is conducting numerous concurrent AD and CVD

[7] *See* Petition, at relevant volume or exhibit number.
[8] *See* CBP Data Memorandum at Attachment. In arriving at this number, consistent with Commerce's practice, we treated companies with minor variations in the spelling of their names as the same entity.

proceedings.[9] Further, because this is an investigation, verification will be mandatory.[10] The number and complexity of the allegations in this investigation, combined with overlapping statutory deadlines of other AD and CVD proceedings, as well as Office IV's additional workload, place a significant constraint on the number of analysts that can be assigned to this case and, thus, limit the number of respondents Commerce can reasonably examine. Moreover, because of the significant workload throughout Enforcement and Compliance, Office IV does not anticipate receiving any additional resources to devote to this investigation.

In light of the large number of known exporters or producers of shrimp from Ecuador, Commerce's current resource constraints and practical considerations outlined above, and after careful consideration, we find that it is not practicable to individually examine all known exporters or producers of shrimp from Ecuador as directed by section 777A(e)(1) of the Act.

<u>Recommendation</u>

For the reasons discussed above, we recommend limiting Commerce's examination of respondents in this investigation to a reasonable number of exporters or producers, consistent with section 777A(e)(2) of the Act and 19 CFR 351.204(c)(2).

☒ ☐

_________ _________

Agree Disagree

[9] Office IV is currently conducting numerous concurrent and complex investigations and administrative reviews, including, but not limited to, for example the following cases: Softwood Lumber from Canada (AD), Welded Stainless Steel Pressure Pipe from Vietnam (AD), Copper Pipe and Tube from Vietnam (AD), Wind Towers from China (AD), Raw Honey from Argentina (AD), Raw Honey from Vietnam (AD), Olives from Spain (AD), Brass Rods from the Republic of Korea (Korea)(AD), Wooden Bedroom Furniture from the People's Republic of China (China)(AD), Steel Nails from the Sultanate of Oman (Oman)(AD), Polyethylene Terephthalate (PET) Resin from Oman (AD), Welded Carbon Steel Pipe & Tube from the Republic of Turkey (Turkey)(AD), Xanthan Gum from China (AD), Crystalline Silicon Photovoltaic Cells, Whether or not Assembled Into Modules, from China (AD), Common Alloy Aluminum Sheet from the Federal Republic of Germany (AD), Light-walled Rectangular Pipe and Tube from China (AD), Steel Racks from China (two AD and two CVD reviews), Mattresses from the Kingdom of Thailand (AD), Citric Acid from China (AD), Certain Solar Products from Taiwan (AD), Paper File Folders from Indonesia (CVD), Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from Ukraine (AD – two reviews), Methionine from Spain (AD), Electrolytic Manganese Dioxide from China (AD), Brass Rod from Israel (CVD), Mattresses from Mexico (AD), Mattresses from Poland (AD), Paper Shopping Bags from India (CVD), Paper Shopping Bags from Turkey (AD), Aluminum Extrusions from Ecuador (AD), Aluminum Extrusions from Malaysia (AD), Aluminum Extrusions from China (AD), and Shrimp from Ecuador (CVD). Moreover, Office IV is involved in ongoing litigation, including Court directed remand redeterminations, as well as multiple scope rulings, sunset reviews, changed circumstances reviews, and multiple circumvention inquiries. Not only do these other cases present a significant workload, but the deadlines for several of the cases coincide or overlap with anticipated deadlines in this proceeding.

[10] *See* section 782(i)(1) of the Act.

**Issue 2: Selection of Respondents**

Applicable Statutory Provision

Where it is not practicable to examine all known exporters or producers of the subject merchandise, section 777A(e)(2) of the Act permits Commerce to determine individual countervailable subsidy rates for a reasonable number of exporters or producers, by limiting its examination to: (1) a sample of exporters or producers that it determines is statistically valid based on the information available to it at the time of selection; or (2) the exporters or producers accounting for the largest volume of the subject merchandise from the exporting country that Commerce determines can be reasonably examined.[11] The Act does not express a preference for either methodology.

*Santa Priscila and SONGA's Comments*[12]

- Commerce should rely on the NCA data because they are simpler and more accurate than Commerce's CBP data.[13]
- Commerce's CBP data do not accurately reflect the total quantities attributed to foreign manufacturers of U.S. imports of shrimp from Ecuador, because foreign manufacturer names reported in Commerce's CBP data vary in spelling, resulting in company imports being reported as separate observations across multiple line items in the data.[14]
- Some companies are misreported in the CBP data as exporters of subject merchandise and should have been reported as the manufacturer.[15] Furthermore, the affiliated and/or unaffiliated processors of Ecuadorian shrimp are incorrectly reported in the CBP data as the manufacturer, despite [ ] the actual manufacturer of subject merchandise.[16]
- If Commerce determines to rely on the CBP data for the purposes of selecting mandatory respondents in this investigation, then it should select Santa Priscila and SONGA, because they [ ].[17]

Analysis

In this investigation, we are selecting respondents accounting for the largest volume of subject merchandise that can be reasonably examined, consistent with section 777A(e)(2)(A)(ii) of the Act. This methodology is transparent and consistent with the methodology used in other CVD

---

[11] *See* sections 777A(e)(2)(A)(i) and (ii) of the Act.
[12] *See* CBP Data Comments at 2 through 5.
[13] *Id.* at 2 and 3.
[14] *See* CBP Data Memorandum at Attachment; *see also* CBP Data Comments at 3.
[15] *See* CBP Data Comments at 3.
[16] *Id.*
[17] *See* CBP Data Memorandum at Attachment.

proceedings. Furthermore, no party has argued that Commerce should select respondents for limited examination pursuant to 777A(e)(2)(A)(i) (*i.e.*, based on sampling).

We disagree with Santa Priscila and SONGA that the CBP data are an inaccurate basis to select mandatory respondents for individual examination in this investigation. Santa Priscila and SONGA contend that the NCA data are more reliable than the CBP data. However, the total amount of exports of Ecuadorian shrimp to the United States during the POI as reported by NCA (*i.e.*, [ ] pounds)[18] [ ] the total quantity of entries of shrimp reported in Commerce's CBP data (*i.e.*, [ ] kg, or [ ] pounds).[19] However, the total quantities of subject merchandise entered into the U.S. during the POI as reported by NCA and CBP [ ], indicating that [ ] between the data as reported by CBP and the data as reported by NCA, belying Santa Priscila and SONGA's claim that the NCA data are more representative of shrimp entry quantities for respondent selection purposes than the CBP data.

Furthermore, as noted above, Commerce's usual practice in analyzing CBP data for respondent selection purposes is to consolidate the total quantities of entries of subject merchandise attributed to companies with minor spelling variations in their names. In the instant investigation, Commerce has determined that certain companies with minor spelling variations should be compiled in order to accurately represent the total quantity of shrimp entered into the U.S. by each company during the POI.[20] Therefore, we disagree with Santa Priscila and SONGA's claim that minor spelling variations undermine Commerce's CBP data for respondent selection purposes, because we have taken into account these minor spelling variations and adjusted the data to remedy any potential discrepancies.

Finally, we disagree with Santa Priscila and SONGA that the CBP data are unreliable because companies may have been misreported as manufacturers but are actually the [ ]. In making this claim, Santa Priscila and SONGA state that the company [ ].[21] Santa Priscila and SONGA claim that this [ ] may have occurred because [ ].[22] At the current stage of this investigation, Commerce has no information on the record with which to corroborate or refute Santa Priscila and SONGA's claim that [ ], or whether there are other [ ]. We can only

[18] *Id*.
[19] The total kilogram amount was multiplied by a conversion factor of 2.205 to arrive at the same amount in pounds. *See* CBP Data Memorandum at Attachment.
[20] *See* Attachment, *infra*.
[21] *See* CBP Data Comments at 3.
[22] *Id.* at 3 and 4.

gather this type of information after we select mandatory respondents and issue our questionnaire, which we have not done. Therefore, we find it appropriate to rely on the CBP data for the purpose of respondent selection in this investigation.

To determine the exporters and producers which account for the largest volume of subject merchandise, we reviewed the CBP entry data for each company in terms of the aggregated volume of entries of subject merchandise attributed to that company into the United States during the POI. We combined the entry quantities of companies with minor variations in the spelling of their names, and ranked these companies by the total volume of entries into the United States during the POI.[23] An individual examination of the two exporters and producers that account for the largest volume of entries of subject merchandise during the POI will allow Commerce to capture the largest volume of exports Commerce can reasonably examine, in light of resource constraints and in compliance with the statutory requirements. Following these parameters, we selected the top two exporters and producers of shrimp entered for consumption into the United States. Based on the CBP data, the two exporters and producers with the largest volume of entries of subject merchandise, are, in alphabetical order: Santa Priscila and SONGA.[24]

Recommendation

For the reasons discussed above, we recommend selecting Santa Priscila and SONGA, the two exporters or producers that account for the largest volume of subject merchandise, for individual examination as mandatory respondents in this investigation.

☒ ☐

Agree Disagree

12/7/2023

X James Maeder

Signed by: JAMES MAEDER

James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

[23] *See* Attachment for each company's volume of exports to the United States during the POI, based on CBP entry data.

[24] *See* Attachment to this memorandum. According to CBP, the names and addresses of the largest exporters and/or producers do not constitute business proprietary information.

Barcode:4475955-01 C-331-806 INV - Investigation -

**Attachment**

***Public Version***

1. Exporters/Producers Total Exports
   Quantity: [ ] kg.

2. The following chart identifies the entry volume (%) of exports of shrimp from the top 10 Ecuadorian companies during the POI, in alphabetical order.

   Source: Customs and Border Protection.

| COMPANY NAME | TOTAL QUANTITY (kg) | ENTRY VOLUME (%) |
|---|---|---|
| CULTIVO Y EXPORTACION ACUICOLA CEAE | [ ] | [ ] |
| EMP.GRUPO GRANMAR S.A.-EMPAGRAN | [ ] | [ ] |
| EMPACRECI S.A. | [ ] | [ ] |
| EXPORTADORA LANGOSMAR S.A.* | [ ] | [ ] |
| INDUSTRIA PESQUERA JAMBELI CA | [ ] | [ ] |
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A.* | [ ] | [ ] |
| PROPEMAR S.A.* | [ ] | [ ] |
| SOCIEDAD NACIONAL DE GLAPAGOS C.A. SONGA | [ ] | [ ] |
| TROPICAL PACKING ECUADOR S A* | [ ] | [ ] |
| TROPICAL PACKING ECUADOR S.A. TROPACK* | [ ] | [ ] |
| Other | [ ] | [ ] |
| **Grand Total** | **[ ]** | 100.00 |

*The export quantities of companies with minor variations in the spelling of their names have been combined.



Filed By: Zachary Shaykin, Filed Date: 12/8/23 10:12 AM, Submission Status: Approved

# Tab 5

# P.R. 98

Barcode:4477678-01 C-331-806 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
Public Document
E&C/OIV: ZS

December 12, 2023

Ms. Andrea Ruiz
Embassy of Ecuador
2535 15th St., N.W.
Washington, D.C. 20009

Re: Investigation of Frozen Warmwater Shrimp from Ecuador: Countervailing Duty Questionnaire

Dear Ms. Ruiz:

The U.S. Department of Commerce (Commerce) is conducting a countervailing duty investigation of Frozen Warmwater Shrimp (Shrimp) from Ecuador.[1] As part of our investigation, we are requesting that your government and certain companies provide answers to the enclosed questionnaire. We have selected the following companies as respondents in this investigation: Industrial Pesquera Santa Priscila S.A. (Santa Priscila) and Sociedad Nacional de Galápagos C.A. (SONGA).[2] Please note that your government is responsible for forwarding copies of this cover letter and questionnaire to these respondent companies.

In this questionnaire, we are requesting information on programs which may constitute subsidies under U.S. law which were alleged in the petition and on which Commerce initiated an investigation. Commerce has taken no position on whether these programs provide subsidies in this case, and our request for information on these programs does not imply that we will necessarily find them to provide countervailable subsidies. Our decisions on those questions will be made on the basis of information received during this proceeding (including information from you) in light of the applicable provisions of U.S. law.

Please refer to the cover page and general instructions of the enclosed questionnaire for the due dates for responding to this questionnaire, the official in charge, and the instructions for filing the response. The companies identified above must complete Section III of the questionnaire and must submit their responses to Commerce by the deadlines noted. Your government must complete Section II of the questionnaire and submit a response by the same deadline.

---

[1] On November 21, 2023, Commerce published in the Federal Register the initiation of the countervailing duty investigation on frozen warmwater shrimp from Ecuador. *See* Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations, 88 FR 81053 (November 21, 2023).

[2] *See* Memorandum, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Respondent Selection," dated December 7, 2023.

Filed By: Zachary Shaykin, Filed Date: 12/12/23 3:28 PM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

## SECTION I

## GENERAL INSTRUCTIONS

Commerce requests information about the programs on which an investigation was initiated in order to determine whether countervailable subsidies have been provided to producers/exporters in Ecuador of frozen warmwater shrimp (shrimp or the subject merchandise). Section 775 of the Tariff Act of 1930, as amended (the Act), also requires Commerce to investigate any other potential countervailable subsidies it discovers during the course of this investigation that pertain to the manufacture, production, or exportation of shrimp.

If you have questions during the course of this investigation, we urge you to consult with the officials in charge named on the cover page. If for any reason you do not believe that you can complete a response to this questionnaire by the date specified on the cover page of this questionnaire, or in the form requested, you must notify the official in charge within 14 days of the date of this questionnaire.

Your response to the questionnaire should include all of the information requested. It is essential and in your interest that Commerce receive complete information early in the proceeding to ensure a thorough and accurate analysis, and to provide all parties the fullest opportunity to review and comment on your submission and Commerce's analysis. We appreciate your cooperation in this investigation.

### I. <u>PRODUCERS/EXPORTERS SUBJECT TO INVESTIGATION</u>

We have selected Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional de Galápagos C.A., publicly identifiable producers/exporters of subject merchandise, as the mandatory company respondents (hereinafter, respondent(s), company respondent(s), or company(ies) under investigation).[12]

Please note that the Government of Ecuador (GOE) is responsible for forwarding a copy of Section I and Section III of this questionnaire and the Initiation Checklist (Public Version), which contains more detailed information on the programs alleged for this investigation, to the producer(s) and/or exporter(s) subject to investigation.

### II. <u>SCOPE AND TIME PERIOD OF INVESTIGATION</u>

A. <u>Scope</u>

The scope of these investigations includes certain frozen warmwater shrimp and prawns whether wild-caught (ocean harvested) or farm-raised (produced by aquaculture), head-on or head-off, shell-on or peeled, tail-on or tail-off, deveined or not deveined, cooked or raw, or otherwise

[12] *See* Memorandum, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Respondent Selection," dated December 7, 2023.

Barcode:4477678-01 C-331-806 INV - Investigation -



## *SECTION II*

## *QUESTIONNAIRE FOR THE GOVERNMENT OF ECUADOR*

Commerce requests information about the programs on which an investigation was initiated in order to determine whether countervailable subsidies have been provided to producers/exporters in Ecuador of frozen warmwater shrimp (shrimp or the subject merchandise). Section 775 of the Tariff Act of 1930, as amended (the Act), also requires Commerce to investigate any other potentially countervailable subsidies it discovers during the course of this investigation that pertain to the manufacture, production, or exportation of shrimp.

Commerce has selected the following companies as mandatory respondents in this investigation.

- Industrial Pesquera Santa Priscila S.A. (Santa Priscila)
- Sociedad Nacional de Galápagos C.A. (SONGA)

Therefore, the information contained in this questionnaire should be answered for these companies. We note that the company is instructed to provide you with the name(s) of any "cross-owned" companies, which it must include in its questionnaire responses. Please ensure that you provide a complete response for these "cross-owned" companies as well.

Your responses to this questionnaire should clearly identify all mandatory respondents' involvement with each program. We note that the mandatory respondent companies are instructed in Section III to provide you with the name(s) of other potentially relevant companies, including certain other companies affiliated with the mandatory respondents, certain companies otherwise involved in the mandatory respondents' production or sales of subject merchandise, and former owners. (Please see Section III below for additional information.) Accordingly, when providing answers to the questions below that solicit specific information for respondent companies, you must provide information regarding all such relevant companies that have been identified. (Note that all references to the company respondent, company under investigation, company under examination, *etc.* in the questions below should be understood to be references to the mandatory respondent companies as well as all these other companies, as identified by the mandatory respondents, that are required to respond to Section III of this questionnaire.)

Furthermore, the government is responsible for providing the information requested below even if the alleged subsidy was received by respondent companies, or their former parent companies, which have since been merged with, purchased by, or have transferred a substantial portion of their assets to, other companies. If former parent companies received assistance under any of the programs listed below, please indicate and provide separate answers.

Respondents should be aware that Commerce allocates the benefits received from certain types of subsidies over time (see 19 CFR 351.524). The average useful life he (AUL) for this investigation is 12 years. Thus, in order to appropriately measure any allocated subsidies, Commerce will use a 12-year AUL in this investigation. Although the POI is a recent period, we are investigating alleged subsidies received over a time period corresponding to the AUL.



Filed By: Zachary Shaykin, Filed Date: 12/12/23 3:28 PM, Submission Status: Approved

## I. GENERAL QUESTIONS

A. Provide a copy of bulletins of economic and/or financial statistics regarding lending, economic development, and economic planning, published during the period of investigation (POI).

B. Provide a copy of the generally accepted accounting principles of Ecuador. If there are different accounting principles applicable to different types of companies, explain the differences in detail and describe to which type of companies each set of principles applies.

C. Provide the GOE's tariff schedule numbers which correspond to the HTSUS item numbers listed under Scope in Section I, General Instructions of this questionnaire. Provide the official description applicable to the products covered by these numbers.

D. Unless the government or the companies choose to demonstrate that a company-specific or alternative country-wide AUL of renewable physical assets differs from the AUL of renewable physical assets for the industry concerned as listed in the U.S. Internal Revenue Service's Depreciation Range System (IRS tables), Commerce will use the AUL set forth by the IRS tables for this industry as the allocation period for non-recurring subsidies. See 19 CFR 351.524(d)(2). In the case of the subject merchandise, the AUL for the industry is set at 12 years.

E. Please provide the standard income tax rate for corporations applicable for calendar year 2021 and 2022, and include supporting documentation such as the applicable legislation supporting this rate.

F. When a company has been privatized or otherwise has changed ownership, in whole or part, during the AUL period, Commerce has a baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period. If a company wishes to challenge the baseline presumption, please coordinate with the company to answer the questions in the ***Change-in-Ownership Appendix***.

## II. PROGRAM-SPECIFIC QUESTIONS

In responding to the questions below for each subsidy program, be sure that you clearly indicate whether a respondent company or any other company identified as potentially relevant (e.g., cross-owned companies, trading companies) did or did not apply for, use, or benefit from that program during the POI.

We note that many of the questions below solicit information of a general nature about e.g., the nature, scope, operation or overall availability and usage of a program. You are required to

provide full, complete responses to all questions for all programs, regardless of whether any respondent company applied for or used that program during the POI.[15]

For any program which had multiple funding sources or was administered by different governmental levels, please provide information as to the roles played by each administrating authority. If a question requires information from other authorities, e.g., local governments, please forward questions to the correct source. It is the responsibility of the GOE to ensure that full and complete responses to questions on regional/local programs are obtained from the appropriate regional/local authority.

For detailed descriptions of the programs listed below, see the Initiation Checklist (public version) included with this questionnaire as Attachment C.

**TAX PROGRAMS:**

### A. Environmental Tax Incentives

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***

### B. Tax Incentives for Priority Sectors Under the 2010 Organic Production Code

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***

### C. Fee Exemptions for Brackish Water

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***

### D. Government Forgiveness of Land Use Fees and Provision of Land to Delinquent Shrimp Farmers

[15] Failure to provide answers to these questions may result in the determination on the basis of facts available under section 776 of the Act for financial contribution and specificity if it is determined during the course of the investigation that a company fails to cooperate; has been found to use and/or receive measurable benefits from the program; or has failed all or portions of a verification.

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***

## EXPORT PROGRAMS

### A. Refund of Currency Outflow Tax (ISD) on Purchase of Inputs

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***,
2. ***Tax Appendix***, and
3. ***Input Producer Appendix***

### B. Export Tax Incentive

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

### C. Export Tax incentives for Sustained/Increased Employment

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

### D. Export Taxes Lowered to Promote Agricultural Exports

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

### E. Export Credits from National Finance Corporation

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

### F. International Factoring

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

**<u>LOANS AND CREDIT PROGRAMS</u>:**

**A. Access to Preferential Lines of Credit for Aquaculture and Fishing**

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix*****,** and
2. ***Loan Benchmark and Loan Guarantee Appendix***

**B. Loans for Organic Production**

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix*****,** and
2. ***Loan Benchmark and Loan Guarantee Appendix***

**C. Credit Line Boost for Shrimp Sector's Reconstruction After the Earthquake**

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix*****,** and
2. ***Loan Benchmark and Loan Guarantee Appendix***

**<u>PROVISION OF GOODS OR SERVICES FOR LESS THAN ADEQUATE REMUNERATION (LTAR)</u>**

**A. Government Provision of Electricity for LTAR**

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***,
2. ***Provision of Goods/Services Appendix,*** and

**B. Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays**

Please respond to all questions in the following appendices:

1. ***Standard Questions Appendix*****,** and
2. ***Provision of Goods/Services Appendix*****,**

In addition, please respond to the following:

1. Please identify all instances in which land or land-use rights in beaches and/or bay areas in Ecuador were provided by the GOE to any mandatory respondent after December 31, 2010, through the end of the POI.

2. If land or land-use rights were provided to a mandatory respondent within beaches and/or bay areas in Ecuador during this period, please provide all government laws or regulations (at all levels of government) pertaining to the provision of land or land-use rights in beaches and/or bay areas in Ecuador.

3. Indicate whether the provision of land or land-use rights was contingent upon the firm's status (e.g., state-owned enterprise, located in a particular geographical area, etc.) or activity (e.g., export sales, purchases from domestic suppliers, etc.).

**A. OTHER SUBSIDIES**

Does the GOE (or entities owned directly, in whole or in part, by the GOE or any provincial or local government) provide, directly or indirectly, any other forms of assistance to producers or exporters of frozen warmwater shrimp from Ecuador? Please coordinate with the respondent companies to determine if they are reporting usage of any such program(s). For each such program, please describe such assistance in detail, including the amounts, date of receipt, purpose and terms, and answer all questions in the Standard Questions Appendix, as well as other appropriate appendices attached to this questionnaire.

You must provide complete responses for certain "cross-owned" affiliated companies.

Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other. In addition, if two companies are both cross-owned by a third party, the two companies themselves would be considered cross-owned (forexample, cross-ownership exists between two companies owned by the same parent).

You must provide a complete questionnaire response for those affiliates where "cross-ownership" exists, and one of the following situations exists:

- the cross-owned company produces the subject merchandise; or

- the cross-owned company is a holding company or a parent company (with its ownoperations) of your company;[17] or

- the cross-owned company supplies an input product to you for production of thedownstream product produced by the respondent; or

- the cross-owned company has received a subsidy and transferred it to your company.

D. Former Owners / Changes in Ownership[2]

Commerce allocates the benefits received from certain types of subsidies over time (*e.g.*, equityinfusions, non-recurring grants, debt forgiveness, import duty or value-added tax (VAT) exemptions or reductions on capital equipment, *etc.*). *See* 19 CFR 351.524 and subsection C of the "General Questions" section below for a complete explanation.

Thus, in addition to investigating alleged subsidies that your company may have received duringthe POI, Commerce is also investigating alleged allocable, non-recurring subsidies that your company may have received during the AUL period. Because of this, if your company obtained all or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, or its assets continue to operate as part of your company, we require a complete questionnaire response for

[17] Your response must cover all cross-owned parent companies and holding companies, not only companies that directly held a controlling stake in your company during or prior to the POI. For example, if your company was a direct subsidiary of one cross-owned company, and that company was a direct subsidiary of another cross-owned company, then you must respond on behalf of both the cross-owned parent and the cross-owned "grandparent" companies. By direct subsidiary, we are referring to a company that is directly owned by another company. An indirect subsidiary, by contrast, has an intermediate owner between itself and the ultimate owner.

[2] All cross-owned affiliates meeting the conditions under sub section C during the POI and AUL and are required to submit a complete questionnaire response should also provide a response to this section with regard to any former owners and changes in ownership

copies of the consolidatedfinancial statements.

C. As established in 19 CFR 351.524(d)(2), the allocation period for non-recurring[18] subsidies is defined by the Average Useful Life (AUL) of renewable physical assets forthe industry concerned, as listed in the U.S. Internal Revenue Service's Depreciation Range System (IRS tables). The AUL listed in the IRS tables that applies to this investigation is 12 years.

Parties may rebut the presumption to use the IRS tables by demonstrating either that the company-specific AUL or country-wide AUL for the industry in the respondent country differs by one year or more from the AUL in the IRS tables for the industry under review.Unless the parties establish that the IRS tables do not reasonably reflect the AUL of a firm's assets, however, Commerce will rely on the IRS tables to define the appropriate AUL.

If your company chooses to rebut the presumption to use the IRS tables, please respond to the Average Useful Life Appendix. **If you do <u>not</u> want to rebut the use of the AUL in the IRS tables, you do <u>not</u> need to answer the questions in the Average Useful LifeAppendix.**

## D. <u>PROGRAM-SPECIFIC QUESTIONS</u>

*For each program*, if your company (including cross-owned affiliates required to respond, as well as all trading companies) did not apply for, use, or benefit from that program during the POI, you must clearly state so. Otherwise, please answer the questions listed. To determine the information which must be reported under each program, please see the instructions for each program in this section of the questionnaire and in the referenced appendices.

If any government assistance, as enumerated below, was received by companies which have since been merged with or purchased by your company, you are responsible for answering thequestions with respect to such assistance to the merged or purchased company.

For detailed descriptions of the programs listed below, *see* Attachment C of Section II (theInitiation Checklist), and consult with the GOE.

## <u>TAX PROGRAMS</u>:

### G. Refund of Currency Outflow Tax (ISD) on Purchase of Inputs

Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***,

[18] For definitions of **recurring** and **non-recurring** benefits, *see* the Grant and Allocation Appendix; *See also* 19CFR 351.524(c).

2. ***Tax Appendix***, and
3. ***Input Producer Appendix***

**H. Export Tax Incentive**

Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

**I. Export Tax Incentives for Sustained/Increased Employment**

Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

**J. Export Taxes Lowered to Promote Agricultural Exports**

Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

**K. Export Credits from National Finance Corporation**

Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

**L. International Factoring**

Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

**LOANS AND CREDIT PROGRAMS:**

**D. Access to Preferential Lines of Credit for Aquaculture and Fishing**

1. Report all loans from any state-owned banks in Ecuador received by your company, which were outstanding during the POI. Submit the information requested in the Loan Template as an attachment to your response and in electronic format using Microsoft Excel.

2. Please respond to all questions in the **Standard Questions Appendix** and the **Loan Benchmark and Loan Guarantee Appendix**.

**E. Loans for Organic Production**

1. Report all loans under this program, received by your company, which were outstanding during the POI. Submit the information requested in the **Loan Template** as anattachment to your response and in electronic format using Microsoft Excel.

2. Please respond to all questions in the **Standard Questions Appendix** and the L**oan Benchmark and Loan Guarantee Appendix** for each program**.**

**F. Credit Line Boost for Shrimp Sector's Reconstruction After the Earthquake**

1. Report all credit line increases under this program, received by your company, which were outstanding during the POI. Submit the information requested in the **Loan Template** as anattachment to your response and in electronic format using Microsoft Excel.

2. Please respond to all questions in the **Standard Questions Appendix** and the L**oan Benchmark and Loan Guarantee Appendix** for this program.

**PROVISION OF GOODS OR SERVICES FOR LESS THAN ADEQUATE REMUNERATION (LTAR)**

**A. Government Provision of Electricity for LTAR**

Please respond to all question in the **Standard Questions Appendix** and the **Provision of Goods/Services Appendix.** In addition, please respond to the following:

1. Identify your company's suppliers of electricity during the POI.

2. State whether your firm paid reduced rates for electricity during the POI becauseof its location in a designated geographical area (*e.g.*, industrial estates).

3. Report the volume of your company's electricity use and the corresponding charges your company paid, by month, during the POI. Submit this information

in electronic format using Microsoft Excel and include a printout of the electronic file in your response.

4. Please identify the appropriate rate and fee categories in the chart you submit.

## B. Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays

Please respond to all question in the **Standard Questions Appendix** and the **Provision of Goods/Services Appendix.** In addition, please respond to the following:

1. Identify all instances during the POI and the prior 11 (years (*i.e.*, the AUL) in which your firm received land or land leases at reduced rates because ofits location in a designated geographical area (*e.g.*, industrial estates).

2. For each instance in which your firm acquired such and or land leases, please indicate the following:

   a. Date of acquisition

   b. Identity of seller or leaseholder (provide the name in both Arabic and English and an address).

   c. Location of the land (specify whether the land is located in a special economic zone and/or development zone).

   d. Area of land (specify the unit of measure).

   e. Price paid for land or lease (specify whether the payment is in a lump sum or in installments).

   f. Terms of payment.

   g. The amount of land-use taxes and other fees paid annually. Identify the authority to whom these taxes and fees are paid and provide a sample invoice (or other relevant billing document) for each type of tax or fee. If you are exempted from payment of these taxes or fees, or you pay these taxes or fees at a reduced rate, please provide the details of the value of theexemptions/reductions over the period corresponding to the AUL.

   h. Duration of lease.

   i. Translated copy of the land-use contract.

## B. OTHER SUBSIDIES

Did the GOE (or entities owned directly, in whole or in part, by the GOE or any provincial or local government) provide, directly or indirectly, any other forms of assistance to your company between January 1, 2011, and the end of the POI? If so, please describe such assistance in detail, including the amounts, date of receipt, purpose and terms, and answer all questions in the appropriate appendices.

# Tab 6

# P.R. 102

Barcode:4478261-01 C-331-806 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
Public Document
E&C/OIV: ZS

December 14, 2023

Industrial Pesquera Santa Priscila S.A.
c/o Mr. Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, D.C. 20003

**RE:** Countervailing Duty (CVD) Investigation on Frozen Warmwater Shrimp from Ecuador: Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp

To Whom It May Concern:

On November 14, 2023, Commerce of Commerce (Commerce) published the initiation of the countervailing duty (CVD) investigation on frozen warmwater shrimp (frozen shrimp or subject merchandise) from Ecuador.[1] Commerce asks that you respond to the questions outlined in Attachment I to this letter and provide the requested information on your company's sources of raw shrimp that were processed into frozen shrimp during the period of investigation (POI) January 1, 2022 through December 31, 2022. The merchandise covered by the scope of this investigation, the guidelines for responding to this questionnaire, and instructions for filing your response with Commerce electronically are contained in Attachment II to this letter.

Your response to "Attachment I – Questionnaire – Sources of Raw Shrimp" is due to Commerce no later than **5:00 p.m. (Eastern Time) on December 22, 2023**. Commerce is requesting this information on an expedited basis because the nature of its inquiries and the course of the investigation may vary depending on the facts contained in the responses. Attachment II to this questionnaire provides instructions for filing this information with Commerce.

Please understand that if you fail to respond or provide an incomplete response to the requested information by the due date indicated above, Commerce may no longer consider your company to be a mandatory respondent, finding that you have not cooperated by not acting to the best of your ability to comply, and may use an inference that is adverse to your interests in selecting from the facts otherwise available, in accordance with section 776(b) of the Tariff Act of 1930, as amended (the Act).

[1] *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations,* 88 FR 81053, (November 14, 2023) (*Initiation Notice*).

INTERNATIONAL TRADE ADMINISTRATION

Filed By: Zachary Shaykin, Filed Date: 12/14/23 10:22 AM, Submission Status: Approved

Additionally, Commerce will be issuing to you under separate cover another questionnaire that will include questions concerning your company's use of the subsidy programs that are under investigation.

Should you need further assistance or information with regard to this investigation, please contact Zachary Shaykin at Zachary.Shaykin@trade.gov.

Sincerely,

for

Robert Bolling
Program Manager, Office IV
AD/CVD Operations
Enforcement and Compliance

Enclosure

## ATTACHMENT I

## QUESTIONNAIRE – SOURCES OF RAW SHRIMP

1. Please explain how your company is organized; include an explanation of whether your company farms or otherwise harvests raw shrimp, processes raw shrimp into frozen shrimp, or both.[2]

2. Please explain whether your company is comprised of cooperatives and explain whether these cooperatives farm or otherwise harvest raw shrimp, process raw shrimp into the subject merchandise, or both.

3. Is your company only an exporter of frozen shrimp (that is, your company does not farm or otherwise harvest raw shrimp or process raw shrimp into frozen shrimp)?

4. If "yes" to question 3, then using the attached "Template for Processors of Raw Shrimp," report **all** the processors of raw shrimp from which you purchased the frozen shrimp exported during the period January 1, 2022, through December 31, 2022. Please submit your completed worksheet to Commerce as both an attachment to your response and in an Excel file.

5. Further, if "yes" to question 3, please provide a copy of this questionnaire and accompanying "Template for Suppliers of Raw Shrimp" to each of the processors identified in response to question 4 so that they can complete it with respect to their shrimp suppliers. Please confirm in your response to this questionnaire that you have done so. If possible, please obtain the questionnaire responses from these companies and submit them with your response. However, if you have purchased from more than 10 processors, please immediately contact the official listed in the cover letter of this attachment.

6. If your company processes raw shrimp and obtains its raw shrimp from suppliers that are affiliated with, but separately incorporated from your company or from suppliers that are not affiliated with your company, please complete the attached "Template for Suppliers of Raw Shrimp," to include **all** of those suppliers. Please be sure to indicate whether the supplier(s) might be considered cross-owned with your company.[3]

---

[2] *See* Attachment II of this letter for a full description of the scope of this investigation.

[3] Cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets. This standard will normally be met where there is a majority voting interest between two corporations or through common ownership of two (or more) corporations. Cross-ownership does not require one corporation to own 100 percent of the other corporation. Normally, cross-ownership will exist where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations. In certain circumstances, a large minority voting interest (for example, 40 percent) or a "golden share" may also result in cross-ownership. *See* Section III of the Initial Questionnaire at "Affiliated Companies," for more information.

7. If your company processes raw shrimp and you have no suppliers that are separately incorporated or unaffiliated, please confirm that the raw shrimp your company processes into frozen shrimp are produced within your company (that is, none of your suppliers are separately incorporated) and report the quantity of raw shrimp produced by your company. If not, please explain the sources of the raw shrimp you process.

8. If your company processes raw shrimp and produces frozen shrimp, but you also have outside suppliers of raw shrimp, please complete the attached "Template for Suppliers of Raw Shrimp," for your outside purchases. Please also report the quantity of frozen shrimp produced by your company.

# ATTACHMENT II

## GENERAL INSTRUCTIONS

The U.S. Department of Commerce (Commerce) requests information about the programs on which an investigation was initiated, in order to determine whether countervailable subsidies have been provided to producers/exporters in Ecuador of frozen shrimp. Section 775 of the Tariff Act of 1930, as amended (the Act), also requires Commerce to investigate any other potential countervailable subsidies it discovers during the course of this investigation that pertain to the manufacture, production, or exportation of frozen shrimp.

If you have questions during the course of this investigation, we urge you to consult with the officials in charge named on the cover page. If for any reason you do not believe that you can complete a response to this questionnaire by the date specified on the cover page of this questionnaire, or in the form requested, you must notify the official in charge within 3 days of the date of this questionnaire.

Your response to the questionnaire should include all of the information requested. It is essential and in your interest that Commerce receive complete information early in the proceeding to ensure a thorough and accurate analysis, and to provide all parties the fullest opportunity to review and comment on your submission and Commerce's analysis. We appreciate your cooperation in this investigation.

## I. PRODUCERS/EXPORTERS SUBJECT TO INVESTIGATION

We have selected Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional de Galápagos C.A., publicly identifiable producers/exporters of subject merchandise, as the mandatory company respondents (hereinafter, "respondents," "company respondents," or "companies under investigation").[4]

## II. SCOPE AND TIME PERIOD OF INVESTIGATION

### A. Scope

The scope of these investigations includes certain frozen warmwater shrimp and prawns whether wild-caught (ocean harvested) or farm-raised (produced by aquaculture), head-on or head-off, shell-on or peeled, tail-on or tail-off, deveined or not deveined, cooked or raw, or otherwise processed in frozen form. "Tails" in this context means the tail fan, which includes the telson and the uropods.

The frozen warmwater shrimp and prawn products included in the scope, regardless of definitions in the Harmonized Tariff Schedule of the United States (HTSUS), are products which

[4] *See* Memorandum, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Respondent Selection," dated December 7, 2023.

are processed from warmwater shrimp and prawns through freezing and which are sold in any count size.

The products described above may be processed from any species of warmwater shrimp and prawns. Warmwater shrimp and prawns are generally classified in, but are not limited to, the *Penaeidae* family. Some examples of the farmed and wild-caught warmwater species include, but are not limited to, whiteleg shrimp (*Penaeus vannemei*), banana prawn (*Penaeus merguiensis*), fleshy prawn (*Penaeus chinensis*), giant river prawn (*Macrobrachium rosenbergii*), giant tiger prawn (*Penaeus monodon*), redspotted shrimp (*Penaeus brasiliensis*), southern brown shrimp (*Penaeus subtilis*), southern pink shrimp (*Penaeus notialis*), southern rough shrimp (*Trachypenaeus curvirostris*), southern white shrimp (*Penaeus schmitti*), blue shrimp (*Penaeus stylirostris*), western white shrimp (*Penaeus occidentalis*), and Indian white prawn (*Penaeus indicus*).

Frozen shrimp and prawns that are packed with marinade, spices or sauce are included in the scope. In addition, food preparations, which are not "prepared meals," that contain more than 20 percent by weight of shrimp or prawn are also included in the scope.

Excluded from the scope are: (1) breaded shrimp and prawns (HTSUS subheading 1605.21.1020); (2) shrimp and prawns generally classified in the *Pandalidae* family and commonly referred to as coldwater shrimp, in any state of processing; (3) fresh shrimp and prawns whether shell-on or peeled (HTSUS subheadings 0306.36.0020 and 0306.36.0040); (4) shrimp and prawns in prepared meals (HTSUS subheadings 1605.21.0500 and 1605.29.0500); (5) dried shrimp and prawns; (6) canned warmwater shrimp and prawns (HTSUS subheading 1605.29.1040); and (7) certain battered shrimp. Battered shrimp is a shrimp-based product: (1) that is produced from fresh (or thawed-from-frozen) and peeled shrimp; (2) to which a "dusting" layer of rice or wheat flour of at least 95 percent purity has been applied; (3) with the entire surface of the shrimp flesh thoroughly and evenly coated with the flour; (4) with the non-shrimp content of the end product constituting between four and ten percent of the product's total weight after being dusted, but prior to being frozen; and (5) that is subjected to individually quick frozen (IQF) freezing immediately after application of the dusting layer. When dusted in accordance with the definition of dusting above, the battered shrimp product is also coated with a wet viscous layer containing egg and/or milk, and par-fried.

The products covered by the scope are currently classified under the following HTSUS subheadings: 0306.17.0004, 0306.17.0005, 0306.17.0007, 0306.17.0008, 0306.17.0010, 0306.17.0011, 0306.17.0013, 0306.17.0014, 0306.17.0016, 0306.17.0017, 0306.17.0019, 0306.17.0020, 0306.17.0022, 0306.17.0023, 0306.17.0025, 0306.17.0026, 0306.17.0028, 0306.17.0029, 0306.17.0041, 0306.17.0042, 1605.21.1030, and 1605.29.1010. These HTSUS subheadings are provided for convenience and for customs purposes only and are not dispositive, but rather the written description of the scope is dispositive.

B. <u>Period of Investigation</u>

The time period covered by this investigation (the period of investigation - POI) is January 1, 2022, through December 31, 2022.

Barcode:4478261-01 C-331-806 INV - Investigation -

## III. INSTRUCTIONS FOR FILING THE RESPONSE

The following instructions apply to your response to this questionnaire and all other documents that you submit to Commerce during the course of this proceeding, such as responses to additional questionnaires, extension requests, and case briefs.

A. Filing:

1. The companies under investigation are responsible for submitting the response to Commerce in a timely manner such that they will be received by Commerce in Washington, DC, no later than the close of business on the due date specified on the cover page of this questionnaire. Any materials that supplement your response should be submitted on the same date as the response.

2. All submissions must be made electronically using Commerce's ACCESS website at http://access.trade.gov. If an exception to the electronic filing requirement applies, you must address and manually submit your response to the address indicated at Section C "Manual Filing," below. To determine if your response qualifies for manual filing, see "Manual Filing."

3. The business proprietary response should be submitted on the due date specified. The public version of the response may be filed one business day after the proprietary response.

4. An electronically filed document must be received successfully in its entirety by ACCESS by 5:00 pm Eastern Time (ET) on the due date, unless an earlier time is specified.

B. Format

1. You are required to state in the upper right-hand corner of your cover letter the following information in the following format:

   a. on the first line, indicate the case number stated on the cover page to this questionnaire (*i.e.*, C-552-838);
   b. on the second line, indicate the total number of pages in the document including cover pages, appendices, and any unnumbered pages;
   c. on the third line, indicate "investigation" and the POI (01/01/2022-12/31/2022);
   d. on the fourth line, indicate Commerce office conducting the proceeding (the office is indicated on the cover page to this questionnaire);
   e. on the fifth and subsequent lines, indicate whether any portion of the document contains business proprietary information and, if so, list the page numbers containing business proprietary information; and indicate the business proprietary/public status of the document and whether you agree or object to release of the submitted information under administrative protective order (APO) by stating one of the following:



Filed By: Zachary Shaykin, Filed Date: 12/14/23 10:22 AM, Submission Status: Approved

- "Business Proprietary Document -- May Be Released Under APO,"
- "Business Proprietary Document -- May Not Be Released Under APO,"
- "Business Proprietary/APO Version-- May Be Released Under APO,"
- "Public Version," or
- "Public Document."

2. Please include a "Re:" line on the cover letter of your response, and any other submissions you make during this proceeding. In the Re: line, briefly summarize the purpose of your submission, *e.g.*, "response to questionnaire," "case brief."

3. Prepare your response in typed form and in English (*see* 19 CFR 351.303(d) and (e) for these and other formatting requirements). Include an original and translated version of all pertinent portions of non-English language documents that accompany your response, including financial statements. Any foreign language submission which is not accompanied by an English translation will be disregarded.

4. Repeat the question to which you are responding in your narrative submission and place your answer directly below it.

5. Please respond to each question. If a particular question does not apply, please state so and explain why in your response. Failure to do so could lead to the use of adverse inferences for that particular question.

6. In each of your answers, please identify your source of information. Please include with your response copies of source documents necessary to understand your response and include an original and translated version of all source documents. For additional information sources not included in your response, indicate the location where the documents or electronic data systems are maintained. If information is maintained at multiple locations, please list in an appendix to your response these locations along with notes indicating the information maintained at each location. This information is used by Commerce to prepare for verification.

7. Include all worksheets, financial reports, and other requested documents as appendices to your response.

8. Provide a table of appendices. Assign a number to each appendix and include a descriptive name for each appendix and its number in the table.

9. Identify all units of measurement, currencies, and conversion factors used in your narrative response, worksheets, or other appendices. All monetary amounts should be shown in the currency in which they were originally denominated, and

in the currency in which they are registered in your accounts (if the two are different). Also, report the actual exchange rate used for a particular conversion. For all values adjusted for inflation, please provide the data in both nominal and adjusted terms and explain how these values were adjusted.

10. We request that tabulated information regarding company use of programs (*e.g.*, loans, loan guarantees, and grants) be submitted using the Microsoft Excel spreadsheet program compatible with the Microsoft Windows Operating System (MS-Windows) software for PCs.

11. It is your responsibility to contact the officials in charge if subsequent to your filing there are events that affect your response (*e.g.*, changes as a result of an audit).

C. Manual Filing

1. All submissions must be filed electronically. Only under the following four circumstances will Commerce accept a hardcopy response that is manually filed:
   - Documents exceeding 500 pages in length may be filed manually (in paper form) in the APO/Dockets Unit. This is referred to as a "bulky document."
   - Data files greater than 20 MB must be filed manually on CD-ROM or DVD.
   - If the ACCESS system is unable to accept filings continuously or intermittently over the course of any period of time greater than one hour between 12:00 pm and 4:30 pm ET or for any duration of time between 4:31 pm and 5:00 pm ET, then a person may manually file the document in the APO/Dockets Unit. Commerce will provide notice of such technical failures on the ACCESS Help Desk line at 202-482-3150 and on Enforcement and Compliance's website, which is http://www.trade.gov/enforcement/.
   - Apart from the above, if you are unable to comply with the electronic filing requirement, as provided in 19 CFR 351.103(c) and in accordance with section 782(c) of the Act, you must promptly notify the officials in charge and submit a full written explanation of the reasons you are unable to file the document electronically. You must also suggest alternative forms in which to submit the information. Commerce will consider the ability of a submitter and may modify the electronic filing requirement on a case-by-case basis.

2. All manually filed documents must be accompanied by a cover sheet generated in ACCESS. For manually filed bulky documents, separator sheets must also be generated and used.

3. If your response qualifies as a bulky document and you opt to file it manually, you must file two identical paper copies of the document. For all other authorized manual submissions, only one paper copy is required.

4. Manual submissions must be addressed and submitted to:
Secretary of Commerce
APO/Dockets Unit
Room 18022
U.S. Department of Commerce
Fourteenth Street and Constitution Avenue, NW
Washington, DC 20230
Attn: Enforcement & Compliance
AD/CVD Operations, Office IX

D. Certifications

1. Submit the required *certification of factual information*.[5] Providers of information and the person(s) submitting it, if different (*e.g.*, a legal representative), must certify that they have read the submission and that the information submitted is accurate and complete. Commerce cannot accept questionnaire responses that do not contain signed certifications. Forms for such certification are included as attachments to this questionnaire within Sections II and III.

2. Provide the required *certificate of service* (included as an attachment) with each business proprietary submission and its public version, as well as each fully public submission.

3. Signed certifications of accuracy and certificates of service should be scanned and appended to the appropriate electronic documents filed in ACCESS.

E. Business Proprietary Information and Summarization of Business Proprietary Information

1. You may request business proprietary treatment for information submitted that is not publicly available. As a general rule, Commerce places all correspondence and submissions received in the course of an antidumping or countervailing duty proceeding in a public reading file. However, information deemed to be proprietary will not be made available to the public. If you wish to make a request for proprietary treatment for particular information, refer to 19 CFR 351.304, 351.305, and 351.306. You must submit the request for proprietary treatment at the same time as the claimed business proprietary information is submitted to Commerce.

[5] Commerce's certification requirements changed effective March 14, 2011. Additional changes regarding the certification of factual information by governments participating in a proceeding became effective on September 2, 2011. Any submissions made to Commerce pursuant to proceedings initiated on or after March 14, 2011, must be accompanied by the appropriate company, government, and representative certifications (as applicable). For more information refer to 76 FR 7491 (February 10, 2011) and 76 FR 54697 (September 2, 2011) of the *Federal Register*.

2. Utilize the "one-day lag rule" under 19 CFR 351.303(c)(2) if you wish an additional day to review the final bracketing of business proprietary information in a document and to prepare the required public version. The filing requirements under the one-day lag rule provide for a party to file only the business proprietary document within the applicable time limit (19 CFR 351.303(c)(2)(i)). By the close of business one business day after the date the business proprietary document is filed, the person must file the complete final business proprietary document (19 CFR 351.303(c)(2)(i)(ii)). The final business proprietary document must be identical to the original document except for any bracketing corrections.

3. By the close of business one business day after the date the business proprietary document is filed (refer to the "one-day lag rule" in the preceding paragraph), submit the public version of your response (19 CFR 351.303(c)(2)(i)(iii)). A public version must contain:
   (1) a non-proprietary (public) version of your response that has sufficient detail to permit a reasonable understanding of the information submitted in confidence, and/or
   (2) an itemization of particular information that you believe you are unable to summarize. State the reasons why you cannot summarize each piece of information.

   Please note: The summarization requirement does not apply solely to the narrative portion of your response. It applies equally to worksheets and other appendices to your response. Generally, numerical data, such as that provided in sales and loan charts, are adequately summarized only if grouped or presented in terms of indices or figures ranged within 10 percent of the actual figure. Responses, or portions thereof, that are not adequately summarized may be rejected from the record of this proceeding.

4. Submit the statements required regarding limited release of business proprietary information under the provisions of an APO. U.S. law permits limited disclosure to representatives of parties (*e.g.*, legal counsel) of certain business proprietary information, including electronic business proprietary information, under an APO. (Note that data received under an APO cannot be shared with others who are not covered by the APO.) Under the provisions governing APO disclosure, you must submit either:

   (1) a statement agreeing to permit the release under APO of information submitted by you in confidence during the course of the proceeding, or
   (2) a statement itemizing those portions of the information which you believe should not be released under APO, together with arguments supporting your objections to that release.

   We are required by our regulations to reject, at the time of filing, submissions of business proprietary information that do not contain one of these statements. As discussed above, you must state in the upper right-hand corner of the cover letter

accompanying your questionnaire response whether you agree or object to release of the submitted information under APO (*e.g.*, May Be Released Under APO or May Not Be Released Under APO). *See* 19 CFR 351.304 for specific instructions. If you do not agree to release under APO all or part of the proprietary information, but we determine that the information should be released, you will have the opportunity to withdraw the information (see 19 CFR 351.304(d)). However, any information which you withdraw will be removed from the official record and will not be used in our determination.

5. Place brackets ("[ ]") around information for which you request business proprietary treatment. Place double brackets ("[[ ]]") around information for which you request proprietary treatment and which you do not agree to release under APO.[6]

6. Provide to all parties whose representatives have been granted APO access and who are listed on Commerce's most recent APO Service List, a complete copy of the submission--proprietary document and public version, except for that information which you do not agree to release under APO. (APO service lists, as well as public service lists, are maintained at http:/enforcement.trade.gov/apo/apo-svc-lists.html, and are also either attached to the cover letter of this questionnaire or will be provided by a subsequent letter from Commerce). If you exclude information because you do not agree to release it under APO, you must submit the complete business proprietary version, wherein information in double brackets has been excluded. This version of the response must be marked "Business Proprietary/APO Version-- May Be Released Under APO" on the cover page. For parties that do not have access to information under APO, please provide a public version only.

7. A chart summarizing AD/CVD document filing requirements can be found at http://enforcement.trade.gov/filing/index.html. Detailed and supplemental information concerning APOs, including the APO Handbook, a complete set of APO regulations, and APO application forms and service lists, can be found at http:/enforcement.trade.gov/apo/index.html.

G. Verification

All information submitted is subject to verification. Failure to allow full and complete verification of any information may affect the consideration accorded to that or any other verified or non-verified item in the responses.

H. Extension Requests

[6] Commerce will not disclose proprietary customer names under APO during an antidumping or countervailing duty investigation until either an order is published or the investigation is suspended. To ensure that proprietary customer names are properly treated in this case, place double brackets ("[[ ]]") around all proprietary customer names in your submissions to Commerce during the course of this investigation.

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadline, or are unable to provide all requested supporting documentation by the same date, you must notify the officials in charge and submit a written request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request. All extension requests must be in writing and should state the reasons for the request pursuant to 19 CFR 351.302(c). Any extension granted in response to your request will be communicated in writing by Commerce; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5:00 pm ET on the established deadline, we may conclude that you have decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the deadline. As required by 19 CFR 351.302(d), we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

I. Separate Letter of Appearance Required

Pursuant to 19 CFR 351.103(d)(1), "with the exception of a petitioner filing a petition in an investigation, to be included on the public service list for a particular segment, each interested party must file a letter of appearance." The letter of appearance must be filed separately from any other document (with the exception of an application for APO access) and must be accompanied by the certification(s) required under 19 CFR 351.303(g).

## IV. SUBMISSION OF COMPUTER DATABASES AND SPREADSHEETS

### A. Filing Instructions

Except as described above under the section "Manual Filing," all database files, including Microsoft Excel spreadsheets that are less than 20 MB in size must be filed electronically using ACCESS. Instructions for using ACCESS can be found above and at http://access.trade.gov. Please refer to the Handbook on Electronic Filing Procedures in the "Help" section of the website.

For manual filings (when applicable), separately pack and label the electronic media containing the databases or spreadsheets (see section below for labeling and other instructions). Deliver the package to the address listed in the section "Manual Filing." (Note that databases over 20 MB must be filed manually.)

B. Special Instructions for Manual Filing

For manual filings (when applicable), you may submit your databases or spreadsheets on either a CD or DVD. Compressed databases are acceptable, but decompression instructions and software must accompany any compressed data submission.

Clearly label the CD or DVD with the following information:

1. Case name, case number, and submission date
2. Name of respondent
3. Proceeding and time period (*e.g.*, INV-POI 1/2018-12/2018)
4. Name of official in charge
5. File formats and software used to create the databases or worksheets
6. File names, number of observations, and record lengths
7. ACCESS bar code number

C. Data Formatting Instructions

1. Since the database or spreadsheet must be readable by an IBM-compatible PC, the data must be encoded in ASCII format or, at your option, PC SAS, Access, dBase, or Excel formats.

2. Report numerical data in a numerical format that allows calculations (*e.g.*, 10, not 10 MT). Units should be reported in fields separate from numerical values.

# CERTIFICATION

**COMPANY CERTIFICATION**

I, **(PRINTED NAME AND TITLE)**, currently employed by **(COMPANY NAME)**, certify that I prepared or otherwise supervised the preparation of the attached submission of (**IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {THE (ANTIDUMPING OR COUNTERVAILING) DUTY INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**. I certify that the public information and any business proprietary information of **(CERTIFIER'S COMPANY NAME)** contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature: ____________________**
**Date: ________________________**

* For multiple person certifications, all persons should be listed in the first sentence of the certification and all persons should sign and date the certification. In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.*, "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."

**REPRESENTATIVE CERTIFICATION** ***

I, **(PRINTED NAME)**, with **(LAW FIRM or OTHER FIRM)**, **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {COUNSEL TO} or {REPRESENTATIVE OF}) (COMPANY NAME, OR GOVERNMENT OF COUNTRY, OR NAME OF ANOTHER PARTY)**, certify that I have read the attached submission of **(IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {THE (ANTIDUMPING OR COUNTERVAILING DUTY) INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**. In my capacity as **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {COUNSEL} or {ADVISER, PREPARER, OR REVIEWER})** of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature:** ______________________
**Date:** __________________________

*** For multiple representative certifications, all representatives and their firms should be listed in the first sentence of the certification and all representatives should sign and date the certification. In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.*, "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."

# Tab 7

# P.R. 104

Barcode:4478263-01 C-331-806 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
Public Document
E&C/OIV: ZS

December 14, 2023

Sociedad Nacional de Galápagos C.A.
c/o Mr. Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, D.C. 20003

**RE:** Countervailing Duty (CVD) Investigation on Frozen Warmwater Shrimp from Ecuador: Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp

To Whom It May Concern:

On November 14, 2023, Commerce of Commerce (Commerce) published the initiation of the countervailing duty (CVD) investigation on frozen warmwater shrimp (frozen shrimp or subject merchandise) from Ecuador.[1] Commerce asks that you respond to the questions outlined in Attachment I to this letter and provide the requested information on your company's sources of raw shrimp that were processed into frozen shrimp during the period of investigation (POI) January 1, 2022 through December 31, 2022. The merchandise covered by the scope of this investigation, the guidelines for responding to this questionnaire, and instructions for filing your response with Commerce electronically are contained in Attachment II to this letter.

Your response to "Attachment I – Questionnaire – Sources of Raw Shrimp" is due to Commerce no later than **5:00 p.m. (Eastern Time) on December 22, 2023**. Commerce is requesting this information on an expedited basis because the nature of its inquiries and the course of the investigation may vary depending on the facts contained in the responses. Attachment II to this questionnaire provides instructions for filing this information with Commerce.

Please understand that if you fail to respond or provide an incomplete response to the requested information by the due date indicated above, Commerce may no longer consider your company to be a mandatory respondent, finding that you have not cooperated by not acting to the best of your ability to comply, and may use an inference that is adverse to your interests in selecting from the facts otherwise available, in accordance with section 776(b) of the Tariff Act of 1930, as amended (the Act).

---

[1] *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations,* 88 FR 81053, (November 14, 2023) (*Initiation Notice*).



Filed By: Zachary Shaykin, Filed Date: 12/14/23 10:23 AM, Submission Status: Approved

Additionally, Commerce will be issuing to you under separate cover another questionnaire that will include questions concerning your company's use of the subsidy programs that are under investigation.

Should you need further assistance or information with regard to this investigation, please contact Zachary Shaykin at Zachary.Shaykin@trade.gov.

Sincerely,

for

Robert Bolling
Program Manager, Office IV
AD/CVD Operations
Enforcement and Compliance

Enclosure

## ATTACHMENT I

## QUESTIONNAIRE – SOURCES OF RAW SHRIMP

1. Please explain how your company is organized; include an explanation of whether your company farms or otherwise harvests raw shrimp, processes raw shrimp into frozen shrimp, or both.[2]

2. Please explain whether your company is comprised of cooperatives and explain whether these cooperatives farm or otherwise harvest raw shrimp, process raw shrimp into the subject merchandise, or both.

3. Is your company only an exporter of frozen shrimp (that is, your company does not farm or otherwise harvest raw shrimp or process raw shrimp into frozen shrimp)?

4. If "yes" to question 3, then using the attached "Template for Processors of Raw Shrimp," report **all** the processors of raw shrimp from which you purchased the frozen shrimp exported during the period January 1, 2022, through December 31, 2022. Please submit your completed worksheet to Commerce as both an attachment to your response and in an Excel file.

5. Further, if "yes" to question 3, please provide a copy of this questionnaire and accompanying "Template for Suppliers of Raw Shrimp" to each of the processors identified in response to question 4 so that they can complete it with respect to their shrimp suppliers. Please confirm in your response to this questionnaire that you have done so. If possible, please obtain the questionnaire responses from these companies and submit them with your response. However, if you have purchased from more than 10 processors, please immediately contact the official listed in the cover letter of this attachment.

6. If your company processes raw shrimp and obtains its raw shrimp from suppliers that are affiliated with, but separately incorporated from your company or from suppliers that are not affiliated with your company, please complete the attached "Template for Suppliers of Raw Shrimp," to include **all** of those suppliers. Please be sure to indicate whether the supplier(s) might be considered cross-owned with your company.[3]

---

[2] *See* Attachment II of this letter for a full description of the scope of this investigation.

[3] Cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets. This standard will normally be met where there is a majority voting interest between two corporations or through common ownership of two (or more) corporations. Cross-ownership does not require one corporation to own 100 percent of the other corporation. Normally, cross-ownership will exist where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations. In certain circumstances, a large minority voting interest (for example, 40 percent) or a "golden share" may also result in cross-ownership. *See* Section III of the Initial Questionnaire at "Affiliated Companies," for more information.

7. If your company processes raw shrimp and you have no suppliers that are separately incorporated or unaffiliated, please confirm that the raw shrimp your company processes into frozen shrimp are produced within your company (that is, none of your suppliers are separately incorporated) and report the quantity of raw shrimp produced by your company. If not, please explain the sources of the raw shrimp you process.

8. If your company processes raw shrimp and produces frozen shrimp, but you also have outside suppliers of raw shrimp, please complete the attached "Template for Suppliers of Raw Shrimp," for your outside purchases. Please also report the quantity of frozen shrimp produced by your company.

# ATTACHMENT II

## GENERAL INSTRUCTIONS

The U.S. Department of Commerce (Commerce) requests information about the programs on which an investigation was initiated, in order to determine whether countervailable subsidies have been provided to producers/exporters in Ecuador of frozen shrimp. Section 775 of the Tariff Act of 1930, as amended (the Act), also requires Commerce to investigate any other potential countervailable subsidies it discovers during the course of this investigation that pertain to the manufacture, production, or exportation of frozen shrimp.

If you have questions during the course of this investigation, we urge you to consult with the officials in charge named on the cover page. If for any reason you do not believe that you can complete a response to this questionnaire by the date specified on the cover page of this questionnaire, or in the form requested, you must notify the official in charge within 3 days of the date of this questionnaire.

Your response to the questionnaire should include all of the information requested. It is essential and in your interest that Commerce receive complete information early in the proceeding to ensure a thorough and accurate analysis, and to provide all parties the fullest opportunity to review and comment on your submission and Commerce's analysis. We appreciate your cooperation in this investigation.

## I. <u>PRODUCERS/EXPORTERS SUBJECT TO INVESTIGATION</u>

We have selected Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional de Galápagos C.A., publicly identifiable producers/exporters of subject merchandise, as the mandatory company respondents (hereinafter, "respondents," "company respondents," or "companies under investigation").[4]

## II. <u>SCOPE AND TIME PERIOD OF INVESTIGATION</u>

### A. <u>Scope</u>

The scope of these investigations includes certain frozen warmwater shrimp and prawns whether wild-caught (ocean harvested) or farm-raised (produced by aquaculture), head-on or head-off, shell-on or peeled, tail-on or tail-off, deveined or not deveined, cooked or raw, or otherwise processed in frozen form. "Tails" in this context means the tail fan, which includes the telson and the uropods.

The frozen warmwater shrimp and prawn products included in the scope, regardless of definitions in the Harmonized Tariff Schedule of the United States (HTSUS), are products which

[4] *See* Memorandum, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Respondent Selection," dated December 7, 2023.

are processed from warmwater shrimp and prawns through freezing and which are sold in any count size.

The products described above may be processed from any species of warmwater shrimp and prawns. Warmwater shrimp and prawns are generally classified in, but are not limited to, the *Penaeidae* family. Some examples of the farmed and wild-caught warmwater species include, but are not limited to, whiteleg shrimp (*Penaeus vannemei*), banana prawn (*Penaeus merguiensis*), fleshy prawn (*Penaeus chinensis*), giant river prawn (*Macrobrachium rosenbergii*), giant tiger prawn (*Penaeus monodon*), redspotted shrimp (*Penaeus brasiliensis*), southern brown shrimp (*Penaeus subtilis*), southern pink shrimp (*Penaeus notialis*), southern rough shrimp (*Trachypenaeus curvirostris*), southern white shrimp (*Penaeus schmitti*), blue shrimp (*Penaeus stylirostris*), western white shrimp (*Penaeus occidentalis*), and Indian white prawn (*Penaeus indicu*s).

Frozen shrimp and prawns that are packed with marinade, spices or sauce are included in the scope. In addition, food preparations, which are not "prepared meals," that contain more than 20 percent by weight of shrimp or prawn are also included in the scope.

Excluded from the scope are: (1) breaded shrimp and prawns (HTSUS subheading 1605.21.1020); (2) shrimp and prawns generally classified in the *Pandalidae* family and commonly referred to as coldwater shrimp, in any state of processing; (3) fresh shrimp and prawns whether shell-on or peeled (HTSUS subheadings 0306.36.0020 and 0306.36.0040); (4) shrimp and prawns in prepared meals (HTSUS subheadings 1605.21.0500 and 1605.29.0500); (5) dried shrimp and prawns; (6) canned warmwater shrimp and prawns (HTSUS subheading 1605.29.1040); and (7) certain battered shrimp. Battered shrimp is a shrimp-based product: (1) that is produced from fresh (or thawed-from-frozen) and peeled shrimp; (2) to which a "dusting" layer of rice or wheat flour of at least 95 percent purity has been applied; (3) with the entire surface of the shrimp flesh thoroughly and evenly coated with the flour; (4) with the non-shrimp content of the end product constituting between four and ten percent of the product's total weight after being dusted, but prior to being frozen; and (5) that is subjected to individually quick frozen (IQF) freezing immediately after application of the dusting layer. When dusted in accordance with the definition of dusting above, the battered shrimp product is also coated with a wet viscous layer containing egg and/or milk, and par-fried.

The products covered by the scope are currently classified under the following HTSUS subheadings: 0306.17.0004, 0306.17.0005, 0306.17.0007, 0306.17.0008, 0306.17.0010, 0306.17.0011, 0306.17.0013, 0306.17.0014, 0306.17.0016, 0306.17.0017, 0306.17.0019, 0306.17.0020, 0306.17.0022, 0306.17.0023, 0306.17.0025, 0306.17.0026, 0306.17.0028, 0306.17.0029, 0306.17.0041, 0306.17.0042, 1605.21.1030, and 1605.29.1010. These HTSUS subheadings are provided for convenience and for customs purposes only and are not dispositive, but rather the written description of the scope is dispositive.

B. Period of Investigation

The time period covered by this investigation (the period of investigation - POI) is January 1, 2022, through December 31, 2022.

## III. INSTRUCTIONS FOR FILING THE RESPONSE

The following instructions apply to your response to this questionnaire and all other documents that you submit to Commerce during the course of this proceeding, such as responses to additional questionnaires, extension requests, and case briefs.

A. Filing:

1. The companies under investigation are responsible for submitting the response to Commerce in a timely manner such that they will be received by Commerce in Washington, DC, no later than the close of business on the due date specified on the cover page of this questionnaire. Any materials that supplement your response should be submitted on the same date as the response.

2. All submissions must be made electronically using Commerce's ACCESS website at http://access.trade.gov. If an exception to the electronic filing requirement applies, you must address and manually submit your response to the address indicated at Section C "Manual Filing," below. To determine if your response qualifies for manual filing, see "Manual Filing."

3. The business proprietary response should be submitted on the due date specified. The public version of the response may be filed one business day after the proprietary response.
4. An electronically filed document must be received successfully in its entirety by ACCESS by 5:00 pm Eastern Time (ET) on the due date, unless an earlier time is specified.

B. Format

1. You are required to state in the upper right-hand corner of your cover letter the following information in the following format:

   a. on the first line, indicate the case number stated on the cover page to this questionnaire (*i.e.*, C-552-838);
   b. on the second line, indicate the total number of pages in the document including cover pages, appendices, and any unnumbered pages;
   c. on the third line, indicate "investigation" and the POI (01/01/2022-12/31/2022);
   d. on the fourth line, indicate Commerce office conducting the proceeding (the office is indicated on the cover page to this questionnaire);
   e. on the fifth and subsequent lines, indicate whether any portion of the document contains business proprietary information and, if so, list the page numbers containing business proprietary information; and indicate the business proprietary/public status of the document and whether you agree or object to release of the submitted information under administrative protective order (APO) by stating one of the following:

- "Business Proprietary Document -- May Be Released Under APO,"
- "Business Proprietary Document -- May Not Be Released Under APO,"
- "Business Proprietary/APO Version-- May Be Released Under APO,"
- "Public Version," or
- "Public Document."

2. Please include a "Re:" line on the cover letter of your response, and any other submissions you make during this proceeding. In the Re: line, briefly summarize the purpose of your submission, *e.g.*, "response to questionnaire," "case brief."

3. Prepare your response in typed form and in English (*see* 19 CFR 351.303(d) and (e) for these and other formatting requirements). Include an original and translated version of all pertinent portions of non-English language documents that accompany your response, including financial statements. Any foreign language submission which is not accompanied by an English translation will be disregarded.

4. Repeat the question to which you are responding in your narrative submission and place your answer directly below it.

5. Please respond to each question. If a particular question does not apply, please state so and explain why in your response. Failure to do so could lead to the use of adverse inferences for that particular question.

6. In each of your answers, please identify your source of information. Please include with your response copies of source documents necessary to understand your response and include an original and translated version of all source documents. For additional information sources not included in your response, indicate the location where the documents or electronic data systems are maintained. If information is maintained at multiple locations, please list in an appendix to your response these locations along with notes indicating the information maintained at each location. This information is used by Commerce to prepare for verification.

7. Include all worksheets, financial reports, and other requested documents as appendices to your response.

8. Provide a table of appendices. Assign a number to each appendix and include a descriptive name for each appendix and its number in the table.

9. Identify all units of measurement, currencies, and conversion factors used in your narrative response, worksheets, or other appendices. All monetary amounts should be shown in the currency in which they were originally denominated, and

in the currency in which they are registered in your accounts (if the two are different). Also, report the actual exchange rate used for a particular conversion. For all values adjusted for inflation, please provide the data in both nominal and adjusted terms and explain how these values were adjusted.

10. We request that tabulated information regarding company use of programs (*e.g.*, loans, loan guarantees, and grants) be submitted using the Microsoft Excel spreadsheet program compatible with the Microsoft Windows Operating System (MS-Windows) software for PCs.

11. It is your responsibility to contact the officials in charge if subsequent to your filing there are events that affect your response (*e.g.*, changes as a result of an audit).

C. Manual Filing

1. All submissions must be filed electronically. Only under the following four circumstances will Commerce accept a hardcopy response that is manually filed:
   - Documents exceeding 500 pages in length may be filed manually (in paper form) in the APO/Dockets Unit. This is referred to as a "bulky document."
   - Data files greater than 20 MB must be filed manually on CD-ROM or DVD.
   - If the ACCESS system is unable to accept filings continuously or intermittently over the course of any period of time greater than one hour between 12:00 pm and 4:30 pm ET or for any duration of time between 4:31 pm and 5:00 pm ET, then a person may manually file the document in the APO/Dockets Unit. Commerce will provide notice of such technical failures on the ACCESS Help Desk line at 202-482-3150 and on Enforcement and Compliance's website, which is http://www.trade.gov/enforcement/.
   - Apart from the above, if you are unable to comply with the electronic filing requirement, as provided in 19 CFR 351.103(c) and in accordance with section 782(c) of the Act, you must promptly notify the officials in charge and submit a full written explanation of the reasons you are unable to file the document electronically. You must also suggest alternative forms in which to submit the information. Commerce will consider the ability of a submitter and may modify the electronic filing requirement on a case-by-case basis.

2. All manually filed documents must be accompanied by a cover sheet generated in ACCESS. For manually filed bulky documents, separator sheets must also be generated and used.

3. If your response qualifies as a bulky document and you opt to file it manually, you must file two identical paper copies of the document. For all other authorized manual submissions, only one paper copy is required.

4. Manual submissions must be addressed and submitted to:
Secretary of Commerce
APO/Dockets Unit
Room 18022
U.S. Department of Commerce
Fourteenth Street and Constitution Avenue, NW
Washington, DC 20230
Attn: Enforcement & Compliance
AD/CVD Operations, Office IX

D. Certifications

1. Submit the required *certification of factual information*.[5] Providers of information and the person(s) submitting it, if different (*e.g.*, a legal representative), must certify that they have read the submission and that the information submitted is accurate and complete. Commerce cannot accept questionnaire responses that do not contain signed certifications. Forms for such certification are included as attachments to this questionnaire within Sections II and III.

2. Provide the required *certificate of service* (included as an attachment) with each business proprietary submission and its public version, as well as each fully public submission.

3. Signed certifications of accuracy and certificates of service should be scanned and appended to the appropriate electronic documents filed in ACCESS.

E. Business Proprietary Information and Summarization of Business Proprietary Information

1. You may request business proprietary treatment for information submitted that is not publicly available. As a general rule, Commerce places all correspondence and submissions received in the course of an antidumping or countervailing duty proceeding in a public reading file. However, information deemed to be proprietary will not be made available to the public. If you wish to make a request for proprietary treatment for particular information, refer to 19 CFR 351.304, 351.305, and 351.306. You must submit the request for proprietary treatment at the same time as the claimed business proprietary information is submitted to Commerce.

---

[5] Commerce's certification requirements changed effective March 14, 2011. Additional changes regarding the certification of factual information by governments participating in a proceeding became effective on September 2, 2011. Any submissions made to Commerce pursuant to proceedings initiated on or after March 14, 2011, must be accompanied by the appropriate company, government, and representative certifications (as applicable). For more information refer to 76 FR 7491 (February 10, 2011) and 76 FR 54697 (September 2, 2011) of the *Federal Register*.

2. Utilize the "one-day lag rule" under 19 CFR 351.303(c)(2) if you wish an additional day to review the final bracketing of business proprietary information in a document and to prepare the required public version. The filing requirements under the one-day lag rule provide for a party to file only the business proprietary document within the applicable time limit (19 CFR 351.303(c)(2)(i)). By the close of business one business day after the date the business proprietary document is filed, the person must file the complete final business proprietary document (19 CFR 351.303(c)(2)(i)(ii)). The final business proprietary document must be identical to the original document except for any bracketing corrections.

3. By the close of business one business day after the date the business proprietary document is filed (refer to the "one-day lag rule" in the preceding paragraph), submit the public version of your response (19 CFR 351.303(c)(2)(i)(iii)). A public version must contain:
   (1) a non-proprietary (public) version of your response that has sufficient detail to permit a reasonable understanding of the information submitted in confidence, and/or
   (2) an itemization of particular information that you believe you are unable to summarize. State the reasons why you cannot summarize each piece of information.

   Please note: The summarization requirement does not apply solely to the narrative portion of your response. It applies equally to worksheets and other appendices to your response. Generally, numerical data, such as that provided in sales and loan charts, are adequately summarized only if grouped or presented in terms of indices or figures ranged within 10 percent of the actual figure. Responses, or portions thereof, that are not adequately summarized may be rejected from the record of this proceeding.

4. Submit the statements required regarding limited release of business proprietary information under the provisions of an APO. U.S. law permits limited disclosure to representatives of parties (*e.g.*, legal counsel) of certain business proprietary information, including electronic business proprietary information, under an APO. (Note that data received under an APO cannot be shared with others who are not covered by the APO.) Under the provisions governing APO disclosure, you must submit either:

   (1) a statement agreeing to permit the release under APO of information submitted by you in confidence during the course of the proceeding, or
   (2) a statement itemizing those portions of the information which you believe should not be released under APO, together with arguments supporting your objections to that release.

   We are required by our regulations to reject, at the time of filing, submissions of business proprietary information that do not contain one of these statements. As discussed above, you must state in the upper right-hand corner of the cover letter

accompanying your questionnaire response whether you agree or object to release of the submitted information under APO (*e.g.*, May Be Released Under APO or May Not Be Released Under APO). *See* 19 CFR 351.304 for specific instructions. If you do not agree to release under APO all or part of the proprietary information, but we determine that the information should be released, you will have the opportunity to withdraw the information (see 19 CFR 351.304(d)). However, any information which you withdraw will be removed from the official record and will not be used in our determination.

5. Place brackets ("[ ]") around information for which you request business proprietary treatment. Place double brackets ("[[ ]]") around information for which you request proprietary treatment and which you do not agree to release under APO.[6]

6. Provide to all parties whose representatives have been granted APO access and who are listed on Commerce's most recent APO Service List, a complete copy of the submission--proprietary document and public version, except for that information which you do not agree to release under APO. (APO service lists, as well as public service lists, are maintained at http:/enforcement.trade.gov/apo/apo-svc-lists.html, and are also either attached to the cover letter of this questionnaire or will be provided by a subsequent letter from Commerce). If you exclude information because you do not agree to release it under APO, you must submit the complete business proprietary version, wherein information in double brackets has been excluded. This version of the response must be marked "Business Proprietary/APO Version-- May Be Released Under APO" on the cover page. For parties that do not have access to information under APO, please provide a public version only.

7. A chart summarizing AD/CVD document filing requirements can be found at http://enforcement.trade.gov/filing/index.html. Detailed and supplemental information concerning APOs, including the APO Handbook, a complete set of APO regulations, and APO application forms and service lists, can be found at http:/enforcement.trade.gov/apo/index.html.

G. Verification

All information submitted is subject to verification. Failure to allow full and complete verification of any information may affect the consideration accorded to that or any other verified or non-verified item in the responses.

H. Extension Requests

[6] Commerce will not disclose proprietary customer names under APO during an antidumping or countervailing duty investigation until either an order is published or the investigation is suspended. To ensure that proprietary customer names are properly treated in this case, place double brackets ("[[ ]]") around all proprietary customer names in your submissions to Commerce during the course of this investigation.

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadline, or are unable to provide all requested supporting documentation by the same date, you must notify the officials in charge and submit a written request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request. All extension requests must be in writing and should state the reasons for the request pursuant to 19 CFR 351.302(c). Any extension granted in response to your request will be communicated in writing by Commerce; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5:00 pm ET on the established deadline, we may conclude that you have decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the deadline. As required by 19 CFR 351.302(d), we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

I. Separate Letter of Appearance Required

Pursuant to 19 CFR 351.103(d)(1), "with the exception of a petitioner filing a petition in an investigation, to be included on the public service list for a particular segment, each interested party must file a letter of appearance." The letter of appearance must be filed separately from any other document (with the exception of an application for APO access) and must be accompanied by the certification(s) required under 19 CFR 351.303(g).

## IV. SUBMISSION OF COMPUTER DATABASES AND SPREADSHEETS

### A. Filing Instructions

Except as described above under the section "Manual Filing," all database files, including Microsoft Excel spreadsheets that are less than 20 MB in size must be filed electronically using ACCESS. Instructions for using ACCESS can be found above and at http://access.trade.gov. Please refer to the Handbook on Electronic Filing Procedures in the "Help" section of the website.

For manual filings (when applicable), separately pack and label the electronic media containing the databases or spreadsheets (see section below for labeling and other instructions). Deliver the package to the address listed in the section "Manual Filing." (Note that databases over 20 MB must be filed manually.)

B. Special Instructions for Manual Filing

For manual filings (when applicable), you may submit your databases or spreadsheets on either a CD or DVD. Compressed databases are acceptable, but decompression instructions and software must accompany any compressed data submission.

Clearly label the CD or DVD with the following information:
1. Case name, case number, and submission date
2. Name of respondent
3. Proceeding and time period (*e.g.*, INV-POI 1/2018-12/2018)
4. Name of official in charge
5. File formats and software used to create the databases or worksheets
6. File names, number of observations, and record lengths
7. ACCESS bar code number

C. Data Formatting Instructions

1. Since the database or spreadsheet must be readable by an IBM-compatible PC, the data must be encoded in ASCII format or, at your option, PC SAS, Access, dBase, or Excel formats.

2. Report numerical data in a numerical format that allows calculations (*e.g.*, 10, not 10 MT). Units should be reported in fields separate from numerical values.

# CERTIFICATION

**COMPANY CERTIFICATION**

I, **(PRINTED NAME AND TITLE)**, currently employed by **(COMPANY NAME)**, certify that I prepared or otherwise supervised the preparation of the attached submission of (**IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {THE (ANTIDUMPING OR COUNTERVAILING) DUTY INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**. I certify that the public information and any business proprietary information of **(CERTIFIER'S COMPANY NAME)** contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature: ____________________**
**Date: ________________________**

* For multiple person certifications, all persons should be listed in the first sentence of the certification and all persons should sign and date the certification. In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.*, "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."

**REPRESENTATIVE CERTIFICATION** ***

I, **(PRINTED NAME)**, with **(LAW FIRM or OTHER FIRM)**, **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {COUNSEL TO} or {REPRESENTATIVE OF}) (COMPANY NAME, OR GOVERNMENT OF COUNTRY, OR NAME OF ANOTHER PARTY)**, certify that I have read the attached submission of **(IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {THE (ANTIDUMPING OR COUNTERVAILING DUTY) INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**. In my capacity as **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {COUNSEL} or {ADVISER, PREPARER, OR REVIEWER})** of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature:** ______________________
**Date:** __________________________

*** For multiple representative certifications, all representatives and their firms should be listed in the first sentence of the certification and all representatives should sign and date the certification. In addition, singular pronouns and possessive adjectives should be changed accordingly, *e.g.*, “I” should be changed to “we” and “my knowledge” should be changed to “our knowledge.”

# Tab 8

# P.R. 115

# C.R. 49-50

Barcode: 4485240-01 C-331-806 INV - Investigation

International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 14
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been ranged or redacted on page SRS-3, and in Exhibit SRS-2.

**PUBLIC VERSION**

January 3, 2024

Re: Frozen Warmwater Shrimp from Ecuador – Sources of Raw Shrimp Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos C.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's December 14, 2023, questionnaire, entitled "Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp" ("Sources Questionnaire"). This response is timely submitted in accordance with the Department's December 18, 2023, letter extending the deadline for the Sources Questionnaire response until today. Accompanying this submission is a completed supplier template in Excel® format.

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA request proprietary treatment and the basis for the request:


Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:25 PM, Submission Status: Approved

- Names of Particular Customers, Distributors, or Suppliers: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Other Specific Business Information Related to SONGA's Business and Production Operations, Volume of Raw Material Purchases, Total Frozen Shrimp Production, etc., the Release of Which to the Public Would Cause Substantial Harm to SONGA's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to SONGA's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's Sources Questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos C.A.*

Barcode: 4485240-01 C-331-806 INV - Investigation

## COMPANY CERTIFICATION

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galápagos C.A. (SONGA), certify that I prepared or otherwise supervised the preparation of the attached submission of the Sources of Raw Shrimp questionnaire response, filed on January 3, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: January 3, 2024

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:25 PM, Submission Status: Approved

Barcode: 4485240-01 C-331-806 INV - Investigation

## Counsel Certification

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galapagos C.A. ("SONGA"), certify that I have read the attached submission of the Souces of Raw Shrimp questionnaire response, filed on January 3, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ____________________

Date: January 3, 2024

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:25 PM, Submission Status: Approved

Barcode: 4485240-01 C-331-806 INV - Investigation

## CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 3rd day of January, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically via ACCESS (proprietary version) or via e-mail (public version), on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:25 PM, Submission Status: Approved

Barcode: 4485240-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**AD/CVD Operations, Office IV**

**Business proprietary information has been redacted on page SRS-3, and in Exhibit SRS-2.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

# COUNTERVAILING DUTY INVESTIGATION OF FROZEN WARMWATER FROM ECUADOR

# RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A. ("SONGA") TO THE DEPARTMENT'S DECEMBER 14, 2023 SOURCES OF RAW SHRIMP QUESTIONNAIRE

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Counsel to Sociedad Nacional de Galápagos C.A.**

**Date submitted: January 3, 2024**

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:25 PM, Submission Status: Approved

Barcode: 4485240-01 C-331-806 INV - Investigation



**Response of Socieded Nacional de Galápagos C.A. ("SONGA")
to the Department's December 14, 2023,
Sources of Raw Shrimp Questionnaire**

**Frozen Warmwater Shrimp From Ecuador
Investigation**

**1. Please explain how your company is organized; include an explanation of whether your company farms or otherwise harvests raw shrimp, processes raw shrimp into frozen shrimp, or both. {See Attachment II of this letter for a full description of the scope of this investigation.}**

ANSWER: Sociedad Nacional de Galápagos C.A. ("SONGA") is a vertically integrated company that produces frozen warmwater shrimp for export to the United States and numerous third countries. SONGA has affiliated shrimp farms that are separately incorporated, and it also purchases raw shrimp from unaffiliated farms. SONGA itself does not own or operate any shrimp farms. **Exhibit SRS-1** contains an organizational chart showing how SONGA's production process and its administrative functions are organized.

**2. Please explain whether your company is comprised of cooperatives and explain whether these cooperatives farm or otherwise harvest raw shrimp, process raw shrimp into the subject merchandise, or both.**

ANSWER: SONGA is not comprised of cooperatives.

**3. Is your company only an exporter of frozen shrimp (that is, your company does not farm or otherwise harvest raw shrimp or process raw shrimp into frozen shrimp)?**

ANSWER: SONGA is not only an exporter of frozen shrimp; rather, it is a processor and exporter of frozen shrimp.

**4. If "yes" to question 3, then using the attached "Template for Processors of Raw Shrimp," report all the processors of raw shrimp from which you purchased the frozen shrimp exported during the period January 1, 2022, through December 31, 2022. Please submit your completed worksheet to Commerce as both an attachment to your response and in an Excel file.**

ANSWER: Not applicable, since SONGA is not only an exporter of frozen shrimp.



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:25 PM, Submission Status: Approved

5. **Further, if "yes" to question 3, please provide a copy of this questionnaire and accompanying "Template for Suppliers of Raw Shrimp" to each of the processors identified in response to question 4 so that they can complete it with respect to their shrimp suppliers. Please confirm in your response to this questionnaire that you have done so. If possible, please obtain the questionnaire responses from these companies and submit them with your response. However, if you have purchased from more than 10 processors, please immediately contact the official listed in the cover letter of this attachment.**

ANSWER: Not applicable, since SONGA is not only an exporter of frozen shrimp.

6. **If your company processes raw shrimp and obtains its raw shrimp from suppliers that are affiliated with, but separately incorporated from your company or from suppliers that are not affiliated with your company, please complete the attached "Template for Suppliers of Raw Shrimp," to include all of those suppliers. Please be sure to indicate whether the supplier(s) might be considered cross-owned with your company. { Cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets. This standard will normally be met where there is a majority voting interest between two corporations or through common ownership of two (or more) corporations. Cross-ownership does not require one corporation to own 100 percent of the other corporation. Normally, cross-ownership will exist where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations. In certain circumstances, a large minority voting interest (for example, 40 percent) or a "golden share" may also result in cross-ownership. See Section III of the Initial Questionnaire at "Affiliated Companies," for more information.}**

ANSWER: **Exhibit SRS-2** contains the completed "Template for Suppliers of Raw Shrimp" in Excel® format. As requested, this template lists all affiliated farms that are separately incorporated and all unaffiliated farms. SONGA also indicates cross-ownership of affiliated shrimp farms in the template, where applicable.

7. **If your company processes raw shrimp and you have no suppliers that are separately incorporated or unaffiliated, please confirm that the raw shrimp your company processes into frozen shrimp are produced within your company (that is, none of your suppliers are separately incorporated) and report the quantity of raw shrimp produced by your company. If not, please explain the sources of the raw shrimp you process.**

ANSWER: SONGA does not own any shrimp farms. Rather, all affiliated and cross-owned farms are separately incorporated. Therefore, this question is not applicable.

8. **If your company processes raw shrimp and produces frozen shrimp, but you also have outside suppliers of raw shrimp, please complete the attached "Template for Suppliers of Raw Shrimp," for your outside purchases. Please also report the quantity of frozen shrimp produced by your company.**



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:25 PM, Submission Status: Approved

ANSWER: SONGA understands the term "outside suppliers of raw shrimp" in this question to ask it to report in the "Template for Suppliers of Raw Shrimp" each of its unaffiliated suppliers of raw shrimp. **Exhibit SRS-2** reports SONGA's unaffiliated suppliers of raw shrimp in response to question no. 6 above. The total quantity of frozen shrimp that Songa produced during the period of investigation (i.e., in the calendar year 2022) was **[** # **]** pounds.



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:25 PM, Submission Status: Approved

PUBLIC VERSION – BPI Has Been Redacted

## Exhibit List

| Exhibit No. | Description | Electronic Format | Classification |
|---|---|---|---|
| **SRS-1** | SONGA Organizational Chart | - | Public |
| **SRS-2** | SONGA Template for Suppliers of Raw Shrimp | Excel® | BPI |

# EXHIBIT SRS-2

**Socieded Nacional de Galápagos C.A. ("SONGA")**
**Template for Suppliers of Raw Shrimp**
Period: January 1, 2022 through December 31, 2022

| Supplier's Name | Supplier's Address | Cross-Owned with Your Company (Insert Yes or No) | Household Farmer or Formal Enterprise (to best of your knowledge) | Volume of Raw Shrimp Purchased | Unit of Measure |
|---|---|---|---|---|---|
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | 5,500 ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | 75 ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| [ | | | | ] | THOUSAND POUNDS |
| **TOTAL** | | | [ | ] | THOUSAND POUNDS |


Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:25 PM, Submission Status: Approved

# Tab 9

# P.R. 116

# C.R. 51

Barcode: 4485246-01 C-331-806 INV - Investigation

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 15
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been ranged or redacted on pages SRS-1 and SRS-3, and in Exhibit SRS-1.

**PUBLIC VERSION**

January 3, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Sources of Raw Shrimp Questionnaire Response

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's December 14, 2023, questionnaire, entitled "Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp" ("Sources Questionnaire"). This response is timely submitted in accordance with the Department's December 18, 2023, letter extending the deadline for the Sources Questionnaire response until today. Accompanying this submission is a completed supplier template in Excel® format.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which Santa Priscila requests proprietary treatment and the basis for the request:


Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:30 PM, Submission Status: Approved

- Names of Particular Customers, Distributors, or Suppliers: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Other Specific Business Information Related to Santa Priscila's Business and Production Operations, Volume of Raw Material Purchases, Total Frozen Shrimp Production, etc., the Release of Which to the Public Would Cause Substantial Harm to Santa Priscila's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to Santa Priscila's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's Sources Questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to Industrial Pesquera Santa Priscila C.A.*

**COMPANY CERTIFICATION**

I, Diego Puente, Vice President, currently employed by Industrial Pesquera Santa Priscila S.A., certify that I prepared or otherwise supervised the preparation of the attached submission of the "Sources of Raw and/or Frozen Warmwater Shrimp" questionnaire response, filed on January 3, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Santa Priscila contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: JANUARY 3RD, 2024

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:30 PM, Submission Status: Approved

## Counsel Certification

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), certify that I have read the attached submission of the Souces of Raw Shrimp questionnaire response, filed on January 3, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Kenneth Hammer

Date: January 3, 2024

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 3rd day of January, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically via ACCESS (proprietary version) or via e-mail (public version), on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4485246-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**AD/CVD Operations, Office IV**

**Business proprietary information has been ranged or redacted on pages SRS-1 and SRS-3, and in Exhibit SRS-1.**

**PUBLIC VERSION**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

# RESPONSE OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A. TO THE DEPARTMENT'S DECEMBER 14, 2023 SOURCES OF RAW SHRIMP QUESTIONNAIRE

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Counsel to Industrial Pesquera Santa Priscila S.A.**

**Date submitted: January 3, 2024**

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:30 PM, Submission Status: Approved

Barcode: 4485246-01 C-331-806 INV - Investigation



**Response of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") to the Department's December 14, 2023, Sources of Raw Shrimp Questionnaire**

**Frozen Warmwater Shrimp From Ecuador Investigation**

**1. Please explain how your company is organized; include an explanation of whether your company farms or otherwise harvests raw shrimp, processes raw shrimp into frozen shrimp, or both.**

ANSWER: Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") is a registered company under Ecuadorian law. It was established in Machala, Ecuador in 1973 as a limited liability company and became a joint stock company in 1993. Santa Priscila is an integrated company that engages in shrimp processing of white shrimp (*litopenaeus vannamei*), shrimp farming, feed production, hatchery operations, and breeding operations. Santa Priscila exports frozen warmwater shrimp to numerous countries around the world, and the product forms that it exports include raw and cooked shrimp, head-on and headless shrimp, and peeled shrimp. All of these products are frozen using a variety of freezing methods.

Santa Priscila processes fresh shrimp in [# ] plants that it owns and in [ # ] unaffiliated plants with which it has a toll processing agreement in which it pays an agreed upon fee to the toll processor for the service of processing the fresh shrimp that Santa Priscila provides. Santa Priscila has the following two sources of raw shrimp:

1. Shrimp Purchased by Santa Priscila: this shrimp comes from purchases made by Santa Priscila from other enterprises, some of which are affiliated and/or cross-owned; and
2. Shrimp Produced by Santa Priscila: this shrimp comes from Santa Priscila's production on its own farms as well as production on farms that belong to affiliated companies or unaffiliated companies, which Santa Priscila operates either by lease or participation contracts.



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:30 PM, Submission Status: Approved

2. **Please explain whether your company is comprised of cooperatives and explain whether these cooperatives farm or otherwise harvest raw shrimp, process raw shrimp into the subject merchandise, or both.**

ANSWER: Santa Priscila is not comprised of cooperatives.

3. **Is your company only an exporter of frozen shrimp (that is, your company does not farm or otherwise harvest raw shrimp or process raw shrimp into frozen shrimp)?**

ANSWER: Santa Priscila is not just an exporter of frozen shrimp. As described in the answer to question no. 1 above, it is a vertically integrated processor of frozen warmwater shrimp.

4. **If "yes" to question 3, then using the attached "Template for Processors of Raw Shrimp," report all the processors of raw shrimp from which you purchased the frozen shrimp exported during the period January 1, 2022, through December 31, 2022. Please submit your completed worksheet to Commerce as both an attachment to your response and in an Excel file.**

ANSWER: Not applicable, since Santa Priscila is not only an exporter of frozen shrimp.

5. **Further, if "yes" to question 3, please provide a copy of this questionnaire and accompanying "Template for Suppliers of Raw Shrimp" to each of the processors identified in response to question 4 so that they can complete it with respect to their shrimp suppliers. Please confirm in your response to this questionnaire that you have done so. If possible, please obtain the questionnaire responses from these companies and submit them with your response. However, if you have purchased from more than 10 processors, please immediately contact the official listed in the cover letter of this attachment.**

ANSWER: Not applicable, since Santa Priscila is not only an exporter of frozen shrimp.

6. **If your company processes raw shrimp and obtains its raw shrimp from suppliers that are affiliated with, but separately incorporated from your company or from suppliers that are not affiliated with your company, please complete the attached "Template for Suppliers of Raw Shrimp," to include all of those suppliers. Please be sure to indicate whether the supplier(s) might be considered cross-owned with your company. { Cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets. This standard will normally be met where there is a majority voting interest between two corporations or through common ownership of two (or more) corporations. Cross-ownership does not require one corporation to own 100 percent of the other corporation. Normally, cross-ownership will exist where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations. In certain circumstances, a large minority voting interest (for example, 40 percent) or a "golden share" may also result in cross-ownership. See Section III of the Initial Questionnaire at "Affiliated Companies," for more information.}**

ANSWER: **Exhibit SRS-1** contains the completed "Template for Suppliers of Raw Shrimp" in Excel® format. As requested, this template lists all affiliated farms that are separately



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:30 PM, Submission Status: Approved

incorporated and all unaffiliated farms. Santa Priscila also indicates cross-ownership of affiliated shrimp farms in the template, where applicable. However, Santa Priscila obtained approximately [ # ] percent of its fresh shrimp supply from farms that it owned and/or operated.

7. **If your company processes raw shrimp and you have no suppliers that are separately incorporated or unaffiliated, please confirm that the raw shrimp your company processes into frozen shrimp are produced within your company (that is, none of your suppliers are separately incorporated) and report the quantity of raw shrimp produced by your company. If not, please explain the sources of the raw shrimp you process.**

ANSWER: The answer to this question is "no" because Santa Priscila is a company that has suppliers that are separately incorporated or unaffiliated. In addition to buying shrimp from unaffiliated and affiliated company-owned farms, Santa Priscila itself owns shrimp farms, which it will identify in its response to the "Other Companies Subject to Investigation" portion of its response to Section III of the countervailing duty questionnaire to be submitted to the Department on January 4, 2024.

8. **If your company processes raw shrimp and produces frozen shrimp, but you also have outside suppliers of raw shrimp, please complete the attached "Template for Suppliers of Raw Shrimp," for your outside purchases. Please also report the quantity of frozen shrimp produced by your company.**

ANSWER: Santa Priscila understands the term "outside suppliers of raw shrimp" in this question to ask it to report in the "Template for Suppliers of Raw Shrimp" each of its unaffiliated suppliers of raw shrimp. **Exhibit SRS-1** includes Santa Priscila's unaffiliated suppliers of raw shrimp in response to question no. 6 above. The total quantity of frozen shrimp that Santa Priscila produced during the period of investigation (i.e., in the calendar year 2022) was [ # ] pounds.



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:30 PM, Submission Status: Approved

Barcode: 4485246-01 C-331-806 INV - Investigation



**Exhibit List**

| Exhibit No. | Description | Electronic Format | Classification |
|---|---|---|---|
| **SRS-1** | Santa Priscila Template for Suppliers of Raw Shrimp | Excel® | BPI |

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/3/24 3:30 PM, Submission Status: Approved

# EXHIBIT SRS-1

**Industrial Pesquera Santa Priscila S.A.**
**Template for Suppliers of Raw Shrimp**
*Period: January 1, 2022 through December 31, 2022*

| | Supplier's Name | Supplier's Address | Province | CITY | Cross-Owned with Your Company (Insert Yes or No) | Household Farmer or Formal Enterprise (to best of your knowledge) | Volume of Raw Shrimp Purchased | Unit of Measure |
|---|---|---|---|---|---|---|---|---|
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | 1,000,000.00 ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |
| [ | | | | | | | ] | LBS |

| Supplier's Name | Supplier's Address | Province | CITY | Cross-Owned with Your Company (Insert Yes or No) | Household Farmer or Formal Enterprise (to best of your knowledge) | Volume of Raw Shrimp Purchased | Unit of Measure |
|---|---|---|---|---|---|---|---|
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | 200,000.00 ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | 100,000.00 ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |

| Supplier's Name | Supplier's Address | Province | CITY | Cross-Owned with Your Company (Insert Yes or No) | Household Farmer or Formal Enterprise (to best of your knowledge) | Volume of Raw Shrimp Purchased | Unit of Measure |
|---|---|---|---|---|---|---|---|
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | 50,000.00 ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |

| Supplier's Name | Supplier's Address | Province | CITY | Cross-Owned with Your Company (Insert Yes or No) | Household Farmer or Formal Enterprise (to best of your knowledge) | Volume of Raw Shrimp Purchased | Unit of Measure |
|---|---|---|---|---|---|---|---|
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | 15,000.00 ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| [ | | | | | | ] | LBS |
| **TOTAL** | | | | | [ | ] | **LBS** |

# Tab 10

# P.R. 117

# C.R. 53

Barcode: 4486136-01 C-331-806 INV - Investigation

International Trade Lawyers

700 Pennsylvania Ave, SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 16
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been
redacted on page AFF-2,
and in Exhibit AFF-1.

**PUBLIC VERSION**

January 5, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
<u>Section III "Affiliated Companies" Questionnaire Response</u>

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos C.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the "Affiliated Companies" portion of Section III of the Department's December 12, 2023, questionnaire. This response is timely submitted in accordance with the Department's December 28, 2023, letter extending the deadline for the affiliation response until today.

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA request proprietary treatment and the basis for the request:

- <u>Nature of Products or Production Process</u>: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(1).

- <u>Names of Particular Customers, Distributors, or Suppliers</u>: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).


Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:24 AM, Submission Status: Approved

- Other Specific Business Information Related to SONGA's Business and Production Operations, Ownership and Affiliations, etc., the Release of Which to the Public Would Cause Substantial Harm to SONGA's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to SONGA's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos C.A.*

Barcode: 4486136-01 C-331-806 INV - Investigation

# COMPANY CERTIFICATION

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galápagos C.A. (SONGA), certify that I prepared or otherwise supervised the preparation of the attached submission of the "Other Companies Subject to Investigation" portion of the Section III questionnaire response, filed on January 4, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: January 3, 2024

Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:24 AM, Submission Status: Approved

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galapagos C.A. ("SONGA"), certify that I have read the attached submission of the "Other Companies Subject to Investigation" portion of the Section III questionnaire response, filed on January 4, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Kenneth Ham

Date: January 4, 2024

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 5th day of January, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically via ACCESS (proprietary version) or via e-mail (public version), on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4486136-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**POI: 1/01/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information has been redacted on page AFF-2, and in Exhibit AFF-1.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

**RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A.**
**TO THE AFFILIATED COMPANIES PORTION OF SECTION III OF THE**
**DEPARTMENT'S DECEMBER 12, 2023 QUESTIONNAIRE –**

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: January 5, 2024**

**Counsel to Sociedad Nacional de Galápagos C.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:24 AM, Submission Status: Approved

## Introduction

This response is submitted on behalf of Sociedad Nacional de Galápagos C.A. ("SONGA") and its affiliated companies, which are identified below in response to the Department's December 12, 2023, questionnaire in this countervailing duty investigation in Frozen Warmwater Shrimp from Ecuador for the January 1, 2022, through December 31, 2022 period of investigation ("POI").

**This questionnaire requests information about programs alleged to be provided to Industrial Pesquera Santa Priscila S.A. (Santa Priscila) and Sociedad Nacional de Galápagos C.A. (SONGA), producers/exporters in Ecuador of frozen warmwater shrimp or "subject merchandise"). Section 775 of the Act also requires Commerce to investigate any other programs discovered during the course of this investigation that potentially confer countervailable subsidies on the manufacture, production, or exportation of subject merchandise.**

**For general instructions, please review *Section I* of this questionnaire.**

**Commerce has standardized the appendices to *Section II* and *Section III* of this questionnaire; one or more of the appendices may not be applicable to the circumstances of this investigation. You should only respond to the questions in a specific appendix if it is identified under a specific question below.**

**Your government may contend that certain programs listed below are not countervailable. For these programs, you must still fully respond to the questions below, unless specifically instructed otherwise.**

**A. OTHER COMPANIES SUBJECT TO INVESTIGATION**

**In addition to providing a response to this questionnaire regarding your own company, we require responses from certain affiliated companies or companies involved in your sales of subject merchandise, as explained below in sections A through D. A failure on the part of any such companies to provide a response to this questionnaire may adversely affect your own results in this investigation. For the remainder of this questionnaire, the terms respondent(s), company respondent(s), "you," or "your company," refer not just to your company, but to all companies required to complete this questionnaire. Please provide separate answers under each question and separate spreadsheets for each of these companies.**

**B. Identification of the companies that you must include in your response is necessary early in this investigation. Therefore, within 14 days of the date of this questionnaire, please submit to Commerce a list of the companies that you intend to include as part of your questionnaire response under the criteria in sections A through D below. Also within 14 days of the date of this questionnaire, please respond to questions C.1 and C.2 under the "Affiliated Companies" section below.**

**Unless specified differently, your answers to the requests below should cover your company's situation during the POI. Usage of the present tense in this section refers to the POI.**

**We also instruct you to provide a list of those companies for which you are responding to your government as soon as possible so that the government can include these companies in its response to this questionnaire.**



Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:24 AM, Submission Status: Approved

**The companies that must submit a complete response are the following:**

**A. Producers Supplying Exporters**

**If your company exported subject merchandise produced by other companies in your country during the POI, then you must submit complete questionnaire responses for all producers that supply your company.**

ANSWER: SONGA produced all the subject merchandise that it exported to the United States during the POI. This production included the subject merchandise processed for SONGA under a toll processing agreement with [ COMPANY ], an affiliated toll processor that is also cross-owned with SONGA. Under this agreement, SONGA delivered fresh raw shrimp that it owned for processing and received back subject merchandise in exchange for the payment of a processing fee.

**B. Export Trading Companies**

**If your company sells the subject merchandise to an export trading company which then exports the subject merchandise to the United States, then you must submit complete questionnaire responses for all such trading companies.**

ANSWER: To the best of its knowledge, SONGA did not sell the subject merchandise to any export trading company located in Ecuador that then sold subject merchandise to the United States.

**C. Affiliated Companies**

**Affiliation is defined in section 771(33)(A)-(G) of the Act. Affiliation can be indicated by a number of factors, including: (1) personal family groupings, (2) corporate groupings, (3) shared board members or executive officers, (4) employer and employee relationships among owners, board members, or executive officers of multiple parties, (5) one party's ownership or control of stock with voting privileges in another, (6) franchise and joint venture agreements, (7) close supplier relationships, and (8) other indicia of control by one party over another, directly, or indirectly through third parties. "Control" exists where one party is legally or operationally in a position to exercise restraint or direction over another party.**

**Please provide the following information about your company's affiliated companies:**

1. **The identity of all companies with which your company is affiliated within the meaning of section 771(33) of the Act, including the full name and mailing address of each company.**



Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:24 AM, Submission Status: Approved

ANSWER: As requested, **Exhibit AFF-1** lists the full name and mailing address of each company affiliated with SONGA within the meaning of Section 771(33) of the Tariff Act of 1930.

**2. Describe in detail the nature of the relationship between your company and those companies listed in response to the prior question. Specify for example, whether the companies share a board of directors, or whether members of each company's board sit on the board(s) of the other companies, and how the voting rights are distributed among board members; specify if, and how, officers of one company are directly involved in overseeing the operations of another company. Specify whether an affiliated company supplies inputs into your company's production process.**

ANSWER: **Exhibit AFF-1** includes a description of the nature of the relationship between SONGA and each company with which SONGA is affiliated.

**You must provide complete responses for certain "cross-owned" affiliated companies.**

**Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other. In addition, if two companies are both cross-owned by a third party, the two companies themselves would be considered cross-owned (for example, cross-ownership exists between two companies owned by the same parent).**

**You must provide a complete questionnaire response for those affiliates where "cross-ownership" exists, and one of the following situations exists:**

- **the cross-owned company produces the subject merchandise; or**
- **the cross-owned company is a holding company or a parent company (with its own operations) of your company; {Your response must cover all cross-owned parent companies and holding companies, not only companies that directly held a controlling stake in your company during or prior to the POI. For example, if your company was a direct subsidiary of one cross-owned company, and that company was a direct subsidiary of another cross-owned company, then you must respond on behalf of both the cross-owned parent and the cross-owned "grandparent" companies. By direct subsidiary, we are referring to a company that is directly owned by another company. An indirect subsidiary, by contrast, has an intermediate owner between itself and the ultimate owner.} or**
- **the cross-owned company supplies an input product to you for production of the downstream product produced by the respondent; or**
- **the cross-owned company has received a subsidy and transferred it to your company.**



Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:24 AM, Submission Status: Approved

<u>ANSWER</u>: **Exhibit AFF-1** identifies each SONGA affiliate that meets the cross-ownership standards stated in the Department's question and in the Department's regulations. SONGA confirms that no cross-owned affiliate produced the subject merchandise during the POI.

In accordance with the Department's instructions, SONGA intends to provide a complete response to Section III of the Department's questionnaire on behalf of each cross-owned affiliate that engaged in any aspect of the production process for subject merchandise, including the provision of inputs and services to SONGA dedicated to the production process of subject merchandise (i.e., frozen shrimp) during the POR or during the AUL period. All of the cross-owned affiliates that are required to provide complete responses to Section III of the Department's questionnaire are identified in **Exhibit AFF-1** in a separate column.

Other than the cross-owned affiliated companies identified in **Exhibit AFF-1**, none of SONGA's cross-owned affiliates is required to provide a complete Section III response based upon the Department's instructions because no such affiliate:

(1) produced the subject merchandise;

(2) was a holding company or parent company of SONGA;

(3) supplied an input product to a cross-owned shrimp farm; or

(4) received a subsidy and transferred it to SONGA.

**D. Former Owners / Changes in Ownership**

**{All cross-owned affiliates meeting the conditions under sub section C during the POI and AUL and are required to submit a complete questionnaire response should also provide a response to this section with regard to any former owners and changes in ownership}**

**Commerce allocates the benefits received from certain types of subsidies over time (*e.g.*, equity infusions, non-recurring grants, debt forgiveness, import duty or value- added tax (VAT) exemptions or reductions on capital equipment, *etc.*). *See* 19 CFR 351.524 and subsection C of the "General Questions" section below for a complete explanation.**

**Thus, in addition to investigating alleged subsidies that your company may have received during the POI, Commerce is also investigating alleged allocable, non-recurring subsidies**

Barcode: 4486136-01 C-331-806 INV - Investigation



**that your company may have received during the AUL period. Because of this, if your company obtained all or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, or its assets continue to operate as part of your company, we require a complete questionnaire response for such company. If your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the *Change-in- Ownership Appendix*. If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do not need to provide a response to the *Change-in-Ownership Appendix*.**

**Finally, if your company has been privatized, changed ownership, merged with another company, or devolved another company/ies from your company's corporate structure in whole or in part, during the AUL period and your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the *Change-in- Ownership Appendix*. If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do not need to provide a response to this appendix.**

ANSWER: SONGA will provide a complete response on behalf of all companies for which it obtained all or substantially all the assets during the average useful life ("AUL") period that continued to exist as ongoing entities during the POI, or whose assets continued to operate as part of SONGA during the POI. SONGA does not challenge the Department's "baseline presumption" that non-recurring subsidies continued to benefit the recipient over the AUL period at this time. Accordingly, SONGA is not required to respond to the Change-in-Ownership Appendix.



Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:24 AM, Submission Status: Approved

# Exhibit List

| Exhibit No. | Description | Classification |
|---|---|---|
| **AFF-1** | List of SONGA's Affiliated Companies | BPI |

# EXHIBIT AFF-1

**List of Affiliates of Socieded Nacional de Galapagos C.A. ("SONGA")**
As of December 31, 2022

| Seq. No. | Name of Affiliate | Mailing Address | Nature of Relationship | Percentage of Shares Owned by SONGA | Description of Business Activity | Cross-Owned with SONGA? (Yes/No) | Producer of Subject Merchandise during the POI (Yes/No) | Business Activity Related to Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production Fresh Shrimp? (Yes/No) | Required to Provide Complete Section III Response (Yes/No) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 [ | | | | | | | | | | | ] |
| 2 [ | | | | | | | | | | | ] |
| 3 [ | | | | | | | | | | | ] |
| 4 [ | | | | | | | | | | | ] |
| 5 [ | | | | | | | | | | | ] |
| 6 [ | | | | | | | | | | | ] |
| 7 [ | | | | | | | | | | | ] |
| 8 [ | | | | | | | | | | | ] |
| 9 [ | | | | | | | | | | | ] |
| 10 [ | | | | | | | | | | | ] |
| 11 [ | | | | | | | | | | | ] |
| 12 [ | | | | | | | | | | | ] |
| 13 [ | | | | | | | | | | | ] |
| 14 [ | | | | | | | | | | | ] |
| 15 [ | | | | | | | | | | | ] |
| 16 [ | | | | | | | | | | | ] |
| 17 [ | | | | | | | | | | | ] |
| 18 [ | | | | | | | | | | | ] |
| 19 [ | | | | | | | | | | | ] |
| 20 [ | | | | | | | | | | | ] |

| Seq. No. | Name of Affiliate | Mailing Address | Nature of Relationship | Percentage of Shares Owned by SONGA | Description of Business Activity | Cross-Owned with SONGA? (Yes/No) | Producer of Subject Merchandise during the POI (Yes/No) | Business Activity Related to Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production Fresh Shrimp? (Yes/No) | Required to Provide Complete Section III Response (Yes/No) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 21 [ | | | | | | | | | | | ] |
| 22 [ | | | | | | | | | | | ] |
| 23 [ | | | | | | | | | | | ] |
| 24 [ | | | | | | | | | | | ] |
| 25 [ | | | | | | | | | | | ] |
| 26 [ | | | | | | | | | | | ] |
| 27 [ | | | | | | | | | | | ] |
| 28 [ | | | | | | | | | | | ] |
| 29 [ | | | | | | | | | | | ] |
| 30 [ | | | | | | | | | | | ] |
| 31 [ | | | | | | | | | | | ] |
| 32 [ | | | | | | | | | | | ] |
| 33 [ | | | | | | | | | | | ] |
| 34 [ | | | | | | | | | | | ] |
| 35 [ | | | | | | | | | | | ] |
| 36 [ | | | | | | | | | | | ] |
| 37 [ | | | | | | | | | | | ] |
| 38 [ | | | | | | | | | | | ] |
| 39 [ | | | | | | | | | | | ] |

| Seq. No. | Name of Affiliate | Mailing Address | Nature of Relationship | Percentage of Shares Owned by SONGA | Description of Business Activity | Cross-Owned with SONGA? (Yes/No) | Producer of Subject Merchandise during the POI (Yes/No) | Business Activity Related to Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production Fresh Shrimp? (Yes/No) | Required to Provide Complete Section III Response (Yes/No) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 40 [ | | | | | | | | | | | ] |
| 41 [ | | | | | | | | | | | ] |
| 42 [ | | | | | | | | | | | ] |
| 43 [ | | | | | | | | | | | ] |
| 44 [ | | | | | | | | | | | ] |

# Tab 11

# P.R. 118

# C.R. 54

Barcode: 4486150-01 C-331-806 INV - Investigation

International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 21
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been redacted on page AFF-2, and in Exhibits AFF-1 and AFF-2.

**PUBLIC VERSION**

January 5, 2024

Re: Frozen Warmwater Shrimp from Ecuador – Section III "Affiliated Companies" Questionnaire Response

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the "Affiliated Companies" portion of Section III of the Department's December 12, 2023, questionnaire. This response is timely submitted in accordance with the Department's December 28, 2023, letter extending the deadline for the affiliation response until today.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which Santa Priscila request proprietary treatment and the basis for the request:

- Nature of Products or Production Process: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(1).


Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:29 AM, Submission Status: Approved

- Names of Particular Customers, Distributors, or Suppliers: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Other Specific Business Information Related to Santa Priscila's Business and Production Operations, Ownership and Affiliations, etc., the Release of Which to the Public Would Cause Substantial Harm to Santa Priscila's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to Santa Priscila's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to Industrial Pesquera Santa Priscila S.A.*

Barcode: 4486150-01 C-331-806 INV - Investigation

## COMPANY CERTIFICATION

I, Diego Puente, Vice President, currently employed by Industrial Pesquera Santa Priscila S.A., certify that I prepared or otherwise supervised the preparation of the attached submission of the "Other Companies Subject to Investigation" portion of the Section III questionnaire response, filed on January 4, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Santa Priscila contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: JANUARY 4TH, 2024

Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:29 AM, Submission Status: Approved

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), certify that I have read the attached submission of the "Other Companies Subject to Invitation" portion of the Section III questionnaire response, filed on January 4, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Kenneth Hammer

Date: January 4, 2024

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 5th day of January, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically via ACCESS (proprietary version) or via e-mail (public version), on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4486150-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**POI: 1/01/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information has been redacted on page AFF-2, and in Exhibits AFF-1 and AFF-2.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

# RESPONSE OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A.TO THE AFFILIATED COMPANIES PORTION OF SECTION III OF THE DEPARTMENT'S DECEMBER 12, 2023 QUESTIONNAIRE

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: January 5, 2024**

**Counsel to Industrial Pesquera Santa Priscila S.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:29 AM, Submission Status: Approved

## Introduction

This response is submitted on behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") and its affiliated companies, which are identified below in response to the Department's December 12, 2023, questionnaire in this countervailing duty investigation in Frozen Warmwater Shrimp from Ecuador for the January 1 through December 31, 2022 period of investigation ("POI").

**This questionnaire requests information about programs alleged to be provided to Industrial Pesquera Santa Priscila S.A. (Santa Priscila) and Sociedad Nacional de Galápagos C.A. (SONGA), producers/exporters in Ecuador of frozen warmwater shrimp or "subject merchandise"). Section 775 of the Act also requires Commerce to investigate any other programs discovered during the course of this investigation that potentially confer countervailable subsidies on the manufacture, production, or exportation of subject merchandise.**

**For general instructions, please review *Section I* of this questionnaire.**

**Commerce has standardized the appendices to *Section II* and *Section III* of this questionnaire; one or more of the appendices may not be applicable to the circumstances of this investigation. You should only respond to the questions in a specific appendix if it is identified under a specific question below.**

**Your government may contend that certain programs listed below are not countervailable. For these programs, you must still fully respond to the questions below, unless specifically instructed otherwise.**

**A. OTHER COMPANIES SUBJECT TO INVESTIGATION**

**In addition to providing a response to this questionnaire regarding your own company, we require responses from certain affiliated companies or companies involved in your sales of subject merchandise, as explained below in sections A through D. A failure on the part of any such companies to provide a response to this questionnaire may adversely affect your own results in this investigation. For the remainder of this questionnaire, the terms respondent(s), company respondent(s), "you," or "your company," refer not just to your company, but to all companies required to complete this questionnaire. Please provide separate answers under each question and separate spreadsheets for each of these companies.**

**B. Identification of the companies that you must include in your response is necessary early in this investigation. Therefore, within 14 days of the date of this questionnaire, please submit to Commerce a list of the companies that you intend to include as part of your questionnaire response under the criteria in sections A through D below. Also within 14 days of the date of this questionnaire, please respond to questions C.1 and C.2 under the "Affiliated Companies" section below.**

**Unless specified differently, your answers to the requests below should cover your company's situation during the POI. Usage of the present tense in this section refers to the POI.**

**We also instruct you to provide a list of those companies for which you are responding to your government as soon as possible so that the government can include these companies in its response to this questionnaire.**



Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:29 AM, Submission Status: Approved

Barcode: 4486150-01 C-331-806 INV - Investigation



**The companies that must submit a complete response are the following:**

**A. Producers Supplying Exporters**

**If your company exported subject merchandise produced by other companies in your country during the POI, then you must submit complete questionnaire responses for all producers that supply your company.**

ANSWER: Santa Priscila produced all the subject merchandise that it exported to the United States during the POI. This production included the subject merchandise processed for Santa Priscila under toll processing agreements with [ # ] toll processors during the POI. Under these agreements, Santa Priscila delivered fresh raw shrimp that it owned to the toll processors for processing and received back subject merchandise in exchange for the payment of a processing fee. One of these toll processors, [ COMPANY NAME ], was affiliated with and cross-owned by Santa Priscila during the POI.

**B. Export Trading Companies**

**If your company sells the subject merchandise to an export trading company which then exports the subject merchandise to the United States, then you must submit complete questionnaire responses for all such trading companies.**

ANSWER: To the best of its knowledge, Santa Priscila did not sell subject merchandise to any export trading company located in Ecuador that then sold subject merchandise to the United States.

**C. Affiliated Companies**

**Affiliation is defined in section 771(33)(A)-(G) of the Act. Affiliation can be indicated by a number of factors, including: (1) personal family groupings, (2) corporate groupings, (3) shared board members or executive officers, (4) employer and employee relationships among owners, board members, or executive officers of multiple parties, (5) one party's ownership or control of stock with voting privileges in another, (6) franchise and joint venture agreements, (7) close supplier relationships, and (8) other indicia of control by one party over another, directly, or indirectly through third parties. "Control" exists where one party is legally or operationally in a position to exercise restraint or direction over another party.**

**Please provide the following information about your company's affiliated companies:**



Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:29 AM, Submission Status: Approved

1. **The identity of all companies with which your company is affiliated within the meaning of section 771(33) of the Act, including the full name and mailing address of each company.**

ANSWER: **Exhibit AFF-1** contains a list of all companies, including their full names and mailing addresses, affiliated with Santa Priscila within the meaning of Section 771(33) of the Tariff Act of 1930.

2. **Describe in detail the nature of the relationship between your company and those companies listed in response to the prior question. Specify for example, whether the companies share a board of directors, or whether members of each company's board sit on the board(s) of the other companies, and how the voting rights are distributed among board members; specify if, and how, officers of one company are directly involved in overseeing the operations of another company. Specify whether an affiliated company supplies inputs into your company's production process.**

ANSWER: **Exhibit AFF-1** includes the requested description of the nature of the relationship between Santa Priscila and each of its affiliated companies.

**You must provide complete responses for certain "cross-owned" affiliated companies.**

**Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other. In addition, if two companies are both cross-owned by a third party, the two companies themselves would be considered cross-owned (for example, cross-ownership exists between two companies owned by the same parent).**

**You must provide a complete questionnaire response for those affiliates where "cross-ownership" exists, and one of the following situations exists:**

- **the cross-owned company produces the subject merchandise; or**
- **the cross-owned company is a holding company or a parent company (with its own operations) of your company; {Your response must cover all cross-owned parent companies and holding companies, not only companies that directly held a controlling stake in your company during or prior to the POI. For example, if your company was a direct subsidiary of one cross-owned company, and that company was a direct subsidiary of another cross-owned company, then you must respond on behalf of both the cross-owned parent and the cross-owned "grandparent" companies. By direct subsidiary, we are referring to a company that is directly owned by another company. An indirect subsidiary, by contrast, has an intermediate owner between itself and the ultimate owner.} or**



Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:29 AM, Submission Status: Approved

- **the cross-owned company supplies an input product to you for production of the downstream product produced by the respondent; <u>or</u>**
- **the cross-owned company has received a subsidy and transferred it to your company.**

<u>ANSWER</u>: **Exhibit AFF-1** identifies each Santa Priscila affiliate that meets the cross-ownership standard stated in the Department's question and in the Department's regulation. Santa Priscila confirms that no cross-owned affiliate produced the subject merchandise during the POI.

In accordance with the Department's instructions, Santa Priscila will provide a complete response to Section III of the Department's questionnaire on behalf of each cross-owned affiliate that engaged in any aspect of the production process for subject merchandise, including the provision of inputs and services primarily dedicated to the production process of subject merchandise. Each cross-owned affiliate is identified in **Exhibit AFF-1**. All of the cross-owned affiliates that are required to provide complete responses to Section III of the Department's questionnaire are identified in **Exhibit AFF-1** in a separate column.

Other than the cross-owned affiliated companies identified in **Exhibit AFF-1**, none of Santa Priscila's cross-owned affiliates is required to provide a complete Section III response based upon the Department's instructions because, during the POI, no such affiliate:

(1) produced the subject merchandise;

(2) was a holding company or parent company of Santa Priscila;

(3) supplied an input product to a cross-owned shrimp farm; or

(4) received a subsidy and transferred it to Santa Priscila.

**D. Former Owners / Changes in Ownership**

**{All cross-owned affiliates meeting the conditions under sub section C during the POI and AUL and are required to submit a complete questionnaire response should also provide a response to this section with regard to any former owners and changes in ownership}**



Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:29 AM, Submission Status: Approved

Barcode: 4486150-01 C-331-806 INV - Investigation



**Commerce allocates the benefits received from certain types of subsidies over time (*e.g.*, equity infusions, non-recurring grants, debt forgiveness, import duty or value- added tax (VAT) exemptions or reductions on capital equipment, *etc.*). *See* 19 CFR 351.524 and subsection C of the "General Questions" section below for a complete explanation.**

**Thus, in addition to investigating alleged subsidies that your company may have received during the POI, Commerce is also investigating alleged allocable, non-recurring subsidies that your company may have received during the AUL period. Because of this, if your company obtained all or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, or its assets continue to operate as part of your company, we require a complete questionnaire response for such company. If your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the *Change-in- Ownership Appendix*. If your company does <u>not</u> wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do <u>not</u> need to provide a response to the *Change-in-Ownership Appendix*.**

**Finally, if your company has been privatized, changed ownership, merged with another company, or devolved another company/ies from your company's corporate structure in whole or in part, during the AUL period and your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the *Change-in- Ownership Appendix*. If your company does <u>not</u> wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do <u>not</u> need to provide a response to this appendix.**

<u>ANSWER</u>: As requested, Santa Priscila will provide a complete response on behalf of all companies from which it obtained all or substantially all the assets during the average useful life ("AUL") period and that continued to exist as ongoing entities during the POI, or whose assets continued to operate as part of Santa Priscila during the POI. Santa Priscila does not at this time challenge Commerce's baseline presumption that non-recurring subsidies continued to benefit the possible recipient over the 12-year AUL period running from 2011 through 2022. Accordingly, Santa Priscila understands that it is not required to respond to the Change-in-Ownership Appendix with respect to these companies.

Santa Priscila sold the companies identified in **Exhibit AFF-2** during the AUL period, and it does not intend to provide a complete questionnaire response for these companies since it obtained no benefit during the POI from any countervailable subsidy that any of them might have received.



Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:29 AM, Submission Status: Approved

**Exhibit List**

| Exhibit No. | Description | Classification |
|---|---|---|
| **AFF-1** | List of Santa Priscila's Affiliated and Cross-Owned Companies | BPI |
| **AFF-2** | List of Companies in Which Santa Priscila or Its Executives Were a Shareholder or are No Longer a Shareholder during the AUL Period | BPI |



Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:29 AM, Submission Status: Approved

# EXHIBIT AFF-1

**List of Affiliates of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila")**

As of December 31, 2022

| № | Name of Affiliate | Description of Business Activity | Mailing Address | Nature of Relationship | Percentage of Shares Owned by Santa Priscila % | Producer of Subject Merchandise during the POI (Yes/No) | Business Activity Related to Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production Fresh Shrimp? (Yes/No) | Cross-Owned with Santa Priscila? (Yes/No) | Required to Provide Complete Section III Response (Yes/No) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | **IPSP SHAREHOLDER COMPANIES** | | | | | | | | | | |
| 01 [ | | | | | | | | | | | ] |
| 02 [ | | | | | | | | | | | ] |
| 03 [ | | | | | | | | | | | ] |
| 04 [ | | | | | | | | | | | ] |
| 05 [ | | | | | | | | | | | ] |
| 06 [ | | | | | | | | | | | ] |
| 07 [ | | | | | | | | | | | ] |
| 08 [ | | | | | | | | | | | ] |
| 09 [ | | | | | | | | | | | ] |
| 10 [ | | | | | | | | | | | ] |
| 11 [ | | | | | | | | | | | ] |
| 12 [ | | | | | | | | | | | ] |
| 13 [ | | | | | | | | | | | ] |
| 14 [ | | | | | | | | | | | ] |
| 15 [ | | | | | | | | | | | ] |
| 16 [ | | | | | | | | | | | ] |
| 17 [ | | | | | | | | | | | ] |
| 18 [ | | | | | | | | | | | ] |
| 19 [ | | | | | | | | | | | ] |
| 20 [ | | | | | | | | | | | ] |
| 21 [ | | | | | | | | | | | ] |
| 22 [ | | | | | | | | | | | ] |
| 23 [ | | | | | | | | | | | ] |
| 24 [ | | | | | | | | | | | ] |
| 25 [ | | | | | | | | | | | ] |
| 26 [ | | | | | | | | | | | ] |
| 27 [ | | | | | | | | | | | ] |
| 28 [ | | | | | | | | | | | ] |
| 29 [ | | | | | | | | | | | ] |
| 30 [ | | | | | | | | | | | ] |
| 31 [ | | | | | | | | | | | ] |
| 32 [ | | | | | | | | | | | ] |
| 33 [ | | | | | | | | | | | ] |
| 34 [ | | | | | | | | | | | ] |
| 35 [ | | | | | | | | | | | ] |
| 36 [ | | | | | | | | | | | ] |
| 37 [ | | | | | | | | | | | ] |
| 38 [ | | | | | | | | | | | ] |

| № | Name of Affiliate | Description of Business Activity | Mailing Address | Nature of Relationship | Percentage of Shares Owned by Santa Priscila % | Producer of Subject Merchandise during the POI (Yes/No) | Business Activity Related to Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production Fresh Shrimp? (Yes/No) | Cross-Owned with Santa Priscila? (Yes/No) | Required to Provide Complete Section III Response (Yes/No) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| 39 [ | | | | | | | | | | | ] |
| 40 [ | | | | | | | | | | | ] |
| 41 [ | | | | | | | | | | | ] |
| 42 [ | | | | | | | | | | | ] |
| | [ ] SUBSIDIARIES | | | | | | | | | | |
| 01 [ | | | | | | | | | | | ] |
| 02 [ | | | | | | | | | | | ] |
| 03 [ | | | | | | | | | | | ] |
| | ENTITIES THAT OWN SHRIMP FARMS RENTED BY IPSP | | | | | | | | | | |
| 1 [ | | | | | | | | | | | ] |
| 2 [ | | | | | | | | | | | ] |
| 3 [ | | | | | | | | | | | ] |
| 4 [ | | | | | | | | | | | ] |
| 5 [ | | | | | | | | | | | ] |
| 6 [ | | | | | | | | | | | ] |
| | COMPANIES OWNED BY IPSP EXECUTIVES | | | | | | | | | | |
| 01 [ | | | | | | | | | | | ] |
| 02 [ | | | | | | | | | | | ] |
| 03 [ | | | | | | | | | | | ] |

| № | Name of Affiliate | Description of Business Activity | Mailing Address | Nature of Relationship | Percentage of Shares Owned by Santa Priscila % | Producer of Subject Merchandise during the POI (Yes/No) | Business Activity Related to Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production Fresh Shrimp? (Yes/No) | Cross-Owned with Santa Priscila? (Yes/No) | Required to Provide Complete Section III Response (Yes/No) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | [ ] FAMILY SHAREHOLDERS | | | | | | | | | | |
| 01 [ | | | | | | | | | | | ] |
| 02 [ | | | | | | | | | | | ] |
| 03 [ | | | | | | | | | | | ] |
| 04 [ | | | | | | | | | | | ] |
| 05 [ | | | | | | | | | | | ] |
| 06 [ | | | | | | | | | | | ] |
| 07 [ | | | | | | | | | | | ] |
| 08 [ | | | | | | | | | | | ] |
| 09 [ | | | | | | | | | | | ] |
| 10 [ | | | | | | | | | | | ] |
| 11 [ | | | | | | | | | | | ] |
| 12 [ | | | | | | | | | | | ] |
| 13 [ | | | | | | | | | | | ] |
| 14 [ | | | | | | | | | | | ] |
| 15 [ | | | | | | | | | | | ] |
| 16 [ | | | | | | | | | | | ] |
| 17 [ | | | | | | | | | | | ] |
| 18 [ | | | | | | | | | | | ] |
| 19 [ | | | | | | | | | | | ] |
| 20 [ | | | | | | | | | | | ] |
| 21 [ | | | | | | | | | | | ] |
| 22 [ | | | | | | | | | | | ] |
| 23 [ | | | | | | | | | | | ] |

**PUBLIC VERSION - BPI Has Been Redacted**

| № | Name of Affiliate | Description of Business Activity | Mailing Address | Nature of Relationship | Percentage of Shares Owned by Santa Priscila % | Producer of Subject Merchandise during the POI (Yes/No) | Business Activity Related to Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production of Frozen Shrimp? (Yes/No) | Supplier of Input Primarily Dedicated to the Production Fresh Shrimp? (Yes/No) | Cross-Owned with Santa Priscila? (Yes/No) | Required to Provide Complete Section III Response (Yes/No) |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | INTERESTS HELD BY SPOUSES OF [ ] FAMILY MEMBERS | | | | | | | | | | |
| 01 [ | | | | | | | | | | | ] |
| 02 [ | | | | | | | | | | | ] |
| 03 [ | | | | | | | | | | | ] |
| 04 [ | | | | | | | | | | | ] |
| 05 [ | | | | | | | | | | | ] |
| 06 [ | | | | | | | | | | | ] |
| 07 [ | | | | | | | | | | | ] |
| 08 [ | | | | | | | | | | | ] |
| 09 [ | | | | | | | | | | | ] |
| 10 [ | | | | | | | | | | | ] |
| 11 [ | | | | | | | | | | | ] |
| 12 [ | | | | | | | | | | | ] |
| 13 [ | | | | | | | | | | | ] |
| 14 [ | | | | | | | | | | | ] |
| | [ ] FAMILY SHARESHOLDINGS LOCATED OUTSIDE OF ECUADOR | | | | | | | | | | |
| 01 [ | | | | | | | | | | | ] |
| 02 [ | | | | | | | | | | | ] |
| 03 [ | | | | | | | | | | | ] |
| 04 [ | | | | | | | | | | | ] |
| 05 [ | | | | | | | | | | | ] |
| 06 [ | | | | | | | | | | | ] |
| 07 [ | | | | | | | | | | | ] |
| 08 [ | | | | | | | | | | | ] |
| 09 [ | | | | | | | | | | | ] |
| 10 [ | | | | | | | | | | | ] |
| 11 [ | | | | | | | | | | | ] |
| 12 [ | | | | | | | | | | | ] |
| 13 [ | | | | | | | | | | | ] |


Filed By: khammer@tradepacificlaw.com, Filed Date: 1/5/24 10:29 AM, Submission Status: Approved

**COMPANIES THAT MERGED WITH CROSS-OWNED AFFILIATES OF SANTA PRISCILA**

| COMPANIES MERGED WITH [ ] | Mailing Addresses |
|---|---|
| [ | ] |
| [ | ] |
| [ | ] |
| [ | ] |
| [ | ] |
| [ | ] |
| [ | ] |

| | COMPANIES MERGED WITH [ ] | Mailing Addresses | |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |

# Tab 12

# P.R. 119

Barcode:4487494-01 C-331-806 INV - Investigation -

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 EDRAKE@SCHAGRINASSOCIATES.COM F: (202) 429-2522

January 8, 2024

DOC Inv. No. C-331-806
Total Pages: 170
Investigation
AD/CVD Office IV

**PUBLIC DOCUMENT**

The Honorable Gina Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations**

Dear Secretary Raimondo:

On behalf of the Petitioner, the American Shrimp Processors Association ("ASPA" or "Petitioner"), we hereby submit new subsidy allegations in the above-referenced investigation. These allegations are accompanied by factual information submitted in accordance with 19 C.F.R. § 351.102(b)(21)(ii) and 19 C.F.R. § 351.301(c)(2)(iv)(A). These allegations are timely filed pursuant to 19 C.F.R. § 351.301(c)(2)(iv)(A). Given the scheduled date short time available for the preliminary determination in this investigation and the early submission of these new subsidy allegations well before the applicable deadline, we respectfully request that Commerce initiate investigations into these programs as soon as practicable so that any subsidies conferred under these programs may be included in the preliminary subsidy rates. ASPA reserves the right to submit additional new subsidy allegations as this investigation proceeds.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/8/24 3:42 PM, Submission Status: Approved

Barcode:4487494-01 C-331-806 INV - Investigation - PUBLIC DOCUMENT

Please contact the undersigned with any questions regarding this request.

Respectfully submitted,

/s/ Elizabeth J. Drake
Roger B. Schagrin
Elizabeth J. Drake
Christopher T. Cloutier
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

Edward T. Hayes
LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701
*Counsel to the American Shrimp Processors Association*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/8/24 3:42 PM, Submission Status: Approved

## NEW SUBSIDY ALLEGATIONS

### I. Investment in the Electrification of the Shrimp Sector

In the Petition, the ASPA alleged that the Government of Ecuador ("GOE") invested some $300 million to "electrify" the country's shrimp industry, thereby reducing the industry's dependence on diesel generators.[1] The reported goal of the program was to

> boost the productivity, export, energy efficiency and marketing opportunities of more than 2,300 shrimp companies in the provinces of Guayas, El Oro, Manabí, Esmeraldas and Santa Elena.[2]

Commerce declined to initiate an investigation of this allegation, stating that the information in the Petition indicated the funding originated with the Inter-American Development Bank and the Development Bank of Latin America.[3] In doing so, Commerce cited 19 C.F.R. § 351.527(b) for the proposition that a subsidy does not exist to the extent that "the funding for the subsidy" is provided "by an international lending or development organization."[4]

Not all of the $300 million to finance the project came from the two development organizations, however, as the GOE also contributed financially.[5] In particular, reports indicate

---

1 *See* Petition (Oct. 25, 2023) at 24-25.

2 *See* "Ecuador will invest around USD 300 million for the electrification of the shrimp sector," *BNAmericas* (Mar. 19, 2021), Petition Exhibit IV-22. Although the mandatory respondents may source raw shrimp from a variety of locations, mandatory respondent Santa Priscila at least has operations in Guayaquil, the capital of Guayas province. *See* Petition Exhibit I-16. Santa Priscila was therefore eligible for this program.

3 Initiation Checklist (Nov. 14, 2023) at 16.

4 *Id*.

5 *See* "Ecuador will invest around USD 300 million for the electrification of the shrimp sector," *BNAmericas* (Mar. 19, 2021), Petition Exhibit IV-22 ("the Electrification Plan … is financed through loans with the Inter-American Development Bank (IDB) and the Development Bank of Latin America (CAF) <u>and a counterpart of the Ecuadorian State</u>") (emphasis added).

Barcode:4487494-01 C-331-806 INV - Investigation - PUBLIC DOCUMENT

### C. Specificity

This program is specific for a number of reasons. First, it is *de jure* specific under 19 U.S.C. § 1677(5)(D)(i) because the program was created to benefit the shrimp sector. The program is also regionally specific under 19 U.S.C. § 1677(5)(D)(iv) because it targets only certain provinces within Ecuador.[15] Available information also indicates that the program is targeted at some 2,300 shrimp farms,[16] and it therefore stands to reason that these farms will be the predominant users of the program as envisioned by 19 U.S.C. § 1677(5)(D)(iii)(II).

## II. The Provision of Fuel to Shrimp Farmers for Less than Adequate Remuneration

The GOE owns all of Ecuador's subsurface resources including oil, and the country's petroleum sector is dominated by one state-owned enterprise, Petroecuador.[17] In addition, since the 1970s, the GOE has regulated domestic prices for fuel, with the resulting subsidized sales accounting for seven percent of the national government's annual expenditures.[18]

The prices the GOE sets for fuel vary by industry and intended use, and are adjusted within certain bands by Petroecuador.[19] Beginning in 2020, Petroecuador set new prices each

---

*and Final Negative Critical Circumstances Determinations: Certain Steel Products from Korea,* 58 Fed. Reg. 37,338, 37,346 (Dep't Commerce July 9, 1993).

15 *See* "Ecuador will invest around USD 300 million for the electrification of the shrimp sector," *BNAmericas* (Mar. 19, 2021), Petition Exhibit IV-22. Although the mandatory respondents may source raw shrimp from a variety of locations, mandatory respondent Santa Priscila at least has operations in Guayaquil, the capital of Guayas province. *See* Petition Exhibit I-16. Santa Priscila was therefore eligible for this program.

16 *See* "Ecuador will invest around USD 300 million for the electrification of the shrimp sector," *BNAmericas* (Mar. 19, 2021), Exhibit IV-22.

17 U.S. Department of State, "2023 Investment Climate Statements: Ecuador," **Exhibit 6**.

18 *See* "Can government transfers make energy subsidy reform socially acceptable? A case study on Ecuador," *Science Direct* (Feb. 2020), **Exhibit 7**.

19 *See* Petroecuador, "Setting fuel prices is carried out with the application of the band system" (Aug. 10, 2020), **Exhibit 8**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/8/24 3:42 PM, Submission Status: Approved

month for the "automotive, shrimp, tuna and fishing segments" within +/- five percent of the price in the previous month – reforms which were introduced to help bring Petroecuador's prices more in line with market pricing while also blunting the impact of any increases.[20]

Petitioner provides in **Exhibit 9** Petroecuador's price lists for fuel covering the period of investigation ("POI").[21] To demonstrate how this subsidy works, Petitioner focuses on the GOE's provision of diesel fuel, because in December 2022 the GOE announced that it would end the diesel subsidy for large (but not small) shrimp farmers, causing an outcry in the industry.[22]

As shown in the list for the period May 12, 2022, to June 11, 2022, the price of "diesel 2" for use in shrimp production and certain limited other applications (the other industries eligible for this price are fishing, tuna farming, and automotive) was set at $1.76 per gallon, whereas the price for the same diesel fuel for use in most other industries/applications was $4.33 per gallon.[23] Similarly, the price for "premium diesel" for use in shrimp production was set at $1.76 per gallon, while the price for the same product for use in most other industries was $4.66 per gallon.[24]

20 *Id*.

21 Please note that the table for July prices lists the same effective dates as the list of June prices, but the prices themselves are different.

22 "The Ecuadorian government will end diesel subsidies," Roda International (Dec. 8, 2022), **Exhibit 10**.

23 *See, e.g.,* Petroecuador, "Fuel Sale Prices," **Exhibit 9**. Shrimp production appears in two industrial groupings – the "Shrimp, Artisanal Fishing, and Electric Sectors" and "Automotive, Fishing, Tuna, Shrimp Sectors." While "diesel 2" appears on both lists, the first list refers only to "electric" diesel 2 (with a price of $0.90) and the second lists refers to diesel 2 as either "automotive," "fishing," "shrimp," or "tuna" – all of which are set at the same price of $1.76 per gallon.

24 *See id*. The prices for premium diesel appear in the second table ("Automotive, Fishing, Tuna, Shrimp Sectors").



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/8/24 3:42 PM, Submission Status: Approved

Barcode:4487494-01 C-331-806 INV - Investigation - PUBLIC DOCUMENT

Starting in September of 2022, Petroecuador modified the organization of the price lists, but the preferential rates for diesel supplied to shrimp producers persisted. Diesel prices for the shrimp sector were moved to the "industrial sector" section of the tables, but the diesel prices for the shrimp sector (highlighted in green) were still lower than the diesel prices for most other sectors. Specifically, from September 12 to October 11, the prices for "diesel 2" and "premium diesel" for the shrimp sector were $1.76 per gallon, while the prices for most other industries and applications were $3.63 per gallon for "diesel 2" and $3.92 per gallon for "premium diesel."[25]

The table below summarizes the government-set prices for diesel 2 and premium diesel for the shrimp sector and other major sectors in Ecuador throughout the POI.

<u>GOE Diesel Prices</u>[26]
$ per gallon

| User | Shrimp Sector | Oil and Mining, Industrial, Marine, Sport Fishing, International Maritime Sectors | |
|---|---|---|---|
| Type of Fuel | Diesel 2 & Premium Diesel | Diesel 2 | Premium Diesel |
| January | $1.76 | $2.42 | $2.64 |
| February | $1.76 | $2.81 | $2.89 |
| March | $1.76 | $3.33 | $3.49 |
| April | $1.76 | $3.85 | $4.05 |
| May | $1.76 | $4.33 | $4.66 |
| June | $1.76 | $4.02 | $4.29 |
| July | $1.66 | $4.02 | $4.29 |
| August | $1.76 | $3.61 | $4.32 |
| September | $1.76 | $3.63 | $3.92 |
| October | $1.76 | $3.55 | $3.85 |
| November | $1.76 | $3.92 | $4.28 |
| December[27] | $1.76 | $3.58 | $4.28 |

25 *See id*.

26 *See id*.

27 December price is for small shrimp farms only.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/8/24 3:42 PM, Submission Status: Approved

The price lists show that prices for users in the shrimp sector remained at $1.76 per gallon for the vast majority of the POI, regardless of the type of diesel and regardless of fluctuations in the prices for most other sectors in Ecuador. For most of the POI, prices for users in the shrimp sector were less than half the price set for users in most other sectors for the same types of fuel.

Petitioner notes that while the lower prices for shrimp producers reflect the degree to which the GOE prioritizes shrimp production and its export revenue over other industries, the prices the GOE sets for other industries would not be appropriate as "market" benchmarks because they are also set by the government.[28] Actual market prices are considerably higher than any price established by the GOE for any sector. For example, the average prices for diesel in the United States from mid-June through July 11, 2022 ranged from a low of $5.66 per gallon to a high of $5.81 per gallon.[29] During the same period, the highest price for any sector listed in the Petroecuador price tables for diesel was $4.29 per gallon.[30]

As indicated above, at the end of 2022 the GOE announced its intention to terminate sales of diesel at the lowest subsidized prices for large, but not small, shrimp farms.[31] As a result of this change, reports indicate that the price of diesel for large shrimp farmers increased from $1.87 to $3.92 per gallon, while the price for small shrimp farmers was unchanged.[32] In contrast,

[28] *See, e.g.*, *Countervailing Duties*, 63 Fed. Reg. at 65,377 ("Where it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's involvement in the market, we will resort to {world market prices}").

[29] U.S. Department of Energy, "2022 DOE Regional Diesel Fuel Prices," **Exhibit 11**.

[30] Petroecuador, "Fuel Sale Prices," **Exhibit 9**.

[31] "The Ecuadorian government will end diesel subsidies," Roda International (Dec. 8, 2022) ("the diesel subsidy for shrimp farms with an area of no more than 30 hectares would remain unchanged."), **Exhibit 10**.

[32] "The Ecuadorian government will end diesel subsidies," Roda International (Dec. 8, 2022) ("the diesel subsidy for shrimp farms with an area of no more than 30 hectares would remain unchanged."), **Exhibit 10**. For reasons that are not presently clear, the format of Petroecuador's price lists were modified at the end of September 2022 so that the two industrial groupings including shrimp farming

market prices were still much higher than the prices for both small and large shrimp farms. Prices for diesel in the United States in December of 2022, for example, ranged from $4.54 to $4.97 per gallon,[33] indicating that even this increased price for large shrimp farmers was still below market rates.[34]

Importantly, while the GOE may have declared its intention to stop subsidizing large shrimp farmers through the provision of diesel at prices lower than those set for other industries in Ecuador the end of the POI, smaller shrimp farmers are still subsidized with lower-cost diesel. Moreover, in addition to continuing to subsidize diesel for small shrimp farmers, available information indicates that GOE continues to the set price of a variety of fuels other than diesel for sale to the both small and large shrimp farmers.[35] Consequently, Commerce should investigate all fuel purchases by the Ecuadorian shrimp industry during the POI.

### A. Financial Contribution

The provision of fuel at the price established by the GOE constitutes a financial contribution under 19 U.S.C. § 1677(5)(D)(iii) to the extent that a state-owned company such as Petroecuador made the sale. To the extent that an entity other than a state-owned enterprise made the sale at the regulated price, that entity would be entrusted or directed to make a financial contribution at government-established prices under 19 U.S.C. § 1677(5)(B)(iii).

---

were removed and the prices of various fuels for shrimp farmers were added to the end of the "industrial sector" grouping. *See* Petroecuador, "Fuel Sale Prices," **Exhibit 9**.

[33] U.S. Department of Energy, "2022 DOE Regional Diesel Fuel Prices," **Exhibit 11**.

[34] *See* "Can government transfers make energy subsidy reform socially acceptable? A case study on Ecuador," Science Direct (Feb. 2020), **Exhibit 7**.

[35] *See* Petroecuador, "Fuel Sale Prices," **Exhibit 9**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/8/24 3:42 PM, Submission Status: Approved

### B. Benefit

The GOE's provision of fuel confers a benefit equal to the difference between the amount of the government-established price and a commercial price pursuant to 19 U.S.C. § 1677(5)(E)(iv). Because the GOE sets the prices for petroleum products in Ecuador, Commerce should not use domestic prices to determine the benefit provided under this program, but should instead proceed down its hierarchy to world market prices under 19 C.F.R. § 351.511(a)(2)(ii). As indicated above, while in mid-2022 the GOE's price for diesel to the shrimp industry was $1.66 per gallon,[36] average prices for diesel in the United States – prices established by supply and demand, as opposed to government fiat – ranged from $5.66 to of $5.81 per gallon.[37]

### C. Specificity

The provision of fuel for less than adequate remuneration to the shrimp industry is *de jure* specific because the GOE expressly limits the prices available to a limited number of industries. 19 U.S.C. § 1677(5A)(D)(i). While the GOE prescribes fuel prices for a number of industries, those prices are not the same for each industry, and not all industries are assigned their own fuel prices. As shown above and in **Exhibit 9**, the prices the GOE set for sales of fuel to the shrimp industry are significantly lower than the prices set for sales of the same types of fuel to the oil and mining sector, the industrial sector generally, the marine sector, the sport fishing sector, and international shipping. Commerce has in the past found similar programs that include some, but not all, industries to be *de jure* specific.[38] Commerce should do so again here,

---

36 *See, e.g.,* Petroecuador, "Fuel Sale Prices," **Exhibit 9**.

37 U.S. Department of Energy, "2022 DOE Regional Diesel Fuel Prices," **Exhibit 11**.

38 *See, e.g., Circular Welded Carbon-Quality Steel Pipe from the United Arab Emirates: Final Affirmative Countervailing Duty Determination,* 77 Fed. Reg. 46 (Dep't Commerce Oct. 22, 2012) and accompanying Issues and Determination Memorandum at Comment 1.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/8/24 3:42 PM, Submission Status: Approved

as the GOE enumerates only a limited number of industries – including the shrimp industry – for the lowest subsidized fuel rates.

## III. Tax Breaks for the Development of Fishing and Aquaculture

### A. Income Tax Reduction for Reinvestments

The *Organic Law for the Development of Aquaculture and Fisheries* provides an advantage to those involved in aquaculture and fisheries who re-invest profits. In particular, the law provides that:

> Taxpayers who reinvest their profits, in Ecuador, in scientific aquaculture and fishing research projects or programs promoted by the Public Aquaculture and Fisheries Research Institute and accredited by the governing body of Higher Education, will have a percentage reduction of 10 % of income tax, in programs or projects classified as priority by the governing body of Higher Education, under the terms and conditions established in the Internal Tax Regime Law and its implementing regulations.[39]

Thus, this law provides those active in the aquaculture sector – including shrimp producers – with the possibility of reducing their income tax liability, which is normally set at 25 percent, by reinvesting in Ecuador's aquaculture industry.[40]

#### 1. Financial Contribution

A reduced income tax rate provides a financial contribution in the form of government revenue foregone under 19 U.S.C. § 1677(5)(D)(ii).

#### 2. Benefit

A reduced income tax rate confers a benefit equal to the amount of revenue foregone by the government under 19 U.S.C. § 1677(5)(E) and 19 C.F.R. § 351.509.

---

39 *Organic Law for the Development of Aquaculture and Fisheries*, Petition Exhibit IV-9 at pdf page 98. The ASPA alleged this program in the Petition at 13-15 but withdrew the allegation on November 1, 2023.

40 *See* PWC, "Ecuador: Corporate – Taxes on corporate income" (Sep. 2023), **Exhibit 12**.

# Tab 13

# P.R. 126

# C.R. 55

Barcode: 4488295-01 C-331-806 INV - Investigation

TRADE PACIFIC

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 10
Investigation
E&C/Office IV
Business proprietary information of Santa Priscila has been redacted on pages 5 and 6, and of SONGA has been redacted on pages 7 and 8.

**PUBLIC VERSION**

January 9, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Request for Clarification of Section III Reporting Obligations and
to Exclude Certain Companies from Reporting

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") and Sociedad Nacional de Galápagos C.A. ("SONGA"), mandatory respondents in the above-referenced CVD investigation, we submit this letter to advise the Department of reporting difficulties that Santa Priscila and SONGA have encountered in responding to Section III of the Department's December 12, 2023, initial questionnaire, which have recently come to the companies' attention.

Specifically, Santa Priscila and SONGA request that the Department clarify and confirm that they are not required to submit complete responses to Section III of the Department's initial questionnaire, on behalf of cross-owned suppliers of inputs to shrimp farms that Santa Priscila and SONGA identified as cross-owned in their respective January 4, 2024, responses to the "Affiliated Companies" portions of their Section III questionnaire responses ("Affiliated Companies' Responses"). In addition, Santa Priscila and SONGA also request that the


Filed By: khammer@tradepacificlaw.com, Filed Date: 1/9/24 2:41 PM, Submission Status: Approved

Department excuse the companies from providing complete Section III responses on behalf of certain suppliers of raw shrimp identified as cross-owned except as described below.

If the Department continues to require complete Section III questionnaire responses on behalf of all affiliates of Santa Priscila and SONGA identified as cross-owned that are the subject of this request, and given the exceptional number of input suppliers identified as cross-owned, the companies instead request that the Department extend the deadline to submit complete Section III responses on behalf of the input suppliers to shrimp farms and raw shrimp suppliers identified as cross-owned by four weeks, i.e., until February 20, 2024.[1] To the best of our knowledge, the sheer number of suppliers identified as cross-owned by Santa Priscila and SONGA is an extremely rare, or even unique, circumstance. For this reason, it is not feasible for Santa Priscila or SONGA to respond on behalf of all suppliers of inputs to shrimp farms and all suppliers raw shrimp with which they are potentially cross-owned within the limited timeframe allotted to respond to Section III of the Department's questionnaire.

**A. The Department Should Confirm That the Companies Are Not Required to Submit Responses for Input Suppliers to Shrimp Farms**

Santa Priscila and SONGA first request that the Department clarify that they are only required by the instructions in the Department's Section III questionnaire to provide complete Section III responses on behalf of input suppliers identified as cross-owned that supplied inputs that were used by Santa Priscila or SONGA in their production of the subject merchandise. Specifically, the instructions in the Department's Section III questionnaire require Santa Priscila and SONGA to provide complete questionnaire responses on behalf of affiliated companies only if "cross-ownership" exists and at least one of the following criteria have been satisfied:

[1] The Department is closed on Monday February 19, 2024, for a federal holiday.

> (1) the cross-owned company produces the subject merchandise; (2) the cross-owned company is a holding company or a parent company (with its own operations) of your company; (3) the cross-owned company supplies an input product to you that is primarily dedicated to the production of the subject merchandise; or (4) the cross-owned company has received a subsidy and transferred it to your company.

Letter to the Embassy of Ecuador, re: "Countervailing Duty Questionnaire" (Dec. 12, 2023), at III-37 (emphasis added).

Exhibit AFF-1 of each of Santa Priscila's and Songa's respective Affiliated Companies' Responses contained lists of all affiliated companies of each company in Ecuador. The only input received by either Santa Priscila or SONGA that is primarily dedicated to the production of frozen processed warmwater shrimp during the period of investigation ("POI") is raw unprocessed shrimp. Because the third criterion of the Department's question focuses on cross-owned companies that were identified as cross-owned, but supply an input product to Santa Priscila or SONGA that is primarily dedicated to the production of subject merchandise, Santa Priscila and SONGA understand that the Department's instructions do not require a complete Section III response on behalf of cross-owned suppliers of inputs to shrimp farms—namely (1) laboratories (brood stock operations that produce and sell shrimp larvae to affiliated shrimp farms), (2) hatcheries, and (3) firms that provide services and/or research and development related to the cultivation of fresh raw shrimp—which Santa Priscila and SONGA reported as cross-owned in their Affiliated Companies' Responses. Since the focus of this investigation is on frozen shrimp products, which are produced from raw unprocessed shrimp, these types of upstream products have little bearing on the Department's analysis, and requiring information from input suppliers to input suppliers would add unnecessary burdens on the Department and the companies but would not materially affect the Department's analysis.

**B. The Department Should Reduce the Reporting Burdens on the Companies with Respect to Raw Shrimp Suppliers**

The instructions in the Department's Section III questionnaire require the Santa Priscila and SONGA to respond on behalf of each supplier of fresh warmwater shrimp that each company reported as cross-owned in their Affiliated Companies' Responses. However, for the reasons explained below, Santa Priscila and SONGA respectfully request that the Department excuse Santa Priscila and SONGA from providing complete Section III questionnaire responses on behalf of the cross-owned suppliers of fresh warmwater shrimp except as described below.

As evidenced by the considerable number of cross-owned suppliers of raw shrimp identified in each company's Affiliated Companies' Response, it is not feasible to respond on behalf of all suppliers of raw shrimp that are potentially cross-owned with Santa Priscila and SONGA, respectively, within the limited timeframe allotted to respond to Section III of the Department's questionnaire. Santa Priscila and SONGA each separately describe below the unique facts—and specific nature of the requests to limit reporting of cross-owned suppliers of raw warmwater shrimp—that support each request to limit the number of cross-owned suppliers of raw shrimp required to provide complete Section III questionnaire responses below.

If, after reviewing the responses from the shrimp farms identified as cross-owned for which Santa Priscila and SONGA intend to provide complete Section III responses (as discussed below), the Department requires more information from additional shrimp farms the companies identified as cross-owned, the Department then may request such additional responses. To the extent the Department decides to solicit additional responses, the companies respectfully urge the Department to assign priority based on the volume of shrimp supplied by each shrimp farm identified as cross-owned in order to manage the burdens on both the agency and the companies.

1. Santa Priscila

Santa Priscila intends to provide a complete response to Section III of the Department's questionnaire on behalf of [ COMPANY ], a separately incorporated affiliated supplier of raw shrimp. **{Santa Priscila BPI}** However, Santa Priscila respectfully requests that the Department excuse it from reporting on behalf of any other affiliated suppliers of raw warmwater shrimp identified as cross-owned in its Affiliated Companies' Response.

Santa Priscila identified [ # ] affiliated and separately incorporated shrimp farms that meet the cross-ownership standard during the POI in its Affiliated Companies' Response. **{Santa Priscila BPI}** See Letter from Trade Pacific PLLC, re: Santa Priscila "Section III 'Affiliated Companies" Questionnaire Response" (Jan. 4, 2024), at Ex. AFF-1. However, the supplier template provided by Santa Priscila in its January 3, 2024, response to the Department's "Sources of Raw Shrimp" questionnaire, demonstrates that it purchased frozen warmwater shrimp from only [ # ] suppliers meeting the cross-ownership standard during the POI. **{SONGA BPI}** See Letter from Trade Pacific PLLC, re: Santa Priscila "Sources of Raw Shrimp Questionnaire Response" (Jan. 3, 2024), at Ex. SRS-1 ("Santa Priscila Sources QR"). The other [ # ] suppliers that Santa Priscila identified as cross-owned in the supplier template collectively represent an insignificant share of its purchases of raw warmwater shrimp during the POI. **{Santa Priscila BPI}** Id.

It is not feasible for Santa Priscila to prepare complete responses to the Section III questionnaire on behalf of this immense number of companies. Critically, as Santa Priscila explained in its January 3, 2024, questionnaire response, it obtained approximately [ # ] **percent** of its fresh shrimp supply from farms that it owned and/or operated. **{Santa Priscila BPI}** See Santa Priscila Sources QR at SRS-3. Conversely, the purchases of fresh warmwater shrimp from

separately incorporated farms that are cross-owned by Santa Priscila account for only [ % ] of the raw shrimp processed by Santa Priscila for production of subject merchandise during the POI. **{Santa Priscila BPI}** Id. Because the separately incorporated shrimp farms that Santa Priscila reported as cross-owned collectively represent an insignificant share of the raw shrimp processed by Santa Priscila to produce the subject merchandise, any countervailable benefit that may have been received by any other supplier of raw shrimp that met the cross-ownership standard will not materially affect the Department's calculation of the overall CVD rate of Santa Priscila. Accordingly, with one exception described next, Santa Priscila respectfully requests that the Department excuse it from providing complete Section III questionnaire responses on behalf of the separately incorporated suppliers of raw shrimp that it identified as cross-owned in its Affiliated Companies' Response.

With that being said, Santa Priscila intends to provide a complete response to Section III of the Department's questionnaire on behalf of [ COMP. ], which accounted for [ # ] of Santa Priscila's total purchases from separately incorporated shrimp farms identified as cross-owned from which Santa Priscila purchased raw shrimp during the POI. **{Santa Priscila BPI}** See Santa Priscila Sources QR at Ex. SRS-1. Because the shrimp farms other than [ COMP. ] collectively represent a miniscule share of Santa Priscila's overall purchases of raw shrimp from separately incorporated suppliers of raw shrimp that Santa Priscila identified as cross-owned, any countervailable benefit that may have been received by any other supplier of raw shrimp that met the cross-ownership standard will not affect the Department's calculation of the overall CVD rate of Santa Priscila. **{Santa Priscila BPI}** Therefore, the Department should not require Santa Priscila to provide complete responses for any such cross-owned supplier of raw shrimp to Santa Priscila other than [ COMP. ] since all other cross-owned affiliated shrimp suppliers cannot

have any material impact on the Department's analysis in this CVD investigation. **{Santa Priscila BPI}** Thus, collecting information from these other entities would heap unnecessary burdens on the Department and Santa Priscila.

**2. <u>SONGA</u>**

SONGA respectfully requests that the Department excuse all suppliers of raw warmwater shrimp identified by SONGA as cross-owned except for **[** COMPANY **]**

SONGA identified **[** # **]** affiliated shrimp farms that meet the cross-ownership standard during the POI in its Affiliated Companies' Response. **{SONGA BPI}** <u>See</u> Letter from Trade Pacific PLLC, re: SONGA "Section III 'Affiliated Companies" Questionnaire Response" (Jan. 4, 2024), at Ex. AFF-1. However, the supplier template provided by SONGA in its January 3, 2024, response to the Department's "Sources of Raw Shrimp" questionnaire, demonstrates that SONGA purchased frozen warmwater shrimp from only **[** # **]** suppliers meeting the cross-ownership standard during the POI. **{SONGA BPI}** <u>See</u> Letter from Trade Pacific PLLC, re: SONGA "Sources of Raw Shrimp Questionnaire Response" (Jan. 3, 2024), at Ex. SRS-2. The other **[** # **]** suppliers that SONGA identified as cross-owned collectively represent an insignificant share of its purchases of raw warmwater shrimp during the POI. **{SONGA BPI}**

SONGA reported that **[** % **]** of its overall purchases of shrimp from separately incorporated entities were purchased from affiliated shrimp farms that are cross-owned with SONGA. **{SONGA BPI}** <u>Id.</u> However, **[** COMP. **]** accounted for **[** % **]** of SONGA's total purchases from cross-owned shrimp farms from which it purchased raw shrimp during the POI. **{SONGA BPI}** <u>Id.</u>

It is not feasible to submit complete Section III responses on behalf of **[** # **]** affiliated shrimp farms—in addition to SONGA's own response and those of any other companies

Filed By: khammer@tradepacificlaw.com, Filed Date: 1/9/24 2:41 PM, Submission Status: Approved

required to respond based on the instructions contained in the Department's questionnaire that meet the cross-ownership standard—within the timeframe allotted by the Department to submit responses to the initial Section III questionnaire. **{SONGA BPI}** Because the shrimp farms other than **[** COMP.**]** collectively represent an insignificant share of SONGA's overall purchases of raw shrimp, any countervailable benefit that may have been received by any other supplier of raw shrimp that met the cross-ownership standard will not affect the Department's calculation of the overall CVD rate of SONGA. **{SONGA BPI}**

Accordingly, SONGA respectfully requests that the Department excuse it from providing complete responses to Section III of the Department's questionnaire on behalf of all suppliers of raw shrimp identified as cross-owned in SONGA's affiliation response other than **[** COMP.**]**. **{SONGA BPI}**

**C. Conclusion**

Santa Priscila and SONGA request that the Department confirm that the companies are not required to submit complete responses to Section III of the Department's initial questionnaire, on behalf of cross-owned suppliers of inputs to shrimp farms that they identified as cross-owned in their respective Affiliated Companies' Responses, because these input suppliers did not provide inputs to Santa Priscila or SONGA that were used in the production of the subject merchandise. In addition, because of the small volume of purchases made by Santa Priscila and SONGA from the separately incorporated suppliers on behalf of whom each requests reporting exemptions, excusing Santa Priscila and SONGA from filing complete responses to Section III of the Department's initial questionnaire from these very small suppliers will not materially affect the Department's CVD analysis in this investigation and will alleviate the burdens on the Department and on Santa Priscila and SONGA, respectively.

* * * * *

The submission contains no new factual information.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila and SONGA request business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which Santa Priscila and SONGA request proprietary treatment and the basis for the request:

- Names of Particular Customers, Distributors, or Suppliers: Contained in the narrative. Protected under 19 C.F.R. § 351.105(c)(6).

- Other Specific Business Information Related to the Submitters' Business and Production Operations, Volume of Raw Material Purchases, Ownership and Affiliations, etc., the Release of Which to the Public Would Cause Substantial Harm to the Submitters' Respective Competitive Positions: Contained in the narrative. Protected under 19 C.F.R. § 351.105(c)(11).

Santa Priscila and SONGA both consent to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer
TRADE PACIFIC PLLC

**Counsel to Santa Priscila and SONGA**

Barcode: 4488295-01 C-331-806 INV - Investigation

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 9th day of January, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806) was served electronically on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>**(* Public Version Only)** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Filed By: khammer@tradepacificlaw.com, Filed Date: 1/9/24 2:41 PM, Submission Status: Approved

# Tab 14

# P.R. 131

Barcode:4489436-01 C-331-806 INV - Investigation -

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 EDRAKE@SCHAGRINASSOCIATES.COM F: (202) 429-2522

January 11, 2024

DOC Inv. No. C-331-806
Total Pages: 13
Investigation
AD/CVD Office IV

**PUBLIC DOCUMENT**

**VIA ELECTRONIC FILING**
The Honorable Gina Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Frozen Warmwater Shrimp from Ecuador: Opposition to Respondents' Request to Exclude Companies from Reporting Obligations**

Dear Secretary Raimondo:

On behalf of the Petitioner, the American Shrimp Processors Association ("ASPA" or "Petitioner"), we hereby submit our opposition to the untimely request filed on January 9, 2024 by Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") and Sociedad Nacional de Galápagos C.A. ("SONGA") (collectively "Respondents") to exclude certain companies from their reporting obligations in this investigation. For the reasons below, the U.S. Department of Commerce ("Commerce") should deny Respondents' request, require Respondents to provide full responses for all of their cross-owned input suppliers, and deny any extensions of time for the reporting of this information. Complete information regarding subsidies received by all of the Respondents' cross-owned input suppliers is required by Commerce's regulations and questionnaire, and Respondents have not provided any legitimate reason why they should be

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/11/24 8:30 AM, Submission Status: Approved

excused from providing this information. To the contrary, the timely submission of information regarding the subsidies received by all of Respondents' cross-owned affiliates is essential to ensuring the accuracy of Commerce's subsidy calculations and the provision of adequate relief from unfair and injurious subsidies to which the domestic industry is entitled under the law.

## I. Respondents' request is untimely and should be rejected outright

As a preliminary matter, Respondents' request is untimely and should be rejected on that basis alone. The first page of Section I of Commerce's December 12, 2023 questionnaire states as follows: "If for any reason you do not believe that you can complete a response to this questionnaire by the date specified on the cover page of this questionnaire, or in the form requested, you must notify the official in charge within 14 days of the date of this questionnaire."[1] The deadline for any notification regarding difficulties in responding to the questionnaire was thus December 26, 2023. Respondent's request was filed two weeks after the deadline, on January 9, 2024.

Respondents never requested an extension of time to notify Commerce of reporting difficulties, nor have they identified any reasons why they could not have submitted their notification of reporting difficulties by the applicable deadline. Respondents have retained experienced counsel and were on notice far ahead of time regarding the issues in this investigation. In addition, as noted below, at least one of the Respondents, SONGA, has participated in a prior countervailing duty investigation on this exact same product that involved the exact same issues regarding cross-owned input suppliers.

---

[1] Questionnaire, Sec. I at 1 (Dec. 12, 2023).

For these reasons alone, Commerce should reject Respondents' request and require complete responses to Section III of the questionnaire on behalf of all covered entities by the original deadline of January 22, 2024.

## II. Respondents' request should be rejected on the merits

Even if Commerce considers Respondents' untimely request, it should be rejected on the merits.

The countervailing duty statute states that Commerce "shall" impose countervailing duties to offset subsidies that are provided "directly or indirectly … with respect to the manufacture, production, or export of a class or kind of merchandise" imported into the United States with regard to which the Commission has made an affirmative injury determination.[2] To determine the subsidies attributable to subject merchandise, Commerce's regulations state that the agency "will apply" the rules set out in 19 C.F.R. § 351.525(b)(2) – (b)(7).[3] Specifically, in the case of a cross-owned input supplier that produces an input that is primarily dedicated to the production of the downstream product, these rules state that Commerce "will" attribute subsidies received by such an input producer to the combined sales of the input and the downstream products produced by both corporations, excluding intra-company sales.[4] Consistent with the statute and regulations, Section III of Commerce's questionnaire states:

> You must provide a complete questionnaire response for those affiliates where "cross-ownership" exists, and one of the following situations exists … the cross-

---

[2] 19 U.S.C. § 1671(a)(1). The Commission published its affirmative preliminary injury determination on December 14, 2023. *Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam*, 88 Fed. Reg. 86,677 (USITC Dec. 14, 2023).

[3] 19 C.F.R. § 351.525(b)(1).

[4] 19 C.F.R. § 351.525(b)(6)(iv).

> owned company supplies an input product to you for production of the downstream product produced by the respondent ….[5]

Despite these clear instructions, Respondents now seek to be excused from reporting for most of their cross-owned input suppliers due to: (1) the nature of the inputs supplied by certain suppliers; (2) the large number of fresh shrimp suppliers involved; (3) the alleged insignificant share of fresh shrimp purchases accounted for by certain cross-owned suppliers of fresh shrimp; and (4) the asserted difficulty in providing complete responses.[6] Each of these arguments are without merit and should be rejected.

First, Respondents seek an exemption from reporting for cross-owned producers that sell shrimp larvae, are shrimp hatcheries, or provide services related to the cultivation of fresh shrimp.[7] Yet production of all of these inputs are "primarily dedicated" to the production of the subject merchandise, *i.e.*, frozen warmwater shrimp. Respondents have not identified any products that can be produced, or indeed are produced, from shrimp larvae, hatched shrimp, or services related to the cultivation of fresh shrimp other than frozen warmwater shrimp. Respondents appear to argue that because these inputs are first used to produce fresh shrimp, which is then processed into frozen shrimp, they are not inputs primarily dedicated to the production of frozen shrimp.[8] Yet Respondents have not identified any categories of downstream products produced from these inputs that are not ultimately processed into frozen shrimp.

---

5 Questionnaire at III-36 (Dec. 12, 2023).

6 Respondents' Request to Exclude Certain Companies from reporting (Jan. 9, 2024) ("Respondents' Exclusion Request") at 2 – 8. Respondents use the terms "raw" shrimp, "fresh" shrimp, or "fresh raw" shrimp to refer to the product supplied by shrimp farmers to processing operations. For the sake of consistency, we refer to the product provided by shrimp farms as "fresh shrimp."

7 *Id*. at 3.

8 *Id*.

Indeed, each of these inputs are "the type of input product that is merely a link in the overall production chain" for frozen warmwater shrimp, and thus precisely the type of input that Commerce was concerned with when it promulgated its cross-owned input supplier regulation.[9] If Commerce were to accept Respondents' argument, it would merely encourage future respondents to structure their operations into separately incorporated units along each step of the production chain, from shrimp seed, to larvae, to fresh shrimp, to frozen shrimp, and thus prevent Commerce from countervailing subsidies to any step in the production chain other than the very last step preceding the production of subject merchandise. This would allow respondents through mere corporate restructuring to evade countervailing duty liability for subsidies further up the production chain – subsidies that serve no other purpose than to benefit the production of the ultimate product that is the subject merchandise. This is exactly the result Commerce sought to avoid through its cross-owned input supplier rule.[10] Commerce should therefore deny Respondents' request to exclude these cross-owned input suppliers from its reporting obligations.

Second, Respondents seek to be excused from their reporting obligations even for their fresh shrimp suppliers given the "considerable number" of cross-owned suppliers of fresh shrimp they have identified.[11] Respondents claim this number of cross-owned input suppliers is "exceptional," "extremely rare, or even unique."[12] As a result, Respondents have stated their

---

9 *Countervailing Duties, Final Rule*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce Nov. 25, 1998).

10 *Id*. (responding to commenters that were concerned that the inability countervail such subsidies "creates a loophole whereby vertically integrated businesses could avoid countervailing duty exposure for input subsidies simply by separately incorporating the division that makes the input").

11 Respondents' Exclusion Request at 4.

12 *Id*. at 2.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/11/24 8:30 AM, Submission Status: Approved

intent to submit a response for only one of Santa Priscila's affiliated suppliers of fresh shrimp and only one of SONGA's suppliers.[13]

Respondents have cited no precedent for Commerce to excuse a company from submitting responses for all of its cross-owned input suppliers merely because the number of its suppliers is large. Indeed, the larger the number of suppliers, the more important it is that Commerce have a full record regarding each of those suppliers to ensure it is capturing the full universe of subsidies that are attributable to subject merchandise. To exclude companies from their reporting obligations merely because they have opted to organize themselves into many separate corporate units would only provide a roadmap to circumvention in future cases and frustrate the remedial purposes of the countervailing duty law. Commerce should thus reject Respondents' request to be exempted from reporting for any of their cross-owned fresh shrimp suppliers, regardless of the number of suppliers involved.

Third, Respondents request that they be excused from submitting responses for cross-owned input suppliers that represent an alleged "insignificant" share of fresh shrimp purchases during the POI.[14] The cross-owned input supplier regulation applies to all suppliers of cross-owned inputs, no matter what share of inputs they account for.[15] There is no *de minimis* threshold for attribution of such subsidies.[16] The U.S. Court of International Trade has upheld Commerce's practice of attributing subsidies from cross-owned input suppliers regardless of the quantity of inputs they provide, stating, "the regulations do not obligate Commerce to measure

---

13 *Id*. at 5 and 7.

14 *Id*. at 5 – 8.

15 *See* 19 C.F.R. § 351.525(b)(6)(iv).

16 *See id*.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/11/24 8:30 AM, Submission Status: Approved

the impact of an input supplier's contributions when weighing whether to attribute its subsidies to the downstream producer."[17] Commerce should continue to follow that practice here and deny Respondents' request.

Fourth, and finally, Respondents claim that they should be excused from fulfilling their obligations to submit complete responses for all of their cross-owned input suppliers because it is "not feasible" to respond.[18] Alternatively, Respondents request that Commerce extend the deadline to submit these responses by four weeks, until February 20, 2024.[19] As noted above, any notification regarding difficulties in responding to Commerce's questionnaire was due December 26, 2023, and Respondents have offered no justification for the lateness of their submission. As discussed below, these requests also lack merit.

There is no basis for Respondents to claim at this late date that they cannot provide responses for their cross-owned input suppliers or need an additional four weeks to do so. The petition for the imposition of countervailing duties on frozen warmwater shrimp from Ecuador was filed on October 25, 2023, and it put Respondents on notice that the Petitioner was alleging subsidies to the production of fresh shrimp, including subsidies to cross-owned input suppliers.[20] Commerce initiated this investigation on November 14, 2023, including investigations into subsidies to producers of fresh shrimp.[21] Respondents were already aware that they were the largest exporters of frozen warmwater shrimp from Ecuador to the United States in 2022 based

---

17 *Icdas Celik Enerji Tersane v. Ulasim Sanayi A.S.*, 498 F. Supp. 3d 1345, 1364 (Ct. Int'l Trade 2021).

18 Respondents' Exclusion Request at 5 and 7.

19 *Id*. at 2.

20 Petition, Vol. IV, at 4 – 5 (Oct. 25, 2023).

21 Frozen Warmwater Shrimp from Ecuador, Countervailing Duty Investigation Initiation Checklist (Nov. 14, 2023).

on data from the National Chamber of Aquaculture (Ecuador), and in early December, Respondents requested that they be selected as mandatory respondents on that basis.[22] Moreover, SONGA already participated as a mandatory respondent in a prior countervailing duty investigation on frozen warmwater shrimp from Ecuador, which also required it to report subsidies to its cross-owned input suppliers of fresh shrimp.[23]

Now, not only two weeks after the deadline for notifying Commerce of difficulties in responding to the questionnaire, but also nearly 11 weeks after the petition was filed and eight weeks after the investigation was initiated, Respondents – who themselves requested to be selected for individual investigation – claim it is not "feasible" for them to comply with the well-established rules for Commerce's subsidy investigations. And this is after one of the Respondents, SONGA, already responded on behalf of its cross-owned input suppliers in a prior investigation of the exact same product. The Respondents have had more than sufficient time to gather the information that has been requested for their Section III questionnaire responses due on January 22, 2024. In addition, if initial responses for most cross-owned companies are extended all the way to February 20, 2024, as Respondents request, it will leave very little time for review and meaningful deficiency questionnaires and responses prior to Commerce's fully extended preliminary determination deadline of March 25, 2024.[24] Thus, given the time that Respondents have had to prepare their responses and their prior experience with these same issues, as well as the lateness of their request, no extension should be granted.

---

22 Respondents' Respondent Selection Comments (Dec. 4, 2023) at 2 – 3 and 5.

23 *See Certain Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty Determination*, 78 Fed. Reg. 50,389 (Dep't Commerce Aug. 19, 2013) and accompanying Issues and Decision Memorandum at 5.

24 *See Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Postponement of Preliminary Determinations in the Countervailing Duty Investigations*, 88 Fed. Reg. 85,216, 85,217 (Dep't Commerce Dec. 7, 2023).

## III. Conclusion

For the reasons above, Commerce should reject Respondents' request and require complete responses to Section III of the questionnaire – including complete responses for all cross-owned input suppliers – by January 22, 2024.

Finally, we wish to emphasize for Commerce how critical it is for the domestic industry to obtain relief from unfairly subsidized imports from Ecuador, including preliminary relief in the March 25 determination. Commerce has previously found shrimp producers in Ecuador to be subsidized at significant margins, ranging from 10.13 to 13.15 percent.[25] As demonstrated in ASPA's petition, Ecuador is now the second largest source of U.S. shrimp imports, accounting for more than 420 million pounds of shrimp imports in 2022, valued at nearly $1.5 billion.[26] Imports from Ecuador have been growing rapidly and entering at abnormally low unit values.[27] The injury caused by these imports, cumulated with imports from other countries, has been devastating to the domestic shrimp industry, including both processors and fishermen.[28] Given the time constraints in this investigation, it is vital that Respondents provide complete and timely responses that allow Commerce to perform its statutory duties and calculate meaningful and accurate subsidy rates for its preliminary determination.

---

25 *See Certain Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty Determination*, 78 Fed. Reg. 50,389, 50,390 (Dep't Commerce Aug. 19, 2013)

26 *See* Petition, Vol. I, at Ex. I-14.

27 *See id.*

28 *See id.*, Vol. I at 18 – 25.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/11/24 8:30 AM, Submission Status: Approved

We appreciate your attention to these concerns. Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

/s/ Elizabeth J. Drake
Roger B. Schagrin
Elizabeth J. Drake
Michelle R. Avrutin
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

Edward T. Hayes
LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701
*Counsel to the American Shrimp Processors Association*

**Counsel Certification**

I, Elizabeth J. Drake, counsel to the American Shrimp Processors Association, certify that I have prepared or otherwise supervised the preparation of the attached *Frozen Warmwater Shrimp from Ecuador: Opposition to Respondents' Request to Exclude Companies from Reporting Obligations*, filed on January 11, 2024, pursuant to the countervailing duty investigation on frozen warmwater shrimp from Ecuador, Case No. C-331-806.

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth J. Drake

Date: 1/10/2024

**Petitioner Certification**

I, Trey Pearson, President of the American Shrimp Processors Association ("ASPA"), certify that I prepared or otherwise supervised the preparation of the attached *Frozen Warmwater Shrimp from Ecuador: Opposition to Respondents' Request to Exclude Companies from Reporting Obligations*, filed on January 11, 2024, pursuant to the countervailing duty investigation on frozen warmwater shrimp from Ecuador, Case No. C-331-806.

I certify that the public information and any business proprietary information of ASPA contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ___  ______________________________________

Date: ____1/10/2024____________________

Barcode:4489436-01 C-331-806 INV - Investigation -

# CERTIFICATE OF SERVICE

**Frozen Warmwater Shrimp from Ecuador**
**C-331-806**
**Investigation**

I, Valencia Harvey, hereby certify that copies of the attached PUBLIC DOCUMENT were served today, January 11, 2024, via ACCESS electronic service:

Nathaniel Rickard, Esq
**Picard Kentz & Rowe LLP**
1750 K Street, NW
Suite 800
Washington, DC 20006
nrickard@pkrllp.com

Andrea Ruiz
**Embassy of Ecuador**
2535 15th St., NW
Washington, DC 20009
acruiz.embajada.ec.eeuu@gmail.com

Edward T. Hayes
**LEAKE & ANDERSSON, LLP**
1100 Poydras Street
Suite 1700
New Orleans, LA 70163
ehayes@leakeandersson.com

Jennifer Michele Smith-Veluz, Esq.
**The Bristol Group PLLC**
1707 L Street, NW, Suite 570
Washington, D.C. 20036
jennifer.smith@bristolgrouplaw.com

Jarrod M. Goldfeder, Esq.
**Trade Pacific PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003
jgoldfeder@tradepacificlaw.com

Jeffrey S. Neeley, Esq.
**Husch Blackwell LLP**
1801 Pennsylvania Avenue, NW
Suite 1000
Washington, DC 20006
jeffrey.neeley@huschblackwell.com

/s/ *Valencia Harvey*
Valencia Harvey
SCHAGRIN ASSOCIATES

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/11/24 8:30 AM, Submission Status: Approved

# Tab 15

# P.R. 134

# C.R. 58

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 E: EDRAKE@SCHAGRINASSOCIATES.COM F: (202) 429-2522

January 12, 2024

DOC Inv. No. C-331-806
Total Pages: 7
Investigation
AD/CVD Operations Office IV

**Public Version**
SONGA's BPI information removed from pages 3-4
Santa Priscila's BPI information removed from pages 4-5

The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Comments on Respondents' Supplier and Affiliation Questionnaire Responses**

Dear Secretary Raimondo:

On behalf of the American Shrimp Processors Association ("ASPA" or "Petitioner"), we hereby submit comments on the questionnaire responses submitted by Sociedad Nacional de Galápagos C.A. ("SONGA") and Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") to the supplier questionnaires issued by the U.S. Department of Commerce ("Commerce")[1] and in

[1] *See* Letter from Santa Priscila, *Certain Frozen Warmwater Shrimp from Ecuador: Countervailing Duty Investigation. Response by Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") Sources of Raw Shrimp Questionnaire Response* (Jan. 3, 2024) ("Santa Priscila Supplier Response"); *see also* Letter from SONGA, *Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Sources of Raw Shrimp Questionnaire Response by Sociedad Nacional de Galápagos C.A.*

response to the affiliated companies portion of the initial Section III questionnaire.[2] For the reasons below, Commerce should issue supplemental questionnaires to SONGA and Santa Priscila providing additional instructions and seeking additional information from both companies regarding their affiliated companies and suppliers.

Information in the attachment to this submission is factual information submitted to rebut, clarify, or correct questionnaire responses within the meaning of 19 C.F.R. § 351.301(c)(1)(v) (information submitted in rebuttal to information submitted in response to a questionnaire). This information is timely submitted within 14 days of the January 3 and January 4, 2024 supplier and affiliation questionnaire responses submitted by Santa Priscila and SONGA.[3] This new factual information in Attachment 1 consists of excerpts from questionnaires issued by Commerce in the countervailing duty investigation of *Ripe Olives from Spain*, and clarifies the appropriate analysis that should be applicable to the supplier questionnaires submitted by the respondents in the instant investigation.

As Commerce noted in the Initiation Checklist, Commerce is investigating whether alleged subsidy programs are providing benefits to producers of fresh shrimp, as subsidies for fresh shrimp may be attributable to the subject frozen shrimp under section 771B of the Tariff Act of 1930, as amended ("the Act").[4] This should be in addition to any subsidies to fresh shrimp production that benefit respondents' own integrated production and/or respondents' cross-owned

---

*("SONGA")* (Jan. 3, 2024) ("SONGA Supplier Response").

2 *See* Letter from SONGA, *Frozen Warmwater Shrimp from Ecuador – Section III "Affiliated Companies" Questionnaire Response* (Jan. 4, 2024) ("SONGA Affiliation Response"); *see also* Letter from Santa Priscila S.A., *Frozen Warmwater Shrimp from Ecuador – Section III "Affiliated Companies" Questionnaire Response* (Jan. 4, 2024) ("Santa Priscila Affiliation Response").

3 *See* 19 C.F.R. § 351.301(c)(1)(v).

4 *See* Initiation Checklist at 6-7.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/12/24 3:16 PM, Submission Status: Approved

input suppliers. Based on the information provided in the supplier questionnaire responses, Petitioner requests that Commerce select the five unaffiliated suppliers of each respondent company accounting for the largest volume of fresh shrimp for examination, to ensure adequate representation of the potential subsidies used by suppliers of fresh shrimp. Selecting five unaffiliated suppliers is consistent with Commerce's most recent countervailing duty investigation involving section 771B of the Act, *Ripe Olives from Spain*.[5]

**<u>SONGA</u>**

With respect to SONGA, Petitioner notes that the company's [

].[6] Therefore, Petitioner requests that Commerce select the [

] suppliers of raw shrimp by volume to SONGA for individual examination in this investigation:[7]

- [ ]
- [ ]
- [ ]
- [ ]
- [ ]

Additionally, in its supplier questionnaire response, SONGA indicates that [

---

5 *See, e.g.*, Attachment 1, questionnaires issued by Commerce to respondents in the *Ripe Olives from Spain* investigation requesting full Section III questionnaire responses from five unaffiliated suppliers each.

6 *See* SONGA Supplier Response at Exhibit SRS-2; *see also* SONGA Affiliation Response at Exhibit AFF-1.

7 *See* SONGA Supplier Response at Exhibit SRS-2.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/12/24 3:16 PM, Submission Status: Approved

].[8] Commerce should ask SONGA to clarify and provide the

[ ].

**Santa Priscila**

With respect to Santa Priscila, Petitioner notes that the largest supplier, [

].[9] In addition, Petitioner requests that Commerce select the [

] suppliers of raw shrimp to Santa Priscila by volume for individual examination in this investigation.[10]

- [ ]
- [ ]
- [ ]
- [ ]
- [ ]

Further, in Santa Priscila's affiliation response, it indicated that one of its toll processors – [ ] – was affiliated and cross-owned by Santa Priscila during the POI.[11] As Commerce's instructions indicate, if a company exported subject merchandise produced by other companies in Ecuador, then the company must submit a complete questionnaire response.[12] Commerce should ensure that [

] submits a complete questionnaire response. Additionally, in Santa Priscila's affiliation response, the respondent did not indicate whether [

---

8 *See* SONGA Supplier Response at Exhibit SRS-2; *see also* SONGA Affiliation Response at Exhibit AFF-1.

9 *See* Santa Priscila Supplier Response at Exhibit SRS-1.

10 *See id.*

11 *See id.* at AFF-2.

12 *Id.*

].[13] Santa Priscila also [

].[14] Commerce should request Santa Priscila to provide this missing information [

]. Additionally, in Exhibit AFF-1, Santa Priscila provides a [

].[15] Commerce should request this additional information regarding these companies.

* * *

---

13 *See* Santa Priscila Affiliation Response at Exhibit AFF-1.

14 *See id.*

15 *See id.*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/12/24 3:16 PM, Submission Status: Approved

Barcode: 4490333-01 C-331-806 INV - Investigation



We appreciate Commerce's attention to this matter. Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

/s/ Elizabeth J. Drake
Roger B. Schagrin
Elizabeth J. Drake
Michelle R. Avrutin
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

Edward T. Hayes
LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701

*Counsel to the American Shrimp Processors Association*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/12/24 3:16 PM, Submission Status: Approved

# CERTIFICATE OF SERVICE

**Frozen Warmwater Shrimp from Ecuador**
**C-331-806**
**Investigation**

I, Brittney Allen, hereby certify that copies of the attached PUBLIC VERSION DOCUMENT were served today, January 12, 2024, via ACCESS electronic service:

Nathaniel Rickard, Esq
**Picard Kentz & Rowe LLP**
1750 K Street, NW
Suite 800
Washington, DC 20006
nrickard@pkrllp.com

Andrea Ruiz
**Embassy of Ecuador**
2535 15th St., NW
Washington, DC 20009
acruiz.embajada.ec.eeuu@gmail.com

Edward T. Hayes
**LEAKE & ANDERSSON, LLP**
1100 Poydras Street
Suite 1700
New Orleans, LA 70163
ehayes@leakeandersson.com

Jennifer Michele Smith-Veluz, Esq.
**The Bristol Group PLLC**
1707 L Street, NW, Suite 570
Washington, D.C. 20036
jennifer.smith@bristolgrouplaw.com

Jarrod M. Goldfeder, Esq.
**Trade Pacific PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003
jgoldfeder@tradepacificlaw.com

Jeffrey S. Neeley, Esq.
**Husch Blackwell LLP**
1801 Pennsylvania Avenue, NW
Suite 1000
Washington, DC 20006
jeffrey.neeley@huschblackwell.com

/s/ *Brittney Allen*
Brittney Allen
SCHAGRIN ASSOCIATES

# Tab 16

# P.R. 137

Barcode:4491005-01 C-331-806 INV - Investigation -

TRADE PACIFIC

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 4
Investigation
E&C/Office IV

**PUBLIC DOCUMENT**

January 16, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Respondents' Objection to Petitioner's Request for
Questionnaire Responses from Unaffiliated Shrimp Farms

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") and Sociedad Nacional de Galápagos C.A. ("SONGA"), mandatory respondents in the above-referenced CVD investigation, we object to the January 12, 2024, comments of the petitioner, the American Shrimp Processors Association, in which they request that Santa Priscila and SONGA each provide complete questionnaire responses for the five largest unaffiliated shrimp farms that supply them. See Letter from Schagrin Associates, "Comments on Respondents' Supplier and Affiliation Questionnaire Responses" (Jan. 12, 2024) ("Petitioner's Request").

The petitioner's request represents a gross overreach that is unsupported by any precedent, including the precedent that the petitioner claims was established in Ripe Olives from Spain. The petitioner claims (at p. 2) that this case provides "new factual information," but the case is neither new nor factual in nature. For example, the Ripe Olives investigation in that case was conducted in 2017-2018. Nor does the petitioner attempt to satisfy the new factual



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/16/24 11:37 AM, Submission Status: Approved

information standard because it seeks to impose an additional reporting requirement. Therefore, it has not been submitted to "rebut, clarify, or correct questionnaire responses" as required by 19 C.F.R. § 351.301(c)(1)(v). Nor has the petitioner provided an analysis of the Department's evaluation of the utility of the requested information in the Ripe Olives case, much less explained the relevance of that case to the vastly different factual situation for Ecuador shrimp.

In their affiliation questionnaire responses, Santa Priscila identified more than 40 cross-owned shrimp farms, and SONGA identified more than 10 cross-owned shrimp farms. In addition, Santa Priscila obtains the vast majority of its raw shrimp from farms that it owns and which will be covered by Santa Priscila's Section III questionnaire response. See Santa Priscila's Sources of Raw Shrimp Questionnaire Response (Jan. 3, 2024), at SRS-3.[1]

The sole purported premise of the petitioner's request is that it is necessary "to ensure adequate representation of the potential subsidies used by suppliers of fresh shrimp." Petitioner's Request at 3. However, it is absurd for the petitioner to claim that the provision of questionnaire responses for over 50 cross-owned shrimp farms will fail to provide "adequate representation" of the potential subsidies, if any, obtained by the two respondents.

Moreover, asking the two respondents to provide additional questionnaire responses at this late date will add to an almost unsurmountable burden that they already face in providing **over 50** separate questionnaire responses for their cross-owned shrimp farms. The petitioner finds it very easy to impose additional reporting burdens on respondents, but they simply have no appreciation for the burdens that these companies already face—especially given the exceptional complications described in the separate extension requests filed today by both Santa Priscila and

---

[1] Additionally, Santa Priscila already confirmed that it intends to provide a complete Section III questionnaire response for a cross-owned affiliated manufacturer, Tropical Packing Ecuador Tropack S.A.

SONGA and by the Government of Ecuador. In addition, the petitioner's reliance on the Ripe Olives case is factually distinguishable and bears no relationship to the complex cross-ownership relations that pertain to SONGA and Santa Priscila.

Finally, if the Department nevertheless grants the petitioner's request, a further extension of the current deadline for submission of the Section III questionnaire responses will be required. There is no assurance that an unaffiliated farm would even provide access to its own confidential records, and the respondents have no means of compelling the provision of these records, not to mention the difficulties that all Ecuadorian companies now fact in light of the state of emergency that Ecuador's President has declared and which respondents have described in their January 16, 2024 requests for extension of the filing deadline for their Section III responses.

For all of these reasons, the Department should reject the petitioner's January 12th request.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer
TRADE PACIFIC PLLC

**Counsel to Santa Priscila and SONGA**

# CERTIFICATE OF SERVICE

I, Jarrod M. Goldfeder, hereby certify on this 16th day of January, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806) was served electronically on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
TRADE PACIFIC PLLC

# Tab 17

# P.R. 139

# C.R. 60

Barcode: 4491754-01 C-331-806 INV - Investigation

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 10
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been redacted on page Supp-AFF-2; and in Exhibit Supp-AFF-1.

**PUBLIC VERSION**

January 16, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Affiliated Companies Supplemental Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos S.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's January 11, 2024, "Affiliated Companies Supplemental Questionnaire." This response is timely submitted in accordance with the deadline established in the Department's January 11th supplemental questionnaire.

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA requests proprietary treatment and the basis for the request:

- Names of Particular Customers, Distributors, or Suppliers: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Other Specific Business Information Related to SONGA's Business and Production Operations, etc., the Release of Which to the Public Would Cause


Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/16/24 4:19 PM, Submission Status: Approved

> Substantial Harm to SONGA's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to SONGA's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos, S.A.*

## COMPANY CERTIFICATION

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galápagos C.A. (SONGA), certify that I prepared or otherwise supervised the preparation of the attached submission of Supplemental Questionnaire Response, filed on January 16, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: January 15, 2024

**Counsel Certification**

I, Jarrod M. Goldfeder, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galápagos C.A. ("SONGA"), certify that I have read the attached submission of SONGA's Supplemental Questionnaire Response, filed on January 16, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: 1/16/2024

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 16th day of January, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically via ACCESS (proprietary version) or via e-mail (public version), on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4491754-01 C-331-806 INV - Investigation

**PUBLIC VERSION – BPI Has Been Redacted**

**Case No. C-331-806**
**Investigation**
**POI: 1/01/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information has been redacted on page Supp-AFF-1, and in Exhibit Supp-AFF-1.**

**PUBLIC VERSION**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

**RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A.**
**TO THE DEPARTMENT'S JANUARY 11, 2024 SUPPLEMENTAL AFFILIATIONS QUESTIONNAIRE**

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: January 16, 2024**

**Counsel to Sociedad Nacional de Galápagos C.A.**

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/16/24 4:19 PM, Submission Status: Approved

**First Affiliation Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador Period of Investigation (POI) 01/01/2022 – 12/31/2022**
**Sociedad Nacional de Galápagos C.A. (SONGA)**

**Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, SONGA should repeat the question in full to which it is responding and place its answer directly below the question. SONGA should also fully answer each question in this supplemental questionnaire. Please ensure that SONGA provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.**

1. **In its responses to the affiliated company portion of Section III of Commerce's December 12, 2023, initial questionnaire, SONGA identified [ ] with [ ] percentage shares owned by SONGA. However, SONGA did not provide the [ ]'s percent [ ] breakout of SONGA. Please respond to the following questions:**
   a. **Please confirm the names of all [ ] during the POI. Please also explain if there were no [ ] during the POI.**

ANSWER: As an initial matter, Sociedad Nacional de Galápagos C.A. ("SONGA") did identify the **[** DESCRIPTION **]** of SONGA. SONGA clarifies the **[** DESCRIPTION **]** during the period of investigation ("POI") are: **[** NAMES AND DESCRIPTION **]**.

   b. **For any [ ], please list their respective percent [ ] of the individual respondent during the POI.**

ANSWER: Please refer to SONGA's response to subpart a above, which includes the percentages of **[** DESCRIPTION **]** identified in response to the preceding question.

   c. **Please provide a corporate structure chart for SONGA[1] indicating which [ ].**

ANSWER: As requested, Exhibit Supp-AFF-1 contains the requested corporate structure chart for SONGA identifying which **[** DESCRIPTION **]**.

[1] The questionnaire issued by the Department identifies "Santa Priscila" in subpart c. However, because this supplemental questionnaire was issued to SONGA, SONGA provides a corporate structure chart for SONGA in response to subpart c, and replaces "Santa Priscila" with "SONGA".



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/16/24 4:19 PM, Submission Status: Approved

**Exhibit List**

| Exhibit No. | Description | Classification |
|---|---|---|
| **Supp-AFF-1** | SONGA Corporate Structure Chart | BPI |

# Exhibit SUPP-AFF-1

# Sociedad Nacional de Galapagos C.A. Corporate Structure

As of December 31, 2022

[ ]

# Tab 18

# P.R. 149

Barcode: 4493137-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
POI: 01/01/2022 – 12/31/2022
**Public Document**
E&C/OIV: ZS

January 18, 2024

**MEMORANDUM TO:** The File

**FROM:** Zachary Shaykin
International Trade Compliance Analyst
AD/CVD Operations, Office IV
Enforcement and Compliance

**SUBJECT:** Antidumping Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Ex Parte Meeting with Counsel to Petitioner

---

On January 11, 2024, Department of Commerce (Commerce) officials held a meeting via Microsoft Teams with counsel to the American Shrimp Processors Association (collectively, the petitioner) in the above mentioned investigation in which the petitioner reiterated its January 11, 2024, comments[1] submitted in opposition to the January 9, 2024, request for clarification letter submitted by the mandatory respondents, *i.e.*, Industrial Pesquera Santa Priscila S.A. (Santa Priscila) and Sociedad Nacional de Galápagos C.A. (SONGA).[2]

The following is a list of participants:

**United States Department of Commerce - Enforcement and Compliance:**

| | |
|---|---|
| Eric Greynolds | Office Director, AD/CVD Operations, Office IV |
| Zachary Shaykin | Analyst, AD/CVD Operations, Office IV |
| Reginald Anadio | Analyst, AD/CVD Operations, Office IV |
| Hendricks Valenzuela | Counsel, Office of the Chief Counsel for Trade Enforcement and Compliance, Office of the General Counsel |
| Erin Howard | Analyst, AD/CVD Operations, Office of Policy |

**Schagrin Associates:**

| | |
|---|---|
| Elizabeth J. Drake | Counsel to Petitioner |

[1] *See* Petitioner's Letter, "Frozen Warmwater Shrimp from Ecuador: Opposition to Respondents' Request to Exclude Companies from Reporting Obligations," dated January 11, 2024.
[2] *See* Santa Priscila and SONGA's Letter, "Frozen Warmwater Shrimp from Ecuador – Request for Clarification of Section III Reporting Obligations and to Exclude Certain Companies from Reporting," dated January 9, 2024.

Filed By: Zachary Shaykin, Filed Date: 1/18/24 9:45 AM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

# Tab 19

# P.R. 152

# C.R. 64

Barcode: 4496471-01 C-331-806 INV - Investigation

International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 8
Investigation
AD/CVD Operations, Office IV
Business proprietary information
has been redacted on pages
SUPP2-AFF-1 to SUPP2-AFF-2.

**PUBLIC VERSION**

January 23, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Affiliated Companies Supplemental Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos S.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's January 19, 2024, "Affiliated Companies Supplemental Questionnaire." This response is timely submitted in accordance with the deadline established in the Department's January 19th supplemental questionnaire.

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA requests proprietary treatment and the basis for the request:

- Other Specific Business Information Related to SONGA's Business and Production Operations, Ownership and Affiliations, etc., the Release of Which to the Public Would Cause Substantial Harm to SONGA's Competitive Position: Contained in the narrative. Protected under 19 C.F.R. § 351.105(c)(11).


Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/23/24 1:31 PM, Submission Status: Approved

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to SONGA's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

<u>/s/ Jarrod M. Goldfeder</u>
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos S.A.*

Barcode: 4496471-01 C-331-806 INV - Investigation

**COMPANY CERTIFICATION**

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galápagos C.A. (SONGA), certify that I prepared or otherwise supervised the preparation of the attached submission of the Affiliated Companies Supplemental questionnaire response, filed on January 23, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: January 22 2024

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/23/24 1:31 PM, Submission Status: Approved

Barcode: 4496471-01 C-331-806 INV - Investigation

# Counsel Certification

I, Jarrod M. Goldfeder, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galápagos C.A. ("SONGA"), certify that I have read the attached submission of SONGA's Affiliated Companies Supplemental Questionnaire Response, filed on January 23, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: 1/23/2024

# CERTIFICATE OF SERVICE

I, Jarrod M. Goldfeder, hereby certify on this 23rd day of January, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically via ACCESS (proprietary version) or via e-mail (public version), on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
TRADE PACIFIC PLLC

Barcode: 4496471-01 C-331-806 INV - Investigation


**Case No. C-331-806**
**Investigation**
**AD/CVD Operations, Office IV**

**Business proprietary information has been redacted on pages SUPP2-AFF-1 to SUPP2-AFF-2.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

# COUNTERVAILING DUTY INVESTIGATION OF FROZEN WARMWATER FROM ECUADOR

# RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A. TO THE DEPARTMENT'S JANUARY 19, 2024, AFFILIATED COMPANIES SUPPLEMENTAL QUESTIONNAIRE

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Counsel to Sociedad Nacional de Galápagos C.A.**

**Date submitted: January 23, 2024**

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/23/24 1:31 PM, Submission Status: Approved

**Response of Sociedad Nacional de Galápagos C.A.
to the Department's January 19, 2024,
Affiliated Companies Supplemental Questionnaire**

**Frozen Warmwater Shrimp From Ecuador
Investigation**

**1. On page Supp-Aff-1 and Exhibit Supp-Aff-1 of SONGA's response to Commerce's January 11, 2024, supplemental questionnaire, SONGA reported that [ ]. Please respond to the following questions:**

**a. Please explain whether SONGA, [ ] have [ ] parent and/or holding companies which may be considered as cross-owned under the definition of cross-ownership as defined in Commerce's regulations at 19 CFR 351.525(b)(6)(ii) – (vi).**

ANSWER: Sociedad Nacional de Galápagos C.A. ("SONGA") confirms that [ NAMES ]—which were identified on page AFF-1 of SONGA's January 16, 2024, supplemental affiliation questionnaire response—SONGA has [ DESCRIPTION ] that may be considered as cross-owned with SONGA under the definition of cross-ownership as defined in 19 C.F.R. § 351.525(b)(6)(ii)–(vi).

SONGA reported previously that [ DESCRIPTION ]. This entity may be considered cross-owned with SONGA under the definition of cross-ownership set forth at 19 C.F.R. § 351.525(b)(6)(ii)–(vi). Please refer to Exhibit AFF-1 of SONGA's January 4, 2024, affiliated companies response.

Finally, SONGA confirms that [ NAME ] has [ ] parent and/or holding companies that may be considered as cross-owned under the definition of cross-ownership set forth at 19 C.F.R. § 351.525(b)(6)(ii)–(vi). During the period of investigation, the shareholders of [ NAME ] all were [ DESCRIPTION ].



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/23/24 1:31 PM, Submission Status: Approved

**b. If yes, please report whether [ ] majority owned by any parent and/or holding companies. Please provide the [ ], if applicable.**

<u>ANSWER</u>: [NAME ], discussed above, [ ] majority-owned by any parent or holding company. [ DESCRIPTION ]. SONGA confirms that [ DESCRIPTION ]. This entity may be considered cross-owned with SONGA under the definition of cross-ownership set forth at 19 C.F.R. § 351.525(b)(6)(ii)–(vi). Please refer to Exhibit AFF-1 of SONGA's January 4, 2024, affiliated companies response. Although [ DESCRIPTION ] holds an [ DESCRIPTION ] SONGA.

SONGA confirms that [ NAME ] is not owned by any parent and/or holding company, but rather, was owned [ DESCRIPTION ] during the POI. As a result, this portion of the Department's question is not applicable as to [ NAME ].



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 1/23/24 1:31 PM, Submission Status: Approved

# Tab 20

# P.R. 160

# C.R. 66

Barcode:4498151-01 C-331-806 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
POI: 01/01/2022 – 12/31/2022
~~Business Proprietary Document~~
E&C/OIV: RA
**Public Version**

January 25, 2024

Sociedad Nacional de Galápagos C.A.
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, DC 20003

**SUBJECT:** Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Sociedad Nacional de Galápagos C.A.

Dear Mr. Goldfeder:

This letter concerns your sources questionnaire response, affiliation questionnaire response, and first supplemental affiliation questionnaire response filed on behalf of Sociedad Nacional de Galápagos C.A. (SONGA), a mandatory respondent in the above-referenced investigation.[1]

Based on comments from interested parties, we have determined to solicit questionnaire responses from certain companies that are cross-owned with SONGA. In response, Commerce notes that Naturisa S.A. (Naturisa) is SONGA's [ ] supplier of shrimp during the period of investigation among SONGA's cross-owned and non-cross-owned suppliers. Therefore, we request that Naturisa provide a response to section II of the attached questionnaire no later than 5:00 p.m. Eastern Time (ET) on February 7, 2023, and section III of the attached questionnaire no later than 5:00 p.m. ET on February 14, 2023. Additionally, we request that Holding Sola & Sola Solacciones S.A. and Empacadora Champmar S.A. provide a response to sections II and III of the attached questionnaire by no later than the deadlines identified above. Please note that SONGA is responsible for forwarding a copy of this questionnaire to the above-referenced companies. Commerce currently does not require responses from other entities identified in SONGA's responses.

Commerce must conduct this investigation in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadlines, or are unable to provide all requested supporting documentation by the

[1] *See* SONGA's Letters, "Sources of Raw Shrimp Questionnaire Response," dated January 3, 2024; "Section III 'Affiliated Companies' Questionnaire Response," dated January 4, 2024; and "Affiliated Companies Supplemental Questionnaire Response," dated January 16, 2024.

INTERNATIONAL TRADE ADMINISTRATION

Filed By: Zachary Shaykin, Filed Date: 1/25/24 10:51 AM, Submission Status: Approved

established dates, you must notify the official in charge and submit a request for an extension of the related deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadlines. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any extension granted in response to your request will be in writing; otherwise the original deadline will apply. Extensions for the suppliers must be requested; any extension granted will apply only to the party identified in the written extension issued by Commerce.

If Commerce does not receive either the requested information or a written extension request before **5:00 p.m. ET** on the established deadlines, we may conclude that the suppliers have decided not to cooperate in this proceeding. Unless extended, Commerce will not accept any requested information submitted after the established deadlines. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

**EXTENSIONS:** **Note well:** Any extension request must be filed in writing. Extension requests filed after 5:00 p.m. on the due date will not be granted, except in extraordinary circumstances. An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means.[2] An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, *force majeure*, or medical emergency."[3] Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the requesting party of its decision before the time limit expires."[4] For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.[5]

**Note well**:

> Parties should be aware that **the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on its disposition. Parties should not assume that they will receive an extension of a time limit if they have not received a response from Commerce. For submissions that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission**

[2] 19 CFR 351.302(a)(2).
[3] *Extension of Time Limits*, 78 FR 57790, 57793 (Sep. 20, 2013) (Preamble to the Final Rule).
[4] *Id.* at 57792.
[5] *Id.*

**would be due by the opening of business (8:30 a.m.) on the next business day**. *See* 19 CFR 351.103(b).[6] **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues. When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise the official in charge, informing them of the filing difficulties. The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.
Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

The information which you submit may be subject to verification. Failure to allow verification of any item may affect the consideration which we will accord to that item or to any other material, whether or not we verify the latter. Please also note that, pursuant to 19 CFR 351.303(e), the Department will not consider any documentation in a foreign language that is not translated into English. Parties must receive approval from the Department before submitting a partial translation of a document.

Should you need further assistance or information with regard to this investigation, please contact Reginald Anadio at Reginald.Anadio@trade.gov. or (202) 482-3166

Sincerely,



Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

Attachment

[6] *Id.* (emphasis added).

***QUESTIONNAIRE FOR SUPPLIER OF***
***Sociedad Nacional de Galápagos C.A.***

## SECTION I: GENERAL INSTRUCTIONS

The U.S. Department of Commerce (Commerce) requests information about the programs on which an investigation was initiated in order to determine whether countervailable subsidies have been provided to producers/exporters in Ecuador of frozen warmwater shrimp (shrimp or subject merchandise). Section 775 of the Tariff Act of 1930, as amended (the Act), also requires Commerce to investigate any other potential countervailable subsidies it discovers during the course of this investigation that pertain to the manufacture, production, or exportation of shrimp.

If you have questions during the course of this investigation, we urge you to consult with the officials in charge named in the cover letter. Your response to the questionnaire should include all of the information requested. It is essential and in your interest that Commerce receive complete information early in the proceeding to ensure a thorough and accurate analysis, and to provide all parties the fullest opportunity to review and comment on your submission and Commerce's analysis. We appreciate your cooperation in this investigation.

### I. SCOPE AND TIME PERIOD OF INVESTIGATION

A. Scope

The scope of these investigations includes certain frozen warmwater shrimp and prawns whether wild-caught (ocean harvested) or farm-raised (produced by aquaculture), head-on or head-off, shell-on or peeled, tail-on or tail-off, deveined or not deveined, cooked or raw, or otherwise processed in frozen form. "Tails" in this context means the tail fan, which includes the telson and the uropods.

The frozen warmwater shrimp and prawn products included in the scope, regardless of definitions in the Harmonized Tariff Schedule of the United States (HTSUS), are products which are processed from warmwater shrimp and prawns through freezing and which are sold in any count size.

The products described above may be processed from any species of warmwater shrimp and prawns. Warmwater shrimp and prawns are generally classified in, but are not limited to, the *Penaeidae* family. Some examples of the farmed and wild-caught warmwater species include, but are not limited to, whiteleg shrimp (*Penaeus vannemei*), banana prawn (*Penaeus merguiensis*), fleshy prawn (*Penaeus chinensis*), giant river prawn (*Macrobrachium rosenbergii*), giant tiger prawn (*Penaeus monodon*), redspotted shrimp (*Penaeus brasiliensis*), southern brown shrimp (*Penaeus subtilis*), southern pink shrimp (*Penaeus notialis*), southern rough shrimp (*Trachypenaeus curvirostris*), southern white shrimp (*Penaeus schmitti*), blue shrimp (*Penaeus stylirostris*), western white shrimp (*Penaeus occidentalis*), and Indian white prawn (*Penaeus indicu*s).

Frozen shrimp and prawns that are packed with marinade, spices or sauce are included in the scope. In addition, food preparations, which are not "prepared meals," that contain more than 20 percent by weight of shrimp or prawn are also included in the scope.

Excluded from the scope are: (1) breaded shrimp and prawns (HTSUS subheading 1605.21.1020); (2) shrimp and prawns generally classified in the *Pandalidae* family and commonly referred to as coldwater shrimp, in any state of processing; (3) fresh shrimp and prawns whether shell-on or peeled (HTSUS subheadings 0306.36.0020 and 0306.36.0040); (4) shrimp and prawns in prepared meals (HTSUS subheadings 1605.21.0500 and 1605.29.0500); (5) dried shrimp and prawns; (6) canned warmwater shrimp and prawns (HTSUS subheading 1605.29.1040); and (7) certain battered shrimp. Battered shrimp is a shrimp-based product: (1) that is produced from fresh (or thawed-from-frozen) and peeled shrimp; (2) to which a "dusting" layer of rice or wheat flour of at least 95 percent purity has been applied; (3) with the entire surface of the shrimp flesh thoroughly and evenly coated with the flour; (4) with the non-shrimp content of the end product constituting between four and ten percent of the product's total weight after being dusted, but prior to being frozen; and (5) that is subjected to individually quick frozen (IQF) freezing immediately after application of the dusting layer. When dusted in accordance with the definition of dusting above, the battered shrimp product is also coated with a wet viscous layer containing egg and/or milk, and par-fried.

The products covered by the scope are currently classified under the following HTSUS subheadings: 0306.17.0004, 0306.17.0005, 0306.17.0007, 0306.17.0008, 0306.17.0010, 0306.17.0011, 0306.17.0013, 0306.17.0014, 0306.17.0016, 0306.17.0017, 0306.17.0019, 0306.17.0020, 0306.17.0022, 0306.17.0023, 0306.17.0025, 0306.17.0026, 0306.17.0028, 0306.17.0029, 0306.17.0041, 0306.17.0042, 1605.21.1030, and 1605.29.1010. These HTSUS subheadings are provided for convenience and for customs purposes only and are not dispositive, but rather the written description of the scope is dispositive.

### B. Period of Investigation

The time period covered by this investigation (the period of investigation - POI) is January 1, 2022, through December 31, 2022.

## II. INSTRUCTIONS FOR FILING THE RESPONSE

The following instructions apply to your response to this questionnaire and all other documents that you submit to the Department during the course of this proceeding, such as responses to additional questionnaires, extension requests, and case briefs.

### A. Filing

1. SONGA is responsible for ensuring that the information the Department is requesting from its supplier is submitted to the Department in a timely manner such that it will be received by the Department in Washington, DC, no later than the close of business on the due date specified on the cover page of this questionnaire. All descriptive materials that supplement your response should be

submitted on the same date as the initial response.

2. All submissions must be made electronically using Commerce's ACCESS website at http://access.trade.gov. If an exception to the electronic filing requirement applies, you must address and manually submit your response to the address indicated at Section C "Manual Filing," below. To determine if your response qualifies for manual filing, see "Manual Filing."

3. The business proprietary response should be submitted on the due dates specified. The public version of the response may be filed one business day after the proprietary response.

4. An electronically filed document must be received successfully in its entirety by ACCESS by 5:00pm Eastern Time (ET) on the due date, unless an earlier time is specified.

B. Format

1. You are required to state in the upper right-hand corner of your cover letter the following information in the following format:

   a. on the first line, indicate the case number stated on the cover page to this questionnaire;

   b. on the second line, indicate the total number of pages in the document including cover pages, appendices, and any unnumbered pages;

   c. on the third line, indicate "investigation" and the time period (MM/DD/YY - MM/DD/YY);

   d. on the fourth line, indicate Commerce office conducting the proceeding (the office is indicated on the cover page to this questionnaire);

   e. on the fifth and subsequent lines, indicate whether any portion of the document contains business proprietary information and, if yes, list the page numbers containing business proprietary information; and indicate the business proprietary/public status of the document and whether you agree or object to release of the submitted information under administrative protective order (APO) by stating one of the following:

      - "Business Proprietary Document -- May Be Released Under APO,"
      - "Business Proprietary Document -- May Not Be Released Under APO,"
      - "Business Proprietary/APO Version-- May Be Released Under APO,"

- "Public Version," or
- "Public Document."

2. Please include a "Re:" line on the cover letter of your response, and any other submissions you make during this proceeding. In the Re: line, briefly summarize the purpose of your submission, e.g., "response to questionnaire," "case brief."

3. Prepare your response in typed form and in English (see 19 CFR 351.303(d) and (e) for these and other formatting requirements). Include an original and translated version of all pertinent portions of non-English language documents that accompany your response, including financial statements. Any foreign language submission which is not accompanied by an English translation will be disregarded.

4. Repeat the question to which you are responding in your narrative submission and place your answer directly below it.

5. Please respond to each question. If a particular question does not apply, please state so and explain why in your response. Failure to do so could lead to the use of adverse inferences for that particular question.

6. In each of your answers, please identify your source of information. Please include with your response copies of source documents necessary to understand your response and include an original and translated version of all source documents. For additional information sources not included in your response, indicate the location where the documents or electronic data systems are maintained. If information is maintained at multiple locations, please list in an appendix to your response these locations along with notes indicating the information maintained at each location. This information is used by Commerce to prepare for verification.

7. Include all worksheets, financial reports, and other requested documents as appendices to your response.

8. Provide a table of appendices. Assign a number to each appendix and include a descriptive name for each appendix and its number in the table.

9. Identify all units of measurement, currencies, and conversion factors used in your narrative response, worksheets, or other appendices. All monetary amounts should be shown in the currency in which they were originally denominated, and in the currency in which they are registered in your accounts (if the two are different). Also, report the actual exchange rate used for a particular conversion. For all values adjusted for inflation, please provide the data in both nominal and adjusted terms and explain how these values were adjusted.

10. We request that tabulated information regarding company use of programs (e.g., loans, loan guarantees, and grants) be submitted using the Microsoft Excel spreadsheet program compatible with the Microsoft Windows Operating System (MS-Windows) software for PCs.

11. It is your responsibility to contact the officials in charge if subsequent to your filing there are events that affect your response (e.g., changes as a result of an audit).

C. Manual Filing

1. All submissions must be filed electronically. Only under the following four circumstances will Commerce accept a hardcopy response that is manually filed:

   - Documents exceeding 500 pages in length may be filed manually (in paper form) in the APO/Dockets Unit. This is referred to as a "bulky document."
   - Data files greater than 50 MB may be filed in an alternative manner after consulting https://access.trade.gov/help/Super_Bulky_Document_Submissions.pdf and contacting the ACCESS Help Desk at 202-482-3150.

   - If the ACCESS system is unable to accept filings continuously or intermittently over the course of any period of time greater than one hour between 12:00 p.m. and 4:30 p.m. ET or for any duration of time between 4:31 p.m. and 5:00 p.m. ET, then a person may manually file the document in the APO/Dockets Unit. Commerce will provide notice of such technical failures on the ACCESS Help Desk line at 202-482-3150 and on the Enforcement and Compliance website, which is https://www.trade.gov/us-antidumping-and-countervailing-duties.

   - Apart from the above, if you are unable to comply with the electronic filing requirement, as provided in 19 CFR 351.103(c) of Commerce's regulations, and in accordance with section 782(c) of the Tariff Act of 1930, as amended (the Act), you must promptly notify the official in charge and submit a full written explanation of the reasons you are unable to file the document electronically. You must also suggest alternative forms in which to submit the information. Commerce will consider the ability of a submitter and may modify the electronic filing requirement on a case-by-case basis.

2. All manually filed documents must be accompanied by a cover sheet generated in ACCESS. For manually filed bulky documents, separator sheets must also be generated and used.

3. If your response qualifies as a bulky document and you opt to file it manually, you must file two identical paper copies of the document. For all other authorized manual submissions, only one paper copy is required.

4. Manual submissions must be addressed and submitted to:
**Secretary of Commerce**
**Attention: Enforcement and Compliance, AD/CVD Operations Office** (*specify office number indicated on the cover page of this questionnaire)*
**APO/Dockets Unit, Room 18022**
**U.S. Department of Commerce**
**Fourteenth Street and Constitution Avenue, N.W.**
**Washington, D.C. 20230**

D. Certifications

1. Submit the required *certification of factual information*.[7] Providers of information and the person(s) submitting it, if different (e.g., a legal representative), must certify that they have read the submission and that the information submitted is accurate and complete. Commerce cannot accept questionnaire responses that do not contain signed certifications. Forms for such certification are included as attachments to this questionnaire within Sections II and III.

2. Provide the required *certificate of service* (included as an attachment) with each business proprietary submission and its public version, as well as each fully public submission.

3. Signed certifications of accuracy and certificates of service should be scanned and appended to the appropriate electronic documents filed in ACCESS.

E. Business Proprietary Information and Summarization of Business Proprietary Information

1. You may request business proprietary treatment for information submitted that is not publicly available. As a general rule, Commerce places all correspondence and submissions received in the course of an antidumping or countervailing duty proceeding in a public reading file. However, information deemed to be proprietary will not be made available to the public. If you wish to make a request for proprietary treatment for particular information, refer to 19 CFR 351.304, 351.305, and 351.306. You must submit the request for proprietary treatment at the same time as the claimed business proprietary information is submitted to Commerce.

[7] Commerce's certification requirements changed effective March 14, 2011. Additional changes regarding the certification of factual information by governments participating in a proceeding became effective on September 2, 2011. Any submissions made to Commerce pursuant to proceedings initiated on or after March 14, 2011, must be accompanied by the appropriate company, government, and representative certifications (as applicable). For more information refer to 76 FR 7491 (February 10, 2011) and 76 FR 54697 (September 2, 2011) of the *Federal Register*.

2. Utilize the "one-day lag rule" under 19 CFR 351.303(c)(2) if you wish an additional day to review the final bracketing of business proprietary information in a document and to prepare the required public version. The filing requirements under the one-day lag rule provide for a party to file only the business proprietary document within the applicable time limit (19 CFR 351.303(c)(2)(i)). By the close of business one business day after the date the business proprietary document is filed, the person must file the complete final business proprietary document (19 CFR 351.303(c)(2)(i)(ii)). The final business proprietary document must be identical to the original document except for any bracketing corrections.

3. By the close of business one business day after the date the business proprietary document is filed (refer to the "one-day lag rule" in the preceding paragraph), submit the public version of your response (19 CFR 351.303(c)(2)(i)(iii)). A public version must contain:

   (1) a non-proprietary (public) version of your response that has sufficient detail to permit a reasonable understanding of the information submitted in confidence, and/or

   (2) an itemization of particular information that you believe you are unable to summarize. State the reasons why you cannot summarize each piece of information.

   Please note: The summarization requirement does not apply solely to the narrative portion of your response. It applies equally to worksheets and other appendices to your response. Generally, numerical data, such as that provided in sales and loan charts, are adequately summarized only if grouped or presented in terms of indices or figures ranged within 10 percent of the actual figure. Responses, or portions thereof, that are not adequately summarized may be rejected from the record of this proceeding.

4. Submit the statements required regarding limited release of business proprietary information under the provisions of an APO. U.S. law permits limited disclosure to representatives of parties (e.g., legal counsel) of certain business proprietary information, including electronic business proprietary information, under an APO. (Note that data received under an APO cannot be shared with others who are not covered by the APO.) Under the provisions governing APO disclosure, you must submit either:

   (1) a statement agreeing to permit the release under APO of information submitted by you in confidence during the course of the proceeding, or

   (2) a statement itemizing those portions of the information which you believe should not be released under APO, together with arguments supporting your objections to that release.

We are required by our regulations to reject, at the time of filing, submissions of business proprietary information that do not contain one of these statements. As discussed above, you must state in the upper right-hand corner of the cover letter accompanying your questionnaire response whether you agree or object to release of the submitted information under APO (e.g., May Be Released Under APO or May Not Be Released Under APO). See 19 CFR 351.304 for specific instructions. If you do not agree to release under APO all or part of the proprietary information, but we determine that the information should be released, you will have the opportunity to withdraw the information (see 19 CFR 351.304(d)). However, any information which you withdraw will be removed from the official record and will not be used in our determination.

5. Place brackets ("[ ]") around information for which you request business proprietary treatment. Place double brackets ("[[ ]]") around information for which you request proprietary treatment and which you do not agree to release under APO.[8]

6. Provide to all parties whose representatives have been granted APO access and who are listed on Commerce's most recent APO Service List, a complete copy of the submission--proprietary document and public version, except for that information which you do not agree to release under APO. (APO service lists, as well as public service lists, are regularly updated and maintained as record documents in ACCESS at https://access.trade.gov. The current service lists are also either attached to the cover letter of this questionnaire or will be provided by a subsequent letter from Commerce). If you exclude information because you do not agree to release it under APO, you must submit the complete business proprietary version, wherein information in double brackets has been excluded. This version of the response must be marked "Business Proprietary/APO Version-- May Be Released Under APO" on the cover page. For parties that do not have access to information under APO, please provide a public version only.

7. A chart summarizing AD/CVD filing requirements can be found at https://access.trade.gov/Resources/filing/index.html. ACCESS filing instructions are https://access.trade.gov/help/Handbook_on_Electronic_Filing_Procedures.pdf. Detailed and supplemental information concerning APOs, including the APO Handbook, a complete set of APO regulations, and APO application forms and service lists, can be found at https://access.trade.gov/Resources/Administrative_Protective_Order.aspx

F. Verification

[8] Commerce will not disclose proprietary customer names under APO during an antidumping or countervailing duty investigation until either an order is published or the investigation is suspended. To ensure that proprietary customer names are properly treated in this case, place double brackets ("[[ ]]") around all proprietary customer names in your submissions to Commerce during the course of this investigation.

All information submitted is subject to verification. Failure to allow full and complete verification of any information may affect the consideration accorded to that or any other verified or non-verified item in the responses.

G. Extension Requests

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadlines, or are unable to provide all requested supporting documentation by the same date, you must notify the officials in charge and submit a written request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future do not substitute for a written extension request. All extension requests must be in writing and should state the reasons for the request pursuant to 19 CFR 351.302(c). Any extension granted in response to your request will be communicated in writing by Commerce; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5:00pm ET on the established deadline, we may conclude that you have decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the established deadlines. As required by 19 CFR 351.302(d), we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

H. Separate Letter of Appearance Required

Pursuant to 19 CFR 351.103(d)(1), "with the exception of a petitioner filing a petition in an investigation, to be included on the public service list for a particular segment, each interested party must file a letter of appearance." The letter of appearance must be filed separately from any other document (with the exception of an application for APO access). If you have an ACCESS E-Filer account, you may also enter your appearance by logging into ACCESS at https://access.trade.gov and clicking on "Manage Entry of Appearance" and then "Create New Entry of Appearance."

## III. SUBMISSION OF COMPUTER DATABASES AND SPREADSHEETS

A. Filing Instructions

Except as described above under the section "Manual Filing," all database files, including

Microsoft Excel spreadsheets that are less than 50 MB in size must be filed electronically using ACCESS. Instructions for using ACCESS can be found above and at https://access.trade.gov. Please refer to the Handbook on Electronic Filing Procedures in the "Help" section of the website.

Please label the electronic files that you upload in a manner indicating their specific contents. For example, ABC Subsidiary 1 March 15 Electricity Worksheet, rather than ABC March 15 QR – Excel 1.

For manual filings (when available), separately pack and label the electronic media containing the databases or spreadsheets (*see* section below for labeling and other instructions). Deliver the package to the address listed in the section "Manual Filing."

B. Special Instructions for Manual Filing of Databases in the Event of ACCESS Technical Failure

In the event of an ACCESS technical failure, you may submit your databases or spreadsheets manually on either a CD or DVD. Compressed databases are acceptable, but decompression instructions and software must accompany any compressed data submission.

Clearly label the CD or DVD with the following information:

1. Case name, case number, and submission date
2. Name of respondent
3. Proceeding and time period (e.g., INV-POI 1/2011-12/2011
4. Name of official in charge
5. File formats and software used to create the databases or worksheets
6. File names, number of observations, and record lengths
7. ACCESS bar code number

C. Data Formatting Instructions

1. Since the database or spreadsheet must be readable by an IBM-compatible PC, the data must be encoded in ASCII format or, at your option, PC SAS, Access, dBase, or Excel formats.

2. Report numerical data in a numerical format that allows calculations (e.g., 10, not 10 MT). Units should be reported in fields separate from numerical values.

**SECTION I**
**ATTACHMENT I**

## CERTIFICATION

**COMPANY CERTIFICATION**

I, **(PRINTED NAME AND TITLE)**, currently employed by **(COMPANY NAME)**, certify that I prepared or otherwise supervised the preparation of the attached submission of (**IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {THE (ANTIDUMPING OR COUNTERVAILING) DUTY INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**. I certify that the public information and any business proprietary information of **(CERTIFIER'S COMPANY NAME)** contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature: ____________________**
**Date: ________________________**

* For multiple person certifications, all persons should be listed in the first sentence of the certification and all persons should sign and date the certification. In addition, singular pronouns and possessive adjectives should be changed accordingly, e.g., "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."

This questionnaire requests information about programs alleged to be provided to producers/ exporters in Ecuador of frozen warmwater shrimp (shrimp or "subject merchandise"). Section 775 of the Act also requires Commerce to investigate any other programs discovered during the course of this investigation that potentially confer countervailable subsidies on the manufacture, production, or exportation of subject merchandise.

## SECTION II: GENERAL QUESTIONS

### I. OTHER COMPANIES SUBJECT TO INVESTIGATION

In addition to providing a response to this questionnaire regarding your own company, we require responses from certain affiliated companies or companies involved in your sales or production of subject merchandise, as explained below in sections A through D. A failure on the part of any such companies to provide a response to this questionnaire may adversely affect your own results in this investigation. For the remainder of this questionnaire, the terms respondent(s), company respondent(s), "you," or "your company," refer not just to your company, but to all companies required to complete this questionnaire. Provide separate answers under each question and separate spreadsheets for each of these companies.

Unless specified differently, your answers to the requests below should cover your company's situation during the POI. Usage of the present tense in this section refers to the POI.

We also instruct you to provide a list of those companies for which you are responding to your government as soon as possible so that the government can include these companies in its response to this questionnaire.

A. Affiliated Companies

Affiliation is defined in section 771(33)(A)-(G) of the Act. Affiliation can be indicated by a number of factors, including: (1) personal family groupings, (2) corporate groupings, (3) shared board members or executive officers, (4) employer and employee relationships among owners, board members, or executive officers of multiple parties, (5) one party's ownership or control of stock with voting privileges in another, (6) franchise and joint venture agreements, (7) close supplier relationships, and (8) other indicia of control by one party over another, directly, or indirectly through third parties. "Control" exists where one party is legally or operationally in a position to exercise restraint or direction over another party.

Provide the following information about your company's affiliated companies:

1. The identity of all companies with which your company is affiliated within the meaning of section 771(33) of the Act, including the full name and mailing address of each company.

2. Describe in detail the nature of the relationship between your company and those companies listed in response to the prior question. Specify for example, whether the companies share a board of directors, or whether members of each company's board sit on the board(s) of the other company(ies), and how the voting rights are distributed among board members; specify if, and how, officers of one company are directly involved in overseeing the operations of another company. Specify whether an affiliated company supplies inputs into your company's production process.

You must provide complete responses for certain "cross-owned" affiliated companies.

Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other. In addition, if two companies are both cross-owned by a third party, the two companies themselves would be considered cross-owned (for example, cross-ownership exists between two companies owned by the same parent).

You must provide a complete questionnaire response for those affiliates where "cross-ownership" exists, and one of the following situations exists:

- the cross-owned company produces the subject merchandise; or
- the cross-owned company is a holding company or a parent company (with its own operations) of your company;[9] or
- the cross-owned company supplies an input product to you for production of the downstream product produced by the respondent; or
- the cross-owned company has received a subsidy and transferred it to your company.

B. Former Owners / Changes in Ownership[10]

Commerce allocates the benefits received from certain types of subsidies over time (*e.g.*, equity infusions, non-recurring grants, debt forgiveness, import duty or value-added tax exemptions or reductions on capital equipment, *etc.*). *See* 19 CFR 351.524 and subsection C of the "General Questions" section below for a complete explanation.

Thus, in addition to investigating alleged subsidies that your company may have received during the POI, Commerce is also investigating alleged allocable, non-recurring subsidies that your company may have received during the AUL period. Because of this, if your company obtained all or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, or its assets continue to operate as part of your company, we require a complete questionnaire response for such company. If your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, coordinate with your government to answer the questions in the ***Change-in-Ownership Appendix***. If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the

[9] Your response must cover all cross-owned parent companies and holding companies, not only companies that directly held a controlling stake in your company during or prior to the POI. For example, if your company was a direct subsidiary of one cross-owned company, and that company was a direct subsidiary of another cross-owned company, then you must respond on behalf of both the cross-owned parent and the cross-owned "grandparent" companies. By direct subsidiary, we are referring to a company that is directly owned by another company. An indirect subsidiary, by contrast, has an intermediate owner between itself and the ultimate owner.

[10] All cross-owned affiliates meeting the conditions under sub section C during the POI and AUL and are required to submit a complete questionnaire response should also provide a response to this section with regard to any former owners and changes in ownership.

allocation period, state so and you do not need to provide a response to the ***Change-in-Ownership Appendix***.

Finally, if your company has been privatized, changed ownership, merged with another company, or devolved another company/ies from your company's corporate structure in whole or in part, during the AUL period and your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, coordinate with your government to answer the questions in the ***Change-in-Ownership Appendix***. If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, state so and you do not need to provide a response to this appendix.

## General Questions

A. Please provide the following information for your company, involved in the farming of raw shrimp.

1. The addresses of the company's headquarters, plant, and any export facilities.

2. A description of the company. Please include in your response:

   a. the date the company was formed;

   b. a history of the company's ownership; and

   c. the products the company produces and/or sells.

3. Using diagrams and/or flow charts, describe the process by which your company produces raw shrimp. If different steps of the production process occur in different production units, divisions, or affiliated companies, please identify those production units, divisions, or affiliated companies.

4. Please provide your company's complete audited financial statements for the fiscal years covering the 2022 POI. Also please provide English translations of these financial statements. If complete English translations are not available, please provide translations of the section(s) that report benefits received from the government. These should be the official financial statements filed with your government. If there is no such filing requirement, the financial statements should be those presented to banks or independent third parties. If you do not prepare audited financial statements, please provide any unaudited financial statements that your company prepares for your board of directors, your shareholders, for banks, or for the government.

5. Please provide complete, translated tax returns **filed during the POI**, which may apply to the previous tax year (preferably a copy of the tax return stamped by the government). Include all schedules and attachments included with your return. In addition, please provide any amendments to your return.

6. Please provide your most up-to-date business registration documents filed with government authorities. If your business registration documents do not indicate the names of your company's owners during the POI, please provide additional documentation that does. If the documents identify corporate owners that own more than 10 percent of your company, please identify the owners of your company's corporate owners.

B. Please provide the following information for your company **for the POI**.

If the actual values recorded in your accounting records are booked on a basis other than free, on-board (f.o.b.), please describe any adjustments that were made to derive the f.o.b. values. In addition, if these values are inclusive of VAT or other indirect taxes, please ensure that such taxes are removed from the figures.

1. Total Production and Sales of Raw Shrimp
The quantity and f.o.b. value of your operations' production and sales of raw shrimp. Provide a worksheet reconciling the total reported production volume and value to your production records.

2. Sales of Raw Shrimp to SONGA
The quantity and f.o.b. value of raw shrimp sold to SONGA. Please report the sales value on an f.o.b. (factory) basis.

**Regarding 1 and 2 above:** Please explain how the volume and value of raw shrimp production and sales are recorded in your company's financial records. If your company's financial records are consolidated with those of other companies in the financial report of a parent, holding company, or group of companies please explain how, and provide copies of the consolidated financial statements.

## SECTION III: PROGRAM-SPECIFIC QUESTIONS

*For each program*, if your company did not apply for, use, or benefit from that program during the POI, you must clearly state so. Otherwise, please answer the questions listed. To determine the information which must be reported under each program, please see the instructions for each program in this section of the questionnaire and in the referenced appendices.

If any government assistance, as enumerated below, was received by companies which have since been merged with or purchased by your company, you are responsible for answering the questions with respect to such assistance to the merged or purchased company.

For detailed descriptions of the programs listed below, consult with SONGA or the Government of Ecuador (GOE).

### I. TAX PROGRAMS:

A. Refund of Currency Outflow Tax (ISD) on Purchase of Inputs

Please provide a detailed description of this program and its workings. In addition, p lease respond to all questions in the following appendices:

1. ***Standard Questions Appendix***,
2. ***Tax Appendix***, and
3. ***Input Producer Appendix***

B. Export Tax Incentive

Please provide a detailed description of this program and its workings. In addition, p lease respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

C. Export Tax Incentives for Sustained/Increased Employment

Please provide a detailed description of this program and its workings. In addition, p lease respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

D. Export Taxes Lowered to Promote Agricultural Exports

Please provide a detailed description of this program and its workings. In addition, p lease respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

E. Export Credits from National Finance Corporation

Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

F. International Factoring

Please provide a detailed description of this program and its workings. In addition, p lease respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

## II. LOANS AND CREDIT PROGRAMS:

A. Access to Preferential Lines of Credit for Aquaculture and Fishing

1. Report all loans from any state-owned banks in Ecuador received by your company, which were outstanding during the POI. Submit the information requested in the Loan Template as an attachment to your response and in electronic format using Microsoft Excel.

2. Please respond to all questions in the **Standard Questions Appendix** and the **Loan Benchmark and Loan Guarantee Appendix**.

B. Loans for Organic Production

1. Report all loans under this program, received by your company, which were outstanding during the POI. Submit the information requested in the **Loan Template** as an attachment to your response and in electronic format using Microsoft Excel.

2. Please respond to all questions in the **Standard Questions Appendix** and the L**oan Benchmark and Loan Guarantee Appendix** for each program**.**

C. Credit Line Boost for Shrimp Sector's Reconstruction After the Earthquake

1. Report all credit line increases under this program, received by your company, which were outstanding during the POI. Submit the information requested in the **Loan Template** as an attachment to your response and in electronic format using Microsoft Excel.

2. Please respond to all questions in the **Standard Questions Appendix** and the L**oan Benchmark and Loan Guarantee Appendix** for this program.

## III. PROVISION OF GOODS OR SERVICES FOR LESS THAN ADEQUATE REMUNERATION (LTAR)

A. Government Provision of Electricity for LTAR

Please respond to all question in the **Standard Questions Appendix** and the **Provision of Goods/Services Appendix.** In addition, please respond to the following:

1. Identify your company's suppliers of electricity during the POI.

2. State whether your firm paid reduced rates for electricity during the POI because of its location in a designated geographical area (*e.g.*, industrial estates).

3. Report the volume of your company's electricity use and the corresponding charges your company paid, by month, during the POI. Submit this information in electronic format using Microsoft Excel and include a printout of the electronic file in your response.

4. Please identify the appropriate rate and fee categories in the chart you submit.

B. Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays

Please respond to all question in the **Standard Questions Appendix** and the **Provision of Goods/Services Appendix.** In addition, please respond to the following:

1. Identify all instances during the POI and the prior 11 (years (*i.e.*, the AUL) in which your firm received land or land leases at reduced rates because of its location in a designated geographical area (*e.g.*, industrial estates).

2. For each instance in which your firm acquired such and or land leases, please indicate the following:

   a. Date of acquisition

b. Identity of seller or leaseholder (provide the name in both Arabic and English and an address).

c. Location of the land (specify whether the land is located in a special economic zone and/or development zone).

d. Area of land (specify the unit of measure).

e. Price paid for land or lease (specify whether the payment is in a lump sum or in installments).

f. Terms of payment.

g. The amount of land-use taxes and other fees paid annually. Identify the authority to whom these taxes and fees are paid and provide a sample invoice (or other relevant billing document) for each type of tax or fee. If you are exempted from payment of these taxes or fees, or you pay these taxes or fees at a reduced rate, please provide the details of the value of the exemptions/reductions over the period corresponding to the AUL.

h. Duration of lease.

i. Translated copy of the land-use contract.

## IV. OTHER SUBSIDIES

Did the GOE (or entities owned directly, in whole or in part, by the GOE or any provincial or local government) provide, directly or indirectly, any other forms of assistance to your company between January 1, 2011, and the end of the POI? If yes, please describe such assistance in detail, including the amounts, date of receipt, purpose and terms, and answer all questions in the appropriate appendices.

## *Appendices*

### *Standard Questions Appendix*

A. Specify the eligibility criteria your company had to meet in order to receive benefits under this program. State whether eligibility was or is currently contingent on one or more of the following criteria: 1) whether or not your company exports or has increased its exports, 2) the use of domestic rather than imported inputs, 3) the industry to which your company belongs, or 4) the region in which your company is located.

B. Describe in detail the application and approval process that your company undertook to receive benefits through the program.

C. Specify the criteria your company met to receive the particular amount of assistance provided. Did the application or approval specify the merchandise for which this assistance was to be provided? If yes, provide details of which merchandise was specified in the application and/or approval documents.

D. What records does your company keep regarding each of the benefits received under this program? Provide your company's executed application forms and other application documents with respect to this program. Provide copies of the documentation sent to your company upon approval of the benefit, including but not limited to: approval letter, contract, claim form, etc.

E. Specify how many years your company has received benefits under this program. What was the first year that your company applied for and received benefits? For programs under investigation that were not enacted pursuant to a legal instrument, indicate for how many years your company has participated in the program. For example, for programs involving the provision of inputs for less than adequate remuneration not enacted pursuant to a legal instrument, please indicate how many years your company has purchased the relevant inputs from the government, government-controlled entities such as state-owned enterprises, or other enterprises alleged to be "authorities" under section 771(5)(B) of the Act.

F. Indicate where benefits under this program can be found in your accounting system (i.e., specify the ledgers or journals) and financial statements. If you have to file anything with the government to continue receiving benefits under this program, provide a complete translated set of your most recent submissions made during, or before, the POI.

G. Has the program been terminated? If yes, please explain. When is the last date that your company could *apply for or claim* benefits under the program? When is the last date that your company could *receive* benefits under the program?

***Allocation Appendix***

Respondents should be aware that, pursuant to section 351.524 of its regulations, Commerce allocates the benefits received from certain types of subsidies over time. Although the POI is a recent period, we are investigating alleged subsidies received over a time period corresponding to the industry's average useful life of assets (AUL). According to section 351.524(d)(2)(i) of the regulations, Commerce will presume that the industry's AUL corresponds to the average useful life of renewable physical assets for the industry concerned as listed in the U.S. Internal Revenue Service's Depreciation Range System (IRS tables). In the case of this investigation, the AUL is 12 years. Therefore, Commerce will investigate alleged subsidies received during the POI and the preceding 11 years (*i.e.*, the years 2009 through 2019).

According to 19 CFR 351.524(d)(2), parties to the investigation may choose to argue that the IRS tables do not reasonably reflect the company-specific AUL or the country-wide AUL for the industry in question. To do so, parties must demonstrate that the company-specific AUL applicable to the respondent companies or country-wide AUL applicable to the industry producing subject merchandise in your country differs by one year or more from the AUL in the IRS tables. If any of the parties under investigation chooses to pursue an AUL other than that identified in the IRS tables, you will be required to provide information for the corresponding number of years.

In table format, enter the beginning and ending gross book values of depreciable productive assets for each of the past ten years. (Do not include non-depreciable assets, such as land or construction in progress. Please seek to exclude the gross book value of any fully depreciated productive assets which are no longer in service.)

A. Enter, as separate items in the table, each year's regular depreciation expense and any special charges to depreciation expense or revaluations and write-downs of productive assets.

B. Explain how the numbers in the table reconcile to your financial statements.

C. Explain your company's accounting policies concerning depreciation of productive assets. State whether straight-line or accelerated depreciation is used, and what conventions are applied.

D. Explain whether your company maintains salvage value for productive assets; how salvage value is treated for depreciation purposes; and, if applicable, beginning and ending salvage value balances for each year in the table.

E. If your company is claiming that the IRS tables do not reasonably reflect your company- specific AUL, please:

1. Provide a worksheet which shows the calculation of your company's AUL. To **calculate the AUL using the raw data listed above:**

a. Sum the average annual balances of productive assets for all years (A).

b. Sum the depreciation expenses for each year (D).

c. Divide the sum of the productive assets amounts (A) by the sum of depreciation expenses (D) to arrive at the AUL. AUL = A/D.

2. Demonstrate that this rate differs significantly from the rate established in the IRS tables (*i.e.*, by at least one year).

F. If your company is claiming that the IRS tables do not reasonably reflect the country-wide AUL for this industry, please:

1. Contact the GOE to ensure that they will submit the country-wide rate.

2. Demonstrate that this rate differs significantly from the rate established in the IRS tables (*i.e.*, by at least one year).

### *Loan Benchmark and Loan Guarantee Appendix*

The following information should be given for loans provided under the program in question. For *short-term loans* (one year or less) or guarantees or insurance on short-term loans, information must be provided for all loans on which principal was outstanding or on which interest was paid, accrued, and/or waived during the POI. Please indicate if any short-term loan program was a line of credit. For *long-term loans* (greater than one year) or guarantees on long-term loans, information must be provided for all loans with principal or interest outstanding during the POI or for any such loans forgiven or assumed. We have attached a Loan Template to this questionnaire to be used for reporting several of the items requested below. *See* Attachment 1. Please use that template in providing that data.

***Loan Information***

A. loan control number;

B. source of loan;

C. program under which loan is provided;

D. original amount of loan and currency of loan;

E. any required collateral;

F. date of loan agreement;

G. date of loan receipt;

H. length of loan;

I. interest rate of loan (specify if fixed or variable; if variable, provide source of base rate and the spread above base rate);

J. principal, and/or, interest amounts paid in 2019;

K. a description of the repayment schedule (principal and interest) and any special features associated with the loan such as grace periods, forgiveness of payments, opportunities for re-discounting, rollovers or debt retirement, repayment contingent upon subsequent events; also, if the repayment schedule has not been met, please provide the actual repayment schedule;

L. if the program provides short-term loans or long-term loans with an initial indefinite repayment schedule, please provide the actual repayment schedule (principal and interest);

M. amount of any fees, commissions, compensating balances, taxes or penalties paid in addition to interest, which affect the cost of the loan (indicate whether paid or provided); specify what type of charges were included in this column;

N. any adjustments made in the loan balance or interest payment to take account of inflation;

O. if principal or interest on any loan provided under this program was forgiven or assumed, during the POI or over a prior period corresponding to the company's AUL, please provide the dates and amounts of each forgiveness or assumption.

***Long-Term Benchmark***

For long-term loans, please provide the information requested in A through O above for any other long-term commercial debt with principal or interest outstanding during the POI that was obtained contemporaneously with and that is comparable to the loan(s) in question. This information may be used for purposes of a benchmark interest rate. Please note that the benchmark loans should be denominated in the same currency as the corresponding loan above. When providing this information, please use Attachment I to this Appendix.

***Short-Term Benchmark***

For short-term loans, please provide the information requested in A through O above for any commercial short-term debt with principal outstanding or on which interest was paid during the POI and that is comparable to the loan(s) in question. Please provide your company-specific interest rate for these short-term commercial loans by weighing the rates by the principal amount of each loan. Please provide the calculation worksheets showing how your company derived the weighted-average rate.

If you had short-term interest loans granted prior to the POI where interest was paid during the POI, you must provide the above information for the year during which the loans were received. When providing this information, please use Attachment I to this Appendix.

***Loan Guarantees***

Please provide the information requested in A through O above for loans guaranteed or insured under this program. If the guaranteed loan is a long-term loan, please provide the benchmark information requested under the "Long-Term Benchmark" section and the following:

P. Source of the loan guarantee and the program under which it is provided;

Q. Terms of guarantee including any fee paid;

R. The effect that the guarantee had on the terms (*e.g.,* interest rate, length, collateral) of the loan. For example, if there were similar commercial loans in the same year without guarantees, please provide the terms of those loans;

S. Your ability to obtain a comparable commercial loan (*e.g.*, a loan for export) without a guarantee;

T. In the case of government ownership, provide any evidence that it is normal commercial practice for shareholders in the country in question to provide similar loan guarantees.

***Income Tax Programs Appendix***

If your company used this program to take deductions from taxable income, credit toward taxes payable, exemptions from taxes owed, accelerated depreciation or other tax benefits on the tax return filed during the POI (the tax period covered by this tax return does not have to correspond with the period of investigation), please answer the following questions:

A. Explain whether the assistance is a deduction from taxable income, an exemption from taxes, a credit toward taxes payable, accelerated depreciation, a deferral of taxes owed, or other tax benefit.

B. Indicate the amount of the tax savings derived from the use of this program. Provide a detailed calculation of the assistance and all source materials. Show the amount of tax (or the amount of loss incurred) that would have been due absent this benefit. **Indicate where in the tax return this assistance is shown**. For tax deferrals, please indicate the amount of tax owed and the length of the deferral period.

C. If your company was in a tax loss position for the tax year to which the return applies, please explain the effect of this assistance on your company's tax position.

D. Will you carry forward any loss to future years? Does the loss represent accrued losses from earlier years? Please explain.

E. Indicate where in your company's financial statements tax information is represented. Are accrued tax losses carried as assets in the financial statements? Please explain.

F. If you carried forward a loss from prior years and used that loss to offset taxes due on the tax return filed during the POI, demonstrate that loss was not generated by use of any countervailable tax program.

***Provision of Goods/Services Appendix***

Please provide the following information with respect to each of the goods/services alleged to be provided at less than adequate remuneration:

A. Provide a general description of the goods/services provided by the government and of the process by which the goods/services are provided.

B. List all suppliers (domestic and foreign) from which you purchased the good/service in question during the POI. Specify whether any of these suppliers are owned or controlled by the Government of Ecuador.

C. Explain how the price of the good/service is determined between your company and each of your suppliers.

D. Provide a listing of all of your purchases of the good/service during the POI. This list should include all purchases in which payment for the purchase was made or due during the POI. Specify the quantity of the purchase, the total amount of the purchase, the date of payment, the characteristics of the product purchased, the delivery terms, and the price per unit (specify unit, *i.e*., ton, etc.). Segregate the list according to the supplier. In addition to a hard copy, provide an electronic version saved as a Microsoft Excel spreadsheet.

E. Are there trade publications which specify the prices of the good/service within Ecuador and on the world market? Provide a list of these publications, along with sample pages from these publications listing the prices of the good/service within Ecuador and in world markets during the period of investigation.

***Land Appendix***

1. Please provide a breakdown of the land that your company purchased/acquired from the government in the POI and prior 11 years (*i.e.*, 2009 through 2019).

2. For each land transaction, please respond to the following:

   a. Date of acquisition;
   b. Identity of seller;
   c. Location of land (please be sure to specify whether the acquired land is located in a special economic and/or development zone);
   d. Area of land (please be sure to specify the unit of measure);
   e. Price paid for land (specify whether payment was in a lump sum or in installments);
   f. Terms of payment;
   g. State the amount of taxes and other annual fees paid yearly and identify the authorities to whom these annual taxes and fees are paid, and provide a sample invoice for each type of tax and fee;
   h. Duration of lease;
   i. Translated copy of the land contract; and
   j. Provide the land certificate(s) issued to your company by the government.

3. For benchmark purposes, please provide any information concerning land prices in Ecuador for the period examined. For example, please list details and provide descriptions of any other land transactions that took place between your company and private parties in the POI and prior 11 years (*i.e.*, 2009 through 2019).

## *Change-in-Ownership Appendix*

If there were any changes in ownership during the Average Useful Life (AUL), answer the applicable questions below for each change in ownership. Note that some of these questions may not be applicable to every change in ownership. In addition, some of the questions may require input from both the government as well as the respondent company. Therefore, the government and the respondent company should coordinate their responses to these questions. However, be sure to clearly identify in the response to each of the change-in-ownership questions the party (*e.g.*, the government, the company) providing the response to that question.

### General Questions

1. If the seller of the assets or shares is a public or government agency or entity, what is the name and purpose of the agency? To whom does the agency report? Explain in detail the nature of this relationship.

2. Describe any involvement in the sale of the assets or shares by any government, government officials, or agencies or institutions that are owned/controlled by the government.

   A. Discuss, for example, any participation in any meetings related to the transaction; any actual or promised funds, loans or debt forgiveness, guarantees, or waivers of rights or laws, credits to the bid price or anything else of value, provided (or required) in connection with the transaction(s).

   B. Provide specific dates and amounts for each such promised funding, loans or debt forgiveness, guarantees, or waivers of rights or laws, credits to the bid price or anything else of value that was provided in connection with the transaction(s).

3. Explain the purpose and expectations of the asset or share sale (*e.g.*, to raise financing, to unload an unprofitable business segment).

   A. Was the sale part of a larger change-in-ownership plan organized by the government or a corporate parent? Provide a detailed explanation of any such plan.

   B. If the plan was implemented, reviewed or ratified by any government entity, provide copies of all laws or decisions ratifying or approving the implementation of the plan.

4. Were any steps (*e.g.*, assumption/write-off of debt, renegotiation of liabilities or restructuring) taken prior to or concurrent with the sale of the assets or shares? If yes, explain in detail.

5. How was the company valued for purposes of the sale? Provide any appraisal or valuation studies (not just the executive summary but the entire study) performed

prior to the sale. In determining the value of the company, were financial statements prepared? If yes, provide the financial statement and any accompanying notes.

6. Provide financial statements for the company whose assets or shares were sold for the two years prior to the sale, the year of the sale, and for two years after the sale. (Be sure to specify the extent to which the operations of the business in question are consolidated within larger corporate financial reporting. Specify the level of consolidation reflected in the financial statements provided.) If the change in ownership was announced more than two years prior to the sale, provide financial statements also for two years prior to the announcement and all subsequent years leading up to the sale.

7. At the time of the sale, were any of the parties to the transaction aware of the possibility that production of the company could be subject to countervailing duties in the United States? If yes, did this play any role in the transactions, *e.g.*, consideration paid, structure of the company, or terms of the contact for sale? If yes, explain and provide documentation.

8. Did the company explicitly pay back any previously received government assistance prior to the change in ownership of the company? Did the company repay subsidies given under specific programs, or did the company repay a general amount? Provide the details of any repayments along with supporting documentation of the repayment.

**<u>Sales Process</u>**

**If the part of all of the assets or shares of the company were sold through a bidding process, answer the questions in section 9, "Bid Process," below. If part or all of the company was sold through a stock offering, answer the questions in section 10, "Sale of Shares," below. If part or all of the company's assets were sold, answer the questions in section 11, "Sale of Assets," below.**

9. <u>Bid Process</u>

A. Describe in detail the structure of the bid process. Discuss why you adopted this particular bid structure.

B. Selection of the winning bid.

(1) Explain in detail the bid selection criteria and how the winning bid was selected. Were these factors ranked in terms of importance? If yes, provide the ranking.

(2) Were any factors other than purchase price (*e.g.*, maintenance of employment and production levels, guarantees by the buyer to keep the company in operation, or the company's impact on the economy) considered when selecting the winning bid?

(3) Provide a copy of the bid contract and supporting documentation under which the company was sold.

C. Aside from the purchase price, were there any conditions of sale placed on the buyer, such as investment commitments or employment and production guarantees?

(1) If yes, describe these conditions of sale in detail. What was the reason for requiring these conditions of sale?

(2) How were the bidding parties' commitments to these conditions of sale valued or quantified when evaluating the bids?

(3) Was the winner of the bidding process free to close the company and liquidate the assets after the company was sold?

D. Has the buyer met all of the terms and conditions of the bid contract? If not, explain why. What options are available to ensure that the buyer has complied with all of the terms of the purchase agreement?

10. <u>Sale of Shares</u>

A. Indicate the percentage and the total number of shares (all classes of stock) sold and the price per share as well as the number and percentage of any shares that remained with the seller.

(1) Identify separately each government-owned (either directly or indirectly) entity that purchased any of the shares sold, along with the number and percentage of shares purchased by each of those entities. Explain why shares were sold to these government-owned entities.

B. Was this a sale of the company's existing shares or of newly issued shares?

C. How were potential investors in the stock offering selected? Were there any limitations on when certain investors could sell their shares in the company? If yes, did all shareholders face the same selling restrictions?

D. Did the purchase of particular shares (*e.g.*, "golden shares") bestow special rights or privileges on any private or government-affiliated investor?[11] If yes, detail all special rights and privileges attendant to such shares.

F. Provide any sales contract governing the sale of shares.

---

[11] A golden share is often characterized as a share which has voting rights capable of exercising a veto over specified or significant changes to the constitution or articles of association of a company.

G. Do the terms of the sale of shares require anything other than cash from the buyer, such as investment commitments, debt assumption, worker training commitments, employment guarantees, *etc.*? If yes, describe the conditions required and reasons for the conditions.

H. Have all buyers met all of terms and conditions of the stock sale? If not, explain why. What options are available to ensure that buyers have complied with all of the terms of the purchase agreement?

11. Sale of Assets

A. Provide a copy of the sales contract and supporting documentation under which the assets of the company were sold.

B. Do the terms of the sales contract require anything other than cash from the buyer, such as investment commitments, debt assumption, worker training commitments, employment guarantees, *etc.*? If yes, describe the conditions required and reasons for the conditions. Support this explanation with specific citations to relevant portions of the sales contract.

C. Did any liabilities transfer with the assets sold? If yes, quantify amount of liabilities and explain why they were transferred. Support this explanation with specific citations to relevant portions of any sales contract.

D. Has the buyer met all of the terms and conditions of the sales contract? If not, explain why. What options are available to ensure that the buyer has complied with all of the terms of the purchase agreement?

E. Were any previously provided subsidies tied, in any way, to the particular assets sold?

**Post-Sales Effect on Company**

12. Explain whether and how any of the proceeds of the sale of assets or shares were reinvested in the company. For example, where the proceeds used to cover the general financing requirements of the company, or were the proceeds used for expansion of a particular facility or product line?

13. Describe the impact of the sale of shares or assets on the legal and corporate structure of the business producing subject merchandise. Also, describe the legal status of the business before and after the sale. Also, describe in detail the nature of the sale, *e.g.*, whether the sale was an acquisition of the firm by another firm or an equal merging of two companies. Provide all formal documents that describe the sale of the company.

14. Detail any instances in which the sale of the shares or assets resulted in any fundamental change in the general business operations of the company.

A. Compare and contrast the main business and product segments of the company's operations after the sale with those before the sale. Detail any ways in which the operations are fundamentally different. Were parts (*e.g.*, production lines, subsidiaries, sales divisions) of the company shut down or ceded to other parts of the buyer's operations? Explain the extent to which these changes are consistent with the original goals and expectations of the sale (citing, as appropriate, to provisions in the sales contract or any pre-sale documents).

B. Identify the legal and trade names of the company and its main product lines before and after the sale. Explain the reasons for any changes.

C. Indicate whether any of the company's suppliers changed as a result of the sale.

D. Identify what impact, if any, the sale had on the company's customer base. Also, describe how the sale affected the company's U.S. sales operations.

E. Support this narrative with specific citations to the company's financial statements or other source documentation on the record.

15. Detail any instances in which the sale of the shares or assets resulted in any fundamental change in the production facilities of the company.

A. Identify any production facilities that were acquired or disposed of as a result of the sale. Provide all documentation pertaining to the acquisition or disposal of any assets (*e.g.*, contracts, sales agreements).

B. Identify any and all changes in the product lines and production capacity at any of the company's facilities producing the subject merchandise that may have occurred as a result of the sale.

16. Detail any instances in which the sale of shares or assets resulted in any fundamental change in the financial structure of the company.

A. Indicate what portion of the assets of the company was transferred as a result of this sale. In cases where the assets sold where those of a parent of affiliated company, explain how the sale impacted the business producing subject merchandise.

B. Provide a detailed explanation of any instances where the purchaser of the shares or assets did not become legally responsible for the existing and potential liabilities of the company. Support this explanation with specific citations to any relevant portions of the sales contract.

17. Detail any instances in which the sale of shares or assets resulted in any fundamental change in the level and composition of the personnel of the company.

A. Identify the total number by category (*e.g.*, management, production workers, sales personnel) of any employees whose jobs were created or terminated as a result of the sale. Tie these numbers to any employment figures reported in the company's financial statements.

B. Explain how, under the terms of the sale, any existing employment agreements or union contracts were treated. Support this explanation with specific citations to any relevant portions of the sales contract and the union contracts.

C. Detail the extent to which the composition and the responsibilities of the Board of Directors of the company changed as a result of the sale.

18. If the transaction was a partial change in ownership (only some portion of the shares or assets of the company were sold), explain to what extent the sale affected control and direction of the company's finances and productive operations.

***ATTACHMENT***

***Templates***

**(*See* Excel file that accompanies this questionnaire)**

# Tab 21

# P.R. 161

# C.R. 67

Barcode:4498153-01 C-331-806 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
POI: 01/01/2022 – 12/31/2022
~~**Business Proprietary Document**~~
E&C/OIV: ZS
**Public Version**

January 25, 2024

Industrial Pesquera Santa Priscila S.A.
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, DC 20003

**SUBJECT:** Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Industrial Pesquera Santa Priscila S.A.

Dear Mr. Goldfeder:

This letter concerns your sources questionnaire response, affiliation questionnaire response, and first supplemental affiliation questionnaire response filed on behalf of Industrial Pesquera Santa Priscila S.A. (Santa Priscila), a mandatory respondent in the above-referenced investigation.[1]

Based on comments from interested parties, we have determined to solicit questionnaire responses from certain companies that are cross-owned with Santa Priscila. In response, Commerce notes Produmar S.A. (Produmar) is Santa Priscila's **[ ]** supplier of shrimp during the period of investigation among Santa Priscila's cross-owned and non-cross-owned suppliers. Therefore, we request that Produmar provide a response to section II of the attached questionnaire no later than 5:00 p.m. Eastern Time (ET) on February 7, 2023, and section III of the attached questionnaire no later than 5:00 p.m. ET on February 14. 2023. Additionally, we request that Manesil, S.A. (Manesil), Egidiosa S.A. (Egidiosa), and Tropical Packing Ecuador Tropack S.A. (Tropak) provide a response provide a response to sections II and III of the attached questionnaire by no later than the deadlines identified above. Regarding Tropak, when responding to section II of the questionnaire, we instruct it to identify any cross-owned entities that were its parent, input supplier, or producer of subject merchandise (other than Santa Priscila) during the POI but refrain from submitting a complete response from any such cross-owned entities until instructed to do so. Please note that Santa Priscila is responsible for forwarding a copy of this questionnaire to Produmar, Manesil, Egidiosa, and Tropak. Commerce currently

[1] *See* Santa Priscila's Letters, "Sources of Raw Shrimp Questionnaire Response," dated January 3, 2024; "Section III 'Affiliated Companies' Questionnaire Response," dated January 4, 2024; and "Affiliated Companies Supplemental Questionnaire Response," dated January 16, 2024.

INTERNATIONAL TRADE ADMINISTRATION

Filed By: Zachary Shaykin, Filed Date: 1/25/24 10:52 AM, Submission Status: Approved

does not require responses from other entities identified as cross-owned suppliers in Santa Priscila's responses.

Commerce must conduct this investigation in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadlines, or are unable to provide all requested supporting documentation by the established dates, you must notify the official in charge and submit a request for an extension of the related deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadlines. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any extension granted in response to your request will be in writing; otherwise the original deadline will apply. Extensions for the suppliers must be requested; any extension granted will apply only to the party identified in the written extension issued by Commerce.

If Commerce does not receive either the requested information or a written extension request before **5:00 p.m. ET** on the established deadlines, we may conclude that the suppliers have decided not to cooperate in this proceeding. Unless extended, Commerce will not accept any requested information submitted after the established deadlines. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

**EXTENSIONS:** **Note well:** Any extension request must be filed in writing. Extension requests filed after 5:00 p.m. on the due date will not be granted, except in extraordinary circumstances. An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means.[2] An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, *force majeure*, or medical emergency."[3] Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the requesting party of its decision before the time limit expires."[4] For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.[5]

**Note well**:

Parties should be aware that **the likelihood of Commerce granting an extension**

[2] 19 CFR 351.302(a)(2).
[3] *Extension of Time Limits*, 78 FR 57790, 57793 (Sep. 20, 2013) (Preamble to the Final Rule).
[4] *Id.* at 57792.
[5] *Id.*

> **will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on its disposition. Parties should not assume that they will receive an extension of a time limit if they have not received a response from Commerce. For submissions that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next business day**. *See* 19 CFR 351.103(b).[6] **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues. When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise the official in charge, informing them of the filing difficulties. The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.

Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

The information which you submit may be subject to verification. Failure to allow verification of any item may affect the consideration which we will accord to that item or to any other material, whether or not we verify the latter. Please also note that, pursuant to 19 CFR 351.303(e), the Department will not consider any documentation in a foreign language that is not translated into English. Parties must receive approval from the Department before submitting a partial translation of a document.

Should you need further assistance or information with regard to this investigation, please contact Zachary Shaykin at Zachary.Shaykin@trade.gov or (202) 482-2638.

[6] *Id.* (emphasis added).

Sincerely,

Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

Attachment

Barcode:4498153-01 C-331-806 INV - Investigation -

***QUESTIONNAIRE FOR SUPPLIER OF Industrial Pesquera Santa Priscila S.A.***

## SECTION I: GENERAL INSTRUCTIONS

The U.S. Department of Commerce (Commerce) requests information about the programs on which an investigation was initiated in order to determine whether countervailable subsidies have been provided to producers/exporters in Ecuador of frozen warmwater shrimp (shrimp or subject merchandise). Section 775 of the Tariff Act of 1930, as amended (the Act), also requires Commerce to investigate any other potential countervailable subsidies it discovers during the course of this investigation that pertain to the manufacture, production, or exportation of shrimp.

If you have questions during the course of this investigation, we urge you to consult with the officials in charge named in the cover letter. Your response to the questionnaire should include all of the information requested. It is essential and in your interest that Commerce receive complete information early in the proceeding to ensure a thorough and accurate analysis, and to provide all parties the fullest opportunity to review and comment on your submission and Commerce's analysis. We appreciate your cooperation in this investigation.

### I. SCOPE AND TIME PERIOD OF INVESTIGATION

A. Scope

The scope of these investigations includes certain frozen warmwater shrimp and prawns whether wild-caught (ocean harvested) or farm-raised (produced by aquaculture), head-on or head-off, shell-on or peeled, tail-on or tail-off, deveined or not deveined, cooked or raw, or otherwise processed in frozen form. "Tails" in this context means the tail fan, which includes the telson and the uropods.

The frozen warmwater shrimp and prawn products included in the scope, regardless of definitions in the Harmonized Tariff Schedule of the United States (HTSUS), are products which are processed from warmwater shrimp and prawns through freezing and which are sold in any count size.

The products described above may be processed from any species of warmwater shrimp and prawns. Warmwater shrimp and prawns are generally classified in, but are not limited to, the *Penaeidae* family. Some examples of the farmed and wild-caught warmwater species include, but are not limited to, whiteleg shrimp (*Penaeus vannemei*), banana prawn (*Penaeus merguiensis*), fleshy prawn (*Penaeus chinensis*), giant river prawn (*Macrobrachium rosenbergii*), giant tiger prawn (*Penaeus monodon*), redspotted shrimp (*Penaeus brasiliensis*), southern brown shrimp (*Penaeus subtilis*), southern pink shrimp (*Penaeus notialis*), southern rough shrimp (*Trachypenaeus curvirostris*), southern white shrimp (*Penaeus schmitti*), blue shrimp (*Penaeus stylirostris*), western white shrimp (*Penaeus occidentalis*), and Indian white prawn (*Penaeus indicu*s).



Filed By: Zachary Shaykin, Filed Date: 1/25/24 10:52 AM, Submission Status: Approved

Frozen shrimp and prawns that are packed with marinade, spices or sauce are included in the scope. In addition, food preparations, which are not "prepared meals," that contain more than 20 percent by weight of shrimp or prawn are also included in the scope.

Excluded from the scope are: (1) breaded shrimp and prawns (HTSUS subheading 1605.21.1020); (2) shrimp and prawns generally classified in the *Pandalidae* family and commonly referred to as coldwater shrimp, in any state of processing; (3) fresh shrimp and prawns whether shell-on or peeled (HTSUS subheadings 0306.36.0020 and 0306.36.0040); (4) shrimp and prawns in prepared meals (HTSUS subheadings 1605.21.0500 and 1605.29.0500); (5) dried shrimp and prawns; (6) canned warmwater shrimp and prawns (HTSUS subheading 1605.29.1040); and (7) certain battered shrimp. Battered shrimp is a shrimp-based product: (1) that is produced from fresh (or thawed-from-frozen) and peeled shrimp; (2) to which a "dusting" layer of rice or wheat flour of at least 95 percent purity has been applied; (3) with the entire surface of the shrimp flesh thoroughly and evenly coated with the flour; (4) with the non-shrimp content of the end product constituting between four and ten percent of the product's total weight after being dusted, but prior to being frozen; and (5) that is subjected to individually quick frozen (IQF) freezing immediately after application of the dusting layer. When dusted in accordance with the definition of dusting above, the battered shrimp product is also coated with a wet viscous layer containing egg and/or milk, and par-fried.

The products covered by the scope are currently classified under the following HTSUS subheadings: 0306.17.0004, 0306.17.0005, 0306.17.0007, 0306.17.0008, 0306.17.0010, 0306.17.0011, 0306.17.0013, 0306.17.0014, 0306.17.0016, 0306.17.0017, 0306.17.0019, 0306.17.0020, 0306.17.0022, 0306.17.0023, 0306.17.0025, 0306.17.0026, 0306.17.0028, 0306.17.0029, 0306.17.0041, 0306.17.0042, 1605.21.1030, and 1605.29.1010. These HTSUS subheadings are provided for convenience and for customs purposes only and are not dispositive, but rather the written description of the scope is dispositive.

B. Period of Investigation

The time period covered by this investigation (the period of investigation - POI) is January 1, 2022, through December 31, 2022.

## II. INSTRUCTIONS FOR FILING THE RESPONSE

The following instructions apply to your response to this questionnaire and all other documents that you submit to the Department during the course of this proceeding, such as responses to additional questionnaires, extension requests, and case briefs.

A. Filing

1. Santa Priscila is responsible for ensuring that the information the Department is requesting from its supplier is submitted to the Department in a timely manner such that it will be received by the Department in Washington, DC, no later than the close of business on the due date specified on the cover page of this questionnaire. All descriptive materials that supplement your response should be

submitted on the same date as the initial response.

2. All submissions must be made electronically using Commerce's ACCESS website at http://access.trade.gov. If an exception to the electronic filing requirement applies, you must address and manually submit your response to the address indicated at Section C "Manual Filing," below. To determine if your response qualifies for manual filing, see "Manual Filing."

3. The business proprietary response should be submitted on the due dates specified. The public version of the response may be filed one business day after the proprietary response.

4. An electronically filed document must be received successfully in its entirety by ACCESS by 5:00pm Eastern Time (ET) on the due date, unless an earlier time is specified.

B. Format

1. You are required to state in the upper right-hand corner of your cover letter the following information in the following format:

   a. on the first line, indicate the case number stated on the cover page to this questionnaire;

   b. on the second line, indicate the total number of pages in the document including cover pages, appendices, and any unnumbered pages;

   c. on the third line, indicate "investigation" and the time period (MM/DD/YY - MM/DD/YY);

   d. on the fourth line, indicate Commerce office conducting the proceeding (the office is indicated on the cover page to this questionnaire);

   e. on the fifth and subsequent lines, indicate whether any portion of the document contains business proprietary information and, if yes, list the page numbers containing business proprietary information; and indicate the business proprietary/public status of the document and whether you agree or object to release of the submitted information under administrative protective order (APO) by stating one of the following:

      - "Business Proprietary Document -- May Be Released Under APO,"
      - "Business Proprietary Document -- May Not Be Released Under APO,"
      - "Business Proprietary/APO Version-- May Be Released Under APO,"

- "Public Version," or
- "Public Document."

2. Please include a "Re:" line on the cover letter of your response, and any other submissions you make during this proceeding. In the Re: line, briefly summarize the purpose of your submission, e.g., "response to questionnaire," "case brief."

3. Prepare your response in typed form and in English (see 19 CFR 351.303(d) and (e) for these and other formatting requirements). Include an original and translated version of all pertinent portions of non-English language documents that accompany your response, including financial statements. Any foreign language submission which is not accompanied by an English translation will be disregarded.

4. Repeat the question to which you are responding in your narrative submission and place your answer directly below it.

5. Please respond to each question. If a particular question does not apply, please state so and explain why in your response. Failure to do so could lead to the use of adverse inferences for that particular question.

6. In each of your answers, please identify your source of information. Please include with your response copies of source documents necessary to understand your response and include an original and translated version of all source documents. For additional information sources not included in your response, indicate the location where the documents or electronic data systems are maintained. If information is maintained at multiple locations, please list in an appendix to your response these locations along with notes indicating the information maintained at each location. This information is used by Commerce to prepare for verification.

7. Include all worksheets, financial reports, and other requested documents as appendices to your response.

8. Provide a table of appendices. Assign a number to each appendix and include a descriptive name for each appendix and its number in the table.

9. Identify all units of measurement, currencies, and conversion factors used in your narrative response, worksheets, or other appendices. All monetary amounts should be shown in the currency in which they were originally denominated, and in the currency in which they are registered in your accounts (if the two are different). Also, report the actual exchange rate used for a particular conversion. For all values adjusted for inflation, please provide the data in both nominal and adjusted terms and explain how these values were adjusted.

10. We request that tabulated information regarding company use of programs (e.g., loans, loan guarantees, and grants) be submitted using the Microsoft Excel spreadsheet program compatible with the Microsoft Windows Operating System (MS-Windows) software for PCs.

11. It is your responsibility to contact the officials in charge if subsequent to your filing there are events that affect your response (e.g., changes as a result of an audit).

C. Manual Filing

1. All submissions must be filed electronically. Only under the following four circumstances will Commerce accept a hardcopy response that is manually filed:

   - Documents exceeding 500 pages in length may be filed manually (in paper form) in the APO/Dockets Unit. This is referred to as a "bulky document."
   - Data files greater than 50 MB may be filed in an alternative manner after consulting https://access.trade.gov/help/Super_Bulky_Document_Submissions.pdf and contacting the ACCESS Help Desk at 202-482-3150.

   - If the ACCESS system is unable to accept filings continuously or intermittently over the course of any period of time greater than one hour between 12:00 p.m. and 4:30 p.m. ET or for any duration of time between 4:31 p.m. and 5:00 p.m. ET, then a person may manually file the document in the APO/Dockets Unit. Commerce will provide notice of such technical failures on the ACCESS Help Desk line at 202-482-3150 and on the Enforcement and Compliance website, which is https://www.trade.gov/us-antidumping-and-countervailing-duties.

   - Apart from the above, if you are unable to comply with the electronic filing requirement, as provided in 19 CFR 351.103(c) of Commerce's regulations, and in accordance with section 782(c) of the Tariff Act of 1930, as amended (the Act), you must promptly notify the official in charge and submit a full written explanation of the reasons you are unable to file the document electronically. You must also suggest alternative forms in which to submit the information. Commerce will consider the ability of a submitter and may modify the electronic filing requirement on a case-by-case basis.

2. All manually filed documents must be accompanied by a cover sheet generated in ACCESS. For manually filed bulky documents, separator sheets must also be generated and used.

3. If your response qualifies as a bulky document and you opt to file it manually, you must file two identical paper copies of the document. For all other authorized manual submissions, only one paper copy is required.

4. Manual submissions must be addressed and submitted to:
**Secretary of Commerce**
**Attention: Enforcement and Compliance, AD/CVD Operations Office** (*specify office number indicated on the cover page of this questionnaire)*
**APO/Dockets Unit, Room 18022**
**U.S. Department of Commerce**
**Fourteenth Street and Constitution Avenue, N.W.**
**Washington, D.C. 20230**

D. Certifications

1. Submit the required *certification of factual information*.[7] Providers of information and the person(s) submitting it, if different (e.g., a legal representative), must certify that they have read the submission and that the information submitted is accurate and complete. Commerce cannot accept questionnaire responses that do not contain signed certifications. Forms for such certification are included as attachments to this questionnaire within Sections II and III.

2. Provide the required *certificate of service* (included as an attachment) with each business proprietary submission and its public version, as well as each fully public submission.

3. Signed certifications of accuracy and certificates of service should be scanned and appended to the appropriate electronic documents filed in ACCESS.

E. Business Proprietary Information and Summarization of Business Proprietary Information

1. You may request business proprietary treatment for information submitted that is not publicly available. As a general rule, Commerce places all correspondence and submissions received in the course of an antidumping or countervailing duty proceeding in a public reading file. However, information deemed to be proprietary will not be made available to the public. If you wish to make a request for proprietary treatment for particular information, refer to 19 CFR 351.304, 351.305, and 351.306. You must submit the request for proprietary treatment at the same time as the claimed business proprietary information is submitted to Commerce.

[7] Commerce's certification requirements changed effective March 14, 2011. Additional changes regarding the certification of factual information by governments participating in a proceeding became effective on September 2, 2011. Any submissions made to Commerce pursuant to proceedings initiated on or after March 14, 2011, must be accompanied by the appropriate company, government, and representative certifications (as applicable). For more information refer to 76 FR 7491 (February 10, 2011) and 76 FR 54697 (September 2, 2011) of the *Federal Register*.

2. Utilize the "one-day lag rule" under 19 CFR 351.303(c)(2) if you wish an additional day to review the final bracketing of business proprietary information in a document and to prepare the required public version. The filing requirements under the one-day lag rule provide for a party to file only the business proprietary document within the applicable time limit (19 CFR 351.303(c)(2)(i)). By the close of business one business day after the date the business proprietary document is filed, the person must file the complete final business proprietary document (19 CFR 351.303(c)(2)(i)(ii)). The final business proprietary document must be identical to the original document except for any bracketing corrections.

3. By the close of business one business day after the date the business proprietary document is filed (refer to the "one-day lag rule" in the preceding paragraph), submit the public version of your response (19 CFR 351.303(c)(2)(i)(iii)). A public version must contain:

   (1) a non-proprietary (public) version of your response that has sufficient detail to permit a reasonable understanding of the information submitted in confidence, and/or

   (2) an itemization of particular information that you believe you are unable to summarize. State the reasons why you cannot summarize each piece of information.

   Please note: The summarization requirement does not apply solely to the narrative portion of your response. It applies equally to worksheets and other appendices to your response. Generally, numerical data, such as that provided in sales and loan charts, are adequately summarized only if grouped or presented in terms of indices or figures ranged within 10 percent of the actual figure. Responses, or portions thereof, that are not adequately summarized may be rejected from the record of this proceeding.

4. Submit the statements required regarding limited release of business proprietary information under the provisions of an APO. U.S. law permits limited disclosure to representatives of parties (e.g., legal counsel) of certain business proprietary information, including electronic business proprietary information, under an APO. (Note that data received under an APO cannot be shared with others who are not covered by the APO.) Under the provisions governing APO disclosure, you must submit either:

   (1) a statement agreeing to permit the release under APO of information submitted by you in confidence during the course of the proceeding, or

   (2) a statement itemizing those portions of the information which you believe should not be released under APO, together with arguments supporting your objections to that release.

We are required by our regulations to reject, at the time of filing, submissions of business proprietary information that do not contain one of these statements. As discussed above, you must state in the upper right-hand corner of the cover letter accompanying your questionnaire response whether you agree or object to release of the submitted information under APO (e.g., May Be Released Under APO or May Not Be Released Under APO). See 19 CFR 351.304 for specific instructions. If you do not agree to release under APO all or part of the proprietary information, but we determine that the information should be released, you will have the opportunity to withdraw the information (see 19 CFR 351.304(d)). However, any information which you withdraw will be removed from the official record and will not be used in our determination.

5. Place brackets ("[ ]") around information for which you request business proprietary treatment. Place double brackets ("[[ ]]") around information for which you request proprietary treatment and which you do not agree to release under APO.[8]

6. Provide to all parties whose representatives have been granted APO access and who are listed on Commerce's most recent APO Service List, a complete copy of the submission--proprietary document and public version, except for that information which you do not agree to release under APO. (APO service lists, as well as public service lists, are regularly updated and maintained as record documents in ACCESS at https://access.trade.gov. The current service lists are also either attached to the cover letter of this questionnaire or will be provided by a subsequent letter from Commerce). If you exclude information because you do not agree to release it under APO, you must submit the complete business proprietary version, wherein information in double brackets has been excluded. This version of the response must be marked "Business Proprietary/APO Version-- May Be Released Under APO" on the cover page. For parties that do not have access to information under APO, please provide a public version only.

7. A chart summarizing AD/CVD filing requirements can be found at https://access.trade.gov/Resources/filing/index.html. ACCESS filing instructions are https://access.trade.gov/help/Handbook_on_Electronic_Filing_Procedures.pdf. Detailed and supplemental information concerning APOs, including the APO Handbook, a complete set of APO regulations, and APO application forms and service lists, can be found at https://access.trade.gov/Resources/Administrative_Protective_Order.aspx

F. Verification

[8] Commerce will not disclose proprietary customer names under APO during an antidumping or countervailing duty investigation until either an order is published or the investigation is suspended. To ensure that proprietary customer names are properly treated in this case, place double brackets ("[[ ]]") around all proprietary customer names in your submissions to Commerce during the course of this investigation.

All information submitted is subject to verification. Failure to allow full and complete verification of any information may affect the consideration accorded to that or any other verified or non-verified item in the responses.

G. Extension Requests

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadlines, or are unable to provide all requested supporting documentation by the same date, you must notify the officials in charge and submit a written request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future do not substitute for a written extension request. All extension requests must be in writing and should state the reasons for the request pursuant to 19 CFR 351.302(c). Any extension granted in response to your request will be communicated in writing by Commerce; otherwise the original deadline will apply.

If Commerce does not receive either the requested information or a written extension request before 5:00pm ET on the established deadline, we may conclude that you have decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the established deadlines. As required by 19 CFR 351.302(d), we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

H. Separate Letter of Appearance Required

Pursuant to 19 CFR 351.103(d)(1), "with the exception of a petitioner filing a petition in an investigation, to be included on the public service list for a particular segment, each interested party must file a letter of appearance." The letter of appearance must be filed separately from any other document (with the exception of an application for APO access). If you have an ACCESS E-Filer account, you may also enter your appearance by logging into ACCESS at https://access.trade.gov and clicking on "Manage Entry of Appearance" and then "Create New Entry of Appearance."

## III. SUBMISSION OF COMPUTER DATABASES AND SPREADSHEETS

A. Filing Instructions

Except as described above under the section "Manual Filing," all database files, including

Microsoft Excel spreadsheets that are less than 50 MB in size must be filed electronically using ACCESS. Instructions for using ACCESS can be found above and at https://access.trade.gov. Please refer to the Handbook on Electronic Filing Procedures in the "Help" section of the website.

Please label the electronic files that you upload in a manner indicating their specific contents. For example, ABC Subsidiary 1 March 15 Electricity Worksheet, rather than ABC March 15 QR – Excel 1.

For manual filings (when available), separately pack and label the electronic media containing the databases or spreadsheets (*see* section below for labeling and other instructions). Deliver the package to the address listed in the section "Manual Filing."

B. Special Instructions for Manual Filing of Databases in the Event of ACCESS Technical Failure

In the event of an ACCESS technical failure, you may submit your databases or spreadsheets manually on either a CD or DVD. Compressed databases are acceptable, but decompression instructions and software must accompany any compressed data submission.

Clearly label the CD or DVD with the following information:

1. Case name, case number, and submission date
2. Name of respondent
3. Proceeding and time period (e.g., INV-POI 1/2011-12/2011
4. Name of official in charge
5. File formats and software used to create the databases or worksheets
6. File names, number of observations, and record lengths
7. ACCESS bar code number

C. Data Formatting Instructions

1. Since the database or spreadsheet must be readable by an IBM-compatible PC, the data must be encoded in ASCII format or, at your option, PC SAS, Access, dBase, or Excel formats.

2. Report numerical data in a numerical format that allows calculations (e.g., 10, not 10 MT). Units should be reported in fields separate from numerical values.

Barcode:4498153-01 C-331-806 INV - Investigation -

**SECTION I**
**ATTACHMENT I**

## CERTIFICATION

**COMPANY CERTIFICATION**

I, **(PRINTED NAME AND TITLE)**, currently employed by **(COMPANY NAME)**, certify that I prepared or otherwise supervised the preparation of the attached submission of (**IDENTIFY THE SPECIFIC SUBMISSION BY TITLE) due on (DATE) OR filed on (DATE)** pursuant to the **(INSERT ONE OF THE FOLLOWING OPTIONS IN { }: {THE (ANTIDUMPING OR COUNTERVAILING) DUTY INVESTIGATION OF (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (DATES OF PERIOD OF REVIEW) (ADMINISTRATIVE OR NEW SHIPPER) REVIEW UNDER THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)} or {THE (SUNSET REVIEW OR CHANGED CIRCUMSTANCE REVIEW OR SCOPE RULING OR CIRCUMVENTION INQUIRY) OF THE (ANTIDUMPING OR COUNTERVAILING) DUTY ORDER ON (PRODUCT) FROM (COUNTRY) (CASE NUMBER)})**. I certify that the public information and any business proprietary information of **(CERTIFIER'S COMPANY NAME)** contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

**Signature: ____________________**
**Date: ________________________**

* For multiple person certifications, all persons should be listed in the first sentence of the certification and all persons should sign and date the certification. In addition, singular pronouns and possessive adjectives should be changed accordingly, e.g., "I" should be changed to "we" and "my knowledge" should be changed to "our knowledge."

This questionnaire requests information about programs alleged to be provided to producers/ exporters in Ecuador of frozen warmwater shrimp (shrimp or "subject merchandise"). Section 775 of the Act also requires Commerce to investigate any other programs discovered during the course of this investigation that potentially confer countervailable subsidies on the manufacture, production, or exportation of subject merchandise.



Filed By: Zachary Shaykin, Filed Date: 1/25/24 10:52 AM, Submission Status: Approved

## SECTION II: GENERAL QUESTIONS

### I. OTHER COMPANIES SUBJECT TO INVESTIGATION

In addition to providing a response to this questionnaire regarding your own company, we require responses from certain affiliated companies or companies involved in your sales or production of subject merchandise, as explained below in sections A through D. A failure on the part of any such companies to provide a response to this questionnaire may adversely affect your own results in this investigation. For the remainder of this questionnaire, the terms respondent(s), company respondent(s), "you," or "your company," refer not just to your company, but to all companies required to complete this questionnaire. Provide separate answers under each question and separate spreadsheets for each of these companies.

Unless specified differently, your answers to the requests below should cover your company's situation during the POI. Usage of the present tense in this section refers to the POI.

We also instruct you to provide a list of those companies for which you are responding to your government as soon as possible so that the government can include these companies in its response to this questionnaire.

A. Affiliated Companies

Affiliation is defined in section 771(33)(A)-(G) of the Act. Affiliation can be indicated by a number of factors, including: (1) personal family groupings, (2) corporate groupings, (3) shared board members or executive officers, (4) employer and employee relationships among owners, board members, or executive officers of multiple parties, (5) one party's ownership or control of stock with voting privileges in another, (6) franchise and joint venture agreements, (7) close supplier relationships, and (8) other indicia of control by one party over another, directly, or indirectly through third parties. "Control" exists where one party is legally or operationally in a position to exercise restraint or direction over another party.

Provide the following information about your company's affiliated companies:

1. The identity of all companies with which your company is affiliated within the meaning of section 771(33) of the Act, including the full name and mailing address of each company.

2. Describe in detail the nature of the relationship between your company and those companies listed in response to the prior question. Specify for example, whether the companies share a board of directors, or whether members of each company's board sit on the board(s) of the other company(ies), and how the voting rights are distributed among board members; specify if, and how, officers of one company are directly involved in overseeing the operations of another company. Specify whether an affiliated company supplies inputs into your company's production process.

You must provide complete responses for certain "cross-owned" affiliated companies.

Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other. In addition, if two companies are both cross-owned by a third party, the two companies themselves would be considered cross-owned (for example, cross-ownership exists between two companies owned by the same parent).

You must provide a complete questionnaire response for those affiliates where "cross-ownership" exists, and one of the following situations exists:

- the cross-owned company produces the subject merchandise; or
- the cross-owned company is a holding company or a parent company (with its own operations) of your company;[9] or
- the cross-owned company supplies an input product to you for production of the downstream product produced by the respondent; or
- the cross-owned company has received a subsidy and transferred it to your company.

B. Former Owners / Changes in Ownership[10]

Commerce allocates the benefits received from certain types of subsidies over time (*e.g.*, equity infusions, non-recurring grants, debt forgiveness, import duty or value-added tax exemptions or reductions on capital equipment, *etc.*). *See* 19 CFR 351.524 and subsection C of the "General Questions" section below for a complete explanation.

Thus, in addition to investigating alleged subsidies that your company may have received during the POI, Commerce is also investigating alleged allocable, non-recurring subsidies that your company may have received during the AUL period. Because of this, if your company obtained all or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, or its assets continue to operate as part of your company, we require a complete questionnaire response for such company. If your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, coordinate with your government to answer the questions in the ***Change-in-Ownership Appendix***. If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the

[9] Your response must cover all cross-owned parent companies and holding companies, not only companies that directly held a controlling stake in your company during or prior to the POI. For example, if your company was a direct subsidiary of one cross-owned company, and that company was a direct subsidiary of another cross-owned company, then you must respond on behalf of both the cross-owned parent and the cross-owned "grandparent" companies. By direct subsidiary, we are referring to a company that is directly owned by another company. An indirect subsidiary, by contrast, has an intermediate owner between itself and the ultimate owner.

[10] All cross-owned affiliates meeting the conditions under sub section C during the POI and AUL and are required to submit a complete questionnaire response should also provide a response to this section with regard to any former owners and changes in ownership.

allocation period, state so and you do not need to provide a response to the ***Change-in-Ownership Appendix***.

Finally, if your company has been privatized, changed ownership, merged with another company, or devolved another company/ies from your company's corporate structure in whole or in part, during the AUL period and your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, coordinate with your government to answer the questions in the ***Change-in-Ownership Appendix***. If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, state so and you do not need to provide a response to this appendix.

**General Questions**

A. Please provide the following information for your company, involved in the farming of raw shrimp.

1. The addresses of the company's headquarters, plant, and any export facilities.

2. A description of the company. Please include in your response:

    a. the date the company was formed;

    b. a history of the company's ownership; and

    c. the products the company produces and/or sells.

3. Using diagrams and/or flow charts, describe the process by which your company produces raw shrimp. If different steps of the production process occur in different production units, divisions, or affiliated companies, please identify those production units, divisions, or affiliated companies.

4. Please provide your company's complete audited financial statements for the fiscal years covering the 2022 POI. Also please provide English translations of these financial statements. If complete English translations are not available, please provide translations of the section(s) that report benefits received from the government. These should be the official financial statements filed with your government. If there is no such filing requirement, the financial statements should be those presented to banks or independent third parties. If you do not prepare audited financial statements, please provide any unaudited financial statements that your company prepares for your board of directors, your shareholders, for banks, or for the government.

5. Please provide complete, translated tax returns **filed during the POI**, which may apply to the previous tax year (preferably a copy of the tax return stamped by the government). Include all schedules and attachments included with your return. In addition, please provide any amendments to your return.

6. Please provide your most up-to-date business registration documents filed with government authorities. If your business registration documents do not indicate the names of your company's owners during the POI, please provide additional documentation that does. If the documents identify corporate owners that own more than 10 percent of your company, please identify the owners of your company's corporate owners.

B. Please provide the following information for your company **for the POI**.

If the actual values recorded in your accounting records are booked on a basis other than free, on-board (f.o.b.), please describe any adjustments that were made to derive the f.o.b. values. In addition, if these values are inclusive of VAT or other indirect taxes, please ensure that such taxes are removed from the figures.

1. Total Production and Sales of Raw Shrimp
The quantity and f.o.b. value of your operations' production and sales of raw shrimp. Provide a worksheet reconciling the total reported production volume and value to your production records.

2. Sales of Raw Shrimp to Santa Priscila
The quantity and f.o.b. value of raw shrimp sold to Santa Priscila. Please report the sales value on an f.o.b. (factory) basis.

**Regarding 1 and 2 above:** Please explain how the volume and value of raw shrimp production and sales are recorded in your company's financial records. If your company's financial records are consolidated with those of other companies in the financial report of a parent, holding company, or group of companies please explain how, and provide copies of the consolidated financial statements.

## SECTION III: PROGRAM-SPECIFIC QUESTIONS

*For each program*, if your company did not apply for, use, or benefit from that program during the POI, you must clearly state so. Otherwise, please answer the questions listed. To determine the information which must be reported under each program, please see the instructions for each program in this section of the questionnaire and in the referenced appendices.

If any government assistance, as enumerated below, was received by companies which have since been merged with or purchased by your company, you are responsible for answering the questions with respect to such assistance to the merged or purchased company.

For detailed descriptions of the programs listed below, consult with Santa Priscila or the Government of Ecuador (GOE).

### I. TAX PROGRAMS:

A. Refund of Currency Outflow Tax (ISD) on Purchase of Inputs

Please provide a detailed description of this program and its workings. In addition, p lease respond to all questions in the following appendices:

1. ***Standard Questions Appendix***,
2. ***Tax Appendix***, and
3. ***Input Producer Appendix***

B. Export Tax Incentive

Please provide a detailed description of this program and its workings. In addition, p lease respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

C. Export Tax Incentives for Sustained/Increased Employment

Please provide a detailed description of this program and its workings. In addition, p lease respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

D. Export Taxes Lowered to Promote Agricultural Exports

Please provide a detailed description of this program and its workings. In addition, p lease respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

E. Export Credits from National Finance Corporation

Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

F. International Factoring

Please provide a detailed description of this program and its workings. In addition, p lease respond to all questions in the following appendices:

1. ***Standard Questions Appendix***, and
2. ***Tax Appendix***.

**II. LOANS AND CREDIT PROGRAMS:**

A. Access to Preferential Lines of Credit for Aquaculture and Fishing

1. Report all loans from any state-owned banks in Ecuador received by your company, which were outstanding during the POI. Submit the information requested in the Loan Template as an attachment to your response and in electronic format using Microsoft Excel.

2. Please respond to all questions in the **Standard Questions Appendix** and the **Loan Benchmark and Loan Guarantee Appendix**.

B. Loans for Organic Production

1. Report all loans under this program, received by your company, which were outstanding during the POI. Submit the information requested in the **Loan Template** as an attachment to your response and in electronic format using Microsoft Excel.

2. Please respond to all questions in the **Standard Questions Appendix** and the L**oan Benchmark and Loan Guarantee Appendix** for each program**.**

C. Credit Line Boost for Shrimp Sector's Reconstruction After the Earthquake

1. Report all credit line increases under this program, received by your company, which were outstanding during the POI. Submit the information requested in the **Loan Template** as an attachment to your response and in electronic format using Microsoft Excel.

2. Please respond to all questions in the **Standard Questions Appendix** and the L**oan Benchmark and Loan Guarantee Appendix** for this program.

## III. PROVISION OF GOODS OR SERVICES FOR LESS THAN ADEQUATE REMUNERATION (LTAR)

A. Government Provision of Electricity for LTAR

Please respond to all question in the **Standard Questions Appendix** and the **Provision of Goods/Services Appendix.** In addition, please respond to the following:

1. Identify your company's suppliers of electricity during the POI.

2. State whether your firm paid reduced rates for electricity during the POI because of its location in a designated geographical area (*e.g.*, industrial estates).

3. Report the volume of your company's electricity use and the corresponding charges your company paid, by month, during the POI. Submit this information in electronic format using Microsoft Excel and include a printout of the electronic file in your response.

4. Please identify the appropriate rate and fee categories in the chart you submit.

B. Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays

Please respond to all question in the **Standard Questions Appendix** and the **Provision of Goods/Services Appendix.** In addition, please respond to the following:

1. Identify all instances during the POI and the prior 11 (years (*i.e.*, the AUL) in which your firm received land or land leases at reduced rates because of its location in a designated geographical area (*e.g.*, industrial estates).

2. For each instance in which your firm acquired such and or land leases, please indicate the following:

   a. Date of acquisition

b. Identity of seller or leaseholder (provide the name in both Arabic and English and an address).

c. Location of the land (specify whether the land is located in a special economic zone and/or development zone).

d. Area of land (specify the unit of measure).

e. Price paid for land or lease (specify whether the payment is in a lump sum or in installments).

f. Terms of payment.

g. The amount of land-use taxes and other fees paid annually. Identify the authority to whom these taxes and fees are paid and provide a sample invoice (or other relevant billing document) for each type of tax or fee. If you are exempted from payment of these taxes or fees, or you pay these taxes or fees at a reduced rate, please provide the details of the value of the exemptions/reductions over the period corresponding to the AUL.

h. Duration of lease.

i. Translated copy of the land-use contract.

## IV. OTHER SUBSIDIES

Did the GOE (or entities owned directly, in whole or in part, by the GOE or any provincial or local government) provide, directly or indirectly, any other forms of assistance to your company between January 1, 2011, and the end of the POI? If yes, please describe such assistance in detail, including the amounts, date of receipt, purpose and terms, and answer all questions in the appropriate appendices.

## *Appendices*

### *Standard Questions Appendix*

A. Specify the eligibility criteria your company had to meet in order to receive benefits under this program. State whether eligibility was or is currently contingent on one or more of the following criteria: 1) whether or not your company exports or has increased its exports, 2) the use of domestic rather than imported inputs, 3) the industry to which your company belongs, or 4) the region in which your company is located.

B. Describe in detail the application and approval process that your company undertook to receive benefits through the program.

C. Specify the criteria your company met to receive the particular amount of assistance provided. Did the application or approval specify the merchandise for which this assistance was to be provided? If yes, provide details of which merchandise was specified in the application and/or approval documents.

D. What records does your company keep regarding each of the benefits received under this program? Provide your company's executed application forms and other application documents with respect to this program. Provide copies of the documentation sent to your company upon approval of the benefit, including but not limited to: approval letter, contract, claim form, etc.

E. Specify how many years your company has received benefits under this program. What was the first year that your company applied for and received benefits? For programs under investigation that were not enacted pursuant to a legal instrument, indicate for how many years your company has participated in the program. For example, for programs involving the provision of inputs for less than adequate remuneration not enacted pursuant to a legal instrument, please indicate how many years your company has purchased the relevant inputs from the government, government-controlled entities such as state-owned enterprises, or other enterprises alleged to be "authorities" under section 771(5)(B) of the Act.

F. Indicate where benefits under this program can be found in your accounting system (i.e., specify the ledgers or journals) and financial statements. If you have to file anything with the government to continue receiving benefits under this program, provide a complete translated set of your most recent submissions made during, or before, the POI.

G. Has the program been terminated? If yes, please explain. When is the last date that your company could *apply for or claim* benefits under the program? When is the last date that your company could *receive* benefits under the program?

### *Allocation Appendix*

Respondents should be aware that, pursuant to section 351.524 of its regulations, Commerce allocates the benefits received from certain types of subsidies over time. Although the POI is a recent period, we are investigating alleged subsidies received over a time period corresponding to the industry's average useful life of assets (AUL). According to section 351.524(d)(2)(i) of the regulations, Commerce will presume that the industry's AUL corresponds to the average useful life of renewable physical assets for the industry concerned as listed in the U.S. Internal Revenue Service's Depreciation Range System (IRS tables). In the case of this investigation, the AUL is 12 years. Therefore, Commerce will investigate alleged subsidies received during the POI and the preceding 11 years (*i.e.*, the years 2009 through 2019).

According to 19 CFR 351.524(d)(2), parties to the investigation may choose to argue that the IRS tables do not reasonably reflect the company-specific AUL or the country-wide AUL for the industry in question. To do so, parties must demonstrate that the company-specific AUL applicable to the respondent companies or country-wide AUL applicable to the industry producing subject merchandise in your country differs by one year or more from the AUL in the IRS tables. If any of the parties under investigation chooses to pursue an AUL other than that identified in the IRS tables, you will be required to provide information for the corresponding number of years.

In table format, enter the beginning and ending gross book values of depreciable productive assets for each of the past ten years. (Do not include non-depreciable assets, such as land or construction in progress. Please seek to exclude the gross book value of any fully depreciated productive assets which are no longer in service.)

A. Enter, as separate items in the table, each year's regular depreciation expense and any special charges to depreciation expense or revaluations and write-downs of productive assets.

B. Explain how the numbers in the table reconcile to your financial statements.

C. Explain your company's accounting policies concerning depreciation of productive assets. State whether straight-line or accelerated depreciation is used, and what conventions are applied.

D. Explain whether your company maintains salvage value for productive assets; how salvage value is treated for depreciation purposes; and, if applicable, beginning and ending salvage value balances for each year in the table.

E. If your company is claiming that the IRS tables do not reasonably reflect your company- specific AUL, please:

1. Provide a worksheet which shows the calculation of your company's AUL. To **calculate the AUL using the raw data listed above:**

a. Sum the average annual balances of productive assets for all years (A).

b. Sum the depreciation expenses for each year (D).

c. Divide the sum of the productive assets amounts (A) by the sum of depreciation expenses (D) to arrive at the AUL. AUL = A/D.

2. Demonstrate that this rate differs significantly from the rate established in the IRS tables (*i.e.*, by at least one year).

F. If your company is claiming that the IRS tables do not reasonably reflect the country-wide AUL for this industry, please:

1. Contact the GOE to ensure that they will submit the country-wide rate.

2. Demonstrate that this rate differs significantly from the rate established in the IRS tables (*i.e.*, by at least one year).

## *Loan Benchmark and Loan Guarantee Appendix*

The following information should be given for loans provided under the program in question. For *short-term loans* (one year or less) or guarantees or insurance on short-term loans, information must be provided for all loans on which principal was outstanding or on which interest was paid, accrued, and/or waived during the POI. Please indicate if any short-term loan program was a line of credit. For *long-term loans* (greater than one year) or guarantees on long-term loans, information must be provided for all loans with principal or interest outstanding during the POI or for any such loans forgiven or assumed. We have attached a Loan Template to this questionnaire to be used for reporting several of the items requested below. *See* Attachment 1. Please use that template in providing that data.

### *Loan Information*

A. loan control number;

B. source of loan;

C. program under which loan is provided;

D. original amount of loan and currency of loan;

E. any required collateral;

F. date of loan agreement;

G. date of loan receipt;

H. length of loan;

I. interest rate of loan (specify if fixed or variable; if variable, provide source of base rate and the spread above base rate);

J. principal, and/or, interest amounts paid in 2019;

K. a description of the repayment schedule (principal and interest) and any special features associated with the loan such as grace periods, forgiveness of payments, opportunities for re-discounting, rollovers or debt retirement, repayment contingent upon subsequent events; also, if the repayment schedule has not been met, please provide the actual repayment schedule;

L. if the program provides short-term loans or long-term loans with an initial indefinite repayment schedule, please provide the actual repayment schedule (principal and interest);

M. amount of any fees, commissions, compensating balances, taxes or penalties paid in addition to interest, which affect the cost of the loan (indicate whether paid or provided); specify what type of charges were included in this column;

N. any adjustments made in the loan balance or interest payment to take account of inflation;

O. if principal or interest on any loan provided under this program was forgiven or assumed, during the POI or over a prior period corresponding to the company's AUL, please provide the dates and amounts of each forgiveness or assumption.

***Long-Term Benchmark***

For long-term loans, please provide the information requested in A through O above for any other long-term commercial debt with principal or interest outstanding during the POI that was obtained contemporaneously with and that is comparable to the loan(s) in question. This information may be used for purposes of a benchmark interest rate. Please note that the benchmark loans should be denominated in the same currency as the corresponding loan above. When providing this information, please use Attachment I to this Appendix.

***Short-Term Benchmark***

For short-term loans, please provide the information requested in A through O above for any commercial short-term debt with principal outstanding or on which interest was paid during the POI and that is comparable to the loan(s) in question. Please provide your company-specific interest rate for these short-term commercial loans by weighing the rates by the principal amount of each loan. Please provide the calculation worksheets showing how your company derived the weighted-average rate.

If you had short-term interest loans granted prior to the POI where interest was paid during the POI, you must provide the above information for the year during which the loans were received. When providing this information, please use Attachment I to this Appendix.

***Loan Guarantees***

Please provide the information requested in A through O above for loans guaranteed or insured under this program. If the guaranteed loan is a long-term loan, please provide the benchmark information requested under the "Long-Term Benchmark" section and the following:

P. Source of the loan guarantee and the program under which it is provided;

Q. Terms of guarantee including any fee paid;

R. The effect that the guarantee had on the terms (*e.g.,* interest rate, length, collateral) of the loan. For example, if there were similar commercial loans in the same year without guarantees, please provide the terms of those loans;

S. Your ability to obtain a comparable commercial loan (*e.g.*, a loan for export) without a guarantee;

T. In the case of government ownership, provide any evidence that it is normal commercial practice for shareholders in the country in question to provide similar loan guarantees.

***Income Tax Programs Appendix***

If your company used this program to take deductions from taxable income, credit toward taxes payable, exemptions from taxes owed, accelerated depreciation or other tax benefits on the tax return filed during the POI (the tax period covered by this tax return does not have to correspond with the period of investigation), please answer the following questions:

A. Explain whether the assistance is a deduction from taxable income, an exemption from taxes, a credit toward taxes payable, accelerated depreciation, a deferral of taxes owed, or other tax benefit.

B. Indicate the amount of the tax savings derived from the use of this program. Provide a detailed calculation of the assistance and all source materials. Show the amount of tax (or the amount of loss incurred) that would have been due absent this benefit. **Indicate where in the tax return this assistance is shown**. For tax deferrals, please indicate the amount of tax owed and the length of the deferral period.

C. If your company was in a tax loss position for the tax year to which the return applies, please explain the effect of this assistance on your company's tax position.

D. Will you carry forward any loss to future years? Does the loss represent accrued losses from earlier years? Please explain.

E. Indicate where in your company's financial statements tax information is represented. Are accrued tax losses carried as assets in the financial statements? Please explain.

F. If you carried forward a loss from prior years and used that loss to offset taxes due on the tax return filed during the POI, demonstrate that loss was not generated by use of any countervailable tax program.

***Provision of Goods/Services Appendix***

Please provide the following information with respect to each of the goods/services alleged to be provided at less than adequate remuneration:

A. Provide a general description of the goods/services provided by the government and of the process by which the goods/services are provided.

B. List all suppliers (domestic and foreign) from which you purchased the good/service in question during the POI. Specify whether any of these suppliers are owned or controlled by the Government of Ecuador.

C. Explain how the price of the good/service is determined between your company and each of your suppliers.

D. Provide a listing of all of your purchases of the good/service during the POI. This list should include all purchases in which payment for the purchase was made or due during the POI. Specify the quantity of the purchase, the total amount of the purchase, the date of payment, the characteristics of the product purchased, the delivery terms, and the price per unit (specify unit, *i.e.*, ton, etc.). Segregate the list according to the supplier. In addition to a hard copy, provide an electronic version saved as a Microsoft Excel spreadsheet.

E. Are there trade publications which specify the prices of the good/service within Ecuador and on the world market? Provide a list of these publications, along with sample pages from these publications listing the prices of the good/service within Ecuador and in world markets during the period of investigation.

## *Land Appendix*

1. Please provide a breakdown of the land that your company purchased/acquired from the government in the POI and prior 11 years (*i.e.*, 2009 through 2019).

2. For each land transaction, please respond to the following:

   a. Date of acquisition;
   b. Identity of seller;
   c. Location of land (please be sure to specify whether the acquired land is located in a special economic and/or development zone);
   d. Area of land (please be sure to specify the unit of measure);
   e. Price paid for land (specify whether payment was in a lump sum or in installments);
   f. Terms of payment;
   g. State the amount of taxes and other annual fees paid yearly and identify the authorities to whom these annual taxes and fees are paid, and provide a sample invoice for each type of tax and fee;
   h. Duration of lease;
   i. Translated copy of the land contract; and
   j. Provide the land certificate(s) issued to your company by the government.

3. For benchmark purposes, please provide any information concerning land prices in Ecuador for the period examined. For example, please list details and provide descriptions of any other land transactions that took place between your company and private parties in the POI and prior 11 years (*i.e.*, 2009 through 2019).

### *Change-in-Ownership Appendix*

If there were any changes in ownership during the Average Useful Life (AUL), answer the applicable questions below for each change in ownership. Note that some of these questions may not be applicable to every change in ownership. In addition, some of the questions may require input from both the government as well as the respondent company. Therefore, the government and the respondent company should coordinate their responses to these questions. However, be sure to clearly identify in the response to each of the change-in-ownership questions the party (*e.g.*, the government, the company) providing the response to that question.

**General Questions**

1. If the seller of the assets or shares is a public or government agency or entity, what is the name and purpose of the agency? To whom does the agency report? Explain in detail the nature of this relationship.

2. Describe any involvement in the sale of the assets or shares by any government, government officials, or agencies or institutions that are owned/controlled by the government.

   A. Discuss, for example, any participation in any meetings related to the transaction; any actual or promised funds, loans or debt forgiveness, guarantees, or waivers of rights or laws, credits to the bid price or anything else of value, provided (or required) in connection with the transaction(s).

   B. Provide specific dates and amounts for each such promised funding, loans or debt forgiveness, guarantees, or waivers of rights or laws, credits to the bid price or anything else of value that was provided in connection with the transaction(s).

3. Explain the purpose and expectations of the asset or share sale (*e.g.*, to raise financing, to unload an unprofitable business segment).

   A. Was the sale part of a larger change-in-ownership plan organized by the government or a corporate parent? Provide a detailed explanation of any such plan.

   B. If the plan was implemented, reviewed or ratified by any government entity, provide copies of all laws or decisions ratifying or approving the implementation of the plan.

4. Were any steps (*e.g.*, assumption/write-off of debt, renegotiation of liabilities or restructuring) taken prior to or concurrent with the sale of the assets or shares? If yes, explain in detail.

5. How was the company valued for purposes of the sale? Provide any appraisal or valuation studies (not just the executive summary but the entire study) performed

prior to the sale. In determining the value of the company, were financial statements prepared? If yes, provide the financial statement and any accompanying notes.

6. Provide financial statements for the company whose assets or shares were sold for the two years prior to the sale, the year of the sale, and for two years after the sale. (Be sure to specify the extent to which the operations of the business in question are consolidated within larger corporate financial reporting. Specify the level of consolidation reflected in the financial statements provided.) If the change in ownership was announced more than two years prior to the sale, provide financial statements also for two years prior to the announcement and all subsequent years leading up to the sale.

7. At the time of the sale, were any of the parties to the transaction aware of the possibility that production of the company could be subject to countervailing duties in the United States? If yes, did this play any role in the transactions, *e.g.*, consideration paid, structure of the company, or terms of the contact for sale? If yes, explain and provide documentation.

8. Did the company explicitly pay back any previously received government assistance prior to the change in ownership of the company? Did the company repay subsidies given under specific programs, or did the company repay a general amount? Provide the details of any repayments along with supporting documentation of the repayment.

**<u>Sales Process</u>**

**If the part of all of the assets or shares of the company were sold through a bidding process, answer the questions in section 9, "Bid Process," below. If part or all of the company was sold through a stock offering, answer the questions in section 10, "Sale of Shares," below. If part or all of the company's assets were sold, answer the questions in section 11, "Sale of Assets," below.**

9. <u>Bid Process</u>

   A. Describe in detail the structure of the bid process. Discuss why you adopted this particular bid structure.

   B. Selection of the winning bid.

      (1) Explain in detail the bid selection criteria and how the winning bid was selected. Were these factors ranked in terms of importance? If yes, provide the ranking.

      (2) Were any factors other than purchase price (*e.g.*, maintenance of employment and production levels, guarantees by the buyer to keep the company in operation, or the company's impact on the economy) considered when selecting the winning bid?

(3) Provide a copy of the bid contract and supporting documentation under which the company was sold.

C. Aside from the purchase price, were there any conditions of sale placed on the buyer, such as investment commitments or employment and production guarantees?

(1) If yes, describe these conditions of sale in detail. What was the reason for requiring these conditions of sale?

(2) How were the bidding parties' commitments to these conditions of sale valued or quantified when evaluating the bids?

(3) Was the winner of the bidding process free to close the company and liquidate the assets after the company was sold?

D. Has the buyer met all of the terms and conditions of the bid contract? If not, explain why. What options are available to ensure that the buyer has complied with all of the terms of the purchase agreement?

10. <u>Sale of Shares</u>

A. Indicate the percentage and the total number of shares (all classes of stock) sold and the price per share as well as the number and percentage of any shares that remained with the seller.

(1) Identify separately each government-owned (either directly or indirectly) entity that purchased any of the shares sold, along with the number and percentage of shares purchased by each of those entities. Explain why shares were sold to these government-owned entities.

B. Was this a sale of the company's existing shares or of newly issued shares?

C. How were potential investors in the stock offering selected? Were there any limitations on when certain investors could sell their shares in the company? If yes, did all shareholders face the same selling restrictions?

D. Did the purchase of particular shares (*e.g.*, "golden shares") bestow special rights or privileges on any private or government-affiliated investor?[11] If yes, detail all special rights and privileges attendant to such shares.

F. Provide any sales contract governing the sale of shares.

---

[11] A golden share is often characterized as a share which has voting rights capable of exercising a veto over specified or significant changes to the constitution or articles of association of a company.

G. Do the terms of the sale of shares require anything other than cash from the buyer, such as investment commitments, debt assumption, worker training commitments, employment guarantees, *etc.*? If yes, describe the conditions required and reasons for the conditions.

H. Have all buyers met all of terms and conditions of the stock sale? If not, explain why. What options are available to ensure that buyers have complied with all of the terms of the purchase agreement?

11. Sale of Assets

A. Provide a copy of the sales contract and supporting documentation under which the assets of the company were sold.

B. Do the terms of the sales contract require anything other than cash from the buyer, such as investment commitments, debt assumption, worker training commitments, employment guarantees, *etc.*? If yes, describe the conditions required and reasons for the conditions. Support this explanation with specific citations to relevant portions of the sales contract.

C. Did any liabilities transfer with the assets sold? If yes, quantify amount of liabilities and explain why they were transferred. Support this explanation with specific citations to relevant portions of any sales contract.

D. Has the buyer met all of the terms and conditions of the sales contract? If not, explain why. What options are available to ensure that the buyer has complied with all of the terms of the purchase agreement?

E. Were any previously provided subsidies tied, in any way, to the particular assets sold?

**Post-Sales Effect on Company**

12. Explain whether and how any of the proceeds of the sale of assets or shares were reinvested in the company. For example, where the proceeds used to cover the general financing requirements of the company, or were the proceeds used for expansion of a particular facility or product line?

13. Describe the impact of the sale of shares or assets on the legal and corporate structure of the business producing subject merchandise. Also, describe the legal status of the business before and after the sale. Also, describe in detail the nature of the sale, *e.g.*, whether the sale was an acquisition of the firm by another firm or an equal merging of two companies. Provide all formal documents that describe the sale of the company.

14. Detail any instances in which the sale of the shares or assets resulted in any fundamental change in the general business operations of the company.

A. Compare and contrast the main business and product segments of the company's operations after the sale with those before the sale. Detail any ways in which the operations are fundamentally different. Were parts (*e.g.*, production lines, subsidiaries, sales divisions) of the company shut down or ceded to other parts of the buyer's operations? Explain the extent to which these changes are consistent with the original goals and expectations of the sale (citing, as appropriate, to provisions in the sales contract or any pre-sale documents).

B. Identify the legal and trade names of the company and its main product lines before and after the sale. Explain the reasons for any changes.

C. Indicate whether any of the company's suppliers changed as a result of the sale.

D. Identify what impact, if any, the sale had on the company's customer base. Also, describe how the sale affected the company's U.S. sales operations.

E. Support this narrative with specific citations to the company's financial statements or other source documentation on the record.

15. Detail any instances in which the sale of the shares or assets resulted in any fundamental change in the production facilities of the company.

A. Identify any production facilities that were acquired or disposed of as a result of the sale. Provide all documentation pertaining to the acquisition or disposal of any assets (*e.g.*, contracts, sales agreements).

B. Identify any and all changes in the product lines and production capacity at any of the company's facilities producing the subject merchandise that may have occurred as a result of the sale.

16. Detail any instances in which the sale of shares or assets resulted in any fundamental change in the financial structure of the company.

A. Indicate what portion of the assets of the company was transferred as a result of this sale. In cases where the assets sold where those of a parent of affiliated company, explain how the sale impacted the business producing subject merchandise.

B. Provide a detailed explanation of any instances where the purchaser of the shares or assets did not become legally responsible for the existing and potential liabilities of the company. Support this explanation with specific citations to any relevant portions of the sales contract.

17. Detail any instances in which the sale of shares or assets resulted in any fundamental change in the level and composition of the personnel of the company.

A. Identify the total number by category (*e.g.*, management, production workers, sales personnel) of any employees whose jobs were created or terminated as a result of the sale. Tie these numbers to any employment figures reported in the company's financial statements.

B. Explain how, under the terms of the sale, any existing employment agreements or union contracts were treated. Support this explanation with specific citations to any relevant portions of the sales contract and the union contracts.

C. Detail the extent to which the composition and the responsibilities of the Board of Directors of the company changed as a result of the sale.

18. If the transaction was a partial change in ownership (only some portion of the shares or assets of the company were sold), explain to what extent the sale affected control and direction of the company's finances and productive operations.

# *ATTACHMENT*

## *Templates*

**(*See* Excel file that accompanies this questionnaire)**

# Tab 22

# P.R. 167

Barcode:4500132-01 C-331-806 INV - Investigation -

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 EDRAKE@SCHAGRINASSOCIATES.COM F: (202) 429-2522

January 29, 2024

DOC Inv. No. C-331-806
Total Pages: 33
Investigation
AD/CVD Office IV

**PUBLIC DOCUMENT**

**VIA ELECTRONIC FILING**
The Honorable Gina Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Frozen Warmwater Shrimp from Ecuador: Opposition to Exclusion of Respondents' Cross-Owned Input Suppliers**

Dear Secretary Raimondo:

On behalf of the Petitioner, the American Shrimp Processors Association ("ASPA" or "Petitioner"), we hereby submit our opposition to the decision of the U.S. Department of Commerce ("Commerce") to excuse mandatory respondents Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") and Sociedad Nacional de Galápagos C.A. ("SONGA") (collectively "Respondents") from reporting on behalf of all of their cross-owned input suppliers at this time except for one supplier each.[1] As ASPA explained in its opposition to Respondents' request to be excused from reporting on behalf of their cross-owned input suppliers, the statute, Commerce's

[1] *See* Letter to Santa Priscila, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Industrial Pesquera Santa Priscila S.A." (Jan. 25, 2024) ("Santa Priscila Supplier Questionnaire"). *See also* Letter to SONGA, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Sociedad Nacional de Galápagos C.A." (Jan. 25, 2024) ("SONGA Supplier Questionnaire").

Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/29/24 2:53 PM, Submission Status: Approved

regulations, agency practice, and Commerce's questionnaire all require Respondents to report on behalf of all of their cross-owned input suppliers and require Commerce to countervail any subsidies to these cross-owned suppliers which are attributable to Respondents.[2] Moreover, there is no *de minimis* threshold for attribution of such subsidies regarding suppliers who provide smaller amounts of the input in question.[3] The U.S. Court of International Trade has upheld Commerce's practice of attributing subsidies from cross-owned input suppliers regardless of the quantity of inputs they provide, stating, "the regulations do not obligate Commerce to measure the impact of an input supplier's contributions when weighing whether to attribute its subsidies to the downstream producer."[4]

In addition, Commerce's decision in this regard is inconsistent with its treatment of Ecuadorian respondents in the prior countervailing duty ("CVD") investigation on shrimp from Ecuador as well as its on-going CVD investigations on shrimp from India, Indonesia, and Vietnam. Neither Commerce nor Respondents have articulated any valid reason why Ecuadorian Respondents should be given special treatment regarding the requirement to report subsidies to cross-owned input suppliers in this case.

In its 2013 CVD investigation on shrimp from Ecuador, Commerce investigated and countervailed subsidies to SONGA's cross-owned input suppliers.[5] As the memo attached at **Exhibit 1** shows, Commerce required SONGA to report on behalf of "all" of its cross-owned

---

2 *See* ASPA Opposition to Respondents' Request to Exclude Companies from Reporting Obligations (Jan. 11, 2024).

3 *See* 19 C.F.R. § 351.525(b)(6)(iv).

4 *Icdas Celik Enerji Tersane v. Ulasim Sanayi A.S.*, 498 F. Supp. 3d 1345, 1364 (Ct. Int'l Trade 2021).

5 *See Certain Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty Determination*, 78 Fed. Reg. 50,389 (Dep't Commerce Aug. 19, 2013) and accompanying Issues and Decision Memorandum at 5.

input suppliers. In addition, as the excerpt from the public version of SONGA's initial questionnaire response in that investigation attached at **Exhibit 2** demonstrates, SONGA in fact reported on behalf of what appear to be at least seven cross-owned shrimp farms, four laboratories or hatcheries, and a pair of additional entities in the prior investigation. We note that the programs related to land for shrimp farms discussed in the excerpt attached at **Exhibit 2** are similar to some of the programs at issue in this investigation.[6] There is no justification for allowing Respondents to be exempt in this investigation from reporting on behalf of the exact same kinds of cross-owned input suppliers that were included in the prior investigation of the same product.

In addition, as far as Petitioner is aware, this is the only on-going CVD investigation on shrimp where respondents are not required to report on all of their cross-owned companies. In the concurrent investigation on shrimp from Indonesia, for example, respondent PT Bahari Makmur Sejati ("BMS") is reporting on both of its cross-owned affiliates, despite objecting based on the percentage of BMS's sales revenue accounted for by the inputs received from these companies.[7] In addition, in the concurrent investigation on shrimp from India, Sandhya Aqua Exports Private Limited ("Sandhya") is reporting on behalf of what appear to be three cross-owned affiliates.[8] Moreover, regardless of whether respondents in the other three shrimp CVD investigations have integrated or cross-owned input suppliers, they have all been asked to also report on behalf of their largest unaffiliated raw shrimp supplier.[9]

---

6 *See* Frozen Warmwater Shrimp from Ecuador, Countervailing Duty Investigation Initiation Checklist (Nov. 14, 2023) at 8 and 11.

7 BMS Sec. III QR (Jan. 15, 2024) at 4, excerpt attached at **Exhibit 3**.

8 Sandhya Partial Sec. III QR (Jan. 10, 2024) at 1 - 2, excerpt attached at **Exhibit 4**.

9 *See* Unaffiliated Shrimp Supplier Response Instructions, attached at **Exhibit 5**.

Petitioner understands and appreciates that Commerce has only stated that it is limiting its examination to the single largest cross-owned input supplier for each Ecuadorian Respondent "at this time."[10] In order to have a complete picture of the full range of subsidies attributable to Respondents, however, we submit that Commerce should first require a complete response on behalf of all cross-owned input affiliates and then determine on the basis of reported information whether there are any subsidies to these entities that are above a negligible level and thus should be included in Respondents' subsidy rates. As reviewed above, this is the practice Commerce has adopted in prior and on-going cases involving the same product and even the same respondent (in the case of SONGA).

Finally, we note that by determining to exclude most of Respondents' cross-owned input suppliers from reporting requirements at this time, Commerce has effectively extended the deadline for the submission of responses on behalf of Respondents' input suppliers. The original deadline for initial complete Section III responses in this investigation was January 22, 2024.[11] That questionnaire stated that the initial Section III response must include a complete response for all cross-owned input suppliers.[12] The deadline for Respondents' initial Section III responses has now been extended to February 1, 2024.[13] Commerce's decision to exclude most cross-owned input suppliers from its reporting requirements has now effectively delayed the deadline for initial responses to Section III from the remaining cross-owned input suppliers even further,

---

[10] *See* Santa Priscila Supplier Questionnaire. *See also* SONGA Supplier Questionnaire.

[11] Questionnaire (Dec. 12, 2023) at 1.

[12] *Id*. at III-36.

[13] *See* Letter to Santa Priscila and SONGA, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Request for Extension to Section II of Initial Questionnaire Response" (Jan. 17, 2024). We note that Respondents requested an additional extension on January 26, 2024, to which Petitioner is fling an opposition today, concurrent with this submission.

to February 14, 2024.[14] This delay is worrisome in itself. Regardless, it should be more than enough time for both Respondents to submit full questionnaire responses on behalf of **all** of their cross-owned input suppliers, or at a minimum those that supplied inputs to the Respondents during the period of investigation.

As noted in Petitioner's initial opposition to Respondents' exclusion request, Respondents and their counsel have been well aware of the requirement to report on behalf of their cross-owned input suppliers since the petition was filed on October 25, 2023, the investigation was initiated on November 14, 2023, and the questionnaire was issued on December 12, 2023.[15] Respondents themselves requested to be mandatory respondents in this investigation on December 4, 2023.[16] It is entirely reasonable to require Respondents to thus report on behalf of all of their cross-owned input suppliers by February 14, 2024, more than two months after the original questionnaire was issued.[17]

For all of these reasons, we respectfully request that Commerce revisit its decision to excuse Respondents from their reporting obligations. Consistent with the statute, regulations, and prior and current practice, Commerce should require full responses on behalf of all of Santa Priscila and SONGA's cross-owned input suppliers in this investigation. There is no reason to further delay the reporting of this information. This information is essential to the calculation of reasonably accurate subsidy rates in Commerce's preliminary determination, and thus the

---

14 *See* Santa Priscila Supplier Questionnaire. *See also* SONGA Supplier Questionnaire.

15 *See* ASPA Opposition to Respondents' Request to Exclude Companies from Reporting Obligations (Jan. 11, 2024) at 7 – 8.

16 Respondents' Respondent Selection Comments (Dec. 4, 2023) at 2 – 3 and 5.

17 We note that respondents in the concurrent CVD investigations on shrimp from India, Indonesia, and Vietnam have been given until February 12, 2024 for their unaffiliated raw shrimp suppliers to respond. *See* **Exhibit 5**.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 1/29/24 2:53 PM, Submission Status: Approved

provision of preliminary relief from injurious subsidies to the Petitioner and the entire domestic shrimp industry.

We appreciate your attention to these concerns. Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

/s/ Elizabeth J. Drake
Roger B. Schagrin
Elizabeth J. Drake
Michelle R. Avrutin
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

Edward T. Hayes
LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701
*Counsel to the American Shrimp Processors Association*

# Tab 23

# P.R. 170

Barcode:4501395-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
POI: 01/01/2022 – 12/31/2022
**Public Document**
E&C/OIV: ZS, RA

January 31, 2024

The American Shrimp Processors Association
c/o Elizabeth Drake
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, D.C. 20001

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: First Supplemental Questionnaire Regarding New Subsidy Allegation

Dear Ms. Drake:

This letter concerns the countervailing duty investigation of frozen warmwater shrimp (shrimp) from Ecuador. The Department of Commerce (Commerce) has identified certain deficiencies in the January 8, 2024, new subsidy allegation (NSA) filed on behalf of your client, the American Shrimp Processors Association (petitioner), for which we require additional information. The additional information requested in the attachment to this letter is due no later than close of business, *i.e.*, 5:00 p.m. Eastern Standard Time (EST), on **February 5, 2024.**

Commerce must conduct this investigation in accordance with Commerce's statutory and regulatory deadlines. If you are unable to respond completely to this request for information by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations. An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted. Any extension granted in response to your request will be in writing; otherwise, the original deadline will apply.

If Commerce does not receive either the requested information or a written extension requests before 5 p.m. EST on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Commerce will not accept any requested information

Filed By: Reginald Anadio, Filed Date: 1/31/24 10:42 AM, Submission Status: Approved

submitted after the deadline. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences, pursuant to section 776(b) of the Act. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available, including adverse inferences.

**DEADLINE FOR SUBMISSION: Your response is due no later than 5:00 p.m. EST on the date identified above.** Questionnaire responses normally entail the filing of many exhibits and databases on ACCESS. Accordingly, to the extent you submit your filing on the day it is due, rather than earlier, we strongly recommend that you begin uploading your response **no later than 12:00 noon on the above due date.** A questionnaire response must be filed in its entirety by the deadline to be considered timely.

**EXTENSIONS: Note well:** Any extension request must be filed in writing. Extension requests filed after 5 p.m. on the due date will not be granted, except in extraordinary circumstances. An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means. An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, force majeure, or medical emergency." Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the requesting party of its decision before the time limit expires." For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.

**Note well:**

> Parties should be aware that **the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on its disposition. Parties should not assume that they will receive an extension of a time limit if they have not received a response from Commerce. For submissions that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next business day.** *See* 19 CFR 351.103(b). **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues. When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise

the official in charge, informing them of the filing difficulties. The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.

Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

If you have any questions regarding this matter, please contact Zachary Shaykin at Zachary.Shaykin@trade.gov or (202) 482-2638.

Sincerely,

Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement & Compliance

Enclosure

**Supplemental Questionnaire**
The American Shrimp Processors Association
**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador (C-331-816)**
**Period of Investigation (POI): 1/1/2022 – 12/31/2022**

**NOTE:** *Please repeat the question prior to giving your response when responding to this supplemental questionnaire.*

**NOTE:** *Please provide page numbers for the narrative and exhibits for ease of reference.*

**NOTE:** *Please submit any data in Excel format and ensure that all formulas in Excel are visible.*

---

Investment in the Electrification of the Shrimp Sector

1. On page 2 of the NSA Submission, you note that "the GOE is reported to have provided an additional $60 million" of funding to this program. However, according to Exhibit 1 and 3 of the NSA Submission, it appears that as late as November 2022 funding had yet to be distributed under this program, with the potential for expiration or further extension of a funding deadline in December 2022. Please provide additional evidence and explanation indicating whether any funds may have been disbursed under this program during the POI.

2. On page 4 of the NSA, the petitioner alleges that the Investment in the Electrification of the Shrimp Sector program is specific under sections 771(5)(D)(i), 771(5)(D)(iv), and 771(5)(D)(iii)(II) of the Act. However, section 771(5)(D) of the Act provides statutory guidance regarding the definition of the financial contribution of a potentially countervailable subsidy. Please explain this discrepancy and provide revised citations to the relevant statute regarding the alleged specificity of this program.

The Provision of Fuel to Shrimp Farmers for LTAR

3. On page 8 of the NSA Submission, you allege that entities other than state-owned companies such as Petroecuador "would be entrusted or directed to make a financial contribution at government-established prices…" Please answer the following questions:

   a. Please clarify wither Petroecuador is the only provider of fuel in Ecuador.
   b. Please explain whether Petroecuador's administratively-set fuel prices are applicable only to Petroecuador, or must also be adhered to by any potentially private sellers of fuel.
   c. In prior CVD proceedings, in the absence of direct legislation to entrust or direct private parties, Commerce has set forth a two-part test to determine entrustment or direction based on circumstantial evidence: 1) whether the government has in place during the relevant period a governmental policy to support that respondent; and 2) whether evidence on the record established a pattern of practices on the part of the government to act upon that policy to entrust or direct the associated

private entity decisions. To the extent that private sellers of fuel are present in Ecuador, and you continue to allege that such private sellers may be entrusted or directed by Petroecuador to provide fuel for LTAR, please provide additional evidence addressing the two-part test outlined above. In addition, please further elaborate as to how pricing schedules constitute the provision of fuel by private sellers.

# Tab 24

# P.R. 179

# C.R. 71

Barcode: 4507321-01 C-331-806 INV - Investigation

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 56
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been redacted on pages NAT-2 to NAT-5, EC-2 to EC-9, SOL-2 to SOL-9, and in Exhibits NAT-1 to NAT-3, EC-1 to EC-3, SOL-1 to SOL-3.

**PUBLIC VERSION**

February 12, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Section II of Supplier Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos C.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the Section II response to the "Supplier Questionnaire for Sociedad Nacional de Galapagos C.A." of the Department's January 24, 2024, questionnaire. This response is timely submitted in accordance with the Department's February 6, 2024 letter extending the deadline for SONGA's response to the supplier questionnaire until today.

Volume I contains Section II of the supplier questionnaire response of Naturisa S.A. Volume II contains Section II of the supplier questionnaire response of Empacadora Champmar S.A. Volume III contains Section II of the supplier questionnaire response of Sola & Sola Solacciones.


Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 2/12/24 2:01 PM, Submission Status: Approved

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA and its affiliated companies request business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA and the affiliates request proprietary treatment and the basis for the request:

- <u>Nature of Products or Production Process</u>: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(1).

- <u>Names of Particular Customers, Distributors, or Suppliers</u>: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- <u>Other Specific Business Information Related to SONGA's Business and Production Operations, Financial Data, Ownership and Affiliations, etc., the Release of Which to the Public Would Cause Substantial Harm to SONGA's Competitive Position</u>: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to the respective competitive positions of SONGA and the other submitters. SONGA consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos C.A.*

Barcode: 4507321-01 C-331-806 INV - Investigation

## COMPANY CERTIFICATION

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I prepared or otherwise supervised the preparation of the attached submission of the "Supplier Questionnaire for Sociedad Nacional de Galapágos C.A.," Section II questionnaire response, filed on February 9, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: February 9, 2024

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 2/12/24 2:01 PM, Submission Status: Approved

Barcode: 4507321-01 C-331-806 INV - Investigation

# Counsel Certification

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I have read the attached submission of the response to Section II of the "Supplier Questionnaire for Sociedad Nacional de Galapágos C.A.," filed on February 9, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: February 9, 2024

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 2/12/24 2:01 PM, Submission Status: Approved

## CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 12th day of February, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically via ACCESS (proprietary version) or via e-mail (public version), on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4507321-01 C-331-806 INV - Investigation


Case No. C-331-806
Investigation
AD/CVD Operations, Office IV

Business proprietary information has been redacted on pages NAT-2 to NAT-5, and in Exhibits NAT-1 to NAT-3.

PUBLIC VERSION

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE
INTERNATIONAL TRADE ADMINISTRATION
ENFORCEMENT AND COMPLIANCE

COUNTERVAILING DUTY INVESTIGATION OF
FROZEN WARMWATER FROM ECUADOR

# RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A. ("SONGA") TO SECTION II OF THE DEPARTMENT'S JANUARY 24, 2024 SUPPLIER QUESTIONNAIRE

## VOLUME I – RESPONSE OF NATURISA S.A.

Submitted by:

Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Date submitted: February 12, 2024

Counsel to Sociedad Nacional de Galápagos C.A.

Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 2/12/24 2:01 PM, Submission Status: Approved

**Section II Response for Naturisa S.A. (Naturisa)
to the Department's January 24, 2024,
Affiliated Supplier Questionnaire**

**Frozen Warmwater Shrimp From Ecuador
Investigation**

**SECTION II -- GENERAL QUESTIONS**

**Introduction**

Naturisa S.A. ("Naturisa") submits this response to Section II of the Department's January 24, 2024, supplier questionnaire in this countervailing duty investigation in Frozen Warmwater Shrimp from Ecuador. Naturisa is not a producer of the subject merchandise, but rather, is a supplier of raw shrimp to Sociedad Nacional de Galápagos C.A. ("SONGA") that is affiliated with and cross-owned with SONGA during the average useful life ("AUL") period and during the period of investigation ("POI").

## I. OTHER COMPANIES SUBJECT TO INVESTIGATION

**In addition to providing a response to this questionnaire regarding your own company, we require responses from certain affiliated companies or companies involved in your sales or production of subject merchandise, as explained below in sections A through D. A failure on thepart of any such companies to provide a response to this questionnaire may adversely affect yourown results in this investigation. For the remainder of this questionnaire, the terms respondent(s), company respondent(s), "you," or "your company," refer not just to your company, but to all companies required to complete this questionnaire. Provide separate answersunder each question and separate spreadsheets for each of these companies.**

**Unless specified differently, your answers to the requests below should cover your company's situation during the POI. Usage of the present tense in this section refers to the POI.**

**We also instruct you to provide a list of those companies for which you are responding to your government as soon as possible so that the government can include these companies in its response to this questionnaire.**

### A. Affiliated Companies

**Affiliation is defined in section 771(33)(A)-(G) of the Act. Affiliation can be indicated by a number of factors, including: (1) personal family groupings, (2) corporate groupings, (3) shared board members or executive officers, (4) employer and employee relationships among owners, board members, or executive officers of multiple parties, (5) one party's ownership or control of stock with voting privileges in another, (6) franchise and joint venture agreements, (7) close supplier relationships, and (8) other indicia of control by one party over another, directly, or indirectly through third parties. "Control" exists where one party is legally or operationally in a position to exercise restraint or direction over another party.**

**Provide the following information about your company's affiliated companies:**



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 2/12/24 2:01 PM, Submission Status: Approved

1. **The identity of all companies with which your company is affiliated within the meaning of section 771(33) of the Act, including the full name and mailing address of each company.**

ANSWER: Naturisa is affiliated with the companies identified in SONGA's Affiliated Companies questionnaire response.

2. **Describe in detail the nature of the relationship between your company and those companies listed in response to the prior question. Specify for example, whether the companies share a board of directors, or whether members of each company's board sit on the board(s) of the other company(ies), and how the voting rights are distributed among board members; specify if, and how, officers of one company are directly involved in overseeing the operations of another company. Specify whether an affiliatedcompany supplies inputs into your company's production process.**

ANSWER: Naturisa is affiliated with SONGA, and SONGA previously reported all its affiliated companies in Exhibit AFF-1 of its affiliation questionnaire response, which it further clarified in its two supplemental affiliation responses. Naturisa itself owns and operates shrimp farms that are separately incorporated, and it also owns [ DESCRIPTION ]. Naturisa is affiliated with the following [ # ] shrimp farms, with which SONGA is also affiliated: [ NAMES ]. Naturisa owns [ DESCRIPTION ]. [ ] is also affiliated with SONGA. Additionally, [ DESCRIPTION ].

**You must provide complete responses for certain "cross-owned" affiliated companies.**

**Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the same ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other. In addition, if two companies are both cross-owned by a third party, the two companies themselves would be considered cross-owned (for example, cross-ownership exists between two companies owned by the same parent).**

**You must provide a <u>complete</u> questionnaire response for those affiliates where "cross-ownership" exists, and <u>one</u> of the following situations exists:**

- **the cross-owned company produces the subject merchandise; <u>or</u>**
- **the cross-owned company is a holding company or a parent company (with its own operations) of your company; <u>or</u>**
- **the cross-owned company supplies an input product to you for production of the**



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 2/12/24 2:01 PM, Submission Status: Approved

**downstream product produced by the respondent; or**

- **the cross-owned company has received a subsidy and transferred it to your company.**

ANSWER: This question does not apply because the Department's questionnaire issued to Naturisa is limited to describing only Naturisa's operations and its participation, if any, in government sponsored subsidy programs.

**B. Former Owners / Changes in Ownership**

**Commerce allocates the benefits received from certain types of subsidies over time (*e.g.*, equityinfusions, non-recurring grants, debt forgiveness, import duty or value-added tax exemptions orreductions on capital equipment, *etc.*). *See* 19 CFR 351.524 and subsection C of the "General Questions" section below for a complete explanation.**

**Thus, in addition to investigating alleged subsidies that your company may have received duringthe POI, Commerce is also investigating alleged allocable, non-recurring subsidies that your company may have received during the AUL period. Because of this, if your company obtainedall or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, or its assets continue to operate as part of your company, we require a complete questionnaire response for such company. If your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit therecipient over the allocation period, coordinate with your government to answer the questions inthe *Change-in-Ownership Appendix*. If your company does not wish to challenge Commerce'sbaseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, state so and you do not need to provide a response to the *Change-in-Ownership Appendix*.**

**Finally, if your company has been privatized, changed ownership, merged with another company, or devolved another company/ies from your company's corporate structure in wholeor in part, during the AUL period and your company wishes to challenge Commerce's baselinepresumption that non-recurring subsidies continue to benefit the recipient over the allocation period, coordinate with your government to answer the questions in the *Change-in-OwnershipAppendix*. If your company does not wish to challenge Commerce's baseline presumption thatnon-recurring subsidies continue to benefit the recipient over the allocation period, state so andyou do not need to provide a response to this appendix.**

ANSWER: Not applicable. There has been no change in Naturisa's ownership during the POI or during the AUL period with the exception that ownership was transferred in 2015 from [ NAME ] to Holding Sola & Sola Solacciones, S.A., ("Sola"), which is in effect the same entity.

**General Questions**

**A. Please provide the following information for your company, involved in the farming of raw shrimp.**

**1. The addresses of the company's headquarters, plant, and any export facilities.**



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 2/12/24 2:01 PM, Submission Status: Approved

ANSWER: Naturisa's headquarters are located at [ ADDRESS ].

2. **A description of the company. Please include in your response:**

a. **the date the company was formed;**

ANSWER: Naturisa was formed on [ DATE ].

b. **a history of the company's ownership; and**

ANSWER: Naturisa has been owned by the [ ] family since it was formed in [YR. ].

c. **the products the company produces and/or sells.**

ANSWER: Naturisa produces fresh shrimp at its shrimp farms for processing into frozen warmwater shrimp.

3. **Using diagrams and/or flow charts, describe the process by which your company produces raw shrimp. If different steps of the production process occur in different production units, divisions, or affiliated companies, please identify those production units, divisions, or affiliated companies.**

ANSWER: SONGA's response to Section III of the Department's initial questionnaire, which is currently due on February 12, 2024, will include a diagram of the shrimp farming process that equally applies to Naturisa's operations.

4. **Please provide your company's complete audited financial statements for the fiscal years covering the 2022 POI. Also please provide English translations of these financial statements. If complete English translations are not available, please provide translations of the section(s) that report benefits received from the government. These should be the official financial statements filed with your government. If there is no such filing requirement, the financial statements should bethose presented to banks or independent third parties. If you do not prepare audited financial statements, please provide any unaudited financial statements that your company prepares for your board of directors, your shareholders, for banks, or for thegovernment.**

ANSWER: As requested, **Exhibit NAT-1** contains Naturisa's audited financial statements for 2022.

5. **Please provide complete, translated tax returns filed during the POI, which may apply to the previous tax year (preferably a copy of the tax return stamped by the government). Include all schedules and attachments included with your return. In addition, please provide any amendments to your return.**



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 2/12/24 2:01 PM, Submission Status: Approved

ANSWER: As requested, **Exhibit NAT-2** contains Naturisa's tax return filed with the Internal Revenue Service of Ecuador in 2022. Naturisa submitted two sets of tax returns in 2022. The original return was incomplete while the second set was corrected. We provide both returns in this exhibit.

6. **Please provide your most up-to-date business registration documents filed with government authorities. If your business registration documents do not indicate the names of your company's owners during the POI, please provide additional documentation that does. If the documents identify corporate owners that own morethan 10 percent of your company, please identify the owners of your company's corporate owners.**

ANSWER: As requested, **Exhibit NAT-3** contains Naturisa's business registration document.

**B. Please provide the following information for your company for the POI.**

**If the actual values recorded in your accounting records are booked on a basis other than free, on-board (f.o.b.), please describe any adjustments that were made to derive the f.o.b. values. In addition, if these values are inclusive of VAT or other indirect taxes, pleaseensure that such taxes are removed from the figures.**

1. **Total Production and Sales of Raw Shrimp**
**The quantity and f.o.b. value of your operations' production and sales of raw shrimp. Provide a worksheet reconciling the total reported production volumeand value to your production records.**

2. **Sales of Raw Shrimp to SONGA**
**The quantity and f.o.b. value of raw shrimp sold to SONGA. Please report thesales value on an f.o.b. (factory) basis.**

**Regarding 1 and 2 above: Please explain how the volume and value of raw shrimp production and sales are recorded in your company's financial records. If your company's financial recordsare consolidated with those of other companies in the financial report of a parent, holding company, or group of companies please explain how, and provide copies of the consolidated financial statements.**

ANSWER: Naturisa produced [ QTY ] pounds of fresh shrimp in 2022, and it sold this entire volume to SONGA for a value of [ VALUE ]. Sales are recorded in account [ ACCOUNT CODE & NAME ]. Naturisa consolidates financial records with [ NAMES & DESCRIPTION ].



Filed By: jgoldfeder@tradepacificlaw.com, Filed Date: 2/12/24 2:01 PM, Submission Status: Approved

**Exhibit List**

| Exhibit No. | Description | Classification |
|---|---|---|
| **NAT-1** | 2022 Audited Financial Statements of Naturisa, S.A. (Spanish Original and English Translation) | BPI |
| **NAT-2** | 2022 Tax Return of Naturisa S.A. – Original and Supplemental Submissions (Spanish Original and English Translation) | BPI |
| **NAT-3** | Business Registration of Naturisa S.A. (Spanish Original and English Translation) | BPI |

# Tab 25

# P.R. 183-84

# C.R. 85, 87-88

Barcode: 4508004-01 C-331-806 INV - Investigation

TRADE PACIFIC

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

Case No. C-331-806
Total No. of Pages: 107
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been ranged or redacted on page III-1 to III-9, III-11, III-16, III-24, and III-26, and in Exhibits 2(a) to 4(a) and 5 to 13.

**PUBLIC VERSION**

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

February 13, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
SONGA's Section III Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos C.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the remaining portions of Section III to the Department's December 12, 2023, questionnaire. This response is timely submitted in accordance with the Department's February 6, 2024, letter, re: "Third Extension Request for Extension to Section III Questionnaire," which extended the deadline for SONGA's Section III response until today. Accompanying this submission are calculation worksheets in Excel® format.

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA requests proprietary treatment and the basis for the request:


Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

- Nature of Products or Production Process: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(1).

- Production and Distribution Costs: Contained in the exhibits. Protected under 19 C.F.R. §§ 351.105(c)(2) and (3).

- Names of Particular Customers, Distributors, or Suppliers: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Exact Amount of Benefits Applied for or Received: Contained in the narratives and exhibits. Protected under 19 C.F.R. § 351.105(c)(8).

- Other Specific Business Information Related to SONGA's Business and Production Operations, Ownership and Affiliations, Financial Data, Applications and Approval Documents etc., the Release of Which to the Public Would Cause Substantial Harm to SONGA's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to SONGA's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos C.A.*

**COMPANY CERTIFICATION**

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galápagos C.A. (SONGA), certify that I prepared or otherwise supervised the preparation of the attached submission of Section A Questionnaire Response, filed on February 13, 2024, pursuant to the antidumping duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. A-331-805). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: February 12 2024

**<u>Counsel Certification</u>**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I have read the attached submission of the Section III Questionnaire Response, filed on February 12, 2024, pursuant to the countervailing duty investigation against <u>Frozen Warmwater Shrimp from Ecuador</u> (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: February 12, 2024

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 13th day of February, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4508004-01 C-331-806 INV - Investigation

**PUBLIC VERSION – BPI Has Been Redacted**

**Case No. C-331-806**
**Investigation**
**POI: 1/01/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**PUBLIC VERSION**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

# RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A. TO THE REMAINING PORTIONS OF SECTION III OF THE DEPARTMENT'S DECEMBER 12, 2023 QUESTIONNAIRE –

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: February 13, 2024**

**Counsel to Sociedad Nacional de Galápagos C.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

**PUBLIC VERSION – BPI Has Been Redacted**

# RESPONSE OF SOCIEDAD NACIONAL DE GALAPAGOS C.A. (SONGA) TO SECTION III OF THE COUNTERVAILING DUTY QUESTIONNAIRE

**This questionnaire requests information about programs alleged to be provided to Industrial Pesquera Santa Priscila S.A. (Santa Priscila) and Sociedad Nacional de Galápagos C.A. (SONGA), producers/exporters in Ecuador of frozen warmwater shrimp or "subject merchandise"). Section 775 of the Act also requires Commerce to investigate any other programs discovered during the course of this investigation that potentially confer countervailable subsidies on the manufacture, production, or exportation of subject merchandise.**

**For general instructions, please review *Section I* of this questionnaire.**

**Commerce has standardized the appendices to *Section II* and *Section III* of this questionnaire; one or more of the appendices may not be applicable to the circumstances of this investigation. You should only respond to the questions in a specific appendix if it is identified under a specific question below.**

**Your government may contend that certain programs listed below are not countervailable. For these programs, you must still fully respond to the questions below, unless specifically instructed otherwise.**

## A. OTHER COMPANIES SUBJECT TO INVESTIGATION

**In addition to providing a response to this questionnaire regarding your own company, we require responses from certain affiliated companies or companies involved in your sales of subject merchandise, as explained below in sections A through D. A failure on the part of any such companies to provide a response to this questionnaire may adversely affect your own results in this investigation. For the remainder of this questionnaire, the terms respondent(s), company respondent(s), "you," or "your company," refer not just to your company, but to all companies required to complete this questionnaire. Please provide separate answers under each question and separate spreadsheets for each of these companies.**

**B. Identification of the companies that you must include in your response is necessary early in this investigation. Therefore, within 14 days of the date of this questionnaire, please submit to Commerce a list of the companies that you intend to include as part of your questionnaire response under the criteria in sections A through D below. Also, within 14 days of the date of this questionnaire, please respond to questions C.1 and C.2 under the "Affiliated Companies" section below.**

**Unless specified differently, your answers to the requests below should cover your company's situation during the POI. Usage of the present tense in this section refers to the POI.**

**The companies that must submit a complete response are the following:**

### A. Producers Supplying Exporters

**If your company exported subject merchandise produced by other companies in your country during the POI, then you must submit complete questionnaire responses for all producers that supply your company.**

**ANSWER:** SONGA did not export subject merchandise produced by any other company in Ecuador during the POI. However, SONGA did sell subject merchandise that it obtained from a cross-owned processor called [ ] in exchange for the payment of a co-



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

packing fee. SONGA supplied the fresh shrimp that it owned to [ ] for processing in return for payment of this fee. Title to the fresh shrimp that SONGA supplied to [ ] and to the finished frozen warmwater shrimp products that [ ] provided remained with SONGA in return for its payment for [ ] processing services.

**B. Export Trading Companies**

**If your company sells the subject merchandise to an export trading company which then exports the subject merchandise to the United States, then you must submit complete questionnaire responses for all such trading companies.**

**ANSWER:** SONGA did not sell the subject merchandise to an export trading company that then exported the subject merchandise to the United States during the POI.

**C. Affiliated Companies**

**Affiliation is defined in section 771(33)(A)-(G) of the Act. Affiliation can be indicated by a number of factors, including: (1) personal family groupings, (2) corporate groupings, (3) shared board members or executive officers, (4) employer and employee relationships among owners, board members, or executive officers of multiple parties, (5) one party's ownership or control of stock with voting privileges in another, (6) franchise and joint venture agreements, (7) close supplier relationships, and (8) other indicia of control by one party over another, directly, or indirectly through third parties. "Control" exists where one party is legally or operationally in a position to exercise restraint or direction over another party.**

**Please provide the following information about your company's affiliated companies:**

1. **The identity of all companies with which your company is affiliated within the meaning of section 771(33) of the Act, including the full name and mailing address of each company.**

**ANSWER:** SONGA identifies below each of its affiliated companies that engaged in the shrimp business. Please also see SONGA's previous responses to the Department's Affiliated Companies questionnaire for a listing of these companies, as well as those affiliated companies that are not involved in the shrimp business. Although an affiliated company named [ ] appears on the list below, SONGA did not use [ ] laboratory analysis services during the POI.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

Barcode: 4508004-01 C-331-806 INV - Investigation

**PUBLIC VERSION – BPI Has Been Redacted**

| Name of Affiliate | Mailing Address |
|---|---|
| [ | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | |
| | ] |

2. **Describe in detail the nature of the relationship between your company and those companies listed in response to the prior question. Specify for example, whether the companies share a board of directors, or whether members of each company's board sit on the board(s) of the other companies, and how the voting rights are distributed among board members; specify if, and how, officers of one company are directly involved in overseeing the operations of another company. Specify whether an affiliated company supplies inputs into your company's production process.**

**ANSWER:** Please refer to details below for each of SONGA's affiliated companies that engage in any aspect of the shrimp business. Please also refer to SONGA's previous response to the Department's Affiliated Companies questionnaire.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

**1.** [ ]

- Shrimp hatchery.
- Supplies larvae to shrimp farms.
- No input is supplied directly to SONGA.
- Officers not involved in SONGA, nor in other companies' operations.
- Shared board members with SONGA: [ ].
  Companies holding voting rights in [ ].

**2.** [ ]

- Plant that produces shrimp feed, sells shrimp feed to Naturisa.
- No input is supplied directly to SONGA.
- Officers not involved in SONGA nor in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [ ].
- Voting right in SONGA [ ]% and in [ ]%.

**3.** [ ]

- This a shrimp farm, sells fresh shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [ ].
- Voting right in SONGA [ ]% and in [ ].

**4.** [ ]

- This is a shrimp farm, sells fresh shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [ ].
- Voting right in SONGA [ ].

**5.** [ ]

- This is a shrimp farm, sells shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [ ].
- Voting right in SONGA [ ].

**6.** [ ]

- This is a shrimp farm, sells shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ]
- Shares board members with the following other companies: [ ].
- Voting right in SONGA [ ].

**7.** [ ]

- This is a shrimp farm, sells shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [ ].
- Voting right in SONGA [ ].

**8.** [ ]

- This is a shrimp farm, sells shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board members with SONGA: [ ].
- Shares board members with the following other companies: [ ].



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

- Voting right in SONGA [

  ].

**9.** [ ]

- This is a shrimp trading company; it did not supply any inputs to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [

  ].
- Voting right in SONGA [ ].

**10.** [ ]

- This is a shrimp farm, sells shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [

  ].
- Voting rights in SONGA [ ].

**11.** [ ]

- Shrimp Laboratory / Shrimp Hatchery.
- Supplies larvae to shrimp farms.
- Sells larvae to all shareholders' farms.
- No input supplied directly to SONGA.
- Officers not involved in other companies.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [

  ].
- Voting right in SONGA [ ].

**12.** [ ]

- Producer of shrimp and poultry feed.
- No input supplied directly to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [

].

- Voting right in SONGA [

].

**13.** [ ]

- This is a shrimp farm, sells shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [

].

- Voting right in SONGA [ ].

**14.** [ ]

- This is a shrimp farm, sells shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [

].

- Voting right in SONGA [ ].

**15.** [ ]

- Shrimp laboratory, supplies larvae to shrimp farms.
- No input supplied directly to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [

].

- Voting right in SONGA [

].

**16.** [ ]

- Shrimp processing plant.
- Processes shrimp for SONGA under a co-packing (toll processing) agreement.
- Officers not involved in other companies' operations.
- Shared board members with SONGA: [ ].

- Shares board members with the following other companies: [

  ].
- Voting right in SONGA [ ].

**17. <u>Naturisa</u>**

- This is a shrimp farm, sells shrimp to SONGA. See separate response for this company in Volume II.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [

  ].

**18. [ ]**

- Laboratory for genetic and molecular biological analysis of shrimp.
- No input supplied to SONGA.
- Officers not involved in other companies' operations.
- Shared board members with SONGA: [ ].
- Shares board members with the following other companies: [

  ].
- Voting right in SONGA [

  ].

**19. [ ]**

- This is a shrimp farm, sells shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [

  ].

**20.** [ ]

- This is a shrimp farm, sells shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [ ].

**21.** [ ]

- This is a shrimp farm, sells shrimp to SONGA.
- Officers not involved in other companies' operations.
- Shared board member with SONGA: [ ].
- Shares board members with the following other companies: [ ].

**22.** [ ]

- Transportation company.
- Trucks are used to bring shrimp from the farms to the plant.
- SONGA officers are involved in the operation of the company.
- SONGA owns [ ].
- Shares board members with the following other companies: [ ].

**You must provide complete responses for certain "cross-owned" affiliated companies.**

**Cross-ownership exists between two companies where one company can use or direct the individual assets of another company in essentially the S.A.me ways it can use its own assets. Normally, such a relationship exists between two companies where one company holds, directly or indirectly, a majority voting interest in the other. In addition, if two companies are both cross-owned by a third party, the two companies themselves would be considered cross-owned (for example, cross-ownership exists between two companies owned by the S.A.me parent).**

**You must provide a <u>complete</u> questionnaire response for those affiliates where "cross-ownership" exists, and <u>one</u> of the following situations exists:**



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

- **the cross-owned company produces the subject merchandise; or**
- **the cross-owned company is a holding company or a parent company (with its own operations) of your company; or**
- **the cross-owned company supplies an input product to you for production of the downstream product produced by the respondent; or**
- **the cross-owned company has received a subsidy and transferred it to your company.**

**ANSWER:** SONGA's obligation to respond concerning cross-owned companies is described in the questionnaire that was issued on January 24, 2024, which requires it to provide Section II and Section III responses for the following cross-owned companies: Naturisa. S.A., Holding Sola & Sola Solacciones S.A., and Empacadora Champmar S.A. Both Sola and Champmar are holding companies with no operations of their own.

**D. Former Owners / Changes in Ownership**

**Commerce allocates the benefits received from certain types of subsidies over time (*e.g.*, equity infusions, non-recurring grants, debt forgiveness, import duty or value- added tax (VAT) exemptions or reductions on capital equipment, *etc.*). *See* 19 CFR 351.524 and subsection C of the "General Questions" section below for a complete explanation.**

**Thus, in addition to investigating alleged subsidies that your company may have received during the POI, Commerce is also investigating alleged allocable, non-recurring subsidies that your company may have received during the AUL period. Because of this, if your company obtained all or substantially all the assets of another company during the AUL period, and that company still exists as an ongoing entity, or its assets continue to operate as part of your company, we require a complete questionnaire response for such company. If your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the *Change-in- Ownership Appendix*. If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do not need to provide a response to the *Change-in-Ownership Appendix*.**

**Finally, if your company has been privatized, changed ownership, merged with another company, or devolved another company/ies from your company's corporate structure in whole or in part, during the AUL period and your company wishes to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please coordinate with your government to answer the questions in the *Change-in- Ownership Appendix*. If your company does not wish to challenge Commerce's baseline presumption that non-recurring subsidies continue to benefit the recipient over the allocation period, please so state and you do not need to provide a response to this appendix.**

**ANSWER:** Not applicable because there was no change in SONGA's ownership during the AUL period.

C. <u>GENERAL QUESTIONS</u>

**A. Please provide the following information for your company, as well as for each cross- owned affiliate, as defined above, that is involved in the manufacture, production or exportation of subject merchandise. Please also <u>provide</u> the information for all trading companies (whether or not affiliated), through which your company sold subject merchandise to the United States during the POI, in accordance with 19 CFR 351.525(c).**

**<u>ANSWER</u>:** The answers provided below to question nos. 1-8 are provided for SONGA. The answers for each of SONGA's cross-owned companies are provided in SONGA's January 4, 2024, Affiliated Companies Questionnaire.

**1. The addresses of the company's headquarters, plant, and export facilities.**

**<u>ANSWER</u>:** The address of the company's headquarters and its plant is: Ave. Las Esclusas, Hcda La Josefina Km. 3.5 Guayaquil, Ecuador. SONGA does not own or operate a separate export facility, nor does [ ].

**2. A description of the company. Please include in your response:**

**a. the date the company was formed;**

**<u>ANSWER</u>:** SONGA was formed in 1932.

**b. a history of the company's ownership;**

**<u>ANSWER</u>:** Founded in 1932 in the Galapagos Islands dedicated to the capture and export of tuna and lobster. In 1982, SONGA moved to one of the largest and most productive water inlets in the world, which is the Gulf of Guayaquil, home of the *penaeus vannamei* species of warmwater shrimp. In 1990, Francisco Solá Medina, owner of shrimp producer Naturisa, acquired SONGA. In 1992, Rodrigo Laniado Romero became a partner. Since then, the shareholders have continued evolving SONGA's operations by strengthening the production chain with larvae breeding facilities, shrimp hatcheries, shrimp farming ponds, processing plants, and developing a worldwide commercialization and export process.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

c. **whether your company is (i) foreign-invested enterprise (FIE), (ii) state-owned enterprise (SOE), (iii) domestically-owned enterprise, or (iv) other; and**

**ANSWER:** SONGA is a domestically owned enterprise.

d. **the products the company produces and/or sells.**

**ANSWER:**

- Frozen Head-On Shrimp
- Frozen Headless Shrimp
- Frozen Value Added Shrimp

Different presentations and count sizes are used for all three types of products. Different packing forms, such as bags and boxes are used. Different freezing types are used, such as Brine, IQF, and Block. A catalog further describing the frozen warmwater shrimp products that SONGA offers for sale is provided in **Exhibit 1.**

3. **Using diagrams and/or flow charts, describe the process by which your company the subject merchandise. If different steps of the production process occur in different production units, divisions, or affiliated companies, please identify those production units, divisions, or affiliated companies.**

**ANSWER:** Please refer to the diagrams below. SONGA does not produce fresh shrimp for processing in its plant, but it also provides a shrimp farming diagram below for the Department's information.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

## Shrimp Farming




## Whole Shrimp Production



**Tail and Value-Added Shrimp Production**




4. **Does your company (including cross-owned affiliates) export subject merchandise produced by other companies in Ecuador? If so, please identify the name and address of each such supplier of subject merchandise.**

**ANSWER:** Neither SONGA nor any of its cross-owned affiliates exported subject merchandise produced by other companies in Ecuador during the POI.

5. **Please provide your company's complete audited financial statements for the last three fiscal years. (Please provide the financial statements in English, if available. If they are not available in English, provide translations of the income statement, the balance sheet, the cash flow statement, the statement of change in equity, all notes thereto, and the auditor's opinion.)**

**These should be the official financial statements filed with your government. If there is no such filing requirement, the financial statements should be those presented to banks or independent third parties. The financial statements should include the complete set of statements, e.g., income statement, balance sheet, cashflow statement, statement of change in equity, all notes thereto, and the auditor's opinion. If you do not prepare audited financial statements, please provide whatever unaudited financial statements that are prepared for your board of directors, your shareholders, and for the government.**

**ANSWER:** The requested audited financial statements for fiscal years 2020 to 2022 are provided in **Exhibit 2**, which were presented to Ecuador's Superintendent of Companies.

6. **Please provide complete, translated tax returns filed during the POI (preferably a copy of the tax return stamped by the government). Include all schedules and attachments included with your return. In addition, please provide any amendments to your return.**

**ANSWER:** The requested tax return that SONGA filed with the GOE in 2022 is provided in **Exhibit 3**.

7. **Please provide your most up-to-date business registration documents filed with government authorities. If your business registration documents do not indicate the names of your company's owners during the POI, please provide additional documentation that does. If the documents identify corporate owners which own more than 10 percent of your company, please identify the owners of your company's corporate owners.**

**ANSWER:** The requested business registration documents are provided in **Exhibit 4**.

8. **Provide the HTSUS subheadings or your country's tariff schedule numbers under which you export the subject merchandise**

**ANSWER:** The six-digit HTSUS headings that SONGA used were 0306.17 and 1605.29.

B. **Please provide the following information for your company for the POI. Do not include the volume and value of merchandise produced outside Ecuador or returned merchandise. Separately report the value of services sold by your company, if any. In addition, separately report the value of sales by each cross-owned company, as well as the value of sales between your company and any cross-owned companies.**

**For years prior to the POI, please report sales information for the years of approval and receipt of non-recurring subsidies you report. *See, e.g.*, the Grant and Allocation Appendix. Please report sales information for all responding cross-owned companies during these years, not only sales information for the recipient of the subsidy.**

**If the actual values recorded in your accounting records are booked on a basis other than f.o.b., please describe any adjustments that were made to derive the f.o.b. values. In addition, if your sales are inclusive of VAT or other indirect taxes, please ensure that such taxes are removed from your sales figures.**

1. **Total Sales**

**The quantity and f.o.b. value of total sales (both subject and non-subject merchandise) to all markets (domestic and foreign). Please report the sales value on an f.o.b. (port) basis with respect to export sales and/or on an f.o.b. (factory) basis**



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

**for domestic sales. Provide a worksheet reconciling the total reported sales value to your financial statements.**

**2. <u>Sales of Subject Merchandise</u>**

**The quantity and f.o.b. value of the subject merchandise sold to all markets (domestic and foreign). Please report the salles value on an f.o.b. (port) basis with respect to export sales and/or on an f.o.b. (factory) basis for domestic sales.**

**3. <u>Total Exports</u>**

**The total quantity and f.o.b. (port) value of export sales (both subject and non-subject merchandise) to all markets.**

**4. <u>Total Exports to the United States</u>**

**The total quantity and f.o.b. (port) value of export sales (both subject and non-subject merchandise) to the United States.**

**5. <u>Exports of Subject Merchandise</u>**

**The total quantity and f.o.b. (port) value of the subject merchandise exported to all markets (including the United States).**

**6. <u>Exports to the United States of Subject Merchandise</u>**

**The total quantity and f.o.b. (port) value of the subject merchandise exported to the United States.**

**Regarding 1 – 6 above: Please explain how the sales of subject merchandise are recorded in your company's financial records. Are your company's sales consolidated with those of other companies in the financial report of a parent, holding company, or group of companies? If so, please explain how, and provide copies of the consolidated financial statements.**

**<u>ANSWER</u>:** The requested information is provided in **Exhibit 5.** SONGA's sales are consolidated with the sales of **[ ]**. SONGA's consolidated financial statement for FY 2022 is provided in **Exhibit 2.** SONGA records its sales of subject merchandise in several accounts based on the type of product (e.g., **[ ]**), as well as in other accounts that record other expenses, discounts, and returns. Subject merchandise is recorded in the company's financial records in the invoice accounting module once an invoice is approved, as well as in the IRS system.

**C. As established in 19 CFR 351.524(d)(2), the allocation period for non- recurring subsidies is defined by the Average Useful Life (AUL) of renewable physical assets for the industry concerned, as listed in the U.S. Internal Revenue Service's Depreciation Range System (IRS tables). {For definitions of recurring and non-recurring benefits, see the Grant and Allocation Appendix; See also 19CFR 351.524(c).} The AUL listed in the IRS tables that applies to this investigation is 12 years.**

**Parties may rebut the presumption to use the IRS tables by demonstrating either that the company-specific AUL or country-wide AUL for the industry in the respondent country differs by one year or more from the AUL in the IRS tables for the industry under review. Unless the parties establish that the IRS tables do not reasonably reflect the AUL of a firm's assets, however, Commerce will rely on the IRS tables to define the appropriate AUL.**

**If your company chooses to rebut the presumption to use the IRS tables, please respond to the Average Useful Life Appendix. If you do <u>not</u> want to rebut the use of the AUL in the IRS tables, you do <u>not</u> need to answer the questions in the Average Useful Life Appendix.**

**<u>ANSWER</u>:** SONGA does not challenge the 12-year average useful life. However, this AUL does not apply to the land on which shrimp farms are constructed or to concessions on those farms since the land on which shrimp is farmed is not a renewable physical asset. In addition, SONGA believes that it did not receive any non-recurring subsidies during the POI that would be subject to the 12-year AUL. In many cases, shrimp farm concessions have been granted and renewed for 30 years or more, including on cross-owned farms from which SONGA has purchased fresh shrimp. Thus, the misnomer "average useful life" of these farms is not 12 years, but much longer.

**D. <u>PROGRAM-SPECIFIC QUESTIONS</u>**

***For each program*, if your company (including cross-owned affiliates required to respond, as well as all trading companies) did not apply for, use, or benefit from that program during the POI, you must clearly state so. Otherwise, please answer the questions listed. To determine the information which must be reported under each program, please see the instructions for each program in this section of the questionnaire and in the referenced appendices.**

**If any government assistance, as enumerated below, was received by companies which have since been merged with or purchased by your company, you are responsible for answering the questions with respect to such assistance to the merged or purchased company.**

**For detailed descriptions of the programs listed below, *see* Attachment C of Section II (the Initiation Checklist), and consult with the GOE.**



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

**TAX PROGRAMS:**

The following four tax programs upon which the Department has initiated an investigation were mistakenly omitted from Section III of the questionnaire issued to SONGA and Santa Priscila. However, they were correctly included in Section II of the questionnaire issued to the Government of Ecuador. Accordingly, SONGA and Santa Priscila have included these four programs in their responses to Section III and have used the same numbering for all initiated-upon programs that the Department used in Section II of the CVD questionnaire.

**A. Environmental Tax Incentives**

**Please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix,* and**
2. ***Tax Appendix.***

**ANSWER:** SONGA did not receive any benefits under this program.

**B. Tax Incentives for Priority Sectors Under the 2010 Organic Production Code**

**Please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix,* and**
2. ***Tax Appendix.***

**ANSWER:** SONGA did not receive any benefits under this program.

**C. Fee Exemptions for Brackish Water**

**Please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix,* and**
2. ***Tax Appendix.***

**ANSWER:** SONGA did not receive any benefits under this program. Brackish water is not fit for human consumption because, by definition, it is brackish, i.e., it is salty. The dictionary defines the term brackish as "somewhat salty." Brackish water refers to a water source that is somewhat salty (more so than freshwater) but not as salty as seawater. The exact amount of salinity will vary depending on environmental factors. Brackish water sources are commonly



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

Barcode: 4508004-01 C-331-806 INV - Investigation



found at transitional points of water where fresh water meets seawater, typically in rivers and estuaries. Companies that use brackish water in their processing plants do not meter it because they do not consume it. Rather, they return it to its original source. For this reason, there is no need for them to measure the volume of their non-consumptive use of water.

Article 108 of Ecuador's Organic Law on Water Resources Use and Exploitation provides the following:

> Utilization of water in aquaculture. Individuals engaged in any piscicultural or aquacultural activity, not considered within the scope of food sovereignty as regulated by this Law, must obtain the necessary permits from the corresponding public authority for the exercise of their activity. Before granting them, the public authority must request reports from the Water Authority regarding the productive use of water, which will incur the payment of fees established in this Law, when consumptive.

(Emphasis added).

The petitioner confuses the charges that the GOE may impose for the consumption of drinking water, which is "consumptive" within the meaning of Article 108, with brackish water, which is not consumed, and which is returned to its source after its non-consumptive use. Neither SONGA, nor GOE, maintains any records of the volume of non-consumptive use of brackish water, so it is impossible to complete the standard questions appendix, the tax appendix, or the provision of goods/services appendix.

For example, the first question in the Standard Appendix asks the respondent to provide eligibility criteria "in order to receive benefits under this program." There are no such criteria since there are no benefits for non-consumptive use. Similarly, there is no way to answer the question seeking a description of the application and approval process. Nor do any records exist concerning benefits received. In the Provision of Goods/Services Appendix, there is no way to



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

report goods provided, suppliers, prices, or purchases of the "goods" involved, much less trade publications specifying the prices of brackish water.

Moreover, if the non-consumptive use of brackish water is regarded as a government benefit program, it is generally available to any person or entity that desires to use it and, therefore, is not countervailable. Nor have the petitioners demonstrated why the rate that the GOE may charge for the consumptive use of water has any relevance to the "price" for non-consumptive and free use of brackish water. Nor have the petitioners provided a benchmark that could be used to measure the benefit of brackish water allegedly provided by the GOE compared to the price of brackish water charged in arm's-length transactions. This is because no such brackish water charges exist in the private sector.

**D. Government Forgiveness of Land Use Fees and Provision of Land to Delinquent Shrimp Farmers**

**Please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix,* and**
2. ***Tax Appendix.***

**ANSWER:** SONGA did not receive any benefits under this program since it does not own or operate any shrimp farms.

**EXPORT PROGRAMS:**

**A. Refund of Currency Outflow Tax (ISD) on Purchase of Inputs**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix,***
2. ***Tax Appendix,* and**
3. ***Input Producer Appendix***

**ANSWER:** The requested Input Producer Appendix applies solely to "government-owned enterprises that produced the input purchased by the respondent companies during the POI."



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

Since the GOE did not produce any input that SONGA purchased during the POI, this Appendix does not apply.

The abbreviation "ISD" refers to the *Impuesto a la Salida de Divisas*, which can be translated as the "foreign exchange export tax." Ecuadorian importers must pay a 5% tax on their currency outflows that are used to purchase inputs for consumption in the production of goods under Ecuador's Reform Law for Tax Equity. Article 162 establishes the 5% tax rate on the outflow of currency. However, "habitual (regular) exporters" do not have to pay this tax when they use imported raw materials, other inputs, and capital goods that they use or else incorporate into goods that they export. The regulations define a habitual exporter as one that exports at least 25% of its total annual sales in the previous fiscal year or makes at least six exports in the same fiscal year and in different monthly periods. SONGA qualified as a habitual exporter in 2022 under this regulation. SONGA records the amount of its currency outflows that are subject to this tax exemption on its annual tax return. SONGA pays the tax but then applies for a tax credit.

SONGA provides the standard questions appendix and the tax appendix for this program in **Exhibit 6**.

**B. Export Tax Incentive**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix*****, and**
2. ***Tax Appendix.***

**ANSWER:** SONGA did not receive any benefits under this program.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

**C. Export Tax Incentives for Sustained/Increased Employment**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix*, and**
2. ***Tax Appendix*.**

**ANSWER:** This program reduces the applicable corporate tax rate from 25% to 22% for qualifying companies. SONGA provides a detailed description of this program and its workings in the Standard Questions Appendix and the Tax Appendix provided in **Exhibit 7.**

**D. Export Taxes Lowered to Promote Agricultural Exports**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix*, and**
2. ***Tax Appendix*.**

**ANSWER:** SONGA did not receive any benefits under this program.

**E. Export Credits from National Finance Corporation**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix*, and**
2. ***Tax Appendix*.**

**ANSWER:** SONGA did not receive any benefits under this program.

**F. International Factoring**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix*, and**
2. ***Tax Appendix*.**

**ANSWER:** SONGA did not receive any benefits under this program.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

**LOANS AND CREDIT PROGRAMS:**

**A. Access to Preferential Lines of Credit for Aquaculture and Fishing**

**1. Report all loans from any state-owned banks in Ecuador received by your company, which were outstanding during the POI. Submit the information requested in the Loan Template as an attachment to your response and in electronic format using Microsoft Excel.**

**2. Please respond to all questions in the Standard Questions Appendix and the Loan Benchmark and Loan Guarantee Appendix.**

**ANSWER:** SONGA did not receive any benefits under this program.

**B. Loans for Organic Production**

**1. Report all loans under this program, received by your company, which were outstanding during the POI. Submit the information requested in the Loan Template as an attachment to your response and in electronic format using Microsoft Excel.**

**2. Please respond to all questions in the Standard Questions Appendix and the Loan Benchmark and Loan Guarantee Appendix for each program.**

**ANSWER:** SONGA did not receive any benefits under this program.

**C. Credit Line Boost for Shrimp Sector's Reconstruction After the Earthquake**

**1. Report all credit line increases under this program, received by your company, which were outstanding during the POI. Submit the information requested in the Loan Template as an attachment to your response and in electronic format using Microsoft Excel.**

**2. Please respond to all questions in the Standard Questions Appendix and the Loan Benchmark and Loan Guarantee Appendix for this program.**

**ANSWER:** SONGA did not receive any benefits under this program.

**PROVISION OF GOODS OR SERVICES FOR LESS THAN ADEQUATE REMUNERATION (LTAR):**

**A. Government Provision of Electricity for LTAR**

**Please respond to all questions in the Standard Questions Appendix and the Provision of Goods/Services Appendix. In addition, please respond to the following:**

**1. Identify your company's suppliers of electricity during the POI.**

**2. State whether your firm paid reduced rates for electricity during the POI because of its location in a designated geographical area (*e.g.*, industrial estates).**

3. **Report the volume of your company's electricity use and the corresponding charges your company paid, by month, during the POI. Submit this information in electronic format using Microsoft Excel and include a printout of the electronic file in your response.**

4. **Please identify the appropriate rate and fee categories in the chart you submit.**

**ANSWER:** SONGA's electricity supplier during the POI was the [ ]. However, SONGA did not pay reduced rates for electricity during the POI because of its location in a designated geographical area. For SONGA's answers to question nos. 3 and 4, including the Microsoft Excel worksheet, please refer to **Exhibit 8**.

**B. Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays**

**Please respond to all questions in the Standard Questions Appendix and the Provision of Goods/Services Appendix. In addition, please respond to the following:**

1. **Identify all instances during the POI and the prior 11 (years (*i.e.*, the AUL) in which your firm received land or land leases at reduced rates because of its location in a designated geographical area (*e.g.*, industrial estates).**

2. **For each instance in which your firm acquired such and or land leases, please indicate the following:**

   a. **Date of acquisition**

   b. **Identity of seller or leaseholder (provide the name in both Arabic and English and an address).**

   c. **Location of the land (specify whether the land is located in a special economic zone and/or development zone).**

   d. **Area of land (specify the unit of measure).**

   e. **Price paid for land or lease (specify whether the payment is in a lump sum or in installments).**

   f. **Terms of payment.**

   g. **The amount of land-use taxes and other fees paid annually. Identify the authority to whom these taxes and fees are paid and provide a sample invoice (or other relevant billing document) for each type of tax or fee. If you are exempted from payment of these taxes or fees, or you pay these taxes or fees at a reduced rate, please provide the details of the value of the exemptions/reductions over the period corresponding to the AUL.**

   h. **Duration of lease.**

   i. **Translated copy of the land-use contract.**



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

**ANSWER:** SONGA held one very small concession for a port during the POI and the prior 11 years. However, shrimp farm concessions, if any, are held by SONGA's cross-owned shrimp farms. SONGA provides the Standard Questions Appendix and the Provision of Goods/Services Appendix for its port in **Exhibit 9.** This exhibit also contains the answers to the questions in item no. 2 above.

**OTHER SUBSIDIES:**

**Did the GOE (or entities owned directly, in whole or in part, by the GOE or any provincial or local government) provide, directly or indirectly, any other forms of assistance to your company between January 1, 2011, and the end of the POI? If so, please describe such assistance in detail, including the amounts, date of receipt, purpose and terms, and answer all questions in the appropriate appendices.**

**ANSWER:** SONGA lists below the other subsidy programs that arguably existed during the POI and describes the benefits, if any, that it received during the POI. SONGA does not concede that any benefits received under these programs identified below are countervailable.

**A. Investment Contract**

**ANSWER:** SONGA participates in an Investment Contract with the Ministry of Production, Commerce, Investment and Fisheries that is available to all companies, regardless of industry, that wish to participate. The issuance of SONGA's investment contract was established under the *Codigo Organico de la Produccion Commericio e Inversiones* (COPCI) law in which SONGA saw the opportunity to receive certain tax incentives for new SONGA projects. The company agreed to comply with the contract clauses for employment and meet a dollar value intended for future investments. The contract is provided in **Exhibit 10**. These tax incentives are generally available.

The tax benefits that SONGA received under the contract in return for a substantial investment intended to expand the production capacity of its shrimp packing plant and thereby generate additional employment are: (1) a proportional reduction in the tax rate for the



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

accumulated investment amount for each year; (2) exemption from the ISD for the importation of materials, commodities and capital goods used in the project; and (3) exemption from the ISD for the repayment of principal and interest on loans obtained from foreign lending institutions.

In 2019, SONGA applied to the Ministry of Production, Foreign Trade, Investments and Fisheries for admission to the investment program and compiled all the information needed for approval for the government's investment program. Once the documentation was compiled, it was sent to the Ministry for review and approval. Once the Ministry declared that SONGA complied with the law's requirements, it signed the investment contract. The entire process took a little more than a year.

The investment program is based on the total amount the company agrees to invest. The purpose is to guarantee the flow of resources intended to increase the company's capital investments in assets that allow an expansion of its productive capacity, generating a higher level of production of goods, or generating new sources of work. SONGA's contract lists the assets that SONGA said would be needed for its investment project. The program allows SONGA to receive benefits until the year 2030.

The investment contract called for SONGA to invest over **[ ]**. SONGA's benefit in 2022 is reported in SONGA's tax return filed with the GOE. The amount of the exemption is determined by a formula set forth in the investment contract.

SONGA provides the Standard Questions Appendix and the Tax Appendix in **Exhibit 11.**

**B. Value Added Tax Exemption**

**ANSWER:** Article 55 of the Internal Tax Regime Law exempts parties from paying the 12% value-added tax ("VAT") on certain products so long as those products (i.e., raw material and inputs) are used in goods that are later exported. The Department does not consider VAT

exemptions to be countervailable because reductions or exemptions do not result in a change to the tax burden of the respondent.

In the 2013 countervailing duty investigation, the Department determined not to investigate any VAT programs because there was no evidence that the Ecuador VAT system does not function as a "normal" VAT system. See Certain Frozen Warmwater Shrimp from Ecuador: Final Affirmative Countervailing Duty Determination, 78 Fed. Reg. 50389 (Aug. 19, 2013), and accompanying Issues and Decision Memorandum at cmt. 4. Ecuador's VAT system has not changed since that time.

Moreover, Ecuador's VAT system operates as a consumption tax that passes through companies and, thus, exemptions or reductions in the VAT rate do not result in a change to the overall VAT burden on a company. Finally, the Department declined to initiate an investigation of Ecuador's VAT system in its initiation checklist in this investigation based on the petitioner's withdrawal of its allegation. Nevertheless, if the Department requires additional information on Ecuador's VAT system, SONGA will provide it.

**C. Municipal Tax Exemptions**

**ANSWER:** Three benefits are potentially available from the Guayaquil municipal government: (1) exemption from the municipal tax on total assets; (2) reduction or exemption from the municipal patent tax; and (3) exemption from the municipal solid waste collection tax. SONGA did not receive any benefits under (2) or (3). SONGA provides the Standard Questions Appendix and the Tax Appendix for program (1) in **Exhibit 12.**

**D. Additional Deduction for Expenses Related to Sponsorship and Promotion of Sports, Educational, and Cultural Programs**

**ANSWER:** SONGA did not receive any benefits under this program.

**E. FODINFA (import tax) exemption/refund**

**ANSWER:** SONGA did not receive any benefits under this program.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

**Exhibit List**

| Exhibit No. | Description | BPI/Public |
|---|---|---|
| Exhibit 1 | Product Catalogue | Public |
| Exhibit 2(a) | 2020 Financial Statements | BPI |
| Exhibit 2(b) | 2021 Financial Statements | BPI |
| Exhibit 2(c) | 2022 Financial Statements | BPI |
| Exhibit 3 | 2022 Tax Return (Covering FY 2021) | BPI |
| Exhibit 4(a) | SONGA Business Registration | BPI |
| Exhibit 4(b) | Habitual Exporter Registry for 2021 | Public |
| Exhibit 5 | Sales Data | BPI |
| Exhibit 6 | ISD Refund – Standard Questions Appendix & Tax Appendix | BPI |
| Exhibit 7 | Tax Incentives for Exporters to Sustain/Increase Employment – Standard Questions Appendix & Tax Appendix | BPI |
| Exhibit 8 | Electricity Template | BPI |
| Exhibit 9 | Land Concessions – Standard Questions Appendix & Tax Appendix | BPI |
| Exhibit 10 | Investment Contract | BPI |
| Exhibit 11 | Investment Contract Tax Incentives – Standard Questions Appendix & Tax Appendix | BPI |
| Exhibit 12 | Municipal Tax Exemption – Standard Questions Appendix & Tax Appendix | BPI |
| Exhibit 13 | Exemption from Municipal Asset Tax | BPI |

# EXHIBIT 10

Barcode: 4508004-02 C-331-806 INV - Investigation

**PUBLIC VERSION**

# 62 PAGES
# NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION

## Investment Contract

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

# EXHIBIT 11

***Investment Contract***

***Standard Questions Appendix***

**A. Specify the eligibility criteria your company had to meet in order to receive benefits under this program. State whether eligibility was or is currently contingent on one or more of the following criteria: 1) whether or not your company exports or has increased its exports, 2) the use of domestic rather than imported inputs, 3) the industry to which your company belongs, or 4) the region in which your company is located.**

ANSWER: The eligibility criteria are provided in the laws that the GOE has submitted and in the Investment Contract that SONGA is providing as **Exhibit 10.**

**B. Describe in detail the application and approval process that your company undertook to receive benefits through the program.**

ANSWER: In 2018, the GOE issued a decree that allowed companies to apply for the investment program that provided tax benefits for productive investments in the country. Songa then sent a request to the Ministry of Production, Foreign Trade, Investments and Fisheries applying for the investment program. Songa worked together with PWC to compile all the information needed for approval of benefits available under the GOE's investment program. Once the documentation was compiled, it was sent to the Ministry, which then designated an inspector to conduct an evaluation. Once the GOE declared that Songa complied with the law's requirements, a meeting was held to sign the investment contract.

**C. Specify the criteria your company met to receive the particular amount of assistance provided. Did the application or approval specify the merchandise for which this assistance was to be provided? If so, provide details of which merchandise was specified in the application and/or approval documents.**

ANSWER: The investment program is based on the total amount the company agrees to invest, which the GOE must approve. The purpose is to encourage the flow of resources needed to increase the amount of invested capital through an investment in assets that allow an expansion of productive capacity, generating increased production of goods or new sources of



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

employment. The contract lists the assets that will be needed for execution of the investment project.

**D. What records does your company keep regarding each of the benefits received under this program? Provide your company's executed application forms and other application documents with respect to this program. Provide copies of the documentation sent to your company upon approval of the benefit, including but not limited to: approval letter, contract, claim form, etc.**

ANSWER: There is no executed application form. Instead, the signed contract with the GOE lists the benefits that SONGA will receive, which are:

1. Income tax rate reduction. See 101 Formulary (Tax Return) which states the income tax rate.

2. ISD exemption on purchase of inputs for approved CAPEX: shown in each payable transaction which has attached an IRS form named "DECLARACION INFORMATIVA DE TRANSACCIONES EXENTAS NO SUJETAS DEL IMPUESTO A LA SALIDA DE DIVISAS".

3. ISD exemption on foreign loan repayments: shown in each payable transaction which has attached an IRS form named "DECLARACION INFORMATIVA DE TRANSACCIONES EXENTAS NO SUJETAS DEL IMPUESTO A LA SALIDA DE DIVISAS".

**E. Specify how many years your company has received benefits under this program. What was the first year that your company applied for and received benefits? For programs under investigation that were not enacted pursuant to a legal instrument, indicate for how many years your company has participated in the program. For example, for programs involving the provision of inputs for less than adequate remuneration not enacted pursuant to a legal instrument, please indicate how many years your company has purchased the relevant inputs from the government, government-controlled entities such as state-owned enterprises, or other enterprises alleged to be "authorities" under section 771(5)(B) of the Act.**

ANSWER: SONGA has received benefits under the program since 2019. The program allows SONGA to continue to receive benefits until 2030.

Barcode: 4508004-02 C-331-806 INV - Investigation



**F. Indicate where benefits under this program can be found in your accounting system (i.e., specify the ledgers or journals) and financial statements. If you have to file anything with the government to continue receiving benefits under this program, provide a complete translated set of your most recent submissions made during, or before, the POI.**

ANSWER: Since the Currency Outflow Tax is an exemption, it is not reflected on SONGA's Financial Statement or in its accounting system. However, the tax reduction rate that SONGA paid for each fiscal year is shown in the 101 Formulary (Tax Return).

**G. Has the program been terminated? If so, please explain. When is the last date that your company could apply for or claim benefits under the program? When is the last date that your company could receive benefits under the program?**

ANSWER: The program has not been terminated.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

***Investment Contract***

***Tax Programs Appendix***

**If your company used this program to take deductions from taxable income, credit toward taxes payable, exemptions from taxes owed, accelerated depreciation or other tax benefits on the tax return filed during the POI (the tax period covered by this tax return does not have to correspond with the period of investigation), please answer the following questions:**

**A.** **Explain whether the assistance is a deduction from taxable income, an exemption from taxes, a credit toward taxes payable, accelerated depreciation, a deferral of taxes owed, or other tax benefit.**

ANSWER: The benefits under the investment contract are:

1. Reduction in the income tax rate.
2. ISD exemption for import of capital goods listed in the contract.
3. ISD exemption for repayment of foreign loans used for the investment.

**B.** **Indicate the amount of the tax Savings derived from the use of this program. Provide a detailed calculation of the assistance and all source materials. Show the amount of tax (or the amount of loss incurred) that would have been due absent this benefit. <u>Indicate where in the tax return this assistance is shown</u>. For tax deferrals, please indicate the amount of tax owed and the length of the deferral period.**

ANSWER: First, the calculation of the income tax rate reduction proportional to investment is as follows.

First, the sum of the investment accumulated from the previous year (2021) to the new productive investment made in 2021:

[ ]

Divide that value by the Total revalued gross fixed assets for 2021: [ ].

[ ].

Then, multiply [ ] by the income tax rate for SONGA that otherwise applies, i.e., 22%

22% x [ ] rate reduction

Finally, 22% - [ ] final tax rate for 2022 fiscal year.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

**PUBLIC VERSION – BPI Has Been Redacted**

| | | 2021 | |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |

Second, the ISD is an exemption from tax. The ISD rate corresponds to 5% over specified imported goods. The amount of the benefit reported on the 2022 return was [ ].

Third, the exemption from ISD on foreign loan repayments was [ ].

**C. If your company was in a tax loss position for the tax year to which the return applies, please explain the effect of this assistance on your company's tax position.**

ANSWER: Not applicable.

**D. Will you carry forward any loss to future years? Does the loss represent accrued losses from earlier years? Please explain.**

ANSWER: Not applicable.

**E. Indicate where in your company's financial statements tax information is represented. Are accrued tax losses carried as assets in the financial statements? Please explain.**

ANSWER: Tax information is reported in SONGA's financial statements as Income Tax Expense. See notes of statements for more information.

**F. If you carried forward a loss from prior years and used that loss to offset taxes due on the tax return filed during the POI, demonstrate that loss was not generated by use of any countervailable tax program.**

ANSWER: Not applicable.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/13/24 2:43 PM, Submission Status: Approved

# Tab 26

# P.R. 186-88

# C.R. 90-91

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave, SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 3,567
Investigation
AD/CVD Operations, Office IV
The GOE's Business proprietary information has been redacted in Volumes II to VI; Santa Priscila's BPI has been redacted in Volumes II, III, and VI; SONGA's BPI has been redacted in Volumes III, and VI; Produmar's BPI has been redacted in Volumes II and VI; Tropack's BPI has been redacted in Volume II; and Naturisa's BPI has been redacted in Volumes II and VI
.

**PUBLIC VERSION**

February 15, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Government of Ecuador's Section II Questionnaire Response

Dear Secretary Raimondo:

On behalf of the Government of Ecuador ("GOE"), we hereby submit the GOE's response to Section II of the Department's December 12, 2023, questionnaire. This response is timely submitted in accordance with the Department's February 8, 2024, letter, re: "Third Request for Extension to Section II of Initial Questionnaire Response," which extended the deadline for the GOE's Section II questionnaire response until today.

Volume I contains the GOE's response to the "General Questions" section of the Section II questionnaire. Volumes II through VI contain the GOE's responses to the following portions of the "Program-Specific Questions" section of the Section II Questionnaire: (1) Volume II contains the response to "Tax Programs"; (2) Volume III contains the GOE's response to

"Export Programs"; (3) Volume IV contains the GOE's response to "Loans and Credit Programs"; (5) Volume V contains the GOE's responses to "Provision of Goods or Services for Less Than Adequate Remuneration"; and (6) Volume VI contains the GOE's response to "Other Subsidies."

Pursuant to 19 C.F.R. § 351.304(a)(1)(i), the GOE requests proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which the GOE requests proprietary treatment, for itself and respondents and their cross-owned affiliates, and the basis for the request:

- Exact Amount of Benefits Applied for or Received: Contained in the narratives and exhibits. Protected under 19 C.F.R. § 351.105(c)(8).

- Other specific information related to the GOE's operations, financial and tax information, etc. the release of which may result in the disclosure of confidential information maintained by the GOE as well as production, operations, ownership and affiliation information of the respondents, and their cross-owned affiliates, the release of which to the public would cause substantial harm to the competitive position of the respondents and their cross-owned affiliates: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to the competitive position of the mandatory respondents and their cross-owned affiliates. The GOE consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos C.A.*

## GOVERNMENT CERTIFICATION

I, Juan Carlos Sanchez, Undersecretary of Origin, Trade Remedies and Trade Normative, currently employed by the Government of Ecuador, certify that I prepared or otherwise supervised the preparation of the attached submission of the Section II Response, filed on February 14, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

I certify that the public information and any business proprietary information of the Government of Ecuador contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.

In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Juan Carlos Sánchez T.

Date: 02/14/2024

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to the Government of Ecuador, certify that I have read the attached submission of the Section II Response, filed on February 14, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: February 14, 2024

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 15th day of February, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode:4509967-02 C-331-806 INV - Investigation -

**Case No. C-331-806**
**Investigation**
**AD/CVD Operations, Office IV**

**The GOE's proprietary information has been redacted from pages TAX-9, TAX-11, TAX-12, TAX-13, TAX-14, TAX-31, TAX-45, TAX 52, TAX-63, and TAX-71, and in Exhibit TAX-7; Naturisa's BPI has been redacted from pages TAX-9, and TAX-11; Produmar's BPI has been redacted from pages TAX-10, TAX-11, TAX-29, TAX-34, and TAX-45; and TROPACK's BPI has been redacted from page TAX-45.**

**PUBLIC VERSION**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

# RESPONSE OF THE GOVERNMENT OF ECUADOR TO SECTION II OF THE DEPARTMENT'S DECEMBER 12, 2024, COUNTERVAILING DUTY QUESTIONNAIRE

## VOLUME II – TAX PROGRAMS

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**

**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: February 15, 2024** **Counsel to the Government of Ecuador**

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

**C. Fee Exemptions for Brackish Water**

**Please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix*, and**
2. ***Tax Appendix***

ANSWER: As requested, please refer to the GOE's responses to the Standard Questions Appendix and Tax Appendix for the Fee Exemptions for Brackish Water program, which appear below.


Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

**TAX PROGRAMS: C. Fee Exemptions for Brackish Water**

***Standard Questions Appendix***

**A. Provide a description of the program, including the purpose of the program.**

ANSWER: For the reasons detailed below, the GOE reports that no program exists to forgive usage fees that would otherwise be owed in connection with concessions held by shrimp farmers. At the outset, no GOE institution levies fees upon the use of brackish water per se. Rather, consumptive users of public water sources—brackish or otherwise—are subject to fees for productive and consumptive use of a public water source. Thus, because under the law, fees are only charged to users of public water sources for consumptive use, the shrimp is not exempted from fees otherwise levied upon the use of brackish water. Rather, the manner in which the shrimp industry uses public water is not subject to any water usage fee in the first instance because the industry's use of water is non-consumptive for the reasons explained below.

Pursuant to Article 318 of the Constitution of the Republic of Ecuador, the MAATE, is singularly responsible for the regulation and management of all water uses in Ecuador. Article 93 of the 2014 Organic Law on Water Resources, Use and Development of Water (Water Resources Law), requires all users intending to extract water from public sources, including rivers, oceans, streams, springs, aquifers, salt pans, etc., to obtain prior authorization from MAATE. **See Exhibits 4(a) and (b)**.

There are two ways that public sources of water can be used – consumptive and non-consumptive. According to Article 108 of the Water Resources Law, those persons engaged in fish or aquaculture activities, including shrimp farming, which do not correspond to food sovereignty (i.e., producing food for their personal consumption only), must obtain from the corresponding public authority the necessary permits for the exercise of their activity. Likewise, they must obtain authorization from the MAATE for the use of water and, if determined that the

water is being used for consumptive purposes, they are subject to water fees like any other consumptive user.

Resolution DIR-ARCA-RG-002-2016 defines consumptive use as that which, by virtue of the processes carried out by the user, consumes water. The same resolution states that non-consumptive use is that which does not extract resource from its source of origin as long as it is returned to the same without the need for prior treatment and without affecting the quantity and quality of the resource. **Exhibits TAX-4(b) and (c)** contain the relevant sections of the law and the resolution. Where a shrimp farm is takes brackish water that is later returned in the same quantity to the source without altering its quantity or quality, this is a non-consumptive use. Because the use of water is non-consumptive, the fee regime for consumptive productive use of water does not apply to the aquaculture industry.

Under Article 135 of the Water Resources Law, every user must pay for the provision of services and authorization for water uses and development when connected to a water supply system (e.g. a municipal water system). Further, Article 142 determines the criteria for the establishment of tariffs for general "productive" water users based on the volume of water used, the efficiency of water use, the extent to which the use in question contributes to water conservation, and employment. **See Exhibit TAX-4(b)** for the relevant sections of the Water Resources Law. The GOE notes that this does not exempt any user from obtaining the requisite permits in order to use this water; all entities drawing water are required to hold the necessary environmental permits and are subject to review to ensure that they are not consuming water.

Within the administrative procedure for the issuance of the water use authorization for productive activities (including aquaculture activities), the MAATE, through its Zonal Directorates, issues a technical report that evaluates the conditions and obligations under which


Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

the use authorization must be issued. Like other water users, shrimp farming activities are subject to this procedure, as well as to the sanctioning regime when they commit administrative infractions regarding water resources, as established in the legislation in force. Technical-administrative management of water resources is carried out through a decentralized system in ten zonal offices that cover the national territory. Meanwhile, the Public Water Company ("EPA") is in charge of billing and collection of water use; and the control and regulation of water quantity and quality in all uses and destinations of water is carried out by the Water Regulation and Control Agency ("ARCA") as a body attached to the MAATE. Non-consumptive use of water is not subject to such billing and collection of water use by the EPA. Therefore, the law does not exempt the shrimp or aquaculture industry from fees assessed on use of brackish water.

**B. Provide the date the program was established and explain how it was enacted, *e.g.*, by law, decree, regulation, etc. For programs under investigation that were not enacted pursuant to a legal instrument, indicate for how many years the program has been in operation. For example, for programs involving the provision of inputs for less than adequate remuneration not enacted pursuant to a legal instrument, please indicate how many years the input has been provided and/or sold by the government, government- controlled entities such as state-owned enterprises, or other enterprises alleged to be "authorities" under section 771(5)(B) of the Act.**

<u>ANSWER</u>: Not applicable. As stated above in response to Question A, there is no program to exempt the shrimp or aquaculture industry from paying water use fees. Nevertheless, in order respond as completely as possible to the Department's question, the Organic Law on Water Resources, Use, and Development was promulgated in August 6, 2014. Please refer to **Exhibits TAX-4(a)–(g)** for the relevant sections of the Constitution of the Republic of Ecuador, Water Resources Law, relevant resolutions, technical rules, and technical opinion regarding the aquaculture industry's non-consumptive use of water.

Additionally, refer to **Exhibit TAX-4(d)** for sections of Agreement 2018-0257 published in January 2019 which incorporates the approval and setting of tariffs for the uses and



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

exploitation of raw water. Further, **Exhibit TAX-4(e)** contains Agreement 2017-1522, which establishes the relevant tariffs for consumptive use of water during the POI.

**C. Provide the name and address of each of the government agencies or authorities responsible for administering the program. Please be specific in identifying the level of government that has the authority to approve the assistance, and the level of government responsible for administering the distribution of assistance.**

ANSWER: As requested, the following institutions are responsible for administration of water rights and fees for water consumption in Ecuador:

1) The Ministry of the Environment Water, and Ecological Transitions ("MAATE")
Calle Madrid 1159
Quito 170525

2) Empresa Publica del AGUA ("EPA")
Km 0.5, via Samborondón
Samborondon, Guayaquil 092301

3) Water Management Zone Offices (Individual Zonal Agencies Responsible for Monitoring Water Consumption):
   a. Zone 1 Office: Pedro Moncayo 6-46 y Bolívar, First Floor, Ibarra
   b. Zone 2 Office: Toledo N22 -286 and Lérida, Quito
   c. Zone 3 Office: Chile 10-51, Riobamba
   d. Zone 4 Office: Los Nardos Street and 15 de abril Avenue, behind ECU911 via Portoviejo Santa Ana, Portoviejo
   e. Zone 5 Office: Av. Francisco de Orellana y Justino Cornejo, Guayaquil
   f. Zone 6 Office: Núñez de Bonilla 195 y Sebastián de Benalcázar, Cuenca
   g. Zone 7 Office: Ave. Orillas del Zamora y Santiago de las Montañas, Loja
   h. Zone 8 Office: Francisco de Orellana and Ave. Antonio Vallejo Barrio Huamaurco on way to new cementery, Tena
   i. Zone 9 Office: Ave. Circunvalacion y Via Moseñor Gonzalo Lopez, Nueva Loja
   j. Zone 10 Office: Diego de Vaca entre Pío Jaramillo Alvarado y 24 de Mayo (front of Judiciary Counsel), Zamora

4) Water Regulation and Control Agency ("ARCA")
Av. de los Shyris N38-28 between El Telégrafo and La Tierra
Quito 170505

**D. Please indicate which of the companies under investigation (including all cross-owned companies and any trading companies exporting subject merchandise into the United States) applied for, accrued, or received benefits under the program during the POI.**

**Please note that if this program has been terminated but there are residual benefits or a replacement program has been put into place (see 19 CFR 351.524), and the companies under investigation are**


Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

**still receiving, claiming or using assistance under the program or if they have applied for, received, claimed, accrued or used assistance under the replacement program, you must respond to all of the remaining questions for residual assistance or replacement programs.**

ANSWER: As stated above in response to Questions A and B, no member of the shrimp industry, including the mandatory respondents, Santa Priscila and SONGA, and their cross-owned affiliates required to respond to the Department's January 24th Supplier Questionnaire received any exemption of fees that are due for the consumptive use of water. Nevetheless, the MAATE zonal offices records reflect that certain mandatory respondents, Santa Priscila and SONGA, and their cross-owned affiliates required to respond to the Department's January 24th Supplier Questionnaire have been authorized to use public sources and possess the requisite permits to allow for the productive use of water, no records show that any of these users is assessed usage fees in connection with the consumptive use of water. Accordingly this question, and the remaining questions below, are not applicable.

**E. Provide translated copies of the laws and regulations relating to the program and any internal or external reports pertaining to the program that were applicable during the POI.**

ANSWER: Please refer to **Exhibit TAX-4(a)** for the relevant sections of the Constitution of the Republic of Ecuador and the Organic Law on Water Resources, Use, and Development of 2014. Please refer to **Exhibits TAX-4(c)-(g)**, which contains the relevant resolutions, technical rules, and technical opinion regarding the aquaculture industry's non-consumptive use of water as well as Agreements 2017-1522 and 2018-0257, which relate to the establishment of the relevant tariffs for consumptive use of water during the POI.

**F. Identify and explain the types of records maintained by the relevant government or governments (e.g., accounting records, company-specific files, databases, budget authorizations, etc.) regarding the program.**

ANSWER: This question is not applicable because neither of the mandatory respondents, nor their cross-owned affiliates required to respond to the Department's questionnaire applied for,


Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

received, claimed, or accrued benefits pursuant to the alleged exemption of fees for brackish water program.

Nevertheless, in order to respond to the Department's question as completely as possible, it should be noted that as a result of the administrative procedure for the issuance of water use authorization for productive activities, the relevant records are registered in the Public Water Registry, a system contained within the Single Registry of Water Authorizations database, which contains the record of authorizations granted at the national level issued by MAATE. Additionally, the MAATE maintains records related to the commercial management of water use and exploitation in the EPA's "EPACOM" system; this system includes the requisite authorizations.

**G. Please identify all instances in which assistance under the program was provided to any mandatory respondent (including all responding cross-owned companies and any trading company) during the POI.**

ANSWER: This question is not applicable because neither of the mandatory respondents, nor their cross-owned affiliates required to respond to the Department's January 24th supplier questionnaire applied for, received, claimed, or accrued any exemption of fees for consumptive use of brackish water program.

Nevertheless, in order to respond to the Department's question as completely as possible, the GOE notes that all of the nine companies subject to reporting have all of their necessary permits and authorizations in place for water use and exploitation. To the extent any of those companies are using water for consumptive purposes, they will be paying for that water use, as required by the various laws and regulations. More specifically, the GOE confirms that, of the respondent companies and the seven affiliates required to respond to the Department's January


Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

24th supplier questionnaire, the following companies incurred fees for productive consumptive use of water during the POI:

| | Usage Purpose | Billing Type | Companies | Billed Amount Year - 2021 | |
|---|---|---|---|---|---|
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |

**{SANTA PRISCILA's, TROPACK's, and PRODUMAR's BPI.}**

Of note, [

].

**H. Please explain whether the assistance under the program was provided to the mandatory respondent(s) pursuant to a statute, regulation, decree or other legal measure/instrument that establishes the conditions and guidelines governing the operation of the program, such as eligibility criteria, amounts, etc.**

ANSWER: In accordance with the Department's instructions, this question is not applicable because neither of the mandatory respondents, nor their cross-owned affiliates required to respond to the Department's January 24, 2024, Supplier questionnaire applied for, received, claimed, or accrued benefits pursuant to the alleged exemption of fees for brackish water program. All companies are subject to the same laws and regulations related to water usage. Please refer to **Exhibits TAX-4(a)-(e)** for the various laws and authorities related to water use.

**I. To the extent they are different from the entity (entities) identified in response to Question C, above, please provide the name(s) of the entity (entities) that provided each instance of assistance under the program to the mandatory respondent(s) described in response to under Question G, above.**

ANSWER: Not applicable. Please refer to the response to Question C above.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

**J. Please specify if the entity (entities) listed in response to Question I, above, is a national, state or local government entity, e.g., a government ministry, department, agency, office, etc.**

ANSWER: Not applicable. Please refer to the response to Question C above.

**K. If the assistance under the program was provided by an entity other than a national, state or local government entity, please respond to the following questions.**

1. **What is the legal status of the entity (entities), e.g., is it a separately incorporated entity and/or a government corporation, government lending institution, commercial entity?**

2. **Please explain how the entity (entities) was established and whether the entity operates pursuant to statutes, decrees, and/or regulations. Please explain the relevant statute, decrees and regulations under which the entity was established and operates.**

3. **What is the legal basis that governs the entity's provision of assistance under the program? Please provide translated copies of the relevant legal measures.**

4. **Has the entity (entities) listed above received any direct or indirect funding or support from a government entity? Please specify if the government provided any such direct or indirect funding for the purpose of providing assistance under this program.**

5. **Did the entity (entities) listed above provide assistance under the program pursuant to specific guidelines and/or criteria under this program? Please describe those guidelines and/or criteria.**

6. **Please provide the ownership structure of each such entity and specify the amount of any direct or indirect government ownership during the POI (and for each year in which the assistance was provided).**

7. **Please provide the translated annual report(s) during the POI (and for each year in which the assistance was provided) for each such entity.**

8. **What are the core activities and functions of each entity that provided the assistance under the program?**

9. **Explain why the assistance under this program was provided by this entity (entities) rather than directly by the government.**

ANSWER: Not applicable. Please refer to the response to Question C above.

**L. Describe the application process for assistance under the program and provide a blank copy of the application form (translated, if necessary). After an application is submitted, please describe the procedures by which an application is analyzed and eventually approved or rejected. Please provide for each company under investigation a copy of at least one completed application and approval package (and provide translations of headings and any summaries and of the exact reason(s) for the application and the exact reason(s) for approving the assistance).**

ANSWER: In accordance with the Department's instructions, this question is not applicable because neither of the mandatory respondents, nor their cross-owned affiliates required to

respond to the Department's questionnaire applied for, received, claimed, or accrued benefits pursuant to the alleged exemption of fees for brackish water program.

Nevertheless, in order to provide the most complete to the Department's question, the GOE explains that in order to obtain water service, an entity must follow the established procedures for submitting a request. This begins with an application that is then evaluated by the zonal office responsible for the location of the entity. See Exhibit TAX-This office reviews the request and will verify the use of the water and the systems in place to access this water. The MAATE and subagencies have well-developed processes and manuals for this review process to ensure full compliance with all pertinent rules. Of note, before a party can obtain water service or extract water, they must have all environmental permits and authorizations. As such, as an example of how an entity's request may be denied is that they do not have their environmental permits in order. They would have to first resolve those issues before they could finalize the necessary permissions to access the water source.

**M. Please answer the following questions regarding eligibility for and actual use of the assistance provided under this program.**

**1. Describe the criteria governing the eligibility for and receipt of any assistance under this program. Please also describe the criteria for determining the amount of the assistance provided. Provide a copy of any law, regulation or other official document detailing these criteria. As part of your response, please also address the following questions:**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

**(a) Is the actual export performance or export potential of an applicant or recipient taken into account in any way in determining eligibility for or receipt of any assistance under this program? Please explain. If eligibility for, or actual use of, this program is contingent upon export performance, whether solely or as one of several other conditions, you need not respond to the remaining questions under section M.**


Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

**(b) Is the use of domestic goods or the creation of domestic value added by an applicant or recipient taken into account in any way in determining eligibility for or receipt of any assistance under this program? Please explain. If eligibility for this program is contingent upon the use of domestic over imported goods, you need not respond to the remaining questions under section M.**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

**(c) Is eligibility for the subsidy limited to enterprises or industries located within designated geographical regions within the jurisdiction that authorized the program? If so, please provide the criteria for eligibility and you need not respond to the remaining questions under section M.**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

**(d) Is the industry or sector in which the applicant or recipient operates taken into account in any way, either under the law or through discretion exercised by the government agency or authority administering the program, in determining eligibility for or receipt of any assistance under this program? Please explain, and identify those industries or sectors that are eligible or otherwise receive special consideration for eligibility. If eligibility is limited, by law or in fact, to any enterprise or group of enterprises, or to any industry or group of industries, you need not respond to the remaining questions under section M.**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

**(e) With respect to the eligibility criteria and your administration of this program, please address the following, and provide documentation, if possible, to support your explanation:**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

i. **If the eligibility criteria, as listed in the applicable law, regulation or other official documents are met, will an applicant always and automatically receive assistance, or is final approval by the government agency or authority which administers the program necessary?**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

ii. **Is the amount of the assistance provided determined solely by established criteria found in the law, regulation or other official document, or is the amount ultimately determined by the government agency or authority which administers the program? If established by criteria, please provide all of the criteria.**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

iii. **If the government agency or authority has any discretion that goes beyond the criteria laid out in the law, regulation or other official document, please explain the nature and extent of that discretion.**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

iv. **Explain how the companies under investigation who have applied for, claimed, received, accrued or used assistance under this program have met the eligibility criteria.**


Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

**(f) Is eligibility for the subsidy limited to small and medium-sized enterprises? If so, please define and document how the term "small and medium-sized enterprises" is defined under the program and on what basis the company(ies) being examined met the definition. If the program is not contingent on firms being small and medium-sized enterprises, then so state and skip this question.**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

**2. Please provide the following information, in table form, regarding the number of recipient companies and industries and the amount of assistance approved under this program for the year in which any mandatory respondent company was approved for assistance, as well as each of the preceding three years (e.g., if a respondent was approved for assistance in 2010 and 2011, provide this information, by year, for 2007 through 2011). If this information is not available on the basis of year of approval, then provide the information based on the year of bestowal.**

**(a) The amount of assistance approved for each mandatory respondent company, including all cross-owned companies and trading companies that sell the subject merchandise to the United States.**

**(b) The total amount of assistance approved for all companies under the program.**

**(c) The total amount of assistance approved for each of the largest 50 recipients under the program and include the industry designation for each of these recipients. Note that at this time, you do not need to provide the name of the recipient, you just need to provide the individual amount of assistance approved.**

**(d) The total number of companies that were approved for assistance under this program.**

**(e) The total number of companies operating or established in the jurisdiction of the granting authority of the investigated program.**

**(f) The total number of corporate/business income tax filers within the jurisdiction of the granting authority of the investigated program.**

**(g) Provide a complete listing of the industries that operate in the jurisdiction of the granting authority of the investigated program. In identifying these industries, please use whatever resource or classification scheme your government normally relies upon to define industries and to classify companies within an industry. Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification.**



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

**(h) The total amount of assistance approved for the industry in which the mandatory respondent companies operate, as well as the totals for every other industry in which companies were approved for assistance under this program. In identifying the industries, please use whatever resource or classification scheme your government normally relies upon to define industries and to classify companies within an industry. Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification. Please clearly identify the industry in which the companies under investigation are classified.**

**(i) The total number of companies that applied for, but were denied, assistance under this program. Be sure that your response to question provides a complete discussion of the circumstances in which applications for assistance are denied.**

**(j) If you have additional information that you believe demonstrates that this program is broadly available and widely used throughout the economy, please provide such information and a narrative description of your contention.**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities.

**N. For purposes of any *de facto* specificity analysis that Commerce may conduct in this proceeding, please provide information on the economic activities within the jurisdiction of the granting authority for each relevant program. At a minimum, this information should include the number of establishments within the following sectors: agriculture, forestry, animal husbandry and fishery; mining; manufacturing; production and supply of electricity, heat, gas, and water; construction; wholesale and retail trades; transport, storage and post; hotel and catering services; information transmission, software and information technology; financial intermediation; real estate; leasing and business services; scientific research and technical services; management of water conservancy, environment and public facilities; services to households, repair and other services; education; health and social services; culture, sports and entertainment; and public management, social security and social organizations.**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish water is subject to usage fees charged by the relevant authorities. Nevertheless, in order to respond to the Department's question as completely as possible, the chart below contains the requested information. The information presented is not specific to any single region within Ecuador. Rather, the GOE is providing a chart for all economic activities and the number of registered companies within each sector across Ecuador. The GOE notes that Ecuador classifies

economic activity based on the fourth revision of the United Nation's International Standard Industrial Classification (ISIC Rev. 4). The industries have been reported at the first level of this classification system.

| | Industries | Companies | |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |

**O. Describe any anticipated changes in the program. Provide documentation substantiating your answer. If the program is being terminated, state the last date that a company could <u>apply for or claim</u> benefits under the program. When is the last date that a company could <u>receive</u> benefits under the program? If the program has been terminated and replaced by a similar type of program, please provide a discussion of the replacement program to include the purpose of the program and the date it was established.**

<u>ANSWER</u>: Not applicable. As discussed above, there is no program whereby any company is exempted from the consumptive use of brackish water because all consumptive use of brackish

water is subject to usage fees charged by the relevant authorities. Therefore there can be no changes to a program that does not exist.

**TAX PROGRAMS: C. Fee Exemptions for Brackish Water**

***Tax Programs Appendix***

**If any of the companies under examination used this program to take deductions from taxable income, to receive credit towards taxes payable, to take exemptions from taxes owed, to reduce the tax rate, to defer payment of taxes, to carry forward losses from previous tax years, to use accelerated depreciation, or to benefit from other tax advantages on the income tax return filed during the POI, please respond to the following questions.**

**A. Please indicate which of the companies under investigation (including all cross-owned companies and any trading companies exporting subject merchandise into the United States) applied for, received, or accrued under the program in the POI.**

ANSWER: Neither Santa Pricila, nor its cross-owned affiliates required to respond to the Department's January 24th Supplier Questionnaire, applied for, received, or accrued any exemptions from fees levied on the consumptive use of brackish water. Likewise, neither SONGA, nor its cross-owned affiliates required to respond to the Department's January 24th Supplier Questionnaire, applied for, received, or accrued any exemptions from fees levied on the use of brackish water.

As stated in the Standard Questions Appendix for this program, all respondents were subject to the permit requirements for the productive use of public water sources at any facility owned or operated by them. Moreover, all of these companies were subject to the normal fee schedule in effect during the POI to the extent they engaged in the use of water for productive, consumptive purposes, just like any other productive, consumptive user of water in Ecuador.

**B. Provide blank corporate tax forms filed in the tax administrative districts in which the respondents are located, including relevant schedules and appendices, with fully translated headings. Identify the specific sections and line items where the tax assistance would be claimed.**

ANSWER: Not applicable. There are no tax forms associated with receiving any fee exemption for brackish water because no such fee exemption program exists. Nevertheless, in order to respond to the Department's question as completely as possible, **Exhibit TAX-8** contains a sample application that must be filed by any productive user of water with the relevant

government authority, the Ministry of the Environment, Water, and Ecological Transition ("MAATE"), regardless of whether the water use is consumptive or non-consumptive.

**C. Provide the name and address of each of the government agencies or authorities responsible for administering the program. Please specifically and separately identify the level of government that has the authority to approve the assistance and the level of government responsible for administering the distribution of assistance.**

ANSWER: As requested, the following institutions are responsible for administration of water rights and fees for water consumption in Ecuador:

1) The Ministry of the Environment Water, and Ecological Transitions ("MAATE")
Calle Madrid 1159
Quito 170525

2) Empresa Publica del AGUA ("EPA")
Km 0.5, via Samborondón
Samborondon, Guayaquil 092301

3) Water Management Zone Offices (Individual Zonal Agencies Responsible for Monitoring Water Consumption):
    a. Zone 1 Office: Pedro Moncayo 6-46 y Bolívar, First Floor, Ibarra
    b. Zone 2 Office: Toledo N22 -286 and Lérida, Quito
    c. Zone 3 Office: Chile 10-51, Riobamba
    d. Zone 4 Office: Los Nardos Street and 15 de abril Avenue, behind ECU911 via Portoviejo Santa Ana, Portoviejo
    e. Zone 5 Office: Av. Francisco de Orellana y Justino Cornejo, Guayaquil
    f. Zone 6 Office: Núñez de Bonilla 195 y Sebastián de Benalcázar, Cuenca
    g. Zone 7 Office: Ave. Orillas del Zamora y Santiago de las Montañas, Loja
    h. Zone 8 Office: Francisco de Orellana and Ave. Antonio Vallejo Barrio Huamaurco on way to new cementery, Tena
    i. Zone 9 Office: Ave. Circunvalacion y Via Moseñor Gonzalo Lopez, Nueva Loja
    j. Zone 10 Office: Diego de Vaca entre Pío Jaramillo Alvarado y 24 de Mayo (front of Judiciary Counsel), Zamora

4) Water Regulation and Control Agency ("ARCA")
Av. de los Shyris N38-28 between El Telégrafo and La Tierra
Quito 170505

**D. Explain whether the assistance is a deduction from taxable income, a credit towards taxes payable, an exemption from taxes owed, a reduction in the tax rate, a deferral of taxes, a loss carry-forward from the previous tax years, accelerated depreciation, or other benefit.**

ANSWER: Not applicable. Article 108 of the Water Resources Law provides that persons who engage in aquaculture activities, including shrimp farming, are subject to the same permit requirements as any other industry in Ecuador that involves the consumptive use of water. Pursuant to Article 135, any productive user must pay the central water authority for the right to exploit water. Pursuant to Article 142, rates are set for general "productive" users of water based on the volume of water used, efficiency of water utilization, extent to which the use in question contributes to water conservation, and employment. **See Exhibit TAX-4(b)**. Therefore, there is no exemption from fees owed by any user in the aquaculture industry from fees associated with the productive use of water when that use is consumptive.

**E. How do companies using this program calculate that tax benefit they claim? Please be specific and provide a sample calculation using a blank tax form.**

ANSWER: Not applicable. As discussed above in response to Question D, there is no exemption from fees owed by any user in the aquaculture industry from fees associated with the productive use of water, which are only applicable where such use of public bodies of water is consumptive.

**F. If the company carried forward a loss from prior years and used that loss to offset taxes due on the tax return filed in the POI, demonstrate that this loss was not generated by use of any countervailable tax program.**

ANSWER: Not applicable. As discussed above in response to Question D, there is no exemption from fees owed by any user in the aquaculture industry from fees associated with the productive use of water when that use is consumptive.

**G. If the program involves a deferral of taxes owed, please provide the amount and length of the deferral, and the details of any interest charged on the deferral.**

ANSWER: Not applicable. As discussed above in response to Question D, there is no exemption from fees owed by any user in the aquaculture industry from fees associated with the productive use of water when that use is consumptive.

**H. If the tax assistance results in negative income for tax purposes (*e.g.*, through accelerated depreciation), is the company able to carry forward this loss?**

ANSWER: Not applicable. As discussed above in response to Question D, there is no exemption from fees owed by any user in the aquaculture industry from fees associated with the productive use of water when that use is consumptive.

**I. For a program that provides a reduction in the tax rate or an exemption from taxes payable, please report the tax rate that was paid under the program and the tax rate that would have applied in absence of the program.**

ANSWER: Not applicable. As discussed above in response to Question D, there is no exemption from fees owed by any user in the aquaculture industry from fees associated with the productive use of water when that use is consumptive.

Barcode:4509967-03 C-331-806 INV - Investigation -
PUBLIC VERSION – BPI Has Been Redacted

## List of Exhibits – GOE's Section II Response – Tax Programs

| Exhibit No. | Description | Classification |
|---|---|---|
| **TAX-1(a)** | Articles 9.1, 10, 37, 37.1, 41 and 55 of the Internal Tax Regime Law (version in effect during POI) (Spanish Original and English Translation) | Public |
| **TAX-1(b)** | 10th Unnumbered Article after Article 7 and Articles 28, 46, 51 of the Regulations for the Application of the Internal Tax Regime Law (Spanish Original and English Translation) | Public |
| **TAX-1(c)** | Ministerial Agreement 048-2019 (Spanish Original and English Translation) | Public |
| **TAX-2** | Form 101: Corporate Tax Form and Annex (Spanish Original and English Translation) | Public |
| **TAX-3(a)** | Article 26 of the Law of Promotion of Production, Attraction of Investments, Generation of Employment, and Fiscal Stability and Equilibrium (Spanish Original and English Translation) | Public |
| **TAX-3(b)** | Articles 13, 25, 26, 93 and Article 2.3, Numeral 2 of Second Reform Provision, of the Organic Code of Production, Commerce, and Investments (Spanish Original and English Translation) | Public |
| **TAX-3(c)** | Articles 12, 17, and 106 of the Investment Regulations of the Organic Code of Production, Commerce, and Investments (Spanish Original and English Translation) | Public |
| **TAX-3(d)** | Twelfth Transitory Provision and Article 32 of the Organic Law for Economic Development and Fiscal Sustainability (Spanish Original and English Translation) | Public |
| **TAX-4(a)** | Articles 318 of the Constitution of the Republic of Ecuador (Spanish Original and English Translation) | Public |
| **TAX-4(b)** | Articles 93, 108, 135, and 142 of the 2014 Organic Law on Water Resources, Use and Development of Water (Spanish Original and English Translation) | Public |
| **TAX-4(c)** | Resolution DIR-ARCA-RG-002-2016 (Spanish Original and English Translation) | Public |
| **TAX-4(d)** | Agreement 2018-0257 (Spanish Original and English Translation) | Public |
| **TAX-4(e)** | Agreement 2017-1522 (Spanish Original and English Translation) | Public |
| **TAX-4(f)** | Undersecretary of Aquaculture Technical Report DPPA-2019-006 (Spanish Original and English Translation) | Public |


Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

| Exhibit No. | Description | Classification |
|---|---|---|
| **TAX-4(g)** | FAO Irrigation Report | Public |
| **TAX-4(h)** | MAATE Application for Water Use (Spanish Original and English Translation) | Public |
| **TAX-5(a)** | Presidential Decree 408 (Spanish Original and English Translation) | Public |
| **TAX-5(b)** | Guidance Issued for Regularization Process of Unregulated Concessions (Spanish Original and English Translation) | Public |
| **TAX-6** | Presidential Decree 852 (Spanish Original and English Translation) | Public |
| **TAX-7** | Usage Fees Collected in Connection With Regularization Process | BPI |

# EXHIBIT TAX-4(a)

PDF generated: 28 Apr 2022, 19:03

Barcode:4509967-03 C-331-806 INV - Investigation -

CONSTITUTE

constituteproject.org

# Ecuador's Constitution of 2008 with Amendments through 2011

This complete constitution has been generated from excerpts of texts from the repository of the Comparative Constitutions Project, and distributed on **constituteproject.org**.

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

Barcode:4509967-03 C-331-806 INV - Investigation -

## Table of contents

Preamble . . . . 4
Title I. Constituent elements of the State . . . . 4
CHAPTER 1. Basic principles . . . . 4
CHAPTER 2. Female and male citizens . . . . 5
Title II. Rights . . . . 6
CHAPTER 1. Principles for the enforcement of rights . . . . 6
CHAPTER 2. Rights of the good way of living . . . . 8
CHAPTER 3. Rights of priority persons and groups . . . . 12
CHAPTER 4. Rights of communities, peoples and nations . . . . 18
CHAPTER 5. Rights to participation . . . . 20
CHAPTER 6. Rights to freedom . . . . 21
CHAPTER 7. Rights of nature . . . . 24
CHAPTER 8. Rights to protection . . . . 25
CHAPTER 9. Responsibilities . . . . 29
TITLE III. CONSTITUTIONAL GUARANTEES . . . . 29
CHAPTER 1. Guarantees of the legal and regulatory framework . . . . 29
CHAPTER 2. Public policies, public services, and public participation . . . . 30
CHAPTER 3. Jurisdictional guarantees . . . . 30
TITLE IV. PARTICIPATION AND ORGANIZATION OF POWER . . . . 33
CHAPTER 1. Participation in democracy . . . . 33
CHAPTER 2. Legislative Branch of Government . . . . 38
CHAPTER 3. Executive Branch of Government . . . . 44
CHAPTER 4. Judicial and Indigenous Justice Branch of Government . . . . 51
CHAPTER 5. Transparency and Social Control Branch of Government . . . . 59
CHAPTER 6. Electoral Branch of Government . . . . 63
CHAPTER 7. Public administration . . . . 65
TITLE V. TERRITORIAL ORGANIZATION OF THE STATE . . . . 68
CHAPTER 1. General principles . . . . 68
CHAPTER 2. Organization of the territory . . . . 68
CHAPTER 3. Decentralized autonomous governments and special systems . . . . 70
CHAPTER 4. System of jurisdictions . . . . 71
CHAPTER 5. Economic resources . . . . 75
TITLE VI. DEVELOPMENT STRUCTURE . . . . 76
CHAPTER 1. General principles . . . . 76
CHAPTER 2. Participatory planning for development . . . . 77
CHAPTER 3. Food sovereignty . . . . 78
CHAPTER 4. Economic sovereignty . . . . 79
CHAPTER 5. Strategic sectors, services and state enterprises . . . . 85
CHAPTER 6. Labor and production . . . . 86
TITLE VII. THE GOOD WAY OF LIVING SYSTEM . . . . 91
CHAPTER 1. Inclusion and equity . . . . 91
CHAPTER 2. Biodiversity and natural resources . . . . 103
TITLE VIII. INTERNATIONAL RELATIONS . . . . 107
CHAPTER 1. Principles governing international relations . . . . 107
CHAPTER 2. International treaties and instruments . . . . 108

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

Barcode:4509967-03 C-331-806 INV - Investigation -
CHAPTER 3. Latin American integration . . . . 109
TITLE IX. SUPREMACY OF THE CONSTITUTION . . . . 110
CHAPTER 1. Principles . . . . 110
CHAPTER 2. Constitutional Court . . . . 111
CHAPTER 3. Amending the Constitution . . . . 113
TRANSITORY PROVISIONS . . . . 114
ONE . . . . 114
TWO . . . . 115
THREE . . . . 115
FOUR . . . . 115
FIVE . . . . 115
SIX . . . . 115
SEVEN . . . . 116
EIGHT . . . . 116
NINE . . . . 116
TEN . . . . 116
ELEVEN . . . . 116
TWELVE . . . . 117
THIRTEEN . . . . 117
FOURTEEN . . . . 117
FIFTEEN . . . . 117
SIXTEEN . . . . 117
SEVENTEEN . . . . 117
EIGHTEEN . . . . 117
NINETEEN . . . . 118
TWENTY . . . . 118
TWENTY-ONE . . . . 118
TWENTY-TWO . . . . 118
TWENTY-THREE . . . . 118
TWENTY-FOUR . . . . 118
TWENTY-FIVE . . . . 118
TWENTY-SIX . . . . 119
TWENTY-SEVEN . . . . 119
TWENTY-EIGHT . . . . 119
TWENTY-NINE . . . . 119
THIRTY . . . . 119
REPEAL PROVISION . . . . 120
TRANSITION SYSTEM . . . . 120
CHAPTER 1. Nature of the transition . . . . 120
CHAPTER 2. Elections . . . . 120
CHAPTER 3. Institutional transition . . . . 124
FINAL PROVISION . . . . 126

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

Barcode:4509967-03 C-331-806 INV - Investigation -

- Motives for writing constitution
- Source of constitutional authority
- Preamble

# Preamble

We women and men, the sovereign people of Ecuador

RECOGNIZING our age-old roots, wrought by women and men from various peoples,

CELEBRATING nature, the Pacha Mama (Mother Earth), of which we are a part and which is vital to our existence,

- God or other deities

INVOKING the name of God and recognizing our diverse forms of religion and spirituality,

CALLING UPON the wisdom of all the cultures that enrich us as a society,

AS HEIRS to social liberation struggles against all forms of domination and colonialism

AND with a profound commitment to the present and to the future,

Hereby decide to build

A new form of public coexistence, in diversity and in harmony with nature, to achieve the good way of living, the sumak kawsay;

- Human dignity

A society that respects, in all its dimensions, the dignity of individuals and community groups;

- Regional group(s)
- Reference to fraternity/solidarity
- Political theorists/figures

A democratic country, committed to Latin American integration-the dream of Simon Bolivar and Eloy Alfaro-peace and solidarity with all peoples of the Earth;

And, exercising our sovereign powers, in Ciudad Alfaro, Montecristi, province of Manabi, we bestow upon ourselves the present:

Constitution of the Republic of Ecuador

# Title I. Constituent elements of the State

## CHAPTER 1. Basic principles

- Type of government envisioned

### Article 1

- Separation of church and state
- Official religion

Ecuador is a constitutional State of rights and justice, a social, democratic, sovereign, independent, unitary, intercultural, multinational and secular State. It is organized as a republic and is governed using a decentralized approach.

Sovereignty lies with the people, whose will is the basis of all authority, and it is exercised through public bodies using direct participatory forms of government as provided for by the Constitution.

Nonrenewable natural resources of the State's territory belong to its inalienable and absolute assets, which are not subject to a statute of limitations.

### Article 2

- National flag
- National anthem

The flag, coat of arms and national anthem, as provided for by law, are the symbols of the nation.

- Official or national languages
- Protection of language use

Spanish is Ecuador's official language; Spanish, Kichwa and Shuar are official languages for intercultural ties. The other ancestral languages are in official use by indigenous

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

Barcode:4509967-03 C-331-806 INV - Investigation -

The State may, on an exceptional basis, delegate the exercise of these activities to private enterprise and the grassroots solidarity sector of the economy, in the cases set out by law.

### Article 317

Nonrenewable natural resources are part of the unalienable heritage of the State and are not subject to a statute of limitations. In the management of these resources, the State shall give priority to responsibility between generations, the conservation of nature, the charging of royalties or other non-tax contributions and corporate shares; and shall minimize the negative impacts of an environmental, cultural, social and economic nature.

### Article 318

Water is part of the country's strategic heritage for public use; it is the unalienable property of the State and is not subject to a statute of limitations. It is a vital element for nature and human existence. Any form of water privatization is forbidden.

The management of water shall be exclusively public or community-based. The public service of sanitation and the supply of drinking and irrigation water shall be provided only by legal entities of the State or communities.

The State shall bolster the management and operating of community initiatives with regard to the management of water and provision of public services, by encouraging alliances between public and community bodies for the provision of services.

The State, through the sole authority for water, shall be directly responsible for planning and managing water resources for human consumption, irrigation to guarantee food sovereignty, ecological wealth and productive activities, in this order of priority. State authorization will be required for the use of water for productive purposes by the public, private and grassroots solidarity sectors, pursuant to the law.

## CHAPTER 6. Labor and production

### SECTION 1. Forms of organizing production and their management

### Article 319

Different forms of organizing production are recognized in the economy, including community, cooperative, public and private business, associative, family, domestic, autonomous and mixed- economy.

The State shall promote forms of production that assure the good way of living of the population and shall discourage those that violate their rights or those of nature; it shall encourage production that meets domestic demand and ensures Ecuador's active participation in the global economy.

### Article 320

Among the various forms of organizing production processes, participatory, transparent and efficient management shall be fostered.

Production, in any form, shall be governed by principles and standards of quality, sustainability, systemic productivity, high esteem for work, and economic and social efficiency.

### SECTION 2. Types of property

- Right to own property

### Article 321

The State recognizes and guarantees the right to property in all of its forms, whether public, private, community, State, associative, cooperative or mixed- economy, and that it must fulfill its social and environmental role.

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

Barcode:4509967-03 C-331-806 INV - Investigation -

# Constitución
## de la República del Ecuador

Incluye las reformas aprobadas en el
Referéndum y Consulta Popular de 7 de mayo de 2011

ASAMBLEA NACIONAL
REPÚBLICA DEL ECUADOR

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

aprovechamiento sustentable de recursos naturales o de bienes públicos y el desarrollo de otras actividades económicas.

Las empresas públicas estarán bajo la regulación y el control específico de los organismos pertinentes, de acuerdo con la ley; funcionarán como sociedades de derecho público, con personalidad jurídica, autonomía financiera, económica, administrativa y de gestión, con altos parámetros de calidad y criterios empresariales, económicos, sociales y ambientales.

Los excedentes podrán destinarse a la inversión y reinversión en las mismas empresas o sus subsidiarias, relacionadas o asociadas, de carácter público, en niveles que garanticen su desarrollo. Los excedentes que no fueran invertidos o reinvertidos se transferirán al Presupuesto General del Estado.

La ley definirá la participación de las empresas públicas en empresas mixtas en las que el Estado siempre tendrá la mayoría accionaria, para la participación en la gestión de los sectores estratégicos y la prestación de los servicios públicos.

**Art. 316.-** El Estado podrá delegar la participación en los sectores estratégicos y servicios públicos a empresas mixtas en las cuales tenga mayoría accionaria. La delegación se sujetará al interés nacional y respetará los plazos y límites fijados en la ley para cada sector estratégico.

El Estado podrá, de forma excepcional, delegar a la iniciativa privada y a la economía popular y solidaria, el ejercicio de estas actividades, en los casos que establezca la ley.

**Art. 317.-** Los recursos naturales no renovables pertenecen al patrimonio inalienable e imprescriptible del Estado. En su gestión, el Estado priorizará la responsabilidad intergeneracional, la conservación de la naturaleza, el cobro de regalías u otras contribuciones no tributarias y de participaciones empresariales; y minimizará los impactos negativos de carácter ambiental, cultural, social y económico.

**Art. 318.-** El agua es patrimonio nacional estratégico de uso público, dominio inalienable e imprescriptible del Estado, y constituye un elemento vital para la naturaleza y para la existencia de los seres humanos. Se prohíbe toda forma de privatización del agua.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

# EXHIBIT TAX-4(b)

# ORGANIC LAW OF WATER RESOURCES USES AND WATER USE

Law
0 Official Registry Supplement 305 of August 6,
2014 Status: Current

ORGANIC LAW OF WATER RESOURCES, USES AND USE OF WATER

REPUBLIC OF ECUADOR

NATIONAL ASSEMBLY

Of. No. SAN-2014-1178

Quito, AUG 05. 2014

Engineer
Hugo Del Pozo Barrezueta
Director of the Official Registry

At his office

My considerations:

The National Assembly, in accordance with the powers conferred on it by the Constitution of the Republic of Ecuador and the Organic Law of the Legislative Function, discussed and approved the Draft ORGANIC LAW ON WATER RESOURCES, USES AND USE OF WATER.

In a session on July 31, 2014, the Plenary Session of the National Assembly heard and ruled on the partial objection presented by the Constitutional President of the Republic.

For the exposed; and, as provided in article 138 of the Constitution of the Republic of Ecuador and article 64 of the Organic Law of the Legislative Function, I accompany the text of the ORGANIC LAW OF WATER RESOURCES, USES AND USE OF WATER, so that please publish it in the Official Registry.

Sincerely,

f.) DR. LIBIA RIVAS ORDOÑEZ, General Secretary.

REPUBLIC OF ECUADOR

NATIONAL ASSEMBLY

CERTIFICATION

I allow myself to CERTIFY that the National Assembly discussed and approved the DRAFT ORGANIC LAW ON WATER RESOURCES, USES AND USE OF WATER, in first debate on November 10, 2009; in second debate on May 4, 6 and 13, 2010, on June 5 and 24, 2014; and, his partial objection on July 31, 2014.

Quito,

a) That the order of priority established in the Constitution and this Law be respected;
b) That the availability of water in sufficient quality and quantity has been certified. Regarding water quality, the Single Water Authority will implement the certification processes progressively; c) That the studies and
hydraulic infrastructure projects necessary for its use have been previously approved by the Single Water Authority; d) That the beneficiary is responsible for the
prevention and mitigation of the environmental damage it causes, and is obliged to contribute to the good management of the authorized water; and, e) That the use of the water is
immediate or within a specific period for the destination for which it was authorized in accordance with the respective technical report.

**Art.** 91.- Recreational and sports use. Recreational events and aquatic competitions that involve non-consumptive use of water will not require prior authorization from the Single Water Authority.

**Art.** 92.- Cultural and sacred practices. The Single Water Authority will guarantee the integrity and permanence of the places where communes, communities, towns and nationalities traditionally practice rituals, cultural and sacred values of water.

The Single Water Authority, together with the communes, communities, towns and nationalities, will carry out and keep duly updated a participatory and comprehensive National Inventory of sacred places and water rituals.

The administration and conservation of sacred places in relation to water will be carried out by the entities or organizations of peoples and nationalities in whose lands or territories they are located, with the support of national programs and projects of public organizations and Decentralized Autonomous Governments, conformity with the Constitution and their own rights.

Third Section
Conditions of Authorization for Use

**Art.** 93.- Definition. The productive use of water is constituted by activities such as irrigation for the popular and solidarity economy, agro-industry, agricultural production or aquaculture production for export or other productive activities such as tourism, hydroelectricity generation, industrial production; mining and mineral refining exploitation; hydrocarbons, packaging and marketing of mineral, medicinal, treated, enriched waters or waters that have certified purification and quality processes; and, other productive activities that involve the use of water.

For the productive use of water, the administrative authorization granted by the Single Water Authority will be required, upon request in accordance with water planning, the requirements and conditions established by this Law.

The use of water for productive activities includes its use in activities not considered in food sovereignty, according to the definition of this Law, when it involves agricultural or aquaculture production.

In other productive activities that use water, the destination of the production to the internal or external market is indifferent.

The authorization for the use of water in productive activities confers on the holder thereof, exclusively, the capacity for the collection, treatment, conduction and use of the flow to which the authorization refers. The owner must install, at his own expense, the water flow measurement devices in the terms defined by the Single Water Authority.

**Art.** 94.- Order of priority for productive activities. Among the productive activities

Water.

Industries that capture water from the drinking water supply networks for productive use will obtain authorization for the connection from the decentralized autonomous government, which must be registered with the Single Water Authority.

People who are dedicated to the extraction of salt from seawater for commercial purposes must obtain the respective authorization for productive use of water from the Single Water Authority, and pay the corresponding fee.

The water destined for industrial use, once used, will be discharged by the user, prior to treatment, complying with the technical parameters dictated by the National Environmental Authority.

Third Section
Aquaculture

**Art. 108.-** Use of water in aquaculture. Persons who engage in any fish farming or aquaculture activity, which is not considered included in food sovereignty in the terms regulated in this Law, must obtain the necessary permits for the exercise of their activity from the corresponding public authority, who prior to granting them. must request from the Single Water Authority the reports regarding the productive use of water, which will cause the payment of the rates established in this Law, when it is consumptive.

**Art. 109.-** Prohibition. Authorizations for the productive use of water in mangroves will not be granted. Only those who comply with the regularization process established in the Regulations may obtain and renew said authorization and for the purposes of aquaculture activity.

Fourth Section
Use of Water in Mining

**Art. 110.-** Use authorization. Mining activities must have authorization for the productive use of the waters used, which will be granted by the Single Water Authority, in accordance with the procedures and requirements established in this Law and its Regulations, for which the order of priority established by the Constitution, that is, human consumption, irrigation that guarantees food sovereignty, ecological flow and productive activities. To this end, it will coordinate with the National Environmental Authority.

All activities that may affect the quality and quantity of water, and the balance of ecosystems, will be regulated, especially in water sources and recharge areas.

The sustainability of ecosystems and human consumption will be priorities in the use and exploitation of water.

Authorization to use water for human consumption in camps must also be obtained.

**Art. 111.-** Protection in water sources. The Single Water Authority and the National Environmental Authority will issue the necessary regulations to guarantee the conservation and balance of ecosystems, especially water sources and recharge areas.

The National Environmental Authority will coordinate with the Single Water Authority, the monitoring of the environmental management system provided for in the respective environmental license, issued by it.

**Art. 112.-** Return of waters. The water destined for mining activities will be returned to the original channel from which it was taken or to the channel that is most suitable, with the user's obligation to treat it before its discharge and discharge, in accordance with what is established in the environmental permit and the

Conflict resolution

**Art. 133.-** Conflict resolution. Conflicts and controversies between authorization holders may be processed and resolved in an administrative unit specialized in alternative conflict resolution.

**Art. 134.-** Mediation and arbitration. The holders of authorizations for the use or exploitation of water, in accordance with the provisions of the law that regulates the arbitration and mediation systems, without prejudice to opting for the procedure at administrative headquarters, may submit their disputes to mediation or arbitration processes. in centers legally established in the jurisdiction in which the water subject to conflict is located.

Direct agreements and arbitration awards that resolve disputes must be notified by the corresponding courts to the Single Water Authority for registration in the public water registry.

If differences persist after having exhausted the administrative procedures and alternative conflict resolution mechanisms, the parties in conflict will submit to jurisdictional channels.

CHAPTER IV
ECONOMIC SYSTEM

First Section
Rates

**Art. 135.-** General criteria for water rates. The rate is understood to be the remuneration that a user must pay for the provision of services and authorization for the use and exploitation of water.

For the purposes of protection, conservation of the basins and financing the costs of related services, the corresponding rates will be established, according to the principles of this Law, the criteria and technical parameters indicated in the Regulation.

The rates for authorization of use and exploitation of water will be regulated and set by the Single Water Authority.

The rates for the provision of drinking water, sanitation, irrigation and drainage services will be set by both public and community providers respectively, based on the regulations issued by the Single Water Authority through the Regulation and Control Agency.

**Art. 136.-** General principles for setting water rates. In establishing rates for authorization of use and exploitation of water as well as drinking water, sanitation and irrigation and drainage services, the principles of solidarity, equity, sustainability and periodicity must be considered.

**Art. 137.-** Tariff component for water conservation. The Single Water Authority, as part of the authorization rates for use and exploitation and water service, will contemplate a component for conservation of the public water domain with priority in sources and water recharge areas.

The Decentralized Autonomous Governments, within the scope of their powers, will establish components in the rates of household public services linked to water to finance the conservation of the public water domain with priority in sources and water recharge areas.

Rates for Productive Use

**Art. 142.-** Rates for productive use of water. Rates for productive use will consider the following criteria:

a) Volume used; b)
Utilization efficiency; c)
Contribution to the conservation of water resources; and,
d) Employment generation.

**Art. 143.-** Rate for the use of water in electricity generation. The productive use for the generation of electricity and the use of hydrothermal energy will have a rate that will be established by the Single Water Authority, based on the regulations issued by the Water Regulation and Control Agency.

**Art. 144.-** Rate for productive use for the popular and solidarity economy. The Single Water Authority, based on the regulations issued by the Regulation and Control Agency, will set the rate for the popular and solidarity economy based on the capacity and productivity of those authorized.

**Art. 145.-** Fee for authorization of discharges. The authorization of discharges will generate the annual payment of a fee, which will be set on the basis of technical criteria established by the National Environmental Authority, which will be in charge of control and collection.

**Art. 146.-** Hydraulic infrastructure for water use. The investments required for the construction of hydraulic or civil infrastructure for a specific productive use of water will be made directly by the interested party.

In response to the national interest, the State may also participate as an investor, in accordance with the priorities established in the National Development Plan.

**Art. 147.-** Coercive jurisdiction. The Single Water Authority, the National Environmental Authority and the public service providers will exercise coercive jurisdiction for the collection of rates and other items and obligations pending payment, established in this Law and its Regulations.

TITLE V
INFRINGEMENTS, SANCTIONS AND RESPONSIBILITIES

CHAPTER I
INFRINGEMENTS

**Art. 148.-** Procedure. The administrative process for the knowledge and sanction of the administrative infractions established in this Law is governed by the rules of this Chapter.

**Art. 149.-** Sanctioning jurisdiction. The knowledge and sanction of infractions to the provisions of this Law or its Regulations, provided that the act does not constitute a crime or contravention, are the responsibility of the Single Water Authority and the Regulation and Control Agency, in the manner established in this Law and its Regulations. In those infractions that in accordance with this Law must be determined by the National Environmental Authority or by the National Health Authority, their final resolution will be required, in the common administrative procedure, before issuing the sanction by the Single Authority of the Water or the Regulation and Control Agency, as appropriate.

**Art. 150.-** Classification of infractions. The administrative infractions contemplated in this Law are classified as minor, serious and very serious.

Barcode:4509967-03 C-331-806 INV - Investigation -



**REPÚBLICA DEL ECUADOR**
**ASAMBLEA NACIONAL**

**Of. No. SAN-2014-1178**

Quito, 05 AGO. 2014

**Ingeniero**
**Hugo Del Pozo Barrezueta**
**Director del Registro Oficial**

En su despacho

De mis consideraciones:

La Asamblea Nacional, de conformidad con las atribuciones que le confiere la Constitución de la República del Ecuador y la Ley Orgánica de la Función Legislativa, discutió y aprobó el Proyecto de **LEY ORGÁNICA DE RECURSOS HÍDRICOS, USOS Y APROVECHAMIENTO DEL AGUA.**

En sesión de 31 de julio del 2014, el Pleno de la Asamblea Nacional conoció y se pronunció sobre la objeción parcial presentada por el señor Presidente Constitucional de la República.

Por lo expuesto; y, tal como lo dispone el artículo 138 de la Constitución de la República del Ecuador y el artículo 64 de la Ley Orgánica de la Función Legislativa, acompaño el texto de la de **LEY ORGÁNICA DE RECURSOS HÍDRICOS, USOS Y APROVECHAMIENTO DEL AGUA,** para que se sirva publicarlo en el Registro Oficial.

Atentamente,

f.) **DRA. LIBIA RIVAS ORDÓÑEZ, Secretaria General.**

**REPÚBLICA DEL ECUADOR**
**ASAMBLEA NACIONAL**

**CERTIFICACIÓN**

Me permito **CERTIFICAR** que la Asamblea Nacional discutió y aprobó el **PROYECTO DE LEY ORGÁNICA DE RECURSOS HÍDRICOS, USOS Y APROVECHAMIENTO DEL AGUA,** en primer debate el 10 de noviembre de 2009; en segundo debate el 4, 6 y 13 de mayo de 2010, el 5 y 24 de junio de 2014; y, su objeción parcial el 31 de julio de 2014.

Quito,

f.) **DRA. LIBIA RIVAS ORDÓÑEZ**, Secretaria General.

**REPÚBLICA DEL ECUADOR**
**ASAMBLEA NACIONAL**

**EL PLENO**

**CONSIDERANDO:**

Que, los artículos 12, 313 y 318 de la Constitución de la República consagran el principio de que el agua es patrimonio nacional estratégico, de uso público, dominio inalienable, imprescriptible e inembargable del Estado y constituye un elemento vital para la naturaleza y para la existencia de los seres humanos, reservando para el Estado el derecho de administrar, regular, controlar y gestionar los sectores estratégicos, de conformidad con los principios de sostenibilidad ambiental, precaución, prevención y eficiencia;

Que, el artículo 318 de la Constitución prohíbe toda forma de privatización del agua y determina que la gestión del agua será exclusivamente pública o comunitaria y que el servicio de saneamiento, el abastecimiento de agua potable y el riego serán prestados únicamente por personas jurídicas estatales o comunitarias; prescribe además, que el Estado a través de la Autoridad Única del Agua, será responsable directa de la planificación y gestión de los recursos hídricos que se destinarán a consumo humano y riego que garantice la soberanía alimentaria, caudal ecológico y actividades productivas, en este orden de prelación y que se requerirá autorización estatal para el aprovechamiento del agua con fines productivos por parte de los sectores público, privado y de la economía popular y solidaria, de acuerdo con la Ley;

Que, el artículo 314 de la Constitución de la República asigna al Estado la responsabilidad de la provisión de los servicios públicos de agua potable y de riego para lo cual dispondrá que sus tarifas sean equitativas y establecerá su control y regulación. La misma norma determina que el Estado fortalecerá la gestión y funcionamiento de las iniciativas comunitarias en torno a la gestión del agua y la prestación de los servicios públicos mediante el incentivo de alianzas entre lo público y comunitario para la prestación de servicios;

Que, el artículo 411 dispone que el Estado garantizará la conservación, recuperación y manejo integral de los recursos hídricos, cuencas hidrográficas y caudales ecológicos asociados al ciclo hidrológico y que regulará toda actividad que pueda afectar la calidad y cantidad de agua, y el equilibrio de los ecosistemas, especialmente en las fuentes y zonas de recarga.

La sustentabilidad de los ecosistemas y el consumo humano serán prioritarios en el uso y aprovechamiento del agua;

Que, la Primera Disposición Transitoria de la Constitución de la República dispone que la Ley que regule los recursos hídricos, usos y aprovechamiento del agua, incluirá los permisos de uso y aprovechamiento, actuales y futuros, sus plazos, condiciones, mecanismos de revisión y auditoría para asegurar la formalización y la distribución equitativa de este patrimonio;

Que, los artículos 66 y 276 reconocen y garantizan a las personas y colectividades el derecho al acceso equitativo, permanente y de calidad al agua, aire y suelo y a una vida digna que asegure la salud, alimentación y nutrición, agua potable, vivienda, saneamiento ambiental, educación, trabajo, empleo, descanso y ocio, cultura física, vestido, seguridad social y otros servicios sociales necesarios;

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

Barcode:4509967-03 C-331-806 INV - Investigation -



realizarán y mantendrán debidamente actualizado un Inventario Nacional participativo e integral de los lugares sagrados y rituales del agua.

La administración y conservación de los lugares sagrados en relación con el agua, realizarán las entidades u organizaciones de pueblos y nacionalidades en cuyas tierras o territorios se encuentren, con el apoyo de programas y proyectos nacionales de los organismos públicos y los Gobiernos Autónomos Descentralizados, de conformidad con la Constitución y sus propios derechos.

### Sección Tercera
### Condiciones de Autorización para Aprovechamiento

**Artículo 93.- Definición.** El aprovechamiento productivo del agua lo constituyen actividades como riego para economía popular y solidaria, agro industria, producción agropecuaria o producción acuícola de exportación u otras actividades productivas como turismo, generación de hidroelectricidad, producción industrial; explotación minera y de refinación de minerales; hidrocarburos, envasado y comercialización de aguas minerales, medicinales, tratadas, enriquecidas o que tengan procesos certificados de purificación y calidad; y, otras actividades productivas que impliquen el aprovechamiento del agua.

Para el aprovechamiento productivo del agua se requerirá de la autorización administrativa que otorga la Autoridad Única del Agua, previa solicitud de conformidad con la planificación hídrica, los requisitos y condiciones que establece esta Ley.

El aprovechamiento del agua para actividades productivas comprende su utilización en actividades no consideradas en la soberanía alimentaria, según la definición de esta Ley, cuando se trate de producción agropecuaria o acuícola.

En las demás actividades productivas que aprovechan el agua, es indiferente el destino de la producción al mercado interno o externo.

La autorización para el aprovechamiento del agua en actividades productivas confiere al titular de esta, de manera exclusiva, la capacidad para la captación, tratamiento, conducción y utilización del caudal a que se refiera la autorización. El titular deberá instalar a su cargo los aparatos de medición del flujo de agua en los términos que defina la Autoridad Única del Agua.

**Artículo 94.- Orden de prioridad para las actividades productivas.** Entre las actividades productivas susceptibles de aprovechamiento del agua se aplicará el siguiente orden de prioridad:

**a)** Riego para producción agropecuaria, acuicultura y agro industria de exportación;

**b)** Actividades turísticas;

**c)** Generación de hidroelectricidad y energía hidrotérmica;

**d)** Proyectos de sectores estratégicos e industriales;

**e)** Balneoterapia, envasado de aguas minerales, medicinales, tratadas o enriquecidas; y,

**f)** Otras actividades productivas.

El orden de prioridad de las actividades productivas podrá modificarse por la Autoridad Única del Agua, en atención a las características de la cuenca, en el marco de los objetivos y lineamientos de la planificación hídrica nacional y el Plan Nacional de Desarrollo.

**Artículo 95. Condiciones de la autorización de aprovechamiento productivo del agua.** La autorización para el aprovechamiento productivo de agua estará subordinada al cumplimiento de las siguientes condiciones:

**a)** Respeto a la prelación de usos y la prioridad de aprovechamientos productivos del agua, en las condiciones de publicidad y competencia determinadas en esta Ley;

**b)** Verificación de la existencia cierta del agua, en calidad y cantidad suficientes, sobre la base de la certificación de disponibilidad. Respecto de la calidad del agua la Autoridad Única del Agua implementará los procesos de certificación de manera progresiva;

**c)** Estudios y proyectos de infraestructura hidráulica necesarios para la utilización del agua, que sean aprobados previamente por la Autoridad Única del Agua;

**d)** Que el usuario se responsabilice por la prevención y mitigación de los daños ambientales que ocasionen y se obligue a contribuir al buen manejo del agua autorizada; y,

**e)** Que la utilización del agua sea inmediata, o en un plazo determinado para el destino al que fue autorizado.

La Autoridad Única del Agua desarrollará estas condiciones en el Reglamento de esta Ley.

**Artículo 96.- Prohibición de transferencia.** La autorización para el uso y aprovechamiento del agua es intransferible, con excepción de la sucesión por causa de muerte siempre que se mantenga el destino para el cual se otorgó la autorización respectiva.

En caso de transferencia de dominio de la tierra o cambio de propietario de la iniciativa productiva, siempre que se mantenga el destino para el cual se otorgó la autorización de uso del agua, el nuevo propietario, de ser el caso, deberá actualizar la autorización cumpliendo los requisitos previstos en el Reglamento. Otorgada la autorización, procederá a su inscripción en el registro público del agua.

**Artículo 97.- Déficit hídrico.** En caso de disminución de caudales por motivo de escasez temporal o permanente, el agua se entregará a los usuarios de las autorizaciones

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

Barcode:4509967-03 C-331-806 INV - Investigation -



es un aprovechamiento productivo consistente en el procesamiento, tratamiento de potabilización o purificación de las aguas captadas de fuentes naturales superficiales o subterráneas, realizada mediante procedimientos técnicos certificados.

La autorización de uso para aprovechamiento de agua para envasado, captada directamente de la fuente natural superficial o subterránea, tendrá una tarifa diferenciada que será determinada por la Autoridad Única del Agua, de acuerdo con el volumen de agua captada. Esta autorización otorgada por la Autoridad Única del Agua, deberá ser requisito obligatorio para realizar las actividades de envasamiento, producción y comercialización del producto.

Este aprovechamiento puede ser realizado por personas naturales, jurídicas, públicas, privadas, comunitarias y mixtas, así como también por las organizaciones de la economía popular y solidaria, por sí mismas o en alianza con los Gobiernos Autónomos Descentralizados o los sistemas comunitarios de gestión de agua.

Las solicitudes que presenten las entidades comunitarias o de la economía popular y solidaria, titulares de derechos colectivos, para el aprovechamiento del agua en sus territorios o tierras comunitarias, tendrán derecho preferente en el otorgamiento de nuevas autorizaciones.

Se prohíbe el envasamiento de todo tipo de agua proveniente de sistemas de abastecimiento públicos o comunitarios. Por excepción, sólo podrá realizarse, previo autorización de la Autoridad Única del Agua, de la Autoridad Sanitaria Nacional correspondiente y del Gobierno Autónomo Descentralizado Municipal, siempre que se garantice que se ha sometido al proceso de tratamiento, purificación o enriquecimiento de acuerdo a las normas técnicas. La entidad que administre el sistema de abastecimiento, establecerá una tarifa diferenciada de acuerdo al volumen de agua procesada.

### Sección Segunda
### Aprovechamiento Energético e Industrial del Agua

**Artículo 106.- Principios y prioridades para el aprovechamiento productivo hidroeléctrico.** En el marco del respeto al orden de prelación que se regula en esta Ley, la Autoridad Única del Agua otorgará autorizaciones de aprovechamiento productivo del agua para la generación de electricidad, de manera preferente para aquellos proyectos de prioridad nacional que se contemplen en el plan maestro de electrificación, incorporando los principios de sostenibilidad ambiental, precaución, prevención y eficiencia.

**Artículo 107.- Aprovechamiento industrial.** Para toda actividad industrial en la que se utilice agua de fuentes hídricas, se solicitará la autorización de aprovechamiento productivo a la Autoridad Única del Agua.

Las industrias que capten el agua de las redes de abastecimiento de agua potable para aprovechamiento productivo, obtendrán del gobierno autónomo descentralizado la autorización para la conexión que deberá registrarse ante la Autoridad Única del Agua.

Las personas que se dediquen a la extracción de sal del agua de mar para fines comerciales, deberán obtener de la Autoridad Única del Agua la respectiva autorización de aprovechamiento productivo del agua, y pagar la tarifa correspondiente.

Las aguas destinadas para el aprovechamiento industrial, una vez utilizadas, serán descargadas por el usuario, previo su tratamiento, cumpliendo con los parámetros técnicos que dicte la Autoridad Ambiental Nacional.

### Sección Tercera
### Acuicultura

**Artículo 108.- Aprovechamiento de agua en acuicultura.** Las personas que se dediquen a cualquier actividad piscícola o acuícola, que no se considere incluida en la soberanía alimentaria en los términos regulados en esta Ley, deberán obtener de la autoridad pública correspondiente los permisos necesarios para el ejercicio de su actividad, quien previo a otorgarlos deberá requerir de la Autoridad Única del Agua los informes respecto del aprovechamiento productivo del agua, que causará el pago de las tarifas establecidas en la presente Ley, cuando sea consuntivo.

**Artículo 109.- Prohibición.** No se otorgarán autorizaciones de aprovechamiento productivo del agua en manglares. Solo podrán obtener y renovar dicha autorización y con fines de actividad de acuicultura, quienes cumplan con el proceso de regularización establecido en el Reglamento.

### Sección Cuarta
### Aprovechamiento del Agua en Minería

**Artículo 110.- Autorización de aprovechamiento.** Las actividades mineras deberán contar con la autorización de aprovechamiento productivo de las aguas que se utilicen, que será otorgada por la Autoridad Única del Agua, de conformidad con los procedimientos y requisitos establecidos en esta Ley y su Reglamento, para lo que se respetará estrictamente el orden de prelación que establece la Constitución, es decir, consumo humano, riego que garantice la soberanía alimentaria, caudal ecológico y actividades productivas. Al efecto, coordinará con la Autoridad Ambiental Nacional.

Se regulará toda actividad que pueda afectar la calidad y cantidad de agua, y el equilibrio de los ecosistemas, en especial en las fuentes y zonas de recarga de agua.

La sustentabilidad de los ecosistemas y el consumo humano serán prioritarios en el uso y aprovechamiento del agua.

También deberá obtenerse la autorización de uso del agua para consumo humano en campamentos.

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

Barcode:4509967-03 C-331-806 INV - Investigation -



a procesos de mediación o arbitraje en centros legalmente establecidos en la jurisdicción en que se encuentre el agua objeto de conflicto.

Los acuerdos directos y laudos arbitrales que resuelvan las controversias deberán ser notificados por los tribunales correspondientes a la Autoridad Única del Agua para su inscripción en el registro público del agua.

En caso de subsistir las divergencias luego de haber agotado los trámites administrativos y mecanismos alternativos de solución de conflictos, las partes en conflicto se someterán a la vía jurisdiccional.

## CAPÍTULO IV
## RÉGIMEN ECONÓMICO

### Sección Primera
### Tarifas

**Artículo 135.- Criterios generales de las tarifas de agua.** Se entiende por tarifa la retribución que un usuario debe pagar por la prestación de servicios y autorización para usos y aprovechamiento del agua.

Para efectos de protección, conservación de las cuencas y financiamiento de los costos de los servicios conexos, se establecerán las correspondientes tarifas, según los principios de esta Ley, los criterios y parámetros técnicos señalados en el Reglamento.

Las tarifas por autorización de uso y aprovechamiento del agua serán reguladas y fijadas por la Autoridad Única del Agua.

Las tarifas por prestación de servicios de agua potable, saneamiento, riego y drenaje serán fijadas por los prestadores tanto públicos como comunitarios respectivamente, sobre la base de las regulaciones emitidas por la Autoridad Única del Agua a través de la Agencia de Regulación y Control.

**Artículo 136.- Principios generales para la fijación de tarifas de agua.** En el establecimiento de tarifas por autorización de uso y aprovechamiento del agua así como de los servicios de agua potable, saneamiento y de los servicios de riego y drenaje, se deben considerar los principios de solidaridad, equidad, sostenibilidad y periodicidad.

**Artículo 137. Componente tarifario para conservación del agua.** La Autoridad Única del Agua, como parte de las tarifas de autorización de uso y aprovechamiento y de servicio del agua contemplará un componente para conservación del dominio hídrico público con prioridad en fuentes y zonas de recarga hídrica.

Los Gobiernos Autónomos Descentralizados en el ámbito de sus competencias, establecerán componentes en las tarifas de los servicios públicos domiciliarios vinculados con el agua para financiar la conservación del dominio hídrico público con prioridad en fuentes y zonas de recarga hídrica.

**Artículo 138.- Tarifa por autorización de uso y aprovechamiento de agua cruda.** Las tarifas por autorización de uso y aprovechamiento de agua cruda se basarán en los siguientes criterios:

**a)** Aplicación a todos los usos y aprovechamientos del agua;

**b)** Diferenciación según el volumen y tipo de uso o aprovechamiento del agua, considerando los criterios que para los mismos se establecerán en el Reglamento;

**c)** Revisión periódica; y,

**d)** Contribución en la operación y mantenimiento de obras multipropósito.

Las tarifas serán aprobadas por la Autoridad Única del Agua en función de los estudios técnicos determinados para el efecto, en aplicación de lo preceptuado en esta Ley y en el Reglamento.

**Artículo 139.- Tarifa por servicios públicos básicos.** Se entenderán por servicios públicos básicos los de abastecimiento de agua potable, saneamiento, riego y drenaje.

Corresponde la competencia para fijar las tarifas a los prestadores públicos de dichos servicios o a las entidades comunitarias que los presten legítimamente sobre la base de las regulaciones de la Autoridad Única del Agua.

El establecimiento de las tarifas atenderá a los siguientes criterios:

**a)** Inclusión de forma proporcional de lo que el titular del servicio debe pagar a la Autoridad Única del Agua por el suministro de agua cruda; y,

**b)** Inclusión de forma proporcional del costo de captación, manejo, impulsión, conducción, operación, tratamiento, administración, depreciación de activos, amortización, distribución, saneamiento ambiental y nuevas inversiones para el suministro de agua.

En todo caso, las tarifas de los servicios serán diferenciadas y considerarán la situación socioeconómica de las personas con menores ingresos y condición de discapacidad de los consumidores.

### Sección Segunda
### Tarifas por el Uso

**Artículo 140.- Tarifa por suministro de agua cruda para consumo humano y doméstico.** La entrega de la cantidad mínima vital de agua cruda establecida por la Autoridad Única del Agua para la provisión de servicios de agua potable no estará sujeta a tarifa alguna.

Cuando el volumen que se entregue a los prestadores del servicio exceda de la cantidad mínima vital determinada, se aplicará la tarifa que corresponda, conforme con lo estipulado en esta Ley y su Reglamento.

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:23 PM, Submission Status: Approved

**Artículo 141.- Tarifa por autorización de uso de agua para riego que garantice la soberanía alimentaria.** Los criterios para fijación de la tarifa hídrica volumétrica del agua para riego que garantice la soberanía alimentaria, son los siguientes:

**a)** Volumen utilizado;

**b)** Cantidad de tierra cultivada y tipo de suelo; y,

**c)** Contribución a la conservación del recurso hídrico.

Se exceptúan del pago de esta tarifa los sistemas comunitarios portadores de derechos colectivos y los prestadores comunitarios de servicios que reciben caudales inferiores a cinco litros por segundo y que están vinculados a la producción para la soberanía alimentaria.

**Sección Tercera**
**Tarifas por el Aprovechamiento Productivo**

**Artículo 142.- Tarifas por aprovechamiento productivo del agua.** Las tarifas por aprovechamiento productivo considerarán los siguientes criterios:

**a)** Volumen utilizado;

**b)** Eficiencia de utilización;

**c)** Contribución a la conservación del recurso hídrico; y,

**d)** Generación de empleo.

**Artículo 143.- Tarifa para aprovechamiento de agua en generación eléctrica.** El aprovechamiento productivo para la generación de electricidad y el aprovechamiento de energía hidrotérmica tendrá una tarifa que se establecerá por la Autoridad Única del Agua, sobre la base de las regulaciones emitidas por la Agencia de Regulación y Control del Agua.

**Artículo 144.- Tarifa para aprovechamiento productivo para la economía popular y solidaria.** La Autoridad Única del Agua, sobre la base de las regulaciones emitidas por la Agencia de Regulación y Control, fijará la tarifa para la economía popular y solidaria en atención a la capacidad y productividad de los autorizados.

**Artículo 145.- Tarifa por autorización de vertidos.** La autorización de vertidos generará el pago anual de una tarifa, que será fijada sobre la base de criterios técnicos establecidos por la Autoridad Ambiental Nacional, la cual será encargada del control y su recaudación.

**Artículo 146.- Infraestructura hidráulica para aprovechamiento del agua.** Las inversiones que se requieran para la construcción de infraestructura hidráulica o civil para un determinado aprovechamiento productivo del agua, la realizará el interesado de manera directa.

En atención al interés nacional, el Estado podrá concurrir también como inversionista, de acuerdo con las prioridades establecidas en el Plan Nacional de Desarrollo.

**Artículo 147.- Jurisdicción coactiva.** La Autoridad Única del Agua, la Autoridad Ambiental Nacional y los prestadores públicos de servicios ejercerán la jurisdicción coactiva para el cobro de tarifas y demás conceptos y obligaciones pendientes de pago, establecidas en esta Ley y en su Reglamento.

**TÍTULO V**
**INFRACCIONES, SANCIONES Y RESPONSABILIDADES**

**CAPÍTULO I**
**INFRACCIONES**

**Artículo. 148.- Procedimiento.** El trámite del proceso administrativo para el conocimiento y sanción de las infracciones administrativas establecidas en esta Ley, se rige por las normas de este Capítulo.

**Artículo. 149.- Competencia sancionatoria.** El conocimiento y sanción de las infracciones a las disposiciones de esta Ley o su Reglamento, siempre que el acto no constituya delito o contravención, son competencia de la Autoridad Única del Agua y de la Agencia de Regulación y Control, en la forma establecida en esta Ley y en su Reglamento. En aquellas infracciones que de conformidad con esta Ley deban ser determinadas por la Autoridad Ambiental Nacional o por la Autoridad Nacional de Salud, se requerirá su resolución en firme, en el procedimiento administrativo común, antes de dictar la sanción por parte de la Autoridad Única del Agua o la Agencia de Regulación y Control, según corresponda.

**Artículo 150.- Clasificación de infracciones.** Las infracciones administrativas contempladas en esta Ley se clasifican en leves, graves y muy graves.

**Artículo 151.- Infracciones administrativas en materia de los recursos hídricos.** Las infracciones administrativas en materia de recursos hídricos son las siguientes:

**a)** Infracciones leves:

  **1.** Provocar el anegamiento de terrenos de terceros y caminos públicos, cuando la responsabilidad sea del usuario; y,

  **2.** Poner obstáculos en el fondo de los canales u otros artificios para elevar el nivel del agua.

**b)** Infracciones graves:

  **1.** Modificar sin autorización, el entorno de las fuentes de agua con las que se provee el consumo humano o riego;

  **2.** Cuando personas que no pertenezcan a la comunidad impidan la aplicación de derecho

# Tab 27

# P.R. 206-07

# C.R. 105

Barcode: 4509967-21 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**AD/CVD Operations, Office IV**

**The GOE's proprietary information has been redacted from pages OTH-15, OTH-16, OTH-29, OTH-43 to OTH-46, OTH-57, and OTH-58; and BPI of SONGA, Produmar, Naturisa, and Santa Priscila has been redacted from pages OTH-36, OTH-37, and OTH-47, and in Exhibit OTH-2(a).**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

# RESPONSE OF THE GOVERNMENT OF ECUADOR TO SECTION II OF THE DEPARTMENT'S DECEMBER 12, 2024, COUNTERVAILING DUTY QUESTIONNAIRE

## VOLUME VI – OTHER SUBSIDIES

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**

**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: February 15, 2024**

**Counsel to the Government of Ecuador**

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:36 PM, Submission Status: Approved

**(h) The total amount of assistance approved for the industry in which the mandatory respondent companies operate, as well as the totals for every other industry in which companies were approved for assistance under this program. In identifying the industries, please use whatever resource or classification scheme your government normally relies upon to define industries and to classify companies within an industry. Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification. Please clearly identify the industry in which the companies under investigation are classified.**

ANSWER: Please refer to the chart below for the requested information:

| SECTOR | No. FIRMS | AMT. OF INVESTMENT BY INDUSTRY (USD) |
|---|---|---|
| AQUACULTURE | [ | ] |
| AGRICULTURE | [ | ] |
| AGROINDUSTRIAL | [ | ] |
| EDUCATION | [ | ] |
| RENEWABLE ENERGY | [ | ] |
| MINING | [ | ] |
| FLORICULTURE | [ | ] |
| HYDROCARBONS | [ | 200,000,000] |
| INDUSTRIAL | [ | ] |
| INFRASTRUCTURE | [ | ] |
| TRANSPORTATION AND LOGISTICS | [ | ] |
| METALLURGY | [ | ] |
| FISHING | [ | ] |
| HEALTH | [ | ] |
| BASIC SERVICES | [ | ] |
| IMPORT SUBSTITUTION | [ | ] |
| TECHNOLOGY | [ | ] |
| TELECOMMUNICATIONS | [ | ] |
| TOURISM | [ | ] |
| **Total** | **[** | **]** |

**(i) The total number of companies that applied for, but were denied, assistance under this program. Be sure that your response to question provides a complete discussion of the circumstances in which applications for assistance are denied.**

ANSWER: The GOE does not maintain statistics on the number of investment contracts that have been denied.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:36 PM, Submission Status: Approved

# EXHIBIT OTH-2(b)

Barcode: 4509967-22 C-331-806 INV - Investigation
PUBLIC VERSION - BPI Has Been Ranged or Redacted

Firms that Entered Into Investment Contracts by Year

| SIGNATURE YEAR | AMT. (USD) | DIRECT EMPLOYEES | No. FIRMS |
|---|---|---|---|
| 2019 [ | | | ] |
| 2020 [ | | | ] |
| 2021 [ | | | ] |
| 2022 [ | | 15,000 | ] |
| **Total general** [ | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:36 PM, Submission Status: Approved

Barcode: 4509967-22 C-331-806 INV - Investigation

# EXHIBIT OTH-4

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:36 PM, Submission Status: Approved

Barcode: 4509967-22 C-331-806 INV - Investigation

REGISTRO OFICIAL®
ÓRGANO DEL GOBIERNO DEL ECUADOR
Administración del Sr. Ec. Rafael Correa Delgado
Presidente Constitucional de la República

SUPPLEMENT

**Year III - Nº 720**

**Quito, Monday, March 28, 2016**

**Value: US$ 1.25 + VAT**

**ING. HUGO DEL POZO BARREZUETA**
**DIRECTOR**

Quito: Avenida 12 de Octubre N23-99 y Wilson

12 de Octubre Building
Second Floor

Headquarters and sales:
Tel. 3941-800
Exts.: 2301 - 2305

Distribution (Warehouse):
Mañosca Nº 201 and 10 de Agosto Av.
Tel. 243-0110

Guayaquil Branch: Malecón Nº 1606 and 10 de Agosto Av.
Tel. 252-7107

Annual subscription:
US$ 400 + VAT for the city of Quito US$ 450 + VAT for the rest of the country

Printed in Editora Nacional 8

pages

www.registroficial.gob.ec

**In the service of the country since July 1, 1895**

ASAMBLEA NACIONAL
REPÚBLICA DEL ECUADOR

# ORGANIC LAW FOR THE PROMOTION OF YOUTH WORK, EXCEPTIONAL REGULATION OF WORKING HOURS, UNEMPLOYMENT AND UNEMPLOYMENT INSURANCE

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:36 PM, Submission Status: Approved

Case 1:25-cv-00025-RKE Document 86 Filed 04/27/26 Page 469 of 508
Barcode: 4509967-22 C-331-806 INV - Investigation



The contributions made by employers; with the contributions of independent insured persons; with the voluntary contributions of Ecuadorians domiciled abroad; and with the contributions and contributions of the State;

Article 16 of the Social Security Law establishes that the Ecuadorian Social Security Institute (IESS) is a decentralized public entity, created by the Political Constitution of the Republic, with regulatory, technical, administrative, financial and budgetary autonomy, with legal personality and its own assets, whose non-delegable purpose is the provision of Compulsory General Insurance throughout the national territory;

That, among the objectives of the constitutionally established Development Regime is that of building a fair, democratic, productive, solidary and sustainable economic system based on the equal distribution of the benefits of development, the means of production and the generation of decent and stable work; and,

In exercise of the powers conferred by Article 120 of the Constitution of the Republic, issues the following:

## ORGANIC LAW FOR THE PROMOTION OF YOUTH WORK, REGULATION OF THE EXCEPTIONAL WORKING HOURS, SEVERANCE PAY AND UNEMPLOYMENT INSURANCE

## CHAPTER I

## REFORM OF THE LAW ON INTERNSHIPS IN THE BUSINESS SECTOR

**Article 1.-** Replace the text of article 3 with the following text:

> **"Art. 3.- SCOPE.-** Private sector companies, institutions and foundations, as well as all students of institutions of the Higher Education System who have opted and opt for a career or profession that requires a minimum of three years of training, may avail themselves of the provisions of this Law.
>
> Such internships for students will be coordinated by the Institutions of Higher Education in accordance with articles 87 and 88 of the Organic Law of Higher Education.
>
> Public and semi-public agencies are excluded from the internship regime created by this Law."

**Article 2.-** Replace the text of article 7 with the following text:

> **"Art. 7.- Internship pension and social security.**
> - The duration of internships shall be regulated by the regulatory body of the Higher Education System and may not be extended without generating a dependency relationship for more than six months. During the time of the internship, a monthly stipend of not less than one third of the salary shall be paid. unified basic salary. In all cases, the intern will be affiliated to Social Security and the company will contribute in full the amount corresponding to the affiliation on the equivalent of the unified basic salary in force.
>
> The governing Ministry of Labor shall determine the minimum percentages of inclusion of trainees in each company based on the type of activity and the size of the companies."

## CHAPTER II

## REFORMS TO THE LABOR CODE

After article 34, add the following paragraph and the articles containing it:

> **"Paragraph 3**
>
> **Youth employment contract**
>
> **Art. 34.1.- Youth Employment. -** The youth employment contract is the agreement by which a young person between eighteen (18) and twenty-six (26) years of age is laborly bound, with the purpose of promoting youth employment in a relationship of dependence, under fair and decent conditions, in order to guarantee access to the first job and the promotion of their skills and knowledge.
>
> The minimum number or percentage of workers between 18 and 26 years of age in the companies will be regulated by the Ministry of Labor according to the type of activity and size of the companies.
>
> **Art. 34.2.- Conditions of Youth Employment. -** The contracting of youth employment does not imply the substitution of workers who maintain a stable and direct labor relationship, therefore the use of this contractual modality will always imply an increase in the total number of stable workers of the employer.
>
> **Art. 34.3.- Social Security Contribution. -** The payment of the employer's contribution under this contractual modality shall be covered by the Central State up to two unified basic salaries of the worker in general for one year, as established by the IESS, provided that the number of juvenile contracts does not exceed 20% of the total stable payroll of workers of each company. If the salary is higher than two unified basic salaries of the worker in general, the difference of the contribution will be paid by the employer, and if the number of workers is higher than 20% of the stable payroll, the total employer's contribution of those workers exceeding such percentage will be paid by the employer.
>
> Only the amount paid to the employee for remuneration will be considered a deductible expense for employer income tax purposes, when the employer's contribution is covered in full by the Central Government; however, when the employer pays the employee a remuneration amount greater than two unified basic salaries, it will be considered a deductible expense for income tax purposes.

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:36 PM, Submission Status: Approved

deductible to this remuneration and to the difference of the contribution mentioned in the previous paragraph, only when the latter has been covered by the employer.

**Art. 34.4.- Verification and Control.-** Employment contracts for youth employment shall be entered into in writing and in any of the types of contracts indicated in Article 19 of this Code; however, the obligation of the Central State for the payment of the employer's contribution shall be covered as long as the worker has stability for at least twelve months.

Employers, once each of these contracts has been subscribed, must comply with the provisions of numeral 7 of Article 42 of the Labor Code, the competent labor authority will ensure compliance with this obligation."

**Article 4.- The** following articles shall be added after article 47:

**"Art. 47.1.-** In exceptional cases, upon agreement between the employer and the worker or workers, and for a period not exceeding six months, renewable for six more months on a single occasion, the working hours referred to in Article 47 may be reduced, upon authorization of the Ministry of Labor, up to a limit of not less than thirty hours per week.

With respect to the fiscal years in which the modification of working hours was agreed, the employer may only distribute dividends to its shareholders if it previously cancels to the workers the hours that were reduced during the duration of the measure.

In the event of dismissal, indemnities and bonuses will be calculated on the last remuneration received by the employee before the adjustment of the working day; likewise, while the reduction lasts, the employer's social security contributions will be paid on eight hours of work per day.

The Ministry of Labor may require that in order to authorize the measure it must be demonstrated that the measure is necessary due to force majeure or due to a reduction of income or verification of losses. The Ministry of Labor shall also require from the employer an austerity plan, among which it may include that the income of the managing agents of the company be reduced in order to maintain the measure.

**Art. 47.2 - Long working hours -** Exceptionally, due to the nature of the work and in accordance with the regulations issued by the Ministry of Labor, it may be agreed in writing to work in shifts that exceed eight hours a day, provided that they do not exceed the maximum of 40 hours a week or ten hours a day, in schedules that may be distributed irregularly over the five working days of the week. The hours that exceed the limit of forty hours per week or ten per day, shall be paid in accordance with the provisions of Article 55 of this Code."

**Article 5.-** After article 152, add the following unnumbered article:

**Article ... .- Unpaid leave of absence or leave of absence for the care of children -** The worker, once the maternity or paternity leave of absence or leave of absence has ended, shall be entitled to an optional and voluntary leave of absence without remuneration, for up to nine months.
(9) additional months for child care within the first twelve months of the child's life.

This leave shall also apply in the case of adoptive parents.

The period in which the workers make use of the leave of absence or permission, in accordance with the provisions o f this article, shall be computable for seniority purposes.

At the end of the period of paternity or maternity leave, respectively, the father or mother may request within 3 days a f t e r t h e end of the paternity or maternity leave the accumulated severance funds, which will be delivered on the sixty-first (61st) day counted from the presentation of the request; and for such purpose these amounts will not be considered for other social security benefits.

During the period of leave without pay, health benefits shall be guaranteed by the social security, which shall be reimbursed by the Ministry of Public Health.

Any temporary contracts entered into with a new employee to replace the employee on leave or furlough provided for in this article shall terminate on the date on which such leave or furlough expires and shall be exempt from the payment of 35% of the 35% provided for in the second paragraph of article 17 of the Labor Code, in which case the term may be extended for the duration of the leave.

If after the use of the unpaid leave of absence the father or mother is dismissed for this reason, it will be considered ineffective dismissal.

## CHAPTER III

### Reforms to the Social Security Law

**Article 6.-** In Title IX, after Article 275, add the following Chapter and unnumbered articles:

**"CHAPTER**

**OF UNEMPLOYMENT AND UNEMPLOYMENT INSURANCE**

**Unemployment Insurance -** Unemployment Insurance is the economic benefit that protects members of the Ecuadorian Institute of Social Security.

Barcode: 4509967-22 C-331-806 INV - Investigation


# REGISTRO OFICIAL®

ÓRGANO DEL GOBIERNO DEL ECUADOR

Administración del Sr. Ec. Rafael Correa Delgado
Presidente Constitucional de la República

**SUPLEMENTO**

**Año III - Nº 720**

**Quito, lunes 28 de marzo de 2016**

**Valor: US$ 1,25 + IVA**

**ING. HUGO DEL POZO BARREZUETA**
**DIRECTOR**

Quito: Avenida 12 de Octubre
N23-99 y Wilson

Edificio 12 de Octubre
Segundo Piso

Oficinas centrales y ventas:
Telf. 3941-800
Exts.: 2301 - 2305

Distribución (Almacén):
Mañosca Nº 201 y Av. 10 de Agosto
Telf. 243-0110

Sucursal Guayaquil:
Malecón Nº 1606 y Av. 10 de Agosto
Telf. 252-7107

Suscripción anual:
US$ 400 + IVA para la ciudad de Quito
US$ 450 + IVA para el resto del país

Impreso en Editora Nacional

8 páginas

www.registroficial.gob.ec

**Al servicio del país**
**desde el 1º de julio de 1895**


ASAMBLEA NACIONAL
REPÚBLICA DEL ECUADOR

# LEY ORGÁNICA PARA LA PROMOCIÓN DEL TRABAJO JUVENIL, REGULACIÓN EXCEPCIONAL DE LA JORNADA DE TRABAJO, CESANTÍA Y SEGURO DE DESEMPLEO

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:36 PM, Submission Status: Approved

empleadoras o empleadores; con los aportes de las personas independientes aseguradas; con los aportes voluntarios de las ecuatorianas y ecuatorianos domiciliados en el exterior; y con los aportes y contribuciones del Estado;

Que, el artículo 16 de la Ley de Seguridad Social establece que el Instituto Ecuatoriano de Seguridad Social (IESS) es una entidad pública descentralizada, creada por la Constitución Política de la República, dotada de autonomía normativa, técnica, administrativa, financiera y presupuestaria, con personería jurídica y patrimonio propio, que tiene por objeto indelegable la prestación del Seguro General Obligatorio en todo el territorio nacional;

Que, entre los objetivos del Régimen de Desarrollo constitucionalmente establecido, se encuentra el de construir un sistema económico, justo, democrático, productivo, solidario y sostenible basado en la distribución igualitaria de los beneficios del desarrollo, de los medios de producción y en la generación de trabajo digno y estable; y,

En ejercicio de las facultades que le confiere el artículo 120 de la Constitución de la República, expide la siguiente:

## LEY ORGÁNICA PARA LA PROMOCIÓN DEL TRABAJO JUVENIL, REGULACIÓN EXCEPCIONAL DE LA JORNADA DE TRABAJO, CESANTÍA Y SEGURO DE DESEMPLEO

### CAPÍTULO I

### REFORMA A LA LEY DE PASANTÍAS EN EL SECTOR EMPRESARIAL

**Artículo 1.-** Sustitúyase el texto del artículo 3, por el siguiente texto:

> **"Art. 3.- ÁMBITO.-** Podrán acogerse a las disposiciones de la presente Ley, las empresas del sector privado, instituciones y fundaciones; así como todos los estudiantes de las instituciones del Sistema de Educación Superior que hayan optado y opten por una carrera o profesión que requiera una formación mínima de tres años.
>
> Dichas pasantías para los estudiantes serán coordinadas por las Instituciones de Educación Superior de conformidad con los artículos 87 y 88 de la Ley Orgánica de Educación Superior.
>
> Se excluye del régimen de pasantías creado por esta Ley, a los organismos públicos y semipúblicos."

**Artículo 2.-** Sustitúyase el texto del artículo 7, por el siguiente texto:

> **"Art. 7.- Pensión de pasantías y seguridad social.** - La duración de las pasantías será normada por el organismo regulador del Sistema de Educación Superior y no podrá prolongarse sin generar relación de dependencia por más de seis meses. Durante el tiempo de la pasantía deberá acordarse la cancelación de un estipendio mensual no menor a un tercio del salario básico unificado. En todos los casos se afiliará a la Seguridad Social al pasante y la empresa aportará en su totalidad lo correspondiente a la afiliación sobre el equivalente al salario básico unificado vigente.
>
> El Ministerio rector del Trabajo determinará los porcentajes mínimos de inclusión de pasantes en cada empresa en función del tipo de actividad y del tamaño de las mismas."

### CAPÍTULO II

### REFORMAS AL CÓDIGO DE TRABAJO

**Artículo 3.-** A continuación del artículo 34, añádase el siguiente parágrafo y los artículos que lo contienen:

> **"Parágrafo 3o**
>
> **Del contrato de trabajo juvenil**
>
> **Art. 34.1.- Trabajo Juvenil.** - El contrato de trabajo juvenil es el convenio por el cual se vincula laboralmente a una persona joven comprendida entre los dieciocho (18) y veintiséis (26) años de edad, con la finalidad de impulsar el empleo juvenil en relación de dependencia, en condiciones justas y dignas, a fin de garantizar el acceso al primer empleo y la promoción de sus habilidades y conocimientos.
>
> El número o porcentaje mínimo de trabajadores entre 18 y 26 años en las empresas será regulado por el Ministerio del Trabajo en función del tipo de actividad y el tamaño de las empresas.
>
> **Art. 34.2.- Condiciones del trabajo Juvenil. -** La contratación del empleo juvenil no implica la sustitución de trabajadores que mantienen una relación laboral estable y directa, por lo que la utilización de esta modalidad contractual siempre implicará aumento del número total de trabajadores estables del empleador.
>
> **Art. 34.3.- Aporte a la Seguridad Social. -** El pago del aporte del empleador bajo esta modalidad contractual será cubierto por el Estado Central hasta dos salarios básicos unificados del trabajador en general por un año, conforme establezca el IESS, siempre que el número de contratos juveniles no supere el 20% del total de la nómina estable de trabajadores de cada empresa. Si el salario es superior a dos salarios básicos unificados del trabajador en general, la diferencia de la aportación la pagará el empleador, y si el número de trabajadores es superior al 20% de la nómina de trabajadores estables, la totalidad de la aportación patronal de aquellos trabajadores que superen dicho porcentaje la pagará el empleador.
>
> Solo el valor pagado al trabajador por concepto de remuneración se considerará gasto deducible para efectos del Impuesto a la Renta del empleador, cuando el aporte patronal lo cubra en su totalidad el Estado Central; más cuando el empleador pagare al trabajador por concepto de remuneración un valor mayor a los dos salarios básicos unificados, se considerará gasto

Case 1:25-cv-00025-RKE Document 86 Filed 04/27/26 Page 473 of 508
Barcode: 4509967-22 C-331-806 INV - Investigation



deducible a esta remuneración y a la diferencia de la aportación mencionada en el inciso anterior, únicamente cuando esta última la haya cubierto el empleador.

**Art. 34.4.- Verificación y Control.-** Los contratos de trabajo de empleo juvenil deberán celebrarse por escrito y en cualquiera de la clase de contratos señalados en el artículo 19 de este Código; sin embargo, la obligación del Estado Central para el pago del aporte del empleador será cubierta siempre y cuando el trabajador tenga estabilidad al menos doce meses.

Los empleadores, una vez suscritos cada uno de estos contratos, deberán cumplir con lo dispuesto en el numeral 7 del artículo 42 del Código del Trabajo, la autoridad laboral competente velará por el cumplimiento de esta obligación."

**Artículo 4.-** A continuación del artículo 47, añádanse los siguientes artículos:

**"Art. 47.1.-** En casos excepcionales, previo acuerdo entre empleador y trabajador o trabajadores, y por un período no mayor a seis meses renovables por seis meses más por una sola ocasión, la jornada de trabajo referida en el artículo 47 podrá ser disminuida, previa autorización del Ministerio rector del Trabajo, hasta un límite no menor a treinta horas semanales.

Respecto de los ejercicios económicos en que acordó la modificación de la jornada de trabajo, el empleador sólo podrá repartir dividendos a sus accionistas si previamente cancela a los trabajadores las horas que se redujeron mientras duró la medida.

De producirse despidos las indemnizaciones y bonificaciones, se calcularán sobre la última remuneración recibida por el trabajador antes del ajuste de la jornada; de igual manera, mientras dure la reducción, las aportaciones a la seguridad social que le corresponden al empleador serán pagadas sobre ocho horas diarias de trabajo.

El Ministerio rector del Trabajo podrá exigir que para autorizar la medida se demuestre que la misma resulte necesaria por causas de fuerza mayor o por reducción de ingresos o verificación de pérdidas. También deberá el Ministerio rector del Trabajo exigir del empleador un plan de austeridad, entre los cuales podrá incluir que los ingresos de los mandatarios administradores de la empresa se reduzcan para mantener la medida.

**Art. 47.2.- Jornada prolongada de trabajo.-** Se podrán pactar por escrito de manera excepcional, en razón de la naturaleza del trabajo y de acuerdo a la normativa que dicte el Ministerio rector del Trabajo, que se labore en jornadas que excedan las ocho horas diarias, siempre que no supere el máximo de 40 horas semanales ni de diez al día, en horarios que se podrán distribuir de manera irregular en los cinco días laborables de la semana. Las horas que excedan el límite de las cuarenta horas semanales o diez al día, se las pagará de acuerdo a lo establecido en el artículo 55 de este Código."

**Artículo 5.-** A continuación del artículo 152, añádase el siguiente artículo innumerado:

**Artículo … .- Licencia o permiso sin remuneración para el cuidado de los hijos.-** El trabajador o trabajadora, concluida la licencia o permiso por maternidad o paternidad, tendrán derecho a una licencia opcional y voluntaria sin remuneración, hasta por nueve (9) meses adicionales, para atender al cuidado de los hijos, dentro de los primeros doce meses de vida del niño o niña.

Esta licencia aplicará también para el caso de padres o madres adoptivos.

El período en que los trabajadores hagan uso de la licencia o permiso, conforme a lo establecido en el presente artículo, será computable a efectos de antigüedad.

Terminado el periodo de licencia o permiso de paternidad o maternidad respectivamente, el padre o la madre podrán solicitar dentro de los 3 días posteriores a la terminación de la licencia o permiso de paternidad o maternidad los fondos de cesantía que tuvieren acumulados, los mismos que serán entregados el día sesenta y uno (61) contados a partir de la presentación de la solicitud; y para tal efecto estos valores no se considerarán para otras prestaciones de la seguridad social.

Durante el periodo de licencia o permiso sin remuneración se garantizarán las prestaciones de salud por parte de la seguridad social, las cuales deberán ser reembolsadas por parte del Ministerio de Salud Pública.

Los contratos eventuales que se celebraren con un nuevo trabajador, para reemplazar en el puesto de trabajo al trabajador en uso de la licencia o permiso previstos en este artículo, terminarán a la fecha en que dicha licencia o permiso expire y estarán exentos del pago del 35% previsto en el segundo inciso del artículo 17 del Código del Trabajo, en estos casos su plazo podrá extenderse hasta que dure la licencia.

Si luego del uso de la licencia sin remuneración a la que se acoja el padre o la madre fuesen despedidos por este hecho, se considerará despido ineficaz.

## CAPÍTULO III

## Reformas a la Ley de Seguridad Social

**Artículo 6.-** En el Título IX, a continuación del artículo 275 añádase el siguiente Capítulo y los artículos innumerados:

**"CAPÍTULO**

**DE LA CESANTÍA Y EL SEGURO DE DESEMPLEO**

**Artículo … .- Del Seguro de Desempleo.-** El Seguro de Desempleo es la prestación económica que protege a los afiliados del Instituto Ecuatoriano de Seguridad

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/15/24 2:36 PM, Submission Status: Approved

# Tab 28

# P.R. 208

# C.R. 106-14

Barcode: 4511854-01 C-331-806 INV - Investigation

TRADE PACIFIC

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 177
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been ranged or redacted in Volumes I, III, and IV

**PUBLIC VERSION**

February 20, 2024

Re: Frozen Warmwater Shrimp from Ecuador – Section III of Supplier Questionnaire Response

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), a mandatory respondent in the above-referenced CVD investigation, we submit the Section III response to the "Supplier Questionnaire for Industrial Pesquera Santa Priscila S.A" of the Department's January 24, 2024, questionnaire. This response is timely submitted in accordance with the Department's February 12, 2024 letter extending the deadline for Santa Priscila's response to the supplier questionnaire until today. Accompanying this submission are calculation worksheets in Excel® format.

Volume I contains Section III of the supplier questionnaire response of Produmar S.A. Volume II contains Section III of the supplier questionnaire response of Manesil S.A. Volume


Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:26 PM, Submission Status: Approved

III contains Section III of the supplier questionnaire response of Egidiosa S.A. Volume IV contains Section III of the supplier questionnaire response of Tropack S.A.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila and its affiliated companies request business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which Santa Priscila and the affiliates request proprietary treatment and the basis for the request:

- Nature of Products or Production Process: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(1).

- Names of Particular Customers, Distributors, or Suppliers: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Exact Amount of Benefits Applied for or Received: Contained in the narratives and exhibits. Protected under 19 C.F.R. § 351.105(c)(8).

- Other Specific Business Information Related to the Submitters' Business Operations, Financial Data, Applications and Approval Documents, the Release of Which to the Public Would Cause Substantial Harm to the Submitters' Competitive Positions: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to the respective competitive positions of Santa Priscila and the other submitters. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Industrial Pesquera Santa Priscila S.A.*

**COMPANY CERTIFICATION**

I, Diego Puente, Vice President, currently employed by Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), certify that I prepared or otherwise supervised the preparation of the attached submission of Section III of the "Supplier Questionnaire for Industrial Pesquera Santa Priscila S.A.," questionnaire response, filed on February 16, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Santa Priscila contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: Febuary 16th, 2024

Barcode: 4511854-01 C-331-806 INV - Investigation

**COMPANY CERTIFICATION**

I, Wolfgang Harten, Special Representative, currently employed by Produmar S.A. ("Produmar"), certify that I prepared or otherwise supervised the preparation of the attached submission of Section III of the "Supplier Questionnaire for Industrial Pesquera Santa Priscila S.A.," questionnaire response, filed on February 16, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Produmar contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: 02/16/2024

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:26 PM, Submission Status: Approved

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), certify that I have read the attached submission of the response to Section III of the Supplier Questionnaire, filed on February 16, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: February 16, 2024

Barcode: 4511854-01 C-331-806 INV - Investigation

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 20th day of February, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically via ACCESS (proprietary version) or via e-mail (public version), on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:26 PM, Submission Status: Approved

Barcode: 4511854-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**AD/CVD Operations, Office IV**

**Business proprietary information has been redacted on pages III-PRO-2, III-PRO-12, and III-PRO-13; and in Exhibits PRO-1 to PRO-18.**

**PUBLIC VERSION**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

# RESPONSE OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A. ("SANTA PRISCILA") TO SECTION III OF THE DEPARTMENT'S JANUARY 24, 2024 SUPPLIER QUESTIONNAIRE

## VOLUME I – RESPONSE OF PRODUMAR S.A.

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: February 20, 2024**

**Counsel to Industrial Pesquera Santa Priscila S.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:26 PM, Submission Status: Approved

*interest generated on loans granted by international financial institutions or qualified non-financial entities, as determined by the corresponding regulatory bodies in Ecuador, are also exempt. These loans are provided with a term of 180 calendar days or more, through credit, deposit, portfolio purchase and sale, purchase and sale of securities in the stock market, and are intended for financing housing, microcredit, investment in capital rights, or productive investments made in Ecuador. In these cases, the interest rate for such transactions must be lower than the benchmark rate defined by Resolution of the Monetary and Financial Policy and Regulation Board. If the interest rate of the financing exceeds the benchmark rate established by the Board, this exemption does not apply to the payment of interest corresponding to the percentage that exceeds said benchmark rate. This exemption also applies to transfers or remittances made to financial institutions abroad, in compliance with conditions established by them, exclusively for the granting of their loans, provided that these payments are not intended for third parties or jurisdictions that are not involved in the credit operation. Those financing operations granted, directly or indirectly, by related parties by direction, administration, control, or capital, and that are residents or established in tax havens or jurisdictions with lower taxation, cannot access this benefit, except when the borrower is a financial institution.*

*The Monetary and Financial Policy and Regulation Board and the Tax Policy Committee, within their competencies, may determine, by resolution, the segments, terms, conditions, and additional requirements for the purposes of this exemption."*

**F. Annual Motor Vehicle Tax Reduction**

ANSWER: Produmar received benefits in the form of an eighty percent reduction of the motor vehicle tax on vehicles used exclusively for productive or commercial activities. Accordingly, this tax incentive is generally available to all natural persons or enterprises in Ecuador, and, therefore, this program is not countervailable because it is not specific. Nevertheless, **Exhibit PRO-15**



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:26 PM, Submission Status: Approved

# PRO-15

***Annual Motor Vehicle Tax Reduction***

***Standard Questions Appendix***

**A. Specify the eligibility criteria that your company had to meet in order to receive the benefits of this program. Indicate whether eligibility was or is currently contingent on one or more of the following criteria: (1) whether your business exports or has increased its exports, (2) the use of domestic rather than imported inputs, (3) the industry to which your business belongs, or (4) the region in which your business is located.**

ANSWER: Produmar is eligible to claim a reduction of eighty percent on its vehicle tax by virtue of owning vehicles weighing one ton or more and using those vehicles exclusively for productive and commercial activities. Produmar confirms that eligibility is not contingent on any of the criteria stated in the Department's question.

**B. Describe in detail the application and approval process your company went through to receive benefits through the program.**

ANSWER: To be approved for the exemption, Produmar must register the vehicle purchase to the local Internal Revenue Service, which grants a permit to the vehicle in order to allow Produmar to claim the tax reduction.

**C. Specify the criteria your company met to receive the particular amount of assistance provided. Was the application or approval specified the goods for which this assistance was to be provided? If yes, please provide details of which merchandise was specified in the application and/or approval documents.**

ANSWER: The benefit is a flat eighty percent reduction in vehicle tax for qualifying taxpayers. In other words, the amount of tax reduction claimed by Produmar is not determined by any specific criteria it met. Rather, Produmar was eligible to claim the full eighty percent in vehicle tax based on the criteria stated in response to subpart A above. **Exhibits PRO-16(a)** and **PRO-16(b)** contain, respectively, sample application and approval documentation for the registration of qualifying vehicles for these benefits.

**D. What records does your company keep regarding each of the benefits received under this program?**



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:26 PM, Submission Status: Approved

**Please provide your company's executed application forms and other application documents regarding this program. Provide copies of documentation sent to your company at the time of benefit approval, including but not limited to: approval letter, contract, claim form, etc.**

ANSWER: Produmar keeps copies of the form to request registration for the tax credit and the approval granted by the GOE. Please refer to **Exhibits PRO-16(a)** and **PRO-16(b)**, respectively.

**E. Specify how many years your business has received benefits under this program. What was the first year your company applied for and received benefits? For programs under investigation that were not enacted pursuant to a legal instrument, please indicate how many years your company has participated in the program. For example, in the case of programmes involving the provision of inputs for less than adequate remuneration not enacted in accordance with a legal instrument, please indicate how many years your company has been purchasing the relevant inputs from the government, from government-controlled entities, such as state-owned enterprises, or other enterprises that are purported to be "authorities" under section 771(5)(B) of the Act.**

ANSWER: Produmar first claimed this benefit in 2013, and it has continued to take advantage of this exemption every year since, including during the POI.

**F. Indicate where the benefits of this program can be found in your accounting system (i.e., specify ledgers or journals) and financial statements. If you have to file something with the government to continue receiving benefits under this program, please provide a complete translated set of your most recent filings made during or before the POI.**

ANSWER: Produmar does not record the exempt portion of tax in its accounting system.

**G. Has the program been terminated? If so, please explain. What is the last date your business can apply for or claim benefits under the program? When is the last date your business would be able to receive benefits under the program?**

ANSWER: No. This exemption remains in force.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:26 PM, Submission Status: Approved

***Annual Motor Vehicle Tax Reduction***
***Tax Appendix***

**If your company used this program to take deductions from taxable income, credit toward taxes payable, exemptions from taxes owed, accelerated depreciation or other tax benefits on the tax return filed during the POI (the tax period covered by this tax return does not have to correspond with the period of investigation), please answer the following questions:**

**A. Explain whether the assistance is a deduction from taxable income, an exemption from taxes, a credit toward taxes payable, accelerated depreciation, a deferral of taxes owed, or other tax benefit.**

ANSWER: This program provides for an exemption from the tax paid to the IRS for acquiring certain vehicles for the production of shrimp .

**B. Indicate the amount of the tax savings derived from the use of this program. Provide a detailed calculation of the assistance and all source materials. Show the amount of tax (or the amount of loss incurred) that would have been due absent this benefit. Indicate where in the tax return this assistance is shown. For tax deferrals, please indicate the amount of tax owed and the length of the deferral period.**

ANSWER: The total amount of the exemption claimed by Produmar during the POI is $[ ].

**C. If your company was in a tax loss position for the tax year to which the return applies, please explain the effect of this assistance on your company's tax position.**

ANSWER: Not applicable. Produmar did not have a tax loss for 2022.

**D. Will you carry forward any loss to future years? Does the loss represent accrued losses from earlier years? Please explain.**

ANSWER: Not applicable.

**E. Indicate where in your company's financial statements tax information is represented. Are accrued tax losses carried as assets in the financial statements? Please explain.**

ANSWER: No tax losses have accrued and are accounted for as assets in the financial

**F. If you carried forward a loss from prior years and used that loss to offset taxes due on the tax return filed during the POI, demonstrate that loss was not generated by use of any countervailable tax program.**

ANSWER: Not applicable.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:26 PM, Submission Status: Approved

# Tab 29

# P.R. 212

# C.R. 115

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 135
Investigation
AD/CVD Operations, Office IV
This document contains business proprietary information in Volume I.

**PUBLIC VESION**

February 20, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Section III of Supplier Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos C.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the response to Section III of the Department's January 24, 2024, "Supplier Questionnaire for Sociedad Nacional de Galapagos C.A." This response is timely submitted in accordance with the Department's February 12, 2024 letter extending the deadline for SONGA's response to the supplier questionnaire until today. Accompanying this submission are calculation worksheets in Excel® format.

Volume I contains Section III of the supplier questionnaire response of Naturisa S.A. Volume II contains Section III of the supplier questionnaire response of Empacadora Champmar S.A. Volume III contains Section III of the supplier questionnaire response of Sola & Sola Solacciones.

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA and the other submitting companies request proprietary treatment and the basis for the request:

- Nature of Products or Production Process: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(1).

- Names of Particular Customers, Distributors, or Suppliers: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Exact Amount of Benefits Applied for or Received: Contained in the narratives and exhibits. Protected under 19 C.F.R. § 351.105(c)(8).

- Other Specific Business Information Related to the Submitters' Business Operations, Financial Data, Applications and Approval Documents, the Release of Which to the Public Would Cause Substantial Harm to the Submittes' Competitive Positions: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to the respective competitive positions of SONGA and the other submitters. SONGA consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos C.A.*

**COMPANY CERTIFICATION**

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I prepared or otherwise supervised the preparation of the attached submission of Section III of the "Supplier Questionnaire for Sociedad Nacional de Galapágos C.A.," questionnaire response, filed on February 16, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: February 16, 2024

# Counsel Certification

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I have read the attached submission of the response to Section IIII of the "Supplier Questionnaire for Sociedad Nacional de Galapágos C.A.," filed on February 16, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: February 16, 2024

Barcode: 4511891-01 C-331-806 INV - Investigation

**CERTIFICATE OF SERVICE**

I, Kenneth N. Hammer, hereby certify on this 20th day of February, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically via ACCESS (proprietary version) or via e-mail (public version), on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved

**Case No. C-331-806**
**Investigation**
**POI: 1/1/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Public Version**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

# COUNTERVAILING DUTY INVESTIGATION OF FROZEN WARMWATER FROM ECUADOR

# RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A. ("SONGA") TO SECTION III OF THE DEPARTMENT'S JANUARY 24, 2024 SUPPLIER QUESTIONNAIRE

## VOLUME I – RESPONSE OF NATURISA S.A.

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: February 20, 2024**

**Counsel to Sociedad Nacional de Galápagos C.A.**



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved

**Section III Response for Naturisa S.A.
to the Department's January 24, 2024,
Supplier Questionnaire**

**Frozen Warmwater Shrimp From Ecuador
Investigation**

## PROGRAM-SPECIFIC QUESTIONS

***For each program*, if your company (including cross-owned affiliates required to respond, as well as all trading companies) did not apply for, use, or benefit from that program during the POI, you must clearly state so. Otherwise, please answer the questions listed. To determine the information which must be reported under each program, please see the instructions for each program in this section of the questionnaire and in the referenced appendices.**

**If any government assistance, as enumerated below, was received by companies which have since been merged with or purchased by your company, you are responsible for answering the questions with respect to such assistance to the merged or purchased company.**

**For detailed descriptions of the programs listed below, *see* Attachment C of Section II (the Initiation Checklist), and consult with the GOE.**

**Note 1:** Section III of the questionnaire that the Department has directed Naturisa S.A. ("Naturisa") to submit does not list the four programs that appear under the heading "Tax Programs" in the initiation checklist and in the questionnaire issued to the Government of Ecuador ("GOE"). These programs are: (a) Environmental Tax Incentives; (b) Tax Incentives for Priority Sectors under the 2010 Organic Production Code; (c) Fee Exemptions for Brackish Water; and (d) Government Forgiveness of Land Use Fees and Provision of Land to Delinquent Shrimp Farmers. The Department's omission was unintentional, and we provide below the required responses for these programs.

**Note 2:** This response is provided on behalf of Naturisa and [ ]. However, other shrimp farm affiliates that Naturisa owns or controls, i.e., [ ], did not provide fresh shrimp to Sociedad Nacional de Galápagos C.A.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved

("SONGA") during the POI. Therefore, SONGA could not have benefited from subsidies, if any, that these companies received. This response also describes any benefits received by [ ]. We refer below to [ ] as the "other covered affiliates." SONGA understands that the January 24, 2024 questionnaire issued to Naturisa does not request responses on behalf of any other company that is affiliated with or cross-owned by SONGA

**I. TAX PROGRAMS:**

**A. <u>Environmental Tax Incentives</u>**

**Please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix, and***
2. ***Tax Appendix***

<u>ANSWER:</u> **Exhibit NAT-III-1** contains the Standard Questions Appendix and the Tax Appendix for Naturisa. The program provides a benefit in the form of an additional deduction of 100% of the depreciation for equipment, machinery or technology, intended for the implementation of cleaner production mechanisms, renewable energy generation mechanisms, reduction of the environmental impact of production activities, and/ or reduction of greenhouse gas emissions.

In 2019, Naturisa invested in new [ ] Naturisa applied for the benefit in [ ]. The purchase of this equipment was used to assist in the [ ], a project described in Naturisa's [ ]. Naturisa's other covered affiliates did not receive this benefit.

The benefit is authorized under Article 10, Numeral 7 of the Internal Tax Regime Law and Ministerial Agreement No. 048. To qualify for this benefit, a company must have an



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved

Barcode: 4511891-01 C-331-806 INV - Investigation


environmental authorization. The benefit is available to all natural and legal persons that conduct a productive activity in the national territory.

### B. Tax Incentives for Priority Sectors Under the 2010 Organic Production Code

**Please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix, and***
2. ***Tax Appendix***

ANSWER: **Exhibit NAT-III-2** contains the Standard Questions Appendix and the Tax Appendix for the wholly owned subsidiary of Naturisa, [ ], which is exempt from paying income tax [ ] under Article 26 of the Organic Law for Productive Development because the company [ ]. Naturisa and [ ] did not receive this benefit.

### C. Fee Exemptions for Brackish Water

**Please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix, and***
2. ***Tax Appendix***

ANSWER: Naturisa and its other covered affiliates did not receive any benefits under this program. Brackish water is not fit for human consumption because, by definition, it is brackish, i.e., it is salty. The dictionary defines the term brackish as "somewhat salty." Brackish water refers to a water source that is somewhat salty (more so than freshwater) but not as salty as seawater. The exact amount of salinity will vary depending on environmental factors. Brackish water sources are commonly found at transitional points of water where fresh water meets seawater, typically in rivers and estuaries. Naturisa does meter brackish water because it does not consume it. Rather, it returns it to its original source. For this reason, there is no need for them to measure the volume of its non-consumptive use of water.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved

Article 108 of Ecuador's Organic Law on Water Resources Use and Exploitation provides the following: "Utilization of water in aquaculture. Individuals engaged in any piscicultural or aquacultural activity, not considered within the scope of food sovereignty as regulated by this Law, must obtain the necessary permits from the corresponding public authority for the exercise of their activity. Before granting them, the public authority must request reports from the Water Authority regarding the productive use of water, which will incur the payment of fees established in this Law, when consumptive." (Emphasis added).

The petitioner confuses the charges that the GOE may impose for the consumption of water that is "consumptive" within the meaning of Article 108, with brackish water, which Naturisa does not consume because it is returned to its source after its non-consumptive use. Neither Naturisa, nor the GOE, maintains a record of the volume of Naturisa's non-consumptive use of brackish water, so it is not possible to complete the standard questions appendix, the tax appendix, or the provision of goods/services appendix.

For example, the first question in the Standard Questions Appendix asks the respondent to provide eligibility criteria "in order to receive benefits under this program." There are no such criteria since there are no benefits for non-consumptive use. Similarly, there is no way to answer the question seeking a description of the application and approval process. Nor do any records exist concerning benefits received. In the Provision of Goods/Services Appendix, there is no way to report goods provided, suppliers, prices, or purchases of the "goods" involved, much less trade publications specifying the prices of brackish water.

Moreover, if the non-consumptive use of brackish water is regarded as a government benefit program, it is generally available to any person or entity that desires to use it and, therefore, is not countervailable. Nor have the petitioners demonstrated why the rate that the

GOE may charge for the consumptive use of water has any relevance to the "price" for non-consumptive and free use of brackish water. Nor have the petitioners provided a benchmark that could be used to measure the benefit of brackish water allegedly provided by the GOE compared to the price of brackish water charged in arm's-length transactions. This is because no such brackish water charges exist in the private sector.

**D. Government Forgiveness of Land Use Fees and Provision of Land to Delinquent Shrimp Farmers**

**Please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix*, and**
2. ***Tax Appendix***

ANSWER: Naturisa and its other covered affiliates did not receive any benefits under this program.

**II. EXPORT PROGRAMS:**

**A. Refund of Currency Outflow Tax (ISD) on Purchase of Inputs**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix,***
2. ***Tax Appendix, and***
3. ***Input Producer Appendix***

ANSWER: **Exhibit NAT-III-3** contains the Standard Questions Appendix and the Tax Appendix for Naturisa. The Input Producer Appendix does not apply because no government-owned company produced an input purchased by Naturisa during the POI. Naturisa's other covered affiliates did not receive this benefit.

The abbreviation "ISD" refers to the *Impuesto a la Salida de Divisas*, which can be translated as the foreign exchange export tax. Article 162 of Ecuador's Reform Law for Tax Equity established this tax as an assessment on any money existing the country in order to stem capital outflows. The rate has historically been set at 5% of the money going out although the



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved

GOE began reducing it in 2021, with the rate at the beginning of the 2022 being set at 4.75% and dropping quarterly until reaching 4% in the fourth quarter of 2022. Thus, all ISD claimed in 2022 tax filings for fiscal year 2021 would have been paid at 5%.

The GOE offers parties the means for requesting reimbursement of this ISD if it was paid in reference to the purchase of qualifying imported raw materials, inputs or capital goods. The GOE maintains a list of these qualifying products, by tariff number and as long as the product falls within that list, a party is entitled to claim a refund. The refund may be claimed on the annual tax return, either as a tax credit or a deduction or, if a company has been designated as a habitual exporter by the Internal Revenue Service, it may apply to get reimbursed on a monthly basis. The GOE defines a habitual exporter as one that exports at least 25% of its total annual sales in the previous fiscal year or makes at least six exports in the same fiscal year and in different monthly periods. However, Naturisa is not a habitual exporter so instead uses the option of applying for a tax credit on its annual tax return. Naturisa records the amount of its currency outflows that are subject to this tax credit on its annual tax return.

**B. Export Tax Incentive**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix, and***
2. ***Tax Appendix.***

ANSWER: Not applicable because Naturisa and its other covered affiliates did not export any of their production during the POI.

**C. Export Tax Incentives for Sustained/Increased Employment**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix, and***
2. ***Tax Appendix.***

Barcode: 4511891-01 C-331-806 INV - Investigation


ANSWER: Not applicable because Naturisa and its other covered affiliates did not export any of their production during the POI. However, Naturisa obtained a tax rate reduction pursuant to its Investment Contract with the GOE, which we describe in the Other Subsidies portion of this response.

**D. Export Taxes Lowered to Promote Agricultural Exports**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix, and***
2. ***Tax Appendix.***

ANSWER: Naturisa and its other covered affiliates did not obtain any benefits under this program because they did not export any of their production during the POI.

**E. Export Credits from National Finance Corporation**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix, and***
2. ***Tax Appendix.***

ANSWER: Naturisa and its other covered affiliates did not obtain any benefits under this program because they did not export any of their production during the POI.

**F. International Factoring**

**Please provide a detailed description of this program and its workings. In addition, please respond to all questions in the following appendices:**

1. ***Standard Questions Appendix, and***
2. ***Tax Appendix.***

ANSWER: Naturisa and its other covered affiliates did not obtain any benefits under this program because they did not export any of their production during the POI.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved

**III. LOANS AND CREDIT PROGRAMS:**

**A. Access to Preferential Lines of Credit for Aquaculture and Fishing**

1. **Report all loans from any state-owned banks in Ecuador received by your company, which were outstanding during the POI. Submit the information requested in the Loan Template as an attachment to your response and in electronic format using Microsoft Excel.**
2. **Please respond to all questions in the Standard Questions Appendix and the Loan Benchmark and Loan Guarantee Appendix.**

ANSWER: **Exhibit NAT-III-4** contains the Standard Questions Appendix and the Loan Benchmark and Loan Guarantee Appendix. Naturisa reports all loans from state-owned banks that were outstanding during the POI. In particular, it notes that these loans came from [ ]. The loans are provided in the Loan Template in **Exhibit NAT-III-4(a).** As part of the loan appendix, Naturisa also provides a separate worksheet for those loans that it obtained from private lending institutions that were outstanding during the POI. **See Exhibit NAT-III-4(b)**. None of Naturisa's loans from state-owned banks were provided on preferential terms or interest rates. Naturisa's other covered affiliates did not have loans outstanding during the POI.

**B. Loans for Organic Production**

1. **Report all loans under this program, received by your company, which were outstanding during the POI. Submit the information requested in the Loan Template as an attachment to your response and in electronic format using Microsoft Excel.**

2. **Please respond to all questions in the Standard Questions Appendix and the Loan Benchmark and Loan Guarantee Appendix for each program.**

ANSWER: Not applicable because Naturisa and its other covered affiliates do not produce organic shrimp.

**C. Credit Line Boost for Shrimp Sector's Reconstruction After the Earthquake**

1. **Report all credit line increases under this program, received by your company, which were outstanding during the POI. Submit the information requested in the Loan Template as an attachment to your response and in electronic format using Microsoft Excel.**

2. **Please respond to all questions in the Standard Questions Appendix and the Loan Benchmark and Loan Guarantee Appendix for this program.**

ANSWER: Not applicable because Naturisa and its other covered affiliates did not receive any benefits under this program.

## IV. PROVISION OF GOODS OR SERVICES FOR LESS THAN ADEQUATE REMUNERATION (LTAR)

### A. Government Provision of Electricity for LTAR

**Please respond to all question in the Standard Questions Appendix and the Provision of Goods/Services Appendix. In addition, please respond to the following:**

1. **Identify your company's suppliers of electricity during the POI.**
2. **State whether your firm paid reduced rates for electricity during the POI because of its location in a designated geographical area (*e.g.*, industrial estates).**
3. **Report the volume of your company's electricity use and the corresponding charges your company paid, by month, during the POI. Submit this information in electronic format using Microsoft Excel and include a printout of the electronic file in your response.**
4. **Please identify the appropriate rate and fee categories in the chart you submit.**

ANSWER: **Exhibit NAT-III-5** contains the Standard Questions Appendix and the Provision of Goods/Services Appendix. The only electricity supplier for Naturisa and its other covered affiliates is the state-owned company, *Corporacion Nacional de Electricidad* (CNEL). Naturisa and its other covered affiliates did not pay reduced rates for electricity because of their location in a designated geographical area, but they did pay a different rate from the normal industrial rate attributable to the electricity that they used to pump water. **Exhibit NAT-III-5(a)** reports the volume of electricity use and the corresponding charges that Naturisa and its other covered affiliates paid, by month. in 2022, along with the rates and fee categories that applied in the template provided by the Department.

### B. Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays

**Please respond to all questions in the Standard Questions Appendix and the Provision of Goods/Services Appendix. In addition, please respond to the following:**



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved

ANSWER: **Exhibit NAT-III-6** contains the Standard Questions Appendix and the Provision of Goods/Services Appendix, along with a land concession template listing information concerning each concession held by Naturisa and its other covered affiliates.

1. **Identify all instances during the POI and the prior 11 (years (*i.e.*, the AUL) in which your firm received land or land leases at reduced rates because of its location in a designated geographical area (*e.g.*, industrial estates).**

2. **For each instance in which your firm acquired such and or land leases, please indicate the following:**

    a. **Date of acquisition**

    b. **Identity of seller or leaseholder (provide the name in both Arabic and English and an address).**

    c. **Location of the land (specify whether the land is located in a special economic zone and/or development zone).**

    d. **Area of land (specify the unit of measure).**

    e. **Price paid for land or lease (specify whether the payment is in a lump sum or in installments).**

    f. **Terms of payment.**

    g. **The amount of land-use taxes and other fees paid annually. Identify the authority to whom these taxes and fees are paid and provide a sample invoice (or other relevant billing document) for each type of tax or fee. If you are exempted from payment of these taxes or fees, or you pay these taxes or fees at a reduced rate, please provide the details of the value of the exemptions/reductions over the period corresponding to the AUL.**

    h. **Duration of lease.**

    i. **Translated copy of the land-use contract.**

ANSWER: The answers to these questions are provided in the Land Concessions Template that is provided as part of **Exhibit NAT-III-6(a).** An example of a land concession agreement is also provided in **Exhibit NAT-III-6(b).**

## V. OTHER SUBSIDIES

**Did the GOE (or entities owned directly, in whole or in part, by the GOE or any provincial or local government) provide, directly or indirectly, any other forms of assistance to your company between January 1, 2011, and the end of the POI? If so, please describe such assistance in detail, including the amounts, date of receipt, purpose and terms, and answer all questions in the appropriate appendices.**



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved

A. **Investment Contract**

ANSWER: The Standard Questions Appendix and the Tax Appendix are provided in **Exhibit NAT-III-7** for this program. Naturisa participates in an Investment Contract with the Ministry of Production, Commerce, Investment and Fisheries ("MPCEIP") that is available to a wide variety of industries that wish to participate. Naturisa's other covered affiliates do not have investment contracts. The issuance of Naturisa's investment contract was established under the *Codigo Organico de la Produccion Commericio e Inversiones* ("COPCI") law in which it saw the opportunity to receive certain tax incentives for new projects. The company agreed to comply with the contract clauses for employment and meet a dollar value intended for future investments. The contract is provided in **Exhibit NAT-III-7(a)**. The tax benefits that Naturisa received under the contract in return for a substantial investment intended to expand the production capacity of its operations and thereby generate additional employment are: (1) a proportional reduction in the tax rate for the accumulated investment amount for each year; (2) exemption from the ISD for the importation of materials, commodities and capital goods used in the project; and (3) exemption from the ISD for the repayment of principal and interest on loans obtained from foreign lending institutions.

Naturisa contacted the MPCEIP to enter into an investment program and contract, as established by the COPCI and compiled all the information needed for approval for the government's investment program. Once the documentation was compiled, it was sent to the Ministry for review and approval. Once the MPCEIP declared that Naturisa complied with the law's requirements, it signed the investment contract. The contract was awarded on [

].



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved

The investment program is based on the total amount the company agreed to invest, which [ ]. The purpose is to guarantee the flow of resources intended to increase the company's capital investments in assets that allow an expansion of its productive capacity, generating a higher level of production of goods, or generating new sources of work. Naturisa's contract lists the assets that it said would be needed for its investment project.

Naturisa's benefit in 2021 is reported in Naturisa's tax return filed with the GOE in 2022. Although the contract exempts Naturisa from the ISD on repayments of foreign loans, Naturisa did not borrow money from any foreign financial institution to finance the investment project.

**B. <u>Exemption from Municipal Taxes</u>**

<u>ANSWER:</u> Three benefits are potentially available from the Guayaquil municipal government: (1) exemption from the municipal tax on total assets; (2) reduction or exemption from the municipal patent tax; and (3) exemption from the municipal solid waste collection tax. Naturisa and [ ] did not receive any benefits under (3). Naturisa provides for itself and and [ ] the Standard Questions Appendix and the Tax Appendix for programs (1) and (2) in **Exhibits NAT-III-8 and 9.**

**C. <u>Hiring of Disabled People</u>**

<u>ANSWER:</u> Naturisa provides the Standard Questions Appendix and the Tax Appendix in **Exhibit NAT-III-10.** This program is generally available and SONGA notes that this was terminated in 2022.

**D. <u>Hiring of Additional Personnel</u>**

<u>ANSWER:</u> Naturisa provides the Standard Questions Appendix and the Tax Appendix in **Exhibit NAT-III-11.** This program is generally available.



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved

**Naturisa S.A. – Section III Questionnaire Response – Exhibit List**

| Exhibit No. | Description | Format | Classification |
|---|---|---|---|
| NAT-III-1 | Environmental Tax Incentives - Standard Questions Appendix and Income Tax Programs Appendix | PDF | BPI |
| NAT-III-1(a) | Ministry of Environment Resolution MET-147-2021 | PDF | BPI |
| NAT-III-1(b) | Ministry of Environment Resolution MET-148-2021 | PDF | BPI |
| NAT-III-1(c) | Ministry of Environment Resolution MET-149-2021 | PDF | BPI |
| NAT-III-2 | Tax Incentives for Priority Sectors Under the 2010 Organic Production Code - Standard Questions Appendix and Income Tax Programs Appendix | PDF | BPI |
| NAT-III-3 | Refund of Currency Outflow Tax (ISD) on Purchase of Inputs - Standard Questions Appendix and Income Tax Programs Appendix | PDF | BPI |
| NAT-III-4 | Access to Preferential Lines of Credit for Aquaculture and Fishing - Standard Questions Appendix and Loan Benchmark and Loan Guarantee Appendix | PDF | BPI |
| NAT-III-4(a) | Loans from State-Owned Bank | PDF and Excel® | BPI |
| NAT-III-4(b) | Loans from Private Banks | PDF and Excel® | BPI |
| NAT-III-5 | Government Provision of Electricity for LTAR – Standard Questions Appendix and Provision of Goods/Services Appendix | PDF | BPI |
| NAT-III-5(a) | Electricity Template | PDF and Excel® | BPI |
| NAT-III-5(b) | Sample Electricity Invoice | PDF | BPI |
| NAT-III-6 | Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays – Standard Questions Appendix and Provision of Goods/Services Appendix | PDF | BPI |
| NAT-III-6(a) | Beach/Bay Concessions Template | PDF and Excel® | BPI |
| NAT-III-6(b) | Dock Concession Agreement | PDF | BPI |
| NAT-III-7 | Naturisa Investment Contract - Standard Questions Appendix and Income Tax Programs Appendix | PDF | BPI |
| NAT-III-7(a) | Naturisa Investment Contract | PDF | BPI |
| NAT-III-8 | Naturisa Exemption/Reduction of Municipal Taxes - Standard Questions Appendix and Income Tax Programs Appendix | PDF | BPI |
| NAT-III-8(a) | Naturisa Exemption Resolutions | PDF | BPI |
| NAT-III-9 | [ ] Exemption/Reduction of Municipal Taxes - Standard Questions Appendix and Income Tax Programs Appendix | PDF | BPI |
| NAT-III-10 | Hiring of Disabled People - Standard Questions Appendix and Income Tax Programs Appendix | PDF | BPI |
| NAT-III-11 | Hiring of Additional Personnel - Standard Questions Appendix and Income Tax Programs Appendix | PDF | BPI |



Filed By: khammer@tradepacificlaw.com, Filed Date: 2/20/24 2:40 PM, Submission Status: Approved