**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE RICHARD K. EATON, SENIOR JUDGE**

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | |
| Plaintiffs, | |
| and | |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, | |
| Consolidated Plaintiff, and | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | **Consol. Ct. No. 25-00025** |
| Consolidated Plaintiff-Intervenor, | **NON-CONFIDENTIAL VERSION** |
| v. | |
| UNITED STATES, | |
| Defendant, and | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, | |
| Defendant-Intervenors, and | |
| INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | |
| Consolidated Defendant-Intervenors. | |

**JOINT APPENDIX**

Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
202-223-3760

Counsel for Industrial Pesquera Santa Priscila, S.A.
and Sociedad Nacional de Galapagos, C.A.

Date: April 27, 2026

**Table of Contents**


| Tab No. | Document Description | Page(s) Included | Record Document Index Nos.[1] |
|---|---|---|---|
| 1 | Petition from Schagrin Associates to Sec'y of Commerce, re: "*Volume IV*" (Oct. 25, 2023) | Cover page, 1-39 | P.R. 26-35; C.R. 20 |
| 2 | Memorandum to The File, re: "*Countervailing Duty Investigation Initiation Checklist*" (Nov. 14, 2023) | Cover page, 5-8, 23-24 | P.R. 79-80; C.R. 44-45 |
| 3 | Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations, 88 Fed. Reg. 81053 (Nov. 21, 2023) | All | P.R. 87 |
| 4 | Memorandum to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Respondent Selection*" (Dec. 7, 2023) | All | P.R. 95; C.R. 48 |
| 5 | Letter from Dep't of Commerce to Embassy of Ecuador, re: "*Investigation of Frozen Warmwater Shrimp from Ecuador: Countervailing Duty Questionnaire*" (Dec. 12, 2023) | Cover page, 1, II-1 to II-6, III-37, III-41 to III-45 | P.R. 98 |
| 6 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty (CVD) Investigation on Frozen Warmwater Shrimp from Ecuador: Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp*" (Industrial Pesquera Santa Priscila S.A.) (Dec. 14, 2023) | All | P.R. 102 |
| 7 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty (CVD) Investigation on Frozen Warmwater Shrimp from Ecuador: Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp*" (Sociedad Nacional de Galápagos C.A.) (Dec. 14, 2023) | All | P.R. 104 |


[1] Documents contained in the administrative record are identified by the name and date of the documents, followed by the confidential ("C.R.") and public ("P.R.") index numbers assigned to these documents in the respective administrative record indices that the U.S. Department of Commerce filed with the Court on March 31, 2025. *See* Admin. Rec. Index, Mar. 31, 2025, ECF No. 27.

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 8 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Sociedad Nacional de Galápagos C.A.'s Sources of Raw Shrimp Questionnaire Response*" (Jan. 3, 2024) | Cover letter, narrative, exhibit list; Ex. SRS-2 | P.R. 115; C.R. 49-50 |
| 9 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Industrial Pesquera Santa Priscila S.A.'s Sources of Raw Shrimp Questionnaire Response*" (Jan. 3, 2024) | All | P.R. 116; C.R. 51 |
| 10 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Sociedad Nacional de Galápagos C.A.'s Section III 'Affiliated Companies' Questionnaire Response*" (Jan. 5, 2024) | All | P.R. 117; C.R. 53 |
| 11 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Industrial Pesquera Santa Priscila S.A.'s Section III 'Affiliated Companies' Questionnaire Response*" (Jan. 5, 2024) | Cover letter, narrative, exhibit list; Ex. AFF-1 | P.R. 118; C.R. 54 |
| 12 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations*" (Jan. 8, 2024) | Cover letter, 1, 4-10 | P.R. 119 |
| 13 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Santa Priscila and Songa's Req for Clarification of Section III Reporting Obligations and to Exclude Certain Companies from Reporting*" (Jan. 9, 2024) | All | P.R. 126; C.R. 55 |
| 14 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Opposition to Respondents' Req to Exclude Companies from Reporting Obligations*" (Jan. 11, 2024) | All | P.R. 131 |
| 15 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Comments on Respondents' Supplier and Affiliation Responses*" (Jan. 12, 2024) | All | P.R. 134; C.R. 58 |
| 16 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Respondents' Objection to Petitioner's Req for Questionnaire Responses from Unaffiliated Shrimp Farms*" (Jan. 16, 2024) | All | P.R. 137 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 17 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Affiliated Companies Supplemental Questionnaire Response*" (Jan. 16, 2024) | All | P.R. 139; C.R. 60 |
| 18 | Memorandum to The File, re: "*Ex Parte Meeting*" (Jan. 18, 2024) | All | P.R. 149 |
| 19 | Letter from Trade Pacific PLLC, re: "*Affiliated Companies Supplemental Questionnaire Response*" (Jan. 23, 2024) | All | P.R. 155; C.R. 64 |
| 20 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Sociedad Nacional de Galápagos C.A.*" (Jan. 25, 2024) | All | P.R. 160; C.R. 66 |
| 21 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Industrial Pesquera Santa Priscila S.A.*" (Jan. 25, 2024) | All | P.R. 161; C.R. 67 |
| 22 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Opposition to Exclusion of Respondents' Cross-Owned Input Suppliers*" (Jan. 29, 2024) | Narrative | P.R. 167 |
| 23 | Letter from Dep't of Commerce to Schagrin Associates, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: First Supplemental Questionnaire Regarding New Subsidy Allegation*" (Jan. 31, 2024) | All | P.R. 170 |
| 24 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Section II of Supplier Questionnaire Response*" (Feb. 12, 2024) | Cover letter, narrative, exhibit list | P.R. 179; C.R. 71 |
| 25 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Section III Questionnaire Response*" (Feb. 13, 2024) | Cover letter, narrative; Exs. 10, 11 | P.R. 183-84; C.R. 85, 87-88 |
| 26 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of the Government of Ecuador to Section II Countervailing Duty Questionnaire, Volume II – Tax Programs*" (Feb. 15, 2024) | Cover letter, Volume II cover page, TAX-38 to TAX-57, exhibit list; Exs. TAX-4(a), TAX-4(b) | P.R. 186-88; C.R. 90-91 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 27 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of the Government of Ecuador to Section II Countervailing Duty Questionnaire, Volume VI*" (Feb. 15, 2024) | Volume VI cover page, OTH-16; Exs. OTH-2(b), OTH-4 | P.R. 206-07; C.R. 105 |
| 28 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of Santa Priscila to Section III Supplier Questionnaire*" (Feb. 20, 2024) | Cover letter, Vol I cover page, III-PRO-14; Ex. PRO-15 | P.R. 208; C.R. 106-14 |
| 29 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of SONGA's Section III Supplier Questionnaire*" (Feb. 20, 2024) | Cover letter, narrative, exhibit list | P.R. 212; C.R. 115 |
| 30 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations*" (Feb. 21, 2024) | All | P.R. 217 |
| 31 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*SONGA Section III Supplemental Questionnaire*" (Feb. 20, 2024) | All | P.R. 218; C.R. 120 |
| 32 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA Section III Supplemental Questionnaire Response*" (Mar. 1, 2024) | Cover letter, cover page, S-7 | P.R. 232; C.R. 134 |
| 33 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Santa Priscila's Supplemental Section III Questionnaire Response*" (Mar. 4, 2024) | Cover letter, cover page, S-2, S-13 to S-14; Exs. S-4(b), S-4(e) | P.R. 234; C.R. 136 |
| 34 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Factual Information to Rebut, Clarify, and/or correct New Subsidy Allegations*" (Mar. 4, 2024) | Cover letter, 2-8 | P.R. 235 |
| 35 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations Supplemental Response*" (Mar. 5, 2024) | Cover letter, 2-4 | P.R. 237 |
| 36 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador Supplemental Section II Questionnaire Response*" (Mar. 14, 2024) | Cover letter, cover page, Ex. S-Q3(a) | P.R. 263-64; C.R. 153 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 37 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Benchmark Supplemental Questionnaire of SONGA and Santa Priscila*" (Mar. 15, 2024) | Cover letter, narrative, exhibit list | P.R. 266; C.R. 170 |
| 38 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Petitioners' March 5, 2024 Response to Supplemental Questionnaire Regarding NSAs*" (Mar. 15, 2024) | 1-5 | P.R. 268 |
| 39 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA Affiliation Supplemental Questionnaire Response*" (Mar. 19, 2024) | Cover letter, cover page, S-AFF-2 to S-AFF-3 | P.R. 273; C.R. 177 |
| 40 | Memorandum to Eric B. Greynold, Director of Office IV, re: "*New Subsidy Allegations*" (Mar. 21, 2024) | All | P.R. 279 |
| 41 | Memorandum to Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, re: "*Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador*" (Mar. 25, 2024) | All | P.R. 283 |
| 42 | Letter from Dep't of Commerce to Embassy of Ecuador, re: "*Countervailing Duty Questionnaire Regarding New Subsidy Allegation*" (Mar. 28, 2024) | All | P.R. 285 |
| 43 | Frozen Warmwater Shrimp From Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With the Final Antidumping Duty Determination, 89 Fed. Reg. 22379 (Apr. 1, 2024) | All | P.R. 293 |
| 44 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's New Subsidy Allegations Questionnaire Response*" (Apr. 19, 2024) | Cover letter, cover page, NSA-1, NSA-6, NSA-10, NSA-15 to NSA-21; Exs. NSA-10, NSA-11 | P.R. 316-17; C.R. 207-08 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 45 | Letter from Trade Pacific PLLC to Sec'y of Commerce re: "*Santa Priscila's New Subsidy Allegations Questionnaire Response*" (Apr. 19, 2024) | Cover letter, cover page, NSA-1 to NSA-3, NSA-7, NSA-16 to NSA-24; Exs. NSA-6, NSA-7(a), NSA-11, NSA-12 | P.R. 318-19; C.R. 210, 212 |
| 46 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador's New Subsidy Allegations Questionnaire Response*" (Apr. 19, 2024) | Cover letter, cover page, NSA-1, NSA-9, NSA-12 to NSA-13, NSA-15, NSA-27 to NSA-28, NSA-35 to NSA-50; Ex. NSA-11 | P.R. 320-21; C.R. 213, 214-15 |
| 47 | Frozen Warmwater Shrimp From Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation, 89 Fed. Reg. 31722 (Apr. 25, 2024) | All | P.R. 338 |
| 48 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's 771B Questionnaire Response*" (Apr. 26, 2024) | Cover letter, narrative, exhibit list | P.R. 342; C.R. 229 |
| 49 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses*" (May 2, 2024) | All | P.R. 350 |
| 50 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Santa Priscila Supplemental Questionnaire*" (May 2, 2024) | All | P.R. 353; C.R. 231 |
| 51 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*SONGA Supplemental Questionnaire*" (May 2, 2024) | All | P.R. 354; C.R. 232 |
| 52 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Respondents' Submission of Factual Information to Rebut, Clarify or Correct Information that the Petitioners Submitted on May 2, 2024 in Their 'Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses' Concerning Their Brackish Water Allegations*" (May 14, 2024) | Narrative | P.R. 365 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 53 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador's Post-Preliminary Supplemental Questionnaire Response*" (May 17, 2024) | Cover letter, cover page, S3-6 to S3-8, S3-16 to S3-18 | P.R. 366; C.R. 234 |
| 54 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA Post-Preliminary Supplemental Questionnaire Response*" (May 17, 2024) | Cover letter, cover page, S2-1 to S2-6 | P.R. 374; C.R. 244 |
| 55 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Request for Supplemental Questionnaire*" (May 22, 2024) | All | P.R. 376 |
| 56 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Respondents' Opposition to the Petitioner's May 22, 2024 'Request for Supplemental Questionnaire' re Brackish Water NSA*" (May 29, 2024) | All | P.R. 377 |
| 57 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*SONGA Post Preliminary Second Supplemental Questionnaire*" (May 31, 2024) | All | P.R. 380 |
| 58 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Santa Priscila Post Preliminary Second Supplemental Questionnaire*" (May 31, 2024) | All | P.R. 381 |
| 59 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Government of Ecuador Post Preliminary Second Supplemental Questionnaire*" (May 31, 2024) | All | P.R. 382 |
| 60 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Second Post-Preliminary Supplemental Questionnaire Response*" (June 11, 2024) | Cover letter, cover page, S3-1 to S3-4; Exs. S3-1 to S3-4 | P.R. 387; C.R. 245-46 |
| 61 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Santa Priscila's Second Post-Preliminary Supplemental Questionnaire Response*" (June 11, 2024) | All | P.R. 388; C.R. 247-48 |
| 62 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador's Second Post-Preliminary Supplemental Questionnaire Response*" (June 12, 2024) | Cover letter, S4-1 to S4-4, exhibit list; Exs. S4-1(a) to S4-2(b) | P.R. 389; C.R. 249-57 |
| 63 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Government of Ecuador Post Preliminary Third Supplemental Questionnaire*" (July 2, 2024) | All | P.R. 390 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 64 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Santa Priscila 3rd Post-Preliminary Supplemental Questionnaire Response*" (July 5, 2024) | All | P.R. 392; C.R. 258 |
| 65 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Verification Agenda of Santa Priscila S.A.*" (July 8, 2024) | All | P.R. 395; C.R. 259 |
| 66 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Verification Agenda of SONGA*" (July 9, 2024) | All | P.R. 397; C.R. 260 |
| 67 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador 3rd Post-Preliminary Supplemental Questionnaire Response*" (July 11, 2024) | Cover letter, cover page, S5-6 to S5-8, S5-15; Exs. S5-4 to S5-6 | P.R. 398; C.R. 261 |
| 68 | Memorandum to Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, re: "*Post-Preliminary Analysis*" (July 12, 2024) | All | P.R. 400 |
| 69 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador Verification Exhibits*" (July 26, 2024) | Cover letter, exhibit list; Ex. VE-4 | P.R. 410; C.R. 271, 276 |
| 70 | Memorandum to The File, re: "*Verification of the Questionnaire Responses of Sociedad Nacional de Galapagos C.A.*" (Aug. 13, 2024) | 1-3, 10 | P.R. 420; C.R. 313 |
| 71 | Memorandum to The File, re: "*Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A.*" (Aug. 22, 2024) | 1-2, 13 | P.R. 421; C.R. 314 |
| 72 | Memorandum to The File, re: "*Verification of the Questionnaire Responses of Government of Ecuador*" (Sept. 3, 2024) | 1, 3-6, 11-12 | P.R. 422; C.R. 315 |
| 73 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Case Brief*" (Sept. 16, 2024) | Cover letter, cover page, table of contents, 1-13, 15-17 | P.R. 427; C.R. 316 |
| 74 | Memorandum to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, re: "*Second Post-Preliminary Analysis*" (Sept. 26, 2024) | All | P.R. 437 |
| 75 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Case Brief*" (Oct. 2, 2024) | All | P.R. 442 |

| **Tab No.** | **Document Description** | **Page(s) Included** | **Record Document Index Nos.** |
|---|---|---|---|
| 76 | Letter from Trade Pacific PLLC to Sec'y Commerce, re: "*Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador Relating to the Three Programs Addressed in the Second Post-Preliminary Determination*" (Oct. 3, 2024) | Cover letter, cover page, table of contents, 1, 3, 4, 21, 23, 27 | P.R. 445; C.R. 325 |
| 77 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Rejection of Respondents' Case and Rebuttal Brief Comments*" (Oct. 10, 2024) | All | P.R. 449 |
| 78 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Redacted Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador*" (Oct. 11, 2024) | Cover letter, attachment, cover letter, cover page, table of contents, 1-6, 31-33, 83-90 | P.R. 451-52; C.R. 327 |
| 79 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Rebuttal Brief*" (Oct. 11, 2024) | Cover letter, attachment, cover letter, cover page, table of contents, 1, 61-69, 71 | P.R. 453-54; C.R. 328 |
| 80 | Memorandum to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, re: "*Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador"* (Oct. 21, 2024) | All | P.R. 456 |
| 81 | Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty Determination, 89 Fed. Reg. 85506 (Oct. 28, 2024) | All | P.R. 459 |
| 82 | Memorandum to The File, re: "*Final Determination Calculations for SONGA*" (Oct. 21, 2024) | All | P.R. 460; C.R. 329 |
| 83 | Memorandum to The File, re: "*Final Determination Calculations for Industrial Pesquera Santa Priscila S.A.*" (Oct. 21, 2024) | All | P.R. 461; C.R. 331 |
| 84 | Frozen Warmwater Shrimp From Ecuador, 89 Fed. Reg. 104982 (Dec. 26, 2024) (countervailing duty order) | All | P.R. 467 |

# Tab 30

# P.R. 217

Barcode:4512905-01 C-331-806 INV - Investigation -

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 E: EDRAKE@SCHAGRINASSOCIATES.COM F: (202) 429-2522

February 21, 2024

DOC Inv. No. C-331-806
Total Pages: 159
Investigation
AD/CVD Office IV

**PUBLIC DOCUMENT**

**VIA ELECTRONIC FILING**
The Honorable Gina Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations**

Dear Secretary Raimondo:

On behalf of the Petitioner, the American Shrimp Processors Association ("ASPA" or "Petitioner"), we hereby submit new subsidy allegations in the above-referenced investigation. Specifically, we allege that (1) the provision of brackish water to shrimp farmers at less than adequate remuneration and (2) the Government of Ecuador's 2017 forgiveness of outstanding debts to Banco Nacional de Fomento constitute countervailable subsidy programs and confer benefits on Ecuadorian producers and exporters of subject merchandise.

These allegations are accompanied by factual information submitted in accordance with 19 C.F.R. § 351.102(b)(21)(ii) and 19 C.F.R. § 351.301(c)(2)(iv)(A). These allegations are

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

timely filed pursuant to the deadline established by the U.S. Department of Commerce ("Commerce").[1]

## I. Brackish Water for Less Than Adequate Remuneration

In the responses to Sections II and III of Commerce's questionnaire from the Government of Ecuador ("GOE"), respondents assert that the "fee regime" for water consumption under Article 108 of the Organic Law on Water Resources, Use and Development is limited only to "consumptive" water uses, and that shrimp producers' use of brackish water is non-consumptive.[2] In fact, both mandatory respondents highlight their "non-consumptive and free use of brackish water."[3]

As explained in Petitioner's original allegations, and in Exhibit TAX-4(a) of the GOE's Section II response, Article 318 of Ecuador's constitution states that water "is the unalienable property of the State," that "{t}he management of water shall be exclusively public or community-based," and that "the State, through the sole authority for water, shall be directly responsible for planning and managing water resources for … productive activities."[4] Additionally, the mandatory respondents' and GOE's responses highlight Article 108 of the Organic Law of Water Resources, Uses and Water Use, which states that:

> Individuals engaged in any fish farming or aquacultural activity, not considered within the scope of food sovereignty as regulated

[1] *See* Letter to Counsel for ASPA, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Extension of time to file new subsidy allegations" (Feb. 14, 2024).

[2] Government of Ecuador's Section II Questionnaire Response (Feb. 15, 2024) ("GOE Section II Response") at TAX-39 – TAX-43; *see also* Santa Priscila's Section III Questionnaire Response (Feb. 13, 2024) ("Santa Priscila Section III Response") at III-12; SONGA's Section III Questionnaire Response (Feb. 13, 2024) ("SONGA Section III Response") at III-19.

[3] Santa Priscila's Section III Response at III-13; SONGA's Section III Response III-20.

[4] GOE Section II Response at Exhibit TAX-4(a); *see also* Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam - Information Related to the Countervailable Subsidies Provided to Ecuadorian Producers of Subject Merchandise (Oct. 25, 2023) ("Petition") at 30 ("All water resources in Ecuador are property of the state").



Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

> by this Law, must obtain the necessary permits from the corresponding public authority for the exercise of their activity. Before granting them, the public authority must request reports from the Water Authority regarding the productive use of water, which will incur the payment of fees established in this Law, when consumptive.[5]

In other words, the GOE controls access to water resources for private entities engaged in aquaculture by requiring them to acquire permits to use this water. As reviewed below, while the GOE appears to only charge fees for the "consumptive" use of this water, that, in and of itself, does not mean that the provision of water for non-consumptive use does not confer a benefit. Otherwise, every time a government decided to charge recipients fees for the use of government-provided goods for only some uses but not others, that fact alone would make the lack of a fee for certain uses non-countervailable. To the contrary, it is the fact that the GOE provides water for certain uses – including shrimp aquaculture – at no cost that renders the provision of such water the provision of a good for less than adequate remuneration ("LTAR") and thus a countervailable subsidy.

The GOE has taken steps to ensure that the shrimp sector in particular is eligible to benefit from the provision of water without the payment of any fees to the government. In 2018, Ecuador's National Secretary of Water "ratified" the National Chamber of Aquaculture's understanding that "the shrimp sector makes non-consumptive use of water," and is therefore "not subject to any fee for water consumption."[6] This policy offers substantial benefits to shrimp producers, as access to water is of key importance to the aquaculture industry. According to a 2021 report, the average total use of water by shrimp farms in Ecuador is 76,800 cubic meters

[5] GOE Section II Response at Exhibit TAX-4(b); Petition at Exhibit IV-31.

[6] Petition at Exhibit IV-32.

per ton of shrimp ($m^3$/t).[7] Only 2,670 $m^3$/t of this total was freshwater.[8] This study also noted that, for shrimp farmers across all countries, "most water use was for brackish water or seawater applied to ponds."[9] As the mandatory respondents and GOE stated in their responses, Ecuador shrimp producers are not charged for their non-consumptive use of brackish water.[10] This means that shrimp producers are not charged for a substantial majority of the water they use, which they are granted authority to use by the GOE.

Further information indicates that the government provision of water rights for use in aquaculture does have a commercial value, and is in fact subject to government use fees in other countries. The Food and Agriculture Organization, for example, reports that Hungary imposes fees for the use of water for irrigation and fish breeding purposes, Malawi requires individuals discharging into public waters to pay fees and rents required by the government, and Zambia allows public water to be diverted or used for fish breeding upon the payment of water rates based on the amount of water supplied and any "special" water right rights conferred.[11] In addition, a government working group in Australia found that there were numerous ways to assess fees for access to public water resources for aquaculture, including a base fee set at a percentage of the value of surrounding rural land that may otherwise have access to that water.[12]

---

7 Claude E. Boyd, Robert P. Davis, and Aaron A. McNevin, "Comparison of resource use for farmed shrimp in Ecuador, India, Indonesia, Thailand, and Vietnam," *Aquaculture, Fish and Fisheries* (2021) at Table 4, attached at **Exhibit 1**.

8 *Id.*

9 *Id.*

10 GOE Section II Response at TAX-40; Songa's Section III Response at III-18 – III-19; Santa Prisila's Section III Response at III-11 – III-12.

11 *See* United Nations Food and Agriculture Organization, *A Preliminary Review of Selected Legislation Governing Aquaculture: 3. Access to and Use of Land and Water* (1989), excerpt attached at **Exhibit 2**.

12 *See* Australia Department of Fisheries, *A method for determining a fee for access to the aquatic environment for aquaculture and pearling purposes* (Feb. 2013) at 8, attached at **Exhibit 3**.

The government of South Africa also charges fees for the use of water in aquaculture. Its policy regarding water usage for aquaculture states as follows:

> Water is a valuable environmental (social, economic and ecological) commodity and charges will be levied for the use of water and the associated infrastructure for aquaculture …. Where the use of State managed water resources or the associated infrastructure for aquaculture (i.e. State impoundments and the related water resources and infrastructure) is concerned, tariffs for such use will be based on market related concessionary charges related to the value of these resources or infrastructure, the nature of the use, other dependants {sic} on these water resource or infrastructure and the administration or management costs related to these resources or infrastructure.[13]

The provision of brackish water from the GOE to shrimp producers free of charge is inconsistent with these policies and thus confers a countervailable benefit on shrimp producers in Ecuador.

A) Financial contribution

This program provides a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(iii) in the form of provision of a good.

B) Specificity

This program is specific within the meaning of 19 U.S.C. § 1677(5A)(D)(i) because the GOE's National Secretary of Water specifically considered, and confirmed, that the shrimp industry's non-consumptive use of water was exempt from fees otherwise levied on the provision of water.[14] Alternatively, this program is specific within the meaning of 19 U.S.C. § 1677(5A)(D)(iii)(II) because the shrimp industry is a predominant beneficiary of this program.

---

13 Republic of South Africa, Department of Water Affairs and Forestry, *Operational Policy: Use of Water for Aquaculture Purposes* (Apr. 2006) at Art. 4.6.1, attached at **Exhibit 4**.

14 Petition at Exhibit IV-32.

C) Benefit

This program confers a benefit within the meaning of 19 U.S.C. § 1677(5)(E)(iv) because the government provides water to the shrimp sector for LTAR. We recognize that Commerce is currently investigating this program as the exemption from water use fees for use of brackish water. Given the respondents' arguments regarding this program, however, we believe Commerce should also investigate this program as the provision of water for LTAR. As noted above, numerous sources indicate that water used in aquaculture does have commercial value, and other governments do in fact charge fees for the use of water in aquaculture on this basis. The provision of such water by the GOE thus confers a benefit equal to the difference between the commercial value of this water and any amount shrimp producers pay for the right to use this water.

## II. Banco Nacional de Fomento Loan Forgiveness

In 2017, Ecuador's National Assembly passed the Organic Law for the Restructuring of Pubic Banking Debt, Closed Banking, and Management of the National Finance System and Securities Regime. This law "forgives the costs, expenses, surcharges, interest and default interest on credit operations granted to clients who maintained obligations with" the National Development Bank, or Banco Nacional de Fomento ("BNF").[15] The BNF was a state-owned

[15] "The Organic Law for the Restructuring of Public Banking Debts comes into force," Naranjo Martinez & Subía (Apr. 24, 2017), attached at **Exhibit 5**; *see also* Organic Law for the Restructuring of Public Banking, Closed Banking, and Management of the National Financial System and Securities Regime, Official Record No. 986 (Apr. 18, 2017), attached at **Exhibit 6**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

bank[16] which the GOE replaced with a new institution, BanEcuador, in 2015[17] due to the BNF's financial failure.[18]

During the previous countervailing duty investigation on frozen warmwater shrimp from Ecuador, Commerce discovered at verification that one of Songa's cross-owned affiliates had received a loan from BNF, which had not been reported when this information had been requested by Commerce.[19] If Songa or its cross-owned affiliates continued to have an outstanding loan from BNF at the time of this 2017 law, it could benefit from this program's forgiveness of "the costs, expenses, surcharges, interest and default interest on credit operations" for debt obligations to BNF, in exchange for "pay{ing} at least five percent (5%) of the principle balance within one hundred and eighty (180) days" of the 2017 law's effective date.[20] It is unknown the extent to which Santa Priscila or any of its cross-owned affiliates may have also benefitted from this program.

A) <u>Financial contribution</u>

Debt forgiveness from the GOE constitutes a financial contribution pursuant to 19 U.S.C. § 1677(5)(D)(ii), in the form of foregone revenue that would otherwise be due.

---

16 *Certain Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty Determination* (Dep't Commerce Aug. 19, 2013) and accompanying Issues and Decision Memorandum ("2013 IDM") at 11.

17 *See* National Government decrees the creation of BanEcuador (DECREE)," Presidency of the Republic of Ecuador (May 13, 2015), attached at **Exhibit 7**.

18 Mónica Orozco, "National Development Bank was turned into a 'financial garbage dump,'" *Primicias* (Dec. 21, 2021), attached at **Exhibit 8**.

19 2013 IDM at 72-73. In fact, Songa had reported that it and its cross-owned affiliates had *not* benefited from BNF financing during the period of investigation. *Id.* at 73.

20 Organic Law for the Restructuring of Public Banking, Closed Banking, and Management of the National Financial System and Securities Regime, Official Record No. 986 (Apr. 18, 2017), attached at **Exhibit 6**.

B) Specificity

This debt forgiveness program is specific within the meaning of 19 U.S.C. § 1677(5A)(D)(i), because it is limited to entities that had outstanding loans with BNF in 2017.

C) Benefit

Debt forgiveness provides a benefit "equal to the amount of the principal and/or interest (including accrued, unpaid interest) that the government has assumed or forgiven," pursuant to 19 C.F.R. § 351.508.

* * *

We respectfully request that Commerce initiate investigations into the two subsidy programs identified above. We appreciate Commerce's attention to this request. Please contact the undersigned with questions relating to this submission.

Respectfully submitted,

Elizabeth J. Drake
Alessandra A. Palazzolo
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

Edward T. Hayes
LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701

*Counsel to the American Shrimp Processors Association*

**Petitioner Certification**

I, Trey Pearson, President of the American Shrimp Processors Association ("ASPA"), certify that I prepared or otherwise supervised the preparation of the attachedb*Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations,* filed on February 21, 2024 pursuant to the countervailing duty investigation on frozen warmwater shrimp from Ecuador, Case No. C-533-921..

I certify that the public information and any business proprietary information of ASPA contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ___ ______________________________________

Date: ____2/21/2024____________________

**Counsel Certification**

I, Elizabeth J. Drake, counsel to the American Shrimp Processors Association, certify that I have prepared or otherwise supervised the preparation of the attached *Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations,* filed on February 21, 2024 pursuant to the countervailing duty investigation on frozen warmwater shrimp from Ecuador, Case No. C-533-921.

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth J. Drake

Date: February 21, 2024

Barcode:4512905-01 C-331-806 INV - Investigation -

# CERTIFICATE OF SERVICE

**Frozen Warmwater Shrimp from Ecuador**
**C-331-806**
**Investigation**

I, Brittney Allen, hereby certify that copies of the attached *PUBLIC DOCUMENT* were served on February 21, 2024, via ACCESS electronic service:

Nathaniel Rickard, Esq
**Picard Kentz & Rowe LLP**
1750 K Street, NW
Suite 800
Washington, DC 20006

Edward T. Hayes
**Leake & Andersson, LLP**
1100 Poydras Street
Suite 1700
New Orleans, LA 70163

Jennifer Michele Smith-Veluz, Esq.
**The Bristol Group PLLC**
1707 L Street, NW
Suite 570
Washington, DC 20036

Jarrod M. Goldfeder, Esq.
**Trade Pacific PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003

Jeffrey S. Neeley, Esq.
**Husch Blackwell LLP**
1801 Pennsylvania Avenue, NW
Suite 1000
Washington, DC 20006

Andrea Ruiz
**Embassy of Ecuador**
2535 15th St., NW
Washington, DC 20009

/s/ *Brittney Allen*
Brittney Allen, *Paralegal*
SCHAGRIN ASSOCIATES

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

# EXHIBIT 1

Received: 14 September 2021 | Revised: 19 October 2021 | Accepted: 24 October 2021

DOI: 10.1002/aff2.23

Barcode:4512905-01 C-331-806 INV - Investigation -

AQUACULTURE, FISH and FISHERIES WILEY

REVIEW ARTICLE

# Comparison of resource use for farmed shrimp in Ecuador, India, Indonesia, Thailand, and Vietnam

Claude E. Boyd[1] | Robert P. Davis[1] | Aaron A. McNevin[2]

[1] School of Fisheries, Aquaculture and Aquatic Sciences, Auburn University, Auburn, Alabama, USA

[2] World Wildlife Fund, Washington, D.C., USA

**Correspondence**
Claude E. Boyd, School of Fisheries, Aquaculture and Aquatic Sciences, Auburn University, 201 Swingle Hall, Auburn, AL 36849, USA.
Email: boydce1@auburn.edu

**Funding information**
Gordon and Betty Moore Foundation

[Correction added on 29 December 2021, after first online publication: Peer review history statement has been added.]

## Abstract

The purpose of this study was to assess the amounts of land, water, energy in fuels, and wild fish for fishmeal and fish oil in feeds required per tonne of harvested, farmed shrimp in five countries producing most of the shrimp destined for the international market. Land use for whiteleg shrimp *Litopenaeus vannamei* production differed slightly between Indonesia (0.37 ha/t shrimp) and the other four, major shrimp exporting countries – Ecuador, India, Thailand, and Vietnam (0.42–0.46 ha/t shrimp). Total water use was greater in Ecuador (76,800 $m^3$/t) and Indonesia (55,000 $m^3$/t) than in the other three countries (14,000–45,500 $m^3$/t), but most water was saline. Freshwater use was mainly embodied in feed, did not differ among countries, and averaged 6.3% of total water use. Energy use ranged from 56.0 GJ/t (Ecuador) to 98.8 GJ/t (Thailand). All Asian countries had energy use above 75 GJ/t. Wild fish use for fishmeal and fish oil in feeds was greatest in Ecuador (0.891 t/t) and similar in Asian countries (0.612–0.670 t/t). In terms of edible crude protein, whiteleg shrimp was similar to broiler chickens, but more efficient than pigs and beef cattle in land and freshwater use, but greater in energy use than were the three terrestrial meat sources. Compared to *L. vannamei*, black tiger shrimp *Penaeus monodon* required more land, a greater amount of water, but less energy per tonne of shrimp. Although comparatively small differences in average uses of these primary resources were found among countries, the large variation which was noted among farms in each country suggests that resource use could be improved considerably.

KEYWORDS
environmental sustainability, *Litopenaeus vannamei*, resource use efficiency, shrimp farming, wild fish use

## 1 | INTRODUCTION

Marine shrimp are a popular seafood item especially in the United States, Japan, China, and the European Union. The demand for shrimp has increased beyond the quantity that can be supplied by the capture fishery, and farmed shrimp production has steadily increased since the 1970s. In 2018, 6.004 million tonnes (Mt) of penaeid shrimp were produced on shrimp farms and comprised 63.5% of total, global shrimp production (FAO, 2020a). Farmed shrimp consisted of 4.966 Mt of whiteleg shrimp *Litopenaeus vannamei*, 0.751 Mt of black tiger shrimp *Penaeus monodon*, and 0.287 Mt of other penaeid shrimp species.

Shrimp farming has been widely criticised for excessive use of various resources and especially for coastal wetlands as farm sites (Primavera, 1997; Boyd and Clay, 1998; Hamilton, 2013;

This is an open access article under the terms of the Creative Commons Attribution License, which permits use, distribution and reproduction in any medium, provided the original work is properly cited.
© 2021 The Authors. *Aquaculture, Fish and Fisheries* published by John Wiley & Sons Ltd.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Case 1:25-cv-00025-RKE PUBLIC DOCUMENT Document 86-1 Filed 04/27/26 Page 26 of 785

Barcode:4512905-01 C-331-806 INV - Investigation -

Lopez-Angarita et al., 2016; Ilman et al., 2016) and for wild fish necessary to make fishmeal and fish oil included in shrimp feed (Naylor et al., 2000, 2009, 2021). Effluents from shrimp ponds and other aquaculture production facilities also result in pollution of receiving water bodies (Tucker and Hargreaves, 2008). Boyd and McNevin (2015), Boyd et al. (2015), and Chatvijitkul et al. (2017a,b) concluded that most negative environmental impacts of shrimp farming and other types of aquaculture result from use of resources at the farm level and in acquisition of the resources themselves (embodied effects). They also concluded that feed use essential for semi-intensive and intensive production was a major source of resource use and the main reason for pollution by pond effluents.

In an effort to obtain a better knowledge of resource use in shrimp farming, the World Wildlife Fund US undertook studies of resource use in shrimp farming. Estimates of land, water, energy, and wild fish use have been made for farmed shrimp in Ecuador, India, Indonesia, Thailand, and Vietnam, the five major farmed shrimp exporters (Boyd et al., 2017, 2018a, 2021a; Juárez et al., 2021). In addition, the benefits to land use of intensification of pond yields have been assessed (Davis et al., 2021a. 2021; Davis et al., 2021a; Boyd et al., 2021b).

The purpose of this report is to compare resource use among the five countries for whiteleg shrimp (*Litopenaeus vannamei*) farming and for farming of black tiger shrimp (*Penaeus monodon*) in the four Asian countries. In addition, application of the data for enhancing resource use and promoting sustainable shrimp farming is considered.

## 2 | APPROACH

The resource use data for Ecuador, India, Thailand, and Vietnam have been published (Boyd et al., 2017, 2018a, 2021a), and a summary of the data for Indonesia was presented in Juárez et al. (2021). The information necessary for estimating resource use was obtained through interviews with farm owners or managers in each country. The methodology for calculating resource use is explained in Boyd et al. (2017) and the estimations of embodied land, water, and energy use and fishmeal and fish oil inclusion rates in feed required applications of embodied resource use coefficients (Chatvijitkul et al., 2017b). Several of these coefficients have been improved based on new information acquired between 2017 and 2021, and this caused some small differences in embodied resource use calculations among the different studies. Moreover, the inclusion of embodied resources in electricity and other fuels was neglected in calculations of resource use in India, Indonesia, Thailand, and Vietnam.

In the present comparison, we recalculated the resource data from the original survey information using the updated embodied resource use coefficients (Boyd and McNevin, 2021). Embodied energy for electricity and other fuels were also included in the recalculations. The Ecuador resource use data were the last collected, and calculation had included embodied energy and were was based on the updated embodied resource coefficients.

Earthwork construction energy for the *P. monodon* resource use data originally had been calculated with the same information used for the intensive farming of *L. vannamei*. Since conducting the farm survey in Asia, we obtained data on the typical embankment sizes of extensive *P. monodon* ponds and estimated energy use for construction and maintenance to be 75.2 GJ/ha. Amortised over 30 years, the coefficient for energy use becomes 2.76 GJ/ha/year and dividing by annual pond yield gives energy use per tonne shrimp. Energy use at extensive *P. monodon* farms reported earlier was also adjusted for the more reliable estimate of energy use for construction and maintenance of earthwork.

The wild fish coefficients for feed (Chatavijitkul et al., 2017b) were derived for the average fish meal and fish oil inclusion rates of 18.2% and 3%, respectively, for seven *L. vannamei* feeds and 28.9% and 3%, respectively, for seven *P. monodon* feeds. A more recent paper (Naylor et al., 2021) reported that compound feeds for shrimp contain an average of 5% fishmeal and 2% fish oil from the reduction fishery. Farmed shrimp production in 2018 consisted of 82.7% L. *vannamei*, 12.5% *P. monodon* (much of which was not feed based), and 1.9% other or unidentified penaeids.

On average, *L. vannamei* feed would be around 5% fishmeal and 2% fish oil, because *L. vannamei* makes up most of the production and almost entirely in ponds with feeding. However, in Ecuador, *L. vannamei* feed has around 3% fish oil (Boyd et al., 2021a). Feeds for *P. monodon* are typically higher in fishmeal and fish oil than are *L. vannamei* feeds (Chatvijitkul et al., 2017b). The amount of fishmeal and fish oil in individual shrimp feeds is seldom available, because feed producers consider this information proprietary. Thus, wild fish coefficients for feed must be developed from average fishmeal and fish oil inclusion rates such as those mentioned above and with the use of equations for estimating wild fish equivalents of feed (Chatvijitkul et al., 2017b; Boyd and McNevin, 2021).

New estimates of fishmeal and fish oil inclusion rates used in the recalculations of the Asian resource use data were 5% fish meal and 2% fish oil for *L. vannamei* feeds and 15% fishmeal and 3% fish oil in *P. monodon* feeds. The Ecuadorian feed had been assumed earlier to contain 5% fishmeal and 3% fish oil (Boyd et al., 2021a). The resulting wild fish use coefficients were 675 kg/t for Ecuadorian feeds, 450 kg/t for Asian *L. vannamei* feeds, and 720 kg/t for *P. monodon* feeds. These are considerably lower than the wild fish coefficients for *L. vannamei* and *P. monodon* originally derived by Chatvijitkul et al. (2017b).

A subset of variables for *L. vannamei* farms were chosen for statistical comparison by the authors based on the relevance of the metric and the suitability of the information to statistical analysis. No statistical comparisons were made amongst the data from different countries for *P. monodon* because of the sparsity of the data. Variables that were chosen for statistical comparison in *L. vannamei* were pond area, land-to-water ratio (LWR), pond depth, individual pond size, feed conversion ratio (FCR), production intensity, water exchange rate, total land use, total water use, and total energy use. Statistical comparisons were made using a non-parametric procedure equivalent to an ANOVA implemented in the 'ARTool' package in R, which is described in detail in Wobbrock et al. (2011). If statistical differences were detected in the global test, pairwise differences between countries were detected

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Barcode:4512905-01 C-331-806 INV - Investigation -

**TABLE 1** Farm-level land use and earthen infrastructure for farmed shrimp production in the five leading export countries. Letters in the same row describe statistical differences in pair-wise comparisons among the countries

| Farm land use | Ecuador[a] | India[b] | Indonesia[b] | Thailand[b] | Vietnam[b] |
|---|---|---|---|---|---|
| Production pond area (ha) | 141.0[a] | 5.15[b] | 2.79[a] | 6.84[b] | 1.77[a] |
| Reservoir (ha) | 8.76[a] | 0.34[c] | 1.08[c] | 3.60[b] | 0.31[c] |
| Canals (ha) | 9.03[a] | 0.20[b] | 1.32[b] | 0.34[b] | 0.16[b] |
| Settling basin (ha) | 11.29[a] | 0.00 | 0.10[b] | 0.86[b] | 0.09[b] |
| Embankments and other support area (ha) | 5.60[a] | 1.15[b] | 0.65[b] | 2.31[b] | 1.12[b] |
| LWR[c] (unitless) | 1.24[a] | 1.33[a] | 1.77[b] | 2.04[b] | 1.95[b] |
| Pond area (ha) | 6.59[c] | 0.79[b] | 0.44a | 0.65a | 0.33a |
| Individual pond depth (m) | 1.22[a,b] | 1.34[b] | 1.19[a] | 1.49[c] | 1.35[b,c] |

[a]Boyd et al. (2021a).
[b]Boyd et al. (2017, 2018a) and Juárez et al. (2021). Slightly adjusted for minor errors found in original analysis.
[c]Shrimp farm land to production water surface area ratio.

based on ranks with the 'emmeans' package with a Tukey's *p*-value adjustment for multiple comparisons. All statistical analyses were conducted in R version 4.03 (R Core Team, 2020).

## 3 | RESOURCE USE FOR *L. vannamei* FARMING

The production of shrimp in Ecuador was done at much larger farms in much larger ponds than it was in the four Asian countries (Table 1). This resulted from two factors: (i) Ecuador shrimp production has traditionally been semi-intensive using feed and water exchange but no aeration; (ii) there is much uninhabited land suitable for large ponds and farms in Ecuador (Piedrahita, 2018a, 2018b).

The total farm area/production pond water surface area (LWR) was comparatively small in Ecuador (Table 1), because less land is necessary for pond embankments per unit water surface area for large ponds than for small ponds (Jescovitch et al., 2016). Nevertheless, there was no difference in the LWR between Ecuador and India because embankments tended to be narrow and little land was devoted to reservoirs, canals, and settling basins in India. The LWR did not differ among Indonesia, Thailand, and Vietnam, and these three countries had larger LWR than did India.

Average area of individual production ponds was much greater in Ecuador than in Asia (Table 1). India had larger ponds than Indonesia, Thailand, and Vietnam which did not differ in average pond area. Average pond depth ranged from 1.19 m in Indonesia to 1.49 m in Thailand with considerable overlap in the statistical comparison. The use of deeper ponds is beneficial where mechanical aeration is applied (Tucker and Hargreaves, 2008) as a means of reducing bank and bottom erosion which leads to higher total suspended solids and turbidity concentrations in pond effluent. All of the Asian farms in this comparison used aeration in *L. vannamei* ponds, and 46% of Ecuadorian farms used aeration in some or all ponds.

The average ratio of reservoir to production pond area was as follows: Ecuador, 0.06; India, 0.07; Indonesia, 0.38; Thailand, 0.53; Vietnam, 0.18. Greater detention time of water in reservoirs is beneficial for settling out turbidity and allowing time for viral particles in the water to die (Tucker and Hargreaves, 2008). A higher ratio of reservoir to production pond area such as noted in Thailand and Indonesia is preferable.

Settling basin area is for farms having settling basins. The percentage of farms with settling basins was as follows: Thailand, 82%; Vietnam, 67%; Ecuador, 16%; Indonesia, 10%; and India, 10%, and average settling basin area (Table 1) is for farms with settling basins. Settling basins are beneficial to removing coarse particles from pond effluent before it enters natural waters. Greater use of settling basins and adoption of larger ones should be encouraged for reduction in effluent turbidity and resulting sedimentation in natural water bodies.

The stocking density in Ecuador of 21 post-larvae/m$^2$ was less than Asia where it ranged from 38 post-larvae/m$^2$ in India to 92 post-larvae/m$^2$ in Indonesia (Table 2). Crop duration was about 90 days in Ecuador, Thailand, and Vietnam; 100 days in Indonesia; and 116 days in India (Table 2). Ecuador had an average of 3.6 crops/year as compared with 1.87–2.45 crops/year in Asia. Shrimp survival ranged from an average of 57% in Ecuador to 73% in Indonesia, but there was great variation among farms.

The percentage of farms using water exchange was greatest in Ecuador and Indonesia with 87% and 90%, respectively (Table 2). One-half of farms in Thailand, 32% of farms in Vietnam, and 27% of farms in India exchanged water regularly. Average exchange rates were between 5% and 21%.

Pond yield per year ranged from 6.67 t/ha/year in India to 19.81 t/ha/year in Indonesia (Table 2). Yields in Ecuador and India were similar, even though only about half of the Ecuadorian farms (46.5%) applied mechanical aeration. Ecuadorian farms produced an average of more than 3.64 crops per year as compared to 1.97 crops per year in India. Annual pond yield ranged from 10.92 to 19.81 t/ha/year in the other three countries, with Vietnam having the lowest and no difference between Thailand and Indonesia.

Average aeration rate was 10 hp/ha for 8 h/day in ponds at farms using aeration in Ecuador. In Asia, average aeration rates were 16 hp/ha for 18 h/day in India, 24 hp/ha for 14 h/day in Vietnam, and 43 hp/ha for

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Barcode:4512905-01 C-331-806 INV - Investigation -

**TABLE 2** Average values for key variables related to shrimp farm management and production in five countries. Letters in the same row describe statistical differences in pair-wise comparisons among the countries

| Item | Ecuador (*n* = 101) | India (*n* = 89) | Indonesia (*n* = 131) | Thailand (*n* = 34) | Vietnam (*n* = 30) |
|---|---|---|---|---|---|
| Stocking density (no./m$^2$)[a] | 21 | 38 | 92 | 77 | 55 |
| Crop duration (days)[a] | 91 | 116 | 100 | 90 | 90 |
| Crop frequency (no./year)[a] | 3.64 | 1.97 | 2.45 | 2.25 | 1.87 |
| Farms using water exchange[a] | 87 | 19 | 123 | 17 | 11 |
| Water exchange rate (%/day) | 8.5[a] | 21[b] | 12[a,b] | 5[a] | 10[a] |
| Farms using aeration[a] | 47 | 89 | 131 | 34 | 30 |
| Aeration rate (hp/ha) | 10[a] | 16[a] | – | 43[b] | 24[c] |
| FCR (t feed/t shrimp) | 1.32[a] | 1.48[b,c] | 1.41[a,b,c] | 1.49[c] | 1.36[a] |
| Pond yield (t/ha/crop) | 1.96[a] | 3.45[a] | 10.01[c] | 7.33[c] | 5.59[b] |
| Annual pond yield (t/ha/year) | 7.03[a] | 6.67[a] | 19.81[c] | 17.31[c] | 10.92[b] |

*Note*: A common letter beside entries (horizonal comparisons only) indicates no statistical significance.
[a]Statistical comparison of entries not conducted.

19 h/day in Thailand. The survey personnel in Indonesia failed to collect data on aeration rate. In India, Thailand, and Vietnam where the number of crops per year were relatively similar and all farms used aeration, there was a general increase in production with greater aeration. The farms in Ecuador that used aeration had an average pond yield of 9.64 t/ha/year as compared to 4.48 t/ha/year at farms not using aeration. In Ecuador, all aerators were factory made, but in Asia, the use of farm-built 'long-arm aerators' is common. The yield to installed aeration capacity, which is based on crop yield instead of annual pond yield, was 964 kg/ha in Ecuador, 214 kg/ha in India, 243 kg/ha in Vietnam, and 179 kg/ha in Thailand. This is in agreement with Boyd and McNevin (2020) that many Asian farms use inefficient farm-built aerators which increase the power requirement. But even farms using more highly efficient, factory-made aerators install more aeration than necessary, and do not adjust aerator use to daily variation in dissolved oxygen concentration.

Feed was used at all *L. vannamei* farms in the five countries. Feed typically contained around 35% crude protein and it was applied three to five times daily. The FCR ranged from 1.32 in Ecuador to 1.49 in Thailand, but the statistical analysis was not clear-cut. Ecuador, Vietnam, and Indonesia did not differ, neither did Indonesia and India nor Indonesia, India, and Thailand.

These FCR values were lower (less feed per tonne shrimp) than expected, and lower than those assumed in shrimp feed assessments by Tacon (2018) and Naylor et al. (2021). Nevertheless, the FCRs reported in the farm surveys were based on total farm feed use and total farm production reported by farmers. These two variables should be known by farmers above most other variables. But there is the possibility that the farmers willing to participate in the survey were more efficient than many other farmers. This bias is implicit in most surveys of farms as those that do not use better practices or desire to hide certain aspects of their performance tend to not engage in surveys, even if randomly selected.

Amendments used in ponds include liming materials for neutralising bottom soil acidity, fertilisers for stimulating primary productivity, chemicals for disinfection and shrimp disease control, and various products for water quality improvement (Table 3). Liming materials were used at more than 80% of the farms in each country. Fertilisers, including silicate fertilisers, were used at nearly all Ecuadorian farms, but mineral mixes were not commonly used in Ecuador. In Asia, mineral mixes were the most common fertilisers used, nitrogen and phosphorus fertilisers were seldom applied, and silicate fertilisers were not used. Disinfectants were commonly used in Asia but rarely applied in Ecuador. Antibiotics, benzalkonium chloride, glutaraldehyde, formalin, and Virkon were used for disease control at some farms in Asia and especially in Vietnam. These compounds were not reported to be applied in Ecuador. Molasses was widely applied for water quality improvement in Ecuador and to a lesser extent in Thailand and India. Yucca extract and zeolite were applied to numerous farms in all countries except Thailand for ammonia removal. Hydrogen peroxide had considerable use as an emergency source of dissolved oxygen in Ecuador, and it was used at three farms in India for this purpose. Probiotics were widely used in all countries. Other than in India, saponin was used at some farms to eradicate wild fish.

Resource use in *L. vannamei* production is summarised in Table 4. Total land use ranged from 0.37 ha/t in Indonesia to 0.52 ha/t in Vietnam. Indonesia had the lowest land use, and no differences were found among the other countries. Embodied land in feed exceeded direct land use in all countries accounting for 59.8% (Ecuador) to 77.9% (Indonesia) of total land use.

Total water use varied from 14,000 m$^3$/t in Thailand to 76,800 m$^3$/t in Ecuador. Total water use was greatest in Ecuador and Indonesia

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Barcode:4512905-01 C-331-806 INV - Investigation -

**TABLE 3** Amendment use in *L. vannamei* ponds in five major shrimp exporting countries

| Amendment | Ecuador ($n = 101$) | India ($n = 89$) | Thailand ($n = 34$) | Vietnam ($n = 30$) |
|---|---|---|---|---|
| Agricultural limestone, burnt lime, or both | 90 | 52 | 30 | 28 |
| Sodium bicarbonate | 0 | 18 | 2 | 0 |
| Mineral mixes[a] | 9 | 70 | 17 | 6 |
| Urea | 13 | | 1 | 0 |
| Ammonium or sodium nitrate | 4 | 0 | 0 | 0 |
| Triple superphosphate | 5 | 0 | 0 | 1 |
| Mixed fertilisers[b] | 24 | 0 | 2 | 1 |
| Organic fertiliser[c] | 13 | 1 | 2 | 0 |
| Calcium or sodium silicate | 43 | 0 | 0 | 0 |
| Nutrilake[d] | 26 | 0 | 0 | 0 |
| Calcium hypochlorite | 8 | 8 | 19 | 10 |
| Potassium permanganate | 0 | 3 | 7 | 1 |
| Copper sulphate (algicide) | 2 | 3 | 15 | 1 |
| Iodine | 0 | 2 | 2 | 16 |
| Benzalkonium chloride | 0 | 8 | 4 | 7 |
| Glutaraldehyde | 0 | 0 | 0 | 2 |
| Formalin | 0 | 4 | 0 | 0 |
| Virkon | 0 | 1 | 0 | 1 |
| Antibiotics | 0 | 0 | 0 | 10 |
| Molasses and sugar[e] | 81 | 3 | 12 | 0 |
| Yucca extract[f] | 0 | 0 | 0 | 5 |
| Zeolite[f] | 43 | 28 | 2 | 17 |
| Hydrogen peroxide[g] | 37 | 3 | 0 | 0 |
| Probiotics | 34 | 49 | 34 | 28 |
| Saponin | 28 | 0 | 9 | 6 |

[a]Sulphates and chlorides of magnesium and calcium; sodium and potassium chloride, trace elements.
[b]Fertilisers containing nitrogen, phosphorus, or both.
[c]Livestock manures and humates.
[d]Sodium nitrate and sodium silicate.
[e]Used to stimulate microbial growth and remove ammonia.
[f]Thought by some farmers to remove ammonia.
[g]Emergency source of dissolved oxygen.

**TABLE 4** Averages for total land, total water, embodied freshwater, total energy, and wild fish embodied in feed achieved at shrimp farms in five countries. Letters in the same row describe statistical differences in pair-wise comparisons among the countries

| Resource | Ecuador | India | Indonesia | Thailand | Vietnam | *p*-value |
|---|---|---|---|---|---|---|
| Total land (ha/t) | 0.46b | 0.42b | 0.37a | 0.42b | 0.45b | <0.0001 |
| Total water ($m^3$/t) | 76,800b | 39,200a | 55,000b | 14,000a | 45,500a | <0.0001 |
| Freshwater ($m^3$/t) | 2670a | 2559a | 2500a | 2591a | 2411a | >0.001 |
| Total energy (GJ/t) | 56.0a | 90.0c | 75.4b | 98.8c | 89.5c | <0.0001 |
| Wild fish (t/t) | 0.891a | 0.666b | 0.634b | 0.670b | 0.612b | <0.001 |

which did not differ from each other. Water use in the other three countries varied from 14,000 to 45,500 $m^3$/t but did not differ because of great variation. Most water use was for brackish water or seawater applied to ponds, and freshwater use, other than for drinking, ice making, and sanitation purposes which was not determined, was the result of embodied water in fuels, feed, and amendments (mainly in feed). Embodied water use was less than 7% of total water use in all countries but Thailand where it was 18% of total water use.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

**TABLE 5** Averages for production data and resource use for *Penaeus monodon* farming in four countries

| | India (n = 11) | Vietnam (n = 26) | Indonesia (n = 33) | Thailand (n = 5) |
|---|---|---|---|---|
| Farm area (ha) | 9.95 | 2.11 | 7.54 | 9.92 |
| Production pond area (ha) | 7.37 | 1.18 | 5.03 | 11.90 |
| LWR | 1.35 | 1.79 | 1.50 | 1.20 |
| Stocking density (no./$m^2$) | 32 | 19 | 9 | 2.5 |
| Farms using feed (n) | 10 | 20 | ? | 0 |
| FCR | 1.36 | 1.47 | 0.83 | – |
| Aeration (hp/ha) | 35.5 | 11.4 | ? | 0 |
| Farms using water exchange (n) | 9 | 5 | 33[a] | 0 |
| Water exchange rate (% pond volume/day) | 13 | 8 | 26 | 0 |
| Crop frequency (no./year) | 1.73 | ? | 2.88 | 1.0 |
| Pond yield (t/ha/year) | 3.88 | 3.60 | 1.51 | 0.33 |
| Total land use (ha/t) | 0.71 | 0.86 | 1.18 | 3.6 |
| Total water use ($m^3$/t) | 175,000 | 43,900 | 2,202,000[a] | 45,450 |
| Total energy use (GJ/t) | 56.5 | 57.9 | 10.6 | 8.4 |
| Wild fish use (t/t) | 0.97 | 1.06 | 0.60 | 0.0 |

[a]Tidal water exchange.

Total energy use of 56.0 GJ/t in Ecuador was less than in Asian countries which have energy use estimates of 75.4–98.8 GJ/t. Among the Asian countries, energy use was lowest in Indonesia, and the other countries did not differ in energy use. Embodied energy comprised 56.3%–63.8% of total energy use in Asia where electricity was the predominant energy source. In Ecuador, where diesel fuel of lower embodied energy content than electricity was the primary fuel, embodied energy comprised 38.4% of total energy use.

Wild fish use for fishmeal and fish oil in feeds was greatest in Ecuador (0.89 t/t) because of the higher wild fish coefficient for feed than in Asian countries. There was no difference in wild fish use among the Asian countries: the values ranged from 0.61 to 0.67 t/t.

## 4 | RESOURCE USE IN *P. monodon* FARMING

Farm data supplied by *P. monodon* farmers generally were far less complete than those provided by *L. vannamei* farmers. The data were particularly scant in Thailand where feed was not applied for *P. monodon* and in Indonesia where feed inputs were low and only to supplement natural food. Considering the amount of missing information and that farmers' memory rather than records was the source of much of the requested information at *P. monodon* farms, statistical analysis of the data beyond calculating average values was not attempted.

In India and Vietnam, production of *P. monodon* was feed based, and production was quite similar to *L. vannamei* production already described. But the majority of *P. monodon* production in Vietnam was by extensive culture producing 0.25–0.5 t/ha/year. There also is considerable *P. monodon* production by extensive culture in India and Indonesia (Boyd et al., 2021b).

The results (Table 5) reveal considerable differences in average production pond areas on farms, stocking rates, differences in feed use, water exchange, and aeration. It is notable that three times as much aeration was used in India as in Vietnam, but the annual pond yield was similar between the two countries. The small feed inputs in Indonesia resulted in a low FCR because much of the production apparently was the result of natural food. Nevertheless, the small feed inputs in Indonesia resulted in considerably greater annual pond yield than was accomplished in Thailand using no feed.

Amendments applied to feed-based *P. monodon* farms in India and Vietnam were quite similar to those mentioned in *L. vannamei* production (Table 3). The extensive *P. monodon* farmers in Thailand applied only probiotics, and no data on amendment use in Indonesia were collected.

Land use in India, Indonesia, and Vietnam ranged from 0.71 to 1.18 ha/t, but it was much greater in Thailand. Water use was especially great in Indonesia where it was applied by tidal action not requiring pumping. Water exchange was not practiced in Thailand, and fewer farms in Vietnam used water exchange than was the case in India.

Total energy use in India, in spite of greater aeration and the pumping of more water for water exchange, was no greater than in Vietnam. We suspect that all of the installed aeration capacity in India was not used and that the daily hours of aeration were much less in India than in Vietnam.

In India and Vietnam, wild fish use was greater than observed in *L. vannamei* farming (Table 2). This was mainly the result of a high wild fish coefficient for *P. monodon* feed. The lower wild fish use in Indonesia was caused by greater reliance on natural food and small inputs of feed.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

In other words, the proportion of production resulting from feed input was less in Indonesia than in India and Vietnam.

## 5 | DISCUSSION

The production of *L. vannamei* in Ecuador appears to be shifting from semi-intensive culture which relies on feed to intensive culture in which both feed and mechanical aeration are applied as done in Asia. Annual, average pond yield in Ecuador is equal to that in India, and yield at farms in Ecuador using aeration was nearly equal to that of Vietnam. Although aeration was used at all *L. vannamei* farms in the four Asian countries, Thailand and Indonesia realised considerably greater annual pond yields than did India and Vietnam. It is clear from this comparison that much greater intensification of *L. vannamei* production is possible without resorting to biofloc technology (Avnimelech, 2015; El-Sayed, 2021) in ponds or intensive tank culture (Lutz, 2020).

Water exchange remains a common practice in *L. vannamei* farming, particularly in Indonesia and Ecuador. Water exchange may be necessary for avoiding excessive salinity at some locations. However, in Thailand only 50% of farms used water exchange with an average rate of 5% of pond volume per day, whereas in Indonesia 94% of farms used water exchange with a daily rate of 12%. Greater water exchange in Indonesia did not result in significantly greater annual pond yield than obtained in Thailand. This seems to suggest that water exchange could be reduced or discontinued. Nevertheless, the Thailand data reveal an apparent benefit to water exchange. Seventeen farms with water exchange had average pond yield of 23.4 t/ha/year as compared to 11.2 t/ha/year at 17 farms without water exchange. Of course, farmers using water exchange may have had confidence in stocking more shrimp in which case the difference in yield may be unrelated to water exchange.

Reservoirs can improve water quality mainly through sediment removal before transfer of water to ponds. The percentage of farms with reservoirs was 86% in Ecuador, 94% in Thailand, 90% in Vietnam, 57% in Indonesia, and 44% in India. Use of reservoirs is apparently widely recognised as an important feature of shrimp farms, but more attention to this fact would be useful in India and Indonesia.

Water exchange should not be promoted with exception of cases of excessive salinity. The longer the hydraulic retention time (lower exchange rate) in ponds, the greater the opportunity for reduction in concentrations of dissolved organic matter, ammonia nitrogen, and soluble phosphorus through natural processes (Tucker and Hargreaves, 2008). Settling basins for farm effluents also are more effective at lower water exchange rates, because the greater water retention times will allow greater removal of suspended solids and turbidity.

Amendments are widely used in shrimp farming. Liming is probably the most common amendment with a use range of 79% of farms in India to 94% of farms in Thailand. Liming mainly improves bottom soil pH and increases alkalinity in the pond water. The problem is that seawater and brackish water in shrimp ponds usually are at or near saturation with calcium carbonate and the liming materials do not dissolve (Boyd, 2020). The expected benefits of liming are often not realised, and liming may often be an unnecessary production cost. Water analyses for total alkalinity should be the indicator for liming during the crop. Unless the alkalinity in water of 25–35 ppt salinity is below 75–100 mg/L alkalinity (as $CaCO_3$), liming materials will not dissolve. Some farmers apply lime to pond bottoms to increase pH with the expectation of destroying disease vectors (Suresh et al., 2006). The effectiveness of this practice is unproven.

Nitrogen, phosphorus, and silicate fertilisers are widely used in Ecuador in an effort to promote phytoplankton and especially diatoms. Although nitrogen and phosphorus fertilisers may encourage phytoplankton, they should only be used in ponds with feeding in the early weeks of grow-out or when waters become clear and underwater aquatic plant infestations are likely to occur. Once daily feed inputs increase, much nitrogen and phosphorous is available from feeding waste (Tucker and Hargreaves, 2008). Silicate fertilisers are used to favour diatom growth, but there is no evidence that more diatoms in the phytoplankton community increase shrimp production (Boyd and Tucker, 1998).

In the Asian countries, there is much less use of nitrogen and phosphorus fertilisers and no reported use of silicate fertilisers. There is wide use of mineral mixes containing calcium, magnesium, potassium, and sometimes trace elements in Asia. Magnesium and potassium may be beneficial in low-salinity water ($<10$ g/m$^3$), but these mixes usually are not necessary in water of greater salinity (Roy et al., 2010).

Disinfectants were used at 10% of farms in Ecuador, 32% in India, and at all farms in Thailand and Vietnam. Although the benefits of disinfectants are likely dependent on the conditions at each farm, disinfection of water before stocking post-larvae appears a logical biosecurity measure. The main limitation of disinfection in Ecuador probably is the high cost of treating ponds containing large volumes of water. Chlorine compounds are common disinfectants in shrimp farming. Chlorine treatment of municipal drinking water containing dissolved organic matter can result in formation of trihalomethanes which are suspected carcinogens (Boyd, 2020). At present, we know of no evidence to suggest that chlorine treatment of shrimp ponds leads to contamination of shrimp with trihalomethane compounds. Only in Vietnam did farmers report using antibiotics, and one third of the survey farms used them.

The use of sugar, molasses, or other carbohydrate source is a necessary treatment in biofloc technology for shrimp production (Hargreaves, 2013), but the use of carbohydrate sources in intensive, 'green-water' culture of shrimp is unproven. Nevertheless, over 80% of farms in Ecuador, 35% of farms in Thailand, and 3% of farms in India applied carbohydrate sources. None of these farms were practicing biofloc technology.

The rather common use of hydrogen peroxide (37 of 101 farms) in Ecuador was for emergency treatment of low dissolved oxygen concentration. When ponds with feeding develop phytoplankton blooms of sufficient abundance causing night-time dissolved oxygen depletion, installation of aeration or of greater aeration capacity is indicated. Mechanical aeration is more effective and cheaper than the use of hydrogen peroxide as an emergency treatment of low dissolved oxygen concentration (Boyd and Tucker, 1998).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 1:25-cv-00025-RKE Document 86-1 Filed 04/27/26 Page 32 of 785
PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

Zeolite was used commonly in all countries except Thailand for ammonia removal. This practice is ineffective and especially in seawater or brackish water (Zhou and Boyd, 2014). Ammonia is likely not as serious an issue in intensive culture as commonly perceived by farmers, and the only effective means of control is good feed management and aeration (Zhou and Boyd, 2016). Probiotics are commonly used in shrimp culture worldwide, but the benefits to water quality are questionable (Boyd and Tucker, 1998).

Piscicides such as saponin can be effective in eradication of wild fish from shrimp ponds. Saponin was used at some farms in all countries except India. Thorough drying of pond bottoms between crops and filtration of incoming water usually can be an effective means of minimising wild fish introduction if fine-mesh filters are used. Screens on water inflow and outflow structures reduce the number of wild fish introduced (Suresh et al., 2006).

The use of some pond amendments in specific instances can be beneficial, for example, liming of ponds with acidic soils, creating phytoplankton shade in clear ponds with nitrogen and phosphorus fertilisers to avoid under-weed infestations, and to encourage more natural food for newly stocked post-larvae through pre-stocking fertilisation of ponds. Amendments, if used properly, will not harm shrimp, even though they may be ineffective for the intended purpose. Nevertheless, amendments add to production cost. Engle et al. (2017) found that the cost of amendments represented about 6.2% of the variable cost in *L. vannamei* production in Thailand and 25.2% in Vietnam. Wiser use of pond amendments can improve profitability in shrimp farming.

The differences in resource use among the five countries were not especially notable (Table 4). Land use was similar in all five countries ranging from 0.37 ha/t in Indonesia to 0.46 ha/t in Ecuador. Only the lowest land use (Indonesia) differed among the countries. This was despite rather large apparent differences and some significant ones in average production pond yield among the countries. The cause was differences in supporting land use at farms and land use for feed. The differences in total water and total energy use among countries were somewhat greater than for land use, and nearly all of the water use was saline water supplied to ponds. Wild fish use differed only in being greater in Ecuador, but all countries had an average wild fish use less than 1.0 meaning that the amount of shrimp produced exceeded the amount of wild fish needed to make fishmeal and fish oil included in feeds.

Weighted averages of resource use were as follows: total land, 0.42 ha/t; total water, 40,900 $m^3$/t; total energy, 76.8 GJ/t; wild fish, 0.710 t/t. Assessment of land and water use is problematic in shrimp farming. Farms are sited in coastal areas, whereas crop land usually is located further inland. The coastal land is considered to represent greater biodiversity than does crop land. Moreover, when a portion of shrimp is eaten, a portion of some other meat choice likely is foregone. Land is required for production of the other meat animals, so increasing crop land for shrimp feed likely does not increase total land use for animal feed (Boyd et al., 2021b). Water for operating shrimp farms is taken mainly from brackish water in estuaries or from the sea. Such water is not useful for most human needs, and it is not considered a part of the supply of water available for human use (Gleick, 2009). Freshwater use in shrimp farming consists of embodied freshwater in feeds, other substances used in producing shrimp, and water used for drinking, ice used to chill harvested shrimp, and sanitary purposes. These uses consume much less freshwater than the amount of saline water used for farm operations. Freshwater use ranged from 2360 $m^3$/t in Ecuador to 2670 $m^3$/t in Thailand. The weighted average for the five countries was 2591 $m^3$/t (Table 5).

In 2018, *L. vannamei* production was 4,966,241 t (FAO, 2020). Applying the weighted resource use estimates as global averages, the total use of the resources was as follows: land, 2.086 million ha; water, 203 billion $m^3$; energy, 381 million GJ; wild fish, 3.53 million t. The wild fish estimate is somewhat higher than the estimate of 3 million t made for the entire farmed shrimp sector based on 2017 global shrimp production of 5.512 million t (Naylor et al., 2021).

The data on *P. monodon* suggest that feed-based production done in India and Vietnam used similar amounts of land, energy, and wild fish, but water use was greater in India than in Vietnam (Table 5). When compared with *L. vannamei* production, feed-based *P. monodon* production appears to use more land, similar quantities of water, somewhat less energy, and more wild fish than does feed-based production of *L. vannamei*. According to Engle et al. (2017), amendments were a lower production cost for *P. monodon* production than for *L. vannamei* production in Vietnam (12.4% vs. 25.2%, respectively). However, in Thailand no amendments other than probiotics were used for *P. monodon* production. The annual pond yield for *P. monodon* did not approach the levels observed for *L. vannamei*.

In Indonesia, the small inputs of feed resulted in greater *P. monodon* yield than observed in Thailand where no feed was used or reported for extensive farms in Vietnam (Johntson et al., 2000; Boyd and McNevin, 2018) and Bangladesh (Akber et al., 2017). The majority of *P. monodon* production is from ponds to which no feed is applied and total land use for extensive shrimp production, most of which is *P. monodon*, was estimated to be 1.804 million ha by Boyd et al. (2021b). There are insufficient data upon which to estimate global water and energy use for production of *P. monodon*.

## 5.1 | Resource use: shrimp versus chicken, pork, and beef

Total land, water, and energy use at the farm level for broiler chickens, pigs, and beef cattle crude protein were derived from data presented in several life cycle analyses (LCA) and reviews of LCA studies (Table 6). Resource use in the present study of shrimp was calculated on the live weight of shrimp harvested at farms. Kim et al. (2011) found that 52.4% of live *L. vannamei* was recovered as edible meat with a crude protein concentration of 20.6%. The factor 0.108 (0.524 × 0.206) divided into live weight estimates of resource use converted the estimates to a crude protein basis (Table 6). Whiteleg shrimp required slightly less land per tonne of edible crude protein than did broiler chickens which required less land for this purpose than did pigs and beef cattle. Shrimp required less freshwater per tonne of edible crude protein than did any of the traditional, terrestrial meat animals. But shrimp used a large

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

**TABLE 6** Comparison of resource use per tonne of edible crude protein by broiler chickens, pigs, beef cattle, and whiteleg shrimp

| Variable | Broiler chickens | Pigs | Beef cattle | Whiteleg shrimp |
|---|---|---|---|---|
| Land (ha/t) | | | | |
| Average | 4.21 | 5.69 | 12.74 | 3.89 |
| Range | 2.3–5.1 | 4.0–7.5 | 7.5–14.3 | 3.4–4.3 |
| Saline water ($m^3$/t) | | | | |
| Average | – | – | – | 354,900 |
| Range | – | – | – | 104,400–687,500 |
| Freshwater ($m^3$/t) | | | | |
| Average | 34,000 | 57,000 | 112,000 | 25,800 |
| Range | – | – | – | 2360–2670 |
| Energy (GJ/t) | | | | |
| Average | 146.9 | 179.7 | 382.2 | 711.4 |
| Range | 110–174 | 96–368 | 274–526 | 519–915 |

*Note*: Data on broiler chickens, pigs, and beef cattle derived from data presented by de Vries and de Boer (2010); Mekonnen and Hoekstra (2010); Veermäe et al. (2012); Ibidhi et al. (2017); Wiedemann et al. (2017); and Mattioli et al. (2018).

amount of saline water not required in production of the other meat proteins.

Energy use per tonne of whiteleg shrimp protein was much greater than for the terrestrial meat animal proteins (Table 6). The higher energy requirement for shrimp production, and presumably for most aquaculture species that use continuous water exchanges (e.g. raceway production systems) recirculating aquaculture systems or considerable aeration, relates to the difficulty in maintaining the dissolved oxygen concentration at a suitable level in water. Water holds much less molecular oxygen per unit volume than does air. At 30 g/L salinity and 28°C, water contains 6.61 mg/L dissolved oxygen at saturation. This is a molecular oxygen percentage by weight of 0.00065%. The corresponding percentage for atmospheric air is 20.95%. Air contains about 32,000 times as much molecular oxygen as occurs in oxygen-saturated seawater. Moreover, water does not circulate as quickly as does air, and when the water surface in contact with air becomes saturated, net diffusion from the air into water ceases until the molecular oxygen in the surface layer is mixed into the water below (Boyd et al., 2018b).

It is possible to supply additional dissolved oxygen in culture systems by pumping in oxygenated water from the external water source, but this practice will not allow much improvement unless the daily rate is at least 50% of the culture system daily. Such a practice usually is not possible other than in raceway systems where there is a source of flowing water and pumping is not necessary. The most effective way of combating low dissolved oxygen concentration is by mechanical aeration, but it is not uncommon to apply both mechanical aeration and a modest amount of water exchange. Both pumping and aeration require considerable energy, and in addition, feeds used in shrimp production have a much higher embodied energy content than do feeds for terrestrial meat animals. These needs impose a high energy requirement on feed-based shrimp culture.

Wild fish use was not included in Table 6, but Naylor et al. (2021) estimated that 0.82 t wild fish were required to the fishmeal and fish oil in feed to produce 1 t of marine shrimp. The weighted average for wild fish use in the five countries for *L. vannamei* was 0.71 t/t shrimp or 6.57 t/t edible shrimp protein. Shrimp aquaculture requires 24.1% of the wild fish use in aquaculture (Naylor et al. 2021), and aquaculture requires about 69% and 75%, respectively, of wild fish use for fishmeal and fish oil (Bachis, 2017).

Fish oil is not used in other animal feeds, but 23% of wild fish are destined for pig feeds and 5% for chicken feeds (Bachis, 2017). About two thirds of the fish meal for chickens is for broiler chickens. The production of broiler chickens and pigs is much greater than for shrimp (FAO, 2020a, 2020b). Boyd and McNevin (2021) estimated that it required 0.0015 t wild fish/t broiler chickens and 0.006 t wild fish/t pigs on a live weight basis.

The production of protein in shrimp meat is relatively conservative of land and water use, and the composition of shrimp meat is of good nutritional quality. From a nutritional standpoint, the proximate composition of shrimp is within the ranges of the three most common terrestrial meat sources (Table 7). The concentrations of macro- and micro-nutrient minerals and vitamins in shrimp meat fall within the ranges found for other meats (Dayal et al., 2013). The essential amino acid concentrations in shrimp meat (Ngoan et al., 2000; Dayal et al., 2013; Xiao et al., 2021) are similar to those reported in chicken, beef, and pork (USDA, 2020). The digestibility of shrimp meat is 93.7% (Dayal et al., 2013). The digestibilities of chicken meat, pork, beef, and other terrestrial meats range from 80.1% to 97.0% (Faber et al., 2010). Fish meat has a digestibility of 95.1% (Deng et al., 2016). Thus, shrimp meat digestibility compares favourably with the digestibility of other meats.

Dayal et al. (2013) reported that the total saturated fatty acid (SFA) concentration in shrimp meat was about 0.25 g/100 g, whereas average values for chicken meat, beef, and pork were about 6, 8, and 13 g/100 g, respectively. They also pointed out that the concentration ratio of total polyunsaturated fatty acids (PUFAs) to total SFAs (ΣPUFA/ΣSFA) in shrimp meat usually is >1.9. This ratio is greater than found in chicken

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Case 1:25-cv-00025-RKE Document 86-1 Filed 04/27/26 Page 34 of 785
PUBLIC DOCUMENT

Barcode:4512905-01 C-331-806 INV - Investigation -

**TABLE 7** Amounts of water, energy, protein, fat, and ash in 100-g portions of shrimp and in selected cuts of chicken, pork, and beef

| Nutrient | Whiteleg shrimp[a] | Black tiger shrimp[b] | Chicken, breast[c] | Pork, lean only, loin[c] | Beef, lean only, round steak[c] |
|---|---|---|---|---|---|
| Water (g) | 76.3 | 72.2 | 73.9 | 76.0 | 73.4 |
| Energy (kcal) | 93 | 106 | 120 | 109 | 121 |
| Protein (g) | 19.4 | 20.3 | 22.5 | 21.0 | 23.4 |
| Fat (g) | 1.0 | 1.7 | 2.62 | 2.17 | 3.04 |
| Ash (g) | 1.7 | 2.34 | 1.13 | 1.03 | 1.10 |

[a]Xiao et al. (2021).
[b]Seafood Source (2014).
[c]USDA (2020).

meat, beef, and pork indicating that there is a cardiovascular benefit to eating shrimp. The cholesterol concentration in shrimp is about twice that of chicken meat, beef, and pork (USDA, 2020). Although cholesterol is considered a factor contributing to cardiovascular disease, shrimp meat provides about 180 mg/100 g combined of the omega-3 fatty acids, eicosapentaenoic and docosahexaenoic, of cardiovascular benefit (Dayal et al., 2013). Mesa et al. (2021) also reported that fishes, shrimps, and molluscs were critical in the diet to meet the needs of the body for *n*-3 long-chain PUFA intake. Considering all the nutrients, shrimp is a healthy food choice.

## 5.2 | Food safety issues with shrimp

A quick Google search for the safety of eating farmed shrimp will reveal some websites claiming that shrimp farming causes many negative impacts, and shrimp meat often is contaminated with pesticides, antibiotics, and a variety of other potentially harmful substances. Several papers revealed pesticide and other types of contamination at shrimp farms in agricultural areas and of the use of antibiotics and other chemicals in shrimp ponds, for example Burgos-Hernández et al. (2006), Khatun et al. (2020), and Braun et al. (2019). However, investigations of shrimp purchased from retail stores suggest that widespread contamination of shrimp has not resulted. McCormick et al. (2020) analysed shrimp from retail stores and found no differences in mercury concentration between shrimp captured from the ocean and those reared on farms. The study also noted that the mercury concentrations were too low to be of food safety concern. Fillos et al. (2012) concluded that polychlorinated biphenyl (PCB) concentrations measured in farm-reared and wild-caught shrimp obtained from retail stores were not likely to pose health risks. The same conclusion was made for PCBs, polychlorinated dibenzo-*p*-dioxins, and polychlorinated dibenzofurans in shrimp from retail stores (Rawn et al., 2006). In a study of concentrations of halogenated contaminants (including several pesticides) in shrimp and fish from retail stores, van Leeuwen et al. (2009) reported levels of these contaminants decreased in the following order: salmon > trout > tilapia ≈ pangasius ≈ shrimp. Farmed shrimp had lower concentrations of halogenated contaminants than measured in wild-caught shrimp. In addition, all samples of fish or shrimp had halogenated contaminant levels far below European and Dutch legislative limits and usually below 1 ng/g.

Analyses of shrimp samples from retail stores in Baton Rouge, Louisiana (Khan and Lively, 2020) gave the following percentages of positive tests for the following antibiotics: nitrofurantoin (70%), fluoroquinolone (17%), oxytetracycline (7%), malachite green (5%), ciprofloxacin (2%), and chloramphenicol (0%). These analyses were made by a novel method, and even though residues were found, the concentrations were not above legislative levels permitted by United States Food and Drug Administration (USFDA). The preceding citation also included analyses of sulphites for which 43% of the samples were positive, but not in excess of legislative limits. Davis et al. (2021b) analysed 68 shrimp samples from retail stores across 16 states in the United States for a suite of 66 antibiotics using a methodology with detection levels similar to those of the USFDA methodology used in antibiotic surveillance of imported food products. Concentrations above the limits of detection for the 66 antibiotics were not measured.

Shrimp are usually harvested from ponds 80–120 days after stocking. Therefore, at farms whose bottom soil or water in ponds is contaminated with heavy metals, pesticides, and antibiotics, the shrimp do not have a long period over which to absorb and accumulate toxic compounds in their tissue. This is probably why farmed shrimp had lower concentrations of halogenated contaminants than wild-caught shrimp (Rawn et al., 2006). The same relationships would apply to other types of contaminants.

Microbial contamination of processed shrimp is a rather common event, and of particular concern is *Salmonella* and *Listeria* (Abdulla et al., 2003; Wan Norhana et al., 2010; Hamilton et al., 2019). Of course, microbial contamination of food extends to all sectors of food production and processing (Grumezescu and Holban, 2017) and is not limited to farmed shrimp. Nevertheless, the risk of microbial contamination of farmed shrimp should be given more attention at the farm level and in processing (Wan Norhana et al., 2010; Hamilton et al., 2019).

## 5.3 | Possible applications of resource use data

Although not discussed in this report, there was large variability in resource use among shrimp farms of the surveys. The coefficients

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Barcode:4512905-01 C-331-806 INV - Investigation -

of variation were typically 30%–50%. This reveals that some farmers were using resources much more efficiently than others. Great improvements would result if the less efficient farmers would improve to the average found in the surveys of the five countries and greater improvements obviously are possible. Moreover, there was a significant ($p < 0.05$) decline in land and water use with greater annual pond yield. Energy use did not decline as markedly as land and water use with greater intensification, but it did not increase in any of the countries (Boyd et al., 2017, 2018a, 2021a; Juárez et al., 2021). Some farmers are much more progressive than others, and any effort to convince farmers to improve would be limited by human nature and personal opinion. We can offer no suggestion on how to convince farms to voluntarily focus on greater intensification and improvement of their production techniques.

Shrimp farm certification has become popular and the market for certified shrimp is growing. Farmers desiring to participate in shrimp certification must be willing to modify their production practices if necessary to comply with certification standards. These standards are many and most of them are only vaguely related to resource use. A recent assessment (Davis and Boyd, 2021) found little difference in the actual performance of farms certified by the Aquaculture Stewardship Council and non-certified farms with respect to land, water, energy, and wild fish use. This suggests that certification programs should give more consideration to the efficiency with which resources are used in shrimp production.

The increased demand for data to compare the sustainability of different food types and the different systems in which these foods are produced requires simplicity and consistency. The reliance on LCAs for determination of sustainability of food systems is neither simple nor consistent. An LCA can be developed to articulate what is desired. Further, it appears that LCAs could be diminishing the generation of primary data that maintains relevance to what is occurring in the food sector. An LCA can be generated for a farm without knowing where the farm is, what system is being employed, and what the practices and localised impacts are of the farming system. This should raise concern that the science of food production is leaning towards a type of alternative reality that can forego with primary data collection.

Primary data collection is critical in understanding how activities are conducted and how they change. This type of data collection may not result in publication of high-impact journal articles, but it is necessary for spotting trends, identifying problems before they become widespread, and more recently, challenging assumptions made through theoretical modelling. Further, applied science implies the application of knowledge to a specific activity. It is concerning that application is being substituted by assumption.

Simplicity assists with interventions in supply chains where actors are big and small, vertically integrated or disaggregated, and whether targeted markets are local or international. Simplicity also allows for the comparison of aquaculture to other forms of food production in a consistent manner. It is clear there is no one superior food type or food system, and that trade-offs among species and between species need to be made. It is important to reconcile these trade-offs in a manner that can be explained to a consumer. The natural resource accounting appears to be an applicable mechanism to explain trade-offs and implications of food choice, but this approach requires consistent primary data generation.

## ACKNOWLEDGEMENT

This research was supported by a grant from the Gordon and Betty Moore Foundation to the World Wildlife Fund.

## AUTHOR CONTRIBUTIONS

Claude Boyd was involved with conceptualization, methodology, supervision, writing- original draft, and project administration. Robert P. Davis curated the data, performed formal analysis, provided software, and reviewed and edited the manuscript. Aaron A. McNevin conceptualised the idea of the study, acquired funding, administered the project, and reviewed and edited the manuscript.

## CONFLICT OF INTEREST

The authors declare no conflict of interest.

## ETHICS STATEMENT

This study is a review of previous work, therefore no ethics statement was obtained by the authors.

## DATA AVAILABILITY STATEMENT

Parties interested in the data should contact the authors.

## PEER REVIEW

The peer review history for this article is available at https://publons.com/publon/10.1002/aff2.23.

## AUTHOR CONTRIBUTIONS

The authors contributions have been edited to completeness.

## ORCID

*Claude E. Boyd* https://orcid.org/0000-0003-4956-7115

## REFERENCES

Abdulla, M. H., Maqbook, T. K., & Kumar, S. S. (2003). Microbial quality of shrimp products of export trade produced from aquacultured shrimp. *International Journal of Food Microbiology* 82, 213–221.

Akber, M. A., Islam, M. A., Ahmed, M., Rahman, M. M., & Rahman, M. R. (2017). Changes of shrimp farming in southwest coastal Bangladesh. *Aquaculture International* 25(5), 1883–1899.

Avnimelech, Y. (Ed.) (2015). *Biofloc technology—a practical guide*. 3rd edition. Baton Rouge, LA: World Aquaculture Society.

Bachis, E. (2017). *Fishmeal and fish oil: a summary of global trends*. 57th IFFO Annual Conference, Washington, D.C. (https://www.iffoevents.com/files/iffo/2.IFFO%20Washington%202017_1.pdf)

Boyd, C. E. (2020). *Water quality, an introduction*. 3rd edition. Cham, Switzerland: Springer.

Boyd, C. E. & Clay, J. (1998). Shrimp aquaculture and the environment. *Scientific American* 278(6), 58–65.

Boyd, C. E. & Tucker, C. S. (1998). *Pond aquaculture water quality management*. Boston, MA: Kluwer Academic Publishers.

Boyd, C. E. & McNevin, A. A. (2015). *Aquaculture, resource use, and the environment*. Hoboken, NJ: Wiley-Blackwell.

Boyd, C. E. & McNevin, A. A. (2018). Land use in shrimp aquaculture. *World Aquaculture*, 49(1), 28–34.

Boyd, C. E. & McNevin, A. A. (2020). Aerator energy use in shrimp farming and means for improvement. *Journal of the World Aquaculture Society* (https://doi.org/10.1111/jwas.12753)

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Barcode:4512905-01 C-331-806 INV - Investigation -

Boyd, C. E. & McNevin, A. A. (2021). Overview of aquaculture feeds: global impacts of ingredient production manufacturing and use. In: Davis, D. A. (Editor), *Feed and feeding practices in aquaculture*. Amsterdam: Woodhead Publishing (in press).

Boyd, C. E, McNevin, A. A., & Clay, J. W. (2015). Resource use efficiency in aquaculture: examining the known and unknown. *World Aquaculture* 46(June), 25-30.

Boyd, C. E., McNevin, A. A., Racine, P., Tinh, H. Q., Minh, H. N., Viriyatum, R., & Paungkaeu, D. (2017). Resource use assessment of shrimp, *Litopenaeus vannamei* and *Penaeus monodon* production in Thailand and Vietnam. *Journal of the World Aquaculture Society* 48, 201-226.

Boyd, C. E., McNevin, A. A., Davis, R. P., Godumala, R., & Mohen, A. B. C. (2018a). Production methods and resource use at *Litopenaeus vannamei* and *Penaeus monodon* farms in India compared with previous findings from Thailand and Vietnam. *Journal of the World Aquaculture Society* 49, 551-569.

Boyd, C. E., Torrans, E. L., & Tucker, C. S. (2018b). Dissolved oxygen and aeration in Ictalurid catfish aquaculture. *Journal of the World Aquaculture Society* 49, 7-70.

Boyd, C. E., Davis, R. P., Wilson, A. G., Marcillo, F., Brian, S., & McNevin, A. A. (2021a). Resource use in whiteleg shrimp *Litopenaeus vannamei* farming in Ecuador. *Journal of the World Aquaculture Society* 52, 772-788 (https://doi.org/10.1111/jwas.12818)

Boyd, C. E., Davis, R. P, & McNevin A. A. (2021b). Perspectives on the mangrove conundrum, land use, and benefits of yield intensification in farmed shrimp production: a review. *Journal of the World Aquaculture Society* (h ttps://doi.org/1111/jwas.12841)

Braun, G., Braun, M., Kruse, J., Amelung, W., Renaud, F. G., Khoi, C. M. Duong, M. V., & Sebesvari, Z. (2019). Pesticides and antibiotics in permanent rice, rice-shrimp and permanent shrimp systems of the coastal Mekong Delta, Vietnam. *Environment International* 127, 442–451.

Burgos-Hernández, A., Zapién, M. G. L., Madrid, M. L. A., Sifuentes, C. O. G., Gil, C. I. M., Burgos, E. C. R., & Olivas, R. R. (2006). Presence of insecticides in shrimp farms adjacent to the Sea of Cortes: detection, quantification, and toxicity testing. *European Food Research and Technology* 222, 380-384.

Chatvijitkul, S., Boyd, C. E., Davis, D. A., & McNevin, A. A. (2017a). Embodied resources in fish and shrimp feeds. *Journal of the World Aquaculture Society* 48, 7-19.

Chatvijitkul, S., Boyd, C. E., Davis, D. A., & McNevin, A. A. (2017b). Pollution potential indicators for feed-based fish and shrimp culture. *Aquaculture* 447, 43-49.

Davis R., Abebe A., Boyd C., McNevin A. (2021) Exploring the relationship between production intensity and land use: a meta-analytic approach with shrimp aquaculture. *Journal of Environmental Management*, 300, 113719. http://doi.org/10.1016/j.jenvman.2021.113719

Davis, R. P. & Boyd, C. E. (2021). A comparison of the technical efficiency of Aquaculture Stewardship Council certified shrimp farms to non-certified farms. *Current Research in Environmental Sustainability* 3, 100069 (https://doi.org/10.1016/jcrsust.2021.100069)

Davis, R. P., Boyd, C. E., & Davis, D. A. (2021a). Resource sharing and resource sparing, understanding the role of production intensity and farm practices in resource use in shrimp aquaculture. *Ocean and Coastal Management*, 207, 105595 (https://doi.org/10.1016/j.ocecoaman.2021.105595)

Davis, R. P., Davis, D. A., & Boyd, C. E. (2021b). A preliminary survey of antibiotic residues in frozen shrimp from retail stores in the United States. *Current Research in Food Science* 4, 679-683.

Dayal, J. S., Ponniah, A. G., Khan, H. I., Babu, E. P. M., Ambassankar, K., & Kumarguri Vasagam. (2013). Shrimps—a nutritional perspective. *Current Science* 141, 1487-1491.

de Vries, M. & de Boer, I. J. M. (2010). Comparing environmental impacts for livestock products: a review of life cycle assessments. *Livestock Science* 128, 1-11.

Deng, P., Utterback, P. L., Parsons, C. M., Hancock, L. & Swanson, K. S. (2016). Chemical composition, true nutrient digestibility, and true metabolizable energy of novel pet food protein sources using the precision-fed cecectomized rooster assay. *Journal Animal Science* 94, 3335-3342.

El-Sayed, A. -F. M. (2021). Use of biofloc technology in shrimp aquaculture: a comprehensive review with emphasis on the last decade. *Reviews in Aquaculture* 13, 676-705.

Engle, C. R., McNevin, A. A., Racine, P., Boyd, C. E., Paungkaew, D., Viriyatum, R., Tinh, H. Q., & Minh, H. N. (2017). Economics of sustainable intensification of aquaculture: evidence from shrimp farms in Vietnam and Thailand. *Journal of the World Aquaculture Society* 48, 227-239.

Faber, T. A., Bechtel, P. J., Hernot, D. C., Parsons, C. M., Swanson, K. S., Smiley, S., & Fahey, G. C. Jr. (2010). Protein digestibility evaluations of meat and fish substrates using laboratory, avian, and ideally cannulated dog assays. *Journal of Animal Science* 88, 1421-1432

FAO. (2020a). *The state or world fisheries and aquaculture 2020*. Rome: FAO (http://www.fao.org/documents/card/en/c/ca9229en)

FAO. (2020b). FAOSTAT, Food and agriculture data (http://www.fao.org/faostat/en/#home)

Fillos, D., Scott, L. L. F., de Sylor, M. A., Grespin, M., Luksemburg, W. J., & Finley, B. (2012). PCB concentrations in shrimp from major import markets and the United States. *Environmental Toxicology and Chemistry* 31, 1063-1071.

Gleick, P. H. (2009). *The world's water*. Washington, D.C: Island Press.

Grumezescu, A. & Holban, A. M. (2017). *Microbial contamination and food degradation*, Volume 10. New York: Academic Press.

Hamilton, S. (2013). Assessing the role of commercial aquaculture in displacing mangrove forest. *Bulletin of Marine Science* 89, 585-601.

Hargreaves, J. A. (2013). *Biofloc production systems for aquaculture, Publication 4503*. Southern Regional Aquaculture Center, Stoneville, MS.

Hamilton, K. A., Chen, A., Johnson, E., Gitter, A., Kozak, S., Niquice, C., Zimmer-Faust, A. G., Weir, M. H., Mitchell, J., & Gurian, P. (2019). *Salmonella* risks due to consumption of aquaculture-produced shrimp. *Microbial Risk Analysis* 9, 22-32.

Ibidhi, R., Hoekstra, A. Y., Gerbens-Leenes, P. W., & Chouchane, H. (2017). Water, land and carbon footprints of sheep and chicken meat produced in Tunisia under different farming systems. *Ecological Indicators* 77, 304-313.

Ilman, M., Dargusch, P., Dart, P., & Onrizal, O. (2016). A historical analysis of the drivers of loss and degradation of Indonesia's mangroves. *Land Use Policy* 54, 448–459.

Jescovitch, L. N., Chaney, P. L., & Boyd, C. E. (2016). A preliminary assessment of land-to-water surface area ratios (LWR) for sustainable land use in aquaculture. *Papers in Applied Geography* 2:178-188.

Joffre, O. M., Bosma, R. H., Bregt, A. K., van Zwieten, A. M., Bush, S. R. & Verreth, J. A. (2015). What drives the adoption of integrated shrimp mangrove aquaculture in Vietnam? *Ocean and Coastal Management* 114(2015), 53–63.

Johnston, D., Trong, N. V., Tien, D. V., & Xuan, T. T. (2000). Shrimp yields and harvest characteristics of mixed shrimp-mangrove forestry farms in southern Vietnam: factors affecting production. *Aquaculture* 188, 263-284.

Juárez, L. N., Boyd, C. E., McNevin, A., Craig, M., & Nates, S. (2021).The quest for environmentally sustainable shrimp aquaculture. In: Alday-Sanz, V. (Ed.), *The shrimp book*, 2nd edition. Nottingham, UK: University Press, in press.

Khan, M. & Lively, J. A. (2020). Determination of sulfite and antimicrobial residue in imported shrimp to the USA. *Aquaculture Reports* 18 (https://doi.org/10.1016/j.aqrep.2020.100529)

Khatun, M. S., Ariful Islam, M., & Ahmed, K. K. U. (2020). Shrimp/prawn farming status in south-west region of Bangladesh in context of quality control and food safety issues. *Bangladesh Journal of Fisheries* 32, 185-192.

Kim, J. D., Nhut, T. M., Hai, T. N., & Ra, C. S. (2011). Effects of dietary essential oils on growth, feed utilization, and meat yields of whiteleg shrimp *L. vannamei*. *Asia-Australian Journal of Animal Science* 24, 1136-1141.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

Barcode:4512905-01 C-331-806 INV - Investigation -

López-Angarita, J., Roberts, C. M., Tilley, A., Hawkins, J. P., & Cooke, R. G. (2016). Mangroves and people: lessons from a history of use and abuse in four Latin American countries. *Forest Ecology and Management* 368, 151-162.

Lutz, C. G. (2020). Why small-scale, tank-based shrimp production is on the rise. The Fish Site (https://thefishsite.com/articles/why-small-scale-tank-based-shrimp-production-is-on-the-rise)

Mattioli, M. C., Campos, A. T., Yanagi, T. Jr., Marin, D. B., Eugêno, T. M., & Costa, J. E. V. Jr. (2018). Energy analysis of broiler chicken production system with darkhouse installation. *Revista Brasileira de Engenharia Agricola e Ambiental* 22, 648-652.

McCormick, A., Robertson, M. D., Brasso, R., & Midway, S. R. (2020). Mercury concentrations in store-bought shrimp. *Food Science and Niutrition* 8, 3731-3737.

Mekonnen, M. M. & Hoekstra, A. Y. (2010). *The green, blue and grey water footprint of farm animals and animal products. Value of Water Research Report Series 48*. Delft, The Netherlands: UNESCO-IHE.

Mesa, M. D., Gil, G. Olmedo, P., & Gil, A. (2021). Nutritional importance of selected fresh fishes, shrimps, and mollusks to meet compliance with nutritional guidelines of n-3 LC-PUFA intake in Spain. *Nutrients* 13, 465 (https://doi.org/10.3390/nu13020465)

Naylor, R. L., Goldberg, R. J., Primavera, J. H., Kautsky, N., Beveridge, M. C. M., Clay, J., Folks, C., Lubchenco, J., Mooney, H., & Troell, M. (2000). Effects of aquaculture on world fish supplies. *Nature* 405, 1017-1024.

Naylor, R. L., Hardy, R. W., Bureau, D. B., Chiu, A., Elliott, M., Farrell, A. P., Foster, I., Gatlin, D. M., Goldburg, R. H., hua, K., & Nicols, P. D. (2009). Feeding aquaculture in anera of finite resources. *Proceedings National Academy of Sciences* 106(36), 15103-15110 (https://doi.org/10.1073/pnas.0905235106)

Naylor, R. L., Hardy, R. W., Buschmann, A. H., Bush, S. R., Cao, L., Klinger, D. H., Little, D. C., Lubchenco, J., Shumway, S. E., & Troell, M. (2021). A 20year retrospective review of global aquaculture. *Nature* 591, 551–563.

Ngoan, L. D., Lindberg, J. E., Ogle, B., & Thomke, S. (2000). Anatomical proportions and chemical and amino acid composition of common shrimp species in central Vietnam. *Asian Australian Journal of Animal Science* 13, 1422-1428.

Piedrahita, Y. (2018a). Shrimp farming industry in Ecuador, part 1. Global Aquaculture Advocate, 25 June (https://www.aquaculturealliance.org/advocate/shrimp-farming-industry-in-Ecuador-part-1/)

Piedrahita, Y. (2018b). Shrimp farming industry in Ecuador, part 2. Global Aquaculture Advocate, 9 July (https://www.aquaculturealliance.org/advocate/shrimp-farming-industry-in-ecuador-part-2/)

Primavera, J. H. (1997). Socio-economic impacts of shrimp culture. *Aquaculture Research* 10, 815-827.

R Core Team. (2020). *A language and environment for statistical computing.* R Foundation for Statistical Computing, Vienna, Austria.

Rawn, D. F. K., Forsyth, D. S., Ryan, J. J., Breakell, K., Verigin, V., Nicolidakis, H., Hayward, S., Laffey, P., Conacher, H. B. S. (2006). PCB, ACDD, and PCDF residues fin and non-fin fish products from the Canadian retail market 2002. *Science of the Total Environment* 359, 101-110.

Roy, L. A., Davis, D. A., Saoud, I. P., Boyd, C. A., Pine, H. J., & Boyd, C. E. (2010). Shrimp culture in inland low salinity waters. *Reviews in Aquaculture* 2, 191-208.

Seafood Source (2014). Shrimp, black tiger (https://www.seafoodsource.com/seafood-handbook/shellfish/shrimp-black-tiger)

Suresh, A. V., Aceituno, C., & Oliva, L. (2006). Pond preparation, pp. 54–60. In: Boyd, C. E. Jory, D. E., & Chamberlain, G. W. (Editors), *Operating procedures for shrimp farming*. St. Louis, MO: Global Aquaculture Alliance.

Tacon, A. G. J. (2018). Global trends in aquaculture and compound aquafeed production. *World Aquaculture* 49(June), 33–35 & 38–46.

Tucker, C. S. & Hargreaves, J. A. (Editors). (2008). *Environmental best management practices in aquaculture*. Ames, IA: Wiley-Blackwell.

USDA (United States Department of Agriculture) (2021). FoodData Central database (https://fdc.nal.usda.gov/index.html)

van Leeuwen, S. P. J., van Velzen, M. J. M., Swart, C. P., van der Veen, I., Traag, W. A., & de Boer, J. (2009). Halogenated contaminant in farmed salmon, trout, tilapia, Pangasius, and shrimp. *Environmental Science and Technology* 43, 4009-4015.

Veermäe, I., Frorip, J., Kokin, E., Praks, J., Poikalainen, V., Ruus, A., & Lepasulu, L. (2012). Energy consumption in animal production (https://enpos.weebly.com/uploads/3/6/7/2/3672459/energy_consumption_in_animal_production.pdf)

Wan Norhana, M. N., Poole, S. E., Deeth, H. C., & Dykes, G. A. (2010). Prevalence, persistence, and control of *Salmonella* and *Listeria* in shrimp and shrimp products. *Food Control* 21, 343-361.

Wiedemann, S. C., McGahan, E. J., & Murphy, C. M. (2017). Resource use and environmental impacts from Australian chicken meat production. *Journal of Cleaner Production* 140, 675-684.

Wobbrock, J. O., Findlater, L., Gergle, D., & Higgins, J. J. (2011). The aligned rank transform for nonparametric factorial analyses using only ANOVA procedures. 29th Annual CHI Conference on Human Factors in Computing Systems. (https://doi.org/10.1145/1978942.1978963)

Xiao, L., Wang, Y., Li, H., Jiang, X., Ji, L., & Sun, Y. (2021). Chemical and quality evaluation of Pacific white shrimp *Litopenaeus vannamei*: influence of strains on flesh nutrition. *Food Science and Nutrition* 9, 5352-5360.

Zhou, L. & Boyd, C. E. (2014). Total ammonia nitrogen removal from aqueous solutions by the natural zeolite, mordenite: a laboratory test and experimental study. *Aquaculture* 432, 252-257.

Zhou, L. & Boyd, C. E. (2016). Comparison of Nessler, phenate, salicylate, and ion selective electrode procedures for determination of total ammonia nitrogen in aquaculture. *Aquaculture*, 450, 187-193.

**How to cite this article:** Boyd, CE. Davis, RP. & McNevin, AA. (2021). Comparison of resource use for farmed shrimp in Ecuador, India, Indonesia, Thailand, and Vietnam. *Aquaculture Fish and Fisheries*, 1, 3–15. https://doi.org/10.1002/aff2.23

26938847, 2021, 1, Downloaded from https://onlinelibrary.wiley.com/doi/10.1002/aff2.23, Wiley Online Library on [19/02/2024]. See the Terms and Conditions (https://onlinelibrary.wiley.com/terms-and-conditions) on Wiley Online Library for rules of use; OA articles are governed by the applicable Creative Commons License

PUBLIC DOCUMENT


# EXHIBIT 2

Barcode:4511305-01 A-331-806 INV - Investigation -

# 3. ACCESS TO AND USE OF LAND AND WATER

3.1 Land
3.2 Water

Aquaculture takes up land, uses water, deals with animals, uses chemicals, etc. The purpose of this section is to analyse the legislation governing access to and use of (1) land and (2) water for aquaculture.

## 3.1 Land

3.1.1 Publicly owned land versus privately owned land
3.1.2 Agriculture Development Policies and Land Reform Regulations
3.1.3 Protected Areas

Despite the fact that in many countries very little attention is paid to use and access of land devoted only to aquaculture purposes, the laws regarding private and public property rights, agriculture development policies and land reform acts (insofar as fish culture is regarded as a branch of agriculture), environment protection policies and finally national security and defense considerations are the ones most likely to regulate the access and use of land for aquaculture purposes.

### 3.1.1 Publicly owned land versus privately owned land

It is well known that fish culture operations are often carried out in coastal areas, or on riparian lands and in some cases on forest lands. Access to and use of the sites, where they fall within the public domain, are most likely to be subject to special concessions or authorizations granted by competent authorities. In France and Ecuador [1/] special regulations provide that aquaculture operations located on the public maritime domain may only be carried out with a concession provided by the competent authorities. In both countries the procedure aims at obtaining, during the "inspection" phase, a favourable report of all persons and state organizations concerned and to involve various Ministries in the allocation of the authorizations.

[1/] France: "concession d'établissement de pêche et de cultures marines; Decree No. 83-228 of 22 March 1983, establishing the rules governing mariculture operations as modified by Decree No. 87-756 of 14 September 1987. The Decree sets out the conditions governing authorizations for mariculture establishments and for sea water intakes for establishments maritime domain and brackish water areas of rivers, lakes and canals. Ecuador: "Concesión de ocupación de zonas de playa y bahía", Reglamento para Cría y Cultivo de Especies Bioacuaticas, No. 12771 de 5 de septiembre de 1975.

In France, applications for concessions are made to the Chief of the maritime affairs area. The application is circulated to interested government officials and departments (e.g. maritime prefect, inland revenue, health and welfare) and the local representative of the Marine Fisheries Scientific and Technical Institute. Each application is subject to an administrative enquiry and to a public enquiry. Public notice of the latter is given in the commune where the site is situated and in the neighbouring communes affected by the operation. Files are opened in the offices of the chief of the area, the chief of the maritime

Filed By: lschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

station and the town halls, and comments on the application are collected and made available to the public [1/].

[1/] Decree No. 83-228 establishing the rules governing mariculture, as modified. Furthermore, this Decree sets up Mariculture Committees for each district, composed of representatives of interested government departments (maritime affairs, inland revenue, health and social affairs, etc.), a representative of the Marine Fisheries Scientific and Technical Institute, members elected by the general or regional councils, and an equal number of members representing mariculturists. The regional mariculture committees are consulted on all proposals to extend or decrease the area of public land put under mariculture, on any plans for the management or improvement of any given sector, and on any scheme for the allotment of mariculture lands prepared by the administration.

The Ecuadorian procedure to obtain authorization for such an establishment involves the Ministries of Natural and Energy Resources and National Defense, and the Department of Merchant Marine and Coasts. On the one hand, they determine, according to the Fisheries and Fisheries Development Act [2/], the maritime areas, shores, tidelands, rivers and lakes and swamps available for public use where the establishment of fish ponds or cisterns for the conservation and fattening/feeding of bioaquatic species and laboratories, agrarian or experimentation centres, may be undertaken; on the other hand, they decide whether or not to grant the authorization [3/]and together they prepare the "Interministerial Agreement on Concession", should the requested authorization be granted [4/].

[2/] Art. 52, Fisheries and Fisheries Development Act, 1974, reads that "for the establishment of fish ponds or fish tanks or animal fattening farms of bioaquatic species and laboratories, aquariums or experimental centres, the Ministries of Natural Energy Resources and National Defense, jointly and before informing the Directorate of the Mercantile and Coastal Navy, will determine the maritime areas, beaches, estuaries, riverbanks and lakes of public use, for this scope".

[3/] Reglamento para Cría y Cultivo de Especies Bioacuáticas, No. 12771/1975, Art. 11.

[4/] i.e. when the authorities consent to grant the authorization; Regulation cit. No. 12771/1975, Art. 15.

Ecuadorians (individuals, companies and cooperatives) [5/] and foreigners, provided that they comply with Art. 2 of the Law on Aliens, must apply to the Directorate of Merchant Marine and Coasts for a licence; the application must include the following information:

(i) identity and nationality of the applicant;
(ii) type of hatchery or fish farm; and
(iii) the geographic area intended to be occupied.

[5/] Ibid., Art. 6.

At the same time, certain documents must be annexed to the application, such as the constitution papers of the company, a map of the area concerned and the design of the installations to be constructed thereon, and, in the case of foreigners, an authorization from the Joint Command of the Armed Forces.

The procedure consists of various phases: (a) submission of the application, (b) inspection of the requested area by the Directorate General for Fisheries and the National Fisheries Institute, (c) report to the Ministries of National Defense and of Natural Resources and Energy, (d) draft of the Interministerial Agreement ("Acuerdo de Concesión") between the state bodies referred to, (e) once promulgated, the licence holder(s) will receive the "matrícula de ocupación" to be renewed annually and upon payment of certain fees [1/].

Filed By: esburgin@hhlaw.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

[1/] Reglamento No. 12771 of 1975, Arts. 13, 14, 15 and 16.

The concession is granted for 10 years and can be renewed under certain conditions. However, the latter will remain without effect if the licence holder does not pay the annually established registration fee [2/]. An inspection will take place each year prior to the payment of the registration fee [3/].

[2/] Ibid. Arts. 7, 8 and 16.

[3/] Ibid. Art. 9.

The concession cannot be transferred [4/] nor sold [5/].

[4/] Ibid. Art. 17 (see also above).

[5/] Ibid. Art. 18.

The areas granted to individuals are between 10 and 50 hectares, while companies and cooperatives can be authorized to occupy between a minimum of 50 and a maximum of 250 hectares, depending on the number of its shareholders. In addition to this, other factors might influence the area granted, such as the investment, or the presence of complementary activities like marketing or industrial operations [6/].

[6/] Ibid. Arts. 21 and 22.

Licences, permits or lease agreements for the use of the public domain for aquaculture purposes are also in force in several other Latin American countries. This is the case for, among others, Peru [7/], Honduras [8/] and Colombia [9/] and El Salvador [10/].

[7/] Law No. 24790, the General Fisheries Law deals with concessions for the use of public properties or of the sub-soil of marine and continental waters.

[8/] Civil Code, section V, Title II, "De la ocupación", Fisheries Law of 1959, Arts. 9 and 11.

[9/] With the Decree No. 2349/1971 the National Government created the Port Maritime Division, DIMAR, an institution empowered to grant permits to use beaches and tidal lands for aquaculture and tourism purposes. Procedures and requirements are also laid down. Decree Law No. 2324/1984 reorganized the structure of DIMAR but did not change the procedure nor the terms and conditions for obtaining the permits.

[10/] El Salvador has a special regulation entitled "Regulation governing the establishment of "salineras and explotaciones con fines de acuicultura marina en los bosques salados". (Decree No. 14 of 1 April 1986). Both operations can only be carried out on such mangrove forest lands with a permit issued by the Forestry and Fauna Service (Arts. 1 and 2). Only the owners of properties contiguous to the mangrove forest lands concerned and the owners of properties located nearby who have a right of way on the properties contiguous to such forest lands can apply for such a permit. An exception is made where the area requested is an island (Art. 3).

Permits, licenses and lease agreements are common to different countries in East Asia. These usually cover the use of the public domain for aquaculture purposes, as fish pond lease agreements or lease hold rights, fish pen operation permits and licences to operate concessions in fry collecting grounds, among others.

In the Philippines, the Fisheries Decree of 1975 [1/] provides for the identification and setting aside by the Bureau of Fisheries and Aquatic Resources of public lands to be sub-divided

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

into family-sized fish ponds to be leased in accordance with guidelines established by the Fishery Industry Development Council [2].

[1] Presidential Decree (P.D. 704) of 1975 revising and consolidating all laws and decrees affecting fishing and fisheries.

[2] Ibid., Sect. 26.

Public lands, available for fish pond development can only be leased to qualified persons, associations, cooperatives and corporations, subject to certain conditions such as duration (25 years), productivity performances, site, etc. [3]. In addition to this basic law, there are regulations pertaining to public forest lands use [4] (covering as well fish pond and fish pen leases) and the zoning of mangrove and lake areas for fish pond and fish pen development respectively [5]. No person, individual or corporation shall occupy or use any portion of public forest lands, including tidal, mangrove and other swamps, ponds and streams within public forest lands or proclaimed timberlands, or established forest reserves, for fish pond purposes without obtaining beforehand a permit or lease [6] issued by the Director of Fisheries or by the Secretary of Agriculture and Natural Resources upon recommendation of the Director. A one-year permit or a ten-year lease are also subject to conditions regarding duration, productivity, performances, finances, payment of fees, etc.

[3] Ibid., Sects. 24 and 25.

[4] Revised Fisheries Administrative Order No. 60 of 1960: Regulations governing the issuance of fish pond permits and/or leases on public forest lands.

[5] Fisheries Administrative Order No. 160, Series of 1986: Regulations and rules governing the construction, establishment or operation of fish pens and fish cages in Philippine waters.

[6] Administrative Order No. 60 of 1960, Sects. 2 and 3.

The interesting point of this legislation is that, where the permit was the standard regime, under certain circumstances and conditions, and in particular if the holder of the permit had improved the area covered by the permit, the latter could be converted into a lease. This regime had been modified in 1979, with the conversion of such permits/leases into fish pond lease agreements of 25 years [1], with the payment of an annual rent.

[1] Fishery Administrative Order No. 125, Series of 1979, Sect. 2.

Terms and conditions, such as establishment of boundaries, drafting of a development plan, introducing improvements in the area within 180 days from the issue date of the lease agreement, use of the land exclusively for fish ponds and other aquaculture purposes, etc. are set out in Section 5 of Administrative Order No. 125/1979.

This legislation obviously takes into account an essential aspect of fish farming, namely the importance of long-term leases for aquaculture to allow for the recuperation of long-term investments.

Exploitation rights of any other resources within the area granted, detrimental to the interests of the permit holder or lessee, will not be granted to other persons [2].

[2] Revised Fisheries Administrative Order No. 60, Sect. 28, (i), "Exclusive privilege".

These examples clearly show that legislation concerning public lands directly influences the access and use of them for aquaculture purposes.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

In some of the Pacific islands, reef and lagoon areas are owned by villages or families. In these cases aquaculture operations must meet with the approval of the appropriate chief or family head. These traditional management systems are still operational in the Cook Islands, Palau, Federated States of Micronesia and on many other islands [3/].

[3/] ADCP/REP/88/32.

In most countries, legislation on this particular subject seeks to offer equal opportunities for nationals, be it administrative units (Peru), small-scale fisherfolk groups or family size groups (Philippines) [4/], or bigger corporations (France). In the latter country, the 1983 legislation for marine and coastal aquaculture was a strong protector of small-scale enterprises and made it extremely difficult for corporations to have access to aquaculture sites. In 1986, the legislation was revised in France to facilitate transfer of aquaculture enterprises from one owner to another, and gave access to corporations for investment. Foreign investors and assistance (foreign capital and technology) are welcome in most developing countries, as long as national investors are not adversely affected, control of the sector is not lost, and nationally oriented sectoral developments are not hindered. Typical examples are the Philippines and Ecuador, where, for the above mentioned reasons, access to aquaculture sites is subject to a complex administrative procedure and foreigners are allowed limited access only.

[4/] "For the purpose of accelerating the development of fish ponds, the Bureau, subject to the approval of the Secretary, shall identify and set aside the public lands which shall be sub-divided into family-size fish ponds and leased in accordance with guidelines established by the Council", Section 26 of the Presidential Decree No. 704.

### 3.1.2 Agriculture Development Policies and Land Reform Regulations

The fact that these policies and laws influence access and use of land for aquaculture purposes is particularly true in Colombia, Panama and Venezuela, and to a lesser extent in Tunisia, Zambia and the Philippines. Access to and use of land for fish culture was facilitated in Colombia by the Rural Integrated Development Programme established in 1975 and the "Programa de Protección Integral de Cuencas en Deterioro (PRIDECU)" set up in 1977. In accordance with those development programmes, areas suitable for aquaculture were granted more easily under the form of leases to small-sized groups, individuals or corporations [1/]. Furthermore, Decree No. 533 of 1986 of the Ministry of Agriculture deals with contracts for the development of uncultivated land for agricultural and pastoral purposes. The economic exploitation of hydrobiological resources of any kind through productive activities, such as aquaculture, is also considered to be an agricultural activity. INCORA [2/] may make contracts for the exploitation of land beyond the 50 metre shoreline established by Decree No. 2324 of 1984 and which have the characteristics of uncultivated land which may be developed. The beneficiaries have to abide by the existing rules for the exploitation of mangrove trees, hydrobiological and other renewable natural resources.

[1/] Freshwater farming development units for the production of seeds (UPIS).

[2/] Institution belonging to the Ministry of Agriculture; its task is to promote the development of aquaculture operations.

In a different way, Egyptian Fisheries Law [3/] states that the establishment of fish farms is prohibited except on fallowland that is unsuitable for agriculture; agricultural lands and farms cannot be prejudiced. An authorization from the Ministry of Agriculture is required.

[3/] Act No. 124 of 1983, Act on fishing, aquatic life and the regulations of fish farms, Arts. 14 and 48.

### 3.1.3 Protected Areas

Filed By: fschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

Legislation regarding so called "protected areas" for aquaculture operations, carried out by private or public bodies, is most likely either to hinder or to facilitate access to and use of lands suited to aquaculture.

Various reasons may justify such rules: environmental protection [1/], aquaculture protection and promotion [2/], natural resources management, educational, research and scientific development purposes [3/], public health protection [4/], management of the conflicting uses of certain natural resources [5/], protection of water quality, etc.

[1/] France (cfr. infra).

[2/] Singapore, The Fisheries Act (Section 294), "The Fish Culture (Control and Licensing) Rules", 1981, Sect. 4.

[3/] Philippines, Section 31 of Presidential Decree No. 704 of 1975 states that upon the recommendation of the Director, the Secretary of Natural Resources may designate by Fishery Administrative Order an area or areas in Philippine waters as a fishery reserve for the exclusive use of the Government or of any of its political sub-divisions, agencies or instrumentalities, or of the inhabitants of any municipality, or for the culture of fish and other aquatic animals for education, research and scientific purposes.

[4/] The Philippine Code of Sanitation, reads in Section 32:

> "1. Oysters shall be planted and grown only in areas approved by the Secretary of Health or his duly authorized representatives and in places duly licensed by the Bureau of Fisheries and Aquatic Resources.
>
> 2. Oysters offered for sale, if not originating from approved areas, shall be confiscated and destroyed by the local health authority."

[5/] The Federal Coastal Zone Management Act (CZM) (1976) in USA provides for Federal support to each state in developing a CZM master plan and in then enacting appropriate legislation and management structures to carry out the plan. The purpose of the CZM plan is to resolve conflicts and ensure that the best use of the coastal zone is made in terms of long-range public interest.

The Government of the Republic of Korea is committed to protect its fishery resources and the Fisheries Law [6/] establishes "protective areas" (waters suitable for the spawning of fish, the seeding of marine animals and plants or the growing of fish larvae).

[6/] Fisheries Law Decree, Art. 12, and Fisheries Law, Art. 25.

The establishment of shrimp hatcheries along the Ecuadorian coast is only allowed in technically specified areas. A Commission, formed by the Oceanographic Institute of the Army, the Directorate for Merchant Marine and Coasts, the Directorate General for Fisheries and the National Fisheries Institute, decides on the location of the specific areas [7/]. The competent authorities have refused to recognize and, consequently legalize, some existing shrimp hatcheries because they were not located in these areas. The authorities have the power to direct that the areas be returned to their natural state.

[7/] Ministerial Agreement No. 14425 of 1978, Article 2.

In France, the situation is even more complex.. Traditional town planning documents [1/] and maritime areas development documents [2/] are Used as tools to preserve and protect, inter alia, aquaculture sites; and also urban areas indirectly. The SDAU control and the POS furnish guidelines to plan national development in certain areas and ensure that on sites suited to aquaculture only the construction of buildings directly related to the fish farming

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -
activity should be allowed. Regarding coastal and marine areas, these documents provide for the optimization of the various activities located there, as veil as resolving problems of compatibility between different uses.

1/ Two documents are relevant: the "SDAU" (Schémas Directeurs d'Aménagement d'Urbanisme) and the "POS" (Plans d'Occupation des Sols), provided for by the "Loi d'Orientation Foncière du 30 Décembre 1967".

2/ The most relevant ones are: (a) Schémas d'Aptitude et d'Utilisation de la Mer (SAUM), decision of the Inter-Ministerial Committee for National Development, dated 26.10.1972; (b) Schémas de la Mise en Valeur de la Mer (SMVM); Law of 7.1.1983.

It is interesting to note that in Zambia, the establishment of special areas is motivated by the wish to protect or control natural resources therein and the quality and the quantity of water resources [3/]. Indeed, Zambia is characterized by a "water resources oriented legislation", in which the conservation of water resources, as natural resources, is of major concern. Thus, upon request of a land occupier of a certain area and on recommendation of the Natural Resources Advisory Board, the Minister of Land and Natural Resources and Tourism may designate the area as a conservation planning area [4/] and elaborate a conservation plan, which might deal among others with the following matters:

(i) the demarcation and allocation of land for agriculture purposes, including the layout of land for fish farms;

(ii) the regulation of bee-keeping and fishing [5/].

3/ The Natural Resources Conservation Act No. 53 of 1970, Sect. 42.

4/ The Natural Resources Conservation Act No. 53 of 1970, Sect. 41.

5/ Ibid, Schedule 4.

In some countries, the intervention and interference of the Government for purposes of National Security and Defense are likely to limit or hinder the access to and use of certain lands. This is, among others, the case in Ecuador. The Ministry of National Defense and the Joint Command of Armed Forces are regularly involved in the decision-making process whether or not to grant the "concesión de ocupación respectiva" [6/]. Furthermore, competent authorities may refuse to recognize existing shrimp hatcheries for, inter alia, reasons of national security [7/].

6/ Reglamento No. 12771 of 1975, Arts. 13, 14, 15 and 16.

7/ Ministerial Agreement No. 14425, Art. 2.

## 3.2 Water

---

3.2.1 Access to and use of water
3.2.2 Discharge of used waters and water quality

---

### 3.2.1 Access to and use of water

Water, together with land, is one of the major and basic natural resources for which each government tries to plan orderly economic policies, at a national, regional or local level. In most countries, the legislation on water resources deals with its beneficial uses (domestic, municipal, irrigation, etc.) the harmful effects of water, the uncontrolled waste and misuse of water, and finally the quality and environmental aspects. Each of these subjects often

Filed By: ssnaghi@cozenassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

seems to be administered by a different ministry, department or autonomous institution without apparent coordination.

Most countries have a regulation dealing with the right to use water resources for aquaculture purposes, either specifically or as a part of the right to use water for fishing or agriculture purposes in general. In the same manner, regulations concerning discharge of waste water and effluent, and more rarely quality aspects, can be found. Indeed, in some countries, the law is first concerned with the conservation of the water resources or with its optimum use and only then with its other uses (e.g. Panama). In other countries, the law deals with water in general, together with other natural resources and environmental elements (e.g. Colombia [1/], Poland).

[1/] For instance, priorities are determined on a regional basis in the light of ecological, economic and social considerations (The National Code of Renewable Natural Resources and Environment Protection, 1974, Art. 49), allowance being made for the need to establish reserves, the wish to conserve the environment, the economic and social costs and benefits of any project, and considerations of subsistence and the economic and social development of the population of the region concerned (Ibid. Art. 49). Furthermore, like any other constituent part of the environment or renewable natural resource, water must be used in an efficient manner so that the maximum gain may accrue, compatible with the general interest of the community and with the principles contemplated by the National Code of Renewable Natural Resources and Environment Protection, in such a way that no interference shall occur with any of those resources or with the rights of third parties (Ibid., Art. 9).

Whether adhering to water law principles of the Common Law System, the Civil Law System, or others, the amount of water available for aquaculture purposes is almost invariably stated in a permit, licence or authorization from local, regional or central governing bodies. Differences found in the following fields are most likely to influence the regime of water use for aquaculture purposes:

(i) legal status of ownership of water;
(ii) explicit reference to the need of a licence for aquaculture; and
(iii) place of aquaculture in the order of priority established among beneficial uses, if there is priority.

In the following paragraphs, a brief analysis is made of legislation dealing with the right to use water resources for aquaculture.

The Federal Water Act (30 December 1971) of Mexico represents the expression of a national water policy embodying the constitutional principle of national ownership of natural resources, with the consequent need for regulating the use of such resources. Title II regulates in detail the various types of water use and the works and facilities associated with them. All water withdrawal or use is subject to prior authorization, with the exception of water use for domestic purposes and for public services (for which a strict order of priority exists). Article 27 of the Act provides for a priority order amongst nine kinds of uses; aquaculture is in the seventh place preceded by domestic use, use for municipal public services, for watering of livestock, use for irrigation, use for hydro-electric power generating industries for public services, and others; it is followed by use for hydro-electric power generating industries for private purposes, drainage and other uses. The setting up of fish farming districts [1/] with a view to preserving and improving "the natural conditions of public water resources (i.e. resources belonging to the Nation), for the development and exploitation of the vegetable and animal aquatic species..." is also provided for [2/]. This law does not deal with the use of water from coastal areas, tide lands and of marine water not located in aquaculture districts. Assignments, concessions and permits granted by the Secretary of Agriculture and Water Resources regulate the use of public water resources. Assignments (asignaciones) are a special type of authorization and are granted by the Secretary to the Governments of the States, of the Federal District and of the Federal Territories and to public agencies. Concessions are granted to private individuals and corporations. Permits are given directly for the construction or alteration of water

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:23 PM, Submission Status: Approved

management works. The users of the aquaculture districts have to pay for the services which are established. The regulation of the use of water is strictly related to the establishment of districts for aquaculture. Moreover, the use of waters should not adversely affect the ecological balance. Rather, water should be used to protect the soil, the wild lands and forest lands, as well as to maintain the flow and the volume of the watercourses and to preserve the aquifers. Special attention is given to these considerations particularly when authorizations to divert or utilize national water are to be issued and when aquaculture districts are established. Finally, the water used for aquaculture operations (marine or freshwater) must meet the quality standards fixed by the Secretariat of Hygiene and Health 4/.

1/ Federal Water Act, 30 December 1971, Art. 87 e.f.

2/ Ibid., Art. 88.

3/ General Law on the Ecological Balance and the Protection of the Environment, 29 January 1988.

4/ Regulation on the Sanitary Control of Fisheries Products, D.O. 7 July 1980.

In Zambia, where the ownership of all water is vested in the State 1/, there is no legal priority among the different uses of water. In terms of the Water Ordinance, different uses of water are classified as "primary" or "secondary" or "tertiary". According to this classification, the use of waters for irrigation and for fish breeding is classified as "secondary use" 2/; domestic use of water, including the watering of animals, is a "primary" water use; and industrial and mechanical use of water, including that for power generation, is "tertiary" use. This classification does not appear to result in a priority status of corresponding uses of water. Different rights of use of water apply to the two different classes (public and private) of water: the acquisition of a right to impound, store, divert or simply use public water for purposes other than domestic use (primary use) is subject to grants by the administrative authority (the Water Board) 3/. The granting of an application takes the form of an order by the Water Board in which water rights can be exercised subject to appropriate terms and conditions 4/. Where a term (i.e. time) clause has been included, renewal of water rights after the term has expired is at the discretion, by a formal act, of the Water Board 5/. Thus, public water can be diverted or utilized for fish breeding purposes, and water rates can be levied in respect of the amount of water supplied and of a "special" water right 6/.

1/ Current legislation, however, classifies waters as "public" and "private":

(i) public waters include public streams, i.e. those waters, courses, drainage depressions and "damboes" (a low-lying area in which water tends to collect during the rains) of natural origin wherein water flows in the ordinary season, as well as the lakes, swamps or marshes which form the source of a public stream;

(ii) private waters include all those swamps and springs which are entirely situated within the boundaries of one's land, and which do not feed a stream or watercourse flowing beyond one's land boundaries. Also groundwater which is artificially brought to the surface of one's land, and flood water which is impounded on one's land, are classified as private waters. The Water Ordinance, No. 34 of 1948 as amended, Sect. 2.

2/ The Water Ordinance, No. 34 of 1948 as amended, Sects. 39, 41.

3/ Ibid., Sects. 9, 16 and 18.

4/ Ibid., Sects. 32, 26(2) and 28(b).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

5/ Ibid., Sect. 33.

6/ Ibid., Sect. 5.

The right to use private water situated on private land for one's own (i) domestic, (ii) irrigation, including fish breeding, (iii) industrial and (iv) hydro-power generation purposes is free from administrative control.

Any land-owner demonstrating a need for water for a secondary use may claim another's surplus upon the eventual payment of compensation with respect to any expenses incurred by the deprived party in making the claimed water available. It is still necessary to obtain the necessary water use right from the water authority 7/.

7/ The Water Ordinance, cit. Sect. 11.

No specific provisions laying down an order of priority in beneficial water uses exist in the United Kingdom. However, in considering an application for a licence to use water, water authorities must be satisfied that a copy of a corresponding notice has been served on any navigation, harbour or conservancy authority having functions in relation to the relevant water resources at any proposed point of abstraction, and on any drainage board within the district in which any proposed point of abstraction is located 1/. The Water Resources Act 1963 introduced a system of licensing for water abstraction. The general effect of the present licensing provisions is that no person is permitted to abstract water from any source of supply except in accordance with a licence to abstract granted by the Water Authority for the area 2/. Nonetheless, an exception to the general licensing requirement for water use is made in respect of uses made by an occupier of land contiguous to the water where the abstracted waters are to be used for agricultural purposes 3/. "Agriculture" in this context is defined to include the keeping of livestock including any creature kept for the production of food 4/. As regards aquaculture, the water abstraction, therefore, will not require a licence provided that the fish farmer is the occupier of land contiguous to a watercourse and that the fish in question are kept for the production of food. Conversely, a water abstraction licence will be required where fish are farmed, for example, for ornamental purposes or for restocking other waters.

1/ In assessing the demand for water, the water authorities must, according to Section 24 of Water Act 1973: prepare an estimate of the future demand for use of that water during a twenty year period from the date on which the survey is completed, or such longer or shorter period from that date as the appropriate Minister or Ministers may in any particular case direct; prepare a plan for action to be taken during that period by the authority (whether by way of executing or otherwise) for the purpose of securing more efficient management of water in their area, including the meeting of future demands for water and the use of water and restoring or maintaining the water quality of rivers and other inland or coastal waters in their area; and carry out a survey of the water in their area, the existing management of that water, the purposes for which it is being used and its quality in relation to its existing and likely future uses, and to prepare a report setting out the results of the survey.

2/ Water Resources Act, 1963, Sect. 23.

3/ Water Resources Act, 1963, Sect. 24(2)b.

4/ Water Resources Act, 1963, Sect. 135(1).

Malawi acknowledges a distinction between private water (which may be privately owned) and public water (which may not). No ownership is possible in the running water over the surface of the ground or contained in or flowing from any river, spring or stream or natural lake or in a pan or swamp and all underground water. Any stagnant pan or swamp wholly contained within the boundaries of any private land is private water 5/. All public water is

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -
vested in the President and the use of public water (direct, dam, storage, abstraction, etc.) is prohibited except with lawful authority. Sources, quantity, period (whether definite or not) are defined in the grant. Only the taking of public water for fighting fires is free. Apparently, there is no legal status regarding priority of uses of public water nor is any reference made to use of water for aquaculture or fishing purposes in the Water Law. In case of private water, the right to use is a normal attribute of the ownership of this water.

5/ The Water and Resources Act of 6 May 1969, Sect. 3.

Panama, in its turn, has a quite distinctive legal regime for water use. Water is not susceptible of ownership. All waters belong to the public domain and their use is subject to government permits or concessions 1/. The latter will only be granted for any demand for "beneficial use" of water 2/, that is to say a use which serves directly its concession holder or permittee, which is rational and which conforms to the social and public interests 3/. The following are considered as beneficial uses of water: domestic use and use for public health purposes, as well as use for agriculture, industry, mining and energy purposes and use for animal health and recreational purposes 4/. Highest priority is given to the use of water for public health purposes as this use serves best the social and public interest. Regarding other uses, priority will be given to existing use rights and then to the use which serves best the social and public interests if any controversy arises among existing rights or to decide on specific demands 5/. There is no definition of "agriculture", nor any reference to fishing or aquaculture. The point is to what extent does aquaculture serve the public and social interests of the State. A similar priority system exists in Ecuador, where among different uses, whenever water is insufficient in quantity to satisfy more than one use, preference will be accorded to the use which best serves the economic and social interests of the country 6/. The Water Act lays down the following priorities, which the authorities may modify in the event of a "social emergency":

1. supply of population centres, domestic needs and livestock watering;
2. crop and animal husbandry;
3. energy production and industrial and mining uses;
4. other uses.

1/ Decree-Law No. 25 of 22 September 1966, Art. 15; and Art. 16 reads that the right to use or to discharge waste water can only be acquired through (a) a permit (period of maximum one year, and special purpose); (b) temporary concession (3 to 5 years, and special purpose); and (c) permanent concession.

2/ Ibid., Art. 15.

3/ Ibid., Art. 16.

4/ Ibid., Art. 16.

5/ Ibid., Art. 40-42.

6/ Water Act of 1972, Sect. 25.

However, the first priority mentioned in the above list may not be modified in any event 1/. The point is to what category does the water use for aquaculture purposes belong. The only reference made is the following: the Water Resource Institute of Ecuador is empowered to grant a water use right in respect of sections of rivers and other natural or artificial watersheds for the culture, harvesting and exploitation of "aquatic flora and fauna" 2/. Before doing so, the Institute must obtain a report from the Fisheries" Department of the Ministry of Natural Resources and Tourism and comply with the terms and conditions prescribed by law. Meanwhile, priority must also be given to considerations of social interest laid down in the Marine Fisheries and Hunting Act. In granting such authority, preference will be given to the harvesting of juveniles of species to be cultivated and exploited 3/.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

1/ Water Act of 1972, Sect. 34 and Water Act Regulation, 1973, Reg. 85.

2/ Supreme Decree No. 40, issuing the Water Act Regulations, 1973, Regs. 126-127.

3/ Ibid.

The use of public waters for aquaculture purposes is clearly regulated in Guatemala. Indeed, the Governmental Decree No. 1235 of 1932 4/ states that the Municipalities in agreement with the Ministry of Agriculture are empowered to grant the use of public waters (fresh or salted) to establish lakes, backwaters or ponds assigned for fish hatcheries or fish ponds, provided that no damage is caused to the public health.

4/ Law which regulates the Freshwater Fisheries and Fisheries.

The Polish Water Law distinguishes between the flowing and stagnant surface waters. Flowing water, except water in ditches, is the property of the State; stagnant water and water in ditches are the property of the land-owners where such waters occur. The groundwater, except water in wells, is also the property of the State. The basic method of regulating water consumption is the issue of a water licence. It is an individual and unilateral administrative act, granting to the persons applying for such a licence the specific right to utilize the water and fixing the respective duties. A legal water licence is required, among others, for fishing purposes, considered as a specific use of water, i.e. one which exceeds public or normal use of water 5/. The control of water use is linked with the economic plans. Thus, irrespective of the subject applying for a water licence, a licence will be refused if the proposed use of water is contrary to the requirements of national economic development or the protection of the natural environment, as set up in the social and economic plan for the country's development 6/.

5/ The basic forms of water use are: public or normal use of water. The latter is available for anyone willing to utilize it for personal and domestic purposes, without the need of a water licence.

6/ The Water Law treats in a special manner irrigation and drainage installations, which include facilities for fish ponds. Indeed, irrigation and drainage installations are divided into basic ones such as canals, weirs, water reservoirs (intended exclusively for agricultural purposes) [...] and detailed ones such as ditches, sprinklers, fishing ponds [...] The costs of basic installations are borne by the State while the detailed installations are financed by the State, which means that part of such expenses is refunded to the State by the respective land-owners in the form of annual land improvement dues. Majewski T., "Economic stimuli of rational water management in Poland, Present state and predicted trends of development". Seminar on the rational use of water in industrial processes, 29 March 1985. Surowiec Stanislaw and Deja Andrzej, "Water law and its application in Poland", 1977.

France, as opposed to the above mentioned countries, does provide for the use of maritime water (sea water) and the use of fresh water for aquaculture purposes.

Sea water is considered as "res communis", that is to say that its nature does not allow any ownership and that the use of it belongs to everyone without limits or permission 1/. However, when the use of such water involves the possession of a part of the public maritime domain, the user must obviously ask for due authorization from the competent authorities. Consequently, as far as aquaculture is concerned, two situations must be distinguished:

1. the fish farm is located on the Public Maritime Domain (PMD): no other authorization is required in addition to the one asked to establish the fish farm, if the water abstraction facility (including pumps, etc.) does not imply a supplementary encroachment/trespass on the public maritime domain; or

Filed By: fschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

2. the fish farm is located on private property [2/] but using seawater. The abstraction of such water is subject to the terms and conditions set out in Decree No. 83-228 if the water intakes are located on the Public Maritime Domain [3/].

[1/] Civil Code, Art. 714.

[2/] Decree No. 83-228 of 22 March 1983, Arts. 1 and 2, establishing the rules governing mariculture operations, as modified by Decree No. 87-756 of 19 September 1987.

[3/] Decree No. 83-228 cit., Art. 17.

On the other hand, the use of surface and groundwater (catchment, diversion, etc., installations) for fresh water culture is submitted to an authorization [5/], unless the water source derives from or flows within privately owned land or the user has some existing ancillary right or prior use rights in this respect.

[4/] Rural Code, Arts. 97, 106 and 107.

There are no legislative provisions establishing a general order of priority between different uses, areas or existing rights. However, in cases where a priority of use has to be established, the National Water Committee, at the national level, and the relevant Basin Committee, at the local level, are consulted and the decision granting priority to one use or area is adopted by Order of the Council of State [1/].

[1/] Law No. 64-1245 of 16 December 1969, Arts. 15 and 31.

Priorities among existing rights to the use of private waters are regulated by the provisions of the Civil Code relating to land ownership. As to the use of public waters, existing rights are taken into consideration during the procedure of inquiry preceding the issuance of water use titles.

Because of the different conditions existing from one country to another and the limited amount of information available, it is difficult at present to make a thorough analysis of the existing situation with respect to water resources administration and legislation for aquaculture purposes. However, from the above country analysis, it was noted that several countries have a statute on water use for aquaculture purposes (Mexico, Guatemala, Poland, France). Many others have a number of discrete enactments which either have an indirect bearing on water use and control on the subject (U.K., Zambia) or which cover only certain aspects of water management without reference to aquaculture as such (Malawi, Panama). Most of the latter countries acknowledge the right to use water for agriculture, animal health, etc., and the point is to know whether or not fish culture can be understood as such or not.

In addition, even in those countries whose laws refer to aquaculture, it is rarely specified if the authorization granting the right to use water for fish culture has a temporary character or not, or if the duration of the water licence agrees with the duration of the aquaculture licence, if any exists [2/]. At the same time, it is also not known whether the duration meets or is adapted to aquaculture needs.

[2/] The only known countries where the aquaculture licence is issued in complete accordance with the Water Laws are El Salvador, Guatemala and France. Indeed, in the former country the General Board of Fishing Resources must grant a permit to engage in aquaculture operations in accordance with the Law on uses of water (General Law on Fishing Activities, Decree No. 799 of 1981, Art. 46).

The priority given to the use of water for aquaculture purposes is not always clear in those countries where a priority order exists: it is most often placed after domestic use and use of

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

livestock watering or for public interests; it is sometimes preceded or followed by the use for agriculture purposes and usually followed by the use for industries or recreational purposes, etc. (depending on whether aquaculture is included in one or another category). Obviously water management policies are to optimize the use of water (domestic, drinking, etc.) and then the other uses. But the criteria for classification do not appear very clear. Lack of awareness of the importance of regulating the use of water for aquaculture could be a reason. But it is also true that aquaculture operations have been integrated in a legislative framework quite recently for many countries while the water laws are much older.

Finally, among the countries analysed, only in France is there a different legal statute between the use of seawater and the use of fresh water for aquaculture purposes (bearing in mind that most countries adhere to the principle that all waters vest in the State). It appears that no significance is attached to the various types of existing aquaculture techniques, i.e. brackish, fresh and marine water fish culture.

## 3.2.2 Discharge of used waters and water quality

---

Water discharge
Water quality

---

Aquaculture is likely to produce significant environmental impacts on rivers, lakes and coastal areas, primarily as a result of the discharge of wastes into them. On the other hand, however, water pollution is a great threat to aquaculture.

Laws dealing with the problems of water discharge, water quality and environment protection are likely to be found in almost all countries. Pollution prevention regulations, water laws, natural resources conservation laws, health codes as well as other laws might regulate these matters.

### Water discharge

Viewed from the perspective of aquaculture operations, legislation on water discharge varies from country to country. First of all, not all countries' legislation deal specifically with discharge of used water by fish farms. The heart of such laws is often the general requirement that "the discharge of any pollutant" must be authorized; in other terms, the most important common feature is the requirement of prior authorization for discharge of waste into water.

This authorization can either be incorporated in the grant (permit or concession) to use water (Zambia, Ecuador) or be given separately (U.K., Korea, Malawi and Poland).

Zambia has specific legislation with respect to the qualitative and quantitative aspects of water. Where water is used under a grant, as is the case for fish breeding purposes, the metering of the water as well as control over water waste may be prescribed by terms and conditions drafted in the grant [1/]. Further, a legal obligation for individuals to take proper antipollution measures at their own expense may arise from a term or condition which the water authority may attach to the grants, whereunder water users may acquire rights to use public and in some cases private water [2/]. Auxiliary legal provisions authorize the Minister of Health to enact regulations governing (a) the setting of quality standards for effluents from any source and (b) the establishment and operation of factories whose activities may result in water pollution [3/]

[1/] The Water Ordinance, No. 34 of 1948, as amended, Sect. 28(b).

[2/] The Natural Resources Conservation Act No. 53 of 1970, Sects. 13(3) and (4).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

[3/] The Public Health Act No. 12 of 1930, as amended, Sect. 78.

According to the Ecuadorian Water Regulations, studies and works concerning water catchment, conduits, diversion, storage and discharge of water may only be executed upon approval of the Water Resources Institute of Ecuador and having regard to legal requisites relating thereto [1/] Several characteristics of a water right are that it is granted on the condition that no interference arises with other uses, that there is water in sufficient quantity and appropriate quality available, and that the authorities approve the plans and the installations (intakes and discharge) [2/]. The Water Authorities supervise, jointly with the Ministry of Health, all installations for the treatment of water that has become polluted [3/] On the other hand, pursuant to the Health Code, the following prohibitions exist:

(i) nightsoil, waste water and industrial water may not be discharged, directly or indirectly, into streams, rivers, lakes, conduits or any watercourse used for domestic, agricultural, industrial or recreational purposes, unless they have first been subjected to treatment to render them harmless to health [4/]

(ii) the discharge into sewerage systems, streams, conduits, rivers, lakes or sea, or the seepage into the soil of effluents containing contaminants that are harmful to human health, the fauna, the flora or to property when such effluents do not conform with the technical rules and regulations prescribed by the authorities [5/].

[1/] Supreme Decree No. 40 issuing The Water Act Regulations, 1973, Art. 187.

[2/] Supreme Decree No. 369, the Water Act 1972, Art. 30.

[3/] The Water Act Regulations 1973, Art. 92.

[4/] The Health Code No. 188, 1971, Arts. 12 and 17

[5/] Ibid.

Water permits are required in Poland, in particular for the discharge of waste water into waters or soil, the collection of waste water and wastes on the littoral, and the discharge or supply of water by means of equipment traversing the land of another freeholder. The permit is issued on the basis of a hearing where the competent administrative body considers and analyses all aspects of the water use intended by the users and the expected impact of that use on water management of the area in question. The Polish Water Code provides for a special clause allowing the administration, at the time of the authorization or later, to require the construction, enlargement, or modification of sewage purification installations or other installations for the prevention of water pollution [6/].

[6/] The Polish Water Code of 30 May 1962, Art. 48.

Moreover, Poland also set up a system of water pollution control based on the prohibition of water pollution in terms of discharge or introduction of effluents, subject to penalties for violations. The prohibitions are formulated in terms of water quality requirements, based on a system of classification of waters according to the ability to receive and also overriding water quality requirements to be imposed irrespective of usability [1/]. Requirements are also imposed on the treatment of effluents prior to discharge, and limitations are placed on specified substances contained in them. Of particular interest is the fact that the discharge of effluents, whatever their quantity, is prohibited if they contain, among other things, "substances imparting a persistent smell or taste to the water or to equipment used in fish rearing" [2/].

[1/] Ordinance of 28 February 1962 of the Council of Ministers.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

[2] Lichorowicz A., "Le droit des eaux en agriculture polonaise", 13th European Congress and Colloquium on Agrarian Law, 23-26 September 1985; and Majewski T. "Economic stimuli of rational water management in Poland. Present state and predicted trends of development", Seminar on the rational use of water in industrial processes, 29 March 1985.

The fish farmer in England or Wales may require a licence from the Water Authority for his area to abstract water for fish farming purposes depending on the nature of his enterprise, but he will invariably require consent from the water authority to discharge water into a watercourse whatever the nature of the enterprise [3]. Such consent may stipulate a range of conditions governing the manner in which water may be discharged and, amongst other things, these may regulate the nature, composition, temperature, volume and rate of discharges and the periods during which the discharges may take place [4]. Failure to obtain consent may result in an offence by the person causing the discharged polluting matter to enter a stream [5] or the offence of causing trade or sewage effluent to be discharged into the stream [6]. Moreover, consent to discharge water into a watercourse will be required whether or not the initial abstraction required a licence.

[3] The Control of Pollution Act, 1974, Sect. 34.

[4] Ibid., Sect. 34(4)(b).

[5] Ibid., Sect. 31(1).

[6] Ibid., Sect. 32.

Since 1978, Malawi has had a general prohibition against water pollution; polluted effluents or waters may be discharged in public waters only under prior written consent delivered by the Minister responsible for Agriculture and Natural Resources [7]. The persons granted permission shall pay the fees and rents specified in the Minister's consent and comply with every obligation (i.e. works or analysis of water or effluent at its own expense) and conditions specified therein [8]. The legislation [9] in the Republic of Korea, has the same intent. In fact, persons wishing to install pollution discharging facilities must obtain the consent of the Minister of Health and Social Affairs; "permissible" criteria for water pollution is established by the Minister of Health and Social Affairs.

[7] Water Resources (Water Pollution Control) Regulations, 1978, Regulation 4.

[8] Ibid., Regulation 12.

[9] Fisheries Amendment Law, 1971, and the Pollution Prevention Law.

The French Decree of 23 February 1973 [1] defines the conditions under which discharge (among other substances) of liquids may occur. Pursuant to Article 1 of this Decree, the following are subject to authorization: any direct or indirect discharge, drainage and deposit of water or matter able to alter the quality of waters, including surface waters, underground waters and maritime waters within the territorial limits. The application must state, for instance, the nature and importance of the discharges, the equipment to be used to discharge and the measures taken to avoid and eliminate water pollution. The discharge authorization is based on the waste load capacity of the recipient water body [2].

[1] Decree No. 73-218 of 23 February 1973, regulating the discharge, dumping, throwing and deposit of liquid or other matters likely to contaminate surface and underground water.

[2] Circular of 4 November 1980.

As opposed to the previous countries, some countries deal specifically with discharge of water by fish farms: aquaculture-related laws and discharge rules might be part of a single

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -
package, insofar as the aquaculture concession or permit creates reciprocal obligations between the user and the administration, and among them there exists the obligation for the fish farmer to provide suitable installations or equipment to discharge the used waters in order to conserve the quality thereof. This is the case of New Zealand and El Salvador, for instance. In New Zealand, the applicant for a fish farm licence must obtain (before application) a right to take or discharge water as required under the Water and Soil Conservation Act 1967. The applicant, immediately after making an application for any such right, must give notice thereof to the acclimatization society in whose district the proposed fish farm will be situated and each acclimatization society into whose district water from the proposed farm may be discharged 3/. Further, the applicant must supply sufficient evidence that all rights, licences and other authorizations allowing him to draw water from and return water to any lake or river or stream, to take or discharge water into the sea... have been duly granted and are in force 4/. It is a condition of every fish farm licence, whether specified in the licence or not, that (i) all rights, licences, etc. relating to the use or discharge of water in the operation of the fish farm shall be kept in full force and effect so long as fish farming operations are carried out under the licence; and that (ii) means are provided to ensure that water can be supplied to every pond on the fish farm and that it cannot be discharged without being treated by the process approved by the Director General 5/. In addition, as regards this subject matter, the Minister may impose other conditions as he thinks fit 6/. The Act further states "without limiting the provisions of regulation 8(4) of these regulations, the Minister shall, where practicable, make it a condition of every fish farm licence that, subject to compliance by the licensee with any requirements of the Water and Soil Conservation Act 1967, and with the terms of any right granted under that Act to the licensee, all effluents from the fish farm shall, after being treated as mentioned in paragraph (b) of regulation 8(3) of these regulations, be discharged into the sea or into estuarine waters or, where that is not practicable, shall be further treated and disposed of in a manner specified by the Minister".

3/ Fresh Water Fish Farming Regulations, 1983.

4/ Ibid., 1983, Sect. 6(4).

5/ Ibid., 1983, Sect. 8(3), paragraphs (a) and (b).

6/ Fresh Water Fish Farming Regulations, 1983, Sect. 8(4).

The French legislation is broadly similar. A French freshwater fish farmer is not able to start his activities without the following prior authorizations 1/:

(i) to create such a farm 2/;
(ii) to abstract and discharge water 3/; and
(iii) to open a "Classified Installation" to protect the environment, if necessary 4/.

1/ Decree No. 85-1400, Art. 3.

2/ Rural Code, Art. 432.

3/ Rural Code, Arts. 97, 106 and 107.

4/ Law No. 76-663 of 19 July 1976 on the "Classified Installations" amended and completed by Law No. 85-661 of 3 July 1985, and executed by Decree No. 77-1133 of 21 September 1977.

The General Law on Fishing Activities in El Salvador explicitly prohibits conveying used/waste waters from fishing activities without proper treatment on beaches and coastal areas, in rivers, lakes, natural or artificial watercourses or to provoke any other form of contamination 5/. Finally, in other cases, discharge of used waters by fish farms is covered by a specific regulation. France again can, together with other countries like Hungary and

Filed By: [illegible] Filed Date: 2/21/24 [illegible] PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -
Ecuador, be listed as the country in which a particular regulation exists regarding the discharge of water by certain fish farms. Shellfish culture farms and more particularly those equipped with oyster depuration facilities are subject to a special regime: the waste waters must in all cases be conducted towards a sewerage system and never into natural waters [6/].

[5/] The General Law on Fishing Activities, Decree No. 799/1981, Art. 51(b).

[6/] Decree on the technical conditions to be satisfied by shellfish breeding farms authorized to market or sell oysters directly, JONC of 6 July 1978.

Hungary, in its turn has a whole set of regulations and guidelines regarding the quantity of water supply for fish breeding purposes [7/], the disposal of sewage in fish ponds and in storage reservoirs used for fish farming [8/], and providing for a progressive system of effluent fines [9/].

[7/] Instruction No. 7/1969 OVH-AH of the President of the National Water Affairs Office on the regulation of water supplies for irrigation and fish breeding purposes, and rates thereof, 19 March 1969, MEM E No. 6, 19 March 1969, p. 228, and guiding principles for the uniform interpretation of the regulations governing the use of and fees of water for irrigation and fish breeding purposes, undated, NEM.E. No. 27, 3 October 1969, p. 672.

[8/] Fisheries in Hungary by A. Lajos Dobrai and Gyula Pekh,

[9/] Order No. 2/1970 - State Decree No. 40 of 1969.

The situation in Ecuador is somewhat different. Generally speaking, it is prohibited, according to the Fisheries and Fisheries Development Act [1/] to direct the used waters, without proper treatment, towards the shores/beaches and seabanks, rivers, lakes, natural and artificial basins as to cause any form of pollution [2/]. Therefore, as seen above, the Water Resources Institute of Ecuador has to approve, among other things, works concerning discharge of water [3/]. In addition to this, shrimp farming industries, in order to obtain tax exemptions or special incentives according to the category of enterprise they belong to must, inter alia, possess a system of treatment for the water used, approved by the Directorate General for Fisheries and other competent authorities, to avoid environmental pollution [4/]. Apparently, Ecuador tries several methods in order to prevent fish farmers from polluting the environment when discharging used water. The question then is what is the most efficient way to compel the fish farmer to protect, preserve and respect the environment?

[1/] Decree No. 178 of 1974.

[2/] Fisheries and Fisheries Development Act, 1974, Art. 2.

[3/] Supreme Decree No. 40, issuing the Water Act Regulations, 1973, Reg. 127.

[4/] Ministerial Agreement 13319 of 1976, Arts. 3(i) and 3(j).

However, all these rules place a considerable amount of power into the hands of the water authorities to determine whether a fish farming operation should be conducted or not, and if so at a particular site.

## Water quality

The importance of water quality and its protection, for aquaculture purposes, has not received much attention and the question has to be asked whether countries are aware of the vulnerability of aquaculture to pollution damage. Again, environment protection laws

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -
water laws, natural resources protection and conservation laws are dealing mostly with water pollution control regulations, either in a general or specific way, with any aspect of it being considered separately. General regulations might prohibit pollution in leased areas, or several plants in the same area, or create civil liability for any damage or consider policies on marine pollution control. In Ecuador, in order to protect waters from damage by pesticides and use of other harmful materials in farming activities, and at the same time the agriculture farms from salt influences, the construction of fish ponds and hatcheries must allow for a security strip of at least 200 metres calculated from the point where the agriculture farms start [5/]. Polluters may be guilty of an offence and subject to the payment of penalties. Preservation of the quality of water for aquaculture might be dealt with separately. For instance, several governments have established "maritime protected areas" where special attention is given to conservation and use of the coastal environment, controlling, for instance, diseases and the introduction of non-indigenous species (see below) [6/].

[5/] Regulation No. 12771 of 1975, Art. 4.

[6/] See sections on use of land for aquaculture (above) and on environmental aspects (below).

Few countries make any real distinction between the control of inland water pollution and coastal water pollution. The question must be asked if this is justified for the actual quality standards? Within the European Community, Council Directives have been made in order to protect, preserve or improve the quality of waters relevant to aquaculture. The waters concerned are salmonid and cyprinoid waters on one hand [1/] and shellfish waters on the other hand [2/]. Pursuant to both directives, quality objectives are met by fixing, firstly, parameters to measure the quality of the waters and, secondly, by establishing a set of reference values. The competent authorities in the Member States should carry on sampling operations and those samples should be in conformity, for at least a certain period (one year), with the values set by Member States. The parameters (physico-chemical) taken into consideration with regard to salmonid and cyprinoid waters are the following: temperature (°C), dissolved oxygen (mg/l $O^2$), pH, suspended solids, total phosphorus, nitrites and some others. These parameters apply also to shellfish waters, but in addition to them there are: salinity, suspended solids mg/1, substances affecting the taste of shellfish, faecal coliforms, etc. The protection and improvement of the environment necessitates, according to the Council, concrete measures to protect waters, including shellfish waters, against pollution and, further, it is necessary to safeguard certain shellfish populations from various harmful consequences, resulting from the discharge of polluting substances into the sea. The Directive of 1979 therefore covers those coastal and brackish waters designated by the Member States as needing protection or improvement in order to support shellfish life and growth [3/]. Shellfish culture is especially dependent on the maintenance of the high quality of coastal waters. Oysters, and sometimes mussels, are eaten raw, hence the preservation of public health requires close attention to water quality standards. The most important shellfish production basins need to be protected against hazardous effects of other human activities.

[1/] Council Directive 78/659/EEC, OJEC No. L 222/1 on the quality of fresh waters needing protection or improvement in order to support fish life.

[2/] Council Directive 79/923/EEC, OJEC No. L 281/47 on the quality required of shellfish waters.

[3/] Ibid.

France, Mexico, Ecuador and the Philippines have rules covering the preservation of high quality standards with regard to their shellfish culture.

In 1974 Mexico established a special Program on the Health of Bivalve Molluscs [4/]. Accordingly, waters used to culture those species have been classified into three
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

categories, depending on the presence of coliform bacteria: approved waters, conditionally approved waters and waters of restricted use. The following physical and chemical parameters have been used to classify the waters: temperature and colour, pH, percentage salinity, dissolved oxygen, minerals and toxic organic elements. Bivalve molluscs cultured in waters defined as "of restricted use" will have to be depurated before being authorized for sale on the market. Whenever the water quality is below the established limits, it is prohibited to harvest, or exploit the species therein, or market them. In addition, the general regulation on the sanitary control of fisheries products [5/] also covers the subject. It states on the one hand, that shellfish depuration activities must be carried out in those places where a continuous flow of salt or fresh water exists which does not contain any contaminants. On the other hand, for the culture of shellfish and some other species, specified in the Act, sanitation certificates are to be issued with respect to the quality of the waters in the area where the fish farm operates. Such certificates can be obtained by means of an application to the Secretary of Health and Hygiene, upon compliance with the rules regarding water quality. These certificates must be renewed regularly.

[4/] Regulation relating to the Mexican Program on the Health of Bivalve Molluscs, 1974.

[5/] Regulation of 5 June 1980, D.O. No. 5, 7 July 1980, p. 9, second part.

In France, the subject falls within the set of rules drafted to protect the culture of products to be eaten raw. First, the French coast has been classified into healthy ("salubre") and non-healthy ("insalubre") areas [1/]. Whether or not an area is salubrious depends on the degree of contamination determined by counting the faecal germs existing in the living shellfish. In those areas recognized as healthy, shellfish culture farms may operate and market their production, while in non-healthy areas, no farm establishment can be authorized [2/]. The harvesting of shellfish is specifically authorized by the Department of Maritime Affairs in case of oyster holding or purification operations [3/]. Secondly, the condition of the area requested for fish culture operations is studied and determined during the preliminary investigation phase of the application for a concession for establishment [4/]. Finally, the oyster culture facilities are protected by a surrounding area, established by law, wherein it is prohibited to deposit or discharge any substance which could be harmful to the sanitary quality of the oysters [5/].

[1/] Decree of 12 June 1969 amending the decree of 20 August 1939 on the healthiness ("salubrity") of oysters, mussels or other shellfish.

[2/] Decree of 12 October 1976 regulating the salubrity rules of shellfish culture areas.

[3/]Ibid., Art. 3.

[4/] Decree of 28 March 1919, Art. 4. Decree governing concessions for fishery establishments.

[5/] Decree of 30 October 1935 relating to the protection of drinking water and oyster culture farms. (J.O. of 31 October 1935).

The Philippines, in its turn, seeks to protect shellfish culture, not from the point of view of water quality but by means of sanitation certificates stating the quality of the shellfish. And finally in Ecuador it is prohibited to harvest molluscs or crustaceans in the neighbourhood of drainage areas or doubtful hygienic areas [6/].

[6/] Code of Maritime Police, Art. 102.

France, Mexico, Colombia and Spain have general regulations regarding the quality of waters for aquaculture operations.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

In Mexico [1/] and Colombia [2/] the Minister of Health states that water used for aquaculture must meet the quality requirements established by law.

[1/] The Regulation on the Sanitary Control of Fisheries Products, D.O. of 7 July 1980. Culture in freshwater, as well as maritime waters, coastal lagoons, rivers and lakes are covered.

[2/] Decree No. 1594/84 of the Ministry of Health establishes rules and criteria for the control of the quality of water and of waste water. Permissible criteria regarding the quality of water to be used in different aquaculture activities are set out.

In areas declared as being of interest for mariculture [3/], the Spanish law provides for a general prohibition directed towards population centres, agriculture enterprises, and industries against the discharge, without proper sewerage systems, into the sea, directly or indirectly, of water or waste products which might contaminate such areas as to damage aquatic species. Consequently, existing sewerage systems should be adapted, whereas new sewerage systems must be approved by competent authorities and be in conformity with the legislation on water treatment and waste disposal [4/].

[3/] Law No. 23/1984 of 25 June 1984, Marine Cultures. Art. 5 reads: "The Government is empowered to declare areas as being of interest for mariculture which, because of their excellent condition for the production of Crustacea, molluscs and shellfish in general, need to receive special protection". Art. 16.

[4/] Ibid., Arts. 23 and 24 "water quality".

France, with respect to the preservation of the quality of the water for aquaculture operations, has several kinds of rules:(i) some of them regulate the co-existence of certain industrial activities in aquaculture areas, such as exploitation of minerals [5/], or the extraction of any materials on the Public Maritime Domain [6/], by means of exploitation concessions or authorizations;(ii) some legal instruments have been introduced to protect the environment and, at the same time, the interests of traditional users of the sea: the impact studies [7/] the "classified installations procedure" for environment purposes [8/], and regulations relative to the discharge of wastes or polluting substances (telluric and also pelagic) into surface waters, and the waters of the sea within the territorial limits and finally, the Director of Health and Social Affairs is consulted by the Director of Maritime Affairs during the administrative enquiry to which each application for concessions is submitted. The opinion of the former is decisive because he determines the compatibility between the aquaculture enterprise and other activities as regards public health [9/].

[5/] Act No. 76-646 of 16 July 1976 and its executive Decree of 18 June 1980: the exploitation of minerals in the marine sub-soils of the Public Maritime Domain is subject to obtaining a "mining title" from the competent Department.

[6/] Decree No. 84-285 of 13 April 1984 provides that any extraction of materials on the public maritime domain cannot take place without authorization delivered by the "Commissaire de la Republique" of the Department (Art. 2).

[7/] The impact studies introduced by Art. 2 of the Act No. 76-629 of 10 July 1976: ("The Nature Protection Act") and enforced by Decree No. 77-1147 of 12 October 1977. This text recognizes, among others, the protection of environmental spaces, the preservation of animal and plant species, the maintaining of biological balance of which those species are component elements and the protection of natural resources against all agents of degradation to which they are exposed (Art. 1). Decree No. 85-1400 prescribing the forms and conditions relative to fish farming concessions and authorizations and the formalities attaching to declarations of existing bodies of

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

waters as contemplated in Art. 433 of the Rural Code, reads in its articles 9 and 10:

> "9. Within two months following the definitive receipt of the application, the Commissioner of the Republic shall either:
>
> > 1. notify the applicant that the application is refused...; or
> >
> > 2. call upon the applicant to carry out, as required by article 10 and within not more than two years, under penalty of being deemed to have withdrawn from the undertaking, an impact assessment or an impact statement within the meaning of Decree No. 77-1141 of 12 October 1977 as cited in the preamble hereto.
>
> 10. The following shall be subject to an impact assessment: new trout farming installations and fish rearing plant for experimental purposes; and fish farms where production and marketing amounts to two tonnes or more, or where the surface area under water is of three hectares or more, as well as any extension of fish farms where the effect is to bring their annual production and marketing or their surface area under water to a figure equal to or in excess of the limits here laid down. An impact statement shall be required for any newly installed fish farm other than those defined in the previous paragraph."

8/ Law No. 76-663 of 19 July 1976, as amended by Law No. 85-661 of 3 July 1985 and its Decree No. 77-1133 of 21 September 1977 according to which certain dangerous plants are submitted to special procedures. As "dangerous" are meant those which can be harmful for agriculture, public health, nature, environment, etc.

9/ Decree No. 83-228 establishing the rules governing mariculture operations, as modified.

At this point it can be questioned whether one alternative or another is more effective in achieving the goals of water quality for aquaculture.

The alternatives given in previous examples are numerous: general prohibition (Spain), sanitary controls (Colombia and Mexico), general quality Standards, sphere of protection (France), impact studies (France), approval systems, etc. (Colombia). One should not forget that all of these laws provide for punishment ranging from fines to imprisonment, and from prohibition on sale to closing of aquaculture establishments, etc. Another question is whether enough information is available to assess the quality standards used and the effectiveness of the methods to protect aquaculture operations. French legislation, for instance, provides for a variety of alternatives. One can speculate on whether the aquaculture farmer really feels protected from large-scale pollutions such as industry, agriculture, and population centres or if he feels that he is one himself.

Finally, the question should be asked whether these various controls aimed at water quality, which operate at almost every phase of the aquaculture process, are more likely to lengthen procedures for obtaining the necessary approvals, or whether they do meet their intended objectives.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

# EXHIBIT 3

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

# A METHOD FOR DETERMINING A FEE FOR ACCESS TO THE AQUATIC ENVIRONMENT FOR AQUACULTURE AND PEARLING PURPOSES

*Water Lease Fees Working Group Report to the Hon Minister Norman Moore, MLC Minister for Fisheries*
*July 2011*

FISHERIES OCCASIONAL PUBLICATION NO. 110

Published by
Department of Fisheries
168 St. Georges Terrace
Perth WA 6000

February 2013

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:4512905-01 C-331-806 INV - Investigation -

Government of **Western Australia**
Department of **Fisheries**

A method for determining a fee for access to the aquatic environment for aquaculture and pearling purposes

Water Lease Fees Working Group Report to the Hon Minister Norman Moore, MLC Minister for Fisheries July 2011

February 2013

Fisheries Occasional Publication No. 110

ISSN: 1447 - 2058 ISBN: 978-1-921845-52-9



Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

## CONTENTS

**1.0 INTRODUCTION** .......... **1**
1.1 Background .......... 1
1.2 The Water Lease Fees Working Group .......... 1
1.3 Terms of Reference .......... 2
1.4 Principles .......... 2

**2.0 BACKGROUND** .......... **3**
2.1 Legal Context .......... 3
2.2 Leases and Licences .......... 3

**3.0 METHOD FOR FEE CALCULATION** .......... **7**
3.1 Preamble .......... 7
3.2 The Preferred Model .......... 7
3.3 Base Fee .......... 8
3.4 Discounts .......... 11
3.4.1 Discount 1 (Intensity) .......... 11
3.4.2 Discount 2 (Property Rights) .......... 12
3.4.3 Discount 3 (Access to Infrastructure and Amenities) .......... 14
3.4.4 Discount 4 (Distance from Populated Area) .......... 15
3.4.5 Discount 5 (Proportional Use) .......... 15
3.4.6 Discount 6 (Ministerial Discretion) .......... 15
3.5 Summary of the Proposed Formula .......... 16
3.6 Fee Implementation, Increases and Review .......... 16

**4.0 CONCLUSION** .......... **17**

**5.0 RECOMMENDATIONS** .......... **19**

# 1.0 INTRODUCTION

## 1.1 Background

The Minister for Fisheries ("Minister") established the Water Lease Fees Working Group ("Working Group") to provide advice on an appropriate fee, and to determine a method for calculating a rate per hectare, for access to the aquatic environment for pearling and aquaculture purposes.

The Minister also established the related Access Rights Working Group to identify factors affecting aspects of statutory access and other usage rights as they relate to commercial fishers and the aquaculture and pearling industries; and where appropriate to enhance various aspects of those usage rights.

For pearling, the access to the wild stock pearl oyster resource would be subject to the 5.75% access fee; access to areas of water for growout would be subject to a process yet to be agreed to by the Minister.

The Minister indicated the Working Group should consider access fees applied by other jurisdictions in the scope of its work and identified 30 August 2010 as the date by when it should provide advice.

The Working Group was also advised to develop the fee setting model and process taking into account the current legislative framework.

In October 2010, the Working Group provided the Minister with an interim report, which made the three recommendations set out below.

1. For the 2010/11 year only, the "At Cost Method" should be adopted for the pearling industry.
2. For the 2010/11 year only, the "Status Quo Method" should be applied to the aquaculture industry given the high transactional costs of moving the aquaculture industry to the "At Cost Method".
3. That the Minister note and take into account the impact of any resulting fee on the pearling and aquaculture industries.

## 1.2 The Water Lease Fees Working Group

The membership of the Working Group comprises people with relevant industry and Government experience and expertise. The Working Group had the option of periodically inviting additional people to provide specific expert information and, or, advice as required.

The initial membership of the Working Group was:

Mr John Hutton (Chair)

Mr Glenn Dibbin (Industry)

Mr Dan Machin (Industry)

Mr Ken Smith (Department of Fisheries)

Mr Jason Froud (Department of Fisheries)

Messrs Smith and Froud ceased working at the Department of Fisheries during the term of the Working Group; they were subsequently replaced by Messrs Mick Connolly and Steve Nel.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

The Working Group met several times and was also informed on various occasions by members of the Department of Fisheries, the Access Rights Working Group. Landgate, the Valuer-General's office and industry representatives.

## 1.3 Terms of Reference

The Terms of Reference of the Working Group are set out below.

1. Provide advice to the Minister for Fisheries on an appropriate method for determining a fee for access to the aquatic environment for pearling and aquaculture purposes based on the existing tenure arrangements.
2. Provide advice to the Minister for Fisheries on the likely impact of proposed new tenure arrangements (for example, the Fish Resources Management Amendment Bill 2011 and the proposed new legislative framework) on fees for access to the aquatic environment for pearling and aquaculture purposes.
3. Identify issues that may have an impact on the implementation of current and future tenure arrangement and fees.
4. Provide advice regarding an appropriate consultation and communication process with industry and department stakeholders regarding the issue of Water Lease fees, noting the limited timeframe of the Working Group.

## 1.4 Principles

In reviewing the existing water lease fees regime, the Working Group determined its effectiveness and efficiency should be measured against the best practice criteria and principles set out below.

- Rationale – provide a clear justification for raising the fee in the first instance, with consideration of a return to the community for the use of public waters.
- Impact on development – consider the impact of the fees on the development and economic sustainability of the industry, including the costs of complying with fees requirements.
- Comparability – take into account other jurisdictional arrangements.
- Efficiency – determine an efficient method and, or, process for fee determination.
- Effectiveness – ensure delivery of lease fee arrangements consistent with the objects of the Acts, which include the sustainable growth of the industry and benefits to the community.
- Transparency and accountability – adopt a process that enables industry, government and the general public to readily enquire about and obtain information about fees and services.
- Clarity – ensure clarity regarding the nature of the leasehold right and the responsibilities of both government and industry.
- Review – determine a proper mechanism with stakeholders.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

# 2.0 BACKGROUND

## 2.1 Legal Context

Section 97 of the *Fish Resources Management Act 1994* ("FRM Act") enables the Minister to grant aquaculture leases over land and waters vested in the Minister for aquaculture purposes, or over an area of coastal waters.[1]

The FRM Act states that a lease may be granted subject to such terms, covenants and conditions as the Minister thinks fit, including the requirement of payment of money to the Minister. The FRM Act also provides that a lease may be varied in the manner provided in the lease.

Section 97(6) provides the Minister with the power to require security to be given for the observance of any terms, covenants, restrictions or conditions.

Section 99 specifies that an aquaculture lease does not authorise the use of the lease without an aquaculture licence.

The FRM Act provides for a lease to be granted for an initial term not exceeding 21 years.

The *Pearling Act 1990* ("Pearling Act") provides for the issuing of pearling leases. As indicated in the Access Rights Working Group report, it takes a similar approach to the FRM Act in relation to access entitlements to the wild pearl oyster resources. Statutory pearling rights are issued under the relevant provisions of the Pearling Act.

Additional information on the legal context of aquaculture and pearling leases is provided in Chapter 2 of the draft Access Rights Working Group report: *Improving Commercial Fishing Access Rights in Western Australia.*

The FRM Act also provides the power to charge fees and enforce requirements attached to them.

Under s.97(3) of the FRM Act, subject to their respective provisions, an aquaculture lease granted under the FRM Act vests in the lessee:

a) The exclusive right during the currency of the aquaculture lease to keep, breed, hatch and culture within the leased area the species of fish that are specified in the lease; and

b) The ownership of all fish within the leased area that are kept, bred, hatched or cultured under the lease.

Under s.97(4) of the FRM Act, a lease may be granted for a term not exceeding 21 years and renewed for further 21-year terms; s.97(5) provides for terms, covenants, restrictions and conditions as the Minister thinks fit including the requirement for payment of money to the Minister.[2]

Sections under Part 12 of the FRM Act provide for aquaculture leases to be kept in a register, for information such as any security interest in the lease to be included in the register and for notations of security interests.

## 2.2 Leases and Licences

There is a distinction between aquaculture leases and licences: both are site specific; however,

1 The *Draft Policy on the Granting Renewal and Regulation of Aquaculture Leases in Western Australia* is provided in *Fisheries Management Paper No. 215 (May 2006).*

2 *Proposed Fees and Charges for Section 97 Aquaculture Leases* is provided in *Fisheries Management Paper No. 216 (May 2006).*


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

an aquaculture lease provides tenure for an area of water, while an aquaculture licence authorises the specific aquaculture activity. Aquaculture lessees require an aquaculture licence to conduct the authorised activity

An aquaculture lease provides the lessee with a degree of security in the form of statutory tenure (to conduct the specific aquaculture activities) in respect of the land or waters that are the subject of the lease. It provides a non-exclusive right to occupy or use the site for the purposes of aquaculture.

An aquaculture licence is currently issued for a period of 12 months under Section 92 of the FRM Act. Under Section 94, if a person applies to the Executive Director for the renewal of an aquaculture licence, the Executive Director must renew the licence, subject to there being no breach of licence conditions.

Aquaculture and pearling leases are issued with regard to Ministerial Policy Guideline No. 8: *Assessment of Applications for Authorisations for Aquaculture and Pearling in Coastal Waters of Western Australia* (FMPG8).3

Some key points about aquaculture and pearling leases, provided in the associated Access Rights Working Group report, are summarised below.

- Leases for aquaculture and pearling provide a right to use specific areas for defined purposes.
- The status of State waters (that is, waters within three nautical miles of the coast) as Crown land under the Land Administration Act 1997 influences the issuing of leases and the nature of their underlying rights, unless these "lands" are formally vested in the Minister for Fisheries.
- Leases issued under the FRM Act provide leasehold rights, while the associated licence authorises the activity.
- This is only of any consequence if the rights are challenged or if there is a wish to transfer them to another entity.
- A key question for Government is the extent, if any to which it wishes to strengthen the property right and to enable and regulate their transfer or other variation (for example, ability to sublease).
- Another issue identified is the absence of a statutory marine planning framework that takes into account the requirements of the aquaculture and pearling industries.
- Current leases issued under s.97 of the FRM Act do allow some flexibility to the lessee, by including provision for subletting, subject to the Minister providing his consent.

The Minister for Fisheries issues leases. The main terms, covenants, restrictions and conditions of leases are broadly consistent; information and conditions specific to a particular lease are itemised in an accompanying schedule.

The Department of Regional Development and Lands ("DRDL"), which administers the *Land Administration Act 1997* ("LAA"), has adopted the principle that the Department of Fisheries is the lead agency for assessment of applications for (among other matters) aquaculture and pearling leases in or on Crown land including coastal waters; and that the Minister for Fisheries may grant leases in accordance with powers provided in the respective Acts in conjunction, where necessary, with the exercise of powers of the Minister for Lands.

3 FMPG8 is available at: www.fish.wa.gov.au

A Memorandum of Administrative Arrangements dated June 2000 ("MoAA") has been executed as a means of managing the interface between the LAA, the FRM Act and the Pearling Act.

A Sub-Working Group, which was jointly established by the Access Rights and Water Lease Fees Working Groups, considered the approach described above to be appropriate and to use a relatively straightforward administrative process.

The Sub-Working Group, which was established to discuss several matters including tenure, recommended (inter alia) that decisions on the issuing and transfer of licences and leases for pearling and aquaculture leases should remain under administrative control and continue to be managed under Fisheries legislation.

Notwithstanding the advice of the Sub-Working-Group, based on the possibility of improving leasehold rights and achieving efficiency gains in the approvals process, the Working Group considered it may be appropriate to include in this report a recommendation to the Minister that the nature of leases and the administrative process by which they are issued should be reviewed. That process should be undertaken through consultation between DRDL and the Department of Fisheries (the respective CEOs of which departments executed the MoAA). The Working Group acknowledged, however, that this matter lies outside the scope of its Terms of Reference.

As noted above, the FRM Act provides for a lease to be granted for an initial term not exceeding 21 years. Lease deeds for new projects may provide a five-year initial term, during which a bond is not required, followed by two 21-year options, with the bond being due at the start of the first 21-year term.4 There is an automatic (but not absolute) right of renewal to renew the lease at the end of the terms, unless the lessee fails to meet the lease conditions.

Leases and licences include conditions that allow resumption of the lease, or cancellation of the licence, in the event of lessees and licensees not meeting the agreed conditions or commitments.

The Working Group considered the term of the aquaculture leases issued under s.97 of the FRM Act to be appropriate.

The terms and conditions of leases issued by a Minister of the Crown under s.97 of the FRM Act are considered to go some way towards providing security of tenure, to the extent that they assist the modelling of medium and long term business plans, opening possible avenues for sources of funding and possibly help with depreciation of capital invested over a longer period.

There also exists a nexus between for aquaculture leases and licences, the main purpose of which is to prevent speculation or investment for a purpose other than aquaculture or pearling. The Working Group noted that this nexus between licences and leases has the effect of reducing the ability to attract investment.

### Performance Criteria

There are concerns the future growth of the offshore sector of the industry may be affected by areas of water being unavailable through non-use; and that producers who want to expand pearling or aquaculture activities could be restricted because otherwise suitable sites may not be available because they are committed by leases not being acted upon. To ensure leases are used for the purpose for which they are intended (that is, to avoid the "sterilisation" of sites by non-use), the Department anticipates introducing performance criteria.

[4] Generally, leases granted over existing licences would start with a 21-year term with the bond being payable at the start of the term.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Some consideration is needed in setting performance criteria, however, because there can often be good reasons for non-activity by pearlers and aquaculturists. The Department proposes to address the setting of performance criteria in a separate policy development process in consultation with industry and stakeholders.

The establishment and enforcement of performance criteria may go some way to reducing the need for the "nexus" between leases and licences in the future.

Where long-term leases are issued with rights to sublease, there is justification for the Crown (Department of Fisheries) to be involved in the use of lease areas, in terms of auditing the use of water areas and enforcing termination rights in the event of inaction. Under these circumstances, the lessees should clearly have the right to provide an explanation in respect of the non-use or limited use of the water.

# 3.0 METHOD FOR FEE CALCULATION

## 3.1 Preamble

A key objective of the Working Group is to develop a basis to calculate a fair and equitable lease fee for the use of the State's aquatic resources. In determining a fee, or a formula to calculate a fee, the State's obligation to obtain a reasonable return for the use of its resources needs to be balanced with the benefit of supporting the growth of an industry that provides, and can provide, maximum value to the aquatic resources as well as providing valuable economic and social benefits to regional communities.

Water lease fees for aquaculture purposes can be determined using a variety of methods, including reference to equipment used (and this can include either "consented" or "deployed" equipment), production level or profitability; and several advantages and disadvantages are associated with each method. There is no single correct method to calculate rentals; however, most commonly, leasing rates are based on a percentage of the value of the land, with rates rising and falling according to economic conditions at the time and land values reflecting the earning potential of the land.

The fundamental methods for setting lease fees are percentage of market valuation and budgeting. The main problem with setting a lease fee for pearling and aquaculture leases based on market valuation is the lack of a trading history in these sectors – a situation that is likely to persist for some time. The budgeting method that can be used to verify appropriate lease values uses the principle that a fair rental would be based on a percentage of the potential returns for business being carried out at the site. Given the variability that exists between different sectors of the industry and the economic changes that can occur from time to time within sectors, the Working Group and industry representations were generally opposed to basing fees on budgeting or similar methods based on profitability.

The October 2010 Working Group report provided four methods for calculating lease fees. In brief, these options were:

i. status quo – the continuation of the existing rate for all leases (recognising that this method affords an interim option for the 2010 – 11 year);

ii. at cost – a method based on full recovery of the Government's costs of managing the lease estate;

iii. variable index – by which the Valuer-General determines the base rate, which would be used in a formula together with specified dilution factors to calculate the fee; and

iv. Valuer-General rent yield – which is similar to the variable index method, but provides more certainty about the estimation of the dilution factors.

The respective advantages and disadvantages associated with each of these options are elaborated in the copy of the Working Group's October 2010 report provided at **Attachment 1**.

## 3.2 The Preferred Model

Following consideration of the proposed methods and ensuing corroborating advice from the Acting Valuer-General of Landgate, and noting that a market-based valuation is not possible at present, the Working Group determined that, until such time that the Valuer-General deems a market has been established, the fee should be set administratively. This proposed method is supported by the industry representative organisations and consistent with those used in several other states.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

To derive a formula for calculating a fee, the industry organisations generally support a model comprising elements of options 3 and 4 in the October report; that is, elements of the variable index and rent yield methods.

The Valuer-General also considers as having merit a formula that identifies a base rate, which is multiplied by a set of dilution or discount factors.

The Working Group concurred that the preferred model for calculating a lease fee for aquaculture and pearling leases should use a base fee and apply discount factors; and, further, that the fee should be set administratively until a trading history is established for these industries that enables the Valuer-General to set a base fee.

## 3.3 Base Fee

The key to the formula to be used to calculate an annual lease fee is the establishment of the base rate.

The Working Group considered establishing a base fee calculated as a percentage of unimproved capital value ("UV") of the land or water, expressed as dollars per hectare per year.

The submission by PPA proposed the base fee be set at 3% of the median market value of adjacent rural land; that by ACWA proposed 3% of median unimproved value of adjacent rural land.

There is some justification for basing the fee on lease rents paid for agricultural leases on mainland WA. Among other benefits, that method would be transparent and equitable. In its ensuing discussion, both internally and with representatives of the industry organisations, the Working Group considered the view that setting a base fee according to the UV of adjacent rural land is unrealistic – there is no analogous interrelationship between the respective values of water and adjacent land. By way of example, the world's best aquaculture site could be in coastal waters adjacent to a terrestrial desert with no value and, similarly, moderately productive coastal waters may be located adjacent to high-value horticultural land.

The Working Group considered the concept that it may be more appropriate to set a base fee according to an "equivalent" agriculture industry sector; that is, to determine whether aquaculture and pearling practices may be generally similar to a particular sector of land-based agriculture, such as pastoral grazing, broad acre farming, horticulture or viticulture. The key to this method is determining which agricultural sector is "equivalent" to aquaculture and pearling and obtaining UV information for those sectors within WA.

Aquaculture can be described in the context of some land-based farming activities by equating elements such as the level of investment, day-to-day activity, technology and management. In that context, the Working Group considered aquaculture activities may be broadly analogous to intensive grazing, dairy production and viticulture.

Information provided by the Property and Valuations section of Landgate provides indicative UVs for different areas and associated land uses various land uses around the State (Table 1).

Indicative UVs for the agriculture sectors considered broadly equivalent to aquaculture and pearling activities are between approximately $6,000 and $2,500 per hectare (the average of all the UV values is $6,084/ha and the average excluding the extreme values (that is, excluding the values for Pilbara and Kimberley pastoral and Carnarvon irrigated agriculture) is $2,456).[5]

[5] The Working Group considered the use of average, rather than median, values were sufficient for its purpose, because it proposed to use these land values only to provide a broad indication of values to affirm their compatibility with water lease fees charged in other jurisdictions.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

**Table 1** Indicative unimproved land values for various agriculture sectors in WA

| Area | Agricultural Land use | UV/ha | Comments |
|---|---|---|---|
| North | Pastoral - Pilbara | $3 – $8 | Variation depending on location, rainfall and quality of land systems |
| North | Pastoral - Kimberley | $3 – $16 | As above |
| Mid west | Farming broad acre cropping / grazing – varying rainfall areas - | $1100<br>$400<br>$200 | Katanning<br>Merredin<br>Yilgarn |
| South west | Intensive grazing | $1350 – $2000 | Kojonup and Collie |
| South west | Dairy production | $3000 | Industry continues to shrink |
| North | Irrigated agric Carnarvon | $40,000 | Values are for a 'wet' ha - intensive vegetables - 10 – 15 ha lots |
| North | Irrigated agric Ord | $4000 – $5000 | Flat-lined values for last 6 – 7 years. Values are for a 'wet' ha broad acre mixed crop farming 80 – 300 ha lots |
| South west | Tree crops (Blue Gums) | $2000 | Tree companies not actively buying |
| South west | Viticulture | $3000 | Currently experiencing difficulty |

DRDL (Landgate) currently determines pastoral lease rents at 2% (previously 3%) of the determined UV of the individual lease (Table 2). This methodology – assessing a UV and applying a percentage return – is used in all states. In the NT and Queensland the rate of return is determined by the Minister in consultation with the industry (rates of return are non-market-based), while in SA and WA the Valuer-General sets the rate of return (market-based).

**Table 2** Pastoral lease rentals

| State | % | Assessed by |
|---|---|---|
| South Australia | 2.7% maintained for 2009 review | VG |
| Queensland | 0.02 – 0.2% | Minister |
| NT | 1.124% | Minister |
| WA | 3% 2004 review<br>2% for 2009 | VG |

The previous lease rent ("cap rate") of 3% for pastoral leases was considered a minimum return to the capital value of the land and roughly aligned with long term inflation at the time and it was considered that any lower rate would result in decreasing real rentals.

Some relevant information and supporting evidence includes:

- the limited historical evidence of improved sub-leases of cattle properties of around 6%;
- improved remote area agricultural and horticultural leases at 5% to 7%, i.e. Broome and Ord areas;
- the Reserve Bank inflation target at under 3% (WA is currently 3.7% and falling);

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

- the Government long-term bond rate of 3.5% (three years) and 4.5% (10 years); and
- other Australian states pastoral lease rentals (Table 2), noting that Queensland and NT are not market related returns and other rural land uses in WA are calculated at values of 5% to 7% for cropping leases and 5% for improved SW grazing.

On the basis of the above rationale and the information provided in tables 1 and 2, for UVs of $6,000 and $2,500 per hectare, respectively, base fee ranges for aquaculture and pearling can be calculated as follows:

- cap rate at 2%: base fee range $120 to $50;
- cap rate at 5%: base fee range $300 to $125.

The Working Group also considered the lease fees currently applied in several Australian jurisdictions (Table 3). The average of these fees is approximately $96/ha.

**Table 3** Summary of annual aquaculture lease fees per sector by State

| State | Type of lease | fee per hectare ($) |
|---|---|---|
| South Australia in 2005/06 | Marine | $45.00 |
| | Tuna | $65.00 |
| | Finfish | $165.00 |
| | Intertidal shellfish | $315.00 |
| | Subtidal shellfish | $220.00 |
| | Subtidal abalone | $150.00 |
| | Holding site/algae | $40.00 |
| | Average | $187.85 |
| Tasmania | Shellfish | $55.00 + $110 base fee |
| | Finfish | $220.00 + $1925 base fee |
| | Average | $137.50 |
| New South Wales in 2005/06 | Marine | $43.00 (min of $116) |
| Northern Territory in 2006 | Class A (< 50km from Darwin) | $25.00 |
| | Class B (50 – 100km from Darwin) | $12.50 |
| | Class C | $6.00 |

The Working Group considered a base fee of $96/ha a reasonable starting point for WA, insofar as it represented current aquaculture lease fees within Australian jurisdictions and, further, that it lies within the admittedly broad range of possible fees provided from calculations for land-based agricultural activities considered reasonably compatible with aquaculture and pearling and particularly where the cap rate is two percent.

The average fee for Australian jurisdictions shown in Table 3 included intertidal and subtidal areas, which generally have significantly less exposure than the marine sites characteristic of WA coastal waters and afford more economic development options. The Working Group


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

consequently formed the view that the base rate should be adjusted to recognise the additional risk to which at-sea ventures are exposed. This risk element was previously contemplated as a discount factor; however, given that it applies in all instances, the Working Group considered it appropriate to accommodate risk into the calculation of a base fee by reducing it by approximately 50 percent. The Working Group also noted that in general, lease fees in other states and sectors are between $6 and $315 per hectare. When removing minimum and maximum outliers, the range reduces to $12.50 to $220 per hectare.

For the reasons provided above, the Working Group proposes the base fee for aquaculture and pearling leases be set at $50 per hectare, with a minimum fee being set at $200 to allow for administration costs associated with small lease areas.

## 3.4 Discounts

PPA and ACWA proposed, respectively, four and three discount categories. The three categories common to both submissions are intensity; property rights; and access to infrastructure and amenities. PPA proposed an additional category of distance from a populated area.

Ensuing discussions with representatives of ACWA and PPA suggested an additional category to cater for pearling holding sites, which are only used for a proportion of the year and consequently that may be afforded a discount on that basis. Proportional site use may be either temporal, as described for pearling holding sites, or spatial, for sites that may be large for reason of environmental sustainability or other reason where the lessee or licensee is required to have a larger site than would otherwise be needed; for example, to achieve a minimum separation between production units.

The Working Group proposed an additional discount factor, to be applied at the discretion of the Minister, to enable a discount to be applied in the event of incidents such as disease outbreak, hardship arising as a result of prevailing economic conditions, industry development initiatives or impositions placed on operators to accommodate environmental or social requirements.

These proposed discount categories and their proposed values are considered in more detail in the following sections.

Submissions made to the Working Group variously expressed the proposed values of discount factors as percentages representing the proportion of the base fee that should be paid (in the case of the intensity discount) or as the reciprocal of that proportion (in the case of the property rights discount). To calculate a fee according to the formula it had adopted, the Working Group consistently uses a multiplier between 0.1 and 1.0 to represent, respectively, payments of 10% and 100% of the base fee and consequently discounts of 90% and zero.

### 3.4.1 Discount 1 (Intensity)

ACWA and PPA proposed implementing the dilution factor as follows:

| | |
|---|---|
| Intensive | 100% |
| Semi-intensive | 75% |
| Extensive | 50% |

(representing discounts of 0%, 25% and 50% respectively).

The submissions provided no rationale supporting the proposed discount figures and no definition of the terms intensive, semi-intensive and extensive, other than endemism, feeding


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

strategy and environmental impact.

Endemism was considered irrelevant in this context – it is an ecological (and possibly an environmental) factor unrelated to intensity and in any case the translocation and culture of non-endemic species is highly unlikely to be permitted in the marine environment.

The description provided for intensity only considered the level of feed inputs and not other defining factors such as technology, capital investment, corporate management, product value, profitability, stock density and yield.

One submission incorrectly claimed oysters are "endogenous" and marine fish fed with manufactured feeds are "exogenous" feeders and proceeds to use that precept to justify the former sector as "extensive" and the latter as "intensive". In fact, oysters and finfish both consume feed from exogenous sources, so by that definition are both "intensive".

Further, on te basis of the provision and consumption of feed, an argument could be made that the cost of feed to growers of filter feeders (such as pearl oysters, mussels and other molluscs) is nil, since the animals consume algae and other material present in the natural environment and that, consequently, this makes the site more valuable so the reverse should apply and these sites should have a smaller or nil discount.

In any case, the Working Group considered the majority of aquaculture activities undertaken in the marine environment to be intensive and consequently that, if a discount was to be applied for intensity, the same value should be applied to all offshore aquaculture sites.

The Working Group is of the view that there appears no justification for a discount based on intensity and this element was therefore not considered in the calculation of a lease fee.

### 3.4.2 Discount 2 (Property Rights)

Term of Reference No. 1 required the Working Group to propose a formula for calculating a fee for access to aquatic resources for pearling and aquaculture purposes based on the existing tenure arrangements.

ACWA and PPA proposed fundamentally similar approaches to determining a discount rate based on property rights; these are summarised by Table 4.

**Table 4** Calculation of a property right discount proposed by industry organisations

| Element | Pearling | | Aquaculture | |
|---|---|---|---|---|
| | Score | Justification | Score | Justification |
| Exclusivity | 2 | Leases are non-exclusive | 3 | Non-exclusive |
| Permanence | 3 | Can be removed if unused | 3 | Can be removed if unused |
| Transferability | 3 | Can only be transferred to holders of quota units | 5 | Can be transferred |
| Security | 3 | Weak rights; no register for security interest | 3 | Weak rights; no register for security interest |
| Total | 55% | | 70% | |
| Discount | 45% | | 30% | |


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

The four elements making up a property right are identified as exclusivity, permanence, transferability and security. Allocating a maximum "score" of five to each of these elements, a "perfect" property right would total 20.

ACWA and PPA proposed the formulae for aquaculture and pearling leases be based on the values set out in Table 4. Based on these values, PPA and ACWA proposed property rights discounts of 45% and 30% for, respectively, pearling and aquaculture leases.

This method for calculating a property right discount appears reasonably transparent and accountable; however, the actual figures used for each defining element required additional discussion before being agreed by the Working Group.

In a general sense the Working Group noted that to have effective property rights you need two primary powers that relate to property in a spatial sense and link into land law through the Lands Administration Act, the new Fisheries Act, or both. These two primary powers are:

- Power to excise areas of Crown land for the purposes of aquaculture; and
- Power to create leases with specific terms of tenancy.

The Working Group undertook a qualitative assessment of nature of the property rights, based on the method used by the Access Rights Working Group. This method is based on the following four key features of property and non-possession rights widely recognised in the international literature and law:

- exclusivity – the impact of others on the right;
- permanence – the degree of temporal duration and renewability of the right;
- transferability – including the divisibility of the right and ease of temporary leasing; and permanent transfer; and
- security – the quality of the right, including ease of cancellation or change and degree of legal protection.

The Working Group mapped and compared the relative strength of three forms of property right; namely freehold title, pastoral lease and a lease issued under s.97 of the FRM Act (Figure 1). As for the Access Rights Working Group, the Working Group also considered the wider context of government policy and law in which these rights exist.

The Working Group agreed the following scores for each of the elements defining the property right for a lease issued under s.97 of the FRM Act:

- Exclusivity 3.5
- Permanence 4.0
- Transferability 3.5
- Security 3.5




**Figure 1** Depiction of strengths of selected property rights.

The proposed property right represents 70% of the total score, affording a discount of 30% (representing a multiplier value of 0.7)

The Working Group recognised that these elements of the property rights calculation are based on leases issued under s.97 of the FRM Act and would vary according to factors such as the industry sector and legislative provisions that may change from time to time. By way of example:

- mussel farmers operate in Cockburn Sound under s.97 leases; however, the tenure arrangements for these lessees are less secure because they are located in port waters; and
- pearling leases may afford a lower level of property right because they are only transferable to holders of quota units.

These factors may be accommodated by either varying the multiplier value or subject to implementing a discount under Ministerial discretion (section 3.4.6 below).

### 3.4.3 Discount 3 (Access to Infrastructure and Amenities)

There was some contention in respect of a discount applied for access to infrastructure and amenities.

The Working Group's October 2010 report proposed leases could be categorised according to their proximity to infrastructure and amenities and the applied discount then being proportional to the distance; that is, the greater the distance the greater the discount that would be applied.

Broadly, both PPA and ACWA expressed the view that water-based leases offer no infrastructure and, or, amenities. On that basis, they would support a discount of 50% (that is, a multiplier of 0.5), regardless of the distance of the lease or site from land-based infrastructure.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

The Working Group generally agreed a discount factor should be applied, provided that the base rate does not take distance from infrastructure into account (thereby avoiding two discounts being afforded for the same factor). This is justified on the basis of the higher costs associated with doing business in the north of the State and the Abrolhos Islands.

The Working Group proposes a discount factor be applied to accommodate access to infrastructure and amenities, based on whether the site is located to the north or south of parallel 26º S. The Working Group proposes discount factors of 40% for sites to the north of parallel 26º S or in the Abrolhos Islands; and zero for those to the south (that is, multipliers of 0.6 and 1.0 respectively).

### 3.4.4 Discount 4 (Distance from Populated Area)

PPA proposed a discount based on proximity of the lease to population, with the rationale that there are more competing interests for water in areas in close proximity to densely populated areas.

The Working Group did not support the proposal that distance from populated areas be included as a discount factor, in part because the concept of "remoteness" is already catered for in the discount for access to infrastructure and amenities and because distance from populated areas has previously been cited as an advantage, for example for pearling leases, in that the distance and remoteness provide a measure of security.

### 3.4.5 Discount 5 (Proportional Use)

A proportional use discount was proposed for situations where either:

sites are not used for the entire year but are required for a specific purpose for shorter periods (for example, pearling holding sites); or

larger water areas are imposed as an environmental requirement (for example, where a minimum distance is required between operating culture units to achieve an environmental objective) or for a social objective.

The Working Group did not support a proportional use discount for several reasons. Even if an area is only used for a part of the year, it is still unavailable for other activities and therefore, effectively, is "used" for the full period.

It was also noted that lessees need to cater for environmental requirements in their activities and, in any case, a requirement for larger water areas on the basis of environmental or social requirements that do not benefit the lessee could be considered through a Ministerial discretion discount.

### 3.4.6 Discount 6 (Ministerial Discretion)

The Working Group recognised any of a number of contingencies could affect the viability of aquaculture and pearling in the State that are beyond the influence of these sectors. These contingencies include, but are not restricted to, financial hardship, economic downturns, disease outbreak and pollution. The Working Group therefore proposes a special discount category, entitled Ministerial discretion, which could be applied as its title suggests at the discretion of the Minister and could include:

- a start-up allowance (such as the current period of five years aligned with the payment of the bond);
- hardship (may be applied in the event of disease or prevailing economic conditions);


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

- poor water quality as a result of pollution from an event outside the control of the lessee; and
- other factors that would reasonably qualify a lessee to apply for a Ministerial discount.
- The Working Group noted that s.128(1) the Land Administration Act 1997 similarly provides for a payment of rent for a pastoral lease to be delayed or waived subject to a lessee applying for rent relief.

## 3.5 Summary of the Proposed Formula

The Working Group proposed the following formula to calculate lease fees:

Annual lease fee = base rate ($50/ha) x property right x remoteness x Ministerial discretion.

Table 5 provides examples of annual fees using the proposed formula.

**Table 5** Indicative lease fees for selected regions in WA

| Region | Base rate | Property right | Remoteness | Ministerial discretion | Annual rate per hectare |
|---|---|---|---|---|---|
| Kimberley (pearling) | $50.00 | 0.70 | 0.60 | 1.00 | $21.00 |
| Kimberley (non-pearling) | $50.00 | 0.70 | 0.60 | 1.00 | $21.00 |
| Exmouth | $50.00 | 0.70 | 0.60 | 1.00 | $21.00 |
| Shark Bay (north of 26) | $50.00 | 0.70 | 0.60 | 1.00 | $21.00 |
| Shark Bay (south of 26) | $50.00 | 0.70 | 1.00 | 1.00 | $35.00 |
| Abrolhos Islands | $50.00 | 0.70 | 0.60 | 1.00 | $21.00 |
| Cockburn Sound | $50.00 | 0.70 | 1.00 | 1.00 | $35.00 |
| Albany | $50.00 | 0.70 | 1.00 | 1.00 | $35.00 |

By way of example, should a sector of the pearling industry apply for and be granted a Ministerial discretionary discount of 50% on the grounds of current industry hardship, the annual rate would be reduced to $10.50 per hectare. That discount would be subject to conditions that would define the terms under which it would be applied and removed.

## 3.6 Fee Implementation, Increases and Review

The Working Group proposed that any substantial fee increases ensuing from the implementation of the formula in this report be phased in over a reasonable period. Fee increases should be applied at a minimum rate per hectare then increased at a rate of 100% (that is, doubled) per year until the calculated fee amount is reached.

In respect of fee increases and reviews, the Working Group proposed that:

- the annual lease fee should be increased annually according to CPI increases;
- the annual lease fee should be reviewed at three-year intervals; and
- any increases exceeding annual CPI increases that ensue from future reviews of lease fees that may be undertaken should be subject to appeal in the State Administrative Tribunal.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

## 4.0 CONCLUSION

The change from the current systems used to calculate and apply lease fees will inevitably result in some lessees being advantaged, while others are disadvantaged. The Working Group was of the view, however, that the model proposed for the calculation of lease fees provides the most practicable and equitable approach.

The submissions from PPA and ACWA indicated general industry agreement with the concept of a water lease fee being set administratively.

The fee needs to be competitive to attract investors to the industry and to help underpin its growth.

The Working Group noted that the preferred method of setting a lease fee would be market-based, which could occur when there is a sufficient trading history to underpin the application of that method. When that stage is reached, the Working Group is of the view that the lease fee should be set by the Valuer General. That view is consistent with the opinion of the Valuer General, provided in earlier correspondence.

The Working Group provides the following summary in respect of addressing the Terms of Reference.

1. *Provide advice to the Minister for Fisheries on an appropriate method for determining a fee for access to the aquatic environment for pearling and aquaculture purposes based on the existing tenure arrangements.*

   Section 3 of this report provides the method the Working Groups considers appropriate for setting a fee for access to the aquatic environment for aquaculture and pearling purposes. The method is based on existing tenure arrangements and accommodates the considered views of industry representative organisations and other relevant Government agencies.

2. *Provide advice to the Minister for Fisheries on the likely impact of proposed new tenure arrangements (e.g. FRMA 2010 amendment and new legislative framework) on fees for access to the aquatic environment for pearling and aquaculture purposes.*

   The Working Group is of the view that the passage of the *Fish Resources Management Amendments Bill 2011* is unlikely to have any impact on the proposed lease fees. The new legislative framework is equally unlikely to have any impact.

3. *Identify issues that may have an impact on the implementation of current and future tenure arrangement and fees.*

   The Working Group is of the view there are no significant issues that may have an impact on the implementation of fees. There are powers in the FRM Act and the Pearling Act to enable fees to be applied to leases and sites authorised under a licence.

   The working group considered the impact that application of bonds may have, particularly when applied to the pearling industry.

   The purpose of applying bonds to leases is to demonstrate the credibility of the lessee and guarantee performance and completion according to the terms of the lease agreement. In this context, a lease bond functions as a guarantee from the lessee to the Government and the community that the lessee will comply with the terms of the lease; it also ensures funds are available to rehabilitate a site in the event of a default.

   The Working Group recognised that the current system, which is based on cash bonds or bank guarantees, may have a significant financial impact on sectors of the industry. Based


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

on total aquaculture and pearling lease areas of approximately 60,000 hectares and a bond rate of $500/ha, the value of bonds can be estimated at $30 million.6 For this reason, the Working Group is of the view there is merit in exploring alternative options for providing the requisite assurances; for example, a model based on the Mining securities review may have the capacity to provide a similar level of financial security to the Government at a lower cost to industry.

A relevant recommendation is provided in the following section.

4. *Provide advice regarding an appropriate consultation and communication process with industry and department stakeholders regarding the issue of Water Lease fees, noting the limited timeframe of the Working Group.*

The communication and consultation process provided industry representative organisations to provide written submissions and to address the Working Group on several occasions. Similarly, relevant Government stakeholders were consulted and provided information to the Working Group, including the Department of Fisheries, Department of Regional Development and Lands and the office of the Valuer-General.

6 This assumes that the total area under lease will be used as the basis for calculating the bond. That may not be the case: bonds may be calculated according to the lease area that accommodates deployed aquaculture gear and not the total area.

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

## 5.0 RECOMMENDATIONS

The Working Group makes the six recommendations set out below.

| | |
|---|---|
| Recommendation 1 | That the formula to be used to calculate lease fees for aquaculture and pearling activities is:<br>Annual lease fee = base rate ($50/ha) x property right x remoteness x Ministerial discretion. |
| Recommendation 2 | That a minimum lease fee be set at $200. |
| Recommendation 3 | That the following implementation schedule be applied:<br>i. where lease fees are lower than those applied in 2010 – 11, they are implemented immediately at the lower rate; and<br>ii. where lease fees are greater than those applied in 2010 – 11, they be implemented at 200% of the 2010 – 11 rate, then increased by an additional 100% per year until the calculated fee is achieved. |
| Recommendation 4 | That the annual lease fee should be increased annually according to CPI increases, that it be reviewed at three-year intervals and that increases exceeding annual CPI increases that ensue from future reviews should be subject to appeal in the State Administrative Tribunal |
| Recommendation 5 | That the Department of Fisheries and Department of Regional Development and Lands consider and explore the option of DRDL issuing Crown leases for aquaculture and pearling in the future. |
| Recommendation 6 | That the Minister reviews the current bonds policy to consider the introduction of a flat fee for small operators and an industry fidelity fund to provide a mechanism to reduce the cost of funding the bonds. |


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

# EXHIBIT 4

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

# USE OF WATER FOR AQUACULTURE PURPOSES

# OPERATIONAL POLICY

April 2006

DIRECTORATE WATER ABSTRACTION AND IN-STREAM USE

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Published by: Department of Water Affairs and Forestry
Private Bag X 313
PRETORIA
0001
Republic of South Africa

Copyright: (2005) Department of Water Affairs and Forestry

No part of this document may be reproduced in any manner without the full acknowledgement of the source

Disclaimer: Although the information contained in this document is presented in good faith and believed to be correct, the Department of Water Affairs and Forestry (DWAF) makes not representations or warranties as to the completeness or accuracy of the information, which is only based on actual information received, and makes no commitment to update or correct information.

Citation: Department of Water Affairs and Forestry (2005). *Operational Policy: Use of Water for Aquaculture Purposes*. Directorate Water Abstraction and Instream Use, Sub-directorate Environment and Recreation.

Short Title: Policy on the use of water for aquaculture

Status: Approved by Water Resource Functional Management Committee
13 April 2006

Prepared by: Directorate Water Abstraction and In-stream Use, Sub-directorate Environment and Recreation

Available from: Department of Water Affairs and Forestry
Sub-directorate Environment and Recreation
Private Bag X 313
PRETORIA
0001
Republic of South Africa

Tel: (012) 336 8224; Fax: (012) 336 6608;
E-mail: deb@dwaf.gov.za

PUBLIC DOCUMENT

Barcode:4512905-01 C-331-806 INV - Investigation -

**APPROVALS**

This document is approved by:

Ms B Schreiner
Chairperson: Water Resource Functional Management Committee
Date:

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

**CONTENTS**

EXECUTIVE SUMMARY ..... V
ACRONYMS ..... VI
GLOSSARY OF TERMS ..... VII
SUPPORTING DOCUMENTS ..... X

**1. INTRODUCTION ..... 1**

1.1 The Definition of Aquaculture ..... 1
1.2 The Need for a Policy ..... 1
1.3 The Purpose of this Policy ..... 2

**2. AQUACULTURE BACKGROUND ..... 2**

2.1 Aquaculture Globally ..... 2
2.2 Aquaculture in Africa ..... 3
2.3 South African Aquaculture ..... 3
2.4 Classification of Aquaculture Types ..... 4
2.5 Negative Impacts of Aquaculture ..... 5

**3. POLICY APPROACH ..... 6**

3.1 Problem Statement ..... 6
3.2 Scope of the Policy ..... 7
3.3 Principles ..... 7
3.4 Policy Aims and Objectives ..... 8
3.5 Wider Legislative Context ..... 9
3.6 Roles and Responsibilities ..... 10

**4. POLICY GUIDELINES ..... 13**

4.1 Equitable Industry Access and Redress ..... 13
4.2 Responsible Aquaculture Practices ..... 14
4.3 Integrated Water Resource Utilisation ..... 14
4.4 Interdepartmental and Other Co-operation ..... 14
4.5 Aquaculture Workgroups, Associations and Institutes ..... 15
4.6 Fiscal Matters ..... 16
*4.6.1 Resource Related Fiscal Matters ..... 16*
*4.6.2 Policy Related Fiscal Matters ..... 16*
4.7 Communications ..... 16
4.8 Information Management ..... 17
4.9 Deployment and Implementation ..... 17
4.10 Monitoring, Auditing and Accountabilities ..... 18
4.11 Research and Development ..... 18

**5. POLICY REVIEW AND UPDATE ..... 18**

**6. CONCLUSION ..... 19**

REFERENCES ..... 20

**TABLES**

Table 1: South African aquaculture production for 1998, 2000 and 2003 (Hoffman, et.al., 2000 and expanded by Brink, 2003) ..... 4


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

**ACKNOWLEDGEMENTS**

The following stakeholders contributed to the compilation of this Operational Policy and their participation and enthusiasm are sincerely appreciated:

(i) The Project Team:

Ms L Fick and Mr F Notling for the Department of Water Affairs and Forestry (DWAF)
Dr D Brink and Mr E Hinrichsen for the Division of Aquaculture of the University of Stellenbosch

(ii) DWAF Project Steering Committee:

| | |
|---|---|
| Environment and Recreation | Messrs S Moganetsi and P Ackerman |
| Civil Design | Mr K Legge |
| Communication | Ms R Seymore |
| Legal Services | Ms N Jones |
| Regional Co-ordination | Ms E Knoetze |
| Resource Directed Measures | Mr H Pienaar |
| Resource Quality Information | Mr N Kleyhans |
| Stakeholder Empowerment | Messrs J Methula and C Mkwalo |
| Water Quality Planning | Dr S Oelofse |
| Resource Protection and Waste | Ms M Lighthelm |
| Water Allocation | Mr A Seetal |
| Institutions Governance | Mr D Weston |
| Water Resource Finance and Pricing | Mr M Vawda |
| Water Use Efficiency | Mr J Fourie |

(iii) Regional representatives of DWAF as assigned by Regional Directors:

| | |
|---|---|
| Northern Cape | Dr H Abbott |
| | Mr H du Toit |
| Western Cape | Mr G McConkey |
| | Mr J Rossouw |
| | Ms W Kloppers |
| | Ms H Lyons |
| | Ms M Kunneke |
| | Ms T Belcher |
| KwaZulu Natal | Mr S Sipho |
| Free State | Mr F van der Walt |
| | Mr D Visser |
| Eastern Cape | Ms Z Sishuba |
| | Mr G Daniell |
| Gauteng | Mr J Maluleke |
| | Mr A Hlabolwa |
| | Mr F Letsoko |
| | Ms D Mare |
| | Mr D Koekemoer |
| | Mr J Malan |
| Limpopo Region | Mr AB Mpete |
| | Mr MMS Machaba |

| | |
|---|---|
| | Mr M Daswa |
| | Mr K Selo |
| | Mr R Ngoasheng |
| | Ms M Chauke |
| Mpumalanga | Mr W Comrie |
| | Mr B Jackson |
| | Ms E Mienie |
| | Mr F Mnisi |
| | Mr D Mthembu |
| | Mr M Selepe |
| | Mr T Mashamba |
| | Ms A Steyn |
| | Ms B Mahlangu |
| | Mr D Joubert |
| | Mr E Motshoeni |
| North West | Mr P Venter |
| | Mr Z Setenane |
| | Mr M Mokgwabone |
| | Mr H Pretorius |

(iv) Dr. C Jones (Department of Ichthyology of the Rhodes University) for reviewing the near-final draft version of the Operational Policy.

(v) The aquaculture sector at large represented on the National and Regional Aquaculture Working Groups.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

**FOREWORD**

The South African aquaculture sector is poised to contribute in a sustainable manner to rural development and poverty relief, and to large-scale economic development, diversification and export opportunities. The non-consumptive and integrated use of water for aquaculture can be economically beneficial, can create Black Economic Empowerment (BEE), small and medium enterprise (SMME) opportunities, Public Private Partnerships (PPP), Community Public Private Partnerships (CPPPs) and skills development without expensive land reform and capitalisation. This development, however, depends on an accessible regulatory and facilitative framework to guide the sustainable utilisation of resources, to which the water resource is central. In this, the equitable intensification of aquaculture must take place without undue impact on water resources, the fitness-for-use of water by other activities and the greater environment.

The Department of Water Affairs and Forestry (DWAF) is obliged to consider the unique regulatory and facilitative nature of water usage for aquaculture. It is also in a position to use the opportunity, provided by aquaculture, to contribute towards achieving the objectives of the National Water Act, 1998 (Act No. 36 of 1998) through integrated and sustainable utilisation of water resources to address socio-economic development, food-security, human resource development and equitable access to water and the water-based economy. To ensure that DWAF is prepared and equipped to deal with these obligations and opportunities, this policy will be used as the core point of departure in the approach that DWAF will adopt to the use of water by the aquaculture sector. This policy aims to be:

(i) Forward Looking: Considerate of the future growth of the aquaculture sector and the need for renewal of policies, strategies and approach.
(ii) Outward Looking: Taking cognisance of the effects of the policy on the sector and thus being service orientated as opposed to restrictive.
(iii) Innovative and Flexible: Leading the design and implementation of more efficient means to ensure the sustainable use of water for aquaculture.
(iv) Joined Up: Linked to all government and private sectors that deal with, or have an interest in the aquaculture sector, and take cognisance of other aquaculture related policies and protocols.
(v) Inclusive: Effective at all levels of the sector from subsistence to large enterprise, across technologies, markets and scale.
(vi) Evidence Based: Geared to the nature of the aquaculture sector and the harmonised, sustainable use of water resources.
(vii) Evaluated: Adequately reviewed and updated through internal (DWAF) and external (aquaculture sector) inputs.

________________________________________

Ms B Schreiner
DEPUTY DIRECTOR GENERAL: POLICY AND REGULATION
Date:


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

## EXECUTIVE SUMMARY

This Operational Policy sets out to define the Department of Water Affairs and Forestry's (DWAF) responsibility in regulating and facilitating the use of water for aquaculture. The policy defines aquaculture and the need for a policy of this nature against the background of the growing world aquaculture sector and the poor participation in this sector by African countries, including South Africa.

The approach of the policy is defined in terms of a problem statement, scope of application, policy principles, the objectives of the document and the implementation responsibilities. Matters ranging from empowerment and redress to interdepartmental cooperation, communication and others are dealt with through the guidelines provided by the policy.

Through active review and implementation this policy will set the manner in which DWAF will deal with aquaculture and it will set the basis for the development of relevant protocols as tools for the realisation of the policy's goals and objectives.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

**ACRONYMS**

| | |
|---|---|
| AASA | Aquaculture Association of Southern Africa |
| AISA | Aquaculture Institute of South Africa |
| BEE | Black Economic Empowerment |
| CMA | Catchment Management Agency |
| CPPP | Community Public Private Partnerships |
| DEAT | Department of Environmental Affairs and Tourism |
| DTI | Department of Trade and Industry |
| DWAF | Department of Water Affairs and Forestry |
| EIA | Environmental Impact Assessment |
| FAO | Food and Agriculture Organisation of the United Nations |
| KPA | Key Performance Area |
| M&CM | Marine and Coastal Management |
| MT | Metric Ton |
| NAP | National Aquaculture Policy |
| NASW | National Aquaculture Sector Workgroup |
| NDA | National Department of Agriculture |
| NEMA | National Environmental Management Act, No. 107 of 1998 |
| NEPAD | New Partnership for Africa's Development |
| NWA | National Water Act, No. 36 of 1998 |
| PPP | Public Private Partnerships |
| RMP | Resource Management Plan |
| SADC | Southern African Development Community |
| SMME | Small, Medium and Micro Enterprise |
| UN | United Nations |
| WA&IU | Water Abstraction and Instream Use |
| WMI | Water Management Institution |
| WRC | Water Research Commission |

**GLOSSARY OF TERMS**

In this document, unless the context indicates otherwise, any word or expression to which a meaning has been assigned in the National Water Act (NWA), 1998 (Act No. 36 of 1998), shall have that meaning, and-

(a) "**Aquaculture**" means the propagation, improvement, trade or rearing of aquatic organisms (plant and animal) in controlled or selected aquatic environments (fresh, sea or brackish waters) for any commercial, subsistence, recreational or other public or private purpose.

(b) "**Aquaculturists**" means a person who practises aquaculture.

(c) "**Basic human needs**" means that component of the Reserve required to satisfy basic human needs by securing a basic water supply, as prescribed under the Water Services Act, No. 108 of 1997, for people who are now or who will, in the reasonably near future, be requiring water.

(d) "**Best Management Practice**" means the application of measures and aspects of management to achieve the best possible outcome in all instances.

(e) "**Biodiversity**" means the variability among living organisms from all sources including, terrestrial, marine and other aquatic ecosystems and the ecological complexes of which they are part and also includes diversity within species, between species, and of ecosystems;

(f) "**Black Economic Empowerment**" is defined as an integrated and coherent socio-economic process that directly contributes to the economic transformation of South Africa and brings about significant increases in the number of black people who manage, own and control the country's economy, as well as significant decreases in income inequalities.

(g) "**Cage culture**" means the practice of aquaculture within a defined pen or net cage or structure that is contained within a larger water body.

(h) "**Candidate species**" means a species that has been identified as having potential for the use in aquaculture.

(i) "**Capture fisheries**" means the harvesting of aquatic organisms from an environment in which no attempt has been made to manage or otherwise influence the organisms by containment, feeding or application of any husbandry techniques.

(j) "**Catchment Management Agency**" means a body corporate that will fulfil the functions as contemplated in Part 2 of Chapter 2 of the NWA.

(k) "**Community Public Private Partnership**" means a program by the Department of Trade and Industry to link resource-rich communities with private investors interested in utilising natural resources. Its core role is in stimulating rural enterprise through facilitating mutually beneficial, sustainable partnerships that result in ownership by the community.

(l) "**Controlled activity**" means an activity having a detrimental impact on water resources as contemplated in Sections 37 and 38 of the NWA.

(m) "**Co-operative governance**" means the process of governance (including regulation, facilitation etc.) between two or more governing bodies (e.g. Government Departments).

(n) "**Crustacean**" means any of various predominantly aquatic arthropods of the class Crustacea, characteristically having a segmented body, a chitinous exoskeleton, and paired, jointed limbs.

(o) "**Cumulative impact**" means the net resultant impact of two or more elements or activities exerting respective individual impacts. This is used in the context of an


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

impact that in itself may not be significant but is significant when added to the impact of other activities.

(p) "**Demographic**" means the adjective of or relating to demography, which is the study of the characteristics of human populations, such as size, growth, density, distribution, and vital statistics.

(q) "**Dissemination**" means effective and equal distribution.

(r) "**Environmental Impact Assessment**" means the process of collecting, organising, analysing, interpreting and communicating information that is relevant to a decision contemplated in Regulation 17 of the National Environmental Management Act, No. 107 of 1998 in respect of the potential impacts of a proposed activity.

(s) "**Equitable"** means marked by or having equity; just and impartial.

(t) "**Equity**" means the state, quality, or ideal of being just, impartial, and fair.

(u) "**Exotic species**" means a species that is not an indigenous species; or an indigenous species translocated or intended to be translocated to a place outside its natural distribution range in nature, but not an indigenous species that has extended its natural distribution range by natural means of migration or dispersal without human intervention.

(v) "**Finfish**" means an aquatic vertebrate of the super-class Pisces.

(w) "**Fitness-for-use**" means the characteristics that are conducive to normal use (i.e. in terms of this policy it refers to the characteristics of water resources that allow for normal use).

(x) "**Food security**" means the attainment of the minimum quantity of sustenance for maintenance of bodily functions and health.

(y) "**Genetically modified**" means the resultant genome from the application of techniques of genetic engineering so that the genome contains one or more modified or alien genes.

(z) "**Guideline**" means a document containing rules and instructions that direct the implementation of a functional business area.

(aa) "**Historical backlog**" means the state of certain demographic groups in South Africa caused by the previous political dispensation prior to democratisation in 1994.

(bb) "**Human resource**" means the collective worth (intellectual, spiritual and physical) of a person or people.

(cc) "**Hybridisation**" means to produce hybrids through crossbreeding of species to form DNA base pairs between complementary genetic regions of two strands of DNA that were not originally paired.

(dd) "**Industrial Aquaculture**" means aquaculture that is practised at large scale, with large production volumes and continues and predictable outputs.

(ee) "**Mariculture**" means the practise of aquaculture in the marine environment or an environment that replicates the marine environment.

(ff) "**Mollusc**" means any of numerous invertebrates of the phylum Mollusca, typically having a soft un-segmented body, a mantle, and a protective calcareous shell and including the edible shellfish and the snails.

(gg) "**Natural fisheries resources**" means the aquatic organisms in an environment in which no attempt has been made to manage or otherwise influence the organisms by containment, feeding or application of any husbandry techniques.

(hh) "**New Partnership for Africa's Development**" means a vision and strategic framework for Africa's renewal.

(ii) "**Non-consumptive**" means to use in a manner which does not decrease the matter quantitatively or qualitatively.

(jj) "**Operational Policy**" means a document outlining the set of principles and ideals on which decision-making and implementation are based and clarifies intent with regards to a particular business area in relation to the National Water Act or other empowering legislative requirements;


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

(kk) "**Ornamental Aquaculture**" means the practise of aquaculture for the provision of products that are used in an aesthetic manner only.

(ll) "**Past imbalances**" means the socio-economic disparity of certain demographic groups in South Africa caused by the previous political dispensation prior to democratisation in 1994.

(mm) "**Previously disadvantaged**" means the socio-political disadvantage of certain demographic groups in South Africa caused by the previous political dispensation prior to democratisation in 1994.

(nn) "**Public Private Partnership**" means a program by the National Business Initiative for the enhancement of private sector participation in the provision, financing and management of public services.

(oo) "**Redress**" means the process of rectifying past socio-economic imbalances in certain demographic groups in South Africa (caused by the previous political dispensation prior to democratisation in 1994).

(pp) "**Resource Management Plan**" means a written plan, for the management of and control over the water surface and water body of a water resource including a water surface and water body of a government waterworks and the surrounding state-owned land, approved by the Minister of Water Affairs and Forestry.

(qq) "**Shellfish**" means an aquatic animal, such as a mollusc or crustacean that has a shell or shell-like exoskeleton.

(rr) "**Socio-economic**" means of or involving both social and economic factors.

(ss) "**State managed water or impoundments**" means water impoundments (dams, weirs etc.) that fall under direct jurisdiction of the South African Government.

(tt) "**State Parties**' is any unit, department or administrative structure bought about by the South African Government and as further contemplated in Section 239 of the South African Constitution.

(uu) "**Structural elements of impoundments**" means all elements that ensure the continued existence and functionality of impoundments and include, pipes, valves, pumps, weirs, dam walls and other infrastructure.

(vv) "**Subsistence**" means just sufficient to maintain life.

(ww) "**Sustainable**" means the capability of continuation with minimal long-term effect on the environment.

(xx) "**Water related infrastructure**" means any building or infrastructure that is necessary for the functioning of the facility or that is used for an ancillary service from the facility.

(yy) "**Water-based economy**" means any economic sector or element, which depends on or is linked to water resources.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:4512905-01 C-331-806 INV - Investigation -

**SUPPORTING DOCUMENTS**

This policy is supported by the following documents:

Department of Water Affairs and Forestry (2006). *Guidelines for Authorising the Use of Water for Aquaculture Purposes*. Directorate Water Abstraction and Instream Use, Sub-directorate Environment and Recreation.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

## 1. INTRODUCTION

### 1.1 The Definition of Aquaculture

Aquaculture is defined as the propagation, improvement, trade or rearing of aquatic organisms (plant and animal) in controlled or selected aquatic environments (fresh, sea or brackish waters) for any commercial, subsistence, recreational or other public or private purpose.

Aquaculture does not include capture fisheries (or fisheries), which entails the harvesting of aquatic organisms from an environment in which no attempt has been made to manage or otherwise influence the organisms by containment, feeding or application of any husbandry techniques.

### 1.2 The Need for a Policy

The use of water for aquaculture has the potential to impact water resources, and the social, economic and biophysical environments. In order to ensure the sustainability of a sector that is so reliant and closely linked to water resources it is imperative that these water resources are protected, and that their utilisation is based on sound management, while ensuring equitable benefits to all. Increased pressure for Government intervention will occur in order to ensure water resource sustainability through clarification by policy regarding equity, resource management, protocols and guidelines for aquaculture regulation and facilitation.

With reference to Section 21 of the National Water Act (NWA), 1998 (Act No. 36 of 1998) the use of water for aquaculture can incorporate none, one or several of the following identified water uses:

(a) taking water from a water resource;
(b) storing water;
(c) impeding or diverting the flow of water in a watercourse;
(f) discharging waste or water containing waste into a water resource through a pipe, canal, sewer, sea outfall or other conduit;
(g) disposing of waste in a manner which may detrimentally impact on a water resource;
(h) disposing in any manner of water which contains waste from, or which has been heated in, any industrial or power generation process; and/or
(i) altering the bed, banks, course or characteristics of a watercourse.

This potential multiple water usage (as classified by Section 21 of the NWA) underpins the need for a comprehensive and effective operational policy to support the regulation and facilitation of the use of water for aquaculture purposes.

Through the Department of Water Affairs and Forestry (DWAF) as custodian authority over water resources, this policy will ensure that Government can provide explicit direction and guidance regarding water utilised by aquaculture, thereby creating an environment that is conducive to unlocking the potential of this activity, and the associated sector, in a sustainable manner. When integrated with the relevant legislation, other policies and strategies, it will ensure that aquaculture becomes an important catalyst in the redress of past imbalances, whilst providing an effective guideline for managing, conserving and using water resources sustainably and equitably.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

### 1.3 The Purpose of this Policy

The core purpose of this policy is to lay the foundation and clarify the approach for DWAF to regulate and facilitate the use of water and associated water related infrastructure for aquaculture within its mandate as custodian authority over water resources and the NWA. In this, the policy will set the principles to be applied in DWAF's authorisation procedures for the use of water in aquaculture, resource allocations and pricing, access to water related infrastructure, the establishment of institutional arrangements, internal and external coordination mechanisms, implementation responsibilities, and the development of best practice around this use.

The aforementioned core purpose of this policy is embedded in the greater purpose of the NWA (Section 2), which states that the Act must ensure that the Nation's water resources are protected, used, developed, conserved and managed in a sustainable and equitable manner. This policy thus defines DWAF's obligations in regulating and facilitating the use of water for aquaculture and establishes the basic principles and aims for this.

## 2. AQUACULTURE BACKGROUND

In order for this policy to be effective it is important to provide background information on aquaculture so that a clear understanding can be developed of the scope, importance, potential impacts and nature of this sector. As this nature is continuously evolving, and the scale of production increasing, it is important that this section be regularly updated to reflect the position of the sector.

### 2.1 Aquaculture Globally

The importance of aquaculture is growing, both as a world food resource and in economic terms. The global population is expanding and the demand for high-quality protein, especially from aquatic sources, is rising steadily. Production from capture fisheries is, however, at capacity and showing further declines due to over fishing, habitat destruction and pollution. Aquaculture production has the potential to meet projected demands of fish, shellfish and other water related product supplies.

Currently, aquaculture contributes 29.1% (37.5 million MT) of total world fisheries (128.8 million MT) compared to a steadily decreasing contribution of 70.9% (91.3 million MT) from conventional capture fisheries (FAO, 2002). Aquaculture has realised a cumulative annual growth rate of 14.5% over the period 1992 to 2000, compared to 3.5% for terrestrial animal production and 1.8% for capture fisheries yields.

The development of aquaculture is driven by market forces (supply and demand) the diversification of the economic base, the sustainable utilisation of resources and a quest for food security. In this, aquaculture has developed into a diverse industry, with over 64 countries participating in the production of more than 300 species of fish, shellfish, crustaceans and aquatic plants. The commercialisation of aquaculture and the development of technologies were initiated mainly by first-world countries in Europe, Asia and North America, but have since spread to a number of developing countries in south-east Asia and South America, with Africa due to follow suite.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

The establishment of commercial aquaculture in developing countries relies on the utilisation of natural, human and energy resources. In developing countries these resources can be harnessed by first-world intervention, causing local aquaculture to become directed towards lucrative first-world markets. This leads to limited benefit sharing in domestic aquaculture. Developing countries should strive to acquire the technologies, skills and finance that will enable them to take the initiative and responsibility for local aquaculture development, thereby ensuring a more equitable share in the sustainable utilisation of local natural, human and energy resources.

## 2.2 Aquaculture in Africa

In spite of its vast natural and human resources, the participation of Africa in the global aquaculture sector is lacking. Aquatic species indigenous to Africa (prawn, tilapia, catfish, eel and abalone) have developed into aquaculture species of international importance. Developing countries from south-east Asia and South America have secured significant participation in these sectors, but African countries, including South Africa, have been unable to secure any meaningful economic benefits from these indigenous aquatic resources. The primary problems causing the lack of participation in the aquaculture sector by the African continent is investigated in detail by a series of work done by Hecht in 2000 and 2001 (as referenced).

## 2.3 South African Aquaculture

Aquaculture in South Africa produces freshwater species such as trout, crocodiles, ornamental fish, marron, catfish and tilapia and marine species such as abalone, prawns, oysters and mussels. Candidate species such as eel, crayfish, cob, yellowtail, grunter, tuna, turbot and seaweed are being developed and/or considered. Aquaculture technology and services are well establish for species such as trout, crocodiles, catfish, tilapia, abalone, prawns, oysters and mussels whilst still lacking for species such as eel, cob, tuna and seaweed. Various factors are currently stimulating the development of aquaculture in South Africa, including:

- The availability of resources such as water, land, labour, energy, etc.;
- The non-consumptive and integrated manner in which aquaculture can use water;
- The diminishing natural fisheries resources;
- Good national and international market interest;
- Good agricultural and other essential infrastructure;
- The need for diversification and optimisation of resources;
- The good access to national and international technologies;
- International partnerships and collaboration within the sector;
- The socio-economic need for redress and food security; and
- The ability of aquaculture to act as a vehicle for participation, skills enhancement, empowerment, food security and socio-economic upliftment.

Factors that are currently inhibiting the development of the aquaculture sector in South Africa include:

- Fragmented policies and protocols from various Government Departments[1];

[1] The Departments of Agriculture and Environmental Affairs and Tourism have initiated a policy co-ordination process that will involve all relevant Government departments as well as stakeholders from the sector.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

- Lack of marketing structures to access the market interest;
- Limited access to finance and developmental capital; and
- Limited human resources in capacity, skills and aquaculture expertise.

The further growth of aquaculture in South Africa depends on the successful integration, use and development of natural resources (water, land, climate, energy and biodiversity), human resources (labour, skills and technology) and economic resources (capital, infrastructure and market access).

Freshwater and marine species that are currently produced in South Africa are listed in Table 1, together with the production volumes and values. Species that are produced in smaller quantities in South African aquaculture have not been included here as these sub-sectors are fragmented and poor statistical data is available. The collection, reporting and dissemination of reliable aquaculture statistics are poor in general.

Considering global trends in aquaculture, the historical backlog in South Africa and the potential of local resources, the aquaculture sector in South Africa is likely to expand rapidly.

Table 1: South African aquaculture production for 1998, 2000 and 2003 (Hoffman, et.al., 2000 and expanded by Brink, 2003)

| Species: Freshwater | Common name | 1998 (M. tons) | 2000 (M. tons) | 2003 (M. tons) | 2003 Value (R. mil.) |
|---|---|---|---|---|---|
| *Aponegeton distachyos* | Hawthorne | 120 | 150 | 170 | 0.280 |
| *Carrasius auratus* | Goldfish | 465 000* | 805 000* | 930 000* | 3.319 |
| *Cherax tenuimanus* | Crawfish | 4 | 8 | 13 | 0.699 |
| *Clarias gariepinus* | Catfish | 40 | 65 | 240 | 3.202 |
| *Crocodylus niloticus* | Crocodile | - | - | 8550* | 11.500 |
| *Cyprynis carpio* | Carp | 45 | 55 | 80 | 1.106 |
| *Koi carp (C. carpio)* | Koi carp | 128 000* | 375 000* | 110 000* | 1.563 |
| *Micropterus salmoides* | Bass | 5 | 8 | 8 | 0.072 |
| *Mugulidae* | Mullet | 12 | 15 | 17 | 0.231 |
| *Onchorhynchus mykiss* | Trout | 1 650 | 1830 | 1750 | 44.011 |
| *Oreochromis mossambicus* | Tilapia | 45 | 130 | 210 | 3.098 |
| *Oreochromis spp.* | Tilapia spp. | 25 | 45 | 52 | 0.739 |
| Ornamental fish spp. | Ornamental | 5 | 7 | 7 | 0.520 |
| *Penaes indicus* | Shrimp | 85 | 120 | 130 | 11.830 |
| **Subtotal** | | **2 036** | **2 433** | **2677** | **82.170** |
| | | | | | **Species: Marine** |
| *Grassostria gigas* | Oysters | 175 | 170 | 250 | 1.600 |
| *Gracilaria spp* | Sea weed | 16 | 40 | 48 | 0.265 |
| *Haliotis midae* | Abalone | 22 | 180 | 515 | 134.000 |
| *Mytilus galoprovincialis* | Mussels | 650 | 790 | 900 | 5.135 |
| **Subtotal** | | **863** | **1 180** | **1713** | **141.000** |
| **Total** | | **2 899** | **3 613** | **4 390** | **223.170** |

** Unit = number of fish*

## 2.4 Classification of Aquaculture Types

The aquaculture sector employs a range of production techniques that can be classified according to the environment in which the activity is practised, the scale and intensity, the


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

nature of water use, the degree of "openness" to the environment, the species, housing facilities for production organisms and more.

Firstly, aquaculture is carried out as either freshwater aquaculture or marine aquaculture (i.e. mariculture), which is practised in fresh and marine waters respectively. Estuarine and brackish water aquaculture straddles the divide between fresh and marine water aquaculture.

Aquaculture can further be defined in terms of the intensity of production. The typical classification in this regard refers to extensive production as opposed to semi-intensive and intensive production where the level of technology, capital expenditure, running costs, control, risk and volume of production per unit area typically increases from the less to more intensive practises. Associated, but not necessarily linked to this, is the magnitude of production that can be broadly divided into small-scale operations (often subsistence ventures), medium scale enterprise and large-scale enterprise (often referred to as industrial aquaculture).

Further classification is possible according to the nature of water use. In this regard differentiation can be made between closed systems where no (or very little) water is replaced, semi-open systems where water is supplemented or replaced from time to time and flow through or open systems where new water is continuously replacing water in the production system. In most cases the water entering into open or semi-open systems allows for the replenishment of oxygen and the removal of production wastes. In closed systems, oxygen (if required) must be added by other means, while production wastes are generally removed by water filtration.

In terms of water usage aquaculture can also be defined according to its position in relation to the water resource. In this regard aquaculture activities can be situated in open waters, in stream or in channel, off channel or in effluent waters.

A range of production facilities are used in aquaculture. These can be classed into tank culture, pond culture and cage culture systems. Within each of these various subcategories derivatives can be identified. Tank culture can range from typical glass tanks to tanks of various sizes constructed of fibreglass, plastics, concrete or other materials. Pond culture typically refers to earthen ponds, but various plastic, concrete and other pond linings are common. Cage culture systems range from basic penned enclosures to basic floating cages and technologically advanced submerged cages.

Categorisation by species not only refers to marine or freshwater species, but also to the typical species groups such as reptiles, finfish, crustaceans, molluscs, aquatic plants or algae.

## 2.5 Negative Impacts of Aquaculture

Aquaculture uses water volumetrically and is generally regarded as a non-consumptive use as the water remains available for other uses after the aquaculture activities. With regard to water chemistry, aquaculture has the potential of adding metabolic wastes to the water and the environment at large (mainly phosphorous and nitrogenous organic compounds). This can lead to an overabundance of algae that can affect the suitability of water for other uses.

Although limited, aquaculture poses potential physical impacts. These include the potential to increase turbidity or destabilization by organisms that disturb the substrates or structural elements of impoundments. From a safety perspective, aquaculture structures could pose a threat to functional elements (valves, cause ways etc.) and to recreational water users.

The potential impacts of aquaculture on biodiversity relate to the escape of exotic or genetically different organisms and the indirect impacts on biodiversity through aquaculture related environmental degradation. Furthermore, the introduction of disease and aquaculture medications and chemicals could also impact on biodiversity. Aquatic biodiversity can further be affected negatively by hybridization, predation, habitat destruction and elimination or competitive advantage (displacement) in an ecosystem.

Other effects such as aesthetic disturbance and the cumulative impact of aquaculture together with other water uses also need to be considered. These potentially negative impacts can, however, be mitigated through adequate planning and control, and should be considered in conjunction with the social and economic benefits that may derive from aquaculture.

## 3. POLICY APPROACH

### 3.1 Problem Statement

As aquaculture is closely linked with the state and availability of water, a function of this policy is to address the problems faced by the aquaculture sector and the problems faced within DWAF in dealing with this expanding sector.

Problems faced by the South African aquaculture sector include:

- Complex, non-existent, ill informed, non-compatible and unrelated statutory frameworks and procedures that are sometimes costly, and hinder the progress of sustainable and equitable aquaculture development;
- Poor and lacking sector planning at national and regional levels;
- Access to aquaculture resources, skills and technologies is poor and not well structured and supported by Government and the private sector. This includes the lack of mechanisms to access State managed water and infrastructure resources for the development of PPP and CPPP ventures;
- Investment confidence in aquaculture is low due to poor feasibility analysis, poor fund distribution and historic unscrupulous use of funding opportunities;
- Factors such as effective market penetration, product acceptance, product quality, aquaculture feeds, aquaculture stock improvement, training and innovation need to be addressed in the sector; and
- Poor penetration of the sector into rural areas.

Problems faced by DWAF in its regulation and facilitation of the use of water for aquaculture include:

- A lack of internal capacity, at national and regional levels, in understanding the intricacies related to the use of water for aquaculture and the nature of this use;
- The multiple water use methods and classifications used in the aquaculture sector, complicates authorisation procedures in terms of the NWA;
- The lack of a comprehensive decision support system (i.e. protocol), backed up by internal expertise in the field of water usage for aquaculture; and
- The lack of awareness of the aquaculture sector within DWAF, which has created a poor image of DWAF by the aquaculture sector.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

### 3.2 Scope of the Policy

This policy is for use by all South Africans. This can be further refined in terms of:

(i) the geographical area of its application;
(ii) the sector for which it is intended;
(iii) the identification of its users; and
(iv) its application in guiding sustainable and equitable practices in the sector and its role in providing information on the approach of DWAF to the regulation and facilitation of the use of water for aquaculture.

In the first instance, this policy is intended for use in all the aquatic environments under South African jurisdiction and over which the Minister through DWAF has jurisdiction in terms of the NWA. This includes all freshwater resources and is limited to marine environments only in instances where aquaculture water use influences estuarine environments and where aquaculture effluents are discharged into the marine environment.

Secondly, this policy is intended for use by the South African Government and in all facets of the aquaculture sector, albeit marine or freshwater aquaculture, ranging from subsistence ventures to the production of high value export products and the ornamental aquaculture trade.

Thirdly, it is intended for use by all parties involved and participating in aquaculture in South Africa. Participants include producers, suppliers, processors, marketers, consultants, tertiary and other educatory bodies, environmental custodians, consumers, the general public and all regulatory and Government sectors.

Fourthly, it must be applied in achieving sustainable and equitable practices in the aquaculture sector.

### 3.3 Principles

The core principle of this policy is to provide an enabling regulatory environment for the use of water for aquaculture under DWAF's mandate as custodian authority over South African water resources and the NWA. This enabling regulatory environment will aim to create accessibility to water resources and the associated infrastructure for the growth of an equitable and sustainable aquaculture sector.

Secondary principles shall include facilitative, socio-economic, commercial and environmental principles, and shall support the aforementioned core principle.

The facilitative principle relates to the manner in which DWAF must equip itself with the necessary tools (i.e. protocols) to deal with the regulation of water use for aquaculture in an effective manner. The socio-economic principle relates to the objectives of the NWA in addressing socio-economic development, food-security, human resource development and equitable access to water and the water-based economy. The commercial principle relates to the creation of an environment that enables the sustainable exploitation of commercial opportunities to the benefit of the South African economy. The environmental principle relates to the responsibilities of DWAF to ensure the protection of the water resources used by aquaculture, as well as the protection of the associated water ecology and all other users, which depend on these resources.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Although not all directly related to the use of water, these principles are echoed in Article 13 of the Protocol on Fisheries (2001) issued by the Southern African Development Community (SADC), which reads as follows:

- State Parties shall take the necessary steps to optimise the economic contribution of aquaculture to the Region;
- State Parties shall review policies, legislation, plans and institutions to address the characteristics and needs of aquaculture in recognition of the fact that aquaculture is a distinct enterprise;
- State Parties shall promote on-site research, demonstrations and increased practitioner-to-practitioner extension as ways to increase economic and social benefits from aquaculture;
- State Parties shall promote private sector participation in aquaculture through access arrangements to designated areas and provide or facilitate the necessary support services and access to finance;
- State Parties shall co-operate, where necessary, in the promotion of inland and marine ranching and stock enhancement;
- State Parties shall undertake research and technological development, particularly in identifying new sources of locally available raw materials for fish feed;
- A State Party shall not introduce exotic species or genetically modified species to shared aquatic ecosystems including the full extent of the river basin unless the affected State Parties agree to the introduction;
- State Parties shall establish standard guidelines and regulations for the application of environmental impact assessments; and
- State Parties shall monitor and exchange information on diseases and the spread of diseases of relevance to cultured aquatic species.

### 3.4 Policy Aims and Objectives

As a holistic policy with the capacity to unify and simplify the regulation and facilitation of water use for sustainable and equitable aquaculture development, the objectives of the policy are to:

(i) Attain this policy's core and secondary principles through the establishment of an enabling regulatory environment for the use of water for aquaculture under DWAF's mandate as custodian authority over South African water resources and the NWA. This includes guiding the creation of a standard, conducive and procedurally just administrative and institutional environment, aligned with other laws, for the consideration, assessment, licensing and authorisation of the use of water for aquaculture;

(ii) Give rise to internal mechanisms, the necessary capacities, and decision making criteria in technical, legal, environmental and social aspects to regulate accessibility and entitlements to water resources and the associated infrastructure required by the aquaculture sector;

(iii) Give rise to the establishment of equity, the participation of all demographic groups, social-economic development, human resource development, and poverty alleviation in all instances where the use of water for aquaculture is regulated and facilitated;

(iv) Give rise to the protection and conservation of water resources and associated ecologies used by aquaculture in an environmentally responsible manner based on best management practices, monitoring, auditing and accountability;

(v) Give rise to the sustainable exploitation of commercial opportunities that rely on the use of water for aquaculture. These opportunities must be equitably proportioned and

benefit communities so that the aquaculture sector contributes to the diversity, vitality and long-term viability of local and regional economies;

(vi) Attain compatible integration of the use of water for aquaculture with other water uses and to ensure that the effects of aquaculture on the fitness of water resources do not impact detrimentally on other rightful users of these common resources;

(vii) Give rise to the establishment of linkages, communication networks and co-operative governance arrangements around the regulation and facilitation of water use for aquaculture. These linkages must straddle the public and private sectors and should clarify the roles of Water Management Institutions (WMIs) and Catchment Management Agencies (CMA's) in order to create a harmonious balance between resource managers, users and affected communities;

(viii) Give rise to the alignment of DWAF's policies and protocols on aquaculture with the National Aquaculture Policy (NAP) of the National Department of Agriculture (NDA), and to cooperate with and participate in the interdepartmental National and Regional Aquaculture Workgroups, the Aquaculture Association of Southern Africa (AASA) and the Aquaculture Institute of South Africa (AISA);

(ix) Guide the water resource tariff measures and arrangements as these relate to the use of water for aquaculture;

(x) Give rise to internal mechanisms for dealing with information that relates to the use of water for aquaculture and thus ensure that internally DWAF becomes aware of this unique water use;

(xi) Continuously determine the potential impacts of aquaculture on water resources in relation to the notion of having aquaculture declared a controlled activity in terms of Section 38 of the NWA; and

(xii) Give rise to the deployment and regular review of this policy to ensure that it remains relevant and in use.

### 3.5 Wider Legislative Context

Although sector specific legislation for aquaculture does not exist, all the laws within the legislative framework of South Africa apply. Apart from the overriding South African Constitution, human rights, right to tenure, labour and commercial laws, many facets of aquaculture are governed by environmental and resource related legislation such as the NWA. These include *inter alia*:

– Conservation of Agricultural Resources Act, 1983 (Act No. 43 of 1983)
– Environment Conservation Act, 1989 (Act No. 73 of 1989);
– National Environmental Management Act, 1998 (Act No. 107 of 1998);
– National Environmental Management: Biodiversity Act, 2004 (Act No. 10 of 2004);
– Marine Living Resources Act, 1998 (Act No. 18 of 1998);
– Agricultural Pests Act, 1983 (Act No. 36 of 1983);
– Animal Diseases Act, 1984 (Act No. 35 of 1984);
– Genetically Modified Organisms Act, 1997 (Act No. 15 of 1997);
– Fertilisers, Farm Feeds, Agricultural Remedies and Shock Remedies Act, 1947 (Act 36 of 1947);
– Animal Health Act, 2002 (Act No. 7 of 2002);
– Various Land Use Planning Ordinances; and
– Various Nature -, Environmental - and Conservation Ordinances.

PUBLIC DOCUMENT

Barcode:4512905-01 C-331-806 INV - Investigation -

This basket of applicable legislation means that the use of water for aquaculture, as entitled under the NWA, cannot stand separately from other legislative requirements.

South Africa has endorsed and is a signatory to many codes of conduct and protocols that exist in the international community. Many of these have bearing on the manner in which aquaculture is developed and conducted and therefore this policy (through the NWA) recognises the existence of these international arrangements and their influence on South African aquaculture. Additionally, aquaculture activities may affect internationally shared resources, where mutually applicable legislative systems may apply.

One of the key regional (Southern African) protocols, which is recognised in this policy, is the SADC Protocol on Fisheries (2001). Apart from its grounding in the NWA and the legislative framework of South Africa this policy recognises the direction given by the New Partnership for Africa's Development (NEPAD) and the international applicability of the guidelines for aquaculture under the Food and Agriculture Organisation (FAO) of the United Nations (UN).

Clear differentiation is required in terms of the legislative implications for the entitlement and authorisation of water resources for aquaculture and the authorisation for the use of the infrastructure associated with such waters (i.e. dams, channels, reservoirs and infrastructure employed in the management of water resources). This differentiation can be approached by means of defining the use of privately owned infrastructure as opposed to Government Waterworks (publicly owned assets) controlled by DWAF. For this reason the legislative implications for the use and access to such State owned assets for aquaculture, requires careful consideration and interdepartmental coordination.

The approval for the use of water resources for aquaculture under the NWA will conform to the existing application procedures for authorisations, licences and approvals as contemplated in the NWA (Parts 6 to 10 of the NWA).

The governing legislative frameworks must be applied to aquaculture in a manner that leads to:

- Equitable access into aquaculture for all sectors of the South African community;
- The responsible allocation and use of national resources;
- The conservation of resources, ecosystems and biodiversity;
- Accountability for natural resource degradation; and
- Development and diversification of the South African economy.

### 3.6 Roles and Responsibilities

In terms of Section 3 of the NWA, National Government, through the Minister of DWAF, is the public trustee of the Nation's water resources with additional powers in terms of Section 26 of the NWA to regulate the manner, purpose and extent of water use and, in this instance, the use of water for aquaculture.

DWAF is thus mandated as the lead organisation concerning the regulation and facilitation of the use of water resources for aquaculture. The Directorate Water Abstraction and Instream Use is the lead directorate within DWAF responsible for this policy. Due to the diverse nature of aquaculture and the importance of a common purpose within DWAF, the other directorates, branches and business units will take equal responsibility in addressing matters that relate to their respective fields:


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

- The Sub-directorate Environment and Recreation will co-ordinate policy and regulation development in support of authorisation of the use of water for aquaculture purposes and provide inputs with regards to Section 21(c) and (i) water uses;
- The Sub-directorate Abstraction and Storage will provide guidance in respect of Section 21(a) and (b) uses;
- The Sub-directorates Agriculture and Industries of the Directorate Resource Protection and Waste provide inputs with regards to waste related impacts from these activities; and
- The Water Resource Infrastructure Branch will provide inputs with regards to access and use of government waterworks - in particular commercial aquaculture ventures (PPPs).

It is the responsibility of DWAF to ensure that this policy is implemented at national and regional level so that the policy's aims and objectives can be achieved. Furthermore, DWAF must convey this policy to the other key Government Departments that are involved in the aquaculture sector, to WMIs, the existing and upcoming CMA's, to the National and Regional Aquaculture Workgroups, to the AASA, the AISA and its affiliated associations and to the aquaculture sector as a whole. In terms of this policy the recommended roles of these public and private recipients are as follows:

(i) The National Department of Agriculture (NDA):
- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with its responsibility as lead department for aquaculture and its development;
- to ensure that this policy is conveyed to the respective provincial departments and to use it in areas of common responsibility;
- to provide recognition of this policy in its role as custodian over the National Aquaculture Sector Workgroup;

(ii) The Department of Environmental Affairs and Tourism (DEAT):
- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with its responsibility in protecting and conserving environmental resources;
- to ensure that this policy is conveyed to the respective provincial departments and to the Marine and Coastal Management (M&CM) section to use it in areas of common responsibility;

(iii) The Department of Health:
- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with its responsibility in ensuring public health related to the utilization of these water resources and the products produced by the aquaculture sector;

(iv) The Department of Land Affairs:
- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with its responsibility in land reform, equitable allocation of land, resettlement and rights to land tenure;

(v) The Department of Provincial and Local Government:
- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to ensure that this policy is recognised by provincial and local governments in their involvement with water resources and the development of aquaculture;

(vi) The Department of Public Works:
- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with mechanisms for the equitable access and use of publicly owned assets associated with these water resources;

(vii) The Department of Science and Technology (DST):

- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with its responsibility in the development and funding of aquaculture initiatives in the dissemination of scientific and technological information;

(viii) The Department of Trade and Industry (DTI):

- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with its responsibility in promoting equitable aquaculture business development and export opportunities;

(ix) Provincial Governments:

- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with their respective provincial mandates that implicate water resources;

(x) Local Government:

- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with their respective local mandates that implicate water resources;

(xi) Water Management Institutions (WMI):

- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with their responsibility over water resources within their respective Institutions;
- to ensure that the policy is communicated to any person or party contemplating or involved in aquaculture and associated with the institution;

(xii) Catchment Management Agencies (CMA):

- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with their responsibility as a catchment based management authority over water resources and the NWA;
- to ensure that the policy is communicated to any person or party contemplating or involved in aquaculture in the catchment;

(xiii) The National Aquaculture Sector Workgroup (NASW):

- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with its responsibility as national-, interdepartmental-, sector- and technical-forum for Aquaculture;
- to actively align this policy with similar policies from other Government Departments;

(xiv) Regional Aquaculture Workgroups:

- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with their responsibility as regional-, interdepartmental-, sector- and technical-forums for aquaculture;
- to ensure that the policy is communicated to all persons and parties associated with the workgroups.

(xv) The Aquaculture Association of Southern Africa (AASA) and affiliated sector associations:

- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with their responsibility to steer the aquaculture sector towards regulatory compliance;
- to ensure that the policy is communicated to any person, party or organisation affiliated to the associations;

(xvi) The Aquaculture Institute of South Africa (AISA) and affiliated sector associations:

- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to align this with their responsibility to steer the aquaculture sector towards regulatory compliance;

- to ensure that the policy is communicated to any person, party or organisation affiliated to the institute;

(xvii) The aquaculture sector:

- to recognise the regulatory and facilitative mandates of DWAF over the water resources used for aquaculture and to use the policy in aquaculture development and planning, and to steer compliance with the NWA.

It remains the responsibility of each of the abovementioned Government departments and organisations to clarify their own mandates towards aquaculture given their respective positions and the legislation over which they have jurisdiction.

## 4. POLICY GUIDELINES

### 4.1 Equitable Industry Access and Redress

Aquaculture in South Africa can contribute to the local, regional, and national economy by providing employment, rural food security, socio-economic development, participation opportunities, business opportunities, skills development and empowerment in a new and diverse sector that uses water in a mostly non-consumptive, often integrated manner, without land reform capitalisation. Aquaculture development must, however, take particular account of the needs of socially and economically disadvantaged communities and the previously disadvantaged sectors in the South African demography.

The Black Economic Empowerment (BEE) mechanisms and associated BEE scoring systems and goals introduced by the National Government will by default apply to the aquaculture sector. In furthering this, DWAF, in mutual partnership with the aquaculture sector, must endeavour to:

- Ensure that this policy is made known to all South Africans and cooperate with other public and private sectors that are involved in the aquaculture sector;
- Promote the reflection of equity, empowerment and socio-economic upliftment in licence and authorisation applications for the use of water resources for aquaculture;
- Set up a system to evaluate the potential use of public water resources and the associated water related infrastructure and assets for aquaculture by ventures that embrace BEE, rural community upliftment, food security, CPPPs and PPPs. This should be done in partnership with the Departments of Public Works and Land Affairs;
- Assist other Government Departments and non-government organisations in their efforts to achieve equity and redress through aquaculture by assisting with applications and authorisations for the sustainable use of water, other natural resources and the associated infrastructure for aquaculture;
- Give outright priority to South African nationals in the allocation of entitlements, licences and authorisations for the use of South African water resources for aquaculture;
- Give consideration to subsistence fisheries supported by aquaculture in publicly managed water resources;
- Include the sustainable use of water and the associated infrastructure for aquaculture into all Resource Management Plans (RMPs), while encouraging integrated use of the resources within such RMPs for aquaculture; and
- Participate in the extension services provided other Government Departments when these services reach into rural communities for the development of aquaculture.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

## 4.2 Responsible Aquaculture Practices

It is not within DWAF's mandate to develop Best Management Practices (BMP) for the aquaculture sector, but such management practices have a direct influence on the protection and conservation of the water resources to which aquaculture is inextricably linked. In this regard DWAF must insist on the implementation of a BMP system when issuing entitlements, general authorisations or licences for water resources used in aquaculture.

The mechanisms for cooperative governance around *inter alia* the Environmental Impact Assessment (EIA) process under the NEMA (administered by DEAT), development facilitation in terms of the Development Facilitation Act, 1995 (Act No. 67 of 1995) and administered by the Department of Provincial and Local Government), establishment of Land Use Management Systems and Integrated Development Plans in terms of the Municipal Systems Act, 2000 (Act No. 32 of 2000) administered by Municipalities, and the powers of DWAF, under the NWA, affords it the opportunity to insists on BMP systems as a condition of approving new aquaculture facilities.

Many aspects contribute to BMP in aquaculture. Of primary concern to the protection of water resources are the following:

- Aquaculture should be correctly positioned and practiced according to the suitability of the water resource, any zoning implications, and the integration of the aquaculture activities with other uses of the same water resource;
- Quantitative control measures should be put in place to limit production to levels that can be sustained by the water resource;
- Effluent discharge and waste control, as these relate to the water resource, should be controlled and monitored;
- Consideration should be given to infrastructure safety and the impact of aquaculture infrastructure on other users of common water resources;
- Systems should be in place for the detection of water resource degradation and negative impacts on other water resource users;
- A clear understanding should be developed regarding accountability associated with the entitlement and authorisation of the sustainable use of water for aquaculture; and
- Attention should be given to the potential impact of aquaculture chemicals, feeds, diseases and exotic organisms on water resources.

## 4.3 Integrated Water Resource Utilisation

The sustainable use of water and the associated infrastructure for aquaculture must recognise that water resources typically serve multiple users, some of which take precedence over activities such as aquaculture. These include primarily the Reserve and water to serve basic human needs, but could also include other water uses according to the specific catchments and uses. Once these needs have been served the sustainable use of water for aquaculture must be compatible both in space and time with other water uses and users; and must comply with public health and safety norms, standards and regulations.

## 4.4 Interdepartmental and Other Co-operation

Due to the diversity of aquaculture and the fact that it is influenced and controlled by legislation and mandates from various Government Departments, it is important that these Departments

interact in a co-operative manner. Developing an approach to incorporate and align legislation, regulation, production, marketing, and sustainable resource use should therefore be a combined effort using interdepartmental expertise.

This policy promotes and emphasizes the legislative obligation on DWAF and all other Government Departments to cooperate on matters in the development, regulation and facilitation of a sustainable aquaculture sector. Government Departments must take the necessary steps for the harmonisation of laws, policies, plans and programs on aquaculture to prevent intergovernmental and industry fragmentation.

The National Aquaculture Sector Workgroup has been established under custodianship of the NDA. DWAF must ensure that it provides continuous inputs into this workgroup and ensure that the DWAF policies and protocols on aquaculture are clearly carried over to other Government Departments so that individual policies, legislation and regulations can be geared to operate in unison.

### 4.5 Aquaculture Workgroups, Associations and Institutes

The National Aquaculture Sector Workgroup (NASW) comprises representatives from the Regional (Northern and Southern) Workgroups, the AASA, the AISA, emergent farmers, marine and freshwater aquaculturists, financial institutions, research institutions and service providers. In this regard the NASW is the most important vehicle outside of DWAF to carry forward the deployment of the DWAF policies and protocols on the sustainable use of water for aquaculture. The continued representation and participation of DWAF on the NASW is thus of great importance.

The NASW under custodianship of the NDA is the guardian of the NAP. This policy recognises and requests that each of the individual Departments (including DWAF) ensures that its own affairs, in relation to the regulation and facilitation of aquaculture, are in order and that this is governed internally by policies and protocols as required.

It is important that regional DWAF officials represent the Department and DWAF's aquaculture related policies and protocols at the Regional (Northern and Southern) Workgroups to ensure the regulation and facilitation of the sustainable use of water for aquaculture at a regional level. These workgroups are also of great importance in carrying forward the deployment of the DWAF policies and protocols.

Producer organisations play an important role in representing the aspirations and concerns of the industry. Such organisations are a vital component of the interface between Government and the commercial and communal sectors of aquaculture. The AASA is recognized in this policy as the umbrella producer organisation for aquaculture in South and southern Africa. As the sub-associations in the aquaculture sector are affiliated to AASA, Government Departments should use AASA as its link to the sector at large and visa versa.

The AISA has been established with the support of various Government Departments and serves as a platform for the consolidation of efforts by these various Government Departments in the promotion and development of the aquaculture sector. Furthermore it serves to represent a common front to industry specific matters such as addressing disease certification for the export of South African aquaculture products. For this reason it is important that the DWAF policies and protocols on the sustainable use of water for aquaculture also be channelled through this common platform created by AISA.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

## 4.6 Fiscal Matters

### *4.6.1 Resource Related Fiscal Matters*

Water is a valuable environmental (social, economic and ecological) commodity and charges will be levied for the use of water and the associated infrastructure for aquaculture as per the relevant pricing strategies for the Section 21 (a), (b), (c), (f), (g), (h), and (i) water uses.

These charges will be related to that of the greater agricultural sector, but due to the communality of largely non-consumptive and integrated use of water sources in aquaculture, the charge component will rest heavily on the waste discharge component and the effects on the quality of the water resource. This is akin to the concept of “the polluter pays”.

The structure and methodologies for the application of tariffs to the use of water for aquaculture will be resolved internally by DWAF (Sections 56 to 60 of the NWA). Where the use of water related State assets for aquaculture is concerned these tariff systems will be addressed jointly with the Departments of Public Works and Land Affairs. Furthermore these tariff structures will be decentralised to the level of CMA’s as these become established over time.

Where the use of State managed water resources or the associated infrastructure for aquaculture (i.e. State impoundments and the related water resources and infrastructure) is concerned, tariffs for such use will be based on market related concessionary charges related to the value of these resources or infrastructure, the nature of the use, other dependants on these water resource or infrastructure and the administration or management costs related to these resources or infrastructure.

### *4.6.2 Policy Related Fiscal Matters*

DWAF will allocate the necessary funds for the effective communication, implementation, review and update of this policy.

## 4.7 Communications

The premise of communication around this policy is that informed stakeholders will actively participate in improving the regulation and facilitation of the sustainable use of water for aquaculture. To achieve this and awareness among stakeholders, communication must be simple, clear, easy to understand and educative.

Communication of this policy aims to achieve greater internal capacity and better external understanding of the role that DWAF plays in the regulation and facilitation of the sustainable use of water for aquaculture.

The Directorate Water Abstraction and Instream Use will be tasked with the required communication of this policy within DWAF, to other Government Departments and to the aquaculture sector. Apart from the policy itself, the message that will be conveyed to all stakeholders is that the sustainable use of water for aquaculture will be governed and facilitated in accordance with NEPAD, the directives of SADC, the South African Constitution and statutory systems, the South African Water Policy, related Acts and the National Water Resource Strategy.

It is intended that this policy be published for general public scrutiny.

### 4.8 Information Management

The timely collection, reporting and dissemination of reliable information about the aquaculture sector are not the responsibilities of DWAF. Nevertheless, the background information provided on the aquaculture sector in Chapter 2 of this policy requires regular updating. This information could be obtained through the Water Research Commission (WRC) and from the NASW, AASA and AISA and incorporated into this policy.

Internally DWAF will, via its regions and later the CMA's, collect a standardised suite of information from any person or party whishing to attain an authorisation or entitlement for the sustainable use of water for aquaculture. This information will stipulate the nature of the resource, the nature of the aquaculture activity and the conditions under which authorisations or entitlements are allocated (according to the administrative stipulations of the NWA).

Information with regard to the sustainable use of water resources for aquaculture will remain public domain and must be kept in an orderly manner according to the legal obligations set for public administration and the duties to make information available to the public (Section 145 of the NWA).

### 4.9 Operationalisation and Implementation

The potential that water resources have to sustain aquaculture must be unlocked and an environment that is conducive for the development of the sector should be created through regulation, facilitation and the use of these resources and the associated infrastructure for aquaculture.

This policy will be operationalised by means of presenting it to the central and regional offices of DWAF that have a vested interest in the regulation and facilitation of the sustainable use of water for aquaculture, other Government Departments, the Regional (Northern and Southern) Aquaculture Workgroups, the AASA, the AISA, emergent farmers, marine and freshwater aquaculturists, financial institutions and research institutions as represented at the NASW. This deployment must be extended to the CMA's and relevant WMI's as these are established over time.

DWAF, as the lead organisation in the regulation and facilitation of the sustainable use of water resources for aquaculture, has a pivotal role to play in unlocking the potential of these water resources for aquaculture. In order to focus the Department's activities on explicit outcomes, six Key Performance Areas (KPAs) have been identified. These KPAs will form the basis and framework for implementation of this policy:

(i) Controlling the sustainable use of water for aquaculture through authorisations, registrations, regulations and other appropriate measures which could include the declaration of aquaculture as a controlled activity in terms of Section 38 of the NWA;
(ii) Establishing effective cooperative linkages with the NASW;
(iii) Ensuring internal capacitation to deal with the regulation and facilitation of the sustainable use of water for aquaculture in an administratively just manner associated with good communication, financial methodologies and information management;


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

(iv) Facilitating access to water resource related infrastructure that can be used in aquaculture;

(v) Facilitating, through this policy, the attainment of equity, empowerment, rural and community benefits, food security, socio-economic upliftment and general business development as a core result from regulating and facilitating the sustainable use of water for aquaculture; and

(vi) Ensuring that responsible best practices are implemented around the sustainable use of water for aquaculture and to associate this with auditing, monitoring and accountability for compliance and performance.

### 4.10 Monitoring, Auditing and Accountabilities

Any authorisation, registration, PPP or entitlement pertaining to the use of water for aquaculture must be accompanied with the necessary conditions to ensure that the effects of the use of a water resource for aquaculture (including ecological impacts, fitness for use for other water users, and socio-economic impacts) is monitored and reported back to DWAF or relevant authority. Furthermore this monitoring and the effects must remain auditable by DWAF or an applicable third party to conform to the stipulations of Section 143 of the NWA.

The users of water resources for aquaculture will be held liable for impacts caused by aquaculture activities that exceed the approved thresholds for such impacts. Such impacts will be regarded as an offence and will be dealt with according to the stipulations in Sections 151 to 155 of the NWA.

### 4.11 Research and Development

Aquaculture related research and development is not the direct responsibility of DWAF. Nevertheless, where specific water resource related research would make the implementation of this policy and the related protocol more effective, such research themes must be presented to and investigated with the WRC and the research institutions represented on the NASW.

## 5. POLICY REVIEW AND UPDATE

As initiators of this policy on the sustainable use of water for aquaculture it is the responsibility of the DWAF Directorate Water Abstraction and Instream Use to undertake the review of this policy on annual basis.

This policy must be reviewed by means of updating the aquaculture sector background information in Chapter 2. The remainder of the policy must be review against its conformity to the NWA and the greater legal framework in which it operates, while taking cognisance of the policy's performance at national (NASW) and regional (DWAF offices and CMAs) levels and in the aquaculture sector.

The review criteria must include the policy's answerability to being understandable, aligned with the NWA and other laws and policies, implementable and its ability to effectively regulate and facilitate the sustainable use of water for aquaculture towards achieving the aims and objectives set in 3.4 above.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:4512905-01 C-331-806 INV - Investigation -

## 6. CONCLUSION

By regulating and facilitating the sustainable use of water for aquaculture through a policy that encompasses responsible resource use, equity and sustainability, DWAF will be ensured of meeting its obligation to contribute to attaining the objectives of the NWA.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

**REFERENCES**

Bailly, D. and Paquotte, P. 1996. Aquaculture and environment interactions in the perspective of renewable resource management theory. Coastal Management, 24(3): 251-269. 1996.

Bartley, D.M. et al. 1996. Framework for the Responsible use of Introduced Species. Nineteenth session of the European Inland Fisheries Advisory Commission, Dublin, Ireland.

Beveridge, M. 1984. Cage Aquaculture. Fishing News Books, Oxford, UK.

Beveridge, M., Philips, M. and Macintosh, D.J. 1997. Aquaculture and the environment: the supply of and demand for environmental goods and services by Asian aquaculture and the implications for sustainability. Aquaculture Research, 28(10): 797-807. 1997.

Beveridge, M., Ross, L. and Kelly, L. 1994. Aquaculture and biodiversity. Ambio, 23(8): 497-502. 1994.

Beveridge, M., Ross L. and Stewart J. 1996. The development of aquaculture and its implication for biodiversity. Pp.372-393 in: Marine Biodiversity: Patterns and Process. Cambridge University Press, UK.

Boyd, C.E. 1990. Water Quality in Pond for Aquaculture. Auburn University, Alabama, USA.

Brink, D. 2003. Overview of Aquaculture in South Africa. Conference of the Agricultural Feed Manufacturers Association of South Africa, Pretoria.

Cape Nature Conservation. 1993. Guidelines for Freshwater Aquaculture in the Western Cape. Cape Town, South Africa.

Charlton, M.N. 2000. Freshwater Aquaculture Water Quality Studies in Ontario. Aquaculture Canada 2000 Abstracts.

Chua, T. and Bardach, J.E. (Ed) 1997. Sustainable Aquaculture. John Wiley and Sons.

Costa- Pierce, B. 1994. Environmental impacts of nutrients discharged from aquaculture: Towards the evolution of sustainable, ecological aquaculture systems. Aquaculture and Water Resource Management. 1994.

Costa-Pierce, B. 1996. Environmental impacts of nutrients discharged from aquaculture: Towards the evolution of sustainable, ecological aquaculture systems. 81-113. 1996.

Cabinet Office of the Strategic Policy Making Team. 1999. Professional Policy Making for the Twenty First Century. London, UK.

Department of Water Affairs and Forestry, 1996. South African Water Quality Guidelines (second ed.). Volume 6: Agricultural Water Use: Aquaculture.

Department of Water Affairs and Forestry, 1996. South African Water Quality Guidelines (second ed.). Volume 7: Aquatic Ecosystems.

Folke, C. and Kautsky, N. 1992. Aquaculture with its environment: prospects for sustainability. Ocean and Coastal Management, 17(15): 24-. 1992.

Folke, C., Kautsky, N. and Troell, M. 1992. The cost of eutrophication from salmon farming: implications for policy. Journal of Environmental Management, 40: 173-182. 1992.

Food and Agriculture Organization, 1995. *Code of Conduct for Responsible Fisheries.* FAO, Rome.

Food and Agriculture Organization, 1996. FAO Technical Guidelines for Responsible Fisheries Vol. 2: Precautionary Approach to Capture Fisheries and Species Introductions. FAO, Rome.

Food and Agriculture Organization, 1996. FAO Technical Guidelines for Responsible Fisheries Vol. 3: Integration of Fisheries into Coastal Area Management. FAO, Rome.

Food and Agriculture Organization, 1996. Report of the Symposium on Social, Economic and Management Aspects of Recreational Fisheries. Nineteenth session of the European Inland Fisheries Advisory Commission, Dublin, Ireland.

Food and Agriculture Organization, 2001. Promotion of sustainable commercial Aquaculture in sub-Saharan Africa: Volume 1: Policy framework, 408/1 of 2001. FAO, Rome.

Food and Agriculture Organization, 2001. Promotion of sustainable commercial Aquaculture in sub-Saharan Africa: Volume 3: Legal, regulatory and institutional framework, 408/3 of 2001. FAO, Rome.

Food and Agriculture Organization, 2002. Promotion of sustainable commercial Aquaculture in sub-Saharan Africa: Volume 2: Investment and economic feasibility, 408/2 of 2002. FAO, Rome.

Goldberg, R. 1996. Benefits and Risks of a Growing Aquaculture Industry. EDF Letter, 27(1): 7-1996.

Goldburg, R. and Triplett, T. 1997. Murky Waters: Environmental Effects of Aquaculture in the United States. Environmental Defence Fund, USA.

Gowen, R., Rosenthal, H., Makinen, T. and Ezzi, I. 1990. Environmental impact of aquaculture activities. Aquaculture Europe 1989 – Business Joins Science (Special Publication) No. 12. 1990.

Gowen, R. 1991. Aquaculture and the Environment. European Aquaculture Society Special Publication, No.16 (Grent, Belgium. 1991).

Gowen, R. 1994. Managing environmental problems: economic analysis of selected issues. Aquaculture, 124: 307-320. 1994.

Hecth, T. and Britz, P.J. (eds.) 1993. Aquaculture 1992: Proceedings of the Aquaculture Association of Southern Africa. Rhodes University, South Africa.

Hecht, T. 1997. Background Paper for the Livestock and Animal Health Policy Working Group: Subtheme – Aquaculture. Rhodes University, Grahamstown, South Africa.

Hecht, T. 2000. Considerations on African Aquaculture .World Aquaculture 31(1): 12-15 and 66-69.

Hecht, T. 2001. Alternative Approaches for the Development of Aquaculture in sub-Saharan Africa and Implications for Research. Presentation to Africa and West Asia Program Development Workshop, ICLARM, Abassa, Egypt.

Hecht, T. 2001. Strategies and Measures for Sustainable Aquaculture in sub-Saharan Africa. Presentation to Expert Consultation on Indicators of Sustainable Aquaculture Development, FAO, Rome.

Hinrichsen, E. 2003. Industry Contribution to the South African National Policy for Aquaculture Development. Aquaculture Association of Southern Africa. Stellenbosch, South Africa.

Hoffman, L., Swart, J. and Brink, D. 2000. The 1998 production and status of aquaculture in South Africa. Water SA Vol. 26, no. 1, Jan 2000. Pretoria, South Africa.

Insull, D. and Shehadeh, Z. 1996. Policy Directions for Sustainable Aquaculture Development. FAO Aquaculture Newsletter. FAO, Rome.

Iwama, G. 1991. Interaction between aquaculture and the environment. Critical Reviews in Environment Control, 21(2): 177-216.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

Masood. E. 1997. Aquaculture: a solution, or source of new problems? Nature, 386(6621): 109-109.

PIRSA Aquaculture. 2003. Aquaculture Environmental Management Policy Report. Adelaide, South Australia.

PIRSA Aquaculture. 2003. Aquaculture Resource Management and Ecologically Sustainable Development Policy. Adelaide, South Australia.

REPUBLIC OF SOUTH AFRICA, 1989, *Environment Conservation Act, Act 73 of 1989. Government Gazette*, Vol. 5999, 5 September 1989.

REPUBLIC OF SOUTH AFRICA, 1996, *Constitution of the Republic of South Africa, Act 108 of 1996. Government Gazette*, Vol. 378, No 17678, 18 December 1996.

REPUBLIC OF SOUTH AFRICA, 1998, *Marine Living Resources Act, Act 18 of 1998. Government Gazette*, Vol. 464, 20 February 2004.

REPUBLIC OF SOUTH AFRICA, 1998, *National Water Act, Act 36 of 1998. Government Gazette*, Vol. 398, No 19182, 26 August 1998.

REPUBLIC OF SOUTH AFRICA, 1998, *National Environmental Management Act, Act 107 of 1998 Government. Government Gazette*, Vol. 464, 20 February 2004.

REPUBLIC OF SOUTH AFRICA, 1998, *National Environmental Management: Biodiversity Act, Act 10 of 2004 Government. Government Gazette*, Vol. 467, 7 June 2004.

Rubino, M.C. and Wilson, C.A. 1993. Issues in Aquaculture Regulation. National Oceanic and Atmospheric Administration, USA.

Safriel, O. and Bruton, M.N. 1984. Aquaculture in South Africa: A cooperative research programme. South African National Scientific Programmes Report No. 89. Foundation for Research Development, South Africa.

Smith, D 1989. Aquaculture Effluent Management – Types of Effluent Management on Fish Farms in the Midwest, USA.

Southern African Development Community, 2001. SADC Protocol on Fisheries.

South African Agricultural Research Council, 1997. Fishing the Future. Workshop proceedings, Pretoria, South Africa. Stewart, J.E. 1997. Environmental impacts of aquaculture. World Aquaculture, 28(47): 52-1997.

Stewart, J.E. 2000. Selected Interactions between Aquaculture and the Environment. Aquaculture Canada 2000 Abstracts.

Stickney, R.R. 1989. Freshwater Environments. Pg. 171 – 188 in: Johnson, F.G. and Stickney, R.R. Fisheries: Harvesting Life from Water. University of Washington, USA.

Welcomme, R.L. 1997. Framework for the Development and Management of Inland Fisheries. Department of Fisheries, FAO, Rome.

Wilks, A. Clunies-Ross T. and Hildyard N. 1996. The social and environmental impacts of aquaculture: a dossier. The Ecologist, 1996.

Working Group on Aquaculture. 1994. National Strategy on Aquaculture in Australia. Steering Committee on Fisheries and Aquaculture, Australia.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

# EXHIBIT 5

(https://nmslaw.com.ec/es/home/)

CURRENT LEGAL NEWS (HTTPS://NMSLAW.COM.EC/CATEGORY/ARTICULOS)

# The Organic Law for the Restructuring of Public Banking Debts comes into force

On Tuesday, April 18, 2017, the Organic Law for the Restructuring of Public Banking Debts, Closed Banking and Management of the National Financial System and Securities Regime came into force after its publication in the Official Registry. The law is aimed at debtors who could not benefit from the benefits of the Organic Law for the Closing of the Banking Crisis of 1999 or who were not able to pay their obligations with public and closed banks. The objective is to give these people the possibility of renegotiating them.

Barcode:4512905-01 C-331-806 INV - Investigation -

In the main, the law:



- It forgives the costs, expenses, surcharges, interest and default interest on credit operations granted to clients who maintain obligations with the Development Bank.
- Extends the deadlines for debtors in good faith to meet their pending payment obligations.
- Authorizes the Central Bank to sell the portfolio of credit and non-credit operations that come from the processes and operations derived from the 1999 crisis to financial entities of auxiliary services specialized in collections of majority public property within a period of 90 days. .

In order to establish the procedures to achieve the aforementioned objective, the law brings a series of reforms to various regulatory bodies:

- Internal Tax Regime Law
- Organic Monetary and Financial Code, Book I
- Organic Law of Solidarity and Citizen Co-Responsibility for the Reconstruction and Reactivation of the Areas Affected by the Earthquake of April 16, 2016
- Organic Law for the Closing of the Banking Crisis of 1999
- Organic Law for the Strengthening and Optimization of the Corporate and Stock Market Sector
- Organic Law for the Defense of Labor Rights.

Access the full text of the law ( Organic Law for the Restructuring of Public Banking Debts (https://nmslaw.com.ec/wp-content/uploads/2017/04/Ley-Orgánica-para-la-Reestructuración-de-las-Deudas-de-la-Banca-Pública.pdf) )

04.24.2017

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

(https://nmslaw.com.ec/es/home/)

NOTICIAS DE ACTUALIDAD LEGAL (HTTPS://NMSLAW.COM.EC/CATEGORY/ARTICULOS)

# Entra en vigencia la Ley Orgánica para la Restructuración de las Deudas de la Banca Pública

---

El martes 18 de abril de 2017 entró en vigencia la Ley Orgánica para la Restructuración de las Deudas de la Banca Pública, Banca Cerrada y Gestión del Sistema Financiero Nacional y Régimen de Valores tras su publicación en el Registro Oficial. La ley está dirigida a los deudores que no pudieron acogerse a los beneficios de la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999 o

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4562905-01 C-331-806 INV - Investigation -

que no estuvieron en capacidad de pagar sus obligaciones con la banca pública y cerrada. El objetivo es otorgar a dichas personas la posibilidad de renegociarlas.



En lo principal, la ley:

- Condona las costas, gastos, recargos, intereses e intereses de mora de las operaciones de crédito otorgadas a clientes que mantienen obligaciones con el Banco de Fomento.
- Amplía los plazos para que los deudores de buena fe cumplan sus obligaciones pendientes de pago.
- Autoriza al Banco Central a que la cartera de las operaciones crediticias y no crediticias que provenga de los procesos y operaciones derivados de la crisis de 1999, sean vendidos a entidades financieras de servicios auxiliares especializadas en cobranzas de propiedad mayoritariamente pública en el plazo de 90 días.

Con el fin de fijar los procedimientos para alcanzar el objetivo mencionado, la ley trae una serie de reformas a diversos cuerpos normativos:

- Ley de Régimen Tributario Interno
- Código Orgánico Monetario y Financiero, Libro I
- Ley Orgánica de Solidaridad y de Corresponsabilidad Ciudadana para la Reconstrucción y Reactivación de las Zonas Afectadas por el Terremoto de 16 de abril de 2016
- Ley Orgánica para el Cierre de la Crisis Bancaria de 1999
- Ley Orgánica para el Fortalecimiento y Optimización del Sector Societario y Bursátil
- Ley Orgánica para la Defensa de los Derechos Laborales.

Acceder al texto completo de la ley (Ley Orgánica para la Reestructuración de las Deudas de la Banca Pública (https://nmslaw.com.ec/wp-content/uploads/2017/04/Ley-Orgánica-para-la-Reestructuración-de-las-

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:53 PM, Submission Status: Approved

# EXHIBIT 6

# REGISTRO OFICIAL

**Administración del Sr. Ec. Rafael Correa Delgado**
**Presidente Constitucional de la República**

SUPPLEMENT

**Year IV - No. 986**

**Quito, Tuesday, April 18 of 2017**


## LEXIS

CÓDIGO ORGÁNICO DE LA ECONOMÍA SOCIAL DE LOS CONOCIMIENTOS, CREATIVIDAD E INNOVACIÓN

**Art. 107.-** Materia no protegible.- No son objeto de protección las disposiciones legales y reglamentarias, los proyectos de ley, las resoluciones judiciales, los actos, decretos, acuerdos, resoluciones, deliberaciones y dictámenes de los organismos públicos, y los demás textos oficiales de orden legislativo, administrativo o judicial, así como sus traducciones oficiales.

Tampoco son objeto de protección los discursos políticos ni las disertaciones pronunciadas en debates judiciales. Sin embargo, el autor gozará del derecho exclusivo de reunir en colección las obras mencionadas en este inciso con sujeción a lo dispuesto en este Capítulo.

**Art. 116.-** ...

La información y el contenido de las bases de datos producto de las investigaciones financiadas con recursos públicos serán de acceso abierto. Las instituciones o entidades responsables de tales investigaciones deberán poner a disposición dicha información a través de las tecnologías de la información.

**REGISTRO OFICIAL:** Órgano del Gobierno del Ecuador marca registrada de la Corte Constitucional.

## SUMMARY:


P.

**LEGISLATIVE FUNCTION**

**LAW:**

**NATIONAL ASSEMBLY:**

**- ORGANIC LAW FOR THE RESTRUCTURING OF DEBT OF PUBLIC BANKING, CLOSED BANKING AND MANAGEMENT OF THE NATIONAL FINANCIAL SYSTEM AND SECURITIES REGIME ...................... ................. 2**

**EXECUTIVE FUNCTION**

**DECREES:**

**PRESIDENCY OF THE REPUBLIC:**

**1358 Appoint the Ambassador, Leopoldo Enrique Rovayo Verdesoto, Extraordinary and Concurrent Plenipotentiary Ambassador of the Republic of Ecuador to the Government of Equatorial Guinea, with headquarters in Abuja, Nigeria.......................... 12**

**1359 Division General Luis Miguel Ángel Castro Ayala is discharged from active service in the Armed Forces ........................... 12**

**1360 Place Division General Carlos Modesto Rodríguez Arrieta in legal condition of availability ................ 13**

**1361 Division General Gustavo Vicente Cabrera Campuzano is discharged from active service in the Armed Forces ........................ 14**

**1362 Dismiss Mr. GRAD from active service in the Armed Forces. Carlos Gustavo Egüez Espinosa ............................................ ............ 14**

2 - Martes April 18, 2017 Supplement - Official Record No. 986

**REPUBLIC OF ECUADOR**
**NATIONAL ASSEMBLY**

**Official Letter No. SAN-2017-0412**

Quito, April 17, 2017

Engineer
Hugo Del Pozo Barrezueta
**Director of the Official Registry**
In his office.-From my considerations:

The National Assembly, in accordance with the powers conferred on it by the Constitution of the Republic of Ecuador and the Organic Law of the Legislative Function, discussed and approved the DRAFT ORGANIC **LAW FOR THE RESTRUCTURING OF THE DEBT OF PUBLIC BANKING, CLOSED BANKING AND MANAGEMENT OF THE NATIONAL FINANCIAL SYSTEM AND VALUES REGIME.**

In a session on April 12, 2017, the Plenary Session of the National Assembly heard and ruled on the partial objection presented by the Constitutional President of the Republic.

For the above reasons, and as provided in article 138 of the Constitution of the Republic of Ecuador and article 64 of the Organic Law of the Legislative Function, I accompany the text of the ORGANIC LAW **FOR THE RESTRUCTURING OF PUBLIC BANKING DEBT , CLOSED BANKING AND MANAGEMENT OF THE NATIONAL FINANCIAL SYSTEM AND SECURITIES REGIME,** so that it can be published in the Official Registry.

Carefully,

**f.) DRA. LIBYA RIVAS ORDON**
General Secretariat

**REPUBLIC OF ECUADOR**
**NATIONAL ASSEMBLY**

**CERTIFICATION**

In my capacity as Secretary General of the Assembly National, I wish to **CERTIFY** that the National Assembly discussed the **"DRAFT ORGANIC LAW FOR THE RESTRUCTURING OF PUBLIC BANKING DEBT, CLOSED BANKING AND MANAGEMENT OF THE NATIONAL FINANCIAL SYSTEM AND SECURITIES REGIME",** in first debate on March 1, 2017 , discussed and approved in the second debate on March 13, 2017; and, he ruled on the partial objection of the Constitutional President of the Republic on April 12, 2017.

Quito, April 12, 2017

**f.) DR. LIBIA RIVAS ORDOÑEZ**
General Secretariat

**REPUBLIC OF ECUADOR**

**NATIONAL ASSEMBLY**

**THE FULL**

**CONSIDERING:**

That, article 227 of the Constitution of the Republic establishes that public administration constitutes a service to the community that is governed, among others, by the principles of effectiveness and efficiency;

That, article 303 of the Constitution of the Republic prescribes that the formulation of monetary, credit, exchange and financial policies is the exclusive power of the Executive Function, which will be implemented through the Bank Central; In addition, the execution of the credit and financial policy will also be carried out through public banking;

That, article 309 of the Constitution of the Republic provides that the national financial system is made up of the public, private and popular and solidarity sectors, which intermediate public resources and prescribes that each of these sectors will have regulations and entities of specific and differentiated controls, which will be responsible for preserving its security, stability, transparency and solidity;

That, the Organic Law for the Closing of the Banking Crisis of 1999 provides the conditions and deadlines for unrelated debtors to comply with their pending obligations;

That, the Electronic Money System includes all those entities of the national financial system that require connection to the Electronic Money Platform (PDE) to offer own or third-party products and services through the aforementioned platform in the Bank Central Ecuador;

That, some debtors in good faith have not been able to cover their debts within the established deadlines;

That it has been considered necessary to establish conditions similar to those established for debtors in good faith, for those who have had linked credits, even for amounts that have not represented a greater impact;

That, corporate disclosure processes in cases of coercive execution must be improved, in order to avoid the commission of injustices; and,

In exercise of the power conferred on it by numeral 6 of article 120 of the Constitution of the Republic of Ecuador, it issues the following:

**ORGANIC LAW FOR RESTRUCTURING OF THE DEBT OF THE PUBLIC BANKING, CLOSED BANKING AND SYSTEM MANAGEMENT NATIONAL FINANCIAL AND REGIME OF VALUES**

Document with possible errors digitized from the original publication. Please verify with image.
Do not print this document unless absolutely necessary.

## CHAPTER I

## DEBTS DERIVED FROM THE CRISIS

### 1999 FINANCIAL STATEMENT

**Article 1.-** The portfolio resulting from credit operations, and non-credit operations that on the date of The enactment of this Law is owned by the Central Bank of Ecuador and that come from the processes and operations derived from the financial crisis that occurred in 1999, will be sold in accordance with the Law, to auxiliary service entities of the national financial system. specialized collections of majority public property within a period of up to (90) ninety days in accordance with the following rules:

a. The total term for payment of auxiliary service entities of the national financial system specialized in collections of majority public property to the Central Bank of Ecuador for the sale of credit operations and non-credit operations will be up to fifteen (15) years from the date of sale. The payment method will be agreed between the parties considering the recovery of the portfolio.

b. The value for the sale of credit operations and non-credit operations whose operations are backed by mortgage guarantees will correspond to the value of the cadastral appraisal in the year in which the sale of the portfolio is executed, provided that there is no legal contingency in the operation. or in the mortgage guarantee, in which case it will have a value of 0.01 United States dollars.

c. The value for sale of credit operations and non-credit operations that do not have guarantees will be made at the value of 0.01 United States dollars.

d. The value for sale of credit operations and non-credit operations that have collateral guarantees will be the value of the depreciated asset in accordance with the Organic Law of the Internal Tax Regime, and may be at values lower than or equal to 0.01 United States dollars. if the goods have been damaged or are in poor condition state, according to the reports issued by appraisal experts.

It is. The value for sale of credit operations and non-credit operations that have collateral consisting of shares will be established by their equity value.

Once the portfolio sale has been executed, the Central Bank of Ecuador and the auxiliary service entities of the national financial system specialized in collections of majority public property that acquire the portfolio will proceed to record in their balance sheets what is pertinent. The transfer of said portfolio and its guarantees will operate by operation of law without the need for acceptance by the debtor, and must be recorded by the registries. corresponding public funds by the sole requirement of the Central Bank of Ecuador and/or the auxiliary service entities of the national financial system specialized in collections of majority public property that acquire the portfolio, being exempt from the payment of any type of tax or charge.

Debtors must be notified through different physical, electronic or written media. within thirty (30) days following the sale or transfer of portfolio to the system's auxiliary service entities national financial institution specialized in collections of majority public property.

The Central Bank of Ecuador will proceed to execute the corresponding record in the liquidations of each defunct financial entity and the accounting record of the corresponding portfolio compensations.

**Article 2.-** If there are errors of substance and form in the deeds of transfer of assets, databases, documentary files transferred to the Central Bank of Ecuador as well as new documentary evidence of payments that affect the rights of the debtors, these within the term Sixty (60) days from the enactment of this Law, they may request rectification of the same by submitting a sworn statement in which they will attach the evidentiary documents that justify the inconsistencies or payments made that have not been recorded by the defunct financial entities, whose relevance will be determined by the Central Bank of Ecuador or by the auxiliary services entities of the national financial system specialized in collections of majority public property that acquire the portfolio.

Without prejudice to the guarantees of due process and the principle of res judicata, if there is reasonable doubt within this review, the interpretation that most favors the debtor will be followed.

**Article 3.-** The Central Bank of Ecuador will execute, ex officio and without a request from any party, the recalculation of the part of the unlinked portfolio transferred by the defunct financial institutions by provision of the resolution of the Banking Board JB-2009 -1427 provided for in article 14 of the Organic Law for the Closing of the Banking Crisis of 1999. The National Financial Corporation will apply the same recalculation procedure to the portfolio that has been transferred to it by the defunct financial institutions. The recalculation will be carried out on the debts of all unrelated debtors, without difference in amounts.

All debtors provided for in the previous paragraph will be beneficiaries of the recalculation under the conditions provided for in this Law. Therefore, the conditions provided for in paragraphs 1, 2 and 3 of article 15 of the Organic Law for the Closing of the Banking Crisis of 1999.

Once the recalculated amounts have been determined, the creditor entity will proceed to register and collect them. In no case will the original values acquired with the defunct financial institutions be charged, but only those recalculated.

Document with possible errors digitized from the original publication. Please verify with image.
Do not print this document unless absolutely necessary.

**Article 4.-** The suspension of the benefits granted by the Organic Law for the Closing of the Banking Crisis of 1999 is voided, to debtors who, having signed recalculation agreements, have failed to comply with two consecutive payments.

These debtors will have a period of ninety (90) days from the enactment of this Law to request the Central Bank of Ecuador or the auxiliary service entities of the national financial system specialized in collections of majority public property, as appropriate, the modification of the recalculation agreement suspended based on the provisions of this Law. Debtors who have not signed recalculation agreements will have a period of ninety (90) days to request it and thirty (30) additional days to sign the recalculation agreement in accordance with article 14 of the Organic Law for the Closing of the Banking Crisis of 1999 and the modifications included in this Law. This new agreement may contain options for fractioning the operation and its guarantees, prior authorization from the corresponding entity.

Within the modified agreement provided for in the previous paragraph, the unpaid installments of those debtors who, having entered into recalculation agreements, have fallen into default in the fulfillment of their obligations will be included.

Debtors who have signed recalculation agreements and who have not been able to honor their obligations, may benefit from the provisions of this Law without the need to make a new payment, as established in article 15 of the Organic Law for the Closing of the Banking Crisis. of 1999. The operations resulting from the recalculation agreement must necessarily have tax credit insurance.

The debtors of the National Financial Corporation who could not comply with the payment of the recalculation agreement made will have the same period to request said public financial entity to reactivate said agreement, in accordance with the conditions established in this Law.

**Article** 5.- The term for the payment of mortgage loans by debtors who have signed agreements, under the provisions of the Organic Law for the Closing of the Banking Crisis of 1999 or as established in this Law, it will be for up to twelve (12) years including one (1) year of grace, counted from the effective date of this Law.

The total period for the payment of other credit operations by debtors not contemplated in the previous paragraph, who have signed agreements, under the provisions of the Organic Law for the Closing of the Banking Crisis of 1999 or as established in this Law, will be up to twelve (12) years, counted from the effective date of this Law.

The debtors indicated in the preceding paragraphs who have signed recalculation agreements that are in force may request the Central Bank of Ecuador or to the auxiliary service entities of the national financial system specialized in collections of majority public property, as appropriate, the modification of their agreements with the purpose of adhering to the indicated terms and conditions.

**Article** 6.- Failure to make payments that exceeds six (6) months or failure to subscribe to the documents that formalize the payment obligation will reactivate or be grounds for immediately initiating coercive processes and those followed before ordinary justice. for the total amount of the recalculated debt that remains unpaid, applying the default interest rate from the moment it is declared overdue. Payments that have been made under this Law will be applied in accordance with the provisions of article 1611 of the Civil Code.

Upon sale of the portfolio by the Central Bank of Ecuador, all litigation rights derived from the lawsuits initiated are considered transferred by operation of law, in favor of the auxiliary service entities of the national financial system specialized in collections of majority public property. for the collection of credits, without the need for acceptance by the debtor, and must be registered by the corresponding public registries or courts, by the sole request of the Central Bank of Ecuador and/or the specialized auxiliary service entities of the national financial system. in collections of mostly public property; so that said entity may reactivate, restart or initiate judicial or coercive processes, in accordance with the provisions of the previous section.

**Article 7.-** As of the issuance of this Law, the coercive processes initiated and the insolvency or bankruptcy trials, as well as the precautionary measures that have been issued in these, will be suspended for a period of up to one hundred and twenty (120) days. , during which debtors, depending on the case, may sign payment agreements or reactivate their recalculation agreements or modify payment terms, in these cases, after signing the corresponding documents.

The coercive judges, by mandate of this Law, will establish the reason for suspension of the coercive in each of the processes under their charge. The length of time the suspension of said processes lasts will not be considered to establish the period for the prescription of the respective actions.

**Article** 8.- The Central Bank of Ecuador of its budget will allocate the necessary resources to cover the expenses generated by the effects of the application of the transfer of assets determined in article 6 of the Organic Law for the Closing of the Banking Crisis of 1999 and, exclusively for the fulfillment of this provision, The prohibitions determined in article 56 of the Organic Monetary and Financial Code will not apply.

**Article 9.-** Notwithstanding the provisions of the current Civil Code, the debts recorded in the accounting of the entities of the defunct financial system of up to one hundred and fifty thousand dollars of the United States of America (US$ 150,000.00), transferred to the Central Bank of the

Document with possible errors digitized from the original publication. Please verify with image.

Do not print this document unless absolutely necessary.

Official Record No. 986 - Martes Supplement April 18, 2017 - 5

Ecuador, by provision of resolution JB-2009-1427 of the Banking Board, and that correspond to credits acquired by natural persons in a marital partnership or property partnership, in which one of the spouses or cohabitants in a de facto union has died, for this one time only, they are extinguished and, consequently, the Central Bank of Ecuador or the competent collection entities will notify the Superintendency of Banks, the Risk Central and/or the National Directorate of Public Data Registration, so that the or the surviving spouse and/or heirs are rehabilitated to operate in the national financial system.

The forgiven amounts will be recorded and deducted from the sale price of the portfolio provided for in Article 1. Likewise, the forgiveness made by the collection entity will be reported to the Central Bank of Ecuador.

Those debtors who have suffered a disability after the time in which they incurred their debt will also benefit from the same forgiveness, provided they demonstrate the impossibility of complying with the payment of their obligations. In this case, the remissions will be granted in the same proportion of the tax exemptions provided for in the Organic Law on Disabilities and its Regulations.

**Article 10.-** Companies in liquidation, whose only partner or shareholder is the AGD-CFN No Más Impunidad Mercantile Trust or the Central Bank of Ecuador, will be canceled if they have no assets. Regarding the Inactive companies will be grounds for dissolution if they incur the same budgets. The Superintendency of Companies will execute all the necessary actions to complete the cancellation of these companies within a period of ninety (90) days from the publication in the Official Registry of this Law. The obligations that these companies have pending with the Service of Internal Revenue and with the Superintendence of Companies will not be collected but will be registered in the equity deficit of the corresponding defunct financial institution.

The Central Bank of Ecuador and the AGD-CFN No More Impunity Mercantile Trust will cancel the employer obligations that the aforementioned companies have pending with the Ecuadorian Social Security Institute, which will proceed to collect the obligations without accounting for default interest or fines.

**Article 11.-** Related debtors whose initial capital of the total of their accumulated related operations is up to twenty-five thousand dollars of the United States of America (US$ 25,000) will also have access to the recalculations provided for in this Law.

**Article** 12.- After the modification of the credit recalculation has been carried out, the debtors may request the Central Bank of Ecuador or the entities of auxiliary services of the national financial system specialized entities, in collections of mostly public property, that had acquired the portfolio, the return and release of both the seized assets and the guarantees when together they exceed two hundred percent (200%) of the recalculated value, as long as there are several assets or they are susceptible to divisibility. For the application of this standard, an updated report issued by an expert qualified by the Superintendency of Banks will be required.

**Article 13.-** The Monetary and Financial Policy and Regulation Board will issue the necessary regulations for the application of the provisions of this Law.

## CHAPTER II

## PUBLIC BANK DEBT

**Article 14.-** Condone the costs, expenses, surcharges, interest and default interest on credit operations granted to natural or legal persons that maintain obligations with the National Development Bank in Liquidation, originated or acquired by this entity, provided that the debtors pay at least five percent (5%) of the principal balance within a period of one hundred eighty (180) days from the effective date of this Law.

**Article 15.-** Credit operations whose costs, expenses, surcharges, interest and default interest have been subject to forgiveness, may, at the request of the party, be restructured or refinanced by the liquidator. During the period of one hundred eighty (180) days, the portfolio management costs will be assumed by the National Development Bank in liquidation. These restructured or refinanced operations must necessarily have credit life insurance in all cases and, if possible, agricultural insurance, if the product exists in the Ecuadorian insurance market.

Without prejudice to the period determined in paragraph 4 of article 307 of the Organic Monetary and Financial Code, the liquidation process of public financial entities in liquidation that have refinanced or restructured credit operations under this Law, will extend up to the double the term agreed in the original operation granted for said refinancing or restructuring, but in no case may it exceed twelve (12) years. In all cases, these operations will have a two (2) year grace period.

Obligations that have been originally signed by several debtors may be divided and individualized among all of them provided that the guarantees can also be divided, or that their debtors offer guarantees for all the obligations.

After the modification of the credit recalculation has been carried out, the debtors may request the National Bank for Development in Liquidation, the return and release of both the seized assets and the guarantees when they together exceed two hundred percent (200% ) of the recalculation value, as long as there are several assets or they are susceptible to divisibility. For the application of this standard, an updated report issued by an expert qualified by the Superintendency of Banks will be required.

Document with possible errors digitized from the original publication. Please verify with image.
Do not print this document unless absolutely necessary.

**Article 16.-** The interest rate for restructured operations will be five percent (5%).

**Article 17.-** As of the issuance of this Law, the coercive processes initiated and the insolvency or bankruptcy trials will be suspended, as well as the precautionary measures that have been issued in these, for the duration of the period provided for in this rule for restructuring. .

**Article 18.-** Notwithstanding the provisions of the current Civil Code, debts recorded in the accounting of the National Development Bank in Liquidation of up to forty thousand dollars of the United States of America (US$ 40,000.00), which correspond to credits acquired by natural persons in a conjugal partnership or property partnership, in which one of the spouses or cohabitants in a de facto union has died, for this one time only, are extinguished. Consequently, the National Development Bank in Liquidation will notify the Superintendency of Banks, the Risk Central and/or the National Directorate of Public Data Registration, so that the surviving spouse and/or heirs are rehabilitated to operate in the national financial system.

Those debtors who have suffered a disability after the time in which they incurred their debt will also benefit from the same forgiveness, provided they demonstrate the impossibility of complying with the payment of their obligations. In this case, the remissions will be granted in the same proportion of the tax exemptions provided for in the Organic Law on Disabilities and its Regulations.

**Article 19.-** The National Development Bank in Liquidation, in the context of this Law, may, within a period of two hundred ten (210) days, carry out portfolio purchase and sale operations with public financial institutions, at the request of these entities. . For the application of the provisions of this article, the National Development Bank in Liquidation will prioritize the acquisition of portfolio of public financial entities granted in the areas affected by the earthquake of April 16, 2016.

Additionally, the National Development Bank in Liquidation, within the same period as the previous paragraph, may purchase portfolios of financial entities in liquidation processes that are under the control of the Superintendency of Banks, and may also be assignee of other assets and litigated rights coming from those financial entities in liquidation.

Its price will be the value resulting from the portfolio balance minus the amount of the respective provisions; In no case will the value be less than one United States dollar.

## GENERAL DISPOSITION

**First.-** The liquidation processes of the Mutual Housing Savings and Credit Associations that are underway will be finalized by the control body before which such process was initiated.

**Second.-** For the application of the Organic Law for the Balance of Public Finances, and the second transitional provision of the Organic Law of Solidarity and Citizen Co-responsibility for the Reconstruction and Reactivation of the Areas Affected by the Earthquake of April 16 of 2016, where it says: “with or in electronic money” it will be understood that this meaning also includes “the Electronic Money System (SDE)”; and, where it says: “electronic money account or accounts” it will be understood that this meaning also includes “account or accounts in institutions of the financial system associated with the System of Electronic Money (SDE)”.

The Monetary and Financial Policy and Regulation Board and the Tax Policy Committee will regulate, within the framework of their powers, the application of the Value Added Tax – VAT refund benefit.

**Third.-** For rediscounted portfolio operations in the National Financial Corporation that have as creditors the Central Bank of Ecuador on behalf of the defunct financial institutions and the National Financial Corporation, they must be considered as a single operation against the debtors for the process. of recalculation and imputation of dividends or partial payments.

**Fourth.-** The application of the provisions of this Law will in no case allow the return of the amounts paid or the assets that have been seized or auctioned, except as provided in articles 12 and 15 of this Law.

**Fifth.-** The officials of the Central Bank of Ecuador, the Superintendency of Banks and other public institutions that, by mandate of the ninth general provision of the Law to Close the Banking Crisis of 1999, do not send the semiannual report to the National Assembly , will be sanctioned as provided by the Organic Law of Public Service for serious offenses.

**Sixth.-** The obligations contracted for all credits granted by the entities of the national financial system, including financial institutions in the process of liquidation and that are declared overdue, may be canceled through the respective execution or payment of the good. given as collateral, with which the debt will be extinguished, as long as the value at which the financial entity had originally valued the asset as collateral, covers more than one hundred percent of the capital of the original debt.

Once the property given as collateral or given in payment has been auctioned or auctioned, said obligation will be extinguished, so the creditor or his successors in law will not be able to pursue the personal assets of the debtor, or his successors in law, or the marital partnership or property partnership, nor initiate bankruptcy proceedings against them, not even alleging outstanding debts for procedural costs, attorneys' fees or other expenses, so articles 2327 and 2367 of the Civil Code, nor any other, will not be applicable. article that opposes the full validity of this Law. This provision will also be applicable to cases in which a guarantee trust or any other instrument or

Document with possible errors digitized from the original publication. Please verify with image.
Do not print this document unless absolutely necessary.

financial mechanism that guarantees the debt. The auctions will be instructed in accordance with the applicable regulations of the General Organic Code of Processes.

The Monetary and Financial Policy and Regulation Board will regulate the application of this provision.

TRANSITORY DISPOSITIONS

**First.-** Within a period of one hundred and twenty (120) days, counted from the effective date of this Law, public financial entities open or in liquidation will extinguish the overdue credit operations that would have been generated by the sale of agricultural machinery carried out by the same entity, through the delivery of said agricultural machinery in dation in payment.

The debtors of the National Financial Corporation who, in the process of delivering credits, have been directed or ordered to acquire the machinery, tools or goods subject to the credit from companies that have delivered final goods with defects in quality or operation, following a report from the organization. corresponding control; Said goods may be delivered as payment in payment, which will completely extinguish the overdue credit operations.

**Second.-** Within a period of one hundred and eighty (180) days from the validity of this transitional period, credit operations carried out by public financial sector entities that are in the process of liquidation, directly or indirectly, that are overdue, following a report from the corresponding control body, which shows that there are non-compliance with obligations attributable to the public financial sector, may be restructured or refinanced by public financial entities, at the request of the interested party, under the financial conditions established by the entity. In these restructured or refinanced operations, the values corresponding to interest, fines, expenses and legal costs will not be considered, due to the time of impact attributable to the public financial sector.

In order to facilitate the restructuring or refinancing of credit operations, coercive actions that have been initiated will be temporarily suspended as will the deadlines for prescription.

The corresponding control agencies will monitor compliance with these provisions, and if there are indications of criminal responsibility, they will inform the Prosecutor's Office.

**Third.-** Within a period of sixty (60) days from the effective date of this Law, the Central Bank of Ecuador and the National Financial Corporation, at the request of the party, will carry out the valuations of the movable and immovable property indicated in the articles 18 and 19 of the Organic Law for the Closing of the Banking Crisis of 1999.

**Fourth.-** For tourist establishments duly registered with the national tourism authority, located in the provinces of Manabí and Esmeraldas, given the impacts to the sector, as a result of the earthquake of April 16, 2016 and the consequent aftershocks, the exemption of the amounts pending payment derived from the contribution of one per thousand on fixed assets determined by letter b) of article 39 of the Tourism Law, for capital, interest, fines, and surcharges generated up to and including the financial year 2017.

**Fifth.-** The debtors who are beneficiaries of the provisions of Article 6 of the Organic Law of Remission of Interest, Fines and Surcharges, may benefit from the same forgiveness and restructuring, but with the conditions provided for here.

To benefit from these benefits, debtors must submit their application to the National Financial Corporation. Upon accessing the remission contemplated in this provision, the debtors must pay the entire capital owed within the following ten (10) business days of the aforementioned period or may sign an agreement to pay the capital owed in equal installments, according to your payment capacity, up to a period of no more than sixty (60) months, with an interest rate of five percent (5%) annually.

The period will be extended up to one hundred and twenty (120) business days following the publication of this Law in the Official Registry, in the case of stolen or totally damaged goods, attaching to the request the proof or complaint that has been presented to the Captaincy. Port or Prosecutor's Office of the respective jurisdiction.

Regarding non-compliance with the agreements that are signed and the suspension of coercive processes, the same rules established in Article 6 of the Organic Law of Remission of Interest, Fines and Surcharges will be followed, whose deadlines will be counted from the validity of this law.

REFORMATIVE PROVISIONS

**First.-** In the Organic Law for the Closing of the Banking Crisis of 1999, the following reforms are carried out:

1. In the third paragraph of article 14, replace the last sentence with the following: "The recalculation will be carried out taking the value of the initial capital delivered in credit, to which the annual interest rate of five percent (5%) will be applied. ) for the period elapsed from January 1, 2010 until the publication of this Law."

2. In the fourth paragraph of article 14 replace the phrase: "The "Evidence will be evaluated by the competent authority in accordance with the rules of sound criticism." by the following:

"The records and documentation presented will be valued in accordance with the rules of sound criticism and the principles of informality, relevance, conduct, loyalty and truthfulness. According to the principle of coordination, the authority will require public sector entities to provide information that, without being in their possession, leads to elucidating the material truth of the specific case. In its resolution, the

Document with possible errors digitized from the original publication. Please verify with image.

Do not print this document unless absolutely necessary.

competent authority will state all the information it has about the debtor.

If internal or external technical and legal reports are required, the competent authority may extend the sixty-day period prescribed in the following paragraph, for up to thirty additional days. The required public institutions will have a period of 10 days to respond to requests for information, reports and opinions requested by the competent authority.

Without prejudice to the guarantees of due process and res judicata, if there is reasonable doubt within this analysis, the interpretation that most favors the debtor will be followed."

3. In the seventh paragraph of article 14, replace the phrase "and on the capital balance the rate of 5% annual interest will be applied, which will remain in force from the date of its granting until the total cancellation of the obligation", with the following: "and on the capital balance the rate of 5% annual interest will be applied, for the period elapsed from January 1, 2010 until the total cancellation of the obligation."

4. Eliminate the ninth paragraph of article 14.

5. In article 14, replace the text of letter c) with the following:

"c) If, due to the commercial lease contract, the property is in the possession of the debtor or his heirs, at the request of any of them, the commercial lease contract will be terminated and in its place it will be constituted in a portfolio operation for the amount of the outstanding obligation, whose initial capital value will be that reported to the Central Bank of Ecuador in accordance with the fourth paragraph of this article or the

amount stated in the commercial lease contract, applying for this purpose the provisions of the second paragraph of article three of the Organic Law for the Restructuring of Debts of Public Banking, Closed Banking and Management of the National Financial System and Securities Regime . Once the payment of the obligation has been completed, the property will be transferred to the debtor or his legitimate heirs. If the recalculation agreement is not complied with, the movable property will be auctioned and the real estate will be transferred to the corresponding entity, as established by this law.

For the purposes of this paragraph, the debtor will be understood as both the commercial lessee and the guarantor of the obligation, if the latter or his heirs have signed or sign the recalculation agreement and therefore undertake to cancel the obligation.

6. Add the following as the last paragraphs of article 14:

"In commercial leasing contracts that, based on the Organic Law for the Closing of the Banking Crisis of 1999, were converted into portfolio operations, it will not be required that the solemnity of registration in the Commercial Registry has been complied with; In addition, the payments that were recorded through judicial means will be added and deducted from the debt, provided that the payments and installments have been complied with in a timely manner.

For the purposes of this Law, to determine the value of the initial capital of the portfolio denominated in Constant Value Units (UVC), the initial capital will be divided by 2.6289."

7. Delete the last paragraph of article 15.

8. Delete in the first, fourth and fifth paragraphs of the article 18, the word "original."

9. Replace article 19 with the following:

"Art. 19.- Extinction of obligations.- In those cases in which assets of the debtors constituted as original guarantee of obligations acquired with the defunct financial institutions were seized or delivered in dation in payment, the debts will be reduced by (i) the value in which the guarantees have been established; (ii) the value of the assets on the date of seizure; (iii) the value of the auction, if they were auctioned; or (iv) the updated value of the asset, whichever is the greatest of the four. At the request of the debtor, the seized assets may be received in payment in relation to the debts maintained with the closed bank.

If, following any of these criteria, for the appraisal of the assets constituted as original collateral for the credit, the total amount of the debt is covered, it will be deemed cancelled, otherwise the balance may be subject to the recalculation procedure."

10. Include at the end of the tenth general provision the following: "The State may take action against officials who have caused damages or losses due to their actions or omissions."

11. Add a final paragraph to the tenth general provision, which establishes:

"The actions and omissions described in the previous section that are detected in the process of administration and collection of the portfolio by the Central Bank of Ecuador or the financial entity providing auxiliary debt collection services.
majority public property that the portfolio acquires by mandate of this Law, must be reported to the corresponding control and jurisdictional bodies."

**Second.-** In the Organic Monetary Financial Code, the following reforms are carried out:

1. In the fourth paragraph of article 8, replace the phrase: "they will be prevented from providing their services in the regulated entities or those that are under their scope of control", with the following: "they will be prevented from providing their services in the "private financial entities, of the popular and solidarity economy or in private securities and insurance entities, which are regulated or controlled."

2. Add to the end of paragraph 1 of article 56, after the phrase "international financial institutions", the following: "multilateral or public financial sector entities".

Barcode:4512905-01 C-331-806 INV - Investigation -



3. In article 62, add the following paragraph: "28. Prepare the technical report so that the Monetary and Financial Policy and Regulation Board establishes the annual contributions that private financial entities must pay", therefore it is renumbered and in paragraph 29 as stated in the law it will say "The others that are assigned the law".

4. Incorporate at the end of paragraph 7 of article 80, the following text:

"Among the procedures that allow the application of the rule of the lowest cost with respect to the payment of Deposit Insurance, COSEDE may invest Deposit Insurance resources, with up to two (2) years of grace and up to twenty (20) years term, in financial entities that acquire assets and liabilities of unviable financial entities, at the weighted average interest rate of the returns of the Deposit Insurance portfolio plus a margin determined by the COSEDE.

Within the process of exclusion of assets and liabilities, to apply the rule of least cost the COSEDE will use the valuation of assets established by the temporary administrator of the non-viable entity."

5. Replace the second paragraph of Article 238 with the following: "In the event of forced liquidation of a private financial entity, the shareholders who, directly or indirectly, are persons with influential assets, will respond even with their personal assets in case that they have incurred serious negligence or fraud and minor negligence.

In the case of shareholders with or without influential equity ownership, who exercise the administration of the private financial entity, they will be jointly and severally liable for the entire equity deficit, even due to slight fault. The trusts created to manage shares, their constituents and the administrators of the entities of the system will have the same responsibility.

national financial."

6. Replace the third paragraph of article 328 with the following:

"The insured amounts of deposits in the rest of the segments of the popular and solidarity financial sector will be defined by the Monetary and Financial Policy and Regulation Board, based on the proposal that the Deposit Insurance Corporation, Fund, sends for this purpose. Liquidity and Private Insurance Fund. The defined amounts may in no case be higher than the insured amount of deposits in private financial entities and those in segment one (1) of the popular and solidarity financial sector."

7. Repeal numeral 10 of Article 85 and replace article 349 with the following:

"Article 349.- Resources of the Private Insurance Fund.- The Private Insurance Fund will be constituted with the following resources that will be considered public:

a) A basic contribution of up to 0.7% on the value of net direct insurance premiums that will be made by all insurance companies, in the percentage set annually by the Policy and Board.
Monetary and Financial Regulation; and, a variable contribution of up to 0.8% of the same value depending on the risk ratings, also set by the Board, whose maximum percentage may not exceed, in any case, 120% of the basic contribution;

b) The proportion of the contribution determined in article 67 of Book III of this Code;

c) The performance of investments and net profits for each annual exercise of the Investment Fund.
Private Insurance;

d) The donations you receive; and,

e) Those coming from loans or contingent lines obtained for the financing of their activities.

The Fund's resources must be invested observing the principles of security, liquidity, diversification and profitability and falling within the investment policies approved by the Board of Directors.

The resources of the Fund may not be used to cover administrative expenses or to pay for investments in fixed assets of the Corporation.

The resources of the Private Insurance Fund will be accumulated up to the amount determined by the Monetary and Financial Policy and Regulation Board, based on the technical report that will be prepared and presented by the Corporation. "

8. In article 375 make the following reforms:

to. In paragraph 16, eliminate the word "and" after control;

b. Replace numeral 17 with the following: "17. Resolve on the distribution of profits;" and include numeral 18 with the following text: "The others assigned by the Law."

c. Replace the last paragraph with the following:

"In the case of the public financial entity in charge of financing the Decentralized Autonomous Governments, the functions of paragraphs 14 and 17 will be resolved by the General Meeting of Shareholders."

9. Replace article 434 with the following:

Document with possible errors digitized from the original publication. Please verify with image.
Do not print this document unless absolutely necessary.
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

10 - Martes April 18, 2017 Supplement - Official Record No. 986

"Art. 434.- Nature.- Ancillary services will be provided by non-financial legal entities constituted as public limited companies. or limited companies, whose legal life will be governed by the provisions of the Companies Law. The corporate purpose of these companies will be clearly determined.

By exception and at the motivated request of the interested party, the Superintendency of Banks will authorize auxiliary service companies that have capital owned by entities in the financial sector to provide their services on an exceptional basis to another class of natural or legal persons outside the national financial system.

Ancillary services companies that do not have shares or ownership interests in a private financial entity will not require authorization from the Superintendency of Banks to provide services to third parties and may do so without any limitations.

Private financial sector entities may invest in limited liability companies for auxiliary services only."

10. In article 436 replace the text: "before the Superintendency of Banks" with "before the corresponding control body."

11. Eliminate the second paragraph of article 437.

12. Following the Forty-Second Transitional Provision, add the following:

"FORTY-THIRD.- Within a period of thirty (30) days from the validity of this transitional provision, the constituents of the trusts created to comply with the divestments ordered in the Twenty-Fifth and Twenty-Sixth Transitional Provisions of this Code must reform said trust contracts in accordance with the instructions issued by the Superintendency of Banks through the corresponding control standard, which must necessarily consider the power for said Superintendency to direct to the trustee the sale of the shares contributed to the trust, under any modality, within the period and conditions that it establishes. determine. The disposal of the shares must comply with the legal and other formalities expressed in the respective trust contract.

Failure to comply with the provisions of the preceding paragraph will result in the Superintendency of Banks ordering to the constituent the immediate termination of the respective trust contract, and the sale in public auction of the shares contributed to the assets of said trust.

FORTY-FOURTH.- Without prejudice to the prohibition contained in section 4 of the Article 399 of this Code, the Superintendency of Banks may approve the conversion of financial companies that have among their shareholders people with influential assets, and who, in turn, own shares of the same quality in a bank, provided that in The same administrative act provides that within a period of thirty (30) days from the conversion, the shareholders constitute a trust by contributing the shares they have in both entities, the purpose of which will be the disposal of the shares of any of them that is sold first, in accordance with the instructions issued by the Superintendency of Banks through the corresponding control standard, which must consider on a mandatory basis the power for said Superintendency to direct to the trustee the sale of the shares contributed to the trust, under any modality, within the period and conditions determined by it. The disposal of the shares must necessarily comply with the formalities and others expressed in the respective trust contract.

In the event that the trust indicated in the preceding paragraph is not established, or that once established, the instructions of the trust are not complied with in accordance with the standard issued by the Superintendency of Banks, said control body will dispose of the assets in a public auction. shares of whichever of them is sold first.

FORTY-FIFTH.- The shareholders of the banks that, as of the date of issuance of this transitional document, do not comply with the minimum capital requirement established in the Organic Monetary and Financial Code, must establish a trust whose purpose will be to comply with the minimum capital requirement. , for which they will contribute all the shares they own in the entity, so that they may or may not be sold to an investor who carries out the necessary capital increase. Said trust must be implemented in accordance with the instructions issued by the Superintendency of Banks through the corresponding control standard, which must consider in a mandatory manner the power for said Superintendency to direct the trustee to fulfill the purpose of the trust, including the sale of the shares contributed, under any modality, in the term and conditions that it determines. The contribution of capital and/or the sale of shares must necessarily comply with the legal and other formalities expressed in the respective trust contract.

In the event that the trust is not established or that its purpose is not fulfilled within a period of two years from the issuance of this provision, the bank may merge or cease to operate and will begin a liquidation process in accordance with the rules issued by the Superintendency. of Banks."

Document with possible errors digitized from the original publication. Please verify with image.
Do not print this document unless absolutely necessary.

13. In book II of the Monetary and Financial Code corresponding to the Securities Market Law, the following reforms are carried out:

to. In article 9 replace numeral 4 with the following: "Issue the resolutions necessary for the application of this Law."

b. In article 10, include the following final paragraph:

"The Superintendency, for the fulfillment of these powers and functions, may issue all acts that are necessary.

Likewise, it may issue administrative control acts in matters

within their jurisdiction, without being able to alter or innovate the legal provisions or regulations issued by the Monetary and Financial Policy and Regulation Board."

c. Replace the fourth paragraph of article 11 with the following: "The securities that are issued to be submitted to a public offering process must be dematerialized, except for generic securities issued by the financial sector registered in the Public Registry of the Stock Market that may be physical or dematerialized titles. The securities issued by public sector entities may be physical if they have the authorization of the Monetary and Financial Policy and Regulation Board."

d. In the first paragraph of article 41, delete the next phrase: "non-financial".

and. In article 46, replace "five percent" with "ten percent".

F. Replace article 69 with the following:

"Art. 69.- Rates.- The Centralized Securities Clearing and Settlement Deposits will establish the charges or rates that they will charge to the users of their services. Such charges or rates, as well as their modifications, will be communicated to the Superintendency of Companies, Securities and Insurance, and in no case may they exceed the limits established by the Superintendency itself."

g. In article 87, replace numeral 3 with the following:

"3. "Real estate located in national territory."

**Third.-** In the Organic Law of the Internal Tax Regime, the following is amended:

1. Following article 9.4, include the following:

**"Art. 9.5. Exemption from Income Tax in the merger of entities of the popular and solidarity financial sector.-**

The Entities of the popular and solidarity financial sector resulting from merger processes of cooperatives of the last two segments that are part of the aforementioned sector and that comply with the requirements and conditions established by the Monetary and Financial Policy and Regulation Board, will enjoy an exemption from the payment of income tax for five years, counted from the first year in which the merger occurs."

2. Replace article 116 with the following: "Without prejudice to the provisions of article 87 of this Law, the Internal Revenue Service may also establish identification, marking and tracking mechanisms, with respect to other products whose marketing is subject to authorization. prior to the State."

**Fourth.-** In the Organic Law for the Defense of Labor Rights, the following text is included after the first paragraph of article 1:

"Shareholders who own less than 6% of the share capital of public limited companies registered in

the Public Registry of the Stock Market, as long as they have acquired these shares through the Stock Exchanges, or through inheritances, donations or legacies, and as long as they have not participated in the administration of the corporation."

**Fifth.-** Reform the Organic Law for the Strengthening and Optimization of the Corporate and Stock Market Sector, as follows:

The penultimate and last paragraphs of the fourth transitional provision are deleted.

**Sixth.-** In the Organic Law of Solidarity and Citizen Co-Responsibility for the Reconstruction and Reactivation of the areas affected by the Earthquake of April 16, 2016, after the fourteenth transitional provision, include a transitional provision with the following text:

**"Fifteenth.-** Because the provisions contained in this law generate resources and expenditures not provided for in the General State Budget to address the emergency of the earthquake of April 16, 2016, the authorization to exceed by these values the percentage calculation provided in article 74 numeral 10 of the Organic Code of Planning and Public Finance and its incorporation in the 2016 Budget. The same treatment applies in the case of resources and disbursements of the same year to meet the obligations that originate from international awards.

Based on the above, for this only time, the budget settlement and the Monitoring and Evaluation Report corresponding to the 2016 fiscal year may be issued until May 5, 2017."

Document with possible errors digitized from the original publication. Please verify with image.
Do not print this document unless absolutely necessary.

**FINAL PROVISION.-** This Law will come into force upon its publication in the Official Registry.

Given and signed at the Headquarters of the National Assembly, located in the Metropolitan District of Quito, on the twelfth day of the month of April, two thousand and seventeen.

f.) GABRIELA RIVADENEIRA BURBANO
**President**

f.) DRA. LIBIA RIVAS ORDONÉZ
**Secretary General**

f.) Guillaume Long, Minister of Foreign Affairs and Human Mobility.

Quito, April 12, 2017, I certify that the above is a faithful copy of the original.

**Electronically signed document**

Dr. Alexis Mera Giler
LEGAL GENERAL SECRETARY OF
THE PRESIDENCY OF THE REPUBLIC OF
ECUADOR.

**N° 1358**

**Rafael Correa Delgado**
**CONSTITUTIONAL PRESIDENT**
**OF THE REPUBLIC**

**Considering:**

That, article 147 paragraph 10 of the Constitution of the Republic of Ecuador, provides as one of the powers of the President of the Republic, to appoint and remove ambassadors and heads of mission;

That, article 113 of the Codification of the Organic Law of the Foreign Service establishes that the appointment of heads of diplomatic missions will be made through Decree, once the internal legal requirements are met and the consent of the government to which they will be accredited is obtained;

That, the Government of the Republic of Equatorial Guinea has granted style approval for the appointment of the Ambassador, Leopoldo Enrique Rovayo Verdesoto, as Ambassador Extraordinary and Concurrent Plenipotentiary of the Republic of Ecuador to the Government of the Republic of Equatorial Guinea, based in Abuja, Nigeria; and,

In exercise of the powers conferred by the Constitution of the Republic and the Law,

**Decrees:**

**ARTICLE.- FIRST.-** Appoint the Ambassador, Leopoldo Enrique Rovayo Verdesoto, Extraordinary and Concurrent Plenipotentiary Ambassador of the Republic of Ecuador to the Government of Equatorial Guinea, based in Abuja, Nigeria.

**SECOND ARTICLE.-** The Minister of Foreign Affairs and Human Mobility is responsible for the execution of this Executive Decree.

Given in the National Palace, in Quito, on April 6, 2017.

f.) Rafael Correa Delgado, Constitutional President of the Republic.

**N° 1359**

**Rafael Correa Delgado**
**CONSTITUTIONAL PRESIDENT**
**OF THE REPUBLIC**

**Considering:**

That, article 147 of the Constitution of the Republic, contemplates as powers and duties of the President and Republic President:

*"(...) 5. Direct the public administration in a deconcentrated manner and issue the necessary decrees for its integration, organization, regulation and control. (…)";*

That, article 65 of the Forces Personnel Law Armed Forces, provides: *"The military situation will be established:*

*- To the General Officers by Executive Decree;(…)";*

That, article 75 Ibidem states that: *"The soldier will have the right to up to six months of availability, if he proves at least five years of uninterrupted active and effective service, and may renounce all or part of the time of availability, to directly request his discharge. .",*

That, article 87 letter a) of the aforementioned Law provides: *"The soldier will be discharged for one of the following reasons:*

*a) Voluntary application; (…)";*

That, Mr. General of Division LUIS MIGUEL ÁNGEL CASTRO AYALA, was placed on availability as a result of the issuance of Executive Decree No. 1333 of March 5, 2017;

That, through official letter No. 17-LMACA-1 of March 6, 2017, Division General LUIS MIGUEL ÁNGEL CASTRO AYALA, presents to the Supreme Council of the Armed Forces his request for direct discharge, expressly renouncing all time availability, in accordance with article 75 of the Armed Forces Personnel Law;

Document with possible errors digitized from the original publication. Please verify with image.
Do not print this document unless absolutely necessary.

That, by resolution No. CSFA-004-2017 of March 15, 2017, the Supreme Council of the Armed Forces, ***"RESOLVE: 1)*** *Accept the request for voluntary discharge in accordance with the provisions of article 87, letter a) of Mr. GRAD's Armed Forces Personnel Law. Luis Miguel Ángel Castro Ayala; on the date of your respective request for voluntary withdrawal, after expressly waiving the time of Availability. (…)"; and,*

That, the General Commander of the Land Force, through official letter No. I7-E1-o-sp-41 of March 28, 2017, sends the file to the Ministry of National Defense for discharge from active service of the Armed Forces. to the aforementioned Major General.

In exercise of the powers conferred on it by the Constitution of the Republic of Ecuador; in accordance with article 65 of the Armed Forces Personnel Law, at the request of the Minister of National Defense.

**Decrees:**

**Art. 1.** Give direct discharge from active service of the Armed Forces, on March 31, 2017, to Division General LUIS MIGUEL ÁNGEL CASTRO AYALA, in accordance with article 87 letter a) in accordance with article 75 of the Armed Forces Personnel Law, by express waiver of part of the availability time.

**Art. 2.** The Minister of National Defense is responsible for the execution of this Executive Decree, which will come into force on this date, without prejudice to its publication in the Official Registry.

Given in the National Palace, in Quito on April 6, 2017.

f.) Rafael Correa Delgado, Constitutional President of the Republic.

f.) Ricardo Patiño Aroca, Minister of National Defense.

Quito, April 12, 2017, I certify that the above is a faithful copy of the original.

**Electronically signed document**

Dr. Alexis Mera Giler
LEGAL GENERAL SECRETARY OF THE
PRESIDENCY OF THE REPUBLIC OF ECUADOR.

**N° 1360**

**Rafael Correa Delgado**
**CONSTITUTIONAL PRESIDENT**
**OF THE REPUBLIC**

**Considering:**

That, article 147 of the Constitution of the Republic, contemplates as powers and duties of the President and
Republic President:

*"(...) 5. Direct the public administration in a deconcentrated manner and issue the necessary decrees for its integration, organization, regulation and control (...)";*

That, article 65 of the Forces Personnel Law
Armed, has:

*"The military situation will be established: To the Officers General by Executive Decree (…)";*

That, article 76 letter a) of the aforementioned Law, provides: *"The soldier will be made available, for one of the following reasons:*

*a) Voluntary application (...)";*

That, through official letter No. GRAD-CRA-2017-005-O-OF dated March 6, 2017, Division General CARLOS MODESTO RODRÍGUEZ ARRIETA, presents his request for availability, in accordance with article 76 literal a) of the Armed Forces Personnel Law;

That, through Resolution No. CSFA-003-2017 of March 15, 2017, the Supreme Council of the Armed Forces, ***"RESOLVE: 1)*** *Place Mr. GRAD Carlos Modesto Rodríguez Arrieta in the legal status of* ***Availability ,*** *as of the issuance of Decree No. 1333 of the Constitutional President of the Republic (...):* and,

That, the Commander General of the Land Force, through official letter No. 17-E1-o-sp-40 of March 28, 2017, sends the file to the Ministry of National Defense so that the aforementioned is placed in a military situation of availability. Mr. Division General.

In exercise of the powers conferred on it by the Constitution of the Republic of Ecuador; in accordance with article 65 of the Armed Forces Personnel Law, at the request of the Minister of National Defense.

**Decrees:**

**Art. 1.** Place Major General Carlos Modesto Rodríguez Arrieta in legal status of Availability, as of the issuance of Decree No. 1333 of March 5, 2017, in accordance with article 76 letter a) of the Law of Armed Forces Personnel.

**Art. 2.** The execution of this Executive Decree, which will come into force on the present date, without prejudice to its publication in the Official Registry, is entrusted to the Minister of National Defense.

Given in the National Palace, in Quito on April 6, 2017.

f.) Rafael Correa Delgado, Constitutional President of the Republic.

f.) Ricardo Patiño Aroca, Minister of National Defense.

Document with possible errors digitized from the original publication. Please verify with image.
Do not print this document unless absolutely necessary.

14 - Martes April 18, 2017 Supplement - Official Record No. 986

Quito, April 12, 2017, I certify that the above is a faithful copy of the original.

**Electronically signed document**

Dr. Alexis Mera Giler
LEGAL GENERAL SECRETARY OF
THE PRESIDENCY OF THE REPUBLIC OF ECUADOR.

**N° 1361**

**Rafael Correa Delgado**
**CONSTITUTIONAL PRESIDENT**
**OF THE REPUBLIC**

**Considering:**

That, article 147 of the Constitution of the Republic, contemplates as powers and duties of the President and Republic President:

*"(...) 5. Direct the public administration in a deconcentrated manner and issue the necessary decrees for its integration, organization, regulation and control (...)";*

That, article 65 of the Forces Personnel Law Armed Forces, provides: *"The military situation will be established:*

*- To the General Officers by Executive Decree (…)";*

That, article 75 Ibidem states that: *"The soldier will have the right to up to six months of availability, if he proves at least five years of uninterrupted active and effective service, and may renounce all or part of the time of availability, to directly request his discharge. .";*

That, article 87 letter a) of the aforementioned Law, provides: *"The soldier will be discharged for one of the following reasons:*

*a) Voluntary application (...)";*

That Mr. GRAD, GUSTAVO VICENTE CABRERA CAMPUZANO, was placed on availability as a result of the issuance of Executive Decree No. 1333 of March 6, 2017;

That, through official letter No. 17-E1-o-sp-10 of March 7, 2017, Division General GUSTAVO VICENTE CABRERA CAMPUZANO presents his request for direct voluntary discharge from the active service of the Armed Forces, expressly renouncing all the time of availability, in accordance with article 75 of the Armed Forces Personnel Law;

That, through Resolution No. CSFA-005-2017 of March 15, 2017, the Supreme Council of the Forces Armed Forces, ***"RESOLVE: 1)*** *Accept the request for voluntary discharge in accordance with the provisions of article 87 letter a) of the Armed Forces Personnel Law of Mr. GRAD. Gustavo Vicente Cabrera Campuzano; on the date stated in your respective request for voluntary withdrawal, after express waiver of the time of availability.";* and,

That the General Commander of the Land Force, through official letter No. 17-E1-o-sp-41 of March 28, 2017, sends the file to the Ministry of National Defense to be discharged from the active service of the Armed Forces. to the aforementioned General Officer,

In exercise of the powers conferred on it by the Constitution of the Republic of Ecuador, in accordance with article 65 of the Armed Forces Personnel Law, at the request of the Minister of National Defense.

**Decrees:**

**Art. 1.** Give direct discharge from active service of the Armed Forces, on March 31, 2017, to Division General GUSTAVO VICENTE CABRERA CAMPUZANO, in accordance with article 87 letter a) in accordance with article 75 of the Armed Forces Personnel Law, by express waiver of availability time.

**Art. 2.** The execution of this Executive Decree, which will come into force on the present date, without prejudice to its publication in the Official Registry, is entrusted to the Minister of National Defense.

Given in the National Palace, in Quito on April 6, 2017.

f.) Rafael Correa Delgado, Constitutional President of the Republic.

f.) Ricardo Patiño Aroca, Minister of National Defense.

Quito, April 12, 2017, I certify that the above is a faithful copy of the original.

**Electronically signed document**

Dr. Alexis Mera Giler
LEGAL GENERAL SECRETARY OF
THE PRESIDENCY OF THE REPUBLIC OF ECUADOR.

**N° 1362**

**Rafael Correa Delgado**
**CONSTITUTIONAL PRESIDENT**
**OF THE REPUBLIC**

**Considering:**

That, article 147 of the Constitution of the Republic, contemplates as powers and duties of the President and Republic President:

Document with possible errors digitized from the original publication. Please verify with image.
Do not print this document unless absolutely necessary.

Official Record No. 986 - Martes Supplement April 18, 2017 - 15

*"(…) 5. Direct the public administration in a deconcentrated manner and issue the necessary decrees for its integration, organization, regulation and control. (…)";*

That, article 65 of the Forces Personnel Law Armed Forces, provides: *"The military situation will be established:*

*- To General Officers by Decree Executive;(…)";*

That, article 75 Ibidem states that: *"The soldier will have the right to up to six months of availability, if he proves at least five years of uninterrupted active and effective service, and may renounce all or part of the time of availability, to directly request his discharge. .";*

That, article 87 letter a) of the aforementioned Law, provides: *"The soldier will be discharged for one of the following reasons:*

*a) Voluntary application; (...)";*

That, Mr. GRAD. CARLOS GUSTAVO EGÜEZ ESPINOSA, was placed on availability as a result of the issuance of Executive Decree No. 1334 of March 6, 2017;

That, through official letter 17-E1-o-sp-08, dated March 7, 2017, Mr. GRAD. CARLOS GUSTAVO EGÜEZ ESPINOSA, presents his request for direct voluntary discharge from the active service of the Armed Forces, expressly waiving all time of availability, in accordance with article 75 of the Armed Forces Personnel Law;

That, by resolution No. CSFA-006-2017 of March 15, 2017, the Supreme Council of the Armed Forces, ***"RESOLVE: 1)*** *Accept the request for voluntary discharge in accordance with the provisions of article 87*

*letter a) of the Armed Forces Personnel Law of Mr. GRAD. Carlos Gustavo Egüez Espinosa; on the date stated in your respective request for voluntary withdrawal, after express waiver of the time of Availability (…)"; and,*

That, the Commander General of the Land Force, through official letter No. 17-E1-o-sp-41 of March 28, 2017, sends the file to the Ministry of National Defense for discharge from the active service of the Forces. Armed to the aforementioned Mr. General.

In exercise of the powers conferred on it by the Constitution of the Republic of Ecuador; in accordance with article 65 of the Armed Forces Personnel Law, at the request of the Minister of National Defense.

**Decrees:**

**Art. 1.** Direct discharge from active service of the Armed Forces, on March 31, 2017, to Mr. GRAD. CARLOS GUSTAVO EGÜEZ ESPINOSA, in accordance with article 87 letter a) in accordance with article 75 of the Armed Forces Personnel Law, by express waiver of part of the availability time.

**Art. 2.** The execution of this Executive Decree, which will come into force on the present date, without prejudice to its publication in the Official Registry, is entrusted to the Minister of National Defense.

Given in the National Palace, in Quito on April 6, 2017.

f.) Rafael Correa Delgado, Constitutional President of the Republic.

f.) Ricardo Patiño Aroca, Minister of National Defense.

Quito, April 12, 2017, I certify that the above is a faithful copy of the original.

**Electronically signed document**

Dr. Alexis Mera Giler
LEGAL GENERAL SECRETARY OF THE PRESIDENCY OF THE REPUBLIC OF ECUADOR.

Document with possible errors digitized from the original publication. Please verify with image.
Do not print this document unless absolutely necessary.

Image

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -


# REGISTRO OFICIAL

**Administración del Sr. Ec. Rafael Correa Delgado**
**Presidente Constitucional de la República**

# SUPLEMENTO

**Año IV - Nº 986**

**Quito, martes 18 de abril de 2017**



**LEXIS**

**CÓDIGO ORGÁNICO DE LA ECONOMÍA SOCIAL DE LOS CONOCIMIENTOS, CREATIVIDAD E INNOVACIÓN**

**Art. 107.-** Materia no protegible.- No son objeto de protección las disposiciones legales y reglamentarias, los proyectos de ley, las resoluciones judiciales, los actos, decretos, acuerdos, resoluciones, deliberaciones y dictámenes de los organismos públicos, y los demás textos oficiales de orden legislativo, administrativo o judicial, así como sus traducciones oficiales.

Tampoco son objeto de protección los discursos políticos ni las disertaciones pronunciadas en debates judiciales. Sin embargo, el autor gozará del derecho exclusivo de reunir en colección las obras mencionadas en este inciso con sujeción a lo dispuesto en este Capítulo.

**Art. 116.-** ...

La información y el contenido de las bases de datos producto de las investigaciones financiadas con recursos públicos serán de acceso abierto. Las instituciones o entidades responsables de tales investigaciones deberán poner a disposición dicha información a través de las tecnologías de la información.

**REGISTRO OFICIAL:** Órgano del Gobierno del Ecuador marca registrada de la Corte Constitucional.


## SUMARIO:

Págs.

**FUNCIÓN LEGISLATIVA**

**LEY:**

**ASAMBLEA NACIONAL:**


- LEY ORGÁNICA PARA LA RESTRUCTURACIÓN DE LAS DEUDAS DE LA BANCA PÚBLICA, BANCA CERRADA Y GESTIÓN DEL SISTEMA FINANCIERO NACIONAL Y RÉGIMEN DE VALORES .......................................... 2


**FUNCIÓN EJECUTIVA**

**DECRETOS:**

**PRESIDENCIA DE LA REPÚBLICA:**


1358 Nómbrese al Embajador, Leopoldo Enrique Rovayo Verdesoto, Embajador Extraordinario y Plenipotenciario Concurrente de la República del Ecuador ante el Gobierno de Guinea Ecuatorial, con sede en Abuja, Nigeria.......................... 12

1359 Dese la baja del servicio activo de las Fuerzas Armadas, al señor General de División Luis Miguel Ángel Castro Ayala ............................ 12

1360 Colóquese en condición jurídica de disponibilidad, al señor General de División Carlos Modesto Rodríguez Arrieta ................ 13

1361 Dese la baja del servicio activo de las Fuerzas Armadas, al señor General de División Gustavo Vicente Cabrera Campuzano ......................... 14

1362 Dese la baja del servicio activo de las Fuerzas Armadas, al señor GRAD. Carlos Gustavo Egüez Espinosa ....................................................... 14


Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

**REPÚBLICA DEL ECUADOR**
**ASAMBLEA NACIONAL**

**Oficio No. SAN-2017-0412**

Quito, 17 de abril del 2017

Ingeniero
Hugo Del Pozo Barrezueta
**Director Del Registro Oficial**
En su despacho.-De mis consideraciones:

La Asamblea Nacional, de conformidad con las atribuciones que le confiere la Constitución de la República del Ecuador y la Ley Orgánica de la Función Legislativa, discutió y aprobó el **PROYECTO DE LEY ORGÁNICA PARA LA RESTRUCTURACIÓN DE LAS DEUDAS DE LA BANCA PÚBLICA, BANCA CERRADA Y GETIÓN DEL SISTEMA FINANCIERO NACIONAL Y RÉGIMEN DE VALORES.**

En sesión de 12 de abril de 2017, el Pleno de la Asamblea Nacional conoció y se pronunció sobre la objeción parcial presentada por el señor Presidente Constitucional de la República.

Por lo expuesto, y, tal como dispone el artículo 138 de la Constitución de la República del Ecuador y el artículo 64 de la Ley Orgánica de la Función Legislativa, acompaño el texto de la **LEY ORGÁNICA PARA LA RESTRUCTURACIÓN DE LAS DEUDAS DE LA BANCA PÚBLICA, BANCA CERRADA Y GESTIÓN DEL SISTEMA FINANCIERO NACIONAL Y RÉGIMEN DE VALORES,** para que se sirva publicarlo en el Registro Oficial.

Atentamente,

**f.) DRA. LIBIA RIVAS ORDÓÑEZ**
Secretaria General

**REPÚBLICA DEL ECUADOR**
**ASAMBLEA NACIONAL**

**CERTIFICACIÓN**

En mi calidad de Secretaria General de la Asamblea Nacional, me permito **CERTIFICAR** que la Asamblea Nacional discutió el **"PROYECTO DE LEY ORGÁNICA PARA LA RESTRUCTURACIÓN DE LAS DEUDAS DE LA BANCA PÚBLICA, BANCA CERRADA Y GESTIÓN DEL SISTEMA FINANCIERO NACIONAL Y RÉGIMEN DE VALORES"**, en primer debate el 1 de marzo de 2017, discutió y aprobó en segundo debate el 13 de marzo de 2017; y, se pronunció sobre la objeción parcial del Presidente Constitucional de la República el 12 de abril de 2017.

Quito, 12 de abril de 2017

**f.) DRA. LIBIA RIVAS ORDOÑEZ**
Secretaria General

**REPUBLICA DEL ECUADOR**

**ASAMBLEA NACIONAL**

**EL PLENO**

**CONSIDERANDO:**

Que, el artículo 227 de la Constitución de la República establece que la administración pública constituye un servicio a la colectividad que se rige, entre otros por los principios de eficacia y eficiencia;

Que, el artículo 303 de la Constitución de la República prescribe que la formulación de las políticas monetaria, crediticia, cambiaria y financiera es facultad exclusiva de la Función Ejecutiva, que se instrumentará a través del Banco Central; además la ejecución de la política crediticia y financiera también se ejercerá a través de la banca pública;

Que, el artículo 309 de la Constitución de la República dispone que el sistema financiero nacional se compone de los sectores público, privado y del popular y solidario, que intermedian recursos del público y prescribe que cada uno de estos sectores contará con normas y entidades de control específicas y diferenciadas, que se encargarán de preservar su seguridad, estabilidad, transparencia y solidez;

Que, la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999 prevé las condiciones y plazos para que los deudores no vinculados, cumplan con sus obligaciones pendientes;

Que, el Sistema de Dinero Electrónico comprende a todas aquellas entidades del sistema financiero nacional que requieran conectarse a la Plataforma de Dinero Electrónico (PDE) para ofrecer productos y servicios propios o de terceros a través de la referida plataforma en el Banco Central del Ecuador;

Que, algunos deudores de buena fe no han podido cubrir sus deudas en los plazos establecidos;

Que, se ha considerado necesario fijar condiciones similares a las fijadas para los deudores de buena fe, para quienes hayan tenido créditos vinculados, hasta por montos que no han representado mayor impacto;

Que, se deben mejorar los procesos de desvelamiento societario en casos de ejecución coactiva, a efectos de evitar el cometimiento de injusticias; y,

En ejercicio de la atribución que le confiere el numeral 6 del artículo 120 de la Constitución de la República del Ecuador, expide la siguiente:

**LEY ORGÁNICA PARA LA RESTRUCTURACIÓN DE LAS DEUDAS DE LA BANCA PÚBLICA, BANCA CERRADA Y GESTIÓN DEL SISTEMA FINANCIERO NACIONAL Y RÉGIMEN DE VALORES**

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -



## CAPÍTULO I

## DEUDAS DERIVADAS DE LA CRISIS FINANCIERA DE 1999

**Artículo 1.-** La cartera resultante de las operaciones crediticias, y las operaciones no crediticias que a la fecha de la promulgación de esta Ley posee el Banco Central Ecuador y que provengan de los procesos y operaciones derivados de la crisis financiera suscitada en el año 1999, serán vendidos de conformidad con la Ley, a entidades de servicios auxiliares del sistema financiero nacional especializadas en cobranzas de propiedad mayoritariamente pública en el plazo de hasta (90) noventa días de conformidad con las siguientes reglas:

a. El plazo total para el pago de las entidades de servicios auxiliares del sistema financiero nacional especializadas en cobranzas de propiedad mayoritariamente pública al Banco Central del Ecuador por la venta de las operaciones crediticias y las operaciones no crediticias será de hasta quince (15) años a partir de la fecha de la venta. La forma de pago será acordada entre las partes considerando la recuperación de la cartera.

b. El valor para la venta de las operaciones crediticias y las operaciones no crediticias cuyas operaciones se encuentren respaldadas con garantías hipotecarias corresponderá al valor del avalúo catastral en el año en que se ejecute la venta de la cartera, siempre que no exista contingencia legal en la operación o en la garantía hipotecaria, en cuyo caso tendrá valor de 0.01 dólares de los Estados Unidos de América.

c. El valor para la venta de las operaciones crediticias y las operaciones no crediticias que no posean garantías se efectuará al valor de 0.01 dólares de los Estados Unidos de América.

d. El valor para la venta de las operaciones crediticias y las operaciones no crediticias que posean garantías prendarias será el valor del bien depreciado de acuerdo a la Ley Orgánica de Régimen Tributario Interno, pudiendo ser a valores inferiores o a 0.01 dólares de los Estados Unidos de América, si los bienes han sido siniestrados o se encuentran en mal estado, conforme a los informes emitidos por peritos avaluadores.

e. El valor para la venta de las operaciones crediticias y las operaciones no crediticias que posean garantías prendarias consistentes en acciones se establecerá por su valor patrimonial.

Una vez ejecutada la venta de cartera, el Banco Central del Ecuador y las entidades de servicios auxiliares del sistema financiero nacional especializadas en cobranzas de propiedad mayoritariamente pública que adquieran la cartera procederán a registrar en sus balances lo que fuera pertinente. La transferencia de dicha cartera y sus garantías operará de pleno derecho sin necesidad de aceptación por parte del deudor, debiendo ser registrada por los registros públicos correspondientes por el sólo requerimiento del Banco Central del Ecuador y/o de las entidades de servicios auxiliares del sistema financiero nacional especializadas en cobranzas de propiedad mayoritariamente pública que adquieran la cartera, estando exenta del pago de cualquier tipo de tributo o cargo.

Los deudores deberán ser notificados a través de los distintos medios físicos, electrónicos o por la prensa escrita, dentro de los treinta (30) días siguientes a la venta o cesión de cartera a las entidades de servicios auxiliares del sistema financiero nacional especializadas en cobranzas de propiedad mayoritariamente pública.

El Banco Central del Ecuador procederá a ejecutar el registro correspondiente en las liquidaciones de cada entidad financiera extinta y el registro contable de las compensaciones de cartera que correspondan.

**Artículo 2 .-** De existir errores de fondo y de forma en las escrituras de cesión de activos, bases de datos, archivos documentales transferidos al Banco Central del Ecuador así como nuevas evidencias documentarias de pagos que afecten derechos de los deudores, éstos en el plazo de sesenta (60) días a partir de la promulgación de esta Ley, podrán solicitar la rectificación de los mismos mediante la presentación de una declaración juramentada en la que adjuntará los documentos probatorios que justifiquen las inconsistencias o pagos efectuados que no hubieren sido registrados por las entidades financieras extintas, cuya pertinencia será determinada por el Banco Central del Ecuador o por las entidades de servicios auxiliares del sistema financiero nacional especializadas en cobranzas de propiedad mayoritariamente pública que adquieran la cartera.

Sin perjuicio de las garantías de debido proceso y el principio de cosa juzgada, de existir duda razonable dentro de esta revisión, se estará a la interpretación que más favorezca al deudor.

**Artículo 3.-** El Banco Central del Ecuador ejecutará, de oficio y sin que medie petición de parte, el recálculo de la parte de la cartera no vinculada y cedida por las instituciones financieras extintas por disposición de la resolución de la Junta Bancaria JB-2009-1427 previsto en el artículo 14 de la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999. La Corporación Financiera Nacional aplicará el mismo procedimiento de recálculo a la cartera que le hubiere sido transferida por las instituciones financieras extintas. El recálculo se efectuará a las deudas de todos los deudores no vinculados, sin diferencia de los montos.

Todos los deudores previstos en el inciso anterior serán beneficiarios del recálculo en las condiciones previstas en esta Ley. Por tanto, no les serán aplicables las condiciones previstas en los numerales 1, 2 y 3 del artículo 15 de la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999.

Una vez determinados los montos recalculados, la entidad acreedora procederá a registrarlos y a cobrarlos. En ningún caso se cobrarán los valores originales adquiridos con las instituciones financieras extintas, sino sólo aquellos recalculados.

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -



**Artículo 4.-** Se deja sin efecto la suspensión de los beneficios concedidos por la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999, a los deudores que, habiendo suscrito convenios de recálculo, hubieren incumplido dos pagos consecutivos.

Estos deudores tendrán el plazo de noventa (90) días a partir de la promulgación de esta Ley para solicitar al Banco Central del Ecuador o a las entidades de servicios auxiliares del sistema financiero nacional especializadas en cobranzas de propiedad mayoritariamente pública, según corresponda, la modificación del convenio de recálculo suspenso con base a las disposiciones de esta Ley. Los deudores que no hubieren suscrito convenios de recálculo, tendrán un plazo de noventa (90) días para solicitarlo y treinta (30) días adicionales para suscribir el convenio de recálculo conforme al artículo 14 de la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999 y las modificaciones que comprende la presente Ley. Este nuevo convenio podrá contener opciones de fraccionamiento de la operación y de sus garantías, previa autorización de la entidad correspondiente.

Dentro del convenio modificado previsto en el inciso anterior, se incluirán reprogramadas las cuotas impagas de aquellos deudores que, habiendo celebrado convenios de recálculo, hayan caído en mora del cumplimiento de sus obligaciones.

Los deudores que hubiesen suscrito convenios de recálculo y que no hayan podido honrar sus obligaciones, podrán acogerse a lo dispuesto en esta Ley sin necesidad de efectuar un nuevo abono, conforme lo establece el artículo 15 de la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999. Las operaciones consecuencia del convenio de recálculo deberán contar obligatoriamente con seguro de desgravamen.

Igual plazo tendrán los deudores de la Corporación Financiera Nacional que no pudieron cumplir con el pago del convenio de recálculo efectuado, para solicitar a dicha entidad financiera pública la reactivación de dicho convenio, conforme a las condiciones establecidas en esta Ley.

**Artículo 5**.- El plazo para el pago de los créditos de origen hipotecario por parte de los deudores que hayan suscrito convenios, al amparo de lo previsto en la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999 o de lo establecido en esta Ley, será de hasta doce (12) años incluido un (1) año de gracia, contados a partir de la vigencia de esta Ley.

El plazo total para el pago de las demás operaciones de crédito por parte de los deudores no contempladas en el inciso anterior, que hayan suscrito convenios, al amparo de lo previsto en la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999 o de lo establecido en esta Ley, será de hasta doce (12) años, contados a partir de la vigencia de esta Ley.

Los deudores señalados en los incisos precedentes que hubiesen suscrito convenios de recálculo que se encuentren vigentes podrán requerir al Banco Central del Ecuador o a las entidades de servicios auxiliares del sistema financiero nacional especializadas en cobranzas de propiedad mayoritariamente pública, según corresponda, la modificación de sus convenios con el propósito de acogerse a los plazos y condiciones señalados.

**Artículo 6**.- El incumplimiento de pagos que supere seis (6) meses o la falta de concurrencia a la suscripción de los documentos que formalicen la obligación de pago reactivará o será causal para iniciar inmediatamente los procesos coactivos y aquellos seguidos ante la justicia ordinaria, por el monto total de la deuda recalculada que se mantuviere impaga, aplicando la tasa de interés de mora a partir de que sea declarada de plazo vencido. Los pagos que se hubieren hecho al amparo de esta Ley serán aplicados conforme a lo dispuesto en el artículo 1611 del Código Civil.

Al realizarse la venta de la cartera por parte del Banco Central del Ecuador, se consideran cedidos de pleno derecho, a favor de las entidades de servicios auxiliares del sistema financiero nacional especializadas en cobranzas de propiedad mayoritariamente pública todos los derechos litigiosos derivados de los juicios iniciados para la cobranza de los créditos, sin necesidad de aceptación por parte del deudor, debiendo ser registrados por los registros públicos o juzgados correspondientes, por el sólo requerimiento del Banco Central del Ecuador y/o de las entidades de servicios auxiliares del sistema financiero nacional especializadas en cobranzas de propiedad mayoritariamente pública; de manera que dicha entidad podrá reactivar, reiniciar o iniciar los procesos judiciales o coactivos, de conformidad a lo previsto en el inciso anterior.

**Artículo 7.-** A partir de la expedición de esta Ley, se suspenderán los procesos coactivos iniciados y los juicios de insolvencia o quiebra, así como las medidas cautelares que en estos se hayan dictado, por el plazo de hasta ciento veinte (120) días, durante el cual los deudores, según el caso, podrán suscribir convenios de pago o reactivar sus convenios de recálculo o modificar los plazos de pago, en estos supuestos, previa suscripción de los documentos correspondientes.

Los jueces de coactiva, por mandato de esta Ley, sentarán la razón de suspensión de la coactiva en cada uno de los procesos a su cargo. No se considerará el tiempo que dure la suspensión de dichos procesos, para establecer el plazo para la prescripción de las acciones respectivas.

**Artículo 8**.- El Banco Central del Ecuador de su presupuesto destinará los recursos necesarios para solventar los gastos que se generen por efectos de la aplicación de la transferencia de activos determinada en el artículo 6 de la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999 y, exclusivamente para el cumplimento de esta disposición, no aplicarán las prohibiciones determinadas en el artículo 56 del Código Orgánico Monetario y Financiero.

**Artículo 9.-** No obstante lo previsto en el Código Civil vigente, las deudas registradas en la contabilidad de las entidades del sistema financiero extintas de hasta ciento cincuenta mil dólares de los Estados Unidos de América (US$ 150.000,00), transferidas al Banco Central del

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -



Ecuador, por disposición de la resolución JB-2009-1427 de la Junta Bancaria, y que correspondan a créditos adquiridos por personas naturales en sociedad conyugal o sociedad de bienes, en la que uno de los cónyuges o convivientes en unión de hecho ha fallecido, por esta sola vez, quedan extinguidas y, en consecuencia, el Banco Central del Ecuador o las entidades competentes de cobranza, notificarán a la Superintendencia de Bancos, Central de Riesgos y/o Dirección Nacional de Registro de Datos Públicos, a fin de que el o la cónyuge sobreviviente y/o los herederos sean rehabilitados para operar en el sistema financiero nacional.

Los montos condonados se registrarán y se deducirán del precio de la venta de la cartera prevista en el artículo 1. Asimismo, las condonaciones que se efectúen por la entidad de cobranzas serán reportadas al Banco Central del Ecuador.

También se beneficiarán de la misma condonación, aquellos deudores a quienes les haya sobrevenido una discapacidad, con posterioridad a la época en que contrajeron su deuda, siempre que demuestren la imposibilidad de cumplir con el pago de sus obligaciones. En este caso, las condonaciones se conferirán en la misma proporción de las exenciones tributarias, previstas en la Ley Orgánica de Discapacidades y su Reglamento.

**Artículo 10.-** Las compañías en liquidación, cuyo único socio o accionista es el Fideicomiso Mercantil AGD-CFN No Más Impunidad o el Banco Central del Ecuador, se cancelarán si no tuvieren activos. Tratándose de las compañías inactivas será causal de disolución si incurrieren en iguales presupuestos. La Superintendencia de Compañías ejecutará todas las acciones necesarias para perfeccionar la cancelación de estas compañías en el plazo de noventa (90) días a partir de la publicación en el Registro Oficial de la presente Ley. Las obligaciones que mantengan pendientes estas compañías con el Servicio de Rentas Internas y con la Superintendencia de Compañías no se cobrarán pero serán registradas en el déficit patrimonial de la institución financiera extinta que corresponda.

El Banco Central del Ecuador y el Fideicomiso Mercantil AGD-CFN No Más Impunidad cancelarán las obligaciones patronales que las referidas compañías tuvieren pendientes con el Instituto Ecuatoriano de Seguridad Social, que procederá al cobro de las obligaciones sin contabilizar intereses moratorios ni multas.

**Artículo 11.-** También accederán a los recálculos previstos en esta Ley los deudores vinculados cuyo capital inicial del total de sus operaciones vinculadas acumuladas fuere de hasta veinticinco mil dólares de los Estados Unidos de América (US$ 25.000).

**Artículo 12**.- Luego de que se hubiere efectuado la modificación del recálculo del crédito, los deudores podrán solicitar al Banco Central del Ecuador o a las entidades de servicios auxiliares del sistema financiero nacional especializadas en cobranzas de propiedad mayoritariamente pública que hubieren adquirido la cartera, la devolución y liberación tanto de los bienes embargados como de las garantías cuando en su conjunto superen el doscientos por ciento (200%) del valor del recálculo, siempre y cuando existan varios bienes o éstos sean susceptibles de divisibilidad. Para la aplicación de esta norma, se requerirá de un informe actualizado emitido por un perito calificado por la Superintendencia de Bancos.

**Artículo 13.-** La Junta de Política y Regulación Monetaria y Financiera expedirá las regulaciones necesarias para la aplicación de las disposiciones de esta Ley.

## CAPÍTULO II

## DEUDAS DE LA BANCA PÚBLICA

**Artículo 14.-** Condónense las costas, gastos, recargos, intereses e intereses de mora de las operaciones de crédito otorgadas a personas naturales o jurídicas que mantienen obligaciones con el Banco Nacional de Fomento en Liquidación, originadas o adquiridas por esta entidad, siempre que los deudores paguen al menos el cinco por ciento (5%) del saldo del capital dentro del plazo de ciento ochenta (180) días a partir de la vigencia de la presente Ley.

**Artículo 15.-** Las operaciones de crédito cuyas costas, gastos, recargos, intereses e intereses de mora hayan sido objeto de la condonación, podrán, a petición de parte, ser restructuradas o refinanciadas por el liquidador. Durante el plazo de ciento ochenta (180) días los costos de gestión de la cartera serán asumidos por el Banco Nacional de Fomento en liquidación. Estas operaciones restructuradas o refinanciadas deberán contar obligatoriamente con seguro de desgravamen en todos los casos y de ser posible seguro agrícola, en caso de que exista el producto en el mercado asegurador ecuatoriano.

Sin perjuicio del plazo determinado en el numeral 4 del artículo 307 del Código Orgánico Monetario y Financiero, el proceso de liquidación de las entidades financieras públicas en liquidación que hayan refinanciado o restructurado las operaciones de crédito al amparo de esta Ley, se extenderá hasta por el doble del plazo pactado en la operación original otorgado para dichos refinanciamientos o restructuraciones, pero que en ningún caso podrá ser superior a doce (12) años. En todos los casos, estas operaciones contarán con dos (2) años de gracia.

Las obligaciones que hayan sido originalmente firmadas por varios deudores, podrán ser divididas e individualizadas entre todas siempre que las garantías puedan también ser divididas, o que sus deudores ofrezcan garantías por todas las obligaciones.

Luego de que se hubiere efectuado la modificación del recálculo del crédito, los deudores podrán solicitar al Banco Nacional de Fomento en Liquidación, la devolución y liberación tanto de los bienes embargados como de las garantías cuando en su conjunto superen el doscientos por ciento (200%) del valor del recálculo, siempre y cuando existan varios bienes o éstos sean susceptibles de divisibilidad. Para la aplicación de esta norma, se requerirá de un informe actualizado emitido por un perito calificado por la Superintendencia de Bancos.

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

**Artículo 16.-** La tasa de interés para las operaciones restructuradas será del cinco por ciento (5%).

**Artículo 17.-** A partir de la expedición de esta Ley, se suspenderán los procesos coactivos iniciados y los juicios de insolvencia o quiebra, así como las medidas cautelares que en estos se haya dictado, mientras dure el plazo previsto en esta norma para la restructuración.

**Artículo 18.-** No obstante lo previsto en el Código Civil vigente, las deudas registradas en la contabilidad del Banco Nacional de Fomento en Liquidación de hasta cuarenta mil dólares de los Estados Unidos de América (US$ 40.000,00), que correspondan a créditos adquiridos por personas naturales en sociedad conyugal o sociedad de bienes, en la que uno de los cónyuges o convivientes en unión de hecho ha fallecido, por esta sola vez, quedan extinguidas. En consecuencia, el Banco Nacional de Fomento en Liquidación notificará a la Superintendencia de Bancos, Central de Riesgos y/o Dirección Nacional de Registro de Datos Públicos, a fin de que el o la cónyuge sobreviviente y/o los herederos sean rehabilitados para operar en el sistema financiero nacional.

También se beneficiarán de la misma condonación, aquellos deudores a quienes les haya sobrevenido una discapacidad, con posterioridad a la época en que contrajeron su deuda, siempre que demuestren la imposibilidad de cumplir con el pago de sus obligaciones. En este caso, las condonaciones se conferirán en la misma proporción de las exenciones tributarias, previstas en la Ley Orgánica de Discapacidades y su Reglamento.

**Artículo 19.-** El Banco Nacional de Fomento en Liquidación, en el contexto de esta Ley, podrá, dentro del plazo de doscientos diez (210) días, realizar operaciones de compra y venta de cartera con instituciones financieras públicas, por requerimiento de estas entidades. Para la aplicación de lo previsto en este artículo el Banco Nacional de Fomento en Liquidación priorizará la adquisición de cartera de las entidades financieras públicas otorgada en las zonas afectadas por el terremoto de 16 de abril de 2016.

Adicionalmente el Banco Nacional de Fomento en Liquidación, en el mismo plazo del inciso anterior, podrá comprar cartera de entidades financieras en procesos liquidatorios que se encuentren bajo el control de la Superintendencia de Bancos, asimismo podrá ser cesionario de otros activos y derechos litigiosos provenientes de esas entidades financieras en liquidación.

El precio de la misma será el valor resultante del saldo de la cartera menos el monto de las respectivas provisiones; en ningún caso, el valor será menor a un dólar de los Estados Unidos de América.

## DISPOSICIONES GENERALES

**Primera.-** Los procesos de liquidación de las Asociaciones Mutualistas de Ahorro y Crédito para la Vivienda que se encuentran decurriendo serán finiquitados por el organismo de control ante el que se inició tal proceso.

**Segunda.-** Para la aplicación de la Ley Orgánica para el Equilibrio de las Finanzas Públicas, y de la disposición transitoria segunda de la Ley Orgánica de Solidaridad y de Corresponsabilidad Ciudadana para la Reconstrucción y Reactivación de las Zonas Afectadas por el Terremoto de 16 de abril de 2016, en donde se diga: "con o en dinero electrónico" se entenderá que ésta acepción incluye también "el Sistema de Dinero Electrónico (SDE)"; y, en donde diga: "cuenta o cuentas de dinero electrónico" se entenderá que ésta acepción incluye también "cuenta o cuentas en instituciones del sistema financiero asociadas al Sistema de Dinero Electrónico (SDE)".

La Junta de Política y Regulación Monetaria y Financiera y el Comité de Política Tributaria regularán, en el marco de sus competencias, la aplicación del beneficio de devolución del Impuesto al Valor Agregado – IVA.

**Tercera.-** Para las operaciones de cartera redescontadas en la Corporación Financiera Nacional que tienen como acreedores al Banco Central del Ecuador por cuenta de las instituciones financieras extintas y a la Corporación Financiera Nacional, deben ser consideradas como una sola operación frente a los deudores para el proceso de recálculo e imputación de los dividendos o abonos parciales.

**Cuarta.-** La aplicación de lo previsto en esta Ley, en ningún caso permitirá la devolución de los montos pagados ni de los bienes que hubieren sido embargados o rematados, salvo lo previsto en los artículos 12 y 15 de esta Ley.

**Quinta.-** Los funcionarios del Banco Central del Ecuador, de la Superintendencia de Bancos y las demás instituciones públicas que por mandato de la disposición general novena de la Ley para el Cierre de la Crisis Bancaria de 1999 no envíen el informe semestral a la Asamblea Nacional, serán sancionados conforme lo dispone la Ley Orgánica de Servicio Público para las faltas graves.

**Sexta.-** Las obligaciones contraídas por todos los créditos otorgados por las entidades del sistema financiero nacional, incluidas las instituciones financieras en proceso de liquidación y que sean declaradas de plazo vencido, podrán ser canceladas a través de la respectiva ejecución o dación en pago del bien dado en garantía, con lo cual se extinguirá la deuda, siempre y cuando el valor al cual la entidad financiera hubiere avaluado originalmente el bien en garantía, cubra más del cien por cien del capital de la deuda original.

Una vez rematado o subastado el bien entregado en garantía o entregado en dación en pago, dicha obligación se extinguirá por lo que el acreedor o sus sucesores en derecho, no podrán perseguir los bienes personales del deudor, ni de sus sucesores en derecho, ni de la sociedad conyugal o sociedad de bienes, ni iniciar concurso de acreedores contra estos, ni aun alegando deudas pendientes por costas procesales, honorarios de abogados u otros gastos, por lo que no serán aplicables los artículos 2327 y 2367 del Código Civil, ni cualquier otro artículo que se oponga a la plena vigencia de la presente Ley. Esta disposición será aplicable también a los casos en los que se haya constituido un fidecomiso de garantía o cualquier otro instrumento o

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.

Barcode:4512905-01 C-331-806 INV - Investigation -



mecanismo financiero que garantice la deuda. Los remates se instruirán de conformidad con las normas aplicables del Código Orgánico General de Procesos.

La Junta de Política y Regulación Monetaria y Financiera regulará la aplicación de esta disposición.

**DISPOSICIONES TRANSITORIAS**

**Primera.-** Dentro del plazo de ciento veinte (120) días, contados a partir de la vigencia de esta Ley, las entidades financieras públicas abiertas o en liquidación, extinguirán las operaciones de crédito vencidas que se hubieren generado por la venta de maquinaria agrícola efectuada por la misma entidad, mediante la entrega en dación en pago de dicha maquinaria agrícola.

Los deudores de la Corporación Financiera Nacional que en el proceso de entrega de créditos, hayan sido dirigidos o conminados a adquirir las maquinarias, herramientas o bienes objeto del crédito a empresas que hubieren entregado bienes finales con vicios de calidad o funcionamiento, previo informe del organismo de control correspondiente; dichos bienes podrán ser entregados como dación en pago, con lo cual se dará por extinguida totalmente las operaciones de crédito vencidas.

**Segunda**.- Dentro del plazo de ciento ochenta (180) días contados a partir de la vigencia de esta transitoria, las operaciones de crédito realizadas por las entidades del sector financiero público, que se encuentren en proceso de liquidación, en forma directa o indirecta, que se encuentren vencidas, previo informe del organismo de control correspondiente, que evidencie que existen incumplimientos de obligaciones imputables al sector financiero público, podrán ser restructuradas o refinanciadas por las entidades financieras públicas, a petición de parte interesada, en las condiciones financieras que establezca la entidad. En estas operaciones restructuradas o refinanciadas no serán considerados los valores correspondientes a intereses, multas, gastos y costas judiciales, por el tiempo de afectación imputable al sector financiero público.

Con la finalidad de facilitar la restructura o refinanciamiento de las operaciones de crédito, las acciones coactivas que se hubieren iniciado se suspenderán temporalmente al igual que los plazos para la prescripción.

Los organismos de control correspondientes vigilarán el cumplimiento de estas disposiciones, y en caso de existir indicios de responsabilidad penal, trasladará su conocimiento a la Fiscalía.

**Tercera.-** Dentro del plazo de sesenta (60) días contados a partir de la vigencia de esta Ley, el Banco Central del Ecuador y la Corporación Financiera Nacional, a petición de parte, efectuarán las valoraciones de los bienes muebles e inmuebles señalados en los artículos 18 y 19 de la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999.

**Cuarta.-** Para los establecimientos turísticos debidamente registrados ante la autoridad nacional de turismo, ubicados en las provincias de Manabí y Esmeraldas, dadas las afectaciones al sector, producto del terremoto del 16 de abril del 2016 y las réplicas consiguientes, se dispone la exoneración de los valores pendientes de pago derivados de la contribución del uno por mil sobre activos fijos determinada por la letra b) del artículo 39 de la Ley de Turismo, por concepto de capital, intereses, multas, y recargos generados hasta el ejercicio económico del año 2017, inclusive.

**Quinta**.- Los deudores beneficiarios de lo dispuesto en el Artículo 6 de la Ley Orgánica de Remisión de Intereses, Multas y Recargos, podrán acogerse a las mismas condonación y restructuración, pero con las condiciones que aquí se prevén.

Para acogerse a dichos beneficios, los deudores deberán presentar su solicitud ante la Corporación Financiera Nacional. Al acceder a la remisión contemplada en esta disposición, los deudores deberán cancelar la totalidad del capital adeudado dentro de los siguientes diez (10) días hábiles del plazo antes referido o podrán suscribir un convenio de pago del capital adeudado en cuotas iguales, de acuerdo a su capacidad de pago, hasta en un plazo no mayor a sesenta (60) meses, con una tasa de interés del cinco por ciento (5%) anual.

Se ampliará el plazo hasta en ciento veinte (120) días hábiles siguientes a la publicación de esta Ley en el Registro Oficial, para el caso de bienes robados o siniestrados totalmente, adjuntando a la solicitud la constancia o denuncia que haya sido presentada a la Capitanía de Puerto o Fiscalía de la respectiva jurisdicción.

Sobre el incumplimiento a los convenios que se suscriban y la suspensión de los procesos coactivos, se seguirán las mismas reglas establecidas en el Artículo 6 de la Ley Orgánica de Remisión de Intereses, Multas y Recargos, cuyos plazos se contarán a partir de la vigencia de esta Ley.

**DISPOSICIONES REFORMATORIAS**

**Primera.-** En la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999, efectúense las siguientes reformas:

1. En el tercer inciso del artículo 14, sustituir la última oración por la siguiente: “El recálculo se realizará tomando el valor del capital inicial entregado en crédito, al cual se le aplicará la tasa de interés anual del cinco por ciento (5%) por el plazo transcurrido desde el primero de enero del año 2010 hasta la publicación de esta Ley.”.

2. En el cuarto inciso del artículo 14 sustituir la frase: “Las pruebas serán apreciadas por la autoridad competente de conformidad con las reglas de la sana crítica.” por lo siguiente:

“Se valorará los registros y documentación presentada de conformidad con las reglas de sana crítica y los principios de informalidad, pertinencia, conducencia, lealtad y veracidad. De acuerdo al principio de coordinación, la autoridad requerirá a las entidades del sector público, información que, sin estar en su poder, conduzca a dilucidar la verdad material del caso específico. En su resolución, la

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

autoridad competente enunciará toda la información que posea del deudor.

En caso de requerirse informes técnicos y jurídicos internos o externos, la autoridad competente podrá prorrogar el plazo de sesenta días prescrito en el inciso siguiente, hasta por treinta días adicionales. Las instituciones públicas requeridas tendrán un plazo de 10 días para absolver los pedidos de información, informes y dictámenes solicitados por la autoridad competente.

Sin perjuicio de las garantías de debido proceso y cosa juzgada, de existir duda razonable dentro de este análisis, se estará a la interpretación que más favorezca al deudor."

3. En el séptimo inciso del artículo 14, sustitúyase la frase "y sobre el saldo de capital se aplicará la tasa del 5% de interés anual que se mantendrá vigente desde la fecha de su concesión hasta la cancelación total de la obligación", por la siguiente: "y sobre el saldo de capital se aplicará la tasa del 5% de interés anual, por el plazo transcurrido desde el primero de enero del año 2010 hasta la cancelación total de la obligación".

4. Eliminar el inciso noveno del artículo 14.

5. En el artículo 14, sustitúyase el texto de la letra c) por el siguiente:

"c) Si en razón del contrato de arrendamiento mercantil, el bien se encuentra en goce del deudor o sus herederos, a solicitud de cualquiera de ellos, se dará por terminado el contrato de arrendamiento mercantil y en su lugar se constituirá el mismo en una operación de cartera por el monto de la obligación pendiente, cuyo valor de capital inicial será el reportado al Banco Central del Ecuador de conformidad con el inciso cuarto de este artículo o la cuantía que conste en el contrato de arrendamiento mercantil, aplicando para tal efecto lo dispuesto por el segundo inciso del artículo tres de la Ley Orgánica para la Restructuración de las Deudas de la Banca Pública, Banca Cerrada y Gestión del Sistema Financiero Nacional y Régimen de Valores. Una vez concluido el pago de la obligación se procederá a la transferencia del bien al deudor o a sus legítimos herederos. En caso de no cumplirse con el convenio de recálculo, los bienes muebles serán rematados y los bienes inmuebles serán transferidos a la entidad que corresponda, según lo establece esta ley.

Para efectos de este literal, se entenderá como deudor tanto al arrendatario mercantil cuanto al garante de la obligación, si este último o sus herederos han suscrito o suscriben el convenio de recálculo y por tal se comprometen a cancelar la obligación."

6. Agregar como últimos incisos del artículo 14, los siguientes:

"En los contratos de arrendamiento mercantil que en función de la Ley Orgánica para el Cierre de la Crisis Bancaria de 1999 se convirtieron en operación de cartera, no se exigirá que se hubiese cumplido con la solemnidad de la inscripción en el Registro Mercantil; además, los abonos que se consignaron por vía judicial se agregarán y se deducirán de la deuda, siempre que se hayan cumplido con los pagos y cuotas oportunamente.

Para efectos de esta Ley, para determinar el valor del capital inicial de la cartera denominada en Unidades de Valor Constante (UVC), se dividirá el capital inicial para 2,6289."

7. Suprímase el último inciso del artículo 15.

8. Eliminar en el primero, cuarto y quinto incisos del artículo 18, la palabra "original".

9. Sustituir el artículo 19 por el siguiente:

"Art. 19.- Extinción de obligaciones.- En aquellos casos en que fueron embargados o entregados en dación en pago bienes de los deudores constituidos en garantía original de obligaciones adquiridas con las instituciones financieras extintas, las deudas se reducirán en (i) el valor en que las garantías hubieren sido constituidas; (ii) el valor de los bienes a la fecha de embargo; (iii) el valor del remate, si es que fueron rematados; o (iv) el valor actualizado del bien, cualesquiera sea el mayor de los cuatro. A petición del deudor, los bienes embargados podrán recibirse en dación en pago en relación a las deudas mantenidas con la banca cerrada.

Si acogiéndose alguno de estos criterios, para el avalúo de los bienes constituidos en garantía original del crédito, se cubriera el total del importe de la deuda, se entenderá cancelada, caso contrario el saldo podrá sujetarse al procedimiento de recálculo."

10. Incluir al final de la disposición general décima lo siguiente: "El Estado podrá repetir contra los funcionarios que hubiesen ocasionado daños o perjuicios por sus acciones u omisiones.".

11. Agregar un inciso final a la disposición general décima, que establezca:

"Las acciones y omisiones descritas en el inciso anterior que se detecten en el proceso de administración y cobro de la cartera por parte del Banco Central del Ecuador o de la entidad financiera de servicios auxiliares de cobranza de propiedad mayoritariamente pública que adquiera la cartera por mandato de esta Ley, deberán ser denunciadas ante los órganos de control y jurisdiccionales correspondientes."

**Segunda.-** En el Código Orgánico Monetario Financiero, efectúense las siguientes reformas:

1. En el cuarto inciso del artículo 8, sustitúyase la frase: "estarán impedidos de prestar sus servicios en las entidades reguladas o en las que están bajo su ámbito de control", por la siguiente: "estarán impedidos de prestar sus servicios en las entidades financieras privadas, de la economía popular y solidaria o en las entidades privadas de valores y seguros, que sean reguladas o controladas".

2. Agregar al final del numeral 1 del artículo 56, después de la frase "financieras internacionales", la siguiente: "multilaterales o en entidades del sector financiero público".

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.

PUBLIC DOCUMENT

Barcode:4512905-01 C-331-806 INV - Investigation -



3. En el artículo 62, agréguese el siguiente numeral: “28. Preparar el informe técnico para que la Junta de Política y Regulación Monetaria y Financiera fije las contribuciones anuales que deben pagar las entidades financieras privadas”, por tanto se renumera y en el numeral 29 tal como consta en la ley dirá “Las demás que le asigne la Ley”.

4. Incorpórese al final del numeral 7 del artículo 80, el siguiente texto:

   “Entre los procedimientos que permitan la aplicación de la regla del menor costo respecto del pago del Seguro de Depósitos, la COSEDE podrá invertir recursos del Seguro de Depósitos, hasta con dos (2) años de gracia y hasta veinte (20) años plazo, en entidades financieras que adquieran activos y pasivos de entidades financieras inviables, a la tasa de interés promedio ponderada de los rendimientos del portafolio del Seguro de Depósitos más un margen determinado por la COSEDE.

   Dentro del proceso de exclusión de activos y pasivos, para aplicar la regla del menor costo la COSEDE utilizará la valoración de los activos establecida por el administrador temporal de la entidad inviable.”

5. Sustitúyase el segundo inciso del Artículo 238, por el siguiente: “En caso de liquidación forzosa de una entidad financiera privada, los accionistas que, directa o indirectamente, sean personas con propiedad patrimonial con influencia, responderán inclusive con su patrimonio personal en caso de que hayan incurrido en culpa grave o dolo y culpa leve. Tratándose de accionistas con o sin propiedad patrimonial con influencia, que ejerzan la administración de la entidad financiera privada, responderán solidariamente y por la totalidad del déficit patrimonial, aun por culpa levísima. Igual responsabilidad tendrán los fideicomisos creados para administrar acciones, sus constituyentes y los administradores de las entidades del sistema financiero nacional.”.

6. Sustitúyase el tercer inciso del artículo 328 por el siguiente:

   “Los montos asegurados de los depósitos en el resto de segmentos del sector financiero popular y solidario serán definidos por la Junta de Política y Regulación Monetaria y Financiera, sobre la base de la propuesta que para el efecto remita la Corporación del Seguro de Depósitos, Fondo de Liquidez y Fondo de Seguros Privados. Los montos definidos en ningún caso podrán ser superiores al monto asegurado de los depósitos en las entidades financieras privadas y las del segmento uno (1) del sector financiero popular y solidario.”

7. Derógase el numeral 10 del Artículo 85 y sustitúyase el artículo 349, por el siguiente:

   “Artículo 349.- Recursos del Fondo de Seguros Privados.- El Fondo de Seguros Privados se constituirá con los siguientes recursos que se considerarán públicos:

   a) Una contribución básica de hasta el 0,7% sobre el valor de las primas netas de seguros directos que realizarán todas las empresas aseguradoras, en el porcentaje que fije anualmente la Junta de Política y Regulación Monetaria y Financiera; y, una contribución variable de hasta el 0,8% del mismo valor en función de las calificaciones de riesgo, fijada asimismo por la Junta, cuyo máximo porcentaje no podrá sobrepasar, en ningún caso, el 120% de la contribución básica;

   b) La proporción de la contribución determinada en el artículo 67 del Libro III de este Código;

   c) El rendimiento de las inversiones y las utilidades líquidas de cada ejercicio anual del Fondo de Seguros Privados;

   d) Las donaciones que reciba; y,

   e) Las provenientes de préstamos o líneas contingentes obtenidos para el financiamiento de sus actividades.

   Los recursos del Fondo deberán invertirse observando los principios de seguridad, liquidez, diversificación y rentabilidad y enmarcarse en las políticas de inversión aprobadas por el Directorio.

   Los recursos del Fondo no podrán ser destinados para cubrir gastos administrativos ni para pago de inversiones en activos fijos de la Corporación.

   Los recursos del Fondo de Seguros Privados se acumularán hasta el monto que determine la Junta de Política y Regulación Monetaria y Financiera, sobre la base del informe técnico que será elaborado y presentado por la Corporación. ”

8. En el artículo 375 efectuar las siguientes reformas:

   a. En el numeral 16 eliminar la palabra “y” después de control;

   b. Sustituir el numeral 17 por el siguiente: “17. Resolver sobre el reparto de utilidades;” e incluir el numeral 18 con el siguiente texto: “Las demás que le asigne la Ley”.

   c. Sustituir el último inciso por el siguiente:

      “En el caso de la entidad financiera pública a cargo del financiamiento a los Gobiernos Autónomos Descentralizados, las funciones de los numerales 14 y 17 serán resueltas por la Junta General de Accionistas.”

9. Sustituir el artículo 434 por el siguiente:

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

"Art. 434.- Naturaleza.- Los servicios auxiliares serán prestados por personas jurídicas no financieras constituidas como sociedades anónimas o compañías limitadas, cuya vida jurídica se regirá por las disposiciones de la Ley de Compañías. El objeto social de estas compañías será claramente determinado.

Por excepción y a petición motivada del interesado, la Superintendencia de Bancos autorizará que las empresas de servicios auxiliares que tengan capital de propiedad de entidades del sector financiero presten sus servicios de manera excepcional a otra clase de personas naturales o jurídicas ajenas al sistema financiero nacional.

Las compañías de servicios auxiliares que no tienen acciones o participaciones de propiedad de una entidad financiera privada, no requerirán autorización por parte de la Superintendencia de Bancos para prestar servicios a terceros y podrán hacerlo sin ninguna limitación.

Las entidades del sector financiero privado podrán invertir en compañías de responsabilidad limitada únicamente de servicios auxiliares."

10. En el artículo 436 sustituir el texto: "ante la Superintendencia de Bancos", por "ante el organismo de control correspondiente".

11. Eliminar el segundo inciso del artículo 437.

12. A continuación de la Disposición Transitoria Cuadragésimo Segunda, añádanse las siguientes:

"CUADRAGÉSIMA TERCERA.- En el plazo de treinta (30) días contados a partir de la vigencia de esta transitoria, los constituyentes de los fideicomisos creados para dar cumplimiento con las desinversiones ordenadas en las Disposiciones Transitorias Vigésima Quinta y Vigésima Sexta de este Código deberán reformar dichos contratos de fideicomiso de conformidad con las instrucciones que expida la Superintendencia de Bancos mediante la correspondiente norma de control, la cual deberá considerar de forma obligatoria la facultad para que dicha Superintendencia pueda disponer al fiduciario la venta de las acciones aportadas al fideicomiso, bajo cualquier modalidad, en el plazo y condiciones que ésta determine. La enajenación de las acciones deberá cumplir de forma obligatoria con las formalidades legales y otras que se expresen en el respectivo contrato de fideicomiso.

El incumplimiento de lo dispuesto en el inciso precedente dará lugar a que la Superintendencia de Bancos disponga al constituyente la terminación inmediata del respectivo contrato de fideicomiso, y la enajenación en pública subasta de las acciones aportadas al patrimonio de dicho fideicomiso.

CUADRAGÉSIMA CUARTA.- Sin perjuicio de la prohibición contenida en el numeral 4 del artículo 399 de este Código, la Superintendencia de Bancos podrá aprobar la conversión de las sociedades financieras que tengan entre sus accionistas a personas con propiedad patrimonial con influencia, y que a su vez, posean acciones de la misma calidad en un banco, siempre que en el mismo acto administrativo se disponga que en el plazo de treinta (30) días contados a partir de la conversión, los accionistas constituyan un fideicomiso aportando las acciones que tengan en ambas entidades, cuyo objeto será la enajenación de las acciones de cualquiera de ellas que se venda primero, de conformidad con las instrucciones que expida la Superintendencia de Bancos mediante la correspondiente norma de control, la cual deberá considerar de forma obligatoria la facultad para que dicha Superintendencia pueda disponer al fiduciario la venta de las acciones aportadas al fideicomiso, bajo cualquier modalidad, en el plazo y condiciones que ésta determine. La enajenación de las acciones deberá cumplir de forma obligatoria con las formalidades y otras que se expresen en el respectivo contrato de fideicomiso.

En el caso de que no se constituya el fideicomiso señalado en el inciso precedente, o que una vez constituido no se cumplan con las instrucciones del fideicomiso en concordancia con la norma expedida por la Superintendencia de Bancos, dicho organismo de control enajenará en pública subasta las acciones de cualquiera de ellas que se venda primero.

CUADRAGÉSIMA QUINTA.- Los accionistas de los bancos que a la fecha de expedición de la presente transitoria no cumplan con el requerimiento mínimo de capital establecido en el Código Orgánico Monetario y Financiero, deberán constituir un fideicomiso cuyo objeto será el cumplimiento del requerimiento mínimo de capital, para lo cual aportarán la totalidad de acciones que posean en la entidad, con el objeto que las mismas puedan ser o no enajenadas a un inversor que realice el aumento de capital necesario. Dicho fideicomiso deberá instrumentarse de acuerdo con las instrucciones que expida la Superintendencia de Bancos mediante la correspondiente norma de control, el cual deberá considerar de forma obligatoria la facultad para que dicha Superintendencia pueda disponer al fiduciario el cumplimento del objeto del fideicomiso, incluyendo la venta de las acciones aportadas, bajo cualquier modalidad, en el plazo y condiciones que esta determine. El aporte de capital y/o la enajenación de las acciones deberán cumplir de forma obligatoria con las formalidades legales y otras que se expresen en el respectivo contrato de fideicomiso.

En el caso de no constituirse el fideicomiso o que su objeto no se cumpla en el plazo de dos años de emitida la presente disposición, el banco podrá fusionarse o dejará de operar e iniciará un proceso de liquidación en apego a las normas que dicte la Superintendencia de Bancos."

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

13. En el libro II del Código Monetario y Financiero correspondiente a la Ley de Mercado de Valores realícense las siguientes reformas:

a. En el artículo 9 sustituir el numeral 4 con lo siguiente: "Expedir las resoluciones necesarias para la aplicación de la presente Ley."

b. En el artículo 10, inclúyase el siguiente inciso final:

"La Superintendencia, para el cumplimiento de estas atribuciones y funciones, podrá expedir todos los actos que fueren necesarios. Asimismo, podrá expedir los actos administrativos de control en las materias propias de su competencia, sin que puedan alterar o innovar las disposiciones legales ni las regulaciones que expida la Junta de Política y Regulación Monetaria y Financiera."

c. Sustitúyase el cuarto inciso del artículo 11, por el siguiente: "Los valores que se emitan para someterlos a un proceso de oferta pública deben ser desmaterializados, exceptuando los valores genéricos emitidos por el sector financiero inscritos en el Catastro Público del Mercado de Valores que podrán ser títulos físicos o desmaterializados. Los valores que emitan las entidades del sector público podrán ser físicos si cuentan con la autorización de la Junta de Política y Regulación Monetaria y Financiera."

d. En el inciso primero del artículo 41, suprímase la siguiente frase: "no financiero".

e. En el artículo 46, sustitúyase "cinco por ciento" por "diez por ciento".

f. Sustitúyase el artículo 69, por el siguiente:

"Art. 69.- Tarifas.- Los Depósitos Centralizados de Compensación y Liquidación de Valores establecerán los cargos o tarifas que cobrarán a los usuarios de sus servicios. Tales cargos o tarifas, como sus modificaciones, serán comunicadas a la Superintendencia de Compañías, Valores y Seguros, y en ningún caso podrán superar los límites establecidos por la propia Superintendencia."

g. En el artículo 87 sustitúyase el numeral 3 por el siguiente:

"3. Bienes raíces ubicados en territorio nacional."

**Tercera.-** En la Ley Orgánica de Régimen Tributario Interno, refórmese lo siguiente:

1. A continuación del artículo 9.4 inclúyase el siguiente:

"**Art. 9.5. Exoneración de Impuesto a la Renta en la fusión de entidades del sector financiero popular y solidario.-** Las entidades del sector financiero popular y solidario resultantes de procesos de fusión de cooperativas de los dos últimos segmentos que formen parte del referido sector y que cumplan con los requisitos y condiciones establecidas por la Junta de Política y Regulación Monetaria y Financiera, gozarán de una exoneración del pago del impuesto a la renta durante cinco años, contados desde el primer año en el que se produzca la fusión."

2. Sustitúyase el artículo 116 por el siguiente: "Sin perjuicio de lo dispuesto en el artículo 87 de esta Ley, el Servicio de Rentas Internas también podrá establecer mecanismos de identificación, marcación y rastreo, respecto de otros productos cuya comercialización está sujeta a autorización previa del Estado."

**Cuarta.-** En la Ley Orgánica para la Defensa de los Derechos Laborales inclúyase a continuación del inciso primero del artículo 1, el siguiente texto:

"Se exceptúa de lo previsto en este inciso a los accionistas que posean menos del 6% del capital accionarial de las sociedades anónimas inscritas en el Catastro Público del Mercado de Valores, siempre que hubieren adquirido estas acciones a través de las Bolsas de Valores, o a través de herencias, donaciones o legados, y siempre y cuando no hubieren participado en la administración de la sociedad anónima."

**Quinta.-** Refórmese la Ley Orgánica para el Fortalecimiento y Optimización del Sector Societario y Bursátil, de la siguiente manera:

Suprímanse el penúltimo y último incisos de la disposición transitoria cuarta.

**Sexta.-** En la Ley Orgánica de Solidaridad y de Corresponsabilidad Ciudadana para la Reconstrucción y Reactivación de las zonas afectadas por el Terremoto de 16 de abril de 2016, después de la disposición transitoria décima cuarta inclúyase una disposición transitoria con el siguiente texto:

"**Décima Quinta**.- En razón de que las disposiciones contenidas en esta ley generan recursos y erogaciones no previstos en el Presupuesto General del Estado para atender la emergencia del terremoto del 16 de abril de 2016, se convalida la autorización para superar por estos valores el cálculo porcentual dispuesto en el artículo 74 numeral 10 del Código Orgánico de Planificación y Finanzas Públicas y su incorporación en el Presupuesto 2016. Igual tratamiento aplica para el caso de los recursos y erogaciones del mismo ejercicio para atender las obligaciones que tengan como origen laudos internacionales.

Sobre la base de lo expuesto, por esta única vez, la liquidación presupuestaria y el Informe de Seguimiento y Evaluación correspondiente al ejercicio fiscal 2016, se podrá emitir hasta el 5 de mayo de 2017."

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.

PUBLIC DOCUMENT

Barcode:4512905-01 C-331-806 INV - Investigation -



**DISPOSICIÓN FINAL.-** La presente Ley entrará en vigencia a partir de su publicación en el Registro Oficial.

Dado y suscrito en la Sede de la Asamblea Nacional, ubicada en el Distrito Metropolitano de Quito, a los doce días del mes de abril de dos mil diecisiete.

f.) GABRIELA RIVADENEIRA BURBANO
**Presidenta**

f.) DRA. LIBIA RIVAS ORDÓÑEZ
**Secretaria General**

**N° 1358**

**Rafael Correa Delgado**
**PRESIDENTE CONSTITUCIONAL**
**DE LA REPÚBLICA**

**Considerando:**

Que, el artículo 147 numeral 10 de la Constitución de la República del Ecuador, prevé como una de las atribuciones del Presidente de la República, nombrar y remover a embajadores y jefes de misión;

Que, el artículo 113 de la Codificación de la Ley Orgánica del Servicio Exterior establece que el nombramiento de jefes titulares de misiones diplomáticas se hará mediante Decreto, una vez que se cumplan los requisitos legales de orden interno y se obtenga el asentimiento del gobierno ante el cual serán acreditados;

Que, el Gobierno de la República de Guinea Ecuatorial ha otorgado el beneplácito de estilo, para la designación del Embajador, Leopoldo Enrique Rovayo Verdesoto, como Embajador Extraordinario y Plenipotenciario Concurrente de la República del Ecuador ante el Gobierno de la República de Guinea Ecuatorial, con sede en Abuja, Nigeria; y,

En ejercicio de las atribuciones que le confiere la Constitución de la República y la Ley,

**Decreta:**

**ARTÍCULO.- PRIMERO.-** Nombrar al Embajador, Leopoldo Enrique Rovayo Verdesoto, Embajador Extraordinario y Plenipotenciario Concurrente de la República del Ecuador ante el Gobierno de Guinea Ecuatorial, con sede en Abuja, Nigeria.

**ARTÍCULO SEGUNDO.-** De la ejecución del presente Decreto Ejecutivo, encárguese al Ministro de Relaciones Exteriores y Movilidad Humana.

Dado en el Palacio Nacional, en Quito, a 6 de abril de 2017.

f.) Rafael Correa Delgado, Presidente Constitucional de la República.

f.) Guillaume Long, Ministro de Relaciones Exteriores y Movilidad Humana.

Quito, 12 de abril del 2017, certifico que el que antecede es fiel copia del original.

**Documento firmado electrónicamente**

Dr. Alexis Mera Giler
SECRETARIO GENERAL JURÍDICO
DE LA PRESIDENCIA DE LA REPÚBLICA DEL ECUADOR.

**N° 1359**

**Rafael Correa Delgado**
**PRESIDENTE CONSTITUCIONAL**
**DE LA REPÚBLICA**

**Considerando:**

Que, el artículo 147 de la Constitución de la República, contempla como atribuciones y deberes de la Presidenta y Presidente de la República:

*"(...) 5. Dirigir la administración pública en forma desconcentrada y expedir los decretos necesarios para su integración, organización, regulación y control. (…)";*

Que, el artículo 65 de la Ley de Personal de las Fuerzas Armadas, dispone: *"La situación militar se establecerá:*

*- A los Oficiales Generales mediante Decreto Ejecutivo;(…)";*

Que, el artículo 75 Ibídem manda que: *"El militar tendrá derecho hasta seis meses de disponibilidad, si acreditare por lo menos cinco años de servicio activo y efectivo ininterrumpidos, pudiendo renunciar a todo o parte del tiempo de disponibilidad, para solicitar directamente su baja.",*

Que, el artículo 87 letra a) de la citada Ley dispone: *"El militar será dado de baja por una de las siguientes causas:*

*a) Solicitud voluntaria; (…)";*

Que, el señor General de División LUIS MIGUEL ÁNGEL CASTRO AYALA, fue colocado en situación de disponibilidad por efecto de la expedición del Decreto Ejecutivo No. 1333 de 05 de marzo de 2017;

Que, mediante oficio No. 17-LMACA-1 de 06 de marzo de 2017, el señor General de División LUIS MIGUEL ÁNGEL CASTRO AYALA, presenta al Consejo Supremo de Fuerzas Armadas su solicitud de baja directa, renunciando en forma expresa a todo el tiempo de disponibilidad, de conformidad con el artículo 75 de la Ley de Personal de las Fuerzas Armadas;

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Que, Mediante resolución No. CSFA-004-2017 del 15 de marzo de 2017 el Consejo Supremo de las Fuerzas Armadas, *"**RESUELVE: 1)** Aceptar el pedido de baja voluntaria de conformidad a lo señalado en el artículo 87, letra a) de la Ley de Personal de fuerzas Armadas del señor GRAD. Luis Miguel Ángel Castro Ayala; en la fecha en su respectivo pedido de baja voluntaria, previo renuncia expresa al tiempo de Disponibilidad. (…)"; y,*

Que, el señor Comandante General de la Fuerza Terrestre, mediante oficio Nº I7-E1-o-sp-41 del 28 de marzo de 2017, remite al Ministerio de Defensa Nacional el expediente para que se dé la baja del servicio activo de Fuerzas Armadas al mencionado señor General de División.

En ejercicio de las atribuciones que le confiere la Constitución de la República del Ecuador; en concordancia con el artículo 65, de la Ley de Personal de las Fuerzas Armadas, a solicitud del señor Ministro de Defensa Nacional.

**Decreta:**

**Art. 1.** Dar la baja directa del servicio activo de las Fuerzas Armadas, con fecha 31 de marzo de 2017, al señor General de División LUIS MIGUEL ÁNGEL CASTRO AYALA, de conformidad con el artículo 87 letra a) en concordancia con el artículo 75 de la Ley de Personal de las Fuerzas Armadas, por renuncia expresa a parte del tiempo de disponibilidad.

**Art. 2.** De la ejecución del presente Decreto Ejecutivo, que entrará en vigencia en la presente fecha, sin perjuicio de su publicación en el Registro Oficial encárguese al señor Ministro de Defensa Nacional.

Dado en el Palacio Nacional, en Quito a 6 de abril de 2017.

f.) Rafael Correa Delgado, Presidente Constitucional de la República.

f.) Ricardo Patiño Aroca, Ministro de Defensa Nacional.

Quito, 12 de abril del 2017, certifico que el que antecede es fiel copia del original.

**Documento firmado electrónicamente**

Dr. Alexis Mera Giler
SECRETARIO GENERAL JURÍDICO
DE LA PRESIDENCIA DE LA REPÚBLICA DEL ECUADOR.

**N° 1360**

**Rafael Correa Delgado**
**PRESIDENTE CONSTITUCIONAL**
**DE LA REPÚBLICA**

**Considerando:**

Que, el artículo 147 de la Constitución de la República, contempla como atribuciones y deberes de la Presidenta y Presidente de la República:

*"(...) 5. Dirigir la administración pública en forma desconcentrada y expedir los decretos necesarios para su integración, organización, regulación y control (…)";*

Que, el artículo 65 de la Ley de Personal de las Fuerzas Armadas, dispone:

*"La situación militar se establecerá: A los Oficiales Generales mediante Decreto Ejecutivo (…)";*

Que, el artículo 76 letra a) de la citada Ley, dispone: *"El militar será puesto en disponibilidad, por una de las siguientes causas:*

*a) Solicitud voluntaria (...)";*

Que, mediante oficio Nro. GRAD-CRA-2017-005-O-OF de 06 de marzo de 2017, el señor General de División CARLOS MODESTO RODRÍGUEZ ARRIETA, presenta su solicitud de disponibilidad, de conformidad con el artículo 76 literal a) de la Ley de Personal de las Fuerzas Armadas;

Que, mediante Resolución Nro. CSFA-003-2017 de 15 de marzo de 2017, el Consejo Supremo de las Fuerzas Armadas, ***"RESUELVE: 1)** Colocar en la condición jurídica de **Disponibilidad** al señor GRAD Carlos Modesto Rodríguez Arrieta, a partir de la expedición del Decreto No. 1333 del Presidente Constitucional de la República (...):* y,

Que, el señor Comandante General de la Fuerza Terrestre, mediante oficio N° 17-E1-o-sp-40 de 28 de marzo de 2017, remite al Ministerio de Defensa Nacional el expediente para que se coloque en situación militar de disponibilidad al mencionado señor General de División.

En ejercicio de las atribuciones que le confiere la Constitución de la República del Ecuador; en concordancia con el artículo 65, de la Ley de Personal de las Fuerzas Armadas, a solicitud del señor Ministro de Defensa Nacional.

**Decreta:**

**Art. 1.** Colocar en condición jurídica de Disponibilidad, a partir de la expedición del Decreto No. 1333 de 05 de marzo de 2017, al señor General de División Carlos Modesto Rodríguez Arrieta, de conformidad con el artículo 76 letra a) de la Ley de Personal de las Fuerzas Armadas.

**Art. 2.** De la ejecución del presente Decreto Ejecutivo, que entrará en vigencia en la presente fecha, sin perjuicio de su publicación en el Registro Oficial, encárguese al señor Ministro de Defensa Nacional.

Dado en el Palacio Nacional, en Quito a 6 de abril de 2017.

f.) Rafael Correa Delgado, Presidente Constitucional de la República.

f.) Ricardo Patiño Aroca, Ministro de Defensa Nacional.

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Quito, 12 de abril del 2017, certifico que el que antecede es fiel copia del original.

**Documento firmado electrónicamente**

Dr. Alexis Mera Giler
SECRETARIO GENERAL JURÍDICO
DE LA PRESIDENCIA DE LA REPÚBLICA DEL ECUADOR.

**N° 1361**

**Rafael Correa Delgado**
**PRESIDENTE CONSTITUCIONAL**
**DE LA REPÚBLICA**

**Considerando:**

Que, el artículo 147 de la Constitución de la República, contempla como atribuciones y deberes de la Presidenta y Presidente de la República:

*"(...) 5. Dirigir la administración pública en forma desconcentrada y expedir los decretos necesarios para su integración, organización, regulación y control (…)";*

Que, el artículo 65 de la Ley de Personal de las Fuerzas Armadas, dispone: *"La situación militar se establecerá:*

*- A los Oficiales Generales mediante Decreto Ejecutivo (…)";*

Que, el artículo 75 Ibídem manda que: *"El militar tendrá derecho hasta seis meses de disponibilidad, si acreditare por lo menos cinco años de servicio activo y efectivo ininterrumpidos, pudiendo renunciar a todo o parte del tiempo de disponibilidad, para solicitar directamente su baja.";*

Que, el artículo 87 letra a) de la citada Ley, dispone*: "El militar será dado de baja por una de las siguientes causas:*

*a) Solicitud voluntaria (...)";*

Que, el señor GRAD, GUSTAVO VICENTE CABRERA CAMPUZANO, fue colocado en situación de disponibilidad por efecto de la expedición del Decreto Ejecutivo No. 1333 de 06 de marzo de 2017;

Que, mediante oficio No. 17-E1-o-sp-10 de 07 de marzo de 2017 el señor General de División GUSTAVO VICENTE CABRERA CAMPUZANO presenta su solicitud de baja directa voluntaria del servicio activo de las Fuerzas Armadas, renunciando en forma expresa a todo el tiempo de disponibilidad, de conformidad con el artículo 75 de la Ley de Personal de las Fuerzas Armadas;

Que, mediante Resolución No. CSFA-005-2017 de 15 de marzo de 2017, el Consejo Supremo de las Fuerzas Armadas, ***"RESUELVE: 1)*** *Aceptar el pedido de baja voluntaria de conformidad a lo señalado en el artículo 87 letra a) de la Ley de Personal de las Fuerzas Armadas del señor GRAD. Gustavo Vicente Cabrera Campuzano; en la fecha que consta en su respectivo pedido de baja voluntaria, previo renuncia expresa al tiempo de disponibilidad.";* y,

Que el señor Comandante General de la Fuerza Terrestre, mediante oficio No. 17-E1-o-sp-41 de 28 de marzo de 2017, remite al Ministerio de Defensa Nacional el expediente para que se dé la baja del servicio activo de Fuerzas Armadas al mencionado señor Oficial General,

En ejercicio de las atribuciones que le confiere la Constitución de la República del Ecuador, en concordancia con el artículo 65 de la Ley de Personal de las Fuerzas Armadas, a solicitud del señor Ministro de Defensa Nacional.

**Decreta:**

**Art. 1.** Dar la baja directa del servicio activo de las Fuerzas Armadas, con fecha 31 de marzo de 2017, al señor General de División GUSTAVO VICENTE CABRERA CAMPUZANO, de conformidad con el artículo 87 letra a) en concordancia con el artículo 75 de la Ley de Personal de las Fuerzas Armadas, por renuncia expresa al tiempo de disponibilidad.

**Art. 2.** De la ejecución del presente Decreto Ejecutivo, que entrará en vigencia en la presente fecha, sin perjuicio de su publicación en el Registro Oficial, encárguese al señor Ministro de Defensa Nacional.

Dado en el Palacio Nacional, en Quito a 6 de abril de 2017.

f.) Rafael Correa Delgado, Presidente Constitucional de la República.

f.) Ricardo Patiño Aroca, Ministro de Defensa Nacional.

Quito, 12 de abril del 2017, certifico que el que antecede es fiel copia del original.

**Documento firmado electrónicamente**

Dr. Alexis Mera Giler
SECRETARIO GENERAL JURÍDICO
DE LA PRESIDENCIA DE LA REPÚBLICA DEL ECUADOR.

**N° 1362**

**Rafael Correa Delgado**
**PRESIDENTE CONSTITUCIONAL**
**DE LA REPÚBLICA**

**Considerando:**

Que, el artículo 147 de la Constitución de la República, contempla como atribuciones y deberes de la Presidenta y Presidente de la República:

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -



*"(…) 5. Dirigir la administración pública en forma desconcentrada y expedir los decretos necesarios para su integración, organización, regulación y control. (…)";*

Que, el artículo 65 de la Ley de Personal de las Fuerzas Armadas, dispone: *"La situación militar se establecerá:*

*- A los Oficiales Generales mediante Decreto Ejecutivo;(…)";*

Que, el artículo 75 Ibídem manda que: "*El militar tendrá derecho hasta seis meses de disponibilidad, si acreditare por lo menos cinco años de servicio activo y efectivo ininterrumpidos, pudiendo renunciar a todo o parte del tiempo de disponibilidad, para solicitar directamente su baja.";*

Que, el artículo 87 letra a) de la citada Ley, dispone: *"El militar será dado de baja por una de las siguientes causas:*

*a) Solicitud voluntaria; (...)";*

Que, el señor GRAD. CARLOS GUSTAVO EGÜEZ ESPINOSA, fue colocado en situación de disponibilidad por efecto de la expedición del Decreto Ejecutivo No. 1334 de 06 de marzo de 2017;

Que, mediante oficio 17-E1-o-sp-08, de 07 de marzo de 2017, el señor GRAD. CARLOS GUSTAVO EGÜEZ ESPINOSA, presenta su solicitud de baja directa voluntaria del servicio activo de las Fuerzas Armadas, renunciando en forma expresa a todo el tiempo de disponibilidad, de conformidad con el artículo 75 de la Ley de Personal de las Fuerzas Armadas;

Que, mediante resolución No. CSFA-006-2017 de 15 de marzo de 2017 el Consejo Supremo de las Fuerzas Armadas, ***"RESUELVE: 1)*** *Aceptar el pedido de baja voluntaria de conformidad a lo señalado en el artículo 87 letra a) de la Ley de Personal de las Fuerzas Armadas del señor GRAD. Carlos Gustavo Egüez Espinosa; en la fecha que constan en su respectivo pedido de baja voluntaria, previo renuncia expresa al tiempo de Disponibilidad (…)";*y,

Que, el señor Comandante General de la Fuerza Terrestre, mediante oficio N° 17-E1-o-sp-41 de 28 de marzo de 2017, remite al Ministerio de Defensa Nacional el expediente para que se dé la baja del servicio activo de Fuerzas Armadas al mencionado señor General.

En ejercicio de las atribuciones que le confiere la Constitución de la República del Ecuador; en concordancia con el artículo 65, de la Ley de Personal de las Fuerzas Armadas, a solicitud del señor Ministro de Defensa Nacional.

**Decreta:**

**Art. 1.** Dar la baja directa del servicio activo de las Fuerzas Armadas, con fecha 31 de marzo de 2017, al señor GRAD. CARLOS GUSTAVO EGÜEZ ESPINOSA, de conformidad con el artículo 87 letra a) en concordancia con el artículo 75 de la Ley de Personal de las Fuerzas Armadas, por renuncia expresa a parte del tiempo de disponibilidad.

**Art. 2.** De la ejecución del presente Decreto Ejecutivo, que entrará en vigencia en la presente fecha, sin perjuicio de su publicación en el Registro Oficial, encárguese al señor Ministro de Defensa Nacional.

Dado en el Palacio Nacional, en Quito a 6 de abril de 2017.

f.) Rafael Correa Delgado, Presidente Constitucional de la República.

f.) Ricardo Patiño Aroca, Ministro de Defensa Nacional.

Quito, 12 de abril del 2017, certifico que el que antecede es fiel copia del original.

**Documento firmado electrónicamente**

Dr. Alexis Mera Giler
SECRETARIO GENERAL JURÍDICO
DE LA PRESIDENCIA DE LA REPÚBLICA DEL ECUADOR.

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

PUBLIC DOCUMENT

Barcode:4512905-01 C-331-806 INV - Investigation -



Imagen

Documento con posibles errores digitalizado de la publicación original. Favor verificar con imagen.
No imprima este documento a menos que sea absolutamente necesario.
Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

# EXHIBIT 7

Barcode:4512905-01 C-331-806 INV - Investigation -

(https://www.presidencia.gob.ec/)

(https://www.presidencia.gob.ec/)

Presidency of the Republic of Ecuador

**(https://www.presidencia.gob.ec/accesibilidad)**
**(https://www.presidencia.gob.ec/transparencia)**
**(https://twitter.com/Presidencia_Ec)**
**(https://www.facebook.com/ComunicacionEcuador/)**
**(http://www.youtube.com/user/presidenciaec)**
**(http://www.flickr.com/photos/presidenciaecuador/)**

**Presidency of the Republic of Ecuador (https://www.presidencia.gob.ec)** > **Press (https://www.presidencia.gob.ec/category/prensa/)** > **News (https://www.presidencia.gob.ec/category/prensa/noticias/)** > National Government decrees the creation of BanEcuador (DECREE)

# National Government decrees the creation of BanEcuador (DECREE)




Quito (Pichincha).- President Rafael Correa today decreed the creation of the public bank BanEcuador BP as a financial entity with its own legal personality and national jurisdiction, autonomous assets, technical, administrative, financial and budgetary autonomy. ( **SEE DECREE (http://www.elciudadano.gob.ec/wp-content/uploads/2015/05/d_677-2015-may-13.pdf)** )

Last Saturday, May 9, during the Citizen Link 423, the first President explained that the new entity will replace the National Development Bank (BNF) and will operate since October 2015.

On that occasion, the Head of State recalled that the BNF had several problems, since it was not adapted to users. Among the drawbacks of the institution was "that the credits do not coincide with the crops (...) what was done was bankrupt the farmers."

He also stressed that BanEcuador will focus on rural and marginal areas throughout the country, and the financial structure will adjust to the needs and schedules of the farmers.

According to Executive Decree 677, the objective of this entity will be the provision of financial services of credit, savings and investment, under the criterion of financial intermediation of public and private resources, serving micro, small and medium-sized companies, as well as associative companies. in production sectors, mainly agribusiness, commerce and services. Its focus will be "on local development and with preferences in rural and urban-marginal areas, contributing to the strengthening of the National Plan for Good Living."

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Case 1:25-cv-00035-RKE Document 30-1 Filed 04/27/26 Page 160 of 785
PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

BanEcuador will have an indefinite duration and will be domiciled in the city of Quevedo, but with branches around the country. You may carry out active, passive, contingent and service operations, in accordance with the provisions of the Organic Monetary and Financial Code. Likewise, grant mortgage and pledge loans, unsecured loans and any other modality authorized by the Monetary and Financial Regulation Board.

The capital subscribed and paid for operation will be $15 million, constituted with a contribution from the State, through the Ministry of Finance. While the authorized capital will be $30 million.

Its assets will be composed of the subscribed and paid capital, the constitution of non-distributable reserves and other equity contributions.

The Board of Directors of BanEcuador will be chaired by the Minister of Agriculture, as a delegate of the President of the Republic, and will have the casting vote.The other members are made up of the heads (or their permanent delegates) of the Economic Policy Coordinator ministries;of Production, Employment and Competitiveness;of Economic and Social Inclusion;and Industries and Productivity.

The Board of Directors will be established within 10 business days following the issuance of the decree, which will appoint the General Manager of the bank, approve the action regulations and the action plan.

BanEcuador will begin operations within a maximum period of 180 days from the date of approval of the budget, the decree indicates. /The Telegraph – The Citizen

Share this post:

- Tweet
- Share
- Print
- Mail (mailto:?subject=Presidencia de la República del Ecuador: Gobierno Nacional decreta la creación de BanEcuador (DECRETO)&body=Gobierno Nacional decreta la creación de BanEcuador (DECRETO) %0D%0A %0D%0A Quito (Pichincha).- El Presidente Rafael Correa decretó hoy la creación del banco público BanEcuador B.P. como una entidad financiera con personalidad jurídica propia y jurisdicción nacional, patrimonio autónomo, autonomía técnica, administrativa, financiera y presupuestaria. (VER DECRETO) El pasado sábado 9 de mayo, durante el Enlace Ciudadano 423, el primer Mandatario explicó que la nueva entidad reemplazará al Banco Nacional del... %0D%0A Leer más: https://www.presidencia.gob.ec/gobierno-nacional-decreta-la-creacion-de-banecuador-decreto/)

Find out

The new childhood (https://www.inclusion.gob.ec/registra-tu-cuenta-para-recibir-de-manera-segura-el-bono-infancia-futuro/)

## Leave a reply

Your email address will not be published.Required fields are marked*

**Comment ***

**Name ***

**Email ***

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -



(https://www.presidencia.gob.ec/)



# Gobierno Nacional decreta la creación de BanEcuador (DECRETO)




Quito (Pichincha).- El Presidente Rafael Correa decretó hoy la creación del banco público BanEcuador B.P. como una entidad financiera con personalidad jurídica propia y jurisdicción nacional, patrimonio autónomo, autonomía técnica, administrativa, financiera y presupuestaria. (**VER DECRETO (http://www.elciudadano.gob.ec/wp-content/uploads/2015/05/d_677-2015-may-13.pdf)**)

El pasado sábado 9 de mayo, durante el Enlace Ciudadano 423, el primer Mandatario explicó que la nueva entidad reemplazará al Banco Nacional del Fomento (BNF) y operará desde octubre de 2015.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

En esa ocasión, el Jefe de Estado recordó que el BNF tenía varios problemas, ya que no estaba adaptada para los usuarios. Entre los inconvenientes de la institución estaba "que los créditos no coinciden con los cultivos (…) lo que se hacía era quebrar a los campesinos".

También recalcó que BanEcuador se enfocará en las zonas rurales y marginales de todo el país, y la estructura financiera se ajustará a las necesidades y horarios de los campesinos.

Según el Decreto Ejecutivo 677, el objetivo de esta entidad será la prestación de servicios financieros de crédito, ahorro e inversión, bajo el criterio de intermediación financiera de recursos públicos y privados, atendiendo a la micro, pequeña y mediana empresa, así como empresas asociativas en sectores de producción, principalmente de agronegocios, comercio y servicios. Su enfoque será "de desarrollo local y con preferencias en áreas rurales y urbano-marginales, coadyuvando al fortalecimiento del Plan Nacional del Buen Vivir".

BanEcuador tendrá una duración indefinida y estará domiciliada en la ciudad de Quevedo, pero con sucursales alrededor del país. Podrá realizar operaciones activas, pasivas, contingentes y de servicios, de conformidad con lo dispuesto por el Código Orgánico Monetario y Financiero. Asimismo otorgar préstamos hipotecarios y prendarios, quirografarios y cualquier otra modalidad que autorice la Junta de Regulación Monetaria y Financiera.

El capital suscrito y pagado para el funcionamiento será de $ 15 millones, constituido con aporte del Estado, a través del Ministerio de Finanzas. Mientras el capital autorizado será de $ 30 millones.

Su patrimonio estará compuesto del capital suscrito y pagado, constitución de reservas irrepartibles y otros aportes patrimoniales.

El Directorio de BanEcuador estará presidido por el Ministro de Agricultura, en calidad de delegado del Presidente de la República, y tendrá voto dirimente. Los otros integrantes los conforman los titulares (o sus delegados permanentes) de los ministerios Coordinador de la Política Económica; de la Producción, Empleo y Competitividad; de Inclusión Económica y Social; y de Industrias y Productividad.

El Directorio se constituirá dentro de los 10 días hábiles siguientes a la expedición del decreto, el cual designará al Gerente General del banco, aprobará el reglamento de acción y el plan de acción.

BanEcuador iniciará operaciones en el plazo máximo de 180 días contados a partir de la fecha de aprobación del presupuesto, indica el decreto. /El Telégrafo – El Ciudadano

## Comparte esta publicación:

**Tweet**

**Compartir**

**Imprimir**

**Mail (mailto:?subject=Presidencia de la República del Ecuador: Gobierno Nacional decreta la creación de BanEcuador (DECRETO)&body=Gobierno Nacional decreta la creación de BanEcuador (DECRETO) %0D%0A %0D%0A Quito (Pichincha).- El Presidente Rafael Correa decretó hoy la creación del banco público BanEcuador B.P. como una entidad financiera con personalidad jurídica propia y jurisdicción nacional, patrimonio autónomo, autonomía técnica, administrativa, financiera y presupuestaria. (VER DECRETO) El pasado sábado 9 de mayo, durante el Enlace Ciudadano 423, el primer Mandatario explicó que la nueva entidad reemplazará al Banco Nacional del… %0D%0A Leer más: https://www.presidencia.gob.ec/gobierno-nacional-decreta-la-creacion-de-banecuador-decreto/)**

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

# EXHIBIT 8

PRIMICIAS EL PERIODISMO COMPROMETIDO

Tuesday, February 20, 2024



Economy

# National Development Bank was turned into a 'financial garbage dump'

**Loans with rates below market rates, an increase in bad loans and debt forgiveness led to the bank's liquidation. The entity bought written-off portfolios from four more banks.**




Author: Monica Orozco | Updated: 21 Dic 2021 - 0:05

Debtors in a workshop to learn about one of the many debt restructurings of the National Development Bank, in 2017. - Photo: Twitter Ministry of Agriculture

Join WhatsApp

In 2028, the **National Development Bank (BNF), currently in liquidation** , would have celebrated a century of existence, but instead that year it will complete its definitive closure process.

There are three factors that explain the end of this almost century-old State bank. One of them is having been used to provide loans with conditions that increased **the default rate** , that is, to lend money that could not be collected later.

These are **loans known as '5-5-5 Credits'** . A financial product that was a campaign offer by Rafael Correa and whose implementation began in 2007, during the first year of Correa's government.

The objective of '5-5-5' was to promote small and medium-sized businesses, but the program lasted less than eight years.

The characteristics of the 5-5-5 credit were: **5% interest rate, five years of payment term and a maximum amount of USD 5,000.**

The attractive conditions of the new product caused an **exorbitant expansion of the BNF's microcredit portfolio** , which went from USD 2 million in 2007 to USD 649 million in 2014.




Fuente: Superintendencia de Bancos • Gráfico: Eduardo Cobos- Primicias

A Flourish chart

## Manual to break a bank

However, the proposed rate for '5-5-5' loans did not cover the actual cost of providing the loans, **which was around 11%** .

For this reason, the 5% rate required a **State subsidy** , which was covered by the BNF itself and with 'aid' from the Ministry of Agriculture.

**Rubén Flores, former president of BanEcuador** between 2017 and 2018, explains that this financial scheme was not enough to compensate for the high costs involved in operating in the microcredit segment, especially due to the monitoring processes in the clients' territory.

In addition to the increase in the microcredit portfolio, there were other drawbacks such as **high levels of delinquency** , which even reached 33.49% in 2009.

Then delinquency decreased a little, but this indicator almost always remained at double the level of delinquency for the microcredit segment registered in private banks.

Even, says Flores, there were cases in which the beneficiaries of the '5-5-5' used the capital for **purposes other than those declared** . The poor results led to closing this product, explains Flores.




## Forgive debts

From 1985 to 2018 **there were 13 forgiveness for BNF debtors** for different reasons, from the 1987 earthquake, through the Cenepa War, to the eruption of the Tungurahua volcano or the 1999 financial crisis.

Although in most cases the forgiveness was on the interest, fines and surcharges owed, **there were also forgiveness of the principal** owed by the BNF's delinquent clients.

These condonations were not only made while the BNF was operational, but **three of them were approved by Law when the bank was already in liquidation.** This is explained by Esteban Melo, who took over as liquidator of the BNF in August 2021.

The three laws that allowed this are:

1. Law for the Restructuring of public banking debts, closed banking.
2. Law for Economic Reactivation.
3. Law for Productive Development.

**ERROR:** Error [410 Gone] fetching sheets data

The three laws encouraged a debt restructuring with the BNF as long as the debtors paid between 5% and 1% of the capital owed. In exchange, the bank forgave them interest, fines and surcharges.

They were approved between 2017 and 2018 and allowed 18,753 operations to be restructured. But the BNF recovered only USD 35 million of all this.

In addition to affecting the bank financially, Flores believes that the forgiveness ended up producing **a "culture of non-payment among the beneficiaries of public banking** . "

Flores adds that this history should leave **lessons so that the state bank BanEcuador,** which took over from BNF, **does not make the same mistakes.**

In fact, the Economic Development Law, in force since November 2021, determines that, via decree, loans of up to USD 10,000 in public banks that are considered unrecoverable can be forgiven.

## Bad portfolio

To make matters worse, in May 2016, Rafael Correa's government decided to liquidate the National Development Bank (BNF) and create a new 'healthy' bank, which was BanEcuador.

But in reality the BNF in liquidation **was left with the bad or E portfolio** and a part of the restructured portfolio,

And the new BanEcuador took the best-rated portfolio, deposits, assets and liabilities of the BNF.

Which means that the BNF in liquidation assumed a **written-off portfolio of USD 149 million** with a deadline until 2028 to collect it and close it.

But, over time, the BNF in liquidation continued to receive poor quality portfolio from other state banks and private banks in liquidation, such as:

- 22,067 operations from BanEcuador
- 5,113 operations of the National Financial Corporation
- 2,144 corresponding operations of the now defunct Ecuadorian Housing Bank.
- 87 operations of the private and bankrupt (2008) Mutualista Benalcázar.

The Debt Restructuring Law, approved in 2017, **opened the possibility for the BNF in liquidation to purchase the written-off portfolio** of these entities.

PRI MI CIAS
Suscríbete a nuestras notificaciones para recibir las últimas noticias y actualizaciones.
Después Suscribirme



Economía

# Banco Nacional de Fomento fue convertido en un 'basurero financiero'

**Créditos con tasas por debajo de las del mercado, aumento de la cartera mala y condonaciones de deudas llevaron a la liquidación del banco. La entidad compró cartera castigada de cuatro bancos más.**




Autor: Mónica Orozco

Actualizada:
21 Dic 2021 - 0:05

Deudores en un taller para conocer una de las tantas reestructuraciones de deudas del Banco Nacional de Fomento, en 2017. - Foto: Twitter Ministerio de Agricultura

Unirse a WhatsApp

En 2028 el **Banco Nacional de Fomento (BNF), hoy en liquidación**, hubiera cumplido un siglo de existencia, pero en su lugar ese año completará su proceso definitivo de cierre.

Hay tres factores que explican el final de este banco del Estado casi centenario. Uno de ellos es el haber sido utilizado para entregar créditos con condiciones que elevaron **la tasa de morosidad**, es decir, a prestar dinero que luego no podía cobrar.

Se trata de los **préstamos conocidos como 'Créditos 5-5-5'**. Un producto financiero que fue una oferta de campaña de Rafael Correa y cuya implementación comenzó en 2007, durante el primer año de gobierno de Correa.

El objetivo del '5-5-5' era impulsar a la pequeña y mediana empresas, pero el programa duró menos de ocho años.

Las características del crédito 5-5-5 eran: **5% de tasa interés, cinco años de plazo para pagar y un monto máximo de USD 5.000.**

Las atractivas condiciones del nuevo producto provocaron una **expansión exorbitante de la cartera de microcrédito** del BNF, que pasó de USD 2 millones en 2007 a USD 649 millones en 2014.

PUBLIC DOCUMENT
Barcode:4512905-01 C-331-806 INV - Investigation -

PRI MI CIAS
Suscríbete a nuestras notificaciones para recibir las últimas noticias y actualizaciones.






## Manual para quebrar un banco

Sin embargo, la tasa propuesta para los créditos '5-5-5' no cubría el costo real de la entrega de los préstamos, **que era de alrededor del 11%**.

Por eso, la tasa del 5% requería de **subsidio del Estado**, que fue cubierto por el propio BNF y con 'ayudas' del Ministerio de Agricultura.

**Rubén Flores, expresidente de BanEcuador** entre 2017 y 2018, explica que ese esquema financiero no fue suficiente para compensar los altos costos que implicaba operar en el segmento de microcrédito, sobre todo por los procesos de seguimiento en territorio de los clientes.

Además del aumento de la cartera de microcrédito, hubo otros inconvenientes como los **altos niveles de morosidad**, que incluso llegaron a ser 33,49% en 2009.

Luego la morosidad bajó un poco, pero ese indicador casi siempre se mantuvo al doble del nivel de morosidad para el segmento de microcrédito registrado en la banca privada.

Incluso, dice Flores, hubo casos en los que los beneficiarios del '5-5-5' usaron el capital para **fines distintos a los declarados**. Los malos resultados llevaron a cerrar este producto, explica Flores.

## Morosidad en BNF frente a la banca privada

Deslice el cursor sobre el gráfico para visualizar las cifras

**Seleccione:** Cartera total | **Microcrédito**

Banco Nacional de Fomento (antes de la liquidación)    Banca privada

A Flourish chart

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

PRI MI CIAS Suscríbete a nuestras notificaciones para recibir las últimas noticias y actualizaciones.



Esas condonaciones no solo se hicieron mientras el BNF estaba operativo, sino que **tres de ellas fueron aprobadas por Ley cuando el banco ya se hallaba en liquidación.** Lo explica Esteban Melo, quien asumió como liquidador del BNF en agosto de 2021.

Las tres leyes que permitieron esto son:

1. Ley para la Reestructuración de las deudas de la banca pública, banca cerrada.
2. Ley para la Reactivación Económica.
3. Ley para el Fomento Productivo.

**ERROR:** Error [410 Gone] fetching sheets data

Las tres leyes incentivaron una reestructuración de deudas con el BNF siempre que los deudores pagaran entre el 5% y el 1% de capital adeudado. A cambio, el banco les perdonaba intereses, multas y recargos.

Fueron aprobadas entre 2017 y 2018 y permitieron reestructurar 18.753 operaciones. Pero el BNF recuperó solo USD 35 millones de todo esto.

Además de afectar financieramente al banco, Flores cree que las condonaciones terminaron produciendo **una "cultura de no pago entre los beneficiarios de la banca pública"**.

Flores agrega que este historial debe dejar **lecciones para que el banco estatal BanEcuador,** que tomó la posta del BNF, **no comenta los mismos errores.**

De hecho, la Ley de Desarrollo Económico, en vigencia desde noviembre de 2021, determina que, vía decreto, se pueden condonar los créditos de hasta USD 10.000 en la banca pública que sean considerados irrecuperables.

## Cartera incobrable

Para empeorar las cosas, en mayo de 2016, el gobierno de Rafael Correa decidió liquidar al Banco Nacional de Fomento (BNF) y crear un nuevo banco 'saneado', que fue BanEcuador.

Pero en realidad el BNF en liquidación **se quedó con la cartera mala o E** y una parte de la cartera reestructurada.

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

Barcode:4512905-01 C-331-806 INV - Investigation -

Suscríbete a nuestras notificaciones para recibir las últimas noticias y actualizaciones.



- 22.067 operaciones provenientes de BanEcuador
- 5.113 operaciones de la Corporación Financiera Nacional
- 2.144 operaciones correspondientes del ahora desaparecido Banco Ecuatoriano de la Vivienda.
- 87 operaciones de la privada y quebrada (2008) Mutualista Benalcázar.

La Ley para la reestructuración de deudas, aprobada en 2017, **abrió la posibilidad para que el BNF en liquidación comprara la cartera castigada** de esas entidades.

La mayoría de las operaciones se concretó en septiembre de ese mismo año, según Melo.

Era optativo comprar la cartera, según la Ley, pero se hizo y los problemas crecieron, dice Melo.

Según el actual liquidador, el BNF hasta compró **cartera CFN que data de la crisis financiera de 1999 y** que ya no tiene garantías.

Con ello, la cartera por cobrar de BNF en liquidación aumentó de USD 149 millones en 2016 a USD 414 millones en 2021.

**Entre 2016 y 2021, este banco público ha recuperado solo USD 70 millones**. "Si hasta 2028 no se ha recuperado todo el valor pendiente de cobro, las autoridades deberán disponer qué hacer con esa cartera", advierte Melo.

**Melo hizo un llamado a los 52.000 deudores** del BNF en liquidación para que se acerquen a arreglar sus deudas y eviten acciones coactivas.

De los 52.000 deudores morosos del BNF, unos 120 deben montos sobre USD 500.000 y se trata en su mayoría de empresas, dice Melo.

#banca pública #crédito #microcrédito #morosidad #Rafael Correa

Compartir:



Contenido Patrocinado

UEES

La UEES alcanza equivalencia académica en EE.UU

Leer más »



Contenido Patro

CCI

El patio de co
convierte en

Leer más »

## Noticias relacionadas

Filed By: rschagrin@schagrinassociates.com, Filed Date: 2/21/24 2:33 PM, Submission Status: Approved

# Tab 31

# P.R. 218

# C.R. 120

Barcode: 4512988-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
POI: 01/01/2022-12/31/2022
~~**Business Proprietary Document**~~
ITA/E&C/OIV: RA
**Public Version**

February 20, 2024

Sociedad Nacional de Galápagos C.A.
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, DC 20003

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Section III Questionnaire Response

Dear Mr. Goldfeder:

On February 12, 2024, the U.S. Department of Commerce (Commerce) received a response on behalf of your client, Sociedad Nacional de Galápagos C.A. (SONGA), to Section III of Commerce's December 12, 2023, countervailing duty initial questionnaire (Section III IQR). Commerce has identified certain areas in SONGA's response for which Commerce requires additional information. The additional information requested in the attachment to this letter is **due no later than close of business (*i.e.*, 5:00 p.m. Eastern Standard Time) on February 27, 2024**.

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations. An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted. Any extension granted in response to your request will be in writing; otherwise, the original deadline will apply.

Filed By: Zachary Shaykin, Filed Date: 2/21/24 3:49 PM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

If Commerce does not receive either the requested information or a written extension requests before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the deadline. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences, pursuant to section 776(b) of the Act. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available, including adverse inferences.

**DEADLINE FOR SUBMISSION**: **Your response is due no later than 5:00 p.m. ET on the date identified above.** Questionnaire responses normally entail the filing of many exhibits and databases on ACCESS. Accordingly, to the extent you submit your filing on the day it is due, rather than earlier, we strongly recommend that you begin uploading your response **no later than 12:00 noon on the above due date**. A questionnaire response must be filed in its entirety by the deadline to be considered timely.[1]

**EXTENSIONS:** **Note well:** Any extension request must be filed in writing. Extension requests filed after 5 p.m. on the due date will not be granted, except in extraordinary circumstances. An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means.[2] An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, *force majeure*, or medical emergency."[3] Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the requesting party of its decision before the time limit expires."[4] For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.[5]

**Note well**:

> Parties should be aware that **the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on its disposition. Parties should not assume that they will receive an extension of a time limit if they have not received a response from Commerce. For submissions that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next business day**.

---

[1] 19 CFR 351.303(b)(1).
[2] 19 CFR 351.302(a)(2).
[3] *Extension of Time Limits*, 78 FR 57790, 57793 (Sep. 20, 2013) (Preamble to the Final Rule).
[4] *Id.* at 57792.
[5] *Id.*

> *See* 19 CFR 351.103(b).[6] **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues. When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise the official in charge, informing them of the filing difficulties. The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.

Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

If you have any questions about this matter, please contact Zachary Shaykin at (202) 482-2638 or Reginald Anadio at (202) 482-3166.

Sincerely,

Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

[6] *Id.* (emphasis added).

**Section III Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador
Period of Investigation (POI) 01/01/2022 – 12/31/2022
Sociedad Nacional de Galápagos C.A. (SONGA)**

Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, SONGA should repeat the question in full to which it is responding and place its answer directly below the question. SONGA should also fully answer each question in this supplemental questionnaire. Please ensure that SONGA provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.

---

## General Questions

1. Please provide SONGA's tax returns for the fiscal year 2022. If it cannot do so, please explain why.

2. According to pages III-1 to III-2 of SONGA's Section III IQR, SONGA's owed its cross-owned processor, [ ], a co-packing fee. To pay for this co-packing fee, SONGA supplied [ ] fresh shrimp that [ ] processed. Please respond to the following questions:
    a. Please state whether the finished frozen warmwater shrimp products that [ ] processed were returned to SONGA prior to it being sold.
    b. Please confirm that this transaction, in its entirety (*i.e.*, accrual of the co-packing fee, shrimp supply, shrimp processing and processed product return), happened during the POI. If not, please explain what part of this transaction, if any, is related to the POI.
    c. Please explain whether the finished frozen warmwater shrimp products that [ ] processed was sold during the POI. If yes, please explain how the quantity and value for this shrimp was reported in SONGA's Section III response, including in Exhibit 5.

3. On page III-3 of SONGA's Section III IQR, SONGA identified affiliated companies that engaged in the shrimp business. In its January 4, 2024, Affiliation response, SONGA identified [ ] as a supplier of input primarily dedicated to the production of fresh shrimp; however, [ ] was not reported on page III-3 of SONGA's Section III response. Please explain why [ ] was not reported as an affiliated company that engaged in the shrimp business.

4. At Exhibit 5 of SONGA's Section III IQR, SONGA provides the FOB value of its sales during the POI. Please provide a worksheet demonstrating how SONGA calculated the FOB value of its sales during the POI. Please provide copies of all worksheets in Excel format.

5. The production process flowcharts at pages III-13 and III-14 of SONGA's Section III IQR have sections which state "classified." Please provide a fully unredacted version of these flowcharts.

6. Please explain whether SONGA, in the ordinary course of business, maintains its financial records in U.S. dollars (USD) or another currency. If it ordinarily conducts business in a currency other than USD, please revise SONGA's reporting of any values (*e.g.*, sales values, program benefits, taxes, losses, *etc.*) in the currency in which they were incurred and/or realized.

**<u>Program Specific Questions</u>**

*Government Provision of Electricity for Less-than-Adequate-Remuneration (LTAR) Program*

7. Regarding the Government Provision of Electricity for LTAR program, pursuant to Commerce's original questionnaire, please respond to all questions in the Standard Questions Appendix and the Provision of Goods/Services Appendix. If SONGA cannot do so, please explain why.

*Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays*

8. On page III-25 of SONGA's Section III IQR, SONGA states that its cross-owned shrimp farms may hold shrimp farm land concessions. Please explain whether SONGA uses any land concessions owned by any affiliated and/or cross-owned entities. If yes, please provide a list of the land concessions used by SONGA.

9. On page 5 of Exhibit 9 of SONGA's Section III IQR, please indicate which exhibit SONGA references in its statement: "See Exhibit that contains the above-referenced registration document."

*Refund of Currency Outflow Tax (ISD) on Purchase of Inputs Program*

10. Please provide supporting documentation (*e.g.*, bank statements, chart of accounts printouts, *etc.*) to support the $[ ] figure that SONGA claimed in benefits under the Refund of Currency Outflow Tax program.

11. On pages III-20 to III-21 of SONGA's Section III IQR, SONGA claims to have received ISD/foreign exchange export tax for purchases of inputs for consumption in the production of goods under Ecuador's Reform Law for Tax Equity. On page III-26 of SONGA's Section III IQR, SONGA claims to have received an "exemption from the ISD for the importation of materials, commodities and capital goods used in the project." Please confirm whether these are two separate programs under which SONGA received benefits.

*Investment Contract Program*

12. In Exhibit 10 of SONGA's Section III IQR, SONGA provided the investment contract for tax benefits that SONGA received, including "(1) a proportional reduction in the tax rate for the accumulated investment amount for each year; (2) exemption from the ISD for the importation of materials, commodities and capital goods used in the project; and (3) exemption from the ISD for the repayment of principal and interest on loans obtained from foreign lending institutions." Please respond to the following questions:
    a. Please resubmit the contract and separately enumerate the specific pages and lines that are relevant for each one of the three subcomponents of this tax benefit.
    b. Please note the pages and lines for each subcomponent of this tax benefit where "the amount of the exemption is determined by a formula set forth in the investment contract." If this exact formula does not appear in the investment contract, please explain and provide evidence of how the tax benefit is administered and/or calculated for each subcomponent of this tax benefit.

13. Please explain whether the receipt of Investment Contract program benefits is contingent on the sector in which SONGA invested its resources, *i.e.*, aquaculture and fisheries. Also explain whether the benefits provided to shrimp processors and/or producers under the Investment Contract program are unique to the shrimp processing/production industry or preferential in comparison to the benefits received by eligible entities in other industries.

*Exemption from Municipal Taxes Program*

14. Pursuant to Commerce's initial questionnaire, please indicate where in SONGA's fiscal year 2021 tax returns the savings of $[ ] reported at page 3 of Exhibit 12 of SONGA's Section III IQR is recorded. Please demonstrate how SONGA calculated the $[ ] in savings that it reported.

# Tab 32

# P.R. 232

# C.R. 134

Barcode: 4517781-01 C-331-806 INV - Investigation

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 62
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been ranged or redacted from pages S-1 to S-6, and S-11 to S-14; and in Exhibits S-1 to S-7 and S-9.

**PUBLIC VERSION**

March 1, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
SONGA Supplemental Section III Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos C.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's February 20, 2024 Section III Supplemental Questionnaire. This response is timely submitted in accordance with the Department's February 23, 2024, letter, re: "Request for Extension for Section III Supplemental Questionnaire Response," which extended the deadline for SONGA's supplemental response until today. Accompanying this submission are calculation worksheets in Excel® format.

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA request proprietary treatment and the basis for the request:


Filed By: khammer@tradepacificlaw.com, Filed Date: 3/1/24 11:27 AM, Submission Status: Approved

- Nature of Products or Production Process: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(1).

- Production and Distribution Costs: Contained in the exhibits. Protected under 19 C.F.R. §§ 351.105(c)(2) and (3).

- Names of Particular Customers, Distributors, or Suppliers: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Exact Amount of Benefits Applied for or Received: Contained in the narratives and exhibits. Protected under 19 C.F.R. § 351.105(c)(8).

- Other Specific Business Information Related to SONGA's Business and Production Operations, Ownership and Affiliations, Financial Data, Applications and Approval Documents etc., the Release of Which to the Public Would Cause Substantial Harm to SONGA's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to SONGA's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos C.A.*

## COMPANY CERTIFICATION

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I prepared or otherwise supervised the preparation of the attached submission of the Section III Supplemental Questionnaire Response, filed on March 1, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: March 1, 2024

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galápagos C.A. ("SONGA"), certify that I have read the attached submission of the Supplemental Section III Questionnaire Response, filed on March 1, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: March 1, 2024

**CERTIFICATE OF SERVICE**

I, Kenneth N. Hammer, hereby certify on this 1st day of March, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4517781-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**POI: 1/1/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information has been ranged or redacted from pages S-1 to S-6, and S-11 to S-14; and in Exhibits S-1 to S-7, and S-9.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

# COUNTERVAILING DUTY INVESTIGATION OF FROZEN WARMWATER FROM ECUADOR

# RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A. ("SONGA") TO THE DEPARTMENT'S FEBRUARY 20, 2024 SUPPLEMENTAL SECTION III QUESTIONNAIRE

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: March 1, 2024**

**Counsel to Sociedad Nacional de Galápagos C.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 3/1/24 11:27 AM, Submission Status: Approved

**11. On pages III-20 to III-21 of SONGA's Section III IQR, SONGA claims to have received ISD/foreign exchange export tax for purchases of inputs for consumption in the production of goods under Ecuador's Reform Law for Tax Equity. On page III-26 of SONGA's Section III IQR, SONGA claims to have received an "exemption from the ISD for the importation of materials, commodities and capital goods used in the project." Please confirm whether these are two separate programs under which SONGA received benefits.**

ANSWER: SONGA confirms that there are two separate ISD benefit programs. First, as discussed on pages III-20 to III-21 of SONGA's IQR, taxpayers may claim refunds of ISD on qualifying imported inputs, as established by the Reform Law of Tax Equity.[1] Second, qualifying taxpayers may claim an exemption on ISD payable on imports of items approved as part of an investment contract. Critically, taxpayers' right to claim an ISD exemption under an investment contract is unrelated to eligibility to claim an ISD refund on qualifying imported goods. Under the ISD refund program discussed on pages III-20 to III-21 of SONGA's IQR, SONGA pays ISD on qualifying imports and then claims a refund of ISD as a tax credit on its annual tax filing for the fiscal year when the qualifying ISD was paid (e.g., ISD paid in 2021 is claimed on the fiscal year 2021 taxes filed in 2022). Under the ISD exemption program discussed on page III-26 of SONGA's IQR, approved companies with investment contracts may present to the National Customs Service of Ecuador that an imported item is among a list of pre-approved merchandise in order to avoid payment of ISD at the time of importation. Under no circumstances can a company claim both a refund of ISD paid and an exemption from payment of ISD on the same imported merchandise.

***Investment Contract Program***

**12. In Exhibit 10 of SONGA's Section III IQR, SONGA provided the investment contract for tax benefits that SONGA received, including "(1) a proportional reduction in the tax rate for the accumulated investment amount for each year; (2) exemption from the ISD for the importation of materials, commodities and capital goods used in the project; and (3) exemption from the ISD for the**

[1] In the GOE's February 12, 2024, Section II questionnaire response, the GOE translated the name of the law as "Reformatory Law for Tax Equity in Ecuador."

# Tab 33

# P.R. 234

# C.R. 136

Barcode:4519007-01 C-331-806 INV - Investigation -

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 183
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been ranged or redacted on pages S-1, S-3 to S-14, S-16, S-18, and S-19, and in the Exhibit List, and from Exhibits S-1 to S-14, and S-15(b) to S-16(c).

**PUBLIC VERSION**

March 4, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Santa Priscila's Supplemental Section III Questionnaire Response

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's February 20, 2024, supplemental Section III questionnaire. This response is timely submitted in accordance with the Department's February 23, 2024, letter, re: "Request for Extension for Section III Supplemental Questionnaire Response," which extended the deadline for Santa Priscila's supplemental response until today. Accompanying this submission are calculation worksheets in Excel® format.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the



Filed By: khammer@tradepacificlaw.com, Filed Date: 3/4/24 1:28 PM, Submission Status: Approved

nature of the information for which Santa Priscila requests proprietary treatment and the basis for the request:

- Nature of Products or Production Process: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(1).

- Production and Distribution Costs: Contained in the exhibits. Protected under 19 C.F.R. §§ 351.105(c)(2) and (3).

- Names of Particular Customers, Distributors, or Suppliers: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Exact Amount of Benefits Applied for or Received: Contained in the narratives and exhibits. Protected under 19 C.F.R. § 351.105(c)(8).

- Other Specific Business Information Related to Santa Priscila's Business and Production Operations, Ownership and Affiliations, Financial Data, Applications and Approval Documents etc., the Release of Which to the Public Would Cause Substantial Harm to Santa Priscila's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to Santa Priscila's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Industrial Pesquera Santa Priscila S.A.*

## COMPANY CERTIFICATION

I, Diego Puente, Vice President, currently employed by Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), certify that I prepared or otherwise supervised the preparation of the attached submission of Supplemental Section III questionnaire response, filed on March 1, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Santa Priscila contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: March 1st, 2024

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), certify that I have read the attached submission of the Supplemental Section III Questionnaire Response, filed on March 1, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: March 1, 2024

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 4th day of March 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode:4519007-01 C-331-806 INV - Investigation -

**Case No. C-331-806**
**Investigation**
**POI: 1/01/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information has been ranged or redacted from pages S-1, S-3 to S-14, S-16, S-18, and S-19, and from the Exhibit List; and from Exhibits S-1 to S-14 and S-15(b) to S-16(c).**

**PUBLIC VERSION**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

# RESPONSE OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A. TO THE DEPARTMENT'S FEBRUARY 20, 2024 SUPPLEMENTAL SECTION III QUESTIONNAIRE

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: March 4, 2024**

**Counsel to Industrial Pesquera Santa Priscila S.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 3/4/24 1:28 PM, Submission Status: Approved

**3. Pursuant to Commerce's initial questionnaire, please provide the quantity of sales for each sales type that Santa Priscila provided at Exhibit 5 of its Section III IQR. If it cannot do so, please explain why.**

ANSWER: As requested, **Exhibit S-3** contains a revised version of Exhibit 5 of Santa Priscila's IQR, which includes quantity of sales for each sales type reported in Exhibit 5 of Santa Priscila's IQR.

In addition, in order to assist the Department in following Santa Priscila's revised sales reporting methodology, **Exhibit S-3** includes the following additional columns to reflect each step to report FOB sales values: (1) Sales Book Value (USD); (2) Sales to Cross-Owned Companies' Required to Respond to Supplier's Questionnaire Book Value (USD); (3) Domestic Freight Expenses; (4) Export Expenses, including insurance & handling; and (5) Adjustment for Calculating FOB Value. Please refer to **Exhibit S-2** for a detailed calculation of how "Domestic Freight Expenses", "Export Expenses", and export insurance expenses were calculated.

**4. Please provide Santa Priscila's tax returns for the fiscal year 2022. If it cannot do so, please explain why.**

ANSWER: As requested, **Exhibit S-4(a)** contains Santa Priscila's income tax declaration, in original form and with English translation, for the 2022 fiscal year. As reflected in the exhibit, these tax returns were filed in 2023 (i.e., outside the POI).

In the course of preparing its response to the Department's question, Santa Priscila realized that it inadvertently did not report benefits received under the Annual Motor Vehicle Tax Reduction program during the POI. This tax incentive is generally available to all natural persons or enterprises in Ecuador, and, therefore, this program is not countervailable because it is not specific. Nevertheless, **Exhibit S-4(b)** contains Santa Priscila's response to the Standard Questions Appendix and Tax Appendix for this program.

sector to which Santa Priscila invested its resources. However, during the period in which Santa Priscila made the qualifying investment that resulted in the approved investment contract contained in Exhibit 14 of its IQR (i.e., 2019), only 25 priority sectors, as established by the Investment Regulations for the Organic Code of Production, Commerce and Investments ("COPCI"), were eligible for benefits under the investment contracts program. Santa Priscila understands that the categories were particularly broad, ranging from software to petrochemicals to tourism to renewable energy. Among those widely varied 25 priority sector identified in the Investment Regulations for the COPCI is the aquaculture sector. However, because these sectors were so broad as to encompass virtually every industry, the investment contract is generally available.

To Santa Priscila's knowledge, the benefits available pursuant to the Organic Law for the Promotion, Attraction of Investment, Employment Generation, and Fiscal Stability and Balance, which was the investment contract regime in place during the time Santa Priscila concluded its investment contract with the GOE, all priority sectors were eligible for the same benefits established by law regardless of the specific priority industry or sector to which they belonged by law. In other words, to Santa Priscila's knowledge, it did not receive any unique or preferential benefits in comparison to other eligible sectors under the investment contract program.

***Exemption from Municipal Taxes Program***

**17. Regarding Exhibit 20 of Santa Priscila's Section III IQR, please provide the following:**

**a. Please provide calculations or supporting documentation demonstrating how Santa Priscila derived the following:**

**i. Aquaculture Assets (i.e., [ ]);**

<u>ANSWER</u>: Santa Priscila's 2022 total assets (i.e., $[ ]) are stated in Santa Priscila's balance sheet on page 6 of the 2022 audit report contained in Exhibit 2 of Santa

Priscila's IQR. Santa Priscila confirms that, since [ ] the aquaculture assets can be calculated by taking the difference between the difference between Santa Priscila's total assets, as presented in Exhibit 20 of Santa Priscila's IQR, and the "Non-Aquaculture Assets" calculated in response to question no. 17.a.ii below.

**ii. Non-Aquaculture Assets (i.e., [ ]); and**

ANSWER: As requested, **Exhibit S-12** contains an Excel®-based worksheet extracted from Santa Priscila's accounting system, which demonstrates the calculation of the "Non-Aquaculture Assets" as presented in Exhibit 20 of Santa Priscila's IQR.

**iii. Total Revenue (i.e., [ ]).**

ANSWER: As requested, **Exhibit S-13** contains an Excel®-based worksheet demonstrated how the "Total General Revenues," as reported in Exhibit 20 of Santa Priscila's IQR is calculated.

**b. Please explain how Santa Priscila is able to differentiate between its assets that are used in aquaculture activities and those assets which are not used for aquaculture activities.**

ANSWER: As an initial matter, as reflected in Exhibit 20 of Santa Priscila's IQR, the [ ] of Santa Priscila's total assets are classified as aquacultural assets for purposes of calculating the municipal asset tax because Santa Priscila's business activities during the 2021 fiscal year were primarily the farming and production of shrimp. In other words, before making its municipal tax payment, Santa Priscila manually reviews its accounting records to identify any assets that are clearly not used for aquacultural activities, based on the description recorded in its accounting records in the ordinary course of business. Please refer to **Exhibit S-12** for examples of assets classified as not relating to aquacultural activities.

# EXHIBIT S - 4(b)

***Annual Motor Vehicle Tax Reduction***

***Standard Questions Appendix***

**A. Specify the eligibility criteria that your company had to meet in order to receive the benefits of this program. Indicate whether eligibility was or is currently contingent on one or more of the following criteria: (1) whether your business exports or has increased its exports, (2) the use of domestic rather than imported inputs, (3) the industry to which your business belongs, or (4) the region in which your business is located.**

ANSWER: Santa Priscila is eligible to claim a reduction of eighty percent on its vehicle tax by virtue of owning vehicles weighing one ton or more and using those vehicles exclusively for productive and commercial activities. Santa Priscila confirms that eligibility is not contingent on any of the criteria stated in the Department's question.

**B. Describe in detail the application and approval process your company went through to receive benefits through the program.**

ANSWER: To be approved for the exemption, Santa Priscila must register the vehicle purchase to the local Internal Revenue Service, which grants a permit to the vehicle in order to allow Santa Priscila to claim the tax reduction.

**C. Specify the criteria your company met to receive the particular amount of assistance provided. Was the application or approval specified the goods for which this assistance was to be provided? If yes, please provide details of which merchandise was specified in the application and/or approval documents.**

ANSWER: The benefit is a flat eighty percent reduction in vehicle tax for qualifying taxpayers. In other words, the amount of tax reduction claimed by Santa Priscila is not determined by any specific criteria it met. Rather, Santa Priscila was eligible to claim the full eighty percent in vehicle tax based on the criteria stated in response to subpart A above. **Exhibits S-4(c)** and **S-4(d)** contain, respectively, sample application and approval documentation for the registration of qualifying vehicles for these benefits.

**D. What records does your company keep regarding each of the benefits received under this program? Please provide your company's executed application forms and other application documents**

**regarding this program. Provide copies of documentation sent to your company at the time of benefit approval, including but not limited to: approval letter, contract, claim form, etc.**

ANSWER: Santa Priscila keeps copies of the form to request registration for the tax credit and the approval granted by the GOE. Please refer to **Exhibits S-4(c)** and **S-4(d)**, respectively.

**E. Specify how many years your business has received benefits under this program. What was the first year your company applied for and received benefits? For programs under investigation that were not enacted pursuant to a legal instrument, please indicate how many years your company has participated in the program. For example, in the case of programmes involving the provision of inputs for less than adequate remuneration not enacted in accordance with a legal instrument, please indicate how many years your company has been purchasing the relevant inputs from the government, from government-controlled entities, such as state-owned enterprises, or other enterprises that are purported to be "authorities" under section 771(5)(B) of the Act.**

ANSWER: Santa Priscila first claimed this benefit in 2001, and it has continued to take advantage of this exemption every year since, including during the POI.

**F. Indicate where the benefits of this program can be found in your accounting system (i.e., specify ledgers or journals) and financial statements. If you have to file something with the government to continue receiving benefits under this program, please provide a complete translated set of your most recent filings made during or before the POI.**

ANSWER: Santa Priscila does not record the exempt portion of tax in its accounting system.

**G. Has the program been terminated? If so, please explain. What is the last date your business can apply for or claim benefits under the program? When is the last date your business would be able to receive benefits under the program?**

ANSWER: No. This exemption remains in force.

***Annual Motor Vehicle Tax Reduction***
***Tax Appendix***

**If your company used this program to take deductions from taxable income, credit toward taxes payable, exemptions from taxes owed, accelerated depreciation or other tax benefits on the tax return filed during the POI (the tax period covered by this tax return does not have to correspond with the period of investigation), please answer the following questions:**

**A. Explain whether the assistance is a deduction from taxable income, an exemption from taxes, a credit toward taxes payable, accelerated depreciation, a deferral of taxes owed, or other tax benefit.**

ANSWER: This program provides for an exemption from the tax paid to the IRS for acquiring certain vehicles weighing one ton or more and using those vehicles exclusively for productive and commercial activities.

**B. Indicate the amount of the tax savings derived from the use of this program. Provide a detailed calculation of the assistance and all source materials. Show the amount of tax (or the amount of loss incurred) that would have been due absent this benefit. Indicate where in the tax return this assistance is shown. For tax deferrals, please indicate the amount of tax owed and the length of the deferral period.**

ANSWER: The total amount of the exemption claimed by Santa Priscila during the POI is $**[ ]**. **Exhibit S-4(e)** contains a detailed report of motor vehicle tax exemptions received by Santa Priscila during the POI, which includes a calculation of the exemption.

**C. If your company was in a tax loss position for the tax year to which the return applies, please explain the effect of this assistance on your company's tax position.**

ANSWER: Not applicable. Santa Priscila did not have a tax loss for 2022.

**D. Will you carry forward any loss to future years? Does the loss represent accrued losses from earlier years? Please explain.**

ANSWER: Not applicable.

**E. Indicate where in your company's financial statements tax information is represented. Are accrued tax losses carried as assets in the financial statements? Please explain.**

ANSWER: No tax losses have accrued and are accounted for as assets in the financial statements.

**F. If you carried forward a loss from prior years and used that loss to offset taxes due on the tax return filed during the POI, demonstrate that loss was not generated by use of any countervailable tax program.**

<u>ANSWER</u>: Not applicable.

# EXHIBIT S - 4(e)

**PUBLIC VERSION - BPI Has Been Ranged or Redacted**

***INDUSTRIAL PESQUERA SANTA PRISCILA S.A.***

***REPORT OF VEHICLE TAX EXEMPTIONS***

***Year2022***

| | INFORMATION VALIDATED BY THE SRI | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PLATE | YEAR | CATEGORY | TYPE | TOTAL PATENT TAX | EXEMPTION | OTHER FEES | TOTAL PATENT TAX PAID | % EXEMPT | |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | $ 6,400.00 | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 3/4/24 1:28 PM, Submission Status: Approved

| INFORMATION VALIDATED BY THE SRI | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PLATE | YEAR | CATEGORY | TYPE | TOTAL PATENT TAX | EXEMPTION | OTHER FEES | TOTAL PATENT TAX PAID | % EXEMPT |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | $ 2,450.00 | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |

| | INFORMATION VALIDATED BY THE SRI | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PLATE | YEAR | CATEGORY | TYPE | TOTAL PATENT TAX | EXEMPTION | OTHER FEES | TOTAL PATENT TAX PAID | % EXEMPT | |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | $ 790.00 | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |

| | INFORMATION VALIDATED BY THE SRI | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PLATE | YEAR | CATEGORY | TYPE | TOTAL PATENT TAX | EXEMPTION | OTHER FEES | TOTAL PATENT TAX PAID | % EXEMPT | |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | $ 2,750.00 | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 3/4/24 1:28 PM, Submission Status: Approved

| | INFORMATION VALIDATED BY THE SRI | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PLATE | YEAR | CATEGORY | TYPE | TOTAL PATENT TAX | EXEMPTION | OTHER FEES | TOTAL PATENT TAX PAID | % EXEMPT | |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | $ 2,540.00 | | | | | ] |
| [ | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 3/4/24 1:28 PM, Submission Status: Approved

| | INFORMATION VALIDATED BY THE SRI | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | PLATE | YEAR | CATEGORY | TYPE | TOTAL PATENT TAX | EXEMPTION | OTHER FEES | TOTAL PATENT TAX PAID | % EXEMPT | |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | $ 940.00 | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |
| [ | | | | | | | | | | ] |

PUBLIC VERSION - BPI Has Been Ranged or Redacted

| INFORMATION VALIDATED BY THE SRI | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PLATE | YEAR | CATEGORY | TYPE | TOTAL PATENT TAX | EXEMPTION | OTHER FEES | TOTAL PATENT TAX PAID | % EXEMPT |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | $ 1,300.00 | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 3/4/24 1:28 PM, Submission Status: Approved

| INFORMATION VALIDATED BY THE SRI | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PLATE | YEAR | CATEGORY | TYPE | TOTAL PATENT TAX | EXEMPTION | OTHER FEES | TOTAL PATENT TAX PAID | % EXEMPT |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | $ 1,800.00 | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |
| [ | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 3/4/24 1:28 PM, Submission Status: Approved

# Tab 34

# P.R. 235

Barcode:4519363-01 C-331-806 INV - Investigation -

TRADE PACIFIC
International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

March 4, 2024

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806 Total
No. of Pages: 120
Investigation
POI: 1/1/2022 – 12/31/2022
ITA/E&C, Office IV

**PUBLICDOCUMENT**

Re: Frozen Warmwater Shrimp from Ecuador: Factual Information to Rebut, Clarify, and/or Correct New Subsidy Allegations

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galapaágos C.A. ("SONGA") and Industrial Pesquera Santa Priscila S.A. (collectively the "Respondents"), as well as the Government of Ecuador ("GOE"), we hereby submit, pursuant to 19 C.F.R. § 351.301(c)(2)(vi), factual information to "rebut, clarify and correct" information that the petitioners submitted in support of their February 21, 2024 New Subsidy Allegations ("NSA"). This submission is timely filed within the 10-day deadline specified in the regulation cited above.[1]

[1] Because the deadline fell on a weekend (i.e., March 2, 2024), the deadline moves to the next business day.

Filed By: khammer@tradepacificlaw.com, Filed Date: 3/4/24 2:54 PM, Submission Status: Approved

Petitioners have submitted two new allegations that have no merit. These allegations intentionally ignore contradictory information in the brackish water-related documents that they have submitted as exhibits to their NSA. They also ignore the significance of documents in the record of the 2013 countervailing duty investigation of SONGA pertaining to the alleged BNF loan, which they intentionally did not submit. Moreover, the alleged loan to one of SONGA's cross-owned affiliates that they speculate may have continued to remain outstanding was in fact an equipment lease that the parties cancelled in 2015. We address each allegation in detail below.

**1. Alleged Brackish Water for Less Than Adequate Remuneration**

Petitioners have rethought their original allegation that the provision of brackish water constituted "revenue foregone." Instead. their recent NSA now asks the Department to treat their allegation as the provision of brackish water for Less Than Adequate Remuneration ("LTAR"). However, the "evidence" that they purport to submit in support of their LTAR NSA suffers from the same defects as their original allegation, namely, they fail to provide any evidence that any other country charges for brackish water used in aquaculture operations. Moreover, it is undisputed that neither SONGA nor Santa Priscila consumed brackish water in the sense that they retained it for permanent use.

In order to obtain a countervailable benefit, a respondent must actually receive and then consume that benefit. However, when brackish water is returned to its source, it has not been "consumed." Moreover, if there was a benefit in receiving brackish water, that benefit was returned when the non-consumed water was returned to the original source. Petitioners nowhere contend that the water was consumed and was not returned to its source.

Exhibit 1 to the NSA submission is a 2021 study entitled "Comparison of resource use for farmed shrimp in Ecuador, India, Indonesia, Thailand, and Vietnam." This study contains the unremarkable finding that shrimp farms use water. However, the study nowhere discusses whether any of the four countries besides Ecuador that the authors discuss charges for the non-consumptive use of brackish water. As a result, the study provides no support for the initiation of an investigation of brackish water for LTAR.

Exhibit 2 to their brackish water allegation is an excerpt from a United Nations Food and Agriculture Organization ("FAO") publication issued in 1989. As such, it is out of date and, therefore, unreliable as to whether any country now charges for the non-consumptive use of brackish water. Second, the study is entitled "Preliminary Review of Selected Legislation Governing Aquaculture: 3. Access to and Use of Land and Water." The submission of a "preliminary study" begs the question as to whether a "final study" was ever issued. Third, without the final study, there is no basis to assume that the excerpt provides an accurate picture of the worldwide provision or non-provision of brackish water for a fee. Fourth, the study states that the FAO reviewed "selected legislation," so the absence of a discussion of the "unselected legislation" renders the study incomplete. These defects render the study unreliable and, therefore, irrelevant.

In **Exhibit 1**, we provide additional excerpts from the FAO study. The Foreword to the study states that it was not "practicable" to ensure that all relevant laws could be examined. Therefore, "the study has necessarily been characterized as a preliminary review at this stage." One "Conclusion" of the study was that some regulatory burdens "may be inappropriate for aquaculture activities." Undoubtedly, one such burden would be the imposition of a fee on brackish water that is not consumed.

Petitioners' reliance on this defective document boils down to the following proposition: "We have searched every corner of the world, and we have managed to find three examples of countries that charge for water, which are Hungary, Malawi, and Zambia. Therefore, Ecuador should have also charged for water." The hollowness of the evidence that petitioners rely upon as proof that Ecuador should also charge for brackish water is revealed by an examination of the FAO's discussion of the actual basis for purported water charges in these three countries.

Hungary: The FAO Study (at 18) contains the following passage and accompanying footnote 7, which petitioners rely upon. See NSA at 4.

> Hungary, in its turn has a whole set of regulations and guidelines regarding the quantity of water supply for fish breeding purposes 7/, the disposal of sewage in fish ponds and in storage reservoirs used for fish farming, and providing for a progressive system of effluent fines.
>
>> 7/ Instruction No. 7/1969 OVH-AH of the President of the National Water Affairs Office on the regulation of water supplies for irrigation and fish breeding purposes, and rates thereof, 19 March 1969, MEM E No. 6, 19 March 1969, p.228, and guiding principles for the uniform interpretation of the regulations governing the use of and fees of water for irrigation and fish breeding purposes, undated, NEM.E. No. 27, 3 October 1969, p. 672.

It is by no means clear that any "rates" that pertain to "fish breeding " or the "regulation of water supplies for irrigation" also apply to the non-consumptive use of brackish water in aquaculture. The common meaning of the term "irrigation" has nothing to do with aquaculture farming. Moreover, it is possible that no rates apply to fish breeding because, as the quoted text says, Hungary "has a whole set of regulations and guidelines regarding the quantity of water supply for fish breeding purposes." There is no evidence that the regulation of the quantity of water implicates the charging of rates for that water.

Finally, Hungary is landlocked so no brackish water charges could be imposed.

Malawi: The FAO Study (at 16) says the following about Malawi, which petitioners rely upon. See NSA at 4.

> Since 1978, Malawi has had a general prohibition against water pollution; polluted effluents or waters may be discharged in public waters only under prior written consent delivered by the Minister responsible for Agriculture and Natural Resources. The persons granted permission shall pay the fees and rents specified in the Minister's consent and comply with every obligation (i.e. works or analysis of water or effluent at its own expense) and conditions specified therein.

Fees and rents for the discharge of water in order to compensate a government for possible pollution have nothing to do with the non-consumptive use of water in an aquaculture operation.

Finally, Malawi is landlocked so no brackish water charges could be imposed.

Zambia: The FAO Study (at 9) says the following about Zambia, which petitioners rely upon. See NSA at 4.

> In Zambia, where the ownership of all water is vested in the State, there is no legal priority among the different uses of water. In terms of the Water Ordinance, different uses of water are classified as "primary" or "secondary" or "tertiary". According to this classification, the use of waters for irrigation and for fish breeding is classified as "secondary use"; domestic use of water, including the watering of animals, is a "primary" water use; and industrial and mechanical use of water, including that for power generation, is "tertiary" use. This classification does not appear to result in a priority status of corresponding uses of water. Different rights of use of water apply to the two different classes (public and private) of water: the acquisition of a right to impound, store, divert or simply use public water for purposes other than domestic use (primary use) is subject to grants by the administrative authority (the Water Board). The granting of an application takes the form of an order by the Water Board in which water rights can be exercised subject to appropriate terms and conditions. Where a term (i.e. time) clause has been included, renewal of water rights after the term has expired is at the discretion, by a formal act, of the Water Board. Thus, public water can be diverted or utilized for fish breeding purposes, and water rates can be levied in respect of the amount of water supplied and of a "special" water right. (Underlinng added.)

The fatal problem with the petitioners' reliance on the example of Zambia is that they nowhere establish that Zambia has in fact levied "water rates" on the non-consumptive use of water for aquaculture.[2]

Finally, Zambia is landlocked so no brackish water charges could be imposed.

In their Exhibit 3, petitioners rely on a 2013 Australian study entitled "A Method for Determining a Fee for Access to the Aquatic Environment for Aquaculture and Pearling Purposes." The "Preamble" to the study's discussion of the "Method for Fee Calculation" states that "A key objective of the Working Group is to develop a basis to calculate a fair and equitable lease fee for the use of the State's aquatic resources." But, the petitioners fail to acknowledge that the purpose of the Australian study was to establish lease fees, not water fees, for aquaculture facilities. Water charges are nowhere mentioned in the study. Rather, the study's authors recommended fee increases for the right to use land for aquaculture purposes, which was already subject to fees. By another name, these leases are in effect the same as government-provided land concessions. In other words, the study has nothing to do with the provision of water for non-consumptive use in return for a fee.

We provide in **Exhibit 2** an excerpt from that portion of the Australian lease fee study concerning what the lease charges were at the time in Australia and what they should be in the future. The lease fee in 2013 in South Australia for "Subtidal shellfish" was $220 per hectare and for "Intertidal shellfish" it was $315 per hectare. The lease fee in Tasmania for "Shellfish"

[2] The FAO Study upon which petitioners attempt to rely identified the following other countries as having been considered: Panama; Colombia; Poland; Mexico; United Kingdom; Guatemala; Poland; France; El Salvador; Korea; Wales; New Zealand; and Spain. The authors of the study apparently found no laws or regulations in those countries that imposed charges for the non-consumptive use of brackish water for aquaculture purposes. If they had found such fees, they would have said so.

was $55 + $110 base fee per hectare. The average of all lease fees for all types of aquaculture leases was a minimal $96 per hectare. See attached **Exhibit 2** at 10.[3]

Next, petitioners quote from a South African document entitled "Operational Policy: Use of Water for Aquaculture Purposes." See NSA at 5 and Exhibit 4 thereto. However, they have omitted critical language from the entire passage, which we provide in attached **Exhibit 3**. The entire passage reads as follows, and we have underlined the portions of the passage that petitioners omitted from their NSA.

> ***4.6.1 Resource Related Fiscal Matters***
>
> Water is a valuable environmental (social, economic and ecological) commodity and charges will be levied for the use of water and the associated infrastructure for aquaculture as per the relevant pricing strategies for the Section 21 (a), (b), (c), (f), (g), (h), and (i) water uses.
>
> These charges will be related to that of the greater agricultural sector, but due to the communality of largely non-consumptive and integrated use of water sources in aquaculture, the charge component will rest heavily on the waste discharge component and the effects on the quality of the water resource. This is akin to the concept of "the polluter pays".
>
> .
>
> The structure and methodologies for the application of tariffs to the use of water for aquaculture will be resolved internally by DWAF (Sections 56 to 60 of the NWA). Where the use of water related State assets for aquaculture is concerned these tariff systems will be addressed jointly with the Departments of Public Works and Land Affairs. Furthermore these tariff structures will be decentralised to the level of CMA's as these become established over time.
>
> Where the use of State managed water resources or the associated infrastructure for aquaculture (i.e. State impoundments and the related water resources and infrastructure) is concerned, tariffs for such use will be based on market related concessionary charges related to the value of these resources or infrastructure, the nature of the use, other dependants on these water resource or infrastructure and the administration or management costs related to these resources or infrastructure.

[3] The average exchange rate in 2013 was $1 Australian dollar to $0.9675 USD. See https://www.exchangerates.org.uk/AUD-USD-spot-exchange-rates-history-2013.html.

The omitted portion of the first paragraph refers to the "relevant pricing strategies for the Section 21 (a), (b), (c), (f), (g), (h), and (i) water uses." The third paragraph quoted above references the "NWA." This is a reference to the Water Act of 1948, excerpts from which we also provide in **Exhibit 3**. The reference to certain subsections of Section 21 in the Water Act means that the alleged charges will be levied as per the cited provisions of the seven subsections of Section 21 of the Water Act. **Exhibit 3** demonstrates that the following water uses are subject to possible charges: (a) taking water from a resource; (b) storing water; (c) impeding or diverting the flow of water in a watercourse; (f) discharging waste or water containing waste into a water resource through a pipe, canal, sewer, sea outfall or other conduit; (g) disposing of waste in a manner which may detrimentally impact of a water resource; (h) disposing in any manner of water which contains waste from, or which has been heated in, any industrial of power generation process; and (i) altering the bed, banks, course or characteristics of a watercourse.

So, the bottom line is that nothing in South Africa's law addresses the non-consumptive use of brackish water in an aquaculture facility.

Similarly, the petitioners wrongly claim that "The provision of brackish water from the GOE to shrimp producers free of charge is consistent with these policies {i.e., the alleged policies of the five countries discussed above} and thus confers a countervailable benefit on shrimp producers in Ecuador." NSA at 5. The incontrovertible fact is that petitioners have not identified a single country that charges for the non-consumptive use of brackish water for aquaculture purposes.

**2. Alleged Banco Nacional de Fomento Loan Forgiveness**

Petitioners assert that the GOE passed a law in 2017 that forgave certain charges associated with loans extended by the state-owned Banco Nacional de Fomento ("BNF"). NSA at

For all these reasons, the Department should decline to initiate an investigation of alleged subsidies provided on brackish water and on an alleged loan from the BNF.

Please let us know if you have any questions concerning this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant

TRADE PACIFIC PLLC

*Counsel to SONGA and Santa Priscila*, and the Government of Ecuador

# Tab 35

# P.R. 237

Barcode:4520165-01 C-331-806 INV - Investigation -
SCHAGRIN ASSOCIATES
900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 EDRAKE@SCHAGRINASSOCIATES.COM F: (202) 429-2522

March 5, 2024

DOC Inv. No. C-331-806
Total Pages: 34
Investigation
AD/CVD Office IV

**PUBLIC DOCUMENT**

**VIA ELECTRONIC FILING**
The Honorable Gina Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations Supplemental Response**

Dear Secretary Raimondo:

On behalf of the Petitioner, the American Shrimp Processors Association ("ASPA" or "Petitioner"), we hereby submit our response to the supplemental questions issued by the U.S. Department of Commerce ("Commerce") on March 1, 2024 regarding the new subsidy allegations filed by ASPA in the above-referenced investigation on February 21, 2024.[1] The new factual information contained in this submission is information to respond to a supplemental questionnaire from Commerce, as described in 19 C.F.R. § 351.102(b)(21)(i).[2] This response is

[1] *See* Letter to ASPA from Robert Bolling, Program Manager, AD/CVD Operations, Office IV, Enforcement & Compliance, *Frozen Warmwater Shrimp from Ecuador: Supplemental Questions Regarding New Subsidy Allegation* (Mar. 1, 2024).

[2] This statement complies with 19 C.F.R. § 351.301(b).



Filed By: rschagrin@schagrinassociates.com, Filed Date: 3/5/24 1:28 PM, Submission Status: Approved

timely filed by the deadline established by Commerce. We reproduce in bold below the supplemental questions issued by Commerce, followed by our response to each question.

**<u>Government Provision of Brackish Water for Less than Adequate Remuneration (LTAR)</u>**

1. **Please provide documentation supporting the petitioner's claim on page 5 of the NSA that this program is de facto specific within the meaning of section 771(5A)(D)(iii)(II) of the Act and that the shrimp industry is the "predominant beneficiary" of this program.**

   **Response:**

As explained in the original allegation of this program contained in the Petition, this program is *de jure* specific in accordance with 19 U.S.C. § 1677(5A)(D)(i), because free water use is limited to a group of industries, namely those in the shrimp sector.[3] Commerce initiated its investigation on this alleged basis for specificity, but restricted its investigation to fee exemptions rather than the provision of water.[4]

In the new subsidy allegation filed on February 21, 2024, Petitioner again alleged that the program was *de jure* specific pursuant to 19 U.S.C. § 1677(5A)(D)(i), noting that "the GOE's National Secretary of Water specifically considered, and confirmed, that the shrimp industry's non-consumptive use of water was exempt from fees otherwise levied on the provision of water."[5] The Government of Ecuador ("GOE") confirmed this fact by providing a 2019 pronouncement from the Undersecretariat of Aquaculture within the Ministry of Production, Trade, Investment, and Fishing, which states that the: "Undersecretary of Aquaculture concludes and pronounces that natural or legal persons engaged in aquaculture activities use water and do

---

[3] Petition at Volume VI, page 31.

[4] *See* Enforcement and Compliance, Office of AD/CD Operations, *Frozen Warmwater Shrimp from Ecuador: Countervailing Duty Investigation Initiation Checklist* (Nov. 14, 2023) at 8.

[5] ASPA New Subsidy Allegations (Feb. 21, 2024) at 5 (citing the Petition at Exhibit IV-32).

not consume it; therefore, this sector should not be subject to any fee or rate for the use of raw water."[6] Thus, Commerce should find that the provision of brackish water is *de jure* specific, as only the aquaculture sector was subject to the special pronouncement declaring that all persons engaged in aquaculture will be deemed to not make consumptive use of water and therefore be provided such water free of any fees or rates.

In addition, as an alternative basis for specificity, the record also shows that the shrimp industry is likely to be the predominant user of this program. The same pronouncement announcing the policy reviewed above states: "In Ecuador, the main aquaculture activity is the cultivation of white shrimp (Litopennaeus vanamei){.}"[7] Thus, shrimp producers are the predominant beneficiary of the program providing water to the aquaculture industry free of charge. The GOE pronouncement also notes that the salinity of the water present on the Ecuadorian coast is well-suited to shrimp aquaculture.[8] Similarly, the GOE notes that all of the aquaculture operations that take place on beach and bay concessions with proximity to coastal water are currently engaged in shrimp farming.[9] Based on this information, it is reasonable to conclude that the shrimp industry is the predominant user of the provision of brackish water program pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(II).

---

6 Ministry of Production, Trade, Investment, and Fishing, Undersecretariat of Aquaculture, *Technical Report DPPA-2019-006* (Feb. 25, 2019), attached to the GOE Section II Questionnaire Response (Feb. 15, 2024) at Exhibit TAX-4(f).

7 *See id*.

8 *See id*.

9 GOE Section II Questionnaire Response (Feb. 15, 2024) at LTAR-36 – LTAR-37.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 3/5/24 1:28 PM, Submission Status: Approved

2. **Please provide a market-determined benchmark price for the commercial value of the non-consumptive use of brackish water. Please provide supporting documentation demonstrating how the petitioner acquired and/or calculated this price.**

**Response:**

Because the GOE owns all water resources in Ecuador,[10] there are no market-determined prices for brackish water in Ecuador pursuant to 19 C.F.R. § 351.511(a)(2)(i). Therefore, Commerce should use an out-of-country benchmark to measure the benefit conferred by the provision of brackish water.

Petitioner identified two sources for market-determined benchmark prices for the non-consumptive use of brackish water. Because all brackish water is non-potable, it is not consumed in its brackish state like drinking water.[11] Attached at **Exhibit 2** is a price for brackish water from the water utility for the city of El Paso, Texas. The document states as follows: "Brackish Water means water containing 1000 mg/L or more of Total Dissolved Solids (TDS) and/or 300 mg/L or more of chlorides. The Utility will supply Brackish Water at a rate of $3.09 per CCF." Attached at **Exhibit 3** is a price for brackish non-potable water from the Lanai Water Company in Lanai, Hawaii. In addition to a flat monthly service charge, in 2023 the Lanai Water Company charged from $3.45 to $5.40 per thousand gallons of brackish non-potable water. Attached at **Exhibit 4** is the conversion factor from centum cubic feet ("CCF") to gallons.

---

10 *See* Petition at Volume IV, page 30 and Exhibit IV-30. *See also* Ecuador's Constitution of 2008 with Amendments through 2011 at Art. 318, attached to GOE Section II Questionnaire Response (Feb. 15, 2024) at Exhibit TAX-4(a).

11 *See* "What is Brackish Water? The basics about brackish water," attached at **Exhibit 1**.

# Tab 36

# P.R. 263-64

# C.R. 153

Barcode: 4526186-01 C-331-806 INV - Investigation

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 319
Investigation
AD/CVD Operations, Office IV
Business proprietary information of the GOE has been redacted on pages S-7, S-16 to S-18, S-20 to S-22, S-27 to S-30, S-36, S-37, S-39, S-45 to S-47, S-48, S-50 to S-54, S-56, S-58, and S-61; and in Exhibits S-Q2, S-Q3(a), S-Q5(a) and (b), S-Q36(b) to S-Q38(b)-2, S-Q41(a) to S-Q41(d), S-Q41(f) to S-Q43, S-Q52(a), and S-Q52(b);
And see Addendum for business proprietary information of other submitters redacted from this submission.

**PUBLIC VERSION**

March 14, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Government of Ecuador's Supplemental Section II Questionnaire Response

Dear Secretary Raimondo:

On behalf of the Government of Ecuador ("GOE"), we hereby submit the GOE's response to the Department's March 1, 2024, questionnaire. This response is timely submitted in accordance with the Department's March 8, 2024, letter, re: "Request for Extension to GOE Supplemental Questionnaire," which extended the deadline for the GOE's supplemental questionnaire response until today. Accompanying this submission are calculation worksheets in Excel® format.


Filed By: unuremburg@tradepacificlaw.com, Filed Date: 3/14/24 1:46 PM, Submission Status: Approved

Pursuant to 19 C.F.R. § 351.304(a)(1)(i), the GOE requests proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which the GOE requests proprietary treatment, for itself and respondents and their cross-owned affiliates, and the basis for the request:

- Exact Amount of Benefits Applied for or Received: Contained in the narratives and exhibits. Protected under 19 C.F.R. § 351.105(c)(8).

- Other specific information related to the GOE's operations, financial and tax information, etc. the release of which may result in the disclosure of confidential information maintained by the GOE as well as production, operations, ownership and affiliation information of the respondents, and their cross-owned affiliates, the release of which to the public would cause substantial harm to the competitive position of the respondents and their cross-owned affiliates: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to the competitive position of the mandatory respondents and their cross-owned affiliates. The GOE consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to the Government of Ecuador*

REPÚBLICA DEL ECUADOR

Ministerio de Producción, Comercio Exterior, Inversiones y Pesca

## GOVERNMENT CERTIFICATION

I, Juan Carlos Sanchez, Undersecretary of Origin, Trade Remedies and Trade Normative, currently employed by the Government of Ecuador, certify that I prepared or otherwise supervised the preparation of the attached submission of the Supplemental Section II Response, filed on March 13, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806)

I certify that the public information and any business proprietary information of the Government of Ecuador contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.

In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: JuanCarlosSánchez T.

Date: 03/13/2024



EL NUEVO ECUADOR

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to the Government of Ecuador, certify that I have read the attached submission of the Supplemental Section II Questionnaire Response, filed on March 13, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: March 13, 2024

Barcode: 4526186-01 C-331-806 INV - Investigation

**CERTIFICATE OF SERVICE**

I, Kenneth N. Hammer, hereby certify on this 14th day of March, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Filed By: unuremburg@tradepacificlaw.com, Filed Date: 3/14/24 1:46 PM, Submission Status: Approved

**Addendum Listing Other Submitters' Business Proprietary Information**

Tropack's BPI has been redacted from pages S-5, S-28, and S-29; and from Exhibits S-Q5(b), S-Q12, S-Q20, S-Q27, and S-Q36(b).

Naturisa's BPI has been redacted from pages S-8, S-39, S-56, and S-57; and from Exhibits S-Q3(a), S-Q5(a), S-Q6, S-Q13(a) to S-Q27, S-Q36(b) to S-Q38(b)-2, S-Q41(a) to S-Q41(f), S-Q45, S-Q49, S-Q50, S-Q56(a), S-Q56(b), and S-Q58(b).

SONGA's BPI has been redacted from pages S-16 and S-38; and from Exhibits S-Q3(a), S-Q20, S-Q27, S-Q38(b)-2, S-Q41(c), S-Q41(d), S-Q43, S-Q45, S-Q49, S-Q50, S-Q56(a), S-Q56(b), and S-Q58(b).

Produmar's BPI has been redacted from page S-17; and from Exhibits S-Q3(a), S-Q6, S-Q20, S-Q27, S-Q36(b), S-Q45, S-Q49, S-Q50, and S-Q58(b).

Santa Priscila's BPI has been redacted from pages S-17 and S-18; and from Exhibits S-Q3(a), S-Q13(a), S-Q20, S-Q27, S-Q36(b), S-Q38(b)-1, S-Q41(a), S-Q41(e), S-Q41(f), S-Q45, S-Q49, S-Q50, and S-Q56(a).

Champmar's BPI has been redacted from page S-42; and from Exhibits S-Q27, S-Q38(b)-1, S-Q38(b)-2, S-Q41(c), and S-Q41(d).

Egidiosa's BPI has been redacted from page S-44; and from Exhibits S-Q27, S-Q38(b)-1, S-Q38(b)-2, S-Q41(a) to S-Q41(f).
Holding Sola & Sola Solacciones BPI is contained in Exhibit S-Q56(a).

Barcode: 4526186-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**AD/CVD Operations, Office IV**

**Business proprietary information of the GOE, Tropack, Naturisa, SONGA, Produmar, Santa Priscila, Champmar, and Egidiosa has been ranged or redacted on the pages and in the exhibits listed on the cover letter of this submission.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

# COUNTERVAILING DUTY INVESTIGATION OF FROZEN WARMWATER SHRIMP FROM ECUADOR

# RESPONSE OF THE GOVERNMENT OF ECUADOR TO THE DEPARTMENT'S MARCH 1, 2024, SUPPLEMENTAL SECTION II QUESTIONNAIRE

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**

**Trade Pacific PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: March 14, 2024**

**Counsel to the Government of Ecuador**

Filed By: unuremburg@tradepacificlaw.com, Filed Date: 3/14/24 1:46 PM, Submission Status: Approved

# Exhibit S-Q3(a)

**Environmental Tax Incentive**

| Line 810 |
|---|
| LRTI - Article 10 Paragraph 7/ 100% deduction for depreciation and amortization of machinery, equipment and technologies for clean production, renewable energy, reduction of environmental impact and reduction of greenhouse gases. |

**a. Value of Deduction Claimed by Responding Companies**

| Company name | | Fiscal Year 2019 | Fiscal Year 2020 | Fiscal Year 2021 | |
|---|---|---|---|---|---|
| PRODUMAR S.A. | [ | | | | ] |
| NATURISA S. A. | [ | | | | ] |

**b. Total Number of All Companies and Value of Deducations Claimed, by Year and Industry**

| | | Fiscal Year 2019 | | Fiscal Year 2020 | | Fiscal Year 2021 | | |
|---|---|---|---|---|---|---|---|---|
| Industry | | # of Cos | Value | # of Cos | Value | # of Cos | Value | |
| Accommodation and food service activities | [ | | | | | | | ] |
| Administrative and support service activities | [ | | | | | | | ] |
| Agriculture, forestry and fishing | [ | | | | | | | ] |
| Construction | [ | | | | | | | ] |
| Education | [ | | $ 3,380.00 | | | | | ] |
| Electricity, gas, steam and air conditioning supply | [ | | | | | | | ] |
| Financial and insurance activities | [ | | | | | | | ] |
| Human health and social work activities | [ | | | | | | | ] |
| Information and communication | [ | | | | $ 43,500.00 | | | ] |
| Manufacturing | [ | | | | | | | ] |
| Mining and quarrying | [ | | | | | | | ] |
| Other service activities | [ | | | | | | | ] |
| Professional, scientific and technical activities | [ | | | | | | | ] |
| Public administration and defence; compulsory social security | [ | | | | | | | ] |
| Real estate activities | [ | | | | | | | ] |
| Transportation and storage | [ | | | | | | | ] |
| Water supply; sewerage, waste management and remediation activities | [ | | | | | | | ] |
| Wholesale and retail trade; repair of motor vehicles and motorcycles | [ | | | | | | | ] |
| **Grand Total** | [ | | | | | | | ] |

**c. Total Value of Deducations Claimed by Top 50 Companies, by Year and Industry**

| | | Fiscal Year 2019 | | Fiscal Year 2020 | | Fiscal Year 2021 | | |
|---|---|---|---|---|---|---|---|---|
| Industry | | # of Cos | Value | # of Cos | Value | # of Cos | Value | |
| Administrative and support service activities | [ | | | | | | | ] |
| Agriculture, forestry and fishing | [ | | | | | | | ] |
| Construction | [ | | | | | | | ] |
| Human health and social work activities | [ | | | | | | | ] |
| Information and communication | [ | | | | | | | ] |
| Manufacturing | [ | | | | | | | ] |
| Mining and quarrying | [ | | | | | | | ] |
| Public administration and defence; compulsory social security | [ | | | | | | | ] |
| Real estate activities | [ | | | | | | $ 445,000.00 | ] |
| Transportation and storage | [ | | | | | | | ] |
| Wholesale and retail trade; repair of motor vehicles and motorcycles | [ | | | | | | | ] |
| **Grand Total** | [ | | | | | | | ] |

**Tax Incentives to Priority Sectors Under 2010 Organic Production Code**

**Line 810**

Ley Fomento Productivo - Article 26 / Income from new productive investments, according to letters a and b of Art. 13 of the COPCI, in the prioritized sectors established in Art. 9.1 of the LRTI outside Quito and Guayaquil.

**a. Value of Deduction Claimed by Responding Companies**

| Company name | | Fiscal Year 2019 | Fiscal Year 2020 | Fiscal Year 2021 | |
|---|---|---|---|---|---|
| PRODUMAR S.A. | [ | | | | ] |
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. | [ | | | | ] |

**b. Total Number of All Companies and Value of Deducations Claimed, by Year and Industry**

| | | Fiscal Year 2019 | | Fiscal Year 2020 | | Fiscal Year 2021 | | |
|---|---|---|---|---|---|---|---|---|
| Industry | | # of Cos | Value | # of Cos | Value | # of Cos | Value | |
| Accommodation and food service activities | [ | | | | | | | ] |
| Administrative and support service activities | [ | | $ 127,000.00 | | | | | ] |
| Agriculture, forestry and fishing | [ | | | | | | | ] |
| Arts, entertainment and recreation | [ | | | | | | | ] |
| Construction | [ | | | | | | | ] |
| Education | [ | | | | | | | ] |
| Electricity, gas, steam and air conditioning supply | [ | | | | | | | ] |
| Financial and insurance activities | [ | | | | | | | ] |
| Human health and social work activities | [ | | | | | | $ 11,600.00 | ] |
| Information and communication | [ | | | | | | | ] |
| Manufacturing | [ | | | | | | | ] |
| Other service activities | [ | | | | | | | ] |
| Professional, scientific and technical activities | [ | | | | | | | ] |
| Real estate activities | [ | | | | | | | ] |
| Transportation and storage | [ | | | | | | | ] |
| Wholesale and retail trade; repair of motor vehicles and motorcycles | [ | | | | | | | ] |
| **Grand Total** | [ | | | | | | | ] |

c. Total Value of Deducations Claimed by Top 50 Companies, by Year and Industry

| | | Fiscal Year 2019 | | Fiscal Year 2020 | | Fiscal Year 2021 | | |
|---|---|---|---|---|---|---|---|---|
| Industry | | # of Cos | Value | # of Cos | Value | # of Cos | Value | |
| Accommodation and food service activities | [ | | | | | | | ] |
| Administrative and support service activities | [ | | | | | | | ] |
| Agriculture, forestry and fishing | [ | | | | | | | ] |
| Electricity, gas, steam and air conditioning supply | [ | | | | | | | ] |
| Financial and insurance activities | [ | | | | | | | ] |
| Human health and social work activities | [ | | | | | | | ] |
| Information and communication | [ | | | | $ 1,920,000.00 | | | ] |
| Manufacturing | [ | | | | | | | ] |
| Other service activities | [ | | | | | | | ] |
| Professional, scientific and technical activities | [ | | | | | | | ] |
| Real estate activities | [ | | | | | | | ] |
| Transportation and storage | [ | | | | | | | ] |
| Wholesale and retail trade; repair of motor vehicles and motorcycles | [ | | | | | | | ] |
| **Grand Total** | [ | | | | | | | ] |

**Export Tax Incentive**

| |
|---|
| **Line 033** |
| For the selected tax period, are you incorporated in a company that meets the condition for the benefit of the rate reduction for reinvestment of profits? **YES** |

**a. Values Related to this Incentive as Reported by Responding Companies**

| Company name | | Fiscal Year 2018 | Fiscal Year 2019 | Fiscal Year 2020 | Fiscal Year 2021 | |
|---|---|---|---|---|---|---|
| PRODUMAR S.A. | | | | | | |
| Taxable Income (Field 836) | [ | | | | | ] |
| Profit to be reinvested and capitalized (legally subject to rate reduction) (Field 847) | [ | | | | | ] |
| Income tax due (Field 850) | [ | | | | | ] |
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. | | | | | | |
| Taxable Income (Field 836) | [ | | | | | ] |
| Profit to be reinvested and capitalized (legally subject to rate reduction) (Field 847) | [ | | | | | ] |
| Income tax due (Field 850) | [ | | | | | ] |
| NATURISA S.A | | | | | | |
| Taxable Income (Field 836) | [ | | | | | ] |
| Profit to be reinvested and capitalized (legally subject to rate reduction) (Field 847) | [ | | | | | ] |
| Income tax due (Field 850) | [ | | | | | ] |

**b. Total Number of All Companies and Values, by Year and Industry**

| | | Fiscal Year 2018 | | | | Fiscal Year 2019 | | | | Fiscal Year 2020 | | | | Fiscal Year 2021 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Industry | | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | |
| Accommodation and food service activities | [ | | | | | | | | | | | | | | | | | ] |
| Administrative and support service activities | [ | | | | | | | | | | | | | | | | | ] |
| Agriculture, forestry and fishing | [ | | | | | | | | | | | | | | | | | ] |
| Arts, entertainment and recreation | [ | | | | | | | | | | | | | | | | | ] |
| Construction | [ | | | | | | | | | | | | | | | | | ] |
| Education | [ | | | | | | | | | | | | | | | | | ] |
| Financial and insurance activities | [ | | | | | | | | | | | | | | | | | ] |
| Human health and social work activities | [ | | | | | | | | | | | | | | | | | ] |
| Information and communication | [ | | | | | | | | | | | | | | | | | ] |
| Manufacturing | [ | | | | | | | | | | | | | | | | | ] |
| Mining and quarrying | [ | | | | | | | | | | | | | | | | | ] |
| Other service activities | [ | | | | | | | | | | | | | | | | | ] |
| Professional, scientific and technical activities | [ | | | | | | | | | | | | | | | | | ] |
| Public administration and defence; compulsory social security | [ | | | | | | | | | | | | | | | | | ] |
| Real estate activities | [ | | | | | | | | | | | | | | | | | ] |
| Transportation and storage | [ | | | | | | | | | | | | | | | | | ] |
| Water supply; sewerage, waste management and remediation activities | [ | | $ 39,000.00 | | | | | | | | | | | | | | | ] |
| Wholesale and retail trade; repair of motor vehicles and motorcycles | [ | | | | | | | | | | | | | | | | | ] |
| **Grand Total** | [ | | | | | | | | | | | | | | | | | ] |

**c. Top 50 Companies and Values, by Year and Industry**

| | | Fiscal Year 2018 | | | | Fiscal Year 2019 | | | | Fiscal Year 2020 | | | | Fiscal Year 2021 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Industry | | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | |
| Accommodation and food service activities | [ | | | | | | | | | | | | | | | | | ] |
| Agriculture, forestry and fishing | [ | | | | | | | | | | | | | | | | | ] |
| Construction | [ | | | | | | | | | | | | | | | | | ] |
| Financial and insurance activities | [ | | | | | | | | | | | | | | | $ 385,000.00 | | ] |
| Human health and social work activities | [ | | | | | | | | | | | | | | | | | ] |
| Information and communication | [ | | | | | | | | | | | | | | | | | ] |
| Manufacturing | [ | | | | | | | | | | | | | | | | | ] |
| Mining and quarrying | [ | | | | | | | | | | | | | | | | | ] |
| Professional, scientific and technical activities | [ | | | | | | | | | | | | | | | | | ] |
| Real estate activities | [ | | | | | | | | | | | | | | | | | ] |
| Transportation and storage | [ | | | | | | | | | | | | | | | | | ] |
| Wholesale and retail trade; repair of motor vehicles and motorcycles | [ | | | | | | | | | | | | | | | | | ] |
| **Grand Total** | [ | | | | | | | | | | | | | | | | | ] |

PUBLIC VERSION - BPI Has Been Ranged or Redacted

**Export Tax Incentives for Sustained/Increased Employment**

| Line 034 | |
|---|---|
| For the selected tax period, are you a regular exporting company that meets the conditions for the benefit of the income tax rate reduction? | **YES** |

**a. Values Related to this Incentive as Reported by Responding Companies**

| Company name | | Fiscal Year 2018 | Fiscal Year 2019 | Fiscal Year 2020 | Fiscal Year 2021 | |
|---|---|---|---|---|---|---|
| NATIONAL SOCIETY OF GALAPAGOS C.A. | | | | | | |
| Taxable Income (Field 836) | [ | | | | | ] |
| Profit to be reinvested and capitalized (legally subject to rate reduction) (Field 847) | [ | | | | | ] |
| Income tax due (Field 850) | [ | | | | | ] |
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. | | | | | | |
| Taxable Income (Field 836) | [ | | | | | ] |
| Profit to be reinvested and capitalized (legally subject to rate reduction) (Field 847) | [ | | | | | ] |
| Income tax due (Field 850) | [ | | | | | ] |

**b. Total Number of All Companies and Values, by Year and Industry**

| | | Fiscal Year 2018 | | | | Fiscal Year 2019 | | | | Fiscal Year 2020 | | | | Fiscal Year 2021 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Industry | | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | # of Cos | Taxable Income Field 836 | Reinvst Profit Field 847 | Tax Due Field 850 | |
| Accommodation and food service activities | [ | | | | | | | | | | $ 25,150.00 | | | | | | | ] |
| Administrative and support service activities | [ | | | | | | | | | | | | | | | | | ] |
| Agriculture, forestry and fishing | [ | | | | | | | | | | | | | | | | | ] |
| Arts, entertainment and recreation | [ | | | | | | | | | | | | | | | | | ] |
| Construction | [ | | | | | | | | | | | | | | | | | ] |
| Education | [ | | | | | | | | | | | | | | | | | ] |
| Electricity, gas, steam and air conditioning supply | [ | | | | | | | | | | | | | | | | | ] |
| Financial and insurance activities | [ | | | | | | | | | | | | | | | | | ] |
| Human health and social work activities | [ | | | | | | | | | | | | | | | | | ] |
| Information and communication | [ | | | | | | | | | | | | | | | | | ] |
| Manufacturing | [ | | | | | | | | | | | | | | | | | ] |
| Mining and quarrying | [ | | | | | | | | | | | | | | | | | ] |
| Other service activities | [ | | | | | | | | | | | | | | | | | ] |
| Professional, scientific and technical activities | [ | | | | | | | | | | | | | | | | | ] |
| Public administration and defence; compulsory social security | [ | | | | | | | | | | | | | | | | | ] |
| Real estate activities | [ | | | | | | | | | | | | | | | | | ] |
| Transportation and storage | [ | | | | | | | | | | | | | | | | | ] |
| Water supply; sewerage, waste management and remediation activities | [ | | | | | | | | | | | | | | | | | ] |
| Wholesale and retail trade; repair of motor vehicles and motorcycles | [ | | | | | | | | | | | | | | | | | ] |
| **Grand Total** | [ | | | | | | | | | | | | | | | | | ] |

**c. Top 50 Companies and Values, by Year and Industry**

| | | Fiscal Year 2018 | | | | Fiscal Year 2019 | | | | Fiscal Year 2020 | | | | Fiscal Year 2021 | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Industry | | | | | | | | | | | | | | | | | | |
| Administrative and support service activities | [ | | | | | | | | | | | | | | | | | ] |
| Agriculture, forestry and fishing | [ | | | | | | | | | | | | | | | | | ] |
| Electricity, gas, steam and air conditioning supply | [ | | | | | | | | | | | | | | | | | ] |
| Manufacturing | [ | | | | | | | | | | | | | | | | | ] |
| Mining and quarrying | [ | | | | | | | | $ 295,000.00 | | | | | | | | | ] |
| Transportation and storage | [ | | | | | | | | | | | | | | | | | ] |
| Wholesale and retail trade; repair of motor vehicles and motorcycles | [ | | | | | | | | | | | | | | | | | ] |
| **Grand Total** | [ | | | | | | | | | | | | | | | | | ] |

# Tab 37

# P.R. 266

# C.R. 170

Barcode: 4526979-01 C-331-806 INV - Investigation

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 67
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been redacted from pages 2, 3, 7 to 9, and in the Exhibit List; and in Exhibits SQ-1, SQ-6, and SQ-7.

**PUBLIC VERSION**

March 15, 2024

Re: Frozen Warmwater Shrimp from Ecuador – Benchmark Supplemental Questionnaire of SONGA and Industrial Pesquera Santa Priscila

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") and Industrial Pesquera Santa Priscila, S.A, mandatory respondents in the above-referenced CVD investigation, we submit the companies' response to the Department's March 7, 2024, benchmarks supplemental questionnaire. This response is timely submitted in accordance with the Department's March 11, 2024, letter, re: "Request for Benchmark Submission Supplemental Questionnaire," which extended the deadline for the supplemental response until today.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the


Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

nature of the information for which Santa Priscila and SONGA requests proprietary treatment and the basis for the request:

- Other Specific Business Information Related to Santa Priscila's and SONGA's purchase and sale transactions, etc., the Release of Which to the Public Would Cause Substantial Harm to Santa Priscila's and SONGA's Competitive Positions: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to Santa Priscila's and SONGA's competitive positions. The companies consent to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional de Galapagos, C.A.*

**COMPANY CERTIFICATION**

I, Diego Puente, Vice President, currently employed by Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), certify that I prepared or otherwise supervised the preparation of the attached submission of the Benchmark Submission Supplemental Questionnaire response, filed on March 15, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Santa Priscila contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: March 15th, 2024

Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

**COMPANY CERTIFICATION**

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I prepared or otherwise supervised the preparation of the attached submission of the Benchmark Submission Supplemental Questionnaire response, filed on March 15, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: March 15 2024

Barcode: 4526979-01 C-331-806 INV - Investigation

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to the Industrial Pesquera Santa Priscila S.A. and Sociedad Nacional de Galápagos C.A., certify that I have read the attached submission of the Supplemental Benchmarks Questionnaire Response, filed on March 15, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: March 15, 2024

Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 15th day of March 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4526979-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**AD/CVD Operations, Office IV**

**Business proprietary information of Tropack, Naturisa, SONGA, and Santa Priscila has been redacted on the pages and in the exhibits listed on the cover letter of this submission.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER SHRIMP FROM ECUADOR**

# RESPONSE OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A. AND SOCIEDAD NACIONAL DE GALAPAGOS C.A. TO THE DEPARTMENT'S MARCH 7, 2024, SUPPLEMENTAL BENCHMARK QUESTIONNAIRE

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**

**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: March 15, 2024**

**Counsel to Santa Priscila and SONGA**

Barcode: 4526979-01 C-331-806 INV - Investigation

**PUBLIC VERSION – BPI Has Been Redacted**

**Benchmark Submission Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador**
**Period of Investigation (POI) 01/01/2022 – 12/31/2022**

**Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, SONGA and Santa Priscila should repeat the question in full to which they are responding and place their answer directly below the question. SONGA and Santa Priscila should also fully answer each question in this supplemental questionnaire. Please ensure that SONGA and Santa Priscila provides a cover sheet for each exhibit they submit that clearly states the complete exhibit number and title.**

**<u>Electricity</u>**

1. **In Exhibit 2(b), the respondents provided sample invoices that were issued to Tropical Ecuador Tropack S.A. (Tropack) during the POI. However, several pages of Exhibit 2(b) are blurry and illegible. Please resubmit Exhibit 2(b) in its entirety and ensure that each page is clear and legible.**

<u>ANSWER</u>: As requested, **Exhibit SQ-1** contains the resubmitted 12 monthly invoices issued to Tropack by the privately owned company, **[ ]**, **{Tropack BPI}** covering electricity provided in 2022.

2. **Please confirm that any reference to "[ ]" in all exhibits refers to [ ] and not Santa Priscila or Tropack.**

<u>ANSWER</u>: Santa Priscila confirms that all references to "[ ]" in the agreements contained in Exhibit 1(b) to the February 28, 2024, benchmark submission, refer to [ ], not Santa Priscila. This fact can also be confirmed from the fact that the recitals at the beginning of each contract contained in Exhibits 1(b) and 1(c) to the February 28th benchmark submission **[** ] in each agreement. **{Santa Priscila BPI}**

3. **Please confirm that Santa Priscila's electricity rates remained the same regardless of time and type of consumption, and that Commerce's understanding that, based on electricity service contracts with [ ], Santa Priscila's electricity rates changed as follows:**

- **[ ].**
- **[ ].**
- **[ ].**



Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

ANSWER: Santa Priscila confirms that it paid a [ ] throughout 2022 regardless of the time of day or the nature of the consumption. **{Santa Priscila BPI}** This rate went into effect under the agreement with [ ]. **{Santa Priscila BPI}** Exhibit 2(a) to the February 28th benchmark submission contains invoices for every month of the POI in original Spanish and with English translation. The page of each monthly invoice that lists [ ] also lists a unit price of [ ], which matches the price stated in the second service contract referenced in the Department's question and confirms Santa Priscila's statement above. **{Santa Priscila BPI}**

**4. In Exhibit 4(a), the respondents provided electricity prices that were charged in Indonesia for industrial and commercial uses as "accessed via CEIC." Please submit screenshots/printouts of the original report as accessed via CEIC that would substantiate the extracted data.**

ANSWER: The requested screen shots to substantiate the extracted data are provided in **Exhibit SQ-2**.

**5. In Exhibit 5, the respondents provided electricity prices that were charged in India's state of Andhra Pradesh. The rate schedule includes five columns, titled: "SALES, MU," "Charges Tariff," "Total Charges," "Non-Tariff Income," and "Total Revenue." Please respond to the following.**

**a. Please explain the meaning of each column and why the respondents selected the rates in "Charges Tariff."**

ANSWER:

- *SALES, MU*: This column represents total electricity sales in "million units (MU)," or gigawatt hours. See Exhibit 5 of Santa Priscila and SONGA's February 28, 2024, benchmark submission, "*Electricity Tariff & Duty and Average Rates of Electricity Supply in India*" at iii referring to kilowatt hours (kWh) as "units."[1] Accordingly, the calculation provided in Exhibit 6a multiplies the sales quantity in MU by 1,000,000 to convert to kWh.

- *Charges tariff*: This column provides the per kWh and fixed charges for electricity use. The subheading "EnCharge" corresponds to the rupees (Rs) per kWh price, while

[1] See **Exhibit SQ-3**, which explains that "In India, the kilowatt hour is often simply called a Unit of energy. A million units, designated MU, is a gigawatt hour and a BU (billion units) is a terawatt hour."

Barcode: 4526979-01 C-331-806 INV - Investigation



"FxCharge" refers to a fixed ("demand") charge that may vary by individual users' peak energy usage and is expressed in Rs/kW/month.

- These tariff rates are more clearly delineated on page 51 of Exhibit 5 of Santa Priscila and SONGA's February 28, 2024, benchmark submission, "*Electricity Tariff & Duty and Average Rates of Electricity Supply in India*". For the line labeled "Aqua Culture & Animal Husbandry," the "Demand charge" corresponds to the fixed "FxCharge of 30 Rs/kW/month, and the "Energy charge" of 385 Paise/kWh (3.85 Rs/kWh) corresponds to the per kWh "EnCharge" of 3.85 Rs/kWh. These charges are identical to those on page 326 of Exhibit 5 document *Tariff for Retail Sale of Electricity during 2022-23* in the row labeled "Aquaculture and Animal Husbandry,"[2] which includes the figures used in the calculation in Exhibit 6a of Santa Priscila and SONGA's February 28, 2024, benchmark submission.

- Exhibit 5 of Santa Priscila and SONGA's February 28, 2024, benchmark submission, "*Tariff & Duty and Average Rates of Electricity Supply in India*" at pages iii-iv provides an example of how this fixed or "demand" charge is incorporated into a tariff charge calculation for an individual user, based on its peak usage. Note that this particular example is for residential use in Rajasthan and, therefore, the tiered Fixed/Demand and Energy charge structure is not applicable to aquaculture in Andhra Pradesh, though the remainder still applies as noted at the bottom of page iv.

- *Total charges*: These columns represent estimates of actual usage and charges (or revenue) at the tariff rates described above. The total charges incorporate the sales in MU at the per kWh rate, plus the fixed charges for all users.

  - These charges are expressed in "Rs crores," as shown on page 312 of Exhibit 5 of Santa Priscila and SONGA's February 28, 2024, benchmark submission, "*Tariff for Retail Sale of Electricity during 2022-23*," which equal 10,000,000 Rs. Thus, the calculation provided in Exhibit 6a of Santa Priscila and SONGA's February 28, 2024, benchmark submission, multiplies the value in Total Charges by 10,000,000 to derive Rs. See also this website https://www.dictionary.com/browse/crore defining "crore."

  - Since there is a fixed charge associated with the electricity rates (which may vary by individual user) *in addition* to the per kWh charge, we instead use these sales figures to derive a per kWh cost based on actual usage and charges, as provided in

[2] Respondents notes that the calculation provided at the end of Exhibit 6a includes a label "Actual usage for agriculture and animal husbandry" which should instead read "Actual usage for *aquaculture* and animal husbandry."



Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

Exhibit 6a of Santa Priscila and SONGA's February 28, 2024, benchmark submission.

- For example:
  - *Total charges* for aquaculture & animal husbandry are 1,564.72 Rs crores (or 15,647,200,000 Rs).
  - *Sales* of 3,876.72 MU (or 3,876,720,000 kWh) multiplied by the per kWh rate of 3.85 Rs yields 1,492.54 Rs crores. The remainder (1,564.72 – 1492.54 = 72.18 Rs crores) represents revenue from fixed demand charges, as discussed below.
  - In the calculation provided in Exhibit 6a of Santa Priscila and SONGA's February 28, 2024, benchmark submission, we divide actual usage under column *"Sales, MU"* (converted to kWh) by actual tariff revenue under column "*Total charges"* (converted to Rs) in order to derive the price of 4.036 Rs/kWh or $0.051/kWh. This price is comparable to the "energy price" alone (3.85 Rs/kWh or $0.049/kWh), indicating that the fixed "demand" or "FxCharge" is comparatively minimal once taken into account.

- *Non-tariff income*: This refers to additional income received by the state of Andhra Pradesh not specifically related to electricity tariff charges. A similar report for the previous year describes these charges as: "delayed payment surcharge, recoveries from theft of power or other malpractices, interest on income and other miscellaneous receipts."[3] These revenues are considered irrelevant and therefore not included or considered in our calculation. In any case, they are minimal in comparison to tariff-related charges.

- *Total Revenue*: Total charges plus non-tariff income. Again, these figures are not used in the per kWh calculation, as they incorporate non-tariff income.

**b. Please explain what rates for "Salt farming units with Connected Load up to 15HP" represent.**

[3] See **Exhibit SQ-4** for Andhra Pradesh Electricity Regulatory Commission, "Retail Supply Tariffs 2021-22" (March 25, 2021) at 142. Additionally, see the second cover page of this document indicating that "SPDCL," "EPDCL," and "CPDCL" refer to the Southern, Eastern, and Central divisions of the Anhdra Pradesh Power Distribution Company, respectively. These correspond to the sub-columns for *Sales, MU* and *Charges Tariff*, which collectively sum to the Total column for each of these items.



Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

ANSWER: The rates for "Salt-farming units" are not relevant to our calculation and pertain only to production of salt. Our calculations only consider the tariff rates and usage for "Aquaculture and Animal Husbandry."

**6. In Exhibit 7, the respondents provided the production volume of Pacific white leg shrimp in India, by state, in 2022. Please compare white leg shrimp to the merchandise under consideration.**

ANSWER: White leg shrimp and the merchandise under consideration are the same thing, as the Department stated in its "Appendix -- Scope of the Investigations" to its November 21, 2023 Notice of Initiation of Countervailing Duty Investigations. See 88 Fed. Reg. 81053. The Appendix states in relevant part that "Warmwater shrimp and prawns are generally classified in, but are not limited to, the *Penaeidae* family. Some examples of the farmed and wild-caught warmwater species include, but are not limited to, whiteleg shrimp (*Penaeus vannamei)* . . . ." Id. at 81057-81058.

See also **Exhibit SQ-5**. This article states that "*Penaeus vannamei*, also known as the Pacific White Shrimp and the Whiteleg Shrimp, is native to the tropical East Pacific from the Gulf of California, Mexico to northern Peru. It is the most widely cultured shrimp in the world and is raised in at least 27 countries, with major production operations occurring in the US, Mexico, Central America, tropical South America, China, India, and southeast Asia."

**Land**

**7. In Exhibit 9-14, the respondents provided land purchases between various parties. For each sale, please state whether the sale was or was not for a beach or bay area.**

ANSWER: As the Department is aware from the questionnaire response of the GOE, the law prohibits the sale of beach or bay area land, which remains the property of the GOE but may be subject to land concessions. Therefore, the sales reported in Exhibits 9-14 were not for a beach or bay area, but rather, were for "high land." This term denominates land that is immediately adjacent to beach or bay areas. It does not denote mountainous areas, as the petitioners have



Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

Barcode: 4526979-01 C-331-806 INV - Investigation



suggested. Shrimp farms located on high land (in Spanish: *"tierra alta")*, like shrimp farms located on intertidal land, make non-consumptive use of brackish water in their ponds. Pumps are used to move brackish water from its source to the pond and then to return that water to the source after its non-consumptive use.

**8. In Exhibit 11 and 14, the respondents provided documentation for land purchases between two parties. Several pages of the original Spanish text remained untranslated in the English version as found in Exhibits 11 and 14. Please resubmit both exhibits with all pages of the Spanish version translated into English.**

ANSWER: The Respondents provide English translation of all pages of the Spanish language version of Santa Priscila's purchase contract with [ ] **{Santa Priscila BPI}** in **Exhibit SQ-6**. We provide the English translation of all pages of the Spanish language version of [ ] **{Santa Priscila BPI}** in **Exhibit SQ-7**.

**9. In Exhibit 12, the respondents broke out the price of land as found in Exhibit 11. The supporting documentation does not list the total hectares of the property. Please explain how Exhibit 12 ties to the sale contract in Exhibit 11 and that the Exhibit 12 evaluation accounts for all hectares of the property as found in Exhibit 11.**

ANSWER: Exhibits 11 and 12 tie together. Exhibit 11 is the contract of sale in which Santa Priscila purchased a shrimp farm from a company called [ ]. The contract states that the farm being sold covered [ ] and the sale price of this farm was [ ]. The sale price included a building, camps, land, and infrastructure, as shown in Exhibit 12. The right-hand column of Exhibit 12 lists the total sales price of each element of the farm. The total of all six elements of the purchase shown in Exhibit 12 is the very same [ ]. Thus, the two documents tie to each other.



Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

Barcode: 4526979-01 C-331-806 INV - Investigation



The value of the land shown in Exhibit 12 has two elements, which add to [ ]. Thus, the price per hectare of the land subject to this sale equals [

]. **{Santa Priscila BPI}**

**10. In addition to what has been provided in Exhibits 9-14, please provide examples, preferably in Ecuador, of monthly and/or yearly rental prices for coastal land that is or may be used for commercial/industrial purposes. In your response, please list the price, lot size, rental dates, location, and distance from the coast.**

ANSWER: We have been unable to find monthly or yearly rental prices for coastal land that is or may be used for commercial/industrial purposes. The same is true of petitioners, who in their benchmark submission provided the prices of two plots of land that were 500 square meters and 553 square meters, respectively, in size. Plot 1, which sold for $40,000, appears to be located in a residential area. Plot 2 appears to be a beachfront lot that, according to the real estate agent, is "Ideal for the construction of your business project or a single-family home for a beach vacation." These small beachfront plots are obviously unsuitable for commercial/industrial purposes, and petitioners have not claimed that they are suitable. There is no zoning-related information that establishes that a tiny shrimp farm could be constructed on either plot. Moreover, Plot 2, from the photographs that the agent provides, appears to be filled with boulders.

The Respondents have located the following advertisements of land for sale, but all appear to be equally unsuitable for a shrimp farm. See **Exhibits SQ-8(a)-(d).**

(1) A 60,000 square meter (6 hectares) parcel of land for sale at $4.1 million, which equals $683,333 per hectare.[4] See **Exhibit SQ-8(a).** The ad mentions that the land is suitable

[4] One hectare equals 2.471 acres. See **Exhibit SQ-9**, which states that: "**Definition:** A hectare (symbol: ha) is a unit of area that is accepted in the International System of Units (SI). It is primarily used to measure land area. One hectare is equal to 10,000 square meters and is equivalent to approximately 2.471 acres."



Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

for a "shrimp lab," but does not say it is suitable for a shrimp farm. Three shrimp labs operated by SONGA's two affiliates, [ ] and Naturisa in 2002 (under land concessions) occupied [ ]. **{Naturisa BPI}** See list of concessions provided as Exhibit NAT-III-6(a), which is the Beach/Bay Concessions Template provided in Naturisa's February 20, 2024 Response to Section III of the Department's January 24, 2024 Supplier Questionnaire.

Moreover, there is no indication that this land ever had a shrimp lab concession that could be transferred to a new owner. Nor is there any indication that the local zoning laws would permit the construction of a shrimp farm or lab. The ad suggests that the land is appropriate for a real estate developer. If it was suitable for a shrimp farm, then the real estate agent would certainly have said so since they were conscious of the existence of shrimp labs near the coast. The price of the land is, of course, just as prohibitive as the prices that petitioners submitted in their February 28, 2024 benchmark submission.

(2) An 1,800-hectare parcel of land for sale at $108 million, which equals $60,000 per hectare. See **Exhibit SQ-8(b).** Here again, the real estate agent suggests that the land is suitable for real estate development. However, the land extends "from the mountains to the beach." Even the petitioners do not claim that shrimp farms are or can be located in the mountains. The land also suffers from the same prohibitive obstacles to shrimp farm construction as discussed above for parcel (1).

(3) A 256.74-acre (103.9 hectares) parcel of land for sale at $8.3 million, which equals $79,884 per hectare. See **Exhibit SQ-8(c).** The real estate agent states that the land has "plans in place for subdivided lots." Clearly, a shrimp farm cannot be located on this land, and it also



Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

suffers from the same prohibitive obstacles to shrimp farm construction as discussed for parcel (1) above.

(4) A 4,322-acre (1,719 hectare) parcel of land for sale at $18 million, which equals $1,079 per hectare. See **Exhibit SQ-8(d).** The picture of the land shows a "stunning hillside," which means that the land is not flat and, therefore, would be difficult, if not impossible to construct a shrimp farm on. Therefore, the real estate agent imagines the use of this property as "a resort with top notch amenities, or luxury condos."



Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

Barcode: 4526979-01 C-331-806 INV - Investigation

**PUBLIC VERSION – BPI Has Been Redacted**

## Benchmark Supplemental Questionnaire – Exhibit List

| Exhibit No. | Description | Electronic | BPI/Public |
|---|---|---|---|
| **SQ-1** | Tropack [ ] Invoices | - | BPI |
| **SQ-2** | Supporting Documentation for Electricity | - | Public |
| **SQ-3** | Scholarly Encyclopedia Community, "Kilowatt Hour | - | Public |
| **SQ-4** | India Electricity Tariff Excerpts | - | Public |
| **SQ-5** | *Penaeus vannamei* Invasion History | - | Public |
| **SQ-6** | [ ] Purchase | - | BPI |
| **SQ-7** | [ ] Purchase Contract | - | BPI |
| **SQ-8(a)** | Land Sale Engabao, Ecuador | - | Public |
| **SQ-8(b)** | Land Sale Manta, Ecuador | - | Public |
| **SQ-8(c)** | Land Sale Esmeraldas, Ecuador | - | Public |
| **SQ-8(d)** | Land Sale Anconcito, Ecuador | - | Public |
| **SQ-9** | Hectare Conversion | - | Public |

Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:49 PM, Submission Status: Approved

# Tab 38

# P.R. 268

Barcode:4526987-01 C-331-806 INV - Investigation -

TRADE PACIFIC

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

March 15, 2024

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 42
Investigation
POI: 1/1/2022 – 12/31/2022
ITA/E&C, Office IV

**PUBLIC DOCUMENT**

Re: Frozen Warmwater Shrimp from Ecuador: Rebuttal Submission of SONGA and Industrial Pesquera Santa Priscila to the Petitioners' March 5, 2024 Response to Supplemental Questions Regarding New Subsidy Allegations

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galapagos, S.A. ("SONGA") and Industrial Pesquera Santa Priscila, S.A. (collectively the "Respondents"), we hereby submit factual information to rebut, clarify and correct the information that the petitioners submitted on March 5, 2024 in response to the Department's March 1, 2024 "Supplemental Questions Regarding New Subsidy Allegations." This submission is timely filed under 19 C.F.R.§ 351.301(c)(1)(v).

The Department's supplemental questionnaire sought evidentiary support for the petitioners' February 21, 2024 new subsidy allegation that the Government of Ecuador provided brackish water to shrimp farms for less than adequate remuneration. The petitioners' February 28, 2024 benchmark submission did not contain such support. That submission provided only the irrelevant rates charged by a municipal water authority, called ETAPA EP, in the mountain



Filed By: khammer@tradepacificlaw.com, Filed Date: 3/15/24 1:51 PM, Submission Status: Approved

town of Cuenca for fresh drinking water (*agua potable*) used for residential consumption or sanitation purposes.[1]

The petitioners' March 5, 2024 New Subsidy Allegations Supplemental Response is equally defective. Therefore, the Department should not initiate an investigation of the provision of brackish water for LTAR. Additional grounds for declining to initiate an investigation of brackish water for LTAR are provided below.

The Department first asked for documentation of petitioners' claim that the alleged provision of brackish water for non-consumptive use is *de facto* specific under the statute. However, the petitioners' answer to this question fails because no program exists under which the GOE has forgone the collection of revenue otherwise due from shrimp farmers or else provides brackish water for LTAR. Rather, the use of brackish water by shrimp farms is characterized by the absence of a program. In other words, the water is free when it is not consumed. Moreover, anyone can use brackish water for free if they do not consume it. Petitioners fail to show the contrary.

In question no. 2, the Department asked the petitioners to submit a "market-determined benchmark price for the commercial value of the non-consumptive use of brackish water" and further asked for "supporting documentation demonstrating how the petitioner acquired and/or calculated this price." (Emphasis added.) Petitioners did not answer either question. Instead, they provided the "price for brackish water from the water utility for the city of El Paso, Texas" and "the price for brackish non-potable water from the Lanai Water Company in Lanai, Hawaii."[2] See Petitioners' Supplemental Response at 4 and related exhibits 2-4.

[1] See Exhibit 4 to the petitioners' February 28th benchmark information submission.

[2] Petitioners have apparently abandoned the allegation in their petition that the Department should use as a benchmark "the official rate for raw water provided to drinking water service providers {that} is

El Paso purportedly charges $3.09 for 748 gallons of brackish water.[3] The island of Lanai purportedly charges from $3.45 to $5.40 for 1,000 gallons of brackish water. Id. However, petitioners have failed to show that either water authority charges for non-consumptive use. Therefore, the submitted water rates fail to respond to the Department's request for "the commercial value of the non-consumptive use of brackish water." Thus, petitioners' non-responsive submission is irrelevant to the calculation of a benchmark for the non-consumptive use of brackish water. We now provide additional reasons why the Department should reject use of the petitioners' proposed brackish water benchmarks and reject the new subsidy allegation.

Attached **Exhibit 1**, entitled "Resource use in Whiteleg Shrimp *Litopenaeus vannamei* Farming in Ecuador," provides statistical information concerning a random sample of 101 Ecuadorian shrimp farms in 2021, including the following findings: (1) the average size of a shrimp farm pond was 6.59 hectares; (2) the average depth of each shrimp pond was 1.22 meters; (3) the ponds averaged 3.6 crops per year; and (4) the daily amount of water exchange averaged 8.5%. The importance of daily water exchange is described in **Exhibit 2**.

From this information, it is possible to determine the volume of water used in an average size shrimp pond and the cost of that water using the (irrelevant) El Paso and Lanai prices, as we now explain.[4]

One hectare = 10,000 square meters.

The depth of an average pond is 1.22 meters. See **Exhibit 1**.

---

valued at $0.0039 per cubic meter. See November 20, 2023 Initiation Checklist at 8. This is appropriate since the price of potable drinking water is irrelevant to the price, if any, of brackish water used for a non-consumptive purpose.

[3] Petitioners' Exhibit 2 is El Paso's "Rules and Regulations No. 5," which is dated February 14, 2024 (at the bottom of each page). There is no indication in this document that the Brackish Water Rate" of $3.09 per CCF listed on page 3 applied during the 2022 POI.

[4] See **Exhibit 3** for the conversion factors used in this analysis.

Therefore, a pond with an average depth of 1.22 meters contains 12,200 cubic meters of water. (10,000 x 1.22 = 12,200).

One cubic meter of water contains 264 gallons. See conversion chart in **Exhibit 3.**

Therefore, 12,200 cubic meters of water contains 3,220,800 gallons. (12,200 x 264 = 3,320,800).

An average size pond occupies 6.59 hectares. See **Exhibit 1**.

Therefore, an average size pond contains 21,225,072 gallons of water. (6.59 x 3,320,800 = 21,225,072).

Using petitioners' proposed benchmarks for the price of water yields the following cost of water in an average size pond in Ecuador.

The term CCF stands for one hundred cubic feet.

There are 748 gallons in one CCF. See conversion chart in **Exhibit 3.**

El Paso charges $3.09 for one CCF of brackish water. One CCF = 748 gallons.

Therefore, 21,225,072 gallons of water in an average size pond, divided by 748 gallons per CCF = 29,224 x $3.09 El Paso price = $87,681 charge for brackish water to fill an average size pond.

Lanai low price of $4.40 for 1,000 gallons if consumption exceeds 300,000 gallons. Therefore, 21,225,072 x $4.40/1000 = $93,390 water charge to fill an average size pond.[5]

Lanai high price of $5.40 for 1,000 gallons if consumption exceeds 300,000 gallons. Therefore, 21,225,072 x $5.40/1,000 = $114,615 water charge to fill an average size pond.

Next, to calculate the total cost of water using petitioners' proposed benchmarks, the daily rate of water exchange must also be considered. The average daily exchange rate of 8.5% means that the water in a pond is completely replaced approximately every 12 days. Thus, over the course of one year, water is completely exchanged approximately 30 times (365 days divided by

[5] Petitioners erroneously state that the Lanai price for water ranges from $3.45 to $5.40 per 1,000 cubic feet. However, the $3.45 price applies to consumption up to 50,000 gallons. An average Ecuadorian shrimp farm that is one hectare in size will make non-consumptive use exceeding 3.2 million gallons of water.

12 days). Thus, the actual cost of water, according to petitioners would range from a low of 30 x $87,681 = $2,630,430 to a high of 30 x $114,615 = $3,438,450 for a single, average size farm.[6]

This enormous subsidy, according to petitioners' logic, would then need to be calculated for every shrimp farm from which Santa Priscila or SONGA purchased fresh shrimp. Santa Priscila reported in its January 3, 2024 Sources of Raw Shrimp questionnaire response that it purchased shrimp from over 200 farms. SONGA reported in its January 3, 2024 Sources of Raw Shrimp questionnaire response that it purchased shrimp from 34 farms. Thus, the per hectare price of water would need to be multiplied by the number of hectares occupied by 234 shrimp farms.

This alleged brackish water subsidy could never be reduced or eliminated by the GOE since shrimp farms must make non-consumptive use of brackish water to grow shrimp. Thus, the staggering financial consequences of petitioners' brackish water subsidy allegations, are so ludicrous as to render that allegation inherently incredible.

It is no exaggeration to say that acceptance of the petitioners' brackish water allegation would bankrupt every Ecuadorian shrimp farm. That result explains why the petitioners intentionally fail to explain the absurd consequences of the Department's inappropriate use of water prices (for consumptive, <u>not non-consumptive</u>, use) that they submitted as benchmarks. This submission does explain those consequences.

[6] This analysis omits consideration of the monthly flat rate service charges that the City of El Paso and the Lanai Water Company also impose. See petitioners' Exhibits 2 and 3 to their March 5th submission.

Please let us know if you have any questions concerning this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant

TRADE PACIFIC PLLC

*Counsel to SONGA and Santa Priscila*

# Tab 39

# P.R. 273

# C.R. 177

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 75
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been ranged or redacted on pages S-AFF-4 to S-AFF-20 and EXH-1; and in Exhibits S-AFF-Q1(a) to S-AFF-Q26(c).

**PUBLIC VERSION**

March 19, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
SONGA Affiliated Companies Supplemental Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos C.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department of Commerce's March 8, 2024 Affiliated Companies Supplemental Questionnaire. This response is timely submitted in accordance with the Department's March 13, 2024, letter, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Extension Request for Affiliated Companies Supplemental Questionnaires," which extended the deadline for SONGA's supplemental response until today. Accompanying this submission are calculation worksheets in Excel® format.

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA request proprietary treatment and the basis for the request:

- Nature of Products or Production Process: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(1).

- Production and Distribution Costs: Contained in the exhibits. Protected under 19 C.F.R. §§ 351.105(c)(2) and (3).

- Names of Particular Customers, Distributors, or Suppliers: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Exact Amount of Benefits Applied for or Received: Contained in the narratives and exhibits. Protected under 19 C.F.R. § 351.105(c)(8).

- Other Specific Business Information Related to SONGA's Business and Production Operations, Ownership and Affiliations, Financial Data, Applications and Approval Documents etc., the Release of Which to the Public Would Cause Substantial Harm to SONGA's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to SONGA's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos C.A.*

**COMPANY CERTIFICATION**

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I prepared or otherwise supervised the preparation of the attached submission of the Section II and Section III Supplier Supplemental Questionnaire Response, filed on March 18, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: March 18, 2024

# Counsel Certification

I, Jarrod M. Goldfeder, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I have read the attached submission of Affiliated Companies Supplemental Questionnaire Response, filed on March 18, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: 3/18/2024

**CERTIFICATE OF SERVICE**

I, Kenneth N. Hammer, hereby certify on this 19th day of March, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be served electronically via ACCESS (proprietary version) or via e-mail (public version), on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

**PUBLIC VERSION – BPI Has Been Redacted**

**Case No. C-331-806**
**Investigation**
**POI: 1/1/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information has been redacted on pages S-AFF-4 - S-AFF-20 and EXH-1; and in Exhibits S-AFF-Q1(a) to S-AFF-Q26(c).**

**PUBLIC VERSION**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

# RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A. ("SONGA") TO THE DEPARTMENT'S MARCH 8, 2024 AFFILIATED COMPANIES SUPPLEMENTAL QUESTIONNAIRE

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: March 19, 2024**

**Counsel to Sociedad Nacional de Galápagos C.A.**

| Company | Item | Date | Citation |
|---|---|---|---|
| SONGA | 2021 Financial Statement | April 12, 2022 | Sec III IQR Exh 2b |
| | Fiscal Year 2021 Tax Filing | April 8, 2022 | Sec III IQR Exh 3 |
| Naturisa | 2021 Financial Statement | March 25, 2022 | **S-AFF-Q1(a)** |
| | Fiscal Year 2021 Tax Filing – Original (submitted in error prior to end of 2021) | December 16, 2021 | Sec II Affiliates QR at Exhibit NAT-2 |
| | Fiscal Year 2021 Tax Filing – Supplemental (overrides original) | April 7, 2022 | Sec II Affiliates QR at Exhibit NAT-2 |
| Champmar | 2021 Financial Statement | March 31, 2022 | **S-AFF-Q1(b)** |
| | Fiscal Year 2021 Tax Filing | April 12, 2022 | Sec II Affiliates QR at Exhibit EC-2 |
| Sola | 2021 Financial Statement | March 31, 2022 | **S-AFF-Q1(c)** |
| | Fiscal Year 2021 Tax Filing | April 8, 2022 | Sec II Affiliates QR at Exhibit SOL-2 |

**2. In an Excel table, please provide a list of all tax programs that SONGA reported that it and/or its selected cross-owned companies benefitted from, the amount, and a column that lists the line and page where this benefit is found in the company's tax return.**

ANSWER: SONGA provides this requested information in **Exhibit S-AFF-Q2** for SONGA and Naturisa (Champmar and Sola did not claim any tax benefits during the POI). SONGA cautions that, while the Department's question requests that we identify the line where the benefit is listed in the tax filing, it is not always the case that a tax program appears on the tax filing form or it may not appear that way the question requests it. For example, a deduction reported within line 810 of the tax filing does not represent the amount of the benefit but instead represents the amount that the taxable income is reduced by all qualifying deductions within the line. In order to determine the actual reduction on the tax burden, i.e., benefit, the value of the deduction corresponding to each program within line 810 must be multiplied by the applicable tax rate. This benefit amount is not contained in the tax filing form because the tax form only determines the amount of tax due based on the income subject to the ultimate tax rate. Separately, for example, when claiming the benefits under the incentive for exports to sustain/increase employment, no amount is reported but, instead, a selection of "Yes" is made on

the form and, based on that, the online tax filing automatically makes the corresponding adjustments; no benefit amount must be entered. SONGA has provided a benefit amount for each of the reported tax programs throughout its various questionnaire responses; for ease, we have also included these benefit amounts in **Exhibit S-AFF-Q2**.[1]

Furthermore, as SONGA has explained previously, certain tax programs do not appear on the tax form. For example, exemptions on paying currency outflow taxes do not appear on the tax form because they are an exemption at the time of entry and thus, there is no need to report that within the tax filing. Additionally, as explained in prior questionnaire responses, the municipal tax exemptions or reductions do not appear on the tax form submitted to the national tax authorities. Notwithstanding this, SONGA has also included those items in **Exhibit S-AFF-Q2** for the purposes of including all tax programs.

**3. Please confirm that in all of its narrative responses for various benefits, SONGA reported the benefits as received in 2022 based on the tax return, financial statements, and corporate tax forms filed in 2022, not 2023. This means that the benefit is calculated based on the fiscal year end (FYE) 2021. If not, please provide a revised calculation for all relevant programs based on FYE 2021.**

<u>ANSWER</u>: SONGA confirms that all of the benefits that were reported in its previous responses for SONGA, Naturisa, Champmar and Sola, as applicable, pertain to a benefit that was received in 2022, with the exception of the reported amount related to the refund of the currency outflow tax on purchases of inputs, as discussed below in response to Question 13. SONGA notes that tax incentives are available to all companies in Ecuador that meet the established

[1] In the preparation of this response, SONGA discovered that it only reported the claimed deductions for Naturisa's use of the environmental tax incentive program, i.e., $[ ], and the hiring of additional personnel program, i.e., [ ]. See the Tax Appendices in Exhibits NAT-III-1 and NAT-III-11, respectively, of the February 20, 2024 Supplier Questionnaire Response. While the Department requests in Question 29 below that we provide the calculation for the hiring of additional personnel program, we provide the benefit calculation for the environmental tax incentives program here. In this case, Naturisa paid a tax rate of [ ]%. Accordingly, the benefit for the environmental incentive program is $[ ]. This benefit and the benefit reported in response to Question 29 are included in **Exhibit S-AFF-Q2**.

# Tab 40

# P.R. 279

Barcode:4530111-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
**Public Document**
E&C/OIV: ZS, RA

March 21, 2024

**MEMORANDUM TO:** Eric B. Greynolds
Director, Office IV
Antidumping and Countervailing Duty Operations

**FROM:** Zachary Shaykin
International Trade Compliance Analyst, Office IV
Antidumping and Countervailing Duty Operations

Reginald Anadio
International Trade Compliance Analyst, Office IV
Antidumping and Countervailing Duty Operations

**SUBJECT:** Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations

---

## I. SUMMARY

On November 13, 2023, the U.S. Department of Commerce (Commerce) published its initiation of the countervailing duty (CVD) investigation of frozen warmwater shrimp (shrimp) from Ecuador.[1] The period of investigation (POI) is January 1, 2022, through December 31, 2022.

On January 8 and February 21, 2024 the American Shrimp Processors Association (the petitioner) timely filed new subsidy allegations (NSA) with respect to six programs.[2] On January 10, 2024, the Ad Hoc Shrimp Trade Action Committee (AHSTAC), a domestic producer of subject merchandise, timely filed new factual information regarding one of the programs alleged in the petitioner's First NSA (AHSTAC's NSA Submission).[3] On January 25 and March 4, 2024, Industrial Pesquera Santa Priscila S.A. (Santa Priscila), Sociedad Nacional de Galapagos S.A. (SONGA) and the Government of Ecuador (GOE) submitted rebuttal comments regarding the petitioner's First and Second NSA and AHSTAC's NSA Submission.[4] On February 5 and March 5, 2024, the petitioner submitted its response to our NSA supplemental

---

[1] *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 88 FR 81053 (November 14, 2023).
[2] *See* Petitioner's Letters, "New Subsidy Allegations," dated August 23, 2023, resubmitted January 8, 2024 (First NSA); and "New Subsidy Allegations," dated February 21, 2024 (Second NSA).
[3] *See* AHSTAC's Letter, "New Subsidy Allegation," dated January 10, 2024 (AHSTAC's NSA).
[4] *See* Santa Priscila's, SONGA's and GOE's Letters, "Factual Information to Rebut, Clarify, and/or Correct New Subsidy Allegations," dated January 25, 2024; and "Factual Information to Rebut, Clarify, and/or Correct New Subsidy Allegations," dated March 4, 2024.

Filed By: Reginald Anadio, Filed Date: 3/21/24 12:22 PM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

questionnaires.[5] After analyzing these allegations, we recommend initiating on four programs, and not initiating on two programs, as described below.

## II. INITIATION STANDARD

Section 702(b)(1) of the Tariff Act of 1930, as amended (the Act), states that an interested party must allege the elements necessary for the imposition of the duty imposed by section 701(a) of the Act, and each allegation must be accompanied by information reasonably available to the petitioners supporting those allegations. Section 771(5)(B) of the Act states that a subsidy shall be deemed to exist if: (1) there is a financial contribution by an "authority" or an "authority" entrusts or directs a private party to make a financial contribution to a person; and (2) a benefit is thereby conferred. To be countervailable, the subsidy must also be specific within the meaning of section 771(5A) of the Act.

## III. PROGRAMS ON WHICH WE RECOMMEND INITIATING AN INVESTIGATION

*Recommendation:* For each of the following programs, the petitioner, and in some instances, AHSTAC, alleged the elements of a subsidy, *i.e.*, financial contribution, benefit, and specificity (description and specific provisions summarized below). We find that the petitioner's and AHSTAC's allegations are supported by adequate and accurate information that was reasonably available to them. We recommend investigating the programs listed below based on the description and support provided by the petitioner and AHSTAC. Unless otherwise noted, we recommend initiating on these programs as alleged by the petitioner and AHSTAC. Any program below for which we recommend initiating on a different basis than that alleged by the petitioner, we state our recommendation under each program.

### A. Less Than Adequate Remuneration (LTAR) Programs

For the LTAR programs listed below, the petitioner alleges that: (1) a financial contribution is conferred *via* the GOE's provision of goods or services, pursuant to section 771(5)(D)(iii) of the Act; (2) it confers the benefit because goods or services is provided for LTAR under section 771(5)(E)(iv) of the Act; and (3) it is *de jure* specific under section 771(5A)(D)(i) of the Act because the goods/services provided are expressly limited to specific industries, including shrimp processors in Ecuador.

1. Provision of Fuel to Shrimp Farmers for LTAR

Information to support the petitioner's allegation regarding this program can be found on pages 4 through 10 and Exhibits 6-11 of the petitioner's first NSA, pages 2 through 8 and Exhibits 1-13 of AHSTAC's NSA, and pages 3 through 9 of the petitioner's First Supplemental NSA. The petitioner states that the GOE owns all of Ecuador's subsurface resources including oil, Ecuador's petroleum sector is dominated by one state-owned enterprise, Petroecuador, and the

[5] *See* Petitioner's Letter, "New Subsidy Allegations Supplemental Response," dated February 5, 2024 (Petitioner's First Supplemental NSA); and "New Subsidy Allegations Supplemental Response," dated March 5, 2024 (Petitioner's Second Supplemental NSA).

Barcode:4530111-01 C-331-806 INV - Investigation -

GOE has regulated domestic fuel prices since the 1970s.[6] The petitioner states that Petroecuador is not the only provider of fuel in Ecuador; however, the petitioner claims that prices for diesel fuel for shrimp producers set by Petroecuador are applicable not only to Petroecuador but also adhered to by any private sellers of diesel in Ecuador.[7]

AHSTAC states that the GOE has subsidized gasoline, diesel, liquefied petroleum gas, and electricity by up to 85 percent, and that fuel subsidies are widely understood to support Ecuador's shrimp farming sector as the Ecuadorian industry is highly reliant on pumps and generators that run on diesel fuel.[8] Specifically, AHSTAC claims that more than 65 percent of the shrimp farms in Ecuador use diesel as the main input for their water pumps and production processes.[9]

Furthermore, according to the petitioner, for the period May 12, 2022, to June 11, 2022, Petroecuador's price of "diesel 2" for use in shrimp production and certain other application was set at $1.76 per gallon, whereas the same diesel price in most other industries was $4.33 per gallon.[10] Similarly, the petitioner states that the "premium diesel" for use in shrimp production was set at $1.76 per gallon, while the same diesel price in most other industries was $4.66 per gallon.[11] A price list presented by the petitioner shows that prices for users in the shrimp sector remained at $1.76 per gallon for the vast majority of the POI, regardless of the type of diesel and regardless of fluctuations in the prices for most other sectors in Ecuador. The petitioner states that for most of the POI, prices for users in the shrimp sector were less than half the price set for users in most other sectors for the same types of fuel. However, the petitioner states that the actual market prices are considerably higher than any price established by the GOE for any sector.

Additionally, the petitioner states that at the end of 2022, the GOE announced its intention to terminate sales of diesel at the lowest subsidized prices for large, but not small, shrimp farms (*i.e.*, farms under 30 hectares[12]). AHSTAC states that excluding large shrimp farms from the diesel fuel subsidy increased their production costs by 16 cents per pound and affects 82 percent of the national shrimp production.[13] Further, the petitioner alleges that the market prices for diesel were still much higher than the diesel prices in Ecuador for both small and large shrimp farms. For example, the prices for diesel in the United States in December of 2022 ranged from $4.54 to $4.97 per gallon, indicating that even the increased diesel price for large shrimp farmers in Ecuador was still below market rates.[14]

Lastly, the petitioner alleges that private sellers are entrusted or directed to provide diesel fuel for LTAR, stating in a supplemental response that the GOE had a policy in place during the POI to use subsidized fuel prices to support the shrimp industry and had a pattern of practices to act

---

[6] *See* Petitioner's First NSA at 4-5 and Exhibits 5-6.
[7] *See* Petitioner's First Supplemental NSA at 3-7 and Exhibits 2-9.
[8] *See* AHSTAC's NSA at 2-3 and Exhibit 2, 5, and 6.
[9] *Id.* at 3-4 and Exhibit 7.
[10] *See* Petitioner's First NSA at 5 and Exhibit 10.
[11] *Id.*
[12] *Id.* at 4 and Exhibit 5 and 11.
[13] *Id.* at 5 and Exhibit 12.
[14] *Id*. at 8 and Exhibits 7 and 9.



Filed By: Reginald Anadio, Filed Date: 3/21/24 12:22 PM, Submission Status: Approved

upon that policy to entrust or direct private entities to provide fuel to shrimp producers at subsidized rates.[15] Specifically, the petitioner states that: (1) Petroecuador, a state-owned enterprise, is the predominant supplier of fuel in Ecuador; (2) other sources of fuel, including imports, are subsidized by the GOE; (3) the GOE sets domestic retail fuel prices; (4) the GOE lowered those retail fuel prices during the POI; (5) public and private marketers must sell fuel at prices within a tight band of the monthly prices set by Petroecuador; and (6) to the extent private marketers may set their own fuel prices, that flexibility does not extend to sales of diesel.[16]

*Recommendation*: We recommend initiating on this program, in part, on the basis that the direct provision of fuel from the GOE/Petroecuador may be *de facto* specific under the meaning of section 771(5A)(D)(iii)(II) of the Act, because record evidence indicates that, while there is no law limiting the provision of diesel fuel to specific industries under this program, shrimp farmers may be the predominant users of diesel fuel subsidies. However, we find that the evidence provided by petitioner is insufficient to justify its claim that the GOE may be entrusting or directing private entities to provide fuel to the shrimp sector. Specifically, while the petitioner provided some evidence to address the "two-part test" that Commerce has used to determine entrustment or direction based on circumstantial evidence,[17] the petitioner's information related entirely to the publication of price lists by the GOE/Petroecuador and not private entities. Further, while the publication of price lists may be relevant evidence in support of a potential benefit, it does not speak to financial contribution – *i.e.*, the provision of fuel to the shrimp industry.[18] Therefore, based on the lack of information provided indicating that the GOE/Petroecuador may be entrusting or directing private sellers of fuel to provide diesel fuel for LTAR, we recommend not initiating on this portion of the allegation.

2. Provision of Brackish Water for LTAR

Information to support the petitioner's allegation regarding this program can be found on pages 2 through 6 and Exhibits 1 through 4 of the petitioner's Second NSA and pages 2 through 4 of the petitioner's Second Supplemental NSA. The petitioner provided information indicating that the GOE controls access to all water resources by private entities, including those which are engaged in the aquaculture industry, by requiring private entities to apply for permits to consumptively use water resources in Ecuador[19] via Article 108 of the Organic Law of Water Resources, Uses and Water Use.[20] Furthermore, the petitioner provides evidence that the shrimp industry uses water non-consumptively, which has been publicly recognized by Ecuador's National Chamber of Aquaculture, and, therefore, does not pay a fee for its use of water resources.[21] The petitioner

---

[15] *See* Petitioner's First Supplemental NSA at 7-9 and Exhibits 2-10.
[16] *Id.* At 9 and Attachments 2-9.
[17] *See Biodiesel from the Republic of Argentina: Final Affirmative Countervailing Duty Determination*, 82 FR 53477 (November 16, 2017), and accompanying Issues and Decision Memorandum (IDM) at Comment 1.
[18] *See Supercalendered Paper from Canada: Final Affirmative Countervailing Duty Determination*, 80 FR 63535 (October 20, 2015), and accompanying IDM at 37-38 ("Again, we clarify that the provision of the financial contribution, the provision of electricity, is separate from whether the individual electricity rate provided to Port Hawkesbury provides a benefit… Accordingly, whether the terms are sufficiently affected by government action so as to make the provision actionable is a factual element relevant to the measurement of 'benefit,' not 'financial contribution.'").
[19] *See* Petitioner's Second NSA at 3.
[20] *Id.* at 2 and 3.
[21] *Id.* at 3; *see also* Petitioner's Second Supplemental NSA at 2 and 3.

provides evidence that shrimp farms use brackish water for a majority of their shrimp farm operations in, *inter alia*, Ecuador.[22] The petitioner claims that the GOE provides water for non-consumptive use to shrimp processors for LTAR, because the GOE provides water for non-consumptive use to the aquaculture industry, including shrimp processing,[23] and because non-consumptive use of brackish water has commercial value for which the GOE has not established a fee mechanism in Ecuador for adequate remuneration.[24] The petitioner provided further information indicating that the shrimp processing industry may be the predominant beneficiary of this program,[25] and provided potential benchmarks for usage of brackish water ranging from $3.09 centum cubic feet (CCF) and $3.45 to $5.40 per thousand gallons of brackish water.[26]

*Recommendation*: We recommend initiating this program as *de facto* specific under the meaning of section 771(5A)(D)(iii)(II) of the Act, because record evidence indicates, while there is no law limiting the provision of brackish water to specific industries under this program, that shrimp farmers may be the predominant users of brackish water for non-consumptive use in Ecuador.[27]

B. Tax Program

Unless otherwise noted, for the tax program listed below, the petitioner alleges that: (1) it provides a financial contribution in the form of revenue forgone, pursuant to section 771(5)(D)(ii) of the Act; (2) it confers the benefit in the amount of revenue forgone under the meaning of section 771(5)(E) of the Act and 19 CFR 351.509; and (3) it is *de jure* specific under section 771(5A)(D)(i) of the Act, because recipients are limited by law to certain enterprises or industries.

1. Income Tax Reduction for Reinvestments

Information to support the petitioner's allegation regarding this program can be found on pages 10 and 11 and Exhibit 12 of the petitioner's NSA. The petitioner states that, under the *Organic Law for the Development of Aquaculture and Fisheries*, companies which reinvest their profits in scientific aquaculture and fishing research projects/programs promoted by the Public Aquaculture and Fisheries Research Institute and accredited by the governing Higher Education body will receive a 10 percent income tax reduction.[28] The petitioners states that the regular income tax liability for the aquaculture sector, including shrimp producers, is normally 25 percent.[29]

[22] *See* Petitioner's Second NSA at 3 and 4 and Exhibit 1.
[23] *Id.* at 2.
[24] *Id.* at 4 and Exhibits 2 through 4.
[25] *See* Petitioner's Second Supplemental NSA at 3.
[26] *Id.* at 4 and Exhibit 1.
[27] *See* Petitioner's Second NSA at 3 through 5 and Exhibit 1; *see also* Petitioner's Second Supplemental NSA at pages 2 and 3.
[28] *See* Petitioner's First NSA at 10 (citing Petition at Exhibit IV-9).
[29] *Id.* at 10 and Exhibit 12.

C. Loan Program

Unless otherwise noted, for the loan program listed below, the petitioner alleges that: (1) it provides a financial contribution in the form of revenue forgone, pursuant to section 771(5)(D)(ii) of the Act; (2) it confers the benefit in the amount equal to the amount of principal and/or interest, including accrued, unpaid interest, that the government has assumed or forgiven under the meaning 19 CFR 351.508; and (3) it is *de jure* specific under section 771(5A)(D)(i) of the Act, because recipients are limited by law to entities that have outstanding loans with the BNF.

1. Banco Nacional de Fomento (BNF) Loan/Interest Forgiveness Program

Information to support the petitioner's allegation regarding this program can be found on pages 6 through 8 and Exhibits 5 through 8 of the petitioner's Second NSA. The petitioner provides evidence that the GOE, through the Organic Law for the Restructuring of Public Banking Debt, Closed Banking, and Management of the National Finance System and Securities Regime, has forgiven "costs, expenses, surcharges, interest and default interest" on the credit operations of clients that maintained obligations with the BNF,[30] a state-owned bank.[31] The petitioner provided evidence that, in *Shrimp from Ecuador 2013*, SONGA and/or one of its cross-owned affiliates continued to have outstanding loans from the BNF at the time the abovementioned law was passed, and may still have outstanding debt obligations to the BNF that have been forgiven during the POI of the instant investigation.[32] We previously found loans from the BNF to be countervailable in *Shrimp from Ecuador 2013*.[33]

## IV. PROGRAMS ON WHICH WE DO NOT RECOMMEND INITIATING AN INVESTIGATION

1. Investment in the Electrification of the Shrimp Sector

Information to support the petitioner's allegation regarding this program can be found on pages 1 through 4 and Exhibits 1 through 5 of the petitioner's NSA, and pages 2 through 3 of the petitioner's NSA supplemental questionnaire response. The petitioner states that the GOE invested some $300 million to electrify the country's shrimp industry to reduce the industry's dependence on diesel generators. The petitioner states that the Development Bank of Latin America provided $200 million in financing, the Inter-American Development Bank provided $44 million, and the GOE provided $60 million.[34] Thus, $60 million of the funds do not originate with international lending or development organization and are not implicated by 19

[30] *See* Petitioner's Second NSA at 7 and Exhibits 5 and 6.
[31] *Id.* at 7 (citing *Certain Frozen Warmwater Shrimp from Ecuador: Final Affirmative Countervailing Duty Determination*, 78 FR 50389 (August 19, 2013) (*Shrimp from Ecuador 2013*), and accompanying IDM at 11).
[32] *Id.* at 7 (citing *Shrimp from Ecuador 2013* IDM at 72 and 73).
[33] *See Shrimp from Ecuador 2013* IDM at 33-34 and Comment 13 ("Petitioner stated that the BNF accomplishes these goals by extending credit to firms performing certain economic activities, including aquaculture and fishing, two of seven activities specifically identified by the BNF. In addition, Petitioner noted that the BNF's website specifically identifies the 'Fishing, Small Scale Fishing, Water Tourism, Pisciculture and Aquaculture Sector' as a 'target' eligible for certain loans.").
[34] *See* Petitioner's Second NSA at 1-2 and Exhibits 1-3.

CFR 351.527(b). Petitioner also states that according to the National Chamber of Aquaculture in Ecuador, the project was announced in 2019 but there were implementation delays as late as August 2023.[35]

*Recommendation*: According to an article dated August 22, 2023 (after the POI), as found in Exhibit 1 of the Petitioner's Supplemental NSA, the project contract was still awaiting approval and signing of the GOE's Ministry of Economy and Finance. Similarly, the petitioner states that it was "unable to find evidence confirming that funds for this program were disbursed during the POI." Accordingly, record evidence indicates that this program was not in operation during the POI. Therefore, we recommend not initiating an investigation of this program.

2. Value Added Tax (VAT) Reductions for Small Operations

Information to support the petitioner's allegation regarding this program can be found on pages 11 and 12 and Exhibit 13 of the petitioner's First NSA. The petitioner states that the *Organic Law for the Development of Aquaculture and Fisheries* provides a VAT exemption, which is generally 12 percent, for acquisitions of boats, machinery, navigation equipment, and other materials used in artisanal fishing and aquaculture operations, which are defined to include family operations with limited commercial activity.[36] The petitioner states that the mandatory respondents source shrimp from a variety of sources that could include "artisanal" operations.

*Recommendation*: Commerce previously found that VAT is a consumption tax that "the company merely conveys to the government, ultimately paying nothing because it is the final consumer who actually shoulders the tax burden;"[37] thus, it is Commerce's policy not to initiate an investigation on exemptions under a consumption-based VAT system.[38] Further, consistent with the 2011 investigation of shrimp from Ecuador,[39] the petitioner provided no evidence that VAT exemptions in Ecuador may provide a benefit. Therefore, we recommend not initiating an investigation of this program.

[35] *See* Petitioner's First Supplemental NSA at 2 and Exhibit 1.
[36] *See* Petitioner's First NSA at 11 and Exhibit 13 (citing Petitioner's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam," dated October 23, 2023, at Exhibit IV-9).
[37] *See*, *e.g.*, *Final Affirmative Countervailing Duty Determination: Dynamic Random Access Memory Semiconductors from the Republic of Korea*, 68 FR 37122 (June 23, 2003), and accompanying IDM at Comment 34.
[38] *Id.*
[39] *See Shrimp from Ecuador 2013* IDM.

## V. RECOMMENDATION

We recommend that you accept the positions described above.

☒ ☐

__________ __________
Agree Disagree

Eric Greynolds
Director, Office IV
Antidumping and Countervailing Duty Operations

03/21/2024
Date



Filed By: Reginald Anadio, Filed Date: 3/21/24 12:22 PM, Submission Status: Approved

# Tab 41

# P.R. 283

Barcode:4532208-02 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
**Public Document**
E&C/OIV: ZS/RA

March 25, 2024

**MEMORANDUM TO:** Abdelali Elouaradia
Deputy Assistant Secretary
for Enforcement and Compliance

**FROM:** James Maeder
Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:** Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador

---

## I. SUMMARY

The U.S. Department of Commerce (Commerce) preliminarily determines that countervailable subsidies are being provided to the producers and exporters of frozen warmwater shrimp (shrimp) from Ecuador, as provided in section 703(b)(1) of the Tariff Act of 1930, as amended (the Act).

## II. BACKGROUND

### A. Initiation and Case History

On October 25, 2023, the American Shrimp Processors Association (the petitioner) filed a petition with Commerce seeking the imposition of countervailing duties (CVDs) on imports of shrimp from Ecuador.[1] On October 27, 2023, the Ad Hoc Shrimp Trade Action Committee (AHSTAC) submitted its support for the Petition.[2] On October 27, 2023, Commerce invited representatives of the Government of Ecuador (GOE) for consultations with respect to the Petition but did not receive any response from the GOE.[3] On November 21, 2023, Commerce initiated a CVD investigation on shrimp from Ecuador.[4]

---

[1] *See* Petitioner's Letter, "Petitions for the Imposition of Antidumping and Countervailing Duties on Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam," dated October 25, 2023 (the Petition).
[2] *See* AHSTAC Letter, "Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam: Additional Support for Petitions," dated October 27. 2023.
[3] *See* Commerce's Letter, "Invitation for Consultations to Discuss the Countervailing Duty Petition," dated October 27, 2023.
[4] *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations*, 88 FR 81053 (November 21, 2023) (*Initiation Notice*).

Filed By: Zachary Shaykin, Filed Date: 3/26/24 12:18 PM, Submission Status: Approved

### B. Respondent Selection

The Petition identified 237 companies in Ecuador that produce and/or export shrimp.[5] As stated in the *Initiation Notice*, in the event that Commerce determined that the number of companies is large and it cannot individually examine each company based upon Commerce's resources, where appropriate, Commerce intended to select companies for individual examination in this investigation based on U.S. Customs and Border Protection (CBP) data for U.S. imports of shrimp from Ecuador.[6] On November 13, 2023, Commerce released CBP data of U.S. imports of shrimp from Ecuador, and invited interested parties to comment on the CBP data and respondent selection.[7] On December 1, 2023, Commerce received comments on behalf of Industrial Pesquera Santa Priscila S.A. (Santa Priscila) and Sociedad Nacional de Galapagos C.A. (SONGA), requesting that Commerce select Santa Priscila and SONGA as the mandatory respondents.[8] No other parties filed comments regarding respondent selection. On December 7, 2023, Commerce selected Santa Priscila and SONGA (collectively, mandatory respondents) as the mandatory respondents in this CVD investigation.[9]

### C. Questionnaires and Responses

On December 12, 2023, Commerce issued its Initial Questionnaire to the GOE requesting information on the programs used by the mandatory respondents which may constitute subsidies under U.S. law.[10] On December 14, 2023, Commerce issued its Sources Questionnaire to the mandatory respondents.[11] On January 3, 2024, the mandatory respondents responded to the Sources Questionnaire.[12] On January 4, 2024, the mandatory respondents responded to the affiliated companies section of the questionnaire,[13] and on January 12, 2024, Commerce received comments regarding the Sources Responses and Affiliations Responses.[14] On January 11, 2024, Commerce issued supplemental questionnaires to the mandatory respondents for clarification on certain companies potentially affiliated with the mandatory respondents, respectively, to which the mandatory respondents timely responded on January 16, 2024.[15] On January 19, 2024,

---

[5] *See* Petition at Exhibit I-16.
[6] *See Initiation Notice*, 88 FR at 81056.
[7] *See* Memorandum, "Frozen Warmwater Shrimp from Ecuador Countervailing Duty Petition: Release of U.S. Customs and Border Protection Entry Data," dated November 13, 2023.
[8] *See* Santa Priscila and SONGA's Letter, "Respondent Selection Comments," dated December 1, 2023.
[9] *See* Memorandum, "Respondent Selection," dated December 7, 2023.
[10] *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated December 12, 2023 (Initial Questionnaire).
[11] *See* Commerce's Letters, "Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp," dated December 14, 2023 (Sources Questionnaire).
[12] *See* Santa Priscila's Letter, "Sources of Raw Shrimp Questionnaire Response," dated January 3, 2024, and SONGA's Letter, "Sources of Raw Shrimp Questionnaire Response," dated January 3, 2024 (collectively, Sources Responses).
[13] *See* Santa Priscila's Letter, "Section III 'Affiliated Companies' Questionnaire Response," dated January 4, 2024 (Santa Priscila's AQR), and SONGA's Letter, "Section III 'Affiliated Companies' Questionnaire Response," dated January 4, 2024 (SONGA's AQR) (collectively, Affiliations Responses).
[14] *See* Petitioners' Letter, "Comments on Respondents' Supplier and Affiliation Questionnaire Responses," dated January 12, 2024.
[15] *See* Commerce's Letters, "Affiliated Companies Supplemental Questionnaire," dated January 11, 2024; *see also* Santa Priscila's Letter, "Affiliated Companies Supplemental Questionnaire Response," dated January 16, 2024, and SONGA's Letter, "Affiliated Companies Supplemental Questionnaire Response," dated January 16, 2024 (collectively, Affiliated Companies SQR).

Commerce issued its second supplemental questionnaires to the mandatory respondents regarding the Affiliated Companies SQR,[16] to which the mandatory respondents timely responded on January 23, 2024.[17] On January 24, 2024, the petitioner submitted comments and rebuttal factual information regarding the Affiliated Companies SQR and Affiliated Companies Second SQR.

On January 25, 2024, Commerce issued the mandatory respondents Supplier Questionnaires.[18] On January 29, 2024, the petitioner submitted their opposition to Commerce's supplier selection identified in the Supplier Questionnaires.[19] Between February 9 and 21, 2024, Commerce received responses to its Supplier Questionnaires.[20] On February 23, 2024, the petitioner filed rebuttal comments on the mandatory respondents' responses to Commerce's Supplier Questionnaires.[21] On March 8, 2024, Commerce issued supplemental questionnaires to the mandatory respondents to clarify Santa Priscila's and SONGA's responses to Commerce's Supplier Questionnaires, respectively,[22] and on March 19, 2024, Commerce received timely responses to its supplemental questionnaires.[23]

Between February 12 and 14, 2024, Commerce received responses to its Initial Questionnaire from the mandatory respondents and GOE.[24] Between February 20 and March 13, 2024, Commerce issued supplemental questionnaires to the mandatory respondents and the GOE regarding their initial questionnaire responses,[25] and between March 1 and 19, 2024, the

---

[16] *See* Commerce's Letters, "Affiliated Companies Supplemental Questionnaire," dated January 19, 2024.
[17] *See* Santa Priscila's Letter, "Affiliated Companies Supplemental Questionnaire Response," dated January 23, 2024, and SONGA's Letter, "Affiliated Companies Supplemental Questionnaire Response," dated January 23, 2024 (collectively, Affiliated Companies Second SQR).
[18] *See* Commerce's Letters, "Supplier Questionnaire for Sociedad Nacional de Galapagos C.A.," and "Supplier Questionnaire for Industrial Pesquera Santa Priscila S.A.," dated January 25, 2024 (collectively, Supplier Questionnaires).
[19] *See* Petitioner's Letter, "Opposition to Exclusion of Respondents' Cross-Owned Input Suppliers," dated January 29, 2024.
[20] *See* Santa Priscila's Letter, "Section II 'Affiliated Companies' Questionnaire Response," dated February 9, 2024, and "Section III of Supplier Questionnaire Response," dated February 20, 2024 (Santa Priscila's Affiliated Sec III QR) (Commerce notes that although the letter is dated February 16, 2024, it was filed on February 20, 2024); *see also* SONGA's Letter, "Section II 'Affiliated Companies' Questionnaire Response," dated February 9, 2024 (SONGA's Affiliated Sec II QR), and "Section III of Supplier Questionnaire Response," dated February 20, 2024 (Commerce notes that although the letter is dated February 16, 2024, it was filed on February 20, 2024), and "Errata to Section III of SONGA's Supplier Questionnaire Response," dated February 21, 2024 (SONGA's Affiliated Sec III QR) (collectively, SONGA's Supplier IQR).
[21] *See* Petitioner's Letter, "Rebuttal Comments on Supplier Affiliation Questionnaires," dated February 23, 2024.
[22] *See* Commerce's Letters, "Affiliated Companies Supplemental Questionnaire," dated March 8, 2024.
[23] *See* Santa Priscila's Letter, "Frozen Warmwater Shrimp from Ecuador – Section II and III Supplier Supplemental Questionnaire Response," dated March 19, 2024; *see also* SONGA's Letter, "Frozen Warmwater Shrimp from Ecuador – SONGA Affiliated Companies Supplemental Questionnaire Response," dated March 19, 2024.
[24] *See* Santa Priscila's Letter, "Santa Priscila's Section III Questionnaire Response," dated February 12, 2024 (Santa Priscila's IQR); *see also* SONGA's Letter, "SONGA's Section III Questionnaire Response," dated February 12, 2024 (SONGA's IQR); GOE's Letters, "Government of Ecuador's Section II Questionnaire Response," dated February 14, 2024 (GOE's IQR).
[25] *See* Commerce's Letters, "Section III Questionnaire Response," dated February 20, 2024; see also Commerce's Letters, "Government of Ecuador's Section II Questionnaire Response," dated March 1, 2024; Commerce's Letter, "Government of Ecuador's Section II Questionnaire Response," dated March 13, 2024 (Second GOE Supplemental Questionnaire).

mandatory respondents and the GOE responded to Commerce's supplemental questionnaires.[26] Between March 13 and 18, 2024, Commerce received pre-preliminary determination comments from Santa Priscila, SONGA, and the petitioner.[27]

### D. Postponement of Preliminary Determination

On December 7, 2023, based on a request from the petitioner,[28] Commerce postponed the deadline for the preliminary determination until March 25, 2024, in accordance with section 703(c)(1)(A) of the Act and 19 CFR 351.205(e).[29]

### E. New Subsidy Allegations

On January 8, 2024, the petitioner timely submitted its First New Subsidy Allegations.[30] On January 10, 2024, AHSTAC timely submitted a new subsidy allegation.[31] On January 25, 2024, the mandatory respondents and GOE submitted comments regarding petitioner's First New Subsidy Allegations.[32] On January 31, 2024, Commerce issued a supplemental questionnaire regarding certain deficiencies in the First New Subsidy Allegations,[33] and on February 5, 2024, the petitioner timely responded to Commerce's supplemental questionnaire.[34] On February 21, 2024, the petitioner timely submitted its Second New Subsidy Allegations.[35] On March 1, 2024, Commerce issued a supplemental questionnaire regarding certain deficiencies in the Second New Subsidy Allegations,[36] and on March 5, 2024, the petitioner timely responded to Commerce's supplemental questionnaire.[37] On March 4, 2024, the mandatory respondents and GOE submitted comments regarding petitioner's Second New Subsidy Allegations.[38] On March 21, 2024, Commerce initiated an investigation of three of the five new subsidy allegations.[39] We

[26] *See* Santa Priscila's Letter, "Santa Priscila's Supplemental Section III Questionnaire Response," dated March 1, 2024; *see also* SONGA's Letter, "SONGA Supplemental Section III Questionnaire Response," dated March 1, 2024; GOE's Letter, "Government of Ecuador's Supplemental Section II Questionnaire Response," dated March 13, 2024 (GOE's SQR); SONGA's Letter, "SONGA Affiliated Companies Supplemental Questionnaire Response," dated March 18, 2024 (SONGA's Affiliated Second SQR); GOE's Letter, "Government of Ecuador's Supplemental Section II Questionnaire Response," dated March 19, 2024 (GOE's Second SQR).

[27] *See* Petitioner's Letter, "Pre-Preliminary Comments on Affiliation," dated March 13, 2024; *see also* SONGA's and Santa Priscila's Letter, "Respondents' Pre-Preliminary Comments Regarding Tax Programs and Land Concessions," dated March 18, 2024; Petitioner's Letter, "Additional Pre-Preliminary Comments," dated March 18, 2024.

[28] *See* Petitioner's Letter, "Request to Extend the Preliminary Determination," dated November 27, 2023.

[29] *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Postponement of Preliminary Determinations in the Countervailing Duty Investigations*, 88 FR 85216 (December 7, 2023).

[30] *See* Petitioners' Letter, "New Subsidy Allegations," dated January 8, 2024.

[31] *See* AHSTAC's Letter, "New Subsidy Allegation," dated January 10, 2024.

[32] *See* Santa Priscila's, SONGA's and GOE's Letter, "Factual Information to Rebut, Clarify, and/or Correct New Subsidy Allegations," dated January 25, 2024.

[33] *See* Commerce's Letter, "First Supplemental Questionnaire Regarding New Subsidy Allegation," dated January 31, 2024.

[34] *See* Petitioner's Letter, "New Subsidy Allegations Supplemental Response," dated February 5, 2024.

[35] *See* Petitioner's Letter, "New Subsidy Allegations," dated February 21, 2024 (Second New Subsidy Allegations).

[36] *See* Commerce's Letter, "Supplemental Questions Regarding New Subsidy Allegation," dated March 1, 2024.

[37] *See* Petitioner's Letter, "New Subsidy Allegations Supplemental Response," dated March 5, 2024.

[38] *See* Santa Priscila's, SONGA's and GOE's Letter, "Factual Information to Rebut, Clarify, and/or Correct New Subsidy Allegations," dated March 4, 2024.

[39] *See* Memorandum, "New Subsidy Allegations," dated March 21, 2024.

will issue Commerce's preliminary analysis regarding the subsidies alleged in the petitioner and AHSTAC's new subsidy allegations in a post-preliminary analysis memorandum.

### F. Period of Investigation

The period of investigation (POI) is January 1, 2022, through December 31, 2022.

### G. Alignment

In accordance with section 705(a)(1) of the Act and 19 CFR 351.210(b)(4), and based on the petitioner's request,[40] we are aligning the final CVD determination in this investigation with the final determination in the companion antidumping duty (AD) investigation of shrimp from Ecuador. Consequently, the final CVD determination will be issued on the same date as the final AD determination, which is currently scheduled to be issued no later than August 5, 2024, unless postponed.

## III. SCOPE COMMENTS

In accordance with the *Preamble* to Commerce's regulations,[41] in the *Initiation Notice*, Commerce notified parties of an opportunity to comment on the scope of the investigation.[42] No parties commented on the scope of the investigation.

## IV. SCOPE OF THE INVESTIGATION

The products covered by this investigation is frozen warmwater shrimp (shrimp) from Ecuador. For a full description of the scope of this investigation, *see* this memorandum's accompanying *Federal Register* notice at Appendix I.

## V. DIVERSIFICATION OF ECUADOR'S ECONOMY.

Section 771(5A)(D)(iii) of the Act provides that, in evaluating the factors set forth under the provision, Commerce shall take into account the extent of economic diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation. The Statement of Administrative Action (SAA) elaborates that "these additional criteria serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors;" that is, they "may provide a clearer context within which the *de facto* factors would be analyzed" but are not *per se* "additional indicators of whether specificity exists."[43]

In this investigation, we asked that the GOE provide information on the economic activities within the jurisdiction of the granting authority for each relevant program. The GOE provided information from the SRI's Single Taxpayer Registry System on the companies operating in

[40] *See* Petitioner's Letter, "Request for Alignment," dated February 22, 2024.
[41] *See Antidumping Duties; Countervailing Duties; Final Rule,* 62 FR 27296, 27323 (May 19, 1997) (*Preamble*).
[42] *See Initiation Notice*, 88 FR at 81053.
[43] *See* SAA, H.R. Doc. 103-316, vol I (1994) at 931.

Ecuador during the POI.[44] The evidence on the record indicates that, for purposes of our *de facto* specificity analysis, the Ecuadorean economy is diversified. Specifically, the information provided by the GOE indicates that many industries operate in Ecuador, including: manufacturing; agriculture, forestry, and fishing; arts, entertainment and recreation; electricity, gas, steam and air conditioning supply; financial and insurance activities; information and communication; mining and quarrying; real estate activities; transportation and storage; wholesale and retail trade; repair of motor vehicles and motorcycles; and a variety of service-related industries.[45] Based on this information, we preliminarily determine that the level of economic diversification in Ecuador does not detract from finding a program to be *de facto* specific for programs in this memorandum as relevant, where other information so indicates in accordance with section 771(5A)(D)(iii) of the Act (*e.g.*, where the number of recipients are limited in number).

## VI. INJURY TEST

Because Ecuador is a "Subsidies Agreement Country" within the meaning of section 701(b)(1) of the Act, the U.S. International Trade Commission (ITC) is required to determine whether imports of the subject merchandise from Ecuador materially injure or threaten material injury to, a U.S. industry. On December 14, 2023, the ITC determined that there is a reasonable indication that an industry in the United States is materially injured by reason of imports of shrimp from Ecuador that are allegedly subsidized by the GOE.[46]

## VII. SUBSIDIES VALUATION

### A. Allocation Period

Commerce normally allocates the benefits from non-recurring subsidies over the average useful life (AUL) of renewable physical assets used in the production of subject merchandise. Pursuant to 19 CFR 351.524(d)(2) and the U.S. Internal Revenue Service's 1977 Class Life Asset Depreciation Range System,[47] the AUL in this proceeding is 12 years. The 12-year AUL period corresponds to IRS Pub. 946 asset class 20.4. No party in this investigation challenged the proposed AUL period. Therefore, we preliminarily determine that a 12-year period is appropriate for purposes of allocating non-recurring subsidies.

### B. Attribution of Subsidies

In accordance with 19 CFR 351.525(b)(6)(i), Commerce normally attributes a subsidy to the products produced by the company that received the subsidy. However, 19 CFR 351.525(b)(6)(ii)-(v) provide additional rules for the attribution of subsidies received by respondents with cross-owned affiliates. Subsidies to the following types of cross owned

---

[44] *See, e.g.*, GOE's IQR at TAX-13 and TAX-14.
[45] *Id.*
[46] *See Frozen Warmwater Shrimp From Ecuador, India, Indonesia, and Vietnam,* Investigation Nos. 701-TA-699-702 and 731-TA-1659-1660 (Preliminary), USITC Publication, December 2023.
[47] *See* U.S. Internal Revenue Service Pub 946 (2017), "Appendix B - Table of Class Lives and Recovery Periods" (IRS Pub. 946).

affiliates are covered in these additional attribution rules: (ii) producers of the subject merchandise; (iii) holding companies or parent companies; (iv) producers of an input that is primarily dedicated to the production of the downstream product; or (v) an affiliate producing non-subject merchandise that otherwise transfers a subsidy to a respondent. Further, 19 CFR 351.525(c) provides that benefits from subsidies provided to a trading company which exports subject merchandise shall be cumulated with benefits from subsidies provided to the firm producing the subject merchandise that is sold through the trading company, regardless of affiliation.

In accordance with 19 CFR 351.525(b)(6)(vi), cross-ownership exists between two or more corporations where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets. This section of Commerce's regulations states that this standard will normally be met where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations. The *CVD Preamble*[48] to Commerce's regulations further clarifies Commerce's cross-ownership standard.[49] According to the *CVD Preamble*, relationships captured by the cross-ownership definition include those where:

> {T}he interests of two corporations have merged to such a degree that one corporation can use or direct the individual assets (or subsidy benefits) of the other corporation in essentially the same way it can use its own assets (or subsidy benefits) … . Cross-ownership does not require one corporation to own 100 percent of the other corporation. Normally, cross-ownership will exist where there is a majority voting ownership interest between two corporations or through common ownership of two (or more) corporations. In certain circumstances, a large minority voting interest (for example, 40 percent) or a "golden share" may also result in cross-ownership.[50]

Thus, Commerce's regulations make clear that the agency must look at the facts presented in each case in determining whether cross-ownership exists. The U.S. Court of International Trade has upheld Commerce's authority to attribute subsidies based on whether a company could use or direct the subsidy benefits of another company in essentially the same way it could use its own subsidy benefits.[51]

*SONGA*

In its AQR at Exhibit AFF-1, SONGA submitted a list of companies with which it is affiliated within the meaning of Section 771(33) of the Act. This exhibit indicates that there is common ownership between SONGA and 44 entities. We instructed SONGA to respond to Section III of Commerce's questionnaire on behalf of a select number of entities that were reported as being cross-owned with SONGA. Per Commerce's instructions,[52] SONGA responded to Commerce's

---

[48] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65401-02 (November 25, 1998) (*CVD Preamble*).
[49] *Id.*, 63 FR at 65401.
[50] *Id*.
[51] *See Fabrique de Fer de Charleroi, SA v. United States*, 166 F. Supp. 2d 593, 600-04 (CIT 2001).
[52] *See* Supplier Questionnaires; *see also* Initial Questionnaire.

initial and supplemental questionnaires on behalf of itself and the following cross-owned affiliates: Naturisa S.A. (Naturisa), a producer of fresh shrimp that supplied SONGA during the POI, Holding Sola & Sola Solacciones S.A. (Sola), and Empacadora Champmar S.A. (Champmar), holding companies with no operations that owned SONGA during the POI. Because Naturisa supplied SONGA with fresh shrimp during the POI, we find Naturisa to be a cross-owned input supplier under 19 CFR 351.525(b)(6)(iv). Further, we find Sola and Champmar to be cross-owned parent companies under 19 CFR 351.525(b)(6)(iii).[53]

Accordingly, pursuant to 19 CFR 351.525(b)(6)(iv), we attributed subsidies to Naturisa to the combined sales of Naturisa and SONGA, net of inter-company sales. Further, under 19 CFR 351.525(b)(6)(iii), we find that subsidies received by Sola and Champmar are attributable to their respective, consolidated sales.[54] We also find that subsidies received by SONGA are attributable to its sales.[55]

SONGA also identified three additional companies in its questionnaire response, only one of which was cross-owned with SONGA during the POI.[56] Concerning the cross-owned company, SONGA reported that the company had no involvement in the shrimp production process, nor did it provide any inputs related to the production or processing of shrimp.[57] Therefore, in the absence of any basis for attribution under the regulations (*e.g.*, the supply of an input under 19 CFR 351.525(b)(6)(iv), the production of subject merchandise under 19 CFR 351.525(b)(6)(ii), or corporate parent ownership under 19 CFR 351.525(b)(6)(ii)), we have not included the cross-owned firm in our subsidy analysis.

*Santa Priscila*

Santa Priscila submitted a list of companies affiliated with Santa Priscila within the meaning of Section 771(33) of the Act.[58] Santa Priscila reported that common ownership existed between Santa Priscila and 71 entities.[59] We instructed Santa Priscila to respond to Section III of Commerce's questionnaire on behalf of a select number of entities that were reported as being cross owned with Santa Priscila. Per Commerce's instructions,[60] Santa Priscila responded to Commerce's initial and supplemental questionnaires on behalf of itself and its affiliates Manesil S.A. (Manesil), Produmar S.A. (Produmar), Tropack S.A. (Tropack), and Egidiosa S.A. (Egidiosa). Specifically, Santa Priscila reported that there is common ownership between Produmar, Egidiosa, and Santa Priscila, as defined under 19 CFR 351.525(b)(6)(vi).[61] Produmar is a supplier of raw shrimp to Santa Priscila that was affiliated and cross-owned with Santa Priscila during the AUL and POI,[62] and Egidiosa is a shrimp hatchery that supplies inputs

---

[53] *See* SONGA's AQR at AFF-1; *see also* SONGA's Affiliated Sec II QR at SOL-1 and EC-1.
[54] We note that SONGA reported that Sola and Champmar did not use any subsidies under examination in this investigation.
[55] *See* 19 CFR 351.525(b)(6)(i).
[56] *See* SONGA's Affiliated Second SQR at S-AFF-5 to S-AFF-6.
[57] *Id*.
[58] *See* Santa Priscila's Section III Affiliation IQR at AFF-1.
[59] *Id.*
[60] *See* Supplier Questionnaires; *see also* Initial Questionnaire.
[61] *Id.*
[62] *Id.*

(shrimp fry) in the production of subject merchandise to Santa Priscila and was affiliated and cross-owned with Santa Priscila during the AUL and POI.[63] Consequently, we find that Produmar and Egidiosa are cross-owned input suppliers under 19 CFR 351.525(b)(6)(iv). Santa Priscila reported that Tropack was affiliated and cross-owned with Santa Priscila during the POI as a toll processor and producer of subject merchandise.[64] Therefore, we find Tropak is a cross-owned producer of subject merchandise under 19 CFR 351.525(b)(6)(ii). Manesil is a parent company of Santa Priscila with no operations of its own that was cross-owned with Santa Priscila during the AUL and POI.[65] Thus, we find Manesil is a cross-owned parent/holding company under 19 CFR 351.525(b)(6)(iii).[66]

Accordingly, pursuant to 19 CFR 351.525(b)(6)(ii), we attributed subsidies received by Santa Priscila and/or Tropack are attributable to their combined sales, net of inter-company sales. Pursuant to 19 CFR 351.525(b)(6)(iv), we attributed subsidies received by Produmar to the combined sales of Produmar and Santa Priscila, net of inter-company sales, and attributed subsidies received by Egidiosa to the combined sales of Egidiosa and Santa Priscila, net of inter-company sales. Under 19 CFR 351.525(b)(6)(iii) we find that subsidies received by Manesil are attributable to its consolidated sales.[67]

### C. Application of Section 771B of the Act

Section 771B of the Act addresses the calculation of countervailable subsidies on certain processed agricultural products:

> In the case of an agricultural product processed from an agricultural product in which—
>
> (1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and
> (2) the processing operation adds only limited value to the raw commodity,
>
> countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

The petitioner claimed that these conditions are met with respect to fresh and processed shrimp and substantiated its claim with supporting evidence. Based on the information in the Petition, Commerce found at the time of initiation that the petitioner supported its allegation that subsidies for fresh shrimp may be attributable to frozen shrimp in accordance with section 771B of the Act.[68]

---

[63] *Id.*
[64] *See* Santa Priscila's AQR at AFF-2.
[65] *See* Supplier Questionnaires; *see also* Initial Questionnaire.
[66] For further discussion of Santa Priscila's cross-owned entities, which is business proprietary in nature, *see* Memorandum, "Preliminary Determination Calculations for Industrial Pesquera Santa Priscila S.A.," dated concurrently with this memorandum (Santa Priscila's Preliminary Calculation Memorandum).
[67] We note that Santa Priscila reported that Manesil did not use any subsidy programs during the POI.
[68] *See* Checklist, "Countervailing Duty Initiation Checklist," dated November 14, 2023 (Initiation Checklist), at 6.

In this case, we find that, consistent with prior CVD shrimp investigations, including *Shrimp from China*,[69] fresh shrimp is a raw agricultural product under section 771B of the Act. Further, record evidence demonstrates that "the overwhelming majority of fresh warmwater shrimp is not sold as a finished product but rather is used as an input for further processing into frozen products."[70] We find that, because the "overwhelming majority" of fresh shrimp is processed into frozen shrimp, if demand for frozen shrimp were to cease, a substantial percentage of the market would be negatively affected. Thus, in accordance with our practice,[71] we preliminarily determine that the demand for unprocessed fresh shrimp, is "substantially dependent" on the demand for frozen shrimp,[72] in accordance with section 771B(1) of the Act.

Regarding the second prong of section 771B of the Act, evidence on the record demonstrates that fresh shrimp accounts for over 70 percent of the value of the frozen shrimp, as other raw materials and costs together account for less than 30 percent of the final value.[73] Further, raw materials, specifically raw shrimp, account for most of U.S. processors' costs,[74] ranging from 72.2 to 78.3 percent between 2020 and 2022 on average across processors.[75] Further, as the ITC explained in the *ITC Preliminary Report*, frozen shrimp after initial processing are not substantially different than the fresh shrimp, and their characteristics appear to be the same, except longer shelf life for frozen shrimp.[76] As such, we preliminarily find that record evidence shows processing of the raw input adds less than 30 percent of the final value and that the essential character of the fresh shrimp is not changed with processing, in accordance with section 771B(2) of the Act and consistent with our practice.[77]

As noted above, Commerce requested, and received, subsidy information for certain cross-owned input suppliers of the mandatory respondents and are using the attribution rules under 19 CFR 351.525(b)(6) to attribute subsidies received by those cross-owned companies. However, both the mandatory respondents also reported purchasing raw shrimp from non-cross-owned suppliers that are not being individually examined by Commerce. Commerce is preliminarily relying on the subsidy information of the reporting cross-owned input suppliers of the mandatory respondents, as well as Santa Priscila's in-house farming operations, to determine the level of

---

[69] *See Certain Frozen Warmwater Shrimp from China: Final Affirmative Countervailing Duty Determination*, 78 FR 50391 (August 19, 2013) (*Shrimp from China*), and accompanying IDM at Comment 5.
[70] *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, Inv. Nos. 701-TA-699-702 and 731-TA-1659-1660, (Preliminary), USITC Pub. 5482 (December 2023) (*ITC Preliminary Report*), at 15.
[71] *See, e.g., Shrimp from China* IDM at Comment 5; and *Certain Frozen Warmwater Shrimp from Ecuador: Final Affirmative Countervailing Duty Determination*, 78 FR 50389 (August 19, 2013) (*Shrimp from Ecuador*), and accompanying IDM at Comment 1.
[72] While the ITC does not define "overwhelming majority" in *ITC Preliminary Report*, we understand this term to far exceed the requirements of the substantial dependence criterion. *See Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 589 F. Supp. 3d 1346, 1347 (CIT September 14, 2022) (explaining that the plain meaning of section 771B of the Act requires a finding of substantial dependence where the demand for raw olives is "largely, but not wholly, contingent on the demand for table olives." (quotations omitted)).
[73] *See ITC Preliminary Report* at 16.
[74] *Id*. at V-1.
[75] *Id*. at Table VI-1 on page VI-3.
[76] *Id*. at 16.
[77] *See Rice from Thailand; Final Results of Countervailing Duty Administrative Review*, 56 FR 68, 69 (January 2, 1991); and *Final Countervailing Duty Determination: Fresh, Chilled, and Frozen Pork from Canada*, 54 FR 30774, 30775 (July 24, 1989).

subsidization bestowed on the raw shrimp from these non-cross-owned suppliers. Specifically, to calculate the amount of subsidies to be attributed to processed shrimp as a result of the GOE's provision of subsidies to fresh shrimp producers, we preliminarily: (1) summed the amount of the benefit received under a given countervailable subsidy program by Naturisa or Produmar and Santa Priscila, which are the firms under individual examination who produced fresh shrimp during the POI; (2) divided the total benefit received by Naturisa or Produmar and Santa Priscila by their respective total sales quantity of shrimp to arrive at a per-kilogram (kg) benefit amount; (3) applied the per-kg benefit to the volume of fresh shrimp supplied to the mandatory respondents during the POI by non-cross-owned fresh shrimp producers; and (4) divided the resulting benefit amount by the appropriate sales denominator of the mandatory respondents to determine the *ad valorem* countervailable subsidy rate.[78] In this way we attributed subsidies to the non-cross-owned shrimp suppliers that are specific to each mandatory respondent.

### D. Denominators

In accordance with 19 CFR 351.525(b)(1)-(5), Commerce considers the basis for a respondent's receipt of benefits under each program when attributing subsidies, *e.g.*, to the respondent's export (where the program is determined to be countervailable as an export subsidy) or total sales (where the program is determined to be countervailable as a domestic subsidy). In the "Programs Preliminarily Determined to Be Countervailable" section below, we describe the denominator we used to calculate the countervailable subsidy rate for each program. Further, the denominators used to calculate the countervailable subsidy rates are explained in further detail in the preliminary calculation memoranda prepared for this preliminary determination.[79]

## VIII. BENCHMARKS AND DISCOUNT RATES

### A. Benchmarks for Provision of Land for Less than Adequate Remuneration (LTAR)

Santa Priscila, Produmar, and Naturisa reported that the GOE granted them land concessions for land in bay and beach areas in Ecuador for which the companies had to pay an annual fee to the GOE.[80]

We selected benchmarks for determining the benefit from the provision of land for LTAR in accordance with 19 CFR 351.511. The basis for identifying comparative benchmarks for determining whether a government good or service is provided for LTAR is set forth under 19 CFR 351.511(a)(2). The potential benchmarks are listed in hierarchical order by preference: (1) market prices from actual transactions within the country under investigation (*e.g.*, actual sales, actual imports or competitively run government auctions) (tier-one); (2) world market prices that would be available to purchasers in the country under investigation (tier-two); or (3) an assessment of whether the government price is consistent with market principles (tier-three).[81]

[78] *See* Santa Priscila's Preliminary Calculation Memorandum; *see also* Memorandum, "Preliminary Determination Calculations for Sociedad Nacional de Galapagos C.A.," dated concurrently with this memorandum (SONGA's Preliminary Calculation Memorandum).
[79] *See* Santa Priscila's Preliminary Calculation Memorandum; *see also* SONGA's Preliminary Calculation Memorandum.
[80] *See* Finkelstein's IQR at 11 and 12 and Exhibits LAND-01 and LAND-02.
[81] *See* 19 CFR 351.51(a)(2).


Filed By: Zachary Shaykin, Filed Date: 3/26/24 12:18 PM, Submission Status: Approved

We received benchmark prices from the mandatory respondents[82] and the petitioner.[83] Specifically, Santa Priscila and Songa reported certain private contract sales of land purchased in Ecuador during the POI[84] and the petitioners reported the prices for coastal land sold in San Jacinto, Ecuador, in the year 2021.[85]

Furthermore, we solicited information from Santa Priscila, SONGA, and the petitioner regarding rental prices for coastal land during the POI.[86] The mandatory respondents reported that they were unable to provide coastal land rental prices that are suitable for commercial and/or industrial use, and reported land purchase prices for parcels of land in coastal, mountain, and hillside regions of Ecuador.[87] The petitioner provided a sample commercial rental offer land price in the coastal region of Santa Elena, Ecuador, and a beachfront commercial land rental price for land in Tulum, Mexico.[88]

The land concessions at issue allow firms to use the GOE land for a 20-year period, do not confer ownership rights, and there is no evidence that the concessions require an upfront, lump-sum fee that may be considered similar to a down payment.[89] Therefore, we preliminarily determine to analyze the land concession program as akin to a "rental" or "lease" of land for LTAR program that provides recurring benefits that are expensed in the year of receipt as provided under 19 CFR 351.511(b) and (c).

The petitioner's proposed Ecuadorean land rental benchmarks include a rental offer price for a plot of land located near the Ecuadorean coast. This is the only Ecuadorean rental price on the record. However, the petitioner's proposed benchmark reflects a rental offer price for a plot land that is far smaller than the land utilized by the respondents under the land concession program and reflects a rental price for *commercial* land rather than agricultural or industrial land.[90] Further, the petitioner's proposed benchmark price reflects an offer price, not actual rental prices paid, and as noted above, Commerce's preference is to use actual transactions and to only use offer prices to the extent they constitute the best information available on the record. .[91] Therefore, we preliminarily determine that the petitioner's proposed rental price is not comparable to the land concessions the respondents received from the GOE.

---

[82] *See* SONGA's and Santa Priscila's Joint Letter, "Benchmark Submission of SONGA and Industrial Pesquera Santa Priscila," dated February 28, 2024 (Respondents' Benchmarks) at 3 and 4 and Exhibits 9 through 16.
[83] *See* Petitioner's Benchmarks at 1 and 2 and Exhibits 1 through 4.
[84] *See* Respondents' Benchmarks at 3 and Exhibits 9 through 14.
[85] *See* Petitioner's Benchmarks at 1 and Exhibit 1.
[86] *See* Commerce's Letters, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Benchmarks," dated March 7, 2024; and "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Benchmarks," dated March 8, 2024.
[87] *See* Santa Priscila and SONGA's Letter, "Frozen Warmwater Shrimp from Ecuador – Benchmark Supplemental Questionnaire of SONGA and Industrial Pesquera Santa Priscila," dated March 15, 2024 (Respondents' Benchmarks SQR), at 8 through 9 and Exhibits SQ-8(a) through SQ-8(d).
[88] *See* Petitioner's Letter, "Frozen Warmwater Shrimp from Ecuador: Benchmarks Supplemental Response," dated March 12, 2024 (Petitioner's Benchmarks SQR) at 4 and Exhibits 6 and 7.
[89] *See* GOE's IQR at LTAR-23, LTAR-30, and LTAR-34 to LTAR-35.
[90] *See* Petitioner's Letter, "Benchmarks Supplemental Response," dated March 12, 2024, at 4 and Exhibit 6.
[91] *Id*.

The petitioner also provided a rental price for land in Tulum, Mexico.[92] However, consistent with 19 FR 351.511(a)(2)(ii) Commerce considers it appropriate to preliminarily rely on in-country tier-one prices to calculate a benefit under this program, and thus we have not relied on the rental price from Mexico.

In the absence of any other suitable land rental prices on the record, we examined the land purchase price information interested parties submitted on the record. As noted above, the mandatory respondents submitted information on company-specific land purchase transactions that they conducted with unaffiliated parties.[93] Further, these land transactions involved industrial land plots used for shrimp production.[94] Thus, because the transactions reflect actual, company-specific prices between private parties for comparable land used for shrimp production, we have preliminarily determined to use these transactions to derive a land rental benchmark under 19 CFR 351.511(a)(2)(i). We will continue to consider this issue further following the publication of the preliminary determination.

## VIII. ANALYSIS OF PROGRAMS

Based upon our analysis of the record information, we preliminarily find the following:

### A. Programs Preliminarily Determined to Be Countervailable

#### 1. Environmental Tax Incentives

Ecuadorian businesses, in addition to deducting depreciation and amortization in relation to fixed assets over the useful life of the asset, are also permitted to deduct, against taxable income, 100 percent of the depreciation for equipment, machinery or technology, intended for the implementation of cleaner production mechanisms, renewable energy generation mechanisms, reduction of the environmental impact of production activities, and/or the reduction of greenhouse gas emissions.[95] The additional 100 percent deduction is authorized under Article 10, Numeral 7 of Ecuador's Internal Tax Regime Law (LRTI).[96] The purpose of this program is to encourage private actors to make investments to reduce the environmental impact of their operations and improve the environment.[97] In order to claim the additional deduction of 100 percent, taxpayers must apply to the Ministry of the Environment, Water, and Ecological Transition to obtain approval that the capital expenditure meets the criteria of an investment in renewable or sustainable technology before they may claim the deduction. After a company receives approval, it can claim the applicable depreciation in any tax declaration filed in a subsequent year.[98] Parties claiming this deduction must carry out their own calculations, outside of the tax form, to determine the total value of the asset and amount of depreciation that can be claimed on line 810 of their tax form.[99] The tax form does not offer an option to itemize each

[92] *Id*. at Exhibit 7.
[93] *See* Respondents' Benchmark at 3 and Exhibits 9 through 13.
[94] *Id*.
[95] *See* GOE's IQR at TAX-2 through TAX-3; *see also* SONGA's Supplier IQR at NAT-III-3 to NAT-III-4.
[96] *See* GOE's IQR at TAX-2.
[97] *Id*. at TAX-3.
[98] *Id*. at TAX-7.
[99] See GOE's SQR at S-6.

asset or require the actual asset value to be reported.[100] However, the Internal Revenue Service (SRI) may audit claimed deductions when deemed necessary.[101]

The ability to claim this depreciation as a deduction for these types of assets was established through Numeral 2 of Article 2.3 of the second reforming provision of the Organic Code on Production, Commerce, and Investments, published December 29, 2010.[102] Ministerial Agreement 048-2019, which defines the types of technologies that may qualify as a clean manufacturing or sustainable technology, was issued on June 19, 2019. Pursuant to Article 10, Numeral 7, paragraph 2 of the LRTI, deductions are only permitted to the extent that the company or private actor makes such qualifying investments that are unrelated to compliance with relevant environmental laws and regulations.[103]

We preliminarily determine that the tax deduction constitutes a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act. We preliminarily determine that the deduction provides a benefit in the amount of the tax savings to the company, pursuant to 19 CFR 351.509(a)(1) and section 771(5)(E) of the Act. Based on information from the GOE, we preliminarily determine that there is insufficient information to find that the eligibility under this program was limited to enterprises and/or industries in a manner that is *de jure* specific as defined under section 771(5A)(D)(i) of the Act. Therefore, we next examined whether the manner in which benefits were disbursed under this program were *de facto* specific to limited enterprises or industries under section 771(5A)(D)(iii)(I) of the Act. Based on information supplied by the GOE, we find that this program was provided to a limited number of users and, thus, is *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act.[104]

Naturisa and Produmar reported receiving benefits under this program during the POI.

Consistent with 19 CFR 351.509(c), we are treating the income tax deduction as a recurring benefit. Pursuant to 19 CFR 351.509(b)(1), we expensed the benefit received by Produmar and Naturisa to the year in which the firms otherwise would have had to pay the taxes, *i.e.*, the year in which each company claimed this benefit in their tax returns that were filed during the POI.

To calculate the benefit from this program for Produmar and Naturisa we multiplied the amount of depreciation deductions claimed by each company by the corporate income tax rate in Ecuador, *i.e.*, 25 percent. We then divided the benefit amounts by each company's applicable sales denominator. Specifically, for Produmar, we divided the benefit by the combined total sales of Produmar and Santa Priscila for the POI, net of inter-company sales. For Naturisa, we divided the benefit by the combined total sales of Naturisa and SONGA for the POI, net of inter-company sales for the POI.

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during

[100] *Id*.
[101] *See* GOE's IQR at TAX-7.
[102] *Id.* at TAX-4.
[103] *Id*. at TAX-3.
[104] *See* GOE's Section II SQR at Exhibit S-Q3(a).

the POI. Thus, for this program, we divided the benefit that Produmar and Naturisa each received by their respective volumes of shrimp they produced during the POI. We then multiplied the resulting per-unit benefit for Produmar and Naturisa by the total volume of raw shrimp supplied to Santa Priscila and SONGA during the POI by the non-cross-owned shrimp producers. We then divided the benefit attributed to the non-cross-owned raw shrimp suppliers by the total POI sales of Santa Priscila and SONGA.

On this basis, we preliminarily determine a net countervailable subsidy rate of 0.01 percent *ad valorem* for Santa Priscila/Tropack and a subsidy rate of 0.04 percent *ad valorem* for SONGA.[105]

2. Tax Incentives for Priority Sectors Under the 2010 Organic Production Code

The Tax Incentives for Priority Sectors Under the 2010 Organic Production Code program allows taxpayers in certain priority sectors of the economy to claim exemptions from corporate income taxes owed for income generated from the installation and deployment of a qualifying investment in a "productive" asset,[106] and the investment is made outside of the Ecuadorean *cantons* of Quito and Quayaquil.[107] The priority sectors covered by this program are established in Article 9.1, Section 2 of the LRTI[108] *via* the Organic Code on Production, Commerce, and Investments (COPCI), published December 29, 2010,[109] and include "agricultural sector companies," including, *inter alia*, the aquaculture sector.[110] Taxpayers eligible for investments under this program may claim corporate income tax exemptions for up to five years from the date in which the qualifying asset generates income.[111] In 2018, the GOE passed the Organic Law of Promotion of Production, Attraction of Investments, Generation of Employment, and Fiscal Stability and Equilibrium (Law of Production Promotion) which expanded eligibility for corporate income tax benefits under this program to several additional sectors, covered investments made within the *cantons* of Quito and Guayaquil, and extended the time that corporate income tax exemptions may be claimed from eight to twelve years.[112] While the tax exemptions provided under COPCI and the LRTI were repealed by Article 32 of the Organic Law for Economic Development and Fiscal Sustainability (Law of Economic Development) in the year 2021,[113] the Twelfth Transitory Provision of the Law of Economic Development allows companies that had residual rights (*i.e.*, had remaining years prior to 2021 in which companies who were eligible for corporate income tax exemptions under this program) were still eligible to

[105] *See* SONGA's Preliminary Calculation Memorandum; *see also* Santa Priscila's Preliminary Calculation Memorandum.
[106] A "productive" investment is defined as "…the flow of resources destined to produce goods and services, to expand the productive capacity and to generate sources of employment in the national economy." *See* GOE's IQR at TAX-35 and Exhibit TAX-1(b) at Article 13(a).
[107] *See* GOE's IQR at TAX-21.
[108] *Id.* At TAX-21 and Exhibit TAX-1(a).
[109] *Id.* at pages TAX-4 and TAX-21.
[110] *Id.* At TAX-21 and Exhibit TAX-3(c) at Article 17(a) ("{The agricultural} sector…includes the entire agricultural, agroindustrial, livestock, industrial livestock, aquaculture, mariculture and fishing chain {industries}").
[111] *Id.* At TAX-21.
[112] *Id.* At TAX-21 and Exhibit TAX-3(a).
[113] *Id.*at TAX-21 and Exhibit TAX-3(d) at Article 32 ("Article 9.1 {of the LRTI} is hereby deleted").

claim exemptions from corporate income tax.[114] This program is administered by Ecuador's SRI,[115] which maintains a database of all income tax reductions claimed by taxpayers, including those tax reductions claimed under this program.[116] Corporate income tax reductions claimed under this program are calculated by the companies wishing to claim these benefits and are claimed on the eligible companies tax filings for the applicable year.[117]

Based on this information, we preliminarily determine that tax exemptions under this program constitute a financial contribution in the form of government revenue forgone within the meaning of section 771(5)(D)(ii) of the Act. We preliminarily determine that the deduction provides a benefit in the amount of the tax savings to the company, pursuant to 19 CFR 351.509(a)(1) and section 771(5)(E) of the Act. As noted above, the GOE has expanded the eligibility of tax benefits under this program on multiple occasions since 2010. Based on information from the GOE and the eligibility conditions currently in place, we preliminarily determine that there is not a basis to find that the eligibility under the program was limited to enterprises or industries in a manner that is *de jure* specific under section 771(5A)(D)(i) of the Act. Therefore, we next examined whether the manner in which benefits were disbursed under the program were *de facto* specific to limited enterprises or industries under section 771(5A)(D)(iii)(I) of the Act. Based on usage information from the GOE, we preliminarily determine that this program provided benefits to a limited number of users, and thus, is specific under 771(5A)(D)(iii)(I) of the Act.[118]

The GOE reported that Produmar and Santa Priscila claimed benefits under this program during the POI.[119] While Produmar has claimed that this tax deduction was made pursuant to the Investment Contract Program, we find that the manner in which it was claimed in its tax returns indicates that it more properly reflects benefits received under this program. Because the tax returns are entirely business proprietary information, for more discussion regarding this issue, *see* Preliminary Calculation Memorandum for Santa Priscila. We will continue examining this issue.

Consistent with 19 CFR 351.509(c), we are treating the income tax deduction as a recurring benefit. Pursuant to 19 CFR 351.509(b)(1), we expensed the benefit received by Produmar and Santa Priscila to the year in which the firms otherwise would have had to pay the taxes, *i.e.*, the year in which each company claimed this benefit in their tax returns that were filed during the POI. To calculate the benefit from this program for Produmar and Santa Priscila, we multiplied the amount of tax exemptions generated from the income generated from the applicable productive asset that were claimed by each company by the corporate income tax rate in Ecuador, *i.e.*, 25 percent. We then summed the benefit calculated for Produmar with the benefit calculated for Santa Priscila, and divided the combined benefit by the combined total sales for each company, net of any intra-company sales.

[114] *Id.* At TAX-21 and Exhibit TAX-3(d) at the Twelfth Transitory Provision (noting that "…qualifying companies that had residual rights to claim the tax exemption pursuant to Article 9.1 of the LRTI, retained the right to continue claiming the tax exemption for the remainder of the five year period allowed under the law before repeal").
[115] *Id.* At TAX-23.
[116] *Id.*at TAX-24.
[117] *Id.*
[118] *See* GOE SQR at Exhibit S-Q3(a).
[119] *Id.* At TAX-23 and TAX-29.

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers for Santa Priscila who supplied raw shrimp to the mandatory respondents during the POI. Thus, for this program, we divided the benefit received by Produmar and Santa Priscila, which farmed raw shrimp in-house during the POI, by their respective volume of shrimp they produced during the POI. We then multiplied the resulting per-unit benefit for Produmar and Santa Priscila by the total volume of raw shrimp supplied to Santa Priscila during the POI by the non-cross-owned shrimp producers. We then divided the benefit attributed to the non-cross-owned raw shrimp suppliers by the total POI sales of Santa Priscila.

On this basis, we preliminarily determine a net countervailable subsidy rate of 11.08 percent *ad valorem* for Santa Priscila/Tropack. [120]

3. Refund of Currency Outflow Tax (ISD) on Purchase of Inputs

Refund of ISD on Purchase of Input program was established in 2012 under Article 20 of the Environmental Promotion and Optimization of State Revenues Law,[121] and allows taxpayers that imported inputs, consumable goods, and capital goods that are subsequently incorporated into, consumed, or used in the manufacture of goods, to claim a credit of the ISD normally levied on such goods of 5 percent.[122] The GOE's Resolution No. CPT-RES-2021-001 indicates the list of imported goods for which taxpayers may qualify for ISD credits under this program during the POI.[123] The GOE allows for the following mechanisms for claiming either tax credits or refunds against the ISD paid in the applicable fiscal year of the filing of the tax return: (1) a deductible credit up to the amount of the full amount of value of ISD paid on the qualifying inputs or capital goods against income tax owed, and may be claimed within five years of the payment of ISD on the qualifying imported input or capital goods;[124] (2) a total refund of ISD paid in connection with qualifying imported inputs or capital goods;[125] and (3) a refund, received on a monthly basis, of the value of ISD paid in connection with the importation of qualifying inputs or capital goods for habitual exporters.[126] Habitual exporters are defined in the 10th Unnumbered Article after Article 7 of the LRTI Regulations as exporters; (1) which made six or more exports during the calendar year, and (2) whose total export sales represent at least 25 percent of its total sales.[127]

In order to receive a total refund of ISD or a monthly refund of ISD for habitual exporters, eligible taxpayers must submit an application with the SRI.[128] In order to receive a deductible tax credit of the value of ISD paid in the applicable tax year, qualifying taxpayers claim the ISD credit in an income tax declaration within five years after the ISD qualifying for a refund was

---

[120] *See* Santa Priscila's Preliminary Calculation Memorandum.
[121] *See* GOE's IQR at EXP-2 and EXP-3 and Exhibit EXPORT-1(a).
[122] *Id.*; *see also* Santa Priscila's Section III IQR at page III-14.
[123] *See* GOE's IQR at EXP-2 and Exhibit EXPORT-1(c).
[124] *Id.*
[125] *Id.* at EXP-2 and EXP-3.
[126] *Id.* at EXP-3.
[127] *Id.* at EXP-4 and Exhibits Tax-1(b) and EXPORT-1(a) through (f).
[128] *Id.* at EXP-2, EXP-3, EXP-7, and EXP-8

paid.[129] The ISD credit is calculated by the eligible taxpayer and is subject to audit by the SRI, as there is no application to apply for credits under this program.

Based on this information, we preliminarily determine that tax exemptions under this program constitute a financial contribution in the form of government revenue forgone within the meaning of section 771(5)(D)(ii) of the Act. We preliminarily determine that the deduction provides a benefit in the amount of the tax savings to the company, pursuant to 19 CFR 351.509(a)(1) and section 771(5)(E) of the Act.

Concerning specificity, we find that the list of imported goods eligible to receive a deductible credit under this program is not expressly limited to certain enterprises or industries under section 771(5A)(D)(i) of the Act, and thus, we preliminarily find the program is not *de jure* specific.[130] However, based on information provided by the GOI, we preliminarily determine that the program is *de facto* specific under section 771(5A)(D)(iii)(I) of the Act because the actual recipients of tax benefits under this program are limited in number.[131]

Santa Priscila, Produmar, SONGA, and Naturisa reported receiving benefits under this program during the POI.

Consistent with 19 CFR 351.509(c), we are treating the tax savings received by Santa Priscila, Produmar, SONGA, and Naturisa as a recurring benefit. Pursuant to 19 CFR 351.509(b)(1), we expensed the benefit received by Santa Priscila, Produmar, SONGA, and Naturisa to the year in which the firms otherwise would have had to pay the taxes, *i.e.*, the year in which each company claimed this benefit in their tax returns that were filed during the POI. The benefit from this program for Santa Priscila, Produmar, SONGA, and Naturisa is the amount of tax credits generated from the ISD taxes paid in the years 2020 and 2021 and claimed on the fiscal year 2021 tax returns as filed in 2022.

For Produmar, we divided the benefit it received under the program by the combined total sales of Produmar and Santa Priscila during the POI, net of inter-company sales. For Naturisa, we divided the benefit it received under the program by the combined total sales of Naturisa and SONGA, net of inter-company sales. For SONGA, we divided the benefit it received under the program by SONGA's total sales for the POI. For Santa Priscila, we divided the benefit it received under the program by the combined total sales of Santa Priscila and Tropack, net of inter-company sales.

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI. Thus, for this program, we divided the benefit that Santa Priscila, Produmar, and Naturisa each received under the program by their respective volume of shrimp produced during the POI. We then multiplied the resulting per-unit benefit for Santa Priscila, Produmar, and Naturisa by the total volume of raw shrimp supplied to Santa Priscila and SONGA during the POI by the non-cross-owned shrimp producers. We then divided the benefit attributed to the

[129] *Id.* at EXP-7.
[130] *See* GOE's IQR at EXP-2 and Exhibit EXPORT-1(c).
[131] *Id*. at EXP-3 and EXP-13 to EXP-14.

non-cross-owned raw shrimp suppliers of Santa Priscila and SONGA by the total POI sales of Santa Priscila and SONGA.

On this basis, we preliminarily determine a net countervailable subsidy rate of 0.05 percent *ad valorem* for SONGA and a net countervailable subsidy rate of 0.12 percent *ad valorem* for Santa Priscila/Tropack. [132]

4. Export Tax Incentive Program

The Export Tax Incentive program was established via Article 37 of the LRTI to provide habitual exporters that reinvest taxable profits in qualifying productive capital assets in the subsequent year a 10 percent reduction in the corporate income tax rate levied on the total amount of profits reinvested in eligible productive capital assets.[133] The normal corporate income tax rate is 25 percent.[134]

Based on this information, we preliminarily determine that tax exemptions under this program constitute a financial contribution in the form of government revenue forgone within the meaning of section 771(5)(D)(ii) of the Act. We preliminarily determine that the deduction provides a benefit in the amount of the tax savings to the company, pursuant to 19 CFR 351.509(a)(1) and section 771(5)(E) of the Act. We also preliminarily determine this program to be specific within the meaning of sections 771(5A)(A) and (B) of the Act because the program is export contingent, *i.e.*, only available to habitual exporters.

Santa Priscila reported receiving benefits under this program.

Consistent with 19 CFR 351.509(c), we are treating the tax savings received by the firm as a recurring benefit. Pursuant to 19 CFR 351.509(b)(1), we expensed the benefit received by Santa Priscila to the year in which the firm otherwise would have had to pay the taxes, *i.e.*, the year in which the company claimed this benefit in its tax returns that was filed during the POI. To calculate the benefit from this program for Santa Priscila, we multiplied the amount of tax credits generated from the ISD taxes paid in the years 2020 and 2021 and claimed on the fiscal year 2022 tax returns by the corporate income tax rate in Ecuador, *i.e.*, 25 percent.

We divided the benefit Santa Priscila received under the program by the combined total export sales of Santa Priscila and Tropack, net of inter-company sales.

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to Santa Priscila during the POI. Thus, for this program, we divided the benefit that Santa Priscila received under the program by its volume of shrimp produced during the POI. We then multiplied the resulting per-unit benefit for Santa Priscila by the total volume of raw shrimp supplied to Santa Priscila during the POI by its

[132] *See* SONGA's Preliminary Calculation Memorandum; *see also* Santa Priscila's Preliminary Calculation Memorandum.
[133] *See* GOE IQR at EXP-32.
[134] *See* Santa Priscila's Section III IQR at Exhibit 7 at page 4.

non-cross-owned shrimp producers. We then divided the benefit attributed to the non-cross-owned raw shrimp suppliers of Santa Priscila by the total POI export sales of Santa Priscila.

On this basis, we preliminarily determine a net countervailable subsidy rate of 0.30 percent *ad valorem* for Santa Priscila/Tropack. [135]

5. Export Tax Incentives for Sustained/Increased Employment

As published on December 29, 2017, the GOE, through the 2nd Unnumbered Article After Article 37.1 of the LRTI, allows eligible taxpayers to claim a three-percentage point reduction in the applicable corporate income tax rate where a company meets certain criteria.[136] This provision, administered by Ecuador's Internal Revenue Service, took effect at the beginning of the 2018 fiscal year and continued through the POI.[137] It was modified to fall under Article 37.3 after the POI.[138] Pursuant to Resolution NO. CPT-RES_2019-005, to claim this reduction, taxpayers must comply with two requirements: (1) be considered a micro- or small- business or a habitual exporter, and (2) maintain or increase employment over the fiscal year in which the tax filing covers.[139] The 9 Unnumbered Article after Article 7 of the LRTI Regulations defines a habitual exporter as:

> For tax purposes, a habitual exporter shall be understood as a taxpayer who, in the respective fiscal year, has complied with the following conditions:
>
> a) The amount of its annual net exports equals or exceeds 25% of the total amount of its annual net sales or goods and/or services;
>
> b) Has made at least six (6) exports of goods and/or services and in six (6) different monthly periods. In the case of exports of cyclical production, at least three (3) exports will be considered, in three (3) different monthly periods; and,

The mandatory respondents reported receiving benefits under this program during the POI.

Commerce preliminarily determines that the export tax incentives constitute a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act. Commerce preliminarily determines that the deduction provides a benefit in the amount of the tax savings to the company, pursuant to 19 CFR 351.509(a)(1) and section 771(5)(E) of the Act. Commerce also preliminarily determines that this deduction is specific under sections 771(5A)(A) and (B) of the Act because receipt of this tax deduction is contingent on export sales.

Consistent with 19 CFR 351.509(c), we are treating the tax savings received by the firms as a recurring benefit. Pursuant to 19 CFR 351.509(b)(1), we expensed the benefit received by Santa

---

[135] *See* Santa Priscila's Preliminary Calculation Memorandum.
[136] *See* GOE's IQR at EXP-36.
[137] *Id*. at EXP-37.
[138] *Id*.
[139] *Id*. at EXP-36.



Filed By: Zachary Shaykin, Filed Date: 3/26/24 12:18 PM, Submission Status: Approved

Priscila and SONGA to the year in which the firms otherwise would have had to pay the taxes, *i.e.*, the year in which each company claimed this benefit in their tax returns that were filed during the POI. The benefit is equal to the amount of tax that would have been paid absent the program minus the amount of tax paid under the program.[140]

For Santa Priscila, we divided the benefit it received under the program by the combined total export sales during the POI of Santa Priscila and Tropack, minus inter-company sales. For SONGA, we divided the benefit it received under the program by its total export sales for the POI.

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI. Thus, for this program, we divided the benefit that Santa Priscila received under the program by the volume of shrimp it produced during the POI. We then multiplied the resulting per-unit benefit for Santa Priscila by the total volume of raw shrimp supplied to Santa Priscila during the POI by its unaffiliated shrimp producers. We then divided the benefit attributed to the unaffiliated raw shrimp suppliers of Santa Priscila by the total POI export sales of Santa Priscila.

On this basis, we preliminarily determine a net countervailable subsidy rate of 0.06 percent *ad valorem* for SONGA and a net countervailable subsidy rate of 0.10 percent *ad valorem* for Santa Priscila/Tropak.[141]

6. Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays

Pursuant to Articles 604 and 615 of Ecuador's Civil Code,[142] all coastal areas are national property and usage of these areas requires government approval by the Undersecretariat of Aquaculture of the Ministry of Production, Foreign Trade Investment and Fisheries.[143] Anyone can apply for a land use concession with the GOE as long as they devote a part of the land for aquacultural use.[144] The GOE states that concession holders do not receive ownership rights to the land granted by the concession but, rather, receive the rights to exploit the land for aquacultural purposes.[145] In order to apply for a concession, eligible companies much pay an occupancy fee for the conceded area, and must use the conceded area for the approved purpose of use of the land.[146] Concessions began being granted in 1970, and concession granting was terminated in 1999; however, extant concession holders were able to continue renewing the concession each year for an applicable fee per hectare of land subject to the applicable concession. Furthermore, pursuant to Decree 408, the GOE created a mechanism under which to regularize concessions for unregulated shrimp farms in coastal areas of Ecuador.[147] To renew a

---

[140] *See* Santa Priscila's Section III IQR at Exhibit 8; *see also* SONGA's IQR at Exhibits 3 and 7.
[141] *See* SONGA's Preliminary Calculation Memorandum; *see also* Santa Priscila's Preliminary Calculation Memorandum.
[142] *See* GOE IQR at LTAR 26 and Exhibit LTAR-4.
[143] *See* GOE IQR at LTAR-26 and Exhibit LTAR-5.
[144] *Id.*
[145] *Id.*
[146] *Id.*
[147] *Id.* at LTAR-28.

concession, concession holders pay an annual concession fee. Concessions are issued for up to a 20-year period.[148]

Egidiosa and Naturisa reported that they held land-use concessions under this program during the POI.[149] Additionally, in the case of Santa Priscila, during the POI it reportedly used land from other cross-owned affiliates, including cross-owned affiliates that we did not select for individual examination, that was obtained by means of concessions received from the GOE.[150]

We preliminarily determine that the GOE's provision of land use concessions to Santa Priscila, Egidiosa, and Naturisa constitutes a financial contribution under section 771(5)(D)(iii) of the Act. We preliminarily determine the program confers a benefit under section 771(5)(E)(iv) of the Act and 19 CFR 351.511(a)(1) to the extent the annual fees for land use concessions paid to the GOE during the POI is less than what would have been paid on a comparable benchmark rental price. We preliminarily find this program is *de jure* specific under section 771(5A)(D)(i) of the Act because concessions are expressly limited to companies engaged in aquaculture activities. Further, we note that this program is also regionally specific within the meaning of section 771(5A)(D)(iv) of the Act, because eligibility for land leases under this program is limited to designated geographic regions (*i.e.*, enterprises or industries located near coastal regions, *i.e.*, beach and bay areas) within the jurisdiction of the authority providing the subsidy.

We require a land benchmark price to determine whether the provision of the land concessions conferred a benefit. As noted above, the concessions allow firms to use the GOE land for up to 20-year period, do not confer ownership rights, and do not require an upfront, lump-sum fee that may be considered similar to a down payment. Therefore, we preliminarily determine that this program is akin to a "rental" or "lease" of land in which any benefits are recurring that are expensed in the year of receipt as provided under 19 CFR 351.511(b) and (c).

In selecting a benchmark, 19 CFR 351.511(a)(2)(i) directs Commerce to first seek to compare the government price at issue, in this case a rental price, to a market-determined rental price resulting from actual transactions in the country in question. As explained in the "Land Benchmark" section above, we preliminarily determine that company-specific land sale transactions provided by Santa Priscila and SONGA represent the most comparable land values on the record to use as a benchmark under 19 CFR 351.511(a)(2)(i). For each land sale transaction, we derived an annual per-unit rental price by dividing the purchase price by the area of the purchased land. Where appropriate, we indexed the per-unit price to the POI.

We calculated the per-unit benefit as the difference between the annual fee paid during the POI to the GOE for the land concessions to the annual per-unit rental benchmark. To calculate the benefit, we multiplied the per-unit benefit by the area of the land concession. Next, we summed the benefit associated with each land concession to arrive at the total benefit under the program.

---

[148] *See* GOE's IQR at LTAR-23.
[149] *See* Santa Priscila's Section III IQR at III-18 and III-19 and Exhibits 11 and 12; *see also* SONGA's Affiliated Second SQR at Exhibit S-AFF-Q26b.
[150] *See* Santa Priscila's Section III IQR at Exhibit 12; *see also* Santa Priscila's Supplier Section III IQR at Exhibit EGI-2.

For Naturisa, we divided the benefit it received under the program by the combined sales of Naturisa and SONGA, net of inter-company sales. For Egidiosa, we divided the benefit it received under the program by the combined sales of Egidiosa and Santa Priscila, net of inter-company sales. For Santa Priscila, we divided the benefit it received under the program by the combined total sales of Santa Priscila and Tropack, net of inter-company sales. As noted above, during the POI Egidiosa and Santa Priscila used land from cross-owned affiliates (who were not selected for individual examination) that was obtained by means of concessions received by the GOE. In this preliminary determination, we find that the use of the land by Egidiosa and Santa Priscila that its cross-owned affiliates acquired by means of concessions received from the GOE constitutes the transfer of a subsidy between cross-owned companies as described under 19 CFR 351.525(b)(6)(v). Thus, for land concession subsidies found to have been transferred to Egidiosa, we divided the benefit by the combined sales of Egidiosa and Santa Priscila, net of inter-company sales, and divided the benefit received by Santa Priscila by the combined total sales of Santa Priscila and Tropack, net of inter-company sales.

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI. Thus, for this program, we divided the benefit that Santa Priscila and Naturisa received under the program by their volume of shrimp produced during the POI. We then multiplied the resulting per-unit benefit for Santa Priscila and Naturisa by the total volume of raw shrimp supplied to the mandatory respondents during the POI by their unaffiliated shrimp producers. We then divided the benefit attributed to the unaffiliated raw shrimp suppliers of the mandatory respondents by the total POI sales of Santa Priscila and SONGA.

On this basis, we calculated a net subsidy rate of 0.17 percent *ad valorem* for SONGA and a net subsidy rate of 0.60 percent *ad valorem* for Santa Priscila/Tropack.[151]

7. Investment Contract

The mandatory respondents and the GOE self-reported tax incentives for an investment contracts program that allows the GOE, through the Ministry of Production, Trade, Investment, and Fisheries (MPCEIP), to enter into investment contracts with domestic and foreign investors who make investments of at least one million U.S. dollars that generate employment in Ecuador.[152] The program requires beneficiaries to meet specific conditions in exchange for receiving various combinations of recurring benefits, including income tax rate reductions, ISD exemptions and reductions in import duties, during the term of the investment contract.[153] Investment contracts that were in effect during the POI were provided by the government by one of two legal regimes: Articles 25 and 26 of the Organic Code of Production, Commerce and Investments (COPCI) or Articles 26 to 30 of the Organic Law for the Promotion, Attraction of Investment, Employment Generation, and Fiscal Stability and Balance (LFP).[154]

---

[151] *See* SONGA's Preliminary Calculation Memorandum; *see also* Santa Priscila's Preliminary Calculation Memorandum.
[152] *See* GOE's IQR at OTH-4; *see also* SONGA's IQR at III-25 to III-26 and Exhibits 10 and 11; Santa Priscila's Section III IQR at Exhibits 13 and 14.
[153] *See* GOE's IQR at OTH-4.
[154] *See* GOE SQR at Exhibit S-Q45.

The benefits under COPCI were available to 13 priority sectors from 2010 to 2018.[155] Under this program, investment contracts approved by MPCEIP would be eligible for tax incentives, such as a total income tax exemption for up to 5 years on additional income generated by new business investments, for the duration of the contract related to income generated from the investments. Contracts under this regime could be signed for up to 10 years.

The benefits under LFP were available to 25 priority sectors from 2018 to 2021.[156] Under this program, investors could qualify to receive: (1) exemption from income tax on income generated by the new investment; and/or (2) exemption of ISD on foreign payments to acquire capital goods or raw materials necessary for the development of the project.[157] If the investment was made within Quito or Guayaquil, the duration of benefits was 8 years, whereas outside of these areas, benefits could extend up to 15 years.[158]

Investment contracts that were available from 2021 to 2022 were governed by Articles 25, 37.3, 172 and 185 of the Organic Law for Economic Development and Fiscal Sustainability in the Ware of the COVID-19 Pandemic.[159] However, neither mandatory respondent or their selected cross-owned companies reported to have benefitted under this law during the POI.[160]

Commerce preliminarily determines that the tax deduction and/or ISD exemptions constitute a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act. Commerce preliminarily determines that the tax deduction and/or ISD exemptions provide a benefit in the amount of the tax savings to the company, pursuant to 19 CFR 351.509(a)(1) and section 771(5)(E) of the Act. As noted above, eligibility for tax incentives under this program was expanded on multiple occasions since 2010, and our review of the respondents' usage information indicates that their respective investment contracts were signed under the expanded list of eligible sectors. Therefore, based on information from the GOE we preliminarily determine that there is not a basis to find that the eligibility under the program was expressly limited to enterprises or industries in a manner that is *de jure* specific under section 771(5A)(D)(i) of the Act. We next examined whether the manner in which benefits were disbursed under the program were *de facto* specific to limited enterprises or industries under section 771(5A)(D)(iii)(I) of the Act. Based on usage information from the GOE, we preliminarily determine that this program provided benefits to a limited number of users, and thus, is specific under 771(5A)(D)(iii)(I) of the Act.[161]

Consistent with 19 CFR 351.509(c), we are treating the tax savings received by the firms as a recurring benefit. Pursuant to 19 CFR 351.509(b)(1), we expensed the benefit received to the year in which the recipient of the tax savings otherwise would have had to pay the taxes, *i.e.*, the year in which each company claimed this benefit in its tax returns that were filed during the POI.

---

[155] *See* GOE's IQR at OTH-4.
[156] *Id.* at OTH-5.
[157] *Id.*
[158] *Id.*
[159] *Id.*
[160] *See* GOE's SQR at Exhibit S-Q45.
[161] *See* GOE's IQR at OTH-15 and OTH-16.

*Investment Contract Tax Rate Reduction*

Santa Priscila claimed to have held investment contracts with the GOE during the POI.[162] Under these contracts, Santa Priscila received a complete, 25 percent corporate income tax exemption on the income generated from new businesses for which the investment contract was approved.[163] Santa Priscila reported claiming the tax exemption on the fiscal year 2021 tax returns filed during the POI.[164]

SONGA and Naturisa claimed to have held investment contracts with the GOE during the POI.[165] SONGA's and Naturisa's investment contracts were established under COPCI, in which SONGA and Naturisa, in return for an investment intended to expand their production capacity that would generate additional employment, would receive a proportional reduction in the tax rate for the accumulated investment amount for each year, SONGA and Naturisa would receive an exemption from the ISD for the importation of materials, commodities and capital goods used in the project, and SONGA would receive an exemption from the ISD for the repayment of principal and interest on loans obtained from foreign lending institutions.[166] SONGA and Naturisa reported receiving benefits under their contract in 2021 as claimed in their tax return filed with the GOE in 2022.[167]

To calculate the benefit, we compared the amount of income tax paid under the program's reduced income tax rate to the income tax that would have been paid absent the program, as indicated by the income tax return filed during the POI.

For income tax savings received by Santa Priscila, we divided the benefit under the program by the combined total sales of Santa Priscila and Tropack for the POI, net of inter-company sales. For income tax savings received by SONGA, we divided the benefit under the program by SONGA's total sales for the POI. For Naturisa, we divided the benefit under the program by the combined total sales of Naturisa and SONGA, net of inter-company sales.

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI. Thus, for this program, we divided the benefit that Santa Priscila, and Naturisa received under the program by their volume of shrimp produced during the POI. We then multiplied the resulting per-unit benefit for Sana Priscila, and Naturisa by the total volume of raw shrimp supplied to the mandatory respondents during the POI by their non-cross-owned shrimp producers. We then divided the benefit attributed to the non-cross-owned raw shrimp suppliers of Santa Priscila and SONGA by the total POI sales of Santa Priscila and SONGA.

[162] *See* Santa Priscila's IQR at III-19 and Exhibit 13.
[163] *See* Santa Priscila's Section III IQR at Exhibits 13 and 14; *see also* Santa Priscila's Supplier Section III IQR at PRO-6.
[164] *See* Santa Priscila's Section III IQR at Exhibit 13 at 2 and Exhibit 14.
[165] *See* SONGA's IQR at III-25 to III-26 and Exhibit 11; *see also* SONGA's Affiliated Sec III QR at NAT-III-12 to NAT-III-13 and Exhibits NAT-III-7 and NAT-III-7(a).
[166] *Id.*
[167] *See* SONGA's Affiliated Sec III QR at Exhibit NAT-III-7.

On this basis, we calculated a net subsidy rate of 1.30 percent *ad valorem* for SONGA and a net subsidy rate of 1.10 percent *ad valorem* for Santa Priscila/Tropack. [168]

*Investment Contract ISD Exemption for Imported Materials*

SONGA reported receiving an ISD tax exemption for imported materials under the program as part of the income tax return it filed in 2022 for the 2021 fiscal year.[169] Accordingly, benefit is equal to the amount of the exempted taxes that otherwise would have been paid absent the program.

We divided the benefit SONGA received under the program by its total sales for the POI.

The resulting net subsidy rate for SONGA was less than 0.005 percent, and thus, is not measurable.[170]

*Investment Contract ISD Exemption for Repayment of Principal and Interest on Loans Obtained from Foreign Lending Institutions*

SONGA reported receiving an ISD exemption for repayment of principal and interest on loans obtained from foreign lending institutions.[171] Accordingly, we preliminarily determine the benefit is equal to the amount of the exempted taxes that otherwise would have been paid absent the program. Concerning Naturisa, although its investment contract exempts Natursia from the ISD on repayments of foreign loans, Naturisa claims to not have borrowed money from any foreign financial institution to finance the investment project.[172] Thus we find Naturisa did not use this program.

To calculate the countervailable subsidy rate for SONGA, we divided SONGA's benefit by its total sales value for the POI. On this basis, we preliminarily determine a countervailable subsidy rate of 0.02 percent *ad valorem* for SONGA's investment contract ISD exemption for imported materials.[173]

8. <u>Municipal Tax Program</u>

The mandatory respondents and GOE reported that the Municipal Council of Guayaquil allows for three municipal tax exemptions, *i.e.*, municipal tax exemption on total assets, municipal solid waste collection tax exemption, and municipal patent tax exemption. The municipal tax exemption on total assets is described below. Commerce preliminarily determines that the municipal solid waste collection tax exemption was not used during the POI. Commerce will continue to examine the municipal patent tax exemption in a post-preliminary decision memorandum.

---

[168] *See* SONGA's Preliminary Calculation Memorandum.
[169] *See* SONGA's IQR at Exhibit 11.
[170] *See* SONGA's Preliminary Calculation Memorandum; *see also* Santa Priscila's Preliminary Calculation Memorandum.
[171] *See* SONGA's IQR at Exhibit 11.
[172] *See* SONGA's Affiliated Sec III QR at Exhibit NAT-III-7.
[173] *See* SONGA's Preliminary Calculation Memorandum.

*a.* Municipal Tax Exemption on Total Assets

Santa Priscila, Produmar, SONGA, and Naturisa reported that they received under this program an exemption of 0.15 percent municipal tax levied by the GOE on the total assets of Santa Priscila, Produmar, SONGA, and Naturisa that are engaged in the aquaculture sector.[174] The GOE established this tax exemption in July, 2017, through Article 554 of the Organic Code of Territorial Organization, Autonomy, and Decentralization, in order to reduce the financial burden of aquacultural and agricultural facilities in the *canton* of Guayaquil,[175] *i.e.*, the location of Santa Priscila's, Produmar's, SONGA's and Naturisa's production facilities. Pursuant to Resolution No. 6203-2017, legal persons engaged exclusively in agricultural, aquacultural, or fishing activities are eligible to claim exemptions from the 0.15 percent municipal tax on the total assets of the entity receiving benefits under this program, excluding any short-term liabilities held by eligible entities.[176] Eligibility for benefits under this program is not contingent on submitting an application to receive the 0.15 percent tax deduction; rather, the benefits are provided automatically based on the purpose of the business of the eligible taxpayer.[177]

We preliminarily determine that the exemption from the 0.15 percent municipal asset tax constitutes a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act. We preliminarily determine that the exemption from the 0.15 percent municipal asset tax provides a benefit in the amount of the tax savings to the company, pursuant to 19 CFR 351.509(a)(1) and section 771(5)(E) of the Act. We preliminarily determine the program is specific under section 771(5A)(D)(iv) of the Act because eligible recipients are limited to firms with aquacultural and agricultural facilities in the *canton* of Guayaquil.

Consistent with 19 CFR 351.509(c), we are treating the tax savings received by the firms as a recurring benefit. Pursuant to 19 CFR 351.509(b)(1), we expensed the benefit received to the year in which the recipient of the tax savings otherwise would have had to pay the taxes, *i.e.*, the POI. Thus, the benefit received under this program is equal to the amount of tax that would have been paid absent the program during the POI.

For Santa Priscila, we divided the benefit by the combined total sales of Santa Priscila and Tropack for the POI, net of inter-company sales. For Produmar, we divided the benefit by the combined total sales of Produmar and Santa Priscila, net of inter-company sales. For SONGA, we divided the benefit by the combined total sales of SONGA. For Naturisa, we divided the benefit by the combined total sales of SONGA and Naturisa, net of inter-company sales.

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI. Thus, for this program, we divided the benefit that Santa Priscila, Produmar, and Naturisa received under the program by their volume of shrimp produced during the POI. We then multiplied the resulting per-unit benefit for Sana Priscila, Produmar, and Naturisa by the

---

[174] *See* Santa Priscila's Section III IQR at Exhibit 15 at III-1; *see also* Santa Priscila's Supplier Section III IQR at Exhibit PRO-8 at 1.
[175] *See* GOE's IQR at OTH-62.
[176] *Id.* at OTH-62, OTH-65, and OTH-72.
[177] *Id*. at OTH-65.

total volume of raw shrimp supplied to the mandatory respondents during the POI by their non-cross-owned shrimp producers. We then divided the benefit attributed to the non-cross-owned raw shrimp suppliers of Santa Priscila and SONGA by the total POI sales of Santa Priscila and SONGA.

On this basis, we preliminary determine that Santa Priscila/Tropack received a net countervailable subsidy rates, respectively: 0.10 percent *ad valorem*, and that SONGA received a net countervailable rate of 0.05 percent *ad valorem*.[178]

### B. Programs Preliminarily Determined to Not Be Used during the POI

The mandatory respondents reported that they and their cross-owned affiliates under examination in this investigation did not use or was not eligible to receive benefits under the following programs during the POI or over the AUL period, as relevant:

1. Fee Exemptions for Brackish Water Program[179]
2. Government Forgiveness of Land Use Fees and Provision of Land to Delinquent Shrimp Farmers[180]
3. Export Taxes Lowered to Promote Agricultural Exports[181]
4. Export Credits from National Finance Corporation[182]
5. International Factoring[183]
6. Access to Preferential Lines of Credit for Aquaculture and Fisheries[184]
7. Loans for Organic Production[185]
8. Credit Line Boost for Shrimp Sector's Reconstruction After the Earthquake[186]
9. Sports, Educational and Cultural Expense Deduction[187]
10. Municipal Solid Waste Collection Tax[188]

---

[178] *See* SONGA's Preliminary Calculation Memorandum; *see also* Santa Priscila's Preliminary Calculation Memorandum.

[179] As noted above in the section titled "New Subsidy Allegations," Commerce has initiated on several new subsidy allegations submitted by the petitioner, one of which is the "Provision of Brackish Water for LTAR." Commerce will address this program in a post-preliminary memorandum; *see* Santa Priscila's Section III IQR at III-11 through III-13; *see also* Santa Priscila's Supplier Section III IQR at III-PRO-2 to III-PRO-5, MAN-2, III-EGI-2 and III-EGI-3, and III-TRO-1 through III-TRO-3; SONGA's IQR at III-18 to III-20; SONGA's Affiliated Sec III QR at NAT-III-4 to NAT-III-6.

[180] *See* Santa Priscila's Section III IQR at III-13; *see also* Santa Priscila's Supplier Section III IQR at III-PRO-5, III-EGI-3, III-EGI-4, and III-TRO-3; SONGA's IQR at III-20; SONGA's Affiliated Sec III QR at NAT-III-6.

[181] *See* Santa Priscila's Section III IQR at III-15; *see also* Santa Priscila's Supplier Section III IQR at III-PRO-6, MAN-3, III-EGI-4, and III-TRO-4; III-SONGA's IQR at III-22; SONGA's Affiliated Sec III QR at NAT-III-8.

[182] *See* Santa Priscila's Section III IQR at III-15; *see also* Santa Priscila's Supplier Section III IQR at III-PRO-6, MAN-3, III-EGI-5, and III-TRO-4; SONGA's IQR at III-22; SONGA's Affiliated Sec III QR at NAT-III-8.

[183] *See* Santa Priscila's Section III IQR at III-16; *see also* Santa Priscila's Supplier Section III IQR at III-PRO-7, MAN-3, III-EGI-5, and III-TRO-4 to III-TRO-5; SONGA's IQR at III-22; SONGA's Affiliated Sec III QR at NAT-III-8.

[184] *See* Santa Priscila's IQR at III-16; *see also* SONGA's IQR at III-23; SONGA's Affiliated Sec III QR at NAT-III-9.

[185] *Id.*

[186] *See* Santa Priscila's IQR at III-16; *see also* SONGA's IQR at III-23; SONGA's Affiliated Sec III QR at NAT-III-9 to NAT-III-10.

[187] *See* SONGA's IQR at III-27.

[188] *See* SONGA's IQR at III-27; SONGA's Affiliated Sec III QR at NAT-III-13.

Barcode:4532208-02 C-331-806 INV - Investigation -

### C. Programs To Be Examined in a Post-Preliminary Decision Memorandum

Below are programs we have not addressed in this preliminary determination.

1. Government Provision of Electricity for LTAR

The GOE has provided electricity in Ecuador for many years, and the centralized provision of electricity is established by Ecuador's Constitution.[189] Electricity rates in Ecuador are established by GOE's Agency for Regulation and Control of Energy and Non-Renewable Natural Resources (ARCERNNR), under the Ministry of Energy and Mines.[190] In February and March of each year, ARCERNNR collects and analyzes data from state-owned distributors regarding their electricity demand and costs for the following year, which must conform to relevant laws and regulations governing the provision of electricity and the establishment of electricity tariff rates.[191] ARCERNNR's Board of Directors, led by the Minister of Energy and Mines, then decides whether rates should be adjusted for the following year.[192] In September of each year, ARCERNNR publishes the annual list of tariff rates that will be in effect for the following year.[193] ARCERNNR is responsible for issuing a tariff schedule for each year, which includes tariffs for each category of electricity consumers. Companies are charged based on electricity classification and not the type of company. Further, the GOE reports that, while electricity tariffs are generally uniform throughout Ecuador, there are areas where tariffs are not uniform (*e.g.*, Guayaquil and Quito) because of historical pricing and differences in operating costs.[194]

There are 20 state-owned electricity distributors throughout Ecuador, which are responsible for directly supplying and managing connections and billing customers. Eleven of the companies are under the national-level, state-owned entity, called the National Electricity Corporation (CNEL). The remaining nine distributors are regional entities, owned by regional governments.

The mandatory respondents reported purchasing electricity from government electricity providers during the POI.[195]

While the GOE provided some information as to its price-setting philosophy and cost structure, Commerce requires additional time to analyze information submitted in the GOE's Second SQR, and potentially additional information regarding costs, the underlying pricing formula, and whether the GOE's electricity tariff-setting practice is consistent with market-determined principles. Therefore, we intend to analyze this program in a post-preliminary memorandum.

2. Youth Employment: State Economic Incentive for the Private Sector
3. ISD Exemption on Principal and Interest Payments on Foreign Loans

---

[189] *See* GOE's IQR at LTAR-3.
[190] *Id.* at LTAR-2.
[191] *Id*. at LTAR-3 and LTAR-10.
[192] *Id*. at LTAR-3.
[193] *Id*.
[194] *Id*. at LTAR-3 and LTAR-9.
[195] *See* Santa Priscila's Section III IQR at III-17; *see also* SONGA's IQR at III-23 to III-24; SONGA's Affiliated Sec III QR at NAT-III-10.


Filed By: Zachary Shaykin, Filed Date: 3/26/24 12:18 PM, Submission Status: Approved

4. Annual Motor Vehicle Tax Reduction Program
5. Income Tax Deduction for Net Increase in Employment Program
6. Exemption of Financial Returns
7. Hiring of Additional Personnel
8. Municipal Patent Exemption

## IX. RECOMMENDATION

We recommend that you approve the preliminary findings described above.

☒ ☐

_________ _________

Agree Disagree

3/25/2024

X

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
for Enforcement and Compliance

# Tab 42

# P.R. 285

Barcode:4534221-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
**Public Document**
E&C/OIV: ZS

March 28, 2024

Ms. Andrea Ruiz
Embassy of Ecuador
2535 15th St., N.W.
Washington, D.C. 20009

Re: Investigation of Frozen Warmwater Shrimp from Ecuador: Countervailing Duty Questionnaire regarding New Subsidy Allegation

Dear Ms. Ruiz:

As explained in the March 21, 2024, New Subsidy Allegation Memorandum,[1] the Department of Commerce (Commerce) has determined to include in this investigation additional newly alleged subsidies. The Government of Ecuador (GOE), Industrial Pesquera Santa Priscila (Santa Priscila), Sociedad Nacional de Galápagos (SONGA), as well as certain affiliates which are cross-owned with Santa Priscila (*i.e.*, Manesil S.A., Produmar S.A., Tropical Packing Ecuador S.A., and Egidiosa S.A.) and SONGA (*i.e.*, Naturisa S.A., Holding Sola & Sola Solacciones S.A., and Empacadora Champmar S.A.) are requested to respond to the attached questionnaire by **5:00 p.m. Eastern Standard Time (EST) on April 11, 2024**. Please follow the filing requirements outline in the December 12, 2023, initial questionnaire and ensure that the government's submission is accompanied by a certification of accuracy and completeness. Commerce will not accept responses to questions beyond those in the attached questionnaire. Please note that the GOE is responsible for forwarding copies of this cover letter and questionnaire to these respondent companies identified above.

In this questionnaire, we are requesting information on programs which may constitute subsidies under U.S. law which were alleged in the petition and on which Commerce initiated an investigation. Commerce has taken no position on whether these programs provide subsidies in this case, and our request for information on these programs does not imply that we will necessarily find them to provide countervailable subsidies. Our decisions on those questions will be made on the basis of information received during this proceeding (including information from you) in light of the applicable provisions of U.S. law.

Commerce must conduct this investigation in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadlines, or are unable to provide all requested supporting documentation by the established dates, you must notify the official in charge and submit a request for an extension of the related deadline for all or part of the questionnaire response. If you require an extension for

[1] *See* Memorandum, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations," dated March 21, 2024

Filed By: Zachary Shaykin, Filed Date: 3/28/24 1:48 PM, Submission Status: Approved

only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadlines. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information, and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any extension granted in response to your request will be in writing; otherwise the original deadline will apply. Extensions for your government and for the respondent companies identified above must be requested separately; any extension granted will apply only to the party identified in the written extension issued by Commerce.

If Commerce does not receive either the requested information or a written extension request before **5 p.m. ET** on the established deadlines, we may conclude that the government or the respondent company(ies) have decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the established deadlines. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Act, which may include adverse inferences, pursuant to section 776(b) of the Act.

In the unlikely event that you have received this questionnaire after the deadlines to respond, you MUST contact the official in charge within 5 days of receipt of the questionnaire to receive further instructions and revised deadlines for the submission of the required information. Failure to do so may result in the presumption that you failed to cooperate by not acting to the best of your ability to comply with the request for information, and Commerce may use an inference that is adverse to your interests in selecting from the facts otherwise available, in accordance with section 776(b) of the Act.

**DEADLINE FOR SUBMISSION**: **Your response is due no later than 5:00 p.m. Eastern Time on the date specified above.** Questionnaire responses normally entail the filing of many exhibits and databases on ACCESS. Accordingly, to the extent you submit your filing on the day it is due, rather than earlier, we strongly recommend that you begin uploading your response **no later than 12:00 noon on the above due date**. A questionnaire response must be filed in its entirety by the deadline to be considered timely.[2]

**EXTENSIONS:** **Note well:** Any extension request must be filed in writing. Extension requests filed after 5 p.m. on the due date will not be granted, except in extraordinary circumstances. An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means.[3] An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, *force majeure*, or medical emergency."[4] Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the

[2] 19 CFR 351.303(b)(1).
[3] 19 CFR 351.302(a)(2).
[4] *Extension of Time Limits*, 78 FR 57790, 57793 (Sep. 20, 2013) (Preamble to the Final Rule).

requesting party of its decision before the time limit expires."[5] For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.[6]

**Note well**:

> Parties should be aware that **the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on its disposition. Parties should not assume that they will receive an extension of a time limit if they have not received a response from Commerce. For submissions that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next business day**. *See* 19 CFR 351.103(b).[7] **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues. When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise the official in charge, informing them of the filing difficulties. The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.

Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

Should you have any questions about this matter, please contact Zachary Shaykin at (202) 482-2638 or Reginald Anadio at (202) 482-3166.

Sincerely,



Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

[5] *Id.* at 57792.
[6] *Id.*
[7] *Id.* (emphasis added).



Filed By: Zachary Shaykin, Filed Date: 3/28/24 1:48 PM, Submission Status: Approved

Enclosure

**ATTACHMENT**

**Frozen Warmwater Shrimp from Ecuador**

**New Subsidy Allegation Questionnaire**

**NOTE:** *In accordance with section 351.303(e) of Commerce's regulations, "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain Commerce's approval for submission of an English translation fo only portions of a document prior to submission to Commerce."*

**NOTE:** *Please repeat the question prior to giving your response when responding to this supplemental questionnaire.*

---

Please respond to the following questions. For more detailed instructions, including the appendices requested below (*i.e.*, questions 1 through 4), refer to the guidelines and instructions included in the initial questionnaire issued on December 12, 2023. Also, refer to the New Subsidy Allegation memorandum for Commerce's analysis of the initiation of the below programs. The mandatory respondents in this investigation are Industrial Pesquera Santa Priscila S.A. (Santa Priscila), Sociedad Nacional de Galápagos C.A. (SONGA). In addition, the Government of Ecuador and certain companies which are cross-owned with Santa Priscila (*i.e.*, Manesil S.A., Produmar S.A., Tropack S.A., Egidiosa S.A.) and SONGA (*i.e.*, Naturisa S.A., Holding Sola & Sola Solacciones S.A., and Empacadora Champmar S.A.) are required to respond completely to the below questions.

**A. <u>Less than Adequate Remuneration (LTAR) Programs</u>**

**1. Provision of Fuel to Shrimp Farmers for LTAR**

Please respond to all questions in the following appendices, as applicable:

a. **Standard Questions Appendix,** and
b. **Provision of Goods/Services Appendix.**

**2. Provision of Brackish Water for LTAR**

Please respond to all questions in the following appendices, as applicable:

a. **Standard Questions Appendix**, and
b. **Provision of Goods/Services Appendix.**

**B. <u>Tax Program</u>**

### 3. Income Tax Reduction for Reinvestments

Please respond to all questions in the following appendices, as applicable:

a. **Standard Questions Appendix**, and
b. **Tax Program Appendix.**

## C. Loan Program

### 4. Banco Nacional de Fomento (BNF) Loan/Interest Forgiveness Program

Please respond to all questions in the following appendices, as applicable:

a. **Standard Questions Appendix**, and
b. **Loan Benchmark and Loan Guarantee Appendix**.

# Tab 43

# P.R. 293

inch (15.24 mm) or more in diameter, that project from the door into the body or frame of the safe when in the locked position.

The scope also excludes metal safes with each of the following characteristics:

(1) Pry resistant hinges, whether concealed or external. External hinges must be accompanied by solid steel inactive bolts (minimum 0.75 inch (19 mm) diameter) or plates (minimum 0.177 inch (4.5 mm) thickness), welded or bolted to the door and protrude into the safe and into or behind the door frame by at least 0.39 inches (10 mm) to prevent the physical removal or opening of the door;

(2) body walls and doors made of steel that is at least 17 gauge (0.05625 inch or 1.42874 mm thick);

(3) an integrated locking mechanism that includes one of the following: (a) at least two round steel active bolts 0.75 inch (19 mm) or larger in diameter; (b) three or more steel active bolts 0.70 inch (17.78 mm) or more in diameter; (c) four or more steel active bolts at least 0.60 inch (15.24 mm) or more in diameter; or (d) four or more flat steel locking plates (at least two active and two inactive) of a minimum of 0.177 inch (4.5 mm) in thickness and minimum height of 1.57 inches (40 mm), that extend out from the door by at least 0.78 inches (20 mm). The bolts or plates must project from the door, into the safe, and into or behind the door frame by at least 0.39 inches (10 mm) to prevent the physical removal or opening of the door; and

(4) made of a welded body construction and enter the United States fully assembled.

The scope also excludes gun safes meeting each of the following requirements:

(1) Shall be able to fully contain firearms and provide for their secure storage.

(2) Shall have a locking system consisting of at minimum a mechanical or electronic combination lock. The mechanical or electronic combination lock utilized by the safe shall have at least 10,000 possible combinations consisting of a minimum three numbers, letters, or symbols. The lock shall be protected by a casehardened (Rc 60+) drill-resistant steel plate, or drill-resistant material of equivalent strength.

(3) Boltwork shall consist of a minimum of three steel locking bolts of at least ½ inch thickness that intrude from the door of the safe into the body of the safe or from the body of the safe into the door of the safe, which are operated by a separate handle and secured by the lock.

(4) The exterior walls shall be constructed of a minimum 12-gauge thick steel for a single-walled safe, or the sum of the steel walls shall add up to at least 0.100 inches for safes with walls made from two pieces of flat-rolled steel.

(5) Doors shall be constructed of a minimum one layer of 7-gauge steel plate reinforced construction or at least two layers of a minimum 12-gauge steel compound construction.

(6) Door hinges shall be protected to prevent the removal of the door. Protective features include, but are not limited to: Hinges not exposed to the outside, interlocking door designs, dead bars, jeweler's lugs and active or inactive locking bolts.

The scope also excludes gun safes meeting each of the following requirements:

(1) Shall be able to fully contain firearms and provide for their secure storage.

(2) Shall have a locking system consisting of at minimum a mechanical or electronic combination lock with a lock body that is integrated into the door of the safe. The mechanical or electronic combination lock utilized by the safe shall have at least 10,000 possible combinations consisting of a minimum three numbers, letters, or symbols.

(3) Bolt work shall consist of a minimum of three steel locking bolts of at least ½-inch diameter that intrude from the door of the safe into the body of the safe or from the body of the safe into the door of the safe, which are operated by a separate handle and secured by the lock.

(4) The exterior walls (inclusive of the floor and top) shall be constructed of a minimum 14-gauge thick steel and shall be lined with one or more layers of fire-retardant gypsum board bonded, affixed with brackets or otherwise securely attached to the exterior walls. The fire retardant gypsum board shall be at least 15 mm in thickness for a single layer or shall sum to at least 19 mm in thickness where multiple layers are combined together.

(5) Doors shall be constructed of a minimum of one layer of 14-gauge steel lined with a minimum of one layer of 15 mm thick, fire-retardant gypsum board bonded, affixed with brackets or otherwise securely attached to the door. The doors shall fit into jambs equipped with a fire seal fitted completely around the door frame consisting of a hydrated sodium silicate encapsulated in a plastic film or sleeve that, when heat-activated by temperatures of over 210 degrees, expands to cover the space between the jambs and door, providing a barrier to prevent the intrusion of flames, gas, or smoke into the safe.

(6) Door hinges shall be protected to prevent the removal of the door. Protective features include but are not limited to: hinges not exposed to the outside, interlocking door designs, dead bars, jeweler's lugs and active or inactive locking bolts.

(7) The excluded safe must be imported in the fully assembled condition.

The scope also excludes metal storage devices that (1) have two or more exterior exposed drawers regardless of the height of the unit, or (2) are no more than 30 inches tall and have at least one exterior exposed drawer.

Also excluded from the scope are free standing metal cabinets less than 30 inches tall with a single opening, single door and an installed tabletop.

The scope also excludes metal storage devices less than 27 inches wide and deep that: (1) Have two doors hinged on the right and left side of the door frame respectively covering a single opening and that open from the middle toward the outer frame; or (2) are free standing or wall-mounted, single-opening units 20 inches or less high with a single door.

The subject certain metal lockers are classified under Harmonized Tariff Schedule of the United States (HTSUS) subheading 9403.20.0078. Parts of subject certain metal lockers are classified under HTS subheading 9403.90.8041. In addition, subject certain metal lockers may also enter under HTS subheading 9403.20.0050. While HTSUS subheadings are provided for convenience and Customs purposes, the written description of the scope of the *Orders* is dispositive.

[FR Doc. 2024–06840 Filed 3–29–24; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[C–331–806]**

### Frozen Warmwater Shrimp From Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With the Final Antidumping Duty Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) preliminarily determines that countervailable subsidies are being provided to producers and exporters of frozen warmwater shrimp (shrimp) from Ecuador. The period of investigation (POI) is January 1, 2022, through December 31, 2022. Interested parties are invited to comment on this preliminary determination.

**DATES:** Applicable April 1, 2024.

**FOR FURTHER INFORMATION CONTACT:** Reginald Anadio or Zachary Shaykin, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–3166 or (202) 482–5377, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

This preliminary determination is made in accordance with section 703(b) of the Tariff Act of 1930, as amended (the Act). On November 21, 2023, Commerce published in the **Federal Register** the notice of initiation of this investigation.[1] On December 7, 2023, Commerce postponed the preliminary determination until March 25, 2024.[2]

[1] *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations,* 88 FR 81053 (November 21, 2023) (*Initiation Notice*).

[2] *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Postponement of Preliminary*

Continued

For a complete description of events that followed the initiation of this investigation, *see* the Preliminary Decision Memorandum.[3] A list of topics discussed in the Preliminary Decision Memorandum is included as Appendix II to this notice. The Preliminary Decision Memorandum is a public document and is on file electronically via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *https://access.trade.gov.* In addition, a complete version of the Preliminary Decision Memorandum can be accessed directly at *https://access.trade.gov/public/FRNoticesListLayout.aspx.*

**Scope of the Investigation**

The product covered by this investigation is shrimp from Ecuador. For a complete description of the scope of this investigation, *see* Appendix I.

**Scope Comments**

In accordance with the *Preamble* to Commerce's regulations,[4] in the *Initiation Notice* Commerce set aside a period of time for parties to raise issues regarding product coverage (*i.e.,* scope).[5] No interested party commented on the scope of the investigation as it appeared in the *Initiation Notice.*

**Methodology**

Commerce is conducting this investigation in accordance with section 701 of the Act. For each subsidy program found to be countervailable, Commerce preliminarily determines that there is a subsidy, *i.e.,* a financial contribution by an "authority" that gives rise to a benefit to the recipient, and that the subsidy is specific.[6] For a full description of the methodology underlying our preliminary determination, *see* the Preliminary Decision Memorandum.

**Alignment**

As noted in the Preliminary Decision Memorandum, in accordance with section 705(a)(1) of the Act and 19 CFR 351.210(b)(4), Commerce is aligning the final countervailing duty (CVD) determination in this investigation with the final determinations in the companion antidumping duty (AD) investigations of shrimp from Ecuador and Indonesia, based on a request made by the petitioner.[7] Consequently, the final CVD determination will be issued on the same date as the final AD determinations, which are currently scheduled to be issued no later than August 5, 2024, unless postponed.

**All-Others Rate**

Sections 703(d) and 705(c)(5)(A) of the Act provide that, in the preliminary determination, Commerce shall determine an estimated all-others rate for companies not individually examined. This rate shall be an amount equal to the weighted average of the estimated subsidy rates established for those companies individually examined, excluding any zero and *de minimis* rates and any rates based entirely under section 776 of the Act.

In this investigation, Commerce preliminarily calculated total net subsidy rates for Industrial Pesquera Santa Priscila S.A. (Santa Priscila) and Sociedad Nacional de Galapagos C.A. (SONGA) that are not zero, *de minimis,* or based entirely on the facts otherwise available. Because Commerce calculated individual estimated countervailable subsidy rates for Santa Priscila and SONGA that are not zero, *de minimis,* or based entirely on the facts otherwise available, we have preliminarily calculated the all-others rate using a simple average of the individual estimated subsidy rates calculated for the examined respondents.[8]

**Preliminary Determination**

Commerce preliminarily determines that the following estimated countervailable subsidy rates exist:

| Producer/exporter | Subsidy rate (percent *ad valorem*) |
|---|---|
| Industrial Pesquera Santa Priscila S.A.[9] | 13.41 |
| Sociedad Nacional de Galapagos C.A.[10] | 1.69 |
| All Others | 7.55 |

**Suspension of Liquidation**

In accordance with section 703(d)(1)(B) and (d)(2) of the Act, Commerce will direct U.S. Customs and Border Protection (CBP) to suspend liquidation of entries of subject merchandise as described in the scope of the investigation section entered, or withdrawn from warehouse, for consumption on or after the date of publication of this notice in the **Federal Register**. Further, pursuant to 19 CFR 351.205(d), Commerce will instruct CBP to require a cash deposit equal to the rates indicated above.

**Disclosure**

Commerce intends to disclose its calculations and analysis performed to interested parties in this preliminary determination within five days of its public announcement, or if there is no public announcement, within five days of the date of the publication of this notice, in accordance with 19 CFR 351.224(b).

**Verification**

As provided in section 782(i)(1) of the Act, Commerce intends to verify the information relied upon in making its final determination.

**Public Comment**

Case briefs or other written comments may be submitted to the Assistant Secretary for Enforcement and Compliance no later than seven days after the date on which the last verification report is issued in this investigation. Rebuttal briefs, limited to issues raised in the case briefs, may be filed not later than five days after the

---

*Determinations in the Countervailing Duty Investigations,* 88 FR 85216 (December 7, 2023).

[3] *See* Memorandum, "Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of frozen warmwater shrimp from Ecuador," dated concurrently with, and hereby adopted by, this notice (Preliminary Decision Memorandum).

[4] *See Antidumping Duties; Countervailing Duties, Final Rule,* 62 FR 27296, 27323 (May 19, 1997) (*Preamble*).

[5] *See Initiation Notice,* 88 FR at 81054.

[6] *See* sections 771(5)(B) and (D) of the Act regarding financial contribution; section 771(5)(E) of the Act regarding benefit; and section 771(5A) of the Act regarding specificity.

[7] *See* Petitioner's Letter, "Request to Alignment," dated February 22, 2024. The petitioner is the American Shrimp Processors Association.

[8] When two respondents are under examination, Commerce normally calculates (A) a weighted-average of the estimated subsidy rates calculated for the examined respondents using each company's proprietary U.S. sale quantities for the merchandise under consideration; (B) a simple average of the estimated subsidy rates calculated for the examined respondents; and (C) a weighted-average of the estimated subsidy rates calculated for the examined respondents using each company's publicly-ranged U.S. sale quantities for the merchandise under consideration. Commerce then compares (B) and (C) to (A) and selects the rate closest to (A) as the most appropriate rate for all other producers and exporters. *See, e.g., Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Duty Administrative Reviews, Final Results of Changed-Circumstances Review, and Revocation of an Order in Part,* 75 FR 53661, 53663 (September 1, 2010). We currently do not have on the record the necessary publicly-ranged sales data to conduct the rate comparison discussed above. Therefore, for purposes of the preliminary determination, we calculated the all-others rate as the simple average of the total net subsidy rates calculated for the two mandatory respondents. We will solicit the necessary publicly-ranged sales data after the issuance of the preliminary determination.

[9] As discussed in the Preliminary Decision Memorandum, Commerce preliminarily determines Industrial Pesquera Santa Priscila S.A. is cross-owned with Manesil S.A., Produmar S.A., Tropack S.A., and Egidiosa S.A.

[10] As discussed in the Preliminary Decision Memorandum, Commerce preliminarily determines Sociedad Nacional de Galapagos C.A. is cross-owned with Naturisa S.A., Holding Sola & Sola Solacciones S.A., and Empacadora Champmar S.A.

date for filing case briefs.[11] Interested parties who submit case briefs or rebuttal briefs in this proceeding must submit: (1) a table of contents listing each issue; and (2) a table of authorities.[12]

As provided under 19 CFR 351.309(c)(2) and (d)(2), in prior proceedings we have encouraged interested parties to provide an executive summary of their brief that should be limited to five pages total, including footnotes. In this investigation, we instead request that interested parties provide at the beginning of their briefs a public, executive summary for each issue raised in their briefs.[13] Further, we request that interested parties limit their executive summary of each issue to no more than 450 words, not including citations. We intend to use the executive summaries as the basis of the comment summaries included in the issues and decision memorandum that will accompany the final determination in this investigation. We request that interested parties include footnotes for relevant citations in the executive summary of each issue. Note that Commerce has amended certain of its requirements pertaining to the service of documents in 19 CFR 351.303(f).[14]

Pursuant to 19 CFR 351.310(c), interested parties who wish to request a hearing, limited to issues raised in the case and rebuttal briefs, must submit a written request to the Assistant Secretary for Enforcement and Compliance, U.S. Department of Commerce within 30 days after the date of publication of this notice. Requests should contain the party's name, address, and telephone number, the number of participants, whether any participant is a foreign national, and a list of the issues to be discussed. Oral presentations at the hearing will be limited to issues raised in the briefs. If a request for a hearing is made, Commerce intends to hold the hearing at a time and date to be determined.[15] Parties should confirm by telephone the date, time, and location of the hearing two days before the scheduled date.

[11] *See* 19 CFR 351.309(d); *see also Administrative Protective Order, Service, and Other Procedures in Antidumping and Countervailing Duty Proceedings*, 88 FR 67069, 67077 (September 29, 2023) (*APO and Service Final Rule*).

[12] *See* 19 351.309(c)(2) and (d)(2).

[13] We use the term ''issue'' here to describe an argument that Commerce would normally address in a comment of the Issues and Decision Memorandum.

[14] *See APO and Service Final Rule.*

[15] *See* 19 CFR 351.310(d).

## U.S. International Trade Commission Notification

In accordance with section 703(f) of the Act, Commerce will notify the U.S. International Trade Commission (ITC) of its determination. If the final determination is affirmative, the ITC will determine before the later of 120 days after the date of this preliminary determination or 45 days after the final determination whether imports of aluminum extrusions from Indonesia are materially injuring, or threaten material injury to, the U.S. industry.

## Notification to Interested Parties

This determination is issued and published pursuant to sections 703(f) and 777(i) of the Act, and 19 CFR 351.205(c).

Dated: March 25, 2024.

**Abdelali Elouaradia,**

*Deputy Assistant Secretary for Enforcement and Compliance.*

## Appendix I—Scope of the Investigation

The scope of this investigation includes certain frozen warmwater shrimp and prawns whether wild-caught (ocean harvested) or farm-raised (produced by aquaculture), head-on or head-off, shell-on or peeled, tail-on or tail-off, deveined or not deveined, cooked or raw, or otherwise processed in frozen form. ''Tails'' in this context means the tail fan, which includes the telson and the uropods.

The frozen warmwater shrimp and prawn products included in the scope, regardless of definitions in the Harmonized Tariff Schedule of the United States (HTSUS), are products which are processed from warmwater shrimp and prawns through freezing and which are sold in any count size.

The products described above may be processed from any species of warmwater shrimp and prawns. Warmwater shrimp and prawns are generally classified in, but are not limited to, the Penaeidae family. Some examples of the farmed and wild-caught warmwater species include, but are not limited to, whiteleg shrimp (Penaeus vannemei), banana prawn (Penaeus merguiensis), fleshy prawn (Penaeus chinensis), giant river prawn (Macrobrachium rosenbergii), giant tiger prawn (Penaeus monodon), redspotted shrimp (Penaeus brasiliensis), southern brown shrimp (Penaeus subtilis), southern pink shrimp (Penaeus notialis), southern rough shrimp (Trachypenaeus curvirostris), southern white shrimp (Penaeus schmitti), blue shrimp (Penaeus stylirostris), western white shrimp (Penaeus occidentalis), and Indian white prawn (Penaeus indicus).

Frozen shrimp and prawns that are packed with marinade, spices or sauce are included in the scope. In addition, food preparations, which are not ''prepared meals,'' that contain more than 20 percent by weight of shrimp or prawn are also included in the scope.

*Excluded from the scope are:* (1) breaded shrimp and prawns (HTSUS subheading 1605.20.10.20); (2) shrimp and prawns generally classified in the Pandalidae family and commonly referred to as coldwater shrimp, in any state of processing; (3) fresh shrimp and prawns whether shell-on or peeled (HTSUS subheadings 0306.36.0020 and 0306.36.0040); (4) shrimp and prawns in prepared meals (HTSUS subheading 1605.20.05.10); (5) dried shrimp and prawns; (6) canned warmwater shrimp and prawns (HTSUS subheading 1605.20.10.40); (7) certain dusted shrimp; and (8) certain battered shrimp. Dusted shrimp is a shrimp-based product: (1) that is produced from fresh (or thawed-from-frozen) and peeled shrimp; (2) to which a ''dusting'' layer of rice or wheat flour of at least 95 percent purity has been applied; (3) with the entire surface of the shrimp flesh thoroughly and evenly coated with the flour; (4) with the nonshrimp content of the end product constituting between four and 10 percent of the product's total weight after being dusted, but prior to being frozen; and (5) that is subjected to IQF freezing immediately after application of the dusting layer. Battered shrimp is a shrimp-based product that, when dusted in accordance with the definition of dusting above, is coated with a wet viscous layer containing egg and/or milk, and par-fried.

The products covered by the scope are currently classified under the following HTSUS subheadings: 0306.17.0004, 0306.17.0005, 0306.17.0007, 0306.17.0008, 0306.17.0010, 0306.17.0011, 0306.17.0013, 0306.17.0014, 0306.17.0016, 0306.17.0017, 0306.17.0019, 0306.17.0020, 0306.17.0022, 0306.17.0023, 0306.17.0025, 0306.17.0026, 0306.17.0028, 0306.17.0029, 0306.17.0041, 0306.17.0042, 1605.21.1030, and 1605.29.1010. These HTSUS subheadings are provided for convenience and for customs purposes only and are not dispositive, but rather the written description of the scope is dispositive.

## Appendix II

I. Summary
II. Background
III. Scope Comments
IV. Scope of the Investigation
V. Diversification of Ecuador's Economy
VI. Injury Test
VII. Subsidies Valuation
VIII. Benchmarks and Discount Rates
IX. Analysis of Programs
X. Recommendation

[FR Doc. 2024–06845 Filed 3–29–24; 8:45 am]

**BILLING CODE 3510–DS–P**

# Tab 44

# P.R. 316-17

# C.R. 207-08

Barcode:4546014-01 C-331-806 INV - Investigation -

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 348
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been redacted from pages NSA-8, NSA-10, and NSA-13; and in Exhibits NSA-1, NSA-5, NSA-8(a), NSA-8(b), and NSA-11.

**PUBLIC VERSION**

April 19, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
SONGA's New Subsidy Allegations Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos C.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's March 28, 2024, New Subsidy Allegations ("NSA") questionnaire. This response is timely submitted in accordance with the Department's April 5, 2024, letter, re: "Request for Extension to New Subsidy Allegations Questionnaire Response," which extended the deadline for SONGA's NSA questionnaire response until today. Accompanying this submission are calculation worksheets in Excel® format.

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA requests proprietary treatment and the basis for the request:



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

- Production and Distribution Costs: Contained in the exhibits. Protected under 19 C.F.R. §§ 351.105(c)(2) and (3).

- Names of Particular Customers, Distributors, or Suppliers: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Exact Amount of Benefits Applied for or Received: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(8).

- Other Specific Business Information Related to SONGA's Business and Production Operations, Applications and Approval Documents etc., the Release of Which to the Public Would Cause Substantial Harm to SONGA's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to SONGA's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's NSA questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos C.A.*

## COMPANY CERTIFICATION

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I prepared or otherwise supervised the preparation of the attached submission of the New Subsidy Allegations Questionnaire Response, filed on April 18, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: April 18, 2024

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galápagos C.A., certify that I have read the attached New Subsidy Allegations Questionaire Response, filed on April 18, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: April 18, 2024

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 19th day of April 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode:4546014-01 C-331-806 INV - Investigation -

**Case No. C-331-806**
**Investigation**
**POI: 1/01/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**This document contains business proprietary information on pages NSA-8, NSA-10, and NSA-13, and in Exhibits NSA-1, NSA-5, NSA-8(a), NSA-8(b), and NSA-11.**

**PUBLIC VERSION**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION of**
**FROZEN WARMWATER FROM ECUADOR**

# RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A. TO THE DEPARTMENT'S MARCH 28, 2024 NEW SUBSIDY ALLEGATION QUESTIONNAIRE

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**Trade Pacific PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: April 19, 2024**

**Counsel to Sociedad Nacional de Galapagos C.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode:4546014-01 C-331-806 INV - Investigation -


**New Subsidy Allegation Questionnaire**

**NOTE:** ***In accordance with section 351.303(e) of Commerce's regulations, "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain Commerce's approval for submission of an English translation fo only portions of a document prior to submission to Commerce."***

**NOTE:** ***Please repeat the question prior to giving your response when responding to this supplemental questionnaire.***

---

**Please respond to the following questions. For more detailed instructions, including the appendices requested below (*i.e.*, questions 1 through 4), refer to the guidelines and instructions included in the initial questionnaire issued on December 12, 2023. Also, refer to the New Subsidy Allegation memorandum for Commerce's analysis of the initiation of the below programs. The mandatory respondents in this investigation are Industrial Pesquera Santa Priscila S.A. (Santa Priscila), Sociedad Nacional de Galápagos C.A. (SONGA). In addition, the Government of Ecuador and certain companies which are cross-owned with Santa Priscila (*i.e.*, Manesil S.A., Produmar S.A., Tropack S.A., Egidiosa S.A.) and SONGA (*i.e.*, Naturisa S.A., Holding Sola & Sola Solacciones S.A., and Empacadora Champmar S.A.) are required to respond completely to the below questions.**

Introduction: This questionnaire is provided on behalf of Sociedad Nacional de Galapagos ("SONGA") and its cross-owned affiliates, Naturisa S.A. ("Naturisa"), Empacadora Champmar S.A. ("Champmar"), and Holding Sola & Sola Solacciones S.A..

**A. Less than Adequate Remuneration (LTAR) Programs**

**1. Provision of Fuel to Shrimp Farmers for LTAR**

**Please respond to all questions in the following appendices, as applicable:**

- **a. Standard Questions Appendix, and**
- **b. Provision of Goods/Services Appendix.**

ANSWER: As requested, SONGA responds below to the Standard Questions and Provision of Goods/Services Appendices for Naturisa for the alleged provision of fuel to shrimp farmers for less than adequate remuneration ("LTAR") program. SONGA and Empacadora Champmar do not own shrimp farms, and, therefore, the alleged provision of diesel fuel to shrimp farmers is not applicable. Empacadora Champmar and Holding Sola & Sola Solacciones also did not have any diesel purchases during the period of investigation ("POI").



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Therefore, the total quantity authorized for any given month is the sum of quantities authorized in all valid authorizations for all establishments under Naturisa's RUC.

As of December 1, 2022, when Executive Decree No. 614 limited eligibility for the fixed price applicable to traders selling to registered companies in the shrimp shrimp customer segment to shrimp companies registered on the "domestic" registry (i.e., those with monthly demand of less than 1,200 gallons per month on an annualized basis), Naturisa was no longer eligible for any fixed price applicable to the shrimp consumer segment because it was registered to purchase diesel fuel on the "industrial" registry.

**C. Specify the criteria your company met to receive the particular amount of assistance provided. Did the application or approval specify the merchandise for which this assistance was to be provided? If yes, provide details of which merchandise was specified in the application and/or approval documents.**

ANSWER: In order to qualify for the fixed price of Diesel 2 and Premium Diesel Fuel applicable to traders selling to registered companies in the shrimp consumer segment until December 2022, Naturisa demonstrated that it had Ministerial Agreements issued by the Undersecretariat of Aquaculture, which authorized it to engage in shrimp farming. The application in the Industrial Registry also requires that Naturisa provide the monthly volume of fuel they intended to purchase.

Once the permit was approved, the supplier used the permit to purchase fuel from Petroecuador on behalf of Naturisa. The price that the supplier paid to Petroecuador was the price that was set in the executive decrees. The price that Naturisa paid to the supplier was negotiated with the supplier based on the amount of fuel that the company was purchasing. Please refer to subpart A above for further details on the criteria met to be eligible for the fixed price regime that applied to the shrimp consumer segment until December 1, 2022.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode:4546014-01 C-331-806 INV - Investigation -
**PUBLIC VERSION – BPI Has Been Redacted**

**Provision of Fuel to Shrimp Farmers for LTAR**

***Provision of Goods/Services Appendix***

**Please provide the following information with respect to each of the goods/services alleged to be provided at less than adequate remuneration:**

**A. Provide a general description of the goods/services provided by the government and of the process by which the goods/services are provided.**

ANSWER: SONGA and Naturisa clarify that diesel fuel is not provided by the GOE. Rather, Naturisa purchases from a private trader/distributor that is authorized to purchase diesel from Petroecuador at terminal-gate prices. These terminal gate prices are the prices that privately-owned and operating traders are charged for the fuel. After taking delivery of fuel at Petroecuador's fuel terminal, these suppliers and/or distributors deliver the diesel fuel to Naturisa, as authorized by ARCERNNR. Naturisa then purchases diesel fuel from private diesel suppliers with which it negotiates sales prices directly. The price paid by Naturisa includes a markup to cover the supplier's business expenses plus profit.

For further details on the application and approval process by which Naturisa was authorized to purchase Diesel 2/Premium Diesel from private traders/distributors, please refer to the responses to subparts A and B of the Standard Questions Appendix above.

**B. List all suppliers (domestic and foreign) from which you purchased the good/service in question during the POI. Specify whether any of these suppliers are owned or controlled by the Government of Ecuador.**

ANSWER: During the POI, Naturisa purchased exclusively from [

]. This supplier is a private entity with no GOE ownership.

**C. Explain how the price of the good/service is determined between your company and each of your suppliers.**

ANSWER: Presidential Decree Nos. 231, 462 and 467 established the fixed terminal-gate prices for Diesel 2 and Premium Diesel that would be charged to private traders selling to certain



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

**2. Provision of Brackish Water for LTAR**

**Please respond to all questions in the following appendices, as applicable:**

- **a. Standard Questions Appendix, and**
- **b. Provision of Goods/Services Appendix.**

ANSWER: As requested, SONGA responds below to the Standard Questions and Provision of Goods/Services Appendices for SONGA and Naturisa for the alleged provision of brackish water for LTAR program. Of the four reporting companies, only Naturisa used brackish water during the POI.

**Provision of Brackish Water for LTAR**

***Standard Questions Appendix***

**A. Specify the eligibility criteria your company had to meet in order to receive benefits under this program. State whether eligibility was or is currently contingent on one or more of the following criteria: 1) whether or not your company exports or has increased its exports, 2) the use of domestic rather than imported inputs, 3) the industry to which your company belongs, or 4) the region in which your company is located.**

ANSWER: The GOE does not provide brackish water, which is not suited for human consumption or purchased by the GOE and is, therefore, not sold by the public water utilities, to Naturisa. In Ecuador, the law requires that any entity or individual that is consuming water must pay for that water. However, entities or individuals using water for non-consumptive purposes are not required to pay for this water, regardless of type, so long as they are able to demonstrate that the water is being returned to the source at a similar quality and quantity. Thus, whether a party pays for brackish water in Ecuador is not a matter of the type of water or the user but rather, whether the water is being consumed or not.

Naturisa does not consume brackish water. Rather, it uses brackish water to fill the shrimp ponds where the shrimp are raised. Brackish water is never drawn from the source and retained. Rather, Naturisa invests heavily in machinery and pays all expenses, including significant fuel expenses, to pump brackish water from an estuary or other source. They likewise incur significant expenses in order to return the same water to the source. The GOE does not provide any brackish water as a good, or any connections or services. The party accessing the brackish water must make all necessary investments to withdraw and return it. In other words, the GOE does not provide brackish water itself, or any pipelines, pumps, hookups, or any services that are part of the provision of fresh water to a business or home for consumption.

Of the companies required to respond to the Department's NSA questionnaire, oinly Naturisa, accessed brackish water during the POI. In order to do so, once Naturisa was entirely



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

responsible for any necessary infrastructure (e.g., pipes, water pumps) to access the water and all operational costs (e.g., fuel or electricity for water pumps, maintenance of systems). Moreover, were Naturisa to consume (and not return to its source) the brackish water, it would be required to pay for that water, in addition to bearing the operational costs, just like any other consumptive user of water. In other words, the GOE provides no water, brackish or otherwise, to Naturisa, and no public water utility or entity monitors Naturisa's actual pumping of brackish water.

All laws and regulations governing the use of water apply to all users and no preference is shown to shrimp or aquaculture activities. Accessing this water is not contingent on whether a company exports, uses domestic goods, the industry in which they operate or the location of the firm.

**B. Describe in detail the application and approval process that your company undertook to receive benefits through the program.**

ANSWER: As stated above in response to subpart A, there is no program whereby the GOE provides brackish water to any consumer in Ecuador. Because no such program exists, Naturisa did not file any application or receive any approval to pump and return brackish water from sources located in Ecuador. So long as Naturisa does not consume brackish water in its operations, it is not required to pay or provide any additional information to the GOE.

**C. Specify the criteria your company met to receive the particular amount of assistance provided. Did the application or approval specify the merchandise for which this assistance was to be provided? If yes, provide details of which merchandise was specified in the application and/or approval documents.**

ANSWER: Please refer to SONGA's response to Subpart A above. There is no program whereby the GOE provides brackish water or any initiatives specifically focused on providing water at preferential rates to any industries, including the aquaculture industry. There is no specific application for accessing brackish water. The fact that the water is productively used to



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

grow shrimp does not render it consumptively used. Accordingly, there is no application that relates to the alleged program.

**D. What records does your company keep regarding each of the benefits received under this program? Provide your company's executed application forms and other application documents with respect to this program. Provide copies of the documentation sent to your company upon approval of the benefit, including but not limited to: approval letter, contract, claim form, etc.**

ANSWER: Not applicable. Because the GOE provides no brackish water to Naturisa, there are no records of any alleged benefits received. Moreover, Naturisa is responsible for making all infrastructure investments and incurring all operational costs related to accessing brackish water. As such, the GOE does not provide any brackish water at a reduced or preferential price to Naturisa. The water that Naturisa pumped from its sources is returned to the sources and thus is not consumed. To the extent there are records, they consist of the significant costs that Naturisa incurred to install, maintain and operate the systems that move water from the sources to the farm ponds and back again to the sources. Naturisa does not purchase brackish water from any supplier. Rather, Naturisa pumps brackish water from public estuaries and other sources, which it returns.

**E. Specify how many years your company has received benefits under this program. What was the first year that your company applied for and received benefits? For programs under investigation that were not enacted pursuant to a legal instrument, indicate for how many years your company has participated in the program. For example, for programs involving the provision of inputs for less than adequate remuneration not enacted pursuant to a legal instrument, please indicate how many years your company has purchased the relevant inputs from the government, government-controlled entities such as state-owned enterprises, or other enterprises alleged to be "authorities" under section 771(5)(B) of the Act.**

ANSWER: There is no program whereby the GOE provides brackish water, and, as such, there are no benefits to report. Entities or individuals in Ecuador are not required to pay for non-consumptive use of brackish or fresh water. Brackish water is not an input into the production of shrimp, but rather the medium in which the shrimp are raised. This is no different than dirt on a farm; dirt facilitates growth of crops but dirt does not become part of the crops. Additionally, as



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

discussed above, there is no authority within Ecuador that provides brackish water; any party that wishes to access brackish water must bear all costs related to developing any necessary infrastructure and operational costs.

**F. Indicate where benefits under this program can be found in your accounting system (i.e., specify the ledgers or journals) and financial statements. If you have to file anything with the government to continue receiving benefits under this program, provide a complete translated set of your most recent submissions made during, or before, the POI.**

ANSWER: Because there is no program to provide brackish water at less than adequate remuneration, Naturisa does not record any pumping brackish water.. However, as noted above, Naturisa incurs significant costs to install, maintain and operate its water system. These costs are reflected in Naturisa's accounting records. For example, Naturisa purchases diesel to operate water pumps that move water between the source and the farm ponds. Please refer to Naturisa's response to the Standard Questions Appendix for the alleged provision of diesel fuel to shrimp farmers for LTAR program above for the accounts where these diesel fuel expenses are recorded for Naturisa.

**G. Has the program been terminated? If yes, please explain. When is the last date that your company could apply for or claim benefits under the program? When is the last date that your company could receive benefits under the program?**

ANSWER: Not applicable. As stated above, there is no program whereby the GOE provides brackish water to Naturisa because it does not engage in consumptive use of brackish water. Accordingly, there is no program that could have been terminated.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

**Provision of Brackish Water for LTAR**
***Provision of Goods/Services Appendix***

**Please provide the following information with respect to each of the goods/services alleged to be provided at less than adequate remuneration:**

**A. Provide a general description of the goods/services provided by the government and of the process by which the goods/services are provided.**

ANSWER: The GOE does not provide any brackish water to shrimp farms. Unlike when requesting water service to be consumed at a business or home, Naturisa bears all investments and costs incurred to pump and return water to the source from which it is drawn. Thus, unlike water utility rates, which are intended to cover costs of extraction and delivery, those costs are borne entirely by Naturisa.

**B. List all suppliers (domestic and foreign) from which you purchased the good/service in question during the POI. Specify whether any of these suppliers are owned or controlled by the Government of Ecuador.**

ANSWER: Not applicable. Naturisa does not purchase brackish water from any supplier. Rather, Naturisa pumps brackish water from public estuaries and other sources, which it returns. Naturisa is wholly responsible for all costs related to pumping and returning brackish water to the source from which it is drawn. Naturisa also provides all infrastructure and incurs all operational-related expenses. In other words, the GOE does not provide brackish water to shrimp farms at all.

**C. Explain how the price of the good/service is determined between your company and each of your suppliers.**

ANSWER: Not applicable. Brackish water is not suitable for human consumption and has no market value. Naturisa does not purchase brackish water from any supplier. As discussed above, there are no suppliers of brackish water in Ecuador. Naturisa is wholly responsible for making the investments and incurring all operational costs to access and move the brackish water

from the estuary and the shrimp ponds, all of which is returned to the source from which it is drawn.

**D. Provide a listing of all of your purchases of the good/service during the POI. This list should include all purchases in which payment for the purchase was made or due during the POI. Specify the quantity of the purchase, the total amount of the purchase, the date of payment, the characteristics of the product purchased, the delivery terms, and the price per unit (specify unit, *i.e.*, ton, etc.). Segregate the list according to the supplier. In addition to a hard copy, provide an electronic version saved as a Microsoft Excel spreadsheet.**

ANSWER: Naturisa did not purchase any brackish water during the POI. Likewise, Naturisa does not consume any brackish water as all water pumped from the source is returned to the source. Therefore, it was not required to pay for the water.

**E. Are there trade publications which specify the prices of the good/service within Ecuador and on the world market? Provide a list of these publications, along with sample pages from these publications listing the prices of the good/service within Ecuador and in world markets during the period of investigation.**

ANSWER: The GOE is wholly responsible for setting water rates within Ecuador. However, because it does not provide brackish water, it has not established any rates specific to the provision of brackish water. SONGA is not aware of any commercial market domestically or internationally for non-consumptive use of brackish water that would list prices for brackish water during the POI.

Likewise, there is no price for brackish water within Ecuador or anywhere else. Throughout the world, shrimp farmers do not pay any governmental authority or any private entity for brackish water that is pumped from the source and returned to the source. **Exhibits NSA-9** and **NSA-10** contain declarations from George W. Chamberlain and Claude E. Boyd, world renowned experts on aquaculture practices and water use, which confirm that no government authority or any private entity assesses any fees on the non-consumptive use of brackish water.

# EXHIBIT NSA-10

Barcode: 4546014-02 C-331-806 INV - Investigation

Case no. C-331-806
Investigation
E&C/Office IV
PUBLIC DOCUMENT

**DECLARATION OF CLAUDE E. BOYD**

1. I, Claude E. Boyd, hereby declare that the statements contained in this declaration are true and correct and are based on my own personal experience and knowledge.

2. I am currently a Professor Emeritus at the Auburn University School of Fisheries, Aquaculture and Aquatic Sciences. I hold a B.S. in Chemistry and Entomology, and an M.S. in Insect Toxicology from Mississippi State University. In 1966, I earned a Ph.D. in Water Quality from Auburn University. Since then, I have devoted my career to the study of water quality and water use in aquaculture, including shrimp aquaculture.

3. I have authored or co-authored over 300 scientific journals articles, and numerous contributions to types of scientific publications devoted primarily to aquaculture. My research and writings include both brackish and fresh water in aquaculture. I also authored a popular text on the principles of water quality that is in its 3rd edition, and I authored or coauthored three books on pond water quality management, one on pond bottom soils, and one on water use in aquaculture. I have written over 100 practical advice columns in the *Global Aquaculture Advocate* since 1998 that primarily address water-related issues in aquaculture. A partial list of my recently published work is attached to this Declaration.

4. My research efforts have included the ecology and utilization of aquatic weeds, pond liming and fertilization, water quality and aeration, pond bottom soil management, hydrology of ponds, and resource use and environmental impacts of aquaculture. I also have done considerable work on water quality analysis methodology and hydrological measurements used in both freshwater and brackish water aquaculture.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

5. My teaching has focused on graduate training in water quality management and continuing education for professionals. I have been the major professor for 131 graduate committees as well as serving as a member of over 200 additional ones. I have transferred my research findings to user groups through hundreds of international consultancy and advisory activities to farmers, industry, and various governmental and non-governmental organizations, both in the United States and abroad.

6. The legal counsel for the mandatory respondents in the Department of Commerce's countervailing duty investigation of frozen warmwater shrimp from Ecuador have asked me to provide my opinion as to whether any government anywhere in the world charges for the provision of brackish water for non-consumptive use in shrimp farms.

7. During my 55-year career, I have visited shrimp farms in over 35 countries, as well as most shrimp farms in the United States, as part of my research and consultation efforts. In my personal experience, no federal, provincial, state, or local authority in any country, including in the United States, charges for brackish water that is pumped into shrimp ponds and subsequently discharged through water exchange or at harvest.

8. Legal counsel has also asked me if I know of any prices that are charged anywhere in the world for brackish water that is non-consumptively used. I do not. In fact, if a governmental authority charged a shrimp farm for its non-consumptive use of brackish water at the prices that governmental authorities charge for fresh water for consumptive use, the cost would be prohibitive. In other words, shrimp farmers could not afford to grow shrimp if they had to pay fresh water prices that typically are charged for consumptive use.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

9. I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 15, 2024.

Claude E Boyd

Claude E. Boyd



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

## Recent Publications of Dr. Claude E. Boyd

Publications (564)

**Resource Use and Pollution Potential in Feed-Based Aquaculture**
Article

- Sep 2023

**The role of species and geography in the elemental profiles of farm-raised shrimp from Indonesia**
Article

- Sep 2022

Elemental profiling is being explored as a traceability tool in many seafood products. However, the extent that elemental profiling can be used at finer geographical scales in cultured shrimp is unknown. Additionally, few studies have included multiple species in the same discriminant models, which would be useful in applications where one species...

**Sources of variation in elemental profiles of whiteleg shrimp (Litopenaeus vannamei) and their potential effects on the accuracy of discriminant analysis**
Article

- Feb 2022

Background Elemental profiling is a tool that has been proposed to improve the traceability of seafood products. Small sources of variation can affect the outcome of elemental profiling and therefore pose to lower the overall accuracy of analyses. Here, we investigate two potential sources of variation through three experiments: laboratory variatio...

**The effect of commercial scale processing on trace element concentrations in shrimp muscle tissue – A preliminary study from two processors in Thailand and Ecuador**
Article

- Jan 2022

Commercial processing is potentially a confounding factor for elemental profiling in shrimp. Here, two sets of paired samples were collected pre/post-processing from the same farms; one set from Thailand (n = 15) and one from Ecuador (n = 19). The samples from Ecuador were subjected to a meta-bisulfite bath as part of the processing regimen while t...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

### The contribution of fisheries and aquaculture to the global protein supply
Article

- Jan 2022

The contribution of aquatic animal protein to the global, animal-source protein supply and the relative importance of aquaculture to capture fisheries in supplying this protein is relevant in assessments and decisions related to the future of aquatic food production and its security. Meat of terrestrial animals, milk, and eggs resulted in 76,966 Kt...

### Overview of aquaculture feeds: global impacts of ingredient production, manufacturing, and use
Chapter

- Jan 2022

Embodied land, water, and energy are contained in aquaculture feeds, and small, pelagic, marine fish are the source of fish meal and fish oil included in these feeds. Mechanical aeration typically applied to ponds receiving feeds requires energy. Aquaculture feeds are the main source of pollution in aquaculture effluents. While aquaculture feeds pl...

### Technical and financial feasibility for intensification of the extensive shrimp farming area in Mekong Delta, Vietnam
Article

- Dec 2021

Engineering design studies and financial feasibility assessments were made for construction, maintenance, equipment, operations, loan requirement, shrimp sales and predicted cash flows for simulated transformations of extensive shrimp farms to intensive shrimp farms in the Mekong Delta, Vietnam. Farms with less than 2.8 ha of feed-based, aerated pr...

### Exploring the relationship between production intensity and land use: A meta-analytic approach with shrimp aquaculture
Article

- Dec 2021

Shrimp are one of the fastest growing commodities in aquaculture and have a considerable land footprint. Here, we explored the impact of utilizing different production methods (extensive vs intensive) for expanding shrimp production on the cumulative land footprint of shrimp aquaculture. A meta-analytic approach was utilized to simultaneously estim...

### Comparison of resource use for farmed shrimp in Ecuador, India, Indonesia, Thailand, and Vietnam



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Article

- Nov 2021

The purpose of this study was to assess the amounts of land, water, energy in fuels, and wild fish for fishmeal and fish oil in feeds required per tonne of harvested, farmed shrimp in five countries producing most of the shrimp destined for the international market. Land use for whiteleg shrimp Litopenaeus vannamei production differed slightly betw...

**A preliminary survey of antibiotic residues in frozen shrimp from retail stores in the United States**
Article

- Sep 2021

Shrimp are an important and valuable commodity for aquaculture that is widely traded internationally. Widespread antibiotic use has been documented in shrimp farming and is a common source of criticism of aquaculture products. Additionally, previous reports have found some evidence of antibiotic residues in shrimp samples obtained from retail store...

**Trace element concentrations in white leg shrimp Litopenaeus vannamei from retail stores in the EU, UK, and USA and the ability to discern country of origin with classification models**
Article

- Sep 2021

Shrimp are a globally traded aquaculture commodity that accounts for a large proportion of the monetary value of aquaculture. There are concerns among consumers about seafood labeling fraud and environmental sustainability. Therefore, the geographic origin of shrimp from retail stores was investigated with trace element profiling. 94 shrimp samples...

**Perspectives on the mangrove conundrum, land use, and benefits of yield intensification in farmed shrimp production: A review**
Article

Globally, shrimp farms occupied an estimated 3.490 million hectares (Mha) of land and operated 2.426 Mha of production ponds in 2018. Extensive shrimp farms used 1.804 Mha of farm area (1.377 Mha of production ponds), but produced 11.4% of global shrimp production. An estimated 1.718 Mha of land was required to produce ingredients for feeds used in...

**A comparison of the technical efficiency of Aquaculture Stewardship Council certified shrimp farms to non-certified farms**
Article



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

- Aug 2021

Aquaculture will play an increasingly important role in the global seafood supply as fisheries harvests have plateaued. Shrimp are a highly valuable aquaculture commodity which are produced largely for global trade. The Aquaculture Stewardship Council's shrimp certification standard is meant to serve as a market-based tool that rewards the better a...

**Resource use in whiteleg shrimp Litopenaeus vannamei farming in Ecuador**
Article

- Jun 2021

A survey of 101 shrimp farms in Ecuador revealed that the average annual shrimp yield based on production pond water surface area was 7.03 ± 0.93 (SE) t/ha/year. The range in annual yield among the five provinces with shrimp farms was 3.67 ± 0.71 to 11.95 ± 5.56 t/ha year, respectively. Averages for total land, water, and energy use were 0.54 ± 0.0...

**Resource sharing and resource sparing, understanding the role of production intensity and farm practices in resource use in shrimp aquaculture**
Article

- Jun 2021

Aquaculture production is an important part of the global food supply and has equaled or surpassed fisheries production as the main source of aquatic foods. Aquaculture is a resource intensive practice that can use large amounts of land, water, energy, and cause pollution and degradation to the local environment. Intensive production practices have...

**The Utility of Discriminant Analysis to Determine the Geographic Origin of Commercially Important Seafood and Aquaculture Species: A Meta-Analysis**
Article

- Feb 2021

Elemental profiling is a process where element concentrations in tissues are used to discern group membership between a priori groups, such as geographic location. The goal of this meta-analysis was to determine the effectiveness of elemental profiling to discern the geographic origin of seafood products when coupled with discriminant analyses. Coh...

**Aerator energy use in shrimp farming and means for improvement**
Article

Estimates of aeration energy use in shrimp farming varied from 11.4 to 41.6 GJ/t shrimp (average = 19.8 GJ/t). Several opportunities for reducing energy use in aeration are available.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Many farms adopt an excessive yield to installed aeration capacity ratio. Moreover, the proportion of installed aerator capacity in use and duration of aerator operat..

### Penaeid Shrimp Aquaculture

Chapter

- Jul 2020

Aquaculture supplies about 60% of the current market demand for shrimp. The entire increase for future demands must come from aquaculture since the capture from natural waters is not expected to increase. Shrimp aquaculture is conducted in many tropical and subtropical countries, but six countries—China, Indonesia, Vietnam, India, Ecuador, and Thai..

### Achieving sustainable aquaculture: Historical and current perspectives and future needs and challenges

Article

- Jun 2020

Important operational changes that have gradually been assimilated and new approaches that are developing as part of the movement toward sustainable intensive aquaculture production systems are presented via historical, current, and future perspectives. Improved environmental and economic sustainability based on increased efficiency of production c...

### Acidity

Chapter

- Jan 2020

Acidity in water bodies with pH of about 4 up to 8.3 is caused by carbon dioxide and dissolved humic substances. Waters with pH $<4.0$ usually contain sulfuric acid or possibly another strong acid, but they still contain carbon dioxide and possibly humic compounds. Low pH is associated with low productivity and biodiversity. Acidity is measured by ti...

### Dissolved Oxygen and Other Gases

Chapter

- Jan 2020

Concentrations of dissolved oxygen and other dissolved atmospheric gases at saturation in water vary with the partial pressures and solubilities of the gases, and the temperature and salinity of the water. Concentrations of dissolved oxygen and other dissolved gases at saturation decrease with greater elevation (lower barometric pressure), higher s...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

## Carbon Dioxide, pH, and Alkalinity

Chapter

- Jan 2020

The pH or negative logarithm of the hydrogen ion concentration is a master variable in water quality because the hydrogen ion influences many reactions. Because dissolved carbon dioxide is acidic, rainwater that is saturated with this gas is naturally acidic—usually about pH 5.6. Limestone, calcium silicate, and feldspars in soils and other geologi...

## Phosphorus

Chapter

- Jan 2020

Phosphorus usually is the most important nutrient limiting phytoplankton productivity in both aquatic and terrestrial ecosystems. Phosphorus occurs naturally in most geological formations and soils in varying amounts and forms; the main source of agricultural and industrial phosphate is deposits of the mineral apatite—known as rock phosphate. Munic...

## Sulfur

Chapter

- Jan 2020

Sulfur is a nutrient for plants and animals; hydrogen sulfide is an odorous, toxic material; and sulfur dioxide is an air pollutant responsible for acid rain. Plants primarily use sulfate as a sulfur source, and sulfur containing amino acids in plants are important to animal nutrition. Sulfur compounds undergo oxidations and reductions in the envir...

## Solar Radiation and Water Temperature

Chapter

- Jan 2020

Temperature is a measure of the heat content of an object which results from the energy content of that object. The main source of energy in ecological systems is solar radiation. The earth's energy budget is essentially balanced with the incoming solar radiation being balanced by the reflection of solar radiation and the re-radiation of energy abs...

## An Overview of Hydrology and Water Supply

Chapter

- Jan 2020



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

The familiar water cycle is driven by solar radiation, and water is continually transformed back and forth between water vapor and liquid water. In the process, water passes through several distinct compartments of the hydrosphere to include atmospheric moisture, precipitation, runoff, groundwater, standing water bodies, flowing streams, and ocean....

## Water Quality Protection

Chapter

- Jan 2020

Impaired water quality can result from natural causes, but the most common cause is anthropogenic pollution. Soil erosion leads to turbidity and sedimentation in water bodies. Organic wastes impart a high oxygen demand often culminating in low dissolved oxygen concentrations and nitrogen and phosphorus in effluents cause eutrophication. Pesticides,...

## Eutrophication

Chapter

- Jan 2020

The term eutrophication refers to a water body changing over time from nutrient-poor to nutrient-rich status. More nutrients cause increased aquatic plant growth that negatively influences water quality and especially dissolved oxygen availability. The result is a decrease in species diversity and an increase in the biomass of a few and usually les...

## Physical Properties of Water

Chapter

- Jan 2020

The water molecule is electrostatically charged with a negative site on one side and two positive sites on the other. Attractions between oppositely-charged sites on adjacent water molecules are stronger than typical van der Waals attractions among molecules and are called hydrogen bonds. The molecules in solid (ice) and in liquid water exhibit str...

## Suspended Solids, Color, Turbidity, and Light

Chapter

- Jan 2020

Natural waters contain suspended particulates that increase turbidity, impart apparent color, and interfere with light penetration. These particles originate from erosion, vegetative debris from watersheds, and microorganisms produced in water bodies. Suspended particles vary from colloids that remain suspended indefinitely to larger silt and sand...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

### Micronutrients and Other Trace Elements
Chapter

- Jan 2020

The solubilities of most minerals from which trace metals in natural waters originate are favored by low pH. The concentration of the free ion of a dissolved trace element usually is much lower than is the total concentration of the trace element. This results from ion pair associations between the free trace ion and major ions, complex ion formati...

### Total Hardness
Chapter

- Jan 2020

The total hardness of water results from divalent cations—mainly from calcium and magnesium—expressed as equivalent calcium carbonate. The total hardness equivalence of 1 mg/L calcium is 2.5 mg/L, while 1 mg/L magnesium equates to 4.12 mg/L. Hardness and alkalinity often are similar in concentration in waters of humid regions, but hardness frequent...

### Dissolved Solids
Chapter

- Jan 2020

The total dissolved solids (TDS) concentration in freshwater is determined by passing water through a 2-μm filter, evaporating the filtrate to dryness, and reporting the weight of the solids remaining after evaporation in milligrams per liter. Salinity and electrical conductivity usually are used to assess the concentrations of ions in seawater, an...

### Microorganisms and Water Quality
Chapter

- Jan 2020

Phytoplankton and bacteria have a greater effect on water quality than do other aquatic microorganisms. Phytoplankton are the main primary producers while bacteria are responsible for the majority of organic matter decomposition and nutrient recycling. An overview of microbial growth, photosynthesis, and respiration is provided, and methods for mea...

### Solubility and Chemical Equilibrium
Chapter



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

- Jan 2020

Solubility, chemical equilibrium, and equilibrium constants are closely related to Gibbs free energy of reaction. Electrostatic interactions among ions decrease the activities of ions, and these interactions increase with greater ionic strength. As a result, for precise calculations related to solubility and equilibrium, ionic activities instead of...

### Redox Potential

Chapter

- Jan 2020

Electrons are lost when a substance is oxidized and gained when a substance is reduced. Oxidations and reductions occur in couplets—known as half-cells—in which one substance, the oxidizing agent, accepts electrons from another substance, the reducing agent. The oxidizing agent is reduced and the reducing agent is oxidized. The flow of electrons be...

### Nitrogen

Chapter

- Jan 2020

The atmosphere is a vast storehouse of nitrogen—it consists of 78% by volume of this gas. Atmospheric nitrogen is converted by electrical activity to nitrate ($NO3^-$) that reaches the earth's surface in rainfall. Atmospheric nitrogen also can be fixed as organic nitrogen by bacteria and blue-green algae, and it can be reduced to ammonia (NH3) by indu...

### Water Quality: An Introduction

Book

- Jan 2020

This volume is of great importance to humans and other living organisms. The study of water quality draws information from a variety of disciplines including chemistry, biology, mathematics, physics, engineering, and resource management. University training in water quality is often limited to specialized courses in engineering, ecology, and fisher...

### Trace element profiling - Where we are and what's next

Presentation

- Mar 2019



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

### Influence of variation in water temperature on survival, growth and yield of Pacific white shrimp Litopenaeus vannamei in inland ponds for low-salinity culture

Article

- Feb 2019

There is considerable interest in the culture of whiteleg shrimp (Litopenaeus van-namei) in inland low-salinity water in Alabama and other states in the Sunbelt region of the US. However, the growing season is truncated as compared with tropical or subtropical areas where this species is typically cultured, and temperature is thought to be a major...

### Environmental Factors and Acute Hepatopancreatic Necrosis Disease (AHPND) in Shrimp Ponds in Viet Nam: Practices for Reducing Risks

Article

- Jan 2019

### Lentic Freshwater: Ponds—Aquaculture Ponds

Chapter

- Jan 2019

### Effect of organic matter concentration on agricultural limestone dissolution in laboratory soil-water systems

Article

- Aug 2018

Laboratory soil–water systems in which soil organic matter was increased by 0.0%, 0.5%, 1.0%, 2.0% and 4.0% by adding dry, chopped ryegrass (Lolium perenne) shoots to sandy soil containing 0.06% organic matter. Agricultural limestone was added to the systems, and pH, alkalinity and hardness of the water were monitored for 65 days. The pH, alkalinit...

### Use of elemental profiling and isotopic signatures to differentiate Pacific white shrimp (Litopenaeus vannamei) from freshwater and seawater culture areas

Article

- Aug 2018

Shrimp samples from aquaculture ponds supplied with either freshwater (0.2–1.3 g $L^{-1}$ salinity) or seawater (27.6–39.0 g $L^{-1}$ salinity) were subjected to elemental profiling and to stable isotope analysis. Concentrations of 35 trace elements, including rare earth elements (REEs) were analyzed by ICP-MS, and the $\delta^{13}C$ and $\delta^{15}N$ concentrations were analy...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

### Economics of alternative catfish production technologies
Article

The US catfish industry has shown increasing trends toward intensification of production as a means of achieving cost efficiencies on farms. Previous studies depicted the potential for cost efficiencies in alternative technologies such as split-pond systems, intensively aerated ponds, and in-pond raceway systems. This study provides an economic com...

### Effects of mechanical aeration on evaporation rate and water temperature in aquaculture ponds
Article

### Effects of mechanical aeration on evaporation rate, water temperature
Article

- May 2018

### Aquaculture pond fertilization
Article

Organic fertilizers (livestock manures and other agricultural wastes or by-products) and chemical fertilizers can be applied to aquaculture ponds to increase fish or shrimp production. Pond fertilization increases concentrations of nitrogen, phosphorus and other plant nutrients to stimulate phytoplankton photosynthesis that is the base of the food...

### Dissolved and suspended solids in aquaculture.
Article

- Jan 2019

A few major ions contribute most of the weight of dissolved solids in water. Direct determination of total dissolved solids (TDS) concentration is tedious, and the electrical conductivity of freshwater and the salinity of saline water are common surrogates for TDS in aquaculture. The primary concern over dissolved solids is maintaining TDS concentr...

### WOMEN IN UGANDA AQUACULTURE: NUTRITION, TRAINING, AND ADVANCEMENT
Technical Report

- Mar 2018

The study used discussions and interviews with selected respondents to generate relevant information for training fish farmer groups and other actors involved in aquaculture. The



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

trainings followed data collection so as to make sure that training focused on identified knowledge gaps among target groups. The study focused on selected districts in ce...

### IMPLEMENTING AND ASSESSING CELL-BASED TECHNICAL AND MARKETING SUPPORT SYSTEMS FOR SMALL AND MEDIUM-SCALE FISH FARMERS IN UGANDA

Technical Report

- Mar 2018

The rapid development of mobile technology, the increased penetration rates and the inherent characteristics of mobile phones are the reasons mobile phones are currently emerging as the fast widespread form of electronic communication system in African countries. Mobile phones can, therefore play a key role in disseminating relevant information to...

### Growth of Pacific White Shrimp Litopenaeus vannamei Cultured on Inland Low-Salinity Pond Soils

Article

- Feb 2018

Low-salinity inland ponds in west Alabama were used to determine if soil composition and water ionic profiles influenced shrimp growth. Soils from four farms were collected and placed into individual tanks equipped with airlift biofilters and 2.5% reconstituted seawater. Pacific White Shrimp Litopenaeus vannamei were cultured for 42 d. Growth, surv...

### General Relationship Between Water Quality and Aquaculture Performance in Ponds

Chapter

- Dec 2017

There is a close relationship between water-quality conditions in grow-out systems and the health of aquaculture animals. Impaired water quality can cause direct mortality, but more often, it stresses aquatic animals making them more susceptible to infectious diseases. The effort required for maintaining homeostasis by aquatic animals exposed to su...

### Pond Bottom Soils

Chapter

- Dec 2017

### Environmental Considerations

Chapter

- Dec 2017



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

## Water Quality in Ponds

Chapter

- Dec 2017

## Physical and chemical characteristics of soil from tiger shrimp aquaculture pond at Malacca, Malaysia

Article

- Nov 2017

Soil physico-chemical properties of the growout ponds of black tiger shrimp (Penaeus monodon) were in relation to shrimp yields for one production cycle. The culture ponds were old (>5 years) and new (newly constructed) types. Soil texture was silty clay with low sand content and high proportion of clay for both the pond types with alkaline soil pH...

## Production Methods and Resource Use at Litopenaeus vannamei and Penaeus monodon Farms in India Compared with Previous Findings from Thailand and Vietnam

Article

- Nov 2017

Shrimp farms in India had average yields (pond surface basis) of 7.86 ± 1.04 (SE) m.t./ha/yr for Litopenaeus vannamei (n = 89) and 3.88 m.t./ha/yr for Penaeus monodon (n = 11). Average feed conversion ratio was 1.48 ± 0.04 for L. vannamei and 1.24 ± 0.12 for P. monodon. Land use for production ponds, supporting area, and feed ingredients averaged 0...

## Assessment of elemental profiling for distinguishing geographic origin of aquacultured shrimp from India, Thailand and Vietnam

Article

- Oct 2017

Shrimp from three major exporting countries – India, Vietnam, and Thailand – were identified to country of origin by elemental profiling. Concentrations of 23 elements, including essential macro- and micro-nutrients and non-essential trace elements, in headless shell on shrimp (HLSO) samples were analyzed by ICP-AES. Elemental concentrations in shr...

## Use of agricultural limestone and lime in aquaculture

Article

- Oct 2017



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Application of agricultural limestone to increase alkalinity to about 50 mg/l improves production in fertilized ponds and enhances water quality in ponds for feed-based aquaculture. Burnt lime and hydrated lime cause an initial high pH, but they can be applied to bottoms of empty ponds for the purpose of neutralizing bottom soil acidity. In additio...
View

### Dissolved Oxygen and Aeration in Ictalurid Catfish Aquaculture
Article

- Oct 2017

Feed-based production of ictalurid catfish in ponds is the largest aquaculture sector in the USA. Feed has an oxygen demand, and increases carbon dioxide, ammonia nitrogen, and phosphate inputs to ponds. Major sources of oxygen in ponds are phytoplankton photosynthesis and mechanical aeration; the major sink for oxygen is respiration by fish and by...

### Role of salinity in the dissolution rates of CaCO 3 and its implications for aquaculture liming
Article

- Sep 2017

This work aimed at assessing the role of salinity in the dissolution rates of $CaCO_3$, discussing its implications for aquaculture liming. A simplified formula of artificial seawater without $HCO_3^-$ was initially prepared. Four batches of 10 L of diluted artificial seawater (salinity = 3.3 g/L) without $HCO_3^-$ were prepared. Sixteen Erlenmeyer flasks wer...

### A Case Study: Impacts of Deviating from Model Research Design to the Commercial Industry for Split-Pond Aquaculture
Article

- Sep 2017

A case study is presented to compare the results of design and management including circulation and dissolved oxygen management at a modified split-pond facility in west-central Alabama to the recommended design. Modifications included: the use of and a propeller pump instead of a slow-moving paddlewheel, lack of baffle in the waste cells, waste ce...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

### Assessing the Reliability of Water-Test Kits for Use in Pond Aquaculture: ASSESSING THE RELIABILITY OF WATER-TEST KITS

Article

- Aug 2017

Water-analysis kits are useful for practical aquaculture only if they provide equivalent decision-making as compared to standard water-analysis methods. This study used weighted Cohen's kappa (κ) statistics to compare management decisions made by farmers who used water-analysis kits (e.g., Seneye slide kit, Tetra EasyStrips, API test strips, Seache...

### Effects of mechanical aeration in the waste-treatment cells of split-pond aquaculture systems on water quality

Article

- Aug 2017

Split-pond systems divide a traditional pond into a 1:4 relationship where 20% of the water surface area is designated to fish production and 80% is designated to waste-treatment. Water passes from the fish cell to the waste cell for water quality improvement and flows back to the fish cell. The present study was conducted on a commercial catfish f...

### Nitrogen, Phosphorus, and Carbon Concentrations in Some Common Aquaculture Feeds: FEED CHEMICAL COMPOSITION

Article

- Jun 2017

Nitrogen, phosphorus, and carbon concentrations were measured from 203 samples of starter, fingerling, and grower aquaculture feeds from several countries and for several common species. The feed protein concentrations reported by manufacturers often were slightly greater than the measured crude protein concentrations. The correlation coefficients...

### Economics of Sustainable Intensification of Aquaculture: Evidence from Shrimp Farms in Vietnam and Thailand

Article

- Apr 2017

There is growing interest in sustainable intensification of aquaculture production. Yet little economic analysis has been done on farm-level effects of the economic sustainability of production intensification. Data from 83 shrimp farms (43 in Vietnam and 40 in Thailand) were used to identify (through principal component and cluster analyses) 13 cl...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

### Pollution potential indicators for feed-based fish and shrimp culture
Article

- Apr 2017

The oxygen demand, acidification potential, and waste loads of carbon dioxide, nitrogen, and phosphorus from feed were determined for production of channel catfish Ictalurus punctatus, tilapia Oreochromis spp., Atlantic salmon Salmo salar, rainbow trout Oncorhynchus mykiss, and whiteleg shrimp Litopenaeus vannamei. Loads of these variables in cultu...

### Performance and Application of a Fluidized Bed Limestone Reactor Designed for Control of Alkalinity, Hardness and pH at the Warm Springs Regional Fisheries Center
Article

- Mar 2017

Springs serving the Warm Springs Regional Fisheries Center, Warm Springs, Georgia, have pH, alkalinity, and hardness levels that lie under the range required for successful fish propagation while free CO2 is well above allowable targets. We evaluate a pretreatment process that exploits limestone's (CaCO3) ability to react away hydrogen ions ($H^+$) an...

### Effects of aeration on water quality in waste-treatment sections of split-pond aquaculture, a three-year synopsis.
Conference Paper

- Feb 2017

Split ponds have a fish cell and a waste cell, approximately 20% water surface area and 80% water surface area respectively, in which water recirculates to improve water quality as a more intensive management system than traditional ponds. This is a continuation of a study that focuses on the possible benefits of using mechanical aeration in the wa...

### Likely Effects of the Increasing Alkalinity of Inland Waters on Aquaculture: INCREASING ALKALINITY AND AQUACULTURE
Article

- Feb 2017

The rising atmospheric carbon dioxide (CO2) concentration is increasing the solubility of limestone, calcium silicate, and feldspars, resulting in greater total alkalinity concentration in inland waters. This phenomenon will result in inland waters having slightly greater alkalinity concentration (and buffering capacity), higher pH when at equilibr...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

### EFFECTS OF CLAY AND PHYTOPLANKTON TURBIDITY ON THERMAL STRATIFICATION IN SHALLOW AQUACULTURE PONDS

Conference Paper

- Feb 2017

Water temperature is a vital factor controlling the growth rate of all cultured aquatic species. Shallow water aquaculture ponds typically stratify thermally in the day and destratify at night. The severity of thermal stratification in the pond is controlled by the degree of light penetration. The depth of penetration of solar radiation into a smal...

### Resource Use Assessment of Shrimp, Litopenaeus vannamei and Penaeus monodon , Production in Thailand and Vietnam: RESOURCE USE IN SHRIMP CULTURE

Article

- Dec 2016

Resource use was investigated at 34 Litopenaeus vannamei and five Penaeus monodon farms in Thailand and 30 L. vannamei and 24 P. monodon farms in Vietnam. Farms varied in water surface areas for production, reservoirs, canals, and settling basins; in pond size and depth; and in water management, stocking density, feeding rate, amendment input, aera...

### Variability in the solubility of agricultural limestone from different sources and its pertinence for aquaculture

Article

- Dec 2016

Samples of agricultural limestone were obtained from quarries in the USA as follows: Talking Rock, GA; Whitestone, GA; Austinville, VA; Bonham, TX; and Thomasville, PA, referred as GA-1, GA-2, VA, TX and PA respectively. The limestone products were tested initially for non-equilibrium pH, concentrations of calcium and magnesium, neutralizing value...

### Naigaga et al-2016-Journal of the World Aquaculture Society

Data

- Nov 2016

### Dissolution rate of calcium carbonate and calcium hydroxide in saline waters and its relevance for aquaculture

Article

- Nov 2016



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

The solubilities of calcium carbonate and calcium hydroxide were determined in four waters of different initial salinity, pH, and alkalinity (in parentheses, respectively) as follows: freshwater (0.01 g L− 1, 6.26, 2.79 mg L− 1); diluted seawater (3.7 g L− 1, 7.37, 13 mg L− 1); diluted seawater (11.0 g L− 1, 7.97, 35.3 mg L− 1); seawater (31.7 g L−...

### Effects of Liming on Quality of Water Discharged from the Supply Reservoir at a Fisheries Research Station

Article

- Oct 2016

Annual treatment of a water supply reservoir with agricultural limestone at the E. W. Shell Fisheries Center at Auburn University has roughly doubled conductivity and concentrations of total alkalinity, total hardness, and calcium hardness in the discharge water. It also has prevented pH values below 6.7. Concentrations of water quality variables d...

### Water Loss as a Consequence of Using Mechanical Aeration in Aquaculture Ponds

Poster

- Oct 2016

### Embodied Resources in Fish and Shrimp Feeds: EMBODIED RESOURCES IN AQUACULTURE FEED

Article

- Sep 2016

Global averages were obtained for amounts of energy, land, water, wildfish, nitrogen, and phosphorus embodied in aquaculture feed ingredients. These data allowed amounts of these embodied resources to be calculated for typical feed formulations for channel catfish, Ictalurus punctatus; hybrid catfish, I. punctatus♀ × I. furcatus♂; Vietnamese catfis...

### Reducing the monitoring parameters of fish pond water quality

Article

- Sep 2016

A study was conducted at Auburn University, Auburn, Alabama, USA to reduce monitoring parameters in the evaluation of fish pond water qualities. Concentrations of settleable solids (Set), turbidity (Tur), total suspended solids (TSS), particulate organic matter (POM), chlorophyll-a (Chl), 5-day biochemical oxygen demand (BOD), total phosphorus (TP)...

### Evaluation and Optimization of Chemical Treatments for Reducing Yellow Discoloration of Channel Catfish ( Ictalurus Punctatus ) Fillets During Cold Storage



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Article

- Jun 2016

The effects of chemical treatments on color change of yellow discolored catfish fillets during both refrigerated and frozen storage were investigated in this work. For the refrigerated storage (4°C), the effects of concentration of sodium bisulfite on reducing the yellow discoloration were studied. Compared to the untreated fillets, sodium bisulfit...

### Slow-release Coated Copper Sulfate as an Algicide for Aquaculture: Slow-release Copper Algicide

Article

- Jun 2016

A coated copper sulfate algicide designed for controlled release of copper was evaluated for its effectiveness in controlling phytoplankton in hybrid catfish, ♀Ictalurus punctatus × ♂Ictalurus furcatus, ponds. Copper concentrations were greater in ponds receiving weekly treatments with copper sulfate crystals than in ponds in which the coated coppe...

### Influence of a Bacterial Amendment on Water Quality in Small Research Ponds for Channel Catfish, Ictalurus punctatus , Production: INFLUENCE OF A BACTERIAL AMENDMENT ON WATER QUALITY

Article

- May 2016

There has been considerable interest worldwide in applying bacterial inocula to channel catfish ponds for improving water quality, especially for acceleration of ammonia nitrogen oxidation through bacterial nitrification. The effects of a selected bacterial amendment on water quality in small research ponds for channel catfish production were evalu...

### A Preliminary Assessment of Land-to-Water Surface Area Ratios (LWR) for Sustainable Land Use in Aquaculture

Article

- Apr 2016

Several organizations have developed eco-label certification programs with standards to conserve resources and reduce negative environmental impacts of fish and shrimp production. Production by pond aquaculture is reported on a water surface area basis, but additional land for embankments, roads, storage areas, and so on, is required. Thus, data on...

**Water temperature as a possible cause of variations in performance of Pacific white shrimp Litopenaeus vannamei in inland ponds for low-salinity culture**
Conference Paper

- Apr 2016

Description: There is considerable interest in the culture of Whiteleg shrimp (Litopenaeus vannamei) in inland low-salinity water in Alabama and other states in the Sunbelt region of the US. However, the growing season is truncated as compared to tropical or subtropical areas where this species is typically cultured, and the temperature is thought...

**Laboratory tests of bacterial amendments for accelerating oxidation rates of ammonia, nitrite and organic matter in aquaculture pond water**
Article

- Apr 2016

The effects of 12 bacterial amendments on reducing concentrations of total ammonia nitrogen (TAN), nitrite nitrogen (NO2− N) and organic matter in pond waters were evaluated in the laboratory. Concentrations of TAN, NO2− N and organic matter in untreated water (controls) naturally decreased with time during 16 days. No large acceleration in nitrifi...

**New Approaches to Inform, Motivate, and Advance Small and Mediums-scale Fish Farmers: Building Industry Capacity Through Cell Phone Networks, Training, and Market Participation Production System Design and Best Management.**
Technical Report

- Mar 2016

Mobile phones can improve aquaculture productivity by increasing access to technical guidance, extension services, product assembly, input coordination, and price discovery for small-and medium-scale fish farmers. Data were obtained in five focused group interviews held across Uganda. The findings indicate that the use of mobile phones is common am...

**Authentication of fishery and aquaculture products by multi-element and stable isotope analysis**
Article

- Mar 2016

**An assessment of factors affecting the reliability of total alkalinity measurements**
Article

- Mar 2016



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

The accuracy and precision of different methods for detecting the endpoint of the total alkalinity titration and the typical accuracy and precision obtained for alkalinity analyses by a large sample of laboratories were investigated. The optimum, endpoint for total alkalinity titrations decreased from pH 5.0 at 10 mg l− 1 alkalinity to pH 4.2 for 3...

### THERMAL STRATIFICATION IN SHALLOW AQUACULTURE PONDS: RESPONSE TO TURBIDITY AND AERATION

Conference Paper

- Feb 2016

Water temperature directly affects the growth rate of all cultured aquatic species. Shallow water aquaculture ponds typically stratify thermally in the day and destratify at night. Thermal gradients are caused by the attenuation of solar radiation in the water, and attenuation is a function of water turbidity. The objectives of this study were to m..

### WATER QUALITY MANAGEMENT IN WASTE-TREATMENT SECTIONS OF SPLIT POND AQUACULTURE

Conference Paper

- Feb 2016

The original split-pond concept involved no water quality management in the waste-treatment section of the system. Dissolved oxygen concentrations commonly fall to near 0 mg/L each night during the summer. Cycles of daily aerobic conditions and nightly anaerobic conditions are thought to be keys to efficient waste nitrogen processing, which is a di...

### INFLUENCE OF VARIATION IN WATER TEMPERATURE ON SURVIVAL, GROWTH, AND YIELD OF PACIFIC WHITE SHRIMP Litopenaeus vannamei IN INLAND PONDS FOR LOW-SALINITY CULTURE

Conference Paper

- Feb 2016

There is considerable interest in culture of Whiteleg shrimp (Litopenaeus vannamei) in inland lowsalinity water in Alabama and other states in Sunbelt region of the US. However the growth season is truncated as compared to tropical or subtropical areas where this species is typically cultured, and temperature is thought to be a major factor influe...

### World Aquaculture Society Aquaculture America 2014 - Presentation abstract

Data

- Feb 2016



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

**World Aquaculture Society Aquaculture America 2015 - Presentation abstract - EFFECTS OF CLAY AND PHYTOPLANKTON TURBIDITY ON WATER TEMPERATURE AND POND EVAPORATION**
Data

- Feb 2016

**Influences of Different Types and Rates of Mechanical Aeration on Water Temperature and Evaporation Rate in Aquaculture Ponds**
Conference Paper

- Feb 2016

Aeration is increasingly used to improve water quality and increase yields in aquaculture ponds. Surface aerators increase oxygenation by creating a greater area of contact between water and air – a process that also favors higher evaporation rate. Evaporation results in heat loss from water bodies; therefore, it affects temperature that is an impo...

**Alkalinity and Hardness: Critical but Elusive Concepts in Aquaculture**
Article

- Feb 2016

Total alkalinity and total hardness are familiar variables in aquatic animal production. Aquaculturists-both scientists and practitioners alike-have some understanding of the two variables and of methods for adjusting their concentrations. The chemistry and the biological effects of alkalinity and hardness, however, are more complex than generally...

**Tomato seedling growth response to different water sources and a substrate partially replaced with dewatered aquaculture effluent**
Article

- Jan 2016



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Purpose The experiment was performed to determine the effect a commercial potting mix partially replaced with dewatered aquaculture effluent had on tomato transplant growth. Methods The experiment was designed as a 2 × 3 factorial and evaluated two water sources (water-soluble, inorganic fertilizer or municipal water) and three soilless substrates...

### Overview of aquaculture feeds

Chapter

- Dec 2015

Feed-based aquaculture is an important part of global aquaculture production. Feed use in aquaculture is expected to increase as aquaculture production expands to meet the demands of the growing human population. Aquaculture feeds require fish meal and oil made from pelagic, marine fish and products from agriculture as ingredients. The major concer...

### A preliminary assessment of land-to-water surface area ratios (LWR) for sustainable land use in aquaculture.

Conference Paper

- Nov 2015

Aquaculture farms require land in addition to pond surface areas for embankments, canals, roads, storage areas, offices, and parking lots. One hundred farms for pond culture of several species in 26 countries were selected using satellite imagery. Total farm area devoted to aquaculture, including production pond surfaces and pond surface areas, wer...

### Organic Carbon and Dissolved Oxygen Budgets for a Commercial-Size, In-pond Raceway System

Article

- Oct 2015

Intensive production of ictalurid catfish in the USA has increased over the past several years, and a better understanding of the amount of organic carbon (OC) and dissolved oxygen (DO) in these culture environments is needed. Budgets for OC and DO were estimated over a production season (March to November) for an in-pond raceway system for channel...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

BIOGRAPHICAL DATA
for
Claude E. Boyd

Personal:
Born – Hatley, Mississippi U.S.A.; November 14, 1939.
Address – School of Fisheries, Aquaculture and Aquatic Sciences, Auburn University, Auburn, Alabama 36849 (Office); P.O. Box 3074, Auburn, Alabama 36831 (Home).
Telephone – 334-844-4078 (Office); 334-887-8012 (Home); 334-742-1316 (Cellular)
Fax – 334-844-9208 (office); 334-502-7261 (Home).
E-mail: boydce1@auburn.edu
Language proficiency: English (native speaker); Thai (good); Spanish (fair).

Education and Area of Specialization:
B.S. (Entomology and chemistry) 1962, M.S. (Environmental toxicology) 1963, Mississippi State University; Ph.D. (Water and aquatic soil chemistry) 1966, Auburn University.

Employment History:
Instructor, Mississippi State University 1963; Aquatic Biologist, Federal Water Pollution Control Administration 1966; Assistant Professor, Auburn University, 1967; Ecologist, Savannah River Ecology Laboratory, University of Georgia 1968-70; Associate Professor, Auburn University, 1971-77; Professor, Auburn University, 1977-2015 (Butler/Cunningham Eminent Scholar in Agriculture and the Environment, 2001-2014); Professor Emeritus, Auburn University, 2015-present.

Honors and Awards:
B.S. Degree with "Special Honors"
Phi Kappa Phi (scholastic)
Research Award, Catfish Farmers of America
Distinguished Service Award, Catfish Farmers of America
Award of Excellence, Bioengineering Section, American Fisheries Society
Dean's Award for Contributions to Agriculture, Auburn University
Director's Senior Research Award, Alabama Agricultural Experiment Station, Auburn University
Research Achievement Award, Surathani Prawn Producers Association, Surathani, Thailand
Creative Research Award, Research Advisory Council, Auburn University.
Honorary Life Membership Award, World Aquaculture Society
Service Award, Catfish Farmers of America
Service Award, Alabama Catfish Producers
Appreciation Award, USDA Joint Subcommittee on Aquaculture
Lifetime Achievement Award, US Chapter, World Aquaculture Society
Fellow, American Association for the Advancement of Science
Academy of Fellows, Auburn University College of Agriculture
Lifetime Achievement Award, US Catfish Farmers
Recognition of support for Ecuadorian aquaculture industry, Camara Nacional de Acuacultura and



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Escuela Superior Politecnica del Litoral,
Dean's Grantsmanship Award, Auburn University

Teaching:

1. Classes taught at Auburn University
   Water Science (taught annually)
   Water and Sediment Quality Management in Aquaculture (taught alternate years)
   Resource Use and Environmental Issues in Aquaculture (taught alternate years)

2. Graduate program involvement
   Graduate Council at Auburn University (1978-1981).
   Student committees:
   Major professor - 58 M.S., 61 Ph.D.
   Committee member - 75 M.S., 34 Ph.D.

3. Postgraduate training
   Provided training of 1- month to 24-month duration for 28 visiting scientists.

4. Other
   Each year, I assist with several workshops for fishery biologists, fish farmers, and professional aquaculturists.

Committees, Boards, and Panels:

Southern Regional Aquaculture Center, Technical Committee (3 years)
Southern Regional Aquaculture Center, Steering Committee for four projects
Catfish Farmers of America, Research Committee (3 years)
World Aquaculture Society, Co-Program Chairman for 1996 annual meeting in Bangkok, Thailand
Environmental Sciences Committee, School of Agriculture, Auburn University (Current)
Auburn University representative to the University Council of Water Resources (Current)
Creative Research award Committee, Auburn University (2000 and 2001)
Oceanic Institute, Industry Liaison Committee (Current)
Editorial Boards:
  Progressive Fish Culturist (3 years)
  Aquaculture (2 years)
  Journal of Aquaculture in the Tropics (Current)
  Journal of Applied Aquaculture (Current)
  Reviews in Fisheries Science (Current)
  Aquaculture International (Current)
  Biosphere Journal (Current)
  Advanced Studies in Biology (Current)
National Academy of Sciences, Panel on Aquatic Weeds (1978)
USEPA, Environmental Biology Review Panel (1981-1984)
USEPA, Program Review, Corvallis, Oregon (1984)
U.S. National Research Council and Academia Sinica, Taiwan, Panel on Aquacultural



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Engineering and Simulation (1985)
NACA Working Group on Aquaculture Sustainability, Beijing, China (1995)
FAO/WHO/NACA Working Group on Aquaculture Product Food Safety, Bangkok, Thailand (1997)
FAO Expert Consultation on sustainable Shrimp Farming, Bangkok, Thailand (1997)
FAO Ad-Hoc Meeting on Criteria and Indicators of Sustainable Shrimp Farming, Rome, Italy (1998)
FAO Expert Consultation on Best Management Practices in Aquaculture, Brisbane, Australia (1999)
FAO Expert Consultation on Water and Land Use in Aquaculture, Rome, Italy (2002)
USAID PD/A CRSP, Materials and Methods Committee (1995-present)
USAID PD/A CRSP, Technical Committee Co-chairman (2005)
USAID, Joint Subcommittee on Aquaculture, Effluents Task Force (1999-2004)
Oceanic Institute (Hawaii), Industry Liaison Committee (1997-2000)
Aquaculture Certification Council, Board of Directors (2002-2004)
Global Aquaculture Alliance Shrimp Farm Standards Committee (2003-present)

Consulting:
I have served as a consultant to the following:
University of Florida, USA, 1976 (aquatic weed control)
North Carolina State University, USA, 1978 (water quality instruction)
Mississippi State University, USA, 1979 (water quality instruction)
U.S. Fish and Wildlife Service, USA, 1979, 1981, 1983, 1987 (water quality instruction)
Fitts Farms, Alabama, USA, 1979 (assessment of minnow farm)
T.E. Wanamaker, South Carolina, USA, 1980 (aeration)
Inverness, Alabama, USA, 1980 (turbidity control)
Occidental Chemical Company, Florida, USA, 1981 (water quality and mine reclamation)
Holland and Knight, Florida, USA, 1981 (water quality standards)
Vulcan Materials Company, North Carolina, USA, 1981-1983 (water quality standards)
Carpenter's Gold Fish Farm, California, USA, 1981 (pond water quality management)
Aeration Industries, Minnesota, USA, 1981-1986, 1995-1996 (aerator testing)
McDonald Co., Tennessee, USA, 1982 (aerator testing)
Carolina Power and Light, North Carolina, USA, 1983 (water quality standards)
Government of Suriname, 1983 (site selection for research station)
Savannah River Ecology Laboratory, South Carolina, USA, 1984, 1991-1993 (pond and lake management
Westinghouse, Savannah River Plant, South Carolina, USA, 1990, 1991 (pond management)
DuPont, Savannah River Plant, South Carolina, USA, 1984-1988 (pond design and management)
Engelhard Corporation, Georgia, USA, 1984, 1990, 1991, 1994, 1995, 1996 (water quality standards)
FAO, India, 1984, 1988, 1991 (pond water quality management)
Green, Dees, and France, LLP, Florida, USA, 1985 (fish kill investigation)
North Carolina Division of Boating and Inland Fisheries, USA, 1985 (pond water quality management)
The Power House, Maryland, USA, 1985-1987 (aerator testing)
Florida Bureau of Marine Research, USA, 1986 (pond design)



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Pac Mar/Asian Development Bank, Thailand, 1987, 1988 (water quality in shrimp farming area)
Lake Management Services 1987 (salinity and freshwater fish)
EMC Engineering, Georgia, USA, 1987 (pond reclamation)
Proexporca Shrimp Farm, Ecuador, 1987 (shrimp pond water quality management)
CSRIO and private shrimp farmers, Australia, 1987 (shrimp pond water and soil management)
Southland Fisheries and Camp O`Brien, North Carolina, USA, 1988 (pond liming)
Acapolon Shrimp Farm, Guatemala, 1988 (shrimp pond water quality management)
USDA/OCID, Taiwan, 1989 (shrimp farming practices)
Science and Technology Development Board, Thailand, 1989 (shrimp farming research evaluation)
Bechtel International, Thailand, 1990 (shrimp pond sediment control)
Acuespecies Shrimp Farm, Ecuador, 1990, 1992, 1993, 1994 (shrimp pond water quality management)
Inducam Shrimp Farm, Ecuador, 1990, 1991, 1992, 1993, 1994 (shrimp pond water quality management)
Deakin University, Warrnambool, Australia, 1990-1991 (instructional material on water quality)
DIBSA, Continental Grain Co., Ecuador, 1987-1992 (shrimp pond water quality management)
San Miguel Corp., Agricultural Division, Philippines, 1991 (shrimp pond water quality management)
Dole Philippines, Seafood Division, 1991 (shrimp pond water quality management)
American Soybean Association, Philippines and Thailand, 1989, 1991 (shrimp pond water quality management)
American Soybean Association, Colombia, 1994, 1995 (shrimp pond water quality management)
American Soybean Association, Venezuela, 1997 (shrimp pond water quality management)
American Soybean Association, China, 1997 (fish pond water quality management)
American soybean Association, Venezuela, 1998 (soil and water quality management)
Aquastar, Thailand, 1991, 1994 (shrimp pond water quality management)
Charoen Pokphand (C.P. Group) Feedmill Co., Thailand, 1989, 1991 (shrimp pond water quality management)
Rosario Shrimp Farm, Ecuador, 1990, 1992 (shrimp pond water quality management)
USDA/OCID, Thailand, 1989, 1992 (shrimp farming practices)
Wilfley-Weber, Inc., Colorado, USA, 1992 (aerator testing)
Wildlife Int., Washington, D.C., USA,1992, 1995 (pond testing of pesticides)
Texas Aquaculture Association, USA, 1992 (freshwater aquaculture effluents; NPDES permits)
Texas Aquaculture Association, USA, 1993 (brackishwater shrimp farm effluents; NPDES permits)
MCR Aquacultura, Brazil, 1994 (shrimp pond water quality management)
U.S. Army Corps of Engineers, Louisiana and Texas, USA, 1992 (evaluation of dredging project)
Laguna Madre Shrimp Farm, Belize, 1992 (shrimp pond water quality management)
Biomarsa, Ecuador, 1992, 1996, 1997 (shrimp pond water quality instruction)



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Southern Machine Welding, Alabama, USA, 1992 (aerator testing)
Kimberly-Clark, Alabama, USA, 1992 (lake sedimentation problem)
ESPOL/CENAIM, Ecuador, 1993, 1994 (shrimp pond water quality instruction)
Fisheries Information Mgt. Systems, Kentucky, USA, 1993 (lake fertilization)
Aquatic Ecosystems, Florida, USA, 1993 (aerator testing)
Benchmark Engineering, Alabama, USA, 1993 (fish kill investigation)
Aquamar Shrimp Farm, Ecuador, 1993 (shrimp pond water quality management)
Agromarina Shrimp Farm, Panama, 1993, 1996 (shrimp pond water quality management)
China Fisheries Soc., 1993 (water quality instruction)
CENIACUA (Shrimp Farmer's Association), Colombia, 1993, 1995 (shrimp pond water quality instruction)
Cartegenera de Acuicultura, Colombia, 1994, 1998, 2001 (shrimp pond soil and water quality management)
Asian Institute of Technology, Thailand, 1994, 1995 (shrimp pond water quality instruction)
Union Carbide/Inge, Twitty, and Duffy, Alabama, USA, 1994-1996 (ground water pollution)
SQM Nitratos, Chile 1995, 1996, 1998 (pond fertilizers)
Freshwater Institute (The Conservation Fund), West Virginia, USA, 1995 (acid mine drainage)
James Clements, Illinois, USA, 1995 (aerator design)
Agrosoledad, Colombia, 1995 (shrimp pond water quality management)
Jay Capozzi, New York, USA, 1995 (pond site evaluation)
Shrimp Mart, Malaysia, 1995 (shrimp pond water quality instruction)
Rodney Hale, 1995 (pond management)
Garner Lake Home Owners Association, Germantown, Tennessee, USA, 1995 (lake management)
Tanna Shrimp Mart, India, 1995 (shrimp pond water quality instruction)
Shrimp Culture II, Honduras, 1995 (shrimp pond soil evaluation)
NACA, Bangkok, Thailand, 1995 (shrimp farming practices)
Chomesmar Shrimp Farm, Costa Rica, 1996 (shrimp pond water quality management)
Nova Shrimp Farm, Belize, 1996 (shrimp pond soil management)
South China Sea Shrimp Farm, Viet Nam, 1996 and 2002 (shrimp pond soil management)
Shrimp Mart, Thailand, 1996 (shrimp pond water quality instruction)
Southern Star Shrimp Farm, Texas, USA, 1996 (sedimentation pond design)
Sekar Bumi Group, Indonesia, 1996 (shrimp pond design and construction)
Aquasol, Florida, USA, 1995-1996 (pond soil evaluation)
Australia Prawn Farmers Association, 1996 (shrimp pond management)
World Bank, Thailand, 1996, 1997 (shrimp farm rehabilitation project)
Caribuena Foods, Inc., Belize, 1996 (shrimp pond site evaluation and EIA)
National Fisheries Institute, Virginia, USA, 1996 (shrimp farming and the environment)
CH2M Hill, North Carolina, USA, 1996, 1997 (water quality standards)
Codamet, Ecuador, 1996, 1997 (shrimp pond aeration and evaluation of liming materials)
Millander and Sons Seafood, Florida, USA, 1996 (shrimp pond water quality management)
Modercorp, Ecuador, 1996 (quality of pond source water)
Inacua, Ecuador, 1996 (water quality instruction)
Tannol Holdings, Tanzania, 1996, 1997 (shrimp pond site evaluation and EIA)
Lake Tindall, LLP, Mississippi, USA, 1996, 1997 (fish kill evaluation)
Ret-Ser Engineering Agency, Malaysia, 1977 (shrimp pond construction)



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Japfa Comfeed, Indonesia, 1997-1998 (shrimp pond water quality management)
Chemie, Ecuador, 1997 (shrimp pond water quality research)
Alabama Power Company, USA, 1997 (water quality standards)
Global Aquaculture Alliance, USA, 1997-2006 (technical advisor)
Diamasa, Ecuador ,1997-1998 (shrimp pond fertilizers)
Siembramar Shrimp Farm, Venezuela 1997 (shrimp pond water quality management)
Camara de Aquacultura, Ecuador ,1997-1998 (shrimp pond water quality instruction)
S & N Sprayer Corporation, Mississippi, USA, 1997 (aerator design)
Alfonso Delfini, Ecuador, 1997, 1999 (tilapia pond water quality management)
CRI, University of Rhode Island, USA, 1997, 1998, 1999 (shrimp farming practices)
Union Carbide/Connelly and Williams, Alabama, USA, 1998 (ground water pollution)
PT Banggai Sentral Shrimp, Indonesia, 1998 (shrimp pond management and site evaluation)
University of Monterey, Mazatlan Campus, 1998 (shrimp pond water quality instruction)
NESTA Advisors & Capital, 1998 (shrimp farming in Thailand)
World Bank 1998, 1999 (shrimp farming code of practice, Thailand)
Nicovita Feeds, Peru, 1998 (shrimp farming water quality management)
Aqualma Shrimp Farm, Madagascar, 1998-present (shrimp pond soil and water quality management)
Lasertec SA, Ecuador,1998 (silicate analyses)
Granjas Marinas San Bernardo, Honduras, 1999 (alkalinity control)
BTG Golder Co., Thailand, 1999 (water pollution control)
Marfrisco Shrimp Farm, Ecuador, 1999 (pond sediment management)
Plantaciones del Pacifico, Ecuador, 1999, 2000 (shrimp pond soil reclamation)
AquaNova Shrimp Farm, Mexico, 1999 (blue-green algae control)
National Prawn Company, Saudi Arabia, 1999, 2000 (shrimp farm design and construction; technical advisor)
NACA, Thailand 1999, 2000 (environmental issues in aquaculture)
World Wildlife Fund, Belize, 1999 (environmental issues in aquaculture)
CENAIM, Ecuador, 1997-2000 (advisor to water quality research program)
Spring Hill Lake Home Owners Association, Tuscaloosa, Alabama, USA, 1999 (fish pond Management and correction of sediment problem)
Etec, Colombia, 2000 (performance of water circulator for ponds)
SeaFarms Dev. Corp., Oman, 2000 (environmental assessment of shrimp farm project)
World Bank, 2000-2002 (shrimp farming case studies)
Tecojete Shrimp Farm, Guatemala, 2001 (water quality)
Rosario, Ecuador, 2001 (inland shrimp farming)
Smithfield Foods and McGuire and Woods, North Carolina, USA, 2001 (hog farm waste management)
Research Corporation of University of Hawaii, USA, 2001 (BMPs for shrimp farming in Honduras and Nicaragua)
Las Tolas and LaFran Shrimp Farms, Ecuador, 2001-2002 (ground water quality for shrimp farms)
La Garzal Shrimp Farm, Ecuador, 2001 (ground water quality)
BetzDearborn (Hercules), Illinois, USA, 2002, 2004 (water quality in cooling water lake)
Soules and Wallace, Texas, USA, 2002 (Edwards Aquifer water rights issue)
Donny McKinney, Georgia, USA, 2002 (water quality)



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

FAO, Rome, Italy, 2002 (inland shrimp farming case studies)
Pate, Lloyd, & Cochrin, Alabama, USA, 2002 and 2003 (urban flooding)
CSA, Ecuador 2002 (water analyses)
Aquaculture Certification Council, USA, 2002 and 2003 (certification standards)
University of Hawaii, USA, 2003 (aquaculture BMPs and training)
World Wildlife Fund, USA, 2003-2004 (aquaculture certification reports)
World Wildlife Fund, Madagascar, 2004 (shrimp farm certification project)
Ministry of Agriculture and Ministry of Environment, Honduras, 2004 (environmental assessment of tilapia farming)
Esteromar, Guatemala, 2004 (water quality in shrimp farming)
Oman Fisheries, Oman, 2004 (coastal water management issues)
Conservation International, 2004 (review of position papers on aquaculture)
Aquafarms, Indonesia, 2005 (environment assessment of tilapia cage culture)
World Wildlife Fund, USA, 2005 (tilapia certification project)
Jose Vincent Rincon, Venezuela, 2005 (shrimp farm water quality management)
Bayer, Vietnam, 2005 (presentation of workshop on shrimp pond ecosystem)
Esteromar, Guatemala, 2005 (water quality in shrimp farming)
Belize Aquaculture, Belize, 1997, 2006 (water quality management in shrimp ponds)
Balch and Bingham, Alabama, USA, 2006 (water quality issues)
Environmental Defense, 2006 (shrimp certification standards)
Swiss Contact, Indonesia, 2006 (water quality and shrimp culture
Partridge and Smith, Alabama, USA, 2006 (pond turbidity and sedimentation)
World Wildlife Fund, USA, 2006 (Basa certification possibilities in Vietnam)
Global Aquaculture Alliance, USA, 2006-2008 (fish and shrimp certification standards)
Aquarium of the Pacific, California, USA, 2006 (shrimp farming environmental issues)
Hoover Slovacok, Texas, USA, 2006-2008 (lake seepage problem)
CPB Indonesia, 2007, 2008, 2009 (shrimp farm water quality management; country of origin of shirmp)
Global Aquaculture Alliance, USA, 2007, 2008, 2009 (aquaculture certification standards)
Monteray Bay Aquarium, California, USA, 2007 (sources of responsibly-cultured shrimp)
Shook, Hardy, and Bacon, Florida, USA, 2007 (shrimp mortality in Ecuador)
World Wildlife Fund, USA, 2007, 2009 (tilapia and shrimp culture effluent standards)
Deli Group, Honduras), 2009 (shrimp farm management)
Friedman and Leak, Alabama, USA, 2009 (Pond seepage issue)
CLECO, Louisiana, USA, 2009 (turbidity in cooling water reservoir)
Baker and Donelson, Quitman, Mississippi, USA, 2010 ( turbidity problem in pond)
Kluobec Koi Farm, Amana, Iowa, USA, 2010 (water quality problem in koi ponds)
World Wildlife Fund, USA, 2010 (shrimp farm certification standards)
Aquasol, New Caledonia, 2011 (shrimp farm water quality)
Nutrimar, Mexico, 2011 (water quality lectures)
Pescanova, Ecuador, 2011 (shrimp pond water quality)
Resolve, Washington, D.C., 2011 (assessment of shrimp aquaculture certification)
Dewees, LLC, Homewood, Alabama, USA, 2012-2013 (Runoff problem)
Cobb, Boyd, White, and Cobb, Dothan, Alabama, USA, 2013-2014 (Runoff problem)
World Wildlife Fund, Thailand and Vietnam, 2013-2015 (shrimp farm resource use efficiency)
Aquasol, Missouri, USA, 2014 (suitability of lead mine pump-out water for fish culture)



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

National Aquaculture Group, Saudi Arabia, 2014 (aeration of shrimp ponds)
Spain and Gilliam, Birmingham, Alabama, USA, 2014 (pond seepage problem)
Aquasol, Venezuela, 2015 (soil assessment for proposed shrimp farm site)
Keeton Industries, Colorado, USA, 2015 (help with aerator patent claim)
Walton Family Foundation, Arkansas, 2015-2016 (improving sustainability of aquaculture)

Grants and Contracts:
Obtained research grants as follows:

| Agency | Short title | Duration (yrs) | Amount ($) |
|---|---|---|---|
| Auburn University Water Resources Res. Inst. | 1) Phytoplankton dieoffs in ponds | 3 | 30,000 |
| | 2) Oxygen depletion in ponds | 1 | 3,000 |
| | 3) Water exchange in ponds | 1 | 5,000 |
| USGS, Office of Water Res. and Tech. | Oxygen dynamics in ponds | 3 | 47,000 |
| TVA, National Fertilizer Center | Fluid fertilizers for ponds | 3 | 9,000 |
| Rodale Resources | Aerator evaluation | 1 | 2,000 |
| Aquashade, Inc. | Use of Aquashade in ponds | 1 | 2,000 |
| USDA/Aquaculture | 1) Emergency aeration | 2 | 18,000 |
| | 2) Feeding practices and effluents | 3 | 61,000 |
| Aeration Industries, Inc. | Aerator evaluation | 3 | 6,000 |
| Catfish Farmers | 1) Aerator design | 3 | 17,500 |
| | 2) Off-flavor in catfish | 1 | 5,000 |
| Aeras Water Resources, Inc. | Aerator evaluation | 1 | 5,000 |
| Penn. Power and Light Co. | Pure oxygen contact systems | 2 | 10,000 |



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

| | | | |
|---|---|---|---|
| US Gypsum Co. | Uses of gypsum in ponds | 2 | 6,000 |
| Alabama Div. Marine Res. | Water quality in mariculture ponds | 3 | 20,000 |
| USDA/BARD | 1) Mixing and aeration | 3 | 85,000 |
| | 2) Water quality in intensive, recir-culating system | 3 | 11,000 |
| Alabama Dept. Env. Mgt. | 1) Nutrient removal from wastewater with aquatic plants | 2 | 80,000 |
| | 2) Pond effluent treatment in wetlands | 2 | 76,000 |
| | 3) BMPs for aquaculture | 1 | 5,000 |
| | 4) Definition of excess runoff | 1.5 | 7,000 |
| USFWS | 1) Pure oxygen contactors | 1 | 20,000 |
| | 2) Copper dynamics in ponds | 1 | 20,000 |
| | 3) Pond bottom soils | 4 | 200,000 |
| | 4) Cage culture | 2 | 35,000 |
| | 5) Carbon dioxide monitoring | 1 | 10,000 |
| | 6) Water quality in striped bass ponds | 2 | 40,000 |
| USDA/SRAC | 1) Water circulation | 3 | 47,000 |
| | 2) Pond effluents | 3 | 77,500 |
| | 3) Phosphorus control in ponds | 5 | 150,000 |
| | 4) Feeding and water quality | 3 | 30,000 |
| | 5) Bluegreen algae control | 3 | 110,000 |
| | 6) Management of aquacultural effluents | 3 | 84,000 |
| | 7) Energy use in channel catfish farming | 3 | 75,528 |
| USDA/OICD | US-Thailand Cooperation | 1 | 2,000 |



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

| | | | |
|---|---|---|---|
| NSF | US-Thailand Water quality in shrimp ponds | 2 | 14,000 |
| Carson Co. | Wastewater treatment by wetlands | 3 | 30,000 |
| Scott Co. | Slow-release fertilizers | 2 | 18,000 |
| Alabama Catfish Producers | 1) Chlorination of ponds | 1 | 27,000 |
| | 2) Effluent management | 1.5 | 51,000 |
| | 3) Environmental audit | 1 | 25,599 |
| | 4) Soil and water quality survey | 2 | 13,776 |
| | 5) BMPs for catfish farming | 3 | 65,000 |
| | 6) Water quality monitoring in Big Prairie Creek | 3 | 16,800 |
| | 7) Toxic algae | 2.5 | 74,900 |
| Alabama Inland Shrimp Producer Association | 1) Potassium analyses | 1 | 3,000 |
| | 2) Trace metal research | 2 | 10,000 |
| USAID/OSU | 1) Pond bottom soil research | 1 | 49,500 |
| | 2) Pond bottom soil research | 1 | 28,380 |
| | 3) Pond bottom soil research | 1 | 35,983 |
| | 4) Pond bottom soil research | 2 | 58,000 |
| | 5) Pond bottom soil research, Brazil and South Africa | 2 | 95,757 |
| | 6) Pond bottom soil research, Thailand | 2 | 87,332 |
| | 7) Pond bottom soil research, South Africa and Brazil | 1 | 40,000 |
| | 8) Aquaculture BMP workshops | 1 | 60,630 |
| | 9) Exit and Capacity Building Plan | 1 | 61,000 |
| | 10) Watershed studies | 2 | 65,000 |
| Neozymes, Inc. | Evaluation of enzymes for water quality improvement | 1 | 8,000 |
| Chilean Nitrate Corp. | 1) Sportfish pond fertilizer development | 1 | 7,500 |
| | 2) Evaluation of a mineral admendment | 1 | 10,000 |



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

| | | | |
|---|---|---|---|
| Auburn University | Butler/Cunningham Eminent Scholar | 10 | ≈750,000 |
| Auburn University Environmental Institute | Copper dynamics of ponds | 2 | 18,000 |
| Auburn University | AALGA water quality project | 2 | 26,666 |
| | Blackbelt Initiative (2006) | 1 | 50,000 |
| | Blackbelt Initiative (2007) | 1 | 49,930 |
| | Hach Supplement (2007) | 1 | 35,882 |
| | AAES grant program (2007-2008) | 1 | 52,503 |
| | AAES grant program (2007-2008) | 1 | 49,162 |
| | AAES equipment grant (2007) | 1 | 16,000 |
| | AAES grant program (2009-2011) | 3 | 132,000 |
| Kimera | Evaluation of compounds to remove phosphorus from water | 1 | 4,200 |
| Federal Aviation Administration | Reducing the attractiveness of airport stormwater retention facilities to birds | 3 | 800,000 |
| Agrium | Evaluation of coated algicides | 1 | 3,000 |

I have been the principal investigator on four, 5-year Hatch Projects at the Auburn University Agricultural Experiment Station. Total expenditure on these projects has been about $375,000.

<u>International Activities</u>:

(1) I have been involved in many short-term (<1 week to 6 months) activities in the following countries: Canada, Australia, Ecuador, Panama, Honduras, Suriname, Guatemala, India, France, Italy, Thailand, Indonesia, Israel, Philippines, Taiwan, Tanzania, Mexico, China, Colombia, Belize, Malaysia, Vietnam, Chile, Brazil, Costa Rica, Venezuela, South Africa, Egypt, Peru, Saudi Arabia, Madagascar, Oman, Nicaragua. and Namibia.

(2) Co-principal investigator for USAID/Aquaculture CRSP Project in Honduras (1990-1998).

(3) Technical advisor to Global Aquaculture Alliance regarding Codes of Conduct for shrimp farming (1997-present).

(4) Adjunct Professor, Faculty of Fisheries, Kasetsart University, Bangkok, Thailand (1988-2000).



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

(5) Technical advisor to Thailand Department of Fisheries, Bangkok, Thailand (1995-2003).

Publications:

**Journal Articles:**

Boyd, C.E. and D.H. Vickers. 1963. Distribution of some Mississippi amphibians and reptiles. Herpetologia 19:202-205.

Boyd, C.E., S.B. Vinson, and D.E. Ferguson. 1963. Possible DDT resistance in two species of frogs. Copeia 1963:426-429.

Vinson, S.B., C.E. Boyd, and D.E. Ferguson. 1963. Aldrin toxicity and possible cross-resistance in cricket frogs. Herpetologica 19:77-80.

Vinson, S.B., C.E. Boyd, and D.E. Ferguson. 1963. Resistance to DDT in the mosquito fish, *Gambusia affinis*. Science 139:217-218.

Boyd, C.E. 1964. Insecticides cause mosquito fish to abort. Progressive Fish-Culturist 26:138.

Boyd, C.E. and D.E. Ferguson. 1964. Spectrum of cross-resistance to insecticides in the mosquito fish, *Gambusia affinis*. Mosquito News 24:19-21.

Boyd, C.E. and D.E. Ferguson. 1964. Susceptibility and resistance of mosquito fish to several insecticides. Journal of Economic Entomology 57:430-431.

Ferguson, D.E. and C.E. Boyd. 1964. Apparent resistance to methyl parathion in mosquito fish. Copeia 1964:706.

Boyd, C.E. and J.M. Lawrence. 1966. The mineral composition of several freshwater algae. Proceedings of the Annual Conference Southeastern Association of Game and Fish Commissioners 20:413-424.

Boyd, C.E. 1968. Evaluation of some common aquatic weeds as possible feedstuffs. Hyacinth Control Journal 7:26-27.

Boyd, C.E. 1968. Freshwater plants: A potential source of protein. Economic Botany 22:359-368.

Boyd, C.E. 1969. Production, mineral nutrient absorption, and bio-chemical assimilation by *Justicia americana* and *Alternanthera philoxeroides*. Archives fur Hydrobiologia 66:139-160.

Boyd, C.E. 1969. The nutritive value of three species of water weeds. Economic Botany 23:123-127.

Boyd, C.E. 1969. Vascular aquatic plants for mineral nutrient removal from polluted waters. Economic Botany 24:95-103.

Boyd, C.E. 1970. Amino acid, protein, and caloric content of aquatic macrophytes. Ecology

Barcode: 4546014-02 C-331-806 INV - Investigation

51:901-906.

Boyd, C.E. 1970. Boron accumulation by native algae. American Midland Naturalist 84:565-568.

Boyd, C.E. 1970. Chemical analysis of some vascular aquatic plants. Archives fur Hydrobiologia 67:78-85.

Boyd, C.E. 1970. Influence of organic matter on some hydrosoil characteristics. Hydrobiologia 36:17-21.

Boyd, C.E. 1970. Losses of mineral nutrients during decomposition of *Typha latifolia*. Archives fur Hydrobiologia 66:511-517.

Boyd, C.E. 1970. Nutrient content of offal and small fish from some freshwater fish cultures. Transactions of the American Fisheries Society 99:809-811.

Boyd, C.E. 1970. Production, mineral nutrient accumulation and pigment concentrations in *Typha latifolia* and *Scirpus americanus*. Ecology 51:285-290.

Boyd, C.E. and R.D. Blackburn. 1970. Seasonal changes in the proximate composition of some common aquatic weeds. Hyacinth Control Journal 8:42-44.

Boyd, C.E. and L.W. Hess. 1970. Factors influencing shoot production and mineral nutrient levels in *Typha latifolia*. Ecology 51:296-300.

Polisini, J.M., C.E. Boyd, and B. Didgeon. 1970. Productivity and nutrient relationships in an oligotrophic South Carolina pond. Oikos 21:343-346.

Boyd, C.E. 1971. Further studies on productivity, nutrient, and pigment relationships in *Typha latifolia* populations. Bulletin Torrey Botany Club 98:144-150.

Boyd, C.E. 1971. Phosphorus dynamics in ponds. Proceedings of the Annual Conference of Southeastern Association of Game and Fisheries Commissioners 25:418-426.

Boyd, C.E. 1971. The dynamics of dry matter and chemical substances in a *Juncus effusus* population. American Midland Naturalist 86:28-45.

Boyd, C.E. and C.P. Goodyear. 1971. The nutritive quality of food in ecological systems. Archives fur Hydrobiologia 69:256-270.

Boyd, C.E. and C.P. Goodyear. 1971. The protein content of some common reptiles and amphibians. Herpetologica 27:317-320.

Boyd, C.E. and C.P. Goodyear. 1971. Somatic and gametic dry matter and protein in gravid females of several amphibian species. Comparative Biochemistry and Physiology 40A:771-775.

Boyd, C.E. and D.H. Vickers. 1971. Relationships between production, nutrient accumulation,


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

and chlorophyll synthesis in an *Eleocharis quadrangulata* population. Canadian Journal of Botany 49:883-888.

Boyd, C.E. and D.H. Vickers. 1971. Variation in the elemental composition of *Eichhornia crassipes*. Hydrobiologia 38:409-414.

Lollar, A.Q., D.C. Coleman, and C.E. Boyd. 1971. Carnivorous pathway of phosphorus uptake by *Utricularia inflata*. Archives fur Hydrobiologia 69:400-404.

Boyd, C.E. 1972. A bibliography of interest in the utilization of vascular aquatic plants. Economic Botany 26:74-84.

Boyd, C.E. 1972. Sources of carbon dioxide for nuisance blooms of algae. Weed Science 20:492-497.

Boyd, C.E. and W.W. Walley. 1972. Production and chemical composition of *Saururus cernnus* from sites of different fertility. Ecology 53:927-932.

Boyd, C.E. and W.W. Walley. 1972. Studies of the biogeochemistry of boron. I. Concentrations in surface waters, rainfall, and aquatic plants. American Midland Naturalist 88:1-14.

Goodyear, C.P. and C.E. Boyd. 1972. Elemental composition of largemouth bass (*Micropterus salomoides*). Transactions of the American Fisheries Society 101:545-547.

Goodyear, C.P., C.E. Boyd, and R.J. Beyers. 1972. Relationships between primary production and mosquitofish (*Gambusia affinis*) production in large microcosms. Limnology Oceanography 17:445-450.

Polisini, J.M. and C.E. Boyd. 1972. Relationships between cell wall fractions, nitrogen, and standing crop in aquatic macrophytes. Ecology 53:484-488.

Boyd, C.E. 1973. Biotic interactions between different species of algae. Weed Science 21:32-37.

Boyd, C.E. 1973. Amino acid composition of freshwater algae. Archives fur Hydrobiologia 72:1-9.

Boyd, C.E. 1973. Summer algal communities and primary productivity in fish ponds. Hydrobiologia 41:357-390.

Boyd, C.E. 1973. The chemical oxygen demand of waters and biological materials from ponds. Transactions of the American Fisheries Society 102:606-611.

Boyd, C.E. 1974. The utilization of nitrogen from decomposition of organic matter by cultures of *Scenedesmus dimorphus*. Archives fur Hydrobiologia 73:361-368.

Boyd, C.E. 1974. Water quality in catfish ponds. Journal of Marine Science of Alabama 2:19-30.

Boyd, C.E. and E. Scarsbrook. 1974. Effects of agricultural limestone on phytoplankton


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

communities of fish ponds. Archives fur Hydrobiologia 74:336-349.

Chiou, C., C.E. Boyd. 1974. The utilization of phosphorus from muds by the phytoplankter *Scendesmus dimorphus* and the significance of these findings to the practice of pond fertilization. Hydrobiologia 45:345-355.

Arce, R.G. and C.E. Boyd. 1975. Effects of agricultural limestone on water chemistry, phytoplankton productivity, and fish production in soft-water ponds. Transactions of the American Fisheries Society 104:308-312.

Boyd, C.E. and E. Scarsbrook. 1975. Influence of nutrient additions and initial density of plants on production of waterhyacinth, *Eichhornia crassipes*. Aquatic Botany 1:253-261.

Boyd, C.E., E.E. Prather, and R.W. Parks. 1975. Sudden mortality of massive phytoplankton bloom. Weed Science 23:61-67.

McVea, C. and C.E. Boyd. 1975. Effects of water hyacinth cover on water chemistry, phytoplankton, and fish in ponds. Journal of Environmental Quality 4:375-378.

Boyd, C.E. 1976. Accumulation of dry matter, nitrogen, and phosphorus by cultivated water hyacinths. Economic Botany 30:51-56.

Boyd, C.E. 1976. Chemical and textural properties of muds from different depths in ponds. Hydrobiologia 48:141-144.

Boyd, C.E. 1976. Nitrogen fertilizer effects on production of *Tilapia* in ponds fertilized with phosphorus and potassium. Aquaculture 7:385-390.

Boyd, C.E. 1976. Water chemistry and plankton in unfertilized ponds in pastures and in woods. Transactions of the American Fisheries Society 105:634-636.

Dobbins, D.A. and C.E. Boyd. 1976. Phosphorus and potassium fertilization of sunfish ponds. Transactions of the American Fisheries Society 105:536-540.

Boyd, C.E. 1977. Evaluation of a water analysis kit. Journal of Environmental Quality 6:381-384.

Boyd, C.E. 1977. Organic matter concentrations and textural properties of muds from different depths in four fish ponds. Hydrobiologia. 53:277-279.

Lichtkoppler, F. and C.E. Boyd. 1977. Phosphorus fertilization of sunfish ponds. Transactions of the American Fisheries Society 106:634-636.

Tucker, C.S. and C.E. Boyd. 1977. Relationships between potassium permanganate treatment and water quality. Transactions of the American Fisheries Society 106:481-488.

Almazan, G. and C.E Boyd. 1978. An evaluation of Secchi disk visibility for estimating plankton density in fish ponds. Hydrobiologia 61:205-208.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Almazan, G. and C.E. Boyd. 1978. Effects of nitrogen levels on rates of oxygen consumption during decay of aquatic plants. Aquatic Botany 5:119-126.

Almazan, G. and C.E. Boyd. 1978. Plankton production and tilapia yields in ponds. Aquaculture 15:75-77.

Boyd, C.E. 1978. Effluents from catfish ponds during fish harvest. Journal of Environmental Quality 7:59-63.

Boyd, C.E. and J.W. Sowles. 1978. Nitrogen fertilization of ponds. Transactions of the American Fisheries Society 107:737-741.

Boyd, C.E., J.A. Davis, and E. Johnston. 1978. Die-offs of the blue-green alga, *Anabaena variabilis*, in fish ponds. Hydrobiologia 61:129-133.

Boyd, C.E., J.W. Preacher, and L. Justice. 1978. Hardness, alkalinity, pH, and pond fertilization. Proceedings of the Annual Conference of Southeastern Association of Game and Fish Commissioners 107:605-611.

Boyd, C.E., R.P. Romaire, and E. Johnston. 1978. Predicting early morning dissolved oxygen concentrations in channel catfish ponds. Transactions of the American Fisheries Society 107:484-492.

Davis, J.A. and C.E. Boyd. 1978. Concentrations of selected elements and ash in bluegill (*Lepomis macrochirus*) and certain other freshwater fish. Transactions of the American Fisheries Society 107:862-867.

Romaire, R.P., C.E. Boyd, and W.J. Collis. 1978. Predicting nighttime dissolved oxygen decline in ponds used for tilapia culture. Transactions of the American Fisheries Society 107:804-808.

Tucker, C.S. and C.E. Boyd. 1978. Consequences of periodic applications of copper sulfate and simazine for phytoplankton control in catfish ponds. Transactions of the American Fisheries Society 107:316-320

Tucker, C.S. and C.E. Boyd. 1978. Effects of simazine treatment on channel catfish and bluegill production in ponds. Aquaculture 15:345-352.

Boyd, C.E. 1979. Aluminum sulfate (alum) for precipitating clay turbidity from fish ponds. Transactions of the American Fisheries Society 108:307-313.

Boyd, C.E. 1979. Determination of total ammonia nitrogen and chemical oxygen demand in fish culture systems. Transactions of the American Fisheries Society 108:314-319.

Boyd, C.E. and C.S. Tucker. 1979. Emergency aeration of fish ponds. Transactions of the American Fisheries Society 108:299-306.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Boyd, C.E., R.P. Romaire, and E. Johnston. 1979. Water quality in channel catfish production ponds. Journal of Environmental Quality 8:423-429.

Boyd, C.E., J.A. Steeby, and E.W. McCoy. 1979. Frequency of low dissolved oxygen concentrations in catfish ponds. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 33:591-599.

Romaire, R.P. and C.E. Boyd. 1979. Effects of solar radiation on the dynamics of dissolved oxygen in channel catfish ponds. Transactions of the American Fisheries Society 108:473-478.

Tucker, L., C.E. Boyd, and E.W. McCoy. 1979. Effects of feeding rate on water quality, production of channel catfish, and economic returns. Transactions of the American Fisheries Society 108:389-396.

Boyd, C.E. 1980. Comparisons of water analysis kits. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 34:39-48.

Boyd, C.E. 1980. Reliability of water analysis kits. Transactions of the American Fisheries Society 109:239-243.

Boyd, C.E. and M.L. Cuenco. 1980. Refinements of the lime requirement procedure for fish ponds. Aquaculture 21:293-299.

Boyd, C.E., Y. Musig, and L. Tucker. 1980. Effects of three phosphorus fertilizers on phosphorus concentrations and phytoplankton production. Aquaculture 22:175-180.

Boyd, C.E. and L. Tucker. 1980. Determination of filtrable orthophosphate in waters from fish ponds. Transactions of the American Fisheries Society 109:314-318.

Halverson, C.J., J.W. Jensen, and C.E. Boyd. 1980. Water quality in standing-water ponds for winter production of rainbow trout in Alabama. Transactions of the American Fisheries Society 109:310-313.

Hansell, D.A. and C.E. Boyd. 1980. Use of hydrated lime in fish ponds. Proceedings of the Annual Conference of the Southeastern Fish and Wildlife Agencies 34:49-58.

Hollerman, W.D. and C.E. Boyd. 1980. Nightly aeration to increase production of channel catfish. Transactions of the American Fisheries Society 109:446-452.

Mandal, B.K. and C.E. Boyd. 1980. The reduction of pH in water of high total alkalinity and low total hardness. Progressive Fish-Culturist 42:183-185.

Metzger, R.J. and C.E. Boyd. 1980. Liquid ammonium polyphosphate as a fish pond fertilizer. Transactions of the American Fisheries Society 109:563-570.

Musig, Y. and C.E. Boyd. 1980. Comparisons of orthophosphate and polyphosphate as


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

fertilizers for fish ponds. Aquaculture 20:135-138.

Boyd, C.E. 1981. Comparison of five fertilization programs for fish ponds. Transactions of the American Fisheries Society 110:541-545.

Boyd, C.E. 1981. Effects of ion-pairing on calculations of ionic activities of major ions in freshwater. Hydrobiologia 80:91-93.

Boyd, C.E. 1981. Fertilization of warmwater fish ponds. Journal of Soil and Water Conservation 36:142-145.

Boyd, C.E. 1981. Solubility of granular inorganic fertilizers for fish ponds. Transactions of the American Fisheries Society 110:451-454.

Boyd, C.E. and W.D. Hollerman. 1981. Methods of applying liquid fertilizers to fish ponds. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 35:525-530.

Boyd, C.E. and P.S. McGinty. 1981. Percentage of digestible matter and crude protein in dried aquatic weeds. Economic Botany 35:296-299.

Boyd, C.E. and Y. Musig. 1981. Orthophosphate uptake by phytoplankton and sediment. Aquaculture 22:165-173.

Davidson, R.G. and C.E. Boyd. 1981. Phytoplankton response to liquid fertilizers. Progressive Fish-Culturist 43:126-129.

Hunt, D. and C.E. Boyd. 1981. Alkalinity losses resulting from ammonium fertilizers used in fish ponds. Transactions of the American Fisheries Society 110:81-85.

Tucker, C.S. and C.E. Boyd. 1981. Relationships between pond sediments and simazine loss from waters of laboratory systems. Journal of Aquatic Plant Management 19:55-57.

Armstrong, M.S. and C.E. Boyd. 1982. Oxygen transfer calculations for a tractor-powered paddlewheel aerator. Transactions of the American Fisheries Society 111:361-366.

Boyd, C.E. 1982. Hydrology of small experimental fish ponds at Auburn, Alabama. Transactions of the American Fisheries Society 111:638-644.

Boyd, C.E. 1982. Liming fish ponds. Journal of Soil and Water Conservation 37:86-88.

Boyd, C.E. 1982. Managing water quality in channel catfish ponds. Journal of Soil and Water Conservation 37:207-209.

Boyd, C.E. and W.D. Hollerman. 1982. Influence of particle size of agricultural limestone on pond liming. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 36:196-201.

Boyd, C.E. and M.H.M. Noor. 1982. Aquashade treatment of channel catfish ponds. North

Barcode: 4546014-02 C-331-806 INV - Investigation

American Journal of Fish Management 2:193-196.

Brown, S.W., and C.E. Boyd. 1982. Off-flavor in channel catfish from commercial ponds. Transactions of the American Fisheries Society 111:379-383.

Boyd, C.E. and J.L. Shelton, Jr. 1983. Estimating average depths in ponds. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 37:364-367.

Boyd, C.E., S.W. Brown, and D.R. Bayne. 1983. Phytoplankton communities in channel catfish ponds. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 37:401-407.

McGee, M.V. and C.E. Boyd. 1983. Evaluation of the influence of water exchange in channel catfish ponds. Transactions of the American Fisheries Society 112:557-560.

Shelton, J.L., Jr. and C.E. Boyd. 1983. Correction factors for calculating oxygen-transfer rates of ponds aerators. Transactions of the American Fisheries Society 112:120-122.

Boyd, C.E. and D.J Martinson. 1984. Evaluation of propeller-aspirator-pump aerators. Aquaculture 36:283-292.

Boyd, C.E., W.D. Hollerman, J.A. Plumb, and M. Saeed. 1984. Effect of treatment with a commercial bacterial suspension on water quality in channel catfish ponds. Progressive Fish-Culturist 46:36-40.

Doyle, K.M. and C.E. Boyd. 1984. The timing of inorganic fertilization of sunfish ponds. Aquaculture 37:169-177.

Moore, J. M. and C.E. Boyd. 1984. Comparisons of devices for aerating inflow of pipes. Aquaculture 38:89-96.

Petrille, J. and C.E. Boyd. 1984. Comparisons of oxygen-transfer rates and water-circulating capabilities of emergency aerators for fish ponds. Aquaculture 38:377-386.

Soderberg, R.W., M.V. McGee, and C.E. Boyd. 1984. Histology of cultured channel catfish, *Ictalurus puntatus* (Rafinesque). Journal of Fisheries Biology 24:683-690.

Soderberg, R.W., M.V. McGee, J.M. Grizzle, and C.E. Boyd. 1984. Comparative histology of rainbow trout and channel catfish grown in intensive static water aquaculture. Progressive Fish-Culturist 46:195-199.

Boyd, C.E. 1985. Chemical budgets for channel catfish ponds. Transactions of the American Fisheries Society 114:291-298.

Boyd, C.E. 1985. Pond evaporation. Transactions of the American Fisheries Society 114:299-303.

Hollerman, W.D. and C.E. Boyd. 1985. Effects of annual draining on water quality and production


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

of channel catfish in ponds. Aquaculture 46:45-54.

Pillai, V.K. and C.E. Boyd. 1985. A simple method for calculating liming rates for fish ponds. Aquaculture 46:157-162.

Armstrong, M.S., C.E. Boyd, and R.T. Lovell. 1986. Environmental factors affecting flavor of channel catfish from production ponds. Progressive Fish-Culturist 48:113-119.

Boyd, C.E. 1986. Comments of the development of techniques for management of environmental quality in aquaculture. Aquacultural Engineering 5:135-146.

Boyd, C.E. 1986. Method for testing aerators. Progressive Fish-Culturist 48:68-70.

Boyd, C.E., R.B. Rajendren, and J. Durda. 1986. Economic considerations of fish pond aeration. Journal of Aquaculture in the Tropics 1:1-5.

Cole, B.A. and C.E. Boyd. 1986. Feeding rate, water quality, and channel catfish production in ponds. Progressive Fish-Culturist 48:25-29.

Hollerman, W.D. and C.E. Boyd. 1986. Effects of annual draining on the limnology of sunfish ponds. Progressive Fish-Culturist 48:120-124.

Lovell, R.T., I.Y. Lelana, C.E. Boyd, and M.S. Armstrong. 1986. Geosmin and musty-muddy flavors in pond-raised channel catfish. Transactions of the American Fisheries Society 115:485-489.

Maskey S. and C.E. Boyd. 1986. Seasonal changes in phosphorus concentrations in sunfish and channel catfish ponds. Journal of Aquaculture in the Tropics 1:35-42.

Boyd, C.E. 1987. Evapotranspiration/evaporation ($E/E_0$) ratios for aquatic plants. Journal of Aquatic Plant Management 25:1-3.

Boyd, C.E. and H.V. Daniels. 1987. Performance of surface aerators in saline pond water. Progressive Fish-Culturist 49:306-308.

Daniels, H.V., C.E. Boyd, and R.V. Minton. 1987. Acute toxicity of ammonia and nitrite to spotted trout. Progressive Fish-Culturist 49:260-263.

Murad, A. and C.E. Boyd. 1987. Experiments on fertilization of sportfish ponds. Progressive Fish-Culturist 49:100-107.

Snyder, R.L. and C.E. Boyd. 1987. Evapotranspiration by *Eichhornia crassipes* (Mart.) Solms and *Typha latifolia* L. Aquatic Botony 27:217-227.

Ahmad, T. and C.E. Boyd. 1988. Design and performance of paddlewheel aerators. Aquacultural Engineering 7:39-62.

Boyd, C.E. and H.V. Daniels. 1988. Evaluation of Hach fish farmer's water quality test kits for


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

saline water. Journal of the World Aquaculture Society 19:21-26.

Boyd, C.E., T. Ahmad, and Z. Lai-fa. 1988. Evaluation of plastic pipe paddlewheel aerators. Aquacultural Engineering 7:63-72.

Lai-fa, Z., and C.E. Boyd. 1988. Nightly aeration to increase the efficiency of channel catfish production. Progressive Fish-Culturist 50:237-242.

Boyd, C.E. and B.J. Watten. 1989. Aeration systems in aquaculture. Reviews of Aquatic Science 1:425-472.

Daniels, H.V. and C.E. Boyd. 1989. Chemical budgets for polyethylene-lined brackishwater ponds. Journal of the World Aquaculture Society 20:53-60.

Ruttanagosrigit, W. and C.E. Boyd. 1989. Measurement of chemical oxygen demand in waters of high chloride concentration. Journal of the World Aquaculture Society 20:170-172.

Scott, J.H., D.R. Bayne, and C.E. Boyd. 1989. Effects of sodium ricinoleate on water quality, phytoplankton, and off-flavor in channel catfish ponds. Journal of Aquatic Plant Management 27:26-31.

Watten, B.J. and C.E. Boyd. 1989. Gas phase axial dispersion in a packed column oxygen absorber. Aquacultural Engineering 8:421-434.

Watten, B.J. and C.E. Boyd. 1990. Gas transfer within a multi-stage packed column oxygen absorber: model development and application. Aquacultural Engineering 9:33-59.

Watten, B.J., J. Meade, and C.E. Boyd. 1990. Modelling the effects of serial off-gas reuse on the performance of a hooded, surface oxygen absorption system. Aquacultural Engineering 9:97-120.

Wu, R. and C.E. Boyd. 1990. Evaluation of calcium sulfate for use in aquaculture ponds. Progressive Fish-Culturist 52:26-31.

Yuehua, L. and C.E. Boyd. 1990. Ineffectiveness of winter fertilization of sportfish ponds. Progressive Fish-Culturist 52:270-272.

Murad, H. and C.E. Boyd. 1991. Production of sunfish (*Lepomis* spp.) and channel catfish (*Ictalurus punctatus*) in acidified ponds. Aquaculture 94:381-388.

Ruttanagosrigit, W., Y. Musig, C.E. Boyd, and L. Sukhareon. 1991. Effect of salinity on oxygen transfer by propeller-aspirator-pump and paddle wheel aerators used in shrimp farming. Aquacultural Engineering 10:121-131.

Thomforde, H. and C.E. Boyd. 1991. Effects of aeration on water quality and channel catfish production. Bamidgeh 43:3-26.

Van der Ploeg, M. and C.E. Boyd. 1991. Geosmin production by cyanobacteria (blue-green algae) in fish ponds at Auburn, Alabama. Journal of the World Aquaculture Society 22:207-216.

Van der Ploeg, M. and C.E. Boyd. 1991. Effects of copper sulfate treatments on off-flavor and levels of dissolved copper in channel catfish ponds. Proceedings of the Louisiana Aquaculture Conference, p. 17-18.

Watten, B.J., J. Colt, and C.E. Boyd. 1991. Modeling the effect of dissolved nitrogen and carbon dioxide on the performance of pure oxygen absorption systems. American Fisheries Society Symposium 10:474-481.

Boyd, C.E. and D. Teichert-Coddington. 1992. Relationship between wind speed and reaeration in small aquaculture ponds. Aquacultural Engineering 11:121-131.

Howerton, R.D. and C.E. Boyd. 1992. Measurement of water circulation in ponds with gypsum blocks. Aquacultural Engineering 11:141-155.

Mevel, J. and C.E. Boyd. 1992. Channel catfish production and water quality in ponds with different rates of continuous, diffused-air aeration. Journal of Aquaculture in the Tropics 6:275-285.

Moore, J.M. and C.E. Boyd. 1992. Design of small paddlewheel aerators. Aquacultural Engineering 11:55-69.

Van der Ploeg, M., C.S. Tucker, and C.E. Boyd. 1992. Geosmin and 2-methylisoborneol production by cyanobacteria in fish ponds in the southeastern United States. Proc. 3rd International Symposium on Off-flavor in the Environment, Water Science Technology 25:283-290.

Ayub, M., C.E. Boyd, and D. Teichert-Coddington. 1993. Effects of urea application, aeration, and drying on total carbon concentrations in pond bottom soils. Progressive Fish-Culturist 55:210-213.

Boyd, C.E. and H.V. Daniels. 1993. Liming and fertilization of brackishwater shrimp ponds. Journal of Applied Aquaculture 2:221-234.

Boyd, C.E. and K. Masuda. 1993. Characteristics of liming materials used in aquaculture ponds. World Aquaculture 25:76-79.

Boyd, C.E. and J.M. Moore. 1993. Factors affecting the performance of diffused-air aeration systems for aquaculture. Journal of Applied Aquaculture 2:1-12.

Chiayvareesajja, S. and C.E. Boyd. 1993. Effects of zeolite, formalin, bacterial augmentation, and aeration on total ammonia nitrogen concentrations. Aquaculture 116:33-45.

Daniels, H.V. and C.E. Boyd. 1993. Nitrogen, phosphorus, and silica fertilization of brackishwater ponds. Journal of Aquaculture in the Tropics 8:103-110.

Howerton, R.D., C.E. Boyd, and B.J. Watten. 1993. Design and performance of a horizontal, axial-flow water circulator. Journal of Applied Aquaculture 3:163-183.

Masuda, K. and C.E. Boyd. 1993. Comparative evaluation of the solubility and algal toxicity of copper sulfate and chelated copper. Aquaculture 117:287-302.

Pipoppinyo, S. and C.E. Boyd. 1993. The α-coefficient in pond aeration. Journal of Aquaculture in the Tropics 8:111-119.

Shelton, J.L., Jr. and C.E. Boyd. 1993. Water budgets for aquaculture ponds supplied by runoff with reference to effluent volume. Journal of Applied Aquaculture 2(1):1-27.

Ayub, M. and C.E. Boyd. 1994. Comparison of different methods for measuring organic carbon concentrations in pond bottom soils. Journal of the World Aquaculture Society 25:322-325.

Boyd, C.E., P. Munsiri, and B.F. Hajek. 1994. Composition of sediment from intensive shrimp ponds in Thailand. World Aquaculture 25:53-55.

Boyd, C.E. and S. Pipoppinyo. 1994. Factors affecting respiration in dry pond bottom soils. Aquaculture 120:283-293.

Boyd, C.E., E. Hernandez, J.C. Williams, and R.P. Romaire. 1994. Effects of sampling technique on precision estimates for water quality variables in fish culture ponds. Journal of Applied Aquaculture 4:1-18.

Boyd, C.E., M. Tanner, M. Madkour, and K. Masuda. 1994. Chemical characteristics of bottom soils from freshwater and brackishwater aquaculture ponds. Journal of the World Aquaculture Society 25:517-534.

Boyd, C.E. and D. Teichert-Coddington. 1994. Pond bottom soil respiration during fallow and culture periods in heavily-fertilized tropical fish ponds. Journal of the World Aquaculture Society 25:417-423.

Boyd, C.E., B.J. Watten, V. Goubier, and R. Wu. 1994. Gas supersaturation in surface waters of aquaculture ponds. Aquacultural Engineering 13:31-39.

Dendup, T. and C.E. Boyd. 1994. Chemical features of water and soil in fish farming areas of Bhutan. Journal of Aquaculture in the Tropics 9:35-41.

Hajek, B.F. and C.E. Boyd. 1994. Rating soil and water information for aquaculture. Aquacultural Engineering 13:115-128.

Hariyadi, S., C. Tucker, J. Steeby, M. van der Ploeg, and C.E. Boyd. 1994. Environmental conditions and channel catfish (*Ictalurus punctatus*) production under similar pond management regimes in Alabama and Mississippi. Journal of the World Aquaculture Society 25:236-249.

Masuda, K. and C.E. Boyd. 1994. Chemistry of sediment pore water in aquaculture ponds built on clayey, Ultisols at Auburn, Alabama. Journal of the World Aquaculture Society 25:396-404.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Masuda, K. and C.E. Boyd. 1994. Effects of aeration, alum treatment, liming and organic matter application on phosphorus exchange between pond soil and water in aquaculture ponds at Auburn, Alabama. Journal of the World Aquaculture Society 25:405-416.

Masuda, K. and C.E. Boyd. 1994. Phosphorus fractions in soil and water of aquaculture ponds built on clayey, Ultisols at Auburn, Alabama. Journal of the World Aquaculture Society 25:379-395.

Schwartz, M.F. and C.E. Boyd. 1994. Channel catfish pond effluents. Progressive Fish-Culturist 56:273-281

Schwartz, M. and C.E. Boyd. 1994. Effluent quality during harvest of channel catfish from watershed ponds. Progressive Fish-Culturist 56:25-32.

Boyd, C.E. 1995. Deep water installation of a diffused-air aeration system in a shallow pond. J. Applied Aquaculture 5:1-9.

Boyd, C.E. 1995. Potential of sodium nitrate to improve environmental conditions in aquaculture ponds. World Aquaculture 26(2):38-40.

Boyd, C.E. and T. Dhendup. 1995. Quality of potential effluents from the hypolimnia of watershed ponds used in aquaculture. Progressive Fish-Culturist 57:59-63.

Boyd, C.E. and D. Teichert-Coddington. 1995. Dry matter, ash, and elemental composition of pond-cultured *Penaeus vannamei* and *P. stylirostis*. Journal of the World Aquaculture Society 26:88-92.

Boyd, C.E. and C.S. Tucker. 1995. Sustainability of channel catfish farming. World Aquaculture 26:45-53.

Green, B.W. and C.E. Boyd. 1995. Chemical budgets for organically-fertilized fish ponds in the dry tropics. Journal of the World Aquaculture Society 26:284-296.

Green, B.W. and C.E. Boyd. 1995. Water budgets for fish ponds in the dry tropics. Aquacultural Engineering 14:347-356.

Munsiri, P., C.E. Boyd, and B.F. Hajek. 1995. Physical and chemical characteristics of bottom soil profiles in ponds at Auburn, Alabama, USA, and a proposed method for describing pond soil horizons. Journal of the World Aquaculture Society 26:346-377.

Schwartz, M.F. and C.E. Boyd. 1995. Constructed wetlands for treatment of channel catfish pond effluents. Progressive Fish-Culturist 57:255-266.

Schwartz, M.F. and C.E. Boyd. 1995. The use of constructed wetlands to treat aquacultural effluents. World Aquaculture 26(4):42-44.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Seok, K., S. Leonard, C.E. Boyd, and M. Schwartz. 1995. Water quality in annually drained and undrained channel catfish ponds over a three-year period. Progressive Fish-Culturist 57:52-58.

Boyd, C.E. 1996. Chlorination and water quality in aquaculture ponds. World Aquaculture 27:41-45.

Boyd, C.E. and P. Munsiri. 1996. Phosphorus adsorption capacity and availability of added phosphorus in soils from aquaculture areas in Thailand. Journal of the World Aquaculture Society 27:160-167.

Kastner, R.J. and C.E. Boyd. 1996. Production of sunfish (Lepomis spp.) in ponds treated with controlled-release fertilizers. Journal of the World Aquaculture Society 27:228-234.

Munsiri, P., C.E. Boyd, B.W. Green, and B.F. Hajek. 1996. Chemical and physical characteristics of bottom soil profiles in ponds on Haplaquents in an arid climate at Abbassa, Egypt. Journal of Aquaculture in the Tropics 11:319-326.

Munsiri, P., C.E. Boyd, D. Teichert-Coddington, and B.F. Hajek. 1996. Texture and chemical composition of soils from shrimp ponds near Choluteca, Honduras. Aquaculture International 4:157-168.

Neori, A., M.D. Krom, S.P. Ellner, C.E. Boyd, D. Popper, R. Rabinevitch, P.J. Davison, O. Dvin, D. Zuker, M. Ucko, D. Angel, and H. Gordin. 1996. Seaweed biofilters as regulators of water quality in integrated fish-seaweed culture units. Aquaculture 141:183-199.

Boyd, C.E. 1997. Practical aspects of chemistry in pond aquaculture. Progressive Fish-Culturist 59:85-93.

Boyd, C.E. and P. Munsiri. 1997. Water quality in laboratory soil-water microcosms with soils from different areas of Thailand. Journal of the World Aquaculture Society 28:165-170.

Teichert-Coddington, D, C.E. Boyd, and D. Martinez de Pinel. 1997. Solubility of selected inorganic fertilizers in brackish water. Journal of the World Aquaculture Society 28:205-210.

Boyd, C.E. 1998. Pond water aeration systems. Aquacultural Engineering 18:9-40.

Boyd, C.E. and B. Green. 1998. Dry matter, ash, and elemental composition of pond-cultured tilapia (*Oreochromis aureus* and *O. niloticus*). Journal of the World Aquaculture Society 29:125-128.

Boyd, C.E., A. Gross, and M. Rowan. 1998. Laboratory study of sedimentation for improving quality of pond effluents. Journal of Applied Aquaculture 8:39-48.

Boyd, C.E. and M. Tanner. 1998. Coliform organisms in water of channel catfish ponds. Journal of the World Aquaculture Society 29:74-78.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Gross, A. and C.E. Boyd. 1998. A digestion procedure for the simultaneous determination of total nitrogen and total phosphorus in pond water. Journal of the World Aquaculture Society 29:300-303.

Gross, A., C.E. Boyd, and R.T. Lovell. 1998. Phosphorus budgets for channel catfish ponds receiving diets with different phosphorus concentrations. Journal of the World Aquaculture Society 29:31-39.

Potts, A.C. and C.E. Boyd. 1998. Chlorination of channel catfish ponds. Journal of the World Aquaculture Society 29:432-440.

Queiroz, J.F. and C.E. Boyd. 1998. Effects of a bacterial inoculum in channel catfish ponds. Journal of the World Aquaculture Society 29:67-73.

Queiroz, J.F. and C.E. Boyd. 1998. Evaluation of a kit for estimating organic matter concentrations in bottom soils of aquaculture ponds. Journal of the World Aquaculture Society 29:230-233.

Queiroz, J.F, C.E. Boyd, and A. Gross. 1998. Evaluation of a bio-organic catalyst in channel catfish, *Ictalurus punctatus*, ponds. Journal of Applied Aquaculture 8:49-61.

Boyd, C.E. 1999. Aquaculture sustainability and environmental issues. World Aquaculture 30(June):10-15.

Boyd, C.E. and A. Gross. 1999. Biochemical oxygen demand in channel catfish *Ictalurus punctatus* pond waters. Journal of the World Aquaculture Society 30:349-356.

Boyd, C.E. and L. Massaut. 1999. Risks associated with use of chemicals in pond aquaculture. Aquacultural Engineering 20:113-132.

Boyd, C.E. and H.R. Schmittou. 1999. Achievement of sustainable aquaculture through environmental management. International Journal of Aquaculture Economics and Management 2:59-69.

Gross, A., C.E. Boyd, and R.T. Lovell. 1999. Effects of feed protein concentration and feeding rate combinations on quality of pond water and effluent in channel catfish culture. Israeli Journal of Aquaculture 51(2):47-57.

Gross, A., C.E. Boyd, and J. Seo. 1999. Evaluation of the ultraviolet spectrophotometric method for the measurement of total nitrogen in water. Journal of the World Aquaculture Society 30:388-393.

Gross, A., C.E. Boyd, and C.W. Wood. 1999. Ammonia volatilization from freshwater ponds. Journal of Environmental Quality 28:793-797.

Teichert-Coddington, D.R., D.B. Rouse, A. Potts, and C.E. Boyd. 1999. Treatment of harvest discharge from intensive shrimp ponds by settling. Aquacultural Engineering 19:147-161.

Boyd, C.E. and A. Gross. 2000. Water use and conservation for inland aquaculture ponds. Fisheries Management and Ecology 7:55-63.

Boyd, C.E., J. Queiroz, J. Lee, M. Rowan, G.N. Whitis, and A. Gross. 2000. Environmental assessment of channel catfish, *Ictalurus punctatus*, farming in Alabama. Journal of the World Aquaculture Society 31(4):511-544.

Giri, B.J., III and C.E. Boyd. 2000. Effects of frequent, small doses of calcium carbonate on water quality and phytoplankton in channel catfish ponds. North American Journal of Aquaculture 62:225-228.

Gross, A., C.E. Boyd, and C.W. Wood. 2000. Nitrogen transformations and balance in channel catfish ponds. Aquacultural Engineering 24:1-14.

Queiroz, J.F., E. Ortega, J.M.G. Ferraz, and C.E. Boyd. 2000. Analise emergetica da producao de bagre do canal (*Ictalurus punctatus*). Brazilian Journal of Ecology 4(1-2):61-70.

Rushton, Y.G. and C.E. Boyd. 2000. A comparison of water-soluble fertilizer with liquid fertilizer for sportfish pond fertilization. North American Journal of Aquaculture 62:212-218.

Sonnenholzner, S. and C.E. Boyd. 2000. Chemical and physical properties of shrimp pond bottom soils in Ecuador. Journal of the World Aquaculture Society 31:358-375.

Sonnenholzner, S. and C.E. Boyd. 2000. Managing the accumulation of organic matter deposited on the bottom of shrimp ponds….Do chemical and biological probiotics really work? World Aquaculture 31(3):24-28.

Sonnenholzner, S. and C.E. Boyd. 2000. Vertical gradients of organic matter concentration and respiration rate in pond bottom soils. Journal of the World Aquaculture Society 31:376-380.

Boyd, C.E. 2001. Inland shrimp farming and the environment. World Aquaculture 32(1):10-12.

Boyd, C.E. and J. Queiroz. 2001. Feasibility of retention structures, settling basins, and best management practices in effluent regulation for Alabama channel catfish farming. Reviews in Fisheries Science 9:43-67.

Hoagland, R.H., III, D.B. Rouse, D. Teichert-Coddington, and C.E. Boyd. 2001. Evaluation of automated aeration control in shrimp ponds. Journal of Applied Aquaculture 11(3):45-61.

McGraw, W. D. Teichert-Coddington, D.B. Rouse, and C.E. Boyd. 2001. Higher minimum dissolved oxygen concentrations increase penaeid shrimp yields in earthen ponds. Aquaculture 199:311-321.

Seo, J. and C.E. Boyd. 2001. Dry-tilling of pond bottoms and calcium sulfate treatment for water quality improvement. Journal of the World Aquaculture Society 32:257-268.

Seo, J. and C.E. Boyd. 2001. Effects of bottom soil management practices on water quality improvement in channel catfish *Ictalurus punctatus* ponds. Aquacultural Engineering 25:83-97.

Tepe, Y. and C.E. Boyd. 2001. A sodium nitrate-based, water-soluble fertilizer for sportfish ponds. North American Journal of Aquaculture 63:328-332.

Barcode: 4546014-02 C-331-806 INV - Investigation

Thunjai, T., C.E. Boyd, and K. Dube. 2001. Pond soil pH measurement. Journal of the World Aquaculture Society 32:141-152.

Gautier, D., C.E. Boyd, and R.T. Lovell. 2002. Sampling channel catfish ponds for pre-harvest off-flavor detection. Aquacultural Engineering 26:205-213.

Kitamura, P.C., J.F. Queiroz, R.B. Lopes, F G. de Castro, Jr., and C.E. Boyd. 2002. Environmental and economic assessment of fee-fishing in Sao Paulo State, Brazil. Journal of Applied Aquaculture: 12(4):23-41.

Tepe, Y. and C.E. Boyd. 2002. Nitrogen fertilization of golden shiner ponds. North American Journal of Aquaculture 64:284-289.

Tepe, Y. and C.E. Boyd. 2002. Sediment quality in Arkansas bait minnow ponds. Journal of the World Aquaculture Society 33:221-232.

Boyd, C.E. 2003. Bottom soil and water quality management in shrimp ponds. Journal of Applied Aquaculture 13(1/2):11-33.

Boyd, C. E. 2003. Guidelines for aquaculture effluent management at the farm-level. Aquaculture 226:101-112.

Boyd, C.E. 2003. The status of codes of practice in aquaculture. World Aquaculture 34(2):63-66.

Boyd, C.E. and T. Thunjai. 2003. Concentrations of major ions in waters of inland shrimp farms in China, Ecuador, Thailand, and the United States. Journal of the World Aquaculture Society 34:524-532.

Gomes, F. and C.E. Boyd. 2003. Dry matter, ash, and elemental composition of farm-cultured, black tiger prawn *Penaeus monodon*. World Aquaculture 34(4):61-63.

Ozbay, G. and C.E. Boyd. 2003. Particle size fractions in pond effluents. World Aquaculture 34(4):56-59.

Tavares, L.H. and C.E. Boyd. 2003. Comparison of a dry ash method with perchloric acid digestion for total phosphorus analysis of pond sediment. Journal of Aquaculture in the Tropics 18(3):239-244.

Tavares, L.H. and C.E. Boyd. 2003. Possible effects of sodium chloride on quality of effluents from Alabama channel catfish ponds. Journal of the World Aquaculture Society 34:217-222.

Tepe, Y. and C.E. Boyd. 2003. A reassessment of nitrogen fertilization for sunfish ponds. Journal of the World Aquaculture Society 34:505-511.

McNevin, A. and C.E. Boyd. 2004. Copper concentrations in channel catfish Ictalurus punctatus ponds treated with copper sulfate. Journal of the World Aquaculture Society 35:16-24.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

McNevin, A., C.E. Boyd, O. Silapajarn, and K. Silapajarn. 2004. Ionic supplementation of pond waters for inland culture of marine shrimp. Journal of World Aquaculture Society 35:460-467.

Ozbay, G. and C.E. Boyd. 2004. Treatment of channel catfish pond effluents in sedimentation basins. World Aquaculture 35(3):10-13.

Rowan, M., A. Gross, and C.E. Boyd. 2004. Effects of alum on the quality of aquaculture effluents in settling ponds. Bamidgeh 56(3):166-175.

Silapajarn, K., C.E. Boyd, and O. Silapajarn. 2004. An improved method for determining the fineness value of agricultural limestone for aquaculture. North American Journal of Aquaculture 66:113-118.

Thunjai, T., C.E. Boyd, and M. Boonyaratpalin. 2004. Bottom soil quality in tilapia ponds of different age in Thailand. Aquaculture Research 35:698-705.

Thunjai, T., C.E. Boyd, and M. Boonyaratpalin. 2004. Quality of liming materials used in aquaculture in Thailand. Aquaculture International 12:161-168.

Watten, B.J., C.E. Boyd, M.F. Schwartz, S.T. Summerfelt, and B.L. Brazil. 2004. Feasibility of measuring dissolved carbon dioxide based on headspace partial pressures. Aquacultural Engineering 30:83-101.

Boyd, C.E. 2005. Water use in aquaculture. World Aquaculture 36(3):12-15 and 70.

Boyd, C.E., A.A. McNevin, J. Clay, and H.M. Johnson. 2005. Certification issues for some common aquaculture species. Reviews in Fisheries Science 13:231-279.

Davis, D.A., C.E. Boyd, D.B. Rouse, and I.P. Saoud. 2005. Effects of potassium, magnesium and age on acclimation of *Litopenaeus vannamei* postlarvae to inland saline well-water in west Alabama. Journal of the World Aquaculture Society 36(3):416-419.

Silapajarn, O. and C.E. Boyd. 2005. Effects of channel catfish farming on water quality and flow in an Alabama stream. Reviews in Fisheries Science 13:109-140.

Silapajarn, K., O. Silapajarn, and C.E. Boyd. 2005. Evaluation of lime requirement procedures and liming materials for aquaculture ponds in Thailand. Journal of Applied Aquaculture 17:77-88.

Wudtisin, W. and C.E. Boyd. 2005. Determination of the phosphorus fertilization rate for bluegill ponds using regression analysis. Aquaculture Research 36:593-599.

Xinglong, J. and C.E. Boyd. 2005. Measurement of 5-day biochemical oxygen demand without sample dilution or bacterial and nutrient enhancement. Aquacultural Engineering 33:250-257.

Boyd, C.A., C.E. Boyd, A.A. McNevin, and D.B. Rouse. 2006. Salt discharge from an inland farm

for marine shrimp in Alabama. Journal of the World Aquaculture Society 37(4):345-355.

Boyd, C.E., K. Corpron, E. Bernard, and P. Pengseng. 2006. Estimates of bottom soil and effluent load of phosphorus at a semi-intensive marine shrimp farm. Journal of the World Aquaculture Society 37:41-47.

Silapajarn, O. and C.E. Boyd. 2006. Copper adsorption capacity of pond bottom soils. Journal of Applied Aquaculture 18(2):85-92.

Silapajarn, O., K. Silapajarn, and C.E. Boyd. 2006. Evaluation of zeolite products used for aquaculture in Thailand. Journal of the World Aquaculture Society 37:136-138.

Wudtisin, I. and C.E. Boyd. 2006. Physical and chemical characteristics of sediments in catfish, freshwater prawn, and carp ponds in Thailand. Aquaculture Research 37:1,202-1,214.

Xinglong, J. and C.E. Boyd. 2006. Relationship between organic carbon concentration and potential pond bottom soil respiration. Aquacultural Engineering 35:147-151.

Yuvanatemiya, V. and C.E. Boyd. 2006. Physical and chemical changes in aquaculture pond bottom soil resulting from sediment removal. Aquacultural Engineering 35:199-205.

Boyd, C.A., C.E. Boyd, and D.B. Rouse. 2007. Potassium budget for inland, saline water shrimp ponds in Alabama. Aquacultural Engineering 36:45-50.

Boyd, C.A., C.E. Boyd, and D.B. Rouse. 2007. Potassium adsorption by bottom soils in ponds for inland culture of marine shrimp in Alabama. Journal of the World Aquaculture Society 38:85-91.

Boyd, C.E., C.S. Tucker, A. McNevin, K. Bostick, and J. Clay. 2007. Indicators of resource use efficiency and environmental performance in fish and crustacean aquaculture. Reviews in Fisheries Science 15:327-360.

Banas, D., G. Masson, L. Leglize, P. Usseglio-Polatera, and C.E. Boyd. 2008. Assessment of sediment concentration and nutrients loads in effluents drained from extensively-managed fishponds in France. Environmental Pollution 152(3):679-685.

Boyd, C.E. 2008. Calculating the feed oxygen demand (FOD) of Aquafeeds. Kasetsart University Fisheries Research Bulletin 32(3):26-31.

Boyd, C.A., P. Pengseng, and C.E. Boyd. 2008. New nitrogen fertilization recommendations for bluegill ponds in the southeastern United States. North American Journal of Aquaculture 70:308-313.

Boyd, C.E., H. Pine, C.A. Boyd, and R. Hulcher. 2008. Excess runoff contribution to daily discharge frequency of channel catfish farms in Alabama. Journal of the World Aquaculture Society 39(4):490-499.

Banerjee, A., G. N. Chattopadhyay, and C.E. Boyd. 2009. Determination of critical limits of soil

nutrients for use in optimizing fertilizer rates for fish ponds in red, lateritic soil zones. Aquacultural Engineering 40:144-148.

Boyd, C.A., P.L. Chaney, C.E. Boyd, and D.B. Rouse. 2009. Distribution of ground water suitable for use in saline-water aquaculture in central and west-central Alabama. Journal of Applied Aquaculture 21:228-240.

Boyd, C.E., C. W. Wood, P. Chaney, and J. F. Queiroz. 2010. Role of aquaculture pond sediments in sequestration of annual global carbon emissions. Environmental Pollution 158:2,537-2,540.

Chainark, S. and C.E. Boyd. 2010. Evaluation of a meter for testing potassium concentration in low-salinity aquaculture ponds. Journal of the World Aquaculture Society 41:102-106.

Chainark, S. and C.E. Boyd. 2010. Water and sediment quality, phytoplankton communities, and channel catfish production in sodium nitrate-treated ponds. Journal of Applied Aquaculture 22:171-185.

Pine, H.J. and C.E. Boyd. 2010. Adsorption of magnesium by bottom soils in inland brackishwater shrimp ponds in Alabama. Journal of the World Aquaculture Society 41:603-609.

Roy, L.A., D.A. Davis, I.P. Saoud, C.A. Boyd, H.J. Pine, and C.E. Boyd. 2010. Shrimp culture in inland low salinity waters. Reviews in Aquaculture 2:191-208.

Boyd, C. E., C. S. Tucker, and R. Viriyatum. 2011. Interpretation of pH, acidity and alkalinity in aquaculture and fisheries. North American Journal of Aquaculture 73(4):403-408.

Brown, T. W., J. A. Chappell, C. E. Boyd. 2011. A commercial-scale, in-pond raceway system for *Ictalurid* catfish production. Aquacultural Engineering 44:72-79.

Pengseng, P. and C.E. Boyd. 2011. Evaluating fertilizer application rates for giant gourami, *Osphronemus goramy*, ponds. Journal of the World Aquaculture Society 42:297-305.

Pine, H. J. and C. E. Boyd. 2011. Magnesium budget for inland low-salinity water shrimp ponds in Alabama. Journal of the World Aquaculture Society 42(5):705-713.

Pine, H.J. and C.E. Boyd. 2011. Stream salinization by inland brackish-water aquaculture. North American Journal of Aquaculture 73:107-113.

Viriyatum, R. and C.E. Boyd. 2011. Re-evaluation of potassium fertilization of bluegill, *Lepomis macrochirus*, ponds. Journal of the World Aquaculture Society 42:332-338.

Wudtisin, I. and C.E. Boyd. 2011. Possible potassium and magnesium limitations for shrimp survival and production in low-salinity, pond waters in Thailand. Journal of the World Aquaculture Society 42:766-777.

Yuvanatemiya, V., C.E. Boyd, and P. Thavipoke. 2011. Pond bottom management at commercial shrimp farms in Chantaburi Province, Thailand. Journal of the World Aquaculture Society

Barcode: 4546014-02 C-331-806 INV - Investigation

42(5):618-632.

Boyd, C. E. 2012. Personal experiences in pond water quality management. World Aquaculture 43(4):60-65.

Boyd, C. E., Li Li, and R. Brummett. 2012. Relationship of freshwater aquaculture production to renewable freshwater resources. Journal of Applied Aquaculture 24:99-106.

Brown, T., C.E. Boyd, and J. Chappell. 2012. Approximate water and chemical budgets for an experimental, in-pond raceway system. Journal of the World Aquaculture Society 43:526-537.

Chaney, P.L., C. E.Boyd, and M. Polioudakis. 2012. Number, size, distribution, and hydrologic role of small impoundments in Alabama. Journal of Soil and Water Conservation 67(2):111-121.

Le, P.T. and C.E. Boyd. 2012. Comparison of phenate and salicylate methods for determination of total ammonia nitrogen in freshwater and saline water. Journal of the World Aquaculture Society 43(6):885-889.

Prapaiwong, N. and C.E. Boyd. 2012. Effects of major water quality variables on shrimp production in inland, low-salinity ponds in Alabama. Journal of the World Aquaculture Society 43:349-361.

Prapaiwong, N. and C.E. Boyd. 2012. Effluent volume and pollutant loads of an inland, low-salinity shrimp farm in Alabama. Aquacultural Engineering 48:1-5.

Prapaiwong, N. and C.E. Boyd. 2012. Water temperature in inland, low-salinity shrimp ponds in Alabama. Journal of Applied Aquaculture 24(4):334-341

Soongsawang, S. and C.E. Boyd. 2012. Effects of effluents from a fisheries research station on stream water quality. North American Journal of Aquaculture 74:73-79.

Boyd, C.E. 2013. Aquaculture, Freshwater. Reference Module in Earth Systems and Environmental Sciences (http://dx.doi.org/10.1016/B978-0-12-409548-9.03764-7).

Boyd, C.E., J. Queiroz, and A. McNevin. 2013. Perspectives on the responsible aquaculture movement. World Aquaculture 44(4):14-21.

Danaher, J.J., J.M. Pickens, J.L. Sibley, J.A. Chappell, T.R. Hanson, and C.E. Boyd. 2013. Petunia growth response to container substrate amended with dewatered aquaculture effluent. HortTechnology 23(1):57-63.

Li, L., C.E. Boyd, J. Odom, and S. Dong. 2013. Identification of Ictalurid catfish fillets to rearing location using elemental profiling. Journal of the World Aquaculture Society 44(3):405-414.

Li L., S. Dong, X. Tian, and C.E. Boyd. 2013. Equilibrium concentrations of major cations and total alkalinity in laboratory soil-water systems. Journal of Applied Aquaculture 25(1):50-65.

Sun, W. and C.E. Boyd. 2013. Phosphorus and nitrogen budgets for inland, saline water shrimp


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

ponds in Alabama. Fisheries and Aquaculture Journal 4(1): online.

Boyd, C.E. 2014. A review of sportfish pond fertilization studies at Auburn University. World Aquaculture 45(1):41-45.

Brown, T.W., T.R. Hanson, J.A. Chappell, C.E. Boyd, and D.S. Wilson. 2014. Economic feasibility of an in-pond raceway system for commercial catfish production in west Alabama. North American Journal of Aquaculture 76:79-89.

Danaher, J.J., J.M Pickens, J.L Sibley, J.A. Chappell, T.R. Hanson, and C.E. Boyd. 2014. Growth of tomato seedlings in commercial substrate amended with dewatered aquaculture effluent. International Journal of Vegetable Science 20(4):340-353.

Han, Y., C.E. Boyd, and R. Viriyatum. 2014. A bicarbonate titration method for lime requirement to neutralize exchangeable acidity of pond bottom soils. Aquaculture 434:282-287.

Jescovitch, L.N., P. Chaney, and C.E. Boyd. 2014. Land to water surface area ratio in pond aquaculture. World Aquaculture 45(4):44-46.

Li, L., C.E. Boyd, and J. Odom. 2014. Identification of Pacific white shrimp (*Litopenaeus vannamei*) to rearing location using elemental profiling. Food Control 45:70-75.

Prapaiwong, N. and C.E. Boyd. 2014. Trace elements in waters of inland, low-salinity shrimp ponds in Alabama. Aquaculture Research 45:327-333.

Saengrungruang, P. and C.E. Boyd. 2014. Evaluation of porous, geotextile liners for erosion control in small aquaculture ponds. North American Journal of Aquaculture 76:369-374.

Zhou, L. and C.E. Boyd. 2014. Total ammonia nitrogen removal from aqueous solutions by the natural zeolite, mordenite: A laboratory test and experimental study. Aquaculture 432:252-257.

Boyd, C.E., A. McNevin, and J.W. Clay. 2015. Resource use efficiency in aquaculture: examining the known and unknown. World Aquaculture 46(2):25-30.

Brown, T.W., C E. Boyd, and J.A. Chappell. 2015. Organic carbon and dissolved oxygen budgets for a commercial-size, in-pond raceway system. Journal of the World Aquaculture Society 46(5):539-548.

Chumnanka, N., C.E. Boyd, R. Viriyatum, and S. Tunkijjanukij. 2015. Bottom soil characteristics, survival and production of shrimp in low-salinity, inland ponds in Alabama and Florida (USA). Journal of Soils and Sediments 15:671-682.

Li, L., C.E. Boyd, and S. Dong. 2015. Chemical profiling with modeling differentiates Ictalurid catfish produced in fertilized and feeding ponds. Food Control 50:18-22.

Zhou, L. and C.E. Boyd. 2015. An assessment of total ammonia nitrogen concentration in Alabama (USA) ictalurid catfish ponds and the possible risk of ammonia toxicity. Aquaculture


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

437:263-269.

Zhou, L. and C.E. Boyd. 2015. Bluegill yield in response to nitrogen and phosphorus versus phosphorus-only fertilization in ponds at different times since sediment removal. Aquaculture 446:7-11.

Boyd, C.E., C.S. Tucker, and B. Somridhivej. 2016. Alkalinity and hardness: critical but elusive concepts in aquaculture. Journal of the World Aquaculture Society 47(1):6-41.

Danaher, J. J., J. M. Pickens, J. L. Sibley, J. A. Chappell, T. R. Hanson, and C. E. Boyd. 2016. Tomato seedling growth response to different water sources and a substrate partially replaced with dewatered aquaculture effluent. International Journal of Recycling of Organic Waste in Agriculture 5:25-32.

Jescovitch, L. N., P. L. Chaney, and C. E. Boyd. 2016. A preliminary assessment of land-to-water surface area ratios (LWR) for sustainable land use in aquaculture. Papers in Applied Geography 2(2):178-188.

Li, L. C.E. Boyd, and Z. Sun. 2016. Authentication of fishery and aquaculture products by multi-element and stable isotope analysis. Food Chemistry 194:1238-1244.

Li, Y. and C.E. Boyd. 2016. Influence of a bacterial amendment on water quality in small, research ponds for channel catfish, *Ictalurus punctatus*, production. Journal of the World Aquaculture Society 47(2):464-469.

Li, Y. and C. E. Boyd. 2016. Laboratory tests of bacterial amendments for accelerating oxidation rates of ammonia, nitrite, and organic matter in aquaculture pond water. Aquaculture 460:45-58.

Li, Y., Y. Wang, C. E. Boyd, R. R. Hanson, and S. Liu. 2016. Evaluation and optimization of chemical treatments for reducing yellow discoloration of channel catfish (*Ictalurus punctatus*) fillets during cold storage. Journal of Aquatic Food Product Technology 26(1):132-137.

Somridhivej, B. and C.E. Boyd. 2016. An assessment of factors affecting the reliability of total alkalinity measurements. Aquaculture 459:99-109.

Somridhivej, B. and C. E. Boyd. 2016. Effects of liming on quality of water discharged from the supply reservoir at a fisheries research station. North American Journal of Aquaculture 78:356-361.

Viriyatum, R. and C. E. Boyd. 2016. Slow-release coated copper sulfate as an algicide for aquaculture. Journal of the World Aquaculture Society 47:667-675.

Zhou, L. and C.E. Boyd. 2016. Comparison of Nessler, phenate, salicylate and ion selective electrode procedures for determination of total ammonia nitrogen in aquaculture. Aquaculture 450:187-193.

Boyd, C.E. 2017. Use of agricultural limestone and lime in aquaculture. CAB Reviews 12 (No.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

015).

Boyd, C. E., A. A. McNevin, P. Racine, H. Q. Tinh, H. N. Minh, R. Viriyatun, D. Paungkaew, and C. Engle. 2017. Resource use assessment of shrimp, *Litopenaeus vannamei* and *Penaeus monodon*, production in Thailand and Vietnam. Journal of the World Aquaculture Society 48:201-226.

Chatvijitkul, S., C. E. Boyd, D. A. Davis, and A. A. McNevin. 2017. Embodied resources in fish and shrimp feeds. Journal of the World Aquaculture Society 48(1):7-19.

Chatvijitkul, S., C. E. Boyd, D. A. Davis, and A. A. McNevin. 2017. Pollution potential indicators for feed-based fish and shrimp culture. Aquaculture 477:43-49.

Engle, C. R., A. McNevin, P. Racine, C. E. Boyd, D. Paungkaew, R. Viriyatum, H. Q. Tinh, and H. N. Minh. 2017. Economics of sustainable intensification of aquaculture: evidence from shrimp farms in Vietnam and Thailand. Journal of the World Aquaculture Society 48(2):227-239.

Jescovitch, L. N, and C. E. Boyd. 2017. A case study: impacts of deviating from model research design to the commercial industry for split-pond aquaculture. Aquacultural Engineering 79:35-41.

Jescovitch, L. N., C. E. Boyd, and G. N. Whitis. 2017. Effects of mechanical aeration in the waste-treatment cells of split-pond aquaculture systems on water quality. Aquaculture 480:32-41.

Kamal, A. H. M., O. Hishamuddin, and C. E. Boyd. 2017. Physical and chemical characteristics of soil from tiger shrimp aquaculture ponds at Malacca, Malaysia. Journal of Applied Aquaculture doi:10.1080/10454438.2017.1406417.

Li, L., C. E. Boyd, P. Racine, A. A. McNevin, B. Somridhivej,. H. N. Minh, H. Q. Tinh and R. Godumala. 2017. Assessment of elemental profiling for distinguishing geographic origin of aquacultured shrimp from India, Thailand and Vietnam. Food Control 80:162-169.

Naigaga, S., C. E. Boyd, P. Gaillard, H. A. Abdelrahaman, and J. Molnar. 2017. Assessing the reliability of water-test kits for use in pond aquaculture. Journal of the World Aquaculture Society 48(4):555-562.

Sá, M.V.C. and C.E. Boyd. 2017. Dissolution rate of calcium carbonate and calcium hydroxide in saline waters and its relevance for aquaculture. Aquaculture 469:102-105.

Sá, M.V.C. and C.E. Boyd. 2017. Role of salinity in the dissolution rates of $CaCO_3$ and its implications for aquaculture liming. Aquaculture Research doi:10.1111/are.13489.

Sá, M.V.C. and C.E. Boyd. 2017. Variability in the solubility of agricultural limestone from different sources and its pertinence for aquaculture. Aquaculture Research 48(8):4,292-4,299.

Somridhivej, B. and C. E. Boyd. 2017. Likely effects of the increasing alkalinity of inland waters on aquaculture. Journal of the World Aquaculture Society 48(3):496-502.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Abdelrahman, H. A. and C. E. Boyd. 2018. Effects of mechanical aeration on evaporation rate and water temperature in aquaculture ponds. Aquaculture Research doi: 10.1111/are.13674.

Boyd, C. E. and A. A. McNevin. 2018. Land use in shrimp aquaculture. World Aquaculture, March:28-34.

Boyd, C. E. and T. Q. Phu. 2018. Environmental factors and Acute Hepatopancreatic Necrosis Disease (AHPND) in shrimp ponds in Viet Nam: practices for reducing risks. Asian fisheries Science 31S:121-136.

Boyd, C. E., E. L. Torrans, and C. S. Tucker. 2018. Dissolved oxygen and aeration in Ictalurid catfish aquaculture. Journal of the World Aquaculture Society 49(1):7-70.

Boyd, C. E., A. A. McNevin, and R. P. Davis. 2018. Production methods and resource use at *Litopenaeus vannamei* and *Penaeus monodon* farms in India compared with previous findings from Thailand and Vietnam. Journal of the World Aquaculture Society 49(3):551-569.

Chatvijitkul, S., C. E. Boyd, and D. A. Davis. 2018. Nitrogen, phosphorus, and carbon concentrations in some common aquaculture feeds. Journal of the World Aquaculture Society 49(3):477-483.

Han, Y. and C. E. Boyd. 2018. Effect or organic matter concentration on agricultural limestone dissolution in laboratory soil-water systems. Aquaculture Research doi:10.1111/are.13810.

Kumar, G, C. R. Engle, T. R. Hanson, C. S. Tucker, T. W. Brown, L. B. Bott, L. A. Roy, C. E. Boyd, M. S. Recsetar, J. Park, and E. L. Torrans. 2018. Economics of alternative catfish production technologies. Journal of the World Aquaculture Society doi: 10.1111.jwas.12555

Li, L., C. Han, S. Dong, and C. E. Boyd. 2019. Use of elemental profiling and isotopic signatures to differentiate Pacific white shrimp (*Litopenaeus vannamei*) from freshwater and seawater culture areas. Food Control 95:249-256.

**Book Chapters and Proceedings of Symposia:**

Boyd, C.E. 1967. Some aspects of aquatic plant ecology, p. 114-129. In: Reservoir Fishery Resources Symposium, University of Georgia Press, Athens.

Boyd, C.E. 1971. Leaf protein from aquatic plants, p. 44-49. In: N.W. Pirie (ed.), Leaf Protein, its Quality, Agronomy, and Use. IBP Handbook No. 22, Blackwell Scientific Publishers, Oxford.

Boyd, C.E. 1971. The limnological role of aquatic macrophytes and their relationship to reservoir management, p. 153-166. In: G.E. Hall (ed.), Reservoir Fisheries and Limnology. Special Publication No. 8, American Fisheries Society, Washington, D.C.

Vickers, D.H. and C.E. Boyd. 1971. Effects of organic insecticides upon carbon$^{14}$ uptake by freshwater phytoplankton, p. 492-496. In: D.J. Nelson (ed.), Radioneuclides in Ecosystems, Vol. 1, Proc. 3rd Nat. Symposium on Radioecology, Oak Ridge National Laboratory, Oak Ridge, Tennessee.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Boyd, C.E. 1974. Utilization of aquatic plants, p. 107-115. In: D.S. Mitchell (ed.), Aquatic vegetation and its use and control. United Nations Educational, Scientific, and Cultural Organization, Paris.

Boyd, C.E. and E. Scarsbrook. 1975. Chemical composition of aquatic weeds, p. 144-150. In: P.L. Brezonik and J.L. Fox (ed.), Water Quality Management through Biological Control, Report No. ENV-07-75-1, U.S. Environmental Protection Agency.

Boyd, C.E. 1976. Lime requirements and application in fish ponds. FAO Technical Conference on Aquaculture, Kyoto, Japan:120-122.

Boyd, C.E. 1978. Chemical composition of wetland plants, p. 155-167. In: R.E. Good, D.F. Whigham, and R.L. Simpson (ed.), Freshwater Wetlands, Ecological Processes and Management Potential. Academic Press, New York.

Boyd, C.E. 1984. Effects of acid rain on aquatic ecosystems in Alabama. In: Proceedings of Conference on Acid Rain in Alabama, Department of Environmental Management, Montgomery, Alabama.

Boyd, C.E. 1985. Hydrology and pond construction, p. 107-134. In: C.S. Tucker, (ed.), Channel Catfish Culture. Elsevier Scientific Publishing Company, Amsterdam.

Boyd, C.E. 1985. Water quality management in ponds, p. 25-32. In: M. Porter, K. Gee, J. Jackson, and S. Hensley, (eds.), Proceedings of the Symposium of Pond Management in Oklahoma, Samuel Roberts Noble Foundation, Inc., Oklahoma City.

Tucker, C.S. and C.E. Boyd. 1985. Water quality, p. 135-228. In: C.S. Tucker, (ed.), Channel Catfish Culture. Elsevier Scientific Publishing Company, Amsterdam.

Boyd, C.E. 1986. Influence of evaporation excess on water requirements for fish farming, p. 62-64. In: Conference on Climate and Water Management - A Critical Era. American Meteorological Soc., Boston, Massachusetts.

Boyd, C.E. 1986. Water quality, p. 283-294. In: R. Billard and J. Marcel (ed.), L`aquaculture des Cyprinides. Institut National de la Rescherche Agronomique, Paris.

Boyd, C.E. 1987. Water conservation measures in fish farming, p.88-91. In: Fifth Conference on Applied Climatology. American Meteorological Soc., Boston, Massachusetts.

Boyd, C.E. 1988. Water quality variables in aquaculture, p. 36-64. In: Jan Paynter (ed.), Proceedings Australian Mariculture Association, 3rd Annual Conference, Lismore NSW, Australia.

Boyd, C.E. 1989. Aeration of shrimp ponds, p. 134-140. In: D.M. Akiyama (ed.), Proceedings South Eastern Asia Shrimp Pond Management Workshop, American Soybean Association, Singapore.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Boyd, C.E. 1991. Empirical modeling of phytoplankton growth and oxygen production in aquaculture ponds, p. 363-395. In: D.E. Brune and J.R. Tomasso (eds.), Aquaculture and Water Quality, Advances in World Aquaculture, Volume 3, World Aquaculture Society, Baton Rouge, Louisiana.

Boyd, C.E. 1991. Experiences in evaluating surface and diffused-air aerators. Fisheries Bioengineering Symposium, American Fisheries Society Special Symposium 10:473-481.

Boyd, C.E. and A.W. Fast. 1992. Pond monitoring and management, p. 497-513. In: A.W. Fast and L.J. Lester, (eds.), Marine Shrimp Culture: Principles and Practices, Elsevier Scientific Publishing Company, Amsterdam, The Netherlands.

Fast, A.W. and C.E. Boyd. 1992. Water circulation, aeration and other management practices, p. 457-495. In: A.W. Fast and L.J. Lester, (eds.), Marine Shrimp Culture: Principles and Practices, Elsevier Scientific Publishing Company, Amsterdam, The Netherlands.

Watten, B., J. Colt, and C.E. Boyd. 1991. Impact of dissolved nitrogen and carbon dioxide on the operation of pure oxygen systems. Fisheries Bioengineering Symposium, American Fisheries Society Special Symposium 10:471-481.

Boyd, C.E. 1992. Shrimp pond bottom soil and sediment management, p. 166-181. In: J.A. Wyban, (ed.), Proceedings Special Session on Shrimp Farming, World Aquaculture Society.

Boyd, C.E. and Y. Musig. 1992. Shrimp pond effluents, p. 195-197. In: J.A. Wyban (ed.), Proceedings Special Session on Shrimp Farming, World Aquaculture Society.

Boyd, C.E. 1993. Water quality and soil condition in brackishwater ponds, p. 129-136. Memorias Primer Congreso Ecuatoriano de Acuicultura, ESPOL, Guayaquil, Ecuador.

Neori, A., S.P. Ellner, C.E. Boyd, and M.D. Krom. 1993. The integration of seaweed biofilters with intensive fish ponds to improve water quality and recapture nutrients, p. 603-608. In: G.A. Moshiri (ed.), Constructed Wetlands for Water Quality Improvement. Lewis Publishers, Boca Raton, Florida.

Boyd, C.E. 1994. Pond bottom soil chemistry and management. In: Memorias Segundo Congreso Ecuatoriano de Acuicultura, ESPOL, Guayaquil, Ecuador.

Boyd, C.E. 1995. Chemistry and efficacy of amendments used to treat water and soil quality imbalances in shrimp ponds, p. 183-199. In: C.L. Browdy and J.S. Hopkins, (eds.), Proceedings of the Special Session on Shrimp Farming. The World Aquaculture Society, Baton Rouge, Louisiana.

Boyd, C.E. 1997. Environmental issues in shrimp farming, pages 9-23. In D.E. Alston, B.W. Green, and H.C. Clifford, III (eds.), IV Simposio Centroamericano de Aquacultura, Tegucigalpa, Honduras.

Boyd, C.E. 1997. Microbiological and physicochemical characteristics of pond sediment and methods for improving oxygenation of the soil-water interface. Proceedings of the Second


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Pacific Marine Biotechnology Conference, Phuket, Thailand.

Boyd, C.E. and J.R. Bowman. 1997. Pond bottom soils, p. 135-162. In: H.S. Egna and C.E. Boyd (eds.), Dynamics of Pond Aquaculture, CRC Press, Boca Raton, Florida.

Boyd, C.E. and L. Massaut. 1997. Perspectives for sustainable aquaculture through use of better environmental management. (On CD-ROM). Proceedings of the IV Congresso Ecuatoriano de Acuicultura, CENAIM-ESPOL, Guayaquil, Ecuador.

Diana, J.S., J.P. Szyper, T.R. Batterson, C.E. Boyd, and R.H. Piedrahita. 1997. Water quality in ponds, p. 63-71. In: H.S. Egna and C.E. Boyd (eds.), Dynamics of Pond Aquaculture, CRC Press, Boca Raton, Florida.

Egna, H.S., C.E. Boyd, and D.A. Burke. 1997. Introduction, p. 1-18. In: H.S Egna and C.E. Boyd (eds.), Dynamics of Pond Aquaculture, CRC Press, Boca Raton, Florida.

Seim, W.K., C.E. Boyd, and J.S. Diana. 1997. Environmental considerations, p. 163-182. In: H.S. Egna and C.E. Boyd (eds.), Dynamics of Pond Aquaculture, CRC Press, Boca Raton, Florida.

Boyd, C.E. and A. Gross. 1998. Use of probiotics for improving soil and water quality in aquaculture ponds, p. 101-106. In: T.W. Flegel (ed.), Advances in Shrimp Biotechnology, The National Center for Genetic Engineering and Biotechnology, Bangkok, Thailand.

Boyd, C.E. 1999. Codes of conduct and better management practices in shrimp farming. In: Proceedings of the Fifth Ecuadorian Aquaculture Conference, Guayaquil, Ecuador.

Boyd, C.E. 1999. Pond water and soil management procedures to minimize the effects of disease epidemics in shrimp farming. In: Proceedings of the Fifth Ecuadorian Aquaculture conference, Guayaquil, Ecuador.

Boyd, C.E. and M.C. Haws. 1999. Good management practices (GMPs) to reduce environmental impacts and improve efficiency of shrimp aquaculture in Latin America, p. 9-33. In: B.W. Green, H.C. Clifford, M. McNamara, and G.M. Moctezuma (eds.), Simposio 5 Centroamericano de Acuacultura, San Pedro Sula, Honduras.

Green, B.W, D.R. Teichert-Coddington, C.E. Boyd, J. Wigglesworth, H. Corrales, D. Martinez, and E. Raminez. 1999. Efecto del recambio de agua en la produccion semi-intensiva de *Penaeus vannamei*, p. 209-212. In: B.W. Green, H.C. Clifford III, M. McNamara, and G.M. Moctezuma (eds.), Symposio 5 Centroamericaro de Acuacultura, San Pedro Sula, Honduras.

Ortega, E., J.F. Queiroz, C.E. Boyd, and J.M.G. Ferraz. 1999. Energy analysis of channel catfish farming in Alabama, USA. First Approach: A General Overview, pp. 171-180. In: First Biennial Energy analyses Research Conference – Energy Quality and Transformities. University of Florida, Gainesville, Florida.

Boyd, C.E. and S. Zimmerman. 2000. Grow-out systems – water quality and soil management, p. 221-238. In: M. New and W.C. Valenti (eds.), Freshwater Prawn Farming, Fishing News


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Books, Blackwell Science, Oxford, UK.

Arhelger, M.E., F.R. Parker, Jr., P.A. Jensen, and C.E. Boyd. 2001. Estero Salado/Guayaquil ship channel containment assessment, pp. 40-55. In: B.M. Greenberg, R.N. Hull, M.H. Robers, Jr., and R.W. Gensemer, (editors), Environmental Toxicology and Risk Assessment: Science, Policy, and Standardization – Implications for Environmental Decisions, 10th edition, American Society for Testing and Materials, West Conshohocken, Pennsylvania, USA.

Boyd, C.E. 2001. Aquaculture and water pollution, p. 153-157. In: D.F. Hayes and M. McKee (eds.), Decision Support Systems for Water Resources Management, American Water Resources Association, Middleburg, Virginia.

Boyd, C.E. 2001. Management practices for reducing the environmental impacts of shrimp farming, p. 265-292. In: M. C. Haws and C. E. Boyd (eds.), Methods for Improving Shrimp Farming in Central America. USDA Hurricane Mitch Reconstruction Project. UCA University Press, Managua, Nicaragua.

Boyd, C.E. 2001. Soil and water quality considerations in shrimp farming, p. 1-30. In: M.C. Haws and C.E. Boyd (eds.), Methods for Improving Shrimp Farming in Central America. USDA Hurricane Mitch Reconstruction Project. UCA University Press, Managua, Nicaragua.

Boyd, C.E., J.A. Hargreaves, and J.W. Clay. 2001. Codes of conduct for marine shrimp aquaculture, p. 238-256. In: C.L. Browdy and D.E. Jory (eds.), The New Wave. Proceedings of the Special Session on Sustainable Shrimp Culture, Aquaculture 2001, World Aquaculture Society, Baton Rouge, Louisiana.

Phillips, M.J., C.E. Boyd, and P. Edwards. 2001. Systems approach to aquaculture management, p. 239-247. In: R.P. Subasinghe, P. Bueno, M.J. Phillips, C. Hough, S.E. McGladdery, and J.R. Arthur (eds.), Aquaculture in the Third Millennium. Technical Proceedings of the Conference on Aquaculture in the Third Millennium, Bangkok, Thailand, 20-25 February 2000. NACA, Bangkok, and FAO, Rome.

Boyd, C.E. 2002. Mangroves and coastal aquaculture, p. 145-157. In: R.R. Stickney and J.P. McVey (eds.), Responsible Marine Aquaculture. CABI Publishing, Oxon, United Kingdom.

Hargreaves, J.A., C.E. Boyd, and C.S. Tucker. 2002. Water budgets for aquaculture production, p. 9-34. In: J.R. Tomasso (ed.), Aquaculture and the Environment in the United States. U.S. Aquaculture Society, A Chapter of the World Aquaculture Society, Baton Rouge, Louisiana.

Tucker, C.S., CE. Boyd, and J.A. Hargreaves. 2002. Characterization and management of effluents from warmwater aquaculture ponds, p. 35-76. In: J.R. Tomasso (ed.), Aquaculture and the Environment in the United States. U.S. Aquaculture Society, A Chapter of the World Aquaculture Society, Baton Rouge, Louisiana.

Boyd, C.E. 2003. Environmental management in marine shrimp farming, p. 229-239. In: B. Couteaux, Z. Kasprzyk, and E. Ranaivoson (eds.), Proceedings of the International Conference on Responsible Crustacean Culture. Centre d'Information Technique et Economique, Antananarivo, Madagascar, 3-5 December, 2002.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Boyd, C.E. 2003. Off-flavor in pond-cultured marine shrimp, p. 45-53. In: A.M. Rimando and K.K. Schrader (eds.), Off-Flavors in Aquaculture. American Chemical Society, Washington, D.C.

Boyd, C.E. 2004. Environmental issues, p. 634-657. In: C.S. Tucker and J.A. Hargreaves (eds.), Biology and Culture of Channel Catfish. Elsevier Publishing Company, Amsterdam, The Netherlands.

Boyd, C.E. 2004. Pond hydrology, p. 196-214. In: C.S. Tucker and J.A. Hargreaves (eds.), Biology and Culture of Channel Catfish. Elsevier Publishing Company, Amsterdam, The Netherlands.

Boyd, C.E. 2006. Datasheet on drainage. In: Aquaculture Compendium. Online at www.cabicompendium.org/ac. CAB International, Wallingford, UK.

Boyd, C.E. 2006. Datasheet on land and water use conflicts. In: Aquaculture Compendium. Online at www.cabicompendium.org/ac. CAB International, Wallingford, UK.

Boyd, C.E. 2006. Datasheet on watershed management. In: Aquaculture Compendium. Online at www.cabicompendium.org/ac. CAB International, Wallingford, UK.

Boyd, C.E. 2006. Global shrimp OP survey results and recommendations, p. 2-6. In: C.E. Boyd, D.E. Jory, and G.W. Chamberlain (eds.), Operating Procedures for Shrimp Farming. Global Aquaculture Alliance, St. Louis, Missouri.

Boyd, C.E. 2006. Management of bottom soil condition and pond water and effluent quality, p. 449-467. In: C. Lim and C.D. Webster (eds.), Tilapia Biology, Culture, and Nutrition. Food Products Press, New York, New York.

Boyd, C.E. and O. Silapajarn. 2006. Influence of microorganisms on water and sediment quality in aquaculture ponds, p. 261-285. In: R.C. Ray (ed.), Microbial Biotechnology in Agriculture and Aquaculture. Science Publishers, Enfield, New Hampshire.

Jackson, C. and C.E. Boyd. 2006. Effluent water quality, p. 106-112. In: C.E. Boyd, D.E. Jory, and G.W. Chamberlain (eds.). Operating Procedures for Shrimp Farming. Global Aquaculture Alliance, St. Louis, Missouri.

Olah, J., M. Polioudakis, and C.E. Boyd. 2006. Linking ecotechnology and biotechnology in aquaculture, p. 287-317. In: R.C. Ray (ed.), Microbial Biotechnology in Agriculture and Aquaculture. Science Publishers, Enfield, New Hampshire.

Boyd, C.E. and H. Pine. 2008. Application of agrometeorology to aquaculture and fisheries. Chapter 13 in: K. Stigter and H.P. Das (eds.), Guide to Agricultural Meteorological Practices. World Meteorological Organization, Geneva, Switzerland.

Boyd, C.E. 2008. Better management practices in international aquaculture, p. 73-90. In: C.S. Tucker and J.A. Hargreaves (eds.), Environmental Best Management Practices for Aquaculture.

Blackwell Publishing, Ames, IA.

Boyd, C. E. 2008. Better management practices in marine shrimp aquaculture, p. 227-259. In: C.S. Tucker and J.A. Hargreaves (eds.), Environmental Best Management Practices for Aquaculture. Blackwell Publishing, Ames, IA.

Boyd, C.E., P. Zajicek, and J.A. Hargreaves. 2008. Development, implementation and verification of best management practices for aquaculture, p. 129-149. In: C.S. Tucker and J.A. Hargreaves (eds.), Environmental Best Management Practices for Aquaculture. Blackwell Publishing, Ames, IA.

Tucker, C.S., J.A. Hargreaves, and C.E. Boyd. 2008. Aquaculture and the environment in the United States, p. 3-54. In: C.S. Tucker and J.A. Hargreaves (eds.), Environmental Best Management Practices for Aquaculture. Blackwell Publishing, Ames, IA.

Tucker, C.S., J.A. Hargreaves, and C.E. Boyd. 2008. Best management practices for freshwater pond aquaculture, p. 151-226. In: In: C.S. Tucker and J.A. Hargreaves (eds.), Environmental Best Management Practices for Aquaculture. Blackwell Publishing, Ames, IA.

Boyd, C.E. 2009. Aquaculture, freshwater, p. 234-241. In: G.E. Likens (ed.), Encyclopedia of Inland Waters, Vol 1. Elsevier Publishing Company, Oxford, UK.

Boyd, C.E. 2009. Estimating mechanical aeration requirement in shrimp ponds from oxygen demand of feed, p. 230-234. In: C.L. Browdy and D.E. Jory (eds.), The Rising Tide Proceedings of the Special Session on Sustainable Shrimp Farming. World Aquaculture Society, Baton Rouge, LA.

Boyd, C.E. and S. Chainark. 2009. Advances in technology and practice for land-based aquaculture systems: ponds for finfish production, p. 984-1,009. In: G. Burnell and G. Allen (eds.), New Technologies in Aquaculture. Woodhead Publishing, Oxford, UK.

Boyd, C.E. and S. Zimmerman. 2009. Grow-out systems – water quality and soil management, p. 239-255. In: M.B. New, W.C. Valenti, J.H. Tidwell, L. D'Abramo, and M.N. Kutty, (eds.), Freshwater Prawns Biology and Farming. Wiley-Blackwell, West Sussex, UK.

Boyd, C.E., S. Soongsawang, E.W. Shell, and S. Fowler. 2009. Small impoundment complexes as a possible method to increase water supply in Alabama. Proceedings of the 2009 Georgia Water Resources Conference, April 27-29, University of Georgia, Athens.

Boyd, C.E., C.A. Boyd, and S. Chainark. 2010. Shrimp pond soil and water quality management, p. 281-303. In: V. Alday-Sanz (ed.), The Shrimp Book. Nottingham University Press, Nottingham, UK.

Boyd, C.E. 2012. Water quality, p. 52-83. In: J.S. Lucas and P.C. Southgate (eds.), Aquaculture: Farming Aquatic Animals and Plants, 2nd Edition. Wiley Blackwell, West Sussex, UK.

Boyd, C.E. 2012. Nutrient cycling, p. 3-21. In: C.C. Mischke (ed.), Aquaculture Pond Fertilization: Impacts of Nutrient Input on Production. Wiley-Blackwell, West Sussex, UK.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Boyd, C. E. 2012. Water quality and pond fertilization, p. 47-63. In: C.C. Mischke (ed.), Aquaculture Pond Fertilization: Impacts of Nutrient Input on Production. Wiley-Blackwell, West Sussex, UK.

Boyd, C.E. and Li, L. 2012. Environmental issues in pond fertilization, p. 65-72. In: C.C. Mischke (ed.), Aquaculture Pond Fertilization: Impacts of Nutrient Input on Production. Wiley-Blackwell, West Sussex, UK.

Boyd, C.E. and C.A. Boyd. 2012. Physiochemical characteristics of ponds, p. 49-81. In: J.W. Neal and D.W. Willis (eds.), Small Impoundment Management in North America. American Fisheries Society, Bethesda, MD.

Boyd, C.E. 2013. On water, p. 10-15. In: B.G. Lockaby (ed.), Auburn Speaks – On Water. Office of the Vice President for Research, Auburn University, Alabama.

Boyd, C.E. and P.L. Chaney. 2013. Alabama fish ponds, p. 114-121. In: B.G. Lockaby (ed.), Auburn Speaks – On Water. Office of the Vice President for Research, Auburn University, Alabama.

Boyd, C.E. 2015. Overview of aquaculture feeds: global impacts of ingredient use. In: D. A. Davis, (ed.), Feed and Feeding Practices in Aquaculture. Woodhead Publishing, Cambridge, United Kingdom.

Boyd, C.E. 2017. General relationship between water quality and aquaculture performance in ponds, p. 147-164. In: G. Jeney (ed.), Fish Diseases: Prevention and Control Strategies.

**Experiment Station Bulletins, Circulars, etc.:**

Boyd, C.E. 1974. Lime requirements of Alabama fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Bulletin 459. 19 p.

Boyd, C.E. 1975. Competition for light by aquatic plants in fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Circular 215. 19 p.

Boyd, C.E. and W.W. Walley. 1975. Total alkalinity and hardness of surface waters in Alabama and Mississippi. Alabama Agricultural Experiment Station Auburn University, Alabama Bulletin 465. 16 p.

Parks, R.W., E. Scarsbrook, and C.E. Boyd. 1975. Phytoplankton and water quality in a fertilized fish pond. Alabama Agricultural Experiment Station, Auburn University, Alabama, Circular 224. 16 p.

Boyd, C.E. 1976. An evaluation of a water analysis kit. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 92. 3 p.

Boyd, C.E. 1976. Fertilizing farm fish ponds. Alabama Agricultural Experiment Station Auburn


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

University, Alabama, Highlights Agricultural Research 23:8.

Boyd, C.E. 1976. Liming fish farm ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 91. 7 p.

Boyd, C.E. and J.R. Snow. 1976. Fertilizing farm fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 88. 6 p

Boyd, C.E. and R.P. Romaire. 1978. Predicting nighttime depletion of dissolved oxygen in catfish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Highlights of Agricultural Research 25:13.

Romaire, R.P. and C.E. Boyd. 1978. Predicting oxygen depletion in catfish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Bulletin 505. 32 p.

Arce, R.G. and C.E. Boyd. 1980. Water chemistry of Alabama ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Bulletin 522. 35 p.

Boyd, C.E. and W.D. Hollerman. 1980. Determination of nitrate in waters from fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 99. 4 p.

Boyd, C.E. 1981. Liquid fertilizers for fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Highlights of Agricultural Research 28:3.

Boyd, C.E. and J.C. Williams. 1981. Samples size for water quality measurements in fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 100. 4 p.

Boyd, C.E. 1983. Effluents, p. 50-53. In: C.S. Tucker (ed.), Water quality in channel catfish ponds. Mississippi Agricultural Forestry Experiment Station, Mississippi State, Mississippi, Southern Cooperative Series Bulletin 290.

Boyd, C.E. 1983. Hydrology of channel catfish ponds, p. 44-49. In: C.S. Tucker (ed.), Water quality in channel catfish ponds. Mississippi Agricultural Forestry Experiment Station, Mississippi State, Mississippi Southern Cooperative Series Bulletin 290.

Boyd, C.E. 1983. Theory of aeration, p. 13-20. In: C.S. Tucker (ed.), Water quality in channel catfish ponds. Mississippi Agricultural Forestry Experiment Station, Mississippi State, Mississippi, South Cooperative Series Bulletin 290.

Boyd, C.E. and W.D. Hollerman. 1984. Performance of a water analysis kit. Alabama Agricultural Experiment Station, Auburn University, Alabama Circular 174. 10 p.

Boyd, C.E. and J.L. Shelton, Jr. 1984. Observations on the hydrology and morphometry of ponds on the Auburn University Fisheries Research Unit. Alabama Agricultural Experiment Station, Auburn University, Alabama Bulletin 558. 64 p.

Boyd, C.E. 1885. Seepage and evaporation losses from farm ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama Highlights of Agricultural Research 32:11.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Boyd, C.E. 1987. Electric paddle wheel aerators for catfish farming. Alabama Agricultural Experiment Station, Auburn University, Alabama Highlights Agricultural Research 34:5.

Boyd, C.E. and T. Ahmad. 1987. Evaluation of aerators for channel catfish farming. Alabama Agricultural Experiment Station, Auburn University, Alabama, Bulletin 584. 52 p.

Boyd, C.E. and N. Stone. 1987. Evaluation of aeration attachments for a Crisafulli pump. Alabama Agricultural Experiment Station, Auburn University, Alabama, Circular 293. 10 p.

Pillai, V.K. and C.E. Boyd. 1988. Comparison of the perchloric acid and persulfate methods for digestion of pond waters for total phosphorus analysis, p. 221-225. In: Proceedings 50th Anniversary Symposium, Department of Fisheries and Allied Aquacultures.

Boyd, C.E. 1989. Nighttime pond aeration boosts catfish production. Alabama Agricultural Experiment Station, Auburn University, Alabama, Highlights of Agricultural Research 36(1):11.

Stone, N. and C.E. Boyd. 1989. Seepage from fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Bulletin 599. 63 p.

Boyd, C.E. and S.W. Brown. 1990. Quality of water from wells in the major catfish farming area of Alabama, p. 195-206. Alabama Agricultural Experiment Station, Auburn University, Alabama. In: Proceedings 50th Anniversary Symposium, Department of Fisheries and Allied Aquacultures.

Rushton, Y. and C.E. Boyd. 1995. New opportunities for sportfish pond fertilization. Alabama Agricultural Experiment Station, Auburn University, Alabama, Highlights of Agricultural Research 42(3):3-4.

Schwartz, M.F. and C.E. Boyd. 1996. Suggested management to improve quality and reduce quantity of channel catfish pond effluents. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 108. 4 pp.

Boyd, C.E. 1998. Water quality for pond aquaculture. Alabama Agricultural Experiment Station, Auburn University, Alabama, Research and Development Series No. 43. 37 p.

Boyd, C.E. and R.F. Hulcher. 2001. Best management practices for channel catfish farming in Alabama. Alabama Agricultural Experiment Station, Auburn University, Alabama, Highlights of Agricultural Research 48 (fall):1-4.

Boyd, C.E., J.F. Queiroz, G.N. Whitis, R. Hulcher, P. Oakes, J. Carlisle, D. Odom, Jr., M.M. Nelson, and W.G. Hemstreet. 2003. Best management practices for channel catfish farming in Alabama. Special Report 1, Alabama Catfish Producers, Montgomery, Alabama. 39 p.

Boyd, C.E., C.A. Boyd, J. Chappell, R. Hulcher, P. Oakes, and D.B. Rouse. 2004. Additional best management practices for Alabama aquaculture. Special Report 3, Alabama Agricultural Experiment Station, Auburn University. 27 p.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Davis, A.D., T.M. Samocha, and C.E. Boyd. 2004. Acclimating Pacific white shrimp, Litopenaeus vannamei, to inland, low-salinity waters. SRAC Publication 2600, Southern Regional Aquaculture Center, Mississippi State University, Stoneville, Mississippi, Publication No. 2600.

Silapajarn, K., C.E. Boyd, and O. Silapajarn. 2004. Physical and chemical characteristics of pond water and bottom soil in channel catfish ponds in west-central Alabama. Bulletin 655, Alabama Agricultural Experiment Station, Auburn University, 44 p.

Silapajarn, O., C.E. Boyd, K. Silapajarn, and P.L. Chaney. 2004. Effects of channel catfish farming on water quality in Big Prairie Creek, west-central Alabama. Special Report No. 2 for Alabama Catfish Producers, Alabama Agricultural Experiment Station, Auburn University. 51 p.

**Books:**

Boyd, C.E. 1979. Water Quality in Warmwater Fish Ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama. 359 p.

Boyd, C.E. 1982. Water Quality Management for Pond Fish Culture. Elsevier Scientific Publishing Company, Amsterdam. 318 p.

Boyd, C.E. 1990. Water Quality in Ponds for Aquaculture. Alabama Agricultural Experiment Station, Auburn University, Alabama. 482 p.

Boyd, C.E. and C.S. Tucker. 1992. Water Quality and Pond Soil Analyses for Aquaculture. Alabama Agricultural Experiment Station, Auburn University, Alabama. 183 p.

Yoo, K.H. and C.E. Boyd. 1994. Hydrology and Water Supply for Pond Aquaculture. Chapman and Hall, New York. 483 p.

Boyd, C.E. 1995. Bottom Soils, Sediment, and Pond Aquaculture. Chapman and Hall, New York. 348 p.

Egna, H.S. and C.E. Boyd (editors). 1997. Dynamics of Pond Aquaculture. CRC Press, Boca Raton, Florida. 437 p.

Boyd, C.E. and C.S. Tucker. 1998. Pond Aquaculture Water Quality Management. Kluwer Academic Publishers, Boston, Massachusetts. 700 p.

Boyd, C.E. 2000. Water Quality, an Introduction. Kluwer Academic Publishers, Boston, Massachusetts. 330 p.

Boyd, C.E., D.E. Jory, and G.W. Chamberlain (editors). 2006. Operating Procedures for Shrimp Farming. Global Aquaculture Alliance, St. Louis, Missouri. 169 pp.

Boyd, C.E. and C.S. Tucker. 2014. Handbook for Aquaculture Water Quality. Craftmaster Printers, Inc., Auburn, Alabama. 439 pp.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Boyd, C.E. 2015. Water Quality, an Introduction, 2nd edition. Springer, New York, New York. 357 pp.

Boyd, C.E. and A. A. McNevin. 2015. Aquaculture, Resource Use, and the Environment. Wiley-Blackwell, Hoboken, New Jersey. 337 pp.

**Manuals:**

Boyd, C.E. and F. Lichtkopper. 1979. Water quality in fish culture. Alabama Agricultural Experiment Station, Auburn University, Alabama, Research and Development Series No. 22. 30 p.

Boyd, C.E. and V.K. Pillai. 1984. Water quality management in aquaculture. Central Marine Fisheries Research Institute, Cochin, India. Special Publication No. 22. 97 p.

Boyd, C.E. 1989. Water quality management and aeration in shrimp farming. Alabama Agricultural Experiment Station, Auburn University, Alabama, Fisheries and Allied Aquacultures Departmental Series No. 2. 83 p.

Boyd, C.E. 1996. Manejo de Suelo y de la calidad de agua en laacuicultura de piscinas. American Soybean Association, St. Louis, Missouri. 62 p.

Boyd, C.E. 1996. Shrimp farming and the environment, A white paper. The Shrimp Council, National Fisheries Institute, Arlington, Virginia. 8 p.

Boyd, C.E. 1999. Codes of practice for responsible shrimp farming. Global Aquaculture Alliance, St. Louis, Missouri. 42 p.

Boyd, C.E., M.C. Haws, and B.W. Green. 2001. Improving shrimp mariculture in Latin America: Good management practices (GMPs) to reduce environmental impacts and improve efficiency of shrimp aquaculture in Latin America and an assessment of practices in the Honduran shrimp industry. Coastal Resources Center, University of Rhode Island, Narragansett, Rhode Island. 88 p.

Haws, M.C. and C.E. Boyd, editors. 2001. Methods for improving shrimp farming in Central America. USDA Hurricane Mitch Reconstruction Project. UCA University Press, Managua, Nicaragua. 292 p.

Boyd, C.E., C.W. Wood, and T. Thunjai. 2002. Aquaculture pond bottom soil quality management. Pond Dynamics/ Aquaculture Collaborative Research Support Program, Oregon State University, Corvallis, Oregon. 41 p.

**Trade Journals and Magazines:**

Boyd, C.E. 1980. Water quality in catfish ponds. Aquaculture Magazine 6(6):39.

Boyd, C.E. 1983. New aeration tests may provide better basis for comparison. Aquaculture Magazine 8 (May/June):28-31.

Barcode: 4546014-02 C-331-806 INV - Investigation

Boyd, C.E. 1983. Seepage control in a pond with the "Soil-Crete Geo-Lining System". Farm Pond Harvest. Fall/83.

Boyd, C.E. 1984. Fluids beat granular in fish pond trials. Solutions, Journal of Fluid Fertilizer Industry 28(2):56-60.

Boyd, C.E. 1988. Water quality in aquaculture. Austasia Aquaculture. 2(10).

Boyd, C.E. 1989. Electric surface aerators. How much oxygen do they transfer? Aquaculture Today 2(1):23-25.

Schwartz, M. and C.E. Boyd. 1993. Aquaculture pond effluents. Feedstuffs 64(49):11.

Boyd, C.E. 1995. Soil and water quality management in aquaculture ponds. INFOFISH 5/95:29-36.

Boyd, C.E. 1997. Advances in pond aeration technology and practices. INFOFISH 2/97:24-28.

Boyd, C.E. 1997. Shrimp farming and the environment. Aquacultura del Ecuador 18:14-19.

Boyd, C.E. and J.F. Queiroz. 1997. Aquaculture and effluent management. Aquaculture Asia II (2):43-46.

Boyd, C.E. and J.W. Clay. 1998. Shrimp aquaculture and the environment. Scientific American, June 1998, 278(6):42-49.

Boyd, C.E. and L. Massaut. 1998. Soils in pond aquaculture. Aquaculture Asia III (1):6-10.

Boyd, C.E., L. Massaut, and L. Weddig. 1998. Procedures to lessen the environmental impacts of pond aquaculture. INFOFISH 2/98:27-33.

Boyd, C.E. 1999. Environmental codes of practice in aquaculture. Global Aquaculture Advocate 2(4/5):17-18.

Boyd, C.E. 1999. Management of shrimp ponds to reduce the eutrophication potential of effluents. Global Aquaculture Advocate 2(6):12-13.

Boyd, C.E., J. Calderon, and S. Sonnenholzner. 1999. Sugerencias para combatin el WSSV en el Ecuador. Fundacion CENAIM-ESPOL, Guayaquil, Ecuador, El Mundo Acuicola 5(2):19-20.

Boyd, C.E. 2000. Formulating standards for effluent management. Global Aquaculture Advocate 3(1):10-11.

Boyd, C.E. 2000. Case studies of world shrimp farming. Global Aquaculture Advocate 3(2):11-12.

Boyd, C.E. 2000. Water use in aquaculture. Global Aquaculture Advocate 3(3):12-13.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Boyd, C.E. 2000. Farm effluent during draining for harvest. Global Aquaculture Advocate 3(4):26-27.

Boyd, C.E. 2000. Water composition and shrimp pond management. Global Aquaculture Advocate 3(5)40-41

Boyd, C.E. and D. Gautier. 2000. Effluent composition and water quality standards. Global Aquaculture Advocate 3(5):61-66.

Boyd, C.E. and C.S. Tucker. 2000. EPA rule-making for aquaculture effluents in the US. Global Aquaculture Advocate 3(6):81-82.

Massaut, L. S. Sonnenholzner, and C.E. Boyd. 2000. Risks associated with chemicals and other agents used in attempts to control WSSV. Global Aquaculture Advocate 3(3):26-29.

Tookwinas, S., S. Dirakkait, W. Prompoj, C.E. Boyd, and R. Shaw. 2000. Thailand develops code of conduct for shrimp farming. Aquacultue Asia V(1):25-28.

Boyd, C.E. 2001. Site selection, design, and construction for environmentally-responsible aquaculture. Eurofish 1/2001:96-98.

Boyd, C.E. 2001. Water quality standards: pH. Global Aquaculture Advocate 4(1):42-44.

Boyd, C.E. 2001. Water quality standards: total suspended solids. Global Aquaculture Advocate 4(2):70-71.

Boyd, C.E. 2001. Water quality standards: total phosphorus. Global Aquaculture Advocate 4(3)70-71.

Boyd, C.E. 2001. Water quality standards: total ammonia nitrogen. Global Aquaculture Advocate 4(4):84-85.

Boyd, C.E. and C. Jackson. 2001. Effluent water quality report. Global Aquaculture Advocate 4(4):52-53.

Boyd, C.E. 2001. Inland shrimp farming and the environment. Global Aquaculture Advocate 4(4):88-89.

Boyd, C.E. 2001. Water quality standards: biochemical oxygen demand. Global Aquaculture Advocate 4(5):71-72.

Boyd, C.E. 2001. Water quality standards: dissolved oxygen. Global Aquaculture Advocate 4(6): 70-71.

Boyd, C.E. and J. Queiroz 2001. Nitrogen and phosphorus loads by system, USEPA should consider system variables in setting new effluent rules. Global Aquaculture Advocate 4(6): 84-86.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Boyd, C.E. 2002. Specific conductance: alternative salinity measurement. Global Aquaculture Advocate 5(1) 70-71.

Boyd, C.E. 2002. Anion-cation balance: cross-check for reliability of ion analyses. Global Aquaculture Advocate 5(2): 74-75.

Boyd, C.E. 2002. Understanding pond pH. Global Aquaculture Advocate 5(3):74-75.

Boyd, C.E. 2002. Correct liming improves pond water, bottom quality. Global Aquaculture Advocate 5(4):58-59.

Boyd, C.E. 2002. Standardize terminology for low-salinity shrimp culture. Global Aquaculture Advocate 5(5):58-59.

Boyd, C.E. 2002. ACC updates effluent standard. Global Aquaculture Advocate 5(6):10-12.

Boyd, C.E. 2002. Land and water use issues in aquaculture. Global Aquaculture Advocate 5(6):78-79.

Boyd, C.E. 2002. Inland shrimp farming environmental issues, pages 115-117, World Shrimp Farming 2002, Shrimp News International, San Diego, California.

Boyd, C.E., M. Boonyaratpalin, and T. Thunjai. 2002. Properties of liming materials. Aquaculture Asia 7(3):7-8.

Boyd, C.E. and D. Gautier. 2002. Sodium bisulfite treatments improve shrimp appearance but require proper disposal. Global Aquaculture Advocate 5(4):70-71.

Boyd, C.E., J. Queiroz, and R. Wright. 2002. Managing sport fish ponds to lessen nutrient discharge to streams. Wildlife Trends 2(7):13-15.

Boyd, C.E., T. Thunjai, and M. Boonyaratpalin 2002. Dissolved salts in waters for inland, low-salinity shrimp culture. Global Aquaculture Advocate 5(3):40-45.

Sonnenholzner, S., L. Massaut, and C.E. Boyd. 2002. Ecuador study shows wild postlarvae use down. Global Aquaculture Advocate 5(5):56-57.

Tookwinas, S., S. Dirakkait, W. Prompou, C. Boyd, and R. Shaw. 2002. Thailand: Operating guidelines for marine shrimp farms. SEAFDEC Asian Aquaculture 24(1):1-2 and 13-15.

Boyd, C.E. 2003. EPA drafts effluent guidelines for U.S. aquaculture. Global Aquaculture Advocate 6(1):57-58

Boyd, C.E. 2003. Organic matter in pond bottom sediment. Global Aquaculture Advocate 6(2):76-77.

Boyd, C.E. 2003. Applying effluent standards to small-scale farms. Global Aquaculture Advocate


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

6(3):8-10.

Boyd, C.E. 2003. Chemical fertilizers in pond aquaculture. Global Aquaculture Advocate 6(3):74-75.

Boyd, C.E. 2003. Mineral salts correct imbalances in culture water. Global Aquaculture Advocate 6(4):56-57.

Boyd, C.E. 2003. Alternate measurement of biochemical oxygen demand. Global Aquaculture Advocate 6(6):10-11.

Boyd, C.E. 2003. Zeolite ineffective as pond treatment. Global Aquaculture Advocate 6(6):33-34.

Ozbay, G. and C.E. Boyd. 2003. U.S. study finds turbidity useful in TSS, ISS estimates. Global Aquaculture Advocate 6(4):58-60.

Boyd, C.E. 2004. Secchi disk visibility: correct measurement, interpretation. Global Aquaculture Advocate 7(1):66-67.

Boyd, C.E. 2004. Probiotics' enhancement of soil, water quality examined. Global Aquaculture Advocate 7(2):32-33.

Boyd, C.E. 2004. Feeding affects pond water quality. Global Aquaculture Advocate 7(3):29-30.

Boyd, C.E. 2004. Overview: Mechanical pond aeration. Global Aquaculture Advocate 7(4):59-60.

Boyd, C.E. 2004. Sediment microbiology, management. Global Aquaculture Advocate 7(5):56-58.

Boyd, C.E. 2004. Prevention, treatments clear muddy ponds. Global Aquaculture Advocate 7(6):52 and 54.

Boyd, C.E. 2005. $LC_{50}$ calculations help predict toxicity. Global Aquaculture Advocate 8(1):84 and 87.

Boyd, C.E. 2005. Copper treatments control phytoplankton. Global Aquaculture Advocate 8(2):69-70.

Boyd, C.E. 2005. Ground water and wells. Global Aquaculture Advocate 8(3):62-63.

Boyd, C.E. 2005. Estimating water volumes in aquaculture. Global Aquaculture Advocate 8(4):70-71.

Boyd, C.E. 2005. Measuring water flow. Global Aquaculture Advocate 8(5):76-77.

Boyd, C.E. 2005. Feed efficiency indicators for responsible aquaculture. Global Aquaculture Advocate 8(6):73-74.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Boyd, C.E. 2006. Tractor-powered paddlewheels provide emergency pond aeration. Global Aquaculture Advocate 9(1):60-61.

Boyd, C.E. and M. Polioudakis. 2006. Land use for aquaculture production. Global Aquaculture Advocate 9(2):64-65.

Boyd, C.E. 2006. Effluent effects. Global Aquaculture Advocate 9(3):62-63.

Boyd, C.E. 2006. Mechanical water circulation. Global Aquaculture Advocate 9(4):60-61.

Boyd, C.E. 2006. Measuring circulation, mixing in ponds. Global Aquaculture Advocate 9(5):71-72.

Boyd, C.E. 2006. Phytoplankton dynamics in aquaculture ponds. Global Aquaculture Advocate 9(6):67-68.

Silapajarn, O. and C.E. Boyd. 2006. Study identifies maximum holding times for water samples. Global Aquaculture Advocate 9(6):70-71.

Boyd, C.E. 2 007. Sediment, water sampling in aquaculture. Global Aquaculture Advocate 10(1):74-75.

Boyd, C.E. 2007. Total alkalinity, total hardness. Global Aquaculture Advocate 10(2):64-66.

Boyd, C. E. 2007. Nitrification important process in aquaculture. Global Aquaculture Advocate 10(3):64-66.

Boyd, C.E. 2007. Phosphorus: Key to phytoplankton management. Global Aquaculture Advocate 10(4):62 and 64.

Boyd, C.E. 2007. Salinity balance key to culture success. Global Aquaculture Advocate 10(5):78-79.

Boyd, C.E. 2007. Sulfides alter pond pH, can be toxic. Global Aquaculture Advocate 10(6):78-80

Boyd, C.E., O. Decamp, R. Crab, and W. Verstraete. 2007. Improving conditions in shrimp and fish ponds. Aqua Culture AsiaPacific Magazine 3(5):27-28.

Boyd, C.E. 2008. Dissolved oxygen management in aquaculture. Global Aquaculture Advocate 11(1):60-61.

Boyd, C.E. 2008. Nitrogen limiting factor in aquaculture production. Global Aquaculture Advocate 11(2):61-62.

Boyd, C.E. 2008. Iron important to pond water, bottom quality. Global Aquaculture Advocate 11(3):59-60.

Boyd, C.E., M. Polioudakis, and G.N. Whitis. 2008. Direct energy use in channel catfish production. Global Aquaculture Advocate 11(4):48-50.

Barcode: 4546014-02 C-331-806 INV - Investigation

Boyd, C.E. 2008. Carbon dioxide: waste, nutrient. Global Aquaculture Advocate 11(4):62-65.

Boyd, C.E. 2008. Pond bottom soil analyses. Global Aquaculture Advocate 11(5):91-92.

Boyd, C.E. 2008. Chlorine, effective disinfectant in aquaculture. Global Aquaculture Advocate 11(6):52-53.

Boyd, C.E. 2009. Phytoplankton in aquaculture ponds. Global Aquaculture Advocate 12(1):65-66.

Boyd, C.E. 2009. Assessing, reducing pond seepage. Global Aquaculture Advocate 12(2):62-63.

Boyd, C.E. 2009. Calculating chemical treatments for aquaculture production 12(3):52-54.

Boyd, C.E. 2009. Trace metals toxic at high concentrations. Global Aquaculture Advocate 12(4):24-26.

Boyd, C.E. 2009. Carbon:nitrogen ratio management. Global Aquaculture Advocate 12(5):82-84.

Boyd, C.E. 2009. Oxygen demand of aquaculture feeds. Global Aquaculture Advocate 12(6):44-46.

Banerjee, A., G.N. Chattopadhyay, and C.E. Boyd. 2010. Soil system-based approach: A tool for fish pond fertilization. Better Crops with Plant Food 94(1):22-24.

Boyd, C.E. and Terry Hanson. 2010. Dissolved-oxygen concentration in pond aquaculture. Global Aquaculture Advocate 13(1):40-41.

Boyd, C.E. 2010. Aquaculture ponds hold carbon. Global Aquaculture Advocate 13(2):23-24.

Boyd, C.E. 2010. Water temperature in aquaculture. Global Aquaculture Advocate 13(3):32-34.

Boyd, C.E. 2010. Pond fertilization reevaluated. Global Aquaculture Advocate 13(4):26-27.

Boyd, C.E. 2010. Lake, reservoir characteristics affect cage culture potential. Global Aquaculture Advocate 13(5):46-47.

Boyd, C.E. 2010. Cage design, placement affect water quality. Global Aquaculture Advocate 13(6):21-22.

Boyd, C.E. 2011. Erosion, sedimentation in earthen aquaculture ponds. Global Aquaculture Advocate 14(1):33-34.

Boyd, C.E. 2011. Multiple methods for phytoplankton assessment. Global Aquaculture Advocate 14(2):32-33

Boyd, C.E. 2011. Reactions between pond bottom soil, water. Global Aquaculture Advocate


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

14(3):20-22.

Boyd, C.E. 2011. Liming materials for aquaculture. Global Aquaculture Advocate 14(4):12-13.

Boyd, C.E. 2011. Organic matter for pond fertilizer. Global Aquaculture Advocate 14(5):36-38

Boyd, C.E., F. Rajts, and J. Firth. 2011. Sludge management at BAP Pangasius farm cuts TAN, $BOD_5$, TSS in discharges. Global Aquaculture Advocate 14(5):40-42.

Boyd, C.E. 2011. Dissolved-oxygen requirements in aquatic animal respiration. Global Aquaculture Advocate 14(6):22-23.

Boyd, C. E. 2012. Groundwater quality in aquaculture. Global Aquaculture Advocate 15(1):44-45.

Boyd, C.E., C.A. Boyd, and S. Chainark. 2012. From The Shrimp Book, Shrimp pond soil and water quality management. Global Aquaculture Advocate 15(1):28-29.

Boyd, C. E. 2012. Settling basin design, operation. Global Aquaculture Advocate 15(2):18-19.

Boyd, C.E. 2012. Evaporation affected by sunlight, temperature, wind. Global Aquaculture Advocate 15(3):16-17.

Boyd, C.E. 2012. Effective management avoids gas bubble trauma. Global Aquaculture Advocate 15(4):36-37.

Boyd, C.E. 2012. Turbidity removal from pond water. Global Aquaculture Advocate 15(5):50-51.

Boyd, C.E. 2012. Drying, liming, other treatments disinfect pond bottoms. Global Aquaculture Advocate 15(6):32-34.

Boyd, C. E. 2012. Feed input versus dissolved oxygen dynamics in aquaculture systems. INFOFISH International 6/2012:25-29.

Boyd, C.E. 2013. Oxidants enhance water quality. Global Aquaculture Advocate 16(1):34-36.

Boyd, C.E. 2013. On-farm trials test new products, methods. Global Aquaculture Advocate 16(2):22-24.

Le, P. T. and C. E. Boyd. 2013. Accuracy of custom water analyses varies. Global Aquaculture Advocate 16(3):34-36

Boyd, C.E. 2013. Manage pH cycles to maintain animal health. Global Aquaculture Advocate 16(4):28-30.

Boyd, C.E. 2013. Carbon footprint of aquaculture. Global Aquaculture Advocate 16(5):34, 36.

Boyd, C.E. 2013. Ammonia toxicity degrades animal health, growth. Global Aquaculture


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Barcode: 4546014-02 C-331-806 INV - Investigation

Advocate 16(6): 40, 42-43.

Boyd, C.E. 2014. Nitrite toxicity affected by species susceptibility, environmental conditions. Global Aquaculture Advocate 17(1):34, 36-37.

Boyd, C.E. 2014. Hydrogen sulfide toxic, but manageable. Global Aquaculture Advocate 17(2):34 and 36.

Boyd, C.E. and J. F. Queiroz. 2014. The role and management of bottom soils in aquaculture ponds. INFOFISH International 2:22-28.

Boyd, C.E. 2014. Silicon, diatoms in aquaculture. Global Aquaculture Advocate 17(3):38-39.

Boyd, C.E. 2014. Species, pond size define aeration approaches. Global Aquaculture Advocate 17(4):31-33.

Li, L., J.F. Queiroz, and C.E. Boyd. 2014. Pond bottom dry-out, liming, Part 1 – Disinfection in semi-intensive shrimp farms. Global Aquaculture Advocate 17(4):34-35.

Boyd, C.E. 2014. Atmospheric pollution affects water quality. Global Aquaculture Advocate 17(5):57-58.

Boyd, C.E. 2014. Light penetration in water. Global Aquaculture Advocate 17(6):36, 38.

Boyd, C.E. 2015. Copper use in aquaculture. Global Aquaculture Advocate 18(1):38-39.

Boyd, C.E. 2015. Defining ranges for water quality variables presents complex, challenging process. Global Aquaculture Advocate 18(2):23-33.

Boyd, C.E. 2015. Water composition: dissolved inorganic solids. Global Aquaculture Advocate 18(4):30-32.

Boyd, C.E. 2015. Calcium, magnesium use in aquaculture. Global Aquaculture Advocate 18(5):28, 30

Boyd, C.E. 2015. Efficiency of mechanical aeration. Global Aquaculture Advocate 18(6):32-34.

Boyd, C.E. 2015. The nature of pond water. Pond Boss, May/June 24(6):24-26.

Boyd, C.E. 2015. Sportfish pond fertilization. Pond Boss, July/August 25(1):28-29.

Boyd, C.E. 2015. Turbidity removal from ponds. Pond Boss, September/October 25(2):24-25.

Boyd, C.E. 2015. Liming sportfish ponds. Pond Boss, November/December 25(3):22-23.

Boyd, C.E. and A. McNevin. 2015. Embodied resource use in feed-based aquaculture. Global Aquaculture Advocate 18(3):25-27.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Boyd, C.E. 2015. Water composition: Dissolved inorganic solids. Global Aquaculture Advocate 18(4):30-32.

Boyd, C.E. 2015. Calcium, magnesium use in aquaculture. Global Aquaculture Advocate 18(5):28, 30.

Boyd, C.E. 2015. Efficiency of mechanical aeration. Global Aquaculture Advocate 18(6):32-34.

Zhou, L. and C.E. Boyd. 2015. Ammonia nitrogen management in aquaculture ponds. Aquaculture Magazine, October-November, 18-21.

Boyd, C.E. 2016. Decomposition and accumulation of organic matter in ponds. Global Aquaculture Advocate, March 6.

Boyd, C.E. 2016. The importance of water analysis in aquaculture. Global Aquaculture Advocate, April 8.

Boyd, C.E. 2016.Thoughts on improving responsible aquaculture intervention efforts. Global Aquaculture Advocate, May 23.

Boyd, C.E. 2016. The importance of iron in aquaculture systems. Global Aquaculture Advocate, June 17.

Boyd, C.E. 2016. The importance of liming materials in aquaculture. Global Aquaculture Advocate, July 22.

Boyd, C.E. 2016. The complex principles of redox measurement. Global Aquaculture Advocate, September 5.

Boyd, C.E. 2016. What causes alkalinity changes in aquaculture waters? Global Aquaculture Advocate, September 26.

Boyd, C.E. 2016. Reviewing the “near-magical” properties of water. Global Aquaculture Advocate, November 14.

Boyd, C.E. 2016. Inorganic fertilization of production ponds. Global Aquaculture Advocate, December 14.

Boyd, C.E. 2016. Fate of fertilizer nutrients in ponds. Pond Boss, January/February 24(4):22-23.

Boyd, C.E. 2016. Why alkalinity is important. Pond Boss, March/April 24(5):22-23.

Boyd, C.E. 2016. Phytoplankton blooms. Pond Boss, May/June 24(6): 22-23.

Boyd, C.E. 2016. Weather and pond water. Pond Boss, July/August 24(1): 22-23.

Boyd, C.E. 2016. Conductivity of pond waters. Pond Boss, September/October 25(2): 24-25.

Boyd, C.E. 2016. Morphometry of sportfish ponds. Pond Boss, November/December 25(3): 22, 24.

Boyd, C.E and A. McNevin. 2016. Shrimp aquaculture certification: The way forward part 1. Aquaculture Magazine, December/January:67-71.

Boyd, C.E. and A. McNevin. 2016. Shrimp aquaculture certification: The way forward part II. Aquaculture Magazine, February/March:68-70.

Boyd, C.E. 2017. The inevitable pH fluctuations of aquaculture pond water. Global Aquaculture Advocate, January 9.

Sá, M.V.C. and C.E. Boyd. 2017. Testing agricultural limestone in aquaculture ponds. Global Aquaculture Advocate, February 10.

Boyd, C.E. 2017. Does Coriolis force impact aerator placement in aquaculture ponds? Global Aquaculture Advocate, March 8.

Boyd, C.E., S. Chatvijitkul, and D.A. Davis. 2017. Understanding the oxygen demand of aquafeeds. Global Aquaculture Advocate, April 17.

Boyd, C.E. 2017. How decomposition of organic matter impacts aquaculture ponds. Global Aquaculture Advocate, May 8.

Boyd, C.E. 2017. Lime plays crucial role in aquaculture pond management. Global Aquaculture Advocate, July 10.

Boyd, C E. 2017. Phytoplankton and its impact on water quality. Global Aquaculture Advocate, August 21.

Boyd, C.E. 2017. The impact of atmospheric carbon dioxide, alkalinity in freshwater aquaculture. Global Aquaculture Advocate, September 4.

Boyd, C.E. 2017. Electrical conductivity of water, part 1. Global Aquaculture Advocate, October 1.

Boyd, C.E. 2017. Electrical conductivity of water, part 2. Global Aquaculture Advocate, October 6.

Boyd, C.E. 2017. Understanding water quality variables for aquaculture. Global Aquaculture Advocate, November 13, 2017.

Boyd, C.E. 2017. Factors affecting efficiency of commercial fertilizers in aquaculture. Global Aquaculture Advocate, December 11, 2017.

Boyd, C. E. 2017. Pond soil test reports. Pond Boss, January-February 25(4):20, 22.

Boyd, C. E. 2017. The blue-green algae dilemma in fertilized sportfish ponds. Pond Boss, March-April 25(5):20, 22-23.

Boyd, C. E. 2017. The Secchi disk. Pond Boss, May-June 25(6): 24, 26.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Boyd, C. E. 2017. Water analysis reports for sportfish ponds. Pond Boss, July-August 26(1):20, 22.

Boyd, C. E. 2017. Climate change and sportfish ponds. Pond Boss, September-October 26(2):28, 29.

Boyd, C. E. 2017. Do microbial amendments improve water quality in ponds? Pond Boss, November-December 26(3): 20-21.

Boyd, C. E. 2018. What is biodiversity and its relevance to aquaculture certification? Global Aquaculture Advocate, January 15.

Boyd, C. E. 2018. Why water mixing and movement is key in aquaculture systems. Global Aquaculture Advocate, February 19.

Boyd, C. E. 2018. Revisiting ionic imbalance in low-salinity shrimp aquaculture. Global Aquaculture Advocate, March 19.

Boyd, C. E. 2018. Estimating global shrimp pond area. Global Aquaculture Advocate, April 23.

Abdelrahman, H. A. and C. E. Boyd. Effects of mechanical aeration on evaporation rate, water temperature. May 14.

Ranjan A. and C. E. Boyd. 2018. Appraising pond liners for shrimp culture. Global Aquaculture Advocate, May 28.

Boyd, C. E. 2018. Carbon-nitrogen ratios in pond fertilization and biofloc systems. Global Aquaculture Advocate, June 18.

Boyd, C. E. 2018. Constantly changing pH unavoidable, completely normal. Global Aquaculture Advocate, July 23.

Boyd, C. E. 2018. Dissolved oxygen dynamics. Global Aquaculture Advocate, August 20.

Boyd, C. E. 2018. Protein conversion efficiency in aquaculture. Global Aquaculture Advocate, September 24.

Boyd, C. E. 2018. Water temperature in aquaculture. Global Aquaculture Advocate, November 26.

Boyd, C. E. 2019.Nitrogen, phosphorus, eutrophication and effluent standards for aquaculture certification. Global Aquaculture Advocate, January 7.

Boyd, C. E. 2019. Thoughts on pond fertilization. Global Aquaculture Advocate, February 11.

Boyd, C. E. 2019. Shrimp pond preparation crucial for production, disease prevention. Global Aquaculture Advocate, March 25.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

**Book Reviews:**

Boyd, C.E. 1981. Water Chemistry. By Vernon L. Snoeyink and David Jenkins. John Wiley and Sons, New York. 463 p. Transactions of the American Fisheries Society ll0:665-666.

Boyd, C.E. 1990. Environmental Bioassay Techniques and Their Application. By M. Munawar et al. (editors). Kluwer Academic Publishers, Dordrecht, The Netherlands. 680 p. Aquaculture.

Boyd, C.E. 1993. The State of the Marine Environment. By GESAMP, FAO (editors). Blackwell Scientific Publishers, London, UK. 146 p. Aquaculture 114:370-371.

Boyd, C.E. 1993. Fish Ecophysiology. By J. C. Renkin and F. B. Jensen (editors). Chapman and Hall, New York. 42l p. Aquaculture 114:361-362.

Boyd, C.E. 1997. Fundamentals of Aquacultural Engineering. By Thomas B. Lawson. Chapman and Hall, New York. 355 p. The Quarterly Review of Biology 72:97.

Case 1:25-cv-00025-RKE Document 80-1 Filed 04/27/26 Page 435 of 785
Barcode: 4546014-02 C-331-806 INV - Investigation

ALLIANCE™

(https://www.globalseafood.org)

Responsible Seafood ADVOCATE

Innovation & Investment

# After half a century, Auburn's Claude Boyd to 'retire'

21 April 2016

By James Wright

## Fish farming researcher with distinguished career has written more than 100 articles for the *Advocate*

The aquaculture industry has changed dramatically in Claude Boyd's time. The Auburn University professor was already years into researching fish farming and water quality — work he began in the mid-1960s — before he'd even heard the word "aquaculture."

"When I started it was just called fish farming," Boyd told the *Global Aquaculture Advocate*, a publication that has published more than 100 of his articles since its inception in 1998. In fact, of the 102 print editions of the magazine from 1998 to 2015, Boyd's work appeared in all but one.

Prolific researcher and writer Dr. Claude E. Boyd, 76, is officially retiring from Auburn after more than 50 years of studying, researching and teaching aquaculture, most of them at the Alabama institution. He will continue in his role for the next two years to see his five remaining graduate students through the program, so it'll be a "soft" retirement for the hard-working Mississippi native.

"I never did do anything but work. I don't know what else to do," Boyd said in a heavy Southern accent that those who know him best say is one of his trademark features, along with an insatiable thirst for knowledge.

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

Case 1:25-cv-00025-RKE Document 80-1 Filed 04/27/26 Page 436 of 785
Barcode: 4546014-02 C-331-806 INV - Investigation



Dr. Claude E. Boyd, Ph.D.



(https://aquabounty.com/)

Boyd first came to Auburn in 1964 as a graduate student, and began teaching classes in 1971. Other than a three-year stint working at the University of Georgia in the late 1960s, Boyd has been a fixture at the Auburn campus and its School of Fisheries, Aquaculture and Aquatic Sciences for 49 years, when adding up his time as a student, researcher and professor. His colleagues — most of them former students — say he is the world's leading expert on water analysis.

*(Editor's Note: See Dr. Boyd's April 8, 2016 article, "**The importance of water analysis in aquaculture (https://www.aquaculturealliance.org/advocate/the-importance-of-water-analysis-in-aquaculture/)**.")*

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

"Dr. Boyd is a walking encyclopedia for water quality and all things related," said Bill Daniels, associate professor at Auburn. "During our travel to Namibia, he complained about having to find all the references that the publisher wanted for a book chapter he wrote. He had all the information in his head and could recite it but couldn't remember exactly the sources."

***He was a feared, revered, respected, entertaining and extraordinarily effective teacher. And the most prolific researcher in aquaculture.***

Boyd — whose professional resume requires an astounding 54 pages to list the titles of all his published works and other contributions — is "more chalkboard than PowerPoint," Daniels said. He is appreciated by fish farmers everywhere for his ability to translate water quality and water chemistry terms and concepts into words they can understand. Boyd speaks some Thai and Spanish as well.



Dr. Claude E. Boyd, Ph.D.

"Of course, they still have a hard time understanding his accent," Daniels joked. "While Dr. Boyd may be retiring, I seriously doubt he will slow down. He still travels internationally better than most of us."

Ironic, because Boyd initially refused to travel overseas, back when researchers were being regularly deployed by USAID (U.S. Agency for International Development), right out of school, to faraway locations in Asia, Africa and South America.

"I didn't think I knew enough to help anybody," the humble professor said. "So I stayed here for 20 years working on research."

His adventurous side obviously emerged, as Boyd has since made numerous trips to those places and many others to give lectures that, according to his longtime secretary June Burns, "could be quite a challenge for interpreters," due to his strong accent.

Always with an eye on the future, Boyd would like to see the U.S. aquaculture industry grow, and to see more investment into practical, commercially viable work to expand production everywhere.

"We can grow more fish than we can keep alive. We need to spend more time improving production systems instead of just improving the fish," he said. "[Aquaculture is] an essential part of the world food system. I don't see anything that's going to keep it from continuing to grow. But [the U.S. is] a very small segment of world production. There's been a lot of development of techniques here, that've been spread to other parts of the world."

Thanks in no small part to knowledge sharing from people like Dr. Claude E. Boyd.

Craig Tucker, lead researcher at the U.S. Department of Agriculture's Agricultural Research Service (USDA ARS) Warmwater Aquaculture Research Unit in Stoneville, Miss., was Dr. Boyd's first doctoral student back in 1976. The two have worked closely together ever since, having published books and numerous papers.



Dr. Claude E. Boyd, Ph.D.

When Tucker nominated Boyd for the **U.S. Aquaculture Society Distinguished Lifetime Achievement Award** (http://usaquaculture.org/professional-achievement-awards) back in 2009, he wrote that Boyd "stands alone as the universally recognized authority" in water quality and environmental science. Boyd has been honored with too many other awards to mention in this article.

"I recall his teaching method to be frightening, because he was one of the few teachers who made you come to class prepared to think," Tucker wrote in that letter.

"He was a feared, revered, respected, entertaining and extraordinarily effective teacher," Tucker told the *Advocate* upon hearing the news of Boyd's pending retirement. "And the most prolific researcher in aquaculture."

***@GAA_Advocate (https://twitter.com/GAA_Advocate)***

*Editor's Note: The Global Aquaculture Alliance congratulates Dr. Claude Boyd on his outstanding career and thanks him for all of his contributions to the* Advocate *and to the aquaculture industry over the years. Please see links to some of his recently published work below.*

## Author



**JAMES WRIGHT**

Editorial Manager
Global Aquaculture Alliance
Portsmouth, NH, USA

james.wright@gaalliance.org (mailto:james.wright@gaalliance.org)

Copyright © 2023 Global Seafood Alliance

All rights reserved.

# EXHIBIT NSA-11

Barcode: 4546014-02 C-331-806 INV - Investigation

**PUBLIC VERSION**

# 10 Pages

# NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION

# Cancellation of Commercial Lease Contract

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:03 PM, Submission Status: Approved

# Tab 45

# P.R. 318-19

# C.R. 210, 212

Barcode:4546036-01 C-331-806 INV - Investigation -

TRADE PACIFIC

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 337
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been ranged or redacted from pages NSA-8, NSA-9, and NSA-13; and in Exhibits NSA-1, NSA-2, NSA-6 to NSA-7(b), NSA-10(a), and NSA-10(b).

**PUBLIC VERSION**

April 19, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Santa Priscila's New Subsidy Allegations Questionnaire Response

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's March 28, 2024, New Subsidy Allegations ("NSA") questionnaire. This response is timely submitted in accordance with the Department's April 5, 2024, letter, re: "Request for Extension to New Subsidy Allegations Questionnaire Response," which extended the deadline for Santa Priscila's NSA questionnaire response until today. Accompanying this submission are calculation worksheets in Excel® format.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

nature of the information for which Santa Priscila requests proprietary treatment and the basis for the request:

- Production and Distribution Costs: Contained in the exhibits. Protected under 19 C.F.R. §§ 351.105(c)(2) and (3).

- Names of Particular Customers, Distributors, or Suppliers: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Exact Amount of Benefits Applied for or Received: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(8).

- Other Specific Business Information Related to Santa Priscila's Business and Production Operations, Applications and Approval Documents etc., the Release of Which to the Public Would Cause Substantial Harm to Santa Priscila's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to Santa Priscila's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's NSA questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Industrial Pesquera Santa Priscila S.A.*

**COMPANY CERTIFICATION**

I, Diego Puente, Vice President, currently employed by Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), certify that I prepared or otherwise supervised the preparation of the attached submission of the New Subsidy Allegations Questionnaire Response, filed on April 18, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Santa Priscila contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ____________________

Date: April, 18th, 2024

**COMPANY CERTIFICATION**

I, Wolfgang Harten, Special Representative, currently employed by Produmar S.A. ("Produmar"), certify that I prepared or otherwise supervised the preparation of the attached submission of the New Subsidy Allegations Questionnaire Response, filed on April 18, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Produmar contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: April 17, 2024

# Counsel Certification

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Industrial Pesquera Santa Priscila S.A., certify that I have read the attached New Subsidy Allegations Questionaire Response, filed on April 18, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: April 18, 2024

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 19th day of April 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode:4546036-01 C-331-806 INV - Investigation -

**Case No. C-331-806**
**Investigation**
**POI: 1/01/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information has been redacted from pages NSA-8, NSA-9, and NSA-13, and in Exhibits NSA-1, NSA-2, NSA-6 to NSA-7(b), NSA-10(a), and NSA-10(b).**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

# COUNTERVAILING DUTY INVESTIGATION of FROZEN WARMWATER FROM ECUADOR

# RESPONSE OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A. TO THE DEPARTMENT'S MARCH 28, 2024 NEW SUBSIDY ALLEGATION QUESTIONNAIRE

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**Trade Pacific PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: April 19, 2024**

**Counsel to Industrial Pesquera Santa Priscila S.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode:4546036-01 C-331-806 INV - Investigation



**New Subsidy Allegation Questionnaire**

**NOTE:** ***In accordance with section 351.303(e) of Commerce's regulations, "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain Commerce's approval for submission of an English translation fo only portions of a document prior to submission to Commerce."***

**NOTE:** ***Please repeat the question prior to giving your response when responding to this supplemental questionnaire.***

---

**Please respond to the following questions. For more detailed instructions, including the appendices requested below (*i.e.*, questions 1 through 4), refer to the guidelines and instructions included in the initial questionnaire issued on December 12, 2023. Also, refer to the New Subsidy Allegation memorandum for Commerce's analysis of the initiation of the below programs. The mandatory respondents in this investigation are Industrial Pesquera Santa Priscila S.A. (Santa Priscila), Sociedad Nacional de Galápagos C.A. (SONGA). In addition, the Government of Ecuador and certain companies which are cross-owned with Santa Priscila (*i.e.*, Manesil S.A., Produmar S.A., Tropack S.A., Egidiosa S.A.) and SONGA (*i.e.*, Naturisa S.A., Holding Sola & Sola Solacciones S.A., and Empacadora Champmar S.A.) are required to respond completely to the below questions.**

Introduction: This questionnaire is provided on behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") and its cross-owned affiliates, Produmar S.A., Egidiosa S.A., Tropical Packing Ecuador S.A. ("Tropack"), and Manesil S.A.

**A. Less than Adequate Remuneration (LTAR) Programs**

**1. Provision of Fuel to Shrimp Farmers for LTAR**

**Please respond to all questions in the following appendices, as applicable:**

**a. Standard Questions Appendix, and**
**b. Provision of Goods/Services Appendix.**

ANSWER: As requested, Santa Priscila responds below to the Standard Questions and Provision of Goods/Services Appendices for the alleged provision of fuel to shrimp farmers for less than adequate remuneration ("LTAR") program.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode:4546036-01 C-331-806 INV - Investigation


**Provision of Fuel to Shrimp Farmers for LTAR**
***Standard Questions Appendix***

**A. Specify the eligibility criteria your company had to meet in order to receive benefits under this program. State whether eligibility was or is currently contingent on one or more of the following criteria: 1) whether or not your company exports or has increased its exports, 2) the use of domestic rather than imported inputs, 3) the industry to which your company belongs, or 4) the region in which your company is located.**

ANSWER: In order to be eligible to purchase diesel fuel in large quantities through private trading/distribution companies eligible to purchase at the fixed price and then sell to certain consumer categories, including the automotive and other fisheries sectors, established by Executive Decree No. 231, and further modified by Decree Nos. 1158, 724, 462 and 467, Santa Priscila and Produmar each had to submit a request for a permit to the Agency for Regulation and Control of Energy and Non-Renewable Natural Resources ("ARCERNNR") through the Industrial Registry ("*Cadastre Industrial*"). Santa Priscila and Produmar registered with the Industrial registry because companies that purchase 1,200 gallons or more per month, regardless of fuel type, are required to register through the industrial registry maintained by ARCERNNR.

However, Santa Priscila clarifies that the prices regulated through Executive Decree No. 231 were the terminal-gate prices at which the state-owned petroleum company EP Petroecuador sold diesel fuel to the private traders. Those private traders were only permitted to take delivery and sell diesel fuel subject to the fixed price regime to distributors or companies identified in the authorization given by the ARCERNNR as eligible for purchase of diesel fuel subject to fixed pricing decrees. Thus, the price established in Executive Decree No. 231 was not the price at which Santa Priscila and Produmar were eligible to purchase diesel fuel subject to the fixed price regime paid. Rather, these prices reflected the price that the Government of Ecuador ("GOE"), through EP Petroecuador, charged the suppliers when purchasing and picking up the diesel fuel at the terminals to be sold to Santa Priscila and Produmar.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Traders and/or distributors negotiated directly with Santa Priscila and Produmar to determine a final sales price. No law or regulation controlled the price that fuel traders and distributors charged to authorized end users when selling the diesel fuel subject to the fixed pricing regime applicable to the terminal-gate prices. Fuel traders and/or distributors charged a markup on the terminal-gate price to Santa Priscila and Produmar, which was determined based on market forces. Traders/distributors also provided other services, including transportation, related to delivery of diesel fuel to Santa Priscila and Produmar.

Because executive decrees only established a fixed price for fuel traders and distributors selling Diesel 2 and Premium Diesel to the shrimp customer category until November 30 2022, Santa Priscila and Produmar also had to provide additional information when registering with the Industrial Registry. In order to be eligible to purchase diesel fuel within fixed price available to the shrimp consumer segment, Santa Priscila and Produmar also had to: (1) demonstrate that its Single Taxpayer Registry number ("RUC") was registered for an aquaculture activity, (2) present the approved registration from ARCERNNR, and (3) present a ministerial agreement with the Undersecretariat of Aquaculture authorizing it to engage in shrimp farming. Accordingly, the industry in which a company operates was a requirement in order to access the fixed fuel pricing established by executive decree until December 2022. None of the other eligibility criteria stated in the Department's question applies to the fixed price system applicable to Diesel 2 and Premium Diesel Fuel that was in effect until December 2022. Of Santa Priscila's cross-owned affiliates required to respond to the Department's questionnaire, only Santa Priscila and Produmar had authorization to purchase Diesel 2/Premium Diesel fuel from private distribution companies authorized to purchase through the fixed fuel pricing established by executive decree until December 2022.

Once the permit was approved, the supplier used the permit to purchase fuel from Petroecuador for Santa Priscila or Produmar. The price that the supplier paid to Petroecuador was the price that was set in the executive decrees. The price that Santa Priscila and Produmar paid to the supplier was negotiated with the supplier based on the amount of fuel that the companies were purchasing. Please refer to subpart A above for further details on the criteria met to be eligible for the fixed price regime that applied to the shrimp consumer segment until December 1, 2022.

**D. What records does your company keep regarding each of the benefits received under this program? Provide your company's executed application forms and other application documents with respect to this program. Provide copies of the documentation sent to your company upon approval of the benefit, including but not limited to: approval letter, contract, claim form, etc.**

ANSWER: Santa Priscila and Produmar retain copies of the Industrial Registry Authorizations ("*Authorización de Catastre Industrial*") gramted by ARCERNNR. **Exhibits NSA-1** and **NSA-2** contain sample authorizations obtained by Santa Priscila and Produmar, respectively, that were in effect during the POI, with English translations. In addition, Santa Priscila provides sample screenshots from ARCERNNR's SISCOH online system to demonstrate how the requests for authorization are submitted. There is no physical application submitted. Santa Priscila and Produmar also retain invoices issued by each trader and distributor of Diesel 2/Premium Diesel fuel, payment documentation, and accounting records relating to fuel expenses and payments.

**E. Specify how many years your company has received benefits under this program. What was the first year that your company applied for and received benefits? For programs under investigation that were not enacted pursuant to a legal instrument, indicate for how many years your company has participated in the program. For example, for programs involving the provision of inputs for less than adequate remuneration not enacted pursuant to a legal instrument, please indicate how many years your company has purchased the relevant inputs from the government, government-controlled entities such as state-owned enterprises, or other enterprises alleged to be "authorities" under section 771(5)(B) of the Act.**

Barcode:4546036-01 C-331-806 INV - Investigation



**2. Provision of Brackish Water for LTAR**

**Please respond to all questions in the following appendices, as applicable:**

**a. Standard Questions Appendix, and**
**b. Provision of Goods/Services Appendix.**

ANSWER: As requested, Santa Priscila provides the completed appendices below on behalf of Santa Priscila and Produmar. Egidiosa, Tropack, and Manesil did not use any brackish water during the POI.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode:4546036-01 C-331-806 INV - Investigation

PUBLIC VERSION – BPI Has Been Redacted

**Provision of Brackish Water for LTAR**
***Standard Questions Appendix***

**A. Specify the eligibility criteria your company had to meet in order to receive benefits under this program. State whether eligibility was or is currently contingent on one or more of the following criteria: 1) whether or not your company exports or has increased its exports, 2) the use of domestic rather than imported inputs, 3) the industry to which your company belongs, or 4) the region in which your company is located.**

ANSWER: The GOE does not provide brackish water, which is not suited for human consumption or purchased by the GOE and is, therefore, not sold by the public water utilities, to Santa Priscila or Produmar. In Ecuador, the law requires that any entity or individual that is consuming water must pay for that water. However, entities or individuals using water for non-consumptive purposes are not required to pay for this water, regardless of type, so long as they are able to demonstrate that the water is being returned to the source at a similar quality and quantity. Thus, whether a party pays for brackish water in Ecuador is not a matter of the type of water or the user but rather, whether the water is being consumed or not.

Santa Priscila and Produmar do not consume brackish water. Rather, they use brackish water to fill the shrimp ponds where the shrimp are raised. Brackish water is never drawn from the source and retained. Rather, Santa Priscila and Produmar invest heavily in machinery and pay all expenses, including significant fuel expenses, to pump brackish water from an estuary or other source. They likewise incur significant expenses in order to return the same water to the source. The GOE does not provide any brackish water as a good, or any connections or services. The party accessing the brackish water must make all necessary investments to withdraw and return it. In other words, the GOE does not provide brackish water itself, or any pipelines, pumps, hookups, or any services that are part of the provision of fresh water to a business or home for consumption.

Other than Santa Priscila and Produmar, none of the companies cross-owned by Santa Priscila required to respond to the Department's questionnaire accessed brackish water during



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

the POI. In order to do so, Santa Priscila and Produmar were entirely responsible for any necessary infrastructure (e.g., pipes, water pumps) to access the water and all operational costs (e.g., fuel or electricity for water pumps, maintenance of systems). Moreover, were Santa Priscila and Produmar to consume (and not return to its source) the brackish water, they would be required to pay for that water, in addition to bearing the operational costs, just like any other consumptive user of water. In other words, the GOE provides no water, brackish or otherwise, to Santa Priscila or Produmar, and no public water utility or entity monitors Santa Priscila's or Produmar's actual pumping of brackish water.

All laws and regulations governing the use of water apply to all users and no preference is shown to shrimp or aquaculture activities. Accessing this water is not contingent on whether a company exports, uses domestic goods, the industry in which they operate or the location of the firm.

**B. Describe in detail the application and approval process that your company undertook to receive benefits through the program.**

ANSWER: As stated above in response to subpart A, there is no program whereby the GOE provides brackish water to any consumer in Ecuador. Because no such program exists, neither Santa Priscila nor Produmar filed any application or received any approval to pump and return brackish water from sources located in Ecuador. So long as Santa Priscila and Produmar do not consume brackish water in their operations, they are not required to pay or provide any additional information to the GOE.

**C. Specify the criteria your company met to receive the particular amount of assistance provided. Did the application or approval specify the merchandise for which this assistance was to be provided? If yes, provide details of which merchandise was specified in the application and/or approval documents.**

ANSWER: Please refer to Santa Priscila's and Produmar's response to Subpart A above.

There is no program whereby the GOE provides brackish water or any initiatives specifically focused on providing water at preferential rates to any industries, including the aquaculture industry. There is no specific application for accessing brackish water. The fact that the water is productively used to grow shrimp does not render it consumptively used. Accordingly, there is no application that relates to the alleged program.

**D. What records does your company keep regarding each of the benefits received under this program? Provide your company's executed application forms and other application documents with respect to this program. Provide copies of the documentation sent to your company upon approval of the benefit, including but not limited to: approval letter, contract, claim form, etc.**

ANSWER: Not applicable. Because the GOE provides no brackish water to Santa Priscila or Produmar, there are no records of any benefits received. Moreover, they are responsible for making all infrastructure investments and incurring all operational costs related to accessing brackish water. As such, the GOE does not provide any brackish water at a reduced or preferential price to Santa Priscila or Produmar. The water that Santa Priscila and Produmar pumped from their sources is returned to the sources and thus is not consumed. To the extent there are records, they consist of the significant costs that Santa Priscila and Produmar incur to install, maintain and operate the systems that move water from the sources to the farm ponds and back again to the sources. However, neither Santa Priscila nor Produmar purchase brackish water from any supplier. Rather, Santa Priscila and Produmar pump brackish water from public estuaries and other sources, which they return.

**E. Specify how many years your company has received benefits under this program. What was the first year that your company applied for and received benefits? For programs under investigation that were not enacted pursuant to a legal instrument, indicate for how many years your company has participated in the program. For example, for programs involving the provision of inputs for less than adequate remuneration not enacted pursuant to a legal instrument, please indicate how many years your company has purchased the relevant inputs from the government, government-controlled entities such as state-owned enterprises, or other enterprises alleged to be "authorities" under section 771(5)(B) of the Act.**

ANSWER: There is no program whereby the GOE provides brackish water, and, as such, there are no benefits to report. Entities or individuals in Ecuador are not required to pay for non-consumptive use of brackish or fresh water. Brackish water is not an input into the production of shrimp, but rather the medium in which the shrimp are raised. This is no different than dirt on a farm; dirt facilitates growth of crops but dirt does not become part of the crops. Additionally, as discussed above, there is no authority within Ecuador that provides brackish water; any party that wishes to access brackish water must bear all costs related to developing any necessary infrastructure and operational costs.

**F. Indicate where benefits under this program can be found in your accounting system (i.e., specify the ledgers or journals) and financial statements. If you have to file anything with the government to continue receiving benefits under this program, provide a complete translated set of your most recent submissions made during, or before, the POI.**

ANSWER: Because there is no program to provide brackish water at less than adequate remuneration, neither Santa Priscila nor Produmar records pumping brackish water. However, as noted above, Santa Priscila and Produmar incur significant costs to install, maintain and operate its water system. These costs are reflected in Santa Priscila's and Produmar's accounting records. For example, Santa Priscila and Produmar purchase diesel to operate water pumps that move water between the source and the farm ponds. Please refer to Santa Priscila's response to the Standard Questions Appendix for the alleged provision of diesel fuel to shrimp farmers for LTAR program above for the accounts where these diesel fuel expenses are recorded for Santa Priscila and Produmar, respectively.

**G. Has the program been terminated? If yes, please explain. When is the last date that your company could apply for or claim benefits under the program? When is the last date that your company could receive benefits under the program?**

Barcode:4546036-01 C-331-806 INV - Investigation



ANSWER: Not applicable. As stated above, there is no program whereby the GOE provides brackish water to Santa Priscila or Produmar because neither company engages in consumptive use of brackish water. Accordingly, there is no program that could have been terminated.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

**Provision of Brackish Water for LTAR**
***Provision of Goods/Services Appendix***

**Please provide the following information with respect to each of the goods/services alleged to be provided at less than adequate remuneration:**

**A. Provide a general description of the goods/services provided by the government and of the process by which the goods/services are provided.**

ANSWER: The GOE does not provide any brackish water to shrimp farms. Unlike when requesting water service to be consumed at a business or home, Santa Priscila and Produmar bear all investments and costs incurred to pump and return water to the source from which it is drawn. Thus, unlike water utility rates, which are intended to cover costs of extraction and delivery, those costs are borne entirely by Santa Priscila and Produmar.

**B. List all suppliers (domestic and foreign) from which you purchased the good/service in question during the POI. Specify whether any of these suppliers are owned or controlled by the Government of Ecuador.**

ANSWER: Not applicable. Santa Priscila and Produmar do not purchase brackish water from any supplier. Rather, Santa Priscila and Produmar pump brackish water from public estuaries and other sources, which they return. Santa Priscila and Produmar are wholly responsible for all costs related to pumping and returning brackish water to the source from which it is drawn. Santa Priscila or Produmar also provide all infrastructure and incur all operational-related expenses. In other words, the GOE does not provide brackish water to shrimp farms at all.

**C. Explain how the price of the good/service is determined between your company and each of your suppliers.**

ANSWER: Not applicable. Brackish water is not suitable for human consumption and has no market value. Neither Santa Priscila nor Produmar purchases brackish water from any supplier. As discussed above, there are no suppliers of brackish water in Ecuador. Santa Priscila and Produmar are wholly responsible for making the investments and incurring all operational costs

Barcode:4546036-01 C-331-806 INV - Investigation



to access and move the brackish water from the estuary and the shrimp ponds, all of which is returned to the source from which it is drawn.

**D. Provide a listing of all of your purchases of the good/service during the POI. This list should include all purchases in which payment for the purchase was made or due during the POI. Specify the quantity of the purchase, the total amount of the purchase, the date of payment, the characteristics of the product purchased, the delivery terms, and the price per unit (specify unit, *i.e.*, ton, etc.). Segregate the list according to the supplier. In addition to a hard copy, provide an electronic version saved as a Microsoft Excel spreadsheet.**

ANSWER: Neither Santa Priscila nor Produmar purchased any brackish water during the POI. Likewise, neither Santa Priscila nor Produmar consume any brackish water as all water pumped from the source is returned to the source. Therefore, they were not required to pay for the water.

**E. Are there trade publications which specify the prices of the good/service within Ecuador and on the world market? Provide a list of these publications, along with sample pages from these publications listing the prices of the good/service within Ecuador and in world markets during the period of investigation.**

ANSWER: The GOE is wholly responsible for setting water rates within Ecuador. However, because it does not provide brackish water, it has not established any rates specific to the provision of brackish water. Neither Santa Priscila nor Produmar is aware of any commercial market domestically or internationally for non-consumptive use of brackish water that would list prices for brackish water during the POI.

Likewise, there is no price for brackish water within Ecuador or anywhere else. Throughout the world, shrimp farmers do not pay any governmental authority or any private entity for brackish water that is pumped from the source and returned to the source. **Exhibits NSA-11** and **NSA-12** contain declarations from George W. Chamberlain and Claude E. Boyd, world renowned experts on aquaculture practices and water use, which confirm that no



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

government authority or any private entity assesses any fees on the non-consumptive use of brackish water.

# EXHIBIT NSA-6

## Santa Priscila Diesel 2 / Premium Diesel Purchases During Period of Investigation

Diesel Fuel for LTAR

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1 | [ | | | | | | | ] |
| 2 | [ | | | | | | | ] |
| 3 | [ | | | | | | | ] |
| 4 | [ | | | | | | | ] |
| 5 | [ | | | | | | | ] |
| 6 | [ | | | | | | | ] |
| 7 | [ | | | | | | | ] |
| 8 | [ | | | | | | | ] |
| 9 | [ | | | | | | | ] |
| 10 | [ | | | | | | | ] |
| 11 | [ | | | | | | | ] |
| 12 | [ | | | | | | | ] |
| 13 | [ | | | | | | | ] |
| 14 | [ | | | | | | | ] |
| 15 | [ | | | | | | | ] |
| 16 | [ | | | | | | | ] |
| 17 | [ | | | | | | | ] |
| 18 | [ | | | | | | | ] |
| 19 | [ | | | | | | | ] |
| 20 | [ | | | | | | | ] |
| 21 | [ | | | | | | | ] |
| 22 | [ | | | | | | | ] |
| 23 | [ | | | | | | | ] |
| 24 | [ | | | | | | | ] |
| 25 | [ | | | | | | | ] |
| 26 | [ | | | | | | | ] |
| 27 | [ | | | | | | | ] |
| 28 | [ | | | | | | | ] |
| 29 | [ | | | | | | | ] |
| 30 | [ | | | | | | | ] |
| 31 | [ | | | | | | | ] |
| 32 | [ | | | | | | | ] |
| 33 | [ | | | | | | | ] |
| 34 | [ | | | | | | | ] |
| 35 | [ | | | | | | | ] |
| 36 | [ | | | | | | | ] |
| 37 | [ | | | | | | | ] |
| 38 | [ | | | | | | | ] |
| 39 | [ | | | | | | | ] |
| 40 | [ | | | | | | | ] |
| 41 | [ | | | | | | | ] |
| 42 | [ | | | | | | | ] |
| 43 | [ | | | | | | | ] |
| 44 | [ | | | | | | | ] |
| 45 | [ | | | | | | | ] |
| 46 | [ | | | | | | | ] |
| 47 | [ | | | | | | | ] |
| 48 | [ | | | | | | | ] |
| 49 | [ | | | | | | | ] |
| 50 | [ | | | | | | | ] |
| 51 | [ | | | | | | | ] |
| 52 | [ | | | | | | | ] |
| 53 | [ | | | | | | | ] |
| 54 | [ | | | | | | | ] |
| 55 | [ | | | | | | | ] |
| 56 | [ | | | | | | | ] |
| 57 | [ | | | | | | | ] |
| 58 | [ | | | | | | | ] |
| 59 | [ | | | | | | | ] |
| 60 | [ | | | | | | | ] |
| 61 | [ | | | | | | | ] |
| 62 | [ | | | | | | | ] |
| 63 | [ | | | | | | | ] |
| 64 | [ | | | | | | | ] |
| 65 | [ | | | | | | | ] |
| 66 | [ | | | | | | | ] |
| 67 | [ | | | | | | | ] |
| 68 | [ | | | | | | | ] |
| 69 | [ | | | | | | | ] |
| 70 | [ | | | | | | | ] |
| 71 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 72 | [ | | | | | | | ] |
| 73 | [ | | | | | | | ] |
| 74 | [ | | | | | | | ] |
| 75 | [ | | | | | | | ] |
| 76 | [ | | | | | | | ] |
| 77 | [ | | | | | | | ] |
| 78 | [ | | | | | | | ] |
| 79 | [ | | | | | | | ] |
| 80 | [ | | | | | | | ] |
| 81 | [ | | | | | | | ] |
| 82 | [ | | | | | | | ] |
| 83 | [ | | | | | | | ] |
| 84 | [ | | | | | | | ] |
| 85 | [ | | | | | | | ] |
| 86 | [ | | | | | | | ] |
| 87 | [ | | | | | | | ] |
| 88 | [ | | | | | | | ] |
| 89 | [ | | | | | | | ] |
| 90 | [ | | | | | | | ] |
| 91 | [ | | | | | | | ] |
| 92 | [ | | | | | | | ] |
| 93 | [ | | | | | | | ] |
| 94 | [ | | | | | | | ] |
| 95 | [ | | | | | | | ] |
| 96 | [ | | | | | | | ] |
| 97 | [ | | | | | | | ] |
| 98 | [ | | | | | | | ] |
| 99 | [ | | | | | | | ] |
| 100 | [ | | | | | | | ] |
| 101 | [ | | | | | | | ] |
| 102 | [ | | | | | | | ] |
| 103 | [ | | | | | | | ] |
| 104 | [ | | | | | | | ] |
| 105 | [ | | | | | | | ] |
| 106 | [ | | | | | | | ] |
| 107 | [ | | | | | | | ] |
| 108 | [ | | | | | | | ] |
| 109 | [ | | | | | | | ] |
| 110 | [ | | | | | | | ] |
| 111 | [ | | | | | | | ] |
| 112 | [ | | | | | | | ] |
| 113 | [ | | | | | | | ] |
| 114 | [ | | | | | | | ] |
| 115 | [ | | | | | | | ] |
| 116 | [ | | | | | | | ] |
| 117 | [ | | | | | | | ] |
| 118 | [ | | | | | | | ] |
| 119 | [ | | | | | | | ] |
| 120 | [ | | | | | | | ] |
| 121 | [ | | | | | | | ] |
| 122 | [ | | | | | | | ] |
| 123 | [ | | | | | | | ] |
| 124 | [ | | | | | | | ] |
| 125 | [ | | | | | | | ] |
| 126 | [ | | | | | | | ] |
| 127 | [ | | | | | | | ] |
| 128 | [ | | | | | | | ] |
| 129 | [ | | | | | | | ] |
| 130 | [ | | | | | | | ] |
| 131 | [ | | | | | | | ] |
| 132 | [ | | | | | | | ] |
| 133 | [ | | | | | | | ] |
| 134 | [ | | | | | | | ] |
| 135 | [ | | | | | | | ] |
| 136 | [ | | | | | | | ] |
| 137 | [ | | | | | | | ] |
| 138 | [ | | | | | | | ] |
| 139 | [ | | | | | | | ] |
| 140 | [ | | | | | | | ] |
| 141 | [ | | | | | | | ] |
| 142 | [ | | | | | | | ] |
| 143 | [ | | | | | | | ] |
| 144 | [ | | | | | | | ] |
| 145 | [ | | | | | | | ] |
| 146 | [ | | | | | | | ] |

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 147 | [ | | | | | | | ] |
| 148 | [ | | | | | | | ] |
| 149 | [ | | | | | | | ] |
| 150 | [ | | | | | | | ] |
| 151 | [ | | | | | | | ] |
| 152 | [ | | | | | | | ] |
| 153 | [ | | | | | | | ] |
| 154 | [ | | | | | | | ] |
| 155 | [ | | | | | | | ] |
| 156 | [ | | | | | | | ] |
| 157 | [ | | | | | | | ] |
| 158 | [ | | | | | | | ] |
| 159 | [ | | | | | | | ] |
| 160 | [ | | | | | | | ] |
| 161 | [ | | | | | | | ] |
| 162 | [ | | | | | | | ] |
| 163 | [ | | | | | | | ] |
| 164 | [ | | | | | | | ] |
| 165 | [ | | | | | | | ] |
| 166 | [ | | | | | | | ] |
| 167 | [ | | | | | | | ] |
| 168 | [ | | | | | | | ] |
| 169 | [ | | | | | | | ] |
| 170 | [ | | | | | | | ] |
| 171 | [ | | | | | | | ] |
| 172 | [ | | | | | | | ] |
| 173 | [ | | | | | | | ] |
| 174 | [ | | | | | | | ] |
| 175 | [ | | | | | | | ] |
| 176 | [ | | | | | | | ] |
| 177 | [ | | | | | | | ] |
| 178 | [ | | | | | | | ] |
| 179 | [ | | | | | | | ] |
| 180 | [ | | | | | | | ] |
| 181 | [ | | | | | | | ] |
| 182 | [ | | | | | | | ] |
| 183 | [ | | | | | | | ] |
| 184 | [ | | | | | | | ] |
| 185 | [ | | | | | | | ] |
| 186 | [ | | | | | | | ] |
| 187 | [ | | | | | | | ] |
| 188 | [ | | | | | | | ] |
| 189 | [ | | | | | | | ] |
| 190 | [ | | | | | | | ] |
| 191 | [ | | | | | | | ] |
| 192 | [ | | | | | | | ] |
| 193 | [ | | | | | | | ] |
| 194 | [ | | | | | | | ] |
| 195 | [ | | | | | | | ] |
| 196 | [ | | | | | | | ] |
| 197 | [ | | | | | | | ] |
| 198 | [ | | | | | | | ] |
| 199 | [ | | | | | | | ] |
| 200 | [ | | | | | | | ] |
| 201 | [ | | | | | | | ] |
| 202 | [ | | | | | | | ] |
| 203 | [ | | | | | | | ] |
| 204 | [ | | | | | | | ] |
| 205 | [ | | | | | | | ] |
| 206 | [ | | | | | | | ] |
| 207 | [ | | | | | | | ] |
| 208 | [ | | | | | | | ] |
| 209 | [ | | | | | | | ] |
| 210 | [ | | | | | | | ] |
| 211 | [ | | | | | | | ] |
| 212 | [ | | | | | | | ] |
| 213 | [ | | | | | | | ] |
| 214 | [ | | | | | | | ] |
| 215 | [ | | | | | | | ] |
| 216 | [ | | | | | | | ] |
| 217 | [ | | | | | | | ] |
| 218 | [ | | | | | | | ] |
| 219 | [ | | | | | | | ] |
| 220 | [ | | | | | | | ] |
| 221 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

PUBLIC VERSION – BPI Has Been Ranged or Redacted

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 222 | [ | | | | | | | ] |
| 223 | [ | | | | | | | ] |
| 224 | [ | | | | | | | ] |
| 225 | [ | | | | | | | ] |
| 226 | [ | | | | | | | ] |
| 227 | [ | | | | | | | ] |
| 228 | [ | | | | | | | ] |
| 229 | [ | | | | | | | ] |
| 230 | [ | | | | | | | ] |
| 231 | [ | | | | | | | ] |
| 232 | [ | | | | | | | ] |
| 233 | [ | | | | | | | ] |
| 234 | [ | | | | | | | ] |
| 235 | [ | | | | | | | ] |
| 236 | [ | | | | | | | ] |
| 237 | [ | | | | | | | ] |
| 238 | [ | | | | | | | ] |
| 239 | [ | | | | | | | ] |
| 240 | [ | | | | | | | ] |
| 241 | [ | | | | | | | ] |
| 242 | [ | | | | | | | ] |
| 243 | [ | | | | | | | ] |
| 244 | [ | | | | | | | ] |
| 245 | [ | | | | | | | ] |
| 246 | [ | | | | | | | ] |
| 247 | [ | | | | | | | ] |
| 248 | [ | | | | | | | ] |
| 249 | [ | | | | | | | ] |
| 250 | [ | | | | | | | ] |
| 251 | [ | | | | | | | ] |
| 252 | [ | | | | | | | ] |
| 253 | [ | | | | | | | ] |
| 254 | [ | | | | | | | ] |
| 255 | [ | | | | | | | ] |
| 256 | [ | | | | | | | ] |
| 257 | [ | | | | | | | ] |
| 258 | [ | | | | | | | ] |
| 259 | [ | | | | | | | ] |
| 260 | [ | | | | | | | ] |
| 261 | [ | | | | | | | ] |
| 262 | [ | | | | | | | ] |
| 263 | [ | | | | | | | ] |
| 264 | [ | | | | | | | ] |
| 265 | [ | | | | | | | ] |
| 266 | [ | | | | | | | ] |
| 267 | [ | | | | | | | ] |
| 268 | [ | | | | | | | ] |
| 269 | [ | | | | | | | ] |
| 270 | [ | | | | | | | ] |
| 271 | [ | | | | | | | ] |
| 272 | [ | | | | | | | ] |
| 273 | [ | | | | | | | ] |
| 274 | [ | | | | | | | ] |
| 275 | [ | | | | | | | ] |
| 276 | [ | | | | | | | ] |
| 277 | [ | | | | | | | ] |
| 278 | [ | | | | | | | ] |
| 279 | [ | | | | | | | ] |
| 280 | [ | | | | | | | ] |
| 281 | [ | | | | | | | ] |
| 282 | [ | | | | | | | ] |
| 283 | [ | | | | | | | ] |
| 284 | [ | | | | | | | ] |
| 285 | [ | | | | | | | ] |
| 286 | [ | | | | | | | ] |
| 287 | [ | | | | | | | ] |
| 288 | [ | | | | | | | ] |
| 289 | [ | | | | | | | ] |
| 290 | [ | | | | | | | ] |
| 291 | [ | | | | | | | ] |
| 292 | [ | | | | | | | ] |
| 293 | [ | | | | | | | ] |
| 294 | [ | | | | | | | ] |
| 295 | [ | | | | | | | ] |
| 296 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 297 | [ | | | | | | | ] |
| 298 | [ | | | | | | | ] |
| 299 | [ | | | | | | | ] |
| 300 | [ | | | | | | | ] |
| 301 | [ | | | | | | | ] |
| 302 | [ | | | | | | | ] |
| 303 | [ | | | | | | | ] |
| 304 | [ | | | | | | | ] |
| 305 | [ | | | | | | | ] |
| 306 | [ | | | | | | | ] |
| 307 | [ | | | | | | | ] |
| 308 | [ | | | | | | | ] |
| 309 | [ | | | | | | | ] |
| 310 | [ | | | | | | | ] |
| 311 | [ | | | | | | | ] |
| 312 | [ | | | | | | | ] |
| 313 | [ | | | | | | | ] |
| 314 | [ | | | | | | | ] |
| 315 | [ | | | | | | | ] |
| 316 | [ | | | | | | | ] |
| 317 | [ | | | | | | | ] |
| 318 | [ | | | | | | | ] |
| 319 | [ | | | | | | | ] |
| 320 | [ | | | | | | | ] |
| 321 | [ | | | | | | | ] |
| 322 | [ | | | | | | | ] |
| 323 | [ | | | | | | | ] |
| 324 | [ | | | | | | | ] |
| 325 | [ | | | | | | | ] |
| 326 | [ | | | | | | | ] |
| 327 | [ | | | | | | | ] |
| 328 | [ | | | | | | | ] |
| 329 | [ | | | | | | | ] |
| 330 | [ | | | | | | | ] |
| 331 | [ | | | | | | | ] |
| 332 | [ | | | | | | | ] |
| 333 | [ | | | | | | | ] |
| 334 | [ | | | | | | | ] |
| 335 | [ | | | | | | | ] |
| 336 | [ | | | | | | | ] |
| 337 | [ | | | | | | | ] |
| 338 | [ | | | | | | | ] |
| 339 | [ | | | | | | | ] |
| 340 | [ | | | | | | | ] |
| 341 | [ | | | | | | | ] |
| 342 | [ | | | | | | | ] |
| 343 | [ | | | | | | | ] |
| 344 | [ | | | | | | | ] |
| 345 | [ | | | | | | | ] |
| 346 | [ | | | | | | | ] |
| 347 | [ | | | | | | | ] |
| 348 | [ | | | | | | | ] |
| 349 | [ | | | | | | | ] |
| 350 | [ | | | | | | | ] |
| 351 | [ | | | | | | | ] |
| 352 | [ | | | | | | | ] |
| 353 | [ | | | | | | | ] |
| 354 | [ | | | | | | | ] |
| 355 | [ | | | | | | | ] |
| 356 | [ | | | | | | | ] |
| 357 | [ | | | | | | | ] |
| 358 | [ | | | | | | | ] |
| 359 | [ | | | | | | | ] |
| 360 | [ | | | | | | | ] |
| 361 | [ | | | | | | | ] |
| 362 | [ | | | | | | | ] |
| 363 | [ | | | | | | | ] |
| 364 | [ | | | | | | | ] |
| 365 | [ | | | | | | | ] |
| 366 | [ | | | | | | | ] |
| 367 | [ | | | | | | | ] |
| 368 | [ | | | | | | | ] |
| 369 | [ | | | | | | | ] |
| 370 | [ | | | | | | | ] |
| 371 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 372 | [ | | | | | | | ] |
| 373 | [ | | | | | | | ] |
| 374 | [ | | | | | | | ] |
| 375 | [ | | | | | | | ] |
| 376 | [ | | | | | | | ] |
| 377 | [ | | | | | | | ] |
| 378 | [ | | | | | | | ] |
| 379 | [ | | | | | | | ] |
| 380 | [ | | | | | | | ] |
| 381 | [ | | | | | | | ] |
| 382 | [ | | | | | | | ] |
| 383 | [ | | | | | | | ] |
| 384 | [ | | | | | | | ] |
| 385 | [ | | | | | | | ] |
| 386 | [ | | | | | | | ] |
| 387 | [ | | | | | | | ] |
| 388 | [ | | | | | | | ] |
| 389 | [ | | | | | | | ] |
| 390 | [ | | | | | | | ] |
| 391 | [ | | | | | | | ] |
| 392 | [ | | | | | | | ] |
| 393 | [ | | | | | | | ] |
| 394 | [ | | | | | | | ] |
| 395 | [ | | | | | | | ] |
| 396 | [ | | | | | | | ] |
| 397 | [ | | | | | | | ] |
| 398 | [ | | | | | | | ] |
| 399 | [ | | | | | | | ] |
| 400 | [ | | | | | | | ] |
| 401 | [ | | | | | | | ] |
| 402 | [ | | | | | | | ] |
| 403 | [ | | | | | | | ] |
| 404 | [ | | | | | | | ] |
| 405 | [ | | | | | | | ] |
| 406 | [ | | | | | | | ] |
| 407 | [ | | | | | | | ] |
| 408 | [ | | | | | | | ] |
| 409 | [ | | | | | | | ] |
| 410 | [ | | | | | | | ] |
| 411 | [ | | | | | | | ] |
| 412 | [ | | | | | | | ] |
| 413 | [ | | | | | | | ] |
| 414 | [ | | | | | | | ] |
| 415 | [ | | | | | | | ] |
| 416 | [ | | | | | | | ] |
| 417 | [ | | | | | | | ] |
| 418 | [ | | | | | | | ] |
| 419 | [ | | | | | | | ] |
| 420 | [ | | | | | | | ] |
| 421 | [ | | | | | | | ] |
| 422 | [ | | | | | | | ] |
| 423 | [ | | | | | | | ] |
| 424 | [ | | | | | | | ] |
| 425 | [ | | | | | | | ] |
| 426 | [ | | | | | | | ] |
| 427 | [ | | | | | | | ] |
| 428 | [ | | | | | | | ] |
| 429 | [ | | | | | | | ] |
| 430 | [ | | | | | | | ] |
| 431 | [ | | | | | | | ] |
| 432 | [ | | | | | | | ] |
| 433 | [ | | | | | | | ] |
| 434 | [ | | | | | | | ] |
| 435 | [ | | | | | | | ] |
| 436 | [ | | | | | | | ] |
| 437 | [ | | | | | | | ] |
| 438 | [ | | | | | | | ] |
| 439 | [ | | | | | | | ] |
| 440 | [ | | | | | | | ] |
| 441 | [ | | | | | | | ] |
| 442 | [ | | | | | | | ] |
| 443 | [ | | | | | | | ] |
| 444 | [ | | | | | | | ] |
| 445 | [ | | | | | | | ] |
| 446 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 447 | [ | | | | | | | ] |
| 448 | [ | | | | | | | ] |
| 449 | [ | | | | | | | ] |
| 450 | [ | | | | | | | ] |
| 451 | [ | | | | | | | ] |
| 452 | [ | | | | | | | ] |
| 453 | [ | | | | | | | ] |
| 454 | [ | | | | | | | ] |
| 455 | [ | | | | | | | ] |
| 456 | [ | | | | | | | ] |
| 457 | [ | | | | | | | ] |
| 458 | [ | | | | | | | ] |
| 459 | [ | | | | | | | ] |
| 460 | [ | | | | | | | ] |
| 461 | [ | | | | | | | ] |
| 462 | [ | | | | | | | ] |
| 463 | [ | | | | | | | ] |
| 464 | [ | | | | | | | ] |
| 465 | [ | | | | | | | ] |
| 466 | [ | | | | | | | ] |
| 467 | [ | | | | | | | ] |
| 468 | [ | | | | | | | ] |
| 469 | [ | | | | | | | ] |
| 470 | [ | | | | | | | ] |
| 471 | [ | | | | | | | ] |
| 472 | [ | | | | | | | ] |
| 473 | [ | | | | | | | ] |
| 474 | [ | | | | | | | ] |
| 475 | [ | | | | | | | ] |
| 476 | [ | | | | | | | ] |
| 477 | [ | | | | | | | ] |
| 478 | [ | | | | | | | ] |
| 479 | [ | | | | | | | ] |
| 480 | [ | | | | | | | ] |
| 481 | [ | | | | | | | ] |
| 482 | [ | | | | | | | ] |
| 483 | [ | | | | | | | ] |
| 484 | [ | | | | | | | ] |
| 485 | [ | | | | | | | ] |
| 486 | [ | | | | | | | ] |
| 487 | [ | | | | | | | ] |
| 488 | [ | | | | | | | ] |
| 489 | [ | | | | | | | ] |
| 490 | [ | | | | | | | ] |
| 491 | [ | | | | | | | ] |
| 492 | [ | | | | | | | ] |
| 493 | [ | | | | | | | ] |
| 494 | [ | | | | | | | ] |
| 495 | [ | | | | | | | ] |
| 496 | [ | | | | | | | ] |
| 497 | [ | | | | | | | ] |
| 498 | [ | | | | | | | ] |
| 499 | [ | | | | | | | ] |
| 500 | [ | | | | | | | ] |
| 501 | [ | | | | | | | ] |
| 502 | [ | | | | | | | ] |
| 503 | [ | | | | | | | ] |
| 504 | [ | | | | | | | ] |
| 505 | [ | | | | | | | ] |
| 506 | [ | | | | | | | ] |
| 507 | [ | | | | | | | ] |
| 508 | [ | | | | | | | ] |
| 509 | [ | | | | | | | ] |
| 510 | [ | | | | | | | ] |
| 511 | [ | | | | | | | ] |
| 512 | [ | | | | | | | ] |
| 513 | [ | | | | | | | ] |
| 514 | [ | | | | | | | ] |
| 515 | [ | | | | | | | ] |
| 516 | [ | | | | | | | ] |
| 517 | [ | | | | | | | ] |
| 518 | [ | | | | | | | ] |
| 519 | [ | | | | | | | ] |
| 520 | [ | | | | | | | ] |
| 521 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

PUBLIC VERSION – BPI Has Been Ranged or Redacted

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 522 | [ | | | | | | | ] |
| 523 | [ | | | | | | | ] |
| 524 | [ | | | | | | | ] |
| 525 | [ | | | | | | | ] |
| 526 | [ | | | | | | | ] |
| 527 | [ | | | | | | | ] |
| 528 | [ | | | | | | | ] |
| 529 | [ | | | | | | | ] |
| 530 | [ | | | | | | | ] |
| 531 | [ | | | | | | | ] |
| 532 | [ | | | | | | | ] |
| 533 | [ | | | | | | | ] |
| 534 | [ | | | | | | | ] |
| 535 | [ | | | | | | | ] |
| 536 | [ | | | | | | | ] |
| 537 | [ | | | | | | | ] |
| 538 | [ | | | | | | | ] |
| 539 | [ | | | | | | | ] |
| 540 | [ | | | | | | | ] |
| 541 | [ | | | | | | | ] |
| 542 | [ | | | | | | | ] |
| 543 | [ | | | | | | | ] |
| 544 | [ | | | | | | | ] |
| 545 | [ | | | | | | | ] |
| 546 | [ | | | | | | | ] |
| 547 | [ | | | | | | | ] |
| 548 | [ | | | | | | | ] |
| 549 | [ | | | | | | | ] |
| 550 | [ | | | | | | | ] |
| 551 | [ | | | | | | | ] |
| 552 | [ | | | | | | | ] |
| 553 | [ | | | | | | | ] |
| 554 | [ | | | | | | | ] |
| 555 | [ | | | | | | | ] |
| 556 | [ | | | | | | | ] |
| 557 | [ | | | | | | | ] |
| 558 | [ | | | | | | | ] |
| 559 | [ | | | | | | | ] |
| 560 | [ | | | | | | | ] |
| 561 | [ | | | | | | | ] |
| 562 | [ | | | | | | | ] |
| 563 | [ | | | | | | | ] |
| 564 | [ | | | | | | | ] |
| 565 | [ | | | | | | | ] |
| 566 | [ | | | | | | | ] |
| 567 | [ | | | | | | | ] |
| 568 | [ | | | | | | | ] |
| 569 | [ | | | | | | | ] |
| 570 | [ | | | | | | | ] |
| 571 | [ | | | | | | | ] |
| 572 | [ | | | | | | | ] |
| 573 | [ | | | | | | | ] |
| 574 | [ | | | | | | | ] |
| 575 | [ | | | | | | | ] |
| 576 | [ | | | | | | | ] |
| 577 | [ | | | | | | | ] |
| 578 | [ | | | | | | | ] |
| 579 | [ | | | | | | | ] |
| 580 | [ | | | | | | | ] |
| 581 | [ | | | | | | | ] |
| 582 | [ | | | | | | | ] |
| 583 | [ | | | | | | | ] |
| 584 | [ | | | | | | | ] |
| 585 | [ | | | | | | | ] |
| 586 | [ | | | | | | | ] |
| 587 | [ | | | | | | | ] |
| 588 | [ | | | | | | | ] |
| 589 | [ | | | | | | | ] |
| 590 | [ | | | | | | | ] |
| 591 | [ | | | | | | | ] |
| 592 | [ | | | | | | | ] |
| 593 | [ | | | | | | | ] |
| 594 | [ | | | | | | | ] |
| 595 | [ | | | | | | | ] |
| 596 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 597 | [ | | | | | | | ] |
| 598 | [ | | | | | | | ] |
| 599 | [ | | | | | | | ] |
| 600 | [ | | | | | | | ] |
| 601 | [ | | | | | | | ] |
| 602 | [ | | | | | | | ] |
| 603 | [ | | | | | | | ] |
| 604 | [ | | | | | | | ] |
| 605 | [ | | | | | | | ] |
| 606 | [ | | | | | | | ] |
| 607 | [ | | | | | | | ] |
| 608 | [ | | | | | | | ] |
| 609 | [ | | | | | | | ] |
| 610 | [ | | | | | | | ] |
| 611 | [ | | | | | | | ] |
| 612 | [ | | | | | | | ] |
| 613 | [ | | | | | | | ] |
| 614 | [ | | | | | | | ] |
| 615 | [ | | | | | | | ] |
| 616 | [ | | | | | | | ] |
| 617 | [ | | | | | | | ] |
| 618 | [ | | | | | | | ] |
| 619 | [ | | | | | | | ] |
| 620 | [ | | | | | | | ] |
| 621 | [ | | | | | | | ] |
| 622 | [ | | | | | | | ] |
| 623 | [ | | | | | | | ] |
| 624 | [ | | | | | | | ] |
| 625 | [ | | | | | | | ] |
| 626 | [ | | | | | | | ] |
| 627 | [ | | | | | | | ] |
| 628 | [ | | | | | | | ] |
| 629 | [ | | | | | | | ] |
| 630 | [ | | | | | | | ] |
| 631 | [ | | | | | | | ] |
| 632 | [ | | | | | | | ] |
| 633 | [ | | | | | | | ] |
| 634 | [ | | | | | | | ] |
| 635 | [ | | | | | | | ] |
| 636 | [ | | | | | | | ] |
| 637 | [ | | | | | | | ] |
| 638 | [ | | | | | | | ] |
| 639 | [ | | | | | | | ] |
| 640 | [ | | | | | | | ] |
| 641 | [ | | | | | | | ] |
| 642 | [ | | | | | | | ] |
| 643 | [ | | | | | | | ] |
| 644 | [ | | | | | | | ] |
| 645 | [ | | | | | | | ] |
| 646 | [ | | | | | | | ] |
| 647 | [ | | | | | | | ] |
| 648 | [ | | | | | | | ] |
| 649 | [ | | | | | | | ] |
| 650 | [ | | | | | | | ] |
| 651 | [ | | | | | | | ] |
| 652 | [ | | | | | | | ] |
| 653 | [ | | | | | | | ] |
| 654 | [ | | | | | | | ] |
| 655 | [ | | | | | | | ] |
| 656 | [ | | | | | | | ] |
| 657 | [ | | | | | | | ] |
| 658 | [ | | | | | | | ] |
| 659 | [ | | | | | | | ] |
| 660 | [ | | | | | | | ] |
| 661 | [ | | | | | | | ] |
| 662 | [ | | | | | | | ] |
| 663 | [ | | | | | | | ] |
| 664 | [ | | | | | | | ] |
| 665 | [ | | | | | | | ] |
| 666 | [ | | | | | | | ] |
| 667 | [ | | | | | | | ] |
| 668 | [ | | | | | | | ] |
| 669 | [ | | | | | | | ] |
| 670 | [ | | | | | | | ] |
| 671 | [ | | | | | | | ] |

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 672 | [ | | | | | | | ] |
| 673 | [ | | | | | | | ] |
| 674 | [ | | | | | | | ] |
| 675 | [ | | | | | | | ] |
| 676 | [ | | | | | | | ] |
| 677 | [ | | | | | | | ] |
| 678 | [ | | | | | | | ] |
| 679 | [ | | | | | | | ] |
| 680 | [ | | | | | | | ] |
| 681 | [ | | | | | | | ] |
| 682 | [ | | | | | | | ] |
| 683 | [ | | | | | | | ] |
| 684 | [ | | | | | | | ] |
| 685 | [ | | | | | | | ] |
| 686 | [ | | | | | | | ] |
| 687 | [ | | | | | | | ] |
| 688 | [ | | | | | | | ] |
| 689 | [ | | | | | | | ] |
| 690 | [ | | | | | | | ] |
| 691 | [ | | | | | | | ] |
| 692 | [ | | | | | | | ] |
| 693 | [ | | | | | | | ] |
| 694 | [ | | | | | | | ] |
| 695 | [ | | | | | | | ] |
| 696 | [ | | | | | | | ] |
| 697 | [ | | | | | | | ] |
| 698 | [ | | | | | | | ] |
| 699 | [ | | | | | | | ] |
| 700 | [ | | | | | | | ] |
| 701 | [ | | | | | | | ] |
| 702 | [ | | | | | | | ] |
| 703 | [ | | | | | | | ] |
| 704 | [ | | | | | | | ] |
| 705 | [ | | | | | | | ] |
| 706 | [ | | | | | | | ] |
| 707 | [ | | | | | | | ] |
| 708 | [ | | | | | | | ] |
| 709 | [ | | | | | | | ] |
| 710 | [ | | | | | | | ] |
| 711 | [ | | | | | | | ] |
| 712 | [ | | | | | | | ] |
| 713 | [ | | | | | | | ] |
| 714 | [ | | | | | | | ] |
| 715 | [ | | | | | | | ] |
| 716 | [ | | | | | | | ] |
| 717 | [ | | | | | | | ] |
| 718 | [ | | | | | | | ] |
| 719 | [ | | | | | | | ] |
| 720 | [ | | | | | | | ] |
| 721 | [ | | | | | | | ] |
| 722 | [ | | | | | | | ] |
| 723 | [ | | | | | | | ] |
| 724 | [ | | | | | | | ] |
| 725 | [ | | | | | | | ] |
| 726 | [ | | | | | | | ] |
| 727 | [ | | | | | | | ] |
| 728 | [ | | | | | | | ] |
| 729 | [ | | | | | | | ] |
| 730 | [ | | | | | | | ] |
| 731 | [ | | | | | | | ] |
| 732 | [ | | | | | | | ] |
| 733 | [ | | | | | | | ] |
| 734 | [ | | | | | | | ] |
| 735 | [ | | | | | | | ] |
| 736 | [ | | | | | | | ] |
| 737 | [ | | | | | | | ] |
| 738 | [ | | | | | | | ] |
| 739 | [ | | | | | | | ] |
| 740 | [ | | | | | | | ] |
| 741 | [ | | | | | | | ] |
| 742 | [ | | | | | | | ] |
| 743 | [ | | | | | | | ] |
| 744 | [ | | | | | | | ] |
| 745 | [ | | | | | | | ] |
| 746 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 747 | [ | | | | | | | ] |
| 748 | [ | | | | | | | ] |
| 749 | [ | | | | | | | ] |
| 750 | [ | | | | | | | ] |
| 751 | [ | | | | | | | ] |
| 752 | [ | | | | | | | ] |
| 753 | [ | | | | | | | ] |
| 754 | [ | | | | | | | ] |
| 755 | [ | | | | | | | ] |
| 756 | [ | | | | | | | ] |
| 757 | [ | | | | | | | ] |
| 758 | [ | | | | | | | ] |
| 759 | [ | | | | | | | ] |
| 760 | [ | | | | | | | ] |
| 761 | [ | | | | | | | ] |
| 762 | [ | | | | | | | ] |
| 763 | [ | | | | | | | ] |
| 764 | [ | | | | | | | ] |
| 765 | [ | | | | | | | ] |
| 766 | [ | | | | | | | ] |
| 767 | [ | | | | | | | ] |
| 768 | [ | | | | | | | ] |
| 769 | [ | | | | | | | ] |
| 770 | [ | | | | | | | ] |
| 771 | [ | | | | | | | ] |
| 772 | [ | | | | | | | ] |
| 773 | [ | | | | | | | ] |
| 774 | [ | | | | | | | ] |
| 775 | [ | | | | | | | ] |
| 776 | [ | | | | | | | ] |
| 777 | [ | | | | | | | ] |
| 778 | [ | | | | | | | ] |
| 779 | [ | | | | | | | ] |
| 780 | [ | | | | | | | ] |
| 781 | [ | | | | | | | ] |
| 782 | [ | | | | | | | ] |
| 783 | [ | | | | | | | ] |
| 784 | [ | | | | | | | ] |
| 785 | [ | | | | | | | ] |
| 786 | [ | | | | | | | ] |
| 787 | [ | | | | | | | ] |
| 788 | [ | | | | | | | ] |
| 789 | [ | | | | | | | ] |
| 790 | [ | | | | | | | ] |
| 791 | [ | | | | | | | ] |
| 792 | [ | | | | | | | ] |
| 793 | [ | | | | | | | ] |
| 794 | [ | | | | | | | ] |
| 795 | [ | | | | | | | ] |
| 796 | [ | | | | | | | ] |
| 797 | [ | | | | | | | ] |
| 798 | [ | | | | | | | ] |
| 799 | [ | | | | | | | ] |
| 800 | [ | | | | | | | ] |
| 801 | [ | | | | | | | ] |
| 802 | [ | | | | | | | ] |
| 803 | [ | | | | | | | ] |
| 804 | [ | | | | | | | ] |
| 805 | [ | | | | | | | ] |
| 806 | [ | | | | | | | ] |
| 807 | [ | | | | | | | ] |
| 808 | [ | | | | | | | ] |
| 809 | [ | | | | | | | ] |
| 810 | [ | | | | | | | ] |
| 811 | [ | | | | | | | ] |
| 812 | [ | | | | | | | ] |
| 813 | [ | | | | | | | ] |
| 814 | [ | | | | | | | ] |
| 815 | [ | | | | | | | ] |
| 816 | [ | | | | | | | ] |
| 817 | [ | | | | | | | ] |
| 818 | [ | | | | | | | ] |
| 819 | [ | | | | | | | ] |
| 820 | [ | | | | | | | ] |
| 821 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 822 | [ | | | | | | | ] |
| 823 | [ | | | | | | | ] |
| 824 | [ | | | | | | | ] |
| 825 | [ | | | | | | | ] |
| 826 | [ | | | | | | | ] |
| 827 | [ | | | | | | | ] |
| 828 | [ | | | | | | | ] |
| 829 | [ | | | | | | | ] |
| 830 | [ | | | | | | | ] |
| 831 | [ | | | | | | | ] |
| 832 | [ | | | | | | | ] |
| 833 | [ | | | | | | | ] |
| 834 | [ | | | | | | | ] |
| 835 | [ | | | | | | | ] |
| 836 | [ | | | | | | | ] |
| 837 | [ | | | | | | | ] |
| 838 | [ | | | | | | | ] |
| 839 | [ | | | | | | | ] |
| 840 | [ | | | | | | | ] |
| 841 | [ | | | | | | | ] |
| 842 | [ | | | | | | | ] |
| 843 | [ | | | | | | | ] |
| 844 | [ | | | | | | | ] |
| 845 | [ | | | | | | | ] |
| 846 | [ | | | | | | | ] |
| 847 | [ | | | | | | | ] |
| 848 | [ | | | | | | | ] |
| 849 | [ | | | | | | | ] |
| 850 | [ | | | | | | | ] |
| 851 | [ | | | | | | | ] |
| 852 | [ | | | | | | | ] |
| 853 | [ | | | | | | | ] |
| 854 | [ | | | | | | | ] |
| 855 | [ | | | | | | | ] |
| 856 | [ | | | | | | | ] |
| 857 | [ | | | | | | | ] |
| 858 | [ | | | | | | | ] |
| 859 | [ | | | | | | | ] |
| 860 | [ | | | | | | | ] |
| 861 | [ | | | | | | | ] |
| 862 | [ | | | | | | | ] |
| 863 | [ | | | | | | | ] |
| 864 | [ | | | | | | | ] |
| 865 | [ | | | | | | | ] |
| 866 | [ | | | | | | | ] |
| 867 | [ | | | | | | | ] |
| 868 | [ | | | | | | | ] |
| 869 | [ | | | | | | | ] |
| 870 | [ | | | | | | | ] |
| 871 | [ | | | | | | | ] |
| 872 | [ | | | | | | | ] |
| 873 | [ | | | | | | | ] |
| 874 | [ | | | | | | | ] |
| 875 | [ | | | | | | | ] |
| 876 | [ | | | | | | | ] |
| 877 | [ | | | | | | | ] |
| 878 | [ | | | | | | | ] |
| 879 | [ | | | | | | | ] |
| 880 | [ | | | | | | | ] |
| 881 | [ | | | | | | | ] |
| 882 | [ | | | | | | | ] |
| 883 | [ | | | | | | | ] |
| 884 | [ | | | | | | | ] |
| 885 | [ | | | | | | | ] |
| 886 | [ | | | | | | | ] |
| 887 | [ | | | | | | | ] |
| 888 | [ | | | | | | | ] |
| 889 | [ | | | | | | | ] |
| 890 | [ | | | | | | | ] |
| 891 | [ | | | | | | | ] |
| 892 | [ | | | | | | | ] |
| 893 | [ | | | | | | | ] |
| 894 | [ | | | | | | | ] |
| 895 | [ | | | | | | | ] |
| 896 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 897 | [ | | | | | | | ] |
| 898 | [ | | | | | | | ] |
| 899 | [ | | | | | | | ] |
| 900 | [ | | | | | | | ] |
| 901 | [ | | | | | | | ] |
| 902 | [ | | | | | | | ] |
| 903 | [ | | | | | | | ] |
| 904 | [ | | | | | | | ] |
| 905 | [ | | | | | | | ] |
| 906 | [ | | | | | | | ] |
| 907 | [ | | | | | | | ] |
| 908 | [ | | | | | | | ] |
| 909 | [ | | | | | | | ] |
| 910 | [ | | | | | | | ] |
| 911 | [ | | | | | | | ] |
| 912 | [ | | | | | | | ] |
| 913 | [ | | | | | | | ] |
| 914 | [ | | | | | | | ] |
| 915 | [ | | | | | | | ] |
| 916 | [ | | | | | | | ] |
| 917 | [ | | | | | | | ] |
| 918 | [ | | | | | | | ] |
| 919 | [ | | | | | | | ] |
| 920 | [ | | | | | | | ] |
| 921 | [ | | | | | | | ] |
| 922 | [ | | | | | | | ] |
| 923 | [ | | | | | | | ] |
| 924 | [ | | | | | | | ] |
| 925 | [ | | | | | | | ] |
| 926 | [ | | | | | | | ] |
| 927 | [ | | | | | | | ] |
| 928 | [ | | | | | | | ] |
| 929 | [ | | | | | | | ] |
| 930 | [ | | | | | | | ] |
| 931 | [ | | | | | | | ] |
| 932 | [ | | | | | | | ] |
| 933 | [ | | | | | | | ] |
| 934 | [ | | | | | | | ] |
| 935 | [ | | | | | | | ] |
| 936 | [ | | | | | | | ] |
| 937 | [ | | | | | | | ] |
| 938 | [ | | | | | | | ] |
| 939 | [ | | | | | | | ] |
| 940 | [ | | | | | | | ] |
| 941 | [ | | | | | | | ] |
| 942 | [ | | | | | | | ] |
| 943 | [ | | | | | | | ] |
| 944 | [ | | | | | | | ] |
| 945 | [ | | | | | | | ] |
| 946 | [ | | | | | | | ] |
| 947 | [ | | | | | | | ] |
| 948 | [ | | | | | | | ] |
| 949 | [ | | | | | | | ] |
| 950 | [ | | | | | | | ] |
| 951 | [ | | | | | | | ] |
| 952 | [ | | | | | | | ] |
| 953 | [ | | | | | | | ] |
| 954 | [ | | | | | | | ] |
| 955 | [ | | | | | | | ] |
| 956 | [ | | | | | | | ] |
| 957 | [ | | | | | | | ] |
| 958 | [ | | | | | | | ] |
| 959 | [ | | | | | | | ] |
| 960 | [ | | | | | | | ] |
| 961 | [ | | | | | | | ] |
| 962 | [ | | | | | | | ] |
| 963 | [ | | | | | | | ] |
| 964 | [ | | | | | | | ] |
| 965 | [ | | | | | | | ] |
| 966 | [ | | | | | | | ] |
| 967 | [ | | | | | | | ] |
| 968 | [ | | | | | | | ] |
| 969 | [ | | | | | | | ] |
| 970 | [ | | | | | | | ] |
| 971 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 972 | [ | | | | | | | ] |
| 973 | [ | | | | | | | ] |
| 974 | [ | | | | | | | ] |
| 975 | [ | | | | | | | ] |
| 976 | [ | | | | | | | ] |
| 977 | [ | | | | | | | ] |
| 978 | [ | | | | | | | ] |
| 979 | [ | | | | | | | ] |
| 980 | [ | | | | | | | ] |
| 981 | [ | | | | | | | ] |
| 982 | [ | | | | | | | ] |
| 983 | [ | | | | | | | ] |
| 984 | [ | | | | | | | ] |
| 985 | [ | | | | | | | ] |
| 986 | [ | | | | | | | ] |
| 987 | [ | | | | | | | ] |
| 988 | [ | | | | | | | ] |
| 989 | [ | | | | | | | ] |
| 990 | [ | | | | | | | ] |
| 991 | [ | | | | | | | ] |
| 992 | [ | | | | | | | ] |
| 993 | [ | | | | | | | ] |
| 994 | [ | | | | | | | ] |
| 995 | [ | | | | | | | ] |
| 996 | [ | | | | | | | ] |
| 997 | [ | | | | | | | ] |
| 998 | [ | | | | | | | ] |
| 999 | [ | | | | | | | ] |
| 1000 | [ | | | | | | | ] |
| 1001 | [ | | | | | | | ] |
| 1002 | [ | | | | | | | ] |
| 1003 | [ | | | | | | | ] |
| 1004 | [ | | | | | | | ] |
| 1005 | [ | | | | | | | ] |
| 1006 | [ | | | | | | | ] |
| 1007 | [ | | | | | | | ] |
| 1008 | [ | | | | | | | ] |
| 1009 | [ | | | | | | | ] |
| 1010 | [ | | | | | | | ] |
| 1011 | [ | | | | | | | ] |
| 1012 | [ | | | | | | | ] |
| 1013 | [ | | | | | | | ] |
| 1014 | [ | | | | | | | ] |
| 1015 | [ | | | | | | | ] |
| 1016 | [ | | | | | | | ] |
| 1017 | [ | | | | | | | ] |
| 1018 | [ | | | | | | | ] |
| 1019 | [ | | | | | | | ] |
| 1020 | [ | | | | | | | ] |
| 1021 | [ | | | | | | | ] |
| 1022 | [ | | | | | | | ] |
| 1023 | [ | | | | | | | ] |
| 1024 | [ | | | | | | | ] |
| 1025 | [ | | | | | | | ] |
| 1026 | [ | | | | | | | ] |
| 1027 | [ | | | | | | | ] |
| 1028 | [ | | | | | | | ] |
| 1029 | [ | | | | | | | ] |
| 1030 | [ | | | | | | | ] |
| 1031 | [ | | | | | | | ] |
| 1032 | [ | | | | | | | ] |
| 1033 | [ | | | | | | | ] |
| 1034 | [ | | | | | | | ] |
| 1035 | [ | | | | | | | ] |
| 1036 | [ | | | | | | | ] |
| 1037 | [ | | | | | | | ] |
| 1038 | [ | | | | | | | ] |
| 1039 | [ | | | | | | | ] |
| 1040 | [ | | | | | | | ] |
| 1041 | [ | | | | | | | ] |
| 1042 | [ | | | | | | | ] |
| 1043 | [ | | | | | | | ] |
| 1044 | [ | | | | | | | ] |
| 1045 | [ | | | | | | | ] |
| 1046 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1047 | [ | | | | | | | ] |
| 1048 | [ | | | | | | | ] |
| 1049 | [ | | | | | | | ] |
| 1050 | [ | | | | | | | ] |
| 1051 | [ | | | | | | | ] |
| 1052 | [ | | | | | | | ] |
| 1053 | [ | | | | | | | ] |
| 1054 | [ | | | | | | | ] |
| 1055 | [ | | | | | | | ] |
| 1056 | [ | | | | | | | ] |
| 1057 | [ | | | | | | | ] |
| 1058 | [ | | | | | | | ] |
| 1059 | [ | | | | | | | ] |
| 1060 | [ | | | | | | | ] |
| 1061 | [ | | | | | | | ] |
| 1062 | [ | | | | | | | ] |
| 1063 | [ | | | | | | | ] |
| 1064 | [ | | | | | | | ] |
| 1065 | [ | | | | | | | ] |
| 1066 | [ | | | | | | | ] |
| 1067 | [ | | | | | | | ] |
| 1068 | [ | | | | | | | ] |
| 1069 | [ | | | | | | | ] |
| 1070 | [ | | | | | | | ] |
| 1071 | [ | | | | | | | ] |
| 1072 | [ | | | | | | | ] |
| 1073 | [ | | | | | | | ] |
| 1074 | [ | | | | | | | ] |
| 1075 | [ | | | | | | | ] |
| 1076 | [ | | | | | | | ] |
| 1077 | [ | | | | | | | ] |
| 1078 | [ | | | | | | | ] |
| 1079 | [ | | | | | | | ] |
| 1080 | [ | | | | | | | ] |
| 1081 | [ | | | | | | | ] |
| 1082 | [ | | | | | | | ] |
| 1083 | [ | | | | | | | ] |
| 1084 | [ | | | | | | | ] |
| 1085 | [ | | | | | | | ] |
| 1086 | [ | | | | | | | ] |
| 1087 | [ | | | | | | | ] |
| 1088 | [ | | | | | | | ] |
| 1089 | [ | | | | | | | ] |
| 1090 | [ | | | | | | | ] |
| 1091 | [ | | | | | | | ] |
| 1092 | [ | | | | | | | ] |
| 1093 | [ | | | | | | | ] |
| 1094 | [ | | | | | | | ] |
| 1095 | [ | | | | | | | ] |
| 1096 | [ | | | | | | | ] |
| 1097 | [ | | | | | | | ] |
| 1098 | [ | | | | | | | ] |
| 1099 | [ | | | | | | | ] |
| 1100 | [ | | | | | | | ] |
| 1101 | [ | | | | | | | ] |
| 1102 | [ | | | | | | | ] |
| 1103 | [ | | | | | | | ] |
| 1104 | [ | | | | | | | ] |
| 1105 | [ | | | | | | | ] |
| 1106 | [ | | | | | | | ] |
| 1107 | [ | | | | | | | ] |
| 1108 | [ | | | | | | | ] |
| 1109 | [ | | | | | | | ] |
| 1110 | [ | | | | | | | ] |
| 1111 | [ | | | | | | | ] |
| 1112 | [ | | | | | | | ] |
| 1113 | [ | | | | | | | ] |
| 1114 | [ | | | | | | | ] |
| 1115 | [ | | | | | | | ] |
| 1116 | [ | | | | | | | ] |
| 1117 | [ | | | | | | | ] |
| 1118 | [ | | | | | | | ] |
| 1119 | [ | | | | | | | ] |
| 1120 | [ | | | | | | | ] |
| 1121 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1122 | [ | | | | | | | ] |
| 1123 | [ | | | | | | | ] |
| 1124 | [ | | | | | | | ] |
| 1125 | [ | | | | | | | ] |
| 1126 | [ | | | | | | | ] |
| 1127 | [ | | | | | | | ] |
| 1128 | [ | | | | | | | ] |
| 1129 | [ | | | | | | | ] |
| 1130 | [ | | | | | | | ] |
| 1131 | [ | | | | | | | ] |
| 1132 | [ | | | | | | | ] |
| 1133 | [ | | | | | | | ] |
| 1134 | [ | | | | | | | ] |
| 1135 | [ | | | | | | | ] |
| 1136 | [ | | | | | | | ] |
| 1137 | [ | | | | | | | ] |
| 1138 | [ | | | | | | | ] |
| 1139 | [ | | | | | | | ] |
| 1140 | [ | | | | | | | ] |
| 1141 | [ | | | | | | | ] |
| 1142 | [ | | | | | | | ] |
| 1143 | [ | | | | | | | ] |
| 1144 | [ | | | | | | | ] |
| 1145 | [ | | | | | | | ] |
| 1146 | [ | | | | | | | ] |
| 1147 | [ | | | | | | | ] |
| 1148 | [ | | | | | | | ] |
| 1149 | [ | | | | | | | ] |
| 1150 | [ | | | | | | | ] |
| 1151 | [ | | | | | | | ] |
| 1152 | [ | | | | | | | ] |
| 1153 | [ | | | | | | | ] |
| 1154 | [ | | | | | | | ] |
| 1155 | [ | | | | | | | ] |
| 1156 | [ | | | | | | | ] |
| 1157 | [ | | | | | | | ] |
| 1158 | [ | | | | | | | ] |
| 1159 | [ | | | | | | | ] |
| 1160 | [ | | | | | | | ] |
| 1161 | [ | | | | | | | ] |
| 1162 | [ | | | | | | | ] |
| 1163 | [ | | | | | | | ] |
| 1164 | [ | | | | | | | ] |
| 1165 | [ | | | | | | | ] |
| 1166 | [ | | | | | | | ] |
| 1167 | [ | | | | | | | ] |
| 1168 | [ | | | | | | | ] |
| 1169 | [ | | | | | | | ] |
| 1170 | [ | | | | | | | ] |
| 1171 | [ | | | | | | | ] |
| 1172 | [ | | | | | | | ] |
| 1173 | [ | | | | | | | ] |
| 1174 | [ | | | | | | | ] |
| 1175 | [ | | | | | | | ] |
| 1176 | [ | | | | | | | ] |
| 1177 | [ | | | | | | | ] |
| 1178 | [ | | | | | | | ] |
| 1179 | [ | | | | | | | ] |
| 1180 | [ | | | | | | | ] |
| 1181 | [ | | | | | | | ] |
| 1182 | [ | | | | | | | ] |
| 1183 | [ | | | | | | | ] |
| 1184 | [ | | | | | | | ] |
| 1185 | [ | | | | | | | ] |
| 1186 | [ | | | | | | | ] |
| 1187 | [ | | | | | | | ] |
| 1188 | [ | | | | | | | ] |
| 1189 | [ | | | | | | | ] |
| 1190 | [ | | | | | | | ] |
| 1191 | [ | | | | | | | ] |
| 1192 | [ | | | | | | | ] |
| 1193 | [ | | | | | | | ] |
| 1194 | [ | | | | | | | ] |
| 1195 | [ | | | | | | | ] |
| 1196 | [ | | | | | | | ] |

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1197 | [ | | | | | | | ] |
| 1198 | [ | | | | | | | ] |
| 1199 | [ | | | | | | | ] |
| 1200 | [ | | | | | | | ] |
| 1201 | [ | | | | | | | ] |
| 1202 | [ | | | | | | | ] |
| 1203 | [ | | | | | | | ] |
| 1204 | [ | | | | | | | ] |
| 1205 | [ | | | | | | | ] |
| 1206 | [ | | | | | | | ] |
| 1207 | [ | | | | | | | ] |
| 1208 | [ | | | | | | | ] |
| 1209 | [ | | | | | | | ] |
| 1210 | [ | | | | | | | ] |
| 1211 | [ | | | | | | | ] |
| 1212 | [ | | | | | | | ] |
| 1213 | [ | | | | | | | ] |
| 1214 | [ | | | | | | | ] |
| 1215 | [ | | | | | | | ] |
| 1216 | [ | | | | | | | ] |
| 1217 | [ | | | | | | | ] |
| 1218 | [ | | | | | | | ] |
| 1219 | [ | | | | | | | ] |
| 1220 | [ | | | | | | | ] |
| 1221 | [ | | | | | | | ] |
| 1222 | [ | | | | | | | ] |
| 1223 | [ | | | | | | | ] |
| 1224 | [ | | | | | | | ] |
| 1225 | [ | | | | | | | ] |
| 1226 | [ | | | | | | | ] |
| 1227 | [ | | | | | | | ] |
| 1228 | [ | | | | | | | ] |
| 1229 | [ | | | | | | | ] |
| 1230 | [ | | | | | | | ] |
| 1231 | [ | | | | | | | ] |
| 1232 | [ | | | | | | | ] |
| 1233 | [ | | | | | | | ] |
| 1234 | [ | | | | | | | ] |
| 1235 | [ | | | | | | | ] |
| 1236 | [ | | | | | | | ] |
| 1237 | [ | | | | | | | ] |
| 1238 | [ | | | | | | | ] |
| 1239 | [ | | | | | | | ] |
| 1240 | [ | | | | | | | ] |
| 1241 | [ | | | | | | | ] |
| 1242 | [ | | | | | | | ] |
| 1243 | [ | | | | | | | ] |
| 1244 | [ | | | | | | | ] |
| 1245 | [ | | | | | | | ] |
| 1246 | [ | | | | | | | ] |
| 1247 | [ | | | | | | | ] |
| 1248 | [ | | | | | | | ] |
| 1249 | [ | | | | | | | ] |
| 1250 | [ | | | | | | | ] |
| 1251 | [ | | | | | | | ] |
| 1252 | [ | | | | | | | ] |
| 1253 | [ | | | | | | | ] |
| 1254 | [ | | | | | | | ] |
| 1255 | [ | | | | | | | ] |
| 1256 | [ | | | | | | | ] |
| 1257 | [ | | | | | | | ] |
| 1258 | [ | | | | | | | ] |
| 1259 | [ | | | | | | | ] |
| 1260 | [ | | | | | | | ] |
| 1261 | [ | | | | | | | ] |
| 1262 | [ | | | | | | | ] |
| 1263 | [ | | | | | | | ] |
| 1264 | [ | | | | | | | ] |
| 1265 | [ | | | | | | | ] |
| 1266 | [ | | | | | | | ] |
| 1267 | [ | | | | | | | ] |
| 1268 | [ | | | | | | | ] |
| 1269 | [ | | | | | | | ] |
| 1270 | [ | | | | | | | ] |
| 1271 | [ | | | | | | | ] |

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1272 | [ | | | | | | | ] |
| 1273 | [ | | | | | | | ] |
| 1274 | [ | | | | | | | ] |
| 1275 | [ | | | | | | | ] |
| 1276 | [ | | | | | | | ] |
| 1277 | [ | | | | | | | ] |
| 1278 | [ | | | | | | | ] |
| 1279 | [ | | | | | | | ] |
| 1280 | [ | | | | | | | ] |
| 1281 | [ | | | | | | | ] |
| 1282 | [ | | | | | | | ] |
| 1283 | [ | | | | | | | ] |
| 1284 | [ | | | | | | | ] |
| 1285 | [ | | | | | | | ] |
| 1286 | [ | | | | | | | ] |
| 1287 | [ | | | | | | | ] |
| 1288 | [ | | | | | | | ] |
| 1289 | [ | | | | | | | ] |
| 1290 | [ | | | | | | | ] |
| 1291 | [ | | | | | | | ] |
| 1292 | [ | | | | | | | ] |
| 1293 | [ | | | | | | | ] |
| 1294 | [ | | | | | | | ] |
| 1295 | [ | | | | | | | ] |
| 1296 | [ | | | | | | | ] |
| 1297 | [ | | | | | | | ] |
| 1298 | [ | | | | | | | ] |
| 1299 | [ | | | | | | | ] |
| 1300 | [ | | | | | | | ] |
| 1301 | [ | | | | | | | ] |
| 1302 | [ | | | | | | | ] |
| 1303 | [ | | | | | | | ] |
| 1304 | [ | | | | | | | ] |
| 1305 | [ | | | | | | | ] |
| 1306 | [ | | | | | | | ] |
| 1307 | [ | | | | | | | ] |
| 1308 | [ | | | | | | | ] |
| 1309 | [ | | | | | | | ] |
| 1310 | [ | | | | | | | ] |
| 1311 | [ | | | | | | | ] |
| 1312 | [ | | | | | | | ] |
| 1313 | [ | | | | | | | ] |
| 1314 | [ | | | | | | | ] |
| 1315 | [ | | | | | | | ] |
| 1316 | [ | | | | | | | ] |
| 1317 | [ | | | | | | | ] |
| 1318 | [ | | | | | | | ] |
| 1319 | [ | | | | | | | ] |
| 1320 | [ | | | | | | | ] |
| 1321 | [ | | | | | | | ] |
| 1322 | [ | | | | | | | ] |
| 1323 | [ | | | | | | | ] |
| 1324 | [ | | | | | | | ] |
| 1325 | [ | | | | | | | ] |
| 1326 | [ | | | | | | | ] |
| 1327 | [ | | | | | | | ] |
| 1328 | [ | | | | | | | ] |
| 1329 | [ | | | | | | | ] |
| 1330 | [ | | | | | | | ] |
| 1331 | [ | | | | | | | ] |
| 1332 | [ | | | | | | | ] |
| 1333 | [ | | | | | | | ] |
| 1334 | [ | | | | | | | ] |
| 1335 | [ | | | | | | | ] |
| 1336 | [ | | | | | | | ] |
| 1337 | [ | | | | | | | ] |
| 1338 | [ | | | | | | | ] |
| 1339 | [ | | | | | | | ] |
| 1340 | [ | | | | | | | ] |
| 1341 | [ | | | | | | | ] |
| 1342 | [ | | | | | | | ] |
| 1343 | [ | | | | | | | ] |
| 1344 | [ | | | | | | | ] |
| 1345 | [ | | | | | | | ] |
| 1346 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1347 | [ | | | | | | | ] |
| 1348 | [ | | | | | | | ] |
| 1349 | [ | | | | | | | ] |
| 1350 | [ | | | | | | | ] |
| 1351 | [ | | | | | | | ] |
| 1352 | [ | | | | | | | ] |
| 1353 | [ | | | | | | | ] |
| 1354 | [ | | | | | | | ] |
| 1355 | [ | | | | | | | ] |
| 1356 | [ | | | | | | | ] |
| 1357 | [ | | | | | | | ] |
| 1358 | [ | | | | | | | ] |
| 1359 | [ | | | | | | | ] |
| 1360 | [ | | | | | | | ] |
| 1361 | [ | | | | | | | ] |
| 1362 | [ | | | | | | | ] |
| 1363 | [ | | | | | | | ] |
| 1364 | [ | | | | | | | ] |
| 1365 | [ | | | | | | | ] |
| 1366 | [ | | | | | | | ] |
| 1367 | [ | | | | | | | ] |
| 1368 | [ | | | | | | | ] |
| 1369 | [ | | | | | | | ] |
| 1370 | [ | | | | | | | ] |
| 1371 | [ | | | | | | | ] |
| 1372 | [ | | | | | | | ] |
| 1373 | [ | | | | | | | ] |
| 1374 | [ | | | | | | | ] |
| 1375 | [ | | | | | | | ] |
| 1376 | [ | | | | | | | ] |
| 1377 | [ | | | | | | | ] |
| 1378 | [ | | | | | | | ] |
| 1379 | [ | | | | | | | ] |
| 1380 | [ | | | | | | | ] |
| 1381 | [ | | | | | | | ] |
| 1382 | [ | | | | | | | ] |
| 1383 | [ | | | | | | | ] |
| 1384 | [ | | | | | | | ] |
| 1385 | [ | | | | | | | ] |
| 1386 | [ | | | | | | | ] |
| 1387 | [ | | | | | | | ] |
| 1388 | [ | | | | | | | ] |
| 1389 | [ | | | | | | | ] |
| 1390 | [ | | | | | | | ] |
| 1391 | [ | | | | | | | ] |
| 1392 | [ | | | | | | | ] |
| 1393 | [ | | | | | | | ] |
| 1394 | [ | | | | | | | ] |
| 1395 | [ | | | | | | | ] |
| 1396 | [ | | | | | | | ] |
| 1397 | [ | | | | | | | ] |
| 1398 | [ | | | | | | | ] |
| 1399 | [ | | | | | | | ] |
| 1400 | [ | | | | | | | ] |
| 1401 | [ | | | | | | | ] |
| 1402 | [ | | | | | | | ] |
| 1403 | [ | | | | | | | ] |
| 1404 | [ | | | | | | | ] |
| 1405 | [ | | | | | | | ] |
| 1406 | [ | | | | | | | ] |
| 1407 | [ | | | | | | | ] |
| 1408 | [ | | | | | | | ] |
| 1409 | [ | | | | | | | ] |
| 1410 | [ | | | | | | | ] |
| 1411 | [ | | | | | | | ] |
| 1412 | [ | | | | | | | ] |
| 1413 | [ | | | | | | | ] |
| 1414 | [ | | | | | | | ] |
| 1415 | [ | | | | | | | ] |
| 1416 | [ | | | | | | | ] |
| 1417 | [ | | | | | | | ] |
| 1418 | [ | | | | | | | ] |
| 1419 | [ | | | | | | | ] |
| 1420 | [ | | | | | | | ] |
| 1421 | [ | | | | | | | ] |

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1422 | [ | | | | | | | ] |
| 1423 | [ | | | | | | | ] |
| 1424 | [ | | | | | | | ] |
| 1425 | [ | | | | | | | ] |
| 1426 | [ | | | | | | | ] |
| 1427 | [ | | | | | | | ] |
| 1428 | [ | | | | | | | ] |
| 1429 | [ | | | | | | | ] |
| 1430 | [ | | | | | | | ] |
| 1431 | [ | | | | | | | ] |
| 1432 | [ | | | | | | | ] |
| 1433 | [ | | | | | | | ] |
| 1434 | [ | | | | | | | ] |
| 1435 | [ | | | | | | | ] |
| 1436 | [ | | | | | | | ] |
| 1437 | [ | | | | | | | ] |
| 1438 | [ | | | | | | | ] |
| 1439 | [ | | | | | | | ] |
| 1440 | [ | | | | | | | ] |
| 1441 | [ | | | | | | | ] |
| 1442 | [ | | | | | | | ] |
| 1443 | [ | | | | | | | ] |
| 1444 | [ | | | | | | | ] |
| 1445 | [ | | | | | | | ] |
| 1446 | [ | | | | | | | ] |
| 1447 | [ | | | | | | | ] |
| 1448 | [ | | | | | | | ] |
| 1449 | [ | | | | | | | ] |
| 1450 | [ | | | | | | | ] |
| 1451 | [ | | | | | | | ] |
| 1452 | [ | | | | | | | ] |
| 1453 | [ | | | | | | | ] |
| 1454 | [ | | | | | | | ] |
| 1455 | [ | | | | | | | ] |
| 1456 | [ | | | | | | | ] |
| 1457 | [ | | | | | | | ] |
| 1458 | [ | | | | | | | ] |
| 1459 | [ | | | | | | | ] |
| 1460 | [ | | | | | | | ] |
| 1461 | [ | | | | | | | ] |
| 1462 | [ | | | | | | | ] |
| 1463 | [ | | | | | | | ] |
| 1464 | [ | | | | | | | ] |
| 1465 | [ | | | | | | | ] |
| 1466 | [ | | | | | | | ] |
| 1467 | [ | | | | | | | ] |
| 1468 | [ | | | | | | | ] |
| 1469 | [ | | | | | | | ] |
| 1470 | [ | | | | | | | ] |
| 1471 | [ | | | | | | | ] |
| 1472 | [ | | | | | | | ] |
| 1473 | [ | | | | | | | ] |
| 1474 | [ | | | | | | | ] |
| 1475 | [ | | | | | | | ] |
| 1476 | [ | | | | | | | ] |
| 1477 | [ | | | | | | | ] |
| 1478 | [ | | | | | | | ] |
| 1479 | [ | | | | | | | ] |
| 1480 | [ | | | | | | | ] |
| 1481 | [ | | | | | | | ] |
| 1482 | [ | | | | | | | ] |
| 1483 | [ | | | | | | | ] |
| 1484 | [ | | | | | | | ] |
| 1485 | [ | | | | | | | ] |
| 1486 | [ | | | | | | | ] |
| 1487 | [ | | | | | | | ] |
| 1488 | [ | | | | | | | ] |
| 1489 | [ | | | | | | | ] |
| 1490 | [ | | | | | | | ] |
| 1491 | [ | | | | | | | ] |
| 1492 | [ | | | | | | | ] |
| 1493 | [ | | | | | | | ] |
| 1494 | [ | | | | | | | ] |
| 1495 | [ | | | | | | | ] |
| 1496 | [ | | | | | | | ] |

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1497 | [ | | | | | | | ] |
| 1498 | [ | | | | | | | ] |
| 1499 | [ | | | | | | | ] |
| 1500 | [ | | | | | | | ] |
| 1501 | [ | | | | | | | ] |
| 1502 | [ | | | | | | | ] |
| 1503 | [ | | | | | | | ] |
| 1504 | [ | | | | | | | ] |
| 1505 | [ | | | | | | | ] |
| 1506 | [ | | | | | | | ] |
| 1507 | [ | | | | | | | ] |
| 1508 | [ | | | | | | | ] |
| 1509 | [ | | | | | | | ] |
| 1510 | [ | | | | | | | ] |
| 1511 | [ | | | | | | | ] |
| 1512 | [ | | | | | | | ] |
| 1513 | [ | | | | | | | ] |
| 1514 | [ | | | | | | | ] |
| 1515 | [ | | | | | | | ] |
| 1516 | [ | | | | | | | ] |
| 1517 | [ | | | | | | | ] |
| 1518 | [ | | | | | | | ] |
| 1519 | [ | | | | | | | ] |
| 1520 | [ | | | | | | | ] |
| 1521 | [ | | | | | | | ] |
| 1522 | [ | | | | | | | ] |
| 1523 | [ | | | | | | | ] |
| 1524 | [ | | | | | | | ] |
| 1525 | [ | | | | | | | ] |
| 1526 | [ | | | | | | | ] |
| 1527 | [ | | | | | | | ] |
| 1528 | [ | | | | | | | ] |
| 1529 | [ | | | | | | | ] |
| 1530 | [ | | | | | | | ] |
| 1531 | [ | | | | | | | ] |
| 1532 | [ | | | | | | | ] |
| 1533 | [ | | | | | | | ] |
| 1534 | [ | | | | | | | ] |
| 1535 | [ | | | | | | | ] |
| 1536 | [ | | | | | | | ] |
| 1537 | [ | | | | | | | ] |
| 1538 | [ | | | | | | | ] |
| 1539 | [ | | | | | | | ] |
| 1540 | [ | | | | | | | ] |
| 1541 | [ | | | | | | | ] |
| 1542 | [ | | | | | | | ] |
| 1543 | [ | | | | | | | ] |
| 1544 | [ | | | | | | | ] |
| 1545 | [ | | | | | | | ] |
| 1546 | [ | | | | | | | ] |
| 1547 | [ | | | | | | | ] |
| 1548 | [ | | | | | | | ] |
| 1549 | [ | | | | | | | ] |
| 1550 | [ | | | | | | | ] |
| 1551 | [ | | | | | | | ] |
| 1552 | [ | | | | | | | ] |
| 1553 | [ | | | | | | | ] |
| 1554 | [ | | | | | | | ] |
| 1555 | [ | | | | | | | ] |
| 1556 | [ | | | | | | | ] |
| 1557 | [ | | | | | | | ] |
| 1558 | [ | | | | | | | ] |
| 1559 | [ | | | | | | | ] |
| 1560 | [ | | | | | | | ] |
| 1561 | [ | | | | | | | ] |
| 1562 | [ | | | | | | | ] |
| 1563 | [ | | | | | | | ] |
| 1564 | [ | | | | | | | ] |
| 1565 | [ | | | | | | | ] |
| 1566 | [ | | | | | | | ] |
| 1567 | [ | | | | | | | ] |
| 1568 | [ | | | | | | | ] |
| 1569 | [ | | | | | | | ] |
| 1570 | [ | | | | | | | ] |
| 1571 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1572 | [ | | | | | | | ] |
| 1573 | [ | | | | | | | ] |
| 1574 | [ | | | | | | | ] |
| 1575 | [ | | | | | | | ] |
| 1576 | [ | | | | | | | ] |
| 1577 | [ | | | | | | | ] |
| 1578 | [ | | | | | | | ] |
| 1579 | [ | | | | | | | ] |
| 1580 | [ | | | | | | | ] |
| 1581 | [ | | | | | | | ] |
| 1582 | [ | | | | | | | ] |
| 1583 | [ | | | | | | | ] |
| 1584 | [ | | | | | | | ] |
| 1585 | [ | | | | | | | ] |
| 1586 | [ | | | | | | | ] |
| 1587 | [ | | | | | | | ] |
| 1588 | [ | | | | | | | ] |
| 1589 | [ | | | | | | | ] |
| 1590 | [ | | | | | | | ] |
| 1591 | [ | | | | | | | ] |
| 1592 | [ | | | | | | | ] |
| 1593 | [ | | | | | | | ] |
| 1594 | [ | | | | | | | ] |
| 1595 | [ | | | | | | | ] |
| 1596 | [ | | | | | | | ] |
| 1597 | [ | | | | | | | ] |
| 1598 | [ | | | | | | | ] |
| 1599 | [ | | | | | | | ] |
| 1600 | [ | | | | | | | ] |
| 1601 | [ | | | | | | | ] |
| 1602 | [ | | | | | | | ] |
| 1603 | [ | | | | | | | ] |
| 1604 | [ | | | | | | | ] |
| 1605 | [ | | | | | | | ] |
| 1606 | [ | | | | | | | ] |
| 1607 | [ | | | | | | | ] |
| 1608 | [ | | | | | | | ] |
| 1609 | [ | | | | | | | ] |
| 1610 | [ | | | | | | | ] |
| 1611 | [ | | | | | | | ] |
| 1612 | [ | | | | | | | ] |
| 1613 | [ | | | | | | | ] |
| 1614 | [ | | | | | | | ] |
| 1615 | [ | | | | | | | ] |
| 1616 | [ | | | | | | | ] |
| 1617 | [ | | | | | | | ] |
| 1618 | [ | | | | | | | ] |
| 1619 | [ | | | | | | | ] |
| 1620 | [ | | | | | | | ] |
| 1621 | [ | | | | | | | ] |
| 1622 | [ | | | | | | | ] |
| 1623 | [ | | | | | | | ] |
| 1624 | [ | | | | | | | ] |
| 1625 | [ | | | | | | | ] |
| 1626 | [ | | | | | | | ] |
| 1627 | [ | | | | | | | ] |
| 1628 | [ | | | | | | | ] |
| 1629 | [ | | | | | | | ] |
| 1630 | [ | | | | | | | ] |
| 1631 | [ | | | | | | | ] |
| 1632 | [ | | | | | | | ] |
| 1633 | [ | | | | | | | ] |
| 1634 | [ | | | | | | | ] |
| 1635 | [ | | | | | | | ] |
| 1636 | [ | | | | | | | ] |
| 1637 | [ | | | | | | | ] |
| 1638 | [ | | | | | | | ] |
| 1639 | [ | | | | | | | ] |
| 1640 | [ | | | | | | | ] |
| 1641 | [ | | | | | | | ] |
| 1642 | [ | | | | | | | ] |
| 1643 | [ | | | | | | | ] |
| 1644 | [ | | | | | | | ] |
| 1645 | [ | | | | | | | ] |
| 1646 | [ | | | | | | | ] |

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1647 | [ | | | | | | | ] |
| 1648 | [ | | | | | | | ] |
| 1649 | [ | | | | | | | ] |
| 1650 | [ | | | | | | | ] |
| 1651 | [ | | | | | | | ] |
| 1652 | [ | | | | | | | ] |
| 1653 | [ | | | | | | | ] |
| 1654 | [ | | | | | | | ] |
| 1655 | [ | | | | | | | ] |
| 1656 | [ | | | | | | | ] |
| 1657 | [ | | | | | | | ] |
| 1658 | [ | | | | | | | ] |
| 1659 | [ | | | | | | | ] |
| 1660 | [ | | | | | | | ] |
| 1661 | [ | | | | | | | ] |
| 1662 | [ | | | | | | | ] |
| 1663 | [ | | | | | | | ] |
| 1664 | [ | | | | | | | ] |
| 1665 | [ | | | | | | | ] |
| 1666 | [ | | | | | | | ] |
| 1667 | [ | | | | | | | ] |
| 1668 | [ | | | | | | | ] |
| 1669 | [ | | | | | | | ] |
| 1670 | [ | | | | | | | ] |
| 1671 | [ | | | | | | | ] |
| 1672 | [ | | | | | | | ] |
| 1673 | [ | | | | | | | ] |
| 1674 | [ | | | | | | | ] |
| 1675 | [ | | | | | | | ] |
| 1676 | [ | | | | | | | ] |
| 1677 | [ | | | | | | | ] |
| 1678 | [ | | | | | | | ] |
| 1679 | [ | | | | | | | ] |
| 1680 | [ | | | | | | | ] |
| 1681 | [ | | | | | | | ] |
| 1682 | [ | | | | | | | ] |
| 1683 | [ | | | | | | | ] |
| 1684 | [ | | | | | | | ] |
| 1685 | [ | | | | | | | ] |
| 1686 | [ | | | | | | | ] |
| 1687 | [ | | | | | | | ] |
| 1688 | [ | | | | | | | ] |
| 1689 | [ | | | | | | | ] |
| 1690 | [ | | | | | | | ] |
| 1691 | [ | | | | | | | ] |
| 1692 | [ | | | | | | | ] |
| 1693 | [ | | | | | | | ] |
| 1694 | [ | | | | | | | ] |
| 1695 | [ | | | | | | | ] |
| 1696 | [ | | | | | | | ] |
| 1697 | [ | | | | | | | ] |
| 1698 | [ | | | | | | | ] |
| 1699 | [ | | | | | | | ] |
| 1700 | [ | | | | | | | ] |
| 1701 | [ | | | | | | | ] |
| 1702 | [ | | | | | | | ] |
| 1703 | [ | | | | | | | ] |
| 1704 | [ | | | | | | | ] |
| 1705 | [ | | | | | | | ] |
| 1706 | [ | | | | | | | ] |
| 1707 | [ | | | | | | | ] |
| 1708 | [ | | | | | | | ] |
| 1709 | [ | | | | | | | ] |
| 1710 | [ | | | | | | | ] |
| 1711 | [ | | | | | | | ] |
| 1712 | [ | | | | | | | ] |
| 1713 | [ | | | | | | | ] |
| 1714 | [ | | | | | | | ] |
| 1715 | [ | | | | | | | ] |
| 1716 | [ | | | | | | | ] |
| 1717 | [ | | | | | | | ] |
| 1718 | [ | | | | | | | ] |
| 1719 | [ | | | | | | | ] |
| 1720 | [ | | | | | | | ] |
| 1721 | [ | | | | | | | ] |

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1722 | [ | | | | | | | ] |
| 1723 | [ | | | | | | | ] |
| 1724 | [ | | | | | | | ] |
| 1725 | [ | | | | | | | ] |
| 1726 | [ | | | | | | | ] |
| 1727 | [ | | | | | | | ] |
| 1728 | [ | | | | | | | ] |
| 1729 | [ | | | | | | | ] |
| 1730 | [ | | | | | | | ] |
| 1731 | [ | | | | | | | ] |
| 1732 | [ | | | | | | | ] |
| 1733 | [ | | | | | | | ] |
| 1734 | [ | | | | | | | ] |
| 1735 | [ | | | | | | | ] |
| 1736 | [ | | | | | | | ] |
| 1737 | [ | | | | | | | ] |
| 1738 | [ | | | | | | | ] |
| 1739 | [ | | | | | | | ] |
| 1740 | [ | | | | | | | ] |
| 1741 | [ | | | | | | | ] |
| 1742 | [ | | | | | | | ] |
| 1743 | [ | | | | | | | ] |
| 1744 | [ | | | | | | | ] |
| 1745 | [ | | | | | | | ] |
| 1746 | [ | | | | | | | ] |
| 1747 | [ | | | | | | | ] |
| 1748 | [ | | | | | | | ] |
| 1749 | [ | | | | | | | ] |
| 1750 | [ | | | | | | | ] |
| 1751 | [ | | | | | | | ] |
| 1752 | [ | | | | | | | ] |
| 1753 | [ | | | | | | | ] |
| 1754 | [ | | | | | | | ] |
| 1755 | [ | | | | | | | ] |
| 1756 | [ | | | | | | | ] |
| 1757 | [ | | | | | | | ] |
| 1758 | [ | | | | | | | ] |
| 1759 | [ | | | | | | | ] |
| 1760 | [ | | | | | | | ] |
| 1761 | [ | | | | | | | ] |
| 1762 | [ | | | | | | | ] |
| 1763 | [ | | | | | | | ] |
| 1764 | [ | | | | | | | ] |
| 1765 | [ | | | | | | | ] |
| 1766 | [ | | | | | | | ] |
| 1767 | [ | | | | | | | ] |
| 1768 | [ | | | | | | | ] |
| 1769 | [ | | | | | | | ] |
| 1770 | [ | | | | | | | ] |
| 1771 | [ | | | | | | | ] |
| 1772 | [ | | | | | | | ] |
| 1773 | [ | | | | | | | ] |
| 1774 | [ | | | | | | | ] |
| 1775 | [ | | | | | | | ] |
| 1776 | [ | | | | | | | ] |
| 1777 | [ | | | | | | | ] |
| 1778 | [ | | | | | | | ] |
| 1779 | [ | | | | | | | ] |
| 1780 | [ | | | | | | | ] |
| 1781 | [ | | | | | | | ] |
| 1782 | [ | | | | | | | ] |
| 1783 | [ | | | | | | | ] |
| 1784 | [ | | | | | | | ] |
| 1785 | [ | | | | | | | ] |
| 1786 | [ | | | | | | | ] |
| 1787 | [ | | | | | | | ] |
| 1788 | [ | | | | | | | ] |
| 1789 | [ | | | | | | | ] |
| 1790 | [ | | | | | | | ] |
| 1791 | [ | | | | | | | ] |
| 1792 | [ | | | | | | | ] |
| 1793 | [ | | | | | | | ] |
| 1794 | [ | | | | | | | ] |
| 1795 | [ | | | | | | | ] |
| 1796 | [ | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1797 | [ | | | | | | | ] |
| 1798 | [ | | | | | | | ] |
| 1799 | [ | | | | | | | ] |
| 1800 | [ | | | | | | | ] |
| 1801 | [ | | | | | | | ] |
| 1802 | [ | | | | | | | ] |
| 1803 | [ | | | | | | | ] |
| 1804 | [ | | | | | | | ] |
| 1805 | [ | | | | | | | ] |
| 1806 | [ | | | | | | | ] |
| 1807 | [ | | | | | | | ] |
| 1808 | [ | | | | | | | ] |
| 1809 | [ | | | | | | | ] |
| 1810 | [ | | | | | | | ] |
| 1811 | [ | | | | | | | ] |
| 1812 | [ | | | | | | | ] |
| 1813 | [ | | | | | | | ] |
| 1814 | [ | | | | | | | ] |
| 1815 | [ | | | | | | | ] |
| 1816 | [ | | | | | | | ] |
| 1817 | [ | | | | | | | ] |
| 1818 | [ | | | | | | | ] |
| 1819 | [ | | | | | | | ] |
| 1820 | [ | | | | | | | ] |
| 1821 | [ | | | | | | | ] |
| 1822 | [ | | | | | | | ] |
| 1823 | [ | | | | | | | ] |
| 1824 | [ | | | | | | | ] |
| 1825 | [ | | | | | | | ] |
| 1826 | [ | | | | | | | ] |
| 1827 | [ | | | | | | | ] |
| 1828 | [ | | | | | | | ] |
| 1829 | [ | | | | | | | ] |
| 1830 | [ | | | | | | | ] |
| 1831 | [ | | | | | | | ] |
| 1832 | [ | | | | | | | ] |
| 1833 | [ | | | | | | | ] |
| 1834 | [ | | | | | | | ] |
| 1835 | [ | | | | | | | ] |
| 1836 | [ | | | | | | | ] |
| 1837 | [ | | | | | | | ] |
| 1838 | [ | | | | | | | ] |
| 1839 | [ | | | | | | | ] |
| 1840 | [ | | | | | | | ] |
| 1841 | [ | | | | | | | ] |
| 1842 | [ | | | | | | | ] |
| 1843 | [ | | | | | | | ] |
| 1844 | [ | | | | | | | ] |
| 1845 | [ | | | | | | | ] |
| 1846 | [ | | | | | | | ] |
| 1847 | [ | | | | | | | ] |
| 1848 | [ | | | | | | | ] |
| 1849 | [ | | | | | | | ] |
| 1850 | [ | | | | | | | ] |
| 1851 | [ | | | | | | | ] |
| 1852 | [ | | | | | | | ] |
| 1853 | [ | | | | | | | ] |
| 1854 | [ | | | | | | | ] |
| 1855 | [ | | | | | | | ] |
| 1856 | [ | | | | | | | ] |
| 1857 | [ | | | | | | | ] |
| 1858 | [ | | | | | | | ] |
| 1859 | [ | | | | | | | ] |
| 1860 | [ | | | | | | | ] |
| 1861 | [ | | | | | | | ] |
| 1862 | [ | | | | | | | ] |
| 1863 | [ | | | | | | | ] |
| 1864 | [ | | | | | | | ] |
| 1865 | [ | | | | | | | ] |
| 1866 | [ | | | | | | | ] |
| 1867 | [ | | | | | | | ] |
| 1868 | [ | | | | | | | ] |
| 1869 | [ | | | | | | | ] |
| 1870 | [ | | | | | | | ] |
| 1871 | [ | | | | | | | ] |

| Purchase Number (Número de compra) | Month of Purchase (mes de compra) | Cost Center (Centro de Costo) | Invoice Number (Numero de Factura) | Invoice Date (Fecha Factura) | Supplier Name (Nombre del Proveedor) | Supplier Address (Direccion) | Producer Name (Producto) | Producer Address (Direccion Matriz Productor ) |
|---|---|---|---|---|---|---|---|---|
| 1872 | [ | | | | | | | ] |
| 1873 | [ | | | | | | | ] |
| 1874 | [ | | | | | | | ] |
| 1875 | [ | | | | | | | ] |
| 1876 | [ | | | | | | | ] |
| 1877 | [ | | | | | | | ] |
| 1878 | [ | | | | | | | ] |
| 1879 | [ | | | | | | | ] |
| 1880 | [ | | | | | | | ] |
| 1881 | [ | | | | | | | ] |
| 1882 | [ | | | | | | | ] |
| 1883 | [ | | | | | | | ] |
| 1884 | [ | | | | | | | ] |
| 1885 | [ | | | | | | | ] |
| 1886 | [ | | | | | | | ] |
| 1887 | [ | | | | | | | ] |
| 1888 | [ | | | | | | | ] |
| 1889 | [ | | | | | | | ] |
| 1890 | [ | | | | | | | ] |
| 1891 | [ | | | | | | | ] |
| 1892 | [ | | | | | | | ] |
| 1893 | [ | | | | | | | ] |
| 1894 | [ | | | | | | | ] |
| 1895 | [ | | | | | | | ] |
| 1896 | [ | | | | | | | ] |
| 1897 | [ | | | | | | | ] |
| 1898 | [ | | | | | | | ] |
| 1899 | [ | | | | | | | ] |
| 1900 | [ | | | | | | | ] |
| 1901 | [ | | | | | | | ] |
| 1902 | [ | | | | | | | ] |
| 1903 | [ | | | | | | | ] |
| 1904 | [ | | | | | | | ] |
| 1905 | [ | | | | | | | ] |
| 1906 | [ | | | | | | | ] |
| 1907 | [ | | | | | | | ] |
| 1908 | [ | | | | | | | ] |
| 1909 | [ | | | | | | | ] |
| 1910 | [ | | | | | | | ] |
| 1911 | [ | | | | | | | ] |
| 1912 | [ | | | | | | | ] |
| 1913 | [ | | | | | | | ] |
| 1914 | [ | | | | | | | ] |
| 1915 | [ | | | | | | | ] |
| 1916 | [ | | | | | | | ] |
| 1917 | [ | | | | | | | ] |
| 1918 | [ | | | | | | | ] |
| 1919 | [ | | | | | | | ] |
| 1920 | [ | | | | | | | ] |
| 1921 | [ | | | | | | | ] |
| 1922 | [ | | | | | | | ] |
| 1923 | [ | | | | | | | ] |
| 1924 | [ | | | | | | | ] |
| 1925 | [ | | | | | | | ] |
| 1926 | [ | | | | | | | ] |
| 1927 | [ | | | | | | | ] |
| 1928 | [ | | | | | | | ] |
| 1929 | [ | | | | | | | ] |
| 1930 | [ | | | | | | | ] |
| 1931 | [ | | | | | | | ] |
| 1932 | [ | | | | | | | ] |
| 1933 | [ | | | | | | | ] |
| 1934 | [ | | | | | | | ] |
| 1935 | [ | | | | | | | ] |
| 1936 | [ | | | | | | | ] |
| 1937 | [ | | | | | | | ] |
| 1938 | [ | | | | | | | ] |
| 1939 | [ | | | | | | | ] |
| 1940 | [ | | | | | | | ] |

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | [ | | | | | | | | | | | | | ] |
| 2 | [ | | | | | | | | | | | | | ] |
| 3 | [ | | | | | | | | | | | | | ] |
| 4 | [ | | | | | | | | | | | | | ] |
| 5 | [ | | | | | | | | | | | | | ] |
| 6 | [ | | | | | | | | | | | | | ] |
| 7 | [ | | | | | | | | | | | | | ] |
| 8 | [ | | | | | | | | | | | | | ] |
| 9 | [ | | | | | | | | | | | | | ] |
| 10 | [ | | | | | | | | | | | | | ] |
| 11 | [ | | | | | | | | | | | | | ] |
| 12 | [ | | | | | | | | | | | | | ] |
| 13 | [ | | | | | | | | | | | | | ] |
| 14 | [ | | | | | | | | | | | | | ] |
| 15 | [ | | | | | | | | | | | | | ] |
| 16 | [ | | | | | | | | | | | | | ] |
| 17 | [ | | | | | | | | | | | | | ] |
| 18 | [ | | | | | | | | | | | | | ] |
| 19 | [ | | | | | | | | | | | | | ] |
| 20 | [ | | | | | | | | | | | | | ] |
| 21 | [ | | | | | | | | | | | | | ] |
| 22 | [ | | | | | | | | | | | | | ] |
| 23 | [ | | | | | | | | | | | | | ] |
| 24 | [ | | | | | | | | | | | | | ] |
| 25 | [ | | | | | | | | | | | | | ] |
| 26 | [ | | | | | | | | | | | | | ] |
| 27 | [ | | | | | | | | | | | | | ] |
| 28 | [ | | | | | | | | | | | | | ] |
| 29 | [ | | | | | | | | | | | | | ] |
| 30 | [ | | | | | | | | | | | | | ] |
| 31 | [ | | | | | | | | | | | | | ] |
| 32 | [ | | | | | | | | | | | | | ] |
| 33 | [ | | | | | | | | | | | | | ] |
| 34 | [ | | | | | | | | | | | | | ] |
| 35 | [ | | | | | 5,200.00 | | | | | | | | ] |
| 36 | [ | | | | | | | | | | | | | ] |
| 37 | [ | | | | | | | | | | | | | ] |
| 38 | [ | | | | | | | | | | | | | ] |
| 39 | [ | | | | | | | | | | | | | ] |
| 40 | [ | | | | | | | | | | | | | ] |
| 41 | [ | | | | | | | | | | | | | ] |
| 42 | [ | | | | | | | | | | | | | ] |
| 43 | [ | | | | | | | | | | | | | ] |
| 44 | [ | | | | | | | | | | | | | ] |
| 45 | [ | | | | | | | | | | | | | ] |
| 46 | [ | | | | | | | | | | | | | ] |
| 47 | [ | | | | | | | | | | | | | ] |
| 48 | [ | | | | | | | | | | | | | ] |
| 49 | [ | | | | | | | | | | | | | ] |
| 50 | [ | | | | | | | | | | | | | ] |
| 51 | [ | | | | | | | | | | | | | ] |
| 52 | [ | | | | | | | | | | | | | ] |
| 53 | [ | | | | | | | | | | | | | ] |
| 54 | [ | | | | | | | | | | | | | ] |
| 55 | [ | | | | | | | | | | | | | ] |
| 56 | [ | | | | | | | | | | | | | ] |
| 57 | [ | | | | | | | | | | | | | ] |
| 58 | [ | | | | | | | | | | | | | ] |
| 59 | [ | | | | | | | | | | | | | ] |
| 60 | [ | | | | | | | | | | | | | ] |
| 61 | [ | | | | | | | | | | | | | ] |
| 62 | [ | | | | | | | | | | | | | ] |
| 63 | [ | | | | | | | | | | | | | ] |
| 64 | [ | | | | | | | | | | | | | ] |
| 65 | [ | | | | | | | | | | | | | ] |
| 66 | [ | | | | | | | | | | | | | ] |
| 67 | [ | | | | | | | | | | | | | ] |
| 68 | [ | | | | | | | | | | | | | ] |
| 69 | [ | | | | | | | | | | | | | ] |
| 70 | [ | | | | | | | | | | | | | ] |
| 71 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 72 | [ | | | | | | | | | | | | | ] |
| 73 | [ | | | | | | | | | | | | | ] |
| 74 | [ | | | | | | | | | | | | | ] |
| 75 | [ | | | | | | | | | | | | | ] |
| 76 | [ | | | | | | | | | | | | | ] |
| 77 | [ | | | | | | | | | 25,000.00 | | | | ] |
| 78 | [ | | | | | | | | | | | | | ] |
| 79 | [ | | | | | | | | | | | | | ] |
| 80 | [ | | | | | | | | | | | | | ] |
| 81 | [ | | | | | | | | | | | | | ] |
| 82 | [ | | | | | | | | | | | | | ] |
| 83 | [ | | | | | | | | | | | | | ] |
| 84 | [ | | | | | | | | | | | | | ] |
| 85 | [ | | | | | | | | | | | | | ] |
| 86 | [ | | | | | | | | | | | | | ] |
| 87 | [ | | | | | | | | | | | | | ] |
| 88 | [ | | | | | | | | | | | | | ] |
| 89 | [ | | | | | | | | | | | | | ] |
| 90 | [ | | | | | | | | | | | | | ] |
| 91 | [ | | | | | | | | | | | | | ] |
| 92 | [ | | | | | | | | | | | | | ] |
| 93 | [ | | | | | | | | | | | | | ] |
| 94 | [ | | | | | | | | | | | | | ] |
| 95 | [ | | | | | | | | | | | | | ] |
| 96 | [ | | | | | | | | | | | | | ] |
| 97 | [ | | | | | | | | | | | | | ] |
| 98 | [ | | | | | | | | | | | | | ] |
| 99 | [ | | | | | | | | | | | | | ] |
| 100 | [ | | | | | | | | | | | | | ] |
| 101 | [ | | | | | | | | | | | | | ] |
| 102 | [ | | | | | | | | | | | | | ] |
| 103 | [ | | | | | | | | | | | | | ] |
| 104 | [ | | | | | | | | | | | | | ] |
| 105 | [ | | | | | | | | | | | | | ] |
| 106 | [ | | | | | | | | | | | | | ] |
| 107 | [ | | | | | | | | | | | | | ] |
| 108 | [ | | | | | | | | | | | | | ] |
| 109 | [ | | | | | | | | | | | | | ] |
| 110 | [ | | | | | | | | | | | | | ] |
| 111 | [ | | | | | | | | | | | | | ] |
| 112 | [ | | | | | | | | | | | | | ] |
| 113 | [ | | | | | | | | | | | | | ] |
| 114 | [ | | | | | | | | | | | | | ] |
| 115 | [ | | | | | | | | | | | | | ] |
| 116 | [ | | | | | | | | | | | | | ] |
| 117 | [ | | | | | | | | | | | | | ] |
| 118 | [ | | | | | | | | | | | | | ] |
| 119 | [ | | | | | | | | | | | | | ] |
| 120 | [ | | | | | | | | | | | | | ] |
| 121 | [ | | | | | | | | | | | | | ] |
| 122 | [ | | | | | | | | | | | | | ] |
| 123 | [ | | | | | | | | | | | | | ] |
| 124 | [ | | | | | | | | | | | | | ] |
| 125 | [ | | | | | | | | | | | | | ] |
| 126 | [ | | | | | | | | | | | | | ] |
| 127 | [ | | | | | | | | | | | | | ] |
| 128 | [ | | | | | | | | | | | | | ] |
| 129 | [ | | | | | | | | | | | | | ] |
| 130 | [ | | | | | | | | | | | | | ] |
| 131 | [ | | | | | | | | | | | | | ] |
| 132 | [ | | | | | | | | | | | | | ] |
| 133 | [ | | | | | | | | | | | | | ] |
| 134 | [ | | | | | | | | | | | | | ] |
| 135 | [ | | | | | | | | | | | | | ] |
| 136 | [ | | | | | | | | | | | | | ] |
| 137 | [ | | | | | | | | | | | | | ] |
| 138 | [ | | | | | | | | | | | | | ] |
| 139 | [ | | | | | | | | | | | | | ] |
| 140 | [ | | | | | | | | | | | | | ] |
| 141 | [ | | | | | | | | | | | | | ] |
| 142 | [ | | | | | | | | | | | | | ] |
| 143 | [ | | | | | | | | | | | | | ] |
| 144 | [ | | | | | | | | | | | | | ] |
| 145 | [ | | | | | | | | | | | | | ] |
| 146 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 147 | [ | | | | | | | | | | | | | ] |
| 148 | [ | | | | | | | | | | | | | ] |
| 149 | [ | | | | | | | | | | | | | ] |
| 150 | [ | | | | | | | | | | | | | ] |
| 151 | [ | | | | | | | | | | | | | ] |
| 152 | [ | | | | | | | | | 19,000.00 | | | | ] |
| 153 | [ | | | | | | | | | | | | | ] |
| 154 | [ | | | | | | | | | | | | | ] |
| 155 | [ | | | | | | | | | | | | | ] |
| 156 | [ | | | | | | | | | | | | | ] |
| 157 | [ | | | | | | | | | | | | | ] |
| 158 | [ | | | | | | | | | | | | | ] |
| 159 | [ | | | | | | | | | | | | | ] |
| 160 | [ | | | | | | | | | | | | | ] |
| 161 | [ | | | | | | | | | | | | | ] |
| 162 | [ | | | | | | | | | | | | | ] |
| 163 | [ | | | | | | | | | | | | | ] |
| 164 | [ | | | | | | | | | | | | | ] |
| 165 | [ | | | | | | | | | | | | | ] |
| 166 | [ | | | | | | | | | | | | | ] |
| 167 | [ | | | | | | | | | | | | | ] |
| 168 | [ | | | | | | | | | | | | | ] |
| 169 | [ | | | | | | | | | | | | | ] |
| 170 | [ | | | | | | | | | | | | | ] |
| 171 | [ | | | | | | | | | | | | | ] |
| 172 | [ | | | | | | | | | | | | | ] |
| 173 | [ | | | | | | | | | | | | | ] |
| 174 | [ | | | | | | | | | | | | | ] |
| 175 | [ | | | | | | | | | | | | | ] |
| 176 | [ | | | | | | | | | | | | | ] |
| 177 | [ | | | | | | | | | | | | | ] |
| 178 | [ | | | | | | | | | | | | | ] |
| 179 | [ | | | | | | | | | | | | | ] |
| 180 | [ | | | | | | | | | | | | | ] |
| 181 | [ | | | | | | | | | | | | | ] |
| 182 | [ | | | | | | | | | | | | | ] |
| 183 | [ | | | | | | | | | | | | | ] |
| 184 | [ | | | | | | | | | | | | | ] |
| 185 | [ | | | | | | | | | | | | | ] |
| 186 | [ | | | | | | | | | | | | | ] |
| 187 | [ | | | | | | | | | | | | | ] |
| 188 | [ | | | | | | | | | | | | | ] |
| 189 | [ | | | | | | | | | | | | | ] |
| 190 | [ | | | | | | | | | | | | | ] |
| 191 | [ | | | | | | | | | | | | | ] |
| 192 | [ | | | | | | | | | | | | | ] |
| 193 | [ | | | | | | | | | | | | | ] |
| 194 | [ | | | | | | | | | | | | | ] |
| 195 | [ | | | | | | | | | | | | | ] |
| 196 | [ | | | | | | | | | | | | | ] |
| 197 | [ | | | | | | | | | | | | | ] |
| 198 | [ | | | | | | | | | | | | | ] |
| 199 | [ | | | | | | | | | | | | | ] |
| 200 | [ | | | | | | | | | | | | | ] |
| 201 | [ | | | | | | | | | | | | | ] |
| 202 | [ | | | | | | | | | | | | | ] |
| 203 | [ | | | | | | | | | | | | | ] |
| 204 | [ | | | | | | | | | | | | | ] |
| 205 | [ | | | | | | | | | | | | | ] |
| 206 | [ | | | | | | | | | | | | | ] |
| 207 | [ | | | | | | | | | | | | | ] |
| 208 | [ | | | | | | | | | | | | | ] |
| 209 | [ | | | | | | | | | | | | | ] |
| 210 | [ | | | | | | | | | | | | | ] |
| 211 | [ | | | | | | | | | | | | | ] |
| 212 | [ | | | | | | | | | | | | | ] |
| 213 | [ | | | | | | | | | | | | | ] |
| 214 | [ | | | | | | | | | | | | | ] |
| 215 | [ | | | | | | | | | | | | | ] |
| 216 | [ | | | | | | | | | | | | | ] |
| 217 | [ | | | | | | | | | | | | | ] |
| 218 | [ | | | | | | | | | | | | | ] |
| 219 | [ | | | | | | | | | | | | | ] |
| 220 | [ | | | | | | | | | | | | | ] |
| 221 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 222 | [ | | | | | | | | | | | | | ] |
| 223 | [ | | | | | | | | | | | | | ] |
| 224 | [ | | | | | | | | | | | | | ] |
| 225 | [ | | | | | | | | | | | | | ] |
| 226 | [ | | | | | | | | | | | | | ] |
| 227 | [ | | | | | | | | | | | | | ] |
| 228 | [ | | | | | | | | | | | | | ] |
| 229 | [ | | | | | | | | | | | | | ] |
| 230 | [ | | | | | | | | | | | | | ] |
| 231 | [ | | | | | | | | | | | | | ] |
| 232 | [ | | | | | | | | | | | | | ] |
| 233 | [ | | | | | | | | | | | | | ] |
| 234 | [ | | | | | | | | | | | | | ] |
| 235 | [ | | | | | | | | | | | | | ] |
| 236 | [ | | | | | | | | | | | | | ] |
| 237 | [ | | | | | | | | | | | | | ] |
| 238 | [ | | | | | | | | | | | | | ] |
| 239 | [ | | | | | | | | | | | | | ] |
| 240 | [ | | | | | | | | | | | | | ] |
| 241 | [ | | | | | | | | | | | | | ] |
| 242 | [ | | | | | | | | | | | | | ] |
| 243 | [ | | | | | | | | | | | | | ] |
| 244 | [ | | | | | | | | | | | | | ] |
| 245 | [ | | | | | | | | | | | | | ] |
| 246 | [ | | | | | | | | | | | | | ] |
| 247 | [ | | | | | | | | | | | | | ] |
| 248 | [ | | | | | | | | | | | | | ] |
| 249 | [ | | | | | | | | | | | | | ] |
| 250 | [ | | | | | | | | | | | | | ] |
| 251 | [ | | | | | | | | | | | | | ] |
| 252 | [ | | | | | | | | | | | | | ] |
| 253 | [ | | | | | | | | | | | | | ] |
| 254 | [ | | | | | | | | | | | | | ] |
| 255 | [ | | | | | | | | | | | | | ] |
| 256 | [ | | | | | | | | | | | | | ] |
| 257 | [ | | | | | | | | | | | | | ] |
| 258 | [ | | | | | | | | | | | | | ] |
| 259 | [ | | | | | | | | | | | | | ] |
| 260 | [ | | | | | | | | | | | | | ] |
| 261 | [ | | | | | | | | | | | | | ] |
| 262 | [ | | | | | | | | | | | | | ] |
| 263 | [ | | | | | | | | | | | | | ] |
| 264 | [ | | | | | | | | | | | | | ] |
| 265 | [ | | | | | | | | | | | | | ] |
| 266 | [ | | | | | | | | | | | | | ] |
| 267 | [ | | | | | | | | | | | | | ] |
| 268 | [ | | | | | | | | | | | | | ] |
| 269 | [ | | | | | | | | | | | | | ] |
| 270 | [ | | | | | | | | | | | | | ] |
| 271 | [ | | | | | | | | | | | | | ] |
| 272 | [ | | | | | | | | | | | | | ] |
| 273 | [ | | | | | | | | | | | | | ] |
| 274 | [ | | | | | | | | | | | | | ] |
| 275 | [ | | | | | | | | | | | | | ] |
| 276 | [ | | | | | | | | | | | | | ] |
| 277 | [ | | | | | | | | | | | | | ] |
| 278 | [ | | | | | | | | | | | | | ] |
| 279 | [ | | | | | | | | | | | | | ] |
| 280 | [ | | | | | | | | | | | | | ] |
| 281 | [ | | | | | | | | | | | | | ] |
| 282 | [ | | | | | | | | | | | | | ] |
| 283 | [ | | | | | | | | | | | | | ] |
| 284 | [ | | | | | | | | | | | | | ] |
| 285 | [ | | | | | | | | | | | | | ] |
| 286 | [ | | | | | | | | | | | | | ] |
| 287 | [ | | | | | | | | | | | | | ] |
| 288 | [ | | | | | | | | | | | | | ] |
| 289 | [ | | | | | | | | | | | | | ] |
| 290 | [ | | | | | | | | | | | | | ] |
| 291 | [ | | | | | | | | | | | | | ] |
| 292 | [ | | | | | | | | | | | | | ] |
| 293 | [ | | | | | | | | | | | | | ] |
| 294 | [ | | | | | | | | | | | | | ] |
| 295 | [ | | | | | 5,500.00 | | | | | | | | ] |
| 296 | [ | | | | | | | | | | | | | ] |

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 297 | [ | | | | | | | | | | | | | ] |
| 298 | [ | | | | | | | | | | | | | ] |
| 299 | [ | | | | | | | | | | | | | ] |
| 300 | [ | | | | | | | | | | | | | ] |
| 301 | [ | | | | | | | | | | | | | ] |
| 302 | [ | | | | | | | | | | | | | ] |
| 303 | [ | | | | | | | | | | | | | ] |
| 304 | [ | | | | | | | | | | | | | ] |
| 305 | [ | | | | | | | | | | | | | ] |
| 306 | [ | | | | | | | | | | | | | ] |
| 307 | [ | | | | | | | | | | | | | ] |
| 308 | [ | | | | | | | | | | | | | ] |
| 309 | [ | | | | | | | | | | | | | ] |
| 310 | [ | | | | | | | | | | | | | ] |
| 311 | [ | | | | | | | | | | | | | ] |
| 312 | [ | | | | | | | | | | | | | ] |
| 313 | [ | | | | | | | | | | | | | ] |
| 314 | [ | | | | | | | | | | | | | ] |
| 315 | [ | | | | | | | | | | | | | ] |
| 316 | [ | | | | | | | | | | | | | ] |
| 317 | [ | | | | | | | | | | | | | ] |
| 318 | [ | | | | | | | | | | | | | ] |
| 319 | [ | | | | | | | | | | | | | ] |
| 320 | [ | | | | | | | | | | | | | ] |
| 321 | [ | | | | | | | | | | | | | ] |
| 322 | [ | | | | | | | | | | | | | ] |
| 323 | [ | | | | | | | | | | | | | ] |
| 324 | [ | | | | | | | | | | | | | ] |
| 325 | [ | | | | | | | | | | | | | ] |
| 326 | [ | | | | | | | | | | | | | ] |
| 327 | [ | | | | | | | | | | | | | ] |
| 328 | [ | | | | | | | | | | | | | ] |
| 329 | [ | | | | | | | | | | | | | ] |
| 330 | [ | | 200,000.00 | | | | | | | | | | | ] |
| 331 | [ | | | | | | | | | | | | | ] |
| 332 | [ | | | | | | | | | | | | | ] |
| 333 | [ | | | | | | | | | | | | | ] |
| 334 | [ | | | | | | | | | | | | | ] |
| 335 | [ | | | | | | | | | | | | | ] |
| 336 | [ | | | | | | | | | | | | | ] |
| 337 | [ | | | | | | | | | | | | | ] |
| 338 | [ | | | | | | | | | | | | | ] |
| 339 | [ | | | | | | | | | | | | | ] |
| 340 | [ | | | | | | | | | | | | | ] |
| 341 | [ | | | | | | | | | | | | | ] |
| 342 | [ | | | | | | | | | | | | | ] |
| 343 | [ | | | | | | | | | | | | | ] |
| 344 | [ | | | | | | | | | | | | | ] |
| 345 | [ | | | | | | | | | | | | | ] |
| 346 | [ | | | | | | | | | | | | | ] |
| 347 | [ | | | | | | | | | | | | | ] |
| 348 | [ | | | | | | | | | | | | | ] |
| 349 | [ | | | | | | | | | | | | | ] |
| 350 | [ | | | | | | | | | | | | | ] |
| 351 | [ | | | | | | | | | | | | | ] |
| 352 | [ | | | | | | | | | | | | | ] |
| 353 | [ | | | | | | | | | | | | | ] |
| 354 | [ | | | | | | | | | | | | | ] |
| 355 | [ | | | | | | | | | | | | | ] |
| 356 | [ | | | | | | | | | | | | | ] |
| 357 | [ | | | | | | | | | | | | | ] |
| 358 | [ | | | | | | | | | | | | | ] |
| 359 | [ | | | | | | | | | | | | | ] |
| 360 | [ | | | | | | | | | | | | | ] |
| 361 | [ | | | | | | | | | | | | | ] |
| 362 | [ | | | | | | | | | | | | | ] |
| 363 | [ | | | | | | | | | | | | | ] |
| 364 | [ | | | | | | | | | | | | | ] |
| 365 | [ | | | | | | | | | | | | | ] |
| 366 | [ | | | | | | | | | | | | | ] |
| 367 | [ | | | | | | | | | | | | | ] |
| 368 | [ | | | | | | | | | | | | | ] |
| 369 | [ | | | | | | | | | | | | | ] |
| 370 | [ | | | | | | | | | | | | | ] |
| 371 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 372 | [ | | | | | | | | | | | | | | | ] |
| 373 | [ | | | | | | | | | | | | | | | ] |
| 374 | [ | | | | | | | | | | | | | | | ] |
| 375 | [ | | | | | | | | | | | | | | | ] |
| 376 | [ | | | | | | | | | | | | | | | ] |
| 377 | [ | | | | | | | | | | | | | | | ] |
| 378 | [ | | | | | | | | | | | | | | | ] |
| 379 | [ | | | | | | | | | | | | | | | ] |
| 380 | [ | | | | | | | | | | | | | | | ] |
| 381 | [ | | | | | | | | | | | | | | | ] |
| 382 | [ | | | | | | | | | | | | | | | ] |
| 383 | [ | | | | | | | | | | | | | | | ] |
| 384 | [ | | | | | | | | | | | | | | | ] |
| 385 | [ | | | | | | | | | | | | | | | ] |
| 386 | [ | | | | | | | | | | | | | | | ] |
| 387 | [ | | | | | | | | | | | | | | | ] |
| 388 | [ | | | | | | | | | | | | | | | ] |
| 389 | [ | | | | | | | | | | | | | | | ] |
| 390 | [ | | | | | | | | | | | | | | | ] |
| 391 | [ | | | | | | | | | | | | | | | ] |
| 392 | [ | | | | | | | | | | | 10,000.00 | | | | | ] |
| 393 | [ | | | | | | | | | | | | | | | ] |
| 394 | [ | | | | | | | | | | | | | | | ] |
| 395 | [ | | | | | | | | | | | | | | | ] |
| 396 | [ | | | | | | | | | | | | | | | ] |
| 397 | [ | | | | | | | | | | | | | | | ] |
| 398 | [ | | | | | | | | | | | | | | | ] |
| 399 | [ | | | | | | | | | | | | | | | ] |
| 400 | [ | | | | | | | | | | | | | | | ] |
| 401 | [ | | | | | | | | | | | | | | | ] |
| 402 | [ | | | | | | | | | | | | | | | ] |
| 403 | [ | | | | | | | | | | | | | | | ] |
| 404 | [ | | | | | | | | | | | | | | | ] |
| 405 | [ | | | | | | | | | | | | | | | ] |
| 406 | [ | | | | | | | | | | | | | | | ] |
| 407 | [ | | | | | | | | | | | | | | | ] |
| 408 | [ | | | | | | | | | | | | | | | ] |
| 409 | [ | | | | | | | | | | | | | | | ] |
| 410 | [ | | | | | | | | | | | | | | | ] |
| 411 | [ | | | | | | | | | | | | | | | ] |
| 412 | [ | | | | | | | | | | | | | | | ] |
| 413 | [ | | | | | | | | | | | | | | | ] |
| 414 | [ | | | | | | | | | | | | | | | ] |
| 415 | [ | | | | | | | | | | | | | | | ] |
| 416 | [ | | | | | | | | | | | | | | | ] |
| 417 | [ | | | | | | | | | | | | | | | ] |
| 418 | [ | | | | | | | | | | | | | | | ] |
| 419 | [ | | | | | | | | | | | | | | | ] |
| 420 | [ | | | | | | | | | | | | | | | ] |
| 421 | [ | | | | | | | | | | | | | | | ] |
| 422 | [ | | | | | | | | | | | | | | | ] |
| 423 | [ | | | | | | | | | | | | | | | ] |
| 424 | [ | | | | | | | | | | | | | | | ] |
| 425 | [ | | | | | | | | | | | | | | | ] |
| 426 | [ | | | | | | | | | | | | | | | ] |
| 427 | [ | | | | | | | | | | | | | | | ] |
| 428 | [ | | | | | | | | | | | | | | | ] |
| 429 | [ | | | | | | | | | | | | | | | ] |
| 430 | [ | | | | | | | | | | | | | | | ] |
| 431 | [ | | | | | | | | | | | | | | | ] |
| 432 | [ | | | | | | | | | | | | | | | ] |
| 433 | [ | | | | | | | | | | | | | | | ] |
| 434 | [ | | | | | | | | | | | | | | | ] |
| 435 | [ | | | | | | | | | | | | | | | ] |
| 436 | [ | | | | | | | | | | | | | | | ] |
| 437 | [ | | | | | | | | | | | | | | | ] |
| 438 | [ | | | | | | | | | | | | | | | ] |
| 439 | [ | | | | | | | | | | | | | | | ] |
| 440 | [ | | | | | | | | | | | | | | | ] |
| 441 | [ | | | | | | | | | | | | | | | ] |
| 442 | [ | | | | | | | | | | | | | | | ] |
| 443 | [ | | | | | | | | | | | | | | | ] |
| 444 | [ | | | | | | | | | | | | | | | ] |
| 445 | [ | | | | | | | | | | | | | | | ] |
| 446 | [ | | | | | | | | | | | | | | | ] |

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 447 | [ | | | | | | | | | | | | | ] |
| 448 | [ | | | | | | | | | | | | | ] |
| 449 | [ | | | | | | | | | | | | | ] |
| 450 | [ | | | | | | | | | | | | | ] |
| 451 | [ | | | | | | | | | | | | | ] |
| 452 | [ | | | | | | | | | | | | | ] |
| 453 | [ | | | | | | | | | | | | | ] |
| 454 | [ | | | | | | | | | | | | | ] |
| 455 | [ | | | | | | | | | | | | | ] |
| 456 | [ | | | | | | | | | | | | | ] |
| 457 | [ | | | | | | | | | | | | | ] |
| 458 | [ | | | | | | | | | | | | | ] |
| 459 | [ | | | | | | | | | | | | | ] |
| 460 | [ | | | | | | | | | | | | | ] |
| 461 | [ | | | | | | | | | | | | | ] |
| 462 | [ | | | | | | | | | | | | | ] |
| 463 | [ | | | | | | | | | | | | | ] |
| 464 | [ | | | | | | | | | | | | | ] |
| 465 | [ | | | | | | | | | | | | | ] |
| 466 | [ | | | | | | | | | | | | | ] |
| 467 | [ | | | | | | | | | | | | | ] |
| 468 | [ | | | | | | | | | | | | | ] |
| 469 | [ | | | | | | | | | | | | | ] |
| 470 | [ | | | | | | | | | | | | | ] |
| 471 | [ | | | | | | | | | | | | | ] |
| 472 | [ | | | | | | | | | | | | | ] |
| 473 | [ | | | | | | | | | | | | | ] |
| 474 | [ | | | | | | | | | | | | | ] |
| 475 | [ | | | | | | | | | | | | | ] |
| 476 | [ | | | | | | | | | | | | | ] |
| 477 | [ | | | | | | | | | | | | | ] |
| 478 | [ | | | | | | | | | | | | | ] |
| 479 | [ | | | | | | | | | | | | | ] |
| 480 | [ | | | | | | | | | | | | | ] |
| 481 | [ | | | | | | | | | | | | | ] |
| 482 | [ | | | | | | | | | | | | | ] |
| 483 | [ | | | | | | | | | | | | | ] |
| 484 | [ | | | | | | | | | | | | | ] |
| 485 | [ | | | | | | | | | | | | | ] |
| 486 | [ | | | | | | | | | | | | | ] |
| 487 | [ | | | | | | | | | | | | | ] |
| 488 | [ | | | | | | | | | | | | | ] |
| 489 | [ | | | | | 6,500.00 | | | | | | | | ] |
| 490 | [ | | | | | | | | | | | | | ] |
| 491 | [ | | | | | | | | | | | | | ] |
| 492 | [ | | | | | | | | | | | | | ] |
| 493 | [ | | | | | | | | | | | | | ] |
| 494 | [ | | | | | | | | | | | | | ] |
| 495 | [ | | | | | | | | | | | | | ] |
| 496 | [ | | | | | | | | | | | | | ] |
| 497 | [ | | | | | | | | | | | | | ] |
| 498 | [ | | | | | | | | | | | | | ] |
| 499 | [ | | | | | | | | | | | | | ] |
| 500 | [ | | | | | | | | | | | | | ] |
| 501 | [ | | | | | | | | | | | | | ] |
| 502 | [ | | | | | | | | | | | | | ] |
| 503 | [ | | | | | | | | | | | | | ] |
| 504 | [ | | | | | | | | | | | | | ] |
| 505 | [ | | | | | | | | | | | | | ] |
| 506 | [ | | | | | | | | | | | | | ] |
| 507 | [ | | | | | | | | | | | | | ] |
| 508 | [ | | | | | | | | | | | | | ] |
| 509 | [ | | | | | | | | | | | | | ] |
| 510 | [ | | | | | | | | | | | | | ] |
| 511 | [ | | | | | | | | | | | | | ] |
| 512 | [ | | | | | | | | | | | | | ] |
| 513 | [ | | | | | | | | | | | | | ] |
| 514 | [ | | | | | | | | | | | | | ] |
| 515 | [ | | | | | | | | | | | | | ] |
| 516 | [ | | | | | | | | | | | | | ] |
| 517 | [ | | | | | | | | | | | | | ] |
| 518 | [ | | | | | | | | | | | | | ] |
| 519 | [ | | | | | | | | | | | | | ] |
| 520 | [ | | | | | | | | | | | | | ] |
| 521 | [ | | | | | | | | | | | | | ] |

| Purchase Number (Número de compra) | | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 522 | [ | | | | | | | | | | | | | | | ] |
| 523 | [ | | | | | | | | | | | | | | | ] |
| 524 | [ | | | | | | | | | | | | | | | ] |
| 525 | [ | | | | | | | | | | | | | | | ] |
| 526 | [ | | | | | | | | | | | | | | | ] |
| 527 | [ | | | | | | | | | | | | | | | ] |
| 528 | [ | | | | | | | | | | | | | | | ] |
| 529 | [ | | | | | | | | | | | | | | | ] |
| 530 | [ | | | | | | | | | | | | | | | ] |
| 531 | [ | | | | | | | | | | | | | | | ] |
| 532 | [ | | | | | | | | | | | | | | | ] |
| 533 | [ | | | | | | | | | | | | | | | ] |
| 534 | [ | | | | | | | | | | | | | | | ] |
| 535 | [ | | | | | | | | | | | | | | | ] |
| 536 | [ | | | | | | | | | | | | | | | ] |
| 537 | [ | | | | | | | | | | | | | | | ] |
| 538 | [ | | | | | | | | | | | | | | | ] |
| 539 | [ | | | | | | | | | | | | | | | ] |
| 540 | [ | | | | | | | | | | | | | | | ] |
| 541 | [ | | | | | | | | | | | | | | | ] |
| 542 | [ | | | | | | | | | | | | | | | ] |
| 543 | [ | | | | | | | | | | | | | | | ] |
| 544 | [ | | | | | | | | | | | | | | | ] |
| 545 | [ | | | | | | | | | | | | | | | ] |
| 546 | [ | | | | | | | | | | | | | | | ] |
| 547 | [ | | | | | | | | | | | | | | | ] |
| 548 | [ | | | | | | | | | | | | | | | ] |
| 549 | [ | | | | | | | | | | | | | | | ] |
| 550 | [ | | | | | | | | | | | | | | | ] |
| 551 | [ | | | | | | | | | | | | | | | ] |
| 552 | [ | | | | | | | | | | | | | | | ] |
| 553 | [ | | | | | | | | | | | | | | | ] |
| 554 | [ | | | | | | | | | | | | | | | ] |
| 555 | [ | | | | | | | | | | | | | | | ] |
| 556 | [ | | | | | | | | | | | | | | | ] |
| 557 | [ | | | | | | | | | | | | | | | ] |
| 558 | [ | | | | | | | | | | | | | | | ] |
| 559 | [ | | | | | | | | | | | | | | | ] |
| 560 | [ | | | | | | | | | | | | | | | ] |
| 561 | [ | | | | | | | | | | | | | | | ] |
| 562 | [ | | | | | | | | | | | | | | | ] |
| 563 | [ | | | | | | | | | | | | | | | ] |
| 564 | [ | | | | | | | | | | | | | | | ] |
| 565 | [ | | | | | | | | | | | | | | | ] |
| 566 | [ | | | | | | | | | | | | | | | ] |
| 567 | [ | | | | | | | | | | | | | | | ] |
| 568 | [ | | | | | | | | | | | | | | | ] |
| 569 | [ | | | | | | | | | | | | | | | ] |
| 570 | [ | | | | | | | | | | | | | | | ] |
| 571 | [ | | | | | | | | | | | | | | | ] |
| 572 | [ | | | | | | | | | | | | | | | ] |
| 573 | [ | | | | | | | | | | | | | | | ] |
| 574 | [ | | | | | | | | | | | | | | | ] |
| 575 | [ | | | | | | | | | | | | | | | ] |
| 576 | [ | | | | | | | | | | | | | | | ] |
| 577 | [ | 4,300.00 | | | | | | | | | | | | | | ] |
| 578 | [ | | | | | | | | | | | | | | | ] |
| 579 | [ | | | | | | | | | | | | | | | ] |
| 580 | [ | | | | | | | | | | | | | | | ] |
| 581 | [ | | | | | | | | | | | | | | | ] |
| 582 | [ | | | | | | | | | | | | | | | ] |
| 583 | [ | | | | | | | | | | | | | | | ] |
| 584 | [ | | | | | | | | | | | | | | | ] |
| 585 | [ | | | | | | | | | | | | | | | ] |
| 586 | [ | | | | | | | | | | | | | | | ] |
| 587 | [ | | | | | | | | | | | | | | | ] |
| 588 | [ | | | | | | | | | | | | | | | ] |
| 589 | [ | | | | | | | | | | | | | | | ] |
| 590 | [ | | | | | | | | | | | | | | | ] |
| 591 | [ | | | | | | | | | | | | | | | ] |
| 592 | [ | | | | | | | | | | | | | | | ] |
| 593 | [ | | | | | | | | | | | | | | | ] |
| 594 | [ | | | | | | | | | | | | | | | ] |
| 595 | [ | | | | | | | | | | | | | | | ] |
| 596 | [ | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 597 | [ | | | | | | | | | | | | | ] |
| 598 | [ | | | | | | | | | | | | | ] |
| 599 | [ | | | | | | | | | | | | | ] |
| 600 | [ | | | | | | | | | | | | | ] |
| 601 | [ | | | | | | | | | | | | | ] |
| 602 | [ | | | | | | | | | | | | | ] |
| 603 | [ | | | | | | | | | | | | | ] |
| 604 | [ | | | | | | | | | | | | | ] |
| 605 | [ | | | | | | | | | | | | | ] |
| 606 | [ | | | | | | | | | | | | | ] |
| 607 | [ | | | | | | | | | | | | | ] |
| 608 | [ | | | | | | | | | | | | | ] |
| 609 | [ | | | | | | | | | | | | | ] |
| 610 | [ | | | | | | | | | | | | | ] |
| 611 | [ | | | | | | | | | | | | | ] |
| 612 | [ | | | | | | | | | | | | | ] |
| 613 | [ | | | | | | | | | | | | | ] |
| 614 | [ | | | | | | | | | | | | | ] |
| 615 | [ | | | | | | | | | | | | | ] |
| 616 | [ | | | | | | | | | | | | | ] |
| 617 | [ | | | | | | | | | | | | | ] |
| 618 | [ | | | | | | | | | | | | | ] |
| 619 | [ | | | | | | | | | | | | | ] |
| 620 | [ | | | | | | | | | | | | | ] |
| 621 | [ | | | | | | | | | | | | | ] |
| 622 | [ | | | | | | | | | | | | | ] |
| 623 | [ | | | | | | | | | | | | | ] |
| 624 | [ | | | | | | | | | | | | | ] |
| 625 | [ | | | | | | | | | | | | | ] |
| 626 | [ | | | | | | | | | | | | | ] |
| 627 | [ | | | | | | | | | | | | | ] |
| 628 | [ | | | | | | | | | | | | | ] |
| 629 | [ | | | | | | | | | | | | | ] |
| 630 | [ | | | | | | | | | | | | | ] |
| 631 | [ | | | | | | | | | | | | | ] |
| 632 | [ | | | | | | | | | | | | | ] |
| 633 | [ | | | | | | | | | | | | | ] |
| 634 | [ | | | | | | | | | | | | | ] |
| 635 | [ | | | | | | | | | | | | | ] |
| 636 | [ | | | | | | | | | | | | | ] |
| 637 | [ | | | | | | | | | | | | | ] |
| 638 | [ | | | | | | | | | | | | | ] |
| 639 | [ | | 5,900.00 | | | | | | | | | | | ] |
| 640 | [ | | | | | | | | | | | | | ] |
| 641 | [ | | | | | | | | | | | | | ] |
| 642 | [ | | | | | | | | | | | | | ] |
| 643 | [ | | | | | | | | | | | | | ] |
| 644 | [ | | | | | | | | | | | | | ] |
| 645 | [ | | | | | | | | | | | | | ] |
| 646 | [ | | | | | | | | | | | | | ] |
| 647 | [ | | | | | | | | | | | | | ] |
| 648 | [ | | | | | | | | | | | | | ] |
| 649 | [ | | | | | | | | | | | | | ] |
| 650 | [ | | | | | | | | | | | | | ] |
| 651 | [ | | | | | | | | | | | | | ] |
| 652 | [ | | | | | | | | | | | | | ] |
| 653 | [ | | | | | | | | | | | | | ] |
| 654 | [ | | | | | | | | | | | | | ] |
| 655 | [ | | | | | | | | | | | | | ] |
| 656 | [ | | | | | | | | | | | | | ] |
| 657 | [ | | | | | | | | | | | | | ] |
| 658 | [ | | | | | | | | | | | | | ] |
| 659 | [ | | | | | | | | | | | | | ] |
| 660 | [ | | | | | | | | | | | | | ] |
| 661 | [ | | | | | | | | | | | | | ] |
| 662 | [ | | | | | | | | | | | | | ] |
| 663 | [ | | | | | | | | | | | | | ] |
| 664 | [ | | | | | | | | | | | | | ] |
| 665 | [ | | | | | | | | | | | | | ] |
| 666 | [ | | | | | | | | | | | | | ] |
| 667 | [ | | | | | | | | | | | | | ] |
| 668 | [ | | | | | | | | | | | | | ] |
| 669 | [ | | | | | | | | | | | | | ] |
| 670 | [ | | | | | | | | | | | | | ] |
| 671 | [ | | | | | | | | | | | | | ] |

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 672 | [ | | | | | | | | | | | | | ] |
| 673 | [ | | | | | | | | | | | | | ] |
| 674 | [ | | | | | | | | | | | | | ] |
| 675 | [ | | | | | | | | | | | | | ] |
| 676 | [ | | | | | | | | | | | | | ] |
| 677 | [ | | | | | | | | | | | | | ] |
| 678 | [ | | | | | | | | | | | | | ] |
| 679 | [ | | | | | | | | | | | | | ] |
| 680 | [ | | | | | | | | | | | | | ] |
| 681 | [ | | | | | | | | | | | | | ] |
| 682 | [ | | | | | | | | | | | | | ] |
| 683 | [ | | | | | | | | | | | | | ] |
| 684 | [ | | | | | | | | | | | | | ] |
| 685 | [ | | | | | | | | | | | | | ] |
| 686 | [ | | | | | | | | | | | | | ] |
| 687 | [ | | | | | | | | | | | | | ] |
| 688 | [ | | | | | | | | | | | | | ] |
| 689 | [ | | | | | | | | | | | | | ] |
| 690 | [ | | | | | | | | | | | | | ] |
| 691 | [ | | | | | | | | | | | | | ] |
| 692 | [ | | | | | | | | | | | | | ] |
| 693 | [ | | | | | | | | | | | | | ] |
| 694 | [ | | | | | | | | | | | | | ] |
| 695 | [ | | | | | | | | | | | | | ] |
| 696 | [ | | | | | | | | | | | | | ] |
| 697 | [ | | | | | | | | | 4,800.00 | | | | ] |
| 698 | [ | | | | | | | | | | | | | ] |
| 699 | [ | | | | | | | | | | | | | ] |
| 700 | [ | | | | | | | | | | | | | ] |
| 701 | [ | | | | | | | | | | | | | ] |
| 702 | [ | | | | | | | | | | | | | ] |
| 703 | [ | | | | | | | | | | | | | ] |
| 704 | [ | | | | | | | | | | | | | ] |
| 705 | [ | | | | | | | | | | | | | ] |
| 706 | [ | | | | | | | | | | | | | ] |
| 707 | [ | | | | | | | | | | | | | ] |
| 708 | [ | | | | | | | | | | | | | ] |
| 709 | [ | | | | | | | | | | | | | ] |
| 710 | [ | | | | | | | | | | | | | ] |
| 711 | [ | | | | | | | | | | | | | ] |
| 712 | [ | | | | | | | | | | | | | ] |
| 713 | [ | | | | | | | | | | | | | ] |
| 714 | [ | | | | | | | | | | | | | ] |
| 715 | [ | | | | | | | | | | | | | ] |
| 716 | [ | | | | | | | | | | | | | ] |
| 717 | [ | | | | | | | | | | | | | ] |
| 718 | [ | | | | | | | | | | | | | ] |
| 719 | [ | | | | | | | | | | | | | ] |
| 720 | [ | | | | | | | | | | | | | ] |
| 721 | [ | | | | | | | | | | | | | ] |
| 722 | [ | | | | | | | | | | | | | ] |
| 723 | [ | | | | | | | | | | | | | ] |
| 724 | [ | | | | | | | | | | | | | ] |
| 725 | [ | | | | | | | | | | | | | ] |
| 726 | [ | | | | | | | | | | | | | ] |
| 727 | [ | | | | | | | | | | | | | ] |
| 728 | [ | | | | | | | | | | | | | ] |
| 729 | [ | | | | | | | | | | | | | ] |
| 730 | [ | | | | | | | | | | | | | ] |
| 731 | [ | | | | | | | | | | | | | ] |
| 732 | [ | | | | | | | | | | | | | ] |
| 733 | [ | | | | | | | | | | | | | ] |
| 734 | [ | | | | | | | | | | | | | ] |
| 735 | [ | | | | | | | | | | | | | ] |
| 736 | [ | | | | | | | | | | | | | ] |
| 737 | [ | | | | | | | | | | | | | ] |
| 738 | [ | | | | | | | | | | | | | ] |
| 739 | [ | | | | | | | | | | | | | ] |
| 740 | [ | | | | | | | | | | | | | ] |
| 741 | [ | | | | | | | | | | | | | ] |
| 742 | [ | | | | | | | | | | | | | ] |
| 743 | [ | | | | | | | | | | | | | ] |
| 744 | [ | | | | | | | | | | | | | ] |
| 745 | [ | | | | | | | | | | | | | ] |
| 746 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 747 | [ | | | | | | | | | | | | | | | ] |
| 748 | [ | | | | | | | | | | | | | | | ] |
| 749 | [ | | | | | | | | | | | | | | | ] |
| 750 | [ | | | | | | | | | | | | | | | ] |
| 751 | [ | | | | | | | | | | | | | | | ] |
| 752 | [ | | | | | | | | | | | | | | | ] |
| 753 | [ | | | | | | | | | | | | | | | ] |
| 754 | [ | | | | | | | | | | | | | | | ] |
| 755 | [ | | | | | | | | | | | | | | | ] |
| 756 | [ | | | | | | | | | | | | | | | ] |
| 757 | [ | | | | | | | | | | | | | | | ] |
| 758 | [ | | | | | | | | | | | | | | | ] |
| 759 | [ | | | | | | | | | | | | | | | ] |
| 760 | [ | | | | | | | | | | | | | | | ] |
| 761 | [ | | | | | | | | | | | | | | | ] |
| 762 | [ | | | | | | | | | | | | | | | ] |
| 763 | [ | | | | | | | | | | | | | | | ] |
| 764 | [ | | | | | | | | | | | | | | | ] |
| 765 | [ | | | | | | | | | | | | | | | ] |
| 766 | [ | | | | | | | | | | | | | | | ] |
| 767 | [ | | | | | | | | | | | | | | | ] |
| 768 | [ | | | | | | | | | | | | | | | ] |
| 769 | [ | | | | | | | | | | | | | | | ] |
| 770 | [ | | | | | | | | | | | | | | | ] |
| 771 | [ | | | | | | | | | | | | | | | ] |
| 772 | [ | | | | | | | | | | | | | | | ] |
| 773 | [ | | | | | | | | | | | | | | | ] |
| 774 | [ | | | | | | | | | | | | | | | ] |
| 775 | [ | | | | | | | | | | | | | | | ] |
| 776 | [ | | | | | | | | | | | | | | | ] |
| 777 | [ | | | | | | | | | | | | | | | ] |
| 778 | [ | | | | | | | | | | | | | | | ] |
| 779 | [ | | | | | | | | | | | | | | | ] |
| 780 | [ | | | | | | | | | | | | | | | ] |
| 781 | [ | | | | | | | | | | | | | | | ] |
| 782 | [ | | | | | | | | | | | | | | | ] |
| 783 | [ | | | | | | | | | | | | | | | ] |
| 784 | [ | | | | | | | | | | | | | | | ] |
| 785 | [ | | | | | | | | | | | | | | | ] |
| 786 | [ | | | | | | | | | | | | | | | ] |
| 787 | [ | | | | | | | | | | | | | | | ] |
| 788 | [ | | | | | | | | | | | | | | | ] |
| 789 | [ | | | | | | | | | | | | | | | ] |
| 790 | [ | | | | | | | | | | | | | | | ] |
| 791 | [ | | | | | | | | | | | | | | | ] |
| 792 | [ | | | | | | | | | | | | | | | ] |
| 793 | [ | | | | | | | | | | | | | | | ] |
| 794 | [ | | | | | | | | | | | | | | | ] |
| 795 | [ | | | | | | | | | | | | | | | ] |
| 796 | [ | | | | | | | | | | | | | | | ] |
| 797 | [ | | | | | | | | | | | | | | | ] |
| 798 | [ | | | | | | | | | | | | | | | ] |
| 799 | [ | | | | | | | | | | | | | | | ] |
| 800 | [ | | | | | | | | | | | | | | | ] |
| 801 | [ | | | | | | | | | | | | | | | ] |
| 802 | [ | | | 225,000.00 | | | | | | | | | | | | ] |
| 803 | [ | | | | | | | | | | | | | | | ] |
| 804 | [ | | | | | | | | | | | | | | | ] |
| 805 | [ | | | | | | | | | | | | | | | ] |
| 806 | [ | | | | | | | | | | | | | | | ] |
| 807 | [ | | | | | | | | | | | | | | | ] |
| 808 | [ | | | | | | | | | | | | | | | ] |
| 809 | [ | | | | | | | | | | | | | | | ] |
| 810 | [ | | | | | | | | | | | | | | | ] |
| 811 | [ | | | | | | | | | | | | | | | ] |
| 812 | [ | | | | | | | | | | | | | | | ] |
| 813 | [ | | | | | | | | | | | | | | | ] |
| 814 | [ | | | | | | | | | | | | | | | ] |
| 815 | [ | | | | | | | | | | | | | | | ] |
| 816 | [ | | | | | | | | | | | | | | | ] |
| 817 | [ | | | | | | | | | | | | | | | ] |
| 818 | [ | | | | | | | | | | | | | | | ] |
| 819 | [ | | | | | | | | | | | | | | | ] |
| 820 | [ | | | | | | | | | | | | | | | ] |
| 821 | [ | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 822 | [ | | | | | | | | | | | | | ] |
| 823 | [ | | | | | | | | | | | | | ] |
| 824 | [ | | | | | | | | | | | | | ] |
| 825 | [ | | | | | | | | | | | | | ] |
| 826 | [ | | | | | | | | | | | | | ] |
| 827 | [ | | | | | | | | | | | | | ] |
| 828 | [ | | | | | | | | | | | | | ] |
| 829 | [ | | | | | | | | | | | | | ] |
| 830 | [ | | | | | | | | | | | | | ] |
| 831 | [ | | | | | | | | | | | | | ] |
| 832 | [ | | | | | | | | | | | | | ] |
| 833 | [ | | | | | | | | | | | | | ] |
| 834 | [ | | | | | | | | | | | | | ] |
| 835 | [ | | | | | | | | | | | | | ] |
| 836 | [ | | | | | | | | | | | | | ] |
| 837 | [ | | | | | | | | | | | | | ] |
| 838 | [ | | | | | | | | | | | | | ] |
| 839 | [ | | | | | | | | | | | | | ] |
| 840 | [ | | | | | | | | | | | | | ] |
| 841 | [ | | | | | | | | | | | | | ] |
| 842 | [ | | | | | | | | | 25,000.00 | | | | ] |
| 843 | [ | | | | | | | | | | | | | ] |
| 844 | [ | | | | | | | | | | | | | ] |
| 845 | [ | | | | | | | | | | | | | ] |
| 846 | [ | | | | | | | | | | | | | ] |
| 847 | [ | | | | | | | | | | | | | ] |
| 848 | [ | | | | | | | | | | | | | ] |
| 849 | [ | | | | | | | | | | | | | ] |
| 850 | [ | | | | | | | | | | | | | ] |
| 851 | [ | | | | | | | | | | | | | ] |
| 852 | [ | | | | | | | | | | | | | ] |
| 853 | [ | | | | | | | | | | | | | ] |
| 854 | [ | | | | | | | | | | | | | ] |
| 855 | [ | | | | | | | | | | | | | ] |
| 856 | [ | | | | | | | | | | | | | ] |
| 857 | [ | | | | | | | | | | | | | ] |
| 858 | [ | | | | | | | | | | | | | ] |
| 859 | [ | | | | | | | | | | | | | ] |
| 860 | [ | | | | | | | | | | | | | ] |
| 861 | [ | | | | | | | | | | | | | ] |
| 862 | [ | | | | | | | | | | | | | ] |
| 863 | [ | | | | | | | | | | | | | ] |
| 864 | [ | | | | | | | | | | | | | ] |
| 865 | [ | | | | | | | | | | | | | ] |
| 866 | [ | | | | | | | | | | | | | ] |
| 867 | [ | | | | | | | | | | | | | ] |
| 868 | [ | | | | | | | | | | | | | ] |
| 869 | [ | | | | | | | | | | | | | ] |
| 870 | [ | | | | | | | | | | | | | ] |
| 871 | [ | | | | | | | | | | | | | ] |
| 872 | [ | | | | | | | | | | | | | ] |
| 873 | [ | | | | | | | | | | | | | ] |
| 874 | [ | | | | | | | | | | | | | ] |
| 875 | [ | | | | | | | | | | | | | ] |
| 876 | [ | | | | | | | | | | | | | ] |
| 877 | [ | | | | | | | | | | | | | ] |
| 878 | [ | | | | | | | | | | | | | ] |
| 879 | [ | | | | | | | | | | | | | ] |
| 880 | [ | | | | | | | | | | | | | ] |
| 881 | [ | | | | | | | | | | | | | ] |
| 882 | [ | | | | | | | | | | | | | ] |
| 883 | [ | | | | | | | | | | | | | ] |
| 884 | [ | | | | | | | | | | | | | ] |
| 885 | [ | | | | | | | | | | | | | ] |
| 886 | [ | | | | | | | | | | | | | ] |
| 887 | [ | | | | | | | | | | | | | ] |
| 888 | [ | | | | | | | | | | | | | ] |
| 889 | [ | | | | | | | | | | | | | ] |
| 890 | [ | | | | | | | | | | | | | ] |
| 891 | [ | | | | | | | | | | | | | ] |
| 892 | [ | | | | | | | | | | | | | ] |
| 893 | [ | | | | | | | | | | | | | ] |
| 894 | [ | | | | | | | | | | | | | ] |
| 895 | [ | | | | | | | | | | | | | ] |
| 896 | [ | | | | | | | | | | | | | ] |

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 897 | [ | | | | | | | | | | | | | ] |
| 898 | [ | | | | | | | | | | | | | ] |
| 899 | [ | | | | | | | | | | | | | ] |
| 900 | [ | | | | | | | | | | | | | ] |
| 901 | [ | | | | | | | | | | | | | ] |
| 902 | [ | | | | | | | | | | | | | ] |
| 903 | [ | | | | | | | | | | | | | ] |
| 904 | [ | | | | | | | | | | | | | ] |
| 905 | [ | | | | | | | | | | | | | ] |
| 906 | [ | | | | | | | | | | | | | ] |
| 907 | [ | | | | | | | | | | | | | ] |
| 908 | [ | | | | | | | | | | | | | ] |
| 909 | [ | | | | | | | | | | | | | ] |
| 910 | [ | | | | | | | | | | | | | ] |
| 911 | [ | | | | | | | | | | | | | ] |
| 912 | [ | | | | | | | | | | | | | ] |
| 913 | [ | | | | | | | | | | | | | ] |
| 914 | [ | | | | | | | | | | | | | ] |
| 915 | [ | | | | | | | | | | | | | ] |
| 916 | [ | | | | | | | | | | | | | ] |
| 917 | [ | | | | | | | | | | | | | ] |
| 918 | [ | | | | | | | | | | | | | ] |
| 919 | [ | | | | | | | | | | | | | ] |
| 920 | [ | | | | | | | | | | | | | ] |
| 921 | [ 130,000.00 | | | | | | | | | | | | | ] |
| 922 | [ | | | | | | | | | | | | | ] |
| 923 | [ | | | | | | | | | | | | | ] |
| 924 | [ | | | | | | | | | | | | | ] |
| 925 | [ | | | | | | | | | | | | | ] |
| 926 | [ | | | | | | | | | | | | | ] |
| 927 | [ | | | | | | | | | | | | | ] |
| 928 | [ | | | | | | | | | | | | | ] |
| 929 | [ | | | | | | | | | | | | | ] |
| 930 | [ | | | | | | | | | | | | | ] |
| 931 | [ | | | | | | | | | | | | | ] |
| 932 | [ | | | | | | | | | | | | | ] |
| 933 | [ | | | | | | | | | | | | | ] |
| 934 | [ | | | | | | | | | | | | | ] |
| 935 | [ | | | | | | | | | | | | | ] |
| 936 | [ | | | | | | | | | | | | | ] |
| 937 | [ | | | | | | | | | | | | | ] |
| 938 | [ | | | | | | | | | | | | | ] |
| 939 | [ | | | | | | | | | | | | | ] |
| 940 | [ | | | | | | | | | | | | | ] |
| 941 | [ | | | | | | | | | | | | | ] |
| 942 | [ | | | | | | | | | | | | | ] |
| 943 | [ | | | | | | | | | | | | | ] |
| 944 | [ | | | | | | | | | | | | | ] |
| 945 | [ | | | | | | | | | | | | | ] |
| 946 | [ | | | | | | | | | | | | | ] |
| 947 | [ | | | | | | | | | | | | | ] |
| 948 | [ | | | | | | | | | | | | | ] |
| 949 | [ | | | | | | | | | | | | | ] |
| 950 | [ | | | | | | | | | | | | | ] |
| 951 | [ | | | | | | | | | | | | | ] |
| 952 | [ | | | | | | | | | | | | | ] |
| 953 | [ | | | | | | | | | | | | | ] |
| 954 | [ | | | | | | | | | | | | | ] |
| 955 | [ | | | | | | | | | | | | | ] |
| 956 | [ | | | | | | | | | | | | | ] |
| 957 | [ | | | | | | | | | | | | | ] |
| 958 | [ | | | | | | | | | | | | | ] |
| 959 | [ | | | | | | | | | | | | | ] |
| 960 | [ | | | | | | | | | | | | | ] |
| 961 | [ | | | | | | | | | | | | | ] |
| 962 | [ | | | | | | | | | | | | | ] |
| 963 | [ | | | | | | | | | | | | | ] |
| 964 | [ | | | | | | | | | | | | | ] |
| 965 | [ | | | | | | | | | | | | | ] |
| 966 | [ | | | | | | | | | | | | | ] |
| 967 | [ | | | | | | | | | | | | | ] |
| 968 | [ | | | | | | | | | | | | | ] |
| 969 | [ | | | | | | | | | | | | | ] |
| 970 | [ | | | | | | | | | | | | | ] |
| 971 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 972 | [ | | | | | | | | | | | | | ] |
| 973 | [ | | | | | | | | | | | | | ] |
| 974 | [ | | | | | | | | | | | | | ] |
| 975 | [ | | | | | | | | | | | | | ] |
| 976 | [ | | | | | | | | | | | | | ] |
| 977 | [ | | | | | | | | | | | | | ] |
| 978 | [ | | | | | | | | | | | | | ] |
| 979 | [ | | | | | | | | | | | | | ] |
| 980 | [ | | | | | | | | | | | | | ] |
| 981 | [ | | | | | | | | | | | | | ] |
| 982 | [ | | | | | | | | | | | | | ] |
| 983 | [ | | | | | | | | | | | | | ] |
| 984 | [ | | | | | | | | | | | | | ] |
| 985 | [ | | | | | | | | | | | | | ] |
| 986 | [ | | | | | | | | | | | | | ] |
| 987 | [ | | | | | | | | | | | | | ] |
| 988 | [ | | | | | | | | | | | | | ] |
| 989 | [ | | | | | | | | | | | | | ] |
| 990 | [ | | | | | | | | | | | | | ] |
| 991 | [ | | | | | | | | | | | | | ] |
| 992 | [ | | | | | | | | | | | | | ] |
| 993 | [ | | | | | | | | | | | | | ] |
| 994 | [ | | | | | | | | | | | | | ] |
| 995 | [ | | | | | | | | | | | | | ] |
| 996 | [ | | | | | | | | | | | | | ] |
| 997 | [ | | | | | | | | | | | | | ] |
| 998 | [ | | | | | | | | | | | | | ] |
| 999 | [ | | | | | | | | | | | | | ] |
| 1000 | [ | | | | | | | | | | | | | ] |
| 1001 | [ | | | | | | | | | | | | | ] |
| 1002 | [ | | | | | | | | | | | | | ] |
| 1003 | [ | | | | | | | | | | | | | ] |
| 1004 | [ | | | | | | | | | | | | | ] |
| 1005 | [ | | | | | | | | | | | | | ] |
| 1006 | [ | | | | | | | | | | | | | ] |
| 1007 | [ | | | | | | | | | | | | | ] |
| 1008 | [ | | | | | | | | | | | | | ] |
| 1009 | [ | | | | | | | | | | | | | ] |
| 1010 | [ | | | | | | | | | | | | | ] |
| 1011 | [ | | | | | | | | | | | | | ] |
| 1012 | [ | | | | | | | | | | | | | ] |
| 1013 | [ | | | | | | | | | | | | | ] |
| 1014 | [ | | | | | | | | | | | | | ] |
| 1015 | [ | | | | | | | | | | | | | ] |
| 1016 | [ | | | | | | | | | | | | | ] |
| 1017 | [ | | | | | | | | | | | | | ] |
| 1018 | [ | | | | | | | | | | | | | ] |
| 1019 | [ | | | | | | | | | | | | | ] |
| 1020 | [ | | | | | | | | | | | | | ] |
| 1021 | [ | | | | | | | | | | | | | ] |
| 1022 | [ | | | | | | | | | | | | | ] |
| 1023 | [ | | | | | | | | | | | | | ] |
| 1024 | [ | | | | | | | | | | | | | ] |
| 1025 | [ | | | | | | | | | | | | | ] |
| 1026 | [ | | | | | | | | | | | | | ] |
| 1027 | [ | | | | | | | | | | | | | ] |
| 1028 | [ | | | | | | | | | | | | | ] |
| 1029 | [ | | 200,000.00 | | | | | | | | | | | ] |
| 1030 | [ | | | | | | | | | | | | | ] |
| 1031 | [ | | | | | | | | | | | | | ] |
| 1032 | [ | | | | | | | | | | | | | ] |
| 1033 | [ | | | | | | | | | | | | | ] |
| 1034 | [ | | | | | | | | | | | | | ] |
| 1035 | [ | | | | | | | | | | | | | ] |
| 1036 | [ | | | | | | | | | | | | | ] |
| 1037 | [ | | | | | | | | | | | | | ] |
| 1038 | [ | | | | | | | | | | | | | ] |
| 1039 | [ | | | | | | | | | | | | | ] |
| 1040 | [ | | | | | | | | | | | | | ] |
| 1041 | [ | | | | | | | | | | | | | ] |
| 1042 | [ | | | | | | | | | | | | | ] |
| 1043 | [ | | | | | | | | | | | | | ] |
| 1044 | [ | | | | | | | | | | | | | ] |
| 1045 | [ | | | | | | | | | | | | | ] |
| 1046 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1047 | [ | | | | | | | | | | | | | | ] |
| 1048 | [ | | | | | | | | | | | | | | ] |
| 1049 | [ | | | | | | | | | | | | | | ] |
| 1050 | [ | | | | | | | | | | | | | | ] |
| 1051 | [ | | | | | | | | | | | | | | ] |
| 1052 | [ | | | | | | | | | | | | | | ] |
| 1053 | [ | | | | | | | | | | | | | | ] |
| 1054 | [ | | | | | | | | | | | | | | ] |
| 1055 | [ | | | | | | | | | | | | | | ] |
| 1056 | [ | | | | | | | | | | | | | | ] |
| 1057 | [ | | | | | | | | | | | | | | ] |
| 1058 | [ | | | | | | | | | | | | | | ] |
| 1059 | [ | | | | | | | | | | | | | | ] |
| 1060 | [ | | | | | | | | | | | | | | ] |
| 1061 | [ | | | | | | | | | | | | | | ] |
| 1062 | [ | | | | | | | | | | | | | | ] |
| 1063 | [ | | | | | | | | | | | | | | ] |
| 1064 | [ | 100,000.00 | | | | | | | | | | | | | ] |
| 1065 | [ | | | | | | | | | | | | | | ] |
| 1066 | [ | | | | | | | | | | | | | | ] |
| 1067 | [ | | | | | | | | | | | | | | ] |
| 1068 | [ | | | | | | | | | | | | | | ] |
| 1069 | [ | | | | | | | | | | | | | | ] |
| 1070 | [ | | | | | | | | | | | | | | ] |
| 1071 | [ | | | | | | | | | | | | | | ] |
| 1072 | [ | | | | | | | | | | | | | | ] |
| 1073 | [ | | | | | | | | | | | | | | ] |
| 1074 | [ | | | | | | | | | | | | | | ] |
| 1075 | [ | | | | | | | | | | | | | | ] |
| 1076 | [ | | | | | | | | | | | | | | ] |
| 1077 | [ | | | | | | | | | | | | | | ] |
| 1078 | [ | | | | | | | | | | | | | | ] |
| 1079 | [ | | | | | | | | | | | | | | ] |
| 1080 | [ | | | | | | | | | | | | | | ] |
| 1081 | [ | | | | | | | | | | | | | | ] |
| 1082 | [ | | | | | | | | | | | | | | ] |
| 1083 | [ | | | | | | | | | | | | | | ] |
| 1084 | [ | | | | | | | | | | | | | | ] |
| 1085 | [ | | | | | | | | | | | | | | ] |
| 1086 | [ | | | | | | | | | | | | | | ] |
| 1087 | [ | | | | | | | | | | | | | | ] |
| 1088 | [ | | | | | | | | | | | | | | ] |
| 1089 | [ | | | | | | | | | | | | | | ] |
| 1090 | [ | | | | | | | | | | | | | | ] |
| 1091 | [ | | | | | | | | | | | | | | ] |
| 1092 | [ | | | | | | | | | | | | | | ] |
| 1093 | [ | | | | | | | | | | | | | | ] |
| 1094 | [ | | | | | | | | | | | | | | ] |
| 1095 | [ | | | | | | | | | | | | | | ] |
| 1096 | [ | | | | | | | | | | | | | | ] |
| 1097 | [ | | | | | | | | | | | | | | ] |
| 1098 | [ | | | | | | | | | | | | | | ] |
| 1099 | [ | | | | | | | | | | | | | | ] |
| 1100 | [ | | | | | | | | | | | | | | ] |
| 1101 | [ | | | | | | | | | | | | | | ] |
| 1102 | [ | | | | | | | | | | | | | | ] |
| 1103 | [ | | | | | | | | | | | | | | ] |
| 1104 | [ | | | | | | | | | | | | | | ] |
| 1105 | [ | | | | | | | | | | | | | | ] |
| 1106 | [ | | | | | | | | | | | | | | ] |
| 1107 | [ | | | | | | | | | | | | | | ] |
| 1108 | [ | | | | | | | | | | | | | | ] |
| 1109 | [ | | | | | | | | | | | | | | ] |
| 1110 | [ | | | | | | | | | | | | | | ] |
| 1111 | [ | | | | | | | | | | | | | | ] |
| 1112 | [ | | | | | | | | | | | | | | ] |
| 1113 | [ | | | | | | | | | | | | | | ] |
| 1114 | [ | | | | | | | | | | | | | | ] |
| 1115 | [ | | | | | | | | | | | | | | ] |
| 1116 | [ | | | | | | | | | | | | | | ] |
| 1117 | [ | | | | | | | | | | | | | | ] |
| 1118 | [ | | | | | | | | | | | | | | ] |
| 1119 | [ | | | | | | | | | | | | | | ] |
| 1120 | [ | | | | | | | | | | | | | | ] |
| 1121 | [ | | | | | | | | | | | | | | ] |

| Purchase Number (Número de compra) | | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1122 | [ | | | | | | | | | | | | | | | ] |
| 1123 | [ | | | | | | | | | | | | | | | ] |
| 1124 | [ | | | | | | | | | | | | | | | ] |
| 1125 | [ | | | | | | | | | | | | | | | ] |
| 1126 | [ | | | | | | | | | | | | | | | ] |
| 1127 | [ | | | | | | | | | | | | | | | ] |
| 1128 | [ | | | | | | | | | | | | | | | ] |
| 1129 | [ | | | | | | | | | | | | | | | ] |
| 1130 | [ | | | | | | | | | | | | | | | ] |
| 1131 | [ | | | | | | | | | | | | | | | ] |
| 1132 | [ | | | | | | | | | | | | | | | ] |
| 1133 | [ | | | | | | | | | | | | | | | ] |
| 1134 | [ | | | | | | | | | | | | | | | ] |
| 1135 | [ | | | | | | | | | | | | | | | ] |
| 1136 | [ | | | | | | | | | | | | | | | ] |
| 1137 | [ | | | | | | | | | | | | | | | ] |
| 1138 | [ | | | | | | | | | | | | | | | ] |
| 1139 | [ | | | | | | | | | | | | | | | ] |
| 1140 | [ | | | | | | | | | | | | | | | ] |
| 1141 | [ | | | | | | | | | | | | | | | ] |
| 1142 | [ | | | | | | | | | | | | | | | ] |
| 1143 | [ | | | | | | | | | | | | | | | ] |
| 1144 | [ | | | | | | | | | | | | | | | ] |
| 1145 | [ | | | | | | | | | | | | | | | ] |
| 1146 | [ | | | | | | | | | | | | | | | ] |
| 1147 | [ | | | | | | | | | | | | | | | ] |
| 1148 | [ | | | | | | | | | | | | | | | ] |
| 1149 | [ | | | | | | | | | | | | | | | ] |
| 1150 | [ | | | | | | | | | | | | | | | ] |
| 1151 | [ | | | | | | | | | | | | | | | ] |
| 1152 | [ | | | | | | | | | | | | | | | ] |
| 1153 | [ | | | | | | | | | | | | | | | ] |
| 1154 | [ | | | | | | | | | | | | | | | ] |
| 1155 | [ | | | | | | | | | | | | | | | ] |
| 1156 | [ | | | | | | | | | | | | | | | ] |
| 1157 | [ | | | | | | | | | | | | | | | ] |
| 1158 | [ | | | | | | | | | | | | | | | ] |
| 1159 | [ | | | | | | | | | | | | | | | ] |
| 1160 | [ | | | | | | | | | | | | | | | ] |
| 1161 | [ | | | | | | | | | | | | | | | ] |
| 1162 | [ | | | | | | | | | | | | | | | ] |
| 1163 | [ | | | | | | | | | | | | | | | ] |
| 1164 | [ | | | | | | | | | | | | | | | ] |
| 1165 | [ | | | | | | | | | | | | | | | ] |
| 1166 | [ | | | | | | | | | | | | | | | ] |
| 1167 | [ | | | | | | | | | | | | | | | ] |
| 1168 | [ | | | | | | | | | | | | | | | ] |
| 1169 | [ | | | | | | | | | | | | | | | ] |
| 1170 | [ | | | | | | | | | | | | | | | ] |
| 1171 | [ | | | | | | | | | | | | | | | ] |
| 1172 | [ | | | | | | | | | | | | | | | ] |
| 1173 | [ | | | | | | | | | | | | | | | ] |
| 1174 | [ | | | | | | | | | | | | | | | ] |
| 1175 | [ | | | | | | | | | | | | | | | ] |
| 1176 | [ | | | | | | | | | | | | | | | ] |
| 1177 | [ | | | | | | | | | | | | | | | ] |
| 1178 | [ | | | | | | | | | | | | | | | ] |
| 1179 | [ | | | | | | | | | | | | | | | ] |
| 1180 | [ | | | | | | | | | | | | | | | ] |
| 1181 | [ | | | | | | | | | | | | | | | ] |
| 1182 | [ | | | | | | | | | | | | | | | ] |
| 1183 | [ | | | | | | 8,000.00 | | | | | | | | | ] |
| 1184 | [ | | | | | | | | | | | | | | | ] |
| 1185 | [ | | | | | | | | | | | | | | | ] |
| 1186 | [ | | | | | | | | | | | | | | | ] |
| 1187 | [ | | | | | | | | | | | | | | | ] |
| 1188 | [ | | | | | | | | | | | | | | | ] |
| 1189 | [ | | | | | | | | | | | | | | | ] |
| 1190 | [ | | | | | | | | | | | | | | | ] |
| 1191 | [ | | | | | | | | | | | | | | | ] |
| 1192 | [ | | | | | | | | | | | | | | | ] |
| 1193 | [ | | | | | | | | | | | | | | | ] |
| 1194 | [ | | | | | | | | | | | | | | | ] |
| 1195 | [ | | | | | | | | | | | | | | | ] |
| 1196 | [ | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1197 | [ | | | | | | | | | | | | | ] |
| 1198 | [ | | | | | | | | | | | | | ] |
| 1199 | [ | | | | | | | | | | | | | ] |
| 1200 | [ | | | | | | | | | | | | | ] |
| 1201 | [ | | | | | | | | | | | | | ] |
| 1202 | [ | | | | | | | | | | | | | ] |
| 1203 | [ | | | | | | | | | | | | | ] |
| 1204 | [ | | | | | | | | | | | | | ] |
| 1205 | [ | | | | | | | | | | | | | ] |
| 1206 | [ | | | | | | | | | | | | | ] |
| 1207 | [ | | | | | | | | | | | | | ] |
| 1208 | [ | | | | | | | | | | | | | ] |
| 1209 | [ | | | | | | | | | | | | | ] |
| 1210 | [ | | | | | | | | | 30,000.00 | | | | ] |
| 1211 | [ | | | | | | | | | | | | | ] |
| 1212 | [ | | | | | | | | | | | | | ] |
| 1213 | [ | | | | | | | | | | | | | ] |
| 1214 | [ | | | | | | | | | | | | | ] |
| 1215 | [ | | | | | | | | | | | | | ] |
| 1216 | [ | | | | | | | | | | | | | ] |
| 1217 | [ | | | | | | | | | | | | | ] |
| 1218 | [ | | | | | | | | | | | | | ] |
| 1219 | [ | | | | | | | | | | | | | ] |
| 1220 | [ | | | | | | | | | | | | | ] |
| 1221 | [ | | | | | | | | | | | | | ] |
| 1222 | [ | | | | | | | | | | | | | ] |
| 1223 | [ | | | | | | | | | | | | | ] |
| 1224 | [ | | | | | | | | | | | | | ] |
| 1225 | [ | | | | | | | | | | | | | ] |
| 1226 | [ | | | | | | | | | | | | | ] |
| 1227 | [ | | | | | | | | | | | | | ] |
| 1228 | [ | | | | | | | | | | | | | ] |
| 1229 | [ | | | | | | | | | | | | | ] |
| 1230 | [ | | | | | | | | | | | | | ] |
| 1231 | [ | | | | | | | | | | | | | ] |
| 1232 | [ | | | | | | | | | | | | | ] |
| 1233 | [ | | | | | | | | | | | | | ] |
| 1234 | [ | | | | | | | | | | | | | ] |
| 1235 | [ | | | | | | | | | | | | | ] |
| 1236 | [ | | | | | | | | | | | | | ] |
| 1237 | [ | | | | | | | | | | | | | ] |
| 1238 | [ | | | | | | | | | | | | | ] |
| 1239 | [ | | | | | | | | | | | | | ] |
| 1240 | [ | | | | | | | | | | | | | ] |
| 1241 | [ | | | | | | | | | | | | | ] |
| 1242 | [ | | | | | | | | | | | | | ] |
| 1243 | [ | | | | | | | | | | | | | ] |
| 1244 | [ | | | | | | | | | | | | | ] |
| 1245 | [ | | | | | | | | | | | | | ] |
| 1246 | [ | | | | | | | | | | | | | ] |
| 1247 | [ | | | | | | | | | | | | | ] |
| 1248 | [ | | | | | | | | | | | | | ] |
| 1249 | [ | | | | | | | | | | | | | ] |
| 1250 | [ | | | | | | | | | | | | | ] |
| 1251 | [ | | | | | | | | | | | | | ] |
| 1252 | [ | | | | | | | | | | | | | ] |
| 1253 | [ | | | | | | | | | | | | | ] |
| 1254 | [ | | | | | | | | | | | | | ] |
| 1255 | [ | | | | | | | | | | | | | ] |
| 1256 | [ | | | | | | | | | | | | | ] |
| 1257 | [ | | | | | | | | | | | | | ] |
| 1258 | [ | | | | | | | | | | | | | ] |
| 1259 | [ | | | | | | | | | | | | | ] |
| 1260 | [ | | | | | | | | | | | | | ] |
| 1261 | [ | | | | | | | | | | | | | ] |
| 1262 | [ | | | | | | | | | | | | | ] |
| 1263 | [ | | | | | | | | | | | | | ] |
| 1264 | [ | | | | | | | | | | | | | ] |
| 1265 | [ | | | | | | | | | | | | | ] |
| 1266 | [ | | | | | | | | | | | | | ] |
| 1267 | [ | | | | | | | | | | | | | ] |
| 1268 | [ | | | | | | | | | | | | | ] |
| 1269 | [ | | | | | | | | | | | | | ] |
| 1270 | [ | | | | | | | | | | | | | ] |
| 1271 | [ | | | | | | | | | | | | | ] |

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1272 | [ | | 7,000.00 | | | | | | | | | | | ] |
| 1273 | [ | | | | | | | | | | | | | ] |
| 1274 | [ | | | | | | | | | | | | | ] |
| 1275 | [ | | | | | | | | | | | | | ] |
| 1276 | [ | | | | | | | | | | | | | ] |
| 1277 | [ | | | | | | | | | | | | | ] |
| 1278 | [ | | | | | | | | | | | | | ] |
| 1279 | [ | | | | | | | | | | | | | ] |
| 1280 | [ | | | | | | | | | | | | | ] |
| 1281 | [ | | | | | | | | | | | | | ] |
| 1282 | [ | | | | | | | | | | | | | ] |
| 1283 | [ | | | | | | | | | | | | | ] |
| 1284 | [ | | | | | | | | | | | | | ] |
| 1285 | [ | | | | | | | | | | | | | ] |
| 1286 | [ | | | | | | | | | | | | | ] |
| 1287 | [ | | | | | | | | | | | | | ] |
| 1288 | [ | | | | | | | | | | | | | ] |
| 1289 | [ | | | | | | | | | | | | | ] |
| 1290 | [ | | | | | | | | | | | | | ] |
| 1291 | [ | | | | | | | | | | | | | ] |
| 1292 | [ | | | | | | | | | | | | | ] |
| 1293 | [ | | | | | | | | | | | | | ] |
| 1294 | [ | | | | | | | | | | | | | ] |
| 1295 | [ | | | | | | | | | | | | | ] |
| 1296 | [ | | | | | | | | | | | | | ] |
| 1297 | [ | | | | | | | | | | | | | ] |
| 1298 | [ | | | | | | | | | | | | | ] |
| 1299 | [ | | | | | | | | | | | | | ] |
| 1300 | [ | | | | | | | | | | | | | ] |
| 1301 | [ | | | | | | | | | | | | | ] |
| 1302 | [ | | | | | | | | | | | | | ] |
| 1303 | [ | | | | | | | | | | | | | ] |
| 1304 | [ | | | | | | | | | | | | | ] |
| 1305 | [ | | | | | | | | | | | | | ] |
| 1306 | [ | | | | | | | | | | | | | ] |
| 1307 | [ | | | | | | | | | | | | | ] |
| 1308 | [ | | | | | | | | | | | | | ] |
| 1309 | [ | | | | | | | | | | | | | ] |
| 1310 | [ | | | | | | | | | | | | | ] |
| 1311 | [ | | | | | | | | | | | | | ] |
| 1312 | [ | | | | | | | | | | | | | ] |
| 1313 | [ | | | | | | | | | | | | | ] |
| 1314 | [ | | | | | | | | | | | | | ] |
| 1315 | [ | | | | | | | | | | | | | ] |
| 1316 | [ | | | | | | | | | | | | | ] |
| 1317 | [ | | | | | | | | | | | | | ] |
| 1318 | [ | | | | | | | | | | | | | ] |
| 1319 | [ | | | | | | | | | | | | | ] |
| 1320 | [ | | | | | | | | | | | | | ] |
| 1321 | [ | | | | | | | | | | | | | ] |
| 1322 | [ | | | | | | | | | | | | | ] |
| 1323 | [ | | | | | | | | | | | | | ] |
| 1324 | [ | | | | | | | | | | | | | ] |
| 1325 | [ | | | | | | | | | | | | | ] |
| 1326 | [ | | | | | | | | | | | | | ] |
| 1327 | [ | | | | | | | | | | | | | ] |
| 1328 | [ | | | | | | | | | | | | | ] |
| 1329 | [ | | | | | | | | | | | | | ] |
| 1330 | [ | | | | | | | | | | | | | ] |
| 1331 | [ | | | | | | | | | | | | | ] |
| 1332 | [ | | | | | | | | | | | | | ] |
| 1333 | [ | | | | | | | | | | | | | ] |
| 1334 | [ | | | | | | | | | | | | | ] |
| 1335 | [ | | | | | | | | | | | | | ] |
| 1336 | [ | | | | | | | | | | | | | ] |
| 1337 | [ | | | | | | | | | | | | | ] |
| 1338 | [ | | | | | | | | | | | | | ] |
| 1339 | [ | | | | | | | | | | | | | ] |
| 1340 | [ | | | | | | | | | | | | | ] |
| 1341 | [ | | | | | | | | | | | | | ] |
| 1342 | [ | | | | | | | | | | | | | ] |
| 1343 | [ | | | | | | | | | | | | | ] |
| 1344 | [ | | | | | | | | | | | | | ] |
| 1345 | [ | | | | | | | | | | | | | ] |
| 1346 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1347 | [ | | | | | | | | | | | | | ] |
| 1348 | [ | | | | | | | | | | | | | ] |
| 1349 | [ | | | | | | | | | | | | | ] |
| 1350 | [ | | | | | | | | | | | | | ] |
| 1351 | [ | | | | | | | | | | | | | ] |
| 1352 | [ | | | | | | | | | | | | | ] |
| 1353 | [ | | | | | | | | | | | | | ] |
| 1354 | [ | | | | | | | | | | | | | ] |
| 1355 | [ | | | | | | | | | | | | | ] |
| 1356 | [ | | | | | | | | | | | | | ] |
| 1357 | [ | | | | | | | | | | | | | ] |
| 1358 | [ | | | | | | | | | | | | | ] |
| 1359 | [ | | | | | | | | | | | | | ] |
| 1360 | [ | | | | | | | | | | | | | ] |
| 1361 | [ | | | | | | | | | | | | | ] |
| 1362 | [ | | | | | | | | | | | | | ] |
| 1363 | [ | | | | | | | | | | | | | ] |
| 1364 | [ | | | | | | | | | | | | | ] |
| 1365 | [ | | | | | | | | | | | | | ] |
| 1366 | [ | | | | | | | | | | | | | ] |
| 1367 | [ | | | | | | | | | | | | | ] |
| 1368 | [ | | | | | | | | | | | | | ] |
| 1369 | [ | | | | | | | | | | | | | ] |
| 1370 | [ | | | | | | | | | | | | | ] |
| 1371 | [ | | | | | | | | | | | | | ] |
| 1372 | [ | | | | | | | | | | | | | ] |
| 1373 | [ | | | | | | | | | | | | | ] |
| 1374 | [ | | | | | | | | | | | | | ] |
| 1375 | [ | | | | | | | | | 20,000.00 | | | | ] |
| 1376 | [ | | | | | | | | | | | | | ] |
| 1377 | [ | | | | | | | | | | | | | ] |
| 1378 | [ | | | | | | | | | | | | | ] |
| 1379 | [ | | | | | | | | | | | | | ] |
| 1380 | [ | | | | | | | | | | | | | ] |
| 1381 | [ | | | | | | | | | | | | | ] |
| 1382 | [ | | | | | | | | | | | | | ] |
| 1383 | [ | | | | | | | | | | | | | ] |
| 1384 | [ | | | | | | | | | | | | | ] |
| 1385 | [ | | | | | | | | | | | | | ] |
| 1386 | [ | | | | | | | | | | | | | ] |
| 1387 | [ | | | | | | | | | | | | | ] |
| 1388 | [ | | | | | | | | | | | | | ] |
| 1389 | [ | | | | | | | | | | | | | ] |
| 1390 | [ | | | | | | | | | | | | | ] |
| 1391 | [ | | | | | | | | | | | | | ] |
| 1392 | [ | | | | | | | | | | | | | ] |
| 1393 | [ | | | | | | | | | | | | | ] |
| 1394 | [ | | | | | | | | | | | | | ] |
| 1395 | [ | | | | | | | | | | | | | ] |
| 1396 | [ | | | | | | | | | | | | | ] |
| 1397 | [ | | | | | | | | | | | | | ] |
| 1398 | [ | | | | | | | | | | | | | ] |
| 1399 | [ | | | | | | | | | | | | | ] |
| 1400 | [ | | | | | | | | | | | | | ] |
| 1401 | [ | | | | | | | | | | | | | ] |
| 1402 | [ | | | | | | | | | | | | | ] |
| 1403 | [ | | | | | | | | | | | | | ] |
| 1404 | [ | | | | | | | | | | | | | ] |
| 1405 | [ | | | | | | | | | | | | | ] |
| 1406 | [ | | | | | | | | | | | | | ] |
| 1407 | [ | | | | | | | | | | | | | ] |
| 1408 | [ | | | | | | | | | | | | | ] |
| 1409 | [ | | | | | | | | | | | | | ] |
| 1410 | [ | | | | | | | | | | | | | ] |
| 1411 | [ | | | | | | | | | | | | | ] |
| 1412 | [ | | | | | | | | | | | | | ] |
| 1413 | [ | | | | | | | | | | | | | ] |
| 1414 | [ | | | | | | | | | | | | | ] |
| 1415 | [ | | | | | | | | | | | | | ] |
| 1416 | [ | | | | | | | | | | | | | ] |
| 1417 | [ | | | | | | | | | | | | | ] |
| 1418 | [ | | | | | | | | | | | | | ] |
| 1419 | [ | | | | | | | | | | | | | ] |
| 1420 | [ | | | | | | | | | | | | | ] |
| 1421 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1422 | [ | | | | | | | | | | | | | ] |
| 1423 | [ | | | | | | | | | | | | | ] |
| 1424 | [ | | | | | | | | | | | | | ] |
| 1425 | [ | | | | | | | | | | | | | ] |
| 1426 | [ | | | | | | | | | | | | | ] |
| 1427 | [ | | | | | | | | | | | | | ] |
| 1428 | [ | | | | | | | | | | | | | ] |
| 1429 | [ | | | | | | | | | | | | | ] |
| 1430 | [ | | | | | | | | | | | | | ] |
| 1431 | [ | | | | | | | | | | | | | ] |
| 1432 | [ | | | | | | | | | | | | | ] |
| 1433 | [ | | | | | | | | | | | | | ] |
| 1434 | [ | | | | | | | | | | | | | ] |
| 1435 | [ | | | | | | | | | | | | | ] |
| 1436 | [ | | | | | | | | | | | | | ] |
| 1437 | [ | | | | | | | | | | | | | ] |
| 1438 | [ | | | | | | | | | | | | | ] |
| 1439 | [ | | | | | | | | | | | | | ] |
| 1440 | [ | | | | | | | | | | | | | ] |
| 1441 | [ | | | | | | | | | | | | | ] |
| 1442 | [ | | | | | | | | | | | | | ] |
| 1443 | [ | | | | | | | | | | | | | ] |
| 1444 | [ | | | | | | | | | | | | | ] |
| 1445 | [ | | | | | | | | | | | | | ] |
| 1446 | [ | | | | | | | | | | | | | ] |
| 1447 | [ | | | | | | | | | | | | | ] |
| 1448 | [ | | | | | | | | | | | | | ] |
| 1449 | [ | | | | | | | | | | | | | ] |
| 1450 | [ | | | | | | | | | | | | | ] |
| 1451 | [ | | | | | | | | | | | | | ] |
| 1452 | [ | | | | | | | | | | | | | ] |
| 1453 | [ 50,000.00 | | | | | | | | | | | | | ] |
| 1454 | [ | | | | | | | | | | | | | ] |
| 1455 | [ | | | | | | | | | | | | | ] |
| 1456 | [ | | | | | | | | | | | | | ] |
| 1457 | [ | | | | | | | | | | | | | ] |
| 1458 | [ | | | | | | | | | | | | | ] |
| 1459 | [ | | | | | | | | | | | | | ] |
| 1460 | [ | | | | | | | | | | | | | ] |
| 1461 | [ | | | | | | | | | | | | | ] |
| 1462 | [ | | | | | | | | | | | | | ] |
| 1463 | [ | | | | | | | | | | | | | ] |
| 1464 | [ | | | | | | | | | | | | | ] |
| 1465 | [ | | | | | | | | | | | | | ] |
| 1466 | [ | | | | | | | | | | | | | ] |
| 1467 | [ | | | | | | | | | | | | | ] |
| 1468 | [ | | | | | | | | | | | | | ] |
| 1469 | [ | | | | | | | | | | | | | ] |
| 1470 | [ | | | | | | | | | | | | | ] |
| 1471 | [ | | | | | | | | | | | | | ] |
| 1472 | [ | | | | | | | | | | | | | ] |
| 1473 | [ | | | | | | | | | | | | | ] |
| 1474 | [ | | | | | | | | | | | | | ] |
| 1475 | [ | | | | | | | | | | | | | ] |
| 1476 | [ | | | | | | | | | | | | | ] |
| 1477 | [ | | | | | | | | | | | | | ] |
| 1478 | [ | | | | | | | | | | | | | ] |
| 1479 | [ | | | | | | | | | | | | | ] |
| 1480 | [ | | | | | | | | | | | | | ] |
| 1481 | [ | | | | | | | | | | | | | ] |
| 1482 | [ | | | | | | | | | | | | | ] |
| 1483 | [ | | | | | | | | | | | | | ] |
| 1484 | [ | | | | | | | | | | | | | ] |
| 1485 | [ | | | | | | | | | | | | | ] |
| 1486 | [ | | | | | | | | | | | | | ] |
| 1487 | [ | | | | | | | | | | | | | ] |
| 1488 | [ | | | | | | | | | | | | | ] |
| 1489 | [ | | | | | | | | | | | | | ] |
| 1490 | [ | | | | | | | | | | | | | ] |
| 1491 | [ | | | | | | | | | | | | | ] |
| 1492 | [ | | | | | | | | | | | | | ] |
| 1493 | [ | | | | | | | | | | | | | ] |
| 1494 | [ | | | | | | | | | | | | | ] |
| 1495 | [ | | | | | | | | | | | | | ] |
| 1496 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1497 | [ | | 35,000.00 | | | | | | | | | | | ] |
| 1498 | [ | | | | | | | | | | | | | ] |
| 1499 | [ | | | | | | | | | | | | | ] |
| 1500 | [ | | | | | | | | | | | | | ] |
| 1501 | [ | | | | | | | | | | | | | ] |
| 1502 | [ | | | | | | | | | | | | | ] |
| 1503 | [ | | | | | | | | | | | | | ] |
| 1504 | [ | | | | | | | | | | | | | ] |
| 1505 | [ | | | | | | | | | | | | | ] |
| 1506 | [ | | | | | | | | | | | | | ] |
| 1507 | [ | | | | | | | | | | | | | ] |
| 1508 | [ | | | | | | | | | | | | | ] |
| 1509 | [ | | | | | | | | | | | | | ] |
| 1510 | [ | | | | | | | | | | | | | ] |
| 1511 | [ | | | | | | | | | | | | | ] |
| 1512 | [ | | | | | | | | | | | | | ] |
| 1513 | [ | | | | | | | | | | | | | ] |
| 1514 | [ | | | | | | | | | | | | | ] |
| 1515 | [ | | | | | | | | | | | | | ] |
| 1516 | [ | | | | | | | | | | | | | ] |
| 1517 | [ | | | | | | | | | | | | | ] |
| 1518 | [ | | | | | | | | | | | | | ] |
| 1519 | [ | | | | | | | | | | | | | ] |
| 1520 | [ | | | | | | | | | | | | | ] |
| 1521 | [ | | | | | | | | | | | | | ] |
| 1522 | [ | | | | | | | | | | | | | ] |
| 1523 | [ | | | | | | | | | | | | | ] |
| 1524 | [ | | | | | | | | | | | | | ] |
| 1525 | [ | | | | | | | | | | | | | ] |
| 1526 | [ | | | | | | | | | | | | | ] |
| 1527 | [ | | | | | | | | | | | | | ] |
| 1528 | [ | | | | | | | | | | | | | ] |
| 1529 | [ | | | | | | | | | | | | | ] |
| 1530 | [ | | | | | | | | | | | | | ] |
| 1531 | [ | | | | | | | | | | | | | ] |
| 1532 | [ | | | | | | | | | | | | | ] |
| 1533 | [ | | | | | | | | | | | | | ] |
| 1534 | [ | | | | | | | | | | | | | ] |
| 1535 | [ | | | | | | | | | | | | | ] |
| 1536 | [ | | | | | | | | | | | | | ] |
| 1537 | [ | | | | | | | | | | | | | ] |
| 1538 | [ | | | | | | | | | | | | | ] |
| 1539 | [ | | | | | | | | | | | | | ] |
| 1540 | [ | | | | | | | | | | | | | ] |
| 1541 | [ | | | | | | | | | | | | | ] |
| 1542 | [ | | | | | | | | | | | | | ] |
| 1543 | [ | | | | | | | | | | | | | ] |
| 1544 | [ | | | | | | | | | | | | | ] |
| 1545 | [ | | | | | | | | | | | | | ] |
| 1546 | [ | | | | | | | | | | | | | ] |
| 1547 | [ | | | | | | | | | | | | | ] |
| 1548 | [ | | | | | | | | | | | | | ] |
| 1549 | [ | | | | | | | | | | | | | ] |
| 1550 | [ | | | | | | | | | | | | | ] |
| 1551 | [ | | | | | | | | | | | | | ] |
| 1552 | [ | | | | | | | | | | | | | ] |
| 1553 | [ | | | | | | | | | | | | | ] |
| 1554 | [ | | | | | | | | | | | | | ] |
| 1555 | [ | | | | | | | | | | | | | ] |
| 1556 | [ | | | | | | | | | | | | | ] |
| 1557 | [ | | | | | | | | | | | | | ] |
| 1558 | [ | | | | | | | | | | | | | ] |
| 1559 | [ | | | | | | | | | | | | | ] |
| 1560 | [ | | | | | | | | | | | | | ] |
| 1561 | [ | | | | | | | | | | | | | ] |
| 1562 | [ | | | | | | | | | | | | | ] |
| 1563 | [ | | | | | | | | | | | | | ] |
| 1564 | [ | | | | | | | | | | | | | ] |
| 1565 | [ | | | | | | | | | | | | | ] |
| 1566 | [ | | | | | | | | | | | | | ] |
| 1567 | [ | | | | | | | | | | | | | ] |
| 1568 | [ | | | | | | | | | | | | | ] |
| 1569 | [ | | | | | | | | | | | | | ] |
| 1570 | [ | | | | | | | | | | | | | ] |
| 1571 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1572 | [ | | | | | | | | | | | | | | | ] |
| 1573 | [ | | | | | | | | | | | | | | | ] |
| 1574 | [ | | | | | | | | | | | | | | | ] |
| 1575 | [ | | | | | | | | | | | | | | | ] |
| 1576 | [ | | | | | | | | | | | | | | | ] |
| 1577 | [ | | | | | | | | | | | | | | | ] |
| 1578 | [ | | | | | | | | | | | | | | | ] |
| 1579 | [ | | | | | | | | | | | | | | | ] |
| 1580 | [ | | | | | | | | | | | | | | | ] |
| 1581 | [ | | | | | | | | | | | | | | | ] |
| 1582 | [ | | | | | | | | | | | | | | | ] |
| 1583 | [ | | | | | | | | | | | | | | | ] |
| 1584 | [ | | | | | | | | | | | | | | | ] |
| 1585 | [ | | | | | | | | | | | | | | | ] |
| 1586 | [ | | | | | | | | | | | | | | | ] |
| 1587 | [ | | | | | | | | | | | | | | | ] |
| 1588 | [ | | | | | | | | | | | | | | | ] |
| 1589 | [ | | | | | | | | | | | | | | | ] |
| 1590 | [ | | | | | | | | | | | | | | | ] |
| 1591 | [ | | | | | | | | | | | | | | | ] |
| 1592 | [ | | | | | | | | | | | | | | | ] |
| 1593 | [ | | | | | | | | | | | | | | | ] |
| 1594 | [ | | | | | | | | | | | | | | | ] |
| 1595 | [ | | | | | | | | | | | | | | | ] |
| 1596 | [ | | | | | | | | | | | | | | | ] |
| 1597 | [ | | | | | | | | | | | | | | | ] |
| 1598 | [ | | | | | | | | | | | | | | | ] |
| 1599 | [ | | | | | | | | | | | | | | | ] |
| 1600 | [ | | | | | | | | | | | | | | | ] |
| 1601 | [ | | | | | | | | | | | | | | | ] |
| 1602 | [ | | | | | | | | | | | | | | | ] |
| 1603 | [ | | | | | | | | | | | | | | | ] |
| 1604 | [ | | | | | | | | | | | | | | | ] |
| 1605 | [ | | | | | | | | | | | | | | | ] |
| 1606 | [ | | | | | | | | | | | | | | | ] |
| 1607 | [ | | | | | | | | | | | | | | | ] |
| 1608 | [ | | | | | | | | | | | | | | | ] |
| 1609 | [ | | | | | | | | | | | | | | | ] |
| 1610 | [ | | | | | | | | | | | | | | | ] |
| 1611 | [ | | | | | | | | | | | | | | | ] |
| 1612 | [ | | | | | | | | | | | | | | | ] |
| 1613 | [ | | | | | | | | | | | | | | | ] |
| 1614 | [ | | | | | | | | | | | | | | | ] |
| 1615 | [ | | | | | | | | | | | | | | | ] |
| 1616 | [ | | | | | | | | | | | | | | | ] |
| 1617 | [ | | | | | | | | | | | | | | | ] |
| 1618 | [ | | | | | | | | | | | | | | | ] |
| 1619 | [ | | | | | | | | | | | | | | | ] |
| 1620 | [ | | | | | | | | | | | | | | | ] |
| 1621 | [ | | | | | | | | | | | | | | | ] |
| 1622 | [ | | | | | | | | | | | | | | | ] |
| 1623 | [ | | | | | | | | | | | | | | | ] |
| 1624 | [ | | | | | | | | | | | | | | | ] |
| 1625 | [ | | | | | | | | | | | | | | | ] |
| 1626 | [ | | | | | | | | | | | | | | | ] |
| 1627 | [ | | | | | | | | | | | | | | | ] |
| 1628 | [ | | | | | | | | | | | | | | | ] |
| 1629 | [ | | | | | | | | | | | | | | | ] |
| 1630 | [ | | | | | | | | | | | | | | | ] |
| 1631 | [ | | | | | | | | | | | | | | | ] |
| 1632 | [ | | | | | | 6,000.00 | | | | | | | | | ] |
| 1633 | [ | | | | | | | | | | | | | | | ] |
| 1634 | [ | | | | | | | | | | | | | | | ] |
| 1635 | [ | | | | | | | | | | | | | | | ] |
| 1636 | [ | | | | | | | | | | | | | | | ] |
| 1637 | [ | | | | | | | | | | | | | | | ] |
| 1638 | [ | | | | | | | | | | | | | | | ] |
| 1639 | [ | | | | | | | | | | | | | | | ] |
| 1640 | [ | | | | | | | | | | | | | | | ] |
| 1641 | [ | | | | | | | | | | | | | | | ] |
| 1642 | [ | | | | | | | | | | | | | | | ] |
| 1643 | [ | | | | | | | | | | | | | | | ] |
| 1644 | [ | | | | | | | | | | | | | | | ] |
| 1645 | [ | | | | | | | | | | | | | | | ] |
| 1646 | [ | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1647 | [ | | | | | | | | | | | | | | | ] |
| 1648 | [ | | | | | | | | | | | | | | | ] |
| 1649 | [ | | | | | | | | | | | | | | | ] |
| 1650 | [ | | | | | | | | | | | | | | | ] |
| 1651 | [ | | | | | | | | | | | | | | | ] |
| 1652 | [ | | | | | | | | | | | | | | | ] |
| 1653 | [ | | | | | | | | | | | | | | | ] |
| 1654 | [ | | | | | | | | | | | | | | | ] |
| 1655 | [ | | | | | | | | | | | | | | | ] |
| 1656 | [ | | | | | | | | | | | | | | | ] |
| 1657 | [ | | | | | | | | | | | | | | | ] |
| 1658 | [ | | | | | | | | | | | | | | | ] |
| 1659 | [ | | | | | | | | | | | | | | | ] |
| 1660 | [ | | | | | | | | | | | | | | | ] |
| 1661 | [ | | | | | | | | | | | | | | | ] |
| 1662 | [ | | | | | | | | | | | | | | | ] |
| 1663 | [ | | | | | | | | | | | | | | | ] |
| 1664 | [ | | | | | | | | | | | | | | | ] |
| 1665 | [ | | | | | | | | | | | | | | | ] |
| 1666 | [ | | | | | | | | | | | | | | | ] |
| 1667 | [ | 20,000.00 | | | | | | | | | | | | | | ] |
| 1668 | [ | | | | | | | | | | | | | | | ] |
| 1669 | [ | | | | | | | | | | | | | | | ] |
| 1670 | [ | | | | | | | | | | | | | | | ] |
| 1671 | [ | | | | | | | | | | | | | | | ] |
| 1672 | [ | | | | | | | | | | | | | | | ] |
| 1673 | [ | | | | | | | | | | | | | | | ] |
| 1674 | [ | | | | | | | | | | | | | | | ] |
| 1675 | [ | | | | | | | | | | | | | | | ] |
| 1676 | [ | | | | | | | | | | | | | | | ] |
| 1677 | [ | | | | | | | | | | | | | | | ] |
| 1678 | [ | | | | | | | | | | | | | | | ] |
| 1679 | [ | | | | | | | | | | | | | | | ] |
| 1680 | [ | | | | | | | | | | | | | | | ] |
| 1681 | [ | | | | | | | | | | | | | | | ] |
| 1682 | [ | | | | | | | | | | | | | | | ] |
| 1683 | [ | | | | | | | | | | | | | | | ] |
| 1684 | [ | | | | | | | | | | | | | | | ] |
| 1685 | [ | | | | | | | | | | | | | | | ] |
| 1686 | [ | | | | | | | | | | | | | | | ] |
| 1687 | [ | | | | | | | | | | | | | | | ] |
| 1688 | [ | | | | | | | | | | | | | | | ] |
| 1689 | [ | | | | | | | | | | | | | | | ] |
| 1690 | [ | | | | | | | | | | | | | | | ] |
| 1691 | [ | | | | | | | | | | | | | | | ] |
| 1692 | [ | | | | | | | | | | | | | | | ] |
| 1693 | [ | | | | | | | | | | | | | | | ] |
| 1694 | [ | | | | | | | | | | | | | | | ] |
| 1695 | [ | | | | | | | | | | | | | | | ] |
| 1696 | [ | | | | | | | | | | | | | | | ] |
| 1697 | [ | | | | | | | | | | | | | | | ] |
| 1698 | [ | | | | | | | | | | | | | | | ] |
| 1699 | [ | | | | | | | | | | | | | | | ] |
| 1700 | [ | | | | | | | | | | | | | | | ] |
| 1701 | [ | | | | | | | | | | | | | | | ] |
| 1702 | [ | | | | | | | | | | | | | | | ] |
| 1703 | [ | | | | | | | | | | | | | | | ] |
| 1704 | [ | | | | | | | | | | | | | | | ] |
| 1705 | [ | | | | | | | | | | | | | | | ] |
| 1706 | [ | | | | | | | | | | | | | | | ] |
| 1707 | [ | | | | | | | | | | | | | | | ] |
| 1708 | [ | | | | | | | | | | | | | | | ] |
| 1709 | [ | | | | | | | | | | | | | | | ] |
| 1710 | [ | | | | | | | | | | | | | | | ] |
| 1711 | [ | | | | | | | | | | | | | | | ] |
| 1712 | [ | | | | | | | | | | | | | | | ] |
| 1713 | [ | | | | | | | | | | | | | | | ] |
| 1714 | [ | | | | | | | | | | | | | | | ] |
| 1715 | [ | | | | | | | | | | | | | | | ] |
| 1716 | [ | | | | | | | | | | | | | | | ] |
| 1717 | [ | | | | | | | | | | | | | | | ] |
| 1718 | [ | | | | | | | | | | | | | | | ] |
| 1719 | [ | | | | | | | | | | | | | | | ] |
| 1720 | [ | | | | | | | | | | | | | | | ] |
| 1721 | [ | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1722 | [ | | 275,000.00 | | | | | | | | | | | ] |
| 1723 | [ | | | | | | | | | | | | | ] |
| 1724 | [ | | | | | | | | | | | | | ] |
| 1725 | [ | | | | | | | | | | | | | ] |
| 1726 | [ | | | | | | | | | | | | | ] |
| 1727 | [ | | | | | | | | | | | | | ] |
| 1728 | [ | | | | | | | | | | | | | ] |
| 1729 | [ | | | | | | | | | | | | | ] |
| 1730 | [ | | | | | | | | | | | | | ] |
| 1731 | [ | | | | | | | | | | | | | ] |
| 1732 | [ | | | | | | | | | | | | | ] |
| 1733 | [ | | | | | | | | | | | | | ] |
| 1734 | [ | | | | | | | | | | | | | ] |
| 1735 | [ | | | | | | | | | | | | | ] |
| 1736 | [ | | | | | | | | | | | | | ] |
| 1737 | [ | | | | | | | | | | | | | ] |
| 1738 | [ | | | | | | | | | | | | | ] |
| 1739 | [ | | | | | | | | | | | | | ] |
| 1740 | [ | | | | | | | | | | | | | ] |
| 1741 | [ | | | | | | | | | | | | | ] |
| 1742 | [ | | | | | | | | | | | | | ] |
| 1743 | [ | | | | | | | | | | | | | ] |
| 1744 | [ | | | | | | | | | | | | | ] |
| 1745 | [ | | | | | | | | | | | | | ] |
| 1746 | [ | | | | | | | | | | | | | ] |
| 1747 | [ | | | | | | | | | | | | | ] |
| 1748 | [ | | | | | | | | | | | | | ] |
| 1749 | [ | | | | | | | | | | | | | ] |
| 1750 | [ | | | | | | | | | | | | | ] |
| 1751 | [ | | | | | | | | | | | | | ] |
| 1752 | [ | | | | | | | | | | | | | ] |
| 1753 | [ | | | | | | | | | | | | | ] |
| 1754 | [ | | | | | | | | | | | | | ] |
| 1755 | [ | | | | | | | | | | | | | ] |
| 1756 | [ | | | | | | | | | | | | | ] |
| 1757 | [ | | | | | | | | | | | | | ] |
| 1758 | [ | | | | | | | | | | | | | ] |
| 1759 | [ | | | | | | | | | | | | | ] |
| 1760 | [ | | | | | | | | | | | | | ] |
| 1761 | [ | | | | | | | | | | | | | ] |
| 1762 | [ | | | | | | | | | | | | | ] |
| 1763 | [ | | | | | | | | | | | | | ] |
| 1764 | [ | | | | | | | | | | | | | ] |
| 1765 | [ | | | | | | | | | | | | | ] |
| 1766 | [ | | | | | | | | | | | | | ] |
| 1767 | [ | | | | | | | | | | | | | ] |
| 1768 | [ | | | | | | | | | | | | | ] |
| 1769 | [ | | | | | | | | | | | | | ] |
| 1770 | [ | | | | | | | | | | | | | ] |
| 1771 | [ | | | | | | | | | | | | | ] |
| 1772 | [ | | | | | | | | | | | | | ] |
| 1773 | [ | | | | | | | | | | | | | ] |
| 1774 | [ | | | | | | | | | | | | | ] |
| 1775 | [ | | | | | | | | | | | | | ] |
| 1776 | [ | | | | | | | | | | | | | ] |
| 1777 | [ | | | | | | | | | | | | | ] |
| 1778 | [ | | | | | | | | | | | | | ] |
| 1779 | [ | | | | | | | | | | | | | ] |
| 1780 | [ | | | | | | | | | | | | | ] |
| 1781 | [ | | | | | | | | | | | | | ] |
| 1782 | [ | | | | | | | | | | | | | ] |
| 1783 | [ | | | | | | | | | | | | | ] |
| 1784 | [ | | | | | | | | | | | | | ] |
| 1785 | [ | | | | | | | | | | | | | ] |
| 1786 | [ | | | | | | | | | | | | | ] |
| 1787 | [ | | | | | | | | | | | | | ] |
| 1788 | [ | | | | | | | | | | | | | ] |
| 1789 | [ | | | | | | | | | | | | | ] |
| 1790 | [ | | | | | | | | | | | | | ] |
| 1791 | [ | | | | | | | | | | | | | ] |
| 1792 | [ | | | | | | | | | | | | | ] |
| 1793 | [ | | | | | | | | | | | | | ] |
| 1794 | [ | | | | | | | | | | | | | ] |
| 1795 | [ | | | | | | | | | | | | | ] |
| 1796 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1797 | [ | | | | | | | | | | | | | ] |
| 1798 | [ | | | | | | | | | | | | | ] |
| 1799 | [ | | | | | | | | | 25,000.00 | | | | ] |
| 1800 | [ | | | | | | | | | | | | | ] |
| 1801 | [ | | | | | | | | | | | | | ] |
| 1802 | [ | | | | | | | | | | | | | ] |
| 1803 | [ | | | | | | | | | | | | | ] |
| 1804 | [ | | | | | | | | | | | | | ] |
| 1805 | [ | | | | | | | | | | | | | ] |
| 1806 | [ | | | | | | | | | | | | | ] |
| 1807 | [ | | | | | | | | | | | | | ] |
| 1808 | [ | | | | | | | | | | | | | ] |
| 1809 | [ | | | | | | | | | | | | | ] |
| 1810 | [ | | | | | | | | | | | | | ] |
| 1811 | [ | | | | | | | | | | | | | ] |
| 1812 | [ | | | | | | | | | | | | | ] |
| 1813 | [ | | | | | | | | | | | | | ] |
| 1814 | [ | | | | | | | | | | | | | ] |
| 1815 | [ | | | | | | | | | | | | | ] |
| 1816 | [ | | | | | | | | | | | | | ] |
| 1817 | [ | | | | | | | | | | | | | ] |
| 1818 | [ | | | | | | | | | | | | | ] |
| 1819 | [ | | | | | | | | | | | | | ] |
| 1820 | [ | | | | | | | | | | | | | ] |
| 1821 | [ | | | | | | | | | | | | | ] |
| 1822 | [ | | | | | | | | | | | | | ] |
| 1823 | [ | | | | | | | | | | | | | ] |
| 1824 | [ | | | | | | | | | | | | | ] |
| 1825 | [ | | | | | | | | | | | | | ] |
| 1826 | [ | | | | | | | | | | | | | ] |
| 1827 | [ | | | | | | | | | | | | | ] |
| 1828 | [ | | | | | | | | | | | | | ] |
| 1829 | [ | | | | | | | | | | | | | ] |
| 1830 | [ | | | | | | | | | | | | | ] |
| 1831 | [ | | | | | | | | | | | | | ] |
| 1832 | [ | | | | | | | | | | | | | ] |
| 1833 | [ | | | | | | | | | | | | | ] |
| 1834 | [ | | | | | | | | | | | | | ] |
| 1835 | [ | | | | | | | | | | | | | ] |
| 1836 | [ | | | | | | | | | | | | | ] |
| 1837 | [ | | | | | | | | | | | | | ] |
| 1838 | [ | | | | | | | | | | | | | ] |
| 1839 | [ | | | | | | | | | | | | | ] |
| 1840 | [ | | | | | | | | | | | | | ] |
| 1841 | [ | | | | | | | | | | | | | ] |
| 1842 | [ | | | | | | | | | | | | | ] |
| 1843 | [ | | | | | | | | | | | | | ] |
| 1844 | [ | | | | | | | | | | | | | ] |
| 1845 | [ | | | | | | | | | | | | | ] |
| 1846 | [ | | | | | | | | | | | | | ] |
| 1847 | [ | | | | | | | | | | | | | ] |
| 1848 | [ | | | | | | | | | | | | | ] |
| 1849 | [ | | | | | | | | | | | | | ] |
| 1850 | [ | | | | | | | | | | | | | ] |
| 1851 | [ | | | | | | | | | | | | | ] |
| 1852 | [ | | | | | | | | | | | | | ] |
| 1853 | [ | | | | | | | | | | | | | ] |
| 1854 | [ | | | | | | | | | | | | | ] |
| 1855 | [ | | | | | | | | | | | | | ] |
| 1856 | [ | | | | | | | | | | | | | ] |
| 1857 | [ | | | | | | | | | | | | | ] |
| 1858 | [ | | | | | | | | | | | | | ] |
| 1859 | [ | | | | | | | | | | | | | ] |
| 1860 | [ | | | | | | | | | | | | | ] |
| 1861 | [ | | | | | | | | | | | | | ] |
| 1862 | [ | | | | | | | | | | | | | ] |
| 1863 | [ | | | | | | | | | | | | | ] |
| 1864 | [ | | | | | | | | | | | | | ] |
| 1865 | [ | | | | | | | | | | | | | ] |
| 1866 | [ | | | | | | | | | | | | | ] |
| 1867 | [ | | | | | | | | | | | | | ] |
| 1868 | [ | | | | | | | | | | | | | ] |
| 1869 | [ | | | | | | | | | | | | | ] |
| 1870 | [ | | | | | | | | | | | | | ] |
| 1871 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

PUBLIC VERSION – BPI Has Been Ranged or Redacted

| Purchase Number (Número de compra) | Volume (Cantidad) | Unit of Measure (Unidad de Medida) | Total Value (CIF Value Rs., exclusive of VAT) (Sub-Total) | Average Unit Value (Rs., exclusive of VAT) (Valor Unitrario) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | Average Unit Value Delivery (Rs., exclusive of VAT) (Valor Unitrario Transporte) | Total Unit Cost (Fuel+Transportation) | VAT Rate (%) Paid (% IVA) | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | Product (Producto) | Proof of Payment (Comprobante Pago) |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1872 | [ | | | | | | | | | | | | | ] |
| 1873 | [ | | | | | | | | | | | | | ] |
| 1874 | [ | | | | | | | | | | | | | ] |
| 1875 | [ | | | | | | | | | | | | | ] |
| 1876 | [ | | | | | | | | | | | | | ] |
| 1877 | [ | | | | | | | | | | | | | ] |
| 1878 | [ | | | | | | | | | | | | | ] |
| 1879 | [ | | | | | | | | | | | | | ] |
| 1880 | [ | | | | | | | | | | | | | ] |
| 1881 | [ | | | | | | | | | | | | | ] |
| 1882 | [ | | | | | | | | | | | | | ] |
| 1883 | [ | | | | | | | | | | | | | ] |
| 1884 | [ | | | | | | | | | | | | | ] |
| 1885 | [ | | | | | | | | | | | | | ] |
| 1886 | [ | | | | | | | | | | | | | ] |
| 1887 | [ | | | | | | | | | | | | | ] |
| 1888 | [ | | | | | | | | | | | | | ] |
| 1889 | [ | | | | | | | | | | | | | ] |
| 1890 | [ | | | | | | | | | | | | | ] |
| 1891 | [ | | | | | | | | | | | | | ] |
| 1892 | [ | | | | | | | | | | | | | ] |
| 1893 | [ | | | | | | | | | | | | | ] |
| 1894 | [ | | | | | | | | | | | | | ] |
| 1895 | [ | | | | | | | | | | | | | ] |
| 1896 | [ | | | | | | | | | | | | | ] |
| 1897 | [ | | | | | | | | | | | | | ] |
| 1898 | [ | | | | | | | | | | | | | ] |
| 1899 | [ | | | | | | | | | | | | | ] |
| 1900 | [ | | | | | | | | | | | | | ] |
| 1901 | [ | | | | | | | | | | | | | ] |
| 1902 | [ | | | | | | | | | | | | | ] |
| 1903 | [ | | | | | | | | | | | | | ] |
| 1904 | [ | | | | | | | | | | | | | ] |
| 1905 | [ | | | | | | | | | | | | | ] |
| 1906 | [ | | | | | | | | | | | | | ] |
| 1907 | [ | | | | | | | | | | | | | ] |
| 1908 | [ | | | | | | | | | | | | | ] |
| 1909 | [ | | | | | | | | | | | | | ] |
| 1910 | [ | | | | | | | | | | | | | ] |
| 1911 | [ | | | | | | | | | | | | | ] |
| 1912 | [ | | | | | | | | | | | | | ] |
| 1913 | [ | | | | | | | | | | | | | ] |
| 1914 | [ | | | | | | | | | | | | | ] |
| 1915 | [ | | | | | | | | | | | | | ] |
| 1916 | [ | | | | | | | | | | | | | ] |
| 1917 | [ | | | | | | | | | | | | | ] |
| 1918 | [ | | | | | | | | | | | | | ] |
| 1919 | [ | | | | | | | | | | | | | ] |
| 1920 | [ | | | | | | | | | | | | | ] |
| 1921 | [ | | | | | | | | | | | | | ] |
| 1922 | [ | | | | | | | | | | | | | ] |
| 1923 | [ | | | | | | | | | | | | | ] |
| 1924 | [ | | | | | | | | | | | | | ] |
| 1925 | [ | | | | | | | | | | | | | ] |
| 1926 | [ | | | | | | | | | | | | | ] |
| 1927 | [ | | | | | | | | | | | | | ] |
| 1928 | [ | | | | | | | | | | | | | ] |
| 1929 | [ 150,000.00 | | | | | | | | | | | | | ] |
| 1930 | [ | | | | | | | | | | | | | ] |
| 1931 | [ | | | | | | | | | | | | | ] |
| 1932 | [ | | | | | | | | | | | | | ] |
| 1933 | [ | | | | | | | | | | | | | ] |
| 1934 | [ | | | | | | | | | | | | | ] |
| 1935 | [ | | | | | | | | | | | | | ] |
| 1936 | [ | | | | | | | | | | | | | ] |
| 1937 | [ | | | | | | | | | | | | | ] |
| 1938 | [ | | | | | | | | | | | | | ] |
| 1939 | [ | | | | | | | | | | | | | ] |
| 1940 | [ | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

# EXHIBIT NSA-7(a)

## Produmar Diesel 2 / Premium Diesel Purchases During Period of Investigation

Diesel Fuel for LTAR

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | [ | | | | | | | | | | | | | | | | | | ] |
| 2 | [ | | | | | | | | | | | | | | | | | | ] |
| 3 | [ | | | | | | | | 4,000.00 | | | | | | | | | | ] |
| 4 | [ | | | | | | | | | | | | | | | | | | ] |
| 5 | [ | | | | | | | | | | | | | | | | | | ] |
| 6 | [ | | | | | | | | | | | | | | | | | | ] |
| 7 | [ | | | | | | | | | | | | | | | | | | ] |
| 8 | [ | | | | | | | | | | | | | | | | | | ] |
| 9 | [ | | | | | | | | | | | | | | | | | | ] |
| 10 | [ | | | | | | | | | | | | | | | | | | ] |
| 11 | [ | | | | | | | | | | | | | | | | | | ] |
| 12 | [ | | | | | | | | | | | | | | | | | | ] |
| 13 | [ | | | | | | | | | | | | | | | | | | ] |
| 14 | [ | | | | | | | | | | | | | | | | | | ] |
| 15 | [ | | | | | | | | | | | | | | | | | | ] |
| 16 | [ | | | | | | | | | | | | | | | | | | ] |
| 17 | [ | | | | | | | | | | | | | | | | | | ] |
| 18 | [ | | | | | | | | | | | | | | | | | | ] |
| 19 | [ | | | | | | | | | | | | | | | | | | ] |
| 20 | [ | | | | | | | | | | | | | | | | | | ] |
| 21 | [ | | | | | | | | | | | | | | | | | | ] |
| 22 | [ | | | | | | | | | | | | | | | | | | ] |
| 23 | [ | | | | | | | | | | | | | | | | | | ] |
| 24 | [ | | | | | | | | | | | | | | | | | | ] |
| 25 | [ | | | | | | | | | | | | | | | | | | ] |
| 26 | [ | | | | | | | | | | | | | | | | | | ] |
| 27 | [ | | | | | | | | | | | | | | | | | | ] |
| 28 | [ | | | | | | | | | | | | | | | | | | ] |
| 29 | [ | | | | | | | | | | | | | | | | | | ] |
| 30 | [ | | | | | | | | | | | | | | | | | | ] |
| 31 | [ | | | | | | | | | | | | | | | | | | ] |
| 32 | [ | | | | | | | | | | | | | | | | | | ] |
| 33 | [ | | | | | | | | | | | | | | | | | | ] |
| 34 | [ | | | | | | | | | | | | | | | | | | ] |
| 35 | [ | | | | | | | | | | | | | | | | | | ] |
| 36 | [ | | | | | | | | | | | | | | | | | | ] |
| 37 | [ | | | | | | | | | | | | | | | | | | ] |
| 38 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

PUBLIC VERSION - BPI Has Been Ranged or Redacted

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 39 | [ | | | | | | | | | | | | | | | | | | ] |
| 40 | [ | | | | | | | | | | | | | | | | | | ] |
| 41 | [ | | | | | | | | | | | | | | | | | | ] |
| 42 | [ | | | | | | | | | | | | | | | | | | ] |
| 43 | [ | | | | | | | | | | | | | | | | | | ] |
| 44 | [ | | | | | | | | | | | | | | | | | | ] |
| 45 | [ | | | | | | | | | | | | | | | | | | ] |
| 46 | [ | | | | | | | | | | | | | | | | | | ] |
| 47 | [ | | | | | | | | | | | | | | | | | | ] |
| 48 | [ | | | | | | | | | | | | | | | | | | ] |
| 49 | [ | | | | | | | | | | 6,000.00 | | | | | | | | ] |
| 50 | [ | | | | | | | | | | | | | | | | | | ] |
| 51 | [ | | | | | | | | | | | | | | | | | | ] |
| 52 | [ | | | | | | | | | | | | | | | | | | ] |
| 53 | [ | | | | | | | | | | | | | | | | | | ] |
| 54 | [ | | | | | | | | | | | | | | | | | | ] |
| 55 | [ | | | | | | | | | | | | | | | | | | ] |
| 56 | [ | | | | | | | | | | | | | | | | | | ] |
| 57 | [ | | | | | | | | | | | | | | | | | | ] |
| 58 | [ | | | | | | | | | | | | | | | | | | ] |
| 59 | [ | | | | | | | | | | | | | | | | | | ] |
| 60 | [ | | | | | | | | | | | | | | | | | | ] |
| 61 | [ | | | | | | | | | | | | | | | | | | ] |
| 62 | [ | | | | | | | | | | | | | | | | | | ] |
| 63 | [ | | | | | | | | | | | | | | | | | | ] |
| 64 | [ | | | | | | | | | | | | | | | | | | ] |
| 65 | [ | | | | | | | | | | | | | | | | | | ] |
| 66 | [ | | | | | | | | | | | | | | | | | | ] |
| 67 | [ | | | | | | | | | | | | | | | | | | ] |
| 68 | [ | | | | | | | | | | | | | | | | | | ] |
| 69 | [ | | | | | | | | | | | | | | | | | | ] |
| 70 | [ | | | | | | | | | | | | | | | | | | ] |
| 71 | [ | | | | | | | | | | | | | | | | | | ] |
| 72 | [ | | | | | | | | | | | | | | | | | | ] |
| 73 | [ | | | | | | | | | | | | | | | | | | ] |
| 74 | [ | | | | | | | | | | | | | | | | | | ] |
| 75 | [ | | | | | | | | | | | | | | | | | | ] |
| 76 | [ | | | | | | | | | | | | | | | | | | ] |
| 77 | [ | | | | | | | | | | | | | | | | | | ] |
| 78 | [ | | | | | | | | | | | | | | | | | | ] |
| 79 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 80 | [ | | | | | | | | | | | | | | | | | | ] |
| 81 | [ | | | | | | | | | | | | | | | | | | ] |
| 82 | [ | | | | | | | | | | | | | | | | | | ] |
| 83 | [ | | | | | | | | | | | | | | | | | | ] |
| 84 | [ | | | | | | | | | | | | | | | | | | ] |
| 85 | [ | | | | | | | | | | | | | | | | | | ] |
| 86 | [ | | | | | | | | | | | | | | | | | | ] |
| 87 | [ | | | | | | | | | | | | | | | | | | ] |
| 88 | [ | | | | | | | | | | | | | | | | | | ] |
| 89 | [ | | | | | | | | | | | | | | | | | | ] |
| 90 | [ | | | | | | | | | | | | | | | | | | ] |
| 91 | [ | | | | | | | | | | | | | | | | | | ] |
| 92 | [ | | | | | | | | | | | | | | | | | | ] |
| 93 | [ | | | | | | | | | | | | | | | 750.00 | | | ] |
| 94 | [ | | | | | | | | | | | | | | | | | | ] |
| 95 | [ | | | | | | | | | | | | | | | | | | ] |
| 96 | [ | | | | | | | | | | | | | | | | | | ] |
| 97 | [ | | | | | | | | | | | | | | | | | | ] |
| 98 | [ | | | | | | | | | | | | | | | | | | ] |
| 99 | [ | | | | | | | | | | | | | | | | | | ] |
| 100 | [ | | | | | | | | | | | | | | | | | | ] |
| 101 | [ | | | | | | | | | | | | | | | | | | ] |
| 102 | [ | | | | | | | | | | | | | | | | | | ] |
| 103 | [ | | | | | | | | | | | | | | | | | | ] |
| 104 | [ | | | | | | | | | | | | | | | | | | ] |
| 105 | [ | | | | | | | | | | | | | | | | | | ] |
| 106 | [ | | | | | | | | | | | | | | | | | | ] |
| 107 | [ | | | | | | | | | | | | | | | | | | ] |
| 108 | [ | | | | | | | | | | | | | | | | | | ] |
| 109 | [ | | | | | | | | | | | | | | | | | | ] |
| 110 | [ | | | | | | | | | | | | | | | | | | ] |
| 111 | [ | | | | | | | | | | | | | | | | | | ] |
| 112 | [ | | | | | | | | | | | | | | | | | | ] |
| 113 | [ | | | | | | | | | | | | | | | | | | ] |
| 114 | [ | | | | | | | | | | | | | | | | | | ] |
| 115 | [ | | | | | | | | | | | | | | | | | | ] |
| 116 | [ | | | | | | | | | | | | | | | | | | ] |
| 117 | [ | | | | | | | | | | | | | | | | | | ] |
| 118 | [ | | | | | | | | | | | | | | | | | | ] |
| 119 | [ | | | | | | | | | | | | | | | | | | ] |
| 120 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

PUBLIC VERSION - BPI Has Been Ranged or Redacted

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 121 | [ | | | | | | | | | | | | | | | | | | ] |
| 122 | [ | | | | | | | | | | | | | | | | | | ] |
| 123 | [ | | | | | | | | | | | | | | | | | | ] |
| 124 | [ | | | | | | | | | | | | | | | | | | ] |
| 125 | [ | | | | | | | | | | | | | | | | | | ] |
| 126 | [ | | | | | | | | | | | | | | | | | | ] |
| 127 | [ | | | | | | | | | | | | | | | | | | ] |
| 128 | [ | | | | | | | | | | | | | | | | | | ] |
| 129 | [ | | | | | | | | | | | | | | | | | | ] |
| 130 | [ | | | | | | | | | | | | | | | | | | ] |
| 131 | [ | | | | | | | | | | | | | | | | | | ] |
| 132 | [ | | | | | | | | | | | | | | | | | | ] |
| 133 | [ | | | | | | | | | | | | | | | | | | ] |
| 134 | [ | | | | | | | | | | | | | | | | | | ] |
| 135 | [ | | | | | | | | | | | | | | | | | | ] |
| 136 | [ | | | | | | | | | | | | | | | | | | ] |
| 137 | [ | | | | | | | | | | | | | | | | | | ] |
| 138 | [ | | | | | | | | 4,000.00 | | | | | | | | | | ] |
| 139 | [ | | | | | | | | | | | | | | | | | | ] |
| 140 | [ | | | | | | | | | | | | | | | | | | ] |
| 141 | [ | | | | | | | | | | | | | | | | | | ] |
| 142 | [ | | | | | | | | | | | | | | | | | | ] |
| 143 | [ | | | | | | | | | | | | | | | | | | ] |
| 144 | [ | | | | | | | | | | | | | | | | | | ] |
| 145 | [ | | | | | | | | | | | | | | | | | | ] |
| 146 | [ | | | | | | | | | | | | | | | | | | ] |
| 147 | [ | | | | | | | | | | | | | | | | | | ] |
| 148 | [ | | | | | | | | | | | | | | | | | | ] |
| 149 | [ | | | | | | | | | | | | | | | | | | ] |
| 150 | [ | | | | | | | | | | | | | | | | | | ] |
| 151 | [ | | | | | | | | | | | | | | | | | | ] |
| 152 | [ | | | | | | | | | | | | | | | | | | ] |
| 153 | [ | | | | | | | | | | | | | | | | | | ] |
| 154 | [ | | | | | | | | | | | | | | | | | | ] |
| 155 | [ | | | | | | | | | | | | | | | | | | ] |
| 156 | [ | | | | | | | | | | | | | | | | | | ] |
| 157 | [ | | | | | | | | | | | | | | | | | | ] |
| 158 | [ | | | | | | | | | | | | | | | | | | ] |
| 159 | [ | | | | | | | | | | | | | | | | | | ] |
| 160 | [ | | | | | | | | | | | | | | | | | | ] |
| 161 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 162 | [ | | | | | | | | | | | | | | | | | | ] |
| 163 | [ | | | | | | | | | | | | | | | | | | ] |
| 164 | [ | | | | | | | | | | | | | | | | | | ] |
| 165 | [ | | | | | | | | | | | | | | | | | | ] |
| 166 | [ | | | | | | | | | | | | | | | | | | ] |
| 167 | [ | | | | | | | | | | | | | | | | | | ] |
| 168 | [ | | | | | | | | | | | | | | | | | | ] |
| 169 | [ | | | | | | | | | | | | | | | | | | ] |
| 170 | [ | | | | | | | | | | | | | | | | | | ] |
| 171 | [ | | | | | | | | | | | | | | | | | | ] |
| 172 | [ | | | | | | | | | | | | | | | | | | ] |
| 173 | [ | | | | | | | | | | | | | | | | | | ] |
| 174 | [ | | | | | | | | | | | | | | | | | | ] |
| 175 | [ | | | | | | | | | | | | | | | | | | ] |
| 176 | [ | | | | | | | | | | | | | | | | | | ] |
| 177 | [ | | | | | | | | | | | | | | | | | | ] |
| 178 | [ | | | | | | | | | | | | | | | | | | ] |
| 179 | [ | | | | | | | | | | | 6,500.00 | | | | | | | | ] |
| 180 | [ | | | | | | | | | | | | | | | | | | ] |
| 181 | [ | | | | | | | | | | | | | | | | | | ] |
| 182 | [ | | | | | | | | | | | | | | | | | | ] |
| 183 | [ | | | | | | | | | | | | | | | | | | ] |
| 184 | [ | | | | | | | | | | | | | | | | | | ] |
| 185 | [ | | | | | | | | | | | | | | | | | | ] |
| 186 | [ | | | | | | | | | | | | | | | | | | ] |
| 187 | [ | | | | | | | | | | | | | | | | | | ] |
| 188 | [ | | | | | | | | | | | | | | | | | | ] |
| 189 | [ | | | | | | | | | | | | | | | | | | ] |
| 190 | [ | | | | | | | | | | | | | | | | | | ] |
| 191 | [ | | | | | | | | | | | | | | | | | | ] |
| 192 | [ | | | | | | | | | | | | | | | | | | ] |
| 193 | [ | | | | | | | | | | | | | | | | | | ] |
| 194 | [ | | | | | | | | | | | | | | | | | | ] |
| 195 | [ | | | | | | | | | | | | | | | | | | ] |
| 196 | [ | | | | | | | | | | | | | | | | | | ] |
| 197 | [ | | | | | | | | | | | | | | | | | | ] |
| 198 | [ | | | | | | | | | | | | | | | | | | ] |
| 199 | [ | | | | | | | | | | | | | | | | | | ] |
| 200 | [ | | | | | | | | | | | | | | | | | | ] |
| 201 | [ | | | | | | | | | | | | | | | | | | ] |
| 202 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 203 | [ | | | | | | | | | | | | | | | | | | ] |
| 204 | [ | | | | | | | | | | | | | | | | | | ] |
| 205 | [ | | | | | | | | | | | | | | | | | | ] |
| 206 | [ | | | | | | | | | | | | | | | | | | ] |
| 207 | [ | | | | | | | | | | | | | | | | | | ] |
| 208 | [ | | | | | | | | | | | | | | | | | | ] |
| 209 | [ | | | | | | | | | | | | | | | | | | ] |
| 210 | [ | | | | | | | | | | | | | | | | | | ] |
| 211 | [ | | | | | | | | | | | | | | | | | | ] |
| 212 | [ | | | | | | | | | | | | | | | | | | ] |
| 213 | [ | | | | | | | | | | | | | | | | | | ] |
| 214 | [ | | | | | | | | | | | | | | | | | | ] |
| 215 | [ | | | | | | | | | | | | | | | | | | ] |
| 216 | [ | | | | | | | | | | | | | | | | | | ] |
| 217 | [ | | | | | | | | | | | | | | | 800.00 | | | ] |
| 218 | [ | | | | | | | | | | | | | | | | | | ] |
| 219 | [ | | | | | | | | | | | | | | | | | | ] |
| 220 | [ | | | | | | | | | | | | | | | | | | ] |
| 221 | [ | | | | | | | | | | | | | | | | | | ] |
| 222 | [ | | | | | | | | | | | | | | | | | | ] |
| 223 | [ | | | | | | | | | | | | | | | | | | ] |
| 224 | [ | | | | | | | | | | | | | | | | | | ] |
| 225 | [ | | | | | | | | | | | | | | | | | | ] |
| 226 | [ | | | | | | | | | | | | | | | | | | ] |
| 227 | [ | | | | | | | | | | | | | | | | | | ] |
| 228 | [ | | | | | | | | | | | | | | | | | | ] |
| 229 | [ | | | | | | | | | | | | | | | | | | ] |
| 230 | [ | | | | | | | | | | | | | | | | | | ] |
| 231 | [ | | | | | | | | | | | | | | | | | | ] |
| 232 | [ | | | | | | | | | | | | | | | | | | ] |
| 233 | [ | | | | | | | | | | | | | | | | | | ] |
| 234 | [ | | | | | | | | | | | | | | | | | | ] |
| 235 | [ | | | | | | | | | | | | | | | | | | ] |
| 236 | [ | | | | | | | | | | | | | | | | | | ] |
| 237 | [ | | | | | | | | | | | | | | | | | | ] |
| 238 | [ | | | | | | | | | | | | | | | | | | ] |
| 239 | [ | | | | | | | | | | | | | | | | | | ] |
| 240 | [ | | | | | | | | | | | | | | | | | | ] |
| 241 | [ | | | | | | | | | | | | | | | | | | ] |
| 242 | [ | | | | | | | | | | | | | | | | | | ] |
| 243 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

PUBLIC VERSION - BPI Has Been Ranged or Redacted

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 244 | [ | | | | | | | | | | | | | | | | | | ] |
| 245 | [ | | | | | | | | | | | | | | | | | | ] |
| 246 | [ | | | | | | | | | | | | | | | | | | ] |
| 247 | [ | | | | | | | | | | | | | | | | | | ] |
| 248 | [ | | | | | | | | | | | | | | | | | | ] |
| 249 | [ | | | | | | | | | | | | | | | | | | ] |
| 250 | [ | | | | | | | | | | | | | | | | | | ] |
| 251 | [ | | | | | | | | | | | | | | | | | | ] |
| 252 | [ | | | | | | | | | | | | | | | | | | ] |
| 253 | [ | | | | | | | | | | | | | | | | | | ] |
| 254 | [ | | | | | | | | | | | | | | | | | | ] |
| 255 | [ | | | | | | | | | | | | | | | | | | ] |
| 256 | [ | | | | | | | | | | | | | | | | | | ] |
| 257 | [ | | | | | | | | | | | | | | | | | | ] |
| 258 | [ | | | | | | | | 4,250.00 | | | | | | | | | | ] |
| 259 | [ | | | | | | | | | | | | | | | | | | ] |
| 260 | [ | | | | | | | | | | | | | | | | | | ] |
| 261 | [ | | | | | | | | | | | | | | | | | | ] |
| 262 | [ | | | | | | | | | | | | | | | | | | ] |
| 263 | [ | | | | | | | | | | | | | | | | | | ] |
| 264 | [ | | | | | | | | | | | | | | | | | | ] |
| 265 | [ | | | | | | | | | | | | | | | | | | ] |
| 266 | [ | | | | | | | | | | | | | | | | | | ] |
| 267 | [ | | | | | | | | | | | | | | | | | | ] |
| 268 | [ | | | | | | | | | | | | | | | | | | ] |
| 269 | [ | | | | | | | | | | | | | | | | | | ] |
| 270 | [ | | | | | | | | | | | | | | | | | | ] |
| 271 | [ | | | | | | | | | | | | | | | | | | ] |
| 272 | [ | | | | | | | | | | | | | | | | | | ] |
| 273 | [ | | | | | | | | | | | | | | | | | | ] |
| 274 | [ | | | | | | | | | | | | | | | | | | ] |
| 275 | [ | | | | | | | | | | | | | | | | | | ] |
| 276 | [ | | | | | | | | | | | | | | | | | | ] |
| 277 | [ | | | | | | | | | | | | | | | | | | ] |
| 278 | [ | | | | | | | | | | | | | | | | | | ] |
| 279 | [ | | | | | | | | | | | | | | | | | | ] |
| 280 | [ | | | | | | | | | | | | | | | | | | ] |
| 281 | [ | | | | | | | | | | | | | | | | | | ] |
| 282 | [ | | | | | | | | | | | | | | | | | | ] |
| 283 | [ | | | | | | | | | | | | | | | | | | ] |
| 284 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 285 | [ | | | | | | | | | | | | | | | | | | ] |
| 286 | [ | | | | | | | | | | | | | | | | | | ] |
| 287 | [ | | | | | | | | | | | | | | | | | | ] |
| 288 | [ | | | | | | | | | | | | | | | | | | ] |
| 289 | [ | | | | | | | | | | | | | | | | | | ] |
| 290 | [ | | | | | | | | | | | | | | | | | | ] |
| 291 | [ | | | | | | | | | | | | | | | | | | ] |
| 292 | [ | | | | | | | | | | | | | | | | | | ] |
| 293 | [ | | | | | | | | | | | | | | | | | | ] |
| 294 | [ | | | | | | | | | | | | | | | | | | ] |
| 295 | [ | | | | | | | | | | | | | | | | | | ] |
| 296 | [ | | | | | | | | | | | | | | | | | | ] |
| 297 | [ | | | | | | | | | | | | | | | | | | ] |
| 298 | [ | | | | | | | | | | | | | | | | | | ] |
| 299 | [ | | | | | | | | | | | | | | | | | | ] |
| 300 | [ | | | | | | | | | | | | | | | | | | ] |
| 301 | [ | | | | | | | | | | 6,100.00 | | | | | | | | ] |
| 302 | [ | | | | | | | | | | | | | | | | | | ] |
| 303 | [ | | | | | | | | | | | | | | | | | | ] |
| 304 | [ | | | | | | | | | | | | | | | | | | ] |
| 305 | [ | | | | | | | | | | | | | | | | | | ] |
| 306 | [ | | | | | | | | | | | | | | | | | | ] |
| 307 | [ | | | | | | | | | | | | | | | | | | ] |
| 308 | [ | | | | | | | | | | | | | | | | | | ] |
| 309 | [ | | | | | | | | | | | | | | | | | | ] |
| 310 | [ | | | | | | | | | | | | | | | | | | ] |
| 311 | [ | | | | | | | | | | | | | | | | | | ] |
| 312 | [ | | | | | | | | | | | | | | | | | | ] |
| 313 | [ | | | | | | | | | | | | | | | | | | ] |
| 314 | [ | | | | | | | | | | | | | | | | | | ] |
| 315 | [ | | | | | | | | | | | | | | | | | | ] |
| 316 | [ | | | | | | | | | | | | | | | | | | ] |
| 317 | [ | | | | | | | | | | | | | | | | | | ] |
| 318 | [ | | | | | | | | | | | | | | | | | | ] |
| 319 | [ | | | | | | | | | | | | | | | | | | ] |
| 320 | [ | | | | | | | | | | | | | | | | | | ] |
| 321 | [ | | | | | | | | | | | | | | | | | | ] |
| 322 | [ | | | | | | | | | | | | | | | | | | ] |
| 323 | [ | | | | | | | | | | | | | | | | | | ] |
| 324 | [ | | | | | | | | | | | | | | | | | | ] |
| 325 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 326 | [ | | | | | | | | | | | | | | | | | | ] |
| 327 | [ | | | | | | | | | | | | | | | | | | ] |
| 328 | [ | | | | | | | | | | | | | | | | | | ] |
| 329 | [ | | | | | | | | | | | | | | | | | | ] |
| 330 | [ | | | | | | | | | | | | | | | | | | ] |
| 331 | [ | | | | | | | | | | | | | | | | | | ] |
| 332 | [ | | | | | | | | | | | | | | | | | | ] |
| 333 | [ | | | | | | | | | | | | | | | | | | ] |
| 334 | [ | | | | | | | | | | | | | | | | | | ] |
| 335 | [ | | | | | | | | | | | | | | | | | | ] |
| 336 | [ | | | | | | | | | | | | | | | | | | ] |
| 337 | [ | | | | | | | | | | | | | | | | | | ] |
| 338 | [ | | | | | | | | | | | | | | | 690.00 | | | ] |
| 339 | [ | | | | | | | | | | | | | | | | | | ] |
| 340 | [ | | | | | | | | | | | | | | | | | | ] |
| 341 | [ | | | | | | | | | | | | | | | | | | ] |
| 342 | [ | | | | | | | | | | | | | | | | | | ] |
| 343 | [ | | | | | | | | | | | | | | | | | | ] |
| 344 | [ | | | | | | | | | | | | | | | | | | ] |
| 345 | [ | | | | | | | | | | | | | | | | | | ] |
| 346 | [ | | | | | | | | | | | | | | | | | | ] |
| 347 | [ | | | | | | | | | | | | | | | | | | ] |
| 348 | [ | | | | | | | | | | | | | | | | | | ] |
| 349 | [ | | | | | | | | | | | | | | | | | | ] |
| 350 | [ | | | | | | | | | | | | | | | | | | ] |
| 351 | [ | | | | | | | | | | | | | | | | | | ] |
| 352 | [ | | | | | | | | | | | | | | | | | | ] |
| 353 | [ | | | | | | | | | | | | | | | | | | ] |
| 354 | [ | | | | | | | | | | | | | | | | | | ] |
| 355 | [ | | | | | | | | | | | | | | | | | | ] |
| 356 | [ | | | | | | | | | | | | | | | | | | ] |
| 357 | [ | | | | | | | | | | | | | | | | | | ] |
| 358 | [ | | | | | | | | | | | | | | | | | | ] |
| 359 | [ | | | | | | | | | | | | | | | | | | ] |
| 360 | [ | | | | | | | | | | | | | | | | | | ] |
| 361 | [ | | | | | | | | | | | | | | | | | | ] |
| 362 | [ | | | | | | | | | | | | | | | | | | ] |
| 363 | [ | | | | | | | | | | | | | | | | | | ] |
| 364 | [ | | | | | | | | | | | | | | | | | | ] |
| 365 | [ | | | | | | | | | | | | | | | | | | ] |
| 366 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 367 | [ | | | | | | | | | | | | | | | | | | ] |
| 368 | [ | | | | | | | | | | | | | | | | | | ] |
| 369 | [ | | | | | | | | | | | | | | | | | | ] |
| 370 | [ | | | | | | | | | | | | | | | | | | ] |
| 371 | [ | | | | | | | | | | | | | | | | | | ] |
| 372 | [ | | | | | | | | | | | | | | | | | | ] |
| 373 | [ | | | | | | | | | | | | | | | | | | ] |
| 374 | [ | | | | | | | | | | | | | | | | | | ] |
| 375 | [ | | | | | | | | | | | | | | | | | | ] |
| 376 | [ | | | | | | | | | | | | | | | | | | ] |
| 377 | [ | | | | | | | | | | | | | | | | | | ] |
| 378 | [ | | | | | | | | | | | | | | | | | | ] |
| 379 | [ | | | | | | | | | | | | | | | | | | ] |
| 380 | [ | | | | | | | | | | | | | | | | | | ] |
| 381 | [ | | | | | | | | | | | | | | | | | | ] |
| 382 | [ | | | | | | | | | | | | | | | | | | ] |
| 383 | [ | | | | | | | | 3,700.00 | | | | | | | | | | ] |
| 384 | [ | | | | | | | | | | | | | | | | | | ] |
| 385 | [ | | | | | | | | | | | | | | | | | | ] |
| 386 | [ | | | | | | | | | | | | | | | | | | ] |
| 387 | [ | | | | | | | | | | | | | | | | | | ] |
| 388 | [ | | | | | | | | | | | | | | | | | | ] |
| 389 | [ | | | | | | | | | | | | | | | | | | ] |
| 390 | [ | | | | | | | | | | | | | | | | | | ] |
| 391 | [ | | | | | | | | | | | | | | | | | | ] |
| 392 | [ | | | | | | | | | | | | | | | | | | ] |
| 393 | [ | | | | | | | | | | | | | | | | | | ] |
| 394 | [ | | | | | | | | | | | | | | | | | | ] |
| 395 | [ | | | | | | | | | | | | | | | | | | ] |
| 396 | [ | | | | | | | | | | | | | | | | | | ] |
| 397 | [ | | | | | | | | | | | | | | | | | | ] |
| 398 | [ | | | | | | | | | | | | | | | | | | ] |
| 399 | [ | | | | | | | | | | | | | | | | | | ] |
| 400 | [ | | | | | | | | | | | | | | | | | | ] |
| 401 | [ | | | | | | | | | | | | | | | | | | ] |
| 402 | [ | | | | | | | | | | | | | | | | | | ] |
| 403 | [ | | | | | | | | | | | | | | | | | | ] |
| 404 | [ | | | | | | | | | | | | | | | | | | ] |
| 405 | [ | | | | | | | | | | | | | | | | | | ] |
| 406 | [ | | | | | | | | | | | | | | | | | | ] |
| 407 | [ | | | | | | | | | | | | | | | | | | ] |

PUBLIC VERSION - BPI Has Been Ranged or Redacted

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 408 | [ | | | | | | | | | | | | | | | | | | ] |
| 409 | [ | | | | | | | | | | | | | | | | | | ] |
| 410 | [ | | | | | | | | | | | | | | | | | | ] |
| 411 | [ | | | | | | | | | | | | | | | | | | ] |
| 412 | [ | | | | | | | | | | | | | | | | | | ] |
| 413 | [ | | | | | | | | | | | | | | | | | | ] |
| 414 | [ | | | | | | | | | | | | | | | | | | ] |
| 415 | [ | | | | | | | | | | | | | | | | | | ] |
| 416 | [ | | | | | | | | | | | | | | | | | | ] |
| 417 | [ | | | | | | | | | | | | | | | | | | ] |
| 418 | [ | | | | | | | | | | | | | | | | | | ] |
| 419 | [ | | | | | | | | | | | | | | | | | | ] |
| 420 | [ | | | | | | | | | | | | | | | | | | ] |
| 421 | [ | | | | | | | | | | | | | | | | | | ] |
| 422 | [ | | | | | | | | | | | | | | | | | | ] |
| 423 | [ | | | | | | | | | | | | | | | | | | ] |
| 424 | [ | | | | | | | | | | 6,800.00 | | | | | | | | ] |
| 425 | [ | | | | | | | | | | | | | | | | | | ] |
| 426 | [ | | | | | | | | | | | | | | | | | | ] |
| 427 | [ | | | | | | | | | | | | | | | | | | ] |
| 428 | [ | | | | | | | | | | | | | | | | | | ] |
| 429 | [ | | | | | | | | | | | | | | | | | | ] |
| 430 | [ | | | | | | | | | | | | | | | | | | ] |
| 431 | [ | | | | | | | | | | | | | | | | | | ] |
| 432 | [ | | | | | | | | | | | | | | | | | | ] |
| 433 | [ | | | | | | | | | | | | | | | | | | ] |
| 434 | [ | | | | | | | | | | | | | | | | | | ] |
| 435 | [ | | | | | | | | | | | | | | | | | | ] |
| 436 | [ | | | | | | | | | | | | | | | | | | ] |
| 437 | [ | | | | | | | | | | | | | | | | | | ] |
| 438 | [ | | | | | | | | | | | | | | | | | | ] |
| 439 | [ | | | | | | | | | | | | | | | | | | ] |
| 440 | [ | | | | | | | | | | | | | | | | | | ] |
| 441 | [ | | | | | | | | | | | | | | | | | | ] |
| 442 | [ | | | | | | | | | | | | | | | | | | ] |
| 443 | [ | | | | | | | | | | | | | | | | | | ] |
| 444 | [ | | | | | | | | | | | | | | | | | | ] |
| 445 | [ | | | | | | | | | | | | | | | | | | ] |
| 446 | [ | | | | | | | | | | | | | | | | | | ] |
| 447 | [ | | | | | | | | | | | | | | | | | | ] |
| 448 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 449 | [ | | | | | | | | | | | | | | | | | | ] |
| 450 | [ | | | | | | | | | | | | | | | | | | ] |
| 451 | [ | | | | | | | | | | | | | | | | | | ] |
| 452 | [ | | | | | | | | | | | | | | | | | | ] |
| 453 | [ | | | | | | | | | | | | | | | | | | ] |
| 454 | [ | | | | | | | | | | | | | | | | | | ] |
| 455 | [ | | | | | | | | | | | | | | | | | | ] |
| 456 | [ | | | | | | | | | | | | | | | | | | ] |
| 457 | [ | | | | | | | | | | | | | | | | | | ] |
| 458 | [ | | | | | | | | | | | | | | | | 820.00 | | | ] |
| 459 | [ | | | | | | | | | | | | | | | | | | ] |
| 460 | [ | | | | | | | | | | | | | | | | | | ] |
| 461 | [ | | | | | | | | | | | | | | | | | | ] |
| 462 | [ | | | | | | | | | | | | | | | | | | ] |
| 463 | [ | | | | | | | | | | | | | | | | | | ] |
| 464 | [ | | | | | | | | | | | | | | | | | | ] |
| 465 | [ | | | | | | | | | | | | | | | | | | ] |
| 466 | [ | | | | | | | | | | | | | | | | | | ] |
| 467 | [ | | | | | | | | | | | | | | | | | | ] |
| 468 | [ | | | | | | | | | | | | | | | | | | ] |
| 469 | [ | | | | | | | | | | | | | | | | | | ] |
| 470 | [ | | | | | | | | | | | | | | | | | | ] |
| 471 | [ | | | | | | | | | | | | | | | | | | ] |
| 472 | [ | | | | | | | | | | | | | | | | | | ] |
| 473 | [ | | | | | | | | | | | | | | | | | | ] |
| 474 | [ | | | | | | | | | | | | | | | | | | ] |
| 475 | [ | | | | | | | | | | | | | | | | | | ] |
| 476 | [ | | | | | | | | | | | | | | | | | | ] |
| 477 | [ | | | | | | | | | | | | | | | | | | ] |
| 478 | [ | | | | | | | | | | | | | | | | | | ] |
| 479 | [ | | | | | | | | | | | | | | | | | | ] |
| 480 | [ | | | | | | | | | | | | | | | | | | ] |
| 481 | [ | | | | | | | | | | | | | | | | | | ] |
| 482 | [ | | | | | | | | | | | | | | | | | | ] |
| 483 | [ | | | | | | | | | | | | | | | | | | ] |
| 484 | [ | | | | | | | | | | | | | | | | | | ] |
| 485 | [ | | | | | | | | | | | | | | | | | | ] |
| 486 | [ | | | | | | | | | | | | | | | | | | ] |
| 487 | [ | | | | | | | | | | | | | | | | | | ] |
| 488 | [ | | | | | | | | | | | | | | | | | | ] |
| 489 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

PUBLIC VERSION - BPI Has Been Ranged or Redacted

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 490 | [ | | | | | | | | | | | | | | | | | | ] |
| 491 | [ | | | | | | | | | | | | | | | | | | ] |
| 492 | [ | | | | | | | | | | | | | | | | | | ] |
| 493 | [ | | | | | | | | | | | | | | | | | | ] |
| 494 | [ | | | | | | | | | | | | | | | | | | ] |
| 495 | [ | | | | | | | | | | | | | | | | | | ] |
| 496 | [ | | | | | | | | | | | | | | | | | | ] |
| 497 | [ | | | | | | | | | | | | | | | | | | ] |
| 498 | [ | | | | | | | | | | | | | | | | | | ] |
| 499 | [ | | | | | | | | | | | | | | | | | | ] |
| 500 | [ | | | | | | | | | | | | | | | | | | ] |
| 501 | [ | | | | | | | | | | | | | | | | | | ] |
| 502 | [ | | | | | | | | | | | | | | | | | | ] |
| 503 | [ | | | | | | | | | | | | | | | | | | ] |
| 504 | [ | | | | | | | | | | | | | | | | | | ] |
| 505 | [ | | | | | | | | | | | | | | | | | | ] |
| 506 | [ | | | | | | | | | | | | | | | | | | ] |
| 507 | [ | | | | | | | | | | | | | | | | | | ] |
| 508 | [ | | | | | | | | | | | | | | | | | | ] |
| 509 | [ | | | | | | | | | | | | | | | | | | ] |
| 510 | [ | | | | | | | | | | | | | | | | | | ] |
| 511 | [ | | | | | | | | | | | | | | | | | | ] |
| 512 | [ | | | | | | | | | | | | | | | | | | ] |
| 513 | [ | | | | | | | | | | | | | | | | | | ] |
| 514 | [ | | | | | | | | | | | | | | | | | | ] |
| 515 | [ | | | | | | | | | | | | | | | | | | ] |
| 516 | [ | | | | | | | | | | | | | | | | | | ] |
| 517 | [ | | | | | | | | | | | | | | | | | | ] |
| 518 | [ | | | | | | | | | | | | | | | | | | ] |
| 519 | [ | | | | | | | | | | | | | | | | | | ] |
| 520 | [ | | | | | | | | | | | | | | | | | | ] |
| 521 | [ | | | | | | | | | | | | | | | | | | ] |
| 522 | [ | | | | | | | | | | | | | | | | | | ] |
| 523 | [ | | | | | | | | | | | | | | | | | | ] |
| 524 | [ | | | | | | | | | | | | | | | | | | ] |
| 525 | [ | | | | | | | | | | | | | | | | | | ] |
| 526 | [ | | | | | | | | | | | | | | | | | | ] |
| 527 | [ | | | | | | | | 4,050.00 | | | | | | | | | | ] |
| 528 | [ | | | | | | | | | | | | | | | | | | ] |
| 529 | [ | | | | | | | | | | | | | | | | | | ] |
| 530 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 531 | [ | | | | | | | | | | | | | | | | | | ] |
| 532 | [ | | | | | | | | | | | | | | | | | | ] |
| 533 | [ | | | | | | | | | | | | | | | | | | ] |
| 534 | [ | | | | | | | | | | | | | | | | | | ] |
| 535 | [ | | | | | | | | | | | | | | | | | | ] |
| 536 | [ | | | | | | | | | | 6,900.00 | | | | | | | | ] |
| 537 | [ | | | | | | | | | | | | | | | | | | ] |
| 538 | [ | | | | | | | | | | | | | | | | | | ] |
| 539 | [ | | | | | | | | | | | | | | | | | | ] |
| 540 | [ | | | | | | | | | | | | | | | | | | ] |
| 541 | [ | | | | | | | | | | | | | | | | | | ] |
| 542 | [ | | | | | | | | | | | | | | | | | | ] |
| 543 | [ | | | | | | | | | | | | | | | | | | ] |
| 544 | [ | | | | | | | | | | | | | | | | | | ] |
| 545 | [ | | | | | | | | | | | | | | | | | | ] |
| 546 | [ | | | | | | | | | | | | | | | | | | ] |
| 547 | [ | | | | | | | | | | | | | | | | | | ] |
| 548 | [ | | | | | | | | | | | | | | | | | | ] |
| 549 | [ | | | | | | | | | | | | | | | | | | ] |
| 550 | [ | | | | | | | | | | | | | | | | | | ] |
| 551 | [ | | | | | | | | | | | | | | | | | | ] |
| 552 | [ | | | | | | | | | | | | | | | | | | ] |
| 553 | [ | | | | | | | | | | | | | | | | | | ] |
| 554 | [ | | | | | | | | | | | | | | | | | | ] |
| 555 | [ | | | | | | | | | | | | | | | | | | ] |
| 556 | [ | | | | | | | | | | | | | | | | | | ] |
| 557 | [ | | | | | | | | | | | | | | | | | | ] |
| 558 | [ | | | | | | | | | | | | | | | | | | ] |
| 559 | [ | | | | | | | | | | | | | | | | | | ] |
| 560 | [ | | | | | | | | | | | | | | | | | | ] |
| 561 | [ | | | | | | | | | | | | | | | | | | ] |
| 562 | [ | | | | | | | | | | | | | | | | | | ] |
| 563 | [ | | | | | | | | | | | | | | | | | | ] |
| 564 | [ | | | | | | | | | | | | | | | | | | ] |
| 565 | [ | | | | | | | | | | | | | | | | | | ] |
| 566 | [ | | | | | | | | | | | | | | | | | | ] |
| 567 | [ | | | | | | | | | | | | | | | | | | ] |
| 568 | [ | | | | | | | | | | | | | | | | | | ] |
| 569 | [ | | | | | | | | | | | | | | | | | | ] |
| 570 | [ | | | | | | | | | | | | | | | | | | ] |
| 571 | [ | | | | | | | | | | | | | | | | | | ] |

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 572 | [ | | | | | | | | | | | | | | | | | | ] |
| 573 | [ | | | | | | | | | | | | | | | | | | ] |
| 574 | [ | | | | | | | | | | | | | | | | | | ] |
| 575 | [ | | | | | | | | | | | | | | | | | | ] |
| 576 | [ | | | | | | | | | | | | | | | | | | ] |
| 577 | [ | | | | | | | | | | | | | | | | | | ] |
| 578 | [ | | | | | | | | | | | | | | | | | | ] |
| 579 | [ | | | | | | | | | | | | | | | | | | ] |
| 580 | [ | | | | | | | | | | | | | | | | | | ] |
| 581 | [ | | | | | | | | | | | | | | | | | | ] |
| 582 | [ | | | | | | | | | | | | | | | | | | ] |
| 583 | [ | | | | | | | | | | | | | | | | | | ] |
| 584 | [ | | | | | | | | | | | | | | | | | | ] |
| 585 | [ | | | | | | | | | | | | | | | | | | ] |
| 586 | [ | | | | | | | | | | | | | | | | | | ] |
| 587 | [ | | | | | | | | | | | | | | | | | | ] |
| 588 | [ | | | | | | | | | | | | | | | | | | ] |
| 589 | [ | | | | | | | | | | | | | | | | | | ] |
| 590 | [ | | | | | | | | | | | | | | | | | | ] |
| 591 | [ | | | | | | | | | | | | | | | | | | ] |
| 592 | [ | | | | | | | | | | | | | | | | | | ] |
| 593 | [ | | | | | | | | | | | | | | | | | | ] |
| 594 | [ | | | | | | | | | | | | | | | | | | ] |
| 595 | [ | | | | | | | | | | | | | | | | | | ] |
| 596 | [ | | | | | | | | | | | | | | | | | | ] |
| 597 | [ | | | | | | | | | | | | | | | | | | ] |
| 598 | [ | | | | | | | | | | | | | | | | | | ] |
| 599 | [ | | | | | | | | | | | | | | | | | | ] |
| 600 | [ | | | | | | | | | | | | | | | | | | ] |
| 601 | [ | | | | | | | | | | | | | | | | | | ] |
| 602 | [ | | | | | | | | | | | | | | | | | | ] |
| 603 | [ | | | | | | | | | | | | | | | | | | ] |
| 604 | [ | | | | | | | | | | | | | | | | | | ] |
| 605 | [ | | | | | | | | | | | | | | | | | | ] |
| 606 | [ | | | | | | | | | | | | | | | | | | ] |
| 607 | [ | | | | | | | | | | | | | | | | | | ] |
| 608 | [ | | | | | | | | | | | | | | | | | | ] |
| 609 | [ | | | | | | | | | | | | | | | 700.00 | | | ] |
| 610 | [ | | | | | | | | | | | | | | | | | | ] |
| 611 | [ | | | | | | | | | | | | | | | | | | ] |
| 612 | [ | | | | | | | | | | | | | | | | | | ] |

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 613 | [ | | | | | | | | | | | | | | | | | | ] |
| 614 | [ | | | | | | | | | | | | | | | | | | ] |
| 615 | [ | | | | | | | | | | | | | | | | | | ] |
| 616 | [ | | | | | | | | | | | | | | | | | | ] |
| 617 | [ | | | | | | | | | | | | | | | | | | ] |
| 618 | [ | | | | | | | | 3,725.00 | | | | | | | | | | ] |
| 619 | [ | | | | | | | | | | | | | | | | | | ] |
| 620 | [ | | | | | | | | | | | | | | | | | | ] |
| 621 | [ | | | | | | | | | | | | | | | | | | ] |
| 622 | [ | | | | | | | | | | | | | | | | | | ] |
| 623 | [ | | | | | | | | | | | | | | | | | | ] |
| 624 | [ | | | | | | | | | | | | | | | | | | ] |
| 625 | [ | | | | | | | | | | | | | | | | | | ] |
| 626 | [ | | | | | | | | | | | | | | | | | | ] |
| 627 | [ | | | | | | | | | | | | | | | | | | ] |
| 628 | [ | | | | | | | | | | | | | | | | | | ] |
| 629 | [ | | | | | | | | | | | | | | | | | | ] |
| 630 | [ | | | | | | | | | | | | | | | | | | ] |
| 631 | [ | | | | | | | | | | | | | | | | | | ] |
| 632 | [ | | | | | | | | | | | | | | | | | | ] |
| 633 | [ | | | | | | | | | | | | | | | | | | ] |
| 634 | [ | | | | | | | | | | | | | | | | | | ] |
| 635 | [ | | | | | | | | | | | | | | | | | | ] |
| 636 | [ | | | | | | | | | | | | | | | | | | ] |
| 637 | [ | | | | | | | | | | | | | | | | | | ] |
| 638 | [ | | | | | | | | | | | | | | | | | | ] |
| 639 | [ | | | | | | | | | | | | | | | | | | ] |
| 640 | [ | | | | | | | | | | | | | | | | | | ] |
| 641 | [ | | | | | | | | | | | | | | | | | | ] |
| 642 | [ | | | | | | | | | | | | | | | | | | ] |
| 643 | [ | | | | | | | | | | | | | | | | | | ] |
| 644 | [ | | | | | | | | | | | | | | | | | | ] |
| 645 | [ | | | | | | | | | | | | | | | | | | ] |
| 646 | [ | | | | | | | | | | | | | | | | | | ] |
| 647 | [ | | | | | | | | | | | | | | | | | | ] |
| 648 | [ | | | | | | | | | | | | | | | | | | ] |
| 649 | [ | | | | | | | | | | | | | | | | | | ] |
| 650 | [ | | | | | | | | | | | | | | | | | | ] |
| 651 | [ | | | | | | | | | | | | | | | | | | ] |
| 652 | [ | | | | | | | | | | | | | | | | | | ] |
| 653 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 654 | [ | | | | | | | | | | | | | | | | | | ] |
| 655 | [ | | | | | | | | | | | | | | | | | | ] |
| 656 | [ | | | | | | | | | | | | | | | | | | ] |
| 657 | [ | | | | | | | | | | | | | | | | | | ] |
| 658 | [ | | | | | | | | | | | | | | | | | | ] |
| 659 | [ | | | | | | | | | | | | | | | | | | ] |
| 660 | [ | | | | | | | | | | | | | | | | | | ] |
| 661 | [ | | | | | | | | | | 5,400.00 | | | | | | | | ] |
| 662 | [ | | | | | | | | | | | | | | | | | | ] |
| 663 | [ | | | | | | | | | | | | | | | | | | ] |
| 664 | [ | | | | | | | | | | | | | | | | | | ] |
| 665 | [ | | | | | | | | | | | | | | | | | | ] |
| 666 | [ | | | | | | | | | | | | | | | | | | ] |
| 667 | [ | | | | | | | | | | | | | | | | | | ] |
| 668 | [ | | | | | | | | | | | | | | | | | | ] |
| 669 | [ | | | | | | | | | | | | | | | | | | ] |
| 670 | [ | | | | | | | | | | | | | | | | | | ] |
| 671 | [ | | | | | | | | | | | | | | | | | | ] |
| 672 | [ | | | | | | | | | | | | | | | | | | ] |
| 673 | [ | | | | | | | | | | | | | | | | | | ] |
| 674 | [ | | | | | | | | | | | | | | | | | | ] |
| 675 | [ | | | | | | | | | | | | | | | | | | ] |
| 676 | [ | | | | | | | | | | | | | | | | | | ] |
| 677 | [ | | | | | | | | | | | | | | | | | | ] |
| 678 | [ | | | | | | | | | | | | | | | | | | ] |
| 679 | [ | | | | | | | | | | | | | | | | | | ] |
| 680 | [ | | | | | | | | | | | | | | | | | | ] |
| 681 | [ | | | | | | | | | | | | | | | | | | ] |
| 682 | [ | | | | | | | | | | | | | | | | | | ] |
| 683 | [ | | | | | | | | | | | | | | | | | | ] |
| 684 | [ | | | | | | | | | | | | | | | | | | ] |
| 685 | [ | | | | | | | | | | | | | | | | | | ] |
| 686 | [ | | | | | | | | | | | | | | | | | | ] |
| 687 | [ | | | | | | | | | | | | | | | | | | ] |
| 688 | [ | | | | | | | | | | | | | | | | | | ] |
| 689 | [ | | | | | | | | | | | | | | | | | | ] |
| 690 | [ | | | | | | | | | | | | | | | | | | ] |
| 691 | [ | | | | | | | | | | | | | | | | | | ] |
| 692 | [ | | | | | | | | | | | | | | | | | | ] |
| 693 | [ | | | | | | | | | | | | | | | | | | ] |
| 694 | [ | | | | | | | | | | | | | | | | | | ] |

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 695 | [ | | | | | | | | | | | | | | | | | | ] |
| 696 | [ | | | | | | | | | | | | | | | | | | ] |
| 697 | [ | | | | | | | | | | | | | | | | | | ] |
| 698 | [ | | | | | | | | | | | | | | | | | | ] |
| 699 | [ | | | | | | | | | | | | | | | | | | ] |
| 700 | [ | | | | | | | | | | | | | | | | | | ] |
| 701 | [ | | | | | | | | | | | | | | | | | | ] |
| 702 | [ | | | | | | | | | | | | | | | | | | ] |
| 703 | [ | | | | | | | | | | | | | | | | | | ] |
| 704 | [ | | | | | | | | | | | | | | | | | | ] |
| 705 | [ | | | | | | | | | | | | | | | | | | ] |
| 706 | [ | | | | | | | | | | | | | | | | | | ] |
| 707 | [ | | | | | | | | | | | | | | | | | | ] |
| 708 | [ | | | | | | | | | | | | | | | | | | ] |
| 709 | [ | | | | | | | | | | | | | | | | | | ] |
| 710 | [ | | | | | | | | | | | | | | | | | | ] |
| 711 | [ | | | | | | | | | | | | | | | | | | ] |
| 712 | [ | | | | | | | | | | | | | | | | | | ] |
| 713 | [ | | | | | | | | | | | | | | | | | | ] |
| 714 | [ | | | | | | | | | | | | | | | | | | ] |
| 715 | [ | | | | | | | | | | | | | | | | | | ] |
| 716 | [ | | | | | | | | | | | | | | | | | | ] |
| 717 | [ | | | | | | | | | | | | | | | | | | ] |
| 718 | [ | | | | | | | | | | | | | | | | | | ] |
| 719 | [ | | | | | | | | | | | | | | | | | | ] |
| 720 | [ | | | | | | | | | | | | | | | | | | ] |
| 721 | [ | | | | | | | | | | | | | | | | | | ] |
| 722 | [ | | | | | | | | | | | | | | | | | | ] |
| 723 | [ | | | | | | | | | | | | | | | | | | ] |
| 724 | [ | | | | | | | | | | | | | | | | | | ] |
| 725 | [ | | | | | | | | | | | | | | | | | | ] |
| 726 | [ | | | | | | | | | | | | | | | | | | ] |
| 727 | [ | | | | | | | | | | | | | | | | | | ] |
| 728 | [ | | | | | | | | | | | | | | | | | | ] |
| 729 | [ | | | | | | | | | | | | | | | 715.00 | | | ] |
| 730 | [ | | | | | | | | | | | | | | | | | | ] |
| 731 | [ | | | | | | | | | | | | | | | | | | ] |
| 732 | [ | | | | | | | | | | | | | | | | | | ] |
| 733 | [ | | | | | | | | | | | | | | | | | | ] |
| 734 | [ | | | | | | | | | | | | | | | | | | ] |
| 735 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 736 | [ | | | | | | | | | | | | | | | | | | ] |
| 737 | [ | | | | | | | | | | | | | | | | | | ] |
| 738 | [ | | | | | | | | | | | | | | | | | | ] |
| 739 | [ | | | | | | | | | | | | | | | | | | ] |
| 740 | [ | | | | | | | | | | | | | | | | | | ] |
| 741 | [ | | | | | | | | | | | | | | | | | | ] |
| 742 | [ | | | | | | | | | | | | | | | | | | ] |
| 743 | [ | | | | | | | | | | | | | | | | | | ] |
| 744 | [ | | | | | | | | | | | | | | | | | | ] |
| 745 | [ | | | | | | | | | | | | | | | | | | ] |
| 746 | [ | | | | | | | | | | | | | | | | | | ] |
| 747 | [ | | | | | | | | | | | | | | | | | | ] |
| 748 | [ | | | | | | | | | | | | | | | | | | ] |
| 749 | [ | | | | | | | | | | | | | | | | | | ] |
| 750 | [ | | | | | | | | | | | | | | | | | | ] |
| 751 | [ | | | | | | | | | | | | | | | | | | ] |
| 752 | [ | | | | | | | | | | | | | | | | | | ] |
| 753 | [ | | | | | | | | | | | | | | | | | | ] |
| 754 | [ | | | | | | | | | | | | | | | | | | ] |
| 755 | [ | | | | | | | | | | | | | | | | | | ] |
| 756 | [ | | | | | | | | | | | | | | | | | | ] |
| 757 | [ | | | | | | | | | | | | | | | | | | ] |
| 758 | [ | | | | | | | | | | | | | | | | | | ] |
| 759 | [ | | | | | | | | | | | | | | | | | | ] |
| 760 | [ | | | | | | | | | | | | | | | | | | ] |
| 761 | [ | | | | | | | | | | | | | | | | | | ] |
| 762 | [ | | | | | | | | | | | | | | | | | | ] |
| 763 | [ | | | | | | | | | | | | | | | | | | ] |
| 764 | [ | | | | | | | | | | | | | | | | | | ] |
| 765 | [ | | | | | | | | | | | | | | | | | | ] |
| 766 | [ | | | | | | | | | | | | | | | | | | ] |
| 767 | [ | | | | | | | | | | | | | | | | | | ] |
| 768 | [ | | | | | | | | | | | | | | | | | | ] |
| 769 | [ | | | | | | | | | | | | | | | | | | ] |
| 770 | [ | | | | | | | | | | | | | | | | | | ] |
| 771 | [ | | | | | | | | | | | | | | | | | | ] |
| 772 | [ | | | | | | | | 4,000.00 | | | | | | | | | | ] |
| 773 | [ | | | | | | | | | | | | | | | | | | ] |
| 774 | [ | | | | | | | | | | | | | | | | | | ] |
| 775 | [ | | | | | | | | | | | | | | | | | | ] |
| 776 | [ | | | | | | | | | | | | | | | | | | ] |

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 777 | [ | | | | | | | | | | | | | | | | | | ] |
| 778 | [ | | | | | | | | | | | | | | | | | | ] |
| 779 | [ | | | | | | | | | | | | | | | | | | ] |
| 780 | [ | | | | | | | | | | | | | | | | | | ] |
| 781 | [ | | | | | | | | | | | | | | | | | | ] |
| 782 | [ | | | | | | | | | | | | | | | | | | ] |
| 783 | [ | | | | | | | | | | | | | | | | | | ] |
| 784 | [ | | | | | | | | | | | | | | | | | | ] |
| 785 | [ | | | | | | | | | | | | | | | | | | ] |
| 786 | [ | | | | | | | | | | | | | | | | | | ] |
| 787 | [ | | | | | | | | | | | | | | | | | | ] |
| 788 | [ | | | | | | | | | | | | | | | | | | ] |
| 789 | [ | | | | | | | | | | | | | | | | | | ] |
| 790 | [ | | | | | | | | | | | | | | | | | | ] |
| 791 | [ | | | | | | | | | | | | | | | | | | ] |
| 792 | [ | | | | | | | | | | | | | | | | | | ] |
| 793 | [ | | | | | | | | | | | | | | | | | | ] |
| 794 | [ | | | | | | | | | | | | | | | | | | ] |
| 795 | [ | | | | | | | | | | | | | | | | | | ] |
| 796 | [ | | | | | | | | | | | | | | | | | | ] |
| 797 | [ | | | | | | | | | | | | | | | | | | ] |
| 798 | [ | | | | | | | | | | | | | | | | | | ] |
| 799 | [ | | | | | | | | | | | | | | | | | | ] |
| 800 | [ | | | | | | | | | | | | | | | | | | ] |
| 801 | [ | | | | | | | | | | | | | | | | | | ] |
| 802 | [ | | | | | | | | | | | | | | | | | | ] |
| 803 | [ | | | | | | | | | | | | | | | | | | ] |
| 804 | [ | | | | | | | | | | | | | | | | | | ] |
| 805 | [ | | | | | | | | | | | | | | | | | | ] |
| 806 | [ | | | | | | | | | | | | | | | | | | ] |
| 807 | [ | | | | | | | | | | | | | | | | | | ] |
| 808 | [ | | | | | | | | | | | | | | | | | | ] |
| 809 | [ | | | | | | | | | | | | | | | | | | ] |
| 810 | [ | | | | | | | | | | | | | | | | | | ] |
| 811 | [ | | | | | | | | | | | | | | | | | | ] |
| 812 | [ | | | | | | | | | | | | | | | | | | ] |
| 813 | [ | | | | | | | | | | | | | | | | | | ] |
| 814 | [ | | | | | | | | | | | | | | | | | | ] |
| 815 | [ | | | | | | | | | | | | | | | | | | ] |
| 816 | [ | | | | | | | | | | 7,000.00 | | | | | | | | ] |
| 817 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 818 | [ | | | | | | | | | | | | | | | | | | ] |
| 819 | [ | | | | | | | | | | | | | | | | | | ] |
| 820 | [ | | | | | | | | | | | | | | | | | | ] |
| 821 | [ | | | | | | | | | | | | | | | | | | ] |
| 822 | [ | | | | | | | | | | | | | | | | | | ] |
| 823 | [ | | | | | | | | | | | | | | | | | | ] |
| 824 | [ | | | | | | | | | | | | | | | | | | ] |
| 825 | [ | | | | | | | | | | | | | | | | | | ] |
| 826 | [ | | | | | | | | | | | | | | | | | | ] |
| 827 | [ | | | | | | | | | | | | | | | | | | ] |
| 828 | [ | | | | | | | | | | | | | | | | | | ] |
| 829 | [ | | | | | | | | | | | | | | | | 800.00 | | | ] |
| 830 | [ | | | | | | | | | | | | | | | | | | ] |
| 831 | [ | | | | | | | | | | | | | | | | | | ] |
| 832 | [ | | | | | | | | | | | | | | | | | | ] |
| 833 | [ | | | | | | | | | | | | | | | | | | ] |
| 834 | [ | | | | | | | | | | | | | | | | | | ] |
| 835 | [ | | | | | | | | | | | | | | | | | | ] |
| 836 | [ | | | | | | | | | | | | | | | | | | ] |
| 837 | [ | | | | | | | | | | | | | | | | | | ] |
| 838 | [ | | | | | | | | | | | | | | | | | | ] |
| 839 | [ | | | | | | | | | | | | | | | | | | ] |
| 840 | [ | | | | | | | | | | | | | | | | | | ] |
| 841 | [ | | | | | | | | | | | | | | | | | | ] |
| 842 | [ | | | | | | | | | | | | | | | | | | ] |
| 843 | [ | | | | | | | | | | | | | | | | | | ] |
| 844 | [ | | | | | | | | | | | | | | | | | | ] |
| 845 | [ | | | | | | | | | | | | | | | | | | ] |
| 846 | [ | | | | | | | | | | | | | | | | | | ] |
| 847 | [ | | | | | | | | | | | | | | | | | | ] |
| 848 | [ | | | | | | | | | | | | | | | | | | ] |
| 849 | [ | | | | | | | | | | | | | | | | | | ] |
| 850 | [ | | | | | | | | | | | | | | | | | | ] |
| 851 | [ | | | | | | | | | | | | | | | | | | ] |
| 852 | [ | | | | | | | | | | | | | | | | | | ] |
| 853 | [ | | | | | | | | | | | | | | | | | | ] |
| 854 | [ | | | | | | | | | | | | | | | | | | ] |
| 855 | [ | | | | | | | | | | | | | | | | | | ] |
| 856 | [ | | | | | | | | | | | | | | | | | | ] |
| 857 | [ | | | | | | | | | | | | | | | | | | ] |
| 858 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 859 | [ | | | | | | | | | | | | | | | | | | ] |
| 860 | [ | | | | | | | | | | | | | | | | | | ] |
| 861 | [ | | | | | | | | | | | | | | | | | | ] |
| 862 | [ | | | | | | | | | | | | | | | | | | ] |
| 863 | [ | | | | | | | | | | | | | | | | | | ] |
| 864 | [ | | | | | | | | | | | | | | | | | | ] |
| 865 | [ | | | | | | | | | | | | | | | | | | ] |
| 866 | [ | | | | | | | | | | | | | | | | | | ] |
| 867 | [ | | | | | | | | | | | | | | | | | | ] |
| 868 | [ | | | | | | | | | | | | | | | | | | ] |
| 869 | [ | | | | | | | | | | | | | | | | | | ] |
| 870 | [ | | | | | | | | | | | | | | | | | | ] |
| 871 | [ | | | | | | | | | | | | | | | | | | ] |
| 872 | [ | | | | | | | | | | | | | | | | | | ] |
| 873 | [ | | | | | | | | | | | | | | | | | | ] |
| 874 | [ | | | | | | | | | | | | | | | | | | ] |
| 875 | [ | | | | | | | | | | | | | | | | | | ] |
| 876 | [ | | | | | | | | | | | | | | | | | | ] |
| 877 | [ | | | | | | | | | | | | | | | | | | ] |
| 878 | [ | | | | | | | | | | | | | | | | | | ] |
| 879 | [ | | | | | | | | | | | | | | | | | | ] |
| 880 | [ | | | | | | | | | | | | | | | | | | ] |
| 881 | [ | | | | | | | | | | | | | | | | | | ] |
| 882 | [ | | | | | | | | | | | | | | | | | | ] |
| 883 | [ | | | | | | | | | | | | | | | | | | ] |
| 884 | [ | | | | | | | | | | | | | | | | | | ] |
| 885 | [ | | | | | | | | | | | | | | | | | | ] |
| 886 | [ | | | | | | | | | | | | | | | | | | ] |
| 887 | [ | | | | | | | | | | | | | | | | | | ] |
| 888 | [ | | | | | | | | 4,250.00 | | | | | | | | | | ] |
| 889 | [ | | | | | | | | | | | | | | | | | | ] |
| 890 | [ | | | | | | | | | | | | | | | | | | ] |
| 891 | [ | | | | | | | | | | | | | | | | | | ] |
| 892 | [ | | | | | | | | | | | | | | | | | | ] |
| 893 | [ | | | | | | | | | | | | | | | | | | ] |
| 894 | [ | | | | | | | | | | | | | | | | | | ] |
| 895 | [ | | | | | | | | | | | | | | | | | | ] |
| 896 | [ | | | | | | | | | | | | | | | | | | ] |
| 897 | [ | | | | | | | | | | | | | | | | | | ] |
| 898 | [ | | | | | | | | | | | | | | | | | | ] |
| 899 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

PUBLIC VERSION - BPI Has Been Ranged or Redacted

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 900 | [ | | | | | | | | | | | | | | | | | | ] |
| 901 | [ | | | | | | | | | | | | | | | | | | ] |
| 902 | [ | | | | | | | | | | | | | | | | | | ] |
| 903 | [ | | | | | | | | | | | | | | | | | | ] |
| 904 | [ | | | | | | | | | | | | | | | | | | ] |
| 905 | [ | | | | | | | | | | | | | | | | | | ] |
| 906 | [ | | | | | | | | | | | | | | | | | | ] |
| 907 | [ | | | | | | | | | | | | | | | | | | ] |
| 908 | [ | | | | | | | | | | | | | | | | | | ] |
| 909 | [ | | | | | | | | | | | | | | | | | | ] |
| 910 | [ | | | | | | | | | | | | | | | | | | ] |
| 911 | [ | | | | | | | | | | | | | | | | | | ] |
| 912 | [ | | | | | | | | | | | | | | | | | | ] |
| 913 | [ | | | | | | | | | | | | | | | | | | ] |
| 914 | [ | | | | | | | | | | | | | | | | | | ] |
| 915 | [ | | | | | | | | | | | | | | | | | | ] |
| 916 | [ | | | | | | | | | | | | | | | | | | ] |
| 917 | [ | | | | | | | | | | | | | | | | | | ] |
| 918 | [ | | | | | | | | | | | | | | | | | | ] |
| 919 | [ | | | | | | | | | | | | | | | | | | ] |
| 920 | [ | | | | | | | | | | | | | | | | | | ] |
| 921 | [ | | | | | | | | | | | | | | | | | | ] |
| 922 | [ | | | | | | | | | | | | | | | | | | ] |
| 923 | [ | | | | | | | | | | | | | | | | | | ] |
| 924 | [ | | | | | | | | | | | | | | | | | | ] |
| 925 | [ | | | | | | | | | | | | | | | | | | ] |
| 926 | [ | | | | | | | | | | | | | | | | | | ] |
| 927 | [ | | | | | | | | | | | | | | | | | | ] |
| 928 | [ | | | | | | | | | | | | | | | | | | ] |
| 929 | [ | | | | | | | | | | | | | | | | | | ] |
| 930 | [ | | | | | | | | | | | | | | | | | | ] |
| 931 | [ | | | | | | | | | | | | | | | | | | ] |
| 932 | [ | | | | | | | | | | | | | | | | | | ] |
| 933 | [ | | | | | | | | | | 5,800.00 | | | | | | | | ] |
| 934 | [ | | | | | | | | | | | | | | | | | | ] |
| 935 | [ | | | | | | | | | | | | | | | | | | ] |
| 936 | [ | | | | | | | | | | | | | | | | | | ] |
| 937 | [ | | | | | | | | | | | | | | | | | | ] |
| 938 | [ | | | | | | | | | | | | | | | | | | ] |
| 939 | [ | | | | | | | | | | | | | | | | | | ] |
| 940 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 941 | [ | | | | | | | | | | | | | | | | | | ] |
| 942 | [ | | | | | | | | | | | | | | | 715.00 | | | ] |
| 943 | [ | | | | | | | | | | | | | | | | | | ] |
| 944 | [ | | | | | | | | | | | | | | | | | | ] |
| 945 | [ | | | | | | | | | | | | | | | | | | ] |
| 946 | [ | | | | | | | | | | | | | | | | | | ] |
| 947 | [ | | | | | | | | | | | | | | | | | | ] |
| 948 | [ | | | | | | | | | | | | | | | | | | ] |
| 949 | [ | | | | | | | | | | | | | | | | | | ] |
| 950 | [ | | | | | | | | | | | | | | | | | | ] |
| 951 | [ | | | | | | | | | | | | | | | | | | ] |
| 952 | [ | | | | | | | | | | | | | | | | | | ] |
| 953 | [ | | | | | | | | | | | | | | | | | | ] |
| 954 | [ | | | | | | | | | | | | | | | | | | ] |
| 955 | [ | | | | | | | | | | | | | | | | | | ] |
| 956 | [ | | | | | | | | | | | | | | | | | | ] |
| 957 | [ | | | | | | | | | | | | | | | | | | ] |
| 958 | [ | | | | | | | | | | | | | | | | | | ] |
| 959 | [ | | | | | | | | | | | | | | | | | | ] |
| 960 | [ | | | | | | | | | | | | | | | | | | ] |
| 961 | [ | | | | | | | | | | | | | | | | | | ] |
| 962 | [ | | | | | | | | | | | | | | | | | | ] |
| 963 | [ | | | | | | | | | | | | | | | | | | ] |
| 964 | [ | | | | | | | | | | | | | | | | | | ] |
| 965 | [ | | | | | | | | | | | | | | | | | | ] |
| 966 | [ | | | | | | | | | | | | | | | | | | ] |
| 967 | [ | | | | | | | | | | | | | | | | | | ] |
| 968 | [ | | | | | | | | | | | | | | | | | | ] |
| 969 | [ | | | | | | | | | | | | | | | | | | ] |
| 970 | [ | | | | | | | | | | | | | | | | | | ] |
| 971 | [ | | | | | | | | | | | | | | | | | | ] |
| 972 | [ | | | | | | | | | | | | | | | | | | ] |
| 973 | [ | | | | | | | | | | | | | | | | | | ] |
| 974 | [ | | | | | | | | | | | | | | | | | | ] |
| 975 | [ | | | | | | | | | | | | | | | | | | ] |
| 976 | [ | | | | | | | | | | | | | | | | | | ] |
| 977 | [ | | | | | | | | | | | | | | | | | | ] |
| 978 | [ | | | | | | | | | | | | | | | | | | ] |
| 979 | [ | | | | | | | | | | | | | | | | | | ] |
| 980 | [ | | | | | | | | | | | | | | | | | | ] |
| 981 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

PUBLIC VERSION - BPI Has Been Ranged or Redacted

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 982 | [ | | | | | | | | | | | | | | | | | | ] |
| 983 | [ | | | | | | | | | | | | | | | | | | ] |
| 984 | [ | | | | | | | | | | | | | | | | | | ] |
| 985 | [ | | | | | | | | | | | | | | | | | | ] |
| 986 | [ | | | | | | | | | | | | | | | | | | ] |
| 987 | [ | | | | | | | | | | | | | | | | | | ] |
| 988 | [ | | | | | | | | | | | | | | | | | | ] |
| 989 | [ | | | | | | | | | | | | | | | | | | ] |
| 990 | [ | | | | | | | | | | | | | | | | | | ] |
| 991 | [ | | | | | | | | | | | | | | | | | | ] |
| 992 | [ | | | | | | | | | | | | | | | | | | ] |
| 993 | [ | | | | | | | | | | | | | | | | | | ] |
| 994 | [ | | | | | | | | | | | | | | | | | | ] |
| 995 | [ | | | | | | | | | | | | | | | | | | ] |
| 996 | [ | | | | | | | | | | | | | | | | | | ] |
| 997 | [ | | | | | | | | | | | | | | | | | | ] |
| 998 | [ | | | | | | | | | | | | | | | | | | ] |
| 999 | [ | | | | | | | | | | | | | | | | | | ] |
| 1000 | [ | | | | | | | | | | | | | | | | | | ] |
| 1001 | [ | | | | | | | | | | | | | | | | | | ] |
| 1002 | [ | | | | | | | | | | | | | | | | | | ] |
| 1003 | [ | | | | | | | | | | | | | | | | | | ] |
| 1004 | [ | | | | | | | | | | | | | | | | | | ] |
| 1005 | [ | | | | | | | | | | | | | | | | | | ] |
| 1006 | [ | | | | | | | | | | | | | | | | | | ] |
| 1007 | [ | | | | | | | | 4,000.00 | | | | | | | | | | ] |
| 1008 | [ | | | | | | | | | | | | | | | | | | ] |
| 1009 | [ | | | | | | | | | | | | | | | | | | ] |
| 1010 | [ | | | | | | | | | | | | | | | | | | ] |
| 1011 | [ | | | | | | | | | | | | | | | | | | ] |
| 1012 | [ | | | | | | | | | | | | | | | | | | ] |
| 1013 | [ | | | | | | | | | | | | | | | | | | ] |
| 1014 | [ | | | | | | | | | | | | | | | | | | ] |
| 1015 | [ | | | | | | | | | | | | | | | | | | ] |
| 1016 | [ | | | | | | | | | | | | | | | | | | ] |
| 1017 | [ | | | | | | | | | | | | | | | | | | ] |
| 1018 | [ | | | | | | | | | | | | | | | | | | ] |
| 1019 | [ | | | | | | | | | | | | | | | | | | ] |
| 1020 | [ | | | | | | | | | | | | | | | | | | ] |
| 1021 | [ | | | | | | | | | | | | | | | | | | ] |
| 1022 | [ | | | | | | | | | | | | | | | | | | ] |

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| Purchase Number | | Month of Purchase | Invoice Number | Invoice Date | Supplier Name | Supplier Address | Producer Name | Producer Address | Volume | Unit of Measure | Total Value (Not including delivery) (CIF Value Rs., exclusive of VAT) | Average Unit Value (Rs., exclusive of VAT) | Delivery Terms | Total Delivery Charges for Sales Not on Delivered Terms | VAT Rate (%) Paid | VAT Amount Paid (Rs.) | Import Duty Rate (%) (if applicable) | Import Duty Amount Paid (Rs.) (if applicable) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1023 | [ | | | | | | | | | | | | | | | | | | ] |
| 1024 | [ | | | | | | | | | | | | | | | | | | ] |
| 1025 | [ | | | | | | | | | | | | | | | | | | ] |
| 1026 | [ | | | | | | | | | | | | | | | | | | ] |
| 1027 | [ | | | | | | | | | | | | | | | | | | ] |
| 1028 | [ | | | | | | | | | | | | | | | | | | ] |
| 1029 | [ | | | | | | | | | | | | | | | | | | ] |
| 1030 | [ | | | | | | | | | | | | | | | | | | ] |
| 1031 | [ | | | | | | | | | | | | | | | | | | ] |
| 1032 | [ | | | | | | | | | | | | | | | | | | ] |
| 1033 | [ | | | | | | | | | | | | | | | | | | ] |
| 1034 | [ | | | | | | | | | | | | | | | | | | ] |
| 1035 | [ | | | | | | | | | | | | | | | | | | ] |
| 1036 | [ | | | | | | | | | | | | | | | | | | ] |
| 1037 | [ | | | | | | | | | | | | | | | | | | ] |
| 1038 | [ | | | | | | | | | | | | | | | | | | ] |
| 1039 | [ | | | | | | | | | | | | | | | | | | ] |
| 1040 | [ | | | | | | | | | | | | | | | | | | ] |
| 1041 | [ | | | | | | | | | | | | | | | | | | ] |
| 1042 | [ | | | | | | | | | | 13,000.00 | | | | | | | | ] |
| 1043 | [ | | | | | | | | | | | | | | | | | | ] |
| 1044 | [ | | | | | | | | | | | | | | | | | | ] |
| 1045 | [ | | | | | | | | | | | | | | | | | | ] |
| 1046 | [ | | | | | | | | | | | | | | | | | | ] |
| 1047 | [ | | | | | | | | | | | | | | | | | | ] |
| 1048 | [ | | | | | | | | | | | | | | | | | | ] |
| 1049 | [ | | | | | | | | | | | | | | | | | | ] |
| 1050 | [ | | | | | | | | | | | | | | | | | | ] |
| 1051 | [ | | | | | | | | | | | | | | | | | | ] |
| 1052 | [ | | | | | | | | | | | | | | | | | | ] |
| 1053 | [ | | | | | | | | | | | | | | | | | | ] |
| 1054 | [ | | | | | | | | | | | | | | | | | | ] |
| 1055 | [ | | | | | | | | | | | | | | | | | | ] |
| 1056 | [ | | | | | | | | | | | | | | | | | | ] |
| 1057 | [ | | | | | | | | | | | | | | | | | | ] |
| 1058 | [ | | | | | | | | | | | | | | | | | | ] |
| | | | | | | | | TOTALS | [ | | | | | | | | | | ] |

**Notes Produmar:**

The column "Total Value (CIF Rs. Value, excluding VAT)" does not include the value of fuel transportation, this value is clearly represented by the price of diesel and its quantity purchased, which is called the terminal selling price.

**DPU:** Delivered at place unloaded

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

# EXHIBIT NSA-11

Case no. C-331-806
Investigation
E&C/Office IV
PUBLIC DOCUMENT

**DECLARATION OF GEORGE CHAMBERLAIN**

1. I, George Chamberlain, hereby declare that the statements contained in this declaration are true and correct and are based on my own personal knowledge.

2. I began my career in aquaculture in 1975 as a graduate student and later a researcher at Texas A&M University. I conducted shrimp farming consulting projects in Asia, Africa, Latin America, and Europe. In 1990, I moved to Ralston Purina International where I directed their international aquaculture feed program in the Americas, Europe, and Asia. Eight years later, I moved to Monsanto, where I led a program on genetically selected marine shrimp, soy-based feed, and sustainable pond systems for marine shrimp.

3. I have been directly involved in the shrimp farming business for over 25 years. In 1999, I co-owned a 420-acre shrimp farm, breeding center, hatchery, and processing facility in Malaysia. In 2004, I sold that business and invested the profits in a shrimp farming technology company, Integrated Aquaculture International (IAI), which installed a breeding facility at a large farm in Malaysia in 2005. In 2006, IAI partnered with the Brunei government to establish a breeding center for *Penaeus monodon* (black tiger shrimp) as well as a hatchery, shrimp nutrition research center, and highly advanced research farm. In 2009, my partners and I purchased a *Penaeus vannamei* (white shrimp) farm, breeding center, hatchery, and processing plant in Hawaii. It was the largest aquaculture producer in Hawaii. In 2017, I sold my shares in that company to Hendrix Genetics, a Dutch breeding company with global leadership in layer, turkey, swine, and salmon breeding.

4. I am the President of the Global Aquaculture Alliance (GAA) and was one of its co-founders in 1997. The GAA expanded its mission to include wild caught seafood in 2021 and became the Global Seafood Alliance. Its mission now includes promoting best practices in fisheries around the world.

3. The GAA, now the GSA, is an international non-profit trade association dedicated to advancing responsible seafood production through the promotion of Best Aquaculture Practices and Best Seafood Practices. We collaborate with industry, NGOs, governments, academia, and the investment community to promote sustainable practices in aquaculture and fisheries. Extensive information about the GSA is available at: www.globalseafood.org.

4. As just noted, a vitally important program that the GSA administers is its Best Aquaculture Practices (BAP) program. The BAP program is the only third-party aquaculture certification program that encompasses the entire production chain, including processing plants, farms, hatcheries, and feed mills. Through this program, entities can become certified as meeting rigorous standards, which allows them to certify their products as meeting the BAP standards. We have certified over 2,905 aquaculture farms as having met those standards. Detailed information about the BAP standards is available at: Best Aquaculture Practices (bapcertification.org).

5. During my career, including as President of the GAA, I have attended hundreds of conferences around the world, including conferences sponsored by governments and the United Nations, where best aquaculture practices were discussed and where developments in aquaculture and shrimp farming were reviewed. Moreover, the GAA's magazine, the Global Aquaculture Advocate, has carried hundreds of articles dedicated to improving aquaculture

practices, including the practices used on shrimp farms and the use of brackish water in shrimp ponds.

6. Also, over the course of my career, I have personally visited shrimp farms in over 30 countries. During my entire career, which includes my detailed understanding of shrimp farm operations, I have never encountered a single farm that has paid a governmental authority for the brackish water that it uses in its ponds and then returns to its original source. To the best of my knowledge, no governmental authority charges for the non-consumptive use of brackish water.

7. I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 9, 2024

George W. Chamberlain

George W. Chamberlain



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode:4546036-01 C-331-806 INV - Investigation -

**CURRICULUM VITAE**

GEORGE W. CHAMBERLAIN
85 New Hampshire Avenue, Suite 200
Portsmouth, NH 03801
Office: 603-317-5000 Ext 122
Mobile: 314-607-8466

Global Seafood Alliance
george.chamberlain@globalseafood.org

The Center for Responsible Seafood
george.chamberlain@responsibleseafood.org

## EDUCATION

- Ph.D., 1988, Texas A&M University, College Station, Texas. Dissertation: "Stepwise investigation of environmental and nutritional requirements for reproduction of penaeid shrimp". Received graduate student research awards from American Oceanic Organization (1982) and National Sea Grant Association (1982).
- M.S., 1978, Texas A&M University, College Station, Texas. Thesis: "Use of caged fishes for mariculture and environmental monitoring in a power-plant cooling-water system". Received Second-Best Paper Award at 1977 meeting of the World Mariculture Society. Awarded graduate Marine Fellowship from TAMU.
- B.S., 1974, Jacksonville University, Jacksonville, Florida. Major: Biology; Minor: Chemistry. Received Florida Regent's Scholarship (1970-1973).

## ORGANIZATIONAL LEADERSHIP

- World Aquaculture Society: Served on the Board of Directors from 1990-1995 and as President from 1995 to 1996, presiding over first WAS conference and seafood show in Asia and formation of the Asia Pacific Chapter. Received WAS Honorary Life Member award in 2016.
- Global Seafood Alliance: Co-Founder and President from inception in 1997 to present. GSA is a non-profit industry association dedicated to responsible seafood. Its certification standards (Best Aquaculture Practices and Best Seafood Practices) account for nearly 3 MMT per year of certified seafood. Its annual GOAL meeting brings together top buyers and producers from around the world. Its online magazine and social media assets generate over 100,000 page views per month.
- The Center for Responsible Seafood: Co-Founder and President from 2017 to present. TCRS is a charitable organization supporting responsible seafood through research, education, and collaboration, and its ecosystem of communities provide a rich resource for knowledge transfer and online education. Managed a series of TCRS projects (see below).

## BUSINESS LEADERSHIP

- Kona Bay: Managing Director. From 2017 to 2020, transitioned from Integrated Aquaculture International to Kona Bay by merging breeding, farming, and nutrition assets in Hawaii, Malaysia, and US and inviting investment from invited Hendrix Genetics (a global multi-species breeding company headquartered in the Netherlands). In 2020, I sold my shares to Hendrix Genetics and exited from the business.

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

- Integrated Aquaculture International: Co-owner and Managing Director.
    - From 2004 to 2006, established a black tiger shrimp breeding program for Agrobest, a large integrated farm owned by the Japanese restaurant company, Skylark.
    - From 2006 to 2015, developed a integrated black tiger shrimp technology program in conjunction with the Brunei government. We developed a sophisticated Aquatic Animal Health Laboratory, sourced adult P. monodon from the coastal waters of Brunei and passed them through a primary and secondary quarantine process to produce SPF stocks, domesticated and selectively bred the SPF stocks for 7 generations, developed self cleaning ponds with automated feeding and harvest systems, and developed high performance diets including versions which were free of fishmeal. Combined these elements to demonstrate production of up to 10 mt/ha of 50 g black tiger shrimp in 120 days. (Link to five papers: https://www.dropbox.com/sh/z6wmeko1wt8ll49/AAC1qTqpT55lmeqjFgJitCvOa?dl=0).
    - In 2009, purchased the bankrupt Kona Bay breeding program, farm, and processing plant for *L. vannamei* in Hawaii and developed it into a world class business.
    - In 2015, established a satellite breeding center and hatchery production network in Malaysia for production of *L. vannamei* with resistance to WSSV, EMS, and EHP.
- Black Tiger Aquaculture: Co-owner and Managing Director of integrated 170-ha breeding, farming, and processing operation for black tiger shrimp in Malaysia (1999-2004). This facility was the first in Malaysia to develop SPF lines of P. monodon and an associated breeding program. This greatly improved performance and productivity of ponds and led to a high demand for BTA postlarvae throughout Malaysia. Sold the business to Grobest in 2004 to focus on offering technical services in breeding and hatchery management.
- Monsanto: Technical Lead of aquaculture business unit (1998-1999). Developed plans for breeding, soy-based feeds, and intensive zero water exchange farms.
- Ralston Purina International: Director of international aquaculture business unit (1990-1998) with responsibilities for feed ingredient specifications, formulation, manufacturing systems, and technical service to customers in Canada, Mexico, Guatemala, Colombia, Venezuela, Peru, Brazil, Spain, Philippines, Korea, and China.
- Texas A&M University: Researcher and Extension Aquaculture Specialist (1978-1990).

**PROJECT MANAGEMENT**

Managed the following projects through TCRS or GSA to address fundamental issues of aquatic animal health, food safety, and animal welfare through research, education, and collaboration with producers, non-government organizations, development banks, and foundations.

- *Case Study on Infectious Salmon Anemia Outbreak in Chile*
- *Case Study on Shrimp Acute Hepatopancreatic Necrosis Syndrome Outbreak in Vietnam*
- *Case Study on Shrimp White Spot Disease Outbreak in Mozambique and Madagascar*
- *Survey of Farm Management Practices to Control EMS*
- *Development of Online Education Platform*
- *Develop Educational Program for Food Safety*
- *Expand Online Education Program*
- *Fish Welfare Project*

## SELECTED PUBLICATIONS


Chamberlain, G.W. 1997. Sustainability of world shrimp farming. Pages 195-209 in E. K. Pikitch, D.D Huppert, and M.P. Sissenwine, editors. Global trends: fisheries management. American Fisheries Society Symposium 20, Bethesda, Maryland.

Chamberlain, G.W. 2010. History of shrimp farming. Pages 1-38 in V. Alday-Sanz editors. The Shrimp Book. Nottingham University Press.

Chamberlain, G.W. and A.L. Lawrence. 1981. Maturation, reproduction, and growth of *Penaeus vannamei* and *P. stylirostris* fed natural diets. J. World Maricul. Soc. 12:209-224.

Chamberlain, G.W. and A.L. Lawrence. 1981. Effect of light intensity and male and female eyestalk ablation on reproduction of *Penaeus stylirostris* and *P. vannamei*. J. World Maricul. Soc. 12(2):357-372.

Derby, C. D., Elsayed, F. H., Williams, S. A., Gonzalez, C., Choe, M., Bharadwaj, A. S., and Chamberlain, G. W. 2016. Krill meal enhances performance of feed pellets through concentration-dependent prolongation of consumption by Pacific white shrimp, *L. vannamei*. Aquaculture 458:13-20.

World Bank. 2014. Reducing disease risk in aquaculture. World Bank Report Number 88257-GLB. 119 p. http://documents.worldbank.org/curated/en/110681468054563438/Reducing-disease-risk-in-aquaculture

FROZEN FOODSBIZ.COM

FISH & SEAFOOD

# George Chamberlain to be Honored by GSA for Lifetime Achievement

25TH SEPTEMBER 2022

Share on Facebook   Share on Twitter



≡

National Fisheries Institute President John Connelly as a recipient of this year's Wallace R. Stevens Lifetime Achievement Award during the GSA's GOAL Responsible Seafood Conference in at the Fairmont Olympic Hotel in Seattle, Washington on October 4.

The remarkable career of Chamberlain, a tireless ambassador for aquaculture and one of the world's most respected aquaculture professionals, especially in the field of shrimp breeding and farming, spans more than four decades. Entering the field as a researcher and extension specialist at Texas A&M University in the United States, he went on to direct aquaculture programs at Ralston Purina International and Monsanto, and led the development of an integrated shrimp farm in Malaysia. He also served as president of the World Aquaculture Society (WAS).

It was out of that role that Chamberlain co-founded the Global Aquaculture Alliance along with a group of like-minded people following a WAS meeting in Seattle during February of 1997. The nonprofit organization was established to act as a voice for responsible aquaculture, in response to criticism about mangrove deforestation resulting from shrimp farming. He enlisted experts to gather the facts about mangrove loss and published their recommendations for conservation in a qualitative predecessor to Best Aquaculture Practices (BAP) standards, "Codes of Practice for Responsible Shrimp Farming."

To enhance communication within the sector about issues and solutions, Chamberlain launched a magazine and an event, now known as the Responsible Seafood Advocate and GOAL: The Responsible Seafood Conference. He chaired the BAP Standards Oversight Committee for the first 12 years of its existence. Today, BAP is the world's largest and most comprehensive aquaculture certification program.

During his tenure as president of GSA, Chamberlain co-founded Kona Bay, a shrimp breeding, nutrition and farming business with operations in Hawaii, Brunei and Malaysia. In 2020, he retired from Kona Bay, continuing with the GSA and taking on the additional role of leading another non-profit organization, The Center for Responsible Seafood (TCRS), which the GSA helped establish to promote knowledge sharing within the seafood sector. Beginning in 2023, Chamberlain plans to reduce his GSA role to focus more on TCRS in the coming years.

Stevens, Brian Perkins and many others at GSA. From the beginning, our handful of 'missionaries' had no illusions about our ability to effect change. We could only convene leaders, present the facts and leave it in their capable hands. The results have been transformative. We've witnessed the development of an industrywide movement, as the entire seafood value chain has proactively joined the sustainability journey. We still have far to go, and immense challenges lie ahead of us. But I'm confident that together we can continue to overcome them," said Chamberlain.

"George was among the early visionaries 25 years ago for a global aquaculture organization. He then took the vision, founded the Global Aquaculture Alliance and is responsible for what that organization has become," said GSA Chairman Wally Stevens. "George is a bit of an aquaculture scientist, researcher, practitioner and convener. But most of all he is one of the most respected individuals in the aquaculture world. Now he moves on to his next vision, TCRS, where he will continue to serve as president. How fortunate we have been, and the best is yet to come."

"George is known the world over for his aquaculture knowledge, particularly in regard to shrimp breeding and farming. But it's his forward-thinking approach and abilities as a convener that have really helped move the dial on some of the key challenges and opportunities facing aquaculture and seafood in general. The industry is in a better place because of him," said GSA CEO Brian Perkins. "It's been a pleasure working with George over the years and in particular over the past year-and-a-half since I joined the organization."



# EXHIBIT NSA-12

Case no. C-331-806
Investigation
E&C/Office IV
PUBLIC DOCUMENT

## DECLARATION OF CLAUDE E. BOYD

1. I, Claude E. Boyd, hereby declare that the statements contained in this declaration are true and correct and are based on my own personal experience and knowledge.

2. I am currently a Professor Emeritus at the Auburn University School of Fisheries, Aquaculture and Aquatic Sciences. I hold a B.S. in Chemistry and Entomology, and an M.S. in Insect Toxicology from Mississippi State University. In 1966, I earned a Ph.D. in Water Quality from Auburn University. Since then, I have devoted my career to the study of water quality and water use in aquaculture, including shrimp aquaculture.

3. I have authored or co-authored over 300 scientific journals articles, and numerous contributions to types of scientific publications devoted primarily to aquaculture. My research and writings include both brackish and fresh water in aquaculture. I also authored a popular text on the principles of water quality that is in its 3rd edition, and I authored or coauthored three books on pond water quality management, one on pond bottom soils, and one on water use in aquaculture. I have written over 100 practical advice columns in the *Global Aquaculture Advocate* since 1998 that primarily address water-related issues in aquaculture. A partial list of my recently published work is attached to this Declaration.

4. My research efforts have included the ecology and utilization of aquatic weeds, pond liming and fertilization, water quality and aeration, pond bottom soil management, hydrology of ponds, and resource use and environmental impacts of aquaculture. I also have done considerable work on water quality analysis methodology and hydrological measurements used in both freshwater and brackish water aquaculture.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

5. My teaching has focused on graduate training in water quality management and continuing education for professionals. I have been the major professor for 131 graduate committees as well as serving as a member of over 200 additional ones. I have transferred my research findings to user groups through hundreds of international consultancy and advisory activities to farmers, industry, and various governmental and non-governmental organizations, both in the United States and abroad.

6. The legal counsel for the mandatory respondents in the Department of Commerce's countervailing duty investigation of frozen warmwater shrimp from Ecuador have asked me to provide my opinion as to whether any government anywhere in the world charges for the provision of brackish water for non-consumptive use in shrimp farms.

7. During my 55-year career, I have visited shrimp farms in over 35 countries, as well as most shrimp farms in the United States, as part of my research and consultation efforts. In my personal experience, no federal, provincial, state, or local authority in any country, including in the United States, charges for brackish water that is pumped into shrimp ponds and subsequently discharged through water exchange or at harvest.

8. Legal counsel has also asked me if I know of any prices that are charged anywhere in the world for brackish water that is non-consumptively used. I do not. In fact, if a governmental authority charged a shrimp farm for its non-consumptive use of brackish water at the prices that governmental authorities charge for fresh water for consumptive use, the cost would be prohibitive. In other words, shrimp farmers could not afford to grow shrimp if they had to pay fresh water prices that typically are charged for consumptive use.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

9. I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 15, 2024.

Claude E Boyd

Claude E. Boyd

# Recent Publications of Dr. Claude E. Boyd

Publications (564)

**Resource Use and Pollution Potential in Feed-Based Aquaculture**
Article

- Sep 2023

**The role of species and geography in the elemental profiles of farm-raised shrimp from Indonesia**
Article

- Sep 2022

Elemental profiling is being explored as a traceability tool in many seafood products. However, the extent that elemental profiling can be used at finer geographical scales in cultured shrimp is unknown. Additionally, few studies have included multiple species in the same discriminant models, which would be useful in applications where one species...

**Sources of variation in elemental profiles of whiteleg shrimp (Litopenaeus vannamei) and their potential effects on the accuracy of discriminant analysis**
Article

- Feb 2022

Background Elemental profiling is a tool that has been proposed to improve the traceability of seafood products. Small sources of variation can affect the outcome of elemental profiling and therefore pose to lower the overall accuracy of analyses. Here, we investigate two potential sources of variation through three experiments: laboratory variatio...

**The effect of commercial scale processing on trace element concentrations in shrimp muscle tissue – A preliminary study from two processors in Thailand and Ecuador**
Article

- Jan 2022

Commercial processing is potentially a confounding factor for elemental profiling in shrimp. Here, two sets of paired samples were collected pre/post-processing from the same farms; one set from Thailand (n = 15) and one from Ecuador (n = 19). The samples from Ecuador were subjected to a meta-bisulfite bath as part of the processing regimen while t...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

### The contribution of fisheries and aquaculture to the global protein supply

Article

- Jan 2022

The contribution of aquatic animal protein to the global, animal-source protein supply and the relative importance of aquaculture to capture fisheries in supplying this protein is relevant in assessments and decisions related to the future of aquatic food production and its security. Meat of terrestrial animals, milk, and eggs resulted in 76,966 Kt...

### Overview of aquaculture feeds: global impacts of ingredient production, manufacturing, and use

Chapter

- Jan 2022

Embodied land, water, and energy are contained in aquaculture feeds, and small, pelagic, marine fish are the source of fish meal and fish oil included in these feeds. Mechanical aeration typically applied to ponds receiving feeds requires energy. Aquaculture feeds are the main source of pollution in aquaculture effluents. While aquaculture feeds pl...

### Technical and financial feasibility for intensification of the extensive shrimp farming area in Mekong Delta, Vietnam

Article

- Dec 2021

Engineering design studies and financial feasibility assessments were made for construction, maintenance, equipment, operations, loan requirement, shrimp sales and predicted cash flows for simulated transformations of extensive shrimp farms to intensive shrimp farms in the Mekong Delta, Vietnam. Farms with less than 2.8 ha of feed-based, aerated pr...

### Exploring the relationship between production intensity and land use: A meta-analytic approach with shrimp aquaculture

Article

- Dec 2021

Shrimp are one of the fastest growing commodities in aquaculture and have a considerable land footprint. Here, we explored the impact of utilizing different production methods (extensive vs intensive) for expanding shrimp production on the cumulative land footprint of shrimp aquaculture. A meta-analytic approach was utilized to simultaneously estim...

### Comparison of resource use for farmed shrimp in Ecuador, India, Indonesia, Thailand, and Vietnam



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Article

- Nov 2021

The purpose of this study was to assess the amounts of land, water, energy in fuels, and wild fish for fishmeal and fish oil in feeds required per tonne of harvested, farmed shrimp in five countries producing most of the shrimp destined for the international market. Land use for whiteleg shrimp Litopenaeus vannamei production differed slightly betw...

**A preliminary survey of antibiotic residues in frozen shrimp from retail stores in the United States**
Article

- Sep 2021

Shrimp are an important and valuable commodity for aquaculture that is widely traded internationally. Widespread antibiotic use has been documented in shrimp farming and is a common source of criticism of aquaculture products. Additionally, previous reports have found some evidence of antibiotic residues in shrimp samples obtained from retail store...

**Trace element concentrations in white leg shrimp Litopenaeus vannamei from retail stores in the EU, UK, and USA and the ability to discern country of origin with classification models**
Article

- Sep 2021

Shrimp are a globally traded aquaculture commodity that accounts for a large proportion of the monetary value of aquaculture. There are concerns among consumers about seafood labeling fraud and environmental sustainability. Therefore, the geographic origin of shrimp from retail stores was investigated with trace element profiling. 94 shrimp samples...

**Perspectives on the mangrove conundrum, land use, and benefits of yield intensification in farmed shrimp production: A review**
Article

Globally, shrimp farms occupied an estimated 3.490 million hectares (Mha) of land and operated 2.426 Mha of production ponds in 2018. Extensive shrimp farms used 1.804 Mha of farm area (1.377 Mha of production ponds), but produced 11.4% of global shrimp production. An estimated 1.718 Mha of land was required to produce ingredients for feeds used in...

**A comparison of the technical efficiency of Aquaculture Stewardship Council certified shrimp farms to non-certified farms**
Article



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

- Aug 2021

Aquaculture will play an increasingly important role in the global seafood supply as fisheries harvests have plateaued. Shrimp are a highly valuable aquaculture commodity which are produced largely for global trade. The Aquaculture Stewardship Council's shrimp certification standard is meant to serve as a market-based tool that rewards the better a...

**Resource use in whiteleg shrimp Litopenaeus vannamei farming in Ecuador**
Article

- Jun 2021

A survey of 101 shrimp farms in Ecuador revealed that the average annual shrimp yield based on production pond water surface area was 7.03 ± 0.93 (SE) t/ha/year. The range in annual yield among the five provinces with shrimp farms was 3.67 ± 0.71 to 11.95 ± 5.56 t/ha year, respectively. Averages for total land, water, and energy use were 0.54 ± 0.0...

**Resource sharing and resource sparing, understanding the role of production intensity and farm practices in resource use in shrimp aquaculture**
Article

- Jun 2021

Aquaculture production is an important part of the global food supply and has equaled or surpassed fisheries production as the main source of aquatic foods. Aquaculture is a resource intensive practice that can use large amounts of land, water, energy, and cause pollution and degradation to the local environment. Intensive production practices have...

**The Utility of Discriminant Analysis to Determine the Geographic Origin of Commercially Important Seafood and Aquaculture Species: A Meta-Analysis**
Article

- Feb 2021

Elemental profiling is a process where element concentrations in tissues are used to discern group membership between a priori groups, such as geographic location. The goal of this meta-analysis was to determine the effectiveness of elemental profiling to discern the geographic origin of seafood products when coupled with discriminant analyses. Coh...

**Aerator energy use in shrimp farming and means for improvement**
Article

Estimates of aeration energy use in shrimp farming varied from 11.4 to 41.6 GJ/t shrimp (average = 19.8 GJ/t). Several opportunities for reducing energy use in aeration are available.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Many farms adopt an excessive yield to installed aeration capacity ratio. Moreover, the proportion of installed aerator capacity in use and duration of aerator operat..

### Penaeid Shrimp Aquaculture

Chapter

- Jul 2020

Aquaculture supplies about 60% of the current market demand for shrimp. The entire increase for future demands must come from aquaculture since the capture from natural waters is not expected to increase. Shrimp aquaculture is conducted in many tropical and subtropical countries, but six countries—China, Indonesia, Vietnam, India, Ecuador, and Thai..

### Achieving sustainable aquaculture: Historical and current perspectives and future needs and challenges

Article

- Jun 2020

Important operational changes that have gradually been assimilated and new approaches that are developing as part of the movement toward sustainable intensive aquaculture production systems are presented via historical, current, and future perspectives. Improved environmental and economic sustainability based on increased efficiency of production c...

### Acidity

Chapter

- Jan 2020

Acidity in water bodies with pH of about 4 up to 8.3 is caused by carbon dioxide and dissolved humic substances. Waters with pH <4.0 usually contain sulfuric acid or possibly another strong acid, but they still contain carbon dioxide and possibly humic compounds. Low pH is associated with low productivity and biodiversity. Acidity is measured by ti...

### Dissolved Oxygen and Other Gases

Chapter

- Jan 2020

Concentrations of dissolved oxygen and other dissolved atmospheric gases at saturation in water vary with the partial pressures and solubilities of the gases, and the temperature and salinity of the water. Concentrations of dissolved oxygen and other dissolved gases at saturation decrease with greater elevation (lower barometric pressure), higher s...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

### Carbon Dioxide, pH, and Alkalinity
Chapter

- Jan 2020

The pH or negative logarithm of the hydrogen ion concentration is a master variable in water quality because the hydrogen ion influences many reactions. Because dissolved carbon dioxide is acidic, rainwater that is saturated with this gas is naturally acidic—usually about pH 5.6. Limestone, calcium silicate, and feldspars in soils and other geologi...

### Phosphorus
Chapter

- Jan 2020

Phosphorus usually is the most important nutrient limiting phytoplankton productivity in both aquatic and terrestrial ecosystems. Phosphorus occurs naturally in most geological formations and soils in varying amounts and forms; the main source of agricultural and industrial phosphate is deposits of the mineral apatite—known as rock phosphate. Munic...

### Sulfur
Chapter

- Jan 2020

Sulfur is a nutrient for plants and animals; hydrogen sulfide is an odorous, toxic material; and sulfur dioxide is an air pollutant responsible for acid rain. Plants primarily use sulfate as a sulfur source, and sulfur containing amino acids in plants are important to animal nutrition. Sulfur compounds undergo oxidations and reductions in the envir...

### Solar Radiation and Water Temperature
Chapter

- Jan 2020

Temperature is a measure of the heat content of an object which results from the energy content of that object. The main source of energy in ecological systems is solar radiation. The earth's energy budget is essentially balanced with the incoming solar radiation being balanced by the reflection of solar radiation and the re-radiation of energy abs...

### An Overview of Hydrology and Water Supply
Chapter

- Jan 2020



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

The familiar water cycle is driven by solar radiation, and water is continually transformed back and forth between water vapor and liquid water. In the process, water passes through several distinct compartments of the hydrosphere to include atmospheric moisture, precipitation, runoff, groundwater, standing water bodies, flowing streams, and ocean....

## Water Quality Protection

Chapter

- Jan 2020

Impaired water quality can result from natural causes, but the most common cause is anthropogenic pollution. Soil erosion leads to turbidity and sedimentation in water bodies. Organic wastes impart a high oxygen demand often culminating in low dissolved oxygen concentrations and nitrogen and phosphorus in effluents cause eutrophication. Pesticides,...

## Eutrophication

Chapter

- Jan 2020

The term eutrophication refers to a water body changing over time from nutrient-poor to nutrient-rich status. More nutrients cause increased aquatic plant growth that negatively influences water quality and especially dissolved oxygen availability. The result is a decrease in species diversity and an increase in the biomass of a few and usually les...

## Physical Properties of Water

Chapter

- Jan 2020

The water molecule is electrostatically charged with a negative site on one side and two positive sites on the other. Attractions between oppositely-charged sites on adjacent water molecules are stronger than typical van der Waals attractions among molecules and are called hydrogen bonds. The molecules in solid (ice) and in liquid water exhibit str...

## Suspended Solids, Color, Turbidity, and Light

Chapter

- Jan 2020

Natural waters contain suspended particulates that increase turbidity, impart apparent color, and interfere with light penetration. These particles originate from erosion, vegetative debris from watersheds, and microorganisms produced in water bodies. Suspended particles vary from colloids that remain suspended indefinitely to larger silt and sand...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

### Micronutrients and Other Trace Elements

Chapter

- Jan 2020

The solubilities of most minerals from which trace metals in natural waters originate are favored by low pH. The concentration of the free ion of a dissolved trace element usually is much lower than is the total concentration of the trace element. This results from ion pair associations between the free trace ion and major ions, complex ion formati...

### Total Hardness

Chapter

- Jan 2020

The total hardness of water results from divalent cations—mainly from calcium and magnesium—expressed as equivalent calcium carbonate. The total hardness equivalence of 1 mg/L calcium is 2.5 mg/L, while 1 mg/L magnesium equates to 4.12 mg/L. Hardness and alkalinity often are similar in concentration in waters of humid regions, but hardness frequent...

### Dissolved Solids

Chapter

- Jan 2020

The total dissolved solids (TDS) concentration in freshwater is determined by passing water through a 2-μm filter, evaporating the filtrate to dryness, and reporting the weight of the solids remaining after evaporation in milligrams per liter. Salinity and electrical conductivity usually are used to assess the concentrations of ions in seawater, an...

### Microorganisms and Water Quality

Chapter

- Jan 2020

Phytoplankton and bacteria have a greater effect on water quality than do other aquatic microorganisms. Phytoplankton are the main primary producers while bacteria are responsible for the majority of organic matter decomposition and nutrient recycling. An overview of microbial growth, photosynthesis, and respiration is provided, and methods for mea...

### Solubility and Chemical Equilibrium

Chapter



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

- Jan 2020

Solubility, chemical equilibrium, and equilibrium constants are closely related to Gibbs free energy of reaction. Electrostatic interactions among ions decrease the activities of ions, and these interactions increase with greater ionic strength. As a result, for precise calculations related to solubility and equilibrium, ionic activities instead of...

### Redox Potential

Chapter

- Jan 2020

Electrons are lost when a substance is oxidized and gained when a substance is reduced. Oxidations and reductions occur in couplets—known as half-cells—in which one substance, the oxidizing agent, accepts electrons from another substance, the reducing agent. The oxidizing agent is reduced and the reducing agent is oxidized. The flow of electrons be...

### Nitrogen

Chapter

- Jan 2020

The atmosphere is a vast storehouse of nitrogen—it consists of 78% by volume of this gas. Atmospheric nitrogen is converted by electrical activity to nitrate ($NO3^-$) that reaches the earth's surface in rainfall. Atmospheric nitrogen also can be fixed as organic nitrogen by bacteria and blue-green algae, and it can be reduced to ammonia (NH3) by indu...

### Water Quality: An Introduction

Book

- Jan 2020

This volume is of great importance to humans and other living organisms. The study of water quality draws information from a variety of disciplines including chemistry, biology, mathematics, physics, engineering, and resource management. University training in water quality is often limited to specialized courses in engineering, ecology, and fisher...

### Trace element profiling - Where we are and what's next

Presentation

- Mar 2019



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

### Influence of variation in water temperature on survival, growth and yield of Pacific white shrimp Litopenaeus vannamei in inland ponds for low-salinity culture

Article

- Feb 2019

There is considerable interest in the culture of whiteleg shrimp (Litopenaeus van-namei) in inland low-salinity water in Alabama and other states in the Sunbelt region of the US. However, the growing season is truncated as compared with tropical or subtropical areas where this species is typically cultured, and temperature is thought to be a major...

### Environmental Factors and Acute Hepatopancreatic Necrosis Disease (AHPND) in Shrimp Ponds in Viet Nam: Practices for Reducing Risks

Article

- Jan 2019

### Lentic Freshwater: Ponds—Aquaculture Ponds

Chapter

- Jan 2019

### Effect of organic matter concentration on agricultural limestone dissolution in laboratory soil-water systems

Article

- Aug 2018

Laboratory soil–water systems in which soil organic matter was increased by 0.0%, 0.5%, 1.0%, 2.0% and 4.0% by adding dry, chopped ryegrass (Lolium perenne) shoots to sandy soil containing 0.06% organic matter. Agricultural limestone was added to the systems, and pH, alkalinity and hardness of the water were monitored for 65 days. The pH, alkalinit...

### Use of elemental profiling and isotopic signatures to differentiate Pacific white shrimp (Litopenaeus vannamei) from freshwater and seawater culture areas

Article

- Aug 2018

Shrimp samples from aquaculture ponds supplied with either freshwater (0.2–1.3 g $L^{-1}$ salinity) or seawater (27.6–39.0 g $L^{-1}$ salinity) were subjected to elemental profiling and to stable isotope analysis. Concentrations of 35 trace elements, including rare earth elements (REEs) were analyzed by ICP-MS, and the $\delta^{13}C$ and $\delta^{15}N$ concentrations were analy...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

### Economics of alternative catfish production technologies
Article

The US catfish industry has shown increasing trends toward intensification of production as a means of achieving cost efficiencies on farms. Previous studies depicted the potential for cost efficiencies in alternative technologies such as split-pond systems, intensively aerated ponds, and in-pond raceway systems. This study provides an economic com...

### Effects of mechanical aeration on evaporation rate and water temperature in aquaculture ponds
Article

### Effects of mechanical aeration on evaporation rate, water temperature
Article

- May 2018

### Aquaculture pond fertilization
Article

Organic fertilizers (livestock manures and other agricultural wastes or by-products) and chemical fertilizers can be applied to aquaculture ponds to increase fish or shrimp production. Pond fertilization increases concentrations of nitrogen, phosphorus and other plant nutrients to stimulate phytoplankton photosynthesis that is the base of the food...

### Dissolved and suspended solids in aquaculture.
Article

- Jan 2019

A few major ions contribute most of the weight of dissolved solids in water. Direct determination of total dissolved solids (TDS) concentration is tedious, and the electrical conductivity of freshwater and the salinity of saline water are common surrogates for TDS in aquaculture. The primary concern over dissolved solids is maintaining TDS concentr...

### WOMEN IN UGANDA AQUACULTURE: NUTRITION, TRAINING, AND ADVANCEMENT
Technical Report

- Mar 2018

The study used discussions and interviews with selected respondents to generate relevant information for training fish farmer groups and other actors involved in aquaculture. The



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

trainings followed data collection so as to make sure that training focused on identified knowledge gaps among target groups. The study focused on selected districts in ce...

### IMPLEMENTING AND ASSESSING CELL-BASED TECHNICAL AND MARKETING SUPPORT SYSTEMS FOR SMALL AND MEDIUM-SCALE FISH FARMERS IN UGANDA

Technical Report

- Mar 2018

The rapid development of mobile technology, the increased penetration rates and the inherent characteristics of mobile phones are the reasons mobile phones are currently emerging as the fast widespread form of electronic communication system in African countries. Mobile phones can, therefore play a key role in disseminating relevant information to...

### Growth of Pacific White Shrimp Litopenaeus vannamei Cultured on Inland Low-Salinity Pond Soils

Article

- Feb 2018

Low-salinity inland ponds in west Alabama were used to determine if soil composition and water ionic profiles influenced shrimp growth. Soils from four farms were collected and placed into individual tanks equipped with airlift biofilters and 2.5% reconstituted seawater. Pacific White Shrimp Litopenaeus vannamei were cultured for 42 d. Growth, surv...

### General Relationship Between Water Quality and Aquaculture Performance in Ponds

Chapter

- Dec 2017

There is a close relationship between water-quality conditions in grow-out systems and the health of aquaculture animals. Impaired water quality can cause direct mortality, but more often, it stresses aquatic animals making them more susceptible to infectious diseases. The effort required for maintaining homeostasis by aquatic animals exposed to su...

### Pond Bottom Soils

Chapter

- Dec 2017

### Environmental Considerations

Chapter

- Dec 2017



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

### Water Quality in Ponds
Chapter

- Dec 2017

### Physical and chemical characteristics of soil from tiger shrimp aquaculture pond at Malacca, Malaysia
Article

- Nov 2017

Soil physico-chemical properties of the growout ponds of black tiger shrimp (Penaeus monodon) were in relation to shrimp yields for one production cycle. The culture ponds were old (>5 years) and new (newly constructed) types. Soil texture was silty clay with low sand content and high proportion of clay for both the pond types with alkaline soil pH...

### Production Methods and Resource Use at Litopenaeus vannamei and Penaeus monodon Farms in India Compared with Previous Findings from Thailand and Vietnam
Article

- Nov 2017

Shrimp farms in India had average yields (pond surface basis) of 7.86 ± 1.04 (SE) m.t./ha/yr for Litopenaeus vannamei (n = 89) and 3.88 m.t./ha/yr for Penaeus monodon (n = 11). Average feed conversion ratio was 1.48 ± 0.04 for L. vannamei and 1.24 ± 0.12 for P. monodon. Land use for production ponds, supporting area, and feed ingredients averaged 0...

### Assessment of elemental profiling for distinguishing geographic origin of aquacultured shrimp from India, Thailand and Vietnam
Article

- Oct 2017

Shrimp from three major exporting countries – India, Vietnam, and Thailand – were identified to country of origin by elemental profiling. Concentrations of 23 elements, including essential macro- and micro-nutrients and non-essential trace elements, in headless shell on shrimp (HLSO) samples were analyzed by ICP-AES. Elemental concentrations in shr...

### Use of agricultural limestone and lime in aquaculture
Article

- Oct 2017

Application of agricultural limestone to increase alkalinity to about 50 mg/l improves production in fertilized ponds and enhances water quality in ponds for feed-based aquaculture. Burnt lime and hydrated lime cause an initial high pH, but they can be applied to bottoms of empty ponds for the purpose of neutralizing bottom soil acidity. In additio...
View

### Dissolved Oxygen and Aeration in Ictalurid Catfish Aquaculture
Article

- Oct 2017

Feed-based production of ictalurid catfish in ponds is the largest aquaculture sector in the USA. Feed has an oxygen demand, and increases carbon dioxide, ammonia nitrogen, and phosphate inputs to ponds. Major sources of oxygen in ponds are phytoplankton photosynthesis and mechanical aeration; the major sink for oxygen is respiration by fish and by...

### Role of salinity in the dissolution rates of CaCO 3 and its implications for aquaculture liming
Article

- Sep 2017

This work aimed at assessing the role of salinity in the dissolution rates of $CaCO_3$, discussing its implications for aquaculture liming. A simplified formula of artificial seawater without $HCO_3^-$ was initially prepared. Four batches of 10 L of diluted artificial seawater (salinity = 3.3 g/L) without $HCO_3^-$ were prepared. Sixteen Erlenmeyer flasks wer...

### A Case Study: Impacts of Deviating from Model Research Design to the Commercial Industry for Split-Pond Aquaculture
Article

- Sep 2017

A case study is presented to compare the results of design and management including circulation and dissolved oxygen management at a modified split-pond facility in west-central Alabama to the recommended design. Modifications included: the use of and a propeller pump instead of a slow-moving paddlewheel, lack of baffle in the waste cells, waste ce...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

### Assessing the Reliability of Water-Test Kits for Use in Pond Aquaculture: ASSESSING THE RELIABILITY OF WATER-TEST KITS

Article

- Aug 2017

Water-analysis kits are useful for practical aquaculture only if they provide equivalent decision-making as compared to standard water-analysis methods. This study used weighted Cohen's kappa (κ) statistics to compare management decisions made by farmers who used water-analysis kits (e.g., Seneye slide kit, Tetra EasyStrips, API test strips, Seache...

### Effects of mechanical aeration in the waste-treatment cells of split-pond aquaculture systems on water quality

Article

- Aug 2017

Split-pond systems divide a traditional pond into a 1:4 relationship where 20% of the water surface area is designated to fish production and 80% is designated to waste-treatment. Water passes from the fish cell to the waste cell for water quality improvement and flows back to the fish cell. The present study was conducted on a commercial catfish f...

### Nitrogen, Phosphorus, and Carbon Concentrations in Some Common Aquaculture Feeds: FEED CHEMICAL COMPOSITION

Article

- Jun 2017

Nitrogen, phosphorus, and carbon concentrations were measured from 203 samples of starter, fingerling, and grower aquaculture feeds from several countries and for several common species. The feed protein concentrations reported by manufacturers often were slightly greater than the measured crude protein concentrations. The correlation coefficients...

### Economics of Sustainable Intensification of Aquaculture: Evidence from Shrimp Farms in Vietnam and Thailand

Article

- Apr 2017

There is growing interest in sustainable intensification of aquaculture production. Yet little economic analysis has been done on farm-level effects of the economic sustainability of production intensification. Data from 83 shrimp farms (43 in Vietnam and 40 in Thailand) were used to identify (through principal component and cluster analyses) 13 cl...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

### Pollution potential indicators for feed-based fish and shrimp culture
Article

- Apr 2017

The oxygen demand, acidification potential, and waste loads of carbon dioxide, nitrogen, and phosphorus from feed were determined for production of channel catfish Ictalurus punctatus, tilapia Oreochromis spp., Atlantic salmon Salmo salar, rainbow trout Oncorhynchus mykiss, and whiteleg shrimp Litopenaeus vannamei. Loads of these variables in cultu...

### Performance and Application of a Fluidized Bed Limestone Reactor Designed for Control of Alkalinity, Hardness and pH at the Warm Springs Regional Fisheries Center
Article

- Mar 2017

Springs serving the Warm Springs Regional Fisheries Center, Warm Springs, Georgia, have pH, alkalinity, and hardness levels that lie under the range required for successful fish propagation while free CO2 is well above allowable targets. We evaluate a pretreatment process that exploits limestone's (CaCO3) ability to react away hydrogen ions ($H^+$) an...

### Effects of aeration on water quality in waste-treatment sections of split-pond aquaculture, a three-year synopsis.
Conference Paper

- Feb 2017

Split ponds have a fish cell and a waste cell, approximately 20% water surface area and 80% water surface area respectively, in which water recirculates to improve water quality as a more intensive management system than traditional ponds. This is a continuation of a study that focuses on the possible benefits of using mechanical aeration in the wa...

### Likely Effects of the Increasing Alkalinity of Inland Waters on Aquaculture: INCREASING ALKALINITY AND AQUACULTURE
Article

- Feb 2017

The rising atmospheric carbon dioxide (CO2) concentration is increasing the solubility of limestone, calcium silicate, and feldspars, resulting in greater total alkalinity concentration in inland waters. This phenomenon will result in inland waters having slightly greater alkalinity concentration (and buffering capacity), higher pH when at equilibr...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

## EFFECTS OF CLAY AND PHYTOPLANKTON TURBIDITY ON THERMAL STRATIFICATION IN SHALLOW AQUACULTURE PONDS

Conference Paper

- Feb 2017

Water temperature is a vital factor controlling the growth rate of all cultured aquatic species. Shallow water aquaculture ponds typically stratify thermally in the day and destratify at night. The severity of thermal stratification in the pond is controlled by the degree of light penetration. The depth of penetration of solar radiation into a smal...

## Resource Use Assessment of Shrimp, Litopenaeus vannamei and Penaeus monodon, Production in Thailand and Vietnam: RESOURCE USE IN SHRIMP CULTURE

Article

- Dec 2016

Resource use was investigated at 34 Litopenaeus vannamei and five Penaeus monodon farms in Thailand and 30 L. vannamei and 24 P. monodon farms in Vietnam. Farms varied in water surface areas for production, reservoirs, canals, and settling basins; in pond size and depth; and in water management, stocking density, feeding rate, amendment input, aera...

## Variability in the solubility of agricultural limestone from different sources and its pertinence for aquaculture

Article

- Dec 2016

Samples of agricultural limestone were obtained from quarries in the USA as follows: Talking Rock, GA; Whitestone, GA; Austinville, VA; Bonham, TX; and Thomasville, PA, referred as GA-1, GA-2, VA, TX and PA respectively. The limestone products were tested initially for non-equilibrium pH, concentrations of calcium and magnesium, neutralizing value...

## Naigaga et al-2016-Journal of the World Aquaculture Society

Data

- Nov 2016

## Dissolution rate of calcium carbonate and calcium hydroxide in saline waters and its relevance for aquaculture

Article

- Nov 2016



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

The solubilities of calcium carbonate and calcium hydroxide were determined in four waters of different initial salinity, pH, and alkalinity (in parentheses, respectively) as follows: freshwater (0.01 g L− 1, 6.26, 2.79 mg L− 1); diluted seawater (3.7 g L− 1, 7.37, 13 mg L− 1); diluted seawater (11.0 g L− 1, 7.97, 35.3 mg L− 1); seawater (31.7 g L−...

### Effects of Liming on Quality of Water Discharged from the Supply Reservoir at a Fisheries Research Station

Article

- Oct 2016

Annual treatment of a water supply reservoir with agricultural limestone at the E. W. Shell Fisheries Center at Auburn University has roughly doubled conductivity and concentrations of total alkalinity, total hardness, and calcium hardness in the discharge water. It also has prevented pH values below 6.7. Concentrations of water quality variables d...

### Water Loss as a Consequence of Using Mechanical Aeration in Aquaculture Ponds

Poster

- Oct 2016

### Embodied Resources in Fish and Shrimp Feeds: EMBODIED RESOURCES IN AQUACULTURE FEED

Article

- Sep 2016

Global averages were obtained for amounts of energy, land, water, wildfish, nitrogen, and phosphorus embodied in aquaculture feed ingredients. These data allowed amounts of these embodied resources to be calculated for typical feed formulations for channel catfish, Ictalurus punctatus; hybrid catfish, I. punctatus♀ × I. furcatus♂; Vietnamese catfis...

### Reducing the monitoring parameters of fish pond water quality

Article

- Sep 2016

A study was conducted at Auburn University, Auburn, Alabama, USA to reduce monitoring parameters in the evaluation of fish pond water qualities. Concentrations of settleable solids (Set), turbidity (Tur), total suspended solids (TSS), particulate organic matter (POM), chlorophyll-a (Chl), 5-day biochemical oxygen demand (BOD), total phosphorus (TP)...

### Evaluation and Optimization of Chemical Treatments for Reducing Yellow Discoloration of Channel Catfish ( Ictalurus Punctatus ) Fillets During Cold Storage



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Article

- Jun 2016

The effects of chemical treatments on color change of yellow discolored catfish fillets during both refrigerated and frozen storage were investigated in this work. For the refrigerated storage (4°C), the effects of concentration of sodium bisulfite on reducing the yellow discoloration were studied. Compared to the untreated fillets, sodium bisulfit...

### Slow-release Coated Copper Sulfate as an Algicide for Aquaculture: Slow-release Copper Algicide

Article

- Jun 2016

A coated copper sulfate algicide designed for controlled release of copper was evaluated for its effectiveness in controlling phytoplankton in hybrid catfish, ♀Ictalurus punctatus × ♂Ictalurus furcatus, ponds. Copper concentrations were greater in ponds receiving weekly treatments with copper sulfate crystals than in ponds in which the coated coppe...

### Influence of a Bacterial Amendment on Water Quality in Small Research Ponds for Channel Catfish, Ictalurus punctatus , Production: INFLUENCE OF A BACTERIAL AMENDMENT ON WATER QUALITY

Article

- May 2016

There has been considerable interest worldwide in applying bacterial inocula to channel catfish ponds for improving water quality, especially for acceleration of ammonia nitrogen oxidation through bacterial nitrification. The effects of a selected bacterial amendment on water quality in small research ponds for channel catfish production were evalu...

### A Preliminary Assessment of Land-to-Water Surface Area Ratios (LWR) for Sustainable Land Use in Aquaculture

Article

- Apr 2016

Several organizations have developed eco-label certification programs with standards to conserve resources and reduce negative environmental impacts of fish and shrimp production. Production by pond aquaculture is reported on a water surface area basis, but additional land for embankments, roads, storage areas, and so on, is required. Thus, data on...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

### Water temperature as a possible cause of variations in performance of Pacific white shrimp Litopenaeus vannamei in inland ponds for low-salinity culture
Conference Paper

- Apr 2016

Description: There is considerable interest in the culture of Whiteleg shrimp (Litopenaeus vannamei) in inland low-salinity water in Alabama and other states in the Sunbelt region of the US. However, the growing season is truncated as compared to tropical or subtropical areas where this species is typically cultured, and the temperature is thought...

### Laboratory tests of bacterial amendments for accelerating oxidation rates of ammonia, nitrite and organic matter in aquaculture pond water
Article

- Apr 2016

The effects of 12 bacterial amendments on reducing concentrations of total ammonia nitrogen (TAN), nitrite nitrogen (NO2− N) and organic matter in pond waters were evaluated in the laboratory. Concentrations of TAN, NO2− N and organic matter in untreated water (controls) naturally decreased with time during 16 days. No large acceleration in nitrifi...

### New Approaches to Inform, Motivate, and Advance Small and Mediums-scale Fish Farmers: Building Industry Capacity Through Cell Phone Networks, Training, and Market Participation Production System Design and Best Management.
Technical Report

- Mar 2016

Mobile phones can improve aquaculture productivity by increasing access to technical guidance, extension services, product assembly, input coordination, and price discovery for small-and medium-scale fish farmers. Data were obtained in five focused group interviews held across Uganda. The findings indicate that the use of mobile phones is common am...

### Authentication of fishery and aquaculture products by multi-element and stable isotope analysis
Article

- Mar 2016

### An assessment of factors affecting the reliability of total alkalinity measurements
Article

- Mar 2016



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

The accuracy and precision of different methods for detecting the endpoint of the total alkalinity titration and the typical accuracy and precision obtained for alkalinity analyses by a large sample of laboratories were investigated. The optimum, endpoint for total alkalinity titrations decreased from pH 5.0 at 10 mg l− 1 alkalinity to pH 4.2 for 3...

### THERMAL STRATIFICATION IN SHALLOW AQUACULTURE PONDS: RESPONSE TO TURBIDITY AND AERATION

Conference Paper

- Feb 2016

Water temperature directly affects the growth rate of all cultured aquatic species. Shallow water aquaculture ponds typically stratify thermally in the day and destratify at night. Thermal gradients are caused by the attenuation of solar radiation in the water, and attenuation is a function of water turbidity. The objectives of this study were to m..

### WATER QUALITY MANAGEMENT IN WASTE-TREATMENT SECTIONS OF SPLIT POND AQUACULTURE

Conference Paper

- Feb 2016

The original split-pond concept involved no water quality management in the waste-treatment section of the system. Dissolved oxygen concentrations commonly fall to near 0 mg/L each night during the summer. Cycles of daily aerobic conditions and nightly anaerobic conditions are thought to be keys to efficient waste nitrogen processing, which is a di...

### INFLUENCE OF VARIATION IN WATER TEMPERATURE ON SURVIVAL, GROWTH, AND YIELD OF PACIFIC WHITE SHRIMP Litopenaeus vannamei IN INLAND PONDS FOR LOW-SALINITY CULTURE

Conference Paper

- Feb 2016

There is considerable interest in culture of Whiteleg shrimp (Litopenaeus vannamei) in inland lowsalinity water in Alabama and other states in Sunbelt region of the US. However the growth season is truncated as compared to tropical or subtropical areas where this species is typically cultured, and temperature is thought to be a major factor influe...

### World Aquaculture Society Aquaculture America 2014 - Presentation abstract

Data

- Feb 2016



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

### World Aquaculture Society Aquaculture America 2015 - Presentation abstract - EFFECTS OF CLAY AND PHYTOPLANKTON TURBIDITY ON WATER TEMPERATURE AND POND EVAPORATION

Data

- Feb 2016

### Influences of Different Types and Rates of Mechanical Aeration on Water Temperature and Evaporation Rate in Aquaculture Ponds

Conference Paper

- Feb 2016

Aeration is increasingly used to improve water quality and increase yields in aquaculture ponds. Surface aerators increase oxygenation by creating a greater area of contact between water and air – a process that also favors higher evaporation rate. Evaporation results in heat loss from water bodies; therefore, it affects temperature that is an impo...

### Alkalinity and Hardness: Critical but Elusive Concepts in Aquaculture

Article

- Feb 2016

Total alkalinity and total hardness are familiar variables in aquatic animal production. Aquaculturists-both scientists and practitioners alike-have some understanding of the two variables and of methods for adjusting their concentrations. The chemistry and the biological effects of alkalinity and hardness, however, are more complex than generally...

### Tomato seedling growth response to different water sources and a substrate partially replaced with dewatered aquaculture effluent

Article

- Jan 2016



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Purpose The experiment was performed to determine the effect a commercial potting mix partially replaced with dewatered aquaculture effluent had on tomato transplant growth. Methods The experiment was designed as a 2 × 3 factorial and evaluated two water sources (water-soluble, inorganic fertilizer or municipal water) and three soilless substrates...

### Overview of aquaculture feeds

Chapter

- Dec 2015

Feed-based aquaculture is an important part of global aquaculture production. Feed use in aquaculture is expected to increase as aquaculture production expands to meet the demands of the growing human population. Aquaculture feeds require fish meal and oil made from pelagic, marine fish and products from agriculture as ingredients. The major concer...

### A preliminary assessment of land-to-water surface area ratios (LWR) for sustainable land use in aquaculture.

Conference Paper

- Nov 2015

Aquaculture farms require land in addition to pond surface areas for embankments, canals, roads, storage areas, offices, and parking lots. One hundred farms for pond culture of several species in 26 countries were selected using satellite imagery. Total farm area devoted to aquaculture, including production pond surfaces and pond surface areas, wer...

### Organic Carbon and Dissolved Oxygen Budgets for a Commercial-Size, In-pond Raceway System

Article

- Oct 2015

Intensive production of ictalurid catfish in the USA has increased over the past several years, and a better understanding of the amount of organic carbon (OC) and dissolved oxygen (DO) in these culture environments is needed. Budgets for OC and DO were estimated over a production season (March to November) for an in-pond raceway system for channel...



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

BIOGRAPHICAL DATA
for
Claude E. Boyd

Personal:
Born – Hatley, Mississippi U.S.A.; November 14, 1939.
Address – School of Fisheries, Aquaculture and Aquatic Sciences, Auburn University, Auburn, Alabama 36849 (Office); P.O. Box 3074, Auburn, Alabama 36831 (Home).
Telephone – 334-844-4078 (Office); 334-887-8012 (Home); 334-742-1316 (Cellular)
Fax – 334-844-9208 (office); 334-502-7261 (Home).
E-mail: boydce1@auburn.edu
Language proficiency: English (native speaker); Thai (good); Spanish (fair).

Education and Area of Specialization:
B.S. (Entomology and chemistry) 1962, M.S. (Environmental toxicology) 1963, Mississippi State University; Ph.D. (Water and aquatic soil chemistry) 1966, Auburn University.

Employment History:
Instructor, Mississippi State University 1963; Aquatic Biologist, Federal Water Pollution Control Administration 1966; Assistant Professor, Auburn University, 1967; Ecologist, Savannah River Ecology Laboratory, University of Georgia 1968-70; Associate Professor, Auburn University, 1971-77; Professor, Auburn University, 1977-2015 (Butler/Cunningham Eminent Scholar in Agriculture and the Environment, 2001-2014); Professor Emeritus, Auburn University, 2015-present.

Honors and Awards:
B.S. Degree with "Special Honors"
Phi Kappa Phi (scholastic)
Research Award, Catfish Farmers of America
Distinguished Service Award, Catfish Farmers of America
Award of Excellence, Bioengineering Section, American Fisheries Society
Dean's Award for Contributions to Agriculture, Auburn University
Director's Senior Research Award, Alabama Agricultural Experiment Station, Auburn University
Research Achievement Award, Surathani Prawn Producers Association, Surathani, Thailand
Creative Research Award, Research Advisory Council, Auburn University.
Honorary Life Membership Award, World Aquaculture Society
Service Award, Catfish Farmers of America
Service Award, Alabama Catfish Producers
Appreciation Award, USDA Joint Subcommittee on Aquaculture
Lifetime Achievement Award, US Chapter, World Aquaculture Society
Fellow, American Association for the Advancement of Science
Academy of Fellows, Auburn University College of Agriculture
Lifetime Achievement Award, US Catfish Farmers
Recognition of support for Ecuadorian aquaculture industry, Camara Nacional de Acuacultura and



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Escuela Superior Politecnica del Litoral,
Dean's Grantsmanship Award, Auburn University

Teaching:

1. Classes taught at Auburn University
   Water Science (taught annually)
   Water and Sediment Quality Management in Aquaculture (taught alternate years)
   Resource Use and Environmental Issues in Aquaculture (taught alternate years)

2. Graduate program involvement
   Graduate Council at Auburn University (1978-1981).
   Student committees:
   Major professor - 58 M.S., 61 Ph.D.
   Committee member - 75 M.S., 34 Ph.D.

3. Postgraduate training
   Provided training of 1- month to 24-month duration for 28 visiting scientists.

4. Other
   Each year, I assist with several workshops for fishery biologists, fish farmers, and professional aquaculturists.

Committees, Boards, and Panels:

Southern Regional Aquaculture Center, Technical Committee (3 years)
Southern Regional Aquaculture Center, Steering Committee for four projects
Catfish Farmers of America, Research Committee (3 years)
World Aquaculture Society, Co-Program Chairman for 1996 annual meeting in Bangkok, Thailand
Environmental Sciences Committee, School of Agriculture, Auburn University (Current)
Auburn University representative to the University Council of Water Resources (Current)
Creative Research award Committee, Auburn University (2000 and 2001)
Oceanic Institute, Industry Liaison Committee (Current)
Editorial Boards:
Progressive Fish Culturist (3 years)
Aquaculture (2 years)
Journal of Aquaculture in the Tropics (Current)
Journal of Applied Aquaculture (Current)
Reviews in Fisheries Science (Current)
Aquaculture International (Current)
Biosphere Journal (Current)
Advanced Studies in Biology (Current)
National Academy of Sciences, Panel on Aquatic Weeds (1978)
USEPA, Environmental Biology Review Panel (1981-1984)
USEPA, Program Review, Corvallis, Oregon (1984)
U.S. National Research Council and Academia Sinica, Taiwan, Panel on Aquacultural



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Engineering and Simulation (1985)
NACA Working Group on Aquaculture Sustainability, Beijing, China (1995)
FAO/WHO/NACA Working Group on Aquaculture Product Food Safety, Bangkok, Thailand (1997)
FAO Expert Consultation on sustainable Shrimp Farming, Bangkok, Thailand (1997)
FAO Ad-Hoc Meeting on Criteria and Indicators of Sustainable Shrimp Farming, Rome, Italy (1998)
FAO Expert Consultation on Best Management Practices in Aquaculture, Brisbane, Australia (1999)
FAO Expert Consultation on Water and Land Use in Aquaculture, Rome, Italy (2002)
USAID PD/A CRSP, Materials and Methods Committee (1995-present)
USAID PD/A CRSP, Technical Committee Co-chairman (2005)
USAID, Joint Subcommittee on Aquaculture, Effluents Task Force (1999-2004)
Oceanic Institute (Hawaii), Industry Liaison Committee (1997-2000)
Aquaculture Certification Council, Board of Directors (2002-2004)
Global Aquaculture Alliance Shrimp Farm Standards Committee (2003-present)

Consulting:
I have served as a consultant to the following:
University of Florida, USA, 1976 (aquatic weed control)
North Carolina State University, USA, 1978 (water quality instruction)
Mississippi State University, USA, 1979 (water quality instruction)
U.S. Fish and Wildlife Service, USA, 1979, 1981, 1983, 1987 (water quality instruction)
Fitts Farms, Alabama, USA, 1979 (assessment of minnow farm)
T.E. Wanamaker, South Carolina, USA, 1980 (aeration)
Inverness, Alabama, USA, 1980 (turbidity control)
Occidental Chemical Company, Florida, USA, 1981 (water quality and mine reclamation)
Holland and Knight, Florida, USA, 1981 (water quality standards)
Vulcan Materials Company, North Carolina, USA, 1981-1983 (water quality standards)
Carpenter's Gold Fish Farm, California, USA, 1981 (pond water quality management)
Aeration Industries, Minnesota, USA, 1981-1986, 1995-1996 (aerator testing)
McDonald Co., Tennessee, USA, 1982 (aerator testing)
Carolina Power and Light, North Carolina, USA, 1983 (water quality standards)
Government of Suriname, 1983 (site selection for research station)
Savannah River Ecology Laboratory, South Carolina, USA, 1984, 1991-1993 (pond and lake management
Westinghouse, Savannah River Plant, South Carolina, USA, 1990, 1991 (pond management)
DuPont, Savannah River Plant, South Carolina, USA, 1984-1988 (pond design and management)
Engelhard Corporation, Georgia, USA, 1984, 1990, 1991, 1994, 1995, 1996 (water quality standards)
FAO, India, 1984, 1988, 1991 (pond water quality management)
Green, Dees, and France, LLP, Florida, USA, 1985 (fish kill investigation)
North Carolina Division of Boating and Inland Fisheries, USA, 1985 (pond water quality management)
The Power House, Maryland, USA, 1985-1987 (aerator testing)
Florida Bureau of Marine Research, USA, 1986 (pond design)



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Pac Mar/Asian Development Bank, Thailand, 1987, 1988 (water quality in shrimp farming area)
Lake Management Services 1987 (salinity and freshwater fish)
EMC Engineering, Georgia, USA, 1987 (pond reclamation)
Proexporca Shrimp Farm, Ecuador, 1987 (shrimp pond water quality management)
CSRIO and private shrimp farmers, Australia, 1987 (shrimp pond water and soil management)
Southland Fisheries and Camp O`Brien, North Carolina, USA, 1988 (pond liming)
Acapolon Shrimp Farm, Guatemala, 1988 (shrimp pond water quality management)
USDA/OCID, Taiwan, 1989 (shrimp farming practices)
Science and Technology Development Board, Thailand, 1989 (shrimp farming research evaluation)
Bechtel International, Thailand, 1990 (shrimp pond sediment control)
Acuespecies Shrimp Farm, Ecuador, 1990, 1992, 1993, 1994 (shrimp pond water quality management)
Inducam Shrimp Farm, Ecuador, 1990, 1991, 1992, 1993, 1994 (shrimp pond water quality management)
Deakin University, Warrnambool, Australia, 1990-1991 (instructional material on water quality)
DIBSA, Continental Grain Co., Ecuador, 1987-1992 (shrimp pond water quality management)
San Miguel Corp., Agricultural Division, Philippines, 1991 (shrimp pond water quality management)
Dole Philippines, Seafood Division, 1991 (shrimp pond water quality management)
American Soybean Association, Philippines and Thailand, 1989, 1991 (shrimp pond water quality management)
American Soybean Association, Colombia, 1994, 1995 (shrimp pond water quality management)
American Soybean Association, Venezuela, 1997 (shrimp pond water quality management)
American Soybean Association, China, 1997 (fish pond water quality management)
American soybean Association, Venezuela, 1998 (soil and water quality management)
Aquastar, Thailand, 1991, 1994 (shrimp pond water quality management)
Charoen Pokphand (C.P. Group) Feedmill Co., Thailand, 1989, 1991 (shrimp pond water quality management)
Rosario Shrimp Farm, Ecuador, 1990, 1992 (shrimp pond water quality management)
USDA/OCID, Thailand, 1989, 1992 (shrimp farming practices)
Wilfley-Weber, Inc., Colorado, USA, 1992 (aerator testing)
Wildlife Int., Washington, D.C., USA,1992, 1995 (pond testing of pesticides)
Texas Aquaculture Association, USA, 1992 (freshwater aquaculture effluents; NPDES permits)
Texas Aquaculture Association, USA, 1993 (brackishwater shrimp farm effluents; NPDES permits)
MCR Aquacultura, Brazil, 1994 (shrimp pond water quality management)
U.S. Army Corps of Engineers, Louisiana and Texas, USA, 1992 (evaluation of dredging project)
Laguna Madre Shrimp Farm, Belize, 1992 (shrimp pond water quality management)
Biomarsa, Ecuador, 1992, 1996, 1997 (shrimp pond water quality instruction)



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Southern Machine Welding, Alabama, USA, 1992 (aerator testing)
Kimberly-Clark, Alabama, USA, 1992 (lake sedimentation problem)
ESPOL/CENAIM, Ecuador, 1993, 1994 (shrimp pond water quality instruction)
Fisheries Information Mgt. Systems, Kentucky, USA, 1993 (lake fertilization)
Aquatic Ecosystems, Florida, USA, 1993 (aerator testing)
Benchmark Engineering, Alabama, USA, 1993 (fish kill investigation)
Aquamar Shrimp Farm, Ecuador, 1993 (shrimp pond water quality management)
Agromarina Shrimp Farm, Panama, 1993, 1996 (shrimp pond water quality management)
China Fisheries Soc., 1993 (water quality instruction)
CENIACUA (Shrimp Farmer's Association), Colombia, 1993, 1995 (shrimp pond water quality instruction)
Cartegenera de Acuicultura, Colombia, 1994, 1998, 2001 (shrimp pond soil and water quality management)
Asian Institute of Technology, Thailand, 1994, 1995 (shrimp pond water quality instruction)
Union Carbide/Inge, Twitty, and Duffy, Alabama, USA, 1994-1996 (ground water pollution)
SQM Nitratos, Chile 1995, 1996, 1998 (pond fertilizers)
Freshwater Institute (The Conservation Fund), West Virginia, USA, 1995 (acid mine drainage)
James Clements, Illinois, USA, 1995 (aerator design)
Agrosoledad, Colombia, 1995 (shrimp pond water quality management)
Jay Capozzi, New York, USA, 1995 (pond site evaluation)
Shrimp Mart, Malaysia, 1995 (shrimp pond water quality instruction)
Rodney Hale, 1995 (pond management)
Garner Lake Home Owners Association, Germantown, Tennessee, USA, 1995 (lake management)
Tanna Shrimp Mart, India, 1995 (shrimp pond water quality instruction)
Shrimp Culture II, Honduras, 1995 (shrimp pond soil evaluation)
NACA, Bangkok, Thailand, 1995 (shrimp farming practices)
Chomesmar Shrimp Farm, Costa Rica, 1996 (shrimp pond water quality management)
Nova Shrimp Farm, Belize, 1996 (shrimp pond soil management)
South China Sea Shrimp Farm, Viet Nam, 1996 and 2002 (shrimp pond soil management)
Shrimp Mart, Thailand, 1996 (shrimp pond water quality instruction)
Southern Star Shrimp Farm, Texas, USA, 1996 (sedimentation pond design)
Sekar Bumi Group, Indonesia, 1996 (shrimp pond design and construction)
Aquasol, Florida, USA, 1995-1996 (pond soil evaluation)
Australia Prawn Farmers Association, 1996 (shrimp pond management)
World Bank, Thailand, 1996, 1997 (shrimp farm rehabilitation project)
Caribuena Foods, Inc., Belize, 1996 (shrimp pond site evaluation and EIA)
National Fisheries Institute, Virginia, USA, 1996 (shrimp farming and the environment)
CH2M Hill, North Carolina, USA, 1996, 1997 (water quality standards)
Codamet, Ecuador, 1996, 1997 (shrimp pond aeration and evaluation of liming materials)
Millander and Sons Seafood, Florida, USA, 1996 (shrimp pond water quality management)
Modercorp, Ecuador, 1996 (quality of pond source water)
Inacua, Ecuador, 1996 (water quality instruction)
Tannol Holdings, Tanzania, 1996, 1997 (shrimp pond site evaluation and EIA)
Lake Tindall, LLP, Mississippi, USA, 1996, 1997 (fish kill evaluation)
Ret-Ser Engineering Agency, Malaysia, 1977 (shrimp pond construction)



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Japfa Comfeed, Indonesia, 1997-1998 (shrimp pond water quality management)
Chemie, Ecuador, 1997 (shrimp pond water quality research)
Alabama Power Company, USA, 1997 (water quality standards)
Global Aquaculture Alliance, USA, 1997-2006 (technical advisor)
Diamasa, Ecuador ,1997-1998 (shrimp pond fertilizers)
Siembramar Shrimp Farm, Venezuela 1997 (shrimp pond water quality management)
Camara de Aquacultura, Ecuador ,1997-1998 (shrimp pond water quality instruction)
S & N Sprayer Corporation, Mississippi, USA, 1997 (aerator design)
Alfonso Delfini, Ecuador, 1997, 1999 (tilapia pond water quality management)
CRI, University of Rhode Island, USA, 1997, 1998, 1999 (shrimp farming practices)
Union Carbide/Connelly and Williams, Alabama, USA, 1998 (ground water pollution)
PT Banggai Sentral Shrimp, Indonesia, 1998 (shrimp pond management and site evaluation)
University of Monterey, Mazatlan Campus, 1998 (shrimp pond water quality instruction)
NESTA Advisors & Capital, 1998 (shrimp farming in Thailand)
World Bank 1998, 1999 (shrimp farming code of practice, Thailand)
Nicovita Feeds, Peru, 1998 (shrimp farming water quality management)
Aqualma Shrimp Farm, Madagascar, 1998-present (shrimp pond soil and water quality management)
Lasertec SA, Ecuador,1998 (silicate analyses)
Granjas Marinas San Bernardo, Honduras, 1999 (alkalinity control)
BTG Golder Co., Thailand, 1999 (water pollution control)
Marfrisco Shrimp Farm, Ecuador, 1999 (pond sediment management)
Plantaciones del Pacifico, Ecuador, 1999, 2000 (shrimp pond soil reclamation)
AquaNova Shrimp Farm, Mexico, 1999 (blue-green algae control)
National Prawn Company, Saudi Arabia, 1999, 2000 (shrimp farm design and construction; technical advisor)
NACA, Thailand 1999, 2000 (environmental issues in aquaculture)
World Wildlife Fund, Belize, 1999 (environmental issues in aquaculture)
CENAIM, Ecuador, 1997-2000 (advisor to water quality research program)
Spring Hill Lake Home Owners Association, Tuscaloosa, Alabama, USA, 1999 (fish pond Management and correction of sediment problem)
Etec, Colombia, 2000 (performance of water circulator for ponds)
SeaFarms Dev. Corp., Oman, 2000 (environmental assessment of shrimp farm project)
World Bank, 2000-2002 (shrimp farming case studies)
Tecojete Shrimp Farm, Guatemala, 2001 (water quality)
Rosario, Ecuador, 2001 (inland shrimp farming)
Smithfield Foods and McGuire and Woods, North Carolina, USA, 2001 (hog farm waste management)
Research Corporation of University of Hawaii, USA, 2001 (BMPs for shrimp farming in Honduras and Nicaragua)
Las Tolas and LaFran Shrimp Farms, Ecuador, 2001-2002 (ground water quality for shrimp farms)
La Garzal Shrimp Farm, Ecuador, 2001 (ground water quality)
BetzDearborn (Hercules), Illinois, USA, 2002, 2004 (water quality in cooling water lake)
Soules and Wallace, Texas, USA, 2002 (Edwards Aquifer water rights issue)
Donny McKinney, Georgia, USA, 2002 (water quality)



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

FAO, Rome, Italy, 2002 (inland shrimp farming case studies)
Pate, Lloyd, & Cochrin, Alabama, USA, 2002 and 2003 (urban flooding)
CSA, Ecuador 2002 (water analyses)
Aquaculture Certification Council, USA, 2002 and 2003 (certification standards)
University of Hawaii, USA, 2003 (aquaculture BMPs and training)
World Wildlife Fund, USA, 2003-2004 (aquaculture certification reports)
World Wildlife Fund, Madagascar, 2004 (shrimp farm certification project)
Ministry of Agriculture and Ministry of Environment, Honduras, 2004 (environmental assessment of tilapia farming)
Esteromar, Guatemala, 2004 (water quality in shrimp farming)
Oman Fisheries, Oman, 2004 (coastal water management issues)
Conservation International, 2004 (review of position papers on aquaculture)
Aquafarms, Indonesia, 2005 (environment assessment of tilapia cage culture)
World Wildlife Fund, USA, 2005 (tilapia certification project)
Jose Vincent Rincon, Venezuela, 2005 (shrimp farm water quality management)
Bayer, Vietnam, 2005 (presentation of workshop on shrimp pond ecosystem)
Esteromar, Guatemala, 2005 (water quality in shrimp farming)
Belize Aquaculture, Belize, 1997, 2006 (water quality management in shrimp ponds)
Balch and Bingham, Alabama, USA, 2006 (water quality issues)
Environmental Defense, 2006 (shrimp certification standards)
Swiss Contact, Indonesia, 2006 (water quality and shrimp culture
Partridge and Smith, Alabama, USA, 2006 (pond turbidity and sedimentation)
World Wildlife Fund, USA, 2006 (Basa certification possibilities in Vietnam)
Global Aquaculture Alliance, USA, 2006-2008 (fish and shrimp certification standards)
Aquarium of the Pacific, California, USA, 2006 (shrimp farming environmental issues)
Hoover Slovacok, Texas, USA, 2006-2008 (lake seepage problem)
CPB Indonesia, 2007, 2008, 2009 (shrimp farm water quality management; country of origin of shirmp)
Global Aquaculture Alliance, USA, 2007, 2008, 2009 (aquaculture certification standards)
Monteray Bay Aquarium, California, USA, 2007 (sources of responsibly-cultured shrimp)
Shook, Hardy, and Bacon, Florida, USA, 2007 (shrimp mortality in Ecuador)
World Wildlife Fund, USA, 2007, 2009 (tilapia and shrimp culture effluent standards)
Deli Group, Honduras), 2009 (shrimp farm management)
Friedman and Leak, Alabama, USA, 2009 (Pond seepage issue)
CLECO, Louisiana, USA, 2009 (turbidity in cooling water reservoir)
Baker and Donelson, Quitman, Mississippi, USA, 2010 ( turbidity problem in pond)
Kluobec Koi Farm, Amana, Iowa, USA, 2010 (water quality problem in koi ponds)
World Wildlife Fund, USA, 2010 (shrimp farm certification standards)
Aquasol, New Caledonia, 2011 (shrimp farm water quality)
Nutrimar, Mexico, 2011 (water quality lectures)
Pescanova, Ecuador, 2011 (shrimp pond water quality)
Resolve, Washington, D.C., 2011 (assessment of shrimp aquaculture certification)
Dewees, LLC, Homewood, Alabama, USA, 2012-2013 (Runoff problem)
Cobb, Boyd, White, and Cobb, Dothan, Alabama, USA, 2013-2014 (Runoff problem)
World Wildlife Fund, Thailand and Vietnam, 2013-2015 (shrimp farm resource use efficiency)
Aquasol, Missouri, USA, 2014 (suitability of lead mine pump-out water for fish culture)



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

National Aquaculture Group, Saudi Arabia, 2014 (aeration of shrimp ponds)
Spain and Gilliam, Birmingham, Alabama, USA, 2014 (pond seepage problem)
Aquasol, Venezuela, 2015 (soil assessment for proposed shrimp farm site)
Keeton Industries, Colorado, USA, 2015 (help with aerator patent claim)
Walton Family Foundation, Arkansas, 2015-2016 (improving sustainability of aquaculture)

Grants and Contracts:
Obtained research grants as follows:

| Agency | Short title | Duration (yrs) | Amount ($) |
|---|---|---|---|
| Auburn University Water Resources Res. Inst. | 1) Phytoplankton dieoffs in ponds | 3 | 30,000 |
| | 2) Oxygen depletion in ponds | 1 | 3,000 |
| | 3) Water exchange in ponds | 1 | 5,000 |
| USGS, Office of Water Res. and Tech. | Oxygen dynamics in ponds | 3 | 47,000 |
| TVA, National Fertilizer Center | Fluid fertilizers for ponds | 3 | 9,000 |
| Rodale Resources | Aerator evaluation | 1 | 2,000 |
| Aquashade, Inc. | Use of Aquashade in ponds | 1 | 2,000 |
| USDA/Aquaculture | 1) Emergency aeration | 2 | 18,000 |
| | 2) Feeding practices and effluents | 3 | 61,000 |
| Aeration Industries, Inc. | Aerator evaluation | 3 | 6,000 |
| Catfish Farmers | 1) Aerator design | 3 | 17,500 |
| | 2) Off-flavor in catfish | 1 | 5,000 |
| Aeras Water Resources, Inc. | Aerator evaluation | 1 | 5,000 |
| Penn. Power and Light Co. | Pure oxygen contact systems | 2 | 10,000 |



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

| | | | |
|---|---|---|---|
| US Gypsum Co. | Uses of gypsum in ponds | 2 | 6,000 |
| Alabama Div. Marine Res. | Water quality in mariculture ponds | 3 | 20,000 |
| USDA/BARD | 1) Mixing and aeration | 3 | 85,000 |
| | 2) Water quality in intensive, recir-culating system | 3 | 11,000 |
| Alabama Dept. Env. Mgt. | 1) Nutrient removal from wastewater with aquatic plants | 2 | 80,000 |
| | 2) Pond effluent treatment in wetlands | 2 | 76,000 |
| | 3) BMPs for aquaculture | 1 | 5,000 |
| | 4) Definition of excess runoff | 1.5 | 7,000 |
| USFWS | 1) Pure oxygen contactors | 1 | 20,000 |
| | 2) Copper dynamics in ponds | 1 | 20,000 |
| | 3) Pond bottom soils | 4 | 200,000 |
| | 4) Cage culture | 2 | 35,000 |
| | 5) Carbon dioxide monitoring | 1 | 10,000 |
| | 6) Water quality in striped bass ponds | 2 | 40,000 |
| USDA/SRAC | 1) Water circulation | 3 | 47,000 |
| | 2) Pond effluents | 3 | 77,500 |
| | 3) Phosphorus control in ponds | 5 | 150,000 |
| | 4) Feeding and water quality | 3 | 30,000 |
| | 5) Bluegreen algae control | 3 | 110,000 |
| | 6) Management of aquacultural effluents | 3 | 84,000 |
| | 7) Energy use in channel catfish farming | 3 | 75,528 |
| USDA/OICD | US-Thailand Cooperation | 1 | 2,000 |



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| | | | |
|---|---|---|---|
| NSF | US-Thailand<br>Water quality in<br>shrimp ponds | 2 | 14,000 |
| Carson Co. | Wastewater treatment<br>by wetlands | 3 | 30,000 |
| Scott Co. | Slow-release fertilizers | 2 | 18,000 |
| Alabama Catfish Producers | 1) Chlorination of ponds | 1 | 27,000 |
| | 2) Effluent management | 1.5 | 51,000 |
| | 3) Environmental audit | 1 | 25,599 |
| | 4) Soil and water quality survey | 2 | 13,776 |
| | 5) BMPs for catfish farming | 3 | 65,000 |
| | 6) Water quality monitoring in Big Prairie Creek | 3 | 16,800 |
| | 7) Toxic algae | 2.5 | 74,900 |
| Alabama Inland Shrimp Producer Association | 1) Potassium analyses | 1 | 3,000 |
| | 2) Trace metal research | 2 | 10,000 |
| USAID/OSU | 1) Pond bottom soil research | 1 | 49,500 |
| | 2) Pond bottom soil research | 1 | 28,380 |
| | 3) Pond bottom soil research | 1 | 35,983 |
| | 4) Pond bottom soil research | 2 | 58,000 |
| | 5) Pond bottom soil research, Brazil and South Africa | 2 | 95,757 |
| | 6) Pond bottom soil research, Thailand | 2 | 87,332 |
| | 7) Pond bottom soil research, South Africa and Brazil | 1 | 40,000 |
| | 8) Aquaculture BMP workshops | 1 | 60,630 |
| | 9) Exit and Capacity Building Plan | 1 | 61,000 |
| | 10) Watershed studies | 2 | 65,000 |
| Neozymes, Inc. | Evaluation of enzymes for water quality improvement | 1 | 8,000 |
| Chilean Nitrate Corp. | 1) Sportfish pond fertilizer development | 1 | 7,500 |
| | 2) Evaluation of a mineral admendment | 1 | 10,000 |



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

| | | | |
|---|---|---|---|
| Auburn University | Butler/Cunningham Eminent Scholar | 10 | ≈750,000 |
| Auburn University Environmental Institute | Copper dynamics of ponds | 2 | 18,000 |
| Auburn University | AALGA water quality project | 2 | 26,666 |
| | Blackbelt Initiative (2006) | 1 | 50,000 |
| | Blackbelt Initiative (2007) | 1 | 49,930 |
| | Hach Supplement (2007) | 1 | 35,882 |
| | AAES grant program (2007-2008) | 1 | 52,503 |
| | AAES grant program (2007-2008) | 1 | 49,162 |
| | AAES equipment grant (2007) | 1 | 16,000 |
| | AAES grant program (2009-2011) | 3 | 132,000 |
| Kimera | Evaluation of compounds to remove phosphorus from water | 1 | 4,200 |
| Federal Aviation Administration | Reducing the attractiveness of airport stormwater retention facilities to birds | 3 | 800,000 |
| Agrium | Evaluation of coated algicides | 1 | 3,000 |

I have been the principal investigator on four, 5-year Hatch Projects at the Auburn University Agricultural Experiment Station. Total expenditure on these projects has been about $375,000.

<u>International Activities</u>:

(1) I have been involved in many short-term (<1 week to 6 months) activities in the following countries: Canada, Australia, Ecuador, Panama, Honduras, Suriname, Guatemala, India, France, Italy, Thailand, Indonesia, Israel, Philippines, Taiwan, Tanzania, Mexico, China, Colombia, Belize, Malaysia, Vietnam, Chile, Brazil, Costa Rica, Venezuela, South Africa, Egypt, Peru, Saudi Arabia, Madagascar, Oman, Nicaragua. and Namibia.

(2) Co-principal investigator for USAID/Aquaculture CRSP Project in Honduras (1990-1998).

(3) Technical advisor to Global Aquaculture Alliance regarding Codes of Conduct for shrimp farming (1997-present).

(4) Adjunct Professor, Faculty of Fisheries, Kasetsart University, Bangkok, Thailand (1988-2000).



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

(5) Technical advisor to Thailand Department of Fisheries, Bangkok, Thailand (1995-2003).

Publications:

**Journal Articles:**

Boyd, C.E. and D.H. Vickers. 1963. Distribution of some Mississippi amphibians and reptiles. Herpetologia 19:202-205.

Boyd, C.E., S.B. Vinson, and D.E. Ferguson. 1963. Possible DDT resistance in two species of frogs. Copeia 1963:426-429.

Vinson, S.B., C.E. Boyd, and D.E. Ferguson. 1963. Aldrin toxicity and possible cross-resistance in cricket frogs. Herpetologica 19:77-80.

Vinson, S.B., C.E. Boyd, and D.E. Ferguson. 1963. Resistance to DDT in the mosquito fish, *Gambusia affinis*. Science 139:217-218.

Boyd, C.E. 1964. Insecticides cause mosquito fish to abort. Progressive Fish-Culturist 26:138.

Boyd, C.E. and D.E. Ferguson. 1964. Spectrum of cross-resistance to insecticides in the mosquito fish, *Gambusia affinis*. Mosquito News 24:19-21.

Boyd, C.E. and D.E. Ferguson. 1964. Susceptibility and resistance of mosquito fish to several insecticides. Journal of Economic Entomology 57:430-431.

Ferguson, D.E. and C.E. Boyd. 1964. Apparent resistance to methyl parathion in mosquito fish. Copeia 1964:706.

Boyd, C.E. and J.M. Lawrence. 1966. The mineral composition of several freshwater algae. Proceedings of the Annual Conference Southeastern Association of Game and Fish Commissioners 20:413-424.

Boyd, C.E. 1968. Evaluation of some common aquatic weeds as possible feedstuffs. Hyacinth Control Journal 7:26-27.

Boyd, C.E. 1968. Freshwater plants: A potential source of protein. Economic Botany 22:359-368.

Boyd, C.E. 1969. Production, mineral nutrient absorption, and bio-chemical assimilation by *Justicia americana* and *Alternanthera philoxeroides*. Archives fur Hydrobiologia 66:139-160.

Boyd, C.E. 1969. The nutritive value of three species of water weeds. Economic Botany 23:123-127.

Boyd, C.E. 1969. Vascular aquatic plants for mineral nutrient removal from polluted waters. Economic Botany 24:95-103.

Boyd, C.E. 1970. Amino acid, protein, and caloric content of aquatic macrophytes. Ecology

Barcode: 4546036-02 C-331-806 INV - Investigation

51:901-906.

Boyd, C.E. 1970. Boron accumulation by native algae. American Midland Naturalist 84:565-568.

Boyd, C.E. 1970. Chemical analysis of some vascular aquatic plants. Archives fur Hydrobiologia 67:78-85.

Boyd, C.E. 1970. Influence of organic matter on some hydrosoil characteristics. Hydrobiologia 36:17-21.

Boyd, C.E. 1970. Losses of mineral nutrients during decomposition of *Typha latifolia*. Archives fur Hydrobiologia 66:511-517.

Boyd, C.E. 1970. Nutrient content of offal and small fish from some freshwater fish cultures. Transactions of the American Fisheries Society 99:809-811.

Boyd, C.E. 1970. Production, mineral nutrient accumulation and pigment concentrations in *Typha latifolia* and *Scirpus americanus*. Ecology 51:285-290.

Boyd, C.E. and R.D. Blackburn. 1970. Seasonal changes in the proximate composition of some common aquatic weeds. Hyacinth Control Journal 8:42-44.

Boyd, C.E. and L.W. Hess. 1970. Factors influencing shoot production and mineral nutrient levels in *Typha latifolia*. Ecology 51:296-300.

Polisini, J.M., C.E. Boyd, and B. Didgeon. 1970. Productivity and nutrient relationships in an oligotrophic South Carolina pond. Oikos 21:343-346.

Boyd, C.E. 1971. Further studies on productivity, nutrient, and pigment relationships in *Typha latifolia* populations. Bulletin Torrey Botany Club 98:144-150.

Boyd, C.E. 1971. Phosphorus dynamics in ponds. Proceedings of the Annual Conference of Southeastern Association of Game and Fisheries Commissioners 25:418-426.

Boyd, C.E. 1971. The dynamics of dry matter and chemical substances in a *Juncus effusus* population. American Midland Naturalist 86:28-45.

Boyd, C.E. and C.P. Goodyear. 1971. The nutritive quality of food in ecological systems. Archives fur Hydrobiologia 69:256-270.

Boyd, C.E. and C.P. Goodyear. 1971. The protein content of some common reptiles and amphibians. Herpetologica 27:317-320.

Boyd, C.E. and C.P. Goodyear. 1971. Somatic and gametic dry matter and protein in gravid females of several amphibian species. Comparative Biochemistry and Physiology 40A:771-775.

Boyd, C.E. and D.H. Vickers. 1971. Relationships between production, nutrient accumulation,


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

and chlorophyll synthesis in an *Eleocharis quadrangulata* population. Canadian Journal of Botany 49:883-888.

Boyd, C.E. and D.H. Vickers. 1971. Variation in the elemental composition of *Eichhornia crassipes*. Hydrobiologia 38:409-414.

Lollar, A.Q., D.C. Coleman, and C.E. Boyd. 1971. Carnivorous pathway of phosphorus uptake by *Utricularia inflata*. Archives fur Hydrobiologia 69:400-404.

Boyd, C.E. 1972. A bibliography of interest in the utilization of vascular aquatic plants. Economic Botany 26:74-84.

Boyd, C.E. 1972. Sources of carbon dioxide for nuisance blooms of algae. Weed Science 20:492-497.

Boyd, C.E. and W.W. Walley. 1972. Production and chemical composition of *Saururus cernnus* from sites of different fertility. Ecology 53:927-932.

Boyd, C.E. and W.W. Walley. 1972. Studies of the biogeochemistry of boron. I. Concentrations in surface waters, rainfall, and aquatic plants. American Midland Naturalist 88:1-14.

Goodyear, C.P. and C.E. Boyd. 1972. Elemental composition of largemouth bass (*Micropterus salomoides*). Transactions of the American Fisheries Society 101:545-547.

Goodyear, C.P., C.E. Boyd, and R.J. Beyers. 1972. Relationships between primary production and mosquitofish (*Gambusia affinis*) production in large microcosms. Limnology Oceanography 17:445-450.

Polisini, J.M. and C.E. Boyd. 1972. Relationships between cell wall fractions, nitrogen, and standing crop in aquatic macrophytes. Ecology 53:484-488.

Boyd, C.E. 1973. Biotic interactions between different species of algae. Weed Science 21:32-37.

Boyd, C.E. 1973. Amino acid composition of freshwater algae. Archives fur Hydrobiologia 72:1-9.

Boyd, C.E. 1973. Summer algal communities and primary productivity in fish ponds. Hydrobiologia 41:357-390.

Boyd, C.E. 1973. The chemical oxygen demand of waters and biological materials from ponds. Transactions of the American Fisheries Society 102:606-611.

Boyd, C.E. 1974. The utilization of nitrogen from decomposition of organic matter by cultures of *Scenedesmus dimorphus*. Archives fur Hydrobiologia 73:361-368.

Boyd, C.E. 1974. Water quality in catfish ponds. Journal of Marine Science of Alabama 2:19-30.

Boyd, C.E. and E. Scarsbrook. 1974. Effects of agricultural limestone on phytoplankton


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

communities of fish ponds. Archives fur Hydrobiologia 74:336-349.

Chiou, C., C.E. Boyd. 1974. The utilization of phosphorus from muds by the phytoplankter *Scendesmus dimorphus* and the significance of these findings to the practice of pond fertilization. Hydrobiologia 45:345-355.

Arce, R.G. and C.E. Boyd. 1975. Effects of agricultural limestone on water chemistry, phytoplankton productivity, and fish production in soft-water ponds. Transactions of the American Fisheries Society 104:308-312.

Boyd, C.E. and E. Scarsbrook. 1975. Influence of nutrient additions and initial density of plants on production of waterhyacinth, *Eichhornia crassipes*. Aquatic Botany 1:253-261.

Boyd, C.E., E.E. Prather, and R.W. Parks. 1975. Sudden mortality of massive phytoplankton bloom. Weed Science 23:61-67.

McVea, C. and C.E. Boyd. 1975. Effects of water hyacinth cover on water chemistry, phytoplankton, and fish in ponds. Journal of Environmental Quality 4:375-378.

Boyd, C.E. 1976. Accumulation of dry matter, nitrogen, and phosphorus by cultivated water hyacinths. Economic Botany 30:51-56.

Boyd, C.E. 1976. Chemical and textural properties of muds from different depths in ponds. Hydrobiologia 48:141-144.

Boyd, C.E. 1976. Nitrogen fertilizer effects on production of *Tilapia* in ponds fertilized with phosphorus and potassium. Aquaculture 7:385-390.

Boyd, C.E. 1976. Water chemistry and plankton in unfertilized ponds in pastures and in woods. Transactions of the American Fisheries Society 105:634-636.

Dobbins, D.A. and C.E. Boyd. 1976. Phosphorus and potassium fertilization of sunfish ponds. Transactions of the American Fisheries Society 105:536-540.

Boyd, C.E. 1977. Evaluation of a water analysis kit. Journal of Environmental Quality 6:381-384.

Boyd, C.E. 1977. Organic matter concentrations and textural properties of muds from different depths in four fish ponds. Hydrobiologia. 53:277-279.

Lichtkoppler, F. and C.E. Boyd. 1977. Phosphorus fertilization of sunfish ponds. Transactions of the American Fisheries Society 106:634-636.

Tucker, C.S. and C.E. Boyd. 1977. Relationships between potassium permanganate treatment and water quality. Transactions of the American Fisheries Society 106:481-488.

Almazan, G. and C.E Boyd. 1978. An evaluation of Secchi disk visibility for estimating plankton density in fish ponds. Hydrobiologia 61:205-208.

Almazan, G. and C.E. Boyd. 1978. Effects of nitrogen levels on rates of oxygen consumption during decay of aquatic plants. Aquatic Botany 5:119-126.

Almazan, G. and C.E. Boyd. 1978. Plankton production and tilapia yields in ponds. Aquaculture 15:75-77.

Boyd, C.E. 1978. Effluents from catfish ponds during fish harvest. Journal of Environmental Quality 7:59-63.

Boyd, C.E. and J.W. Sowles. 1978. Nitrogen fertilization of ponds. Transactions of the American Fisheries Society 107:737-741.

Boyd, C.E., J.A. Davis, and E. Johnston. 1978. Die-offs of the blue-green alga, *Anabaena variabilis*, in fish ponds. Hydrobiologia 61:129-133.

Boyd, C.E., J.W. Preacher, and L. Justice. 1978. Hardness, alkalinity, pH, and pond fertilization. Proceedings of the Annual Conference of Southeastern Association of Game and Fish Commissioners 107:605-611.

Boyd, C.E., R.P. Romaire, and E. Johnston. 1978. Predicting early morning dissolved oxygen concentrations in channel catfish ponds. Transactions of the American Fisheries Society 107:484-492.

Davis, J.A. and C.E. Boyd. 1978. Concentrations of selected elements and ash in bluegill (*Lepomis macrochirus*) and certain other freshwater fish. Transactions of the American Fisheries Society 107:862-867.

Romaire, R.P., C.E. Boyd, and W.J. Collis. 1978. Predicting nighttime dissolved oxygen decline in ponds used for tilapia culture. Transactions of the American Fisheries Society 107:804-808.

Tucker, C.S. and C.E. Boyd. 1978. Consequences of periodic applications of copper sulfate and simazine for phytoplankton control in catfish ponds. Transactions of the American Fisheries Society 107:316-320

Tucker, C.S. and C.E. Boyd. 1978. Effects of simazine treatment on channel catfish and bluegill production in ponds. Aquaculture 15:345-352.

Boyd, C.E. 1979. Aluminum sulfate (alum) for precipitating clay turbidity from fish ponds. Transactions of the American Fisheries Society 108:307-313.

Boyd, C.E. 1979. Determination of total ammonia nitrogen and chemical oxygen demand in fish culture systems. Transactions of the American Fisheries Society 108:314-319.

Boyd, C.E. and C.S. Tucker. 1979. Emergency aeration of fish ponds. Transactions of the American Fisheries Society 108:299-306.

Boyd, C.E., R.P. Romaire, and E. Johnston. 1979. Water quality in channel catfish production ponds. Journal of Environmental Quality 8:423-429.

Boyd, C.E., J.A. Steeby, and E.W. McCoy. 1979. Frequency of low dissolved oxygen concentrations in catfish ponds. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 33:591-599.

Romaire, R.P. and C.E. Boyd. 1979. Effects of solar radiation on the dynamics of dissolved oxygen in channel catfish ponds. Transactions of the American Fisheries Society 108:473-478.

Tucker, L., C.E. Boyd, and E.W. McCoy. 1979. Effects of feeding rate on water quality, production of channel catfish, and economic returns. Transactions of the American Fisheries Society 108:389-396.

Boyd, C.E. 1980. Comparisons of water analysis kits. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 34:39-48.

Boyd, C.E. 1980. Reliability of water analysis kits. Transactions of the American Fisheries Society 109:239-243.

Boyd, C.E. and M.L. Cuenco. 1980. Refinements of the lime requirement procedure for fish ponds. Aquaculture 21:293-299.

Boyd, C.E., Y. Musig, and L. Tucker. 1980. Effects of three phosphorus fertilizers on phosphorus concentrations and phytoplankton production. Aquaculture 22:175-180.

Boyd, C.E. and L. Tucker. 1980. Determination of filtrable orthophosphate in waters from fish ponds. Transactions of the American Fisheries Society 109:314-318.

Halverson, C.J., J.W. Jensen, and C.E. Boyd. 1980. Water quality in standing-water ponds for winter production of rainbow trout in Alabama. Transactions of the American Fisheries Society 109:310-313.

Hansell, D.A. and C.E. Boyd. 1980. Use of hydrated lime in fish ponds. Proceedings of the Annual Conference of the Southeastern Fish and Wildlife Agencies 34:49-58.

Hollerman, W.D. and C.E. Boyd. 1980. Nightly aeration to increase production of channel catfish. Transactions of the American Fisheries Society 109:446-452.

Mandal, B.K. and C.E. Boyd. 1980. The reduction of pH in water of high total alkalinity and low total hardness. Progressive Fish-Culturist 42:183-185.

Metzger, R.J. and C.E. Boyd. 1980. Liquid ammonium polyphosphate as a fish pond fertilizer. Transactions of the American Fisheries Society 109:563-570.

Musig, Y. and C.E. Boyd. 1980. Comparisons of orthophosphate and polyphosphate as

fertilizers for fish ponds. Aquaculture 20:135-138.

Boyd, C.E. 1981. Comparison of five fertilization programs for fish ponds. Transactions of the American Fisheries Society 110:541-545.

Boyd, C.E. 1981. Effects of ion-pairing on calculations of ionic activities of major ions in freshwater. Hydrobiologia 80:91-93.

Boyd, C.E. 1981. Fertilization of warmwater fish ponds. Journal of Soil and Water Conservation 36:142-145.

Boyd, C.E. 1981. Solubility of granular inorganic fertilizers for fish ponds. Transactions of the American Fisheries Society 110:451-454.

Boyd, C.E. and W.D. Hollerman. 1981. Methods of applying liquid fertilizers to fish ponds. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 35:525-530.

Boyd, C.E. and P.S. McGinty. 1981. Percentage of digestible matter and crude protein in dried aquatic weeds. Economic Botany 35:296-299.

Boyd, C.E. and Y. Musig. 1981. Orthophosphate uptake by phytoplankton and sediment. Aquaculture 22:165-173.

Davidson, R.G. and C.E. Boyd. 1981. Phytoplankton response to liquid fertilizers. Progressive Fish-Culturist 43:126-129.

Hunt, D. and C.E. Boyd. 1981. Alkalinity losses resulting from ammonium fertilizers used in fish ponds. Transactions of the American Fisheries Society 110:81-85.

Tucker, C.S. and C.E. Boyd. 1981. Relationships between pond sediments and simazine loss from waters of laboratory systems. Journal of Aquatic Plant Management 19:55-57.

Armstrong, M.S. and C.E. Boyd. 1982. Oxygen transfer calculations for a tractor-powered paddlewheel aerator. Transactions of the American Fisheries Society 111:361-366.

Boyd, C.E. 1982. Hydrology of small experimental fish ponds at Auburn, Alabama. Transactions of the American Fisheries Society 111:638-644.

Boyd, C.E. 1982. Liming fish ponds. Journal of Soil and Water Conservation 37:86-88.

Boyd, C.E. 1982. Managing water quality in channel catfish ponds. Journal of Soil and Water Conservation 37:207-209.

Boyd, C.E. and W.D. Hollerman. 1982. Influence of particle size of agricultural limestone on pond liming. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 36:196-201.

Boyd, C.E. and M.H.M. Noor. 1982. Aquashade treatment of channel catfish ponds. North

Barcode: 4546036-02 C-331-806 INV - Investigation

American Journal of Fish Management 2:193-196.

Brown, S.W., and C.E. Boyd. 1982. Off-flavor in channel catfish from commercial ponds. Transactions of the American Fisheries Society 111:379-383.

Boyd, C.E. and J.L. Shelton, Jr. 1983. Estimating average depths in ponds. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 37:364-367.

Boyd, C.E., S.W. Brown, and D.R. Bayne. 1983. Phytoplankton communities in channel catfish ponds. Proceedings of the Annual Conference of the Southeastern Association of Fish and Wildlife Agencies 37:401-407.

McGee, M.V. and C.E. Boyd. 1983. Evaluation of the influence of water exchange in channel catfish ponds. Transactions of the American Fisheries Society 112:557-560.

Shelton, J.L., Jr. and C.E. Boyd. 1983. Correction factors for calculating oxygen-transfer rates of ponds aerators. Transactions of the American Fisheries Society 112:120-122.

Boyd, C.E. and D.J Martinson. 1984. Evaluation of propeller-aspirator-pump aerators. Aquaculture 36:283-292.

Boyd, C.E., W.D. Hollerman, J.A. Plumb, and M. Saeed. 1984. Effect of treatment with a commercial bacterial suspension on water quality in channel catfish ponds. Progressive Fish-Culturist 46:36-40.

Doyle, K.M. and C.E. Boyd. 1984. The timing of inorganic fertilization of sunfish ponds. Aquaculture 37:169-177.

Moore, J. M. and C.E. Boyd. 1984. Comparisons of devices for aerating inflow of pipes. Aquaculture 38:89-96.

Petrille, J. and C.E. Boyd. 1984. Comparisons of oxygen-transfer rates and water-circulating capabilities of emergency aerators for fish ponds. Aquaculture 38:377-386.

Soderberg, R.W., M.V. McGee, and C.E. Boyd. 1984. Histology of cultured channel catfish, *Ictalurus puntatus* (Rafinesque). Journal of Fisheries Biology 24:683-690.

Soderberg, R.W., M.V. McGee, J.M. Grizzle, and C.E. Boyd. 1984. Comparative histology of rainbow trout and channel catfish grown in intensive static water aquaculture. Progressive Fish-Culturist 46:195-199.

Boyd, C.E. 1985. Chemical budgets for channel catfish ponds. Transactions of the American Fisheries Society 114:291-298.

Boyd, C.E. 1985. Pond evaporation. Transactions of the American Fisheries Society 114:299-303.

Hollerman, W.D. and C.E. Boyd. 1985. Effects of annual draining on water quality and production


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

of channel catfish in ponds. Aquaculture 46:45-54.

Pillai, V.K. and C.E. Boyd. 1985. A simple method for calculating liming rates for fish ponds. Aquaculture 46:157-162.

Armstrong, M.S., C.E. Boyd, and R.T. Lovell. 1986. Environmental factors affecting flavor of channel catfish from production ponds. Progressive Fish-Culturist 48:113-119.

Boyd, C.E. 1986. Comments of the development of techniques for management of environmental quality in aquaculture. Aquacultural Engineering 5:135-146.

Boyd, C.E. 1986. Method for testing aerators. Progressive Fish-Culturist 48:68-70.

Boyd, C.E., R.B. Rajendren, and J. Durda. 1986. Economic considerations of fish pond aeration. Journal of Aquaculture in the Tropics 1:1-5.

Cole, B.A. and C.E. Boyd. 1986. Feeding rate, water quality, and channel catfish production in ponds. Progressive Fish-Culturist 48:25-29.

Hollerman, W.D. and C.E. Boyd. 1986. Effects of annual draining on the limnology of sunfish ponds. Progressive Fish-Culturist 48:120-124.

Lovell, R.T., I.Y. Lelana, C.E. Boyd, and M.S. Armstrong. 1986. Geosmin and musty-muddy flavors in pond-raised channel catfish. Transactions of the American Fisheries Society 115:485-489.

Maskey S. and C.E. Boyd. 1986. Seasonal changes in phosphorus concentrations in sunfish and channel catfish ponds. Journal of Aquaculture in the Tropics 1:35-42.

Boyd, C.E. 1987. Evapotranspiration/evaporation ($E/E_0$) ratios for aquatic plants. Journal of Aquatic Plant Management 25:1-3.

Boyd, C.E. and H.V. Daniels. 1987. Performance of surface aerators in saline pond water. Progressive Fish-Culturist 49:306-308.

Daniels, H.V., C.E. Boyd, and R.V. Minton. 1987. Acute toxicity of ammonia and nitrite to spotted trout. Progressive Fish-Culturist 49:260-263.

Murad, A. and C.E. Boyd. 1987. Experiments on fertilization of sportfish ponds. Progressive Fish-Culturist 49:100-107.

Snyder, R.L. and C.E. Boyd. 1987. Evapotranspiration by *Eichhornia crassipes* (Mart.) Solms and *Typha latifolia* L. Aquatic Botony 27:217-227.

Ahmad, T. and C.E. Boyd. 1988. Design and performance of paddlewheel aerators. Aquacultural Engineering 7:39-62.

Boyd, C.E. and H.V. Daniels. 1988. Evaluation of Hach fish farmer's water quality test kits for


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

saline water. Journal of the World Aquaculture Society 19:21-26.

Boyd, C.E., T. Ahmad, and Z. Lai-fa. 1988. Evaluation of plastic pipe paddlewheel aerators. Aquacultural Engineering 7:63-72.

Lai-fa, Z., and C.E. Boyd. 1988. Nightly aeration to increase the efficiency of channel catfish production. Progressive Fish-Culturist 50:237-242.

Boyd, C.E. and B.J. Watten. 1989. Aeration systems in aquaculture. Reviews of Aquatic Science 1:425-472.

Daniels, H.V. and C.E. Boyd. 1989. Chemical budgets for polyethylene-lined brackishwater ponds. Journal of the World Aquaculture Society 20:53-60.

Ruttanagosrigit, W. and C.E. Boyd. 1989. Measurement of chemical oxygen demand in waters of high chloride concentration. Journal of the World Aquaculture Society 20:170-172.

Scott, J.H., D.R. Bayne, and C.E. Boyd. 1989. Effects of sodium ricinoleate on water quality, phytoplankton, and off-flavor in channel catfish ponds. Journal of Aquatic Plant Management 27:26-31.

Watten, B.J. and C.E. Boyd. 1989. Gas phase axial dispersion in a packed column oxygen absorber. Aquacultural Engineering 8:421-434.

Watten, B.J. and C.E. Boyd. 1990. Gas transfer within a multi-stage packed column oxygen absorber: model development and application. Aquacultural Engineering 9:33-59.

Watten, B.J., J. Meade, and C.E. Boyd. 1990. Modelling the effects of serial off-gas reuse on the performance of a hooded, surface oxygen absorption system. Aquacultural Engineering 9:97-120.

Wu, R. and C.E. Boyd. 1990. Evaluation of calcium sulfate for use in aquaculture ponds. Progressive Fish-Culturist 52:26-31.

Yuehua, L. and C.E. Boyd. 1990. Ineffectiveness of winter fertilization of sportfish ponds. Progressive Fish-Culturist 52:270-272.

Murad, H. and C.E. Boyd. 1991. Production of sunfish (*Lepomis* spp.) and channel catfish (*Ictalurus punctatus*) in acidified ponds. Aquaculture 94:381-388.

Ruttanagosrigit, W., Y. Musig, C.E. Boyd, and L. Sukhareon. 1991. Effect of salinity on oxygen transfer by propeller-aspirator-pump and paddle wheel aerators used in shrimp farming. Aquacultural Engineering 10:121-131.

Thomforde, H. and C.E. Boyd. 1991. Effects of aeration on water quality and channel catfish production. Bamidgeh 43:3-26.

Van der Ploeg, M. and C.E. Boyd. 1991. Geosmin production by cyanobacteria (blue-green algae) in fish ponds at Auburn, Alabama. Journal of the World Aquaculture Society 22:207-216.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Van der Ploeg, M. and C.E. Boyd. 1991. Effects of copper sulfate treatments on off-flavor and levels of dissolved copper in channel catfish ponds. Proceedings of the Louisiana Aquaculture Conference, p. 17-18.

Watten, B.J., J. Colt, and C.E. Boyd. 1991. Modeling the effect of dissolved nitrogen and carbon dioxide on the performance of pure oxygen absorption systems. American Fisheries Society Symposium 10:474-481.

Boyd, C.E. and D. Teichert-Coddington. 1992. Relationship between wind speed and reaeration in small aquaculture ponds. Aquacultural Engineering 11:121-131.

Howerton, R.D. and C.E. Boyd. 1992. Measurement of water circulation in ponds with gypsum blocks. Aquacultural Engineering 11:141-155.

Mevel, J. and C.E. Boyd. 1992. Channel catfish production and water quality in ponds with different rates of continuous, diffused-air aeration. Journal of Aquaculture in the Tropics 6:275-285.

Moore, J.M. and C.E. Boyd. 1992. Design of small paddlewheel aerators. Aquacultural Engineering 11:55-69.

Van der Ploeg, M., C.S. Tucker, and C.E. Boyd. 1992. Geosmin and 2-methylisoborneol production by cyanobacteria in fish ponds in the southeastern United States. Proc. 3rd International Symposium on Off-flavor in the Environment, Water Science Technology 25:283-290.

Ayub, M., C.E. Boyd, and D. Teichert-Coddington. 1993. Effects of urea application, aeration, and drying on total carbon concentrations in pond bottom soils. Progressive Fish-Culturist 55:210-213.

Boyd, C.E. and H.V. Daniels. 1993. Liming and fertilization of brackishwater shrimp ponds. Journal of Applied Aquaculture 2:221-234.

Boyd, C.E. and K. Masuda. 1993. Characteristics of liming materials used in aquaculture ponds. World Aquaculture 25:76-79.

Boyd, C.E. and J.M. Moore. 1993. Factors affecting the performance of diffused-air aeration systems for aquaculture. Journal of Applied Aquaculture 2:1-12.

Chiayvareesajja, S. and C.E. Boyd. 1993. Effects of zeolite, formalin, bacterial augmentation, and aeration on total ammonia nitrogen concentrations. Aquaculture 116:33-45.

Daniels, H.V. and C.E. Boyd. 1993. Nitrogen, phosphorus, and silica fertilization of brackishwater ponds. Journal of Aquaculture in the Tropics 8:103-110.

Barcode: 4546036-02 C-331-806 INV - Investigation

Howerton, R.D., C.E. Boyd, and B.J. Watten. 1993. Design and performance of a horizontal, axial-flow water circulator. Journal of Applied Aquaculture 3:163-183.

Masuda, K. and C.E. Boyd. 1993. Comparative evaluation of the solubility and algal toxicity of copper sulfate and chelated copper. Aquaculture 117:287-302.

Pipoppinyo, S. and C.E. Boyd. 1993. The α-coefficient in pond aeration. Journal of Aquaculture in the Tropics 8:111-119.

Shelton, J.L., Jr. and C.E. Boyd. 1993. Water budgets for aquaculture ponds supplied by runoff with reference to effluent volume. Journal of Applied Aquaculture 2(1):1-27.

Ayub, M. and C.E. Boyd. 1994. Comparison of different methods for measuring organic carbon concentrations in pond bottom soils. Journal of the World Aquaculture Society 25:322-325.

Boyd, C.E., P. Munsiri, and B.F. Hajek. 1994. Composition of sediment from intensive shrimp ponds in Thailand. World Aquaculture 25:53-55.

Boyd, C.E. and S. Pipoppinyo. 1994. Factors affecting respiration in dry pond bottom soils. Aquaculture 120:283-293.

Boyd, C.E., E. Hernandez, J.C. Williams, and R.P. Romaire. 1994. Effects of sampling technique on precision estimates for water quality variables in fish culture ponds. Journal of Applied Aquaculture 4:1-18.

Boyd, C.E., M. Tanner, M. Madkour, and K. Masuda. 1994. Chemical characteristics of bottom soils from freshwater and brackishwater aquaculture ponds. Journal of the World Aquaculture Society 25:517-534.

Boyd, C.E. and D. Teichert-Coddington. 1994. Pond bottom soil respiration during fallow and culture periods in heavily-fertilized tropical fish ponds. Journal of the World Aquaculture Society 25:417-423.

Boyd, C.E., B.J. Watten, V. Goubier, and R. Wu. 1994. Gas supersaturation in surface waters of aquaculture ponds. Aquacultural Engineering 13:31-39.

Dendup, T. and C.E. Boyd. 1994. Chemical features of water and soil in fish farming areas of Bhutan. Journal of Aquaculture in the Tropics 9:35-41.

Hajek, B.F. and C.E. Boyd. 1994. Rating soil and water information for aquaculture. Aquacultural Engineering 13:115-128.

Hariyadi, S., C. Tucker, J. Steeby, M. van der Ploeg, and C.E. Boyd. 1994. Environmental conditions and channel catfish (*Ictalurus punctatus*) production under similar pond management regimes in Alabama and Mississippi. Journal of the World Aquaculture Society 25:236-249.

Masuda, K. and C.E. Boyd. 1994. Chemistry of sediment pore water in aquaculture ponds built on clayey, Ultisols at Auburn, Alabama. Journal of the World Aquaculture Society 25:396-404.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Masuda, K. and C.E. Boyd. 1994. Effects of aeration, alum treatment, liming and organic matter application on phosphorus exchange between pond soil and water in aquaculture ponds at Auburn, Alabama. Journal of the World Aquaculture Society 25:405-416.

Masuda, K. and C.E. Boyd. 1994. Phosphorus fractions in soil and water of aquaculture ponds built on clayey, Ultisols at Auburn, Alabama. Journal of the World Aquaculture Society 25:379-395.

Schwartz, M.F. and C.E. Boyd. 1994. Channel catfish pond effluents. Progressive Fish-Culturist 56:273-281

Schwartz, M. and C.E. Boyd. 1994. Effluent quality during harvest of channel catfish from watershed ponds. Progressive Fish-Culturist 56:25-32.

Boyd, C.E. 1995. Deep water installation of a diffused-air aeration system in a shallow pond. J. Applied Aquaculture 5:1-9.

Boyd, C.E. 1995. Potential of sodium nitrate to improve environmental conditions in aquaculture ponds. World Aquaculture 26(2):38-40.

Boyd, C.E. and T. Dhendup. 1995. Quality of potential effluents from the hypolimnia of watershed ponds used in aquaculture. Progressive Fish-Culturist 57:59-63.

Boyd, C.E. and D. Teichert-Coddington. 1995. Dry matter, ash, and elemental composition of pond-cultured *Penaeus vannamei* and *P. stylirostis*. Journal of the World Aquaculture Society 26:88-92.

Boyd, C.E. and C.S. Tucker. 1995. Sustainability of channel catfish farming. World Aquaculture 26:45-53.

Green, B.W. and C.E. Boyd. 1995. Chemical budgets for organically-fertilized fish ponds in the dry tropics. Journal of the World Aquaculture Society 26:284-296.

Green, B.W. and C.E. Boyd. 1995. Water budgets for fish ponds in the dry tropics. Aquacultural Engineering 14:347-356.

Munsiri, P., C.E. Boyd, and B.F. Hajek. 1995. Physical and chemical characteristics of bottom soil profiles in ponds at Auburn, Alabama, USA, and a proposed method for describing pond soil horizons. Journal of the World Aquaculture Society 26:346-377.

Schwartz, M.F. and C.E. Boyd. 1995. Constructed wetlands for treatment of channel catfish pond effluents. Progressive Fish-Culturist 57:255-266.

Schwartz, M.F. and C.E. Boyd. 1995. The use of constructed wetlands to treat aquacultural effluents. World Aquaculture 26(4):42-44.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Seok, K., S. Leonard, C.E. Boyd, and M. Schwartz. 1995. Water quality in annually drained and undrained channel catfish ponds over a three-year period. Progressive Fish-Culturist 57:52-58.

Boyd, C.E. 1996. Chlorination and water quality in aquaculture ponds. World Aquaculture 27:41-45.

Boyd, C.E. and P. Munsiri. 1996. Phosphorus adsorption capacity and availability of added phosphorus in soils from aquaculture areas in Thailand. Journal of the World Aquaculture Society 27:160-167.

Kastner, R.J. and C.E. Boyd. 1996. Production of sunfish (Lepomis spp.) in ponds treated with controlled-release fertilizers. Journal of the World Aquaculture Society 27:228-234.

Munsiri, P., C.E. Boyd, B.W. Green, and B.F. Hajek. 1996. Chemical and physical characteristics of bottom soil profiles in ponds on Haplaquents in an arid climate at Abbassa, Egypt. Journal of Aquaculture in the Tropics 11:319-326.

Munsiri, P., C.E. Boyd, D. Teichert-Coddington, and B.F. Hajek. 1996. Texture and chemical composition of soils from shrimp ponds near Choluteca, Honduras. Aquaculture International 4:157-168.

Neori, A., M.D. Krom, S.P. Ellner, C.E. Boyd, D. Popper, R. Rabinevitch, P.J. Davison, O. Dvin, D. Zuker, M. Ucko, D. Angel, and H. Gordin. 1996. Seaweed biofilters as regulators of water quality in integrated fish-seaweed culture units. Aquaculture 141:183-199.

Boyd, C.E. 1997. Practical aspects of chemistry in pond aquaculture. Progressive Fish-Culturist 59:85-93.

Boyd, C.E. and P. Munsiri. 1997. Water quality in laboratory soil-water microcosms with soils from different areas of Thailand. Journal of the World Aquaculture Society 28:165-170.

Teichert-Coddington, D, C.E. Boyd, and D. Martinez de Pinel. 1997. Solubility of selected inorganic fertilizers in brackish water. Journal of the World Aquaculture Society 28:205-210.

Boyd, C.E. 1998. Pond water aeration systems. Aquacultural Engineering 18:9-40.

Boyd, C.E. and B. Green. 1998. Dry matter, ash, and elemental composition of pond-cultured tilapia (*Oreochromis aureus* and *O. niloticus*). Journal of the World Aquaculture Society 29:125-128.

Boyd, C.E., A. Gross, and M. Rowan. 1998. Laboratory study of sedimentation for improving quality of pond effluents. Journal of Applied Aquaculture 8:39-48.

Boyd, C.E. and M. Tanner. 1998. Coliform organisms in water of channel catfish ponds. Journal of the World Aquaculture Society 29:74-78.

Barcode: 4546036-02 C-331-806 INV - Investigation

Gross, A. and C.E. Boyd. 1998. A digestion procedure for the simultaneous determination of total nitrogen and total phosphorus in pond water. Journal of the World Aquaculture Society 29:300-303.

Gross, A., C.E. Boyd, and R.T. Lovell. 1998. Phosphorus budgets for channel catfish ponds receiving diets with different phosphorus concentrations. Journal of the World Aquaculture Society 29:31-39.

Potts, A.C. and C.E. Boyd. 1998. Chlorination of channel catfish ponds. Journal of the World Aquaculture Society 29:432-440.

Queiroz, J.F. and C.E. Boyd. 1998. Effects of a bacterial inoculum in channel catfish ponds. Journal of the World Aquaculture Society 29:67-73.

Queiroz, J.F. and C.E. Boyd. 1998. Evaluation of a kit for estimating organic matter concentrations in bottom soils of aquaculture ponds. Journal of the World Aquaculture Society 29:230-233.

Queiroz, J.F, C.E. Boyd, and A. Gross. 1998. Evaluation of a bio-organic catalyst in channel catfish, *Ictalurus punctatus*, ponds. Journal of Applied Aquaculture 8:49-61.

Boyd, C.E. 1999. Aquaculture sustainability and environmental issues. World Aquaculture 30(June):10-15.

Boyd, C.E. and A. Gross. 1999. Biochemical oxygen demand in channel catfish *Ictalurus punctatus* pond waters. Journal of the World Aquaculture Society 30:349-356.

Boyd, C.E. and L. Massaut. 1999. Risks associated with use of chemicals in pond aquaculture. Aquacultural Engineering 20:113-132.

Boyd, C.E. and H.R. Schmittou. 1999. Achievement of sustainable aquaculture through environmental management. International Journal of Aquaculture Economics and Management 2:59-69.

Gross, A., C.E. Boyd, and R.T. Lovell. 1999. Effects of feed protein concentration and feeding rate combinations on quality of pond water and effluent in channel catfish culture. Israeli Journal of Aquaculture 51(2):47-57.

Gross, A., C.E. Boyd, and J. Seo. 1999. Evaluation of the ultraviolet spectrophotometric method for the measurement of total nitrogen in water. Journal of the World Aquaculture Society 30:388-393.

Gross, A., C.E. Boyd, and C.W. Wood. 1999. Ammonia volatilization from freshwater ponds. Journal of Environmental Quality 28:793-797.

Teichert-Coddington, D.R., D.B. Rouse, A. Potts, and C.E. Boyd. 1999. Treatment of harvest discharge from intensive shrimp ponds by settling. Aquacultural Engineering 19:147-161.

Boyd, C.E. and A. Gross. 2000. Water use and conservation for inland aquaculture ponds. Fisheries Management and Ecology 7:55-63.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Boyd, C.E., J. Queiroz, J. Lee, M. Rowan, G.N. Whitis, and A. Gross. 2000. Environmental assessment of channel catfish, *Ictalurus punctatus*, farming in Alabama. Journal of the World Aquaculture Society 31(4):511-544.

Giri, B.J., III and C.E. Boyd. 2000. Effects of frequent, small doses of calcium carbonate on water quality and phytoplankton in channel catfish ponds. North American Journal of Aquaculture 62:225-228.

Gross, A., C.E. Boyd, and C.W. Wood. 2000. Nitrogen transformations and balance in channel catfish ponds. Aquacultural Engineering 24:1-14.

Queiroz, J.F., E. Ortega, J.M.G. Ferraz, and C.E. Boyd. 2000. Analise emergetica da producao de bagre do canal (*Ictalurus punctatus*). Brazilian Journal of Ecology 4(1-2):61-70.

Rushton, Y.G. and C.E. Boyd. 2000. A comparison of water-soluble fertilizer with liquid fertilizer for sportfish pond fertilization. North American Journal of Aquaculture 62:212-218.

Sonnenholzner, S. and C.E. Boyd. 2000. Chemical and physical properties of shrimp pond bottom soils in Ecuador. Journal of the World Aquaculture Society 31:358-375.

Sonnenholzner, S. and C.E. Boyd. 2000. Managing the accumulation of organic matter deposited on the bottom of shrimp ponds….Do chemical and biological probiotics really work? World Aquaculture 31(3):24-28.

Sonnenholzner, S. and C.E. Boyd. 2000. Vertical gradients of organic matter concentration and respiration rate in pond bottom soils. Journal of the World Aquaculture Society 31:376-380.

Boyd, C.E. 2001. Inland shrimp farming and the environment. World Aquaculture 32(1):10-12.

Boyd, C.E. and J. Queiroz. 2001. Feasibility of retention structures, settling basins, and best management practices in effluent regulation for Alabama channel catfish farming. Reviews in Fisheries Science 9:43-67.

Hoagland, R.H., III, D.B. Rouse, D. Teichert-Coddington, and C.E. Boyd. 2001. Evaluation of automated aeration control in shrimp ponds. Journal of Applied Aquaculture 11(3):45-61.

McGraw, W. D. Teichert-Coddington, D.B. Rouse, and C.E. Boyd. 2001. Higher minimum dissolved oxygen concentrations increase penaeid shrimp yields in earthen ponds. Aquaculture 199:311-321.

Seo, J. and C.E. Boyd. 2001. Dry-tilling of pond bottoms and calcium sulfate treatment for water quality improvement. Journal of the World Aquaculture Society 32:257-268.

Seo, J. and C.E. Boyd. 2001. Effects of bottom soil management practices on water quality improvement in channel catfish *Ictalurus punctatus* ponds. Aquacultural Engineering 25:83-97.

Tepe, Y. and C.E. Boyd. 2001. A sodium nitrate-based, water-soluble fertilizer for sportfish ponds. North American Journal of Aquaculture 63:328-332.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Thunjai, T., C.E. Boyd, and K. Dube. 2001. Pond soil pH measurement. Journal of the World Aquaculture Society 32:141-152.

Gautier, D., C.E. Boyd, and R.T. Lovell. 2002. Sampling channel catfish ponds for pre-harvest off-flavor detection. Aquacultural Engineering 26:205-213.

Kitamura, P.C., J.F. Queiroz, R.B. Lopes, F G. de Castro, Jr., and C.E. Boyd. 2002. Environmental and economic assessment of fee-fishing in Sao Paulo State, Brazil. Journal of Applied Aquaculture: 12(4):23-41.

Tepe, Y. and C.E. Boyd. 2002. Nitrogen fertilization of golden shiner ponds. North American Journal of Aquaculture 64:284-289.

Tepe, Y. and C.E. Boyd. 2002. Sediment quality in Arkansas bait minnow ponds. Journal of the World Aquaculture Society 33:221-232.

Boyd, C.E. 2003. Bottom soil and water quality management in shrimp ponds. Journal of Applied Aquaculture 13(1/2):11-33.

Boyd, C. E. 2003. Guidelines for aquaculture effluent management at the farm-level. Aquaculture 226:101-112.

Boyd, C.E. 2003. The status of codes of practice in aquaculture. World Aquaculture 34(2):63-66.

Boyd, C.E. and T. Thunjai. 2003. Concentrations of major ions in waters of inland shrimp farms in China, Ecuador, Thailand, and the United States. Journal of the World Aquaculture Society 34:524-532.

Gomes, F. and C.E. Boyd. 2003. Dry matter, ash, and elemental composition of farm-cultured, black tiger prawn *Penaeus monodon*. World Aquaculture 34(4):61-63.

Ozbay, G. and C.E. Boyd. 2003. Particle size fractions in pond effluents. World Aquaculture 34(4):56-59.

Tavares, L.H. and C.E. Boyd. 2003. Comparison of a dry ash method with perchloric acid digestion for total phosphorus analysis of pond sediment. Journal of Aquaculture in the Tropics 18(3):239-244.

Tavares, L.H. and C.E. Boyd. 2003. Possible effects of sodium chloride on quality of effluents from Alabama channel catfish ponds. Journal of the World Aquaculture Society 34:217-222.

Tepe, Y. and C.E. Boyd. 2003. A reassessment of nitrogen fertilization for sunfish ponds. Journal of the World Aquaculture Society 34:505-511.

McNevin, A. and C.E. Boyd. 2004. Copper concentrations in channel catfish Ictalurus punctatus ponds treated with copper sulfate. Journal of the World Aquaculture Society 35:16-24.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

McNevin, A., C.E. Boyd, O. Silapajarn, and K. Silapajarn. 2004. Ionic supplementation of pond waters for inland culture of marine shrimp. Journal of World Aquaculture Society 35:460-467.

Ozbay, G. and C.E. Boyd. 2004. Treatment of channel catfish pond effluents in sedimentation basins. World Aquaculture 35(3):10-13.

Rowan, M., A. Gross, and C.E. Boyd. 2004. Effects of alum on the quality of aquaculture effluents in settling ponds. Bamidgeh 56(3):166-175.

Silapajarn, K., C.E. Boyd, and O. Silapajarn. 2004. An improved method for determining the fineness value of agricultural limestone for aquaculture. North American Journal of Aquaculture 66:113-118.

Thunjai, T., C.E. Boyd, and M. Boonyaratpalin. 2004. Bottom soil quality in tilapia ponds of different age in Thailand. Aquaculture Research 35:698-705.

Thunjai, T., C.E. Boyd, and M. Boonyaratpalin. 2004. Quality of liming materials used in aquaculture in Thailand. Aquaculture International 12:161-168.

Watten, B.J., C.E. Boyd, M.F. Schwartz, S.T. Summerfelt, and B.L. Brazil. 2004. Feasibility of measuring dissolved carbon dioxide based on headspace partial pressures. Aquacultural Engineering 30:83-101.

Boyd, C.E. 2005. Water use in aquaculture. World Aquaculture 36(3):12-15 and 70.

Boyd, C.E., A.A. McNevin, J. Clay, and H.M. Johnson. 2005. Certification issues for some common aquaculture species. Reviews in Fisheries Science 13:231-279.

Davis, D.A., C.E. Boyd, D.B. Rouse, and I.P. Saoud. 2005. Effects of potassium, magnesium and age on acclimation of *Litopenaeus vannamei* postlarvae to inland saline well-water in west Alabama. Journal of the World Aquaculture Society 36(3):416-419.

Silapajarn, O. and C.E. Boyd. 2005. Effects of channel catfish farming on water quality and flow in an Alabama stream. Reviews in Fisheries Science 13:109-140.

Silapajarn, K., O. Silapajarn, and C.E. Boyd. 2005. Evaluation of lime requirement procedures and liming materials for aquaculture ponds in Thailand. Journal of Applied Aquaculture 17:77-88.

Wudtisin, W. and C.E. Boyd. 2005. Determination of the phosphorus fertilization rate for bluegill ponds using regression analysis. Aquaculture Research 36:593-599.

Xinglong, J. and C.E. Boyd. 2005. Measurement of 5-day biochemical oxygen demand without sample dilution or bacterial and nutrient enhancement. Aquacultural Engineering 33:250-257.

Boyd, C.A., C.E. Boyd, A.A. McNevin, and D.B. Rouse. 2006. Salt discharge from an inland farm

Barcode: 4546036-02 C-331-806 INV - Investigation

for marine shrimp in Alabama. Journal of the World Aquaculture Society 37(4):345-355.

Boyd, C.E., K. Corpron, E. Bernard, and P. Pengseng. 2006. Estimates of bottom soil and effluent load of phosphorus at a semi-intensive marine shrimp farm. Journal of the World Aquaculture Society 37:41-47.

Silapajarn, O. and C.E. Boyd. 2006. Copper adsorption capacity of pond bottom soils. Journal of Applied Aquaculture 18(2):85-92.

Silapajarn, O., K. Silapajarn, and C.E. Boyd. 2006. Evaluation of zeolite products used for aquaculture in Thailand. Journal of the World Aquaculture Society 37:136-138.

Wudtisin, I. and C.E. Boyd. 2006. Physical and chemical characteristics of sediments in catfish, freshwater prawn, and carp ponds in Thailand. Aquaculture Research 37:1,202-1,214.

Xinglong, J. and C.E. Boyd. 2006. Relationship between organic carbon concentration and potential pond bottom soil respiration. Aquacultural Engineering 35:147-151.

Yuvanatemiya, V. and C.E. Boyd. 2006. Physical and chemical changes in aquaculture pond bottom soil resulting from sediment removal. Aquacultural Engineering 35:199-205.

Boyd, C.A., C.E. Boyd, and D.B. Rouse. 2007. Potassium budget for inland, saline water shrimp ponds in Alabama. Aquacultural Engineering 36:45-50.

Boyd, C.A., C.E. Boyd, and D.B. Rouse. 2007. Potassium adsorption by bottom soils in ponds for inland culture of marine shrimp in Alabama. Journal of the World Aquaculture Society 38:85-91.

Boyd, C.E., C.S. Tucker, A. McNevin, K. Bostick, and J. Clay. 2007. Indicators of resource use efficiency and environmental performance in fish and crustacean aquaculture. Reviews in Fisheries Science 15:327-360.

Banas, D., G. Masson, L. Leglize, P. Usseglio-Polatera, and C.E. Boyd. 2008. Assessment of sediment concentration and nutrients loads in effluents drained from extensively-managed fishponds in France. Environmental Pollution 152(3):679-685.

Boyd, C.E. 2008. Calculating the feed oxygen demand (FOD) of Aquafeeds. Kasetsart University Fisheries Research Bulletin 32(3):26-31.

Boyd, C.A., P. Pengseng, and C.E. Boyd. 2008. New nitrogen fertilization recommendations for bluegill ponds in the southeastern United States. North American Journal of Aquaculture 70:308-313.

Boyd, C.E., H. Pine, C.A. Boyd, and R. Hulcher. 2008. Excess runoff contribution to daily discharge frequency of channel catfish farms in Alabama. Journal of the World Aquaculture Society 39(4):490-499.

Banerjee, A., G. N. Chattopadhyay, and C.E. Boyd. 2009. Determination of critical limits of soil


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

nutrients for use in optimizing fertilizer rates for fish ponds in red, lateritic soil zones. Aquacultural Engineering 40:144-148.

Boyd, C.A., P.L. Chaney, C.E. Boyd, and D.B. Rouse. 2009. Distribution of ground water suitable for use in saline-water aquaculture in central and west-central Alabama. Journal of Applied Aquaculture 21:228-240.

Boyd, C.E., C. W. Wood, P. Chaney, and J. F. Queiroz. 2010. Role of aquaculture pond sediments in sequestration of annual global carbon emissions. Environmental Pollution 158:2,537-2,540.

Chainark, S. and C.E. Boyd. 2010. Evaluation of a meter for testing potassium concentration in low-salinity aquaculture ponds. Journal of the World Aquaculture Society 41:102-106.

Chainark, S. and C.E. Boyd. 2010. Water and sediment quality, phytoplankton communities, and channel catfish production in sodium nitrate-treated ponds. Journal of Applied Aquaculture 22:171-185.

Pine, H.J. and C.E. Boyd. 2010. Adsorption of magnesium by bottom soils in inland brackishwater shrimp ponds in Alabama. Journal of the World Aquaculture Society 41:603-609.

Roy, L.A., D.A. Davis, I.P. Saoud, C.A. Boyd, H.J. Pine, and C.E. Boyd. 2010. Shrimp culture in inland low salinity waters. Reviews in Aquaculture 2:191-208.

Boyd, C. E., C. S. Tucker, and R. Viriyatum. 2011. Interpretation of pH, acidity and alkalinity in aquaculture and fisheries. North American Journal of Aquaculture 73(4):403-408.

Brown, T. W., J. A. Chappell, C. E. Boyd. 2011. A commercial-scale, in-pond raceway system for *Ictalurid* catfish production. Aquacultural Engineering 44:72-79.

Pengseng, P. and C.E. Boyd. 2011. Evaluating fertilizer application rates for giant gourami, *Osphronemus goramy*, ponds. Journal of the World Aquaculture Society 42:297-305.

Pine, H. J. and C. E. Boyd. 2011. Magnesium budget for inland low-salinity water shrimp ponds in Alabama. Journal of the World Aquaculture Society 42(5):705-713.

Pine, H.J. and C.E. Boyd. 2011. Stream salinization by inland brackish-water aquaculture. North American Journal of Aquaculture 73:107-113.

Viriyatum, R. and C.E. Boyd. 2011. Re-evaluation of potassium fertilization of bluegill, *Lepomis macrochirus*, ponds. Journal of the World Aquaculture Society 42:332-338.

Wudtisin, I. and C.E. Boyd. 2011. Possible potassium and magnesium limitations for shrimp survival and production in low-salinity, pond waters in Thailand. Journal of the World Aquaculture Society 42:766-777.

Yuvanatemiya, V., C.E. Boyd, and P. Thavipoke. 2011. Pond bottom management at commercial shrimp farms in Chantaburi Province, Thailand. Journal of the World Aquaculture Society


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

42(5):618-632.

Boyd, C. E. 2012. Personal experiences in pond water quality management. World Aquaculture 43(4):60-65.

Boyd, C. E., Li Li, and R. Brummett. 2012. Relationship of freshwater aquaculture production to renewable freshwater resources. Journal of Applied Aquaculture 24:99-106.

Brown, T., C.E. Boyd, and J. Chappell. 2012. Approximate water and chemical budgets for an experimental, in-pond raceway system. Journal of the World Aquaculture Society 43:526-537.

Chaney, P.L., C. E.Boyd, and M. Polioudakis. 2012. Number, size, distribution, and hydrologic role of small impoundments in Alabama. Journal of Soil and Water Conservation 67(2):111-121.

Le, P.T. and C.E. Boyd. 2012. Comparison of phenate and salicylate methods for determination of total ammonia nitrogen in freshwater and saline water. Journal of the World Aquaculture Society 43(6):885-889.

Prapaiwong, N. and C.E. Boyd. 2012. Effects of major water quality variables on shrimp production in inland, low-salinity ponds in Alabama. Journal of the World Aquaculture Society 43:349-361.

Prapaiwong, N. and C.E. Boyd. 2012. Effluent volume and pollutant loads of an inland, low-salinity shrimp farm in Alabama. Aquacultural Engineering 48:1-5.

Prapaiwong, N. and C.E. Boyd. 2012. Water temperature in inland, low-salinity shrimp ponds in Alabama. Journal of Applied Aquaculture 24(4):334-341

Soongsawang, S. and C.E. Boyd. 2012. Effects of effluents from a fisheries research station on stream water quality. North American Journal of Aquaculture 74:73-79.

Boyd, C.E. 2013. Aquaculture, Freshwater. Reference Module in Earth Systems and Environmental Sciences (http://dx.doi.org/10.1016/B978-0-12-409548-9.03764-7).

Boyd, C.E., J. Queiroz, and A. McNevin. 2013. Perspectives on the responsible aquaculture movement. World Aquaculture 44(4):14-21.

Danaher, J.J., J.M. Pickens, J.L. Sibley, J.A. Chappell, T.R. Hanson, and C.E. Boyd. 2013. Petunia growth response to container substrate amended with dewatered aquaculture effluent. HortTechnology 23(1):57-63.

Li, L., C.E. Boyd, J. Odom, and S. Dong. 2013. Identification of Ictalurid catfish fillets to rearing location using elemental profiling. Journal of the World Aquaculture Society 44(3):405-414.

Li L., S. Dong, X. Tian, and C.E. Boyd. 2013. Equilibrium concentrations of major cations and total alkalinity in laboratory soil-water systems. Journal of Applied Aquaculture 25(1):50-65.

Sun, W. and C.E. Boyd. 2013. Phosphorus and nitrogen budgets for inland, saline water shrimp


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

ponds in Alabama. Fisheries and Aquaculture Journal 4(1): online.

Boyd, C.E. 2014. A review of sportfish pond fertilization studies at Auburn University. World Aquaculture 45(1):41-45.

Brown, T.W., T.R. Hanson, J.A. Chappell, C.E. Boyd, and D.S. Wilson. 2014. Economic feasibility of an in-pond raceway system for commercial catfish production in west Alabama. North American Journal of Aquaculture 76:79-89.

Danaher, J.J., J.M Pickens, J.L Sibley, J.A. Chappell, T.R. Hanson, and C.E. Boyd. 2014. Growth of tomato seedlings in commercial substrate amended with dewatered aquaculture effluent. International Journal of Vegetable Science 20(4):340-353.

Han, Y., C.E. Boyd, and R. Viriyatum. 2014. A bicarbonate titration method for lime requirement to neutralize exchangeable acidity of pond bottom soils. Aquaculture 434:282-287.

Jescovitch, L.N., P. Chaney, and C.E. Boyd. 2014. Land to water surface area ratio in pond aquaculture. World Aquaculture 45(4):44-46.

Li, L., C.E. Boyd, and J. Odom. 2014. Identification of Pacific white shrimp (*Litopenaeus vannamei*) to rearing location using elemental profiling. Food Control 45:70-75.

Prapaiwong, N. and C.E. Boyd. 2014. Trace elements in waters of inland, low-salinity shrimp ponds in Alabama. Aquaculture Research 45:327-333.

Saengrungruang, P. and C.E. Boyd. 2014. Evaluation of porous, geotextile liners for erosion control in small aquaculture ponds. North American Journal of Aquaculture 76:369-374.

Zhou, L. and C.E. Boyd. 2014. Total ammonia nitrogen removal from aqueous solutions by the natural zeolite, mordenite: A laboratory test and experimental study. Aquaculture 432:252-257.

Boyd, C.E., A. McNevin, and J.W. Clay. 2015. Resource use efficiency in aquaculture: examining the known and unknown. World Aquaculture 46(2):25-30.

Brown, T.W., C E. Boyd, and J.A. Chappell. 2015. Organic carbon and dissolved oxygen budgets for a commercial-size, in-pond raceway system. Journal of the World Aquaculture Society 46(5):539-548.

Chumnanka, N., C.E. Boyd, R. Viriyatum, and S. Tunkijjanukij. 2015. Bottom soil characteristics, survival and production of shrimp in low-salinity, inland ponds in Alabama and Florida (USA). Journal of Soils and Sediments 15:671-682.

Li, L., C.E. Boyd, and S. Dong. 2015. Chemical profiling with modeling differentiates Ictalurid catfish produced in fertilized and feeding ponds. Food Control 50:18-22.

Zhou, L. and C.E. Boyd. 2015. An assessment of total ammonia nitrogen concentration in Alabama (USA) ictalurid catfish ponds and the possible risk of ammonia toxicity. Aquaculture


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

437:263-269.

Zhou, L. and C.E. Boyd. 2015. Bluegill yield in response to nitrogen and phosphorus versus phosphorus-only fertilization in ponds at different times since sediment removal. Aquaculture 446:7-11.

Boyd, C.E., C.S. Tucker, and B. Somridhivej. 2016. Alkalinity and hardness: critical but elusive concepts in aquaculture. Journal of the World Aquaculture Society 47(1):6-41.

Danaher, J. J., J. M. Pickens, J. L. Sibley, J. A. Chappell, T. R. Hanson, and C. E. Boyd. 2016. Tomato seedling growth response to different water sources and a substrate partially replaced with dewatered aquaculture effluent. International Journal of Recycling of Organic Waste in Agriculture 5:25-32.

Jescovitch, L. N., P. L. Chaney, and C. E. Boyd. 2016. A preliminary assessment of land-to-water surface area ratios (LWR) for sustainable land use in aquaculture. Papers in Applied Geography 2(2):178-188.

Li, L. C.E. Boyd, and Z. Sun. 2016. Authentication of fishery and aquaculture products by multi-element and stable isotope analysis. Food Chemistry 194:1238-1244.

Li, Y. and C.E. Boyd. 2016. Influence of a bacterial amendment on water quality in small, research ponds for channel catfish, *Ictalurus punctatus*, production. Journal of the World Aquaculture Society 47(2):464-469.

Li, Y. and C. E. Boyd. 2016. Laboratory tests of bacterial amendments for accelerating oxidation rates of ammonia, nitrite, and organic matter in aquaculture pond water. Aquaculture 460:45-58.

Li, Y., Y. Wang, C. E. Boyd, R. R. Hanson, and S. Liu. 2016. Evaluation and optimization of chemical treatments for reducing yellow discoloration of channel catfish (*Ictalurus punctatus*) fillets during cold storage. Journal of Aquatic Food Product Technology 26(1):132-137.

Somridhivej, B. and C.E. Boyd. 2016. An assessment of factors affecting the reliability of total alkalinity measurements. Aquaculture 459:99-109.

Somridhivej, B. and C. E. Boyd. 2016. Effects of liming on quality of water discharged from the supply reservoir at a fisheries research station. North American Journal of Aquaculture 78:356-361.

Viriyatum, R. and C. E. Boyd. 2016. Slow-release coated copper sulfate as an algicide for aquaculture. Journal of the World Aquaculture Society 47:667-675.

Zhou, L. and C.E. Boyd. 2016. Comparison of Nessler, phenate, salicylate and ion selective electrode procedures for determination of total ammonia nitrogen in aquaculture. Aquaculture 450:187-193.

Boyd, C.E. 2017. Use of agricultural limestone and lime in aquaculture. CAB Reviews 12 (No.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

015).

Boyd, C. E., A. A. McNevin, P. Racine, H. Q. Tinh, H. N. Minh, R. Viriyatun, D. Paungkaew, and C. Engle. 2017. Resource use assessment of shrimp, *Litopenaeus vannamei* and *Penaeus monodon*, production in Thailand and Vietnam. Journal of the World Aquaculture Society 48:201-226.

Chatvijitkul, S., C. E. Boyd, D. A. Davis, and A. A. McNevin. 2017. Embodied resources in fish and shrimp feeds. Journal of the World Aquaculture Society 48(1):7-19.

Chatvijitkul, S., C. E. Boyd, D. A. Davis, and A. A. McNevin. 2017. Pollution potential indicators for feed-based fish and shrimp culture. Aquaculture 477:43-49.

Engle, C. R., A. McNevin, P. Racine, C. E. Boyd, D. Paungkaew, R. Viriyatum, H. Q. Tinh, and H. N. Minh. 2017. Economics of sustainable intensification of aquaculture: evidence from shrimp farms in Vietnam and Thailand. Journal of the World Aquaculture Society 48(2):227-239.

Jescovitch, L. N, and C. E. Boyd. 2017. A case study: impacts of deviating from model research design to the commercial industry for split-pond aquaculture. Aquacultural Engineering 79:35-41.

Jescovitch, L. N., C. E. Boyd, and G. N. Whitis. 2017. Effects of mechanical aeration in the waste-treatment cells of split-pond aquaculture systems on water quality. Aquaculture 480:32-41.

Kamal, A. H. M., O. Hishamuddin, and C. E. Boyd. 2017. Physical and chemical characteristics of soil from tiger shrimp aquaculture ponds at Malacca, Malaysia. Journal of Applied Aquaculture doi:10.1080/10454438.2017.1406417.

Li, L., C. E. Boyd, P. Racine, A. A. McNevin, B. Somridhivej,. H. N. Minh, H. Q. Tinh and R. Godumala. 2017. Assessment of elemental profiling for distinguishing geographic origin of aquacultured shrimp from India, Thailand and Vietnam. Food Control 80:162-169.

Naigaga, S., C. E. Boyd, P. Gaillard, H. A. Abdelrahaman, and J. Molnar. 2017. Assessing the reliability of water-test kits for use in pond aquaculture. Journal of the World Aquaculture Society 48(4):555-562.

Sá, M.V.C. and C.E. Boyd. 2017. Dissolution rate of calcium carbonate and calcium hydroxide in saline waters and its relevance for aquaculture. Aquaculture 469:102-105.

Sá, M.V.C. and C.E. Boyd. 2017. Role of salinity in the dissolution rates of $CaCO_3$ and its implications for aquaculture liming. Aquaculture Research doi:10.1111/are.13489.

Sá, M.V.C. and C.E. Boyd. 2017. Variability in the solubility of agricultural limestone from different sources and its pertinence for aquaculture. Aquaculture Research 48(8):4,292-4,299.

Somridhivej, B. and C. E. Boyd. 2017. Likely effects of the increasing alkalinity of inland waters on aquaculture. Journal of the World Aquaculture Society 48(3):496-502.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Abdelrahman, H. A. and C. E. Boyd. 2018. Effects of mechanical aeration on evaporation rate and water temperature in aquaculture ponds. Aquaculture Research doi: 10.1111/are.13674.

Boyd, C. E. and A. A. McNevin. 2018. Land use in shrimp aquaculture. World Aquaculture, March:28-34.

Boyd, C. E. and T. Q. Phu. 2018. Environmental factors and Acute Hepatopancreatic Necrosis Disease (AHPND) in shrimp ponds in Viet Nam: practices for reducing risks. Asian fisheries Science 31S:121-136.

Boyd, C. E., E. L. Torrans, and C. S. Tucker. 2018. Dissolved oxygen and aeration in Ictalurid catfish aquaculture. Journal of the World Aquaculture Society 49(1):7-70.

Boyd, C. E., A. A. McNevin, and R. P. Davis. 2018. Production methods and resource use at *Litopenaeus vannamei* and *Penaeus monodon* farms in India compared with previous findings from Thailand and Vietnam. Journal of the World Aquaculture Society 49(3):551-569.

Chatvijitkul, S., C. E. Boyd, and D. A. Davis. 2018. Nitrogen, phosphorus, and carbon concentrations in some common aquaculture feeds. Journal of the World Aquaculture Society 49(3):477-483.

Han, Y. and C. E. Boyd. 2018. Effect or organic matter concentration on agricultural limestone dissolution in laboratory soil-water systems. Aquaculture Research doi:10.1111/are.13810.

Kumar, G, C. R. Engle, T. R. Hanson, C. S. Tucker, T. W. Brown, L. B. Bott, L. A. Roy, C. E. Boyd, M. S. Recsetar, J. Park, and E. L. Torrans. 2018. Economics of alternative catfish production technologies. Journal of the World Aquaculture Society doi: 10.1111.jwas.12555

Li, L., C. Han, S. Dong, and C. E. Boyd. 2019. Use of elemental profiling and isotopic signatures to differentiate Pacific white shrimp (*Litopenaeus vannamei*) from freshwater and seawater culture areas. Food Control 95:249-256.

**Book Chapters and Proceedings of Symposia:**

Boyd, C.E. 1967. Some aspects of aquatic plant ecology, p. 114-129. In: Reservoir Fishery Resources Symposium, University of Georgia Press, Athens.

Boyd, C.E. 1971. Leaf protein from aquatic plants, p. 44-49. In: N.W. Pirie (ed.), Leaf Protein, its Quality, Agronomy, and Use. IBP Handbook No. 22, Blackwell Scientific Publishers, Oxford.

Boyd, C.E. 1971. The limnological role of aquatic macrophytes and their relationship to reservoir management, p. 153-166. In: G.E. Hall (ed.), Reservoir Fisheries and Limnology. Special Publication No. 8, American Fisheries Society, Washington, D.C.

Vickers, D.H. and C.E. Boyd. 1971. Effects of organic insecticides upon carbon$^{14}$ uptake by freshwater phytoplankton, p. 492-496. In: D.J. Nelson (ed.), Radioneuclides in Ecosystems, Vol. 1, Proc. 3rd Nat. Symposium on Radioecology, Oak Ridge National Laboratory, Oak Ridge, Tennessee.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Boyd, C.E. 1974. Utilization of aquatic plants, p. 107-115. In: D.S. Mitchell (ed.), Aquatic vegetation and its use and control. United Nations Educational, Scientific, and Cultural Organization, Paris.

Boyd, C.E. and E. Scarsbrook. 1975. Chemical composition of aquatic weeds, p. 144-150. In: P.L. Brezonik and J.L. Fox (ed.), Water Quality Management through Biological Control, Report No. ENV-07-75-1, U.S. Environmental Protection Agency.

Boyd, C.E. 1976. Lime requirements and application in fish ponds. FAO Technical Conference on Aquaculture, Kyoto, Japan:120-122.

Boyd, C.E. 1978. Chemical composition of wetland plants, p. 155-167. In: R.E. Good, D.F. Whigham, and R.L. Simpson (ed.), Freshwater Wetlands, Ecological Processes and Management Potential. Academic Press, New York.

Boyd, C.E. 1984. Effects of acid rain on aquatic ecosystems in Alabama. In: Proceedings of Conference on Acid Rain in Alabama, Department of Environmental Management, Montgomery, Alabama.

Boyd, C.E. 1985. Hydrology and pond construction, p. 107-134. In: C.S. Tucker, (ed.), Channel Catfish Culture. Elsevier Scientific Publishing Company, Amsterdam.

Boyd, C.E. 1985. Water quality management in ponds, p. 25-32. In: M. Porter, K. Gee, J. Jackson, and S. Hensley, (eds.), Proceedings of the Symposium of Pond Management in Oklahoma, Samuel Roberts Noble Foundation, Inc., Oklahoma City.

Tucker, C.S. and C.E. Boyd. 1985. Water quality, p. 135-228. In: C.S. Tucker, (ed.), Channel Catfish Culture. Elsevier Scientific Publishing Company, Amsterdam.

Boyd, C.E. 1986. Influence of evaporation excess on water requirements for fish farming, p. 62-64. In: Conference on Climate and Water Management - A Critical Era. American Meteorological Soc., Boston, Massachusetts.

Boyd, C.E. 1986. Water quality, p. 283-294. In: R. Billard and J. Marcel (ed.), L`aquaculture des Cyprinides. Institut National de la Rescherche Agronomique, Paris.

Boyd, C.E. 1987. Water conservation measures in fish farming, p.88-91. In: Fifth Conference on Applied Climatology. American Meteorological Soc., Boston, Massachusetts.

Boyd, C.E. 1988. Water quality variables in aquaculture, p. 36-64. In: Jan Paynter (ed.), Proceedings Australian Mariculture Association, 3rd Annual Conference, Lismore NSW, Australia.

Boyd, C.E. 1989. Aeration of shrimp ponds, p. 134-140. In: D.M. Akiyama (ed.), Proceedings South Eastern Asia Shrimp Pond Management Workshop, American Soybean Association, Singapore.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Boyd, C.E. 1991. Empirical modeling of phytoplankton growth and oxygen production in aquaculture ponds, p. 363-395. In: D.E. Brune and J.R. Tomasso (eds.), Aquaculture and Water Quality, Advances in World Aquaculture, Volume 3, World Aquaculture Society, Baton Rouge, Louisiana.

Boyd, C.E. 1991. Experiences in evaluating surface and diffused-air aerators. Fisheries Bioengineering Symposium, American Fisheries Society Special Symposium 10:473-481.

Boyd, C.E. and A.W. Fast. 1992. Pond monitoring and management, p. 497-513. In: A.W. Fast and L.J. Lester, (eds.), Marine Shrimp Culture: Principles and Practices, Elsevier Scientific Publishing Company, Amsterdam, The Netherlands.

Fast, A.W. and C.E. Boyd. 1992. Water circulation, aeration and other management practices, p. 457-495. In: A.W. Fast and L.J. Lester, (eds.), Marine Shrimp Culture: Principles and Practices, Elsevier Scientific Publishing Company, Amsterdam, The Netherlands.

Watten, B., J. Colt, and C.E. Boyd. 1991. Impact of dissolved nitrogen and carbon dioxide on the operation of pure oxygen systems. Fisheries Bioengineering Symposium, American Fisheries Society Special Symposium 10:471-481.

Boyd, C.E. 1992. Shrimp pond bottom soil and sediment management, p. 166-181. In: J.A. Wyban, (ed.), Proceedings Special Session on Shrimp Farming, World Aquaculture Society.

Boyd, C.E. and Y. Musig. 1992. Shrimp pond effluents, p. 195-197. In: J.A. Wyban (ed.), Proceedings Special Session on Shrimp Farming, World Aquaculture Society.

Boyd, C.E. 1993. Water quality and soil condition in brackishwater ponds, p. 129-136. Memorias Primer Congreso Ecuatoriano de Acuicultura, ESPOL, Guayaquil, Ecuador.

Neori, A., S.P. Ellner, C.E. Boyd, and M.D. Krom. 1993. The integration of seaweed biofilters with intensive fish ponds to improve water quality and recapture nutrients, p. 603-608. In: G.A. Moshiri (ed.), Constructed Wetlands for Water Quality Improvement. Lewis Publishers, Boca Raton, Florida.

Boyd, C.E. 1994. Pond bottom soil chemistry and management. In: Memorias Segundo Congreso Ecuatoriano de Acuicultura, ESPOL, Guayaquil, Ecuador.

Boyd, C.E. 1995. Chemistry and efficacy of amendments used to treat water and soil quality imbalances in shrimp ponds, p. 183-199. In: C.L. Browdy and J.S. Hopkins, (eds.), Proceedings of the Special Session on Shrimp Farming. The World Aquaculture Society, Baton Rouge, Louisiana.

Boyd, C.E. 1997. Environmental issues in shrimp farming, pages 9-23. In D.E. Alston, B.W. Green, and H.C. Clifford, III (eds.), IV Simposio Centroamericano de Aquacultura, Tegucigalpa, Honduras.

Boyd, C.E. 1997. Microbiological and physicochemical characteristics of pond sediment and methods for improving oxygenation of the soil-water interface. Proceedings of the Second

Barcode: 4546036-02 C-331-806 INV - Investigation

Pacific Marine Biotechnology Conference, Phuket, Thailand.

Boyd, C.E. and J.R. Bowman. 1997. Pond bottom soils, p. 135-162. In: H.S. Egna and C.E. Boyd (eds.), Dynamics of Pond Aquaculture, CRC Press, Boca Raton, Florida.

Boyd, C.E. and L. Massaut. 1997. Perspectives for sustainable aquaculture through use of better environmental management. (On CD-ROM). Proceedings of the IV Congresso Ecuatoriano de Acuicultura, CENAIM-ESPOL, Guayaquil, Ecuador.

Diana, J.S., J.P. Szyper, T.R. Batterson, C.E. Boyd, and R.H. Piedrahita. 1997. Water quality in ponds, p. 63-71. In: H.S. Egna and C.E. Boyd (eds.), Dynamics of Pond Aquaculture, CRC Press, Boca Raton, Florida.

Egna, H.S., C.E. Boyd, and D.A. Burke. 1997. Introduction, p. 1-18. In: H.S Egna and C.E. Boyd (eds.), Dynamics of Pond Aquaculture, CRC Press, Boca Raton, Florida.

Seim, W.K., C.E. Boyd, and J.S. Diana. 1997. Environmental considerations, p. 163-182. In: H.S. Egna and C.E. Boyd (eds.), Dynamics of Pond Aquaculture, CRC Press, Boca Raton, Florida.

Boyd, C.E. and A. Gross. 1998. Use of probiotics for improving soil and water quality in aquaculture ponds, p. 101-106. In: T.W. Flegel (ed.), Advances in Shrimp Biotechnology, The National Center for Genetic Engineering and Biotechnology, Bangkok, Thailand.

Boyd, C.E. 1999. Codes of conduct and better management practices in shrimp farming. In: Proceedings of the Fifth Ecuadorian Aquaculture Conference, Guayaquil, Ecuador.

Boyd, C.E. 1999. Pond water and soil management procedures to minimize the effects of disease epidemics in shrimp farming. In: Proceedings of the Fifth Ecuadorian Aquaculture conference, Guayaquil, Ecuador.

Boyd, C.E. and M.C. Haws. 1999. Good management practices (GMPs) to reduce environmental impacts and improve efficiency of shrimp aquaculture in Latin America, p. 9-33. In: B.W. Green, H.C. Clifford, M. McNamara, and G.M. Moctezuma (eds.), Simposio 5 Centroamericano de Acuacultura, San Pedro Sula, Honduras.

Green, B.W, D.R. Teichert-Coddington, C.E. Boyd, J. Wigglesworth, H. Corrales, D. Martinez, and E. Raminez. 1999. Efecto del recambio de agua en la produccion semi-intensiva de *Penaeus vannamei*, p. 209-212. In: B.W. Green, H.C. Clifford III, M. McNamara, and G.M. Moctezuma (eds.), Symposio 5 Centroamericaro de Acuacultura, San Pedro Sula, Honduras.

Ortega, E., J.F. Queiroz, C.E. Boyd, and J.M.G. Ferraz. 1999. Energy analysis of channel catfish farming in Alabama, USA. First Approach: A General Overview, pp. 171-180. In: First Biennial Energy analyses Research Conference – Energy Quality and Transformities. University of Florida, Gainesville, Florida.

Boyd, C.E. and S. Zimmerman. 2000. Grow-out systems – water quality and soil management, p. 221-238. In: M. New and W.C. Valenti (eds.), Freshwater Prawn Farming, Fishing News


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Books, Blackwell Science, Oxford, UK.

Arhelger, M.E., F.R. Parker, Jr., P.A. Jensen, and C.E. Boyd. 2001. Estero Salado/Guayaquil ship channel containment assessment, pp. 40-55. In: B.M. Greenberg, R.N. Hull, M.H. Robers, Jr., and R.W. Gensemer, (editors), Environmental Toxicology and Risk Assessment: Science, Policy, and Standardization – Implications for Environmental Decisions, 10th edition, American Society for Testing and Materials, West Conshohocken, Pennsylvania, USA.

Boyd, C.E. 2001. Aquaculture and water pollution, p. 153-157. In: D.F. Hayes and M. McKee (eds.), Decision Support Systems for Water Resources Management, American Water Resources Association, Middleburg, Virginia.

Boyd, C.E. 2001. Management practices for reducing the environmental impacts of shrimp farming, p. 265-292. In: M. C. Haws and C. E. Boyd (eds.), Methods for Improving Shrimp Farming in Central America. USDA Hurricane Mitch Reconstruction Project. UCA University Press, Managua, Nicaragua.

Boyd, C.E. 2001. Soil and water quality considerations in shrimp farming, p. 1-30. In: M.C. Haws and C.E. Boyd (eds.), Methods for Improving Shrimp Farming in Central America. USDA Hurricane Mitch Reconstruction Project. UCA University Press, Managua, Nicaragua.

Boyd, C.E., J.A. Hargreaves, and J.W. Clay. 2001. Codes of conduct for marine shrimp aquaculture, p. 238-256. In: C.L. Browdy and D.E. Jory (eds.), The New Wave. Proceedings of the Special Session on Sustainable Shrimp Culture, Aquaculture 2001, World Aquaculture Society, Baton Rouge, Louisiana.

Phillips, M.J., C.E. Boyd, and P. Edwards. 2001. Systems approach to aquaculture management, p. 239-247. In: R.P. Subasinghe, P. Bueno, M.J. Phillips, C. Hough, S.E. McGladdery, and J.R. Arthur (eds.), Aquaculture in the Third Millennium. Technical Proceedings of the Conference on Aquaculture in the Third Millennium, Bangkok, Thailand, 20-25 February 2000. NACA, Bangkok, and FAO, Rome.

Boyd, C.E. 2002. Mangroves and coastal aquaculture, p. 145-157. In: R.R. Stickney and J.P. McVey (eds.), Responsible Marine Aquaculture. CABI Publishing, Oxon, United Kingdom.

Hargreaves, J.A., C.E. Boyd, and C.S. Tucker. 2002. Water budgets for aquaculture production, p. 9-34. In: J.R. Tomasso (ed.), Aquaculture and the Environment in the United States. U.S. Aquaculture Society, A Chapter of the World Aquaculture Society, Baton Rouge, Louisiana.

Tucker, C.S., CE. Boyd, and J.A. Hargreaves. 2002. Characterization and management of effluents from warmwater aquaculture ponds, p. 35-76. In: J.R. Tomasso (ed.), Aquaculture and the Environment in the United States. U.S. Aquaculture Society, A Chapter of the World Aquaculture Society, Baton Rouge, Louisiana.

Boyd, C.E. 2003. Environmental management in marine shrimp farming, p. 229-239. In: B. Couteaux, Z. Kasprzyk, and E. Ranaivoson (eds.), Proceedings of the International Conference on Responsible Crustacean Culture. Centre d'Information Technique et Economique, Antananarivo, Madagascar, 3-5 December, 2002.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Boyd, C.E. 2003. Off-flavor in pond-cultured marine shrimp, p. 45-53. In: A.M. Rimando and K.K. Schrader (eds.), Off-Flavors in Aquaculture. American Chemical Society, Washington, D.C.

Boyd, C.E. 2004. Environmental issues, p. 634-657. In: C.S. Tucker and J.A. Hargreaves (eds.), Biology and Culture of Channel Catfish. Elsevier Publishing Company, Amsterdam, The Netherlands.

Boyd, C.E. 2004. Pond hydrology, p. 196-214. In: C.S. Tucker and J.A. Hargreaves (eds.), Biology and Culture of Channel Catfish. Elsevier Publishing Company, Amsterdam, The Netherlands.

Boyd, C.E. 2006. Datasheet on drainage. In: Aquaculture Compendium. Online at www.cabicompendium.org/ac. CAB International, Wallingford, UK.

Boyd, C.E. 2006. Datasheet on land and water use conflicts. In: Aquaculture Compendium. Online at www.cabicompendium.org/ac. CAB International, Wallingford, UK.

Boyd, C.E. 2006. Datasheet on watershed management. In: Aquaculture Compendium. Online at www.cabicompendium.org/ac. CAB International, Wallingford, UK.

Boyd, C.E. 2006. Global shrimp OP survey results and recommendations, p. 2-6. In: C.E. Boyd, D.E. Jory, and G.W. Chamberlain (eds.), Operating Procedures for Shrimp Farming. Global Aquaculture Alliance, St. Louis, Missouri.

Boyd, C.E. 2006. Management of bottom soil condition and pond water and effluent quality, p. 449-467. In: C. Lim and C.D. Webster (eds.), Tilapia Biology, Culture, and Nutrition. Food Products Press, New York, New York.

Boyd, C.E. and O. Silapajarn. 2006. Influence of microorganisms on water and sediment quality in aquaculture ponds, p. 261-285. In: R.C. Ray (ed.), Microbial Biotechnology in Agriculture and Aquaculture. Science Publishers, Enfield, New Hampshire.

Jackson, C. and C.E. Boyd. 2006. Effluent water quality, p. 106-112. In: C.E. Boyd, D.E. Jory, and G.W. Chamberlain (eds.). Operating Procedures for Shrimp Farming. Global Aquaculture Alliance, St. Louis, Missouri.

Olah, J., M. Polioudakis, and C.E. Boyd. 2006. Linking ecotechnology and biotechnology in aquaculture, p. 287-317. In: R.C. Ray (ed.), Microbial Biotechnology in Agriculture and Aquaculture. Science Publishers, Enfield, New Hampshire.

Boyd, C.E. and H. Pine. 2008. Application of agrometeorology to aquaculture and fisheries. Chapter 13 in: K. Stigter and H.P. Das (eds.), Guide to Agricultural Meteorological Practices. World Meteorological Organization, Geneva, Switzerland.

Boyd, C.E. 2008. Better management practices in international aquaculture, p. 73-90. In: C.S. Tucker and J.A. Hargreaves (eds.), Environmental Best Management Practices for Aquaculture.

Barcode: 4546036-02 C-331-806 INV - Investigation

Blackwell Publishing, Ames, IA.

Boyd, C. E. 2008. Better management practices in marine shrimp aquaculture, p. 227-259. In: C.S. Tucker and J.A. Hargreaves (eds.), Environmental Best Management Practices for Aquaculture. Blackwell Publishing, Ames, IA.

Boyd, C.E., P. Zajicek, and J.A. Hargreaves. 2008. Development, implementation and verification of best management practices for aquaculture, p. 129-149. In: C.S. Tucker and J.A. Hargreaves (eds.), Environmental Best Management Practices for Aquaculture. Blackwell Publishing, Ames, IA.

Tucker, C.S., J.A. Hargreaves, and C.E. Boyd. 2008. Aquaculture and the environment in the United States, p. 3-54. In: C.S. Tucker and J.A. Hargreaves (eds.), Environmental Best Management Practices for Aquaculture. Blackwell Publishing, Ames, IA.

Tucker, C.S., J.A. Hargreaves, and C.E. Boyd. 2008. Best management practices for freshwater pond aquaculture, p. 151-226. In: In: C.S. Tucker and J.A. Hargreaves (eds.), Environmental Best Management Practices for Aquaculture. Blackwell Publishing, Ames, IA.

Boyd, C.E. 2009. Aquaculture, freshwater, p. 234-241. In: G.E. Likens (ed.), Encyclopedia of Inland Waters, Vol 1. Elsevier Publishing Company, Oxford, UK.

Boyd, C.E. 2009. Estimating mechanical aeration requirement in shrimp ponds from oxygen demand of feed, p. 230-234. In: C.L. Browdy and D.E. Jory (eds.), The Rising Tide Proceedings of the Special Session on Sustainable Shrimp Farming. World Aquaculture Society, Baton Rouge, LA.

Boyd, C.E. and S. Chainark. 2009. Advances in technology and practice for land-based aquaculture systems: ponds for finfish production, p. 984-1,009. In: G. Burnell and G. Allen (eds.), New Technologies in Aquaculture. Woodhead Publishing, Oxford, UK.

Boyd, C.E. and S. Zimmerman. 2009. Grow-out systems – water quality and soil management, p. 239-255. In: M.B. New, W.C. Valenti, J.H. Tidwell, L. D'Abramo, and M.N. Kutty, (eds.), Freshwater Prawns Biology and Farming. Wiley-Blackwell, West Sussex, UK.

Boyd, C.E., S. Soongsawang, E.W. Shell, and S. Fowler. 2009. Small impoundment complexes as a possible method to increase water supply in Alabama. Proceedings of the 2009 Georgia Water Resources Conference, April 27-29, University of Georgia, Athens.

Boyd, C.E., C.A. Boyd, and S. Chainark. 2010. Shrimp pond soil and water quality management, p. 281-303. In: V. Alday-Sanz (ed.), The Shrimp Book. Nottingham University Press, Nottingham, UK.

Boyd, C.E. 2012. Water quality, p. 52-83. In: J.S. Lucas and P.C. Southgate (eds.), Aquaculture: Farming Aquatic Animals and Plants, 2nd Edition. Wiley Blackwell, West Sussex, UK.

Boyd, C.E. 2012. Nutrient cycling, p. 3-21. In: C.C. Mischke (ed.), Aquaculture Pond Fertilization: Impacts of Nutrient Input on Production. Wiley-Blackwell, West Sussex, UK.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Boyd, C. E. 2012. Water quality and pond fertilization, p. 47-63. In: C.C. Mischke (ed.), Aquaculture Pond Fertilization: Impacts of Nutrient Input on Production. Wiley-Blackwell, West Sussex, UK.

Boyd, C.E. and Li, L. 2012. Environmental issues in pond fertilization, p. 65-72. In: C.C. Mischke (ed.), Aquaculture Pond Fertilization: Impacts of Nutrient Input on Production. Wiley-Blackwell, West Sussex, UK.

Boyd, C.E. and C.A. Boyd. 2012. Physiochemical characteristics of ponds, p. 49-81. In: J.W. Neal and D.W. Willis (eds.), Small Impoundment Management in North America. American Fisheries Society, Bethesda, MD.

Boyd, C.E. 2013. On water, p. 10-15. In: B.G. Lockaby (ed.), Auburn Speaks – On Water. Office of the Vice President for Research, Auburn University, Alabama.

Boyd, C.E. and P.L. Chaney. 2013. Alabama fish ponds, p. 114-121. In: B.G. Lockaby (ed.), Auburn Speaks – On Water. Office of the Vice President for Research, Auburn University, Alabama.

Boyd, C.E. 2015. Overview of aquaculture feeds: global impacts of ingredient use. In: D. A. Davis, (ed.), Feed and Feeding Practices in Aquaculture. Woodhead Publishing, Cambridge, United Kingdom.

Boyd, C.E. 2017. General relationship between water quality and aquaculture performance in ponds, p. 147-164. In: G. Jeney (ed.), Fish Diseases: Prevention and Control Strategies.

**Experiment Station Bulletins, Circulars, etc.:**

Boyd, C.E. 1974. Lime requirements of Alabama fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Bulletin 459. 19 p.

Boyd, C.E. 1975. Competition for light by aquatic plants in fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Circular 215. 19 p.

Boyd, C.E. and W.W. Walley. 1975. Total alkalinity and hardness of surface waters in Alabama and Mississippi. Alabama Agricultural Experiment Station Auburn University, Alabama Bulletin 465. 16 p.

Parks, R.W., E. Scarsbrook, and C.E. Boyd. 1975. Phytoplankton and water quality in a fertilized fish pond. Alabama Agricultural Experiment Station, Auburn University, Alabama, Circular 224. 16 p.

Boyd, C.E. 1976. An evaluation of a water analysis kit. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 92. 3 p.

Boyd, C.E. 1976. Fertilizing farm fish ponds. Alabama Agricultural Experiment Station Auburn


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

University, Alabama, Highlights Agricultural Research 23:8.

Boyd, C.E. 1976. Liming fish farm ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 91. 7 p.

Boyd, C.E. and J.R. Snow. 1976. Fertilizing farm fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 88. 6 p

Boyd, C.E. and R.P. Romaire. 1978. Predicting nighttime depletion of dissolved oxygen in catfish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Highlights of Agricultural Research 25:13.

Romaire, R.P. and C.E. Boyd. 1978. Predicting oxygen depletion in catfish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Bulletin 505. 32 p.

Arce, R.G. and C.E. Boyd. 1980. Water chemistry of Alabama ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Bulletin 522. 35 p.

Boyd, C.E. and W.D. Hollerman. 1980. Determination of nitrate in waters from fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 99. 4 p.

Boyd, C.E. 1981. Liquid fertilizers for fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Highlights of Agricultural Research 28:3.

Boyd, C.E. and J.C. Williams. 1981. Samples size for water quality measurements in fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 100. 4 p.

Boyd, C.E. 1983. Effluents, p. 50-53. In: C.S. Tucker (ed.), Water quality in channel catfish ponds. Mississippi Agricultural Forestry Experiment Station, Mississippi State, Mississippi, Southern Cooperative Series Bulletin 290.

Boyd, C.E. 1983. Hydrology of channel catfish ponds, p. 44-49. In: C.S. Tucker (ed.), Water quality in channel catfish ponds. Mississippi Agricultural Forestry Experiment Station, Mississippi State, Mississippi Southern Cooperative Series Bulletin 290.

Boyd, C.E. 1983. Theory of aeration, p. 13-20. In: C.S. Tucker (ed.), Water quality in channel catfish ponds. Mississippi Agricultural Forestry Experiment Station, Mississippi State, Mississippi, South Cooperative Series Bulletin 290.

Boyd, C.E. and W.D. Hollerman. 1984. Performance of a water analysis kit. Alabama Agricultural Experiment Station, Auburn University, Alabama Circular 174. 10 p.

Boyd, C.E. and J.L. Shelton, Jr. 1984. Observations on the hydrology and morphometry of ponds on the Auburn University Fisheries Research Unit. Alabama Agricultural Experiment Station, Auburn University, Alabama Bulletin 558. 64 p.

Boyd, C.E. 1885. Seepage and evaporation losses from farm ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama Highlights of Agricultural Research 32:11.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Boyd, C.E. 1987. Electric paddle wheel aerators for catfish farming. Alabama Agricultural Experiment Station, Auburn University, Alabama Highlights Agricultural Research 34:5.

Boyd, C.E. and T. Ahmad. 1987. Evaluation of aerators for channel catfish farming. Alabama Agricultural Experiment Station, Auburn University, Alabama, Bulletin 584. 52 p.

Boyd, C.E. and N. Stone. 1987. Evaluation of aeration attachments for a Crisafulli pump. Alabama Agricultural Experiment Station, Auburn University, Alabama, Circular 293. 10 p.

Pillai, V.K. and C.E. Boyd. 1988. Comparison of the perchloric acid and persulfate methods for digestion of pond waters for total phosphorus analysis, p. 221-225. In: Proceedings 50th Anniversary Symposium, Department of Fisheries and Allied Aquacultures.

Boyd, C.E. 1989. Nighttime pond aeration boosts catfish production. Alabama Agricultural Experiment Station, Auburn University, Alabama, Highlights of Agricultural Research 36(1):11.

Stone, N. and C.E. Boyd. 1989. Seepage from fish ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama, Bulletin 599. 63 p.

Boyd, C.E. and S.W. Brown. 1990. Quality of water from wells in the major catfish farming area of Alabama, p. 195-206. Alabama Agricultural Experiment Station, Auburn University, Alabama. In: Proceedings 50th Anniversary Symposium, Department of Fisheries and Allied Aquacultures.

Rushton, Y. and C.E. Boyd. 1995. New opportunities for sportfish pond fertilization. Alabama Agricultural Experiment Station, Auburn University, Alabama, Highlights of Agricultural Research 42(3):3-4.

Schwartz, M.F. and C.E. Boyd. 1996. Suggested management to improve quality and reduce quantity of channel catfish pond effluents. Alabama Agricultural Experiment Station, Auburn University, Alabama, Leaflet 108. 4 pp.

Boyd, C.E. 1998. Water quality for pond aquaculture. Alabama Agricultural Experiment Station, Auburn University, Alabama, Research and Development Series No. 43. 37 p.

Boyd, C.E. and R.F. Hulcher. 2001. Best management practices for channel catfish farming in Alabama. Alabama Agricultural Experiment Station, Auburn University, Alabama, Highlights of Agricultural Research 48 (fall):1-4.

Boyd, C.E., J.F. Queiroz, G.N. Whitis, R. Hulcher, P. Oakes, J. Carlisle, D. Odom, Jr., M.M. Nelson, and W.G. Hemstreet. 2003. Best management practices for channel catfish farming in Alabama. Special Report 1, Alabama Catfish Producers, Montgomery, Alabama. 39 p.

Boyd, C.E., C.A. Boyd, J. Chappell, R. Hulcher, P. Oakes, and D.B. Rouse. 2004. Additional best management practices for Alabama aquaculture. Special Report 3, Alabama Agricultural Experiment Station, Auburn University. 27 p.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Davis, A.D., T.M. Samocha, and C.E. Boyd. 2004. Acclimating Pacific white shrimp, Litopenaeus vannamei, to inland, low-salinity waters. SRAC Publication 2600, Southern Regional Aquaculture Center, Mississippi State University, Stoneville, Mississippi, Publication No. 2600.

Silapajarn, K., C.E. Boyd, and O. Silapajarn. 2004. Physical and chemical characteristics of pond water and bottom soil in channel catfish ponds in west-central Alabama. Bulletin 655, Alabama Agricultural Experiment Station, Auburn University, 44 p.

Silapajarn, O., C.E. Boyd, K. Silapajarn, and P.L. Chaney. 2004. Effects of channel catfish farming on water quality in Big Prairie Creek, west-central Alabama. Special Report No. 2 for Alabama Catfish Producers, Alabama Agricultural Experiment Station, Auburn University. 51 p.

**Books:**

Boyd, C.E. 1979. Water Quality in Warmwater Fish Ponds. Alabama Agricultural Experiment Station, Auburn University, Alabama. 359 p.

Boyd, C.E. 1982. Water Quality Management for Pond Fish Culture. Elsevier Scientific Publishing Company, Amsterdam. 318 p.

Boyd, C.E. 1990. Water Quality in Ponds for Aquaculture. Alabama Agricultural Experiment Station, Auburn University, Alabama. 482 p.

Boyd, C.E. and C.S. Tucker. 1992. Water Quality and Pond Soil Analyses for Aquaculture. Alabama Agricultural Experiment Station, Auburn University, Alabama. 183 p.

Yoo, K.H. and C.E. Boyd. 1994. Hydrology and Water Supply for Pond Aquaculture. Chapman and Hall, New York. 483 p.

Boyd, C.E. 1995. Bottom Soils, Sediment, and Pond Aquaculture. Chapman and Hall, New York. 348 p.

Egna, H.S. and C.E. Boyd (editors). 1997. Dynamics of Pond Aquaculture. CRC Press, Boca Raton, Florida. 437 p.

Boyd, C.E. and C.S. Tucker. 1998. Pond Aquaculture Water Quality Management. Kluwer Academic Publishers, Boston, Massachusetts. 700 p.

Boyd, C.E. 2000. Water Quality, an Introduction. Kluwer Academic Publishers, Boston, Massachusetts. 330 p.

Boyd, C.E., D.E. Jory, and G.W. Chamberlain (editors). 2006. Operating Procedures for Shrimp Farming. Global Aquaculture Alliance, St. Louis, Missouri. 169 pp.

Boyd, C.E. and C.S. Tucker. 2014. Handbook for Aquaculture Water Quality. Craftmaster Printers, Inc., Auburn, Alabama. 439 pp.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Boyd, C.E. 2015. Water Quality, an Introduction, 2nd edition. Springer, New York, New York. 357 pp.

Boyd, C.E. and A. A. McNevin. 2015. Aquaculture, Resource Use, and the Environment. Wiley-Blackwell, Hoboken, New Jersey. 337 pp.

**Manuals:**

Boyd, C.E. and F. Lichtkopper. 1979. Water quality in fish culture. Alabama Agricultural Experiment Station, Auburn University, Alabama, Research and Development Series No. 22. 30 p.

Boyd, C.E. and V.K. Pillai. 1984. Water quality management in aquaculture. Central Marine Fisheries Research Institute, Cochin, India. Special Publication No. 22. 97 p.

Boyd, C.E. 1989. Water quality management and aeration in shrimp farming. Alabama Agricultural Experiment Station, Auburn University, Alabama, Fisheries and Allied Aquacultures Departmental Series No. 2. 83 p.

Boyd, C.E. 1996. Manejo de Suelo y de la calidad de agua en laacuicultura de piscinas. American Soybean Association, St. Louis, Missouri. 62 p.

Boyd, C.E. 1996. Shrimp farming and the environment, A white paper. The Shrimp Council, National Fisheries Institute, Arlington, Virginia. 8 p.

Boyd, C.E. 1999. Codes of practice for responsible shrimp farming. Global Aquaculture Alliance, St. Louis, Missouri. 42 p.

Boyd, C.E., M.C. Haws, and B.W. Green. 2001. Improving shrimp mariculture in Latin America: Good management practices (GMPs) to reduce environmental impacts and improve efficiency of shrimp aquaculture in Latin America and an assessment of practices in the Honduran shrimp industry. Coastal Resources Center, University of Rhode Island, Narragansett, Rhode Island. 88 p.

Haws, M.C. and C.E. Boyd, editors. 2001. Methods for improving shrimp farming in Central America. USDA Hurricane Mitch Reconstruction Project. UCA University Press, Managua, Nicaragua. 292 p.

Boyd, C.E., C.W. Wood, and T. Thunjai. 2002. Aquaculture pond bottom soil quality management. Pond Dynamics/ Aquaculture Collaborative Research Support Program, Oregon State University, Corvallis, Oregon. 41 p.

**Trade Journals and Magazines:**

Boyd, C.E. 1980. Water quality in catfish ponds. Aquaculture Magazine 6(6):39.

Boyd, C.E. 1983. New aeration tests may provide better basis for comparison. Aquaculture Magazine 8 (May/June):28-31.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Boyd, C.E. 1983. Seepage control in a pond with the "Soil-Crete Geo-Lining System". Farm Pond Harvest. Fall/83.

Boyd, C.E. 1984. Fluids beat granular in fish pond trials. Solutions, Journal of Fluid Fertilizer Industry 28(2):56-60.

Boyd, C.E. 1988. Water quality in aquaculture. Austasia Aquaculture. 2(10).

Boyd, C.E. 1989. Electric surface aerators. How much oxygen do they transfer? Aquaculture Today 2(1):23-25.

Schwartz, M. and C.E. Boyd. 1993. Aquaculture pond effluents. Feedstuffs 64(49):11.

Boyd, C.E. 1995. Soil and water quality management in aquaculture ponds. INFOFISH 5/95:29-36.

Boyd, C.E. 1997. Advances in pond aeration technology and practices. INFOFISH 2/97:24-28.

Boyd, C.E. 1997. Shrimp farming and the environment. Aquacultura del Ecuador 18:14-19.

Boyd, C.E. and J.F. Queiroz. 1997. Aquaculture and effluent management. Aquaculture Asia II (2):43-46.

Boyd, C.E. and J.W. Clay. 1998. Shrimp aquaculture and the environment. Scientific American, June 1998, 278(6):42-49.

Boyd, C.E. and L. Massaut. 1998. Soils in pond aquaculture. Aquaculture Asia III (1):6-10.

Boyd, C.E., L. Massaut, and L. Weddig. 1998. Procedures to lessen the environmental impacts of pond aquaculture. INFOFISH 2/98:27-33.

Boyd, C.E. 1999. Environmental codes of practice in aquaculture. Global Aquaculture Advocate 2(4/5):17-18.

Boyd, C.E. 1999. Management of shrimp ponds to reduce the eutrophication potential of effluents. Global Aquaculture Advocate 2(6):12-13.

Boyd, C.E., J. Calderon, and S. Sonnenholzner. 1999. Sugerencias para combatin el WSSV en el Ecuador. Fundacion CENAIM-ESPOL, Guayaquil, Ecuador, El Mundo Acuicola 5(2):19-20.

Boyd, C.E. 2000. Formulating standards for effluent management. Global Aquaculture Advocate 3(1):10-11.

Boyd, C.E. 2000. Case studies of world shrimp farming. Global Aquaculture Advocate 3(2):11-12.

Boyd, C.E. 2000. Water use in aquaculture. Global Aquaculture Advocate 3(3):12-13.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Boyd, C.E. 2000. Farm effluent during draining for harvest. Global Aquaculture Advocate 3(4):26-27.

Boyd, C.E. 2000. Water composition and shrimp pond management. Global Aquaculture Advocate 3(5)40-41

Boyd, C.E. and D. Gautier. 2000. Effluent composition and water quality standards. Global Aquaculture Advocate 3(5):61-66.

Boyd, C.E. and C.S. Tucker. 2000. EPA rule-making for aquaculture effluents in the US. Global Aquaculture Advocate 3(6):81-82.

Massaut, L. S. Sonnenholzner, and C.E. Boyd. 2000. Risks associated with chemicals and other agents used in attempts to control WSSV. Global Aquaculture Advocate 3(3):26-29.

Tookwinas, S., S. Dirakkait, W. Prompoj, C.E. Boyd, and R. Shaw. 2000. Thailand develops code of conduct for shrimp farming. Aquacultue Asia V(1):25-28.

Boyd, C.E. 2001. Site selection, design, and construction for environmentally-responsible aquaculture. Eurofish 1/2001:96-98.

Boyd, C.E. 2001. Water quality standards: pH. Global Aquaculture Advocate 4(1):42-44.

Boyd, C.E. 2001. Water quality standards: total suspended solids. Global Aquaculture Advocate 4(2):70-71.

Boyd, C.E. 2001. Water quality standards: total phosphorus. Global Aquaculture Advocate 4(3)70-71.

Boyd, C.E. 2001. Water quality standards: total ammonia nitrogen. Global Aquaculture Advocate 4(4):84-85.

Boyd, C.E. and C. Jackson. 2001. Effluent water quality report. Global Aquaculture Advocate 4(4):52-53.

Boyd, C.E. 2001. Inland shrimp farming and the environment. Global Aquaculture Advocate 4(4):88-89.

Boyd, C.E. 2001. Water quality standards: biochemical oxygen demand. Global Aquaculture Advocate 4(5):71-72.

Boyd, C.E. 2001. Water quality standards: dissolved oxygen. Global Aquaculture Advocate 4(6): 70-71.

Boyd, C.E. and J. Queiroz 2001. Nitrogen and phosphorus loads by system, USEPA should consider system variables in setting new effluent rules. Global Aquaculture Advocate 4(6): 84-86.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Boyd, C.E. 2002. Specific conductance: alternative salinity measurement. Global Aquaculture Advocate 5(1) 70-71.

Boyd, C.E. 2002. Anion-cation balance: cross-check for reliability of ion analyses. Global Aquaculture Advocate 5(2): 74-75.

Boyd, C.E. 2002. Understanding pond pH. Global Aquaculture Advocate 5(3):74-75.

Boyd, C.E. 2002. Correct liming improves pond water, bottom quality. Global Aquaculture Advocate 5(4):58-59.

Boyd, C.E. 2002. Standardize terminology for low-salinity shrimp culture. Global Aquaculture Advocate 5(5):58-59.

Boyd, C.E. 2002. ACC updates effluent standard. Global Aquaculture Advocate 5(6):10-12.

Boyd, C.E. 2002. Land and water use issues in aquaculture. Global Aquaculture Advocate 5(6):78-79.

Boyd, C.E. 2002. Inland shrimp farming environmental issues, pages 115-117, World Shrimp Farming 2002, Shrimp News International, San Diego, California.

Boyd, C.E., M. Boonyaratpalin, and T. Thunjai. 2002. Properties of liming materials. Aquaculture Asia 7(3):7-8.

Boyd, C.E. and D. Gautier. 2002. Sodium bisulfite treatments improve shrimp appearance but require proper disposal. Global Aquaculture Advocate 5(4):70-71.

Boyd, C.E., J. Queiroz, and R. Wright. 2002. Managing sport fish ponds to lessen nutrient discharge to streams. Wildlife Trends 2(7):13-15.

Boyd, C.E., T. Thunjai, and M. Boonyaratpalin 2002. Dissolved salts in waters for inland, low-salinity shrimp culture. Global Aquaculture Advocate 5(3):40-45.

Sonnenholzner, S., L. Massaut, and C.E. Boyd. 2002. Ecuador study shows wild postlarvae use down. Global Aquaculture Advocate 5(5):56-57.

Tookwinas, S., S. Dirakkait, W. Prompou, C. Boyd, and R. Shaw. 2002. Thailand: Operating guidelines for marine shrimp farms. SEAFDEC Asian Aquaculture 24(1):1-2 and 13-15.

Boyd, C.E. 2003. EPA drafts effluent guidelines for U.S. aquaculture. Global Aquaculture Advocate 6(1):57-58

Boyd, C.E. 2003. Organic matter in pond bottom sediment. Global Aquaculture Advocate 6(2):76-77.

Boyd, C.E. 2003. Applying effluent standards to small-scale farms. Global Aquaculture Advocate


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

6(3):8-10.

Boyd, C.E. 2003. Chemical fertilizers in pond aquaculture. Global Aquaculture Advocate 6(3):74-75.

Boyd, C.E. 2003. Mineral salts correct imbalances in culture water. Global Aquaculture Advocate 6(4):56-57.

Boyd, C.E. 2003. Alternate measurement of biochemical oxygen demand. Global Aquaculture Advocate 6(6):10-11.

Boyd, C.E. 2003. Zeolite ineffective as pond treatment. Global Aquaculture Advocate 6(6):33-34.

Ozbay, G. and C.E. Boyd. 2003. U.S. study finds turbidity useful in TSS, ISS estimates. Global Aquaculture Advocate 6(4):58-60.

Boyd, C.E. 2004. Secchi disk visibility: correct measurement, interpretation. Global Aquaculture Advocate 7(1):66-67.

Boyd, C.E. 2004. Probiotics' enhancement of soil, water quality examined. Global Aquaculture Advocate 7(2):32-33.

Boyd, C.E. 2004. Feeding affects pond water quality. Global Aquaculture Advocate 7(3):29-30.

Boyd, C.E. 2004. Overview: Mechanical pond aeration. Global Aquaculture Advocate 7(4):59-60.

Boyd, C.E. 2004. Sediment microbiology, management. Global Aquaculture Advocate 7(5):56-58.

Boyd, C.E. 2004. Prevention, treatments clear muddy ponds. Global Aquaculture Advocate 7(6):52 and 54.

Boyd, C.E. 2005. $LC_{50}$ calculations help predict toxicity. Global Aquaculture Advocate 8(1):84 and 87.

Boyd, C.E. 2005. Copper treatments control phytoplankton. Global Aquaculture Advocate 8(2):69-70.

Boyd, C.E. 2005. Ground water and wells. Global Aquaculture Advocate 8(3):62-63.

Boyd, C.E. 2005. Estimating water volumes in aquaculture. Global Aquaculture Advocate 8(4):70-71.

Boyd, C.E. 2005. Measuring water flow. Global Aquaculture Advocate 8(5):76-77.

Boyd, C.E. 2005. Feed efficiency indicators for responsible aquaculture. Global Aquaculture Advocate 8(6):73-74.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Boyd, C.E. 2006. Tractor-powered paddlewheels provide emergency pond aeration. Global Aquaculture Advocate 9(1):60-61.

Boyd, C.E. and M. Polioudakis. 2006. Land use for aquaculture production. Global Aquaculture Advocate 9(2):64-65.

Boyd, C.E. 2006. Effluent effects. Global Aquaculture Advocate 9(3):62-63.

Boyd, C.E. 2006. Mechanical water circulation. Global Aquaculture Advocate 9(4):60-61.

Boyd, C.E. 2006. Measuring circulation, mixing in ponds. Global Aquaculture Advocate 9(5):71-72.

Boyd, C.E. 2006. Phytoplankton dynamics in aquaculture ponds. Global Aquaculture Advocate 9(6):67-68.

Silapajarn, O. and C.E. Boyd. 2006. Study identifies maximum holding times for water samples. Global Aquaculture Advocate 9(6):70-71.

Boyd, C.E. 2 007. Sediment, water sampling in aquaculture. Global Aquaculture Advocate 10(1):74-75.

Boyd, C.E. 2007. Total alkalinity, total hardness. Global Aquaculture Advocate 10(2):64-66.

Boyd, C. E. 2007. Nitrification important process in aquaculture. Global Aquaculture Advocate 10(3):64-66.

Boyd, C.E. 2007. Phosphorus: Key to phytoplankton management. Global Aquaculture Advocate 10(4):62 and 64.

Boyd, C.E. 2007. Salinity balance key to culture success. Global Aquaculture Advocate 10(5):78-79.

Boyd, C.E. 2007. Sulfides alter pond pH, can be toxic. Global Aquaculture Advocate 10(6):78-80

Boyd, C.E., O. Decamp, R. Crab, and W. Verstraete. 2007. Improving conditions in shrimp and fish ponds. Aqua Culture AsiaPacific Magazine 3(5):27-28.

Boyd, C.E. 2008. Dissolved oxygen management in aquaculture. Global Aquaculture Advocate 11(1):60-61.

Boyd, C.E. 2008. Nitrogen limiting factor in aquaculture production. Global Aquaculture Advocate 11(2):61-62.

Boyd, C.E. 2008. Iron important to pond water, bottom quality. Global Aquaculture Advocate 11(3):59-60.

Boyd, C.E., M. Polioudakis, and G.N. Whitis. 2008. Direct energy use in channel catfish production. Global Aquaculture Advocate 11(4):48-50.

Barcode: 4546036-02 C-331-806 INV - Investigation

Boyd, C.E. 2008. Carbon dioxide: waste, nutrient. Global Aquaculture Advocate 11(4):62-65.

Boyd, C.E. 2008. Pond bottom soil analyses. Global Aquaculture Advocate 11(5):91-92.

Boyd, C.E. 2008. Chlorine, effective disinfectant in aquaculture. Global Aquaculture Advocate 11(6):52-53.

Boyd, C.E. 2009. Phytoplankton in aquaculture ponds. Global Aquaculture Advocate 12(1):65-66.

Boyd, C.E. 2009. Assessing, reducing pond seepage. Global Aquaculture Advocate 12(2):62-63.

Boyd, C.E. 2009. Calculating chemical treatments for aquaculture production 12(3):52-54.

Boyd, C.E. 2009. Trace metals toxic at high concentrations. Global Aquaculture Advocate 12(4):24-26.

Boyd, C.E. 2009. Carbon:nitrogen ratio management. Global Aquaculture Advocate 12(5):82-84.

Boyd, C.E. 2009. Oxygen demand of aquaculture feeds. Global Aquaculture Advocate 12(6):44-46.

Banerjee, A., G.N. Chattopadhyay, and C.E. Boyd. 2010. Soil system-based approach: A tool for fish pond fertilization. Better Crops with Plant Food 94(1):22-24.

Boyd, C.E. and Terry Hanson. 2010. Dissolved-oxygen concentration in pond aquaculture. Global Aquaculture Advocate 13(1):40-41.

Boyd, C.E. 2010. Aquaculture ponds hold carbon. Global Aquaculture Advocate 13(2):23-24.

Boyd, C.E. 2010. Water temperature in aquaculture. Global Aquaculture Advocate 13(3):32-34.

Boyd, C.E. 2010. Pond fertilization reevaluated. Global Aquaculture Advocate 13(4):26-27.

Boyd, C.E. 2010. Lake, reservoir characteristics affect cage culture potential. Global Aquaculture Advocate 13(5):46-47.

Boyd, C.E. 2010. Cage design, placement affect water quality. Global Aquaculture Advocate 13(6):21-22.

Boyd, C.E. 2011. Erosion, sedimentation in earthen aquaculture ponds. Global Aquaculture Advocate 14(1):33-34.

Boyd, C.E. 2011. Multiple methods for phytoplankton assessment. Global Aquaculture Advocate 14(2):32-33

Boyd, C.E. 2011. Reactions between pond bottom soil, water. Global Aquaculture Advocate


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

14(3):20-22.

Boyd, C.E. 2011. Liming materials for aquaculture. Global Aquaculture Advocate 14(4):12-13.

Boyd, C.E. 2011. Organic matter for pond fertilizer. Global Aquaculture Advocate 14(5):36-38

Boyd, C.E., F. Rajts, and J. Firth. 2011. Sludge management at BAP Pangasius farm cuts TAN, $BOD_5$, TSS in discharges. Global Aquaculture Advocate 14(5):40-42.

Boyd, C.E. 2011. Dissolved-oxygen requirements in aquatic animal respiration. Global Aquaculture Advocate 14(6):22-23.

Boyd, C. E. 2012. Groundwater quality in aquaculture. Global Aquaculture Advocate 15(1):44-45.

Boyd, C.E., C.A. Boyd, and S. Chainark. 2012. From The Shrimp Book, Shrimp pond soil and water quality management. Global Aquaculture Advocate 15(1):28-29.

Boyd, C. E. 2012. Settling basin design, operation. Global Aquaculture Advocate 15(2):18-19.

Boyd, C.E. 2012. Evaporation affected by sunlight, temperature, wind. Global Aquaculture Advocate 15(3):16-17.

Boyd, C.E. 2012. Effective management avoids gas bubble trauma. Global Aquaculture Advocate 15(4):36-37.

Boyd, C.E. 2012. Turbidity removal from pond water. Global Aquaculture Advocate 15(5):50-51.

Boyd, C.E. 2012. Drying, liming, other treatments disinfect pond bottoms. Global Aquaculture Advocate 15(6):32-34.

Boyd, C. E. 2012. Feed input versus dissolved oxygen dynamics in aquaculture systems. INFOFISH International 6/2012:25-29.

Boyd, C.E. 2013. Oxidants enhance water quality. Global Aquaculture Advocate 16(1):34-36.

Boyd, C.E. 2013. On-farm trials test new products, methods. Global Aquaculture Advocate 16(2):22-24.

Le, P. T. and C. E. Boyd. 2013. Accuracy of custom water analyses varies. Global Aquaculture Advocate 16(3):34-36

Boyd, C.E. 2013. Manage pH cycles to maintain animal health. Global Aquaculture Advocate 16(4):28-30.

Boyd, C.E. 2013. Carbon footprint of aquaculture. Global Aquaculture Advocate 16(5):34, 36.

Boyd, C.E. 2013. Ammonia toxicity degrades animal health, growth. Global Aquaculture


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Advocate 16(6): 40, 42-43.

Boyd, C.E. 2014. Nitrite toxicity affected by species susceptibility, environmental conditions. Global Aquaculture Advocate 17(1):34, 36-37.

Boyd, C.E. 2014. Hydrogen sulfide toxic, but manageable. Global Aquaculture Advocate 17(2):34 and 36.

Boyd, C.E. and J. F. Queiroz. 2014. The role and management of bottom soils in aquaculture ponds. INFOFISH International 2:22-28.

Boyd, C.E. 2014. Silicon, diatoms in aquaculture. Global Aquaculture Advocate 17(3):38-39.

Boyd, C.E. 2014. Species, pond size define aeration approaches. Global Aquaculture Advocate 17(4):31-33.

Li, L., J.F. Queiroz, and C.E. Boyd. 2014. Pond bottom dry-out, liming, Part 1 – Disinfection in semi-intensive shrimp farms. Global Aquaculture Advocate 17(4):34-35.

Boyd, C.E. 2014. Atmospheric pollution affects water quality. Global Aquaculture Advocate 17(5):57-58.

Boyd, C.E. 2014. Light penetration in water. Global Aquaculture Advocate 17(6):36, 38.

Boyd, C.E. 2015. Copper use in aquaculture. Global Aquaculture Advocate 18(1):38-39.

Boyd, C.E. 2015. Defining ranges for water quality variables presents complex, challenging process. Global Aquaculture Advocate 18(2):23-33.

Boyd, C.E. 2015. Water composition: dissolved inorganic solids. Global Aquaculture Advocate 18(4):30-32.

Boyd, C.E. 2015. Calcium, magnesium use in aquaculture. Global Aquaculture Advocate 18(5):28, 30

Boyd, C.E. 2015. Efficiency of mechanical aeration. Global Aquaculture Advocate 18(6):32-34.

Boyd, C.E. 2015. The nature of pond water. Pond Boss, May/June 24(6):24-26.

Boyd, C.E. 2015. Sportfish pond fertilization. Pond Boss, July/August 25(1):28-29.

Boyd, C.E. 2015. Turbidity removal from ponds. Pond Boss, September/October 25(2):24-25.

Boyd, C.E. 2015. Liming sportfish ponds. Pond Boss, November/December 25(3):22-23.

Boyd, C.E. and A. McNevin. 2015. Embodied resource use in feed-based aquaculture. Global Aquaculture Advocate 18(3):25-27.

Boyd, C.E. 2015. Water composition: Dissolved inorganic solids. Global Aquaculture Advocate 18(4):30-32.

Boyd, C.E. 2015. Calcium, magnesium use in aquaculture. Global Aquaculture Advocate 18(5):28, 30.

Boyd, C.E. 2015. Efficiency of mechanical aeration. Global Aquaculture Advocate 18(6):32-34.

Zhou, L. and C.E. Boyd. 2015. Ammonia nitrogen management in aquaculture ponds. Aquaculture Magazine, October-November, 18-21.

Boyd, C.E. 2016. Decomposition and accumulation of organic matter in ponds. Global Aquaculture Advocate, March 6.

Boyd, C.E. 2016. The importance of water analysis in aquaculture. Global Aquaculture Advocate, April 8.

Boyd, C.E. 2016.Thoughts on improving responsible aquaculture intervention efforts. Global Aquaculture Advocate, May 23.

Boyd, C.E. 2016. The importance of iron in aquaculture systems. Global Aquaculture Advocate, June 17.

Boyd, C.E. 2016. The importance of liming materials in aquaculture. Global Aquaculture Advocate, July 22.

Boyd, C.E. 2016. The complex principles of redox measurement. Global Aquaculture Advocate, September 5.

Boyd, C.E. 2016. What causes alkalinity changes in aquaculture waters? Global Aquaculture Advocate, September 26.

Boyd, C.E. 2016. Reviewing the “near-magical” properties of water. Global Aquaculture Advocate, November 14.

Boyd, C.E. 2016. Inorganic fertilization of production ponds. Global Aquaculture Advocate, December 14.

Boyd, C.E. 2016. Fate of fertilizer nutrients in ponds. Pond Boss, January/February 24(4):22-23.

Boyd, C.E. 2016. Why alkalinity is important. Pond Boss, March/April 24(5):22-23.

Boyd, C.E. 2016. Phytoplankton blooms. Pond Boss, May/June 24(6): 22-23.

Boyd, C.E. 2016. Weather and pond water. Pond Boss, July/August 24(1): 22-23.

Boyd, C.E. 2016. Conductivity of pond waters. Pond Boss, September/October 25(2): 24-25.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

Boyd, C.E. 2016. Morphometry of sportfish ponds. Pond Boss, November/December 25(3): 22, 24.

Boyd, C.E and A. McNevin. 2016. Shrimp aquaculture certification: The way forward part 1. Aquaculture Magazine, December/January:67-71.

Boyd, C.E. and A. McNevin. 2016. Shrimp aquaculture certification: The way forward part II. Aquaculture Magazine, February/March:68-70.

Boyd, C.E. 2017. The inevitable pH fluctuations of aquaculture pond water. Global Aquaculture Advocate, January 9.

Sá, M.V.C. and C.E. Boyd. 2017. Testing agricultural limestone in aquaculture ponds. Global Aquaculture Advocate, February 10.

Boyd, C.E. 2017. Does Coriolis force impact aerator placement in aquaculture ponds? Global Aquaculture Advocate, March 8.

Boyd, C.E., S. Chatvijitkul, and D.A. Davis. 2017. Understanding the oxygen demand of aquafeeds. Global Aquaculture Advocate, April 17.

Boyd, C.E. 2017. How decomposition of organic matter impacts aquaculture ponds. Global Aquaculture Advocate, May 8.

Boyd, C.E. 2017. Lime plays crucial role in aquaculture pond management. Global Aquaculture Advocate, July 10.

Boyd, C E. 2017. Phytoplankton and its impact on water quality. Global Aquaculture Advocate, August 21.

Boyd, C.E. 2017. The impact of atmospheric carbon dioxide, alkalinity in freshwater aquaculture. Global Aquaculture Advocate, September 4.

Boyd, C.E. 2017. Electrical conductivity of water, part 1. Global Aquaculture Advocate, October 1.

Boyd, C.E. 2017. Electrical conductivity of water, part 2. Global Aquaculture Advocate, October 6.

Boyd, C.E. 2017. Understanding water quality variables for aquaculture. Global Aquaculture Advocate, November 13, 2017.

Boyd, C.E. 2017. Factors affecting efficiency of commercial fertilizers in aquaculture. Global Aquaculture Advocate, December 11, 2017.

Boyd, C. E. 2017. Pond soil test reports. Pond Boss, January-February 25(4):20, 22.

Boyd, C. E. 2017. The blue-green algae dilemma in fertilized sportfish ponds. Pond Boss, March-April 25(5):20, 22-23.

Boyd, C. E. 2017. The Secchi disk. Pond Boss, May-June 25(6): 24, 26.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Boyd, C. E. 2017. Water analysis reports for sportfish ponds. Pond Boss, July-August 26(1):20, 22.

Boyd, C. E. 2017. Climate change and sportfish ponds. Pond Boss, September-October 26(2):28, 29.

Boyd, C. E. 2017. Do microbial amendments improve water quality in ponds? Pond Boss, November-December 26(3): 20-21.

Boyd, C. E. 2018. What is biodiversity and its relevance to aquaculture certification? Global Aquaculture Advocate, January 15.

Boyd, C. E. 2018. Why water mixing and movement is key in aquaculture systems. Global Aquaculture Advocate, February 19.

Boyd, C. E. 2018. Revisiting ionic imbalance in low-salinity shrimp aquaculture. Global Aquaculture Advocate, March 19.

Boyd, C. E. 2018. Estimating global shrimp pond area. Global Aquaculture Advocate, April 23.

Abdelrahman, H. A. and C. E. Boyd. Effects of mechanical aeration on evaporation rate, water temperature. May 14.

Ranjan A. and C. E. Boyd. 2018. Appraising pond liners for shrimp culture. Global Aquaculture Advocate, May 28.

Boyd, C. E. 2018. Carbon-nitrogen ratios in pond fertilization and biofloc systems. Global Aquaculture Advocate, June 18.

Boyd, C. E. 2018. Constantly changing pH unavoidable, completely normal. Global Aquaculture Advocate, July 23.

Boyd, C. E. 2018. Dissolved oxygen dynamics. Global Aquaculture Advocate, August 20.

Boyd, C. E. 2018. Protein conversion efficiency in aquaculture. Global Aquaculture Advocate, September 24.

Boyd, C. E. 2018. Water temperature in aquaculture. Global Aquaculture Advocate, November 26.

Boyd, C. E. 2019.Nitrogen, phosphorus, eutrophication and effluent standards for aquaculture certification. Global Aquaculture Advocate, January 7.

Boyd, C. E. 2019. Thoughts on pond fertilization. Global Aquaculture Advocate, February 11.

Boyd, C. E. 2019. Shrimp pond preparation crucial for production, disease prevention. Global Aquaculture Advocate, March 25.


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Barcode: 4546036-02 C-331-806 INV - Investigation

**Book Reviews:**

Boyd, C.E. 1981. Water Chemistry. By Vernon L. Snoeyink and David Jenkins. John Wiley and Sons, New York. 463 p. Transactions of the American Fisheries Society ll0:665-666.

Boyd, C.E. 1990. Environmental Bioassay Techniques and Their Application. By M. Munawar et al. (editors). Kluwer Academic Publishers, Dordrecht, The Netherlands. 680 p. Aquaculture.

Boyd, C.E. 1993. The State of the Marine Environment. By GESAMP, FAO (editors). Blackwell Scientific Publishers, London, UK. 146 p. Aquaculture 114:370-371.

Boyd, C.E. 1993. Fish Ecophysiology. By J. C. Renkin and F. B. Jensen (editors). Chapman and Hall, New York. 42l p. Aquaculture 114:361-362.

Boyd, C.E. 1997. Fundamentals of Aquacultural Engineering. By Thomas B. Lawson. Chapman and Hall, New York. 355 p. The Quarterly Review of Biology 72:97.

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Case 1:25-cv-00025-RKE Document 80-1 Filed 04/27/26 Page 640 of 785
Barcode: 4546036-02 C-331-806 INV - Investigation

(https://www.globalseafood.org)

Innovation & Investment

# After half a century, Auburn's Claude Boyd to 'retire'

21 April 2016
By James Wright

## Fish farming researcher with distinguished career has written more than 100 articles for the *Advocate*

The aquaculture industry has changed dramatically in Claude Boyd's time. The Auburn University professor was already years into researching fish farming and water quality — work he began in the mid-1960s — before he'd even heard the word "aquaculture."

"When I started it was just called fish farming," Boyd told the *Global Aquaculture Advocate*, a publication that has published more than 100 of his articles since its inception in 1998. In fact, of the 102 print editions of the magazine from 1998 to 2015, Boyd's work appeared in all but one.

Prolific researcher and writer Dr. Claude E. Boyd, 76, is officially retiring from Auburn after more than 50 years of studying, researching and teaching aquaculture, most of them at the Alabama institution. He will continue in his role for the next two years to see his five remaining graduate students through the program, so it'll be a "soft" retirement for the hard-working Mississippi native.

"I never did do anything but work. I don't know what else to do," Boyd said in a heavy Southern accent that those who know him best say is one of his trademark features, along with an insatiable thirst for knowledge.

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

Case 1:25-cv-00025-RKE Document 80-1 Filed 04/27/26 Page 641 of 785
Barcode: 4546036-02 C-331-806 INV - Investigation



Dr. Claude E. Boyd, Ph.D.



(https://aquabounty.com/)

Boyd first came to Auburn in 1964 as a graduate student, and began teaching classes in 1971. Other than a three-year stint working at the University of Georgia in the late 1960s, Boyd has been a fixture at the Auburn campus and its School of Fisheries, Aquaculture and Aquatic Sciences for 49 years, when adding up his time as a student, researcher and professor. His colleagues — most of them former students — say he is the world's leading expert on water analysis.

*(Editor's Note: See Dr. Boyd's April 8, 2016 article, "**The importance of water analysis in aquaculture** (https://www.aquaculturealliance.org/advocate/the-importance-of-water-analysis-in-aquaculture/).")*

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:14 PM, Submission Status: Approved

"Dr. Boyd is a walking encyclopedia for water quality and all things related," said Bill Daniels, associate professor at Auburn. "During our travel to Namibia, he complained about having to find all the references that the publisher wanted for a book chapter he wrote. He had all the information in his head and could recite it but couldn't remember exactly the sources."

***He was a feared, revered, respected, entertaining and extraordinarily effective teacher. And the most prolific researcher in aquaculture.***

Boyd — whose professional resume requires an astounding 54 pages to list the titles of all his published works and other contributions — is "more chalkboard than PowerPoint," Daniels said. He is appreciated by fish farmers everywhere for his ability to translate water quality and water chemistry terms and concepts into words they can understand. Boyd speaks some Thai and Spanish as well.



Dr. Claude E. Boyd, Ph.D.

"Of course, they still have a hard time understanding his accent," Daniels joked. "While Dr. Boyd may be retiring, I seriously doubt he will slow down. He still travels internationally better than most of us."

Ironic, because Boyd initially refused to travel overseas, back when researchers were being regularly deployed by USAID (U.S. Agency for International Development), right out of school, to faraway locations in Asia, Africa and South America.

"I didn't think I knew enough to help anybody," the humble professor said. "So I stayed here for 20 years working on research."

His adventurous side obviously emerged, as Boyd has since made numerous trips to those places and many others to give lectures that, according to his longtime secretary June Burns, "could be quite a challenge for interpreters," due to his strong accent.

Always with an eye on the future, Boyd would like to see the U.S. aquaculture industry grow, and to see more investment into practical, commercially viable work to expand production everywhere.

"We can grow more fish than we can keep alive. We need to spend more time improving production systems instead of just improving the fish," he said. "[Aquaculture is] an essential part of the world food system. I don't see anything that's going to keep it from continuing to grow. But [the U.S. is] a very small segment of world production. There's been a lot of development of techniques here, that've been spread to other parts of the world."

Thanks in no small part to knowledge sharing from people like Dr. Claude E. Boyd.

Craig Tucker, lead researcher at the U.S. Department of Agriculture's Agricultural Research Service (USDA ARS) Warmwater Aquaculture Research Unit in Stoneville, Miss., was Dr. Boyd's first doctoral student back in 1976. The two have worked closely together ever since, having published books and numerous papers.



Dr. Claude E. Boyd, Ph.D.

When Tucker nominated Boyd for the **U.S. Aquaculture Society Distinguished Lifetime Achievement Award** (http://usaquaculture.org/professional-achievement-awards) back in 2009, he wrote that Boyd "stands alone as the universally recognized authority" in water quality and environmental science. Boyd has been honored with too many other awards to mention in this article.

"I recall his teaching method to be frightening, because he was one of the few teachers who made you come to class prepared to think," Tucker wrote in that letter.

"He was a feared, revered, respected, entertaining and extraordinarily effective teacher," Tucker told the *Advocate* upon hearing the news of Boyd's pending retirement. "And the most prolific researcher in aquaculture."

***@GAA_Advocate (https://twitter.com/GAA_Advocate)***

*Editor's Note: The Global Aquaculture Alliance congratulates Dr. Claude Boyd on his outstanding career and thanks him for all of his contributions to the* Advocate *and to the aquaculture industry over the years. Please see links to some of his recently published work below.*

## Author



**JAMES WRIGHT**

Editorial Manager
Global Aquaculture Alliance
Portsmouth, NH, USA

james.wright@gaalliance.org (mailto:james.wright@gaalliance.org)

Copyright © 2023 Global Seafood Alliance

All rights reserved.

# Tab 46

# P.R. 320-21

# C.R. 213, 214-15

Barcode:4546062-01 C-331-806 INV - Investigation -

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 1,533
Investigation
AD/CVD Operations, Office IV
Business proprietary information of the GOE has been ranged or redacted on pages NSA-12, NSA-13, NSA-23, NSA-27 to NSA-29, NSA-61, NSA-62, and NSA-82, and in Exhibits NSA-4(b), NSA-14(a), and NSA-14(b); business proprietary information of Santa Priscila has been ranged or redacted in Exhibits NSA-9 and NSA-13(a); business proprietary information of Produmar has been ranged or redacted in Exhibits NSA-9 and NSA-13(b); business proprietary information of Naturisa has been ranged or redacted in Exhibits NSA-9 and NSA-13(c).

**PUBLIC VERSION**

April 19, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Government of Ecuador's New Subsidy Allegations Questionnaire Response

Dear Secretary Raimondo:

On behalf of the Government of Ecuador ("GOE"), we hereby submit the GOE's response to the Department's March 28, 2024, New Subsidy Allegations ("NSA") questionnaire. This response is timely submitted in accordance with the Department's April 5, 2024, letter, re: "Request for Extension to New Subsidy Allegations Questionnaire Response," which extended the deadline for the GOE's NSA questionnaire response until today.

Pursuant to 19 C.F.R. § 351.304(a)(1)(i), the GOE requests proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

information for which the GOE requests proprietary treatment, for itself and respondents and their cross-owned affiliates, and the basis for the request:

- Other specific information related to the GOE's operations, fuel pricing and cost information, etc. the release of which may result in the disclosure of confidential information maintained by the GOE, as well as other specific information related to the operations of the respondents, and their cross-owned affiliates, the release of which to the public would cause substantial harm to the competitive position of the respondents and their cross-owned affiliates: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to the competitive position of the mandatory respondents and their cross-owned affiliates. The GOE consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's NSA questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to the Government of Ecuador*

REPÚBLICA DEL ECUADOR

Ministerio de Producción, Comercio Exterior, Inversiones y Pesca

## GOVERNMENT CERTIFICATION

I, Juan Carlos Sanchez, Undersecretary of Origin, Trade Remedies and Trade Normative, currently employed by the Government of Ecuador, certify that I prepared or otherwise supervised the preparation of the New Subsidy Allegations Questionnaire Response, filed on April 18, 2024 pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of the Government of Ecuador contained in this submission are accurate and complete to the best of my knowledge.

I certify that the public information and any business proprietary information of the Government of Ecuador contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.

In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Juan Carlos Sánchez

Date: 04/18/2024



EL NUEVO ECUADOR

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to the Government of Ecuador, certify that I have read the attached New Subsidy Allegations Questionaire Response, filed on April 18, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: April 18, 2024

**CERTIFICATE OF SERVICE**

I, Kenneth N. Hammer, hereby certify on this 19th day of April, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode:4546062-01 C-331-806 INV - Investigation -

**Case No. C-331-806**
**Investigation**
**AD/CVD Operations, Office IV**

**Business proprietary information of the GOE, Naturisa, SONGA, Produmar, and Santa Priscila is contained on the pages and in the exhibits listed on the cover letter of this submission.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

# COUNTERVAILING DUTY INVESTIGATION OF FROZEN WARMWATER FROM ECUADOR

# RESPONSE OF THE GOVERNMENT OF ECUADOR TO THE DEPARTMENT'S MARCH 28, 2024, NEW SUBSIDY ALLEGATION QUESTIONNAIRE

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**

**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: April 19, 2024**

**Counsel to the Government of Ecuador**

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

Barcode:4546062-01 C-331-806 INV - Investigation



**Response of the Government of Ecuador ("GOE")**
**To the Department's March 28, 2024, New Subsidy Allegation Questionnaire**
**Countervailing Duty Questionnaire for the Government of Ecuador**

**NOTE:** ***In accordance with section 351.303(e) of Commerce's regulations, "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain Commerce's approval for submission of an English translation fo only portions of a document prior to submission to Commerce."***

**NOTE:** ***Please repeat the question prior to giving your response when responding to this supplemental questionnaire.***

---

**Please respond to the following questions. For more detailed instructions, including the appendices requested below (*i.e.*, questions 1 through 4), refer to the guidelines and instructions included in the initial questionnaire issued on December 12, 2023. Also, refer to the New Subsidy Allegation memorandum for Commerce's analysis of the initiation of the below programs. The mandatory respondents in this investigation are Industrial Pesquera Santa Priscila S.A. (Santa Priscila), Sociedad Nacional de Galápagos C.A. (SONGA). In addition, the Government of Ecuador and certain companies which are cross-owned with Santa Priscila (*i.e.*, Manesil S.A., Produmar S.A., Tropack S.A., Egidiosa S.A.) and SONGA (*i.e.*, Naturisa S.A., Holding Sola & Sola Solacciones S.A., and Empacadora Champmar S.A.) are required to respond completely to the below questions.**

**A. <u>Less than Adequate Remuneration (LTAR) Programs</u>**

**1. Provision of Fuel to Shrimp Farmers for LTAR**

**Please respond to all questions in the following appendices, as applicable:**

**a. Standard Questions Appendix, and**
**b. Provision of Goods/Services Appendix.**

<u>ANSWER</u>: As requested, the Government of Ecuador ("GOE") responds below to the Standard Questions and Provision of Goods/Services Appendices for the alleged provision of fuel to shrimp farmers for less than adequate remuneration ("LTAR") program.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

Undersecretariat of Aquaculture
Ministry of Productino, Foreign Trade, Investments , and Fisheries ("MPCEIP")
La Previsora Building, 19th floor
Malecón Simon Bolivar Avenida #100 and Avenida Octubre
Guayaquil 090307.

**D. Please indicate which of the companies under investigation (including all cross-owned companies and any trading companies exporting subject merchandise into the United States) applied for, accrued, or received benefits under the program during the POI.**

**Please note that if this program has been terminated but there are residual benefits or a replacement program has been put into place (see 19 CFR 351.524), and the companies under investigation are still receiving, claiming or using assistance under the program or if they have applied for, received, claimed, accrued or used assistance under the replacement program, you must respond to all of the remaining questions for residual assistance or replacement programs.**

ANSWER: ARCERNNR requires that companies register in order to make large volume purchases of diesel fuel, but they do not maintain or collect records of actual purchases. Rather, ARCERNNR merely approves a maximum monthly quantity, which is annualized, that may be purchased by each approved registered company. The GOE confirms that all responding companies were registered in the "industrial registry" because their monthly demand for Diesel 2 and Premium Diesel fuel exceeded 1,200 gallons per month on an annualized basis. Likewise, while Petroecuador supplies diesel fuel to the distributors, Petroecudor does not collect information from the traders and/or distributors on sales to registered end-users. The actual quantity of the Diesel 2/Premium Diesel fuel supplied is determined by the needs of registered end-users. Accordingly, the GOE does not have any of the specific quantity and price information for specific companies, including the companies under investigation.

Additionally, companies' authorizations remain valid for an indefinite period, and, thus, they are not specific to any particular pricing regime. For example, a company may have received an authorization in 2019 that continued to be in effect in 2022. Thus, the fact a company held an industrial authorization does not mean a company was eligible to purchase

**G. Please identify all instances in which assistance under the program was provided to any mandatory respondent (including all responding cross-owned companies and any trading company) during the POI.**

ANSWER: ARCERNRR only maintains registers of the maximum quantities that it authorized each company required to register as part of the domestic or industrial registers is approved to purchase at a fixed price. However, the GOE does not maintain records of the actual purchases made by each company required to register with the domestic or industrial registers. Moreover, the GOE does not record individual transactions under the fixed diesel prices so it is unable to report pricing information on each purchase by any end user.

The information maintained by ARCERNRR is provided above in response to Question D. However, as noted there, these quantities cover the entire year 2022, including December 2022, when the executive decrees that applied a fixed price to users in the shrimp consumer segment were terminated. As such, the GOE refers the Department to the questionnaire responses submitted by the respondents for this information.

**H. Please explain whether the assistance under the program was provided to the mandatory respondent(s) pursuant to a statute, regulation, decree or other legal measure/instrument that establishes the conditions and guidelines governing the operation of the program, such as eligibility criteria, amounts, etc.**

ANSWER: Please refer to the response to subpart E above.

**I. To the extent they are different from the entity (entities) identified in response to Question C, above, please provide the name(s) of the entity (entities) that provided each instance of assistance under the program to the mandatory respondent(s) described in response to under Question G, above.**

ANSWER: Please refer to the response to subpart A above.

Below is a list of the private traders that were authorized during the POI to sell Diesel 2/Premium Diesel Fuel at the prices applicable to the shrimp consumer segment in 2022.

| | Authorized Companies | | |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |

| | | | |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |

**J. Please specify if the entity (entities) listed in response to Question I, above, is a national, state or local government entity, e.g., a government ministry, department, agency, office, etc.**

ANSWER: Please refer to the response to subpart A above.

**K. If the assistance under the program was provided by an entity other than a national, state or local government entity, please respond to the following questions:**

ANSWER: All the agencies and institutions involved in administering this program are national level entities. However, Petroecuador is a state-owned company that made all of the sales to the suppliers and distributors; the suppliers and distributors are private entities who determined their own pricing. As discussed in the GOE's response to Question A above, the terminal gate pricing charged by Petroecuador for this program was at the direction of the President of Ecuador through the various executive decrees in place during the POI until the program was terminated, effective December 1, 2022. The GOE provides the following responses for Petroecuador and notes that, because the traders and distributors are private entities, the GOE has no authority to compel them to provide information on this program.

**1. What is the legal status of the entity (entities), e.g., is it a separately incorporated entity and/or a government corporation, government lending institution, commercial entity?**

ANSWER: EP Petroecuador was established in 1972 and is the national oil company of Ecuador, and it is wholly-owned by the GOE. It is registered as a public company (*Empresa*



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

Barcode:4546062-01 C-331-806 INV - Investigation


Once EMCO EP, the Ministry of Finance issues a compliance report, establishing the budget ceiling and, with this, the Petroecuador Board of Directors approves the budget. If there is a budget shortfall, including any difference between fuel acquisition costs and sales prices of fuel overall, this budget item is passed forward to Petroecuador's budget for the following year and, if approved by EMCO, they are funded by the Ministry of Finance.

**5. Did the entity (entities) listed above provide assistance under the program pursuant to specific guidelines and/or criteria under this program? Please describe those guidelines and/or criteria.**

ANSWER: As discussed above in response to Question A, in 2021, in order to access the prices set through the various executive decrees in place during the POI, the shrimp industry had to provide their tax identification number (i.e., "RUC") to demonstrate that they were involved in the shrimp industry, had to obtain a ministerial agreement from the Undersecretary of Aquaculture to demonstrate that they qualified for the fuel and to have an authorization from ARCERNNR, either through the domestic registry or the industrial registry. As long as they met this criterion, which was all administered by those agencies, Petroecuador would provide the fuel to distributors at the fixed prices. These distributors separately had agreements with the shrimp sector which determined the prices and quantities. There were no guidelines or requirements imposed on these private distributors; they were free to negotiate the prices charged to the shrimp parties and the GOE does not have access to the prices that were charged to the ultimate consumers.

**6. Please provide the ownership structure of each such entity and specify the amount of any direct or indirect government ownership during the POI (and for each year in which the assistance was provided).**

ANSWER: Petroecuador is 100 percent owned by the GOE.

**7. Please provide the translated annual report(s) during the POI (and for each year in which the assistance was provided) for each such entity.**


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

**C. Describe the market for the good/service being provided in your country. Specify the number of producers and distributors of the good/service and the nature of their relationship to the government, including government ownership, control, and regulation. What types of industries generally consume this good/service?**

ANSWER: Petroecuador is a state-owned petroleum extraction and refining company that distributes its products throughout the country. Petroecuador produces some Diesel 2 and Premium Diesel at its refining facilities although most of the Diesel 2 and Premium Diesel sold by Petroecuador is imported.

As discussed in the Standard Questions Appendix, while Petroecuador provided the Diesel 2 and Premium Diesel subject to this program, most sales were made by private distributors that purchased from Petroecuador.

Petroecuador provides the quantities of Diesel 2 and Premium Diesel delivered to these private companies for resale to the shrimp sector during the POI (including after the program in question terminated at the end of November 2022). This chart also includes the amount of Diesel 2 and Premium Diesel that Petroecuador sold directly to the shrimp consumer segment.

| Industrial Diesel Sales to Shrimp Sector in 2022 | | | | | |
|---|---|---|---|---|---|
| | **TRADING COMPANY** | **DIESEL 2 (gallons)** | **PREMIUM DIESEL (gallons)** | **TOTAL (gallons)** | |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | 5,250,000 | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |

| | | | | | |
|---|---|---|---|---|---|
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| [ | | | | | ] |
| | **Grand total: [** | | | | ] |

With respect to the type of industries that are authorized to make industrial- or domestic-level purchases of Diesel 2 and Premium Diesel, see the information provided in **Exhibits 14(a) and (b)**.

The GOE does not track actual consumption amounts but does have limited information on shipments for "industrial consumption," which are included separately below, along with the automotive and shipping sector consumption amounts for the POI:

| **2022 Shipments of Diesel, by Industry** | | | | | |
|---|---|---|---|---|---|
| **ECONOMIC SEGMENT** | | **DIESEL 2 (gallons)** | **PREMIUM DIESEL (gallons)** | **TOTAL (gallons)** | |
| Automotive | [ | | 900,000,000 | | ] |
| Industrial | [ | | | | ] |
| International Shipping[2] | [ | | | | ] |
| National Shipping | [ | | | | ] |
| **Total:** | **[** | | | | ] |

**D. What percentage of total domestic consumption of the good/service is provided by the government? What percentage of consumption of the good/service by the industry producing the subject merchandise is provided by the government?**

ANSWER: As explained in the Standard Questions Appendix, Petroecuador generally sells to private retailers/suppliers. However, it did provide a small amount of fuel directly to consumers

2 This includes the purchase of [ ] gallons.

Barcode:4546062-01 C-331-806 INV - Investigation



**NEW SUBSIDY PROGRAMS: Provision of Brackish Water for LTAR**

***Standard Questions Appendix***

**A. Provide a description of the program, including the purpose of the program.**

ANSWER: No program exists that provides brackish water for non-consumptive use for less than adequate remuneration for any Ecuadorian industry or user, including shrimp farmers. As is the case with shrimp farms in Ecuador, when water is not consumed but returned to the source unaltered, it is considered a non-consumptive use. As such, when brackish water is used for non-consumptive purposes, the end result is no loss in quantity or quality of the water at the source and thus, the GOE has no basis upon which to charge a fee for the temporary use of that water. To the extent that the water of any type is used for consumptive purposes, any party, including shrimp farms, would be subject to payment of the standard applicable fees and tariffs for that water.

As explained in the Standard Questions Appendix for the Fee Exemption for Brackish Water, that the GOE submitted in its February 14, 2024 Section II Questionnaire Response ("IQR"), under Article 318 of the Constitution of the Republic of Ecuador, the Ministry of Environment, Water and Ecological Transitions ("MAATE"), is the sole water authority responsible for the regulation and management of all water uses in Ecuador.

There are two ways that public sources of water can be used – consumptive and non-consumptive. Resolution DIR-ARCA-RG-002-2016 defines consumptive use as that which, by virtue of the processes carried out by the user, consumes water. The same resolution states that non-consumptive use is that which does not extract a resource from its source as long as it is returned without affecting the quantity and quality of the resource. Exhibits TAX-4(b) and (c) of the GOE's IQR contain the relevant sections of the law and the resolution.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

Importantly, unlike freshwater, neither the GOE nor any other water-related agency supplies brackish or salt water to any users in Ecuador. The GOE and water agencies only have infrastructure in place to supply fresh water. Because of the limited applications and abundance of brackish water, parties wishing to access either of these types of water for productive purposes are wholly responsible for all costs and expenses related to accessing this water. As noted above, parties using water for non-consumptive applications must return the water to the source at a similar quantity and quality. In other words, while a party may borrow the brackish water without paying a fee, the costs and expenses associated with obtaining the water, maintaining the water quality and returning it to the source are entirely the responsibility of that party.

Under Article 135 of the Water Resources Law, every user must pay for the provision of services and authorization for water uses and development when connected to a water supply system (e.g., a municipal water system). Further, Article 142 provides the criteria for the establishment of tariffs for general "productive" water users based on the volume of water used, the efficiency of water use. See Exhibit TAX-4(b) of the GOE's IQR for the relevant sections of the Water Resources Law.

Management of water resources is carried out through a decentralized system in ten zonal offices (also referred to as directorates) that cover the entire country. The Public Water Company ("EPA") oversees billing and collections. The control and regulation of water quantity and quality for all uses and destinations of water is carried out by the Water Regulation and Control Agency ("ARCA"), which is affiliated with the MAATE. Non-consumptive use of water is not subject to billing and collections by the EPA because the water is returned to its source within a short period of time. Therefore, the law does not provide the shrimp or aquaculture industry with brackish water for less than adequate remuneration.

Barcode:4546062-01 C-331-806 INV - Investigation


As noted above, no brackish water supply system exists. Shrimp farms are responsible for building their own infrastructure (e.g., pipes, water pumps, etc.) in order to access the brackish water from the source, move it to the farm, and return it to the source. In fact, pursuant to Article 11 of the Water Resources Law, the hydraulic pipes and infrastructure may be owned by private parties where they are built and financed by private parties. Thus, the GOE is not providing brackish water to shrimp farms like it provides drinking water to a home or water for industrial use at a factory. Farms are responsible for all costs of drawing brackish water from its source and returning it.

Resolution DIR-ARCA-RG-002-2016 establishes that water is considered to be used for a non-consumptive purpose and thus not extracted from the source when it is returned to its source. Non-consumptive water use is the act of borrowing the water and then returning it. No water is consumed in the process. The brackish water being investigated here is used to fill ponds that the shrimp are grown in. The water is not retained, nor is the water consumed by the farms. If the water were consumed (i.e., not returned to the source), then, as noted above, it would be subject to fees for consumptive use because it would be considered "extracted" from the source. Moreover, brackish water for non-consumptive use is not provided to shrimp farms by the GOE. Rather, companies that use water for a non-consumptive purpose are not subject to water charges. For example, other users of brackish water for non-consumptive purposes include recreational events, ships (for ballast water), and cooling equipment for power generation equipment; these are also not subject to paying for the water so long as the use is non-consumptive.

Accordingly, the GOE reiterates that permitting shrimp farms to access brackish water does not constitute a subsidy because the water is not provided by any government authority to


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

Barcode:4546062-01 C-331-806 INV - Investigation


any party, including shrimp farmers, for less than the price the GOE would otherwise charge for it. The GOE's laws and regulations are clear that if water of any type (fresh, brackish, salt) is being used for non-consumptive purposes and is returned to the source, then the water is not considered to have been consumed. Thus, the GOE does not charge for that water.

**B. Provide the date the program was established and explain how it was enacted, *e.g.*, by law, decree, regulation, etc. For programs under investigation that were not enacted pursuant to a legal instrument, indicate for how many years the program has been in operation. For example, for programs involving the provision of inputs for less than adequate remuneration not enacted pursuant to a legal instrument, please indicate how many years the input has been provided and/or sold by the government, government- controlled entities such as state-owned enterprises, or other enterprises alleged to be "authorities" under section 771(5)(B) of the Act.**

ANSWER: Not applicable. As stated above in response to Question A, no program exists to provide brackish water at less than adequate remuneration by the GOE. Nevertheless, in order respond as completely as possible to the Department's question, the Organic Law on Water Resources, Use, and Development was promulgated in August 6, 2014. Please refer to Exhibits TAX-4(a)–(g) of the GOE's IQR for the relevant sections of the Constitution of the Republic of Ecuador, Water Resources Law, relevant resolutions, technical rules, and technical opinion regarding the aquaculture industry's non-consumptive use of water.

Additionally, please refer to Exhibits TAX-4(d) and 4(e) of the GOE's IQR for sections of Agreements no. 2017-1522 and 2018-0257, which incorporate the approval and setting of tariffs for the uses and exploitation of raw water. Additionally, the GOE provides **Exhibit NSA-15**, which contains Agreement No. 2017-0010, which also includes tariff-related guidance.

**C. Provide the name and address of each of the government agencies or authorities responsible for administering the program. Please be specific in identifying the level of government that has the authority to approve the assistance, and the level of government responsible for administering the distribution of assistance.**

ANSWER: As requested, the following institutions are responsible for administration of water rights and fees for water consumption in Ecuador:


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

1) The Ministry of the Environment Water, and Ecological Transitions ("MAATE")
Calle Madrid 1159
Quito 170525

2) Empresa Publica del AGUA ("EPA")
Km 0.5, via Samborondón
Samborondon, Guayaquil 092301

3) Water Management Zonal Directorates (Individual Zonal Agencies Responsible for Monitoring Water Consumption):
    a. Zonal 1: Pedro Moncayo 6-46 y Bolívar, First Floor, Ibarra
    b. Zonal 2: Toledo N22 -286 and Lérida, Quito
    c. Zonal 3: Chile 10-51, Riobamba
    d. Zonal 4: Los Nardos Street and 15 de abril Avenue, behind ECU911 via Portoviejo Santa Ana, Portoviejo
    e. Zonal 5: Av. Francisco de Orellana y Justino Cornejo, Guayaquil
    f. Zonal 6: Núñez de Bonilla 195 y Sebastián de Benalcázar, Cuenca
    g. Zonal 7: Ave. Orillas del Zamora y Santiago de las Montañas, Loja
    h. Zonal 8: Francisco de Orellana and Ave. Antonio Vallejo Barrio Huamaurco on way to new cementery, Tena
    i. Zonal 9: Ave. Circunvalacion y Via Moseñor Gonzalo Lopez, Nueva Loja
    j. Zonal 10: Diego de Vaca entre Pío Jaramillo Alvarado y 24 de Mayo (front of Judiciary Counsel), Zamora

4) Water Regulation and Control Agency ("ARCA")
Av. de los Shyris N38-28 between El Telégrafo and La Tierra
Quito 170505.

**D. Please indicate which of the companies under investigation (including all cross-owned companies and any trading companies exporting subject merchandise into the United States) applied for, accrued, or received benefits under the program during the POI.**

**Please note that if this program has been terminated but there are residual benefits or a replacement program has been put into place (see 19 CFR 351.524), and the companies under investigation are still receiving, claiming or using assistance under the program or if they have applied for, received, claimed, accrued or used assistance under the replacement program, you must respond to all of the remaining questions for residual assistance or replacement programs.**

ANSWER: No member of the shrimp industry, including the mandatory respondents, Santa Priscila and SONGA, and those cross-owned affiliates that were required to respond to the Department's January 24th Supplier Questionnaire, received any brackish water for less than adequate remuneration. No brackish water used by the respondents was provided by any water authority and, had any used brackish water for consumptive purposes, they would have been

Barcode:4546062-01 C-331-806 INV - Investigation


responsible for paying for the water in accordance with all laws and regulations governing water consumption.

**E. Provide translated copies of the laws and regulations relating to the program and any internal or external reports pertaining to the program that were applicable during the POI.**

ANSWER: Please refer to Exhibit TAX-4(a) of the GOE's IQR for the relevant sections of the Constitution of the Republic of Ecuador and the Water Resources Law. Please refer to Exhibits TAX-4(c)-(g) of the GOE IQR, as well as Agreements 2017-0010 and 2018-0257, which refer to the establishment of the relevant tariffs for the use and development of water.

**F. Identify and explain the types of records maintained by the relevant government or governments (e.g., accounting records, company-specific files, databases, budget authorizations, etc.) regarding the program.**

ANSWER: This question is not applicable because neither of the mandatory respondents, nor their cross-owned affiliates required to respond to the Department's questionnaire applied for, received, claimed, or accrued benefits pursuant to the alleged provision of brackish water at less than adequate remuneration program.

Nevertheless, to respond to the Department's question as completely as possible, the records related to the administrative procedures for the issuance of water use authorization for productive activities, are registered in the Public Water Registry, which is a system contained within the Single Registry of Water Authorizations database and which contains the records of authorizations granted at the national level by MAATE. Additionally, the EPA maintains records related to the commercial management of water use and exploitation in the "EPACOM" system; this system includes the requisite authorizations. However, EPACOM does not keep specific records on brackish water use as there is no water authority in Ecuador that provides either type of water. The system does identify approvals for use of brackish water for shrimp farmers, which are classified under "National Aquaculture."


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

**G. Please identify all instances in which assistance under the program was provided to any mandatory respondent (including all responding cross-owned companies and any trading company) during the POI.**

ANSWER: This question is not applicable because neither of the mandatory respondents, nor their cross-owned affiliates required to respond to the Department's January 24th supplier questionnaire applied for, received, claimed, or accrued benefits pursuant to the alleged provision of brackish water at less than adequate remuneration program.

**H. Please explain whether the assistance under the program was provided to the mandatory respondent(s) pursuant to a statute, regulation, decree or other legal measure/instrument that establishes the conditions and guidelines governing the operation of the program, such as eligibility criteria, amounts, etc.**

ANSWER: In accordance with the Department's instructions, this question is not applicable because neither of the mandatory respondents, nor their cross-owned affiliates required to respond to the Department's January 24, 2024, Supplier questionnaire applied for, received, claimed, or accrued benefits pursuant to the alleged provision of brackish water at less than adequate remuneration program. All companies are subject to the same laws and regulations related to water use and development. Please refer to Exhibits TAX-4(a)-(e) of the GOE's IQR for the various laws and authorities related to water use and development.

**I. To the extent they are different from the entity (entities) identified in response to Question C, above, please provide the name(s) of the entity (entities) that provided each instance of assistance under the program to the mandatory respondent(s) described in response to under Question G, above.**

ANSWER: Not applicable. Please refer to the response to Question C above.

**J. Please specify if the entity (entities) listed in response to Question I, above, is a national, state or local government entity, e.g., a government ministry, department, agency, office, etc.**

ANSWER: Not applicable. Please refer to the response to Question C above.

**K. If the assistance under the program was provided by an entity other than a national, state or local government entity, please respond to the following questions.**

1. **What is the legal status of the entity (entities), e.g., is it a separately incorporated entity and/or a government corporation, government lending institution, commercial entity?**

2. **Please explain how the entity (entities) was established and whether the entity operates pursuant to statutes, decrees, and/or regulations. Please explain the relevant statute, decrees and regulations under which the entity was established and operates.**

3. **What is the legal basis that governs the entity's provision of assistance under the program? Please provide translated copies of the relevant legal measures.**

4. **Has the entity (entities) listed above received any direct or indirect funding or support from a government entity? Please specify if the government provided any such direct or indirect funding for the purpose of providing assistance under this program.**

5. **Did the entity (entities) listed above provide assistance under the program pursuant to specific guidelines and/or criteria under this program? Please describe those guidelines and/or criteria.**

6. **Please provide the ownership structure of each such entity and specify the amount of any direct or indirect government ownership during the POI (and for each year in which the assistance was provided).**

7. **Please provide the translated annual report(s) during the POI (and for each year in which the assistance was provided) for each such entity.**

8. **What are the core activities and functions of each entity that provided the assistance under the program?**

9. **Explain why the assistance under this program was provided by this entity (entities) rather than directly by the government.**

ANSWER: Not applicable. Please refer to the response to Question C above.

**L. Describe the application process for assistance under the program and provide a blank copy of the application form (translated, if necessary). After an application is submitted, please describe the procedures by which an application is analyzed and eventually approved or rejected. Please provide for each company under investigation a copy of at least one completed application and approval package (and provide translations of headings and any summaries and of the exact reason(s) for the application and the exact reason(s) for approving the assistance).**

ANSWER: In accordance with the Department's instructions, this question is not applicable because neither of the mandatory respondents, nor their cross-owned affiliates required to respond to the Department's questionnaire applied for, received, claimed, or accrued benefits pursuant to the alleged provision of brackish water at less than adequate remuneration program. As discussed above, the GOE does not assess any fees or charges in connection with non-consumptive use of water. Because the GOE does not assess any fees in connection with non-

Barcode:4546062-01 C-331-806 INV - Investigation



consumptive use of water it does not forego any revenues that would otherwise be collected. Moreover, neither the GOE, nor any entity controlled by the GOE, provides brackish water to any non-consumptive user of water because, as discussed above, such users pump water from the source and back into the source using their own equipment.

**M. Please answer the following questions regarding eligibility for and actual use of the assistance provided under this program.**

**1. Describe the criteria governing the eligibility for and receipt of any assistance under this program. Please also describe the criteria for determining the amount of the assistance provided. Provide a copy of any law, regulation or other official document detailing these criteria. As part of your response, please also address the following questions:**

**(a) Is the actual export performance or export potential of an applicant or recipient taken into account in any way in determining eligibility for or receipt of any assistance under this program? Please explain. If eligibility for, or actual use of, this program is contingent upon export performance, whether solely or as one of several other conditions, you need not respond to the remaining questions under section M.**

**(b) Is the use of domestic goods or the creation of domestic value added by an applicant or recipient taken into account in any way in determining eligibility for or receipt of any assistance under this program? Please explain. If eligibility for this program is contingent upon the use of domestic over imported goods, you need not respond to the remaining questions under section M.**

**(c) Is eligibility for the subsidy limited to enterprises or industries located within designated geographical regions within the jurisdiction that authorized the program? If so, please provide the criteria for eligibility and you need not respond to the remaining questions under section M.**

**(d) Is the industry or sector in which the applicant or recipient operates taken into account in any way, either under the law or through discretion exercised by the government agency or authority administering the program, in determining eligibility for or receipt of any assistance under this program? Please explain, and identify those industries or sectors that are eligible or otherwise receive special consideration for eligibility. If eligibility is limited, by law or in fact, to any enterprise or group of enterprises, or to any industry or group of industries, you need not respond to the remaining questions under section M.**

**(e) With respect to the eligibility criteria and your administration of this program, please address the following, and provide documentation, if possible, to support your explanation:**

**i. If the eligibility criteria, as listed in the applicable law, regulation or other official documents are met, will an applicant always and automatically receive assistance, or is final approval by the government agency or authority which administers the program necessary?**



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

Barcode:4546062-01 C-331-806 INV - Investigation



**ii. Is the amount of the assistance provided determined solely by established criteria found in the law, regulation or other official document, or is the amount ultimately determined by the government agency or authority which administers the program? If established by criteria, please provide all of the criteria.**

**iii. If the government agency or authority has any discretion that goes beyond the criteria laid out in the law, regulation or other official document, please explain the nature and extent of that discretion.**

**iv. Explain how the companies under investigation who have applied for, claimed, received, accrued or used assistance under this program have met the eligibility criteria.**

**(f) Is eligibility for the subsidy limited to small and medium-sized enterprises? If so, please define and document how the term "small and medium-sized enterprises" is defined under the program and on what basis the company(ies) being examined met the definition. If the program is not contingent on firms being small and medium-sized enterprises, then so state and skip this question.**

ANSWER: Not applicable. As discussed above, there is no program under any laws or regulations whereby brackish water is granted by any government-controlled authority to any company where the company engages in non-consumptive use of water, including prior to, during and after the POI.

**2. Please provide the following information, in table form, regarding the number of recipient companies and industries and the amount of assistance approved under this program for the year in which any mandatory respondent company was approved for assistance, as well as each of the preceding three years (e.g., if a respondent was approved for assistance in 2010 and 2011, provide this information, by year, for 2007 through 2011). If this information is not available on the basis of year of approval, then provide the information based on the year of bestowal.**

**(a) The amount of assistance approved for each mandatory respondent company, including all cross-owned companies and trading companies that sell the subject merchandise to the United States.**

**(b) The total amount of assistance approved for all companies under the program.**

**(c) The total amount of assistance approved for each of the largest 50 recipients under the program and include the industry designation for each of these recipients. Note that at this time, you do not need to provide the name of the recipient, you just need to provide the individual amount of assistance approved.**

**(d) The total number of companies that were approved for assistance under this program.**

**(e) The total number of companies operating or established in the jurisdiction of the granting authority of the investigated program.**



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

**(f) The total number of corporate/business income tax filers within the jurisdiction of the granting authority of the investigated program.**

**(g) Provide a complete listing of the industries that operate in the jurisdiction of the granting authority of the investigated program. In identifying these industries, please use whatever resource or classification scheme your government normally relies upon to define industries and to classify companies within an industry. Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification.**

**(h) The total amount of assistance approved for the industry in which the mandatory respondent companies operate, as well as the totals for every other industry in which companies were approved for assistance under this program. In identifying the industries, please use whatever resource or classification scheme your government normally relies upon to define industries and to classify companies within an industry. Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification. Please clearly identify the industry in which the companies under investigation are classified.**

**(i) The total number of companies that applied for, but were denied, assistance under this program. Be sure that your response to question provides a complete discussion of the circumstances in which applications for assistance are denied.**

**(j) If you have additional information that you believe demonstrates that this program is broadly available and widely used throughout the economy, please provide such information and a narrative description of your contention.**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is provided by any government-controlled authority where the company engages in non-consumptive use of water, including prior to, during and after the POI.

**N. For purposes of any *de facto* specificity analysis that Commerce may conduct in this proceeding, please provide information on the economic activities within the jurisdiction of the granting authority for each relevant program. At a minimum, this information should include the number of establishments within the following sectors: agriculture, forestry, animal husbandry and fishery; mining; manufacturing; production and supply of electricity, heat, gas, and water; construction; wholesale and retail trades; transport, storage and post; hotel and catering services; information transmission, software and information technology; financial intermediation; real estate; leasing and business services; scientific research and technical services; management of water conservancy, environment and public facilities; services to households, repair and other services; education; health and social services; culture, sports and entertainment; and public management, social security and social organizations.**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is provided brackish water by any government-controlled authority where the company engages in non-consumptive use of water, including prior to, during, or after the POI.

O. **Describe any anticipated changes in the program. Provide documentation substantiating your answer. If the program is being terminated, state the last date that a company could apply for or claim benefits under the program. When is the last date that a company could receive benefits under the program? If the program has been terminated and replaced by a similar type of program, please provide a discussion of the replacement program to include the purpose of the program and the date it was established.**

ANSWER: Not applicable. As discussed above, there is no program whereby any company is provided brackish water by any government-controlled authority where the company engages in non-consumptive use of water, including prior to, during and after the POI. In particular, the GOE has no law or regulation that provides brackish water at lower prices (or for free) to certain companies, industries, etc. than would be charged to other companies, industries, etc. Instead, to the extent that any entity is using water of any kind (e.g., fresh, brackish, etc.) for non-consumptive purposes, the GOE's laws and regulations are clear that there is no basis for charging for that water. However, if an entity is found to be consuming water, regardless of type, it is required to pay for that water. Therefore, there can be no change to a program that does not exist.

**NEW SUBSIDY PROGRAMS: Provision of Brackish Water for LTAR**

***Provision of Goods/Services Appendix***

**Please provide the following information with respect to each of the goods/services alleged to be provided at less than adequate remuneration (LTAR):**

**A. Provide a general description of the goods/services provided by the government and of the process by which the goods/services are provided. Identify the government entity or government-owned company responsible for providing the goods/services.**

ANSWER: No GOE agency, institution, water authority or other entity provides brackish water to shrimp farms. Additionally, there is no program wherein the GOE provides brackish water at a price that is lower for certain customers or industries than others. As such, no program to provide brackish water at less than adequate remuneration exists in Ecuador.

**B. Provide the quantity and value of the good/service provided to each respondent during the POI and the price charged by the government. Provide copies of any price lists or rate sheets applicable to the good/service being provided.**

ANSWER: Because the brackish water used by shrimp farms is non-consumptive use, the GOE does not measure the amount of water and, thus, is not able to provide any information on the quantity. Likewise, because the water is for non-consumptive use, the GOE has no modality under which it may charge for this water and, thus, cannot report a value for this water. For tariff information, see Exhibits TAX-4(d) and 4(e) of the GOE's IQR and **Exhibit NSA-15** for relevant sections of Agreements no. 2017-1522, 2017-0010 and 2018-0257, which incorporate the approval and setting of tariffs for the uses and exploitation of raw water.

**C. Describe the market for the good/service being provided in your country. Specify the number of producers and distributors of the good/service and the nature of their relationship to the government, including government ownership, control, and regulation. What types of industries generally consume this good/service?**

ANSWER: As explained in the Standard Questions Appendix, the Constitution of Ecuador establishes that water is part of the national patrimony and, as such, the GOE is the sole entity responsible for managing water resources in the country. Therefore, there is no market for

brackish water in Ecuador, nor are there any producers or distributors of brackish water, whether privately- or government-owned. No institutions of the GOE track consumption or use of brackish water or other sources raw water.

**D. What percentage of total domestic consumption of the good/service is provided by the government? What percentage of consumption of the good/service by the industry producing the subject merchandise is provided by the government?**

ANSWER: The GOE does not provide any brackish water.

**E. If there are commercial producers or distributers of the good/service in your country, provide any available information pertaining to the prices charged by such companies for goods/services comparable to that provided by the government during the POI.**

ANSWER: There are no commercial producers or distributors of brackish water from naturally occurring sources in Ecuador.

**F. Are there any restrictions on the importation of the good/service in question into your country? If yes, please explain the nature of the restrictions. Provide the volume and f.o.b. value of imports, by country, during the POI.**

ANSWER: The GOE does not have any restrictions on the importation of brackish water.

**G. Explain the overall pricing policy of the government provider of the good/service in question. How does this differ with respect to sales to various industries, including the industry which produces the subject merchandise? Explain how this pricing policy compares with that of commercial producers or distributors of the good/service in your country.**

ANSWER: The GOE has no pricing policy for non-consumptive use of brackish water.

All tariffs related to water for consumptive use and exploitation of water are established in Agreements No. 2017-0010 and No. 2018-0257 (see the GOE IQR Exhibit TAX-4(e) and **Exhibit NSA-15**). Article 135 of the Water Resources Law requires that any natural or legal person that consumes water resources is obliged to pay the corresponding rate. Furthermore, pursuant to Article 142 of the Water Resources Law, the tariffs are set according to the volume of water used, the efficiency of water use, and the contribution to water conservation and employment generation. See GOE IQR Exhibit TAX-4(b).

**H. Are there trade publications which specify the prices of the good/service within your country and on the world market? Provide a list of these publications, along with sample pages from these publications listing the prices of the good/service within your country and in world markets during the POI.**

**Answer the following questions if there are no commercial suppliers of the good/service in question in your country: Document whether and to what extent the price charged by the government covers the government's operating costs and ensures a reasonable return to the government.**

ANSWER: The GOE is not aware of any trade publications that specify the prices of brackish water within Ecuador or on the world market. Normally, the GOE determines the water rates based on the cost of providing the water, including infrastructure costs (e.g., pipes and machinery for collecting and delivering it to a customer's location), operational costs (e.g., electricity expenses for pumping, salaries) and conservation investments to preserve the source (i.e., this water is for consumption so is not returned to the source and thus, the source is protected so it can continue to provide the necessary water in the future). All the pricing related to water tariffs is established through the various regulations and laws governing the supply of water to customers in Ecuador.

While those costs are incurred for the provision of fresh, potable water, the GOE does not incur any of these costs when granting access to brackish water. Accordingly, the GOE has no basis for determining a price to charge for brackish water.

**1. Describe how the price charged by the government is determined.**

ANSWER: The GOE does not have a price for brackish water used by shrimp farms because the water is considered not to be consumed under the law, and the GOE does not assess charges for non-consumptive use of brackish or fresh water. Moreover, water tariffs normally account for infrastructure, operational and other costs related to the delivery of water to customers. However, because the users of brackish water are solely responsible for all expenses related to

infrastructure, operations, etc., the GOE incurs no costs when parties access brackish water and return it to the source.

**2. Please explain in detail the pricing criteria that are used to reach this price.**

ANSWER: Not applicable as there is no price for non-consumptive use of brackish water from public sources in Ecuador.

**3. Please describe the government's operating costs, investment costs, and returns.**

ANSWER: Not applicable. As noted above, the GOE does not incur any costs related to a party accessing brackish water.

**I. Provide a breakdown of the prices charged by the government to the different categories of consumers of the good/service in question. Explain any differences in the prices charged to various industries.**

ANSWER: There are no differences between different categories of non-consumptive users of brackish water. However, to access the water, non-consumptive users are responsible for covering all infrastructure and operational costs. Thus, the price that is paid by brackish water users is the cost they incur to access the water and return it to the source. This also applies to any parties who are accessing fresh or salt water for non-consumptive purposes.

The GOE has established the tariffs for consumptive use, which are stated in the Agreements provided in Exhibits TAX-4(d) and TAX-4(e) of the GOE's IQR and also in **Exhibit NSA-15**. These fees are based on the activity for which the water is applied for consumptive purposes, which include activities such as human consumption, irrigation, mining and petroleum, water bottling, etc.

# EXHIBIT NSA-11

EDICIONES LEGALES

**Third Supplement to the Official Gazette No.353 , December 18, 2020**

**Regulation:** In effect

**Last Amendment:** Resolution ARCERNNR-020/2020 (Third Supplement to the Official Gazette 353, December 18, 2020).

**RESOLUTION No. ARCERNNR-020/2020**
**(SUBSTITUTE INSTRUCTIONS FOR THE AUTHORIZATION OF THE PURCHASE OF PETROLEUM DERIVATIVES FOR INDUSTRIAL SEGMENTS)**

THE BOARD OF DIRECTORS OF THE AGENCY FOR THE REGULATION AND CONTROL OF ENERGY AND NON-RENEWABLE NATURAL RESOURCES

**WHEREAS:**

Article 227 of the Constitution of the Republic of Ecuador states that *"public administration constitutes a service to the community that is governed by the principles of effectiveness, efficiency, quality, hierarchy, deconcentration, decentralization, coordination, participation, planning, transparency and evaluation";*

**That** number 11 of article 261 of the Constitution of the Republic of Ecuador establishes that the Central State has exclusive jurisdiction over hydrocarbons;

Article 313 of the Constitution provides: *"(...) the State reserves the right to administer, regulate, control and manage strategic sectors, including non-renewable natural resources, in accordance with the principles of environmental sustainability, precaution, prevention and efficiency (...)";*

Article 314 of the Supreme Law establishes that the State shall be responsible for the provision of public services and shall guarantee that they comply with the principles of obligatory nature, generality, uniformity, efficiency, responsibility, universality, accessibility, regularity, continuity and quality; it shall also ensure that the prices and rates of public services are equitable, and shall establish their control and regulation;

Article 11 of the Hydrocarbons Law in force provides for the creation of the Hydrocarbons Regulation and Control Agency, ARCH, as the technical-administrative body responsible for regulating, controlling and supervising the technical and operational activities in the different phases of the hydrocarbons industry carried out by public or private, national or foreign companies, joint ventures, consortiums, associations or other contractual forms and other national or foreign individuals or legal entities that


All rights reserved. Reproduction in whole or in part is prohibited.
Think about the environment. Print only if necessary.

The Company's functions include the technical control of hydrocarbon activities in Ecuador and the correct application of the Hydrocarbons Law, its regulations and other applicable hydrocarbon regulations;

**That**, the Law for the Optimization and Efficiency of Administrative Procedures Official Gazette Second Supplement 353 of October 23, 2018, *"Art. 1. The entities regulated by this Law shall presume that the statements, documents* and *actions of the persons carried out by virtue of administrative procedures are true, under notice to the person or persons administered that, in case of verification to the contrary, the procedure and final result of the management may be denied and filed, or the documents issued shall lack any validity, without prejudice to the sanctions and other legal effects established in the law (...).*

*For the purposes of this Law, a responsible declaration shall be understood to be the public instrument signed by the interested party in which he/she declares, under his/her responsibility, that he/she complies with the requirements established in the regulations in force for the exercise of an activity, that he/she has the documentation that accredits this and that he/she undertakes to maintain compliance during the period of time inherent to said exercise.*

*The responsible declarations shall contain notes that remind the responsibility of the subscriber with respect to the truthfulness of the information provided and shall allow the exercise of an activity, from the day of its presentation, without prejudice to the powers of control, inspection and surveillance attributed to the competent entity before which the responsible declaration was made and of the administrative, civil or criminal liabilities that may be established for providing incomplete, false or adulterated information";*

**Whereas**, the article numbered after article 3 of Executive Decree No. 407 published in Official Gazette No. 90 of August 26, 2005, added by Executive Decree No. 982 published in Official Gazette No. 179 of January 3, 2006, provides: *"The National Directorate of Hydrocarbons shall control the issuance* and *validity of all customer codes issued by PETROCOMERCIAL in its capacity as supplier and shall analyze the evolution of the volumes dispatched under these codes";*

Article 2 of Executive Decree No. 1859 published in Official Gazette Supplement No. 364 of September 26, 2006 states: *"(,...) Petrocomercial (today EP PETROECUADOR) and the marketers shall supply fuels derived from hydrocarbons and LPG exclusively to the subjects of control that are registered and registered with the National Hydrocarbons Directorate (DNH) (today ARCH) for having complied with all the legal requirements and conditions to carry out such activity";*

**That**, Article 5 of Executive Decree No.149, published in the Official Gazette Supplement No. 146 of December 18, 2013, when determining the simplification of



All rights reserved. Reproduction in whole or in part is prohibited.
Think about the environment. Print only if necessary.
Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

*The central public administration, institutional and that depends on the Executive Function will establish the management with a focus on the simplification of procedures. Public management will progressively tend to the reduction and elimination of the duplicity of requirements and activities that the citizen must perform before the administration in order to access efficient, transparent and quality services (...,)";*

**That**, through Executive Decree 1036 of May 6, 2020, the Merger of the Mining Regulation and Control Agency, the Electricity Regulation and Control Agency and the Hydrocarbons Regulation and Control Agency into a single entity called: *"Energy and Non-Renewable Natural Resources Regulation and Control Agency";*

Article 2 of the aforementioned decree establishes that: *"Once the merger process is concluded, all the powers, functions, programs, projects, representations and delegations established in laws, decrees, regulations and other regulations in force that corresponded to the Mining Regulation and Control Agency, the Electricity Regulation and Control Agency and the Hydrocarbons Regulation and Control Agency, shall be assumed by the Energy* and *Non-Renewable Natural Resources Regulation and Control Agency";*

**That**, by means of Resolution 006-003 EXTRAORDINARY DIRECTORY ARCH-2015, published in Official Gazette No. 636 Supplement of November 26, 2015, the "Instructions for the Purchase of Petroleum Derivatives for the Industrial Segments" was issued.

**That**, by means of Memorandum No. ARCERNNR-DCOMH-2020-0465-ME, dated October 31, 2020, the Technical Directorate for the Control and Inspection of the Commercialization of Hydrocarbons, their Derivatives, Biofuels and their Mixtures recommends *"issuing the Instructions for the Authorization of the Purchase of Petroleum Derivatives for the Industrial Segments".*

**That**, by means of Memorandum No. ARCERNNR-DRNH-2020-0067-ME, dated November 01, 2020, the Director of Hydrocarbons Regulation and Standards issues its favorable regulatory and normative report indicating: *"(...) this Directorate issues the favorable pronouncement to the aforementioned draft Resolution, considering it appropriate to continue with the formalization process. (...)",* and requests to forward these documents for the preparation of the corresponding legal report on the attached proposed Resolution to be sent to the Executive Directorate of the ARC; and,

**That**, by means of Memorandum No. ARCERNNR-CGJ-2020-0455-ME, dated November 08, 2020, the General Legal Coordinator issued a favorable legal report in which he indicates in the main that: *"(...) he accepts the Technical Report issued by Memorandum No. ARCERNNR-DCOMH-2020-0465-ME, dated October 31, 2020, by the Technical Directorate of Control and Inspection of Hydrocarbon Commercialization, its derivatives,*


All rights reserved. Reproduction in whole or in part is prohibited.
Think about the environment. Print only if necessary.
Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

*biofuels and their blends, as well as the Favorable Report of the Directorate of Regulation and Hydrocarbons Standards, which is contained in Memorandum No. ARCERNNR- DRNH-2020-0067-ME, dated November 1, 2020, since they have been developed in strict compliance with the Constitution and the applicable Law and Regulations, therefore, their content is not contrary to the current legal system (...). (...)".*

In exercise of the powers conferred by Article 11 of the Hydrocarbons Law and Executive Decree No. 1036, the Board of Directors of the Agency for Regulation and Control of Energy and Non-Renewable Natural Resources, unanimously.

**RESOLVED:**

**To issue the Instructions Substitute to: *"Instructions for the Authorization of Purchase of Petroleum Derivatives for the Industrial Segments".***

Art. 1.- **Purpose: To** establish the requirements and administrative procedure to grant authorizations for the purchase of petroleum derivatives for the industrial, shrimp, tuna and other fisheries segments.

Art. 2.- **Scope: These** Instructions shall apply to public or private companies, national, foreign, joint ventures, consortiums, associations or other contractual forms and other natural or legal persons, national or foreign, that require to purchase petroleum derivatives, through the trading companies and/or distribution centers of the industrial segments.

Art. 3.- **Definitions and Acronyms:** The following definitions and acronyms shall apply to these Instructions:

- **ARC:** Agency for Regulation and Control of Energy and Non-Renewable Natural Resources.

- **Industrial Segment Cadastre:** This is the registry of final customers **that** use petroleum derivatives at the national level.

- **Distribution Centers:** Facilities authorized and registered with the Agency for Regulation and Control of Energy and Non-Renewable Natural Resources, in which activities of reception, storage and sale to the final consumer of petroleum and petroleum derivatives and their blends with biofuels are carried out.

- **Commercialization:** National or foreign natural or legal person, public, private or mixed, authorized by the Sectorial Minister to commercialize petroleum derivatives or petroleum derivatives and their blends with biofuels.

- **Consortium:** Association of companies or entities with common interests to participate jointly in a project or business.

- **Final Customer in the Industrial Segment: The** natural or legal person, national or international, that is the person or legal entity that



All rights reserved. Reproduction in whole or in part is prohibited.
Think about the environment. Print only if necessary.
Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

The Company is a foreign company, which is supplied with petroleum derivatives from industrial segments, which will be used in duly declared licit activities.

- **Petroleum Derivatives:** Petroleum derivatives and their blends with biofuels, solvents, asphalts, oils and other products obtained from the refining or industrialization of petroleum, except Liquefied Petroleum Gas.

Art. 4.- **Requirements:** Public or private companies, national, foreign, joint ventures, consortiums, associations or other forms, contractual, interested in purchasing oil derivatives in the industrial segments, shall observe the following requirements:

1. Online application form for the purchase of petroleum derivatives in the industrial segments, according to the format established by the ARC.
2. Scanned deposit of the payment for the service fee set by the ARC
3. Electronic invoice generated by the payment made (scanned).

Art. 5.- **Procedure:** Public or private companies, national, foreign, joint ventures, consortiums, associations or other contractual forms, interested in purchasing petroleum derivatives through the marketing companies and/or distribution centers of the industrial segments, shall enter the industrial cadastre system SISCOH, through the institutional web page of the ARC, register and complete the application form for the purchase of petroleum derivatives of the industrial segments.

The original deposit and the electronic invoice for the payment of the service fee set by the ARC, if required, must be attached to the application.

Payments are only made with a consumption greater than 30,000 gallons per month or change of supplier with consumption greater than 30,000 gallons per establishment.

Art. 6.- **Authorization:** The Executive Director of the Agency for Regulation and Control of Energy and Non-Renewable Natural Resources-ARC or his delegate, within a term of three (3) days, counted from the entry of the online form in the Industrial Cadastre System SISCOH, through the ARC website, shall notify the e-mails of **the** duly authorized supplier, marketer or authorized industrial distribution center and the applicant, of the issuance of the corresponding authorization.

In the event that the form submitted does not comply with the requirements established by the ARC, within the term of three (3) days, counted as of the entry of the form on line of the Industrial Cadastre System SISCOH, it will be automatically notified to the e-mails registered by the applicant, denying the procedure. In this case the applicant must enter a new form through the above mentioned system, correcting the observations notified.


All rights reserved. Reproduction in whole or in part is prohibited.
Think about the environment. Print only if necessary.

**Art. 7.- Authorization Reform:** The end customer must enter the institutional web page of !a ARC, enter the industrial cadastre system SISCOH, and fill out the application form according to its requirement (increase in volume, and/or change of trading company or industrial distribution center and/or extension of contract term and/or update of authorization information), according to article 5 of these Instructions.

**Art. 8.- Volume Adjustments:** The Agency for Regulation and Control of Energy and Non-Renewable Natural Resources-ARC shall make volume adjustments as a result of:

a) Statistical analysis of fuel dispatches, purchases and sales.
b) Analysis of the report issued by the trading company and/or industrial distribution center on the volume of fuels purchased.

The Agency will notify the volume adjustments to the authorized supplier, marketer and/or industrial distribution center, respectively.

**Art. 9.- Suspension**: The authorization for the purchase of liquid fuels derived from petroleum in the industrial segments, granted to end customers, shall be suspended for the following causes:

a) At the end customer's request;
b) At the reasoned request of a competent public authority or institution in its correlated activities; and,
c) Once the term of validity has expired for the authorizations issued as unforeseen cases, they must be renewed within thirty (30) days, after which the suspended authorization will be extinguished.

The suspension issued by the Executive Director of the Agency or his Delegate will be notified to the authorized supplier, marketer/distribution center of the industrial segment.

**Article 10 - Termination:** The authorization to purchase petroleum derivatives in the industrial segment shall be extinguished for the following causes:

a) At the end customer's request;
b) Once the authorization is terminated, the rights for payment of services previously rendered to the ARC by the end client are lost; and,
c) *The* reasoned request of an authority or public institution competent in its correlated aci/vities.

The termination issued by the Executive Director of the Agency for Regulation and Control of Energy and Non-Renewable Natural Resources or his delegate, will be notified to the authorized supplier, the marketer and/or distribution center.

**GENERAL PROVISIONS**


All rights reserved. Reproduction in whole or in part is prohibited.
Think about the environment. Print only if necessary.

**First -** This Instrument will be of mandatory application at the national level for marketers, industrial distribution centers and final customers that require to purchase petroleum derivatives from the industrial segments.
**Second:** The authorizations for the purchase of fuels by industrial cadastre for mining activities must be previously verified in the mining cadastre of the Agency.
**Third:** Cases not foreseen by the application of this rule shall be resolved by the Director of the Agency for Regulation and Control of Energy and Non-Renewable Natural Resources, in accordance with the applicable regulations and its provisions.

Authorizations issued for unforeseen cases will be valid for a maximum period of twelve (12) years.
(12) months, and may be renewed immediately as long as the initial conditions under which the authorization was issued are maintained, and will be communicated to the Board of Directors at the following session.
**Fourth:** Clients who have an industrial registry in force may not request an authorization for domestic amount for the same Single Taxpayers Registry RUC. **Fifth.-** The sale price at terminal level for the shrimp, tuna and other fisheries sector shall be established in accordance with the legal regulations in force.

## TRANSITIONAL PROVISIONS

**First:** Any request for authorization that is being processed must comply with the provisions of these Instructions and the policies for the use of the online program of the Industrial Cadastre.

## DEROGATORY PROVISION

Resolution 006-003 EXTRAORDINARY DIRECTORATE ARCH-2015, published in Official Gazette No. 636 Supplement of November 26, 2015, which issued the *"Instructions for the purchase of Oil Derivatives for the Industrial Segments",* is hereby repealed,

## FINAL DISPOSITION

This Resolution of the Board of Directors will become effective as of its publication in the Official Gazette and the Agency for Regulation and Control of Energy and Non-Renewable Natural Resources is responsible for its execution.

Given in the city of San Francisco de Quito, Metropolitan District, on the thirteenth day of November of the year two thousand and twenty.

## SOURCES OF THIS EDITION OF THE SUBSTITUTE INSTRUCTIONS FOR THE AUTHORIZATION OF THE PURCHASE OF PETROLEUM DERIVATIVES FOR INDUSTRIAL SEGMENTS


All rights reserved. Reproduction in whole or in part is prohibited.
Think about the environment. Print only if necessary.
Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

Resolution ARCERNNR-020/2020 (Third Supplement to the Official Gazette 353, December 18, 2020).


All rights reserved. Reproduction in whole or in part is prohibited.
Think about the environment. Print only if necessary.

# RESOLUCIÓN Nro. ARCERNNR-020/2020

## EL DIRECTORIO DE LA AGENCIA DE REGULACIÓN Y CONTROL DE ENERGÍA Y RECURSOS NATURALES NO RENOVABLES

## CONSIDERANDO:

**Que,** el artículo 227 de la Constitución de la República del Ecuador dispone que la *"administración pública constituye un servicio a la colectividad que se rige por los principios de eficacia, eficiencia, calidad, jerarquía, desconcentración, descentralización, coordinación, participación, planificación, transparencia y evaluación";*

**Que,** el número 11 del artículo 261 de la Constitución de la República del Ecuador, establece que, el Estado Central tiene competencia exclusiva sobre los hidrocarburos;

**Que,** el artículo 313 de la Constitución ibídem, dispone: *"(...) el Estado se reserva el derecho de administrar, regular, controlar y gestionar los sectores estratégicos, entre ellos los recursos naturales no renovables, de conformidad con los principios de sostenibilidad ambiental, precaución," prevención y eficiencia (...)";*

**Que,** el artículo 314 de la Ley Suprema, establece que, el Estado será responsable de la provisión de los servicios públicos, garantizará que éstos respondan a los principios de obligatoriedad, generalidad, uniformidad, eficiencia, responsabilidad, universalidad, accesibilidad, regularidad, continuidad y calidad; así como dispondrá que los precios y tarifas de los servicios públicos sean equitativos, y establecerá su control y regulación;

**Que,** el artículo 11 de la Ley de Hidrocarburos vigente, dispone la creación de la Agencia de Regulación y Control Hidrocarburífero, ARCH, como organismo técnico-administrativo, encargado de regular, controlar y fiscalizar las actividades técnicas y operacionales en las diferentes fases de la industria hidrocarburífera, que realicen las empresas públicas o privadas, nacionales, extranjeras, empresas mixtas, consorcios, asociaciones, u otras formas contractuales y demás personas naturales o jurídicas, nacionales o extranjeras que ejecuten actividades hidrocarburíferas en el Ecuador; y que entre sus atribuciones están el control técnico de las actividades hidrocarburíferas, y la correcta aplicación de la Ley de Hidrocarburos, sus reglamentos y demás normativa aplicable en materia hidrocarburífera;

**Que,** la Ley para la Optimización y Eficiencia de Trámites Administrativos Registro Oficial Segundo Suplemento 353 de 23 de octubre de 2018, *"Art. 10.- Veracidad de la información.- Las entidades reguladas por esta Ley presumirán que las declaraciones, documentos y actuaciones de las*



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved
Dirección
Código Postal: 170506 / Quito Ecuador
Teléfono: 593 2 2268744 www.regulacionelectrica.gob.ec
Toda una Vida
GOBIERNO DE TODOS

*personas efectuadas en virtud de trámites administrativos son verdaderas, bajo aviso a la o al administrado de que, en caso de verificarse lo contrario, el trámite y resultado final de la gestión podrán ser negados y archivados, o los documentos emitidos carecerán de validez alguna, sin perjuicio de las sanciones y otros efectos jurídicos establecidos en la ley (…).*

*A los efectos de esta Ley, se entenderá por declaración responsable el instrumento público suscrito por el interesado en el que manifiesta, bajo su responsabilidad, que cumple con los requisitos establecidos en la normativa vigente para el ejercicio de una actividad, que dispone de la documentación que así lo acredita y que se compromete a mantener su cumplimiento durante el periodo de tiempo inherente a dicho ejercicio.*

*Las declaraciones responsables contendrán notas que recuerden la responsabilidad del suscriptor respecto de la veracidad de la información proporcionada y permitirán ejercer una actividad, desde el día de su presentación, sin perjuicio de las facultades de control, inspección y vigilancia que tenga atribuida la entidad competente ante la cual se realizó la declaración responsable y de las responsabilidades administrativas, civiles o penales que se puedan establecer por consagrar información incompleta, falsa o adulterada.";*

**Que,** el artículo innumerado a continuación del artículo 3 del Decreto Ejecutivo No. 407 publicado en el Registro Oficial No. 90 de 26 de agosto de 2005, agregado por el Decreto Ejecutivo No. 982 promulgado en el Registro Oficial No. 179 de 03 de enero de 2006, dispone: *"La Dirección Nacional de Hidrocarburos controlará la emisión y vigencia de todos los códigos de clientes que emita PETROCOMERCIAL en su calidad de abastecedora y realizará análisis de la evolución de los volúmenes despachados con cargo a estos códigos";*

**Que,** el artículo 2 del Decreto Ejecutivo No. 1859 publicado en el Registro Oficial Suplemento No. 364 de 26 de septiembre del 2006 establece: *"(...) Petrocomercial (hoy EP PETROECUADOR) y las comercializadoras proveerán de combustibles derivados de hidrocarburos y GLP exclusivamente a los sujetos de control que se encuentren registrados y catastrados en la Dirección Nacional de Hidrocarburos (DNH) (hoy ARCH) por haber cumplido con todos los requisitos y condiciones legales para realizar dicha actividad";*

**Que,** el artículo 5 del Decreto Ejecutivo No.149, publicado en el Registro Oficial Suplemento No. 146 de 18 de diciembre de 2013, al determinar la simplificación de trámites señala: *"(...)La administración pública central, institucional y que depende de la Función Ejecutiva establecerá la gestión con enfoque en la simplificación de trámites. La gestión Pública propenderá progresivamente a la disminución y la eliminación de la duplicidad de requisitos y actividades que debe realizar el ciudadano*



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

*frente a la administración para acceder a servicios eficientes, transparentes y de calidad. (...)";*

**Que**, mediante Decreto Ejecutivo 1036 de 06 de mayo de 2020, se dispone la Fusión entre la Agencia de Regulación y Control Minero, la Agencia de Regulación y Control de Electricidad y la Agencia de Regulación y Control de Hidrocarburos en una sola entidad denominada: *"Agencia de Regulación y Control de Energía y Recursos Naturales no Renovables";*

**Que,** el artículo 2 del decreto Ibídem establece que: "*Una vez concluido el proceso de fusión, todas las atribuciones, funciones programas, proyectos, representaciones y delegaciones constantes en leyes, decretos, reglamentos y demás normativa vigente que le correspondían a la Agencia de Regulación y Control Minero, a la Agencia de Regulación y Control de Electricidad y a la Agencia de Regulación y Control de Hidrocarburos, serán asumidas por la Agencia de Regulación y Control de Energía y Recursos Naturales no Renovables.";*

**Que,** mediante Resolución 006-003 DIRECTORIO EXTRAORDINARIO ARCH-2015, publicada en el Registro Oficial N° 636 Suplemento del 26 de noviembre de 2015, se expidió el "Instructivo para la compra de Derivados del petróleo para los Segmentos Industriales"

**Que,** mediante Memorando Nro. ARCERNNR-DCOMH-2020-0465-ME, de 31 de Octubre de 2020, la Dirección Técnica de Control y Fiscalización de Comercialización de Hidrocarburos, sus Derivados, Biocombustibles y sus Mezclas recomienda; *"emitir el Instructivo para la Autorización de Compra de Derivados del Petróleo para los Segmentos Industriales"*

**Que,** mediante Memorando Nro. ARCERNNR-DRNH-2020-0067-ME, de 01 de noviembre de 2020, el Director de Regulación y Normativa Hidrocarburífera emite su informe regulatorio y normativo favorable indicando: *"(...) esta Dirección emite el pronunciamiento favorable al proyecto de Resolución mencionada anteriormente, considerando procedente continuar con el trámite de oficialización. (...).",* y solicita remitir los presentes documentos para la elaboración del informe Jurídico correspondiente sobre la propuesta de Resolución adjunta para a su vez remitirlo al Dirección Ejecutiva de la ARC; y,

**Que,** mediante Memorando Nro. ARCERNNR-CGJ-2020-0455-ME, de 08 de noviembre de 2020, el Coordinador General Jurídico emite su informe jurídico favorable en el cual indica en lo principal que: *"(...) acoge el Informe Técnico emitido mediante Memorando Nro. ARCERNNR-DCOMH-2020-0465-ME, de 31 de octubre de 2020, por la Dirección Técnica de Control y Fiscalización de Comercialización de Hidrocarburos, sus derivados, biocombustibles y sus mezclas, así como el Informe Favorable de la Dirección de Regulación y Normativa Hidrocarburífera, que consta del Memorando Nro. ARCERNNR-DRNH-*


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/19/24 1:30 PM, Submission Status: Approved

# Tab 47

# P.R. 338

committee discussions and guidance regarding U.S. Government strategies and policies.

The open session will be accessible via teleconference. To join the conference, submit inquiries to Ms. Yvette Springer at *Yvette.Springer@bis.doc.gov,* no later than April 23, 2024.

To the extent time permits, members of the public may present oral statements to the Committee. The public may submit written statements at any time before or after the meeting. However, to facilitate distribution of materials to Committee members, the Committee suggests that members of the public forward their materials prior to the meeting to Ms. Springer. Material submitted by the public will be made public and therefore should not contain confidential information.

The Deputy Assistant Secretary for Administration Performing the non-exclusive functions and duties of the Chief Financial Officer with the concurrence of the delegate of the General Counsel, formally determined on April 9, 2024, pursuant to 5 U.S.C. 1009(d)), that the portion of the meeting dealing with pre-decisional changes to the Commerce Control List and the U.S. export control policies shall be exempt from the provisions relating to public meetings found in 5 U.S.C. 1009(a)(1) and 1009(a)(3). The remaining portions of the meeting will be open to the public.

For more information, contact Ms. Springer via email.

**Yvette Springer,**

*Committee Liaison Officer.*

[FR Doc. 2024–08857 Filed 4–24–24; 8:45 am]

**BILLING CODE 3510–JT–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[C–331–806]**

### Frozen Warmwater Shrimp From Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) published a notice in the **Federal Register** on April 1, 2024, in which Commerce preliminarily determined that countervailable subsidies are being provided to producers and exporters of frozen warmwater shrimp (shrimp) from Ecuador. Based on comments filed by interested parties in this investigation, Commerce is amending the preliminary affirmative countervailing duty (CVD) determination on shrimp from Ecuador to correct significant ministerial errors.

**DATES:** Applicable April 25, 2024.

**FOR FURTHER INFORMATION CONTACT:** Zachary Shaykin or Reginald Anadio, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–2638 or (202) 482–3166, respectively.

**SUPPLEMENTARY INFORMATION:**

#### Background

In accordance with section 703(b) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.205(b), on April 1, 2024, Commerce published in the **Federal Register** the preliminary affirmative CVD determination for shrimp from Ecuador, and alignment of the final determination with the final antidumping duty determination.[1] From March 28 through April 2, 2024, we received timely-filed ministerial error allegations from Industrial Pesquera Santa Priscila S.A. (Santa Priscila), Sociedad Nacional de Galápagos C.A. (SONGA), the petitioner,[2] and the Government of Ecuador (GOE).[3] Santa Priscila, SONGA, and the GOE alleged in their ministerial error allegations that Commerce made significant ministerial errors in the *Preliminary Determination* with respect to Santa Priscila and SONGA's subsidy rates.[4]

#### Period of Investigation

The period of investigation (POI) is January 1, 2022, through December 31, 2022.

#### Scope of the Investigation

The products covered by this investigation are shrimp from Ecuador. For a complete description of the scope of this investigation, *see Preliminary Determination* at Appendix I.

#### Analysis of Significant Ministerial Error Allegations

Commerce will analyze any comments received and, if appropriate, correct any significant ministerial error by amending the preliminary determination according to 19 CFR 351.224(e). A ministerial error is defined in 19 CFR 351.224(f) as ''an error in addition, subtraction, or other arithmetic function, clerical error resulting from inaccurate copying, duplication, or the like, and any other similar type of unintentional error which the Secretary considers ministerial.''[5] A significant ministerial error is defined as a ministerial error, the correction of which, singly or in combination with other errors, would result in: (1) a change of at least five absolute percentage points in, but not less than 25 percent of, the CVD rate calculated in the original preliminary determination; or (2) a difference between a CVD rate of zero (or *de minimis*) and a CVD rate greater than *de minimis,* or vice versa.[6]

#### Amended Preliminary Determination

Pursuant to 19 CFR 351.224(e) and (g)(1), Commerce is amending the *Preliminary Determination* to reflect the correction of two ministerial errors made in the calculation of the countervailable subsidy rate for Santa Priscila.[7] Specifically, when calculating a countervailable subsidy rate attributable to Santa Priscila under the Tax Incentives for Priority Sectors under the 2010 Organic Production Code (Priority Sectors) program, we inadvertently used the wrong tax deduction amount with which to calculate the benefit attributable to Santa Priscila under the Priority Sectors Program.[8] Further, we inadvertently

[1] *See Frozen Warmwater Shrimp From Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With the Final Antidumping Duty Determination,* 89 FR 22379 (April 1, 2024) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[2] The petitioner in this investigation is the American Shrimp Processors Association.

[3] *See* Santa Priscila's Letter, ''Frozen Warmwater Shrimp from Ecuador—Request for Correction of Ministerial Errors with Respect to Industrial Pesquera Santa Priscila S.A. and Request for Meeting,'' dated March 28, 2024 (Santa Priscila's Ministerial Error Allegation); SONGA's Letter, ''Frozen Warmwater Shrimp from Ecuador—Request for Correction of Ministerial Error in Preliminary Determination,'' dated March 29, 2024 (SONGA's Ministerial Error Allegation); *see also* Petitioner's Letter, ''Frozen Warmwater Shrimp from Ecuador: Ministerial Error Comments,'' dated April 2, 2024; and GOE's Letter, ''Frozen Warmwater Shrimp from Ecuador—Request for Correction of Ministerial Errors with Respect to Industrial Pesquera Santa Priscila S.A. and Request for Meeting,'' dated April 2, 2024 (GOE's Ministerial Error Allegation).

[4] *See* Santa Priscila's Ministerial Error Allegation; *see also* SONGA's Ministerial Error Allegation; and GOE's Ministerial Error Allegation.

[5] *See* section 705(e) of the Act.

[6] *See* 19 CFR 351.224(g).

[7] *See* Memorandum, ''Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Allegations of Significant Ministerial Errors in the Preliminary Determination,'' dated concurrently with, and hereby adopted by, this notice (Preliminary Ministerial Error Memorandum).

[8] *See Preliminary Determination* PDM at 15 through 17.

Filed By: Katrina Dyer, Filed Date: 4/25/24 10:27 AM, Submission Status: Approved

calculated a countervailable subsidy rate attributable to Santa Priscila under both the Priority Sectors program and the Investment Contract program that should have only been calculated pursuant to one program, *i.e.,* the Priority Sectors Program.[9] Commerce finds that these ministerial errors are significant ministerial errors within the meaning of 19 CFR 351.224(g) because correction of these errors decreases Santa Priscila's countervailing subsidy rate from 13.41 to 2.89 percent, which is a change that is at least five absolute percentage points in, and more than 25 percent of, the subsidy rate calculated for Santa Priscila in the original *Preliminary Determination.*

Furthermore, in the *Preliminary Determination,* we calculated a 1.69 percent subsidy rate for SONGA and indicated that we will instruct U.S. Customs and Border Protection (CBP) to require a cash deposit equal to that rate. Section 703(b)(4)(B) of the Act, provides that Commerce will apply a *de minimis* threshold of two percent to a country designated by the United States Trade Representative (USTR) as a developing country for purposes of the CVD law.[10] Ecuador is designated as a developing country by the USTR under CVD law and is subject to a *de minimis* standard of two percent.[11] As stated by SONGA and the GOE,[12] we inadvertently did not designate the preliminary *ad valorem* subsidy rate assigned to SONGA as *de minimis* as stipulated by section 703(b)(4)(B) of the Act. Therefore, for SONGA, we will not direct CBP to suspend liquidation of entries of the subject merchandise from Ecuador, in accordance with section 703(b)(4)(B) of the Act.

In addition, as a result of this inadvertent error and as stipulated by section 705(c)(5)(A) of the Act, we are correcting the all-others rate to equal the amended preliminary CVD rate established for Santa Priscila, *i.e.,* 2.89 percent *ad valorem,* as this is the only rate that is not zero, *de minimis,* or based entirely on the facts otherwise available.

Also, we listed an incorrect name for one of Santa Priscila's cross-owned companies, *i.e.,* Tropical Packing Ecuador S.A.[13] Moreover, we inadvertently stated ''aluminum extrusions from Indonesia'' in the ITC Notification section of the original notice.[14]

For a complete discussion of the alleged ministerial errors, *see* the Preliminary Ministerial Error Memorandum.

**Amended Preliminary Determination**

| Company | Subsidy rate (percent *ad valorem*) |
|---|---|
| Industrial Pesquera Santa Priscila S.A.[15] | 2.89. |
| Sociedad Nacional de Galápagos C.A.[16] | 1.69 (*de minimis*). |
| All-Others | 2.89. |

**Correction**

In the **Federal Register** of April 1, 2024, in FR Doc 2024–06845, on page 22380, in the third column, correct the Subsidy Rate (percent *ad valorem*) for Sociedad Nacional de Galapagos C.A. and All Others, as found in the rate table, to 1.69 *de minimis* and 2.89, respectively, and correct the name ''Tropack S.A.'' as found under footnote 9 to ''Tropical Packing Ecuador S.A.'' Additionally, in FR Doc 2024–06845, on page 22380, in the third column, second paragraph, include ''As provided for in section 703(b)(4)(B) of the Act, for developing countries, any rate less than two percent *ad valorem* in an investigation is *de minimis.* Accordingly, for SONGA, we will not direct CBP to suspend liquidation of entries of subject merchandise'' before the sentence stating, ''Further, pursuant to 19 CFR 351.205(d), Commerce will instruct CBP to require a cash deposit equal to the rates indicated above.'' Additionally, in FR Doc 2024–06845, on page 22381, in the second column, correct ''aluminum extrusions from Indonesia'' to ''shrimp from Ecuador.''

**Amended Cash Deposits and Suspension of Liquidation**

The collection of cash deposits and suspension of liquidation will be established according to the rates calculated in this amended preliminary determination. Because the amended rates for Santa Priscila and all others result in decreased cash deposits, they will be effective retroactively to April 1, 2024, the date of publication of the *Preliminary Determination.* Parties will be notified of this determination, in accordance with section 703(d) and (f) of the Act.

**Disclosure**

We intend to disclose the calculations performed to parties in this proceeding within five days after public announcement of the amended preliminary determination, in accordance with 19 CFR 351.224.

**International Trade Commission Notification**

In accordance with section 703(f) of the Act, we will notify the International Trade Commission of our amended preliminary determination.

**Notification to Interested Parties**

This notice is issued and published in accordance with sections 703(f) and 777(i) of the Act.

Dated: April 19, 2024.

**Ryan Majerus,**

*Deputy Assistant Secretary for Policy and Negotiations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

[FR Doc. 2024–08817 Filed 4–24–24; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

### The Regents of the University of Michigan; Application(s) for Duty-Free Entry of Scientific Instruments

Pursuant to section 6(c) of the Educational, Scientific and Cultural Materials Importation Act of 1966 (Pub. L. 89–651, asamended by Pub. L. 106–36; 80 Stat. 897; 15 CFR part 301), we

---

[9] *Id.* at 15 through 17 and 23 through 26.

[10] *See* section 703(b)(4)(B) of the Act; *see also* section 771(36) of the Act.

[11] *See Designations of Developing and Least Developed Countries Under the Countervailing Duty Law,* 85 FR 7613, 7615 (February 10, 2020); *see also Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigation,* 88 FR 81053, 81056 (November 21, 2023).

[12] *See* SONGA's Ministerial Error Allegation; *see also* GOE's Ministerial Error Allegation.

[13] *See Preliminary Determination,* 89 FR at 22380.

[14] *Id.* at 22381

[15] As discussed in the *Preliminary Determination,* Commerce has found the following companies to be cross-owned with Santa Priscila: Manesil S.A., Produmar S.A., Egidiosa S.A., and Tropical Packing Ecuador S.A.

[16] As discussed in the *Preliminary Determination,* Commerce has found the following companies to be cross-owned with SONGA: Naturisa S.A., Holding Sola & Sola Solacciones S.A., and Empacadora Champmar S.A.

# Tab 48

# P.R. 342

# C.R. 229

Barcode: 4549843-01 C-331-806 INV - Investigation

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE. Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 46
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been ranged
or redacted from pages 4, 5, and 9;
and in Exhibits 1 to 5.

**PUBLIC VERSION**

April 26, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
SONGA's 771B Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos C.A. ("SONGA"), we hereby submit the GOE's response to the Department's April 3, 2024, supplemental questionnaire. This response is timely submitted in accordance with the Department's April 22, 2024, letter entitled, "Second Request for Extension to 771B Questionnaire Response," which extended the deadline to today.

Accompanying this submission are calculation worksheets in Excel® format.

Pursuant to 19 C.F.R. § 351.304(a)(1)(i), SONGA requests proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which the GOE requests proprietary treatment and the basis for the request:

- Nature of Products or Production Process: Contained in the narratives and exhibits. Protected under 19 C.F.R. § 351.105(c)(1).

- Production and Distribution Costs: Contained in the narratives and exhibits. Protected under 19 C.F.R. §§ 351.105(c)(2) and (3).


Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

- Other Specific Business Information Related to SONGA's Business and Production Operations, Accounting and Financial Practices and Documents, etc., the Release of Which to the Public Would Cause Substantial Harm to SONGA's Competitive Position: Contained in the narratives and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to SONGA's competitive position. SONGA consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to SONGA*

Barcode: 4549843-01 C-331-806 INV - Investigation

## COMPANY CERTIFICATION

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I prepared or otherwise supervised the preparation of the attached submission of the response to the Countervailing Duty Questionnaire Regarding Section 771B of the Act, filed on April 25, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: April 25 2024

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galápagos C.A., certify that I have read the attached the response to the Countervailing Duty Questionnaire Regarding Section 771B of the Act, filed on April 25, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: April 25, 2024

Barcode: 4549843-01 C-331-806 INV - Investigation

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 26th day of April, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

Barcode: 4549843-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**POI: 1/01/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information has been ranged or redacted from pages 4, 5, and 9; and in Exhibits 1 to 5.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

# RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A. TO THE DEPARTMENT'S APRIL 3, 2024 COUNTERVAILING DUTY QUESTIONNAIRE REGARDING 771B OF THE ACT

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: April 26, 2024**

**Counsel to Sociedad Nacional de Galápagos C.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

**ATTACHMENT**
**Frozen Warmwater Shrimp from Ecuador**
**Section 771B Questionnaire**
**Industrial Pesquera Santa Priscila and SONGA**

**NOTE:** ***In accordance with section 351.303(e) of Commerce's regulations, "A document submitted in a foreign language must be accompanied by an English translation of the entire document or of only pertinent portions, where appropriate, unless the Secretary waives this requirement for an individual document. A party must obtain Commerce's approval for submission of an English translation fo only portions of a document prior to submission to Commerce."***

**NOTE:** ***Please repeat the question prior to giving your response when responding to this supplemental questionnaire.***

---

**Section 771B of the Act – Respondent**

**1. The petitioner has alleged that countervailable subsidies found to be provided to either growers and/or suppliers of raw shrimp shall be deemed to be provided with respect to the manufacture, production or exportation of the subject merchandise under section 771B of the Tariff Act of 1930, as amended (the Act). As Commerce noted at the time of initiation of this investigation, {*See* Countervailing Duty Initiation Checklist: Frozen Warmwater Shrimp from Ecuador, dated November 14, 2023.} the petitioner provided adequate information demonstrating that section 771B of the Act is applicable to the investigation of the shrimp industry in Ecuador and subsequently preliminarily found that the record evidence was sufficient to apply section 771B of the Act in the *Preliminary Determination*. {*See Preliminary Determination* and accompanying PDM at 9 through 11.} If you disagree that section 771B of the Act is applicable to the shrimp industry in Ecuador, please submit information and all supporting documentation to demonstrate that this provision is not applicable. Any information and supporting documentation submitted should address the two factors enumerated under section 771B of the Act:**

**(1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and**

**(2) the processing operation adds only limited value to the raw commodity.**

ANSWER: Sociedad Nacional de Galápagos C.A. ("SONGA") does not contest that the demand for subject merchandise is substantially dependent upon the demand for raw shrimp. However, processing of raw shrimp into subject merchandise in Ecuador adds significant value to the value of raw shrimp harvested from ponds by shrimp farmers.

The added value is demonstrated by a comparison of the net ex-factory subject merchandise sales value to the raw shrimp commodity material input cost. **Exhibit 1** contains a listing—separated and cumulated by product type—of all frozen warmwater shrimp merchandise matching the scope of this investigation that SONGA sold during the period October 1, 2022, through September 30, 2023, which SONGA submitted to the Department in the course of its participation



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

as a mandatory respondent in the separate antidumping duty ("AD") investigation of certain frozen warmwater shrimp from Ecuador covering that same time period. The period of investigation in that AD investigation overlaps by three months with the period of investigation ("POI") in this countervailing duty ("CVD") investigation and provides a contemporaneous listing of the subject merchandise that SONGA sold to the United States.

The products identified in **Exhibit 1** have been segregated and cumulated by "control number," a method by which SONGA assigned codes to subject merchandise sold to the United States based on each finished product's physical characteristics, as established by the Department. Products sharing identical physical characteristics (e.g., raw or cooked, head-on or headless, with shell or shell-less, veined or deveined, etc.) have the same control number. **Exhibit 2** contains an excerpt from SONGA's Section C response filed in the AD investigation with narrative descriptions of how SONGA assigned the control number characteristics to each product sold to the United States. Using the corresponding control number assigned to each product listed in **Exhibit 1**, SONGA has calculated a weighted-average net ex-factory price *per pound* based on the gross unit prices minus all adjustments and movement and direct selling expenses. A summary chart with this information, as well as a step-by-step list of the methodology used to calculate the summary net prices, are attached in **Exhibit 3**.

**Exhibit 4** contains a listing of the raw shrimp material purchases made by SONGA during the same time period (i.e., October 1, 2022, through September 30, 2023). Like the U.S. sales data in **Exhibit 1** and **3**, these raw shrimp material purchase data previously were submitted to the Department in the course of the antidumping duty investigation of certain frozen warmwater shrimp from Ecuador covering the same time period. These fresh shrimp purchase price data, which we also provide to the Department in electronic format, provide subtotals for SONGA that show the quantities purchased, the total dollar amount paid, and the average price per pound.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

As shown in **Exhibit 4**, the average price for raw shrimp material purchased by SONGA during the period October 1, 2022, through September 30, 2023 was $[ ] per pound. In contrast, as shown in **Exhibit 3**, the average net ex-factory selling price for all frozen subject merchandise shrimp that SONGA sold to the United States during the period October 1, 2022, through September 30, 2023 was [ ] per pound. This difference in value represents a [ ] percent average value-added increase between the raw material purchased by SONGA and the finished frozen products sold.

Much of the value added by SONGA in transforming raw shrimp material into frozen subject merchandise comes from the capital-intensive nature of its production facilities. The nature and sophistication of SONGA's processing operations are the critical parts of producing a finished frozen shrimp product. While it can be said that growing shrimp is the first necessary step in the production of subject merchandise, it is not the operation that imparts the product's final physical characteristics; nor is it an especially sophisticated production step. Rather, the production of the raw shrimp commodity is simply the initial material input stage in the production of the subsequent downstream finished frozen shrimp product.

The far more intensive production steps, which require sophisticated machinery and equipment and which impart the physical characteristics that respond to and dictate customer demand (i.e., cooked form, head status, shell status, vein status, tail status, shrimp preparation, frozen form, flavoring, container weight, presentation, and preservatives) are the processing, cooking, freezing, and packaging stages. These steps are not, and simply cannot be, performed by shrimp farmers (or shrimp fishermen), who lack the technical expertise, the machinery and equipment, the sanitary facilities, the quality control and laboratory facilities, and the freezing capability to engage in such production. As demonstrated by the value differences described above, the processing facility adds the majority of the finished product's value.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

SONGA's shrimp processing plants are massive buildings equipped with state-of-art technology to maximize production volume and enhance the consistency and quality of the products. SONGA's processing plant has eleven automatic sizing machines, steamers, tunnel freezing rooms, and an IQF freezer. And, SONGA employs thousands of skilled workers to assist in processing and transforming the raw shrimp commodity. The shrimp processing facilities also have specialized cold storage facilities that permit SONGA to store finished products.

The capital investment necessary to establish and operate a shrimp processing facility is enormous, requiring millions of dollars in specialized machinery and equipment. As shown in SONGA's 2022 balance sheet, previously provided in Exhibit 2(c) of SONGA's initial Section III questionnaire response ("IQR"), SONGA had significant total capital investment in plant and equipment related to its processing activities. The financial data for SONGA not only demonstrates substantial levels of investment in plants, machinery, and equipment, but also establish that these investments constitute a considerable amount in comparison to each company's annual revenues. For example, as shown in Note 10 of SONGA's 2022 Financial Statements contained Exhibit 2(c) of SONGA's IQR, SONGA's (remaining undepreciated) investment in "Machinery and Equipment" and "Building and Facilities" constituted [ ] of its 2022 revenue (i.e., $[ ])]. Based on the major level of investment necessary to operate a shrimp processing facility, it is both natural and expected that the processing of frozen shrimp results in a significant value added to the raw shrimp input commodity.

**In addition to the above factors, please also provide any other relevant information and supporting documentation for Commerce's consideration regarding the frozen warmwater shrimp market.**

**Please note that any information submitted in response to this question, including any cost information submitted to rebut the application of section 771B of the Act, is subject to verification, as required under section 782 of the Act.**



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

ANSWER: The underlying assumption of the Department's attribution of subsidy benefits to unaffiliated shrimp farmers who supplied raw shrimp to SONGA has no factual basis in the record. The Department found that many of the programs under investigation, for which the Department attributed benefits to unaffiliated shrimp farmers, are programs where eligibility is not broadly available to all shrimp farmers, but rather, requires significant capital investment and/or reinvestment of those capital investments by a shrimp farm devoted to specific purposes.

For example, the Department preliminarily found that Environmental Tax Incentive program requires that Ecuadorian businesses may deduct, against taxable income, 100 percent of the depreciation for equipment, machinery or technology, intended for the implementation of cleaner production mechanisms, renewable energy generation mechanisms, reduction of the environmental impact of production activities, and/or the reduction of greenhouse gas emissions. See Memorandum to Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, re: "Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador" (Mar. 25, 2024), at 13 ("Prelim. Decision Memo").

Moreover, the Department found that no party may claim the additional deduction unless it first "obtains approval that the capital expenditure meets the criteria of an investment in renewable or sustainable technology before {a taxpayer} may claim the deduction." Id. The Department preliminarily attributed subsidy benefits under this program to unaffiliated shrimp farmers who supplied raw shrimp to Santa Priscila and SONGA during the POI without any evidence that any unaffiliated shrimp farmer that supplied Santa Priscila or SONGA with raw shrimp made a qualifying investment that would entitle it to claim such a deduction or that any unaffiliated shrimp farmer that supplied SONGA with raw shrimp received approval. See Memorandum to The File, re: "Preliminary Determination Calculations for Sociedad Nacional de Galapagos C.A." (Mar. 25,



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

2024), at 2–3 ("SONGA Prelim. Calc. Memo"), Memorandum to The File, re: "Preliminary Determination Calculations for Industrial Pesquera Santa Priscila S.A." (Mar. 25, 2024), at 2–3 ("Santa Priscila Prelim. Calc. Memo").

Likewise, the Department preliminarily found that the Refund of Currency Outflow Tax ("ISD") on Purchase of inputs allows taxpayers that imported inputs, consumable goods, and capital goods that are subsequently incorporated into, consumed, or used in the manufacture of goods, to claim a credit of ISD normally levied on such goods at a 5 percent rate. Prelim. Decision Memo at 17. The Department preliminarily attributed subsidy benefits under this program to unaffiliated shrimp farmers who supplied raw shrimp to Santa Priscila and SONGA during the POI without any evidence that any unaffiliated shrimp supplier that supplied Santa Priscila or SONGA with raw shrimp made any purchases of qualifying imported inputs, consumable goods, or capital goods, or that any such unaffiliated shrimp supplier claimed such an ISD through any available mechanism. SONGA Prelim. Calc. Memo at 3, Santa Priscila Prelim. Calc. Memo at 5.

The Department also preliminarily found that the Municipal Tax on Total Assets may be exempted by the municipality of Guayaquil on assets that are engaged in aquacultural activities in the Canton of Guayaquil. Prelim. Decision Memo at 27. The Department further preliminarily found that this benefit was provided automatically based on the purpose of the business of the eligible taxpayer with no application. Id. However, the Department preliminarily attributed subsidy benefits under this program to unaffiliated shrimp farmers who supplied raw shrimp to Santa Priscila and SONGA during the POI without any evidence that those unaffiliated shrimp suppliers had operations located in the Canton of Guayaquil or in any other municipality that allowed a taxpayer engaged in aquacultural activity to claim an exemption from tax on aquacultural assets located within the municipality. SONGA Prelim. Calc. Memo at 6, Santa Priscila Prelim. Calc. Memo at 9–10.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

Finally, the Department erroneously preliminarily attributed subsidy benefits received by Santa Priscila and Naturisa received under the investment contract program to unaffiliated shrimp farmers who supplied raw shrimp to Santa Priscila and SONGA during the POI. See Santa Priscila Prelim. Calc. Memo at 9, SONGA Prelim Calc Memo at 5–6. The Department preliminarily found that the program requires an eligible company to be awarded an investment contract by making investments of at least one million U.S. dollars and to meet specific conditions in exchange for receiving various combinations of recurring benefits, including income tax rate reductions, ISD exemptions and reductions in import duties during the term of the contract. Prelim. Decision Memo at 23.

The Department's preliminary determination to attribute benefits received by Santa Priscila, SONGA, and Naturisa to unaffiliated shrimp farmers who supplied raw shrimp to Santa Priscila and SONGA is unsupported because there is no evidence that any of the unaffiliated shrimp farmers who supplied raw shrimp to Santa Priscila or SONGA during the POI was awarded an investment contract or even had sufficient working capital to make a qualifying investment of at least one million U.S. dollars. Accordingly, the record does not support the Department's preliminary determination to attribute subsidy benefits received by Santa Priscila and Naturisa received under the investment contract program to unaffiliated shrimp farmers who supplied raw shrimp to Santa Priscila and SONGA during the POI. The Department should solicit this information from SONGA's unaffiliated suppliers of raw shrimp rather than assume that they have benefited from investment contracts.

**2. Explain and provide documentation to demonstrate the share of the cost of production of subject merchandise which fresh shrimp represented for your company during the period of investigation.**

ANSWER: **Exhibit 5** contains a worksheet reflecting the share of cost of production of subject merchandise whish fresh shrimp represented for SONGA during the POI, which was submitted as Exhibit D-4 of SONGA's Section D response in the concurrent AD investigation. As reflected in



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

**Exhibit 5,** fresh shrimp raw material costs accounted for [ ] percent of extended total costs of production, as reflected in the cost of production ("COP") file submitted by SONGA in its Section D response in the concurrent AD investigation.

Addition of raw materials, processing costs, selling, general, and administrative expenses, and profit, which the petitioner concedes collectively adds value of [ ]% to the value to the finished product, adds more than "limited value" as that term is used in Section 771B of the Act.

The Petitioner concedes that the "vast majority of fresh warmwater shrimp—as much as 95 percent—undergoes further processing." Volume Vol. I of the Petition at page 4 (citing U.S. International Trade Commission, Frozen Warmwater Shrimp From China, Ecuador, India, Indonesia, Malaysia, Thailand, and Vietnam, Inv. Nos. 701-TA-491-497 (Preliminary), USITC Pub. 4380 (Feb.2013), attached as Exhibit I-4 to the Petition). Raw unprocessed shrimp is different from processed shrimp for a number of important reasons, including that: (1) it has not been deheaded, sorted, graded, or packaged; and (2) it is transported to shrimp farms on ice in plastic baskets that also contains foreign objects, such as sticks, leaves, small fish, and other detritus that collects in a pond over time. As such, raw, unprocessed shrimp is not suitable for sale for human consumption. Moreover, raw shrimp cannot be transported in significant volumes for export (or to local) markets without prior processing and immediate freezing because of its perishability. For these reasons, the "essential character" of raw and unprocessed shrimp is completely different from that of processed shrimp products. The term "limited value" connotes a minor amount of value added, not processing steps that can add [ ]% to the value of the final product.



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

**Exhibit List**

| Exhibit No. | Description | Electronic | BPI/Public |
|---|---|---|---|
| **Exhibit 1** | List of All Frozen Warmwater Shrimp Sold by SONGA from AD Investigation response | - | BPI |
| **Exhibit 2** | Excerpt from SONGA's Section C response Filed in the AD Investigation | - | BPI |
| **Exhibit 3** | Calculations and Methodology Used to Derive the Net Selling Prices from AD Investigation | - | BPI |
| **Exhibit 4** | Quantity and Value of Purchases of Shrimp from Affiliated and Unaffiliated Farms During the POI | - | BPI |
| **Exhibit 5** | Raw Shrimp Input and % of COM | - | BPI |



Filed By: khammer@tradepacificlaw.com, Filed Date: 4/26/24 1:54 PM, Submission Status: Approved

# Tab 49

# P.R. 350

Barcode:4552883-01 C-331-806 INV - Investigation -

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 EDRAKE@SCHAGRINASSOCIATES.COM F: (202) 429-2522

May 2, 2024

DOC Inv. No. C-331-806
Total Pages: 105
Investigation
AD/CVD Office IV

**PUBLIC DOCUMENT**

**BY ELECTRONIC FILING**
The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Frozen Warmwater Shrimp from Ecuador: Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses**

Dear Secretary Raimondo:

On behalf of the American Shrimp Processors Association ("ASPA" or "Petitioner"), we hereby submit to the U.S. Department of Commerce ("Commerce") deficiency comments and rebuttal factual information regarding the new subsidy questionnaire responses filed by the Government of Ecuador ("GOE"), Sociedad Nacional de Galápagos C.A. ("SONGA"), and Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") (collectively "Respondents") in this investigation on April 18, 2024. This submission contains factual information to correct, clarify, or rebut information contained in an initial questionnaire response, as defined in 19 C.F.R. § 351.102(b)(21)(i).[1] The specific information in Respondents' questionnaire responses this submission rebuts is described in more detail below. This information is timely submitted 14

[1] This statement satisfies 19 C.F.R. § 351.301(b).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 5/2/24 2:15 PM, Submission Status: Approved

days after Respondents' initial new subsidy allegation responses, in accordance with 19 C.F.R. § 351.301(c)(1)(v).

As detailed below, there are numerous deficiencies in Respondents' New Subsidy questionnaire responses. The most glaring deficiencies are in the responses regarding the provision of brackish water, and those are the focus of these comments. ASPA reserves the right to submit additional comments on other aspects of the New Subsidy responses in the near future. If Commerce decides to give Respondents another chance to cooperate with its investigation into these programs, it should issue supplemental questionnaires directing Respondents to cure these deficiencies. Throughout these comments any suggested questions for Commerce to include in supplemental questionnaires are set out in bold, single-spaced type.

As noted above, the most blatant deficiencies in Respondents' new subsidy questionnaire responses are their flat-out refusal to provide any of the information requested by Commerce regarding the provision of brackish water for less than adequate remuneration ("LTAR") program. Instead of answering Commerce's questions, the GOE, SONGA, and Santa Priscila merely assert the program does not exist and continue to try to re-litigate Commerce's decision to initiate an investigation into this program.[2] It is not Respondents' place to decide which programs Commerce may or may not investigate. Commerce must reject these evasion tactics. Respondents' withholding of information is already significantly impeding this investigation, and their failure to cooperate to the best of their ability to provide the requested information

---

[2] *See* Government of Ecuador's New Subsidy Allegations Questionnaire Response (Apr. 18, 2024) ("GOE NSA Response") at NSA-34 – NSA-50; SONGA's New Subsidy Allegations Questionnaire Response (Apr. 18, 2024) ("SONGA NSA Response") at NSA-16 – NSA-21; Santa Priscila's New Subsidy Allegations Questionnaire Response (Apr. 18, 2024) ("Santa Priscila NSA Response") at NSA-16 – NSA-24.

warrants the application of adverse facts available regarding this program.[3] If Commerce decides to give Respondents one more chance to cooperate, it must require Respondents to provide complete and meaningful responses to all of its questions regarding this program.

It is indisputable that shrimp farms in Ecuador use large amounts of brackish water in their shrimp ponds.[4] This includes the shrimp farms operated by SONGA and Santa Priscila.[5] It is also indisputable that all water resources in Ecuador are the property of the state.[6] Thus, the GOE is providing brackish water to the shrimp farms operated by SONGA and Santa Priscila. The record also establishes that the GOE provides this water free of charge, pursuant to a specific decision by the GOE to deem the use of brackish water by shrimp farms "non-consumptive," and thus not subject to charge. Thus, the GOE provides brackish water to shrimp farms for free, *i.e.*, for less than adequate remuneration.

Despite these uncontested facts, Respondents refuse to answer Commerce's questions about this program based on their assertion that they do not "consume" the brackish water provided by the GOE.[7] Whether Respondents characterize their use of brackish water as consumptive or non-consumptive is irrelevant. Indeed, Commerce explicitly recognized that the brackish water being provided by the GOE to shrimp farms is characterized as water provided for non-consumptive use, and that even brackish water for non-consumptive use has a

---

3 *See* 19 U.S.C. § 1677e.

4 *See, e.g.*, Ecuadorian Respondents Rebuttal to ASPA's Supplemental New Subsidy Allegations Response (Mar. 15, 2024) at 3 – 5 and Ex. 1. *See also* ASPA Second New Subsidy Allegations (Feb. 21, 2024) at 3 – 4 and Ex. 1.

5 *See, e.g.*, SONGA NSA Response at NSA-16 – NSA-18 (describing Naturisa's pumping of brackish water to its shrimp ponds). See also Santa Priscila NSA Response at NSA-17 – NSA-19 (describing the same for Santa Priscila and Produmar).

6 *See, e.g.*, ASPA Second New Subsidy Allegations (Feb. 21, 2024) at 2. *See also* GOE Section II Questionnaire Response (Feb. 15, 2024) at Ex. TAX-4(a).

7 *See, e.g.*, SONGA NSA Response at NSA-16; Santa Priscila NSA Response at NSA-17.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 5/2/24 2:15 PM, Submission Status: Approved

commercial value.[8] Thus, Respondents' arguments fly in the face of Commerce's own reasoning in initiating an investigation of this program. If Respondents wish to continue to argue that this program is not countervailable, they may do so, but such argumentation cannot substitute for cooperation and the provision of complete and accurate responses to Commerce's questions.

One of the key questions Commerce asked was a request for a list of the quantity of brackish water purchased by SONGA and Santa Priscila during the period of investigation ("POI").[9] Respondents provided no information in response to this question, on the basis that they did not "purchase" the brackish water they pumped into their shrimp ponds.[10] Commerce should not let Respondents avoid this question through an overly narrow interpretation of Commerce's standard Provision of Goods/Service Appendix questions. Instead, Commerce should direct Respondents to report the quantity of brackish water they pumped into their shrimp ponds during the POI.

Respondents should have no trouble reporting this information to Commerce. First, Respondents state that they have installed water pumps and pipes to pump brackish water from estuaries or other sources to their shrimp ponds.[11] Designing, installing, and maintaining a pump system adequate to supply water to a farm's shrimp ponds is central to any shrimp farming operation.[12] These pumps come with specific capacities for the quantity of water that can be

8 *See* Memorandum to Eric B. Greynolds, Director, Office IV, Antidumping and Countervailing Duty Operations, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations" (Mar. 21, 2024) (ACCESS Barcode 4530111-01) ("NSA Initiation Memo") at 5.

9 *See* SONGA NSA Response at NSA-21; Santa Priscila NSA Response at NSA-23.

10 *See* SONGA NSA Response at NSA-21; Santa Priscila NSA Response at NSA-23.

11 *See* SONGA NSA Response at NSA-16 – NSA-17; Santa Priscila NSA Response at NSA-17 – NSA-18.

12 *See* Ing. Fernando Huerta and Darryl E. Jory, "Retrofitting shrimp farms to recirculating systems," Responsible Seafood Advocate (Nov. 27, 2017), attached at **Exhibit 1**.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 5/2/24 2:15 PM, Submission Status: Approved

pumped, maximum flow rates, etc.[13] In addition, Respondents may use flow meters to monitor the volume of water being pumped into their ponds.[14] Thus, Respondents should be able to provide information regarding the quantity of brackish water pumped into their shrimp ponds during the POI.

Second, Respondents have provided information regarding the quantity of water that would be necessary to service a shrimp pond of a particular size for one year based on standard industry practices in Ecuador.[15] This information includes the average size of shrimp ponds in Ecuador, the average depth, the average number of crops per year, and the average amount of water exchanged each day.[16] Based on these figures, Respondents were able to calculate the amount of water contained in an average sized pond, and they were also able to estimate that each pond would need to have its water completely replaced approximately every 12 days, or about 30 times a year, resulting in a required volume of water for a year's operations that was 30 times the volume of water contained in the pond.[17] Respondents should similarly be able to provide information regarding the size and depth of the ponds on their shrimp farms, the amount of water exchanged each day, and thus the quantity of water used in their shrimp farms over the POI.

Third, Respondents tout their environmentally responsible shrimp farming practices, including the treatment of the water they use in their shrimp ponds.[18] SONGA, for example,

---

[13] *See* Aquaculture Water Pump Advertising Materials, attached at **Exhibit 2**.

[14] *See* Aquaculture Water Meter Advertising Materials, attached at **Exhibit 3**.

[15] See Ecuadorian Respondents Rebuttal to ASPA's Supplemental New Subsidy Allegations Response (Mar. 15, 2024) at 3 – 4.

[16] *See id*. at 3 and Exs. 1 and 2.

[17] *See id*. at 3 – 5 and Exs. 1 – 3.

[18] *See* SONGA and Santa Priscila Website Excerpts, attached at **Exhibit 4**.

states on its website that it has "a high-tech treatment system that guarantees the return of the water to the river."[19] The GOE also states that all shrimp farms have "Environmental Management Plan (EMP), which establishes plans or measures to prevent impacts or any type of contamination that generates environmental liabilities, and the Ministry of the Environment is responsible for ensuring compliance," and that the farm operators must also monitor discharge to ensure compliance.[20] These plans and compliance activities presumably also contain information about the amount of water used and discharged by shrimp farms in Ecuador.

Fourth, to the extent that the GOE requires shrimp farms to obtain permits to access brackish water, these permits may contain information on the quantity of water the farms are allowed to pump. The GOE states "all entities drawing water are required to hold the necessary environmental permits and are subject to review to ensure they are not consuming water."[21] In addition, the GOE states that SONGA and Santa Priscila and their cross-owned affiliates have been authorized to use public sources of water and possess the requisite permits.[22] Copies of SONGA and Santa Priscila's authorizations and permits were not provided by the GOE, but the GOE did provide a sample permit that includes a flow rate in liters per second for each water source a permit holder is allowed to access.[23] The GOE also states that while it does not keep specific records on brackish water use, its systems do "identify approvals for use of brackish water for shrimp farmers," though it did not provide copies of such approvals.[24]

---

19 *Id*.

20 GOE Section II Questionnaire Response (Feb. 15, 2024) at Ex. TAX-4(f).

21 *Id*. at TAX-40.

22 *See id*. at TAX-43 and TAX-44.

23 *See id*. at Ex. TAX-4(h).

24 GOE NSA Response at NSA-40.

In addition, the definition of non-consumptive use of water in Ecuador is use in which all of the water used is returned to the source without affecting the quantity and quality of the resource.[25] Presumably through these approvals or other permits, monitoring, on-site audits, or other methods the GOE thus confirms that amount of brackish water accessed and returned by shrimp farms to ensure their use is actually non-consumptive, and thus eligible to be provided free of charge. Copies of these documents thus may establish the amount of brackish water Respondents are permitted to access on their shrimp farms.

Suggested questions for supplemental questionnaires to SONGA and Santa Priscila on the quantity of brackish water they accessed during the POI are below.

> **In your initial New Subsidy response, you did not list the quantity of brackish water you used during the POI, on the basis that this water was not "purchased." Regardless of whether you purchased the brackish water or pumped it into your shrimp ponds at no cost, please provide the quantity of brackish water you pumped into your shrimp ponds during the POI. Please provide the records kept in the normal course of business that substantiate the amount of brackish water pumped into your shrimp ponds during the POI.**
>
> **Please provide any planning, design, or similar documents that establish the annual water needs of your shrimp farming operations, including any documents regarding the number, size, and capacity of your shrimp ponds and the pumping capacity required to service your shrimp ponds during the POI.**
>
> **The GOE states that every shrimp farm in Ecuador has an Environmental Management Plan, and that compliance with these plans is mandatory. GOE IQR (Feb. 15, 2024) at Ex. TAX-4(f). Please provide a copy of any Environmental Management Plans or similar environmental compliance plans in effect for your shrimp farms during the POI and explain how the plan accounts for your water usage. Please explain how the plan was created and how regularly it is updated, and any auditing or monitoring procedures that are carried out to ensure the plan is followed.**

---

[25] *See id*. at NSA-35 – NSA-36.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 5/2/24 2:15 PM, Submission Status: Approved

**Did your company produce any internal or external reports documenting its compliance with its environmental management plans during the POI? If so, please provide copies of these reports and any supporting documentation.**

**Please explain how the GOE confirms compliance with your Environmental Management Plan or other environmental requirements related to the use of water on your shrimp farms. Did the GOE conduct any audits, monitoring, or other enforcement activities during the POI to confirm compliance? If so, please provide copies of any correspondence, reports, or any other documents associated with this enforcement activity.**

**Please provide copies of any approvals or permits you received from the GOE to access brackish water on your shrimp farms that were in effect during the POI, as well as any amendments to these approvals or permits. Please explain in detail the approval and permitting process involved and document your requests for such approvals or permits.**

**Please explain how the GOE confirms that the use of brackish water on your shrimp farms is non-consumptive, *i.e.*, that all water used is returned to the source and does not affect the quantity or quality of the resource. Did the GOE conduct any audits, monitoring, or other enforcement activities during the POI to confirm that all of the brackish water accessed by your shrimp farms was in fact returned to the source and did not affect the quantity or quality of the resource? If so, please provide copies of any correspondence, reports, or any other documents associated with this enforcement activity.**

**Please provide a list of the water pumps used to access brackish water for your shrimp farming operations and the pumping capacity and flow rate for each pump. Please explain what records are kept in the ordinary course of business regarding the quantity of water used in your shrimp farming operations, such as pump logs or meter readings, and provide samples of these records. Please explain how these records tie to the total quantity of brackish water you reported pumping into your shrimp ponds during the POI.**

**Please provide a list of the number of shrimp ponds used in your farming operations during the POI, and the size, depth, and location of each pond. Please provide the water capacity of each pond and report the daily water exchange rate for each pond during the POI. Please report the frequency with which the water was completely replaced in each pond during the POI. Please provide maps, plans, monitoring reports, and any other documents kept in the ordinary course of business that substantiate these figures. Please explain how these records tie to the total quantity of brackish water you reported pumping into your shrimp ponds during the POI.**

Suggested questions for a supplemental questionnaire to the GOE on the brackish water program is below.

> **In your initial New Subsidy response, you state that the EPACOM system "does not keep specific records on brackish water use," but that the system "does identify approvals for use of brackish water for shrimp farmers." GOE Initial NSA Response at NSA-40. Please provide copies of the approvals for use of brackish water that were in effect for respondents' shrimp farms during the POI.**
>
> **Please provide a complete response to Questions L and M of the *Standard Questions Appendix* regarding the application process for the "approvals for use of brackish water for shrimp farmers" discussed at page NSA-40 of the GOE's Initial NSA Response.**
>
> **In your initial New Subsidy response, you state that shrimp farms' use of brackish water is considered "non-consumptive" because the amount of water accessed is returned to the source without affecting the quantity and quality of the resource. GOE Initial NSA Response at NSA-35 – NSA-36. Please explain how the GOE confirms that all brackish water accessed by respondents over the POI was in fact returned to the source and did not affect the quantity or quality of the resource.**
>
> **Did the GOE conduct any audits, monitoring, or other enforcement activities during the POI to confirm that all of the brackish water accessed by respondents' shrimp farms was in fact returned to the source and did not affect the quantity or quality of the resource? If so, please provide copies of any correspondence, reports, or any other documents associated with this enforcement activity.**
>
> **Please provide a copy of any environmental permits and environmental laws and regulations regarding the use and treatment of water that were in effect for respondents' shrimp farms during the POI. Please explain the permitting and regulatory process in detail, including how the process accounts for water usage by respondents' shrimp farms. Please explain how any conditions in the permits and other regulatory requirements are enforced.**
>
> **Did the GOE conduct any audits, monitoring, or other enforcement activities during the POI to ensure that respondents' shrimp farms were in compliance with all applicable environmental permits, Environmental Management Plans, and any other environmental requirements related to the use of brackish water? If so, please provide copies of any correspondence, reports, or any other documents associated with this enforcement activity.**

Respondents also claim that there is no price for brackish water anywhere in the world, and that no government or private entity assesses any fees for the use of brackish water.[26] These statements are not only irrelevant, they are also incorrect. ASPA has already put on the record evidence that there are government authorities that charge for access to brackish water.[27] In addition, attached at **Exhibit 5** is a report from 2016 regarding the regulation of brackish water, noting that the state of Arizona requires certain users to "pay a groundwater withdrawal fee for each acre-foot of groundwater pumped."[28] In addition, a 2006 study attached at **Exhibit 6** reports that the Broome Tropical Aquaculture Park in Australia, which leases aquaculture facilities, charges as a part of those leases 20 cents per liter of sea water and 8 cents per liter of bore water.[29] This is in addition to charges for the area leased and for water treatment services.[30] These reports only further confirm that there is a commercial value to the brackish water that the GOE provides to Respondents free of charge.

In short, Respondents have defied Commerce's instructions and refused to respond to Commerce's questions about the provision of brackish water for LTAR. Instead, they have only offered arguments seeking to re-litigate Commerce's decision to investigate this program and claims of non-use that ignore the reasoning in Commerce's initiation decision. This lack of cooperation has significantly impeded Commerce's investigation. If Commerce grants

---

26 *See* SONGA NSA Response at NSA-21. *See also* Santa Priscila NSA Response at NSA-23 – NSA-24.

27 *See* ASPA New Subsidy Allegations Supplemental Response (Mar. 5, 2024) at 4 and Ex. 1. *See also* NSA Initiation Memo at 5.

28 *See* Regina M. Buono, et al., "Brackish Groundwater: Current Status and Potential Benefits for Water Management," Center for Energy Studies Issue Brief (Apr. 11, 2016), attached at **Exhibit 5**.

29 *See* Western Australia Department of Fisheries, *Proposed Fees and Charges for Section 97 Aquaculture Leases*, Fisheries Management Paper 216 (May 2006) at 7, attached at **Exhibit 6**.

30 *See id*.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 5/2/24 2:15 PM, Submission Status: Approved

Respondents another opportunity to cooperate with the agency's investigation of this program, we respectfully request that Commerce include the questions proposed above in its supplemental questionnaires to the GOE, SONGA, and Santa Priscila.

Thank you for your attention to these matters. Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

Roger B. Schagrin
Elizabeth J. Drake
Michelle R. Avrutin
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

Edward T. Hayes
LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701
*Counsel to the American Shrimp Processors Association*

**Counsel Certification**

I, Elizabeth J. Drake, counsel to the American Shrimp Processors Association, certify that I have prepared or otherwise supervised the preparation of the attached *Frozen Warmwater Shrimp from Ecuador: Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses*, filed on May 2, 2024, pursuant to the countervailing duty investigation on frozen warmwater shrimp from Ecuador, Case No. C-331-806.

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. § 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth J. Drake

Date: 5/2/2024

**Petitioner Certification**

I, Trey Pearson, President of the American Shrimp Processors Association ("ASPA"), certify that I prepared or otherwise supervised the preparation of the attached *Frozen Warmwater Shrimp from Ecuador: Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses*, filed on May 2, 2024, pursuant to the countervailing duty investigation on frozen warmwater shrimp from Ecuador, Case No. C-331-806.

I certify that the public information and any business proprietary information of ASPA contained in this submission is accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ___  ______________________________________

Date: ____5/2/2024____________________

Barcode:4552883-01 C-331-806 INV - Investigation -

# CERTIFICATE OF SERVICE

**Frozen Warmwater Shrimp from Ecuador**
**C-331-806**
**Investigation**

I, Steve Satchell, hereby certify that copies of the attached *public document* were served on May 2, 2024, via ACCESS electronic service:

Nathaniel Rickard, Esq
**Picard Kentz & Rowe LLP**
1155 Connecticut Avenue, NW
Suite 700
Washington, DC 20036

Edward T. Hayes, Esq.
**Leake & Anderson, LLP**
1100 Poydras Street
Suite 1700
New Orleans, LA 70163

Jennifer Michele Smith-Veluz, Esq.
**The Bristol Group PLLC**
1707 L Street, NW
Suite 570
Washington, DC 20036

Jarrod M. Goldfeder, Esq.
**Trade Pacific PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003

Jeffrey S. Neeley, Esq.
**Husch Blackwell LLP**
1801 Pennsylvania Avenue, NW
Suite 1000
Washington, DC 20006

Andrea Ruiz
**Embassy of Ecuador**
2535 15th Street, NW
Washington, DC 20009

/s/ *Steve Satchell*
Steve Satchell, *Paralegal*
SCHAGRIN ASSOCIATES

Filed By: rschagrin@schagrinassociates.com, Filed Date: 5/2/24 2:15 PM, Submission Status: Approved

# Tab 50

# P.R. 353

# C.R. 231

Barcode: 4554012-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
POI: 01/01/2022-12/31/2022
~~**Business Proprietary Document**~~
ITA/E&C/OIV: RA
**Public Version**

May 2, 2024

Industrial Pesquera Santa Priscila S.A.
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, DC 20003

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Santa Priscila Post Preliminary Supplemental Questionnaire

Dear Mr. Goldfeder:

On April 18, 2024, the U.S. Department of Commerce (Commerce) received a response on behalf of your client, Industrial Pesquera Santa Priscila S.A. (Santa Priscila), to Commerce's March 28, 2024, countervailing duty questionnaire regarding the new subsidy allegation. On February 9 and 18, 2024, Commerce received Santa Priscila's Section II and III supplier questionnaire responses. On February 12 and March 1, 2024, Commerce received Santa Priscila's Section III responses to countervailing duty initial questionnaire and corresponding supplemental questionnaire, respectively. On March 18, 2024, Commerce received Santa Priscila's pre-preliminary comments regarding tax programs and land concessions. Commerce has identified certain areas in Santa Priscila's abovementioned responses for which Commerce requires additional information. The additional information requested in the attachment to this letter is **due no later than close of business (*i.e.*, 5:00 p.m. Eastern Standard Time) on May 9, 2024**.

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the

Filed By: Zachary Shaykin, Filed Date: 5/3/24 4:24 PM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

regulations. An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted. Any extension granted in response to your request will be in writing; otherwise, the original deadline will apply.

If Commerce does not receive either the requested information or a written extension requests before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the deadline. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences, pursuant to section 776(b) of the Act. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available, including adverse inferences.

**DEADLINE FOR SUBMISSION**: **Your response is due no later than 5:00 p.m. ET on the date identified above.** Questionnaire responses normally entail the filing of many exhibits and databases on ACCESS. Accordingly, to the extent you submit your filing on the day it is due, rather than earlier, we strongly recommend that you begin uploading your response **no later than 12:00 noon on the above due date**. A questionnaire response must be filed in its entirety by the deadline to be considered timely.[1]

**EXTENSIONS:** **Note well:** Any extension request must be filed in writing. Extension requests filed after 5 p.m. on the due date will not be granted, except in extraordinary circumstances. An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means.[2] An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, *force majeure*, or medical emergency."[3] Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the requesting party of its decision before the time limit expires."[4] For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.[5]

**Note well**:

> Parties should be aware that **the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on

---

[1] 19 CFR 351.303(b)(1).
[2] 19 CFR 351.302(a)(2).
[3] *Extension of Time Limits*, 78 FR 57790, 57793 (Sep. 20, 2013) (Preamble to the Final Rule).
[4] *Id.* at 57792.
[5] *Id.*

its disposition. Parties should not assume that they will receive an extension of a time limit if they have not received a response from Commerce. For submissions that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next business day**. *See* 19 CFR 351.103(b).[6] **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues. When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise the official in charge, informing them of the filing difficulties. The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.

Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

If you have any questions about this matter, please contact Zachary Shaykin at (202) 482-2638 or Reginald Anadio at (202) 482-3166.

Sincerely,

Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

[6] *Id.* (emphasis added).

Barcode: 4554012-01 C-331-806 INV - Investigation

**Post-Preliminary Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador**
**Period of Investigation (POI) 01/01/2022 – 12/31/2022**
**Industrial Pesquera Santa Priscila S.A. (Santa Priscila)**

Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, Santa Priscila should repeat the question in full to which it is responding and place its answer directly below the question. Santa Priscila should also fully answer each question in this supplemental questionnaire. Please ensure that Santa Priscila provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.

---

**General**

1. Please provide public ranges for the sales value in U.S. Dollars (USD) for Santa Priscila's export sales of merchandise under consideration to the United States (*i.e.*, [ ] USD) as found at Exhibit 5 of Santa Priscila's February 12, 2024, Section III initial questionnaire response.

**Pre-Preliminary Comments**

2. At Attachment B of Santa Priscila's March 18, 2024, pre-preliminary comments, Santa Priscila lists all of the programs under which Santa Priscila and Produmar S.A. (Produmar) received benefits. However, Santa Priscila omitted from this list the Environmental Tax Incentives program benefit received by Produmar or the Youth Employment program benefit received by Tropical Packing Ecuador S.A. (Tropack). Please explain these discrepancies, and provide a revised table submitted at Attachment B of Santa Priscila's March 18, 2024, pre-preliminary comments that reports these programs. Also revise this Attachment B to include all benefits and subsidies received under these programs and received under programs reported in Santa Priscila's April 18, 2024, response to Commerce's questionnaire regarding new subsidy allegations (Santa Priscila's NSA IQR).

3. Please tie the benefit amounts and corresponding calculations (including the calculation of an appropriate tax rate) of the benefits received by Santa Priscila and its cross-owned affiliates required to respond to Commerce's request for information (*i.e.*, Produmar, Tropack, Egidiosa S.A., and Manesil S.A.) to the amount reported under the following programs at Attachment B of Santa Priscila's March 18, 2024, pre-preliminary comments in each respective companies' tax forms:
   a. Youth Employment – Article 16 of the Labor Law;
   b. Youth Employment – Social Security Benefits;
   c. Exemption from ISD Payments on Foreign Loans;
   d. Hiring of Additional Personnel/Tax Deduction for Net Increase in Employment; and

Filed By: Zachary Shaykin, Filed Date: 5/3/24 4:24 PM, Submission Status: Approved

Barcode: 4554012-01 C-331-806 INV - Investigation

e. Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities.

**Municipal Tax Exemption Program**

4. At Exhibit D-Q56(a) of the Government of Ecuador (the GOE)'s March 13, 2024, supplemental questionnaire (GOE's SQR), the GOE reported that Produmar did not receive any municipal tax exemption. However, according to Exhibit PRO-8 of Santa Priscila's February 16, 2024, Section III supplier questionnaire response, Santa Priscila claims that Produmar "has received {the municipal total assets tax} benefit since May 2017." Please explain this discrepancy, and provide a complete response to the applicable appendices included in Commerce's original questionnaire issued on December 12, 2023.

**New Subsidy Allegations (NSAs)**

*Provision of Gas for Less-than-Adequate-Remuneration*

5. At page NSA-6 of Santa Priscila's April xx, 2024 New Subsidy Allegations questionnaire response (NSA IQR), Santa Priscila reported that authorizations to consume gas in Ecuador are indefinite in length of validity and are cumulative. Please report the total amount of gas that Santa Priscila and Produmar were eligible to receive during the POI.

6. Please provide supporting sales documentation underlying the figures reported for the sales of gas at Exhibit NSA-6 associated with Purchase Orders [ ] and [ ] and the figures reported at Exhibit NSA-7(a) associated with Purchase Orders [ ] and [ ] of Santa Priscila's NSA IQR.

7. Please explain why [ ] associated with certain purchase orders at Exhibits NSA-6 and NSA-7(a) of Santa Priscila's NSA IQR.

8. At Exhibit NSA-7(a) of Santa Priscila's NSA IQR, Santa Priscila states: "[ ]." Please explain whether "[ ]" indicates the [ ] or whether it indicates [ ].

9. Please explain which columns at Exhibits NSA-6 and NSA-7(a) represent the price of fuel charged to Santa Priscila and Produmar, respectively. If not reported, please amend Exhibits NSA-6 and NSA-7(a) to include a column that reports these values.

Filed By: Zachary Shaykin, Filed Date: 5/3/24 4:24 PM, Submission Status: Approved

# Tab 51

# P.R. 354

# C.R. 232

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
POI: 01/01/2022-12/31/2022
~~**Business Proprietary Document**~~
ITA/E&C/OIV: RA
**Public Version**

May 2, 2024

Sociedad Nacional de Galápagos C.A.
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, DC 20003

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: SONGA Post Preliminary Supplemental Questionnaire

Dear Mr. Goldfeder:

On April 18, 2024, the U.S. Department of Commerce (Commerce) received a response on behalf of your client, Sociedad Nacional de Galápagos C.A. (SONGA), to Commerce's March 28, 2024, countervailing duty questionnaire regarding the new subsidy allegation. On February 9 and 18, 2024, Commerce received SONGA's Section II and III supplier questionnaire responses. On February 12 and March 1, 2024, Commerce received SONGA's Section III responses to countervailing duty initial questionnaire and corresponding supplemental questionnaire, respectively. On March 18, 2024, Commerce received SONGA's pre-preliminary comments regarding tax programs and land concessions. Commerce has identified certain areas in SONGA's responses for which Commerce requires additional information. The additional information requested in the attachment to this letter is **due no later than close of business (*i.e.*, 5:00 p.m. Eastern Standard Time) on May 9, 2024**.

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations. An extension request submitted without a proper certification for any factual

information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted. Any extension granted in response to your request will be in writing; otherwise, the original deadline will apply.

If Commerce does not receive either the requested information or a written extension requests before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the deadline. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences, pursuant to section 776(b) of the Act. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available, including adverse inferences.

**DEADLINE FOR SUBMISSION**: **Your response is due no later than 5:00 p.m. ET on the date identified above.** Questionnaire responses normally entail the filing of many exhibits and databases on ACCESS. Accordingly, to the extent you submit your filing on the day it is due, rather than earlier, we strongly recommend that you begin uploading your response **no later than 12:00 noon on the above due date**. A questionnaire response must be filed in its entirety by the deadline to be considered timely.[1]

**EXTENSIONS:** **Note well:** Any extension request must be filed in writing. Extension requests filed after 5 p.m. on the due date will not be granted, except in extraordinary circumstances. An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means.[2] An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, *force majeure*, or medical emergency."[3] Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the requesting party of its decision before the time limit expires."[4] For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.[5]

**Note well**:

> Parties should be aware that **the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on its disposition. Parties should not assume that they will receive an extension of a

---

[1] 19 CFR 351.303(b)(1).
[2] 19 CFR 351.302(a)(2).
[3] *Extension of Time Limits*, 78 FR 57790, 57793 (Sep. 20, 2013) (Preamble to the Final Rule).
[4] *Id.* at 57792.
[5] *Id.*

> time limit if they have not received a response from Commerce. For submissions that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next business day**. *See* 19 CFR 351.103(b).[6] **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues. When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise the official in charge, informing them of the filing difficulties. The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.

Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

If you have any questions about this matter, please contact Zachary Shaykin at (202) 482-2638 or Reginald Anadio at (202) 482-3166.

Sincerely,

Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

[6] *Id.* (emphasis added).

**Post-Preliminary Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador**
**Period of Investigation (POI) 01/01/2022 – 12/31/2022**
**Sociedad Nacional de Galápagos C.A. (SONGA)**

Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, SONGA should repeat the question in full to which it is responding and place its answer directly below the question. SONGA should also fully answer each question in this supplemental questionnaire. Please ensure that SONGA provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.

---

General

1. Please provide public ranges for the sales value in U.S. Dollars (USD) for SONGA's export sales of merchandise under consideration to the United States (*i.e.*, [ ] USD) found in Exhibit 5 of SONGA's February 12, 2024, Section III initial questionnaire response (IQR).

2. On pages S-AFF-5 to S-AFF-6 of SONGA's March 18, 2024, supplemental questionnaire response, SONGA explained that it excluded [ ] from the countervailing duty (CVD) affiliated company list. Please confirm that all three companies are considered cross-owned companies. Additionally, explain how they fit the definition of cross-ownership per 19 CFR 351.525(b)(6). Further, please confirm that [ ] was not a holding or parent company.

Environmental Tax Incentives

3. In Attachment A of SONGA's March 18, 2024 pre-preliminary comments, SONGA provided a self-calculated benefit amount for the Environmental Tax Incentives program. Please provide the calculation that SONGA use to calculate the reported benefit received by Naturisa S.A. (Naturisa) (*i.e.*, [ ] USD). In your response, please tie the benefit amount and corresponding calculation (including the calculation of an appropriate tax rate) to the amount reported in Naturisa's tax forms.

Provision of Land Use Concessions

4. In Exhibit S-AFF-Q26b of SONGA's March 18, 2024 supplemental questionnaire response, SONGA provided land and dock concessions and enumerated the concession number per Commerce's instructions. On page LTAR-23 of the Government of Ecuador (the GOE)'s February 14, 2024, Section II initial questionnaire response, the GOE listed a concession held by Naturisa under concession number [ ] that was not provided by SONGA in its Exhibit S-AFF-Q26b. Please explain this discrepancy and resubmit

Exhibit S-AFF-Q26b in excel format to include concession number [ ] information, if applicable.

Investment Contract

5. In Attachment A of SONGA's March 18, 2024, pre-preliminary comments, SONGA reported [ ] USD and [ ] USD as the benefits received under the investment contract's ISD exemption on imported materials and ISD exemption on foreign loans programs, respectively. Please explain how SONGA calculated these amounts and how they were reported in SONGA's tax returns.

Municipal Tax Exemption

6. As found in Exhibit 12 of SONGA's IQR and Exhibit NAT-III-8 of SONGA's February 16, 2024, section III supplier questionnaire response, SONGA reported benefits under the municipal tax exemption on total assets program. Please explain how SONGA calculated the amount owed had Naturisa's assets been fully taxed without the 1.5% total assets municipal tax exemption. Additionally, please tie SONGA's and Naturisa's benefits to their tax returns.

New Subsidy Allegations

*Provision of Fuel*

7. At page NSA-6 of SONGA's April 18, 2024 New Subsidy Allegations questionnaire response (NSA IQR), SONGA reported that authorizations to consume gas in Ecuador are indefinite in length of validity and are cumulative. Please report the total amount of gas that Naturisa was eligible to receive during the POI.

8. Please provide supporting documentation for the information reported for the purchases of gas in Exhibit NSA-5 associated with Purchase Numbers 1063 and 1081.

9. On page NSA-11 of SONGA's NSA IQR, SONGA states that "{t}he prices suppliers charged to Naturisa were based on negotiations between Naturisa…" Please provide documentation to substantiate that Naturisa engaged in negotiations (e.g., email correspondence).

*Provision of Brackish Water*

10. On page NSA-21 of SONGA's April 18, 2024, new subsidy allegations questionnaire response, SONGA stated that the declaration "from George W. Chamberlain and Claude E. Boyd, world renowned experts on aquaculture practices and water use, {confirms} that no government authority or any private entity assesses any fees on the non-consumptive use of brackish water." Please respond to the following questions:

    a. Please quote the exact language in the declarations which confirms that private

entities do not assess any fees on the non-consumptive use of brackish water.

b. If available, please provide an example, preferably in Ecuador, of a private entity that offers non-consumptive use of its brackish water, and list the fees, if any, that the private entity charges for the use of its brackish water.

# Tab 52

# P.R. 365

Barcode:4559279-01 C-331-806 INV - Investigation -

TRADE PACIFIC

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 79
Investigation
POI: 1/1/22 – 12/31/22
E&C/Office IV

**PUBLIC DOCUMENT**

May 14, 2024

Re: Frozen Warmwater Shrimp from Ecuador – Respondents' Submission of Factual Information to Rebut, Clarify, or Correct Information that the Petitioners Submitted on May 2, 2024 in Their "Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses" Concerning Their Brackish Water Allegations

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila ("Santa Priscila"), Sociedad Nacional de Galápagos C.A. ("SONGA"), and the Government of Ecuador ("GOE") (collectively "the Respondents"), we timely submit factual information to rebut, clarify, or correct factual information contained in the above-referenced submission of the petitioners ("Submission"). This submission is timely filed in accordance with the deadline established in the Department's May 8, 2024 letter, which extended the deadline to submit rebuttal factual information until today.

1. Petitioners state that they "reserve" the right to submit additional comments on other aspects of the New Subsidy responses "in the near future." Submission at 2. Petitioners do not have a right to submit additional rebuttal factual information under the Department's regulations. See 19 C.F.R. § 351.301(c)(1)(v).


Filed By: khammer@tradepacificlaw.com, Filed Date: 5/14/24 2:47 PM, Submission Status: Approved

2. Petitioners assert that the Respondents have "flat-out" refused "to provide any of the information requested by Commerce regarding the provision of brackish water for less than adequate remuneration." Submission at 2. This assertion is utter nonsense as shown in the February 15, 2024 Section II questionnaire response of the GOE, in the Section III questionnaire responses of Santa Priscila and SONGA on that same date, as well as in their April 19, 2024 responses to the NSA questionnaire.

3. Petitioners take issue with the Respondents' assertion that a brackish water subsidy program "does not exist." Submission at 2. The Respondents' position is supported by all the factual information that they have submitted. The fact that the petitioners choose not to agree does not render the Respondents' position an "evasion tactic," as they allege. Submission at 2. Nor have the Respondents "withheld information" in those instances where no such information exists. Thus, the petitioners' further assertion that application of adverse facts available is warranted is ludicrous and reeks of desperation. Submission at 2-3.

4. Petitioners assert that the "GOE is providing water to the shrimp farms operated by SONGA and Santa Priscila" free of charge. Submission at 3. In fact, as stated in the Respondents' respective April 18, 2024, NSA questionnaire responses, shrimp farmers themselves provide the water to their ponds through their pumping operations. Moreover, the petitioners conveniently omit the fact that neither Respondent consumes this water, but rather, they return it to its source. Therefore, nothing has been "provided" by the GOE, nothing has been consumed by the Respondents, and no value has been conveyed.

5. Petitioners assert that whether the Respondents engage in "consumptive or non-consumptive {use} is irrelevant." Submission at 3. However, the distinction between consumptive and non-consumptive use is well-established. For example, the state of Florida

requires permits for only the consumptive use of water. See "Water Use Fees: An Underutilized Tool for Enhancing Water Conservation in the Sunshine State," available at Water-Use-Fees_An-Underutilized-Tool_White.pdf (floridaspringsinstitute.org) and provided in **Exhibit 1**. See also the "Rules and Regulations Covering the Provision of Non-Potable Water of the Lanai Water Company," which are available at Microsoft Word - PULAMA LANAI LWC RC - Cover letter to PUC re Submission of Final Tariff Sheets and Rate Sch(1194623.1).docx (lanaiwatercompany.com). Lanai's rules are provided in **Exhibit 2**.

Lanai's rules apply the published rates to "Consumers." To be a consumer of brackish water, one must obviously consume it, not "non-consume" it. Moreover, the term "non-potable water" is defined as "untreated water used for irrigation and other non-potable purposes within the service area," and the term "non-potable water" is defined to include "brackish water." The rules also require that water consumption must be measured. In contrast, no measurement requirement exists for non-consumptive use of brackish water in Ecuador. In short, the charges that the Lanai Water Company imposes for the consumptive use of brackish water are irrelevant.[1]

6. Even assuming, as petitioners assert, that the provision of water for non-consumptive use has a value, that value is returned to the GOE when the water is discharged from a pond and is returned to its source. Moreover, since ponds collect rainwater, Santa Priscila and SONGA arguably return more water to their sources than they have withdrawn.

7. Petitioners rebuke Respondents for not listing the quantity of water that they "purchased" during the POI. Submission at 4. Every dictionary defines the word "purchase" as

---

[1] The petitioners conveniently omitted these facts when they submitted the Lanai Water Company's rates for consumptive use of brackish water in their March 5, 2024 "New Subsidy Allegations Supplemental Response."

the act of obtaining something by paying money or the equivalent. Thus, the Respondents answered this question accurately when they stated that they did not purchase water from the GOE.[2] The Department did not ask the Respondents to "report the quantity of brackish water they pumped into their shrimp ponds," as opposed to the amount of water that they purchased. Submission at 4.

8. Petitioners go to great lengths to describe both the efforts that shrimp farmers must make and the equipment they must use to pump water to and from their shrimp ponds. Submission at 4-5. This is no secret, nor have the Respondents attempted to conceal any facts concerning their pumping operations. Rather, they have expressly stated that they bear the entire expense of installing and operating pumping equipment. See, e.g., Santa Priscila's NSA QR at NSA-17-18; SONGA's NSA QR at NSA-16-17. In contrast, the GOE provides nothing of value to shrimp farmers.

9. Petitioners state that pumps "come with specific capacities for the quantity of water that can be pumped, maximum flow rates, etc." Submission at 4-5. Then, they speculate that "Respondents may use flow meters to monitor the volume of water being pumped into their ponds." Therefore, they "should be able to provide information regarding the quantity of brackish water pumped into their shrimp ponds during the POI." Submission at 5.

However, Santa Priscila stated in its February 15, 2024 Section III questionnaire response (at III-12) that "{n}either Santa Priscila, nor GOE maintains any records of the volume of non-consumptive use of brackish water, so it is impossible to complete the standard questions

---

[2] The petitioners' assertion that the Respondents adopted an "overly narrow interpretation" of the term "purchase" is contradicted by the plain language of the question that the Department asked. Submission at 4.

appendix, the tax appendix, or the provision of goods/services appendix." SONGA stated the same thing in its own Section III questionnaire response (at III-19).

Then, in its April 19, 2024 response to the NSA Allegation Questionnaire, Santa Priscila again stated (at NSA-20- that "neither Santa Priscila nor Produmar records pumping brackish water.: SONGA similarly stated in its own April 19th response (at NSA-21) that "Naturisa does not record any pumping brackish water."

Therefore, there is no factual basis for inquiring further concerning whether shrimp farmers during the POI measured the actual amount of water that they pumped into their shrimp ponds.

10. Petitioners rely on a 2021 article authored by Professor Claude Boyd and two colleagues, entitled "Comparison of resources use for farmed shrimp in Ecuador, India, Indonesia, Thailand, and Vietnam" (the "Boyd article") for the proposition that the Ecuador-related information in that article means that "Respondents should similarly be able to provide information regarding the size and depth of the ponds on their shrimp farms, the amount of water exchanged each day, and thus the quantity of water used in their shrimp farms over the POI."[3] See Submission at 5.

Santa Priscila owns or operates shrimp farms on approximately 13,000 hectares. SONGA purchased shrimp during the POI from affiliated and unaffiliated ponds with a total surface area that exceeded 15,000 hectares. In addition to those ponds, Santa Priscila and

[3] Petitioners agree with the methodology that Respondents stated must be used to measure the total amount of brackish water non-consumptively used during the POI where they cite with approval the hypothetical calculation methodology that Respondents used in their March 15, 2024 Rebuttal Submission to the petitioners' March 5, 2024 Response to Supplemental Questions Regarding New Subsidy Allegations. Submission at 5. This methodology requires the following information for every shrimp pond, including unaffiliated shrimp ponds, from which the Respondents purchased shrimp in 2022: surface area of the pond, depth of the pond, number of harvests from that pond in 2022, and daily volume of water exchange in that pond in 2022.

SONGA maintain an as yet undetermined number of reservoirs, canals, and settling basins that similarly use brackish water.[4]

To determine the volume of water in a shrimp pond, the surface area and the depth of each pond must be known. Similarly, the volume of water in reservoirs, canals, and settling basins must be determined. Then, the number of harvests per year and the volume of water that is exchanged daily between the original source and the shrimp pond must be known.[5] The pond-by-pond calculation requirement that the petitioners urge the Department to require would impose an unfair burden, and it is irrelevant. The absurdity and extraordinarily burdensome nature of the petitioners' new subsidy allegation concerning brackish water is illustrated by the following analysis using the Boyd article's findings as proxies for the Respondents' own pond depths, average number of harvests per year, and volumes of daily water exchange.

11. There is no dispute that a 1-hectare size pond equals a 10,000 square meter pond. Now, assume that the average depth of a pond is 1.22 meters (based on the survey result in the Boyd article identified in paragraph no. 10 above).[6] Thus, a 1-hectare surface area pond holds 12,200 cubic meters of water. It is equally undisputed that one cubic meter of water holds 264

---

[4] The Boyd article (at 5) notes the frequent use of reservoirs, canals and settling basins in Ecuador. See also Resource Use in Whiteleg Shrimp *Litopenaeus vannamei* farming in Ecuador, Journal of the World Aquaculture Society 52, 772-788 (2021), available at https://doi.org/10.1111/jwas.12818. Of the 101 farms surveyed by Boyd, et al., 87 had reservoirs, and 42 had canals. Sedimentation basins were present at 15 farms.

[5] The necessity of daily water exchange is explained in Exhibit 2 to Respondents' March 15, 2024 Response to the petitioners' Supplemental Questions Regarding New Subsidy Allegations.

[6] The Boyd article contains information concerning resource use, including water use, in Ecuador and four other countries. The information concerning water use in Ecuador was obtained from a non-random sample of 101 shrimp farms. Respondents previously relied on this information for the sole purpose of demonstrating the irrationality of accepting the petitioners' allegation that the GOE provides brackish water for LTAR. Respondents do not concede that the farms from which they purchase shrimp contain ponds that have the identical characteristics in terms of depth, number of crops harvested per year, or frequency of daily water exchange as were reported in the Boyd article.

gallons. Thus, a 1-hectare pond with an average depth of 1.22 meters holds 3,220,800 gallons of water (264 x 12,200 = 3,220,800).

Petitioners submitted several benchmarks for measuring the alleged value of brackish water provided by the GOE to shrimp farms. The average of the two prices that they submitted for the Lanai Water Company was $4.90 for 1,000 gallons where consumption exceeds 300,000 gallons. See Petitioners' March 5, 2024 NSA Supplemental Response at 4 and related Exhibit 3. Thus, according to petitioners, to fill a 1-hectare pond one time would cost $4.90 x 3,220.8 = $15,782.

However, the Boyd article found that the sample of 101 farms in Ecuador produced an average of 3.64 crops per year. Therefore, to fill a 1-hectare pond 3.64 times in one year would cost 3.64 x $15,782 = $57,446. Next, the daily rate of water exchange must be considered. The Boyd article found that the authors' sample of 101 Ecuadorian farms had an average daily rate of exchange of 8.5%. That means that the water in a pond is completely replaced approximately every 12 days. However, ponds can remain dry for 7-10 days, or longer, between harvests. Thus, using 10 days as the average dry out period, over the course of one year, water is completely exchanged approximately 27 times (331 days/12 = 27.6). This essential water exchange multiplies the cost of water by 27 x $57,446 = $1,551,042[7]

As noted above, the ponds on Santa Priscila's own farms have a surface area of approximately 13,000 hectares. This means that the total cost of water to fill those ponds during 2022, using the survey data compiled by Prof. Boyd as a proxy, would be 13,000 x $1,551,042 =

[7] The petitioners do not challenge the Boyd article's finding that daily water exchange averages 8.5% for the sampled farms. Nor do they challenge the average depth of a pond or the average number of crops per year that the Boyd article found from its non-random sample of 101 Ecuadorian shrimp farms. Submission at 5. However, the pond depth, average number of crops per year, amount of drying time between harvests, and volume of daily water exchange would vary for Santa Priscila and SONGA from the averages that the Boyd article found for its sample.

$20,163,546,000.[8] Using the denominator of Santa Priscila's total POI sales that the Department used in the preliminary determination, the *ad valorem* subsidy margin attributable to brackish water would be over 1500% higher than the company's POI sales value.

The extraordinary size of this alleged subsidy illustrates the ridiculousness of the petitioners' effort to treat the non-consumptive use of brackish water as a countervailable subsidy. Needless to add, no Ecuadorian processor could afford to sell its shrimp in the United States if the Department calculated a subsidy using the methodology that the petitioners seek to have the Department implement.[9] It is equally essential to understand that a brackish water subsidy, if found, can never be eliminated or reduced since brackish water is essential to grow shrimp. Unlike every other subsidy program that we know about, the subsidy would last forever. This cannot be what the countervailing duty laws and regulations require.

12. Petitioners speculate that information about water treatment practices, other environmental requirements, and shrimp farm permitting requirements "may contain information on the quantity of water that farms are allowed to pump." Submission at 6. These are speculative fishing expeditions that lack any rational basis or relevance.

13. Petitioners purport to provide prices for brackish water, but these alleged prices are irrelevant and easily distinguishable, as we now demonstrate.

First, the prices that the petitioners submitted in their March 5, 2024 NSA Supplemental Response (at 4 and Exhibit 1), are irrelevant for the reasons that the Respondents explained in

[8] Since SONGA purchased shrimp from an even larger number of hectares of shrimp ponds than Santa Priscila, its alleged brackish water subsidy during the POI would be even higher than the roughly estimated $20.7 billion. Moreover, the Santa Priscila calculation does not include the number of hectares occupied by shrimp ponds owned and operated by Santa Priscila's cross-owned affiliate, Produmar, or by unaffiliated farms. Thus, even the illustrative $20.7 billion subsidy calculation for the POI is underestimated.

[9] The petitioners have consistently declined to estimate the subsidy amount that their allegations contemplate because they know that the required methodology yields an absurd result.

their March 15, 2024 Response, i.e., the petitioners failed to show that the prices they submitted for the El Paso and Lanai water authorities were for non-consumptive use. See Respondents' Response at 3.

Second, Exhibit 5 to their May 2, 2024 submission is a state of Arizona report concerning "brackish groundwater," i.e., brackish water not found in rivers, estuaries, or other water sources that supply shrimp farms in Ecuador and elsewhere around the world. Rather, it is water usually found deep underground and onshore. As such, the economics of pumping groundwater are completely different and, therefore, the prices that state water authorities may charge are irrelevant. In fact, the Arizona report states (at 4) that "Brackish groundwater is withdrawn for consumptive use in many parts of the United States, including Texas, Florida, Arizona, and New Mexico." Moreover, petitioners do not provide any prices charged by any of these four states, which further indicates the hollowness of their reliance upon the report. Here again, all of these states distinguish between consumptive and non-consumptive use.

Third, Exhibit 6 to their May 2, 2024 submission is a 2006 "Discussion Paper" from the Ministry of Fisheries for the Western Australia Government entitled "Proposed Fees and Charges for Section 97 Aquaculture Leases." The title of this Discussion Paper alone reveals its irrelevance since the proposed fees are for leases, not brackish water. The paper states that there is a charge of $0.20 per liter for "Sea Water Supply" and $0.08 per liter for "Bore Water Supply" at the Broome Tropical Aquaculture Park. However, the paragraph preceding these two rates states that these rates are charged at "Section 101 leases," and at these leases "the Department has established the site and is providing infrastructure and utilities. The costs are therefore commensurate with this situation." Discussion Paper at 7.

In other words, the rates upon which the petitioners rely are intended to reimburse the government for the costs it incurs for infrastructure and utilities, not the water itself. As such, the situation is readily distinguishable from Ecuador's brackish water situation, where the GOE provides nothing, and the shrimp farms provide everything needed to pump water from, and return water to, its source.

Attached **Exhibit 3** further describes the park, including the fact that "{i}n addition to standard facilities such as electricity, each site is supplied with filtered seawater (via a pumping station located on Broome Jetty)" by the Government of Western Australia. Moreover, the government-supplied filtration system service "reduces the need for tenants to use their own filtration systems." Moreover, a discharge pump station and pipeline remove wastewater from both domestic and aquaculture effluent from the park.

* * *

For all these reasons, the Department should reject the petitioners' request for the issuance of additional brackish water-related questions and find that the alleged provision of brackish water to shrimp farms is not countervailable.

* * *

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1)(v) and 19 C.F.R. § 351.102(b)(21)(i) in order to rebut, clarify, or correct information submitted in an interested party's rebuttal, clarification, or correction.

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission are deemed served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this request.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

**Counsel to Santa Priscila, SONGA, and the Government of Ecuador**

# Tab 53

# P.R. 366

# C.R. 234

Barcode: 4561324-01 C-331-806 INV - Investigation

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 625
Investigation
AD/CVD Operations, Office IV
Business proprietary information of the GOE has been redacted in Exhibits S3-3, and S3-6 to S3-7(e); business proprietary information of Santa Priscila has been redacted on pages S3-2, S3-3, S3-5, and S3-6; and business proprietary information of Produmar has been redacted on pages S3-2, S3-3, S3-5, S3-6, and S3-10.

**PUBLIC VERSION**

May 17, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Government of Ecuador's Post-Preliminary Supplemental Questionnaire Response

Dear Secretary Raimondo:

On behalf of the Government of Ecuador ("GOE"), we hereby submit the GOE's response to the Department's May 2, 2024, post-preliminary supplemental questionnaire. This response is timely submitted in accordance with the Department's May 7, 2024, letter, re: "Government of Ecuador's Request for Extension to Post-Preliminary Supplemental Questionnaire Response," which extended the deadline for the Government of Ecuador's supplemental response until today.

Pursuant to 19 C.F.R. § 351.304(a)(1)(i), the GOE requests proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the


Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 12:54 PM, Submission Status: Approved

information for which the GOE requests proprietary treatment, for itself and respondents and their cross-owned affiliates, and the basis for the request:

- Other specific information related to the GOE's operations, electricity cost information, etc. the release of which may result in the disclosure of confidential information maintained by the GOE, as well as other specific information related to the operations of the respondents, and their cross-owned affiliates, the release of which to the public would cause substantial harm to the competitive position of the respondents and their cross-owned affiliates: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to the competitive position of the mandatory respondents and their cross-owned affiliates. The GOE consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to the Government of Ecuador*

Barcode: 4561324-01 C-331-806 INV - Investigation

REPÚBLICA DEL ECUADOR

Ministerio de Producción, Comercio Exterior, Inversiones y Pesca

## GOVERNMENT CERTIFICATION

I, Juan Carlos Sanchez, Undersecretary of Origin, Trade Remedies and Trade Normative, currently employed by the Government of Ecuador, certify that I prepared or otherwise supervised the preparation of the attached submission of the Post-Preliminary Questionnaire Response, filed on May 16, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of the Government of Ecuador contained in this submission are accurate and complete to the best of my knowledge.

I certify that the public information and any business proprietary information of the Government of Ecuador contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.

In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Juan Carlos Sanchez

Date: 05/16/2024

Guayaquil: Av. Malecón 100 y Av. 9 de octubre, Edif. La Previsora, pisos 15-18-19 Teléfono: +593 4 2591370
Quito: Av. Amazonas entre Unión Nacional de Periodistas y Alfonso Pereira
Plataforma Gubernamental de Gestión Financiera, pisos 8 y 9 Teléfono: 593 2 3948760
Manta: Puerto Pesquero de San Mateo Teléfono: 593 5 26661009
www.produccion.gob.ec

EL NUEVO ECUADOR

Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 12:54 PM, Submission Status: Approved

Barcode: 4561324-01 C-331-806 INV - Investigation

# Counsel Certification

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to the Government of Ecuador, certify that I have read the attached submission of the Post-Preliminary Supplemental Questionnaire, filed on May 16, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: May 16, 2024

Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 12:54 PM, Submission Status: Approved

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 17th day of May, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4561324-01 C-331-806 INV - Investigation

Case No. C-331-806
Investigation
AD/CVD Operations, Office IV

**Business proprietary information of the GOE has been redacted in Exhibits S3-3, and S3-6 to S3-7(e); business proprietary information of Santa Priscila has been redacted on pages S3-2, S3-3, S3-5, and S3-6; business proprietary information of Produmar has been redacted on pages S3-2, S3-3, S3-5, S3-6, and S3-10.**

**PUBLIC VERSION**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

# COUNTERVAILING DUTY INVESTIGATION OF FROZEN WARMWATER SHRIMP FROM ECUADOR

# RESPONSE OF THE GOVERNMENT OF ECUADOR TO THE DEPARTMENT'S MAY 2, 2024, POST-PRELIMINARY SUPPLEMENTAL QUESTIONNAIRE

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**

**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: May 17, 2024**

**Counsel to the Government of Ecuador**

Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 12:54 PM, Submission Status: Approved

9.1 of the LRTI or the Law for Productive Promotion, the taxpayer selects line 805, which includes "Income from new productive investments" made under Article 9.1 of the LRTI, which was established by the COPCI. Therefore, the income tax declaration for 2021 does not contain any box where a party may select income tax incentives incident to "investment contracts." Please refer to the GOE's response to question no. 1 above for further explanation of why the tax exemptions claimed by Santa Priscila and Produmar were made pursuant to the tax incentives on [ ], rather than pursuant to the investment contracts signed between Santa Priscila and Produmar, respectively, with the GOE. **{BPI of Santa Priscila and Produmar.}**

**Investment Contract**

**3. On pages OTH-4 and OTH-5 of the GOE's February 14, 2024, initial questionnaire response (IQR), the GOE stated that the Tax Incentives for Investment Contracts program first targeted 13 priority sectors and then 25 priority sectors as established in the Investment Regulations of the Organic Code of Production, Commerce and Investments (COPCI). Please respond to the following questions:**

**a. Please enumerate separately the specific sectors that fall under the 13 and 25 priority sectors.**

**ANSWER:** As an initial matter, the GOE corrects its statement on page OTH-4 of its IQR to clarify that, under the rules for investment contracts that were available beginning in 2010 under the initial COPCI regime, there were ten priority sectors, not 13. The GOE provides the following list of ten priority sectors, as stated in the Second Amendment (2.1) to the LRTI as published in the Official Gazette Supplement No. 351 of December 29, 2010:

| |
|---|
| a. Production of fresh, frozen and industrialized foodstuffs; |
| b. Forestry and agroforestry chain and its processed products; |
| c. Metal mechanics; |
| d. Petrochemicals; |
| e. Pharmaceuticals; |
| f. Tourism; |
| g. Renewable energies including bioenergy or energy from biomass; |
| h. Foreign trade logistics services; |

| |
|---|
| i. Biotechnology and Applied Software; and, |
| j. The sectors of strategic import substitution and export promotion, determined by the President of the Republic. |

Likewise, the GOE corrects its statement on page OTH-5 of its IQR to clarify that, under Articles 17 and 18 of the Investment Regulations for the COPCI, as published in the Official Gazette Supplement No. 450 of May 17, 2011, there were 24 priority sectors, not 25.[1] The GOE provides the following list of the priority sectors, which includes import substitution sectors, as published in the Official Gazette:

| |
|---|
| A. AGRICULTURAL SECTOR; FRESH, FROZEN AND INDUSTRIALIZED FOODS |
| B. AGROFORESTRY CHAIN AND PROCESSED PRODUCTS |
| C. METALMECHANICAL |
| D. PETROCHEMICALS AND OLEOCHEMICALS |
| E. PHARMACEUTICAL |
| F. TOURISM, CINEMATOGRAPHY AND AUDIOVISUALS; AND, INTERNATIONAL EVENTS |
| G. RENEWABLE ENERGIES INCLUDING BIOENERGY OR ENERGY FROM BIOMASS |
| H. FOREIGN TRADE LOGISTICS SERVICES |
| I. BIOTECHNOLOGY AND APPLIED SOFTWARE. |
| J. EXPORT OF SERVICES |
| K) SOFTWARE DEVELOPMENT AND SERVICES, TECHNOLOGY HARDWARE PRODUCTION AND DEVELOPMENT, DIGITAL INFRASTRUCTURE, INFORMATION SECURITY, DIGITAL PRODUCTS AND CONTENT, AND ONLINE SERVICES. |
| L) ENERGY EFFICIENCY |
| M) SUSTAINABLE CONSTRUCTION MATERIALS INDUSTRIES AND TECHNOLOGIES |
| N) INDUSTRIAL, AGRO-INDUSTRIAL AND AGRIBUSINESS SECTOR |

[1] The GOE clarifies that it inadvertently included the "technological hardware" sub-sector as a separate sector, which caused it to misstate the number of sectors as 25 instead of 24.



Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 12:54 PM, Submission Status: Approved

| |
|---|
| Import substitution and export promotion sectors:<br>a.-Manufacture of basic chemical substances, including fertilizers and nitrogen compounds;<br>b.-Manufacture of pesticides and other chemical products for agricultural use;<br>c.-Manufacture of soaps and detergents, cleaning and polishing preparations, perfumes and toilet preparations;<br>d.-Manufacture of other chemical products;<br>e.-Manufacture of ceramic products;<br>f.-Manufacture of radio, television and cellular receivers and related products for consumers;<br>g.-Manufacture of clothing and textile materials;<br>h.-Manufacture of leather and footwear; e, and; (sic)<br>j. Cement manufacturing (sic)<br>i.-Manufacture of domestic appliances. |

**b. Please attach the source documentation, even if previously provided, that lists those priority sectors.**

**ANSWER:** As requested, **Exhibit S3-1(a)** contains the Second Amendment (2.1) to the LRTI as published in the Official Gazette Supplement No. 351 of December 29, 2010. **Exhibit S3-1(b)** contains Articles 17 and 18 of the Investment Regulations for the COPCI, as published in the Official Gazette Supplement No. 450 of May 17, 2011.

**c. Please explain if Article 9.1 of the COPCI is the same as Article 9.1 of the Internal Tax Regime Law (LRTI). If not, please provide Article 9.1 of the COPCI. If they are the same, please explain why Article 9.1 of LRTI, provided in Exhibit TAX-1(a) of GOE's IQR, lists 18 sectors (*i.e.*, (a) through (q)) and not 13 or 25 priority sectors.**

**ANSWER:** The GOE clarifies that the COPCI has no Article 9.1. The GOE corrects its reference on page OTH-4 of its IQR to Article 9.1 of the COPCI, which should have referred to Article 9.1 of the LRTI. Article 9 of the COPCI defines how a legally adequate monthly salary of a working person shall be calculated.

Rather, as stated above, the COPCI added Article 9.1, Section 2 to the LRTI. Article 9.1 of the LRTI allows certain corporate taxpayers to claim an exemption from corporate income tax where the taxpayer makes a qualifying new investment in a "productive" asset pursuant to the terms of the COPCI.



Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 12:54 PM, Submission Status: Approved

The Municipalities of Durán and Santa Elena confirm that no companies applied for, but were denied, requests for forgiveness from patent tax, during the years 2019-2022.

**(j) If you have additional information that you believe demonstrates that this program is broadly available and widely used throughout the economy, please provide such information and a narrative description of your contention.**

ANSWER: Not applicable.

**6. In Exhibit S-Q56(a) of the GOE's SQR, the GOE provided a table "listing Santa Priscila, SONGA, and their respective cross-owned affiliates required to respond to {Commerce}'s January 24 supplier questionnaire, and the municipal tax exemption programs administered by the Municipality of Guayaquil that each company was approved for, along with a listing of the municipal resolution approving each tax exemption." In Exhibit D-Q56(a), the GOE reported that Produmar, *i.e.*, Santa Priscila's cross-owned affiliate, did not receive any municipal tax exemption. However, according to Exhibit PRO-8 of Santa Priscila's February 16, 2024, Section III of supplier questionnaire response, Santa Priscila claims that Produmar "has received {the municipal total assets tax} benefit since May 2017." Please explain this discrepancy.**

**ANSWER:** Please refer to the GOE's response to question no. 4 above.

**Brackish Water**

**7. Please provide a list of all industries in Ecuador that use brackish water non- consumptively.**

**ANSWER:** As stated on page NSA-36 of the GOE's April 18, 2024, New Subsidy Allegation questionnaire response ("NSA QR"), neither the GOE nor any other water-related agency supplies brackish or salt water to any users in Ecuador. Moreover, non-consumptive use of brackish water is not subject to billing and collections by the Public Water Company ("EPA").

Rather, the GOE only has infrastructure in place to supply fresh water. Because of the limited applications and abundance of brackish water, parties wishing to access either of these types of water for productive purposes are wholly responsible for all costs and expenses related to accessing this water.

As stated on page NSA-37 of the GOE's April 18th NSA QR, other users of brackish water for non-consumptive purposes may include recreational events, ships (for ballast water), and cooling equipment for power generation equipment. This is However, the GOE maintains



Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 12:54 PM, Submission Status: Approved

no records of industries in Ecuador that use brackish water non-consumptively.

**8. On page NSA-21 of SONGA's April 18, 2024, new subsidy allegations questionnaire response, Sociedad Nacional de Galápagos C.A. (SONGA) stated that the declaration "from George W. Chamberlain and Claude E. Boyd, world renowned experts on aquaculture practices and water use, {confirms} that no government authority or any private entity assesses any fees on the non-consumptive use of brackish water." If available, please provide an example, preferably in Ecuador, of a private entity that offers non-consumptive use of its brackish water, and list the fees, if any, that the private entity charges for the use of its brackish water.**

**ANSWER:** As stated on page NSA-37 of the GOE's April 18th NSA QR, pursuant to Article 11 of the Organic Law on Water Resources, Use and Development of Water ("Water Resources Law"), the hydraulic pipes and infrastructure used to access brackish water from the source, move it to the farm, and return it to the source, may be owned by private parties where they are built and financed by private parties. To the GOE's knowledge, the hydraulic pipes and infrastructure used to access brackish water, move it to the farm, and return it to the source (i.e., estuary), are used by shrimp farms for self-consumption and not for resale to other entities.

As stated on page TAX-39 of the GOE's IQR, pursuant to Article 318 of the Constitution of the Republic of Ecuador, the Ministry of the Environment, Water, and Ecological Transition ("MAATE"), is the only entity in Ecuador responsible for the regulation and management of water use in Ecuador. As stated on page NSA-36 of the GOE's April 18th NSA QR, non-consumptive use of water is not subject to billing and collections by EPA according to the resolutions issued by the Sole Water Authority. Pursuant to Article 6 of the Water Resources Law, private entities are prohibited from charging fees for the non-consumptive use of brackish water or to enter into any commercial agreement to profit from water management in Ecuador.

Moreover, as stated on page NSA-36 of the GOE's April 18th NSA QR, the GOE and water agencies only have infrastructure (e.g., pipes, water pumps, etc.) in place to supply fresh water. Therefore, no brackish water supply system exists. Because of the limited applications and abundance of brackish water, parties wishing to access either of these types of water for



Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 12:54 PM, Submission Status: Approved

Barcode: 4561324-01 C-331-806 INV - Investigation


productive purposes are wholly responsible the bear their own costs and expenses related to accessing this water. Pursuant to Article 11 of the Organic Law on Water Resources, Use, and Development of Water, the hydraulic pipes and infrastructure may be owned by public, private, or community parties depending upon who built and financed the infrastructure in question.

**Electricity**

**9. On page S2-6 of the GOE's March 19, 2024, second supplemental questionnaire response (S2QR), the GOE stated that "ARCERNNR projects and analyzes the impact of continuing to apply the same electricity tariff from the previous year upon projected revenues and costs for the upcoming year. Where the proposed tariff would have considerable impact upon the projected revenues of each distribution and commercialization company, ARCERNNRR's Board of Directors will not apply the proposed tariff." Please provide a detailed explanation as to what "considerable impact" means in this context, including whether generation/distribution/transmission companies suffering a loss may constitute a "considerable impact." Specifically, if the prior year's electricity tariff will result in projected loss for the generation/distribution/transmission companies, explain whether the Agency for Regulation and Control of Energy and Non- Renewable Natural Resources (ARCERNNR) could apply the prior year's electricity tariff in any way.**

**ANSWER:** The GOE clarifies that a "considerable impact" is measured by the standards for review and/or update of service costs, as established by Regulation ARCERNNR 006/21, "Economic and Tariff Regime for Rendering of Public Utilities of Electric Energy and General Public Lighting," at Numerals 10.7 and 22, which is contained in Exhibit LTAR-2 of the GOE's IQR. Therefore, as stated on pages S2-7 to S2-8 of the GOE's March 19th SQR 2, cost adjustments may be made, when approved by ARCERNNR's board of directors where:

1) ARCERNNR initiates the administrative tariff revision process;
2) fixed costs differ by more than 5% in the base calculation, or in any individual cost category (i.e., generation, transmission, distribution, transmission, or commercialization), or collectively;
3) Where there is more than a 10% projected shortfall in revenues below the demand projection in ARCERRNNR's cost analysis.

Moreover, the GOE confirms that tariff adjustments may be made where:



Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 12:54 PM, Submission Status: Approved

# Tab 54

# P.R. 374

# C.R. 244

Barcode: 4561345-01 C-331-806 INV - Investigation

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave, SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 162
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been ranged or redacted on pages S2-1 to S2-9, and S2-14; and in Exhibits S2-2 to S2-8.

**PUBLIC VERSION**

May 17, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
SONGA Post-Preliminary Supplemental Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos C.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's May 2, 2024, post-preliminary supplemental questionnaire. This response is timely submitted in accordance with the Department's May 7, 2024, letter, re: "Respondents' Request for Extension to Post-Preliminary Supplemental Questionnaire Response," which extended the deadline for SONGA's supplemental response until today. Accompanying this submission are calculation worksheets in Excel® format.

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA request proprietary treatment and the basis for the request:


Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 1:07 PM, Submission Status: Approved

- Names of Particular Customers, Distributors, or Suppliers: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(6).

- Exact Amount of Benefits Applied for or Received: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(8).

- Other Specific Business Information Related to SONGA's Ownership and Affiliations, Financial Data, Applications and Approval Documents etc., the Release of Which to the Public Would Cause Substantial Harm to SONGA's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to SONGA's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos C.A.*

## COMPANY CERTIFICATION

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I prepared or otherwise supervised the preparation of the attached submission of the Post-Preliminary Questionnaire Response, filed on May 16, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elizabeth Landes

Date: May 16, 2024

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galápagos C.A., certify that I have read the attached submission of the Post-Preliminary Supplemental Questionnaire, filed on May 16, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: May 16, 2024

Barcode: 4561345-01 C-331-806 INV - Investigation

**CERTIFICATE OF SERVICE**

I, Kenneth N. Hammer, hereby certify on this 17th day of May, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 1:07 PM, Submission Status: Approved

Barcode: 4561345-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**POI: 1/01/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information has been ranged or redacted on pages S2-1 to S2-9, and S2-14; and in Exhibits S2-2 to S2-8.**

**PUBLIC VERSION**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

# COUNTERVAILING DUTY INVESTIGATION OF FROZEN WARMWATER FROM ECUADOR

# RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A. TO THE DEPARTMENT'S MAY 2, 2024 POST-PRELIMINARY SUPPLEMENTAL QUESTIONNAIRE

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: May 17, 2024**

**Counsel to Sociedad Nacional de Galápagos C.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 1:07 PM, Submission Status: Approved

**Post-Preliminary Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador**
**Period of Investigation ("POI") 01/01/2022 – 12/31/2022**
**Sociedad Nacional de Galápagos C.A. (SONGA)**

**Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, SONGA should repeat the question in full to which it is responding and place its answer directly below the question. SONGA should also fully answer each question in this supplemental questionnaire. Please ensure that SONGA provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.**

---

**General**

1. **Please provide public ranges for the sales value in U.S. Dollars (USD) for SONGA's export sales of merchandise under consideration to the United States (*i.e.*, [ ] USD) found in Exhibit 5 of SONGA's February 12, 2024, Section III initial questionnaire response (IQR).**

**ANSWER:** As requested, **Exhibit S2-1(a)** contains an updated public version of Exhibit 5 from Sociedad Nacional de Galápagos's ("SONGA") initial Section III questionnaire response with publicly ranged free-on-board ("FOB") sales values of SONGA's export sales of subject merchandise. In addition, for the Department's convenience, **Exhibit S2-1(b)** contains an updated public version of Exhibit S-2 of SONGA's March 1, 2024, Supplemental Section III questionnaire response ("SQR"), which updated the sales values reported in Exhibit 5 of SONGA's initial Section III response ("IQR"), with publicly ranged FOB sales values of SONGA's export sales of subject merchandise.

2. **On pages S-AFF-5 to S-AFF-6 of SONGA's March 18, 2024, supplemental questionnaire response, SONGA explained that it excluded [ ] from the countervailing duty (CVD) affiliated company list. Please confirm that all three companies are considered cross-owned companies. Additionally, explain how they fit the definition of cross- ownership per 19 CFR 351.525(b)(6). Further, please confirm that [ ] was not a holding or parent company.**

**ANSWER:** After reviewing its prior affiliation responses, SONGA clarifies that it is not affiliated with **[** **]** under Section 771(33) of the Tariff Act of 1930, as amended. Specifically, Holding Sola & Sola Solacciones S.A. ("Sola") owns **[** **]**; and SONGA



Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 1:07 PM, Submission Status: Approved

companies own a total of [ ]. Moreover, there are no shared board members between SONGA, [ ]. Accordingly, SONGA, [ ] are also not cross-owned under the definition stated in 19 C.F.R. § 351.525(b)(6). In addition, SONGA confirms that [ ] was not a parent or holding company of SONGA or any of its cross-owned affiliates.

[ ] is affiliated with SONGA under Section 771(33) of the Tariff Act of 1930, as amended, because Sola, which holds [ ]. However, [ ] is not cross-owned under the definition stated in 19 C.F.R. § 351.525(b)(6) because SONGA cannot use or direct the individual assets and [ ].

As stated on page SUPP2-AFF-1 of SONGA's January 24, 2024, Supplemental Affiliation questionnaire response, Sola is [ ]. A member of the [

]. SONGA clarifies that it inadvertently identified its affiliate, [ ], as cross-owned under the definition stated in 19 C.F.R. § 351.525(b)(6) in its Section A response in the antidumping duty investigation, but this statement, and the legal standard contained in the Department's regulation, is irrelevant to the Department's conduct of an antidumping duty investigation. Critically, [ ] also was not required to respond to the Department's Section III questionnaire in this investigation because, in addition to not being cross-owned with SONGA, it does not produce the subject merchandise, is not a cross-owned holding company or parent company of SONGA, does not supply an input product to SONGA for production of the downstream product produced of SONGA, and did not receive any subsidy and transfer it to SONGA.

**Environmental Tax Incentives**

**3. In Attachment A of SONGA's March 18, 2024 pre-preliminary comments, SONGA provided a self-calculated benefit amount for the Environmental Tax Incentives program. Please provide the calculation that SONGA use to calculate the reported benefit received by Naturisa S.A. (Naturisa) (*i.e.*, [ ] USD). In your response, please tie the benefit amount and corresponding calculation (including the calculation of an appropriate tax rate) to the amount reported in Naturisa's tax forms.**

**ANSWER:** As requested, **Exhibit S2-2** contains a calculation worksheet for benefits received by Naturisa, S.A. under the Environmental Tax Incentives program and tying the benefits reported to the amount reported in Naturisa's income tax declaration. This calculation was also provided in Excel® format in Exhibit S-AFF-Q2 of SONGA's March 18, 2024 Affiliated Companies Supplemental Questionnaire Response ("Affiliate SQR"). For the Department's understanding, SONGA provides additional clarification on how the claimed deduction ties to Naturisa's tax declaration. In particular, the deduction related to this program is claimed on line 810 "Additional Deductions" of the tax form. However, this is not the only additional deduction



Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 1:07 PM, Submission Status: Approved

that SONGA reported for 2021. The value that Naturisa claimed on line 810 of the tax form can be calculated by adding all the deductions SONGA listed in Exhibit S-AFF-Q2 for three programs—(1) Environmental Tax Incentives, (2) Hiring of Disabled People and (3) Hiring of Additional Personnel/Tax Deduction for Net Increase in Employment.

As reflected in Exhibit S-AFF-Q2, to determine the reported benefit received by Naturisa, SONGA applied a [ ] percent tax rate to the portion of line 810 of Naturisa's tax return are deductible expenses under the Environmental Tax Incentive. Line 810 is deducted from the calculation of Total Income on line 836 of the tax form, which is the amount of income subject to the applied tax rate, which for 2021 was [ ] percent. This is the same tax rate that was applied to the two other programs that were claimed under this same deduction line (i.e., line 810).

**Provision of Land Use Concessions**

4. **In Exhibit S-AFF-Q26b of SONGA's March 18, 2024 supplemental questionnaire response, SONGA provided land and dock concessions and enumerated the concession number per Commerce's instructions. On page LTAR-23 of the Government of Ecuador (the GOE)'s February 14, 2024, Section II initial questionnaire response, the GOE listed a concession held by Naturisa under concession number [ ] that was not provided by SONGA in its Exhibit S-AFF-Q26b. Please explain this discrepancy and resubmit Exhibit S-AFF-Q26b in excel format to include concession number [ ] information, if applicable.**

**ANSWER:** SONGA clarifies that Exhibit S-AFF-Q26b of its March 18, 2024, supplemental supplier questionnaire response identifies the concession number identified in the Government of Ecuador's initial Section II questionnaire as concession number [ ] and in the Department's question at Seq. # 4. Specifically, SONGA clarifies that the concession number identified as concession number [ ] reflects the number of the most recent ministerial agreement of the identified concession, which renewed the concession initially associated with concession number [ ] For the Department's reference, **Exhibit S2-3** contains a copy Ministerial Agreement No. [



Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 1:07 PM, Submission Status: Approved

], which reflects on page 3 of 7, that the concession number identified in the Department's question was granted to Naturisa after Naturisa requested renewal of that concession. After the request for renewal was approved, Naturisa continued to hold concession rights for the same parcel identified in Ministerial Agreement No. [ ].

**Investment Contract**

**5. In Attachment A of SONGA's March 18, 2024, pre-preliminary comments, SONGA reported [ ] USD and [ ] USD as the benefits received under the investment contract's ISD exemption on imported materials and ISD exemption on foreign loans programs, respectively. Please explain how SONGA calculated these amounts and how they were reported in SONGA's tax returns.**

**ANSWER:** As explained on pages S-8 and S-10 to S-11 of SONGA's March 1st SQR, the investment contract included a list of imported materials related to the approved investment that were approved to be exempt from currency outflow tax ("ISD"). While this list included estimated values of the goods and the exemptions, the actual values of imported materials and inputs are not stated in the investment contract. However, SONGA confirms that, unless the investment contract is amended, the list of approved items cannot change. Thus, in order to calculate the benefits received under the ISD exemption on imported materials under its investment contract, SONGA reviewed the value of the imported goods that were approved under its investment contract and purchased during 2021. Then, using this information, SONGA determined the tax value that would have been due on each one and applied the ISD rate in effect during the period of investigation ("POI") (i.e., 5 percent) to calculate the reported benefit amount under this exemption. **Exhibit S2-4(a)** contains a worksheet illustrating how SONGA calculated the ISD exemption on imported materials.

Separately, as explained on page S-11 of SONGA's March 1st SQR, there is no formula for calculating exemptions of the payment of ISD on principal and interest on loans used for the approved investment project from lenders outside Ecuador under the investment contract.



Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 1:07 PM, Submission Status: Approved

Rather, SONGA is approved to receive an exemption from payment of ISD on all loan payments related to the investment contract at the applicable ISD rate established by the GOE for transactions of this nature (i.e., 5%). In order to determine the exemption amount, SONGA reviewed all of its payments made on these loans during the POI that were to foreign lenders and determined the tax value that would have been due on each one; this is the amount that was reported as a benefit for this exemption. **Exhibit S2-4(b)** contains a worksheet demonstrating how SONGA calculated the ISD exemption on foreign loan payments during the POI.

Finally, as SONGA stated on page S-AFF-3 of the March 18th Affiliate SQR, the ISD exemption tax benefits do not appear in SONGA's tax declaration.

**Municipal Tax Exemption**

6. **As found in Exhibit 12 of SONGA's IQR and Exhibit NAT-III-8 of SONGA's February 16, 2024, section III supplier questionnaire response, SONGA reported benefits under the municipal tax exemption on total assets program. Please explain how SONGA calculated the amount owed had Naturisa's assets been fully taxed without the 1.5% total assets municipal tax exemption. Additionally, please tie SONGA's and Naturisa's benefits to their tax returns.**

**ANSWER:** SONGA calculated its own benefit under 0.15% total assets municipal tax using the methodology stated on page S-14 of its March 1st SQR. In order to calculate Naturisa's benefits under the 0.15% total assets municipal tax exemption program, SONGA used the same methodology explained with respect to SONGA's calculation of its own benefits on page S-14 of its SQR. Specifically, the municipal tax statement issued by the relevant municipality states the amount of tax due (i.e., [ ]. In order to report the benefit for Naturisa, SONGA multiplied the value of assets exempt from the municipal asset tax by the tax rate of 0.15% (i.e., $[ ] x 0.15% = [ ]). First, SONGA calculated the value of Naturisa's non-exempt assets subject to municipal tax by identifying total assets (i.e., $[ ]) and subtracting current liabilities (i.e., $[ ]). This calculation determines the taxable base assets (i.e., $[ ]) had Naturisa's assets been fully taxed without any



Filed By: khammer@tradepacificlaw.com, Filed Date: 5/17/24 1:07 PM, Submission Status: Approved

# Tab 55

# P.R. 376

Barcode:4563674-01 C-331-806 INV - Investigation -

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 EDRAKE@SCHAGRINASSOCIATES.COM F: (202) 429-2522

May 22, 2024

DOC Inv. No. C-331-806
Total Pages: 5
Investigation
AD/CVD Office IV

**PUBLIC DOCUMENT**

**BY ELECTRONIC FILING**
The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Frozen Warmwater Shrimp from Ecuador: Request for Supplemental Questionnaire**

Dear Secretary Raimondo:

On behalf of the American Shrimp Processors Association ("ASPA" or "Petitioner"), we hereby submit to the U.S. Department of Commerce ("Commerce") a request to issue supplemental questionnaires to the Government of Ecuador ("GOE"), Sociedad Nacional de Galápagos C.A. ("SONGA"), and Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") (collectively "Respondents") regarding the provision of brackish water for less than adequate remuneration.[1] As detailed in Petitioner's May 2, 2024 deficiency comments, Respondents have refused to answer Commerce's most basic questions about this program, including the amount of government-owned water they accessed on their shrimp farms during the POI.[2]

---

1 This submission contains no new factual information.

2 *See* ASPA Deficiency Comments and Rebuttal factual Information to New Subsidy Questionnaire Responses (May 2, 2024) ("ASPA May 2, 2024 Deficiencies").

Filed By: rschagrin@schagrinassociates.com, Filed Date: 5/22/24 3:49 PM, Submission Status: Approved

We appreciate Commerce's decision to initiate an investigation into the provision of brackish water for less than adequate remuneration. We respectfully request that Commerce follow through on this decision by requiring Respondents to provide at least some basic information about their use of brackish water during the period of investigation ("POI"). To do any less would amount to tacit acceptance of Respondents' arguments about this program in the absence of any meaningful information about their own actual use of brackish water. We urge Commerce not to let Respondents stonewall its investigation through argument and evasion, and instead gather all pertinent facts before pre-judging the countervailability of this program.

Respondents' repeated arguments that their use of brackish water is non-consumptive and that other entities do not charge for non-consumptive use of brackish water cannot justify their lack of responsiveness regarding this program. In its initiation notice regarding this program, Commerce explicitly recognized that the brackish water being provided by the GOE to shrimp farms is characterized as water provided for non-consumptive use, and that even brackish water for non-consumptive use has a commercial value.[3] Thus, Respondents' characterization of the type of use involved are irrelevant. Moreover, Petitioners have irrefutably shown that entities do charge for the use of brackish water.[4] Whether or not Respondents believe these examples represent consumptive or non-consumptive use (by their own definitions) may be argued at a later stage of the proceedings, to the degree it they may believe it is relevant (which ASPA does not concede). Such arguments, however, cannot excuse Respondents' failure to provide the information that Commerce has requested.

---

[3] *See* Memorandum to Eric B. Greynolds, Director, Office IV, Antidumping and Countervailing Duty Operations, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations" (Mar. 21, 2024) (ACCESS Barcode 4530111-01) ("NSA Initiation Memo") at 5.

[4] *See id*. *See also* ASPA May 2, 2024 Deficiencies at 10 and Exs. 5 and 6.

For these reasons, Petitioner respectfully requests that Commerce issue supplemental questionnaires to Respondents regarding these programs. Petitioner provided a list of proposed supplemental questions in its May 2, 2024 deficiency comments.[5] To the extent Commerce wishes to limit its further questions on this program, we respectfully request that Commerce at a minimum issue the following supplemental questions to Respondents. For SONGA and Santa Priscila, we propose the following questions:

> **Please report the volume of brackish water used by your shrimp farms during the POI. If this information is not available, please explain why not. Please explain how your company is able to confirm that it returns all of the brackish water it uses in its shrimp ponds if it does not track the amount of water used.**
>
> **Please provide the total area, in hectares, of your shrimp farms that used brackish water during the POI. Please provide supporting documentation.**
>
> **For your largest shrimp pond that used brackish water during the POI, please report the volume of water used during the POI. If this information is not available, please report: (1) the area of the pond in hectares; (2) the depth of the pond; (3) the number of crops produced by the pond during the POI; and (4) the average amount of water exchanged in the pond each day during the POI. Please provide supporting documentation for these figures.**

For the GOE, we propose the following questions:

> **Please clarify whether Respondents are required to obtain permits for access to brackish water by their shrimp farms. If not, please explain why not. If so, please provide copies of such permits in effect for the POI.**
>
> **Please describe in detail how the GOE confirms that all of the brackish water used by Respondents is returned to the source. Please provide supporting documentation such as monitoring reports, on-site audits, or the results of any other verification or enforcement activities regarding the use of brackish water by Respondents during the POI.**

Thank you for your attention to these matters. Please contact the undersigned with any questions regarding this submission.

---

[5] *See* ASPA May 2, 2024 Deficiencies at 7 – 9.

Respectfully submitted,

Roger B. Schagrin
Elizabeth J. Drake
Michelle R. Avrutin
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

Edward T. Hayes
LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701
*Counsel to the American Shrimp Processors Association*

Barcode:4563674-01 C-331-806 INV - Investigation -

# CERTIFICATE OF SERVICE

**Frozen Warmwater Shrimp from Ecuador**
**C-331-806**
**Investigation**

I, Karen Johnson, hereby certify that copies of the attached *public document* were served on May 22, 2024, via ACCESS electronic service:

Nathaniel Rickard, Esq
**Picard Kentz & Rowe LLP**
1155 Connecticut Avenue, NW
Suite 700
Washington, DC 20036

Edward T. Hayes, Esq.
**Leake & Anderson, LLP**
1100 Poydras Street
Suite 1700
New Orleans, LA 70163

Jennifer Michele Smith-Veluz, Esq.
**The Bristol Group PLLC**
1707 L Street, NW
Suite 570
Washington, DC 20036

Jarrod M. Goldfeder, Esq.
**Trade Pacific PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003

Jeffrey S. Neeley, Esq.
**Husch Blackwell LLP**
1801 Pennsylvania Avenue, NW
Suite 1000
Washington, DC 20006

Andrea Ruiz
**Embassy of Ecuador**
2535 15th Street, NW
Washington, DC 20009

/s/ *Karen Johnson*
Karen Johnson, *Paralegal*
SCHAGRIN ASSOCIATES

Filed By: rschagrin@schagrinassociates.com, Filed Date: 5/22/24 3:49 PM, Submission Status: Approved

# Tab 56

# P.R. 377

Barcode:4566642-01 C-331-806 INV - Investigation -

TRADE PACIFIC

International Trade Lawyers

700 Pennsylvania Ave, SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 4
Investigation
POI: 1/1/22 – 12/31/22
E&C/Office IV

**PUBLIC DOCUMENT**

May 29, 2024

Re: Frozen Warmwater Shrimp from Ecuador – Respondents' Opposition to the Petitioner's May 22, 2024 "Request for Supplemental Questionnaire" re Brackish Water NSA

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), Sociedad Nacional de Galápagos C.A. ("SONGA"), and the Government of Ecuador ("GOE") (collectively "the Respondents"), we submit this response in opposition to the petitioner's May 22, 2024, letter repeating its request that the Department issue a supplemental questionnaire concerning its allegation that the Government of Ecuador provides brackish water to every Ecuadorian shrimp farm for less than adequate remuneration. This allegation applies to over 3,350 shrimp farms,[1] and, if the petitioner's proposed methodology is taken to its logical conclusion, it could result in calculating a benefit in the multiple billions of dollars for Santa Priscila and SONGA alone.

---

[1] See Letter from Trade Pacific PLLC, re: "Government of Ecuador's 771B Questionnaire Response" (Apr. 25, 2024), at 2.


Filed By: khammer@tradepacificlaw.com, Filed Date: 5/29/24 10:11 AM, Submission Status: Approved

For the reasons discussed in greater detail in the Respondents' May 14, 2024, letter responding to the Petitioner's May 2, 2024, submission of rebuttal factual information ("RFI") to the Respondents' new subsidy allegations questionnaire responses, there is no factual basis to inquire further concerning whether shrimp farmers during the period of investigation ("POI") measured the actual amount of water that they pumped into their shrimp ponds. Not satisfied with the information contained in the Respondents' May 14th rebuttal submission, the petitioner repeats the same arguments stated in its May 2nd RFI submission. This conclusion is confirmed by the petitioner's express reliance on their "May 2, 2024, deficiency comments."

The petitioner intentionally avoids addressing the Respondents' prior responses in which they stated that they do not record the quantities of brackish water pumped. Further, the uncontradicted record evidence shows that the GOE provides nothing of value to Santa Priscila and SONGA because Santa Priscila and SONGA bear the full expense of installing and operating pumping equipment.

Finally, it is indisputable that the petitioner urges the Department to request information about pond area, pond depth, number of harvests, and frequency of water exchange that would only confirm the Respondents' reasonable estimation of the outrageous benefit that could be calculated based on the information the petitioner urges the Department to request. As outlined on pages 8 to 9 of Respondents' May 14th submission, under the petitioner's theory, the likely countervailable benefit for the use of brackish water to Santa Priscila would exceed $20 billion in 2022. The extraordinary size of the alleged benefit illustrates the ridiculousness of the petitioner's effort to treat the non-consumptive use of brackish water as a countervailable subsidy.

For all these reasons, as discussed in greater detail in the Respondent's May 14th submission, the Department should reject the petitioner's request to issue additional brackish water-related questions and find the alleged provision of brackish water to shrimp farms is not countervailable.

* * *

This submission contains no new factual information. In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

**Counsel to Santa Priscila, SONGA, and the Government of Ecuador**

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 29th day of May 2024, that the foregoing document submitted in the countervailing duty investigation in Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806) is deemed served via ACCESS on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC