**IN THE UNITED STATES COURT OF INTERNATIONAL TRADE**
**BEFORE THE HONORABLE RICHARD K. EATON, SENIOR JUDGE**

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | |
| Plaintiffs, | |
| and | |
| AMERICAN SHRIMP PROCESSORS ASSOCIATION, | |
| Consolidated Plaintiff, and | **Consol. Ct. No. 25-00025** |
| AD HOC SHRIMP TRADE ACTION COMMITTEE, | **NON-CONFIDENTIAL VERSION** |
| Consolidated Plaintiff-Intervenor, | |
| v. | |
| UNITED STATES, | |
| Defendant, and | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, | |
| Defendant-Intervenors, and | |
| INDUSTRIAL PESQUERA SANTA PRISCILA, S.A. and SOCIEDAD NACIONAL DE GALAPAGOS, C.A., | |
| Consolidated Defendant-Intervenors. | |

**JOINT APPENDIX**

Warren E. Connelly
Jarrod M. Goldfeder
Kenneth N. Hammer

TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
202-223-3760

Counsel for Industrial Pesquera Santa Priscila, S.A.
and Sociedad Nacional de Galapagos, C.A.

Date: April 27, 2026

<u>**Table of Contents**</u>


| Tab No. | Document Description | Page(s) Included | Record Document Index Nos.[1] |
|---|---|---|---|
| 1 | Petition from Schagrin Associates to Sec'y of Commerce, re: "*Volume IV*" (Oct. 25, 2023) | Cover page, 1-39 | P.R. 26-35; C.R. 20 |
| 2 | Memorandum to The File, re: "*Countervailing Duty Investigation Initiation Checklist*" (Nov. 14, 2023) | Cover page, 5-8, 23-24 | P.R. 79-80; C.R. 44-45 |
| 3 | Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam: Initiation of Countervailing Duty Investigations, 88 Fed. Reg. 81053 (Nov. 21, 2023) | All | P.R. 87 |
| 4 | Memorandum to James Maeder, Deputy Assistant Secretary for Antidumping and Countervailing Duty Operations, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Respondent Selection*" (Dec. 7, 2023) | All | P.R. 95; C.R. 48 |
| 5 | Letter from Dep't of Commerce to Embassy of Ecuador, re: "*Investigation of Frozen Warmwater Shrimp from Ecuador: Countervailing Duty Questionnaire*" (Dec. 12, 2023) | Cover page, 1, II-1 to II-6, III-37, III-41 to III-45 | P.R. 98 |
| 6 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty (CVD) Investigation on Frozen Warmwater Shrimp from Ecuador: Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp*" (Industrial Pesquera Santa Priscila S.A.) (Dec. 14, 2023) | All | P.R. 102 |
| 7 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty (CVD) Investigation on Frozen Warmwater Shrimp from Ecuador: Questionnaire on Sources of Raw and/or Frozen Warmwater Shrimp*" (Sociedad Nacional de Galápagos C.A.) (Dec. 14, 2023) | All | P.R. 104 |


[1] Documents contained in the administrative record are identified by the name and date of the documents, followed by the confidential ("C.R.") and public ("P.R.") index numbers assigned to these documents in the respective administrative record indices that the U.S. Department of Commerce filed with the Court on March 31, 2025. *See* Admin. Rec. Index, Mar. 31, 2025, ECF No. 27.

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 8 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Sociedad Nacional de Galápagos C.A.'s Sources of Raw Shrimp Questionnaire Response*" (Jan. 3, 2024) | Cover letter, narrative, exhibit list; Ex. SRS-2 | P.R. 115; C.R. 49-50 |
| 9 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Industrial Pesquera Santa Priscila S.A.'s Sources of Raw Shrimp Questionnaire Response*" (Jan. 3, 2024) | All | P.R. 116; C.R. 51 |
| 10 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Sociedad Nacional de Galápagos C.A.'s Section III 'Affiliated Companies' Questionnaire Response*" (Jan. 5, 2024) | All | P.R. 117; C.R. 53 |
| 11 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Industrial Pesquera Santa Priscila S.A.'s Section III 'Affiliated Companies' Questionnaire Response*" (Jan. 5, 2024) | Cover letter, narrative, exhibit list; Ex. AFF-1 | P.R. 118; C.R. 54 |
| 12 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations*" (Jan. 8, 2024) | Cover letter, 1, 4-10 | P.R. 119 |
| 13 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Santa Priscila and Songa's Req for Clarification of Section III Reporting Obligations and to Exclude Certain Companies from Reporting*" (Jan. 9, 2024) | All | P.R. 126; C.R. 55 |
| 14 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Opposition to Respondents' Req to Exclude Companies from Reporting Obligations*" (Jan. 11, 2024) | All | P.R. 131 |
| 15 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Comments on Respondents' Supplier and Affiliation Responses*" (Jan. 12, 2024) | All | P.R. 134; C.R. 58 |
| 16 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Respondents' Objection to Petitioner's Req for Questionnaire Responses from Unaffiliated Shrimp Farms*" (Jan. 16, 2024) | All | P.R. 137 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 17 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Affiliated Companies Supplemental Questionnaire Response*" (Jan. 16, 2024) | All | P.R. 139; C.R. 60 |
| 18 | Memorandum to The File, re: "*Ex Parte Meeting*" (Jan. 18, 2024) | All | P.R. 149 |
| 19 | Letter from Trade Pacific PLLC, re: "*Affiliated Companies Supplemental Questionnaire Response*" (Jan. 23, 2024) | All | P.R. 155; C.R. 64 |
| 20 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Sociedad Nacional de Galápagos C.A.*" (Jan. 25, 2024) | All | P.R. 160; C.R. 66 |
| 21 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Industrial Pesquera Santa Priscila S.A.*" (Jan. 25, 2024) | All | P.R. 161; C.R. 67 |
| 22 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Opposition to Exclusion of Respondents' Cross-Owned Input Suppliers*" (Jan. 29, 2024) | Narrative | P.R. 167 |
| 23 | Letter from Dep't of Commerce to Schagrin Associates, re: "*Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: First Supplemental Questionnaire Regarding New Subsidy Allegation*" (Jan. 31, 2024) | All | P.R. 170 |
| 24 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Section II of Supplier Questionnaire Response*" (Feb. 12, 2024) | Cover letter, narrative, exhibit list | P.R. 179; C.R. 71 |
| 25 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Section III Questionnaire Response*" (Feb. 13, 2024) | Cover letter, narrative; Exs. 10, 11 | P.R. 183-84; C.R. 85, 87-88 |
| 26 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of the Government of Ecuador to Section II Countervailing Duty Questionnaire, Volume II – Tax Programs*" (Feb. 15, 2024) | Cover letter, Volume II cover page, TAX-38 to TAX-57, exhibit list; Exs. TAX-4(a), TAX-4(b) | P.R. 186-88; C.R. 90-91 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 27 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of the Government of Ecuador to Section II Countervailing Duty Questionnaire, Volume VI*" (Feb. 15, 2024) | Volume VI cover page, OTH-16; Exs. OTH-2(b), OTH-4 | P.R. 206-07; C.R. 105 |
| 28 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of Santa Priscila to Section III Supplier Questionnaire*" (Feb. 20, 2024) | Cover letter, Vol I cover page, III-PRO-14; Ex. PRO-15 | P.R. 208; C.R. 106-14 |
| 29 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Response of SONGA's Section III Supplier Questionnaire*" (Feb. 20, 2024) | Cover letter, narrative, exhibit list | P.R. 212; C.R. 115 |
| 30 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations*" (Feb. 21, 2024) | All | P.R. 217 |
| 31 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*SONGA Section III Supplemental Questionnaire*" (Feb. 20, 2024) | All | P.R. 218; C.R. 120 |
| 32 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA Section III Supplemental Questionnaire Response*" (Mar. 1, 2024) | Cover letter, cover page, S-7 | P.R. 232; C.R. 134 |
| 33 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Santa Priscila's Supplemental Section III Questionnaire Response*" (Mar. 4, 2024) | Cover letter, cover page, S-2, S-13 to S-14; Exs. S-4(b), S-4(e) | P.R. 234; C.R. 136 |
| 34 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: Factual Information to Rebut, Clarify, and/or correct New Subsidy Allegations*" (Mar. 4, 2024) | Cover letter, 2-8 | P.R. 235 |
| 35 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations Supplemental Response*" (Mar. 5, 2024) | Cover letter, 2-4 | P.R. 237 |
| 36 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador Supplemental Section II Questionnaire Response*" (Mar. 14, 2024) | Cover letter, cover page, Ex. S-Q3(a) | P.R. 263-64; C.R. 153 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 37 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Benchmark Supplemental Questionnaire of SONGA and Santa Priscila*" (Mar. 15, 2024) | Cover letter, narrative, exhibit list | P.R. 266; C.R. 170 |
| 38 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Petitioners' March 5, 2024 Response to Supplemental Questionnaire Regarding NSAs*" (Mar. 15, 2024) | 1-5 | P.R. 268 |
| 39 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA Affiliation Supplemental Questionnaire Response*" (Mar. 19, 2024) | Cover letter, cover page, S-AFF-2 to S-AFF-3 | P.R. 273; C.R. 177 |
| 40 | Memorandum to Eric B. Greynold, Director of Office IV, re: "*New Subsidy Allegations*" (Mar. 21, 2024) | All | P.R. 279 |
| 41 | Memorandum to Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, re: "*Decision Memorandum for the Preliminary Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador*" (Mar. 25, 2024) | All | P.R. 283 |
| 42 | Letter from Dep't of Commerce to Embassy of Ecuador, re: "*Countervailing Duty Questionnaire Regarding New Subsidy Allegation*" (Mar. 28, 2024) | All | P.R. 285 |
| 43 | Frozen Warmwater Shrimp From Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With the Final Antidumping Duty Determination, 89 Fed. Reg. 22379 (Apr. 1, 2024) | All | P.R. 293 |
| 44 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's New Subsidy Allegations Questionnaire Response*" (Apr. 19, 2024) | Cover letter, cover page, NSA-1, NSA-6, NSA-10, NSA-15 to NSA-21; Exs. NSA-10, NSA-11 | P.R. 316-17; C.R. 207-08 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 45 | Letter from Trade Pacific PLLC to Sec'y of Commerce re: "*Santa Priscila's New Subsidy Allegations Questionnaire Response*" (Apr. 19, 2024) | Cover letter, cover page, NSA-1 to NSA-3, NSA-7, NSA-16 to NSA-24; Exs. NSA-6, NSA-7(a), NSA-11, NSA-12 | P.R. 318-19; C.R. 210, 212 |
| 46 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador's New Subsidy Allegations Questionnaire Response*" (Apr. 19, 2024) | Cover letter, cover page, NSA-1, NSA-9, NSA-12 to NSA-13, NSA-15, NSA-27 to NSA-28, NSA-35 to NSA-50; Ex. NSA-11 | P.R. 320-21; C.R. 213, 214-15 |
| 47 | Frozen Warmwater Shrimp From Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation, 89 Fed. Reg. 31722 (Apr. 25, 2024) | All | P.R. 338 |
| 48 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's 771B Questionnaire Response*" (Apr. 26, 2024) | Cover letter, narrative, exhibit list | P.R. 342; C.R. 229 |
| 49 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses*" (May 2, 2024) | All | P.R. 350 |
| 50 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Santa Priscila Supplemental Questionnaire*" (May 2, 2024) | All | P.R. 353; C.R. 231 |
| 51 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*SONGA Supplemental Questionnaire*" (May 2, 2024) | All | P.R. 354; C.R. 232 |
| 52 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Respondents' Submission of Factual Information to Rebut, Clarify or Correct Information that the Petitioners Submitted on May 2, 2024 in Their 'Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses' Concerning Their Brackish Water Allegations*" (May 14, 2024) | Narrative | P.R. 365 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 53 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador's Post-Preliminary Supplemental Questionnaire Response*" (May 17, 2024) | Cover letter, cover page, S3-6 to S3-8, S3-16 to S3-18 | P.R. 366; C.R. 234 |
| 54 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA Post-Preliminary Supplemental Questionnaire Response*" (May 17, 2024) | Cover letter, cover page, S2-1 to S2-6 | P.R. 374; C.R. 244 |
| 55 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Request for Supplemental Questionnaire*" (May 22, 2024) | All | P.R. 376 |
| 56 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Respondents' Opposition to the Petitioner's May 22, 2024 'Request for Supplemental Questionnaire' re Brackish Water NSA*" (May 29, 2024) | All | P.R. 377 |
| 57 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*SONGA Post Preliminary Second Supplemental Questionnaire*" (May 31, 2024) | All | P.R. 380 |
| 58 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Santa Priscila Post Preliminary Second Supplemental Questionnaire*" (May 31, 2024) | All | P.R. 381 |
| 59 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Government of Ecuador Post Preliminary Second Supplemental Questionnaire*" (May 31, 2024) | All | P.R. 382 |
| 60 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*SONGA's Second Post-Preliminary Supplemental Questionnaire Response*" (June 11, 2024) | Cover letter, cover page, S3-1 to S3-4; Exs. S3-1 to S3-4 | P.R. 387; C.R. 245-46 |
| 61 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Santa Priscila's Second Post-Preliminary Supplemental Questionnaire Response*" (June 11, 2024) | All | P.R. 388; C.R. 247-48 |
| 62 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador's Second Post-Preliminary Supplemental Questionnaire Response*" (June 12, 2024) | Cover letter, S4-1 to S4-4, exhibit list; Exs. S4-1(a) to S4-2(b) | P.R. 389; C.R. 249-57 |
| 63 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Government of Ecuador Post Preliminary Third Supplemental Questionnaire*" (July 2, 2024) | All | P.R. 390 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 64 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Santa Priscila 3rd Post-Preliminary Supplemental Questionnaire Response*" (July 5, 2024) | All | P.R. 392; C.R. 258 |
| 65 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Verification Agenda of Santa Priscila S.A.*" (July 8, 2024) | All | P.R. 395; C.R. 259 |
| 66 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Verification Agenda of SONGA*" (July 9, 2024) | All | P.R. 397; C.R. 260 |
| 67 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador 3rd Post-Preliminary Supplemental Questionnaire Response*" (July 11, 2024) | Cover letter, cover page, S5-6 to S5-8, S5-15; Exs. S5-4 to S5-6 | P.R. 398; C.R. 261 |
| 68 | Memorandum to Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, re: "*Post-Preliminary Analysis*" (July 12, 2024) | All | P.R. 400 |
| 69 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Government of Ecuador Verification Exhibits*" (July 26, 2024) | Cover letter, exhibit list; Ex. VE-4 | P.R. 410; C.R. 271, 276 |
| 70 | Memorandum to The File, re: "*Verification of the Questionnaire Responses of Sociedad Nacional de Galapagos C.A.*" (Aug. 13, 2024) | 1-3, 10 | P.R. 420; C.R. 313 |
| 71 | Memorandum to The File, re: "*Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A.*" (Aug. 22, 2024) | 1-2, 13 | P.R. 421; C.R. 314 |
| 72 | Memorandum to The File, re: "*Verification of the Questionnaire Responses of Government of Ecuador*" (Sept. 3, 2024) | 1, 3-6, 11-12 | P.R. 422; C.R. 315 |
| 73 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Case Brief*" (Sept. 16, 2024) | Cover letter, cover page, table of contents, 1-13, 15-17 | P.R. 427; C.R. 316 |
| 74 | Memorandum to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, re: "*Second Post-Preliminary Analysis*" (Sept. 26, 2024) | All | P.R. 437 |
| 75 | Letter from Schagrin Associates to Sec'y of Commerce, re: "*Case Brief*" (Oct. 2, 2024) | All | P.R. 442 |

| Tab No. | Document Description | Page(s) Included | Record Document Index Nos. |
|---|---|---|---|
| 76 | Letter from Trade Pacific PLLC to Sec'y Commerce, re: "*Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador Relating to the Three Programs Addressed in the Second Post-Preliminary Determination*" (Oct. 3, 2024) | Cover letter, cover page, table of contents, 1, 3, 4, 21, 23, 27 | P.R. 445; C.R. 325 |
| 77 | Letter from Dep't of Commerce to Trade Pacific PLLC, re: "*Rejection of Respondents' Case and Rebuttal Brief Comments*" (Oct. 10, 2024) | All | P.R. 449 |
| 78 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Redacted Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador*" (Oct. 11, 2024) | Cover letter, attachment, cover letter, cover page, table of contents, 1-6, 31-33, 83-90 | P.R. 451-52; C.R. 327 |
| 79 | Letter from Trade Pacific PLLC to Sec'y of Commerce, re: "*Rebuttal Brief*" (Oct. 11, 2024) | Cover letter, attachment, cover letter, cover page, table of contents, 1, 61-69, 71 | P.R. 453-54; C.R. 328 |
| 80 | Memorandum to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, re: "*Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador*" (Oct. 21, 2024) | All | P.R. 456 |
| 81 | Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty Determination, 89 Fed. Reg. 85506 (Oct. 28, 2024) | All | P.R. 459 |
| 82 | Memorandum to The File, re: "*Final Determination Calculations for SONGA*" (Oct. 21, 2024) | All | P.R. 460; C.R. 329 |
| 83 | Memorandum to The File, re: "*Final Determination Calculations for Industrial Pesquera Santa Priscila S.A.*" (Oct. 21, 2024) | All | P.R. 461; C.R. 331 |
| 84 | Frozen Warmwater Shrimp From Ecuador, 89 Fed. Reg. 104982 (Dec. 26, 2024) (countervailing duty order) | All | P.R. 467 |

# Tab 57

# P.R. 380

Barcode:4569749-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
POI: 01/01/2022-12/31/2022
**Public Document**
ITA/E&C/OIV: RA

May 31, 2024

Sociedad Nacional de Galápagos C.A.
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, DC 20003

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: SONGA Post Preliminary Second Supplemental Questionnaire

Dear Mr. Goldfeder:

On May 16, 2024, the U.S. Department of Commerce (Commerce) received a response on behalf of your client, Sociedad Nacional de Galapagos C.A. (SONGA), to Commerce's May 2, 2024, countervailing duty supplemental questionnaire regarding the new subsidy allegation. On April 18, 2024, Commerce received SONGA's response to Commerce's March 28, 2024, countervailing duty questionnaire regarding the new subsidy allegation. On February 9 and 18, 2024, Commerce received SONGA's Section II and III supplier questionnaire responses. On February 12 and March 1, 2024, Commerce received SONGA's Section III responses to countervailing duty initial questionnaire and corresponding supplemental questionnaire, respectively. On March 18, 2024, Commerce received SONGA's pre-preliminary comments regarding tax programs and land concessions. Commerce has identified certain areas in SONGA's responses for which Commerce requires additional information. The additional information requested in the attachment to this letter is **due no later than close of business (*i.e.*, 5:00 p.m. Eastern Standard Time) on June 7, 2024**.

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the



INTERNATIONAL TRADE ADMINISTRATION

regulations. An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted. Any extension granted in response to your request will be in writing; otherwise, the original deadline will apply.

If Commerce does not receive either the requested information or a written extension requests before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the deadline. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences, pursuant to section 776(b) of the Act. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available, including adverse inferences.

**DEADLINE FOR SUBMISSION**: **Your response is due no later than 5:00 p.m. ET on the date identified above.** Questionnaire responses normally entail the filing of many exhibits and databases on ACCESS. Accordingly, to the extent you submit your filing on the day it is due, rather than earlier, we strongly recommend that you begin uploading your response **no later than 12:00 noon on the above due date**. A questionnaire response must be filed in its entirety by the deadline to be considered timely.[1]

**EXTENSIONS:** **Note well:** Any extension request must be filed in writing. Extension requests filed after 5 p.m. on the due date will not be granted, except in extraordinary circumstances. An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means.[2] An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, *force majeure*, or medical emergency."[3] Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the requesting party of its decision before the time limit expires."[4] For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.[5]

**Note well**:

> Parties should be aware that **the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on

---

[1] 19 CFR 351.303(b)(1).
[2] 19 CFR 351.302(a)(2).
[3] *Extension of Time Limits*, 78 FR 57790, 57793 (Sep. 20, 2013) (Preamble to the Final Rule).
[4] *Id.* at 57792.
[5] *Id.*

its disposition. Parties should not assume that they will receive an extension of a time limit if they have not received a response from Commerce. For submissions that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next business day**. *See* 19 CFR 351.103(b).[6] **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues. When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise the official in charge, informing them of the filing difficulties. The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.

Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

If you have any questions about this matter, please contact Zachary Shaykin at (202) 482-2638 or Reginald Anadio at (202) 482-3166.

Sincerely,

Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

---

[6] *Id.* (emphasis added).

Barcode:4569749-01 C-331-806 INV - Investigation -

**Second Post-Preliminary Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador**
**Period of Investigation (POI) 01/01/2022 – 12/31/2022**
**Sociedad Nacional de Galápagos C.A. (SONGA)**

Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, SONGA should repeat the question in full to which it is responding and place its answer directly below the question. SONGA should also fully answer each question in this supplemental questionnaire. Please ensure that SONGA provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.

---

**Brackish Water**

1. Please describe SONGA's use of brackish water. In your response, please include details regarding the source of water, type of infrastructure, and method for returning water to the original source. Additionally, explain how SONGA ensures and tracks that all brackish water is returned to the original source.

2. On page NSA-17 of SONGA's April 18, 2024 NSA Questionnaire Response, SONGA stated that "were {Naturisa S.A. (Naturisa)} to consume (and not return to its source) the brackish water, it would be required to pay for that water…" Please explain whether Naturisa has ever consumed brackish water. If Naturisa has consumed brackish water, please provide evidence (such as an invoice) that Naturisa paid for such water.

Filed By: Reginald Anadio, Filed Date: 6/3/24 12:10 PM, Submission Status: Approved

# Tab 58

# P.R. 381

Barcode:4569750-01 C-331-806 INV - Investigation
UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
POI: 01/01/2022-12/31/2022
**Public Document**
ITA/E&C/OIV: RA

May 31, 2024

Industrial Pesquera Santa Priscila S.A.
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, DC 20003

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Santa Priscila Post Preliminary Second Supplemental Questionnaire

Dear Mr. Goldfeder:

On May 16, 2024, the U.S. Department of Commerce (Commerce) received a response on behalf of your client, Industrial Pesquera Santa Priscila S.A. (Santa Priscila), to Commerce's May 2, 2024, countervailing duty supplemental questionnaire regarding the new subsidy allegation. On April 18, 2024, Commerce received Santa Priscila's response to Commerce's March 28, 2024, countervailing duty questionnaire regarding the new subsidy allegation. On February 9 and 18, 2024, Commerce received Santa Priscila's Section II and III supplier questionnaire responses. On February 12 and March 1, 2024, Commerce received Santa Priscila's Section III responses to countervailing duty initial questionnaire and corresponding supplemental questionnaire, respectively. On March 18, 2024, Commerce received Santa Priscila's pre-preliminary comments regarding tax programs and land concessions. Commerce has identified certain areas in Santa Priscila's responses for which Commerce requires additional information. The additional information requested in the attachment to this letter is **due no later than close of business (*i.e.*, 5:00 p.m. Eastern Standard Time) on June 7, 2024**.

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the

Filed By: Reginald Anadio, Filed Date: 6/3/24 12:10 PM, Submission Status: Approved

regulations. An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted. Any extension granted in response to your request will be in writing; otherwise, the original deadline will apply.

If Commerce does not receive either the requested information or a written extension requests before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the deadline. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences, pursuant to section 776(b) of the Act. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available, including adverse inferences.

**<u>DEADLINE FOR SUBMISSION</u>**: **Your response is due no later than 5:00 p.m. ET on the date identified above.** Questionnaire responses normally entail the filing of many exhibits and databases on ACCESS. Accordingly, to the extent you submit your filing on the day it is due, rather than earlier, we strongly recommend that you begin uploading your response **no later than 12:00 noon on the above due date**. A questionnaire response must be filed in its entirety by the deadline to be considered timely.[1]

**<u>EXTENSIONS:</u>** **Note well:** Any extension request must be filed in writing. Extension requests filed after 5 p.m. on the due date will not be granted, except in extraordinary circumstances. An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means.[2] An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, *force majeure*, or medical emergency."[3] Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the requesting party of its decision before the time limit expires."[4] For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.[5]

**Note well**:

> Parties should be aware that **the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on

[1] 19 CFR 351.303(b)(1).
[2] 19 CFR 351.302(a)(2).
[3] *Extension of Time Limits*, 78 FR 57790, 57793 (Sep. 20, 2013) (Preamble to the Final Rule).
[4] *Id.* at 57792.
[5] *Id.*

its disposition. Parties should not assume that they will receive an extension of a time limit if they have not received a response from Commerce. For submissions that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next business day**. *See* 19 CFR 351.103(b).[6] **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues. When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise the official in charge, informing them of the filing difficulties. The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.

Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

If you have any questions about this matter, please contact Zachary Shaykin at (202) 482-2638 or Reginald Anadio at (202) 482-3166.

Sincerely,

Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

---

[6] *Id.* (emphasis added).

**Second Post-Preliminary Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador**
**Period of Investigation (POI) 01/01/2022 – 12/31/2022**
**Industrial Pesquera Santa Priscila S.A. (Santa Priscila)**

Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, Santa Priscila should repeat the question in full to which it is responding and place its answer directly below the question. Santa Priscila should also fully answer each question in this supplemental questionnaire. Please ensure that Santa Priscila provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.

---

**Brackish Water**

1. Please describe Santa Priscila's use of brackish water. In your response, please include details regarding the source of water, type of infrastructure, and method for returning water to the original source. Additionally, explain how Santa Priscila ensures and tracks that all brackish water is returned to the original source.

2. On page NSA-18 of Santa Priscila's April 18, 2024 NSA Questionnaire Response, Santa Priscila stated that "were Santa Priscila and {Produmar S.A. (Produmar)} to consume (and not return to its source) the brackish water, it would be required to pay for that water…" Please explain whether Santa Priscila and/or Produmar ever consumed brackish water. If either or both companies have consumed brackish water, please provide evidence (such as an invoice) that Santa Priscila and/or Produmar paid for such water.

# Tab 59

# P.R. 382

Barcode:4569752-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
POI: 01/01/2022-12/31/2022
**Public Document**
ITA/E&C/OIV: RA

May 31, 2024

Government of Ecuador
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, DC 20003

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Government of Ecuador Post Preliminary Second Supplemental Questionnaire

Dear Mr. Goldfeder:

On May 16, 2024, the U.S. Department of Commerce (Commerce) received a response on behalf of your client, the government of Ecuador (the GOE), to Commerce's May 2, 2024, countervailing duty supplemental questionnaire regarding the new subsidy allegation. On April 19, 2024, the Commerce received the GOE's response to Commerce's March 28, 2024, countervailing duty questionnaire regarding the new subsidy allegation. On February 14, March 13, and March 19, 2024, Commerce received the GOE's response to Section II of Commerce's December 12, 2023, countervailing duty initial questionnaire and two subsequent supplemental questionnaires, respectively. Commerce has identified certain areas in the GOE's responses for which Commerce requires additional information. The additional information requested in the attachment to this letter is **due no later than close of business (*i.e.*, 5:00 p.m. Eastern Standard Time) on June 7, 2024**.

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations. An extension request submitted without a proper certification for any factual information contained therein will be considered improperly filed and, as with any other

Filed By: Reginald Anadio, Filed Date: 6/3/24 12:11 PM, Submission Status: Approved

improperly filed document, will not be accepted. Any extension granted in response to your request will be in writing; otherwise, the original deadline will apply.

If Commerce does not receive either the requested information or a written extension requests before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the deadline. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences, pursuant to section 776(b) of the Act. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available, including adverse inferences.

**DEADLINE FOR SUBMISSION**: **Your response is due no later than 5:00 p.m. ET on the date identified above.** Questionnaire responses normally entail the filing of many exhibits and databases on ACCESS. Accordingly, to the extent you submit your filing on the day it is due, rather than earlier, we strongly recommend that you begin uploading your response **no later than 12:00 noon on the above due date**. A questionnaire response must be filed in its entirety by the deadline to be considered timely.[1]

**EXTENSIONS:** **Note well:** Any extension request must be filed in writing. Extension requests filed after 5 p.m. on the due date will not be granted, except in extraordinary circumstances. An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means.[2] An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, *force majeure*, or medical emergency."[3] Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the requesting party of its decision before the time limit expires."[4] For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.[5]

**Note well**:

> Parties should be aware that **the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on its disposition. Parties should not assume that they will receive an extension of a time limit if they have not received a response from Commerce. For submissions

---

[1] 19 CFR 351.303(b)(1).
[2] 19 CFR 351.302(a)(2).
[3] *Extension of Time Limits*, 78 FR 57790, 57793 (Sep. 20, 2013) (Preamble to the Final Rule).
[4] *Id.* at 57792.
[5] *Id.*

> that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next business day**. *See* 19 CFR 351.103(b).[6] **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues. When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise the official in charge, informing them of the filing difficulties. The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.

Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

If you have any questions about this matter, please contact Zachary Shaykin at (202) 482-2638 or Reginald Anadio at (202) 482-3166.

Sincerely,

Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

---

[6] *Id.* (emphasis added).

Barcode:4569752-01 C-331-806 INV - Investigation -

**Second Post-Preliminary Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador**
**Period of Investigation (POI) 01/01/2022 – 12/31/2022**
**Government of Ecuador (GOE)**

Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, the GOE should repeat the question in full to which it is responding and place its answer directly below the question. The GOE should also fully answer each question in this supplemental questionnaire. Please ensure that the GOE provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.

---

**Brackish Water**

1. Please state whether the mandatory respondents and their selected cross-owned affiliates are required to obtain permits for access to brackish water by their shrimp farms. If not, please further explain. If they do require permits, please provide copies of such permits in effect during the POI.

2. Please describe in detail how the GOE confirms that all the brackish water used by the respondents and their selected cross-owned affiliates is returned to the source. Please provide supporting documentation for your answer, including, as applicable, monitoring reports, on-site audits, results of any verification or enforcement activities, or any other documents regarding the non-consumptive use of brackish water by the respondents.

**Electricity**

3. Per question M.2(b) of the Less Than Adequate Remuneration (LTAR) program questionnaire, please provide the total amount of electricity purchased by the largest 50 recipients in Ecuador. The GOE does not need to provide the name of the recipient; the GOE just needs to provide the individual amount of purchased electricity. Additionally, explain whether the GOE is able to identify if any of the largest 50 recipients are in the shrimp sector.

4. Acknowledging the GOE's prior response that they are unable to provide data on recipients and amounts of assistance by industry, please explain whether the GOE collects any of this data at a higher level of classification (*i.e.*, at the "sector" level). If yes, please provide this data as requested in the Standard Questions Appendix.

5. In preparing demand projections for the upcoming tariff year, please explain whether the GOE considers any information that would indicate the demand projections by "type of consumer" (*i.e.*, industry, sector, or other comparable classification). If yes, please provide this information.

Filed By: Reginald Anadio, Filed Date: 6/3/24 12:11 PM, Submission Status: Approved

6. In preparing cost projections for the upcoming tariff year, please explain whether the GOE calculates costs of service by tariff category (*i.e.*, residential *vs*. commercial *vs*. industrial). If yes, please provide data on the costs of electricity service by tariff category.
    a. If the GOE does not calculate costs by tariff category, then please explain how the GOE determines the tariff rates applicable to different consumer categories with the aim of covering costs without this information.

7. Please provide a copy of the following documents:
    a. Official Communication No. ARCERNNNR-ARCERNNNR-2022-0047-OF dated January 24, 2022.
    b. Sectorial Ministry Report No. INF.DRETSE.2021.104.

8. Exhibit S3-3 highlights an internal audit of a distributor's projections where it requests to revise demand projections based on "cartilla." Please explain what the GOE means by "cartilla."

# Tab 60

# P.R. 387

# C.R. 245-46

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave, SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 37
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been redacted on pages S3-2 and S3-3; and in Exhibits S3-3 and S3-4.

**PUBLIC VERSION**

June 11, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
SONGA Second Post-Preliminary Supplemental Questionnaire Response

Dear Secretary Raimondo:

On behalf of Sociedad Nacional de Galápagos C.A. ("SONGA"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's May 31, 2024, post-preliminary second supplemental questionnaire. This response is timely submitted in accordance with the Department's June 5, 2024, letter, re: "Respondents' Request for Extension to Second Post-Preliminary Supplemental Questionnaire Response," which extended the deadline for SONGA's supplemental response until today.

Pursuant to 19 C.F.R. § 351.304(a)(i), SONGA requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which SONGA request proprietary treatment and the basis for the request:

- Production Costs: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(2).

- Other Specific Business Information Related to SONGA's Business and Production Operations etc., the Release of Which to the Public Would Cause Substantial Harm to SONGA's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to SONGA's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Sociedad Nacional de Galápagos C.A.*

**COMPANY CERTIFICATION**

I, Elizabeth Landes de Neale, General Manager, currently employed by Sociedad Nacional de Galapágos C.A. ("SONGA"), certify that I prepared or otherwise supervised the preparation of the attached submission of the Second Post-Preliminary Questionnaire Response, filed on June 11, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of SONGA contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Elisabeth Landes

Date: June 11 2024

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Sociedad Nacional de Galápagos C.A., certify that I have read the attached submission of the Second Post-Preliminary Supplemental Questionnaire, filed on June 11, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: June 11, 2024

**CERTIFICATE OF SERVICE**

I, Kenneth N. Hammer, hereby certify on this 11th day of June, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4576201-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**POI: 1/01/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information has been redacted on pages S3-2 and S3-3; and in Exhibits S3-3 and S3-4.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

**RESPONSE OF SOCIEDAD NACIONAL DE GALÁPAGOS C.A.**
**TO THE DEPARTMENT'S MAY 31, 2024 POST-PRELIMINARY**
**SECOND SUPPLEMENTAL QUESTIONNAIRE**

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: June 11, 2024**

**Counsel to Sociedad Nacional de Galápagos C.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 6/11/24 2:05 PM, Submission Status: Approved

**Second Post-Preliminary Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador Period of Investigation (POI) 01/01/2022 – 12/31/2022**
**Sociedad Nacional de Galápagos C.A. (SONGA)**

**Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, SONGA should repeat the question in full to which it is responding and place its answer directly below the question. SONGA should also fully answer each question in this supplemental questionnaire. Please ensure that SONGA provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.**

---

**Brackish Water**

1. **Please describe SONGA's use of brackish water. In your response, please include details regarding the source of water, type of infrastructure, and method for returning water to the original source. Additionally, explain how SONGA ensures and tracks that all brackish water is returned to the original source.**

ANSWER: As stated on page NSA-16 of Sociedad Nacional de Galápagos's ("SONGA") April 18, 2024, New Subsidy Allegations questionnaire response ("NSA QR"), Naturisa invests heavily in equipment and incurs significant operating costs to pump brackish water from local estuaries to shrimp farms that it owns or operates. That is because Ecuadorian shrimp farmers, not the Government of Ecuador, must make all necessary investments to obtain brackish water from local estuaries and then return it to those estuaries after each harvest and water exchange takes place.

As stated on page NSA-15 of SONGA's April 18th NSA QR, of SONGA and its three reporting cross-owned affiliates, only Naturisa used brackish water during the period of investigation ("POI"). Naturisa uses diesel and/or electrically powered pumps to extract brackish water from local estuaries and move that water to ponds located on shrimp farms it owns and/or operates. **Exhibit S3-1** contains a table listing farm locations owned and/or operated by Naturisa, or its subsidiary Aquanaturisa, S.A., the estuaries that supply those farms, and the required water pumping infrastructure. Naturisa used an average of two to four pumps



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/11/24 2:05 PM, Submission Status: Approved

per farm in 2022 to initially fill its ponds and subsequently exchange water from time to time. Naturisa used a total of [ ] pumps in 2022.

In order to move water from local estuaries, Naturisa typically has installed pipelines between the estuaries and [ ]. In a few cases, however, pipelines connect the estuaries [ ]. Brackish water is pumped from the local estuaries to the [ ]. From the [ ]. Each pond has a [ ]. The flow of water between the ponds [ ] is typically controlled through [ ]. During the production cycle, paddle wheel aerators are used to maintain dissolved oxygen at the desired level.

**Exhibit S3-2** contains photographs of a typical pumping system and a typical pipeline system used by Naturisa during the POI. **Exhibit S3-3** contains an article that discusses the importance of pond preparation and water management. During the POI, Naturisa operated approximately [ ] ponds with an average surface area ranging from [ ] hectares and approximately [ ] ponds with an average surface area ranging from [ ] hectares.

When shrimp is harvested, the pond is completely drained through the [ ]. After each harvest, the pond must be drained and then undergo a drying process to ensure that soil particles eroded from



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/11/24 2:05 PM, Submission Status: Approved

Barcode: 4576201-01 C-331-806 INV - Investigation



earthwork and organic matter are removed. If ponds are not drained and dried, productivity for future harvests can be severely affected. **Exhibit S3-4** contains an article describing the mechanics of pond drainage, as it is typically performed in Ecuador.

After draining, no water is retained in the pond. Therefore, Naturisa does not, and has no reason to, record the volume of water returned to the source. However, Naturisa knows that all water pumped from the local estuaries is returned to the source because the pipelines through which the ponds drain lead only back to the [ ] lead back to same estuaries from which Naturisa pumps brackish water. The water has nowhere else to go other than back to the source.

During 2022, Naturisa averaged approximately [ ] harvests per pond. After harvest, the ponds were dried for an average period of approximately [ ] days.

**2. On page NSA-17 of SONGA's April 18, 2024 NSA Questionnaire Response, SONGA stated that "were {Naturisa S.A. (Naturisa)} to consume (and not return to its source) the brackish water, it would be required to pay for that water…" Please explain whether Naturisa has ever consumed brackish water. If Naturisa has consumed brackish water, please provide evidence (such as an invoice) that Naturisa paid for such water.**

ANSWER: Naturisa has never consumed brackish water or used water for consumptive purposes because all brackish water pumped from local estuaries to ponds located on farms owned and/or operated by Naturisa is returned to the source either at the time of harvest or via water exchange. As stated on page NSA-18 of SONGA's April 18th NSA QR, entities or individuals using water for non-consumptive purposes are not required to pay for this water, regardless of type. Accordingly, SONGA confirms that Naturisa has never paid for consumptive use of brackish water. Nor has it applied for an authorization to use brackish water for productive purposes.



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/11/24 2:05 PM, Submission Status: Approved

**<u>Exhibit List – Second Post-Preliminary Supplemental Questionnaire Response</u>**

| Exhibit No. | Description | Electronic | BPI/Public |
|---|---|---|---|
| **S3-1** | Farm Locations and Pumping Infrastructure for Naturisa Brackish Water Pumping | - | BPI |
| **S3-2** | Photographs of Naturisa's Pumping and Pipeline Systems | - | BPI |
| **S3-3** | "Shrimp Pond Preparation Crucial for Production, Disease Prevention" Article | - | Public |
| **S3-4** | "Mechanized Shrimp Harvesting" Article | | Public |



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/11/24 2:05 PM, Submission Status: Approved

# EXHIBIT S3-1

**Naturisa S.A. Estuaries**

**DETAIL OF AREAS AND CORRESPONDING ESTUARIES**

| Farm | Estuary Name | Location |
|---|---|---|
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |
| [ | | ] |

**PUBLIC VERSION**

**9 PAGES**

**NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION**

**Farm Location Map Images**

# EXHIBIT S3-2

**PUBLIC VERSION**

**4 PAGES**

**NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION**

**Pumping System and Water Infrastructure Photographs**

# EXHIBIT S3-3

Case 1:25-cv-00025-RKE Document 86-2 Filed 04/27/26 Page 45 of 659
Barcode: 4576201-01 C-331-806 INV - Investigation

ALLIANCE™
(https://www.globalseafood.org)

Responsible Seafood ADVOCATE

Responsibility

# Shrimp pond preparation crucial for production, disease prevention

25 March 2019

**By Claude E. Boyd, Ph.D.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 6/11/24 2:05 PM, Submission Status: Approved

# Following proper steps assures the right conditions for next production cycle



View of shrimp pond that has just been harvested, with heavy concentrations of organic matter on the bottom which requires proper preparation before stocking for the next production cycle. Photo by Darryl Jory.

After draining for shrimp harvest, production ponds are typically subjected to various combinations of treatments in preparation for the next grow-out cycle. Preventing diseases is a major concern in shrimp farming, so pond preparation focuses on avoiding the carryover of disease organisms from one crop to the next and preventing disease introductions in water used to refill ponds. Impaired soil and water quality stresses shrimp predisposing them to disease, and treatments to improve soil quality also may be included in pond preparation.

Ponds accumulate soil particles eroded from earthwork and organic matter originating from dead plankton, uneaten feed and feces. It is common in intensive shrimp culture to clean pond bottoms after each crop. This may be done hydraulically using high-pressure hoses while pond bottoms are wet or by use of excavating machines after bottoms dry.

It is not clear whether sediment removal after each crop is necessary. Ponds have been operated successfully for 10 to 15 years without sediment removal, but if sediment becomes more than 5 to 10 cm deep, it does not dry completely.

## Pond bottom drying, tilling, liming

The bottoms of empty ponds usually are allowed to dry and bake in the sun for two weeks or more. Ideally, this practice reduces soil moisture concentration sufficiently to destroy most of the organisms (including disease organisms) remaining in the pond after draining.

Tilling with a disk harrow is sometimes done to break up the soil mass, increase exposure of soil to the air and accelerate drying. Rototiller plows also can be used for this purpose, but moldboard plows that turn the soil over are not as effective.

Some ponds have depressions that retain water long after the rest of the bottom has dried. Some ponds also may not dry well because of infiltration of groundwater from adjacent ponds or canals. Complete bottom dry-out may not be possible and especially in the rainy season.

Some farmers apply burnt or hydrated lime to pond bottoms. This treatment can increase soil pH high enough to kill unwanted organisms including disease organisms. However, the effective treatment rate is high – a minimum of 3,000 kg/ha (300 grams per square meter) of burnt lime or 4,000 kg/ha (400 grams per square meter) of hydrated lime.

The best procedure likely is to dry pond bottoms, and reserve lime treatment to the areas of the bottom that do not dry. Nevertheless, some producers treat their entire pond bottoms with lime after each crop. Liming materials will not dissolve in dry soil to increase pH, and lime should be applied while pond bottoms are still moist.

Calcium hypochlorite can also be applied over wet areas for the purpose of disinfection. Application of 100 to 200 grams per square meter of this disinfectant often are used. Copper sulfate, formalin and potassium permanganate have also been used to disinfect soil, but they are not as effective as lime or calcium hypochlorite.



Proper pond preparation requires drying of bottoms and applications of lime products, as seen in this shrimp pond in Africa. Photo by Darryl Jory.

Pond bottoms with soil pH less than 7 should be limed to increase pH. If burnt or hydrated lime are used for disinfection, their application will also neutralize soil acidity. If ponds dry completely and lime is not used for disinfection, it is less expensive to use agricultural limestone for the purpose of

neutralizing soil acidity. Typical agricultural limestone application rates are provided in Table 1. Agricultural limestone should be spread uniformly over bottoms of ponds while soil is still moist.

# Boyd, pond preparation, Table 1

| Soil pH | Liming rate (CaCO3 equivalent, kg/ha) |
|---|---|
| >7.5 | 0 |
| 7.0 to 7.5 | 500 (optional) |
| 6.5 to 6.9 | 1,000 |
| 6.0 to 6.4 | 1,500 |
| 5.5 to 5.9 | 2,000 |
| 5.0 to 5.4 | 2,500 |
| <5.0 | 3,000 |

Table 1. Approximate lime requirements of bottom soils in shrimp ponds based on soil pH.

# Pond refilling, disinfection

Water for refilling ponds is often passed through fine screens or filters to remove unwanted organisms. While filtration will lessen the possibility of fish and other relatively large organisms from entering ponds, it will not prevent the entry of many disease organisms and smaller vectors of disease organisms.

The most effective way of preventing the entry of disease organisms via the water supply is disinfection. The disinfectant can be applied to water held in a reservoir or done directly in recently-filled ponds. A variety of disinfectants such as calcium hypochlorite, chloramine T, potassium permanganate, copper sulfate, hydrogen peroxide, iodine compounds, benzalkonium chloride and glutaraldehyde are used. The most effective one probably is calcium hydochlorite at a concentration of 20 to 30 mg/L.

# Postlarvae stocking and fertilization

Postlarvae cannot be stocked until the toxic effect of the disinfectants has dissipated – this usually requires only three to five days. However, the pond bottom usually has been dried, lime applied to bottom to raise pH and kill unwanted organisms, and water for filling ponds disinfected. Ponds often have clear water and few benthic organisms are present in bottom soil after disinfection.

Postlarval shrimp can use manufactured feed, but they benefit greatly from natural food organisms for a few weeks after stocking them into ponds. Ponds should be fertilized to encourage the growth of phytoplankton, zooplankton and benthos before the postlarvae are stocked. Fertilization with urea and triple superphosphate or other commercial fertilizers can be used to initiate a phytoplankton bloom.

However, inclusion of an organic fertilizer with the commercial fertilizer will result in a more rapid increase in zooplankton and benthic organisms than possible with commercial fertilizer alone. Manure can be used as an organic fertilizer, but it is better and more sanitary to apply soybean meal, old shrimp feed, rice bran, or some other high-quality organic matter.

Case 1:25-cv-00025-RKE Document 86-2 Filed 04/27/26 Page 49 of 659
Barcode: 4576201-01 C-331-806 INV - Investigation

There is no generally accepted fertilization rate for ponds. Typical rates are 6 to 8 kg nitrogen (12 to 18 kg/ha urea), 1 to 2 kg phosphorus (5 to 10 kg/ha triple superphosphate) and around 100 to 200 kg/ha of high-quality organic fertilizer. The applications should be repeated if a plankton bloom has not developed within four to five days. Sometimes it may take up to two weeks to obtain a good plankton bloom.

Fertilization may have to be continued at two- to three-week intervals to maintain the plankton bloom, but once the feeding rate reaches 20 to 30 kg/ha/day, there usually will be enough nutrients reaching the water for uneaten feed, feces and shrimp excretion to maintain the bloom.



Aerial view of earthen ponds at shrimp farm in Latin America. Note ponds with varying degrees of lime (white) applications. Photo by Daryl Jory.

## Other considerations

Some farmers like to apply liming materials to pond water in small amounts at frequent intervals during the grow-out period. Liming materials do not dissolve unless the alkalinity of the water falls below 60 to 70 mg/L. Liming usually is of no benefit during the crop period.

Microbial products, often called probiotics, are often applied to ponds. While these products possibly may be beneficial immediately after pond disinfection when bacteria abundance is low, there is no reason to suspect that they would be beneficial later.

### Author



**CLAUDE E. BOYD, PH.D.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 6/11/24 2:05 PM, Submission Status: Approved

School of Fisheries, Aquaculture and Aquatic Sciences
Auburn University
Auburn, Alabama 36849 USA

boydce1@auburn.edu (mailto:boydce1@auburn.edu)

Copyright © 2024 Global Seafood Alliance

All rights reserved.

# EXHIBIT S3-4

ALLIANCE™
(https://www.globalseafood.org)

Responsible Seafood ADVOCATE

Intelligence

# Mechanized shrimp harvesting

1 August 2000

By Les Hodgson , Keith Gregg and Robins McIntosh

## Goal is to efficiently extract shrimp from the drain and chill them to near freezing temperature within seconds after harvest

Shrimp is a delicate and highly perishable product. Once quality is lost, no amount of manipulation can restore it. The most demanding market for premium quality is the European heads-on market. Shrimp that meet the standards of the European market will be judged as first-quality anywhere in the world. The following describes a harvesting system that consistently yields quality product suitable for that market.

Case 1:25-cv-00025-RKE Document 86-2 Filed 04/27/26 Page 55 of 659
Barcode: 4576201-01 C-331-806 INV - Investigation



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/11/24 2:05 PM, Submission Status: Approved



Shrimp from a draining pond (background) are lifted by recessed-impeller pump (bottom) to the de-watering tower (top) and then to ice slurry. Water from the tower drains through the hose on right to a ditch.

## Basic steps in shrimp harvesting

The process of harvesting a shrimp pond is simple in concept. The pond is most often drained through a net, which captures the shrimp as they leave the pond with the draining water. Following capture, shrimp are either manually or mechanically lifted out of the drainage area, chilled with ice, and transported to the processing plant. This can be a major task considering that a pond may contain five to 40 tons of shrimp that must be harvested in a few hours, chilled from 30 degrees C to near freezing, and packed without damage.

In a well-designed pond that has been skillfully drained, little or no shrimp remain on the pond bottom to be picked up by hand. Shrimp that are picked from the pond bottom do not meet the highest quality standards due to delayed chilling and to mud embedded in gills and joints between tail segments. Thus, the major challenges at harvest are to minimize the quantity of shrimp left on the pond bottom, immediately chill shrimp to near freezing, and pack them in a manner that avoids damage.

### *Pond design*

The first prerequisite of a successful harvest is pond design and construction. The bottom must be sloped to drain completely without leaving large puddles, where shrimp tend to remain. Cylindrical drainage culverts have diminishing cross-sectional area as the pond level drops. Culverts should be installed slightly below the level of the pond bottom to help avoid slow drainage as the water level decreases at the end of the harvest.

### *Shrimp behavior*

Shrimp behavior varies with a number of factors such as species, lunar stage, temperature, and molt stage. As a general rule, shrimp do not begin to move toward the pond outlet until most of the water has drained from the pond. Consequently, it is a common practice in large ponds that require more than six hours to drain to slowly reduce the pond level by about 50 percent the day before harvest.



Shrimp from the de-watering tower (upper left) tumble through a hose into the ice slurry in an insulated box.

Once the harvest begins and shrimp begin to move toward the outlet, the emigration process tends to accellerate as long as the pond continues draining. This can result in several tons of shrimp reaching the outlet over the course of a few minutes. If the harvesting crew gets overloaded and the drainage process must be interrupted, shrimp tend to settle back to the bottom again.

To re-establish the emigration generally requires considerable drainage of water. As a result, the pond may completely drain before many of the shrimp have had an opportunity to exit. It is important to maintain continuous water flow throughout the harvest process. Skillful harvesting reduces the number of interruptions and results in less than 1 percent of the shrimp remaining on the pond bottom.

## *Importance of chilling*

Shrimp begin to deteriorate within minutes after death at normal pond temperatures of 25 to 30 degrees C. Initial damage is caused by digestive enzymes released from the hepatopancreas (liver-like organ in the head). At elevated temperatures, these enzymes quickly break down tissue at the junction of the head and tail.

This makes the interior of the head darken in color and the attachment of the head with the tail loosen and sag, which is unacceptable to the European market for head-on shrimp. Some European buyers simulate the conditions in their seafood markets by taking a frozen block of shrimp out of its packaging and leaving it at room temperature for four hours. If the heads turn black or loosen, the product is rejected.

Shrimp digestive enzymes also cause protein destruction, which reduces product weight and may effect meat texture. High temperatures also promote chemical and bacterial decomposition. These enzymatic, chemical, and bacterial processes can be slowed to a standstill by immediately reducing the body temperature to near freezing.

It is important to handle shrimp gently during packaging into containers with ice. Rough handling can break appendages or bruise the head, which also limits acceptability to certain markets.



Shrimp are periodically stirred to suspend them evenly in the ice slurry.

### *Timing the harvest*

In the hot tropical sun, temperatures at the bottom of a drained pond can exceed 40 degrees C. At these temperatures, stranded shrimp can begin to spoil before they can be picked. To avoid this problem, harvests are most often conducted during the night with the intention of completing the process by early morning, when lighting is available for hand picking but temperatures are still moderate enough to avoid rapid spoilage.

In areas where ponds can be drained only at low tide, harvests must be timed to reach the final stage of drainage at low tide, or sufficient pumping must be available to quickly remove all the water.

## Mechanical harvesting systems

Just as combines and tractors have long harvested agricultural row crops, shrimp pond harvesting is also becoming more mechanized. There are several types of mechanical harvesting systems including Archimedes screw systems, reciprocating vacuum/pressure pumps, and recessed impeller pumps.

Each of these has advantages and disadvantages. For example, the screw system has many advocates, because it is a simple mechanism that is easily repaired on the farm. It requires only a small electric motor, because it is designed to elevate only shrimp, not water. Pump harvesters require larger motors to move water and shrimp, but the watermoving capability can be a useful tool. Our experience has been with recessed impeller pumps, so we will focus our discussion on these systems.

## *Shrimp collecting funnel*





After a pond is drained, shrimp gather in remaining puddles, where they must be picked by hand. Hand picking is expensive in both labor and quality loss.

The vast majority of water drained from a pond is not pumped by the harvesting system. It simply drains through a funnel-shaped net or cage, which concentrates the shrimp, while the majority of the water passes through the sides of the net or cage. The continual flow of water directs shrimp toward the cone of the funnel where a submersible pump or suction hose is located. In SouthTexas, we typically use a stainless-steel collecting funnel connected to a submersible harvesting pump. A tripod is used to lower the funnel into the harvest box using a block and tackle and “come along” (hand winch).

The funnel measures 2 ft deep by 4 ft wide by 2 ft long (60 x 120 x 60 cm), and fits over the culvert outlet on the discharge side of the harvest gate. A rubber gasket is positioned between the harvest box and the funnel to assure a complete seal. A jack is used to hold the funnel tightly against the concrete harvest box. The cable from the tripod to the funnel is kept in place for support.

## *Recessed impeller pumps*

Recessed impeller pumps create a water current, which moves the shrimp upwards to a de-watering tower without the impeller touching it. These pumps have been used for many years for applications ranging from tomatoes to live trout. Marine Culture Enterprises, the super-intensive raceway project developed in Hawaii during the 1980s, used these pumps to transfer juvenile shrimp from one raceway to another during the grow-out process.

Recessed impeller pumps are hydraulically driven by a separate electric, diesel, or gas-powered motor. The pumps are available in submersible and non-submersible designs. The non-submersible design tends to lose its prime periodically, which can be problematic during peak harvest periods. Both in Texas and Belize, the submersible design is used.

## *De-watering tower*

The mixture of shrimp and water is pumped from the collecting funnel via a 6- to 8-ft- (15- to 20-cm-) diameter hose to a de-watering tower at the top of the levee. The dewatering tower consists of a funnel-shaped vessel, which decelerates the water velocity from the hose and directs the water and shrimp over an angled grating. The water drains through the grating, while the shrimp tumble over it.

The result is that clean, live shrimp with a minimum amount of water are delivered to the top of the levee, where they can be further processed or dropped directly into insulated boxes with ice. The discharge water from the tower can be directed either to the drainage ditch to speed up water removal from the pond, or back to the pond to replenish oxygen or conserve water needed by the remaining shrimp.

## *Insulated totes*



Mechanical harvesting can reduce labor by more than 50 percent. It also delivers a more consistently premium crop.

We prefer to discharge shrimp from the de-watering tower directly into an ice slurry within 1-cubic-meter insulated boxes. We prefer boxes without drainage plugs due to danger of unintentional draining, which can result in spoilage if the product is stored in boxes for several days.

To minimize the number of workers needed during harvest, boxes are pre-filled with about 21 in (53 cm) of ice slurry using a mark on the inside of the box. Slush ice is ideal for this purpose (see article, page 55). Another option is to pass about 1.5 bars of block ice through a flaking machine and then add water to create a slurry. If bacteria are a problem, chlorine can be added at low levels to the ice slurry. For the European market, sodium bisulfite is also added to the slurry to prevent blackening within the head.

During harvest, shrimp from the de-watering tower are discharged directly into the boxes, which results in immediate chilling to near freezing. The traditional system of alternately applying a layer of shrimp and a layer of ice provides nearly equivalent chilling, if it is done properly. However, if a

particular scoop of shrimp is too large or a scoop of ice is too small, then hot spots can result. These hot spots result in product deterioration.

The ice slurry system provides consistent chilling every time. Also, crushing is avoided due to suspension of shrimp in the ice/water slurry. Each box is filled to about 4 in (10 cm) from the top, whereupon it contains about 800 lbs (360 kg) of head-on shrimp.

## Transport, storage, and weighing

Various methods can be used to transport the insulated boxes to and from the ponds. To operate at the top of the pond levee, inexpensive low-riding trailers with wide tires are sometimes used. Six to eight boxes can be hauled per trailer. In advance of a harvest, several trailers can be connected together like railroad cars under the discharge from the de-watering tower.

As the first totes are filled, the chain of trailers is simply pulled forward by a truck or small tractor. In Belize trailers have been assembled that carry three insulated boxes, and another three boxes are placed in the back of the truck that pulls the trailers.

Harlingen Shrimp Farms harvests beside a road that can handle 18-wheeled trailers that can pack 22 insulated boxes per trailer. In advance of a harvest, several trailers of insulated boxes pre-filled with ice slurry are dropped off at the pond. A pallet jack is used to lift and wheel each insulated box to the door of the trailer, where a fork lift puts it in place to be filled with shrimp.

Once at the processing plant, boxes are lifted off the trailers by forklift. The shrimp can be held for several days in the totes without loss of quality if the excess water is siphoned off using a PVC pipe and replaced with clean water and ice. When the plant is ready to receive the shrimp, the boxes are unloaded into the thaw tank using a forklift to load a simple counterbalanced dumper.

Final accounting of the weights and sizes of shrimp occurs at the processing plant. If a third-party processor is used, it is prudent to provide a trusted farm employee to oversee the weighing process.

## Labor requirements

Mechanical harvesting systems reduce labor requirements for pond harvesting by at least 50 percent. For example, Harlingen Shrimp Farms utilizes six people to harvest ponds that yield up to 40 tons each. This includes a supervisor, two workers for the pallet jack, a forklift operator, and two workers operating the harvest machine.

## Optional post-harvesting steps

In some cases, it may be beneficial to conduct additional processing at the pond bank. This can include:

- Dipping live shrimp in sodium bisulfite to reduce blackening of the head for head-on shrimp.
- Removing crabs, fish, and trash.
- Selecting the largest animals to be used as potential broodstock.

These processes can easily be incorporated by addition of a conveyor following the de-watering tower.

# Conclusions

Mechanical harvesting systems have been developed to assure consistently top quality by efficiently extracting shrimp from the drain and chilling them to near freezing temperature within seconds after harvest. These systems have the capability of handling large volumes of shrimp over a short period of time with minimal labor. By avoiding the need to stop water flow during harvest, these systems also minimize the number of shrimp left in the pond to be hand picked. The process involves screening shrimp from the drainage water, pumping them to the dewatering tower where they are separated from pond water, and discharging them into an ice slurry.

*(Editor's Note: This article was originally published in the August 2000 print edition of the* Global Aquaculture Advocate.*)*

## Authors

**LES HODGSON**

Marco Sales, Inc.
Brownsville, Texas USA

msshrimp@aol.com (mailto:msshrimp@aol.com)

**KEITH GREGG**

Harlingen Shrimp Farms, Ltd.
Los Fresnos, Texas USA

hsfbayview@compuserve.com (mailto:hsfbayview@compuserve.com)



**ROBINS MCINTOSH**

Belize Aquaculture, Ltd.
Belize

belizeaqua@btl.net (mailto:belizeaqua@btl.net)

Copyright © 2024 Global Seafood Alliance

All rights reserved.

# Tab 61

# P.R. 388

# C.R. 247-48

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 137
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been redacted from pages S3-1 to S3-6; and from Exhibits S3-1, S3-2, S3-5(a), S3-5(b), S3-7, and S3-8.

**PUBLIC VERSION**

June 11, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Santa Priscila's Second Post-Preliminary Supplemental Questionnaire Response

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's May 31, 2024, post-preliminary second supplemental questionnaire. This response is timely submitted in accordance with the Department's June 5, 2024, letter, re: "Respondents' Request for Extension to Second Post-Preliminary Supplemental Questionnaire Response," which extended the deadline for Santa Priscila's supplemental response until today.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which Santa Priscila requests proprietary treatment and the basis for the request:

- Production Costs: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(2).

- Other Specific Business Information Related to Santa Priscila's Business and Production Operations, Applications and Approval Documents etc., the Release of Which to the Public Would Cause Substantial Harm to Santa Priscila's Competitive Position: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to Santa Priscila's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Industrial Pesquera Santa Priscila S.A.*

**COMPANY CERTIFICATION**

I, Diego Puente, Vice President, currently employed by Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), certify that I prepared or otherwise supervised the preparation of the attached Second Post-Preliminary Supplemental Questionnaire Response, filed on June 11, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Santa Priscila contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: June 10th, 2024

**COMPANY CERTIFICATION**

I, Wolfgang Harten, Special Representative, currently employed by Produmar S.A. ("Produmar"), certify that I prepared or otherwise supervised the preparation of the attached submission of the Second Post-Preliminary Supplemental Questionnaire Response, filed on June 11, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Produmar contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: JUNE 11, 2024

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Industrial Pesquera Santa Priscila S.A., certify that I have read the attached submission of the Second Post-Preliminary Supplemental Questionnaire, filed on June 11, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: June 11, 2024

**CERTIFICATE OF SERVICE**

I, Kenneth N. Hammer, hereby certify on this 11th day of June 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Case No. C-331-806
Investigation
POI: 1/01/2022 – 12/31/2022
AD/CVD Operations, Office IV

Business proprietary information has been redacted from pages S3-1 to S3-6 and S3-8; and from Exhibits S3-1, S3-2, S3-5(a), S3-5(b), S3-7, and S3-8.

PUBLIC VERSION

BEFORE THE
UNITED STATES DEPARTMENT OF COMMERCE
INTERNATIONAL TRADE ADMINISTRATION
ENFORCEMENT AND COMPLIANCE

COUNTERVAILING DUTY INVESTIGATION OF
FROZEN WARMWATER FROM ECUADOR

# RESPONSE OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A. TO THE DEPARTMENT'S MAY 31, 2024 POST-PRELIMINARY SECOND SUPPLEMENTAL QUESTIONNAIRE

Submitted by:

Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, D.C. 20003
(202) 223-3760

Date submitted: June 11, 2024

Counsel to Industrial Pesquera Santa Priscila S.A.

**Second Post-Preliminary Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador Period of Investigation (POI) 01/01/2022 – 12/31/2022**
**Industrial Pesquera Santa Priscila S.A. (Santa Priscila)**

**Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, Santa Priscila should repeat the question in full to which it is responding and place its answer directly below the question. Santa Priscila should also fully answer each question in this supplemental questionnaire. Please ensure that Santa Priscila provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.**

---

**Brackish Water**

1. **Please describe Santa Priscila's use of brackish water. In your response, please include details regarding the source of water, type of infrastructure, and method for returning water to the original source. Additionally, explain how Santa Priscila ensures and tracks that all brackish water is returned to the original source.**

ANSWER: As stated on page NSA-17 of Industrial Pesquera Santa Priscila S.A.'s April 18, 2024 New Subsidy Allegations questionnaire response ("NSA QR"), Santa Priscila and Produmar S.A. invest heavily in equipment and incur significant operating costs to pump brackish water from local estuaries to shrimp farms they own or operate. That is because Ecuadorian shrimp farmers, not the Government of Ecuador, must make all necessary investments to obtain brackish water from local estuaries and then return it to those estuaries after each harvest takes place.

Santa Priscila uses diesel or electrically powered pumps to extract brackish water from local estuaries and move that water to ponds located on their shrimp farms. During 2022, Produmar used approximately [ ] pumps for its farming operations. **Exhibit S3-1** contains a table listing farm locations, the estuaries that supply those farms, and the required water pumping infrastructure. To extract water from local estuaries, Santa Priscila used approximately [ ] in its farming operations in 2022 to initially fill its ponds and subsequently exchange water from time to time.

In order to move water from local estuaries, Santa Priscila has installed pipelines between the estuaries and [ ] located on their farms. Ponds are filled initially, the ponds are then seeded with shrimp larvae, and, subsequently, water is pumped from the same estuaries to the [ ] for water exchange. From the [ ]. Each pond has a [ ]. The flow of water between the ponds [ ] is controlled through [ ]. Throughout the shrimp production cycle, [ ] aerators are used to maintain dissolved oxygen at the desired level.

Produmar uses a system of [ ] from local estuaries when the tide is high. New water that enters the system combines with [ ] water, and Produmar's pumps circulate water throughout its pond system.

**Exhibit S3-2** contains photographs of a typical pumping system and a typical pipeline system used by Santa Priscila during the POI. **Exhibit S3-3** contains an article that discusses the importance of pond preparation and water management. During the POI, Santa Priscila operated approximately [ ] ponds with an average surface area of approximately [ ] hectares. During the POI, Produmar operated approximately [ ] ponds with an average surface area of [ ] hectares.

During the production cycle, Santa Priscila generally uses electrically operated aeration equipment to maintain dissolved oxygen at the desired level. Produmar does not use aeration

systems to treat brackish water that enters its [ ] system. Produmar applies probiotics, and [

].

To harvest shrimp, the pond is drained through an [

]. After each harvest, each pond must be drained completely and then undergo a drying process to ensure that soil particles eroded from earthwork and organic matter are removed. If ponds are not drained and dried, productivity of future harvests can be severely affected. **Exhibit S3-4** contains an article describing the mechanics of pond drainage, as it is typically performed in Ecuador.

Since no water is retained in a pond after a harvest, Santa Priscila and Produmar do not, and have no reason to, record the volume of water returned to the source. However, Santa Priscila and Produmar know that all water pumped from the local estuaries is returned to the source because the pipelines through which the ponds drain lead back to the [

] lead back to the same estuaries from which Santa Priscila and Produmar initially obrained brackish water. The water has nowhere else to go other than back to its source.

During 2022, Santa Priscila averaged approximately [ ] harvests per pond, and Produmar averaged approximately [ ] harvests per pond.

**2. On page NSA-18 of Santa Priscila's April 18, 2024 NSA Questionnaire Response, Santa Priscila stated that "were Santa Priscila and {Produmar S.A. (Produmar)} to consume (and not return to its source) the brackish water, it would be required to pay for that water…" Please explain whether Santa Priscila and/or Produmar ever consumed brackish water. If either or both companies have consumed brackish water, please provide evidence (such as an invoice) that Santa Priscila and/or Produmar paid for such water.**

ANSWER: Santa Priscila and Produmar confirm that they have never consumed brackish water or used brackish water for consumptive purposes because all brackish water pumped from local estuaries to their ponds located on farms owned or operated by Santa Priscila and Produmar

is returned to the source via periodic water exchange and after each harvest, as discussed in response to question no. 1 above. Therefore, no consumption, i.e., retention, of brackish water ever occurs. As stated on page NSA-17 of Santa Priscila's April 18th NSA QR, Ecuadorian law states that entities or individuals using water for non-consumptive purposes are not required to pay for this water. Accordingly, Santa Priscila and Produmar confirm that did not pay for consumptive use of brackish water during the POI. Therefore, the remainder of the Department's question is not applicable.

Nevertheless, Produmar was erroneously invoiced for its non-consumptive use of brackish water during the POI by the Public Water Authority ("EPA"). However, Produmar made no payments for brackish water during the POI, and Produmar has filed a pending legal challenge to EPA's erroneous invoicing.

This challenge demonstrates that Article 108 of the Organic Law of the Organic Law on Water Resources, Use and Development of Water ("Water Resources Law") establishes that the productive use of water for aquaculture is not subject to a fee so long as the water use is non-consumptive. Produmar's legal challenge asserts that the Agency for Regulation and Control of Water ("ARCA") and the EPA erroneously applied the Water Resources Law in assessing fees because Produmar's use of brackish water is non-consumptive for the reasons explained above and in previous submissions.

Produmar now describes the status of its water authorizations and its legal challenges to the actions taken by the water authorities. First, Produmar was granted two authorizations to draw brackish water: (1) from the Guayas River for shrimp farms located in the Municipality of Durán, File No [ ], dated January 21, 2019; and (2) from the Taura River for shrimp farms located in the Canton of Naranjal, File No. [ ], dated March 31, 2021.

The first authorization permitted Produmar to use brackish surface water drawn from the Guayas River in specific quantities established in the authorization for certain farms located in the Municipality of Duran, Guayas Province, for aquaculture activities (shrimp farming) for a period of [ ].

The second authorization permitted Produmar to use brackish surface water drawn from the Taura River in specific quantities established in the authorization for certain farms located in the Canton of Naranjal, Guayas Province, for aquaculture activities (shrimp farming) for a period of [ ].

**Exhibits S3-5(a)** and **S3-5(b)** contain copies of Produmar's authorization Nos. [ ], respectively. Produmar has not sought authorizations for any other farms, and Santa Priscila has not sought any authorizations.[1]

Authorization No. [ ]. Although the authorization required Produmar to notify the water regulating authority (i.e., ARCA) and the water billing authority (i.e., EPA) regarding the content of the authorization, the authorization itself [ ]. The authorization also established Produmar's right to appeal the administrative conditions set by the authorization. Following the issuance of Authorization No. [ ], ARCA and EPA took no action to assess fees in connection with Produmar's productive use of brackish water at the Taura farm.

---

[1] On January 12, 2022, the Constitutional Court of Ecuador declared the Organic Law on Water Resources, Use and Development of Water unconstitutional. However, as stated in paragraph 97 of the court's decision, the law remains in effect until the National Assembly passes a new law that conforms to the requirements stated in the court's decision. **Exhibit S3-6** contains a copy of the decision of the Constitutional Court of Ecuador.

Authorization No. [

].

Produmar filed an administrative request for reconsideration of this authorization with the administering agency in 2021, which the agency never answered. The effect of this non-response was that the request for reconsideration was deemed denied after 30 days.

In late 2021, EPA began to issue invoices to the company in which it demanded payment for unpaid brackish water usage fees allegedly owed in connection with Authorization Nos. [ ]. **Exhibit S3-7** contains a copy of the invoice issued to Produmar by EPA. The rate at which EPA billed Produmar for productive use of brackish water was [ ].

After receiving these invoices, Produmar initiated an action in the District Court of Administrative Litigation of the Canton of Guayaquil, Guayas Province, challenging the Ministry of the Environment and Water's ("MAATE") deemed denial of its request for reconsideration. The legal basis for Produmar's court action is that the MAATE [ ]. The District Court of

Administrative Litigation did not opine on the merits of Produmar's action, but rather dismissed the action on procedural grounds.

On April 17, 2024, Produmar initiated an appeal at the National Court of Justice of Ecuador, which is currently pending. Produmar's appeal requests that the National Court of Justice order the Court of Administrative Litigation of Guayas Province to hear Produmar's administrative challenge. **Exhibit S3-8** contains a copy of Produmar's petition initiating an appeal, which includes copies of the underlying petition to the Administrative Court of the Canton of Guayaquil challenging the MAATE's determination regarding brackish water usage.

**Exhibit List – Second Post-Preliminary Supplemental Questionnaire Response**

| Exhibit No. | Description | Electronic | BPI/Public |
|---|---|---|---|
| **S3-1** | Farm Locations and Pumping Infrastructure for Santa Priscila and Produmar Brackish Water Pumping | - | BPI |
| **S3-2** | Photographs of Typical Pumping and Pipeline Systems | - | BPI |
| **S3-3** | Article Published in Responsible Seafood Advocate re: "Shrimp Pond Preparation Crucial for Production, Disease Prevention" | - | Public |
| **S3-4** | "Mechanized Shrimp Harvesting" Article | - | Public |
| **S3-5(a)** | Produmar Water Authorization No. [ ] (Spanish Original and English Translation) | - | BPI |
| **S3-5(b)** | Produmar Water Authorization No. [ ] (Spanish Original and English Translation) | - | BPI |
| **S3-6** | Decision of the Constitutional Court of Ecuador Decision No. 45-15-IN/22 (Spanish Original and English Translation) | - | Public |
| **S3-7** | Water Invoice Issued to Produmar for Brackish Water Usage (Spanish Original and English Translation) | - | BPI |
| **S3-8** | Petitioner of Produmar S.A. to the National Court of Ecuador (Spanish Original and English Translation) | - | BPI |

# EXHIBIT S3-1

**Industrial Pesquera Santa Priscila and Produmar Estuaries**

**DETAIL OF AREAS AND CORRESPONDING ESTUARIES**

**For 2022**

| | Area/Farm | ESTUARIES | LOCATION | COORDINATES | TYPE OF PUMPS | # OF PUMPS | |
|---|---|---|---|---|---|---|---|
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |
| [ | | | | | | | ] |

# EXHIBIT S3-2

**PUBLIC VERSION**

**10 PAGES**

**NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION**

**Pumping System Photographs**

# EXHIBIT S3-3

Case 1:25-cv-00025-RKE Document 86-2 Filed 04/27/26 Page 87 of 659

ALLIANCE™
(https://www.globalseafood.org)

Responsible Seafood ADVOCATE

Responsibility

# Shrimp pond preparation crucial for production, disease prevention

25 March 2019

**By Claude E. Boyd, Ph.D.**

## Following proper steps assures the right conditions for next production cycle



View of shrimp pond that has just been harvested, with heavy concentrations of organic matter on the bottom which requires proper preparation before stocking for the next production cycle. Photo by Darryl Jory.

After draining for shrimp harvest, production ponds are typically subjected to various combinations of treatments in preparation for the next grow-out cycle. Preventing diseases is a major concern in shrimp farming, so pond preparation focuses on avoiding the carryover of disease organisms from one crop to the next and preventing disease introductions in water used to refill ponds. Impaired soil and water quality stresses shrimp predisposing them to disease, and treatments to improve soil quality also may be included in pond preparation.

Ponds accumulate soil particles eroded from earthwork and organic matter originating from dead plankton, uneaten feed and feces. It is common in intensive shrimp culture to clean pond bottoms after each crop. This may be done hydraulically using high-pressure hoses while pond bottoms are wet or by use of excavating machines after bottoms dry.

It is not clear whether sediment removal after each crop is necessary. Ponds have been operated successfully for 10 to 15 years without sediment removal, but if sediment becomes more than 5 to 10 cm deep, it does not dry completely.

## Pond bottom drying, tilling, liming

The bottoms of empty ponds usually are allowed to dry and bake in the sun for two weeks or more. Ideally, this practice reduces soil moisture concentration sufficiently to destroy most of the organisms (including disease organisms) remaining in the pond after draining.

Tilling with a disk harrow is sometimes done to break up the soil mass, increase exposure of soil to the air and accelerate drying. Rototiller plows also can be used for this purpose, but moldboard plows that turn the soil over are not as effective.

Some ponds have depressions that retain water long after the rest of the bottom has dried. Some ponds also may not dry well because of infiltration of groundwater from adjacent ponds or canals. Complete bottom dry-out may not be possible and especially in the rainy season.

Some farmers apply burnt or hydrated lime to pond bottoms. This treatment can increase soil pH high enough to kill unwanted organisms including disease organisms. However, the effective treatment rate is high – a minimum of 3,000 kg/ha (300 grams per square meter) of burnt lime or 4,000 kg/ha (400 grams per square meter) of hydrated lime.

The best procedure likely is to dry pond bottoms, and reserve lime treatment to the areas of the bottom that do not dry. Nevertheless, some producers treat their entire pond bottoms with lime after each crop. Liming materials will not dissolve in dry soil to increase pH, and lime should be applied while pond bottoms are still moist.

Calcium hypochlorite can also be applied over wet areas for the purpose of disinfection. Application of 100 to 200 grams per square meter of this disinfectant often are used. Copper sulfate, formalin and potassium permanganate have also been used to disinfect soil, but they are not as effective as lime or calcium hypochlorite.



Proper pond preparation requires drying of bottoms and applications of lime products, as seen in this shrimp pond in Africa. Photo by Darryl Jory.

Pond bottoms with soil pH less than 7 should be limed to increase pH. If burnt or hydrated lime are used for disinfection, their application will also neutralize soil acidity. If ponds dry completely and lime is not used for disinfection, it is less expensive to use agricultural limestone for the purpose of

neutralizing soil acidity. Typical agricultural limestone application rates are provided in Table 1. Agricultural limestone should be spread uniformly over bottoms of ponds while soil is still moist.

## Boyd, pond preparation, Table 1

| Soil pH | Liming rate (CaCO3 equivalent, kg/ha) |
|---|---|
| >7.5 | 0 |
| 7.0 to 7.5 | 500 (optional) |
| 6.5 to 6.9 | 1,000 |
| 6.0 to 6.4 | 1,500 |
| 5.5 to 5.9 | 2,000 |
| 5.0 to 5.4 | 2,500 |
| <5.0 | 3,000 |

Table 1. Approximate lime requirements of bottom soils in shrimp ponds based on soil pH.

## Pond refilling, disinfection

Water for refilling ponds is often passed through fine screens or filters to remove unwanted organisms. While filtration will lessen the possibility of fish and other relatively large organisms from entering ponds, it will not prevent the entry of many disease organisms and smaller vectors of disease organisms.

The most effective way of preventing the entry of disease organisms via the water supply is disinfection. The disinfectant can be applied to water held in a reservoir or done directly in recently-filled ponds. A variety of disinfectants such as calcium hypochlorite, chloramine T, potassium permanganate, copper sulfate, hydrogen peroxide, iodine compounds, benzalkonium chloride and glutaraldehyde are used. The most effective one probably is calcium hydochlorite at a concentration of 20 to 30 mg/L.

## Postlarvae stocking and fertilization

Postlarvae cannot be stocked until the toxic effect of the disinfectants has dissipated – this usually requires only three to five days. However, the pond bottom usually has been dried, lime applied to bottom to raise pH and kill unwanted organisms, and water for filling ponds disinfected. Ponds often have clear water and few benthic organisms are present in bottom soil after disinfection.

Postlarval shrimp can use manufactured feed, but they benefit greatly from natural food organisms for a few weeks after stocking them into ponds. Ponds should be fertilized to encourage the growth of phytoplankton, zooplankton and benthos before the postlarvae are stocked. Fertilization with urea and triple superphosphate or other commercial fertilizers can be used to initiate a phytoplankton bloom.

However, inclusion of an organic fertilizer with the commercial fertilizer will result in a more rapid increase in zooplankton and benthic organisms than possible with commercial fertilizer alone. Manure can be used as an organic fertilizer, but it is better and more sanitary to apply soybean meal, old shrimp feed, rice bran, or some other high-quality organic matter.

There is no generally accepted fertilization rate for ponds. Typical rates are 6 to 8 kg nitrogen (12 to 18 kg/ha urea), 1 to 2 kg phosphorus (5 to 10 kg/ha triple superphosphate) and around 100 to 200 kg/ha of high-quality organic fertilizer. The applications should be repeated if a plankton bloom has not developed within four to five days. Sometimes it may take up to two weeks to obtain a good plankton bloom.

Fertilization may have to be continued at two- to three-week intervals to maintain the plankton bloom, but once the feeding rate reaches 20 to 30 kg/ha/day, there usually will be enough nutrients reaching the water for uneaten feed, feces and shrimp excretion to maintain the bloom.



Aerial view of earthen ponds at shrimp farm in Latin America. Note ponds with varying degrees of lime (white) applications. Photo by Daryl Jory.

## Other considerations

Some farmers like to apply liming materials to pond water in small amounts at frequent intervals during the grow-out period. Liming materials do not dissolve unless the alkalinity of the water falls below 60 to 70 mg/L. Liming usually is of no benefit during the crop period.

Microbial products, often called probiotics, are often applied to ponds. While these products possibly may be beneficial immediately after pond disinfection when bacteria abundance is low, there is no reason to suspect that they would be beneficial later.

### Author



**CLAUDE E. BOYD, PH.D.**

School of Fisheries, Aquaculture and Aquatic Sciences
Auburn University
Auburn, Alabama 36849 USA

boydce1@auburn.edu (mailto:boydce1@auburn.edu)

Copyright © 2024 Global Seafood Alliance

All rights reserved.

# EXHIBIT S3-4

ALLIANCE™
(https://www.globalseafood.org)

Responsible Seafood ADVOCATE

Intelligence

# Mechanized shrimp harvesting

1 August 2000

By Les Hodgson , Keith Gregg and Robins McIntosh

## Goal is to efficiently extract shrimp from the drain and chill them to near freezing temperature within seconds after harvest

Shrimp is a delicate and highly perishable product. Once quality is lost, no amount of manipulation can restore it. The most demanding market for premium quality is the European heads-on market. Shrimp that meet the standards of the European market will be judged as first-quality anywhere in the world. The following describes a harvesting system that consistently yields quality product suitable for that market.





Shrimp from a draining pond (background) are lifted by recessed-impeller pump (bottom) to the de-watering tower (top) and then to ice slurry. Water from the tower drains through the hose on right to a ditch.

## Basic steps in shrimp harvesting

The process of harvesting a shrimp pond is simple in concept. The pond is most often drained through a net, which captures the shrimp as they leave the pond with the draining water. Following capture, shrimp are either manually or mechanically lifted out of the drainage area, chilled with ice, and transported to the processing plant. This can be a major task considering that a pond may contain five to 40 tons of shrimp that must be harvested in a few hours, chilled from 30 degrees C to near freezing, and packed without damage.

In a well-designed pond that has been skillfully drained, little or no shrimp remain on the pond bottom to be picked up by hand. Shrimp that are picked from the pond bottom do not meet the highest quality standards due to delayed chilling and to mud embedded in gills and joints between tail segments. Thus, the major challenges at harvest are to minimize the quantity of shrimp left on the pond bottom, immediately chill shrimp to near freezing, and pack them in a manner that avoids damage.

### *Pond design*

The first prerequisite of a successful harvest is pond design and construction. The bottom must be sloped to drain completely without leaving large puddles, where shrimp tend to remain. Cylindrical drainage culverts have diminishing cross-sectional area as the pond level drops. Culverts should be installed slightly below the level of the pond bottom to help avoid slow drainage as the water level decreases at the end of the harvest.

### *Shrimp behavior*

Shrimp behavior varies with a number of factors such as species, lunar stage, temperature, and molt stage. As a general rule, shrimp do not begin to move toward the pond outlet until most of the water has drained from the pond. Consequently, it is a common practice in large ponds that require more than six hours to drain to slowly reduce the pond level by about 50 percent the day before harvest.



Shrimp from the de-watering tower (upper left) tumble through a hose into the ice slurry in an insulated box.

Once the harvest begins and shrimp begin to move toward the outlet, the emigration process tends to accellerate as long as the pond continues draining. This can result in several tons of shrimp reaching the outlet over the course of a few minutes. If the harvesting crew gets overloaded and the drainage process must be interrupted, shrimp tend to settle back to the bottom again.

To re-establish the emigration generally requires considerable drainage of water. As a result, the pond may completely drain before many of the shrimp have had an opportunity to exit. It is important to maintain continuous water flow throughout the harvest process. Skillful harvesting reduces the number of interruptions and results in less than 1 percent of the shrimp remaining on the pond bottom.

## *Importance of chilling*

Shrimp begin to deteriorate within minutes after death at normal pond temperatures of 25 to 30 degrees C. Initial damage is caused by digestive enzymes released from the hepatopancreas (liver-like organ in the head). At elevated temperatures, these enzymes quickly break down tissue at the junction of the head and tail.

This makes the interior of the head darken in color and the attachment of the head with the tail loosen and sag, which is unacceptable to the European market for head-on shrimp. Some European buyers simulate the conditions in their seafood markets by taking a frozen block of shrimp out of its packaging and leaving it at room temperature for four hours. If the heads turn black or loosen, the product is rejected.

Shrimp digestive enzymes also cause protein destruction, which reduces product weight and may effect meat texture. High temperatures also promote chemical and bacterial decomposition. These enzymatic, chemical, and bacterial processes can be slowed to a standstill by immediately reducing the body temperature to near freezing.

It is important to handle shrimp gently during packaging into containers with ice. Rough handling can break appendages or bruise the head, which also limits acceptability to certain markets.



Shrimp are periodically stirred to suspend them evenly in the ice slurry.

### *Timing the harvest*

In the hot tropical sun, temperatures at the bottom of a drained pond can exceed 40 degrees C. At these temperatures, stranded shrimp can begin to spoil before they can be picked. To avoid this problem, harvests are most often conducted during the night with the intention of completing the process by early morning, when lighting is available for hand picking but temperatures are still moderate enough to avoid rapid spoilage.

In areas where ponds can be drained only at low tide, harvests must be timed to reach the final stage of drainage at low tide, or sufficient pumping must be available to quickly remove all the water.

## Mechanical harvesting systems

Just as combines and tractors have long harvested agricultural row crops, shrimp pond harvesting is also becoming more mechanized. There are several types of mechanical harvesting systems including Archimedes screw systems, reciprocating vacuum/pressure pumps, and recessed impeller pumps.

Each of these has advantages and disadvantages. For example, the screw system has many advocates, because it is a simple mechanism that is easily repaired on the farm. It requires only a small electric motor, because it is designed to elevate only shrimp, not water. Pump harvesters require larger motors to move water and shrimp, but the watermoving capability can be a useful tool. Our experience has been with recessed impeller pumps, so we will focus our discussion on these systems.

## *Shrimp collecting funnel*



After a pond is drained, shrimp gather in remaining puddles, where they must be picked by hand. Hand picking is expensive in both labor and quality loss.

The vast majority of water drained from a pond is not pumped by the harvesting system. It simply drains through a funnel-shaped net or cage, which concentrates the shrimp, while the majority of the water passes through the sides of the net or cage. The continual flow of water directs shrimp toward the cone of the funnel where a submersible pump or suction hose is located. In SouthTexas, we typically use a stainless-steel collecting funnel connected to a submersible harvesting pump. A tripod is used to lower the funnel into the harvest box using a block and tackle and "come along" (hand winch).

The funnel measures 2 ft deep by 4 ft wide by 2 ft long (60 x 120 x 60 cm), and fits over the culvert outlet on the discharge side of the harvest gate. A rubber gasket is positioned between the harvest box and the funnel to assure a complete seal. A jack is used to hold the funnel tightly against the concrete harvest box. The cable from the tripod to the funnel is kept in place for support.

## *Recessed impeller pumps*

Recessed impeller pumps create a water current, which moves the shrimp upwards to a de-watering tower without the impeller touching it. These pumps have been used for many years for applications ranging from tomatoes to live trout. Marine Culture Enterprises, the super-intensive raceway project developed in Hawaii during the 1980s, used these pumps to transfer juvenile shrimp from one raceway to another during the grow-out process.

Recessed impeller pumps are hydraulically driven by a separate electric, diesel, or gas-powered motor. The pumps are available in submersible and non-submersible designs. The non-submersible design tends to lose its prime periodically, which can be problematic during peak harvest periods. Both in Texas and Belize, the submersible design is used.

## *De-watering tower*

The mixture of shrimp and water is pumped from the collecting funnel via a 6- to 8-ft- (15- to 20-cm-) diameter hose to a de-watering tower at the top of the levee. The dewatering tower consists of a funnel-shaped vessel, which decelerates the water velocity from the hose and directs the water and shrimp over an angled grating. The water drains through the grating, while the shrimp tumble over it.

The result is that clean, live shrimp with a minimum amount of water are delivered to the top of the levee, where they can be further processed or dropped directly into insulated boxes with ice. The discharge water from the tower can be directed either to the drainage ditch to speed up water removal from the pond, or back to the pond to replenish oxygen or conserve water needed by the remaining shrimp.

## Insulated totes



Mechanical harvesting can reduce labor by more than 50 percent. It also delivers a more consistently premium crop.

We prefer to discharge shrimp from the de-watering tower directly into an ice slurry within 1-cubic-meter insulated boxes. We prefer boxes without drainage plugs due to danger of unintentional draining, which can result in spoilage if the product is stored in boxes for several days.

To minimize the number of workers needed during harvest, boxes are pre-filled with about 21 in (53 cm) of ice slurry using a mark on the inside of the box. Slush ice is ideal for this purpose (see article, page 55). Another option is to pass about 1.5 bars of block ice through a flaking machine and then add water to create a slurry. If bacteria are a problem, chlorine can be added at low levels to the ice slurry. For the European market, sodium bisulfite is also added to the slurry to prevent blackening within the head.

During harvest, shrimp from the de-watering tower are discharged directly into the boxes, which results in immediate chilling to near freezing. The traditional system of alternately applying a layer of shrimp and a layer of ice provides nearly equivalent chilling, if it is done properly. However, if a

particular scoop of shrimp is too large or a scoop of ice is too small, then hot spots can result. These hot spots result in product deterioration.

The ice slurry system provides consistent chilling every time. Also, crushing is avoided due to suspension of shrimp in the ice/water slurry. Each box is filled to about 4 in (10 cm) from the top, whereupon it contains about 800 lbs (360 kg) of head-on shrimp.

## *Transport, storage, and weighing*

Various methods can be used to transport the insulated boxes to and from the ponds. To operate at the top of the pond levee, inexpensive low-riding trailers with wide tires are sometimes used. Six to eight boxes can be hauled per trailer. In advance of a harvest, several trailers can be connected together like railroad cars under the discharge from the de-watering tower.

As the first totes are filled, the chain of trailers is simply pulled forward by a truck or small tractor. In Belize trailers have been assembled that carry three insulated boxes, and another three boxes are placed in the back of the truck that pulls the trailers.

Harlingen Shrimp Farms harvests beside a road that can handle 18-wheeled trailers that can pack 22 insulated boxes per trailer. In advance of a harvest, several trailers of insulated boxes pre-filled with ice slurry are dropped off at the pond. A pallet jack is used to lift and wheel each insulated box to the door of the trailer, where a fork lift puts it in place to be filled with shrimp.

Once at the processing plant, boxes are lifted off the trailers by forklift. The shrimp can be held for several days in the totes without loss of quality if the excess water is siphoned off using a PVC pipe and replaced with clean water and ice. When the plant is ready to receive the shrimp, the boxes are unloaded into the thaw tank using a forklift to load a simple counterbalanced dumper.

Final accounting of the weights and sizes of shrimp occurs at the processing plant. If a third-party processor is used, it is prudent to provide a trusted farm employee to oversee the weighing process.

## *Labor requirements*

Mechanical harvesting systems reduce labor requirements for pond harvesting by at least 50 percent. For example, Harlingen Shrimp Farms utilizes six people to harvest ponds that yield up to 40 tons each. This includes a supervisor, two workers for the pallet jack, a forklift operator, and two workers operating the harvest machine.

## *Optional post-harvesting steps*

In some cases, it may be beneficial to conduct additional processing at the pond bank. This can include:

- Dipping live shrimp in sodium bisulfite to reduce blackening of the head for head-on shrimp.
- Removing crabs, fish, and trash.
- Selecting the largest animals to be used as potential broodstock.

These processes can easily be incorporated by addition of a conveyor following the de-watering tower.

# Conclusions

Mechanical harvesting systems have been developed to assure consistently top quality by efficiently extracting shrimp from the drain and chilling them to near freezing temperature within seconds after harvest. These systems have the capability of handling large volumes of shrimp over a short period of time with minimal labor. By avoiding the need to stop water flow during harvest, these systems also minimize the number of shrimp left in the pond to be hand picked. The process involves screening shrimp from the drainage water, pumping them to the dewatering tower where they are separated from pond water, and discharging them into an ice slurry.

*(Editor's Note: This article was originally published in the August 2000 print edition of the* Global Aquaculture Advocate.*)*

## Authors

**LES HODGSON**

Marco Sales, Inc.
Brownsville, Texas USA

msshrimp@aol.com (mailto:msshrimp@aol.com)

**KEITH GREGG**

Harlingen Shrimp Farms, Ltd.
Los Fresnos, Texas USA

hsfbayview@compuserve.com (mailto:hsfbayview@compuserve.com)



**ROBINS MCINTOSH**

Belize Aquaculture, Ltd.
Belize

belizeaqua@btl.net (mailto:belizeaqua@btl.net)

Copyright © 2024 Global Seafood Alliance

All rights reserved.

# EXHIBIT S3-5(a)

**10 PAGES**

**NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION**

**Produmar Water Authorization No. 1**

# EXHIBIT S3-5(b)

**PUBLIC VERSION**

**15 PAGES**

**NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION**

**Produmar Water Authorization # 2**

# EXHIBIT S3-6

CORTE CONSTITUCIONAL DEL ECUADOR

**Ruling No. 45-15-IN/22**
**Reporting Judge:** Karla Andrade Quevedo

Quito, D.M., January 12, 2022

**CASE No. 45-15-IN**

**THE PLENARY OF THE CONSTITUTIONAL COURT OF ECUADOR, IN EXERCISE OF ITS CONSTITUTIONAL AND LEGAL POWERS, HEREBY ISSUES THE FOLLOWING**

**SENTENCE**

**Subject**: The Constitutional Court analyzes the Organic Law on Water Resources, Uses and Development of Water and its Regulations. After the respective constitutional analysis by form, it is concluded that the LORHUAA and its regulations are unconstitutional by form as they are contrary to article 57 numeral 17 of the CRE.

## I. Background

### 1.1. Case No. 45-15-IN

**1.** On June 10, 2015, Jorge Herrera Morocho, in his own rights and as president of the Confederation of Indigenous Nationalities of Ecuador -CONAIE filed a public action of unconstitutionality against the Organic Law on Water Resources, Uses and Development of Water ("**LORHUUA**") and its Regulations.

**2.** On September 17, 2015, the Court of the Admission Chamber of the Constitutional Court admitted the case for processing and ordered to transfer the case to the Presidency of the Republic, the National Assembly and the Attorney General's Office in order for them to intervene defending or challenging the constitutionality of the challenged norms. In addition, it requested the National Assembly to send the file with the reports and other documents that gave rise to the challenged norm.

**3.** On February 5, 2019, the current judges of the Constitutional Court were sworn in before the National Assembly of Ecuador.

**4.** On March 19, 2019, by drawing lots, the present case was assigned to the constitutional judge Carmen Corral Ponce, who, by order of September 1, 2021, took cognizance of the case and requested information from the entities involved.

**5.** In an ordinary session of October 13, 2021, the Plenary of the Constitutional Court heard the draft judgment submitted by the reporting judge. Since it did not have enough votes for its approval, a recourse was made and the substantiation of the case fell to Constitutional Judge Karla Andrade Quevedo,

in accordance with Article 38 of the Rules of Procedure for Proceedings under the Jurisdiction of the Constitutional Court[1] .

**6.** On November 25, 2021, constitutional judge Karla Andrade Quevedo took cognizance of the case and its detailed accumulated *infra* and held a public hearing on December 3, 2021, at 10:00 am.

**1.2. Case No. 46-15-IN**

**7.** On June 09, 2015, Carlos Pérez Guartambel, as president of the Confederation of Peoples of the Kichwa Nationality of Ecuador ("**ECUARUNARI**"); Lauro Sigcha Vele, as president of the Federation of Indigenous and Peasant Organizations of Azuay; Tomás Morocho, as president of the *Tukuy Cañar Ayllukunapa Tantanakuy* **("TUCAYTA")**; Patricio Sagñay, as president of the UCIA; and, Virgilio Ramón Quezada, as president of the Union of Community Water Systems of Girón ("**UNAGUA**") filed a public action of unconstitutionality of the LORHUUA regulation.

**8.** On December 8, 2015, the Admission Court of the Constitutional Court of Ecuador requested the plaintiffs to clarify the capacity in which they appeared; whereupon, Carlos Pérez Guartambel filed a brief in which he stated that he is the common procurator of the plaintiffs and that he appears in his own rights and in his capacity as president of ECUARUNARI.

**9.** On March 15, 2016, the Admission Court of the Constitutional Court of Ecuador admitted the complaint in the case and ordered the President of the Republic, the President of the National Assembly and the Attorney General of the State to intervene defending or challenging the constitutionality of the challenged norms.

**10.** On July 9, 2019, the case was drawn by lot and its substantiation corresponded to Constitutional Judge Enrique Herrería Bonnet.

**11.** On November 24, 2021, the Plenary of the Constitutional Court of Ecuador approved the joinder of this case to case No. 45-15-IN.

---

[1] According to Article 38 of the Rules of Procedure of the Constitutional Court, "[...] *when the votes in favor of the project are not sufficient for its approval, the Plenary will draw lots, in the same session, by means of the automated system of the Constitutional Court,* ***a new judge from among those who voted against the project****, to present a new project arguing the thesis of the majority, which will be submitted again for consideration by the Plenary of the Constitutional Court"* (emphasis added).

## II. Competition

**12.** The Constitutional Court of Ecuador is competent to hear and resolve public actions of unconstitutionality on the merits and form against normative acts of a general nature issued by organs and authorities of the State, pursuant to Article 436(2) of the Constitution of the Republic of Ecuador ("**CRE**"), in accordance with Articles 74 to 98 of the Organic Law of Jurisdictional Guarantees and Constitutional Control ("**LOGJCC**").

## III. Rules in respect of which unconstitutionality is challenged

**13.** As described in the procedural background, the plaintiffs challenge the form of the following regulations:

**i.** Organic Law on Water Resources, Uses and Development of Water, published in Official Gazette Supplement No. 305 of August 06, 2014.

**ii.** Regulations to the LORHUAA issued by Executive Decree No. 650, published in Official Gazette Supplement 483 of April 20, 2015.

**14.** On the other hand, on the merits, the following rules are challenged:

**iii.** Articles 1, 43, 45, 46, 47, 51, 52, 53, 54, 55 and 98 of the Organic Law on Water Resources, Uses and Development of Water.

**iv.** Articles 6, 20, 47, 51, 52, 72 and the sole general provision of the Regulations to the Organic Law on Water Resources, Uses and Development of Water.

## IV. Claims and arguments of the parties

### 4.1. Arguments of the plaintiffs against the LORHUUA

**15.** In their claim, the plaintiffs state that the LORHUAA is unconstitutional due to its form. Thus, they describe that (i) on March 23, 2014, the president of the National Assembly summoned representatives of indigenous, Montubio and Afro-Ecuadorian organizations, through the country's most widely circulated newspapers, to provincial public hearings as part of the pre-legislative consultation on the LORHUAA and that (ii) between March 5 and April 1, 2014, the organizations had discussed issues related to the consultation in the Food Sovereignty Commission.

**16.** They point out that a guarantee for the participation of indigenous peoples and communities in decisions that affect their rights, and in particular their right to communal property, is the recognition of their right to consultation. Within this framework, they warn that "[t]*hese processes must respect the particular system of consultation of each people or community, so that it can be understood as an adequate and effective relationship with other state authorities, social or political actors and interested third parties*".

**17.** They emphasize that the State is obliged to guarantee the right to consultation and participation in all phases of construction of a regulatory project that may affect the territory on which the indigenous nationalities are settled. In this sense, it specified that such processes "*must be carried out from the early stages of the elaboration or planning of the proposed measure, so that indigenous peoples can truly participate and influence the decision-making process, in accordance with the relevant international standards*".

**18.** In this sense, they consider that the pre-legislative consultation process of the LORHUAA is unconstitutional, since (i) there was no comprehensive consultation of the normative text "*knowing that water is a natural resource that, prominently, is found in indigenous territories*"; (ii) it was not carried out in good faith, since there were previous pronouncements of public authorities, where it was evident that the process was a mere formality; and, (iii) it was not culturally adequate, "*since the consultation mechanism was not agreed upon with the Confederation of Indigenous Nationalities of Ecuador, nor with its three regional organizations, ECUARRUNARI of the highlands, CONFENIAE of the Amazon and CONAICE of the Coast, authorities and organizations representative and historical of the indigenous peoples in Ecuador. On the contrary, the consultation process was only agreed upon within the National Assembly without external participation*".

**19.** On the other hand, they establish that the normative provisions contained in articles 1, 43, 45, 46, 47, 51, 53, 54 and 55 establish a centralist and homogenizing model for the administration and management of the right to water in Ecuador. This is because, prior to the enactment of the law "(...) *the right to self-determination recognized in article 57, paragraph 1 of the constitution, governed community water management. In this sense, the Water Boards were autonomous and were governed by their own law and norms*". However, the challenged norms have regressive effects because "[a]*s they had enjoyed an autonomous system of water administration and management, the new law and regulations should guarantee a progressive development of that right*".

**20.** Likewise, in relation to Articles 98 of the LORHUAA and 72 of its regulations, they establish that the possibility of establishing easements in ancestral territories would directly violate the inalienability of indigenous territories and their natural resources.

**21.** Finally, they state that articles 51, 52, 53, 54 and 55 "*disproportionately limit the free disposal of water resources in indigenous territories*" and that "*the State is promoting centralist and monopolizing water policies, and has opened up the possibility of forcibly privatizing water sources*".

### 4.2. Arguments of the plaintiffs against the regulation to the LORHUUA

**22.** The plaintiffs state that the regulation to the LORHUAA "*is a new normative measure, different in nature from that of the Law, for which reason it was necessary to*

*to carry out another pre-legislative consultation. This was not done, so the regulation is unconstitutional due to its form*". In this sense, they consider that the regulation to the LORHUAA is contrary to article 57, numeral 17 of the CRE, since "*for the issuance of this regulation that affects our collective rights (...) we were never consulted, avoiding this unrenounceable right and expressly contravening the provisions of art. 57, no. 17, which in addition to all that has been stated, makes the entire content of the regulation unconstitutional in its entirety*".

**23.** They also state that articles 6 and 44 of the regulation are incompatible with article 318 of the CRE since "*the private companies (sic) enter to supply drinking water, sewage, wastewater treatment. With this it will no longer be only INTERAGUAS in Guayaquil but it opens the wide doors for the privatization of water in Ecuador, they assume the community work collectively, using knowledge and ancient institutions such as the minka to supply water and in this cosmovivencia have been able to achieve, through water, to satisfy other basic needs inspired by the sumak kawsay. With this regulation the community water management organizations will be dismantled, annihilated, and usurped by the great leviathan, the state turned into a devouring monster of community water management, to hand over to municipal and parish governments and as these, surely also the vast majority (sic), do not have technical or financial resources will pass to the control of private enterprise where water will be a great corporate business*".

**24.** Likewise, they allege that article 39 of the regulation deepens "*the persecution of community water management when article 39 of said regulatory body prescribes a number of requirements for community organizations to be able to administer water in their territories*" and that article 47 "*orders to regulate and control the administration of water in the communities,* (sic) *we ask ourselves where is the self-determination of the communities: autonomy is sacrificed* (...)".

**25.** Finally, they allude to the fact that article 47 states that if they do not comply with an improvement plan "*within a period of time, all at the discretion of the State SENAGUA, the government and the state intervene; and suspend (sic) that is, remove the president and directors of the water board, then modify the values of the rates; then come the revocation of the authorization of use and exploitation* (...) *finally unilaterally extinguish the legal status*".

### 4.3. Arguments of the National Assembly of Ecuador

**26.** On October 30, 2015, Mauro Andino, in his capacity as judicial attorney for the former president of the National Assembly of Ecuador, answered the lawsuit defending the constitutionality of the challenged norm.

**27.** Regarding unconstitutionality on the grounds of form, he argues that *"in the present case, the party with standing to act, as provided for in Article 79(a) and (b) of the Organic Law on Jurisdictional Guarantees and Constitutional Control - LOGJCC -, should have*

*to support its claim in a well-founded manner. After reviewing the complaint, it does not appear that the plaintiff adequately motivates, with clear, specific and pertinent arguments*, the *reasons for which he considers that there is a normative incompatibility".*

**28.** It explains that the National Assembly complied with the rules established in the Constitution of the Republic and, therefore, there is no violation of the constitutional procedure for approval of laws. Additionally, it explains the chronology of the law in question, which details the steps taken within the legislature to socialize and publicize the bill.

**29.** It states that "*in compliance with Ruling No. 001-10-SIN-CC and in accordance with the procedure established by the Legislative Administration Council, the Permanent Specialized Commission on Food Sovereignty and Development of the Agricultural and Fishing Sector*" would have carried out the pre-legislative consultation guaranteed in Article 57 numeral 17 of the Constitution of the Republic. It also emphasizes that in the pre-legislative consultation process 1697 organizations representing collective rights holders participated and that the texts on which there was consensus were incorporated and those on which there was dissent were debated, which shows that the process was democratic.

**30.** Regarding the arguments of unconstitutionality on the merits, it states that the sole purpose of the law in question is to guarantee the conservation, recovery and integral management of water resources, geographic basins and ecological flows associated with the ecological cycle and to regulate all activities that may affect the quality and quantity of water, and the balance of ecosystems, especially in the sources and recharge areas.

**31.** He adds that there is no regression whatsoever and that, on the contrary, the law that previously governed "*was an archaic, precarious law where water resources were concentrated in the hands of agro-industrialists and few community members*".

**32.** The plaintiff emphasizes that the law generates equitable and fair conditions for the use of this vital resource, and also prohibits any form of privatization of water, since its management will be public and communal, "*no form of appropriation or individual or collective possession will be recognized, regardless of its status, in such a way that inequalities towards the popular and rural sectors disappear*".

### 4.4. Arguments of the Presidency of the Republic

**33.** On October 28, 2015, Alexis Mera Giler, then legal secretary of the Presidency of the Republic of Ecuador, answered the lawsuit denying the unconstitutionality of the regulation.

**34.** It states that "*CONAIE played a leading role in the process of discussion and socialization of the Law (...) Provincial Public Hearings* (sic) *were convened as part of the pre-legislative consultation process (...) in which CONAIE participated*".

In this sense, it points out that the Permanent Specialized Commission on Food Sovereignty and Agricultural and Fishing Development at the time of the pre-legislative consultation *"received, in writing and in public hearings, a huge amount of arguments from several citizens and social organizations with collective rights, among them CONAIE*".

**35.** Regarding the need for the regulation of the LORHUAA to have been submitted to pre-legislative consultation, it states that Article 57 paragraph 17 of the Constitution of the Republic prescribes that the communities, communes, indigenous peoples and nationalities have the right to be consulted before the adoption of legislative measures, which must be understood as those issued within the scope of their competencies by the National Assembly, so that the Regulation to the LORHUAA does not suffer from formal defects.

**36.** It also argues that the Law does not "*generate excessive requirements for the constitution of drinking water boards*" since this is regulated by regulation; that easements do not deprive the conservation of the right of ownership of natural resources and that such encumbrance does not hinder the conservation of the right of ownership of the property on which it is imposed, nor does it obstruct the communities, communes, indigenous peoples and nationalities from continuing to exercise activities proper to their territories, with the limitations imposed by the Constitution and the law; and, that articles 47, 51, 52 of the Regulation to the LORHUAA have been reformed and that they generate new prescriptions that would not merit a constitutionality control. Consequently, it requests that the claim of unconstitutionality be rejected.

### 4.5. Arguments of the State Attorney General's Office

**37.** On October 30, 2015, Marcos Arteaga Valenzuela, then national director of sponsorship of the Attorney General's Office filed the respective response defending the constitutionality of the challenged article.

**38.** In the main part, he states that: *"The plaintiff claims that the legal provisions accused of being unconstitutional due to the form* (...) *did not meet the conditions of being a comprehensive consultation of the normative text, in good faith and culturally appropriate. However, there is a conceptual confusion on the part of the plaintiffs, since they equate pre-legislative consultation with prior consultation* [further alleges] *that the article of the Constitution that allegedly violates the Water Resources Law, Article 57-12, is not related to the right to property of the indigenous territories, as the plaintiff wrongly claims* (...) *Additionally, the mere incoherent and isolated citation of doctrine and jurisprudence is not sufficient to demonstrate violations of constitutional rights".*

**39.** Likewise, it indicates that when contrasting the challenged norms with the constitutional provisions alleged to have been transgressed, the arguments of the complaint do not demonstrate how they violate the obligation contained in Article 281.4 of the Constitution of the Republic, so that the principle of "*in dubio pro*

*legislatore*". It ends, requesting the Plenary of the Constitutional Court to issue a sentence rejecting the public action of unconstitutionality.

## V. Constitutional analysis

### 5.1. Constitutional control by form

**40.** The plaintiffs have established that the LORHUAA and its regulations are unconstitutional due to their form, since the pre-legislative consultation carried out does not comply with constitutional standards and is contrary to its constitutional recognition in Article 57, paragraph 17 of the CRE, which requires it to be carried out prior to the approval of norms that affect collective rights.

**41.** Hence, although this Court has recognized that pre-legislative consultation is a right recognized in the Constitution, it will proceed to examine the present legal problem as a matter of form as has been alleged by the plaintiffs[2] .

#### 5.1.1. On pre-legislative consultation in the LORHUAA

**42.** Article 57, paragraph 17 of the Constitution recognizes the right to pre-legislative consultation in the following terms:

> "The *following collective rights shall be recognized and guaranteed to the communes, communities, indigenous peoples and nationalities, in accordance with the Constitution and with the covenants, conventions, declarations and other international human rights instruments: (...) 17. To be consulted prior to the adoption of a legislative measure that may affect any of their* collective *rights*"[3] .

**43.** Thus, it follows from the constitutional text that pre-legislative consultation is mandatory prior to the adoption of a regulatory measure that may affect indigenous communes, communities, peoples or nationalities in ways not perceived by other individuals in society, being a collective right of such communities[4] .

**44.** In this sense, regarding the nature of the pre-legislative consultation, the Constitutional Court has determined that it has a double dimension:

---

[2] In this regard, the Constitutional Court has determined that "*the failure to carry out pre-legislative consultation may give rise to unconstitutionality in terms of form, since it constitutes an omission in the legislative process; and in turn to unconstitutionality in terms of substance, since the content of the provisions of a regulatory act that have been issued without consultation violates the aforementioned constitutional right*". Constitutional Court. Judgment No. 20-12-IN/20 of July 1, 2020, para. 99 and Constitutional Court. Judgment No. 69-16-IN/21 of October 20, 2021, para. 51.

[3] The obligation to carry out pre-legislative consultation is rooted in the following international human rights instruments: (**i**) ILO Convention 169; and (**ii**) the United Nations Declaration on the Rights of Indigenous Peoples ("**UNDRIP**").

[4] Constitutional Court of Ecuador. Judgment No. 69-16-IN/21 of October 20, 2021, para. 44; Constitutional Court of Ecuador. Judgment No. 20-12-IN/20 of July 1, 2020, para. 84.

**(i)** On the one hand, pre-legislative consultation is a **formal requirement** prior to the issuance of measures adopted in the exercise of any regulatory power insofar as it constitutes a phase prior to their approval.

**(ii)** On the other hand, pre-legislative consultation is a **constitutional right** recognized by Article 57 paragraph 17 of the CRE and in international instruments such as Article 6 paragraph 1 of ILO Convention 169 and Article 19 of the United Nations Declaration on the Rights of Indigenous Peoples.

**45.** Likewise, this Constitutional Body has established that the right to pre-legislative consultation is much more extensive than a simple participation in dissemination processes or public hearings, inasmuch as these types of mechanisms do not constitute a pre-legislative consultation process appropriate for indigenous peoples, but rather simple hearings to which they could attend like any other citizen[5] .

**46.** In the same vein, both the UN Special Rapporteur on the situation of human rights and fundamental freedoms of indigenous people and the ILO supervisory bodies have emphasized that mere hearings or information procedures do not constitute adequate consultation in the light of international standards. In fact, the ILO standard-setting bodies have expressly determined that "*a mere information meeting cannot be considered in conformity with the provisions of the Convention*", particularly in view of the establishment of a "*genuine dialogue between both* (sic) *parties marked by communication and understanding, mutual respect and good faith, and with a sincere desire to reach a* common *agreement*"[6] .

**47.** In the specific case, a review of the documentation in the file shows that the National Assembly of Ecuador carried out a pre-legislative consultation[7] in which the following actions are recorded:

**48.** Prior to the consultation, the Permanent Specialized Commission on Food Sovereignty and Development of the Agricultural and Fishing Sector of the National Assembly defined the substantive topics to be consulted during the preparation phase, which were approved by the Legislative Administration Council on July 31, 2012.

**49.** Thus, the National Assembly delimited the following topics to be consulted:

**1)** Ancestral traditions, ritual and sacred sites (Articles 24, 41, 43, 44, 88, 170 (c) and (l) of the Water Resources Bill).

---

[5] Constitutional Court of Ecuador. Judgment No. 3-15-IA/20 of November 11, 2020, paras. 107- 108.
[6] Ibid.
[7] Final report on the results of the pre-legislative consultation of the draft Organic Law on Water Resources, Use and Development of Water.

**2)** Ancestral water management (Articles 17, 23 to 33, 35, 37, 38 lit. b), 40, 56 to 63, 66, 68, 69, 101, 112, 117, 159, 163 of the Water Resources Bill).
**3)** Use, usufruct and administration (Articles 6 and 8, paragraph 1; 26, 27, 67, 86, 93, 137, 176 and 178 of the Water Resources Bill).
**4)** Own or customary law (Articles 38, 42, 150, 151, 152, 179, 205, 206 and 207 of the Draft Water Resources Law).
**5)** Participation and representation in official bodies (Articles 12 lit. d), 58, 61, 78, 175, 225, 226, 231, 233 and 234 of the Water Resources Bill).

**50.** Subsequently, in the phase of public call and registration, on September 14, 2012, "*through the media*", the Presidency of the Assembly summoned the communes, communities, peoples and nationalities "*to participate in the consultation and register*".

**51.** The pre-legislative consultation, strictly speaking, "*formally began on March 5 and concluded on April 1, 2013*". In this sense, the National Assembly delivered forms and minutes to be filled out by the corresponding organizations after "*the internal discussion at the different organizational levels (...) according to their internal procedures of deliberation and decision making*".

**52.** Subsequently, the Permanent Specialized Commission on Food Sovereignty and Development of the Agricultural and Fishing Sector of the National Assembly "*carried out the compilation of provincial results; after which the Presidency of the current Assembly, on March 20, 2014, summoned the representatives of the second degree organizations of the holders of collective rights, (no more than 3 for each entity) to provincial public hearings, in order to socialize the results obtained and identify the consensuses and dissensuses to be proposed as provincial contribution to the national dialogue table*". The provincial public hearings were held from March 26 to April 15, 2014 and a national dialogue table was held to discuss the results of the pre-legislative consultation on May 9, 2014.

**53.** Now, since in the present case, prior to the issuance of the LORHUUA, it is evident that a pre-legislative consultation was indeed carried out, it is necessary to verify whether the materialization of the consultation complied with the minimum parameters established by this Agency and contained in international instruments.

**The exclusive delimitation by the National Assembly of the topics to be consulted:**

**54.** The plaintiffs argue that the LORHUAA is unconstitutional, since there was no comprehensive consultation of the regulatory text "*knowing that water is a natural resource that is prominently found in indigenous territories*". Likewise, they mention that participation must be guaranteed in all phases of the construction of a regulatory project that could affect the territory on which the indigenous peoples are settled.

indigenous nationalities. In this regard, they specified that such processes "*must be carried out from the earliest stages of the development or planning of the proposed measure, so that indigenous peoples can truly participate and influence the decision-making process, in accordance with relevant international standards*".

**55.** Thus, during the public hearing, the plaintiffs stated that "*international standards establish that the consultation should be designed in consultation with the legitimate leaders of the communities (...) it would have been important to discuss precisely with the leadership of CONAIE or at least of the 3 indigenous regions of the country or directly with the representatives of the 15 peoples and nationalities of the country where it could be developed precisely if, for operational reasons, it was better to discuss the entire law or if it should be discussed in parts. This decision was totally arbitrary on the part of the legislature, who decided that there were only some issues that would threaten or jeopardize the rights of indigenous peoples and only consulted them on this point*".

**56.** In this regard, as noted above, a review of the pre-legislative consultation process shows that the delimitation of the issues to be consulted - due to the possible impact on the collective rights of the indigenous communities - was carried out exclusively by the National Assembly through the Permanent Specialized Commission on Food Sovereignty and Development of the Agricultural and Fishing Sector and the Legislative Administration Council, without any participation by the affected indigenous communities.

**57.** In previous decisions, this Constitutional Court has emphasized the importance of the opinions of indigenous peoples in determining whether a legislative measure directly affects them:

> "*the Court considers it indispensable to point out that* ***in order to determine whether a legislative or administrative measure related to the territories of indigenous peoples should be consulted, it is extremely relevant to have recourse to the opinion of the indigenous persons*** involved"[8] .

**58.** Likewise, the Expert Mechanism on the Rights of Indigenous Peoples of the United Nations Human Rights Council has established that, in order to determine whether a legislative measure affects indigenous peoples, it is essential to take their opinion into consideration:

> *"The views of the indigenous peoples concerned about the possible wider implications of a decision are the starting point for assessing whether a legislative or administrative measure or project affecting their lands or territories affects them. Indigenous peoples should have an important role in establishing whether and, if so, to what extent the measure or project affects them. The*

[8] Constitutional Court of Ecuador. Judgment No. 3-15-IA/20, November 11, 2020, para. 102.

*indigenous peoples may reveal possible harm that is not evident to the* State"[9] .

**59.** Hence, in the opinion of this Court, the opinion of the indigenous communities is not only relevant when they participate in the pre-legislative consultation, but their opinion must be taken into consideration during all stages of the pre-legislative consultation, including its preparation[10] . In this sense, the declaration of the indigenous communities precisely makes it possible to delimit the legislative measures that, due to their potential to affect their collective rights, must be consulted.

**60.** Otherwise, the exclusive delimitation by the National Assembly of the issues and legislative measures that could have an impact on the collective rights of the communes, communities, indigenous peoples and nationalities excludes those affected from the same and is incompatible with the rationale of consultation, as it could not cover other possible damages or affectations that cannot be perceived by the State and other individuals of society outside the communities.

**61.** Although the previous conformation of this Constitutional Body in Ruling No. 001-10-SIN-CC established that it is up to the National Assembly to determine "*through an administrative act, the consultation agenda with identification of the substantive issues to be* consulted"[11] , this does not imply that the legislative body should not guarantee the participation of the representatives of the indigenous peoples and nationalities in the construction of its agendas. In this sense, in order to guarantee their right to participate in matters of public interest and to pre-legislative consultation recognized in Articles 61, paragraph 2 and 57, paragraph 17 of the CRE, the National Assembly must take into consideration the opinion of the representatives of the indigenous peoples and nationalities in the delimitation of the topics that, due to their possible effects, must be consulted.

---

[9] Human Rights Council, Expert Mechanism on the Rights of Indigenous Peoples (2018) Free, prior and informed consent: a human rights-based approach, A/HRC/39/62 para. 34.

[10] In relation to the right to free, prior and informed consultation, the Inter-American Court has determined that "*these processes of dialogue and the search for agreements must be carried out from the early stages of the development or planning of the proposed measure, so that the indigenous peoples can truly participate and influence the decision-making process, in accordance with the relevant international standards*". I/A Court H.R. Case of the Kichwa Indigenous People of Sarayaku v. Ecuador. Merits and Reparations, 2012, para. 167.

[11] Constitutional Court of Ecuador. Decision No. 001-10-SIN-CC, page 41. In the same line, the current Article 109.9 of the LOFL, incorporated by amendment of November 10, 2020, determines that "within *the term of five days following the decision of the Plenary of the National Assembly on the appropriateness of the pre-legislative consultation, the permanent or occasional specialized commission, responsible for the treatment of the bill, shall deliver to the President or the President of the National Assembly, the substantive issues, duly grounded, to be submitted to the pre-legislative consultation mechanism. These topics shall be approved by the Legislative Administration Council, in order to proceed with the immediate convening of the pre-legislative consultation. To carry out the pre-legislative consultation, the permanent or occasional specialized commission and the National Electoral Council shall use the forms to be approved by the Legislative Administration Council*".

**62.** Furthermore, it should be taken into consideration that in this case, prior to the delimitation of the issues made by the National Assembly (July 2012), the IACHR Court already determined "*the processes of dialogue and search for agreements must be carried out from the early stages of the development or planning of the proposed measure, so that indigenous peoples can truly participate and influence the decision-making process, in accordance with the* relevant *international standards*"[12] .

**63.** As noted above, the Permanent Specialized Commission on Food Sovereignty and Development of the Agricultural and Fishing Sector of the National Assembly and the Legislative Administration Council exclusively delimited the topics of the consultation, without any participation of the indigenous communities. Furthermore, from the review of the final report of the results of the draft Organic Law on Water Resources, Uses and Development of Water, there is no evidence of the criteria used by the legislative body for the selection of the topics and articles that were to be consulted due to their potential to affect the rights of indigenous peoples and nationalities.

**64.** Consequently, since there was no evidence of any type of participation by the leaders of the indigenous peoples in the demarcation made by the National Assembly of the issues to be consulted and the exclusion of certain issues from discussion was not substantiated, this Court considers that the approval of the LORHUAA is contrary to the aforementioned constitutional standards.

**Participation in prelegislative consultation**

**65.** The plaintiffs claim that the consultation was not carried out in good faith with the intention of reaching agreements, that it was not culturally adequate since it was not fully translated and that there were various problems of participation on the part of the indigenous communities, since although 1,500 communities were registered, in the end only 900 communities were given minutes.

**66.** In this regard, it is worth mentioning that according to the IACHR Court, consultation with indigenous peoples is an integral part of the right to participation in public affairs, in relation to Article 23 of the ACHR[13] . For its part, Article 95 of the Constitution generally recognizes the right to participation and mandates that citizens, individually and collectively, participate in a leading role in decision-making, planning and management of public affairs and in the popular control of State institutions and society and its representatives, in a permanent process of building citizen power. Participation is

[12] I/A Court H.R., Case of the Kichwa Indigenous People of Sarayaku v. Ecuador. Case of the Kichwa Indigenous People of Sarayaku v. Ecuador. Merits and Reparations. Judgment of June 27, 2012, para. 167.

[13] According to the IACHR Court, the consultation "*is part of the exercise of their right to participate in the adoption of decisions in matters that affect their interests, in accordance with their own procedures and institutions, in relation to Article 23 of the American Convention*". I/A Court H.R. Case of the Kaliña and Lokono Peoples v. Suriname. 2015, para. 203.

will be guided by the principles of equality, autonomy, public deliberation, respect for differences, popular control, solidarity and interculturality. The participation[14] of citizens in all matters of public interest is a right to be exercised through the mechanisms of representative, direct and community democracy.

**67.** Therefore, since pre-legislative consultation, in addition to being a collective right, is related to participation in public affairs, the State must ensure that it reaches a high degree of participation by the communes, communities, indigenous peoples and nationalities through interculturally appropriate mechanisms that guarantee the participation of those who may be affected by the legislative measure.

**68.** Thus, the IACHR has established that consultation and its process of obtaining consent requires "*at a minimum, that* ***all members of the community*** *be* ***fully and accurately informed of the nature and consequences of the process and have an effective opportunity to participate*** *individually or* collectively"[15] . Similarly, it has established that the requirement of participation of indigenous and tribal peoples "*is disregarded when there are members of such peoples who have not had the opportunity to play a full or effective role in the selection, authorization or instruction of those who act on behalf of the people before the authorities; when the corresponding claims are promoted by a particular band, clan or segment of the corresponding people, with no apparent mandate from the other bands, clans or segments thereof; or when appropriate consultations are not developed among the members of the entire people at the time of adopting substantial decisions on such rights or interests, particularly when such decisions entail the extinguishment of rights over* ancestral *territories*"[16] .

**69.** Therefore, it is necessary to examine whether the LORHUAA had an adequate process of participation of the indigenous communes, communities, peoples and nationalities.

**70.** From the review of the final report of results it is verified that on September 14, 2012, "*through the media*", the Presidency of the Assembly summoned the "*communes, communities, indigenous peoples and nationalities, the people*

[14] The Inter-American Democratic Charter establishes that "the participation of citizens in decisions relating to their own development is a right and a responsibility" and "is also a necessary condition for the full and effective exercise of democracy", for which reason "the elimination of all forms of discrimination [...] and of the various forms of intolerance [...] contribute to the strengthening of democracy and citizen participation". Principle 22 of the Rio Declaration on Environment and Development states that indigenous peoples and their communities [...] play a fundamental role in environmental management and development because of their traditional knowledge and practices. States should recognize and duly support their identity, culture and interests and enable their effective participation in achieving sustainable development.

[15] IACHR, Report No. 40/04, Case 12.053, Mayan Indigenous Communities of the Toledo District (Belize), October 12, 2004, para. 142.

[16] IACHR. (2009). Indigenous and Tribal Peoples' Rights over their Ancestral Lands and Natural Resources: Norms and Jurisprudence of the Inter-American Human Rights System. para. 286.

*Afro-Ecuadorian and Montubio people and the organizations of the holders of collective rights, linked to the substantive issues to be consulted, to participate in the consultation and register in compliance with the requirements and within the determined deadlines*".

**71.** At this point it is important to mention that the call through the media, even though it may be efficient, is not the only mechanism to summon citizens, especially in the case of indigenous peoples and nationalities, Afro-Ecuadorians and Montubias who do not necessarily have access to them or whose content is not transmitted in their language. It is important to use mechanisms with an intercultural vision to reach all strata and sectors of society. Thus, the use of community media, invitations through social organizations and community leaders or face-to-face calls -in their respective language or with the corresponding translation or interpretation- are means that contribute to make broad calls that allow real access of the population to participation.

**72.** In any case, the analysis of the file shows that in this phase "*1494 first degree organizations, 64 second degree organizations, and 12 third degree organizations"* were registered; *and 12 third degree organizations*", among which "*one hundred and fifteen (115) second degree organizations representing collective rights holders* attended the provincial public hearings held in twenty-two provinces, *of which seventy-four (74) organizations were previously registered and forty-one (41) organizations that registered in the same act of the hearings*" and in the national dialogue table participated "*eighteen (18) national organizations out of a total of twenty (20) registered, representative of collective rights holders, among organizations of indigenous nationalities, Montubio and Afro-Ecuadorian peoples*". Therefore, the great confluence of participating organizations shows that in the elaboration of the LORHUAA there was the participation of different organizations.

**73.** Now, the Court's attention is drawn to the claimants' statement during the hearing of this case that the pre-legislative consultation process involved people and associations "*that have nothing to do with the organization of indigenous peoples, and of course this added up to a large number and then the National Assembly presented reports in which there is a very high number of consensus, but when we analyze who attended these meetings, they were people of the most varied nature that somehow* ***made them lose the voices of the people who did represent organizations of indigenous peoples and nationalities***".

**74.** In this regard, from the review of the reports and information on the pre-legislative consultation process of the LORHUAA presented by the National Assembly, it is clear that in the compilation of the results of consensus and dissent, there was no differentiation of the participating organizations that would make it possible to evidence and determine the concerns of the different indigenous peoples and nationalities regarding the provisions that affect their ancestral traditions, ritual and sacred places; ancestral management and administration; use, usufruct and administration of water; their own or customary law; and, participation and

representation in official bodies, which means that they have not been duly considered by the legislative body[17] .

**75.** Therefore, for this Constitutional Magistracy, it is essential that the consulting bodies guarantee and ensure the effective participation of the legitimate representatives of the communities, communes, peoples and nationalities, because without their participation, the consultation lacks effectiveness[18] . Thus, it is important that the consulting body makes an adequate differentiation between the representatives of indigenous peoples and nationalities and other persons and organizations that are not subject to consultation to ensure that their results of consensus and dissent are reliable and compiled in good faith.

**76.** In this regard, it should be recalled that, according to international standards, the body adopting the regulatory measure that affects the interests of indigenous peoples has the duty to duly analyze their concerns and have sufficient flexibility to modify the initial project on the basis of the results of the consultation. Otherwise, if the accommodation of the project is not possible "*for objective, reasonable and proportional reasons to a legitimate interest in a* democratic *society*"[19] , the consulting subject must externalize and argue, in a reasoned manner, what those reasons are.

**77.** Hence, in the opinion of this Court, the lack of an adequate and differentiated compilation of the results of the consultation makes it impossible for the legislative body to know the specific concerns of the indigenous communities and, based on them, to modify the normative project or adopt reasoned decisions on the legitimate reasons that make it impossible to incorporate their results after the consultation.

**78.** On the other hand, regarding the fact that the consultation was not interculturally adequate, this Court observes that according to the documentation sent by the National Assembly "*the publication of the topics to be consulted was also done in the languages of* intercultural *relation*"[20] . However, since, as established in the previous section, the National Assembly made an exclusive delimitation of the consultation topics without the participation of the communities and these were the aspects translated into the languages of intercultural relations, this Court considers that the same was not culturally adequate.

---

[17] In fact, for example, in an amicus curiae of December 16, 2021, it is stated that "indigenous representatives questioned some organizations of not being related to community water management". [18] In this regard, Ruling No. 001-10-SIN-CC stated that "the result of the consultation shall be signed by the legitimate representatives of the entities consulted, without detriment to the attachment of lists of participants in the internal deliberation process, in accordance with their own customs, traditions and procedures".
[19] IACHR. (2009). Rights of Indigenous and Tribal Peoples over their Ancestral Lands and Natural Resources: Norms and Jurisprudence of the Inter-American Human Rights System Ibid. para. 325.
[20] Constitutional file, fj. 200.

**79.** Finally, the plaintiffs have alleged that the pre-legislative consultation was carried out very quickly and the provincial hearings were held in the provincial capitals, which had repercussions in terms of participation, since people who lived in the urban centers and did not belong to the communities participated. In this sense, "*the convocation (sic) was made to 1494 first degree associations, 64 second degree associations and 12 national organizations;* ***out of 6000 communities, 1500 were registered, of which only 930 managed to respond to the consultation within a period of twenty days, which does not respect the community procedures for decision making***".

**80.** In this regard, it is worth mentioning that Ruling No. 001-10-SIN-CC established a term of twenty days for the consultation stage once the registrations are closed. Thus, Ruling No. 001-10-SIN-CC established:

> ***"Within twenty working days from the closing date of registration, the consultation offices shall receive the consultation documents duly stamped. In these, in addition to the official results ballot, the list of participants in the internal deliberation processes of the entities consulted may be attached, as well as the respective minutes of community meetings or assemblies****. The internal discussion at the different levels of organization of the participating communes, communities, peoples and nationalities shall be carried out based on their customs, traditions and internal procedures of deliberation and decision making, without any external instance intervening in the internal process. However, the entities participating in the consultation may seek technical and specialized opinions, if so* required"[21] .

**81.** Therefore, in the present case, it is observed that the term of the consultation was carried out in accordance with Ruling No. 001-10-SIN-CC.

**82.** However, beyond the formal compliance with the deadlines and the list of participants, this Court finds that the constitutional and international standards on pre-legislative consultation have not been met due to the lack of an adequate and differentiated compilation of the results of the consultation.

**83.** Consequently, from the foregoing, this Court finds that the LORHUAA is unconstitutional due to its form, since the pre-legislative consultation has not guaranteed its purpose of listening to the opinion of the communes, communities, indigenous peoples and nationalities, that they participate in the public affairs that affect them, and given that it was not culturally adequate.[22] By virtue of this, once the unconstitutionality has been verified, it is no longer appropriate to analyze the charges raised on the merits.

---

[21] Constitutional Court of Ecuador. Ruling No. 001-10-SIN-CC, page 42.

[22]. In this sense, Article 76 paragraph 7 of the LOGJCC establishes that "The disregard or violation of the formal and procedural rules in the production of norms only entails the declaration of unconstitutionality when it implies the transgression of the principles or substantial purposes for which the respective rule was instituted".

**5.1.2. On the pre-legislative consultation of the LORHUUA regulations**

**84.** The plaintiffs state that the regulation to the LORHUAA is unconstitutional since "*it is a new normative measure, different in nature from the Law, so it was necessary to carry out another pre-legislative consultation. This was not done, so the regulation is unconstitutional due to its form*".

**85.** For its part, the Presidency of the Republic argued that it was not appropriate to carry out a pre-legislative consultation, since the President has the constitutional power to regulate laws and that the scope of Article 57 paragraph 17 of the CRE is limited to the consultation of legislative norms issued by the National Assembly.

**86.** In this regard, in previous decisions, this Court has already established that Article 57 paragraph 17 of the CRE, in harmony with the aforementioned international human rights instruments that are part of the constitutional block, must be interpreted in the most favorable sense for the full exercise of constitutional rights and that, therefore, it is applicable to any act issued in the exercise of regulatory power that has the potential to affect indigenous peoples and nationalities:

> *"The criterion referred to in sentence No. 001-10-SINCC, contains an illegitimate restriction of the collective rights of the communes, communities, indigenous peoples and nationalities. In the first place, because it does not contemplate the interpretation of article 57 numeral 17 of the Constitution that is more favorable for the full validity of rights (...). With respect to the first point,* ***although it is possible to understand the term "legislative measures" as measures adopted exclusively by the National Assembly, as a body connatural to the legislative power, it is also possible to interpret it, in a general manner, as measures adopted in the exercise of the normative power, as this interpretation is more favorable for the full exercise of rights.*** *In the opinion of this Court, it is necessary to recognize that the organs with normative power -in addition to the National Assembly- could issue normative measures that affect or have an impact on the collective rights of the peoples and communities referred to*" (emphasis added)[23] .

**87.** Likewise, in addition to the constitutional recognition of the right to pre-legislative consultation, international instruments establish that this right must be exercised before any act that may directly affect indigenous peoples and contains normative measures that directly affect the collective rights of indigenous communities, regardless of whether it is a normative act of a legislative or administrative nature. In this regard, Article 6, paragraph 1 of ILO Convention No. 169 states:

[23] Constitutional Court of Ecuador. Judgment No. 20-12-IN/20 of July 1, 2020, para. 87.

> *"governments shall consult the peoples concerned, through appropriate procedures and in particular through their representative institutions**, whenever consideration is being given to legislative or administrative measures which may affect them directly**"* (emphasis added).

**88.** Similarly, Article 19 of the United Nations Declaration on the Rights of Indigenous Peoples states:

> "*[s]tates shall consult and cooperate in good faith with the indigenous peoples concerned through their **representative** institutions in order to obtain their free, prior and informed consent **before adopting and implementing legislative or administrative measures that may affect them***."

**89.** Hence, in short, the National Assembly is not the only body that has the duty to consult the communes, communities, indigenous peoples and nationalities on the various regulatory measures that have the potential to affect their rights, but this extends to any body with regulatory powers such as the President of the Republic as long as the measure has the potential to affect indigenous peoples and nationalities.

**90.** Thus, in the opinion of this Court, for purposes of guaranteeing the right to pre-legislative consultation of the indigenous communes, communities, peoples and nationalities, it makes no difference whether the norm to be consulted constitutes an expression of the general will (law) or of the will of an administrative body (regulation), since the determining factor is whether the norm, beyond its nature, has the potential to affect the collective rights of the indigenous communities. Therefore, if the challenged regulation contains normative measures that directly affect the indigenous peoples and nationalities, it was appropriate to consult them.

**91.** In its various briefs and interventions, the Presidency of the Republic has established that the regulation to the LORHUAA is a regulation issued pursuant to article 147 numeral 13 of the CRE to regulate the application of a law that has already been consulted, and therefore it is not appropriate to carry out a new consultation on these matters. However, precisely because subordinate regulations -such as the one in the present case- complement and develop in a concrete and specific manner normative measures that could have an impact on indigenous communes, communities, peoples and nationalities, it is even more necessary that their opinion be taken into consideration prior to the issuance of the regulation.

**92.** In this sense, for the legislative process of the LORHUAA, the National Assembly determined that, for example, the norms of the bill oriented to the regulation of community water management, the registration of ancestral practices and easements were issues that needed to be consulted. On the other hand, the regulation to the LORHUAA contains provisions on the same topics of the LORHUAA, but the content of these norms in their concretization and development has not been consulted with the indigenous peoples and nationalities. Thus, for example, Article 54 of the LORHUAA, which was consulted, recognizes community management of water, whereas

Article 39 of the regulation that has not been the subject of consultation determines the requirements that the application for authorization to provide water services must contain in order to be considered.

**93.** Consequently, a comprehensive review of the regulation shows that it develops and specifies provisions alluding to the same issues that were consulted for the law and that there has been no pre-legislative consultation prior to its issuance, so that the regulation to the LORHUAA is unconstitutional as it contravenes Article 57 paragraph 17 of the CRE and Article 6 paragraph 1 of ILO Convention 169.

**5.2. Effects of the judgment**

**94.** In the present case, by virtue of the deficient performance of the pre-legislative consultation in the case of the LORHUAA and its lack of performance in the case of the LORHUUA regulation, it should be declared unconstitutional and the consequent establishment of the effects of the present decision.

**95.** As for the effects in time, the present decision will have effects towards the future in accordance with article 95 of the LOGJCC.

**96.** The general rule in matters of constitutional control is that the declaration of unconstitutionality has immediate effects. However, the LOGJCC allows that in certain cases, the Constitutional Court may defer the effects of the declaration (*vacatio sententiae*) when the unconstitutionality is likely to produce a normative vacuum that affects the full validity of rights or produces serious damages.

**97.** In the present case, it is clear that the immediate unconstitutionality of the entire LORHUAA and its regulations would cause a great normative vacuum on the regulation of water in Ecuador and the conditions for its use and exploitation. Therefore, in this case, it is essential to defer the effects of this judgment so that the National Assembly and the Presidency of the Republic have the necessary time to process a new regulation in which an adequate pre-legislative consultation is carried out with the participation of the indigenous peoples from the first stages of the consultation process. To this end, this Court determines that despite the formal unconstitutionality of the LORHUAA and its regulations, in accordance with Article 95 of the LOGJCC, these will remain in force until the approval of a new water resources law. Consequently, within 12 months from the publication of this judgment in the Official Gazette, the President of the Republic shall prepare and submit a draft law to be sent to the National Assembly for processing in accordance with the provisions of the Constitution and respecting the jurisprudential criteria and international standards on pre-legislative consultation.

**98.** In addition, if the President of the Republic, in use of his constitutional powers, considers it necessary to issue a new regulation to the new law, he must obligatorily carry out a pre-legislative consultation in accordance with the criteria set forth in this decision and in the applicable international human rights instruments.

**99.** Taking into consideration that through judgment No. 69-16-IN/21 of October 20, 2021, it was declared unconstitutional. 69-16-IN/21 of October 20, 2021, the Instructions for the conformation, legalization, and dissolution of Administrative Boards of Drinking Water and Regional Sanitation, Second and Third Degree Boards and Irrigation and/or Drainage Boards of First, Second and Third Degree 2016 were declared unconstitutional and that the Ministry of Environment and Water was given a period of one year to prepare a new instruction, this Agency considers it essential to urge the authorities involved in both cases (President of the Republic, National Assembly and Ministry of Environment and Water) to exhaust the necessary dialogues aimed at coordinating the preparation of their respective regulations in order to achieve a coherent and harmonious normative production.

**100.** Finally, as long as the normative bodies subsist, their content must be interpreted with strict adherence to constitutional rights and in the manner most favorable to the full enjoyment of rights. This Court emphasizes that for the elaboration of the corresponding pre-legislative consultations, the bodies with normative power must apply the standards established in the present judgment, in conjunction with what is determined by the Constitution, the law and international instruments, in order to avoid incurring again in the defects identified in the present decision.

## VI. Decision

In merit of the foregoing, administering constitutional justice and by mandate of the Constitution of the Republic of Ecuador, the Plenary of the Constitutional Court resolves:

1. Declare the unconstitutionality of the Organic Law on Water Resources, Uses and Development of Water and its Regulations.

2. In order to avoid a serious regulatory vacuum, both regulations will remain in force until the approval of a new water resources law. Consequently, within 12 months from the publication of this judgment in the Official Gazette, the President of the Republic shall prepare and submit a draft law to be sent to the National Assembly for processing in accordance with the provisions of the Constitution and respecting the jurisprudential criteria and international standards on pre-legislative consultation.

3. Notify, publish and comply.

LUIS HERNAN BOLIVAR SALGADO PESANTES

Digitally signed by LUIS HERNAN BOLIVAR SALGADO PESANTES
Date: 2022.01.28 09:07:36 -05'00'

Dr. Hernán Salgado Pesantes
**CHAIRMAN**

CORTE CONSTITUCIONAL DEL ECUADOR

**Ruling No. 45-15-IN/22**
**Reporting Judge:** Karla Andrade Quevedo

**Reason:** I hereby state that the foregoing Ruling was approved by the Plenary of the Constitutional Court with seven votes in favor, of Constitutional Judges Karla Andrade Quevedo, Ramiro Avila Santamaría, Agustín Grijalva Jiménez, Alí Lozada Prado, Teresa Nuques Martínez, Daniela Salazar Marín and Hernán Salgado Pesantes; and, two dissenting votes of Constitutional Judges Carmen Corral Ponce and Enrique Herrería Bonnet, in ordinary session of Wednesday, January 12, 2022.- I certify it.

AIDA SOLEDAD GARCIA BERNI
Digitally signed by AIDA SOLEDAD GARCIA BERNI

Dr. Aída García Berni
**GENERAL SECRETARY**

CORTE CONSTITUCIONAL DEL ECUADOR

**JUDGMENT No. 45-15-IN/22 and joinder**

**VOTE SAVED**

**Constitutional Judges Carmen Corral Ponce and Enrique Herrería Bonnet**

1. With the customary respect for the arguments presented by the judge and the magistrates who voted in favor of Judgment No. 45-15-IN/22 and accumulated, within the public actions of unconstitutionality filed against the Organic Law of Water Resources, Uses and Development of Water ("**LORHUAA**") and its Regulations; we allow ourselves to disagree with the majority vote and for this purpose we formulate the following reasoning:

2. As a first point, it is necessary to specify that we do not agree with the analysis made in the dissenting judgment, so we have considered it pertinent to develop an argumentation in which the legal problems exposed in the claims will be addressed; so that, as in the majority vote (with respect to the formal constitutional control) our considerations will be presented in a general manner for both joined cases, making some clarifications in relation to case No. 45-15-IN, since it is the one that allows us to express some additional criteria that we consider relevant to the case at hand.

3. In this regard, the following legal problems are formulated:

    **a)** Does the Organic Law on Water Resources, Uses and Development of Water become unconstitutional due to its form?
    **b)** Are the Regulations to the Organic Law on Water Resources, Uses and Development of Water unconstitutional as a matter of form?

**Resolution of the first legal problem: Does the Organic Law on Water Resources, Uses and Development of Water become unconstitutional due to its form?**

4. Article 114 of the Organic Law of Jurisdictional Guarantees and Constitutional Control ("**LOGJCC**") states that for the formal control of constitutionality of legal provisions of parliamentary origin, the principles and rules set forth in the Constitution of the Republic ("**CRE**") and the law that regulates the Legislative Function ("**LOFL**") must be taken into account, as well as compliance with the principles of publicity and unity of subject matter.

5. From this legal precept it is clear that the constitutional review on procedural grounds is limited to the confrontation of two possible defects, namely: **i)** the non-observance of the provisions of the CRE and the LOFL, with respect to the process of formation of the norm; and, **ii)** the verification that the challenged norm has guaranteed the principles of publicity and unity of subject matter.



www.corteconstitucional.gob.ec
**Quito:** José Tamayo E10-25 and Lizardo García. **Tel.** (593-2) 394-1800
**Guayaquil:** Pichincha St. and 9 de Octubre Ave. Banco Pichincha **Building,** 6th floor.
email: comunicacion@cce.gob.ec

6. In the *instant case*, it is clear that the charges brought by the plaintiffs are aimed at attacking the first of the premises referred to in the paragraph *above*, specifically, the non-observance of constitutional provisions relating to the process of legislative production of the LORHUAA. In that sense, they allege the erroneous application of the standards of pre-legislative consultation, enshrined in Article 57 numeral 17 of the CRE, which provides:

> "*Art. 57.- The following collective rights shall be recognized and guaranteed to the indigenous communes, communities, peoples and nationalities, in accordance with the Constitution and the covenants, conventions, declarations and other international human rights instruments:*
>
> (...) *17. To be consulted prior to the adoption of a legislative measure that may affect any of their collective rights*".

7. Therefore, it is up to the Constitutional Court to verify that in the pre-legislative consultation procedure, the indigenous communes, communities, peoples and nationalities have been guaranteed the full exercise of their right to be consulted with respect to any legislative measure that could affect their collective rights. For such purposes, it will be necessary to emphasize that this jurisdictional work is not limited only to evidence that a formal consultation process has been complied with, but that such participation mechanism is in accordance with the purposes pursued by this constitutional figure.

8. Therefore, it should be emphasized that the aspects related to pre-legislative consultation involve procedural issues (understood as the set of actions aimed at promoting and ensuring the participation of communes, communities, indigenous peoples and nationalities in the process of creating a law that could affect their collective rights), the breach or omission of which affects the process of enactment of the law; For these reasons, its constitutional control should not be reduced to a simple and plain verification of purely formal requirements, but on the contrary, it obliges a substantial study of the forms used in the process of construction of the norm.

9. In the case at hand, the formal unconstitutionality of the LORHUAA is accused, under the argument that there was no comprehensive consultation process of the normative text; that is to say, that each and every article of the bill was not consulted, which makes it imperative to understand the scope of the legal institution of pre-legislative consultation.

10. Article 57.17 of the CRE clearly states that pre-legislative consultation (hereinafter "consultation") must be carried out **prior** to the adoption of a **legislative measure** that may **affect collective rights**, so that its scope is strictly limited to the possible impact on the rights of indigenous communities, communities, peoples and nationalities (hereinafter "indigenous communities").

events in which it is noted that certain **normative statements** could undermine, harm, alter, encumber or negatively influence the rights of indigenous communities (but not the entire articles of a bill, since there may be legal provisions that are not at all related to the spectrum of protection or general interest of such groups holding collective rights, so it would be fruitless to consult them about it).

**11.** In this sense, it is important to specify that the purpose of the LORHUAA is to "*guarantee the human right to water as well as to regulate and control the authorization, management, preservation, conservation, restoration, use and exploitation of water resources, the integral management and its recovery, in its different phases, forms and physical states, in order to guarantee the sumak kawsay or good living and the rights of nature established in the* Constitution"[1] . Therefore, its scope of application is very broad[2] , being aimed at regulating a series of factual, legal, administrative and organizational situations that are typical of a general legislative framework[3] and on which the rights of the indigenous communities recognized in Article 57 of the CRE do not materialize[4] .

---

[1] Article 3 of the Organic Law on Water Resources, Uses and Development of Water.

[2] Ibid. Article 2: "*The present Organic Law shall govern throughout the national territory, being subject to its norms the persons, nationals or foreigners who are in it*".

[3] Verbigracia: determination of the types of hydraulic works or infrastructure (art. 11); creation and conformation of the Water Regulation and Control Agency (arts. 17, 21, 22 and 23); water diversions (art. 31); modalities of productive use (art. 95); grounds for suspension or reversion of permits (art. 128); construction of infrastructure for the productive use of water (art. 132); tariffs for basic public services (art. 139); coercive jurisdiction (art. 147); classification of administrative infractions (art. 151); determination of fines (art. 162), etc.

[4] Constitution of the Republic of Ecuador: "*Art. 57.- The following collective rights shall be recognized and guaranteed to the indigenous communes, communities, peoples and nationalities, in accordance with the Constitution and the covenants, conventions, declarations and other international human rights instruments: 1. To freely maintain, develop and strengthen their identity, sense of belonging, ancestral traditions and forms of social organization. 2. Not to be subjected to racism and any form of discrimination based on their origin, ethnic or cultural identity. 3. Recognition, reparation and redress for collectivities affected by racism, xenophobia and other related forms of intolerance and discrimination. 4. To conserve the imprescriptible property of their community lands, which shall be inalienable, unseizable and indivisible. These lands shall be exempt from the payment of fees and taxes. 5. Maintain possession of the ancestral lands and territories and obtain their free adjudication. 6. To participate in the use, usufruct, administration and conservation of the renewable natural resources found in their lands. 7. Free, prior and informed consultation, within a reasonable period of time, on plans and programs for prospecting, exploitation and commercialization of non-renewable resources found on their lands that may affect them environmentally or culturally; to participate in the benefits of such projects and to receive compensation for the social, cultural and environmental damage they cause them. The consultation to be carried out by the competent authorities shall be mandatory and timely. If the consent of the consulted community is not obtained, they shall proceed in accordance with the Constitution and the law.*

*8. Conserve and promote their biodiversity and natural environment management practices. The State shall establish and implement programs, with the participation of the community, to ensure the conservation and sustainable use of biodiversity. 9. Conserve and develop their own forms of coexistence and social organization, and of generation and exercise of authority, in their legally recognized territories and community lands of ancestral possession. 10. Create, develop, apply and practice their own or customary law, which may not violate constitutional rights, particularly those of women, children and adolescents. 11. Not to be displaced from their ancestral lands. 12. To maintain, protect and develop their collective knowledge; their ancestral sciences, technologies and knowledge; the*

**12.** From what is outlined in footnote No. 3, it can be seen that the challenged norm regulates aspects of diverse nature and not only those related to the exercise of the collective rights of the indigenous communities, therefore, it is inappropriate to demand as a rigorous parameter of formal control that the entire bill has been submitted to the pre-legislative consultation; To hold otherwise would mean to generate a sort of reduction of the exclusive competences of the National Assembly (the body responsible for planning, delimiting, implementing and processing the consultation) and a clear affectation to the principle of freedom of legislative configuration (since it would be obliging to generate debates outside the parliamentary bosom on the whole normative text and not specifically regarding the collective rights of the indigenous communities, conditioning the constitutional and legal power of the legislator to technically and legally design a law). Additionally, it should be noted that the plaintiffs do not identify in their complaint particular elements of the law that affect the rights of communities, peoples and nationalities and that have not been subject to pre-legislative consultation.

**13.** Now, without prejudice of having ruled out the unconstitutionality defect due to the alleged lack of submission to pre-legislative consultation of the entire LORHUAA project, it is deemed necessary to verify which were the substantive issues that were part of the pre-legislative consultation procedure, in order to observe if there was any deficiency or transcendental omission that could affect the purpose of the consultation. Thus, as can be seen in the final report of

---

*genetic resources containing biological diversity and agrobiodiversity; their medicines and traditional medicine practices, including the right to recover, promote and protect ritual and sacred sites, as well as plants, animals, minerals and ecosystems within their territories; and the knowledge of the resources and properties of fauna and flora. Any form of appropriation of their knowledge, innovations and practices is prohibited. 13. Maintain, recover, protect, develop and preserve their cultural and historical heritage as an indivisible part of Ecuador's heritage. The State shall provide the resources for this purpose. 14. To develop, strengthen and promote the intercultural bilingual education system, with quality criteria, from early stimulation to the higher level, in accordance with cultural diversity, for the care and preservation of identities in line with their teaching and learning methodologies. A dignified teaching career will be guaranteed. The administration of this system will be collective and participatory, with temporal and spatial alternation, based on community oversight and accountability. 15. Build and maintain organizations that represent them, within the framework of respect for pluralism and cultural, political and organizational diversity. The State shall recognize and promote all forms of expression and organization. 16. To participate through their representatives in the official bodies determined by law, in the definition of public policies that concern them, as well as in the design and decision of their priorities in the plans and projects of the State.*

*17. To be consulted prior to the adoption of any legislative measure that may affect any of their collective rights. 18. To maintain and develop contacts, relations and cooperation with other peoples, particularly those divided by international borders. 19. To promote the use of the garments, symbols and emblems that identify them. 20. The limitation of military activities in their territories, in accordance with the law. 21. That the dignity and diversity of their cultures, traditions, histories and aspirations be reflected in public education and the media; the creation of their own media in their own languages and access to others without discrimination.*

CORTE CONSTITUCIONAL DEL ECUADOR

results of the pre-legislative consultation of the LORHUAA project[5] , the substantive issues[6] were the following:

"***Ancestral traditions, ritual and sacred places.***

*The contents of the draft Law on Water Resources, Uses and Development of Water, included in this first topic consulted, had a broad consensus of the participants, as they refer to the human right to water (Art. 24 of the draft); to the conservation of water management practices, the spiritual relationship with water (Art. 43); to the protection of collective knowledge and ancestral knowledge (Art. 44); to cultural and sacred practices (Art. 88); and to the definition of public policies for the recovery and promotion of ancestral knowledge and scientific knowledge of the water cycle, together with the promotion and promotion of the water cycle (Art. 88). 44); to cultural and sacred practices (Art. 88) and to the definition of public policies for the recovery and promotion of ancestral knowledge and scientific knowledge of the water cycle, together with the promotion and development of a new water culture based on the multiplicity of values it has (Art. 170 c and l).*

*(...)* ***Management and ancestral management***

*The ancestral management and management of water and water resources by communities, peoples and nationalities, in accordance with the contents of the draft law under consultation, involves the different moments and aspects that integrate it: The protection, recovery and conservation of sources (Art. 17 of the bill); the guarantee of the different elements that make up the human right to water and the rights related to it (from Art. 23 to Art. 33); as well as the relationship with the right to participate in the use, usufruct and administration of water on their lands (Art. 40); state responsibilities for the enforcement of the human right to water (from Art. 56 to Art. 63); and water protection areas, including the protection and conservation of groundwater (Art. 112). The permanence and strengthening of community and self-managed forms of drinking water and irrigation services (Art. 38, literal b); the autonomous administration of these community systems for the provision of public services (Art. 40 and 38 literal b) of the project.*

*(...)* ***Use, usufruct and administration***

*The collective right to participate in the use, usufruct and administration of water and renewable resources found in their lands is a right to be part of such activities and dynamics (Art. 57 numeral 6 of the Constitution). In the context of pre-legislative consultation, this right is related to the general conditions and nature of the national water administration, which is why it is related to the prohibition of privatization of water management (Art. 6); the participatory formulation of public policies for the administration of water resources (Art. 8); the enforceability of the human right to water (Art. 26). It also specifies the conditions for water administration, such as: the guarantee for the ecological flow (Art. 67); the vital quantity with a minimum tariff (Art. 27); clear public competences to guarantee water for human consumption (Art. 8); and an order of water management (Art. 8).*

[5] Report on the final results of the pre-legislative consultation of the draft Organic Law on Water Resources, Uses and Development of Water of May 19, 2014. Pages 202 to 205 vta. of the constitutional file.

[6] It should be clarified that the articles cited correspond to the then draft law that was subject to the pre-legislative consultation procedure.

*of priorities for access to water for productive activities (Art. 93). Furthermore, in relation to the public irrigation service, this right of participation implies guarantees for the redistribution and reallocation of irrigation water to banish hoarding (Art. 137); the participatory management of community irrigation and the strengthening of irrigators' organizations (Arts. 176 and 178).*

***Local or customary law***

*The collective rights included in this topic establish the internal norms for the resolution of differences in relation to collective water rights (Art. 38 and Art. 42 of the project), develop aspects related to conflict resolution (Art. 150), mediation and arbitration (Art. 151), resolution of divergences in customary orders (Art. 152), controversy regime (Art. 179), recognition of collective and traditional forms of management (Art. 205), customary norms in relation to third parties (Art. 206 and 207).*

*These provisions consider the constitutional right to create, develop, apply and practice their own customary law; and the exercise of jurisdiction by the community authorities in internal affairs.*

***Participation and representation in government agencies***

*This substantive issue addresses the duties of the State in the integrated management of water resources at the level of river basins. The consultation promotes and strengthens the participation of organizations of users, consumers, public and community systems, and citizens' organizations regarding the destiny of water (Art. 12 (d) of the bill); establishes public policies in relation to water (Art. 58); likewise develops the obligations of co-responsibility - State and communities - (Art. 61); regulates the levels of participation in surveillance, monitoring, and citizen oversight of water systems (Art. 78); and, the joint conduction of water for irrigation (Art. 175).*

*This substantive issue also regulates: the integration and attributions of the intercultural and pluricultural water council (Sections 225 and 226); the watershed water resources council (Sections 231 and 233); the watershed organizations and the assembly of users of a watershed (Sections 233 and 234)*".

**14.** From the above, it can be deduced that within the framework of the pre-legislative consultation of the LORHUAA project, several aspects and normative sections were contemplated that denote that the legislative body complied with its constitutional obligation to consult on possible effects on collective rights, with a view to establishing, to the greatest extent possible, a genuine dialogue that would allow reaching achievable consensus among all the participants; Therefore, it is not evident that substantial aspects have been omitted that should have been an integral part of the thematic axis that would be the subject of consultation and approval of the indigenous communities.

**15.** Another allegation regarding the alleged unconstitutionality is aimed at questioning that the consultation was not culturally adequate, since the consultation mechanism was not agreed upon with CONAIE, ECUARUNARI, CONFENAIE and CONAICE. In order to analyze

CORTE CONSTITUCIONAL DEL ECUADOR

This charge must be based on the delimitation of the legal framework under which the pre-legislative consultation procedure of the LORHUAA was carried out; thus we have that it would have been carried out in accordance with Constitutional Court Ruling No. 001-10-SIN- CC of March 18, 2010 and with the provisions of the Instructions for the Implementation of the Pre-legislative Consultation of the National Assembly ("**Assembly Instructions**") issued in Resolution of the Legislative Administration Council of June 13, 2012[7] , whose sole transitory provision[8] , in fact, expressly refers to the processing of the *"Organic Law on Water Resources, Use and Development of Water, which is in second debate*"; being said instructions applicable at the time of the issuance of this law[9] , for which reason it would be unheard of for an omission or constitutional breach to be imputed on the part of the organic legislator, when it has faithfully followed the procedure that the same jurisprudence of this Court has defined as the appropriate one, in order not to violate the rights of the indigenous communities.

**16.** Both the Instructions of the Assembly and Ruling No. 001-10-SIN-CC, determined that the pre-legislative consultation procedure must be developed in four phases: **a)** preparation phase; **b)** public call phase; **c)** implementation phase; and, **d)** phase of analysis of results and closing of the consultation. Each of these phases contemplates the mechanisms through which the pre-legislative consultation must be implemented, being in principle a power of the consulting body (National Assembly) to define through an administrative act the agenda of the consultation with the identification of the substantive issues to be consulted, the consultation procedure, the consultation times and the procedure for dialogue and decision making[10] .

**17.** In other words, in this first phase, also known as preparatory, it is the exclusive responsibility of the respective permanent or occasional specialized commission of the National Assembly to define in a reasoned manner (within the following five days), the following

[7] Published in Official Gazette No. 733 of June 27, 2012.
[8] In the sole transitory provision of the Instructions for the Application of the Pre-legislative Consultation of the National Assembly (replaced by resolution of July 17, 2012), it was provided that: "*The processing of the draft Law on Cultures that has a report for second debate and the draft Organic Law on Water Resources, Use and Development of Water, which is in second debate and is pending a vote, shall be suspended until the corresponding pre-legislative consultation is carried out, so that the Permanent or Occasional Specialized Commission re-drafts the report for second debate and complies with Article 20 of these instructions*."
[9] Subsequently, in Constitutional Court Ruling No. 38-13-IS/19 of December 13, 2019, it was declared that the National Assembly failed to comply with Ruling No. 001-10-SIN-CC of March 18, 2010, regarding the instrument for regulating the pre-legislative consultation (determining that it must be contemplated in a legal norm); Without having declared unconstitutional the Instructions for the Application of the Pre-legislative Consultation, granting the Legislative the maximum term of one year for it to issue the law that regulates the pre-legislative consultation; noting the issuance of an amendment to the Organic Law of the Legislative Function in this regard, which incorporates Chapter XI.I "Pre-legislative Consultation", articles 109.1. to 109.18, being published in the Supplement to the Official Gazette No. 326 of November 10, 2020 and that according to the final provision "shall enter into force in the following legislature or legislative period, except for what is expressly stated in the transitory provisions, which shall enter into force once the law is published in the Official Gazette", therefore, the indicated chapter on pre-legislative consultation is in force since May 14, 2021.
[10] Constitutional Court of Ecuador, Judgment No. 001-10-SIN-CC of March 18, 2010, p. 41.

days to the decision of the Plenary of the National Assembly to convene the pre-legislative consultation) on the substantive issues to be submitted to the consultation mechanism, which shall be approved by the Legislative Administration Council, in order to proceed with the immediate convening of the pre-legislative consultation[11] . From the review of the Instructions of the Assembly and Ruling No. 001-10-SIN-CC, it is not determined that the intervention of representative structures of the different communes, communities, indigenous peoples and nationalities has been contemplated as mandatory during this procedural stage.

**18.** However, the fact that it is not a legal obligation to officially summon the national representatives of the indigenous communities during this stage of preparation of the pre-legislative consultation (which is considered desirable), does not constitute an obstacle for not allowing their voluntary intervention; On the contrary, as stated in memorandum No. SAN-2012-1525 of July 4, 2012, signed by the then Vice President of the Specialized Commission on Food Sovereignty and Development of the Agricultural and Fishing Sector, the substantive issues for the pre-legislative consultation would have been approved with the participation of several organizations representing indigenous, peasant, Afro-Ecuadorian and Montubian communities. In addition, it is worth noting that during the subsequent phases of the pre-legislative consultation procedure (registration and implementation)[12] , the active participation of the Confederation of Indigenous Nationalities of Ecuador is observed; for which reason, this Court considers that the charge of lack of consensus in the implementation of the consultation mechanisms lacks factual and legal support.

**19.** Therefore, it is concluded that the LORHUAA does not suffer from unconstitutional defects due to the alleged absence of consensus in the mechanisms of implementation and realization of an integral consultation regarding those normative sections that are not directly related to the exercise of the rights of the indigenous communities; in view of the fact that the object of the pre-legislative consultation is strictly limited to the discussion of possible effects on collective rights and not for matters reserved to the field of general legislative production.

**20.** On this point, it should be clarified that it is not the power of this Agency to reproach the content of the pre-legislative consultation, nor to evaluate its results; however, this does not prevent it from pronouncing on the possible disregard or violation of formal and procedural rules implied by the

[11] Article 7 of the Instructions for the Application of the Pre-legislative Consultation of the National Assembly.

[12] Report on the final results of the pre-legislative consultation of the draft Organic Law on Water Resources, Uses and Development of Water of May 19, 2014, table N° 3 (referring to the list of organizations participating in the national dialogue roundtable, constant at page 202 of the constitutional file); minutes of the national dialogue roundtable for the pre-legislative consultation of May 09, 2014 (pages 53 and 54 of the constitutional file).

transgression of the purposes for which the pre-legislative consultation to be approved should be instructed, which, as has been evidenced, in this case did not exist[13] .

**Resolution of the second legal problem Does the Regulation to the Organic Law on Water Resources, Uses and Development of Water become unconstitutional due to the form?**

**21.** Regarding the formal unconstitutionality of the Regulation to the LORHUAA, it is stated that this is a new regulatory measure, different in nature from that of the law, so it was necessary to carry out another pre-legislative consultation.

**22.** In relation to this argument, it is important to emphasize that the regulation is a normative act issued by the President of the Republic, whose purpose is to complement the content of a law in order to facilitate its application or practical execution, provided that in the exercise of this power it does not alter or contravene its literal meaning[14] . Therefore, the Regulation to the LORHUAA does not entail -in its essence- a scope different from that allowed by the law itself, since by mandate of article 147 numeral 13 of the CRE, the President of the Republic is prohibited from innovating, expanding or restricting the content of a law by means of regulations.

**23.** In the case under study, it should be noted that, logically, the Regulation was preceded by the enactment of the LORHUAA, a norm that, as part of its creation process, has implemented the parliamentary procedure of pre-legislative consultation; In other words, the substantive issues that are complemented or developed in greater depth in the Regulation **have already been the subject of consultation, so** it would be unwise to implement a new pre-legislative consultation procedure[15] (with the consequent mobilization of public resources that this represents) to discuss the same issues that have already been the subject of consensus and processing by the indigenous communities and the National Assembly[16] .

---

[13] Organic Law of Jurisdictional Guarantees and Constitutional Control, Article 76.7: "*Instrumentality of the forms and procedures. - The disregard or violation of the formal and procedural rules in the normative production, only entails the declaration of unconstitutionality when it implies the transgression of the principles or substantial purposes for which the respective rule was instituted*".

[14] Article 147 numeral 13 of the Constitution of the Republic of Ecuador.

[15] This Agency, in paragraph 92 of majority judgment No. 20-12-IN of July 1, 2020, determined that pre-legislative consultation: "*is not limited to the adoption of measures issued by the legislative body but, in general, to regulatory and administrative measures"*; however, for this particular case where it has been noted that there was a pre-legislative consultation procedure "for substantive issues of the Law", it is considered that the requirement of a new pre-legislative consultation would mean a duplication of procedures.

[16] The national results of the pre-legislative consultation show the following results: **(a)** consensus 63%; **(b)** dissent 2%; **(c)** other alternative 7%; and, **(d)** no opinion 29% (there is a variation of 1%, corresponding to the figures quantified in the report of compilation of provincial results of the pre-legislative consultation to the draft Organic Law on Water Resources, Uses and Development of Water of April 19, 2013, signed by the president of the Permanent Specialized Commission on Food Sovereignty and Development of the Agricultural and Fishing Sector). Pages 160 to 168 of the constitutional file.

CORTE CONSTITUCIONAL DEL ECUADOR

**24.** In this context, it is necessary to reiterate that the purpose of the pre-legislative consultation is to guarantee the participation of the indigenous communities prior to the adoption of measures that could presumably affect collective rights; In this case, such measures were already consulted, debated and adopted by the National Assembly, therefore, this dissenting vote considers that the alleged unconstitutionality on the grounds of form does not apply, since, as previously mentioned, the Regulation responds to the normative principles of **subordination** (that is, that it derives from or is framed within a hierarchically superior norm) and **supraordination** (that is, that it applies or develops what the superior norm contemplates)[17] .

**Material control of case No. 45-15-IN, in order to clarify criteria on the sufficiency of the arguments required by the public action of constitutionality.**

**25.** Although the majority vote does not analyze the arguments on the merits of any of the claims subject to constitutional control, this dissenting vote finds that it is extremely useful to refer at least to case No. 45-15-IN in order to delimit some relevant criteria on the sufficiency of the arguments that must be observed at the time of proposing a public action of unconstitutionality.

**26.** Therefore, prior to the material control of the rules accused of being unconstitutional, it is considered appropriate to refer to the power of this Body to review the requirements of argumentative aptitude of the claim of public action of unconstitutionality during the substantiation phase; Thus, it is imperative to specify that although it is during the admissibility phase where compliance with the minimum requirements of the argumentative burden of the act of proposition is verified, such analysis corresponds to a preliminary and summary pronouncement of the Court of the Admission Chamber that does not compromise or impair the power of the Plenary of the Constitutional Court to analyze during the resolution stage on the possible argumentative deficiencies of the claim.

**27.** In this regard, the Colombian Constitutional Court has been reiterative in elucidating that although: "*the ideal procedural moment to rule on the non-existence of charges of unconstitutionality is the stage in which the admissibility of the claim is decided, as it is more in line with the guarantee of the expectation that the parties have of a constitutional right.*

[17] Abelardo Torré, "Introducción al Derecho", Chapter V "La teoría de la norma jurídica y los conceptos jurídicos fundamentales", Section two "Teoría de la norma jurídica", point "Clasificación de las normas jurídicas", Buenos Aires, Editorial Abeledo-Perrot, Fourteenth edition, 2003, p. 177-178 states: "(...) *14.- By their hierarchy they have been divided into fundamental (or primary) and derived (or secondary) ... the law of each state constitutes not an inorganic set of legal rules, but an ordered whole or system of rules, among which there are relations of coordination and subordination (or supraordination) ... a graded system of rules ... of this hierarchical order, each rule derives its validity from another or other hierarchically superior ones ... (in turn, that same rule is the source of validity of another or other hierarchically subordinate ones) ... Ex...A law will be valid if it is in accordance with the Constitution, etc. (...)15.-On this basis...1) fundamental (or primary or constitutional): they are those norms that in each legal system occupy the highest level ... 2) derived (or secondary, or common or ordinary): they are*

*the remaining norms of the legal system* (...)".

CORTE CONSTITUCIONAL DEL ECUADOR

*In order for the Court to receive a substantive ruling on the constitutionality of the provisions challenged by them,* ***this decision may also be adopted at the time of issuing a judgment, since it is at this procedural stage that the Court analyzes in greater detail and depth the accusations presented by the*** *citizens* ***in the unconstitutionality claims.*** *Moreover, on certain occasions it is impossible to establish the ineptitude of the charges within the proceedings in which the admissibility of the tutela action is decided,* ***and therefore, this decision must be made in the*** judgment"[18] (emphasis added).

**28.** The foregoing is consistent with the general principles and rules governing this method of abstract control, since the LOGJCC categorically prescribes that "[t]*he examination of constitutionality must be oriented to allow the permanence of the provisions in the legal system", with a declaration of unconstitutionality being the last resort to which this Court must resort , since "[t]he constitutionality of legal provisions is presumed" , and even "[e]ven "[t]he constitutionality of the legal provisions is presumed".* [19] and the declaration of unconstitutionality is the last resort to which this Court must resort[20] , since "[t]*he constitutionality of* legal *provisions is presumed*"[21] , and even "[i]*n case of doubt as to the constitutionality of a legal provision, it will be decided not to declare it* unconstitutional"[22] . Thus, the application of these principles and the requirement of a sufficient burden of argumentation are decisive at the time of deciding on the merits of the charges raised in the complaint.

**29.** In this regard, in order to resolve this material constitutionality review, the arguments of the complaint will be analyzed under the following problem:

**Does the proposed public action of unconstitutionality against the LORHUAA and its Regulations comply with the requirement of clear, certain, specific and pertinent arguments?**

**Regression of the right to water**

**30.** It is mainly argued that articles 1, 43, 45, 46, 47, 51, 52, 53, 54 and 55 of the Organic Law on Water Resources, Uses and Development of Water are unconstitutional because they generate a centralist and homogenizing model for the administration and management of the right to water; that the challenged norms limit access to water sources within indigenous territories; and that excessive requirements are generated for the constitution of water boards.

**31.** From the reading of the lawsuit, it can be observed that a kind of "block challenge" is made to several normative statements of the LORHUAA under the same assumption.

---

[18] Constitutional Court of Colombia, Judgment No. C-874/02 of October 15, 2020. Also, see the inhibitory rulings for manifest ineptitude of the claim due to the absence of clear, certain, specific, pertinent and sufficient arguments: N° C-382/12 of May 24, 2012; C-202/19 of May 15, 2019; C-037/20 February 05, 2020; and, C-044/21 of February 25, 2021.
[19] Organic Law of Jurisdictional Guarantees and Constitutional Control, art. 76.4.
[20] Ibid., art. 76.6.

CORTE CONSTITUCIONAL DEL ECUADOR

[21] Ibid., art. 76.2.
[22] Ibid., art. 76.3.



www.corteconstitucional.gob.ec
**Quito:** José Tamayo E10-25 and Lizardo García. **Tel.** (593-2) 394-1800
**Guayaquil:** Pichincha St. and 9 de Octubre Ave. Banco Pichincha **Building,** 6th floor.
email: comunicacion@cce.gob.ec

This represents an insurmountable problem of argumentative deficiency, given that in the model of abstract control of constitutionality it is precisely "*the arguments of the claim that must demonstrate such normative incompatibility*"[23] .

**32.** Thus, within the section under analysis, it is verified that the allegations of the plaintiffs do not meet the criteria of specificity, clarity and certainty, inasmuch as the allegations of the plaintiffs do not meet the criteria of specificity, clarity and certainty:
**i) they** are indeterminate since they do not focus on revealing how the content of a specific regulatory provision infringes or contravenes any constitutional provision, (specificity); **ii)** there is no specific argument to demonstrate the existence of any unconstitutional defect attributable to any of the articles being censured (clarity). On the contrary, the complaint contains several general, scattered and unconnected quotations on the right to water, without identifying in any of them the alleged regression of rights or normative incompatibility between the propositions of the LORHUAA and the Constitution; and, **iii)** what is expressed in the arguments of the complaint is not what is regulated by the norm, for example, the requirements for the constitution of the water boards are not defined in the law, its article 43 prescribes that this will be done through regulations by the water authority (lack of certainty).

**33.** By virtue of the foregoing, the Constitutional Court is prevented from ruling on the charges of unconstitutionality on the merits of the LORHUAA.

**Territory restriction**

**34.** It is alleged that Articles 98 of the LORHUAA and 72 of its Regulations are unconstitutional because they establish the possibility of establishing forced easements on water sources to make way for productive activities such as mining. It is also stated that these norms violate the inalienability of the indigenous territories and their natural resources "*including water, which also include the activities carried out by the communities themselves, which in addition to hunting, fishing and agriculture, are the rituals carried out by the grandparents of the sector to maintain their harmonious coexistence with Pachamama*", which would violate their right to "[m]*aintain, protect and develop collective knowledge; their ancestral sciences, technologies and knowledge; genetic resources containing biological diversity and agrobiodiversity; their medicines and traditional medicine practices, including the right to recover, promote and protect ritual and sacred places, as well as plants, animals, minerals and ecosystems within their territories; and the knowledge of the resources and properties of the fauna and* flora"[24] .

[23] Constitutional Court of Ecuador, Judgment No. 94-15-IN/21 of June 2, 2021, para. 25.
[24] Constitution of the Republic of Ecuador, article 57 numeral 12.

**35.** In the case at hand, it is verified that the contested norms essentially regulate the same legal premise, that is, the constitution of easements in water matters, and that, given the abstract characteristics of the law and the regulation, no detailed or casuistic distinctions are made as to the types of lands on which this type of permits may be authorized; However, in order to fully understand the context of the censured articles, it is necessary to resort to a systematic interpretation of said norms in relation to the rest of the provisions that make up the same body of law, in order to establish whether there is due correspondence and harmony in the legal text[25] , or if not, the article in question transgresses the collective rights of the indigenous communities, in relation to the development of their ancestral and/or cultural practices.

**36.** In this regard, it is pertinent to reproduce the following normative sections of the LORHUAA:

> *"Art. 71.- Collective rights over water. The communes, communities, indigenous peoples and nationalities, Afro-Ecuadorian and Montubio people from their own worldview, enjoy the following collective rights over water:*

a. *To conserve and protect the water that flows through their lands and territories where they live and develop their collective life;*

b. *Participate in the use, usufruct and community management of the water that flows through their lands and territories and is necessary for the development of their collective life;*

c. *Maintain and strengthen your spiritual relationship with water;*

d. ***Safeguard and disseminate their collective knowledge, sciences, technologies and ancestral knowledge about water****;*

e. ***To be consulted in a mandatory prior, free, informed and timely manner on any relevant regulatory decision or state authorization that may affect the management of water flowing through their lands and territories"*** (emphasis added).

> *"Art. 73.- Use, usufruct and community management of water. The communes, communities, peoples and nationalities have the right to participate in the communal use, usufruct and management of water flowing through their lands and territories as a means to strengthen their identity, culture, traditions and rights, in accordance with the legal system".*

> *"Article 92 - Cultural and sacred practices. The Autoridad Unica (sic) del Agua* ***shall guarantee the integrity and permanence of the places where communes, communities, peoples and nationalities traditionally practice water rites, cultural and sacred values****.*

[25] Organic Law of Jurisdictional Guarantees and Constitutional Control, Article 3.5. "*Legal norms must be interpreted based on the general context of the normative text, in order to achieve the proper coexistence, correspondence and harmony among all the provisions*".



www.corteconstitucional.gob.ec
**Quito:** José Tamayo E10-25 and Lizardo García. **Tel.** (593-2) 394-1800
**Guayaquil:** Pichincha St. and 9 de Octubre Ave. Banco Pichincha **Building,** 6th floor.
email: comunicacion@cce.gob.ec

*The Autoridad Unica (sic) del Agua together with the communes, communities, peoples and nationalities shall carry out and keep duly updated a participatory and comprehensive National Inventory of sacred and ritual water sites.*

***The administration and conservation of sacred sites in relation to water shall be carried out by the entities or organizations of peoples and nationalities in whose lands or territories they are located****, with the support of national programs and projects of public agencies and the Decentralized Autonomous Governments, in accordance with the Constitution and their own rights*" (emphasis added).

**37.** From what is transcribed *ut supra* it is evident that the constitution of easements is not an absolute attribution and that far from being arbitrary it finds its limits in the law itself, given that it would not be legal, nor technically plausible to grant or authorize any forced easement if this would put at risk the **permanence and integrity** of the places "*in which traditionally the communes, communities, peoples and nationalities practice rituals, cultural and sacred values of water".* It is important to emphasize that the administration and conservation of the sacred and ritual places associated with the use of water corresponds to the indigenous entities or organizations in whose territories they are located, so the prerogative of granting or not granting water easements in such geographic spaces (sacred or ritual places) is part of their competence.

**38.** On the other hand, it is stated that the articles in reference (para. 50 *above*) become unconstitutional due to the fact that the constitution of forced easements give way to the execution of productive activities such as mining, however, this argument alone does not objectively expose a problem of incompatibility between the challenged norms and the Constitution; even more so considering that Article 318 of the CRE establishes that: "*The State, through the single water authority, shall be directly responsible for the planning and management of water resources to be used for human consumption, irrigation that guarantees food sovereignty, ecological flow and* ***productive activities****, in this order of priority. State authorization shall be required for the* ***use of water for productive purposes by the*** *public, private and popular and solidarity economy sectors, in accordance with the law*" (emphasis added).

**39.** Based on the foregoing, it follows that the arguments of the plaintiff lack certainty, since the charges raised are not objective or in accordance with the scope of regulation of the general regime of water easements, since it is not legally possible to grant such authorizations to the detriment of the integral protection of places with ritual or sacred value for the indigenous communities, and therefore no substantive ruling is issued on the alleged material unconstitutionality.

**40.** As a corollary, it should be noted that in the event that any state authority, exceeding the scope of its powers, orders the establishment of forced easements in places of ancestral protection, it is appropriate to activate the legal remedy for the protection of rights, since it is precisely for this purpose that the CRE and LORHUAA have

These areas have been endowed with a special regulatory framework for protection.

**41.** The plaintiff contends that Articles 52 of the LORHUAA and 52 of the Regulations are contrary to Article 57.1 of the CRE[26] , because they "*establish a process of registration of the customary practices of indigenous peoples and nationalities, generating a discriminatory and homogenizing statement that violates our right to freely preserve our culture and ancestral traditions*".

**42.** In this regard, it should be pointed out that Article 52 of the Regulations to the LORHUAA, as of this date, has been amended, however, it is noted that the norm in reference (with its subsequent amendments) is materially reproduced in the same article, therefore, the examination of constitutionality must be carried out on said normative statement in order to avoid the ruling being inoffensive or innocuous. Having said this, the article in question is transcribed below:

> *"Article 52.- Proprietary or customary law. - (Amended by Art. 8 of Executive Order 740, R.O. 570, 21-VIII-2015). - In accordance with the provisions of Article 52 of the Law, the customary practices that are in application for the access, use and distribution of water by communes, communities, peoples, nationalities and collectives, constitute mandatory practice for its members.*
>
> *For the purpose of general knowledge of these* (sic) *customary practices, the Secretariat of Water will collect the corresponding information for its subsequent incorporation in the Public Water Registry. Said registry will be made for declaratory purposes only.*
>
> *In no case may such practices limit free access to water for consumption and domestic use under the terms established in these Regulations, nor may they oppose efficient water use or good environmental practices. The Hydrographic Demarcation Authority or the person in charge of the corresponding Citizen Service Center shall not register customary practices that oppose the provisions of this subsection.*"

**43.** Article 52 of the LORHUAA and Article 52 of the Regulations provide for a policy of registration of the customary practices of the indigenous communities, with a view to obtaining sufficient information to enable their subsequent incorporation in the Public Water Registry for declaratory purposes only. This being the context and the main reason for which the aforementioned norms are challenged, it is necessary to verify whether the arguments of the lawsuit are conducive to demonstrating a possible substantive defect or constitutional incompatibility.

**44.** In this regard, it should be noted that pages 16 and 17 of the complaint contain several references to international instruments for the protection of human rights, without there being any connection or common thread between the citations and the reasons for which it is considered that such legal provisions in any way contravene the

[26] Article 57.1 of the Constitution of the Republic of Ecuador: "To *freely maintain, develop and strengthen their identity, sense of belonging, ancestral traditions and forms of social organization*".

Supreme Charter.

**45.** The insufficiency of clear, certain, specific and pertinent arguments prevent this Constitutional Court from even inferring that the regulation of this registry impedes the development and strengthening of the cultural identity, sense of belonging, ancestral traditions and form of organization of the indigenous communities.
57.1 of the CRE, has its very special form of perfection or exercise, so the charge is dismissed, since there are not sufficient reasons to rebut the presumption of constitutionality of the rules in question[27] .

**46.** Despite the insufficiency of the arguments in the complaint, the undersigned judges consider it necessary to make some general reflections regarding the right to water within the framework of the collective rights of the indigenous communities. In the first place, it is necessary to specify that the right to water is guaranteed in Article 12 of the CRE, which provides that said resource is a fundamental and unrenounceable right, of public use, inalienable, imprescriptible, unseizable and essential for life. In relation to the above, this Court has stated that "*the content of the right to water includes the right of all persons to have access to this resource for its use in activities vital to the existence of human beings, such as food and* hygiene"[28] .

**47.** From the foregoing it can be inferred that water as a natural element is not susceptible to appropriation and that its access cannot be subject to a regime of absolute unavailability; on the contrary, the SRA establishes it as necessary for the development of other constitutional rights, such as life. In fact, its full access guarantees the exercise of several interdependent fundamental rights[29] , such as health, food, irrigation, nutrition, decent housing, etc.

**48.** Similarly, the right to water in indigenous communities is intimately connected to the right to the conservation and possession of their communal and ancestral lands[30] , for which reason it is a legal obligation of the State to conceive of the right to water from a holistic perspective that encompasses "[t]*his connection between the territory and the natural resources necessary for their physical and cultural survival* (...).) *From this analysis, it is understood that the natural resources found in the territories of indigenous and tribal peoples that are protected under the terms of Article 21* [of the American Convention on Human Rights] *are those natural resources that they have traditionally used and that are necessary for their own physical and cultural survival (...)*".

[27] Article 76.2 of the Organic Law on Jurisdictional Guarantees and Constitutional Control: "*Presumption of constitutionality of legal provisions. - The constitutionality of legal provisions is presumed*".
[28] Constitutional Court of Ecuador, Judgment No. 232-15-JP/21 of July 28, 2021, para. 36.
[29] Constitution of the Republic, Article 11.6 "*All principles and rights are inalienable, unrenounceable, indivisible, interdependent and of equal hierarchy*".
[30] This is related to the rights recognized in article 57, paragraphs 4 and 5.

*survival, development and continuity of their way of life*"[31] .

**49.** This ratifies the constitutional recognition of indigenous communities in the use, management and conservation of water sources that originate, flow or flow into their ancestral lands and territories in accordance with their traditions, knowledge, customs and their own rights.

**Restriction of the right to food sovereignty**

**50.** In relation to the present charge of unconstitutionality, it is verified that the same defects of argumentation outlined in the previous paragraphs are replicated, given that textual quotations are reproduced from Articles 281 and 13 of the Constitution; 11.1 of the International Protocol on Economic, Social and Cultural Rights; and General Comment No. 12 of the Committee on Economic, Social and Cultural Rights, to conclude that Articles 51, 52, 53, 54 and 55 of the LORHUAA are unconstitutional because: "*they disproportionately limit the free disposal of water resources in indigenous territories*".

**51.** On the foregoing, it remains to say that the plaintiffs have not proceeded in accordance with the provisions of Article 79.5 of the LOGJCC, in view of the fact that the complaint does not have an argumentative burden that would allow this Agency to carry out an abstract control of the constitutionality of the challenged articles, since: "[t]*he plaintiffs had the obligation to argue and demonstrate the unconstitutionality being challenged. The mere invocation of a constitutional rule or principle is not sufficient to constitutionalize an* argument"[32] ; therefore, it does not see that there are clear, certain, specific and pertinent charges of the material unconstitutionality that is argued.

**52.** Finally, it should be clarified that Articles 20, 47 and 51 of the Regulations to the LORHUAA are also challenged in the lawsuit, but no express reference has been made to them in its argumentative development; consequently, given that no specific arguments of unconstitutionality of such provisions have been presented, the principle of presumption of constitutionality of the regulation provided in Article 76 paragraph 2 of the LOGJCC must be applied, which obliges the plaintiff to present the necessary arguments to rebut such presumption[33] .

**53.** In merit of what has been stated in this dissenting opinion, the undersigned judges, administering constitutional justice and by mandate of the Constitution of the Republic of Ecuador, resolve:

1. Reject as inadmissible the public action of unconstitutionality **No. 45-15-IN/22 and accumulated.**

2. To order the case to be closed.

[31] Inter-American Court of Human Rights. Case of the Saramaka People v. Suriname, para. 122.
[32] Constitutional Court of Ecuador, Judgment No. 80-16-IN/21 of June 2, 2021, para. 15.
[33] Constitutional Court of Ecuador, Judgment No. 16-09-IN/21 of October 28, 2020 para. 51.

CORTE CONSTITUCIONAL DEL ECUADOR

**3.** Notify and publish.

CARMEN FAVIOLA CORRAL PONCE Digitally signed by CARMEN FAVIOLA CORRAL PONCE Date: 2022.01.28 12:18:40 -05'00'

PABLO ENRIQUE BLACKSMITH BONNET Digitally signed by PABLO ENRIQUE BLACKSMITH BONNET Date: 2022.01.28 10:00:05 -05'00'

Dr. Carmen Corral PonceDr. Enrique Herrería Bonnet

**CONSTITUTIONAL**

**JUDGECONSTITUTIONAL JUDGE**

**Reason:** I hereby state that the dissenting opinion of Constitutional Judges Carmen Corral Ponce and Enrique Herrería Bonnet, in case 45-15-IN, was filed in the General Secretariat, on January 26, 2022, by e-mail at 15:49; and, it has been processed together with the Judgment - I certify it.

AIDA SOLEDAD GARCIA BERNI Digitally signed by AIDA SOLEDAD GARCIA BERNI

Dr. Aída García Berni

**GENERAL SECRETARY**

CORTE CONSTITUCIONAL DEL ECUADOR

**Sentencia No. 45-15-IN/22**
**Jueza ponente:** Karla Andrade Quevedo

Quito, D.M., 12 de enero de 2022

**CASO No. 45-15-IN**

**EL PLENO DE LA CORTE CONSTITUCIONAL DEL ECUADOR, EN EJERCICIO DE SUS ATRIBUCIONES CONSTITUCIONALES Y LEGALES, EXPIDE LA SIGUIENTE**

**SENTENCIA**

**Tema**: La Corte Constitucional analiza la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua y su Reglamento. Luego del respectivo análisis constitucional por la forma, se concluye que la LORHUAA y su reglamento son inconstitucionales por la forma al contrariar el artículo 57 numeral 17 de la CRE.

## I. Antecedentes

### 1.1. Caso No. 45-15-IN

**1.** El 10 de junio de 2015, Jorge Herrera Morocho, por sus propios derechos y en calidad de presidente de la Confederación de Nacionalidades Indígenas del Ecuador –CONAIE presentó una acción pública de inconstitucionalidad en contra de la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua ("**LORHUUA**") y su Reglamento.

**2.** El 17 de septiembre de 2015, el Tribunal de la Sala de Admisión de la Corte Constitucional admitió a trámite la causa y dispuso correr traslado a la Presidencia de la República, a la Asamblea Nacional y a la Procuraduría General del Estado a fin de que intervengan defendiendo o impugnando la constitucionalidad de las normas impugnadas. Además, solicitó a la Asamblea Nacional remitir el expediente con los informes y demás documentos que dieron origen a la norma impugnada.

**3.** El 05 de febrero de 2019, se posesionaron ante la Asamblea Nacional del Ecuador los actuales jueces y juezas de la Corte Constitucional.

**4.** En sorteo de 19 de marzo de 2019, le correspondió la sustanciación de la presente causa a la jueza constitucional Carmen Corral Ponce, quien mediante providencia de 01 de septiembre de 2021 avocó conocimiento y requirió información a las entidades accionadas.

**5.** En sesión ordinaria de 13 de octubre de 2021, el Pleno de la Corte Constitucional conoció el proyecto de sentencia remitido por la jueza ponente. En virtud de que este no contó con los votos suficientes para su aprobación, se realizó un resorteo y la sustanciación de la causa recayó en la jueza constitucional Karla Andrade Quevedo,



Quito: José Tamayo E10-25 y Lizardo García. Tel.(593-2) 394-1800
www.corteconstitucional.gob.ec
Guayaquil: Calle Pichincha y Av. 9 de Octubre. Edif. Banco Pichincha 6to piso
email: comunicacion@cce.gob.ec

conforme manda el artículo 38 del Reglamento de Sustanciación de Procesos de Competencia de la Corte Constitucional[1].

**6.** El 25 de noviembre de 2021, la jueza constitucional Karla Andrade Quevedo avocó conocimiento de la causa y su acumulado detallado *infra* y realizó una audiencia pública el 03 de diciembre de 2021, a las 10h00.

**1.2. Caso No. 46-15-IN**

**7.** El 09 de junio de 2015, Carlos Pérez Guartambel, en calidad de presidente de la Confederación de Pueblos de la Nacionalidad Kichwa del Ecuador ("**ECUARUNARI**"); Lauro Sigcha Vele, en calidad de presidente de la Federación de Organizaciones Indígenas y Campesinas del Azuay; Tomás Morocho, en calidad de presidente de la *Tukuy Cañar Ayllukunapa Tantanakuy* **("TUCAYTA")**; Patricio Sagñay, en calidad de presidente de la UCIA; y, Virgilio Ramón Quezada, en calidad de presidente de la Unión de Sistemas Comunitarios de Agua de Girón ("**UNAGUA**") presentaron una acción pública de inconstitucionalidad del reglamento de la LORHUUA.

**8.** El 8 de diciembre de 2015, el Tribunal de Admisión de la Corte Constitucional del Ecuador solicitó a los accionantes que aclaren la calidad en la que comparecieron; por lo que, Carlos Pérez Guartambel presentó un escrito en el que señaló que es el procurador común de los accionantes y que comparece por sus propios derechos y en calidad de presidente de la ECUARUNARI.

**9.** El 15 de marzo de 2016, el Tribunal de Admisión de la Corte Constitucional del Ecuador admitió a trámite la demanda de la causa y dispuso correr traslado al Presidente de la República, a la Presidenta de la Asamblea Nacional y al Procurador General del Estado a fin de que intervengan defendiendo o impugnando la constitucionalidad de las normas impugnadas.

**10.** El 09 de julio de 2019, se sorteó la causa y su sustanciación correspondió al juez constitucional Enrique Herrería Bonnet.

**11.** El 24 de noviembre de 2021, el Pleno de la Corte Constitucional del Ecuador aprobó la acumulación de esta causa al caso No. 45-15-IN.

---

[1] Según el artículo 38 del Reglamento de Sustanciación de Procesos de Competencia de la Corte Constitucional, *"[…] cuando los votos a favor del proyecto no sean suficientes para su aprobación, el Pleno sorteará, en la misma sesión, por medio del sistema automatizado de la Corte Constitucional,* ***una nueva jueza o juez sustanciador entre aquellos que votaron en contra del proyecto****, para que presente un nuevo proyecto en el que se argumente la tesis de la mayoría, el cuál será sometido nuevamente a consideración del Pleno de la Corte Constitucional"* (énfasis añadido).

## II. Competencia

**12.** La Corte Constitucional del Ecuador es competente para conocer y resolver acciones públicas de inconstitucionalidad por el fondo y por la forma contra actos normativos de carácter general emitidos por órganos y autoridades del Estado, de conformidad con el numeral 2, artículo 436 de la Constitución de la República del Ecuador ("**CRE**"), en concordancia con los artículos 74 al 98 de la Ley Orgánica de Garantías Jurisdiccionales y Control Constitucional ("**LOGJCC**").

## III. Normas respecto de las que se demanda la inconstitucionalidad

**13.** Conforme se describió en los antecedentes procesales, los accionantes impugnan por la forma las siguientes normas:

**i.** Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua, publicada en el Registro Oficial Suplemento No. 305 de 06 de agosto de 2014.

**ii.** Reglamento a la LORHUAA expedido mediante Decreto Ejecutivo No. 650, publicado en el Registro Oficial Suplemento 483 de 20 de abril de 2015.

**14.** Por otra parte, por el fondo, impugnan las siguientes normas:

**iii.** Los artículos 1, 43, 45, 46, 47, 51, 52, 53, 54, 55 y 98 de la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua.

**iv.** Los artículos 6, 20, 47, 51, 52, 72 y disposición general única del Reglamento a la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua.

## IV. Pretensiones y fundamentos de las partes

### 4.1. Argumentos de los accionantes en contra de la LORHUUA

**15.** En su demanda, los accionantes manifiestan que la LORHUAAes inconstitucional por la forma. Así, describen que (i) el 23 de marzo de 2014, la presidenta de la Asamblea Nacional convocó a los representantes de las organizaciones indígenas, montubias y afroecuatorianas, a través de los diarios de mayor circulación del país a audiencias públicas provinciales como parte de la consulta prelegislativa sobre la LORHUAA y que (ii) entre el 5 de marzo y 1 de abril de 2014 las organizaciones habrían discutido temáticas referentes a la consulta en la Comisión de Soberanía Alimentaria.

**16.** Señalan que una garantía para la participación de los pueblos y comunidades indígenas en las decisiones que afecten sus derechos, y en particular su derecho a la propiedad comunal, es el reconocimiento de su derecho a la consulta. Con este marco, advierten que "[d]*ichos procesos deben respetar el sistema particular de consulta de cada pueblo o comunidad, para que pueda entenderse como un relacionamiento adecuado y efectivo con otras autoridades estatales, actores sociales o políticos y terceros interesados*".



Quito: José Tamayo E10-25 y Lizardo García. Tel.(593-2) 394-1800
www.corteconstitucional.gob.ec
Guayaquil: Calle Pichincha y Av. 9 de Octubre. Edif. Banco Pichincha 6to piso
email: comunicacion@cce.gob.ec

**17.** Enfatizan que el Estado es el obligado a garantizar el derecho de consulta y participación en todas las fases de construcción de un proyecto normativo que pueda afectar el territorio sobre el cual se asientan las nacionalidades indígenas. En este sentido, precisó que dichos procesos "*deben realizarse desde las primeras etapas de la elaboración o planificación de la medida propuesta, a fin de que los pueblos indígenas puedan verdaderamente participar e influir en el proceso de adopción de decisiones, de conformidad con los estándares internacionales pertinentes*".

**18.** En tal sentido, consideran que el proceso de consulta prelegislativa de la LORHUAA es inconstitucional, puesto que (i) no se efectuó una consulta integral del texto normativo "*a sabiendas de que el agua es un recurso natural que, prominentemente se encuentra en territorios indígenas*"; (ii) no fue realizada de buena fe, pues ya existían pronunciamientos previos de autoridades públicas, en donde se evidenciaba el carácter de mera formalidad que le dieron al proceso; y, (iii) no fue culturalmente adecuada, "*pues no se consensuó el mecanismo de consulta con la Confederación de Nacionalidades Indígenas del Ecuador, ni con sus 3 regionales, ECUARRUNARI de la sierra, CONFENIAE de la Amazonia y CONAICE de la Costa, autoridades y organizaciones representativas e históricas de los pueblos indígenas en el Ecuador. Por el contrario, el proceso de consulta únicamente fue consensuado al interior de la Asamblea Nacional sin participación externa*".

**19.** Por otra parte, establecen que las disposiciones normativas contenidas en los artículos 1, 43, 45, 46, 47, 51, 53, 54 y 55 establecen un modelo centralista y homogeneizador de la administración y gestión del derecho al agua en el Ecuador. Esto pues, previo a la promulgación de la ley "(...) *el derecho a la libre determinación reconocido en el artículo 57 numeral 1 de la constitución, regía en el manejo comunitario del agua. En ese sentido, las Juntas de agua, eran autónomas y se regían por su derecho y normas propias*". No obstante, las normas impugnadas tienen efectos regresivos pues "[a]*l haber gozado de un sistema autónomo de administración y gestión del agua, la nueva ley y el reglamento debían garantizar un desarrollo progresivo de ese derecho*".

**20.** Asimismo, en relación a los artículos 98 de la LORHUAA y 72 de su reglamento, establecen que la posibilidad de constituir servidumbres en territorios ancestrales vulneraría directamente la inalienabilidad de la que gozan los territorios indígenas y sus recursos naturales.

**21.** Finalmente, establecen que los artículos 51, 52, 53, 54 y 55 "*limitan desproporcionadamente la libre disposición del recurso hídrico en los territorios indígenas*" y que "*el Estado está promoviendo políticas centralistas, y monopolizantes del agua, y ha abierto la posibilidad de privatizar forzadamente las fuentes*".

### 4.2. Argumentos de los accionantes en contra del reglamento a la LORHUUA

**22.** Los accionantes establecen que el reglamento a la LORHUAA "*es una medida normativa nueva, de naturaleza diferente a la de la Ley, por lo que era necesario*

*realizar otra consulta prelegislativa. Esto no se realizó, por lo que la norma es inconstitucional por la forma*". En tal sentido, consideran que el reglamento a la LORHUAA es contrario al artículo 57 numeral 17 de la CRE, puesto que "*para la expedición de este reglamento que afecta nuestros derechos colectivos (...) jamás se nos consultó soslayando este derecho irrenunciable y contraviniendo expresamente lo dispuesto en el art. 57, no. 17 lo cual a más de todo lo manifestado vuelve inconstitucional en su integridad todo el contenido del reglamento*".

**23.** Asimismo, establecen que los artículos 6 y 44 del reglamento son incompatibles con el artículo 318 de la CRE puesto que "*las, empresas privadas (sic) entrar a suministrar el agua potable, alcantarillado, tratamiento de aguas residuales. Con ello ya no será solo INTERAGUAS en Guayaquil sino se abre las anchas puertas para la privatización del agua en el Ecuador asumen el trabajo Comunitario colectivamente, utilizando conocimiento é instituciones milenarias como la minka para suministrar el agua y en esta cosmovivencia haber podido alcanzar, a través del agua, satisfacer otras necesidades básicas inspirados en el allí sumak kawsay. Con este reglamento las organizaciones gestoras del agua comunitaria serán desmanteladas, aniquiladas, y usurpadas por el gran leviatán, el estado convertido en monstruo devorador de la gestión comunitaria del agua, para entregar a los gobiernos municipales y parroquiales y como estas, de seguro además la inmensa mayoría (sic), no cuentan con recursos técnicos ni financieros pasarán al control de la empresa privada donde el agua será un gran negocio empresarial*".

**24.** De igual manera, alegan que el artículo 39 del reglamento profundiza "*más la persecución a la gestión comunitaria del agua cuando el art. 39 de dicho cuerpo normativo prescribe un sin número de requisitos a las organizaciones comunitarias para poder administrar el agua en sus territorios*" y que el 47 "*ordena regular y controlar la administración del agua en las comunidades,* (sic) *nos preguntamos y donde queda la libre determinación de las comunidades: se sacrifica la autonomía* (...)".

**25.** Finalmente, aluden a que el artículo 47 dispone que si no cumplen con un plan de mejoras "e*n un plazo todo a discreción del Estado SENAGUA, viene la intervención del gobierno y estado; y suspender (sic) es decir descabeza al presidente y directivos de la junta de agua, luego modificaron los valores de las tarifas; luego viene la revocatoria de la autorización de uso y aprovechamiento* (...) *finalmente unilateralmente extinguen la personería jurídica*".

**4.3. Argumentos de la Asamblea Nacional del Ecuador**

**26.** El 30 de octubre de 2015, Mauro Andino, en calidad de procurador judicial de la ex presidenta de la Asamblea Nacional del Ecuador, contestó la demanda defendiendo la constitucionalidad de la norma impugnada.

**27.** Sobre la inconstitucionalidad por la forma aduce que *"en el presente caso el legitimado activo, conforme lo dispone el numeral quinto, letras a) y b) del artículo 79 de la Ley Orgánica de Garantías Jurisdiccionales y Control Constitucional - LOGJCC -, debió*

*sostener su demanda de manera fundamentada. Revisada la demanda no aparece que el impugnante motive de forma adecuada, con argumentos claros* (sic) *ciertos, específicos y pertinentes, las razones por las cuales considera que existe una incompatibilidad normativa".*

**28.** Realiza una explicación de que la Asamblea Nacional cumplió con las reglas establecidas en la Constitución de la República y, por lo tanto, no existe violación al procedimiento constitucional de aprobación de leyes. Adicionalmente, explica la cronología de la ley en cuestión, misma que detalla las diligencias realizadas dentro de la legislatura para socializar y publicitar el proyecto de ley.

**29.** Expresa que "*en cumplimiento de la sentencia No. 001-10-SIN-CC y de acuerdo con el procedimiento establecido por el Consejo de la Administración Legislativa, la Comisión Especializada Permanente de Soberanía Alimentaria y Desarrollo del Sector Agropecuario y Pesquero*" habría llevado a cabo la consulta prelegislativa garantizada en el artículo 57 numeral 17 de la Constitución de la República. Asimismo, resalta que en el proceso de consulta prelegislativa participaron 1697 organizaciones representativas de titulares de derechos colectivos y que se incorporaron los textos en los que hubo consensos y se debatieron aquellos sobre los que hubo disenso, lo que demuestra que el proceso fue democrático.

**30.** Sobre los argumentos de inconstitucionalidad por el fondo, expresa que la única finalidad de la ley en cuestión es garantizar la conservación, recuperación y manejo integral de los recursos hídricos, cuencas geográficas y caudales ecológicos asociados al ciclo ecológico y regular toda actividad que pueda afectar la calidad y cantidad del agua, y el equilibrio de los ecosistemas especialmente en las fuentes y zonas de recarga.

**31.** Agrega que no existe regresividad alguna y que, por el contrario, la ley que anteriormente regía "*era una ley arcaica, precaria donde los recursos hídricos estaban concentrados en manos de los agroindustriales y pocos comuneros*".

**32.** Resalta el accionado que la ley genera condiciones equitativas y justas para el uso del recurso vital, además se prohíbe toda forma de privatización del agua ya que su gestión será pública y comunitaria, "*no se reconocerá ninguna forma de apropiación o de posesión individual o colectiva, cualquiera sea su estado, de tal manera que las inequidades hacia los sectores populares y rurales desaparecen*".

### 4.4. Argumentos de la Presidencia de la República

**33.** El 28 de octubre de 2015, Alexis Mera Giler, entonces secretario jurídico de la Presidencia de la República del Ecuador, contestó la demanda negando la inconstitucionalidad del reglamento.

**34.** Expone que "*la CONAIE tuvo un rol protagónico en el proceso de discusión y socialización de la Ley* (…) *se convocaron a Audiencias Públicas Provinciales* (sic) *dentro procedimiento de consulta prelegislativa* (…) *en las que intervino la CONAIE*".

En ese sentido, señala que la Comisión Especializada Permanente de Soberanía Alimentaria y Desarrollo Agropecuario y Pesquero al momento de realizar la consulta prelegislativa *"recibió, por escrito y en audiencias públicas, una cantidad ingente de argumentos por parte de varios ciudadanos y organizaciones sociales titulares de derechos colectivos, entre ellos la CONAIE*".

**35.** Sobre la necesidad de que el reglamento de la LORHUAA haya sido sometido a consulta prelegislativa, manifiesta que el artículo 57 numeral 17 de la Constitución de la República prescribe que las comunidades, comunas, pueblos y nacionalidades indígenas tienen el derecho a ser consultados ante la adopción de medidas de carácter legislativo, las cuales deben entenderse como aquellas expedidas en el ámbito de sus competencias por la Asamblea Nacional, de manera tal que el Reglamento a la LORHUAA no adolece de vicios de forma.

**36.** Sostiene además que la Ley no "*genera excesivos requisitos para la constitución de juntas de agua potable*" ya que ello se regula reglamentariamente; que las servidumbres no privan la conservación del derecho de propiedad de los recursos naturales y que tal gravamen tampoco obstaculiza la conservación del derecho de propiedad del bien sobre la cual se impone, ni obstruye que las comunidades, comunas, pueblos y nacionalidades indígenas puedan continuar ejerciendo actividades propias de sus territorios, con las limitaciones impuestas por la Constitución y la ley; y, que los artículos 47, 51, 52 del Reglamento a la LORHUAA han sido reformados y que generan nuevas prescripciones que no ameritarían un control de constitucionalidad. En consecuencia, solicita que se rechace la demanda de inconstitucionalidad.

### 4.5. Argumentos de la Procuraduría General del Estado

**37.** El 30 de octubre de 2015, Marcos Arteaga Valenzuela, en ese entonces director nacional de patrocinio de la Procuraduría General del Estado presentó la respectiva contestación defendiendo la constitucionalidad del articulado impugnado.

**38.** En lo principal manifiesta que: *"El accionante afirma que las disposiciones legales acusadas de inconstitucionales por la forma* (…) *no reunió las condiciones de ser una consulta integral del texto normativo, de buena fe y culturalmente adecuada. No obstante, existe una confusión conceptual por parte de los legitimados activos, pues equiparan la consulta prelegislativa con la consulta previa* [más adelante alega] *que, el artículo del Constitución que supuestamente infringe la Ley de Recursos Hídricos, el artículo 57-12, no se relaciona con el derecho a la propiedad de los territorios indígenas, como equivocadamente afirma el legitimado activo* (…) *Adicionalmente, la sola cita incoherente y aislada de doctrina y jurisprudencia no es suficiente para demostrar violaciones de derechos constitucionales".*

**39.** De igual modo, indica que al contrastar las normas impugnadas con las disposiciones constitucionales alegadas como transgredidas, los argumentos de la demanda no demuestran cómo éstas violan la obligación contenida en el artículo 281.4 de la Constitución de la República, por lo que debe primar el principio "*in dubio pro*

*legislatore*". Finaliza, solicitando al Pleno de la Corte Constitucional que emita sentencia rechazando la acción pública de inconstitucionalidad.

## V. Análisis constitucional

### 5.1. Control constitucional por la forma

**40.** Los accionantes han establecido que la LORHUAA y su reglamento son inconstitucionales por la forma, por cuanto la consulta prelegislativa efectuada no cumple los estándares constitucionales y es contraria a su reconocimiento constitucional en el artículo 57 numeral 17 de la CRE que impone su realización previo a la aprobación de normas que afecten derechos colectivos.

**41.** De ahí que, aunque esta Corte ha reconocido que la consulta prelegislativa es un derecho reconocido en la Constitución, procederá a examinar el presente problema jurídico como un asunto de forma conforme ha sido alegado por los accionantes[2].

#### 5.1.1. Sobre la consulta prelegislativa en la LORHUAA

**42.** El artículo 57 numeral 17 de la Constitución reconoce el derecho a la consulta prelegislativa en los siguientes términos:

> "*Se reconoce y garantizará a las comunas, comunidades, pueblos y nacionalidades indígenas, de conformidad con la Constitución y con los pactos, convenios, declaraciones y demás instrumentos internacionales de derechos humanos, los siguientes derechos colectivos: (...) 17. Ser consultados antes de la adopción de una medida legislativa que pueda afectar cualquiera de sus derechos colectivos*"[3].

**43.** Así, del texto constitucional se desprende que la consulta prelegislativa se realiza obligatoriamente antes de la adopción de una medida normativa que pueda afectar a las comunas, comunidades, pueblos o nacionalidades indígenas en modos no percibidos por otros individuos de la sociedad, siendo un derecho colectivo de dichas comunidades[4].

**44.** En tal sentido, sobre la naturaleza de la consulta prelegislativa, la Corte Constitucional ha determinado que esta tiene una doble dimensión:

---

[2] Al respecto, la Corte Constitucional ha determinado que "*la falta de realización de consulta prelegislativa puede dar lugar a una inconstitucionalidad por la forma, en tanto constituye una omisión en el proceso legislativo; y a su vez a una inconstitucionalidad por el fondo, en tanto el contenido de las disposiciones de un acto normativo que han sido emitidas sin consulta vulnera el mencionado derecho constitucional*". Corte Constitucional. Sentencia No. 20-12-IN/20 de 01 de julio de 2020, párr. 99 y Corte Constitucional. Sentencia No. 69-16-IN/21 de 20 de octubre de 2021, párr. 51.

[3] La obligación de efectuar una consulta prelegislativa tiene como origen los siguientes instrumentos internacionales de derechos humanos: (**i**) Convenio 169 de la OIT; y (**ii**) Declaración de las Naciones Unidas sobre los Derechos de los Pueblos Indígenas ("**DNUDPI**") .

[4] Corte Constitucional del Ecuador. Sentencia No. 69-16-IN/21 de 20 de octubre de 2021, párr. 44; Corte Constitucional del Ecuador. Sentencia No. 20-12-IN/20, de 01 de julio de 2020, párr. 84.

**(i)** Por un lado, la consulta prelegislativa constituye un **requisito de forma** previo a la expedición de medidas adoptadas en ejercicio de cualquier poder normativo en cuanto constituye una fase previa a su aprobación.

**(ii)** Por otra parte, la consulta prelegislativa constituye un **derecho constitucional** reconocido por el artículo 57 numeral 17 de la CRE y en instrumentos internacionales como el artículo 6 numeral 1 del Convenio 169 de la OIT y el artículo 19 de la Declaración de las Naciones Unidas sobre los Derechos de los Pueblos Indígenas.

**45.** Asimismo, este Organismo Constitucional ha establecido que el derecho a la consulta prelegislativa es mucho más extenso que una simple participación en procesos de difusión o audiencias públicas, en cuanto este tipo de mecanismos no constituyen un proceso de consulta prelegislativa adecuada a pueblos indígenas, sino simples audiencias a las que pudieran acudir como cualquier otro ciudadano[5].

**46.** En la misma línea, tanto el Relator Especial de Naciones Unidas sobre la situación de los derechos humanos y las libertades fundamentales de los indígenas como los órganos de control normativo de la OIT, han resaltado que simples trámites de audiencia o de información no constituyen una adecuada consulta a la luz de los estándares internacionales. De hecho, los órganos de control normativo de la OIT expresamente han determinado que "*una reunión de mera información no se puede considerar de conformidad con lo dispuesto en el Convenio*", particularmente a la vista del establecimiento de un "*diálogo genuino entre ambas* (sic) *partas signadas por comunicación y entendimiento, mutuo respeto y buena fe, y con el deseo sincero de llegar a un acuerdo común*"[6].

**47.** En el caso concreto, de la revisión de la documentación que consta en el expediente se observa que la Asamblea Nacional del Ecuador realizó una consulta prelegislativa[7] en la que constan las siguientes actuaciones:

**48.** Previo a la consulta, la Comisión Especializada Permanente de Soberanía Alimentaria y Desarrollo del Sector Agropecuario y Pesquero de la Asamblea Nacional, definió los temas sustantivos a ser consultados durante la fase de preparación, mismos que fueron aprobados por el Consejo de Administración Legislativa el 31 de julio de 2012.

**49.** Así, la Asamblea Nacional delimitó los siguientes temas a consultar:

**1)** Tradiciones ancestrales, lugares rituales y sagrados (Artículos 24, 41, 43, 44, 88, 170 literales c) y l) del Proyecto de Ley de Recursos Hídricos).

---

[5] Corte Constitucional del Ecuador. Sentencia No. 3-15-IA/20 de 11 de noviembre de 2020, párrs. 107-108.
[6] Ibid.
[7] Informe final de resultados de la consulta prelegislativa del proyecto de Ley Orgánica de Recursos Hídricos, Uso y Aprovechamiento del Agua.

**2)** Gestión y manejo ancestral del agua (Artículos 17, 23 al 33, 35, 37, 38 lit. b), 40, 56 al 63, 66, 68, 69, 101, 112, 117, 159, 163 del Proyecto de Ley de Recursos Hídricos).
**3)** Uso, usufructo y administración (Artículos 6 y 8 inc. Primer; 26, 27, 67, 86, 93, 137, 176 y 178 del Proyecto de Ley de Recursos Hídricos).
**4)** Derecho propio o consuetudinario (Artículos 38, 42, 150, 151, 152, 179, 205, 206 y 207 del Proyecto de Ley de Recursos Hídricos).
**5)** Participación y representación en los organismos oficiales (Artículos 12 lit. d), 58, 61, 78, 175, 225, 226, 231, 233 y 234 del Proyecto de Ley de Recursos Hídricos).

**50.** Posteriormente, en la fase de convocatoria pública e inscripción, el 14 de septiembre de 2012, "*a través de los medios de comunicación*", la Presidencia de la Asamblea convocó a las comunas, comunidades, pueblos y nacionalidades "*a participar en la consulta e inscribirse*".

**51.** La consulta prelegislativa, en estricto sentido, "*se inició formalmente el 5 de marzo y concluyó el 1 de abril de 2013*". En tal sentido, la Asamblea Nacional entregó formularios y actas que debían ser llenados por las organizaciones correspondientes con posterioridad a "*la discusión interna en los diferentes niveles de organización (...) de acuerdo a sus procedimientos internos de deliberación y toma de decisiones*".

**52.** Posteriormente, la Comisión Especializada Permanente de Soberanía Alimentaria y Desarrollo del Sector Agropecuario y Pesquero de la Asamblea Nacional "*realizó la compilación de resultados provinciales; luego de lo cual la Presidencia de la Asamblea actual, el 20 de marzo de 2014, convocó a los representantes de las organizaciones de segundo grado de los titulares de derechos colectivos, (no más de 3 por cada entidad) a las audiencias públicas provinciales, con la finalidad de socializar los resultados obtenidos e identificar los consensos y disensos a ser propuestos como aporte provincial a la mesa de diálogo nacional*". Las audiencias públicas provinciales se realizaron desde el 26 de marzo al 15 de abril de 2014 y se llevó a cabo una mesa de diálogo nacional para discutir los resultados de la consulta prelegislativa el 9 de mayo de 2014.

**53.** Ahora bien, en virtud de que en el presente caso, previo a la expedición de la LORHUUA, se evidencia que efectivamente se llevó a cabo una consulta prelegislativa, corresponde verificar si la materialización de la consulta se ajustó a los parámetros mínimos establecidos por este Organismo y contenidos en instrumentos internacionales.

**La delimitación exclusiva por parte de la Asamblea Nacional de los temas a ser consultados:**

**54.** Los accionantes sostienen que la LORHUAA es inconstitucional, puesto que no existió una consulta integral del texto normativo "*a sabiendas de que el agua es un recurso natural que, prominentemente se encuentra en territorios indígenas*". De igual manera, mencionan que se debe garantizar la participación en todas las fases de construcción de un proyecto normativo que pueda afectar el territorio sobre el cual se asientan las

nacionalidades indígenas. En este sentido, precisaron que dichos procesos "*deben realizarse desde las primeras etapas de la elaboración o planificación de la medida propuesta, a fin de que los pueblos indígenas puedan verdaderamente participar e influir en el proceso de adopción de decisiones, de conformidad con los estándares internacionales pertinentes*".

**55.** Así, durante la audiencia pública, los accionantes establecieron que "*los estándares internacionales establecen que la consulta debe ser diseñada en consulta con los dirigentes legítimos de las comunidades (…) habría sido importante que se discuta precisamente con la dirigencia de la CONAIE o por lo menos de las 3 regionales indígenas del país o directamente con los representantes de los 15 pueblos y nacionalidades del país en donde se podía desarrollar precisamente si es que, por cuestiones operativas, era mejor discutir toda la ley o si se debía discutir por partes. Esta decisión fue totalmente arbitraria por parte del legislativo, quien decidió que existían solamente algunos temas que atentarían o pondrían en riesgo los derechos de los pueblos indígenas y solo les consultó sobre este punto*".

**56.** Al respecto, como ha quedado anotado, de la revisión del proceso de consulta prelegislativa se verifica que la delimitación de los temas a ser consultados -por la posible afectación de los derechos colectivos de las comunidades indígenas- fue realizado de forma exclusiva por la Asamblea Nacional a través de la Comisión Especializada Permanente de Soberanía Alimentaria y Desarrollo del Sector Agropecuario y Pesquero y el Consejo de Administración Legislativa, sin ningún tipo de participación por parte de las comunidades indígenas afectadas.

**57.** En decisiones anteriores, esta Corte Constitucional ha enfatizado en la importancia de las opiniones de los pueblos indígenas para efectos de determinar si una medida legislativa les afecta directamente:

> "*la Corte considera indispensable señalar que **para determinar si una medida legislativa o administrativa relacionada a los territorios de los pueblos indígenas debe ser consultada, es extremadamente relevante recurrir a la opinión de las personas indígenas que se encuentran involucradas***"[8].

**58.** Asimismo, el Mecanismo de Expertos sobre los Derechos de los Pueblos Indígenas del Consejo de Derechos Humanos de la Organización de las Naciones Unidas (ONU) ha establecido que, para efectos de determinar si una medida legislativa afecta a los pueblos indígenas, es primordial tomar en consideración su opinión:

> "*La opinión de los pueblos indígenas de que se trate acerca de las posibles consecuencias más amplias de una decisión constituye el punto de partida para evaluar si una medida legislativa o administrativa o un proyecto que se refiera a sus tierras o territorios los afecta. Debe caber a los pueblos indígenas una importante función en la tarea de establecer si la medida o proyecto les afecta y, en la afirmativa, hasta qué punto. Los*

[8] Corte Constitucional del Ecuador. Sentencia No. 3-15-IA/20, 11 de noviembre de 2020, párr. 102.

*pueblos indígenas pueden poner de manifiesto posibles perjuicios que no sean evidentes para el Estado*"[9].

**59.** De ahí que, a consideración de esta Corte, la opinión de las comunidades indígenas no es únicamente relevante al momento en que estas participan en la consulta prelegislativa, sino que su criterio debe ser tomado en consideración durante todas las etapas de la consulta prelegislativa, incluida su preparación[10]. En tal sentido, la declaración de las comunidades indígenas precisamente permite delimitar las medidas legislativas que, por su potencialidad de afectar sus derechos colectivos, deben ser consultadas.

**60.** De otro modo, la delimitación exclusiva por parte de la Asamblea Nacional de los temas y medidas legislativas que podrían repercutir en los derechos colectivos de las comunas, comunidades, pueblos y nacionalidades indígenas excluye a los afectados de la misma y es incompatible con el fundamento de la consulta, pues podría no abarcar otros posibles perjuicios o afectaciones que no pueden ser percibidos por el Estado y otros individuos de la sociedad ajenos a las comunidades.

**61.** Si bien la anterior conformación de este Organismo Constitucional en la sentencia No. 001-10-SIN-CC estableció que corresponde a la Asamblea Nacional determinar "*mediante acto administrativo, la agenda de consulta con identificación de los temas sustantivos a ser consultados*"[11], esto no implica que el órgano legislativo no deba garantizar la participación de los representantes de los pueblos y nacionalidades indígenas en la construcción de sus temarios. En tal sentido, a fin de garantizar su derecho a participar en los asuntos de interés público y a la consulta prelegislativa reconocidos en los artículos 61 numeral 2 y 57 numeral 17 de la CRE, la Asamblea Nacional debe tomar en consideración la opinión de los representantes de los pueblos y nacionalidades indígenas en la delimitación de los temas que por sus posibles afectaciones deben ser consultados.

---

[9] Consejo de Derechos Humanos, Mecanismo de Expertos sobre los Derechos de los Pueblos Indígenas (2018) Consentimiento libre, previo e informado: un enfoque basado en los derechos humanos, A/HRC/39/62 párr. 34.

[10] En relación al derecho a la consulta previa, libre e informada, la Corte IDH ha determinado que "*estos procesos de diálogo y búsqueda de acuerdos deben realizarse desde las primeras etapas de la elaboración o planificación de la medida propuesta, a fin de que los pueblos indígenas puedan verdaderamente participar e influir en el proceso de adopción de decisiones, de conformidad con los estándares internacionales pertinentes*". Corte IDH. Caso Pueblo Indígena Kichwa de Sarayaku vs. Ecuador. Fondo y Reparaciones, 2012, párr. 167.

[11] Corte Constitucional del Ecuador. Sentencia No. 001-10-SIN-CC, página 41. En la misma línea, el actual artículo 109.9 de la LOFL, incorporado mediante reforma de 10 de noviembre de 2020, determina que "*dentro del término de cinco días siguientes a la decisión del Pleno de la Asamblea Nacional sobre la procedencia de la consulta prelegislativa, la comisión especializada permanente u ocasional, responsable del tratamiento del proyecto de ley, entregará al Presidente o a la Presidenta de la Asamblea Nacional, los temas sustantivos, debidamente fundamentados, por ser sometidos al mecanismo de consulta prelegislativa. Estos temas serán aprobados por el Consejo de Administración Legislativa, a fin de proceder a la inmediata convocatoria a la consulta prelegislativa. Para la realización de la consulta prelegislativa, la comisión especializada permanente u ocasional y el Consejo Nacional Electoral utilizarán los formularios que serán aprobados por el Consejo de Administración Legislativa*".

**62.** Además, debe tomarse en consideración que en este caso, previo a la delimitación de los temas efectuada por la Asamblea Nacional (julio de 2012), la Corte IDH ya determinó "*los procesos de diálogo y búsqueda de acuerdos deben realizarse desde las primeras etapas de la elaboración o planificación de la medida propuesta, a fin de que los pueblos indígenas puedan verdaderamente participar e influir en el proceso de adopción de decisiones, de conformidad con los estándares internacionales pertinentes*"[12].

**63.** Como ha quedado anotado, la Comisión Especializada Permanente de Soberanía Alimentaria y Desarrollo del Sector Agropecuario y Pesquero de la Asamblea Nacional y el Consejo de Administración Legislativa delimitaron de forma exclusiva los temas de la consulta, sin ninguna participación de las comunidades indígenas. Más aun, de la revisión del informe final de resultados del proyecto de Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua, no se evidencia cuáles fueron los criterios utilizados por el órgano legislativo para la selección de los temas y artículos que iban a ser consultados por su potencialidad de afectar los derechos de los pueblos y nacionalidades indígenas.

**64.** En consecuencia, al no haberse acreditado ningún tipo de participación de los dirigentes de los pueblos indígenas en la demarcación efectuada por la Asamblea Nacional de los temas que debían ser consultados y al no haberse fundamentado la exclusión de ciertos temas de discusión, esta Corte considera que la aprobación de la LORHUAA es contraria a los estándares constitucionales antes mencionados.

**La participación en la consulta prelegislativa**

**65.** Los accionantes sostienen que la consulta no fue realizada de buena fe con la intención de arribar a acuerdos, no fue culturalmente adecuada puesto que no fue traducida integralmente y que existieron distintos problemas de participación por parte de las comunidades indígenas, pues aunque se inscribieron 1500 comunidades, al final únicamente se entregaron actas respecto de 900 comunidades.

**66.** Al respecto, cabe mencionar que conforme a la Corte IDH la consulta a pueblos indígenas se inserta como parte integrante del derecho de participación en los asuntos públicos, en relación con el artículo 23 de la CADH[13]. Por su parte, la Constitución reconoce en su artículo 95 de manera general el derecho de participación y ordena que las ciudadanas y ciudadanos, en forma individual y colectiva, participen de manera protagónica en la toma de decisiones, planificación y gestión de los asuntos públicos y en el control popular de las instituciones del Estado y la sociedad y de sus representantes, en un proceso permanente de construcción del poder ciudadano. La participación se

---

12 Corte IDH. Caso Pueblo Indígena Kichwa de Sarayaku Vs. Ecuador. Fondo y reparaciones. Sentencia de 27 de junio de 2012, párr. 167.

13 Conforme a la Corte IDH, la consulta "*forma parte del ejercicio de su derecho a participar en la adopción de decisiones en las cuestiones que afectan sus intereses, de conformidad con sus propios procedimientos e instituciones, en relación con el artículo 23 de la Convención Americana*". Corte IDH. Caso Pueblos Kaliña y Lokono vs. Surinam. 2015, párr. 203.



Quito: José Tamayo E10-25 y Lizardo García. Tel.(593-2) 394-1800
www.corteconstitucional.gob.ec Guayaquil: Calle Pichincha y Av. 9 de Octubre. Edif. Banco Pichincha 6to piso
email: comunicacion@cce.gob.ec

orientará por los principios de igualdad, autonomía, deliberación pública, respeto a la diferencia, control popular, solidaridad e interculturalidad. La participación[14] de la ciudadanía en todos los asuntos de interés público es un derecho que se ejercerá a través de los mecanismos de la democracia representativa, directa y comunitaria.

**67.** De ahí que en virtud de que la consulta prelegislativa además de constituir un derecho colectivo se relaciona con la participación en los asuntos públicos, el Estado debe procurar que esta alcance un alto grado de participación por parte de las comunas, comunidades, pueblos y nacionalidades indígenas a través de mecanismos interculturalmente adecuados que garanticen la participación de quienes pueden resultar afectados por la medida legislativa.

**68.** Así, la CIDH ha establecido que la consulta y su proceso de obtención del consentimiento exige "*como mínimo, que* ***todos los miembros de la comunidad sean plena y precisamente informados de la naturaleza y las consecuencias del proceso y cuenten con una oportunidad efectiva de participar*** *individual o colectivamente*"[15]. De igual manera, ha establecido que el requisito de participación de los pueblos indígenas y tribales "*se desconoce cuando hay miembros de tales pueblos que no han tenido la oportunidad de jugar un rol pleno o efectivo en la selección, autorización o instrucción de quienes actúan a nombre del pueblo frente a las autoridades; cuando las reclamaciones correspondientes son promovidas por una determinada banda, clan o segmento del pueblo correspondiente, sin mandato aparente de las demás bandas, clanes o segmentos del mismo; o cuando no se desarrollan consultas apropiadas entre los miembros de todo el pueblo al momento de adoptar decisiones sustanciales sobre dichos derechos o intereses, en particular cuando dichas decisiones conllevan la extinción de los derechos sobre los territorios ancestrales*"[16].

**69.** Es por ello que corresponde examinar si en la LORHUAAexistió un adecuado proceso de participación de las comunas, comunidades, pueblos y nacionalidades indígenas.

**70.** De la revisión del informe final de resultados se verifica que el 14 de septiembre de 2012, "*a través de los medios de comunicación*", la Presidencia de la Asamblea convocó a las "*comunas, comunidades, pueblos y nacionalidades indígenas, al pueblo*

---

[14] La Carta Democrática Interamericana establece que son "elementos esenciales de la democracia representativa "la participación de la ciudadanía en las decisiones relativas a su propio desarrollo es un derecho y una responsabilidad" y "es también una condición necesaria para el pleno y efectivo ejercicio de la democracia", por lo cual "la eliminación de toda forma de discriminación […] y de las diversas formas de intolerancia […] contribuyen al fortalecimiento de la democracia y la participación ciudadana". Por su parte, el Principio 22 de la Declaración de Río sobre el Medio Ambiente y Desarrollo, establece que las poblaciones indígenas y sus comunidades […] desempeñan un papel fundamental en la ordenación del medio ambiente y en el desarrollo debido a sus conocimientos y prácticas tradicionales. Los Estados deberían reconocer y apoyar debidamente su identidad, cultura e intereses y hacer posible su participación efectiva en el logro del desarrollo sustentable.

[15] CIDH, Informe No. 40/04, Caso 12.053, Comunidades Indígenas Mayas del Distrito de Toledo (Belice), 12 de octubre de 2004, párr. 142

[16] CIDH. (2009). Derechos de los pueblos indígenas y tribales sobre sus tierras ancestrales y recursos naturales: Normas y jurisprudencia del Sistema Interamericano de Derechos Humanos. párr. 286.

*afroecuatoriano y pueblo montubio y a las organizaciones de los titulares de derechos colectivos, vinculados a los temas sustantivos a ser consultados, a participar en la consulta e inscribirse cumpliendo los requisitos y en los plazos determinados*".

**71.** En este punto es importante mencionar que el llamado a través de los medios de comunicación, aun cuando puede ser eficiente, no es el único mecanismo para convocar a la ciudadanía, especialmente para el caso de pueblos y nacionalidades indígenas, afro ecuatorianas y montubias que no necesariamente tienen acceso a ellos o cuyo contenido no se transmite en su idioma. Es importante utilizar mecanismos con una visión intercultural que permitan llegar a todos los estratos y sectores de la sociedad. Así, el uso de medios comunitarios, invitaciones a través de organizaciones sociales y líderes comunitarios o convocatorias presenciales -en su respectivo idioma o con la traducción o interpretación que corresponda- constituyen medios que contribuyen a efectuar amplias convocatorias que permitan el acceso real de la población a la participación.

**72.** En todo caso, del análisis del expediente se evidencia que en esta fase se registraron "*1494 organizaciones de primer grado, 64 organizaciones de segundo grado; y, 12 organizaciones de tercer grado*", entre las cuales asistieron a las audiencias públicas provinciales realizadas en veintidós provincias "*ciento quince (115) organizaciones de segundo grado representativas de titulares de derechos colectivos, de las cauales setenta y cuatro (74) organizaciones estaban previamente inscritas y cuarentaiún (41) organizaciones que se registraron en el mismo acto de las audiencias*" y en la mesa de diálogo nacional participaron "*dieciocho (18) organizaciones nacionales de un total de veinte (20) inscritas, representativas de titulares de derechos colectivos, entre organizaciones de nacionalidades indígenas, pueblos montubios y afroecuatorianos*". Por lo que, la gran confluencia de organizaciones participantes, dan cuenta de que en la elaboración de la LORHUAA existió la participación de distintas organizaciones.

**73.** Ahora bien, llama la atención de esta Corte lo sostenido por los accionantes durante la audiencia de la presente causa respecto a que en el proceso de consulta prelegislativa participaron personas y asociaciones "*que nada tienen que ver con la organización de los pueblos indígenas, y claro esto sumaba numeros y luego la Asamblea Nacional presentó reportes en donde hay un altísimo número de consenso, pero cuando analizamos quiénes acudieron a estas reuniones eran personas de la más variada índole que de alguna* ***manera hacía que se perdiesen las voces de las personas que sí representaban a organizaciones de pueblos y nacionalidades indígenas***".

**74.** En tal sentido, de la revisión de los informes e información del proceso de consulta prelegislativa de la LORHUAA que ha sido presentada por la Asamblea Nacional efectivamente se desprende que en la recopilación de los resultados de consensos y disensos no existió una diferenciación sobre las organizaciones participantes que permita evidenciar y determinar las preocupaciones de los distintos pueblos y nacionalidades indígenas en torno a las disposiciones que afectan sus tradiciones ancestrales, lugares rituales y sagrados; gestión y manejo ancestral; uso, usufructo y administración del agua; derecho propio o consuetudinario; y, participación y

representación en los organismos oficiales, lo cual provoca que estas no hayan podido ser debidamente consideradas por parte del órgano legislativo[17].

**75.** Por lo anotado, para esta Magistratura Constitucional es fundamental que los órganos consultantes garanticen y se cercioren de la participación efectiva de los representantes legítimos de las comunidades, comunas, pueblos y nacionalidades, pues sin su participación la consulta carece de eficacia[18]. Así, es de importancia que el órgano consultante realice una diferenciación adecuada entre las representaciones de los pueblos y nacionalidades indígenas y otras personas y organizaciones que no son sujetos de consulta para garantizar que sus resultados de consensos y disensos sean fidedignos y recopilados de buena fe.

**76.** Al respecto, debe recordarse que, conforme a los estándares internacionales, el órgano que adopta la medida normativa que afecte los intereses de los pueblos indígenas tiene el deber de analizar debidamente sus preocupaciones y tener la flexibilidad suficiente para modificar el proyecto inicial sobre la base de los resultados de la consulta. En caso contrario, si el acomodo del proyecto no resulta posible "*por motivos objetivos, razonables y proporcionales a un interés legítimo en una sociedad democrática*"[19], el sujeto consultante debe exteriorizar y argumentar, de forma razonada, cuáles son dichos motivos.

**77.** De ahí que, a consideración de esta Corte, la falta de una recopilación adecuada y diferenciada de los resultados de la consulta imposibilita que el órgano legislativo pueda conocer las preocupaciones específicas de las comunidades indígenas y sobre la base de ellas modificar el proyecto normativo o adoptar decisiones razonadas sobre los motivos legítimos que imposibilitan incorporar sus resultados con posterioridad a la consulta.

**78.** Por otra parte, en cuanto a que la consulta no fue interculturalmente adecuada, esta Corte observa que conforme a la documentación enviada por la Asamblea Nacional "*la publicación de los temas a ser consultados se realizó también en los idiomas de relación intercultural*"[20]. No obstante, en virtud de que conforme se estableció en la sección anterior, la Asamblea Nacional realizó una delimitación exclusiva de los temas de consulta sin la participación de las comunidades y fueron estos los aspectos traducidos a los idiomas de relación intercultural, esta Corte considera que la misma no fue culturalmente adecuada.

---

[17] De hecho, por ejemplo, en un amicus curiae de 16 de diciembre de 2021 se recoge que "representantes indígenas cuestionaron a algunas organizaciones de no tener relación con la gestión comunitaria del agua".
[18] Al respecto, la sentencia No. 001-10-SIN-CC señaló que "el resultado de la consulta estará suscrito por los representantes legítimos de las entidades consultadas, sin desmedro de que se adjunten listados de participantes en el proceso de deliberación interna, de conformidad con sus costumbres, tradiciones y procedimientos propios".
[19] CIDH. (2009). Derechos de los pueblos indígenas y tribales sobre sus tierras ancestrales y recursos naturales: Normas y jurisprudencia del Sistema Interamericano de Derechos Humanos Ibíd. Párr. 325.
[20] Expediente constitucional, fj. 200.



Quito: José Tamayo E10-25 y Lizardo García. Tel.(593-2) 394-1800
www.corteconstitucional.gob.ec Guayaquil: Calle Pichincha y Av. 9 de Octubre. Edif. Banco Pichincha 6to piso
email: comunicacion@cce.gob.ec

**79.** Finalmente, los accionantes han alegado que la consulta prelegislativa fue efectuada de manera muy rápida y las audiencias provinciales fueron realizadas en las capitales de provincia, lo cual tuvo repercusiones en términos de participación, pues en ella participaban las personas que vivían en los cascos urbanos y que no pertenecían a las comunidades. En tal sentido, "*la convocatorio (sic) se efectuó a 1494 asociaciones de primer grado, 64 de segundo grado y 12 organizaciones nacionales;* ***de 6000 comunidades, se inscribieron 1500, de esta cantidad solo 930 lograron responder a la consulta en un plazo de veinte días que no respeta los procedimientos comunitarios para la toma de decisiones***".

**80.** Al respecto, es preciso mencionar que la sentencia No. 001-10-SIN-CC estableció un plazo de duración de veinte días para la etapa de consulta una vez cerradas las inscripciones. Así, la sentencia No. 001-10-SIN-CC estableció:

> "***En veinte días laborables, a partir de la fecha de cierre de las inscripciones, las oficinas de consulta receptarán los documentos de la consulta debidamente sellados. En estos, a más de la papeleta oficial de resultados, se podrá adjuntar el listado de participantes en los procesos de deliberación interna de las entidades consultadas, así como las respectivas actas de reuniones o asambleas comunitarias****. La discusión interna en los distintos niveles de organización de las comunas, comunidades, pueblos y nacionalidades que participen, se realizará en base a sus costumbres, tradiciones y procedimientos internos de deliberación y toma de decisiones, sin que ninguna instancia ajena a éstas intervenga en el proceso interno. No obstante, las entidades participantes de la consulta podrán recabar opiniones técnicas y especializadas, si así lo requieren*"[21].

**81.** Es por ello que, en el presente caso, se observa que el plazo de duración de la consulta fue realizado de conformidad a la sentencia No. 001-10-SIN-CC.

**82.** No obstante, más allá del cumplimiento formal de los plazos y el listado de participantes, esta Corte encuentra que no se cumple con los estándares constitucionales e internacionales sobre consulta prelegislativa al no existir una recopilación adecuada y diferenciada de los resultados de la consulta.

**83.** En consecuencia, de todo lo expuesto, esta Corte encuentra que la LORHUAA es inconstitucional por la forma pues la realización de la consulta prelegislativa no ha garantizado su finalidad de que se escuche la opinión de las comunas, comunidades, pueblos y nacionalidades indígenas, que estos participen en los asuntos públicos que les afectan y dado que tampoco fue culturalmente adecuada.[22] En virtud de ello, una vez verificada la inconstitucionalidad ya no corresponde entrar a analizar los cargos planteados por el fondo.

---

[21] Corte Constitucional del Ecuador. Sentencia No. 001-10-SIN-CC, página 42.

[22]. En tal sentido, el artículo 76 numeral 7 de la LOGJCC establece que "El desconocimiento o vulneración de las reglas formales y procedimentales en la producción normativa, únicamente acarrea la declaratoria de inconstitucionalidad cuando implica la transgresión de los principios o fines sustanciales para los cuales fue instituida la respectiva regla".

### 5.1.2. Sobre la consulta prelegislativa del reglamento a la LORHUUA

**84.** Los accionantes establecen que el reglamento a la LORHUAA es inconstitucional puesto que "*es una medida normativa nueva, de naturaleza diferente a la de la Ley, por lo que era necesario realizar otra consulta prelegislativa. Esto no se realizó, por lo que la norma es inconstitucional por la forma*".

**85.** Por su parte, la Presidencia de la República alegó que no correspondía efectuar una consulta prelegislativa en función de que el presidente tiene la atribución constitucional de reglamentar las leyes y que el alcance del artículo 57 numeral 17 de la CRE vincula únicamente a realizar la consulta respecto a las normas de carácter legislativo emitidos por la Asamblea Nacional.

**86.** Al respecto, en decisiones anteriores, esta Corte ya ha establecido que el artículo 57 numeral 17 de la CRE, en sintonía con los instrumentos internacionales de derechos humanos antes citados que forman parte del bloque de constitucionalidad, debe ser interpretado en el sentido más favorable para la plena vigencia de los derechos constitucionales y que, por lo tanto, este es aplicable a cualquier acto emitido en ejercicio del poder normativo que tenga la potencialidad de afectar a los pueblos y nacionalidades indígenas:

> "*dicho criterio referido en la sentencia No. 001-10-SINCC, contiene una restricción ilegítima de los derechos colectivos de las comunas, comunidades, pueblos y nacionalidades indígenas. En primer lugar, porque no contempla la interpretación del artículo 57 numeral 17 de la Constitución que resulta más favorable para la plena vigencia de derechos (...). Con respecto al primer punto,* ***si bien es posible entender al término "medidas legislativas" como medidas adoptadas exclusivamente por la Asamblea Nacional, como órgano connatural a la potestad legislativa, también es posible interpretarlo, de manera general, como medidas adoptadas en ejercicio de la potestad normativa, en tanto esta interpretación resulta más favorable para la plena vigencia de los derechos****. A juicio de esta Corte, es necesario reconocer que los órganos con potestad normativa –además de la Asamblea Nacional- podrían llegar a expedir medidas normativas que afecten o tengan un impacto en los derechos colectivos de los pueblos y comunidades referidas*" (énfasis añadido)[23].

**87.** Asimismo, junto al reconocimiento constitucional del derecho a la consulta prelegislativa, los instrumentos internacionales establecen que este debe ser realizado ante cualquier acto que sea susceptible de afectar directamente a los pueblos indígenas y contiene medidas normativas que inciden directamente en los derechos colectivos de las comunidades indígenas, con independencia de si se trata de un acto normativo de naturaleza legislativa o administrativa. En tal sentido, el artículo 6 numeral 1 del Convenio No. 169 de la OIT determina:

---

[23] Corte Constitucional del Ecuador. Sentencia No. 20-12-IN/20 de 01 de julio de 2020, párr. 87.



Quito: José Tamayo E10-25 y Lizardo García. Tel.(593-2) 394-1800
www.corteconstitucional.gob.ec Guayaquil: Calle Pichincha y Av. 9 de Octubre. Edif. Banco Pichincha 6to piso
email: comunicacion@cce.gob.ec

*"los gobiernos deberán consultar a los pueblos interesados, mediante procedimientos apropiados y en particular a través de sus instituciones representativas****, cada vez que se prevean medidas legislativas o administrativas susceptibles de afectarles directamente***" (énfasis añadido).

**88.** De igual manera, el artículo 19 de la Declaración de las Naciones Unidas sobre los Derechos de los Pueblos Indígenas establece:

"*[l]os Estados celebrarán consultas y cooperarán de buena fe con los pueblos indígenas interesados por medio de sus instituciones* ***representativas antes de adoptar y aplicar medidas legislativas o administrativas que los afecten****, a fin de obtener su consentimiento libre, previo e informado*".

**89.** De ahí que, en definitiva, la Asamblea Nacional no es el único órgano que tiene el deber de consultar a las comunas, comunidades, pueblos y nacionalidades indígenas sobre las distintas medidas normativas que tengan la potencialidad de afectar sus derechos, sino que este se extiende a cualquier órgano con potestad normativa como el presidente de la República siempre que la medida tenga la potencialidad de afectar a los pueblos y nacionalidades indígenas.

**90.** Así, a criterio de esta Corte, para efectos de garantizar el derecho a la consulta prelegislativa de las comunas, comunidades, pueblos y nacionalidades indígenas resulta indistinto si la norma a consultar constituye una expresión de la voluntad general (ley) o de la voluntad de un órgano administrativo (reglamento), pues lo determinante es si esta, más allá de su naturaleza, tiene la potencialidad de afectar los derechos colectivos de las comunidades indígenas. Por lo que, si el reglamento impugnado contiene medidas normativas que inciden directamente en los pueblos y nacionalidades indígenas correspondía su consulta.

**91.** En sus distintos escritos e intervenciones, la Presidencia de la República ha establecido que el reglamento a la LORHUAA se trata de un reglamento expedido conforme al artículo 147 numeral 13 de la CRE para regular la aplicación de una ley que ya ha sido consultada, por lo que no corresponde realizar una nueva consulta sobre estos asuntos. Sin embargo, precisamente porque los reglamentos subordinados -como el del presente caso- complementan y desarrollan de manera concreta y específica medidas normativas que podrían repercutir en las comunas, comunidades, pueblos y nacionalidades indígenas, es todavía más necesario que se tome en consideración su opinión previo a la expedición de la norma.

**92.** En tal sentido, para el trámite legislativo de la LORHUAA, la Asamblea Nacional determinó que, por ejemplo, las normas del proyecto de ley orientadas a la regulación de la gestión comunitaria del agua, el registro de las prácticas ancestrales y sobre las servidumbres eran temas que necesitaban ser consultados. Por su parte, el reglamento a la LORHUAA contiene disposiciones sobre los mismos temas de la LORHUUA, pero el contenido de estas normas en su concretización y desarrollo no ha sido consultada a los pueblos y nacionalidades indígenas. Así, por ejemplo, el artículo 54 de la LORHUAAque fue consultado reconoce la gestión comunitaria del agua, mientras que

el artículo 39 del reglamento que no ha sido materia de consulta determina los requisitos que debe contener la solicitud de autorización de prestación de servicio de agua para ser considerada.

**93.** En consecuencia, de la revisión integral del reglamento se desprende que este desarrolla y concreta disposiciones alusivas a los mismos temas que fueron consultados para la ley y que no ha existido ninguna consulta prelegislativa previo a su expedición, por lo que el reglamento a la LORHUAA es inconstitucional al contravenir el artículo 57 numeral 17 de la CRE y al artículo 6 numeral 1 del Convenio 169 de la OIT.

**5.2. Efectos de la sentencia**

**94.** En el presente caso, en virtud de la deficiente realización de la consulta prelegislativa en el caso de la LORHUAA y su falta de realización en el caso del reglamento LORHUUA, corresponde su declaratoria de inconstitucionalidad y el consecuente establecimiento de los efectos de la presente decisión.

**95.** En cuanto a los efectos en el tiempo, la presente decisión tendrá efectos hacia el futuro de conformidad al artículo 95 de la LOGJCC.

**96.** La regla general en materia de control constitucional es que la declaratoria de inconstitucionalidad tenga efectos inmediatos. Sin embargo, la LOGJCC permite que en determinados casos, la Corte Constitucional difiera los efectos de la declaratoria (*vacatio sententiae*) cuando la inconstitucionalidad sea susceptible de producir un vacío normativo que afecte la plena vigencia de los derechos o produzca graves daños.

**97.** En el presente caso, es claro que la inmediata inconstitucionalidad de toda la LORHUAA y su reglamento provocaría un gran vacío normativo sobre la regulación del agua en el Ecuador y las condiciones para su uso y aprovechamiento. Por lo que, en este caso, resulta imprescindible diferir los efectos de la presente sentencia para que la Asamblea Nacional y la presidencia de la República tengan el tiempo necesario para tramitar una nueva normativa en la que se realice una consulta prelegislativa adecuada en el que participen los pueblos indígenas desde las primeras etapas del proceso de consulta. Para ello, esta Corte determina que pese a la inconstitucionalidad formal de la LORHUAA y su reglamento, conforme al artículo 95 de la LOGJCC, estas permanecerán vigentes hasta la aprobación de una nueva ley de recursos hídricos. En consecuencia, en el plazo de 12 meses contados desde la publicación de esta sentencia en el Registro Oficial, el Presidente de la República elaborará y presentará un proyecto de ley que deberá ser enviado a la Asamblea Nacional para que esta lo tramite de conformidad con lo prescrito en la Constitución y respetando los criterios jurisprudenciales y estándares internacionales sobre la consulta prelegislativa.

**98.** Además, si el presidente de la República, en uso de sus facultades constitucionales, considera necesario expedir un nuevo reglamento a la nueva ley deberá obligatoriamente realizar una consulta prelegislativa conforme los criterios expuestos en esta decisión y en los instrumentos internacionales de derechos humanos aplicables.

**99.** Tomando en consideración que a través de la sentencia No. 69-16-IN/21 de 20 de octubre de 2021, se declaró inconstitucional el Instructivo para la conformación, legalización, y disolución de Juntas Administradoras de Agua Potable y Saneamiento Regional, Juntas de Segundo y Tercer Grado y de Juntas de Riego y/o Drenaje de Primero, Segundo y Tercer Grado 2016 y que se dispuso al Ministerio del Ambiente y Agua el plazo de un año para la elaboración de un nuevo instructivo, este Organismo estima imprescindible conminar que las autoridades obligadas en ambas causas (presidente de la República, Asamblea Nacional y Ministerio de Ambiente y Agua) agoten los diálogos necesarios tendientes a coordinar la elaboración de sus respectivas normativas con miras a lograr una producción normativa coherente y armónica.

**100.** Finalmente, mientras los cuerpos normativos subsistan su contenido debe interpretarse con estricto apego a los derechos constitucionales y de la manera más favorable a la plena vigencia de derechos. Esta Corte enfatiza que para la elaboración de las correspondientes consultas prelegislativas, los órganos con potestad normativa deben aplicar los estándares establecidos en la presente sentencia, en conjunto con lo que determina la Constitución, la ley y los instrumentos internacionales, a fin de no volver a incurrir en los vicios identificados en la presente decisión.

## VI. Decisión

En mérito de lo expuesto, administrando justicia constitucional y por mandato de la Constitución de la República del Ecuador, el Pleno de la Corte Constitucional resuelve:

1. Declarar la inconstitucionalidad por la forma de la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua y su Reglamento.

2. A fin de evitar un vacío normativo grave ambas normas permanecerán vigentes hasta la aprobación de una nueva ley de recursos hídricos. En consecuencia, en el plazo de 12 meses contados desde la publicación de esta sentencia en el Registro Oficial el Presidente de la República elaborará y presentará un proyecto de ley que deberá ser enviado a la Asamblea Nacional para que esta lo tramite de conformidad con lo prescrito en la Constitución y respetando los criterios jurisprudenciales y estándares internacionales sobre la consulta prelegislativa.

3. Notifíquese, publíquese y cúmplase.

LUIS HERNAN BOLIVAR SALGADO PESANTES

Firmado digitalmente por LUIS HERNAN BOLIVAR SALGADO PESANTES
Fecha: 2022.01.28 09:07:36 -05'00'

Dr. Hernán Salgado Pesantes
**PRESIDENTE**

**Razón:** Siento por tal, que la Sentencia que antecede fue aprobada por el Pleno de la Corte Constitucional con siete votos a favor, de los Jueces Constitucionales Karla Andrade Quevedo, Ramiro Avila Santamaría, Agustín Grijalva Jiménez, Alí Lozada Prado, Teresa Nuques Martínez, Daniela Salazar Marín y Hernán Salgado Pesantes; y, dos votos salvados de los Jueces Constitucionales Carmen Corral Ponce y Enrique Herrería Bonnet, en sesión ordinaria de miércoles 12 de enero de 2022.- Lo certifico.

AIDA SOLEDAD GARCIA BERNI

Firmado digitalmente por AIDA SOLEDAD GARCIA BERNI

Dra. Aída García Berni
**SECRETARIA GENERAL**

**SENTENCIA N° 45-15-IN/22 y acumulado**

**VOTO SALVADO**

**Jueces constitucionales Carmen Corral Ponce y Enrique Herrería Bonnet**

1. Con el acostumbrado respeto a los argumentos esgrimidos por la jueza ponente y los magistrados que votaron a favor de la sentencia N° 45-15-IN/22 y acumulado, dentro de las acciones públicas de inconstitucionalidad presentadas en contra de la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua ("**LORHUAA**") y su Reglamento; nos permitimos disentir con el voto de mayoría y para el efecto formulamos los siguientes razonamientos:

2. Como un primer punto, es menester precisar que no compartimos con el análisis realizado en el fallo objeto de disidencia, por lo que hemos estimado pertinente desarrollar una argumentación en la que se abordarán los problemas jurídicos expuestos en las demandas; de modo que, al igual que en el voto de mayoría (con respecto al control constitucional formal) nuestras consideraciones se esgrimirán de manera general para ambos casos acumulados, efectuando algunas puntualizaciones en relación al caso N° 45-15-IN, por ser el que en mayor medida permite expresar algunos criterios adicionales que consideramos relevantes para el caso en ciernes.

3. En ese sentido, se formulan los siguientes problemas jurídicos:

   **a)** ¿La Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua deviene en inconstitucional por la forma?
   **b)** ¿El Reglamento a la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua deviene en inconstitucional por la forma?

**Resolución del primer problema jurídico: ¿La Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua deviene en inconstitucional por la forma?**

4. El artículo 114 de la Ley Orgánica de Garantías Jurisdiccionales y Control Constitucional ("**LOGJCC**") expresa que para el control formal de constitucionalidad de las disposiciones legales de origen parlamentario se deberá tener en cuenta los principios y reglas previstos en la Constitución de la República ("**CRE**") y la ley que regula la Función Legislativa ("**LOFL**"), así como el cumplimiento de los principios de publicidad y unidad de materia.

5. De este precepto jurídico se extrae que el control constitucional por razones de forma se constriñe a la confrontación de dos posibles vicios, a saber: **i)** la inobservancia de las prescripciones de la CRE y la LOFL, en lo que respecta al proceso de formación de la norma; y, **ii)** la comprobación de que en la norma impugnada se hayan garantizado los principios de publicidad y unidad de materia.

CORTE CONSTITUCIONAL DEL ECUADOR

**6.** Dentro del caso *in examine*, se colige que los cargos formulados por los accionantes se dirigen a atacar el primero de los presupuestos referidos en el párrafo *ut supra*, concretamente, la inobservancia de disposiciones constitucionales relativas al proceso de producción legislativa de la LORHUAA. En ese sentido, alegan la errónea aplicación de los estándares de la consulta prelegislativa, consagrada en el artículo 57 numeral 17 de la CRE, que dispone:

> "*Art. 57.- Se reconoce y garantizará a las comunas, comunidades, pueblos y nacionalidades indígenas, de conformidad con la Constitución y con los pactos, convenios, declaraciones y demás instrumentos internacionales de derechos humanos, los siguientes derechos colectivos:*
>
> (…) *17. Ser consultados antes de la adopción de una medida legislativa que pueda afectar cualquiera de sus derechos colectivos*".

**7.** De manera que le corresponde a la Corte Constitucional contrastar que en el procedimiento de consulta prelegislativa se haya garantizado a las comunas, comunidades, pueblos y nacionalidades indígenas, el pleno ejercicio del derecho a ser consultados respecto de cualquier medida de carácter legislativa que pudiese afectar sus derechos colectivos. Para tales efectos será necesario enfatizar que esta labor jurisdiccional no se limita únicamente a evidenciar que se haya cumplido con un proceso formal de consulta, sino que dicho mecanismo de participación sea acorde a los fines que persigue esta figura constitucional.

**8.** Es por ello, que cabe resaltar que los aspectos relacionados a la consulta prelegislativa comportan cuestiones de procedimiento (entendido como el conjunto de acciones tendientes a promover y asegurar la participación de las comunas, comunidades, pueblos y nacionalidades indígenas en el trámite de creación de una ley que pudiese afectar sus derechos colectivos), cuyo quebrantamiento u omisión afectan al proceso de promulgación de la ley; sin que por tales razones, su control constitucional se deba reducir a una simple y llana verificación de requisitos puramente formales, sino que por el contrario obliga a un estudio sustancial de las formas empleadas en el proceso de construcción de la norma.

**9.** En la especie, se acusa la inconstitucionalidad formal de la LORHUAA, bajo el argumento de que no hubo un proceso de consulta integral del texto normativo; es decir, que no se habrían consultado todos y cada uno de los artículos del proyecto de ley, ante lo cual, resulta imperativo comprender el alcance de la institución jurídica de la consulta prelegislativa.

**10.** El artículo 57.17 de la CRE, señala con meridiana claridad que la consulta prelegislativa (en lo sucesivo "consulta") se debe realizar **antes** de la adopción de una **medida legislativa** que pueda **afectar derechos colectivos**; de forma que su alcance se encuentra taxativamente circunscrito a la posible afectación de derechos de comunas, comunidades, pueblos y nacionalidades indígenas (en adelante "comunidades indígenas"); de modo, que su conveniencia está orientada para aquellos

eventos en los que se advierta que determinados **enunciados normativos** pudiesen menoscabar, perjudicar, alterar, gravar o influir negativamente en los derechos de las comunidades indígenas (mas no a todo el articulado de un proyecto de ley, en razón de que pueden existir disposiciones jurídicas que no se relación en lo absoluto con el espectro de protección o interés general de dichos grupos titulares de derechos colectivos, por lo que resultaría infructuoso consultarles sobre aquello).

**11.** En ese orden de ideas resulta importante precisar que la LORHUAA tiene como objeto "*garantizar el derecho humano al agua así como regular y controlar la autorización, gestión, preservación, conservación, restauración, de los recursos hídricos, uso y aprovechamiento del agua, la gestión integral y su recuperación, en sus distintas fases, formas y estados físicos, a fin de garantizar el sumak kawsay o buen vivir y los derechos de la naturaleza establecidos en la Constitución*"[1]. Por ende, su ámbito de aplicación es muy amplio[2], encontrándose dirigido a normar una serie de situaciones fácticas, jurídicas, administrativas y organizacionales que son propias de un marco legislativo general[3] y sobre los cuales no se materializan los derechos de las comunidades indígenas reconocidos en el artículo 57 de la CRE[4].

---

[1] Artículo 3 de la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua.
[2] Ibid. Artículo 2: "*La presente Ley Orgánica regirá en todo el territorio nacional, quedando sujetos a sus normas las personas, nacionales o extranjeras que se encuentren en él*".
[3] Verbigracia: la determinación de las clases de obras o infraestructura hidráulica (art. 11); creación y conformación de la Agencia de Regulación y Control del Agua (arts. 17, 21, 22 y 23); trasvases (art. 31); modalidades de aprovechamiento productivo (art. 95); causales de suspensión o reversión de permisos (art. 128); construcción de infraestructura para el aprovechamiento productivo del agua (art. 132); tarifas por servicios públicos básicos (art. 139); jurisdicción coactiva (art. 147) tipificación de infracciones administrativas (art. 151); determinación de multas (art. 162), etc.
[4] Constitución de la República del Ecuador: "*Art. 57.- Se reconoce y garantizará a las comunas, comunidades, pueblos y nacionalidades indígenas, de conformidad con la Constitución y con los pactos, convenios, declaraciones y demás instrumentos internacionales de derechos humanos, los siguientes derechos colectivos: 1. Mantener, desarrollar y fortalecer libremente su identidad, sentido de pertenencia, tradiciones ancestrales y formas de organización social. 2. No ser objeto de racismo y de ninguna forma de discriminación fundada en su origen, identidad étnica o cultural. 3. El reconocimiento, reparación y resarcimiento a las colectividades afectadas por racismo, xenofobia y otras formas conexas de intolerancia y discriminación. 4. Conservar la propiedad imprescriptible de sus tierras comunitarias, que serán inalienables, inembargables e indivisibles. Estas tierras estarán exentas del pago de tasas e impuestos. 5. Mantener la posesión de las tierras y territorios ancestrales y obtener su adjudicación gratuita. 6. Participar en el uso, usufructo, administración y conservación de los recursos naturales renovables que se hallen en sus tierras. 7. La consulta previa, libre e informada, dentro de un plazo razonable, sobre planes y programas de prospección, explotación y comercialización de recursos no renovables que se encuentren en sus tierras y que puedan afectarles ambiental o culturalmente; participar en los beneficios que esos proyectos reporten y recibir indemnizaciones por los perjuicios sociales, culturales y ambientales que les causen. La consulta que deban realizar las autoridades competentes será obligatoria y oportuna. Si no se obtuviese el consentimiento de la comunidad consultada, se procederá conforme a la Constitución y la ley. 8. Conservar y promover sus prácticas de manejo de la biodiversidad y de su entorno natural. El Estado establecerá y ejecutará programas, con la participación de la comunidad, para asegurar la conservación y utilización sustentable de la biodiversidad. 9. Conservar y desarrollar sus propias formas de convivencia y organización social, y de generación y ejercicio de la autoridad, en sus territorios legalmente reconocidos y tierras comunitarias de posesión ancestral. 10. Crear, desarrollar, aplicar y practicar su derecho propio o consuetudinario, que no podrá vulnerar derechos constitucionales, en particular de las mujeres, niñas, niños y adolescentes. 11. No ser desplazados de sus tierras ancestrales. 12. Mantener, proteger y desarrollar los conocimientos colectivos; sus ciencias, tecnologías y saberes ancestrales; los*

**12.** De lo reseñado en el pie de página N° 3, se puede apreciar que la norma impugnada regula aspectos de diversa índole y no solamente aquellos relacionados con el ejercicio de los derechos colectivos de las comunidades indígenas, por lo cual, resulta inapropiado que se exija como un riguroso parámetro de control formal que se haya sometido la integralidad del proyecto de ley a la consulta prelegislativa; sostener lo contrario, significaría generar una suerte de disminución a las competencias privativas de la Asamblea Nacional (órgano responsable planificar, delimitar, implementar y procesar la consulta) y una clara afectación al principio de libertad de configuración legislativa (ya que se estaría obligando a generar debates fuera del seno parlamentario sobre todo el texto normativo y no específicamente respecto de los derechos colectivos de las comunidades indígenas, condicionado la facultad constitucional y legal del legislador de diseñar técnica y jurídicamente una ley). Adicionalmente, conviene hacer notar que los accionantes no identifican en su demanda elementos particulares de la ley que afecten los derechos de las comunidades, pueblos y nacionalidades y que no hayan sido objeto de consulta prelegislativa.

**13.** Ahora bien, sin perjuicio de haberse descartado el vicio de inconstitucionalidad por la forma ante la supuesta falta de sometimiento a consulta prelegislativa de la totalidad del proyecto de LORHUAA, se estima necesario constatar cuáles fueron los temas sustantivos que formaron parte del procedimiento de consulta prelegislativa, a fin de observar si existió alguna deficiencia u omisión trascendental que pudiese afectar el objeto de la consulta. Así se tiene, que conforme se desprende del informe final de

*recursos genéticos que contienen la diversidad biológica y la agrobiodiversidad; sus medicinas y prácticas de medicina tradicional, con inclusión del derecho a recuperar, promover y proteger los lugares rituales y sagrados, así como plantas, animales, minerales y ecosistemas dentro de sus territorios; y el conocimiento de los recursos y propiedades de la fauna y la flora. Se prohíbe toda forma de apropiación sobre sus conocimientos, innovaciones y prácticas. 13. Mantener, recuperar, proteger, desarrollar y preservar su patrimonio cultural e histórico como parte indivisible del patrimonio del Ecuador. El Estado proveerá los recursos para el efecto. 14. Desarrollar, fortalecer y potenciar el sistema de educación intercultural bilingüe, con criterios de calidad, desde la estimulación temprana hasta el nivel superior, conforme a la diversidad cultural, para el cuidado y preservación de las identidades en consonancia con sus metodologías de enseñanza y aprendizaje. Se garantizará una carrera docente digna. La administración de este sistema será colectiva y participativa, con alternancia temporal y espacial, basada en veeduría comunitaria y rendición de cuentas. 15. Construir y mantener organizaciones que los representen, en el marco del respeto al pluralismo y a la diversidad cultural, política y organizativa. El Estado reconocerá y promoverá todas sus formas de expresión y organización. 16. Participar mediante sus representantes en los organismos oficiales que determine la ley, en la definición de las políticas públicas que les conciernan, así como en el diseño y decisión de sus prioridades en los planes y proyectos del Estado. 17. Ser consultados antes de la adopción de una medida legislativa que pueda afectar cualquiera de sus derechos colectivos. 18. Mantener y desarrollar los contactos, las relaciones y la cooperación con otros pueblos, en particular los que estén divididos por fronteras internacionales. 19. Impulsar el uso de las vestimentas, los símbolos y los emblemas que los identifiquen. 20. La limitación de las actividades militares en sus territorios, de acuerdo con la ley. 21. Que la dignidad y diversidad de sus culturas, tradiciones, historias y aspiraciones se reflejen en la educación pública y en los medios de comunicación; la creación de sus propios medios de comunicación social en sus idiomas y el acceso a los demás sin discriminación alguna*".

resultados de la consulta prelegislativa del proyecto de LORHUAA[5], los temas sustantivos[6] fueron los siguientes:

> "***Tradiciones ancestrales, lugares rituales y sagrados.***
>
> *Los contenidos del proyecto de Ley de Recursos Hídricos, Usos y Aprovechamiento del Agua, comprendidos en este primer tema consultado, tuvieron un amplio consenso de los participantes, pues se refieren al derecho humano al agua (Art. 24 del proyecto); a la conservación de prácticas de manejo del agua, la relación espiritual con el agua (Art. 43); a la protección de los conocimientos colectivos y saberes ancestrales (Art. 44); a las prácticas culturales y sagradas (Art. 88) y a la definición de políticas públicas para la recuperación y promoción de los saberes ancestrales y el conocimiento científico del ciclo del agua, junto con la promoción y desarrollo de una nueva cultura del agua a partir de la multiplicidad de valores que ésta tiene. (Art. 170 literales c y l).*
>
> *(…)* ***Gestión y manejo ancestral***
>
> *La gestión y manejo ancestral del agua y los recursos hídricos por parte de las comunidades, pueblos y nacionalidades, de conformidad con los contenidos del proyecto de ley objeto de consulta, suponen los diferentes momentos y aspectos que la integran: La protección, recuperación y conservación de fuentes (Art. 17 del proyecto); la garantía de los diferentes elementos que integran el derecho humano al agua y los derechos relacionados con éste (del Art. 23 al Art. 33); así como la relación con el derecho a participar en el uso, usufructo y administración de las aguas en sus tierras (Art. 40); las responsabilidades estatales para la vigencia del derecho humano al agua (del Art. 56 al Art. 63); y áreas de protección hídrica, incluida la protección y conservación de aguas subterráneas (Art. 112). La permanencia y fortalecimiento de las formas comunitarias y autogestionarias de los servicios de agua potable y de riego (Art. 38, literal b); la administración autónoma de estos sistemas comunitarios de provisión de servicios públicos (Art. 40 y 38 literal b) del proyecto.*
>
> *(…)* ***Uso, usufructo y administración***
>
> *El derecho colectivo a participar en el uso, usufructo y administración de las aguas y recursos renovables que se encuentren en sus tierras, es un derecho a ser parte de tales actividades y dinámicas (Art. 57 numeral 6 de la Constitución). En el contexto de la consulta pre legislativa, este derecho se encuentra relacionado con las condiciones generales y el carácter de la administración nacional del agua, razón por la cual se relaciona con la prohibición de privatización de la gestión del agua (Art. 6); la formulación participativa de las políticas públicas para la administración de los recursos hídricos (Art. 8); la exigibilidad del derecho humano al agua (Art. 26). Se precisa además, las condiciones de la administración de las aguas, tales como: la garantía para el caudal ecológico (Art. 67); la cantidad vital con una tarifa mínima (Art. 27); claras competencias públicas para garantizar agua para consumo humano (Art, 8); y un orden*

---

[5] Informe de resultados finales de la consulta prelegislativa del proyecto de Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua de 19 de mayo de 2014. Fojas 202 a 205 vta., del expediente constitucional.

[6] Cabe aclarar que los artículos que se citan corresponden al entonces proyecto de ley que fue sujeto al procedimiento de consulta prelegislativa.

*de prioridades para el acceso al agua para actividades productivas (Art 93). Además, con relación al servicio público de riego, este derecho de participación implica las garantías para la redistribución y reasignación del agua para riego para desterrar el acaparamiento (Art. 137); la gestión participativa del riego comunitario y el fortalecimiento de las organizaciones de regantes (Arts. 176 y 178).*

***Derecho propio o consuetudinario***

*Los derechos colectivos comprendidos en este tema, establecen las normas internas para la resolución de diferencias en relación a los derechos colectivos sobre el agua (Art. 38 y Art. 42 del proyecto), desarrollan aspectos en relación a la resolución de conflictos (Art. 150), mediación y arbitraje (Art. 151), resolución de divergencias en órdenes consuetudinarios (Art. 152), régimen de controversias (Art. 179), reconocimiento de formas colectivas y tradicionales de gestión (Art. 205), norma consuetudinaria en relación con terceros (Art. 206 y 207).*

*Estas disposiciones, consideran el derecho constitucional a crear, desarrollar, aplicar y practicar el derecho propio consuetudinario; y el ejercicio de la jurisdicción de las autoridades comunitarias en asuntos internos.*

***Participación y representación en los organismos oficiales***

*Dentro de este tema sustantivo se abordan los deberes estatales en la gestión integrada de los recursos hídricos por cuenca hidrográfica. La consulta promueve y fortalece la participación de las organizaciones de usuarios, consumidores, de sistemas públicos y comunitarios, de organizaciones ciudadanas en torno a los destinos del agua (Art. 12 literal d) del proyecto); establece las políticas públicas en relación al agua (Art. 58); de igual manera desarrolla las obligaciones de corresponsabilidad -Estado y comunidades- (Art. 61); se regulan los niveles de participación en vigilancia, monitoreo, y veeduría ciudadana de los sistemas hídricos (Art.78); y, la conducción conjunta de aguas para riego (Art.175).*

*En este tema sustantivo se regulan también: la integración y las atribuciones del consejo intercultural y pluricultural de agua, (Arts. 225 y 226); del consejo de recursos hídricos de cuenca hidrográfica (arts. 231 y 233); de las organizaciones de cuenca y de la asamblea de usuarios de una cuenca (Arts. 233 y 234)*".

**14.** De lo expuesto líneas arriba se colige que en el marco de la consulta prelegislativa del proyecto de LORHUAA, se contemplaron varios aspectos y apartados normativos que denotan que el órgano legislativo cumplió con su obligación constitucional de consultar sobre posibles afectaciones a derechos colectivos, con miras a entablar en la mayor medida de lo posible un diálogo genuino que permita arribar a consensos realizables entre todos los participantes; por lo que no se advierte que se hayan omitido aspectos sustanciales que debieron ser parte integrante del eje temático que sería materia de consulta y aprobación de las comunidades indígenas.

**15.** Otra alegación sobre la supuesta inconstitucionalidad se dirige a cuestionar que la consulta no fue culturalmente adecuada, puesto que no se consensuó el mecanismo de consulta con la CONAIE, ECUARUNARI, CONFENAIE y CONAICE. Para analizar

CORTE CONSTITUCIONAL DEL ECUADOR

este cargo se debe partir de la delimitación del marco jurídico bajo el cual se realizó el procedimiento de consulta prelegislativa de la LORHUAA; así tenemos que se habría efectuado de conformidad con la sentencia de la Corte Constitucional N° 001-10-SIN-CC de 18 de marzo de 2010 y con las disposiciones del Instructivo para la Aplicación de la Consulta Prelegislativa de la Asamblea Nacional ("**Instructivo de la Asamblea**") emitido en Resolución del Consejo de Administración Legislativa de 13 de junio de 2012[7], cuya disposición transitoria única[8], de hecho, se refiere expresamente a la tramitación de la *"Ley Orgánica de Recurso Hídricos, Uso y Aprovechamiento del Agua, que se encuentra en segundo debate"*; siendo dicho instructivo aplicable a la época de la expedición de esta ley[9], por lo que resultaría inaudito que se impute una omisión o quebrantamiento constitucional por parte del legislador orgánico, cuando éste ha seguido fielmente el procedimiento que la misma jurisprudencia de esta Corte le ha definido como el adecuado, a efectos de no vulnerar los derechos de las comunidades indígenas.

**16.** Tanto el Instructivo de la Asamblea como la sentencia N° 001-10-SIN-CC, determinaban que el procedimiento de consulta prelegislativa se debe desarrollar en cuatro fases: **a)** fase de preparación; **b)** fase convocatoria pública; **c)** fase de realización; y, **d)** fase de análisis de resultados y cierre de consulta. Cada una de estas fases contemplan los mecanismos mediante los cuales se debe implementar la consulta prelegislativa, siendo en principio una potestad del órgano consultante (Asamblea Nacional) definir mediante acto administrativo la agenda de la consulta con la identificación de los temas sustantivos a ser consultados, el procedimiento de consulta, los tiempos de consulta y el procedimiento de diálogo y toma de decisiones[10].

**17.** Es decir, que en esta primera fase también denominada preparatoria, le corresponde de forma exclusiva a la respectiva comisión especializada permanente u ocasional de la Asamblea Nacional, definir de forma fundamentada (dentro de los siguientes cinco

[7] Publicado en el Registro Oficial N° 733 de 27 de junio de 2012.

[8] En la disposición transitoria única del Instructivo para la Aplicación de la Consulta Prelegislativa de la Asamblea Nacional (sustituida mediante resolución de 17 de julio de 2012), se dispuso que: "*El trámite del proyecto de Ley de Culturas que tiene informe para segundo debate y el proyecto de Ley Orgánica de Recursos Hídricos, Uso y Aprovechamiento del Agua, que está en segundo debate y se encuentra pendiente de votación, se suspenderán hasta que se realice la correspondiente consulta prelegislativa, para que la Comisión Especializada Permanente u Ocasional reelabore el informe para segundo debate y cumpla con el Artículo 20 de este instructivo*".

[9] De forma posterior en la Sentencia de la Corte Constitucional N° 38-13-IS/19 de 13 de diciembre de 2019, se declaró que la Asamblea Nacional incurrió en incumplimiento de la Sentencia N° 001-10-SIN-CC de 18 de marzo de 2010, en lo relativo al instrumento de regulación de la consulta prelegislativa (determinando que se debe contemplar en una norma legal); sin que se haya declarado inconstitucional al Instructivo para la Aplicación de la Consulta Prelegislativa, concediéndole al Legislativo el plazo máximo de un año para que el expida la ley que norme la consulta prelegislativa; constando la expedición de una reforma a la Ley Orgánica de la Función Legislativa al respecto, por la que se incorpora el Capítulo XI.I "Consulta prelegislativa", artículos 109.1. al 109.18, siendo publicada en Suplemento del Registro Oficial N° 326 de 10 de noviembre de 2020 y que según la disposición final "entrará en vigencia en la siguiente legislatura o periodo legislativo, excepto en lo que expresamente se señala en las disposiciones transitorias, que entrarán en vigencia una vez publicada la ley en el Registro Oficial", por lo que el indicado capítulo sobre la consulta prelegislativa se encuentra en aplicación desde el 14 de mayo de 2021.

[10] Corte Constitucional del Ecuador, sentencia N° 001-10-SIN-CC de 18 de marzo de 2010, pág. 41.

días a la decisión del Pleno de la Asamblea Nacional convocar a la consulta prelegislativa) sobre los temas sustantivos a ser sometidos al mecanismo de consulta, los cuales serán aprobados por el Consejo de Administración Legislativa, a fin de proceder con la inmediata convocatoria a la consulta prelegislativa[11]. De la revisión del Instructivo de la Asamblea y de la sentencia N° 001-10-SIN-CC, no se determina que se haya contemplado de forma obligatoria la intervención de estructuras representativas de las diferentes comunas, comunidades, pueblos y nacionalidades indígenas durante esta etapa procedimental.

**18.** Ahora bien, el hecho de que no sea una obligación jurídica convocar oficialmente a los representantes nacionales de las comunidades indígenas durante esta etapa de preparación de la consulta prelegislativa (que esta se estima como deseable), aquello tampoco se constituye en un óbice para que no se permita su intervención voluntaria; al contrario, conforme se señala en el memorando N° SAN-2012-1525 de 04 de julio de 2012, suscrito por la entonces vicepresidenta de la Comisión Especializada de Soberanía Alimentaria y Desarrollo del Sector Agropecuario y Pesquero, los temas sustantivos para la realización de la consulta prelegislativa se habrían aprobado con la participación de varias organizaciones representativas de comunidades indígenas, campesinas, afroecuatorianas y montubias. Además, vale relievar que durante las subsiguientes fases del procedimiento de consulta prelegislativa (inscripción y realización)[12], se observa la participación activa de la Confederación de Nacionalidades Indígenas del Ecuador; razón por la cual, esta Corte estima que el cargo de falta de consenso en la instrumentación de los mecanismos de consulta carece de asidero fáctico y jurídico.

**19.** En tal virtud, se concluye que la LORHUAA no adolece de vicios de inconstitucionalidad por la forma ante la supuesta ausencia de consensos en los mecanismos de implementación y realización de una consulta integral respecto de aquellos apartados normativos que no guardan relación directa con el ejercicio de los derechos de las comunidades indígenas; en atención a que el objeto de la consulta prelegislativa se halla rigurosamente delimitado hacia la discusión de posibles afectaciones de derechos colectivos y no para asuntos reservados al campo de la producción legislativa general.

**20.** En este punto, se aclara que no es una potestad de este Organismo realizar reproches acerca de lo acertado o no del contenido de la consulta prelegislativa, ni valorar sus resultados; empero, ello no impide que se pueda pronunciar sobre el posible desconocimiento o vulneración de reglas formales y procedimentales que implique la

---

[11] Artículo 7 del Instructivo para la Aplicación de la Consulta Prelegislativa de la Asamblea Nacional.

[12] Informe de resultados finales de la consulta prelegislativa del proyecto de Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua de 19 de mayo de 2014, cuadro N° 3 (referente al listado de organizaciones participantes en la mesa de diálogo nacional, constante a fojas 202 del expediente constitucional); acta de la mesa de diálogo nacional para la consulta prelegislativa de 09 de mayo de 2014 (fojas 53 y 54 del expediente constitucional).

transgresión de los fines para los cuales se debe instruir la consulta prelegislativa a ser aprobada, que como ha quedado evidenciado, en este caso no existieron[13].

**Resolución del segundo problema jurídico ¿El Reglamento a la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua deviene en inconstitucional por la forma?**

**21.** Respecto a la inconstitucionalidad formal del Reglamento a la LORHUAA se manifiesta que esta es una medida normativa nueva, de naturaleza diferente a la de la ley, por lo que era necesario realizar otra consulta prelegislativa.

**22.** En relación a este argumento es importante resaltar que el reglamento se erige como un acto normativo expedido por el presidente de la República, que tiene como finalidad complementar el contenido de una ley a efectos de facilitar su aplicación o ejecución práctica, siempre que en el ejercicio de esta potestad no se altere ni contravenga su sentido literal[14]. De manera, que el Reglamento a la LORHUAA no comporta -en su esencia- un alcance distinto al permitido por la propia ley, puesto que por mandato del artículo 147 numeral 13 de la CRE, le está vedado a la Presidencia de la República innovar, ampliar o restringir el contenido de una ley por vía reglamentaria.

**23.** Para el caso en estudio resulta conveniente señalar que, como es lógico, al Reglamento le ha precedido la promulgación de la LORHUAA, norma que dentro de su trámite de creación ha implementado el procedimiento parlamentario de la consulta prelegislativa; es decir, que los temas sustantivos que se complementan o desarrollan con mayor profundidad en el Reglamento, **ya han sido materia de consulta**, por lo que resultaría incensario instrumentar un nuevo procedimiento de consulta prelegislativa[15] (con la consecuente movilización de recursos públicos que ello representa) para discutir sobre los mismos temas que ya fueron objeto de consenso y procesamiento por parte de las comunidades indígenas y la Asamblea Nacional[16].

---

[13] Ley Orgánica de Garantías Jurisdiccionales y Control Constitucional, artículo 76.7: "*Instrumentalidad de las formas y procedimientos. - El desconocimiento o vulneración de las reglas formales y procedimentales en la producción normativa, únicamente acarrea la declaratoria de inconstitucionalidad cuando implica la trasgresión de los principios o fines sustanciales para los cuales fue instituida la respectiva regla*".

[14] Artículo 147 numeral 13 de la Constitución de la República del Ecuador.

[15] Este Organismo en el párrafo 92 de la sentencia de mayoría N° 20-12-IN de 01 de julio de 2020, determinó que la consulta prelegislativa: "*no se limita a la adopción de medidas expedidas por el órgano legislativo sino, de manera general, a medidas normativas y administrativas*"; sin embargo, para este caso en particular donde se ha logrado advertir que existió un procedimiento de consulta prelegislativo "por temas sustantivos de la Ley", se considera que la exigencia de un nueva consulta prelegislativa significaría una duplicación de trámites.

[16] Los resultados nacionales de la consulta prelegislativa arrojan los siguientes resultados: **a)** consensos 63%; **b)** disensos 2%; **c)** otra alternativa 7%; y, **d)** no se pronuncia 29% (existe una variación del 1%, correspondiente a las cifras cuantificadas en el informe de compilación de resultados provinciales de la consulta prelegislativa al proyecto de Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua de 19 de abril de 2013, suscrito por la presidenta de la Comisión Especializada Permanente de Soberanía Alimentaria y Desarrollo del Sector Agropecuario y Pesquero). Fojas.160 a 168 vta., del expediente constitucional.

**24.** En ese contexto, es menester reiterar que la consulta prelegislativa tiene como finalidad garantizar la participación de las comunidades indígenas de forma previa a la adopción de medidas que presumiblemente pudieran afectar derechos colectivos; en este caso, dichas medidas ya fueron consultadas, debatidas y adoptadas por la Asamblea Nacional, por lo que esta voto salvado considera que no procede la alegada inconstitucionalidad por la forma, ya que como se mencionó precedentemente el Reglamento responde a los principios normativos de **subordinación** (es decir, que deriva o se encuadra a una norma jerárquicamente superior) y de **supraordinación** (esto es, que aplica o desarrolla lo que la normativa superior contempla)[17].

**Control material del caso N°. 45-15-IN, a efectos de explicitar criterios sobre la suficiencia argumentativa que exige la acción pública de constitucionalidad.**

**25.** Si bien en el voto de mayoría no se analizan los argumentos de fondo de ninguna de las demandas materia de control constitucional, el presente voto salvado encuentra que es de suma utilidad referirse al menos al caso N°. 45-15-IN para delimitar algunos criterios relevantes sobre la suficiencia argumentativa que debe observase al momento de proponer una demanda de acción pública de inconstitucionalidad.

**26.** De tal forma, que previo a realizar el control material de las normas acusadas de inconstitucionales, se valora como oportuno referirse a la potestad de este Organismo para revisar los requisitos de aptitud argumentativa de la demanda de acción pública de inconstitucionalidad durante la fase de sustanciación; es así, que resulta imperativo precisar que si bien, es durante la fase de admisibilidad es donde se verifica el cumplimiento de los requisitos mínimos de la carga argumentativa del acto de proposición, dicho análisis corresponde a un pronunciamiento apenas preliminar y sumario del Tribunal de la Sala de Admisión que no compromete ni enerva la facultad del Pleno de la Corte Constitucional para analizar durante la etapa de resolución sobre las posibles deficiencias argumentativas de la demanda.

**27.** Al respecto la Corte Constitucional de Colombia ha sido reiterativa en dilucidar que aunque: "*el momento procesal ideal para pronunciarse sobre la inexistencia de cargos de inconstitucionalidad es la etapa en la que se decide sobre la admisibilidad de la demanda, por resultar más acorde con la garantía de la expectativa que tienen los*

[17] Abelardo Torré, "Introducción al Derecho", Capítulo V "La teoría de la norma jurídica y los conceptos jurídicos fundamentales", Sección segunda "Teoría de la norma jurídica", punto "Clasificación de las normas jurídicas", Buenos Aires, Editorial Abeledo-Perrot, Décimo cuarta edición, 2003, p. 177-178 expone: *"(…) 14.- Por su jerarquía han sido divididas en fundamentales (o primarias) y derivadas (o secundarias) … el derecho de cada estado constituye no un conjunto inorgánico de normas jurídicas, sino un todo ordenado o sistema de normas, entre las cuales hay relaciones de coordinación y de subordinación (o supraordinación)… un sistema escalonado de normas … de ese ordenamiento escalonado, cada norma deriva su validez de otra u otras jerárquicamente superiores … (a su vez esa misma norma es la fuente de validez de otra u otras jerárquicamente subordinadas) … Ej…Una ley será válida si encuadra en la Constitución, etc. (...)15.-Sobre esta base…1) fundamentales (o primarias o constitucionales): son aquellas normas que en cada sistema jurídico ocupan el plano más alto … 2) derivadas (o secundarias, o comunes u ordinarias) : son las restantes del sistema jurídico (…)".*



Quito: José Tamayo E10-25 y Lizardo García. Tel. (593-2) 394-1800
www.corteconstitucional.gob.ec
Guayaquil: Calle Pichincha y Av. 9 de Octubre. Edif. Banco Pichincha 6to piso
email: comunicacion@cce.gob.ec

*ciudadanos de recibir un pronunciamiento de fondo sobre la constitucionalidad de las disposiciones demandadas por ellos,* ***esta decisión también puede adoptarse al momento de proferir un fallo, pues en esta etapa procesal en la que la Corte analiza con mayor detenimiento y profundidad las acusaciones presentadas por los ciudadanos en las demandas de inconstitucionalidad****. Por lo demás, en ciertas ocasiones resulta imposible establecer la ineptitud de los cargos dentro del trámite en el que se decide acerca de la admisibilidad de la acción de tutela,* ***y por lo tanto, esta decisión debe tomarse en la sentencia***"[18] (énfasis añadido).

**28.** Lo antes dicho es coherente con los principios y reglas generales que gobiernan a este método de control abstracto, ya que precisamente la LOGJCC prescribe de forma categórica que "[e]*l examen de constitucionalidad debe estar orientado a permitir la permanencia de las disposiciones en el ordenamiento jurídico"*[19], siendo la declaratoria de inconstitucionalidad el último recurso al cual esta Corte debe acudir[20], pues "[s]*e presume la constitucionalidad de las disposiciones jurídicas*"[21], e incluso "[e]*n caso de duda sobre la constitucionalidad de una disposición jurídica, se optará por no declarar la inconstitucionalidad*"[22]. De modo, que la aplicación de estos principios y la exigencia de una carga argumentativa suficiente son determinantes al momento de resolver sobre la procedencia de los cargos esgrimidos en la demanda.

**29.** En tal sentido, a efectos de resolver sobre el presente control de constitucionalidad material se analizarán los argumentos de la demanda bajo el siguiente problema:

**¿La demanda de acción pública de inconstitucionalidad propuesta en contra la LORHUAA y su Reglamento, cumple con el requisito de la carga argumentativa clara, cierta, específica y pertinente?**

**Regresividad del derecho al agua**

**30.** Se expone principalmente que los artículos 1, 43, 45, 46, 47, 51, 52, 53, 54 y 55 de la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua serían inconstitucionales por cuanto generan un modelo centralista y homogeneizador de la administración y gestión del derecho al agua; que las normas impugnadas limitan el acceso a las fuentes de agua dentro de los territorios indígenas; y, que se generan excesivos requisitos para la constitución de las juntas de agua.

**31.** De la lectura de la demanda se observa que se realiza una especie de "impugnación en bloque" de varios enunciados normativos de la LORHUAA bajo el mismo supuesto

---

[18] Corte Constitucional de Colombia, sentencia N° C-874/02 de 15 de octubre de 2020. Asimismo, ver las sentencias inhibitorias por ineptidud manifiesta de la demanda debido a la ausencia de argumentos claros, ciertos, específicos, pertinentes y suficientes: N° C-382/12 de 24 de mayo de 2012; C-202/19 de 15 de mayo de 2019; C-037/20 05 de febrero de 2020; y, C-044/21 de 25 de febrero de 2021.
[19] Ley Orgánica de Garantías Jurisdiccionales y Control Constitucional, art. 76.4.
[20] Ibid., art. 76.6.
[21] Ibid., art. 76.2.
[22] Ibid., art. 76.3.

de "regresividad de derechos de las comunidades indígenas", sin ofrecer razones explícitas de en qué medida las normas impugnadas resultan contrarias al texto de la Constitución, lo que representa un problema de deficiencia argumentativa infranqueable, habida cuenta, que en el modelo de control abstracto de constitucionalidad son precisamente "*los argumentos de la demanda los que deben demostrar dicha incompatibilidad normativa"*[23].

**32.** Es así, que dentro del apartado que se analiza se verifica que las alegaciones de los accionantes no cumplen con los criterios de especificidad, claridad y certeza, en tanto: **i)** devienen en indeterminadas ya que no se concentran en revelar de qué manera el contenido de un enunciado normativo en específico infringe o contraviene alguna disposición constitucional, (especificidad); **ii)** tampoco existe una concreción argumentativa que demuestre la existencia de algún vicio de inconstitucionalidad atribuible a cualquiera de los artículos censurados (claridad). Por el contrario, en la demanda constan varias citas generales, dispersas e inconexas sobre derecho al agua, sin que se identifique en ninguna de ellas la supuesta regresión de derechos o incompatibilidad normativa entre las proposiciones de la LORHUAA y la Constitución; y, **iii)** lo que expresa en los argumentos de la demanda, no es lo que regula la norma, por ejemplo, los requisitos para la constitución de las juntas de agua no están definidos en la ley, su artículo 43 prescribe que aquello se realizará vía reglamentaria por la autoridad del agua (falta de certeza).

**33.** En virtud de lo precisado, la Corte Constitucional se encuentra impedida de pronunciarse sobre los cargos de inconstitucionalidad por el fondo de la LORHUAA.

**Restricción del territorio**

**34.** Se alega que los artículos 98 de la LORHUAA y 72 de su Reglamento son inconstitucionales debido a que establecen la posibilidad de constituir servidumbres forzosas en las fuentes de agua para dar paso a actividades productivas como la minería. Asimismo, se manifiesta que dichas normas vulneran la inalienabilidad de los territorios indígenas y sus recursos naturales "*entre ellos el agua, que incluyen también las actividades propias que realizan las comunidades que además de la caza, la pesca y la agricultura, son los rituales que llevan a cabo los abuelos del sector para mantener su convivencia armoniosa con la Pachamama*", lo que atentaría contra su derecho a "[m]*antener, proteger y desarrollar los conocimientos colectivos; sus ciencias, tecnologías y saberes ancestrales; los recursos genéticos que contienen la diversidad biológica y la agrobiodiversidad; sus medicinas y prácticas de medicina tradicional, con inclusión del derecho a recuperar, promover y proteger los lugares rituales y sagrados, así como plantas, animales, minerales y ecosistemas dentro de sus territorios; y el conocimiento de los recursos y propiedades de la fauna y la flora*"[24].

[23] Corte Constitucional del Ecuador, sentencia N° 94-15-IN/21 de 02 de junio de 2021, párr. 25.
[24] Constitución de la República del Ecuador, artículo 57 numeral 12.

**35.** En la especie, se verifica que las normas impugnadas regulan esencialmente el mismo presupuesto jurídico; esto es, la constitución de servidumbres en materia de agua, y que, dadas las características de abstracción de la ley y del reglamento no se hacen distinciones pormenorizadas o casuísticas de los tipos de predios sobre los cuales se puede autorizar esta clase de permisos; sin embargo, para comprender integralmente el contexto de los artículos censurados, es necesario acudir a una interpretación sistemática de dichas normas frente el resto de las disposiciones que conforman el mismo cuerpo normativo, a fin de establecer si existe una debida correspondencia y armonía en el texto legal[25], o en su defecto el articulado en cuestión transgrede derechos colectivos de las comunidades indígenas, en relación al desarrollo de sus prácticas ancestrales y/o culturales.

**36.** En ese sentido, es pertinente reproducir los siguientes apartados normativos de la LORHUAA:

> "*Art. 71.- Derechos colectivos sobre el agua. Las comunas, comunidades, pueblos y nacionalidades indígenas, pueblo afro ecuatoriano y montubio desde su propia cosmovisión, gozan de los siguientes derechos colectivos sobre el agua:*
>
> a. *<u>Conservar y proteger el agua que fluye por sus tierras y territorios en los que habitan y desarrollan su vida colectiva</u>;*
>
> b. *<u>Participar en el uso, usufructo y gestión comunitaria del agua que fluye por sus tierras y territorios y sea necesaria para el desarrollo de su vida colectiva;</u>*
>
> c. *<u>Mantener y fortalecer su relación espiritual con el agua</u>;*
>
> d. ***Salvaguardar y difundir sus conocimientos colectivos, ciencias, tecnologías y saberes ancestrales sobre el agua**;*
>
> e. ***Ser consultados de forma obligatoria previa, libre, informada y en el plazo razonable, acerca de toda decisión normativa o autorización estatal relevante que pueda afectar a la gestión del agua que discurre por sus tierras y territorios"*** (énfasis añadido).
>
> "*Art. 73.- Uso, usufructo y gestión comunitaria del agua. Las comunas, comunidades, pueblos y nacionalidades tienen derecho a participar en el uso, usufructo y gestión comunitaria del agua que fluya por sus tierras y territorios como medio para fortalecer su identidad, cultura, tradiciones y derechos, de conformidad con el ordenamiento jurídico".*
>
> *"Art. 92.- Prácticas culturales y sagradas. La Autoridad Unica (sic) del Agua* ***garantizará la integridad y permanencia de los lugares en que tradicionalmente las comunas, comunidades, pueblos y nacionalidades practican ritos, valores culturales y sagrados del agua****.*

[25] Ley Orgánica de Garantías Jurisdiccionales y Control Constitucional, artículo 3.5. "*Las normas jurídicas deberán ser interpretadas a partir del contexto general del texto normativo, para lograr entre todas las disposiciones la debida coexistencia, correspondencia y armonía*".

> *La Autoridad Unica (sic) del Agua conjuntamente con las comunas, comunidades, pueblos y nacionalidades realizarán y mantendrán debidamente actualizado un Inventario Nacional participativo e integral de los lugares sagrados y rituales del agua.*
>
> ***La administración y conservación de los lugares sagrados en relación con el agua, realizarán las entidades u organizaciones de pueblos y nacionalidades en cuyas tierras o territorios se encuentren****, con el apoyo de programas y proyectos nacionales de los organismos públicos y los Gobiernos Autónomos Descentralizados, de conformidad con la Constitución y sus propios derechos*" (énfasis agregado).

**37.** De lo transcrito *ut supra* se evidencia que la constitución de servidumbres no es una atribución absoluta y que lejos de ser arbitraria encuentra sus límites en la propia ley, visto que no sería legal, ni técnicamente plausible conceder o autorizar alguna servidumbre forzosa si con ello se coloca en situación de riesgo la **permanencia e integridad** de los lugares "*en que tradicionalmente las comunas, comunidades, pueblos y nacionalidades practican ritos, valores culturales y sagrados del agua.*". Es importante resaltar que la administración y conservación de los lugares sagrados y rituales asociados al uso del agua le corresponde a las entidades u organizaciones indígenas en cuyos territorios se encuentren, por lo que la prerrogativa de otorgar o no servidumbres de agua en dichos espacios geográficos (lugares sagrados o rituales) es parte de su competencia.

**38.** Por otro lado, se indica que los artículos en referencia (párr. 50 *supra*) devienen en inconstitucionales debido a que la constitución de servidumbres forzosas dan paso a la ejecución de actividades productivas como la minería, empero, este argumento por sí solo no expone objetivamente un problema de incompatibilidad entre las normas impugnadas y la Constitución; más aun considerando que el artículo 318 de la CRE establece que: "*El Estado, a través de la autoridad única del agua, será el responsable directo de la planificación y gestión de los recursos hídricos que se destinarán a consumo humano, riego que garantice la soberanía alimentaria, caudal ecológico y* ***actividades productivas****, en este orden de prelación. Se requerirá autorización del Estado para el* ***aprovechamiento del agua con fines productivos*** *por parte de los sectores público, privado y de la economía popular y solidaria, de acuerdo con la ley*" (énfasis añadido).

**39.** En función de lo expuesto, se colige que los argumentos del accionante carecen de certeza, ya que los cargos que se esgrimen no son objetivos o acordes al ámbito de regulación del régimen general de las servidumbres de agua, en razón de que no es jurídicamente posible conceder tales autorizaciones en detrimento de la protección integral de los lugares con valor ritual o sagrado para las comunidades indígenas, por lo que no se emite un pronunciamiento de fondo sobre la alegada inconstitucionalidad material.

**40.** A modo de corolario, cabe señalar que en el evento de que alguna autoridad estatal excediendo el ámbito de sus competencias ordene la constitución de servidumbres forzosas en lugares de protección ancestral, corresponde activar la vía jurisdiccional de tutela de derechos, pues es justamente para ello que la CRE y LORHUAA han

dotado a estos espacios de un marco normativo de protección especial.

**41.** El accionante cuestiona que los artículos 52 de la LORHUAA y 52 del Reglamento son contrarios al artículo 57.1 de la CRE[26], por cuanto: "*establecen un proceso de registro de las prácticas consuetudinarias de pueblos y nacionalidades indígenas, generando un enunciado discriminatorio, homogeneizante y violador de nuestro derecho a conservar libremente nuestra cultura y tradiciones ancestrales*".

**42.** Al respecto, vale precisar que el artículo 52 del Reglamento a la LORHUAA, a la presente fecha se encuentra reformado, sin embargo, se constata que la norma en referencia (con sus posteriores modificaciones) se reproduce materialmente en el mismo artículo, por lo que el examen de constitucionalidad debe efectuarse sobre dicho enunciado normativo con la finalidad de evitar que el fallo resulte inoficioso o inocuo. Dicho esto, se procede a transcribir el artículo en cuestión:

> "*Art. 52.- Derecho propio o consuetudinario. - (Reformado por el Art. 8 del D.E. 740, R.O. 570, 21-VIII-2015). - De acuerdo con lo previsto en el artículo 52 de la Ley, las prácticas consuetudinarias que se encuentren en aplicación para el acceso, uso y distribución del agua por parte de comunas, comunidades pueblos, nacionalidades y colectivos, constituyen práctica obligatoria para sus integrantes.*
>
> *A efectos del conocimiento general de etas* (sic) *prácticas consuetudinarias, la Secretaría del Agua recabará la información correspondiente para su posterior incorporación en el Registro Público del Agua. Dicho registro se efectuará únicamente para efectos declarativos.*
>
> *En ningún caso dichas prácticas podrán limitar el libre acceso al agua para su consumo y uso doméstico en los términos establecidos en este Reglamento ni tampoco podrán oponerse a un uso eficiente del agua ni a las buenas prácticas ambientales. La Autoridad de Demarcación Hidrográfica o el Responsable del Centro de Atención al Ciudadano correspondiente no inscribirán las prácticas consuetudinarias que se opongan a lo establecido en este inciso*".

**43.** Ahora bien, el artículo 52 de la LORHUAA y 52 del Reglamento prevén una política de registro de las prácticas consuetudinarias de las comunidades indígenas, con miras a obtener información suficiente que permita su posterior incorporación en el Registro Público del Agua con fines únicamente declarativos. Siendo este el contexto y la razón principal por la cual se impugnan las referidas normas, corresponde comprobar si los argumentos de la demanda son conducentes a demostrar un posible vicio de fondo o incompatibilidad constitucional.

**44.** En tal sentido, cabe señalar que en las páginas 16 y 17 de la demanda se observan varias referencias a instrumentos internacionales de protección de derechos humanos, sin que exista una conexión o hilo conductor entre las citas expuestas y las razones por las cuales se considera que tales disposiciones legales contravienen de algún modo la

---

[26] Artículo 57.1 de la Constitución de la República del Ecuador: "*Mantener, desarrollar y fortalecer libremente su identidad, sentido de pertenencia, tradiciones ancestrales y formas de organización social*".

Carta Suprema.

**45.** La insuficiencia de argumentos claros, ciertos, específicos y pertinentes impiden que esta Corte Constitucional pueda tan siquiera inferir que la reglamentación de dicho registro impida el desarrollo y fortalecimiento de la identidad cultural, sentido de pertenencia, tradiciones ancestrales y forma de organización de las comunidades indígenas; es más, cada uno de los competentes de este derecho reconocido el artículo 57.1 de la CRE, tiene su forma especialísima de perfeccionamiento o ejercicio, por lo se desecha el cargo, toda vez, que no existen razones suficientes para desvirtuar la presunción de constitucionalidad de las normas en cuestión[27].

**46.** A pesar de la insuficiencia argumentativa de la demanda, los suscritos juzgadores consideran necesario plantear algunas reflexiones generales respecto del derecho al agua en el marco de los derechos colectivos de las comunidades indígenas. En primer lugar, es menester precisar que el derecho al agua se encuentra garantizado en el artículo 12 de la CRE, por medio del cual se dispone que dicho recurso es un derecho fundamental e irrenunciable, de uso público, inalienable, imprescriptible, inembargable y esencial para la vida. Con relación a lo anterior, esta Corte ha señalado que "*el contenido del derecho al agua comprende el derecho de todas las personas a disponer de este recurso para su empleo en las actividades vitales para la existencia de los seres humanos, tales como la alimentación y la higiene*"[28].

**47.** De lo anotado precedentemente se puede colegir que el agua como elemento natural no es susceptible de apropiación y que su acceso tampoco puede estar sometido a un régimen de indisponibilidad absoluto; por el contrario, la CRE lo instituye como necesario para el desarrollo de otros derechos constitucionales, como la vida. De hecho, su pleno acceso garantiza el ejercicio de varios derechos fundamentales interdependientes[29], tales como la salud, alimentación, riego, nutrición, vivienda digna, etc.

**48.** De igual manera, el derecho al agua en las comunidades indígenas mantiene una íntima conexión con el derecho a la conservación y posesión de sus tierras comunitarias y ancestrales[30], por lo que es una obligación jurídica del Estado, concebir al derecho al agua desde una perspectiva holística que abarque "[e]*sta conexión entre el territorio y los recursos naturales necesarios para su supervivencia física y cultural* (…) *De este análisis, se entiende que los recursos naturales que se encuentran en los territorios de los pueblos indígenas y tribales que están protegidos en los términos del artículo 21* [de la Convención Americana sobre Derechos Humanos] *son aquellos recursos naturales que han usado tradicionalmente y que son necesarios para la propia*

---

[27] Artículo 76.2 de la Ley Orgánica de Garantías Jurisdiccionales y Control Constitucional: "*Presunción de constitucionalidad de las disposiciones jurídicas. - Se presume la constitucionalidad de las disposiciones jurídicas*".
[28] Corte Constitucional del Ecuador, sentencia N° 232-15-JP/21 de 28 de julio de 2021, párr. 36.
[29] Constitución de la República, artículo 11.6 "*Todos los principios y los derechos son inalienables, irrenunciables, indivisibles, interdependientes y de igual jerarquía*".
[30] Lo cual guarda relación con los derechos reconocidos en el artículo 57 numerales 4 y 5.



Quito: José Tamayo E10-25 y Lizardo García. Tel. (593-2) 394-1800
www.corteconstitucional.gob.ec Guayaquil: Calle Pichincha y Av. 9 de Octubre. Edif. Banco Pichincha 6to piso
email: comunicacion@cce.gob.ec

*supervivencia, desarrollo y continuidad del estilo de vida de dicho pueblo*"[31].

**49.** De modo que se ratifica el reconocimiento constitucional a las comunidades indígenas en el uso, gestión y conservación de las fuentes de agua que nacen, fluyen o desembocan en sus tierras y territorios ancestrales conforme sus tradiciones, saberes, costumbres y derecho propio.

**Restricción del derecho a la soberanía alimentaria**

**50.** En relación al presente cargo de inconstitucionalidad se verifica que se replican los mismos defectos de argumentación reseñados en los párrafos anteriores, dado que se reproducen citas textuales de los artículos 281 y 13 del Constitución; 11.1 del Protocolo Internacional de Derechos Económicos, Sociales y Culturales; y, la Observación General N° 12 del Comité de Derechos Económicos, Sociales y Culturales, para concluir que los artículos 51, 52, 53, 54 y 55 de la LORHUAA son inconstitucionales porque: "*limitan desproporcionadamente la libre disposición del recurso hídrico en los territorios indígenas*".

**51.** Sobre lo anterior resta decir que los accionantes no han procedido conforme lo dispuesto en el artículo 79.5 de la LOGJCC, en vista que a la demanda no le asiste una carga argumentativa que le permita a este Organismo efectuar un control abstracto de constitucionalidad de los artículos impugnados, en función de que: "[l]*os accionantes tenían la obligación de argumentar y demostrar la inconstitucionalidad demandada. La mera invocación de una norma o principio constitucional no es suficiente para constitucionalizar un argumento*"[32]; por lo que no advierte que existan cargos claros, ciertos, específicos y pertinentes de la inconstitucionalidad material que se arguye.

**52.** Finalmente, se aclara que en libelo de la demanda también se impugnan los artículos 20, 47 y 51 del Reglamento a la LORHUAA, pero en su desarrollo argumentativo no se ha hecho referencia expresa a ellos; en consecuencia, dado que no se han presentado argumentos específicos de inconstitucionalidad de tales de disposiciones, se debe aplicar el principio de presunción de constitucionalidad de la norma previsto en el artículo 76 numeral 2 de la LOGJCC, el cual obliga al accionante a presentar los argumentos necesarios para desvanecer dicha presunción[33].

**53.** En mérito de lo expuesto en el presente voto salvado, los infrascritos juzgadores, administrando justicia constitucional y por mandato de la Constitución de la República del Ecuador, resuelven:

1. Rechazar por improcedente la acción pública de inconstitucionalidad **No. 45-15-IN/22 y acumulado.**

2. Disponer el archivo de la causa.

---

[31] Corte Interamericana de Derechos Humanos. Caso del Pueblo Saramaka v. Surinam, párr. 122.
[32] Corte Constitucional del Ecuador, sentencia N° 80-16-IN/21 de 02 de junio de 2021, párr. 15.
[33] Corte Constitucional del Ecuador, sentencia N° 16-09-IN/21 de 28 de octubre de 2020 párr. 51.

CORTE CONSTITUCIONAL DEL ECUADOR

**3.** Notifíquese y publíquese.

CARMEN FAVIOLA CORRAL PONCE
Firmado digitalmente por CARMEN FAVIOLA CORRAL PONCE
Fecha: 2022.01.28 12:18:40 -05'00'

Dra. Carmen Corral Ponce
**JUEZA CONSTITUCIONAL**

PABLO ENRIQUE HERRERIA BONNET
Firmado digitalmente por PABLO ENRIQUE HERRERIA BONNET
Fecha: 2022.01.28 10:00:05 -05'00'

Dr. Enrique Herrería Bonnet
**JUEZ CONSTITUCIONAL**

**Razón.-** Siento por tal que el voto salvado de los Jueces Constitucionales Carmen Corral Ponce y Enrique Herrería Bonnet, en la causa 45-15-IN, fue presentado en Secretaría General, el 26 de enero de 2022, mediante correo electrónico a las 15:49; y, ha sido procesado conjuntamente con la Sentencia.- Lo certifico.

AIDA SOLEDAD GARCIA BERNI
Firmado digitalmente por AIDA SOLEDAD GARCIA BERNI

Dra. Aída García Berni
**SECRETARIA GENERAL**



Quito: José Tamayo E10-25 y Lizardo García. Tel. (593-2) 394-1800
www.corteconstitucional.gob.ec
Guayaquil: Calle Pichincha y Av. 9 de Octubre. Edif. Banco Pichincha 6to piso
email: comunicacion@cce.gob.ec

# EXHIBIT S3-7

PUBLIC VERSION

**2 PAGES**

**NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION**

**Produmar Water Invoice**

# EXHIBIT S3-8

**49 PAGES**

**NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION**

**Produmar Court Appeal Petition**

# Tab 62

# P.R. 389

# C.R. 249-57

Barcode:4577357-01 C-331-806 INV - Investigation -

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 100
Investigation
AD/CVD Operations, Office IV
Business proprietary information of the GOE has been redacted from page S4-5; business proprietary information of Produmar has been redacted from pages S4-2, S4-4, and S4-10; and from Exhibits S4-1(a) to S4-2(b).

**PUBLIC VERSION**

June 12, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Government of Ecuador's Second Post-Preliminary Supplemental Questionnaire Response

Dear Secretary Raimondo:

On behalf of the Government of Ecuador ("GOE"), we hereby submit the GOE's response to the Department's May 31, 2024, post-preliminary second supplemental questionnaire. This response is timely submitted in accordance with the Department's June 5, 2024, letter, re: "Request for Extension to Second Post-Preliminary Supplemental Questionnaire Response," which extended the deadline for the Government of Ecuador's supplemental response until today.

Pursuant to 19 C.F.R. § 351.304(a)(1)(i), the GOE requests proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/12/24 3:20 PM, Submission Status: Approved

information for which the GOE requests proprietary treatment, for itself and respondents and their cross-owned affiliates, and the basis for the request:

- Other specific information related to the GOE's operations, electricity usage information, etc. the release of which may result in the disclosure of confidential information maintained by the GOE, as well as other specific information related to the operations of the respondents, and their cross-owned affiliates, the release of which to the public would cause substantial harm to the competitive position of the respondents and their cross-owned affiliates: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to the competitive position of the mandatory respondents and their cross-owned affiliates. The GOE consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to the Government of Ecuador*

## GOVERNMENT CERTIFICATION

I, Juan Carlos Sanchez, Undersecretary of Origin, Trade Remedies and Trade Normative,, currently employed by the Government of Ecuador, certify that I prepared or otherwise supervised the preparation of the attached submission of the Second Post-Preliminary Questionnaire Response, filed on June 12, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

I certify that the public information and any business proprietary information of the Government of Ecuador contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.

In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Juan Carlos Sánchez T.

Date: 06/12/2024



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/12/24 3:20 PM, Submission Status: Approved

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to the Government of Ecuador, certify that I have read the attached submission of the Second Post-Preliminary Supplemental Questionnaire, filed on June 12, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: June 12, 2024

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 12th day of June, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode:4577357-01 C-331-806 INV - Investigation -

**Case No. C-331-806**
**Investigation**
**AD/CVD Operations, Office IV**

**Business proprietary information of the GOE has been redacted from page S4-5; business proprietary information of Produmar has been redacted from pages S4-2, S4-4, and S4-10; and from Exhibits S4-1(a) to S4-2(b).**

**PUBLIC VERSION**

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

# COUNTERVAILING DUTY INVESTIGATION OF FROZEN WARMWATER SHRIMP FROM ECUADOR

# RESPONSE OF THE GOVERNMENT OF ECUADOR TO THE DEPARTMENT'S MAY 31, 2024, POST-PRELIMINARY SECOND SUPPLEMENTAL QUESTIONNAIRE

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**

**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: June 12, 2024**

**Counsel to the Government of Ecuador**

Filed By: khammer@tradepacificlaw.com, Filed Date: 6/12/24 3:20 PM, Submission Status: Approved

**Second Post-Preliminary Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador Period of Investigation (POI) 01/01/2022 – 12/31/2022**
**Government of Ecuador (GOE)**

**Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, the GOE should repeat the question in full to which it is responding and place its answer directly below the question. The GOE should also fully answer each question in this supplemental questionnaire. Please ensure that the GOE provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.**

---

**Brackish Water**

1. **Please state whether the mandatory respondents and their selected cross-owned affiliates are required to obtain permits for access to brackish water by their shrimp farms. If not, please further explain. If they do require permits, please provide copies of such permits in effect during the POI.**

ANSWER: The following four cross-owned affiliates of mandatory respondent, Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), responded to the Department's January 24, 2024, supplier questionnaire: (1) Produmar S.A.; (2) Manesil S.A.; (3) Egidiosa S.A.; and (4) Tropical Packing Ecuador S.A. ("Tropack"). Based on Santa Priscila's responses, only Santa Priscila and Produmar used brackish water in operating shrimp farms during the period of investigation ("POI"). Likewise, the following three cross-owned affiliates of mandatory respondent, Sociedad Nacional de Galápagos C.A. ("SONGA"), responded to the Department's January 24, 2024, supplier questionnaire: (1) Naturisa S.A.; (2) Empacadora Champmar S.A.; and (3) Sola & Sola Solacciones. Based on SONGA's responses, only Naturisa used brackish water in operating shrimp farms during the POI.

Ecuadorian law does not require any permit or authorization for accessing brackish water. However, as stated on page TAX-39 of the Government of Ecuador's initial Section III questionnaire response ("IQR"), Article 93 of the 2014 Organic Law on Water Resources, Use and Development of Water ("Water Resources Law"), requires all productive users, not just consumptive users, intending to extract any type of water from any public source, including



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/12/24 3:20 PM, Submission Status: Approved

rivers, oceans, streams, springs, aquifers, salt pans, and other coastal water sources, to obtain an authorization from the Ministry of the Environment, Water, and Ecological Transition ("MAATE"). Productive use of water is defined by Article 93 of the Water Resources Law by the business activity in which the user is engaged, which includes aquacultural production. However, as stated on pages TAX-39 to TAX-40 of the GOE's IQR, only the consumptive use of water is subject to a fee. As stated on page NSA-35 of the GOE's April 18, 2024, New Subsidy Allegations ("NSA") questionnaire response, if water of any type is used for consumptive purposes, any individual or entity, including a shrimp farm, would be subject to payment of the applicable fee.

As of 2022, neither Santa Priscila nor Naturisa had applied for an authorization for productive use of water for any shrimp farm it owned or operated.

During the POI, Produmar had two authorizations for the productive use of water:

| Company | | Usage Purpose | Productive Use Authorization | |
|---|---|---|---|---|
| Produmar S.A. | [ | | | ] |
| Produmar S.A. | [ | | | ] |

**{Contains Produmar's BPI.}** As requested, **Exhibits S4-1(a)** and **S4-1(b)** contain copies of these authorizations.

Authorization No. [

].

**{Contains Produmar's BPI.}** However, the payment requirement of MAATE's authorization is



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/12/24 3:20 PM, Submission Status: Approved

Barcode:4577357-01 C-331-806 INV - Investigation


subject to a pending appeal filed by Produmar before the National Court of Justice of Ecuador. Produmar has not made any payment for its productive use of water during 2017 through 2022.

**2. Please describe in detail how the GOE confirms that all the brackish water used by the respondents and their selected cross-owned affiliates is returned to the source. Please provide supporting documentation for your answer, including, as applicable, monitoring reports, on-site audits, results of any verification or enforcement activities, or any other documents regarding the non-consumptive use of brackish water by the respondents.**

ANSWER: The GOE does not generally take any steps to confirm that the volume of brackish water accessed by any shrimp farm, including the respondents' farms, is returned to the source. Rather, after a user files an application for productive use,[1] the local zonal directorate of the MAATE undertakes an on-site study and prepare a technical plan in relation to the planned water infrastructure for the capture, channels, measurement, and distribution of the requested flow of water. As part of this process, the local zonal water directorate of MAATE requests that ARCA issue a water availability certificate, which determines whether the amount of water flow requested by the applicant is available at the catchment point that is the subject of the application for productive use of water. In accordance with Article 23, paragraph i, of the Water Resources Law, ARCA is charged with enforcing the terms of the authorizations granted by MAATE to ensure that end users comply with the terms of those authorizations.

Once a productive use authorization resolution is granted by MAATE, ARCA may undertake a technical report in order as a part of its enforcement duties as its budget allows, in order to ensure the end user's compliance with the terms of the approved productive use authorization. However, these technical reports do not undertake any study or inquiry into how and to what extent brackish water is returned to the source unless the terms of the productive use authorization requires that the brackish water be returned to the source.

[1] The GOE submitted a sample blank application for productive use of water, which is contained in Exhibit TAX-4(h) of its IQR.



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/12/24 3:20 PM, Submission Status: Approved

**Exhibit S4-2(a)** contains copies of studies and technical reports undertaken with respect to Produmar's application for Authorization No. [ ], which authorized Produmar's productive use of brackish water during the POI. **{Contains Produmar's BPI.}** **Exhibit S4-2(b)** contains copies of studies and technical reports undertaken with respect to Produmar's application for Authorization No. [ ], which authorized Produmar's productive use of brackish water during the POI. **{Contains Produmar's BPI.}** During the POI, ARCA did not prepare any technical reports as part of its enforcement duties with respect to productive use authorizations in effect for Produmar. Moreover, Produmar's productive use authorizations do not contain a term that requires ARCA to ensure that brackish water is returned to the source or measure the volume of water returned to the source.

Pursuant to the terms of Produmar's productive use authorizations, Produmar's infrastructure for pumping brackish water is subject to inspection and enforcement to ensure that it complies with the terms of its authorization. Like all productive users of water, users of brackish water in shrimp farming activities are subject to this procedure, as well as to the sanctioning regime if they commit administrative infractions by using water resources in a manner that does not comply with the authorization.

In the normal course of operations, shrimp farms in Ecuador drain shrimp ponds after each harvest. After draining, no water is retained because the pipelines through which the ponds drain lead only back to the same estuaries from which shrimp farmers pump brackish water. Other than the technical reports included in **Exhibits S4-2(a)** and **S4-2(b)**, the GOE did not conduct any monitoring, on-site audits, verification or enforcement activities with respect to farms owned and/or operated by the mandatory respondents or their cross-owned affiliates, including Produmar. As a result, the remainder of the Department's question is not applicable.



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/12/24 3:20 PM, Submission Status: Approved

**List of Exhibits – GOE's Second Post-Preliminary Supplemental Questionnaire Response**

| Exhibit No. | Description | Electronic | Classification |
|---|---|---|---|
| **S4-1(a)** | Produmar Water Authorization No. [ ] (Spanish Original and English Translation) **{Contains Produmar's BPI.}** | - | BPI |
| **S4-1(b)** | Produmar Water Authorization No. [ ] (Spanish Original and English Translation) **{Contains Produmar's BPI.}** | - | BPI |
| **S4-2(a)** | Technical Studies Undertaken in Connection with Produmar's Water Authorization No. [ ] (Spanish Original and English Translation) **{Contains Produmar's BPI.}** | - | BPI |
| **S4-2(b)** | Technical Studies Undertaken in Connection with Produmar's Water Authorization No. [ ] (Spanish Original and English Translation) **{Contains Produmar's BPI.}** | - | BPI |
| **S4-3(a)** | Official Communication No. ARCERNNNR-ARCERNNNR-2022-0047-OF (Spanish Original and English Translation) | - | Public |
| **S4-3(b)** | Sectorial Ministry Report No. INF.DRETSE.2021.104 (Spanish Original and English Translation) | - | Public |



Filed By: khammer@tradepacificlaw.com, Filed Date: 6/12/24 3:20 PM, Submission Status: Approved

# EXHIBIT S4-1(a)

**PUBLIC VERSION**

**10 PAGES**

**NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION**

**Produmar Water Authorization No. 1**

# EXHIBIT S4-1(b)

**PUBLIC VERSION**

**15 PAGES**

**NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION**

**Produmar Water Authorization # 2**

# EXHIBIT S4-2(a)

**PUBLIC VERSION**

# 105 PAGES

# NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION

# Technical Reports

# Produmar Authorization #1

# EXHIBIT S4-2(b)

PUBLIC VERSION

# 449 PAGES

# NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION

# Technical Reports

# Produmar Authorization #2

# Tab 63

# P.R. 390

Barcode:4588865-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
**Public Document**
ITA/E&C/OIV: RA, ZS

July 2, 2024

Government of Ecuador
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, DC 20003

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Government of Ecuador Post Preliminary Third Supplemental Questionnaire

Dear Mr. Goldfeder:

On July 12, 2024, the U.S. Department of Commerce (Commerce) received a response on behalf of your client, the government of Ecuador (the GOE), to Commerce's May 31, 2024, countervailing duty second post preliminary supplemental questionnaire. On May 16, 2024, Commerce received GOE's response to Commerce's May 2, 2024, countervailing duty supplemental questionnaire regarding the new subsidy allegation. On April 19, 2024, the Commerce received the GOE's response to Commerce's March 28, 2024, countervailing duty questionnaire regarding the new subsidy allegation. On February 14, March 13, and March 19, 2024, Commerce received the GOE's response to Section II of Commerce's December 12, 2023, countervailing duty initial questionnaire and two subsequent supplemental questionnaires, respectively. Commerce has identified certain areas in the GOE's responses for which Commerce requires additional information. The additional information requested in the attachment to this letter is **due no later than close of business (*i.e.*, 5:00 p.m. Eastern Standard Time) on July 9, 2024**.

Commerce must conduct this proceeding in accordance with statutory and regulatory deadlines. If you are unable to respond completely to every question in the attached questionnaire by the established deadline or are unable to provide all requested supporting documentation by the same date, you must notify the official in charge and submit a request for an extension of the deadline for all or part of the questionnaire response. If you require an extension for only part of your response, such a request should be submitted separately from the portion of your response filed under the current deadline. Statements included within a questionnaire response regarding a respondent's ongoing efforts to collect part of the requested information and promises to supply such missing information when available in the future, do not substitute for a written extension request. Section 351.302(c) of Commerce's regulations requires that all extension requests be in writing and state the reasons for the request. Any factual statements made in support of such reasons must be accompanied by the certifications required under section 351.303(g) of the regulations. An extension request submitted without a proper certification for any factual

Filed By: Zachary Shaykin, Filed Date: 7/2/24 1:45 PM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

information contained therein will be considered improperly filed and, as with any other improperly filed document, will not be accepted. Any extension granted in response to your request will be in writing; otherwise, the original deadline will apply.

If Commerce does not receive either the requested information or a written extension requests before 5 p.m. ET on the established deadline, we may conclude that your company has decided not to cooperate in this proceeding. Commerce will not accept any requested information submitted after the deadline. As required by section 351.302(d) of our regulations, we will reject such submissions as untimely. Therefore, failure to properly request extensions for all or part of a questionnaire response may result in the application of partial or total facts available, pursuant to section 776(a) of the Tariff Act of 1930, as amended (the Act), which may include adverse inferences, pursuant to section 776(b) of the Act. Furthermore, upon receipt of a response that is incomplete or deficient to the extent Commerce determines it to be non-responsive, Commerce may not issue additional supplemental questionnaires but may use facts available, including adverse inferences.

**DEADLINE FOR SUBMISSION**: **Your response is due no later than 5:00 p.m. ET on the date identified above.** Questionnaire responses normally entail the filing of many exhibits and databases on ACCESS. Accordingly, to the extent you submit your filing on the day it is due, rather than earlier, we strongly recommend that you begin uploading your response **no later than 12:00 noon on the above due date**. A questionnaire response must be filed in its entirety by the deadline to be considered timely.[1]

**EXTENSIONS:** **Note well:** Any extension request must be filed in writing. Extension requests filed after 5 p.m. on the due date will not be granted, except in extraordinary circumstances. An extraordinary circumstance is an unexpected event that could not have been prevented if reasonable measures had been taken, and that precludes a party or its representative from timely filing an extension request through all reasonable means.[2] An extraordinary circumstance is extremely rare and may include "a natural disaster, riot, war, *force majeure*, or medical emergency."[3] Note that "the earlier an extension request is filed, the more likely Commerce may consider the extension request, decide on its disposition, and inform the requesting party of its decision before the time limit expires."[4] For extension requests that are filed very close to the expiration of the time for filing the submission, Commerce may issue a verbal response to a party's extension request before the applicable time limit expires and issue a written response as soon as practicable.[5]

**Note well**:

> Parties should be aware that **the likelihood of Commerce granting an extension will decrease the closer the extension request is filed to the applicable time limit** because Commerce must have time to consider the extension request and decide on its disposition. Parties should not assume that they will receive an extension of a

[1] 19 CFR 351.303(b)(1).
[2] 19 CFR 351.302(a)(2).
[3] *Extension of Time Limits*, 78 FR 57790, 57793 (Sep. 20, 2013) (Preamble to the Final Rule).
[4] *Id.* at 57792.
[5] *Id.*

> time limit if they have not received a response from Commerce. For submissions that are due at 5:00 p.m., **if Commerce is not able to notify the party requesting the extension of the disposition of the request by 5:00 p.m., then the submission would be due by the opening of business (8:30 a.m.) on the next business day**. *See* 19 CFR 351.103(b).[6] **If a party requests an extension because of ACCESS/technical filing difficulties to which it did not receive a response from Commerce by 5:00 p.m., and the filing difficulties persist past 8:30 a.m. on the next business day, the party should contact the case analyst.**

If a party is experiencing issues with an ACCESS filing, the party should contact the ACCESS Help Desk by telephone to troubleshoot the filing issues. When experiencing filing issues on the day a submission is due, the filing party should also contact the case analyst if known, otherwise the official in charge, informing them of the filing difficulties. The submission for which a party is having difficulties filing on ACCESS should not be emailed to the case analyst or the official in charge.

Help Desk
(202) 482-3150
access@trade.gov
https://access.trade.gov

If you have any questions about this matter, please contact Zachary Shaykin at (202) 482-2638 or Reginald Anadio at (202) 482-3166.

Sincerely,

Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

---

[6] *Id.* (emphasis added).

**Third Post-Preliminary Supplemental Questionnaire**

**Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador**
**Period of Investigation (POI) 01/01/2022 – 12/31/2022**
**Government of Ecuador (GOE)**

Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, the GOE should repeat the question in full to which it is responding and place its answer directly below the question. The GOE should also fully answer each question in this supplemental questionnaire. Please ensure that the GOE provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.

---

**<u>General</u>**

1. Pursuant to Question M(2) of Commerce's December 12, 2023, initial questionnaire, please respond to the following items for the programs: (1) Youth Employment – State Economic Incentive for the Private Sector Program; (2) Motor Vehicle Tax Reduction; and (3) Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities:
   a. The amount of assistance approved for each mandatory respondent company, including all cross-owned companies and trading companies that sell the subject merchandise to the United States.
   b. The total amount of assistance approved for all companies under these programs.
   c. The total amount of assistance approved for each of the largest 50 recipients under these programs and include the industry designation for each of these recipients. Note that at this time, you do not need to provide the name of the recipient, you just need to provide the individual amount of assistance approved.
   d. The total number of companies that were approved for assistance under these programs.
   e. The total number of companies operating or established in the jurisdiction of the granting authority of the investigated programs.
   f. The total number of corporate/business income tax filers within the jurisdiction of the granting authority of the investigated programs.
   g. Provide a complete listing of the industries that operate in the jurisdiction of the granting authority of the investigated programs. In identifying these industries, please use whatever resource or classification scheme your government normally relies upon to define industries and to classify companies within an industry. Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification.
   h. The total amount of assistance approved for the industry in which the mandatory respondent companies operate, as well as the totals for every other industry in which companies were approved for assistance under these programs. In identifying the industries, please use whatever resource or classification scheme

your government normally relies upon to define industries and to classify companies within an industry. Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification. Please clearly identify the industry in which the companies under investigation are classified.

i. The total number of companies that applied for, but were denied, assistance under these programs. Be sure that your response to this question provides a complete discussion of the circumstances in which applications for assistance are denied.

j. If you have additional information that you believe demonstrates that the program is broadly available and widely used throughout the economy, please provide such information and a narrative description of your contention.

**Electricity**

2. In GOE's May 16, 2024, First Post-Preliminary Supplemental Questionnaire at Exhibit S3-4, Table No. 1.1 and Table No. 4 list the number of consumers and the GWh of billed electric service split between electricity consumer types. Please respond to the following:

   a. Please confirm that the number of consumers and their total consumption quantity for water pumping electricity are likely found under "Others" in Table No. 1.1 and Table No. 4.
   b. If the answer to question 2(a) is no, please explain how the GOE categorized water pumping electricity consumers in Table No. 1.1 and Table No. 4.
   c. If water pumping electricity consumers were not accounted for in Table No. 1.1 or Table No. 4, please provide the average water pumping electricity consumption in kWh per water pumping electricity consumer. If water pumping electricity consumers were accounted for in Table No. 1 and Table No. 4, please do not respond to this question.

# Tab 64

# P.R. 392

# C.R. 258

Barcode: 4590775-01 C-331-806 INV - Investigation

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 14
Investigation
AD/CVD Operations, Office IV
Business proprietary information has been redacted from pages S4-1 and S4-3; and from Exhibits S4-1 and S4-2.

**PUBLIC VERSION**

July 5, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
Santa Priscila's Third Post-Preliminary Supplemental Questionnaire Response

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), a mandatory respondent in the above-referenced CVD investigation, we submit the company's response to the Department's July 2, 2024, post-preliminary third supplemental questionnaire. This response is timely submitted in accordance with the deadline established in the cover letter of the Department's supplemental questionnaire.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila requests business proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the information for which Santa Priscila requests proprietary treatment and the basis for the request:

- Production Costs: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(2).


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/5/24 2:09 PM, Submission Status: Approved

- <u>Other Specific Business Information Related to Santa Priscila's Business and Production Operations, etc., the Release of Which to the Public Would Cause Substantial Harm to Santa Priscila's Competitive Position</u>: Contained in the narrative and exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to Santa Priscila's competitive position. The company consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

<u>/s/ Jarrod M. Goldfeder</u>
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
David Lindgren, Trade Consultant
TRADE PACIFIC PLLC

*Counsel to Industrial Pesquera Santa Priscila S.A.*

## COMPANY CERTIFICATION

I, Ernesto Frias, Controller, currently employed by Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), certify that I prepared or otherwise supervised the preparation of the attached Third Post-Preliminary Supplemental Questionnaire Response, filed on July 5, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Santa Priscila contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________________

Date: July 5, 2024

**COMPANY CERTIFICATION**

I, Wolfgang Harten, Special Representative, currently employed by Produmar S.A. ("Produmar"), certify that I prepared or otherwise supervised the preparation of the attached submission of Santa Priscila's Third Post-Preliminary Supplemental Questionnaire Response, filed on July 5, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806). I certify that the public information and any business proprietary information of Produmar contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: [signature]

Date: JULY 4, 2024

## Counsel Certification

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to Industrial Pesquera Santa Priscila S.A., certify that I have read the attached submission of the Third Post-Preliminary Supplemental Questionnaire, filed on July 5, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Kenneth Hammer

Date: July 5, 2024

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify on this 5th day of July 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4590775-01 C-331-806 INV - Investigation

**Case No. C-331-806**
**Investigation**
**POI: 1/01/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**This document contains business proprietary information on pages S4-1 and S4-3; and in Exhibits S4-1 and S4-2.**

**Business Proprietary Document – May Be Released under APO**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER FROM ECUADOR**

**RESPONSE OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A.**
**TO THE DEPARTMENT'S JULY 2, 2024 POST-PRELIMINARY**
**THIRD SUPPLEMENTAL QUESTIONNAIRE**

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: July 5, 2024**

**Counsel to Industrial Pesquera Santa Priscila S.A.**

Filed By: khammer@tradepacificlaw.com, Filed Date: 7/5/24 2:09 PM, Submission Status: Approved

**PUBLIC VERSION – BPI Has Been Redacted**

**Third Post-Preliminary Supplemental Questionnaire Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador**

**Period of Investigation (POI) 01/01/2022 – 12/31/2022 Santa Priscila S.A. (Santa Priscila)**

**Please ensure that all documents submitted to the U.S. Department of Commerce (Commerce) are translated fully into English and are legible. In its narrative submission, Santa Priscila should repeat the question in full to which it is responding and place its answer directly below the question. Santa Priscila should also fully answer each question in this supplemental questionnaire. Please ensure that Santa Priscila provides a cover sheet for each exhibit it submits that clearly states the complete exhibit number and title.**

---

**Electricity**

1. **For each location at which Santa Priscila S.A. (Santa Priscila), Produmar S.A., and Egidiosa S.A., reported that it consumed electricity at Exhibit S-9(a) of Santa Priscila's March 1, 2024, Section III supplemental questionnaire response, Exhibit PRO-5 of Santa Priscila's February 16, 2024, Section III supplemental questionnaire response, and Exhibit EGI-1 of Santa Priscila's February 16, 2024, Section III supplemental questionnaire response, please provide the following information:**

    a. **The address of each location; and**

    b. **The identification (name) of the distribution center of electricity from the table provided at Table 24 of Exhibit LTAR-3(c) of the Government of Ecuador's February 14, 2024, Section II questionnaire response.**

ANSWER: As requested, **Exhibit S4-1** contains the information requested in the Department's question.

Separately, in the course of reviewing its electricity reporting in order to respond to the Department's question, Santa Priscila determined that it inadvertently misidentified the electricity tariff consumption category applicable to the facility labeled "IPSP", (i.e., "Electricity Meter" # **[** **]** (rows 71 to 75)) in Exhibit S-9(a) of its March 1, 2024, supplemental Section III questionnaire response. Santa Priscila corrects the applicable electricity tariff consumption category for the identified meter, which should be: **[** **]**. Otherwise, all reported information for the identified location is correct as reported in Exhibit S-9(a) of the March 1st supplemental questionnaire response. **Exhibit S4-2** contains a sample electricity invoice for the identified



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/5/24 2:09 PM, Submission Status: Approved

electricity meter, with English translation, to support the corrected electricity consumption category identified above.



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/5/24 2:09 PM, Submission Status: Approved

**<u>Exhibit List – Third Post-Preliminary Supplemental Questionnaire Response</u>**

| Exhibit No. | Description | Electronic | BPI/Public |
|---|---|---|---|
| **S4-1** | Addresses of Electricity Service Locations Reported by Santa Priscila, Produmar, and Egidiosa and Relevant CNEL EP Distributor/Business Unit | - | BPI |
| **S4-2** | Sample Electricity Invoice for Location Identified as IPSP "Electricity Meter" # [ ] in Exhibit S-9(a) of Santa Priscila's March 1, 2024 Supplemental Questionnaire Response (Spanish Original and English Translation) | - | BPI |



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/5/24 2:09 PM, Submission Status: Approved

# EXHIBIT S4-1

| COMPANY NAME | GROUP | LOCATION | ELECTRIC METER # | SERVICE ADDRESS | CNEL EP DISTRIBUTOR/BUSINESS UNIT |
|---|---|---|---|---|---|
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Milagro |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNELl EP / UN-Milagro |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Milagro |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Milagro |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Santa Elena |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Santa Elena |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Guayaquil |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Guayaquil |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Santa Elena |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Guayaquil |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Santa Elena |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Santa Elena |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Guayaquil |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Guayaquil |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Guayaquil |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Guayaquil |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Guayaquil |
| Industrial Pesquera Santa Priscila S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Guayaquil |
| Produmar S.A. [ | | | | ] | CNEL Guayas-Los Rios |
| Produmar S.A. [ | | | | ] | CNEL Guayas-Los Rios |
| Produmar S.A. [ | | | | ] | CNEL Guayas-Los Rios |
| Produmar S.A. [ | | | | ] | CNEL Guayas-Los Rios |
| Produmar S.A. [ | | | | ] | CNEL Guayas-Los Rios |
| Egidiosa S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Santa Elena |
| Egidiosa S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Santa Elena |
| Egidiosa S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Santa Elena |
| Egidiosa S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Santa Elena |
| Egidiosa S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Santa Elena |
| Egidiosa S.A. [ | | | | ] | Corporacion Nacional de Electricidad - CNEL EP / UN-Santa Elena |

# EXHIBIT S4-2

**PUBLIC VERSION**

# 4 PAGES

# NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION

# Sample Electricity Invoice

# Tab 65

# P.R. 395

# C.R. 259

Barcode:4592081-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
~~**Business Proprietary**~~
E&C/OIV: ZS
**Public Version**

July 8, 2024

Santa Priscila S.A.
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003

Re: Frozen Warmwater Shrimp from Ecuador: Verification Agenda of Santa Priscila S.A.

Dear Mr. Goldfeder:

On June 28, 2024, we indicated that the U.S. Department of Commerce (Commerce) intended to conduct verification of the data reported by your client, *i.e.* Santa Priscila S.A. (Santa Priscila, in the above-referenced investigation through a remote, virtual videoconference. The virtual videoconference verification is scheduled for July 15 through July 17, 2024, *via* Microsoft Teams. You will receive an email containing the link to the meeting at the email addresses you have provided to Commerce officials. Commerce officials Zachary Shaykin and Reginald Anadio will conduct the verification.

Attached you will find the agenda we intend to follow at the verification of your client's questionnaire responses in this investigation. We may, however, revise the order of this agenda, or of specific items described in the agenda, depending on the needs of the verification.

The purpose of providing this agenda in advance of the actual verification is to allow you to brief the appropriate company personnel on the items to be covered and the type of documentation required to verify each item. The attached agenda is not necessarily all inclusive and we reserve the right to request any additional information or materials necessary for a complete verification.

Please reiterate to your client the statutory requirement for verification and note the following facts: (1) the information gathered during the verification will be used solely for the purposes of this proceeding; and (2) it is in your client's interest to cooperate since failure to permit verification may result in the Commerce relying on adverse "facts available" under section 776 of the Tariff Act of 1930, as amended (the Act).

To facilitate the verification process, we have described the types of source documents that we will require to support the submitted data. As you are aware, the time available for the verification is limited. Consequently, we ask that the necessary information be gathered by the appropriate personnel prior to the start of the virtual verification, and be provided to the verifiers via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized



INTERNATIONAL TRADE ADMINISTRATION

Electronic Service System (ACCESS), **by 5:00 p.m. Friday, July 12, 2024,** in advance of the start of the first scheduled verification meeting. The attached agenda provides directions regarding the advance submission of documents that will be examined during verification.

In addition to examining supporting documentation, the verifiers will need to speak to appropriate personnel concerning your client's questionnaire responses and other information submitted on the record of the proceeding. Please ensure appropriate personnel are available to meet with the verifiers. Please note that the names and titles of all company personnel and representatives participating in the verification, regardless of the role played, will be included in the verification report and treated as public information.

It is the responsibility of the respondent to be fully prepared for this verification. If your client is not prepared to support or explain a response item at the appropriate time, the verifiers will move on to another topic. If, due to time constraints, it is not possible to return to that item, we may consider the item unverified, which may result in our basing the final determination of this investigation on the facts available, possibly including information that is adverse to the interests of your client.

Please note that verification is not intended to be an opportunity for submission of new factual information. New information will be accepted at verification only when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record. Our acceptance of such information for examination at verification does not guarantee that we will be able to use it for our final determination.

Please note that verification is not intended to be an opportunity for the submission of new factual information. Information will be accepted at verification only when the information makes minor corrections to information already on the record or when information is requested by the verifiers, in accordance with the agenda below, to corroborate, support, and clarify factual information already on the record. 19 CFR 351.301(b) establishes time limits for the submission of new factual information and 19 CFR 351.302 establishes procedures for the extension of time limits, and the return of untimely filed or unsolicited material. If minor errors were found in any of your previously submitted filings they must be presented at the start of verification. If you present corrections of minor errors, you must file the information in ACCESS within **two business days of the start of verification.**

Section 777(c)(1) of the Act provides for the release of all business proprietary information, under administrative protective order (APO), presented to or obtained by Commerce during a proceeding, except privileged information, classified information, and specific information of a type for which there is a clear and compelling need to withhold from disclosure. As such, we request that you file final verification exhibits no later than the end of the fifth business day after each verification is completed. Unless you provide detailed, specific information to establish that there is a "clear and compelling need" to withhold a verification exhibit from disclosure, all business proprietary exhibits must be filed with Commerce as business proprietary documents in accordance with 19 CFR 351.303(b) and 351.303(f) no later than the end of the fifth business day after each verification is completed. It is not necessary to create or file public versions of

exhibits that are not public in their entirety. Your submission of the exhibits must be accompanied by the certificate of service required by 19 CFR 351.303(f)(2) indicating service on the parties on the APO service list, as well as the certificates of factual accuracy included with the initial questionnaire issued to you by Commerce. Exhibits that are public in their entirety (*e.g.*, public laws, annual reports) must be filed with Commerce in accordance with the requirements set forth in 19 CFR 351.303(b) and 351.303(f) for submission of public information. If, upon review, Commerce finds that any of the exhibits filed do not match the exhibits that Commerce decided to take during verification, Commerce will notify the submitter and other parties, and will take appropriate steps to address any inconsistencies.

As noted above, upon the completion of verification, all final verification exhibits must be filed electronically using ACCESS. An electronically-filed document must be received successfully in its entirety by Commerce's electronic records system, ACCESS, by 5:00 p.m. Eastern Time, unless otherwise specified by Commerce, on the fifth business day after verification is completed. Documents excepted from the electronic filing requirement under 19 CFR 351.303(b)(2)(ii) must be filed manually (*i.e.*, in paper form) with the APO/Dockets Unit in Room 18022 and stamped with the date of receipt on the fifth business day after verification is completed.

If you have any questions regarding this verification, please contact Zachary Shaykin at (202) 482-2638 or Reginald Anadio at (202) 482-3166. If, upon receipt of this agenda, you feel any of the verification procedures cannot be performed, please contact us immediately.

Sincerely,

Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

Barcode:4592081-01 C-331-806 INV - Investigation -

# VERIFICATION AGENDA

## Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador (C-331-806)

**Period of Investigation (POI): 01/01/2022 – 12/31/2022**

**Santa Priscila S.A. (Santa Priscila)**

We will verify the questionnaire responses of Santa Priscila submitted in this investigation to check the accuracy and completeness of the information provided. To do so, we will trace information in the responses to original source documents and to accounting records (*e.g.*, a software-based accounting system). The source documents and accounting records should be actual records kept by the company, and not documents or electronic files that were created for this investigation. Documents or electronic files created for purposes of questionnaire responses and verification may be presented at verification solely for purposes of reconciling and tracing your responses to source documents. The objective of verification, however, is to tie information already on the record to source documents and your electronic accounting systems. For more information on the source records that will need to be available for examination at verification, *see* "Summary of Types of Source Documents," below.

Companies must provide all appropriate source records to substantiate the completeness and accuracy of the information in the responses, including use of programs, non-use of programs, and sales and export information. Company officials must be prepared to review relevant accounting records to establish that all assistance received under the programs being examined was reported. As such, company staff that can access accounting records to substantiate information in the responses must be available at verification.

To the extent possible, we specify the records that we require for each section of the verification. However, company accounting systems vary widely, and some of the verification steps may not be possible with a particular firm's accounting system. In these instances, the company should review the goal of the particular section and determine the best method to accomplish the goal through company records.

Additionally, please note that the verification agenda is not all inclusive. We may need to request further information or materials as necessary to conduct a complete and thorough verification. Lastly, please note that the verification outline lists the order in which the verifiers want to cover the agenda topics. If you think the subjects should be covered in a different order, please notify the verification team in advance of your proposal.



Filed By: Zachary Shaykin, Filed Date: 7/9/24 8:51 AM, Submission Status: Approved

**Prior to the Start of Virtual Verification**

1. Verifiers will schedule a short Microsoft Teams test call with a company official and the company's counsel. During the test call, the verifier will request that the company official test the verification documents' submission process via ACCESS.
2. As explained in the cover letter, your client must have complete supporting documentation for the items outlined below for each verification procedure (pre-verification document "packages"). Complete supporting documentation would consist of all documentation necessary to verify the items listed in the outline below. For example, they may include applications, approvals, receipt of the subsidy, tracing the reported subsidy to the general ledger accounts and source documents, as well as complete English translations of these documents, if necessary. The time available for the verification is limited. Consequently, the appropriate personnel must prepare and submit the pre-verification packages prior to the start of verification.
3. <u>Pre-verification packages are not the same as final verification exhibits.</u> Therefore, they must be submitted via ACCESS using a designated "document type" that will direct the submission to a special depository only available to the verifiers.
4. File all pre-verification document packages via ACCESS, **on the date indicated in the cover letter.** When submitting the document in ACCESS select "TempVirtualVerificationExhibit" under the document type. <u>**Do not** file pre-verification documents using the "Verification" document type.</u> Contact the official in charge if any pre-verification documents are accidentally submitted as "Verification" document type.
5. The pre-verification documents filed via ACCESS:
    a. Just like any other submission, must be submitted as one file with multiple parts, if needed, to comply with ACCESS's filing size restrictions. The submission must include a cover letter to include the case information and indicate that these are pre-verification documents;
    b. Are temporary working documents for the verifiers to use during the verification; therefore, because they are not the final verification exhibits, they will not be available to interested parties;
    c. Must be treated as BPI in their entirety, with no public version;
    d. Must be scanned for optimal character recognition (OCR) prior to upload;and
    e. Certifications are not required for the pre-verification packages.

**During the Virtual Verification**

1. Appropriate personnel who are knowledgeable about the company's questionnaire responses, other information submitted on the record of the proceeding, and the underlying accounting systems must be available to speak to the verifiers when needed.
2. Company officials present during the virtual verification, including appropriate personnel who are knowledgeable about the accounting system, must have online access to the accounting system where online inquires can be made during verification and observed *via* Microsoft Teams.
3. Original company records and other source documentation used to prepare any part of the response (*e.g.*, general ledger, trial balance, sales journals, bank statements, applications, letters of approval, etc.) must be available when requested.

4. All documents, screen prints, etc., requested by the verifiers during the course of the virtual verification must be filed, by the deadline established by the verifiers at the time of the request, via ACCESS under the "TempVirtualVerificationExhibit" document type. **DO NOT** file these documents using the "Verification" document type. Follow the same filing guidelines set forth in step 5 of the prior section.
5. All documents presented before and during verification (*e.g.*, pre-verification document packages and *ad hoc* requests, etc.) must be translated into English on the first occasion on which they are presented to the verifiers.
6. Ensure that you or your representative retain at least one copy of each document presented to and/or requested by the verifiers.
7. The verifiers will indicate which documents will be placed in specific final verification exhibits, which you will submit to the official record of the proceeding. This may happen at the end of the verification of a particular topic, of each verification day, or of the verification process itself.
8. Maintain a list of the names and titles of all company personnel and representatives participating in the verification, regardless of the role played. Provide the list to the verifiers at the conclusion of the virtual verification.

**Summary of Types of Source Documents**

Although other records may be required, the following is an illustrative list of the type of source records that will be examined during verification:

1. Complete financial statements and footnotes, or interim financial statements and footnotes, covering the POI**.**

2. General ledger and subsidiary ledgers for accounts receivable, accounts payable, and sales (including all records in your company's accounting software).

3. Chart of accounts and sub-accounts.

4. Journals for accounts receivable, accounts payable, and sales.

5. Sales agreements or contracts, purchase orders, order confirmations, invoices, shipping notices and bills of lading.

6. Purchase agreements and records of payment made for production inputs, bank statements, payment notifications and vouchers, and invoices.

7. Loan applications, agreements, and approval notices with associated payment vouchers/bank statements for interest and principal.

8. Grant applications and government approval letters, and bank statements demonstrating receipt of assistance.

9. Certified/date-stamped original income tax returns (national/local) filed with tax authorities during the POI with all accompanying schedules and appendices.

10. Business Registration Forms, Business Licenses, Certificates, Capital Verification Reports, etc.

## SECTION I: GENERAL INFORMATION

### A. Corrections to Response

If you identified errors in the responses while preparing for verification, please provide the following at the outset of verification:

1. a list of the errors;
2. original documentation to show the corrections; and
3. a chart that shows the magnitude of changes to quantitative data.

For example, if you find an error in the reported sales value, please provide the following in your chart for no. 3, above:

1. the original sales value;
2. the corrected sales value; and
3. the percentage change in the sales value that results from the minor correction.

The verifiers will examine the errors to determine if they are minor. Further, depending upon the nature of the errors that you identify (*e.g.*, discovery of unreported loans), you should contact the officials in charge prior to the start of verification. It might be necessary for the verifiers to discuss the corrections with team members before deciding whether the corrections can be accepted. In such cases, the verifiers will not be able to tell you whether the corrections are accepted on the same day that they are presented.

### B. Accounting System

Be prepared to discuss and demonstrate that the accounting system used by your company(s) reconciles to the information provided in the questionnaire response.

### C. Company History, Affiliations, Cross-ownership, and Corporate Structure

1. For Santa Priscila and cross-owned affiliates Produmar S.A. (Produmar), Egidiosa S.A. (Egidiosa), and Tropical Packing Ecuador S.A. (Tropack), discuss and document:

    a. corporate history, ownership, structure, and affiliations;
    b. products produced and exported;
    c. location of all offices and facilities.

    Have available original records that substantiate the information that was reported in the questionnaire responses.

2. For Santa Priscila, discuss how Santa Priscila reported the amount of shrimp provided by Santa Priscila's top two unaffiliated suppliers. Provide any documentation to support its reporting of these suppliers.


Filed By: Zachary Shaykin, Filed Date: 7/9/24 8:51 AM, Submission Status: Approved

Barcode:4592081-01 C-331-806 INV - Investigation -

## D. Sales and Export Information

1. Provide an overview of the sales process and document flow/accounting entries for sales of frozen warmwater shrimp in the domestic market and to the United States.

2. For the POI, as well as other years of the average-useful life (AUL) period, be prepared to review the total sales and total export sales reported in the questionnaire responses, and be prepared to tie those sales values from the responses to the overall sales values in the company's general ledger and financial statements. *Have all necessary sales reconciliation worksheets prepared in advance.*

3. For specific sales categories (*i.e.*, total sales, total exports of subject merchandise, and total exports of subject merchandise to the United States), be prepared to tie the reported sales totals to the company's general ledger.

4. Demonstrate that the reported sales figures are on a free-on-board (FOB) factory basis for domestic sales and an FOB port basis for export sales, and be prepared to tie transportation and insurance to the general ledger and financial statements. *Prepare in advance any necessary worksheets to detail any adjustments for transportation and insurance charges to derive the FOB values.*

# SECTION II: SUBSIDY PROGRAMS TO BE EXAMINED

## A. Tax Programs

I. Tax Incentives for Priority Sectors Under the 2010 Organic Production Code (Priority Sectors Program)
II. Investment Contract Program
III. Export Tax Incentive Program
IV. Youth Employment - State Economic Incentive for the Private Sector Program (Youth Employment State Incentive Program)
V. Motor Vehicle Tax Reduction
VI. Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities (Income Tax Exemption on Financial Returns Program)



Filed By: Zachary Shaykin, Filed Date: 7/9/24 8:51 AM, Submission Status: Approved

For the Priority Sectors Program, the verifiers will:

1. Discuss Santa Priscila's claims that it did not benefit from the use of this program, and the association of benefits under this program with the Investment Contract Program.

For the Investment Contract Program and the Export Tax Incentive Program, the verifiers will:

1. Discuss (a) an overview of the program and (b) eligibility criteria.

2. Examine the certified/date-stamped income tax return and all schedules and appendices attached to it that were filed in the POI. Be prepared to demonstrate that there were no amendments, audits, or other corrections to the tax returns.

3. Examine, if applicable (a) copy of the application; (b) any necessary certificates; (c) approval documents; and (d) other source documentation (*e.g.*, receipts, tax returns, journal entries, etc.) demonstrating the amount of the benefit received.

4. Review how the company records the benefit in its accounting system, if at all.

For the Youth Employment State Incentive Program, the Motor Vehicle Tax Reduction Program, and the Income Tax Exemption on Financial Returns Program, the verifiers will:

1. Examine, if applicable (a) copy of the application; (b) any necessary certificates; (c) approval documents; and (d) other source documentation (e.g., receipts, tax returns, journal entries, etc.) demonstrating the amount of the benefit received.

2. Review how the company records the benefit in its accounting system, if at all.

**B. <u>Provision of Electricity for LTAR</u>**

For electricity payments made during the POI, the verifiers will:

1. Discuss the company's electricity usage and how payments are reflected in the accounting system. *Be prepared to discuss the diagram, provided in the response, which demonstrates the flow of information through accounting records for electricity purchases.*

2. Examine documentation for electricity payments made for two months of the POI, from invoice to payment receipt and then tie the payments to the accounting system associated with Santa Priscila's electric meter [ ] for May, 2022; and associated with Egidiosa's electric meter [ ] for September, 2022.

*These trace packages for these pre-selects must be submitted prior to the start of verification, as explained above.*

3. Tie the company's reported electricity rates paid to the tariff rate schedule of the electricity supplier.

**C. <u>Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays for LTAR</u>**

For the land under examination, the verifiers will:

1. Review (a) land contracts/agreements associated with sequence numbers [ ] and and (b) payment documentation for all purchases/leases of land/land-use rights reported in the questionnaire response for these sequence numbers. Ensure that the supporting documentation includes: the total hectares of land, the annual land use concession fee, and the application fee associated with the land use concessions reported under sequence numbers [ ].

2. Provide a sample agreement for Santa Priscila's [ ] as reported in Santa Priscila's Section III SQR.

3. Examine the accounting system and other financial accounts to verify that all purchases/leases of land by Santa Priscila were reported.

**SECTION III: NON-USE OF OTHER SUBSIDY PROGRAMS**

For the programs preliminarily found to be not used (as listed below), be prepared to demonstrate that Santa Priscila and its cross owned affiliates Produmar, Egidiosa, and Tropack, as applicable, did not receive assistance under these programs. In verifying "non-use," Commerce will examine any evidence of subsidies provided by your government under any subsidy program, including programs not currently subject to investigation. In particular, the verifiers will:

1. Examine the sub-ledger detail of various accounts in which unreported assistance would likely be recorded (*i.e.*, Commerce will review account detail for accounts such as "special payables," "other payables," and "government subsidies" for evidence of any unreported subsidies, *including subsidies provided under programs not currently subject to investigation).*

2. Query your accounting system.

3. Review all attachments and schedules submitted along with your tax return filed with the tax authorities during the POI.

4. Examine all notes attached to your audited financial statements for the POI and prior years of the AUL.

5. Review documentation confirming that your company's facilities are not located in regions to which certain programs are limited (*e.g.*, economic zones, specific cities, specific provinces).

6. Review documentation confirming that your company is not eligible for certain programs (*i.e.*, documentation indicating that your company has no foreign ownership and is thus not qualified for programs targeting foreign invested enterprises).

# Tab 66

# P.R. 397

# C.R. 260

Barcode:4594014-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
~~**Business Proprietary Document**~~
**Public Version**
E&C/OIV: RA

July 9, 2024

Sociedad Nacional de Galapagos C.A.
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, SE
Suite 500,
Washington, DC 20003

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification Agenda of SONGA

Dear Mr. Goldfeder:

On June 28, 2024, we indicated that the U.S. Department of Commerce (Commerce) intended to conduct verification of the data reported by your client, *i.e.* Sociedad Nacional de Galapagos C.A. (SONGA), in the above-referenced investigation through a remote, virtual videoconference. The virtual videoconference verification is scheduled for July 22 through July 24, 2024, *via* Microsoft Teams. You will receive an email containing the link to the meeting at the email addresses you have provided to Commerce officials. Commerce officials Reginald Anadio and Zachary Shaykin will conduct the verification.

Attached you will find the agenda we intend to follow at the verification of your client's questionnaire responses in this investigation. We may, however, revise the order of this agenda, or of specific items described in the agenda, depending on the needs of the verification.

The purpose of providing this agenda in advance of the actual verification is to allow you to brief the appropriate company personnel on the items to be covered and the type of documentation required to verify each item. The attached agenda is not necessarily all inclusive and we reserve the right to request any additional information or materials necessary for a complete verification.

Please reiterate to your client the statutory requirement for verification and note the following facts: (1) the information gathered during the verification will be used solely for the purposes of this proceeding; and (2) it is in your client's interest to cooperate since failure to permit verification may result in the Commerce relying on adverse "facts available" under section 776 of the Tariff Act of 1930, as amended (the Act).

To facilitate the verification process, we have described the types of source documents that we will require to support the submitted data. As you are aware, the time available for the verification is limited. Consequently, we ask that the necessary information be gathered by the appropriate personnel prior to the start of the virtual verification, and be provided to the verifiers


INTERNATIONAL TRADE ADMINISTRATION

via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS), **by 5:00 p.m. Friday, July 18, 2024,** in advance of the start of the first scheduled verification meeting. The attached agenda provides directions regarding the advance submission of documents that will be examined during verification.

In addition to examining supporting documentation, the verifiers will need to speak to appropriate personnel concerning your client's questionnaire responses and other information submitted on the record of the proceeding. Please ensure appropriate personnel are available to meet with the verifiers. Please note that the names and titles of all company personnel and representatives participating in the verification, regardless of the role played, will be included in the verification report and treated as public information.

It is the responsibility of the respondent to be fully prepared for this verification. If your client is not prepared to support or explain a response item at the appropriate time, the verifiers will move on to another topic. If, due to time constraints, it is not possible to return to that item, we may consider the item unverified, which may result in our basing the final determination of this investigation on the facts available, possibly including information that is adverse to the interests of your client.

Please note that verification is not intended to be an opportunity for submission of new factual information. New information will be accepted at verification only when: (1) the need for that information was not evident previously; (2) the information makes minor corrections to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record. Our acceptance of such information for examination at verification does not guarantee that we will be able to use it for our final determination.

Please note that verification is not intended to be an opportunity for the submission of new factual information. Information will be accepted at verification only when the information makes minor corrections to information already on the record or when information is requested by the verifiers, in accordance with the agenda below, to corroborate, support, and clarify factual information already on the record. 19 CFR 351.301(b) establishes time limits for the submission of new factual information and 19 CFR 351.302 establishes procedures for the extension of time limits, and the return of untimely filed or unsolicited material. If minor errors were found in any of your previously submitted filings they must be presented at the start of verification. If you present corrections of minor errors, you must file the information in ACCESS within **two business days of the start of verification.**

Section 777(c)(1) of the Act provides for the release of all business proprietary information, under administrative protective order (APO), presented to or obtained by Commerce during a proceeding, except privileged information, classified information, and specific information of a type for which there is a clear and compelling need to withhold from disclosure. As such, we request that you file final verification exhibits no later than the end of the fifth business day after each verification is completed. Unless you provide detailed, specific information to establish that there is a "clear and compelling need" to withhold a verification exhibit from disclosure, all business proprietary exhibits must be filed with Commerce as business proprietary documents in accordance with 19 CFR 351.303(b) and 351.303(f) no later than the end of the fifth business

day after each verification is completed. It is not necessary to create or file public versions of exhibits that are not public in their entirety. Your submission of the exhibits must be accompanied by the certificate of service required by 19 CFR 351.303(f)(2) indicating service on the parties on the APO service list, as well as the certificates of factual accuracy included with the initial questionnaire issued to you by Commerce. Exhibits that are public in their entirety (*e.g.*, public laws, annual reports) must be filed with Commerce in accordance with the requirements set forth in 19 CFR 351.303(b) and 351.303(f) for submission of public information. If, upon review, Commerce finds that any of the exhibits filed do not match the exhibits that Commerce decided to take during verification, Commerce will notify the submitter and other parties, and will take appropriate steps to address any inconsistencies.

As noted above, upon the completion of verification, all final verification exhibits must be filed electronically using ACCESS. An electronically-filed document must be received successfully in its entirety by Commerce's electronic records system, ACCESS, by 5:00 p.m. Eastern Time, unless otherwise specified by Commerce, on the fifth business day after verification is completed. Documents excepted from the electronic filing requirement under 19 CFR 351.303(b)(2)(ii) must be filed manually (*i.e.*, in paper form) with the APO/Dockets Unit in Room 18022 and stamped with the date of receipt on the fifth business day after verification is completed.

If you have any questions regarding this verification, please contact Zachary Shaykin at (202) 482-2638 or Reginald Anadio at (202) 482-3166. If, upon receipt of this agenda, you feel any of the verification procedures cannot be performed, please contact us immediately.

Sincerely,

Robert Boling
Program Manager
AD/CVD Operations, Office IV

# VERIFICATION AGENDA

**Countervailing Duty Investigation of**
**Frozen Warmwater Shrimp**
**from Ecuador**
**(C-331-806)**

**Period of Investigation (POI): 01/01/2022 – 12/31/2022**

**Sociedad Nacional de Galapagos C.A. (SONGA)**

We will verify the questionnaire responses of SONGA submitted in this investigation to check the accuracy and completeness of the information provided. To do so, we will trace information in the responses to original source documents and to accounting records (*e.g.*, a software-based accounting system). The source documents and accounting records should be actual records kept by the company, and not documents or electronic files that were created for this investigation. Documents or electronic files created for purposes of questionnaire responses and verification may be presented at verification solely for purposes of reconciling and tracing your responses to source documents. The objective of verification, however, is to tie information already on the record to source documents and your electronic accounting systems. For more information on the source records that will need to be available for examination at verification, *see* "Summary of Types of Source Documents," below.

Companies must provide all appropriate source records to substantiate the completeness and accuracy of the information in the responses, including use of programs, non-use of programs, and sales and export information. Company officials must be prepared to review relevant accounting records to establish that all assistance received under the programs being examined was reported. As such, company staff that can access accounting records to substantiate information in the responses must be available at verification.

To the extent possible, we specify the records that we require for each section of the verification. However, company accounting systems vary widely, and some of the verification steps may not be possible with a particular firm's accounting system. In these instances, the company should review the goal of the particular section and determine the best method to accomplish the goal through company records.

Additionally, please note that the verification agenda is not all inclusive. We may need to request further information or materials as necessary to conduct a complete and thorough verification. Lastly, please note that the verification outline lists the order in which the verifiers want to cover the agenda topics. If you think the subjects should be covered in a different order, please notify the verification team in advance of your proposal.

**Prior to the Start of Virtual Verification**

1. Verifiers will schedule a short Microsoft Teams test call with a company official and the company's counsel. During the test call, the verifier will request that the company official test the verification documents' submission process via ACCESS.
2. As explained in the cover letter, your client must have complete supporting documentation for the items outlined below for each verification procedure (pre-verification document "packages"). Complete supporting documentation would consist of all documentation necessary to verify the items listed in the outline below. For example, they may include applications, approvals, receipt of the subsidy, tracing the reported subsidy to the general ledger accounts and source documents, as well as complete English translations of these documents, if necessary. The time available for the verification is limited. Consequently, the appropriate personnel must prepare and submit the pre-verification packages prior to the start of verification.
3. Pre-verification packages are not the same as final verification exhibits. Therefore, they must be submitted via ACCESS using a designated "document type" that will direct the submission to a special depository only available to the verifiers.
4. File all pre-verification document packages via ACCESS, **on the date indicated in the cover letter.** When submitting the document in ACCESS select "TempVirtualVerificationExhibit" under the document type. **Do not** file pre-verification documents using the "Verification" document type. Contact the official in charge if any pre-verification documents are accidentally submitted as "Verification" document type.
5. The pre-verification documents filed via ACCESS:
   a. Just like any other submission, must be submitted as one file with multiple parts, if needed, to comply with ACCESS's filing size restrictions. The submission must include a cover letter to include the case information and indicate that these are pre-verification documents;
   b. Are temporary working documents for the verifiers to use during the verification; therefore, because they are not the final verification exhibits, they will not be available to interested parties;
   c. Must be treated as BPI in their entirety, with no public version;
   d. Must be scanned for optimal character recognition (OCR) prior to upload; and
   e. Certifications are not required for the pre-verification packages.

**During the Virtual Verification**

1. Appropriate personnel who are knowledgeable about the company's questionnaire responses, other information submitted on the record of the proceeding, and the underlying accounting systems must be available to speak to the verifiers when needed.
2. Company officials present during the virtual verification, including appropriate personnel who are knowledgeable about the accounting system, must have online access to the accounting system where online inquires can be made during verification and observed *via* Microsoft Teams.
3. Original company records and other source documentation used to prepare any part of the response (*e.g.*, general ledger, trial balance, sales journals, bank statements, applications, letters of approval, etc.) must be available when requested.

4. All documents, screen prints, etc., requested by the verifiers during the course of the virtual verification must be filed, by the deadline established by the verifiers at the time of the request, via ACCESS under the "TempVirtualVerificationExhibit" document type. <u>**DO NOT** file these documents using the "Verification" document type. Follow the same filing guidelines set forth in step 5 of the prior section.</u>
5. All documents presented before and during verification (*e.g.*, pre-verification document packages and *ad hoc* requests, etc.) must be translated into English on the first occasion on which they are presented to the verifiers.
6. Ensure that you or your representative retain at least one copy of each document presented to and/or requested by the verifiers.
7. The verifiers will indicate which documents will be placed in specific final verification exhibits, which you will submit to the official record of the proceeding. This may happen at the end of the verification of a particular topic, of each verification day, or of the verification process itself.
8. Maintain a list of the names and titles of all company personnel and representatives participating in the verification, regardless of the role played. Provide the list to the verifiers at the conclusion of the virtual verification.

**Summary of Types of Source Documents**

Although other records may be required, the following is an illustrative list of the type of source records that will be examined during verification:

1. Complete financial statements and footnotes, or interim financial statements and footnotes, covering the POI**.**

2. General ledger and subsidiary ledgers for accounts receivable, accounts payable, and sales (including all records in your company's accounting software).

3. Chart of accounts and sub-accounts.

4. Journals for accounts receivable, accounts payable, and sales.

5. Sales agreements or contracts, purchase orders, order confirmations, invoices, shipping notices and bills of lading.

6. Purchase agreements and records of payment made for production inputs, bank statements, payment notifications and vouchers, and invoices.

7. Loan applications, agreements, and approval notices with associated payment vouchers/bank statements for interest and principal.

8. Grant applications and government approval letters, and bank statements demonstrating receipt of assistance.

9. Certified/date-stamped original income tax returns (national/local) filed with tax authorities during the POI with all accompanying schedules and appendices.

10. Business Registration Forms, Business Licenses, Certificates, Capital Verification Reports, etc.

## SECTION I: GENERAL INFORMATION

### A. <u>Corrections to Response</u>

If you identified errors in the responses while preparing for verification, please provide the following at the outset of verification:

1. a list of the errors;
2. original documentation to show the corrections; and
3. a chart that shows the magnitude of changes to quantitative data.

For example, if you find an error in the reported sales value, please provide the following in your chart for no. 3, above:

1. the original sales value;
2. the corrected sales value; and
3. the percentage change in the sales value that results from the minor correction.

The verifiers will examine the errors to determine if they are minor. Further, depending upon the nature of the errors that you identify (*e.g.*, discovery of unreported loans), you should contact the officials in charge prior to the start of verification. It might be necessary for the verifiers to discuss the corrections with team members before deciding whether the corrections can be accepted. In such cases, the verifiers will not be able to tell you whether the corrections are accepted on the same day that they are presented.

### B. <u>Accounting System</u>

Be prepared to discuss and demonstrate that the accounting system used by your company(s) reconciles to the information provided in the questionnaire response.

### C. <u>Company History, Affiliations, Cross-ownership, and Corporate Structure</u>

1. For SONGA and cross-owned affiliates Naturisa S.A. (Naturisa), Empacadora Champmar S.A. (Champmar), and Holding Sola & Sola (Sola), discuss and document:

   a. corporate history, ownership, structure, and affiliations;
   b. products produced and exported; and
   c. location of all offices and facilities.

   Have available original records that substantiate the information that was reported in the questionnaire responses.

2. Discuss how SONGA calculated the amount of shrimp provided by SONGA's top two unaffiliated suppliers (*i.e.*, [ ] and [ ] of

[ ] and [ ] pounds, respectively).[1] Provide any documentation to support its reporting of these suppliers.

**D. <u>Sales and Export Information</u>**

1. Provide an overview of the sales process and document flow/accounting entries for sales of frozen warmwater shrimp in the domestic market and to the United States.

2. For the POI, as well as other years of the average-useful life (AUL) period, be prepared to review the total sales and total export sales reported in the questionnaire responses, and be prepared to tie those sales values from the responses to the overall sales values in the company's general ledger and financial statements. Additionally, be prepared to discuss why SONGA's sales are consolidated with [ ]. *Have all necessary sales reconciliation worksheets prepared in advance.*

3. For specific sales categories (*i.e.*, SONGA's total sales and total exports, and Naturisa's total sales quantity), be prepared to tie the reported sales totals to the company's general ledger.

4. Demonstrate that the reported sales figures are on a free-on-board (FOB) factory basis for domestic sales and an FOB port basis for export sales, and be prepared to tie transportation and insurance to the general ledger and financial statements. *Prepare in advance any necessary worksheets to detail any adjustments for transportation and insurance charges to derive the FOB values.*

**SECTION II: SUBSIDY PROGRAMS TO BE EXAMINED**

**A. <u>Tax Programs</u>**

I. Investment Contract Program
   i. Accumulated investment tax rate reduction
   ii. ISD exemption on imported materials
   iii. ISD exemption on foreign loans

For the Investment Contract Program, the verifiers will:

1. Discuss (a) an overview of the program and (b) eligibility criteria.

2. Examine the certified/date-stamped income tax return and all schedules and appendices attached to it that were filed in the POI. Be prepared to demonstrate that there were no amendments, audits, or other corrections to the tax returns.

[1] *See* SONGA's Letter, "Sources of Raw Shrimp Questionnaire Response," dated January 3, 2024, at Exhibit SRS-2.

3. Examine, if applicable: (a) copy of the application; (b) any necessary certificates; (c) approval documents; and (d) other source documentation (*e.g.*, receipts, tax returns, journal entries, etc.) demonstrating the amount of the benefit received.

4. Review how SONGA records the benefit in its accounting system, if at all.

## B. <u>Provision of Electricity for Less Than Adequate Remuneration (LTAR)</u>

For electricity payments made during the POI, the verifiers will:

1. Discuss SONGA's electricity usage and how payments are reflected in the accounting system. *Be prepared to discuss the diagram, provided in the response, which demonstrates the flow of information through accounting records for electricity purchases.*

2. Examine documentation for electricity payments made for two months of the POI. Specifically, provide information from invoice to payment receipt and then tie the payments to the accounting system associated with Naturisa's [ ] electric consumption at [ ] for May 2022 and SONGA's [ ] electric consumption at [ ] for August 2022.

   *These trace packages for these pre-selects must be submitted prior to the start of verification, as explained above.*

3. Tie SONGA's reported electricity rates paid to the tariff rate schedule of the electricity supplier.

## C. <u>Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays for LTAR</u>

For the land under examination, the verifiers will:

1. Review (a) land contracts/agreements associated with concession numbers [ ] and (b) payment documentation for all purchases/leases of land/land-use rights reported in the questionnaire response for these concession numbers. Ensure that the supporting documentation includes: year of concession renewal, the total hectares of land, the annual land use concession fee, most recent payment of such fees during the POI, and the application fee associated with the land use concessions reported under concession numbers [ ].

2. Examine the accounting system and other financial accounts to verify that Naturisa reported all applicable land concessions.

3. Confirm that SONGA did not hold land concessions by examining the sub-ledger detail of various accounts in which fees associated with the concession would likely be recorded.

**SECTION III: NON-USE OF OTHER SUBSIDY PROGRAMS**

For the programs preliminarily found to be not used (as listed below), be prepared to demonstrate that SONGA and its cross owned affiliates Naturisa, Champmar, and Sola, as applicable, did not receive assistance under these programs. In verifying "non-use," Commerce will examine any evidence of subsidies provided by your government under any subsidy program, including programs not currently subject to investigation. In particular, the verifiers will:

1. Examine the sub-ledger detail of various accounts in which unreported assistance would likely be recorded (*i.e.*, Commerce will review account detail for accounts such as "special payables," "other payables," and "government subsidies" for evidence of any unreported subsidies, *including subsidies provided under programs not currently subject to investigation).*

2. Query SONGA's and Naturisa's accounting system.

3. Review all attachments and schedules submitted along with SONGA's and Naturisa's tax return filed with the tax authorities during the POI.

4. Examine all notes attached to SONGA's and Naturisa's audited financial statements for the POI and prior years of the AUL.

5. Review documentation confirming that SONGA is not eligible for certain programs (*i.e.*, documentation indicating that your company has no foreign ownership and is thus not qualified for programs targeting foreign invested enterprises).

# Tab 67

# P.R. 398

# C.R. 261

Barcode: 4594285-01 C-331-806 INV - Investigation

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 37
Investigation
AD/CVD Operations, Office IV
Business proprietary information of the GOE has been ranged or redacted pages S5-3 to S5-5, S5-7 to S5-9, and S5-11 to S5-13; and from Exhibits S5-1 to S5-6; business proprietary information of Santa Priscila, Produmar, Tropack, SONGA, and Naturisa has been redacted from pages S5-2; business proprietary information of Santa Priscila, Produmar, SONGA, and Naturisa has been redacted from pages S5-6; business proprietary information of Sola is contained in on pages S5-10.

**<u>PUBLIC VERSION</u>**

July 11, 2024

Re: Frozen Warmwater Shrimp from Ecuador –
<u>Government of Ecuador's Third Post-Preliminary Supplemental Questionnaire Response</u>

Dear Secretary Raimondo:

On behalf of the Government of Ecuador ("GOE"), we hereby submit the GOE's response to the Department's July 2, 2024, post-preliminary third supplemental questionnaire. This response is timely submitted in accordance with the Department's July 9, 2024, letter, re: "Request for Extension to July 2, 2024, Supplemental Questionnaire Response," which extended the deadline for the Government of Ecuador's supplemental response until today.

Pursuant to 19 C.F.R. § 351.304(a)(1)(i), the GOE requests proprietary treatment for the information enclosed in brackets in this submission. We describe below the nature of the


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/11/24 11:30 AM, Submission Status: Approved

information for which the GOE requests proprietary treatment, for itself and respondents and their cross-owned affiliates, and the basis for the request:

- The exact amount of benefit applied for: Contained in the narrative. Protected under 19 C.F.R. § 351.105(c)(8).

- Other specific information related to the GOE's operations, tax collections, and other benefits, etc. the release of which may result in the disclosure of confidential information maintained by the GOE, as well as other specific information related to the operations of the respondents, and their cross-owned affiliates, the release of which to the public would cause substantial harm to the competitive position of the respondents and their cross-owned affiliates: Contained in the exhibits. Protected under 19 C.F.R. § 351.105(c)(11).

Public disclosure of the proprietary information contained in this submission would cause serious commercial harm to the competitive position of the mandatory respondents and their cross-owned affiliates. The GOE consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

The factual information contained herein is submitted in accordance with 19 C.F.R. § 351.301(c)(1) and 19 C.F.R. § 351.102(b)(21)(i) in response to the Department's supplemental questionnaire.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to the Government of Ecuador*

REPÚBLICA DEL ECUADOR

Ministerio de Producción, Comercio Exterior, Inversiones y Pesca

## GOVERNMENT CERTIFICATION

I, Juan Carlos Sanchez, Undersecretary of Origin, Trade Remedies and Trade Normative,, currently employed by the Government of Ecuador, certify that I prepared or otherwise supervised the preparation of the attached submission of the Third Post-Preliminary Questionnaire Response, filed on July 10, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

I certify that the public information and any business proprietary information of the Government of Ecuador contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.

In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Juan Carlos Sánchez

Date: 07/10/2024

# Counsel Certification

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to the Government of Ecuador, certify that I have read the attached submission of the Third Post-Preliminary Supplemental Questionnaire, filed on July 10, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ______________________

Date: July 10, 2024

**CERTIFICATE OF SERVICE**

I, Kenneth N. Hammer, hereby certify on this 11th day of July, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), will be deemed served via ACCESS, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

**Case No. C-331-806**
**Investigation**
**AD/CVD Operations, Office IV**

**Business proprietary information of the GOE has been ranged or redacted from pages S5-3 to S5-5, S5-7 to S5-9, and S5-11 to S5-13; and from Exhibit S5-1 to S5-6; business proprietary information of Santa Priscila, Produmar, Tropack, SONGA, Sola, and Naturisa has been redacted on the pages listed on the cover letter of this submission.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER SHRIMP FROM ECUADOR**

# RESPONSE OF THE GOVERNMENT OF ECUADOR TO THE DEPARTMENT'S JULY 2, 2024, POST-PRELIMINARY THIRD SUPPLEMENTAL QUESTIONNAIRE

---

**Submitted by:**

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**David Lindgren, Trade Consultant**

**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE**
**Suite 500**
**Washington, D.C. 20003**
**(202) 223-3760**

**Date submitted: July 11, 2024**

**Counsel to the Government of Ecuador**

**PUBLIC VERSION – BPI Has Been Redacted**

December 31, 2021. Therefore, no new approvals for wage support under the program were approved under the program in either 2021 or 2022.

**j. If you have additional information that you believe demonstrates that the program is broadly available and widely used throughout the economy, please provide such information and a narrative description of your contention.**

ANSWER: Not applicable because the program was terminated before the start of the period of investigation.

**Motor Vehicle Tax Reduction**

**a. The amount of assistance approved for each mandatory respondent company, including all cross-owned companies and trading companies that sell the subject merchandise to the United States.**

ANSWER: The chart below lists the respondents and cross-owned affiliates required to respond to the Department's questionnaire that were approved for benefits under the Motor Vehicle Tax Reduction program between 2019 and 2022 and the amounts of those approved benefits:

| COMPANY NAME | 2019 | 2020 | 2021 | 2022 |
|---|---|---|---|---|
| [ | | | | |
| | | | | |
| | | | | |
| | | | | ] |

**{Contains BPI of SONGA, Produmar, Naturisa, and Santa Priscila.}**

**b. The total amount of assistance approved for all companies under these programs.**

ANSWER: The chart below lists the total amount of benefits that were approved for all companies for the Motor Vehicle Tax Reduction program during the years 2019-2022:

| Year | Total Benefits for All Companies |
|---|---|
| 2019 | [ |
| 2020 | |
| 2021 | |
| 2022 | ] |



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/11/24 11:30 AM, Submission Status: Approved

**c. The total amount of assistance approved for each of the largest 50 recipients under these programs and include the industry designation for each of these recipients. Note that at this time, you do not need to provide the name of the recipient, you just need to provide the individual amount of assistance approved.**

ANSWER: **Exhibit S5-3** contains a table with the total number of companies and amount of benefits for the largest 50 recipients under the Motor Vehicle Tax Reduction program between 2019 and 2022.

The program is de jure widely available and is not de facto specific because the "Agriculture, Forestry and Fishing" sector overall, which includes a much wider range of companies than the shrimp industry, did not receive a disproportionate share of benefits under the program among the largest 50 recipients. Specifically, among the largest 50 recipients under the program, the "Agriculture, Forestry and Fishing" sector received only [ ]% of total benefits approved for the top 50 recipients for the year 2019; [ ]% of total benefits approved for the top 50 recipients for the year 2020; [ ]% of total benefits approved for the top 50 recipients for the year 2021; and [ ]% of total benefits approved for the top 50 recipients for the year 2022.

**d. The total number of companies that were approved for assistance under these programs.**

ANSWER: The chart below lists the total number of companies that were approved for benefits under the Motor Vehicle Tax Reduction program during the years 2019-2022:

| Year | Number of Companies Approved |
|---|---|
| 2019 | [ |
| 2020 | |
| 2021 | |
| 2022 | ] |

**e. The total number of companies operating or established in the jurisdiction of the granting authority of the investigated programs.**

ANSWER: As this was a nationwide, widely available, program, a list of the total number of companies operating throughout the country, by top-level industry, as classified by the ISIC Rev. 4, was previously provided in Exhibit S-Q3(b) of the GOE's SQR 1. Ecuador classifies economic activity



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/11/24 11:30 AM, Submission Status: Approved

based on the ISIC Rev. 4. The industries have been reported at the first level of this classification system. Aquaculture activities fall within the industrial category "Agriculture, Forestry and Fishing."

**f. The total number of corporate/business income tax filers within the jurisdiction of the granting authority of the investigated programs.**

ANSWER: Please refer to the GOE's response to subpart (e) above.

**g. Provide a complete listing of the industries that operate in the jurisdiction of the granting authority of the investigated programs. In identifying these industries, please use whatever resource or classification scheme your government normally relies upon to define industries and to classify companies within an industry. Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification.**

ANSWER: Please refer to the GOE's response to subpart (e) above.

**h. The total amount of assistance approved for the industry in which the mandatory respondent companies operate, as well as the totals for every other industry in which companies were approved for assistance under these programs. In identifying the industries, please use whatever resource or classification scheme your government normally relies upon to define industries and to classify companies within an industry. Please provide the relevant classification guidelines, and please ensure the list provided reflects consistent levels of industrial classification. Please clearly identify the industry in which the companies under investigation are classified.**

ANSWER: As stated in subpart (e) above, aquaculture activities, including shrimp production, fall within the ISIC Rev. 4 industrial category "Agriculture, Forestry and Fishing." **Exhibit S5-4** contains a table with the total number of companies and amount of benefits for all approved beneficiaries under the Motor Vehicle Tax Reduction program between 2019 and 2022. As reflected in the data reported by the GOE, the "Agriculture, Forestry and Fishing" sector overall, which includes a much wider range of companies than the shrimp industry, is not specific because it does not receive a disproportionate share of benefits under the Vehicle Tax Reduction program. Companies operating in the "Agriculture, Forestry and Fishing" sector, which includes far more recipients than the shrimp industry's recipients, represent only [ ]% of companies overall approved in 2019; [ ]% of companies approved in 2020; [ ]% of companies approved in 2021; and [ ]% of companies approved in 2022. Likewise, the total approved benefit amount for companies operating in the "Agriculture, Forestry and Fishing" sector, which includes more than the shrimp industry's companies, was [ ]% of benefits approved for all recipients in 2019; [ ]% of benefits approved in 2020; [ ]% of benefits approved in 2021; and [ ]%



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/11/24 11:30 AM, Submission Status: Approved

Barcode: 4594285-01 C-331-806 INV - Investigation



**List of Exhibits – GOE's Third Post-Preliminary Supplemental Questionnaire Response**

| Exhibit No. | Description | Electronic | Classification |
|---|---|---|---|
| **S5-1** | Top 50 Recipients Usage Data for Tax Incentive for Youth Employment – State Economic Incentives for Private Sector Program | - | BPI |
| **S5-2** | Usage Data Among Industry Sectors for Tax Incentive for Youth Employment – State Economic Incentives for Private Sector Program | - | BPI |
| **S5-3** | Top 50 Recipients Usage Data for Tax Incentive for Motor Vehicle Tax Reduction Program | - | BPI |
| **S5-4** | Usage Data Among Industry Sectors for Tax Incentive for Motor Vehicle Tax Reduction Program | | |
| **S5-5** | Top 50 RecipientsUsage Data for Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities Program | - | BPI |
| **S5-6** | Usage Data Among Industry Sectors for Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities Program | - | BPI |



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/11/24 11:30 AM, Submission Status: Approved

# EXHIBIT S5-4

**All Sectors Vehicle Tax Reduction**

| | 2019 | | 2020 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|---|---|
| ISIC Rev 4 Industrial Category | # of Companies | Value | # of Companies | Value | # of Companies | Value | # of Companies | Value |
| Accommodation and food service activities [ | | | | | | | | ] |
| Activities of extraterritorial organizations and bodies [ | | | | | | | | ] |
| Activities of households as employers; undifferentiated goods- and services-producing activities of households for own use [ | | | | | | | | ] |
| Administrative and support service activities [ | | | | | | | 2,500 | ] |
| Agriculture, forestry and fishing [ | | | | | | | | ] |
| Arts, entertainment and recreation [ | | | | | | | | ] |
| Construction [ | 1,000 | | | | | | | ] |
| Education [ | | | | $ 25,000.00 | | | | ] |
| Electricity, gas, steam and air conditioning supply [ | | | | | | | | ] |
| Financial and insurance activities [ | | | | | | | | ] |
| Human health and social work activities [ | | | | | | | | ] |
| Information and communication [ | | | | | | | | ] |
| Manufacturing [ | | | | | | | | ] |
| Mining and quarrying [ | | | | | | | | ] |
| Other service activities [ | | | | | | | | ] |
| Professional, scientific and technical activities [ | | | | | | | | ] |
| Public administration and defence; compulsory social security [ | | | | | | | | ] |
| Public Sector Dependencies [ | | | | | | | | ] |
| Real estate activities [ | | | | | | | | ] |
| Transportation and storage [ | | | | | | | | ] |
| Water supply; sewerage, waste management and remediation activities [ | | | | | | | | ] |
| Wholesale and retail trade; repair of motor vehicles and motorcycles [ | | | | | | | | ] |
| **Total** [ | | | | | | | | ] |

# EXHIBIT S5-5

**Top 50 Companies - Tax Exemption for Time Deposits and Other Fixed Income Securities**

| ISIC Rev 4 Industrial Category | 2019 | | 2020 | | 2021 | |
|---|---|---|---|---|---|---|
| | # of Companies | Declared Value | # of Companies | Declared Value | # of Companies | Declared Value |
| Accommodation and food service activities [ | | | | $ 300,000.00 | | ] |
| Administrative and support service activities [ | | | | | | ] |
| Agriculture, forestry and fishing [ | | | | | | ] |
| Construction [ | | | | | | ] |
| Education [ | | | | | | ] |
| Financial and insurance activities [ | | | | | | ] |
| Human health and social work activities [ | | | | | | ] |
| Manufacturing [ | | | | | | ] |
| Mining and quarrying [ | | | | | | ] |
| Other service activities [ | | | | | | ] |
| Professional, scientific and technical activities [ | | | | | | ] |
| Real estate activities [ | | | | | | ] |
| Transportation and storage [ | | | | | | $ 250,000.00 ] |
| Wholesale and retail trade; repair of motor vehicles and motorcycles [ | | | | | | ] |
| **Total** [ | | | | | | ] |

Barcode: 4594285-01 C-331-806 INV - Investigation

# EXHIBIT S5-6

Filed By: khammer@tradepacificlaw.com, Filed Date: 7/11/24 11:30 AM, Submission Status: Approved

**All Sectors - Tax Exemption for Time Deposits and Other Fixed Income Securities**

| | 2019 | | 2020 | | 2021 | | |
|---|---|---|---|---|---|---|---|
| **ISIC Rev 4 Industrial Category** | **# of Companies** | **Total Declared Value** | **# of Companies** | **Total Declared Value** | **# of Companies** | **Total Declared Value** | |
| Accommodation and food service activities [ | | | | | | | ] |
| Administrative and support service activities [ | | | | | | | ] |
| Agriculture, forestry and fishing [ | | | | | | | ] |
| Arts, entertainment and recreation [ | | | | | | | ] |
| Construction [ | | | | | | | ] |
| Education [ | | | | | | | ] |
| Electricity, gas, steam and air conditioning supply [ | | | | | | | ] |
| Financial and insurance activities [ | | | | $ 30,000,000.00 | | | ] |
| Human health and social work activities [ | | | | | | | ] |
| Information and communication [ | | | | | | | ] |
| Manufacturing [ | | | | | | | ] |
| Mining and quarrying [ | | | | | | | ] |
| Other service activities [ | | | | | | | ] |
| Professional, scientific and technical activities [ | | | | | | | ] |
| Public administration and defence; compulsory social security [ | | | | | | | ] |
| Real estate activities [ | | | | | | $ 2,000,000.00 | ] |
| Transportation and storage [ | 20 | | | | | | ] |
| Water supply; sewerage, waste management and remediation activities [ | | | | | | | ] |
| Wholesale and retail trade; repair of motor vehicles and motorcycles [ | | | | | | | ] |
| **Total** [ | | | | | | | ] |

# Tab 68

# P.R. 400

Barcode:4595988-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
**Public Document**
E&C/OIV: ZS, RA

July 12, 2024

**MEMORANDUM TO:** Abdelali Elouaradia
Deputy Assistant Secretary
for Enforcement and Compliance

**FROM:** Scot Fullerton
Acting Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:** Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Post-Preliminary Analysis

---

## I. SUMMARY

The U.S. Department of Commerce (Commerce) preliminarily finds additional countervailable subsidies are being provided to Santa Priscila S.A. (Santa Priscila), Sociedad Nacional de Galapagos C.A. (SONGA), and certain of their cross-owned entities,[1] as well as to unaffiliated shrimp producers, from the Government of Ecuador (GOE). The period of investigation (POI) is January 1, 2022, through December 31, 2022.

## II. BACKGROUND

On April 1, 2024, Commerce published the preliminary determination in the countervailing duty (CVD) investigation of frozen warmwater shrimp (shrimp) from Ecuador.[2] The mandatory respondents in this investigation are Santa Priscila and SONGA, and certain of their cross-owned entities. On April 19, 2024, Commerce published an *Amended Preliminary Determination*[3] in

[1] The entities that we preliminarily determined are cross-owned with Santa Priscila are: Manesil S.A., Produmar S.A. (Produmar); Egidiosa S.A. (Egidiosa); and Tropical Packing Ecuador S.A. (Tropack). The entities that we preliminarily determined are cross-owned with SONGA are: Naturisa S.A. (Naturisa); Holding Sola & Sola Solacciones S.A.; and Empacadora Champmar S.A. (Champmar).

[2] *See Frozen Warmwater Shrimp from Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with the Final Antidumping Duty Determination*, 89 FR 22379 (April 1, 2024) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).

[3] *See Frozen Warmwater Shrimp from Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation*, 89 FR 31722 (April 25, 2024) (*Amended Preliminary Determination*), and accompanying Preliminary Ministerial Error Memorandum.

Filed By: Reginald Anadio, Filed Date: 7/12/24 4:04 PM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

response to ministerial error comments submitted by interested parties on Commerce's *Preliminary Determination*.[4]

On January 8 and February 21, 2024, Commerce received timely filed new subsidy allegations (NSA) from the American Shrimp Processors Association (*i.e.*, the petitioner).[5] The petitioner alleged that Santa Priscila, SONGA, and certain of their cross-owned affiliates had benefited from certain additional countervailable subsidies from the GOE.[6] On January 25 and March 4, 2024, Santa Priscila, SONGA, and the GOE timely submitted rebuttal comments to the Petitioner's NSAs.[7] On January 31 and March 1, 2024, Commerce issued supplemental questionnaires to the petitioner regarding the NSAs[8] and received timely responses on February 5 and March 5, 2024, respectively.[9] Santa Priscila, SONGA, and the GOE timely submitted rebuttal comments to the petitioner's March 5, 2024, supplemental questionnaire response.[10] On March 21, 2024, Commerce initiated its investigation of the Petitioner's NSAs.[11]

In the *Preliminary Determination*, we stated our intention to address the Petitioner's NSAs, as well as certain other programs at issue in this investigation, in a post-preliminary analysis memorandum.[12] In the Initiation of NSAs, Commerce initiated an investigation of four newly alleged subsidy programs: (1) Provision of Fuel to Shrimp Farmers for Less Than Adequate Remuneration (LTAR); (2) Provision of Brackish Water for LTAR; (3) Income Tax Reductions for Reinvestments; and (4) Banco Nacional de Fomento (BNF) Loan/Interest Forgiveness Program.[13] In the *Preliminary Determination*, we stated that we would continue to examine the following programs: (1) Government Provision of Electricity for LTAR; (2) Municipal Tax Program; (3) Youth Employment: State Economic Incentive for the Private Sector; (4) Currency Outflow Tax (ISD) Exemption on Principal and Interest Payments on Foreign Loans; (5) Annual Motor Vehicle Tax Reduction Program; (6) Income Tax Deduction for Net Increase in Employment Program; (7) Exemption of Financial Returns; (8) Hiring of Additional Personnel;

---

[4] *See* Santa Priscila's Letter, "Request for Correction of Ministerial Errors with Respect to Industrial Pesquera Santa Priscila S.A. and Request for Meeting," dated March 28, 2024; *see also* SONGA's Letter, "Request for Correction of Ministerial Error in Preliminary Determination," dated March 29, 2024; GOE's Letter, "Request for Correction of Ministerial Errors with Respect to Industrial Pesquera Santa Priscila S.A. and Request for Meeting," dated April 2, 2024; Petitioner's Letter, "Ministerial Error Comments," dated April 2, 2024.
[5] *See* Petitioner's Letters, "New Subsidy Allegations," dated January 8, 2024; and "New Subsidy Allegations," dated February 2, 2024 (collectively, Petitioner's NSAs).
[6] *Id*.
[7] *See* Santa Priscila, SONGA, and the GOE's Letters, "Factual Information to Rebut, Clarify, and/or Correct New Subsidy Allegations," dated January 25, 2024; and "Factual Information to Rebut, Clarify, and/or Correct New Subsidy Allegations," dated March 4, 2024.
[8] *See* Commerce's Letters, "First Supplemental Questionnaire Regarding New Subsidy Allegation," dated January 31, 2024; and "Supplemental Questions Regarding New Subsidy Allegation," dated March 1, 2024.
[9] *See* Petitioner's Letters, "New Subsidy Allegations Supplemental Response," dated February 5, 2024; and "New Subsidy Allegations Supplemental Response," dated March 5, 2024.
[10] *See* Santa Priscila, SONGA, and the GOE's Letter, "Rebuttal Submission of SONGA and Industrial Pesquera Santa Priscila to the Petitioners' March 5, 2024 Response to Supplemental Questions Regarding New Subsidy Allegations," dated March 15, 2024.
[11] *See* Memorandum, "New Subsidy Allegations," dated March 21, 2024 (Initiation of NSAs).
[12] *See Preliminary Determination* PDM at 4-5, 26, and 29-30.
[13] *See* Initiation of NSAs at 2-4.

and (9) Municipal Patent Exemption.[14] Commerce notes that the Income Tax Deduction for Net Increase in Employment Program and Hiring of Additional Personnel are the same program.[15]

From March 28 through May 31, 2024, Commerce issued initial and supplemental questionnaires to Santa Priscila, SONGA, and the GOE regarding the abovementioned programs.[16] From April 18 through June 12, 2024, Santa Priscila,[17] SONGA,[18] and the GOE[19] submitted timely responses to Commerce's questionnaires. From April 25 through May 22, 2024, the petitioners submitted rebuttal comments regarding Santa Priscila, SONGA, and the GOE's initial and supplemental questionnaire responses,[20] and from May 1 through 29, 2024, Santa Priscila, SONGA, and the GOE submitted comments in response to the petitioner's rebuttal comments regarding Santa Priscila, SONGA, and the GOE's initial and supplemental questionnaire responses.[21]

On April 3, 2024, pursuant to Commerce's determination that fresh shrimp may be attributable to frozen shrimp in accordance with section 771B of the Tariff Act of 1930, as amended (the Act),[22] Commerce issued questionnaires to Santa Priscila, SONGA, and the GOE regarding the shrimp industry in Ecuador and the provision of shrimp to Santa Priscila, SONGA, and their cross-owned affiliates.[23] On April 25, 2024, Santa Priscila, SONGA, and the GOE timely submitted

---

[14] *See Preliminary Determination* PDM at 26 and 29-30.
[15] *See* Santa Priscila's Letter, "Santa Priscila's Post-Preliminary Supplemental Questionnaire Response," dated May 16, 2024 (Santa Priscila's Post-Preliminary SQR1), at Exhibit S2-2.
[16] *See* Commerce's Letters, "Countervailing Duty Questionnaire regarding New Subsidy Allegation ," dated March 28, 2024; "Priscila Post Preliminary Supplemental Questionnaire," dated May 2, 2024; "SONGA Post Preliminary Supplemental Questionnaire," dated May 2, 2024; "Government of Ecuador Post Preliminary Supplemental Questionnaire," dated May 2, 2024; "Santa Priscila Post Preliminary Second Supplemental Questionnaire," dated May 31, 2024; "SONGA Post Preliminary Second Supplemental Questionnaire," dated May 31, 2024; and "Government of Ecuador Post Preliminary Second Supplemental Questionnaire," dated May 31, 2024.
[17] *See* Santa Priscila's Letters, "Santa Priscila's New Subsidy Allegations Questionnaire Response," dated April 18, 2024 (Santa Priscila's NSA IQR); Santa Priscila's Post-Preliminary SQR1; and "Santa Priscila's Second Post-Preliminary Supplemental Questionnaire Response," dated June 11, 2024 (Santa Priscila's Post-Preliminary SQR2).
[18] *See* SONGA's Letters, "SONGA's New Subsidy Allegations Questionnaire Response," dated April 18, 2024 (SONGA's NSA IQR); "SONGA Post-Preliminary Supplemental Questionnaire Response," dated May 16, 2024; and "SONGA Second Post-Preliminary Supplemental Questionnaire Response," dated June 11, 2024 (SONGA's Post-Preliminary SQR2).
[19] *See* GOE's Letters, "Government of Ecuador's New Subsidy Allegations Questionnaire Response," dated April 18, 2024 (GOE's NSA IQR); "Government of Ecuador's Post-Preliminary Supplemental Questionnaire Response," dated May 16, 2024 (GOE's Post-Preliminary SQR1); and "Government of Ecuador's Second Post-Preliminary Supplemental Questionnaire Response," dated June 12, 2024 (GOE's Post-Preliminary SQR2).
[20] *See* Petitioner's Letters, "Request to Reject Untimely and Unsolicited Factual Information," dated April 25, 2024; "Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses," dated May 2, 2024; and "Request for Supplemental Questionnaire," dated May 22, 2024.
[21] *See* Santa Priscila, SONGA, and the GOE's Letters, "Response to Petitioners' Request to Reject Benchmark Information," dated May 1, 2024; " Respondents' Submission of Factual Information to Rebut, Clarify, or Correct Information that the Petitioners Submitted on May 2, 2024 in Their "Deficiency Comments and Rebuttal Factual Information to New Subsidy Questionnaire Responses" Concerning Their Brackish Water Allegations," dated May 14, 2024; and "Respondents' Opposition to the Petitioner's May 22, 2024 'Request for Supplemental Questionnaire' re Brackish Water NSA," dated May 29, 2024.
[22] *See Preliminary Determination* PDM at 9-11.
[23] *See* Commerce's Letter, "Countervailing Duty Questionnaire regarding Section 771B of the Act," dated April 3, 2024 (Section 771B Questionnaires).

their responses to Commerce's Section 771B Questionnaires.[24] On May 9, 2024, the petitioner submitted comments regarding Commerce's Application of section 771B of the Act in this investigation.[25]

## III. DIVERSIFICATION OF ECUADOR'S ECONOMY

Section 771(5A)(D)(iii) of the Act provides that, in evaluating the factors set forth under the provision, Commerce shall take into account the extent of economic diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation. The SAA elaborates that "these additional criteria serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors"; that is, they "may provide a clearer context within which the *de facto* factors would be analyzed" but are not *per se* "additional indicators of whether specificity exists."[26]

In this investigation, we asked that the GOE provide information on the economic activities within the jurisdiction of the granting authority for each relevant program. The GOE provided information from the Ecuadorean Internal Revenue Service's (SRI) Single Taxpayer Registry System on the companies operating in Ecuador during the POI.[27] The evidence on the record indicates that, for purposes of our *de facto* specificity analysis, the Ecuadorian economy is diversified. Specifically, the information provided by the GOE indicates that many industries operate in Ecuador, including: manufacturing; agriculture, forestry, and fishing; arts, entertainment and recreation; electricity, gas, steam and air conditioning supply; financial and insurance activities; information and communication; mining and quarrying; real estate activities; transportation and storage; wholesale and retail trade; repair of motor vehicles and motorcycles; and a variety of service-related industries.[28] Based on this information, we preliminarily determine that the level of economic diversification in Ecuador does not detract from finding a program to be *de facto* specific for programs in this memorandum as relevant, where other information so indicates in accordance with section 771(5A)(D)(iii) of the Act (*e.g.*, where the number of recipients are limited in number).

---

[24] *See* Santa Priscila's Letter, "Santa Priscila's 771B Questionnaire Response," dated April 25, 2024; *see also* SONGA's Letter, "SONGA's 771B Questionnaire Response," dated April 25, 2024; and GOE's Letter, "Government of Ecuador's 771B Questionnaire Response," dated April 25, 2024.
[25] *See* Petitioner's Letter, "Comments on the Application of Section 771B," dated May 9, 2024.
[26] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. I (1994), at 931.
[27] *See, e.g.*, GOE's Letter, "Government of Ecuador's Section II Questionnaire Response," dated February 14, 2024 (GOE's IQR), at TAX-13 and TAX-14.
[28] *Id.*

## IV. SUBSIDIES VALUATION

### A. Allocation Period

The allocation period or average useful life of renewable physical assets in the production of subject merchandise is 12 years, unchanged from the *Preliminary Determination*.[29]

### B. Attribution of Subsidies

Commerce's attribution methodology is unchanged from the *Preliminary Determination*.[30] Therefore, we are attributing the benefits to the sales of Santa Priscila, SONGA, and certain of their cross-owned affiliates in accordance with 19 CFR 351.525(b)(6)(ii)-(iv).

### C. Application of Section 771B of the Act

In the *Preliminary Determination*, in accordance with section 771B(1) of the Act, Commerce preliminarily determined that record evidence indicated that the demand for unprocessed shrimp is "substantially dependent" on the demand for frozen shrimp.[31] Furthermore, in accordance with section 771(B)(2) of the Act, Commerce preliminarily determined that processing of the raw input of subject merchandise added less than 30 percent of the final value of subject merchandise, and that the essential character of the fresh shrimp consumed is not changed with processing.[32] Therefore, Commerce preliminarily attributed subsidies to the non-cross-owned shrimp suppliers that are specific to Santa Priscila and SONGA.[33] Accordingly, Commerce's decision to attribute subsidies to the non-cross-owned shrimp suppliers that are specific to Santa Priscila and SONGA remains unchanged from the *Preliminary Determination*.[34]

### D. Denominators

The denominators used are unchanged from the *Preliminary Determination*.[35] We have identified the denominators we used to calculate the subsidy rates for the alleged subsidy programs listed above and as discussed below and in the calculation memorandum prepared for this post-preliminary analysis.[36]

---

[29] *See Preliminary Determination* PDM at 6.
[30] *Id.* at 5 and 6.
[31] *Id.* at 10.
[32] *Id*.
[33] *Id.* at 11.
[34] Commerce will analyze responses to the Section 771B Initial Questionnaires in its final determination.
[35] *See Preliminary Determination* PDM at 11.
[36] *See* Memoranda, "Post-Preliminary Determination Calculations for Santa Priscila S.A.," dated concurrently with this memorandum (Santa Priscila's Post-Preliminary Calculation Memorandum); and "Post-Preliminary Determination Calculations for Sociedad Nacional de Galapagos C.A.," dated concurrently with this memorandum (SONGA's Post-Preliminary Calculation Memorandum).

## V. BENCHMARKS

### A. Benchmarks for the Provision of Electricity for LTAR

Santa Priscila, Produmar, Egidiosa, Tropack, SONGA, Naturisa, and Champmar reported paying for electricity from state-owned electricity distributors during the POI.[37]

Commerce selected a benchmark for determining the benefit from the Provision of Electricity for LTAR program in accordance with the methodology described in 19 CFR 351.511(a)(2), which sets forth the basis for identifying appropriate market-determined benchmarks for determining whether a government good or service is provided for LTAR. These potential benchmarks are listed in hierarchical order by preference: (1) market prices from actual transactions within the country under investigation (*e.g.*, actual transactions between private parties, actual imports, or actual sales from competitively run government auctions) (tier one); (2) world market prices that would be available to purchasers in the country under investigation (tier two); or (3) an assessment of whether the government price is consistent with market principles (tier three).[38]

As discussed in the "Analysis of Programs" section below, in accordance with an analysis conducted pursuant to tier three of the benchmark hierarchy and for purposes of calculating an appropriate benchmark in the preliminary decision, Commerce selected the per unit average cost of electricity distribution services per Table No. 25 of the GOE's Analysis and Determination of the Cost of Public Electric Energy Service for January-December 2022.[39] Specifically, as the tier three benchmark, Commerce used the average per-unit cost of service for the distribution company applicable to the respective mandatory respondents.

## VI. ANALYSIS OF PROGRAMS

### A. Programs Preliminarily Determined to Be Countervailable

### 1. Government Provision of Electricity for LTAR

The GOE reported that it has provided electricity in Ecuador for many years, and the centralized provision of electricity is established by Ecuador's Constitution.[40] Electricity rates in Ecuador

---

[37] *See* Santa Priscila's Letters, "Santa Priscila's Section III Questionnaire Response," dated February 12, 2024 (Santa Priscila's Section III IQR), at III-17 and Exhibit 9; "Section III of Supplier Questionnaire Response," dated May 16, 2024 (Santa Priscila's Supplier Section III IQR), at III-PRO-8, III-PRO-9, III-EGI-6, III-EGI-7, and III-TRO-6 and Exhibits PRO-5, EGI-1, and TRO-1; and "Santa Priscila's Supplemental Section III Questionnaire Response," dated March 1, 2024, at S-5 and S-6 and Exhibits S-9(a) and S-9(b); *see also* SONGA's Letters, "SONGA's Section III Questionnaire Response," dated February 12, 2024, at Exhibit 8; "Section III of Supplier Questionnaire Response," dated February 16, 2024 (SONGA's Supplier Section III IQR), at Exhibit NAT-III-5 and EC-III-1; "SONGA Supplemental Section III Questionnaire Response," dated March 1, 2024, at Exhibit S-4(a); and "SONGA Affiliated Companies Supplemental Questionnaire Response," dated March 18, 2024, at Exhibit S-AFF-Q23a.

[38] *See* 19 CFR 351.51(a)(2).

[39] *See* GOE's Letter, "Government of Ecuador's Section II Questionnaire Response," dated February 14, 2024, at Exhibit LTAR-3(c) at Table No. 25.

[40] *See* GOE's IQR at LTAR-3.

are established by GOE's Agency for Regulation and Control of Energy and Non-Renewable Natural Resources (ARCERNNR), under the Ministry of Energy and Mines.[41] In February and March of each year, ARCERNNR collects and analyzes data from state-owned distributors regarding their electricity demand and costs for the following year, which must conform to the relevant laws and regulations governing the provision of electricity and the establishment of electricity tariff rates.[42] ARCERNNR's Board of Directors, led by the Minister of Energy and Mines, then decides whether rates should be adjusted for the following year.[43] Around September of each year, ARCERNNR publishes the annual list of tariff rates that will be in effect for the following year.[44] ARCERNNR is responsible for issuing a tariff schedule each year, which includes tariffs for each category of electricity consumers. Companies are charged based on electricity classification, and not the type of company. Further, the GOE reported that, while electricity tariffs are generally uniform throughout Ecuador, there are areas where tariffs are not uniform (*i.e*., Guayaquil and Quito) because of historical pricing and differences in operating costs.[45]

There are 20 state-owned electricity distributors throughout Ecuador, which are responsible for directly supplying and managing connections and billing customers.[46] Eleven of the distributors are under the national-level, state-owned entity, called the National Electricity Corporation. The remaining nine distributors are regional entities, owned by regional governments.

*Financial Contribution*

We preliminarily determine that a financial contribution exists as defined by section 771(5)(D)(iii) of the Act in the form of the provision of a good. ARCERNNR formulated and regulated the tariff-setting policy, which was implemented by state-owned electricity distributors throughout Ecuador. We find that ARCERNNR and the 20 state-owned electricity distributors constitute "authorities" within the meaning of section 771(5)(B) of the Act, because they effectuate government policy, exercise government authority, were created by statute, and/or are state-owned.[47] Moreover, the GOE has not disputed that these entities are "authorities" within the meaning of section 771(5)(B) of the Act. Therefore, we preliminarily determine that the GOE provided a financial contribution under section 771(5)(D)(iii) of the Act to Santa Priscila and SONGA by providing electricity to them during the POI.

*Specificity*

We analyzed whether the GOE's provision of electricity to the mandatory respondents is specific under section 771(5A)(D) of the Act.

---

[41] *Id.* at LTAR-2.
[42] *Id*. at LTAR-3 and LTAR-10.
[43] *Id*. at LTAR-3.
[44] *Id*.
[45] *Id*. at LTAR-3 and LTAR-9.
[46] *Id*. at LTAR-2.
[47] *Id.* at LTAR-2 to LTAR-22.

The GOE explained that ARCERNNR assesses whether maintaining the electricity tariff structure from the previous year would significantly impact costs of generation, transmission and distribution, at the national level, and that it must guarantee that average costs of service are recouped on a netwide level.[48] However, the GOE does not consider the type of end-user (*i.e.*, electricity consumer) in analyzing demand projections in its system-wide cost analysis,[49] does not calculate costs of service by tariff category (*e.g.*, commercial vs. industrial),[50] and does not track the economic activities of the registered electricity customers.[51] Additionally, the GOE does not further delineate among industrial users when setting electricity rates.[52] Further, the GOE does not have an electricity tariff rate within Ecuador that is established specifically for shrimp producers.[53] Based on this information, we preliminarily determine that the provision of electricity for LTAR program is not *de jure* specific under section 771(5A)(D)(i) of the Act.

Therefore, we have examined whether the GOE's provision of electricity to the mandatory respondents is *de facto* specific under section 771(5A)(D)(iii) of the Act. We note that the GOE was unable to provide program usage information, as requested, on an industry category basis, noting at several points that it does not collect information on electricity users' industry classification. Therefore, to conduct the *de facto* specificity analysis, we compared the respondents' electricity consumption to the average Ecuadorian consumer's electricity consumption, broken out by the applicable electricity rate types (*i.e.*, commercial, industrial, water pumping), as found in the GOE's Annual and Multiyear Statistics of the Electrical Sector in Ecuador for 2022 (2022 Electricity Statistics).[54] We note that the report did not list, and the GOE did not provide, information to determine the average consumption per user in the water pumping category. Accordingly, based on neutral facts available pursuant to section 776(a)(1) of the Act, we analyzed whether the GOE's provision of electricity for water pumping was *de facto* specific by comparing the respondents' water pumping electricity usage to Ecuador's per user "Others" electricity consumption, as this consumption category may have reasonably included water pumping electricity in the GOE's 2022 Electricity Statistics.[55] Based on this analysis, for all applicable electricity rate types (*i.e.*, commercial, industrial, water pumping), we preliminarily determine that Santa Priscila and SONGA received a disproportionately large amount of electricity when compared to an average Ecuadorian consumer in the corresponding category,[56] and thus, we find the GOE's provision of such electricity was *de facto* specific as described under 771(5A)(D)(iii)(III) of the Act.

---

[48] *See* GOE's Letter, "Government of Ecuador's Second Post-Preliminary Supplemental Questionnaire," dated June 12, 2024, at S4-6.
[49] *Id*. at S4-7.
[50] *Id*.
[51] *Id*. at S4-5.
[52] *Id*. at S4-5 to S4-6.
[53] *See* GOE's IQR at LTAR-9 to LTAR-10.
[54] *See* GOE's Post-Preliminary SQR1 at Exhibit S3-4.
[55] *Id.* at Exhibit S3-4.
[56] We note that the calculations for comparing electricity consumption include business proprietary information. *See* SONGA's Post-Preliminary Calculation Memorandum; *see also* Santa Priscila's Post-Preliminary Calculation Memorandum.

*Benefit*

Section 771(5)(E) of the Act states that "the adequacy of remuneration shall be determined in relation to prevailing market conditions for the good or service being provided or the goods being purchased in the country which is subject to the investigation or review."[57] Commerce's regulations set forth a hierarchy, or three "tiers," for determining the adequacy of the remuneration paid.[58] Commerce prefers to measure the adequacy of remuneration using a tier one benchmark, *i.e.*, "by comparing the government price to a market determined price for the good or service resulting from actual transactions in the country in question";[59] however, "{w}here it is reasonable to conclude that actual transaction prices are significantly distorted as a result of the government's involvement in the market, {Commerce} will resort to the next alternative in the hierarchy."[60] Subsequently, if there is no useable tier one benchmark, Commerce measures the adequacy of remuneration by comparing the government price to a world market price, "where it is reasonable to conclude that such price would be available to purchasers in the country in question."[61] Finally, if there is no usable tier two benchmark, Commerce normally assesses whether the government price is consistent with market principles.[62]

First, according to the GOE, approximately 95 percent of all electricity is provided by the state-owned distribution companies, as established by the constitution of Ecuador, and the remaining five percent is electricity generated by private entities, predominately for self-consumption.[63] The self-generators are permitted to sell excess electricity based on private negotiations and they are not governed by ARCERNNR's electricity tariffs; however, the prices paid between these parties are not publicly available and there is no public information available generally on the pricing of private transactions within Ecuador.[64] As evidenced by the GOE's 2022 Electricity Statistics, the total quantity of electricity delivered to the grid by generators, which are all state-owned entities, in 2022 was 25,756.06 gigawatt hours (GWh), and the total quantity of electricity delivered to the grid by self-generators, which are all privately-owned entities, in 2022 was 6,115.02 GWh (*i.e.*, approximately 19 percent of combined delivered electricity was supplied by private self-generators).[65] Therefore, Commerce finds that the electricity prices in Ecuador were significantly distorted because of the government's significant presence in the market and thus concludes that there are no usable tier one benchmarks.

---

[57] *See* section 771(5)(E) of the Act.
[58] *See* 19 CFR 351.511.
[59] *See* 19 CFR 351.511(a)(2)(i).
[60] *See Countervailing Duties*, 63 FR 65348, 65377 (November 25, 1998) (*CVD Preamble*).
[61] *See* 19 CFR 351.511(a)(2)(ii).
[62] *See* 19 CFR 351.511(a)(2)(iii).
[63] *See* GOE's IQR at LTAR-18 to LTAR-19.
[64] *Id*. at LTAR-19.
[65] *See* GOE's Post-Preliminary SQR1 at S3-20 to S3-21.

Second, Commerce has previously recognized that the nature of electricity may not lend itself to a "world market price" comparison in some instances.[66] In the instant proceeding, the GOE reported that in 2022, Ecuador imported 465.83 GWh of electricity, valued at 5.95 million U.S. dollars from Colombia and Peru, combined.[67] However, the GOE further clarified that the electricity imported from Colombia and Peru is not directly accessible to domestic electricity consumers in Ecuador.[68] Commerce notes that on the record in the instant investigation, there are benchmark electricity tariffs outside of Ecuadorian rates such as electricity prices in the state of Andhra Pradesh, India, Uruguay, Germany, France, Spain, the United States, Japan, Australia, India, and Indonesia.[69] However, record evidence does not indicate that these prices were available to purchasers in Ecuador. Therefore, consistent with 19 FR 511(a)(2)(ii), we find that there is no usable tier two benchmark.

*Price Setting Philosophy*

Under a tier three benchmark analysis, the regulations under 19 CFR 351.511(a)(2)(iii) do not prescribe any specific analysis under this prong. However, the *CVD Preamble* discusses that an assessment of market principles may consider such factors as price-setting philosophy, costs (including rates of return sufficient to ensure future operations), or possible price discrimination.[70] In accordance with past practice and the *CVD Preamble*, we are not putting these factors in any hierarchy, and we may rely on one or more of these factors in any particular case.[71] By its nature, the tier three analysis depends upon available information concerning the market sector at issue and, therefore, must be assessed on a case-by-case basis.

In the second goe supplemental questionnaire,[72] Commerce requested information to assess whether ARCERNNR's issuance and calculation of electricity tariffs are representative of market-determined principles. As mentioned above, the GOE explained that ARCERNNR assesses whether maintaining the electricity tariff structure from the previous year would significantly impact costs of generation, transmission and distribution, at the national level, and that it must guarantee that average costs of service are recouped on a netwide level.[73]

---

[66] *See CVD Preamble*, 63 FR at 65377-78 ("We will consider whether the market conditions in the country are such that it is reasonable to conclude that the purchaser could obtain the good or service on the world market. For example, a European price for electricity normally would not be an acceptable comparison price for electricity provided by a Latin American government, because electricity from Europe in all likelihood would not be available to consumers in Latin America.").
[67] *See* GOE's Post-Preliminary SQR1 at S3-24.
[68] *Id*. at S3-25.
[69] *See* Santa Priscila and SONGA's Letter, "Benchmark Submission of SONGA and Industrial Pesquera Santa Priscila," dated February 28, 2024, at 2-3 and Exhibit 4(a), 5, 6(a), and 6(b); *see also* Petitioner's Letter, "Benchmark Information," dated February 28, 2024, at Exhibits 10 and 13.
[70] *See CVD Preamble*, 63 FR 65378.
[71] *Id.*; *see also, e.g.*, *Certain Cut-to-Length Carbon-Quality Steel Plate from the Republic of Korea: Preliminary Results and Preliminary Intent To Rescind, in Part, the Countervailing Duty Administrative Review; 2021*, 88 FR 13433 (March 3, 2023), and accompanying PDM.
[72] *See* Commerce's Letter, "Government of Ecuador's Section II Questionnaire Response," dated March 13, 2024 (GOE's SQR), at Question 2.
[73] *See* GOE's Post-Preliminary SQR2 at S4-6.

*Cost*

Each year, ARCERNNR requests *pro forma* budget information from the boards of directors of each distributor to project costs for the upcoming year. ARCERNNR then conducts a comparative analysis of the proforma budget information collected from each distribution company. If significant anomalies are observed in the budget information collected, ARCERNNR may adjust the submitted *pro forma* budget information. In assessing for significant cost variations, ARCERNNR assesses whether costs vary by 10 percent or more from historical costs.

To determine variable costs of electricity generation, ARCERNNR evaluates economic dispatch data generated from the energy simulations conducted by the National Operator of Electricity in which it evaluates the production values of generators based on current contract prices.[74] To determine fixed costs, ARCERNNR requests information on administration, operation, and maintenance costs, quality, reliability, and availability of service, and environmental responsibility factors. According to the GOE, these factors are regulated based on efficiency parameters, *i.e*., performance indicators of the resources used for a company to provide service continuously and guarantee quality of service. In addition to gathering information from energy simulations, ARCERNNR gathers and analyzes costs of ancillary services, including: (1) frequency regulation; (2) start-stop turbo-steam units; (3) power reserve; and (4) reactive power. The specific cost calculation is set forth in Articles 11.1.2 and 11.1.3 of the Regulation No. ARCERNNR-006/21.[75]

As part of its cost generating process, electricity distribution companies present demand projection information in addition to information regarding their service costs. These projections are based on historical data, user behavior, and past energy consumption, which are based on providers knowledge of service provision in the provider's geographic area. ARCERNNR's review of historical values allows it to control for normal cost increases based on expected growth in demand. When ARCERNNR observes significant spikes in demand, it holds working meetings with each distribution company. Generally, ARCERNNR must respond to the entry of significant industrial users to the grid, which requires planning to respond to increases in demand caused by new significant consumers.

ARCERNNR compares the demand projections with statistical data of energy sales and number of users collected from each distribution company. If ARCERNNR detects considerable variations from statistical expectations, the distributor is subjected to an audit process to justify and/or adjust their demand projections.

Upon gathering cost information, ARCERNNR projects and analyzes the impact of continuing to apply the same electricity tariff from the previous year upon projected revenues and costs for the upcoming year. Where the proposed tariff would have considerable impact upon the projected

---

[74] *See* GOE's Letter, "Government of Ecuador's Supplemental Section II Questionnaire Response," dated March 19, 2024, at S2-2.
[75] *See* GOE's IQR at Exhibit LTAR-2.

revenues of each distribution and commercialization company, ARCERNNR's Board of Directors will adjust the proposed tariff. ARCERNNR is the only entity with authority to approve the tariff structure in Ecuador and publicly owned distribution companies are required, by law, to apply the rates established in the tariff regime which is fixed by ARCERNNR.

To conduct a benefit analysis under 19 CFR 351.511(a)(2)(iii), we require information on whether the government price is consistent with market principles, which could include the government's price-setting philosophy, whether the price charged is sufficient to recover costs with a rate of return sufficient to ensure future operations, or whether there is discrimination among various types of users. The GOE confirmed that ARCERNNR does not calculate costs of service by tariff category (*i.e*., residential, commercial, industrial).[76] Consequently, we were unable to examine data to determine whether the GOE recovered costs based on an analysis of revenues and costs in the applicable tariff categories. Further, we were unable to compare the respondents' average tariff for each location to a distributor's cost on a tariff category-specific basis. Consequently, we preliminarily determine that necessary information is not available on the record and that Commerce must rely on facts otherwise available in making our preliminary determination, in accordance with section 776(a)(1) of the Act. In the absence of such information, pursuant to 776(a)(1) of the Act, we utilized the tariff rates paid by Santa Priscila and SONGA as a proxy to compare to the relevant distributors' average cost of service to determine whether the GOE set prices sufficient to recover costs. To that end, we multiplied Santa Priscila's and SONGA's kilowatt hours (kWh) consumption for each tariff category by the distributor's average per kWh cost and subtracted the total paid by the respondents for those rate types.[77] Based on this calculation performed under 19 CFR 351.511(a)(2)(iii), we find that that Santa Priscila and SONGA benefited from the provision of electricity at LTAR because, based on respondent specific-data, the GOE is not charging tariffs high enough to cover the applicable average cost of service. Regarding timing of receipt of the benefit, consistent with 19 CFR 351.511(b), we determine that benefits under this program were received as of the date on which Santa Priscila and SONGA paid for the electricity during the POI.

To calculate the net subsidy rate for Santa Priscila, we divided the benefit by the combined total sales of Santa Priscila and Tropack's, net of intercompany sales for the POI.[78] To calculate the net subsidy rate for Produmar, we divided the benefit by the combined total sales of Santa Priscila and Produmar, net of intercompany sales for the POI.[79] To calculate the net subsidy rate for Egidiosa, we divided the benefit by the combined total sales of Egidiosa and Santa Priscila.[80] To calculate the net subsidy rate for SONGA, we divided the benefit by the combined total sales of Naturisa and SONGA for the POI, net of inter-company sales for the POI. [81]

[76] *Id*. at S4-7.
[77] *See* SONGA's Post-Preliminary Calculation Memorandum; *see also* Santa Priscila's Post-Preliminary Calculation Memorandum.
[78] *See* Santa Priscila's Post-Preliminary Calculation Memorandum.
[79] *Id*.
[80] *Id*.
[81] *See* SONGA's Post-Preliminary Calculation Memorandum.

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI. Thus, for this program, we divided the benefit that Santa Priscila, Produmar, Egidiosa, and Naturisa received under the program by their respective volume of shrimp produced during the POI. We then multiplied the resulting per-unit benefit for Santa Priscila, Produmar, Egidiosa, and Naturisa by the total volume of raw shrimp supplied to the mandatory respondents during the POI by their unaffiliated shrimp producers. We then divided the benefit attributed to the unaffiliated raw shrimp suppliers of the mandatory respondents by the total POI sales of Santa Priscila and SONGA.

On this basis, we preliminary determine a net countervailable *ad valorem* subsidy rate of 0.04 for Santa Priscila and 0.02 for SONGA.[82]

**2. Hiring of Additional Personnel**

According to Article 10, Numeral 9 of the Internal Tax Regime Law, a company may claim an additional deduction of 100 percent of the payroll-related expenses to new employees in the year that they were hired, as long as they have been employees for at least six months.[83] The program requires that there is a net increase in employment of direct hires during the calendar year.[35] Naturisa and Produmar self-reported using this program.[84]

Commerce preliminarily determines that the exemption from the deduction of 100 percent of payroll-related expenses in its annual income tax submission constitutes a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act. Additionally, Commerce preliminarily determines that the deduction provides a benefit in the amount of the tax savings to the company, pursuant to 19 CFR 351.509(a)(1) and section 771(5)(E) of the Act. Commerce also preliminarily determines that this deduction is specific under section 771(5A)(D)(iii)(I) of the Act because this program was provided to a limited number of users.[85]

Consistent with 19 CFR 351.509(c), we are treating the tax savings received by the firms as a recurring benefit. Pursuant to 19 CFR 351.509(b)(1), we expensed the benefit received to the year in which the recipient of the tax savings otherwise would have had to pay the taxes, *i.e.*, the POI. Thus, the benefit received under this program is equal to the amount of tax that would have been paid absent the program during the POI.

---

[82] *See* SONGA's Post-Preliminary Calculation Memorandum; *see also* Santa Priscila's Post-Preliminary Calculation Memorandum.
[83] *See* SONGA's Supplier Section III IQR at Exhibit NAT-III-11; *see also* GOE's SQR at S-74 to S-87.
[84] *See* Santa Priscila's Supplier Section III IQR at Exhibit PRO-17; *see also* Santa Priscila's Letter, "Section II and III Supplier Supplemental Questionnaire Response," dated March 18, 2024, at S-PRO-2; *see also* SONGA's Supplier Section III IQR at NAT-III-13 and Exhibit NAT-III-11.
[85] *See* GOE's SQR at Exhibit S-Q58(b).

For Produmar, we divided the benefit by the combined total sales of Santa Priscila and Produmar during the POI, net of intercompany sales.[86] For Naturisa, we divided the benefit by the combined total sales of SONGA and Naturisa, net intercompany sales, during the POI.[87]

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI. Thus, for this program, we divided the benefit that Naturisa and Produmar received under the program by its volume of shrimp produced during the POI. We then multiplied the resulting per-unit benefit for Naturisa and Produmar by the total volume of raw shrimp supplied to SONGA and Santa Priscila, respectively, during the POI by their non-cross-owned shrimp producers. We then divided the benefit attributed to the unaffiliated raw shrimp suppliers of SONGA and Santa Priscila by the total POI sales of SONGA and Santa Pricila.[88]

On this basis, we preliminarily determine a countervailable subsidy rate of 0.01 percent *ad valorem* for Santa Priscila/Tropack and 0.05 percent *ad valorem* for SONGA.[89]

### 3. ISD Exemption on Principal and Interest Payments on Foreign Loans

Under Article 159 of the Reform Law for Tax Equity in Ecuador, individuals which made payments abroad may exempt the amortization of capital and interest which is generated on loans granted by international financial institutions or qualified non-financial entities.[90] In order to receive amortization exemptions under this program, an individual and/or entity must: (a) have received a loan from a foreign entity; and (b) the loan must be for a term of 180 days or longer.[91] The maximum amount of an exemption under this program is 7.39 percent of the principal/interest payments made on foreign loans, as established by the Monetary and Financial Policy and Regulation Board of Ecuador.[92] Santa Priscila and Produmar self-reported receiving benefits under this program.[93]

Commerce preliminarily determines that the exemption from the tax constitutes a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act. Additionally, Commerce preliminarily determines that the amortization exemption provides a benefit in the amount of the tax savings to the company, pursuant to 19 CFR 351.509(a)(1) and section 771(5)(E) of the Act. Commerce also preliminarily determines that this exemption is specific under section 771(5A)(D)(iii)(I) of the Act because this program was provided to a limited number of users.[94]

---

[86] *See* Santa Priscila's Post-Preliminary Calculation Memorandum.
[87] *See* SONGA's Post-Preliminary Calculation Memorandum.
[88] *Id.*; *see also* Santa Priscila's Post-Preliminary Calculation Memorandum.
[89] *Id*.
[90] *See* Santa Priscila's Section III IQR at III-23 and III-24 and Exhibit 19.
[91] *Id.* at Exhibit 19 at 1.
[92] *Id.*
[93] *Id.* at III-23 and Exhibit 19; *see also* Santa Priscila's Supplier Section III IQR at PRO-13.
[94] *See* GOE's IQR at OTH-7.

Consistent with 19 CFR 351.509(c), we are treating the tax savings received by the firms as a recurring benefit. Pursuant to 19 CFR 351.509(b)(1), we expensed the benefit received to the year in which the recipient of the tax savings otherwise would have had to pay the taxes, *i.e.*, the POI. Thus, the benefit received under this program is equal to the amount of tax that would have been paid absent the program during the POI.

For Santa Priscila, we divided the benefit by the combined total sales of Santa Priscila and Tropack during the POI, net of inter-company sales. For Produmar, we divided the benefit by the combined total sales of Santa Priscila and Produmar, net intercompany sales, during the POI.[95]

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI. Thus, for this program, we divided the benefit that Santa Priscila and Produmar received under the program by its volume of shrimp produced during the POI. Next, we multiplied the resulting per-unit benefit for Sana Priscila and Produmar by the total volume of raw shrimp supplied to Santa Priscila during the POI by their non-cross-owned shrimp producers. We then divided the benefit attributed to the unaffiliated raw shrimp suppliers of Santa Priscila and Produmar by the total POI sales of Santa Pricila and Produmar.

On this basis, we preliminarily determine a countervailable subsidy rate of 0.03 percent *ad valorem* for Santa Priscila/Tropack.[96]

## B. Programs Preliminarily Determined Not to Be Countervailable

### 1. Provision of Fuel for LTAR

The GOE reported that, under Article 72 of the Hydrocarbons Law of 1978, as amended, that all prices of hydrocarbon derivatives to consumers shall be regulated, and in 2005, a pricing regime for hydrocarbon derivatives, including diesel fuel, was established under Executive Decree Number 338.[97] In 2021, under Executive Decree number 231, the GOE indicated that consumers of natural gas, *i.e.*, Diesel 2 and Premium Diesel, for shrimp farming would be eligible for specific fuel price categories.[98] EP Petroecuador, the government-owned petroleum company, sells fuel to private traders in Ecuador, which are then permitted to sell diesel fuel purchased under the fixed prices for fuel set by the government and issued through ARCERNNR, and the prices that were established in Executive Decree Number 231 are not the prices that companies pay to purchase diesel fuel.[99] In particular, the GOE reported that a majority of the diesel fuel sold to the shrimp sector was sold through private traders and/or distributors, and that none of the mandatory respondents nor the cross-owned entities for which Commerce solicited information

---

[95] *See* Santa Priscila's Post-Preliminary Calculation Memorandum.
[96] *Id*.
[97] *See* GOE's NSA IQR at NSA-2 and Exhibits NSA-1 and NSA-2.
[98] *Id.*
[99] *Id.*

in this investigation directly received fuel from government-owned fuel suppliers.[100] We note that we initiated on this program on the basis that the GOE may have directly provided fuel to the mandatory respondents.[101] However, Commerce explicitly noted that it was not initiating on the portion of the allegation that the GOE may be entrusting or directing private sellers of fuel to provide diesel fuel for LTAR. We note that the record continues to contain no evidence indicating that private sellers of diesel fuel may have been entrusted or directed by the GOE. Therefore, consistent with Commerce's initiation decision,[102] and because none of the mandatory respondents nor their cross-owned affiliates directly purchased fuel from state-owned providers of fuel, we preliminarily determine that the respondents' purchases do not constitute a financial contribution in accordance with section 771(5)(D)(iii) of the Act.

**2. Provision of Brackish Water for LTAR**

The mandatory respondents reported using brackish water non-consumptively on their shrimp farms in the production raw shrimp for which the government does not charge fees.[103] Furthermore, the GOE reported that it does not require permits or the authorization for accessing brackish water by any entity which wishes to access brackish water.[104] Rather, under Article 93 of the 2014 Organic Law on Water Resources, Use and Development of Water (Water Resources Law), the government requires that non-consumptive users obtain an authorization from the Ecuadorean Ministry of Environment, Water, and Ecological Transition (MAATE) to extract water from a "public source," including brackish water sources from which the mandatory respondents pump in the production of subject merchandise.[105] The GOE reported that, after filing for productive use of a water source, including water pumping for shrimp production, as defined by Article 93 of the Water Resources Law, the MAATE conducts an on-site study and prepares a technical plan in relation to water pumping of public water sources for businesses.[106] In order to pump water from the local estuaries to the mandatory respondents' shrimp farm locations, Santa Priscila and SONGA stated that they and/or their cross-owned affiliates invest in equipment and incur significant operating costs for the water pumping infrastructure, including pipelines and powered pumps.[107] The GOE stated that it provides no infrastructure for the respondents' pumping of brackish water. Moreover, Santa Priscila and SONGA reported that Santa Priscila, Produmar, and Naturisa (*i.e.*, the entities which engage in water pumping of brackish water for non-consumptive use) have never consumed brackish water or used brackish water for consumptive purposes, because all of the brackish water which is pumped from local estuaries in the production of subject merchandise is returned to the source, either at the time at which shrimp is harvested or via a "water exchange."[108]

---

[100] *Id.* at NSA-4.
[101] *Id.*
[102] *See* Initiation of NSAs at 4.
[103] *See* GOE's NSA IQR at NSA-42.
[104] *See* GOE's Post-Preliminary SQR2 at S4-1.
[105] *Id.* at S4-1 and S4-2.
[106] *Id.* at S4-3.
[107] *See* Santa Priscila's Post-Preliminary SQR2 at S3-1; *see also* SONGA's Post-Preliminary SQR2 at S3-1 through S3-3.
[108] *See* Santa Priscila's Post-Preliminary SQR2 at S3-3 through S-7; see *also* SONGA's Post-Preliminary SQR2 at S3-3.

Barcode:4595988-01 C-331-806 INV - Investigation -

The respondents confirmed that their usage of brackish water was non-consumptive in nature, *i.e.*, shrimp farms operated by Santa Priscila, Produmar, and Naturisa pump brackish water from estuaries for use in shrimp farms, and the water is subsequently returned to those estuaries in the same quantity and quality. Further, the GOE confirmed that the government does not charge, and has never charged, for the non-consumptive use of brackish water, nor does it provide any infrastructure to the respondents for pumping such water to their facilities.[109] Rather, as indicated by Santa Priscila and SONGA in their questionnaire responses, Santa Priscila, Produmar, and Naturisa bear all costs for constructing, maintaining, and operating the infrastructure to transport brackish water to and from their facilities.[110] As a result, considering the totality of evidence referenced above, we preliminarily find that this program does not provide countervailable benefits.

### C. Program Preliminarily Determined to Provide Non-Measurable Benefits during the POI

#### 1. Youth Employment – Social Security Benefits

Santa Priscila, Produmar, and Tropack self-reported receiving benefits under this program during the POI.[111] We divided the benefit Santa Priscila received under this program by the total combined sales of Santa Priscila and Tropack, net of intercompany sales. We divided the benefit Produmar received under this program by the total combined sales of Santa Priscila and Produmar, net of intercompany sales. We divided the benefit received by Tropack by the total combined sales of Santa Priscila and Tropack, net of intercompany sales. We then combined the resulting company-specific subsidy rates calculated for Santa Priscila, Produmar, and Tropack, and attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI. The resulting net subsidy rate for Santa Priscila/Tropack was less than 0.005 percent, and thus, is not measurable.[112]

#### 2. Hiring of Disabled People

Naturisa self-reported using this program.[113] We divided the benefits Naturisa received under the program by its total sales for the POI and attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI. The resulting net subsidy rate for SONGA was less than 0.005 percent, and thus, is not measurable.[114]

---

[109] *See* GOE's NSA IQR at NSA-37 and NSA-42.
[110] *See* Santa Priscila's Post-Preliminary SQR2 at S3-1; *see* SONGA's Post-Preliminary SQR2 at S3-1.
[111] *See* Santa Priscila's Supplier Section III IQR at III-TRO-8 and Exhibits PRO-11 at 2 and TRO-2 at 2; *see also* Santa Priscila's Section III IQR at Exhibit 17.
[112] *See* Santa Priscila's Preliminary Calculation Memorandum.
[113] *See* SONGA's Supplier Section III IQR at NAT-III-13 and Exhibit NAT-III-10.
[114] *See* SONGA's Preliminary Calculation Memorandum.



Filed By: Reginald Anadio, Filed Date: 7/12/24 4:04 PM, Submission Status: Approved

### 3. Municipal Patent Tax Exemption

Santa Priscila, Egidiosa, Produmar, and Naturisa reported receiving tax savings under this program during the POI.[115] For Santa Priscila, we divided the benefit by the combined total sales of Santa Priscila and Tropack during the POI, net of intercompany sales.[116] For Egidiosa, we divided the benefit by the combined total sales of Santa Priscila and Egidiosa during the POI, net of intercompany sales.[117] For Naturisa, we divided the benefit by the combined total sales of SONGA and Naturisa, net intercompany sales, during the POI.[118] For both Santa Priscila and SONGA, we attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI.

The resulting net subsidy rate for Santa Priscila/Tropack and SONGA was less than 0.005 percent, and thus, is not measurable.[119]

### D. Programs Preliminarily Determined Not to Be Used during the POI

Santa Priscila[120] and SONGA[121] and their cross-owned affiliates indicated that they did not use the following programs:

1. BNF Loan/Interest Forgiveness Program
2. Income Tax Reduction for Reinvestments

### E. Programs to be Examined in an Additional Post-Preliminary Determination

1. Youth Employment Program – Article 16 of Labor Law
2. Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities
3. Annual Motor Vehicle Tax Reduction Program

## V. PUBLIC COMMENT

We invite interested parties to include comments on the above programs; we will notify parties at a later date of the deadline for commenting on the issues addressed in this decision memorandum.

---

[115] *See* SONGA's Affiliated Sec III QR at NAT-III-8; *see also* Santa Priscila's Supplier Section III IQR at PRO-10 at 4 and III-EGI-11; Santa Priscila's Section III IQR at Exhibit 16 at III-2.
[116] *See* Santa Priscila's Post-Preliminary Calculation Memorandum.
[117] *Id*.
[118] *See* SONGA's Post-Preliminary Calculation Memorandum.
[119] *Id.*
[120] *See* Santa Priscila's NSA IQR at NSA-25 and NSA-26.
[121] *See* SONGA's NSA IQR at NSA-22 and NSA-23.

## VI. RECOMMENDATION

We recommend that you approve the positions described in this memorandum.

☒ ☐

_________ _________

Agree Disagree

7/12/2024

X

Signed by: ABDELALI ELOUARADIA

Abdelali Elouaradia
Deputy Assistant Secretary
for Enforcement and Compliance

# Tab 69

# P.R. 410
# C.R. 271, 276

International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 385
Investigation
POI: 1/1/22 – 12/31/22
E&C/Office IV
Business proprietary information has been redacted in the enclosed Verification Exhibits.

**PUBLIC VERSION**

July 26, 2024

Re: Frozen Warmwater Shrimp from Ecuador – Submission of Verification Exhibits

Dear Secretary Raimondo:

On behalf of the Government of Ecuador ("GOE"), we submit the exhibits collected during the Department's virtual verification, which took place from July 15, 2024, through July 17, 2024. This submission is timely filed in accordance with the Department's memorandum to the File, which extended the deadline to submit verification exhibits until today. See Memorandum to The File, re: "Ex Parte Memorandum Regarding Final Verification Exhibits for the Government of Ecuador and Industrial Pesquera Santa Priscila" (July 25, 2024).

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila requests business proprietary treatment for the information enclosed in brackets in this submission. The bracketed information pertains to production costs, the exact amount of benefit applied for or received, and other specific business information the business operations, accounting practices and documents, etc.

Barcode: 4604551-01 C-331-806 INV - Investigation



of respondents and their cross-owned affiliates, the release of which to the public would cause substantial competitive and commercial harm to the respondents and their cross-owned affiliates. The bracketed information also pertains to information related to the GOE's operations, tax collections and other benefits, and other confidential information maintained by the GOE. This information is protected from public disclosure under 19 C.F.R. §§ 351.105(c)(2), (8), and (11). The GOE consents to the release of the enclosed business proprietary information to the extent required by the Department under an appropriately issued Administrative Protective Order. All business proprietary information has been deleted from the public version of this submission.

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this submission have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

*Counsel to the Government of Ecuador*

Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

REPÚBLICA DEL ECUADOR

Ministerio de Producción, Comercio Exterior, Inversiones y Pesca

## GOVERNMENT CERTIFICATION

I, Juan Carlos Sanchez, Undersecretary of Origin, Trade Remedies and Trade Normative, currently employed by the Government of Ecuador, certify that I prepared or otherwise supervised the preparation of the attached submission of the Verification Exhibits, filed on July 26, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

I certify that the public information and any business proprietary information of the Government of Ecuador contained in this submission are accurate and complete to the best of my knowledge. I am aware that the information contained in this submission may be subject to verification or corroboration (as appropriate) by the U.S. Department of Commerce. I am also aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government.

In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the Department may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: Juan Carlos Sanchez T.

Date: 07/26/2024

**Guayaquil:** Av. Malecón 100 y Av. 9 de octubre, Edif. La Previsora, pisos 15-18-19 **Teléfono:** +593 4 2591370
**Quito:** Av. Amazonas entre Unión Nacional de Periodistas y Alfonso Pereira
Plataforma Gubernamental de Gestión Financiera, pisos 8 y 9 **Teléfono:** 593 2 3948760
**Manta:** Puerto Pesquero de San Mateo Teléfono: 593 5 26661009
www.produccion.gob.ec

EL NUEVO ECUADOR

**Counsel Certification**

I, Kenneth N. Hammer, with the law firm Trade Pacific PLLC, counsel to the Government of Ecuador, certify that I have read the attached submission of the Verification Exhibits, filed on July 26, 2024, pursuant to the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806).

In my capacity as counsel of this submission, I certify that the information contained in this submission is accurate and complete to the best of my knowledge. I am aware that U.S. law (including, but not limited to, 18 U.S.C. 1001) imposes criminal sanctions on individuals who knowingly and willfully make material false statements to the U.S. Government. In addition, I am aware that, even if this submission may be withdrawn from the record of the AD/CVD proceeding, the U.S. Department of Commerce may preserve this submission, including a business proprietary submission, for purposes of determining the accuracy of this certification. I certify that a copy of this signed certification will be filed with this submission to the U.S. Department of Commerce.

Signature: ____________________

Date: July 25, 2024

**CERTIFICATE OF SERVICE**

I, Kenneth N. Hammer, hereby certify on this 26th day of July, 2024, that the foregoing document submitted in the countervailing duty investigation against Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806) will be deemed served via ACCESS, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Barcode: 4604551-01 C-331-806 INV - Investigation

**Warmwater Shrimp from Ecuador (C-331-806)**
**GOE CVD Verification Exhibits**

**July 17-19, 2024**

| Exhibit No. | Exhibit Name | Page Count |
|---|---|---|
| Exhibit SVE-1 | II. A. Tax Programs - Investment Contract | 68 |
| Exhibit SVE-2 | II.B. Provision of Land Use Concessions for Aquacultural Facilities in Beaches and Bays for Less Than Adequate Remuneration (LTAR) | 214 |
| Exhibit SVE-3 | II.C. Provision of Electricity for LTAR | 266 |
| Exhibit SVE-4 | II.D. Provision of Brackish Water for LTAR | 117 |
| Exhibit SVE-5 | III.(1) Non-Use of Other Subsidy Programs: Access to Preferential Lines of Credit for Aquaculture and Fishing, Loans for Organic Production, Credit Line Boost to Shrimp Sector's Reconstruction After Earthquake | 32 |

Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

Barcode: 4604551-01 C-331-806 INV - Investigation

# CVD Verification Exhibit
# D. Provision of Brackish Water for LTAR

## <u>Exhibit VE – 4</u>

**July 2024**

**Government of Ecuador**


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

# EXHIBIT TAX-4(a)

Barcode: 4604551-01 C-331-806 INV - Investigation
PDF generated: 28 Apr 2022, 19:03

CONSTITUTE

constituteproject.org

# Ecuador's Constitution of 2008 with Amendments through 2011

This complete constitution has been generated from excerpts of texts from the repository of the Comparative Constitutions Project, and distributed on **constituteproject.org**.


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

## Table of contents

Preamble . . . . . 4
Title I. Constituent elements of the State . . . . . 4
CHAPTER 1. Basic principles . . . . . 4
CHAPTER 2. Female and male citizens . . . . . 5
Title II. Rights . . . . . 6
CHAPTER 1. Principles for the enforcement of rights . . . . . 6
CHAPTER 2. Rights of the good way of living . . . . . 8
CHAPTER 3. Rights of priority persons and groups . . . . . 12
CHAPTER 4. Rights of communities, peoples and nations . . . . . 18
CHAPTER 5. Rights to participation . . . . . 20
CHAPTER 6. Rights to freedom . . . . . 21
CHAPTER 7. Rights of nature . . . . . 24
CHAPTER 8. Rights to protection . . . . . 25
CHAPTER 9. Responsibilities . . . . . 29
TITLE III. CONSTITUTIONAL GUARANTEES . . . . . 29
CHAPTER 1. Guarantees of the legal and regulatory framework . . . . . 29
CHAPTER 2. Public policies, public services, and public participation . . . . . 30
CHAPTER 3. Jurisdictional guarantees . . . . . 30
TITLE IV. PARTICIPATION AND ORGANIZATION OF POWER . . . . . 33
CHAPTER 1. Participation in democracy . . . . . 33
CHAPTER 2. Legislative Branch of Government . . . . . 38
CHAPTER 3. Executive Branch of Government . . . . . 44
CHAPTER 4. Judicial and Indigenous Justice Branch of Government . . . . . 51
CHAPTER 5. Transparency and Social Control Branch of Government . . . . . 59
CHAPTER 6. Electoral Branch of Government . . . . . 63
CHAPTER 7. Public administration . . . . . 65
TITLE V. TERRITORIAL ORGANIZATION OF THE STATE . . . . . 68
CHAPTER 1. General principles . . . . . 68
CHAPTER 2. Organization of the territory . . . . . 68
CHAPTER 3. Decentralized autonomous governments and special systems . . . . . 70
CHAPTER 4. System of jurisdictions . . . . . 71
CHAPTER 5. Economic resources . . . . . 75
TITLE VI. DEVELOPMENT STRUCTURE . . . . . 76
CHAPTER 1. General principles . . . . . 76
CHAPTER 2. Participatory planning for development . . . . . 77
CHAPTER 3. Food sovereignty . . . . . 78
CHAPTER 4. Economic sovereignty . . . . . 79
CHAPTER 5. Strategic sectors, services and state enterprises . . . . . 85
CHAPTER 6. Labor and production . . . . . 86
TITLE VII. THE GOOD WAY OF LIVING SYSTEM . . . . . 91
CHAPTER 1. Inclusion and equity . . . . . 91
CHAPTER 2. Biodiversity and natural resources . . . . . 103
TITLE VIII. INTERNATIONAL RELATIONS . . . . . 107
CHAPTER 1. Principles governing international relations . . . . . 107
CHAPTER 2. International treaties and instruments . . . . . 108

CHAPTER 3. Latin American integration . . . 109
TITLE IX. SUPREMACY OF THE CONSTITUTION . . . 110
CHAPTER 1. Principles . . . 110
CHAPTER 2. Constitutional Court . . . 111
CHAPTER 3. Amending the Constitution . . . 113
TRANSITORY PROVISIONS . . . 114
ONE . . . 114
TWO . . . 115
THREE . . . 115
FOUR . . . 115
FIVE . . . 115
SIX . . . 115
SEVEN . . . 116
EIGHT . . . 116
NINE . . . 116
TEN . . . 116
ELEVEN . . . 116
TWELVE . . . 117
THIRTEEN . . . 117
FOURTEEN . . . 117
FIFTEEN . . . 117
SIXTEEN . . . 117
SEVENTEEN . . . 117
EIGHTEEN . . . 117
NINETEEN . . . 118
TWENTY . . . 118
TWENTY-ONE . . . 118
TWENTY-TWO . . . 118
TWENTY-THREE . . . 118
TWENTY-FOUR . . . 118
TWENTY-FIVE . . . 118
TWENTY-SIX . . . 119
TWENTY-SEVEN . . . 119
TWENTY-EIGHT . . . 119
TWENTY-NINE . . . 119
THIRTY . . . 119
REPEAL PROVISION . . . 120
TRANSITION SYSTEM . . . 120
CHAPTER 1. Nature of the transition . . . 120
CHAPTER 2. Elections . . . 120
CHAPTER 3. Institutional transition . . . 124
FINAL PROVISION . . . 126

- Motives for writing constitution
- Source of constitutional authority
- Preamble

# Preamble

We women and men, the sovereign people of Ecuador

RECOGNIZING our age-old roots, wrought by women and men from various peoples,

CELEBRATING nature, the Pacha Mama (Mother Earth), of which we are a part and which is vital to our existence,

- God or other deities

INVOKING the name of God and recognizing our diverse forms of religion and spirituality,

CALLING UPON the wisdom of all the cultures that enrich us as a society,

AS HEIRS to social liberation struggles against all forms of domination and colonialism

AND with a profound commitment to the present and to the future,

Hereby decide to build

A new form of public coexistence, in diversity and in harmony with nature, to achieve the good way of living, the sumak kawsay;

- Human dignity

A society that respects, in all its dimensions, the dignity of individuals and community groups;

- Regional group(s)
- Reference to fraternity/solidarity
- Political theorists/figures

A democratic country, committed to Latin American integration-the dream of Simon Bolivar and Eloy Alfaro-peace and solidarity with all peoples of the Earth;

And, exercising our sovereign powers, in Ciudad Alfaro, Montecristi, province of Manabi, we bestow upon ourselves the present:

Constitution of the Republic of Ecuador

# Title I. Constituent elements of the State

## CHAPTER 1. Basic principles

- Type of government envisioned

### Article 1

- Separation of church and state
- Official religion

Ecuador is a constitutional State of rights and justice, a social, democratic, sovereign, independent, unitary, intercultural, multinational and secular State. It is organized as a republic and is governed using a decentralized approach.

Sovereignty lies with the people, whose will is the basis of all authority, and it is exercised through public bodies using direct participatory forms of government as provided for by the Constitution.

Nonrenewable natural resources of the State's territory belong to its inalienable and absolute assets, which are not subject to a statute of limitations.

### Article 2

- National flag
- National anthem

The flag, coat of arms and national anthem, as provided for by law, are the symbols of the nation.

- Official or national languages
- Protection of language use

Spanish is Ecuador's official language; Spanish, Kichwa and Shuar are official languages for intercultural ties. The other ancestral languages are in official use by indigenous


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

The State may, on an exceptional basis, delegate the exercise of these activities to private enterprise and the grassroots solidarity sector of the economy, in the cases set out by law.

### Article 317

Nonrenewable natural resources are part of the unalienable heritage of the State and are not subject to a statute of limitations. In the management of these resources, the State shall give priority to responsibility between generations, the conservation of nature, the charging of royalties or other non-tax contributions and corporate shares; and shall minimize the negative impacts of an environmental, cultural, social and economic nature.

### Article 318

Water is part of the country's strategic heritage for public use; it is the unalienable property of the State and is not subject to a statute of limitations. It is a vital element for nature and human existence. Any form of water privatization is forbidden.

The management of water shall be exclusively public or community-based. The public service of sanitation and the supply of drinking and irrigation water shall be provided only by legal entities of the State or communities.

The State shall bolster the management and operating of community initiatives with regard to the management of water and provision of public services, by encouraging alliances between public and community bodies for the provision of services.

The State, through the sole authority for water, shall be directly responsible for planning and managing water resources for human consumption, irrigation to guarantee food sovereignty, ecological wealth and productive activities, in this order of priority. State authorization will be required for the use of water for productive purposes by the public, private and grassroots solidarity sectors, pursuant to the law.

## CHAPTER 6. Labor and production

### SECTION 1. Forms of organizing production and their management

### Article 319

Different forms of organizing production are recognized in the economy, including community, cooperative, public and private business, associative, family, domestic, autonomous and mixed- economy.

The State shall promote forms of production that assure the good way of living of the population and shall discourage those that violate their rights or those of nature; it shall encourage production that meets domestic demand and ensures Ecuador's active participation in the global economy.

### Article 320

Among the various forms of organizing production processes, participatory, transparent and efficient management shall be fostered.

Production, in any form, shall be governed by principles and standards of quality, sustainability, systemic productivity, high esteem for work, and economic and social efficiency.

### SECTION 2. Types of property

- Right to own property

### Article 321

The State recognizes and guarantees the right to property in all of its forms, whether public, private, community, State, associative, cooperative or mixed- economy, and that it must fulfill its social and environmental role.

Barcode: 4604551-01 C-331-806 INV - Investigation

# Constitución
## de la República del Ecuador

Incluye las reformas aprobadas en el
Referéndum y Consulta Popular de 7 de mayo de 2011

Asamblea Nacional
República del Ecuador


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

aprovechamiento sustentable de recursos naturales o de bienes públicos y el desarrollo de otras actividades económicas.

Las empresas públicas estarán bajo la regulación y el control específico de los organismos pertinentes, de acuerdo con la ley; funcionarán como sociedades de derecho público, con personalidad jurídica, autonomía financiera, económica, administrativa y de gestión, con altos parámetros de calidad y criterios empresariales, económicos, sociales y ambientales.

Los excedentes podrán destinarse a la inversión y reinversión en las mismas empresas o sus subsidiarias, relacionadas o asociadas, de carácter público, en niveles que garanticen su desarrollo. Los excedentes que no fueran invertidos o reinvertidos se transferirán al Presupuesto General del Estado.

La ley definirá la participación de las empresas públicas en empresas mixtas en las que el Estado siempre tendrá la mayoría accionaria, para la participación en la gestión de los sectores estratégicos y la prestación de los servicios públicos.

**Art. 316.-** El Estado podrá delegar la participación en los sectores estratégicos y servicios públicos a empresas mixtas en las cuales tenga mayoría accionaria. La delegación se sujetará al interés nacional y respetará los plazos y límites fijados en la ley para cada sector estratégico.

El Estado podrá, de forma excepcional, delegar a la iniciativa privada y a la economía popular y solidaria, el ejercicio de estas actividades, en los casos que establezca la ley.

**Art. 317.-** Los recursos naturales no renovables pertenecen al patrimonio inalienable e imprescriptible del Estado. En su gestión, el Estado priorizará la responsabilidad intergeneracional, la conservación de la naturaleza, el cobro de regalías u otras contribuciones no tributarias y de participaciones empresariales; y minimizará los impactos negativos de carácter ambiental, cultural, social y económico.

**Art. 318.-** El agua es patrimonio nacional estratégico de uso público, dominio inalienable e imprescriptible del Estado, y constituye un elemento vital para la naturaleza y para la existencia de los seres humanos. Se prohíbe toda forma de privatización del agua.




Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

# EXHIBIT TAX-4(b)

# ORGANIC LAW OF WATER RESOURCES USES AND WATER USE

Law
0 Official Registry Supplement 305 of August 6,
2014 Status: Current

ORGANIC LAW OF WATER RESOURCES, USES AND USE OF WATER

REPUBLIC OF ECUADOR

NATIONAL ASSEMBLY

Of. No. SAN-2014-1178

Quito, AUG 05. 2014

Engineer
Hugo Del Pozo Barrezueta
Director of the Official Registry

At his office

My considerations:

The National Assembly, in accordance with the powers conferred on it by the Constitution of the Republic of Ecuador and the Organic Law of the Legislative Function, discussed and approved the Draft ORGANIC LAW ON WATER RESOURCES, USES AND USE OF WATER.

In a session on July 31, 2014, the Plenary Session of the National Assembly heard and ruled on the partial objection presented by the Constitutional President of the Republic.

For the exposed; and, as provided in article 138 of the Constitution of the Republic of Ecuador and article 64 of the Organic Law of the Legislative Function, I accompany the text of the ORGANIC LAW OF WATER RESOURCES, USES AND USE OF WATER, so that please publish it in the Official Registry.

Sincerely,

f.) DR. LIBIA RIVAS ORDOÑEZ, General Secretary.

REPUBLIC OF ECUADOR

NATIONAL ASSEMBLY

CERTIFICATION

I allow myself to CERTIFY that the National Assembly discussed and approved the DRAFT ORGANIC LAW ON WATER RESOURCES, USES AND USE OF WATER, in first debate on November 10, 2009; in second debate on May 4, 6 and 13, 2010, on June 5 and 24, 2014; and, his partial objection on July 31, 2014.

Quito,

No imprima este documento a menos que sea absolutamente necesario


a) That the order of priority established in the Constitution and this Law be respected;
b) That the availability of water in sufficient quality and quantity has been certified. Regarding water quality, the Single Water Authority will implement the certification processes progressively; c) That the studies and
hydraulic infrastructure projects necessary for its use have been previously approved by the Single Water Authority; d) That the beneficiary is responsible for the
prevention and mitigation of the environmental damage it causes, and is obliged to contribute to the good management of the authorized water; and, e) That the use of the water is
immediate or within a specific period for the destination for which it was authorized in accordance with the respective technical report.

**Art.** 91.- Recreational and sports use. Recreational events and aquatic competitions that involve non-consumptive use of water will not require prior authorization from the Single Water Authority.

**Art.** 92.- Cultural and sacred practices. The Single Water Authority will guarantee the integrity and permanence of the places where communes, communities, towns and nationalities traditionally practice rituals, cultural and sacred values of water.

The Single Water Authority, together with the communes, communities, towns and nationalities, will carry out and keep duly updated a participatory and comprehensive National Inventory of sacred places and water rituals.

The administration and conservation of sacred places in relation to water will be carried out by the entities or organizations of peoples and nationalities in whose lands or territories they are located, with the support of national programs and projects of public organizations and Decentralized Autonomous Governments, conformity with the Constitution and their own rights.

Third Section
Conditions of Authorization for Use

**Art.** 93.- Definition. The productive use of water is constituted by activities such as irrigation for the popular and solidarity economy, agro-industry, agricultural production or aquaculture production for export or other productive activities such as tourism, hydroelectricity generation, industrial production; mining and mineral refining exploitation; hydrocarbons, packaging and marketing of mineral, medicinal, treated, enriched waters or waters that have certified purification and quality processes; and, other productive activities that involve the use of water.

For the productive use of water, the administrative authorization granted by the Single Water Authority will be required, upon request in accordance with water planning, the requirements and conditions established by this Law.

The use of water for productive activities includes its use in activities not considered in food sovereignty, according to the definition of this Law, when it involves agricultural or aquaculture production.

In other productive activities that use water, the destination of the production to the internal or external market is indifferent.

The authorization for the use of water in productive activities confers on the holder thereof, exclusively, the capacity for the collection, treatment, conduction and use of the flow to which the authorization refers. The owner must install, at his own expense, the water flow measurement devices in the terms defined by the Single Water Authority.

**Art.** 94.- Order of priority for productive activities. Among the productive activities

Water.

Industries that capture water from the drinking water supply networks for productive use will obtain authorization for the connection from the decentralized autonomous government, which must be registered with the Single Water Authority.

People who are dedicated to the extraction of salt from seawater for commercial purposes must obtain the respective authorization for productive use of water from the Single Water Authority, and pay the corresponding fee.

The water destined for industrial use, once used, will be discharged by the user, prior to treatment, complying with the technical parameters dictated by the National Environmental Authority.

Third Section
Aquaculture

**Art. 108.-** Use of water in aquaculture. Persons who engage in any fish farming or aquaculture activity, which is not considered included in food sovereignty in the terms regulated in this Law, must obtain the necessary permits for the exercise of their activity from the corresponding public authority, who prior to granting them. must request from the Single Water Authority the reports regarding the productive use of water, which will cause the payment of the rates established in this Law, when it is consumptive.

**Art. 109.-** Prohibition. Authorizations for the productive use of water in mangroves will not be granted. Only those who comply with the regularization process established in the Regulations may obtain and renew said authorization and for the purposes of aquaculture activity.

Fourth Section
Use of Water in Mining

**Art. 110.-** Use authorization. Mining activities must have authorization for the productive use of the waters used, which will be granted by the Single Water Authority, in accordance with the procedures and requirements established in this Law and its Regulations, for which the order of priority established by the Constitution, that is, human consumption, irrigation that guarantees food sovereignty, ecological flow and productive activities. To this end, it will coordinate with the National Environmental Authority.

All activities that may affect the quality and quantity of water, and the balance of ecosystems, will be regulated, especially in water sources and recharge areas.

The sustainability of ecosystems and human consumption will be priorities in the use and exploitation of water.

Authorization to use water for human consumption in camps must also be obtained.

**Art. 111.-** Protection in water sources. The Single Water Authority and the National Environmental Authority will issue the necessary regulations to guarantee the conservation and balance of ecosystems, especially water sources and recharge areas.

The National Environmental Authority will coordinate with the Single Water Authority, the monitoring of the environmental management system provided for in the respective environmental license, issued by it.

**Art. 112.-** Return of waters. The water destined for mining activities will be returned to the original channel from which it was taken or to the channel that is most suitable, with the user's obligation to treat it before its discharge and discharge, in accordance with what is established in the environmental permit and the

Conflict resolution

**Art. 133.-** Conflict resolution. Conflicts and controversies between authorization holders may be processed and resolved in an administrative unit specialized in alternative conflict resolution.

**Art. 134.-** Mediation and arbitration. The holders of authorizations for the use or exploitation of water, in accordance with the provisions of the law that regulates the arbitration and mediation systems, without prejudice to opting for the procedure at administrative headquarters, may submit their disputes to mediation or arbitration processes. in centers legally established in the jurisdiction in which the water subject to conflict is located.

Direct agreements and arbitration awards that resolve disputes must be notified by the corresponding courts to the Single Water Authority for registration in the public water registry.

If differences persist after having exhausted the administrative procedures and alternative conflict resolution mechanisms, the parties in conflict will submit to jurisdictional channels.

CHAPTER IV
ECONOMIC SYSTEM

First Section
Rates

**Art. 135.-** General criteria for water rates. The rate is understood to be the remuneration that a user must pay for the provision of services and authorization for the use and exploitation of water.

For the purposes of protection, conservation of the basins and financing the costs of related services, the corresponding rates will be established, according to the principles of this Law, the criteria and technical parameters indicated in the Regulation.

The rates for authorization of use and exploitation of water will be regulated and set by the Single Water Authority.

The rates for the provision of drinking water, sanitation, irrigation and drainage services will be set by both public and community providers respectively, based on the regulations issued by the Single Water Authority through the Regulation and Control Agency.

**Art. 136.-** General principles for setting water rates. In establishing rates for authorization of use and exploitation of water as well as drinking water, sanitation and irrigation and drainage services, the principles of solidarity, equity, sustainability and periodicity must be considered.

**Art. 137.-** Tariff component for water conservation. The Single Water Authority, as part of the authorization rates for use and exploitation and water service, will contemplate a component for conservation of the public water domain with priority in sources and water recharge areas.

The Decentralized Autonomous Governments, within the scope of their powers, will establish components in the rates of household public services linked to water to finance the conservation of the public water domain with priority in sources and water recharge areas.

Rates for Productive Use

**Art. 142.-** Rates for productive use of water. Rates for productive use will consider the following criteria:

a) Volume used; b)
Utilization efficiency; c)
Contribution to the conservation of water resources; and,
d) Employment generation.

**Art. 143.-** Rate for the use of water in electricity generation. The productive use for the generation of electricity and the use of hydrothermal energy will have a rate that will be established by the Single Water Authority, based on the regulations issued by the Water Regulation and Control Agency.

**Art. 144.-** Rate for productive use for the popular and solidarity economy. The Single Water Authority, based on the regulations issued by the Regulation and Control Agency, will set the rate for the popular and solidarity economy based on the capacity and productivity of those authorized.

**Art. 145.-** Fee for authorization of discharges. The authorization of discharges will generate the annual payment of a fee, which will be set on the basis of technical criteria established by the National Environmental Authority, which will be in charge of control and collection.

**Art. 146.-** Hydraulic infrastructure for water use. The investments required for the construction of hydraulic or civil infrastructure for a specific productive use of water will be made directly by the interested party.

In response to the national interest, the State may also participate as an investor, in accordance with the priorities established in the National Development Plan.

**Art. 147.-** Coercive jurisdiction. The Single Water Authority, the National Environmental Authority and the public service providers will exercise coercive jurisdiction for the collection of rates and other items and obligations pending payment, established in this Law and its Regulations.

TITLE V
INFRINGEMENTS, SANCTIONS AND RESPONSIBILITIES

CHAPTER I
INFRINGEMENTS

**Art. 148.-** Procedure. The administrative process for the knowledge and sanction of the administrative infractions established in this Law is governed by the rules of this Chapter.

**Art. 149.-** Sanctioning jurisdiction. The knowledge and sanction of infractions to the provisions of this Law or its Regulations, provided that the act does not constitute a crime or contravention, are the responsibility of the Single Water Authority and the Regulation and Control Agency, in the manner established in this Law and its Regulations. In those infractions that in accordance with this Law must be determined by the National Environmental Authority or by the National Health Authority, their final resolution will be required, in the common administrative procedure, before issuing the sanction by the Single Authority of the Water or the Regulation and Control Agency, as appropriate.

**Art. 150.-** Classification of infractions. The administrative infractions contemplated in this Law are classified as minor, serious and very serious.

**REPÚBLICA DEL ECUADOR**
**ASAMBLEA NACIONAL**

**Of. No. SAN-2014-1178**

Quito, 05 AGO. 2014

**Ingeniero**
**Hugo Del Pozo Barrezueta**
**Director del Registro Oficial**

En su despacho

De mis consideraciones:

La Asamblea Nacional, de conformidad con las atribuciones que le confiere la Constitución de la República del Ecuador y la Ley Orgánica de la Función Legislativa, discutió y aprobó el Proyecto de **LEY ORGÁNICA DE RECURSOS HÍDRICOS, USOS Y APROVECHAMIENTO DEL AGUA.**

En sesión de 31 de julio del 2014, el Pleno de la Asamblea Nacional conoció y se pronunció sobre la objeción parcial presentada por el señor Presidente Constitucional de la República.

Por lo expuesto; y, tal como lo dispone el artículo 138 de la Constitución de la República del Ecuador y el artículo 64 de la Ley Orgánica de la Función Legislativa, acompaño el texto de la de **LEY ORGÁNICA DE RECURSOS HÍDRICOS, USOS Y APROVECHAMIENTO DEL AGUA,** para que se sirva publicarlo en el Registro Oficial.

Atentamente,

f.) **DRA. LIBIA RIVAS ORDÓÑEZ, Secretaria General.**

**REPÚBLICA DEL ECUADOR**
**ASAMBLEA NACIONAL**

**CERTIFICACIÓN**

Me permito **CERTIFICAR** que la Asamblea Nacional discutió y aprobó el **PROYECTO DE LEY ORGÁNICA DE RECURSOS HÍDRICOS, USOS Y APROVECHAMIENTO DEL AGUA,** en primer debate el 10 de noviembre de 2009; en segundo debate el 4, 6 y 13 de mayo de 2010, el 5 y 24 de junio de 2014; y, su objeción parcial el 31 de julio de 2014.

Quito,

f.) **DRA. LIBIA RIVAS ORDÓÑEZ**, Secretaria General.

**REPÚBLICA DEL ECUADOR**
**ASAMBLEA NACIONAL**

**EL PLENO**

**CONSIDERANDO:**

Que, los artículos 12, 313 y 318 de la Constitución de la República consagran el principio de que el agua es patrimonio nacional estratégico, de uso público, dominio inalienable, imprescriptible e inembargable del Estado y constituye un elemento vital para la naturaleza y para la existencia de los seres humanos, reservando para el Estado el derecho de administrar, regular, controlar y gestionar los sectores estratégicos, de conformidad con los principios de sostenibilidad ambiental, precaución, prevención y eficiencia;

Que, el artículo 318 de la Constitución prohíbe toda forma de privatización del agua y determina que la gestión del agua será exclusivamente pública o comunitaria y que el servicio de saneamiento, el abastecimiento de agua potable y el riego serán prestados únicamente por personas jurídicas estatales o comunitarias; prescribe además, que el Estado a través de la Autoridad Única del Agua, será responsable directa de la planificación y gestión de los recursos hídricos que se destinarán a consumo humano y riego que garantice la soberanía alimentaria, caudal ecológico y actividades productivas, en este orden de prelación y que se requerirá autorización estatal para el aprovechamiento del agua con fines productivos por parte de los sectores público, privado y de la economía popular y solidaria, de acuerdo con la Ley;

Que, el artículo 314 de la Constitución de la República asigna al Estado la responsabilidad de la provisión de los servicios públicos de agua potable y de riego para lo cual dispondrá que sus tarifas sean equitativas y establecerá su control y regulación. La misma norma determina que el Estado fortalecerá la gestión y funcionamiento de las iniciativas comunitarias en torno a la gestión del agua y la prestación de los servicios públicos mediante el incentivo de alianzas entre lo público y comunitario para la prestación de servicios;

Que, el artículo 411 dispone que el Estado garantizará la conservación, recuperación y manejo integral de los recursos hídricos, cuencas hidrográficas y caudales ecológicos asociados al ciclo hidrológico y que regulará toda actividad que pueda afectar la calidad y cantidad de agua, y el equilibrio de los ecosistemas, especialmente en las fuentes y zonas de recarga.

La sustentabilidad de los ecosistemas y el consumo humano serán prioritarios en el uso y aprovechamiento del agua;

Que, la Primera Disposición Transitoria de la Constitución de la República dispone que la Ley que regule los recursos hídricos, usos y aprovechamiento del agua, incluirá los permisos de uso y aprovechamiento, actuales y futuros, sus plazos, condiciones, mecanismos de revisión y auditoría para asegurar la formalización y la distribución equitativa de este patrimonio;

Que, los artículos 66 y 276 reconocen y garantizan a las personas y colectividades el derecho al acceso equitativo, permanente y de calidad al agua, aire y suelo y a una vida digna que asegure la salud, alimentación y nutrición, agua potable, vivienda, saneamiento ambiental, educación, trabajo, empleo, descanso y ocio, cultura física, vestido, seguridad social y otros servicios sociales necesarios;

realizarán y mantendrán debidamente actualizado un Inventario Nacional participativo e integral de los lugares sagrados y rituales del agua.

La administración y conservación de los lugares sagrados en relación con el agua, realizarán las entidades u organizaciones de pueblos y nacionalidades en cuyas tierras o territorios se encuentren, con el apoyo de programas y proyectos nacionales de los organismos públicos y los Gobiernos Autónomos Descentralizados, de conformidad con la Constitución y sus propios derechos.

**Sección Tercera**
**Condiciones de Autorización para Aprovechamiento**

**Artículo 93.- Definición.** El aprovechamiento productivo del agua lo constituyen actividades como riego para economía popular y solidaria, agro industria, producción agropecuaria o producción acuícola de exportación u otras actividades productivas como turismo, generación de hidroelectricidad, producción industrial; explotación minera y de refinación de minerales; hidrocarburos, envasado y comercialización de aguas minerales, medicinales, tratadas, enriquecidas o que tengan procesos certificados de purificación y calidad; y, otras actividades productivas que impliquen el aprovechamiento del agua.

Para el aprovechamiento productivo del agua se requerirá de la autorización administrativa que otorga la Autoridad Única del Agua, previa solicitud de conformidad con la planificación hídrica, los requisitos y condiciones que establece esta Ley.

El aprovechamiento del agua para actividades productivas comprende su utilización en actividades no consideradas en la soberanía alimentaria, según la definición de esta Ley, cuando se trate de producción agropecuaria o acuícola.

En las demás actividades productivas que aprovechan el agua, es indiferente el destino de la producción al mercado interno o externo.

La autorización para el aprovechamiento del agua en actividades productivas confiere al titular de esta, de manera exclusiva, la capacidad para la captación, tratamiento, conducción y utilización del caudal a que se refiera la autorización. El titular deberá instalar a su cargo los aparatos de medición del flujo de agua en los términos que defina la Autoridad Única del Agua.

**Artículo 94.- Orden de prioridad para las actividades productivas.** Entre las actividades productivas susceptibles de aprovechamiento del agua se aplicará el siguiente orden de prioridad:

**a)** Riego para producción agropecuaria, acuicultura y agro industria de exportación;

**b)** Actividades turísticas;

**c)** Generación de hidroelectricidad y energía hidrotérmica;

**d)** Proyectos de sectores estratégicos e industriales;

**e)** Balneoterapia, envasado de aguas minerales, medicinales, tratadas o enriquecidas; y,

**f)** Otras actividades productivas.

El orden de prioridad de las actividades productivas podrá modificarse por la Autoridad Única del Agua, en atención a las características de la cuenca, en el marco de los objetivos y lineamientos de la planificación hídrica nacional y el Plan Nacional de Desarrollo.

**Artículo 95. Condiciones de la autorización de aprovechamiento productivo del agua.** La autorización para el aprovechamiento productivo de agua estará subordinada al cumplimiento de las siguientes condiciones:

**a)** Respeto a la prelación de usos y la prioridad de aprovechamientos productivos del agua, en las condiciones de publicidad y competencia determinadas en esta Ley;

**b)** Verificación de la existencia cierta del agua, en calidad y cantidad suficientes, sobre la base de la certificación de disponibilidad. Respecto de la calidad del agua la Autoridad Única del Agua implementará los procesos de certificación de manera progresiva;

**c)** Estudios y proyectos de infraestructura hidráulica necesarios para la utilización del agua, que sean aprobados previamente por la Autoridad Única del Agua;

**d)** Que el usuario se responsabilice por la prevención y mitigación de los daños ambientales que ocasionen y se obligue a contribuir al buen manejo del agua autorizada; y,

**e)** Que la utilización del agua sea inmediata, o en un plazo determinado para el destino al que fue autorizado.

La Autoridad Única del Agua desarrollará estas condiciones en el Reglamento de esta Ley.

**Artículo 96.- Prohibición de transferencia.** La autorización para el uso y aprovechamiento del agua es intransferible, con excepción de la sucesión por causa de muerte siempre que se mantenga el destino para el cual se otorgó la autorización respectiva.

En caso de transferencia de dominio de la tierra o cambio de propietario de la iniciativa productiva, siempre que se mantenga el destino para el cual se otorgó la autorización de uso del agua, el nuevo propietario, de ser el caso, deberá actualizar la autorización cumpliendo los requisitos previstos en el Reglamento. Otorgada la autorización, procederá a su inscripción en el registro público del agua.

**Artículo 97.- Déficit hídrico.** En caso de disminución de caudales por motivo de escasez temporal o permanente, el agua se entregará a los usuarios de las autorizaciones


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

es un aprovechamiento productivo consistente en el procesamiento, tratamiento de potabilización o purificación de las aguas captadas de fuentes naturales superficiales o subterráneas, realizada mediante procedimientos técnicos certificados.

La autorización de uso para aprovechamiento de agua para envasado, captada directamente de la fuente natural superficial o subterránea, tendrá una tarifa diferenciada que será determinada por la Autoridad Única del Agua, de acuerdo con el volumen de agua captada. Esta autorización otorgada por la Autoridad Única del Agua, deberá ser requisito obligatorio para realizar las actividades de envasamiento, producción y comercialización del producto.

Este aprovechamiento puede ser realizado por personas naturales, jurídicas, públicas, privadas, comunitarias y mixtas, así como también por las organizaciones de la economía popular y solidaria, por sí mismas o en alianza con los Gobiernos Autónomos Descentralizados o los sistemas comunitarios de gestión de agua.

Las solicitudes que presenten las entidades comunitarias o de la economía popular y solidaria, titulares de derechos colectivos, para el aprovechamiento del agua en sus territorios o tierras comunitarias, tendrán derecho preferente en el otorgamiento de nuevas autorizaciones.

Se prohíbe el envasamiento de todo tipo de agua proveniente de sistemas de abastecimiento públicos o comunitarios. Por excepción, sólo podrá realizarse, previo autorización de la Autoridad Única del Agua, de la Autoridad Sanitaria Nacional correspondiente y del Gobierno Autónomo Descentralizado Municipal, siempre que se garantice que se ha sometido al proceso de tratamiento, purificación o enriquecimiento de acuerdo a las normas técnicas. La entidad que administre el sistema de abastecimiento, establecerá una tarifa diferenciada de acuerdo al volumen de agua procesada.

**Sección Segunda**
**Aprovechamiento Energético e Industrial del Agua**

**Artículo 106.- Principios y prioridades para el aprovechamiento productivo hidroeléctrico.** En el marco del respeto al orden de prelación que se regula en esta Ley, la Autoridad Única del Agua otorgará autorizaciones de aprovechamiento productivo del agua para la generación de electricidad, de manera preferente para aquellos proyectos de prioridad nacional que se contemplen en el plan maestro de electrificación, incorporando los principios de sostenibilidad ambiental, precaución, prevención y eficiencia.

**Artículo 107.- Aprovechamiento industrial.** Para toda actividad industrial en la que se utilice agua de fuentes hídricas, se solicitará la autorización de aprovechamiento productivo a la Autoridad Única del Agua.

Las industrias que capten el agua de las redes de abastecimiento de agua potable para aprovechamiento productivo, obtendrán del gobierno autónomo descentralizado la autorización para la conexión que deberá registrarse ante la Autoridad Única del Agua.

Las personas que se dediquen a la extracción de sal del agua de mar para fines comerciales, deberán obtener de la Autoridad Única del Agua la respectiva autorización de aprovechamiento productivo del agua, y pagar la tarifa correspondiente.

Las aguas destinadas para el aprovechamiento industrial, una vez utilizadas, serán descargadas por el usuario, previo su tratamiento, cumpliendo con los parámetros técnicos que dicte la Autoridad Ambiental Nacional.

**Sección Tercera**
**Acuicultura**

**Artículo 108.- Aprovechamiento de agua en acuicultura.** Las personas que se dediquen a cualquier actividad piscícola o acuícola, que no se considere incluida en la soberanía alimentaria en los términos regulados en esta Ley, deberán obtener de la autoridad pública correspondiente los permisos necesarios para el ejercicio de su actividad, quien previo a otorgarlos deberá requerir de la Autoridad Única del Agua los informes respecto del aprovechamiento productivo del agua, que causará el pago de las tarifas establecidas en la presente Ley, cuando sea consuntivo.

**Artículo 109.- Prohibición.** No se otorgarán autorizaciones de aprovechamiento productivo del agua en manglares. Solo podrán obtener y renovar dicha autorización y con fines de actividad de acuicultura, quienes cumplan con el proceso de regularización establecido en el Reglamento.

**Sección Cuarta**
**Aprovechamiento del Agua en Minería**

**Artículo 110.- Autorización de aprovechamiento.** Las actividades mineras deberán contar con la autorización de aprovechamiento productivo de las aguas que se utilicen, que será otorgada por la Autoridad Única del Agua, de conformidad con los procedimientos y requisitos establecidos en esta Ley y su Reglamento, para lo que se respetará estrictamente el orden de prelación que establece la Constitución, es decir, consumo humano, riego que garantice la soberanía alimentaria, caudal ecológico y actividades productivas. Al efecto, coordinará con la Autoridad Ambiental Nacional.

Se regulará toda actividad que pueda afectar la calidad y cantidad de agua, y el equilibrio de los ecosistemas, en especial en las fuentes y zonas de recarga de agua.

La sustentabilidad de los ecosistemas y el consumo humano serán prioritarios en el uso y aprovechamiento del agua.

También deberá obtenerse la autorización de uso del agua para consumo humano en campamentos.

a procesos de mediación o arbitraje en centros legalmente establecidos en la jurisdicción en que se encuentre el agua objeto de conflicto.

Los acuerdos directos y laudos arbitrales que resuelvan las controversias deberán ser notificados por los tribunales correspondientes a la Autoridad Única del Agua para su inscripción en el registro público del agua.

En caso de subsistir las divergencias luego de haber agotado los trámites administrativos y mecanismos alternativos de solución de conflictos, las partes en conflicto se someterán a la vía jurisdiccional.

## CAPÍTULO IV
## RÉGIMEN ECONÓMICO

### Sección Primera
### Tarifas

**Artículo 135.- Criterios generales de las tarifas de agua.** Se entiende por tarifa la retribución que un usuario debe pagar por la prestación de servicios y autorización para usos y aprovechamiento del agua.

Para efectos de protección, conservación de las cuencas y financiamiento de los costos de los servicios conexos, se establecerán las correspondientes tarifas, según los principios de esta Ley, los criterios y parámetros técnicos señalados en el Reglamento.

Las tarifas por autorización de uso y aprovechamiento del agua serán reguladas y fijadas por la Autoridad Única del Agua.

Las tarifas por prestación de servicios de agua potable, saneamiento, riego y drenaje serán fijadas por los prestadores tanto públicos como comunitarios respectivamente, sobre la base de las regulaciones emitidas por la Autoridad Única del Agua a través de la Agencia de Regulación y Control.

**Artículo 136.- Principios generales para la fijación de tarifas de agua.** En el establecimiento de tarifas por autorización de uso y aprovechamiento del agua así como de los servicios de agua potable, saneamiento y de los servicios de riego y drenaje, se deben considerar los principios de solidaridad, equidad, sostenibilidad y periodicidad.

**Artículo 137. Componente tarifario para conservación del agua.** La Autoridad Única del Agua, como parte de las tarifas de autorización de uso y aprovechamiento y de servicio del agua contemplará un componente para conservación del dominio hídrico público con prioridad en fuentes y zonas de recarga hídrica.

Los Gobiernos Autónomos Descentralizados en el ámbito de sus competencias, establecerán componentes en las tarifas de los servicios públicos domiciliarios vinculados con el agua para financiar la conservación del dominio hídrico público con prioridad en fuentes y zonas de recarga hídrica.

**Artículo 138.- Tarifa por autorización de uso y aprovechamiento de agua cruda.** Las tarifas por autorización de uso y aprovechamiento de agua cruda se basarán en los siguientes criterios:

**a)** Aplicación a todos los usos y aprovechamientos del agua;

**b)** Diferenciación según el volumen y tipo de uso o aprovechamiento del agua, considerando los criterios que para los mismos se establecerán en el Reglamento;

**c)** Revisión periódica; y,

**d)** Contribución en la operación y mantenimiento de obras multipropósito.

Las tarifas serán aprobadas por la Autoridad Única del Agua en función de los estudios técnicos determinados para el efecto, en aplicación de lo preceptuado en esta Ley y en el Reglamento.

**Artículo 139.- Tarifa por servicios públicos básicos.** Se entenderán por servicios públicos básicos los de abastecimiento de agua potable, saneamiento, riego y drenaje.

Corresponde la competencia para fijar las tarifas a los prestadores públicos de dichos servicios o a las entidades comunitarias que los presten legítimamente sobre la base de las regulaciones de la Autoridad Única del Agua.

El establecimiento de las tarifas atenderá a los siguientes criterios:

**a)** Inclusión de forma proporcional de lo que el titular del servicio debe pagar a la Autoridad Única del Agua por el suministro de agua cruda; y,

**b)** Inclusión de forma proporcional del costo de captación, manejo, impulsión, conducción, operación, tratamiento, administración, depreciación de activos, amortización, distribución, saneamiento ambiental y nuevas inversiones para el suministro de agua.

En todo caso, las tarifas de los servicios serán diferenciadas y considerarán la situación socioeconómica de las personas con menores ingresos y condición de discapacidad de los consumidores.

### Sección Segunda
### Tarifas por el Uso

**Artículo 140.- Tarifa por suministro de agua cruda para consumo humano y doméstico.** La entrega de la cantidad mínima vital de agua cruda establecida por la Autoridad Única del Agua para la provisión de servicios de agua potable no estará sujeta a tarifa alguna.

Cuando el volumen que se entregue a los prestadores del servicio exceda de la cantidad mínima vital determinada, se aplicará la tarifa que corresponda, conforme con lo estipulado en esta Ley y su Reglamento.


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

**Artículo 141.- Tarifa por autorización de uso de agua para riego que garantice la soberanía alimentaria.** Los criterios para fijación de la tarifa hídrica volumétrica del agua para riego que garantice la soberanía alimentaria, son los siguientes:

**a)** Volumen utilizado;

**b)** Cantidad de tierra cultivada y tipo de suelo; y,

**c)** Contribución a la conservación del recurso hídrico.

Se exceptúan del pago de esta tarifa los sistemas comunitarios portadores de derechos colectivos y los prestadores comunitarios de servicios que reciben caudales inferiores a cinco litros por segundo y que están vinculados a la producción para la soberanía alimentaria.

**Sección Tercera**
**Tarifas por el Aprovechamiento Productivo**

**Artículo 142.- Tarifas por aprovechamiento productivo del agua.** Las tarifas por aprovechamiento productivo considerarán los siguientes criterios:

**a)** Volumen utilizado;

**b)** Eficiencia de utilización;

**c)** Contribución a la conservación del recurso hídrico; y,

**d)** Generación de empleo.

**Artículo 143.- Tarifa para aprovechamiento de agua en generación eléctrica.** El aprovechamiento productivo para la generación de electricidad y el aprovechamiento de energía hidrotérmica tendrá una tarifa que se establecerá por la Autoridad Única del Agua, sobre la base de las regulaciones emitidas por la Agencia de Regulación y Control del Agua.

**Artículo 144.- Tarifa para aprovechamiento productivo para la economía popular y solidaria.** La Autoridad Única del Agua, sobre la base de las regulaciones emitidas por la Agencia de Regulación y Control, fijará la tarifa para la economía popular y solidaria en atención a la capacidad y productividad de los autorizados.

**Artículo 145.- Tarifa por autorización de vertidos.** La autorización de vertidos generará el pago anual de una tarifa, que será fijada sobre la base de criterios técnicos establecidos por la Autoridad Ambiental Nacional, la cual será encargada del control y su recaudación.

**Artículo 146.- Infraestructura hidráulica para aprovechamiento del agua.** Las inversiones que se requieran para la construcción de infraestructura hidráulica o civil para un determinado aprovechamiento productivo del agua, la realizará el interesado de manera directa.

En atención al interés nacional, el Estado podrá concurrir también como inversionista, de acuerdo con las prioridades establecidas en el Plan Nacional de Desarrollo.

**Artículo 147.- Jurisdicción coactiva.** La Autoridad Única del Agua, la Autoridad Ambiental Nacional y los prestadores públicos de servicios ejercerán la jurisdicción coactiva para el cobro de tarifas y demás conceptos y obligaciones pendientes de pago, establecidas en esta Ley y en su Reglamento.

**TÍTULO V**
**INFRACCIONES, SANCIONES Y RESPONSABILIDADES**

**CAPÍTULO I**
**INFRACCIONES**

**Artículo. 148.- Procedimiento.** El trámite del proceso administrativo para el conocimiento y sanción de las infracciones administrativas establecidas en esta Ley, se rige por las normas de este Capítulo.

**Artículo. 149.- Competencia sancionatoria.** El conocimiento y sanción de las infracciones a las disposiciones de esta Ley o su Reglamento, siempre que el acto no constituya delito o contravención, son competencia de la Autoridad Única del Agua y de la Agencia de Regulación y Control, en la forma establecida en esta Ley y en su Reglamento. En aquellas infracciones que de conformidad con esta Ley deban ser determinadas por la Autoridad Ambiental Nacional o por la Autoridad Nacional de Salud, se requerirá su resolución en firme, en el procedimiento administrativo común, antes de dictar la sanción por parte de la Autoridad Única del Agua o la Agencia de Regulación y Control, según corresponda.

**Artículo 150.- Clasificación de infracciones.** Las infracciones administrativas contempladas en esta Ley se clasifican en leves, graves y muy graves.

**Artículo 151.- Infracciones administrativas en materia de los recursos hídricos.** Las infracciones administrativas en materia de recursos hídricos son las siguientes:

**a)** Infracciones leves:

**1.** Provocar el anegamiento de terrenos de terceros y caminos públicos, cuando la responsabilidad sea del usuario; y,

**2.** Poner obstáculos en el fondo de los canales u otros artificios para elevar el nivel del agua.

**b)** Infracciones graves:

**1.** Modificar sin autorización, el entorno de las fuentes de agua con las que se provee el consumo humano o riego;

**2.** Cuando personas que no pertenezcan a la comunidad impidan la aplicación de derecho


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

Barcode: 4604551-01 C-331-806 INV - Investigation


# REGISTRO OFICIAL®

ÓRGANO DEL GOBIERNO DEL ECUADOR

Administración del Sr. Lcdo. Lenín Moreno Garcés
Presidente Constitucional de la República

SEGSUUNPDLO ESUMPELENMTEONTO

Year I - Nº 54

Quito, Wednesday, August 9, 2017

Value: US$ 1.25 + VAT

ING. HUGO DEL POZO BARREZUETA
DIRECTOR

Quito: Avenida 12 de Octubre
N23-99 y Wilson
Second Floor

Headquarters and sales: Tel. 3941-800
Exts.: 2301 - 2305

Guayaquil Branch:
Av. 9 de Octubre Nº 1616 and Av. Del Ejército corner, Guayas Bar Association Building, second floor. Tel. 252-7107

Annual subscription:
US$ 400 + VAT for the city of Quito US$ 450 + VAT for the rest of the country

Printed in Editora Nacional 24

pages

www.registroficial.gob.ec

In the service of the country since July 1, 1895


## SUMMARY:


Págs.

EXECUTIVE FUNCTION

AGREEMENT:

WATER SECRETARIAT:

2017-1522 Approve the calculation formula for obtaining the referential raw water tariff, for the sustainability of the water sector ............... 1


---

CORTE CONSTITUCIONAL DEL ECUADOR

**2017-1522**

**MSc. Alexis Sánchez Miño**
**THE WATER SECRETARY**

**Whereas:**

Article 12 of the Constitution of the Republic of Ecuador states that *"the human right to water is fundamental and unrenounceable, being a strategic national patrimony of inalienable, imprescriptible, unseizable and essential for life"*;

That Article 14 ibid. states that: *"(...) recognizes the right of the population to live in a healthy and ecologically balanced environment that guarantees sustainability and good living, sumak kawsay"*;

That, numeral 1 of Article 154 of the Constitution states that: "*The Ministers of State,* in *addition to the powers established by law, are responsible for: 1. Exercising the leadership of public policies in the area under their charge and issuing the agreements and administrative resolutions required by their management (...)";*

That, Article 226 of the Constitution states that *"State institutions, its agencies, dependencies, public servants and persons acting by virtue of a State power shall exercise only the competencies and powers attributed to them by the Constitution and the law. They shall have the duty to coordinate actions for the fulfillment of their purposes and to make effective the enjoyment and exercise of the rights recognized in the Constitution*";

That Article 227 ibidem, determines: "*Principles of the Public Administration: "The public administration constitutes a*


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

*service to the community, which is governed by the principles of effectiveness, efficiency, quality, hierarchy, deconcentration, decentralization, coordination, participation, planning, transparency and evaluation*";

Article 314 of the same law establishes that: *"The State shall be responsible for the provision of public drinking water and irrigation services, sanitation, electric power, telecommunications, roads, port and airport infrastructure, and any others determined by law.*

*The State shall guarantee that public services and their provision respond to the principles of obligatory nature, generality, uniformity, efficiency, responsibility, universality, accessibility, regularity, continuity and quality. The State shall provide that the prices and tariffs of public services shall be equitable, and shall establish their control and regulation...;*

That Article 318 ibidem establishes that: "*Water is a strategic national patrimony of public use, inalienable and imprescriptible domain of the State, and constitutes a vital element for nature and for the existence of human beings (...).*

*The State, through the single water authority, will be directly responsible for the planning and management of water resources to be used for human consumption, irrigation to ensure food sovereignty, ecological flow and productive activities, in this order of priority. (...);*

That, Article 412 of the same law states that: *"The authority shall in charge of the water management will be responsible for its planning, regulation and control. This authority cooperate and coordinate with the environmental management agency to ensure the management of water with an ecosystemic approach";*

Article 3 of the Organic Law on Water Resources, Uses and Development of Water (LORHUyA, hereinafter referred to as LORHUyA), defines the purpose of the Law as *"to guarantee human rights to water as well as to regulate and control the authorization, management, preservation, conservation, restoration, of water resources, use and exploitation of water, integral management and its recovery, in its different phases, forms and physical states, in order to guarantee the sumak kawsay or good living and the rights of nature established in the Constitution*";

Article 17 of the same law provides that: *"The Single Water Authority is the entity that manages the national strategic water system and is a legal entity under public law. Its head shall be appointed by the President or the President of the Republic and shall have the rank of minister. It is responsible for the steering, planning and management of water resources. Its management shall be deconcentrated in the territory";*

Article 18(p) of the aforementioned Article 18 states that the Single Water Authority is responsible for: *"Establishing the general parameters, based on technical and actuarial studies, for the setting of tariffs. for the provision of public drinking water and sanitation, irrigation and drainage services,* ***and to set the amounts of the tariffs for the authorizations for the productive use and exploitation of water, in the cases determined in this Law****";*

Article 135 of the same law establishes that: *"Tariff is understood to be the remuneration that a user must pay for the provision of services and authorization for the use and development of water.*

*For the purposes of protection, conservation of the basins and financing of the costs of related services, the corresponding tariffs will be established, the principles of this Law, the criteria and technical parameters indicated in the Regulations.*

*The rates for water use and development authorization shall be regulated and set by the Single Water Authority...".*

That, Article 136 ibidem establishes: *"General principles for setting water rates. In the establishment of rates for the authorization of use and use of water as well as for drinking water, sanitation and sewage services, the following shall be established of irrigation and drainage services should be considered the principles of solidarity, equity, sustainability and periodicity";*

Article 137 of the same law establishes that: *"The Single Water Authority, as part of the tariffs for authorization of water use and development and service, shall include a component for conservation of the water domain. public water sources and water recharge areas;*

*The Decentralized Autonomous Governments, within the scope of their competencies, shall establish components in the tariffs of domiciliary public utilities related to water to finance the conservation of the public water domain with priority in water sources and recharge areas";*

That Book IV of the Regulations to the Organic Law on Water Resources, Uses and Exploitation of Water determines the tariff system, types, general principles and criteria for the establishment of tariffs for the use and/or exploitation of water;

Article 17 of the Statute of the Administrative Legal Regime of the Executive Branch establishes that *"The Ministers of State are competent to deal with all matters inherent to their ministries without the need for any authorization from the President of the Republic, except for those cases expressly indicated in special laws*";

That, through Executive Decree No. 1088 of May 15, 2008, published in Official Gazette No. 346 of May 27, 2008, the National Water Resources Council (CNRH) was reorganized through the creation of the National Water Secretariat, as a public law entity, attached to the Presidency of the Republic, with its own assets and budget, and with technical, operational, administrative and financial independence; in its

CORTE CONSTITUCIONAL DEL ECUADOR

Article 4 provides that the National Water Secretariat shall be headed by the National Water Secretary, with the rank of Minister, who shall be the legal representative of the entity;

Whereas, Executive Decree No. 90, dated October 12, 2009 and published in the Official Gazette No. 52, dated October 22, 2009, amends Executive Decree No.1088 and establishes in its Article 8 that: *"The integrated management of water resources shall be exercised in a decentralized manner by Hydrographic Districts, basins or sub-basins, through the hydrographic basin water resources management agencies and their respective authority, which shall be established by the National Secretary of Water and their functions, powers and competencies shall be established in the entity's functional organic regulations*";

That, through Executive Decree No. 62 of August 5, 2013, the Statute of the Legal and Administrative Regime of the Executive Branch was amended regarding the names, powers and administrative organization of several Executive Branch agencies, including the Water Secretariat;

That, the Water Regulation and Control Agency, on April 04, 2016, issued Regulation DIR-ARCA- RG-002-2016, with which in its Article 12 establishes that: *"every 5 years the tariff will be reviewed and/or updated, for which the provisions of Chapter II of this regulation and the relative planning for the application of the new tariffs for the following 5 years will be taken into account".*

That, by Agreement No. 2016-1260, dated January 08, 2016, the Water Economy Committee was created as a consultative body of state institutions.
Ecuador, governing, regulating and executors the water resources;

That, with Executive Decree No. 1008, dated May 4, 2016, published in Official Gazette Supplement No. 760, dated May 23, 2016, the President of the Republic appointed Mgs. Alexis Sán hez Miño, as Secretary of Water;

That, by means of Meeting Minutes subscribed on May 18, 2017, the Water Economy Committee, approved the Technical Report on Methodology and Calculation of Tariffs for the Uses and Exploitation of Raw Water;

That, with memorandum No. SENAGUA-AS.1-2017-0007-M, dated May 22, 2017, Mgs. David Andrés Mejía Sarmiento, in his capacity as President of the Water Economy Committee, requested the Secretary of Water to approve the rates agreed upon in the "Technical Report on Methodology and Calculation of Rates for the Use and Development of Raw Water" (ANNEX 1); as well as to have the General Legal Coordination proceed with the preparation of the Ministerial Agreement, which allows setting the Rates for Authorization of Use and Development of Water, which was authorized, by means of a note inserted in the same document.

In exercise of the powers conferred by articles 154 numeral 1 of the Constitution of the Republic and 17 of the Statute of the Administrative Legal Regime of the Executive Branch.

**Agrees:**

**Art.1.- APPROVE** the calculation formula for obtaining the referential tariff for raw water, for the sustainability of the water sector, based on the following detail:

$$\frac{\text{Costos Totales Sostenibilidad Hídrica}}{\text{Volumen Nacional de Agua Autorizado}} = \frac{77\ \text{MMUSD}}{19.986\ \text{hm3}} = 0{,}0039$$

*The values were determined based on the year 2016 and will be valid for 5 (five) years, as established in Regulation DIR-ARCA-RG-002-2016;

**Art. 2.- TO APPROVE** and fix the Rates for the authorizations for the Use and Development of Water; in accordance with the following detail:

| BLOCKS | Type of use a rovec ement | Tariff USD/m³ |
|---|---|---|
| **EXEMPT FROM** R ego **sovereign PAG** | feeding < 5 l/s | Exempt from payment by law |
| **BLOQ E** | **1Productive irrigation** up to 50 l/s | 0,0039 |
| **BLOCK 2** | **Industrial** | 0,0049 |
| | **Tourism** | 0,0049 |
| | **Productive** irrigation > 50 l/s | 0,0049 |
| | **Others** | 0,0049 |
| **BLOCK 3** | Irrigation **sovereignty** food > 5 l/s | 0,0029 |
| | Hydroelectricity | 0,0049 |
| | Water bottling | 0,2435 |

**Final Provision:** The Water Secretariat, Undersecretariats of the Hydrographic Districts, the Water Regulation and Control Agency, and the Public Water Company shall be charged with the execution of this Agreement, for compliance within the scope of their competence.

This Agreement shall enter into force as of its issuance, notwithstanding its publication in the Official Gazette.

**COMMUNICATE AND PUBLISH.**

Given in the city of Quito Metropolitan District, on May 23, 2017.

f.) MSc. Alexis Sánchez Miño, Secretary of Water.

**ANNEX 1:** "Technical Report on Methodology and Calculation of Tariffs for Raw Water Uses and Exploitation".

CORTE CONSTITUCIONAL DEL ECUADOR

**TECHNICAL REPORT ON THE METHODOLOGY AND CALCULATION OF TARIFFS FOR RAW WATER USES AND DEVELOPMENTS**

Secretaría de Agua

SOCIO-ECONOMIC VALUATION DEPARTMENT

MAY, 2017

**INDEX**

1 BACKGROUND

2 LEGAL BASIS

2.1 Constitution of the Republic

2.2 Organic Law on Water Resources, Water Uses and Development

2.3 Regulations for the application of the Organic Law on Water Resources, Water Uses and Water Development

2.4 Definitions and concepts

3 ANALYSIS OF THE CURRENT RAW WATER TARIFF SITUATION

4 CALCULATIONS

4.1 Costs at se considered for the calculation of l rate

4.1.1 Conservation of public water resources with source priority and recharge areas

4.1.2 Related services

5 BREAK-EVEN MODEL

5.1 Detail of projected costs

5.2 Detail of expected income projection

5.3 Differentiating Factors

6 PROPOSAL FOR A SUSTAINABILITY TARIFF FOR WATER RESOURCES BY CONSUMPTION BLOCKS

7 IMPLEMENTATION

7.1 Gradation Criteria

7.2 Tariff Impact Analysis

7.2. 1Impact on Municipal Governments.

8 CONCLUSIONS

9 APPROVAL

**TABLES**

Table 1: Proposed Investment Path for Source and Water Recharge Zone Conservation (USD)

Table 2: Conservation measures and actions for water sources and recharge zones

Table 3: National measures and actions (governance) in support of the conservation of water sources and recharge areas

Table 4: Reference budget

Table 5: Efficient water management program costs

Table 6: Costs of related services

Table 7: Operation and maintenance costs of multipurpose works

Table 8: Infrastructure management (O&M) cost proposal

Table 9: Percentage cost structure with the proposal for

modifying the O&M costs

Table 10: Authorized flow of the BNA

Table 11: Consumptive factors

Table 12: Average projected volume

Table 13: Percentage breakdown of projected costs Table 14:

Percentage structure of financing

Table 15: Expected projected revenues

Table 16: Solidarity and Sustainability Factors (Fs)

Table 17: Surplus over human consumption - GAD

Table 18: Gradualness of tariff implementation in the first year

Table 19: Impact on Decentralized Autonomous Governments (GAD)

Table 20: Impact on other sectors Table

21: Impact on main crops

Table 22: Variation in consumers' electricity bills

Table 23: Impact on other sectors

CORTE CONSTITUCIONAL DEL ECUADOR



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

**ILLUSTRATIONS**

Illustration 1*: Tariffs for industrial purposes - Water Law Regulations 2004*

Illustration 2: *Methodology for calculating the referential rate*

Illustration 3: *Financial Equilibrium Model*

Illustration 4: Block Tariff Schedule **GLOSSARY OF**

**TERMS**

| | |
|---|---|
| ARCAA | Water Regulation and Control Agency |
| ARCONELA | Electricity Regulation and Control Agency |
| BIOFIN | Initiative Initiative Finance for Finance for Biodiversity |
| BNA | Banco Nacional de Autorizaciones |
| CMVC | Minimum Vital Consumption |
| EPA | SPE Public Water Company |
| LORHUandAAL | Organic Law on Water Resources Water Uses and Exploitation |
| MAE | Ministry of the Environment |
| MICSE | Ministry Sector Coordinator Strategic |
| PNA | National Water Plan |
| SENAGUA | Water Secretariat |

**1 BACKGROUND**

On April 04, 2016, the Water Regulation and Control Agency issues Regulation No. DIR-ARCA-RG-002-2016 "Technical and actuarial criteria for setting tariffs for raw water uses and exploitation".

By Memorandum No. SENAGUA-SSG.2-2016- 0057-M, the Undersecretary General requested the official delegation of officials to form the technical working team to contribute to the structuring of the *"Technical Support Report for the establishment of water use and exploitation tariffs"*.

In 2016, through Agreement 2016-1260, the Water Economy Committee was created as a consultative body of the Ecuadorian State institutions, governing, regulating and executing water resources integrated by: a) The Secretary of Water or his delegate, b) Delegate of the Water Regulation and Control Agency (ARCA) and, c) Delegate of the Public Water Company (EPA).

Several meetings of the Water Economics Committee have been held, where the financial equilibrium model has been reviewed, and the calculations and some guidelines have been agreed upon, such as the following:

- The types of authorizations of the National Authorization Bank (Banco Nacional de Autorizaciones -BNA) are adjusted according to the uses and exploitation established in the Organic Law on Water Resources, Uses and Development of Water and, based on these uses and exploitation, the tariff schedule by blocks was prepared.

- Until the Water Secretariat forms the Irrigation Commission for Food Sovereignty, the authorizations granted for this concept to date will be maintained as stated in the basis of the BNA.

  Productive irrigation is established as the authorizations granted to public and/or private (non-community) individuals and legal entities. And that these authorizations are subdivided into flow ranges that will have differentiated rates for each range.

**2 LEGAL BASIS**

**2.1 Constitution of the Republic**

Article 12 of the Constitution of the Republic of Ecuador establishes that the human right to water is fundamental and unrenounceable, constitutes a strategic national patrimony of public use, inalienable, imprescriptible, unseizable and essential for life.

Article 313 ibi em, i s stitutes that the State reserves the right to
the right to administer, re ul r, control and manage the
sectore n accordance with the principles of the
of environmental sustainability, precaution,
prevention and efficiency.

Article 318 of the Constitutional text defines water as a strategic national patrimony for public use.

**2.2 Organic Law on Water Resources, Water Uses and Development**

Article 18 of the Organic Law on Water Resources, Uses and Development of Water determines the competencies and attributions of the Single Water Authority, among them,
*p) Establish the general parameters, based on technical and actuarial studies, for setting the rates for the provision of public drinking water and sanitation, irrigation and drainage services, and set the amounts of the rates for authorizations for the productive use and exploitation of water, in the cases determined in this Law.*

Article 21 of the Organic Law on Water Resources, Uses and Development of Water, published in Official Gazette Supplement 305 of August 6, 2014, establishes that the Water Regulation and Control Agency (ARCA), is a public law body, of a technical-administrative nature, attached to the Single Water Authority, with legal personality, administrative and financial autonomy, with its own assets and national jurisdiction. It will regulate and control the integral and integrated management of water resources, the quantity and quality of water in its sources and recharge areas, the quality of public services related to the water sector and all uses, exploitation and destinations of water.

CORTE CONSTITUCIONAL DEL ECUADOR

Barcode: 4604551-01 C-331-806 INV - Investigation



Article 23 ibid. establishes the competencies of the Water Regulation and Control Agency, among them:
h) To regulate and control the application of technical and actuarial criteria for setting rates for the use and productive development of water by the Single Water Authority and for the provision of water-related services.

Article 65 of the same legal body states that water resources shall be managed in an integrated and comprehensive manner, with an eco-systemic approach that guarantees biodiversity, sustainability and their preservation.

The second paragraph of Article 68 of the LORHUyAA states that without prejudice to the obligations of the State, water users shall contribute economically, in proportion to the amount of water they use for the preservation, conservation and sustainable management of water resources in the river basin and shall participate in its management. In the case of community users, who are also water consumers, they shall contribute financially or through community work.

Article 93 of the same text establishes that the productive use of water is constituted by activities such as irrigation for popular and solidarity economy, agro-industry, agricultural production or aquaculture production for export or other productive activities such as tourism, hydroelectricity generation, industrial production, mining and mineral refining,
hydrocarbons, packaging and water marketing
minerals, medicinal products, enriched teas or those with certified purification and quality processes; and other productive activities that involve the use o f water.

Article 106 ibid. states that within the framework of respect for the order of priority regulated in this law, the Sole Water Authority shall grant authorizations for the productive use of water for the generation of electricity, preferentially for projects of national priority, which are contemplated in the electrification master plan, incorporating the principles of environmental sustainability, precaution, prevention and efficiency, all this in accordance with Article 143 of the same legal body, which provides that the use for electricity generation shall have a rate established by the Sole Water Authority, based on the regulations issued by the ARCA.

Article 135, ibidem, defines the tariff as the remuneration that a user must pay for the provision of services and authorization for water uses and exploitation.

For the purposes of protection, conservation of the basins and financing of the costs of related services, the corresponding tariffs will be established, according to the principles of this Law, the criteria and technical parameters indicated in the Regulations.

The rates for the authorization of water use and development will be regulated and set by the Single Water Authority.

Article 136 of the aforementioned Law determines that in the establishment of tariffs for the authorization of water use and exploitation, as well as for potable water, sanitation, irrigation and drainage services, the principles of solidarity, equity, sustainability and periodicity must be considered;

Article 137 of the LORHUyAA, states that the Sole Water Authority, as part of the rates for authorization of use and exploitation and water service, will consider a component for conservation of the public water domain with priority in sources and water recharge areas.

Article 139 of the Organic Law in reference, states that in order to establish rates, the following criteria must be met:

a) Inclusion on a proportional basis of what the service holder must pay to the Single Water Authority for the supply of raw water; and,

b) Proportional inclusion of the cost of catchment, handling, impulsion, conduction, operation, treatment, administration, depreciation of assets, amortization, distribution, environmental sanitation and new investments for water supply.

Article 142 of the Law in reference determines that the tariffs for productive use will consider the volume used, the efficiency of use, contribution to the conservation of water resources and the generation of vater for the production of water.
employment.

**2.3 Regulations for the application of the Organic Law on Water Resources, Water Uses and Water Development**

Article 113 of the Regulations for the application of the Organic Law on Water Resources, Water Use and Development, establishes that the Water Secretariat is responsible for setting the amounts of the rates for authorizations for the productive use and development of water in accordance with the regulations established by the Water Regulation and Control Agency.

Article 114 of the Regulations for the application of the Organic Law on Water Resources, Water Use and Development establishes that in accordance with Article 23 paragraph h) of the LORHUyAA, the Water Regulation and Control Agency is responsible for regulating the application of technical and actuarial criteria for setting rates for productive water use and development by the Water Secretariat;

Article 116 of the ibidem, determines that the tariff system shall serve to achieve an efficient use of water, discouraging excessive consumption, waste, operating losses and others, favoring water saving and conservation, as well as an efficient collection system, facilitating the proper use and state of protection and conservation of watershed management.

The same article stipulates that the establishment of tariffs, together with other economic resources, should promote a policy of investment in hydraulic infrastructures.


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

Article 117 ibid. clearly defines the principles of solidarity, equity, sustainability and periodicity, in the following terms:

a) Solidarity: A tariff system is solidarity-based if **it** is possible to ensure that the tariffs established for high consumers of a service favor the possibility of low consumption consumers to receive the service at a value that can be assumed by them without affecting the sustainability of the service.

b) Equity: The establishment of tariffs is based on principles of equity when equal situations are subject to identical tariff levels. The purpose of equity also coincides with the basic principles of solidarity.

c) Sustainability: A tariff system is economically sustainable when, through its establishment and collection, it is possible to manage a system of water infrastructure, watershed protection and management, and progressively improve its quality and efficiency in water management, as well as the provision of related public services.

d) Periodicity: The tariffs must be reviewed periodically to adapt them to new circumstances that arise and to the achievement of sustainability. The maximum period for tariff revision by the licensee entity is established as follows

its fixation, that of five years.

Article 121 of the aforementioned regulation states that the rates for the authorization of use and exploitation of raw water may be different according to the different uses of water based on the following criteria:

a) The social and economic utility of the use of the water. Within these concepts, the economic capacity of the holder of the authorization, the geographic location of the water use or the productive use according to state incentives, the generation of employment and the character of popular and solidarity economy of the holder of the corresponding authorization shall be considered.

**2.4 Definitions and Concepts**

**Tariff (Art. 112 Regulations)**

In accordance with the provisions of Article 135 of the LORHUyAA, a tariff is understood to be the fee that a user must pay for the provision of services and authorization for the use and development of water.

Definition of raw water tariff (Adapted from Art. 112 Regulation): It is the cost of the provision of services and authorizations for the use and exploitation of raw water, which the users of the resource must pay in retribution for said service, but affected or modulated by a public policy of an economic, social or environmental type. This affectation is made using differential factors that allow the implementation of this policy.

The principles to be contemplated in the tariff (based on Art. 136 of the LORHUyAA, and 117 of the Regulations) are:

**Solidarity**: The impact of the tariff must fall to a greater extent on those users who can pay more for the resource. Solidarity must be transversal to all users of the resource, regardless of the magnitude of the individual benefit obtained, what is fundamental is the country as a whole, this principle cannot be optional in a socially conscious society. It can also be understood as a principle of subsidiarity (public or private) of those who have more towards others.

**Equity**: Equal rates must be charged for equal situations, and no user may be excluded from being charged to the detriment of others. Equal contributions must be made according to the use and exploitation of the resource.

**Sustainability**: The contribution of all users of raw water services, according to their consumption (Art. 138 LORHUyAA), will help the sustainability of the water infrastructure system, improve the quality of the resource, as well as the protection and management of watersheds. However, the principles of solidarity and equity must be taken into account to ensure social justice. It can also be understood as a principle of complementarity among all users to guarantee the resource in the long term.

**Periodicity**: The rates should be reviewed periodically to adapt them to new circumstances and to achieve sustainability. A maximum review period of 5 years is established.

## 3 ANALYSIS OF THE CURRENT SITUATION OF THE RAW WATER RATE

Article 73 of the General Regulations for the Application of the Water Law (2004 codification) states that the concessionaires of a water use right shall pay the following annual rates:

a) For irrigation with surface water and having meters: US$ 0.0000344/m$^3$

b) For irrigation with surface water and non-compliance with the provisions on the construction of metering works: US$ 0.0000588/m$^3$

c) Groundwater irrigation: US$ 0,0000344/m$^3$

d) For mechanical strength: US$ 1.72/HP

e) For industrial purposes, for surface and subway water, they will pay according to the following table:

**Illustration 1**: *Tariffs for industrial purposes - Water Law Regulations 2004*

| BASE (m³ year) | UNTIL (m³ year) | BASE RATE (US$) | ADDITIONAL (per thousand M )³ (US$ 1,000 m )³ |
|---|---|---|---|
| ........ | 10.000 | ........ | 0.74 |
| 10.001.01 | 100.000 | 7.35 | 0.59 |
| 100.000.01 | 1.000.000 | 60.30 | 0.49 |
| 1.000.000.01 | 10.000.000 | 501.54 | 0.39 |

CORTE CONSTITUCIONAL DEL ECUADOR


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

| | | | |
|---|---|---|---|
| 10.000.000.01 | 100.000.000 | 4.031.43 | 0.29 |
| 100.000.000.01 | ........ | 30.505.60 | 0.25 |

**Source: Water Law Regulations-2004**

f) For mineral and non-mineral table waters sold packaged or in bulk: US$ 0.0002/liter.

The calculation of the volume will be made considering the authorized days of use per week, as stated in the resolutions.

g) For thermal and non-thermal waters for recreational purposes: 0.016/$m^3$

h) For hydroelectric power production: US$ 0.0000344/$m^3$

Resolution 2013-666 of January 23, 2013, states: For fish farming and aquaculture activities will be paid: US$ 0.0000344/$m^3$

## 4 CALCULATIONS

In compliance with Regulation DIR-ARCA- RG-002-2016 (Water Regulation and Control Agency-2016) referring to the establishment of Technical and Actuarial Criteria for setting rates for water use and development, the following variables have been considered to calculate the referential rate:

- Costs to be considered for the calculation of the rate
- Projected volume
- Consumptive factors

In addition, it is necessary to have the update of

- Adjusted annual projected volume
- Detail of projection of expected revenues
- Financial equilibrium model
- Collection of fees for each use and exploitation

### 4.1 Costs to be considered for the calculation of the rate

In accordance with the provisions of the Regulation, the costs to be financed by the tariff have been grouped into the following cost groups:

a) Conservation of public water resources with priority to sources and recharge areas.

b) Related services

c) Operation and maintenance of multipurpose works

The elements to be considered for each of the above costs are detailed below.

#### 4.1.1 Conservation of public water resources with priority to sources and recharge areas.

The Water Secretariat has planned the following activities for the conservation of water resources with priority to water sources and recharge areas that supply water for human consumption and food sovereignty, and for measures to protect and conserve water basins, as detailed below:

1) Investment for the conservation of water sources and recharge areas, as components for the establishment of tariffs according to each of the uses and exploitation of water framed in Article 137 of the LORHUyAA.

In the National Water Plan, an estimated investment of around US$ 109,877,287 has been projected. However, as is evident at first glance, it is necessary to prioritize the investments required for water resource conservation, given that the

The total requirements proposed by the National Water Plan (PNA), amounting to a total of US$ 109,877,287, are too high to be fully financed by the raw water tariff.

2) Define actions, or characterization of conservation measures.

Given that the quantities initially estimated for the conservation section is clearly too high to be included directly as part of the raw water tariff, it is considered necessary to work with cost-effectiveness criteria to propose measures and actions that are less costly and have a greater environmental impact. Based on the results of the studies carried out with the support of the BIOFIN-UNDP Project, the following values are obtained for the first 5 years:

CORTE CONSTITUCIONAL DEL ECUADOR

**Table 1: Proposed Investment Path for Source Conservation and Water Recharge Areas (USD)**

| Costs | Annual cost | | | | | Total cost for five years |
|---|---|---|---|---|---|---|
| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | |
| Measurement cost | 6.332.298,05 | 6.368.298,05 | 6.161.798,05 | 6.137.798,05 | 6.177.798,05 | |
| Cost of implementation | 5.129.626,50 | 4.902.103,22 | 4.898.547,62 | 4.888.044,26 | 4.881.742,24 | |
| **Total cost of the measure** | **11.461.924,55** | **11.270.401,27** | **11.060.345,67** | **11.025.842,31** | **11.059.540,29** | **55.878.054,10** |

**Source:** SENAGUA - BIOFIN **Prepared by:** SENAGUA

Barcode: 4604551-01 C-331-806 INV - Investigation



The conservation measures and actions for water recharge sources and zones are as follows:

**Table 2: Conservation measures and actions for water sources and recharge zones**

| Measures | | Shares | |
|---|---|---|---|
| **1** | Protection of moorland, forest and scrubland remnants | A 1.1 | Protection of moorland remnants (forest, moorland, scrubland) in water sources |
| **2** | Restoration of areas of water interest | A 2.1 | Revegetation in areas of importance for moisture interception (mountain ridges) of water sources (water recharge). |
| | | A 2.2 | Recovery of riparian strips (vegetative filters) |
| | | A 2.3 | Conformation of horizontal vegetative connectivity strips. |
| | | A 2.4 | Revegetation in degraded areas |
| **3** | Establishment of agrosilvopastoral plantations | A 3.1 | Implementation and management of boundaries, fences, and living barriers. |
| | | A 3.2 | Implementation and management of forestry plantations associated with pastures and fodder banks. |
| **4** | Plantation and natural regeneration management | A 4.1 | Highlighting or shimmer management |
| | | A 4.2 | Thinning of unmanaged pine plantations on mountain ridges |
| **5** | Establishment and management of soil conservation practices. | A 5.1 | Implementation of barriers with grasses in level curves and infiltration ditches associated with such plantations. |
| **6** | Promotion of agroecological practices | A 6.1 | Promotion of zero tillage, crop association and rotation, recycling of organic matter, etc. |
| **7** | Support for the management of protected areas | A 7.1 | Support for the management of protected areas |

**Source:** SENAGUA - BIOFIN

CORTE CONSTITUCIONAL DEL ECUADOR

**Table 3: National measures and a ctions (g o v e r n a n c e)**
**as an aid in the conservation of water sources and recharge areas**

| Measures | | Shares | |
|---|---|---|---|
| **8** | Promoting ongoing communication, environmental education and research | A 8.1 | Integration with universities |
| | | A 8.2 | Promotion of continuous communication and information |
| **9** | Improvement of institutional political articulation, development of land-use planning with water as an integrating element of the territory and development of public monitoring and control processes. | A 9.1 | Institutional articulation |
| **10** | Determination and application of financial mechanisms focused on conservation programs for water recharge areas. | A 10.1 | Articulation with financial mechanisms |
| **11** | Monitoring and evaluation | A 11.1 | Monitoring and evaluation |

**Source**: SENAGUA - BIOFIN

#### 4.1.2 Related services

The costs of related services, as established in the legislation, involve: "*Activities necessary for the regulation, control and management of water, including the implementation of programs, projects and activities for the improvement of water management efficiency*" (Art. 135 LORHUyAA). (Art. 135 LORHUyAA).

The actors that have the competence to provide these services are:

- The Water Regulation and Control Agency (ARCA).
- Citizen Service Centers (CAC).

For the management of these services, the costs to be incurred by each of them are broken down:


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

Barcode: 4604551-01 C-331-806 INV - Investigation



***4.1.2.1 WATER REGULATION AND CONTROL AGENDA***

Based on the reference budget for ARCA's management prepared by the Planning Department in coordination with the Administrative and Financial Department, the values were optimized resulting in the minimum necessary budget, sent through Official Letter No. ARCA-DE-2016-0112-OF, ARCA submitted the report *"Estimated costs to be incurred by the Water Regulation and Control Agency on Water Resource Management*".

**Table 4: Reference budget**

| Detail | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | Total Cost | Average Cost |
|---|---|---|---|---|---|---|---|
| Regulatory Projects | 1.717.992,00 | 1.975.690,80 | 2.272.044,42 | 2.221.049,64 | 1.940.635,78 | 10.127.412,64 | 2.025.482,53 |
| Control Projects | 3.282.119,48 | 4.248.402,11 | 4.835.896,48 | 5.338.746,02 | 5.417.550,42 | 23.122.714,51 | 4.624.542,90 |
| **Total** | **5.000.111,48** | **6.224.092,91** | **7.107.940,90** | **7.559.795,66** | **7.358.186,20** | **33.250.127,15** | **6.650.025,43** |

**Source**: ARCA

The activities included in this budget are as follows:

**Optimization of functions:** through deconcentration at the national level in 4 Zonal Coordination Offices and 5 Technical Control Offices.

**Zonal ManagementTechnical Control Offices**

- Guayaquil- Loja
- Cuenca- Machala
- Esmeraldas- Ibarra
- Riobamba- Tena

- Portoviejo

**Regulatory Projects**: ARCA plans to prepare 29 regulations by 2020. For the year 2017 it is planned to prepare 9 regulations, 9 for the year 2018, 8 for the year 2019, 3 for the year 2020 and for the year 2021 the new ARCA's Regulatory Agenda and regulatory issues are planned; the total required amounts to $ 10'127,412.64

**Control projects:** their purpose is to control compliance with the obligations established in the authorizations,
evaluation of the provision of unitary water service, evaluation of the provision of drinking water service, control
The budget required until the year 2020 amounts to $ 23,122,714.51. The Agency is in compliance with the regulations issued by the Agency and with the provisions of the LORHUyAA for all water users.

The Water Regulation and Control Agency will continue with the control of productive use users, drinking water service providers, water boards and irrigation boards until 2021. Starting in 2018, ARCA will begin the process of deconcentration in the territory.

***4.1.2.2 DECONCENTRATION OF THE SINGLE WATER AUTHORITY***

By means of Memorandum No. SENAGUA-CGEP.3-2016-0162-M, the General Coordination of Planning and Strategic Management, sends the *"Costing Report of the Citizen Service Centers*", where the methodology of information request, information gathering, consolidation, analysis and projection was used, taking into account the following variables sent by the Hydrographic Districts and by the Water Resources Administration Directorate:

- ✓ Direct personnel per Citizen Service Center (CAC).
- ✓ Verification of procedures entered by CAC (Demand 2014 - 2015)
- ✓ Verification of unprompted and delayed procedures by CAC (Demand 2014-2015)
- ✓ Processes resolved (2014 - 2015)
- ✓ Analysis of cost items (2015 by ACC)
- ✓ Database of Authorizations by CAC (2014 and 2015)

Once all the information was compiled, the demand vs. resolved procedures for the years 2013, 2014 and 2015 were obtained.


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

Case 1:25-cv-00025-RKE Document 86-2 Filed 04/27/26 Page 346 of 659
Barcode: 4604551-01 C-331-806 INV - Investigation



After analyzing the typology by ACC, the optimal deconcentrated organizational structure was established for the proper management of the ACCs, which is the basis for the projection of strengthening costs for the ACCs, including: personnel expenses, goods and services, other general expenses, fixed assets, real estate (leases), personal property, vehicles, as detailed below:

**Table 5: Efficient water management program costs**

| Detail/Years | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Costs of the Water Efficiency Management Program | 6.358.386 | 6.251.819 | 6.163.388 | 6.090.829 | 6.034.231 |

**Source:** Information from Hydrographic Districts and ACC.
**Prepared by:** SENAGUA

The following table summarizes the costs for related services for the 5 years:

**Table 6: Costs of related services**

| Detail/Years | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Efficient water management program costs | 6'358.386 | 6'251.819 | 6'163.388 | 6'090.826 | 6'034.231 |
| Regulation and Control | 5'000.111 | 6'224.093 | 7'107.941 | 7'559.796 | 7'358.186 |

**Source:** ARCA, General Coordination of Planning and Strategic Management-SENAGUA, 2016.[1]
**Prepared by:** SENAGUA

**4.1.3 Operation and maintenance of multi-purpose works-EPA**

Decree No. 310 of April 14, 2014 created the Empresa Pública del Agua-EPA EP, an entity in charge of the operation and maintenance of all multi-purpose projects y proyect s d flood control. The operation and maintenance of works m ltip oppose for the State asc end to USD 43'86 .642.02 per year, considering the following projects:

1. Daule-Santa Elena Diversion System
2. La Esperanza and Poza Honda Transfer System
3. Chone Multiple System
4. Latacunga- Salcedo-Ambato and Quimiag Irrigation Systems
5. Santiaguillo-Cunambo and Ambuquí Irrigation System
6. Tahuin Dam
7. Daule-Vinces Diversion
8. Lower basin flood control
9. BuluBulu flood control
10. Flood control Cañar
11. Flood control Naranjal

CORTE CONSTITUCIONAL DEL ECUADOR

[1] Oficio No. ARCA-DE-2016-0171-OF
Report "Estimated costs to be incurred by the Water Regulation and Control Agency on Water Resources Management" Memorandum SENAGUA-CGEP.3-2016-0162-M
Report "Citizen Service Centers Costing Report".


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

Barcode: 4604551-01 C-331-806 INV - Investigation



**Table 7: Operation and maintenance costs of multipurpose works**

| PROJECT | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | TOTAL |
|---|---|---|---|---|---|---|
| DAULE-SANTA ELENA WATER TRANSFER SYSTEM | 13.827.134,50 | 13.827.134,50 | 13.827.134,50 | 13.827.134,50 | 13.827.134,50 | 69.135.672,50 |
| LA ESPERANZA AND POZA HONDA DIVERSION SYSTEM | 6.426.514,38 | 6.426.514,38 | 6.426.514,38 | 6.426.514,38 | 6.426.514,38 | 32.132.571,90 |
| CHONE MULTIPLE SYSTEM | 788.728,54 | 788.728,54 | 788.728,54 | 788.728,54 | 788.728,54 | 3.943.642,70 |
| LATACUNGA-SALCEDO-AMBATO AND QUIMIAG IRRIGATION SYSTEM | 768.385,03 | 768.385,03 | 768.385,03 | 768.385,03 | 768.385,03 | 3.841.925,15 |
| SANTIAGUILLO - CUAMBO AND AMBUQUÍ IRRIGATION SYSTEM | 717.481,63 | 717.481,63 | 717.481,63 | 717.481,63 | 717.481,63 | 3.587.408,17 |
| TAHUIN DAM | 505.889,51 | 505.889,51 | 505.889,51 | 505.889,51 | 505. 89,51 | 2.529.447,55 |
| DAULE- VINCES WATER TRANSFER | 3.933.775,74 | 3.933.775,74 | 3.933.775,74 | 3.933.775,74 | 3.933.775,74 | 19.668.878,72 |
| FLOOD CONTROL IN THE LOWER BASIN | 4.770.084,00 | 4.770.085,00 | 4. 70.086,00 | 4.770.087,0 | 4.770.088,00 | 23.850.430,00 |
| BULUBULU FLOOD CONTROL | 715.276,24 | 715.276,24 | 715.276,24 | 715.276,24 | 715.276,24 | 3.576.381,21 |
| CAÑAR FLOOD CONTROL | 3.107.730,00 | 3.107.730,00 | 3.107.730,00 | 3.107.730,00 | 3.107.730,00 | 15.538.650,00 |
| FLOOD CONTROL NARANJAL | 1.301 642,44 | 1.301.642,44 | 1.301.642,44 | 1.301.642,44 | 1.301.642,44 | 6.508.212,22 |
| EPA EP. | 7.000.000,00 | 7.000.000,00 | 7.000.000,00 | 7.000.000,00 | 7.000.000,00 | 35.000.000,00 |
| **TOTAL MANAGEMENT YO&M** | **43.862.642,01** | **43.862.643,02** | **43.862.644,03** | **43.862.645,03** | **43.862.646,03** | **219.313.220,12** |

**Source: EPA, 2016[2] Elaboration: EPA-** SENAGUA

The multipurpose projects in charge of EPA have fixed values throughout the analysis period (US$ 43 million per year) and could increase by up to US$ 8,715,953.69 in the medium term due to the incorporation of new water infrastructure[3] being studied by SENAGUA, which would not reduce (affect) the reference tariff. For this reason, in the last two years the O&M has been increased to cover the new multipurpose facilities as of years 4 and 5.

[2] Annexes:
Oficio No. EPA-GG.2-2016-00256-O
Referential rate calculation model report

[3] This possible increase in O&M costs due to the incorporation of new water infrastructure (which is an EPA objective), is an aspect that should be analyzed by the EPA and introduced in the calculation of the tariff, as long as it is feasible to have such an estimate in the short term, and under the premise that the raw water tariff should "contribute" to the operation of the water infrastructure.

CORTE CONSTITUCIONAL DEL ECUADOR


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

**Table 8: Infrastructure management (O&M) cost proposal**

| Costs | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 | AVERAGE |
|---|---|---|---|---|---|---|
| Water Resources Conservation | 11.461.924,55 | 11.270.401,27 | 11.060.345,67 | 11.025.842,31 | 11.059.540,29 | 11.175.610,82 |
| Infrastructure Management (O&M) | 43.862.642,02 | 43.862.643,02 | 43.862.644,02 | 52.578.598,71 | 52.578.599,71 | 47.349.025,50 |
| Participation (CAC) | 6.358.386,17 | 6.251.819,00 | 6.163.388,00 | 6.090.826,00 | 6.034.231,00 | 6.179.730,03 |
| Regulation and Control | 5.000.111,48 | 6.224.093,00 | 7.107.941,00 | 7.559.796,00 | 7.358.186,00 | 6.650.025,50 |
| **TOTAL** | **66.683.064,22** | **67.608.956,29** | **68.194.318,69** | **77.255.063,02** | **77.030.557,00** | **71.354.391,85** |

**Source:** SENAGUA - BIOFIN **Preparation:** SENAGUA

If this proposed increase in infrastructure management costs is accepted, which obviously has to be analyzed and validated by EPA, the percentage structure of the cost components of the raw water tariff would also be modified as shown below.

**Table 9: Percentage structure of costs with the proposed cost change d O M**

| Costs | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Water Resource Conservation | 17,2% | 16,7% | 16,2% | 14,3% | 14,4% |
| Infrastructure Management (O&M) | 65,8% | 64,9% | 64,3% | 68,1% | 68,3% |
| Participation (CAC) | 9,5% | 9,2% | 9,0% | 7,9% | 7,8% |
| Regulation and Control | 7,5% | 9,2% | 10,4% | 9,8% | 9,6% |
| **TOTAL** | **100%** | **100%** | **100%** | **100%** | **100%** |

**Source:** SENAGUA 2016**. Prepared by:** BIOFIN- SENAGUA Consultant.

CORTE CONSTITUCIONAL DEL ECUADOR

**4.2 Projected volumes**

Considering that the authorizations are given in flow rates (l/s), it will be necessary to estimate a volume of use in $m^3$ /year, for which the following methodological treatment will be used:

***(1)*** *Projected volume [$m^3$ /year] = Flow rate [l/s]*31,536*Fc*

Where:

Fc: is the Consumptive Use Factor.

**4.3 Flow rate (l/s)**

To project the raw water demand for the determination of tariffs, the National Bank of Authorizations-BNA of the Water Secretariat was used, with a cut-off as of December 2015, which shows 89,941 users and an authorized flow of 3'192,839 liters per second. Authorizations were grouped into the uses and exploitation established in Articles 88 and 93 of the Organic Law on Water Resources, Uses and Development of Water, as shown in the table below:



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

Barcode: 4604551-01 C-331-806 INV - Investigation



**Table 10: BNA authorized flow rate**

| **Uses and Development** | **Authorized Flow (l/s) YEAR 1 BNA** |
|---|---|
| *Human Consumption* | 99.828,55 |
| ***Irrigation Food Sovereignty*** | |
| *Food Sovereignty Irrigation > 5 (l/s)* | 256.355,77 |
| *Irrigation Food Sovereignty < 5 (l/s)* | 3.153,48 |
| ***Productive irrigation*** | |
| *Productive irrigation < 5 l/s* | 26.779,29 |
| *Productive irrigation > 5 l/s and < 20* | 36.839,65 |
| *Productive Irrigation > 20 and <50 l/s* | 41.966,40 |
| *Productive irrigation > 50 l/s* | 165.947,11 |
| *Tourism* | 1.139,49 |
| *Hydroelectricity* | 2.500.181,53 |
| *Industrial* | 60.352,16 |
| *Water Bottling* | 221,19 |
| *Other Productive Activities* | 7 ,41 |
| ***Grand total*** | **3.192.839** |

**Source** National Authorization Bank 2015 - SENAGUA
**Prepared by:** SENAG A

### *4.4* Consumptive Factors

This factor accounts for the real water consumption, which is not equal to the authorized flow, which is why to calculate the real volume, the concessioned volume is multiplied by the consumptive factor.

To determine this factor, in the projections made we will apply a consumptive use factor of 60% to the volume for irrigation use over the authorized flows, considering that the Water Secretariat's database has not been updated since 1973 and there would be flow authorizations that have not been used. The consumptive use factor of 30%, determined by the AIGOS Consultant, will not be used because it would underestimate the real demand and would cause an artificial increase in the reference rate.

For the use of hydroelectric generation, a ***consumptive*** use of 6% of the authorized volumes was considered to adequately balance the tariff schedule.

***The*** water ***used by these activities is mostly returned, except for some losses due to friction and evaporation of the liquid, and a consumption factor of 0.5" is applied to these activities.***

For tourism, the same consumptive use factor recommended by AIGOS is used. Therefore, the Consumptive Factor for each use and exploitation is established as shown below:

**Table 11: Consumptive factors**

| **Uses and Development** | **Consumptive Factor Fc** |
|---|---|
| *Human Consumption* | 1 |
| ***Irrigation Food Sovereignty*** | |
| *Food Sovereignty Irrigation > 5 (l/s)* | 0,6 |
| *Irrigation Food Sovereignty < 5 (l/s)* | 0,6 |
| ***Productive irrigation*** | |
| *Productive irrigation < 5 l/s* | 0,6 |
| *Productive irrigation > 5 l/s and < 20* | 0,6 |
| *Productive Irrigation > 20 and <50 l/s* | 0,6 |
| *Productive irrigation > 50 l/s* | 0,6 |
| *Tourism* | 0,5 |
| *Hydroelectricity* | 0,06 |
| *Industrial* | 1 |
| *Water Bottling* | 1 |
| *Other Productive Activities* | 1 |

**Source:** AIGOS 2014, SENAGUA 2016, EPA 2016[4].
**Prepared by:** SENAGUA

### 4.5 Annual Projected Volume

Applying equation (1), the volumes for year 1 were calculated and projected for the following 4 years with a growth rate of 2% (annual growth rate for the last 4 years according to BNA data analyzed), resulting in the projected volumes and the average volume, as shown below:

[4] Consultoría Aigos S.A.S. de Asistencia Técnica Internacional award resolution No. MICSE-RPB-CE-2014-003.
Article 121 of the Regulations of the LORHUyA A defines that the rates for authorization for use and exploitation may be different depending on "Whether or not there is a consumptive use of water and in the case of consumptive use, the degree of efficiency will be differentiated". Therefore, it is proposed to take into account a usage factor for tariffs. This use factor considers whether a consumptive or non-consumptive use of water is being made, with values between 0.1 and 1 where 1 is a totally consumptive use.

CORTE CONSTITUCIONAL DEL ECUADOR


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

Barcode: 4604551-01 C-331-806 INV - Investigation



**Table 12: Average projected volume**

| Uses and Development | Volume ($m^3$ /year) Year 1 | Volume ($m^3$ /year) Year 2 | Volume ($m^3$ /year) Year 3 | Volume ($m^3$ /year) Year 4 | Volume ($m^3$ /year) Year 5 | Average Volume ($m^3$ /year) |
|---|---|---|---|---|---|---|
| Human Consumption | | 3.148.193.025 | 3.211.156.885 | 3.275.380.023 | 3.340.887.623 | 3.243.904.389 |
| **Irrigation Food Sovereignty** | | | | | | |
| Food Sovereignty Irrigation > 5 l/s) | 4.850.661.322 | 4.947.674.548 | 5.046.628.039 | 5.147.560.600 | 5.250.511.812 | 5.048.607.264 |
| Irrigation Food Sovereignty < 5 (l/s) | 59.668.942 | 60.862.320 | 62.079.567 | 63.321.158 | 64.587.581 | - |
| **Productive irrigation** | - | - | - | - | - | - |
| Productive irrigation < 5 l/s | 506.706.985 | 516.841.125 | 527.177.948 | 537.721.507 | 548.475.937 | 527.384.700 |
| Productive irrigation > 5 l/s and < 20 | 697.065.173 | 711.006.477 | 725.226.606 | 739.731.138 | 754.525.761 | 725.511.031 |
| Productive Irrigation > 20 and <50 l/s | 794.071.517 | 809.952.948 | 826.152.007 | 842.675.047 | 859.528.548 | 826.476.013 |
| Productive irrigation > 50 l/s | 3.139.984.812 | 3.202.784.508 | 3.266.840.198 | 3.332.177.002 | 3.398.820.542 | 3.268.121.413 |
| Tourism | 17.967.516 | 18.326.867 | 18.693.404 | 19.067.272 | 19.448.618 | 18.700.735 |
| Hydroelectricity | 4.730.743.480 | 4.825.358.350 | 4.921.865.517 | 5.020.302.827 | 5.120.708 883 | 4.923.795.811 |
| Industrial | 1.903.265.860 | 1.941.331.177 | 1.980.157.801 | 2.019.760.957 | 2.060.156.176 | 1.980.934.394 |
| Water Bottling | 6.975.331 | 7.114.838 | 7.257.135 | 7.402.277 | 7.550.323 | 7.259.981 |
| Other Productive Activities | 2.346.531 | 2.393.461 | 2.441.331 | 2.490 157 | 2.539.960 | 2.442.288 |
| **Grand total** | **16.709.457.470** | **20.191.839.644** | **20.595.676.437** | **21.007.589.966** | **21 427.7 1.765** | **19.986.461.056** |

**Source:** AIGOS, SEN GUA 2016
**Elaboration:** BIOFIN-S NAGUA

### 4.6 Referential Tariff

In accordance with the provisions of Regulation 002 of the Water Regulation and Control Agency in its Article 7.- Calculation of t h e referential tariff (Tr), it has been carried out:

1. Calculation of the annual To cost projected for a 5-year horizon, to be financed by the tariff, taking the value of the highest projected year: (Year 4: USD 77'255,063).

2. Calculation of the average annual projected volumes for the analysis period: (19,986'461,056 $m^3$ ) (Table 12).

3. Determine the break-even tariff so that revenues are generated to cover costs. This tariff will be the result of the relationship between the Total Cost and the average Projected Volume; and will be the basis for the establishment of the tariffs to be applied:

   (USD 77'255,063/ 19,986'461,056 $m^3$ = 0.0039)

**Illustration 2**: Methodology for calculating the referential rate

$$\frac{Costo\ Total\ Promedio}{Volumen\ Proyectado\ Promedio} = \frac{77\ MMUSD}{19.986\ hm3} = Tarifa\ Referencial\ \$/m3$$

$$Tarifa\ Referencial \frac{\$}{m3}\ x\ Factores\ Diferenciadores = usos/aprovechamientos$$

**Source:** SENAGUA 2016.
**Prepared by:** Directorate of Socioeconomic Assessment SENAGUA


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

## 5 BREAK-EVEN MODEL

As in any financial management model, it is always desirable that the model be balanced in the balance between expected revenues from the application of the proposed tariff and the costs that the implementation of the tariff is expected to cover, so as not to generate deficits and surpluses in the final accounts. This financial balance is what will ultimately allow for financial sustainability in the long term.

**Illustration 3**: Financial Balance Model




**SourceTPreparation:** SENAGUA 2016

### 5.1 Detail of projected costs

The following is the percentage structure of the projected cost path as part of the raw water tariff.

**Table 13: Percentage breakdown of projected costs**

| Costs | A or 1 | A or 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| Conservation of H drico Resources | 17,2% | 16,7% | 16,2% | 14,3% | 14,4% |
| Infrastructure Management (O&M) | 65,8% | 64,9% | 64,3% | 68,1% | 68,3% |
| Participation (CAC) | 9,5% | 9,2% | 9,0% | 7,9% | 7,8% |
| Regulation and Control | 7,5% | 9,2% | 10,4% | 9,8% | 9,6% |
| **TOTAL** | **100%** | **100%** | **100%** | **100%** | **100%** |

**Source:** SENAGUA, 2016

### 5.2 Detail of expected income projection

A percentage of the total costs to be financed by the tariff has been determined, and a percentage that should be financed by transfer from the State, as is currently being done, because the process of adjusting the EPA's collection cannot be automatic given the enormous technical and personnel effort that such collection would imply if it is to be able to charge 100% of the water users in the short term.

In this sense, it is expected that the collectability percentage for the first year of implementation of the tariff will reach 55% of the total number of users and then gradually increase to 75%. This is undoubtedly a conservative collection path that can be adjusted in the short term if synergies and economies of scale occur favorably in the collection process.

However, it should be kept in mind that with a collectibility rate ranging from 55% to 75% for the period under analysis, between 51% and 70% of the total costs of raw water use and development are covered, with the State covering the difference until the collectibility rate reaches or approaches 100%.

CORTE CONSTITUCIONAL DEL ECUADOR

It should be borne in mind that the chargeability rate structure has been applied linearly to all water uses and uses, but there are cases in which the chargeability rate may be 100% from the first year, given that users may be fully identified in which case the revenue estimates could be favorably modified.

**Table 14: Percentage structure of financing**

| | Year 1 | Year 2 | Year 3 | Year 4 | Year 5 |
|---|---|---|---|---|---|
| **Restriction of financing to the tariff** | 51% | 56% | 61% | 59% | 64% |
| **State transfers** | 49% | 44% | 39% | 41% | 36% |
| **TOTAL FINANCING** | 100% | 100% | 100% | 100% | 100% |

**Source:** EPA, SENAGUA 2016

**Gross Revenues:** Represents all revenues generated, calculated on the invoicing sheet without considering the uncollectibility of the portfolio.

**Net Revenues:** Gross revenues affected by a collectibility rate of 55% in the first year, which grows annually until reaching 75% in year 5, and represent the effective collection.

With the exception of State transfers, which by their nature do not have a collectibility rate:

**Table 15: Expected projected revenues**

| **AR 1** | **YEARSYE** | **Year 2** | **Year 3** | **Year 4** | **Year 5** |
|---|---|---|---|---|---|
| Human Consumption | 2.844.657,39 | 2.844.657,39 | 2.844.657,39 | 2. 44.657,39 | 2.844.657,39 |
| ***Irrigation Food Sovereignty*** | | | | | |
| *Irrigation Food Sovereignty > 5 (l/s)* | 1.406.691,78 | 1 434.82 ,62 | 1.463.5 2,13 | 1.492. 92,57 | 1.522.648,43 |
| *Irrigation Sovereignty A imentary Sovereignty < 5 (l/s)* | | | | | |
| ***Productive irrigation*** | | | | | |
| *Productive irrigation < 5 l/s* | 1.976.1 7,24 | 2.015.680,3 | 2.055.994,00 | 2.097.113,88 | 2.139.056,15 |
| *Productive irrigation > 5 l/s and < 20 l/s* | 2.7 8.554 18 | 2 772.925 26 | 2.828.383,76 | 2.884.951,44 | 2.942.650,47 |
| *Productive Irrigation > 20 and <50 l/s* | 3.096 878,92 | 3.1 8.816,50 | 3.221.992,83 | 3.286.432,68 | 3.352.161,34 |
| *Productive irrigation > 50 l/s* | 15.385.925 58 | 15.693.644,09 | 16.007.516,97 | 16.327.667,31 | 16.654.220,66 |
| *Tourism* | 88 040,83 | 89.801,65 | 91.597,68 | 93.429,63 | 95.298,23 |
| *Hydroelectricity* | 23.180.643,05 | 23.644.255,91 | 24.117.141,03 | 24.599.483,85 | 25.091.473,53 |
| *Industrial* | 9.326.002,71 | 9.512.522,77 | 9.702.773,22 | 9.896.828,69 | 10.094.765,26 |
| *Water Bottling* | 1.698.620,77 | 1.732.593,18 | 1.767.245,05 | 1.802.589,95 | 1.838.641,75 |
| *Other Productive Activities* | 11.498,00 | 11.727,96 | 11.962,52 | 12.201,77 | 12.445,81 |
| **BILLING** | **61.733.670,45** | **62.911.450,72** | **64.112.786,58** | **65.338.149,17** | **66.588.019,00** |

CORTE CONSTITUCIONAL DEL ECUADOR

**Source:** EPA, SENAGUA 2016

The tariff required for each use and exploitation that allows for a long-term financial equilibrium, i.e., that achieves equality of the present value of cost flows and present value of net income, is calculated with the reference tariff and the differentiating factors detailed in the following paragraphs.

**5.3 Differentiating Factors**

Before presenting the differentiating factors, it is important to define what rates are.

**Definition of tariff (Art. 135 of the LORHUyAA)**

In accordance with the provisions of Article 135 of the LORHUyAA, a tariff is understood to be the fee that a user must pay for the provision of services and authorization for the use and development of water.

**Definition of raw water rate (Adapted from Art. 112 Regulation)**

This is the cost of providing services and authorizations for the use and exploitation of raw water, which the users of the resource must pay in return for this service, but affected or modulated by a public policy of an economic, social or environmental nature. This affectation i s made using differential factors that allow the implementation of this policy.

**Differential Factors**

Differential factors are those that will make it possible to implement the government's public policy objectives. They are factors that allow, through coefficients, to reduce or increase the referential tariff (the average cost of the service) that users would pay, in order to achieve the State's economic, social and environmental objectives. These factors are:

**a) Consumptive factor (CF) ( Adapted Art. 121 Regulation) applied to volume.**

They are set according to the activity carried out by the water user and may cause different levels of loss of the resource. It is based on the principle that water has two types of use or exploitation: consumptive and non-consumptive use. There are activities with a high use of the resource, i.e., the use implies a detraction of the resource.
resource (only a minor per...tage returns to the
The values of th... values are not necessarily th... s the values of the other a... agriculture), and activities with ... detraction (higher return to ... ey would range from 0 to ... e proposal. This factor has a ... tured.

On the other han... that do... t affect the volume of wa... e the volume of water.
at the referential rate, th... e:

**b) Solidarity and Sos enibility Factor (Fs to applied the tariff.**

This factor can be used to introduce the government's social policy and enable the sustainability of services in the long term. These factors can be used, for example, to implement a cross-subsidy scheme (the better-off pays more)[5] , which favors lower-income users (social justice). These would be values greater than or equal to zero, where factors close to zero would imply a greater social benefit for the user. They have been estimated in the proposal developed by the Water Secretariat.

[5] Cross-subsidies involve charging below-cost tariffs to one group of users (those with a lower ability to pay) and above-cost tariffs to others (often users with a higher ability to pay). The main objective of this policy has been to favor access to services for low-income users.

**Analyzing LORHUyAA in article 88**

Article 140 of the LORHUyAA establishes that water use is understood as the use of water for basic activities indispensable for life, such as human consumption, and Article 140 of the LORHUyAA establishes the charge for human consumption over the minimum vital amount. With this background and considering that this rate will be charged on the excess of the minimum vital consumption and with the purpose of discouraging the waste of the resource, a solidarity factor of 5 is established for human consumption.

Irrigation, aquaculture and animal watering to guarantee food sovereignty is a use that has a payment exception for community lenders using less than 5 l/s; this use has a solidarity factor of less than 1, both for less than 5 l/s (who do not pay, but the tariff has been calculated to make costs and subsidies transparent) and for more than 5 l/s.

Article 93 defines the productive use of water as activities such as irrigation for popular and solidarity economy, agro-industry, agricultural production or aquaculture production for export or other productive activities such as tourism, hydroelectricity generation,
industrial production; mining and refining of minerals; hydrocarbons; bottling and commercialization of mineral, municipal, treated or enriched waters, or waters with certified purification and quality processes; and other productive activities involving the use of water. For this reason, they must have a water treatment rating greater than 1, i.e. greater than 1.
The reference tariff, exempted for productive irrigation in the ranges < 5 and between 5 and 2 liters since they generally correspond to uses associated with the popular and solidarity economy, sectors that use little flow and generate employment for sectors that are growing.

The Solidarity and Sustainability Factors (SFs) that will be applied for each type of use and exploitation were defined with these guidelines and in a round table of experts.

**Table 16: Solidarity and Sustainability Factors (Fs)**

| Uses and Development | Fs |
|---|---|
| *Human Consumption* | 1 |
| ***Irrigation Food Sovereignty*** | |
| *Food Sovereignty Irrigation > 5 (l/s)* | 0,075 |
| *Irrigation Food Sovereignty < 5 (l/s)* | Except for payment by law |
| ***Productive irrigation*** | |
| *Productive irrigation < 5 l/s* | 1 |
| *Productive irrigation > 5 l/s and < 20* | 1 |
| *Productive irrigation > 20 and <50 l/s* | 1 |
| *Productive irrigation > 50 l/s* | 1,3 |
| *Tourism* | 1,3 |
| *Hydroelectricity* | 1,3 |
| *Industrial* | 2 |
| *Water Bottling* | 63 |
| *Other Productive Activities* | 1,3 |

**Prepared by:** SENAGUA

CORTE CONSTITUCIONAL DEL ECUADOR



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

Case 1:25-cv-00025-RKE Document 86-2 Filed 04/27/26 Page 354 of 659
Barcode: 4604551-01 C-331-806 INV - Investigation



As can be seen, the factor of 1 applies to productive uses for irrigation, agroindustry, agricultural production and aquaculture production.

The factor of less than 1 applies to the following uses: irrigation for food sovereignty, since they are for subsistence activities and are rights enshrined in the Constitution of Ecuador; productive irrigation of less than 20 l/s, which could be for popular and solidarity economy enterprises.

Factors greater than the other uses, in which water is used to generate products or services that generate profits for the private sector, such as in the tourism, industrial and water bottling sectors.

It should be noted that a process of adjustments in the authorizations is needed, which is in process at the Water Secretariat, to clearly define those that correspond to food sovereignty irrigation, which has been agreed upon in the Water Economy Committee meetings.

### 6 PROPOSAL FOR A SUSTAINABILITY TARIFF FOR WATER RESOURCES BY CONSUMPTION BLOCKS

The tariff in this case would be the amount of money per volume of water (19,986 cubic hectometers) offered by SENAGUA, which would allow it to cover the costs necessary to guarantee the sustainable management of the water resource (about 77 million dollars per year), costs that are distributed as follows: conservation of watersheds and water sources (water planting), around 11 million; related services (SENAGUA and deconcentrated ARC), around 13 million; and contribution to O&M of multipurpose projects, around 53 million. The amount of this referential tariff reaches 0.0039 dollars/m³ .

$$\frac{\text{costo total promedio}}{\text{volumen proyectado promedio}} = \frac{77\ MMUSD}{19.986\ hm3} = 0{,}0039$$

In order to take into account the particularities of the use and exploitation of raw water as a vital and strategic resource for the development and welfare of the population, we propose the creation of three consumption blocks with the following considerations:

**BLOCK 1**: Pays the referential rate, for authorizations of less than 50 l/s (0.0039 dollars/m³ ). Productive Irrigation, Industry, Tourism.

**BLOCK 2**: Authorizations greater than 50 l/s would pay a rate of US$0.0049/m³ . It has been estimated that the impacts on the productive irrigation, industrial and tourism sectors would be insignificant (2% of profitability).

**BLOCK 3**: Exempt from payment of tariffs by volume. Contemplates uses and exploitations that due to their vulnerability and because they are strategic sectors should have a special treatment: irrigation for food sovereignty, hydroelectric plants, and water bottling.

- Irrigation for food sovereignty greater than 5 l/s with a rate of US$0.0029/m³ , lower than the reference rate, which is considered balanced so as not to cause a significant impact on the sector.

- Hydroelectric (rate of 0.0049 dollars/m³ ), it must be taken into account that in this case the rate will be applied only to 6% of the volume turbined, not to the authorized volume, which is generally higher than the volume turbined. This rate is the same as the one charged to other productive sectors with volumes higher than 50 l/s, which is unsatisfactory taking into account the principle of opportunity cost in the use of the resource, i.e., to ensure that the hydroelectric sector has sufficient flows for its generation, the Water Secretariat could find it necessary to reduce the use of other sectors, which represents a cost for SENAGUA.

- Water Bottling (rate of 0.24 dollars/m³ ) in relation to the high benefits that this sector has for the use of a vital resource.

**Illustration 4: Block Tariff Schedule**

| BLOCKS | Type of use/utilization | Current Rate USD/m³ | Proposed Rate USD/ m3 | Volume (million m³ / year) |
|---|---|---|---|---|
| EXEMPT FROM PAYMENT | Irrigation food sovereignty < 5 l/s | 0,000034 | Exempt from payment by law | 64,60 |
| BLOCK 1 | Productive irrigation < 5 l/s | 0,000034 | 0,0039 | 548,50 |
| | Productive irrigation > 5 l/s and < 20 l/s | 0,000034 | 0,0039 | 754,50 |
| | Productive irrigation >20 l/s and < 50 l/s | 0,000034 | 0,0039 | 859,50 |
| BLOCK 2 | Productive irrigation > 50 l/s | 0,000034 | 0,0049 | 3.398,80 |
| | Tourism | 0,016 | 0,0049 | 19,40 |
| | Others | 0,000034 | 0,0049 | 2,50 |
| | Industrial | 0,0005 | 0,0049 | 2.060,10 |
| BLOCK 3 | Food Sovereignty Irrigation > 5 l/s | 0,000034 | 0,0029 | 5.250,50 |
| | Hydroelectricity | 0,000034 | 0,0049 | 5.120,70 |
| | Water bottling | 0,2 | 0,2435 | 7,60 |

**Prepared by:** SENAGUA

CORTE CONSTITUCIONAL DEL ECUADOR



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

In the model previously proposed, for the excess over the minimum vital consumption (200 l/h/d) a rate of 0.02 dollars/$m^3$ (taken from the Hexagon Consultores study) had been established. However, in this proposal we recommend assigning a reference rate of 0.0039 $m^3$ /s, which does not have a collection purpose, but is rationally punitive, since the main purpose is to discourage service providers from wasting a scarce resource. The application of this tariff deserves a separate calculation, since it is a tariff that will be managed by the Municipal Decentralized Autonomous Governments (GAD municipal) and not directly by the Water Secretariat.

**Table 17: Surplus over human consumption -GAD**

| Type of use/utilization | | Current Rate USD/$m^3$ | Proposed Tariff USD/$m^3$ | Volume ( millions m3/year) |
|---|---|---|---|---|
| **GAD** | **Human** Consumption (surplus over CMV) | 0 | 0,0039 | 3.340,90 |

**Prepared by:** SENAGUA

Although it is true that the calculation of the rate for the surplus of the minimum vital consumption has been included in the raw water rate, since it is one of the most relevant uses of water established in our Constitution and the Water Resources Law, directly related to the fulfillment of human rights, it should be noted that it has a specific calculation methodology, which is oriented to the collection of the difference between the volume of water collected and the volume actually demanded by the population.

The raw water tariff, in the case of human consumption, "does not have a collection purpose", but rather is intended to be used as a "dissuasive incentive". It should be remembered that what is sought in economics with the use of prices (tariffs) is to send a message of scarcity of a resource and therefore promote its efficient use.

The proposed tariff system also guarantees the financial equilibrium necessary for the sustainability of the water sector, i.e., the revenues generated should be sufficient to cover the costs required for the sustainability of the resource.

## 7 IMPLEMENTATION

### 7.1 Gradation Criteria

In accordance with the provisions of Article 13 of the technical and actuarial criteria regulation, the following gradual criteria have been established:

- For the first year, the fee for authorization of water use for human consumption will be USD 0.00, as an incentive for those amounts to be charged to be invested in improving their efficiency through the Improvement Plans to be submitted to the Water Secretariat. This is a measure of greater impact, since the preparation and execution of the Improvement Plans will generate savings for the State in the medium and long term.

- For the first year, a collection rate of 55% is considered, which increases in the following years to reach 75%.

Applying these criteria, the amount to be collected in the first year is USD 39 million, as shown in the following table:

**Table 18: Gradualness of tariff implementation in the first year**

| PROPOSED CURRENT EPA COLLECTIBILITY | | | |
|---|---|---|---|
| **Uses and Development** | **Graduation Year 1** | **Turnover Year 1** | **Collection Year 1** |
| *Human Consumption* | 55% | 2.844.657 | 1.564.562 |
| ***Irrigation Food Sovereignty*** | | - | |
| *Irrigation Food Sovereignty > 5 (l/s)* | 0% | 1.406.692 | |
| *Irrigation Food Sovereignty < 5 (l/s)* | Except for payment by law | Except for payment by law | Except for payment by law |
| ***Productive irrigation*** | | - | - |
| *Productive irrigation < 5 l/s* | 0% | 1.976.157 | - |

CORTE CONSTITUCIONAL DEL ECUADOR


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

| | | | |
|---|---|---|---|
| *Productive irrigation > 5 l/s and < 20 l/s* | 0% | 2.718.554 | - |
| *Productive irrigation > 20 l/s y <50 l/s* | 15% | 3.096.879 | 464.532 |
| *Productive irrigation > 50 l/s* | 65% | 15.385.926 | 10.000.852 |
| *Tourism* | 75% | 88.041 | 66.031 |
| *Hydroelectricity* | 90% | 23.180.643 | 20.862.579 |
| *Industrial* | 55% | 9.326.003 | 5.129.301 |
| *Water Bottling* | 90% | 1.698.621 | 1.528.759 |
| *Other Productive Activities* | 90% | 11.498 | 10.348 |
| **TOTAL** | **49%** | **61.733.670** | **39.626.963** |

**Source:** SENAGUA 2016

On the other hand, it is possible to present a different degree of gradualism, as an exercise, according to which the collection percentage would be differentiated based on the ease of identification of users and the feasibility of collection of the tariff by the EPA (given the current capacities of the EPA). In this case, the collection amount would be higher and the GADs would be included from the first year.

### 7.2 Tariff Impact Analysis

#### 7.2.1 Impact on municipal governments.

The following is an analysis of the possible impact that the application of the proposed raw water tariff (0.0039 US$/M³ ) would have on the municipal utilities of the country's main GADs.

**Table 19: Impact on Decentralized Autonomous Governments ( AD)**

| CANTON | Volume Capture d m /year³ | Volum n CMV m³/year | Surplus Volume m³ year | Mont a pag r US | Estimated Annual Turnover (USD) | Impact (%) |
|---|---|---|---|---|---|---|
| | a | b | c=a-b | d= c* rate | e | f=d/e |
| GUAYAQUIL | 3 5.268.2 6 | 137.323.175 | 247.945.091 | 966.986 | 122.339.548 | 1% |
| QUITO | 247.981.896 | 93.692.798 | 154.289.098 | 601.727 | 134.786.476 | 0% |
| BASIN | 50.783. 52 | 21.579. 18 | 29.203.634 | 113.894 | 25.643.726 | 0% |
| LOJA | 23.887.872 | 8.821.470 | 15.066.402 | 58.759 | 2.952.271 | 2% |
| AMBATO | 29.265.922 | 11.418.608 | 17.847.314 | 69.605 | 8.562.259 | 1% |
| ESMERALDAS | 27.993.600 | 12.462.062 | 15.531.538 | 60.573 | 4.223.628 | 1% |
| MACHALA | 24.883.200 | 10.154.352 | 14.728.848 | 57.443 | 3.465.600 | 2% |
| PORTOVIEJO | 36.288.000 | 11.050.289 | 25.237.711 | 98.427 | 6.092.445 | 2% |
| IBARRA | 25.066.615 | 9.589.783 | 15.476.831 | 60.360 | 7.900.524 | 1% |
| MANTA | 25.521.999 | 13.408.800 | 12.113.199 | 47.241 | 12.402.086 | 0% |
| PUJILI | 1.084.204 | 469.912 | 614.292 | 2.396 | 249.432 | 1% |
| SUCUMBIOS | 100.075 | 43.578 | 56.498 | 220 | 16.325 | 1% |
| QUEVEDO | 20.513.088 | 6.228.432 | 14.284.656 | 55.710 | 9.583.920 | 1% |
| FREEDOM | 7.535.237 | 4.533.076 | 3.002.161 | 11.708 | 1.499.693 | 1% |
| AZOGUEZ | 7.309.440 | 1.864.669 | 5.444.771 | 21.235 | 1.782.744 | 1% |
| SANTA ELENA | 6.257.314 | 1.611.940 | 4.645.374 | 18.117 | 665.213 | 3% |
| REST GADS | 262.949.411 | 109.037.497 | 153.911.914 | 600.256 | 60.621.593 | 1% |
| **TOTAL** | **1.182.689.391** | **453.290.060** | **729.399.331** | **2.844.657** | **402.787.483** | **1%** |

**Source:** SENAGUA and ARCA, 2016 **Prepared by:** Directorate of Socioeconomic Assessment and BIOFIN Consultant.

CORTE CONSTITUCIONAL DEL ECUADOR



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

**Impact on other sectors Table**

**20: Impact on other sectors.**

| BLOCKS | Type of use | Proposed Rate USD/m³ | Volume (millions of m³ /year) | Revenues generated (year 2016) EPA | Revenues generated (year 1) Proposal | Difference | Users | What would have to be paid per user per year |
|---|---|---|---|---|---|---|---|---|
| **EXEMPT FROM PAYMEN T** | Irrigation **sovereignty** food < 5 l/s | Exempt from payment by law | 64,60 | - | | | 3.737,00 | |
| **BLOCK 1** | **Productive** irrigation up to 50 l/s | 0,0039 | 2.162,50 | $ 469.076,95 | $ 7.791.590,34 | $ 7,32 | 7.728,00 | $ 947,53 |
| **BLOCK 2** | **Industrial** | 0,0049 | 2.060,10 | $ 446.864,94 | $ 9.326.002,71 | $ 8,88 | 3.795,00 | $ 2.339,69 |
| | **Tourism** | 0,0049 | 19,40 | $ 4.208,14 | $ 88.040,83 | $ 0,08 | 545,00 | $ 153,82 |
| | **Productive irrigation > 50 l/s** | 0,0049 | 3.398,80 | $ 737.247,97 | $15.385.925,58 | $ 14,65 | 1.026,00 | $ 14.277,46 |
| | **Others** | 0,0049 | 2,50 | $ 542,29 | $ 11.498,00 | $ 0,01 | 23,00 | $ 476,34 |
| **BLOCK 3** | Irrigation **sovereignty** food >5 l/s | 0,0029 | 5.250,50 | $1.138.907,99 | $ 1.406.691,78 | $ 0,27 | 48.557,00 | $ 5,51 |
| | Hydroelectricity | 0,0049 | 5.120,70 | $1.110.752,53 | $23.180.643,05 | $ 22,07 | 244,00 | $ 90.450,37 |
| | Water bottling | 0,2435 | 7,60 | $ 1.648,55 | $ 1.698.620,77 | $ 1,70 | 11 ,0 | $ 14.629,07 |

**IMPACT ON THE LARGEST CONSUMERS IN THE PRODUCTIVE SECTOR (AGR-EXPORT)**

In general terms, the impact on the agro-export sector, which is the priority sector for the implementation o f the raw water tariff in the short term, does not present excessive values, so that at no time would the production costs for the export of these products be affected and their competitiveness in the domestic market would be affected, as can be seen in the table below:

**Tabl 21: Imp cto in p inci ales cu tivo**

| PRODUCT | COST OF PRODUCTION (USD/HA) | GROSS INCOME (USD/HA) | PROFIT (USD/HA) | REN A-BILITY PER HA | WATER REQUIRE MENT IN M /H³ | CURRENT RATE | | | PROPOSED TARIFF COST | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | VALUE (USD/M )³ | WATER COST (USD/HA) | IMPACT ON PROFIT (%) | VALUE (USD/M3) | WATER COST (USD/HA) | IMPACT ON PROFIT (%) |
| CACAO | 1.908,50 | 5.400,00 | 3.491,50 | 182,94% | 18.000,00 | 0,0000344 | 0,619 | 0,018% | 0,0041598 | 74,88 | 2,14% |
| RICE | 1.300,00 | 1. 00,00 | 500,00 | 38,46% | 12.000,00 | 0,0000344 | 0,413 | 0,083% | 0,0041598 | 49,92 | 9,98% |
| BANANA | 9.500,00 | 15.758,00 | 6.258,00 | 65,87% | 20.000,00 | 0,0000344 | 0,688 | 0,011% | 0,0041598 | 83,20 | 1,33% |
| CANE OF SUGAR | 1.800,00 | 3.170,00 | 1.370,00 | 76,11% | 18.000,00 | 0,0000344 | 0,619 | 0,045% | 0,0041598 | 74,88 | 5,47% |
| MANGO | 10.000,00 | 30.000,00 | 20.000,00 | 200,00% | 6.000,00 | 0,0000344 | 0,206 | 0,001% | 0,0041598 | 24,96 | 0,12% |
| PINEAPP LE | 3.500,00 | 7.800,00 | 4.300,00 | 122,86% | 12.000,00 | 0,0000344 | 0,413 | 0,010% | 0,0041598 | 49,92 | 1,16% |
| PAPAYA | 3.280,00 | 8.640,00 | 5.360,00 | 163,41% | 20.000,00 | 0,0000344 | 0,688 | 0,013% | 0,0041598 | 83,20 | 1,55% |
| MORA | 15.000,00 | 28.000,00 | 13.000,00 | 86,67% | 20.000,00 | 0,0000344 | 0,688 | 0,005% | 0,0041598 | 83,20 | 0,64% |
| BROCOLÍ | 6.500,00 | 12.400,00 | 5.900,00 | 90,77% | 12.000,00 | 0,0000344 | 0,413 | 0,007% | 0,0041598 | 49,92 | 0,85% |
| PAPAYA | 2.600,00 | 5.702,00 | 3.102,00 | 119,31% | 18.000,00 | 0,0000344 | 0,619 | 0,020% | 0,0041598 | 74,88 | 2,41% |
| ROSES | 200.000,00 | 301.000,00 | 101.000,00 | 50,50% | 15.000,00 | 0,0000344 | 0,516 | 0,001% | 0,0041598 | 62,40 | 0,06% |
| PASTURE S*. | 1.092,00 | 3.200,00 | 2.108,00 | 193,04% | 5.000,00 | 0,0000344 | 0,172 | 0,008% | 0,0041598 | 20,80 | 0,99% |

**Source:** Undersecretariat of Irrigation and Drainage, 2016.



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

Barcode: 4604551-01 C-331-806 INV - Investigation



In any case, the reflection that these users internalize perfectly well is that the opportunity cost of not having the resource in the future and therefore not being able to amortize their current investments, is greater than the increase in the current raw water tariff that guarantees them to have water in the medium and long term. In fact, a study carried out in the Santa Elena Peninsula in 2007, states that the willingness to pay of users of all uses for the guarantee of raw water availability is equivalent to a value per m3 of water of US$ 0.08, which updated by the CPI to 2016 values, which is the reference year in the analysis of the SENAGUA raw water tariff, would give a willingness to pay of users of around US$ 0.11 $m^3$ .

**Two relevant examples of impact on the productive sector:**

Two large users are cocoa producers on the coast and rose producers in the highlands. The impact on production costs in the case of cocoa with the previous tariff was 0.02%, with a water requirement of 18,000 $m^3$ /ha per year, and paid per ha 0.62 dollars per year. Now with the new tariff, the impact on the cost of production would be 2.53% and it would have to pay US$88.2 per hectare per year. The cost of production per hectare of this product is US$1,908.

In the case of roses, the impact with the previous tariff is 0.0010% (0.52 USD/ha per year) and with the new tariff it is 0.07% (73.5 USD/ha per year). The water requirement is 15,000 $m^3$ /ha per year and the production cost is 200,000 USD/ha.

**Impact on the largest consumers in the industrial sector**

Regarding the possible impacts of the implementation of the raw water tariff on the industrial sector (0.0049 US$/ $M^3$ ), it can be affirmed that, as in the sectors previously analyzed, the impact of the new tariff on production costs will be relatively small. As an example, the increases in the production costs of some representative industries in the country have been analyzed, finding that the effects of the raw water tariff are marginal, not even reaching 0.1% of production costs.

**Impact on the hydroelectric sector**

For the analysis of the possible impact that the implementation of the raw water tariff may have on the country's hydroelectric sector, the Agency for Regulation and Control of Electricity (ARCONEL) has collaborated with the following impact analysis:

**Table 22: Variation in consumers' electricity bills**

| Consumption range | Consumers | Average Consumption | Current | Adjustment | Variation | % |
|---|---|---|---|---|---|---|
| kWh | # | kWh/# | USD | | | |
| 131-140 | 157.692 | 140 00 | 14 41 | 14,41 | 0,00 | 0,0 |
| 141-150 | 140.795 | 149,99 | 15 36 | 15,36 | 0,00 | 0,0 |
| 151-160 | 25.140 | 160,00 | 16,33 | 16,43 | 0,10 | 0,6 |
| 161-170 | 111.667 | 170,00 | 17,30 | 17,50 | 0,20 | 1,1 |
| 171-180 | 101.004 | 180,00 | 18,27 | 18,57 | 0,30 | 1,6 |
| 181-190 | 90.115 | 190,00 | 19,24 | 19,64 | 0,40 | 2,1 |
| 191-200 | 81.234 | 199,99 | 20,21 | 20,71 | 0,50 | 2,5 |
| 201-250 | 296.234 | 249,99 | 25,16 | 26,16 | 0,99 | 3,9 |
| 251-300 | 177.380 | 299,99 | 30,21 | 31,70 | 1,49 | 4,9 |
| 301-350 | 109.934 | 349,99 | 35,36 | 37,35 | 1,99 | 5,6 |
| 351-400 | 72.649 | 400,00 | 40,61 | 43,10 | 2,48 | 6,1 |
| 401-450 | 50.157 | 450,00 | 45,86 | 48,84 | 2,98 | 6,5 |
| 451-500 | 36.670 | 499,99 | 51,11 | 54,59 | 3,48 | 6,8 |
| 501-700 | 77.285 | 699,02 | 72,01 | 77,47 | 5,45 | 7,6 |
| 701-1000 | 40.126 | 984,33 | 113,34 | 121,63 | 8,29 | 7,3 |
| 1001-1500 | 18.771 | 1.430,73 | 189,23 | 201,95 | 12,72 | 6,7 |
| 1501-2500 | 6.971 | 2.242,64 | 405,44 | 418,85 | 13,41 | 3,3 |
| 2501-3500 | 1.018 | 3.499,99 | 912,26 | 925,67 | 13,41 | 1,5 |
| Sup to 3500 | 457 | 7.624,00 | 3.721,53 | 3.734,94 | 13,41 | 0,4 |

**Source:** Electricity Regulation and Control Agency-2016.

According to ARCONEL, the total amount of the raw water tariff would be considered an additional production cost of the hydroelectric sector and should be passed on in full to all consumers in the country. The above table, as a representative example, shows the possible impact that this tariff would have on residential consumers' bills, with an increase ranging from US$ 0.10 cents per month (0.6%) for most subscribers (125,140 subscribers between 151-160 kWh/month), to US$ 12.72 dollars (6.7%) for high consumption subscribers (18,771 consumers between 1001-1500 kWk/month), which are a smaller percentage of the users subject to the increase. It should be noted that


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

the possible tariff increase would not be applied to the sector of consumers belonging to the "Dignity Tariff" with consumption up to 150 kWh/month, which represent 68.22% of the subscribers (2.99 million subscribers), concentrating the tariff increase on subscribers ranging from 151 kWh/month to 1500 kWh/month, which in the residential case represent upper-middle class sectors (31.59% of the consumers).

**Impact on other sectors**

Regarding other productive uses, including other industrial sectors, tourism (balneology) and water bottling, SENAGUA has conducted the following impact analysis:

**Table 23: Impact on other sectors**

| | | | INDUSTRIAL | | BALNEOLOGY/ TOURISM | BOTTLER |
|---|---|---|---|---|---|---|
| **SOURCE** | **VARIABLES** | | **COTOPAXI AGGLOMERATE S COMPANY** | **REYBANPAC** | **PAPALLACT A HOT SPRINGS** | **THE TESALIA SPRINGS COMPANY S. A.** |
| BNA | a | FLOW GRANTED l/s/year | 54,58 | 101 | 41,02 | 5,21 |
| | b=a*31536 | VOLUME USED m3/year | 1.721.235 | 3.175.675 | 1.293.607 | 164.303 |
| EKOS 2014 | c | UTILITY USD/year | 2.904.445 | 12.848.197 | 1.352.046 | 13.561.538 |
| WATER LAW REGULATION 2004 | d | CURRENT RATE USD/m3 | 0,008168 | 0,008168 | 0,016 | 0,2 |
| BNA | e | CURRENT PAYMENT USD/year | 101 | 3.875 | 20.708 | 32.860,0 |
| | f | PROPOSED RATE USD/m3 | 0,0049 | 0,0049 | 0,0049 | 0,244 |
| | g=f*b | AMOUNT TO BE PAID PROPOSED FEE USD/year | 8.434 | 15.561 | 6.339 | 40.011 |
| | h=g/c | IMPACT ON UTILITIES | 0,3 | 0,1% | 0,5% | 0,3% |

**Source:** SENAGUA

They would have an impact on their profits of less than 2%.

## 8 CONCLUSIONS

The established rates cover the aspects established in the legal framework of the LORHUyAA, as well as other technical and economic criteria.
The Company's actuarial studies for uses and exploitation of cross water established in Regulation No. DIR-ARCA-RG-002-2016.

With the referential tariff for raw water, there will be a deficit of 11 million pesos, which will have to be covered with a contribution from the State or with improvements in collection, depending on the efficiency of management.

In accordance with the stipulations of Regulation No. DIR-ARCA-RG-002-2016, in its Art. 13 transition period: *"It corresponds to the Single Water Authority to define the period of time in which the application of 100% of the calculated referential tariff will be reached, not exceeding 5 years";* the calculated tariffs are start-up tariffs where an expected collection of 55% of the total costs is applied, which will increase to reach 73% within 4 years.

In conclusion, the proposed tariff system guarantees the financial equilibrium necessary for the sustainability of the water sector, i.e., the revenues generated should be sufficient to cover the costs required for the sustainability of the resource; in other words, without tariffs, the sustainability of the sector is not possible.

With this background, and once the "Simplified Model of the Sustainable Tariff for the Water Sector" has been presented, it is requested that this commitment be considered fulfilled.

## 9 APPROVAL

Date of update Quito, May 17, 2017.

**SENAGUA.- SECRETARÍA NACIONAL DE AGUA.-** I certify that this is a true copy of the original in the files of the General Legal Coordination.- Quito, May 24, 2017.- f.) Illegible, Authorized.

CORTE CONSTITUCIONAL DEL ECUADOR

**ACUERDO**

**2017-1522**

**MSc. ALEXIS SÁNCHEZ MIÑO**
**EL SECRETARIO DEL AGUA**

**CONSIDERANDO:**

**Que,** el artículo 12 de la Constitución de la República del Ecuador, consagra que *"el derecho humano al agua es fundamental e irrenunciable, siendo patrimonio nacional estratégico de uso público inalienable, imprescriptible, inembargable y esencial para la vida";*

**Que,** el artículo 14 ibídem expresa que: *"(...) reconoce el derecho de la población a vivir en un ambiente sano y ecológicamente equilibrado, que garantice la sostenibilidad y el buen vivir, sumak kawsay";*

**Que,** el numeral 1 del artículo 154 ibídem señala que: *"A las ministras y ministros de Estado, además de las atribuciones establecidas en la ley, les corresponde: 1. Ejercer la rectoría de las políticas públicas del área a su cargo y expedir los acuerdos y resoluciones administrativas que requiera su gestión. (...)";*

**Que,** el artículo 226 ibídem, indica que *"las instituciones del Estado, sus organismos, dependencias, las servidoras o servidores públicos y las personas que actúen en virtud de una potestad estatal ejercerán solamente las competencias y facultades que les sean atribuidas en la Constitución y la ley. Tendrán el deber de coordinar acciones para el cumplimiento de sus fines y hacer efectivo el goce y ejercicio de los derechos reconocidos en la Constitución*";

**Que,** el artículo 227 ibídem, determina: "*Principios de la Administración Pública: "La administración pública constituye un servicio a la colectividad que se rige por los principios de eficacia, eficiencia, calidad, jerarquía, desconcentración, descentralización, coordinación, participación, planificación, transparencia y evaluación*";

**Que,** el artículo 314 ibídem establece que: *"El Estado será responsable de la provisión de los servicios públicos de agua potable y de riego, saneamiento, energía eléctrica, telecomunicaciones, vialidad, infraestructuras portuarias y aeroportuarias, y los demás que determine la ley.*



Av. Toledo N22-286 y calle Lérida
Telf.: (593 2) 3815-640, Código Postal: 170525
Quito-Ecuador
RUC: 1768142090001
www.agua.gob.ec



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

GOBIERNO NACIONAL DE LA REPÚBLICA DEL ECUADOR

Secretaría del Agua

2017-1522

*El Estado garantizará que los servicios públicos y su provisión respondan a los principios de obligatoriedad, generalidad, uniformidad, eficiencia, responsabilidad, universalidad, accesibilidad, regularidad, continuidad y calidad. El Estado dispondrá que los precios y tarifas de los servicios públicos sean equitativos, y establecerá su control y regulación.;*

**Que,** el artículo 318 ibídem consagra que: "*El agua es patrimonio nacional estratégico de uso público, dominio inalienable e imprescriptible del Estado, y constituye un elemento vital para la naturaleza y para la existencia de los seres humanos. (…).*
*El Estado, a través de la autoridad única del agua, será el responsable directo de la planificación y gestión de los recursos hídricos que se destinarán a consumo humano, riego que garantice la soberanía alimentaria, caudal ecológico y actividades productivas, en este orden de prelación. (…);*

**Que,** el artículo 412 ibídem señala que: *"La autoridad a cargo de la gestión del agua será responsable de su planificación, regulación y control. Esta autoridad cooperará y se coordinará con la que tenga a su cargo la gestión ambiental para garantizar el manejo del agua con un enfoque ecosistémico";*

**Que,** el artículo 3 de la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua (LORHUyA, en adelante), define como objeto de la Ley *"garantizar el derecho humano al agua así como regular y controlar la autorización, gestión, preservación, conservación, restauración, de los recursos hídricos, uso y aprovechamiento del agua, la gestión integral y su recuperación, en sus distintas fases, formas y estados físicos, a fin de garantizar el sumak kawsay o buen vivir y los derechos de la naturaleza establecidos en la Constitución"*;

**Que,** el artículo 17 ibídem, dispone que: *"La Autoridad Única del Agua.- Es la entidad que dirige el sistema nacional estratégico del agua, es persona jurídica de derecho público. Su titular será designado por la Presidenta o el Presidente de la República y tendrá rango de ministra o ministro de Estado… Es responsable de la rectoría, planificación y gestión de los recursos hídricos. Su gestión será desconcentrada en el territorio";*

**Que,** el literal p) del artículo 18 ibídem señala como competencia y atribución de la Autoridad Única del Agua: *"Establecer los parámetros generales, en base a estudios técnicos y actuariales, para la fijación de las tarifas por la prestación del servicio público de agua potable y saneamiento, riego y drenaje,* ***y fijar los montos de las tarifas de las autorizaciones de uso y aprovechamiento productivo del agua, en los casos determinados en esta Ley****";*

2017-1522

**Que,** el artículo 135 ibídem establece que: *"Se entiende por tarifa la retribución que un usuario debe pagar por la prestación de servicios y autorización para usos y aprovechamiento del agua.*

*Para efectos de protección, conservación de las cuencas y financiamiento de los costos de los servicios conexos, se establecerán las correspondientes tarifas, los principios de esta Ley, los criterios y parámetros técnicos señalados en el Reglamento.*

*Las tarifas por autorización de uso y aprovechamiento del agua serán reguladas y fijadas por la Autoridad Única del Agua…"*

**Que,** el artículo 136 ibídem establece: *"Principios generales para la fijación de tarifas de agua. En el establecimiento de tarifas por autorización de uso y aprovechamiento del agua así como de los servicios de agua potable, saneamiento y de los servicios de riego y drenaje, se deben considerar los principios de solidaridad, equidad, sostenibilidad y periodicidad.";*

**Que,** el artículo 137 ibídem establece que: *"La Autoridad Única del Agua, como parte de las tarifas de autorización de uso y aprovechamiento y de servicio del agua contemplará un componente para conservación del dominio hídrico público con prioridad en fuentes y zonas de recarga hídrica;*

*Los Gobiernos Autónomos Descentralizados en el ámbito de sus competencias, establecerán componentes en las tarifas de los servicios públicos domiciliarios vinculados con el agua para financiar la conservación del dominio hídrico público con prioridad en fuentes y zonas de recarga hídrica.";*

**Que,** el Libro IV del Reglamento a la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamientos del Agua determina el sistema tarifario, los tipos, principios generales y criterios para el establecimiento de tarifas por uso y/o aprovechamiento de agua;

**Que,** el artículo 17 del Estatuto del Régimen Jurídico Administrativo de la Función Ejecutiva establece que *"Los ministros de Estado son competentes para el despacho de todos los asuntos inherentes a sus ministerios sin necesidad de autorización alguna del Presidente de la República, salvo los casos expresamente señalados en leyes especiales";*

**Que,** mediante Decreto Ejecutivo No. 1088 de 15 de mayo de 2008, publicado en el Registro Oficial No. 346 de 27 del mismo mes y año, se reorganizó el Consejo Nacional de Recursos Hídricos (CNRH), mediante la creación de la Secretaría Nacional del Agua, como entidad de derecho público, adscrita a la Presidencia de la República, con patrimonio y presupuesto propio, con independencia



Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

2017-1522

técnica, operativa, administrativa y financiera; en su artículo 4 se dispone que la Secretaría Nacional del Agua se encuentre a cargo del Secretario Nacional del Agua, con rango de Ministro, quien ejercerá la representación legal de la entidad;

**Que,** con Decreto Ejecutivo No. 90, de 12 de octubre de 2009 y publicado en el Registro Oficial No. 52, de 22 de octubre de 2009, se reforma el Decreto Ejecutivo No.1088 y establece en su artículo 8 que: *"La gestión integrada de los recursos hídricos se ejercerá de manera desconcentrada por Demarcaciones Hidrográficas, cuencas o subcuencas, a través de los organismos de gestión de los recursos hídricos cuenca hidrográfica y su respectiva autoridad, que serán establecidos por el Secretario Nacional del Agua y sus funciones atribuciones y competencias serán establecidas en el reglamento orgánico funcional de la entidad ";*

**Que,** mediante Decreto Ejecutivo No. 62, de 5 de agosto de 2013, se reformó el Estatuto del Régimen Jurídico y Administrativo de la Función Ejecutiva en cuanto a las denominaciones, facultades y organización administrativa de varios organismos de la Función Ejecutiva, entre ellas la Secretaría del Agua;

**Que,** la Agencia de Regulación y Control del Agua, el 04 de abril de 2016, emitió la Regulación DIR-ARCA-RG-002-2016, con la cual en su artículo 12 establece que: *"cada 5 años se revisará y/o actualizará la tarifa, para lo cual se tomará en cuenta lo establecido en el Capítulo II de la presente regulación y la respectiva planificación para la aplicación de las nuevas tarifas para los siguientes 5 años".*

**Que,** mediante Acuerdo No. 2016-1260, de 08 de enero de 2016, se creó el Comité de Economía del Agua como un organismo consultivo de las instituciones del estado ecuatoriano, rectoras, reguladoras y ejecutoras de los recursos hídricos;

**Que,** con Decreto Ejecutivo No. 1008, de 04 de mayo de 2016, publicado en el Registro Oficial Suplemento No. 760, de 23 de mayo de 2016, el señor Presidente de la República designó al Mgs. Alexis Sánchez Miño, como Secretario del Agua;

**Que,** mediante Acta de Reunión suscrita el 18 de mayo de 2017, el Comité de Economía del Agua, aprobó el Informe Técnico de Metodología y Cálculo de Tarifas por los Usos y Aprovechamientos del Agua Cruda;

**Que,** con memorando No. SENAGUA-AS.1-2017-0007-M, de 22 de mayo de 2017, el Mgs. David Andrés Mejía Sarmiento, en su calidad de Presidente del Comité de Economía del Agua, solicitó al señor Secretario del Agua, la aprobación de las tarifas acordadas en el "Informe Técnico de Metodología y Cálculo de Tarifas

GOBIERNO NACIONAL DE LA REPÚBLICA DEL ECUADOR

Secretaría del Agua

2017- 1522

por los Usos y Aprovechamientos del Agua Cruda" (ANEXO 1); así como disponer a la Coordinación General Jurídica proceda con la elaboración del Acuerdo Ministerial, que permita fijar las Tarifas por Autorización de Uso y Aprovechamiento del Agua, el mismo que fue autorizado, mediante nota inserta en el mismo documento.

En ejercicio de las atribuciones que confieren los artículos 154 numeral 1 de la Constitución de la República y 17 del Estatuto del Régimen Jurídico Administrativo de la Función Ejecutiva.

**ACUERDA:**

**Art.1.-** **APROBAR** la fórmula de cálculo para la obtención de la tarifa referencial de agua cruda, para la sostenibilidad del sector hídrico, en base al siguiente detalle:

$$\frac{\textit{Costos Totales Sostenibilidad Hídrica}}{\textit{Volumen Nacional de Agua Autorizado}} = \frac{77\ MMUSD}{19.986\ hm3} = 0{,}0039$$

*Los valores fueron determinados con base al año 2016 y tendrán una vigencia de 5 (cinco) años, conforme lo establece la Regulación DIR-ARCA-RG-002-2016;

**Art. 2.-** **APROBAR** y fijar las Tarifas de las autorizaciones de Uso y Aprovechamiento del Agua; de conformidad con el siguiente detalle:

| BLOQUES | Tipo uso/aprovechamiento | Tarifa USD/m$^3$ |
|---|---|---|
| EXENTO DE PAGO | Riego **soberania** alimentaria < 5 l/s | Exento de pago por ley |
| [redacted] | Riego **productivo** hasta 50 l/s | 0,0039 |
| [redacted] | **Industrial** | 0,0049 |
| | **Turismo** | 0,0049 |
| | Riego **productivo** > 50 l/s | 0,0049 |
| | **Otros** | 0,0049 |
| | Riego **soberanía** alimentaria > 5 l/s | 0,0029 |
| | Hidroelectricidad | 0,0049 |
| | **Envasado** de agua | 0,2435 |


Av. Toledo N22-286 y calle Lérida
Telf.: (593 2) 3815-640, Código Postal: 170525
Quito-Ecuador
RUC: 1768142090001
www.agua.gob.ec


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

GOBIERNO NACIONAL DE LA REPÚBLICA DEL ECUADOR

Secretaría del **Agua**

**2017-1522**

**Disposición Final.-** De la ejecución del presente Acuerdo, encárguese a la Secretaría del Agua, Subsecretarías de las Demarcaciones Hidrográficas, Agencia de Regulación y Control del Agua; y, Empresa Pública del Agua, para su cumplimiento en el ámbito de su competencia.

El presente Acuerdo entrará en vigencia a partir de su expedición, sin perjuicio de su publicación en el Registro Oficial

**COMUNÍQUESE Y PUBLÍQUESE.-**

Dado en la ciudad de Quito Distrito Metropolitano, a **23 MAYO 2017**

MSc. Alexis Sánchez Miño
**SECRETARIO DEL AGUA**

**ANEXO 1:** "Informe Técnico de Metodología y Cálculo de Tarifas por los Usos y Aprovechamientos del Agua Cruda"

**APV/ASB/MACB/erv.**

FUNCIÓN JUDICIAL

# REPÚBLICA DEL ECUADOR

www.funcionjudicial.gob.ec

## TRIBUNAL DISTRITAL DE LO CONTENCIOSO ADMINISTRATIVO CON SEDE EN EL CANTÓN GUAYAQUIL, PROVINCIA DEL GUAYAS

| | |
|---|---|
| **No. proceso:** | 09802202300757 |
| **No. de ingreso:** | 1 |
| **Tipo de materia:** | CONTENCIOSO ADMINISTRATIVO |
| **Tipo acción/procedimiento:** | EJECUCIÓN |
| **Tipo asunto/delito:** | EJECUCIÓN POR SILENCIO ADMINISTRATIVO |
| **Actor(es)/Ofendido(s):** | Produmar S.a. |
| **Demandado(s)/ Procesado(s):** | Ministerio Del Ambiente, Agua Y Transición Ecológica, Procuraduria General Del Estado |

### 13/12/2023 11:07 RAZON (RAZON)

Se deja constancia, que el presenet proceso se remitió a la Corte Nacional mediante Oficio No. 277-TDCAG-23-09802-2023-00757, habiéndo dicho organo de justicia recibido y sorteado el mismo, tal como consta en el sistema con fecha martes 7 de noviembre de 2023, a las 10:49.

### 30/10/2023 16:36 OFICIO (OFICIO)

Guayaquil, 30 de octubre de 2023 Oficio No. 277- TDCAG-23-09802-2023-00757 Señores SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA De mi consideración: Por disposición de los señores Jueces de este Tribunal Distrital, al haber admitido RECURSO DE CASACIÓN, envío a usted el original del juicio que detallo, para la Corte Nacional, siendo este: JUICIO: Contencioso Administrativo No. 09802-2023-00757 ACTOR: PRODUMAR S.A. DEMANDADO MINISTERIO DEL AMBIENTE, AGUA Y TRANSICIÓN ECOLOGICA CUERPO: 1 (UNO) CUERPO EN 84 FOJAS. Lo que comunico a usted para los fines de Ley. Ab. TANNIA MACIAS NARANJO SECRETARIA RELATORA

### 18/10/2023 15:54 ESCRITO

Escrito, FePresentacion

### 31/08/2023 09:34 CALIFICACION DE RECURSO DE CASACION (RAZON DE NOTIFICACION)

En Guayaquil, jueves treinta y uno de agosto del dos mil veinte y tres, a partir de las nueve horas y treinta y cuatro minutos, mediante boletas judiciales notifiqué el AUTO DE INTERLOCUTORIO que antecede a: PRODUMAR S.A. en el casillero No.269, en el casillero electrónico No.0917244824 correo electrónico nicolascastroq@castrobenites.com. del Dr./ Ab. NICOLAS ALEJANDRO CASTRO QUIROZ; No se notifica a: MINISTERIO DEL AMBIENTE, AGUA Y TRANSICIÓN ECOLÓGICA, PROCURADURIA GENERAL DEL ESTADO, por no haber señalado casillero electrónico. Certifico:MACIAS NARANJO TANNIA AZUCENA SECRETARIO (E)

### 28/08/2023 10:26 CALIFICACION DE RECURSO DE CASACION (AUTO INTERLOCUTORIO)

En atención al escrito de 17 de julio de 2023, las 16h57 presentado por la parte accionante, el cual contiene Recurso de Casación

al auto interlocutorio de martes 6 de junio del 2023, a las 10h34, se dispone: PRIMERO.- El auto dictado en la presente causa es de aquellos contra los cuales procede el Recurso de Casación, tal como así lo establece el Art. 266 del Código Orgánico General de Procesos, al haber puesto fin al proceso de conocimiento. SEGUNDO: El recurso formulado ha sido presentado dentro del término que para ese efecto establece el inciso final del referido artículo, siendo éste el de treinta días, posteriores a la ejecutoria del auto o sentencia o del auto que niegue o acepte su ampliación o aclaración. TERCERO: El escrito que contiene el Recurso de Casación interpuesto por el señor, AB. NICOLÁS ALEJANDRO CASTRO QUIROZ, Procurador Judicial de la Compañía PRODUMAR S.A., parte actora, satisface las exigencias de rigor que establece el Art. 267 del código ibídem y sin otras consideraciones, se lo admite, disponiendo que se remita el expediente a la Sala Especializada de lo Contencioso Administrativo de la Corte Nacional de Justicia. Téngase en cuenta los domicilios que señalan para recibir notificaciones en la ciudad de Quito.- Notifíquese.-

## 14/08/2023 12:13 ESCRITO

Escrito, FePresentacion

## 17/07/2023 16:57 ESCRITO

Escrito, FePresentacion

## 26/06/2023 11:25 RECHAZAR REVOCATORIA Y/O REFORMA (RAZON DE NOTIFICACION)

En Guayaquil, lunes veinte y seis de junio del dos mil veinte y tres, a partir de las once horas y veinte y cinco minutos, mediante boletas judiciales notifiqué el AUTO DE INTERLOCUTORIO que antecede a: PRODUMAR S.A. en el casillero No.269, en el casillero electrónico No.0917244824 correo electrónico nicolascastroq@castrobenites.com. del Dr./Ab. NICOLAS ALEJANDRO CASTRO QUIROZ; No se notifica a: MINISTERIO DEL AMBIENTE, AGUA Y TRANSICIÓN ECOLÓGICA, PROCURADURIA GENERAL DEL ESTADO, por no haber señalado casillero electrónico. Certifico:MACIAS NARANJO TANNIA AZUCENA SECRETARIO (E)

## 26/06/2023 09:20 RECHAZAR REVOCATORIA Y/O REFORMA (AUTO INTERLOCUTORIO)

Agréguese a los autos escritos de la parte actora de 12 y 13 de junio de 2023, mediante los cuales solicita revocatoria al auto dictado el martes 6 de junio del 2023, a las 10h34, en lo principal éste Tribunal considera: 1.- El inciso tercero del Art. 88, del Código Orgánico General de Procesos, define al auto interlocutorio como: " El auto interlocutorio es la providencia que resuelve cuestiones procesales que, no siendo materia de la sentencia, pueden afectar los derechos de las partes o la validez del procedimiento "; 2. El segundo inciso del articulo 250 del COGEP determina: " ...La aclaración, ampliación, revocatoria y reforma serán admisibles en todos los casos , con las limitaciones que sobre la impugnación de las sentencias y autos prevé esta Ley. (...)". (el énfasis es del Tribunal) 3. En ese orden, el primer inciso del artículo 254 del COGEP dispone: "Revocatoria y reforma.- Por la revocatoria la parte pretende que el mismo órgano jurisdiccional que pronunció un auto de sustanciación lo deje sin efecto y dicte otro en sustitución", (el resaltado es fuera de texto); en esa línea, el auto que declaró el archivo de la causa por caducidad, es un auto interlocutorio en los términos establecidos en el artículo 81 del COGEP; por tanto, no es susceptible de recurso de revocatoria ya que la norma adjetiva ha considerado este tipo de recurso para los autos de sustanciación, lo que no sucede en la especie; en ese contexto, el pedido de revocatoria que requiere el accionante al auto interlocutorio que declaró el archivo de la causa, es improcedente, en virtud de aquello se lo niega.- Notifíquese.-

## 13/06/2023 14:00 ESCRITO

Escrito, FePresentacion

## 12/06/2023 13:55 ESCRITO

Escrito, FePresentacion

## 08/06/2023 15:17 INADMITIR DEMANDA Y/O SOLICITUD (RAZON DE NOTIFICACION)

En Guayaquil, jueves ocho de junio del dos mil veinte y tres, a partir de las quince horas y diecisiete minutos, mediante boletas judiciales notifiqué el AUTO DE INTERLOCUTORIO que antecede a: PRODUMAR S.A. en el casillero No.269, en el casillero electrónico No.0917244824 correo electrónico nicolascastroq@castrobenites.com. del Dr./ Ab. NICOLAS ALEJANDRO CASTRO QUIROZ; No se notifica a: MINISTERIO DEL AMBIENTE, AGUA Y TRANSICIÓN ECOLÓGICA, PROCURADURIA GENERAL DEL ESTADO, por no haber señalado casillero electrónico. Certifico:MACIAS NARANJO TANNIA AZUCENA SECRETARIO (E)

## 06/06/2023 10:34 INADMITIR DEMANDA Y/O SOLICITUD (AUTO INTERLOCUTORIO)

VISTOS.- AUTO INTERLOCUTORIO.- Integran la Sala en calidad de Jueces Titulares los Doctores Kelvin Sánchez Romero (juez ponente), Clemente Eduardo Rivas Calderón y Juan Carlos Jaramillo Montesinos, avocan conocimiento de la presente causa puesta a nuestro despacho en esta fecha y proveen: En lo principal; el Abg. NICOLAS ALEJANDRO CASTRO QUIROZ, por los derechos que representa de la compañía PRODUMAR S.A. como Apoderado y Procurador Judicial, conforme lo justifica con el documento que adjunta, comparece ante éste Tribunal, para deducir una demanda POR SILENCIO ADMINISTRATIVO, en contra del MINISTERIO DEL AMBIENTE, AGUA Y TRANSICION ECOLOGICA y Procurador General del Estado, señalando en lo principal de su libelo lo siguiente: “IV.II.· Con fecha 14 de abril de 2021, Produmar S.A. presentó un escrito ante el Ministerio del Ambiente solicitando que de conformidad con el Artículo 133 del Código Orgánico Administrativo, se rectifique la Resolución del 31 de marzo de 2021 antes aludida, toda vez que en la tramitación del expediente quedó claro que el aprovechamiento del agua en la actividad acuícola de Produmar S. A. genera un uso NO CONSUNTIVO del recurso hídrico (no se consume el agua) y, en tal virtud, de conformidad con el Artículo 108 de la 1Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua, no se debe causar el pago de las tarifas establecidas en la Ley, por lo que se solicitó rectificar la Resolución en el sentido de que el pago de la tarifa a la que se refieren los #4 y 5 de la mencionada Resolución por el uso productivo del agua para la actividad acuícola de Produmar S.A. únicamente procederá cuando tal uso sea consuntivo como expresamente lo determina la Ley y el uso, en este caso, es no consuntivo. (ANEXO 2). Este pedido formulado a la administración pública hace más de 2 años hasta la fecha sigue sin ser atendido, habiendo operado el silencio administrativo positivo (…) IV.VI.- Mediante escrito del 25 de enero de 2023 (ANEXO 8), Produmar S.A. le hizo saber al Ministerio de Ambiente que ha operado el silencio administrativo positivo respecto del pedido de rectificación de la Resolución (ANEXO 1), solicitándose que se informe el particular a la EPA para que se abstenga de seguir cobrando a Produmar S. A. valores que legalmente no está obligada a pagar, escrito respecto del cual, hasta la fecha, tampoco hemos recibido contestación alguna por parte del Ministerio de Ambiente. IV.VII.- A la EPA también se le hizo conocer que ha operado el silencio administrativo positivo mediante comunicación presentada el 14 de febrero de 2023 (ANEXO 9), respecto de la cual en Oficio No. EPA-GCOM-2023-00021-0 del 17 de febrero de 2023 (ANEXO 10) la EPA señaló que "PRODUMAR S. A., deberá interponer sus buenos oficios y realizar la solicitud formal ante el Ministerio del Ambiente, Agua y Transición Ecológica como ente rector". IV.VIII.- En resumen: •La autoridad pública, Ministerio de Ambiente, expide una Resolución (ANEXO 1) administrativa; •El administrado (Produmar S.A.) solicita conforme a la Ley que dicha Resolución sea rectificada porque es lo que legalmente corresponde; •El Ministerio de Ambiente no contesta absolutamente nada; •Se produce el silencio administrativo positivo; y, Durante todo ese tiempo (más de 2 años) desde que se solicitó la rectificación de la Resolución hasta la fecha, la empresa pública ejecutora, escudada en una disposición del ente público "mudo", ha estado de forma ilegal compeliendo al administrado a que le pague valores que no se encuentra obligado a pagar (..) VII DECLARACIÓN BAJO JURAMENTO De conformidad con los Artículos 207 del Código Orgánico Administrativo y 370 A del COGEP, declaro bajo juramento que Produmar S.A. no ha sido notificada por el Ministerio de Ambiente, Agua y Transición Ecológica con resolución expresa dentro del término legal, respecto del pedido de rectificación de la Resolución de fecha 31 de marzo de 2021, las 09h40, emitida dentro del Expediente No. 1373-2016, petitorio que se le formuló a dicha Cartera de Estado con escrito presentado el 14 de abril de 2021. VIII PRETENSIÓN En base a lo expuesto, habiendo operado el silencio administrativo positivo a favor de PRODUMAR S.A. y en consideración a que la entidad accionada y terceros involucrados (EPA) no han reconocido este hecho claro y palpable, solicito que se ejecute el acto administrativo presunto y mediante MANDAMIENTO DE EJECUCIÓN se determine y ordene: Vlll.l.· Que el acto administrativo presunto que ha surgido a consecuencia del silencio de la entidad demandada ha nacido a la vida jurídica, no incurre en ninguna causal de nulidad, es un acto legítimo, lícito, apegado a la ley y, por ende, ejecutable. Vlll.ll.· Que, en

consecuencia, la Resolución del Ministerio de Ambiente (ANEXO 1) de fecha 31 de marzo de 2021, las 09h40, dictada dentro del Expediente No. 1373-2016 en la que se concedió a Produmar S. A. la autorización de aprovechamiento de las aguas superficiales del río Taura, ha quedado rectificada en el sentido de que no le corresponde a Produmar S.A. pagar tarifa o valor alguno, pasado, presente o futuro por el aprovechamiento del agua para su actividad acuícola por tratarse de un uso NO CONSUNTIVO, acorde con el Artículo 108 de la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua. VIll.lll.· Que el Ministerio de Ambiente, Agua y Transición Ecológica proceda a incorporar el mandamiento de ejecución que expida el tribunal en el Expediente Administrativo No. 1373-2016 y que informe sobre el mismo a la Empresa Pública del Agua (EPA) y a cualquier otra entidad relacionada para que se abstengan de realizar acciones de cobro de tarifas en relación a la Resolución que por silencio administrativo positivo ha quedado rectificada en el sentido referido en el número anterior.(…)" (el resaltado es del Tribunal). En esa línea, examinado detenidamente el libelo, por parte de éste Tribunal, se procede a determinar si la misma ha sido presentada dentro del término establecido por la legislación procesal, y para hacerlo se considera: PRIMERO.- El artículo 306 del Código Orgánico General de Procesos, establece: "(.) Oportunidad para presentar la demanda. Para el ejercicio de las acciones contencioso tributarias y contencioso administrativas se observará lo siguiente: 1. En los casos en que se interponga una acción subjetiva o de plena jurisdicción, el término para proponer la demanda será de noventa días, contados a partir del día siguiente a la fecha en que se notificó el acto impugnado.2. En los casos de acción objetiva o de anulación por exceso de poder, el plazo para proponer la demanda será de tres años, a partir del día siguiente a la fecha de expedición del acto impugnado (…)"; SEGUNDO. - El artículo 326 del Código Orgánico General de Procesos, en sus numerales 1 y 2 dispone: "(...) Acciones en el procedimiento contencioso administrativo. Se tramitarán en procedimiento contencioso administrativo las siguientes acciones; 1. La de plena jurisdicción o subjetiva que ampara un derecho subjetivo de la o del accionante, presuntamente negado, desconocido o no reconocido total o parcialmente por hechos o actos administrativos que produzcan efectos jurídicos directos. Procede también esta acción contra actos normativos que lesionen derechos subjetivos. 2. La de anulación objetiva o por exceso de poder que tutela el cumplimiento de la norma jurídica objetiva, de carácter administrativo y puede proponerse por quien tenga interés directo para deducir la acción, solicitando la nulidad del acto impugnado por adolecer de un vicio legal (...)"; TERCERO.- La Corte Nacional de Justicia en el Precedente Jurisprudencial Obligatorio, contenido en la Resolución Nro. 13-2015, publicado en el Registro Oficial Suplemento 621, de 5 de Noviembre del 2015, resolución que en su parte pertinente expresa lo siguiente: "(…) RESUELVE Artículo 1.- Confirmar el criterio expuesto por la Sala Especializada de lo Contencioso Administrativo de la Corte Nacional de Justicia y aprobar el informe expedido por el Presidente de la Sala Especializada de lo Contencioso Administrativo de la Corte Nacional de Justicia; en consecuencia, dado que la caducidad es una figura propia del Derecho Público que opera ipso jure, por el transcurso del tiempo para ejercer una acción o una potestad, es declarable de oficio y se refiere a la extinción del derecho para iniciar un proceso; declara la existencia del siguiente precedente jurisprudencial obligatorio por la triple reiteración de fallos sobre un mismo punto de derecho, en el siguiente sentido: a) Los jueces de los tribunales distritales de lo contencioso administrativo, mediante auto definitivo inadmitirán a trámite la demanda, cuando verifiquen que se produjo la caducidad del ejercicio del derecho para presentar la demanda en la vía contencioso administrativa. Este auto es susceptible de recurso de casación; b) Operada la caducidad a petición de parte o de oficio, mediante auto o sentencia, al juzgador de instancia o casación le está vedado entrar a considerar otros aspectos procesales para pronunciar sentencia de fondo o mérito; y, c) La clase de recurso que se propone se determina únicamente por la pretensión que mueve al accionante para promover la acción: si ésta es la de defender directamente un derecho subjetivo violado o ejecutar el silencio administrativo, el recurso necesariamente será de carácter subjetivo, y corresponde al Tribunal así señalarlo, sin considerar la calificación que al mismo haya dado el proponente. (…)" (el énfasis fuera de texto). CUARTO.- De la revisión de los fundamentos de hecho y derecho de la acción, queda claro, que la parte actora busca la ejecución del silencio administrativo, que según sus argumentos se ha producido, por la falta de contestación a una petición realizada el 14 de abril del 2021, en los términos establecidos en la Ley, por lo tanto y tal como se indicó en líneas anteriores, el recurso deducido por el actor, es de carácter subjetivo, ya que la pretensión que mueve al accionante, para proponer la acción, es la defensa de un derecho subjetivo violado o presuntamente negado y así lo califica el Tribunal; QUINTO. Al haberse establecido por éste Tribunal, que el recurso deducido, es de plena jurisdicción o subjetivo, corresponde analizar si el mismo ha sido deducido dentro del término que establece la ley, esto es dentro del término de noventa días que establece el artículo 306, núm. 1 del COGEP. SEXTO. La Sala de lo Contencioso Administrativo de la Corte Suprema de Justicia, sostenía que: "la fecha de inicio para el cómputo de los términos, a efectos de determinarla caducidad del derecho de acción, en los casos en que el administrado busca ejecutar el acto administrativo presunto derivado del silencio administrativo

con efectos positivos, sería, por regla general, el día siguiente a la fecha en que se habría producido el acto administrativo presunto cuya ejecución se busca en sede judicial", [Gaceta Judicial. Año CVIII. Serie XVIII, No. 3. Página 1104. Quito, 31 de enero de 2007], criterio con el cual éste órgano judicial concuerda. SEPTIMO. La parte actora señala como pretensión en su demanda, que éste órgano de administración de justicia, declare que ha operado su favor el silencio administrativo positivo ante la falta de contestación por parte de las autoridades del Ministerio del Ambiente, respecto a una petición formulada el 14 de abril del 2021, tal como lo declara bajo juramento que ésta petición no ha sido contestada, señalando que a partir de cuya fecha, han transcurrido más de treinta días, conforme lo establece el Código Orgánico Administrativo COA, sin que haya recibido contestación alguna por parte de la accionada; en la especie, el Tribunal llega a la conclusión, que el acto administrativo presunto, que se pretende ejecutar, nació del silencio administrativo que proviene de la petición realizada con fecha 14 de abril del 2021, ante aquello éste órgano judicial, considera que al acto administrativo presunto que se pretende ejecutar, se habría producido el día 28 de mayo del 2021, fecha a la que se llega, luego de contabilizar el término de treinta días, que establece el artículo 207 del Código Orgánico Administrativo, por lo que desde allí, correría el término para que se deduzca el recurso subjetivo o de plena jurisdicción en esta jurisdicción. OCTAVO. En el presente caso, la demanda, propuesta por la actora, ha sido presentada el día 24 de mayo del 2023, conforme se desprende de la razón de sorteo, lo que indudablemente se demuestra, que la acción ha sido presentada fuera del tiempo que permite la ley, ya que el artículo 306 número 1 del COGEP, establece con claridad meridiana, que para los casos en que se interponga una acción subjetiva o de plena jurisdicción, el término para proponer la demanda será de noventa días, contados a partir del día siguiente a la fecha en que se notificó el acto impugnado; por lo tanto, es evidente que la demanda ha sido deducida en forma extemporánea, habiendo operado la caducidad de la acción, puesto que ha sido deducida fuera del termino de los noventa días que permite la ley; en virtud, que la Corte Nacional de Justicia, estableció en Precedente Jurisprudencial Obligatorio, que la ejecución del silencio administrativo, corresponde al recurso de carácter subjetivo, conforme el artículo 1 literal c) de la Resolución Nro. 13-2015, que se indicó en líneas anteriores; en ese orden, el término para demandar acciones de ejecución por silencio administrativo, es de noventa días. No debemos olvidar que según el inciso tercero del artículo 28 del Código Orgánico de la Función Judicial, la jurisprudencia sirve para interpretar, integrar y delimitar el campo de aplicación del ordenamiento legal, así como para suplir la ausencia o insuficiencia de las disposiciones que regulan la materia; siguiendo los lineamientos del precedente jurisprudencial obligatorio que se examina en los literales a) y b) de artículo 1 de la Resolución No. 13-2015, los Jueces de los Tribunales Distritales de lo Contencioso Administrativo, mediante auto definitivo inadmitirán a trámite la demanda, cuando verifiquen que se produjo la caducidad del ejercicio del derecho para presentar la acción en vía contenciosa administrativa y que operada la misma, el Tribunal, está vedado de entrar a considerar el asunto de fondo o de mérito; por lo que, éste órgano judicial, considera que al ser la caducidad una figura propia del Derecho Público, que opera ipso jure, por el transcurso del tiempo para ejercer una acción o potestad, que es declarable de oficio; y, en virtud de haber caducado en exceso el derecho que tenían el accionante para presentar su demanda, inadmite la misma y dispone su archivo. Desglósese la documentación que se anexa dejando constancia en el expediente copia de este auto, disponiendo que la Secretaria Relatora de éste Tribunal, remita mediante oficio copia de este auto, a la autoridad administrativa demandada. -NOTIFIQUESE y CÚMPLASE. -

## 24/05/2023 16:11 ACTA DE SORTEO

Recibido en la ciudad de Guayaquil el día de hoy miércoles 24 de mayo de 2023 a las 16:11 horas, el proceso Contencioso administrativo, Tipo de procedimiento: Ejecución, Asunto: Ejecución por silencio administrativo, seguido por: Produmar S.A, en contra de: Ministerio del Ambiente, Agua y Transición Ecológica - NULL, PROCURADURIA GENERAL DEL ESTADO Por sorteo de ley la competencia se radica en: TRIBUNAL DISTRITAL DE LO CONTENCIOSO ADMINISTRATIVO CON SEDE EN EL CANTÓN GUAYAQUIL, PROVINCIA DEL GUAYAS, conformado por los/ las Jueces/ Juezas: Abogado Sanchez Romero Kelvin Petronio (Ponente), Rivas Calderon Clemente Eduardo, Abg Jaramillo Montesinos Juan Carlos Secretaria(o) Macias Naranjo Tannia Azucena Proceso número 09802-2023-00757 (1) Primera Instancia Al que se adjunta los siguientes documentos:

1) PETICIÓN INICIAL (ORIGINAL)

2) ADJ. 55 FJS (FOLIADO POR EL USUARIO) ENTRE CERTIFICADAS/ COMPULSA, SIMPLES Y ORIGINALES (ORIGINAL) Total de fojas: 4 OSCAR DAVID DUQUE MORENO Responsable de sorteo

## 24/05/2023 16:11 CARATULA DE JUICIO

CARATULA

FUNCIÓN JUDICIAL

# REPÚBLICA DEL ECUADOR

www.funcionjudicial.gob.ec

## SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA

| | |
|---|---|
| **No. proceso:** | 09802202300757 |
| **No. de ingreso:** | 1 |
| **Tipo de materia:** | CONTENCIOSO ADMINISTRATIVO |
| **Tipo acción/procedimiento:** | EJECUCIÓN |
| **Tipo asunto/delito:** | EJECUCIÓN POR SILENCIO ADMINISTRATIVO |
| **Actor(es)/Ofendido(s):** | Produmar S.a. |
| **Demandado(s)/ Procesado(s):** | Ministerio Del Ambiente, Agua Y Transición Ecológica, Procuraduria General Del Estado |

### 08/05/2024 17:30 ESCRITO

Escrito, FePresentacion

### 17/04/2024 16:27 ACTA DE SORTEO

Recibido en la ciudad de Quito el día de hoy, martes 7 de noviembre de 2023, a las 10:49, en el proceso No. 09802-2023-00757 (1) Primera Instancia de materia Contencioso administrativo, Tipo de procedimiento: Ejecución por Asunto: Ejecución por silencio administrativo, propuesto por Produmar S.A. en contra de: Procuraduria General del Estado -, Ministerio del Ambiente, Agua y Transición Ecológica -. Por recurso(s):

1. Casación interpuesto por Produmar S.A.. Por sorteo de ley, la competencia se radica en la SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA conformado por Doctor Espinosa Brito Mauricio Bayardo, Secretaria(o): Dra. Nadia Fernanda Armijos Cárdenas. Proceso número: 09802-2023-00757 (1) Corte Nacional Al que se adjunta los siguientes documentos:

1) PETICIÓN INICIAL (ORIGINAL)

2) GUAYAS.- TOTAL 1 CUERPO (ORIGINAL) Total de fojas: 84 Observaciones:

Expediente viene de GUAYAS en 1 cuerpo.

- 1 foja sin foliatura al final

TOTY ARACELY LEMA JARAMILLOANALISTA

### 17/04/2024 16:27 ACTA DE SORTEO

En virtud de lo dispuesto en la Resolución No. 05-2024, emitida por el Pleno de la Corte Nacional de Justicia, en la ciudad de QUITO el día de hoy, miércoles 17 de abril de 2024, a las 12:55 PM, se realiza el sorteo de ley del proceso No. 09802-2023-00757 (1) Corte Nacional, materia: Contencioso Administrativo, tipo de procedimiento: Ejecución, asunto: Ejecución Por Silencio Administrativo. Por recurso: CASACIÓN. La competencia para continuar con el conocimiento del proceso se radica en la SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA en la/el

Conjuez(a):DOCTOR VELASTEGUI AYALA XIMENA DEL ROCIO.

Secretaria(o): DRA. IVONNE MARLENE GUAMANI LEON.

## 07/11/2023 10:49 ACTA DE SORTEO

Recibido en la ciudad de Quito el día de hoy, martes 7 de noviembre de 2023, a las 10:49, en el proceso No. 09802-2023-00757 (1) Primera Instancia de materia Contencioso administrativo, Tipo de procedimiento: Ejecución por Asunto: Ejecución por silencio administrativo, propuesto por Produmar S.A. en contra de: Procuraduria General del Estado -, Ministerio del Ambiente, Agua y Transición Ecológica -. Por recurso(s):

1. Casación interpuesto por Produmar S.A.. Por sorteo de ley, la competencia se radica en la SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA conformado por Doctor Espinosa Brito Mauricio Bayardo, Secretaria(o): Dra. Nadia Fernanda Armijos Cárdenas. Proceso número: 09802-2023-00757 (1) Corte Nacional Al que se adjunta los siguientes documentos:

1) PETICIÓN INICIAL (ORIGINAL)

2) GUAYAS.- TOTAL 1 CUERPO (ORIGINAL) Total de fojas: 84 Observaciones:

Expediente viene de GUAYAS en 1 cuerpo.

- 1 foja sin foliatura al final

TOTY ARACELY LEMA JARAMILLOANALISTA

## 07/11/2023 10:49 ACTA DE SORTEO

En virtud de lo dispuesto en la Resolución No. 05-2024, emitida por el Pleno de la Corte Nacional de Justicia, en la ciudad de QUITO el día de hoy, miércoles 17 de abril de 2024, a las 12:55 PM, se realiza el sorteo de ley del proceso No. 09802-2023-00757 (1) Corte Nacional, materia: Contencioso Administrativo, tipo de procedimiento: Ejecución, asunto: Ejecución Por Silencio Administrativo. Por recurso: CASACIÓN. La competencia para continuar con el conocimiento del proceso se radica en la SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA en la/el

Conjuez(a):DOCTOR VELASTEGUI AYALA XIMENA DEL ROCIO.

Secretaria(o): DRA. IVONNE MARLENE GUAMANI LEON.

PUBLIC VERSION

**31 PAGES**

**NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION**

**Water Authorizations**

FUNCIÓN JUDICIAL

# REPUBLIC OF ECUADOR

www.funcionjudicial.gob.ec

## DISTRICT COURT OF ADMINISTRATIVE LITIGATION LOCATED IN GUAYAQUIL CANTON, GUAYAS PROVINCE

| | |
|---|---|
| No. process: | 09802202300757 |
| Entry no: | 1 |
| Type of subject matter: | ADMINISTRATIVE CONTINGENCIES |
| Type of action/procedure: | ENFORCEMENT |
| Type of case/offense: | ENFORCEMENT BY ADMINISTRATIVE SILENCE |
| Actor(s)/Offendant(s): | Produmar S.a. |
| Defendant(s)/ Prosecuted(s) : | Ministry of Environment, Water and Ecological Transition, State Attorney General's Office |

### 13/12/2023 11:07 REASON (REASON)

It is hereby stated for the record that the present proceeding was forwarded to the National Court by means of Official Letter No. 277- TDCAG-23-09802-2023-00757, having been received and drawn by lot by said judicial body, as recorded in the system on Tuesday, November 7, 2023, at 10:49 a.m.

### 30/10/2023 16:36 OFICIO (OFFICIAL DOCUMENT)

Guayaquil, October 30, 2023 Official Communication No. 277- TDCAG-23-09802-2023-00757 Dear Sirs SPECIALIZED ADMINISTRATIVE CONTENTION CHAMBER OF THE NATIONAL COURT OF JUSTICE For my consideration: By disposition of the Judges of this District Court, having admitted the APPEAL OF CASATION, I am sending you the original of the judgment that I detail, for the National Court, being this: JUDGMENT: Administrative Contentious No. 09802-2023-00757 plaintiff: produmar s.a. defendant ministry of the environment, water and ecological transition body: 1 (one) body in 84 pages. 09802-2023-00757 PLAINTIFF: PRODUMAR S.A. DEFENDANT MINISTRY OF ENVIRONMENT, WATER AND ECOLOGICAL TRANSITION BODY: 1 (ONE) BODY IN 84 PAGES. That which

I am communicating to you for the purposes of the Law. TANNIA MACIAS NARANJO RELATING SECRETARY

### 18/10/2023 15:54 WRITTEN

Written, FaithPresentation

### 08/31/2023 09:34 CLASSIFICATION OF APPEAL (REASON FOR NOTIFICATION)

In Guayaquil, Thursday, August thirty-first, two thousand twenty-three, as of nine hours and thirty-four minutes, by means of judicial ballots I notified the above-mentioned INTERLOCUTORY ORDER to: PRODUMAR S.A. in box No.269, in electronic box No.0917244824 e-mail nicolascastroq@castrobenites.com. of Dr./ Ab. NICOLAS ALEJANDRO CASTRO QUIROZ; Not notified to: MINISTERIO DEL AMBIENTE, AGUA Y TRANSICIÓN ECOLÓGICA, PROCURADURIA GENERAL.

DEL ESTADO, for not having indicated an electronic mailbox. Certifying:MACIAS NARANJO TANNIA AZUCENA SECRETARY (E)

08/28/2023 10:26 CLASSIFICATION OF APPEAL (INTERLOCUTORY INJUNCTION)

In attention to the writ of July 17, 2023, at 4:57 p.m., filed by the plaintiff, which contains an appeal for annulment.


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

to the interlocutory order of Tuesday, June 6, 2023, at 10:34 a.m., it is hereby disposed: FIRST: The order issued in the present case is one of those against which the Appeal for Cassation is applicable, as established in Article 266 of the General Organic Code of Proceedings, having put an end to the process of knowledge. SECOND: The appeal has been filed within the term established in the final clause of said article, which is thirty days after the execution of the order or sentence or of the order denying or accepting its extension or clarification. THIRD: The brief containing the Appeal filed by Mr. AB. NICOLÁS ALEJANDRO CASTRO QUIROZ, Judicial Attorney of the Company PRODUMAR S.A., plaintiff, satisfies the rigorous requirements established in Article 267 of the aforementioned code and without further considerations, it is admitted, ordering that the file be forwarded to the Specialized Chamber for Contentious-Administrative Matters of the National Court of Justice. Take into account the addresses indicated to receive notifications in the city of Quito - Be notified.

## 14/08/2023 12:13 WRITTEN

Written, FaithPresentation

## 17/07/2023 16:57 WRITTEN

Written, FaithPresentation

## 06/26/2023 11:25 REFUSE REVOCATION AND/OR AMENDMENT (REASON FOR NOTIFICATION)

In Guayaquil, Monday, June twenty-sixth, two thousand twenty-three, as of eleven hours and twenty-five minutes, by means of judicial ballots I notified the above-mentioned INTERLOCUTORY ORDER to: PRODUMAR S.A. in box No.269, in electronic box No.0917244824 e-mail nicolascastroq@castrobenites.com. of Dr./ Ab. NICOLAS ALEJANDRO CASTRO QUIROZ; Not notified to: MINISTERIO DEL AMBIENTE, AGUA Y TRANSICIÓN ECOLÓGICA, PROCURADURIA GENERAL DEL.
ESTADO, for not having indicated an electronic mailbox. I certify:MACIAS NARANJO TANNIA AZUCENA SECRETARY (E)

## 06/26/2023 09:20 REFUSE REVOCATION AND/OR REFORM (INTERLOCUTORY INJUNCTION)

Add to the records writs of the plaintiff dated June 12 and 13, 2023, by which it requests revocation of the order issued on Tuesday, June 6, 2023, at 10:34 a.m., in the main part this Court considers: 1. 88, of the General Organic Code of Proceedings, defines the interlocutory order as: "The interlocutory order is the order that resolves procedural issues that, not being the subject of the sentence, may affect the rights of the parties or the validity of the procedure"; 2. The second paragraph of Article 250 of the COGEP determines: "...The clarification, extension, revocation and reform shall be admissible in all cases, with the limitations on the challenge of judgments and orders provided for in this Law. (...)" (emphasis added by the Court) 3. In this order, the first paragraph of Article 254 of the COGEP provides: "Revocation and reformation: - By revocation, the party seeks the revocation of the sentence. By revocation, the party intends that the same jurisdictional body that pronounced an order of substantiation leaves it without effect and issues another in substitution", (emphasis added); in this line, the order that declared the dismissal of the case due to caducidad, is an interlocutory order in the terms established in Article 81 of the COGEP; Therefore, it is not susceptible to appeal for revocation since the adjective norm has considered this type of appeal for the orders of substantiation, which is not the case in this case; in this context, the request for revocation required by the plaintiff to the interlocutory order that declared the dismissal of the case, is inadmissible, by virtue of which it is denied.- Be notified.

## 13/06/2023 14:00 WRITTEN

Written, FaithPresentation

## 12/06/2023 13:55 WRITTEN

## 08/06/2023 15:17 DISMISSAL OF CLAIM AND/OR APPLICATION (REASON FOR NOTIFICATION)

In Guayaquil, Thursday, June eighth, two thousand twenty-three, as of fifteen hours and seventeen minutes, by means of judicial ballots I notified the above-mentioned INTERLOCUTORY ORDER to: PRODUMAR S.A. in box No.269, in electronic box No.0917244824 email nicolascastroq@castrobenites.com. of Dr./ Ab. NICOLAS ALEJANDRO CASTRO QUIROZ; Not notified to: MINISTERIO DEL AMBIENTE, AGUA Y TRANSICIÓN ECOLÓGICA, PROCURADURIA GENERAL DEL.
ESTADO, for not having indicated an electronic mailbox. I certify:MACIAS NARANJO TANNIA AZUCENA SECRETARY (E)

## 06/06/2023 10:34 INADMISSIBILITY OF CLAIM AND/OR APPLICATION (INTERLOCUTORY INJUNCTION)

HAVING REGARD TO THE INTERLOCUTORY ORDER. Kelvin Sánchez Romero (presiding judge), Clemente Eduardo Rivas Calderón and Juan Carlos Jaramillo Montesinos, are the Titular Judges of the Chamber, and they take cognizance of the present case filed in our office on this date and rule: In the main part; Attorney NICOLAS ALEJANDRO CASTRO QUIROZ, for the rights he represents of the company PRODUMAR S.A., as Attorney-in-fact and Judicial Attorney, as justified by the attached document, appears before this Court to file a lawsuit FOR ADMINISTRATIVE SILENCE. as Attorney-in-fact and Judicial Attorney, as justified by the attached document, appears before this Court, to file a lawsuit FOR ADMINISTRATIVE SILENCE, against the MINISTRY OF ENVIRONMENT, WATER AND ECOLOGICAL TRANSITION and Attorney General of the State, stating in the main part of his libel the following: "IV.II.- On April 14, 2021, Produmar S.A. filed a writ before the Ministry of Environment, WATER AND ECOLOGICAL TRANSITION and the Attorney General of the State, stating in the main part of his libel the following: "IV.II. filed a writ before the Ministry of the Environment requesting that in accordance with Article 133 of the Organic Administrative Code, the Resolution of March 31, 2021 mentioned above be rectified, since in the processing of the file it became clear that the use of water in the aquaculture activity of Produmar S.A. generates a NON-CONSUMPTIVE use. generates a NON CONSUMPTIVE use of the water resource (the water is not consumed) and, therefore, in accordance with Article 108 of the Organic Law of Water Resources, Uses and Development of Water, the payment of the rates established in the Law should not be caused, so it was requested to rectify the Resolution in the sense that the payment of the rate referred to in #4 and 5 of the aforementioned Resolution for the productive use of water for the aquaculture activity of Produmar S. A. will only proceed when such productive use of water for the aquaculture activity of Produmar S. A. will only proceed when such productive use of water for the aquaculture activity of Produmar S. A. is not consumed, and therefore, in accordance with Article 108 of the Organic Law of Water Resources, Uses and Development of Water, the payment of the rates established in the Law should not be caused.A. will only proceed when such use is consumptive as expressly determined by the Law and the use, in this case, is non-consumptive. (ANNEX 2). This request formulated to the public administration more than 2 years ago has still not been attended to, and the positive administrative silence has operated (...) IV.VI. By letter dated January 25, 2023 (ANNEX 8), Produmar S.A. informed the Ministry of Environment that the positive administrative silence has operated with respect to the request for rectification of the Resolution (ANNEX 1), requesting that the EPA be informed in order to refrain from continuing to charge Produmar S.A. amounts that it is not legally obliged to pay, a letter to which, to date, we have not received any response from the Ministry of Environment. IV.VIl.- The EPA was also informed that the positive administrative silence has operated by means of a communication presented on February 14, 2023 (ANNEX 9), regarding which in Official Letter No. EPA-GCOM-2023-00021-0 of February 17, 2023 (ANNEX 10) the EPA pointed out that "PRODUMAR
S. A., shall use its good offices and make a formal request to the Ministry of the Environment, Water and Ecological Transition as the governing entity". IV.VIII. In summary: -The public authority, Ministry of Environment, issues an administrative Resolution (ANNEX 1); -The administered party (Produmar S.A.) requests, in accordance with the Law, that such Resolution be issued by the Ministry of Environment, Water and Ecological Transition.The Ministry of Environment does not answer at all; - Positive administrative silence is produced; and, during all that time (more than 2 years) since the rectification of the Resolution was requested until now, the executing public company, shielded in a disposition of the "mute" public entity, has been illegally compelling the administered to pay values that it is not obliged to pay (...).VIl DECLARATION UNDER OATH In accordance with Articles 207 of the Administrative Organic Code and 370 A of the COGEP, I declare under oath that Produmar
S.A. has not been notified by the Ministry of Environment, Water and Ecological Transition with an express resolution within

the legal term, regarding the request for rectification of the Resolution dated March 31, 2021, at 09h40, issued within Case No. 1373-2016, request that was made to said Ministry with a letter filed on April 14, 2021. VIII PRETENSION Based on the foregoing, having operated the positive administrative silence in favor of PRODUMAR S.A. and in consideration that the defendant entity and third parties involved (EPA) have not recognized this clear and palpable fact, I request that the presumed administrative act be executed and by means of an EXECUTION ORDER to determine and order: Vlll.l.- That the presumed administrative act that has arisen as a consequence of the silence of the defendant entity has been born to legal life, does not incur in any cause of nullity, is a legitimate, lawful act, in accordance with the law and, therefore, enforceable. Vlll.ll.- That, in

Consequently, the Resolution of the Ministry of Environment (ANNEX 1) dated March 31, 2021, at 09h40, issued in Case No. 1373-2016 in which Produmar S. A. was granted the authorization to use the surface waters of the Taura River, has been rectified in the sense that Produmar S. A. does not have to pay any fee or value, past, present or future, for the use of the water for its aquaculture activity, since it is a NON-CONSUMPTIONARY use, in accordance with Article 108 of the Organic Law of Water Resources (Ley Orgánica de Recursos Hídricos), Article 108 of the Organic Law of Water Resources.A. is not required to pay any fee or value, past, present or future for the use of water for its aquaculture activity because it is a NON-CONSUMPTIONARY use, in accordance with Article 108 of the Organic Law of Water Resources, Uses and Use of Water. Vlll.lll.- That the Ministry of Environment, Water and Ecological Transition proceeds to incorporate the writ of execution issued by the court in Administrative Case No. 1373-2016 and to inform about the same to the Public Water Company (EPA) and any other related entity so that they refrain from carrying out fee collection actions in relation to the Resolution that by positive administrative silence has been rectified in the sense referred to in the previous number.(...)" (emphasis added by the Court). In this line, having carefully examined the libel, this Tribunal proceeds to determine if the same has been filed within the term established by the procedural legislation, and to do so it is considered: FIRST.- Article 306 of the General Organic Code of Proceedings, establishes: "(.) Opportunity to file the claim. For the exercise of contentious-tax and contentious-administrative actions the following shall be observed: 1. In cases in which a subjective or full jurisdiction action is filed, the term for filing the claim shall be ninety days, counted as of the day following the date on which the challenged act was notified.2. In the cases of objective action or annulment due to excess of power, the term for filing the claim shall be three years, as from the day following the date of issuance of the challenged act (...)"; SECOND - Article 326 of the General Organic Code of Proceedings, in its paragraphs 1 and 2 provides: "(...) Actions in the contentious-administrative procedure. The following actions shall be processed in contentious administrative proceedings;

1. That of full or subjective jurisdiction, which protects a subjective right of the plaintiff, allegedly denied, unknown or not recognized totally or partially by facts or administrative acts that produce direct legal effects. This action may also be brought against normative acts that violate subjective rights. That of objective annulment or due to excess of power, which protects the compliance of the objective legal rule, of administrative nature and can be proposed by whoever has direct interest to deduce the action, requesting the nullity of the challenged act for having a legal defect (...)"; THIRD. The National Court of Justice in the Mandatory Jurisprudential Precedent, contained in Resolution No. 13-2015, published in the Official Gazette Supplement 621, of November 5, 2015, resolution that in its pertinent part expresses the following: "(...) RESOLVES Article 1.- To confirm the criterion set forth by the Specialized Chamber for Contentious Administrative Matters of the National Court of Justice and approve the report issued by the President of the Specialized Chamber for Contentious Administrative Matters of the National Court of Justice; consequently, given that caducidad is a figure proper to Public Law that operates ipso jure, due to the passage of time to exercise an action or a power, is declarable ex officio and refers to the extinction of the right to initiate a process; declares the existence of the following binding jurisprudential precedent due to the triple reiteration of rulings on the same point of law, in the following sense: (a) The judges of the district contentious-administrative courts, by means of a definitive order, will not admit the claim for processing, when they verify that the exercise of the right to file the claim in the contentious-administrative proceeding has lapsed. This order is subject to appeal in cassation; b) Once the expiration of the statute of limitations has occurred at the request of a party or ex officio, by means of an order or judgment, the judge of instance or cassation is prohibited from considering other procedural aspects to pronounce a judgment on the merits; and, c) The type of appeal that is proposed is determined solely by the claim that moves the plaintiff to bring the action: if this is to directly defend a subjective right that has been violated or to enforce administrative silence, the appeal will necessarily be of a subjective nature, and it is up to the Court to so indicate, without considering the qualification given to it by the proponent. (...)" (emphasis out of text). FOURTH. From the review of the factual and legal grounds of the action, it is clear that the plaintiff seeks the enforcement of the administrative silence, which according to its arguments has occurred, due to the lack of response to a request made on April 14, 2021, in the terms established in the Law, therefore, and as indicated above, the appeal filed by the plaintiff is of a subjective nature, since the claim that moves the plaintiff to file the action is the defense of a subjective right that has been violated or allegedly denied, and this is how the Court qualifies it; FIFTH. Since this Court has established that the appeal filed is of full or subjective jurisdiction, it is necessary to analyze whether the same has been filed within the term established by law, that is, within the ninety-day term established in Article 306, No. 1 of the COGEP. SIXTH. The Contentious Administrative Chamber of the Supreme Court of Justice held that: "the starting date for the computation of the

terms, for the purpose of determining the expiration of the right of action, in the cases in which the administrative party seeks to execute the presumed administrative act derived from the administrative silence, is the date of the expiration of the right of action.

with positive effects, would be, as a general rule, the day following the date on which the presumed administrative act whose enforcement is sought in court would have occurred", [Gaceta Judicial. Year CVIII. Series XVIII, No. 3. Page 1104. Quito, January 31, 2007], criterion with which this judicial body agrees. SEVENTH. The plaintiff states as a pretension in its claim, that this organ of administration of justice, declare that the positive administrative silence has operated in its favor due to the lack of answer by the authorities of the Ministry of Environment, regarding a petition formulated on April 14, 2021, as it declares under oath that this petition has not been answered, pointing out that since that date, more than thirty days have elapsed, as established in the Administrative Organic Code COA, without having received any answer from the defendant; in this case, the Court reaches the conclusion that the presumed administrative act, which is intended to be executed, was born from the administrative silence that comes from the petition made on April 14, 2021, before which this judicial body, considers that the presumed administrative act that is intended to be executed, would have been produced on May 28, 2021, date that is reached, after counting the term of thirty days, as established in article 207 of the Administrative Organic Code, so from there, the term would run for the subjective appeal or full jurisdiction in this jurisdiction to be deducted. EIGHTH. In the present case, the claim, proposed by the plaintiff, has been filed on May 24, 2023, according to the reason for the drawing of lots, which undoubtedly demonstrates that the action has been filed outside the time allowed by law, since article 306 number 1 of the COGEP, establishes with meridian clarity, that for the cases in which a subjective or full jurisdiction action is filed, the term to propose the lawsuit will be ninety days, counted from the day following the date on which the challenged act was notified; therefore, it is evident that the claim has been deducted extemporaneously, having operated the expiration of the action, since it has been deducted outside the term of ninety days allowed by law; by virtue, that the National Court of Justice, established in Mandatory Jurisprudential Precedent, that the execution of administrative silence, corresponds to the appeal of subjective character, according to article 1 literal c) of Resolution No. 13-2015, which was indicated in previous lines; in that order, the term to sue actions of execution by administrative silence, is ninety days. We must not forget that according to the third paragraph of article 28 of the Organic Code of the Judicial Function, the jurisprudence serves to interpret, integrate and delimit the field of application of the legal system, as well as to make up for the absence or insufficiency of the provisions that regulate the matter; following the guidelines of the obligatory jurisprudential precedent that is examined in paragraphs a) and

b) of Article 1 of Resolution No. 13-2015. 13-2015, the Judges of the District Courts of Contentious Administrative Matters, by means of a definitive order, will not admit the claim for processing, when they verify that the expiration of the exercise of the right to file the action in contentious administrative proceedings has occurred and that once it has occurred, the Court is forbidden to enter into consideration of the merits or merits of the case; Therefore, this judicial body considers that since the expiration of the time to exercise an action or power, which can be declared ex officio; and, by virtue of the fact that the right of the plaintiff to file his claim has expired in excess, the claim is inadmissible and the case will be filed. The attached documentation is to be attached and a copy of this order is to be included in the file, and the Clerk-Rapporteur of this Court is to send a copy of this order to the defendant administrative authority. -NOTIFY and COMPLY. -

## 24/05/2023 16:11 MINUTES OF DRAWING OF LOTS

Received in the city of Guayaquil today, Wednesday, May 24, 2023 at 4:11 p.m., the administrative contentious process, Type of proceeding: Execution, Subject: Execution by administrative silence, followed by: Produmar S.A, against: Ministerio del Ambiente, Agua y Transición Ecológica - NULL, PROCURADURIA GENERAL DEL ESTADO By lot of law the competence lies in: DISTRICT COURT OF THE ADMINISTRATIVE CONTENTIOUS WITH SEAT IN CANTON

GUAYAQUIL, PROVINCIA DEL GUAYAS, conformed by the Judges: Attorney Sanchez Romero Kelvin Petronio (Speaker), Rivas Calderon Clemente Eduardo, Abg Jaramillo Montesinos Juan Carlos Secretary Macias Naranjo Tannia Azucena Process number 09802-2023-00757 (1) First Instance To which the following documents are attached:

1) INITIAL REQUEST (ORIGINAL)

2) ADJ. 55 FJS (FOLIED BY USER) BETWEEN CERTIFICATES/COMPULSES, SIMPLE AND ORIGINALS (ORIGINAL) Total of page: 4 OSCAR DAVID DUQUE MORENO Drawing Manager

24/05/2023 16:11 TRIAL COVER SHEET

CARATULA


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

FUNCIÓN JUDICIAL

# REPUBLIC OF ECUADOR

www.funcionjudicial.gob.ec

## SPECIALIZED ADMINISTRATIVE CONTENTIOUS CHAMBER OF THE NATIONAL COURT OF JUSTICE

| | |
|---|---|
| No. process: | 09802202300757 |
| Entry no: | 1 |
| Type of subject matter: | ADMINISTRATIVE CONTINGENCIES |
| Type of action/procedure: | ENFORCEMENT |
| Type of case/offense: | ENFORCEMENT BY ADMINISTRATIVE SILENCE |
| Actor(s)/Offendant(s): | Produmar S.a. |
| Defendant(s)/ Prosecuted(s) : | Ministry of Environment, Water and Ecological Transition, State Attorney General's Office |

### 08/05/2024 17:30 WRITTEN

Written, FaithPresentation

### 17/04/2024 16:27 MINUTES OF THE DRAWING OF LOTS

Received in the city of Quito today, Tuesday, November 7, 2023, at 10:49 a.m., in process No. 09802-2023-00757.

(1) First Instance of Contentious Administrative Matters, Type of proceeding: Execution by Administrative Silence, proposed by Produmar S.A. against: Procuraduria General de Estado -, Ministerio de Ambiente, Agua y Transición Ecológica -: Procuraduria General del Estado -, Ministerio del Ambiente, Agua y Transición Ecológica -. Appeal(s):

1. Appeal filed by Produmar S.A.. By lot of law, the competence is placed in the SPECIALIZED ADMINISTRATIVE CONTENTION CHAMBER OF THE NATIONAL COURT OF JUSTICE conformed by Doctor Espinosa Brito Mauricio Bayardo, Secretary: Dr. Nadia Fernanda Armijos Cárdenas. Process number: 09802-2023-00757 (1) National Court To which the following documents are attached:

1) INITIAL REQUEST (ORIGINAL)

2) GUAYAS - TOTAL 1 BODY (ORIGINAL) Total pages: 84 Observations:

File comes from GUAYAS in 1 body.

- 1 sheet without foliation at the end

TOTY ARACELY LEMA JARAMILLOANALYST

### 17/04/2024 16:27 MINUTES OF THE DRAWING OF LOTS

Pursuant to the provisions of Resolution No. 05-2024, issued by the Plenary of the National Court of Justice, in the city of QUITO today, Wednesday, April 17, 2024, at 12:55 PM, the drawing of lots in process No. 09802-2023-00757 is made.

(1) National Court, subject matter: Contentious-Administrative, type of proceeding: Execution, case: Execution by Administrative Silence. Appeal: CASATION. The competence to continue with the knowledge of the process lies in the SPECIALIZED ADMINISTRATIVE CONTENTION CHAMBER OF THE NATIONAL COURT OF JUSTICE at the

Judge: DOCTOR VELASTEGUI AYALA XIMENA DEL ROCIO.

Secretary: DRA. IVONNE MARLENE GUAMANI LEON.

## 07/11/2023 10:49 MINUTES OF DRAWING OF LOTS

Received in the city of Quito today, Tuesday, November 7, 2023, at 10:49 a.m., in process No. 09802-2023-00757.

(1) First Instance of Contentious Administrative Matters, Type of proceeding: Execution by Administrative Silence, proposed by Produmar S.A. against: Procuraduria General de Estado -, Ministerio de Ambiente, Agua y Transición Ecológica -: Procuraduria General del Estado -, Ministerio del Ambiente, Agua y Transición Ecológica -. Appeal(s):

1. Appeal filed by Produmar S.A.. By lot of law, the competence is placed in the SPECIALIZED ADMINISTRATIVE CONTENTION CHAMBER OF THE NATIONAL COURT OF JUSTICE conformed by Doctor Espinosa Brito Mauricio Bayardo, Secretary: Dr. Nadia Fernanda Armijos Cárdenas. Process number: 09802-2023-00757 (1) National Court To which the following documents are attached:

1) INITIAL REQUEST (ORIGINAL)

2) GUAYAS - TOTAL 1 BODY (ORIGINAL) Total pages: 84 Observations:

File comes from GUAYAS in 1 body.

- 1 sheet without foliation at the end

TOTY ARACELY LEMA JARAMILLOANALYST

## 07/11/2023 10:49 MINUTES OF DRAWING OF LOTS

Pursuant to the provisions of Resolution No. 05-2024, issued by the Plenary of the National Court of Justice, in the city of QUITO today, Wednesday, April 17, 2024, at 12:55 PM, the drawing of lots in process No. 09802-2023-00757 is made.

(1) National Court, subject matter: Contentious-Administrative, type of proceeding: Execution, case: Execution by Administrative Silence. Appeal: CASATION. The competence to continue with the knowledge of the process lies in the SPECIALIZED ADMINISTRATIVE CONTENTION CHAMBER OF THE NATIONAL COURT OF JUSTICE at the

Judge: DOCTOR VELASTEGUI AYALA XIMENA DEL ROCIO.

Secretary: DRA. IVONNE MARLENE GUAMANI LEON.

FUNCIÓN JUDICIAL

# REPÚBLICA DEL ECUADOR

www.funcionjudicial.gob.ec

## TRIBUNAL DISTRITAL DE LO CONTENCIOSO ADMINISTRATIVO CON SEDE EN EL CANTÓN GUAYAQUIL, PROVINCIA DEL GUAYAS

| | |
|---|---|
| **No. proceso:** | 09802202300757 |
| **No. de ingreso:** | 1 |
| **Tipo de materia:** | CONTENCIOSO ADMINISTRATIVO |
| **Tipo acción/procedimiento:** | EJECUCIÓN |
| **Tipo asunto/delito:** | EJECUCIÓN POR SILENCIO ADMINISTRATIVO |
| **Actor(es)/Ofendido(s):** | Produmar S.a. |
| **Demandado(s)/ Procesado(s):** | Ministerio Del Ambiente, Agua Y Transición Ecológica, Procuraduria General Del Estado |

### 13/12/2023 11:07 RAZON (RAZON)

Se deja constancia, que el presenet proceso se remitió a la Corte Nacional mediante Oficio No. 277-TDCAG-23-09802-2023-00757, habiéndo dicho organo de justicia recibido y sorteado el mismo, tal como consta en el sistema con fecha martes 7 de noviembre de 2023, a las 10:49.

### 30/10/2023 16:36 OFICIO (OFICIO)

Guayaquil, 30 de octubre de 2023 Oficio No. 277- TDCAG-23-09802-2023-00757 Señores SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA De mi consideración: Por disposición de los señores Jueces de este Tribunal Distrital, al haber admitido RECURSO DE CASACIÓN, envío a usted el original del juicio que detallo, para la Corte Nacional, siendo este: JUICIO: Contencioso Administrativo No. 09802-2023-00757 ACTOR: PRODUMAR S.A. DEMANDADO MINISTERIO DEL AMBIENTE, AGUA Y TRANSICIÓN ECOLOGICA CUERPO: 1 (UNO) CUERPO EN 84 FOJAS. Lo que comunico a usted para los fines de Ley. Ab. TANNIA MACIAS NARANJO SECRETARIA RELATORA

### 18/10/2023 15:54 ESCRITO

Escrito, FePresentacion

### 31/08/2023 09:34 CALIFICACION DE RECURSO DE CASACION (RAZON DE NOTIFICACION)

En Guayaquil, jueves treinta y uno de agosto del dos mil veinte y tres, a partir de las nueve horas y treinta y cuatro minutos, mediante boletas judiciales notifiqué el AUTO DE INTERLOCUTORIO que antecede a: PRODUMAR S.A. en el casillero No.269, en el casillero electrónico No.0917244824 correo electrónico nicolascastroq@castrobenites.com. del Dr./ Ab. NICOLAS ALEJANDRO CASTRO QUIROZ; No se notifica a: MINISTERIO DEL AMBIENTE, AGUA Y TRANSICIÓN ECOLÓGICA, PROCURADURIA GENERAL DEL ESTADO, por no haber señalado casillero electrónico. Certifico:MACIAS NARANJO TANNIA AZUCENA SECRETARIO (E)

### 28/08/2023 10:26 CALIFICACION DE RECURSO DE CASACION (AUTO INTERLOCUTORIO)

En atención al escrito de 17 de julio de 2023, las 16h57 presentado por la parte accionante, el cual contiene Recurso de Casación

al auto interlocutorio de martes 6 de junio del 2023, a las 10h34, se dispone: PRIMERO.- El auto dictado en la presente causa es de aquellos contra los cuales procede el Recurso de Casación, tal como así lo establece el Art. 266 del Código Orgánico General de Procesos, al haber puesto fin al proceso de conocimiento. SEGUNDO: El recurso formulado ha sido presentado dentro del término que para ese efecto establece el inciso final del referido artículo, siendo éste el de treinta días, posteriores a la ejecutoria del auto o sentencia o del auto que niegue o acepte su ampliación o aclaración. TERCERO: El escrito que contiene el Recurso de Casación interpuesto por el señor, AB. NICOLÁS ALEJANDRO CASTRO QUIROZ, Procurador Judicial de la Compañía PRODUMAR S.A., parte actora, satisface las exigencias de rigor que establece el Art. 267 del código ibídem y sin otras consideraciones, se lo admite, disponiendo que se remita el expediente a la Sala Especializada de lo Contencioso Administrativo de la Corte Nacional de Justicia. Téngase en cuenta los domicilios que señalan para recibir notificaciones en la ciudad de Quito.- Notifíquese.-

## 14/08/2023 12:13 ESCRITO

Escrito, FePresentacion

## 17/07/2023 16:57 ESCRITO

Escrito, FePresentacion

## 26/06/2023 11:25 RECHAZAR REVOCATORIA Y/O REFORMA (RAZON DE NOTIFICACION)

En Guayaquil, lunes veinte y seis de junio del dos mil veinte y tres, a partir de las once horas y veinte y cinco minutos, mediante boletas judiciales notifiqué el AUTO DE INTERLOCUTORIO que antecede a: PRODUMAR S.A. en el casillero No.269, en el casillero electrónico No.0917244824 correo electrónico nicolascastroq@castrobenites.com. del Dr./Ab. NICOLAS ALEJANDRO CASTRO QUIROZ; No se notifica a: MINISTERIO DEL AMBIENTE, AGUA Y TRANSICIÓN ECOLÓGICA, PROCURADURIA GENERAL DEL ESTADO, por no haber señalado casillero electrónico. Certifico:MACIAS NARANJO TANNIA AZUCENA SECRETARIO (E)

## 26/06/2023 09:20 RECHAZAR REVOCATORIA Y/O REFORMA (AUTO INTERLOCUTORIO)

Agréguese a los autos escritos de la parte actora de 12 y 13 de junio de 2023, mediante los cuales solicita revocatoria al auto dictado el martes 6 de junio del 2023, a las 10h34, en lo principal éste Tribunal considera: 1.- El inciso tercero del Art. 88, del Código Orgánico General de Procesos, define al auto interlocutorio como: " El auto interlocutorio es la providencia que resuelve cuestiones procesales que, no siendo materia de la sentencia, pueden afectar los derechos de las partes o la validez del procedimiento "; 2. El segundo inciso del articulo 250 del COGEP determina: " ...La aclaración, ampliación, revocatoria y reforma serán admisibles en todos los casos , con las limitaciones que sobre la impugnación de las sentencias y autos prevé esta Ley. (...)". (el énfasis es del Tribunal) 3. En ese orden, el primer inciso del artículo 254 del COGEP dispone: "Revocatoria y reforma.- Por la revocatoria la parte pretende que el mismo órgano jurisdiccional que pronunció un auto de sustanciación lo deje sin efecto y dicte otro en sustitución", (el resaltado es fuera de texto); en esa línea, el auto que declaró el archivo de la causa por caducidad, es un auto interlocutorio en los términos establecidos en el artículo 81 del COGEP; por tanto, no es susceptible de recurso de revocatoria ya que la norma adjetiva ha considerado este tipo de recurso para los autos de sustanciación, lo que no sucede en la especie; en ese contexto, el pedido de revocatoria que requiere el accionante al auto interlocutorio que declaró el archivo de la causa, es improcedente, en virtud de aquello se lo niega.- Notifíquese.-

## 13/06/2023 14:00 ESCRITO

Escrito, FePresentacion

## 12/06/2023 13:55 ESCRITO

Escrito, FePresentacion

## 08/06/2023 15:17 INADMITIR DEMANDA Y/O SOLICITUD (RAZON DE NOTIFICACION)

En Guayaquil, jueves ocho de junio del dos mil veinte y tres, a partir de las quince horas y diecisiete minutos, mediante boletas judiciales notifiqué el AUTO DE INTERLOCUTORIO que antecede a: PRODUMAR S.A. en el casillero No.269, en el casillero electrónico No.0917244824 correo electrónico nicolascastroq@castrobenites.com. del Dr./Ab. NICOLAS ALEJANDRO CASTRO QUIROZ; No se notifica a: MINISTERIO DEL AMBIENTE, AGUA Y TRANSICIÓN ECOLÓGICA, PROCURADURIA GENERAL DEL ESTADO, por no haber señalado casillero electrónico. Certifico:MACIAS NARANJO TANNIA AZUCENA SECRETARIO (E)

## 06/06/2023 10:34 INADMITIR DEMANDA Y/O SOLICITUD (AUTO INTERLOCUTORIO)

VISTOS.- AUTO INTERLOCUTORIO.- Integran la Sala en calidad de Jueces Titulares los Doctores Kelvin Sánchez Romero (juez ponente), Clemente Eduardo Rivas Calderón y Juan Carlos Jaramillo Montesinos, avocan conocimiento de la presente causa puesta a nuestro despacho en esta fecha y proveen: En lo principal; el Abg. NICOLAS ALEJANDRO CASTRO QUIROZ, por los derechos que representa de la compañía PRODUMAR S.A. como Apoderado y Procurador Judicial, conforme lo justifica con el documento que adjunta, comparece ante éste Tribunal, para deducir una demanda POR SILENCIO ADMINISTRATIVO, en contra del MINISTERIO DEL AMBIENTE, AGUA Y TRANSICION ECOLOGICA y Procurador General del Estado, señalando en lo principal de su libelo lo siguiente: "IV.II.· Con fecha 14 de abril de 2021, Produmar S.A. presentó un escrito ante el Ministerio del Ambiente solicitando que de conformidad con el Artículo 133 del Código Orgánico Administrativo, se rectifique la Resolución del 31 de marzo de 2021 antes aludida, toda vez que en la tramitación del expediente quedó claro que el aprovechamiento del agua en la actividad acuícola de Produmar S. A. genera un uso NO CONSUNTIVO del recurso hídrico (no se consume el agua) y, en tal virtud, de conformidad con el Artículo 108 de la 1Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua, no se debe causar el pago de las tarifas establecidas en la Ley, por lo que se solicitó rectificar la Resolución en el sentido de que el pago de la tarifa a la que se refieren los #4 y 5 de la mencionada Resolución por el uso productivo del agua para la actividad acuícola de Produmar S.A. únicamente procederá cuando tal uso sea consuntivo como expresamente lo determina la Ley y el uso, en este caso, es no consuntivo. (ANEXO 2). Este pedido formulado a la administración pública hace más de 2 años hasta la fecha sigue sin ser atendido, habiendo operado el silencio administrativo positivo (...) IV.VI.- Mediante escrito del 25 de enero de 2023 (ANEXO 8), Produmar S.A. le hizo saber al Ministerio de Ambiente que ha operado el silencio administrativo positivo respecto del pedido de rectificación de la Resolución (ANEXO 1), solicitándose que se informe el particular a la EPA para que se abstenga de seguir cobrando a Produmar S. A. valores que legalmente no está obligada a pagar, escrito respecto del cual, hasta la fecha, tampoco hemos recibido contestación alguna por parte del Ministerio de Ambiente. IV.VII.- A la EPA también se le hizo conocer que ha operado el silencio administrativo positivo mediante comunicación presentada el 14 de febrero de 2023 (ANEXO 9), respecto de la cual en Oficio No. EPA-GCOM-2023-00021-0 del 17 de febrero de 2023 (ANEXO 10) la EPA señaló que "PRODUMAR S. A., deberá interponer sus buenos oficios y realizar la solicitud formal ante el Ministerio del Ambiente, Agua y Transición Ecológica como ente rector". IV.VIII.- En resumen: •La autoridad pública, Ministerio de Ambiente, expide una Resolución (ANEXO 1) administrativa; •El administrado (Produmar S.A.) solicita conforme a la Ley que dicha Resolución sea rectificada porque es lo que legalmente corresponde; •El Ministerio de Ambiente no contesta absolutamente nada; •Se produce el silencio administrativo positivo; y, Durante todo ese tiempo (más de 2 años) desde que se solicitó la rectificación de la Resolución hasta la fecha, la empresa pública ejecutora, escudada en una disposición del ente público "mudo", ha estado de forma ilegal compeliendo al administrado a que le pague valores que no se encuentra obligado a pagar (..) VII DECLARACIÓN BAJO JURAMENTO De conformidad con los Artículos 207 del Código Orgánico Administrativo y 370 A del COGEP, declaro bajo juramento que Produmar S.A. no ha sido notificada por el Ministerio de Ambiente, Agua y Transición Ecológica con resolución expresa dentro del término legal, respecto del pedido de rectificación de la Resolución de fecha 31 de marzo de 2021, las 09h40, emitida dentro del Expediente No. 1373-2016, petitorio que se le formuló a dicha Cartera de Estado con escrito presentado el 14 de abril de 2021. VIII PRETENSIÓN En base a lo expuesto, habiendo operado el silencio administrativo positivo a favor de PRODUMAR S.A. y en consideración a que la entidad accionada y terceros involucrados (EPA) no han reconocido este hecho claro y palpable, solicito que se ejecute el acto administrativo presunto y mediante MANDAMIENTO DE EJECUCIÓN se determine y ordene: VIII.I.· Que el acto administrativo presunto que ha surgido a consecuencia del silencio de la entidad demandada ha nacido a la vida jurídica, no incurre en ninguna causal de nulidad, es un acto legítimo, lícito, apegado a la ley y, por ende, ejecutable. VIII.II.· Que, en


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved

consecuencia, la Resolución del Ministerio de Ambiente (ANEXO 1) de fecha 31 de marzo de 2021, las 09h40, dictada dentro del Expediente No. 1373-2016 en la que se concedió a Produmar S. A. la autorización de aprovechamiento de las aguas superficiales del río Taura, ha quedado rectificada en el sentido de que no le corresponde a Produmar S.A. pagar tarifa o valor alguno, pasado, presente o futuro por el aprovechamiento del agua para su actividad acuícola por tratarse de un uso NO CONSUNTIVO, acorde con el Artículo 108 de la Ley Orgánica de Recursos Hídricos, Usos y Aprovechamiento del Agua. Vlll.lll.· Que el Ministerio de Ambiente, Agua y Transición Ecológica proceda a incorporar el mandamiento de ejecución que expida el tribunal en el Expediente Administrativo No. 1373-2016 y que informe sobre el mismo a la Empresa Pública del Agua (EPA) y a cualquier otra entidad relacionada para que se abstengan de realizar acciones de cobro de tarifas en relación a la Resolución que por silencio administrativo positivo ha quedado rectificada en el sentido referido en el número anterior.(…)" (el resaltado es del Tribunal). En esa línea, examinado detenidamente el libelo, por parte de éste Tribunal, se procede a determinar si la misma ha sido presentada dentro del término establecido por la legislación procesal, y para hacerlo se considera: PRIMERO.- El artículo 306 del Código Orgánico General de Procesos, establece: "(.) Oportunidad para presentar la demanda. Para el ejercicio de las acciones contencioso tributarias y contencioso administrativas se observará lo siguiente: 1. En los casos en que se interponga una acción subjetiva o de plena jurisdicción, el término para proponer la demanda será de noventa días, contados a partir del día siguiente a la fecha en que se notificó el acto impugnado.2. En los casos de acción objetiva o de anulación por exceso de poder, el plazo para proponer la demanda será de tres años, a partir del día siguiente a la fecha de expedición del acto impugnado (…)"; SEGUNDO. - El artículo 326 del Código Orgánico General de Procesos, en sus numerales 1 y 2 dispone: "(...) Acciones en el procedimiento contencioso administrativo. Se tramitarán en procedimiento contencioso administrativo las siguientes acciones; 1. La de plena jurisdicción o subjetiva que ampara un derecho subjetivo de la o del accionante, presuntamente negado, desconocido o no reconocido total o parcialmente por hechos o actos administrativos que produzcan efectos jurídicos directos. Procede también esta acción contra actos normativos que lesionen derechos subjetivos. 2. La de anulación objetiva o por exceso de poder que tutela el cumplimiento de la norma jurídica objetiva, de carácter administrativo y puede proponerse por quien tenga interés directo para deducir la acción, solicitando la nulidad del acto impugnado por adolecer de un vicio legal (...)"; TERCERO.- La Corte Nacional de Justicia en el Precedente Jurisprudencial Obligatorio, contenido en la Resolución Nro. 13-2015, publicado en el Registro Oficial Suplemento 621, de 5 de Noviembre del 2015, resolución que en su parte pertinente expresa lo siguiente: "(…) RESUELVE Artículo 1.- Confirmar el criterio expuesto por la Sala Especializada de lo Contencioso Administrativo de la Corte Nacional de Justicia y aprobar el informe expedido por el Presidente de la Sala Especializada de lo Contencioso Administrativo de la Corte Nacional de Justicia; en consecuencia, dado que la caducidad es una figura propia del Derecho Público que opera ipso jure, por el transcurso del tiempo para ejercer una acción o una potestad, es declarable de oficio y se refiere a la extinción del derecho para iniciar un proceso; declara la existencia del siguiente precedente jurisprudencial obligatorio por la triple reiteración de fallos sobre un mismo punto de derecho, en el siguiente sentido: a) Los jueces de los tribunales distritales de lo contencioso administrativo, mediante auto definitivo inadmitirán a trámite la demanda, cuando verifiquen que se produjo la caducidad del ejercicio del derecho para presentar la demanda en la vía contencioso administrativa. Este auto es susceptible de recurso de casación; b) Operada la caducidad a petición de parte o de oficio, mediante auto o sentencia, al juzgador de instancia o casación le está vedado entrar a considerar otros aspectos procesales para pronunciar sentencia de fondo o mérito; y, c) La clase de recurso que se propone se determina únicamente por la pretensión que mueve al accionante para promover la acción: si ésta es la de defender directamente un derecho subjetivo violado o ejecutar el silencio administrativo, el recurso necesariamente será de carácter subjetivo, y corresponde al Tribunal así señalarlo, sin considerar la calificación que al mismo haya dado el proponente. (…)" (el énfasis fuera de texto). CUARTO.- De la revisión de los fundamentos de hecho y derecho de la acción, queda claro, que la parte actora busca la ejecución del silencio administrativo, que según sus argumentos se ha producido, por la falta de contestación a una petición realizada el 14 de abril del 2021, en los términos establecidos en la Ley, por lo tanto y tal como se indicó en líneas anteriores, el recurso deducido por el actor, es de carácter subjetivo, ya que la pretensión que mueve al accionante, para proponer la acción, es la defensa de un derecho subjetivo violado o presuntamente negado y así lo califica el Tribunal; QUINTO. Al haberse establecido por éste Tribunal, que el recurso deducido, es de plena jurisdicción o subjetivo, corresponde analizar si el mismo ha sido deducido dentro del término que establece la ley, esto es dentro del término de noventa días que establece el artículo 306, núm. 1 del COGEP. SEXTO. La Sala de lo Contencioso Administrativo de la Corte Suprema de Justicia, sostenía que: "la fecha de inicio para el cómputo de los términos, a efectos de determinarla caducidad del derecho de acción, en los casos en que el administrado busca ejecutar el acto administrativo presunto derivado del silencio administrativo

con efectos positivos, sería, por regla general, el día siguiente a la fecha en que se habría producido el acto administrativo presunto cuya ejecución se busca en sede judicial", [Gaceta Judicial. Año CVIII. Serie XVIII, No. 3. Página 1104. Quito, 31 de enero de 2007], criterio con el cual éste órgano judicial concuerda. SEPTIMO. La parte actora señala como pretensión en su demanda, que éste órgano de administración de justicia, declare que ha operado su favor el silencio administrativo positivo ante la falta de contestación por parte de las autoridades del Ministerio del Ambiente, respecto a una petición formulada el 14 de abril del 2021, tal como lo declara bajo juramento que ésta petición no ha sido contestada, señalando que a partir de cuya fecha, han transcurrido más de treinta días, conforme lo establece el Código Orgánico Administrativo COA, sin que haya recibido contestación alguna por parte de la accionada; en la especie, el Tribunal llega a la conclusión, que el acto administrativo presunto, que se pretende ejecutar, nació del silencio administrativo que proviene de la petición realizada con fecha 14 de abril del 2021, ante aquello éste órgano judicial, considera que al acto administrativo presunto que se pretende ejecutar, se habría producido el día 28 de mayo del 2021, fecha a la que se llega, luego de contabilizar el término de treinta días, que establece el artículo 207 del Código Orgánico Administrativo, por lo que desde allí, correría el término para que se deduzca el recurso subjetivo o de plena jurisdicción en esta jurisdicción. OCTAVO. En el presente caso, la demanda, propuesta por la actora, ha sido presentada el día 24 de mayo del 2023, conforme se desprende de la razón de sorteo, lo que indudablemente se demuestra, que la acción ha sido presentada fuera del tiempo que permite la ley, ya que el artículo 306 número 1 del COGEP, establece con claridad meridiana, que para los casos en que se interponga una acción subjetiva o de plena jurisdicción, el término para proponer la demanda será de noventa días, contados a partir del día siguiente a la fecha en que se notificó el acto impugnado; por lo tanto, es evidente que la demanda ha sido deducida en forma extemporánea, habiendo operado la caducidad de la acción, puesto que ha sido deducida fuera del termino de los noventa días que permite la ley; en virtud, que la Corte Nacional de Justicia, estableció en Precedente Jurisprudencial Obligatorio, que la ejecución del silencio administrativo, corresponde al recurso de carácter subjetivo, conforme el artículo 1 literal c) de la Resolución Nro. 13-2015, que se indicó en líneas anteriores; en ese orden, el término para demandar acciones de ejecución por silencio administrativo, es de noventa días. No debemos olvidar que según el inciso tercero del artículo 28 del Código Orgánico de la Función Judicial, la jurisprudencia sirve para interpretar, integrar y delimitar el campo de aplicación del ordenamiento legal, así como para suplir la ausencia o insuficiencia de las disposiciones que regulan la materia; siguiendo los lineamientos del precedente jurisprudencial obligatorio que se examina en los literales a) y b) de artículo 1 de la Resolución No. 13-2015, los Jueces de los Tribunales Distritales de lo Contencioso Administrativo, mediante auto definitivo inadmitirán a trámite la demanda, cuando verifiquen que se produjo la caducidad del ejercicio del derecho para presentar la acción en vía contenciosa administrativa y que operada la misma, el Tribunal, está vedado de entrar a considerar el asunto de fondo o de mérito; por lo que, éste órgano judicial, considera que al ser la caducidad una figura propia del Derecho Público, que opera ipso jure, por el transcurso del tiempo para ejercer una acción o potestad, que es declarable de oficio; y, en virtud de haber caducado en exceso el derecho que tenían el accionante para presentar su demanda, inadmite la misma y dispone su archivo. Desglósese la documentación que se anexa dejando constancia en el expediente copia de este auto, disponiendo que la Secretaria Relatora de éste Tribunal, remita mediante oficio copia de este auto, a la autoridad administrativa demandada. -NOTIFIQUESE y CÚMPLASE. -

## 24/05/2023 16:11 ACTA DE SORTEO

Recibido en la ciudad de Guayaquil el día de hoy miércoles 24 de mayo de 2023 a las 16:11 horas, el proceso Contencioso administrativo, Tipo de procedimiento: Ejecución, Asunto: Ejecución por silencio administrativo, seguido por: Produmar S.A, en contra de: Ministerio del Ambiente, Agua y Transición Ecológica - NULL, PROCURADURIA GENERAL DEL ESTADO Por sorteo de ley la competencia se radica en: TRIBUNAL DISTRITAL DE LO CONTENCIOSO ADMINISTRATIVO CON SEDE EN EL CANTÓN GUAYAQUIL, PROVINCIA DEL GUAYAS, conformado por los/ las Jueces/ Juezas: Abogado Sanchez Romero Kelvin Petronio (Ponente), Rivas Calderon Clemente Eduardo, Abg Jaramillo Montesinos Juan Carlos Secretaria(o) Macias Naranjo Tannia Azucena Proceso número 09802-2023-00757 (1) Primera Instancia Al que se adjunta los siguientes documentos:

1) PETICIÓN INICIAL (ORIGINAL)

2) ADJ. 55 FJS (FOLIADO POR EL USUARIO) ENTRE CERTIFICADAS/ COMPULSA, SIMPLES Y ORIGINALES (ORIGINAL) Total de fojas: 4 OSCAR DAVID DUQUE MORENO Responsable de sorteo

## 24/05/2023 16:11 CARATULA DE JUICIO

CARATULA

FUNCIÓN JUDICIAL

# REPÚBLICA DEL ECUADOR

www.funcionjudicial.gob.ec

## SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA

| | |
|---|---|
| **No. proceso:** | 09802202300757 |
| **No. de ingreso:** | 1 |
| **Tipo de materia:** | CONTENCIOSO ADMINISTRATIVO |
| **Tipo acción/procedimiento:** | EJECUCIÓN |
| **Tipo asunto/delito:** | EJECUCIÓN POR SILENCIO ADMINISTRATIVO |
| **Actor(es)/Ofendido(s):** | Produmar S.a. |
| **Demandado(s)/ Procesado(s):** | Ministerio Del Ambiente, Agua Y Transición Ecológica, Procuraduria General Del Estado |

### 08/05/2024 17:30 ESCRITO

Escrito, FePresentacion

### 17/04/2024 16:27 ACTA DE SORTEO

Recibido en la ciudad de Quito el día de hoy, martes 7 de noviembre de 2023, a las 10:49, en el proceso No. 09802-2023-00757 (1) Primera Instancia de materia Contencioso administrativo, Tipo de procedimiento: Ejecución por Asunto: Ejecución por silencio administrativo, propuesto por Produmar S.A. en contra de: Procuraduria General del Estado -, Ministerio del Ambiente, Agua y Transición Ecológica -. Por recurso(s):

1. Casación interpuesto por Produmar S.A.. Por sorteo de ley, la competencia se radica en la SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA conformado por Doctor Espinosa Brito Mauricio Bayardo, Secretaria(o): Dra. Nadia Fernanda Armijos Cárdenas. Proceso número: 09802-2023-00757 (1) Corte Nacional Al que se adjunta los siguientes documentos:

1) PETICIÓN INICIAL (ORIGINAL)

2) GUAYAS.- TOTAL 1 CUERPO (ORIGINAL) Total de fojas: 84 Observaciones:

Expediente viene de GUAYAS en 1 cuerpo.

- 1 foja sin foliatura al final

TOTY ARACELY LEMA JARAMILLOANALISTA

### 17/04/2024 16:27 ACTA DE SORTEO

En virtud de lo dispuesto en la Resolución No. 05-2024, emitida por el Pleno de la Corte Nacional de Justicia, en la ciudad de QUITO el día de hoy, miércoles 17 de abril de 2024, a las 12:55 PM, se realiza el sorteo de ley del proceso No. 09802-2023-00757 (1) Corte Nacional, materia: Contencioso Administrativo, tipo de procedimiento: Ejecución, asunto: Ejecución Por Silencio Administrativo. Por recurso: CASACIÓN. La competencia para continuar con el conocimiento del proceso se radica en la SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA en la/el

Conjuez(a):DOCTOR VELASTEGUI AYALA XIMENA DEL ROCIO.

Secretaria(o): DRA. IVONNE MARLENE GUAMANI LEON.

## 07/11/2023 10:49 ACTA DE SORTEO

Recibido en la ciudad de Quito el día de hoy, martes 7 de noviembre de 2023, a las 10:49, en el proceso No. 09802-2023-00757 (1) Primera Instancia de materia Contencioso administrativo, Tipo de procedimiento: Ejecución por Asunto: Ejecución por silencio administrativo, propuesto por Produmar S.A. en contra de: Procuraduria General del Estado -, Ministerio del Ambiente, Agua y Transición Ecológica -. Por recurso(s):

1. Casación interpuesto por Produmar S.A.. Por sorteo de ley, la competencia se radica en la SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA conformado por Doctor Espinosa Brito Mauricio Bayardo, Secretaria(o): Dra. Nadia Fernanda Armijos Cárdenas. Proceso número: 09802-2023-00757 (1) Corte Nacional Al que se adjunta los siguientes documentos:

1) PETICIÓN INICIAL (ORIGINAL)

2) GUAYAS.- TOTAL 1 CUERPO (ORIGINAL) Total de fojas: 84 Observaciones:

Expediente viene de GUAYAS en 1 cuerpo.

- 1 foja sin foliatura al final

TOTY ARACELY LEMA JARAMILLOANALISTA

## 07/11/2023 10:49 ACTA DE SORTEO

En virtud de lo dispuesto en la Resolución No. 05-2024, emitida por el Pleno de la Corte Nacional de Justicia, en la ciudad de QUITO el día de hoy, miércoles 17 de abril de 2024, a las 12:55 PM, se realiza el sorteo de ley del proceso No. 09802-2023-00757 (1) Corte Nacional, materia: Contencioso Administrativo, tipo de procedimiento: Ejecución, asunto: Ejecución Por Silencio Administrativo. Por recurso: CASACIÓN. La competencia para continuar con el conocimiento del proceso se radica en la SALA ESPECIALIZADA DE LO CONTENCIOSO ADMINISTRATIVO DE LA CORTE NACIONAL DE JUSTICIA en la/el

Conjuez(a):DOCTOR VELASTEGUI AYALA XIMENA DEL ROCIO.

Secretaria(o): DRA. IVONNE MARLENE GUAMANI LEON.

PUBLIC VERSION

**2 PAGES**

**NOT SUSCEPTIBLE TO PUBLIC SUMMARIZATION**

**Memorandum**

c) Ecological flow; and,
d) Productive activities.

Water for irrigation that guarantees food sovereignty includes animal watering, aquaculture and other domestic agricultural and livestock food production activities, in accordance with the Regulations of this Law.

**Article 87** - Types and terms of authorizations. The granting, suspension or cancellation of authorizations is the responsibility of the Single Water Authority. Authorizations, according to the nature of their purpose, are classified as follows:

1. Authorizations for water use. It is the administrative act issued by the Single Water Authority by means of which it favorably attends a request submitted by natural or juridical persons for the use of a water flow, destined for human consumption or irrigation that guarantees food sovereignty, including also the watering of animals and aquaculture production activities in the form and under the conditions provided for in this Law.
2. Authorizations for the productive use of water. It is the administrative act issued by the Single Water Authority, by means of which it favorably attends an application submitted by individuals or legal entities for the productive use of a water flow destined for any of the economic uses in the manner and under the conditions provided for in this Law.

Authorizations are classified according to their duration:

a) Authorizations for human consumption: the term will be twenty years renewable for successive equal periods. These authorizations may be modified in relation to demographic and flow variations;
b) Authorization for irrigation, aquaculture and animal watering to guarantee food sovereignty: these will be granted for a term not exceeding ten years, renewable for the same period;
c) Fixed-term authorizations for productive activities not considered in food sovereignty: these shall be granted for a term of up to ten years, renewable for the same or more periods depending on the investment time of the productive activity, provided that it is included in the National Development Plan. The Single Water Authority may, in accordance with water planning and national interest, modify the terms set forth in this article, giving reasons; and,
d) Occasional authorizations granted for a non-renewable period of no more than two years, on surplus or remaining resources.

The aforementioned authorizations shall be regulated in the Regulations to this Law.

**Article 88** - Use. The use of water is understood as its utilization in basic activities indispensable for life, such as human consumption, irrigation, aquaculture and animal watering to guarantee food sovereignty under the terms established in the Law.

**Article 89** - Authorization for use. The use of water as defined in the preceding article shall be subject to the respective authorization granted in accordance with this Law, its Regulations and water planning.

The authorization for the use of water for human consumption and irrigation for food sovereignty, animal watering and aquaculture, confers to the user, exclusively, the capacity for the collection, treatment, conduction and use of the flow to which the authorization refers.

**Article 90** - Conditions for the granting of water use authorizations. Prior to the granting of authorizations for the use of water, the Single Water Authority shall verify compliance with the following conditions:

No imprima este documento a menos que sea absolutamente necesario
LEXIS

respective authorities.

The Single Water Authority shall authorize the occupation of land for the execution of the works referred to in this article as well as the modifications of any easement in accordance with the provisions of this Law.

In addition, it shall authorize the occupation of land for the execution of the works and shall include the determination of special protection strips for public or community aqueducts referred to in this article.

The holder of the aqueduct and related easements shall indemnify the owner of the property for the damages caused by the establishment of the easement.

The owner of the servient estate does not acquire any right over the works carried out within his property. He may use them only for domestic use and animal watering, provided he does not destroy them, cause pollution or affect the rights of third parties. Failure to comply with this rule will be subject to the sanctions regulated by law.

In case of subdivision of the servient estate, the necessary easements for the use of water shall be maintained.

Easements established in favor of State institutions, in addition to being compulsory, shall be preferential.

**Article 99** - Right of the owner of the servient estate. The owner of the servient estate has the right to have the Single Water Authority order the remediation of leaks, spills or any other damage attributed to defects in construction, conservation, operation and preservation.

**Art. 100**.- Prohibited activities. The Single Water Authority and the Decentralized Autonomous Governments, within the scope of their competencies, shall not authorize agricultural activities or constructions and, in general, new works in the lateral spaces of the aqueduct or pipelines of drinking water systems.

Owners of servient estates are prohibited from grazing animals next to the irrigation ditch or open aqueducts that cross their land, or from dumping waste or contaminated water in the water protection zones.

Forestry activities are prohibited in the servient area or in the water protection zones, when the aqueducts are piped or dammed.

**Article 101** - Use of waters flowing through the servient estate. The owner of the servient estate does not acquire any right or authorization whatsoever over the waters flowing through the servient estate, but may use them only for domestic purposes, without diverting them, polluting them or affecting the rights of third parties. Failure to comply with this rule will be sanctioned in accordance with the Law.

**Article 102** - Termination of easements. Easements are extinguished in the following cases:

a) Failure to carry out the works ordered by the competent authority within the established term;
b) Unjustified lack of use for more than one year;
c) Fulfillment of the purpose for which the easement was authorized;
d) Distinct use from authorized use; and,
e) At the end of the term in case of temporary easement.

**Article 103** - Effects of extinction. Once the easement has been declared extinguished, the property affected by it reverts to the ownership and exclusive use of the servient estate.

No imprima este documento a menos que sea absolutamente necesario
LEXIS

Water.

The industries that take water from the drinking water supply networks for productive use will obtain from the decentralized autonomous government the authorization for the connection, which must be registered before the Autoridad Unica del Agua.

Persons engaged in the extraction of salt from seawater for commercial purposes must obtain from the Autoridad Unica del Agua the respective authorization for the productive use of water, and pay the corresponding fee.

The water intended for industrial use, once used, will be discharged by the user, after treatment, complying with the technical parameters dictated by the National Environmental Authority.

Section Three
Aquaculture

**Article 108** - Use of water in aquaculture. Persons engaged in any fish or aquaculture activity, which is not considered included in food sovereignty under the terms regulated in this Law, shall obtain from the corresponding public authority the necessary permits for the exercise of their activity, who prior to granting them shall require from the Single Water Authority the reports regarding the productive use of water, which shall cause the payment of the rates established in this Law, when it is consumptive.

**Article 109** - Prohibition. No authorizations shall be granted for the productive use of water in mangroves. Only those who comply with the regularization process established in the Regulations may obtain and renew such authorization for aquaculture activities.

Section Four
Water Use in Mining

**Article 110** - Authorization for use. Mining activities must have the authorization for the productive use of the waters used, which shall be granted by the Single Water Authority, in accordance with the procedures and requirements established in this Law and its Regulations, for which the order of priority established in the Constitution shall be strictly respected, i.e., human consumption, irrigation that guarantees food sovereignty, ecological flow and productive activities. For this purpose, it shall coordinate with the National Environmental Authority.

Any activity that may affect the quality and quantity of water and the balance of ecosystems, especially in water sources and recharge areas, will be regulated.

The sustainability of ecosystems and human consumption will be a priority in the use and development of water.

Authorization for the use of water for human consumption in camps must also be obtained.

**Article 111** - Protection of water sources. The Single Water Authority and the National Environmental Authority shall issue the necessary regulations to guarantee the conservation and balance of ecosystems, especially water sources and recharge areas.

The National Environmental Authority will coordinate with the Autoridad Unica del Agua, the monitoring of the environmental management system foreseen in the respective environmental license issued by the former.

**Art. 112**.- Return of water. Water intended for mining activities shall be returned to the original watercourse from which it was taken or to the most appropriate watercourse, with the obligation of the user to treat it prior to its discharge and dumping, in accordance with the provisions of the environmental permit and the

No imprima este documento a menos que sea absolutamente necesario

c) Caudal ecológico; y,
d) Actividades productivas.

El agua para riego que garantice la soberanía alimentaria comprende el abrevadero de animales, acuicultura y otras actividades de la producción agropecuaria alimentaria doméstica; de conformidad con el Reglamento de esta Ley.

**Art. 87**.- Tipos y plazos de autorizaciones. El otorgamiento, suspensión o cancelación de las autorizaciones es competencia de la Autoridad Unica del Agua. Las autorizaciones según la naturaleza de su destino se clasifican en:

1. Autorizaciones para uso de agua. Es el acto administrativo expedido por la Autoridad Unica del Agua por medio del cual atiende favorablemente una solicitud presentada por personas naturales o jurídicas, para el uso de un caudal del agua, destinado al consumo humano o riego que garantice la soberanía alimentaria, incluyendo también el abrevadero de animales y actividades de producción acuícola en la forma y condiciones previstas en esta Ley.
2. Autorizaciones para el aprovechamiento productivo del agua. Es el acto administrativo expedido por la Autoridad única del Agua, por medio del cual atiende favorablemente una solicitud presentada por personas naturales o jurídicas para el aprovechamiento productivo de un caudal de agua destinada a cualquiera de los aprovechamientos económicos en la forma y condiciones previstas en esta Ley.

Las autorizaciones por su duración se clasifican en:

a) Autorizaciones para consumo humano: el plazo será de veinte años renovable por períodos sucesivos iguales. Estas autorizaciones podrán modificarse en relación con las variaciones demográficas y de caudales;
b) Autorización para riego, acuicultura y abrevadero de animales para garantizar la soberanía alimentaria: estas se otorgarán por un plazo no mayor de diez años, renovables por igual periodo;
c) Autorizaciones de plazo determinado para actividades productivas no consideradas en la soberanía alimentaria: éstas se otorgarán por un plazo de hasta diez años, renovables por igual o más periodos dependiendo del tiempo de inversión de la actividad productiva, siempre que conste en el Plan Nacional de Desarrollo. La Autoridad Unica del Agua podrá de conformidad con la planificación hídrica e interés nacional, modificar motivadamente los plazos determinados en este artículo; y,
d) Autorizaciones ocasionales otorgadas por un plazo no mayor de dos años no renovables, sobre recursos sobrantes o remanentes.

Las citadas autorizaciones se normarán en el Reglamento a esta Ley.

**Art. 88**.- Uso. Se entiende por uso del agua su utilización en actividades básicas indispensables para la vida, como el consumo humano, el riego, la acuicultura y el abrevadero de animales para garantizar la soberanía alimentaria en los términos establecidos en la Ley.

**Art. 89**.- Autorización de uso. El uso del agua de acuerdo con la definición del artículo anterior contará con la respectiva autorización otorgada de conformidad con esta Ley, su Reglamento y la planificación hídrica.

La autorización para el uso del agua para consumo humano y riego para soberanía alimentaria, abrevadero de animales y acuicultura, confiere al usuario de esta, de manera exclusiva, la capacidad para la captación, tratamiento, conducción y utilización del caudal al que se refiera la autorización.

**Art. 90**.- Condiciones para el otorgamiento de autorizaciones de uso del agua. Previo al otorgamiento de autorizaciones para el uso del agua, la Autoridad Unica del Agua verificará el cumplimiento de las siguientes condiciones:


Filed By: khammer@tradepacificlaw.com, Filed Date: 7/26/24 3:27 PM, Submission Status: Approved
eSilec Profesional - www.lexis.com.ec

No imprima este documento a menos que sea absolutamente necesario

autoridades respectivas.

La Autoridad Unica del Agua autorizará las ocupaciones de terrenos para la ejecución de las obras a que se refiere este artículo así como las modificaciones de cualquier servidumbre de acuerdo con lo establecido en esta Ley.

Además, autorizará las ocupaciones de terrenos para la ejecución de las obras e incluirá la determinación de franjas especiales de protección de acueductos públicos o comunitarios a que se refiere este artículo.

El titular de la servidumbre de acueducto y sus conexas deberá indemnizar al titular del predio en función de los daños que se causen por el establecimiento de la servidumbre.

El titular del predio sirviente no adquiere derecho sobre las obras realizadas dentro de su predio. Podrá utilizarlas únicamente para uso doméstico y abrevadero de animales siempre y cuando no las destruya, cause contaminación o afecte a derechos de terceros. El incumplimiento de esta norma será objeto de las sanciones reguladas por la Ley.

En caso de fraccionamiento del predio sirviente, se mantendrán las servidumbres necesarias para el uso del agua.

Las servidumbres establecidas a favor de las instituciones del Estado además de forzosas, serán preferentes.

**Art. 99**.- Derecho del propietario del predio sirviente. El titular del predio tiene derecho a que la Autoridad Unica del Agua disponga la remediación de las filtraciones, derrames o cualquier otro perjuicio que se impute a defectos de construcción, conservación, operación y preservación.

**Art. 100**.- Actividades prohibidas. La Autoridad Unica del Agua y los Gobiernos Autónomos Descentralizados, en el ámbito de sus competencias, no autorizarán actividades agropecuarias o construcciones y, en general, obras nuevas en los espacios laterales del acueducto o conducciones de sistemas de agua potable.

Se prohíbe a los dueños de los predios sirvientes apacentar animales junto a la acequia o acueductos abiertos que atraviesen sus terrenos, verter desechos o aguas contaminadas en las zonas de protección hídrica.

Se prohíbe actividades forestales en el área sirviente o en las zonas de protección hídrica, cuando los acueductos estén entubados o embaulados.

**Art. 101**.- Uso de las aguas que corren por el predio sirviente. El titular del predio sirviente no adquiere derecho o autorización alguna sobre las aguas que corran a través del predio sirviente pero podrá utilizarlas únicamente para menesteres domésticos, sin desviarlas, contaminarlas ni afectar a derechos de terceros. El incumplimiento de esta norma será sancionado de acuerdo con la Ley.

**Art. 102**.- Extinción de las servidumbres. Las servidumbres se extinguen en los siguientes casos:

a) Falta de ejecución de las obras ordenadas por la autoridad competente en el plazo establecido;
b) Falta injustificada de uso por más de un año;
c) Cumplimiento del objeto para el cual se autorizó la servidumbre;
d) Distinta utilización del uso autorizado; y,
e) Por finalización del plazo en caso de la servidumbre temporal.

**Art. 103**.- Efectos de la extinción. Declarada extinguida la servidumbre se revierten los bienes que fueron afectados por ella a la propiedad y uso exclusivo del predio sirviente.

No imprima este documento a menos que sea absolutamente necesario
LEXIS

Agua.

Las industrias que capten el agua de las redes de abastecimiento de agua potable para aprovechamiento productivo, obtendrán del gobierno autónomo descentralizado la autorización para la conexión que deberá registrarse ante la Autoridad Unica del Agua.

Las personas que se dediquen a la extracción de sal del agua de mar para fines comerciales, deberán obtener de la Autoridad Unica del Agua la respectiva autorización de aprovechamiento productivo del agua, y pagar la tarifa correspondiente.

Las aguas destinadas para el aprovechamiento industrial, una vez utilizadas, serán descargadas por el usuario, previo su tratamiento, cumpliendo con los parámetros técnicos que dicte la Autoridad Ambiental Nacional.

Sección Tercera
Acuicultura

**Art. 108**.- Aprovechamiento de agua en acuicultura. Las personas que se dediquen a cualquier actividad piscícola o acuícola, que no se considere incluida en la soberanía alimentaria en los términos regulados en esta Ley, deberán obtener de la autoridad pública correspondiente los permisos necesarios para el ejercicio de su actividad, quien previo a otorgarlos deberá requerir de la Autoridad Unica del Agua los informes respecto del aprovechamiento productivo del agua, que causará el pago de las tarifas establecidas en la presente Ley, cuando sea consuntivo.

**Art. 109**.- Prohibición. No se otorgarán autorizaciones de aprovechamiento productivo del agua en manglares. Solo podrán obtener y renovar dicha autorización y con fines de actividad de acuicultura, quienes cumplan con el proceso de regularización establecido en el Reglamento.

Sección Cuarta
Aprovechamiento del Agua en Minería

**Art. 110**.- Autorización de aprovechamiento. Las actividades mineras deberán contar con la autorización de aprovechamiento productivo de las aguas que se utilicen, que será otorgada por la Autoridad Unica del Agua, de conformidad con los procedimientos y requisitos establecidos en esta Ley y su Reglamento, para lo que se respetará estrictamente el orden de prelación que establece la Constitución, es decir, consumo humano, riego que garantice la soberanía alimentaria, caudal ecológico y actividades productivas. Al efecto, coordinará con la Autoridad Ambiental Nacional.

Se regulará toda actividad que pueda afectar la calidad y cantidad de agua, y el equilibrio de los ecosistemas, en especial en las fuentes y zonas de recarga de agua.

La sustentabilidad de los ecosistemas y el consumo humano serán prioritarios en el uso y aprovechamiento del agua.

También deberá obtenerse la autorización de uso del agua para consumo humano en campamentos.

**Art. 111**.- Protección en fuentes de agua. La Autoridad Unica del Agua y la Autoridad Ambiental Nacional emitirán las regulaciones necesarias para garantizar la conservación y el equilibrio de los ecosistemas, en especial de las fuentes y zonas de recarga de agua.

La Autoridad Ambiental Nacional coordinará con la Autoridad Unica del Agua, el monitoreo del sistema de manejo ambiental previsto en la respectiva licencia ambiental, emitida por aquella.

**Art. 112**.- Devolución de las aguas. El agua destinada para actividades mineras, se devolverá al cauce original de donde se la tomó o al cauce que sea más adecuado, con la obligación del usuario de tratarla antes de su descarga y vertido, de acuerdo con lo que establece el permiso ambiental y la

# Tab 70

# P.R. 420

# C.R. 313

Barcode:4614242-01 C-331-806 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
~~**Business Proprietary Document**~~
**Public Version**
E&C/OIV: RA

DATE: August 13, 2024

MEMORANDUM TO: The File

THROUGH: Robert Bolling
Program Manager, Office IV
AD/CVD Operations

FROM: Reginald Anadio
Zachary Shaykin
International Trade Compliance Analysts, Office IV
AD/CVD Operations

SUBJECT: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of Sociedad Nacional de Galapagos C.A.

---

From July 22 to July 24, 2024, officials of the U.S. Department of Commerce (Commerce) met with representatives of Sociedad Nacional de Galapagos C.A. (SONGA), Naturisa S.A. (Naturisa), Empacadora Champmar S.A. (Champmar) and Holding Sola & Sola Solacciones S.A. (Sola), to conduct verification of SONGA's responses in the countervailing duty investigation of frozen warmwater shrimp from Ecuador. The verification exhibits[1] and participants list are attached to this report at Appendix I and Appendix II, respectively.

The purpose of this verification report is to provide parties with a factual report of the methods, procedures, and results collected during Commerce's verification. *See* 19 CFR 351.307(c). This report does *not* draw conclusions as to whether the reported information was successfully verified and does *not* make findings or conclusions regarding how the facts obtained at verification will ultimately be treated in Commerce's analysis.

[1] *See* SONGA's Letter, "Submission of Verification Exhibits," dated July 31, 2024.

Filed By: Reginald Anadio, Filed Date: 8/14/24 12:48 PM, Submission Status: Approved

**Verification of SONGA's Responses**

The verification steps discussed below were presented to SONGA in the Verification Agenda.[2] Below we describe the verification procedures performed and cite the applicable verification exhibit, or exhibit from the questionnaire response, containing information provided by SONGA that relates to the procedure. We also describe any changes to our planned procedures that were considered necessary.

## I. SUMMARY OF OBSERVATIONS

The following is an illustrative list of factual observations that occurred during the verification, which may require further consideration by Commerce. This list is provided simply as a convenience to better aid the parties' preparation of comments before Commerce. This list, however, is not all inclusive as all items included within this report are subject to comment and further consideration.

- At the start of verification, SONGA officials reported that in SONGA's February 12, 2024, Section III questionnaire response at Exhibit 11 and May 16, 2024, supplemental questionnaire response at Exhibit S2-4(a), they mistakenly reported currency outflow tax (ISD) exemptions on purchases of imported assets and raw materials under the investment contract as received in 2021 instead of the period of investigation (POI). The revised database included [ ] transactions for [ ] imported assets. We did not accept these corrections.

- At the start of verification, SONGA and Naturisa officials reported that both entities omitted the reporting of vehicle ownership tax exemptions received pursuant to the Motor Vehicle Tax Exemption program. SONGA claimed that it received vehicle tax exemptions on [ ] vehicles and Naturisa claimed that it received vehicle tax exemptions on [ ] vehicles. We did not accept these corrections.

- Naturisa officials stated that all electricity consumption locations that have been previously reported, even if the electricity template description pertained to a non-selected cross-owned entity, were used and paid by Naturisa. *See* section IV.B.3 below.

- The annual fees for land agreement [ ] from the POI were paid in [ ], not during the POI. *See* section IV.C.2 below.

- Naturisa explained that a [ ] concession held by [ ] (*i.e.*, agreement [ ]) was operated and used by Naturisa during the POI. *See* section IV.C.2 below.

## II. CORRECTIONS TO RESPONSE

[2] *See* Commerce's Letter, "Verification Agenda of SONGA," dated July 9, 2024.



Filed By: Reginald Anadio, Filed Date: 8/14/24 12:48 PM, Submission Status: Approved

At the commencement of verification, SONGA submitted corrections to its questionnaire responses that resulted from its preparation for verification.

Corrections:

1. SONGA's Sales Values: SONGA reported incorrect sales values for [ ], [ ], [ ], and [ ] due to a typographical error and inadvertently excluding certain sales of non-subject merchandise that were used in its calculation. *See* Exhibit VE-1 at Attachment 1.

2. Electricity for Less Than Adequate Remuneration (LTAR) Formatting: SONGA revised the template for SONGA's, Naturisa's and Champmar's electricity consumptions. The revised template provided greater detail for [ ] in order to connect each entities electricity payments to applicable electricity tariffs. *See* Exhibit VE-1 at Attachments 2, 3, and 4.

3. SONGA's Electricity for LTAR: SONGA omitted electricity consumption of [ ] kWh for which it paid a total of [ ] USD associated with [ ] previously unreported meters during the POI. *See* Exhibit VE-1 at Attachment 2.

4. Champmar's Electricity for LTAR: First, Champmar mistakenly reported its [ ] 2022 invoice information for the [ ] as consumption at the [ ], when the consumption at the [ ] should have only included consumption for [ ] 2022. Second, Champmar discovered that it inadvertently omitted [ ] for the [ ]. *See* Exhibit VE-1 at Attachment 4.

5. SONGA's ISD Exemption on Principal and Interest on Foreign Loans: SONGA mistakenly reported ISD exemptions on foreign loans available pursuant to its investment contract received in 2021 instead of the POI. *See* section IV.A below and Exhibit VE-1 at Attachment 5.

6. Sola's Tax Exemption on Time Deposits and Fixed Income Securities: Sola reported that it omitted tax exemptions received pursuant to the Tax Exemptions on Time Deposits and Fixed Income Securities program. *See* Exhibit VE-1 at Attachment 5.

7. Corporate Structure and Affiliation: SONGA stated that it omitted [ ] affiliated [ ] from its reporting. SONGA stated that these [ ] companies are not SONGA's [ ], and the [ ] companies do not hold interest in any of the companies identified in SONGA's February 4, 2024, questionnaire response at Exhibit AFF-1. SONGA noted that the [ ] companies hold assets (*i.e.*, [ ]) unrelated to

For the ISD exemption on foreign loans, SONGA officials stated that in the process of applying for its investment contract, SONGA provided information about its investment projects' capital and company cash flow. Accordingly, officials indicated that certain capital for SONGA's investment projects [ ]. As part of its investment contract, the GOE granted SONGA an ISD exemption on foreign loans. Before SONGA makes a payment for the capital or interest on such loans, it reports the amount to the SRI and receives ISD exemption authorization that is provided to the bank before SONGA transfers the payment. SONGA officials reported that the ISD rates changed four times during the POI and provided a screenshot from SRI's website that substantiated its calculation for the exempted ISD amounts as reported in Exhibit VE-1 at Attachment 5. *See* Exhibit VE-6(a).

As noted above for correction 5, SONGA previously reported an ISD exemption on imported materials based on benefits received in 2021 as opposed to benefits received in the POI. In its corrected submission, SONGA officials reported that in 2022 SONGA benefited from [ ] exemptions under this program which totaled [ ] USD in exempted ISD. We reviewed the values for several of these exemptions (*i.e.*, SRI exemption form numbers [ ]), totaling [ ] of the [ ] USD in exempted ISD, by checking SONGA's SRI declarations, loan statements, account entries, and bank statements. *See* Exhibit VE-6(a). For ISD exemption form number [ ], we asked company officials to explain the difference between the final amount on the [ ] and the amount reported in Exhibit VE-1 attachment 5 (*i.e.*, [ ] USD and [ ] USD, respectively). Company officials explained that the difference was due to a [ ].

**<u>Naturisa</u>**:
Naturisa officials explained that Naturisa applied for its sole investment contract in [ ]. Naturisa's investment contract states that Naturisa must make an investment of [ ] USD and that its investment will generate new employment. Naturisa officials stated that Naturisa received approval for a proportional tax rate reduction that it claims as part of its annual corporate tax return. Accordingly, every year, based on Naturisa's investment amount, a calculation is made for the applicable tax rate reduction. Officials presented Naturisa's calculation for the [ ] percent tax rate reduction, found in its 2021 tax return. *See* Exhibit VE-6(b).

We noted no discrepancies from SONGA's questionnaire responses.

2. *Examine the certified/date-stamped income tax return and all schedules and appendices attached to it that were filed in the POI. Be prepared to demonstrate that there were no amendments, audits, or other corrections to the tax returns.*



Filed By: Reginald Anadio, Filed Date: 8/14/24 12:48 PM, Submission Status: Approved

# Tab 71

# P.R. 421

# C.R. 314

Barcode:4620459-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
~~**Business Proprietary Document**~~
ITA/E&C/OIV: RA, ZS
**Public Version**

| | |
|---|---|
| DATE: | August 22, 2024 |
| MEMORANDUM TO: | The File |
| THROUGH: | Robert Bolling<br>Program Manager, Office IV<br>AD/CVD Operations |
| FROM: | Reginald Anadio<br>Zachary Shaykin<br>International Trade Compliance Analysts, Office IV<br>AD/CVD Operations |
| SUBJECT: | Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A. |

---

From July 15 to July 17, 2024, officials of the U.S. Department of Commerce (Commerce) met with representatives of Industrial Pesquera Santa Priscila (Santa Priscila), Produmar S.A. (Produmar), Egidiosa S.A. (Egidiosa), and Tropical Packing Ecuador S.A. (Tropack), to conduct verification of Santa Priscila's responses in the countervailing duty investigation of frozen warmwater shrimp from Ecuador. The verification exhibits[1] and participants list are attached to this report at Appendix I and Appendix II, respectively.

The purpose of this verification report is to provide parties with a factual report of the methods, procedures, and results collected during Commerce's verification. *See* 19 CFR 351.307(c). This report does *not* draw conclusions as to whether the reported information was successfully verified and does *not* make findings or conclusions regarding how the facts obtained at verification will ultimately be treated in Commerce's analysis.

---

[1] *See* Santa Priscila's Letter, "Frozen Warmwater Shrimp from Ecuador – Submission of Verification Exhibits," dated July 26, 2024.

Filed By: Zachary Shaykin, Filed Date: 8/26/24 11:09 AM, Submission Status: Approved

**Verification of Santa Priscila's Responses**

The verification steps discussed below were presented to Santa Priscila in the Verification Agenda.[2] Below we describe the verification procedures performed and cite the applicable verification exhibit, or exhibit from the questionnaire response, containing information provided by Santa Priscila that relates to the procedure. We also describe any changes to our planned procedures that were considered necessary.

## I. SUMMARY OF OBSERVATIONS

The following is an illustrative list of factual observations that occurred during the verification which may require further consideration by Commerce. This list is provided simply as a convenience to better aid the parties' preparation of comments before Commerce. This list, however, is not all inclusive, as all items included within this report are subject to comment and further consideration.

- At the start of verification, Produmar officials reported that in Santa Priscila's February 16, 2024, Section III questionnaire response at Exhibit PRO-15, Produmar mistakenly reported motor vehicle tax exemptions received under fiscal year [ ], rather than the year of [ ]. The revised database included [ ] of motor vehicle tax exemptions. We did not accept this correction.

## II. CORRECTIONS TO RESPONSES

At the commencement of verification, Santa Priscila submitted corrections to its questionnaire responses, in addition to those described in the "Summary of Observations" section above, that resulted from its preparation for verification.

Corrections:

1. Egidiosa and Produmar Electricity for Less-than-Adequate Remuneration (LTAR): Company officials stated that Egidiosa and Produmar inadvertently overlooked the [ ] of electricity usage periods they reported at Santa Priscila's February 16, 2024, Section III questionnaire response at Exhibits EGI-1 and PRO-5, respectively. Specifically, Egidiosa and Produmar had originally reported consumption of electricity provided by [ ] for [ ]. However, company officials stated that Egidiosa and Produmar had inadvertently reported [ ]. Correcting for this error resulted in a [ ] to the overall value of electricity consumed by

[2] *See* Letter, "Frozen Warmwater Shrimp from Ecuador: Verification Agenda of Santa Priscila S.A.," dated July 8, 2024 (Verification Agenda).

officials demonstrated what the documents page on the SRI website would look like for a year in which [ ] by querying the SRI website for a fiscal year in which [ ], *i.e.*, for fiscal year [ ]. *See* Verification Exhibits at Exhibit VE-6(b) at Part 2.

Regarding the total amount of [ ] that Produmar used as the basis for its calculation of the benefit it received from its investment contract during the POI, *i.e.*, USD $[ ], company officials demonstrated live how Produmar calculated this [ ] amount. Specifically, company officials demonstrated that they queried Produmar's [ ] accounting system for account numbers [ ] during the calendar year 2021, which totaled USD $[ ], respectively. Company officials explained that a [ ] of USD $[ ] was applied to the amount in account [ ] for sales to [ ], and that a [ ] of USD $[ ] was applied to the amount in account [ ]. Company officials explained that the amount of [ ] was pulled by using the [ ] associated with the [ ] investment. *See* Verification Exhibits at Exhibit VE-6(b) at Parts 1 and 2.

Motor Vehicle Tax Reduction Program

*Santa Priscila*

Company officials provided a printout that was taken from the SRI website for each vehicle [ ]. We asked company officials how they received the printout of the vehicle data from the SRI website. Company officials showed us that they clicked on the amount for the year [ ] and went through each plate for [ ] manually for the year [ ] and input the values into the table. We asked company officials how to link the [ ] with a journal entry in their accounting records. Company officials showed us that they linked the [ ] to the journal entry by [ ] in their accounting system.

Income Tax Exemption on Financial Returns Program

*Produmar*

Company officials stated that, in order to receive benefits under this program, Produmar had to have an [ ], including fixed-term accounts and income investments, that were long-term (*e.g.*, had a maturity of 361 days). Officials provided Produmar's accounting system that showed [ ] which were worth a [ ] amount of USD $[ ], and a total generated interest of USD $[ ]. Company officials provided the [ ] for the [ ] under the [ ], indicating that the loans [ ]. *See* Verification Exhibits at Exhibit VE-7 at Part 1.

# Tab 72

# P.R. 422

# C.R. 315

Barcode: 4624849-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
~~Business Proprietary Document~~
E&C/OIV: RA, ZS
**Public Version**

DATE: September 3, 2024

MEMORANDUM TO: The File

THROUGH: Robert Bolling
Program Manager, Office IV
AD/CVD Operations

FROM: Reginald Anadio
Zachary Shaykin
International Trade Compliance Analysts, Office IV
AD/CVD Operations

SUBJECT: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of the Government of Ecuador

---

From July 15, 2024, through July 17, 2024, the Department of Commerce (Commerce) met with representatives of the Government of Ecuador (GOE) to conduct verification of the GOE questionnaire responses regarding the subsidies examined in the *Preliminary Determination*[1] and the GOE responses regarding the alleged new subsidies[2] in the countervailing duty investigation of frozen warmwater shrimp from Ecuador. The verification exhibits[3] and participants lists are attached to this report at Appendix I and Appendix II, respectively.

The purpose of this verification report is to provide parties with a factual report of the methods, procedures, and results collected during Commerce's verification. *See* 19 CFR 351.307(c). This report does *not* draw conclusions as to whether the reported information was successfully verified and does *not* make findings or conclusions regarding how the facts obtained at verification will ultimately be treated in Commerce's analysis.

[1] *See Frozen Warmwater Shrimp from Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with the Final Antidumping Duty Determination*, 89 FR 22379 (April 1, 2024) (*Preliminary Determination*) and accompanying preliminary decision memorandum (PDM); *see also Frozen Warmwater Shrimp from Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation*, 89 FR 31722 (April 25, 2024).
[2] *See* Letter, "Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations," dated January 8, 2024.
[3] *See* GOE's Letter, "Frozen Warmwater Shrimp from Ecuador – Submission of Verification Exhibits," dated July 26, 2024 (Verification Exhibits).

INTERNATIONAL TRADE ADMINISTRATION

Filed By: Reginald Anadio, Filed Date: 9/3/24 4:44 PM, Submission Status: Approved

participation tax (*i.e.*, USD $[ ]) that is attributable to qualifying new productive investments and that should have been deducted from the total amount of income that Produmar claimed in its income tax form. Officials noted that correcting this error results in a new calculated tax benefit for Produmar of USD $[ ], which is [ ] different than the original amount that the GOE had reported for Produmar under this program.

## II. <u>CORRECTIONS TO RESPONSE</u>

At the commencement of verification, the GOE submitted corrections to its questionnaire responses that resulted from its verification preparation. The corrections presented by the GOE are detailed in the section "Summary of Observations," *supra*. We rejected these corrections presented by the GOE and confirmed that there were no other corrections that were presented by the GOE regarding the responses of Santa Priscila, Sociedad Nacional de Galápagos C.A. (SONGA), and their cross-owned affiliates.

## SECTION II: PROGRAMS TO BE EXAMINED

*<u>A. Tax Programs</u>*

*For the tax programs discussed below, please do the following:*

*Investment Contract*

1. *Provide a general overview and the legal provision governing the three parts of the GOE's investment contract program (i.e., (1) Investment Contract Tax Rate Reduction, (2) Investment Contract Currency Outflow Tax (ISD) Exemption for Imported Materials, and (3) Investment Contract ISD Exemption for Repayment of Principal and Interest on Loans Obtained from Foreign lending Institutions). Explain how each part of this program is administered and operated, including the program's eligibility criteria as well as a description of any role played by any other government agency in the program's administration.*

*A. Income Tax Exemption/Reduction*

2. *Discuss how Santa Priscila S.A. (Santa Priscila), Sociedad Nacional de Galapagos C.A. (SONGA) and the selected cross-owned entities (i.e., Manesil S.A., Produmar S.A. (Produmar), Egidiosa S.A., Tropical Packing Ecuador S.A., Naturisa S.A., Holding Sola & Sola Solacciones S.A., and Empacadora Champmar S.A.) applied for and received assistance under this program, as applicable.*

   *A. Explain the differences between:*
      *a. Investment Contract: Income Tax Exemption*



Filed By: Reginald Anadio, Filed Date: 9/3/24 4:44 PM, Submission Status: Approved

Barcode: 4624849-01 C-331-806 INV - Investigation

*b. Investment Contract: ISD Exemption on Capital Goods*

*c. Investment Contract: ISD Exemption on Loan Payments*

*3. Be prepared to discuss and document the amount of assistance received by Santa Priscila, SONGA and the selected cross-owned entities identified above.*

*Tax Incentives for Priority Sectors Under the 2010 Organic Production Code*

1. *Provide a general overview and the legal provision governing the Tax Incentives for Priority Sectors Under the 2010 Organic Production Code. Explain how this program is administered and operated, including the program's eligibility criteria as well as a description of any role played by any other government agency in the program's administration.*

2. *Explain how Santa Priscila, SONGA and the selected cross-owned entities identified above claimed this benefit, as applicable. In doing so, please review how the investment contract tax program mentioned above relates to the 2010 organic production code.*

We performed the above procedures. *See* Verification Exhibits at Exhibit SVE-1.

Government officials stated that the reason why the GOE reported the benefit separately was because of there were two laws applicable to income tax exemptions from new investments, one of which is the Organic Production Code. Government officials stated that the Investment Contract is not the program that creates a benefit for companies in Ecuador; rather, it stabilizes the benefits that a company may receive under other applicable laws, so if the laws become ineffective at a later date while the terms of an investment contract are still applicable, the companies may continue to receive those benefits for qualifying investments after the official termination or amendment of the underlying laws. Therefore, government officials explained that because companies may enter into an investment contract with the GOE under a number of applicable laws for which the applicant seeks tax stability, the GOE reported the benefit received by the applicable mandatory respondents and their cross-owned affiliates under a different program.

We asked government officials to explain the program and how it functions, as well as the subparts of this program. Government officials stated that the investment contract was designed as a mechanism to foster international and domestic investment in Ecuador, and that the objective of the Investment Contract Program is to ensure legal and tax stability when applicable investments are undertaken. Government officials stated that this system was established in 2010 pursuant to the December 29, 2010 Organic Code for Production, Commerce and



Filed By: Reginald Anadio, Filed Date: 9/3/24 4:44 PM, Submission Status: Approved

Investments (COPCI). Following its establishment, the program saw certain amendments that increased access to incentives in order to attract more domestic and foreign investors.

Government officials stated that there have been two main modifications to the contract program. It was originally established under COPCI in 2010 and was governed by COPCI until 2018. Between 2018 and 2021, investments contracts were governed by the Law for Productive Promotion. Government officials explained that, in 2021, the Law for Economic Development provided new rules that governed investments contracts.

Government officials explained that, in order to receive benefits under an investment contract in Ecuador, companies must submit an application that includes certain details regarding the investment, such as the timeline the investment is planned to be carried out and completed. Government officials stated that applications are submitted to the Ministry of Production, Foreign Trade, Investments and Fisheries (MPCEIP), which is the agency in charge of reviewing investment plans and applications under the Investment Contract Program. Government officials stated that the MPCEIP is the agency that drafts an investment contract. Government officials stated that the MPCEIP then contacts the applicable government agency depending on the industry under which the investment contract is requested and obtains a letter that details the proposed economic impacts of the investment.

Government officials stated that, once the MPCEIP completes its initial evaluation and receives the letter from the applicable government agency, the contract is forwarded to a technical subcommittee under the Strategic Committee for Promotion and Attraction of Investments (CEPAI). Government officials stated that once the CEPAI receives a recommendation for approval of the investment contract by the committee, and the recommendation is forwarded to the Minister of Economics and Finance for a report to understand the tax impacts that the investment may have. In the case of a positive report from the Minister, the project covered by the investment contract is sent for approval to the CEPAI and formally approved.

Government officials explained that once the application for an investment contract is initiated with the GOE, the application may be carried out both in paper and digital forms. Government officials explained that every contract is unique, and it is not possible to generalize the details of all contracts. Government officials stated that the Committee for Strategic Investments and Promotion Investments determines whether to approve an investment contract.

We asked government officials to discuss the main different benefits that companies can receive under this program, specifically, the income tax exemption/reduction, exemption of currency outflow tax on imports of capital goods and raw materials, and the facilitation of foreign trade payments.

For the income tax exemption/reduction incentive, government officials explained that this incentive depends on the contract and governing law. If the governing law was COPCI when the investment contract was signed, then companies may apply for a total income tax exemption (*i.e.,* [ ]). Government officials explained that if a company



Filed By: Reginald Anadio, Filed Date: 9/3/24 4:44 PM, Submission Status: Approved

Barcode: 4624849-01 C-331-806 INV - Investigation

uses cost centers where they can classify different costs, then they can receive a total income tax deduction under this program that is proportional to the investment made. Government officials explained that companies must be able to show that their cost center can split income generated from new investments pursuant to the investment contract apart from income generated from other assets. Government officials stated that, if a company does not have a cost center that can separately enumerate generated income, then the company can deduct an amount of tax exemption that is proportional to the investment made *via* a standard formula.

We asked government officials to explain how the standard formula is created. Government officials explained that the generated formula is not included in the investment contract but, rather, in other documents that are used in the process of applying for an investment contract. Government officials explained that the formula is based on the value of fixed assets of the company; specifically, the value of the new investment that is divided by the value of the fixed assets which are re-evaluated and then multiplied by the applicable income tax rate. Government officials stated that the re-evaluation of fixed assets is based on data gathered as part of the investment contract application. Government officials stated that all calculations for benefits under the investment contracts are based on estimates, because government officials do not have access to the applicant's full accounting records regarding any applicable deductions.

Government officials stated that the application for the stabilized incentives are processed by the Ecuador Internal Revenue Service (SRI). Government officials stated that because each contract is unique to the applicant and to the investment stipulated in the investment contract, it is difficult to compare different investment contracts to one another; however government officials stated that the benefits cannot exceed the amount of the investment over the entire life of the contract: the validity of the incentives depend on the life of the investment contract. Furthermore, officials explained that if the laws underlying the tax incentives that companies receive under an investment contract are amended, the companies may still receive the tax benefits based on the original (*i.e.*, unamended) language of the law.

Regarding the ISD exemptions on capital goods and foreign loans, government officials explained that these two incentives fall under two different laws: (1) COPCI and (2) Law for Productive Promotion. As such, companies that wished to stabilize their investment contract can request incentives under these two laws. Government officials stated that the benefits for ISD exemptions are reported separately from the income tax return. Specifically, to receive an ISD exemption, government officials stated that a taxpayer must access the SRI's website and report information regarding the payment. After receiving approval, government officials stated that the taxpayer must provide SRI's completed form to the financial institution where it transfers funds. Therefore, officials noted that the benefit of an ISD exemption is realized upon the transfer of funds at the financial institution and not on a taxpayer's annual tax return.



Filed By: Reginald Anadio, Filed Date: 9/3/24 4:44 PM, Submission Status: Approved

Barcode: 4624849-01 C-331-806 INV - Investigation

***D.*** *<u>Provision of Brackish Water for LTAR</u>*

*For the GOE's provision of brackish water, please:*

1. *Provide a general overview and the legal provision governing the GOE's provision of brackish water. Explain how this program is administered and operated, including the program's eligibility criteria as well as a description of any role played by any other government agency in the program's administration.*

2. *On page III-PRO-4 of Santa Priscila's February 16, 2024, Section III Supplier Questionnaire Response, Santa Priscila reported that Produmar "received invoices from the Public Water Company, which it maintains are in error, which caused Produmar to file a legal action against the Public Water Company to prevent the collection of these fees." Please report on the status of Produmar's litigation (i.e., whether a decision has been made and, if so, the results of this decision. If a decision has not been made, when does the GOE expect the litigation to end? Have available any documentation necessary to facilitate this discussion.*

3. *The GOE stated that Produmar had two authorizations for the productive use of water. Please explain why Produmar had two authorizations for the productive use of water and whether such authorizations were for use of brackish water.*

Government officials explained that the Ministry of the Environment, Water, and Ecological Transition (MAATE) has vested authority in accordance with Article 318 of the Ecuadorian Constitution for regulating and managing all water use in Ecuador. Furthermore, government officials stated that under Article 93 of the Orgainic Law on Water Resources, Use and Development of Water requires that all users who intend to extract water in Ecuador to obtain authorization to do so from MAATE. *See* Verification Exhibits at Exhibit SVE-4.

Government officials explained that the authorization process for the productive use of water requires that a study be carried out regarding the requested water use, and that this process includes a technical evaluation that verifies whether the use of the water will be productive. Government officials stated that after a request for use of water is received by a applicant, that the Water Regulation and Control Agency (ARCA) assess whether water is available for the requested usage. If ARCA determines that water is sufficiently available, government officials stated that the zonal director of MAATE makes an assessment as to whether the water requested to be used is consumptive or non-consumptive.

We only reviewed whether there is availability of the water required by the applicant. MAATE produces a technical report issued prior to the authorization whether the water is consumptive or non-consumptive.



Filed By: Reginald Anadio, Filed Date: 9/3/24 4:44 PM, Submission Status: Approved

We asked the GOE why Produmar was initially charged a fee for its use of brackish water in 2021. Government officials explained that Produmar opened an administrative complaint refuting the GOE's decision to charge them based on the determination that Produmar's usage of water was consumptive, *i.e.*, not returned to its source. Government officials explained that, because the GOE did not respond to Produmar's administrative complaint, that the complaint ultimately resulted in "administrative silence" (*i.e.*, no finding was made in Produmar's favor) and, subsequently, Produmar was charged for their use of brackish water. Government officials stated that Produmar filed litigation after they were charged for its water use on May 24, 2023, which was later dismissed in July 2023, due to improper filing. Lastly, government officials noted that the findings of the trial court were appealed and that litigation regarding Produmar's complaint is ongoing because the date for a hearing with an appeals court has not been scheduled. *See* Verification Exhibits at Exhibit SVE-4.

As explained by the GOE, one of the technical criteria for non-consumptive water use is whether the water can be returned to its source. For Produmar, the GOE stated that their technicians [ ] in Ecuador, the GOE [ ]. However, government officials then retracted their statement regarding the reason for fining Produmar for its consumptive use of water, and stated that the farms location in a [ ] in Ecuador were not the reason for a determination to charge Produmar for its water use. Government officials stated that they do not know the exact reason why Produmar was charged for its use of brackish water. We did not review the technical report because of ongoing litigation. However, government officials noted that the report should have information about the type of water (*i.e.*, whether it was brackish) and whether it was used in high lands. Government officials stated that the report would not include criteria or information why the GOE decided that the water was consumptive. Furthermore, government officials stated that water use authorizations do not specify whether the water was brackish or not. Thus, government officials could not provide an explanation why Produmar was charged a fee for consumptive use of brackish water.

*SECTION III: NON-USE OF OTHER SUBSIDY PROGRAMS*

*For three programs preliminarily found to be not used (as listed below), be prepared to demonstrate that SONGA, Santa Priscila and the selected cross-owned entities did not receive assistance under these programs. In verifying "non-use," Commerce will examine any evidence of subsidies provided by your government under any subsidy program, including programs not currently subject to investigation.*

*(1) Access to Preferential Lines of Credit for Aquaculture and Fishing*
*(2) Loans for Organic Production*
*(3) Credit Line Boost to Shrimp Sector's Reconstruction After Earthquake*

1. *Provide a general overview and the legal provision governing these programs. Explain how these programs are administered and operated, including the*



Filed By: Reginald Anadio, Filed Date: 9/3/24 4:44 PM, Submission Status: Approved

# Tab 73

# P.R. 427

# C.R. 316

Barcode:4631452-01 C-331-806 INV - Investigation -

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 EDRAKE@SCHAGRINASSOCIATES.COM F: (202) 429-2522

September 16, 2024

Case No. C-331-806
Total Pages: 30
Investigation
POI: 01/01/2022 – 12/31/2022
ITA/E&C Office IV

**PUBLIC VERSION**
Business proprietary information of the Government of Ecuador deleted from brackets on pp. 4 & 6.
Business proprietary information of Santa Priscila deleted from brackets on pp. 17 – 22.
Business proprietary information of SONGA deleted from brackets on pp. 16 – 18 & 21.

**BY ELECTRONIC FILING**
The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador – Case Brief**

Dear Secretary Raimondo:

On behalf of the American Shrimp Processors Association ("ASPA" or "Petitioner"), we submit to the U.S. Department of Commerce ("Commerce") the attached case brief in the above-referenced investigation. This case brief is timely filed by the extended deadline set by Commerce. *See* Memorandum to the File, "Countervailing Duty Investigation of Frozen Warmwater Shrimp From Ecuador: Extension of Time to Submit Case Briefs" (Sep. 9, 2024).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 9/16/24 12:18 PM, Submission Status: Approved

Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

/s/ Elizabeth J. Drake
Roger B. Schagrin
Elizabeth J. Drake
Michelle R. Avrutin
Rui Fan, *Consultant*
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

Edward T. Hayes
LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701
*Counsel to the American Shrimp Processors Association*

Barcode:4631452-01 C-331-806 INV - Investigation -

# CERTIFICATE OF SERVICE

**Frozen Warmwater Shrimp from Ecuador**
**C-331-806**
**Investigation**

I, Valencia Harvey, hereby certify that copies of the attached public version document were served today, September 16, 2024, via Access:

Nathaniel Rickard, Esq
**Picard Kentz & Rowe LLP**
1750 K Street, NW
Suite 800
Washington, DC 20006
nrickard@pkrllp.com

Jennifer Michele Smith-Veluz, Esq.
**The Bristol Group PLLC**
1707 L Street, NW, Suite 570
Washington, D.C. 20036
jennifer.smith@bristolgrouplaw.com

Edward T. Hayes
**LEAKE & ANDERSSON, LLP**
1100 Poydras Street
Suite 1700
New Orleans, LA 70163
ehayes@leakeandersson.com

Jeffrey S. Neeley, Esq.
**Husch Blackwell LLP**
1801 Pennsylvania Avenue, NW
Suite 1000
Washington, DC 20006
jeffrey.neeley@huschblackwell.com

Jarrod M. Goldfeder, Esq.
**Trade Pacific PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003
jgoldfeder@tradepacificlaw.com

Andrea Ruiz
**Embassy of Ecuador**
2535 15th St., NW
Washington, DC 20009
Email: acruiz.embajada.ec.eeuu@gmail.com

/s/ *Valencia Harvey*
Valencia Harvey
SCHAGRIN ASSOCIATES

Filed By: rschagrin@schagrinassociates.com, Filed Date: 9/16/24 12:18 PM, Submission Status: Approved

**BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**

Case No. C-331-806
Total Pages:
Investigation
POI: 01/01/2022 – 12/31/2022
ITA/E&C Office IV

**PUBLIC VERSION**
Business proprietary information of the Government of Ecuador deleted from brackets on pp. 4 & 6.
Business proprietary information of Santa Priscila deleted from brackets on pp. 17 – 22.
Business proprietary information of SONGA deleted from brackets on pp. 16 – 18 & 21.

---

**Frozen Warmwater Shrimp from Ecuador**

---

**PETITIONER'S CASE BRIEF**

SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701

*Counsel to the American Shrimp Processors Association*

September 16, 2024

# TABLE OF CONTENTS


TABLE OF AUTHORITIES ........ ii

I. Executive Summary ........ 1

II. Commerce Should Countervail the Provision of Brackish Water ........ 3

III. Commerce Should Countervail the Provision of Fuel ........ 8

IV. Commerce Should Revise the Benchmark Used to Value the Provision of Electricity ... 13

V. Commerce Should Correct the Multiplier Used for Programs Benefitting Respondents' Shrimp Suppliers ........ 15

VI. Commerce Should Apply Adverse Facts Available to Countervail Unverifiable and Omitted Income Tax Programs ........ 17

VII. Commerce Should Revise the Denominator for the Investment Contract / Priority Sectors Program for Santa Priscila ........ 19

VIII. Commerce Should Make Certain Revisions to SONGA's Subsidy Calculations ........ 21

IX. Commerce Should Make Certain Revisions to Santa Priscila's Subsidy Calculations .... 22

X. Conclusion ........ 22

# I. Executive Summary

- In its post-preliminary determination, the U.S. Department of Commerce ("Commerce") determined not to countervail the provision of brackish water for less than adequate remuneration ("LTAR") based on claims by the respondents and the Government of Ecuador ("GOE") that no entity is required to get authorization to access brackish water and no entity is charged for such water. At verification, Commerce discovered that users who wish to extract water in Ecuador must apply for authorization, and that the GOE in fact does charge for the use of brackish water in some circumstances, including in one instance in involving one of the respondents, Produmar S.A. ("Produmar"), a cross-owned shrimp farm supplying Industrial Pesquera Santa Priscila S.A. ("Santa Priscila").

  Respondents have firmly refused to provide any information about their use of this program based on the false premise that it could not possibly provide a meaningful benefit, significantly impeding Commerce's investigation at every turn. As a result, they have left Commerce with no choice but to apply facts available with an adverse inference to countervail this program. Commerce should select the highest non-*de minimis* rate for a provision of goods program in any other proceeding on Ecuador, which is the 10.67 percent calculated for the provision of raw shrimp in the prior countervailing duty investigation on shrimp from Ecuador, and apply it to both respondents in the final results.

- In its post-preliminary determination, Commerce declined to countervail the provision of fuel, stating that the fuel, while ultimately supplied by the government-owned Petroecuador, was funneled through trading companies or distributors to the respondents. This determination is inconsistent with the statute and long-established Commerce practice that has been upheld by the courts. In numerous cases, Commerce has countervailed the provision of a good from a government authority regardless of whether the good was provided through private middlemen such as trading companies or distributors. The U.S. Court of International Trade has repeatedly upheld this practice as consistent with the statute's direction to countervail subsidies that are provided directly or indirectly, Congressional intent that the provision be applied to prevent circumvention of countervailing duty liability, and the statute's distinct analysis of financial contribution and benefit. Commerce and the court have also confirmed that no entrustment or direction analysis, nor pass-through or upstream subsidy analysis, is required to countervail the provision of goods that involves private middlemen. Commerce should countervail this program using the fuel usage volumes reported by respondents and the benchmark price for imported fuel during the period of investigation ("POI") that is on the record of this proceeding, adjusted to a delivered price.

- In its post-preliminary determination, Commerce used Ecuadorian electricity distributors' distribution costs as the benchmark to value the provision of electricity for LTAR as facts available. Commerce correctly determined that the market for electricity in Ecuador is distorted by government predominance, and it correctly



Filed By: rschagrin@schagrinassociates.com, Filed Date: 9/16/24 12:18 PM, Submission Status: Approved

found that it could not conclude that electricity rates in Ecuador are established consistent with market principles. Yet Commerce still chose to use Ecuadorian electricity distribution costs as its benchmark, despite being set in this same distorted market. In the final results, Commerce should use the price for imports of electricity from Colombia and Peru as a tier-two benchmark for this program. The fact that such imports are not delivered directly to consumers but through distributors does not disqualify these import prices. In the alternative, Commerce should use these import prices as facts available, as they are more reliable and less distorted by the internal Ecuadorian costs used in the post-preliminary analysis.

- Contrary to its regulations and prior practice, Commerce excused respondents from reporting for any of its cross-owned shrimp suppliers except for one supplier for each respondent. ASPA continues to object to this decision. Regardless, Commerce should, at a minimum, ensure that its benefit calculations for shrimp farm subsidies takes into account not only the pounds sold by unaffiliated shrimp farms that have not been individually investigated, but also the pounds sold by cross-owned shrimp farms that have not been individually investigated. Commerce should include both categories in the multiplier used to attribute per-pound shrimp farm subsidy benefits to the mandatory respondents. Anything less would understate the full subsidy amount and only further reward respondents that have already been excused from reporting on the majority of their cross-owned shrimp farms.

- At verification, Santa Priscila and Sociedad Nacional de Galapagos C.A. ("SONGA") revealed that they had misreported the amounts of certain tax benefits received and/or omitted tax benefits from their reporting entirely. Commerce correctly refused to accept this new information or attempted "corrections" at verification. In the final results, Commerce should apply adverse facts available to the relevant tax programs by applying the highest non-*de minimis* rate for a tax program in a countervailing duty proceeding on Ecuador, which is currently 1.66 percent.

- In the preliminary determination and ministerial error analysis, Commerce attributed the benefit of the Investment Contract / Priority Sectors program to all of Santa Priscila's sales. Based on confidential record information regarding the agreement underlying this program, as well as confidential information provided at verification, Commerce should revise the denominator used to calculate the subsidy rate for this program in the final results.

- Based on information received from SONGA at verification, Commerce should revise certain calculations regarding the provision of electricity and the provision of land to SONGA in the final results.

- In the final results, Commerce should correct certain errors made in the post-preliminary calculation of the subsidy rate for the provision of electricity to Santa Priscila.

## II. Commerce Should Countervail the Provision of Brackish Water

Both respondents report pumping brackish water owned by the GOE into their shrimp ponds and providing no remuneration to the GOE for access to this brackish water.[1] In the post-preliminary determination, Commerce decided not to countervail the provision of brackish water because respondents' use of the water was deemed non-consumptive in nature and the GOE does not charge for such non-consumptive use.[2] In that determination, Commerce also relied, in part, on the GOE's representation that it "does not require permits or the authorization for accessing brackish water by any entity which wishes to access brackish water."[3]

As an initial matter, the preliminary decision not to countervail this program is based on circular logic. If a government provides a good for free to certain users, the fact that it does not charge those users for that good does not eliminate any element of the subsidy analysis. There is a financial contribution, because a government-owned good is being provided. Specificity exists because the good is provided free of charge to only certain users. Finally, there is a benefit, because the good is provided for free. Indeed, in its initiation notice regarding this program, Commerce explicitly recognized that while the brackish water being provided by the GOE to

---

1 *See, e.g.*, SONGA NSA Response at NSA-16 – NSA-18 (describing Naturisa's pumping of brackish water to its shrimp ponds). *See also* Santa Priscila NSA Response at NSA-17 – NSA-19 (describing the same for Santa Priscila and Produmar). *See also* GOE Section II Questionnaire Response (Feb. 15, 2024) at Ex. TAX-4(a) (all water resources in Ecuador are the property of the state).

2 *See* Memorandum to Abdelali Elouaradia, Deputy Assistant for Enforcement and Compliance, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Post-Preliminary Analysis" (July 12, 2024) ("Post-Prelim Analysis") at 17.

3 *Id*. at 16.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 9/16/24 12:18 PM, Submission Status: Approved

shrimp farms is characterized as water provided for non-consumptive use, even brackish water for non-consumptive use has a commercial value.[4]

Regardless, Commerce need not address these legal arguments in its final determination, because the factual basis for its post-preliminary decision not to countervail the provision of water was revealed at verification to be utterly false. At verification, the GOE explained that "all users who intend to extract water" in Ecuador must obtain authorization from the Ministry of the Environment, Water, and Ecological Transition ("MAATE").[5] This is contrary to Commerce's preliminary finding that no such authorization is required.[6] In addition, [ ].[7] Indeed, [ ].[8] In addition, [ ][9] Indeed, [ ].[10]

---

[4] *See* Memorandum to Eric B. Greynolds, Director, Office IV, Antidumping and Countervailing Duty Operations, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations" (Mar. 21, 2024) ("NSA Initiation Memo") at 5.

[5] GOE Verification Report (Sept. 3, 2024) at 11.

[6] Post-Prelim Analysis at 17.

[7] *Id*. at 18.

[8] *See* GOE Verification Exhibits (July 26, 2024) at Ex. VE-4 ([ ]).

[9] *Id*. at Ex. VE-4 ([ ]).

[10] *Id*.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 9/16/24 12:18 PM, Submission Status: Approved

The GOE revealed for the first time at verification that one of the respondents' suppliers, Produmar, was in fact charged a fee for its use of brackish water in 2021.[11] The GOE offered conflicting explanations for why Produmar was required to pay fees for brackish water.[12] The verification report concludes: "Thus, government officials could not provide an explanation why Produmar was charged a fee for consumptive use of brackish water."[13]

In short, at verification, Commerce discovered that the entire premise for its preliminary decision not to countervail this program was false. Contrary to the repeated claims from respondents and the GOE that brackish water has no value in Ecuador, the GOE has in fact charged for such water, including for a shrimp farm being individually examined in this investigation. Commerce should therefore apply facts available with an adverse inference to countervail this program.

Respondents and the GOE withheld information requested by Commerce regarding this program, warranting the application of facts available pursuant to 19 U.S.C. § 1677e(a)(2)(A). In addition, the mischaracterizations that respondents and the GOE presented regarding the government's regime regulating the use of brackish water and the fact that it does in fact charge for the use of this water in some instances, significantly impeded Commerce's investigation, further warranting the application of facts available pursuant to 19 U.S.C. § 1677e(a)(2)(C). In addition, the information regarding non-use and the lack of value of brackish water that respondents and the GOE provided could not be verified – and was in fact directly contradicted

---

11 GOE Verification Report (Sep. 3, 2024) at 12.

12 *See id*.

13 *Id*.

at verification – warranting the application of facts available pursuant to 19 U.S.C. § 1677e(a)(2)(D).

Commerce should also determine that an adverse inference is warranted pursuant to 19 U.S.C. § 1677e(b), as respondents and the GOE have failed to cooperate by not acting to the best of their ability by withholding information that was in their possession and requested by Commerce and by misrepresenting the facts regarding the regime governing the use of brackish water in Ecuador, including use by respondents themselves. Commerce has expended significant resources in investigating this program, only to be thwarted at every turn by the GOE and respondents. Respondents never provided information on the amount of brackish water they used during the POI, preventing Commerce from determining the benefit conferred by this program. At verification, it was revealed [ ].[14] The GOE and respondents insisted throughout this investigation that brackish water has no value in Ecuador, only to inform Commerce at verification that the GOE has in fact charged for the use of brackish water, including charges to one respondent's individually-investigated shrimp farm.

This intransigence warrants the application of adverse facts available ("AFA"), and the application of AFA should be sufficiently adverse to provide a disincentive for respondents to engage in such uncooperative and misleading behavior in the future.[15] When applying facts

---

14 GOE Verification Exhibits (July 26, 2024) at Ex. VE-4 ([ ]).

15 *See, e.g.*, *Certain Uncoated Paper From Indonesia: Final Affirmative Countervailing Duty Determination*, 81 Fed. Reg. 3104 (Dep't Commerce Jan. 20, 2016) and accompanying Issues and Decision Memorandum ("Uncoated Paper IDM") (ACCESS Barcode: 3431753-01) at 5.

available with an adverse inference, Commerce may rely on the petition, a final determination in the investigation, any previous review or determination, or any other information on the record.[16] Commerce's practice is to select the highest above *de minimis* program rate available based on the following hierarchy: (1) rates for the identical program used by a cooperative respondent in the same investigation; (2) rates for the identical program in another proceeding on the same country; (3) rates for any similar or comparable program (based on the treatment of the benefit) in any proceeding involving the same country; (4) rates from any non-company-specific proceeding involving the same country that the industry could possibly use.[17]

None of the respondents have been cooperative regarding Commerce's investigation into this program, and thus there is no rate available under step one of the hierarchy. In addition, as far as petitioner is aware, the provision of brackish water has not been countervailed in any prior countervailing duty proceeding on Ecuador. Thus, the most similar programs countervailed in prior proceedings are programs in which the GOE has provided other goods or services for LTAR. It appears that the highest non-*de minimis* rate for an LTAR program in a case on Ecuador was 10.67 percent, for the provision of raw shrimp for LTAR in the investigation on *Frozen Warmwater Shrimp from Ecuador*.[18] ASPA believes this rate is highly conservative, given the fact that respondents claim that countervailing this program would result in such large

---

[16] *See* 19 U.S.C. § 1677e(b)(2).

[17] *See* Uncoated Paper IDM at 6.

[18] *See Certain Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty Determination*, 78 Fed. Reg. 50,389 (Dep't Commerce Aug. 19, 2013) and accompanying Issues and Decision Memorandum (ACCESS Barcode: 3149965-01) ("Ecuador Shrimp 2013 IDM") at 35. We note that while Commerce relied on adverse facts available regarding certain elements of this program, the rates were calculated rates and not total AFA rates. *See id.* at 34 – 35.

subsidy margins that it would "bankrupt" the Ecuadorian shrimp industry.[19] This only confirms the significance of the subsidy benefits that respondents have received under this program. For all of these reasons, Commerce should apply the rate of 10.67 percent to both respondents to countervail the provision of brackish water in the final results.

## III. Commerce Should Countervail the Provision of Fuel

Both respondents report purchasing fuel that is supplied by the state-owned fuel supplier, Petroecuador, pursuant to the provision of fuel for LTAR program.[20] Inexplicably, in its post-preliminary determination, Commerce failed to follow its long-established practice and declined to countervail the provision of fuel, on the basis that the fuel provided by Petroecuador to the respondents was sold through private traders and/or distributors.[21] This determination is inconsistent with Commerce's long-established practice, as affirmed by the court, to treat the issue of financial contribution and benefit separately, and to countervail the provision of goods by government authorities regardless of whether those goods are provided directly to respondents or through private trading companies or distributors. [22] In the final determination, Commerce

---

19 Ecuadorian Respondents Rebuttal to ASPA's Supplemental New Subsidy Allegations Response (Mar. 15, 2024) at 5.

20 *See* SONGA New Subsidy Allegations Questionnaire Response (Apr. 18, 2024) ("SONGA NSA Response") at NSA-6, NSA-10, and [ ]. *See also* Santa Priscila New Subsidy Allegations Questionnaire Response (Apr. 18, 2024) ("Santa Priscila NSA Response") at NSA-2, NSA-7, NSA-11, and [ ].

21 *See* Post-Prelim Analysis at 15 – 16.

22 *See, e.g., Citric Acid and Certain Citrate Salts From the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2011*, 79 Fed. Reg. 108 (Dep't Commerce Jan. 2, 2014) and accompanying Issues and Decision Memorandum (ACCESS Barcode: 3170817-01) ("*Citric Acid IDM*") at Comment 5, affirmed in *RZBC Group Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1301 – 1303 (Ct Int'l Trade 2015).

should follow its consistent practice by countervailing the provision of fuel to respondents and their cross-owned entities.

In *Citric Acid from China*, the respondent purchased government-provided steam coal and sulfuric acid through private trading companies, and the respondent argued that Commerce could only countervail the programs if it found that the government entrusted or directed the private trading companies to provide the goods for LTAR.[23] Commerce rejected this argument and countervailed the programs.[24] Commerce explained that in prior countervailing duty proceedings, Commerce had countervailed LTAR programs "when a government's financial contribution (*e.g.*, the provision of a good) is made to the trading company suppliers that purchase the input at issue, while all or some portion of the benefit is conferred on the respondents who purchase the input from the trading company suppliers."[25] Commerce continued, "… when the price paid by the producer of subject merchandise is less than the benchmark price, the producers receive a benefit when they purchase these government-provided goods and, accordingly, receive those inputs for LTAR."[26] Commerce thus explained that no entrustment or direction finding was necessary, because both the financial contribution and benefit elements of a countervailable subsidy were present.

23 *See Citric Acid IDM* at Comment 5.

24 *See id*.

25 *Id*.

26 *Id*.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 9/16/24 12:18 PM, Submission Status: Approved

This determination is consistent with Commerce's practice as established in numerous other cases.[27] This practice has also been upheld by the Court of International Trade.[28] In *Beijing Tianhai*, for example, the court noted that the statute directs Commerce to countervail subsidies whether they are provided "directly or indirectly" to subject merchandise.[29] The court noted that Congress specifically empowered Commerce to countervail subsidies that are conferred indirectly to prevent circumvention of the countervailing duty statute.[30] The court noted that no pass-through analysis or upstream subsidy analysis was required to countervail the provision of goods in such instances, as long as the price at which respondents purchased the goods from the trading companies was below the benchmark price.[31]

---

[27] *See, e.g., Galvanized Steel Wire from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 77 Fed. Reg. 17,418 (Dep't Commerce Mar. 26, 2012) and accompanying Issues and Decision Memorandum (ACCESS barcode 3064920-01) at Comment 5. *See also Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances*, 73 Fed. Reg. 31,966 (Dep't Commerce June 5, 2008) and accompanying Issues and Decision Memorandum (no ACCESS barcode available) at 10; *Final Results of Countervailing Duty Administrative Review: Polyethylene Terephthalate Film, Sheet and Strip from India*, 71 Fed. Reg. 7534 (Dep't Commerce Feb. 13, 2006) and accompanying Issues and Decision Memorandum (no ACCESS barcode available) at Comment 8.

[28] *See Beijing Tianhai Industry Co., Ltd. v. United States*, 52 F.Supp.3d 1351, 1360 - 1367 (Ct Int'l Trade 2015). *See also RZBC Group Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1301 – 1303 (Ct Int'l Trade 2015).

[29] *Beijing Tianhai*, 52 F.Supp.3d at 1362 (citing 19 U.S.C. § 1671(a)). *See also* 19 U.S.C. § 1677(5)(C) (stating the determination of whether a subsidy exists shall be made without regard to whether the subsidy is provided directly or indirectly).

[30] *Beijing Tianhai*, 52 F.Supp.3d at 1363 (citing the Statement of Administrative Action accompanying the Uruguay Round Agreements Act ("SAA"), H.R. Doc. No. 103-316 at 926).

[31] *See id*. at 1363 – 1367.

The court again upheld this practice in *RZBC Group*, the appeal from the *Citric Acid* determination summarized above. In *RZBC Group*, the court stated: "The logic in the *Final Results* is spot on."[32] The court explained that the statute:

> … allows Commerce to counteract contributions which originate with the government, but which pass through an intermediary before going to the ultimate user. In the last variation, the middleman may skim some of the benefit by reselling the subsidized inputs at a markup. But if the marked-up cost that the final user pays is less than the market cost, the user still gets a benefit. Commerce can countervail these sales because the authorities made a contribution to a person (the intermediary), thereby conferring a benefit to the producer (in a sum reduced by the middleman's cut).[33]

The court went on to explain that no entrustment or direction finding was necessary as long as the respondents purchased the good in question from the middlemen at a price that was lower than the benchmark price.[34]

Consistent with the statute, legislative history, and Commerce's longstanding practice as affirmed by the court, Commerce should countervail the provision of fuel in this case. As noted above, the financial contribution element is met because respondents report that the fuel they purchased is originally supplied by the state-owned fuel supplier, Petroecuador.[35] As explained above, no entrustment or direction analysis is necessary to find a financial contribution, because a government authority – Petroecuador – is indisputably providing the fuel in question, albeit

---

32 *RZBC Group*, 100 F.Supp.3d at 1301.

33 *Id*. at 1302.

34 *See id*. at 1303.

35 *See* SONGA New Subsidy Allegations Questionnaire Response (Apr. 18, 2024) ("SONGA NSA Response") at NSA-6, NSA-10, and [ ]. *See also* Santa Priscila New Subsidy Allegations Questionnaire Response (Apr. 18, 2024) ("Santa Priscila NSA Response") at NSA-2, NSA-7, NSA-11, and [ ].

through middlemen. In addition, the specificity prong is met, because consumers of Diesel 2 and Premium Diesel for shrimp farming in Ecuador are eligible for specific fuel price categories.[36]

To determine whether a benefit exists, Commerce need not conduct a pass-through or upstream subsidy analysis. Instead, all Commerce needs to do is compare the prices that respondents paid for fuel to a market-based benchmark. Because the GOE owns all of Ecuador's subsurface resources including oil, Ecuador's petroleum sector is dominated by one state-owned enterprise, Petroecuador, and the GOE heavily regulates domestic fuel prices,[37] Commerce should find that government predominance and interference in Ecuador's fuel market results in no tier one, market-determined prices being available as a benchmark under 19 C.F.R. § 351.511(a)(2)(i).

Thus, Commerce should use a tier two benchmark (*i.e.*, a world market price that would be available to producers in Ecuador). Petitioner has submitted quantity and value data for Ecuador's imports of diesel fuel from the world in 2022, showing that the average price was $1.17/kilogram.[38] This converts into a benchmark price of $4.43/gallon.[39] Petitioner also submitted ocean freight rates for imports of diesel fuel into Ecuador, duty rates on diesel imports, and VAT rates to allow Commerce to calculate the tier-two benchmark on a delivered basis, consistent with its practice.[40] Commerce should compare the rates that respondents paid for diesel fuel that was ultimately supplied from Petroecuador (whether purchased from trading

36 *See* Post-Prelim Analysis at 15 (citing GOE NSA IQR (Apr. 19, 2024) at NSA-2 and Exhibits NSA-1 and NSA-2).

37 *See* ASPA New Subsidy Allegations (Jan. 8, 2024) at 4 – 5 and Exs. 5 – 6.

38 *See* ASPA Benchmark Submission (Feb. 28, 2024) at Ex. 5.

39 *See id*. at Ex. 9 (conversion factor for a kilogram of gasoline to a gallon of gasoline).

40 *See id*. at Exs. 8 – 8.


Filed By: rschagrin@schagrinassociates.com, Filed Date: 9/16/24 12:18 PM, Submission Status: Approved

companies or distributors) to this market-based benchmark and countervail the full amount of benefit received from the government provision of fuel for LTAR.

## IV. Commerce Should Revise the Benchmark Used to Value the Provision of Electricity

In its post-preliminary determination, Commerce correctly determined that the provision of electricity for LTAR was countervailable.[41] Commerce also correctly found that electricity prices in Ecuador are significantly distorted by government predominance in the electricity market, and thus there are no useable tier one benchmarks available to measure the benefit of this program.[42] Commerce noted that Ecuador did in fact import electricity from Colombia and Peru during the POI, and a value and quantity for that electricity were available, providing a basis for world market price for a tier two benchmark pursuant to 19 C.F.R. § 351.511(a)(2)(ii).[43] Yet Commerce declined to use this benchmark because the electricity imported from Colombia and Ecuador is reportedly not "directly accessible to domestic electricity consumers."[44] Commerce also was not able to determine whether the GOE recovered the costs of providing electricity in order to assess whether the government price is consistent with market principles under tier three.[45] Thus, Commerce relied on facts available to use Ecuadorian electricity distributors' cost to provide electricity as the benchmark.[46]

In the final determination, Commerce should use the electricity prices from Colombia and Peru as the benchmark for this program. Commerce's conclusion that this electricity from

---

[41] *See* Post-Prelim Analysis at 6 – 13.

[42] *See id*. at 9.

[43] *See id*. at 10.

[44] *See id*.

[45] *See id*. at 12.

[46] *See id*.

"directly" available or passed through distributors, the import prices avoid the distortions and non-market principles found in the Ecuadorian electricity market, and they are the only appropriate basis for facts available benchmarks.[50]

For all of these reasons, Commerce should use prices for imports of electricity from Colombia and Peru as the benchmark to measure the benefit of the provision of electricity in the final results.

## V. Commerce Should Correct the Multiplier Used for Programs Benefitting Respondents' Shrimp Suppliers

Both respondents have multiple cross-owned shrimp farms, yet Commerce selected only one farm to investigate for each respondent – Naturisa S.A. ("Naturisa") for SONGA and Produmar for Santa Priscila.[51] As noted in previously filed comments, ASPA strongly disagrees with this decision and believes that it violates the plain language of Commerce's regulations and Commerce's established practice.[52] The U.S. Court of International Trade has upheld Commerce's practice of attributing subsidies from cross-owned input suppliers regardless of the quantity of inputs they provide, stating, "the regulations do not obligate Commerce to measure the impact of an input supplier's contributions when weighing whether to attribute its subsidies

---

50 We note that the other third country prices on the record were not available to purchasers in Ecuador at all, because Ecuador did not import electricity from these countries. Post-Prelim Analysis at 10. These third country prices are thus not appropriate benchmarks under either tier two or as facts available.

51 *See* Letter to Santa Priscila, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Industrial Pesquera Santa Priscila S.A." (Jan. 25, 2024) ("Santa Priscila Supplier Questionnaire"). *See also* Letter to SONGA, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Sociedad Nacional de Galápagos C.A." (Jan. 25, 2024) ("SONGA Supplier Questionnaire").

52 *See* ASPA Opposition to Respondents' Request to Exclude Companies from Reporting Obligations (Jan. 11, 2024). *See also* ASPA Opposition to Exclusion of Respondents' Cross-Owned Input Suppliers (Jan. 29, 2024).


Filed By: rschagrin@schagrinassociates.com, Filed Date: 9/16/24 12:18 PM, Submission Status: Approved

to the downstream producer."[53] Indeed, in the prior investigation on shrimp from Ecuador, Commerce required SONGA to report on all of its cross-owned input suppliers, and it investigated seven cross-owned shrimp farms instead of just one.[54] ASPA continues to object to the decision to excuse most of respondents' cross-owned shrimp farms from participating in this investigation.

If Commerce continues to only investigate one shrimp farm for each respondent, it must at a minimum ensure that it correctly attributes the benefit to these shrimp farms to all of the raw shrimp bought by respondents during the POI. In the preliminary determination, Commerce relied on Section 771B of the Act, 19 U.S.C. § 1677-2, to attribute the per-pound benefits received by Naturisa and Produmar to the volume of raw shrimp respondents purchased from unaffiliated shrimp farmers.[55] However, Commerce did not account for the pounds of shrimp purchased by respondents from affiliated shrimp farmers other than Naturisa and Produmar. By not investigating these other affiliated shrimp farms, and by not including their pounds in the multiplier for benefits to shrimp farmers, Commerce has understated the benefit of shrimp farmer subsidies attributable to SONGA and Santa Priscila.

To illustrate, in the preliminary determination Commerce determined that SONGA had the following shrimp purchases:[56]

---

[53] *Icdas Celik Enerji Tersane v. Ulasim Sanayi A.S.*, 498 F. Supp. 3d 1345, 1364 (Ct. Int'l Trade 2021).

[54] *See* ASPA Opposition to Exclusion of Respondents' Cross-Owned Input Suppliers (Jan. 29, 2024) at 2 – 3 and Exs. 1 and 2.

[55] *See, e.g.*, *Frozen Warmwater Shrimp From Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With the Final Antidumping Duty Determination*, 89 Fed. Reg. 22,666 (Dep't Commerce Apr. 2, 2024) and accompanying Decision Memorandum ("Prelim DM") at 14 – 15.

[56] *See* SONGA Prelim Calc Memo (Mar. 25, 2024) at Attachment II.

| | Category | Pounds | |
|---|---|---|---|
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |
| [ | | | ] |

Santa Priscila [ ].[57] Yet Commerce only multiplied the per-pound benefits found for Naturisa and Produmar by the respondents' unaffiliated purchases, and not the pounds purchased from affiliated suppliers. If Commerce refuses to investigate these other cross-owned suppliers, it must a minimum include their pounds in the benefit calculation. Thus, for SONGA, for example, Commerce should multiply the per pound benefit found for Naturisa for each program by the sum of the pounds purchased from other cross-owned suppliers and unaffiliated suppliers (i.e., [ ] pounds), rather than just the volume purchased from unaffiliated suppliers ([ ] pounds). Commerce should do the same for Santa Priscila.

Commerce has already decided to excuse many of respondents' cross-owned input suppliers from investigation. It must, at a minimum, correct its calculations to ensure this decision does not artificially understate the subsidy benefits attributable to SONGA and Santa Priscila.

## VI. Commerce Should Apply Adverse Facts Available to Countervail Unverifiable and Omitted Income Tax Programs

At the start of verification, both respondents revealed for the first time that they had mis-reported or omitted certain tax programs in their questionnaire responses:

- SONGA officials reported that they had mistakenly reported currency outflow tax (ISD) exemptions on purchases of imported assets and raw materials under the investment

[57] *See* Santa Priscila Prelim Calc Memo (Mar. 25, 2024) at Attachment II.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 9/16/24 12:18 PM, Submission Status: Approved

# Tab 74

# P.R. 437

Barcode:4638106-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
**Public Document**
E&C/OIV: ZS, RA

September 26, 2024

**MEMORANDUM TO:** Ryan Majerus
Deputy Assistant Secretary
for Policy and Negotiations,
performing the non-exclusive functions and duties
of the Assistant Secretary for Enforcement and Compliance

**FROM:** Scot Fullerton
Acting Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:** Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Second Post-Preliminary Analysis

---

## I. SUMMARY

The U.S. Department of Commerce (Commerce) preliminarily finds additional countervailable subsidies are being provided to Santa Priscila S.A. (Santa Priscila), Sociedad Nacional de Galapagos C.A. (SONGA), and certain of their cross-owned entities,[1] as well as to unaffiliated shrimp producers, from the Government of Ecuador (GOE). The period of investigation (POI) is January 1, 2022, through December 31, 2022.

## II. BACKGROUND

On April 1, 2024, Commerce published the *Preliminary Determination* in the countervailing duty (CVD) investigation of frozen warmwater shrimp (shrimp) from Ecuador.[2] The mandatory respondents in this investigation are Santa Priscila and SONGA, and certain of their cross-owned entities. On April 19, 2024, Commerce published an *Amended Preliminary Determination*[3] in response to ministerial error comments submitted by interested parties on Commerce's

[1] The entities that we preliminarily determined are cross-owned with Santa Priscila are: Manesil S.A., Produmar S.A. (Produmar); Egidiosa S.A. (Egidiosa); and Tropical Packing Ecuador S.A. (Tropack). The entities that we preliminarily determined are cross-owned with SONGA are: Naturisa S.A. (Naturisa); Holding Sola & Sola Solacciones S.A. (Sola); and Empacadora Champmar S.A. (Champmar).
[2] *See Frozen Warmwater Shrimp from Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with the Final Antidumping Duty Determination*, 89 FR 22379 (April 1, 2024) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).
[3] *See Frozen Warmwater Shrimp from Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation*, 89 FR 31722 (April 25, 2024) (*Amended Preliminary Determination*), and accompanying Ministerial Error Memorandum.

Filed By: Reginald Anadio, Filed Date: 9/27/24 11:06 AM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

*Preliminary Determination*.[4] On July 10, 2024, the GOE submitted its response[5] to Commerce's July 2, 2024, supplemental questionnaire.[6] On July 12, 2024, Commerce issued its post-preliminary findings[7] on subsidies alleged by the American Shrimp Processors Association (*i.e.*, the petitioner) in the petitioner's new subsidy allegations.[8] In the Post-Preliminary Determination, Commerce stated that it would address three more programs in an additional post-preliminary determination.[9]

From July 15 through 17, 2024, Commerce conducted verification of Santa Priscila and the GOE's questionnaire responses regarding the subsidies examined in the *Preliminary Determination* and its responses regarding the alleged new subsidies in this investigation.[10] From July 22 through 24, 2024, Commerce conducted verification of SONGA's responses regarding the subsidies examined in the *Preliminary Determination* and its responses regarding the alleged new subsidies in this investigation.[11]

## III. DIVERSIFICATION OF ECUADOR'S ECONOMY

Section 771(5A)(D)(iii) of the Tariff Act of 1930, amended (the Act) provides that, in evaluating the factors set forth under the provision, Commerce shall take into account the extent of economic diversification of economic activities within the jurisdiction of the authority providing the subsidy, and the length of time during which the subsidy program has been in operation. The SAA elaborates that "these additional criteria serve to inform the application of, rather than supersede or substitute for, the enumerated specificity factors"; that is, they "may provide a clearer context within which the *de facto* factors would be analyzed" but are not *per se* "additional indicators of whether specificity exists."[12]

In this investigation, we asked that the GOE to provide information on the economic activities within the jurisdiction of the granting authority for each relevant program. The GOE provided information from the Ecuadorean Internal Revenue Service's (SRI) Single Taxpayer Registry

[4] *See* Santa Priscila's Letter, "Request for Correction of Ministerial Errors with Respect to Industrial Pesquera Santa Priscila S.A. and Request for Meeting," dated March 28, 2024; *see also* SONGA's Letter, "Request for Correction of Ministerial Error in Preliminary Determination," dated March 29, 2024; GOE's Letter, "Request for Correction of Ministerial Errors with Respect to Industrial Pesquera Santa Priscila S.A. and Request for Meeting," dated April 2, 2024; Petitioner's Letter, "Ministerial Error Comments," dated April 2, 2024.
[5] *See* GOE's Letter, "Government of Ecuador's Third Post-Preliminary Supplemental Questionnaire Response," dated July 10, 2024 (GOE Post-Preliminary SQR 3)
[6] *See* Commerce's Letter, "Government of Ecuador Post Preliminary Third Supplemental Questionnaire," dated July 2, 2024.
[7] *See* Memorandum, "Post-Preliminary Analysis," dated July 12, 2024 (Post-Preliminary Determination).
[8] *See* Petitioner's Letters, "New Subsidy Allegations," dated January 8, 2024; and "New Subsidy Allegations," dated February 2, 2024 (collectively, Petitioner's NSAs).
[9] *See* Post-Preliminary Determination at page 18.
[10] *See* Memorandum, "Verification of the Questionnaire Responses of the Government of Ecuador," dated September 3, 2024 (GOE Verification Report); "Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A.," dated August 22, 2024 (Santa Priscila Verification Report).
[11] *See* Memorandum, "Verification of the Questionnaire Responses of Sociedad Nacional de Galapagos C.A.," dated August 13, 2024 (SONGA Verification Report).
[12] *See* Statement of Administrative Action Accompanying the Uruguay Round Agreements Act, H.R. Doc. 103-316, Vol. I (1994), at 931 (SAA).

System on the companies operating in Ecuador during the POI.[13] The evidence on the record indicates that, for purposes of our *de facto* specificity analysis, the Ecuadorian economy is diversified. Specifically, the information provided by the GOE indicates that many industries operate in Ecuador, including: manufacturing; agriculture, forestry, and fishing; arts, entertainment and recreation; electricity, gas, steam and air conditioning supply; financial and insurance activities; information and communication; mining and quarrying; real estate activities; transportation and storage; wholesale and retail trade; repair of motor vehicles and motorcycles; and a variety of service-related industries.[14] Based on this information, we preliminarily determine that the level of economic diversification in Ecuador does not detract from finding a program to be *de facto* specific for programs in this memorandum as relevant, where other information so indicates in accordance with section 771(5A)(D)(iii) of the Act (*e.g.*, where the number of recipients are limited in number).

## IV. SUBSIDIES VALUATION

### A. Allocation Period

The allocation period or average useful life (AUL) of renewable physical assets in the production of subject merchandise is 12 years, unchanged from the *Preliminary Determination*.[15]

### B. Attribution of Subsidies

Commerce's attribution methodology regarding Santa Priscila and certain of their cross-owned affiliates is unchanged from the *Preliminary Determination*.[16] Therefore, we are attributing the benefits to the sales of Santa Priscila and certain of their cross-owned affiliates in accordance with 19 CFR 351.525(b)(6)(ii)-(iv). With regards to SONGA, at Commerce's verification of SONGA's responses to our requests for information throughout the course of this investigation, SONGA reported that its cross-owned affiliate Sola had used the Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities Program.[17] Therefore, consistent with 19 CFR 351.525(b)(6)(iii), we are attributing benefits received by Sola under the above mentioned program to the sales of SONGA and certain of its cross-owned affiliates. Commerce's attribution methodology regarding SONGA and its other cross-owned affiliates is unchanged from the *Preliminary Determination*.

[13] *See, e.g.*, GOE's Letter, "Government of Ecuador's Section II Questionnaire Response," dated February 14, 2024 (GOE's IQR), at TAX-13 and TAX-14.
[14] *Id.*
[15] *See Preliminary Determination* PDM at 6.
[16] *Id.* at 5 and 6.
[17] *See* SONGA Verification Report at 3 and 16.

### C. Application of Section 771B of the Act

In the *Preliminary Determination*, in accordance with section 771B(1) of the Act, Commerce preliminarily determined that record evidence indicated that the demand for unprocessed shrimp is "substantially dependent" on the demand for frozen shrimp.[18] Furthermore, in accordance with section 771(B)(2) of the Act, Commerce preliminarily determined that processing of the raw input of subject merchandise added less than 30 percent of the final value of subject merchandise, and that the essential character of the fresh shrimp consumed is not changed with processing.[19] Therefore, Commerce preliminarily attributed subsidies to the non-cross-owned shrimp suppliers that are specific to Santa Priscila and SONGA.[20] Accordingly, Commerce's decision to attribute subsidies to the non-cross-owned shrimp suppliers that are specific to Santa Priscila and SONGA remains unchanged from the *Preliminary Determination*.[21]

### D. Denominators

With respect to Santa Priscila, the denominators used are unchanged from the *Preliminary Determination*.[22] With respect to SONGA and its other cross-owned affiliates, the denominators used are unchanged from the *Preliminary Determination*. Under 19 CFR 351.525(b)(6)(iii), we would attribute to the consolidated sales of Sola and its subsidiaries. However, we lack consolidated sales information for Sola and its subsidiaries. Therefore, for the Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities Program, we have used SONGA's consolidated sales and added Sola's revenue for 2022 as the denominator. We have identified the denominators we used to calculate the subsidy rates for the alleged subsidy programs listed above and as discussed below and in the calculation memorandum prepared for this post-preliminary analysis.[23]

## V. USE OF FACTS OTHERWISE AVAILABLE AND ADVERSE INFERENCES

### A. Legal Standards

Section 776(a)(1) and (2) of the Act provide that Commerce shall, subject to section 782(d) of the Act, apply "facts otherwise available" if necessary information is not on the record or an interested party or any other person withholds information that has been requested; fails to provide information within the established deadlines, or in the form and manner requested by Commerce, subject to subsections (c)(1) and (e) of section 782 of the Act; significantly impedes a proceeding; or provides information that cannot be verified, as provided by section 782(i) of the Act.

---

[18] *See Preliminary Determination* PDM at 10.
[19] *Id*.
[20] *Id.* at 11.
[21] Commerce will analyze responses to the Section 771B Initial Questionnaires in its final determination.
[22] *See Preliminary Determination* PDM at 11.
[23] *See* Memoranda, "Second Post-Preliminary Determination Calculations for Santa Priscila S.A.," dated concurrently with this memorandum (Santa Priscila's Second Post-Preliminary Calculation Memorandum); and "Second Post-Preliminary Determination Calculations for Sociedad Nacional de Galapagos C.A.," dated concurrently with this memorandum (SONGA's Second Post-Preliminary Calculation Memorandum).

Where Commerce determines that a response to a request for information does not comply with the request, section 782(d) of the Act provides that the agency will so inform the party submitting the response and will, to the extent practicable, provide that party with an opportunity to remedy or explain the deficiency. If the party fails to remedy or satisfactorily explain the deficiency within the applicable time limits, subject to section 782(e) of the Act, Commerce may disregard all or part of the original and subsequent responses, as appropriate.

Section 776(b) of the Act further provides that Commerce may use an adverse inference in selecting from among the facts otherwise available when a party fails to cooperate by not acting to the best of its ability to comply with a request for information. Further, section 776(b)(2) of the Act states that an adverse inference may include reliance on information derived from the petition, the final determination from the investigation, a previous administrative review, or other information placed on the record. When selecting an adverse facts available (AFA) rate from among the possible sources of information, Commerce's practice is to ensure that the rate is sufficiently adverse "as to effectuate the statutory purposes of the adverse facts available rule to induce respondents to provide Commerce with complete and accurate information in a timely manner."[24] Commerce's practice also ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[25] At the same time, section 776(b)(1)(B) of the Act states that Commerce is not required to determine, or make any adjustments to, a countervailable subsidy rate based on any assumptions about information the interested party would have provided if the interested party had complied with the request for information.

In *Nippon Steel*, the U.S. Court of Appeals for the Federal Circuit (Federal Circuit) held that, while the statute does not provide an express definition of the "failure to act to the best of its ability" standard, the ordinary meaning of "best" is "one's maximum effort."[26] Thus, according to the Federal Circuit, the statutory mandate that a respondent act to the "best of its ability" requires the respondent to do the maximum it is able to do. The Federal Circuit indicated that inadequate responses to an agency's inquiries would suffice to find that a respondent did not act to the best of its ability. While the Federal Circuit noted that the "best of its ability" standard does not require perfection, it does not condone inattentiveness, carelessness, or inadequate record keeping.[27] The "best of its ability" standard recognizes that mistakes sometimes occur; however, it requires a respondent to, among other things, "have familiarity with all of the records it maintains," and "conduct prompt, careful, and comprehensive investigations of all relevant records that refer or relate to the imports in question to the full extent of" its ability to do so.[28]

---

[24] *See, e.g., Drill Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 76 FR 1971 (January 11, 2011); *see also Notice of Final Determination of Sales at Less Than Fair Value: Static Random Access Memory Semiconductors from Taiwan*, 63 FR 8909, 8932 (February 23, 1998).
[25] SAA at 870.
[26] *See Nippon Steel Corp. v. United States*, 337 F.3d 1373, 1382-83 (Fed. Cir. 2003) (Nippon Steel).
[27] *Id.* 337 F.3d at 1382.
[28] *Id.*

Moreover, further, affirmative evidence of bad faith on the part of a respondent is not required before Commerce may make an adverse inference.[29]

Section 776(c) of the Act provides that, when Commerce relies on secondary information rather than information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal. Secondary information is "information derived from the petition that gave rise to the investigation or review, the final determination concerning the subject merchandise, or any previous review under section 751 {of the Act} concerning the subject merchandise."[30] It is Commerce's practice to consider information to be corroborated if it has probative value.[31] In analyzing whether information has probative value, it is Commerce's practice to examine the reliability and relevance of the information to be used.[32] However, the SAA emphasizes that Commerce need not prove that the selected facts available are the best alternative information.[33] Furthermore, Commerce is not required to corroborate any countervailing subsidy rate applied in a separate segment of the same proceeding.[34]

Under section 776(d) of the Act, Commerce may use any countervailable subsidy rate applied for the same or similar program in a CVD proceeding involving the same country, or, if there is no same or similar program, use a CVD rate for a subsidy program from a proceeding that Commerce considers reasonable to use, including the highest of such rates. Additionally, when selecting an AFA rate, Commerce is not required for purposes of section 776(c) of the Act, or any other purpose, to estimate what the countervailable subsidy rate would have been if the interested party had cooperated or to demonstrate that the countervailable subsidy rate reflects an "alleged commercial reality" of the interested party.[35] For purposes of this post-preliminary determination, we are applying AFA for the circumstances outlined below.

### B. Application of AFA: Reporting of Benefits Under the Motor Vehicle Tax Reduction Program

In the Initial Questionnaire,[36] we requested information for all self-reported programs used by the mandatory respondents and their cross-owned affiliates during the AUL.[37] During Commerce's verification of Produmar's responses to our requests for information in this investigation, we discovered that Produmar had misreported its usage of the Motor Vehicle Tax Reduction program.[38] During Commerce's verification of SONGA and Naturisa's responses to our requests for information in this investigation, we discovered that SONGA and Naturisa

[29] *See, e.g., Notice of Final Determination of Sales at Less Than Fair Value: Circular Seamless Stainless Steel Hollow Products from Japan*, 65 FR 42985 (July 12, 2000); *Antidumping Duties; Countervailing Duties: Final Rule*, 62 FR 27296, 27340 (May 19, 1997); and Nippon Steel, 337 F.3d at 1382-83.
[30] *See, e.g.*, SAA at 870.
[31] *Id.*
[32] *Id*. at 869.
[33] *Id.* at 869-870.
[34] *See* section 776(c)(2) of the Act.
[35] *See* section 776(d)(3) of the Act.
[36] *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated December 12, 2023 (Initial Questionnaire).
[37] *Id.* at 44 and 45.
[38] *See* Santa Priscila Verification Report at 2.

received benefits under the Motor Vehicle Tax Reduction program which SONGA and Naturisa did not report in its original responses to our Initial Questionnaire.[39] At verification, we did not accept Santa Priscila's changes to Produmar's reporting for the Motor Vehicle Tax Reduction program, and SONGA's changes to Naturisa's reporting of benefits under the Motor Vehicle Tax Reduction program.[40] As a result, we do not have information available on the record to determine whether each of the financial contributions provided to Produmar, SONGA, and Naturisa constitutes a benefit. Therefore, we have relied on facts available, in accordance with section 776(a) of the Act, because necessary information is not available on the record, and because Produmar, SONGA, and Naturisa failed to provide the necessary information requested by Commerce, significantly impeding this proceeding. Thus, we have relied on facts otherwise available in accordance with sections 776(a)(1) and 776(a)(2)(A)-(C) of the Act.

Furthermore, we preliminarily determine that adverse inferences are warranted, pursuant to section 776(b) of the Act, when selecting from among the facts otherwise available. By failing to provide accurate, timely information regarding the usage of the Motor Vehicle Tax Reduction program pursuant to Commerce's Initial Questionnaire by the established deadline, Produmar, SONGA, and Naturisa failed to cooperate to the best of their ability to comply with Commerce's request for information in this proceeding. Accordingly, we preliminarily find that the use of partial AFA is warranted for Produmar, SONGA, and Naturisa to ensure that the companies do not obtain more favorable results by failing to cooperate than if they had fully complied with our request for information.

As explained below, Commerce is finding the Motor Vehicle Tax Reduction program countervailable in this investigation, and we have included this program in the determination of an AFA rate. As such, we selected an AFA rate for this program in the instant investigation pursuant to the hierarchy set out below and included it in the determination of the AFA rate applied to Produmar, SONGA, and Naturisa.[41] We are also countervailing the Motor Vehicle Tax Reduction program in this investigation with regards to the reported benefits received by Santa Priscila.[42] Additionally, we find that record evidences supports finding that the Motor Vehicle Tax Reduction program constitutes a financial contribution and meets the specificity requirement of the Act, as explained below.

**C. Selection of the AFA Rate**

It is Commerce's practice in CVD proceedings to determine an AFA rate for non-cooperating companies using the highest calculated program-specific rates determined for the cooperating respondents in the instant investigation, or, if not available, rates calculated in prior CVD cases involving the same country.[43] When selecting AFA rates, section 776(d) of the Act provides that

[39] *See* SONGA Verification Report at 2.
[40] *Id.*; *see also* Santa Priscila Verification Report at 2.
[41] *See* Appendix to this memorandum.
[42] *Id*.
[43] *See, e.g., Common Alloy Aluminum Sheet from the People's Republic of China: Preliminary Affirmative Countervailing Duty (CVD) Determination, Alignment of Final CVD Determination with Final Antidumping Duty*

we may use a countervailable subsidy rate determined for the same or a similar program in a CVD proceeding involving the same country, or, if there is no same or similar program, use a countervailable subsidy rate for a subsidy program from a proceeding that Commerce considers reasonable to use, including the highest of such rates.[44] Specifically, Commerce applies the highest calculated rate for the identical subsidy program in the investigation if a responding company used the identical program, and the rate is not zero. If there is no identical program match within the investigation, or if the rate is zero, Commerce uses the highest non-*de minimis* rate for a similar program (based on treatment of the benefit) in a CVD proceeding involving the same country.[45] Absent an above-*de minimis* subsidy rate calculated for a similar program, Commerce applies the highest calculated above-*de minimis* subsidy rate for any non-company specific program otherwise identified in a CVD case involving the same country that could conceivably be used by the non-cooperating company.[46]

Commerce's methodology is consistent with section 776(d)(1)(A) of the Act, which states that, when applying an adverse inference in selecting from the facts otherwise available, we may: (i) "use a countervailable subsidy rate applied for the same or similar program in a {CVD} proceeding involving the same country, or (ii) if there is no same or similar program, use a countervailable subsidy for a subsidy rate from a proceeding that {we} consider {} reasonable to use." Thus, section 776(d)(1)(A) of the Act expressly allows for our existing practice of using an AFA hierarchy in selecting a rate "among the facts otherwise available" in CVD cases, should the facts warrant such a selection.

Section 776(d)(2) of the Act authorizes Commerce to rely on the highest prior rate under certain circumstances. In deriving an AFA rate under section 776(d)(1)(A) of the Act described above, the provision states that we "may apply any of the countervailable subsidy rates or dumping margins specified under that paragraph, including the highest such rate or margin, based on the evaluation by the administering authority of the situation that resulted in the administering authority using an adverse inference in selecting among the facts otherwise available."[47] No legislative history accompanied this particular provision. Accordingly, we are left to interpret this "evaluation by the administering authority of the situation" language in light of existing agency practice, and the structure and provisions of section 776(d) of the Act itself.

---

*Determination, and Preliminary CVD Determination of Critical Circumstances*, 83 FR 17651 (April 23, 2018), and accompanying PDM at "X: Use of Facts Otherwise Available and Adverse Inferences: A. Application of Total AFA: Chalco Ruimin and Chalco-SWA," unchanged in *Countervailing Duty Investigation of Common Alloy Aluminum Sheet from the People's Republic of China: Final Affirmative Determination*, 83 FR 57427 (November 15, 2018), and accompanying Issues and Decision Memorandum (IDM).

[44] *See Certain Frozen Warmwater Shrimp from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 78 FR 50391 (August 19, 2013) (*Shrimp from China*), and accompanying IDM at 13; *see also Essar Steel Ltd. v. United States*, 753 F.3d 1368, 1373-1374 (Fed. Cir. 2014) (upholding "hierarchical methodology for selecting an AFA rate").

[45]For purposes of selecting AFA program rates, we normally treat rates less than 0.5 percent to be *de minimis*. *See, e.g., Pre-Stressed Concrete Steel Wire Strand from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 75 FR 28557 (May 21, 2010), and accompanying IDM at 12-13; *see also Ozdemir Boru San. Ve Tic. Ltd. Ste. V United States,* 273 F. Supp.3d 1225, 1243-45 (CIT 2017).

[46] *See Shrimp from China* IDM at 13-14.

[47] *See* section 776(d)(2) of the Act.

The Act anticipates a two-step process for determining an appropriate AFA rate in CVD cases: (1) Commerce may apply its hierarchy methodology; and (2) Commerce may apply the highest rate derived from this hierarchy to a respondent, should it choose to apply that hierarchy in the first place, unless, after an evaluation of the situation that resulted in the use of AFA, Commerce determines that the situation warrants a rate different than the rate derived from the hierarchy be applied.[48]

In applying the AFA rate provision, it is well established that, when selecting the rate from among possible sources, we seek to use a rate that is sufficiently adverse to effectuate the statutory purpose of section 776(b) of the Act to induce respondents to provide Commerce with complete and accurate information in a timely manner. This ensures "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[49] Further, "in the case of an uncooperative respondent, Commerce is in the best position, based on its expert knowledge of the market and the individual respondent, to select adverse facts that will create the proper deterrent to non-cooperation with its investigations and assure a reasonable margin."[50] It is pursuant to this knowledge and experience that we have implemented our AFA hierarchy in CVD cases to select an appropriate AFA rate.[51]

In applying its AFA hierarchy in CVD investigations, Commerce's goal is as follows: in the absence of necessary information from cooperative respondents, we are seeking to find a rate that is a relevant indicator of how much the government of the country under investigation is likely to subsidize the industry at issue, through the program at issue, while inducing cooperation. Accordingly, in sum, the three factors that we take into account in selecting a rate are: (1) the need to induce cooperation; (2) the relevance of a rate to the industry in the country under investigation (*i.e.*, can the industry use the program from which the rate is derived?); and (3) the relevance of a rate to a particular program, though not necessarily in that order of importance.

Furthermore, the hierarchy (as well as section 776(d)(1) of the Act) recognizes that there may be a "pool" of available rates that we can rely upon for the purpose of identifying an AFA rate for a

---

[48] This differs from antidumping duty (AD) proceedings, for which no hierarchy applies, under section 776(d)(1)(B) of the Act. Under that provision, "any dumping margin from any segment of the proceeding under the applicable antidumping order" may be applied, which suggests an adverse rate could be derived from different available margins, given the facts on the record.

[49] *See* SAA at 870; *see also Essar Steel Ltd. V. United States*, 678 F.3d 1268, 1270-80 (Fed. Cir. 2012) (citing *F. Lii De Cecco Di Filippo Fara S. Martino S.p.A. v. United States*, 216 F.3d 1027 (Fed. Cir. 2000) (*De Cecco*) (finding that "{t}he purpose of the adverse facts statute is 'to provide respondents with an incentive to cooperate' with Commerce's investigation, not to impose punitive damages")).

[50] *See De Cecco*, 216 F.3d at 1032.

[51] We have adopted a practice of applying this hierarchy in CVD cases. *See, e.g., Finished Carbon Steel Flanges from India: Final Affirmative Countervailing Duty Determination*, 82 FR 29479 (June 29, 2017), and accompanying IDM at 28-31 (applying the AFA hierarchical methodology within the context of a CVD investigation); see also *Crystalline Silicon Photovoltaic Cells, Whether or Not Assembled Into Modules, from the People's Republic of China: Final Results of Countervailing Duty Administrative Review; 2012*, 80 FR 41003 (July 14, 2015), and accompanying IDM at 11-15 (applying the AFA hierarchical methodology within the context of a CVD administrative review). However, depending on the type of program, we may not always apply the AFA hierarchy. *See, e.g., Certain Uncoated Paper from Indonesia: Final Affirmative Countervailing Duty Determination*, 81 FR 3104 (January 20, 2016), and accompanying IDM at 7-8 (applying, outside of the AFA hierarchical context, the highest combined standard income tax rate for corporations in Indonesia).

particular program. In investigations, for example, this "pool" of rates could include the rates for the same or similar programs used in either that same investigation, or prior CVD proceedings for that same country. Of those rates, the hierarchy provides a general order of preference to achieve the goal identified above. The hierarchy, therefore, does not focus on identifying the highest possible rate that could be applied from among that "pool" of rates; rather, it adopts the factors identified above of inducement, relevancy to the industry, and relevancy to the particular program.

Under the first step of Commerce's investigation hierarchy, we apply the highest non-zero rate calculated for a cooperating company for the identical program in the investigation. Under this step, we will even use a de minimis rate as AFA if that is the highest rate calculated for another cooperating respondent in the same industry for the same program. However, if there is no identical program match within the investigation, or if the rate is zero, then we will shift to the second step of our investigation hierarchy, and either apply the highest non-de minimis rate calculated for a cooperating company in another CVD proceeding involving the same country for the identical program, or if the identical program is not available, for a similar program. This step focuses on the amount of subsidy that the government has provided in the past under the investigated program. The assumption under this step is that the non-cooperating respondent under investigation uses the identical program at the highest above de minimis rate of any other company using the identical program. Finally, if no such rate exists, under the third step of Commerce's investigation hierarchy, we apply the highest rate calculated for a cooperating company from any non-company-specific program that the industry subject to the investigation could have used for the production or exportation of subject merchandise.[52]

In all three steps of Commerce's AFA investigation hierarchy, if we were to choose low AFA rates consistently, the result could be a negative determination with no order (or a company-specific exclusion from an order) and a lost opportunity to correct future subsidized behavior. In other words, the result of a lack of cooperation would be no order discipline in the future for all or some producers and exporters. Thus, in selecting the highest rate available in each step of Commerce's investigation AFA hierarchy (which is different from selecting the highest possible rate in the "pool" of all available rates), we strike a balance between the three necessary variables: inducement, industry relevancy, and program relevancy.[53]

[52] In an investigation, unlike in an administrative review, Commerce is just beginning to develop an understanding of how the industry under investigation uses subsidies. Commerce may have no prior understanding of the industry and no final calculated and verified rates for the industry.

[53] It is significant that all interested parties, since at least 2007, that choose not to provide requested information have notice that Commerce, in the application of facts available with an adverse inference, may apply its hierarchy methodology and select the highest rate in accordance with that hierarchy. *See, e.g., Coated Free Sheet Paper from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 72 FR 60645 (October 25, 2007), and accompanying IDM at 2 ("As AFA in the instant case, {Commerce} is relying on the highest calculated final subsidy rates for income taxes, VAT and Policy lending programs of the other producer/exporter in this investigation, Gold East Paper (Jiangsu) Co., Ltd. (GE). GE did receive any countervailable grants, so for all grant programs, we are applying the highest subsidy rate for any program otherwise listed …"). Therefore, when an interested party is deciding whether or not to cooperate and respond to a request for information by Commerce, it does not make this decision in a vacuum. Instead, the interested party makes this decision in an environment in which Commerce may, under its hierarchy, apply the highest rate as AFA.

Furthermore, we find that section 776(d)(2) of the Act applies as an exception to the selection of an AFA rate under section 776(d)(1) of the Act; that is, after "an evaluation of the situation that resulted in the application of an adverse inference," we may decide that, given the unique and unusual facts on the record, the use of the highest rate within that step is not appropriate.

There are no facts on this record that suggest that a rate other than the highest rate envisioned under the appropriate step of the hierarchy applied in accordance with section 776(d)(1) of the Act should be applied as AFA. As explained above, we are preliminarily applying partial AFA with respect to the Motor Vehicle Tax Reduction program because Produmar, SONGA, and Naturisa did not provide accurate information regarding their usage of this program in this investigation. Therefore, we preliminarily find that the record does not support the application of an alternative rate, pursuant to section 776(d)(2) of the Act.

In determining the AFA rate for Produmar, SONGA, and Naturisa for this program, we applied Commerce's methodology detailed above. As there is a program-specific, above-zero rate determined for a cooperating respondent in the investigation (*i.e.*, for Santa Priscila), we are applying the highest non-zero rate calculated for the cooperating company for the identical program in the investigation.

Accordingly, we preliminarily determine the AFA net countervailable subsidy rate for Produmar, SONGA, and Naturisa for this program to be 0.04 percent *ad valorem*. The appendix to this memorandum contains a chart summarizing our calculation of this rate.

*Corroboration of AFA Rate*

Section 776(c)(1) of the Act provides that, in general, when Commerce relies on secondary information rather than on information obtained in the course of an investigation or review, it shall, to the extent practicable, corroborate that information from independent sources that are reasonably at its disposal. Secondary information is defined as "information derived from the petition that gave rise to the investigation or review under section 751 {of the Act} concerning the subject merchandise."[54] The SAA provides that to "corroborate" secondary information, Commerce will satisfy itself that the secondary information to be used has probative value.[55]

In the absence of record evidence concerning Produmar, SONGA, and Naturisa's usage of the Motor Vehicle Tax Reduction program, due to their decision not to timely provide usage information regarding this program, Commerce has applied as partial AFA the rate that we calculated for this program with respect to Santa Priscila.[56] Therefore, because the information underlying Commerce's calculation of Santa Priscila's rate was obtained in the course of this investigation and is not secondary information as defined by the SAA,[57] Commerce finds that corroboration of this rate is not warranted.

[54] *See* SAA at 870.
[55] *Id.*
[56] *See* Appendix; *see also* Santa Priscila Second Post-Preliminary Calculation Memorandum.
[57] *See* SAA at 870.

# VI. ANALYSIS OF PROGRAMS

## A. Programs Preliminarily Determined to Be Countervailable

### 1. Youth Employment Program – Article 16 of the Labor Law

Santa Priscila and Tropack reported receiving benefits under this program.[58] Under Article 16 of the Labor Law established by the Ministry of Labor, companies that sign cooperation agreements with the Ministry of Labor and register employment contracts for hired employees that are between the ages of 18 and 26 years of age are eligible to receive reimbursement for actual wages paid to such employees and vacation pay that such employees are eligible to receive.[59] Companies that signed cooperation agreements with the Ministry of Labor were approved to receive benefits under the program after registering an employment contract with the Ministry of Labor.[60] Specifically, Santa Priscila and Tropack reported signing cooperation agreements with the Ministry of Labor to receive the following benefits under this program: (1) 50 percent of the Unified Basic Salary of a general worker; (2) 100 percent of the employers contribution toward the Unified Basic Salary of a general worker; and (3) 100 percent of the vacation pay that a general worker is entitled to based on the Unified Basic Salary of a general worker.[61]

Based on this information, we preliminarily find that this program provides a financial contribution in the form of a direct transfer of funds within the meaning of section 771(5)(D)(i) of the Act. We preliminarily determine that this program provided non-recurring benefits under section 771(5)(E) of the Act in the form of a grant in accordance with 19 CFR 351.524(c) and 351.504(a). Commerce also preliminarily determines that this deduction is specific under section 771(5A)(D)(iii)(I) of the Act because this program was provided to a limited number of enterprises.[62]

Santa Priscila reported receiving reimbursements in 2022 under this program,[63] and Tropack reported receiving reimbursements from 2019 through 2022 under this program. Because the benefits received by Santa Priscila and Tropack under this program are non-recurring in nature, we first applied the "0.5 percent" test described in 19 CFR 351.524(b)(2) to the approved amounts, in the years of the reimbursement approval. The approved amounts were less than 0.5 percent of the relevant sales in the year of approval and, therefore, were expensed to the year of the receipt. For Santa Priscila and Tropack, we divided the combined benefit they received in

---

[58] *See* Santa Priscila's Letter, "Santa Priscila's Section III Questionnaire Response," dated February 12, 2024 (Santa Priscila's Section III IQR) at III-22 and Exhibit 17; *See* Santa Priscila's Letter, "Section III of Supplier Questionnaire Response," dated February 16, 2024 (Santa Priscila's Supplier Section III IQR) at TRO-2 through -4.
[59] *See* GOE Post-Preliminary SQR 3 at S5-2.
[60] *Id* at S5-5.
[61] *See* Santa Priscila's Section III IQR at III-22 and -23 and Exhibit 17 at 2 and Exhibit 22; *see also* Santa Priscila's Supplier Section III IQR at Exhibit TRO-2 at 2 and Exhibit TRO-3.
[62] *See* GOE's Post-Preliminary SQR 3; *see also* Santa Priscila's Second Post-Preliminary Calculation Memorandum; SONGA's Second Post-Preliminary Calculation Memorandum.
[63] *See* Santa Priscila's Section III IQR at III-22 and -23 and Exhibit 17 at 2.

2022 by the combined total sales of Santa Priscila and Tropack during the POI, net of intercompany sales.[64]

As discussed in the *Preliminary Determination*, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to Santa Priscila during the POI. Thus, for this program, we divided the benefit that Santa Priscila received under the program by their volume of shrimp produced during the POI. Next, we multiplied the resulting per-unit benefit for Santa Priscila by the total volume of raw shrimp supplied to Santa Priscila during the POI by Santa Priscila's non-cross-owned shrimp producers. Finally, we divided the benefit attributed to the unaffiliated raw shrimp suppliers by Santa Priscila's/Tropack's total POI sales, net of intercompany sales.[65]

On this basis, we preliminarily determine a countervailable subsidy rate of 0.04 percent *ad valorem* for Santa Priscila/Tropack.[66]

**2. Motor Vehicle Tax Reduction Program**

Santa Priscila,[67] Produmar,[68] SONGA, and Naturisa reported receiving benefits under this program. Under this program, companies may receive an eighty-percent reduction on vehicle taxes owed by; (1) owning (a) vehicle(s) weighing one-ton or more, and (2) by using those vehicles for productive and commercial activities.[69] Companies may receive benefits under this program by registering an applicable vehicle purchase with a local Internal Revenue Service, which authorizes a vehicle permit indicating that the vehicle is subject to benefits under this program.[70]

We preliminarily determine that the exemption of motor vehicle tax constitutes a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act. Additionally, we preliminarily determine that the deduction provides a benefit in the amount of the tax savings to the company, pursuant to 19 CFR 351.509(a)(1) and section 771(5)(E) of the Act. After reviewing the relevant information and program documentation, we preliminary determine that this program does not appear to be *de jure* specific within the meaning of section 771(5A)(D)(i). We next analyzed whether this program may be *de facto* specific within the meaning of section 771(5A)(D)(iii) by analyzing program usage data provided by the GOE. These data indicate that Santa Priscila received a disproportionate amount of benefit under this program, as the amount it reported receiving was many times greater than the average amount received by other program recipients in Ecuador. As noted above, we are applying AFA to SONGA, Produmar, and Naturisa with respect to benefit. As a result, we lack reliable benefit information to assess whether SONGA, Produmar, or Naturisa may have been a disproportionate user based on the benefits they received. However, as facts available we are

[64] *See* Santa Priscila's Second Post-Preliminary Calculation Memorandum.
[65] *Id.*
[66] *Id.*
[67] *See* Santa Priscila's Letter, "Santa Priscila's Supplemental Section III Questionnaire Response," dated March 1, 2024 (Santa Priscila's Section III SQR 1), at page S-2 and Exhibit S(4)-b.
[68] *See* Santa Priscila's Supplier Section III IQR at PRO-15.
[69] *Id.*
[70] *Id.*

relying on Santa Priscila's reported benefit in conducting the specificity analysis, and also find that SONGA, Produmar, and Naturisa received disproportionate amounts of benefit under this program.[71] Accordingly, we preliminarily determine that this program is specific under section 771(5A)(D)(iii)(III) of the Act.

Consistent with 19 CFR 351.509(c), we are treating the tax savings received by the firms as a recurring benefit. Pursuant to 19 CFR 351.509(b)(1), we expensed the benefit received to the year in which the recipient of the tax savings otherwise would have had to pay the taxes, *i.e.*, the POI. Thus, the benefit received under this program is equal to the amount of the tax that would have been paid absent the program during the POI.

For Santa Priscila, we divided the benefit by the combined total sales of Santa Priscila and Tropack during the POI, net of intercompany sales.[72]

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied shrimp to Santa Priscila during the POI. Thus, for this program, we divided the benefit that Santa Priscila received under the program by its volume of shrimp produced during the POI. Next, we multiplied the resulting per-unit benefit for Santa Priscila by the total volume of raw shrimp supplied to Santa Priscila during the POI by its non-cross-owned shrimp producers. Finally, we divided the benefit attributed to Santa Priscila unaffiliated raw shrimp suppliers by Santa Priscila's total POI sales.[73]

On this basis, we preliminarily determine a net countervailable subsidy rate of 0.04 percent *ad valorem* for Santa Priscila/Tropack.[74] Furthermore, as discussed above, we applied this rate, as AFA, to Produmar, SONGA, and Naturisa for this program.

### 3. Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities program

Produmar[75] and Sola[76] reported receiving benefits under this program. According to Article 10 of the Internal Tax Regime Law, entities are eligible to receive a tax exemption on time deposits and fixed income investments that are issued on terms of 180 days or more.[77] In particular, participants in this program may be exonerated from paying tax on fixed-term accounts and fixed income investments whose maturity is greater than 180 days.[78]

We preliminarily determine that the exemption from the tax constitutes a financial contribution in the form of revenue forgone within the meaning of section 771(5)(D)(ii) of the Act.

---

[71] *See* GOE's Post-Preliminary SQR 3; *see also* Santa Priscila's Section III SQR 1 at Exhibit S(4)-b; Santa Priscila's Second Post-Preliminary Calculation Memorandum; and SONGA's Post-Preliminary Calculation Memorandum.
[72] *See* Santa Priscila's Second Post-Preliminary Calculation Memorandum.
[73] *Id.*
[74] *Id*.
[75] *See* Santa Priscila's Supplier Section III IQR at PRO-18.
[76] *See* SONGA Verification Report at 3; *see also* SONGA's Letter, "Section II of Supplier Questionnaire Response," dated February 9, 2024, at Exhibit SOL-2.
[77] *See* Santa Priscila's Supplier Section III IQR at PRO-18.
[78] *Id*.

Additionally, we preliminarily determine that the exemption provides a benefit in the amount of the tax savings to the company, pursuant to 19 CFR 351.509(a)(1) and section 771(5)(E) of the Act. We also preliminarily determine that this exemption is specific under section 771(5A)(D)(iii)(I) of the Act because this program was provided to a limited number of enterprises.[79]

Consistent with 19 CFR 351.509(c), we are treating the tax savings received by the firms as a recurring benefit. Pursuant to 19 CFR 351.509(b)(1), we expensed the benefit received to the year in which the recipient of the tax savings otherwise would have had to pay the taxes, *i.e.*, the POI. Thus, the benefit received under this program is equal to the amount of the tax that would have been paid absent the program during the POI.

To calculate the benefit from this program for Produmar and Sola, we multiplied the amount of income tax exemptions claimed by each company by the corporate income tax rate in Ecuador, (*i.e.*, 25 percent).[80] For Produmar, we divided the resulting benefit by the combined total sales of Santa Priscila and Produmar during the POI, net of inter-company sales.[81] Sola is a holding company of SONGA.[82] Under 19 CFR 351.525(b)(6)(iii), we would attribute to the consolidated sales of Sola and its subsidiaries. However, we lack consolidated sales information for Sola and its subsidiaries. Therefore, we have used SONGA's consolidated sales and added Sola's revenue for 2022 as the denominator in our net subsidy rate calculation for this program.[83]

As discussed above, pursuant to section 771B of the Act, we have attributed subsidy benefits to the unaffiliated shrimp farmers who supplied raw shrimp to the mandatory respondents during the POI. Thus, for this program, we divided the benefit that Produmar received under this program by its volume of shrimp produced during the POI. Next, we multiplied the resulting per-unit benefit for Produmar by the total volume of raw shrimp supplied to the mandatory respondents during the POI by their unaffiliated shrimp producers. Finally, we divided the benefit attributed to unaffiliated raw shrimp suppliers of Santa Priscila and Produmar by Santa Priscila and Produmar total sales value for the POI, net of inter-company sales.[84]

On this basis, we preliminarily determine a net countervailable subsidy rate of 0.01 percent *ad valorem* for Santa Priscila/Tropack and 0.06 percent *ad valorem* for SONGA.

## V. PUBLIC COMMENT

We invite interested parties to include comments on the above programs; we will notify parties at a later date of the deadline for commenting on the issues addressed in this decision memorandum.

---

[79] *See* GOE's Post-Preliminary SQR 3; *see also* Santa Priscila's Second Post-Preliminary Calculation Memorandum; SONGA's Second Post-Preliminary Calculation Memorandum.
[80] *See* GOE's IQR at EXP-32.
[81] *See* Santa Priscila's Second Post-Preliminary Memorandum.
[82] *See* SONGA's Letter, "Affiliated Companies Supplemental Questionnaire Response," dated January 16, 2024, at Supp-AFF-1.
[83] *See* SONGA's Second Post-Preliminary Memorandum.
[84] *See* Santa Priscila's Second Post-Preliminary Memorandum.

## VI. RECOMMENDATION

We recommend that you approve the positions described in this memorandum.

☒ Agree ☐ Disagree

9/26/2024

X

Signed by: RYAN MAJERUS

Ryan Majerus
Deputy Assistant Secretary
for Policy and Negotiations,
performing the non-exclusive functions and duties
of the Assistant Secretary for Enforcement and Compliance

# APPENDIX

## AFA Rate Calculation

| Program Name | AFA Rate (percent) |
|---|---|
| 1. Motor Vehicle Tax Reduction Program[85] | 0.04 |
| Total: | 0.04 |

[85] *See* Santa Priscila's Second Post-Preliminary Calculation Memorandum.

# Tab 75

# P.R. 442

Barcode: 4641128-01 C-331-806 INV - Investigation

SCHAGRIN ASSOCIATES

900 SEVENTH STREET, N.W. - SUITE 500 - WASHINGTON, D.C. 20001
P: (202) 223-1700 EDRAKE@SCHAGRINASSOCIATES.COM F: (202) 429-2522

October 2, 2024

Case No. C-331-806
Total Pages: 11
Investigation
POI: 01/01/2022 – 12/31/2022
ITA/E&C Office IV

**PUBLIC DOCUMENT**

**BY ELECTRONIC FILING**
The Honorable Gina M. Raimondo
Secretary of Commerce
Attention: Enforcement and Compliance
APO/Dockets Unit, Room 18022
U.S. Department of Commerce
14th Street and Constitution Avenue, N.W.
Washington, D.C. 20230

**Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador – Second Case Brief**

Dear Secretary Raimondo:

On behalf of the American Shrimp Processors Association ("ASPA" or "Petitioner"), we submit to the U.S. Department of Commerce ("Commerce") the attached case brief in the above-referenced investigation. This case brief is timely filed by the extended deadline set by Commerce. *See* Memorandum to the File, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Second Briefing Schedule" (Sep. 27, 2024).

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/2/24 10:26 AM, Submission Status: Approved

Barcode: 4641128-01 C-331-806 INV - Investigation



Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

/s/ Elizabeth J. Drake
Roger B. Schagrin
Elizabeth J. Drake
Michelle R. Avrutin
Rui Fan, *Consultant*
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

Edward T. Hayes
LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701

*Counsel to the American Shrimp Processors Association*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/2/24 10:26 AM, Submission Status: Approved

# CERTIFICATE OF SERVICE

**Frozen Warmwater Shrimp from Ecuador**
**C-331-806**
**Investigation**

I, Steve Satchell, hereby certify that copies of the attached *public document* were served on October 2, 2024, via ACCESS electronic service:

Nathaniel Rickard, Esq
**Picard Kentz & Rowe LLP**
1155 Connecticut Avenue, NW
Suite 700
Washington, DC 20036

Edward T. Hayes, Esq.
**Leake & Anderson, LLP**
1100 Poydras Street
Suite 1700
New Orleans, LA 70163

Jennifer Michele Smith-Veluz, Esq.
**The Bristol Group PLLC**
1707 L Street, NW
Suite 570
Washington, DC 20036

Jarrod M. Goldfeder, Esq.
**Trade Pacific PLLC**
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003

Jeffrey S. Neeley, Esq.
**Husch Blackwell LLP**
1801 Pennsylvania Avenue, NW
Suite 1000
Washington, DC 20006

Andrea Ruiz
**Embassy of Ecuador**
2535 15th Street, NW
Washington, DC 20009

/s/ *Steve Satchell*
Steve Satchell, *Paralegal*
SCHAGRIN ASSOCIATES

Barcode: 4641128-01 C-331-806 INV - Investigation



**BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**

Case No. C-331-806
Total Pages: 8
Investigation
POI: 01/01/2022 – 12/31/2022
ITA/E&C Office IV

**PUBLIC DOCUMENT**

---

**Frozen Warmwater Shrimp from Ecuador**

---

**PETITIONER'S SECOND CASE BRIEF**

SCHAGRIN ASSOCIATES
900 Seventh Street, N.W.
Suite 500
Washington, DC 20001
(202) 223-1700

LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701

*Counsel to the American Shrimp Processors Association*

October 2, 2024

Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/2/24 10:26 AM, Submission Status: Approved

PUBLIC DOCUMENT

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ..... ii

I. Executive Summary ..... 1

II. Commerce Should Correct the Multiplier Used for Programs Benefitting Santa Priscila . 2

III. Commerce Should Correct the Application of Adverse Facts Available to SONGA and Naturisa ..... 3

IV. Conclusion ..... 5



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/2/24 10:26 AM, Submission Status: Approved

Barcode: 4641128-01 C-331-806 INV - Investigation



## TABLE OF AUTHORITIES

**Statutes**

19 U.S.C. § 1677-2 .... 1, 2
19 U.S.C. § 1677e .... 3



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/2/24 10:26 AM, Submission Status: Approved

Barcode: 4641128-01 C-331-806 INV - Investigation



## I. Executive Summary

- In its second post-preliminary determination, the U.S. Department of Commerce ("Commerce") found that Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") benefitted from three additional countervailable subsidy programs: the Youth Employment Program – Article 16 of the Labor Law, the Motor Vehicle Tax Reduction Program, and the Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities program. Under Section 771B, 19 U.S.C. § 1677-2, Commerce added an amount to Santa Priscila's subsidy rate for each program by attributing a per-pound benefit amount to the pounds of shrimp supplied to Santa Priscila by its non-cross-owned shrimp suppliers. However, because Commerce only selected one affiliated shrimp farm for investigation – Produmar S.A. ("Produmar") – the multiplier Commerce used omitted pounds provided by uninvestigated, affiliated shrimp suppliers. In the final results, Commerce should correct the multiplier used to attribute benefits to shrimp farms to include the pounds provided both by non-cross-owned shrimp farms and by cross-owned shrimp farms that were not individual investigated.

- In the second post-preliminary determination, Commerce determined that Produmar, Sociedad Nacional de Galapagos C.A. ("SONGA"), and Naturisa S.A. ("Naturisa") had each withheld information requested by Commerce regarding the Motor Vehicle Tax Reduction Program, impeded Commerce's investigation, and failed to cooperate to the best of their ability. Thus, Commerce stated its intention to apply an adverse facts available rate for this program to "Produmar, SONGA, and Naturisa."[1] In its calculations, Commerce did apply the adverse facts available rate to Produmar, adding it to the rate calculated for Santa Priscila for the same program. However, Commerce only applied the rate once to SONGA/Naturisa, even though both companies warranted the application of adverse facts available. As Commerce found at verification, "both entities omitted the reporting of vehicle ownership tax exemptions received pursuant to the Motor Vehicle Tax Exemption program."[2] In the final determination, Commerce should correct this error and apply the adverse facts available rate for this program to both SONGA and Naturisa, resulting in an adverse facts available rate of 0.08 percent for the combined entity.

---

[1] *See* Memorandum to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Second Post-Preliminary Analysis" (Sept. 26, 2024) ("Second Post-Prelim Memo") at 11 and 14.

[2] SONGA Verification Report (Aug. 14, 2024) at 2.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/2/24 10:26 AM, Submission Status: Approved

## II. Commerce Should Correct the Multiplier Used for Programs Benefitting Santa Priscila

In the post-preliminary determination, Commerce relied on Section 771B of the Act, 19 U.S.C. § 1677-2, to attribute the per-pound benefits received by Santa Priscila to the volume of raw shrimp supplied to Santa Priscila by non-cross-owned shrimp producers.[3] Commerce applied this methodology to all three programs found to be countervailable for Santa Priscila: the Youth Employment Program – Article 16 of the Labor Law, the Motor Vehicle Tax Reduction Program, and the Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities program.[4]

Because Commerce only attributed the benefit to pounds supplied by unaffiliated farmers, and because Commerce only selected one of Santa Priscila's affiliated shrimp suppliers – Produmar – for individual examination, the attribution methodology did not account for the pounds of shrimp supplied to Santa Priscila by affiliated shrimp farmers other than Produmar. By not individually investigating these other affiliated shrimp farms, and by not including their pounds in the multiplier for benefits to Santa Priscila's shrimp suppliers, Commerce has understated the benefit of the three subsidies found countervailable in the second post-preliminary determination.

Petitioner's original case brief provides additional details on why Commerce should revise the multiplier when attributing benefits to shrimp farmers to include shrimp supplied by both unaffiliated shrimp farms and affiliated shrimp farms that were not selected for individual examination.[5] We hereby incorporate those arguments by reference. In the final determination,

---

3 *See* Second Post-Prelim Memo at 13 – 15.

4 *See id*.

5 *See* ASPA Case Br. at 15 – 17.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/2/24 10:26 AM, Submission Status: Approved

Commerce should ensure that pounds supplied by non-cross-owned farms, and pounds supplied by cross-owned farms that were not individually investigated, are both included in the multiplier used to attribute subsidy benefits to shrimp farmers for all three tax programs found to be countervailable in the second post-preliminary determination.

### III. Commerce Should Correct the Application of Adverse Facts Available to SONGA and Naturisa

In the second post-preliminary determination, Commerce found that Produmar, SONGA, and Naturisa had each failed to provide the necessary information requested by Commerce with regard to the Motor Vehicle Tax Reduction Program, and thus impeded Commerce's investigation, necessitating reliance on facts available under 19 U.S.C. § 1677e(a).[6] Commerce further determined that an adverse inference was warranted under 19 U.S.C. § 1677e(b), because Produmar, SONGA, and Naturisa had each failed to cooperate to the best of their ability to comply with Commerce's requests for information.[7] As adverse facts available, Commerce stated it was applying the rate found for Santa Priscila for this identical program – 0.04 percent – to "Produmar, SONGA, and Naturisa."[8]

With respect to Produmar, Commerce did correctly add an adverse facts available rate for Produmar to the 0.04 percent found for Santa Priscila, resulting in a total rate of 0.08 percent for Santa Priscila for this program.[9] With regard to SONGA and Naturisa, however, Commerce only

---

6 *See* Second Post-Prelim Memo at 6 – 7.

7 *See id*.

8 *Id*. at 11. *See also id*. at 14 ("… we applied this rate, as AFA, to Produmar, SONGA, and Naturisa for this program.").

9 *See* Memorandum to the File, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Second Post-Preliminary Determination Calculations for Industrial Pesquera Santa Priscila S.A." (Sept. 26, 2024) at 4.



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/2/24 10:26 AM, Submission Status: Approved

applied the adverse facts available rate once.[10] This is despite the fact that Commerce stated it would apply the adverse facts available rate to SONGA and Naturisa.[11] Commerce should have applied the rate twice, because both companies withheld information, impeded Commerce's investigation, and failed to cooperate to the best of their ability.[12]

Specifically, during verification, Commerce discovered that "SONGA and Naturisa received benefits under the Motor Vehicle Tax Reduction program which SONGA and Naturisa did not report in its original responses to our Initial Questionnaire."[13] The verification report states as follows:

> At the start of verification, SONGA and Naturisa officials reported that both entities omitted the reporting of vehicle ownership tax exemptions received pursuant to the Motor Vehicle Tax Exemption program. SONGA claimed that it received vehicle tax exemptions on … vehicles and Naturisa claimed that it received vehicle tax exemptions on … vehicles. We did not accept these corrections.[14]

Thus, to assign adverse facts available to both non-cooperative entities, as is Commerce's stated intention, Commerce should apply the adverse facts available two times – one time for each entity. This is also consistent with how Commerce applied adverse facts available to Produmar for this same program. In the final results, Commerce should correct the rate attributable to SONGA under this program to 0.08 percent.

---

[10] *See* Memorandum to the File, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Second Post-Preliminary Determination Calculations for Sociedad Nacional de Galapagos C.A." (Sept. 26, 2024) at 2.

[11] Second Post-Prelim Analysis at 11 and 14.

[12] *See id*. at 6 – 7.

[13] *See id*.

[14] SONGA Verification Report (Aug. 14, 2024) at 2 (emphasis added).



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/2/24 10:26 AM, Submission Status: Approved

## IV. Conclusion

For the foregoing reasons, Commerce should make the changes described above in its final determination. Commerce should revise the multiplier for benefits to Santa Priscila and correct the application of adverse facts available to SONGA and Naturisa. Please contact the undersigned with any questions regarding this submission.

Respectfully submitted,

/s/ Elizabeth J. Drake
Roger B. Schagrin
Elizabeth J. Drake
Michelle R. Avrutin
Rui Fan, *Consultant*
SCHAGRIN ASSOCIATES
900 Seventh Street, N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

Edward T. Hayes
LEAKE & ANDERSSON LLP
1100 Poydras Street, Suite 1700
New Orleans, LA 7063-1701

*Counsel to the American Shrimp Processors Association*



Filed By: rschagrin@schagrinassociates.com, Filed Date: 10/2/24 10:26 AM, Submission Status: Approved

# Tab 76

# P.R. 445

# C.R. 325

Barcode:4642681-01 C-331-806 INV - Investigation -

TRADE PACIFIC

International Trade Lawyers

700 Pennsylvania Ave, SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

October 3, 2024

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 54
Investigation
POI: 1/1/2022 – 12/31/2022
ITA/E&C/Office IV

Business proprietary information of the GOE has been redacted on pages 13, 15, 16,17,18, 21–24, 29–31, 38, and 40; of Santa Priscila on pages 13, 18, 24, 34–36, 39, 40, and 44; and of SONGA on page 34.

**PUBLIC VERSION**

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador Relating to the Three Programs Addressed in the Second Post-Preliminary Determination

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), Sociedad Nacional de Galápagos C.A. ("SONGA"), mandatory respondents in the above-referenced countervailing duty ("CVD") investigation, and their respective cross-owned affiliates, and on behalf of the Government of Ecuador ("GOE"), we submit this Case Brief commenting on the Department's September 26, 2024, Second Post-Preliminary Determination in the above-referenced countervailing duty investigation. This brief is timely submitted in accordance with



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/3/24 4:23 PM, Submission Status: Approved

the Department's September 27, 2024, Memorandum establishing a briefing schedule regarding the three programs addressed in the Department's September 26th Second Post-Preliminary Determination. See Memorandum to File re: "Second Briefing Schedule" (Sept. 27, 2024).

This submission contains no new factual information.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila, SONGA, and the GOE request business proprietary treatment for the information enclosed in brackets in this submission. The bracketed information pertains to specific business information concerning the exact amounts of benefit applied for or received; and other specific information concerning the business operations of Santa Priscila, SONGA, and other submitters, including the nature of affiliations and financial information, etc., the release of which to the public would cause substantial competitive and commercial harm to Santa Priscila, SONGA, and other submitters. Other bracketed information pertains to other specific information concerning the GOE's operations, tax collections, and other benefits, etc., the release of which may result in the disclosure of confidential information maintained by the GOE. This information is protected from public disclosure under 19 C.F.R. §§ 351.105(c)(8) and (11). Santa Priscila, SONGA, and the GOE consent to the release of the enclosed business proprietary information to the extent required under the Administrative Protective Order issued for this investigation. All business proprietary information has been deleted from the public version of this submission.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this brief have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions or require any additional information regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer

*Counsel to Industrial Pesquera Santa Priscila, S.A., Sociedad Nacional de Galápagos C.A., and the Government of Ecuador*

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify that the foregoing document submitted in the countervailing duty investigation of Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), was deemed served via ACCESS on this 3rd day of October, 2024, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer

Barcode:4642681-01 C-331-806 INV - Investigation -

**Case No. C-331-806**
**Investigation**
**POI: 1/1/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information of the GOE, Santa Priscila, and SONGA has been redacted on the pages indicated on the cover letter of this case brief.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

**COUNTERVAILING DUTY INVESTIGATION OF**
**FROZEN WARMWATER SHRIMP FROM ECUADOR**

# CASE BRIEF OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A., SOCIEDAD NACIONAL DE GALÁPAGOS C.A., AND THE GOVERNMENT OF ECUADOR REGARDING PROGRAMS ADDRESSED IN SECOND POST-PRELIMINARY DETERMINATION

---

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE, Suite 500**
**Washington, DC 20003**
**(202) 223-3760**

**Counsel to Industrial Pesquera Santa Priscila S.A., Sociedad Nacional de Galápagos C.A., and the Government of Ecuador**

**Dated: October 3, 2024**

Filed By: khammer@tradepacificlaw.com, Filed Date: 10/3/24 4:23 PM, Submission Status: Approved

# TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................................... i

TABLE OF AUTHORITIES ........................................................................................... iii

EXECUTIVE SUMMARY ............................................................................................... 2

ARGUMENT ..................................................................................................................... 9

I. THE THREE PROGRAMS EXAMINED IN THE SECOND POST-PRELIMINARY DETERMINATION ARE NOT COUNTERVAILABLE ............................................... 9

A. Legal Standard ......................................................................................... 9

B. The Annual Motor Vehicle Tax Exemption Program Is Not *De Facto* Specific.. 10

1. The Department's Preliminary Disproportionality Analysis Unlawfully Relies on Evidence That Does Not Demonstrate Santa Priscila Received Disproportionate Benefits ..................................................................... 11

2. The Record Does Not Support the Department's Disproportionate Use Preliminary Finding ................................................................... 15

3. The Actual Recipients of the Annual Motor Vehicle Tax Exemption Are Not Limited in Number ............................................................................ 16

4. The Shrimp and Aquaculture Industries Are Not Predominant Users of the Annual Motor Vehicle Tax Exemption Program ...................................... 17

5. The GOE Did Not Exercise Discretion to Grant Annual Motor Vehicle Tax Exemptions to Members of the Shrimp Industry ................................. 18

6. Conclusion ........................................................................................... 19

C. The Income Tax Exemption on Time Deposits and Fixed Income Securities Program Is Neither *De Jure* Nor *De Facto* Specific ........................................... 19

1. Benefits Under the Income Tax Exemption on Time Deposits and Fixed Income Securities Are Actually Received By All Taxpayers Throughout the Entire Ecuadorian Economy ........................................................ 20

2. Neither the Shrimp Industry, Nor Any Member of the Industry, Is a Predominant User of the Income Tax Exemption on Time Deposits and Fixed Income Securities Program ........................................................... 22

3. Neither the Shrimp Industry, Nor Any Member of the Industry, Is a Disproportionate User of the Income Tax Exemption on Time Deposits



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/3/24 4:23 PM, Submission Status: Approved

Barcode:4642681-01 C-331-806 INV - Investigation -



BEFORE THE
INTERNATIONAL TRADE ADMINISTRATION
UNITED STATES DEPARTMENT OF COMMERCE

---

FROZEN WARMWATER SHRIMP FROM ECUADOR

Case No. C-331-806
Investigation
POI: 1/1/2022 – 12/31/2022
AD/CVD Operations, Office IV

---

# CASE BRIEF OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A., SOCIEDAD NACIONAL DE GALÁPAGOS C.A., AND THE GOVERNMENT OF ECUADOR REGARDING PROGRAMS ADDRESSED IN SECOND POST-PRELIMINARY DETERMINATION

---

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), Sociedad Nacional de Galápagos C.A. ("SONGA"), mandatory respondents in the above-referenced countervailing duty ("CVD") investigation, and their cross-owned affiliates, and on behalf of the Government of Ecuador ("GOE") (collectively "Ecuadorian Respondents"), we submit this Case Brief in relation to the three programs addressed in the Department's September 26, 2024, Second Post-Preliminary Determination. See Memorandum addressed to Ryan Majerus, Deputy Assistant Secretary for Policy and Negotiations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Second Post-Preliminary Analysis" (September 26, 2024) ("2nd Post-Prelim. Det."). This brief is timely submitted in accordance with the Department's memorandum establishing a deadline to submit case briefs regarding the three programs addressed in the Department's 2nd Post-Prelim. Det. in this investigation. See Memorandum to File, re: "Second Briefing Schedule" (Sept. 27, 2024).



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/3/24 4:23 PM, Submission Status: Approved

Compelling record facts demonstrate that neither the shrimp nor the aquaculture industries as a whole, or individual companies in these industries, received disproportionate benefits under the AMVTE program. The AMVTE program does not benefit a limited number of recipients. Moreover, neither the shrimp industry nor firms within the industry predominantly benefit from the AMVTE program because other industries, and more firms within those industries, received a greater share of benefits. Finally, the GOE does not exercise discretion in granting AMVTE benefits, which are self-applied by companies in annual vehicle tax filings.

2) The Department's determination that the Income Tax Exemption on Time Deposits and Other Fixed Income Securities ("ITETD") program is *de facto* specific is unlawful. The Department's determination is also contrary to the record evidence, which demonstrates that all taxpayers, not just corporate taxpayers, are eligible to claim benefits under this program.

Since the ITETD program applies to individual taxpayers in addition to corporate taxpayers, the Department may not lawfully base its determination that the actual recipients are "limited in number" on solely upon a comparison of corporate taxpayers that received benefits to all corporate taxpayers. See Mosaic Co. v. United States, 659 F.Supp.3d 1285, 1315 (Ct. Int'l Trade 2023). The Department may not accurately describe such a program as "limited in number" on an enterprise basis because there is no evidence that eligibility, or actual participation, in the ITETD program was based on whether recipients were enterprises or any specific type of enterprise.

Compelling record facts demonstrate that the neither the shrimp nor the aquaculture industries as a whole, or individual companies in these industries, received disproportionate benefits under the ITETD program. The ITETD program does not benefit a limited number of recipients. Moreover, neither the shrimp industry nor firms within the industry predominantly

benefit from the ITETD program because other industries, and more firms within those industries, received a greater share of benefits. Finally, the GOE does not exercise discretion in granting ITETD, which are self-applied by companies in their income tax declarations.

3) The Department did not explain what data supports its determination that the number of enterprises or industries that received benefits under the Youth Employment – Article 16 of the Labor Law ("Youth Employment") program was provided to a limited number of enterprises. If the Department's determination that the Youth Employment program is available to a limited number of users rests solely upon a comparison of the number of corporate taxpayers that were approved for Youth Employment benefits to the total number of corporate taxpayers in Ecuador, that methodology is not a lawful method of analyzing *de facto* specificity.

First, the Department may not lawfully undertake a *de facto* specificity analysis to determine whether benefits are "limited in number" with respect to the Youth Employment that compares the number of enterprises that were approved for Youth Employment program benefits to all corporate taxpayers. Rather, the Department must compare the number of companies that were approved for Youth Employment program benefits to those that met the program eligibility conditions. See Mosaic, 659 F.Supp.3d at 1317.

Not all corporate taxpayers were eligible for benefits under the Youth Employment program. Only corporate taxpayers that met specific conditions (*i.e.*, entered into "cooperation" agreements, hired qualifying young workers under employment contracts, registered those employment contracts, and maintained employment for the qualifying workers for the legally required period) are eligible to be approved for benefits. See IPSP SQR 1, at S-17, Letter from Trade Pacific PLLC, re: "Section III of Supplier Questionnaire Response" (Feb. 16, 2024), Vol. IV, at Ex. TRO-2 ("IPSP Supplier QR"). There is no information that would allow the



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/3/24 4:23 PM, Submission Status: Approved

Barcode:4642681-01 C-331-806 INV - Investigation


taxpayers eligible to claim benefits under the same program—no record information supports the conclusion that the program is not broadly available and broadly used throughout the Ecuadorian economy.

The Department may not base a *de facto* specificity determination on the number and percentage of corporate taxpayers that received ITETD benefits rather than ascertaining the actual number of users, including eligible individual beneficiaries. The record lacks information on use among individual taxpayers. Since the ITETD program applies to individual taxpayers, in addition to corporate taxpayers, the Department may not lawfully base its determination that the actual recipients are "limited in number" solely upon a comparison of corporate taxpayers that received benefits to all corporate taxpayers. See Mosaic Co. v. United States, 659 F.Supp.3d 1285, 1315 (Ct. Int'l Trade 2023) (concluding that the percentage of corporate taxpayers that benefited under a program that "was not limited to corporate taxpayers does not support a conclusion that the program was not broadly available and broadly used throughout the . . . economy.") Furthermore, the Department may not accurately describe such a program as "limited in number" on an enterprise basis because there is no evidence that eligibility, or actual participation, in the ITETD program was based on whether recipients were enterprises or any specific type of enterprise. See id. Moreover, since the ITETD program is available to individual taxpayers, the Department may not reasonably conclude that it is confined to "industries" or any members of any industry under 19 U.S.C. § 1677(5A)(D)(iii)(I). See id.

[ ] of 21 industrial categories received benefits under the ITETD program. GOE PPSQR 3, at Ex. S5-6. If the Department based its determination that ITETD benefits were received by a limited number of companies or industries upon the fact that [ ] companies or [ ] received benefits, this evidence has


Filed By: khammer@tradepacificlaw.com, Filed Date: 10/3/24 4:23 PM, Submission Status: Approved

Moreover, individual enterprises in the shrimp and aquaculture industry did not receive a predominant share of benefits. In fact, [ ] in the "Agriculture, Forestry and Fishing" sector [ ] among the top fifty recipients of benefits the period between 2019 and the POI. **{Contains the GOE's BPI.}** Id. at S5-5.

Therefore, neither the "Agriculture, Forestry and Fishing" sector nor enterprises in the same industrial sector received a predominant share of POI benefits, whether expressed by value or number of firms that received ITETD benefits during the POI.

### 3. Neither the Shrimp Industry, Nor Any Member of the Industry, Is a Disproportionate User of the Income Tax Exemption on Time Deposits and Fixed Income Securities Program

As explained above, the Department may not lawfully conclude that the shrimp and aquaculture industry or enterprises that are members of this industry received a disproportionate share by comparing the share of corporate taxpayers in the "Agriculture, Forestry and Fishing" sector that received ITETD benefits to all corporate taxpayers. See Mosaic, 659 F.Supp.3d at 1315. This is because the program is available to individual and corporate taxpayers.

Even among corporate taxpayers, neither the shrimp nor the aquaculture industry, nor firms within the industries, received a disproportionate share of benefits. As an initial matter, 19 different industrial categories received benefits under the program between 2019 and the POI. See GOE PPSQR 3, at Ex. S5-6. Within the "Agriculture, Forestry and Fishing" sector, fewer companies received benefits during the POI relative to the same industrial category's share of overall corporate taxpayers. Specifically, companies in the "Agriculture, Forestry and Fishing" sector represent just [ ] of corporate taxpayers during the POI. GOE Sec. II QR, Vol VI, at OTH-15. **{Contains the GOE's BPI.}** But companies in the "Agriculture, Forestry and Fishing" sector represented only [ ] of individual companies that

specific. Only where a subsidy is not *de jure* specific, does the Department proceed to 19 U.S.C. § 1677(5A)(D)(iii) to determine whether the program is *de facto* specific.

The Department may not lawfully undertake a *de facto* specificity analysis that compares the number of enterprises that were approved Youth Employment program benefits to all corporate taxpayers. This is because not all corporate taxpayers were eligible for benefits under the program. Rather, only corporate taxpayers that meet specific conditions (*i.e.*, those that enter into "cooperation" agreements, hire qualifying young workers under employment contracts, register those employment contracts, and maintain employment for the qualifying workers for the legally required period) are eligible to be approved for benefits. See IPSP SQR 1, at S-17, IPSP Supplier QR, Vol. IV, at Ex. TRO-2.

In Mosaic, the Court concluded that a methodology that compared the total number of taxpaying recipients to the total number of corporate taxpayers was meaningless from the standpoint of determining *de facto* specificity because the numerator and denominator were not logically comparable. Mosaic, 659 F.Supp.3d at 1315–16. In other words, the Court found that, since only taxpayers that had incurred tax penalties could be eligible for tax penalty relief under the program at issue, it was illogical and unreasonable to assess whether the benefits were limited in number by comparing the number of corporate taxpayers that received tax penalty relief to all corporate taxpayers. See id. The Court reasoned that, under the Department's analysis, a program would be countervailable only where a majority or near majority of corporate taxpayers actually received relief when it was clear that only a subset of corporate taxpayers (*i.e.*, those that had incurred tax penalties) were actually eligible to claim benefits. Id. at 1316. In other words, for the tax penalty relief program to be specific, the Department should

# Tab 77

# P.R. 449

Barcode:4646673-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
**Public Document**
E&C/OIV: RA

October 10, 2024

Government of Ecuador,
Santa Priscila S.A.,
Sociedad Nacional de Galapagos C.A.
c/o Jarrod M. Goldfeder, Esq.
Trade Pacific PLLC
700 Pennsylvania Avenue, S.E.
Suite 500
Washington, DC 20003

Re: Rejection of Respondents' Case and Rebuttal Brief Comments

This letter concerns the countervailing duty investigation of frozen warmwater shrimp from Ecuador, and your clients the Government of Ecuador, Santa Priscila S.A., Sociedad Nacional de Galapagos C.A. (SONGA) (collectively respondents). On September 13, 2024, the respondents submitted their case brief,[1] and on September 20, 2024, the respondents submitted their rebuttal case brief.[2] On September 19, 2024, the U.S. Department of Commerce (Commerce) received a rejection request from the American Shrimp Processors Association (the petitioner) for respondents' September 13, 2024, case brief.[3] On September 24, 2024, SONGA responded to the petitioner's September 19, 2024, rejection request.[4] On September 25, 2024, the petitioner submitted an additional rejection request for respondents' September 20, 2024, rebuttal case brief.[5] On September 26, 2024, respondents responded to the petitioner's September 25, 2024, rejection request.[6]

In the respondents' case brief, the respondents argued that Commerce should have accepted certain minor corrections presented at verification for SONGA's investment contract currency outflow tax exemption for imported materials. In their argument, the respondents disclose a corrected amount under this program and draw quantitative and qualitative conclusions as to the effects of this change on the combined benefit under the investment contract. However, since Commerce previously did not accept the minor correction[7] and as argued by the petitioner in

[1] *See* Respondents' Letter, "Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador," dated September 13, 2024.
[2] *See* Respondents' Letter, "Combined Rebuttal Brief of Santa Priscila, SONGA, and the Government of Ecuador," dated September 20, 2024.
[3] *See* Petitioner's Letter, "Request to Reject Untimely Filed New Factual Information," Dated September 19, 2024.
[4] *See* SONGA's Letter, "Response to Petitioner's Request to Reject Factual Information," dated September 24, 2024.
[5] *See* Petitioner's Letter, "Request to Reject Noncompliant Rebuttal Brief," dated September 25, 2024.
[6] *See* Respondents' Letter, "Response to Petitioner's Request to Reject Two Small Portions of Allegedly Non-Compliant Rebuttal Brief," dated September 26, 2024.
[7] *See* Memorandum, "Verification of the Questionnaire Responses of Sociedad Nacional de Galapagos C.A.," dated August 13, 2024, at 2.

Filed By: Reginald Anadio, Filed Date: 10/10/24 3:21 PM, Submission Status: Approved

their September 19, 2024, rejection request, the respondents' reported value and the corresponding analysis are untimely filed new factual information.

Pursuant to 19 CFR 351.309(d)(2) and as requested by Commerce,[8] rebuttal briefs may respond only to arguments raised in case briefs and should identify the argument(s) to which the interested party is responding. In the respondents' rebuttal case brief, the respondents rebutted the petitioner's argument concerning applying a benchmark electricity price based on prices from Colombia and Peru. However, contrary to Commerce instructions, the respondents included a new, affirmative argument (*i.e.*, concerning "water pumping") that did not respond to any part of petitioner's case brief argument concerning application of a specific benchmark electricity price.

Accordingly, Commerce is rejecting the respondents' September 13, 2024, case brief pursuant to 19 CFR 351.302(d) as it contains untimely new factual information. Additionally, Commerce is rejecting the respondents' September 20, 2024, rebuttal case brief pursuant as it violates 19 CFR 351.309(d)(2). Although Commerce is rejecting the two filings, it will retain a copy for the official record solely for the purpose of establishing and documenting the basis for its rejection, as stipulated in 19 CFR 351.104(a)(2), because the document, although otherwise timely, contains untimely filed new factual information. In addition, we are instructing all interested parties that were served with a copy of the respondents' September 13, 2024, case brief and September 20, 2024, rebuttal case briefs to destroy or return their copy(ies) to Trade Pacific PLLC.

However, we are providing respondents with an opportunity to resubmit a redacted version of its case and rebuttal case briefs with the comments, information, and other data thereto removed. For the reasons stated above, the following parts of the respondents' September 13, 2024, case brief must be redacted:

- The two words between line one and two of the last full paragraph on page 15.
- The two words on the second line of the last full paragraph on page 15 between the following "in benefits reported and a … change in the calculated."
- The last two words of the fourth line on page 16.
- The bracketed number on the third line of the last paragraph on page 85.
- The percent and first dollar number of the bracketed information contained on lines four and five on page 85.
- The word and bracketed number on the second line of the first paragraph on page 86 contained between "it would have resulted in a change of … of the."
- The two bracketed numbers on the fifth line of the first paragraph on page 86.
- The last two words of the sentence on the sixth line of the first paragraph on page 86.
- The last two words of the sentence on the fifth line of the second paragraph on page 86.
- The last word of the final sentence of the second paragraph on page 86.
- The last two words of the third line of the final paragraph on page 87.
- The two bracketed numbers on the fifth line of the first paragraph on page 89.

For the reasons stated above, the following parts of the respondents' September 20, 2024, rebuttal case brief must be redacted:

[8] See Memorandum, "Briefing Schedule," September 4, 2024, at 2.

- The full sentence split between pages 41 and 42.
- Section C starting from page 53 and ending on page 55.

This is not an opportunity for the respondents to provide new or otherwise altered information. The deadline to resubmit the redacted case and rebuttal case briefs is no later than **5:00 p.m. (Eastern Time) on October 11, 2024.**

If you have any questions regarding this matter, please contact Reginald Anadio at 202-482-3166 or Reginald.Anadio@trade.gov.

Sincerely,

Robert Bolling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

# Tab 78

# P.R. 451-52

# C.R. 327

Barcode:4647025-01 C-331-806 INV - Investigation -

TRADE PACIFIC

International Trade Lawyers

700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003

www.TradePacificLaw.com

October 11, 2024

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 105
Investigation
POI: 1/1/2022 – 12/31/2022
ITA/E&C/Office IV

Business proprietary information of the GOE, Santa Priscila, SONGA, and Mixed BPI has been redacted in the Attachment.

**PUBLIC VERSION**

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Redacted Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador

Dear Secretary Raimondo:

In response to the Department's letter, dated October 10, 2024, requesting that the Government of Ecuador, Santa Priscila S.A., and Sociedad Nacional de Galápagos C.A. (collectively "Respondents") submit a redacted version of their case brief, dated September 13, 2024, Respondents submit this redacted Case Brief commenting on the Department's preliminary results in the above-referenced CVD administrative review. See Letter to the Government of Ecuador, Santa Priscila S.A., and Sociedad Nacional de Galápagos C.A., re: "Rejection of Respondents' Case and Rebuttal Brief Comments" (Oct. 10, 2024). As requested in the



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

Department's letter, this redacted version of Respondent's Case Brief is not altered in any manner other than to remove the following information, which the Department explicitly directed that Respondents remove from the record:

- The two words between line one and two of the last full paragraph on page 15.
- The two words on the second line of the last full paragraph on page 15 between the following "in benefits reported and a … change in the calculated."
- The last two words of the fourth line on page 16.
- The bracketed number on the third line of the last paragraph on page 85.
- The percent and first dollar number of the bracketed information contained on lines four and five on page 85.
- The word and bracketed number on the second line of the first paragraph on page 86 contained between "it would have resulted in a change of … of the."
- The two bracketed numbers on the fifth line of the first paragraph on page 86.
- The last two words of the sentence on the sixth line of the first paragraph on page 86.
- The last two words of the sentence on the fifth line of the second paragraph on page 86.
- The last word of the final sentence of the second paragraph on page 86.
- The last two words of the third line of the final paragraph on page 87.
- The two bracketed numbers on the fifth line of the first paragraph on page 89.

This brief is timely submitted in accordance with the deadline contained in the Department's October 10th letter allowing Respondents an opportunity to submit a redacted version of their Case Brief by today. See Letter to the Government of Ecuador, Santa Priscila S.A., and Sociedad Nacional de Galápagos C.A., re: "Rejection of Respondents' Case and Rebuttal Brief Comments" (Oct. 10, 2024).

This submission contains no new factual information.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila, SONGA, and the GOE request business proprietary treatment for the information enclosed in brackets in this submission. The bracketed information pertains to specific business information concerning products and production processes of Santa Priscila, SONGA, and other submitters, the exact amounts of benefit applied for or received, and other specific information concerning the business operations

of Santa Priscila, SONGA, and other submitters, including the nature of affiliations and financial information, etc., the release of which to the public would cause substantial competitive and commercial harm to Santa Priscila, SONGA, and other submitters. Other bracketed information pertains to other specific information concerning the GOE's operations, tax collections, and other benefits, etc., and the release of which may result in the disclosure of confidential information maintained by the GOE. This information is protected from public disclosure under 19 C.F.R. §§ 351.105(c)(1), (8) and (11). Santa Priscila, SONGA, and the GOE consent to the release of the enclosed business proprietary information to the extent required by the Department under the Administrative Protective Order issued for this investigation. All business proprietary information has been deleted from the public version of this submission.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this brief have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions or require any additional information regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer

*Counsel to Industrial Pesquera Santa Priscila, S.A., Sociedad Nacional de Galápagos C.A., and the Government of Ecuador*

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify that the foregoing document submitted in the countervailing duty investigation of Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), was deemed served via ACCESS on this 11th day of October, 2024, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer

# Attachment

Barcode:4647025-01 C-331-806 INV - Investigation -

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE. Suite 500
Washington, DC 20003
www.TradePacificLaw.com

September 16, 2024

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 100
Investigation
POI: 1/1/2022 – 12/31/2022
ITA/E&C/Office IV

Business proprietary information of the GOE has been redacted on pages 32–34, 36, 38, 39, and 42–44; of Santa Priscila has been redacted on pages 18, 20, 21, 24, 25, 26, 30, 31, 45, 48–50, 54, 55, 57, 60–62, 67, 28, 70–73, 76–79, 82, and 83; of SONGA has been redacted on pages 19–21, 22, 24, 26, 31, 51–54, 57, 58, 61, 67, 68, 70, 80, 86, and 89, and Mixed BPI has been redacted on pages 20, 22, 53, 54, 57, and 60.

**PUBLIC VERSION**

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), Sociedad Nacional de Galápagos C.A. ("SONGA"), mandatory respondents in the above-referenced countervailing duty ("CVD") investigation, and their respective cross-owned affiliates, and on behalf of the Government of Ecuador ("GOE"), we submit this Case Brief commenting on the Department's preliminary determination in the above-referenced countervailing duty



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

investigation, as well as on certain aspects of the subsequent verifications. This brief is timely submitted in accordance with the Department's memorandum extending the deadline to submit case briefs in this investigation until today. See Memorandum to File re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Extension of Time to Submit Case Briefs" (Sept. 9, 2024).

This submission contains no new factual information.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila, SONGA, and the GOE request business proprietary treatment for the information enclosed in brackets in this submission. The bracketed information pertains to specific business information concerning products and production processes of Santa Priscila, SONGA, and other submitters, the exact amounts of benefit applied for or received, and other specific information concerning the business operations of Santa Priscila, SONGA, and other submitters, including the nature of affiliations and financial information, etc., the release of which to the public would cause substantial competitive and commercial harm to Santa Priscila, SONGA, and other submitters. Other bracketed information pertains to other specific information concerning the GOE's operations, tax collections, and other benefits, etc., and the release of which may result in the disclosure of confidential information maintained by the GOE. This information is protected from public disclosure under 19 C.F.R. §§ 351.105(c)(1), (8) and (11). Santa Priscila, SONGA, and the GOE consent to the release of the enclosed business proprietary information to the extent required by the Department under the Administrative Protective Order issued for this investigation. All business proprietary information has been deleted from the public version of this submission.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this brief have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions or require any additional information regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer

*Counsel to Industrial Pesquera Santa Priscila, S.A., Sociedad Nacional de Galápagos C.A., and the Government of Ecuador*

## CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify that the foregoing document submitted in the countervailing duty investigation of Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), was deemed served via ACCESS on this 16th day of September, 2024, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer

Barcode:4647025-01 C-331-806 INV - Investigation -

**Case No. C-331-806**
**Investigation**
**POI: 1/1/2022 – 12/31/2022**
**AD/CVD Operations, Office IV**

**Business proprietary information of the GOE, Santa Priscila, SONGA, and MIXED BPI has been redacted on the pages indicated on the cover letter of this case brief.**

**PUBLIC VERSION**

---

**BEFORE THE**
**UNITED STATES DEPARTMENT OF COMMERCE**
**INTERNATIONAL TRADE ADMINISTRATION**
**ENFORCEMENT AND COMPLIANCE**

# COUNTERVAILING DUTY INVESTIGATION AGAINST FROZEN WARMWATER SHRIMP FROM ECUADOR

# CASE BRIEF OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A., SOCIEDAD NACIONAL DE GALÁPAGOS C.A., AND THE GOVERNMENT OF ECUADOR

---

**Jarrod M. Goldfeder**
**Warren E. Connelly**
**Kenneth N. Hammer**
**TRADE PACIFIC PLLC**
**700 Pennsylvania Avenue, SE, Suite 500**
**Washington, DC 20003**
**(202) 223-3760**

**Counsel to Industrial Pesquera Santa Priscila S.A., Sociedad Nacional de Galápagos C.A., and the Government of Ecuador**

**Dated: September 16, 2024**

Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

Barcode:4647025-01 C-331-806 INV - Investigation -

# TABLE OF CONTENTS

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iv

EXECUTIVE SUMMARY ..... 3

ARGUMENT ..... 18

I. THE DEPARTMENT SHOULD REVISE ITS BENCHMARK AND BENEFIT CALCULATIONS UNDER THE PROVISION OF LAND USE CONCESSIONS FOR AQUACULTURE FACILITIES IN BEACHES AND BAYS FOR LTAR PROGRAM 18

II. THE DEPARTMENT SHOULD FIND CERTAIN TAX-RELATED PROGRAMS ARE NOT COUNTERVAILABLE BECAUSE THEY ARE NOT SPECIFIC ..... 27

A. Legal Framework ..... 28

B. Factual Background ..... 28

C. The Department Should Analyze *De Facto* Specificity For All Tax Incentives Received by Santa Priscila and SONGA Incident to Investment Contracts Based on Usage Data for the Investment Contract Program ..... 30

D. The Investment Contract Program Is Not *De Facto* Specific ..... 31

E. If the Department Continues to Analyze Tax Benefits Received by Santa Priscila and Produmar as Benefits Received Pursuant to the COPCI Tax Incentives Program, the COPCI Tax Incentive Program is Not *De Facto* Specific ..... 34

F. The Environmental Tax Incentive Program Is Not Specific ..... 36

1. Environmental Tax Incentives Are Generally Available to All Industries and Firms Under Ecuadorian Law ..... 36

2. The Environmental Tax Incentive Program Is Not *De Facto* Specific ..... 37

3. Conclusion ..... 40

G. The ISD Exemption on Principal and Interest Payments on Foreign Loans Program Is Not Specific ..... 40

1. ISD Exemptions on Principal and Interest Payments on Foreign Loans Are Generally Available to All Industries and Firms Under Ecuadorian Law 41

2. The ISD Exemption on Principal and Interest Payments on Foreign Loans Program Is Not *De Facto* Specific ..... 42



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

Barcode:4647025-01 C-331-806 INV - Investigation -


3. Conclusion ........................................................................................ 44

III. THE DEPARTMENT SHOULD REVISE THE SALES DENOMINATORS OF PRODUMAR AND TROPACK TO ALLOCATE BENEFITS RECEIVED BY THESE CROSS-OWNED AFFILIATES OVER THE COMBINED SALES OF ALL CROSS-OWNED AFFILIATES OF SANTA PRISCILA THAT PRODUCE SUBJECT MERCHANDISE ........................................................................................ 44

IV. THE DEPARTMENT SHOULD RECALCULATE THE SUBSIDY RATE FOR SONGA UNDER THE REFUND OF ISD ON PURCHASE OF INPUTS PROGRAM TO REFLECT THE BENEFIT ACTUALLY REPORTED BY SONGA ........................ 50

V. THE DEPARTMENT'S ATTRIBUTION OF BENEFITS THAT THE RESPONDENTS REPORTED RECEIVING TO UNAFFILIATED SHRIMP FARMS FROM WHICH THEY PURCHASED FRESH SHRIMP IS NOT SUPPORTED BY THE RECORD OR SUBSTANTIAL EVIDENCE ........................................................................ 52

A. Legal Standard ........................................................................................ 53

B. The Record Shows that Processing of Raw Shrimp Into Frozen Shrimp Adds More than Minimal Value to Fresh Raw Shrimp .................................................. 53

C. No Legal Basis Exists for the Department to Attribute to Benefits Received by Affiliated Suppliers of Raw Shrimp to Unaffiliated Suppliers of Raw Shrimp ... 58

D. If It Finds That Section 771B Applies, the Department Should Change its Application and Methodology for Attributing Benefits to Unaffiliated Shrimp Farmers ........................................................................................ 62

1. The Department Should Not Apply 771B to the Export Tax Incentives and Export Tax Incentives for Sustained/Increased Employment Programs Because Neither Program Is Available to Shrimp Farmers ...................... 63

2. The Department Should Adjust Its 771B Calculations for the Municipal Total Assets Tax Exemptions Program .................................................... 67

3. The Department's Methodology for Calculating the Countervailable Benefits Attributed to Santa Priscila's Non-Cross-Owned Shrimp Suppliers Is Not Correct Where Santa Priscila and Produmar Each Reported Benefits Under the Same Program .......................................... 70

a. The Department Should Calculate the Rate Attributed Pursuant to Section 771B Based on the Weighted Average Benefits Received by Santa Priscila and Produmar .................................................. 74

b. The Department Should Not Attribute Benefits Received by Santa Priscila Pursuant to Its Investment Contract to Non-Cross-Owned Raw Shrimp Suppliers .............................................................. 75




Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

c. If the Department Does Attribute Benefits Received by Santa Priscila Pursuant to Its Investment Contract to Non-Cross-Owned Shrimp Suppliers, Then It Should Weight Average Benefits Received by Santa Priscila and Produmar .................................... 78

VI. THE DEPARTMENT SHOULD ADJUST THE CASH DEPOSIT RATES CALCULATED FOR ECUADORIAN RESPONDENTS IN THE FINAL DETERMINATION TO REFLECT PROGRAMS THAT WERE TERMINATED....... 79

A. Relevant Legal Standard .................................................................................. 80

B. The Export Tax Incentives Program Was Terminated ........................................ 81

C. The Hiring of Additional Personnel – Net Increase in Employment Program Was Terminated ........................................................................................................ 82

VII. THE DEPARTMENT'S REJECTION OF SONGA'S MINOR CORRECTION RELATED TO THE ISD EXEMPTION ON IMPORTED ASSETS AND THE RAW MATERIALS BENEFIT RECEIVED PURSUANT TO ITS INVESTMENT CONTRACT IS NOT SUPPORTED BY THE RECORD EVIDENCE OR DEPARTMENT PRACTICE ........................................................................................ 83

A. Factual Background .......................................................................................... 84

B. The Department's Rejection of SONGA's Minor Correction Is Unsupported by the Record and Department Practice.......................................................... 85

C. Even if the Department Does Not Accept SONGA's ISD Exemptions on Imported Raw Materials and Assets Information as a Minor Correction, the Department Should Accept the Reported Information as Facts Available ............................... 89

VIII. CONCLUSION.......................................................................................................... 90




Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

Barcode:4647025-01 C-331-806 INV - Investigation -
PUBLIC VERSION – BPI Has Been Redacted

BEFORE THE
INTERNATIONAL TRADE ADMINISTRATION
UNITED STATES DEPARTMENT OF COMMERCE

| | |
|---|---|
| FROZEN WARMWATER SHRIMP FROM ECUADOR | Case No. C-331-806<br>Investigation<br>POI: 1/1/2022 – 12/31/2022<br>AD/CVD Operations, Office IV |

CASE BRIEF OF
INDUSTRIAL PESQUERA SANTA PRISCILA S.A.,
SOCIEDAD NACIONAL DE GALÁPAGOS C.A, AND
THE GOVERNMENT OF ECUADOR

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), Sociedad Nacional de Galápagos C.A. ("SONGA"), mandatory respondents in the above-referenced countervailing duty ("CVD") investigation, and their cross-owned affiliates, and on behalf of the Government of Ecuador ("GOE") (collectively "Ecuadorian Respondents") we submit this Case Brief to address issues raised in the Department's preliminary determination. See Frozen Warmwater Shrimp From Ecuador: Preliminary Affirmative Countervailing Duty Determination and Alignment of Final Determination With Final Antidumping Duty Determination, 89 Fed. Reg. 22379 (Apr. 1, 2024) ("Prelim. Determination"), and accompanying Unpublished Memorandum addressed to Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, re: "Decision Memorandum for the Preliminary Affirmative Determination pf the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador" (Mar. 25, 2024) ("Prelim. Decision Memo"), as amended by Frozen Warmwater Shrimp From Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation, 89 Fed. Reg. 31722 (Apr. 25, 2024) ("Amended Prelim. Determination"), and the Department's Memorandum



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

addressed to Abdelali Elouaradia, Deputy Assistant Secretary for Enforcement and Compliance, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Post-Preliminary Analysis" (July 12, 2024) ("Post-Prelim. Determination"). This brief is timely submitted in accordance with the Department's memorandum extending the deadline to submit case briefs in this investigation until today. See Memorandum to File, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Extension of Time to Submit Case Briefs" (Sept. 9, 2024).

As stated in the Department's memorandum establishing a briefing schedule, the Department intends to examine the following three programs in an additional post-preliminary determination, which has not been issued as of the date of submission of this brief: (1) Youth Employment – Article 16 of Labor Law; (2) Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities; and (3) Annual Motor Vehicle Tax Reduction. See Memorandum to File from Reginald Anadio and Zachary Shaykin, International Trade Compliance Analysts, AD/CVD Operations, Office IV, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Briefing Schedule" (Sept. 4, 2024). The Department stated it will issue a separate briefing schedule requesting case and rebuttal briefs regarding these three programs. Id. Accordingly, Ecuadorian Respondents reserve arguments, if any, relating to the above-mentioned three programs for case and rebuttal briefs following the Department's announcement of its additional post-preliminary determination and a briefing schedule to address these programs.

## EXECUTIVE SUMMARY

Santa Priscila, SONGA, and the Government of Ecuador raise the following issues for the Department's consideration:

1) In the forthcoming Final Determination, the Department must adjust each land benchmark to allocate the per-hectare prices calculated in the Preliminary Determination over the average useful life of a land concession, which is indisputably 20 years. The land purchase prices for raw land upon which the Department based the land benchmarks in the Preliminary Determination reflect private contracts of sale of land whose terms last indefinitely, not annual rental prices. See Letter from Trade Pacific PLLC, re: Benchmark Submission of SONGA and Industrial Pesquera Santa Priscila" (Feb. 28, 2024), at Exs. 9, 11. Therefore, the land purchase prices used in the Department's calculated benchmark prices reflect a price for the purchase of raw land, and not a limited term annualized rental prices.

The Department correctly recognized that concessions are issued for a 20-year period and that concessions do not confer ownership rights. Prelim. Decision Memo, at 22. The Department's calculation incorrectly and unreasonably treats the purchase price as a lease price by dividing the entire purchase price by the area of the land.

In essence, the Department's methodology assumes that Santa Priscila and SONGA paid the purchase price every year for the life of each concession. Alternatively, the Department erroneously assumes that the entire purchase price was paid in year one of the concession, but no "rental" price was paid for the remaining 19 years of the concession. Both assumptions have no basis in the record and lack a rationale.

Therefore, the Department must recalculate the per-hectare benchmark price for land concessions used to calculate the benefit for each respondent by dividing the per-hectare benchmark price used for each respondent by the number of years the Department found that

aquaculture concessions are granted in the present administrative review (*i.e.*, 20 years) in the forthcoming Final Determination.

2) The following tax related programs are not countervailable because they are not *de jure* or *de facto* specific: (1) Investment Contracts; (2) Environmental Tax Incentive; and (3) Exemption of Foreign Currency Outflow Tax ("ISD").

a) The Department should find that the tax exemptions reported by Santa Priscila and Produmar were claimed incident to the Investment Contract Program, and not the COPCI tax incentives program, because the exempted income claimed by both Santa Priscila and Produmar was related to new productive investments made under their respective investment contracts. The fact that Santa Priscila and Produmar claimed this benefit through a different mechanism results merely from the fact they could identify certain income from its investments, not because the benefits arose in a manner that was any different from income tax benefits claimed by SONGA or Naturisa, for which the Department attributed benefits under the same program to its investment contracts.

Even if information on firms that made investments pursuant to investment contracts could serve as a reasonable proxy for recipients of benefits under the Investment Contract program, the data reported by the GOE demonstrates that a wide range of industries qualified for benefits under the program. The GOE reported that 19 different industry sectors made investments in 2022 under the Investment Contract program. Letter from Trade Pacific PLLC, re: "Government of Ecuador's Section II Questionnaire Response" (Feb. 14, 2024), Vol. VI., at OTH-16 ("GOE Sec. II QR").

The data do not support a conclusion that the aquaculture industry is the predominant user of the Investment Contract program. Furthermore, the aquaculture industry did not invest a disproportionately large amount under the investment contract program. Id. at Ex. OTH-2(c).

There is no record evidence that would support the conclusion that the GOE, in fact, exercised any such discretion because the GOE did not report any information on applications for investment contracts that taxpayers applied for, but were denied, because the GOE stated that it does not maintain such information. Id. at OTH-17.

b) If the Department continues to analyze tax exemptions that Santa Priscila and Produmar reported receiving incident to the Investment Contract as received incident to the Tax Incentives for Priority Sectors Under the 2010 Organic Production Code ("COPCI") Tax Incentives program, the Department should nevertheless conclude that the COPCI Tax Incentive program is not *de facto* specific because it is available to a broad range of enterprises and industries and the shrimp industry neither is the predominant user of this program nor received a disproportionate share of the benefits under this program.

Sixteen different industrial categories out of a total of 21 industrial categories in Ecuador claimed tax benefits under Article 26 of the Organic Law for the Promotion, Attraction of Investment, Employment Generation, and Fiscal Stability and Balance ("LFP"), which expanded the tax exemptions created by Article 9.1 of the LRTI. GOE Sec II QR, at Vol III, at TAX-29 to TAX-30, Letter from Trade Pacific PLLC re: "Government of Ecuador's Supplemental Section II Questionnaire Response" (Mar. 13, 2024), at Ex. S-Q3(a) ("GOE SQR 1").

c) The Department erroneously concluded that the Environmental Tax Incentives program is *de facto* specific pursuant to 19 U.S.C. § 1677(5A)(D)(iii)(I) because it

found that usage information from the GOE shows that the program provided benefits to a limited number of users. Prelim. Decision Memo at 14.

The Environmental Tax Incentives program is not *de facto* specific because almost all industries in Ecuador received benefits under the program, and no industry received a predominant or disproportionate share of benefits under the program. In fact, companies in industrial categories other than those that include aquaculture received a larger share of the benefits than the "Agriculture, Forestry, and Fishing" industrial category, which includes more than the shrimp and aquaculture sector.

First, the data reported by the GOE demonstrate that a wide range of industries qualified for benefits under the Environmental Tax Incentives program. The data do not support a conclusion that the aquaculture industry is the predominant user of the Environmental Tax Incentive program. Companies among 18 different industrial categories out of a total of 21 industrial categories in Ecuador claimed tax benefits under the program. GOE SQR 1, at Ex. S-Q3(a).

Second, the aquaculture industry did not receive a disproportionately large share of benefits under the Environmental Tax Incentives program. On the contrary, the data show that the "Agriculture, Forestry, and Fishing" industrial category accounts for a percentage that is roughly proportionate based on the share of overall taxpayers identified in the same industrial category.

Third, the record shows that the SRI did not exercise discretion to the benefit of an enterprise or industry under the ISD Exemption on Principal and Interest Payments on Foreign Loans program. GOE Sec. II QR, at Vol. VI, at OTH-42. Rather, a borrower automatically qualifies for benefits after registering a qualifying loan with the Central Bank of Ecuador and

], and the [ ] exemption was claimed by both respondents because Santa Priscila and Produmar maintained [ ] unlike SONGA and Naturisa, which claimed the tax exemption under the standard formula. **{Contains Santa Priscila's BPI.}** The fact that Santa Priscila and Produmar claimed this benefit through a different mechanism (i.e., identifying [ ]) results merely from the fact they could identify [ ], not because the benefits arose in a manner that was any different from income tax benefits claimed by SONGA or Naturisa. **{Contains SONGA's BPI.}**

### D. The Investment Contract Program Is Not *De Facto* Specific

In the Preliminary Determination, the Department correctly preliminarily concluded that eligibility for tax related benefits pursuant to the Investment Contract program is not *de jure* specific because the benefits were available at the time the respondents signed their respective investment contracts to an expanded list of eligible sectors that includes a wide range of sectors and industries. Prelim. Decision Memo at 24; see also Letter from Trade Pacific PLLC, re: "Government of Ecuador's Post-Preliminary Supplemental Questionnaire Response" (May 16, 2024), at S3-7 to S3-8 (listing 24 generalized and diverse sectors, many of which include multiple business sectors, including "Industrial, Agro-Industrial and Agribusiness," which includes 10 individual sub-sectors, "Software Development and Services, Technology Hardware Production and Development, Digital Infrastructure, Information, Security, Digital Products and Content, and Online Services," "Tourism, Cinematography and Audiovisuals, and International Events"). Nevertheless, the Department incorrectly determined that the program is specific under 19 U.S.C. § 1677(5A)(D)(iii)(I) because the program provides benefits to a limited number of users.

The Department provides no analysis to support its preliminary finding that benefits are provided to a limited number of users, but the Department references pages OTH-15 and OTH-16 of the GOE's February 14th Sec. II QR, which contains tables listing the number of taxpayers, by industry, and the number of firms and amounts of investments, by industrial sector, respectively. Prelim. Decision Memo, at 24 (citing GOE Sec. II QR, Vol. VI., at OTH-15 to OTH-16). As an initial matter, the GOE did not report the number of firms that received benefits pursuant to investment contracts on an industry or enterprise basis. Rather, the GOE reported the amount of investments made by the industrial sector within Ecuador. See GOE Sec. II QR, Vol. VI., at OTH-16 (containing a chart headed "Amt. of Investment by Industry (USD).").
Therefore, the reported information does not support the Department's preliminary determination that the actual recipients of the benefits under this program are limited in number.

Even if information on firms that made investments pursuant to investment contracts could serve as a reasonable proxy for recipients of benefits under the Investment Contract program, the data reported by the GOE demonstrates that a wide range of industries qualified for benefits under the program. The GOE reported that 19 different industry sectors made investments in 2022 under the Investment Contract program. Id. In the same year, among those 19 industrial sectors, firms in the aquaculture sector accounted for only [ ] (*i.e.*, [ ] of [ ]) of the total value invested among the 19 different industry sectors. **{Contains GOE's BPI.}** Id. Therefore, the record demonstrates that a large number of industries received benefits under the program.

Next, even if the investment data reported by the GOE could serve to demonstrate whether an enterprise or industry is a predominant user of the program, the data do not support a conclusion that the aquaculture industry is the predominant user of the Investment Contract



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

program. Among the 50 individual firms that committed to the largest investments under the program, by value, the aquaculture industry accounted for only [ ] of the total investments under the program during the years 2019 through 2022. **{Contains GOE's BPI.}** Id. at Ex. OTH-2(c). The data also do not support that the aquaculture sector is the predominant user of the program because a larger number of firms in the [ ] made investments under the program than those in the Aquaculture sector [ ]. Id. **{Contains GOE's BPI.}** Collectively, firms in the [ ] sector accounted for [ ] of firms that made investments under the investment contract program, whereas firms in the aquaculture sector accounted for [ ]. **{Contains GOE's BPI.}** Id.

Furthermore, the aquaculture industry did not invest a disproportionately large amount under the investment contract program. Among the top 39 individual firms that committed to the largest investments under the Investment Contract program, aquaculture was one of [ ] different sectors that made such investments. Firms in the aquaculture sector accounted for only [ ] of the 39 (*i.e.*, less than [ ]) individual firms that committed to the largest investments under the program. **{Contains GOE's BPI.}** Id. The largest single investment (*i.e.*, [ ], not the aquaculture sector accounted for only [ ] of the total value invested under the investment contract program by the largest 39 projects between 2019 and 2022. **{Contains GOE's BPI.}** Id.

The record shows that the MCPEIP did not exercise discretion to the benefit of an enterprise or industry in awarding investment contracts. The GOE stated that the GOE does not have discretion under the law to consider approving investments that do not meet the eligibility

"program-wide" change since it applies to all firms except for taxpayers in depressed/border areas.

This change is clearly measurable since the program-wide change resulted in the provision being inapplicable to most taxpayers, including Produmar. In other words, the entirety of the benefit no longer applies. As a result, if the Department continues to calculate an above-*de minimis* total countervailable subsidy rate for any respondent in the Final Determination, the Department should adjust the total countervailable subsidy rate to eliminate the calculated benefit for the Hiring of Additional Personnel – Net Increase in Employment. Specifically, the Department should reduce Santa Priscila's total countervailable subsidy rate by [ ] based on the rate calculated for Produmar in the Post-Preliminary Determination. **{Contains Santa Priscila's BPI.}** If the Department continues to attribute benefits attributed to Santa Priscila's non-cross-owned raw shrimp suppliers pursuant to Section 771B pursuant to this program—which it should not for the reasons discussed above—the Department should likewise eliminate the rate, if any, attributed to Santa Priscila's non-cross-owned shrimp suppliers (*i.e.*, [ ]). **{Contains Santa Priscila's BPI.}**

## VII. THE DEPARTMENT'S REJECTION OF SONGA'S MINOR CORRECTION RELATED TO THE ISD EXEMPTION ON IMPORTED ASSETS AND THE RAW MATERIALS BENEFIT RECEIVED PURSUANT TO ITS INVESTMENT CONTRACT IS NOT SUPPORTED BY THE RECORD EVIDENCE OR DEPARTMENT PRACTICE

SONGA voluntarily reported as a minor correction at verification a small correction to the ISD Exemptions on Imported Assets and Raw Materials aspect of benefits received pursuant to its investment contract. SONGA Verification Rep., at 1. Despite the minor nature and impact of this change, the Department rejected this correction as a minor correction and instructed SONGA to remove it from its minor correction submission. For the reasons explained in greater detail below, the Department's rejection of SONGA's minor correction is not supported by the



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

record of this investigation, and it is also inconsistent with the Department's practice in similar instances. The Department should accept the corrected information related to SONGA's ISD Exemptions on Imported Assets and Raw Materials that SONGA attempted to present at verification and include it in the record, which is required regardless of whether the Department has accepted or rejected it. This inclusion is essential in case this aspect of the Final Determination is appealed. In other words, failure to include SONGA's minor correction submission could deny SONGA a full and fair opportunity to pursue an appeal of the Department's decision to deny acceptance of this minor correction.

### A. Factual Background

In preparing for verification, SONGA discovered that it reported the value of ISD exemptions received under this program in 2022 based on ISD declarations filed with the taxing authorities in 2021. In accordance with the Department's instructions, SONGA disclosed at the start of verification that it inadvertently reported benefits received in 2021 in its questionnaire response instead of benefits in 2022 based on its misunderstanding that benefits under this tax-related program were received in the year it filed its income tax declaration, like most other tax benefits, rather than in the year the tax was paid. See Letter from Robert Bolling, Program Manager, AD/CVD Operations, Office IV, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification Agenda of SONGA" (July 9, 2024), at 2 ("SONGA Verification Agenda"). In addition to explaining how SONGA inadvertently overlooked that it reported benefits for the incorrect year in its previous reporting, SONGA submitted a worksheet summarizing its revised ISD exemptions for 2022 based on its 2022 ISD statements and provided all ISD statements from 2022 to support its revised reporting. The Department disagreed that SONGA's mistake in reporting benefits attributable to 2021 instead of the POI was a minor correction, thereby refusing to accept the submission of relevant facts and



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

instructing SONGA to remove this minor correction from its submission. Letter from Trade Pacific PLLC, re: "Minor Corrections Presented at Verification" (July 24, 2024), SONGA Verification Rep., at 1.

**B. The Department's Rejection of SONGA's Minor Correction Is Unsupported by the Record and Department Practice**

At verification, SONGA demonstrated that it received benefits under the Investment Tax Rate Reduction and ISD Exemption on Foreign Loans aspects of its investment contract in the amount of [ ]. **{Contains SONGA's BPI.}** SONGA Verification Rep., at 10, Exs. VE-1, VE-6(a). The total countervailable subsidy rate preliminarily calculated for SONGA's benefits attributable to these same aspects of the program was [ ]. **{Contains SONGA's BPI.}** See Memorandum to The File, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Preliminary Determination Calculations for Sociedad Nacional de Galapagos, C.A." (Mar. 25, 2024), at Attach. II ("Invest Contract" Tab) ("SONGA Prelim. Calc Memo"). The Department preliminarily calculated a rate of [ ] for the ISD Exemption on Imported Materials aspect of SONGA Investment Contract program benefits. **{Contains SONGA's BPI.}** Id. The Department separately preliminarily calculated total benefits for SONGA's cross-owned affiliate, Naturisa, under the same program of [ ]. **{Contains SONGA's BPI.}** Id.

Therefore, the Department preliminarily calculated collective benefits received by SONGA and Naturisa under their investment contracts of [ ]. **{Contains SONGA's BPI.}** Id. The corrected ISD exemptions of [ ] on raw materials and assets imported in 2022 presented by SONGA at verification would have resulted in a mere [ ] change in total combined benefits reported by SONGA and Naturisa under their investment contracts. **{Contains SONGA's BPI.}** Id.



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

Moreover, SONGA presented at verification that, had the Department accepted the corrected 2022 ISD Exemption benefit, it would have resulted in a change of [redacted] [ ] of the [ ] preliminarily calculated for SONGA and Naturisa under the investment contract program. **{Contains SONGA's BPI.}** Id. By any reasonable definition of the term "minor," an error that leads to a [ ] change in benefits reported and a [ ] change in the calculated rate for the investment contract program is [redacted]." **{Contains SONGA's BPI.}** Therefore, the Department's decision to reject this correction as "not minor" lacks any basis in the record evidence and must be corrected in the Final Determination.

The Department's justification for its rejection, *i.e.*, that SONGA's revised database included [ ] individual transactions for [ ] imported assets does not render the Department's determination supported by the record. **{Contains SONGA's BPI.}** SONGA Verification Rep., at 2. The number of transactions or amount of assets alone cannot make a correction not "minor" in nature without addressing the combined impact of those transactions, which is [redacted]. The Department instructed SONGA to present corrections to its response at the outset of verification, including: a list of errors; original documentation to show the corrections; and a chart that showed the magnitude of changes to quantitative data. SONGA Verification Agenda at 8. Therefore, the instructions make clear that the "magnitude" of the changes, and not the raw number of changes, is the relevant consideration for the Department's evaluation of whether corrections are "minor" in nature. Id. The Department's determination to reject SONGA's minor correction ignores that the magnitude of the changes, when measured by the change to overall benefits reported under the relevant program and the change to the calculated rate [redacted].

Further, the Department's instructions state that new information will be accepted when: "(1) the need for information was not evident previously; (2) the information makes minor



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

correction to information already on the record; or (3) the information corroborates, supports, or clarifies information already on the record." SONGA Verification Agenda at 8. SONGA's corrections clearly satisfy these criteria. SONGA did not fail to report its ISD Exemptions on Imported Raw Materials and Assets. Rather, SONGA reported 2021 benefits in the good faith belief that it was reporting benefits received during the POI because it received benefits under other income tax-related programs based on its 2021 income tax filing. SONGA IQR, at Ex. 11.

In fact, SONGA stated that it was reporting ISD benefits received in 2022 in connection with purchases of qualifying imported materials, commodities and capital goods used to further the investment project pursuant to the terms its investment contract with the Ecuadorian government. See Letter from Trade Pacific PLLC, re: "SONGA Post-Preliminary Supplemental Questionnaire Response" (May 16, 2024), at Exs. S2-4(a), S2-4(b). Immediately upon discovering its misunderstanding, SONGA presented this error to the Department at the start of verification, as instructed.

For the reasons discussed above, SONGA's minor correction, when measured by the change to overall benefits reported under the relevant program and the change to the calculated rate is [redacted]. Finally, the information clarifies that information previously on the record relating to investment contract benefits and, more specifically, clarified that the ISD Exemptions received in connection with imported materials, commodities, and capital goods, was inadvertently, and in good faith, reported for the incorrect year. As a respondent that has not participated in a countervailing duty investigation in over 10 years, SONGA acted to the best of its ability to report ISD exemption information as completely and accurately as it could. For all these reasons, the Department should have accepted SONGA's minor corrections presented at verification relating to this program.



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

The Department's practice also supports accepting the ISD Exemption on Imported Raw Materials data as a minor correction. For example, in 1-Hydroxyethilidene-1, 1-Diphosphonic Acid from China, the Department accepted "a total of 14 previously unreported grants" that were presented at verification as minor corrections. See Memorandum to The File, re: "Verification of the Questionnaire Responses of Shandong Taihe Chemicals Co., Ltd. and Shandong Taihe Water Treatment Technologies Co., Ltd.: Countervailing Duty Investigation of 1-hydroxyethilidene-1, 1-diphosphonic acid from the People's Republic of China" (Jan. 10, 2017), at 2 (ACCESS Barcode 3535537-01).

Indeed, in verifications where respondents demonstrated much less cooperation than SONGA (because the Department discovered for itself the unreported subsidies, rather than the respondents voluntarily disclosing a minor correction, as SONGA did here), the Department has accepted information pertaining to the discovered subsidy on to the record. For example, in Certain Uncoated Groundwood Paper from Canada, the Department accepted two tax credits "in response to Commerce's 'other assistance' question" that were discovered by the Department at verification. See Certain Uncoated Groundwood Paper From Canada: Final Affirmative Countervailing Duty Determination, 83 Fed. Reg. 39414 (Aug. 9, 2018), and accompanying Issues and Decision Memorandum (Aug. 1, 2018), at 60; see also Countervailing Duty Investigation of Certain Passenger Vehicle and Light Truck Tires From the People's Republic of China: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part, 80 Fed. Reg. 34888 (June 18, 2015), and accompanying Issues and Decision Memorandum (June 11, 2015), at 19–20 (accepting as minor corrections in connection with "several unreported grants in certain sub-ledgers of . . . chart of accounts").



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

For all the reasons discussed above, the Department's determination to reject SONGA's corrected ISD Exemptions on Imported Raw Materials and Assets information as a minor correction was unsupported by the record and contrary to the Department's instructions and prior practice as to what will be accepted as a minor correction presented at verification. Considering the minimal [ ] change in benefits reported and [ ] change in the calculated rate for the investment contract program, the Department should reverse this rejection and accept the corrected ISD Exemptions on Imported Raw Materials information as a minor correction. **{Contains SONGA's BPI.}**

### C. Even if the Department Does Not Accept SONGA's ISD Exemptions on Imported Raw Materials and Assets Information as a Minor Correction, the Department Should Accept the Reported Information as Facts Available

As discussed above, there is no information on the record that SONGA refused to cooperate with respect to reporting its loan programs or did not act to the best of its ability to reconcile the reported information. As such, there is no need for the Department to resort to adverse inferences. Instead, the Department should determine that the use of facts available pursuant to 19 U.S.C. § 1677e(a)(2)(D) is appropriate and should calculate any subsidy rate for SONGA's use of the ISD Exemptions on Imported Raw Materials program using the 2021 information that SONGA reported in its responses.



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

## VIII. CONCLUSION

Ecuadorian Respondents respectfully request that the Department issue the Final Determination of this investigation consistent with the foregoing comments.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC

**Dated:** September 13, 2024

***Counsel to Industrial Pesquera Santa Priscila, S.A., Sociedad Nacional de Galápagos C.A., and The Government of Ecuador***



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:11 AM, Submission Status: Approved

# Tab 79

# P.R. 453-54

# C.R. 328

International Trade Lawyers
700 Pennsylvania Ave, SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

October 11, 2024

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 99
Investigation
POI: 1/1/2022 – 12/31/2022
ITA/E&C/Office IV

Business proprietary information of the GOE, Santa Priscila, SONGA, and Mixed BPI has been redacted in the Attachment.

**PUBLIC VERSION**

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Redacted Combined Rebuttal Brief of Santa Priscila, SONGA, and the Government of Ecuador

Dear Secretary Raimondo:

In response to the Department's letter, dated October 10, 2024, requesting that the Government of Ecuador, Santa Priscila S.A., and Sociedad Nacional de Galápagos C.A. (collectively "Respondents") submit a redacted version of their rebuttal brief, dated September 20, 2024, Respondents submit this redacted Rebuttal Brief in response to the September 13, 2024, case brief filed by the petitioner, the American Shrimp Processors Association, in the above-referenced CVD administrative review. See Letter to the Government of Ecuador, Santa Priscila S.A., and Sociedad Nacional de Galápagos C.A., re: "Rejection of Respondents' Case



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

and Rebuttal Brief Comments" (Oct. 10, 2024). As requested in the Department's letter, this redacted version of Respondent's Rebuttal Brief is not altered in any manner other than to remove the following information, which the Department explicitly directed that Respondents remove from the record:

- The full sentence split between pages 41 and 42.
- Section C starting from page 53 and ending on page 55.

This brief is timely submitted in accordance with the deadline contained in the Department's October 10th letter allowing Respondents an opportunity to submit a redacted version of their Rebuttal Brief by today. See Letter to the Government of Ecuador, Santa Priscila S.A., and Sociedad Nacional de Galápagos C.A., re: "Rejection of Respondents' Case and Rebuttal Brief Comments" (Oct. 10, 2024).

This submission contains no new factual information.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila, SONGA, and the GOE request business proprietary treatment for the information enclosed in brackets in this submission. The bracketed information pertains to specific business information concerning products and production processes of Santa Priscila, SONGA, and other submitters, the exact amounts of benefit applied for or received, and other specific information concerning the business operations of Santa Priscila, SONGA, and other submitters, including the nature of affiliations and financial information, etc., the release of which to the public would cause substantial competitive and commercial harm to Santa Priscila, SONGA, and other submitters. Other bracketed information pertains to other specific information concerning the GOE's operations, tax collections, and other benefits, etc., and the release of which may result in the disclosure of confidential information maintained by the GOE. This information is protected from public disclosure under 19 C.F.R. §§ 351.105(c)(1), (8) and (11). Santa Priscila, SONGA, and the GOE consent to the release of

the enclosed business proprietary information to the extent required by the Department under the Administrative Protective Order issued for this investigation. All business proprietary information has been deleted from the public version of this submission.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this brief have been served on interested parties as indicated on the attached certificate of service.

Please let us know if you have any questions or require any additional information regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer

*Counsel to Industrial Pesquera Santa Priscila, S.A., Sociedad Nacional de Galápagos C.A., and the Government of Ecuador*

# CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify that the foregoing document submitted in the countervailing duty investigation of Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), was deemed served via ACCESS on this 11th day of October, 2024, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer

# Attachment

Barcode: 4647033-01 C-331-806 INV - Investigation

TRADE PACIFIC
International Trade Lawyers
700 Pennsylvania Ave. SE, Suite 500
Washington, DC 20003
www.TradePacificLaw.com

September 23, 2024

The Honorable Gina M. Raimondo
Secretary of Commerce
U.S. Department of Commerce
Attn: Enforcement and Compliance
APO/ Dockets Unit, Room 18022
14th Street and Constitution Avenue, NW
Washington, DC 20230

Case No. C-331-806
Total No. of Pages: 94
Investigation
POI: 1/1/2022 – 12/31/2022
ITA/E&C/Office VII
Business proprietary information of the GOE has been redacted on page 75; of Santa Priscila has been redacted on pages 14, 18, 19, 21–24, 26, 28, 53, 59, 67–70, 72, 74–76, and 78–80; of SONGA has been redacted on pages 59, 63, 64, 66, 71, 75, 76, and 81–84, Mixed BPI has been redacted on pages 54, 58, 60, 80; and of Petitioner has been redacted on pages 49–51.

**PUBLIC VERSION**

Re: Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Combined Rebuttal Brief of Santa Priscila, SONGA, and the Government of Ecuador

Dear Secretary Raimondo:

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), Sociedad Nacional de Galápagos C.A. ("SONGA"), mandatory respondents in the above-referenced countervailing duty ("CVD") investigation, and their respective cross-owned affiliates, and on behalf of the Government of Ecuador ("GOE"), we submit this Rebuttal Brief in response to the case brief of the petitioner, the American Shrimp Processors Association ("Petitioner"). See Letter from Schagrin Associates, re: "Frozen Warmwater Shrimp from Ecuador – Case Brief" (Sept. 13, 2024). This rebuttal brief is timely submitted in accordance with the Department's memorandum extending the rebuttal brief deadline to today. See Memorandum to File re:


Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

"Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Extension of Time to Submit Case Briefs" (Sept. 9, 2024).

This submission contains no new factual information.

Pursuant to 19 C.F.R. § 351.304(a)(i), Santa Priscila, SONGA, and the GOE request business proprietary treatment for the information enclosed in brackets in this submission. The bracketed information pertains to specific business information concerning products and production processes of Santa Priscila, SONGA, and other submitters, the exact amounts of benefit applied for or received, and other specific information concerning the business operations of Santa Priscila, SONGA, and other submitters, including the nature of affiliations and financial information, etc., the release of which to the public would cause substantial competitive and commercial harm to Santa Priscila, SONGA, and other submitters. Other bracketed information pertains to other specific information concerning the GOE's operations, and other benefits, etc., and the release of which may result in the disclosure of confidential information maintained by the GOE. This information is protected from public disclosure under 19 C.F.R. §§ 351.105(c)(1), (8) and (11). Santa Priscila, SONGA, and the GOE consent to the release of the enclosed business proprietary information to the extent required by the Department under the Administrative Protective Order issued for this investigation. All business proprietary information has been deleted from the public version of this submission.

* * * * *

In accordance with the Department's regulations, we are filing this submission through ACCESS at http://access.trade.gov. Copies of this rebuttal brief have been served on interested parties as indicated on the attached certificate of service.

Barcode: 4647033-01 C-331-806 INV - Investigation



Please let us know if you have any questions or require any additional information regarding this submission.

Respectfully submitted,

/s/ Jarrod M. Goldfeder
Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer

*Counsel to Industrial Pesquera Santa Priscila, S.A., Sociedad Nacional de Galápagos C.A., and the Government of Ecuador*

Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

Barcode: 4647033-01 C-331-806 INV - Investigation

## CERTIFICATE OF SERVICE

I, Kenneth N. Hammer, hereby certify that the foregoing document submitted in the countervailing duty investigation of Frozen Warmwater Shrimp from Ecuador (Case No. C-331-806), was deemed served via ACCESS on this 23rd day of September, 2024, on the following interested parties:

| | |
|---|---|
| *On behalf of American Shrimp Processors Association and its individual members*<br>Roger B. Schagrin<br>SCHAGRIN ASSOCIATES<br>900 7th Street, NW, Suite 500<br>Washington, DC 20001<br>Email: service@schagrinassociates.com | *On behalf of Ad Hoc Shrimp Trade Action Committee (AHSTAC)*<br>Nathaniel Rickard<br>PICARD KENTZ & ROWE LLP<br>1750 K Street, NW, Suite 800<br>Washington, DC 20006<br>Email: nrickard@pkrllp.com |
| *On behalf of American Shrimp Processors Association and its individual members*<br>Edward T. Hayes<br>LEAKE & ANDERSON, LLP<br>1100 Poydras Street, Suite 1700<br>New Orleans, LA 70163<br>Email: ehayes@leakeandersson.com | *On behalf of U.S. Shrimpers Coalition*<br>Jennifer Michele Smith-Veluz<br>THE BRISTOL GROUP PLLC<br>1707 L Street, NW, Suite 570<br>Washington, DC 20036<br>Email: jennifer.smith@bristolgrouplaw.com |
| Andrea Morela Moscoso Larenas<br>EMBASSY OF ECUADOR<br>2535 15th St., NW<br>Washington, DC 20009<br>Email: t-amoscoso@cancilleria.gob.ec<br>***(*Public Version only)*** | *Representative of Export Packers, Ltd.*<br>Jeffrey S. Neeley<br>HUSCH BLACKWELL LLP<br>1801 Pennsylvania Avenue, NW, Suite 1000<br>Washington, DC 20006<br>Email: jeffrey.neeley@huschblackwell.com |

/s/ Kenneth N. Hammer
Kenneth N. Hammer
TRADE PACIFIC PLLC

Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

Barcode: 4647033-01 C-331-806 INV - Investigation

Case No. C-331-806
Investigation
POI: 1/1/2022 – 12/31/2022
AD/CVD Operations, Office IV

Business proprietary information of the GOE, Santa Priscila, SONGA, MIXED BPI, and of the Petitioner has been redacted on the pages indicated on the cover letter of this case brief.

PUBLIC VERSION

# BEFORE THE UNITED STATES DEPARTMENT OF COMMERCE INTERNATIONAL TRADE ADMINISTRATION ENFORCEMENT AND COMPLIANCE

## COUNTERVAILING DUTY INVESTIGATION AGAINST FROZEN WARMWATER SHRIMP FROM ECUADOR

## REBUTTAL BRIEF OF INDUSTRIAL PESQUERA SANTA PRISCILA S.A., SOCIEDAD NACIONAL DE GALÁPAGOS C.A., AND THE GOVERNMENT OF ECUADOR

Jarrod M. Goldfeder
Warren E. Connelly
Kenneth N. Hammer
TRADE PACIFIC PLLC
700 Pennsylvania Avenue, SE
Suite 500
Washington, DC 20003
(202) 223-3760

Counsel to Industrial Pesquera Santa Priscila S.A., Sociedad Nacional de Galápagos C.A., and the Government of Ecuador

Dated: September 23, 2024

Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

**TABLE OF CONTENTS**

TABLE OF CONTENTS ..... i

TABLE OF AUTHORITIES ..... iv

EXECUTIVE SUMMARY ..... 2

ARGUMENT ..... 8

I. THE DEPARTMENT SHOULD CONTINUE TO FIND THAT THE ALLEGED PROVISION OF BRACKISH WATER FOR LESS THAN ADEQUATE REMUNERATION IS NOT COUNTERVAILABLE ..... 8

A. The Totality of The Evidence Supports the Department's Conclusion that the Alleged Provision of Brackish Water for Less Than Adequate Remuneration Is Not Countervailable ..... 9

B. The Department Should Not Apply Adverse Facts Available Because Ecuadorian Respondents Did Not Withhold Information, Otherwise Impede This Investigation, or Provide Unverifiable Information Concerning the Alleged Brackish Water Program ..... 16

C. The Department May Not Ignore Timely Reported Information Regarding Ecuadorian Respondents Usage of Brackish Water and Apply Its Apply Adverse Facts Available Rate Selection Hierarchy ..... 25

D. If the Department Applies Its Apply Adverse Facts Available Rate Selection Hierarchy to the Provision of Brackish Water for Less Than Adequate Remuneration Program, It Should Apply the Rate Calculated for the Provision of Land Concessions for Less Than Adequate Remuneration Program ..... 25

II. THE DEPARTMENT SHOULD CONTINUE TO FIND THAT THE ALLEGED PROVISION OF DIESEL FUEL FOR LESS THAN ADEQUATE REMUNERATION PROGRAM IS NOT COUNTERVAILABLE ..... 30

A. The Department Correctly Determined Not to Countervail the Alleged Provision of Diesel Fuel For Less Than Adequate Remuneration ..... 30

B. If the Department Were to Determine that the Alleged Provision of Diesel Fuel for Less Than Adequate Remuneration Program is Countervailable, the Department Should Adjust any Calculated Cash Deposit Rate to Reflect that This Program Was Terminated ..... 38



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

III. THE RECORD DOES NOT SUPPORT APPLYING A TIER TWO BENCHMARK PRICEBASED ON PRICES FROM COLOMBIA AND PERU TO MEASURE THE ADEQUACY OF REMUNERATION OF ECUADORIAN RESPONDENTS' ELECTRICITY PURCHASES ........ 41

A. The Record Facts Do Not Support the Department's Preliminary Determination that the Provision of Electricity for Less Than Adequate Remuneration is *De Facto* Specific ........ 42

B. Electricity Prices from Colombia and Peru Are Not Suitable Tier Two Benchmark Prices ........ 46

C. [redacted] ........ 53

IV. NEITHER THE STATUTE NOR THE DEPARTMENT'S PRACTICE SUPPORTS ATTRIBUTING BENEFITS RECEIVED BY RESPONDENTS TO CROSS-OWNED SUPPLIERS OF FRESH SHRIMP THAT WERE EXCUSED FROM RESPONDING TO THE DEPARTMENT'S QUESTIONNAIRES ........ 56

V. THE DEPARTMENT SHOULD NOT APPLY ADVERSE FACTS AVAILABLE TO COUNTERVAIL INCOME TAX PROGRAMS ........ 61

A. SONGA's Reported ISD Exemptions on Imported Assets and Raw Materials Benefits ........ 62

1. If the Department Does Not Accept SONGA's Minor Corrections Relating to ISD Exemptions on Imported Assets and Raw Materials it Should Apply Information Reported by the GOE as Neutral Facts Available ..... 63

2. If the Department Does Apply an Adverse Inference to SONGA, It Should Apply the Highest Calculated Rate for the Nearly Identical ISD Refund Program ........ 67

B. The Department's Rejection of Minor Corrections Related to the Annual Motor Vehicle Tax Exemption Program Is Not Supported By the Record or Department Practice ........ 67

1. Factual Background ........ 68

2. The Department's Rejection of the Minor Corrections Is Unsupported by the Record and Department Practice ........ 70

C. If the Department Does Not Accept SONGA's Minor Corrections, then it Should Apply Neutral Facts Available and Calculate a Rate for Annual Motor Vehicle Tax Reductions Based on Information Reported by the GOE ........ 74




Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

D. If the Department Does Not Accept Minor Corrections Regarding Annual Motor Vehicle Tax Exemption Benefits, It Should Apply the Rate Calculated for Santa Priscila Under the Identical Program ..... 77

VI. THE DEPARTMENT CORRECTLY APPLIED SANTA PRISCILA'S TOTAL SALES DENOMINATOR TO TAX BENEFITS RECEIVED IN CONNECTION WITH ITS INVESTMENT CONTRACT ..... 78

VII. THE DEPARTMENT SHOULD NOT ADJUST SONGA'S SUBSIDY RATE CALCULATIONS ..... 81

VIII. CONCLUSION ..... 84



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

Barcode: 4647033-01 C-331-806 INV - Investigation

**PUBLIC VERSION – BPI Has Been Redacted**

BEFORE THE
INTERNATIONAL TRADE ADMINISTRATION
UNITED STATES DEPARTMENT OF COMMERCE

FROZEN WARMWATER SHRIMP FROM ECUADOR

Case No. C-331-806
Investigation
POI: 1/1/2022 – 12/31/2022
AD/CVD Operations, Office IV

REBUTTAL BRIEF OF
INDUSTRIAL PESQUERA SANTA PRISCILA S.A.,
SOCIEDAD NACIONAL DE GALÁPAGOS C.A, AND
THE GOVERNMENT OF ECUADOR

On behalf of Industrial Pesquera Santa Priscila S.A. ("Santa Priscila"), Sociedad Nacional de Galápagos C.A. ("SONGA"), mandatory respondents in the above-referenced countervailing duty ("CVD") investigation, and their cross-owned affiliates, and on behalf of the Government of Ecuador ("GOE") (collectively "Ecuadorian Respondents") we submit this this rebuttal brief in response to the case brief of the petitioner, the American Shrimp Processing Association ("Petitioner"), in the above-referenced countervailing duty ("CVD") investigation. Letter from Schagrin Associates, re: "Frozen Warmwater Shrimp from Ecuador – Case Brief" (Sept. 13, 2024) ("Pet's Case Br."). This rebuttal brief is timely submitted in accordance with the Department's memorandum extending the rebuttal brief deadline to today. See Memorandum to File re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Extension of Time to Submit Case Briefs" (Sept. 9, 2024).



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

separately calculated subsidy rates based on benefits received by Santa Priscila and Produmar, respectively.

## V. THE DEPARTMENT SHOULD NOT APPLY ADVERSE FACTS AVAILABLE TO COUNTERVAIL INCOME TAX PROGRAMS

The Petitioner argues that the Department should apply AFA to certain programs for which Santa Priscila and SONGA reported minor corrections that were not accepted by the Department at verification. Pet's Case Br., at 17–19 (citing Memorandum to The File re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A." (Aug. 22, 2024), at 2 ("IPSP Verif. Rep."), Memorandum to The File re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of Sociedad Nacional de Galapagos C.A." (Aug. 13, 2024), at 2 ("SONGA Verification Rep."). Specifically, the Petitioner argues that the Department should apply AFA to calculate a rate for the following respondents and programs:

- SONGA for the Currency Outflow Tax ("ISD") Exemptions on Imported Assets and Raw Materials aspect of benefits received pursuant to its investment contract; and
- Produmar, SONGA and Naturisa for the Motor Vehicle Tax Exemption program.

Pet's Case Br., at 17–19.

Ecuadorian Respondents first explain why the Department should apply neutral facts available pursuant to 19 U.S.C. § 1677e(a)(2) to SONGA's ISD Exemptions on Imported Assets and Raw Materials benefits received pursuant to its investment contract if the Department does not accept the minor corrections presented by SONGA at verification.



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

Second, Ecuadorian Respondents explain why the Department should have accepted the minor corrections presented by SONGA, Naturisa, and Produmar that relate to the Annual Motor Vehicle Tax Exemptions program. The Department has not yet determined whether the Motor Vehicle Tax Exemption program is countervailable. See Post-Preliminary Determination, 18 (stating that the Department will examine the Annual Vehicle Motor Vehicle Tax Reduction program in an additional Post-Preliminary Determination).

Before Ecuadorian Respondents reach this issue, as stated in the Department's memorandum establishing a briefing schedule, the Department intends to examine the Annual Motor Vehicle Tax Reduction in a forthcoming additional Post-Preliminary Determination. See Memorandum to File from Reginald Anadio and Zachary Shaykin, International Trade Compliance Analysts, AD/CVD Operations, Office IV, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Briefing Schedule" (Sept. 4, 2024). The Department stated it will issue a separate briefing schedule requesting case and rebuttal briefs regarding this and two other programs. Id.

Accordingly, Ecuadorian Respondents reserve arguments, if any, relating to the countervailability of the Annual Motor Vehicle Tax Reduction program for case and rebuttal briefs following the Department's announcement of its additional post-preliminary determination and a briefing schedule to address these programs. Ecuadorian Respondents only address the Annual Motor Vehicle Tax program to explain why the Department should have accepted the minor corrections presented by Santa Priscila, SONGA, and Naturisa, as presented at verification.

### A. SONGA's Reported ISD Exemptions on Imported Assets and Raw Materials Benefits



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

### 1. If the Department Does Not Accept SONGA's Minor Corrections Relating to ISD Exemptions on Imported Assets and Raw Materials it Should Apply Information Reported by the GOE as Neutral Facts Available

For the reasons discussed in detail on pages 83 to 89 of Ecuadorian Respondents' case brief, the Department should have accepted minor corrections to SONGA's ISD Exemptions on Imported Raw Materials and Assets presented at the outset of verification. See Ecuadorian Respondents' Case. Br., at 83–89. Alternatively, the Department should determine that the use of facts available pursuant to 19 U.S.C. § 1677e(a)(2) is appropriate and should calculate any subsidy rate for SONGA's use of the ISD Exemptions on Imported Raw Materials program using the 2021 information that SONGA reported in its responses for the reasons discussed on page 88 of Ecuadorian Respondents' case brief.

Generally, where an interested party provides information that cannot be verified in accordance with 19 U.S.C. § 1677m(i), the Department will use facts otherwise available to substitute for missing information that was not verifiable. See 19 U.S.C. § 1677e(a)(2)(A)–(D). Only where the Department determines that a party has failed to cooperate to the best of its ability in supplying requested information does the Department have discretion to apply an adverse inference for information that could not be verified. See 19 U.S.C. § 1677e(b).

If the Department does not accept either of SONGA's minor corrections, then the Department should apply the estimated benefit reported by the GOE for the SONGA's ISD Exemptions on Imported Raw Materials and Assets divided by the term of SONGA's investment contract as facts available pursuant to 19 U.S.C. § 1677e(a)(2). Specifically, the GOE reported that SONGA was approved to receive [ ] in ISD Exemption on Imported Raw Materials and Assets benefits over the life of its investment contract (*i.e.*, [ ] years). **{Contains SONGA's BPI.}** See GOE Sec. II QR, Vol. VI, Ex. OTH-2(a) (stating the amount of ISD



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

Exemptions on Imported Raw Materials and Assets), Letter from Trade Pacific PLLC, re: "Government of Ecuador's Supplemental Section II Questionnaire Response" (Mar. 13, 2024), at S-46 (clarifying that the amount stated in Ex. OTH-2(a) of the GOE's initial Section II questionnaire response was an estimated amount based on the investment plan presented by SONGA), Ex. S-Q2 (reporting the same estimated ISD Exemptions on Imported Raw Materials and Assets benefit reported in the GOE's initial Section II questionnaire response); see also SONGA IQR, at Ex. 11 (reporting that SONGA first received benefits pursuant to its investment contract in [ ] and could continue receiving benefits until [ ]), Letter from Trade Pacific PLLC, re: "SONGA Supplemental Section III Questionnaire Response" (Mar. 1, 2024), at Ex. S-7 (containing SONGA's investment contract).

In other words, the Department should apply the total estimated benefit amount over the life of the contract (*i.e.*, [ ]) divided by the [ ] term to yield a POI benefit amount of [ ]. **{Contains SONGA's BPI.}** If the Department applied this benefit amount as facts available, then the resulting benefit for this program for SONGA would be [ ]. **{Contains SONGA's BPI.}**

The Department should apply facts available pursuant to 19 U.S.C. § 1677e(a)(2), rather than AFA pursuant to 19 U.S.C. § 1677e(b), because the record demonstrates that SONGA did not fail to cooperate by not acting to the best of its ability to comply with the request for information. In preparing for verification, SONGA discovered that it reported the value of ISD exemptions received under this program in 2022 based on ISD declarations filed with the taxing authorities in 2021. In accordance with the Department's instructions, SONGA disclosed at the start of verification that it inadvertently reported benefits received in 2021 in its questionnaire response instead of benefits in 2022 based on its misunderstanding that benefits under this tax-



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

related program were received in the year it filed its income tax declaration, like most other tax benefits, rather than in the year the tax was paid. See Letter from Robert Bolling, Program Manager, AD/CVD Operations, Office IV, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification Agenda of SONGA" (July 9, 2024), at 2 ("SONGA Verification Agenda"). The Department disagreed that SONGA's mistake in reporting benefits attributable to 2021 instead of the POI was a minor correction, thereby refusing to accept the submission of relevant facts and instructing SONGA to remove this minor correction from its submission. Letter from Trade Pacific PLLC, re: "Minor Corrections Presented at Verification" (July 24, 2024), SONGA Verification Rep., at 1.

There is no evidence that SONGA refused to cooperate with respect to reporting the ISD Exemptions on Imported Raw Materials and Assets program benefits, nor did fail to act to the best of its ability to report and reconcile the reported information. Rather, SONGA reported 2021 benefits in the good faith belief that it was reporting benefits received during the POI because it received benefits under other income tax-related programs based on its 2021 income tax filing. Letter from Trade Pacific PLLC, re: "SONGA's Section III Questionnaire Response" (Feb. 12, 2024), at Ex. 11 ("SONGA IQR"). In fact, SONGA stated that it was reporting ISD benefits received in 2022 in connection with purchases of qualifying imported materials, commodities and capital goods used to further the investment project pursuant to the terms its investment contract with the Ecuadorian government. See Letter from Trade Pacific PLLC, re: "SONGA Post-Preliminary Supplemental Questionnaire Response" (May 16, 2024), at Exs. S2-4(a), S2-4(b).

Immediately upon discovering its misunderstanding, SONGA presented this error to the Department at the start of verification, as instructed. As a participant that has not participated in a



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

countervailing duty investigation for over ten years, SONGA acted to the best of its ability to report the ISD Exemption information as completely and accurately as it could. As such, there is no reason for the Department to resort to applying AFA.

The Department must consider the overall reporting performance of SONGA and its cross-owned affiliates—the vast majority of which the Department found contained no discrepancies and tied to each affiliate's accounting records—in evaluating whether the reporting of SONGA and its cross-owned affiliates with respect to Investment Contract benefits overall reflected reporting to the best of their abilities. The record clearly reflects the Department verified the accuracy of SONGA's reporting with respect to itself and Naturisa, SONGA's cross-owned affiliated supplier of raw shrimp.

The Department preliminarily calculated collective benefits received by SONGA and Naturisa under their investment contracts of [ ]. **{Contains SONGA's BPI.}** Memorandum to The File, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Preliminary Determination Calculations for Sociedad Nacional de Galapagos, C.A." (Mar. 25, 2024), at Attach. II ("Invest Contract" Tab) ("SONGA Prelim. Calc Memo"). Therefore, if the Department does not accept SONGA's minor corrections—which it should for the reasons discussed in Ecuadorian Respondents case brief—the Department should apply neutral facts available to SONGA to reflect the fact the overall investment contract benefit reporting of SONGA and its cross-owned affiliates reflects reporting to the best of their abilities by SONGA (i.e., [ ]) under the nearly identical ISD Exemption on Foreign Loans program as neutral facts available pursuant to 19 U.S.C. § 1677e(a)(2). **{Contains SONGA's BPI.}**



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

### 2. If the Department Does Apply an Adverse Inference to SONGA, It Should Apply the Highest Calculated Rate for the Nearly Identical ISD Refund Program

However, should the Department apply its AFA rate selection hierarchy, it should apply the highest calculated rate for the nearly identical ISD Refund on Purchase of Inputs program, which is the rate preliminarily calculated for Santa Priscila under this program (i.e., [ ], excluding the [ ] preliminarily attributed to non-cross-owned suppliers of raw shrimp to Santa Priscila pursuant to Section 771B for the reasons discussed on pages 52 to 62 of Ecuadorian Respondents' case brief). **{Contains Santa Priscila's BPI.}** The GOE described the ISD Exemption program as another vehicle whereby taxpayers may claim exemptions of ISD paid on purchases of qualifying goods that were imported into Ecuador, and thus, no purchases were made from state-owned entities. GOE Sec. II QR, Vol. III, at EXP-1. ISD Exemptions are merely an alternative mechanism that allows taxpayers who are granted this benefit pursuant to an investment contract to be excused from paying ISD on imported raw materials. Therefore, if the Department applies AFA to SONGA's reporting of the ISD Exemption on Imported Assets and Raw Materials, which it should not, it should apply the highest calculated rate for the nearly identical ISD Refund on Purchase of Inputs program for Santa Priscila.

## B. The Department's Rejection of Minor Corrections Related to the Annual Motor Vehicle Tax Exemption Program Is Not Supported By the Record or Department Practice

SONGA, Naturisa, and Produmar each voluntarily reported as minor corrections at verification small corrections to the Annual Motor Vehicle Tax Exemptions program. SONGA Verif. Rep., at 1; Memorandum to The File, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A." (Aug. 22, 2024), at 2 ("IPSP Verif. Rep."). Despite the minor nature and impact of these changes, the Department did not accept these corrections as "minor



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

corrections," and it instructed SONGA, Naturisa, and Produmar to remove them from their minor correction submissions. For the reasons explained in greater detail below, the Department's rejection of these minor corrections is not supported by the record of this investigation, and it is also inconsistent with the Department's practice in similar instances.

The Department should accept the corrected information related to SONGA's, Naturisa's, and Produmar's respective Annual Motor Vehicle Tax benefits that each company attempted to present at verification and include it in the record, which is required regardless of whether the Department has accepted or rejected it. This inclusion is essential in case this aspect of the Final Determination is appealed. In other words, failure to include these minor corrections submissions could deny Santa Priscila and SONGA a full and fair opportunity to pursue an appeal of the Department's decision to deny acceptance of this minor correction.

**1. Factual Background**

In preparing for verification, Produmar discovered that it reported the value of Motor Vehicle Tax Exemptions received under this program in 2022 based on Internal Revenue Service's (SRI) electronic registry data attributable to qualifying vehicles for the year [ ] rather than for the POI. **{Contains Santa Priscila's BPI.}** In accordance with the Department's instructions, Produmar disclosed at the start of verification that it inadvertently reported benefits received in [ ] in its questionnaire response instead of benefits in 2022 based on an error in manually capturing data from the Ecuadorian Internal Revenue Service's ("SRI") website for each individual vehicle [ ] number to assemble the universe of qualifying vehicles and Annual Motor Vehicle tax exempted for each vehicle and manually entering that data into a worksheet. **{Contains Santa Priscila's BPI.}** See Letter from Robert Bolling, Program Manager, AD/CVD Operations, Office IV, re: "Countervailing Duty Investigation of Frozen



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

Warmwater Shrimp from Ecuador: Verification Agenda of Santa Priscila S.A." (July 8, 2024), at 2 ("IPSP Verification Agenda").

In addition to explaining how Produmar inadvertently overlooked that it reported benefits for the incorrect year in its previous reporting, Produmar submitted a worksheet summarizing its revised Annual Motor Vehicle Tax exemptions for 2022 based on data captured manually from the SRI website and provided screenshots of SRI data from 2022 to support its revised reporting. The Department disagreed that Produmar's mistake in reporting benefits attributable to [ ] instead of the POI was a minor correction, thereby refusing to accept the submission of relevant facts and instructing SONGA to remove this minor correction from its submission. **{Contains Santa Priscila's BPI.}** Letter from Trade Pacific PLLC, re: "Minor Corrections Presented at Verification" (July 17, 2024), IPSP Verif. Rep., at 2.

In reviewing the Department's verification agenda, which included verifying the Annual Motor Vehicle Tax Exemptions program, SONGA and Naturisa determined they had not reported Annual Motor Vehicle Tax Exemptions received pursuant to the program because these tax benefits are generally available to all businesses in Ecuador and are not disproportionately received by companies in the shrimp industry. In accordance with the Department's instructions, SONGA and Naturisa disclosed at the start of verification that they had not reported benefits in their questionnaire responses because of their understanding that the program is generally available to all businesses in Ecuador. See Letter from Robert Bolling, Program Manager, AD/CVD Operations, Office IV, re: "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification Agenda of Sociedad Nacional de Galápagos C.A." (July 9, 2024), at 2 ("SONGA Verification Agenda"). In addition to explaining how SONGA and Naturisa overlooked the benefits received, Naturisa submitted a worksheet summarizing its



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

**Santa Priscila's BPI.}** Therefore, the Department's decision to reject this correction as "not minor" lacks any basis in the record evidence and must be corrected in the Final Determination.

Likewise, the GOE reported that SONGA and Naturisa claimed [ ] and [ ], respectively, in Annual Motor Vehicle Tax Reduction benefits during the POI. **{Contains SONGA's BPI.}** See GOE PPSQR 3, at S5-6. Even if the Department were to calculate subsidy rates in connection with these benefits—which it should not—SONGA and Naturisa presented information—as corroborated by the information reported by the GOE— that the benefits received under this program would result in no measurable benefit for SONGA (i.e., [ ]). **{Contains SONGA's BPI.}** If the Department were to calculate subsidy rates in connection with these benefits—which it should not—the benefits received under this program would result in a miniscule increase in the total overall subsidy rate calculated Naturisa (i.e., [ ]). **{Contains SONGA's BPI.}** Id. By any reasonable definition of the term "minor," an error that leads to a [ ] change in SONGA's overall *ad valorem* subsidy rate is also "minor." **{Contains SONGA's BPI.}** Therefore, the Department's decision to reject this correction also lacks any basis in the record and must be corrected in the Final Determination.

The Department's justification for its rejection of the minor corrections submitted by Produmar, SONGA, and Naturisa, *i.e.*, based on the raw number of individual vehicle exemptions does not render the Department's determination supported by the record. IPSP Verif. Rep., at 2, SONGA Verification Rep., at 2. The number of transactions alone cannot make a correction not "minor" in nature without addressing the combined impact of those transactions, which is truly miniscule. The Department instructed Santa Priscila, Produmar, and SONGA to present corrections to its response at the outset of verification, including: a list of errors; original documentation to show the corrections; and a chart that showed the magnitude of



Filed By: khammer@tradepacificlaw.com, Filed Date: 10/11/24 11:15 AM, Submission Status: Approved

# Tab 80

# P.R. 456

Barcode:4652034-02 C-331-806 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
**Public Document**
E&C/OIV: ZS, RA

October 21, 2024

**MEMORANDUM TO:** Ryan Majerus
Deputy Assistant Secretary
for Policy and Negotiations,
performing the non-exclusive functions and duties
of the Assistant Secretary for Enforcement and Compliance

**FROM:** Scot Fullerton
Acting Deputy Assistant Secretary
for Antidumping and Countervailing Duty Operations

**SUBJECT:** Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador

---

## I. SUMMARY

The U.S. Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of frozen warmwater shrimp (shrimp) from Ecuador, as provided in section 705 of the Tariff Act of 1930, as amended (the Act). The mandatory respondents in this investigation are Industrial Pesquera Santa Priscila S.A. (Santa Priscila) and Sociedad Nacional de Galápagos C.A. (SONGA), and certain of their cross-owned affiliates[1] Below is a complete list of issues in this investigation for which we received comments in case briefs from interested parties:

Comment 1: Commerce Should Countervail the Provision of Brackish Water
Comment 2: Commerce Should Countervail the Provision of Fuel
Comment 3: Commerce Should Revise the Benchmark Used to Value the Provision of Electricity
Comment 4: Commerce Should Correct the Multiplier Used for Programs Benefitting Respondents' Shrimp Suppliers
Comment 5: Commerce Should Apply Adverse Facts Available (AFA) to Countervail Unverifiable and Omitted Income Tax Programs

---

[1] The responding cross-owned affiliates for Santa Priscila are: Manesil S.A., Produmar S.A.(Produmar), Tropical Packing Ecuador S.A. (Tropack), and Egidiosa S.A. (Egidiosa). The responding cross-owned affiliates for SONGA are: Naturisa S.A. (Naturisa); Holding Sola & Sola Solacciones S.A. (Sola); and Empacadora Champmar S.A. (Champmar).

Filed By: Zachary Shaykin, Filed Date: 10/22/24 2:32 PM, Submission Status: Approved

Barcode:4652034-02 C-331-806 INV - Investigation -

Comment 6: Commerce Should Revise the Denominator for the Investment Contract/Tax Incentives for Priority Sectors Under the 2010 Organic Production Code for Santa Priscila
Comment 7: Commerce Should Make Certain Revisions to SONGA's Subsidy Calculations
Comment 8: Commerce Should Make Certain Revisions to Santa Priscila's Subsidy Calculations
Comment 9: Commerce Should Revise Its Countervailable Subsidy Calculation Regarding Provision of Land Concessions
Comment 10: Commerce Should Find that Certain Tax Programs are not Countervailable
Comment 11: Commerce Should Revise its Attribution of Benefits Received by Cross-Owned Input Suppliers to Santa Priscila
Comment 12: Commerce Should Recalculate Its Countervailable Subsidy Calculation for SONGA under the Refund of Currency Outflow Tax (ISD) On Inputs Program
Comment 13: Section 771B Is Not Supported by the Record
Comment 14: Commerce Should Adjust the Cash Deposit (CD) Rates
Comment 15: Commerce Should Reverse its Rejection of SONGA's Minor Correction
Comment 16: Commerce Should Correct its Application of AFA to SONGA, Naturisa, Santa Priscila and Produmar Under the Motor Vehicle Tax Reduction Program

## II. BACKGROUND

### A. Case History

Prior to the *Preliminary Determination*,[2] on January 8 and February 21, 2024, the petitioner[3] timely filed new subsidy allegations (NSAs).[4] On March 21, 2024, we initiated an investigation into four of the alleged NSA programs.[5] On April 1, 2024, Commerce published the *Preliminary Determination* of this investigation and aligned this final countervailing duty (CVD) determination with the final antidumping duty (AD) determinations of shrimp from Ecuador and Indonesia, in accordance with section 705(a)(1) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.210(b)(4).[6]

---

[2] *See Frozen Warmwater Shrimp from Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with the Final Antidumping Duty Determination*, 89 FR 22379 (April 1, 2024) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM), amended in *Frozen Warmwater Shrimp from Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation*, 89 FR 31722 (April 25, 2024) (*Amended Preliminary Determination*).
[3] The petitioner is the American Shrimp Processors Association.
[4] *See* Petitioner's Letters, "Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations," dated January 8, 2024; *see also* Petitioner's Letter, "Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations," dated February 21, 2024.
[5] *See* Memorandum, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: New Subsidy Allegations," dated March 21, 2024 (NSA Initiation).
[6] *See Preliminary Determination*, 89 FR at 22380.



Filed By: Zachary Shaykin, Filed Date: 10/22/24 2:32 PM, Submission Status: Approved

On March 28 and April 2, 2024, the petitioner, the Government of Ecuador (GOE), Santa Priscila, and SONGA submitted ministerial error allegations regarding Commerce's *Preliminary Determination*.[7] On April 25, 2024, in response to ministerial error comments submitted by the interested parties, we published an amendment to the *Preliminary Determination*,[8] and Commerce received timely responses to questionnaires issued to the GOE, Santa Priscila, and SONGA[9] regarding information pertaining to section 771B of the Act.[10]

Between March 28 and July 2, 2024, Commerce issued supplemental questionnaires to the GOE, Santa Priscila, and SONGA,[11] regarding the programs initiated on in the NSA Initiation and programs that required further investigation from the *Preliminary Determination*,[12] and between

[7] *See* Santa Priscila's Letter, "Frozen Warmwater Shrimp from Ecuador – Request for Correction of Ministerial Errors with Respect to Industrial Pesquera Santa Priscila S.A. and Request for Meeting," dated March 28, 2024; *see also* SONGA's Letter, "Frozen Warmwater Shrimp from Ecuador – Request for Correction of Ministerial Error in Preliminary Determination," dated March 29, 2024; GOE's Letter, "Frozen Warmwater Shrimp from Ecuador – Request for Correction of Ministerial Errors with Respect to Industrial Pesquera Santa Priscila S.A. and Request for Meeting," dated April 2, 2024; and Petitioner's letter, "Frozen Warmwater Shrimp from Ecuador: Ministerial Error Comments," dated April 2, 2024.

[8] *See Amended Preliminary Determination*; *see also* Memorandum, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Allegations of Significant Ministerial Errors in the Preliminary Determination," dated April 19, 2024 (Ministerial Error Memorandum).

[9] *See* Commerce's Letters, "Investigation of Frozen Warmwater Shrimp from Ecuador: Countervailing Duty Questionnaire regarding Section 771B of the Act," dated April 3, 2024; and "Investigation of Frozen Warmwater Shrimp from Ecuador: Countervailing Duty Questionnaire regarding Section 771B of the Act," dated April 3, 2024.

[10] *See* GOE's Letter, "Frozen Warmwater Shrimp from Ecuador – Government of Ecuador's 771B Questionnaire Response," dated April 25, 2024 (GOE's Section 771B QR); *see also* Santa Priscila's Letter, "Frozen Warmwater Shrimp from Ecuador – Santa Priscila's 771B Questionnaire Response," dated April 25, 2024 (Santa Priscila's Section 771B QR); and SONGA's Letter, "Frozen Warmwater Shrimp from Ecuador – SONGA's 771B Questionnaire Response," dated April 25, 2024 (SONGA's Section 771B QR).

[11] *See* Commerce's Letters, "Investigation of Frozen Warmwater Shrimp from Ecuador: Countervailing Duty Questionnaire regarding New Subsidy Allegation," dated March 28, 2024; "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Santa Priscila Post Preliminary Supplemental Questionnaire," dated May 2, 2024; "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: SONGA Post Preliminary Supplemental Questionnaire," dated May 2, 2024 (SONGA Post Preliminary Questionnaire); "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Government of Ecuador Post Preliminary Supplemental Questionnaire," dated May 2, 2024; "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Santa Priscila Post Preliminary Second Supplemental Questionnaire," dated May 31, 2024; "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: SONGA Post Preliminary Second Supplemental Questionnaire," dated May 31, 2024; "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Government of Ecuador Post Preliminary Second Supplemental Questionnaire," dated May 31, 2024; "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Government of Ecuador Post Preliminary Third Supplemental Questionnaire," dated July 2, 2024 (GOE 3rd Post-Prelim SQ); and "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Santa Priscila S.A. Post Preliminary Third Supplemental Questionnaire," dated July 2, 2024.

[12] *See* Memorandum, "New Subsidy Allegations," dated March 21, 2024 (NSA Initiation); *see also Preliminary Determination* PDM.


Filed By: Zachary Shaykin, Filed Date: 10/22/24 2:32 PM, Submission Status: Approved

April 18 and July 10, 2024, Commerce received timely responses to these questionnaires from the GOE,[13] Santa Priscila,[14] and SONGA[15]

On July 12 and September 26, 2024, Commerce issued its post-preliminary determinations regarding the programs initiated on in the NSA Initiation and programs that required further investigation from the *Preliminary Determination*.[16]

On May 30, 2024, Commerce extended the deadline for the final determinations of the companion investigation of sales at less-than-fair-value on shrimp from Ecuador.[17] On July 22, 2024, Commerce tolled certain deadlines in this administrative proceeding by seven days.[18] The deadline for the final determination is now October 22, 2024.

Between July 15 and July 24, 2024, Commerce conducted verification of the GOE, Santa Priscila, SONGA, and certain of these companies' cross-owned affiliates, to verify the information relied upon in making this final determination, in accordance with section 782(i) of the Act.[19]

---

[13] *See* GOE's Letters, "GOE's Letter, "Frozen Warmwater Shrimp from Ecuador – Government of Ecuador's New Subsidy Allegations Questionnaire Response," dated April 18, 2024 (GOE's NSA IQR); "Frozen Warmwater Shrimp from Ecuador – Government of Ecuador's Post-Preliminary Supplemental Questionnaire Response," dated May 16, 2024 (GOE's Post-Preliminary SQR1); "Frozen Warmwater Shrimp from Ecuador – Government of Ecuador's Second Post-Preliminary Supplemental Questionnaire Response," dated June 12, 2024 (GOE's Post-Preliminary SQR2); and "Frozen Warmwater Shrimp from Ecuador – Government of Ecuador's Third Post-Preliminary Supplemental Questionnaire Response," (GOE's Post-Preliminary SQR3) dated July 10, 2024.

[14] *See* Santa Priscila's Letters, "Frozen Warmwater Shrimp from Ecuador – Santa Priscila's New Subsidy Allegations Questionnaire Response," dated April 18, 2024 (Santa Priscila's NSA IQR); "Frozen Warmwater Shrimp from Ecuador – Santa Priscila's Post-Preliminary Supplemental Questionnaire Response," dated May 16, 2024 (Santa Priscila's Post-Preliminary SQR1); "Frozen Warmwater Shrimp from Ecuador – Santa Priscila's Second Post-Preliminary Supplemental Questionnaire Response," dated June 11, 2024 (Santa Priscila's Post-Preliminary SQR2); and "Frozen Warmwater Shrimp from Ecuador – Santa Priscila's Third Post-Preliminary Supplemental Questionnaire Response," dated July 5, 2024 (Santa Priscila's Post-Preliminary SQR3).

[15] *See* SONGA's Letters, "Frozen Warmwater Shrimp from Ecuador – SONGA's New Subsidy Allegations Questionnaire Response," dated April 18, 2024 (SONGA's NSA IQR); "Frozen Warmwater Shrimp from Ecuador – SONGA Post-Preliminary Supplemental Questionnaire Response," dated May 16, 2024 (SONGA's Post Preliminary SQR1); and "Frozen Warmwater Shrimp from Ecuador – SONGA Second Post-Preliminary Supplemental Questionnaire Response," dated June 11, 2024.

[16] *See* Memoranda, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Post-Preliminary Analysis," dated July 12, 2024 (First Post-Preliminary Determination); "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Second Post-Preliminary Determination Calculations for Sociedad Nacional de Galapagos C.A.," dated September 26, 2024 (Second Post-Preliminary Determination).

[17] *See Frozen Warmwater Shrimp from Ecuador: Preliminary Affirmative Determination of Sales at Less than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 89 FR 46857 (May 30, 2024).

[18] *See* Memorandum, "Tolling of the Deadlines for the Antidumping and Countervailing Duty Proceedings," dated July 22, 2024.

[19] *See* Memoranda, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of Sociedad Nacional de Galapagos C.A.," dated August 13, 2024 (SONGA's Verification Report); Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A.," dated August 22, 2024 (Santa Priscila's Verification Report); and "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of the Government of Ecuador," dated September 3, 2024 (GOE's Verification Report).

On September 4 and September 27, 2024, we invited parties to comment on issues related to the First Post-Preliminary Determination and Second Post-Preliminary Determination.[20] Between September 16 and October 8, 2024, we received timely case and rebuttal briefs from the petitioner[21] and timely joint case and rebuttal briefs from the GOE, Santa Priscila, and SONGA.[22]

On April 30 and May 1, 2024, we received timely requests for a hearing from the petitioner and the GOE, Santa Priscila, and SONGA.[23] On October 16, 2024, we held a public hearing with the petitioner and the GOE, Santa Priscila, and SONGA.

### B. Period of Investigation

The period of investigation (POI) is January 1, 2022, through December 31, 2022.

## III. SCOPE OF THE INVESTIGATION

The products covered by this investigation are shrimp from Ecuador. For a full description of the scope of this investigation, *see* this memorandum's accompanying *Federal Register* notice at Appendix I.

## IV. DIVERSIFICATION OF ECUADOR'S ECONOMY

In the *Preliminary Determination*, we determined that there was wide diversification of economic activities in Ecuador, indicating the diversification of the economy.[24] For the final determination, we made no changes to, and interested parties raised no issues in their case briefs regarding, the diversification of Ecuador's economy.

---

[20] *See* Memoranda, "Briefing Schedule," dated September 4, 2024; and "Second Briefing Schedule," dated September 27, 2024.

[21] *See* Petitioner's Letters, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador – Case Brief," dated September 16, 2024 (Petitioner's First Case Brief); "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador – Rebuttal Brief," dated September 23, 2024 (Petitioner's First Rebuttal Brief); "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador – Second Case Brief," dated October 2, 2024 (Petitioner's Second Case Brief); and "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador – Second Rebuttal Brief," dated October 8, 2024 (Petitioner's Second Rebuttal Brief).

[22] *See* Letters from the GOE, Santa Priscila, and SONGA, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador," dated September 13, 2024 (Respondents' First Case Brief); "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Combined Rebuttal Brief of Santa Priscila, SONGA, and the Government of Ecuador," dated September 20, 2024 (Respondents' First Rebuttal Brief); "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador Relating to the Three Programs Addressed in the Second Post-Preliminary Determination," dated October 2, 2024 (Respondents' Second Case Brief); and "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Combined Rebuttal Brief of Santa Priscila, SONGA, and the Government of Ecuador Relating to the Three Programs Addressed in the Second Post-Preliminary Determination," dated October 7, 2024 (Respondents' Second Rebuttal Brief).

[23] *See* Petitioner's Letter, "Frozen Warmwater Shrimp from Ecuador: Hearing Request," dated April 30, 2024; *see also* GOE, Santa Priscila, and SONGA's Letter, "Frozen Warmwater Shrimp from Ecuador – Request for Public Hearing," dated May 1, 2024.

[24] *See Preliminary Determination* PDM at 5 and 6.

## V. SUBSIDIES VALUATION

### A. Allocation Period

Commerce made no changes to, and interested parties raised no issues in their case briefs regarding, the allocation period or allocation methodology used in the *Preliminary Determination*.[25]

### B. Attribution of Subsidies

Based on comments raised by interested parties in their case and rebuttal briefs, Commerce made certain changes to the attribution of subsidies used in the *Preliminary Determination*, the First Post-Preliminary Determination, and the Second Post-Preliminary Determination. Specifically, Commerce changed its attribution of subsidies received by Produmar and Egidiosa, two cross-owned input suppliers of Santa Priscila. The issues raised by interested parties regarding the attribution of subsidies are addressed below. *See* Comment 11.

### C. Application of Section 771B of the Act

Based on comments raised by interested parties in their case and rebuttal briefs, Commerce made certain changes to its application of section 771B of the Act.

In the *Preliminary Determination*,[26] Commerce determined that, at the time of initiation, the petitioner supported its allegation that subsidies for fresh shrimp may be attributable to frozen shrimp in accordance with section 771B of the Act.[27] Section 771B of the Act addresses the calculation of countervailable subsidies on certain processed agricultural products:

> In the case of an agricultural product processed from an agricultural product in which—
>
> > (1) the demand for the prior stage product is substantially dependent on the demand for the latter stage product, and
> >
> > (2) the processing operation adds only limited value to the raw commodity,
>
> countervailable subsidies found to be provided to either producers or processors of the product shall be deemed to be provided with respect to the manufacture, production, or exportation of the processed product.

---

[25] *See Preliminary Determination* PDM at 6.
[26] *Id.* at 9.
[27] *See Preliminary Determination* PDM at 9 and 10 (citing Checklist, "Countervailing Duty Initiation Checklist," dated November 14, 2023, at 6).

In accordance with *Shrimp from China*,[28] we determined that fresh shrimp is a raw agricultural product under section 771B of the Act. In addition, in accordance with the statute, we determined that the "overwhelming majority" of fresh shrimp is processed into frozen shrimp, and that a substantial percentage of the market would be negatively affected, and the demand for unprocessed fresh shrimp is "substantially dependent" on the demand for frozen shrimp in accordance with section 771B(1) of the Act. No interested parties in their case or rebuttal briefs argued against finding that the demand for raw shrimp is substantially dependent on the demand for the processed shrimp.

Second, the *ITC Preliminary Report*[29] demonstrates that fresh shrimp accounts for 70 percent of the value of frozen shrimp, and raw shrimp accounted for 72.2 to 78.3 percent between 2020 and 2022 on average across U.S. processors' costs.[30] Furthermore, we noted that frozen shrimp is not substantially different than fresh shrimp after initial processing.[31] Therefore, we preliminarily determined that section 771(B)(2) of the Act was satisfied because the processing operation for frozen shrimp added only a limited value, *i.e.*, 30 percent or less, to the raw commodity, fresh shrimp and the essential character of fresh shrimp is not changed with processing.[32]

Therefore, because we determined that the two "prongs" of section 771B of the Act had been satisfied, we determined that it was appropriate to deem subsidies provided with respect to the raw shrimp suppliers to Santa Priscila and SONGA (*i.e.*, the respondent processors), in accordance with section 771B of the Act.[33] To calculate subsidies in accordance with section 771B of the Act, we relied on the subsidy information of the reporting cross-owned input suppliers of the mandatory respondents, as well as Santa Priscila's in-house farming operations as a proxy to determine the level of subsidization bestowed on the raw shrimp supplied by non-cross-owned suppliers.[34]

For our final determination, we solicited information from the mandatory respondents and the GOE regarding section 771B, including information on the shrimp industry generally and specifically with respect to the two factors enumerated under section 771B.[35] Based on the totality of record evidence, and considering this information gathered following the *Preliminary Determination*, we continue to find that section 771B of the Act is satisfied because: (1) the evidence demonstrates that the demand for raw shrimp is "substantially dependent" on the demand for processed frozen shrimp in accordance with section 771B of the Act;[36] and (2) because record evidence demonstrates that the processing of raw shrimp to frozen shrimp adds

---

[28] *See Certain Frozen Warmwater Shrimp from China: Final Affirmative Countervailing Duty Determination,* 78 FR 50391 (August 19, 2013) (*Shrimp from China*), and accompanying Issues and Decision Memorandum (IDM) at Comment 5.
[29] *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam*, Inv. Nos. 701-TA-699-702 and 731- TA-1659-1660, (Preliminary), USITC Pub. 5482 (December 2023) (*ITC Preliminary Report*), at 15.
[30] *Id.*; *see also Preliminary Determination* PDM at 10.
[31] *Id.*
[32] *Id.*
[33] *See Preliminary Determination* PDM at 10 and 11.
[34] *Id*.
[35] *See* GOE's Section 771B QR; Santa Priscila's Section 771B QR; and SONGA's Section 771B QR.
[36] *Id*.

limited value (*i.e.*, roughly equivalent to and below the 30 percent threshold relied on in the *Preliminary Determination*[37]) to determine that section 771B(2) of the Act is satisfied. Furthermore, with respect to the second prong of section 771B, we also note there is no evidence on the record refuting our determination that the essential character of the fresh shrimp is not changed with processing.[38]

Because no parties argued against finding that section 771(B)(1) of the Act is satisfied,[39] *i.e.*, that the demand for the prior stage product, *i.e.*, fresh raw shrimp, is substantially dependent on the demand for the latter stage product, *i.e.*, processed shrimp, we continue to find the *ITC Preliminary Report* to be instructive.[40] Therefore, our determination remains unchanged from the *Preliminary Determination* that the demand for raw shrimp demand is substantially dependent on the demand for processed frozen shrimp in accordance with section 771(B)(1) of the Act.

Respondents argued that section 771(B)(2) of the Act is not satisfied, because record evidence indicates that value added is more than "limited" and that the essential characteristics of raw shrimp are changed based on the processing operations of Santa Priscila and SONGA.[41] Furthermore, the respondents argue that, even if both prongs of section 771B of the Act are satisfied, Commerce is precluded from assuming that the experience of cross-owned shrimp suppliers is similar to that of non-cross-owned shrimp suppliers based on the plain language of the statute, which only permits Commerce to consider countervailable subsidies that benefit raw agricultural products to benefit further-processed products.[42]

After analyzing the above comments and the rebuttal comments made by the petitioner, Commerce has continued to determine that section 771B(2) of the Act is satisfied because: (1) the processing operations add limited value to the raw product; and (2) the "essential character" of processed shrimp is not materially dissimilar from that of raw shrimp, *i.e.*, the processed shrimp is still "shrimp." *See* Comment 13 for more information. Furthermore, we find that we are permitted under the statute to continue our practice of utilizing certain raw shrimp suppliers as a proxy to determine the level of subsidization bestowed on the raw shrimp supplied by the non-cross-owned suppliers.

---

[37] *See Preliminary Determination* PDM at 10; *see also ITC Preliminary Report.*

[38] *See*, *e.g.*, *Rice From Thailand; Final Results of Countervailing Duty Administrative Review*, 56 FR 68, 69 (January 2, 1991) (*Rice from Thailand*), *Final Affirmative Countervailing Duty Determination: Fresh, Chilled, and Frozen Pork from Canada*, 54 FR 30774, 30775 (July 24, 1989) (*Pork from Canada*); *Shrimp from China*; and *Ripe Olives From Spain: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination,* 82 FR 56218 (November 28, 2017) (*Olives from Spain Preliminary Determination*), unchanged in *Ripe Olives From Spain: Final Affirmative Countervailing Duty Determination,* 83 FR 28186 (June 18, 2018) (*Olives from Spain*).

[39] *See, e.g.*, GOE's Section 771B QR at 6 (noting "The GOE does not contest at this time, but does not concede the correctness of, the petitioner's assertion that the demand for the prior stage product, *i.e.*, fresh, not frozen, raw shrimp that is harvested from a shrimp pond by a shrimp farmer, is substantially dependent on the demand for the latter stage product, *i.e.*, processed frozen warmwater shrimp.").

[40] *See* GOE's Section 771B QR.

[41] *See* Respondents' First Case Brief at 53 to 58.

[42] *Id*. at 58 through 62.

Barcode:4652034-02 C-331-806 INV - Investigation -

However, in response to comments raised by the respondents regarding the application of section 771B of the Act with respect to certain programs, Commerce has made changes to its application of section 771B of the Act to certain programs from the *Preliminary Determination*. For further discussion of our analysis of these comments, *see* Comment 13 below.

Regarding Commerce's calculation of benefits under section 771B of the Act, the petitioner argues that Commerce should amend the volume of raw shrimp supplied to the mandatory respondents in our calculation of subsidies under section 771B of the Act by including the raw shrimp volumes from unexamined cross-owned suppliers.[43] However, we have made no changes to the volume of raw shrimp supplied to the mandatory respondents in our calculation of subsidies pursuant to section 771B of the Act from the *Preliminary Determination*. For further discussion of our analysis of the petitioner's comments, *see* Comment 4.

**D. Denominators**

Commerce made no changes to, and interested parties raised no issues in their case briefs regarding, the denominators used in the *Preliminary Determination* for Santa Priscila.[44] Regarding SONGA, we revised its sales denominator from the *Preliminary Determination*. *See* SONGA's Final Calculation Memorandum.

**E. Benchmarks**

Interested parties raised issues in their case and rebuttal briefs regarding the Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays and Government Provision of Electricity for Less-than-Adequate-Remuneration (LTAR) programs.

Regarding the Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays program, the mandatory respondents argue, and the petitioners rebut, that we should change the per-unit benchmark Commerce used in its calculation of benefits under this program.[45] Based on these comments, we made one change to the per-unit benchmark used in measuring the adequacy of remuneration under this program. The issues raised by interested parties regarding this program are addressed below. *See* Comment 9.

Regarding the Government Provision of Electricity for LTAR program, the petitioners argue, and the respondents rebut, that we should change our benchmark used to measure the adequacy of remuneration. However, for the final determination, Commerce made no changes from the Post-Preliminary Determination to the benchmark used to measure the adequacy of remuneration under the Government Provision of Electricity for LTAR program. The issues raised by interested parties regarding this program are addressed below. *See* Comment 3.

---

[43] *See* Petitioner's First Case Brief at 15 through 17.
[44] *See Preliminary Determination* PDM at 11.
[45] *See* Respondents' First Case Brief at 18-27; *see also* Petitioner's First Rebuttal Brief at 6 through 9.



Filed By: Zachary Shaykin, Filed Date: 10/22/24 2:32 PM, Submission Status: Approved

## VI. USE OF FACTS OTHERWISE AVAILABLE AND APPLICATION OF ADVERSE INFERENCES

Interested parties raised issues in their case briefs regarding Commerce's application of AFA to programs in the *Preliminary Determination*, the Post-Preliminary Determination, and the Second Post-Preliminary Determination.[46] In particular, the petitioner argues, and the respondents rebut,[47] that Commerce should apply AFA regarding: (1) the Provision of Brackish Water for LTAR program;[48] (2) the Motor Vehicle Tax Reduction program;[49] and (3) the Currency Outflow Tax (ISD) Exemptions on Purchases of Imported Assets and Raw Materials program.[50] Furthermore, the petitioner argues, and the respondents rebut, that Commerce should revise its application of AFA to SONGA under the Motor Vehicle Tax Reduction programs.[51]

In the Post-Preliminary Determination, Commerce determined that the Provision of Brackish Water for LTAR program was not countervailable.[52] Furthermore, during verification, Commerce rejected the minor corrections presented by Produmar, SONGA, and Naturisa regarding their usage of the Motor Vehicle Tax Reduction programs.[53] As such, we applied as AFA, in accordance with section 776(a) and (b) of the Act, the benefit calculated for Santa Priscila under this program to Produmar and SONGA/Naturisa.[54]

Regarding the Provision of Brackish Water for LTAR program, for this final determination, we made no changes from the Post-Preliminary Determination[55] regarding our determination to find that the Provision of Brackish Water for LTAR program is not countervailable and disagree with the petitioners that AFA is warranted.[56] The issues raised by interested parties regarding this program are addressed below. *See* Comment 1.

Regarding the Motor Vehicle Tax Reduction program, Commerce is continuing to find that application of AFA is warranted with respect to Produmar, SONGA, and Naturisa.[57] However, Commerce is making certain changes to the selection of an AFA rate to with respect to this program for Santa Priscila and SONGA from the Second Post-Preliminary Determination.[58] Specifically, Commerce is applying as AFA to Santa Priscila and SONGA under this program the highest calculated above-*de minimis* subsidy rate for a similar or comparable (*i.e.*, tax) program in any CVD proceeding involving Ecuador. That is the rate calculated for Santa Priscila

---

[46] *See Preliminary Determination* PDM; *see also* First Post-Preliminary Determination at 16 and 17; and Second Post-Preliminary Determination at 4 through 11 and 13 through 14.
[47] *See* Respondents' First Rebuttal Brief at 61 through 78; *see also* Respondents' Second Case Brief at 32 through 41.
[48] *See* Petitioner's First Case Brief at 3 through 8.
[49] *Id*. at 17 through 19.
[50] *Id.*
[51] *See* Petitioner's Second Case Brief at 3 through 5; *see also* Respondents' Second Rebuttal Brief at 5 through 12.
[52] *See* First Post-Preliminary Determination at 16 and 17.
[53] *See Preliminary Determination* PDM at 4 through 11.
[54] *Id*. at 11.
[55] *See* First Post-Preliminary Determination at 16 and 17.
[56] *See* Petitioner's First Case Brief at 3 through 8.
[57] *See* Second Post-Preliminary Determination at 13 and 14.
[58] *Id*.

for the Investment Contract program (*i.e.*, 1.38 percent).[59] Furthermore, regarding the Currency Outflow Tax (ISD) Exemptions on Purchases of Imported Assets and Raw Materials program, Commerce is altering the rate selected for SONGA under this program from the *Preliminary Determination*.[60] For this final determination, we are applying, as AFA, the rate calculated for Santa Priscila under the Investment Contract program, because it is the highest calculated subsidy rate for a similar or comparable (*i.e.*, tax) program in any CVD proceeding involving Ecuador, pursuant to Commerce's CVD AFA hierarchy. The issues raised by interested parties regarding these programs are addressed below. *See* Comments 5 and 13.

## VII. ANALYSIS OF PROGRAMS

### A. Programs Determined to Be Countervailable

As explained below, we made changes to our *Preliminary Determination*, First Post-Preliminary Determination, and Second Post-Preliminary Determination with respect to methodologies used to calculate the subsidy rates for the following programs. For additional descriptions, analyses, and calculation methodologies for these programs, *see Preliminary Determination*,[61] First Post-Preliminary Determination,[62] and Second Post-Preliminary Determination.[63]

#### 1. Environmental Tax Incentives

Interested parties submitted comments in their case and rebuttal briefs regarding this program. Commerce continues to find that this program is *de facto* specific. However, we made certain changes to the *Preliminary Determination* regarding our calculation of the countervailable subsidy rate for this program.[64] We changed the attribution of benefits received by Produmar to the total sales value, net of intercompany sales, of Santa Priscila, Tropack, and Produmar. This also impacted our calculation of benefits under section 771B of the Act.[65] The issues raised by interested parties regarding this program are addressed below. *See* Comments 10, 11, and 13.

The final net countervailable subsidy rates calculated for this program are 0.01and 0.04 percent *ad valorem* for Santa Priscila/Tropack and SONGA, respectively.

#### 2. Refund of ISD on Purchase of Inputs

Interested parties submitted comments in their case and rebuttal briefs regarding this program. Based on these comments, we made certain changes to the *Preliminary Determination* regarding our calculation of the countervailable subsidy rate for this program.[66] Regarding SONGA, we revised the benefit received by SONGA under this program.[67] Regarding Santa Priscila, we

[59] *See* section "ANALYSIS OF PROGRAMS," *infra*.
[60] *See Preliminary Determination* PDM at 26.
[61] *Id.* at 13 through 30.
[62] *See* First Post-Preliminary Determination at 6 through 18.
[63] *See* Second Post-Preliminary Determination at 12 through 15.
[64] *See* Santa Priscila's Final Calculation Memorandum, dated concurrently with this memorandum.
[65] *Id.*
[66] *See Preliminary Determination* PDM at 17 through 19.
[67] *See* SONGA's Final Calculation Memorandum, dated concurrently with this memorandum.

changed the attribution of the combined benefits received by Santa Priscila and Produmar to the total sales value, net of intercompany sales, of Santa Priscila, Tropack, and Produmar.[68] This also impacted our calculation of benefits under section 771B of the Act.[69] The issues raised by interested parties regarding this program are addressed below. *See* Comments 11 and 12.

The final net countervailable subsidy rates calculated for this program are 0.10 percent and 0.03 percent *ad valorem* for Santa Priscila/Tropack and SONGA, respectively.

3. Export Tax Incentive

Interested parties submitted comments in their case and rebuttal briefs regarding this program. However, Commerce made no changes to its *Preliminary Determination* regarding this program.[70] Commerce determined not to adjust the cash deposit rates for this program. The issues raised by interested parties regarding this program are addressed below. *See* Comments 13 and 14.

The final net countervailable subsidy rate calculated for this program is 0.30 percent *ad valorem* for Santa Priscila/Tropack.

4. Export Tax Incentive on Sustained/Increased Employment

Interested parties submitted comments in their case and rebuttal briefs regarding this program. However, Commerce made no changes from the *Preliminary Determination* regarding this program.[71] The issues raised by interested parties regarding this program are addressed below. *See* Comment 13.

The final net countervailable subsidy rates calculated for this program are 0.10 and 0.06 percent *ad valorem* for Santa Priscila/Tropack and SONGA, respectively.

5. Government Provision of Land-Use Concessions for Aquaculture Facilities in Beaches and Bays

Interested parties raised comments regarding this program in their case and rebuttal briefs. Based on the interested party comments, Commerce is making certain changes from the *Preliminary Determination* regarding its per-unit land benchmark calculation for Santa Priscila and SONGA and to certain aspects of Commerce's calculation of benefits for SONGA under this program.[72] Furthermore, we changed the attribution of the combined benefits received by Santa Priscila and Egidiosa to the total sales value, net of intercompany sales, of Santa Priscila, Tropack, and Egidiosa.[73] This also impacted our calculation of benefits under section 771B of

[68] *See* Santa Priscila's Final Calculation Memorandum.
[69] *Id*.
[70] *See Preliminary Determination* PDM at 19 and 20.
[71] *Id.*; *see also* Santa Priscila's Final Calculation Memorandum.
[72] *See Preliminary Determination* PDM at 21 through 23; *see also* Santa Priscila's Final Calculation Memorandum; and SONGA's Final Calculation Memorandum.
[73] *See* Santa Priscila's Final Calculation Memorandum.

the Act.[74] The issues raised by interested parties regarding this program are addressed below. *See* Comment 7 and Comment 9.

The final net countervailable subsidy rates calculated for this program are 0.03 and 0.01 percent *ad valorem* for Santa Priscila/Tropack and SONGA, respectively.

6. Investment Contract – Tax Rate Reduction

Interested parties raised comments regarding this program in their case and rebuttal briefs. Based on interested party comments, Commerce is making certain changes from the *Preliminary Determination* regarding its benefit calculated under this program for Santa Priscila/Tropack.[75] Specifically, we determined that the benefit received by Santa Priscila and Produmar that Commerce preliminary attributed to the Tax Incentives for Priority Sectors Under the 2010 Organic Production Code is actually attributable to benefits received under this program.[76] Furthermore, we changed the attribution of the combined benefits received by Santa Priscila and Produmar to the total sales value, net of intercompany sales, of Santa Priscila, Tropack, and Produmar.[77] This also impacted our calculation of benefits under section 771B of the Act.[78] Commerce continues to find that this program is *de facto* specific. The issues raised by interested parties regarding this program are addressed below. *See* Comments 6, 11, and 13.

The final net countervailable subsidy rates calculated for this program are 1.38 and 1.30 percent *ad valorem* for Santa Priscila/Tropack and SONGA, respectively.

7. Investment Contract – ISD Exemption for Imported Materials

Interested parties raised comments regarding this program in their case and rebuttal briefs. Based on interested party comments, Commerce is making certain changes from the *Preliminary Determination* regarding the countervailable subsidy rate calculated under this program for SONGA.[79] Specifically, Commerce is applying AFA to SONGA regarding this program and are applying, as AFA, the highest rate calculated for a similar or comparable (*i.e.*, tax) program in any CVD proceeding involving Ecuador, which is the rate calculated for Santa Priscila for the Investment Contract – Tax Rate Reduction program from this investigation.[80] The issues raised by interested parties regarding this program are addressed below. *See* Comments 5 and 15.

---

[74] *Id*.
[75] *See Preliminary Determination* PDM at 23 through 26.
[76] *See* Santa Priscila's Final Calculation Memorandum.
[77] *Id*.
[78] *Id*.
[79] *See Preliminary Determination* PDM at 26.
[80] *See* SONGA's Final Calculation Memorandum.

The final net countervailable subsidy rate selected, as AFA, for SONGA under this program is 1.38 percent *ad valorem*, *i.e.*, the rate calculated for Santa Priscila under the Investment Contract Tax Rate Reduction program.

8. Investment Contract – ISD Exemption for Repayment of Principal and Interest on Loans Obtained from Foreign Lending Institutions

Commerce made no changes from, and interested parties raised no issues on, the *Preliminary Determination* regarding this program.[81]

The final net countervailable subsidy rate calculated for this program is 0.02 percent *ad valorem* for SONGA.

9. Municipal Tax Exemption on Total Assets

Interested parties made comments in their case and rebuttal briefs regarding this program. Based on these comments, making certain changes from the *Preliminary Determination* regarding the countervailable subsidy rate calculated under this program for Santa Priscila/Tropack and SONGA.[82] Specifically, Commerce is changing its calculation of the subsidy rates for non-cross-owned shrimp suppliers to Santa Priscila and SONGA pursuant to section 771B of the Act by adjusting the volume of shrimp supplied that is used in the calculation of subsidies pursuant to section 771B of the Act.[83] Furthermore, we changed the attribution of the combined benefits received by Santa Priscila and Produmar to the total sales value, net of intercompany sales, of Santa Priscila, Tropack, and Produmar.[84] This also impacted our calculation of benefits under section 771B of the Act.[85] The issues raised by interested parties regarding this program are addressed below. *See* Comments 6 and 13.

The final net countervailable subsidy rates calculated for this program are 0.08 and 0.05 percent *ad valorem* for Santa Priscila/Tropack and SONGA, respectively.

10. Government Provision of Electricity for LTAR

Interested parties made comments in their case and rebuttal briefs regarding this program. Commerce is making certain changes from the First Post-Preliminary Determination regarding the countervailable subsidy rates calculated under this program for Santa Priscila/Tropack and SONGA.[86] Specifically, Commerce is correcting inadvertent errors in its preliminary calculation of benefits received by Santa Priscila and Produmar under this program.[87] Further, we changed the attribution of the combined benefits received by Santa Priscila, Produmar, and Egidiosa to the total sales value, net of intercompany sales, of Santa Priscila, Tropack, Produmar, and

[81] *See Preliminary Determination* PDM at 26.
[82] *Id.* at 26 through 28.
[83] *See* Santa Priscila's Final Calculation Memorandum; *see also* SONGA's Final Calculation Memorandum.
[84] *See* Santa Priscila's Final Calculation Memorandum.
[85] *Id.*
[86] *See* First Post-Preliminary Determination at 6 through 13.
[87] *See* Santa Priscila's Final Calculation Memorandum.

Egidiosa.[88] This also impacted our calculation of benefits under section 771B of the Act.[89] Regarding SONGA, we included certain benefits that were not preliminarily included in our calculation of the countervailable subsidy rate for SONGA under this program.[90] Furthermore, Commerce is making no changes to the benchmark from the First Post-Preliminary Determination used to measure the adequacy of remuneration under this program.[91] The issues raised by interested parties regarding this program are addressed below. *See* Comments 3, 7, 8, and 11.

The final net countervailable subsidy rates calculated for this program are 0.10 and 0.03 percent *ad valorem* for Santa Priscila/Tropack and SONGA, respectively.

11. Hiring of Additional Personnel

Interested parties made comments in their case and rebuttal briefs regarding this program. Commerce made certain changes from the First Post-Preliminary Determination regarding the countervailable subsidy rates calculated under this program for Santa Priscila/Tropack.[92] Specifically, we changed the attribution of the benefit received by Produmar to the total sales value, net of intercompany sales, of Santa Priscila, Tropack, and Produmar.[93] This also impacted our calculation of benefits under section 771B of the Act.[94] Commerce determined not to adjust the cash deposit rates for this program. The issues raised by interested parties regarding this program are addressed below. *See* Comments 11 and 13.

The final net countervailable subsidy rates calculated for this program are 0.02 and 0.05 percent *ad valorem* for Santa Priscila/Tropack and SONGA, respectively.

12. ISD Exemption on Principal and Interest Payments on Foreign Loans

Interested parties made comments in their case and rebuttal briefs regarding this program. Commerce is making certain changes from the First Post-Preliminary Determination regarding the countervailable subsidy rate calculated under this program for Santa Priscila/Tropack.[95] Furthermore, we changed the attribution of the combined benefits received by Santa Priscila and Produmar to the total sales value, net of intercompany sales, of Santa Priscila, Tropack, and Produmar.[96] This also impacted our calculation of benefits under section 771B of the Act.[97] Commerce continues to find that this program is *de facto*. The issues raised by interested parties regarding this program are addressed below. *See* Comment 10.

---

[88] *Id*.
[89] *Id*.
[90] *See* SONGA's Final Calculation Memorandum.
[91] *See* First Post-Preliminary Determination at 6 through 13.
[92] *Id.* at 13 and 14.
[93] *See* Santa Priscila's Final Calculation Memorandum.
[94] *Id*.
[95] *See* First Post-Preliminary Determination at 14 and 15.
[96] *See* Santa Priscila's Final Calculation Memorandum.
[97] *Id*.

The final net countervailable subsidy rate calculated for this program is 0.02 percent *ad valorem* for Santa Priscila/Tropack.

13. Youth Employment – Article 16 of the Labor Law

Interested parties made comments in their case and rebuttal briefs regarding this program. Commerce is making certain changes from the Second Post-Preliminary Determination regarding the countervailable subsidy rate calculated under this program for Santa Priscila/Tropack.[98] Specifically, we changed the attribution of the combined benefits received by Santa Priscila and Tropack to the total sales value, net of intercompany sales, of Santa Priscila and Tropack.[99] This also impacted our calculation of benefits under section 771B of the Act.[100] The issues raised by interested parties regarding this program are addressed below. *See* Comment 10.

The final net countervailable subsidy rate calculated for this program is 0.04 percent *ad valorem* for Santa Priscila/Tropack.

14. Motor Vehicle Tax Reduction Program

Interested parties made comments in their case and rebuttal briefs regarding this program. Based on interested party comments, Commerce is making certain changes from the Second Post-Preliminary Determination regarding the countervailable subsidy rate for Santa Priscila/Tropack and SONGA under this program.[101] Commerce continues to find that this program is *de facto* specific. Furthermore, Commerce continues to find that the application of AFA to SONGA under this program is warranted and finds that it is appropriate to apply AFA to the entire Santa Priscila/Tropack cross-owned entity under this program. Specifically, Commerce is applying as AFA the highest rate calculated for a similar or comparable (*i.e.*, tax) program in any CVD proceeding involving Ecuador, which is the rate calculated for Santa Priscila in this investigation for the Investment Contract – Tax Rate Reduction program.[102] The issues raised by interested parties regarding this program are addressed below. *See* Comments 5, 10, and 16.

The final net countervailable subsidy rates for this program are 1.38 percent *ad valorem* for both Santa Priscila/Tropack and SONGA.

15. Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities

Interested parties made comments in their case and rebuttal briefs regarding this program. Commerce is making certain changes from the Second Post-Preliminary Determination regarding the countervailable subsidy rate calculated for Santa Priscila/Tropack under this program.[103] Specifically, we changed the attribution of the benefit received by Produmar to the total sales

[98] *See* Second Post-Preliminary Determination at 12 and 13.
[99] *See* Santa Priscila's Final Calculation Memorandum.
[100] *Id*.
[101] *See* Second Post-Preliminary Determination at 13 and 14.
[102] *See* Santa Priscila's Final Calculation Memorandum.
[103] *See* Second Post-Preliminary Determination at 14 and 15.

value, net of intercompany sales, of Santa Priscila, Tropack, and Produmar.[104] This also impacted our calculation of benefits under section 771B.[105] Commerce continues to find that this program is *de facto* specific. The issues raised by interested parties regarding this program are addressed below. *See* Comments 10 and 11.

The final net countervailable subsidy rates calculated for this program are 0.01 and 0.06 percent *ad valorem* for Santa Priscila/Tropack and SONGA, respectively.

B. Programs Determined to Be Not Countervailable

1. Provision of Fuel for LTAR

Interested parties made comments in their case and rebuttal briefs regarding this program. However, Commerce made no changes from the First Post-Preliminary Determination and continues to find that this program is not countervailable.[106] The issues raised by interested parties regarding this program are addressed below. *See* Comment 2.

2. Provision of Brackish Water for LTAR

Interested parties made comments in their case and rebuttal briefs regarding this program. However, Commerce made no changes from the First Post-Preliminary Determination and continues to find that this program is not countervailable. Furthermore, Commerce does not find the application of AFA is warranted with respect to this program. The issues raised by interested parties regarding this program are addressed below. *See* Comment 1.

C. Programs Determined Not to Provide Measurable Benefits During the POI

We find that the mandatory respondents did not receive measurable countervailable benefits under the following programs during the average useful life (AUL) period (including the POI):

1. Youth Employment – Social Security Benefits
2. Hiring of Disabled People
3. Municipal Patent Tax Exemption

We made certain changes to our calculations from the First Post-Preliminary Determination.[107] We changed the attribution of the combined benefits received by Santa Priscila, Produmar, and Egidiosa to the total sales value, net of intercompany sales, of Santa Priscila, Tropack, Produmar, and Egidiosa.[108] This also impacted our calculation of benefits under section 771B of the Act.[109] Furthermore, we changed our calculation of the subsidy rates for non-cross-owned shrimp

[104] *See* Santa Priscila's Final Calculation Memorandum.
[105] *Id.*
[106] *See* First Post-Preliminary Determination at 15 and 16.
[107] *Id.* at 16.
[108] *See* Santa Priscila's Final Calculation Memorandum.
[109] *Id.*

suppliers to Santa Priscila pursuant to section 771B of the Act by adjusting the volume of shrimp supplied that is used in the calculation of subsidies pursuant to section 771B of the Act.[110]

D. Programs Determined to Be Not Used

We continue to find that the mandatory respondents did not apply for or receive countervailable benefits under the following programs during the AUL period (including the POI):

1. Tax Incentives for Priority Sectors Under the 2010 Organic Production Code

Interested parties made comments in their case and rebuttal briefs regarding this program. Based on these comments, we made a change from the *Preliminary Determination*.[111] Specifically, we no longer find that Santa Priscila and Produmar applied for or received countervailable benefits under this program during the POI. The issues raised by interested parties regarding this program are addressed below. *See* Comment 10.

2. Fee Exemptions for Brackish Water Program
3. Government Forgiveness of Land Use Fees and Provision of Land to Delinquent Shrimp Farmers
4. Export Taxes Lowered to Promote Agricultural Exports
5. Export Credits from National Finance Corporation
6. International Factoring
7. Access to Preferential Lines of Credit for Aquaculture and Fisheries
8. Loans for Organic Production
9. Credit Line Boost for Shrimp Sector's Reconstruction After the Earthquake
10. Sports, Educational and Cultural Expense Deduction
11. Municipal Solid Waste Collection Tax
12. Banco Nacional de Fomento (BNF) Loan/Interest Forgiveness Program
13. Income Tax Reduction for Reinvestments

## VIII. DISCUSSION OF THE ISSUES

### Comment 1: Commerce Should Countervail the Provision of Brackish Water

*Petitioner's Comments:*

The following is the Petitioner's summary of their argument. For further details, *see* Petitioner's First Case Brief at 3-8.

> In its post-preliminary determination, Commerce determined not to countervail the provision of brackish water for less than adequate remuneration (LTAR) based on claims by the respondents and the Government of Ecuador (GOE) that no entity is required to get authorization to access brackish water and no entity is charged for such water. At verification, Commerce discovered that users who wish to extract

[110] *Id.*
[111] *See Preliminary Determination* PDM at 15 through 17.

water in Ecuador must apply for authorization, and that the GOE in fact does charge for the use of brackish water in some circumstances, including in one instance involving one of the respondents, Produmar S.A. (Produmar), a cross-owned shrimp farm supplying Industrial esquera Santa Priscila S.A. (Santa Priscila).

Respondents have firmly refused to provide any information about their use of this program based on the false premise that it could not possibly provide a meaningful benefit, significantly impeding Commerce's investigation at every turn. As a result, they have left Commerce with no choice but to apply facts available with an adverse inference to countervail this program. Commerce should select the highest non-*de minimis* rate for a provision of goods program in any other proceeding involving Ecuador, which is the 10.67 percent calculated for the provision of raw shrimp in the prior countervailing duty investigation on shrimp from Ecuador, and apply it to both respondents in the final results.

*Respondents' Rebuttal Comments:*

The following is the respondents' summary of their rebuttal comments. For further details, *see* Respondents' First Rebuttal Brief at 8-30.

{Commerce} should continue to find in the forthcoming final determination that the GOE made no financial contribution to Ecuadorian Respondents in the form of revenue foregone that is otherwise due because there is no evidence that contradicts Ecuadorian Respondents' statements that no user is subject to charge for non-consumptive use of water. Ecuadorian Respondents obtain brackish water from local estuaries through their own efforts and investments in infrastructure, and not from a GOE-controlled institution.

The GOE does not provide brackish water to Ecuadorian Respondents through their own infrastructure. On the contrary, Ecuadorian Respondents are providing themselves with brackish water through infrastructure they have invested in, and they also incur all costs of drawing brackish water from the source, circulating it, and returning it to the source. The GOE did not forego revenue in the form of usage fees assessed on users of water that is otherwise due because the GOE does not require any non-consumptive users-which include shrimp farms and other users in Ecuador—to pay fees for non-consumptive use of brackish water.[112]

{Commerce} verified that the GOE made no finding as to whether Produmar was engaged in consumptive or non-consumptive use of water.[113] {Commerce} also verified that Produmar initiated litigation to challenge any assessment of water usage fees assessed on the basis that any such usage was non-consumptive, and therefore, not subject to charge.[114] Thus, {Commerce}'s preliminary finding that

[112] *See* GOE's NSA IQR at NSA-37.
[113] *See* GOE's Verification Report at 12.
[114] *Id.*

the GOE does not assess fees (*i.e.*, collect revenues) for non-consumptive use of brackish water from any user is thoroughly supported by the record.[115]

**Commerce's Position:** We disagree with the petitioner and continue to find that the provision of brackish water for LTAR program is not countervailable.

First, we disagree with the petitioner's argument that Commerce's determination employs circular logic. The petitioner claims Commerce's reasoning is circular because the fact that the GOE does not charge certain users of brackish water does not eliminate any of the elements of the subsidy analysis (*i.e.*, financial contribution, benefit, and specificity).[116] However, Commerce made its preliminary finding regarding this program based on the totality of record evidence. Specifically, the respondents reported that they use brackish water non-consumptively for their shrimp farms, whereby they invest in equipment and water pumping infrastructure to allow them to pump water from local estuaries into shrimp ponds, and subsequently return that water to its source at a later date. We confirmed that the GOE provides no infrastructure to the respondents for pumping such water to their facilities, and the respondents bear all costs for constructing, maintaining, and operating the infrastructure to transport brackish water to and from their facilities. Fundamentally, the record lacks evidence indicating that the GOE is involved in the respondents' pumping of brackish water and returning it in a non-consumptive manner, and the totality of evidence indicates that this program does not provide countervailable benefits or a financial contribution.[117]

Furthermore, we disagree with the petitioner that AFA is warranted in this case. Specifically, the petitioner argues that Commerce should apply AFA to the mandatory respondents and the GOE in finding this program is countervailable, because: (1) the GOE charges for the use of brackish water;[118] (2) the GOE previously claimed it did not require authorizations to use brackish water, when it in fact does;[119] (3) the non-use of this program as reported by the respondents and the lack of value of brackish water reported by the GOE was contradicted during verification;[120] and (4) the respondents and the GOE never provided information regarding the volumes of the brackish water they consume.[121] However, as explained below, we disagree with the petitioner that either the GOE or the mandatory respondents were uncooperative or failed to act to the best of their ability regarding the Provision of Brackish Water for LTAR program such that the application of AFA is warranted.

The petitioner bases its first argument that Commerce should apply AFA to the mandatory respondents on the fact that the GOE charged Produmar for its use of brackish water.[122]

---

[115] *See* First Post-Preliminary Determination at 16.
[116] *See* Petitioner's First Case Brief at 1.
[117] While the petitioners note that Produmar was in fact charged for brackish water use, we note that Produmar and the GOE are currently engaged in litigation concerning those charges. Pending resolution of that issue, the record otherwise supports the respondents' contention that they use brackish water non-consumptively. This is addressed further below.
[118] *See* Petitioner's First Case Brief at 5.
[119] *Id.*
[120] *Id.*
[121] *Id.* at 6.
[122] *See* Santa Priscila's Post-Preliminary SQR2 at Exhibits S3-3 through -7.

However, as stated by Santa Priscila, Produmar filed an appeal to the GOE to reverse its decision on the basis that Produmar believes its use of water to be non-consumptive in nature, and the GOE erroneously charged Produmar for consumptive use of water.[123] Based on the existence of outstanding litigation regarding Produmar's appeal and the lack of final adjudication regarding this litigation, we find that there is an insufficient basis to claim that the GOE charges for non-consumptive use of brackish water.

Second, we disagree with the petitioner that the existence of authorizations indicates that AFA is warranted because the GOE had originally reported that authorizations are not required to utilize brackish water non-consumptively in Ecuador.[124] This is incorrect, and in our First Post-Preliminary Determination, we acknowledged that the "…government requires that non-consumptive users obtain an authorization from the Ecuadorean Ministry of Environment, Water, and Ecological Transition (MAATE) to extract water from a "public source," including brackish water sources from which the mandatory respondents pump in the production of subject merchandise."[125] Because the information regarding authorizations to use public sources of water was readily available for Commerce's First Post-Preliminary Determination and because the GOE provided this information prior to verification, we disagree with the petitioners that the existence of authorizations constituted a "mischaracterization" of the GOE's regime regulating the use of brackish water and run contrary to Commerce's preliminary finding.[126]

Third, we disagree with the petitioner that the lack of reporting of brackish water use warrants application of AFA.[127] Santa Priscila and Produmar reported that, because no water is retained in a pond intended for harvesting raw shrimp after the pond is drained during harvesting, neither company tracks the total volume of water that is pumped back to the main source.[128] As such, it is reasonable that Santa Priscila and Produmar would not be able to report some of the detailed figures requested if such tracking is not undertaken in the ordinary course of business.

Fourth, as noted above, we continue to find in this final determination that this program does not provide countervailable benefits. Therefore, we find there is no evidence on the record to substantiate finding that the mandatory respondents could – and should – have reported certain water-use volumes corresponding to their shrimp farms during the POI.

Therefore, for the reasons stated above, for the final determination, Commerce continues to find that the provision of brackish water program is not countervailable.

---

[123] *Id.* at S3-4.
[124] *See* Petitioner's Case Brief at 4 and 5.
[125] *See* First Post-Preliminary Determination at 16; *see also* GOE's Post-Preliminary SQR2 at Exhibit S4-1.
[126] *See* Petitioner's Case Brief at 5.
[127] *Id.* at 6.
[128] *See* Santa Priscila's Post-Preliminary SQR2 at Exhibit S3-3.

**Comment 2: Commerce Should Countervail the Provision of Fuel**

*Petitioner's Comments:*

The following is the Petitioner's summary of their argument. For further details, *see* Petitioner's First Case Brief at 8-13.

> In its post-preliminary determination, Commerce declined to countervail the provision of fuel, stating that the fuel, while ultimately supplied by the government-owned Petroecuador, was funneled through trading companies or distributors to the respondents. This determination is inconsistent with the statute and long-established Commerce practice that has been upheld by the courts. In numerous cases, Commerce has countervailed the provision of a good from a government authority regardless of whether the good was provided through private middlemen such as trading companies or distributors. The U.S. Court of International Trade has repeatedly upheld this practice as consistent with the statute's direction to countervail subsidies that are provided directly or indirectly, Congressional intent that the provision be applied to prevent circumvention of countervailing duty liability, and the statute's distinct analysis of financial contribution and benefit. Commerce and the court have also confirmed that no entrustment or direction analysis, nor pass-through or upstream subsidy analysis, is required to countervail the provision of goods that involves private middlemen. Commerce should countervail this program using the fuel usage volumes reported by respondents and the benchmark price for imported fuel during the POI that is on the record of this proceeding, adjusted to a delivered price.

*Respondents' Rebuttal Comments:*

The following is the respondents' summary of their rebuttal comments. For further details, *see* Respondents' First Rebuttal Brief at 30-41.

> {Commerce} correctly did not consider the provision of goods by government authorities to confer a benefit where the record contains no evidence that any government pricing policy that was only available to private traders had any impact on prices available to private consumers of diesel fuel.[129] {Commerce} correctly found that the information provided in support of the allegation consisted entirely of price lists published by the GOE that were exclusively available to private traders and not prices charged to consumers of diesel fuel.[130] Therefore, the allegation lacked information to support a persistently large differential between domestic and world market prices available to private consumers for diesel fuel in Ecuador.[131] The Petitioner offered no evidence—and the record still does not contain any evidence—to demonstrate that the government's pricing policy, which was solely

[129] *See* Petitioner's First Case Brief at 8–12.
[130] *Id.*
[131] *Id.*

> available to trading companies and not to Ecuadorian Respondents, affected prices available to end users of diesel fuel.
>
> If {Commerce} countervails the diesel fuel for less than adequate remuneration ("LTAR") program and calculates an above-*de minimis* total countervailable subsidy rate for Santa Priscila and SONGA in the final determination, {Commerce} should nevertheless adjust the cash deposit rate calculated for Santa Priscila and SONGA to remove all calculated benefits under the alleged provision of diesel fuel for LTAR program to reflect the fact that the program was terminated subsequent to the POI, but before the *Preliminary Determination* in accordance with {19 CFR 351.526(a)}. As of November 30, 2022, when the executive decrees that applied a fixed price to traders that sell to end users in the shrimp consumer segment were terminated, the alleged program was also terminated by an official act (*i.e.*, Executive Decree No. 614).

**Commerce's Position:** We disagree with the petitioner. The petitioner did not provide sufficient supporting information for its subsidy allegation that the GOE provided a financial contribution to the mandatory respondents (via price control(s) in place that allegedly involve the sale of fuel to shrimp farmers).

Specifically, in the NSA Initiation, Commerce stated it was "initiating on this program, in part, on the basis that the direct provision of fuel from the GOE/Petroecuador may be *de facto* specific under the meaning of section 771(5A)(D)(iii)(II) of the Act because record evidence indicates that, while there is no law limiting the provision of diesel fuel to specific industries under this program, shrimp farmers may be the predominant users of diesel fuel subsidies."[132] Record evidence indicates that EP Petroecuador, the state-owned petroleum company in Ecuador, sells fuel to private traders in Ecuador, but did not sell fuel to the mandatory respondents during the POI.[133] Furthermore, Santa Priscila, SONGA, and certain of their cross-owned affiliates reported that they did not receive fuel from state-owned fuel suppliers.[134] Therefore, because record evidence indicates that the government does not provide fuel directly to consumers such as Santa Priscila, SONGA, and certain of their cross-owned affiliates, we find that the respondents purchases of fuel do not constitute a financial contribution. As a result, because Commerce is finding that the respondents' purchases are not countervailable, we find that all other comments regarding the benchmark and relevant cases to be moot.

We note that the petitioner had further alleged in its NSA submission that private sellers were entrusted or directed to provide diesel fuel for LTAR, arguing that the GOE had a policy in place during the POI to use subsidized fuel prices to support the shrimp industry and had a pattern of practices to act upon that policy to entrust or direct private entities to provide fuel to shrimp producers at subsidized rates. However, in the NSA Initiation we explicitly stated that we were not initiating on the portion of the petitioner's allegation claiming that the GOE was entrusting or directing private sellers of fuel to provide diesel fuel for LTAR.[135] In the NSA Initiation we explained that the petitioner had provided insufficient evidence in its allegation regarding the

[132] *See* NSA Initiation at 4.
[133] *See* GOE's NSA IQR at NSA-2 and Exhibits NSA-1 and -2.
[134] *See* Santa Priscila's NSA IQR at NSA-11; *see also* SONGA's NSA IQR at NSA-10.
[135] *See* NSA Initiation at 4.

price lists established by the GOE/EP Petroecuador that the petitioner relied on to argue that the GOE entrusted or directed private entities to provide fuel to the shrimp sector, because the price lists did not speak to the financial contribution aspect of this program, *i.e.*, the provision of fuel to the shrimp industry.[136] In light of this explicit initiation decision, and lacking sufficient evidence indicating that private sellers of fuel are entrusted or directed by the GOE, per Commerce's standard,[137] we continue to find that the respondents' purchases do not constitute a financial contribution.

Additionally, in the cases cited by the petitioner, such as, *Galvanized Steel Wire from China*, Commerce countervailed the supply of wire rod because respondents did not provide sufficient documentation to demonstrate that members of the Chinese Communist Party are not owners of the private distributor companies supplying wire rod to respondents.[138] However, this case is not applicable because record evidence in the form of supporting documentation provided by the GOE shows that that none of the mandatory respondents and their cross-owned companies were sold fuel from companies owned or controlled by the GOE.

In *Citric Acid from China from China*, Commerce found that the Government of China (GOC) provided "a direct financial contribution (provision of a good) to the trading companies and, therefore, the existence of a financial contribution is not in doubt." However, this case is not applicable because record evidence indicates the GOE provided supporting documentation to show that shrimp farmers, in particular the mandatory respondents, did not receive a direct financial contribution from Petroecuador and the GOE did not collect information from the private traders and/or distributors on sales to registered end-users.[139]

In *Circular Welded Carbon Quality Steel Pipe from China*, Commerce stated that the GOC did not provide requested information regarding the ownership of certain producer-suppliers. Because of this failure to provide the requested information, Commerce continued treating these suppliers as "authorities" under sections 776(a) and (b) of the Act.[140] In the instant investigation, the GOE, did provide a list of private traders and/or distributors that purchased diesel 2 fuel from Petroecuador during the POI.[141]

In *Polyethylene Terephthalate Film, Sheet and Strip from India*, Commerce did not adjust the cash deposit requested by the respondent in that case because the parties did not provide Commerce sufficient information at an appropriate point in the proceeding to demonstrate that a program has been terminated without being replaced by a new program. Additionally, the respondent, Jindal, did not raise its request for a change to the cash deposit rate until its brief, at which point Commerce did not have sufficient time to verify the information submitted by

[136] *Id.*
[137] *Id.* (citing *Biodiesel from the Republic of Argentina: Final Affirmative Countervailing Duty Determination*, 82 FR 53477 (November 16, 2017), and accompanying IDM at Comment 1.)
[138] *See Galvanized Steel Wire from the People's Republic of China: Final Affirmative Countervailing Duty Determination,* 77 FR 17418 (March. 26, 2012) and accompanying IDM at 40.
[139] *See* GOE's NSA at NSA-9 and NSA-15.
[140] *See Circular Welded Carbon Quality Steel Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances,* 73 FR 31966 (June 5, 2008) (*Steel Pipe from China*), and accompanying IDM at Comment 7.
[141] *See* GOE's NSA at NSA-27 and NSA-28.

Jindal.[142] In the instant investigation, unlike the respondent Jindal, the GOE has provided Commerce information to demonstrate that there is no direct purchasing of fuel between the mandatory respondents and Petroecuador.

Lastly, in *Beijing Tianhai,* as is stated in *Delverde, SRL and Delverde USA, Inc.* v. the U.S., the Court held the statute "requires that Commerce make such a determination by examining the particular facts and circumstances of the sale and determining whether {the purchaser} directly or indirectly received both a financial contribution and benefit from a government."[143] In the instant investigation, as we stated in our Post-Preliminary Analysis, we initiated on this program on the bases that the GOE may have directly provided fuel to the mandatory respondents. And, based on record evidence, we found that the GOE did not provide fuel to the mandatory respondents.

Based on record evidence, unlike the cases mentioned above, we find that the GOE provided supporting documentation to show that none of the mandatory respondents and its cross-owned companies were sold fuel from companies owned or controlled by the GOE.[144] Specifically, in Exhibit NSA-5 and Exhibit NSA-6, Executive Decree No. 231 amended by Executive Decree No. 462, record information indicates that Petroecuador sells to private trading companies.[145]

With respect to the petitioner's arguments regarding Petroecuador's "pricing policy," the GOE provided record evidence (*i.e.*, Exhibits NSA-2 and NSA-4 (a) and (b)) showing Petroecuador's pricing policy is only for private traders and or distributors, not end-users (*i.e.*, shrimp farmers).[146] Furthermore, as Commerce noted in the NSA decision not initaitign on the entrustment or direction allegation from the petitioner, price lists do not speak to the financial contribution aspect of this program (*i.e.*, the provision of fuel to the respondents). Therefore, for the final determination, we have continued to find that the respondents' purchases of fuel do not constitute a financial contribution.

**Comment 3: Commerce Should Revise the Benchmark Used to Value the Provision of Electricity**

*Petitioner's Comments:*

The following is the Petitioner's summary of their argument. For further details, *see* Petitioner's First Case Brief at 41-55.

---

[142] *See Final Results of Countervailing Duty Administrative Review: Polyethylene Terephthalate Film, Sheet and Strip from India,* 73 FR 7534 (February 13, 2006), and accompanying issues and decisions memorandum (IDM) at Comment 8 and page 16.

[143] *See Beijing Tianhai Industry Co., Ltd. v. United States*, 52 F.Supp.3d 1351, 1360 - 1367 (CIT 2015) at page 10; *see also Delverde, Srl and Delverde USA, Inc., Plaintiffs–Appellants, v. United States, Defendant–Appellee. v. Borden, Inc., Hershey Foods Corp. and Gooch Foods, Inc., Defendants–Appellees*, 202 F.3rd 1360 (CIT, April 22, 2024) at page 2.

[144] *See* Post-Preliminary Determination at 15 and 16; *see also* GOE's NSA IQR at NSA-4.

[145] *See* GOE's NSA IQR at Exhibits NSA-5 and Exhibit NSA-6.

> In its post-preliminary determination, Commerce used Ecuadorian electricity distributors' distribution costs as the benchmark to value the provision of electricity for LTAR as facts available. Commerce correctly determined that the market for electricity in Ecuador is distorted by government predominance, and it correctly found that it could not conclude that electricity rates in Ecuador are established consistent with market principles. Yet Commerce still chose to use Ecuadorian electricity distribution costs as its benchmark, despite being set in this same distorted market. In the final results, Commerce should use the price for imports of electricity from Colombia and Peru as a tier-two benchmark for this program. The fact that such imports are not delivered directly to consumers but through distributors does not disqualify these import prices. In the alternative, Commerce should use these import prices as facts available, as they are more reliable and less distorted by the internal Ecuadorian costs used in the post-preliminary analysis.

*Respondents' Rebuttal Comments:*

The following is the respondents' summary of their rebuttal comments. For further details, *see* Respondents' First Rebuttal Brief at 1-6.

> {Commerce} must not select a benchmark based on prices electricity imported from Colombia and Peru into Ecuador.[147] Not only is the benchmark data suggested by the Petitioner fatally flawed, but {Commerce} should not have concluded that the alleged provision of electricity for LTAR program was countervailable in the first instance because the program is not *de jure* or *de facto* specific.
>
> The GOE provides electricity service to a very large number of consumers across many different industries in Ecuador. Within that total number of customers, business consumers do not represent a limited number. No industry or enterprise can be considered the predominant user of electricity service because customers among the "Commercial," "Industrial," and "Others" tariff categories each received approximately equal quantities of electricity service during the POI.[148]
>
> If {Commerce} (incorrectly) continues to find that the GOE's provision of electricity to Santa Priscila and SONGA constituted a *de facto* specific subsidy, then it should nevertheless reject the Petitioner's contention that {Commerce} should use as the benchmark for measuring the amount of the benefit the prices of electricity imported from Colombia and Peru.[149] First, the benchmark pricing advocated by the Petitioner is not timely submitted information upon which to base {Commerce}'s benchmarks in this investigation because this information was absent from the record before the Petitioner submitted this information in its rebuttal benchmark submission, which was filed only 24 days (*i.e.*, March 8, 2024) before the *Preliminary Determination* date (*i.e.*, April 1, 2024). Second,

---

[147] *See* Petitioner's First Case Brief at 14.
[148] *Id.*
[149] *Id.* at 13–15.

> {Commerce} should also not use the Petitioner's suggested benchmark data because it reflects subsidized pricing from only a subset of countries.

**Commerce's Position:** We disagree with the petitioner that we should revise the benchmark used to value the provision of electricity.

In the First Post-Preliminary Determination, we determined that Santa Priscila and SONGA benefited from the provision of electricity for LTAR, determining that the GOE price was not consistent with "market principles" and the tariffs charged to the respondents were not sufficient to recover costs, in accordance with "tier three" of Commerce's benchmark hierarchy.[150] Specifically, Commerce selected a benchmark for determining the benefit from the Provision of Electricity for LTAR program in accordance with the methodology described in 19 CFR 351.511(a)(2), which sets forth the basis for identifying appropriate market-determined benchmarks for determining whether a government good or service is provided for LTAR. These potential benchmarks are listed in hierarchical order by preference: (1) market prices from actual transactions within the country under investigation (*e.g.*, actual transactions between private parties, actual imports, or actual sales from competitively run government auctions) (tier one); (2) world market prices that would be available to purchasers in the country under investigation (tier two); or (3) an assessment of whether the government price is consistent with market principles (tier three).[151]

As discussed in the First Post-Preliminary Determination, in accordance with an analysis conducted pursuant to tier three of the benchmark hierarchy, Commerce examined the GOE's price setting philosophy and, as the best "facts available" on the record, compared the specific tariffs charged to the respondents to the relevant distributor's average cost of service to determine whether the GOE set prices sufficient to recover costs. Based on this analysis, we determined that the GOE did not charge tariffs high enough to cover the applicable average cost of service.

For purposes of calculating an appropriate benchmark, Commerce selected the per unit average cost of electricity distribution services per Table No. 25 of the GOE's Analysis and Determination of the Cost of Public Electric Energy Service for January-December 2022.[152] Specifically, as the tier three benchmark, Commerce used the average per-unit cost of service for the distribution company applicable to the respective mandatory respondents, because this is the amount the GOE would need to charge in electricity tariffs to recover costs.

The petitioners argue that Commerce should treat the prices of imports of electricity from Colombia and Peru into Ecuador as tier-two benchmarks. As an initial matter, we note that Commerce treats import prices paid inside the subject country for the good in question as tier-one prices and not as tier-two prices. Prices paid for electricity in Ecuador imported from Colombia and Peru are tier-one prices. Because we find the Ecuadorean electricity market to be

---

[150] See First Post-Preliminary Determination at 6-13.
[151] *See* 19 CFR 351.511(a)(2).
[152] *See* GOE's Letter, "Government of Ecuador's Section II Questionnaire Response," dated February 14, 2024 (GOE's Section II IQR), at Exhibit LTAR-3(c) at Table No. 25.

distorted by the GOE's large share of the electricity market,[153] we determine that the prices for electricity imported into Ecuador from Colombia and Peru are not suitable for use as tier-one benchmarks. Having determined that the electricity prices imported into Ecuador from Colombia and Peru constitute tier-one prices, it is not appropriate to simply find them to be tier-two "world market prices," as argued by the petitioner. When Commerce finds that a market distortion prevents the use of in-country tier-one prices, it next looks for comparable tier-two "world market prices," which by their definition are prices charged outside of the subject country, and thus, are free of the distortion found to exist in the subject country. Simply referring to the Colombian and Peruvian electricity import prices by another name does not negate the fact that they are distorted or render them viable tier-two benchmarks.

Additionally, even if we were to consider the prices of electricity from Colombia and Peru imported into Ecuador as potential tier-two prices, which as noted above would not be appropriate, we would still find the use of such prices are not suitable. The GOE reported that in 2022, Ecuador imported 465.83 GWh of electricity, valued at 5.95 million U.S. dollars from Colombia and Peru, combined.[154] However, we also noted that the GOE further clarified that the electricity imported from Colombia and Peru is not directly accessible to domestic electricity consumers in Ecuador.[155] The regulations at 19 CFR 351.511(a)(2)(ii) provides that, if there are no useable market-determined prices stemming from *actual* transactions, we will turn to world market prices that *would be available* to the purchaser. The *CVD Preamble* addresses this very question of "availability" in the context of electricity:

> We will consider whether the market conditions in the country are such that it is reasonable to conclude that the purchaser could obtain the good or service on the world market. For example, a European price for electricity normally would not be an acceptable comparison price for electricity provided by a Latin American government, because electricity from Europe in all likelihood would not be available to consumers in Latin America. However, as another example, the world market price for commodity products, such as certain metals and ores, or for certain industrial and electronic goods commonly traded across borders, could be an acceptable comparison price for a government-provided good, provided that it is reasonable to conclude from the record evidence that the purchaser would have access to such internationally traded goods.[156]

In the instant investigation, the GOE explicitly stated that imported electricity from Colombia and Peru is not directly accessible to domestic electricity consumers.[157] Therefore, we find that Colombian and Peruvian electricity is not available to Ecuadorian consumers,[158] and thus, the

[153] *See* First Post-Preliminary Determination at 10.
[154] *See* First Post-Preliminary Determination at 10; *see also* GOE's Post-Preliminary SQR1 at S3-24.
[155] *Id.*
[156] *See Countervailing Duties; Final Rule*, 63 FR 65348, 65377 (November 25, 1998) (*CVD Preamble*).
[157] *See* First Post-Preliminary Determination at 10; *see also* GOE's Post-Preliminary SQR1 at S3-24.
[158] *See* GOE's Post-Preliminary SQR1 at S3-24.

petitioner's proposed electricity rates inside of Colombia and Peru[159] are not appropriate as a tier two benchmark. This is consistent with Commerce practice in similar situations.[160]

Alternatively, the petitioner argues that if Commerce continues to find that it must rely on facts available to select a tier three benchmark for this program, the Colombian and Peruvian electricity import prices are superior to internal Ecuadorian distribution costs as it "does not make sense to select a benchmark that is internal to the same distorted, non-market Ecuadorian electricity system." Further, the petitioner claims that "the prices for imports from outside the distorted Ecuadorian market that are in fact distributed to Ecuadorian consumers are free of these flaws." We find that the petitioner has failed to substantiate its assertion that the prices for electricity imported into Ecuador from Colombia and Peru are a more appropriate proxy for a market-based benchmark. As detailed above, the GOE reported that imported electricity from Colombia and Peru is not directly accessible to domestic electricity consumers.[161] Furthermore, we reiterate our point that prices of electricity imported into Ecuador constitute tier-one prices – not tier-two prices- and that because we find the electricity market to be distorted the use of tier-one electricity import prices are not suitable for use.

Under tier three, Commerce is analyzing whether the government price is set in accordance with market principles, including whether it covers costs. Commerce has on the record the cost of supply as enumerated by the Agency for Regulation and Control of Energy and Non-Renewable Natural Resources (ARCERNNR) for regional Ecuadorian electricity suppliers, and thus can determine the tariff rates that would be sufficient to cover those costs to serve as a benchmark comparison price. As such, for the final determination we will continue to rely on the average per-unit cost of service for the distribution company applicable to the respective mandatory respondents. In prior CVD proceedings, where there are no viable tier-one or tier-two benchmarks available, Commerce has similarly relied upon a cost recovery analysis under tier-three of its benchmark hierarchy to determine whether the government price of the good in question was consistent with market principals when such cost recovery data are available and found to be reliable.[162]

---

[159] *See* Petitioner's Letter, "Rebuttal Benchmark Information," dated March 8, 2024, at 3.

[160] *See Utility Scale Wind Towers from Malaysia: Preliminary Affirmative Countervailing Duty Determination*, 86 FR 15887 (March 25, 2021), and accompanying PDM at 17-18 (noting that while record information indicated that Malaysia had electricity connections to Singapore and Thailand, these prices were not *available* to end users in Malaysia and thus not useable tier two prices), unchanged in *Utility Scale Wind Towers from Malaysia: Final Affirmative Countervailing Duty Determination*, 86 FR 30593 (June 9, 2021). Conversely, in *Urea Ammonium Nitrate Solutions from the Russian Federation: Final Affirmative Countervailing Duty Determination*, 87 FR 37836 (June 24, 2022), and accompanying IDM at Comment 2, where Commerce determined that natural gas from Kazakhstan was available to purchasers in Russia after an examination of pipeline infrastructure, import data, and evidence regarding the purchase of Kazakh natural gas from a Russian gas plant outside of the Russian unified gas supply system.

[161] *See* GOE's Post-Preliminary SQR1 at S3-24.

[162] *See, e.g., Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Preliminary Results of Countervailing Duty Administrative Review, Partial Rescission, and Preliminary Intent To Rescind, in Part; 2021*, 88 FR 69136 (October 5, 2023) and accompanying PDM at 36-38, unchanged in *Certain Cold-Rolled Steel Flat Products From the Republic of Korea: Final Results and Partial Rescission of Countervailing Duty Administrative Review; 2021*, 89 FR 15124 (March 1, 2024) (*CRS from Korea*), and accompanying IDM at Comment 3.

In the alternative, the respondents requested that if Commerce finds imports from Peru and Colombia as reported by the GOE to be suitable data, such data should be used as a tier one benchmark, which would yield a subsidy margin of 0.00 percent across the board.[163] Alternatively, respondents urge Commerce to use a private sale of electricity to Santa Priscila as a tier one benchmark.[164] Commerce determines that imports and the private sale of electricity to Santa Priscila cannot be used as tier one benchmarks because, as explained in the First Post-Preliminary Determination,[165] electricity prices in Ecuador were significantly distorted because of the government's significant presence in the market, and therefore, such prices from within Ecuador are not market-determined.

We also disagree with the respondents that we should remove the petitioner's Colombian and Peruvian electricity benchmark information from the record. First, because Commerce is not using the proposed benchmarks, the issue is moot. Second, since Commerce did not reject the petitioner's benchmarks before the *Preliminary Determination* and did not receive a request to reject the information until the respondents' rebuttal case brief, given the extent of time since the data were submitted on the record, we are exercising our discretion in these circumstances to keep the petitioner's benchmark on the record.[166]

Next, we address the respondents' arguments on specificity. The respondents argue in their rebuttal case brief that electricity is not *de facto* specific, as Commercial, Industrial and Others tariff consumers used approximately equal quantities of electricity and, therefore, no tariff category was a predominant user of electricity. As an initial matter, we find the majority of respondents' arguments on this issue to be misplaced. Specifically, Commerce found that, based on respondent-specific data and aggregate data from the GOE, that the respondents were disproportionate users of electricity during the POI.[167] Commerce did not make a finding that any one tariff category was a predominant user. Therefore, the respondents' arguments on that issue are inapplicable. Nevertheless, we noted several inaccuracies and potential deficiencies with the data highlighted by the respondents, which we address here.

The respondents assert that the "Industrial" category consumed 24.65 percent; however, we note that the table reports that the Industrial category consumed 27.65 percent.[168] Also, the respondents cite to table no 7 and claim that the "'Industrial' commercial category" consumed 543.6 MWh/customer; however, we find that there is no reference to an "'Industrial' commercial category" in the table.[169] Rather, the table lists separate consumptions for "Residential," "Commercials," "Industrials," "Others" and "Lighting" categories, which consumed an average of 1.92, 11.62, 543.56, 56.74 and N/A MWh/customer, respectively.[170] The respondents are relying on data from table 7 of the National Electricity Corporation (CNEL) EP 2022 Annual

[163] *See* Respondents' First Rebuttal Comments at 52.
[164] *Id.* at 52-53.
[165] See First Post-Preliminary Determination at 9.
[166] *See* 19 CFR 351.302(b) providing Commerce the discretion to extend any time limit not precluded by statute and accept information provided by an interested party at any point in the proceeding.
[167] *See* Post-Preliminary Determination at 7-8.
[168] *See* Respondents' First Rebuttal Comments at 44; *see also* GOE's Post-Preliminary SQR1 at Exhibit S3-5(b).
[169] *See* Respondents' First Rebuttal Comments at 45.
[170] *See* GOE's Post-Preliminary SQR1 at Exhibit S3-5(b).



Filed By: Zachary Shaykin, Filed Date: 10/22/24 2:32 PM, Submission Status: Approved

Report, which is an "Accountability Report for the year 2022."[171] CNEL is a national-level, state-owned entity handling electrical distribution responsibilities in 11 regions (*i.e.*, 11 companies) of Ecuador.[172] The GOE explained that there are 20 state-owned electricity distributors throughout Ecuador, which are responsible for directly supplying and managing connections and billing customers.[173] Based on record evidence, we find that the CNEL report does not capture the full universe of consumers because it only covers 11 out of the 20 state-owned electricity distributors in Ecuador.[174]

In contrast, in determining *de facto* specificity, Commerce relied on Table No. 25 of the GOE's Analysis and Determination of the Cost of Public Electric Energy Service for January-December 2022.[175] This report is from a ARCERNNR Cost Analysis for 2022. ARCERNNR is the institution responsible for reviewing the electricity rates and recommending whether they should be adjusted.[176] Additionally, the GOE reported that the ARCERNNR Cost Analysis for 2022 is a report "that was the basis for determining the 2022 tariff rates."[177] Consequently, based on the record, we find that we appropriately relied on the ARCERNNR Cost Analysis for 2022 to conduct our *de facto* specificity analyses because the ARCERNNR Cost Analysis for 2022 captures the entirety of Ecuador's state-owned consumer count and is the basis for determining Ecuador's tariff rates.

Furthermore, we based our specificity determination on a comparison of the respondents' electricity consumption to the average Ecuadorian consumer's electricity consumption, broken out by the applicable electricity rate types (*i.e.*, commercial, industrial, water pumping), as found in the GOE's Annual and Multiyear Statistics of the Electrical Sector in Ecuador for 2022 (2022 Electricity Statistics).[178] More fundamentally, contrary to how respondents compared the tariff categories' MWh/consumer amounts to other tariff categories, Commerce relied on a comparison of the respondents' consumption to the average Ecuadorian consumer's electricity consumption in order to determine specificity. Additionally, to note, while in the First Post-Preliminary Determination Commerce applied neutral facts available pursuant to section 776(a)(1) of the Act to analyze whether the GOE's provision of electricity for water pumping was *de facto* specific,[179] the GOE confirmed at verification that water pumping tariff usage information is included in the "Others" category.[180] While Commerce still lacks the percentage breakout of electricity used for water pumping as part of the "Others" category, we continue to find that the GOE's provision of electricity for water pumping is *de facto* specific on the basis that Santa Priscila and SONGA received a disproportionately large amount of electricity when compared to an average Ecuadorian consumer's water pumping electricity consumption.

[171] *Id.*
[172] *See* GOE's Section II IQR at LTAR-7.
[173] *Id*. at LTAR-2.
[174] *Id*.
[175] *See* First Post-Preliminary Determination at 6; *see also* GOE's Section II IQR at Exhibit LTAR-3(c) at Table No. 25.
[176] *See* GOE's Section II IQR at LTAR-3.
[177] *Id*. at LTAR-5.
[178] *See* GOE's Post-Preliminary SQR1 at Exhibit S3-4.
[179] *See* First Post-Preliminary Determination at 8.
[180] *See* GOE's Verification Report at 10.

**Comment 4: Commerce Should Correct the Multiplier Used for Programs Benefitting Respondents' Shrimp Suppliers**

*Petitioner's Comments:*

The following is the Petitioner's summary of their argument. For further details, *see* Petitioner's First Case Brief at 56-61.

> Contrary to its regulations and prior practice, Commerce excused respondents from reporting for any of its cross-owned shrimp suppliers except for one supplier for each respondent. ASPA continues to object to this decision. Regardless, Commerce should, at a minimum, ensure that its benefit calculations for shrimp farm subsidies account for not only the pounds sold by unaffiliated shrimp farms that have not been individually investigated, but also the pounds sold by cross-owned shrimp farms that have not been individually investigated. Commerce should include both categories in the multiplier used to attribute per-pound shrimp farm subsidy benefits to the mandatory respondents. Anything less would understate the full subsidy amount and only further reward respondents that have already been excused from reporting on the majority of their cross-owned shrimp farms.

*Petitioner's Additional Comments:*

The following is the Petitioner's summary of their argument. For further details, *see* Petitioner's Second Case Brief at 2-3.

> In its second post-preliminary determination, Commerce found that Santa Priscila benefitted from three additional countervailable subsidy programs: the Youth Employment Program – Article 16 of the Labor Law, the Motor Vehicle Tax Reduction Program, and the Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities program. Under Section 771B, 19 U.S.C.§ 1677-2, Commerce added an amount to Santa Priscila's subsidy rate for each program by attributing a per-pound benefit amount to the pounds of shrimp supplied to Santa Priscila by its non-cross-owned shrimp suppliers. However, because Commerce only selected one affiliated shrimp farm for investigation – Produmar – the multiplier Commerce used omitted pounds provided by uninvestigated, affiliated shrimp suppliers. In the final results, Commerce should correct the multiplier used to attribute benefits to shrimp farms to include the pounds provided both by non-cross-owned shrimp farms and by cross-owned shrimp farms that were not individual investigated.

*Respondents' Rebuttal Comments:*

The following is the respondents' summary of their rebuttal comments. For further details, *see* Respondents' First Rebuttal Brief at 1-6.

> {Commerce} should not attribute benefits received by Ecuadorian Respondents to cross-owned suppliers of raw shrimp that were excused from being individually selected for examination pursuant to Section 771B.[181] The statute only permits {Commerce} to deem countervailable subsidies found to be provided to either producers or processors of the product deemed to be provided with respect to the manufacture, production, or exportation of the processed product (*i.e.,* frozen shrimp), not the unprocessed product (*i.e.,* raw shrimp).[182]
>
> The statute only permits {Commerce} to consider countervailable subsidies that benefit raw agricultural products (*i.e.,* raw shrimp) to also benefit the further-processed product (*i.e.,* frozen shrimp). No record evidence can support an inference that every unexamined non-cross- owned shrimp supplier received any benefits, much less the same amount of benefits under every program {Commerce} attributed to the examined shrimp farmers pursuant to Section 771B.

*Respondents' Additional Rebuttal Comments*

The following is the respondents' summary of their rebuttal comments. For further details, *see* Respondents' Second Rebuttal Brief at 4-5.

> {Commerce} should not attribute benefits received by Ecuadorian Respondents under: the Motor Vehicle Tax program; the Income Tax Exemption on Time Deposits and Other Fixed Income Securities (ITETD); and Youth Employment – Article 16 of the Labor Law (Youth Employment) programs to cross-owned suppliers of raw shrimp that {Commerce} excused from responding to {Commerce}'s questionnaires.[183] Ecuadorian Respondents provided arguments in their September 20, 2024, rebuttal brief, to support why the record does not support any inference that every cross-owned shrimp supplier received benefits, much less the same amount of benefits, under every program under which Santa Priscila and SONGA reported receiving benefits pursuant to Section 771B.[184] Ecuadorian Respondents incorporate those arguments by reference because they apply with equal force to calculating a subsidy rate for benefits received by Santa Priscila, SONGA, and their cross-owned affiliates, under the three programs addressed in {Commerce}'s Second Post-Preliminary Determination.

**Commerce's Position:** We disagree with the petitioner that we should incorporate the volumes of shrimp supplied by unexamined cross-owned entities in our calculations of rates attributable to unaffiliated shrimp suppliers pursuant to section 771B of the Act. In its initial questionnaire regarding the suppliers of Santa Priscila and SONGA,[185] Commerce limited Santa Priscila and

[181] *See* Petitioner's First Case Brief at 15–17.
[182] *See* section 771B of the Act (emphasis added).
[183] *See* Petitioner's Second Case Brief at 2–3.
[184] *See* Respondents' First Rebuttal Brief, at 56–61.
[185] *See* Commerce's Letters, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Industrial Pesquera Santa Priscila S.A.," dated January 25, 2024; and "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Supplier Questionnaire for Sociedad Nacional de Galápagos C.A.," dated January 25, 2024 (collectively, Supplier Questionnaires).

SONGA's reporting requirements regarding subsidies received by cross-owned entities to a select number of companies, thereby limiting the investigation to Santa Priscila, SONGA, and certain of their cross-owned entities.[186]

The petitioner objects to Commerce's decision to limit the reporting requirements of certain cross-owned entities because it "violates" the plain language of our regulations and Commerce's practice of attributing benefits received by respondents to their cross-owned affiliates pursuant to 19 CFR 351.525(b)(6).[187] While the regulations state that Commerce "will apply" the regulations set out in 19 CFR 351.525(b)(2)-(b)(7),[188] we note that regulations in 19 CFR 351.525 do not explicitly require Commerce to investigate all cross-owned input suppliers but, rather, instructs Commerce on how to attribute subsidies for those cross-owned input suppliers that Commerce does investigate. Therefore, Commerce finds that it did not run afoul of the requirements pursuant to 19 CFR 351.525(b)(6)(iv) by limiting the reporting requirements to a select group of cross-owned companies and attributing subsidies to only the cross-owned input suppliers we required to respond to our request for information in this investigation.

Ideally, Commerce would examine all cross-owned input suppliers in an investigation; however, in this instance, based on the unique circumstances of this proceeding and the number of cross-owned suppliers reported by Santa Priscila, we exercised our discretion in requiring only certain of the cross-owned suppliers to provide information in investigation.[189] Therefore, we determined that it would not be practicable in this investigation to examine each cross-owned affiliate for Santa Priscila and SONGA, and determined to select certain cross-owned affiliates for investigation.[190] The nature of shrimp farming in Ecuador is such that numerous small shrimp farmers throughout the country supply shrimp to our respondents, Santa Priscila and SONGA.[191] Examining all of Santa Priscila and SONGA's cross-owned affiliates in investigation would require significant resources for Commerce to analyze each company's corporate structure, accounting and selling practices, and production information. The above factors combined with the overlapping statutory deadlines of other AD and CVD proceedings and Office IV's notable workload,[192] place a significant constraint on the number of analysts that can be

[186] *Id.* at 1.
[187] *See* Petitioner's First Case Brief at 15.
[188] *See* 19 CFR 351.525(b)(1).
[189] *See* Santa Priscila's Letter, "Frozen Warmwater Shrimp from Ecuador – Section III "Affiliated Companies" Questionnaire Response," dated January 4, 2024 (Santa Priscila's Affiliation IQR); *see also* SONGA's Letter, "Frozen Warmwater Shrimp from Ecuador – Section III "Affiliated Companies" Questionnaire Response," dated January 4, 2024 (SONGA's Affiliation IQR).
[190] *See Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,* 435 U.S. 519, 543-44 (1978) ("absent constitutional constraints or extremely compelling circumstances the administrative agencies should be free to fashion their own rules of procedure and to pursue methods of inquiry capable of permitting them to discharge their multitudinous duties."); *see also Bebitz Flanges Works Private Ltd. v. United States*, 433 F.Supp.3d 1309, 1325 (Ct. Int'l Trade 2020) ("Commerce has significant discretion in determining the procedures by which it will gather and analyze information necessary to meet the statutory deadlines imposed…").
[191] *See* Santa Priscila's Affiliation IQR at AFF-1; *see also* SONGA's Affiliation IQR at AFF-1.
[192] In addition, Antidumping Duty (AD)/CVD Operations Office IV, the office to which this investigation is assigned, is conducting numerous concurrent AD and CVD proceedings, for example, the following AD investigations: Mattresses from Mexico, Aluminum Extrusions from Ecuador, Aluminum Extrusions from Malaysia, Aluminum Extrusions from China, Solar Cells from Thailand, Wine Bottles from Mexico; the following AD administrative reviews: CAAS from Germany, Ripe Olives from Spain, LWR Pipe from China, Seamless Carbon

assigned to this investigation and, thus, limit the number of cross-owned entities that Commerce can reasonably investigate.

Furthermore, we are unpersuaded by the petitioner's reliance on Commerce's practice in *Certain Frozen Warmwater Shrimp*[193] to illustrate that Commerce should include all cross-owned input suppliers in its calculation of subsidies in this investigation.[194] We are unpersuaded, in part, because in the prior *Certain Frozen Warmwater Shrimp* investigation, the mandatory respondents reported fewer cross-owned entities than in this investigation.[195] Furthermore, Commerce has, in other certain unique circumstances, limited the number of cross-owned firms it examined.[196]

Commerce further disagrees with the petitioner's contention that it must include the volume of all raw shrimp suppliers, including unexamined cross-owned shrimp suppliers, in its calculation of countervailable subsidies attributable to suppliers of raw shrimp pursuant to section 771B of the Act. While the Court has upheld Commerce's discretion involving the specific calculation methodology under section 771B of the Act,[197] we do not agree that the petitioner's methodology is the most appropriate method for attributing subsidies provided to *cross-owned firms* in this case. Specifically, the rules governing the attribution of subsidies received by cross-owned companies are outlined in 19 CFR 351.525(b)(6). Specifically, subparagraph (b)(6)(iv) states that "{i}f there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream

---

and Alloy Steel Standard, Line, and Pressure Pipe from Ukraine, Solar Cells from China, Non Oriented Electrical Steel from Japan, Methionine from Spain, Steel Racks from China, Softwood Lumber from Canada, Forged Steel Fluid End Blocks from Italy, Wooden Bedroom Furniture from China, PET Resin from Oman, Welded Carbon Steel Pipe & Tube from Turkey, Citric Acid from China, Certain Solar Products from China, Certain Solar Products from Taiwan, Raw Honey from Argentina, Raw Honey from Vietnam, Xanthan Gum from China, Steel Nails from Oman, Welded Stainless Pressure Pipe from Vietnam, Welded Carbon Steel Pipe & Tube from Turkey, PET Resin from Oman, Mattresses from Vietnam, Citric Acid from China, Stilbenic OBAs from China, Raw Honey from Argentina, Raw Honey from Vietnam, Steel Nails from Oman, Welded Stainless Pressure Pipe from Vietnam, Certain Freight Rail Couplers and Parts Thereof from China, Xanthan Gum from China; the following CVD investigations: Brass Rod from Israel, Epoxy Resins from South Korea, Aluminum Extrusions from Indonesia, Frozen Warmwater Shrimp from Ecuador, Vanillin from China, Melamine from India, and the Sodium Nitrite from India CVD administrative review. Moreover, Office IV is involved in ongoing litigation, including Court directed remand redeterminations, as well as multiple scope rulings, sunset reviews, changed circumstances reviews, and multiple circumvention inquiries. Not only do these other cases present a significant workload, but the deadlines for several of the cases coincide or overlap with anticipated deadlines in this proceeding.

[193] *See Certain Frozen Warmwater Shrimp from Ecuador: Final Affirmative Countervailing Duty Determination*, 78 FR 50389 (August 19, 2013) (*Certain Frozen Warmwater Shrimp*), and accompanying IDM.

[194] *See* Petitioner's First Case Brief at 16.

[195] *See Certain Frozen Warmwater Shrimp* IDM at 5.

[196] *See, e.g., Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products from the Russian Federation: Preliminary Affirmative Countervailing Duty Determination, Preliminary Negative Critical Circumstances Determination, and Alignment of Final Determination With Final Antidumping Duty Determination*, 80 FR 79564 (December 22, 2015), and accompanying PDM at 2 (noting "On October 19, 2015, {Commerce} found that given the large number of NLMK's cross-owned affiliated input suppliers of scrap, it was not practicable to examine each of them."), unchanged in *Countervailing Duty Investigation of Certain Cold-Rolled Steel Flat Products From the Russian Federation: Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination*, 81 FR 49935 (July 29, 2016).

[197] *See, e.g., Asociación de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 429 F. Supp.3d 1325,1348-49 (*Aceitunas de Mesa*) (CIT 2020).

product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporations (excluding the sales between the two corporations)." For certain of Santa Priscila and SONGA's cross-owned input suppliers for which we determined not to individually examine in this investigation and from whom we did not require responses to our questionnaire, we lack the necessary data, *i.e.*, the subsidies and sales value information for the non-selected cross-owned entities, to perform the proper attribution as mandated by the regulations. The petitioner's proposed methodology would be an incomplete approach under 19 CFR 351.525(b)(6), because it would not account for the information needed for the sales denominator.

Further, we disagree that the petitioner's proposed method (*i.e.*, incorporating the volumes of raw shrimp supplied by unexamined cross-owned suppliers in Commerce's 771B calculation) is necessarily more accurate. As noted above, the attribution of subsidies received by cross-owned companies is governed by the regulations, whereas the attribution of subsidies bestowed on the raw product is not strictly governed by this provision. This is why, in the *Preliminary Determination* and in this final determination, Commerce had two separate calculation methodologies for the two different scenarios. This approach is consistent with past cases involving the application of section 771B of the Act.[198] Moreover, we note that the petitioner did not provide any relevant precedent to support its claim that we "must" include raw shrimp volumes provided by unexamined cross-owned entities in its calculation of subsidies under section 771B of the Act.[199] As a result, we disagree with the petitioner in this instance that it is appropriate to incorporate the volume of raw shrimp supplied by cross-owned suppliers of Santa Priscila and SONGA that Commerce did not examine in this investigation. However, Commerce may continue to further consider this issue in the first administrative review, should this investigation result in an order and a review be requested.

**Comment 5: Commerce Should Apply AFA to Countervail Unverifiable and Omitted Income Tax Programs**

*Petitioner's Comments:*

The following is the Petitioner's summary of their argument. For further details, *see* Petitioner's First Case Brief at 17-19.

> At verification, Santa Priscila and SONGA revealed that they had misreported the amounts of certain tax benefits received and/or omitted tax benefits from their reporting entirely. Commerce correctly refused to accept this new information or attempted "corrections" at verification. In the final results, Commerce should apply adverse facts available to the relevant tax programs by applying the highest non-*de minimis* rate for a tax program in a countervailing duty proceeding on Ecuador, which is currently 1.66 percent.

[198] *See Olives from Spain Preliminary Determination* PDM at 11 and 17 (noting that with respect to subsidies received by Cucanoche and Cuarterola, cross-owned input suppliers of Camacho, Commerce was attributing subsidies per 19 CFR 351.525(b)(6)(iv), whereas Commerce utilized a different calculation methodology for determining benefits under section 771B of the Act, which was addressed in a separate section.).
[199] *See* Petitioner's First Case Brief at 16 and 17.

*Respondents' Rebuttal Comments:*

The following is the respondents' summary of their rebuttal comments. For further details, *see* Respondents' First Rebuttal Brief at 61-78.

> {Commerce} should not apply AFA to the following programs for which Santa Priscila and SONGA reported minor corrections that were not accepted by {Commerce} at verification: (1) ISD Exemptions on Imported Raw Materials and Assets; and (2) Annual Motor Vehicle Tax Re{d}uctions.[200] {Commerce} should have accepted minor corrections to SONGA's ISD Exemptions on Imported Raw Materials and Assets and to SONGA's, Naturisa's and Produmar's Annual Vehicle Tax Reductions presented at the outset of verification. Alternatively, {Commerce} should apply the estimated benefit reported by the GOE as facts available pursuant to {section 776(a)(2) of the Act} for these programs because there is no evidence that Ecuadorian Respondents failed to cooperate to the best of their ability in reporting this information.
>
> If {Commerce} considers the Annual Motor Vehicle Tax Credit countervailable . . ., then {Commerce}'s standard AFA rate selection hierarchy dictates that it should apply Santa Priscila's calculated rate to Produmar, SONGA, and Naturisa because it would be the highest calculated rate for a cooperating respondent for the identical program in Ecuador.

**Commerce's Position:** We agree with the petitioner that Commerce should apply AFA to the Investment Contract ISD Exemption for Imported Assets and Raw Materials and the Motor Vehicle Tax Reduction program. Commerce addresses our application of AFA to the Motor Vehicle Tax Reduction program under comment 16 below.

In the *Preliminary Determination*, Commerce found that tax deductions and/or ISD exemptions under the Investment Contract constituted a financial contribution in the form of revenue foregone within the meaning of section 771(5)(D)(ii) of the Act, and were *de facto* specific under section 771(5A)(D)(iii)(I) of the Act because there were a limited number of users. Those preliminary findings are unchanged in this final determination. With respect to the Investment Contract ISD Exemption for Imported Assets and Raw Materials program, Commerce noted in the *Preliminary Determination* that SONGA received an ISD tax exemption under this program, but that the net subsidy rate was not measurable.[201] However, as described in Commerce's verification report, "at the start of verification, SONGA officials reported that in SONGA's February 12, 2024, Section III questionnaire response at Exhibit 11 and May 16, 2024, supplemental questionnaire response at Exhibit S2-4(a), they mistakenly reported {the ISD} exemptions on purchases of imported assets and raw materials under the investment contract as received in 2021 instead of the {POI}."[202] and thus, SONGA did not include the relevant usage information for 2022 in its prior questionnaire responses. Commerce indicated in the verification report the number of transactions and imported assets associated with the 2022 exemption that

[200] *Id.* 17–19.
[201] *See Preliminary Determination* PDM at 26.
[202] *See* SONGA's Verification Report at 2.

SONGA presented as a minor correction,[203] which is business proprietary in nature. As indicated in the verification report, Commerce did not accept these corrections at verification.[204]

While the respondents argue that Commerce should not apply AFA and should have accepted the alleged minor correction, Commerce disagrees, *see* comment 15 below. SONGA's attempt to characterize its data as minor is not supported by record evidence because the corrections were indeed significant. As stated in the verification report, the revised data presented at verification were based on numerous transactions and assets,[205] and therefore constituted new information that was not minor and that would have been burdensome to verify. Therefore, we find that it was proper that Commerce rejected SONGA's attempt at verification to correct previously submitted information with untimely new factual information.[206]

Also, we find that SONGA consistently failed to explain their underlying calculations, which could have prevented the error and allowed Commerce to request additional explanation and data in a supplemental questionnaire. When SONGA first submitted the relevant data in its IQR at Exhibit 11, SONGA only reported the benefit as "reported on the 2022 return," and not the underlying calculation despite our questionnaire requesting that the respondent "provide a detailed calculation of the assistance and all source materials," and asking, the respondent to "indicate where in the tax return this assistance is shown."[207] Consequently, in a supplemental questionnaire, Commerce requested that SONGA explain how it calculated and reported the ISD exemption for imported assets and raw materials.[208] In response, SONGA explained that "in order to calculate the benefits received under the ISD exemption on imported materials under its investment contract, SONGA reviewed the value of the imported goods that were approved under its investment contract and purchased during 2021. Then, using this information, SONGA determined the tax value that would have been due on each one and applied the ISD rate in effect during the period of investigation ("POI") (*i.e.*, 5 percent) to calculate the reported benefit amount under this exemption."[209] SONGA also provided a calculation worksheet "illustrating how SONGA calculated the ISD exemption on imported materials."[210] Despite Commerce's request for this information (*i.e.*, the benefits in its tax returns), SONGA did not link its reported calculation to any of its tax filings. Therefore, the record demonstrates that Commerce requested the data on multiple occasions, and SONGA did not provide such information at the time it was requested. As such, the record demonstrates that SONGA withheld information requested from it, failed to provide the correct data by the deadlines outlined by Commerce, and significantly impeded the proceeding, consistent with sections 776(a)(2)(A), (B), and (C) of the Act. Further, by failing to provide the requested data at the time it was requested by Commerce, and by failing

---

[203] *Id*.
[204] *Id*.
[205] *Id*.
[206] *See, e.g., Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997) (*Micron*) ("Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc."); *American. Alloys, Inc. v. United States*, 30 F.3d 1469, 1475 (Fed. Cir. 1994) (*American Alloys*) ("{T}he statute gives Commerce wide latitude in its verification procedures.").
[207] *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated December 12, 2023 (SONGA Questionnaire), at 52.
[208] *See* SONGA Post Preliminary Questionnaire at question 5.
[209] *See* SONGA's Post-Preliminary SQR1at S2-5.
[210] *Id*. at S2-5 and Exhibit S2-4(a).

to provide the corrected data prior to verification, we find that SONGA failed to cooperate by not acting to the best of its ability to comply with our requests for the data in accordance with section 776(b)(1) of the Act.

Further, SONGA claims that, alternatively, since SONGA presented its error at the start of verification, Commerce should apply neutral facts available to the Investment Contract ISD Exemption for Imported Assets and Raw Materials by relying on the total amount SONGA was approved under the investment contract (*i.e.*, the benefit divided by the life of the investment contract). We disagree with SONGA's proposed alternative calculation. First, importantly, because we find that SONGA failed to cooperate and act to the best of its ability in providing the necessary data in a timely manner, consistent with section 776(b)(1)(A) and (B) of the Act, Commerce has the discretion to use an adverse inference in selection from facts otherwise available on the record. Furthermore, as the GOE stated in its questionnaire response, "the amount of actual benefits {pursuant to the Investment Contract} may vary subject to the actual investments undertaken by the investor in any given year, which may or may not conform to the chronogram presented in the agreement, or to changes in legal conditions because the benefits are provided in the law, which may be amended."[211] Additionally, according to Commerce's verification, "government officials stated that the benefits cannot exceed the amount of the investment over the entire life of the contract."[212] Thus, we find that the record clearly indicates that except for the enumerated investments and contract stipulation, nothing prevents the respondents from utilizing the entire approved benefit in a single year. It is Commerce's practice "that the party does not obtain a more favorable result by failing to cooperate than if it had cooperated fully."[213] Therefore, we do not find SONGA's proposed alternative to be an appropriate methodology for valuing its benefit under the Investment Contract ISD Exemption for Imported Assets and Raw Materials program

Because SONGA withheld information requested from it and failed to provide requested information in a timely manner in accordance with sections 776(a)(2)(A) and (B), and further failed to cooperate by not acting to the best of its ability in accordance with section 776(b)(1), consistent with section 776(d)(1)(A)(i) of the Act, Commerce is relying on AFA in determining the benefit from this program. In accordance with Commerce's AFA hierarchy, we are assigning a 1.38 percent *ad valorem* rate (the rate assigned to Santa Priscila for the Investment Contract – Tax Rate Reduction program in this investigation, the highest above-*de minimis* rate for a similar program in the immediate proceeding) to SONGA's Investment Contract ISD Exemption for Imported Assets and Raw Materials program.

[211] *See* GOE's Letter, "Government of Ecuador's Supplemental Section II Questionnaire Response," dated March 13, 2024 (GOE's Section II SQR1), at S-46.
[212] *See* GOE's Verification Report at 6.
[213] SAA at 870.

**Comment 6: Commerce Should Revise the Denominator for the Investment Contract/Tax Incentives for Priority Sectors Under the 2010 Organic Production Code for Santa Priscila**

*Petitioner's Comments:*

The following is the Petitioner's summary of their argument. For further details, *see* Petitioner's First Case Brief at 19-21.

> In the preliminary determination and ministerial error analysis, Commerce attributed the benefit of the Investment Contract / Priority Sectors program to all of Santa Priscila's sales. Based on confidential record information regarding the agreement underlying this program, as well as confidential information provided at verification, Commerce should revise the denominator used to calculate the subsidy rate for this program in the final results .

*Respondents' Rebuttal Comments:*

The following is the respondents' summary of their rebuttal comments. For further details, *see* Respondents' First Rebuttal Brief at 78-81.

> {Commerce} should continue to calculate Santa Priscila's rate under the investment contract program by allocating reported benefits over the corrected total sales denominator. Contrary to the Petitioner's claims, the record unequivocally demonstrates that approval for benefits under the investment contract program is not contingent upon export. The language in Santa Priscila's investment contract cited by the Petitioner is merely a description of the project to which the investment was applied. The contract language states conditions for approval that do not include any reference to export sales or future exports.
>
> The Petitioner does not argue that the approvals of other Ecuadorian Respondents or their cross-owned affiliates that received benefits pursuant to the investment contract program are contingent upon export. Therefore, the program is clearly not export contingent. Accordingly, if {Commerce} continues to countervail the Investment Contract program, {Commerce} should continue to calculate Santa Priscila's *ad valorem* subsidy rate for benefits received pursuant to the investment contract program by allocating those benefits over Santa Priscila's corrected total sales denominator.

**Commerce's Position:** We disagree with the petitioner that Commerce should have used a different sales value when calculating the subsidy rate for this program. Specifically, in the *Preliminary Determination*, Commerce attributed the benefit Santa Priscila received under this program to Santa Priscila and Tropack's total sales during the POI, net intercompany sales, pursuant to 19 CFR 351.525(b)(3), because the tax benefits provided for by the Investment Contract program were not "tied" to a specific product, market, or export sales.

The Investment Contract Program was established pursuant to the Organic Code for Production, Commerce and Investments (COPCI) in order to promote productive investments by domestic and international companies,[214] and was further amended by the Law of Productive Promotion in order to expand eligibility to the cantons of Quito and Guayaquil in Ecuador and extend the length of time for which a company may receive benefits under the Investment Contract Program.[215] Furthermore, pursuant to Article 26.1 of the COPCI, the Investment Contract Program is available to productive investments that: (1) are greater than USD $100 million, and (2) a positive report from the GOE on the benefits that the investment may bring to the country.[216] Moreover, Articles 12 and 13 of the COPCI provided further clarity on what a "productive" investment is and broadly defines a "productive" investment as one which expands productive capacity and generates employment.[217]

Based on the above laws establishing the benefits Santa Priscila could receive tax benefits from its investment, we find there is no stipulation that requires the investment be contingent upon: (1) export performance; (2) sales to a specific market; or (3) sales of a particular product. Therefore, absent this information in the underlying laws of the Investment Contract Program, we continue to find it appropriate to attribute benefits under this program to total sales, and will not attribute benefits to Santa Priscila and Tropack's export sales, to sales to a particular market, or to sales of a particular product per 19 CFR 351.525(b)(2), (4) or (5). Therefore, for the final determination, we have attributed to benefits received by Produmar under this program the total sales values of Santa Priscila, Produmar, and Tropack, net of intercompany sales, and have attributed to benefits received by Santa Priscila under this program the total sales values of Santa Priscila and Tropack, net of intercompany sales.[218]

**Comment 7: Commerce Should Make Certain Revisions to SONGA's Subsidy Calculations**

*Petitioner's Comments:*

The following is the Petitioner's summary of their argument. For further details, *see* Petitioner's First Case Brief at 21.

> Based on information received from SONGA at verification, Commerce should revise certain calculations regarding the provision of electricity and the provision of land to SONGA in the final results.

*Respondents' Rebuttal Comments:*

The following is the respondents' summary of their rebuttal comments. For further details, *see* Respondents' First Rebuttal Brief at 81-84.

---

[214] *See* GOE's Section II IQR at OTH-4 and Exhibit OTH-1(a).
[215] *Id.* at TAX-21.
[216] *See* GOE's Section II IQR at OTH-1(a).
[217] *Id.* at TAX-22 and Exhibit TAX-3(c).
[218] *See* Santa Priscila's Final Calculation Memorandum.

> {Commerce} should not calculate countervailable benefits for electricity expenses Naturisa reported that were not included in the calculated rates in the Post-Preliminary Determination.[219] If {Commerce} continues to consider electricity benefits countervailable, then {Commerce} should not revise its electricity calculations in the forthcoming Final Determination because {Commerce} correctly countervailed only benefits reported at facilities that invoiced entities that were required to respond to {Commerce}'s questionnaire.
>
> {Commerce} should not include land under a land concession agreement held by a cross-owned affiliate of Naturisa in its benefit calculations for the Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays for LTAR program. The land usage fees were not incurred by Naturisa. While {Commerce} verified that Naturisa recorded annual usage fee payments for agreements for other agreements it did not incur,[220] nothing on the record supports that Naturisa recorded annual land usage fees for the land concession agreement identified by the Petitioner.
>
> {Commerce} should also not adjust the annual fee payments for the agreement identified by the Petitioner.[221] {Commerce} should make no such adjustment because {Commerce} verified that payments attributable to the agreement identified by the Petitioner were made.[222] {Commerce}'s land benefit calculations should continue to reflect that Naturisa made payments attributable to the agreement identified by the Petitioner. {Commerce}'s calculation would overstate the benefit if it did not reflect these payments because the payments were made and not forgiven by the GOE.

**Commerce's Position:** We agree with the petitioner and have made certain revisions to SONGA's subsidy calculation for the final determination.

In its *Preliminary Determination* and First Post-Preliminary Determination, Commerce countervailed the government provision of land use concessions for aquaculture facilities in beaches and bays and the government provision of electricity for LTAR. In its calculation for both programs, Commerce reviewed concessions and electricity payments by SONGA and its selected cross-owned entities (*i.e.*, Naturisa, Sola, and Champmar). At verification, "Naturisa officials stated that all electricity consumption locations that have been previously reported, even if the electricity template description pertained to a non-selected cross-owned entity, were used and paid by Naturisa."[223] Additionally, during the verification, Commerce discovered that a concession held by a non-selected cross-owned company was operated and used by Naturisa during the POI.[224] Also, during verification, Commerce found that for one of the reported land concessions, Naturisa did not pay the annual fee for this land concession during the POI.[225]

[219] *See* Petitioner's First Case Brief at 21.
[220] *See* SONGA's Verification Report, at Exhibit VE-8.
[221] *See* Petitioner's First Case Brief at 21
[222] *See* SONGA's Verification Report at 14.
[223] *See* SONGA's Verification Report at 2.
[224] *Id*.
[225] *Id*.

Barcode:4652034-02 C-331-806 INV - Investigation -

Regarding interested party comments on the Provision of Electricity for LTAR program, while SONGA claims that it only reported the electricity from non-selected entities for completeness and that the meters were either not directly used for shrimp farming or were not invoiced to Naturisa, we find that Naturisa used and paid for this electricity according to our verification findings.[226] First, the verification report undermines SONGA's claim that it reported the electricity consumption for completeness when SONGA officials explicitly stated that Naturisa used and paid for this electricity.[227] Second, while the verification report does not explain whether Naturisa was invoiced for this electricity, based on record evidence we find that Naturisa used and paid for electricity, which supports finding that Naturisa, not the non-selected cross-owned entity, is the party that benefited from the provision of electricity for LTAR with respect to these additional transactions.[228] Specifically, if Naturisa paid for and used the electricity at issue, then Naturisa would also be the beneficiary of paying less than adequate remuneration for such electricity, as Commerce has determined in this investigation.

Furthermore, regarding the electricity, SONGA appears to be arguing that electricity consumption that Naturisa paid for is not tied to the production of subject merchandise because the consumption of electricity was not involved in shrimp production.[229] Commerce's tying standard requires there to be evidence indicating that the purpose of the subsidy was known by the subsidy provider at the time of bestowal. SONGA has not presented any information, such as application or approval documents, etc., on the record that would indicate a purpose to the susbidy, or otherwise indicate that the GOE required at time of bestowal that the electricity consumption had to be used in connection with production activities that did not involve shrimp production.

We also agree with the petitioner that the amount paid for a certain concession should be set to zero since Naturisa did not pay for the land concession during the POI. Section 19 CFR 351.511(b) of Commerce's regulations states that "{i}n the case of the provision of a good or service, {Commerce} will normally consider a benefit as having been received as of the date on which the firm pays or, in the absence of payment, was due to pay for the government-provided good or service." While the record indicates that Naturisa paid for the land concession after the POI, it also indicates that Naturisa incurred a late payment fee for doing so. As a result, Naturisa was due to pay the fee for this land concession during the POI but did not do so. Therefore, for the final determination, consistent with how we are valuing other land concessions according to the amount Naturisa paid during the POI, we have adjusted one of the land concession payments to zero.[230]

---

[226] *Id.*
[227] *Id.*
[228] *See* SONGA's Verification Report at 2, 12-13 and Exhibit VE-7.
[229] *See* Respondents' Rebuttal Brief at 81 and 82.
[230] *See* SONGA Final Calculation Memorandum.



Filed By: Zachary Shaykin, Filed Date: 10/22/24 2:32 PM, Submission Status: Approved

**Comment 8: Commerce Should Make Certain Revisions to Santa Priscila's Subsidy Calculations**

*Petitioner's Comments:*

The following is the Petitioner's summary of their argument. For further details, *see* Petitioner's First Case Brief at 22.

> In the final results, Commerce should correct certain errors made in the post-preliminary calculation of the subsidy rate for the provision of electricity to Santa Priscila.

**Commerce's Position:** We agree with the petitioner that Commerce made errors in its calculation of benefits for Santa Priscila and Produmar under the Electricity for LTAR program. We have corrected these errors for this final determination. Because discussion of these changes relies heavily on information that is business proprietary in nature, for further discussion of this issue, *see* Santa Priscila's Final Calculation Memorandum.[231]

**Comment 9: Commerce Should Revise Its Countervailable Subsidy Calculation Regarding Provision of Land Concessions**

*Respondents' Comments:*

The following is the respondents' summary of their arguments. For further details, *see* Respondents' First Case Brief at 18-27.

> In the final determination, {Commerce} must adjust each land benchmark to allocate the per-hectare prices calculated in the *Preliminary Determination* over the average useful life of a land concession, which is indisputably 20 years. The land purchase prices for raw land upon which {Commerce} based the land benchmarks in the *Preliminary Determination* reflect private contracts of land sales whose terms last indefinitely, not annual rental prices.[232] Therefore, the land purchase prices used in {Commerce}'s calculated benchmark prices reflect a price for the purchase of raw land, and not a limited term annualized rental prices.
>
> {Commerce} correctly recognized that concessions are issued for a 20-year period and that concessions do not confer ownership rights.[233] {Commerce}'s calculation incorrectly and unreasonably treats the purchase price as a lease price by dividing the entire purchase price by the area of the land.
>
> In essence, {Commerce}'s methodology assumes that Santa Priscila and SONGA paid the purchase price every year for the life of each concession. Alternatively,

---

[231] *See* Santa Priscila Final Calculation Memorandum.

[232] *See* Santa Priscila's and SONGA's Letter, "Benchmark Submission of SONGA and Industrial Pesquera Santa Priscila," dated Feb. 28, 2024 (Benchmark Submission), at Exhibits 9 and 11.

[233] *See Preliminary Determination* PDM at 22.

> {Commerce} erroneously assumes that the entire purchase price was paid in year one of the concession, but no "rental" price was paid for the remaining 19 years of the concession. Both assumptions have no basis in the record and lack a rationale.
>
> Therefore, {Commerce} must recalculate the per-hectare benchmark price for land concessions used to calculate the benefit for each respondent by dividing the per hectare benchmark price used for each respondent by the number of years {Commerce} found that aquaculture concessions are granted in the present administrative review (*i.e.,* 20 years).

*Petitioner's Rebuttal Comments:*

The following is the Petitioner's summary of their rebuttal comments. For further details, *see* Petitioner's Rebuttal Brief at 6-9.

> First, respondents urge Commerce to alter the benchmark for the provision of land in the final determination to allocate the purchase price used in the *Preliminary Determination* over the average useful life of the land concessions, which they argue is 20 years. Commerce should reject this argument. Commerce explained in the *Preliminary Determination* that it used a land purchase price for its benchmark for the land use program because no suitable rental rates were available on the record. In addition, in response to so-called ministerial error allegations from respondents after the *Preliminary Determination*, Commerce reiterated that the statements regarding the selection of the land benchmark in the *Preliminary Determination* "clearly indicate Commerce's intent in benchmark choice and calculation, and Commerce followed that intent in its calculations."
>
> In addition, respondents' proposed method for revising the benchmark would understate the market value of one year's use of a land concession. If Commerce wishes to take these factors into account, the only option is to choose the only Ecuadorean rental price on the record as the benchmark, which is for land situated in the coastal region of Santa Elena, Ecuador.

**Commerce's Position:** We agree with the respondents, in part. Commerce continues to find that the selection of the purchase prices of industrial land for shrimp farming that were reported by Santa Priscila and SONGA are the best available benchmarks on the record of this investigation for purposes of measuring adequacy of remuneration, because they are: (1) company-specific and regard a land purchase that was conducted with an unaffiliated party; and (2) involved the purchase of industrial land suitable for shrimp production.[234] However, we agree with the respondents' argument that application of the *entire* purchase prices of land reported by Santa Priscila and SONGA[235] is not appropriate to compare to the respondents' annual rent fees, and therefore have adjusted the benchmark price, as described further below.[236]

---

[234] *See* Santa Priscila and SONGA's Benchmark Submission at 3 and Exhibits 9 through 13; *see also Preliminary Determination* PDM at 13.
[235] *See* Santa Priscila and SONGA's Benchmark Submission at 3 and Exhibit 9 through 13.
[236] *See* Respondents' First Case Brief at 18 through 26.

The petitioner argues that reconsideration of the calculation of a per-unit land benchmark in the *Preliminary Determination* to measure the adequacy of remuneration under the Provision of Land Concessions for Beaches and Bay Areas Program is not warranted because Commerce had explicitly stated its intent to use the benchmark for the purposes of measuring adequacy of remuneration under this program.[237] While it is true that Commerce stated our intent, and followed that intent, to select among the benchmark options available the land purchase prices provided by Santa Priscila and SONGA.[238] Commerce also stated in the *Preliminary Determination* that it would continue to consider the issue of which benchmark price to select in measuring the adequacy of remuneration under the Provision of Land Concessions for Beaches and Bay Areas Program.[239] Therefore, in light of the arguments provided by the petitioner[240] and Santa Priscila, SONGA, and the GOE,[241] we find it appropriate to reconsider the calculation of the benchmark to measure the adequacy of remuneration under the Provision of Land Concessions for Beaches and Bay Areas program.

In our reconsideration of the calculation of the per-unit land benchmark price used to measure the adequacy of remuneration under the Provision of Land Concessions for Beaches and Bay Areas Program, we have determined to divide the per-unit benchmark price by the term of the land concessions held by Santa Priscila and SONGA. In the *Preliminary Determination*, Commerce stated that it divided the total value of the purchase prices of land plots reported by Santa Priscila and SONGA by the total area in hectares and square meters of the same land plots.[242] Furthermore, in the *Preliminary Determination* we stated that the land-use concessions held by Santa Priscila and SONGA are recurring in nature pursuant to 19 CFR 351.511(b) and (c) because record evidence indicated that the concessions do not confer ownership rights,[243] the land-use concessions offered by the GOE to the mandatory respondents were akin to a "rental" or "lease" of land, because they provide concession holders the right to use the land subject to a concession for a period of up to 20 years, and do not require an upfront, lump-sum fee comparable to a down-payment.[244] Moreover, record evidence indicates that concession holders must pay the GOE an annualized fee in order to renew their right to utilize the land held under a concession.[245] Therefore, for the final determination, we find that it is necessary to adjust the per-unit purchase prices of land to an annualized basis to allow a proper comparison to the

[237] *See* Petitioner's First Rebuttal Brief at 7; *see also* Ministerial Error Memorandum at 6 (noting Commerce's intent in "benchmark choice and calculation," and that "Commerce followed that intent in its calculations" in the *Preliminary Determination*).
[238] *See* Ministerial Error Memorandum at 6; *see also* Santa Priscila and SONGA's Benchmark Submission at 3 and Exhibits 9 through 13.
[239] *See Preliminary Determination* PDM at 13.
[240] *See* Petitioner's First Rebuttal Brief at 6 through 9.
[241] *See* Respondents' First Case Brief at 18 through 26.
[242] *See Preliminary Determination* PDM at 22 (noting, "For each land sale transaction, we derived an annual per-unit rental price by dividing the purchase price by the area of the purchased land.").
[243] *Id.*
[244] *Id.*; *see also* GOE's Section II IQR at LTAR-23 and Exhibit LTAR-5(a) at Article 68 (noting that "The term of the concession for the occupation of the beach and bay area shall be twenty years, renewable for equal periods.").
[245] *See Preliminary Determination* PDM at 21 and 22 (noting that "concession holders pay an annual concession fee" in order to renew the land-use rights conferred by a concession).

respondents' annual concession (*i.e.*, rental) fees.[246] Our determination to annualize the per-unit benchmark prices for this final determination is consistent with Commerce practice.[247]

Furthermore, we disagree with the petitioner that adjusting the per-unit purchase prices on an annualized basis would understate the market value of the land-use concessions held by Santa Priscila, SONGA, and certain of their cross-owned affiliates.[248] In making their claim, the petitioner argues that doing so does not take into account: (1) the time value of money; (2) the impacts of inflation on land prices; and (3) the real estate market value that is reflected in commercial rental rates at the time of rental. The petitioner further asserts that the only land benchmark on the record that takes into account these three factors is the petitioner's proposed benchmark of land situated in the coastal region of Santa Elena, Ecuador.[249]

First, we find this argument unconvincing because the petitioner provides no analysis of how an annualized per-unit benchmark price would undercut the time value of money or the real estate market value that is reflected in commercial rent rates at the time of rental. Second, we disagree that the impact of inflation on land prices are not taken into consideration by annualizing the per-unit purchase prices calculated based on the purchase prices reported by Santa Priscila and SONGA, because Commerce has already taken into account the impacts of inflation by indexing the per-unit benchmark prices to POI prices, which remains unchanged for the final determination.[250] Third, nowhere in the petitioner's argument or the original benchmark submission reporting the Santa Elena, Ecuador, land price does the petitioner indicate how the three abovementioned factors are incorporated in the rental price listing it provided.[251] Finally, Commerce noted various deficiencies with the petitioner's proposed benchmark in the *Preliminary Determination*; namely: (1) the rental price was an offer price not reflective of actual rental prices paid; (2) the proposed rental offer price concerned commercial land, rather than industrial or agricultural land; and (3) the rental offer price was for a plot far smaller than the land utilized by the respondents. Therefore, we find that there is no supporting evidence to conclude that the market value of the land-use concessions held by Santa Priscila, SONGA, and certain of their cross-owned affiliates is understated by annualizing the per-unit purchase prices of land provided by Santa Priscila and SONGA, or that the petitioner's proffered benchmark is a more appropriate alternative.

In determining how to annualize the purchase prices of the land plots reported by Santa Priscila and SONGA, we disagree with the respondents that Commerce should divide the per-unit purchase prices by a 20-year period.[252] Santa Priscila and SONGA reported that land-use

---

[246] *See* Santa Priscila's Final Calculation Memorandum; *see also* SONGA's Final Calculation Memorandum.
[247] *See Certain Frozen Warmwater Shrimp from Ecuador* at 8 ("To calculate the {land} benchmark for aquaculture concessions, we divided the average per hectare price of $847.50 by 10 (the number of years for which aquaculture concessions are granted)…").
[248] *See* Petitioner's First Rebuttal Brief at 7.
[249] *Id.*; *see also* Petitioner's Supplemental Benchmark Submission at 4 and Exhibit 6.
[250] *See Preliminary Determination* PDM at 22 (noting, "Where appropriate, we indexed the per-unit price to the POI.").
[251] *See* Petitioner's Supplemental Benchmark Submission at 4.
[252] *See* Respondents' First Case Brief at 19 and 23 through 25.

concessions are authorized for a period "up to," but not necessarily for a total of, 20 years.[253] Therefore, based on record evidence, we find that a 20-year period is inappropriate for annualizing the per-unit benchmark prices for all land concessions, because land-use concessions are not necessarily authorized or utilized for a full 20-year period.

As an alternative the respondents argue that Commerce should divide the per-unit purchase price benchmarks for both Santa Priscila and SONGA by the weighted-average of the actual concession terms that Santa Priscila reported.[254] We disagree that a weight-average of the actual terms of Santa Priscila's land-use concessions is the proper approach for evaluating the adequacy of remuneration of both Santa Priscila and SONGA under the Provision of Land Concessions for Beaches and Bay Areas Program, because the respondent has provided no evidence why it would be appropriate to evaluate SONGA's adequacy of remuneration under this program using another company's data.

Therefore, for the reasons stated above, for the final determination, we have determined that it is appropriate to adjust Commerce's calculation of the adequacy of remuneration of Santa Priscila, SONGA, and certain of their cross-owned affiliates by annualizing the per-unit purchase price benchmarks reported by Santa Priscila and SONGA using an alternative to the methods proposed by the respondents. Because discussion of the terms used by Commerce to annualize the per-unit purchase price benchmarks relies heavily on information that is business proprietary in nature, for further discussion of this issue, *see* Santa Priscila's Final Calculation Memorandum and SONGA's Final Calculation Memorandum for a full discussion of Commerce's analysis of this argument.

**Comment 10: Commerce Should Find that Certain Tax Programs are not Countervailable**

*Respondents' Comments:*

Respondents did not provide the requested executive summary of 450 words or less regarding this argument. The provided summary of 744 words is too lengthy to include in this document. Respondents' argument may be found at pages 27 to 44 of Respondents' Comments.

*Respondents' Additional Comments:*

Respondents did not provide the requested executive summary of 450 words or less regarding this argument. The provided summary of 939 words is too lengthy to include in this document. Respondents' argument may be found at pages 9 to 33 of Respondents' Comments.

*Petitioner's Rebuttal Comments:*

The following is the Petitioner's summary of their rebuttal comments. For further details, *see* Petitioner's Rebuttal Brief at 9-15.

---

[253] *See* Respondents' First Case Brief at Santa Priscila's Supplier Section III SQR 1 at Exhibit S-SP-3; *see also* SONGA's Supplier Section III SQR 1 at Exhibit S-AFF-Q26b

[254] *See* Santa Priscila's First Case Brief at 25 and 26.

> Commerce should continue to countervail the tax programs that respondents argue are not specific. In the preliminary and post-preliminary determinations, Commerce correctly determined that the following tax programs are *de facto* specific, because each program provided benefits to a limited number of users pursuant to {section 771(5A)(D)(iii)(I) of the Act}: (1) the Investment Contract Program; (2) the Tax Incentives for Priority Sectors Under the 2010 Organic Production Code (COPCI) program; (3) the Environmental Tax Incentives program; and (4) the ISD Exemption on Principal and Interest Payments on Foreign Loans (ISD Foreign Loans) program. These findings were fully supported by record information provided by the GOE regarding the number of enterprises benefitting from each program.
>
> Rather than engaging with the underlying usage data by enterprise, respondents argue that the number of industries benefitting from each program is not limited. But no such finding is required. The statute states that a program is *de facto* specific where "{t}he actual recipients of the subsidy, whether considered on an enterprise or industry basis, are limited in number."[255]
>
> Thus, as long as Commerce finds that the number of enterprises receiving the subsidy is limited, there is no need to also determine that the number of industries receiving the subsidy is limited. In addition, since this basis for specificity is satisfied, Commerce need not establish *de jure* specificity nor *de facto* specific on the basis of predominant use, disproportionate benefits, or discretion in conferral of the subsidy. The statute clearly states that *de facto* specificity is established "if one or more of the following factors exist …"[256] Respondents' lengthy and repetitive arguments regarding these alternative bases for specificity are thus completely irrelevant.

*Petitioner's Additional Rebuttal Comments:*

The following is the Petitioner's summary of their rebuttal comments. For further details, *see* Petitioner's Second Rebuttal Brief at 2-6.

> Commerce should continue to countervail the tax programs that respondents argue are not specific. In the second post-preliminary determination, Commerce correctly determined that the following tax programs are *de facto* specific: (1) the {Motor Vehicle Tax program}; (2) {ITETD}; and (3) {Youth Employment} programs. As explained below, the record fully supports Commerce's determination that these three programs are *de facto* specific. Respondents' arguments to the contrary ignore record evidence regarding the disproportionate and limited use of these programs, and they are based on legal theories that are not applicable to the facts of this case. Commerce should therefore reject respondents' arguments and continue to find these programs specific and therefore countervailable.

---

[255] *See* section 771(5A)(D)(iii)(I) of the Act (emphasis added).
[256] *See* section 771(5A)(D)(iii) of the Act.

**Commerce's Position:** First, we agree with the respondents that tax deductions made by Santa Priscila and Produmar pursuant to investment contracts should be attributed to the Investment Contract Program.[257] In our *Preliminary Determination*, we found that the manner in which Produmar claimed this deduction in its tax return better reflected benefits received under the COPCI program.[258] Subsequently, in our *Ministerial Errors Memo*, we determined that similar deductions claimed by Santa Priscila also reflected benefits received under the COPCI program for the same reason mentioned above.[259] However, during verification, we were able to confirm that these deductions were based on income received pursuant to investment contracts.[260] Accordingly, to be consistent with our analysis of deductions claimed by SONGA and Naturisa, which were also made pursuant to investment contracts, we are treating such deductions made by Santa Priscila and Produmar as benefits received under the Investment Contract – Tax Rate Reduction program.[261]

However, we disagree with the respondents that the Investment Contract, ISD Foreign Loans, COPCI, and Environmental Tax Incentives programs are not *de facto* specific. The SAA states that "{t}he Administration intends to apply the specificity test in light of its original purpose, which is to function as an initial screening mechanism to winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy." [262] Moreover, the specificity test is not, "intended to function as a loophole through which narrowly {focused} subsidies provided to or used by discrete segments of an economy would escape the purview of the CVD law."[263] As a result, Commerce reasonably took into account the number of enterprises in the economy in question (*i.e.*, Ecuador) to determine whether the number of enterprises using a subsidy is actually large or small.[264] Thus, we have followed the instructions of the SAA and our practice in determining, in the *Preliminary Determination* and post preliminary analysis, that a limited number of companies received benefits under these programs during the POI and, therefore, that these programs were *de facto* specific, in accordance with section 771(5A)(D)(iii)(I) of the Act.[265]

The respondents argue that these programs are not *de facto* specific because the aquaculture industry is not a predominant user of the programs, nor does it receive a disproportionally large amount of benefit under the programs.[266] However, those were not the bases upon which Commerce reached its specificity determinations with respect to these programs. Rather, under section 771(5A)(D)(iii)(I) of the Act, we found these subsidy programs *de facto* specific because

[257] *See* Respondents' Letter, "Combined Case Brief of Santa Priscila, SONGA, and the Government of Ecuador," dated September 13, 2024 (Respondents' First Case Brief), at 30-31.
[258] *See Preliminary Determination* PDM at 16.
[259] *See* Memorandum, "Allegations of Significant Ministerial Errors in the Preliminary Determination," dated April 22, 2024 (Ministerial Error Memorandum), at 5.
[260] *See* Memorandum, "Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A.," dated August 22, 2024, at 11-12.
[261] *See Preliminary Determination* PDM at 24.
[262] *See Statement of Administrative Action accompanying the Uruguay Round Agreements Act*, H.R. Doc. No. 316, 103d Cong., 2d Session (1994) (SAA), at 929. The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements and this Act...".
[263] *See* SAA at 930.
[264] *See CRS from Korea* IDM at Comment 13.
[265] *See Preliminary Determination* PDM at 14-15 and 22; *see also* First Post-Preliminary Determination at 14.
[266] *See* Respondents' First Case Brief at 31-44.

the actual recipients of the programs were limited in number on an enterprise basis. As set forth under 19 CFR 351.502(a), in determining whether a subsidy is *de facto* specific, Commerce will examine the factors contained in section 771(5A)(D)(iii) of the Act sequentially in order of appearance. If a single factor warrants a finding of specificity, Commerce will not undertake further analysis.

The respondents argue that the Investment Contract, ISD Foreign Loans, COPCI, and Environmental Tax Incentives programs are not *de facto* specific because companies in a number of different industries benefitted from these programs.[267] However, a specificity analysis under section 771(5A)(D)(iii)(I) of the Act does not require the administering authority to make a determination based on the number of industries that use a program, but instead states that a program is specific if the "actual recipients of the subsidy, whether considered on an enterprise *or* industry basis, are limited in number" {emphasis added}. As a result, the fact that companies in different industries may have benefitted from the programs at issue does not negate the fact that, during the POI, a limited number of companies benefitted from these programs.[268] While the specific number of users of these programs are business proprietary in nature, they represent a very small segment of the Ecuadorian economy. *See* Santa Priscila's Final Calculation Memorandum and SONGA's Final Calculation Memorandum for more information. Thus, Commerce properly found these programs to be *de facto* specific because benefits were provided to only a limited number of users on an enterprise basis.

We also disagree with the respondents that the Motor Vehicle Tax program is not *de facto* specific. In the Second Post-Preliminary Memorandum, we determined that Santa Priscila and SONGA received countervailable benefits under the program. Further, in the Second Post-Preliminary Memorandum, we found that the share of the benefits received by Santa Priscila under this program during the POI was many times greater than the average benefit received by other program recipients in Ecuador.[269] As such, we determined that Santa Priscila, and, as facts available, SONGA, received disproportionate benefits under the program and, therefore, that the program was *de facto* specific under section 771(5A)(D)(iii)(III) of the Act.[270] As explained in Comment 16, in the final determination, we find that Santa Priscila and SONGA failed to indicate the actual amount of benefits they received during the POI under the Motor Vehicle Tax program, thereby warranting the application of AFA to find that both respondents received countervailable benefits under section 771(5)(E) of the Act. Because we lack information on the amount of benefits that Santa Priscila and SONGA received during the POI under the program, we are unable to analyze whether the two respondents received disproportionate benefits under the program within the meaning of section 771(5A)(D)(iii)(III) of the Act. Therefore, because Santa Priscila and SONGA failed to report their respective POI subsidy usage, we are unable to conduct an analysis of disproportionality for the purposes of *de facto* specificity under sub-paragraph (III) of the Act. Thus, we find that the application of adverse inferences is warranted when conducting our *de facto* specificity analysis. Accordingly, pursuant to sections 776(a) and (b) of the Act, we find, as AFA, that Santa Priscila and SONGA received tax saving benefits

---

[267] *See* Santa Priscila's Final Calculation Memorandum; *see also* SONGA's Final Calculation Memorandum.
[268] Because discussion of this issue relies heavily on information that is business proprietary in nature, for further discussion of this issue, *see* Santa Priscila's Final Calculation Memorandum.
[269] *See* Second Post-Preliminary Determination at 13
[270] *Id.*

during the POI under the Motor Vehicle Tax program that were disproportionate, and therefore, *de facto* specific under section 771(5A)(D)(iii)(III) of the Act. In light of this finding, parties' comments concerning our *de facto* specificity analysis of the Motor Vehicle Tax program in the Second Post-Preliminary Memorandum are inapplicable.

Additionally, we disagree with the respondents that the ITETD program is not *de facto* specific. While we did not address *de jure* specificity in the Second Post-Preliminary Determination, we clarify in this final determination that this program is not *de jure* specific. However, in our Second Post-Preliminary Determination, we found the program to be *de facto* specific because the recipients are limited in number, in accordance with section 771(5A)(D)(iii)(I) of the Act.[271] The respondents cite the court's ruling in *Mosaic Company v. United States* in arguing that we cannot conclude that the recipients are limited in number since we included only corporate recipients in our calculation of limited usage while the program also benefits individuals.[272] In our initial questionnaire, we requested information from the GOE regarding *de facto* specificity for all programs, including self-reported programs.[273] As the GOE failed to provide this information for nearly all tax programs,[274] we requested this information again in our third post-preliminary supplemental questionnaire.[275] The GOE reported in its response that the ITETD program "applies throughout the entire Ecuadorian economy and to all taxpayers," but failed to provide any evidence to support this claim, clarify what it meant by "all taxpayers," or provide any other kind of information indicating a different number of recipients than the figure reported in its questionnaire response.[276] In the absence of verifiable supporting information regarding the argument submitted by the GOE on this matter, Commerce is continuing to make its determination based on the information currently on the record.

The respondents also argue that the number of industries receiving benefits under the ITETD program is not limited in number, and that the shrimp industry did not receive a disproportionate share of the benefit under the program.[277] As noted above, since Commerce found this program *de facto* specific because there were a limited number of users, we need not conduct an analysis of disproportionate use. Further, as we have also mentioned previously, section 771(5A)(D)(iii)(I) of the Act allows us to find a subsidy program *de facto* specific if the actual recipients of a subsidy, whether on an enterprise or industry basis, are limited in number. The fact that companies in different industries benefitted from the program does not negate the fact that, during the POI, a limited number of companies benefitted from the program.[278] Accordingly, we continue to find that the ITETD Program is *de facto* specific, in accordance with section 771(5A)(D)(iii)(I) of the Act.

---

[271] *See* Second Post-Preliminary Determination at 15.
[272] *See* Respondents' Second Case Brief at 27-29 (citing *Mosaic Co. v. United States*, 659 F. Supp. 3d 1285 at 1314–15 (2023) (*Mosaic*)).
[273] *See* Commerce's Letter, "Countervailing Duty Questionnaire," dated December 12, 2023, at II-6 and II-11.
[274] *See* GOE's Section II IQR at 4 and 5.
[275] *See* GOE 3rd Post-Prelim SQ at 5.
[276] *See* Post-Prelim SQR3 at S5-13.
[277] *See* Respondents' Second Case Brief at 22-24.
[278] Because discussion of this issue relies heavily on information that is business proprietary in nature, for further discussion of this issue, *see* Santa Priscila's Final Calculation Memorandum and SONGA's Final Calculation Memorandum.

Finally, we disagree with the respondents that the Youth Employment Program is not *de facto specific*. While we did not address *de jure* specificity in our Second Post-Preliminary Determination, we clarify in this final determination that we are finding this program is not *de* jure specific. However, in our Second Post-Preliminary Determination, we found the program to be *de facto* specific in accordance with section 771(5A)(D)(iii)(I) of the Act because the users of this program are limited when properly considering the number of enterprises in the Ecuadorian economy.[279] The respondents argue that we instead should have compared the number of companies that benefitted under the program with the number of companies eligible for benefits under the program, once again citing *Mosaic*.[280] We find that the ruling in *Mosaic* does not apply to the instant proceeding.

The court's ruling in *Mosaic* faulted the use of only corporate taxpayers as the denominator in determining specificity because the program was available to both corporations and individuals.[281] This is distinguishable from the Youth Employment Program, which is only available to corporations.[282] Furthermore, the use of all corporate taxpayers as the denominator to analyze the *de facto* specificity of programs available only to corporations has been upheld by the CIT in the *Government of Quebec v. United States*. The CIT held:

> Commerce did not err in using the total corporate tax filers as a comparator in assessing whether the credit recipients are limited in number… The Government of Québec reported that during the 2018 period of investigation, 4,930 of 387,949 corporate entities, roughly 1.27%, received the on-the-job training credit. Commerce thus concluded that the credit recipients were "limited in number" on an "enterprise" basis.[283]

Commerce has dismissed similar arguments on several occasions with respect to, *e.g.*, research and development programs, and we continue to find such arguments unavailing here.[284]

The respondents also argue that the number of industries receiving benefits under the program is not limited in number, and that the shrimp industry did not receive a disproportionate share of the benefit under the program.[285] We have addressed similar arguments with respect to the prior programs, and incorporate those arguments here, while fundamentally noting the fact that in

---

[279] *See* Second Post-Preliminary Determination at 12.
[280] *See* Respondents' Second Case Brief at 26-29.
[281] *See Mosaic*, 659 F.Supp.3d at 1314-15.
[282] *See* Second Post-Preliminary Determination at 12.
[283] *See Government of Quebec v. United States,* 105 F.4th 1359, 1374 – 75 and n.10 (Fed. Cir. 2024).
[284] *See*, *e.g.*, *Certain Softwood Lumber Products From Canada: Final Affirmative Countervailing Duty Determination, and Final Negative Determination of Critical Circumstances*, 82 FR 51814 (November 8, 2017) (*Lumber from Canada*), and accompanying IDM at Comment 64 ("Further, the GOC and GOA's argument that the Department should have limited its denominator to companies engaged in research and development is in effect an assertion that we should gauge whether the actual number of recipients is limited based on only the enterprises that have been targeted by the government as potential subsidy recipients. The respondents have provided no legal or case support for such a departure from the specificity test. As previously stated, to determine whether a program is not specific, the SAA explicitly states that the Department must determine that the subsidy is broadly available and widely used throughout an economy.").
[285] *See* Respondents' Second Case Brief at 29-31.

Barcode:4652034-02 C-331-806 INV - Investigation -

2019 and 2020, respectively, a limited number of companies benefitted from this program.[286] Therefore, for the final determination, we continue to find that the Youth Employment Program is *de facto* specific, in accordance with section 771(5A)(D)(iii)(I) of the Act.

**Comment 11: Commerce Should Revise its Attribution of Benefits Received by Cross-Owned Input Suppliers to Santa Priscila**

*Respondents' Comments:*

The following is the respondents' summary of their arguments. For further details, *see* Respondents' First Case Brief at 44-50.

> {Commerce} should include Tropack's sales values, net of intercompany sales, in the relevant sales denominators used to calculate countervailable benefits for each cross-owned affiliate of Santa Priscila because it is a cross-owned producer of subject merchandise. Because, the record shows that Santa Priscila, Produmar, Egidiosa, and Tropack are cross-owned within the meaning of {19 CFR 351.525(b)(6)(vi)}, {Commerce} should, consistent with {19 CFR 351.525(b)(6)(ii)}, attribute subsidies received by all cross-owned affiliates of Santa Priscila, to the combined sales of Santa Priscila and Tropack, which both produced subject merchandise during the POI, in the forthcoming final determination.
>
> For the same reasons, {Commerce} should, consistent with {19 CFR 351.525(b)(6)(iv)}, attribute subsidies received by Santa Priscila's cross-owned input suppliers (*i.e.,* Produmar and Egidiosa) to the relevant sales of each cross-owned input supplier plus the sales of Santa Priscila and Tropack, less intercompany sales.
>
> Moreover, {Commerce} should apply the same attribution rules to apply the correct sales denominators, as summarized above, if it continues to attribute subsidies to Santa Priscila's non- cross-owned suppliers of raw shrimp pursuant to Section 771B.

*Petitioner's Rebuttal Comments:*

The following is the Petitioner's summary of their rebuttal comments. For further details, *see* Petitioner's Rebuttal Brief at 15-17.

> Commerce used the correct sales denominators to calculate subsidy rates for Santa Priscila, Produmar , and Tropack. As a preliminary matter, respondents ignore the fact that Section 771B of the Trade Act of 1930, as amended, {section 771B of the Act}, is silent on the methods that Commerce may use to attribute such fresh product subsidies to processed product sales, granting Commerce wide discretion. In addition, respondents seek to impermissibly limit this discretion by improperly

[286] Because discussion of this issue relies heavily on information that is business proprietary in nature, for further discussion of this issue, *see* Santa Priscila's Final Calculation Memorandum.



Filed By: Zachary Shaykin, Filed Date: 10/22/24 2:32 PM, Submission Status: Approved

> conflating Commerce's rules regarding the attribution of subsidies provided to producers of the subject merchandise under {19 CFR 351.525(b)(6)(ii)} and cross-owned input suppliers under {19 CFR 351.525(b)(6)(iv)}.
>
> Commerce properly included only the sales of Santa Priscila and Tropack in the denominator for programs attributed under the first provision, and only the sales of Produmar and Santa Priscila in the denominator for sales attributed under the second provision. There is no basis to include Produmar's sales in the denominator for programs attributed under the first provision that applies to cross-owned producers of the subject merchandise, as Produmar does not produce the subject merchandise. Similarly, there is no basis to include Tropack's sales in the denominator for programs attributed under the cross-owned input supplier rule, as Produmar supplied inputs to Santa Priscila, not Tropack. Commerce's attribution methodology for benefits under Section 771B mirrored its attribution methodology for direct subsidies, and it was thus supported by the statute and regulations and eminently reasonable. Commerce should maintain this methodology in the final results.

**Commerce's Position:** We agree with the mandatory respondents that Commerce should have included the sales of Tropack, net of inter-company sales, when calculating the net subsidy rate for benefits received by Santa Priscila's selected cross-owned input suppliers, *i.e.*, Produmar and Egidiosa.

We disagree with the petitioner that the attribution regulations under 19 CFR 351.525(b)(6)(ii) and (iv) for cross-owned producers of the same merchandise and cross-owned input suppliers should separately be applied with regards to benefits received by Tropack, Produmar, and Egidiosa.[287] According to the petitioner, the attribution of subsidies of cross-owned input suppliers under 19 CFR 351.525(b)(6)(iv) only applies to the direct supplier of a *single* downstream producer, and only applies to the sales of the downstream producer that the cross-owned input supplier actually provided inputs to.[288] That is, the petitioner claims that for cross-owned entities that are composed of multiple producers of subject merchandise and multiple input suppliers, and record evidence only indicates that the cross-owned input suppliers are the suppliers of only one of the cross-owned producers of subject merchandise, that Commerce may only attribute benefits received by a cross-owned input supplier to the one producer of subject merchandise that it supplied.

In making this argument, the petitioner cites to 19 CFR 351.525(b)(6)(iv), which states:

> If there is cross-ownership between an input supplier and a downstream producer, and production of the input product is primarily dedicated to production of the downstream product, the Secretary will attribute subsidies received by the input producer to the combined sales of the input and downstream products produced by both corporation.[289]

[287] *See* Petitioner's First Rebuttal Brief at 15 through 17.
[288] *Id.* at 16
[289] *See* 19 CFR 351.525(b)(iv).

The petitioner appears to suggest that this regulation explicitly limits the attribution of subsidies received by one input supplier to one downstream producer, *i.e.*, the producer which the input supplier actually supplies. However, there is no such restriction in the plain language of 19 CFR 351.525(b)(6)(iv) that establishes this limitation. Furthermore, the petitioner cites to no relevant cases, litigation, or proceedings in which the plain language of 19 CFR 351.525(b)(6)(iv) was interpreted in such a way as to insinuate that only the single direct downstream producer of an input supplier may be attributed the benefits received by an input supplier in instances in which there are multiple, cross-owned producers of subject merchandise.

The *CVD Preamble* makes clear that Commerce's "intent is to apply these {attribution} rules as harmoniously as possible, recognizing that unique and unforeseen factual situations may make complete harmony among these rules impossible."[290] The preamble goes on to state that "{Commerce} intend{s} to apply paragraphs (b)(2) through (b)(7) consistently with each other, to the extent practicable."[291] This is confirmed by Commerce's approach in prior cases with analogous facts. Specifically, in *TFE from China*, Commerce stated the following:

> However, with regard to the attribution rule under 19 CFR 351.525(b)(6)(ii), that rule states that if two (or more) corporations with cross-ownership produce the subject merchandise, the Department will attribute subsidies received by either or both corporations to the products produced by both corporations. Because Sinochem Taicang and Sinochem Xi'an are cross-owned producers of the subject merchandise, we find it appropriate to apply the rule under 19 CFR 351.525(b)(6)(ii) in attributing the benefit from any subsidy going to either or both of these entities. Consistent with this approach, any benefit being attributed through an input supplier to either company under 19 CFR 351.525(b)(6)(iv) will also be attributed to the other."[292]

In other words, in instances where there is more than one cross-owned producer of subject merchandise, the attribution of subsidies to one is also attributed to the other. This is consistent with the principle that Commerce treats responding cross-owned companies as a single entity.[293] As such, we calculate a single CVD margin that applies to all cross-owned subject merchandise producers that are a part of that entity.[294]

The petitioner elicits the plain language of 19 CFR 351.525(b)(6)(ii) regarding cross-owned producers of the same merchandise to argue that, because Produmar is not a cross-owned

---

[290] *See CVD Preamble*, 63 FR at 65400.
[291] *Id.*
[292] *See Countervailing Duty Investigation of 1,1,1,2 Tetrafluoroethane from the People's Republic of China: Final Affirmative Countervailing Duty Determination*, 79 FR 62594 (October 20, 2014), and accompanying IDM at Comment 17.
[293] *See, e.g.*, *Final Affirmative Countervailing Duty Determination and Final Negative Critical Circumstances Determination: Certain Lined Paper Products from Indonesia*, 71 FR 47174 (August 16, 2006) (*Lined Paper from Indonesia*), and accompanying IDM at 26.
[294] *See, e.g.*, *Certain Seamless Carbon and Alloy Steel Standard, Line, and Pressure Pipe from the People's Republic of China: Final Affirmative Countervailing Duty Determination, Final Affirmative Critical Circumstances Determination*, 75 FR 57444, 57448 (September 21, 20210) (*Standard Line Pipe from China*), and accompanying IDM at Comment 21.

producer of subject merchandise, that it is only proper to combine the sales of Produmar with those of its downstream producer, *i.e.*, Santa Priscila. However, this appears to be a misunderstanding and incorrect assumption that attributing the benefits received by Produmar or Egidiosa to the sales of Tropack would be akin to treating Produmar or Egidiosa as a producer of subject merchandise pursuant to 19 CFR 351.525(b)(6)(ii). However, as noted above, that is not the case. Rather, the attribution of benefits received by Produmar to the combined sales of Produmar, Santa Priscila, and Tropack, net of inter-company sales, and the attribution of benefits received by Egidiosa to the combined sales of Egidiosa, Santa Priscila, and Tropack, net of intercompany sales is an appropriate way of applying the attribution rules consistently with each other.

Therefore, for the purposes of this final determination, and consistent with subparagraphs (b)(6)(ii) and (b)(6)(iv), we are attributing subsidies received by Produmar to the combined sales of the input and downstream products, including those of Santa Priscila and Tropack, and are attributing any subsidies received by Egidiosa to the combined sales of the input and downstream products, including those of Santa Priscila and Tropack.[295]

**Comment 12: Commerce Should Recalculate Its Countervailable Subsidy Calculation for SONGA under the Refund of Currency Outflow Tax (ISD) On Inputs Program**

*Respondents' Comments:*

The following is the respondents' summary of their arguments. For further details, *see* Respondents' First Case Brief at 50-52.

> Without explanation, {Commerce} did not divide the benefit amount reported by SONGA in its calculation of SONGA's *ad valorem* subsidy rate in the Preliminary Determination for the ISD Refund on Purchase of Inputs program.[296]
>
> Therefore, in the forthcoming Final Determination, {Commerce} must correct the benefit amount attributed to SONGA to reflect the value reported in SONGA's responses, as well as the *ad valorem* subsidy rate calculated for SONGA. Specifically, {Commerce} should recalculate SONGA's *ad valorem* subsidy rate by dividing the benefit reported by SONGA,[297] by SONGA's total sales value during the POI.

*Petitioner's Rebuttal Comments:*

The following is the Petitioner's summary of their rebuttal comments. For further details, *see* Petitioner's Rebuttal Brief at 18-23.

[295] *See* Santa Priscila's Final Calculation Memorandum.
[296] *See* Memorandum, "Preliminary Determination Calculations for Sociedad Nacional de Galapagos C.A.," dated March 25, 2024, at 3 and Attachment II ("ISD Refund" tab).
[297] *See* SONGA's Letter, "SONGA's Section III Questionnaire Response," dated February 12, 2024, at Exhibit 3.

> Commerce does not need to consider respondents' arguments regarding an alleged error in the calculations for SONGA's rate under the ISD on Purchase of Imported Assets and Raw Materials program, as Commerce should apply facts available with an adverse inference to countervail this program, as detailed in ASPA's case brief. Respondents' arguments that Commerce should accept the "minor" corrections SONGA attempted to provide for this program are unavailing.[298] The application of adverse facts available is warranted as the new information SONGA sought to provide was untimely, and the failure to provide that information impeded Commerce's investigation and displayed a failure of SONGA to act to the best of its ability. Moreover, to the extent that respondents now attempt to add that rejected information to the record in their case brief, Commerce must reject that untimely filed new factual information. Finally, Commerce was fully within its rights to reject the attempted correction, regardless of the magnitude of the impact it may have on SONGA's subsidy rate, as the effort that would have been required to verify the late information on the spot at verification was not "minor."

**Commerce's Position:** We agree with the respondents that for the final determination, Commerce should recalculate the subsidy rate for SONGA under the Refund of ISD on Purchase of Inputs Program to reflect the benefit reported by SONGA.

Commerce notes that in the underlying investigation there are two programs which the petitioner appears to be conflating. The first program, as described in the *Preliminary Determination*,[299] is called the Refund of ISD on Purchase of Inputs. The second program, as described in the *Preliminary Determination*,[300] is called the Investment Contract ISD Exemption for Imported Materials. The respondents are arguing that Commerce should adjust the deduction under the Refund of ISD on Purchase of Inputs program. However, the petitioner's arguments appear to refer to the Investment Contract ISD Exemption for Imported Materials program, which is addressed in comment 5 of this memorandum, and for which Commerce is utilizing AFA in determining the benefit for this final determination.

For the final determination, we reviewed our calculation of SONGA's Refund of ISD on Purchase of Inputs program and agree that we inadvertently applied the wrong claimed deduction. Specifically, as explained by the GOE,[301] the deduction under the Refund of ISD on Purchase of Inputs program is claimed on line 862 of a company's tax return filing, and, we inadvertently applied the wrong figure from the tax return in our subsidy benefit calculation. Therefore, for the final determination, we have recalculated SONGA's subsidy benefit for the Refund of ISD on Purchase of Inputs program using the correct line item from its tax return and calculated a net countervailable subsidy rate of 0.03 percent *ad valorem* for SONGA.[302]

**Comment 13: Section 771B Is Not Supported by the Record**

---

[298] Please note that ASPA addresses together in Section V of this brief the arguments that respondents made about this program in Sections IV and VII of its case brief.
[299] *See Preliminary Determination* PDM at 17-19.
[300] *Id*. at 26.
[301] *See* GOE's Section II IQR at EXP-16.
[302] *See* SONGA Final Calculation Memorandum.

*Respondents' Comments:*

> Respondents did not provide the requested executive summary of 450 words or less regarding this argument. The provided summary of 1572 words is too lengthy to include in this document. Respondents' argument may be found at pages 52 to 79 of Respondents' Comments.

*Respondents' Additional Comments:*

The following is the respondents' summary of their arguments. For further details, *see* Respondents' Second Case Brief at 42-45.

> {Commerce} incorrectly attributed benefits received by Santa Priscila pursuant to the Youth Employment, Motor Vehicle Tax program, and ITETD programs to its non-cross-owned raw shrimp suppliers pursuant to {section 771B of the Act}.[303] Ecuadorian Respondents incorporate by reference arguments made in their case brief that the record does not justify {Commerce}'s preliminary finding that the processing of raw shrimp into frozen shrimp adds minimal value to fresh raw shrimp and that {Commerce} lacked any legal basis to attribute benefits to Santa Priscila's and SONGA's non-cross-owned suppliers of raw shrimp pursuant to {section 771B of the Act}. Those arguments apply with equal force to the three programs addressed in {Commerce}'s 2nd Post-Prelim. Det.
>
> For the same reasons, if {Commerce} continues to find the Motor Vehicle Tax program, ITETD, and Youth Employment programs *de facto* specific, then {Commerce} should not attribute benefits received by Santa Priscila, SONGA, and Santa Priscila's and SONGA's respective cross-owned affiliated suppliers of raw shrimp, to their respective non-cross-owned suppliers of raw shrimp pursuant to {section 771B of the Act}. Likewise, if {Commerce} continues to find the Motor Vehicle Tax programprogram to be countervailable—and it accepts Produmar's, SONGA's, and Naturisa's minor corrections in connection with the same program or calculates benefits based on those reported by the GOE—{Commerce} should not attribute benefits received by Produmar and Naturisa pursuant to {section 771B of the Act}.
>
> {Commerce} should not attribute benefits received by SONGA to SONGA's non-cross-owned suppliers of raw shrimp because SONGA only engaged in processing operations during the POI.[304] Lastly, if {Commerce} continues to attribute subsidies received under the Youth Employment program to Santa Priscila's non-cross-owned suppliers of raw shrimp pursuant to {section 771B of the Act}, it should be sure to continue to exclude the benefits received by Tropack in its calculation in the forthcoming Final Determination.

---

[303] *See* Second Post-Preliminary Determination at 13–15.
[304] *See, e.g.*, *Shrimp from China* IDM at Comment 4.

*Petitioner's Rebuttal Comments:*

The following is the Petitioner's summary of their rebuttal comments. For further details, *see* Petitioner's Rebuttal Brief at 23-34.

> Commerce should continue to apply Section 771B to countervail subsidies to producers of fresh shrimp and attribute them to sales of frozen shrimp in the final determination. In the *Preliminary Determination*, Commerce correctly determined that both prongs of Section 771B are met in this investigation, as: (1) demand for fresh shrimp is substantially dependent on the demand for frozen shrimp; and (2) the processing of the fresh shrimp into frozen shrimp adds limited value and the essential character of the raw product is not changed. This finding is consistent with Commerce's determinations in previous countervailing duty investigations, both on shrimp and other products, and with determinations of the U.S. International Trade Commission ("ITC") regarding fresh and frozen shrimp. The data that respondents offer in an attempt to undermine these findings is flawed, yet it only further confirms that the second prong of the test is met.
>
> In addition, Commerce properly attributed subsidies received by investigated farms to pounds of shrimp supplied by unaffiliated farms, and it should expand this calculation to include shrimp provided by affiliated farms that were not individually investigated. The statute is silent on how Commerce should attribute such subsidies under Section 771B, and Commerce's methodology is reasonable and consistent with its practice in prior proceedings. Thus, Commerce should reject respondents' arguments and apportion a per-pound amount of the subsidy benefits received by investigated shrimp farms to pounds purchased from unaffiliated farms, as well as uninvestigated, affiliated farms. Commerce should deny respondents' requests to eliminate or alter the apportionment of benefits under Section 771B for export programs and the Municipal Total Assets Exemption program. With respect to the Municipal program, if Commerce does exclude certain amounts from its apportionment of these subsidies, it should be based on the actual pounds supplied by suppliers located in different municipalities, not a ratio based on the number of suppliers located in different municipalities. Commerce should also reject respondents' alternative attribution methodologies, as they have no legal basis or precedent in Commerce's practice, and they run contrary to the well-established practice of adding the subsidy benefits that are received directly by mandatory respondents with those received by their cross-owned input suppliers.

*Petitioner's Additional Rebuttal Comments:*

The following is the Petitioner's summary of their rebuttal comments. For further details, see Petitioner's Rebuttal Brief at 6.

> Respondents argue that Commerce should not attribute subsidies to fresh shrimp under Section 771B. ASPA already fully addressed those arguments in its original rebuttal brief, and we hereby incorporate those arguments by reference.

**Commerce's Position:** Commerce disagrees with the respondents and continues to find that section 771B of the Act is applicable in this investigation.

As stated above, Commerce found that it was appropriate to deem subsidies provided with respect to raw shrimp to be provided with respect to processed shrimp in this investigation because record evidence indicates that: (1) the demand for raw shrimp is "substantially dependent" on the demand for frozen shrimp pursuant to section 771B(1) of the Act; and (2) the processing operation adds only limited value pursuant to section 771B(2) of the Act.[305] Therefore, because both "prongs" of section 771B were satisfied based on the evidence available, Commerce determined to calculate subsidies attributable to non-cross-owned raw shrimp suppliers in accordance with section 771B of the Act. As stated above, no parties argued that section 771B(1) of the Act was not satisfied based on evidence in this investigation.

Commerce will deem section 771B(2) of the Act to be satisfied where "the processing operation adds only limited value to the raw commodity." In the *Preliminary Determination*, Commerce determined that this prong of the statute was satisfied because the *ITC Preliminary Report* indicated that "less than 30 percent" of the value of processed shrimp is added by the processing operation on raw shrimp and that the essential character of frozen shrimp is not substantially different than that of fresh shrimp, except for a longer shelf life for frozen shrimp.[306] The respondents argue that this prong of the statute is not satisfied because record evidence indicates that the value added is more than "limited."

We disagree with the respondents that the value added to frozen shrimp by shrimp processing is more than "limited." First, respondents argue that the processing of raw shrimp into frozen shrimp adds more than "minimal value" to fresh raw shrimp based on a comparison of the mandatory respondents' reported purchase price of raw shrimp to the sales prices of processed, frozen shrimp, which the respondents indicate is "significant."[307] In order to determine the value added, the respondents subtracted the average purchase price of raw shrimp for Santa Priscila and SONGA from each companies' average ex-factory sales prices for frozen shrimp for periods overlapping with the POI, and then divided the resulting difference by the average purchase price of raw shrimp for Santa Priscila and SONGA.[308]

As an initial matter, we note certain flaws exist with respect to the respondents' provided data and arguments on this issue. Specifically, the data cited by the respondents looks merely at the difference between the purchase price of raw shrimp and the final sales price of the frozen shrimp, with everything in between essentially labeled as "value added" of the "processing operation." However, as the petitioner notes, these "value added" figures represent what "processing (along with selling, general, and administrative expenses and profit)" account for. Similarly, elsewhere in its case brief the respondents argue that "{a}ddition of raw materials,

[305] *See Preliminary Determination* PDM at 10 (citing *ITC Preliminary Report* at 15 and 16).
[306] *Id.* (citing *ITC Preliminary Report* at 16).
[307] *See* Respondents' First Case Brief at 53 and 54; GOE's Section 771B QR; *see also* Santa Priscila's Section 771B QR; and SONGA's Section 771B QR; *see also* Santa Priscila's Final Calculation Memorandum; SONGA's Final Calculation Memorandum.
[308] *See* Respondents' First Case Brief at 53 and 54; *see also* Santa Priscila's Section 771B QR at 3 through 4 and Exhibits 1 through 4; and SONGA's Section 771B QR at 3 and 4 and Exhibits 1 through 4.

processing costs, selling, general, and administrative expense, and profit… adds more than 'limited value' as that term is used in Section 771B of the Act." However, section 771B(2) of the Act requires that "the *processing operation* adds only limited value to the raw commodity" {emphasis added}. Commerce has historically excluded such extraneous items as packaging costs from its analysis under section 771B(2) of the Act, which the CIT has held is consistent with prior practice and Congress's intent.[309] As a result, we note that the simple analysis performed by the respondents, which appears to include such extraneous items, is erroneous. Nevertheless, despite this data constituting rather conservative (in favor of the respondents' arguments) figures, information on the record supports Commerce's preliminary finding that section 771B(2) of the Act is satisfied, which we address below.

Commerce disagrees that the framework Santa Priscila and SONGA utilized in its calculation of the value added of the processing operations is necessarily accurate. In *Olives from Spain*,[310] Commerce considered the value that various components accounted for of the final product. In accordance with this framework from *Olives from Spain*, Commerce notes that, even relying on the respondents' data, the raw shrimp input accounts for a significant proportion of the value of the final product, whereas the remainder is limited in comparison and such figures are largely consistent with the findings of the *ITC Preliminary Determination* that Commerce cited in its affirmative preliminary finding. We also reiterate here that both sources note post-raw product value added figures that include "additional raw materials, processing costs, selling, general and administrative expenses, and profit." Isolating the processing operation would likely yield figures of a more "limited" nature, and even these conservative figures are consistent with past Commerce findings of "limited value."[311] Further, the respondents point to cost data that purport to show that the "{a}ddition of raw materials, processing costs, selling, general, and administrative expenses, and profit" add more than limited value as stated in section 771B(2) of the Act.[312] However, these data appear to actually undercut their argument, as cost data indicate that the raw shrimp accounts for a significant portion of the cost of production.[313] Again, these data continue to support a finding that the processing operation adds only limited value, despite the data being overly broad and failing to isolate processing costs.

Second, we disagree with the respondents that involved, capital-intensive facilities and investments made by Santa Priscila to its processing operations indicates that processing adds more than limited value.[314] Specifically, the respondents argue that Santa Priscila's shrimp undergoes processing that significantly changes the nature of the shrimp based on the reported percentages of Santa Priscila's shrimp products sold in the United States that undergo peeling, deveining, cooking, and removing the tail.[315] The respondents also note the significant capital investments made by Santa Priscila and SONGA in their processing operations and the

[309] *See Olives from Spain* IDM at Comment 1 (affirmed in *Aceitunas de* , 429 F. Supp. 3d 1325, 1347-48 (CIT 2020)).
[310] *See Olives from Spain Preliminary Determination* PDM*,* unchanged in *Olives From Spain* IDM.
[311] *See*, *e.g.*, *Shrimp from China* IDM at Comment 7 (noting that the respondent's yield ratio "result{ed} in a rate that is on par with the 20-30 percent ratios examined in the *Rice from Thailand 1986 review* and *Pork from Canada.*").
[312] *See* Respondents' First Case Brief at 57 and 58.
[313] *See* Santa Priscila's Final Calculation Memorandum; *see also* SONGA's Final Calculation Memorandum.
[314] *Id.* at 55 through 57.
[315] *Id.* at 55.

"sophisticated" machinery and processing facilities of Santa Priscila and SONGA as evidence that processing of frozen shrimp results in significant value added to the raw shrimp input.[316] Commerce disagrees that capital investments and the "sophisticated" nature of Santa Priscila's and SONGA's shrimp processing facilities necessarily speaks to the value added by the mandatory respondents' processing operations, because the respondents do not establish a clear, quantitative link between their sales practices, shrimp processing capital investments, the steps made in processing shrimp, and the nature of their processing facilities to the value of raw shrimp inputs and the final, processed shrimp. Lacking this linkage, we find such information to be circumstantial at best, and does not speak to the actual value of raw shrimp and frozen shrimp or contradict findings from the *ITC Preliminary Report* that processing of fresh shrimp into frozen shrimp do not "appear to have different product characteristics, beyond longer shelf lives."[317]

Finally, we disagree with the respondents' argument that the essential character of raw shrimp is changed. Commerce has, in past cases, also considered whether the processing operation changed the essential character of the raw product.[318] The respondents argue that the essential character of frozen shrimp is distinct from that of raw shrimp because raw shrimp: (1) is not deheaded, sorted, graded, or packaged; and (2) unlike frozen raw shrimp that is shipped, the method of transporting raw shrimp renders them "not suitable for sale for human consumption," and raw shrimp cannot be transported in significant volumes to export markets without processing and freezing.[319] As we have addressed already, such considerations of packaging and transportation are not typically considered by Commerce in its analysis of the level of value added by processing pursuant to section 771B(2) of the Act.[320] Furthermore, we find unavailing the respondents' argument that processing inedible raw shrimp into an edible frozen shrimp changes the essential character of the product. This argument was addressed, and dismissed, in prior proceedings. Specifically, in *Olives from Spain,* Commerce stated the following:

> We are also not persuaded by the respondents' claim that rendering an olive edible changes its essential character and continue to find that the processing operation does not change the essential character of the olive. As stated in our *Preliminary Determination*, Commerce has found the second prong of section 771B of the Act to be met where processing operations do not change the "essential character" of the raw product. In this case, while processing may remove bitterness and add flavor and tenderness, it does not change the essence of the product – they are olives when they are raw and olives when they are processed.[321]

This analysis was affirmed by the CIT, which stated in its ruling that:

> The court finds that this argument is without merit. As discussed above, Congress relied on Commerce's *Pork from Canada 1985* decision in enacting {section 771B

[316] *Id.* at 55 through 57.
[317] *See ITC Preliminary Report* at 16.
[318] *See*, *e.g.*, *Shrimp from China* IDM at Comment 6.
[319] *See* Respondents' First Case Brief at 58.
[320] *See, e.g.*, *Aceitunas de Mesa*, 429 F.Supp.3d 1325, 1347-48 (CIT 2020); *see also Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 102 F.4th 1252 (Federal Circuit 2024) (*ASEMESA*).
[321] *See Olives from Spain* IDM at Comment 1.

> of the Act}. There, Congress adopted Commerce's limited value analysis. A hog is not edible until it becomes pork, yet Congress believed such processing only added limited value to the raw product. In *Pork from Canada 1985*, Commerce found that the processing of the subject merchandise, fresh, chilled pork, which consisted of "immobilizing, stunning, dehairing, eviscerating, and splitting," constituted only ten percent of the value added to the final product. As such, Commerce determined that processing added only limited value to latter stage product. Although the process in Pork from Canada 1985 is not identical to the process of producing ripe olives from raw olives, the number of steps and value added by these operations is comparable. Since Congress relied on this CVD determination in enacting {section 771B of the Act}, the determinations indicating Commerce's prior analysis of processing operations for the purposes of {section 771B(2) of the Act} are persuasive. Given this legislative history, Commerce's finding that the processing operations of ripe olives added only limited value to the raw product is in accordance with law.[322]

Similarly, here, we find that such processing steps as deheading, sorting, grading, and freezing, are comparable to the processing steps outlined in prior Commerce cases where section 771B(2) was found to be satisfied. Finally, we note the purpose of this provision, as expressed in the legislative history, is to prevent a foreign nation from circumventing a CVD order on an agricultural product "merely by doing some minor processing of the agricultural product before it is exported to the United States." Specifically, Senator Baucus noted that "{h}ogs and pork are both the same product" and freezing raspberries results in the "same raspberries – they're just frozen." Similarly, a shrimp is a shrimp when it is raw, and when it is frozen. The totality of record evidence, including quantitative data from the respondents and included in the *ITC Preliminary Determination*, along with other qualitative aspects discussed above, support finding that section 771B(2) is satisfied in this investigation.

The respondents claim that it is unreasonable for Commerce to assume that the experience of cross-owned suppliers of large shrimp processors is the same for each non-cross-owned supplier and that Commerce did not solicit responses from and did not justify why it did not examine at least one unaffiliated supplier. First, we note that the respondents themselves asked that Commerce "excuse {the respondents} from providing complete Section III responses on behalf of certain suppliers of raw shrimp identified as cross-owned," claiming that "it is not feasible for Santa Priscila or SONGA to respond on behalf of all suppliers of inputs to shrimp farms and all suppliers raw shrimp with which they are potentially cross-owned within the limited timeframe allotted to respond to Section III of {Commerce's} questionnaire."[323] It is odd for the respondents to first request a limited selection and review of their shrimp suppliers and then, when it does not favor the respondents, claim that Commerce did not thoroughly review their suppliers. Fundamentally, given the numerous unaffiliated sources from which the respondents source their raw shrimp, in addition to the cross-owned input suppliers, we determined that it would be impracticable to request information from every supplier of raw shrimp to the respondents. However, under section 771B of the Act Commerce must still determine the level

[322] *See ASEMESA* (internal citations omitted).
[323] *See* Respondents' Letter, "Request for Clarification of Section III Reporting Obligations and to Exclude Certain Companies from Reporting," dated January 9, 2024, at 2.

of subsidization provided with respect to the raw product. As a result, Commerce reasonably determined to use certain cross-owned input suppliers of Santa Priscila and SONGA, as well as Santa Priscila's own in-house farming operations, as a proxy for the purposes of determining the level of subsidization provided to the unaffiliated suppliers of fresh shrimp. We note this is consistent with past Commerce practice.[324]

While the respondents also claim that Commerce should not attribute export programs to raw shrimp suppliers since shrimp cannot be transported in significant volumes for export (or to local) markets without prior processing and immediate freezing due to perishability, Commerce disagrees. First, Commerce notes that the underlying narrative is not supported by any studies, export data or other facts which may substantiate the GOE's claim about significant exports. The GOE simply states, without support, that unprocessed shrimp cannot be transported in significant volumes for export. However, assuming *arguendo* that the GOE's claim is true, there is no record evidence provided by the GOE or the mandatory respondents that the non-cross-owned shrimp suppliers could not also be exporters of processed shrimp. In fact, Santa Priscila is vertically integrated and both a shrimp farmer and processor (and exporter) of shrimp.[325] Therefore, record evidence suggests that there could in fact also be non-cross-owned shrimp suppliers that both farm, process, and export processed shrimp, which would make them eligible for export programs. Second, we note that the Export Tax Incentives for Sustained/Increased Employment is also applicable to micro- or small- businesses, not just habitual exporters. While the respondents benefitted from the program as a habitual exporter, the underlying law permits companies other than habitual exporters to claim this benefit and, therefore, even if the shrimp suppliers are not habitual exporters, they may still benefit from this program.

The respondents also claim that Commerce should adjust its attribution of the Municipal Assets Tax Exemption program under section 771B of the Act for Santa Priscila's and SONGA's non-cross-owned shrimp suppliers to only shrimp farmers with operations located in the municipalities of Guayaquil and Duran. Commerce agrees that the Municipal Assets Tax Exemption program is limited to firms in Guayaquil and Duran and, thus, unaffiliated suppliers not located in those areas and therefore not eligible for this program should not be included in our calculations pursuant to section 771B of the Act. However, while the respondents claim that a certain percentage of non-cross-owned shrimp suppliers during the POI were located in the municipalities of Guayaquil or Duran, in certain instances the record lacks explicit data regarding the provinces of each supplier and in some instances the respondents failed to provide an analysis about which suppliers are located in the Guayaquil and Duran provinces. In fact, with respect to certain suppliers the cited data only lists the addresses and leaves some ambiguity as to which province a particular shrimp farmer is located.[326] Therefore, where Commerce has the required information (*i.e.*, city and province) to determine the municipalities of the non-cross-owned farmers at issue, we have made an adjustment to the calculations to exclude those

[324] *See*, *e.g.*, *Olives from Spain* IDM (utilizing a weighted-average per kilogram benefit using the information provided by all of the *reporting* olive growers); *see also Shrimp from China* IDM at 7 ("the Department selected Guolian's in-house shrimp supplier to serve as a proxy for purposes of determining the level of subsidization provided to Guolian's remaining unaffiliated suppliers of fresh shrimp.").
[325] *See* Santa Priscila's Letter, "Santa Priscila's Section III Questionnaire Response," dated February 12, 2024, at III-6.
[326] *See* SONGA's Letter, "Sources of Raw Shrimp Questionnaire Response," dated January 3, 2024, at Exhibit SRS-2.

volumes of shrimp supplied for that program calculation. Santa Priscila provided complete information in this respect.[327] However, where the unaffiliated shrimp supplier's address, in particular the municipality in which they are located, is ambiguous, Commerce has not made any such adjustment. This was the case for certain of SONGA's unaffiliated shrimp suppliers for which the data provided were incomplete.

The respondents claim that Commerce incorrectly calculated the subsidy rate for Santa Priscila's non-cross-owned suppliers of raw shrimp for programs in which both Santa Priscila and Produmar reported receiving benefits. The respondents claim that Commerce's calculation is mathematically inaccurate by assuming that each non-cross-owned shrimp farmer received benefits for which Santa Priscila and Produmar applied and received separate benefits, and cited *Shrimp from China*.[328] Nevertheless, Commerce agrees that it should calculate a per kilogram subsidy rate by dividing the combined benefit that Santa Priscila and Produmar received under a single program by the combined quantity of the responding entity.

However, in instances in which Egidiosa received a benefit in addition to Santa Priscila or another of its cross-owned affiliates, Commerce finds that it is inappropriate to combine Egidiosa's benefit with the benefits received by the other cross-owned entities for the purposes of determining the level of subsidization to Santa Priscila's non-cross-owned shrimp suppliers pursuant to section 771B of the Act. Specifically, Santa Priscila reported that Egidiosa is a shrimp hatchery, *i.e.*, it produces shrimp larvae that are sold to shrimp farms.[329] For our calculations, we have calculated the level of subsidization to Santa Priscila's non-cross-owned shrimp suppliers by dividing the benefits calculated for each respondent by the volume of shrimp produced. Therefore, because Egidiosa does not produce raw shrimp, we determined not to combine the volume of shrimp larvae produced by Egidiosa to the volume of raw shrimp produced by Santa Priscila and Produmar, because doing so would result in a quantity that is comprised of two different products; *i.e.*, shrimp larvae and raw shrimp.[330]

Lastly, the respondents argue that Commerce should not attribute benefits received by Santa Priscila pursuant to its investment contract to non-cross-owned raw shrimp suppliers because its investment contract is contingent on investments for processing operations and not shrimp farming operations. We disagree. As noted above, given that Santa Priscila has in-house farming operations and is a processor, it is also possible that an unaffiliated shrimp supplier could also be a shrimp processor and have investment contracts according to processing operations. The respondents have provided insufficient evidence to indicate otherwise and in the face of such ambiguity, Commerce is electing not to make such adjustments. However, even if this were not the case, we note that the investment contracts program is available to more than shrimp processors and unaffiliated shrimp suppliers could also sign an investment contract to gain access to the same or similar incentives. Therefore, Commerce correctly included Santa

[327] *See* Santa Priscila's Letter, "Sources of Raw Shrimp Questionnaire Response," dated January 3, 2024, at Exhibit SRS-1.
[328] *See* Respondents' First Case Brief at 74; *see also Shrimp from China* IDM at comment 4.
[329] *See* Santa Priscila's Affiliation IQR at Exhibit AFF-1; *see also* Santa Priscila's Letter, "Frozen Warmwater Shrimp from Ecuador – Section II "Affiliated Companies" Questionnaire Response," dated February 9, 2024, at EG-4.
[330] *See* Santa Priscila's Final Calculation Memorandum.

Priscila's benefits under the investment contract program in determining the level of subsidization to its unaffiliated shrimp suppliers.[331]

**Comment 14: Commerce Should Adjust the Cash Deposit (CD) Rates**

*Respondents' Comments:*

The following is the respondents' summary of their arguments. For further details, *see* Respondents' First Case Brief at 79-83.

> If {Commerce} continues to calculate an above-*de minimis* total countervailable subsidy rate for Santa Priscila in the final determination, {Commerce} should nevertheless adjust the cash deposit rate calculated for Santa Priscila to remove all calculated benefits received by Santa Priscila and Produmar under the Export Tax Incentives and Hiring of Additional Personnel – Net Increase in Employment program, respectively, to reflect the fact that both programs were terminated subsequent to the POI, but before the *Preliminary Determination* in accordance with {19 CFR 351.526(a)}.
>
> The Export Tax Incentives program was repealed in November 2021 by Article 44 of the Organic Law for the Economic Development and Fiscal Sustainability after the COVID-19 Pandemic.[332] Likewise, the Hiring of Additional Personnel – Net Increase in Employment program was repealed in November 2021 by Article 39 of the Organic Law for the Economic Development and Fiscal Sustainability after the COVID-19 Pandemic.[333]
>
> The changes incident to the repeal of these two programs are clearly measurable since the program-wide changes resulted in the provisions being inapplicable to all taxpayers.

*Petitioner's Rebuttal Comments:*

The following is the Petitioner's summary of their rebuttal comments. For further details, *see* Petitioner's Rebuttal Brief at 35-37.

> Commerce should not adjust the cash deposits to exclude subsidy rates calculated for the Export Tax Incentives program and Hiring of Additional Personnel program. Neither of these programs were terminated after the POI, as required under Commerce's regulations, and both provided residual benefits subsequent to their supposed termination. Thus, exclusion from the cash deposit rate is not permitted under {19 CFR 351.526}. In addition, the record fails to support respondents' claim that the Hiring of Additional Personnel program in fact terminated in November of 2021. Finally, even if Commerce finds there was a change to this

[331] *Id.*
[332] *See* GOE's Section II IQR at EXP-21 and Exhibit EXPORT-1(f).
[333] *See* GOE's Section II SQR at Exhibit S-75; *see also* GOE's Section II IQR at EXPORT-1(f).

program, it is not a "program-wide" change pursuant to {19 CFR 351.526(b)(1)}, because the change is limited to firms that are not in depressed or border areas.

**Commerce's Position:** We disagree with Santa Priscila that its cash deposit rate should be adjusted to remove the calculated benefits received under the Export Incentives and Hiring of Additional Personnel – Net Increase in Employment programs because the programs have been terminated.[334] Under 19 CFR 351.526(a), Commerce may take account of a program-wide change in setting the cash deposit rate if the change occurred after the POI, but before the *Preliminary Determination*. The respondents argue that although the programs were repealed in November 2021, as tax returns for each year are filed in the subsequent year (*e.g.*, taxes for 2021 are filed in 2022), 2022 was the last year that companies received benefits under each of the programs and thus should be considered the year in which the change occurred.[335] We disagree. The fact that Santa Priscila received benefits from the programs in 2022 does not negate the fact that the programs' alleged termination, and thus the alleged program-wide change, occurred in 2021. As the termination occurred before the POI, the alleged changes to the programs do not meet the prerequisites for an adjustment to the cash deposit rate as required by our regulations.

Additionally, 19 CFR 351.526(d) requires that, in the case of the termination of a program, there must be no residual benefits or substitute program introduced. Santa Priscila and Produmar reported receiving benefits from one of the programs during the POI.[336] Therefore, it is clear that residual benefits continue to exist under this program, and thus does not warrant a change to the cash deposit rate.[337]

Finally, under Commerce's regulations, a program-wide change is a change that is: 1) not limited to an individual firm or firms; and 2) effectuated by an official act, such as the enactment of a statute, regulation or decree.[338] Both mandatory respondents claim that the GOE provided evidence at Exhibit EXPORT-1(f) of its Section II Questionnaire response that the Hiring of Additional Personnel – Net Increase in Employment program was repealed by Article 39 of the Organic Law for the Economic Development and Fiscal Sustainability after the COVID-19 Pandemic.[339] While this exhibit contains an excerpt of this statute, the excerpt does not include Article 39.[340] Therefore, based on record evidence, the GOE has not provided any evidence of effectuation of an official act with respect to the Hiring of Additional Personnel – Net Increase in Employment program that constitutes a program-wide change under 19 351.526(b)(2) warranting an adjustment to the cash deposit rate.

[334] *See* Respondents' First Case Brief at 79-83
[335] *See* Respondents' First Case Brief at 81 (citing *See* GOE's Section II IQR at EXP-21 and Exhibit EXPORT 1(f)) and 82 (citing *See* GOE's Section II IQR at S-71 and Exhibit EXPORT-1(f)).
[336] *See* Santa Priscila's Section III QR at III-14 and Exhibit 7 at 4; *see also* Santa Priscila's Letters, "Frozen Warmwater Shrimp from Ecuador – Section II and III Supplier Supplemental Questionnaire Response," dated March 18, 2024, at S-4 and S-5 and Exhibit S-7; "Frozen Warmwater Shrimp from Ecuador – Section III of Supplier Questionnaire Response," dated February 16, 2024, at Exhibit PRO-17; and "Frozen Warmwater Shrimp from Ecuador – Santa Priscila's Supplemental Section III Questionnaire Response," dated March 1, 2024, at S-PRO-2; *see also* GOE's Section II IQR at EXP-23 and EXP-32.
[337] *See Preliminary Determination* PDM at 18-19.
[338] *See* 19 C.F.R.§351.526(b)(1) and (b)(2).
[339] *See* Respondents' First Case Brief at 82.
[340] *See* GOE's Section II IQR at Exhibit EXPORT-1(f).

**Comment 15: Commerce Should Reverse its Rejection of SONGA's Minor Correction**

*Respondents' Comments:*

The following is the respondents' summary of their arguments. For further details, *see* Respondents' First Case Brief at 83-89.

> {Commerce} should accept the corrected information related to SONGA's ISD Exemptions on Imported Assets and Raw Materials aspect of benefits received pursuant to its investment contract that SONGA attempted to present at verification and include it in the record, which is required regardless of whether {Commerce} has accepted or rejected it. Failure to include SONGA's minor correction submission could deny SONGA a full and fair opportunity to pursue an appeal of {Commerce}'s decision to deny acceptance of this minor correction.
>
> By any reasonable definition of the term "minor," an error that leads to a very small change in benefits reported and a miniscule percentage change in the calculated rate for the investment contract program is truly "minor." Therefore, {Commerce}'s decision to reject this correction as "not minor" lacks any basis in the record evidence and must be corrected in the Final Determination.
>
> {Commerce}'s justification for its rejection, *i.e.*, that SONGA's revised database included a number of individual transactions for a number of imported assets does not render {Commerce}'s determination supported by the record.[341] The number of transactions or amount of assets alone cannot make a correction not "minor" in nature without addressing the combined impact of those transactions, which is truly miniscule.
>
> SONGA's corrections clearly satisfy the criteria for a "minor correction" based on the instructions provided by {Commerce}.[342]
>
> {Commerce}'s determination to reject SONGA's corrected ISD Exemptions on Imported Raw Materials and Assets information as a minor correction was unsupported by the record and contrary to {Commerce}'s instructions and prior practice as to what will be accepted as a minor correction presented at verification.[343] For example, in *1-Hydroxyethilidene-1, 1-Diphosphonic Acid from China*, {Commerce} accepted "a total of 14 previously unreported grants" that were presented at verification as minor corrections.[344]
>
> If {Commerce} does not accept SONGA's minor correction, {Commerce} should

[341] *See* SONGA's Verification Report at 2.
[342] *See* Commerce's Letter, "Verification Agenda of SONGA," dated July 9, 2024 (SONGA's Verification Agenda) at 8.
[343] *Id.*
[344] *See* Memorandum, "Verification of the Questionnaire Responses of Shandong Taihe Chemicals Co., Ltd. and Shandong Taihe Water Treatment Technologies Co., Ltd.: Countervailing Duty Investigation of 1-hydroxyethilidene-1, 1-diphosphonic acid from the People's Republic of China," dated Jan. 10, 2017, at 2.

> determine that the use of facts available pursuant to {section 776(a)(2)(D) of the Act} is appropriate and should calculate any subsidy rate for SONGA's use of the ISD Exemptions on Imported Raw Materials program using the 2021 information reported by SONGA.

*Petitioner's Rebuttal Comments:*

The following is the Petitioner's summary of their rebuttal comments. For further details, *see* Petitioner's Rebuttal Brief at 18-23.

> Commerce does not need to consider respondents' arguments regarding an alleged error in the calculations for SONGA's rate under the ISD on Purchase of Imported Assets and Raw Materials program, as Commerce should apply facts available with an adverse inference to countervail this program, as detailed in ASPA's case brief. Respondents' arguments that Commerce should accept the "minor" corrections SONGA attempted to provide for this program are unavailing.[345] The application of adverse facts available is warranted as the new information SONGA sought to provide was untimely, and the failure to provide that information impeded Commerce's investigation and displayed a failure of SONGA to act to the best of its ability. Moreover, to the extent that respondents now attempt to add that rejected information to the record in their case brief, Commerce must reject that untimely filed new factual information. Finally, Commerce was fully within its rights to reject the attempted correction, regardless of the magnitude of the impact it may have on SONGA's subsidy rate, as the effort that would have been required to verify the late information on the spot at verification was not "minor."

**Commerce's Position:** We disagree with the respondents that our rejection of SONGA's correction to the ISD Exemption on Imported Assets and Raw Materials program pursuant to SONGA's Investment Contract is not supported by record evidence or Commerce's practice. Congress has implicitly delegated to Commerce the latitude to derive verification procedures *ad hoc*, and the statute provides Commerce wide latitude in its verification procedures.[346] As such, Commerce has broad discretion in setting the scope of each verification and the methodology to be used on a case-by-case basis.[347]

At the start of verification, SONGA officials reported that in its February 12, 2024, Section III questionnaire response at Exhibit 11 and May 16, 2024, supplemental questionnaire response at Exhibit S2-4(a), it inadvertently reported benefits received under the program in 2021 instead of benefits it received in 2022 based on its misunderstanding that benefits under the program were received in the year SONGA filed its income tax declaration rather than in the year the tax was paid. Thus, at verification, SONGA sought to submit as a minor correction the tax savings

---

[345] Please note that ASPA addresses together in Section V of this brief the arguments that respondents made about this program in Sections IV and VII of its case brief.
[346] *See Micron*, 117 F.3d 1386, 1396 (Fed. Cir. 1997); *see also Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1344 (Fed. Cir. 2021); and *American Alloys*30 F.3d 1469, 1475 (Fed. Cir. 1994).
[347] *See Brass Rod from Mexico: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures*, 88 FR 83913 (December 1, 2023), and accompanying IDM at Comment 2.

benefits it received under the program corresponding to tax payments it made in 2022. Commerce did not accept this correction and noted in the verification report the number of transactions and imported assets relating to the proposed correction.[348] SONGA claims that its corrected data is minor in nature and should have been accepted at the start of verification. Further, SONGA claims that, per Commerce's instructions in the verification agenda, the number of transactions or amount of assets alone cannot make a correction not "minor" without addressing the impact of those transactions.

SONGA's attempt to characterize its data as minor is not supported by record evidence since the record lacks such data. Further, while the verification agenda instructed SONGA to demonstrate the magnitude of changes to quantitative data of a minor correction, this does not mean that the magnitude of the change is necessarily the sole guiding factor in Commerce's decision to either accept or reject a correction in every instance. The verification outline states, "verifiers will examine the errors to determine if they are minor," and does not stipulate potential reasons for a rejection. Further, the Courts have upheld Commerce's decision to not accept minor corrections because of the number of affected transactions and the need to account for different aspects of the transactions.[349]

SONGA notes that Commerce's verification agenda states that information will be accepted when: (1) need for it was not evident, (2) minor corrections to information on the record, or (3) information corroborates, supports, or clarifies information on the record. These three points serve as general guidance for when Commerce may, at its discretion, accept new information. However, none of these points are applicable to SONGA's information. SONGA's corrected ISD exemption data, while it corrects information on the record, is not minor. As stated in the verification report, the revised data is based on numerous transactions and assets,[350] which would have been unduly burdensome to verify on the spot. Therefore, Commerce rejected SONGA's attempt to correct previous information because the correction data is not minor in nature, and therefore constituted untimely new factual information. Furthermore, SONGA's aforementioned reference to Commerce's instruction and whether Commerce should accept its correction to its previously misreported ISD exemption is misplaced. The instructions of Commerce's verification agenda state that verifications are not intended to be an opportunity for submission of new factual information (NFI).[351]

Further, SONGA claims that Commerce's decision at verification not to accept the revised information for the ISD Exemption on Imported Assets and Raw Materials was inconsistent with its practice, as evidenced by Commerce's approach in *Acid from China*,[352] *Paper from*

---

[348] *See* SONGA's Verification Report at 2.
[349] *See Eregli Demir ve Celik Fabrikalari T.A.S. v. United States*, 357 F. Supp. 3d 1325, 1336 (CIT 2018).
[350] *See* SONGA's Verification Report at 2.
[351] *See*, *e.g.*, SONGA's Verification Report at 2 ("Please note that verification is not intended to be an opportunity for submission of new factual information.").
[352] *See Countervailing Duty Investigation of 1-Hydroxyethylidene-1, 1-Diphosphonic Acid from the People's Republic of China: Final Affirmative Determination*, 82 FR 14872 (March 23, 2017) (*Acid from China*) (citing Memorandum, "Verification of the Questionnaire Responses of Shandong Taihe Chemicals Co., Ltd. and Shandong Taihe Water Treatment Technologies Co., Ltd.," dated January 10, 2017).

*Canada*,[353] and *Tires from China*.[354] However, we find the facts of the instant investigation are distinct from those of the cited cases.

While Commerce accepted 14 unreported grants as a minor correction in *Acid from China*, the 14 grants were "the same kinds of grants already reported, but just for different years."[355] If in the instant investigation, accepting the alleged minor correction would have required a review of more than 14 transactions at issue in *Acid from China*. Furthermore, in *Acid from China*, the 14 grants were a small portion of the total number of grants previously reported. In the instant investigation, the entire data with its numerous transactions and assets for the ISD Exemption on Imported Assets and Raw Materials pursuant to SONGA's Investment Contract program required a correction.

In *Paper from Canada*, Commerce determined that two tax credits discovered at verification were not countervailable, and thus, did not provide countervailable subsidies. In the instant investigation, Commerce determined that the ISD Exemption on Imported Assets and Raw Materials pursuant to SONGA's Investment Contract is countervailable.[356] Additionally, despite respondents claiming that Commerce accepted information from companies that were less cooperative than SONGA, Commerce has accepted certain other of SONGA's corrections at verification, including a program that was previously incorrectly reported and one that was altogether unreported in SONGA's narrative. For example, Commerce accepted and reviewed new information as it regards SONGA's ISD Exemption on Principal and Interest on Foreign Loans,[357] which required Commerce to review transactions that are similar to items Commerce reviewed in SONGA's cited cases,[358] thereby highlighting Commerce's willingness to accept revisions presented at verification provided that the amount of new information may be adequately examined in the time allotted to Commerce staff during verification.

Contrary to respondents' claim, *Tires from China* is also distinct. In *Tires from China*, Commerce noted that "during the course of this investigation, {Commerce} discovered through examination of submitted financial statements that both respondents had received numerous grants," and we determined that all these grants conferred countervailable benefits. Using AFA, we found them specific. However, in the instant investigation, the change to the ISD Exemption on Imported Assets and Raw Materials pursuant to SONGA's Investment Contract was voluminous, which did not provide Commerce sufficient time to examine the corrected data on the spot at verification, and contrary to the cited case,[359] was not found or traceable in the respondents' financial statement and/or tax return.

---

[353] *See Certain Uncoated Groundwood Paper from Canada: Final Affirmative Countervailing Duty Determination,* 83 FR 39414 (August 9, 2018) (*Paper from Canada*), and accompanying IDM at 60.
[354] *See Countervailing Duty Investigation of Certain Passenger Vehicle and Light Truck Tires from the People's Republic of China: Final Affirmative Determination, and Final Affirmative Critical Circumstances Determination, in Part*, 80 FR 34888 (June 18, 2015) (*Tires from China*), and accompanying IDM at 19-20,
[355] *See* Memorandum, "Verification of the Questionnaire Responses of Shandong Taihe Chemicals Co., Ltd. and Shandong Taihe Water Treatment Technologies Co., Ltd.," dated January 10, 2017, at 2.
[356] *See Preliminary Determination* PDM at 23-26.
[357] *See* SONGA's Verification Report at 3 and Exhibit VE-1 at Attachment 5.
[358] See *Acid from China*; *see also Paper from Canada*.
[359] *See Tires from China*.

We disagree with the respondents that it should use SONGA's previously reported 2021 data as a facts available plug for missing 2022 data. As the GOE stated, "the amount of actual benefits {pursuant to the Investment Contract} may vary subject to the actual investments undertaken by the investor in any given year, which may or may not conform to the chronogram presented in the agreement, or to changes in legal conditions because the benefits are provided in the law, which may be amended."[360] Further, according to Commerce's verification, "government officials stated that the benefits cannot exceed the amount of the investment over the entire life of the contract." Record evidence indicates that nothing, except for the enumerated investments and contract stipulation, prevents the respondents from utilizing the entire approved benefit in a single year. Therefore, we find that SONGA's previously reported 2021 data are an inappropriate means to value the benefit SONGA received in 2022. Thus, consistent with *Tires from China*, we have applied AFA to SONGA's ISD Exemption on Imported Assets and Raw Materials pursuant to SONGA's Investment Contract, see comment 5 above.

Commerce further notes that SONGA consistently failed to explain its underlying calculations of the benefit they reported receiving under the program in 2021. When SONGA first submitted the relevant usage data in its IQR at Exhibit 11, SONGA only reported the benefit as "reported on the 2022 return," and not the underlying calculation despite our questionnaire requesting that the respondent to "provide a detailed calculation of the assistance and all source materials," and underlying this part of the question, for the respondent to "indicate where in the tax return this assistance is shown."[361] Consequently, in a supplemental questionnaire, Commerce requested that SONGA explains how it calculated and reported the ISD exemption on imported materials.[362] In response, SONGA explained that "in order to calculate the benefits received under the ISD exemption on imported materials under its investment contract, SONGA reviewed the value of the imported goods that were approved under its investment contract and purchased during 2021. Then, using this information, SONGA determined the tax value that would have been due on each one and applied the ISD rate in effect during the period of investigation ("POI") (*i.e.*, 5 percent) to calculate the reported benefit amount under this exemption."[363] Songa also provided a calculation worksheet "illustrating how SONGA calculated the ISD exemption on imported materials."[364] However, Despite Commerce's request for information on benefits provided under the program that were listed in its tax returns, SONGA did not link its reported calculation to any of its tax filings. Had SONGA explained how it determined the benefit it reported receiving in 2021, such information could have alerted Commerce to the fact that SONGA's receipt of the tax savings benefits under the program occurred at the time that the taxes were paid or otherwise due, and thus, that the appropriate year of receipt was 2022 and not 2021. In which case, Commerce would have been in the position to solicit the 2022 benefit information from SONGA. However, SONGA did not provide the information that Commerce requested.

Therefore, the record demonstrates that Commerce requested the data on numerous occasions, and SONGA did not provide such information at the time it was requested. As such, the record

---

[360] *See* GOE's Section II SQR at S-46.
[361] *See* SONGA Questionnaire at 52.
[362] *See* SONGA Post Preliminary Questionnaire at question 5.
[363] *See* SONGA's Post-Preliminary SQR1 at S2-5 and Exhibit S2-4(a).
[364] *Id*.

demonstrates that SONGA withheld information requested from it and failed to provide the correct data by the deadlines outlined by Commerce, consistent with section 776(a)(2)(A) and (B) of the Act. Further, by failing to provide the requested data at the time it was requested by Commerce, and by failing to provide the corrected data prior to verification, we continue to find that SONGA failed to cooperate by not acting to the best of its ability to comply with our requests for the data in accordance with section 776(b)(1) of the Act.

**Comment 16: Commerce Should Correct its Application of AFA to SONGA, Naturisa, Santa Priscila and Produmar Under the Motor Vehicle Tax Reduction Program**

*Petitioner's Comments:*

The following is the Petitioner's summary of their arguments. For further details, *see* Petitioner's Second Case Brief at 3-4.

> In the second post-preliminary determination, Commerce determined that Produmar, SONGA, and Naturisa had each withheld information requested by Commerce regarding the Motor Vehicle Tax Reduction Program, impeded Commerce's investigation, and failed to cooperate to the best of their ability. Thus, Commerce stated its intention to apply an adverse facts available rate for this program to "Produmar, SONGA, and Naturisa."[365] In its calculations, Commerce did apply the adverse facts available rate to Produmar, adding it to the rate calculated for Santa Priscila for the same program. However, Commerce only applied the rate once to SONGA/Naturisa, even though both companies warranted the application of adverse facts available. As Commerce found at verification, "both entities omitted the reporting of vehicle ownership tax exemptions received pursuant to the Motor Vehicle Tax Exemption program."[366] In the final determination, Commerce should correct this error and apply the adverse facts available rate for this program to both SONGA and Naturisa, resulting in an adverse facts available rate of 0.08 percent for the combined entity.

*Respondents' Comments:*

The following is the respondents' summary of their arguments. For further details, *see* Respondents' Second Case Brief at 32-41.

> If {Commerce} does not accept the minor corrections related to benefits under the Motor Vehicle Tas Reduction Program presented by Produmar, SONGA, and Naturisa at the outset of verification, {Commerce} should apply neutral facts available based on the benefit information reported by the GOE, and not apply adverse facts available to Produmar, SONGA, and Naturisa.
>
> Available information regarding Produmar's, SONGA's, and Naturisa's usage of

---

[365] *See* Second Post-Preliminary Determination at 11 and 14.
[366] *See* SONGA's Verification Report at 2.

the Motor Vehicle Tas Reduction Program program is available on the record. Moreover, other information on the record undermines that the magnitude of the minor corrections presented at verification by Produmar could have impeded or interfered with {Commerce}'s ability to review and verify the corrected information.

Where {Commerce} has accepted minor corrections, it has dismissed arguments to the effect that the mere fact that a respondent presented minor corrections could impede a proceeding.[367]

Likewise, {Commerce} should conclude that SONGA and Naturisa did not significantly impede this proceeding. SONGA and Naturisa had a good faith basis to believe that the Motor Vehicle Tas Reduction Program program was not countervailable because it is commonly known by all companies that this tax program is generally available and widely used by companies throughout the Ecuadorian economy.

{Commerce} has declined to apply AFA in past cases where the record contained all necessary information that would allow {Commerce} to assess the countervailability of the program, would allow it to calculate the benefit and {Commerce} could verify the information because it had accepted minor corrections.[368] Had {Commerce} accepted SONGA's and Naturisa's minor corrections—as it should have—{Commerce} also could have verified the accuracy of the reported information against SONGA's and Naturisa's accounting records. The fact that {Commerce} unjustifiably declined to accept those minor corrections and verify their accuracy cannot itself warrant the application of AFA to SONGA and Naturisa.

Considering the totality of the evidence, including the miniscule difference in the calculated benefit, and the program usage information from the GOE, {Commerce} should determine that Produmar, SONGA, and Naturisa acted to the best of their ability in reporting countervailable benefits.

Lastly, if {Commerce} determines that it will accept Produmar's Minor Corrections or if it calculates a rate for benefits received under the Motor Vehicle Tas Reduction Program program based on neutral facts available, {Commerce} should include Tropack's sales values, net of intercompany sales, in the sales denominators used to calculate Produmar's the *ad valorem* subsidy rate.

---

[367] *See Fine Denier Polyester Staple Fiber from the Republic of Korea: Final Affirmative Determination of Sales at Less Than Fair Value*, 83 FR 24743 (May 30, 2018), and accompanying IDM at Comment 1.
[368] *See Certain Quartz Surface Products from the Republic of Turkey: Final Affirmative Countervailing Duty Determination and Final Affirmative Determination of Critical Circumstances, In Part*, 85 FR 25400 (May 1, 2020), and accompanying IDM at Comment 1.

*Petitioner's Rebuttal Comments:*

The following is the Petitioner's summary of their rebuttal comments. For further details, *see* Petitioner's Second Rebuttal Brief at 6.

> Respondents argue that Commerce should not apply adverse facts available, despite their lack of cooperation and failure to comply with Commerce's requests for information. ASPA already explained in its case brief why Commerce should apply adverse facts available to Produmar, SONGA, and Santa Priscila, and we incorporate those arguments by reference.

*Respondents' Rebuttal Comments:*

The following is the respondents' summary of their rebuttal comments. For further details, *see* Respondents' Second Rebuttal Brief at 5-12.

> If {Commerce} continues to apply AFA to SONGA—which it should not—it correctly applied its AFA rate selection hierarchy to apply the rate calculated for Santa Priscila (*i.e.*, 0.04%) for benefits received under the Motor Vehicle Tas Reduction Program program to SONGA for the identical program. Moreover, {Commerce} correctly applied its practice by applying the highest calculated rate—that calculated for Santa Priscila—to the respondent SONGA.
>
> {Commerce}'s practice is to apply its AFA rate selection hierarchy to a program for which it finds a respondent did not cooperate to the best of its ability to stand in for a respondent's use of the identical program.[369] {Commerce} applies the highest calculated rate as AFA to the respondent company, and it does not apply AFA for the same program to each cross-owned affiliate of the respondent to estimate benefits that could have been received by the respondent and each cross-owned affiliated with the respondent.[370]
>
> The Petitioner wrongly encourages {Commerce} to apply Santa Priscila's calculated rate twice to SONGA to reflect {Commerce}'s preliminary finding that both SONGA and, its cross-owned affiliate, Naturisa, did not cooperate to the best of their ability.[371] The Petitioner cites no case where {Commerce} applied an AFA rate to each cross- owned affiliate of a respondent that it found not to have cooperated to the best of its ability. To the extent {Commerce} continues to apply its AFA rate selection hierarchy to SONGA, it should only apply the Santa Priscila's calculated rate (*i.e*., 0.04%), and not the additional AFA rate applied to Produmar. This would constitute impermissible double counting.

[369] *See* Second Post-Preliminary Determination at 8.
[370] *Id.*
[371] *See* Petitioner's Second Case Brief at 4.

> To the contrary, where {Commerce} has applied its AFA rate selection hierarchy, it has applied the adverse a single rate for each program for which it concluded that the respondent did not act to the best of its ability.[372]

**Commerce's Position:** We agree with the petitioner that Commerce should correct the application of AFA to SONGA and Naturisa, as well as correct its application of AFA to Santa Priscila and Produmar, for the Motor Vehicle Tax Reduction program. However, we will not apply the petitioner's proposed methodology. Instead, Commerce is correcting its AFA rate to comply with past precedent and its statute.

As described in the Second Post-Preliminary Determination[373], in the absence of record evidence concerning Produmar, SONGA, and Naturisa's usage of the Motor Vehicle Tax Reduction program that resulted from the respodents' failure to timely provide usage information regarding this program, Commerce applied AFA to Produmar, SONGA, and Naturisa. In the selection of an AFA rate, we stated that "as there is a program-specific, above-zero rate determined for a cooperating respondent in the investigation (*i.e*., for Santa Priscila), we are applying the highest non-zero rate calculated for the cooperating company for the identical program in the investigation."[374] Consequently, Commerce assigned a 0.04 percent *ad valorem* subsidy rate for Santa Priscila/Tropack and applied this rate, as AFA, to Produmar and the SONGA/Naturisa entity for this program.

The petitioner argues that Commerce should apply the 0.04 percent rate to both SONGA and Naturisa, *i.e*., consistent with how it applied the AFA rate to Santa Priscila. We disagree, and upon review we have modified our derivation and selection of the AFA rate under the Motor Vehicle Tax program.

Commerce treats responding cross-owned companies as a single entity.[375] As such, in this type of situation, we calculate a single CVD rate that applies to all cross-owned firms that comprised the cross-owned entity.[376] Similarly, when we find that the application of AFA is warranted with regard to a respondent's use of a subsidy program, we apply a single AFA rate to all cross-owned firms that comprise the cross-owned entity.[377] Therefore, Commerce erred in the Second Post-Preliminary Determination when we used the net subsidy rate we calculated for Santa Priscila under the Motor Vehicle Tax Program as an AFA plug for another member of the Santa Priscila cross-owned entity. We similarly erred in the Second Post-Preliminary Determination when we

---

[372] *See, e.g.*, *Welded Line Pipe From the Republic of Turkey: Preliminary Affirmative Countervailing Duty Determination, Preliminary Affirmative Critical Circumstances Determination, in Part*, 85 FR 59287 (September 21, 2010) (*Welded Pipe from Turkey*), and accompanying PDM at 13 (preliminarily applying the AFA rate determined by its AFA rate selection hierarchy to respondent and its relevant cross-owned affiliates), unchanged in *Welded Line Pipe From the Republic of Turkey: Final Affirmative Countervailing Duty Determination*, 80 FR 61371 (October 13, 2015), and accompanying IDM at Appendix 187 (applying, for example, an 8.82 percent rate for the "Pre-Export Credit Program," to respondent Celik Hayat and its cross-owned affiliates a single time based on the highest rate calculated in the investigation).
[373] *See* Second Post-Preliminary Determination at 4-11 and 13-14.
[374] *Id*. at 11.
[375] *See*, *e.g.*, *Lined Paper from Indonesia* IDM at 26.
[376] *See*, *e.g.*, *Standard Line Pipe from China* IDM.
[377] *See, e.g.*, *Welded Pipe from Turkey* PDM at 13 (preliminarily applying the AFA rate determined by its AFA rate selection hierarchy to respondent and its relevant cross-owned affiliates).

used the net subsidy rate calculated for Santa Priscila (which comprised only part of the Santa Priscila cross-owned entity) under the Motor Vehicle Tax program as an AFA plug for the SONGA cross-owned entity. As noted above, given Santa Priscila's and Produmar's failure to report benefits received by Produmar under this program, we are unable to calculate an accurate subsidy rate for Santa Priscila as a whole.

Thus, in the final determination, we have revised our approach to reflect Commerce's practice. Specifically, for this program we have assigned a single AFA rate to the firms that comprise the Santa Priscila cross-owned entity.[378] Inherent in this approach is the view that the cross-owned entity, as a whole, failed to accurately report its usage of the program, and therefore, Commerce lacks sufficient information to determine the actual amount of benefits that the cross-owned entity received under the program. While Santa Priscila may have timely reported the benefits it individually received under the Motor Vehicle Tax program, it did not timely report the benefits received by Produmar, a firm that was part of the cross-owned entity. As a result, we lack complete benefit information for the entire Santa Priscila cross-owned entity, and for this reason, we have not used the partial benefit information reported by Santa Priscila when determining the AFA rate under this program. Our approach is no different from a situation in which a single respondent reports using a subsidy program and then attempts to report additional usage of the program at verification that Commerce finds is not minor. In such a situation, at verification Commerce would not accept the additional usage information, and Commerce would not use the incomplete benefit information the respondent timely divulged as an AFA plug for the additional benefit information that the respondent failed submit prior to verification.

Based on our findings described above, we lack a net subsidy rate calculated in the instant investigation for the Motor Vehicle Tax program that we can use as an AFA plug under the first step of our AFA hierarchy for CVD investigations. Accordingly, we have proceeded to the second step of our AFA hierarchy for CVD investigations, which is to apply the highest non-*de minimis* rate calculated for a cooperating company in another CVD proceeding involving the same country for the identical program, or if the identical program is not available, for a similar program. We have not previously examined the Motor Vehicle Tax program in another CVD proceeding involving Ecuador. Therefore, we used the highest non-*de minimis* subsidy rate calculated for a tax program (*i.e.*, a similar program based on treatment of the benefit) in an Ecuadorean CVD proceeding, which is the 1.38 percent net subsidy rate calculated for Santa Priscila under the Investment Contract Program in the instant investigation. Accordingly, we applied the 1.38 percent net subsidy rate to the firms that comprise the Santa Priscila cross-owned entity and to the firms that comprise the SONGA cross-owned entity.

---

[378] *See*, *e.g.*, *Olives from Spain* IDM at Comment 23 ("For Angel Camacho, because the incomplete reporting relates to its cross-owned suppliers, and we treat a respondent and its cross-owned input suppliers as one entity for purposes of calculating countervailable subsidy rate, for purposes of this final determination, we are relying on our AFA hierarchy to identify a rate applicable to Angel Camacho."); *see also Supercalendered Paper from Canada: Final Affirmative Countervailing Duty Determination*, 80 FR 63535 (October 20, 2015), and accompanying IDM at Comment 17; *see also POSCO v. United States*, 353 F.Supp.3d 1357, 1374-75 (CIT 2018) (sustaining Commerce's application of AFA to a mandatory respondent for failure by foreign producer's cross-owned supply company to report research and development grants).

## IX. RECOMMENDATION

Based on our analysis of the comments received, we recommend adopting the above positions. If this recommendation is accepted, we will publish the final determination of the investigation and the final estimated weighted-average dumping margins in the *Federal Register* and will notify the U.S. International Trade Commission of our determination.

☒ ☐

Agree Disagree

X 

Signed by: RYAN MAJERUS

Ryan Majerus,
Deputy Assistant Secretary
for Policy and Negotiations,
performing the non-exclusive functions and duties
of the Assistant Secretary for Enforcement and Compliance.

# Tab 81

# P.R. 459

SUBSIDY PROGRAMS ON CHEESE SUBJECT TO AN IN-QUOTA RATE OF DUTY—Continued

| Country | Program(s) | Gross[3] subsidy ($/lb) | Net[4] Subsidy ($/lb) |
|---|---|---|---|
| Norway | Indirect (Milk) Subsidy | 0.00 | 0.00 |
| | Consumer Subsidy | 0.00 | 0.00 |
| | Total | 0.00 | 0.00 |
| Switzerland | Deficiency Payments | 0.00 | 0.00 |

[FR Doc. 2024–24956 Filed 10–25–24; 8:45 am]

**BILLING CODE 3510–DS–P**

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[C–331–806]**

### Frozen Warmwater Shrimp From Ecuador: Final Affirmative Countervailing Duty Determination

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that countervailable subsidies are being provided to producers and exporters of frozen warmwater shrimp (shrimp) from Ecuador. The period of investigation (POI) is January 1, 2022, through December 31, 2022.

**DATES:** Applicable October 28, 2024.

**FOR FURTHER INFORMATION CONTACT:** Reginald Anadio or Zachary Shaykin, AD/CVD Operations, Office IV, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230; telephone: (202) 482–3166 or (202) 482-5377, respectively.

**SUPPLEMENTARY INFORMATION:**

### Background

On April 1, 2024, Commerce published its *Preliminary Determination* in the **Federal Register** and invited interested parties to comment.[1] In the *Preliminary Determination*, and in accordance with section 705(a)(1) of the Tariff Act of 1930, as amended (the Act), and 19 CFR 351.210(b)(4), Commerce aligned this final countervailing duty (CVD) determination with the final antidumping duty (AD) determination of frozen warmwater shrimp from Ecuador.[2] On July 12 and September 26, 2024, Commerce issued its post-preliminary determinations.[3] On July 22, 2024, Commerce tolled certain deadlines in this administrative proceeding by seven days.[4] The deadline for the final determination is now October 21, 2024.

For a complete description of the events that followed the *Preliminary Determination*, see the Issues and Decision Memorandum.[5] The Issues and Decision Memorandum is a public document and is made available to the public via Enforcement and Compliance's Antidumping and Countervailing Duty Centralized Electronic Service System (ACCESS). ACCESS is available to registered users at *http://access.trade.gov*. In addition, a complete version of the Issues and Decision Memorandum can be accessed directly at *https://access.trade.gov/public/FRNoticesListLayout.aspx*.

### Scope of the Investigation

The product covered by this investigation is frozen freshwater shrimp from Ecuador. For a complete description of this investigation, *see* Appendix I.

### Scope Comments

We received no comments from interested parties on the scope of the investigation as it appeared in the *Preliminary Determination*. Therefore, we made no changes to the scope of the investigation.

### Verification

As provided in section 782(i)(1) of the Act, in July 2024, Commerce conducted verification of the subsidy information reported by Industrial Pesquera Santa Priscila S.A. (Santa Priscila), Sociedad Nacional de Galápagos C.A. (SONGA), and the Government of Ecuador (GOE) for use in our final determination. We used standard verification procedures, including an examination of relevant accounting records and original source documents provided by Santa Priscila, SONGA, and the GOE.[6]

### Analysis of Subsidy Programs and Comments Received

The subsidy programs under investigation, and the issues raised in the case and rebuttal briefs that were submitted by interested parties in this investigation are discussed in the Issues and Decision Memorandum. For a list of the issues raised by interested parties and addressed in the Issues and Decision Memorandum, *see* Appendix II.

### Methodology

Commerce conducted this investigation in accordance with section 701 of the Act. For each of the subsidy programs found to be countervailable, Commerce determines that there is a subsidy, *i.e.,* a financial contribution by an ''authority'' that gives rise to a benefit to the recipient, and that the subsidy is specific.[7] For a full description of the methodology underlying our final determination, see the Issues and Decision Memorandum.

In making this final determination, Commerce relied, in part, on facts

[1] *See Frozen Warmwater Shrimp from Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with the Final Antidumping Duty Determination,* 89 FR 22379 (April 1, 2024) (*Preliminary Determination*), amended in *Frozen Warmwater Shrimp from Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation,* 89 FR 31722 (April 25, 2024) (*Amended Preliminary Determination*).

[2] *Id.,* 89 FR at 22380.

[3] *See* Memoranda, ''Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Post-Preliminary Analysis,'' dated July 12, 2024 (First Post-Preliminary Determination); and ''Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Second Post-Preliminary Determination Calculations for Sociedad Nacional de Galapagos C.A.,'' dated September 26, 2024 (Second Post-Preliminary Determination).

[4] *See* Memorandum, ''Tolling of Deadlines for Antidumping and Countervailing Duty Proceedings,'' dated July 22, 2024.

[5] *See* Memorandum, ''Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador,'' dated concurrently with, and hereby adopted by, this notice (Issues and Decision Memorandum).

[6] *See* Memoranda, ''Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of Sociedad Nacional de Galápagos C.A.,'' dated August 13, 2024; ''Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A.,'' dated August 22, 2024; and ''Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of the Government of Ecuador,'' dated September 3, 2024.

[7] *See* sections 771(5)(B) and (D) of the Act regarding financial contribution; section 771(5)(E) of the Act regarding benefit; and section 771(5A) of the Act regarding specificity.

otherwise available, including with an adverse inference, pursuant to sections 776(a) and (b) of the Act. For a full discussion of our application of adverse facts available (AFA), see the *Preliminary Determination*,[8] First Post-Preliminary Determination and Second Post-Preliminary Determination,[9] and the Issues and Decision Memorandum section entitled ''Use of Facts Otherwise Available and Application of Adverse Inferences.''

### Changes Since the Preliminary Determination

Based on our review and analysis of the information at verification and comments received from interested parties, we made certain changes to the subsidy rate calculations for both Santa Priscila and SONGA.[10] For a discussion of these changes, see the Issues and Decision Memorandum.

### All-Others Rate

In accordance with section 705(c)(1)(B)(i) of the Act, we calculated an individual estimated countervailable subsidy rates for the mandatory respondents, Santa Priscila and SONGA. Section 705(c)(5)(A)(i) of the Act states that, for companies not individually investigated, Commerce will determine an all-others rate equal to the weighted-average countervailable subsidy rates established for exporters and/or producers individually investigated, excluding any subsidy rates that are zero, *de minimis,* or determined entirely under section 776 of the Act.

In this investigation, we calculated individual total net countervailable subsidy rates for both Santa Priscila and SONGA that are not zero, *de minimis,* or based entirely on facts otherwise available. Therefore, we calculated the all-others rate using a weighted average of the individual estimated subsidy rates calculated for the examined respondents (Santa Priscila and SONGA) using each company's publicly-ranged sales value for their exports to the United States of subject merchandise,[11] in accordance with section 705(c)(5)(A)(i) of the Act.

### Final Determination

Commerce determines that the following estimated countervailable subsidy rates exist:

| Company | Subsidy rate (percent *ad valorem*) |
|---|---|
| Industrial Pesquera Santa Priscila S.A | 3.57 |
| Sociedad Nacional de Galápagos C.A | 4.41 |
| All Others | 3.78 |

### Disclosure

We intend to disclose to interested parties the calculations and analysis performed in this final determination within five days of any public announcement or, if there is no public announcement, within five days of the date of publication of this notice in accordance with 19 CFR 351.224(b).

### Continuation of Suspension of Liquidation

As a result of our *Preliminary Determination*, and pursuant to sections 703(d)(1)(B) and (d)(2) of the Act, Commerce instructed U.S. Customs and Border Protection (CBP) to collect cash deposits and suspend liquidation of entries of subject merchandise from Ecuador that were entered, or withdrawn from warehouse, for consumption on April 1, 2024, the date of publication of the *Preliminary Determination* in the **Federal Register**. In accordance with section 703(d) of the Act, we instructed CBP to discontinue the suspension of liquidation of all entries of subject merchandise entered or withdrawn from warehouse, on or after July 30, 2024, but to continue the suspension of liquidation of all entries of subject merchandise on or before July 29, 2024.

If the U.S. International Trade Commission (ITC) issues a final affirmative injury determination, we will issue a countervailing duty order, reinstate the suspension of liquidation under section 706(a) of the Act, and require a cash deposit of estimated countervailing duties for entries of subject merchandise in the amounts indicated above. If the ITC determines that material injury, or threat of material injury, does not exist, this proceeding will be terminated, and all estimated duties deposited or securities posted as a result of the suspension of liquidation will be refunded or cancelled.

### U.S. International Trade Commission Notification

In accordance with section 705(d) of the Act, Commerce will notify the ITC of its final affirmative determination that countervailable subsidies are being provided to producers and exporters of shrimp from Ecuador. Because the final determination is affirmative, in accordance with section 705(b) of the Act, the ITC will make its final determination as to whether the domestic industry in the United States is materially injured, or threatened with material injury, by reason of imports of shrimp from Ecuador no later than 45 days after our final determination. In addition, we are making available to the ITC all non-privileged and nonproprietary information related to this investigation. We will allow the ITC access to all privileged and business proprietary information in our files, provided the ITC confirms that it will not disclose such information, either publicly or under an administrative protective order (APO), without the written consent of the Assistant Secretary for Enforcement and Compliance. If the ITC determines that material injury or threat of material injury does not exist, this proceeding will be terminated and all cash deposits will be refunded. If the ITC determines

[8] *See Preliminary Determination* and *Amended Preliminary Determination.*

[9] *See* First Post-Preliminary Determination and Second Post-Preliminary Determination.

[10] *See* Memorandum, ''Final Determination Calculations for Santa Priscila,'' dated concurrently with this notice, and Memorandum, ''Final Determination Calculations for SONGA,'' dated concurrently with this notice.

[11] With two respondents under examination, Commerce normally calculates: (A) a weighted-average of the estimated subsidy rates calculated for the examined respondents; (B) a simple average of the estimated subsidy rates calculated for the examined respondents; and (C) a weighted-average of the estimated subsidy rates calculated for the examined respondents using each company's publicly-ranged U.S. sale quantities for the merchandise under consideration. Commerce then compares (B) and (C) to (A) and selects the rate closest to (A) as the most appropriate rate for all other producers and exporters. *See, e.g., Ball Bearings and Parts Thereof from France, Germany, Italy, Japan, and the United Kingdom: Final Results of Antidumping Administrative Reviews, Final Results of Changed-Circumstances Review, and Revocation of an Order in Part,* 75 FR 53661, 53663 (September 1, 2010); *see also Forged Steel Fluid End Blocks from Italy: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with Final Antidumping Duty Determination,* 85 FR 31460, 31461 (May 26, 2020), unchanged in *Forged Steel Fluid End Blocks from Italy: Final Affirmative Countervailing Duty Determination,* 85 80022, 80023 (December 11, 2020).

that such injury does exist, Commerce will issue a countervailing duty order directing CBP to assess, upon further instruction by Commerce, countervailing duties on all imports of the subject merchandise that are entered, or withdrawn, for consumption on or after the effective date of the suspension of liquidation, as discussed above in the ''Continuation of Suspension of Liquidation'' section.

## Administrative Protective Orders

In the event that the ITC issues a final negative injury determination, this notice will serve as the only reminder to parties subject to an APO of their responsibility concerning the destruction of proprietary information disclosed under APO, in accordance with 19 CFR 351.305(a)(3). Timely written notification of the return/destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and terms of an APO is a violation which is subject to sanction.

## Notification to Interested Parties

This determination is issued and published in accordance with sections 705(d) and 777(i) of the Act, and 19 CFR 351.210(c).

Dated: October 21, 2024.

**Ryan Majerus,**

*Deputy Assistant Secretary for Policy and Negotiations, performing the non-exclusive functions and duties of the Assistant Secretary for Enforcement and Compliance.*

## Appendix I

### Scope of the Investigation

The scope of this investigation includes certain frozen warmwater shrimp and prawns whether wild-caught (ocean harvested) or farm-raised (produced by aquaculture), head-on or head-off, shell-on or peeled, tail-on or tail-off, deveined or not deveined, cooked or raw, or otherwise processed in frozen form. ''Tails'' in this context means the tail fan, which includes the telson and the uropods.

The frozen warmwater shrimp and prawn products included in the scope, regardless of definitions in the Harmonized Tariff Schedule of the United States (HTSUS), are products which are processed from warmwater shrimp and prawns through freezing and which are sold in any count size.

The products described above may be processed from any species of warmwater shrimp and prawns. Warmwater shrimp and prawns are generally classified in, but are not limited to, the Penaeidae family. Some examples of the farmed and wild-caught warmwater species include, but are not limited to, whiteleg shrimp (Penaeus vannemei), banana prawn (Penaeus merguiensis), fleshy prawn (Penaeus chinensis), giant river prawn (Macrobrachium rosenbergii), giant tiger prawn (Penaeus monodon), redspotted shrimp (Penaeus brasiliensis), southern brown shrimp (Penaeus subtilis), southern pink shrimp (Penaeus notialis), southern rough shrimp (Trachypenaeus curvirostris), southern white shrimp (Penaeus schmitti), blue shrimp (Penaeus stylirostris), western white shrimp (Penaeus occidentalis), and Indian white prawn (Penaeus indicus).

Frozen shrimp and prawns that are packed with marinade, spices or sauce are included in the scope. In addition, food preparations, which are not ''prepared meals,'' that contain more than 20 percent by weight of shrimp or prawn are also included in the scope.

Excluded from the scope are: (1) breaded shrimp and prawns (HTSUS subheading 1605.20.10.20); (2) shrimp and prawns generally classified in the Pandalidae family and commonly referred to as coldwater shrimp, in any state of processing; (3) fresh shrimp and prawns whether shell-on or peeled (HTSUS subheadings 0306.36.0020 and 0306.36.0040); (4) shrimp and prawns in prepared meals (HTSUS subheading 1605.20.05.10); (5) dried shrimp and prawns; (6) canned warmwater shrimp and prawns (HTSUS subheading 1605.20.10.40); (7) certain dusted shrimp; and (8) certain battered shrimp. Dusted shrimp is a shrimp-based product: (1) that is produced from fresh (or thawed-from-frozen) and peeled shrimp; (2) to which a ''dusting'' layer of rice or wheat flour of at least 95 percent purity has been applied; (3) with the entire surface of the shrimp flesh thoroughly and evenly coated with the flour; (4) with the nonshrimp content of the end product constituting between four and 10 percent of the product's total weight after being dusted, but prior to being frozen; and (5) that is subjected to IQF freezing immediately after application of the dusting layer. Battered shrimp is a shrimp-based product that, when dusted in accordance with the definition of dusting above, is coated with a wet viscous layer containing egg and/or milk, and par-fried.

The products covered by the scope are currently classified under the following HTSUS subheadings: 0306.17.0004, 0306.17.0005, 0306.17.0007, 0306.17.0008, 0306.17.0010, 0306.17.0011, 0306.17.0013, 0306.17.0014, 0306.17.0016, 0306.17.0017, 0306.17.0019, 0306.17.0020, 0306.17.0022, 0306.17.0023, 0306.17.0025, 0306.17.0026, 0306.17.0028, 0306.17.0029, 0306.17.0041, 0306.17.0042, 1605.21.1030, and 1605.29.1010. These HTSUS subheadings are provided for convenience and for customs purposes only and are not dispositive, but rather the written description of the scope is dispositive.

## Appendix II

### List of Topics Discussed in the Issues and Decision Memorandum

I. Summary
II. Background
III. Scope of the Investigation
IV. Diversification of Ecuador's Economy
V. Subsidies Valuation
VI. Use of Facts Otherwise Available and Application of Adverse Inferences
VII. Analysis of Programs
VIII. Discussion of the Issues
Comment 1: Commerce Should Countervail the Provision of Brackish Water
Comment 2: Commerce Should Countervail the Provision of Fuel
Comment 3: Commerce Should Revise the Benchmark Used To Value the Provision of Electricity
Comment 4: Commerce Should Correct the Multiplier Used for Programs Benefitting Respondents' Shrimp Suppliers
Comment 5: Commerce Should Apply Adverse Facts Available (AFA) To Countervail Unverifiable and Omitted Income Tax Programs
Comment 6: Commerce Should Revise the Denominator for the Investment Contract/Tax Incentives for Priority Sectors Under the 2010 Organic Production Code for Santa Priscila
Comment 7: Commerce Should Make Certain Revisions to SONGA's Subsidy Calculations
Comment 8: Commerce Should Make Certain Revisions to Santa Priscila's Subsidy Calculations
Comment 9: Commerce Should Revise Its Countervailable Subsidy Calculation Regarding Provision of Land Concessions
Comment 10: Commerce Should Find That Certain Tax Programs are not Countervailable
Comment 11: Commerce Should Revise its Attribution of Benefits Received by Cross-Owned Input Suppliers to Santa Priscila
Comment 12: Commerce Should Recalculate Its Countervailable Subsidy Calculation for SONGA Under the Refund of Currency Outflow Tax (ISD) On Inputs Program
Comment 13: Section 771B Is Not Supported by the Record
Comment 14: Commerce Should Adjust the Cash Deposit (CD) Rates
Comment 15: Commerce's Should Reverse Its Rejection of SONGA's Minor Correction
Comment 16: Commerce Should Correct its Application of AFA to SONGA and Naturisa, and Santa Priscila and Produmar Under the Motor Vehicle Tax Reduction Program
IX. Recommendation

[FR Doc. 2024–24957 Filed 10–25–24; 8:45 am]

BILLING CODE 3510–DS–P

## DEPARTMENT OF COMMERCE

## International Trade Administration

**[A–331–805]**

## Frozen Warmwater Shrimp From Ecuador: Final Negative Determination of Sales at Less Than Fair Value

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** The U.S. Department of Commerce (Commerce) determines that imports of frozen warmwater shrimp (shrimp) from Ecuador are not being, or not likely to be, sold in the United

# Tab 82

# P.R. 460

# C.R. 329

Barcode: 4655754-01 C-331-806 INV - Investigation

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
~~Business Proprietary Document~~
E&C/OIV: RA
**Public Version**

**DATE:** October 21, 2024

**MEMORANDUM TO:** The File

**THROUGH:** Robert Boling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

**FROM:** Reginald Anadio
International Trade Compliance Analyst
for Antidumping and Countervailing Duty Operations

**SUBJECT:** Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Final Determination Calculations for Sociedad Nacional de Galapagos C.A.

---

On April 1, 2024, the U.S. Department of Commerce (Commerce) published the preliminary determination in this investigation.[1] On April 25, 2024, Commerce published an amended preliminary determination.[2] On July 12, 2024, Commerce published its first post-preliminary determination.[3] On September 26, 2024, Commerce published its second post-preliminary determination.[4]

Attached are the calculations for the above-referenced final determination for Sociedad Nacional de Galápagos C.A. (SONGA) and certain cross-owned entities.[5] The period of investigation (POI) is January 1, 2022, through December 31, 2022. The following is a brief explanation of the calculation methodologies. A summary of the countervailable subsidies can be found at Attachment I and detailed calculations can be found at Attachment II.

**Total Subsidy Rate**: 4.41 % *ad valorem*.

---

[1] *See Frozen Warmwater Shrimp from Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With the Final Antidumping Duty Determination*, 89 FR 22379 (April 1, 2024) (Preliminary Determination), and accompanying Preliminary Decision Memorandum (PDM).
[2] *See Frozen Warmwater Shrimp from Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation*, 89 FR 31722 (April 25, 2024).
[3] *See* Memorandum, "Post-Preliminary Analysis," dated July 12, 2024 (First Post-Preliminary Decision).
[4] See Memorandum, "Second Post-Preliminary Analysis," dated September 26, 2024 (Second Post-Preliminary Decision).
[5] The entities that we preliminarily determined are cross-owned with SONGA are Naturisa S.A. (Naturisa), Holding Sola & Sola Solacciones S.A., (Sola) and Empacadora Champmar S.A. (Champmar).

Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:46 PM, Submission Status: Approved

INTERNATIONAL TRADE ADMINISTRATION

Barcode: 4655754-01 C-331-806 INV - Investigation

## I. General

### A. Currency

SONGA reported that they maintain their books and records in U.S. dollars (USD), which is the currency of circulation in Ecuador.[6] Thus, we calculated all programs in the original currency in which they were provided to SONGA (*i.e.*, USD). The currency selection is unchanged for this final determination.

### B. Allocation Period

The average useful life (AUL) period in this proceeding as described in 19 CFR 351.524(d)(2) is 12 years according to the U.S. Internal Revenue Services 1977 Class Life Asset Depreciation Range System. No party in this investigation challenged the proposed AUL period. The allocation period is unchanged for this final determination.

### C. Sales Value and Attribution

Based on minor corrections accepted by Commerce at verification, Commerce made certain changes to SONGA's sales values. *See* subsection "SONGA's Sales Data," below. Our attribution of subsidies for SONGA and certain of its cross-owned entities remains unchanged for this final determination.

### D. Value Added Calculation

As stated in the accompanying Issues and Decision Memorandum (IDM), we disagree with SONGA's calculation of the value added of SONGA's processing operations on frozen shrimp(*i.e.*, [ ] percent).[7] Specifically, SONGA calculated the value added of its processing operations by taking the difference between raw shrimp purchased by SONGA (*i.e.*. USD $[ ]) during the period October 1, 2022, through September 30, 2023,[8] and the finished frozen shrimp *ex*-factory sales prices (*i.e.*, USD $[ ]) during the same period, and dividing the resulting difference (*i.e.*, USD $[ ]) by the raw shrimp input price.[9] Commerce recalculated the estimated value added of SONGA's processing operations on frozen shrimp based on SONGA's data by dividing the difference between the raw shrimp purchase price and the frozen shrimp ex-factory sales price by the frozen shrimp *ex*-factory sales price. Following this methodology, Commerce calculated a value-added of [ ] percent for SONGA.[10]

### E. *De Facto* Specificity

---

[6] *See* SONGA's Letter, "SONGA Supplemental Section III Questionnaire Response," dated March 1, 2024, at S-5.1
[7] *See* IDM at Comment 13; *see also* SONGA's Letter, "Frozen Warmwater Shrimp from Ecuador – SONGA's 771B Questionnaire Response," dated April 25, 2024 (SONGA's Section 771B QR).
[8] *See* SONGA's Section 771B QR at 4 and Exhibit 4.
[9] *Id.* at 4 and Exhibit 3.
[10] *See* Attachment II.



Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:46 PM, Submission Status: Approved

Barcode: 4655754-01 C-331-806 INV - Investigation

As stated in the accompanying IDM,[11] Commerce received comments regarding our determination from the *Preliminary Determination*[12] and the Second Post-Preliminary Decision[13] regarding its finding that the following programs used by SONGA and/or its cross-owned affiliates were *de facto* specific: (1) the Environmental Tax Incentives program; (2) the Investment Contract program; and (3) the Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities program. However, for the following reasons, we continue to find that these programs are *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act of 1930, as amended (the Act),

Regarding the Environmental Tax Incentives program, the GOE reported that the number of companies that were approved to receive assistance under this program in 2019, 2020, and 2021, were [ ], [ ], and [ ] companies, respectively,[14] and that the total number of companies registered in Ecuador in 2019, 2020, and 2021 were [ ], [ ], and [ ] companies, respectively.[15] Based on these data, the percent of companies that were approved assistance under this program out of all companies registered in Ecuador in the years 2019, 2020, and 2021, were [ ] percent, [ ] percent, and [ ] percent, respectively.[16] Therefore, because the number of companies that received assistance under this program constitute [ ] of the total number of companies registered in Ecuador between 2019 and 2021, we continue to find that assistance under this program was provided to a limited number of users and, thus, is *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act.

Regarding the Investment Contract program, the GOE reported that the number of companies that entered into an investment contract in 2019, 2020, 2021, and 2022, were [ ], [ ], [ ], and [ ] companies, respectively,[17] and that the total number of companies registered in Ecuador in 2019, 2020, 2021, and 2022 were [ ], [ ], [ ], and [ ] companies, respectively.[18] Based on these data, the percent of companies that were approved assistance under this program out of all companies registered in Ecuador in the years 2019, 2020, 2021, and 2022, were [ ] percent, [ ] percent, [ ] percent, and [ ] percent, respectively.[19] Therefore, because the number of companies that received assistance under this program constitute [ ] of the total number of companies registered in Ecuador between 2019 and 2022, we continue to find that assistance under this program was provided to a limited number of users and, thus, is *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act.

Finally, regarding the Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities program, the GOE reported that the number of companies that were approved assistance under this program in 2020, 2021, and 2022, were [ ], [ ], and [ ] companies,

---

[11] *See* IDM at Comment 10.
[12] *See Preliminary Determination* PDM at 13-15 and 23-26.
[13] *See* Second Post-Preliminary Decision at
[14] *See* GOE's Letter, "Frozen Warmwater Shrimp from Ecuador – Government of Ecuador's Supplemental Section II Questionnaire Response," dated March 13, 2024 (GOE's Section II SQR1), at Exhibit S-Q-3(a).
[15] *Id.* at Exhibit S-Q3(b).
[16] *See* Attachment II at tab "De Facto."
[17] *See* GOE's Letter, "Frozen Warmwater Shrimp from Ecuador – Government of Ecuador's Section II Questionnaire Response," dated February 14, 2024 (GOE's Section II IQR), at Exhibit OTH-2(b).
[18] *See* GOE's Section II SQR1 at Exhibit S-Q3(b).
[19] *See* Attachment II at tab "De Facto."



Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:46 PM, Submission Status: Approved

Barcode: 4655754-01 C-331-806 INV - Investigation

respectively,[20] and that the total number of companies registered in Ecuador in 2020, 2021, and 2022 were [ ], [ ], and [ ] companies, respectively.[21] Based on these data, the percent of companies that were approved assistance under this program out of all companies registered in Ecuador in the years 2020, 2021, and 2022, were [ ] percent, [ ] percent, and [ ] percent, respectively.[22] Therefore, because the number of companies that received assistance under this program constitute [ ] of the total number of companies registered in Ecuador between 2020 and 2022, we continue to find that assistance under this program was provided to a limited number of users and, thus, is *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act.

## II. Changes from the *Preliminary Determination*

### 1. Provision of Electricity for Less Than Adequate Remuneration (LTAR)

For the final determination, Commerce is making three changes to its calculation of the provision of electricity for LTAR.

First, according to comment 7 of the IDM, Commerce is incorporating all reported electricity in its benefit analysis since we found at verification that "all electricity consumption locations that have been previously reported, even if the electricity template description pertained to a non-selected cross-owned entity, were used and paid by Naturisa."[23] This includes the [ ] at [ ], [ ] at [ ], [ ] at [ ], [ ] at [ ], [ ] at [ ], and [ ] at [ ].[24]

Second, per SONGA's minor corrections presented at verification,[25] we updated SONGA's reported electricity consumptions and incorporated the [ ] previously unreported meters.

Third, per the changes described above, we recalculated our comparison of SONGA's electricity consumption to the Ecuadorian average electricity consumer on a tariff category specific basis. In total, SONGA's entity consumed [ ] kWh of industrial electricity, [ ] kWh of water pumping electricity, and [ ] kWh of commercial electricity. According to the 2022 Electricity Statistics, in 2022, there were [ ] commercial electricity consumers, [ ] industrial electricity consumers, and [ ] others electricity consumers who consumed [ ] GWh of commercial electricity, [ ] GWh of industrial electricity, and [ ] GWh of

[20] *See* GOE's Letter, "Frozen Warmwater Shrimp from Ecuador – Government of Ecuador's Third Post-Preliminary Supplemental Questionnaire Response," dated July 10, 2024, at Exhibit S5-6.
[21] See GOE's Section II SQR1 at Exhibit S-Q3(b).
[22] *See* Attachment II at tab "De Facto."
[23] *See* Memorandum, "Verification of the Questionnaire Responses of Sociedad Nacional de Galapagos C.A.," dated August 13, 2024 (Verification Report), at 2.
[24] *Id.* at Exhibit VE-1 (changed after its initial reporting in SONGA's Letter, "SONGA Affiliated Companies Supplemental Questionnaire Response," dated March 18, 2024 (SONGA's ASQR), at Exhibit S-AFF-Q23a).
[25] *Id*. at 3-4 and Exhibit VE-1.



Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:46 PM, Submission Status: Approved

"Others" electricity, respectively.[26] Therefore, SONGA's entity consumed [ ] times more than the average Ecuadorian commercial consumer, [ ] times more than the average Ecuadorian industrial consumer, and [ ] times more than the average Ecuadorian water pumping consumer.

For each location that consumed electricity, we calculated a per kWh amount paid and compared it to the regional distributor's electricity generating cost of service.[27] The benefit calculation followed Commerce's methodology described in its First Post-Preliminary Decision. We note that per the changes described above, the combined benefit under this program is [ ] USD and we have attributed the subsidy benefits to unaffiliated shrimp farmers who supplied raw shrimp to SONGA during the POI. On this basis, we determine that SONGA received a countervailable subsidy of 0.03 percent *ad valorem* under this program.[28]

**2. Land Concessions and Benchmark**

For the final determination, Commerce is making three changes to its calculation of the government provision of land use concessions for aquaculture facilities in beaches and bays.

First, per comment 7 of the accompanying IDM and Commerce's verification report, Commerce noted that a concession held by a non-selected cross-owned company, *i.e.*, concession number [ ], was operated and used by Naturisa during the POI.[29] Consequently, consistent with the Preliminary Determination,[30] we compared the government of Ecudaor (GOE) provision of concession [ ] to Naturisa against its benchmark described below. We found that concession [ ] did not provide a benefit.

Second, per comment 7 of the accompanying IDM and Commerce's verification report, we set the annual use fees paid for concession number [ ] to zero, which results in a benefit of [ ] USD to the total benefit under the government provision of land use concessions for aquaculture facilities in beaches and bays.

Third, per comment 9 of the accompanying IDM, Commerce finds that it is necessary for this final determination to adjust the per-unit purchase prices of land calculated by Commerce in the *Preliminary Determination* to an annualized basis to reflect the fact that concessions are not permanent conferrals of land ownership and to reflect the fact that concession holders pay annual concession fees.[31] Therefore, we divided its land benchmark under each concession by the term of the concession.

The benefit calculation followed our methodology described in its Preliminary Determination. We note that per changes described above, the combined benefit under this program is [ ] USD and we have attributed the subsidy benefits to unaffiliated shrimp farmers who supplied

[26] *See* GOE's Letter, "Government of Ecuador's Post-Preliminary Supplemental Questionnaire Response," dated May 16, 2024, at tables no. 1 and 4.
[27] *See* Verification Report at Exhibit VE-7; *see also* GOE's Section II IQR at Exhibit LTAR-3(c) at Table No. 25.
[28] *See* Attachment II.
[29] *See* SONGA's ASQR at Exhibit S-AFF-26b; *see also* Verification Report at 2.
[30] *See Preliminary Determination* PDM at 21-23.
[31] *See* IDM at 12-13 and Comment 9.



Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:46 PM, Submission Status: Approved

raw shrimp to SONGA during the POI. On this basis, we determine that SONGA received a countervailable subsidy of 0.01 percent *ad valorem* under this program.[32]

**3. Currency Outflow Tax (ISD) Exemption for Imported Assets and Raw Materials**

For the final determination, Commerce is making a change to its calculation of the ISD exemption for imported assets and raw materials. As stated in the accompanying IDM[33] and according to section 776(d)(1)(A)(i) of the Act, we relied on Adverse Facts Available (AFA) to assign a 1.38 percent *ad valorem* rate to SONGA's Investment Contract ISD Exemption for Imported Assets and Raw Materials program.

**4. Motor Vehicle Tax Reduction**

For the final determination, Commerce is making a change to its calculation of the motor vehicle tax reduction program. As stated in the accompanying IDM[34] and according to section 776(d)(2) of the Act, we relied on AFA to assign a 1.38 percent *ad valorem* rate to SONGA's entity under the Motor Vehicle Tax Reduction program.

**5. SONGA's Sales Data**

Consistent with the accepted minor correction during verification,[35] Commerce is adjusting certain line items of SONGA's sales values for the final determination. Specifically, we adjusted [ ], [ ], [ ], and [ ]. We note that this change [ ] affect our calculation under [ ] program.

**6. Refund of ISD on Purchase of Inputs**

For the final determination, Commerce is adjusting SONGA's claimed deduction under the refund of ISD on purchase of inputs program. As described in comment 12 of the accompanying IDM, we is adjusted the claimed deduction to reflect the amount reported on line 862 of SONGA's tax return filing, *i.e.*, [ ] USD. The benefit calculation followed Commerce's methodology described in its Preliminary Determination. On this basis, we determine that SONGA received a countervailable subsidy of 0.03 percent *ad valorem* under this program.[36]

**7. Investment Contract ISD Exemption on Principal and Interest on Foreign Loans**

Consistent with the accepted minor correction during verification,[37] Commerce adjusted the ISD exemption on foreign loans available pursuant to the investment contract. Accordingly, the

---

[32] *See* Attachment II.
[33] *See* IDM at 10 and 11, 13 and 14, and Comments 5 and 15.
[34] *Id.* at 10 and 11, 16,and Comments 5 and 16.
[35] *See* Verification report at 3 and Exhibit VE-1 at Attachment 1.
[36] *See* Attachment II.
[37] *See* Verification report at 3 and Exhibit VE-1 at Attachment 5.



Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:46 PM, Submission Status: Approved

Barcode: 4655754-01 C-331-806 INV - Investigation

reported benefit has been updated to [ ] USD and, on this basis, we determine that SONGA received a countervailable subsidy of 0.02 percent *ad valorem* under this program.[38]

**8. Municipal Tax Exemption on Total Assets**

As stated in the accompanying IDM,[39] for the final determination, Commerce adjusted its application of the section 771B of the Act provision for the municipal tax exemption on total assets to only apply the benefit to the total volume of raw shrimp purchased from non-cross-owned entities in covered municipalities. We note that where the location was ambiguous and Commerce lacked record information to substantiate the municipality of a given shrimp supplier, we included the quantity in our calculation of a subsidy rate under section 771B of the Act.

[38] *See* Attachment II.
[39] *See* IDM at 17 and 18 and Comment 13.



Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:46 PM, Submission Status: Approved

Barcode: 4655754-01 C-331-806 INV - Investigation

# Attachment I

## Summary of Countervailable Subsidy Rates for Sociedad Nacional de Galapagos C.A.

(Public Document)

| Subsidy Program | Rate |
|---|---|
| Environmental Tax Incentives | 0.04% |
| Refund of ISD on Purchase of Inputs | 0.03% |
| Export Tax Incentives for Sustained/Increased Employment | 0.06% |
| Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays | 0.01% |
| Investment Contract: Accumulated Investment Tax Rate Reduction | 1.30% |
| AFA: ISD exemption on imported materials | 1.38% |
| Investment Contract: ISD Exemption on foreign loans | 0.02% |
| Municipal Tax Exemption on Total Assets | 0.05% |
| Provision of Electricity for LTAR | 0.03% |
| Hiring of Additional Personnel | 0.05% |
| AFA: Motor Vehicle Tax Reduction | 1.38% |
| Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities | 0.06% |
| **Total Countervailable Subsidy Rate** | **4.41%** |



Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:46 PM, Submission Status: Approved

Barcode: 4655754-01 C-331-806 INV - Investigation

# Attachment II

## Calculation Workbook

(*See* Data File – Not Amenable for Public Summary)



Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:46 PM, Submission Status: Approved

# Tab 83

# P.R. 461

# C.R. 331

Barcode:4655772-01 C-331-806 INV - Investigation -

UNITED STATES DEPARTMENT OF COMMERCE
International Trade Administration
Washington, D.C. 20230

C-331-806
Investigation
~~Business Proprietary Document~~
E&C/OIV: ZS
**Public Version**

**DATE:** October 21, 2024

**MEMORANDUM TO:** The File

**THROUGH:** Robert Boling
Program Manager
AD/CVD Operations, Office IV
Enforcement and Compliance

**FROM:** Zachary Shaykin
International Trade Compliance Analyst
AD/CVD Operations, Office IV
Enforcement and Compliance

**SUBJECT:** Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Final Determination Calculations for Industrial Pesquera Santa Priscila S.A.

---

On April 1, 2024, the U.S. Department of Commerce (Commerce) published the preliminary determination in this investigation.[1] On April 25, 2024, Commerce published an amended preliminary determination.[2] On July 12, 2024, Commerce published its first Post-Preliminary Determination.[3] On September 26, 2024, Commerce published its Second Post-Preliminary Determination.[4]

Attached are the calculations for the final determination for Industrial Pesquera Santa Priscila S.A. (Santa Priscila) and certain cross-owned entities.[5] The period of investigation (POI) is January 1, 2022 through December 31, 2022. The following is a brief explanation of the calculation methodologies. A summary of the countervailable subsidies can be found at Attachment I and detailed calculations can be found at Attachment II.

---

[1] *See Frozen Warmwater Shrimp from Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination with the Final Antidumping Duty Determination*, 89 FR 22379 (April 1, 2024) (*Preliminary Determination*), and accompanying Preliminary Decision Memorandum (PDM).
[2] *See Frozen Warmwater Shrimp from Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation*, 89 FR 31722 (April 25, 2024) (*Amended Preliminary Determination*).
[3] *See* Memorandum, "Post-Preliminary Analysis," dated July 12, 2024 (First Post-Preliminary Determination)
[4] *See* Memorandum, "Second-Post-Preliminary Analysis," dated September 26, 2024 (Second Post-Preliminary Determination).
[5] The entities that we determine are cross-owned with Santa Priscila are Manesil S.A. (Manesil), Produmar S.A. (Produmar), Egidiosa S.A. (Egidiosa), and Tropical Packing Ecuador S.A. (Tropack).

Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:56 PM, Submission Status: Approved

**Total Subsidy Rate**: 3.57 % *ad valorem*.

## I. General

### A. Currency

Santa Priscila reported that they maintain their books and records in U.S. dollars (USD), which is the currency of circulation in Ecuador.[6] Thus, we calculated all programs in the original currency in which they were provided to Santa Priscila (*i.e.*, USD). The currency selection is unchanged for this final determination.

### B. Allocation Period

The average useful life (AUL) period in this proceeding as described in 19 CFR 351.524(d)(2) is 12 years according to the U.S. Internal Revenue Services 1977 Class Life Asset Depreciation Range System. No party in this investigation challenged the proposed AUL period. The allocation period is unchanged for this final determination.

### C. Sales Value and Attribution

Based on comments received in interested parties' case and rebuttal briefs,[7] Commerce made certain changes regarding the attribution of subsidies to Produmar (a producer of fresh shrimp that supplied Santa Priscila during the POI) and Egidiosa (a shrimp hatchery cross-owned with Santa Priscila). Specifically, pursuant to 19 CFR 351.525(b)(6)(iv), we attributed subsidies to Produmar to the combined sales of Produmar, Santa Priscila, and Tropack (a cross-owned producer of Santa Priscila), net of intercompany sales, and for Egidiosa, we attributed subsidies to Egidiosa to the combined sales of Egidiosa, Santa Priscila, and Tropack.

For subsidies attributable to Tropack, our attribution remains unchanged from the *Preliminary Determination*. Pursuant to 19 CFR 351.525(b)(6)(ii), we attributed subsidies to Santa Priscila to the combined sales of Santa Priscila and a cross-owned producer of subject merchandise, Tropack, net of inter-company sales. Furthermore, we continue to find that Santa Priscila's parent company, Manesil, *i.e.*, a holding company with no operations that owned Santa Priscila during the POI, reported that it did not receive nor transfer the benefits from any countervailable programs during the POI.[8]

Additionally, we are making changes to Commerce's calculation of company specific benefits under each program. Specifically, for benefits received by more than one entity within Santa Priscila's cross-owned entity, we first summed the benefits attributed to all entities that utilized

---

[6] *See* Santa Priscila's Letter, "Frozen Warmwater Shrimp from Ecuador – Santa Priscila's Supplemental Section III Questionnaire Response," dated March 1, 2024 (Santa Priscila's Section III SQR) at S-5.

[7] *See* Memorandum, "Issues and Decision Memorandum for the Final Affirmative Determination of the Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador," dated concurrently with this memorandum (Issues and Decision Memorandum) at Comment 11.

[8] *See* Santa Priscila's Letter, "Frozen Warmwater Shrimp from Ecuador – Section III of Supplier Questionnaire Response," dated February16, 2024 (Santa Priscila's Supplier Section III IQR), at MAN-1 through MAN-6.

the program and then attributed the combined benefits to the applicable total sales value, net of intercompany sales.

### D. Attribution of Subsidies Pursuant to 771B of the Act

Based on comments received in interested parties' case and rebuttal briefs,[9] we have made certain changes regarding our calculations of benefits attributed to non-cross-owned shrimp suppliers pursuant to section 771B of the Tariff Act of 1930 as amended (the Act). Specifically, regarding subsidies attributed to non-cross-owned shrimp suppliers based on benefits received by Santa Priscila, Tropack, and/or Produmar, we have combined the benefits and the volume of shrimp produced for each entity and calculated a weight-average net subsidy rate attributable to non-cross-owned shrimp suppliers of Santa Priscila during the POI. For Egidiosa, which is a shrimp hatchery and, thus, does not produce raw shrimp, we have separately calculated benefits attributed to non-cross-owned shrimp suppliers of Santa Priscila during the POI by dividing the benefit received by Egidiosa by the total volume of shrimp supplied to Santa Priscila.

### E. Value-Added Calculation

As stated in the accompanying Issues and Decision Memorandum (IDM), we disagree with Santa Priscila's calculation of the value added of its processing operations on frozen shrimp (*i.e.*, [ ] percent during the period October 1, 2022 through September 30, 2023, and [ ] percent during the period October 1, 2022, through December 31, 2022).[10] Santa Priscila reported the average purchase price for head-on raw shrimp purchased by Santa Priscila of USD $[ ] and USD $[ ] per pound (lbs.) during the periods October 1, 2022, through September 30, 2023, and October 1, 2022, through December 31, 2022, respectively,[11] and reported the average net *ex*-factory selling price for frozen shrimp of USD $[ ] and USD $[ ] per lbs. for the periods October 1, 2022, through September 30, 2023, and October 1, 2022, through December 31, 2022, respectively.[12] Based on this data, Commerce calculated a value-added of [ ] and [ ] percent for Santa Priscila for the periods October 1, 2022, through September 31, 2023, and October 1, 2022, through December 31, 2022, respectively, by taking the difference between the average net *ex*-factory sales price of frozen shrimp and the average purchase price of raw shrimp and dividing the resulting differences by the average net *ex*-factory sales price of frozen shrimp for each respective period.[13]

### F. *De Facto* Specificity

As stated in the accompanying IDM,[14] Commerce received comments regarding our determination from the *Preliminary Determination*,[15] the First Post-Preliminary Determination,

[9] *See* Issues and Decision Memorandum.
[10] *See* IDM at Comment 13; *see also* SONGA's Letter, "Frozen Warmwater Shrimp from Ecuador – Santa Priscila's 771B Questionnaire Response," dated April 25, 2024 (Santa Priscila's Section 771B QR).
[11] *See* Santa Priscila's Section 771B QR at 4 and Exhibit 4.
[12] *Id.* at 4 and Exhibit 3.
[13] *See* Attachment II at tab "Value Added."
[14] *See* IDM at Comment 10.
[15] *See Preliminary Determination* PDM at 13-15 and 23-26.

and the Second Post-Preliminary Decision[16] regarding its finding that the following programs used by Santa Priscila and/or its cross-owned affiliates are *de facto* specific: (1) the Environmental Tax Incentives program; (2) the Investment Contract program; (3) the Exemption from Currency Outflow Tax (ISD) on Payments on Principal and Interest Payments on Foreign Loans program; (4) Youth Employment – Article 16 of Labor Law program; (5) the Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities program; and (6) the Motor Vehicle Tax Reduction Program. However, for the following reasons, we continue to find that these programs are *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act of 1930, as amended (the Act),

Regarding the Environmental Tax Incentives program, the GOE reported that the number of companies that were approved to receive assistance under this program in 2019, 2020, and 2021, were [ ], [ ], and [ ] companies, respectively,[17] and that the total number of companies registered in Ecuador in 2019, 2020, and 2021 were [ ], [ ], and [ ] companies, respectively.[18] Based on these data, the percent of companies that were approved assistance under this program out of all companies registered in Ecuador in the years 2019, 2020, and 2021, were [ ] percent, [ ] percent, and [ ] percent, respectively.[19] Therefore, because the number of companies that received assistance under this program constitute [ ] of the total number of companies registered in Ecuador between 2019 and 2021, we continue to find that assistance under this program was provided to a limited number of users and, thus, is *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act.

Regarding the Investment Contract program, the GOE reported that the number of companies that entered into an investment contract in 2019, 2020, 2021, and 2022, were [ ], [ ], [ ], and [ ] companies, respectively,[20] and that the total number of companies registered in Ecuador in 2019, 2020, 2021, and 2022 were [ ], [ ], [ ], and [ ] companies, respectively.[21] Based on these data, the percent of companies that entered into contracts under this program out of all companies registered in Ecuador in the years 2019, 2020, 2021, and 2022, were [ ] percent, [ ] percent, [ ] percent, and [ ] percent, respectively.[22] Therefore, because the number of companies that entered into investment contracts under this program constitute [ ] of the total number of companies registered in Ecuador between 2019 and 2022, we continue to find that assistance under this program was provided to a limited number of users and, thus, is *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act.

Regarding the Exemption from ISD on Payments on Principal and Interest Payments on Foreign Loans program, the GOE reported that the number of companies that were approved to receive assistance under this program in 2020, 2021, and 2022, were [ ], [ ], and [ ] companies,

---

16 *See* Second Post-Preliminary Decision at

17 *See* GOE's Letter, "Frozen Warmwater Shrimp from Ecuador – Government of Ecuador's Supplemental Section II Questionnaire Response," dated March 13, 2024 (GOE's Section II SQR1), at Exhibit S-Q-3(a).

18 *Id.* at Exhibit S-Q3(b).

19 *See* Attachment II at tab "De Facto."

20 *See* GOE's Letter, "Frozen Warmwater Shrimp from Ecuador – Government of Ecuador's Section II Questionnaire Response," dated February 14, 2024 (GOE's Section II IQR), at Exhibit OTH-2(b).

21 *See* GOE's Section II SQR1 at Exhibit S-Q3(b).

22 *See* Attachment II at tab "De Facto."

respectively,[23] and that the total number of companies registered in Ecuador in 2020, 2021, and 2022, were [ ], [ ], and [ ] companies, respectively.[24] Based on these data, the percent of companies that were approved assistance under this program out of all companies registered in Ecuador in the years 2020, 2021, and 2022, were [ ] percent, [ ] percent, and [ ] percent, respectively.[25] Therefore, because the number of companies that received assistance under this program constitute [ ] of the total number of companies registered in Ecuador between 2020 and 2022, we continue to find that assistance under this program was provided to a limited number of users and, thus, is *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act.

Regarding the Youth Employment - Article 16 of Labor Law program, the GOE reported that the number of companies that were approved assistance under this program in 2019 and 2020 were [ ] and [ ] companies, respectively,[26] and that the total number of companies registered in Ecuador in 2019 and 2020 were [ ], [ ] companies, respectively.[27] Based on these data, the percent of companies that were approved assistance under this program out of all companies registered in Ecuador in the years 2019 and 2022 were [ ] percent and [ ] percent, respectively.[28] Therefore, because the number of companies that received assistance under this program constitute [ ] of the total number of companies registered in Ecuador in 2019 and 2020, we continue to find that assistance under this program was provided to a limited number of users and, thus, is *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act.

Regarding the Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities program, the GOE reported that the number of companies that were approved assistance under this program in 2020, 2021, and 2022, were [ ], [ ], and [ ] companies, respectively,[29] and that the total number of companies registered in Ecuador in 2020, 2021, and 2022 were [ ], [ ], and [ ] companies, respectively.[30] Based on these data, the percent of companies that were approved assistance under this program out of all companies registered in Ecuador in the years 2020, 2021, and 2022, were [ ] percent, [ ] percent, and [ ] percent, respectively.[31] Therefore, because the number of companies that received assistance under this program constitute [ ] of the total number of companies registered in Ecuador between 2020 and 2022, we continue to find that assistance under this program was provided to a limited number of users and, thus, is *de facto* specific under the meaning of section 771(5A)(D)(iii)(I) of the Act.

Finally, as stated in the accompanying IDM, Commerce applied Adverse Facts Available (AFA) regarding the Motor Vehicle Tax Reduction program, because the Santa Priscila cross-owned

---

[23] *See* GOE's Section II SQR1 at Exhibit OTH-7.
[24] *Id.* at Exhibit S-Q3(b).
[25] *See* Attachment II at tab "De Facto."
[26] *See* GOE's Section II IQR at Exhibit OTH-2(b).
[27] *See* GOE's Section II SQR1 at Exhibit S-Q3(b).
[28] *See* Attachment II at tab "De Facto."
[29] *See* GOE's Letter, "Frozen Warmwater Shrimp from Ecuador – Government of Ecuador's Third Post-Preliminary Supplemental Questionnaire Response," dated July 10, 2024, at Exhibit S5-6.
[30] See GOE's Section II SQR1 at Exhibit S-Q3(b).
[31] *See* Attachment II at tab "De Facto."

entity failed to report its POI subsidy usage under this program.[32] Furthermore, because we lack this information, we stated that we applied adverse inferences to our *de facto* specificity analysis regarding this program.[33] Therefore, we find for this final determination that the benefit received by the Santa Priscila cross-owned entity is disproportionate and, thus, *de facto* specific under section 771(5A)(D)(iii)(III) of the Act.

## II. Changes from the *Preliminary Determination*

### 1. Environmental Tax Incentives

*Calculation Methodology: See* IDM at 11.

*Calculations*: *See* Attachment II at tab "EnTI."

*Final Subsidy Rate:* 0.01 percent.

For the final determination, we are making the below changes to our calculation of the Environmental Tax Incentives program.

As stated above, we are attributing to programs received by Santa Priscila's cross-owned input suppliers (*i.e.*, Produmar and Egidiosa) the relevant sales figure from Tropack, net of intercompany sales. Therefore, pursuant to 19 CFR 351.5259(b)(6)(iv), we are attributing the benefit received by Produmar under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

Additionally, we revised our calculation of benefits attributed to unaffiliated suppliers of Santa Priscila during the POI pursuant to section 771B of the Act. Specifically, we attributed the estimated benefit calculated for unaffiliated shrimp suppliers under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

### 2. Investment Contract – Tax Rate Reduction

*Calculation Methodology: See* IDM at 13.

*Calculations*: *See* Attachment II at tab "INVEST."

*Final Subsidy Rate:* 1.38 percent.

For the final determination, we are making the below changes to our calculation of the Investment Contract – Tax Rate Reduction (Investment Contract) program.

First, we are calculating the benefits received by Santa Priscila and Produmar under the Tax Incentives for Priority Sectors Under the 2010 Organic Production Code program (Priority

---

[32] *See* IDM at 51.
[33] *Id.*

Sectors program) at the *Preliminary Determination*[34] as benefits received under the Investment Contract program, because the benefits Santa Priscila received that Commerce had originally attributed to the Priority Sectors program were made pursuant to Santa Priscila and Produmar's investments [ ] covered by its investment contract with the government of Ecuador (GOE).

Furthermore, as stated above, we are attributing to programs received by Santa Priscila's cross-owned input suppliers the relevant sales figure from Tropack, net of intercompany sales. Therefore, pursuant to 19 CFR 351.5259(b)(6)(iv), we are attributing the combined benefits received by Santa Priscila and Produmar under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

Additionally, we revised our calculation of the subsidy rate of benefits received by Produmar and Santa Priscila under this program and attributed to unaffiliated suppliers of Santa Priscila during the POI pursuant to section 771B of the Act. Specifically, we divided the combined benefits received by Santa Priscila and Produmar (*i.e.*, USD $[ ]) by the combined total volume of raw shrimp produced by Santa Priscila and Produmar (*i.e.*, [ ] lbs). We then multiplied the resulting per-unit subsidy rate (*i.e.*, [ ] percent) by the volume of shrimp supplied by unaffiliated shrimp suppliers during the POI (*i.e.*, [ ] lbs.). Finally, we attributed the resulting estimated benefit calculated for the unaffiliated raw shrimp suppliers to Santa Priscila (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

### 3. Refund of ISD on Purchase of Inputs

*Calculation Methodology: See* IDM at 11 and 12.

*Calculations*: *See* Attachment II at tab "ISD Refunds."

*Final Subsidy Rate:* 0.10 percent.

For the final determination, we are making the below changes to our calculation of the Refund of ISD on Purchase of Inputs program.

As stated above, we are attributing to programs received by Santa Priscila's cross-owned input suppliers the relevant sales figure from Tropack, net of intercompany sales. Therefore, pursuant to 19 CFR 351.5259(b)(6)(iv), we are attributing the combined benefits received by Santa Priscila and Produmar under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

Additionally, we revised our calculation of the subsidy rate of benefits received by Produmar and Santa Priscila under this program and attributed to unaffiliated suppliers of Santa Priscila during the POI pursuant to section 771B of the Act. Specifically, we combined the benefits received by Santa Priscila and Produmar (*i.e.*, USD $[ ]) and divided that by the combined total

[34] *See Preliminary Determination* PDM at 15 through 17; *see also Amended Preliminary Determination*.

volume of raw shrimp produced by Santa Priscila and Produmar (*i.e.*, [ ] lbs). We then multiplied the resulting per-unit subsidy rate (*i.e.*, [ ] percent) by the volume of shrimp supplied by unaffiliated shrimp suppliers during the POI (*i.e.*, [ ] lbs.). Finally, we attributed the resulting estimated benefit calculated for the unaffiliated raw shrimp suppliers to Santa Priscila (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

**4. Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays**

*Calculation Methodology: See* IDM at 12 and 13.

*Calculations*: *See* Attachment II at tab "Land LTAR."

*Final Subsidy Rate:* 0.03 percent.

For the final determination, we are making the below changes to our calculation of the Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays program.

First, we adjusted the per-unit land purchase prices calculated in the *Preliminary Determination* to represent per-unit land prices that are made on an annualized basis in order to reflect the fact that land-use concession fees are akin to yearly "rental" fees for terms up to 20 years.[35] Furthermore, Santa Priscila reported land use concessions [ ] 20-year term of validity for land-use concessions set by the GOE.[36]

In order to "annualize" the land benchmarks, for each land-use concession, we divided the land benchmark by length, in years, of the length of the term, in years, of the latest concession renewal. We then subtracted from that value the total fees associated with each land-use concession to derive a benefit for each land-use concession.

Furthermore, as stated above, Commerce is attributing to programs received by Santa Priscila's cross-owned input suppliers the relevant sales figure from Tropack, net of intercompany sales. Therefore, pursuant to 19 CFR 351.5259(b)(6)(iv), we are attributing the combined benefits received by Santa Priscila and Egidiosa under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Egidiosa, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

**5. Municipal Tax Exemption on Total Assets**

*Calculation Methodology: See* IDM at 14.

*Calculations*: *See* Attachment II at tab "1.5MTI."

---

[35] *Id.*; *see also Preliminary Determination* and accompanying PDM at 22.
[36] *See* Santa Priscila Section III SQR at S-6 through S-11.

*Final Subsidy Rate:* 0.08 percent.

For the final determination, we are making the below changes to our calculation of the Municipal Tax Exemption on Total Assets program.

As stated above, we are attributing to programs received by Santa Priscila's cross-owned input suppliers the relevant sales figure from Tropack, net of intercompany sales. Therefore, pursuant to 19 CFR 351.5259(b)(6)(iv), we are attributing the combined benefits received by Santa Priscila and Produmar under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

Additionally, we revised our calculation of the subsidy rate of benefits received by Produmar and Santa Priscila under this program and attributed to unaffiliated suppliers of Santa Priscila during the POI pursuant to section 771B of the Act. First, for the final determination, we adjusted our application of the section 771B provision to this program to only apply the benefit reported by Santa Priscila and Produmar under this program to the total volume of raw shrimp purchased from non-cross-owned entities located in the municipalities that are eligible to receive benefits under this program (*i.e.*, [ ]). Therefore, in calculating the subsidies attributable to unaffiliated shrimp suppliers pursuant to section 771B of the Act, we calculated the total volume of raw shrimp supplied by non-cross-owned entities located in the cantons of [ ] (*i.e.*, [ ] lbs.) and [ ] (*i.e.*, [ ] lbs.) by summing the quantity of shrimp supplied by Santa Priscila's shrimp suppliers that were located in those cantons.[37]

Second, we combined the benefits received by Santa Priscila and Produmar (*i.e.*, USD $[ ]) and divided that benefit by the combined total volume of raw shrimp produced by Santa Priscila and Produmar (*i.e.*, [ ] lbs). We then multiplied the resulting per-unit subsidy rate (*i.e.*, [ ] percent) by the volume of shrimp supplied by unaffiliated shrimp suppliers during the POI and located in the cantons of [ ] (*i.e.*, [ ] lbs.). Finally, we attributed the resulting estimated benefit calculated for the unaffiliated raw shrimp suppliers to Santa Priscila (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

### 6. Municipal Tax Exemption – Patent Tax Program

*Calculation Methodology: See* IDM at 17 and 18.

*Calculations*: *See* Attachment II at tab "MPT."

*Final Subsidy Rate:* 0.00 percent (*de minimis*)

For the final determination, we are making the below changes to our calculation of the Municipal Tax Exemption on Total Assets program.

As stated above, Commerce is attributing to programs received by Santa Priscila's cross-owned input suppliers the relevant sales figure from Tropack, net of intercompany sales. Therefore,

[37] *See* Attachment II.

pursuant to 19 CFR 351.5259(b)(6)(iv), we are attributing the combined benefits received by Santa Priscila, Produmar, and Egidiosa under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Egidiosa, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

Additionally, we revised our calculation of the subsidy rate of benefits received by Produmar, Egidiosa, and Santa Priscila under this program and attributed to unaffiliated suppliers of Santa Priscila during the POI pursuant to section 771B of the Act. First, we adjusted our application of the section 771B provision to this program to only apply the benefit reported by Santa Priscila and Produmar under this program to the total volume of raw shrimp purchased from non-cross-owned entities located in the municipality in which Santa Priscila, Produmar, and Egidiosa received benefits (*i.e.*, [ ]). Therefore, in calculating the subsidies attributable to unaffiliated shrimp suppliers pursuant to section 771B of the Act, we calculated the total volume of raw shrimp supplied by non-cross-owned entities located in the cantons of [ ] (*i.e.*, [ ] lbs.), [ ] (*i.e.*, [ ] lbs.), and [ ] (*i.e.*, [ ] lbs.) by summing the quantity of shrimp supplied by Santa Priscila's shrimp suppliers that were located in those cantons.[38]

Second, with respect to Santa Priscila and Produmar, we combined the benefits received by Santa Priscila and Produmar (*i.e.*, USD $[ ]) and divided that benefit by the combined total volume of raw shrimp produced by Santa Priscila and Produmar (*i.e.*, [ ] lbs.). We then multiplied the resulting per-unit subsidy rate (*i.e.*, [ ] percent) by the volume of shrimp supplied by unaffiliated shrimp suppliers during the POI and located in the cantons of [ ] (*i.e.*, [ ] lbs). Finally, we attributed the resulting estimated benefit calculated for the unaffiliated raw shrimp suppliers to Santa Priscila (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

Third, with respect to Egidiosa, because Egidiosa is a shrimp hatchery, and not a raw shrimp producer, we calculated the subsidy rate attributable to non-cross-owned shrimp suppliers to Santa Priscila for Egidiosa's benefit separately from the rate attributed to non-cross-owned shrimp suppliers to Santa Priscila for Santa Priscila and Produmar. Specifically, we divided the benefit received by Egidiosa under this program (*i.e.*, USD $[ ]) by the volume of raw shrimp produced by Santa Priscila (*i.e.*, [ ] lbs.). We then multiplied the resulting per-unit subsidy rate (*i.e.*, [ ] percent) by the volume of shrimp supplied by unaffiliated shrimp suppliers during the POI and located in the canton of [ ] (*i.e.*, [ ] lbs.). Finally, we attributed the resulting estimated benefit calculated for the unaffiliated raw shrimp suppliers to Santa Priscila (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Egidiosa, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

**7. Exemption from ISD on Principal and Interest Payments on Foreign Loans**

*Calculation Methodology: See* IDM at 15 and 16.

*Calculations*: *See* Attachment II at tab "ISD EXEMP."

[38] *See* Attachment II.

*Final Subsidy Rate:* 0.02 percent

For the final determination, we are making the below changes to our calculation of the Exemption from ISD on Payments on Foreign Loans program.

As stated above, Commerce is attributing to programs received by Santa Priscila's cross-owned input suppliers (*i.e.*, Produmar and Egidiosa) the relevant sales figure from Tropack, net of intercompany sales. Therefore, pursuant to 19 CFR 351.5259(b)(6)(iv), we are attributing the combined benefits received by Santa Priscila and Produmar under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

Additionally, we revised our calculation of benefits attributed to unaffiliated suppliers of Santa Priscila during the POI pursuant to section 771B of the Act. Specifically, we attributed the estimated benefit calculated for unaffiliated shrimp suppliers under this program (*i.e.*, USD $[ ]) the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

**8. Hiring of Additional Personnel/Tax Deduction for Net Increase in Employment**

*Calculation Methodology: See* IDM at 15.

*Calculations*: *See* Attachment II at tab "EMPLOY."

*Final Subsidy Rate:* 0.02 percent.

For the final determination, we are making the below changes to our calculation of the Hiring of Additional Personnel/Tax Deduction for Net Increase in Employment program.

As stated above, we are attributing to programs received by Santa Priscila's cross-owned input suppliers (*i.e.*, Produmar and Egidiosa) the relevant sales figure from Tropack, net of intercompany sales. Therefore, pursuant to 19 CFR 351.5259(b)(6)(iv), we are attributing the benefit received by Produmar under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

Furthermore, in the Post-Preliminary Determination,[39] we inadvertently used Santa Priscila's total volume of produced shrimp (*i.e.*, [ ] lbs.) in its attribution of subsidy benefits received by Produmar to the unaffiliated shrimp farmers who supplied raw shrimp to Santa Priscila during the POI, rather than Produmar's shrimp production volume (*i.e.*, [ ] lbs). Therefore, for the final determination, we recalculated the per-unit subsidy rate attributable to unaffiliated shrimp farmers who supplied raw shrimp to Santa Priscila during the POI under this program for Produmar (*i.e.*, [ ] percent) by dividing the benefit received by Produmar under this program (*i.e.*, USD $[ ]) by Produmar's shrimp production volume (*i.e.*, [ ] lbs.).

[39] *See* Post-Preliminary Determination at 13 and 14.

Additionally, we revised our attribution of the estimated benefit calculated for unaffiliated shrimp suppliers under this program (*i.e.*, USD $[ ]) by attributing this benefit to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

### 9. Electricity for LTAR

*Calculation Methodology: See* IDM at 14 and 15.

*Calculations*: *See* Attachment II at tab "ELEC LTAR."

*Final Subsidy Rate:* 0.10 percent.

For the final determination, we iare making the below changes to our calculation of the Provision of Electricity for LTAR program.

First, at verification, we accepted two corrections regarding Produmar and Egidiosa's reporting of their consumption of electricity provided by [ ].[40] Company officials of Produmar and Egidiosa stated that they inadvertently [ ].[41] We corrected for this error, which resulted in a [ ] of USD $[ ] in the consumption of electricity per kilowatt hours (kWh) for Egidiosa and [ ] in the consumption of electricity per kWh for Produmar.[42]

Second, Egidiosa stated that it had misreported consumption of electricity consumed by [ ] during the POI for [ ].[43] Specifically, Egidiosa originally reported that it had consumed [ ] kWh and [ ] kWh in [ ], when it should have reported [ ] kWh and [ ] kWh consumed in [ ]. We corrected for this error, which resulted in an [ ] in Egidiosa's total reported consumption of electricity from [ ] of [ ] kWh during the POI.

Third, , we inadvertently [ ] in our calculation of Santa Priscila's electricity consumption from [ ] during the POI associated with the electric meter [ ] in the First Post-Preliminary Determination.[44] For the final determination, we [

---

[40] *See* Memorandum, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Verification of the Questionnaire Responses of Industrial Pesquera Santa Priscila S.A.," dated August 22, 2024 (Verification Report), at pages 2 and 3.
[41] *Id.* at 2.
[42] *Id.* at 2 and 3.
[43] *Id.* at 3.
[44] *See* Memorandum, "Countervailing Duty Investigation of Frozen Warmwater Shrimp from Ecuador: Post-Preliminary Determination Calculations for Santa Priscila S.A.," dated July 29, 2024 (Post-Preliminary Calculation Memorandum), at Attachment II.

] electricity consumption from our calculation of Santa Priscila's electricity consumption during the POI associated with electric meter [ ].

Fourth, in the *Preliminary Determination*, we inadvertently calculated Produmar's consumption of electricity from [ ] during the POI associated with Produmar's electric meter [ ] using the [ ] reported for Santa Priscila of USD $[ ], instead of the consumption associated with Produmar's electricity from [ ] of USD $[ ]. For the final determination, we corrected our calculation of electricity consumed by Produmar from [ ] to properly include the electricity consumed by Produmar from [ ] associated with electric meter [ ].

Fifth, as stated above, we are attributing to programs received by Santa Priscila's cross-owned input suppliers the relevant sales figure from Tropack, net of intercompany sales. Therefore, pursuant to 19 CFR 351.5259(b)(6)(iv), we are attributing the combined benefits received by Santa Priscila, Produmar, and Egidiosa under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Egidiosa, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

Sixth, we revised our attribution of the estimated benefit calculated for unaffiliated shrimp suppliers under this program pursuant to section 771B of the Act. Specifically, we combined the benefits received by Santa Priscila and Produmar (*i.e.*, USD $[ ]) and divided that benefit by the combined total volume of raw shrimp produced by Santa Priscila and Produmar (*i.e.*, [ ] lbs.). We then multiplied the resulting per-unit subsidy rate (*i.e.*, [ ] percent) by the volume of shrimp supplied by unaffiliated shrimp suppliers during the POI (*i.e.*, [ ] lbs.). Finally, we attributed the resulting estimated benefit calculated for the unaffiliated raw shrimp suppliers to Santa Priscila (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

With respect to Egidiosa, as stated above, we calculated the subsidy rate attributable to non-cross-owned shrimp suppliers to Santa Priscila for Egidiosa's benefit separately from the rate attributed to non-cross-owned shrimp suppliers to Santa Priscila for Santa Priscila and Produmar. Specifically, we divided the benefit received by Egidiosa under this program (*i.e.*, USD $[ ]) by the volume of raw shrimp produced by Santa Priscila (*i.e.*, [ ] lbs.). We then multiplied the resulting per-unit subsidy rate (*i.e.*, [ ] percent) by the volume of shrimp supplied by unaffiliated shrimp suppliers during the POI and located in the canton of Santa Elena (*i.e.*, [ ] lbs.). Finally, we attributed the resulting estimated benefit calculated for the unaffiliated raw shrimp suppliers to Santa Priscila (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Egidiosa, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

**10. Motor Vehicle Tax Reduction**

*Calculation Methodology: See* IDM at 16.

*Final Subsidy Rate:* 1.38 percent.



Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:56 PM, Submission Status: Approved

For the final determination, we are making a change to Santa Priscila's calculation of the motor vehicle tax reduction program. Pursuant to section 776(d)(2) of the Act, we relied on AFA to assign a 1.38 percent *ad valorem* rate to Santa Priscila's cross-owned entity under the Motor Vehicle Tax Reduction program.

**11. Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities**

*Calculation Methodology: See* IDM at 16 and 17.

*Calculations*: *See* Attachment II at tab "RETURNS."

*Final Subsidy Rate:* 0.01 percent.

For the final determination, we are making the below changes to our calculation of the Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities program.

As stated above, we are attributing to programs received by Santa Priscila's cross-owned input suppliers (*i.e.*, Produmar and Egidiosa) the relevant sales figure from Tropack, net of intercompany sales. Therefore, pursuant to 19 CFR 351.5259(b)(6)(iv), we are attributing the benefit received by Produmar under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).

Additionally, we revised our attribution of the estimated benefit calculated for unaffiliated shrimp suppliers under this program pursuant to section 771B of the Act. Specifically, we attributed the estimated benefit calculated for unaffiliated shrimp suppliers under this program (*i.e.*, USD $[ ]) to the total sales, net of intercompany sales, of Produmar, Santa Priscila, and Tropack (*i.e.*, USD $[ ]).



Filed By: Zachary Shaykin, Filed Date: 10/29/24 2:56 PM, Submission Status: Approved

# Attachment I

## Summary of Countervailable Subsidy Rates for Industrial Pesquera Santa Priscila S.A.

(Public Document)

| Subsidy Program | Subsidy Rate |
|---|---|
| Environmental Tax Incentives (EnTI) | 0.01% |
| Tax Incentives for Priority Sectors Under the 2010 Organic Production Code (2010 TAX) | 1.38% |
| Refund of Currency Outflow Tax (ISD) on Purchase of Inputs (ISD Refunds) | 0.10% |
| Export Tax Incentive (ExTI) | 0.30% |
| Export Tax Incentives for Sustained/Increased Employment (ExTI Employment) | 0.10% |
| Government Provision of Land Use Concessions for Aquaculture Facilities in Beaches and Bays (Land LTAR) | 0.03% |
| Municipal Tax Exemption on Total Assets (1.5MTI) | 0.08% |
| Exemption from Currency Outflow Tax (ISD) on Payments on Foreign Loans (ISD EXEMP) | 0.02% |
| Hiring of Additional Personnel/Tax Deduction for Net Increase in Employment (EMPLOY) | 0.02% |
| Electricity for LTAR (ELEC LTAR) | 0.10% |
| Youth Employment - Article 16 of Labor Law (YOUTH) | 0.04% |
| Motor Vehicle Tax Reduction Program (MOTOR)* | 1.38% |
| Income Tax Exemption on Financial Returns for Time Deposits and Fixed Income Securities (RETURNS) | 0.01% |
| **Total Countervailable Subsidy Rate** | **3.57%** |

*Rate based on adverse facts available.

# Attachment II

## Calculation Workbook

(*See* Data File – Not Amenable for Public Summary)

# Tab 84

# P.R. 467

proceeding. Timely notification of the return or destruction of APO materials or conversion to judicial protective order is hereby requested. Failure to comply with the regulations and the terms of an APO is a sanctionable violation.

**Notification to Interested Parties**

Commerce is issuing and publishing these final results and this notice in accordance with sections 751(c), 752(b), and 777(i)(1) of the Act, and 19 CFR 351.218.

Dated: December 18, 2024.

**Abdelali Elouaradia,**

*Deputy Assistant Secretary for Enforcement and Compliance.*

## Appendix

**List of Topics Discussed in the Issues and Decision Memorandum**

I. Summary
II. Background
III. Scope of the Order
IV. History of the Order
V. Legal Framework
VI. Discussion of the Issues
 1. Likelihood of Continuation or Recurrence of a Countervailable Subsidy
 2. Net Countervailable Subsidy Rates Likely To Prevail
 3. Nature of the Subsidies
VII. Final Results of Sunset Review
VIII. Recommendation

[FR Doc. 2024–30759 Filed 12–23–24; 8:45 am]

BILLING CODE 3510–DS–P

---

## DEPARTMENT OF COMMERCE

### International Trade Administration

**[A–560–842, C–331–806, C–533–921, C–552–838]**

### Frozen Warmwater Shrimp From Indonesia: Antidumping Duty Order; Frozen Warmwater Shrimp From Ecuador, India, and the Socialist Republic of Vietnam: Countervailing Duty Orders

**AGENCY:** Enforcement and Compliance, International Trade Administration, Department of Commerce.

**SUMMARY:** Based on affirmative final determinations by the U.S. Department of Commerce (Commerce) and the U.S. International Trade Commission (ITC), Commerce is issuing an antidumping duty (AD) order on frozen warmwater shrimp (shrimp) from Indonesia and countervailing duty (CVD) orders on shrimp from Ecuador, India, and the Socialist Republic of Vietnam (Vietnam).

**DATES:** Applicable December 26, 2024.

**FOR FURTHER INFORMATION CONTACT:** Benjamin Nathan (CVD India) at (202) 482–3834; Reginald Anadio or Zachary Shaykin (CVD Ecuador) at (202) 482–3166 or (202) 482–5377, respectively; Rachel Jennings or Miranda Bourdeau (AD Indonesia) at (202) 482–1110 or (202) 482–2021, respectively; and Adam Simons (CVD Vietnam) at (202) 482–6172; AD/CVD Operations, Offices II, IV, V, and IX, respectively, Enforcement and Compliance, International Trade Administration, U.S. Department of Commerce, 1401 Constitution Avenue NW, Washington, DC 20230.

**SUPPLEMENTARY INFORMATION:**

**Background**

In accordance with sections 705(d), 735(d), and 777(i) of the Tariff Act of 1930, as amended (the Act), on October 28, 2024, Commerce published its affirmative final determination of sales at less than fair value (LTFV) of shrimp from Indonesia,[1] and its affirmative final determinations that countervailable subsidies are being provided to producers and exporters of shrimp from Ecuador, India, and Vietnam.[2]

On December 12, 2024, pursuant to sections 705(d) and 735(d) of the Act, the ITC notified Commerce of its final affirmative determinations that an industry in the United States is materially injured by reason of dumped imports of shrimp from Indonesia, and subsidized imports of shrimp from Ecuador, India, and Vietnam, within the meaning of sections 705(b)(1)(A)(i) and 735(b)(1)(A)(i) of the Act.[3] On December 17, 2024, the ITC published its final determinations in the **Federal Register**.[4]

**Scope of the Orders**

The merchandise covered by these orders is frozen warmwater shrimp from Ecuador, India, Indonesia, and Vietnam. For a complete description of the scope of the orders, *see* the appendix to this notice.

**AD Order**

On December 12, 2024, in accordance with section 735(d) of the Act, the ITC notified Commerce of its final determinations that an industry in the United States is materially injured within the meaning of section 735(b)(1)(A)(i) of the Act by reason of imports of shrimp from Indonesia that are sold in the United States at LTFV.[5] Therefore, in accordance with sections 735(c)(2) and 736 of the Act, Commerce is issuing this AD order. Because the ITC determined that imports of shrimp from Indonesia are materially injuring a U.S. industry, unliquidated entries of such merchandise from Indonesia, entered or withdrawn from warehouse for consumption, are subject to the assessment of antidumping duties.

Therefore, in accordance with section 736(a)(1) of the Act, Commerce will direct U.S. Customs and Border Protection (CBP) to assess, upon further instruction by Commerce, antidumping duty deposits equal to the amount by which the normal value of the merchandise exceeds the export price (or constructed export price) of the merchandise on all relevant entries of shrimp from Indonesia. Antidumping duties will be assessed on unliquidated entries of shrimp entered, or withdrawn from warehouse, for consumption on or after May 30, 2024, the date of publication of the *LTFV Preliminary Determination,*[6] but will not include entries occurring after the expiration of the provisional measures period and before publication of the ITC's final injury determination, as further described below.

**Continuation of Suspension of Liquidation and Cash Deposits—AD**

Except as noted in the ''Provisional Measures—AD'' section of this notice, Commerce intends to instruct CBP to continue to suspend liquidation on all relevant entries of shrimp from Indonesia, in accordance with section 736 of the Act. Because the estimated weighted-average dumping margin calculated for PT Bahari Makmur Sejati (BMS) in the *Final Determination* was zero,[7] entries of subject merchandise produced and exported by BMS will not be subject to this order. Accordingly, Commerce will direct CBP not to suspend liquidation of, or to require

---

[1] *See Frozen Warmwater Shrimp from Indonesia: Final Affirmative Determination of Sales at Less-Than-Fair Value,* 89 FR 85498 (October 28, 2024) (*Shrimp from Indonesia Final Results*).

[2] *See Frozen Warmwater Shrimp from Ecuador: Final Affirmative Countervailing Duty Determination,* 89 FR 85506 (October 28, 2024); *see also Frozen Warmwater Shrimp from India: Final Affirmative Countervailing Duty Determination,* 89 FR 85502 (October 28, 2024); and *Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Final Affirmative Countervailing Duty Determination,* 89 FR 85500 (October 28, 2024).

[3] *See* ITC's Letter, ''Notification of ITC Final Determination,'' dated December 12, 2024 (ITC Notification Letter).

[4] *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and Vietnam,* 89 FR 102163 (December 17, 2024).

[5] *See* ITC Notification Letter.

[6] *See Frozen Warmwater Shrimp from Indonesia: Preliminary Affirmative Determination of Sales at Less Than Fair Value, Postponement of Final Determination, and Extension of Provisional Measures,* 89 FR 46861 (May 30, 2024) (*LTFV Preliminary Determination*).

[7] *Shrimp from Indonesia Final Results,* 89 FR at 85499.

Filed By: Katrina Dyer, Filed Date: 12/26/24 12:42 PM, Submission Status: Approved

cash deposits of estimated antidumping duties on, entries of subject merchandise produced and exported by BMS. Therefore, in accordance with section 735(a)(4) of the Act and 19 CFR 351.204(e)(1), entries of subject merchandise from this producer/exporter combination will be excluded from the order. However, entries of subject merchandise from BMS in any other producer/exporter combination, or by third parties that sourced subject merchandise from the excluded producer/exporter combination, will be subject to suspension of liquidation and cash deposits of estimated antidumping duties at the all-others rate noted below. These instructions suspending liquidations will remain in effect until further notice.

Commerce also intends to instruct CBP to require cash deposits equal to the estimated weighted-average dumping margins indicated in the tables below. Accordingly, effective on the date of publication in the **Federal Register** of the notice of the ITC's final affirmative injury determination, CBP must require, at the same time as importers would normally deposit estimated customs duties on subject merchandise, a cash deposit equal to the rates listed in the table below.

**Estimated Weighted-Average Dumping Margins**

The estimated weighted-average dumping margins are as follows:

| Exporter/producer | Weighted-average dumping margin (percent) |
|---|---|
| PT Bahari Makmur Sejati | 0.00 |
| PT First Marine Seafoods; PT Khom Foods | 3.90 |
| All Others | 3.90 |

**Provisional Measures—AD**

Section 733(d) of the Act states that suspension of liquidation pursuant to an affirmative preliminary determination may not remain in effect for more than four months, except where exporters representing a significant proportion of exports of the subject merchandise request that Commerce extend the four-month period to no more than six months. At the request of exporters that accounted for a significant proportion of exports of shrimp from Indonesia, Commerce extended the four-month period to no more than six months.[8] In the underlying investigation, Commerce published the *LTFV Preliminary Determination* on May 30, 2024. Therefore, the six-month period beginning on the date of the publication of the *LTFV Preliminary Determination* ended on November 25, 2024. Pursuant to section 737(b) of the Act, the collection of cash deposits at the rates listed above will begin on the date of publication of the ITC's final injury determination. Therefore, in accordance with section 736(a)(1) of the Act and our practice, Commerce will instruct CBP to terminate the suspension of liquidation and to liquidate, without regard to antidumping duties, unliquidated entries of shrimp from Indonesia entered, or withdrawn from warehouse, for consumption on or after November 26, 2024, the first day provisional measures were no longer in effect, until and through the day preceding the date of publication of the ITC's final injury determination in the **Federal Register**. Suspension of liquidation and the collection of cash deposits will resume on the date of publication of the ITC's final determination in the **Federal Register**.

**CVD Orders**

As stated above, based on the above-referenced affirmative final determination by the ITC that an industry in the United States is materially injured within the meaning of section 705(b)(1)(A)(i) of the Act by reason of subsidized imports of shrimp from Ecuador, India, and Vietnam,[9] in accordance with section 705(c)(2) of the Act, Commerce is issuing these CVD orders. Moreover, because the ITC determined that imports of shrimp from Ecuador, India, and Vietnam are materially injuring a U.S. industry, unliquidated entries of subject merchandise from Ecuador, India, and Vietnam entered, or withdrawn from warehouse, for consumption, are subject to the assessment of countervailing duties.

Therefore, in accordance with section 706(a) of the Act, Commerce intends to direct CBP to assess, upon further instructions by Commerce, countervailing duties on all relevant entries of shrimp from Ecuador, India, and Vietnam, which are entered, or withdrawn from warehouse, for consumption on or after April 1, 2024, the date of publication of the *CVD Preliminary Determinations*,[10] but will not include entries occurring after the expiration of the provisional measures period and before the publication of the ITC's final injury determination under section 705(b) of the Act, as further described in the ''Provisional Measures—CVD'' section of this notice.

**Suspension of Liquidation and Cash Deposits—CVD**

In accordance with section 706 of the Act, Commerce intends to instruct CBP to reinstitute the suspension of liquidation of shrimp from Ecuador, India, and Vietnam, effective on the date of publication of the ITC's final affirmative injury determination in the **Federal Register**, and to assess, upon further instruction by Commerce, pursuant to section 706(a)(1) of the Act, countervailing duties on each entry of subject merchandise in an amount based on the net countervailable subsidy rates below. On or after the date of publication of the ITC's final injury determination in the **Federal Register**, CBP must require, at the same time as importers would normally deposit estimated customs duties on this merchandise, a cash deposit equal to the rates listed in the table below. These instructions suspending liquidation will remain in effect until further notice. The all-others rate applies to all producers or exporters not specifically listed below, as appropriate.

**Estimated Countervailing Duty Subsidy Rates**

The estimated countervailing duty subsidy rates are as follows:

[8] *See LTFV Preliminary Determination.*

[9] *See* ITC Notification Letter.

[10] *See Frozen Warmwater Shrimp from Ecuador: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With the Final Antidumping Duty Determination,* 89 FR 22379 (April 1, 2024); *see also Frozen Warmwater Shrimp from India: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination,* 89 FR 22386 (April 1, 2024); and *Frozen Warmwater Shrimp from the Socialist Republic of Vietnam: Preliminary Affirmative Countervailing Duty Determination, and Alignment of Final Determination With Final Antidumping Duty Determination,* 89 FR 22374 (April 1, 2024) (collectively, *CVD Preliminary Determinations*). We note that the preliminary determination for Ecuador was subsequently amended. *See Frozen Warmwater Shrimp from Ecuador: Amended Preliminary Determination of Countervailing Duty Investigation,* 89 FR 31722 (April 25, 2024).

| Company | Subsidy rate (percent *ad valorem*) |
|---|---|
| **Ecuador** | |
| Industrial Pesquera Santa Priscila S.A [11] | 3.57 |
| Sociedad Nacional de Galápagos C.A [12] | 4.41 |
| All Others | 3.78 |
| **India** | |
| Devi Sea Foods Limited [13] | 5.87 |
| Sandhya Aqua Exports Private Limited [14] | 5.63 |
| All Others | 5.77 |
| **Vietnam** | |
| Soc Trang Seafood Joint Stock Company | 2.84 |
| Thong Thuan Company Limited | 221.82 |
| All Others | 2.84 |

## Provisional Measures—CVD

Section 703(d) of the Act states that the suspension of liquidation pursuant to an affirmative preliminary determination may not remain in effect for more than four months. Commerce published the *CVD Preliminary Determinations* on April 1, 2024.[15] As such, the four-month period beginning on the date of the publication of the *CVD Preliminary Determinations* ended on July 29, 2024.

Therefore, in accordance with section 703(d) of the Act, we instructed CBP to terminate the suspension of liquidation and to liquidate, without regard to countervailing duties, unliquidated entries of shrimp from Ecuador, India, and Vietnam or withdrawn from warehouse, for consumption, on or after July 30, 2024, the date on which the provisional measures expired, until and through the day preceding the date of publication of the ITC's final injury determination in the **Federal Register**. Suspension of liquidation and the collection of cash deposits will resume on the date of publication of the ITC's final determination in the **Federal Register**.

## Establishment of the Annual Inquiry Service Lists

On September 20, 2021, Commerce published the *Final Rule* in the **Federal Register**.[16] On September 27, 2021, Commerce also published the *Procedural Guidance* in the **Federal Register**.[17] The *Final Rule* and *Procedural Guidance* provide that Commerce will maintain an annual inquiry service list for each order or suspended investigation, and any interested party submitting a scope ruling application or request for circumvention inquiry shall serve a copy of the application or request on the persons on the annual inquiry service list for that order, as well as any companion order covering the same merchandise from the same country of origin.

In accordance with the *Procedural Guidance,* for orders published in the **Federal Register** after November 4, 2021, Commerce will create an annual inquiry service list segment in Commerce's online e-filing and document management system, Antidumping and Countervailing Duty Electronic Service System (ACCESS), available at *https://access.trade.gov,* within five business days of publication of the notice of the order. Each annual inquiry service list will be saved in ACCESS, under each case number, and under a specific segment type called ''AISL-Annual Inquiry Service List.'' [18]

Interested parties who wish to be added to the annual inquiry service list for an order must submit an entry of appearance to the annual inquiry service list segment for the order in ACCESS within 30 days after the date of publication of the order. For ease of administration, Commerce requests that law firms with more than one attorney representing interested parties in an order designate a lead attorney to be included on the annual inquiry service list. Commerce will finalize the annual inquiry service list within five business days thereafter. As mentioned in the *Procedural Guidance,*[19] the new annual inquiry service list will be in place until the following year, when the *Opportunity Notice* for the anniversary month of the order is published.

Commerce may update an annual inquiry service list at any time as needed based on interested parties' amendments to their entries of appearance to remove or otherwise modify their list of members and representatives, or to update contact information. Any changes or announcements pertaining to these procedures will be posted to the ACCESS website at *https://access.trade.gov.*

## Special Instructions for Petitioner and Foreign Governments

In the *Final Rule,* Commerce stated that, ''after an initial request and placement on the annual inquiry service list, both petitioners and foreign governments will automatically be

[11] Commerce has found the following companies to be cross-owned with Industrial Pesquera Santa Priscila S.A: Manesil S.A., Produmar S.A., Egidiosa S.A., and Tropical Packing Ecuador S.A.

[12] Commerce has found the following companies to be cross-owned with Sociedad Nacional de Galápagos C.A: Naturisa S.A., Holding Sola & Sola Solacciones S.A., and Empacadora Champmar S.A.

[13] Commerce has found the following companies to be cross-owned with Devi Sea Foods Limited: Devi Sea Foods Inc, Devee Horizon LLP, Devee Power Corporation Limited, and Devee Superior Feeds Limited.

[14] Commerce has found the following company to be cross-owned with Sandhya Aqua Exports Private Limited: Neeli Sea Foods Private Limited, Vijay Aqua Processors Private Limited, and Neeli Aqua Farms.

[15] *See CVD Preliminary Determinations.*

[16] *See Regulations to Improve Administration and Enforcement of Antidumping and Countervailing Duty Laws,* 86 FR 52300 (September 20, 2021) (*Final Rule*).

[17] *See Scope Ruling Application; Annual Inquiry Service List; and Informational Sessions,* 86 FR 53205 (September 27, 2021) (*Procedural Guidance*).

[18] This segment will be combined with the ACCESS Segment Specific Information (SSI) field which will display the month in which the notice of the order or suspended investigation was published in the **Federal Register**, also known as the anniversary month. For example, for an order under case number A–000–000 that was published in the **Federal Register** in January, the relevant segment and SSI combination will appear in ACCESS as ''AISL-January Anniversary.'' Note that there will be only one annual inquiry service list segment per case number, and the anniversary month will be pre-populated in ACCESS.

[19] *See Procedural Guidance,* 86 FR at 53206.

placed on the annual inquiry service list in the years that follow.'' [20]
Accordingly, as stated above, the petitioner and the Governments of Ecuador, India, Indonesia, and Vietnam should submit their initial entries of appearance after publication of this notice in order to appear in the first annual inquiry service lists for these orders. Pursuant to 19 CFR 351.225(n)(3), the petitioner and the Governments of Ecuador, India, Indonesia, and Vietnam will not need to resubmit their entries of appearance each year to continue to be included on the annual inquiry service list. However, the petitioner and the Governments of Ecuador, India, Indonesia, and Vietnam are responsible for making amendments to their entries of appearance during the annual update to the annual inquiry service list in accordance with the procedures described above.

### Notification to Interested Parties

This notice constitutes the AD order with respect to shrimp from Indonesia and the CVD orders with respect to shrimp from Ecuador, India, and Vietnam, pursuant to sections 706(a) and 736(a) of the Act. Interested parties can find a list of AD and CVD orders currently in effect at *https://www.trade.gov/datavisualization/adcvd-proceedings.*

These orders are issued and published in accordance with sections 706(a) and 736(a) of the Act and 19 CFR 351.211(b).

Dated: December 18, 2024.

**Abdelali Elouaradia,**

*Deputy Assistant Secretary for Enforcement and Compliance.*

## Appendix

### Scope of the Orders

The scope of these orders includes certain frozen warmwater shrimp and prawns whether wild-caught (ocean harvested) or farm-raised (produced by aquaculture), head-on or head-off, shell-on or peeled, tail-on or tail-off, deveined or not deveined, cooked or raw, or otherwise processed in frozen form. ''Tails'' in this context means the tail fan, which includes the telson and the uropods.

The frozen warmwater shrimp and prawn products included in the scope, regardless of definitions in the Harmonized Tariff Schedule of the United States (HTSUS), are products which are processed from warmwater shrimp and prawns through freezing and which are sold in any count size.

The products described above may be processed from any species of warmwater shrimp and prawns. Warmwater shrimp and prawns are generally classified in, but are not limited to, the *Penaeidae* family. Some examples of the farmed and wild-caught warmwater species include, but are not limited to, whiteleg shrimp (*Penaeus vannemei*), banana prawn (*Penaeus merguiensis*), fleshy prawn (*Penaeus chinensis*), giant river prawn (*Macrobrachium rosenbergii*), giant tiger prawn (*Penaeus monodon*), redspotted shrimp (*Penaeus brasiliensis*), southern brown shrimp (*Penaeus subtilis*), southern pink shrimp (*Penaeus notialis*), southern rough shrimp (*Trachypenaeus curvirostris*), southern white shrimp (*Penaeus schmitti*), blue shrimp (*Penaeus stylirostris*), western white shrimp (*Penaeus occidentalis*), and Indian white prawn (*Penaeus indicus*).

Frozen shrimp and prawns that are packed with marinade, spices or sauce are included in the scope. In addition, food preparations, which are not ''prepared meals,'' that contain more than 20 percent by weight of shrimp or prawn are also included in the scope.

Excluded from the scope are: (1) breaded shrimp and prawns (HTSUS subheading 1605.21.1020); (2) shrimp and prawns generally classified in the *Pandalidae* family and commonly referred to as coldwater shrimp, in any state of processing; (3) fresh shrimp and prawns whether shell-on or peeled (HTSUS subheadings 0306.36.0020 and 0306.36.0040); (4) shrimp and prawns in prepared meals (HTSUS subheadings 1605.21.0500 and 1605.29.0500); (5) dried shrimp and prawns; (6) canned warmwater shrimp and prawns (HTSUS subheading 1605.29.1040); and (7) certain battered shrimp. Battered shrimp is a shrimp-based product: (1) that is produced from fresh (or thawed-from-frozen) and peeled shrimp; (2) to which a ''dusting'' layer of rice or wheat flour of at least 95 percent purity has been applied; (3) with the entire surface of the shrimp flesh thoroughly and evenly coated with the flour; (4) with the non-shrimp content of the end product constituting between four and ten percent of the product's total weight after being dusted, but prior to being frozen; and (5) that is subjected to individually quick frozen (IQF) freezing immediately after application of the dusting layer. When dusted in accordance with the definition of dusting above, the battered shrimp product is also coated with a wet viscous layer containing egg and/or milk, and par-fried.

The products covered by the scope are currently classified under the following HTSUS subheadings: 0306.17.0004, 0306.17.0005, 0306.17.0007, 0306.17.0008, 0306.17.0010, 0306.17.0011, 0306.17.0013, 0306.17.0014, 0306.17.0016, 0306.17.0017, 0306.17.0019, 0306.17.0020, 0306.17.0022, 0306.17.0023, 0306.17.0025, 0306.17.0026, 0306.17.0028, 0306.17.0029, 0306.17.0041, 0306.17.0042, 1605.21.1030, and 1605.29.1010. These HTSUS subheadings are provided for convenience and for customs purposes only and are not dispositive, but rather the written description of the scope is dispositive.

[FR Doc. 2024–30694 Filed 12–23–24; 8:45 am]

**BILLING CODE 3510–DS–P**

[20] *See Final Rule,* 86 FR at 52335.

## DEPARTMENT OF COMMERCE

### Minority Business Development Agency

**[Docket No. 241219–0332]**

### Request for Public Comment on MBDA Information Clearinghouse

**AGENCY:** Minority Business Development Agency, Department of Commerce.

**ACTION:** Request for comments.

**SUMMARY:** The Minority Business Development Agency (MBDA) is accepting written comments from the public regarding the MBDA Information Clearinghouse, through February 28, 2025. The comments will inform MBDA of the types of data and other information sought, best practices or recommendations for studies, analysis and data about Minority Business Enterprises (MBEs) to be published, and ways to improve the user experience.

**ADDRESSES:** Please submit all comments in response to the questions presented in this notice at *www.regulations.gov.* To access the docket where comments may be submitted, please enter ''MBDA–2024–0004'' in the search bar. Written comments must be submitted no later than 11:59 p.m. EST, February 28, 2025. Comments received after the deadline will not be considered. For comments to be considered, they must include the following identification of the commenter: name; title (if applicable); organization or business (if applicable); and city and state.

**FOR FURTHER INFORMATION CONTACT:** Mr. Efrain Gonzalez, Jr., Associate Director, Office of Data, Research and Evaluation, Minority Business Development Agency, at (202) 482–1079; or by email at *egonzalez@mbda.gov.*

**SUPPLEMENTARY INFORMATION:**

### I. Background

The Minority Business Development Act of 2021, 15 U.S.C. 9513, mandates MBDA to develop and implement an Information Clearinghouse that will collect and disseminate demographic, economic, financial, managerial, and technical data relating to MBEs. In conjunction with this Request for Public Comment, MBDA will launch the Information Clearinghouse and allow the public an opportunity to review, and comment based on the initial deployment. The Information Clearinghouse is being released as a beta version hosting data, research, and reports about MBEs, with on-going improvements to its technical functionality and content planned