UNITED STATES COURT OF INTERNATIONAL TRADE
**Before: The Honorable Richard K. Eaton, Senior Judge**

INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and
SOCIEDAD NACIONAL DE GALÁPAGOS C.A.,

*Plaintiffs,*

v.

UNITED STATES,

*Defendant,*

and

AD HOC SHRIMP TRADE ACTION COMMITTEE and
AMERICAN SHRIMP PROCESSORS ASSOCIATION,

*Defendant-Intervenors.*

**PUBLIC VERSION**

Consol. Court No. 25-00025

Business Proprietary Information
Identified by Single Brackets [ ]
and Removed from Pages 6, 8,
10, 19–20, 24, 26–29, 37–39, 41,
and 45.

**PLAINTIFF AMERICAN SHRIMP PROCESSORS ASSOCIATION'S
RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 of the Rules of the U.S. Court of International Trade, Plaintiff

American Shrimp Processors Association ("ASPA") hereby moves for judgment on the agency

record in its appeal of the final determination by the U.S. Department of Commerce

("Commerce") in the countervailing duty investigation of frozen warmwater shrimp from

Ecuador, published as *Frozen Warmwater Shrimp from Ecuador: Final Affirmative*

*Countervailing Duty Determination*, 89 Fed. Reg. 85,506 (Dep't Commerce Oct. 28, 2024)

("*Final Determination*"). As demonstrated in the accompanying memorandum in support of

ASPA's motion for judgment on the agency record, the factual findings and legal conclusions

upon which the *Final Determination* is based are unsupported by substantial evidence and

otherwise not in accordance with law. Therefore, ASPA respectfully requests that the Court grant

ASPA's motion for judgment on the agency record, remand this matter to Commerce for

**PUBLIC VERSION**

disposition consistent with the opinion and order of the Court, and order any additional relief that

the Court may deem just and proper.

Respectfully submitted,

/s/ Elizabeth J. Drake

Roger B. Schagrin
Elizabeth J. Drake
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for American Shrimp
Processors Association*

Date:  August 26, 2025

\*Admitted only in New York and
New Jersey. Practice limited to
matters before federal courts and
agencies.

UNITED STATES COURT OF INTERNATIONAL TRADE
**Before: The Honorable Richard K. Eaton, Senior Judge**

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS C.A., <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant,* <br><br> and <br><br> AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, <br><br> *Defendant-Intervenors.* | **PUBLIC VERSION** <br><br> Consol. Court No. 25-00025 <br><br> Business Proprietary Information Identified by Single Brackets [ ] and Removed from Pages 6, 8, 10, 19–20, 24, 26–29, 37–39, 41, and 45. |

**PLAINTIFF AMERICAN SHRIMP PROCESSORS ASSOCIATION'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Roger B. Schagrin
Elizabeth J. Drake
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W. Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for American Shrimp Processors Association*

Date:  August 26, 2025

*Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

PUBLIC VERSION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... i

STATEMENT PURSUANT TO RULE 56.2(c) ...................................................................... 2

    I.     Administrative Determination Under Review ........................................................... 2

    II.    Issues Presented for Appeal ...................................................................................... 2

STATEMENT OF FACTS ....................................................................................................... 3

    I.     The CVD Petition Alleged that the GOE Provides Countervailable Subsidies to
        Processors of Frozen Shrimp and Producers of Fresh Shrimp ................................... 3

    II.    Commerce Found that the CVD Petition Warranted Investigating Countervailable
        Subsidies to Processors of Frozen Shrimp and Producers of Fresh Shrimp ................. 4

    III.   Commerce Limited its Individual Examination to the Two Largest Respondents,
        Including Their Cross-Owned Input Suppliers .............................................................. 4

    IV.   The Mandatory Respondents Reported Cross-Ownership With Their Fresh Shrimp
        Suppliers ...................................................................................................................... 5

    V.    Commerce Inexplicably Excused the Mandatory Respondents from Submitting
        Questionnaire Responses from Cross-Owned Fresh Shrimp Suppliers ......................... 6

    VI.   Commerce Initiated on New Subsidy Allegations that Fuel and Brackish Water Were
        Provided for Less Than Adequate Remuneration .......................................................... 8

    VII.  Commerce Made an Affirmative Preliminary Determination But Understated the
        Benefit and Did Not Countervail Brackish Water or Fuel............................................. 9

    VIII. Commerce Rejected ASPA's Arguments in the *Final Determination* ....................... 11

SUMMARY OF ARGUMENT ............................................................................................... 12

ARGUMENT ......................................................................................................................... 15

    I.     Standard of Review................................................................................................... 15

    II.    Commerce Unlawfully Excluded Cross-Owned Fresh Shrimp Suppliers from the
        Subsidy Analysis....................................................................................................... 16

        A.    Legal Framework ........................................................................................... 17

        B.    Commerce's Decision Not to Investigate All Cross-Owned Fresh Shrimp
              Suppliers Is Not in Accordance With Law ...................................................... 18

        C.    Commerce Was Otherwise Required to Rely on Facts Otherwise Available to
              Determine the Benefit the Mandatory Respondents Received Through Their
              Purchases of Fresh Shrimp from Unexamined Cross-Owned Suppliers .............. 26

    III.   Commerce's Decision Not to Countervail Free Government-Provided Access to
        Brackish Water Is Unlawful....................................................................................... 30

        A.    Commerce Erroneously Concluded that the Provision of Brackish Water Does
              Not Constitute a Financial Contribution that Confers a Countervailable Benefit 31

**PUBLIC VERSION**

B.  Commerce Should Have Applied AFA and Countervailed the Provision of Brackish Water.................................................................................................. 35

    1.  Legal Framework ...................................................................................... 36

    2.  Verification Confirmed That Non-Consumptive Users of Brackish Water Were Charged Fees and Are Able to Track Their Water Usage..................... 37

    3.  Commerce Should Have Applied AFA to Countervail the Provision of Brackish Water........................................................................................ 39

IV.  Commerce Erroneously Concluded that the Indirect Provision of Government-Produced Fuel Through Private Middlemen Does Not Constitute a Countervailable Financial Contribution ................................................................................... 41

V.  The Errors Committed By Commerce Resulted in Final Rates that Understate the Extent to Which Ecuadorian Producers and Exporters of Frozen Shrimp Benefit from Countervailable Subsidies........................................................................... 46

CONCLUSION................................................................................................... 47

# TABLE OF AUTHORITIES

**Cases**

*AK Steel Corp. v. United States*,
  21 C.I.T. 1265 (1997)..................................................................................................36

*Altx, Inc. v. United States*,
  370 F.3d 1108 (Fed. Cir. 2004)..................................................................................15

*Bebitz Flanges Works Pvt. Ltd. v. United States*,
  433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020) .............................................................23

*Beijing Tianhai Indus. Co. v. United States*,
  52 F. Supp. 3d 1351 (Ct. Int'l Trade 2015). ..............................................................44

*Consol. Edison Co. v. NLRB*,
  305 U.S. 197 (1938).....................................................................................................15

*FCC v. NextWave Pers. Commc'ns, Inc.*,
  537 U.S. 293 (2003).....................................................................................................15

*FDA v. Brown & Williamson Tobacco Corp.*,
  529 U.S. 120 (2000).....................................................................................................42

*Goodluck India Ltd. v. United States*,
  11 F.4th 1335 (Fed. Cir. 2021) ...................................................................................36

*Gov't of Quebec v. United States*,
  105 F.4th 1359 (Fed. Cir. 2024) .................................................................................18

*Guangdong Wireking Housewares and Hardware Co. v. United States*,
  900 F. Supp. 2d 1362 (Ct. Int'l Trade 2013) ...........................................17–18, 44, 46

*Guangdong Wireking Housewares and Hardware Co. v. United States*,
  745 F.3d 1194 (Fed. Cir. 2014)................................................................17–18, 44, 46

*Heveafil Sdn. Bhd. v. United States*,
  25 C.I.T. 147 (2001).....................................................................................................36

*Huvis Corp. v. United States*,
  525 F. Supp. 2d 1370 (Ct. Int'l Trade 2007) ..............................................................15

*Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*,
  28 F. Supp. 3d 1317 (Ct. Int'l Trade 2014) ...............................................................40

Case 1:25-cv-00025-RKE    Document 92    Filed 05/11/26    Page 7 of 60

**PUBLIC VERSION**

*Kisor v. Wilkie*,
  588 U.S. 558 (2019)....................................................................................................16

*Kyocera Solar, Inc. v. United States*,
  844 F.3d 1334 (Fed. Cir. 2016)...................................................................................42

*Loper Bright Enterprises v. Raimondo*,
  603 U.S. 369 (2024)...............................................................................15–16, 32, 41

*Micron Tech., Inc. v. United States*,
  117 F.3d 1386 (Fed. Cir. 1997) ...................................................................................36

*Nippon Steel Corp. v. United States*,
  458 F.3d 1345 (Fed. Cir. 2006)...................................................................................16

*Nippon Steel Corp. v. United States*,
  337 F.3d 1373 (Fed. Cir. 2003). .............................................................................36–37

*Özdemir Boru San ve Tic. Ltd. Sti. v. United States*,
  273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ...............................................................36

*POSCO v. United States*,
  977 F.3d 1369 (Fed. Cir. 2020)...................................................................................20

*Roberts v. United States*,
  745 F.3d 1158 (Fed. Cir. 2014)...................................................................................19

*RZBC Group Shareholding Co. v. United States*,
  100 F. Supp. 3d 1288 (Ct. Int'l Trade 2015) ...............................................................44

*Schism v. United States*,
  316 F.3d 1259 (Fed. Cir. 2002)...................................................................................21

*Shandong Huarong Mach. Co. v. United States*,
  435 F. Supp. 2d 1261 (Ct. Int'l Trade 2006) ...............................................................24

*SKF USA Inc. v. United States*,
  263 F.3d 1369 (Fed. Cir. 2001)...................................................................................40

*Star Fruits S.N.C. v. United States*,
  393 F.3d 1277 (Fed. Cir. 2005)...................................................................................40

*Tianjin Mach. Imp. & Exp. Corp. v. United States*,
  353 F. Supp. 2d 1294 (Ct. Int'l Trade 2004) ...............................................................36

ii

*Tianjin Mach. Imp. & Exp. Corp. v. United States*,
  146 Fed. App'x 493 (Fed. Cir. 2005) ..................................................................36

*YC Rubber Co. (North America) LLC v. United States*,
  711 F. Supp. 3d 1387 (Ct. Int'l Trade 2024) ......................................................17

**Statutes**

19 U.S.C. § 1516a(b)(1)(B)(i)..............................................................................15

19 U.S.C. § 1671(a) .............................................17, 21–23, 25–26, 28, 30, 41–42, 46

19 U.S.C. § 1677(5)(A)........................................................................................31

19 U.S.C. § 1677(5)(B)........................................................................................31

19 U.S.C. § 1677(5)(C)..................................................................................35, 41–42

19 U.S.C. § 1677(5)(D)....................................................................................31, 40

19 U.S.C. § 1677(5)(D)(iii).................................................................................31

19 U.S.C. § 1677(5)(E) ..................................................................................31, 35

19 U.S.C. § 1677(5A) .....................................................................................31, 40

19 U.S.C. § 1677(6) ............................................................................................35

19 U.S.C. § 1677-2 .........................................................4, 6, 9–10, 21– 22, 26–30

19 U.S.C. § 1677e ...............................................................................................36

19 U.S.C. § 1677e(a).........................................................................................39

19 U.S.C. § 1677e(a)(1).................................................................................27–29

19 U.S.C. § 1677e(b)(1)..................................................................................36, 39–40

19 U.S.C. § 1677f-1(e)(1) ...................................................................................17

19 U.S.C. § 1677f-1(e)(2) ...................................................................4–5, 17, 22–23

19 U.S.C. § 1677f-1(e)(2)(A)(ii).........................................................................25

19 U.S.C. § 1677m(i)..........................................................................................36

19 U.S.C. § 1677m(i)(1) ...................................................................................................36

19 U.S.C. § 3512(d) .........................................................................................................31

**Regulations**

19 C.F.R. § 351.511(a)(2)(i).............................................................................................35

