UNITED STATES COURT OF INTERNATIONAL TRADE
**Before: The Honorable Richard K. Eaton, Senior Judge**

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS C.A., *Plaintiffs,* v. UNITED STATES, *Defendant,* and AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, *Defendant-Intervenors.* | **PUBLIC VERSION** Consol. Court No. 25-00025 Business Proprietary Information Identified by Single Brackets [ ] and Removed from Pages 15, 18, and 27. |

## RESPONSE BRIEF OF DEFENDANT-INTERVENORS IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD

Roger B. Schagrin
Elizabeth J. Drake
Justin M. Neuman*
SCHAGRIN ASSOCIATES
900 Seventh St. N.W., Suite 500
Washington, D.C. 20001
(202) 223-1700

*Counsel for American Shrimp Processors Association*

Date: March 13, 2026

*Admitted only in Ohio. Practice limited to matters before federal courts and agencies.

**PUBLIC VERSION**

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ...................................................................................................... i

STATEMENT PURSUANT TO RULE 56.2(c) ..................................................................... 1

    A.    Administrative Determination Under Review ............................................. 1

    B.    Issues Presented for Appeal ......................................................................... 2

    C.    Standard of Review....................................................................................... 2

ARGUMENT ........................................................................................................................... 3

    I.    Commerce's *De Facto* Specificity Analyses Are Supported by Substantial Evidence 3

        A.    Commerce's Finding that the ISD Program Is *De Facto* Specific Is Supported by Substantial Evidence.................................................................. 3

        1.    Plaintiffs' Reliance on *Mosaic I* Is Misplaced............................................ 4

        B.    Commerce's Finding that the AMVTR Program Is *De Facto* Specific Is Supported by Substantial Evidence ........................................................... 7

        1.    The Amount of the Benefit Received by Santa Priscila under the AMVTR Program Is Not on the Record, Warranting Commerce's Application of AFA in Finding the Program *De Facto* Specific ................................................. 7

        2.    Even if the Application of AFA Was Unwarranted, Commerce's *De Facto* Specificity Finding Is Supported by Substantial Evidence.................................... 9

    II.    Substantial Evidence Supports Commerce's Refusal to Accept Plaintiffs' Minor Corrections................................................................................................... 12

        A.    Verification Is Not an Opportunity to Present New Factual Information............. 12

        B.    Commerce's Determination to Reject Santa Priscila's/Produmar's Minor Corrections Was Supported by Substantial Evidence....................................... 15

        C.    Commerce's Determination to Reject SONGA's Minor Corrections Was Supported by Substantial Evidence .................................................................... 19

        1.    19 U.S.C. § 1677m(d) Does Not Require Commerce to Offer SONGA a Chance to Remedy Its Deficient Reply................................................................ 20

        2.    The Precedents Identified by SONGA Are Inapposite and Do Not Compel Commerce to Employ 19 U.S.C. § 1677m(d)......................................... 22

    III.    Commerce's Determination to Apply AFA Was Supported by Substantial Evidence 26

CONCLUSION...................................................................................................................... 28

## TABLE OF AUTHORITIES

**Cases**

*ABB Inc. v. United States*, 355 F. Supp. 3d 1206 (Ct. Int'l Trade 2018) ............................... 20, 23

*AK Steel Corp. v. United States*, 192 F.3d 1367 (Fed. Cir. 1999) ............................................. 9-12

*Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*,
   589 F. Supp. 3d 1346 (Ct. Int'l Trade 2022) ...................................................................... 9

*BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351 (Ct. Int'l Trade 2021) ................... 25

*Bomont Indus. v. United States*, 733 F. Supp. 1507 (Ct. Int'l Trade 1990) ................................ 17

*Branco Peres Citrus, S.A. v. United States*, 173 F.Supp.2d 1363 (2001) .................................... 21

*Ceramica Regiomontana, S.A. v. United States*,
   636 F. Supp. 961 (1986) ................................................................................................... 13

*China Kingdom Imp. & Exp. Co. v. United States*,
   507 F.Supp.2d 1337 (Ct. Int'l Trade 2007) ...................................................................... 25

*Coalition for the Preservation of American Brake Drum and Rotor
   Aftermarket Manufacturers v. United States*, 44 F. Supp. 2d 229, 236 (1999) ....................... 18

*Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938) ............................................................. 2

*Deacero S.A.P.I. de C.V. v. United States*,
   353 F. Supp. 3d 1303 (Ct. Int'l Trade 2018) ..................................................................... 13

*Essar Steel Ltd. v. United States*, 678 F.3d 1268 (Fed. Cir. 2012) ......................................... 13, 14

*Goodluck India Ltd. v. United States*,
   11 F.4th 1335 (Fed. Cir. 2021) ................................................................................... 12-14, 25

*Gov't of Quebec v. United States*,
   105 F.4th 1359 (Fed. Cir. 2024) ........................................................................................ 6

*Gov't of Québec v. United States*,
   567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022) .................................................................. 6, 7

*Guizhou Tyre Co. v. United States*,
   523 F. Supp. 3d 1312 (Ct. Int'l Trade 2021) ....................................................... 12, 18, 19, 26

*Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022) ............................... 23

*Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332 (Ct. Int'l Trade 2018) ................. 23, 24

*Hyundai Steel Co. v. United States*, 803 F. Supp. 3d 1252 (Ct. Int'l Trade 2025) .................... 5, 6

*Magnola Metallurgy, Inc. v. United States*, 508 F.3d 1349 (Fed. Cir. 2007) ............................... 9

*Meihua Grp. Int'l Trading (Hong Kong) Ltd. v. United States*,
   633 F. Supp. 3d 1203 (Ct. Int'l Trade 2023) .................................................................... 24

*Nippon Steel Corp. v. United States*, 458 F.3d 1345 (Fed. Cir. 2006) .......................................... 2

*Nippon Steel Corp. v. United States*, 337 F.3d 1373 (Fed. Cir. 2003) .................................... 16, 26

*NTN Bearing Corp. v. United States*, 74 F.3d 1204 (Fed. Cir. 2006) ........................................ 14

*Özdemir Boru San. v. Tic. Ltd. Sti.*, 273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ................. 17, 18

*Papierfabrik Aug. Koehler SE v. United States*,
    843 F.3d 1373 (Fed. Cir. 2016) ........................................................................ 21, 22

*PT. Zinus Glob. Indonesia v. United States*,
    686 F. Supp. 3d 1349 (Ct. Int'l Trade 2024) ........................................................ 24

*QVD Food Co. v. United States*, 658 F.3d 1318 (Fed. Cir. 2011) ................................................. 16

*Samsung Elecs. Co. v. United States*,
    37 F. Supp. 3d 1320 (Ct. Int'l Trade 2014) ........................................................ 10

*Samsung Elecs. Co. v. United States*,
    973 F. Supp. 2d 1321 (Ct. Int'l Trade 2014) ........................................................ 10

*Shelter Forest Int'l Acquisition, Inc. v. United States*,
    No. 2021-2281, 2022 WL 2155965 (Fed. Cir. 2022) ............................................. 23

*Sugiyama Chain Co. v. United States*,
    797 F. Supp. 989 (Ct. Int'l Trade 1992) ............................................................ 16

*Ta Chen Stainless Steel Pipe, Inc. v. United States*,
    298 F.3d 1330 (Fed. Cir. 2002) ........................................................................ 22