19 C.F.R. § 351.525 .........................................................................................................18

19 C.F.R. § 351.525(b)(5)(ii) .............................................................................................3

19 C.F.R. § 351.525(b)(6)..................................................................................................23

19 C.F.R. § 351.525(b)(6)(iv) ..............................................3 – 4, 9, 18–19, 25–26, 28–29

**Federal Register Notices**

*Certain Cold-Rolled Steel Flat Products from the Russian Federation*,
   80 Fed. Reg. 79,564 (Dep't Commerce Dec. 22, 2015) ......................................24–25

*Certain Corrosion-Resistant Steel Products from Italy*,
   81 Fed. Reg. 35,326 (Dep't Commerce June 2, 2016) ...............................................40

*Certain Frozen Warmwater Shrimp from Ecuador*,
   78 Fed. Reg. 50,389 (Dep't Commerce Aug. 19, 2013)........................................23–24

*Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands*,
   72 Fed. Reg. 35,220 (Dep't Commerce June 27, 2007) .............................................38

*Certain Lined Paper Products from Indonesia*,
   71 Fed. Reg. 47,174 (Dep't of Commerce Aug. 16, 2006)......................................18–19

*Certain Softwood Lumber Products from Canada*,
   82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017)....................................31 – 32, 34

*Citric Acid and Certain Citrate Sales from the People's Republic of China*,
   79 Fed. Reg. 108 (Dep't Commerce Jan. 2, 2014) ...............................................43–44

*Countervailing Duties*,
   63 Fed. Reg. 65,348 (Dep't Commerce Nov. 25, 1998)..............................18–19, 21–22, 30, 35

*Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam*,
   88 Fed. Reg. 81,053 (Dep't Commerce Nov. 21, 2023) .............................................4

**PUBLIC VERSION**

*Frozen Warmwater Shrimp from Ecuador*,
  89 Fed. Reg. 22,379 (Dep't Commerce Apr. 1, 2024) ..................................................4, 9–10, 27

*Frozen Warmwater Shrimp from Ecuador*,
  89 Fed. Reg. 31,722 (Dep't Commerce Apr. 25, 2024) ..........................................................10

*Frozen Warmwater Shrimp from Ecuador*,
  89 Fed. Reg. 85,506 (Dep't Commerce Oct. 28, 2024) ..................................................... *passim*

*Frozen Warmwater Shrimp from Ecuador, India, and the Socialist Republic of Vietnam*,
  89 Fed. Reg. 104,982 (Dep't Commerce Dec. 26, 2024) .......................................................2, 12

*Large Diameter Welded Pipe from the Republic of Korea*,
  88 Fed. Reg. 37,200 (Dep't Commerce June 7, 2023) ...............................................................22

*Phosphate Fertilizers from the Russian Federation*,
  88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023) ...............................................................34

*Ripe Olives from Spain*,
  82 Fed. Reg. 56,218 (Dep't Commerce Nov. 28, 2017) .............................................................29

*Ripe Olives from Spain*,
  83 Fed. Reg. 28,186 (Dep't Commerce June 18, 2018) .............................................................30

*Ripe Olives from Spain*,
  90 Fed. Reg. 25,223 (Dep't Commerce June 16, 2025) .............................................................38

*Stainless Steel Flanges from India*,
  83 Fed. Reg. 40,748 (Dep't Commerce Aug. 16, 2018) .............................................................23

**Other Authorities**

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
  H.R. Rep. No. 103-316, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 ........31–32, 41–43

S. Rep. No. 1221, 92d Cong., 2d Sess. 8 (1972) ..............................................................17–18, 46

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before: The Honorable Richard K. Eaton, Senior Judge**

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS C.A., | |
| *Plaintiffs,* | **PUBLIC VERSION** |
| v. | Consol. Court No. 25-00025 |
| UNITED STATES, | Business Proprietary Information Identified by Single Brackets [ ] and Removed from Pages 6, 8, 10, 19–20, 24, 26–29, 37–39, 41, and 45. |
| *Defendant,* | |
| and | |
| AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, | |
| *Defendant-Intervenors.* | |

**PLAINTIFF AMERICAN SHRIMP PROCESSORS ASSOCIATION'S MEMORANDUM IN SUPPORT OF RULE 56.2 MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2, Plaintiff American Shrimp Processors Association ("ASPA") respectfully submits this memorandum in support of its motion for judgment on the agency record in the above-captioned action. ASPA contests several aspects of the final determination by the U.S. Department of Commerce ("Commerce") in the countervailing duty ("CVD") investigation of frozen warmwater shrimp ("frozen shrimp") from Ecuador. As demonstrated below, Commerce committed various factual and legal errors during the investigation, resulting in final rates that understate the extent to which the Government of Ecuador ("GOE") unfairly subsidizes the production and export of frozen shrimp. Therefore, ASPA respectfully requests that the Court grant ASPA's motion for judgment on the agency record and remand each of the contested issues to Commerce for disposition consistent with the opinion and order of the Court.

<u>**STATEMENT PURSUANT TO RULE 56.2(c)**</u>

**I.    Administrative Determination Under Review**

ASPA seeks judicial review of Commerce's final determination in the CVD investigation of frozen shrimp from Ecuador, after which Commerce issued a CVD order. *See Frozen Warmwater Shrimp from Ecuador*, 89 Fed. Reg. 85,506 (Dep't Commerce Oct. 28, 2024) ("*Final Determination*"), and accompanying Issues and Decision Memorandum ("IDM"); *see also Frozen Warmwater Shrimp from Ecuador, India, and the Socialist Republic of Vietnam*, 89 Fed. Reg. 104,982 (Dep't Commerce Dec. 26, 2024) ("*CVD Order*").

**II.    Issues Presented for Appeal**

1.    Whether Commerce lawfully excused each mandatory respondent from submitting questionnaire responses on behalf of all but one cross-owned supplier of fresh shrimp.

2.    Whether, in the absence of information from each cross-owned supplier, Commerce was at least required to rely on facts otherwise available to fill the informational gap in the record and determine the benefit that the mandatory respondents received through purchases of unfairly subsidized fresh shrimp from their unexamined cross-owned suppliers.

3.    Whether Commerce erred in finding that government-provided and cost-free access to brackish water (*i.e.*, water that is less salty than seawater) from public water sources does not constitute a financial contribution that provides a countervailable benefit.

4.    Whether Commerce's refusal to apply adverse facts available ("AFA") to countervail the provision of brackish water for less than adequate remuneration was based on an unreasonable evaluation of the record evidence and an abuse of discretion.

5.    Whether Commerce applied the best reading of the statute when it concluded that the mandatory respondents did not receive a financial contribution because they purchased

2

government-produced fuel from private trading companies and distributors that acted as middlemen rather than directly from the state-owned fuel supplier.

6. Whether the legal and factual errors committed by Commerce resulted in final rates that understate the extent to which producers and exporters of frozen shrimp in Ecuador benefit from countervailable subsidies.

## STATEMENT OF FACTS

### I. The CVD Petition Alleged that the GOE Provides Countervailable Subsidies to Processors of Frozen Shrimp and Producers of Fresh Shrimp

On October 25, 2023, ASPA filed a CVD petition concerning unfairly traded imports of frozen shrimp from Ecuador. *See* Petition: Volume IV, P.R. 26 (Oct. 24, 2023).[1] ASPA requested that Commerce initiate a CVD investigation and countervail the full universe of subsidies that benefit processors of frozen shrimp, which also encompass subsidies provided to producers of fresh shrimp. *Id.* at 4. ASPA explained that the subsidy analysis must include subsidies to producers of fresh shrimp in at least three scenarios. First, citing to the attribution rules in Commerce's regulations, ASPA explained that if the fresh shrimp is produced by the same company that processes the fresh shrimp into frozen shrimp, then subsidies tied to the production of fresh shrimp are attributed to the input product (fresh shrimp) and the downstream product (frozen shrimp). *Id.* at 4–5 (citing 19 C.F.R. § 351.525(b)(5)(ii)). Second, ASPA explained that subsidies received by cross-owned suppliers of fresh shrimp are attributed to the combined sales of the input product (fresh shrimp) and the downstream product (frozen shrimp). *Id.* at 5 (citing 19 C.F.R. § 351.525(b)(6)(iv)). And third, ASPA explained that the requirements of the

---

[1] Citations to the public record documents are designated as "P.R." and citations to the confidential record documents containing business proprietary information are designated as "C.R."

3

raw/processed agricultural product provisions in 19 U.S.C. § 1677-2 were met in this case, which meant that subsidies provided to producers of fresh shrimp shall be treated as though the subsidies were provided with respect to the production of frozen shrimp. *Id.* at 5–9. The petition alleged all the necessary elements to warrant initiating an investigation into various subsidy programs that support the entire shrimp sector in Ecuador. *Id.* at 9–39.

**II.    Commerce Found that the CVD Petition Warranted Investigating Countervailable Subsidies to Processors of Frozen Shrimp and Producers of Fresh Shrimp**

On November 14, 2023, Commerce found that the allegations in the petition were supported by reasonably available information and initiated the CVD investigation. *See Frozen Warmwater Shrimp from Ecuador, India, Indonesia, and the Socialist Republic of Vietnam*, 88 Fed. Reg. 81,053, 81,056 (Dep't Commerce Nov. 21, 2023). Commerce explained the basis for its decision to initiate in the Ecuador CVD Initiation Checklist, which stated that ASPA "supported its allegations that subsidies for fresh shrimp may be attributable to frozen shrimp." Ecuador CVD Initiation Checklist at 6–7, P.R. 79 (Nov. 20, 2023). Thus, at the very outset, Commerce acknowledged that the information in the petition warranted investigating subsidies provided to processors of frozen shrimp *and* producers of fresh shrimp.

**III.    Commerce Limited its Individual Examination to the Two Largest Respondents, Including Their Cross-Owned Input Suppliers**

After initiating the CVD investigation, Commerce determined that it was not practicable to determine individual countervailable subsidy rates for each known exporter or producer of subject merchandise, and thus invoked its authority under 19 U.S.C. § 1677f-1(e)(2) to limit its individual examination to the two companies that accounted for the largest volume of subject merchandise during the period of investigation ("POI") – Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") and Sociedad Nacional de Galapagos C.A. ("SONGA"). *See* Respondent Selection Memorandum at 2–7, P.R. 95, C.R. 48 (Dec. 8, 2023). Commerce found that based on

resource constraints it could only select two companies for individual examination, stating that it "must" also examine the "corporate structure, financial records, and participation in the alleged subsidy programs" for companies that are cross-owned (specifically mentioning cross-owned input suppliers) with the mandatory respondents. *Id.* at 3. Thus, when it selected Santa Priscila and SONGA as mandatory respondents, Commerce indicated that it would fully examine each mandatory respondent and their cross-owned input suppliers.

## IV.    The Mandatory Respondents Reported Cross-Ownership With Their Fresh Shrimp Suppliers

Commerce issued the standard CVD questionnaire on December 12, 2023. *See* Initial Questionnaire, P.R. 98 (Dec. 12, 2023). Throughout the questionnaire, Commerce requested information regarding subsidies used by each mandatory respondent *and* cross-owned companies, particularly those that supplied an input used in the production of frozen shrimp. *Id.* at Sections II and III Instructions. Commerce also issued a separate questionnaire requesting information on each mandatory respondent's sources of fresh shrimp and asked, *inter alia*, for each supplier's name, whether the supplier is cross-owned or not, and the total amount of fresh shrimp purchased from each supplier. *See* Questionnaires on Sources of Shrimp, P.R. 102–105 (Dec. 14, 2023).

In their responses to the affiliated companies portion of the CVD questionnaire, Santa Priscila and SONGA acknowledged their reporting requirements with respect to cross-owned companies and indicated that they would submit questionnaire responses on behalf of cross-owned companies that were involved in any aspect of the production process. *See* Santa Priscila Affiliated Companies Response at AFF-4 and Exhibit AFF-1, P.R. 118, C.R. 54 (Jan. 5, 2024); SONGA Affiliated Companies Response at AFF-4 and Exhibit AFF-1, P.R. 117, C.R. 53 (Jan. 5, 2024). Santa Priscila and SONGA reported in response to the sources questionnaire that they

each purchased fresh shrimp from cross-owned shrimp farms. *See* Santa Priscila Sources of Shrimp Questionnaire Response at Exhibit SRS-1, P.R. 116, C.R. 51 (Jan. 3, 2024); SONGA Sources of Shrimp Questionnaire Response at Exhibit SRS-2, P.R. 115, C.R. 49 (Jan. 3, 2024). These questionnaire responses confirmed that cross-owned companies supplied the mandatory respondents with [                    ] fresh shrimp, which is by far the most important input in the production of frozen shrimp. *See* Ecuador CVD Initiation Checklist at 6 and 23.