*Tatung Co. v. United States*, 18 C.I.T. 1137 (1994) ....................................................... 13, 16, 17

*The Mosaic Company v. United States*, 659 F. Supp. 3d 1285 (2023) ..................... 4, 5, 7, 10, 11

*The Mosaic Co. v. United States*,
    744 F. Supp. 3d 1367 (Ct. Int'l Trade 2025) ...................................................... 11, 12

*Tianjin Mach. Imp. & Exp. Corp. v. United States*,
    806 F. Supp. 1008 (Ct. Int'l Trade 1992) ............................................................ 16

*Timken U.S. Corp. v. United States*, 434 F.3d 1345 (Fed. Cir. 2006) ............................. 13, 14, 25

*Yangzhou Bestpak Gifts & Crafts Co. v. United States*,
    716 F.3d 1370 (Fed. Cir. 2013) ...................................................................... 12, 13

**Statutes**
19 U.S.C. § 1516a(b)(1)(B)(i) ...................................................................................... 2
19 U.S.C. § 1677(5A)(D)(iii)(I) .................................................................................. 3, 5
19 U.S.C. § 1677(5A)(D)(iii)(III) .............................................................................. 8, 9, 10
19 U.S.C. § 1677e .................................................................................................. 26
19 U.S.C. § 1677e(a) .............................................................................................. 26
19 U.S.C. § 1677m(d) ........................................................................................... 20-23
19 U.S.C. § 1677m(i)(1) ......................................................................................... 12

**PUBLIC VERSION**

**Administrative Determinations**

*Frozen Warmwater Shrimp from Ecuador*, 89 Fed. Reg. 85,506 (Dep't Commerce
Oct. 28, 2024) ("*Final Determination*"), and accompanying Issues and Decision
Memorandum ("IDM").................................................................................................... passim

*Frozen Warmwater Shrimp from Ecuador, India, and the Socialist Republic of Vietnam*,
89 Fed. Reg. 104,982 (Dep't Commerce Dec. 26, 2024) ........................................................ 2

**Other Authorities**

*CVD Preamble*, 63 Fed. Reg. 65,348, at 65,359............................................................................. 6

Statement of Administrative Action Accompanying the Uruguay Round Agreements Act,
H.R. Rep. No. 103-316, at 929, vol. 1 (1994), *reprinted in* 1994 U.S.C.C.A.N. 4040 .............. 3, 7

PUBLIC VERSION

UNITED STATES COURT OF INTERNATIONAL TRADE
Before: The Honorable Richard K. Eaton, Senior Judge

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS C.A., <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant,* <br><br> and <br><br> AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, <br><br> *Defendant-Intervenors.* | **PUBLIC VERSION** <br><br> Consol. Court No. 25-00025 <br><br> Business Proprietary Information Identified by Single Brackets [ ] and Removed from Pages 16, 18, and 27. |

**RESPONSE BRIEF OF DEFENDANT-INTERVENORS IN OPPOSITION TO PLAINTIFFS' MOTION FOR JUDGMENT ON THE AGENCY RECORD**

Pursuant to Rule 56.2 and the Court's January 26, 2025 scheduling order, Defendant-Intervenor the American Shrimp Processors Association ("ASPA") respectfully submits this memorandum in opposition to the motion for judgment on the agency record filed by Industrial Pesquera Santa Priscila S.A. ("Santa Priscila") and Sociedad Nacional De Galápagos, C.A. ("SONGA") in the above-captioned action.

**STATEMENT PURSUANT TO RULE 56.2(c)**

**A. Administrative Determination Under Review**

The administrative determination under review is the final determination in the countervailing duty investigation of frozen shrimp from Ecuador. *See Frozen Warmwater Shrimp*

1

*from Ecuador*, 89 Fed. Reg. 85,506 (Dep't Commerce Oct. 28, 2024) ("*Final Determination*"), and accompanying Issues and Decision Memorandum ("IDM"); *see also Frozen Warmwater Shrimp from Ecuador, India, and the Socialist Republic of Vietnam*, 89 Fed. Reg. 104,982 (Dep't Commerce Dec. 26, 2024).

### B. Issues Presented for Appeal

1.    Whether Commerce's determination that the Investment Contract Tax Exemption ("ISD") and Annual Motor Vehicle Tax Reduction ("AMVTR") programs are *de facto* specific is supported by substantial evidence.

2.    Whether Commerce's rejection of Plaintiffs' minor corrections is supported by substantial evidence.

3.    Whether Commerce's application of adverse facts available ("AFA") to determine the benefit under the ISD and AMVTR programs is supported by substantial evidence.

### C. Standard of Review

The standard of review requires that the Court sustain any determination, finding, or conclusion by Commerce unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). The substantial evidence standard requires "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). The substantial evidence standard requires the Court to assess whether the administrative determination under review is reasonable given the record as a whole. *See Nippon Steel Corp. v. United States*, 458 F.3d 1345, 1350-51 (Fed. Cir. 2006).

PUBLIC VERSION

## ARGUMENT

### I.   Commerce's *De Facto* Specificity Analyses Are Supported by Substantial Evidence

#### A.   Commerce's Finding that the ISD Program Is *De Facto* Specific Is Supported by Substantial Evidence

Commerce's finding that the ISD program was *de facto* specific because the number of recipients was limited in number on an enterprise basis in accordance with 19 U.S.C. § 1677(5A)(D)(iii)(I) is supported by substantial evidence. Commerce explained that it relied on information provided by the Government of Ecuador ("GOE") regarding usage of the program when it "took into account the number of enterprises in the economy in question (*i.e.*, Ecuador) to determine whether the number of enterprises using a subsidy is actually large or small," leading to the conclusion that "a limited number of companies received benefits" because the actual recipients of the subsidy were limited in number on an enterprise basis. IDM at 50-51. Commerce noted that the number of users of the ISD program represented "a very small segment of the Ecuadorian economy." *Id.* at 51.

Plaintiffs claim that the Statement of Administrative Action ("SAA") requires Commerce "to take account of (1) the extent of diversification of economic activities withing the economy in question; and (2) the length of time during which the subsidy program has been in operation," and that Commerce's *de facto* specificity finding is based, in part, on its failure to fulfill this obligation. Nothing could be further from the truth. In fact, Commerce laid out its analysis of the ISD program in the Preliminary Determination, relying on information provided by the GOE in noting that the program had been in effect for 13 priority sectors since 2010, and that it expanded to 25 priority sectors in 2018. PDM at 24. Commerce relied on this information to find that the ISD program was *de facto* specific. *Id.*

### 1. Plaintiffs' Reliance on *Mosaic I* Is Misplaced

Plaintiffs' reliance on *The Mosaic Company v. United States*, 659 F. Supp. 3d 1285 (2023) ("*Mosaic I*") is misplaced, as the scenario at issue in that proceeding is not analogous to the instant case. While Plaintiffs emphasize the court's observation that Commerce relied on the incorrect denominator against which it measured the usage of the tax program at issue, they mischaracterize the court's conclusion that "the correct denominator was 'the total number of corporate taxpayers who incurred penalties.'" Plaintiffs' Br. at 9, citing *Mosaic I*, 659 F. Supp. 3d. at 1314-15. While Plaintiffs opine at great length regarding the mismatch between the denominator selected by Commerce (the total number of corporate taxpayers) and the numerator (the number of corporate taxpaying recipients of penalty relief), the court in *Mosaic I* identified the fatal flaw in Commerce's analysis as a failure to "attempt to compare the actual recipients to the universe or composition of the group of potential recipients." *Mosaic I*, 659 F. Supp. 3d. at 1315. As the court clarified, the program at issue "was available to all taxpayers, not only corporate ones…. The term 'taxpayers' encompasses individuals as well as all types of juridical persons in additions to corporations." *Id.* The fatal flaw in Commerce's determination then was that it did not analyze usage based on all taxpayers in Morocco (*i.e.*, the body of taxpayers that were eligible to use the program) but instead "based its determination on 8,761 corporate taxpayers rather than ascertain the actual number of users of the program." *Id.*

In contrast to the scenario at issue in *Mosaic I,* the ISD program at issue was not available to all taxpayers. As Plaintiffs concede, the ISD program "provides tax benefits *if an enterprise* invests at least $1 million in new productive activities that generate additional employment opportunities." Plaintiffs' Br. at 5 (emphasis added). Commerce distinguished *Mosaic I* in the final determination, clarifying that it was measuring usage of the ISD program against the universe of corporate enterprises that were eligible to use the program. IDM at 53.