ASPA submitted comments stating that the mandatory respondents were already required to submit questionnaire responses on behalf of all cross-owned shrimp suppliers, noting that cross-owned input suppliers are included in the subsidy analysis pursuant to the attribution rules in Commerce's regulations. *See* ASPA Comments on Supplier and Affiliation Responses at 3–4, P.R. 134, C.R. 58 (Jan. 12, 2024). From ASPA's perspective, the only question was each mandatory respondent's reporting obligations for non-cross-owned shrimp suppliers, and ASPA requested that Commerce additionally require each mandatory respondent to submit questionnaire responses for the five largest non-cross-owned shrimp suppliers. *Id.* at 2–3. ASPA noted that Commerce followed this same approach in the most recent CVD investigation in which it examined non-cross-owned input suppliers pursuant to the raw/processed agricultural product provision in 19 U.S.C. § 1677-2. *Id.* at 3.

## V.    Commerce Inexplicably Excused the Mandatory Respondents from Submitting Questionnaire Responses from Cross-Owned Fresh Shrimp Suppliers

Nearly one month after Commerce issued the CVD questionnaire, the mandatory respondents submitted a joint request to be excused from providing questionnaire responses on behalf of their cross-owned fresh shrimp suppliers. *See* Request to Exclude Certain Companies from Reporting, P.R. 126, C.R. 55 (Jan. 9, 2024). ASPA immediately objected, arguing that the request was untimely filed two weeks after the deadline to notify Commerce of any reporting

difficulties and that there was no legitimate reason to excuse the mandatory respondents from submitting full responses for any cross-owned input suppliers. *See* ASPA Opposition to Request to Exclude Companies from Reporting Obligations, P.R. 131 (Jan. 11, 2024). ASPA also noted that the mandatory respondents themselves requested to be selected for individual examination and that SONGA previously submitted responses on behalf of its cross-owned fresh shrimp suppliers when it was a mandatory respondent in a prior CVD investigation on the same product. *Id.* at 7–8. Counsel for ASPA also met with the Commerce officials in charge of the case to reiterate ASPA's strong opposition to the mandatory respondents' request. *See Ex Parte* Meeting, P.R. 149 (Jan. 18, 2024).

Without stating any rationale for its decision, Commerce granted the mandatory respondents' request over ASPA's objections and required each mandatory respondent to submit a questionnaire response on behalf of only one cross-owned shrimp supplier – Produmar S.A. ("Produmar") for Santa Priscila and Naturisa S.A. ("Naturisa") for SONGA. *See* Santa Priscila Supplier Questionnaire, P.R. 161, C.R. 67 (Jan. 25, 2024); SONGA Supplier Questionnaire, P.R. 160, C.R. 66 (Jan. 25, 2024). Commerce did not require information from any other cross-owned shrimp suppliers. Nor did Commerce require information from any non-cross-owned fresh shrimp suppliers. ASPA objected again, arguing that the exclusions were inconsistent with the statute, Commerce's regulations, the parallel CVD investigations involving other countries (*i.e.*, India, Indonesia, and Vietnam), and the prior CVD investigation on frozen shrimp from Ecuador in which Commerce investigated SONGA's cross-owned input suppliers (including at least seven cross-owned shrimp farms). *See* ASPA Opposition to Exclusion of Cross-Owned Input Suppliers at 2–3, P.R. 167 (Jan. 29, 2024). ASPA expressed its concern that by not examining all cross-owned fresh shrimp suppliers, Commerce would not have a complete picture of the subsidies

attributable to frozen shrimp. *Id.* at 4. Commerce did not revisit the issue and proceeded with the investigation without obtaining any information on the subsidies received by [    ] of Santa Priscila's and [    ] of SONGA's cross-owned fresh shrimp suppliers.

**VI.    Commerce Initiated on New Subsidy Allegations that Fuel and Brackish Water Were Provided for Less Than Adequate Remuneration**

During the investigation, ASPA timely submitted two sets of new subsidy allegations and requested that Commerce include six additional subsidy programs as part of its investigation. *See* New Subsidy Allegations, P.R. 119 (Jan. 8, 2024) ("First NSAs"); New Subsidy Allegations, P.R. 217 (Feb. 21, 2024) ("Second NSAs").

In the first set of new subsidy allegations, ASPA alleged that the Government of Ecuador ("GOE") provides fuel to the shrimp sector for less than adequate remuneration. *See* First NSAs at 4–10. ASPA explained that the GOE owns all of Ecuador's subsurface resources, including oil, and Ecuador's petroleum sector is dominated by one state-owned enterprise – Petroecuador. *Id.* at 4. The GOE sets prices for fuel that vary by industry, and the prices for the shrimp industry are lower than those set for other industries. *Id.* at 5–8. Given the highly subsidized fuel prices for shrimp farmers, ASPA asked Commerce to investigate all fuel purchases by the Ecuadorian shrimp industry during the POI. *Id.* at 8. ASPA alleged that the GOE's provision of fuel: (1) constitutes a financial contribution to the extent that a state-owned provider, such as Petroecuador, provided the fuel, (2) confers a benefit equal to the difference between the price for the government-produced fuel and a market-determined price, and (3) is both *de jure* and *de facto* specific to the shrimp industry. *Id.* at 8–10.

In the second set of new subsidy allegations, ASPA alleged that the GOE provided shrimp farmers with cost-free access to brackish water from public water sources. *See* Second NSAs at 2–6. ASPA explained that all water is state-owned property in Ecuador, and the GOE requires

8

private entities to acquire permits to obtain access to government-controlled brackish water for an approved activity. *Id.* at 2–3. According to publicly available information, the GOE charges fees only for consumptive brackish water uses and authorized shrimp producers are not charged for their non-consumptive use of brackish water. *Id.* ASPA highlighted the commercial value of water, including brackish water for non-consumptive use, based on the fees that other countries charge private parties for aquaculture activities. *Id.* at 4–5. ASPA alleged that the GOE's provision of brackish water: (1) constitutes a financial contribution in the form of a government-provided good, (2) confers a benefit equal to the difference between the commercial value of the water and the amount shrimp producers pay for their non-consumptive use (*i.e.*, nothing), and (3) is both *de jure* and *de facto* specific. *Id.* at 5–6.

On March 21, 2024, Commerce initiated on the above-described allegations regarding the provision of fuel and brackish water for less than adequate remuneration. *See* New Subsidy Allegations Initiation at 2–5, P.R. 279 (Mar. 21, 2024).

**VII.    Commerce Made an Affirmative Preliminary Determination But Understated the Benefit and Did Not Countervail Brackish Water or Fuel**

On March 25, 2024, Commerce issued its affirmative preliminary determination. *See Frozen Warmwater Shrimp from Ecuador*, 89 Fed. Reg. 22,379 (Dep't Commerce Apr. 1, 2024), and accompanying Preliminary Decision Memorandum ("PDM"). Commerce preliminarily countervailed eight subsidy programs, some of which were used by the two examined cross-owned fresh shrimp suppliers and attributed to the mandatory respondents pursuant to 19 C.F.R. § 351.525(b)(6)(iv). *See* PDM at 7–8, 13–28. Also, because Commerce preliminarily found that the statutory criteria under 19 U.S.C. § 1677-2 were met in this case, subsidies received by non-cross-owned shrimp farmers were also attributed to the mandatory respondents' frozen shrimp. *Id.* at 9–10. Although the mandatory respondents reported purchasing fresh shrimp from non-

9

cross-owned suppliers, Commerce never asked the mandatory respondents to report subsidy information on behalf of any of these suppliers. *Id.* at 10–11. To address this informational gap in the record, and to determine the benefit that the mandatory respondents received through their non-cross-owned purchases of fresh shrimp, Commerce developed a formula to attribute the per-kilogram subsidy benefit found for examined fresh shrimp producers to unexamined non-cross-owned suppliers. *Id.* Commerce, however, did not take any action to address a similar gap in the record with respect to the [  ] unexamined cross-owned companies that also supplied the mandatory respondents with fresh shrimp. Commerce did not address the provision of brackish water and fuel in the preliminary determination. Subsequently, Commerce published an amended preliminary determination to correct certain ministerial errors. *See Frozen Warmwater Shrimp from Ecuador*, 89 Fed. Reg. 31,722 (Dep't Commerce Apr. 25, 2024).

On July 12, 2025, Commerce issued a post-preliminary analysis memorandum that addressed the provision of brackish water and fuel subsidy programs. *See* Post-Preliminary Analysis, P.R. 400 (July 12, 2024) ("First Post-Preliminary Analysis"). Commerce preliminarily decided not to countervail the provision of brackish water or fuel for less than adequate remuneration. *Id.* at 15–16. According to Commerce, the mandatory respondents did not receive a financial contribution that conferred countervailable benefits because "the government does not charge, and has never charged, for the non-consumptive use of brackish water, nor does it provide any infrastructure to the respondents for pumping such water to their facilities." *Id.* at 17. Additionally, because the mandatory respondents purchased fuel produced by state-owned Petroecuador from private trading companies and distributors that acted as middlemen, rather than directly from Petroecuador, Commerce found that the mandatory respondents' indirect

10

purchases of government-produced fuel did not involve a countervailable financial contribution. *Id.* at 15–16.

Between July 15 and July 24, 2024, Commerce conducted its verification of the questionnaire responses submitted by SONGA, Santa Priscila, and the GOE. *See* IDM at 4. On September 26, 2024, Commerce issued a second post-preliminary analysis memorandum regarding other subsidy programs that are not at issue in this appeal. *See* Second Post-Preliminary Analysis, P.R. 437 (Sept. 27, 2024).

**VIII.    Commerce Rejected ASPA's Arguments in the *Final Determination***

On April 10, 2024, after considering interested parties' case and rebuttal briefs, Commerce published its *Final Determination*. ASPA's case brief challenged several aspects of Commerce's preliminary subsidy analysis, including: (1) the failure to examine all cross-owned suppliers of fresh shrimp, (2) the failure to account for all cross-owned fresh shrimp purchases in the benefit calculation, (3) the conclusion that the provision of brackish water does not constitute a financial contribution that confers a countervailable benefit, and (4) the conclusion that the provision of fuel does not constitute a countervailable financial contribution. *See* ASPA Case Brief at 1–13, 15–17, P.R. 427, C.R. 316 (Sept. 16, 2024). Commerce rejected each of these arguments in the *Final Determination*.

Commerce disagreed that it was obligated to include all cross-owned suppliers of fresh shrimp in the subsidy analysis and claimed that it had the discretion to limit the analysis to just one cross-owned supplier for each mandatory respondent. *See* IDM at Comment 4. Commerce also declined to modify its benefit calculations in any way to account for the subsidies that the mandatory respondents received through their purchases of fresh shrimp from unexamined cross-owned suppliers. *Id.* Commerce concluded that the mandatory respondents' use of brackish water does not constitute a financial contribution that confers countervailable benefits because the

GOE does not charge a fee for non-consumptive use and because the GOE was not involved with transporting brackish water to and from the mandatory respondent's shrimp farms. *Id.* at Comment 1. Finally, Commerce did not countervail the mandatory respondents' purchases of fuel, concluding that they were not direct recipients of a financial contribution and that the evidence on the record did not warrant investigating whether the GOE entrusted and directed private entities to sell fuel to the mandatory respondents for less than adequate remuneration. *Id.* at Comment 2.

Thereafter, Commerce published a CVD order establishing *ad valorem* net countervailable subsidy rates of 3.57 percent for Santa Priscila and 4.41 percent for SONGA, from which Commerce established an "all others" rate of 3.78 percent. *CVD Order*, 89 Fed. Reg. at 104,984. ASPA subsequently filed this action.