4

As the court recently clarified, the scenario presented in *Mosaic I* is distinguishable. "In that case, the court remanded Commerce's choice of both numerator and denominator, namely, corporate taxpaying recipients of the penalty relief and total number of corporate taxpayers, because the program at issue was not limited to corporate taxpayers." *Hyundai Steel Co. v. United States*, 803 F. Supp. 3d 1252, 1258 (Ct. Int'l Trade 2025). The program at issue in *Hyundai Steel* however is analogous to the ISD program at issue in this proceeding, as the K-ETS emissions permit regulation was applicable to only a limited class of enterprises with especially high emissions. Fewer than 1,000 enterprises in Korea, out of 787,438 companies, were subject to K-ETS permit requirements. Under the program, 504 companies in Korea were eligible to receive a greater than normal allocation of free emissions permits. *Id.*, 803 F. Supp. 3d at 1255. Commerce found that the additional allocation of free emissions permits "to just 504 recipients out of the 787,438 companies operating in the GOK's jurisdiction during 2019" warranted a finding that the program was *de facto* specific under § 1677(5A)(D)(iii)(I). *Id.* While Hyundai Steel argued that the appropriate denominator was not the full universe of corporate taxpayers in Korea, but rather the corporate taxpayers subject to K-ETS emissions regulations, the court stated that Hyundai Steel's argument was "unpersuasive and in conflict with the purpose of the specificity test." *Id.*, 803 F. Supp. 3d at 1257. The court noted that "Hyundai Steel's reliance on the fact that not all companies operating in the economy are subject to the K-ETS only supports Commerce's finding that the benefit of the full allocation is, likewise, not 'widely available,'" and therefore specific. *Id.* The court further explained that "there is no requirement that recipients of the benefit of the full allocation share some other characteristic, such as participation in the K-ETS, with the group comprising the denominator: 'the fact that users may be limited due to the inherent characteristics of what is being offered' is not 'a basis

for finding the subsidy non-specific.'" *Id.*, citing *CVD Preamble*, 63 Fed. Reg. at 65,359. "In other words," the court explained,

> a subsidy that has some inherent characteristic that otherwise limits the number of recipients is not rendered non-specific, and therefore non-countervailable, simply because those who did not receive the subsidy were excluded by an inherent characteristic of the subsidy. Hyundai Steel's observation… merely reflects an inherent characteristic of the emissions trading system and is not a basis for finding the subsidy non-specific. (Internal citation omitted.) *Id.*

A similar analysis was upheld in *Gov't of Québec v. United States*, 567 F. Supp. 3d 1273 (Ct. Int'l Trade 2022) ("*Gov't of Québec I*"). The On-the-Job Training Tax Credit program at issue in *Gov't of Québec* encouraged businesses to take on trainees and improve the professional skills of young workers by allowing those businesses which do so to claim a tax credit of 24 percent of salary or wages paid. *Id.*, 567 F. Supp. 3d at 1281. This program was substantially similar to the ISD program because it was not available to all taxpayers throughout the country. Instead it was only available to *enterprises*, and "it was reasonable {for Commerce} to think that a comparison to corporate tax filers would be instructive in determining whether the subsidy is widely spread throughout the economy or limited to a small number of enterprises." *Id.*, 567 F. Supp. 3d at 1291. The court was clear that in this scenario "Commerce did not act contrary to law when considering corporate tax filers as the comparator group in its specificity analysis" and that "Commerce acted reasonable in determining that the actual recipients were limited in number." *Id.*, 567 F. Supp. 3d at 1292.

The court's decision in *Gov't of Québec I* was upheld by the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit"), holding that "Commerce did not err in using the total corporate tax filers as a comparator in assessing whether the credit recipients are limited in number." *Gov't of Quebec v. United States*, 105 F.4th 1359, 1374 (Fed. Cir. 2024) ("*Gov't of Québec II*"). The Federal Circuit confirmed that Commerce's finding was consistent with the

6

purpose of the specificity requirement laid out in the SAA that the "the specificity determination serves to 'winnow out only those foreign subsidies which truly are broadly available and widely used throughout an economy.'" *Id.* at 1375, citing SAA, H.R. Doc. No. 103-316, at 929. The Federal Circuit clarified that "Commerce's comparison of the on-the-job training credit recipients to corporate tax filers aligns with this intended purpose of the specificity determination." *Id.* Notably, the Federal Circuit explicitly rejected the appellants' reliance on *Mosaic I* in examining the tax credit program, highlighting the *Mosaic I* court's own explanation that the tax penalty reduction program at issue in that case "was 'distinguishable' from the on-the-job training program we are evaluating in this case." *Id.*, 105 F.4th at 1375 n.10 (citing *Mosaic I*, 659 F. Supp. 3d at 1315 n.10).

Given the volume of information examined, and relied upon, by Commerce in the underlying investigation, Plaintiffs' claim that Commerce's final determination is unsupported by substantial evidence is specious at best. The data relied upon by Commerce in its final determination was relevant to the issue at hand and supports Commerce's determination that the ISD program was *de facto* specific.

**B.    Commerce's Finding that the AMVTR Program Is *De Facto* Specific Is Supported by Substantial Evidence**

**1.  The Amount of the Benefit Received by Santa Priscila under the AMVTR Program Is Not on the Record, Warranting Commerce's Application of AFA in Finding the Program *De Facto* Specific**

As an initial matter, Plaintiffs' argument fails because Plaintiffs misrepresent the basis of Commerce's specificity finding in the final determination. Plaintiffs argue that Commerce "improperly based its 'disproportionately large amount' determination solely on the fact that 'the amount {Santa Priscila} reported receiving was many times greater than the average amount received by other program recipients in Ecuador.'" Plaintiffs' Br. at 13. This statement was, in

fact, the basis of Commerce's specificity finding in its Second Post-Preliminary Analysis, and not the rationale relied upon by Commerce in the final determination. *See* Second Post-Preliminary Analysis at 13, P.R. 437 (Sept. 27, 2024).