## SUMMARY OF ARGUMENT

The Court should hold that the *Final Determination* is unsupported by substantial evidence and otherwise not in accordance with law.

*First*, Commerce failed to conduct the investigation in a way that would have allowed it to determine final rates that reflect the full extent of countervailable subsidies with respect to the manufacture, production, and export of frozen shrimp in Ecuador. Commerce had a statutory obligation to determine rates based on the full universe of countervailable subsidies that the mandatory respondents benefited from during the POI. To achieve this, Commerce was required to obtain questionnaire responses from each mandatory respondent and the cross-owned companies involved in the production of subject merchandise, including all cross-owned suppliers of fresh shrimp. Commerce contravened the statute when it only required each mandatory respondent to submit information for one cross-owned fresh shrimp supplier. By not fully investigating the mandatory respondents and their cross-owned suppliers, Commerce

12

**PUBLIC VERSION**

abused its discretion under the statute and unduly limited its examination of respondents, did not determine a final rate that accurately reflects the net countervailable subsidy, failed to abide by its own regulation that requires the benefit analysis to include subsidies received by cross-owned input suppliers, and unjustifiably deviated from its normal practice in CVD investigations. To make matters even worse, Commerce refused to fill the informational gap its decisions created in the record when it declined to rely on facts otherwise available to include the unexamined cross-owned suppliers in the subsidy analysis.

*Second*, Commerce's decision not to countervail free government-provided access to brackish water is unsupported by substantial evidence and otherwise not in accordance with law. The record evidence unequivocally shows the GOE's involvement and the provision of a financial contribution in the form of access to a finite, government-owned water resource. Commerce's reasoning in the *Final Determination* reflects a misunderstanding regarding the nature of the financial contribution at issue. A government-provided right to use or access brackish water in and of itself is the provision of a good and constitutes a financial contribution. It is irrelevant that the GOE did not also pay for the equipment and infrastructure that the mandatory respondents needed to extract, use, and return the water. The mandatory respondents received a benefit equal to the difference between any amount they paid and the commercial value of the water they were allowed to access. The record facts demonstrate that the provision of brackish water is a financial contribution that provides countervailable benefits. However, Commerce misapplied the law, drew an unreasonable conclusion from the record evidence, and deviated from how the agency has historically analyzed subsidy programs that give private entities the right to access government-owned resources. Additionally, because the respondents

13

did not put forth their maximum effort regarding material aspects of the subsidy program, Commerce should have applied AFA to countervail the provision of brackish water.

*Third*, Commerce's decision not to countervail the provision of government-produced fuel is unsupported by substantial evidence and otherwise not in accordance with law. The record established that Petroecuador is a governmental authority and was the ultimate supplier of the subsidized fuel that the mandatory respondents purchased from private trading companies and distributors. In other words, the mandatory respondents were indirect recipients of a financial contribution. The statute contemplates this type of scenario and unambiguously instructs Commerce to countervail subsidies, regardless of whether they are provided directly or indirectly. Indeed, the Court has previously explained that the statute's broad definition of financial contribution includes scenarios where a good originates from the government but is sold through private middlemen. However, Commerce concluded that the mandatory respondents' purchases of fuel do not constitute countervailable financial contributions solely because they did not purchase the fuel *directly* from Petroecuador. Commerce's conclusion is based on an untenable reading of the statute and is inconsistent with how the agency has applied the statute in the past, as has been upheld by this court.

*Fourth*, and finally, because Commerce committed the above-described errors, the final rates are understated and do not accurately reflect the extent to which producers and exporters of frozen shrimp in Ecuador benefit from countervailable subsidies. This is contrary to the object and purpose of the CVD statute, which is remedial in nature and required Commerce to countervail the full amount of the countervailable subsidy that exists with respect to the manufacture, production, and export of frozen shrimp from Ecuador. Thus, the final rates are unsupported by substantial evidence and otherwise not in accordance with law.

14

## ARGUMENT

### I.    Standard of Review

The standard of review requires that the Court sustain any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a mere scintilla," but "less than the weight of the evidence." *Altx, Inc. v. United States*, 370 F.3d 1108, 1116 (Fed. Cir. 2004). The substantial evidence standard requires the Court to assess whether the administrative determination under review is reasonable given the record as a whole. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350–51 (Fed. Cir. 2006). Commerce's determination is in accordance with law if it has met all constitutional, statutory, regulatory, and procedural requirements. *See Huvis Corp. v. United States*, 525 F. Supp. 2d 1370, 1374 (Ct. Int'l Trade 2007) (citing *FCC v. NextWave Pers. Commc'ns, Inc.*, 537 U.S. 293, 300 (2003)).

When determining whether Commerce's interpretation and application of the statute is in accordance with law, the Court is guided by the Supreme Court's decision in *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369 (2024). In *Loper Bright*, the Supreme Court established a new standard by which courts resolve questions of statutory interpretation when reviewing challenges to agency action. *Loper Bright* held that courts "may not defer to an agency interpretation of the law simply because a statute is ambiguous," *id.* at 413, and rejected the "presum{ption} that statutory ambiguities are implicit delegations to agencies." *Id.* at 399. In so holding, the Supreme Court overruled the deferential standard under the framework that courts previously relied upon to review whether agency action is lawful under the statute the agency is

15

entrusted to administer. *Id.* at 412 ("*Chevron* is overruled."). Instead of deferring to the agency's preferred interpretation of a statute, courts must "use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* at 403. Although the agency's interpretation of the statute may be accorded "due respect," *id.* at 394–95, ultimately courts must "exercise their independent judgment in deciding whether an agency has acted within its statutory authority." *Id.* at 412. The "best reading of the statute" is "the reading the court would have reached if no agency were involved." *Id.* at 400 (internal quotations omitted).

The Court must also exercise independent judgment when determining whether Commerce's interpretation and application of its own regulations is in accordance with law. While "{i}ssues surrounding judicial deference to agency interpretations of their own regulations are distinct from those raised in connection with judicial deference to agency interpretations of statutes enacted by Congress," courts must "carefully consider the text, structure, history, and purpose of a regulation" before upholding an agency's resolution of a "genuinely ambiguous" regulation. *Kisor v. Wilkie*, 588 U.S. 558, 559 (2019). Indeed, "{s}ome interpretive issues may fall more naturally into a judge's bailiwick." *Id.* at 578.

## II.    Commerce Unlawfully Excluded Cross-Owned Fresh Shrimp Suppliers from the Subsidy Analysis

As demonstrated below, Commerce erred at the very outset of the investigation when it excused each mandatory respondent from reporting on behalf of all but one cross-owned fresh shrimp supplier. Commerce failed to conduct the investigation in a way that would have allowed it to determine final rates that reflect the full extent of countervailable subsidies with respect to the manufacture, production, and export of frozen shrimp in Ecuador. This was contrary to law (*see infra* Section II.B.). Commerce compounded this error when it also refused to fill the resulting informational gap in the record by relying on facts otherwise available to determine the

16

PUBLIC VERSION

benefit that the mandatory respondents received through purchases of unfairly subsidized fresh shrimp from their unexamined cross-owned suppliers (*see infra* Section II.C.). Accordingly, this matter should be remanded for further proceedings with instructions to include the unexamined cross-owned fresh shrimp suppliers in the subsidy analysis.

### A.    Legal Framework

The CVD law directs Commerce to determine individual rates for each known exporter or producer of the subject merchandise. *See* 19 U.S.C. § 1677f-1(e)(1). Congress established this as the general rule and expressed a preference for individually examining all exporters or producers involved in an investigation. However, Congress understood that it could be too onerous for Commerce to follow this general rule in every case and created an exception. Specifically, if Commerce determines that following the general rule would be impracticable because the number of exporters or producers involved in an investigation is large, Commerce may limit its examination to a reasonable number of companies. *See* 19 U.S.C. § 1677f-1(e)(2). Commerce routinely invokes this exception because of resource constraints and selects only one or two companies for individual examination as mandatory respondents. *See YC Rubber Co. (North America) LLC v. United States*, 711 F. Supp. 3d 1387, 1395 (Ct. Int'l Trade 2024) ("Over the last 25 years, the number of respondents Commerce examines in a typical investigation or review has declined to one or two.").

Regardless of whether Commerce decides to limit its examination to one or two companies, Commerce has a duty to conduct its investigation in a manner that is consistent with the remedial purpose of the CVD law and determine subsidy rates that are "equal to the amount of the net countervailable subsidy," *see* 19 U.S.C. § 1671(a), and that "'offset' the harmful effects of foreign subsidies." *See Guangdong Wireking Housewares and Hardware Co. v. United States*, 900 F. Supp. 2d 1362, 1370 (Ct. Int'l Trade 2013), *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014);

17

*see also* S. Rep. No. 1221, 92d Cong., 2d Sess. 8 (1972) ("{C}ountervailing duties are not, nor were they ever intended to be, penal in nature, they are remedial in nature inasmuch as they operate to offset the effect of subsidies afforded foreign merchandise."). Toward that end, Commerce adopted a regulation that sets forth rules regarding the calculation of the *ad valorem* net countervailable subsidy rate and the attribution of a subsidy to the subject merchandise. *See* 19 C.F.R. § 351.525. Commerce's application of these rules must be consistent with its statutory obligation to calculate subsidy rates as accurately as possible. *See Gov't of Quebec v. United States*, 105 F.4th 1359, 1370 (Fed. Cir. 2024).

**B.    Commerce's Decision Not to Investigate All Cross-Owned Fresh Shrimp Suppliers Is Not in Accordance With Law**

As stated above, Commerce adopted a regulation to comply with the statute's instruction to determine an *ad valorem* net countervailable subsidy rate that is equal to the countervailable subsidies conferred on the subject merchandise. *See* 19 C.F.R. § 351.525. Paragraph (b) of the regulation identifies several scenarios and provides the method by which Commerce will attribute subsidies in each scenario. Some of these scenarios address corporations with "cross-ownership," defined as a relationship "where one corporation can use or direct the individual assets of the other corporation(s) in essentially the same ways it can use its own assets." *Id.* § 351.525(b)(6)(vi). In a cross-ownership scenario, the interests of the two corporations have merged to such a degree that it is reasonable to presume the subsidies received by one corporation benefit the other corporation. *See Countervailing Duties*, 63 Fed. Reg. 65,348, 65,401 (Dep't Commerce Nov. 25, 1998) ("*CVD Preamble*"). In fact, Commerce views cross-owned companies as a single entity. *See, e.g.*, *Certain Lined Paper Products from Indonesia*, 71 Fed. Reg. 47,174 (Dep't of Commerce Aug. 16, 2006), and accompanying IDM at Comment 2.

18

Relevant to this appeal is the scenario involving cross-ownership between a company that supplies a downstream producer with an input that is primarily dedicated to the production of a downstream product. In this scenario, Commerce "will" attribute subsidies received by the cross-owned input supplier to the combined sales of that input and the downstream product. *See* 19 C.F.R. § 351.525(b)(6)(iv); *see also Roberts v. United States*, 745 F.3d 1158, 1165 (Fed. Cir. 2014) (characterizing "will" as mandatory rather than permissive). In the final rulemaking, Commerce explained that cross-owned suppliers of inputs primarily dedicated to the production of a downstream product (*e.g.*, timber for lumber or semolina for pasta) are central to the subsidy analysis and were never intended to be excluded. *CVD Preamble*, 63 Fed. Reg. at 65,401 ("The main concern we have tried to address is the situation where a subsidy is provided to an input producer whose production is dedicated almost exclusively to the production of a higher value added product—the type of input product that is merely a link in the overall production chain."). If not for this rule, there would be a loophole whereby a cross-owned entity could avoid CVD exposure for input subsidies by separately incorporating the division that makes the input. *Id.*

Here, Commerce limited its investigation to two mandatory respondents that processed fresh shrimp into frozen shrimp and each reported purchasing fresh shrimp from cross-owned suppliers. Santa Priscila purchased [                    ] fresh shrimp from [    ] cross-owned suppliers,[2] representing [

                    ]. *See* Santa Priscila Sources of Shrimp Questionnaire Response at Exhibit SRS-1. SONGA purchased [                    ] fresh shrimp from [    ] cross-owned

---

[2] Santa Priscila identified the following cross-owned suppliers of fresh shrimp: [

    ]. *See* Santa Priscila Sources of Shrimp Questionnaire Response at Exhibit SRS-1.

suppliers,[3] representing [

]. *See* SONGA Sources of Shrimp Questionnaire Response at Exhibit SRS-2. Obtaining complete information on subsidies received by shrimp farmers was critically important in this investigation because fresh shrimp is the main input in the production of frozen shrimp. Like the lumber and pasta cases that Commerce referenced in the *CVD Preamble*, fresh shrimp is an input that is almost exclusively used to produce frozen shrimp and is merely a link in the overall production chain. This is an undisputed fact. It was thus essential that Commerce collect information on subsidies received by the mandatory respondents through their purchases of fresh shrimp from cross-owned suppliers.