While Commerce provided a summary of its preliminary decision, Commerce's rationale changed in the final determination, clarifying that it was in error when it failed to treat Santa Priscila and Produmar as a single entity. IDM at 51. However, Commerce was correct in its preliminary finding that the application of AFA was warranted in finding Produmar used the AMVTR program due to the fact that Produmar misreported its usage of the program. Second Post-Preliminary Analysis at 6-7. Therefore, in the final determination, Commerce corrected its error of not treating Santa Priscila and Produmar as a single cross-owned entity, highlighting the failure of Santa Priscila and Produmar at verification to "indicate the actual amount of benefits they received during the POI under the Motor Vehicle Tax program." IDM at 51. Commerce explained that Produmar's failure warranted the application of AFA to find that the program provided a countervailable benefit to Santa Priscila. *Id.* Because the exact amount of the benefit was unreported and unknown, Commerce "was unable to conduct an analysis of disproportionality for the purposes of *de facto* specificity under sub-paragraph (III) of the Act." *Id.* Commerce therefore extended its AFA finding to reach the conclusion that Santa Priscila "received tax benefits during the POI under the Motor Vehicle Tax program that were disproportionate, and therefore, *de facto* specific under section 771(5A)(D)(iii)(III) of the Act." *Id.* at 51-52.

Given that Commerce's *de facto* specificity finding regarding the AMVTR program in the final determination was based on AFA, Plaintiffs have no basis to argue that the benefit received by Santa Priscila was not disproportionately large. Commerce's finding that the amount

8

of Santa Priscila's benefit was unknown due to Santa Priscila's and Produmar's own failures at verification underlies Commerce's AFA determination that the benefit received by Santa Priscila was large enough to be disproportionate, and that the program is therefore *de facto* specific under 19 U.S.C. § 1677(5A)(D)(iii)(III). *See Asociacion de Exportadores e Industriales de Aceitunas de Mesa v. United States*, 589 F. Supp. 3d 1346, 1354-55 (Ct. Int'l Trade 2022) (Commerce correctly resorted to facts otherwise available in finding that a program was specific under § 1677(5A)(D)(iii)(III) where the government did not provide all information necessary for Commerce to conduct its analysis). Given the actual basis of Commerce's underlying decision in the final determination, Plaintiffs' arguments that Commerce's *de facto* specificity finding is not supported by substantial evidence lacks merit.

### 2. Even if the Application of AFA Was Unwarranted, Commerce's *De Facto* Specificity Finding Is Supported by Substantial Evidence

As the Federal Circuit explained, "{d}eterminations of disproportionality and dominant use are not subject to rigid rules, but rather must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case." *AK Steel Corp. v. United States*, 192 F.3d 1367, 1385 (Fed. Cir. 1999). Thus, in any examination of *de facto* specificity pertaining to disproportionality under § 1677(5A)(D)(iii)(III), the validity of comparisons drawn by Commerce may differ given the facts and circumstances surrounding the availability, function, and use of a program. For instance, in a case involving a disproportionality analysis not dissimilar from that in the instant case, the Federal Circuit looked favorably on Commerce's finding that a respondent's use of a program was disproportionately large when compared as a percentage share of the total subsidy to other recipients' shares. *Magnola Metallurgy, Inc. v. United States*, 508 F.3d 1349, 1353 (Fed. Cir. 2007) ("Commerce's methodology in determining whether Magnola received a disproportionate share was not unreasonable under U.S. law.").

9

**PUBLIC VERSION**

Plaintiffs' arguments for the universal application of the disproportionality analysis do not withstand scrutiny. While the court held Commerce's disproportionality analysis unreasonable in *Samsung I*, that was only because the facts of the case were undeveloped. *Samsung Elecs. Co. v. United States*, 973 F. Supp. 2d 1321, 1328 (Ct. Int'l Trade 2014) ("*Samsung I*"). The court specifically highlighted that upon remand "Commerce is not barred from comparing Samsung's share of the total benefit to the share an average beneficiary received." *Id.* In other words, the court explicitly opened the door to the exact type of analysis conducted by Commerce in this proceeding, where Santa Priscila "received a disproportionate amount of benefit under this program as the amount it reported receiving was many times greater than the average amount received by other program recipients in Ecuador." Second Post-Preliminary Analysis at 13.

*Samsung II* undermines Plaintiffs' arguments even further. After Commerce reopened the record on remand, the court sustained Commerce's finding that the tax credit program was *de facto* specific under § 1677(5A)(D)(iii)(III) on two bases: 1) that Samsung received a disproportionate percentage of the total benefit in comparison to the amount received by the average beneficiary; and 2) that Commerce accounted for company size and total tax liability to find that Samsung's reduction in taxable income was much greater than that of other companies, resulting in a benefit that was many times greater than that of the comparison group. *Samsung Elecs. Co. v. United States*, 37 F. Supp. 3d 1320, 1325 (Ct. Int'l Trade 2014) ("*Samsung II*"). Based on these factors, the court upheld Commerce's finding of *de facto* specificity based on disproportionality. *Id.*, 37 F. Supp. 3d at 1325.

The ASPA has outlined many of the problems with *Mosaic I*, *supra*, and why the *de facto* specificity analysis undertaken in that case is not pertinent to the instant proceeding. *AK Steel's*

10

admonition that "{d}eterminations of disproportionality… must be determined on a case-by-case basis taking into account all the facts and circumstances of a particular case" is relevant here, because the Moroccan tax program at issue in *Mosaic I* is unlike the tax credit program at issue here. As the court noted in *Mosaic II*, when conducting a disproportionality analysis, "Commerce must distinguish between subsidies that are provided to or used by discrete segments of the economy and those that distribute a benefit throughout the entire economy." *The Mosaic Co. v. United States,* 744 F. Supp. 3d 1367, 1379 (Ct. Int'l Trade 2025) ("*Mosaic II*"). The court again distinguished the Moroccan tax penalty forgiveness program by noting that it was available to <u>all</u> taxpayers in Morocco, and that the program therefore benefited the entire Moroccan economy rather than any discrete sector or industry. *Id.*, 744 F. Supp. 3d at 1380. The court in *Mosaic II* once again siloed its decision from the more flexible reading of the statute provided by the Federal Circuit in *Gov't of Québec II*, acknowledging that "the Court of Appeals expressly distinguished the tax credit program from the Moroccan tax fines and penalties reduction program at issue in this case." *Mosaic II*, 744 F. Supp. 3d at 1380-81. The *Mosaic* court went on to highlight the uniqueness of the Moroccan tax penalty forgiveness program, noting that "{t}his case is distinguishable from the program evaluated in *Gov't of Québec {II}*," as the tax credit recipients in that case "received beneficial business tax credits placing them in a better position than they otherwise would have been, {while} the taxpayers who participated in the Moroccan program remained fully responsible for the taxes they owed… In short, a program that may reduce a tax penalty for any taxpayer incurring one is not the same as a program that actually reduces the tax liability for a defined group of enterprises." *Mosaic II*, 744 F. Supp. 3d at 1381.

The *Mosaic* court implemented the Federal Circuit's mandate to treat disproportionality analyses on a "case by case basis taking into account all the facts and circumstances of a

11

particular case." *AK Steel*, 192 F.3d at 1385. The AMVTR program is not a program designed to have a "broad scope {that} crosses all lines of economic 'diversification'" by virtue of "broad availability" "to all taxpayers." *Mosaic II*, 744 F. Supp. 3d at 1380. It is, as Commerce explained, limited to a discrete segment of the Ecuadorian economy, namely corporate entities using vehicles for productive and commercial activities. Second Post-Preliminary Analysis at 13. Commerce's determination that it is *de facto* specific is, therefore, supported by substantial evidence.