Each mandatory respondent reported that it is part of a cross-owned entity with separately incorporated fresh shrimp suppliers, *i.e.*, the precise cross-ownership situation described in the *CVD Preamble*. Commerce relaxed the mandatory respondents' reporting requirements to an extraordinary degree and excluded [            ] cross-owned fresh shrimp suppliers from the subsidy analysis. By choosing not to examine these cross-owned fresh shrimp suppliers, Commerce did not fulfill its duty to investigate the extent to which the mandatory respondents benefited from the alleged subsidy programs through their respective cross-owned fresh shrimp suppliers. *See POSCO v. United States*, 977 F.3d 1369, 1378 (Fed. Cir. 2020) ("Commerce has an affirmative duty to investigate any appearance of subsidies related to the investigation that are discovered during an investigation.").

Commerce's reasoning in the *Final Determination* is significantly flawed and does not justify its partial examination of the input suppliers that were cross-owned with the mandatory

---

[3] SONGA identified the following cross-owned suppliers of fresh shrimp: [
                                                                                                                    ].
*See* SONGA Sources of Shrimp Questionnaire Response at Exhibit SRS-2.

respondents. In Commerce's view, the law did not require Commerce to investigate all of the mandatory respondents' cross-owned fresh shrimp suppliers. Commerce explained that the attribution rule in the regulation "do{es} not explicitly require Commerce to investigate all cross-owned input suppliers" and simply "instructs Commerce on how to attribute subsidies for those cross-owned input suppliers that Commerce does investigate." IDM at 34. This explanation is not in accord with the *CVD Preamble*, which added the attribution rule for cross-owned input suppliers for the specific purpose of closing a potential loophole that would have allowed companies to avoid CVD exposure. The *CVD Preamble* plainly states that "where the input and downstream production takes place in separately incorporated companies with cross-ownership … and the production of the input product is primarily dedicated to the production of the downstream product, paragraph (b)(6)(iv) *requires* {Commerce} to attribute the subsidies received by the input producer to the combined sales of the input and downstream products (excluding the sales between the two corporations)." 63 Fed. Reg. at 65,401 (emphasis added). Nothing in the *CVD Preamble* indicates that Commerce may choose not to investigate a cross-owned company supplying such inputs and render this attribution rule a nullity. This reading of the regulation is incompatible with the statute. *See Schism v. United States*, 316 F.3d 1259, 1285 (Fed. Cir. 2002) ("{A}n agency cannot do by regulation what the applicable statute itself does not authorize.").

Under the statute, Commerce must fully investigate a respondent, including cross-owned input suppliers, to obtain necessary information regarding the full universe of subsidies with respect to the subject merchandise. *See* 19 U.S.C. § 1671(a). It made little sense for Commerce to exclude cross-owned fresh shrimp suppliers from the subsidy analysis, especially in an investigation in which 19 U.S.C. § 1677-2 applied and required that Commerce additionally

21

include *non-cross-owned* fresh shrimp suppliers in the subsidy analysis. Indeed, Commerce itself has stated that when a cross-owned input supplier's contribution is central to the production of subject merchandise, "any countervailable subsidy to {the cross-owned input supplier} should be captured pursuant to the mandate under {19 U.S.C. § 1671(a)} to impose countervailing duties on subsidies provided 'directly or *indirectly* … with respect to the manufacture, production, or export' of subject merchandise." *Large Diameter Welded Pipe from the Republic of Korea*, 88 Fed. Reg. 37,200 (Dep't Commerce June 7, 2023), and accompanying PDM at 7. The bottom line is that Commerce was required to include all cross-owned fresh shrimp suppliers in the subsidy analysis to determine final rates in accordance with 19 U.S.C. § 1671(a). Commerce failed to do so here, which was contrary to law.

Commerce did not cite to *any* statute that grants it the discretionary authority to limit its examination of cross-owned input suppliers based on an evaluation of the agency's resources. That is because Commerce does not possess such authority. Commerce's discussion of the issue is strikingly similar to the language that the agency uses when it invokes 19 U.S.C. § 1677f-1(e)(2). *See* IDM at 34. That statute grants Commerce the discretion to limit its individual examination to a reasonable number of respondents, if it is not practicable to determine individual rates for all known exporters or producers. Commerce already availed itself of this exception when it selected Santa Priscila and SONGA as the two company respondents subject to individual examination. In fact, when Commerce evaluated its resources and determined that only two respondents can reasonably be examined, Commerce recognized that it "must" examine Santa Priscila's and SONGA's cross-owned input suppliers. *See* Respondent Selection Memorandum at 3. Nothing in the text of 19 U.S.C. § 1677f-1(e)(2) indicates that there is any circumstance in which Commerce may conduct a partial examination of a mandatory respondent.

**PUBLIC VERSION**

Thus, to the extent Commerce relies on this statutory provision as the source of its authority to exclude the unexamined cross-owned fresh shrimp suppliers, that reliance is misplaced.

In addition to violating the statute and regulation, Commerce's decision to exclude the cross-owned fresh shrimp suppliers was not in accordance with the agency's past practice. For decades, Commerce has required mandatory respondents to submit questionnaire responses on behalf of *all* cross-owned suppliers of inputs that are primarily dedicated to the production of subject merchandise. The standard CVD questionnaire instructs respondents to provide complete responses on behalf of themselves *and* cross-owned companies that fall within any of the scenarios in 19 C.F.R. § 351.525(b)(6). *See* Initial Questionnaire at Section II Instructions. This policy gives effect to the requirements of 19 U.S.C. § 1671(a). Indeed, when Commerce has applied AFA based on a failure to report information on behalf of cross-owned companies, Commerce has treated the missing information as "necessary" for its subsidy analysis. *See, e.g.*, *Stainless Steel Flanges from India*, 83 Fed. Reg. 40,748 (Dep't Commerce Aug. 16, 2018), and accompanying IDM at Comment 1 ("Without the complete, accurate and reliable data upon which to attribute cross-owned companies' subsidies to Bebitz, Commerce cannot accurately calculate Bebitz's CVD subsidy rate for this final determination."), *aff'd*, *Bebitz Flanges Works Pvt. Ltd. v. United States*, 433 F. Supp. 3d 1297 (Ct. Int'l Trade 2020).

Commerce asserted that in "unique circumstances" it has "limited the number of cross-owned firms it examined." IDM at 35. But there is nothing unique about this proceeding. Commerce has investigated frozen shrimp numerous times in the past and there are existing orders on imports of frozen shrimp from other countries. In each case, Commerce devoted the resources needed to fulfill its investigative responsibilities under the statute and did not neglect to examine cross-owned fresh shrimp suppliers. Nonetheless, Commerce believes the exclusion

23

in this case is supported by the prior CVD investigation on frozen shrimp from Ecuador, claiming that "the mandatory respondents reported fewer cross-owned entities than in this investigation." IDM at 35 (citing *Certain Frozen Warmwater Shrimp from Ecuador*, 78 Fed. Reg. 50,389 (Dep't Commerce Aug. 19, 2013), and accompanying IDM at 5). However, nothing in the cited decision memorandum indicates that SONGA or the other mandatory respondent in the prior investigation reported fewer cross-owned fresh shrimp suppliers. In fact, as demonstrated by an excerpt from SONGA's initial questionnaire response from the prior CVD investigation, Commerce previously required SONGA to report on behalf of at least seven cross-owned shrimp farms, four laboratories or hatcheries, and a pair of additional entities. *See* ASPA Opposition to Exclusion of Cross-Owned Input Suppliers at Exhibit 2. Commerce also stated that "{t}he nature of shrimp farming in Ecuador is such that numerous small shrimp farmers throughout the country supply shrimp to our respondents{.}" IDM at 34. However, this statement mischaracterizes the total number of *cross-owned* fresh shrimp suppliers, *i.e.*, [    ] for Santa Priscila and [    ] for SONGA.

Commerce references a determination from ten years ago to support its claim that it previously has excluded cross-owned input suppliers in unique circumstances. *See* IDM at 35 (citing *Certain Cold-Rolled Steel Flat Products from the Russian Federation*, 80 Fed. Reg. 79,564 (Dep't Commerce Dec. 22, 2015)). The fact that Commerce has previously excluded cross-owned companies from its analysis in *one* prior case does not establish a practice. *See Shandong Huarong Mach. Co. v. United States*, 435 F. Supp. 2d 1261, 1282 n.23 (Ct. Int'l Trade 2006) (two prior determinations are not enough to constitute binding agency practice). One prior decision also says nothing about whether such an exclusion is permissible under the statute. As established above, 19 U.S.C. §§ 1671(a) and 1677f-1(e)(2)(A)(ii) require a complete

24

investigation of a mandatory respondent, including cross-owned input suppliers. Moreover, the facts in *Cold-Rolled Steel from the Russian Federation* are distinguishable from the facts presented here.

In *Cold-Rolled Steel from the Russian Federation*, Commerce selected Novex Trading and Severstal Export as the two mandatory respondents. Commerce did not exclude *any* of Severstal Export's cross-owned input suppliers. Commerce did limit its examination of Novex Trading's cross-owned suppliers of scrap. However, Novex Trading was cross-owned with suppliers of inputs other than scrap (*i.e.*, coke, dolomite, iron ore, limestone, and alloying elements) and submitted information on their behalf. Novex Trading and Severstal Export submitted questionnaire responses on behalf of a total of eight cross-owned companies (all input suppliers) and five cross-owned companies (four input suppliers), respectively. The exclusion with respect to Novex Trading's cross-owned scrap suppliers was a smaller piece of the analysis and based on a finding that number of scrap suppliers within the cross-owned entity was large. While it is unclear what number qualified as "large," Commerce still examined two cross-owned scrap suppliers. In contrast, fresh shrimp is the most important input in the production of frozen shrimp and Commerce examined only one cross-owned fresh shrimp supplier for each respondent. Commerce failed to cite to any administrative precedent that supported its decision here.

In sum, by not fully investigating all of the mandatory respondents' cross-owned fresh shrimp suppliers, Commerce abused its discretion under 19 U.S.C. § 1677f-1(e)(2)(A)(ii), did not impose a duty that is equal to the amount of the net countervailable subsidy as required by 19 U.S.C. § 1671(a), failed to attribute subsidies received by cross-owned input suppliers as required by 19 C.F.R. § 351.525(b)(6)(iv), and unjustifiably deviated from its practice of

25

requiring respondents to submit questionnaire responses on behalf of all cross-owned input suppliers.

### C. Commerce Was Otherwise Required to Rely on Facts Otherwise Available to Determine the Benefit the Mandatory Respondents Received Through Their Purchases of Fresh Shrimp from Unexamined Cross-Owned Suppliers

Commerce also erred when it refused to rely on facts otherwise available to determine the benefit that the mandatory respondents received through the [                    ] fresh shrimp they each purchased from unexamined cross-owned suppliers. As explained above, Commerce was required to include all cross-owned fresh shrimp suppliers in the subsidy analysis to determine final rates in accordance with 19 U.S.C. § 1671(a). Additionally, Commerce determined that this case satisfied the two-prong criteria set forth in 19 U.S.C. § 1677-2, which directs Commerce to treat subsidies to producers of a raw agricultural product as though the subsidies were provided with respect to the latter stage processed agricultural product. *See* IDM at 6–9.