## II. Substantial Evidence Supports Commerce's Refusal to Accept Plaintiffs' Minor Corrections

### A. Verification Is Not an Opportunity to Present New Factual Information

Pursuant to 19 U.S.C. § 1677m(i)(1), information submitted to Commerce during an investigation is subject to verification. "The statute requires that Commerce verify all information in reaching a final determination." *Guizhou Tyre Co. v. United States*, 523 F. Supp. 3d 1312, 1350 (Ct. Int'l Trade 2021). Verification is part of Commerce's investigatory power, and "{b}y requiring that Commerce report, on a case-by-case basis, the methods and procedures used to verify submitted information, Congress has implicitly delegated to Commerce the latitude to derive verification procedures ad hoc." *Id.* The Federal Circuit has stated that "Commerce enjoys 'broad discretion' to promulgate and enforce its procedural rules" when conducting verification, noting that "Commerce's discretion in establishing and enforcing its procedures, in particular the correction of clerical errors, is grounded in the trade statute." *Goodluck India Ltd. v. United States*, 11 F.4th 1335, 1342, 1344 (Fed. Cir. 2021) ("*Goodluck*").

Verification occurs towards the end of a proceeding, when the record is considered closed. The courts have recognized the need for accuracy in administering the trade remedy laws. *See Yangzhou Bestpak Gifts & Crafts Co. v. United States*, 716 F.3d 1370, 1379 (Fed. Cir.

2013)) ("An overriding purpose of Commerce's administration of antidumping laws is to calculate dumping margins as accurately as possible."). However, they have also recognized the need to balance that goal with a need for finality, recognizing that "Commerce has discretion to establish and enforce time limits for submitting information in an administrative review." *Goodluck*, 11 F.4th at 1342. The Federal Circuit has explained this as necessary because "Commerce clearly cannot complete its own work unless it is able at some point to freeze the record and make calculations and findings based on that fixed and certain body of information." *Id.* As such, once the record is considered closed, "Commerce has discretion to accept or reject corrective information on a case-by-case basis," including the discretion to reject any untimely new factual information presented for the first time at verification. *Id.*, citing *Deacero S.A.P.I. de C.V. v. United States*, 353 F. Supp. 3d 1303, 1307 (Ct. Int'l Trade 2018) (citing *Timken U.S. Corp. v. United States*, 434 F.3d 1345, 1353 (Fed. Cir. 2006) ("*Timken*")). "Due to stringent time deadlines and the significant limitations on Commerce's resources, 'it is vital that accurate information be provided promptly to allow the agency sufficient time for review.'" *Tatung Co. v. United States*, 18 C.I.T. 1137, 1140-41 (1994) ("*Tatung*"), citing *Ceramica Regiomontana, S.A. v. United States*, 636 F. Supp. 961, 967 (1986), *aff'd,* 810 F.2d 1137 (1987)).

The purpose of disallowing any new factual information at verification is to allow Commerce to administer the trade remedy laws in a timely matter by setting a firm deadline for the addition of new materials to the administrative record. *See Essar Steel Ltd. v. United States*, 678 F.3d 1268, 1278 (Fed. Cir. 2012) ("Commerce generally does not consider untimely filed factual information…. Important principles of timeliness and finality undergird all aspects of litigation."). Commerce can only issue its determinations based on a final and complete version of the record. *Id.*, 678 F.3d at 1277 ("To allow constant reopening and supplementation of the

13

record would lead to inefficiency and delay in finality."). Thus, "{v}erification represents a point of no return." *Goodluck*, 11 F.4th at 1343. As the Federal Circuit has highlighted, "the untimely submission of corrective information at verification results in 'a tension between finality and correct result.'" *Goodluck*, 11 F.4th at 1342, citing *Timken*, 434 F.3d at 1353 (citing *NTN Bearing Corp. v. United States*, 74 F.3d 1204, 1208 (Fed. Cir. 2006)). This tension must be resolved by Commerce, and "{t}o that end, Commerce's typical practice is to accept corrective information at verification only for 'minor corrections to information already on the record.'" *Id.*, 11 F.4th at 1342-43. "This practice, as applied at verification, strikes an appropriate balance between finality and accuracy. And, importantly, it is within Commerce's discretion to decide which interest outweighs the other on a case-by-case basis." *Id.*, 11 F.4th at 1343. Commerce does not abuse its discretion by refusing to reopen the administrative record or accept untimely new information presented at verification. *See Essar Steel*, 678 F.3d at 1278.

In the verification outlines provided to Santa Priscila and SONGA, Commerce was explicit that the upcoming verifications would not be an opportunity to present factual information not already on the administrative record, with the exception of minor corrections to information already on the record. *See, e.g.*, Santa Priscila Verification Agenda at 2, P.R. 396. Commerce clearly defined minor corrections as those that would corroborate, support, and clarify information already on the record. *Id.* This delineation by Commerce of what exactly constitutes unacceptable new factual information versus minor corrections is within Commerce's discretion to accept or reject corrective information on a case-by-case basis. *See Goodluck*, 11 F.4th at 1342. Where a respondent presents new factual information to Commerce for the first time at verification, that information may be rejected due to Commerce's inherent authority to manage its own administrative proceedings. Thus, by identifying information presented for the

**PUBLIC VERSION**

first time at verification as new factual information, rather than as a minor correction, Commerce's exercise of its authority is supported by substantial evidence.

### B.    Commerce's Determination to Reject Santa Priscila's/Produmar's Minor Corrections Was Supported by Substantial Evidence

Substantial evidence on the record demonstrates that Commerce properly executed its authority in finding that the corrections presented by Santa Priscila and Produmar at the beginning of verification were not minor in nature and should be rejected. The AMVTR program was not alleged in the underlying investigation. Rather, this program came to Commerce's attention when Santa Priscila and Produmar reported their use of the program in response to Commerce's instructions to report any "Other Subsidies" that they received from the GOE during the AUL period. Initial Questionnaire at III-44–III-45, P.R. 98.

Santa Priscila and Produmar were also required to respond to the appropriate appendices included in the initial questionnaire, including the Income Tax Programs Appendix. *Id.* This appendix included instruction to "{i}ndicate the amount of the tax savings derived from the use of this program." *Id.* at Income Tax Programs Appendix. Importantly, the Income Tax Programs Appendix included its own set of instructions, which directed Santa Priscila and Produmar to respond regarding "tax benefits on the tax return filed during the POI." *Id.*

Critically, these instructions put Santa Priscila and Produmar on notice that they were required to report the amount of tax savings on the tax returns that were filed during the POI (*i.e.*, the tax returns covering the previous year's tax activity) for both Santa Priscila and Produmar. Santa Priscilia heeded these instructions. However, at verification Produmar attempted to revise the benefit amount it received as a minor correction, by explaining that it reported the benefit for the wrong fiscal year. Santa Priscila Verification Report at 2, C.R. 314. This revision included [          ] of tax exemptions. *Id.*