Based on the requirements of 19 U.S.C. §§ 1671(a) and 1677-2, countervailable subsidies received by the mandatory respondents' cross-owned *and* non-cross-owned suppliers of fresh shrimp were attributable to frozen shrimp. The only cross-owned suppliers Commerce obtained subsidy information from were Produmar (cross-owned with Santa Priscila) and Naturisa (cross-owned with SONGA). As a result, the record did not contain necessary information from [        ] cross-owned fresh shrimp suppliers. The record also was missing information from any of the mandatory respondents' non-cross-owned suppliers. In the absence of this necessary information, Commerce relied on facts otherwise available to determine the benefit that the mandatory respondents received through their purchases of fresh shrimp, but only from unexamined non-cross-owned suppliers, and not from unexamined cross-owned suppliers.

26

As facts otherwise available, Commerce developed a formula to attribute the per-kilogram subsidy benefit found for examined fresh shrimp producers to unexamined non-cross-owned suppliers. Specifically, Commerce relied on "the subsidy information of the reporting cross-owned input suppliers of the mandatory respondents, as well as Santa Priscila's in-house farming operations, to determine the level of subsidization bestowed on the raw shrimp from these non-cross-owned suppliers." PDM at 10–11. Commerce explained that even though information for non-cross-owned suppliers was not on the record, "Commerce must still determine the level of subsidization provided with respect to the raw product" pursuant to the statute's instruction in 19 U.S.C. § 1677-2. IDM at 64–65. Commerce further stated that it "reasonably determined to use certain cross-owned input suppliers of Santa Priscila and SONGA, as well as Santa Priscila's own in-house farming operations, as a proxy for the purposes of determining the level of subsidization provided to the unaffiliated suppliers of fresh shrimp." *Id.* at 65. Thus, for purposes of 19 U.S.C. § 1677-2, Commerce multiplied the per-kilogram benefit found for examined fresh shrimp producers by the kilograms of fresh shrimp purchased from unexamined non-cross-owned suppliers. The resulting figure was included in the numerator of the benefit calculation for each subsidy program.

Despite the similar lack of information for a total of [          ] cross-owned suppliers, Commerce refused to apply the same per-kilogram formula to derive the benefit associated with the fresh shrimp purchased from these unexamined suppliers. Commerce's refusal to do so was unsupported by substantial evidence and contrary to law. The statute directs Commerce to use facts otherwise available when "necessary information is not available on the record." 19 U.S.C. § 1677e(a)(1). Here, given the lack of any questionnaire responses from [  ] cross-owned suppliers, the record did not contain necessary information regarding the full universe of

27

subsidies. This information was required to conduct the subsidy analysis in accordance with 19 U.S.C. §§ 1671(a) and 1677-2. Indeed, in addressing arguments challenging the application of 19 U.S.C. § 1677-2, Commerce explained that the lack of information on the record does not excuse Commerce from determining the countervailable subsidies provided with respect to fresh shrimp. *See* IDM at 64–65. ASPA agrees. The statute required Commerce to determine the benefit associated with the mandatory respondents' purchases of fresh shrimp from all cross-owned and non-cross-owned suppliers. Commerce already unduly limited its investigation of the mandatory respondents and the agency's own actions created the informational gap in the record. At the bare minimum, Commerce should have relied on facts available and applied the per-kilogram benefit formula to purchases from the unexamined cross-owned suppliers, just as it did for the purchases from the unexamined non-cross-owned suppliers. Instead, Commerce [        ] understated the benefit by not accounting for [                        ] cross-owned fresh shrimp purchases.

Commerce attempted to justify its dissimilar treatment of unexamined cross-owned fresh shrimp suppliers by explaining that the attribution of subsidies received by these suppliers is governed by 19 C.F.R. § 351.525(b)(6)(iv) and, as such, the per-kilogram formula used for non-cross-owned suppliers would not be "the most appropriate method." IDM at 35–36. The Court should not countenance this circular reasoning. Commerce created an informational gap in the record when it failed to obtain questionnaire responses from the cross-owned fresh shrimp suppliers. Thus, Commerce's own actions prevented it from following the attribution rule that is specific to cross-owned input suppliers. As Commerce stated, it "lack{s} the necessary data, *i.e.*, the subsidies and sales value information for the non-selected cross-owned entities, to perform the proper attribution as mandated by the regulations." *Id.* at 36. The only reason this data was

28

missing was because Commerce impermissibly excused respondents from reporting it. This missing data is not a reason to ignore the [                              ] fresh shrimp that the mandatory respondents purchased from unexamined cross-owned suppliers. Rather, when necessary information is not available on the record, Commerce "shall" use facts otherwise available. *See* 19 U.S.C. § 1677e(a)(1).

Commerce inappropriately faulted ASPA for not identifying any precedent for including unexamined cross-owned entities when calculating the benefit under 19 U.S.C. § 1677-2. Ideally, Commerce would have the information it needs so that it may separately attribute subsidies received by cross-owned suppliers and non-cross-owned suppliers. However, as far as ASPA is aware, the exclusion of cross-owned fresh shrimp suppliers in this investigation is unprecedented. Commerce erroneously claims that the approach it took here is consistent with the calculations for mandatory respondent Angel Camacho in *Ripe Olives from Spain*. *See* IDM at 36 (citing *Ripe Olives from Spain*, 82 Fed. Reg. 56,218 (Dep't Commerce Nov. 28, 2017), and accompanying PDM at 11 and 17). Commerce's decision in *Ripe Olives from Spain* is not an apt comparison because, as explained in the cited pages of the decision memorandum, Angel Camacho reported purchasing raw olives from two cross-owned suppliers (*i.e.*, Cuarterola and Cucanoche) and both suppliers submitted the information that Commerce needed to attribute the subsidy benefits pursuant to 19 C.F.R. § 351.525(b)(6)(iv). That is simply not the case here because Commerce impermissibly excused Santa Priscila and SONGA from the same reporting requirements with respect to their cross-owned fresh shrimp suppliers. If anything, *Ripe Olives from Spain* stands for the proposition that Commerce accounts for all purchases of the raw agricultural product in the subsidy analysis.

On the facts of this case, Commerce was required to rely on facts otherwise available and should have included the fresh shrimp purchases from unexamined cross-owned suppliers in the benefit calculation under 19 U.S.C. § 1677-2. ASPA notes that § 1677-2 applies to countervailable subsidies provided to the raw agricultural product, *i.e.*, fresh shrimp. There is nothing in the statutory text that limits its application to non-cross-owned suppliers. The statute therefore permits applying facts available to include the unexamined cross-owned suppliers. As Commerce explained in *Ripe Olives from Spain*, the attribution rules in the regulations do not account for all situations that may arise, and the agency may need to adapt to unique and unforeseen situations. *See Ripe Olives from Spain*, 83 Fed. Reg. 28,186 (Dep't Commerce June 18, 2018), and accompanying IDM at 43 (citing *CVD Preamble*, 63 Fed. Reg. at 65,401). In *Ripe Olives from Spain*, Commerce tailored the benefit calculation to the facts of the case to give effect to 19 U.S.C. §§ 1671(a) and 1677-2. At the very least, Commerce was required to do the same here by relying on facts available and ensuring that the benefit calculation included the fresh shrimp that the mandatory respondents purchased from the cross-owned suppliers that Commerce itself impermissibly declined to examine.

III.    **Commerce's Decision Not to Countervail Free Government-Provided Access to Brackish Water Is Unlawful**

In the *Final Determination*, Commerce concluded based on "the totality of evidence" that government-provided and cost-free access to brackish water from public water sources does not constitute a financial contribution that provides a countervailable benefit. *See* IDM at Comment 1. Commerce did not countervail the provision of brackish water for three main reasons – the record did not show enough government involvement, the GOE did not charge non-consumptive users, and the mandatory respondents were responsible for the costs to extract, use, and return the water. *Id.* As explained below, Commerce misapplied the law, drew an unreasonable

30

conclusion from the record evidence, and deviated from how the agency has historically analyzed subsidy programs that give private entities the right to access government-owned resources.

A.   **Commerce Erroneously Concluded that the Provision of Brackish Water Does Not Constitute a Financial Contribution that Confers a Countervailable Benefit**

A subsidy is countervailable if the following three elements are satisfied — (1) an "authority" (that is, a government or any public entity of a country) has provided a financial contribution; (2) a benefit is thereby conferred on the recipient of the financial contribution; and (3) the subsidy is specific to a foreign enterprise or foreign industry, or a group of such enterprises or industries. *See* 19 U.S.C. § 1677(5)(A)–(B); *see also* 19 U.S.C. § 1677(5)(D), (5)(E), and (5A). The statute lists four categories of government practices that constitute a financial contribution. *See* 19 U.S.C. § 1677(5)(D). The Statement of Administrative Action Accompanying the Uruguay Round Agreements Act ("SAA") explains that these four categories are "generic" and "sufficiently broad" to encompass a wide range of subsidy programs. H.R. Rep. No. 103-316, vol. 1 (1994), at 927, *reprinted in* 1994 U.S.C.C.A.N. 4040, 4240; *see also* 19 U.S.C. § 3512(d) (regarding the SAA as an authoritative interpretation and application of the CVD law). The provision of a good is listed as one type of government practice that is recognized as a financial contribution. *See* 19 U.S.C. § 1677(5)(D)(iii). Consistent with the statute's broad definition of financial contribution, Commerce has construed this category to encompass the provision of the good itself and making the good available through a right of access. *See, e.g.*, *Certain Softwood Lumber Products from Canada*, 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017), and accompanying IDM at Comment 11 ("{R}egardless of whether the provinces were supplying standing timber or making it available through a right of access,

31

they were providing standing timber."). This constitutes the best reading of the statute, as required under *Loper Bright*.

Commerce erred, both as a matter of fact and as a matter of law, when it found that the provision of brackish water does not constitute a countervailable financial contribution. The record evidence unequivocally shows the GOE's involvement and the provision of a financial contribution. In its questionnaire response, the GOE submitted Article 318 of the country's constitution that plainly states water (including brackish water) is government-owned property and that the GOE is the sole authority that is responsible for planning and managing water resources for productive activities. *See* GOE Section II Response at Exhibit TAX-4(a). The GOE's involvement does not end there. Article 108 of the Organic Law on Water Resources, Use and Development of Water ("Law on Water") establishes a procedure through which private entities engaged in any fish farming or aquacultural activity must obtain a permit from the GOE before conducting the activity. *See id.* at TAX-4(b). A permit is required for both consumptive and non-consumptive use. Private entities thus do not have the right to pump water without the GOE's approval. By granting a permit, the GOE provides a financial contribution in the form of a right to use or access government-owned water.

That the GOE charges a fee for consumptive use and not for non-consumptive use does not extinguish the financial contribution. The fee (or lack thereof) goes to the benefit analysis and the adequacy of remuneration. Financial contribution and benefit are two statutorily distinct inquiries and may not be conflated. It was thus illogical for Commerce to conclude that the provision of brackish water for non-consumptive use did not involve a financial contribution because the GOE "does not charge, and has never charged, for the non-consumptive use of brackish water …." First Post-Preliminary Analysis at 17. According to this logic, if the GOE

32

charged a penny a gallon for access to government-owned water, a subsidy may exist if the market price was 50 cents a gallon. But if access to the water is provided for free, and even if the market price were still 50 cents, the subsidy disappears.

Commerce next argues that a financial contribution could only exist if the GOE also provided assistance with the physical act of pumping the water or with affixing the infrastructure that is necessary to pump the water. *See* IDM at 20 ("{T}he GOE provides no infrastructure to the respondents for pumping such water to their facilities, and the respondents bear all costs for constructing, maintaining, and operating the infrastructure to transport brackish water to and from their facilities."). Commerce misunderstands the nature of the financial contribution at issue. As the GOE explained in its questionnaire responses, the Law on Water "requires *all productive users, not just consumptive users*, intending to extract any type of water from any public source … to obtain an authorization from the Ministry of the Environment, Water, and Ecological Transition{.}" GOE Second Post-Preliminary Supplemental Questionnaire Response at S4-1 – S4-2, P.R. 389, C.R. 249 (June 12, 2024) (emphasis added). Because the "productive use of water" is defined in Article 93 of the Law on Water to include "aquaculture production," *id.* at S4-2, shrimp farmers are considered productive users that may only access and extract brackish water from public sources if they first obtain government authorization. The GOE also reported that "Santa Priscila and SONGA, and their {examined} cross-owned affiliates … have been authorized to use public sources and possess the requisite permits to allow for the productive use of water{.}" GOE Section II Response at TAX-43.