Santa Priscila and Produmar are cross-owned companies, and Commerce treats them as a single entity. IDM at 77. If Santa Priscila can understand how to properly implement Commerce's instructions in the questionnaire, then Produmar can be held to the same standard. *See Tatung*, 18 C.I.T. at 1141 ("It is evident from the record that Tatung was able to find errors and omissions in other areas of its submission, therefore Tatung should have been able to discover the missing sales and commissions as well. Tatung was 'in the best position to organize {its} own sales ... data and *prepare, check, and verify* the information {it} supplied to Commerce; Commerce was not privy to the private business affairs of {Tatung},'" (citing *Sugiyama Chain Co. v. United States*, 797 F. Supp. 989, 994 (Ct. Int'l Trade 1992) (emphasis added)). As the Federal Circuit has stated, "the burden of creating an adequate record lies with {interested parties} and not with Commerce." *QVD Food Co. v. United States*, 658 F.3d 1318, 1324 (Fed. Cir. 2011) ("*QVD Food*"), citing *Tianjin Mach. Imp. & Exp. Corp. v. United States,* 806 F. Supp. 1008, 1015 (Ct. Int'l Trade 1992). The attempt to present new benefit information for the correct tax year at verification was only necessary as a result of Santa Priscila's and Produmar's own inattentiveness and carelessness, and represents a failure of the respondent to respond to Commerce's questionnaire to the best of its ability. *See Nippon Steel Corp.*, 337 F.3d 1373, 1382 (Fed. Cir. 2003) ("*Nippon*"). For Santa Priscila to now argue that Commerce abused its discretion by not accepting untimely new factual information at verification is the height of absurdity. *See QVD Food*, 658 F.3d at 1324 ("QVD is in an awkward position to argue that Commerce abused its discretion by not relying on evidence that QVD itself failed to introduce into the record.").

Nor should the court countenance Plaintiffs' arguments that Commerce's explanations regarding its decision to reject the corrections was unsupported by substantial evidence. For

instance, Plaintiffs' reliance on *Tatung* is misconstrued. In that case, this court stated that "the issue is not the value of the errors as a percentage of total U.S. sales, or the number of instances of errors. Rather the issue is the nature of the errors and their effect on the validity of the submission." *Tatung*, 18 C.I.T. at 1141. That is just the point – the validity of the initial response regarding Produmar's use of the program is called into question because Produmar reported the benefit for the wrong year. Where errors were fundamental and discovered at verification, rather than prior to verification, the correction of those errors "do not ensure the overall accuracy" of the original questionnaire response. *Id.* As the court clarified, the respondent's "argument misconstrues the purpose of the verification procedure. '{V}erification is like an audit, the purpose of which is to test information provided by a party for accuracy and completeness,' so that Commerce can justifiably rely upon that information." *Tatung*, 18 C.I.T. at 1140, citing *Bomont Indus. v. United States*, 733 F. Supp. 1507, 1508 (Ct. Int'l Trade 1990). Thus, when presented with fundamental errors at verification that render a response inaccurate and unreliable, the use of AFA is warranted. *See id.*, 18 C.I.T. at 1142 ("{S}ubstantial evidence in the record to support Commerce's conclusion that Tatung's submission was unreliable, requiring the use of {best available information}").

This court faced a similar scenario in *Özdemir Boru San. v. Tic. Ltd. Sti.*, 273 F. Supp. 3d 1225 (Ct. Int'l Trade 2017) ("*Özdemir*"), where a respondent ignored Commerce's clear instructions in the initial questionnaire regarding how to report its use of a program and did not attempt to correct that reporting until the beginning of verification. This court sustained Commerce's application of AFA, holding that "{t}he contrast between Özdemir's brief, incorrect {initial questionnaire response} statement, and the detailed information that Commerce requested, as well as the explicitly noted {questionnaire instructions}, constitute substantial

17

evidence on the record that Özdemir 'with{e}ld{} information that has been requested by {Commerce}.'" *Id.*, 273 F. Supp. 3d at 1239 (Internal citation omitted.).

Plaintiffs' reliance on *Coalition for the Preservation of American Brake Drum and Rotor Aftermarket Manufacturers v. United States*, 44 F. Supp. 2d 229, 236 (1999) is similarly misplaced, because in that case Commerce exercised its discretion and found that the errors identified at verification were "not substantial" and did not "affect the overall integrity of the response," allowing Commerce to "verif{y} the responses as accurate and reliable." In contrast, the errors in the instant proceeding were substantial – not only did Santa Priscila and Produmar report that the entire benefit amount received under the AMVTR program was incorrect, but that all the underlying documentation supporting that figure was now useless as well. As Commerce explained, "{t}he revised database included [          ] of motor vehicle tax exemptions." Santa Priscila Verification Report at 2, C.R. 314. In addition, the underlying exhibit presented to Commerce at verification only underscores Commerce's decision. In addition to a database containing [          ] of exemptions, the underlying supporting documentation contains [                                              ] that Commerce would have had to examine for the first time at verification. *See* Plaintiffs' Motion to Complete Record (Aug. 29, 2025), at Exhibit 6, ECF 46.

Plaintiffs' reliance on *Guizhou Tyre* is also misplaced. While the court did remand Commerce's decision not to accept information relating to additional grants first presented at verification, the court's chief concern was that record's lack of substantial evidence regarding the size and large number of programs (more than 40) at issue. In that same case, the court sustained Commerce's rejection of the respondent's presentation of new loans at verification because they were untimely:

> Commerce's finding with regard to the loans is supported by substantial evidence. The presentation of an entire new category of loans… is not a minor correction… Commerce acted within its statutory discretion to uphold the enforcement of its deadline for new factual information and correctly rejected the untimely information presented just prior to verification. *Guizhou Tyre*, 523 F. Supp. 3d at 1348.

As in the instant case, Commerce's finding is supported by substantial evidence because the corrected tax benefit information presented by Santa Priscila and Produmar was both substantial and untimely. Therefore, Commerce's determination to uphold the enforcement of its deadlines and reject that new factual information was supported by substantial evidence and within its statutory discretion.

### C.    Commerce's Determination to Reject SONGA's Minor Corrections Was Supported by Substantial Evidence

Commerce's decision to reject SONGA's late reporting of its use of the AMVTR program at verification was supported by substantial evidence. As noted above, the AMVTR program was not included in the petition or in any new subsidy allegation. However, Commerce issued the same questionnaire to SONGA as it did to Santa Priscila, with the same instructions to report any "Other Subsidies" as well as responses to the relevant appendices. Initial Questionnaire at III-44–III-45, P.R. 98. Similarly, Commerce requested information regarding the ISD program. *Id.* at III-41–III-42.

SONGA was obviously aware of, and understood these instructions, as it reported receiving benefits under three additional programs not alleged elsewhere, as well as ISD exemptions, albeit for the incorrect year. Nonetheless, SONGA reported at verification that it omitted the reporting of tax exemptions received pursuant to the AMVTR program, as well as making significant errors in its reporting of benefits under the ISD program. SONGA Verification Report at 2, P.R. 420. Commerce correctly exercised its discretion to reject

19

SONGA's attempt to categorize its corrections as "minor" in refusing to accept this untimely new factual information. SONGA's arguments that Commerce is at fault for accepting SONGA's questionnaire response at face value when it incorrectly reported its use of these programs should be dismissed.