The foregoing evidence demonstrates that the GOE provided the mandatory respondents with the right to use or access brackish water, which in and of itself is the provision of a good and constitutes a financial contribution. The provision of brackish water is like other subsidy

33

programs that Commerce has countervailed in the past. For example, in *Phosphate Fertilizers from the Russian Federation*, Commerce rejected arguments against its finding that the provision of mining rights constitutes a financial contribution because "the good at issue is the right to mine phosphate ore," a subsoil resource owned by the state, and the government "provided access to phosphate ore through the mining rights that it granted{.}" 88 Fed. Reg. 76,182 (Dep't Commerce Nov. 6, 2023), and accompanying IDM at Comment 2a. As another example, in *Certain Softwood Lumber Products from Canada*, Commerce found that providing companies with the right to access standing timber on provincial Crown lands is a countervailable financial contribution. 82 Fed. Reg. 51,814 (Dep't Commerce Nov. 8, 2017), and accompanying IDM at Comment 11. In both cases, as is the case here, the government provided a right to use or access a good.

Neither the statute nor agency practice establish that a financial contribution exists only if the governmental authority not only authorizes access to a government-owned good but also funds the installation of the infrastructure and provides the equipment that is needed for obtaining the government-provided good. The provision of mining rights is a financial contribution even if the government does not also provide excavation equipment. The provision of logging rights is a financial contribution even if the government does not also provide chainsaws. The same is true here. A financial contribution existed irrespective of who paid for the pumps and other equipment that was used to obtain the government-owned water that the GOE authorized respondents to access.

Moreover, any expenses incurred by the mandatory respondents to access the government-provided good also do not negate, offset, or eliminate the countervailable benefit that access to the good provides. Under the benefit-to-the-recipient standard in the statute, a

benefit is conferred if a good is provided for less than adequate remuneration. *See* 19 U.S.C. § 1677(5)(E). Commerce measures the adequacy of remuneration by comparing the government price to a market-determined price. *See* 19 C.F.R. § 351.511(a)(2)(i). Brackish water is a finite resource that has commercial value, even when the brackish water is used for non-consumptive purposes such as aquaculture activities. *See* Second NSAs at 4–5 and Exhibits 2 through 4; *see also* GOE Verification Report at 11, P.R. 422, C.R. 315 (Sept. 3, 2024) (explaining that the authorization process includes evaluating whether the requested water is sufficiently available). Thus, the provision of brackish water conferred a benefit that is equal to the difference between the commercial value of the water and any amount the mandatory respondents paid for their access to the water. The statute does not require Commerce to consider "the effect of the subsidy." *Id.* § 1677(5)(C). The *CVD Preamble* also explains that the benefit analysis does not consider the net effect that a subsidy has on a company's bottom line. 63 Fed. Reg. at 65,361. There are only three offsets that Commerce is permitted to make under the statute, and none of them authorize an offset for costs that are incurred to extract the government-provided good. *See* 19 U.S.C. § 1677(6).

In short, it is irrelevant both to the issue of financial contribution and benefit that the shrimp farmers incurred expenses to obtain the equipment and build the infrastructure to pump government-owned water they were authorized to access for free. Commerce therefore erred in declining to countervail the provision of brackish water program on that basis.

### B.    Commerce Should Have Applied AFA and Countervailed the Provision of Brackish Water

Commerce's decision not to countervail the provision of brackish water was based on a misapplication of the law and an unreasonable evaluation of the record. The evidence demonstrated that the provision of brackish water satisfied all three elements of a countervailable

subsidy. However, as explained below, the mandatory respondents and the GOE failed to cooperate by not acting to the best of their ability, and the factual basis for Commerce's decision was false. Under these circumstances, Commerce should have applied AFA and countervailed the provision of brackish water.

       *1.*     *Legal Framework*

The statute requires that Commerce verify the information upon which it relies in reaching a final determination. *See* 19 U.S.C. § 1677m(i)(1). "Verification represents a point of no return" and "{t}he purpose of verification is 'to test information provided by a party for accuracy and completeness.'" *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1343–44 (Fed. Cir. 2021) (quoting *Micron Tech., Inc. v. United States*, 117 F.3d 1386, 1396 (Fed. Cir. 1997)). Stated another way, "{v}erification is intended to test the accuracy of data already submitted, rather than to provide a respondent with an opportunity to submit a new response." *Özdemir Boru San ve Tic. Ltd. Sti. v. United States*, 273 F. Supp. 3d 1225, 1242 (Ct. Int'l Trade 2017) (quoting *Tianjin Mach. Imp. & Exp. Corp. v. United States*, 353 F. Supp. 2d 1294, 1304 (Ct. Int'l Trade 2004), *aff'd*, 146 Fed. App'x 493 (Fed. Cir. 2005)). If the respondent fails at verification to support the information in its questionnaire responses, the statute provides that Commerce must disregard that information and instead rely on facts otherwise available. *See* 19 U.S.C. §§ 1677e, 1677m(i); *see also Heveafil Sdn. Bhd. v. United States*, 25 C.I.T. 147, 149 (2001); *AK Steel Corp. v. United States*, 21 C.I.T. 1265, 1267 (1997).

Commerce has the discretion to draw adverse inferences in selecting from among the facts otherwise available when it finds that the respondent "has failed to cooperate by not acting to the best of its ability to comply with a request for information." 19 U.S.C. § 1677e(b)(1). A respondent fails to act to the best of its ability when it does not exert "maximum effort to provide Commerce with full and complete answers to all inquiries in an investigation." *Nippon Steel*

36

*Corp. v. United States*, 337 F.3d 1373, 1382 (Fed. Cir. 2003). The "best of its ability" standard requires that the respondent maintain full and complete records, be familiar with all of its records, and conduct a careful review of its records. *Id.* The standard "does not condone inattentiveness, carelessness, or inadequate record keeping." *Id.* The respondent's motivation or intent is not a relevant consideration. *Id.* at 1383 ("While intentional conduct, such as deliberate concealment or inaccurate reporting, surely evinces a failure to cooperate, the statute does not contain an intent element.").

    2.    *Verification Confirmed That Non-Consumptive Users of Brackish Water Were Charged Fees and Are Able to Track Their Water Usage*

In the *Final Determination*, Commerce relied on representations in questionnaire responses that the GOE never charges for the non-consumptive use of brackish water and that the mandatory respondents' non-consumptive use of brackish water is not measured in the ordinary course of business. These facts were directly contradicted at verification.

During its verification of the GOE, Commerce examined documents that authorized Santa Priscila's cross-owned fresh shrimp supplier (*i.e.*, Produmar) to use brackish water for non-consumptive and productive purposes. *See* GOE Verification Exhibits at Exhibit VE-4, P.R. 410, C.R. 276 (July 26, 2024). The authorizations [

    ]. For Produmar, [

    ] *Id.* [

]. *Id.* Additionally, [

] *Id.* In fact, [

]. *Id.* When Commerce requested clarification, government officials could not explain why Produmar was charged a fee for its use of brackish water. *See* GOE Verification Report at 12.

Produmar operated a shrimp farm and was charged for its use of brackish water, contrary to claims from the mandatory respondents and the GOE that brackish water has no value. Commerce gave zero weight to this irrefutable evidence. Commerce considered it significant that there was a pending appeal asking the GOE to reverse the charge for Produmar's water use, stating that the lack of final adjudication of the appeal meant that there was an insufficient basis to find that the GOE charges for non-consumptive use of brackish water. *See* IDM at 21. However, when an issue is subject to pending litigation, Commerce generally accepts the *status quo* unless and until a final and conclusive court decision says otherwise. *See, e.g.*, *Certain Hot-Rolled Carbon Steel Flat Products from the Netherlands*, 72 Fed. Reg. 35,220 (Dep't Commerce June 27, 2007), and accompanying IDM at Comment 1; *Ripe Olives from Spain*, 90 Fed. Reg. 25,223 (Dep't Commerce June 16, 2025), and accompanying IDM at Comment 6. That same principle should have been applied here with respect to Produmar's ongoing appeal — unless and until the GOE reverses its decision, Commerce cannot find that the GOE does not charge fees for the non-consumptive use of brackish water.

Additionally, Commerce incorrectly stated that "there is no evidence on the record to substantiate finding that the mandatory respondents could – and should – have reported certain water-use volumes corresponding to their shrimp farms during the POI." IDM at 21. This

38

**PUBLIC VERSION**

statement is not supported by the record. According to the authorization documents for

Produmar, the GOE requires [

]. Given this

requirement, the mandatory respondents must have [                                    ] and

information on the volume of brackish water they used. Thus, the evidence that Commerce

obtained during verification disproved the mandatory respondents' claim all throughout the

investigation that they had no reason to track the amount of brackish water they used during the

POI.

> 3.    *Commerce Should Have Applied AFA to Countervail the Provision of Brackish Water*

Because the mandatory respondents and the GOE did not submit accurate and complete

information in their questionnaire responses, Commerce was required to resort to facts otherwise

available. *See* 19 U.S.C. § 1677e(a). In fact, Commerce should have applied AFA to countervail

the provision of brackish water. *See id.* § 1677e(b)(1). The mandatory respondents withheld and

did not timely submit information regarding the amount of brackish water they each used during

the POI, thereby significantly impeding the investigation. The GOE also significantly impeded

the investigation when it withheld information on the regime regulating the use of brackish water

and falsely reported that it never charges non-consumptive users a fee. Their conduct in this

investigation fell far short of the maximum that they each could have done and does not satisfy

the "best of its ability" standard under the statute. Fully cooperative respondents would have

disclosed this information in response to Commerce's requests for information by the established

deadlines. Because the mandatory respondents and the GOE were not forthcoming in their

questionnaire responses, the record lacks information that was essential to Commerce's

39

examination of the subsidy program. Commerce failed to adequately explain how the mandatory

respondents and the GOE met the "best of its ability" standard in light of the reporting failures.

In addition, Commerce abused its discretion under 19 U.S.C. § 1677e(b)(1) by not

applying AFA to countervail the provision of brackish water. "An abuse of discretion occurs

where the decision is based on an erroneous interpretation of the law, on factual findings that are

not supported by substantial evidence, or represents an unreasonable judgment in weighing

relevant factors." *Star Fruits S.N.C. v. United States*, 393 F.3d 1277, 1281 (Fed. Cir. 2005). An

agency's decision amounts to an abuse of discretion when it arbitrarily treats similar situations

differently. *See Jiangsu Jiasheng Photovoltaic Tech. Co. v. United States*, 28 F. Supp. 3d 1317,

1323 (Ct. Int'l Trade 2014) (citing *SKF USA Inc. v. United States*, 263 F.3d 1369, 1382 (Fed. Cir.

2001)). Here, Commerce applied a more relaxed standard for AFA that is not consistent with

Commerce's standard practice under these circumstances, as summarized below:

> When the government fails to provide requested information concerning whether
> or not an alleged subsidy program exists, and the nature and details of that
> program, it is {Commerce's} practice, as AFA, to determine that a financial
> contribution exists absent that requested information, in accordance with section
> 771(5)(D) of the Act. Furthermore, when {Commerce} requests information
> which addresses the universe of enterprises or industries which can benefit from a
> subsidy, and the government fails to provide the requested information, it is also
> {Commerce's} practice, as AFA, to find that the subsidy is specific, in accordance
> with section 771(5A) of the Act. However, where possible, {Commerce} will
> normally rely on the foreign producer's or exporter's records to determine the
> existence and amount of the benefit to the extent that such information is useable
> and verifiable.

*Certain Corrosion-Resistant Steel Products from Italy*, 81 Fed. Reg. 35,326 (Dep't Commerce

June 2, 2016), and accompanying IDM at 10–11.