### 1. 19 U.S.C. § 1677m(d) Does Not Require Commerce to Offer SONGA a Chance to Remedy Its Deficient Reply

Contrary to Plaintiffs' argument, 19 U.S.C. § 1677m(d) does not require Commerce to offer SONGA a chance to remedy its deficient reporting. The statute only applies "{i}f the administering authority… determines that a response to a request for information… does not comply with the request…" In relying on this subsection of the statute, SONGA makes multiple incorrect presumptions. First, that Commerce "determine{}" that a response was deficient upon receipt of SONGA's questionnaire response. Commerce made no such determination. As far as Commerce was aware, SONGA's entire response to the "Other Subsidies" question was contained within the four corners of its questionnaire responses. As this court has explained,

> Inherent in the requirement of § 1677m(d) is a finding that Commerce was or should have been aware of the deficiency in the questionnaire response. When a respondent provides seemingly complete, albeit completely inaccurate, information, § 1677m(d) does not require Commerce to issue a supplemental questionnaire seeking assurances that the initial response was complete and accurate. In other words, Commerce is not obligated to issue a supplemental questionnaire to the effect of, "Are you sure?" *ABB Inc. v. United States*, 355 F. Supp. 3d 1206, 1222 (Ct. Int'l Trade 2018).

SONGA provided a seemingly compete response to the "Other Subsidies" section of the initial questionnaire, and Commerce had no reason to suspect that SONGA was unable to identify benefits received under the AMVTR program when it was capable of reporting other additional programs it used. SONGA Sec. III Response at III-25–III-27, C.R. 85, P.R. 183; *see also ABB Inc.*, 355 F. Supp. 3d at 1222 ("{Respondent} provided a seemingly complete response

to Commerce's initial questionnaire," and Commerce "was not in a position to know that {respondent's} response{} {was} incomplete and inaccurate…. The respondent bears the burden to respond with all of the requested information and create an adequate record."). SONGA's inattentive and careless approach to preparing its questionnaire responses explains the deficiency of its reporting. As such, "Commerce was not statutorily mandated to provide… a subsequent opportunity to remedy the deficiency." *Id.*, 355 F. Supp. 3d at 1223.

This court has explained that § 1677m(d) is only triggered "where a party replied in a responsive fashion, which responsive reply Commerce found to be in some respect deficient." *Branco Peres Citrus, S.A. v. United States*, 173 F.Supp.2d 1363, 1369 n5 (2001). Where a questionnaire from Commerce provides a respondent "adequate notice of the information Commerce was seeking" and a response was not forthcoming, Commerce is not required to dig deeper into information that does not even exist on the record. SONGA was clearly aware of the type of information requested by Commerce, as it responded in part by providing information identifying its use of other programs. *See Branco Peres Citrus, S.A. v. United States*, 173 F.Supp.2d 1363, 1369 n.5 (Ct. Int'l Trade 2001) ("{T}he phrase 'a response to a request for information,' … means that the party replied in a responsive fashion, which responsive reply Commerce found to be in some respect deficient…. Here, *Plaintiff submitted no information* as to its costs, much less deficient information.") (emphasis added).

The Federal Circuit has further clarified that Commerce is not required to treat an incomplete response as a deficiency that triggers § 1677m(d). *See Papierfabrik Aug. Koehler SE v. United States*, 843 F.3d 1373, 1384 (Fed. Cir. 2016) ("The consequence of such a reading would be to permit respondents to submit fraudulent data with the knowledge that, should their misconduct come to light, they can demand an opportunity to remedy their intentionally deficient

21

PUBLIC VERSION

data and avoid the otherwise-authorized adverse inferences."). SONGA attempted exactly this sort of gamesmanship in this proceeding, as Plaintiffs concede that "{a}fter recognizing that Commerce might decide to countervail their AMVTR benefits, both Songa and Naturisa submitted minor AMVTR corrections" at verification. Plaintiffs' Br. at 23. In other words, SONGA only considered it worth rectifying its initial reporting at verification when it evaluated the potential outcome of its defective response as negative. To be clear, SONGA's approach at verification was not to present its use of the AMVTR program as a "minor correction" – this was the first time SONGA mentioned any use of the program at all.

As there was no information giving Commerce a basis to identify any defect in the response, Commerce was not obligated under § 1677m(d) to offer an opportunity to remedy the response. *See Ta Chen Stainless Steel Pipe, Inc. v. United States*, 298 F.3d 1330, 1338 (Fed. Cir. 2002) (the respondent "knew that 'the nature of the deficiency' was its complete failure to respond. The statute only applies when a 'response to a request' is deemed to not comply. A failure to respond is not the same as a 'response' as required by the statute."). Therefore, Plaintiffs' argument should be dismissed.

### 2. The Precedents Identified by SONGA Are Inapposite and Do Not Compel Commerce to Employ 19 U.S.C. § 1677m(d)

SONGA identifies a host of Federal Circuit and lower court precedents that supposedly compel Commerce to apply § 1677m(d) in the hopes that one of them will stick. Plaintiffs' Br. at 25-26. However, each of these cases is off-point for similar reasons, namely, that the respondents in the underlying proceedings provided responses to Commerce's questionnaires that provided relevant information that was in some way inadequate. In contrast, SONGA provided no information whatsoever regarding its use of the AMVTR program until the first day of

22

verification, more than five months after it provided its responses to Commerce's initial questionnaire.

Defendant-Intervenor distinguishes these cases below.

In *Hitachi Energy USA Inc. v. United States*, 34 F.4th 1375 (Fed. Cir. 2022), Commerce changed its test for measuring service-related revenue, but rather than request new information from the respondent, it continued to use earlier-provided information which was not up to the task. Rather than request updated or corrected information, Commerce found the information provided in the response deficient and applied AFA. Commerce further refused the respondent's request to augment the record given Commerce's new methodology. Commerce was, in other words, relying on data which it knew to be defective. Notably, in this case the Federal Circuit positively commented on *ABB Inc.*, highlighting that Commerce was not required to apply § 1677m(d) when Commerce did not recognize the errors in the respondent's reporting. *See Hitachi Energy USA Inc. v. United States*, 34 F.4th at 1381 (Fed. Cir. 2022).

In *Shelter Forest Int'l Acquisition, Inc. v. United States*, No. 2021-2281, 2022 WL 2155965 (Fed. Cir. 2022), Commerce relied in the preliminary determination on information provided by voluntary respondent Shelter Forest that it should have known to be insufficient, without notifying Shelter Forest or giving it an opportunity to remedy its response. In the current proceeding, there is no indication that Commerce should have known SONGA's books and records better than the company itself did. SONGA's failure to report any information whatsoever regarding the AMTVR program provides Commerce with no information to identify as deficient.

SONGA claims that per *Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332 (Ct. Int'l Trade 2018), a failure to timely notify a respondent of a deficiency is a violation of

23

§ 1677m(d).  In that case, Commerce had stated in the preliminary determination that there were issues with the data provided by Hyundai, but did not identify them until just before canceling verification nearly three months after the receipt of Hyundai's response. Commerce had responsive data from the respondent, but its failure was to timely notify the respondent of any issues with these data before canceling verification and applying AFA. *Hyundai Steel Co. v. United States*, 282 F. Supp. 3d 1332, 1349 (Ct. Int'l Trade 2018) ("Commerce both failed to provide prompt notice of a deficiency and acted unreasonably in promising an opportunity to remedy this discrepancy, failing to provide such an opportunity, and then holding the discrepancy against Hyundai."). Unlike Hyundai, SONGA provided no indication whatsoever that it had received benefits pursuant to the AMVTR program, and did not correct this lack of information until verification. Thus, Commerce had no opportunity to notify SONGA of any defect in its response.

In *PT. Zinus Glob. Indonesia v. United States*, 686 F. Supp. 3d 1349 (Ct. Int'l Trade 2024) presented a scenario in which there was a discrepancy between two data sets provided in separate questionnaires provided by a respondent. Instead of attempting to reconcile or rely on these data in its final determination, Commerce moved forward with its final determination. Commerce should have given the respondent an opportunity to reconcile the incompatible data sets. The key difference between from the instant case is that the Indonesian respondent provided information for Commerce to analyze for deficiencies. SONGA did not do so.