Commerce's criteria for AFA were met here. Based on Commerce's observations at

verification, as discussed above, the GOE failed to provide accurate and complete information on

the nature of government-provided access to brackish water for productive and non-consumptive

40

use. The GOE also failed to provide requested information on the universe of enterprises or industries that applied for such access. *See* GOE NSA Questionnaire Response at NSA-43–NSA-45. Finally, despite Commerce's requests, the mandatory respondents failed to provide any information on the volumes of brackish water they accessed, and it became clear at verification that [

]. In other words, due to reporting failures, the record lacked verified information that Commerce needed to analyze financial contribution, specificity, and benefit.

For all of these reasons, Commerce should have countervailed the provision of brackish water and determined a rate based on the application of AFA.

**IV.    Commerce Erroneously Concluded that the Indirect Provision of Government-Produced Fuel Through Private Middlemen Does Not Constitute a Countervailable Financial Contribution**

In the *Final Determination*, Commerce concluded that the mandatory respondents' purchases of fuel do not constitute a countervailable financial contribution solely because they did not purchase the fuel *directly* from Petroecuador. *See* IDM at 23–25. Commerce's conclusion is based on an untenable reading of the statute that should not be upheld under the *Loper Bright* standard and is inconsistent with how the agency has applied the statute in the past.

The *Loper Bright* framework requires the Court to discern the "best reading" of the statute using traditional tools of statutory construction. The statute plainly states that a subsidy is countervailable, regardless of whether the subsidy is provided *directly or indirectly* with respect to the manufacture, production, or export of the subject merchandise. *See* 19 U.S.C. §§ 1671(a), 1677(5)(C). The SAA also states that "it is irrelevant whether … the subsidy is provided directly or indirectly." SAA at 927. The SAA further explains that the text of the statute "continues to refer to subsidies provided 'directly or indirectly' by a government" because, as a policy matter,

41

**PUBLIC VERSION**

Congress expressly disapproved of administering the CVD law in a way that "permit{s} the indirect provision of a subsidy to become a loophole when unfairly traded imports enter the United States and injure a U.S. industry." *Id.* at 926. "It is a 'fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme.'" *Kyocera Solar, Inc. v. United States*, 844 F.3d 1334, 1338 (Fed. Cir. 2016) (quoting *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000)). Based on the inclusion of the phrase "directly or indirectly" in the statutory text, as well as Congress's concern regarding indirectly provided subsidies creating a loophole in the CVD law, the best reading of the statute requires Commerce to find the existence of a financial contribution when a respondent receives a good directly or indirectly from a governmental authority.

Here, the record established that Petroecuador is a governmental authority and was the ultimate supplier of the subsidized fuel that the mandatory respondents purchased from private trading companies and distributors. Accordingly, the mandatory respondents were indirect recipients of a financial contribution from Petroecuador. The statute contemplates this type of scenario and unambiguously instructs Commerce to countervail subsidies, regardless of whether they are provided directly or indirectly. *See* 19 U.S.C. §§ 1671(a), 1677(5)(C); *see also* SAA at 926–27. Commerce disregarded the statute's clear instruction when it did not countervail the mandatory respondents' purchases of subsidized fuel for no reason other than the fact that they did not receive the fuel directly from Petroecuador.

Commerce abruptly stopped its analysis and did not examine whether the mandatory respondents indirectly received a financial contribution from Petroecuador. Commerce stated that it never initiated an investigation into whether the GOE entrusted or directed the private

42

middlemen to provide the mandatory respondents with the subsidized fuel. *See* IDM at 23–24. But Commerce was not required to analyze or find entrustment or direction in this case, because the fuel in question was ultimately provided by Petroecuador, and thus an indirect financial contribution already existed. No additional entrustment or direction was required in order for a financial contribution to be found.

Commerce's interpretation fails because it is not based on the best reading of the statute. The statutory text, when read in conjunction with the SAA, make clear that Congress did not intend to limit indirect subsidies to entrustment or direction scenarios. A financial contribution exists, irrespective of whether the respondent is a direct or indirect recipient of the government-produced good. Commerce's reading of the statute is unduly restrictive and would allow foreign governments to avoid CVD exposure by providing goods from government entities through private middlemen. The SAA prohibits Commerce from administering the CVD law in this way. Instead, Congress expected that Commerce would find that the GOE provided a direct financial contribution by selling the fuel to the private middlemen and that the mandatory respondents were indirect recipients of the financial contribution when they purchased the government-produced fuel. This is the only reading of the statute that is consistent with the legislative intent of not permitting the indirect provision of a subsidy to become a loophole in the CVD law.

In fact, Commerce has previously countervailed the provision of steam coal and sulfuric acid supplied by a governmental authority but sold to private traders or distributors before being resold to the respondent subject to review. *See Citric Acid and Certain Citrate Sales from the People's Republic of China*, 79 Fed. Reg. 108 (Dep't Commerce Jan. 2, 2014), and accompanying IDM at Comment 5. Commerce explained that no entrustment or direction analysis was necessary because that analysis is reserved for situations where a financial

contribution originates with a private entity, which differs from situations where a government directly provides a financial contribution to private middlemen that then transfer the financial contribution to another person. *Id.* This decision was upheld on appeal as a "spot on" interpretation of the statute. *See RZBC Group Shareholding Co. v. United States*, 100 F. Supp. 3d 1288, 1301–03 (Ct. Int'l Trade 2015).

In *RZBC Group Shareholding Co.*, the Court recognized that the statute is broad enough to find that a financial contribution exists in a variety of scenarios and "allows Commerce to countervail contributions which originate with the government, but which pass through an intermediary before going to the ultimate user." *Id.* at 1302. In such a scenario, the only question is whether a benefit was conferred upon the indirect recipient of the financial contribution because "the middleman may skim some of the benefit by reselling the subsidized inputs at a markup" and there is a benefit "if the marked-up cost that the final user pays is less than the market cost." *Id.* Similarly, in *Beijing Tianhai Indus. Co. v. United States*, the Court explained that "the statute anticipates that the financial contribution need not be direct," recognized that the issue of financial contribution is distinct from benefit, and held that the financial contribution and the benefit need not be conferred on the same person. 52 F. Supp. 3d 1351, 1360–67 (Ct. Int'l Trade 2015). In another case, the Court adopted the same reading of the statute and explained that "the respondent end user need not directly receive the financial contribution." *Guangdong Wireking*, 900 F. Supp. 2d at 1379–80, *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014).

Here, Commerce claimed that *Citric Acid and Certain Citrate Sales from the People's Republic of China* is distinguishable because Commerce found that the Chinese government provided a direct financial contribution to the trading companies. *See* IDM at 24. But the record supports the exact same conclusion here. Petroecuador provided a direct financial contribution to

the private middlemen. In both cases, the financial contribution originated with a governmental authority and the mandatory respondent was an indirect recipient of the financial contribution. Commerce also suggests that it is unclear from the record whether the fuel that the mandatory respondents purchased was in fact supplied by Petroecuador, stating that "the GOE did not collect information from the private traders and/or distributors on sales to registered end-users." *Id.* While it may be the case that the GOE itself does not maintain records on the private intermediary parties' resales, the record is not as murky as Commerce suggests.

Information on the record leaves no doubt that the fuel that the mandatory respondents purchased was procured from Petroecuador. *See* Santa Priscila's NSA Questionnaire Response at NSA-7, P.R. 319, C.R. 212 (Apr. 18, 2024) ("Once the permit was approved, the supplier used the permit to purchase fuel from Petroecuador for Santa Priscila or Produmar."); SONGA's NSA Questionnaire Response at NSA-6, P.R. 316, C.R. 207 (Apr. 18, 2024) (same but for SONGA). SONGA reported that its cross-owned fresh shrimp supplier "purchased {fuel} exclusively from [                                                        ]," which is [

                                                        ]. SONGA's NSA Questionnaire Response at NSA-10; GOE NSA Questionnaire Response at NSA-12–NSA-13 and NSA-27–NSA-28, P.R. 321, C.R. 213 (Apr. 18, 2024). Santa Priscila submitted information showing that [

                                                        ]. *See* Santa Priscila NSA Questionnaire Response at Exhibits NSA-6 and NSA-7(a). It is abundantly clear from the record that Petroecuador provided the intermediary parties with the fuel that was eventually purchased by the mandatory respondents. Commerce simply turned a blind eye to this overwhelming evidence.

For all of these reasons, Commerce's decision not to countervail the provision of government-produced fuel was based on an erroneous reading of the statute that failed to give

45

effect to the intent of Congress and was inconsistent with prior decisions involving similar facts. The Court should order a remand and instruct Commerce that it may not conclude that the provision of government-produced fuel does not constitute a financial contribution merely because the mandatory respondents were indirect recipients of the fuel.

**V.    The Errors Committed By Commerce Resulted in Final Rates that Understate the Extent to Which Ecuadorian Producers and Exporters of Frozen Shrimp Benefit from Countervailable Subsidies**

As demonstrated above in Sections II through IV, Commerce committed factual and legal errors in the *Final Determination*. Consequently, the final rates for Santa Priscila (3.57 percent), SONGA (4.41 percent), and "all-others" (3.78 percent) are understated and do not accurately reflect the extent to which producers and exporters of frozen shrimp in Ecuador benefit from countervailable subsidies. This is contrary to the object and purpose of the CVD statute, which is remedial in nature and required Commerce to countervail the full amount of the countervailable subsidy that exists with respect to the manufacture, production, and export of frozen shrimp from Ecuador. *See* 19 U.S.C. § 1671(a); *see also Guangdong Wireking*, 900 F. Supp. 2d at 1370, *aff'd*, 745 F.3d 1194 (Fed. Cir. 2014); S. Rep. No. 1221, 92d Cong., 2d Sess. 8 (1972). Thus, the final rates are unsupported by substantial evidence and otherwise not in accordance with law.

PUBLIC VERSION

**CONCLUSION**

For the foregoing reasons, ASPA respectfully requests that the Court grant the motion for judgment on the agency record, hold that Commerce's final determination is unsupported by substantial evidence and otherwise not in accordance with law, remand this matter to Commerce for disposition consistent with the opinion and order of the Court, and order any additional relief that the Court may deem just and proper.

Respectfully submitted,

/s/ Elizabeth J. Drake

Roger B. Schagrin
Elizabeth J. Drake
Saad Y. Chalchal*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for American Shrimp Processors Association*

Date: August 26, 2025

*Admitted only in New York and New Jersey. Practice limited to matters before federal courts and agencies.

47

**CERTIFICATE OF COMPLIANCE**

I hereby certify that the foregoing brief contains 13,991 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.


Dated: August 26, 2025                                    /s/ Elizabeth J. Drake
                                                          Elizabeth J. Drake

UNITED STATES COURT OF INTERNATIONAL TRADE
Before: The Honorable Richard K. Eaton, Senior Judge

INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and
SOCIEDAD NACIONAL DE GALÁPAGOS C.A.,

   *Plaintiffs,*

  v.

UNITED STATES,

   *Defendant,*

  and

AD HOC SHRIMP TRADE ACTION COMMITTEE and
AMERICAN SHRIMP PROCESSORS ASSOCIATION,

   *Defendant-Intervenors.*

Consol. Court No. 25-00025

**ORDER**

Upon consideration of the motion for judgment on the agency record filed by plaintiff American Shrimp Processors Association (the "plaintiff"), the responses thereto filed by the defendant and the defendant-intervenors, the plaintiff's reply, the administrative record, all other papers and proceedings herein, and upon due deliberation, it is hereby

**ORDERED** that the plaintiff's motion for judgment on the agency record is **GRANTED**; it is further

**ORDERED** that the U.S. Department of Commerce's final determination in the countervailing duty investigation of certain frozen warmwater shrimp from Ecuador is remanded for disposition consistent with this Court's opinion and order; and it is further

**ORDERED** that Commerce shall file its remand redetermination within ninety (90) days of this date; and it is further

**ORDERED** that Commerce shall file the administrative record for the remand proceeding within fourteen (14) days of the date of filing its remand redetermination; and it is further

**ORDERED** that the parties shall have thirty (30) days to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have thirty (30) days to file replies to the comments on the remand redetermination; and it is further

**ORDERED** that the parties shall file the joint appendix within fourteen (14) days after the deadline to file replies to the comments on the remand redetermination.

**SO ORDERED**.

_____
Honorable Richard K. Eaton, Senior Judge
U.S. Court of International Trade

Dated: _____, 2025
      New York, New York

2