In *Meihua Grp. Int'l Trading (Hong Kong) Ltd. v. United States*, 633 F. Supp. 3d 1203 (Ct. Int'l Trade 2023), Commerce based its decision on a conflict between two different record documents – one a questionnaire response, the other a CBP document – and went straight to AFA despite clear knowledge of the conflicting information in the documents. Again, the

24

difference here is that the respondent was responsive to Commerce's questionnaire, unlike SONGA's non-response regarding the AMVTR program.

Similarly, in *BlueScope Steel Ltd. v. United States*, 548 F. Supp. 3d 1351, 1367 (Ct. Int'l Trade 2021) ("*BlueScope Steel*"), Commerce had questionnaire responses with conflicting sales databases, then applied AFA because the information in the sales databases could not be reconciled. As the court noted, "generally only after Commerce has determined that there is information missing, creating a gap in the record, can it apply an adverse inference when selecting among the facts otherwise available." *Id.*, 548 F. Supp. 3d at 1358 (emphasis added). The respondent in *BlueScope Steel* provided responsive, but deficient information to Commerce. SONGA provided nothing of the kind that would have allowed Commerce to determine there was information missing from its response.

SONGA argues that *China Kingdom Imp. & Exp. Co. v. United States*, 507 F.Supp.2d 1337 (Ct. Int'l Trade 2007) stands for the proposition that respondents should be permitted to remedy deficiencies in their reporting even at verification. The court's finding in that case should be narrowly construed, however. The court noted that Commerce did not, "to the extent practicable" provide the respondent with an opportunity to explain the corrections to deficient information first provided at verification in an administrative review when the final results were not due for another eight months. *Id.* 507 F.Supp.2d at 1354-55. In light of the Federal Circuit's admonition that "the untimely submission of corrective information at verification results in 'a tension between finality and correct result'" because "{v}erification represents a point of no return," the court should not now give credence to SONGA's implication that verification presents an unbounded opportunity to present untimely new factual information. *Goodluck*, 11 F.4th at 1342-43, citing *Timken*, 434 F.3d at 1353.

25

III.    **Commerce's Determination to Apply AFA Was Supported by Substantial Evidence**

This court has explained that

> {u}nder the statute, if Commerce determines that a party withholds information or fails to provide such information by the established deadline, Commerce must use "facts otherwise available" to fill in the gaps in the record. *See* 19 U.S.C. § 1677e(a). By failing to provide the information by the requested deadline, {the respondent} triggered the statute, and, therefore, Commerce's decision to turn to facts available is supported by record evidence. *Guizhou Tyre*, 523 F. Supp. 3d at 1341.

In explaining the application of adverse facts, this court stated that

> 19 U.S.C. § 1677e provides that Commerce can apply "facts otherwise available" when a respondent: (1) withholds information requested by Commerce; (2) fails to provide such information by Commerce's deadlines for submitting the information or in the form and manner requested; (3) significantly impedes proceedings; or, (4) provides information that cannot be verified… Commerce may apply AFA when Commerce finds that one or more of the above circumstances exists and if Commerce 'finds that an interested party has failed to cooperate by not acting to the best of its ability to comply with a request for information ....'" *Id.* 523 F. Supp. 3d at 1350 (Internal citations omitted.)

A respondent fails to cooperate to the best of its ability when it fails to put forth its maximum effort to comply with requests for information. Moreover, this standard "does not condone inattentiveness, carelessness, or inadequate record keeping." *Nippon*, 337 F.3d at 1382.

The fact that Santa Priscila and Produmar were able to provide the correct information for Santa Priscila's use of the AMVTR program, but not Produmar's, only underscores the inadequacy and inattentiveness of Plaintiff's efforts in preparing its questionnaire response. Where Commerce specifically asked respondents to report the tax benefit received under the AMVTR program using the tax return filed during the POI, and the respondent failed to do so, Commerce's application of an adverse inference is supported by substantial evidence. *See, e.g.*, *Guizhou Tyre*, 523 F. Supp. 3d at 1351.

26

**PUBLIC VERSION**

Moreover, the application of AFA to SONGA's use of the ISD program is warranted. Commerce thoroughly explained that the information requested of SONGA regarding its use of the program was not on the record. IDM at 37-38. The information was indisputably "new" and Commerce correctly exercised its discretion in determining that that new information was "not minor," *id.*, as the underlying support consisted of [

]. *See* Plaintiffs' Motion to Complete Record at Exhibit 3. Given the limited time available at verification, and the untimeliness of the information presented, Commerce's determination not to accept the proffered information, and subsequently apply AFA, is supported by substantial evidence.

27

PUBLIC VERSION

## CONCLUSION

For the foregoing reasons, the ASPA respectfully requests that the Court reject Plaintiffs' challenge and uphold Commerce's final determination as supported by substantial evidence and in accordance with law. Defendant-Intervenor therefore respectfully requests that Plaintiffs' motion for judgment on the agency record be denied.

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td>/s/ Elizabeth J. Drake</td></tr>
<tr><td></td><td>Roger B. Schagrin<br>Elizabeth J. Drake<br>Justin M. Neuman*<br>SCHAGRIN ASSOCIATES<br>900 Seventh St. N.W., Suite 500<br>Washington, D.C. 20001<br>(202) 223-1700</td></tr>
<tr><td></td><td>*Counsel for American Shrimp Processors Association*</td></tr>
<tr><td>Date: March 13, 2026</td><td>*Admitted only in Ohio. Practice limited to matters before federal courts and agencies.</td></tr>
</table>

28

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing brief contains 8,186 words (including text, quotations, footnotes, headings, and attachments) and therefore complies with the word limitation set forth in this Court's Chamber's Procedures. In preparing this certificate of compliance, I have relied upon the word count function of the word processing system used to prepare the brief.

Dated: March 13, 2026                                    /s/ Elizabeth J. Drake
                                                         Elizabeth J. Drake

**UNITED STATES COURT OF INTERNATIONAL TRADE**
**Before: The Honorable Richard K. Eaton, Senior Judge**

| | |
|---|---|
| INDUSTRIAL PESQUERA SANTA PRISCILA S.A. and SOCIEDAD NACIONAL DE GALÁPAGOS C.A., <br><br> *Plaintiffs,* <br><br> v. <br><br> UNITED STATES, <br><br> *Defendant,* <br><br> and <br><br> AD HOC SHRIMP TRADE ACTION COMMITTEE and AMERICAN SHRIMP PROCESSORS ASSOCIATION, <br><br> *Defendant-Intervenors.* | Consol. Court No. 25-00025 |

**ORDER**

Upon consideration of the motion for judgment on the administrative record filed by plaintiffs, the responses thereto filed by the defendant and the defendant-intervenors, plaintiffs' reply, the administrative record, and all other papers and proceedings herein, it is hereby:

**ORDERED** that the motion is **DENIED**; and it is further

**ORDERED** that the U.S. Department of Commerce's final determination is sustained; and it is further

**ORDERED** that judgment is entered in favor of the defendant.

.      It is **SO ORDERED**.

_____
Honorable Richard K. Eaton, Senior Judge
U.S. Court of International Trade

Dated: _____, 2026
        New York, New York